**EXHIBIT 2 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

**PRIVILEGED AND CONFIDENTIAL**

# EXPERT WITNESS VALUATION REPORT

*Washington State Tobacco Settlement Authority 2002 Reserve Fund Agreement*

December 16, 2013

## Introduction

In connection with the issuance of the $517,905,000 Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "Series 2002 Bonds"), the Washington State Tobacco Settlement Authority ("TSA") entered into that certain Reserve Fund Agreement ("RFA"), with Lehman Brothers Special Financing Inc. ("LBSF")[1] as the provider and Lehman Brothers Holdings Inc. ("LBHI")[2] as guarantor of LBSF's obligations under the RFA.

Following the LBHI and LBSF bankruptcies, the RFA was terminated on 25-Mar-2009[3] by rejection order of the bankruptcy court.  Pacifica Law Group ("Pacifica") engaged Daniel Curry and Jeffrey Hasterok ("Expert Witnesses") to provide an independent third party valuation of the RFA as of close of business 25-Mar-2009 ("Valuation Date").

## Expert Witnesses Background, Qualifications and Compensation

Please refer to Exhibits 1-2 for the professional qualifications of the Expert Witnesses Daniel Curry and Jeffrey Hasterok.

### Compensation

Pacifica engaged the Expert Witnesses per the fee structure below.  Compensation is not dependent on the outcome of this litigation.

| | |
|---|---|
| Expert Witness Valuation Report | $500 / hour capped @ $35,000 |
| Conference Calls/Meetings | $500 / hour |
| Deposition | $3,500 / day |
| Trial Testimony | $3,500 / day |
| Discovery Document Review | $250 / hour |

---

[1] Lehman Brothers Special Financing Inc. is also referred to as "Lehman" in the RFA and other documents
[2] Lehman Brothers Holdings Inc. is also referred to as "LBH" in the RFA and other documents
[3] Rejection Order

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

# Report Scope

Based on our experience as municipal finance, derivative and structured reinvestment professionals, Pacifica retained us (the Expert Witnesses) to independently review documentation related to the RFA in order to assess the Termination Amount owed to TSA by LBSF and LBHI.

We formed our opinions based on our review of the documents provided to us by Pacifica, our knowledge of municipal finance and related reinvestment products, and publicly available information.  Documentation referenced in this report is listed in Appendix A.  References to these documents are cited in footnotes.  We reserve the right to supplement or otherwise revise this report in order to respond to any new arguments or information provided by LBSF or other related parties.

# Summary of Conclusions

- No Dealer will replace TSA's lost economics under the RFA by entering into a replacement RFA transaction with TSA at any time from March 2009 onward
- As the Burdened Party, TSA calculates the Termination Amount owed by LBSF and LBHI
- The appropriate calculation methodology should assume:
  - 28-May-2032 as the final maturity date of the RFA
  - TSA's actual replacement yield earned by investing in other Eligible Investments as the replacement yield from the first failed delivery to the termination date
- **The Termination Amount owed to TSA by LBSF and LBHI is $37.5 million**
  - Plus $553,080 of lost earnings under RFA Section 7.7(b), incidental costs and expenses, cost of collection, and reasonable attorneys' fees, all as permitted by the definition of Termination Amount

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

## Supporting Background Facts

The Master Settlement Agreement ("MSA") was entered into 23-Nov-1998 among the attorneys general of 46 states, including the State of Washington (the "Settling States"). The purpose of the MSA was to resolve past smoking related litigation among the parties and provide for continuing release of future smoking-related claims in exchange for annual payments made to the Settling States[4]. The annual payments are subject to numerous and potentially material adjustments, including: reductions for decreased domestic cigarette shipments and reductions for loss of market share attributable by the settling manufacturers, among others, as well as potential increases in payments to the extent the rate of inflation exceeds three percent.

Established by Washington state law (Senate Bill 6828) on 4-Apr-2002, TSA was authorized to finance the purchase of a portion of the State of Washington's payments received under the "MSA"[5]. In connection with the issuance and 5-Nov-2002 delivery of the Series 2002 Bonds, TSA was authorized to invest tax-exempt bond proceeds in Eligible Investments, as defined in the Indenture by and between Tobacco Settlement Authority and U.S. Bank, N.A., as Indenture Trustee ("Indenture")[6].

TSA engaged Public Financial Management ("PFM") to select an eligible provider for a forward delivery agreement[7] of Eligible Investments to invest the proceeds of the Liquidity Reserve Account, as defined by the Indenture[8]. PFM awarded LBSF the transaction via competitive bid process on 24-Oct-2002[9]. The RFA dated 5-Nov-2002 (and associated 26-Mar-2003 amendment) detail the terms and conditions agreed to by the parties[10]. The fixed rate of return (4.484%) on the RFA offered TSA increased predictability of earnings from the Liquidity Reserve Account and, critically, the assurance of cash availability in an amount equal to the Scheduled Reserve Amount on each bond payment date to allow for draws for permitted purposes under the Indenture.

As required by the terms of the RFA, TSA delivered a Scheduled Reserve Amount of $45,534,106 to LBSF. Approximately every six months, LBSF delivered Qualified Securities (as defined in the RFA) priced to yield a fixed rate of 4.484% and selected to mature no later than the next scheduled Bond Payment Date (as defined in the RFA). Upon maturity of each Qualified Security, the proceeds were used to purchase a Qualified Security that matured on or before the next succeeding Bond Payment Date. The Bond Payment Date recurred every six months.

LBHI filed a voluntary petition for relief under Chapter 11 on 15-Sep-2008, and LBSF filed on 3-Oct-2008. On 18-Dec-2008 TSA notified LBSF of its defaults under Sections 7.3(a) and 7.3(d) of

---

[4] 2002 Final OS
[5] 2002 Final OS
[6] Indenture
[7] Forward delivery agreement and forward purchase agreement are used interchangeably
[8] Final Request for Bids
[9] RFA Bid Results
[10] RFA and amendment, jointly

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

the RFA[11], namely, the failure of LBSF to deliver Qualified Securities on 1-Dec-2008 and the aforementioned bankruptcy petitions.

## Transaction Description Grid

| | |
|---|---|
| Scheduled Reserve Amount (non-amortizing bullet) | $45,534,106 (as amended) |
| Guaranteed Rate | 4.484% |
| Interest | 30/360 s/a each Jun 1/Dec 1 |
| Bid date | October 24, 2002 |
| Closing and effective date | November 5, 2002 |
| Final Bond Payment Date / Maturity Date | May 28, 2032 |
| Amendment date to correct maturity date error in original executed RFA | March 26, 2003 |
| Termination payment on mandatory clean up redemption | Par (no Termination Amount due to/from either party) |
| Valuation Date / Rejection Date | March 25, 2009 |

## Expert Witness Assumptions

- TSA is the sole Burdened Party
- LBSF paid the proper amount of interest due to TSA from the original closing date to but excluding the first failed security delivery under the RFA
- All interest paid by LBSF and received by TSA prior to the rejection date is not subject to claw back.
- No other RFA amendments besides the 26-Mar-03 corrective amendment and the rejection order were executed
- The investment amount was an unchanged amount ("bullet") from closing date to Valuation Date to the current date (i.e.: the invested amount did not amortize or change in size in any way)
- After LBSF's default, LBSF did not provide collateral per Section 2.7 of the RFA equal to 104% of the Termination Amount due to TSA
- TSA did not refund or amend the related bonds prior to the Valuation Date
- The valuation estimate as of the Valuation Date assumes the RFA is terminated completely with no expectation of future performance by LBSF and LBHI aside from payment of the Termination Amount
- Default interest calculated at the Default Rate is not included in the valuation estimates

---

[11] Default Notice

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

- The securities delivered under the RFA by LBSF matured and TSA recovered all of its invested principal
- The March 26, 2003 amendment that corrected the final maturity date of the RFA to the intended May 28, 2032 has errors in the Exhibit A schedule of Deposit Dates, beginning in 2026.  These errors are ignored.  In addition, we could not locate a copy of the amendment actually signed by TSA.  We assume the amendment to be in effect and agreed to by all parties.

## TSA's Reinvestment into Alternative Eligible Investments After LBSF Failed to Deliver: Section 7.7(b) Loss

On 1-Dec-2008, LBSF failed to deliver Qualified Securities in accordance with RFA Sections 2.1 and 2.2; the failure continued beyond the Lehman Cure Period[12].  Per RFA Section 2.4(a) (Failure to Deliver), TSA was permitted to invest the Scheduled Reserve Amount in other Qualified securities.  In addition, per RFA Section 7.6(a) (Remedies Upon Occurrence of a Lehman Event of Default) TSA had the right to make demand for any losses as calculated under Section 7.7(b) (Loss Amount if Failed or Late Purchase).

LBSF's failure to deliver Qualified Securities continued from the date of the first failed delivery (1-Dec-2008) to the Rejection Date (25-Mar-2009)[13].  Therefore, TSA's "Section 7.7(b) Loss" should be calculated as the lost interest between the Guaranteed Rate of 4.484% and TSA's actual reinvestment history during the same time period.  $553,080.02 should be included in the calculated Termination Amount:

| Investment | Yield (%) | Interest ($) |
|---|---|---|
| Reserve Fund Agreement | 4.484% | $646,553.95 |
| First American Prime Obligations fund CUSIP 31846V708, symbol FPDXX | 0.648% | $93,473.93 |
| Interest lost (Section 7.7(b) Loss) | 3.836% | **$553,080.02**[14] |

---

[12] Default Notice

[13] Docket 20995, Response Of The Washington State Tobacco Settlement Authority To Debtors' One Hundred Ninety First Omnibus Objection To Claims, Page 6 Paragraph 22

[14] Docket 20995, Response Of The Washington State Tobacco Settlement Authority To Debtors' One Hundred Ninety First Omnibus Objection To Claims, Page 6 Paragraph 22

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

# Inability to Secure Replacement Forward Delivery Agreement

Per RFA Section 7.3 (Lehman Events of Default), if "Lehman is at any time Insolvent", a Lehman Event of Default will have occurred.  Due to the rejection of the RFA by LBSF, 25-Mar-2009 should be used as an early termination date under the RFA[15].

The definition of Termination Amount in the RFA requires the Burdened Party to seek out quotations from at least three Dealers. According to Peter Shapiro of Swap Financial Group, Swap Financial Group (on behalf of TSA) tried and failed to obtain quotes from "every conceivable dealer" of forward purchase agreements on or about January 2009.[16]  We believe Swap Financial Group (on behalf of TSA) made an adequate canvass of the market for replacement forward purchase agreements.  As municipal finance professionals who structured and marketed FPAs, we agree that quotes and in particular actionable quotes could not be obtained at or around the Rejection Date.

Dealer interest in the municipal forward purchase market began to fall substantially in 2007 and particularly after LBHI's bankruptcy in September 2008.  Reinvestment of tax exempt bond proceeds via the competitive bid of forward purchase agreements is a complex business line, typically requiring the deployment of scarce balance sheet and capital resources in long dated, highly customized, illiquid transactions.  With more expensive funding, wider and more volatile credit spreads, and more punitive projected banking regulations, the appeal of the business as a whole dropped substantially.

Offering RFAs and similar long dated investment products became very problematic for financial institutions ("Dealers") following the LBHI bankruptcy.  Offering this type of product requires a Dealer to hedge its interest rate risk through derivative transactions; typically interest rate swaps.  The terms of these swap transactions require a Dealer to exchange collateral based upon changes in prevailing interest rates. This requirement is not matched in the RFA, which from the TSA's standpoint is a required beneficial feature.  The asymmetric collateral posting requirements create tremendous funding volatility, in that the Dealer is constantly sending out or receiving in collateral on its interest rate hedges.  To the extent it is sending out collateral against its hedge, the Dealer effectively needs to borrow the funds at its then prevailing credit spreads.  These spreads became extremely volatile and widened out significantly following the LBHI bankruptcy, making it difficult to properly value the true costs of offering this type of product.

In addition, the market for short dated financial instruments was in a state of disarray during the financial crisis.  At and about the time of the Rejection Date, the US Treasury decided to provide guarantees to money market funds (traditionally viewed as an ultra-safe cash equivalent) as a way of assuring investors in these funds that it was safe to maintain their investments[17].  Additionally, it was generally thought that commercial paper would become a less attractive

---

[15] Rejection Order
[16] Deposition Of Peter Shapiro, 13-Dec-2013, 102:13 – 103:9, 104:17 – 105:17 and 106:19 – 107:08
[17] "Treasury Announces Guaranty Program for Money Market Funds," 19-Sep-2008, US Treasury

PRIVILEGED AND CONFIDENTIAL

funding source going forward, which could lead to a potential shortage or, at the very least, a change in the trading relationships for Qualified Securities[18].

We believe that no replacement market for a long dated (2032, or potentially 23 years long) tobacco forward purchase agreement existed at and around the time of the Rejection Order and the early termination of the RFA on 25-Mar-2009. We also believe that no such market has developed or recovered since 25-Mar-2009.

## TSA's Use of Loss Under the Definition of Termination Amount as the Sole Burdened Party

Since LBSF was unable to calculate the Termination Amount as of the early termination date, and TSA was unable to find a replacement Dealer that would maintain TSA's economic rights under the RFA, the definition of Termination Amount provides TSA the right to calculate its loss as the sole Burdened Party under the RFA:

> (iii) if the Burdened Party is unable to obtain three such quotations, **the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs** (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) **in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position,** and; provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

---

[18] The Federal Reserve created the Commercial Paper Funding Facility ("CPFF") and the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility ("AMLF") to improve liquidity in short-term funding markets, including commercial paper

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

# Expert Witnesses RFA Valuation Methodology

## Overview

For TSA to properly calculate loss under the definition of Termination Amount, two primary factors must be considered: the expected average life and/or expected maturity date of TSA's replacement investment, and the approximate expected yield on the replacement investment.

## Average Life and Expected Maturity Date

The RFA had a defined final Bond Payment date of 28-May-2032[19].  Note the Amendment Agreement has errors in the schedule of dates, but this date is relatively consistent with the Final Request for Bids and the 2002 Final OS[20].

However, under RFA Section 2.8, TSA had the right to withdraw all funds from the RFA prior to the Final Bond Payment Date without paying or receiving a Termination Payment:

> Section 2.8 Issuer Optional Termination. The Issuer may terminate this Agreement, in whole or in part, at any time during the term of this Agreement only in the event of a Mandatory Cleanup Call (an "Issuer Optional Termination") upon thirty (30) days written notice to Lehman. If such Issuer Optional Termination is effected by the Issuer, no Termination Amount shall be due to any party hereto.

This clause allowed TSA to draw funds out of the RFA in the event of a "Mandatory Cleanup Call":

> "Mandatory Cleanup Call" means a mandatory redemption of the Bonds in whole equal to 100 percent of the principal amount being redeemed at any time that the available amounts on deposit in the Accounts (as defined in the Indenture) (other than the Rebate Account, the Operating Account, the Operating Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued interest on, the Bonds.

Consistent with Section 404(i) of the Indenture:

> (i) The Bonds are subject to mandatory redemption in whole only, at a redemption price equal to 100% of the principal amount being redeemed, at any time that the available amounts on deposit in the Accounts (other than the Rebate Account, the Operating Account, the Operating Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued interest on, all Outstanding Bonds.

The size of the 2026 and 2032 Turbo Term Bonds was equal to over $459MM par or almost 90% of the initial overall par value of the Series 2002 Bonds.  To the extent adequate tobacco settlement revenues were available, the Turbo Term Bonds could be redeemed faster than their

---

[19] Amendment Agreement, Page 5
[20] Final Request for Bids, Page 2 and 2002 Final OS, Maturity Schedules

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

final stated maturities.  Once the amount of funds on deposit in the Accounts (including the Liquidity Reserve Account) was in excess of the Outstanding Bonds the Liquidity Reserve Account would be tapped to redeem the remaining Series 2002 Bonds via Section 404(i) of the Indenture.

RFA Section 2.8 therefore means that the RFA could have theoretically been terminated **at par** earlier than 28-May-2032 if domestic cigarette smoking kept pace with the DRI WEFA[21] base case scenarios in the 2002 Final OS[22], thereby making adequate tobacco settlement revenues available to pay for Projected Turbo Redemptions and early redemption of the debt[23].

As of the issuance date of the Series 2002 Bonds, the estimated final Turbo Redemption Date was 1-Jun-2019[24].  However, this was nothing more than a **forecast** based on the DRI WEFA base case scenario, not a guarantee that the Series 2002 Bonds would be redeemed in 2019. Note that other more pessimistic stressed scenarios were also included in the DRI WEFA report as part of the 2002 Final OS[25].

---

[21] Also known as Global Insight. Now known as IHS http://www.ihs.com
[22] 2002 Final OS, Page 65
[23] 2002 Final OS, Page 84
[24] 2002 Final OS, Page 84
[25] 2002 Final OS, Page A-25

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

Domestic cigarette smoking levels did not keep pace with the DRI WEFA base case scenario laid out in the 2002 Final OS.  Over time, market expectations for the final maturity date of the Series 2002 Bonds increased well past the original 1-Jun-2019 date:

| Forecast Date | Series 2002 Bonds Projected Final Maturity Based on DRI WEFA Base Case Scenarios | Source | Note |
|---|---|---|---|
| 25-Oct-2002 | 1-Jun-2019 | 2002 Final OS, Page 84 | Issuance of the Bonds, approximate bid date of the RFA |
| 7-Jun-2006 | 1-Jun-2019 | Tobacco Market Update from TSA Board Minutes, 7-Jun-2006, Pg 5 | |
| 10-Jun-2009 | 1-Jun-2022 | Tobacco Market Update from TSA Board Minutes, 10-June-2009, Pg 8 | Projection calculated at approximately the same time as the RFA early termination date |
| 17-Dec-2010 | 1-Jun-2023 | Executive Director's Report from TSA Board Minutes, 17-Dec-2010, Pg 8 | |
| 8-Jun-2011 | 1-Jun-2024 | Tobacco Market Update from TSA Board Minutes, 18-Jun-2011, Pg 4 | |
| 1-Jul-2013 | 1-Jun-2025 | Tobacco Market Update from TSA Board Minutes, 1-Jul-2013, Pg 4 | Recent update |

The Series 2002 Bonds projected final maturity continued to extend as time passed.  Per the 2002 Final OS, approximately $52 million of the 2026 Turbo bonds should have been redeemed by the Valuation Date[26].  However, only $32 million of the 2026 Turbo bonds were actually redeemed by the Valuation Date[27].  There was unambiguous, factual, publicly available data that indicated the turbo redemptions were proceeding far slower than originally predicted.

---

[26] 2002 Final OS, Page 84
[27] Bloomberg, Corporate Actions, CUSIP 88880MAH (the 2026 Turbo bonds)

PRIVILEGED AND CONFIDENTIAL

Further, the imposition of additional cigarette taxes near the Valuation Date was deemed by the marketplace to put additional future stresses on MSA payments.

Since the issuance of the 2002 Final OS to the Valuation Date, the estimated final maturity of the bonds based on the DRI WEFA base case scenarios extended by at least six years, with expectations of additional declines in the future. If the extension continues to follow this path, by approximately December 2025 the projected final maturity of the bonds will be approximately June 2032:



Past projections are no guarantee of future results. Future domestic cigarette smoking levels and the related tobacco settlement revenues may increase or decrease, thereby speeding up or slowing down the Series 2002 Bonds projected final maturity. It should be noted that only cigarette consumption is factored into MSA payments; introduction of products that replace cigarettes (such as e-cigarettes) could cause cigarette consumption to fall more than expected. In addition, the possibility of the imposition of new cigarette taxes (such as those imposed by the State Children's Health Insurance Program ("S-CHIP") in 2009[28] which increased the federal tax from $0.39 per pack to $1.01[29]) can have a profound and previously unexpected negative impact on cigarette consumption. These are considerations that bondholders and RFA providers must take into account as it relates to MSA exposure.

Note also that earnings on the Liquidity Reserve Account were dedicated to help pay for redemptions of turbo bonds. As TSA is no longer receiving the approximately $2 million of

---

[28] "S-CHIP Reauthorization Could Put Damper on Tobacco Deals," The Bond Buyer, 15-Jan-2009.
[29] S-CHIP was signed into law 4-Feb-2009 and the per pack tax hike became effective on 1-Apr-2009, Alcohol and Tobacco Tax and Trade Bureau

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

annual interest from LBSF and LBHI under the RFA, turbo redemptions can be expected to be even slower.

Accordingly, for the purposes of this report, we calculated the Termination Amount due to TSA under a range of projected final maturities, from the original projection of 1-Jun-2019 up to and including the Final Bond Payment date of 28-May-2032.

It should also be noted that the sensitivity to changes in expected maturity dates are very different for investors in the TSA bonds than those of a provider of investment products such as the RFA.  Most bonds of this type are purchased by individuals and bond funds, investors that are not likely to hedge their interest rate risk.  Increases in the expected maturity will result their receipt of the coupon for a potentially longer period of time, which increases or decreases their expected return (depending on the investors' purchase price), but should not result in a realized gain or loss unless they dispose of the bond prior to maturity.  Accordingly, a bond investor will price their bond to the worst anticipated outcome to compensate them for this risk.

The provider of a product such as the RFA will be required to adjust its hedges as expectations of turbo redemptions change due to variability in MSA receipts.  This exposes the Dealer to interest rates movements to a much greater degree than an investor.  This results in a Dealer needing to be conservative in its maturity assumption and result in additional hedging expense to protect itself from changes in maturity expectations to potentially cause interest rate losses.

## Replacement Yields

### Conservative Restrictions Under the Indenture

TSA has conservative restrictions on its permitted investment activities as determined by restrictions in the Indenture, TSA's investment policy and state law.  Therefore, replacement investment strategies should only be considered if eligible under the Indenture, TSA's investment policy guidelines and state law.   For purposes of this report, we limited the scope of potential replacement investment strategies to those permitted and subject to limitations in the Indenture[30]

Under Section 405(a) of the Indenture[31]:

> Eligible Investments shall mature or be redeemable at the option of the Issuer on or before the Business Day preceding each next succeeding Distribution Date, except to the extent that other Eligible Investments timely mature or are so redeemable in an amount sufficient to make payments under clauses (1) and (2) of Section 402(b) on each such next succeeding Distribution Date.

This effectively means TSA is limited to purchasing investments that mature every six months, or are puttable every six months, or can be drawn upon without penalty for bona fide Debt Service Payments every six months (similar to the RFA).   For example, even noncallable fixed

---

[30] Indenture, definition of Eligible Investments, Page 4-7
[31] Indenture, Section 405(a), Page 27

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

rate US Treasuries with a maturity date greater than six months after the purchase date cannot be purchased under Section 405(a).

## Inapplicability of Forward Curves

### Over Time, Actual LIBOR Resets Usually Do Not Match the Swap Market Implied Path of LIBOR Resets

There are multiple methods to construct interest rate curves, basis curves, forward interest rates and assumptions of the path of various types of forward interest rates.  For example, a standard dealer-to-dealer LIBOR swap[32] can be used to calculate the swap market's expectations for the implied path of 3M LIBOR over the course of a given number of years.  Certain basis swap markets can also be applied to the standard LIBOR swap curve, such as LIBOR/US Treasury Bill or LIBOR/Fed Funds basis swaps, which can then be used to predict the implied path of the related basis market rates (Treasury Bill or Fed Funds in the prior example).

Forward curves can be constructed on many types of securities for which there are traded instruments.  A forward curve, in its most simple form, is mathematical expression of "market expectation" between the dates of the traded instruments and is used to explain the rationale for changes in yields based on tenor. To our knowledge no active and liquid market for forward government agency trading exists.

---

[32] Standard dealer to dealer USD 3M LIBOR swaps assume: swap executed under a fully collateralized ISDA, fixed rate 30/360 paid semiannually, floating rate Actual/360 3M LIBOR reset/paid quarterly

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

For example, the chart below displays the implied path of 3M LIBOR over time as implied by the standard, highly liquid dealer-to-dealer LIBOR swap market as of 25-Mar-2009 (the Valuation Date).  At the time, the LIBOR swap market implied that 3M LIBOR would **rise** steadily from approximately 1.00% in March 2009 to 3.40% by November 2013.  However, these market implied projections did not come close to matching reality.  3M LIBOR actually **fell** and only averaged approximately 0.40% from March 2009 to November 2013.



Source: Bloomberg (implied 3M LIBOR resets), British Bankers' Association (actual 3M LIBOR resets)

Forward rates as implied by market rates and basis curves are not generally accurate representatives of the actual path the rates will actually follow over time[33], and therefore should not be heavily relied upon for calculating the replacement yield and Termination Amount.

<u>Forward Curves Are Not Applicable Unless TSA Can Transact</u>

The major difficulty in using forward curves to calculate replacement yields is the inability of TSA to actually transact in these products under economic terms that mimic the existing terms of the RFA.  Although standard LIBOR swaps, for example, are useful for monitoring the swap market's estimation of implied forward rates, it is inappropriate to use such analysis in this case. TSA, for example, cannot likely enter into a standard long term LIBOR swap, because the current market for over the counter derivatives increasingly requires both participants to bilaterally post collateral.  Moreover, posting collateral on a derivative does not reflect the

---

[33] "50 Years of UST Yields - How Well do Forwards Predict?", Intuitive Analytics, Peter Orr

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

economics of the RFA and therefore using non-callable swaps plus basis curves to project forward rates should not be used to calculate the Termination Amount.

## Limitations of Applying Historical Averages or Actual Reinvestment History to Future Returns

Past performance is no guarantee of future results. Future returns can (and probably will) vary from past returns. Any calculation based on using historical averages or past reinvestment history should not assume that the yield in question is guaranteed and will be actually obtained by TSA in the future with 100% certainty.

In addition, historical average returns are very sensitive to the time period chosen. For example, the average yield for the past year may be materially different than the average yield for the past three years.

## Historical Averages of Various Eligible Investments as RFA Replacement Rate

### Limited and Imperfect Time Series Data Available

Ideally, perfect daily time series data would exist for each category of possible investment allowed per the definition of Eligible Investments under the Indenture. Unfortunately, this is not the case. Data is not available for every business day for every time series in question. Yields are not displayed in a universal format with identical day count conventions; for example, some data sets use discount yields while other use a semi-annual bond basis.

More importantly, the data sets in question usually do not precisely mirror the Eligible Investment language in the Indenture (as seen below). Differences in tenor and permitted credit quality, for example, can have a material effect on the applicable yields.

### Commercial Paper ("CP")

Prior to the first failed delivery on 1-Dec-2008, approximately every six months LBSF sold six-month CP to TSA under the RFA to deliver interest due at the Guaranteed Rate. For example, the final CP delivery on June 2008 for Briarwood CP Trust[34] matured on 1-Dec-2008.

Given LBSF's history of delivering CP under the RFA, it may be appropriate to use average historical CP yields as a proxy for estimating future returns. Unfortunately, the Federal Reserve Statistical Release H.15 does not define CP exactly the same as the RFA or the Indenture. The Fed H.15 data includes A-1 and A-1+ CP[35] while TSA is limited to A-1+ CP. Therefore, the H.15 data may imply higher yields than would be attainable under TSA's Eligible Investment language.

Conversely, the H.15 data only tracks three month CP[36], not six month commercial paper as allowed under the RFA and Indenture. There is typically a positive yield spread between three

---

[34] US Bank account statements, Page 6, USBANK000872 (USBANK000877)
[35] Federal Reserve Criteria for Calculation CP Interest Rate Indexes
[36] Federal Reserve Commercial Paper Rates and Outstanding Summary

PRIVILEGED AND CONFIDENTIAL

and six month CP, so the H.15 data may underestimate the yields available to TSA if they invested in a rolling series of six month CP.

Note also that the H.15 CP data is simply an index, which means the Federal Reserve aggregates and averages CP yields across many different issuers and tenors[37]. This means that a 3M CP yield shown in the H.15 data does not represent the yield on every piece of 3M CP issued on that day. Each CP issuer is different and every issuer's CP is likely to price at different yields. In times of market instability (such as 2007-2009) the range of yields that are used to calculate the H.15 data can be particularly wide. In addition, the requirement that the CP needs be A-1+, plus the further requirement that prohibits CP issuers on "Negative Credit Watch"[38] reduces the universe of deliverable and potentially higher yielding CP.

## Certificates of Deposit ("CDs")

TSA may invest in bank CDs as long as they are rated A-1+/P-1/F1, and have a maximum three month maturity.[39] Unfortunately the Federal Reserve H.15 data does not specify a ratings requirement for the CDs included in the dataset; the H.15 data may therefore overestimate yields available to TSA by investing in CDs. Additionally, the H.15 data ends in June 2013.

The H.15 CD data is also an index similar to the CP data; a broad range of CD rates is used to calculate an aggregated and averaged CD yield for a given day.

## FNMA/FHLMC Discount Notes

Six month discount notes issued by FNMA or FHLMC are acceptable under the RFA and Indenture, and therefore it may be appropriate to use average historical FNMA/FHLMC yields as a proxy for estimating future returns. We used monthly yields for six month FNMA[40] and FHLMC[41] discount notes, and averaged the returns. FNMA and FHLMC yields are generally similar.

## Selected Time Periods

We reviewed historical returns over a variety of time periods:

- Date of First Failed Delivery to Valuation Date
  - Represents yields available during the time period TSA had to first consider reinvestment strategies, but it is a short time period with few data points
- Yields Since Date of First Failed Delivery
  - Represents yields available since TSA had to first consider reinvestment strategies up to the present

Average yields for the various types of Eligible Investments and time periods are listed in the Valuation Matrix below.

---

[37] Federal Reserve Criteria for Calculation CP Interest Rate Indexes
[38] RFA, definition of Eligible Securities, Page 2
[39] Indenture, definition of Eligible Investments, Page 4-7
[40] Fannie Mae Historic Discount Notes Rates
[41] Freddie Mac Reference Bills

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

### Actual Reinvestment History as RFA Replacement Rate

Since LBSF's first failed delivery on 1-Dec-2008, TSA has reinvested the balance of the Liquidity Reserve Account in Eligible Investments as defined in the Indenture, namely, in two money market funds eligible under romanette (viii)[42]:

| Investment | Symbol | Time Period |
|---|---|---|
| First American Prime Obligations | FPDXX | 1-Dec-2008 to 11-Jun-2009[43] |
| Fidelity Institutional Money Market Prime | FIDXX | 11-Jun-2009 to present |

Since LBSF's first failed delivery, TSA has suffered a substantial loss of income:

| Start Date | End Date | RFA Interest | Actual Interest | Lost Interest | Actual Yield Earned (%) |
|---|---|---|---|---|---|
| 1-Dec-2008 | 25-Mar-2009 | $646,553 | $93,474 | $553,080[44] | 0.65% |
| 1-Dec-2008 | 30-Sep-2013 | $9,862,783.49 | $400,774.40[45] | $9,462,009.09 | 0.18% |

Note that just the lost interest alone from 1-Dec-2008 to 30-Sep-2013 is already well in excess of LBSF's proposed settlement figure of $4,325,931.16[46], never mind all of the future earnings expected to be lost because of the RFA termination.

### Projected Liquidity Reserve Account Earnings Based on Series 2013 Refunding Bond Assumptions as RFA Replacement Rate

In 2013 TSA refunded the Series 2002 Bonds by the issuance of $334,700,000 Tobacco Settlement Authority Tobacco Settlement Revenue Refunding Bonds, Series 2013 ("Series 2013 Bonds"). The 2013 Final OS uses the following assumption for interest earnings related to the Liquidity Reserve Account for the Series 2013 Bonds:

> Moneys deposited in the Liquidity Reserve Account are assumed to be invested at rates increasing from 0.03% per annum from December 1, 2013 to 0.75% per annum from December 1, 2018.[47]

---

[42] Indenture, Page 6
[43] US Bank account statements, Page 7, USBANK001462 (USBANK001468)
[44] Docket 20995, Response Of The Washington State Tobacco Settlement Authority To Debtors' One Hundred Ninety First Omnibus Objection To Claims, Page 6 Paragraph 22
[45] Robert Cook Spreadsheet of Actual Liquidity Reserve Account Earnings
[46] Docket 20995, Response Of The Washington State Tobacco Settlement Authority To Debtors' One Hundred Ninety First Omnibus Objection To Claims, Page 1 Introduction
[47] 2013 Final OS, Page 140

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

The 2013 Final OS does not explain the source of the assumed path of yields expected to be earned on the Liquidity Reserve Account.  However, for the purposes of this report we can use this assumed rate of interest plus the actual reinvestment history going back to the initial failed delivery date to inform our calculation of a Termination Amount.

## Receive Fixed on Cancellable Swap plus Invest in Floating Rate Puttable Investment

As discussed earlier in this report, the use of non-callable long dated swaps and forward implied rates is generally an unappealing method to calculate replacement reinvestment yields, and therefore the Termination Amount.  However, it is possible to at least consider the use of LIBOR swaps with cancellation options.  TSA would hypothetically receive a fixed rate vs. paying 3M LIBOR in a swap with a notional amount equal to the size of the Liquidity Reserve Account.  In addition, TSA would embed the right to cancel the swap at par every six months beginning at the next Bond Payment Date, 1-Jun-2009.  TSA would then invest the cash balance of the Liquidity Reserve Account in Eligible Investments such as money market funds.

Although this method would allow TSA to lock in a long term interest rate while still being able to terminate the swap transaction in case of a debt service deficiency, serious issues remain with this method:

- TSA takes on basis risk[48] between 3M LIBOR and the floating investment portfolio
- Low absolute fixed rate on the cancellable swap ("swaption") making it unlikely TSA would actually want to do the trade
  - Locking in a fixed rate under the cancellable swap plus floating investment portfolio approach may not make sense if the fixed rate has a very low absolute level and/or is comparable to current money market rates
- TSA may have to post collateral under an ISDA Master Agreement and Credit Support Annex ("CSA") to induce a dealer to enter the trade
- Unknown exactly how much a theoretical dealer would charge compared to a "mid market" swap rate to enter the trade
- Public entities using a swap overlay in an investment account would be out of the ordinary; TSA may want to reject the strategy simply because it is an out of the ordinary strategy and therefore may be perceived by the public as too risky
- Uncertain rating agency response; the rating agencies might downgrade the bonds if they knew TSA swapped the balance of the Liquidity Reserve Account
- Uncertain if the periodic mark to market of the swap would have to be added to the Liquidity Reserve Account balance on the periodic evaluation dates as prescribed by the Indenture; if added, it might show the Liquidity Reserve Account is underfunded from time to time
- TSA has the right to replenish its Liquidity Reserve Account under the RFA for a period of one year from the date of draw, so in addition needing the right to terminate the swap

---

[48] "Basis risk" in this case means the risk that the earnings from the floating investment portfolio (a money market fund, for example) is not enough to offset the floating rate of interest owed under the swap, typically 3M LIBOR.

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

TSA would require the right to reinstate the swap in the event the funds were available to replenish the Liquidity Reserve Account.  This right is not built in to the cancellable swap rate used in the Valuation Matrix.

## Valuation Matrix

Once a given replacement yield is chosen, we assume that TSA would earn the replacement yield from the early termination date (25-Mar-2009) to the maturity date in question.  The projected interest earned is subtracted from the interest that should have been earned at the Guaranteed Rate under the RFA, and then the differential is discounted back to 25-Mar-2009 using the replacement yield.

**Termination Amounts Using Various Expected Maturity Dates ($MM):**

| Replacement Investment | Replacement Yield (%) | 1-Jun-2019 | 1-Jun-2022 | 1-Jun-2025 | 28-May-2032 |
|---|---|---|---|---|---|
| Commercial Paper | | | | | |
| Average Yield Dec 08 - Mar 09 | 0.89% | 15.90 | 20.31 | 24.61 | 34.20 |
| Average Yield Dec 08 - Jun 13 | 0.29% | 19.15 | 24.68 | 30.17 | 42.77 |
| Certificates of Deposit | | | | | |
| Average Yield Dec 08 - Mar 09 | 1.25% | 14.04 | 17.85 | 21.52 | 29.55 |
| Average Yield Dec 08 - Jun 13 | 0.37% | 18.70 | 24.08 | 29.40 | 41.57 |
| FNMA/FHLMC Discount Notes | | | | | |
| Average Yield Dec 08 - Mar 09 | 0.54% | 17.77 | 22.82 | 27.79 | 39.07 |
| Average Yield Dec 08 - Jun 13 | 0.21% | 19.60 | 25.29 | 30.95 | 44.00 |
| Actual and Projected Reinvestment | | | | | |
| Actual Yield Dec 08 - Mar 09 | 0.65% | 17.18 | 22.02 | 26.78 | 37.50 |
| Actual Yield Dec 08 - Sep 13 | 0.18% | 19.77 | 25.52 | 31.24 | 44.46 |
| Actual Yield plus 2013 OS Projected | 0.55% avg | 19.02 | 23.68 | 28.25 | 38.49 |
| Receive Fixed Via Cancellable Swap plus Invest Floating Portfolio | | | | | |
| Cancellable start Jun 09 | 0.43%[49] | 18.37 | 23.63 | 28.83 | 40.68 |

---

[49] Bloomberg.  Mid market approximately 63 bps, but swap dealers rarely trade "at mid".

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

## Recommended Termination Amount Calculation

Per the RFA, LBSF was obligated to pay the Guaranteed Rate on the invested balance of the Liquidity Reserve Account potentially to 28-May-2032.  Although cigarette consumption in line with or in excess of the original DRI WEFA base case forecast would have allowed TSA to terminate the RFA early, that payoff scenario was only based on a forecast.  Additionally, the forecast for cigarette consumption and related tobacco settlement revenues has consistently fallen, making it more and more likely that the Liquidity Reserve Account may have been invested in the RFA all the way out to 28-May-2032. We believe TSA (as the Burdened Party) should use 28-May-2032 as the expected maturity date.

Average historical yields from theoretical investments in commercial paper, certificates of deposit or FNMA/FHLMC discount notes and the related Termination Amount calculations are shown for purposes of comparison, but due to the variability of the average depending on the time period chosen to calculate the average, use of these methods is inappropriate to determine a final a Termination Amount.

Although using cancellable swaps allows TSA to potentially lock in a long term interest rate on the Liquidity Reserve Account, too many issues exist with the strategy (see bulleted list under "Receive Fixed on Cancellable Swap plus Invest in Floating Rate Puttable Investment" above) to make the method applicable to determine a Termination Amount, making this a purely theoretical exercise. Adjustments to the rates, such as collateral costs, credit reserves, custodial fees, dealer profitability targets, etc., would need to be made which would have additional negative effects.

TSA's actual investment history represents the best choice for the replacement yield to be used to calculate the Termination Amount.  Actual investment history avoids the significant uncertainty and variability associated with the use of hypothetical curves, hypothetical trades, and adjustments, reflecting the costs of trading in the market.  Accordingly, the actual reinvestment yield earned from the first failed delivery up to the Valuation Date should therefore be the replacement yield used to calculate the Termination Amount.

**Therefore, it is our opinion that the calculated Termination Amount due from LBSF (and LBHI, as guarantor) to TSA should be approximately $37.5 million.  This amount assumes 28-May-2032 final maturity with a replacement yield of 0.65%.**

## Total Loss Calculation

Note that the Termination Amounts calculated in the Valuation Matrix do not include:

- Section 7.7(b) Losses ($553,080.02)
- Incidental costs and expenses incurred by the sole Burdened Party (TSA)
- Cost of collection
- Reasonable attorneys' fees

**PRIVILEGED AND CONFIDENTIAL**

Per the definition of Termination Amount, these should be added to the amounts listed in the Valuation Matrix for the total Termination Amount.[50]  We do not have access to the sum of these other costs that should be added to calculate the final Termination Amount.

## 2011 Proposed Alternative Investment Options

In 2011 Grant Street Group, Swap Financial Group, and Barclays Capital proposed TSA enter into various longer dated guaranteed investment contracts.  In March 2011 Grant Street suggested TSA consider entering into either 5 year or 12 year uncollateralized or collateralized investment agreements, with a range of yields from 1.40% to 4.00%[51].  In November 2011, Swap Financial Group proposed TSA consider guaranteed investment contracts from Barclays and/or Deutsche Bank, suggesting a range of 3.00-3.50% for 7-10 year average life GICs.  Swap Financial Group also suggested a fixed rate CD from US Bank at rates 1.00-1.50% worse than the GICs.[52]  Also in November 2011 Barclays Capital proposed a 5 year term GIC (placed with Barclays as principal) at 3M LIBOR + 1.50%, or a fixed rate of 2.75%.[53]

Although these alternatives are interesting, none of the proposed alternatives retain the economics of the RFA for TSA.  Uncollateralized GICs require TSA to take the risk that the provider "jumps to default", thereby putting TSA's invested principal at risk.  Also, forward purchase agreements (such as the RFA) allow the client to sell any securities delivered in the open market if the client believes the threat of default for the security issuer is high; the client cannot readily do so with an uncollateralized GIC. Collateralized GICs generally do not provide a clean bankruptcy opinion as to the ownership of any posted collateral in the event of a provider default; the RFA included a bankruptcy opinion and was highly valued by TSA as evidenced by TSA's June 10, 2009 Board Meeting Minutes[54].  None of these proposed alternative investment options should be used as the basis of determining the Termination Amount for TSA's lost economics per the RFA.

Signed: _____        Signed: _____
        Daniel P. Curry                        Jeffrey A. Hasterok

Dated: December 16, 2013                 Dated: 16-DEC-2013

---

[50] RFA, Page 5-6
[51] Grant Street Debt Service Reserve Fund Rate Indications
[52] Swap Financial Group Reinvestment of TSA's Reserve Fund memo
[53] Barclays Capital Alternatives to Improve the TSA's Cash Flow memo and term sheet
[54] Board of Directors, Special Meeting, Minutes, June 10, 2009, Page 5

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

Exhibit 1

*Daniel P. Curry*

Chappaqua, New York 10514
(914) 666-5954
danielcurry11@gmail.com

# Professional Experience

Daniel Curry has over 20 years of experience in multiple facets of municipal finance developed over the course of his career at several major financial institutions.  His area of expertise include: structuring municipal bonds, investment and management of bond proceeds, structuring of hedging transactions, structured credit solutions and municipal portfolio management.

Mr. Curry was most recently an Executive Director at Morgan Stanley and was in charge of structuring for the Municipal Capital Markets Group.  While at Morgan Stanley, Mr. Curry was responsible for development of several profitable new products and business initiatives. He established and managed the firm's $1.2 billion Municipal Total Return Swap Book, in addition to structuring and risk managing $400 million of tax-exempt direct lending transactions for healthcare and governmental clients.

Mr. Curry was frequently assigned by Morgan Stanley Fixed Income Division management to work on problematic transactions and exposures outside of the Municipal Capital Markets Group.  He utilized his extensive structuring and banking experience to mitigate Firm's losses across several business and product areas that resulted from the financial crisis.  He designed the exchange structure used by the firm's Student Loan Auction Rate Securities ("SLARs") workout team to restructure and exit the SLARs position.  These restructurings permitted the Firm to realize significantly higher value on its $4 billion SLARs portfolio than would have been realized through sale of original, non-restructured securities as well as serving to reduce balance sheet and capital usage.

Mr. Curry's structuring experience as it relates to repurchase agreements and other investment products dates to 1997 when he was a Vice President at TMG Financial Products in Greenwich, Connecticut.  While employed my TMG, Mr. Curry structured and marketed reinvestment agreements, repurchase agreements, interest rate caps and swaps used by state and local governments, non-profit healthcare and higher education clients.  He managed a $150 million Tender Option Bond Portfolio, priced trades, analyzed municipal credits, managed trade documentation and worked with traders on hedging strategies and transactions.  He was a member of the "wind-down" team retained by parent company in order to facilitate the sale and transfer of trading books to another financial institution.

Prior to joining TMG Financial Products, Mr. Curry was employed in the Public Finance Departments of Alex. Brown and Sons in Baltimore and Bear Stearns & Co. in New York, where he started his career.  While at Alex. Brown and Bear Stearns, Mr. Curry specialized in structuring municipal bond issues with an emphasis on refunding transactions.

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

2012 - Present Financial Consultant
 Independent Consultant, Chappaqua, NY
2004 - 2012 Executive Director, Municipal Capital Markets, Structuring
 Morgan Stanley, New York, New York
1999 - 2004 Vice President, Municipal Capital Markets, Tender Option Bond Financing
 Morgan Stanley, New York, New York
1998 - 1999 Associate, Public Finance
 Morgan Stanley, New York, New York
1997 - 1998 Volunteer, Consultant
 American Red Cross, New York, New York
1994 - 1997 Vice President, Municipal Derivatives Marketing
 TMG Financial Products, Greenwich, Connecticut
1992 - 1994 Associate, Public Finance
 Alex. Brown & Sons, Baltimore, Maryland
1990 - 1992 Analyst, Public Finance
 Bear Stearns & Co., New York, New York

## Education

1986 - 1990 Bachelor of Arts in Economics, State University of New York at Albany

## Patents

Curry, Daniel and Garnett, Eben. 2004 Structured Credit Enhancements. U.S. Patent 7606749. Filed March 26, 2004 and issued October 20, 2009

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

# Exhibit 2

*Jeffrey A. Hasterok*

Old Greenwich, Connecticut 06870
(203) 344-1504
jeffrey@hasterok.com

## Professional Experience

*Independent Valuation Expert Witness,* March 2013 – present

Prepared expert valuation reports for commercial paper forward purchase agreements between US municipalities and a financial services provider in bankruptcy.  Provided expert background advice to a subordinate mortgage investor regarding an interest rate swap related to a FNMA enhanced tax exempt multifamily housing transaction in litigation.

**MORGAN STANLEY,** January 2001 – April 2012

*Executive Director, Municipal Derivative Marketing,* January 2010 – April 2012

Managed OTC interest rate derivative, credit derivative and reinvestment business line.  Primary focus: negotiated and competitive derivatives with municipal and not-for-profit counterparties, sourced primarily via regional broker-dealers and independent financial advisors. Responsible for prospecting new middle market issuer clients, broker-dealers and FAs.  Coordinated credit, legal and documentation approvals.  Negotiated deal terms, priced and executed the trade.  Maintained and improved issuer and advisory client relationships with outgoing trade and restructuring ideas. Transactional experience with OTC USD interest rate swaps, swaptions, constant maturity swaps, caps, floors, CVA/DVA pricing, municipal credit default swaps, term repurchase agreements, forward purchase agreements, guaranteed investment contracts, and structured notes. Designed, developed and deployed relative value framework for single name municipal credit default swaps, MCDX and SIFMA/LIBOR basis swaps.  Published weekly trade ideas based on the relative value framework; pitched directly to hedge funds, high net worth private investors and other institutional investors.

*Vice President, Municipal Derivative Marketing,* December 2004 – January 2010

Transitioned to directly managing the regional broker-dealer reinvestment and interest rate derivative business channel.

*Associate, Municipal Derivative Marketing,* August 2002 – December 2004

Assisted senior marketer pricing and placing structured reinvestment and interest rate derivative solutions with municipal and not-for-profit counterparties.

*Analyst, Municipal Sales and Trading,* January 2001 – August 2002

Designed and programmed thorough revenue attribution system for public finance banking revenues in MS Access.

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

**BILL BRADLEY FOR PRESIDENT,** February 1999 – October 2000

_Financial Analyst and Direct Mail Fundraising Coordinator_

Assisted with the creation and execution of an $8.1 million direct mail fundraising program. Defined contribution database requirements for 30+ member national fundraising and compliance staff.  Managed the design and implementation of the intake process for over $29.2 million of individual contributions across 100,000 contributors.

**EDWARD JONES,** June 1996 – October 1998

_Financial Services Industry Analyst_

Reviewed and monitored newly developed and existing fixed-income products and structures. Assisted with developing suitability guidelines for new products.  Completed a one-year rotational training program.

## Education and Designations

Bachelor of Science in Finance, May 1996, University of Illinois at Urbana-Champaign
Chartered Alternative Investment Analyst ("CAIA"), 2009, Chartered Alternative Investment Analyst Association
Financial Risk Manager ("FRM"), 2010, Global Association of Risk Professionals
Eagle Scout, Boy Scouts of America, 1991

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

# Appendix A
*Referenced Source Materials*

## The Agreement
Reserve Fund Agreement (including the March 2009 amendment, "RFA"), 5-Nov-2002, LBHI_WTSA_00002800

Amendment Agreement, 26-Mar-2003, LBHI_WTSA_00000280

Final Request for Bids, PFM, 22-Oct-2002, LBHI_WTSA_00002861

RFA Bid Results, email from Greg Shlionsky, 24-Oct-2002, LBHI_WTSA_00006278

## The Series 2002 Bonds
$517,905,000 Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002, Final Offering Statement ("2002 Final OS"), 25-Oct-2002, Electronic Municipal Market Access ("EMMA")

Indenture by and between Tobacco Settlement Authority and U.S. Bank, N.A., as Indenture Trustee ("Indenture"), 1-Oct-2002, LBHI_WTSA_00005173

## The Series 2013 Bonds
$334,700,000 Tobacco Settlement Authority Tobacco Settlement Revenue Refunding Bonds, Series 2013, Final Offering Statement ("2013 Final OS"), 17-Oct-2013, Electronic Municipal Market Access ("EMMA")

## Default Notice
Notice of Lehman Event of Default under Reserve Fund Agreement ("Default Notice"), 18-Dec-2008, LBHI_WTSA_00005617

## LBSF's Attempt to Obtain Termination Indications, March 2009
- Request to Deutsche Bank, email from Sergey Arefiev, 24-Mar-2009, LBHI_WTSA_00000239
- Response from Deutsche Bank (no quote), email from Dennis Tupper, 24-Mar-2009, LBHI_WTSA_00000331
- Request to Wachovia, email from Sergey Arefiev, 24-Mar-2009, LBHI_WTSA_00000285
- Response from Wachovia with non-actionable quote, email from Casey Rogers, 26-Mar-2009, LBHI_WTSA_00000342 and LBHI_WTSA_00000345
- Request to Barclays, email from Courtney Jenkins, 24-Mar-2009, LBHI_WTSA_00000576
- Attempted response from Barclays, email from Robert Taylor, 25-Mar-2009, LBHI_WTSA_00000574

10000 00001 cm168f1064

**PRIVILEGED AND CONFIDENTIAL**

## TSA Board Minutes

Tobacco Settlement Authority Board of Directors, Special Meeting, Minutes, June 7, 2006, TSA_025170

Tobacco Settlement Authority Board of Directors, Special Meeting, Minutes, June 10, 2009, TSA_027039

Tobacco Settlement Authority Board of Directors, Special Meeting, Minutes, December 17, 2010, TSA_025252

Tobacco Settlement Authority Board of Directors, Special Meeting, Minutes, June 8, 2011, TSA_026071

Tobacco Settlement Authority Board of Directors, Special Meeting, Minutes, July 1, 2013, TSA Website, http://www.tsa-wa.org/minutes2013.07.01.pdf

## Dockets

Docket 3221, Order Authorizing Rejection of Reserve Fund Agreement Pursuant to 11 U.S.C. § 365(a) ("Rejection Order")

Docket 20995, Response Of The Washington State Tobacco Settlement Authority To Debtors' One Hundred Ninety First Omnibus Objection To Claims

## Websites

Tobacco Settlement Authority website, http://www.tsa-wa.org/

## 2011 Alternative Reinvestment Indications

Grant Street Debt Service Reserve Fund Rate Indications, email from John McCarthy, 4-Mar-2011, TSA_016833 and TSA_016834

Swap Financial Group, Reinvestment of TSA's Reserve Fund, memo from Peter Shapiro, 16-Nov-2011, TSA_038481

Barclays Capital, Alternatives to Improve the TSA's Cash Flow, memo and term sheet, TSA_038485 and TSA_038493

## US Bank Liquidity Reserve Account Statements

Account Statement, 1-Oct-2008 to 31-Dec-2008, USBANK000872

Account Statement, 1-Jun-2009 to 30-Jun-2009, USBANK001462

Account Statement, 1-Jul-2012 to 30-Jun-2013, USBANK000211

## Other

Barclays Tobacco Market Update, 1-Jul-2013, TSA_028423

10000 00001 cm168f1064

PRIVILEGED AND CONFIDENTIAL

Fannie Mae Historic Discount Notes Rates Compared to Treasury Bills,
http://www.fanniemae.com/resources/file/debt/pdf/other-debt/historicdiscountnotes.pdf

Freddie Mac Reference Bills Securities History by Auction Date,
http://www.freddiemac.com/debt/data/cgi-bin/refbillaucres.cgi?order=AD

Final Report, Tobacco Settlement Asset-Backed Bonds, Series 2002, http://www.tsa-wa.org/finaltsa.pdf

Federal Reserve Statistical Release H.15,
http://www.federalreserve.gov/releases/h15/current/default.htm

Federal Reserve Criteria for Calculation CP Interest Rate Indexes,
http://www.federalreserve.gov/releases/cp/about.htm

Federal Reserve Commercial Paper Rates and Outstanding Summary,
http://www.federalreserve.gov/releases/cp/default.htm

Robert Cook Spreadsheet of Actual Liquidity Reserve Account Earnings, TSA_042446

"Treasury Announces Guaranty Program for Money Market Funds," 19-Sep-2008, US Treasury,
http://www.treasury.gov/press-center/press-releases/Pages/hp1147.aspx

"S-CHIP Reauthorization Could Put Damper on Tobacco Deals," The Bond Buyer, 15-Jan-2009,
http://www.bondbuyer.com/issues/118_10/-298354-1.html

Alcohol and Tobacco Tax and Trade Bureau, Children's Health Insurance Program
Reauthorization Act of 2009, http://www.ttb.gov/main_pages/schip-summary.shtml

"50 Years of UST Yields - How Well do Forwards Predict?", Intuitive Analytics, Peter Orr,
http://www.intuitive-analytics.com/blog/bid/59605/50-Years-of-UST-Yields-How-Well-do-Forwards-Predict

Commercial Paper Funding Facility ("CPFF"), Federal Reserve,
http://www.federalreserve.gov/monetarypolicy/cpff.htm

Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility ("AMLF"),
Federal Reserve, http://www.federalreserve.gov/monetarypolicy/abcpmmmf.htm

Bloomberg, Corporate Actions, CUSIP 88880MAH

10000 00001 cm168f1064