**EXHIBIT 3 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Chapter 11
CASE NO. 08-13555 (JMP)
Jointly Administered

IN RE: LEHMAN BROTHERS
       HOLDINGS, INC. et al.

       Debtors,

-----------------------------------------

                TRANSCRIPT OF
          DEPOSITION OF JEFFREY HASTEROK

       TRANSCRIPT of the stenographic
notes of the proceedings in the
above-entitled matter, as taken by and
before TAB PREWETT, a Registered
Professional Reporter, a Certified
Shorthand Reporter, a Certified LiveNote
Reporter, and Notary Public, held at the
Offices of JONES DAY, 222 East 41st Street,
New York, New York, on Thursday, January
16, 2014, commencing at 9:35 a.m.

Page 2

1
2   A P P E A R A N C E S :
3
4       JONES DAY
5       BY: JAYANT W. TAMBE, ESQ.
            LAURI SAWYER, ESQ.
6           REBEKAH BINGER, ESQ.
        222 East 41st Street
7       New York, New York  10017-6702
        Attorneys for Lehman Brothers
8
9
10
11
12      PACIFICA LAW GROUP
        BY: PAUL J. LAWRENCE, ESQ.
13      1191 2nd Avenue
        Seattle, Washington  98101-2945
14      Attorneys for Washington TSA
15
16
17
18
19  ALSO PRESENT:
20      Thomas E. Hommel, Esq.
        Co-General Counsel
21      Office of the General Counsel
        Lehman Brothers Holding, Inc.
22      1271 Avenue of the Americas
        New York, New York  10020
23      Mr. Hommel left the deposition
        at the lunch break.
24
25

Page 3

1       Jeffrey Hasterok
2   P R O C E E D I N G S
3   J E F F R E Y   H A S T E R O K,
4   doing business at 5 Wendle Place,
5   Old Greenwich, Connecticut,
6   having been sworn by the notary public to
7   testify to the truth, testified as follows:
8   DIRECT EXAMINATION
9   BY MR. TAMBE:
10      Q    Good morning, Mr. Hasterok.
11      A    Good morning.
12      Q    What is your understanding of
13  the role you are to play in this
14  litigation?
15      A    I was hired by Paul and
16  Pacifica along with my partner Dan Curry to
17  prepare a valuation report on behalf of
18  Washington TSA, and to come up with an
19  estimated termination amount for the
20  forward purchase agreement that they had on
21  with Lehman Brothers in relation to their
22  tobacco bonds from 2002, if I remember
23  correctly.
24      Q    All right.  Is it your
25  understanding that you have provided and

Page 4

1       Jeffrey Hasterok
2   will provide opinion testimony in this
3   matter?
4       A    Yes, correct.
5       Q    And have you ever provided
6   opinion testimony before?
7       A    I have worked on a valuation
8   report against -- in a Lehman matter.  I
9   have not been deposed in this format
10  before, but I worked on a valuation report
11  for the New York State Tobacco.  I was a
12  subcontractor to Mohanty Gargiulo, which is
13  a --
14          (There was a discussion off the
15      record.)
16      A    Sorry.  Mohanty Gargiulo, it's
17  on my resumé actually.  Mohanty is
18  M-o-h-a-n-t-y, and Gargiulo is
19  G-a-r-g-i-u-l-o.  I apologize.  I don't
20  remember off the top of my head.
21          But that that -- what we were
22  hired, I was hired as a subcontractor to
23  that advisory firm.  And we prepared a
24  valuation report in the spring of last
25  year.  We submitted the report.  I haven't

1  (Pages 1 to 4)

Elisa Dreier Reporting Corp.      (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 5

```
 1        Jeffrey Hasterok
 2   been involved in that since.
 3        Q    So I just want to be clear on a
 4   couple of things.  You have never before
 5   today testified under oath in any matter;
 6   is that right?
 7        A    Correct.
 8        Q    Okay.  Whether as an expert or
 9   as a fact witness in any way?
10        A    Correct.
11        Q    Right.
12        A    Right.  I have been talked to
13   by Morgan Stanley's lawyers about Morgan
14   Stanley matters when I worked there, but
15   never in an external court case or
16   deposition or litigation or -- no, I have
17   not.
18        Q    You haven't had other
19   experiences like this morning where someone
20   told you to raise your hand --
21        A    Correct.
22        Q    -- and swear to tell the truth?
23        A    That is correct.
24             MR. LAWRENCE:  You have to wait
25   for him to finish his question before
```

Page 6

```
 1        Jeffrey Hasterok
 2   you start answering.
 3             THE WITNESS:  Sorry.
 4        Q    And for the sake of the court
 5   reporter, we might both need to slow down
 6   because we both are fast talkers.  So I
 7   will do my best, and you should do your
 8   best, too.
 9             Okay.  You described Mr. Curry
10   as your "partner"?
11        A    Correct.
12        Q    Are you, in fact, partners in
13   the legal sense, or you just are partners
14   in the sense you worked together on this
15   particular matter?
16        A    The latter, we are an ad hoc
17   partnership.  We both worked together at
18   Morgan Stanley.  And we have not created a
19   business entity.  We came together as
20   friends and former colleagues to work on
21   this matter.
22        Q    Okay.  On the New York State
23   matter that you testified about, you said
24   you worked as a subcontractor.  Is it
25   correct to say that you did not author a
```

Page 7

```
 1        Jeffrey Hasterok
 2   document the way you have authored a
 3   document in this case?
 4        A    I would say that I worked
 5   collaboratively with the other members of
 6   Mohanty.  We all worked on it together.
 7   There were two principals and two or three
 8   junior people working there at the time.
 9             So I would not declare myself
10   as the sole author of that product,
11   absolutely not.  That was a joint product.
12   And then in this case it was Dan and I that
13   worked on it together.
14        Q    In the New York State matter,
15   did you put your name on this report that
16   was prepared?
17        A    I don't think so.
18        Q    And you would agree in this
19   case you have actually signed the report
20   that was submitted?
21        A    Yes, sir.
22        Q    And is it your understanding
23   that the report you prepared in the New
24   York State matter, was that prepared to be
25   served as a report in a pending lawsuit, or
```

Page 8

```
 1        Jeffrey Hasterok
 2   was it prepared for the benefit of New York
 3   State to use for other purposes?
 4        A    To my knowledge, it was used as
 5   part of the mediation process that Lehman
 6   had entered into with New York State.
 7        Q    Now, other than the New York
 8   State matter and this matter, have you
 9   prepared reports of the type, valuation
10   reports of the type that you have prepared
11   in this case anywhere else?
12        A    No.
13        Q    And at the beginning of this
14   deposition, you described the contract
15   between Washington State Tobacco Authority
16   and Lehman as a "forward purchase
17   agreement."
18             Is that what it is?
19        A    There are multiple ways to
20   describe it.  I have heard -- in my former
21   life as a derivative marketer at Morgan
22   Stanley, we would use the term "forward
23   purchase agreement" or "forward delivery
24   agreement" interchangeably.
25        Q    You understand, do you not,
```

2  (Pages 5 to 8)

Page 9

Jeffrey Hasterok

1
2  that the agreement in this case is called a
3  "reserve fund agreement," correct?
4      A   I do.
5      Q   And do you have a view as to
6  whether "reserve fund agreements" are the
7  same as "forward purchase agreements" or
8  "forward delivery agreements"?
9      A   I would say that the "forward
10  delivery agreement" or "forward purchase
11  agreement" phrasing is a broader term.  And
12  a "reserve fund agreement" is a type of
13  forward purchase agreement.
14          You can also do forward
15  purchase agreements for debt service funds
16  or construction funds or "cap I" funds.  So
17  I -- the reserve fund agreement in this
18  case happens to be an FPA.
19      Q   Okay.  You described that your
20  relationship with Mr. Curry in this matter
21  is you collaborated on the preparation of
22  the report that was submitted here,
23  correct?
24      A   Correct.
25      Q   And both of you have signed the

Page 10

Jeffrey Hasterok

1
2  report that was submitted, correct?
3      A   Correct.
4      Q   And we will get into the
5  details as we go through the day, but, just
6  generally, can you describe what role you
7  played in preparing this report versus the
8  role played by Mr. Curry?
9      A   Sure.  We both did discovery
10  review for Pacifica.  We went through --
11  and correct me if I'm wrong -- but it was
12  something like 7,000 or 8,000 entries in
13  Viewpoint -- I can't remember the exact
14  number.  But Lehman's production was
15  something along those lines.
16          So we -- as part of our
17  engagement with Pacifica, we did a review
18  of those documents to look for documents
19  that were pertinent to the valuation.  We
20  both went through those together, looking
21  for relevant docs.
22          We then -- once we found the
23  information we needed, we prepared the
24  document collaboratively.  I would have a
25  hard time telling you with bright line

Page 11

Jeffrey Hasterok

1
2  certainty that I prepared this paragraph
3  myself and Dan prepared that paragraph
4  himself.
5          Certainly, I would say that I
6  did things like the spreadsheet where --
7  that generated the termination amounts, the
8  formulas in that spreadsheet.
9          Dan, however, looked at it,
10  reviewed it, signed off on the results of
11  it.  So we -- you know, we both read the --
12  we both read the reserve fund agreements.
13  We both read through the discovery.
14      Q   Now, there is a particular
15  approach that the two of you used in
16  providing an opinion as to what you believe
17  the early termination amount should be,
18  correct?
19      A   Yes.
20      Q   In part, you created this grid
21  off investments which resulted in various
22  numbers.  And you picked a particular
23  number, and you opine that that's the
24  number, correct?
25      A   Correct.

Page 12

Jeffrey Hasterok

1
2      Q   Prior to this engagement, had
3  you ever done that in any other matter?
4      A   Well, as I said before, the
5  only -- the only other -- I think he's
6  opining, too -- the only other report that
7  I prepared, helped prepare was the one for
8  New York.
9      Q   Putting aside the New York
10  State report, other than the report in this
11  case, have you ever done anything like that
12  before?
13          MR. LAWRENCE:  You are talking
14  about calculating the termination
15  value for any type of contract?
16          MR. TAMBE:  No, no.
17          MR. LAWRENCE:  Okay.  Then I
18  don't --
19          MR. TAMBE:  It's quite
20  specific.  Go back to the question I
21  asked, please.
22          MR. LAWRENCE:  I object to the
23  form because I don't think the word
24  "that" is specific at all.
25          (Reporter read back pending

3 (Pages 9 to 12)

Page 13

Jeffrey Hasterok

1       Jeffrey Hasterok
2  question:
3       QUESTION:  "Putting aside the
4  New York State report, other than the
5  report in this case, have you ever
6  done anything like that before?")
7       MR. LAWRENCE:  Object to the
8  term "that" as vague.
9     Q    And the "that" I'm referring
10 to, sir, is putting together a grid of
11 possible values and selecting a particular
12 value and saying that is the value that
13 should be attributed.
14      Have you ever done that
15 exercise other than in this matter or New
16 York State?
17    A    Right.  As I sit here today, I
18 can't recall doing something like that.
19    Q    So whose decision was it
20 between you and Mr. Curry to use that
21 approach?
22    A    I don't recall it being one or
23 the other.  I can't recall if it was my
24 idea or his to lay out a grid.  I don't
25 remember.

Page 14

Jeffrey Hasterok

1       Jeffrey Hasterok
2     Q    So at some point in your
3  discussions with Mr. Curry, a grid
4  emanated, but you can't tell me whose idea
5  it was to use that grid?
6     A    Correct.
7     Q    Okay.  How about picking a
8  particular line from that grid as the
9  number that you were going to use?  Whose
10 idea was that?
11    A    That was both of our ideas.
12    Q    So describe for me the process
13 where both of you came up with the idea
14 that you would use a particular line from
15 that grid.
16    A    Sure, we were trying to decide
17 what are the reasonable alternatives that
18 Washington could pursue with the funds made
19 available to them because of Lehman's
20 failure to deliver under the RFA -- the RFA
21 is the "reserve fund agreement."
22      Is it okay if I use "RFA"
23 instead of saying "reserve fund agreement"
24 going forward; is that okay?
25    Q    "RFA" is fine.

Page 15

Jeffrey Hasterok

1       Jeffrey Hasterok
2     A    So we were trying to come up
3  with reasonable alternatives that they
4  could do in reinvesting those funds.  So we
5  thought that the different line items in
6  the matrix or grid were reasonable choices.
7       Once we had selected a bunch of
8  reasonable choices, the two of us had to
9  sit down and decide, of those reasonable
10 choices, which one did we think was the
11 most appropriate to use.
12    Q    Okay.
13    A    And we settled on the one that
14 generated the 37 and a half million
15 termination.
16    Q    That process that you and
17 Mr. Curry went through of sitting down with
18 the grid and picking one of the lines as
19 the one that you would choose, did you
20 consult with anyone else about that
21 process?
22    A    No.
23    Q    Okay.  Did you review --
24    A    Outside of Pacifica.
25 Certainly, we would have talked to Pacifica

Page 16

Jeffrey Hasterok

1       Jeffrey Hasterok
2  about what we were doing and our approach
3  as we were going through the report.
4     Q    And you don't consider Pacifica
5  to be experts in valuation of RFAs; do you?
6     A    Unfortunately, not.
7       THE WITNESS:  I apologize if
8  you feel now as an expert in valuing
9  RFAs.
10      MR. LAWRENCE:  I probably know
11 more about them than I certainly did
12 at the beginning of this case.
13    Q    Just to be clear, you don't
14 consider them or view them as experts in
15 the valuation of RFAs?
16    A    That's correct.
17    Q    Or forward purchase agreements,
18 correct?
19    A    That's correct.
20    Q    Or forward delivery agreements?
21    A    Correct.
22    Q    So other than whatever
23 conversations you may have had with
24 Pacifica, did you consult with anyone else
25 in your process of going from the grid to a

4 (Pages 13 to 16)

Page 17

Jeffrey Hasterok

1 particular number?
2    A   No.
3    Q   Did you speak to Mr. Shapiro
4 about that?
5    A   We were introduced to Pacifica
6 via Mr. Shapiro. Dan -- Mr. Curry has
7 known Peter Shapiro longer than I have. I
8 think the number is something like 18 or
9 20 years Dan has known Peter.
10    I have dealt -- I used to deal
11 with Peter on occasion in my role at Morgan
12 Stanley. I would say I didn't deal with
13 Peter a ton, a lot, because of -- just his
14 client base was slightly different than
15 mine. But, certainly, I would talk to
16 Peter every now and then.
17    To my knowledge, Peter knew
18 that Washington was looking for another
19 valuation expert to help prepare a report,
20 and Peter knew that Dan and I were
21 available and recommended us to Pacifica
22 and Washington.
23    But once we got to the point
24 where we were contracted by Pacifica, we

Page 18

Jeffrey Hasterok

1 did not talk to Peter about how we
2 were coming up with our number. We did not
3 use him as a -- as a reference or somebody
4 to bounce ideas off of as we were preparing
5 the report.
6    His role was introducing us to
7 Washington and Pacifica; and at that point,
8 we did not discuss the matter with him.
9    Q   Is there a particular reason
10 why you didn't discuss the matter with him?
11    A   He was not engaged under the
12 contract we have with Pacifica.
13    Q   Are you aware that Mr. Shapiro
14 had done a valuation off of the same RFA
15 that you had been asked to value?
16    A   I am aware, and I believe Dan
17 is, too. But I am aware that Swap
18 Financial was engaged to do a valuation. I
19 don't know. I don't know if Peter himself
20 did the actual number calculations, but his
21 firm was engaged to do it.
22    Q   And have you seen the valuation
23 or valuations done by Swap Financial Group
24 of the same RFA that you were asked to

Page 19

Jeffrey Hasterok

1 value?
2    A   Yes.
3    Q   And do you have any opinions as
4 to those valuations?
5    A   We were not engaged to provide
6 an opinion about Peter's opinion if that
7 makes sense.
8    Q   I thought you said it was Swap
9 Financial Group's opinion?
10    A   Sorry. I apologize. You are
11 correct. Swap Financial, I tend to use
12 "Swap Financial" and "Peter Shapiro"
13 interchangeably because Peter is the
14 founder of Swap Financial, and it's a
15 relatively small firm.
16    Q   So do I.
17    A   Right.
18    Q   I just made the correction
19 because you had made the correction
20 earlier.
21    A   Yeah, no, I'm sorry. I would
22 say when I say -- when I say "Peter," I
23 really mean Swap Financial. And when I say
24 "Swap Financial," I mean Peter. I wouldn't

Page 20

Jeffrey Hasterok

1 get into that kind of granularity if I am
2 talking about the other employees of Swap
3 Financial.
4    But we knew about and read the
5 mediation statements, the report that he
6 filed -- I believe it's in the public
7 docket, one of the supporting dockets that
8 Peter -- I keep doing it -- one of the
9 supporting dockets that Swap Financial
10 filed included his method, their method.
11    But we tried to come at the
12 issue from a clean slate.
13    Q   So as you sit here, have you
14 formed any opinions about the Swap
15 Financial Group analysis that you have
16 reviewed?
17    A   I would say that one issue we
18 had is that we think that the Swap
19 Financial number -- one of the underlying
20 assumptions in that method relies on
21 using -- the first step is using the swap
22 curve, the LIBOR swap curve, US dollar
23 LIBOR swap curve, as the starting point for
24 the valuation.

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Jeffrey Hasterok

1
2   And one of the key elements
3  that Dan and I are putting forth in our
4  report is that we don't think that that is
5  the most appropriate way to do it because
6  the client Washington TSA cannot actually
7  enter into that trade.
8   They cannot transact in a
9  long-dated interest rate swap that mimics
10  the economics they had under the RFA.
11   And so that basic building
12  block of that approach -- because we didn't
13  think that that was the most appropriate
14  way to do it, we didn't really go down that
15  road in calculating a number using that
16  method.
17   Q   Okay.  Other than Swap
18  Financial's use of a forward swap, can you
19  remember -- do you have any other opinions
20  about the Swap Financial analysis that you
21  have reviewed?
22   A   I would say that we prepared
23  our valuation estimate to the best of our
24  ability and used the models that we thought
25  were most appropriate in this case.

Jeffrey Hasterok

1
2   Q   My question is a little
3  different and a little bit more specific
4  than that.
5   Other than Swap Financial's use
6  of a forward swap curve, do you have any
7  other opinions about the Swap Financial
8  analysis that you have reviewed?
9   A   Not as I sit here today.
10   Q   Are you currently working on
11  any analysis off the Swap Financial
12  methodology?
13   A   I am not.
14   Q   Has Mr. Shapiro expressed to
15  you any views that he has about your
16  methodology?
17   A   No.
18   Q   As you did your analysis and
19  did your work, did you share any of your
20  work product with Mr. Shapiro either orally
21  or in writing in any way?
22   A   No.  Not to my knowledge.
23   Q   Do you know whether Mr. Shapiro
24  has seen your expert report?
25   A   I do not know.

Jeffrey Hasterok

1
2   Q   Going back to Swap Financial
3  Group's use of the forward swap curve,
4  based on your report, would it be fair to
5  conclude that you believe it is wrong to
6  use the forward swap curve to calculate
7  Washington TSA's termination amount?
8   MR. LAWRENCE:  Object to the
9  form.  Go ahead and answer it.
10   A   Okay.
11   MR. LAWRENCE:  If you can.
12   A   Sure, I would say -- I would
13  say that the demise of Lehman Brothers and
14  the bankruptcy of Lehman Brothers created
15  an unfortunate scenario where the market
16  for these products essentially evaporated.
17   And when I say "these
18  products," I mean replacements for purchase
19  agreements, forward delivery agreements,
20  RFAs.  Exact replacements for this product
21  that probably existed back in the early
22  2000s, that market essentially ceased to
23  exist.
24   And, therefore, it became more
25  difficult to calculate termination amounts

Jeffrey Hasterok

1
2  given the collapse of the market.
3   I would say that there are
4  multiple ways to come up with a number in
5  valuating -- evaluating this financial
6  contract.  And we viewed the ones that we
7  put in our report as the most reasonable --
8  using the forward swap curve is a way of
9  evaluating the price.
10   But given that we didn't select
11  it as our method, we would -- I would -- I
12  don't think it's unfair to say we believe
13  that our method -- in our opinion as expert
14  witnesses, believe that our method is more
15  appropriate.
16   Q   Are you expressing an opinion
17  in this case that the demise of Lehman
18  Brothers was responsible for the market for
19  the various forward purchase agreements
20  basically being destroyed, that Lehman was
21  the source of that?
22   And just to be clear, is that
23  an opinion you are expressing in this case?
24   A   Sure.  I would say that --
25   MR. LAWRENCE:  I am going to

Page 25

Jeffrey Hasterok

1  object to the form of the question on
2  that.
3  MR. TAMBE:  You can object.
4  Q    Go ahead.
5  A    I would say that the demise of
6  Lehman Brothers was part of it.  There were
7  other factors such as the collapse of the
8  housing market.  The -- if you read in the
9  financial press, I guess they call it the
10  "financial crisis" -- but over-leverage in
11  the financial system, the bankruptcy of
12  Lehman Brothers.
13  Is the demise of Lehman
14  Brothers, the bankruptcy of Lehman
15  Brothers, the single factor that caused the
16  FPA, FDA, RFA markets to vanish?  No, it's
17  not a single factor.  It's an important
18  one, but it's not the single factor.
19  Q    Did you do any kind of analysis
20  to determine what were the factors that
21  resulted in the demise of the FDA -- FDA,
22  RFA markets?
23  A    If I recall, we spoke to it in
24  the report about why we believed there were

Page 26

Jeffrey Hasterok

1  no replacement providers willing to take on
2  a replacement RFA, which included things
3  like banks -- sorry -- not just banks, but
4  former financial providers that used to do
5  this product believed that it was less
6  attractive as a business line.
7  Capital charges, credit
8  charges, funding charges, things like that
9  became more onerous.  And it looks -- it
10  appears like the provider universe made
11  business decisions that said:
12  "This business is not as
13  attractive as it needs to be, and therefore
14  we are not going to do it anymore."
15  Q    Would you also agree with me
16  that there are regulatory changes that
17  might make this business less attractive
18  from the bank's perspective than it was
19  pre-financial crisis?
20  A    Yes, I would agree with that.
21  I apologize.  I can't quote you -- I can't
22  quote you the line items from Dodd Frank
23  that would support that thesis.  But, in
24  general, if you read the Wall Street

Page 27

Jeffrey Hasterok

1  Journal, they will say things like
2  "financial regulation reform."
3  But they rarely actually quote
4  a specific line item from Dodd Frank; but,
5  yes, I agree with you.
6  Q    So putting aside -- again, we
7  will go back to your opinions about the
8  demise of the FPA, RFA markets.  I believe
9  you said that the use of the forward curve
10  remains a way in which forward contracts
11  can be valued; is that fair?
12  A    Yes.
13  Q    Okay.  It's just -- in your
14  opinion, your way is better than using a
15  forward curve; is that correct?
16  A    Yes.
17  Q    Is it fair to say that, in all
18  of your years at Morgan Stanley, you
19  routinely used forward curves of every
20  shape and size to value Morgan Stanley's
21  positions?
22  A    We absolutely did.
23  Q    And so did Mr. Curry, correct?
24  A    Yes, he did.  Yes, he did.  He

Page 28

Jeffrey Hasterok

1  and I had absolutely different roles.  We
2  sat on the same desk.  We sat a few feet
3  away from each other, but we had slightly
4  different roles.
5  Q    At any time -- how long were
6  you at Morgan Stanley?
7  A    Let's see, 11 years.
8  Q    11 years.  In your 11 years at
9  Morgan Stanley, did you ever mark your
10  positions at Morgan Stanley or value the
11  positions of Morgan Stanley on a basis
12  where you rejected the use of the forward
13  curve?
14  A    I wasn't a trader, so I didn't
15  mark any positions.  That's not a role of a
16  marketer.  I would calculate termination
17  values and new trade values and work with
18  the traders to put risk on or off of the
19  books.  But to be precise about what my
20  role was, I wasn't a trader.
21  But we absolutely used swap --
22  LIBOR swap curves, credit curves when
23  pricing new trades and the termination of
24  old trades.

7 (Pages 25 to 28)

Page 29

Jeffrey Hasterok

1
2    Q    And in those exercises that you
3  did in your 11 years at Morgan Stanley, did
4  you ever say to the customer or a trader or
5  to anyone that the use of the forward curve
6  was not a proper way of valuing a
7  particular position?
8    A    Not to my knowledge.
9    Q    To your knowledge, has
10  Mr. Curry ever written or spoken to the
11  effect that the use of the forward curve is
12  inappropriate to value forward delivery
13  agreements other than this report in this
14  case?
15    A    I doubt it, but you can ask him
16  yourself tomorrow.
17    Q    Sure will.
18          As far as you know, he never
19  expressed that view other than in this
20  case?
21    A    Correct.
22    Q    Okay.  Why did you use the
23  forward curve to do the valuations that you
24  did when you were at Morgan Stanley?
25    A    Because, as a dealer in the

Page 30

Jeffrey Hasterok

1
2  relevant markets we are talking about, and
3  in this case, forward purchase agreements,
4  forward delivery agreements with
5  municipal or municipal type clients -- TSA
6  is a bit of an anomaly, in that, although
7  it's a public entity, the issue -- the
8  bonds -- and entered into the RFA -- the
9  transaction itself is a little bit more
10  similar to an asset-backed transaction.  So
11  it kind of lives in both worlds.
12          As a dealer that is a going
13  concern as Morgan Stanley is and was,
14  generally, we would price things on what's
15  called our side of the market.  Okay.  And
16  that's shorthand for another way of kind of
17  saying "bid/ask."
18          Okay.  And the way to
19  understand that is, if you go to a dealer
20  and you want to buy a share of Microsoft
21  stock, the dealer is going to say:
22          "I will sell it to you at $50,
23  but I, the dealer, don't want to buy it at
24  $50.  I want to buy it at $49."
25          So the dealer is buying it at a

Page 31

Jeffrey Hasterok

1
2  lower price and selling it at a higher
3  price, if that makes sense.  That's one way
4  of running a business, making money.
5          When we priced forward
6  purchase, forward delivery RFA type trades,
7  we absolutely used the swap curve, the
8  LIBOR -- in our case, US dollar only, I
9  don't recall ever looking at a foreign
10  concern denominated trade.
11          We used the US dollar LIBOR
12  swap curve as the starting point for
13  valuing --
14          (There was a discussion off the
15    record.)
16    A    I'm sorry.  I apologize.  I'm
17  sorry I went too fast.
18          We used the US dollar LIBOR,
19  L-I-B-O-R, LIBOR swap curve.
20          Sorry if I -- I apologize if I
21  am going too fast; kick me -- kick me if I
22  am going too fast.
23          The LIBOR swap curve as the
24  basis and the starting point of these
25  trades.

Page 32

Jeffrey Hasterok

1
2          Now, correct me if I'm wrong,
3  but you asked why.  Why did we use that?
4  Is that -- is that correct?  You want why
5  did we use it.  Why are we using LIBOR?
6    Q    Correct.
7    A    The LIBOR market, the LIBOR
8  swap market is one of the most liquid and
9  deep interest rate hedging tools available.
10          Okay.  So one of the risks you
11  take on as a dealer in these products in
12  delivering and -- sorry -- in providing
13  FPAs and RFAs is you are taking the risk of
14  interest rate risk.
15          You are taking the risk that
16  you are paying a given fixed rate of
17  return.  And then you are taking the risk
18  that, over time, rates change, and the rate
19  at which you are paying on the RFA is no
20  longer a market rate anymore.  It's too
21  high or too low.
22          And, generally speaking,
23  providers like Morgan Stanley will try to
24  hedge out of a bunch of those risks.
25          One way they can do that is,

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 33

```
 1          Jeffrey Hasterok
 2  for example, if you're paying a fixed rate
 3  on an RFA, you might go into the swap
 4  market and receive fixed from the swap
 5  market.  To help offset the fact that you
 6  are paying a fixed rate on the RFA, you
 7  will receive a fixed rate in the swap
 8  market.
 9          So because you have a known
10  input, your hedge costs -- your LIBOR swap
11  market is one of your inputs, your hedge
12  costs -- you can then use that as the basis
13  for providing prices for the RFAs.
14          The major difference why that
15  makes sense for a dealer is, again, the
16  dealer can execute the trade.  The dealer
17  can do it.  He can -- the dealer can go
18  into the market and actually pay or receive
19  in the swap market in a very liquid
20  fashion.  It's easy to get in and out of.
21          And when you are expressing a
22  price as a dealer, you are showing a price
23  that makes sense to you as the dealer.
24          You are going to show a price
25  that you believe is a profitable level.
```

Page 34

```
 1          Jeffrey Hasterok
 2  You are not going to pay a rate of interest
 3  that loses money.  Why would you do that?
 4  If you do that continually, you will be out
 5  of business.
 6          So you are doing your best to
 7  try to show a price that induces the client
 8  to enter into the transaction, but at the
 9  same time is profitable for you.
10          So that is a way of saying it's
11  on the dealer side of the market.  It's a
12  level at which it makes sense to the
13  dealer, is profitable to the dealer, both
14  entering into new transactions and exiting
15  transactions.
16          We certainly would have people
17  call and say for whatever reason:
18          "We need to terminate such and
19  such trade.  What's your price?"
20          And we would show a price that,
21  again, which makes sense to the dealer
22  because it's our side of the market.  The
23  other client, the other -- the client
24  asking for a termination price is the
25  burdened party, if you will.
```

Page 35

```
 1          Jeffrey Hasterok
 2          So they have to essentially
 3  accept our price.  And if you don't -- if
 4  they don't like it -- we can go through the
 5  quote process, and a lot of docs have
 6  delineated how that works.
 7          But in this case, in the case
 8  of TSA, we didn't feel using that
 9  methodology -- that exact same methodology
10  that I would have used if I was sitting in
11  my seat at Morgan Stanley, was as
12  appropriate because it was on TSA's side of
13  the market, in our opinion, not the
14  dealer's side of the market.
15          And, therefore, it called for a
16  different methodology of pricing the
17  termination model.
18      Q    If I understood the last part
19  of what you were saying, is it fair to say
20  that, if you were valuing this contract,
21  not from the TSA's perspective, but from
22  the dealer's perspective, you would have
23  used a different methodology?
24      A    Probably.  Sure.
25      Q    You would have more likely used
```

Page 36

```
 1          Jeffrey Hasterok
 2  your forward curve methodology?
 3      A    Well, let -- let's assume that
 4  TSA was facing Morgan Stanley, not Lehman
 5  Brothers.  And Morgan Stanley is still --
 6  let's remove Morgan Stanley.  Just say a
 7  dealer, a going-concern dealer that's still
 8  in the market that has the trade on that
 9  has not defaulted, that has not -- there
10  has not been a termination of some kind
11  that the dealer has generated.
12          And if TSA just contacted the
13  dealer and said, "I want to terminate this
14  trade," then, yes, they would probably use
15  the swap curve as a starting point for
16  calculating a termination amount,
17  absolutely.
18          But, again, in that case,
19  that's a different set of facts than what
20  we have here.  In that hypothetical
21  scenario, that's TSA coming to the dealer
22  and asking for a termination; so,
23  therefore, the termination price is going
24  to be reflective of the dealer's side of
25  the market, not TSA's side of the market.
```

9 (Pages 33 to 36)

Page 37

1          Jeffrey Hasterok
2     Q    Okay.  I want to go back to the
3  question I had asked a couple of answers
4  ago about why you used the forward curve
5  when you were at Morgan Stanley.  And you
6  provided an answer talking about the dealer
7  side of the market and the use of the swap
8  curve, et cetera.
9          Putting aside the municipal
10  desk, you are aware, are you not, that
11  Morgan Stanley and other dealers use
12  forward curves, not only with
13  municipalities, but when they are dealing
14  with all sorts of financial problems?
15     A    Absolutely.
16     Q    In fact, in any long-dated
17  financial product, whether it be a swap or
18  some other type of long-dated contract, the
19  use of the forward curve is widely
20  accepted, correct?
21     A    Yes, I agree with that.
22     Q    It's the norm?
23     A    Yes.
24     Q    And it's not just a valuation
25  exercise.  Banks are making investment

Page 38

1          Jeffrey Hasterok
2  decisions and trading decisions based on
3  the forward curves, correct?
4     A    Sure.
5     Q    In fact, the P&L of your desk
6  depended on how well you understood and
7  used forward curves in pricing
8  transactions, correct?
9     A    In part.  Yes.
10     Q    Now, one other thing you said
11  was you described the LIBOR swap curve --
12  correct me if I get this wrong -- I think
13  you used the words, "most liquid and deep."
14          And I guess there you were
15  describing the market for LIBOR
16  transactions and LIBOR swaps?
17     A    Yeah, let's get -- it's a
18  technicality, just so we are on the same
19  page.
20          When I say the "vanilla LIBOR
21  swap market" or the "LIBOR swap market," I
22  am referring to one party, one party to a
23  derivative contract paying or receiving a
24  fixed rate and the other party paying or
25  receiving a floating rate, and, in this

Page 39

1          Jeffrey Hasterok
2  case, typically, three-month LIBOR.
3          You can go to financial news
4  services like the Wall Street Journal or
5  Bloomberg, and you can -- or
6  Thompson-Reuters, things like that, and you
7  can see quotes for paying or receiving a
8  fixed rate for one year, two years, five,
9  ten -- you know, I think the typical quote
10  goes out every year out to about 30 years.
11          And it means that, if you are a
12  dealer or a large sophisticated financial
13  institution, for example, a PimCo, a Black
14  Rock, an Allstate, something like that,
15  that has existing ISDA docs in place -- and
16  "ISDA" is spelled I-S-D-A -- that's just an
17  agreement between the -- between dealers or
18  agreement between dealers and clients that
19  describes how to -- how to enter into and
20  how to book and how to value and terminate
21  derivative transactions.
22          Assuming you are a dealer
23  and/or a sophisticated financial
24  institution, an eligible contract
25  participant, you can pay or receive a fixed

Page 40

1          Jeffrey Hasterok
2  rate almost anywhere on that curve in large
3  amounts almost 24 hours a day.
4          And so that liquidity is
5  important.  As somebody in a dealer seat
6  providing things like RFAs, you know that
7  almost at any given moment you can hedge
8  out that part of your book of risks.  You
9  can -- you feel extremely confident that,
10  I, sitting in a dealer's seat, can say:
11          "I can contact my LIBOR swap
12  desk and pay or receive fixed anywhere up
13  and down the interest rate curve in almost
14  any size."
15          And that's not true in many,
16  many markets.
17     Q    All right.  So when you talk
18  about the liquidity and depth, are there
19  particular measures of liquidity and depth
20  that you believe are relevant?
21     A    Yes, there are -- there are
22  ways -- and I am a little bit out of my --
23  out of my shoes a little bit here because I
24  am not an equity guy.
25          But I believe there are ways of

10  (Pages 37 to 40)

Elisa Dreier Reporting Corp.      (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 41

Jeffrey Hasterok

1      Jeffrey Hasterok
2  calculating liquidity and equities.  For
3  example, you can show daily average
4  transaction volume versus the number of
5  shares that are outstanding, number of
6  transactions, size of the average
7  transaction.
8      There are -- there are various
9  ways you measure liquidity.  I don't know
10  of a bright line test way of measuring
11  liquidity.
12    Q    Do you believe yourself to be
13  an expert in defining liquidity and depth
14  of markets for financial products?
15    A    No, I wouldn't describe myself
16  as that kind of expert.
17    Q    Have you conducted any kind of
18  analysis or study of the liquidity and
19  depth of the financial markets for
20  government debt instruments?
21    A    No.
22    Q    Do you have an opinion as to
23  the liquidity or depth of the market for
24  United States Treasury obligations?
25    A    Yes, I believe that US

Page 42

1      Jeffrey Hasterok
2  Treasuries are also an extremely deep and
3  liquid interest rate market.
4    Q    Do you have an opinion as to
5  the liquidity or depth of the market for
6  United States obligations?
7      MR. LAWRENCE:  Object to the
8  form.
9    A    I'm sorry.  I think I don't
10  understand "obligations."  Social security,
11  I guess, is an obligation of the
12  United States.
13    Q    You are familiar with the
14  phrase "agency securities," correct?
15    A    Yes.
16    Q    And what do you understand
17  "agency securities" to be?
18    A    That's a good question.  You
19  are going to get different answers
20  depending on who you ask.
21    Q    I am asking you.  You are the
22  one under oath.
23    A    I understand.  I understand.
24      One of the -- one of the roles
25  I played at Morgan Stanley was working on

Page 43

1      Jeffrey Hasterok
2  things like repurchase transactions, in
3  addition to forward purchase agreements and
4  things like that.
5      So, certainly, one of the
6  things we thought about and looked at were
7  the obligations of issuers like Fannie Mae,
8  Freddie Mac, Ginnie Mae.  Fannie and
9  Freddie went into conservatorship, in --
10  boy, I don't remember -- '09, something
11  like that.  I apologize.  I don't remember
12  off the top of my head.
13      But I don't recall looking
14  through the legal documentation around the
15  conservatorship process, whether you can
16  now consider the debt of Fannie and Freddie
17  an obligation of the United States.  I
18  apologize.  I just don't know.
19      But to my knowledge,
20  mortgage-backed obligations and debt
21  obligations of Fannie and Freddie are --
22  they are referred to as "agencies."  But I
23  think you get into a definitional issue of
24  what's an "agency."
25      Does that mean you are a direct

Page 44

1      Jeffrey Hasterok
2  arm of the United States Government and
3  your debt obligations and guarantees are
4  guaranteed by the United States Government?
5  I mean, that's one way you could define an
6  "agency."
7      But in a -- in an offhand way
8  of describing "agencies," yes, Fannie and
9  Freddie and Ginnie are usually viewed as
10  the "agencies."  There are certainly a
11  bunch of other agencies.  But those three,
12  to my knowledge, are the ones that usually
13  see their debt referred to as for tradeable
14  instruments.
15    Q    And with respect to those
16  tradeable instruments, the debt securities
17  issued by Fannie and Freddie and Ginnie, do
18  you have an opinion as to the liquidity or
19  depth of the markets for those securities?
20    A    To my knowledge, they were
21  viewed as relatively deep, relatively
22  liquid, but viewed as a step below depth
23  and liquidity compared to Treasuries,
24  United States Treasuries.
25    Q    Are you generally familiar with

11  (Pages 41 to 44)

Page 45

```
 1          Jeffrey Hasterok
 2   the use of the LIBOR swap curve being used
 3   as a basis to price forward curves for
 4   other securities as a spread to LIBOR, for
 5   example?
 6       A    Could you rephrase that?  I am
 7   struggling with how to answer that.
 8       Q    So we will take it in pieces.
 9       A    Okay.
10       Q    Does the phrase "spread to
11   LIBOR" have any meaning to you?
12       A    Yes.
13       Q    What does it mean to you?
14       A    It means a couple -- it could
15   mean a couple of things.
16          When I hear "spread to LIBOR,"
17   that could mean something like a particular
18   tradeable instrument, maybe a corporate
19   bond, for example, maybe a 5- or a 10-year
20   corporate bond, is trading at a positive or
21   negative spread to the LIBOR swap curve.
22          So if a corporate bond is
23   trading at 5 percent, and the same maturity
24   swap is trading at 4 percent, you might say
25   that that bond is trading at LIBOR plus
```

Page 46

```
 1          Jeffrey Hasterok
 2   100.
 3          Okay.  So it could mean spread
 4   to LIBOR in that sense.  It could mean a
 5   basis swap market, which does exist.  And
 6   there are things like -- you can enter into
 7   transactions in the derivative world where
 8   you pay or receive floating LIBOR,
 9   one-month LIBOR, three-month LIBOR,
10   six-month, whatever.
11          You pay or receive some version
12   of floating LIBOR, and then you pay or
13   receive some other floating rate of
14   interest -- could be T bills, could be
15   prime, could be commercial paper, could be
16   other LIBOR.
17          You can do a basis swap between
18   one-month LIBOR and three-month LIBOR, for
19   example.
20          So "spread to LIBOR" could mean
21   something like that, too, a basis swap.
22       Q    And are you familiar with the
23   use of a LIBOR swap curve for pricing or
24   valuing other forward curves?
25       A    Yes, I believe that LIBOR swaps
```

Page 47

```
 1          Jeffrey Hasterok
 2   are an input into the formula.  For
 3   example, in calculating credit default
 4   swaps, I believe that LIBOR is one of the
 5   inputs.
 6       Q    And when you use the LIBOR
 7   curve in that manner, you are using a view
 8   of a historical relationship between the
 9   LIBOR rate and this other rate or the
10   expected future relationship between the
11   LIBOR rate and this future rate, correct?
12       A    Let's be -- let's be more
13   specific.
14          So when you are using LIBOR
15   swap rates, which is different than LIBOR
16   itself, they are not the same thing.  They
17   are related, but they are not the same
18   thing, one-month LIBOR, three-month LIBOR,
19   six-month LIBOR, the actual reset itself,
20   which you get from the British Bankers
21   Association -- they reset it every business
22   day -- that input, that number, that -- the
23   LIBOR reset is a different number than the
24   LIBOR swap curve.  Okay.  They are separate
25   entities.
```

Page 48

```
 1          Jeffrey Hasterok
 2          The LIBOR swap curve is
 3   referenced directly because dealers will
 4   quote LIBOR swap rates up and down the
 5   curve.  A dealer generally doesn't quote
 6   you -- "I'll make a market in one-month
 7   LIBOR."  They don't do that.
 8          They will make a quote.  They
 9   will make a market in ten-year LIBOR swaps.
10   And if you enter into that transaction with
11   a dealer, you are going to pay or receive a
12   fixed rate, and you are going to pay or
13   receive a floating rated of interest that
14   is probably three-month LIBOR.
15          But there is a differentiation
16   that sometimes people miss, that the actual
17   reset itself that the British Bankers
18   Association quotes is not the same thing as
19   the swap curve that the dealers quote.
20       Q    Does that make sense?
21       Q    I'm not sure if it does.  I'm
22   not sure if it answers my question.
23       A    Okay.
24       Q    Let's go back to the question I
25   had asked.  If you don't understand my
```

12  (Pages 45 to 48)

Page 49

1      Jeffrey Hasterok
2  question, tell me that.
3      A    I'm sorry if I am not getting
4  it. I'm sorry.
5          (Reporter read back pending
6  question:
7          QUESTION:  "And when you use
8      the LIBOR curve in that manner, you
9      are using a view of a historical
10     relationship between the LIBOR rate
11     and this other rate or the expected
12     future relationship between the LIBOR
13     rate and this future rate, correct?")
14     A    I would say, when you use the
15 LIBOR swap curve as an input, you are --
16 you are using the current market's view of
17 where they are willing to buy or --
18 sorry -- where they are willing to pay or
19 receive fixed or floating, depending on
20 which way they are going, in the LIBOR swap
21 market.
22          The historical path of
23 three-month LIBOR, one-month LIBOR, and the
24 historical path of the swap rates
25 themselves -- which, again, are

Page 50

1      Jeffrey Hasterok
2  different -- you can show time series data
3  and the path of how ten-year swap rates
4  have moved over however many years.  You
5  can show a path of where one- and
6  three-month LIBOR has gone, for example.
7          And, certainly, the dealers
8  that quote those markets take into account
9  what the past has done.  They also
10 certainly take into account their future
11 expectations of things like monetary
12 policy, inflation expectations, the health
13 of the Treasury market.  There are multiple
14 inputs into how they come up with a price.
15         So, yes, the LIBOR swap market
16 rates -- that number is a reflection of
17 both past history and future expectations.
18 And then once you get to that point, you
19 can then compare that market, the LIBOR
20 swap market, to whatever other financial
21 instrument you might want to compare it to.
22         So you might want to compare it
23 to a corporate bond, a Treasury, building
24 a -- building a stadium.  I mean, you can
25 view it any -- any investment, any

Page 51

1      Jeffrey Hasterok
2  financial instrument, any NPV, IRR
3  calculation you want -- you can use it as a
4  comparison basis point if you want.
5      Q    Just to be clear, not only can
6  you use it; you are aware that traders and
7  marketers in the financial industry use the
8  LIBOR swap curve in those matters?
9      A    Absolutely, they do, because
10 they are part of a dealer and/or a
11 sophisticated financial institution that is
12 and continues to be a going concern, which
13 is an underlying assumption that is
14 critical to why you would use those
15 markets.
16     Q    And just because Lehman ceased
17 to exist after September of 2008, the
18 financial markets didn't cease to exist.
19 Dealers continued to exist and conduct
20 business and conduct transactions in LIBOR
21 and Treasuries and agencies, correct?
22     A    That is correct.
23         MR. TAMBE:  Let's go ahead and
24 mark Lehman 30, please.
25         MR. LAWRENCE:  Is this a good

Page 52

1      Jeffrey Hasterok
2  time to take a short break?
3          MR. TAMBE:  Yes, we can take a
4  short break before we get into the
5  report.  That's fine.
6          (A break is taken.)
7          (Exhibit No. Lehman 30,
8      12/16/13 Expert Valuation Report, is
9      marked by the reporter for
10     identification.)
11     Q    Sir, I have placed before you a
12 document marked Lehman Exhibit 30.  Do you
13 recognize this as the valuation report that
14 you have prepared with Mr. Curry?
15     A    This looks to be it.  I am
16 assuming it's the same document I -- Dan
17 and I forwarded to Pacifica.  So assuming
18 it's that same document, then, yes, it
19 looks familiar.
20     Q    And yours has -- it's a color
21 copy, right?
22     A    Yes.  Yes.
23     Q    That may be relevant for one or
24 two pages of this document, but I want to
25 make sure you have a color copy.

13 (Pages 49 to 52)

Page 53

Jeffrey Hasterok

1
2       A    Right.  Some of the charts are
3   in color, and that's relevant.
4       Q    I believe this has a date on
5   the first page of December 16, 2013.  Do
6   you see that?
7       A    Correct.
8       Q    Have you made any edits or
9   revisions to this report since the date of
10  December 16, 2013?
11      A    We have not.
12      Q    Any corrections?
13      A    Not to my knowledge.
14      Q    We are going to ask you some
15  questions about this report and maybe look
16  at some of the documents along the way.
17  But let's start with your retention by
18  Pacifica Group.
19          When were you first engaged by
20  Pacifica Group?
21      A    June, maybe.
22          MR. LAWRENCE:  I can't answer
23      the question.  Only you can answer the
24      questions.
25      A    I don't remember.

Page 54

Jeffrey Hasterok

1
2          I am happy to go home and look
3   through my E-Mails, but summer.  I
4   apologize.  I don't have the exact date,
5   something in the summer.
6       Q    Can you get four and five,
7   please.
8          (There was a discussion off the
9      record.)
10      A    I mean our -- we signed an
11  engagement letter with Pacifica, which
12  would be dated.
13      Q    So that's what we are going to
14  go to next.
15          (Exhibit No. Lehman 31,
16      Pacifica and Expert Engagement Letter,
17      is marked by the reporter for
18      identification.)
19      A    I should not -- cannot write on
20  these.
21      Q    No, you cannot write on them.
22      A    Just double checking.
23      Q    If you feel the need to write,
24  I can give you another copy of the marked
25  exhibit, and you can write on that.

Page 55

Jeffrey Hasterok

1
2       A    I just want to make sure I
3   don't screw up an exhibit.  Okay.
4          September.  Okay.
5       Q    So looking at Exhibit 31,
6   that's a consulting agreement that you
7   signed with Pacifica, correct?
8       A    Yes.
9       Q    All right.  And that has a
10  date -- I believe you looked at
11  page three -- of the 23rd of September; is
12  that correct?
13      A    Okay.  So September is when
14  we -- I apologize.  I didn't
15  exactly remember when we were engaged, when
16  we started talking about it.
17      Q    Let's get to that, right.
18      A    Okay.
19      Q    Is it your recollection that
20  you had any substantive discussions about
21  this matter before the date on Exhibit 31,
22  before September 23, 2013?
23          MR. LAWRENCE:  Object to the
24      form.
25      A    Before we signed this, Pacifica

Page 56

Jeffrey Hasterok

1
2   talked to Dan and I about our experience
3   and our approach on how we might go about
4   valuing a transaction such as the RFA.
5   They didn't just hire us sight unseen.
6   They wanted to make sure that we would do
7   in their opinion a decent job.  So --
8       Q    All right.  So let's back up
9   maybe even a little bit further.
10          You told us early this morning
11  that you and Mr. Curry were introduced to
12  Pacifica by Mr. Shapiro, correct?
13      A    Yes.
14      Q    So just rough order of
15  magnitude, days, weeks, how long before
16  September 23, 2013, do you believe you were
17  first introduced to Pacifica by
18  Mr. Shapiro?
19      A    Sure, it would have been, I
20  think -- again, I think the summer, a few
21  months before.  I could be wrong.  It could
22  be later in the summer.  It could actually
23  have even been the spring, but I am
24  happy -- I am happy to find my E-Mails and
25  give you exact dates if you need them.

14 (Pages 53 to 56)

Page 57

```
 1          Jeffrey Hasterok
 2          But it would have been a few
 3   months before we actually signed this
 4   agreement.
 5      Q    Okay.  And before you ever
 6   spoke with anyone from Pacifica Group or
 7   communicated with them via E-Mail --
 8      A    Right.
 9      Q    -- did you have any
10   discussions, you, have any discussions with
11   Mr. Shapiro about the matter?
12      A    Yes.
13      Q    Okay.  So describe for me
14   everything you remember about those
15   discussions.
16      A    Sure.  Dan and I drove out to
17   Swap Financial in New Jersey, and we talked
18   about whether we would be interested in
19   doing this, meaning, Peter and Swap
20   Financial knew that we were currently not
21   working for a dealer or, you know, working
22   with full-time jobs.  So -- and we were
23   both aware of this product, knew how it
24   worked, had had experience in it.
25          So in his mind -- again, you
```

Page 58

```
 1          Jeffrey Hasterok
 2   can ask Peter -- but I believe, in his
 3   mind, we were logical choices to
 4   potentially work on this.
 5          We drove out to his office, and
 6   we talked about the fact that:
 7          "Okay.  It's a tobacco RFA.
 8   There is a dispute over the valuation.  Are
 9   you interested in potentially working for a
10   muni client and doing a valuation report?"
11          And that's what we talked
12   about, and we decided:
13          "Yes, please forward our
14   information to the client and to their law
15   firm."
16      Q    Before you drove out to meet
17   with Mr. Shapiro, had he sent you any of
18   the documentations on the deal?
19      A    Not that I can recall.  No.
20      Q    And this meeting that you just
21   described, at this point in time, had you
22   already been engaged on the New York State
23   matter that you referred to?
24      A    Yes.  I had worked on that one
25   in the spring.
```

Page 59

```
 1          Jeffrey Hasterok
 2      Q    And that was obviously with a
 3   different group of people; is that right?
 4      A    That's correct.
 5      Q    Any Peter Shapiro involvement
 6   in that one?
 7      A    Yes, I believe so.
 8      Q    What was the Peter Shapiro
 9   involvement in that one?
10      A    Swap Financial, I think, did
11   the original valuation on New York.
12      Q    Okay.
13      A    Certainly, Lehman's records
14   will show that he worked on that, I think.
15          And then New York's attorneys
16   decided that they wanted a second opinion;
17   so they were looking for, you know, another
18   report to come up with calculations.
19          I don't recall ever going over
20   New York and discussing the matter with
21   Swap Financial, bouncing ideas off of each
22   other about how to price it, the methods,
23   anything like that.
24          The intellectual banter was
25   within the folks that I worked for, which
```

Page 60

```
 1          Jeffrey Hasterok
 2   was Mohanty, that advisory firm that we
 3   were doing -- we had an independence
 4   arrangement with their law firm to provide
 5   a valuation report.  We did not work
 6   collaboratively with Swap Financial.
 7      Q    Okay.  Were you referred to --
 8   were you and Mr. Curry referred to Mohanty
 9   by Mr. Shapiro?
10      A    No.  Seema -- the spelling is
11   S-e-e-m-a -- Seema Mohanty used to work at
12   Morgan Stanley, so with us.  We all worked
13   on the same desk.  She went to UBS and then
14   now runs her own shop.  So colleague,
15   friend.
16      Q    Okay.  And without going into
17   the specifics of what work and the analysis
18   you did for New York State, did you use a
19   forward curve analysis in the work that you
20   did there?
21      A    It was one of the methods we
22   looked at, but not the one, if I remember
23   correctly, we chose as the preferred
24   number.  In that case, we didn't -- no, we
25   didn't use -- well, I will say "we" -- I
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 61

Jeffrey Hasterok

1
2  think we -- if I remember correctly, we
3  used LIBOR swaps and made adjustments and
4  came up with a number, but say -- we
5  clearly said in the document there are
6  issues with using this method, this method,
7  and we would prefer you use this other
8  method.
9      Q    Okay.  And, again, just in
10  descriptively, what was the other method?
11  Was it the same method you used here?
12      A    It was similar.  It was -- if
13  I -- it was either -- it was either
14  commercial paper rates or their actual
15  reinvestment history.  But it was
16  substantially similar to this.
17      Q    Do you remember, in orders of
18  magnitude, what the size of the New York
19  State claim was?
20      A    Some of the scenarios, if I
21  remember --
22      Q    No, just to be clear, what was
23  the claim filed by New York State, not your
24  scenarios?
25      A    Oh, off the top of my head, I

Page 62

Jeffrey Hasterok

1
2  don't remember.
3      Q    Does the number of about
4  $137 million sound right?
5      A    It could.  It was certainly a
6  bigger transaction than Washington.  There
7  were two trades, actually, two reserve
8  funds in that case.
9      Q    And do you know -- again, just
10  yes or no -- do you know what has happened
11  with the New York State claim against the
12  estate?
13      A    I do not.  Once we filed the
14  report, that was -- that was it for us.  We
15  did not go further.
16      Q    And did you discuss with
17  Mr. Shapiro at any time your methodology
18  and approach on the New York State matter?
19      A    I don't recall doing that.
20      Q    And do you recall reviewing
21  Mr. Shapiro's valuation or the Swap
22  Financial Group valuation that was done for
23  New York State?
24      A    I think -- yes, I believe we
25  saw the Swap Financial report, valuation

Page 63

Jeffrey Hasterok

1
2  report.  There were the -- right, there are
3  two things.  He does -- Swap Financial
4  would have done a report, and then there is
5  also a docket -- a public docket filing.
6      And in some cases, the docket
7  filings will just have a number and will
8  say: "I believe the number should be X."
9      And in some cases there is more
10  detail and granularity about the model and
11  the method, how they got there.
12      And I can't remember which, in
13  New York's case, Peter's filing was --
14  whether it was just a number or it was a
15  model and a number.
16      But I seem to recall seeing the
17  actual model document that doesn't get
18  published to the docket.  But I remember
19  seeing his report.
20      Q    And do you recall his approach
21  generally being similar to the approach he
22  used in this case?
23      A    Yes, to the best of my
24  knowledge, it was a swap-based -- a LIBOR
25  swap-based methodology.

Page 64

Jeffrey Hasterok

1
2      Q    Now, in this case, you came out
3  ultimately with a number in your report,
4  Exhibit 30, that at least numerically seems
5  to be similar to Mr. Shapiro's number,
6  correct?
7      A    I don't recall exactly what his
8  number was, the claim that TSA filed.  I
9  don't remember exactly what it was.  But I
10  want to say it was above 30.  And I think
11  our number was, what, 37 and a half.
12      Q    Which is -- while we are on
13  that topic, let's take a look at 32,
14  please.
15      MR. LAWRENCE:  Lehman 32.
16      Q    Lehman 32.
17      You have been handed a document
18  marked Lehman 32.  Take a moment to just
19  look at the document.  I am going to have a
20  very basic question for you.
21      Have you seen that before
22  today?
23      A    Yes.  Yes, yes.
24      (Exhibit No. Lehman 32,
25  Valuation Claim Document filed by TSA,

16 (Pages 61 to 64)

Page 65

1         Jeffrey Hasterok
2    is marked by the reporter for
3    identification.)
4         A    Yes, yes.
5         Q    You have seen it before today?
6         A    Yes, yes, sir.
7         Q    And looking at the first page
8    of Lehman 32?
9         A    Okay.  The cover page?
10        Q    Yes, the cover page.
11        A    Okay.
12        Q    You will see a number that
13   appears there of $38 million --
14        A    Yes, I see that.
15        Q    -- and some change?
16        A    Yes.
17        Q    Do you see that?
18        A    Yes, I do, sir.
19        Q    So the number that you
20   ultimately come up with in this case is
21   close to the number that Mr. Shapiro came
22   up with?
23        A    Yes.
24        Q    Is that correct?
25        A    Yes.

Page 66

1         Jeffrey Hasterok
2         Q    Okay.  Although you disagree
3    with the way he got there, your numbers are
4    in the same ball park?
5         MR. LAWRENCE:  Object to the
6    form.
7         Q    Is that right?
8         A    Yes, I would say that, as we
9    talked about earlier, his method, we
10   considered a similar approach, but we
11   viewed it as less appropriate than the way
12   we approached the matter.
13        Q    Now, just turning your
14   attention back to the New York State
15   matter, do you recall coming out in
16   basically the same ball park as Mr. Shapiro
17   on that analysis?
18        A    I want to say no.  I think our
19   numbers were higher.  But to give you
20   actual numbers, I would need to go back to
21   that report and pull it up and compare the
22   numbers.
23        But I am sure, as Lehman's
24   attorneys, you can do the same thing and
25   see Peter's -- see Swap Financial's report

Page 67

1         Jeffrey Hasterok
2    and ours and compare them.
3         Q    Had you completed your New York
4    State analysis when you met with
5    Mr. Shapiro in advance of being retained in
6    this case?
7         A    I think so.  I think I was
8    done.  I believe so.  I believe we had
9    filed the report with New York before this
10   engagement became real.
11        Q    And did you discuss with
12   Mr. Shapiro the fact that you had done the
13   New York State analysis when you met him in
14   the summer of 2013?
15        A    I can't recall if I told him we
16   were working on New York.  When I say "we,"
17   Dan -- Dan Curry did not work on New York
18   at all.  It was just -- it was me working
19   at that point.
20        I cannot remember if I said we
21   were working on New York tobacco or just a
22   tobacco trade against Lehman.  I cannot
23   recall.
24        Q    You have that initial meeting
25   with Mr. Shapiro in the summer of 2013,

Page 68

1         Jeffrey Hasterok
2    roughly, some weeks or months before you
3    sign the engagement letter, correct?
4         A    Sure, sure.
5         Q    In terms of this engagement,
6    what happens next?
7         A    Meaning like right after that
8    meeting?
9         Q    Yes.
10        A    What then happens?
11        Q    Yes.
12        A    I believe Swap Financial,
13   probably Peter, contacted the client and/or
14   Pacifica directly.  I don't know who he
15   contacted.  But said:
16        "I know two former Morgan
17   Stanley employees that you might consider
18   talking to."
19        And then I believe Kimberly,
20   which is a -- one of the Pacifica employees
21   contacted us.
22        THE WITNESS:  I don't think it
23   was you contacted us first.  I think
24   it was Kimberly.  I can't remember who
25   first.  It was one of the --

17 (Pages 65 to 68)

Page 69

Jeffrey Hasterok

1          Jeffrey Hasterok
2          MR. LAWRENCE:  I am not
3    testifying.
4          THE WITNESS:  Well, I am
5    just -- this is -- this is --
6          MR. LAWRENCE:  It's what you
7    remember.
8       A    This is just factual stuff.  I
9    think it was Kimberly that contacted us
10   first and said:
11          "Let's schedule a conference
12   call and talk about the matter."
13      Q    All right.  So you talked to
14   Mr. Shapiro.  You get contacted by Pacifica
15   Law Group.  You have a conference call.
16          Do you recall discussing --
17   other than your credentials and your
18   experience, do you recall discussing the
19   specifics of the Washington state RFA?
20      A    Yes.
21      Q    Okay.  Did you -- and did you
22   express a view in that call as to the
23   appropriate valuation methodology?
24      A    We -- we probably would have
25   talked about -- again, my memory is fuzzy

Page 70

Jeffrey Hasterok

1          Jeffrey Hasterok
2    on exactly what was discussed in that
3    conference call from months ago.
4          But we probably would have
5    talked about the fact that there really is
6    no replacement market for this transaction
7    and that we are going to have to look at
8    the next best thing, which is, "What can
9    they actually do.  How can they reinvest
10   their funds?"
11          We wouldn't have modeled up the
12   trade at that point.  It would be speaking
13   in generalities.
14      Q    Right.  You have a meeting with
15   Mr. Shapiro.  You have a conference call
16   with Pacifica Group.
17          Do you know if anyone from the
18   TSA was on that conference call?
19      A    The Washington TSA?
20      Q    Washington TSA.
21      A    No, I don't believe -- no, to
22   my knowledge, I have not spoken or E-Mailed
23   anybody from the client directly.  Our
24   contact has been with Pacifica directly.
25      Q    Have you read any of the

Page 71

Jeffrey Hasterok

1          Jeffrey Hasterok
2    depositions provided by Washington TSA
3    officials?
4       A    No.
5       Q    Have you read --
6       A    I have not -- no.  I read a
7    little bit of Shapiro's deposition.  I did
8    not read the entire document.  And the
9    reason why I read a little bit of it is
10   because we were looking for a -- a footnote
11   on how to reference the quote process.
12      Q    Just let me just step back a
13   step.
14          Is Mr. Shapiro's deposition the
15   only deposition that you have reviewed in
16   this case, or have you reviewed others?
17      A    I think it was just Peter's,
18   but I could be wrong.
19      Q    And you say you did not read
20   the entire document, just a little bit.
21      A    Right.
22      Q    How did you know what "little
23   bit" to look for?
24      A    I asked Pacifica:
25          "Do you happen to know where

Page 72

Jeffrey Hasterok

1          Jeffrey Hasterok
2    a -- where can we reference the fact that a
3    quote process was attempted?"
4          And so Pacifica helped us --
5    say:
6          "Look in this part of the
7    document, and there it is."
8       Q    Did you believe Mr. Shapiro's
9    testimony?
10      A    I did and do.
11      Q    Do you believe he was telling
12   the truth when he described the quotation
13   process?
14      A    I do.
15      Q    Did you do anything to
16   independently verify whether Mr. Shapiro
17   was, in fact, telling the truth?
18      A    I did not.
19      Q    And having read his testimony,
20   did you have any questions about precisely
21   how Mr. Shapiro ran the quote process?
22      A    No.
23      Q    Completely clear to you?
24      A    Yes, not -- again, not his
25   entire deposition, just that small section

18 (Pages 69 to 72)

Page 73

```
1            Jeffrey Hasterok
2    of it where he spoke to the quote process.
3        Q    Do you know the name James
4    Gregara?
5        A    Yes.
6        Q    Do you know Mr. Gregara?
7        A    Yes, he used to work at Morgan
8    Stanley.
9        Q    Do you know whether he has
10   given a deposition in this case?
11       A    I don't know.
12       Q    Do you know what role, if any,
13   he has played with respect to this case?
14       A    My guess is that he calculated
15   the termination amounts for Swap Financial.
16   That's a guess -- because he would have
17   been a junior person at Swap Financial
18   working collaboratively with Peter.  That
19   was his role.  He wasn't a senior partner
20   at Swap Financial.
21           And I don't think James is
22   there anymore.  I don't know where he is
23   now.  I don't know where he's working now.
24       Q    Was he a senior person at
25   Morgan Stanley?
```

Page 74

```
1            Jeffrey Hasterok
2        A    No.
3        Q    What was his role at Morgan
4    Stanley?
5        A    He was on the -- in the public
6    finance and municipal group.  If I remember
7    correctly, he was in derivatives.  He was
8    in public finance.  He bounced around a few
9    roles, but then left.
10       Q    How long was he there?
11       A    I don't remember, you know,
12   five, ten years, something like that.  He
13   left, as I recall, voluntarily long before
14   I left Morgan Stanley.
15       Q    Do you know where he went after
16   he left Morgan Stanley?
17       A    Boy, I can't remember if he
18   went straight to Swap Financial or if he
19   went to UBS first.  There are a bunch of
20   folks that went to UBS in '07 or '08 or
21   something like that or maybe even earlier.
22   But I can't recall.  I'm sorry.
23       Q    Do you know if he ever worked
24   at Lehman?
25       A    That sounds right.  I can't
```

Page 75

```
1            Jeffrey Hasterok
2    remember if he worked at Lehman first and
3    then came to Morgan Stanley or the other
4    way around.
5        Q    Did you work with Mr. Gregara
6    on any forward purchase agreements or
7    forward delivery agreements?
8        A    No, I can't recall us jointly
9    working on something together.
10       Q    You said he wasn't a senior
11   guy?
12       A    Right.
13       Q    What was his role at Morgan
14   Stanley?
15       A    I think, I think his -- he got
16   to, I think, associate or vice president.
17   It's analyst, associate, vice president,
18   executive director, managing director.
19           James did structuring tasks.  I
20   believe he worked on some tobacco models.
21   Dan might have a better memory of exactly
22   what James did.
23       Q    So going back to the retention
24   process, Mr. -- you have a conference call
25   with folks from Pacifica.  Again, in terms
```

Page 76

```
1            Jeffrey Hasterok
2    of your being retained in September of
3    2013, what happens next?
4        A    Then, once we signed the
5    engagement letter, they -- Pacifica started
6    to send us the relevant documents, things
7    like the RFA itself.  So we -- we were
8    then connected to a piece of software
9    called Viewpoint, which is just the
10   software that allows us to see the
11   productions.
12       Q    And what is your understanding
13   of what materials are available in
14   Viewpoint?
15       A    We were able to see three
16   things.  We saw Lehman's production, TSA's
17   production, and Swap Financial's
18   production.
19           And one of the tasks we
20   provided under our consulting agreement was
21   digging through Lehman's production and
22   marking particular line items as relevant
23   or irrelevant or duplications.
24           That was part of Dan and I's
25   job, is to help Pacifica sort through those
```

19 (Pages 73 to 76)

Page 77

```
 1        Jeffrey Hasterok
 2   for further review.
 3        Q    And that was work you began to
 4   do on and after September 23, 2013; is that
 5   right?
 6        A    Right.
 7        Q    What is the total amount that
 8   you have billed to date for the work you've
 9   done, you yourself?
10        A    Right.  Right.  High 20s, I
11   think I have sent one invoice to Pacifica.
12   Dan and I hit the cap.  We billed 35,000
13   for the report itself, and we have
14   approximately split that halfway, not dead
15   on halfway.
16        I billed 18.  Dan is going to
17   bill 17.
18        And then with the discovery
19   review and meetings and et cetera, the
20   number is 28, something like that.  28,000
21   is the first bill.
22        Q    That's your first bill?
23        A    Yes, that's correct.
24        Q    18K in connection with the
25   valuation report, and then the rest of it
```

Page 78

```
 1        Jeffrey Hasterok
 2   is for the other tasks; is that right?
 3        A    Yes.  And Dan is going to have
 4   a separate invoice.
 5        Q    Do you know how big Dan's
 6   invoice is?
 7        A    It's going to be somewhat
 8   similar to mine, maybe a little higher.
 9        Q    When you read the excerpt of
10   the Shapiro deposition, was that available
11   to you on Viewpoint, or you got it some
12   other way?
13        A    I believe Pacifica E-Mailed us
14   that document.
15        Q    Do you know if the depositions
16   are on Viewpoint?
17        A    I don't recall.  I don't
18   remember.  I am happy to go check, but I
19   don't recall off the top of my head -- a
20   lot of documents 7,000 or 8,000 line items
21   so --
22        Q    I think you have before you
23   Exhibit 32, which has the Swap Financial
24   Group document.  Do you see that?
25        A    Yes.
```

Page 79

```
 1        Jeffrey Hasterok
 2        Q    What is your understanding of
 3   whether Mr. Shapiro is acting as an expert
 4   witness in this case?
 5        A    What is my understanding of
 6   Swap Financial's role?  Is that it?
 7        Q    Yes.
 8        A    To my knowledge, they were
 9   engaged by Pacifica and/or Washington.  I
10   don't know who directly engaged Swap
11   Financial, but they were engaged to provide
12   an estimate of the termination amount on
13   the RFA.
14        Q    And is it your understanding
15   that they are also providing an expert
16   opinion the same way you and Mr. Curry are?
17        A    I don't know.
18        Q    And if the court had to choose
19   between your methodology and Mr. Shapiro's
20   methodology, what should the court do?
21        MR. LAWRENCE:  Objection to the
22   form.
23        A    We believe that the methodology
24   that we proposed is the most appropriate.
25        Q    Just to be clear, you are
```

Page 80

```
 1        Jeffrey Hasterok
 2   saying the court should pick your
 3   methodology over Mr. Shapiro's, correct?
 4        MR. LAWRENCE:  Objection to the
 5   form.
 6        A    I have to answer it the same
 7   way, I think.  We believe that the court
 8   should consider our methodology, but I am
 9   not going to preclude them from viewing
10   other methodologies.  That's not my place.
11        Q    Well, I mean, if the court
12   picks Mr. Shapiro's methodology, the court
13   will be choosing not to follow your
14   methodology, correct?
15        MR. LAWRENCE:  Object to the
16   form.
17        Q    Yes.
18        A    If they pick Swap Financial's
19   method, it doesn't necessarily mean that
20   it's mutually exclusive to ours.  It could
21   be that the court considers ours as well as
22   an input in the decision.  It doesn't have
23   to be a binary decision.
24        Q    So even though Mr. Shapiro uses
25   a forward curve as a starting point and you
```

20  (Pages 77 to 80)

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 81

```
 1          Jeffrey Hasterok
 2  reject the use of the forward curve as the
 3  basis for your calculation, you believe the
 4  two are not mutually exclusive; is that
 5  right.
 6          MR. LAWRENCE:  Object to the
 7      form.
 8      A    I think that both Swap
 9  Financial and Dan and myself are trying to
10  come up with reasonable estimates of
11  valuation in a product that doesn't have a
12  peer replacement anymore.  And it's a
13  difficult process, to say the least.
14          And so taking into account
15  multiple ways of calculating this seems
16  reasonable.  We elected to choose one
17  method among many as in our view as the
18  most reasonable.
19      Q    If I understand your grid, I
20  believe, in the lead up to your grid, you
21  reject the use of forward curves for any
22  aspect of your multiple methodologies,
23  correct?
24      A    No, that is not true.  One of
25  our methodologies was using cancellable
```

Page 82

```
 1          Jeffrey Hasterok
 2  swaps.  And that does use forward curves as
 3  part of calculating a swap rate with
 4  embedded options in it.
 5      Q    And is there a reason why the
 6  cancellable swaps -- with respect to
 7  cancellable swaps, you believe it's
 8  appropriate to use a forward curve, but
 9  it's not appropriate with respect to any of
10  the other items in the grid?
11      A    The difference there is that
12  there is a better chance that the client
13  could potentially maybe enter into that
14  trade.  We still found considerations
15  around that method that might block and
16  prohibit a client from actually entering
17  into it.
18          But we felt like that was a
19  little closer than a trade that didn't have
20  those cancellation options.  A swap-based
21  method without the options embedded was
22  less appropriate than one with the options
23  embedded.
24          But even when you use the
25  cancellable swap, there are still
```

Page 83

```
 1          Jeffrey Hasterok
 2  significant issues with using that
 3  method --
 4      Q    So --
 5      A    -- which we list, and there are
 6  a bunch of bullet points we do under that
 7  method.
 8      Q    I understand that you listed
 9  several bullet points under that method.
10  My question is:
11          In light of all of those bullet
12  points, should the court view that
13  methodology, the cancellable swap
14  methodology that you posit, as a reasonable
15  approach, or should the court reject that
16  approach?
17          MR. LAWRENCE:  Object to the
18      form.
19      A    It is less reasonable than the
20  method that we chose.  It is somewhat
21  reasonable, but less reasonable than the
22  one we elected to go with.
23      Q    So what should the court do
24  with it?
25      A    Inform their decision, instead
```

Page 84

```
 1          Jeffrey Hasterok
 2  of -- instead of just plucking a number out
 3  of the air, we felt like, by showing
 4  multiple methods, multiple inputs, it gives
 5  the user of the report some sense of:
 6          "There are multiple ways of
 7  looking at this.  And if you used multiple
 8  ways, you are going to come up with
 9  different numbers."
10          And that gives you some depth
11  of knowledge around and comfort with
12  whatever number you happen to pick and
13  whatever method you happen to pick, as
14  opposed to having no comparison to that one
15  model.
16      Q    And in your grid, therefore,
17  you have included a methodology that uses
18  the forward curve, and you have used -- you
19  have used several methodologies that reject
20  the forward curve?
21      A    That's true.  Yes.
22      Q    And you believe that to be
23  reasonable?
24      A    Well, what do you mean by
25  "forward curve"?  Are we, again, going back
```

21 (Pages 81 to 84)

Page 85

Jeffrey Hasterok

1  
2  to LIBOR swap curves and forwards based off
3  of that? Is that what you mean by --
4  Q    Any kind of market-based inputs
5  that look at expected future values for
6  securities.
7  A    Okay. Because the reason I ask
8  the question is -- can I -- can I flip
9  through this?
10  Q    Sure.
11  A    Okay.
12  Q    Just to be clear, you are
13  looking at Exhibit 30?
14  A    I am.
15  Q    Okay. Okay.
16  A    Let's go to the grid on page
17  19, so the valuation matrix. The only one
18  of these methods is the last one, the
19  cancellable start, June of '09. That is
20  the only method that uses the swap market
21  and the forward curves implied by the LIBOR
22  swap market as an input.
23        The other methods are
24  projecting a forward rate, but not based on
25  long-term tradeable instruments. So I

Page 86

Jeffrey Hasterok

1  
2  don't want to imply that we are not
3  projecting.
4        For example, in the method we
5  selected, we are selecting 65 basis points,
6  or 0.65 percent, as our projected
7  reinvestment rate and replacement yield.
8  We are projecting that going forward into
9  the future.
10        So if you want to say that
11  that's a forward rate, I will agree with
12  you. It's forward, but the rate is not
13  based on long-term tradeable instruments,
14  just to make that distinction.
15  Q    While we are on the topic, what
16  is it based on? I mean, just to be clear,
17  you take the 65 basis point line -- this is
18  on page 19 of Exhibit 30. You have got
19  this area called "actual and projected
20  reinvestment," and in the "replacement
21  yield" column you have 0.65 percent.
22  That's the 65 basis points you are talking
23  about, correct?
24  A    Correct.
25  Q    And what you have done as far

Page 87

Jeffrey Hasterok

1  
2  as I can tell is assume for purposes of
3  that calculation, that line in your grid,
4  that the rate is going to be 65 basis
5  points in 2009, 2010, 2011, all the way out
6  to 2032, right?
7  A    That is correct.
8  Q    That is -- did you look at any
9  market data that showed that the market in
10  March 2009 expected forward rates to be
11  65 basis points for roughly 20 years?
12  A    To our knowledge -- well, you
13  can ask Dan tomorrow -- but to my
14  knowledge, no market exists where you can
15  transact and lock in a rate that reflects
16  what you will pay or receive as an investor
17  in the money market funds in question.
18  Q    And that's true not only for
19  the line you were just discussing, the
20  65 percent line, but it's true for all of
21  the lines other than your last line,
22  correct?
23  A    Not exactly. For example, the
24  scenario above where we talking about
25  Fannie, Freddie discount notes, when --

Page 88

Jeffrey Hasterok

1  
2  FNMA is Fannie Mae and FHLMC is Freddie
3  Mac.
4        So those are agency discount
5  notes.
6        It does exist. I believe there
7  is a basis swap market that exists where
8  you can -- you can, for example, receive
9  fixed on a LIBOR swap, pay three-month
10  LIBOR, and then do another trade, a basis
11  swap where you receive three-month LIBOR
12  and then pay some index based on agency
13  rates.
14        And there is also one for
15  commercial paper, another base -- a LIBOR
16  versus commercial paper basis swap market.
17  I don't think one exists for CDs to my
18  knowledge.
19        So there are markets that do
20  exist for some of these where you can enter
21  into long-term trades; but you have to
22  generally be a dealer, or you have to be a
23  sophisticated financial institution that
24  has an ISDA in place with a dealer and who
25  is willing to transact with you, usually in

22  (Pages 85 to 88)

Page 89

Jeffrey Hasterok

1    a fully collateralized form.
2         So as the value of the trade
3    swings around during the life of the trade,
4    you have to post collateral against that
5    like a futures contract.  If you trade a
6    future, you have to post collateral and
7    margin against it.
8         We did not use that methodology
9    in all of those line items.  The only one
10   where we used the swap curve as an input is
11   really the last one, the cancellable swap.
12        Q    Okay.  All right.  We will
13   probably discuss, as the day goes on, all
14   the things you didn't do.  My question was:
15        In terms of the things that you
16   did do --
17        A    Yes.
18        Q    -- putting aside that last line
19   where you did use a forward swap curve, you
20   did not use a market-input-based forward
21   curve for any of your other line items,
22   correct?
23        A    Right.  We used past
24   performance or average yields or past
25

Page 90

Jeffrey Hasterok

1    actual realized yields, in the case of the
2    65 basis points, and projected it into the
3    future.
4         Q    And projected it unchanged,
5    constant, at the number in the column,
6    correct?
7         A    All except the actual yield
8    plus 2013 OS, that one.  That's why it says
9    55 basis points average.  In the 2013 bond
10   deal that the TSA entered into, the
11   refunding transaction, there is an entry in
12   the OS that says:
13        "For purposes of this bond
14   deal, we are assuming that TSA will
15   earn" -- if I remember correctly -- "three
16   basis points starting out.  And then it
17   will rise up to 75 basis points over the
18   course of the few years.  And then it will
19   be 75 basis points for the rest of the
20   trade."
21        So that one is a sliding scale.
22   It rises up and then goes flat.
23        But, yes, for all of the other
24   ones, it's a flat number for the life of
25

Page 91

Jeffrey Hasterok

1    the trade going forward.
2         Q    Okay.  It's a flat number going
3    forward, either for 10 years, 13 years,
4    16 years, 23 years?
5         A    Yes.
6         Q    Right.  Okay.  In all of your
7    years at Morgan Stanley, when you were
8    doing your various valuations, whether for
9    entering into a transaction or exiting a
10   transaction, did you hold yields constant
11   over such long periods of time?
12        A    We would not have used this
13   type of analysis when -- this method.  We
14   would not have used this method when
15   calculating new RFAs or terminations of old
16   RFAs.
17        Q    All right.  So the answer to my
18   question is that, in all of your years at
19   Morgan Stanley, you never used this type of
20   methodology?
21        A    That's correct.
22        Q    And as far as you're aware,
23   Mr. Curry at Morgan Stanley never used this
24   methodology, correct?
25

Page 92

Jeffrey Hasterok

1         A    I doubt it.  You can ask -- you
2    will have to ask him tomorrow.
3         Q    Other than the discussions that
4    you have had with Mr. Curry and the use of
5    this methodology, are you aware of any
6    academic studies, analyses, that support
7    the use of holding rates fixed in this
8    manner for periods of 10, 15, 20 years?
9         A    I am not.
10        Q    Looking at the grid on page 19,
11   with respect to several of these scenarios,
12   you set forth two types of sub-scenarios.
13   You have an average yield December '08 to
14   March '09; and then you typically have an
15   average yield December '08 to June 2013.
16        Do you see that?
17        A    Right.  June '13, or the --
18   there is one that goes to September of '13.
19   But, yes, yes.
20        Q    Okay.  Right.  And just so I
21   understand, when you say "average yield,"
22   what was your methodology for calculating
23   average yield for either of those two time
24   periods?
25

23  (Pages 89 to 92)

Page 93

Jeffrey Hasterok

1
2    A    Sure.  The data -- I do talk
3    about it -- we talk about it earlier in --
4    above the valuation matrix.  The time
5    series data on these asset classes is not
6    universal.  You don't have perfect daily
7    data on commercial paper yields going back
8    X number of years.
9        So there are slightly different
10   data sources which we refer to in the
11   appendix and footnotes.  But we would do
12   things like -- in some cases, it was
13   monthly data, and you are taking an
14   average.  That's not daily data that is
15   being averaged.
16       You would try to find as
17   most -- as granular of time series data as
18   possible, and then just average it up.
19   What you are trying to get, what you are
20   trying to show is -- what we were trying to
21   show is, at the time past the failed
22   delivery, TSA had to go and reinvest their
23   money in something.
24       And so we were trying to look
25   at things they could have theoretically

Page 94

Jeffrey Hasterok

1
2    done that met their indenture requirements.
3    They could have invested in CP or CDs or
4    agencies.  And we were trying to
5    hypothetically say:
6        "Had they done those things,
7    here is approximately the yields they might
8    have earned."
9        Given that it didn't
10   actually -- they didn't actually do these
11   things, these are best guesses based on the
12   time series data we could find.  And I
13   believe the time series data that we used
14   is actually included in the spreadsheet
15   that we provided to you.
16   Q    A few minutes ago, in response
17   to one of my questions, you used a phrase
18   "locked in."  Just describe for me, in your
19   methodology, what role does that phrase
20   "locked in" play?
21   A    I believe I was talking about
22   using long-dated swaps, long-tenor swaps,
23   and then applying a basis curve and
24   potentially receiving or paying a fixed
25   rate in that package of transactions.

Page 95

Jeffrey Hasterok

1
2    "Locked in" means entering --
3    actually entering into a transaction that
4    guarantees you some either fixed or
5    floating rate for a period of time longer
6    than an overnight.  So you receive
7    4 percent for ten years, and pay
8    three-month LIBOR.  That's locking in a
9    rate.  That's what I mean by that.
10   Q    Are you opining that it was
11   possible in March of 2009 for TSA to lock
12   in these replacement yield rates; is that
13   the basis for your analysis?
14   A    No.
15   Q    In fact, the TSA currently is
16   not locked into any one of these rates,
17   correct?
18   A    That's absolutely true.
19   Q    And putting aside the fact that
20   there was a reinvestment done or
21   refinancing done of the bonds, in March of
22   2009, the TSA had in its possession the
23   reserve fund, correct?
24   A    Yes.
25   Q    And it could have invested that

Page 96

Jeffrey Hasterok

1
2    reserve fund in any one of the eligible
3    investments, correct?
4    A    Yes.
5    Q    It was required to invest it in
6    eligible investments, and they have to be
7    liquid every six months, correct?
8    A    Yes.
9    Q    And once the TSA refinanced the
10   underlying bonds, it's now set up a new
11   reserve fund; is that right?
12   A    Yes.
13   Q    But does the old reserve fund
14   still exist?
15   A    To my knowledge, part of the
16   old reserve fund was transferred to the new
17   reserve fund.  Some of the reserve fund was
18   released as part of the refunding deal, so
19   the new reserve fund amount is smaller than
20   45.  It's 30 something, higher -- high 30s,
21   if I recall.  But it's in the OS.  It's
22   easily looked -- we can look it up.
23       But, yes, some of the -- some
24   of the reserve -- the reserve from the
25   $45 million has been transferred to the new

24  (Pages 93 to 96)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 97

```
 1          Jeffrey Hasterok
 2  deal, the new bond deal.
 3      Q    And what the Washington TSA can
 4  do with the new reserve fund is determined
 5  by the new indenture and the new operative
 6  offering documents; is that right?
 7      A    Yes.
 8      Q    The old ones are no longer
 9  operative because those bonds have been
10  retired?
11      A    Right.
12      Q    And Washington TSA has had the
13  right to do that type of refinancing since
14  March of 2009, correct?
15      A    Since the issuance of the bonds
16  in 2002.
17      Q    They have always had that
18  right?
19      A    Since the issuance of the
20  bonds, yes.
21      Q    Going back to the grid on page
22  19 of Exhibit 30, in calculating your
23  averages for the period December of '08
24  through either June or September of 2013,
25  you used data, observed data from dates on
```

Page 98

```
 1          Jeffrey Hasterok
 2  and after March of 2009, correct?
 3      A    Yes, yes, in the -- for
 4  example, under the CP, commercial paper
 5  scenarios, the first one scenario stops at
 6  March of '09. The second one goes past it.
 7      Q    So you looked at commercial
 8  paper yields in late 2009 and 2010, and
 9  2011, 2012, right?
10      A    Yes.
11      Q    And the same is true for the
12  CDs, correct?
13      A    Yes.
14      Q    And the same is true for the
15  Fannie and Freddie discount notes, correct?
16      A    Yes.
17      Q    And the same is true for the
18  actual and projected reinvestment. You
19  used yields that the TSA actually earned in
20  late 2009, and 2010, 2011; is that right?
21      A    Yes, they have been in the
22  money market fund. They were in one money
23  market fund and switched to a different
24  one.
25          But to my knowledge they have
```

Page 99

```
 1          Jeffrey Hasterok
 2  been in that money market fund since.
 3      Q    Okay. And you would agree with
 4  me that, when the TSA made the decision to
 5  invest in the money market fund, they could
 6  just as easily have elected to invest in
 7  Treasury bills; is that right?
 8      A    I wouldn't say just as easily.
 9  And the reason why is, purchasing a
10  security like a T bill generally means you
11  have to call a broker, a dealer, and say:
12          "I want this CUSIP" -- CUSIP is
13  C-U-S-I-P, all caps -- "I want this
14  particular bond. Where will you sell it to
15  me?"
16          And the dealer says:
17          "Here's your price, done."
18          Once that security matures, you
19  have to go do it again and again and again,
20  every time the security matures. Buying
21  the money market fund is easier because
22  it's -- you dump the money into the fund
23  once, and, generally speaking, you are
24  going to monitor the investment to make
25  sure there is not an issue with the fund
```

Page 100

```
 1          Jeffrey Hasterok
 2  provider. But that has less operational
 3  overhead than buying securities themselves
 4  without you hiring somebody to do it for
 5  you.
 6      Q    Do you know whether the
 7  Washington TSA has hired a financial
 8  advisor to advise it?
 9      A    I do not.
10      Q    Do you know whether, in the
11  time period September 2008 through March of
12  2009, whether the Washington TSA had
13  financial advisors working for it?
14      A    Well, they -- I believe -- I
15  don't know if they had an official
16  engagement with somebody like Barclay's and
17  JP Morgan, who, I believe, were their
18  underwriters on the original deal. I don't
19  know if they had official engagements with
20  them beyond just bankers contacting clients
21  and trying to get new transactions done.
22          I don't know if they had
23  derivative advisors, like a Swap Financial,
24  like a PFM -- or there are multiple firms
25  that do it. I don't know if they have
```

25 (Pages 97 to 100)

Page 101

```
 1           Jeffrey Hasterok
 2  hired them.  I don't know.
 3      Q    Now, you mentioned PFM.  In
 4  doing the work that you have done on this
 5  matter, did you look at any valuation
 6  analyses done by PFM?
 7      A    I recall knowing that PFM has
 8  done a swap-based analysis of terminating
 9  FPAs like this, RFAs like this.  I can't
10  remember where we read that.  I can't
11  remember if that was -- I -- probably in
12  the discovery.
13           In the discovery review, there
14  may have been -- or it actually might have
15  been in the minutes of the TSA board
16  meetings.  They may have -- I can't
17  remember if it was in the board meetings or
18  the internal memos amongst the finance
19  staff at TSA referring to PFM.
20           But if my memory serves, I
21  think PFM has looked at doing termination
22  prices and used a swap-based methodology.
23      Q    And you know PFM as a financial
24  advisor in the municipal market, right?
25      A    Absolutely, I think they are
```

Page 102

```
 1           Jeffrey Hasterok
 2  the biggest.  If not, they are the second
 3  biggest.  It's them or PRAG, one of the
 4  two.
 5      Q    It's them or who?
 6      A    PRAG.  P-R-A-G, all caps.
 7      Q    And you just don't know one way
 8  or the other whether PFM was a financial
 9  advisor to the TSA --
10      A    I don't.
11      Q    -- during this period of time?
12      A    I don't.
13      Q    Do you recall, as you sit here,
14  what valuation PFM had ascribed to the
15  termination of this agreement?
16      A    Off the top of my head, I don't
17  know.
18      Q    Do you recall it being a very
19  low number?
20      A    I don't know.
21      Q    Single digit millions?
22      A    I don't know.
23      Q    You don't know.
24           Did you ask -- did you ask
25  anyone any questions about PFM's analysis?
```

Page 103

```
 1           Jeffrey Hasterok
 2      A    No.
 3      Q    And at no time did you seek to
 4  speak with PFM about their analysis, right?
 5      A    We did not.
 6      Q    Do you have -- have you formed
 7  any opinions about PFM's analysis?
 8      A    Well, I believe it's somewhat
 9  similar to Swap Financial's, where you take
10  LIBOR swap curves and apply certain basis
11  adjustments for credit and profit and
12  delivery risks, things like that, and come
13  up with a number.
14           But we did not do any kind of
15  analysis to dig into it.
16      Q    Okay.  So no opinions with
17  respect to the PFM analysis?
18      A    Anything that's based off of
19  long-term swaps, where you cannot
20  transact -- and when I say "you," I mean
21  TSA.
22           We don't believe TSA reasonably
23  has the ability to enter into long-term
24  swaps, non-callable swaps.  Therefore,
25  that -- that problem, that inability to
```

Page 104

```
 1           Jeffrey Hasterok
 2  enter into, renders that methodology flawed
 3  compared to -- relatively compared to the
 4  one we chose.
 5           It's still something you can
 6  look at and come up with a number.  But
 7  it's a fundamental problem with that method
 8  as itself.  That's why we chose the one we
 9  did and went away from that.
10      Q    All right.  Just going back to
11  our analysis about Treasuries, you said
12  there were some operational costs.  Have
13  you estimated what those operational costs
14  would be?
15      A    I have not.
16      Q    And just as we discussed with
17  the Treasuries, you would agree with me
18  that every six months the TSA had the
19  ability to invest the reserve fund in
20  agency securities that matured in six
21  months, correct?
22      A    Or shorter, yes.
23      Q    Or shorter?
24      A    Yes.
25      Q    Right.  And there would have
```

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

1      Jeffrey Hasterok
2  been some operational costs associated with
3  that, correct?
4      A    I would believe so, sure.  You
5  would need to have a person actively
6  calling the dealer community to do it
7  and/or contract somebody to do it on your
8  behalf.
9      Q    But other than those
10  operational costs, nothing that prohibited
11  the Washington TSA from buying eligible
12  securities every six months?
13      A    Not that I am aware of, no.
14      Q    And they could do that for
15  five years, ten years, fifteen years,
16  twenty years, every six months buy eligible
17  securities, right?
18      A    Correct, sure.  Do you mind if
19  I just grab some water?  Keep talking.
20          (There was a discussion off the
21  record.)
22          MR. TAMBE:  It would be good
23  time to take five minutes.
24          (A break is taken.)
25      Q    Going back to Exhibit 30.

1      Jeffrey Hasterok
2      A    Back to the grid.
3      Q    Well, no.  We will go to the
4  other parts of this document now.
5      A    Okay.
6      Q    Turn to page six of 28.
7      A    Six.  Okay.  Got it.
8      Q    And I want to draw your
9  attention to the second paragraph on that
10  page which begins, "The definition of
11  termination amount."
12      A    Yes.
13      Q    Now, in that paragraph, you
14  discuss the Peter Shapiro deposition,
15  correct?
16      A    Yes.
17      Q    And you write as follows:
18          "In this report, the Swap
19  Financial Group tried and failed to obtain
20  quotes from every conceivable dealer of
21  forward purchase agreements on or about
22  January 2009."
23          Do you see that?
24      A    Yes.
25      Q    And other than reading

1      Jeffrey Hasterok
2  Mr. Shapiro's testimony about what Swap
3  Financial Group did to obtain quotes, you
4  haven't seen any documents that support
5  that testimony, correct?
6      A    Right.
7      Q    Okay.  You were at Morgan
8  Stanley in September of 2008 when Lehman
9  failed?
10      A    Yes.
11      Q    And did you in September of
12  2008 and thereafter receive requests for
13  quotations from counterparties to Lehman?
14      A    Yes.
15      Q    And did you receive some of
16  those by phone?
17      A    Yes.  You would -- yes, you
18  would receive advisors canvassing the
19  market, asking around:
20          "Do you have capacity to do
21  such and such type of trades?"
22      Q    How about requests for quotes?
23  Did you receive those over the phone or by
24  E-Mail?
25      A    Both.

1      Jeffrey Hasterok
2      Q    Okay.
3      A    Both.
4      Q    And when you responded to a
5  request for a quote, did you do that by
6  phone or over an E-Mail?
7      A    Phone, fax, E-Mail.
8      Q    What is your understanding of
9  how Mr. Shapiro requested quotes?
10      A    Just what I read in the
11  deposition.
12      Q    Do you know who at Swap
13  Financial Group was the person who
14  requested the quotes?
15      A    I don't.
16      Q    Okay.  Do you know if Swap
17  Financial Group kept any records of what it
18  did?
19      A    I don't, no.
20      Q    It says at the end of that
21  paragraph that we were looking at, the last
22  phrase:
23          "We agree that quotes and, in
24  particular, actionable quotes could not be
25  obtained at or around the rejection date."

27 (Pages 105 to 108)

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 109

1        Jeffrey Hasterok
2        Do you see that?
3        A    Yes.
4        Q    Okay.  The rejection date was
5    March 2009, correct?
6        A    Yes.
7        Q    Now, you yourself, sitting at
8    the Morgan Stanley desk, were providing
9    quotes at this period of time, right?
10       A    Sometimes.  I can't remember if
11   we -- in this -- I can't remember on this
12   particular transaction if we were
13   contacted.  If we were, it was probably my
14   boss, Kevin Schwartz.  Kevin Schwartz was
15   my superior at Morgan Stanley.
16       It would probably have been
17   him, but I can't remember me personally
18   being involved in a quote on this
19   particular trade.
20       Q    So I am just trying to
21   understand the sentence then.  That entire
22   sentence reads:
23       "As municipal finance
24   professionals who structured and marketed
25   FPAs, we agree that quotes and, in

Page 110

1        Jeffrey Hasterok
2    particular, actionable quotes could not be
3    obtained at or around the rejection date."
4        Putting aside "actionable
5    quotes," if I understand your prior
6    testimony, you are saying that quotes could
7    be obtained around the rejection date,
8    correct?
9        A    Well, I would say we certainly
10   provided quotes on swaps which are not
11   RFAs.  They are not the same contract.  Did
12   we provide quotes on RFAs?  We might have.
13       Did we provide quotes on
14   tobacco, long-dated tobacco RFAs with --
15   one of the features of the TSA RFA is that
16   they had this ability to cancel the
17   transaction if there are turbo redemptions
18   of bonds.  It's a feature of the deal.
19       But do I recall providing
20   quotes on that type of transaction?  No.
21       Q    Well, you don't say in your
22   report:  "We don't recall quotes being
23   obtained at or around the rejection date."
24       You categorically state quotes,
25   and, in particular, actionable quotes,

Page 111

1        Jeffrey Hasterok
2    could not be obtained at or around the
3    rejection date.
4        Do you see that?
5        A    Yes.
6        Q    So if I understand your
7    testimony just now, what you are telling me
8    is that yourself don't recall having
9    provided quotes on transactions with all of
10   the features that the Washington TSA deal
11   had.
12       But, sir, you have no idea
13   whether others at Morgan Stanley and other
14   dealers were, in fact, providing quote at
15   or around the rejection date on similar
16   transactions, correct?
17       MR. LAWRENCE:  Objection.
18   Sorry.  Object to the form.
19       A    It is our belief that the
20   replacement market for a trade
21   substantially similar to this transaction
22   did not exist.
23       Q    See, my question is a little
24   bit narrower than that, okay, and my
25   question goes to the words you use in your

Page 112

1        Jeffrey Hasterok
2    report.
3        You and Mr. Curry state
4    categorically:
5        "As municipal finance
6    professionals," that, "quotes could not be
7    obtained at or around the rejection date."
8        Is that statement based on
9    anything other than just your belief?
10       MR. LAWRENCE:  Object to the
11   form.
12       A    When we are using the word
13   "quotes" in this report, we are make --
14   using it in reference to this particular
15   transaction, not quotes for all types of
16   transactions across the entire market.
17       We are not trying to make a
18   statement that every single type of
19   transaction could not get quotes.  That's
20   not what we are asserting.
21       We are speaking about one type
22   of transaction.  And we don't believe that
23   the dealer community would provide quotes.
24       Q    So let me just make sure I
25   understand what your beliefs are.

28  (Pages 109 to 112)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 113

1          Jeffrey Hasterok
2          Is it your belief that, at or
3   about the rejection date, the dealer
4   community was providing quotes for
5   long-dated forward purchase agreements?
6          MR. LAWRENCE:  Object to the
7      form.
8      A    Possibly.
9      Q    Possibly.  You just don't know
10  one way or the other?
11     A    No.
12     Q    Is it your belief that, at or
13  about the rejection date, the dealer
14  community was providing quotes for
15  long-dated forward purchase agreements with
16  a Tobacco Settlement Authority as the
17  counterparty?
18     A    We don't think so.
19     Q    Okay.  And your belief that you
20  don't think so is based on what?
21     A    In your -- in my role and Dan's
22  role as sitting on the desk, one of the
23  things you do is talk to advisors, okay, in
24  the market.  That was one of our channels
25  of transactions.

Page 114

1          Jeffrey Hasterok
2          So an advisor would bid out a
3   deal of some type.  So you are constantly
4   talking to them, trying to get an idea of
5   what's going on, what type of deals are
6   going done.  The advisors are talking to
7   you because they want to know what's your
8   capacity to do things.
9          And we would get asked on a
10  regular basis:
11          "Do you have any tobacco
12  capacity?  Can you do a tobacco deal?"
13          And we would say "no."  And
14  then we would usually ask questions like,
15  "Are other people doing it," because you
16  want to -- you want to know that.  If you
17  are the only one that is not doing a
18  particular business, you want to know why.
19          You want also want to know if
20  you're the only one doing a particular
21  business, and you want to know why.  Maybe
22  you're -- you shouldn't be in it.
23          So you're -- that's -- I would
24  describe that as market color, market
25  feedback, trying to understand what the --

Page 115

1          Jeffrey Hasterok
2   what the capacity is in the market.
3          So what we are asserting is
4   that from -- from our memory from back in
5   that part of the world, in that time frame,
6   we didn't think that quotes on this type of
7   transaction could be reasonably obtained.
8      Q    And just to be clear, when you
9   use the word "quote" just now in your
10  answer, you are talking about actionable
11  quotes someone prepared to enter into a
12  transaction; is that what you mean?
13     A    We think that's the most
14  appropriate basis of "quote" for this type
15  of structure.
16     Q    Okay.  So, again, I am trying
17  to understand what you have written in your
18  report because you say "quotes," and, "in
19  particular, actionable quotes."
20          Do you mean the same thing by
21  those two phrases?
22     A    No, they are not -- "the quote"
23  and "actionable quote" are not the same
24  thing.
25     Q    Okay.  How are they different?

Page 116

1          Jeffrey Hasterok
2      A    A quote can be many things.
3   And that's why the dealer language, when
4   you -- when you -- now that -- now that I
5   am in a position to see past submissions of
6   other dealers -- you know, certainly, when
7   you are a dealer and you submit a quote,
8   you usually don't get to see what everybody
9   else did in their form of quote document.
10          A lot of times, you fill out a
11  forum and you put your conditions or
12  whatever and you send it in.  You don't get
13  to see what everybody else said.
14          But a quote can be a mid-market
15  quote, for example, just a, "Here's our
16  model."  It doesn't have any profit or loss
17  or reserves or anything in the number.
18          Or it can be, on the other
19  extreme, something that:
20          "We will stand by this number.
21  We will trade it.  If you want to do this
22  trade, we will enter into the transaction."
23          So it can be a lot of things
24  depending on the dealer that's providing
25  it.

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 117

Jeffrey Hasterok

1  Q    And you don't qualify the word
2  "quotes" the first time you use it in this
3  sentence.  You just say "quotes."  Then you
4  say "in particular, actionable quotes" --
5  A    Right.
6  Q    -- "could not be obtained."
7        So is it your opinion and your
8  view that no quotes of any type could be
9  obtained at or around the rejection date?
10       MR. LAWRENCE:  Object to the
11       form.
12  A    We -- again, when we are using
13  the word "quotes" here, we are talking
14  about this transaction in particular.  We
15  are not trying to make a broad assertion
16  that quotes for any type of derivative or
17  forward purchase agreement -- we are not
18  trying -- we are trying -- we are not
19  trying to make it a blanket statement about
20  the entire market.
21       We really care about this
22  transaction, and that's what we were
23  speaking to.
24  Q    So let me see if I can narrow

Page 118

Jeffrey Hasterok

1  this down then.
2        The opinion you were trying to
3  convey to the court is that quotes on the
4  Washington TSA contract could not be
5  obtained at or around the rejection date;
6  is that right?
7  A    Yes.
8  Q    Okay.  You don't know one way
9  or the other whether quotes could be
10  obtained on other tobacco RFA agreements,
11  correct?
12  A    It is our guess that they
13  couldn't.
14  Q    Other than your "guess," do you
15  have any other basis for saying that?
16  A    Beyond the market color process
17  that I described earlier, no, because there
18  is no way for me to know exactly what every
19  other dealer is doing in the market.
20  Q    You were at Morgan Stanley,
21  right?  Do you know whether Morgan Stanley
22  provided quotes on tobacco RFAs at or about
23  the rejection date?
24  A    They may have.

Page 119

Jeffrey Hasterok

1  Q    Did you ask anyone at Morgan
2  Stanley whether they did so?
3  A    When?
4  Q    When you were hired for this
5  assignment?
6  A    No, we did not contact Morgan
7  Stanley and about what they have done or
8  will do in this market.  We did not poll
9  the dealer market about quote processes and
10  appetite for this product.  We did not do
11  that.
12  Q    And you did see that Wachovia
13  at least did provide a quote --
14  A    Correct.
15  Q    -- in response to a request
16  from Lehman, correct?
17  A    That was in the discovery, yes.
18  Q    Did you try to speak to anyone
19  from Wachovia or Wells Fargo about what
20  else they had generally done with respect
21  to quotes at or around the rejection date?
22  A    We did not.
23  Q    Now, you wouldn't be surprised
24  to learn that Morgan Stanley did provide

Page 120

Jeffrey Hasterok

1  quotes on tobacco RFAs at or about the
2  rejection date; would you?
3  A    I would say that my superior,
4  Kevin, didn't tell me everything he did.
5  So if he provided a quote on something,
6  that doesn't necessarily mean he told me he
7  did.
8  Q    Okay.  So there were things
9  going on, in fact, at Morgan Stanley that
10  you may or may not be aware of from the
11  relevant time period?
12  A    Of course.
13  Q    And you certainly don't know
14  what was going on at other dealers at this
15  point in time?
16  A    Not with 100 percent certainty,
17  no.
18  Q    So the opinion you express in
19  here, that quotes could not be obtained at
20  or around the rejection date, that's just
21  base on your own personal experience and
22  your memory of that experience; is that
23  right?
24  A    Yes.

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Jeffrey Hasterok

1
2     Q     As part of your work on this
3   case, have you reviewed the claims filed by
4   any other Tobacco Settlement Authorities
5   against the Lehman estate?
6     A     I have searched for things like
7   the word "tobacco" in the public docket web
8   site.
9     Q     Epic is that web site?
10    A     Yes, right, I think that's what
11  it's called.  But if you search Google for
12  "Lehman dockets," it takes you to a web
13  site.  And you can enter in -- you can
14  enter in words like "tobacco" -- I think,
15  actually, in Washington's case, it's
16  misspelled "tabacco" with an "a."
17          So, yes, we were looking for
18  potentially public information where there
19  may have been information about what other
20  Tobacco Settlement Authorities had -- have
21  come to an agreement with Lehman because
22  that would have been a helpful data point
23  to know:
24          Where did they settle?  Did
25  they show a method?

Jeffrey Hasterok

1
2          I believe Cal might have some
3   information out there, but, yes, we
4   certainly searched for the word "tobacco"
5   in the public docket.
6     Q     And did you -- when you did
7   that search, you did get some hits for
8   tobacco counterparties who had claims
9   against Lehman, correct?
10    A     Correct.
11    Q     Okay.  Did you look into these
12  claims to see what the claims were?
13    A     A cursory review.  I don't
14  think there is a ton of information
15  available in the docket that was really
16  enough depth and detail that would have
17  helped us with our numbers.
18    Q     Do you know, for example,
19  whether any of the claims that have been
20  submitted are based on market quotations?
21    A     I don't know.
22    Q     Well --
23    A     I don't know.
24    Q     Under your expectation, there
25  should be none because you say,

Jeffrey Hasterok

1
2   categorically, quotes could not be obtained
3   at or around the rejection date, correct?
4          MR. LAWRENCE:  Objection to the
5   form.
6     A     Again, we are speaking about
7   Washington TSA.
8     Q     All right.  Let's talk about
9   average life and expected maturity date,
10  the concept you address?
11    A     Is there a page you want me to
12  flip to?
13    Q     Yes, starting on page eight of
14  your report.
15    A     Page eight, okay.
16    Q     You have a discussion that
17  begins on page eight and continues
18  through -- it looks like page 12 -- that
19  talks about average life and expected
20  maturity date.
21          Now, I believe you agree that,
22  as of March 2009, the only public statement
23  made by Washington TSA with respect to the
24  series 2002 bonds was that there was an
25  estimated final total redemption date of

Jeffrey Hasterok

1
2   June of 2019, right?
3     A     Well, in our -- on page ten, we
4   were able to find the board minutes from
5   June of '09.  So a few months after March
6   of '09, where the calculation, according to
7   their bankers, TSA's bankers, I believe
8   Barclay's, maybe JP Morgan or both, they
9   are using a base line assumption of '22.
10          So as of March, I don't know
11  off the top of my head if there were other
12  public documents available that showed '22
13  or '19 or some other date.
14          What would have been publicly
15  available at that time would have been
16  things like turbo redemptions, the actual
17  turbo redemptions that the TSA made versus
18  what actual -- excuse me -- what was
19  projected in the original bond OS from
20  2002.
21    Q     Just so I am clear, in the work
22  that you did in putting together this
23  report and your analysis, you have found no
24  public statements from the Washington TSA
25  as of March of 2009 where they suggest that

31 (Pages 121 to 124)

Page 125

Jeffrey Hasterok

1    there is a different turbo date for the
2    2002 bonds than June of 2019, correct?
3        A    Yes, I couldn't -- I can't
4    recall anything -- generally, the
5    minutes -- if you read through the TSA
6    minutes, they are -- not every board
7    minute -- not every minutes -- not every
8    board meeting explicitly says a date.
9        Okay.  They generally have
10   updates from their banking team in most of
11   their board meetings.  And most of those
12   minutes talk about a slowdown in
13   consumption, the overall health of the
14   tobacco market.  In some cases, they will
15   actually put a date in.  In other cases,
16   they don't.
17       Q    Did they ever put a date in, at
18   any time before March of 2009, other than
19   the June 2019 date?
20       A    I don't know.
21       Q    You didn't see any such
22   occasion, right?
23       A    Not that I can recall.
24       Q    All right.  And then on page 11

Page 126

Jeffrey Hasterok

1    of your report, you have got a chart on
2    there; and you have got a series of data
3    points that are in blue, and then you have
4    got other points that are in red.
5        Do you see that?
6        A    Yes.
7        Q    Okay.  And the red ones are
8    your projections based on the data that you
9    have analyzed?
10       A    That's correct.
11       Q    Okay.  Now, you call the blue
12   dots "past projections"; do you see that?
13       A    Correct.
14       Q    But many of them, in fact, are
15   not past March 2009.  They are just past
16   the date of this report, correct?
17       A    Let's see.  I'll give you the
18   right answer here, so, let's see, the blue
19   one would have been -- it would have been
20   past -- prior to today, yes, the date of
21   the report.  Right.
22       So the last blue dot is
23   approximately as of 2013, July of '13 --
24   that's the final blue dot.  And the

Page 127

Jeffrey Hasterok

1    estimate was around 2025, so, yes, so
2    not -- right.
3        So when I say -- we say "past,"
4    we mean prior to the date of the report,
5    not prior to -- prior to March of '09.
6        Q    And if you said "past" meant
7    prior to March of '09, the date of
8    rejection, only the first two dots on page
9    11 would be past projection; is that
10   correct?
11       A    That's -- according to this
12   data set, yes.
13       Q    And if you ran a regression
14   analysis on those first two dots, you would
15   get a flat line of 2019?
16       A    Correct.  If those were your
17   only two inputs, yes, I agree with that.
18       Q    All right.  Let's go to the
19   discussion about the forward curves on
20   pages 13 through 15 of your report.  On
21   page 14 you have a graph, a chart, again,
22   with a blue line and red line.
23       A    Right.  Apologies if anybody is
24   color blind.

Page 128

Jeffrey Hasterok

1        Q    On the blue line, which you
2    have labeled, "Implied three-month LIBOR
3    resets," correct?
4        A    Yes.
5        Q    The data you used to obtain
6    that line is data that was available to the
7    market on the rejection date, correct?
8        A    Yes.
9        Q    The red line, which you
10   label, "Actual three-month LIBOR resets,"
11   that's based on data that became available
12   to the market after March of 2009, correct?
13       A    That is true.
14       Q    You footnote on page 14 some
15   material written by Peter Orr; do you see
16   that?
17       A    Yes.
18       Q    Who is Peter Orr?
19       A    He is a former JP Morgan, I
20   believe, banker slash derivative marketer,
21   who has his own shop now, as -- he sells
22   structuring software for the public finance
23   market.
24       Q    And that's someone you have

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 129

Jeffrey Hasterok

1  worked with in the past?
2
3      A    I didn't personally work with
4  Peter, but I certainly heard his name from
5  colleagues who used to work with him at JP,
6  or I believe he worked at JP, if my memory
7  serves.
8      Q    And this publication that you
9  refer to, this article you refer to, what
10  is it?  Is it an academic study?
11      A    If you consider Peter an
12  academic, then, yes, but it's his -- it's
13  his attempt at trying to understand:
14          Do swap curves, Treasury
15  curves, agency curves, whatever the curve
16  might be, do they tend to under- or
17  over-predict where rates will actually go,
18  compared to the prediction they make on day
19  one?
20      Q    All right.  Well, my question
21  about whether it's an academic study was a
22  slightly more serious question.
23          You are familiar with finance,
24  academic finance journals; are you not,
25  sir?

Page 130

Jeffrey Hasterok

1
2      A    Sure, the Journal of Finance.
3  There are -- you could have publications
4  from professors at respected universities,
5  sure, if that's -- sure.
6      Q    If you think about an academic
7  study in those terms, something that would
8  be published in the Journal of Finance --
9      A    Sure.
10      Q    -- the Peter Orr article that
11  you referred to, was that published in the
12  Journal of Finance?
13      A    I don't know.
14      Q    Okay.
15      A    I don't know if he had it
16  peer-reviewed, for example.
17      Q    Okay.  If I understand your
18  expert report correctly -- I think you have
19  told us where you got this article from if
20  you look at page 28 of 28, the last page.
21      A    Yes, it's a web -- a URL.  It's
22  a web link.
23      Q    It's a URL.  It's a web link.
24  It's a blog; isn't it?
25      A    Peter, there it is.  Yes, it's

Page 131

Jeffrey Hasterok

1
2  part of his web site.  Intuitive Analytics
3  is his company.
4      Q    Right.
5          (There was a discussion off the
6      record.)
7          (Exhibit No. Lehman 33,
8      Printout of Web Page, Peter Orr
9      Article, is marked by the reporter for
10      identification.)
11      Q    So I have placed before you a
12  document marked Lehman Exhibit 33.  That's
13  a web page we accessed based on your
14  description on page 28 of the report.
15  That's the Peter Orr article you were
16  referring to, correct?
17      A    Yes.
18      Q    And you cite Mr. Orr for the
19  proposition that -- well, he's the only
20  support you cite for your opinion that the
21  forward rates, forward curves should be
22  rejected, correct?
23          MR. LAWRENCE:  I'm sorry.  I
24      didn't understand it.  Could you read
25      the question back.

Page 132

Jeffrey Hasterok

1
2          MR. TAMBE:  I can rephrase the
3  question.
4          MR. LAWRENCE:  Okay.  Thank
5  you.
6      Q    Mr. Orr is the only article you
7  cite for the proposition that forward
8  rates, forward curves should be rejected,
9  correct?
10      A    It is the only article we cite,
11  yes.
12      Q    Did you do any kind of a study
13  of all the literature out there about
14  forward curves before you decided to pick
15  Mr. Orr?
16      A    We did not.
17      Q    And I think we covered this.  I
18  just want to be sure.
19          As far as you know, whatever
20  Mr. Orr says in this article, Lehman
21  Exhibit 33, you don't know if it has been
22  peer-reviewed or not?
23      A    I have no idea.
24      Q    And it's your view that this
25  article supports your contention that the

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 133

Jeffrey Hasterok

1  forward curve should not be used to value
2  the Washington TSA contract, correct?
3      A    It is one factor, yes, that we
4  believe that -- as we said earlier, using
5  long-dated contracts as the basis of the
6  valuation, because the TSA cannot enter
7  into them, is -- is problematic, and is
8  less attractive than the model we
9  suggested.
10     Q    Now, just to be clear, nowhere
11 in this article does Mr. Orr adopt a
12 valuation approach for a long-dated
13 contract like the one you have adopted,
14 correct?
15     A    Absolutely.  He's -- that is
16 not the gist of what's he's talking about.
17 He's not talking about how to value RFAs.
18     Q    All right.
19         Okay.  Did you review other
20 materials written by Mr. Orr other than
21 this article?
22     A    I would have clicked around his
23 web site a little bit; but I didn't -- I
24 didn't do an exhaustive search of the

Page 134

Jeffrey Hasterok

1  internet and the financial literature and
2  Lexis/Nexis type searches for everything he
3  has written.  I have -- I did not do that.
4      Q    And did you do any kind of an
5  analysis to see if the views expressed by
6  Mr. Orr had also been expressed in any
7  peer-reviewed academic journal?
8      A    We did not.
9      Q    Well, did you look to see if
10 any of Mr. Orr's views as expressed in
11 Lehman Exhibit 33 had been opposed or
12 disagreed with by published academic
13 literature?
14     A    We did not seek out direct
15 opposition to this thesis.
16     Q    How did you know to go to
17 Mr. Orr's web site?
18     A    Google search.  We did not know
19 to go to his particular site.
20     Q    What did you search for in
21 Google?
22     A    We were looking, again, for
23 some type of report, analysis, financial
24 literature, that somebody had looked at

Page 135

Jeffrey Hasterok

1  this type of analysis, looked at some --
2  some market like Treasuries, like LIBOR
3  swaps, and done the work -- the actual work
4  of saying:
5         "On day one, here is the swap
6  curve, for example.  Here are the
7  implied -- here is the implied path of
8  rates on that day," and then compare it to
9  the actual path over time, and then shift
10 it by a day and do it again and shift it by
11 a day and do it again.
12        Dan and I did not do the actual
13 coding work ourselves.  We were hoping to
14 take a shortcut and find somebody who had
15 done that work.
16     Q    Now, you have been in the
17 financial markets more than ten years,
18 right?
19     A    Yes.
20     Q    You know the forward curve
21 changes everyday, correct?
22     A    Yes.
23     Q    So you could have the forward
24 curve tell you the market expectations on a

Page 136

Jeffrey Hasterok

1  particular date, and you know for virtual
2  certainty, reality, a week later, a month
3  later, a year later, it's going to be
4  something different, right?
5      A    I agree.
6      Q    So that's not rocket sign; is
7  it, sir?
8      A    No.
9      Q    Now, what search did you run in
10 Google?
11     A    We probably looked for -- I
12 can't remember exactly what I wrote.  But
13 it would have probably been implied
14 forwards versus actual forwards, something
15 along those lines.
16     Q    You didn't keep a record of
17 what search you ran to get to Mr. Orr's
18 article, right?
19     A    No, I did not.
20     Q    And I suspect, when you ran
21 your search, Google being Google, you got
22 pages and pages of results, right?
23     A    I would assume so, yes.
24     Q    Where did Mr. Orr appear, page

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 137

1          Jeffrey Hasterok
2   one?
3      A    I don't remember.
4      Q    Top of page one?
5      A    I don't remember.
6      Q    So you may have gone past many
7   articles before you got to Mr. Orr's
8   article?
9      A    Sure.
10     Q    There may have been many more
11  after Mr. Orr?
12     A    Sure.
13     Q    And some of those articles may
14  have disagreed with Mr. Orr?
15     A    Sure.
16     Q    And some may well have agreed
17  with Mr. Orr?
18     A    I agree.
19     Q    And can you recreate the
20  results of that search you ran?
21     A    No.
22     Q    All right.  So the chart that
23  Mr. Orr has on page one of Exhibit 33, you
24  understand Mr. Orr as sort of comparing a
25  forward curve to actual spot prices --

Page 138

1          Jeffrey Hasterok
2      A    Yes.
3      Q    -- over some long period of
4   time?
5      A    Yes.
6      Q    And he's doing that with the
7   respect to the US Treasury ten-year rates,
8   right?
9      A    Correct.
10     Q    Notwithstanding this chart and
11  this list, which looks like it's a 30- or
12  40-years history, in 2010, the financial
13  markets were still using forward curves,
14  correct?
15     A    Yes.
16     Q    And the US Treasury ten-year
17  note was deep, liquid, widely traded?
18     A    Yes.
19     Q    So whatever else Mr. Orr may be
20  saying in this article, he's not saying:
21       "Don't use the forward curve to
22  do a valuation analysis," correct?
23     A    The last sentence on page two
24  of his entry, his entry, his article --
25     Q    Call it a blog.  It's okay.  He

Page 139

1          Jeffrey Hasterok
2   calls it a blog.
3      A    Okay.  Yeah -- no, it's his
4   blog.
5      Q    Okay.
6      A    The last sentence is:
7       "However, if you're an issuer
8   or working with an issuer looking at some
9   sort of scenario analysis on their debt
10  portfolio, forward rates might be good to
11  know, but probably not the end of the
12  forecasting road."
13     Q    So that's the sentence that you
14  believe supports your rejection of the
15  forward curve in your analysis?
16         MR. LAWRENCE:  Object to the
17  form.
18     Q    Is that right?
19         MR. LAWRENCE:  Object to the
20  form.
21     A    No, no, I -- the core of why we
22  don't use it goes back to the inability of
23  TSA to transact.  That's more important.
24  And that's why we went away from it as the
25  preferred method -- still thought about it,

Page 140

1          Jeffrey Hasterok
2   still looked at it.  That's why we ended up
3   with the cancellable swap scenario.
4      But the point of this article
5   and why we included it is simply to show,
6   just because on a given day the swap curve
7   or the Treasury curve implies rates are
8   going to follow a path, doesn't mean it
9   actually will follow that path.
10         That's simply what we were
11  trying to get at.
12     Q    But as we just discussed,
13  that's not news or rocket science.  No one
14  says the forward curve actually tells the
15  future, correct?
16     A    No one?  I can't say that.
17     Q    It's not a crystal ball,
18  correct?
19     A    I can't speak for everybody in
20  the entire financial markets, but our
21  thrust here is that forward rates are
22  unknown and -- sorry.
23         The actual path of forward
24  rates, the future is unknown.  The future
25  is unknown.  That's all we are getting at.

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 141

Jeffrey Hasterok

1
2    Q    Right, the future is unknown,
3    but the forward rate on any given day is
4    known?
5    A    Can be calculated and inferred
6    from tradeable securities, you are
7    absolutely right.
8    Q    And just to be clear, trillions
9    of dollars of transactions are done on the
10    basis of that forward curve?
11    A    Yes.
12    Q    And, in fact, Mr. Orr, right
13    before he gets to the sentence you quoted,
14    says:
15        "If you are in a financial
16    services environment as a trader or you are
17    looking to perform a fair price analysis of
18    an interest rate derivative using an
19    interest rate model, you better" -- I
20    believe he's italicized "better" -- "you
21    better use forward rates."
22        The next sentence:
23        "If you have got complete and
24    relatively efficient markets, you'll get
25    your head removed if you don't."

Page 142

Jeffrey Hasterok

1
2        Do you see that?
3    A    Very eloquent, yes.
4    Q    You don't disagree with that?
5    A    I do not.
6    Q    Now, you'll see that he engages
7    in some commentary with one of his readers
8    right below his blog.
9        Do you see that?
10    A    Okay. I didn't read that
11    before. But --
12    Q    Take the time to read it.
13    A    Okay.
14    Q    Someone called Sean writes to
15    him, and he responds to Sean, and do you
16    see that?
17    A    Yes.
18    Q    Okay.
19    A    Yes.
20    Q    And then he says at the end of
21    that first line into the second line:
22        "If anything, realized rates
23    are likely to be higher than those forwards
24    at some point over the ten-year horizon, at
25    least at the long end."

Page 143

Jeffrey Hasterok

1
2        Do you see that?
3    A    I'm sorry. I'm sorry. I
4    don't.
5    Q    You're on the page.
6    A    I'm on the right, page two.
7    Q    On the bottom?
8    A    On page two. Okay. Where?
9    Sean's comment, or Peter's foil to Sean's
10    comment? What --
11    Q    Peter's response to Sean's
12    comment?
13    A    Okay.
14    Q    It starts off with, "Hi, Sean,
15    thanks for the comment."
16        At the end of that line:
17        "If anything, realized rates
18    are likely to be higher than those forwards
19    at some point over that ten-year horizon,
20    at least at the long end."
21    A    Okay.
22    Q    All right. Did you -- and the
23    horizon in our case, just to be clear, is
24    not in your view -- not just a 10-year
25    horizon; it's a 23-year horizon, right?

Page 144

Jeffrey Hasterok

1
2    A    Right.
3    Q    Okay. Did you do any -- well,
4    you didn't read this line before today?
5    A    I did not. That's my first
6    time reading that.
7    Q    And it's safe to say you didn't
8    do any analysis to see, to the extent the
9    forward curve is not a crystal ball, does
10    it under-predict or over-predict, correct?
11    A    We did not do any kind of data
12    analysis that can weigh one or the other.
13    I cannot tell you with any certainty
14    whether it over-predicts or under-predicts
15    and under which right environments it does
16    so.
17    Q    But going back to your graph in
18    Exhibit 30 on page 14, so you have got
19    the -- if you can get Exhibit 30 for him,
20    yes.
21        MR. LAWRENCE: His report.
22    Q    You have looked -- you have put
23    out there the forward curve for three-month
24    LIBOR that existed on March 2009, correct?
25    A    Yes.

36 (Pages 141 to 144)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 145

Jeffrey Hasterok

```
 1          Jeffrey Hasterok
 2     Q     And that's what the view of the
 3  market was with respect to forward rates on
 4  the rejection date, correct?
 5     A     Yes.
 6     Q     Then you have put on the same
 7  graph the observed data or months and years
 8  after the rejection date, correct?
 9     A     Sure.
10     Q     But sitting here, you can't
11  tell me what's going to happen to that red
12  curve tomorrow or three months from now or
13  a year from now?
14     A     Absolutely agree.
15     Q     Or 23 years from now.  And --
16          MR. TAMBE:  I think we can
17  break for lunch now.
18          MR. LAWRENCE:  Want to break
19  for lunch --
20          (There was a discussion off the
21  record.)
22          (A lunch recess was taken.)
23     Q     Just going back to the expected
24  maturity date discussion we had
25  previously --
```

Page 146

```
 1          Jeffrey Hasterok
 2     A     Sure.
 3     Q     -- if the RFA had remained in
 4  place and there was a turbo redemption,
 5  would there have been any termination
 6  amount payable under the RFA?
 7     A     Up to the point where there
 8  were enough turbos where the balance of the
 9  bond deal was less than or equal to the --
10  the -- there's a few accounts, one of
11  them -- the biggest one being the RFA, so,
12  yes.
13     Q     Okay.  So it's your
14  understanding that, if there is a turbo
15  redemption and the RFA is still in place,
16  it has not been rejected or terminated?
17     A     Sure.  We're assuming Lehman is
18  a going concern.
19     Q     Lehman is a going concern.
20     A     Right, right.
21     Q     That there would be a
22  termination payment due and owing?
23     A     No.
24     Q     Okay.
25     A     No, no, no.  It's -- the
```

Page 147

```
 1          Jeffrey Hasterok
 2  shorthand phrasing is "par break."
 3     Q     Okay.  All right.
 4     A     And it's not just one single
 5  turbo redemption.  It would be enough that
 6  the balance of the bond deal drops so that
 7  there's only about 45 million outstanding.
 8  And then they can -- then they close the
 9  bond deal out at that point.
10     Q     All right.  Let's go back to
11  the grid.
12     A     Page 19.
13     Q     Yes.  Now, we discussed the
14  grid previously.  I think you told us that
15  you have -- the data that was used to
16  calculate the grid was provided to us in an
17  Excel spreadsheet; is that right?
18     A     Yes.
19     Q     Okay.  So one of the things
20  that we are going to mark is we are going
21  to mark a printout of that Excel
22  spreadsheet.  And then we have available in
23  the room a projector and a screen, so we
24  can look at the spreadsheet in its native
25  format.
```

Page 148

```
 1          Jeffrey Hasterok
 2     A     Got it.  The spreadsheet was
 3  not designed to be to be printer-friendly.
 4  That was never the intention of it.
 5          (Exhibit No. Lehman 34,
 6          Document, Bates No. TSA-042447, Front
 7          Page of 129-page Printout of
 8          Spreadsheet, is marked by the reporter
 9          for identification.)
10     Q     While the spreadsheet is not
11  designed to be printer-friendly, electronic
12  spreadsheets are not deposition-friendly.
13     A     Okay.  Got it.
14     Q     Because we are trying to keep
15  of record of what it is that you are
16  looking at when you testify --
17     A     Yes.
18     Q     -- and make sure that at some
19  later date there is no confusion about what
20  the document is that you are testifying
21  about.
22          Now, if you look at
23  Exhibit 34 -- and I will tell you what that
24  is.  That is a printout of all of the
25  worksheets in the spreadsheet that you
```

Page 149

Jeffrey Hasterok

1  provided to us.
2      A    Got it.
3      Q    Okay.  And what we have done is
4  added at the top of each page a descriptor
5  of the tab in your spreadsheet.
6      A    Yep, understood.
7      Q    And there is a sequential
8  numbering at the bottom, one of 129, total
9  of 129 pages in this printed document.
10     A    Got it.
11     Q    Okay.  The first thing that I
12  would like to do is pull up the
13  spreadsheet, the electronic spreadsheet on
14  the screen.  And you can take a look at the
15  tabs and the file name and et cetera and
16  confirm that that's, in fact, the
17  spreadsheet --
18     A    That appears to be it.
19     Q    -- that you provided.
20         Okay.  And one of the first
21  things we are going to do is we're just
22  going to walk through what the tabs are at
23  the bottom of the spreadsheet?
24     A    Sure.

Page 150

Jeffrey Hasterok

1      Q    Starting from left to right, if
2  you can read out the tab and then describe
3  what the tab is.
4      A    Sure.  So the first tab is 25
5  March 2009, just meaning that that is the
6  rejection date and the date that we are
7  using to calculate the termination amount
8  as of.
9         It has, I would say, a set of
10  inputs in blue at the top left, the
11  guaranteed rate on the existing RFA, a
12  replacement rate, the dollar amount, and so
13  on.
14         The way that we use this is to
15  type in the various replacement rates from
16  the -- from the matrix; so we separately
17  calculated these different replacement
18  yields on page 19 of the report.
19     Q    Yes.
20     A    So, for example, we would have
21  calculated 89 basis points for the first
22  one for CP.  We would have then entered in
23  cell C-4 of that first tab the relevant
24  replacement yield, and then in cells F-2,

Page 151

Jeffrey Hasterok

1  to I-3, that should then tell you the
2  relevant termination amount given a variety
3  of different assumed maturity dates.
4      Q    Okay.  And what you just
5  described, cells F-2 through I-3, there are
6  four different maturity dates and four
7  different amounts, correct?
8      A    Yes, and they transcribe to
9  what you see in the grid.
10     Q    Okay.  And the amounts which
11  are in line three, columns F through I,
12  those are totals of more detailed cash flow
13  calculations done in this tab of the
14  spreadsheet?
15     A    Precisely.
16     Q    Okay.  Now, I assume, if we
17  went over to C-4 and changed the assumption
18  about the replacement rate, the spreadsheet
19  would recalculate those numbers and
20  repopulate all of those numbers?
21     A    Exactly.  So if you want to try
22  to put in point 89 or 0.89 percent --
23     Q    Yeah.
24     A    -- and it should spit out

Page 152

Jeffrey Hasterok

1  numbers that match that first line in page
2  19 of the matrix.
3      Q    Okay.  So we just did that.  We
4  just put in 0.89 in cell C-4.  And it's now
5  calculated new numbers for F-3 through I-3.
6         Do you see that?
7      A    Yes.
8      Q    Okay.
9      A    And it appears to match what we
10  have in the matrix, in the report itself.
11     Q    Okay.  All right.  So we will
12  go back to the way it was produced with
13  0.65 in it.
14         All right.  And then right
15  below the area we were discussing, so B-8
16  through C-15 --
17     A    Yes.
18     Q    -- that's your calculation of
19  the failed delivery for the first period;
20  is that correct?
21     A    That is correct.  So as of
22  December 1st, that's when Lehman was
23  supposed to send them paper.  They did not.
24  That's when they went into an alternative

38  (Pages 149 to 152)

Page 153

Jeffrey Hasterok

1  investment at that point.
2       So it's essentially an unpaid
3  amount, to use -- to borrow an ISDA term.
4       Basically, how much did they
5  lose prior to the termination date, and how
6  much did they lose prior to the termination
7  date is not duplicative.  It's not twice
8  counted in the calculation.
9       Q    All right.  Then if we can roll
10  down to row 15, and then scroll across
11  through to H-15.  And that's simply a sum
12  of the guaranteed interest column; is that
13  right?
14       A    Right.
15       Q    Okay.  If we scroll over two
16  more to J-15, that is the sum of the
17  replacement interest calculated at the
18  replacement rate, correct?
19       A    Correct.
20       Q    The next column over, K, you
21  calculated the differential between those
22  two sums, right?
23       A    Correct.
24       Q    And then we go over three more

Page 154

Jeffrey Hasterok

1  columns to column N; and, now, you have
2  taken the present value of those sums, is
3  that right, the differential of those sums?
4       A    Right, present value of the
5  differential, right.
6       Q    And you have used as your
7  discount rate the same rate that you use as
8  your replacement rate; is that right?
9       A    Yes.
10       Q    In fact, if we can go to C-5,
11  it's -- it's coded that way, correct?
12       A    Yes.
13       Q    It's coded that, no matter what
14  replacement rate you pick, that will in
15  your spreadsheet be exactly the same as the
16  discount rate?
17       A    That is correct.
18       Q    Okay.  What is the basis for
19  that methodology, which is, no matter what
20  replacement rate you use, you use the very
21  same number as the discount rate?
22       A    So why did we choose the same
23  number?
24       Q    Yes.

Page 155

Jeffrey Hasterok

1       A    Because, in our minds, the
2  replacement strategy that TSA is following
3  for all but the -- all but the last
4  scenario where we are using the swaption
5  and the cancellable swap strategy, all the
6  other cases are more similar to actually
7  buying a security.
8       And, for example, if you buy a
9  simple financial instrument like a Treasury
10  bond, the market convention when purchasing
11  such an instrument is to use the
12  acquisition yield or the yield at which you
13  buy that particular instrument as the
14  discount factor in the price formula.
15       There is agreement and
16  convention in the market; there is one
17  formula in how everybody calculates the
18  price of a Treasury bond.  And that formula
19  uses whatever yield of the security as the
20  discount rate.  So we are parroting that
21  type of methodology.
22       Q    Okay.  All right.  Let's scroll
23  over to the next tab in the spreadsheet.
24       A    Sure.

Page 156

Jeffrey Hasterok

1       Q    And if you could, again,
2  describe for the record what that tab is,
3  and then we can go with it.
4       A    Sure.  So this has the name
5  that really rolls off the tongue:
6       "25 March 2009 underscore
7  actual plus 2013 OS prog" -- "projected" is
8  what that means, p-r-o-g.
9       So this is essentially the
10  exact same as the prior tab.  They are
11  essentially carbon copies of each other.
12  The difference here is that, in this
13  particular scenario, which is on page 19 of
14  the report, "actual yield plus 2013 plus OS
15  projected," in this particular scenario, we
16  didn't have a single yield that is the
17  replacement rate.
18       It moves around a little bit.
19  It starts out with using their actual
20  reinvestment history.  It then flips to --
21  if you scroll down a little bit, if you
22  wouldn't mind, right, a little bit more.  I
23  think I have got -- I have got the windows
24  frozen.

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 157

Jeffrey Hasterok

1    But as you can see in column I,
2    in like cell I-35, for example, you can
3    see -- it jumped back up; it jumped back up
4    to row 19.  So scroll down a little bit.
5    Right.  Stop.  That's perfect.
6    So you can see that suddenly in
7    cell I-29, the replacement rate drops to
8    three basis points.  Where did we get that?
9    We got that from the 2013 OS,
10    which, as we talked about before, describes
11    an assumption that they made when they
12    issued those bonds that said:
13    "Beginning in 2013, we are
14    going to assume a rate of three basis
15    points.  And over the course of X number of
16    years" -- I believe it goes out to 2018,
17    2019 -- scroll down; you can see -- not
18    that far -- and one more, right there.
19    Okay.  So there.  Okay.  In
20    2018, by that point, the bond deal assumes
21    that they will start earning 75 basis
22    points.  And then that goes on forever.
23    So because it's not just one
24    number that fills in every single cell in

Page 158

Jeffrey Hasterok

1    this particular scenario, we created the
2    separate tab just to handle this scenario.
3    So it was a little -- a little more unique.
4    That's why we did it that way.  But all the
5    other cells work the same way.
6    Q    What is your understanding of
7    how those numbers, which appear in your
8    replacement rate column, which you say come
9    from the 2013 OS --
10    A    Yes.
11    Q    How were those numbers arrived
12    at?
13    A    We do not know.
14    Q    Do you know who derived those
15    numbers?
16    A    We do not know.  I do not know.
17    Q    Now, if you can just go down
18    to -- let's just pick a row like row 37.
19    Okay.  Row 37 is a calculation
20    for deposit date of December 2017.  Do you
21    see that?
22    A    Let me -- I apologize.  Let me
23    correct myself.
24    The language in the OS isn't

Page 159

Jeffrey Hasterok

1    specific about every single year from 2013
2    to 2018.  It just says 2013 it's three
3    basis points.  By the time we get to 2018,
4    its 75.
5    So, yes, I did calculate
6    between those two dates.  I just used
7    actually an Excel feature.  I think it's
8    for the "fill" feature.  But you give it
9    this starting and -- this starting cell,
10    this ending cell.
11    So the starting cell is three
12    basis points.  The ending cell is 75.  And
13    you say fill it in, so that it's an equal
14    jump between the two.
15    Q    Okay.
16    A    So if you were to graph that,
17    it would look like a straight line between
18    3 to 75, and then straight over.  So I
19    forgot to say that.
20    That element, we did -- I did
21    myself.  It seemed rational to just do a
22    straight line between the two points.  I
23    did not verify that with anybody from the
24    TSA or the banking team.  We just made an

Page 160

Jeffrey Hasterok

1    assumption.
2    Q    Okay.  So, again, the starting
3    point for this analysis is the 2013 OS,
4    correct?
5    A    Yes.
6    Q    And you make some assumptions
7    and some calculations based on the 2013 OS
8    to fill in your replacement rate column?
9    A    That's correct.
10    Q    Okay.  You didn't consult any
11    forward curves when you were putting
12    together that replacement rate column other
13    than what you saw in the OS, correct?
14    A    Right.  We didn't look at a
15    traded long-dated market, for example.  So
16    forward curves, we were projecting this
17    rate into the future.  If you want to call
18    that a "forward curve," okay, but we took
19    it straight from the OS and said:
20    "They are saying it's going to
21    be 75 past 2018, so let's just use it and
22    see -- and see what the number looks like."
23    Q    All right.  And then if I
24    understand your methodology -- I want to

40  (Pages 157 to 160)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 161

```
 1         Jeffrey Hasterok
 2  make sure I do.  If we can roll over a few
 3  more columns to the right, okay, let's just
 4  stop right there.
 5         So looking at that
 6  December 2017 row, row 37, you have got a
 7  replacement rate of 51 basis points --
 8  61 basis points; is that right?
 9     A   Yes.
10     Q   And you have used a discount
11  rate of 61 basis points as well?
12     A   That -- correct.
13     Q   Okay.  And, again, what's
14  your -- what's you rationale for using the
15  same discount rate there as the replacement
16  rate for that period in 2017?
17     A   Same as the first tab where
18  it's more mimicking the convention you
19  would use when you make a security
20  purchase, a fixed income security purchase.
21     Q   If you look in your report,
22  Exhibit 30, page 17.
23     A   Sorry, page 17.  Yes, go ahead.
24     Q   All right.  You have got two
25  boxes on that page.
```

Page 162

```
 1         Jeffrey Hasterok
 2     A   Yes.
 3     Q   The lower box, which has the
 4  start date, end date, do you see that?
 5     A   Yes.
 6     Q   All right.  For the second line
 7  there, which is December 2008 to
 8  September 2013, do you see that?
 9     A   I do.
10     Q   Right.  In the -- in the
11  right-hand column, "actual yield earned" --
12     A   Yes.
13     Q   -- it says 0.18 percent?
14     A   Yes.
15     Q   That's 18 basis points?
16     A   Correct.
17     Q   What you are showing there is
18  what was the yield actually earned by the
19  TSA through September 2013, between
20  December 2008 and September 2013?
21     A   Correct.
22     Q   Can you reconcile that
23  observation with the OS statement, the 2013
24  OS statement, that says the replacement
25  yield is three basis points and will be
```

Page 163

```
 1         Jeffrey Hasterok
 2  three basis points for several years into
 3  the future?
 4     A   I think that the current yield,
 5  as of the time they did the refunding deal,
 6  the TSA was earning approximately three
 7  basis points.  The money market funds that
 8  they were investing in are earning quite
 9  low, lower than 18.
10         The 18 is an average that I
11  backed into that number because the
12  dollar -- the number that the TSA gave me
13  was the dollar amount.  They said:
14         "We earned $400,774," so they
15  didn't say, "We earned 18-basis points."
16         So I backed into that number.
17  Right.  It was -- that's just -- that's
18  just a formula saying, "Start date, end
19  date, this discount convention," that
20  equates to the equivalence of 18 basis
21  points.
22     Q   Let's go back to the tabs.  The
23  next tab over is "final maturity chart."
24     A   Yes.
25     Q   And, again, if you just
```

Page 164

```
 1         Jeffrey Hasterok
 2  describe what that tab is in the
 3  spreadsheet.
 4     A   Sure.
 5     Q   And where the data comes from.
 6     A   Sure.  Sure.  So the columns B,
 7  C, and D are the basis of the chart you see
 8  next to it.  The chart is an X/Y scatter
 9  graph.  The dates in column B are from page
10  ten of the report, so those dates should
11  line up.
12         So the assumption date is the
13  date at which we found some documents that
14  showed a calculated guess as to what the
15  new maturity date of the bonds might be.
16  So, for example, the first one is from the
17  original OS, which is dated as in October
18  of 2002.
19         The OS itself said:
20         "We think the bonds are going
21  to retire in 2019.
22         Okay.  And then so on.
23         And then -- so the -- up to --
24  from cell B-6 to C-11, that range, B-6 to
25  C-11, those should line up with documents
```

41 (Pages 161 to 164)

Page 165

Jeffrey Hasterok

1  we found either -- I think most of these
2  came from board minutes or TSA minutes or
3  reports from Barclay's, which is one of
4  their underwriters.  So those are -- those
5  are -- that's where those data points came
6  from.
7          Then the next three data
8  points, from -- right -- cell B-12 to cell
9  D-14, those three numbers, especially in
10 the D column, are calculated estimates of
11 what the expected maturity date of the
12 bonds will be in the future assuming they
13 continue to follow a linear path between --
14 as extended beyond the original data
15 points.
16         So you are taking a set of data
17 from the past.  And when I mean "past," I
18 mean prior to the date of the report.  You
19 take those data points, and you draw a
20 straight line through them.  You perform a
21 linear regression.
22         You draw a straight line
23 through them, and you try to fit it as best
24 you can.  You -- obviously, you let Excel

Page 166

Jeffrey Hasterok

1  do this for you.  You don't do it by hand.
2          You fit that line to those blue
3  dots.  And then the red dots are on that
4  line extended out in the future.
5          So what you are basically
6  saying is:
7          "If we follow the same
8  approximate part as we have in the future,
9  on given dates in the future, this is what
10 the new termination date of the bonds
11 should be projected to be."
12         And they -- those -- those
13 projected dates come from the cells in A-18
14 to B-20.  And those are simply just inputs
15 in a linear regression analysis.
16         It's -- "R squared" is the R --
17 that cell that you are looking at,
18 "R squared" is a "goodness of fit" measure.
19 It's -- the closer to 100 percent -- if it
20 was 100 percent, that means every single
21 data point you have is exactly on the line.
22         And then "slope" and
23 "intercept" are again your basic -- you
24 know, if you remember high school trig and

Page 167

Jeffrey Hasterok

1  things, it's Y equals the slope times X
2  plus some fixed number, the intercept.
3      Q    In other words, the slope is
4  the -- what, the steepness of the curve?
5      A    Exactly.
6      Q    The line?
7      A    Exactly.
8      Q    And the intercept is what,
9  where that line intercepts the vertical
10 axis?
11     A    Exactly.
12     Q    What does that entry B-19 mean?
13 It's 1954.23?
14     A    That would mean that at -- that
15 would mean at year zero, the bond is
16 worth -- I mean, it's a nonsensical result
17 if you go that far left.
18         But it means that, at year
19 zero, the bond would have retired in the
20 year 1954.
21     Q    I guess I am trying to figure
22 out year zero -- year zero on the
23 horizontal axis.
24     A    Year zero on the horizontal

Page 168

Jeffrey Hasterok

1  axis.  The horizontal is the X variable.
2      Q    And you said this was sort of a
3  linear regression analysis, correct?
4      A    Yes, sir.  Right.
5      Q    Did you have the option of
6  taking some other type of regression
7  analysis other than the linear one?
8      A    You always do.  You can do --
9  there's a variety of ways to fit a curve or
10 a function to a set of data.  I think I
11 would assert that linear is probably the
12 most common, but, yes, there are many ways
13 to do it.
14     Q    And I guess, as the name
15 suggests, the linear regression analysis is
16 going to give you the best straight line
17 answer?
18     A    Exactly.
19     Q    It's not going to yield a
20 curve?
21     A    Right.  Well, a straight line
22 is, I think, technically a curve.
23     Q    With a flat curve.
24     A    But, I -- yes, we agree with

42  (Pages 165 to 168)

Page 169

Jeffrey Hasterok

1    each other, yes.
2        Q    Okay.  The other thing we had
3    talked about is the definition of what is
4    the "past projection."
5        So if we -- if we, in fact, use
6    this model and say that the only past
7    projections that you would consider are the
8    projections that were in the past as of the
9    early termination date, you would have only
10   looked at lines six and seven, correct?
11       A    Yes.
12       Q    Okay.  And what would happen in
13   this spreadsheet if that's what you did, if
14   you sort of zeroed out eight, nine, ten,
15   and eleven, would you get a result?
16       A    You would have a horizontal
17   line that would be 2019 forever.
18       Q    Okay.  And, in fact, would your
19   model do that if we do it now?
20       A    You can try.  Go right ahead.
21   I mean, or just delete it.  Try deleting
22   them, you know.
23       Yes, there it is, in cell B-19.
24       Q    All right.  Okay.  So, now,

Page 170

Jeffrey Hasterok

1    when you zero out the post early
2    termination date observations, what your
3    model predicts an early redemption date
4    of 2019 straight flat line?
5        A    Yep, if that's your only two
6    data points.
7        Q    All right.  So I think we can
8    reset it back to where it was.  All right.
9    Let's go to the next tab.
10       All right.  I am trying to --
11   if you can explain what appears on this
12   spreadsheet.
13       A    Yes, this is called
14   "FNMA-FHLMC," so Fannie and Freddie, okay.
15   And this was our attempt to hunt down some
16   times series data on Fannie and Freddie
17   discount notes and their yields over time.
18       Fannie and Freddie both auction
19   securities to the public similar to the
20   Treasury.  And so they maintain data
21   related to these auctions.  I believe I
22   gave you the links in the appendix to
23   their -- to their home pages, to their web
24   site where the data comes from.

Page 171

Jeffrey Hasterok

1        As you can see, it's monthly
2    data.  It's not daily data.  For the
3    purposes of the report, that granularity
4    was enough.  We didn't feel that this
5    was -- we didn't feel like we had to go the
6    extra step and really find daily data.  And
7    there are differences between where Fannie
8    and Freddie auction securities and versus
9    where they trade in the secondary market.
10   They are not exactly the same.
11       But we found the raw data, and
12   then, I believe, over in the farther right
13   columns, I am -- I am taking the Freddie
14   data and using what's called a "pivot
15   table" to line it up with the Fannie Mae
16   data; so they are both monthly data points
17   with the same months so that they line of
18   up.
19       And then I just average the two
20   in column M; and then, finally, in column
21   N, I am eye-balling month-to-month how wide
22   of a difference is it between Fannie and
23   Freddie.
24       Are they -- do they generally

Page 172

Jeffrey Hasterok

1    move in lock-step, or are some -- are there
2    some cases where Fannie is trading far
3    cheaper than Freddie?  That was just kind
4    of a double-check on the data.  That was an
5    eyeball.  We are just eyeballing the data
6    for data integrity purposes.
7        Q    And, generally, the entries in
8    that column, the column "N" as in
9    "Nancy" --
10       A    Yes.
11       Q    -- for the most part, not
12   across the board, but for the most part are
13   in the hundredths of decimal places.
14   Occasionally, you have, you know 0.15,
15   0.17.
16       A    Sure.
17       Q    And so what impact does that
18   have on your eyeball test?
19       A    Nothing that was -- that felt
20   rational --
21       Q    Okay.
22       A    -- that, occasionally, they are
23   going to trade different than each other,
24   could be the timing of when Fannie did an

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 173

Jeffrey Hasterok

1  auction versus when Freddie did it and
2  rates move around month-to-month.
3          So that's all.  We were just
4  trying to get an estimate of approximately
5  what agency discount notes look like over
6  time.
7      Q    And if I understand your
8  description correctly, what your eyeball
9  test confirmed was that they generally tend
10 to move together?
11     A    Correct.
12     Q    And variations are slight?
13     A    Yes.
14     Q    All right.  And, now, there was
15 a time period -- now, you have looked at a
16 time period starting in October of 2002 all
17 the way through to -- it appears to be
18 November or December of 2013?
19     A    Yes.
20     Q    Is that -- do you see that?
21     A    Yes.
22     Q    Okay.  All right, now, also on
23 this spreadsheet, if you go to the top of
24 the spreadsheet in rows four and five over

Page 174

Jeffrey Hasterok

1  at the right, in columns M, N, and O, it
2  looks like you have gotten some average
3  calculations, correct?
4      A    Yes.
5      Q    So we have highlighted row
6  four, column M; and there is a formula in
7  that cell.  It's the average of entries in
8  a particular column; is that right?
9      A    Yes, they should -- those cells
10 M-85 to M-88, if you scroll down to those
11 cells, should correspond to December of '08
12 to March of '09.  So I hope I did it right.
13         No, don't go over that far.  It
14 should be -- look at the "pivot table"
15 dates.  That's what you want, so -- and --
16     Q    85 to 88.  Okay.
17     A    So it looks like it's lining up
18 correctly.
19     Q    So what you are doing is the
20 average there of the items -- of the
21 numbers that appear for that three-month
22 period?
23     A    Yes, sir.
24     Q    And then, similarly, on the

Page 175

Jeffrey Hasterok

1  next row down -- again, go to the top of
2  the spreadsheet --
3      A    There we go.
4      Q    Row five.
5      A    So look at cell M-5, so it
6  goes -- so 85 to 139.
7      Q    And that's an average that you
8  have run from December of 2008 through --
9  it looks like -- June of 2013?
10     A    Yes.  And I think -- yeah, I
11 think the reason why we stopped at June --
12 why did we stop at June?
13         You know, it might have been --
14 I have to check my -- I have to check all
15 the data.  But it may have been that -- I
16 think one of these data sets, the CDs or
17 the CP, I think, stopped in June.
18         So for consistency's sake,
19 we -- even though we had more data than
20 June, we purposely stopped at June because
21 it lined up with one of the other data sets
22 that didn't go all the way to December, if
23 that makes sense.  We will probably see it
24 in one of the next -- one of the next tabs.

Page 176

Jeffrey Hasterok

1      Q    Give me one moment.
2          All right.  Now, the averages
3  that you have in column M-4 and -5?
4      A    Yes.
5      Q    That 0.54 and 0.21.
6      A    Yes.
7      Q    Those are, in fact, numbers
8  that end up in your grid, correct?
9      A    Exactly.
10     Q    All right.  So they end in your
11 grid on page 19 of your expert report?
12     A    Right.  So you take those two
13 numbers; you go back to the first tab, the
14 March '09 tab.  You punch those numbers in.
15 And then in -- as we talked about in cells
16 F-2 to I-3, it will spit out the
17 termination amounts relevant for that
18 particular replacement yield.
19     Q    Okay.  All right.  I think we
20 will probably go over to the next --
21     A    Okay.  The next data is called
22 "H-15 data."  H-15 is one of the data
23 reports that the Fed puts out.  And the Fed
24 keeps track of a whole host of different

44  (Pages 173 to 176)

Page 177

1      Jeffrey Hasterok
2  financial rates and yields and such.  And
3  so these data points are straight from the
4  Fed report.
5      Q   Okay.
6      A   So if you go to
7  "FederalReserve.gov," you should be able to
8  recreate these numbers.  It works in
9  concert with the next tab, "H-15 pivot."
10  They are complementary.  The pivot
11  basically makes things into dates that line
12  up properly so that everything lines up
13  cleanly.
14      Q   All right.  So let's -- then
15  let's spend some time on the pivot tab, the
16  H-15 pivot tab, right.
17          Again, at the top of at that
18  spreadsheet, you have got, I guess, a
19  couple of summary rows, correct?
20      A   Um-hum.
21      Q   You have got your three-month
22  average, and then you have got the roughly
23  four-year average, right?
24      A   Yes.  Yes, four-month and four
25  or five -- four years, yes, sure.

Page 178

1      Jeffrey Hasterok
2      Q   So the first one, the
3  December '08 through March '09 average in
4  column D-3, you show 1.25; and column E-3
5  is 0.89.
6          What's the difference between
7  those two?
8      A   So D-3 is talking about
9  certificate of deposit rates, and cell E-3
10  is commercial paper rates, financial,
11  three-month commercial paper rates.
12      Q   Again, if we were to try to map
13  those numbers over onto your grid, do those
14  numbers map onto your grid?
15      A   They should.  So 125 in cell
16  D-3, you see under "certificates of
17  deposit," "replacement yield," so 125 and
18  37; you see those two yields.  And then
19  they line up with the averages, so that
20  they go straight into the grid.
21      Q   All right.  And if I understand
22  what you are doing in the grid then with
23  these numbers is you will -- depending on
24  the row, you will hold the 89 basis points
25  or the 125 basis points; you project them

Page 179

1      Jeffrey Hasterok
2  into the future; you hold them constant --
3      A   Yes.
4      Q   -- for the next however many
5  years until --
6      A   Yes.
7      Q   -- until 2032, correct?
8      A   Yes.
9      Q   Did you do any kind of
10  statistical analysis to see whether a
11  three-month sampling of rates or a
12  four-year sampling of rates was a good
13  predictor of what future rates would be?
14      A   No.  You can certainly just
15  scroll through the data and look at the
16  fact that, depending on -- and we make this
17  comment.  We do say, depending on what
18  range you pick, data range you pick -- do
19  you pick five years of data, ten,
20  one month -- whatever you happen to pick --
21  you are going to get at very different
22  number.
23          So did we do a specific
24  analysis that says, "Four months of data is
25  the best predictor of future results," we

Page 180

1      Jeffrey Hasterok
2  did not do that analysis.
3          We used those two ranges
4  because, number one, it's from the first
5  failed delivery when they actually had the
6  first -- finally started looking at
7  alternative reinvestment products, up to
8  two points, the first being the rejection
9  date.  So that's a logical date to look at.
10          And then we felt like:
11          "Well, yes, we were -- we can
12  stop at the rejection date, but let's also
13  look at, well, we have real data from how
14  much they have earned all the way up to
15  almost to today."
16          So although it says June,
17  ideally, we would have gone to, you know,
18  December 16th, if possible.  That says June
19  because of a limitation in the data that
20  was available to us.
21          I believe, if you scroll all
22  the way down, it might stop in June.
23      Q   As a --
24      A   There -- so, there, that's why.
25  It's the CD data that we said:

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 181

Jeffrey Hasterok

1
2      "Okay.  Well, if CDs end in
3   June, let's just do CP, CDs, and Fannies
4   all till June."
5          And so that they are all the
6   same kind of range.  But, as you can tell,
7   even if we had gone a little bit further in
8   CP, the result wouldn't have been all that
9   different.
10     Q    I think you said you did not do
11  a specific analysis that says four months
12  of data is the best predictor of future
13  results?
14     A    Correct.
15     Q    You did not do that analysis?
16     A    No.
17     Q    Did you do any kind of analysis
18  to see whether it is even a decent
19  predictor of rates?
20     A    We did not do any analysis of
21  that type.
22     Q    Okay.  So as you sit here
23  today, you can provide no opinion as to
24  whether using a four-month window or using
25  a four-year window is a good fit or a

Page 182

Jeffrey Hasterok

1
2   decent fit in terms of projecting rates
3   forward?
4      A    Well, I can tell you that, as I
5   said before, depending on the date range,
6   you pick, you are probably going to get
7   very different answers, and -- but we did
8   not do a thorough investigation of
9   back-testing every possible range and how
10  that then fit to future results.  We did
11  not do that.
12     Q    Now, you had available and you
13  have collected in the spreadsheet data that
14  goes back to the beginning of the bonds,
15  correct, October of 2002?
16     A    Yes.
17     Q    And that's, if you look at
18  October of 2002 through March of 2009,
19  that's about a seven-year time period, more
20  than a seven-year time period?
21     A    Seven, eight, something like
22  that.
23     Q    Did you run an average analysis
24  for that time period and see what the rates
25  were over that longer period of time?

Page 183

Jeffrey Hasterok

1
2      A    I don't remember.  We may have.
3   I don't remember exactly; but you can -- I
4   mean, you can eyeball -- you can clearly
5   see, if you go back to '08, you know, rates
6   were higher.
7      Q    Yes.
8      A    So I don't even have to do the
9   math.  If we go back to 2002 and you do an
10  average all the way up to today --
11     Q    Yes.
12     A    -- "today" being June of -- you
13  know what I mean.
14         But if you take the entire data
15  set and average it, the rate is going to be
16  higher.
17     Q    So let's just see how much
18  higher.
19     A    Yes, sure, go ahead -- can you
20  do -- you want to --
21     Q    So just one second.  Let's take
22  it a step at a time.
23     A    All right.
24     Q    So October of 2002 was row
25  eight, correct?

Page 184

Jeffrey Hasterok

1
2      A    Yep, right.
3      Q    And let's roll down to --
4   what's the row for March of 2009?  85.
5   That's the rejection date, correct?
6      A    Um-hum.
7      Q    Should we go to 85 or 86?
8      A    It doesn't matter.
9      Q    So let's go to 85, right.  I
10  guess let's go back up to the top of that
11  spreadsheet.  And to run the averages in
12  that period of time --
13     A    Put it in cell D-2, for
14  example.  Go to D-2.  So equal average --
15     Q    I think you have to spell it
16  out.
17         (There was a discussion off the
18  record.)
19     A    Open paren -- nope, you've got
20  to type the word "average" or click it.
21  Open paren, D-8.  No.
22     Q    Just D-8 all together.
23     A    D-8, right, what was it, 85?
24     Q    85.
25     A    D-85, end paren, enter.

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 185

Jeffrey Hasterok

1
2    Q    So that gives you 3.12?
3    A    And if you copy that formula
4    and paste it into --
5    Q    Control C.
6    A    E-2.
7    Q    Control D.
8    A    There you go.
9    Q    So if you ran your averages for
10   that seven-year time period, you end up
11   with figures of 3.12 and 3.09.  Okay.  And
12   I assume you could just put these numbers
13   into your very first spreadsheet and figure
14   out what kind of a termination amount it
15   gives you?
16   A    Sure, sure, go ahead.
17        Type in 3 percent or whatever.
18   Q    Replacement value.
19   A    No, one cell down.  Go to the
20   next one.  There you go.
21   Q    So what is it, three point --
22   A    3.12, it doesn't matter --
23   no -- 10 million for the -- it's about 10
24   million if you go all the way out to 2032.
25   Q    Hold on.  You've got to change

Page 186

Jeffrey Hasterok

1
2    the replacement rate to 3.12.  You've got to
3    change the discount rate, correct?
4    A    To 3.12.  You just leave that
5    alone.  Just leave that formula alone.
6    That should just be equal C-4.  You don't
7    have to change cell 5, C-5.
8        So click on C-5 -- no, that --
9    that one should just say "equal C-4" --
10   yeah, there you go; you got it.
11        So it's about 10 million, give
12   or take.
13   Q    Okay.  And if you use the early
14   maturity date of 2019, you get a number
15   of --
16   A    Five and a half --
17        (There was a discussion off the
18   record.)
19   Q    So what we have done to do this
20   calculation, sir, is we went to your pivot
21   table, H-15 pivot; and, instead of running
22   a four-month average or a four-year
23   average, we did a seven-year average.  You
24   went all the way back to October of 2002
25   through March of 2009, correct?

Page 187

Jeffrey Hasterok

1
2    A    Yes.
3    Q    And we did your formulas, your
4    setup.  We ran those averages, correct?
5    A    Yes.
6    Q    And we came up -- one of the
7    rates we came up with was 3.12 percent,
8    correct?
9    A    Yes.
10   Q    And we plugged that into your
11   cover spreadsheet with the same discount
12   rate as you said you would use.  And what
13   that gives you is a range of numbers
14   between 5.38 and 10 million, correct?
15   A    Yes.
16   Q    Okay.
17   A    10 and 10.2 million, yes.
18   Q    All right.  So if you want to
19   go back to the spreadsheet the way it was.
20   Go back -- go back one more.
21        All right.  Now, if you really
22   wanted to see what -- withdraw that.
23        You're projecting rates forward
24   not just seven years; you are projecting
25   rates forward 23 years, correct?

Page 188

Jeffrey Hasterok

1
2    A    Yes.
3    Q    All right.  So another option
4    you had was to go back and look at US
5    Treasury data, CD data, other types of
6    market data that went back for an equal
7    period of time --
8    A    Correct.
9    Q    -- 10 years, 15 years, 20
10   years?
11   A    We could have done that.
12   Q    You may not have all of that
13   data, but Treasuries is available going
14   back, correct?
15   A    Yes.
16   Q    You didn't do that?
17   A    We did not.
18   Q    And you didn't do any kind of
19   analysis to see whether that type of a
20   time-period analysis would be a better fit
21   or a worse fit for projecting rates into
22   the future, correct?
23   A    Correct.
24   Q    And we talked earlier about
25   LIBOR rates.  And I guess you could do an

47 (Pages 185 to 188)

Page 189

Jeffrey Hasterok

1 analysis like this for LIBOR rates as well,
2 to see what LIBOR rates were for the past
3 seven years, past ten years, past
4 fifteen years, past twenty years, right?
5 A    Well, when you say LIBOR rates,
6 you can either do the reset itself,
7 one-month, three-month LIBOR, that kind of
8 thing, or the swap rates themselves.  You
9 could go back.
10         You could go back in the '80s.
11 I forget one IBM did the first swap with
12 the World Bank.  I don't remember, but,
13 yes, you could go back thirty --
14 Q    You could go back longer
15 periods of time?
16 A    Sure.
17 Q    Let's go back into the
18 spreadsheet.  I think that the last tab is
19 "LIBOR forwards."  Yes?
20 A    Yes.
21 Q    And that tab is simply the data
22 and the graph that we discussed before in
23 your expert report, correct?
24 A    Yes.  It's equivalent to page

Page 190

Jeffrey Hasterok

1 14 of the report.
2 Q    Okay.
3 A    That's where that graph shows
4 up.
5 Q    If you just go over to row --
6 it looks like column B.  Then --
7 A    Done.
8 Q    In column B, you look at the
9 numbers that appear in column B, so B-2
10 onwards, those are -- just looking at
11 those, they seem to have been keyed in.
12 They are hard-keyed in, right?
13 A    They are a dump from Bloomberg.
14 They're an export of one of the legs of the
15 trade from Bloomberg.
16 Q    So you took the data that
17 appears in Bloomberg, and you took that
18 data as of 25th March of 2009; is that
19 right?
20 A    We modeled a vanilla --
21 Q    Yeah.
22 A    -- a plain -- a simple Li- --
23 fixed rate versus three-month LIBOR swap
24 that -- in US dollars.  You model up that

Page 191

Jeffrey Hasterok

1 trade.  And if -- I don't know -- I don't
2 know if you ever use software like this,
3 but you can look at the individual --
4 called -- they're called legs of the
5 transaction.
6         You can look at the projected
7 cash flows of the fixed leg, meaning how
8 much cash was going to go out the door or
9 come in based on fixed rate.
10         And then what we did was we
11 looked at the floating leg.  And swap
12 software will show you the implied yields
13 on three-month LIBOR or whatever the
14 floating leg happens to be.
15         Those yields are calculated by
16 the software so that it would, on
17 average -- if you average up all of those
18 and average -- you can't -- you don't --
19 you can't use this in Excel.  You can't
20 just say:
21         "Well, average column B."
22         It doesn't work that way
23 because of discount factors and some other
24 technical stuff.

Page 192

Jeffrey Hasterok

1 But it -- a shortcut way of
2 thinking about it is, the average of all of
3 those rates in column B will approximate
4 the fixed rate on the swap.  So we did not
5 create -- we didn't, you know, come up with
6 those numbers in column B ourselves.  That
7 is -- that is spit out from the Bloomberg
8 swap model.
9         And given the type of trade it
10 is, a pure vanilla LIBOR swap, there are --
11 there are multiple software packages that
12 will spit out these types of numbers.  They
13 should be relatively similar for the
14 purposes of this.
15         Even if it's five or ten bps
16 off, it doesn't really matter.  That's
17 not -- that kind of actually is not
18 relevant for what we are trying to get at.
19         MR. TAMBE:  Let's take a short
20 break now.  I think we are done with
21 the spreadsheet, but leave it open.
22 But we will come back with some other
23 questions.  Thanks.
24         (There was a discussion off the

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 193

1        Jeffrey Hasterok
2    record.)
3        (A break is taken.)
4    Q    I want to circle back to one
5  aspect of the grid.  In the grid, on page
6  19 of Exhibit 30 -- we talked about this a
7  number of times -- you used the average
8  yield for that four-month time period,
9  December '08 through March of '09.
10       What are the reasons why you
11 did use that four-month period as opposed
12 to any of the other periods we have
13 discussed?
14   A    It was the beginning of their
15 actual reinvestment of proceeds.  Prior to
16 December 1st of '08, they didn't have to
17 think about reinvestment of proceeds
18 because every -- I believe it was every six
19 months -- there may have been cases before
20 where it was every three months; Lehman had
21 the right to do that.
22       But every six months, they were
23 buying paper.  They didn't really have to
24 think about it.  It was on cruise control.
25 But at that point, they suddenly -- they

Page 194

1        Jeffrey Hasterok
2  had to make the affirmative decision to
3  invest in something.
4        And then -- so we chose out to
5  March of '09, March 25th of '09, because
6  that was a logical date given that that's
7  the rejection date:
8        "So let's see what the numbers
9  look like from when they started to
10 reinvest to the rejection date."
11   Q    Any other reasons why you used
12 that four-month period?
13   A    No, that's -- it's commensurate
14 with their actual investment history up to
15 the -- up to and including the rejection
16 date.
17   Q    All right.  Now, on page 20 of
18 your report, you conclude that, off the
19 various numbers that appear on the grid,
20 that the termination amount should be
21 37.5 million, correct?
22   A    Yes.
23   Q    Okay.
24   A    Plus total loss below that.
25   Q    Plus total loss below that.

Page 195

1        Jeffrey Hasterok
2    A    Right.
3    Q    If I understand the rational
4  for that, it is that you and Mr. Curry had
5  concluded that the actual investment
6  history is the best choice for the
7  replacement yield to be used; is that
8  right?
9    A    Yes.
10   Q    Okay.  And, again, to be clear,
11 the actual investment history for a
12 four-year period in your view is the best
13 choice?
14       MR. LAWRENCE:  Four-month or
15 four-year?
16   Q    I'm sorry.  Four-month period
17 is the best choice for the replacement
18 yield over a 23-year period; is that right?
19   A    Yes.
20   Q    And just to be clear -- I think
21 we covered some of this in the morning --
22 neither you nor Mr. Curry had ever used
23 that type of methodology during the course
24 of your work for Morgan Stanley, correct?
25       MR. LAWRENCE:  Object to the

Page 196

1        Jeffrey Hasterok
2  form.
3    A    This is the first time we have
4  had to calculate an estimated termination
5  amount for a tobacco RFA from the point of
6  view of the client facing a dealer that is
7  in default.
8    Q    I believe you told me this
9  morning -- but I want to confirm -- that,
10 if you were calculating the estimated
11 termination amount, not from the point of
12 view of the client, but from the point of
13 view of the dealer, you would use a
14 different methodology?
15   A    Yes.
16   Q    You would use a forward curve
17 methodology?
18   A    Yes.
19   Q    We talked this morning -- I
20 think it was -- about the Swap Financial
21 Group calculation and whether you had
22 reviewed it and whether you had any
23 criticisms of it.
24       Do you remember that
25 discussion?

49 (Pages 193 to 196)

Page 197

Jeffrey Hasterok

1
2       A    Yes.
3       Q    Now, one aspect of that Swap
4    Financial Group calculation is the -- not
5    the curve that Mr. Shapiro starts with, but
6    the charges that he adds to adjust that
7    curve.
8            Do you remember that aspect of
9    the calculation?
10      A    Yes.  Swap Financial added and
11   subtracted a bunch of different numbers to
12   their base line swap number.
13      Q    Did you study that aspect of
14   the calculation?
15      A    We did not.
16      Q    And do you have an opinion one
17   way or the other as to whether the charges
18   that were added or subtracted to the base
19   LIBOR plus curve were appropriate?
20      A    We -- I don't at this time.
21      Q    Now, when you were at Morgan
22   Stanley, you priced RFAs, correct?
23      A    Yes.
24      Q    And you priced them in the
25   context of bidding for new business; is

Page 198

Jeffrey Hasterok

1
2    that right?
3       A    Both bidding on new
4    transactions and unwinding existing
5    transactions.
6       Q    And, again, if I have
7    understood your testimony before, at Morgan
8    Stanley, you used a forward curve as a
9    basis of a -- of such a calculation?
10      A    Yes.
11      Q    Right?
12      A    Yes.
13      Q    And you would add charges to
14   that curve analysis, correct?
15      A    Yes.
16      Q    Okay.  How would you determine
17   when you were at Morgan Stanley what the
18   appropriate charges should be?
19      A    Well, I have to -- let me
20   say -- I have to be careful about what I
21   say, because, as part of your compensation
22   in leaving the firm, you have to sign a
23   confidentiality agreement that you can't
24   give away proprietary information; so I
25   have to weigh it carefully on how I phrase

Page 199

Jeffrey Hasterok

1
2    this.
3       Q    Okay.  You can start with
4    generalities and --
5       A    Yeah, I have to stick
6    generally.
7            So when entering into new
8    transactions, you are going to start with
9    the swap curve.  You are going to apply
10   some reserve for credit, and potentially
11   funding, and potentially the cost benefit
12   of delivering whatever securities they
13   happen to be, in that -- that are
14   deliverable into that account -- in this
15   case, it was commercial paper and
16   Treasuries HC -- so -- and some amount of
17   profit that you would want to make.
18      Q    Do you recall, just rough
19   orders of magnitude, what type of
20   additional charges you would impose above
21   the forward curve?
22           MR. LAWRENCE:  Object to the
23   form.
24      A    I am worried about whether I
25   can say.  I am worried about if I can give

Page 200

Jeffrey Hasterok

1
2    you that kind of detail and whether that
3    violates my agreements with Morgan Stanley.
4    That's the only hesitation I have about
5    giving you more direct numbers.
6       Q    Okay.  Let me ask you another
7    way.
8            Do you ever recall adding over
9    300 basis points in charges to a forward
10   curve to calculate?
11      A    Well, you subtract in this
12   case.
13      Q    Subtract 300 basis points?
14      A    No.
15      Q    And as someone who has
16   practiced in the municipal derivatives
17   space, municipal securities space, do you
18   believe it's proper to simply use a bond
19   spread to calculate the credit charge on an
20   RFA?
21           MR. LAWRENCE:  Object to the
22   form.
23      A    I haven't thought about it in
24   relation to this type of structure.  I
25   would have to -- I would have to think

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 201

```
 1          Jeffrey Hasterok
 2   about it more.
 3       Q    Well, you have looked at the
 4   Washington TSA reserve funding agreement,
 5   right?
 6       A    Yes.
 7       Q    You are familiar with the
 8   features of that agreement.  You valued it,
 9   correct?
10       A    Yes.
11       Q    So for a hypothetical dealer
12   facing the Washington TSA and thinking
13   about the credit risk of the Washington
14   TSA, how did you go about figuring out what
15   credit charges you would apply as a dealer,
16   a hypothetical dealer facing the Washington
17   TSA?
18          MR. LAWRENCE:  You are talking
19       about more March 2009 or 2002 or --
20          MR. TAMBE:  Ever.
21       Q    Methodology, just what is the
22   methodology?
23          MR. LAWRENCE:  Object to the
24       form.
25       A    We didn't come up with a credit
```

Page 202

```
 1          Jeffrey Hasterok
 2   reserve or charge in facing Washington for
 3   the purposes of this report.
 4          MR. LAWRENCE:  Okay.  Somebody
 5       asked.
 6       Q    I didn't ask you that.
 7          MR. LAWRENCE:  That's not what
 8       he asked.
 9       Q    I didn't ask you that, right.
10   And I understand that you didn't come up
11   with a credit charge for the purposes of
12   your report.  But if you were a
13   hypothetical dealer -- and you are familiar
14   with -- not just with what Morgan Stanley
15   did, but you are familiar with practices of
16   dealers in this industry, correct?
17       A    Yes.
18       Q    And if you were facing the
19   Washington TSA and you had these contract
20   terms that are in the Washington TSA
21   agreement, how would you go about assessing
22   what the credit charges should be?
23          MR. LAWRENCE:  Object to the
24       form.
25       A    I would have to think about it
```

Page 203

```
 1          Jeffrey Hasterok
 2   more fully in relation to this transaction.
 3       Q    Well, in deciding whether or
 4   not to have a credit charge and how big a
 5   credit charge to impose, would you look at
 6   whether the dealer expected to be exposed
 7   to Washington payment risk?
 8          MR. LAWRENCE:  You are still
 9       asking a hypothetical without any time
10       frame?
11          MR. TAMBE:  Yes, yes.
12          MR. LAWRENCE:  Same objection.
13       A    Could you repeat the question?
14   I'm sorry.  Could you repeat it.
15       Q    Sure.
16          If you can describe in your own
17   words, what is the credit risk that a
18   dealer faces when it's facing the
19   Washington TSA on a contract like the RFA?
20       A    Okay.
21          MR. LAWRENCE:  Same objection.
22       A    Assuming a functioning market
23   and people are still doing the
24   transactions --
25       Q    Yep.
```

Page 204

```
 1          Jeffrey Hasterok
 2       A    -- if TSA defaults at a point
 3   in time when they owe the dealer money,
 4   potentially, the dealer would not be able
 5   to recover the entire termination amount
 6   from the client, from the TSA.
 7       Q    And under what types of
 8   scenarios, again, in this hypothetical,
 9   would the TSA owe the dealer money?
10          MR. LAWRENCE:  Same objection.
11       A    Generally, in higher rate
12   environments.
13       Q    So, generally, in an
14   environment where spot or future interest
15   rates were expected to be higher than the
16   fixed rate, the dealer could be in the
17   money on the transaction?
18          MR. LAWRENCE:  Same objection.
19       Q    Is that right?
20       A    Sure.  If TSA is receiving a
21   very low rate in relation to the then
22   current market rate, receiving 2 percent,
23   the current rates are 10, at that point, it
24   is likely that the dealer would be in the
25   money.
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 205

1         Jeffrey Hasterok
2    Q    Okay.  And in that scenario, if
3  the TSA were to default, the dealer would
4  face exposure, the credit risk of the TSA,
5  correct?
6    A    Yes.
7    Q    However, if the TSA were
8  earning a relatively high rate of interest
9  compared to prevailing market interest
10  rates, that credit risk would be lower,
11  correct?
12       MR. LAWRENCE:  Same objection.
13    A    Generally speaking, yes.
14    Q    And it may even be non-existent
15  if the interest rate being paid to the TSA
16  was much higher than prevailing interest
17  rates?
18       MR. LAWRENCE:  Same objection.
19    A    The higher they pay, the higher
20  the rate that the TSA is paying, all else
21  equal, the more likely it is that they will
22  be in the money.
23    Q    And, therefore, if they are in
24  the money, if they, the TSA, are in the
25  money, the dealer is not exposed to credit

Page 206

1         Jeffrey Hasterok
2  risk?
3    A    I wouldn't want to say it is
4  not exposed.  It is less exposed.
5    Q    Okay.  So we had spoken earlier
6  about some -- about some research that you
7  had done going on to the public records
8  from the Lehman bankruptcy.
9       I have placed before you a
10  document marked Lehman Exhibit 35.
11       (Exhibit No. Lehman 35,
12    Printout from a computer screen of
13    Epic Systems, is marked by the
14    reporter for identification.)
15    Q    And you will see it's a
16  printout from a computer screen of
17  something called Epic Systems.
18       Do you see that?
19    A    Yes.
20    Q    And you will see a reference on
21  the right-hand side, "Lehman Brothers
22  Holdings, Inc.," within parens,
23  "Chapter 11."
24       Do you see that?
25    A    Yes.

Page 207

1         Jeffrey Hasterok
2    Q    Have you seen this document
3  before, sir?
4    A    No.
5    Q    And if you look at the body of
6  the document, you will see "Tobacco
7  Settlement Financing Corporation."
8       Do you see that?
9    A    Yes.
10    Q    And you will see claimed --
11  claimed unsecured amount of 135 million?
12    A    Okay.
13    Q    And then you see the allowed
14  unsecured, 37.2 million?
15    A    Okay.
16    Q    Do you see that?
17    A    Yes.
18    Q    Do you recognize these as the
19  claimed and allowed amounts relating to the
20  New York State claim?
21    A    We -- well, I never saw the
22  final numbers that were filed.  We simply
23  submitted the report, and I don't know what
24  K&L Gates and New York did with that.  So
25  this is the first -- I have never seen this

Page 208

1         Jeffrey Hasterok
2  before.
3    Q    Okay.  I am handing you, sir,
4  what is previously marked as Lehman
5  Exhibit 8.
6       (Previously Marked Exhibit No.
7    Lehman 8, PFM Termination Analysis is
8    introduced into the proceedings.)
9    Q    Lehman Exhibit 8.
10    A    Okay.
11    Q    It's a couple of pages.  If you
12  could take a moment to review it and let me
13  know where you are done.
14    A    Okay.  Termination analysis.
15  So -- okay.  So this is PFM sending an
16  E-Mail to -- it looks like the folks at
17  Washington TSA.  Okay.  So this is -- all
18  right -- November -- so that's, what, a
19  month or two months after filing the
20  bankruptcy.
21       MR. LAWRENCE:  Is there a
22  question pending?
23       MR. TAMBE:  Yes.  Is he
24  familiar with it?
25    A    So I am reading this --

52  (Pages 205 to 208)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 209

1          Jeffrey Hasterok
2          MR. LAWRENCE:  Yes, but answer
3     the question.  What is the question?
4          Q    Take a moment to review it and
5     let me know when you are done, question
6     mark.
7          A    Okay.
8          MR. LAWRENCE:  Wait for a
9     question.
10         A    I am reading.
11         MR. LAWRENCE:  No, wait for a
12    question.  If he wants to ask you a
13    question, he will ask you a question.
14         THE WITNESS:  Okay.
15         Q    So you are done reading it?
16    You are done reading it?
17         A    A cursory read, yes.
18         Q    The first question is:
19         Have you seen this document
20    before today?
21         A    No.  I don't recall ever seeing
22    this.
23         Q    Now, you see the page one of
24    this document, Lehman eight?
25         MR. LAWRENCE:  Page one of the

Page 210

1          Jeffrey Hasterok
2     document.
3          A    Okay.
4          Q    It has a label at the bottom,
5     TSA 024147; do you see that?
6          A    Yes.
7          Q    All right.  And any reason --
8     do you have any reason to believe that this
9     document is not in the Viewpoint database
10    that was made available to you?
11         A    I don't know.
12         Q    Okay.  And having done a
13    cursory review of this document, do you
14    understand what it purports to show?
15         MR. LAWRENCE:  Object to the
16    form of the question.
17         A    It's an E-Mail from PFM to the
18    client giving an estimated termination
19    value.
20         Q    Okay.  And this is an E-Mail
21    and an attachment, looks like from the
22    November 2008 time period, correct?
23         MR. LAWRENCE:  Object to the
24    form of the question.
25         Q    Do you see that?

Page 211

1          Jeffrey Hasterok
2          A    Assuming this has not been
3     modified, November of '08.
4          Q    And you have no reason to
5     believe it has been modified?
6          A    I have never seen it.  I don't
7     know anything about it, but, sure.
8          Q    In the middle of page one in
9     the E-Mail chain, there is an E-Mail from
10    someone called Roan, R-o-a-n, to Kim.
11         A    Okay.
12         Q    And it reads:
13         "Good morning, Kim.  Attached
14    is the valuation claim that was forwarded
15    back to Bob.  The termination value is" --
16    in my words approximately 1.2 million, and
17    then the E-Mail goes on to say -- "owed to
18    Washington TSA."
19         Do you see that?
20         A    Yes.
21         Q    Did you do any calculations of
22    the value of the Washington RFA in
23    September or October or November of 2008?
24         A    No.
25         Q    And when you turn to the

Page 212

1          Jeffrey Hasterok
2     calculation on -- just page two of this
3     exhibit, the spreadsheet, can you tell,
4     sitting here, what that calculation
5     purports to do?
6          MR. LAWRENCE:  Object to the
7     form of the question.
8          A    I would have to look at it more
9     closely.
10         Q    And you have no opinion as to
11    whether that's a proper way or improper way
12    of doing the calculation, correct?
13         MR. LAWRENCE:  Object to the
14    form.
15         A    I would hate to hypothesize
16    with this kind of cursory review.
17         Q    Right, so no opinion?
18         A    No opinion.
19         (Exhibit No. Lehman 36,
20    Document from Swap Financial Group
21    providing advice to TSA about how to
22    invest balance of reserve funds, is
23    marked by the reporter for
24    identification.)
25         Q    I hand you a document, sir,

Page 213

```
 1        Jeffrey Hasterok
 2  marked Lehman Exhibit 36.  Take a moment to
 3  flip through the pages.  When you have
 4  completed a cursory review of the document,
 5  tell me when you are done, and I will ask
 6  you some questions about it.
 7      A    This document I remember
 8  seeing.  We actually referred to it in our
 9  report on page 27.  It's in the appendix.
10      Q    So you have seen this document
11  before?
12      A    On matching the TSA Bates
13  numbers, they line up.
14      Q    And not only do you remember
15  the document, it's one of the ones that you
16  specifically cite in your expert report,
17  correct?
18      A    Yes.
19      Q    And you have an understanding
20  of what this document purports to do,
21  correct?
22      A    Yes.
23      Q    Do you -- what is your
24  understanding of what this document
25  purports to do?
```

Page 214

```
 1        Jeffrey Hasterok
 2      A    Well, I would be hypothesizing
 3  what Swap Financial Group is trying to do.
 4  But it appears that they are trying to give
 5  advice to TSA about what to do with the
 6  invested -- now, the balance of the reserve
 7  funds:
 8        "What are we going to do with
 9  this money?"
10      Q    Okay.  If you look on
11  page three of the document Exhibit 36 --
12      A    Got it.
13      Q    -- following a discussion there
14  is a line that appear there which states:
15        "Combined, we would anticipate
16  an average yield of approximately
17  2.6 percent."
18        Do you see that?
19      A    I do.
20      Q    Now, did you do any analysis
21  when you were reviewing replacement yield
22  scenarios that looked at options for
23  Washington TSA similar to the options being
24  proposed by Swap Financial Group?
25      A    The only thing that is somewhat
```

Page 215

```
 1        Jeffrey Hasterok
 2  similar is Swap Financial in C on
 3  page three talks about doing a fixed
 4  receiver swap, which is in the same range
 5  of our -- the final scenario we do in the
 6  matrix where we talk about investing in
 7  some floating rate security or money market
 8  fund or the like and receiving in a
 9  cancellable swap.
10        So they are both "swap plus an
11  investment" scenarios.  I think this swap
12  structure doesn't talk about cancellation
13  options in this paragraph.  But -- but
14  beyond that, we didn't go to this -- this
15  detail of a strategy.
16      Q    Do you have any reason to
17  believe, when you reviewed this document,
18  that the Washington TSA could not have
19  entered into this recommended strategy by
20  Swap Financial Group in 2011?
21      A    I don't know what they could
22  have done.
23      Q    Okay.  You will see that the
24  option that we were just talking about,
25  paragraph C on page three of Exhibit 36,
```

Page 216

```
 1        Jeffrey Hasterok
 2  Mr. Shapiro indicates tranche three has an
 3  indicated leveled of 3.5 percent or 350
 4  basis points as of November 16, 2011.
 5        Do you see that?
 6      A    Yes.
 7      Q    That's obviously far higher
 8  than your projected replacement yield for
 9  the cancellable swap in your grid, correct?
10      A    Yes.
11      Q    In fact, in your grid, you come
12  up with a valuation of 43 basis points,
13  right?
14      A    Yes.
15      Q    So Mr. Shapiro, in November of
16  2011 has a rate that is nine times your
17  rate?
18      A    Yes.
19      Q    Okay.  Now, the very analysis
20  Mr. Shapiro did in November 2011 could also
21  have been done in March of 2009, correct?
22      A    Probably.
23        MR. LAWRENCE:  Object to the
24  form.
25      Q    Probably?
```

54 (Pages 213 to 216)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 217

Jeffrey Hasterok

1
2     A    Sure, you can -- you can price
3  out hypotheticals all you want.
4     Q    And, well, these aren't just
5  hypotheticals, right?  This is Mr. Shapiro
6  giving a recommendation as to what he
7  believed Washington TSA was permitted to
8  invest in and could invest in.
9          He wasn't saying, "This is a
10  hypothetical."
11          He said this is something you
12  can do, correct?
13          MR. LAWRENCE:  Object to the
14     form.
15     A    I still view it as a
16  hypothetical.  Until the trade is done,
17  it's a hypothetical.
18     Q    All right.  But he's not
19  suggesting trades that couldn't be done;
20  he's making recommendations here of what
21  could be done, correct?
22          MR. LAWRENCE:  Objection to the
23     form of the question.
24     A    I don't know that to be true.
25     Q    But you read this document?

Page 218

Jeffrey Hasterok

1
2     A    I did.
3          MR. LAWRENCE:  Do you have a
4     question, or you want to argue with
5     the witness?
6          MR. TAMBE:  I am asking
7     questions, and he's answering.  You
8     are the one obstructing.  Make an
9     objection to the form.  Let's move on.
10     Q    And Swap Financial Group was
11  not the only advisor that was making
12  reinvestment recommendations to the
13  Washington TSA in this period of time,
14  correct?
15     A    That seems correct, per our
16  report.
17     Q    All right.  And so there were
18  others, and your report talks about
19  Barclay's Capital making a similar
20  proposal, correct?
21     A    Correct.
22     Q    And there were others, correct?
23     A    Yes, Grant Street, Swap
24  Financial, Barclay's.
25     Q    And you have reviewed all of

Page 219

Jeffrey Hasterok

1
2  those proposals, correct?
3     A    The ones we could find, yes, we
4  would have referred to the individual
5  E-Mails or memos, so, yes.
6     Q    And all of those proposals set
7  forth replacement yields far in excess of
8  the yield that you actually use in your
9  report, correct?
10          MR. LAWRENCE:  Object to the
11     form.
12     A    That appears to be true.
13     Q    Did you -- did you speak with
14  Swap Financial Group about this
15  recommendation?
16     A    We did not.
17     Q    Did you speak with Barclay's
18  about their recommendation?
19     A    We did not.
20     Q    Did you try and recreate any of
21  these recommendations?
22     A    We did not.
23     Q    And did you check to see if
24  these recommendations were also feasible to
25  transact in March of 2009?

Page 220

Jeffrey Hasterok

1
2          MR. LAWRENCE:  Object to the
3     form.
4     A    We did not.
5     Q    And as you sit here, you have
6  no basis to say that Washington State TSA
7  could not -- was forbidden from entering
8  into these types of transactions, right?
9          MR. LAWRENCE:  Object to the
10     form.
11     A    I don't know precisely what
12  limitations that were in place at the time
13  would have precluded them from doing it.
14  That would have required a lot more work.
15     Q    Okay.  On the spreadsheet that
16  we were looking at -- what's the exhibit
17  number -- Lehman 34 -- and it's up on the
18  screen still.  If we could just go to the
19  tab, the Fannie Mae/Freddie Mac tab -- all
20  right.  All right.
21          Again, you have data on this
22  tab, this worksheet, the Fannie/Freddie
23  worksheet in the spreadsheet that starts in
24  October of 2002 and goes forward until
25  2013, correct?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 221

Jeffrey Hasterok

1
2      A    Yes.
3      Q    And you could do the same type
4  of average analysis that we did previously
5  with the T bills and the CP, correct?
6      A    Yes.
7      Q    So instead of doing a
8  four-month or four-year average, we could
9  do a seven-year average, right?
10     A    Yes.
11     Q    You didn't do that?
12     A    Not for the purposes of the
13  report.
14     Q    Well, did you do it for any
15  purpose?
16     A    No.
17     Q    It's not like you ran the
18  seven-year analysis and decided not to use
19  it, correct?
20     A    You can look -- I mean --
21     MR. LAWRENCE:  Listen to the
22  question.
23     A    I don't recall.  I don't
24  recall.  I don't recall.  I don't recall
25  whether I typed the formula in the cell or

Page 222

Jeffrey Hasterok

1
2  not.
3      Q    It's not a question of whether
4  you typed the formula in the cell or not.
5  It's a matter -- it goes to methodology,
6  right?
7      A    Sure.
8      Q    You had the data available; you
9  had collected the data going back to
10  October of 2002.
11         Did you, as part of coming up
12  with your expert report, run an average for
13  the time period beginning with October of
14  2002?
15     A    I don't recall.
16     Q    And you would agree with me
17  that that average can be calculated on your
18  spreadsheet, correct?
19     A    Yes.
20     Q    Just the way we did for the
21  other numbers?
22     A    Yes.
23     Q    I am handling you what has been
24  marked as Lehman Exhibit 37.
25         (Exhibit No. Lehman 37,

Page 223

Jeffrey Hasterok

1
2  Document, PDF from the Fannie Mae web
3  site with historical auction results,
4  is marked by the reporter for
5  identification.)
6      Q    Do you recognize that document?
7      A    Yes, this should -- this was
8  probably a PDF, if I recall, from the
9  Fannie Mae web site with the historical
10  auction results.
11     Q    And was this document the
12  source of the data that appears in your
13  spreadsheet on the Fannie Freddie tab?
14     A    Yes, I believe so.
15     Q    Now, you will see that this
16  document, Exhibit 37, has data that goes
17  back to January of '99; do you see that?
18     A    Yes.
19     Q    Is that the earliest reported
20  data for these securities, sir?
21     A    I don't know.
22     Q    Okay.  In -- and this data,
23  Exhibit 37, you said was a PDF?
24     A    I think so.
25     Q    And was it a PDF that you had

Page 224

Jeffrey Hasterok

1
2  created by pulling data off of the
3  Fannie/Freddie web site?
4      MR. LAWRENCE:  I'm sorry.  You
5      are asking whether this was something
6      he created --
7      MR. TAMBE:  Yes.
8      MR. LAWRENCE:  -- or something
9      he took that could be taken off.
10     MR. TAMBE:  No.  Is that -- is
11     that -- he said it was a PDF.
12     A    Yeah, but if -- the last page
13  of the appendix, page 28, in the report,
14  the link itself is a PDF.
15     Q    Okay.  So if you were to go to
16  that Fannie Mae web site that is shown on
17  page 28, the only data you would find on
18  that page is this January '99 through
19  November 2013 data; is that right?
20     A    You click on the PDF, and you
21  get something substantially similar to
22  this.
23     Q    Okay.  Is there data available
24  on that web site for other agency
25  securities that goes back even earlier to

Elisa Dreier Reporting Corp.     (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 225

1        Jeffrey Hasterok
2    January '99?
3        A    I don't know.
4        Q    What was your methodology in
5    taking these particular agency securities
6    to look at as opposed to other agency
7    securities?
8        A    Fannie Mae and Freddie Mac
9    discount notes are eligible investments or
10    qualified investments -- I forget the exact
11    phrasing -- but it -- they are, to my
12    belief, eligible both under the RFA for
13    them to have been purchasing.
14        Lehman theoretically could have
15    sold them agencies if they so chose.  And I
16    believe, under their indenture, they can go
17    out and buy them.
18        To my memory and recollection,
19    Fannie and Freddie have the biggest pool of
20    outstanding securities similar to this.
21    There probably are smaller pools of agency
22    securities similar to this, similar to the
23    discount notes, but these are the most --
24    most liquid, largest volumes outstanding to
25    my knowledge.

Page 226

1        Jeffrey Hasterok
2        Q    Just one feature of your last
3    answer, you said that they were -- that
4    Lehman theoretically could have sold them
5    agencies.  That was Lehman's choice under
6    the RFA, correct?
7        A    Exactly.
8        Q    And a dealer facing the
9    Washington TSA under the contract like the
10    RFA would have the option of delivering the
11    cheapest-to-deliver security, correct?
12        A    Yes.
13        Q    And so long as it's an eligible
14    security, the Washington TSA has to accept
15    it, correct?
16        A    Yes.
17        MR. TAMBE:  Let's take a short
18    break.  We may be close to being done.
19        (There was a discussion off the
20    record.)
21        (A break is taken.)
22        MR. TAMBE:  All right.  We have
23    no further questions for the witness.
24    I don't know if you have any
25    questions?

Page 227

1        Jeffrey Hasterok
2        MR. LAWRENCE:  No.
3        MR. TAMBE:  Just one point for
4    the record, we had earlier marked a
5    fairly substantial spreadsheet
6    printout as Lehman Exhibit 34.  I
7    think the parties are in agreement
8    that, just for the sake of
9    record-keeping, only the first page of
10    that spreadsheet will be marked, will
11    be included with the transcript as the
12    exhibit.
13        At the appropriate time in the
14    litigation, we will substitute that
15    with the electronic file for that
16    spreadsheet.  And that will be the
17    exhibit for purposes of the trial.
18        MR. LAWRENCE:  That is correct.
19        MR. TAMBE:  Thank you.
20        (Deposition adjourned, 3:56.)
21
22
23
24
25

Page 228

1
2            J U R A T
3
4        I DO HEREBY CERTIFY that I have
5    read the foregoing transcript of my
6    deposition testimony.
7
8
9
10
11    SWORN TO AND SUBSCRIBED
12    BEFORE ME THIS
13    DAY OF 2014
14    _____
15
16
17
18
19
20
21
22
23
24
25

57 (Pages 225 to 228)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 229

```
 1
 2              I N D E X
 3
 4
 5    WITNESS        DIRECT      CROSS
 6
 7
 8
 9    JEFFREY HASTEROK
10
11
12
13
14     BY MR. TAMBE        3
15
16
17
18
19
20
21
22
23
24
25
```

Page 231

```
 1
 2              CERTIFICATE
 3
 4       I, TAB PREWETT, A Registered
       Professional Reporter, Notary Public,
 5     Certified LiveNote Reporter, and Certified
       Shorthand Reporter, do hereby certify that
 6     prior to the commencement of the
       examination JEFFREY HASTEROK was sworn by
 7     the notary public to testify the truth, the
       whole truth and nothing but the truth.
 8
 9
       I DO FURTHER CERTIFY that the
10     foregoing is a true and accurate transcript
       of the testimony as taken stenographically
11     by and before me at the time, place and on
       the date hereinbefore set forth.
12
13
       I DO FURTHER CERTIFY that I am
14     neither a relative nor employee nor
       attorney nor counsel of any of the parties
15     to this action, and that I am neither a
       relative nor employee of such attorney or
16     counsel, and that I am not financially
       interested in the action.
17
18
19     _____
20
21     Notary Public
22
       My Commission expires February 9, 2014
23     Dated:  January 19, 2014
24
25
```

Page 230

```
 1
 2           E X H I B I T S
 3
 4    NUMBER   DESCRIPTION       PAGE
 5
 6    Exhibit No. Lehman 30, 12/16/13  52
      Expert Valuation Report
 7
      Exhibit No. Lehman 31, Pacifica  54
 8    and Expert Engagement Letter
 9    Exhibit No. Lehman 32, Valuation  64
      Claim Document filed by TSA
10
11    Exhibit No. Lehman 33, Printout  131
      of Web Page, Peter Orr Article
12    Exhibit No. Lehman 34, Document,  148
      Bates No. TSA-042447, Front Page
13    of 129-page Printout of
      Spreadsheet
14
15    Exhibit No. Lehman 35, Printout  206
      from a computer screen of Epic
16    Systems
17    Previously Marked Exhibit No.    208
      Lehman 8, PFM Termination
18    Analysis
19    Exhibit No. Lehman 36, Document  212
      from Swap Financial Group
20    providing advice to TSA about how
      to invest balance of reserve
21    funds
22    Exhibit No. Lehman 37, Document,  222
      PDF from the Fannie Mae web site
23    with historical auction results
24
25
```

58 (Pages 229 to 231)