**EXHIBIT 4 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Chapter 11
CASE NO. 08-13555 (JMP)
Jointly Administered


IN RE:  LEHMAN BROTHERS
        HOLDINGS, INC. et al.

        Debtors,


----------------------------------------



        DEPOSITION OF DANIEL CURRY



        TRANSCRIPT of the stenographic

notes of the proceedings in the

above-entitled matter, as taken by and

before TAB PREWETT, a Registered

Professional Reporter, a Certified

Shorthand Reporter, a Certified LiveNote

Reporter, and Notary Public, held at the

offices of JONES DAY, 222 East 41st Street,

New York, New York, on Friday, January 17,

2014, commencing at 10:00 a.m.

Page 2

1
2  A P P E A R A N C E S :
3
4
5  JONES DAY
   BY: JAYANT W. TAMBE, ESQ.
6      LAURA W. SAWYER, ESQ.
       REBEKAH BINGER, ESQ.
7  222 East 41st Street
   New York, New York  10017-6702
8  Attorneys for Lehman Brothers
9
10
11
12
13  PACIFICA LAW GROUP
    BY: PAUL J. LAWRENCE, ESQ.
14  1191 2nd Avenue
    Seattle, Washington  98101-2945
15  Attorneys for Washington TSA
16
17
18
19  ALSO PRESENT:
20    George Cahill, Esq.
      Counsel
21    Office of the General Counsel
      Lehman Brothers Holding, Inc.
22    1271 Avenue of the Americas
      New York, New York  10020
23
24
25

Page 3

1          Daniel Curry
2        P R O C E E D I N G S
3  D A N I E L   C U R R Y ,
4  doing business at 11 Woodmill Road,
5  Chappaqua, New York  10514,
6  having been sworn by the notary public to
7  testify to the truth, testified as follows:
8  DIRECT EXAMINATION
9  BY MR. TAMBE:
10    Q    Good morning, sir.
11    A    Good morning.
12    Q    By whom are you employed?
13    A    I'm sorry.
14    Q    By whom are you employed?
15    A    I am not.
16    Q    I just want to go through your
17  employment history.
18    A    Sure.
19    Q    I believe one of the documents
20  before you should be Lehman Exhibit 30 that
21  was marked yesterday.  I will dig that up
22  and hand it to you.
23        So I have handed you a document
24  marked Lehman Exhibit 30.
25        (Previously Marked Exhibit No.

Page 4

1          Daniel Curry
2  Lehman 30, Expert Report is introduced
3  into the proceedings.)
4    Q    That's the expert witness
5  valuation report that you prepared and
6  submitted in this case, correct?
7    A    Um-hum.
8    Q    Yes?
9    A    Yes.
10    Q    Okay.  All your answers have to
11  be oral so they can be taken down.
12    A    Sure.
13    Q    And on page 22 of 28 and on
14  page 23 of 28 of this exhibit, does that
15  set forth your professional experience?
16    A    Yes.
17    Q    If I have this right, roughly
18  from 1998 until 2012, you were at Morgan
19  Stanley in one capacity or another; is that
20  right?
21    A    That's correct.
22    Q    And that was uninterrupted?
23    A    Uninterrupted.  Correct.
24    Q    Okay.  And since you left
25  Morgan Stanley in 2012, have you done

Page 5

1          Daniel Curry
2  consulting engagements, expert witness
3  engagements, other assignments, any
4  income-earning activity?
5    A    Yes.
6    Q    And would you describe what
7  that has been?
8    A    I have done some other expert
9  witness work.
10    Q    So if you can give us some
11  detail generally about what type of expert
12  witness work you have done, and then we can
13  talk about whether you can tell us for whom
14  you have done that expert witness work.
15    A    I worked on a transaction
16  dispute between a European bank and a
17  municipal issuer.
18    Q    And who did you -- who retained
19  you in that matter, which party?
20    A    The bank's attorneys.
21    Q    Okay.  Other than that?
22    A    Nothing that I have been
23  engaged on.
24    Q    So to the only two matters
25  since you left Morgan Stanley are this

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 6

```
 1           Daniel Curry
 2  matter and this European bank matter; is
 3  that correct?
 4       A    Correct.
 5       Q    Okay.  In the European bank
 6  matter, did you prepare an expert report?
 7       A    I did.
 8       Q    And was that submitted in a
 9  court proceeding or other type of
10  proceeding somewhere?
11       A    It was, I believe.
12       Q    So can you give us some details
13  on that?
14       A    It was just a dispute.  It was
15  a dispute between UniCredit Bank and
16  Woodlands, Texas.  And the dispute revolved
17  around a reserve fund, not a forward
18  purchase agreement reserve fund.
19       Q    And where was that matter
20  pending?
21       A    Texas.
22       Q    Okay.  So you submitted a
23  report.  Did you testify in that matter?
24       A    No.
25       Q    Have you ever testified before
```

Page 7

```
 1           Daniel Curry
 2  today?
 3       A    I was deposed once.  I have not
 4  testified.
 5       Q    Okay.  All right.  So the only
 6  sworn testimony you have given in any
 7  matter of any kind prior to today was a
 8  deposition?
 9       A    Correct.
10       Q    Okay.  And what matter was that
11  deposition in?
12       A    That was a -- I believe it
13  was -- it was quite some time ago.  It was
14  somewhere between 15, 18 years ago.  And I
15  believe it was an SEC matter between --
16  with Alex Brown.
17       Q    Have you been involved either
18  as a witness or as a party in any other
19  regulatory proceedings?
20       A    No.
21       Q    Any proceedings before FINRA or
22  NASD regulations?
23       A    No.
24       Q    Before you joined Morgan
25  Stanley in 1998, if you could give us just
```

Page 8

```
 1           Daniel Curry
 2  a description of the types of financial
 3  matters with which you had experience with
 4  your previous employers?
 5       A    I mean, starting in 1990, I was
 6  an analyst in the public finance department
 7  of Bear Stearns.  And that entailed working
 8  on proposals and bond deals for municipal
 9  issuers, so I did that for a little over
10  two years, I believe.
11           And from there I went to Alex
12  Brown down in Baltimore as an associate in
13  their public finance department.  And,
14  again, that work revolved around
15  structuring bond issues, responding to
16  requests for proposals, handling some of
17  the reinvestment contracts for Alex Brown's
18  municipal clients, some swap and derivative
19  transactions that were entered into by Alex
20  Brown's municipal clients.
21           And from there, I went to a
22  place called TMG financial products, which
23  was in Greenwich, Connecticut.  And that
24  was a derivatives trading and structuring
25  subsidiary of a Canadian insurance company.
```

Page 9

```
 1           Daniel Curry
 2           And my work there revolved
 3  around doing interest rate hedges and
 4  reinvestment products for municipal
 5  issuers, and non-profits such as health
 6  care providers and universities and that
 7  type of thing.
 8           That -- that company closed.
 9  The parent company went and basically sold
10  off the trading books.
11           And from there, I was a -- I
12  was a volunteer at the American Red Cross
13  here in New York, basically, implementing
14  some or creating some -- well, creating
15  some -- acting as a consultant reviewing
16  some of their operations and then
17  implementing the results of the consulting
18  agreement, just in terms of, you know,
19  where they were going to provide services
20  and the services -- the type of services
21  that they would provide out of their
22  various centers.
23           I did that for approximately a
24  year.  And then I got hired at Morgan
25  Stanley as an associate in their public
```

3  (Pages 6 to 9)

Page 10

```
 1            Daniel Curry
 2    finance department, which involved
 3    structuring bond deals, working on
 4    reinvestment type needs of the public
 5    finance clients, implementation of interest
 6    rate hedges and swaps, that type of thing,
 7    but on the banking side, on the issuer side
 8    of the market.
 9            Then from there I went back out
10    to the trading desk, and I worked on the
11    tender option bond area, which is a way
12    that owners of municipal bonds can finance
13    their inventory.
14            And that role kind of morphed
15    into a more generalized role in the
16    municipal capital markets area, which had
17    some to do with owning tax-exempt bonds,
18    working with the traders to manage
19    positions that I was not a -- we had -- I
20    was not a trader.
21            I was really more of a
22    structurer although I did have some trading
23    responsibilities.  But it was more along
24    the lines of, you know, managing the firm's
25    exposures, managing the firm's risks,
```

Page 11

```
 1            Daniel Curry
 2    managing a portfolio of bonds that we had
 3    as hedges and on a proprietary basis.
 4            And then post-financial crisis
 5    or during the financial crisis, I worked on
 6    a lot of work-out transactions.  So we had
 7    acquired lots of bonds and had positions
 8    that kind of came up or exposures that we
 9    hadn't realized that we had through other
10    positions, and working on solutions to
11    mitigate losses and re-hedge positions,
12    that type of thing.
13        Q    You describe in the expert
14    report that you have 20 years of experience
15    in multiple facets of municipal finance?
16        A    Correct.
17        Q    In your 20 years of experience
18    in multiple facets of municipal finance, is
19    it fair to say that you routinely used all
20    sorts of forward curves for structuring,
21    pricing, and transacting?
22        A    In some circumstances, yes.
23        Q    Well, it's more than;
24    isn't it, sir?  Isn't that commonly what
25    you used for pricing long-dated
```

Page 12

```
 1            Daniel Curry
 2    transactions?
 3        A    It depended on what the
 4    long-dated transaction was.
 5        Q    Okay.  So if it was a
 6    derivative transaction?
 7        A    If it was a derivative
 8    transaction that you were entering into and
 9    you could hedge, you would use forward --
10    forward rates.
11        Q    And that's what you did?
12        A    On those types of transactions,
13    yes.
14        Q    Did you use forward curves to
15    manage Morgan Stanley's risk in its bond
16    portfolio?
17        A    Um-hum.
18        Q    Yes?
19        A    Can you repeat your question,
20    please.
21        Q    Sure.  Did you use forward
22    curves to manage Morgan Stanley's risk in
23    its bond portfolio?
24        A    We didn't use forward curves to
25    manage risk.
```

Page 13

```
 1            Daniel Curry
 2        Q    What else do you use forward
 3    curves for other than for some derivatives
 4    transactions?
 5        A    Where you would use a forward
 6    curve in a derivative transaction is to
 7    price your hedges.  So you don't use
 8    forward curves to manage risk.  You use the
 9    result of a forward curve, or you use a
10    hedgable transaction that's priced off of
11    a forward curve to enter into a hedge that
12    would manage your risk.
13        Q    Did you use forward curves in
14    structuring forward purchase agreements?
15        A    We would use forward curves to
16    price hedges that we would enter into to
17    manage forward purchase agreements.
18        Q    Okay.  So describe generally
19    for me your experience throughout your
20    20-year career with forward purchase
21    agreements?
22            MR. LAWRENCE:  Object to the
23    form.  You can answer.
24        A    Can you repeat the question,
25    please.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1       Daniel Curry
2    Q    Sure.
3        Describe generally for me your
4  experience throughout your 20-year career
5  with forward purchase agreements?
6    A    I transacted and structured
7  forward purchase agreements during my
8  employment at TMG Financial Products.  We
9  engaged in several types of structures
10  there or several types of funds.  We did
11  forward purchase agreements for
12  construction funds.
13        We did forward purchase
14  agreements for debt service funds in
15  this -- in the case where issuers had debt
16  service funds.  That's a fund that is
17  usually only applicable to revenue bond
18  issuers and maybe some health care type
19  issuers.
20        And we did reserve fund forward
21  purchase agreements for issuers that had
22  debt service reserve funds.
23        So my experience dates back to
24  that.
25        My experience at Morgan

1       Daniel Curry
2  Stanley, as it relates to forward purchase
3  agreements, would have been to basically
4  help manage the product after we had
5  already -- well, I would look at
6  transactions as we were doing transactions,
7  maybe opine on structure.
8        But I would say that my role
9  was primarily in dealing with those
10  transactions after they were on our books,
11  so helping to manage the risk that those
12  trades basically placed on the firm.
13    Q    Would you include in your
14  description of forward purchase agreements
15  agreements of the type at issue in this
16  case, a reserve fund agreement?
17    A    I did look at these types of
18  reserve fund agreements.
19    Q    When you were at TMG, I guess
20  there wasn't a Tobacco Settlement Fund
21  then?
22    A    There was not.
23    Q    So you had dealt with other
24  types of forward purchase agreements?
25    A    Correct.

1       Daniel Curry
2    Q    At Morgan Stanley, did Morgan
3  Stanley enter into reserve fund agreements
4  of the type at issue in this case?
5    A    For tobacco issuers.
6    Q    For tobacco issuers?
7    A    That is -- we did.
8    Q    And I understand from your
9  prior answer you had some involvement with
10  some of those tobacco reserve fund
11  agreements or forward purchase agreements,
12  but you were not the principal transactor
13  on behalf of Morgan Stanley on those
14  agreements; is that fair?
15    A    For a tobacco transaction, I
16  would have been involved.  I would say that
17  there -- there was a principal point of
18  contact in -- you could also say perhaps a
19  team leader.
20        But a tobacco transaction would
21  be something that would probably have a
22  little bit more input from a variety of
23  people than a typical -- I am -- and by
24  "typical," I mean, a water and sewer or
25  something like that type forward purchase

1       Daniel Curry
2  agreement.
3    Q    Were you the team leader for
4  the tobacco transaction?
5    A    No.
6    Q    Do you know who at Morgan
7  Stanley served as a team leader during the
8  period 2002 through 2009?
9    A    It would -- if I were to
10  nominate a person, I would say that it was
11  probably Kevin Schwartz, who was one of the
12  marketing people who was in charge of
13  marketing; or the other person might have
14  been Fabrice Pilato, who was my boss, who
15  was the trader who managed the book.
16        And I would say it was actually
17  a little bit more of a joint effort between
18  the two to be honest.
19    Q    Okay.  Was there a -- was
20  there, in fact, a tobacco team at Morgan
21  Stanley?
22    A    No.
23    Q    You said on tobacco
24  transactions there would be involvement
25  from other people.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 18

Daniel Curry

1
2    A    Correct.
3    Q    And since you weren't the team
4    leader, I assume you -- the role you played
5    was you were involved; you were one of the
6    people involved in the tobacco transactions
7    in some way?
8    A    That is correct.
9    Q    Okay.  So in what way were you
10   involved in the tobacco transactions done
11   by Morgan Stanley?
12   A    As we were pre-trade, I would
13   be involved in having discussions with our
14   credit department.  Our legal department, I
15   would be a party to those conversations or
16   conference calls or that type of thing.
17        I would be in contact with our
18   risk management people to discuss the trade
19   and the risk that it presented.
20        And pre-trade, I would say that
21   that would be my involvement in the
22   transactions.
23   Q    Okay.  And then post-trade?
24   A    Post-trade, I would be involved
25   in having discussions if there were any

Page 19

Daniel Curry

1
2    developments in the market.  I would be
3    involved in looking at different
4    deliverables.  If there were capital or
5    funding issues that were presented due to
6    the exposure, I would be somebody who would
7    be involved.
8    Q    Just on that last point,
9    capital funding issues for Morgan Stanley?
10   A    Correct.
11   Q    All right.  So, now, you have
12   described both the pre-trade involvement
13   and the post-trade involvement.  Can you
14   think of any other ways in which, while you
15   were at Morgan Stanley, you were involved
16   with the Morgan Stanley tobacco trades?
17   A    Tobacco FPA trades or tobacco
18   bond trades or --
19   Q    Tobacco FPA trades.
20   A    No, I don't recall.
21   Q    And what was your involvement
22   in tobacco bond trades?
23   A    When the tobacco settlement was
24   originally enacted or shortly thereafter, I
25   had been involved in some of the very, very

Page 20

Daniel Curry

1
2    preliminary modeling and review of the
3    settlement to see if it was bondable, for
4    lack of a better term, but, again, just
5    some of the original modeling.
6        I believe that was really
7    before any -- it was shortly after the
8    settlement itself or, you know, shortly
9    after the first -- you know, one or two
10   payments may have been made.  But I believe
11   it was before any deals themselves were
12   transacted.
13   Q    Okay.  Anything else other than
14   that?
15   A    Not that I recall.
16   Q    Did Morgan Stanley go on to be
17   one of the underwriters for tobacco bond
18   issuances from time to time?
19   A    I don't believe they were --
20   well, I was going to say I don't -- I
21   believe they were an underwriter on one or
22   two, I believe, relatively small
23   transactions.  I can't recall them by name.
24   They were likely a co-manager on other
25   tobacco bond deals.

Page 21

Daniel Curry

1
2    Q    And moving back to tobacco FPAs
3    or RFAs, how many such transactions did
4    Morgan Stanley do?
5    A    I am bound by a confidentiality
6    agreement, but, if you go and you look at
7    tobacco bond deals, it is publicly
8    available where they are a reserve fund
9    provider.
10        And I would -- it's probably
11   somewhere between -- I can't give you an
12   exact number.  I believe it's between four
13   and six, maybe as high as seven or eight.
14   But I believe it's somewhere between four
15   and six.
16   Q    Okay.  And just so I understand
17   your answer correctly, whatever that number
18   is, somewhere between four at one end and
19   maybe eight at the other end, those are
20   cases where Morgan Stanley was involved in
21   a bond deal or in a tobacco FPA deal?
22   A    In an FPA transaction.
23   Q    Okay.  FPA transaction.
24   A    In an FPA transaction.
25   Q    So, again, going back to your

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 22

Daniel Curry

1   Daniel Curry
2   involvement with tobacco FPA deals, that
3   involvement would have been with respect to
4   those four to eight tobacco FPA deals?
5      A    Pre-trade, you know,
6   particularly for some of these smaller
7   earlier deals, I probably was not involved.
8   As we did a few more transactions, I would
9   be a little more -- I would be more
10  involved in the pre-trade aspect.
11         And post-trade, it's a
12  portfolio, so it's not -- if you're
13  involved in one, you are involved in all is
14  basically the way to think about it.
15     Q    So on the pre-trade side, just
16  take me -- walk through what your
17  involvement was.  I think you identified
18  you interacted with the credit department.
19  You interacted with legal.  You were in
20  conference calls, and you were involved in
21  risk management.  Anything else you can
22  think of?
23     A    Not offhand.  No.
24     Q    Do any of those tasks involve
25  the price at which Morgan Stanley is going

Page 23

Daniel Curry

1   Daniel Curry
2   to transact with the counterparty?
3      A    There would be discussions
4   around potential prices, potential hedging,
5   and specifics around a particular deal and
6   the risks that that particular deal may
7   have relative to other deals that we may
8   have looked at.
9      Q    And when I talk about the
10  pricing of a tobacco FPA, I am talking
11  about the fixed rate that Morgan Stanley is
12  going to sign up for as part of that FPA.
13         Do you understand that?
14     A    That would be the -- that would
15  be part of the discussion.
16     Q    Okay.  And in deciding what
17  that rate would be, what that fixed rate
18  would be, Morgan Stanley would use forward
19  curves, correct?
20     A    Morgan Stanley would use
21  forward curves to price the hedges that
22  they would use in order to be able to pay a
23  fixed rate on those trades.
24     Q    Okay.  So knowing what the
25  forward curves are and what the hedges are

Page 24

Daniel Curry

1   Daniel Curry
2   going to be is going to inform Morgan
3   Stanley as to what price, what fixed rate
4   it wants -- it can enter the trade into?
5      A    That would be one input into
6   the terms -- into the fixed rate that we
7   would use.
8      Q    Okay.  Did Morgan Stanley ever
9   derive a price or a tobacco FPA without
10  using a forward curve?
11     A    As we were offering a fixed
12  rate and we needed to hedge, we would have
13  had to have looked at a forward curve in
14  order to price the hedges that we would
15  have entered into in order to pay the fixed
16  rate.
17     Q    Okay.  Now, you were aware,
18  when you were at Morgan Stanley, that the
19  forward curve is not a crystal ball,
20  correct?
21     A    That is correct.
22     Q    You knew that the forward curve
23  changes from day-to-day, correct?
24     A    That is correct.
25     Q    But when Morgan Stanley was

Page 25

Daniel Curry

1   Daniel Curry
2   committing to enter into a transaction at a
3   particular price, that decision was based
4   in part on its reliance on the forward
5   curve and the "hedgability" of the risk,
6   right?
7      A    The forward curve would
8   determine the price at which two parties
9   could hedge.  We would enter into hedges.
10  And the fact that we have locked in hedges,
11  or as locked in as they could be, we could
12  pay a fixed rate.
13         So we weren't reliant on the
14  forward curve.  We were reliant on the
15  hedge that was derived from the forward
16  curve.
17     Q    And, in fact, you referred to
18  the phrase "locked in."  On the day that
19  you entered into your tobacco FPA, you
20  would recognize a P&L event upon the
21  execution of that trade, correct?
22     A    That is correct.
23     Q    That P&L event was based on
24  your valuation of your obligations under
25  the tobacco FPA offset by whatever benefits

7 (Pages 22 to 25)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 26

Daniel Curry

1
2  you got from the hedge, correct?
3      A    Correct.  Less any reserves
4  that we would have had to take in
5  relationship to that specific trade.
6      Q    Okay.  So the modeling that was
7  done and the calculations that were done to
8  come up with what the appropriate hedge
9  would be and what the price would be that
10 you would enter the trade into as Morgan
11 Stanley, did you do that work?
12     A    I did not.
13     Q    Someone else on the tobacco
14 team did that?
15     A    That would usually be the -- a
16 combination of the marketing person and the
17 traders each modeling the transaction to
18 determine where they thought the hedge
19 would trade, in consultation with our
20 credit department, to determine the cost of
21 any credit hedging that they needed to put
22 in place, less -- I am trying to think back
23 in time when things -- when different
24 things implemented.
25         But, you know, likely, you had

Page 27

Daniel Curry

1
2  a CVA desk, a credit valuation desk, which
3  did some Treasury functions, determining
4  reserves and things that costs that needed
5  to be assigned to the transaction.  And all
6  of that would affect the price that we
7  were -- or the rate that we were willing to
8  pay.
9      Q    Did you have any involvement in
10 determining what those charges would be,
11 what the CVA charges would be, what the
12 credit reserves would be, et cetera?
13     A    Are you asking if I determined
14 the price?
15     Q    Yes.
16     A    I did not determine the price.
17     Q    Okay.  So then let me step back
18 from that.  If you didn't determine the
19 price, did you have an involvement in
20 determining what the price would be on
21 the -- on the quantitative side?
22     A    My involvement would have been
23 to sit down with the CVA desk, the credit
24 people to discuss the transaction, so that
25 they could determine the value that they

Page 28

Daniel Curry

1
2  wanted to place on the different items.
3      Q    Okay.  I am just trying to
4  figure out what this discussion involved.
5  So you are sitting down with the CVA desk
6  and the credit people.  They are
7  determining the value that they want to
8  place on the different items.
9          So they are making that
10 determination, correct?
11     A    They are making that
12 determination with input from people like
13 myself --
14     Q    Okay.
15     A    -- in terms of saying:
16        "Okay.  This is how this trade
17 works.  These are where we believe the
18 risks are.  This is where the transaction
19 may speed up.  This is where it may slow
20 down."
21        These are all things that would
22 go into valuing the trade and evaluating
23 the risks of the specific trade.
24     Q    And you provided that input to
25 the credit and CVA people?

Page 29

Daniel Curry

1
2      A    They would -- and the risk
3  management people.  Yes.
4      Q    And what was your understanding
5  of what the credit risks were to Morgan
6  Stanley of entering into a tobacco FPA?
7      A    You know, the -- first, you
8  have to understand the tobacco settlement
9  itself.  And you would need to look at the
10 things that would potentially affect
11 payment or prepayment of these trades.
12        So these trades are subject to
13 a variety of -- what's the word I'm looking
14 for?
15        There are several provisions in
16 the document that could lead to potential
17 decreases in the amount that are paid
18 through the settlement.  So those would
19 have to be explained.
20        To the extent that there were
21 materials or analysis that we could do to,
22 you know, look at the potential for changes
23 in those payments, I would be -- I would be
24 involved there and have discussions with
25 the Treasury people.

8 (Pages 26 to 29)

Page 30

Daniel Curry

1
2       With that, we would have
3   discussions:
4       "Okay.  Well, are there places
5   where a speeding up of a payment or a
6   slowdown of the payment might be beneficial
7   to us," and weigh that versus the -- where
8   those could not go in our favor.
9       So those are the types of
10  inputs that I would -- that I would have
11  with credit and risk and potentially legal.
12      And then we would also have to
13  assess this -- you know, this trade versus
14  other types of trades that we would have
15  entered into.
16  Q    Would you do any kind of
17  analysis to determine what Morgan Stanley's
18  exposure would be to the counterparty on
19  the FPA trade?
20  A    I would have input in the
21  discussions where we calculated the
22  exposure.  Would I -- would I have run the
23  model myself?  Most likely not.
24  Q    And was an analysis of the
25  exposure one of the things that you looked

Page 31

Daniel Curry

1
2   at in determining what the credit charge
3   would be?
4   A    Yes.
5   Q    And just so you and I are on
6   the same page, when you talk about
7   "exposure on tobacco FPA," what do you
8   understand "exposure on tobacco FPA" to
9   mean?
10  A    So our exposure on those cases
11  would be, we would have hedges in place.
12  And if the tobacco transaction didn't
13  perform as we expected, we had the
14  potential that we would need to unwind our
15  hedges.  Our hedges would not perform as
16  expected.
17      And those things expose us to
18  risk.  So to the extent that we were paying
19  a fixed rate and interest rates went up and
20  tobacco revenue slowed or accelerated, you
21  know, otherwise, performed not in the
22  expected fashion, we potentially had the
23  exposure of the need to unwind our
24  transaction in that type of interest rate
25  environment.

Page 32

Daniel Curry

1
2   Q    All right.  You mentioned a
3   couple of concepts.  I want to make sure I
4   understand it.
5       Are you suggesting that there
6   is a -- that it was your view that there
7   was a correlation between interest rates
8   and tobacco revenue?
9   A    No.
10  Q    So let's just separate those
11  two things out.
12  A    With one exception, there is an
13  inflation adjustment in the tobacco
14  settlement.
15  Q    Putting the inflation
16  adjustment aside, just in terms of changes
17  in real interest rates, there is no
18  correlation between changes in real
19  interest rates and tobacco revenues,
20  correct?
21  A    Not that I'm aware of.
22  Q    So let's focus on that then.
23      You have exposure when interest
24  rates go up and you are paying a fixed
25  interest rate because you are more likely

Page 33

Daniel Curry

1
2   to be in a mark-to-market in-the-money
3   position on that trade, correct?
4   A    Correct.
5   Q    And in that position, if the
6   counterparty were to default and not pay,
7   you have exposure?
8   A    Correct.
9   Q    You also said you worked with
10  the legal department pre-trade side?
11  A    We -- sorry.  We had an
12  exposure really to -- regardless of -- from
13  a mark-to-market standpoint, you know --
14  let me step back.
15      From a mark -- we always have
16  an exposure to the client.  You would have
17  a mark-to-market exposure on those
18  particular hedges if rates were higher.
19      But regardless of whether the
20  rates were higher or lower, you know, there
21  are exposures in terms of just the ongoing
22  deliveries.  If you have entered into some
23  sort of hedge to try to hedge some of your
24  deliverables, you would have an exposure
25  regardless of what the market is, not

9 (Pages 30 to 33)

Page 34

Daniel Curry

1
2  necessarily an interest rate exposure.
3      Q   Right.  What I am trying to
4  isolate is your exposure to the risk of
5  non-performance by a tobacco counterparty,
6  not your exposure on the hedge.
7      A   Okay.
8      Q   You might treat those as the
9  same.  But I am focused on the risk of
10  non-performance by a tobacco counterparty.
11      A   Um-hum.
12      Q   And you have that risk of
13  non-performance by the counterparty where
14  you are in an interest rate environment
15  where prevailing interest rates are higher
16  than the fixed rate that you have agreed to
17  in the FPA, correct?
18      A   Um-hum, correct.
19      Q   Okay.  So, now, let's go back
20  to the legal -- your involvement with the
21  legal group on the pre-trade side because
22  that was one of the other categories that
23  you mentioned.
24      A   Okay.
25      Q   What did you do with the legal

Page 35

Daniel Curry

1
2  group, again, generally, not specific
3  advice or questions on specific deals; but,
4  generally, what was your involvement?
5      A   Well, we would talk about the
6  specifics of the individual trade.  Not all
7  reserve funds were the same.  Their primary
8  source of payment was the same, but the
9  individual bond documents would have been
10  different.
11      How they structured their
12  reserve fund would have been different.
13  How they structured their bond deals would
14  have been different, particularly, if you
15  go through different vintages.
16      Q   And were you providing input on
17  the wording of the FPA agreements, or were
18  you talking -- were you describing to the
19  legal department the fundamentals of the
20  bond deal and the FPA transaction or
21  something else?
22      A   The latter, the fundamentals of
23  the bond deal and the FPA transaction.  I
24  do not recall -- I don't recall, actually,
25  specifically commenting on adding something

Page 36

Daniel Curry

1
2  to any of the FPA documents themselves.  I
3  may have.  But I don't recall.
4      Q   Okay.  And you have probably
5  looked at a lot of documents in your
6  20 years in municipal finance.
7      Do you consider yourself to be
8  an expert on the application of deal
9  documents in the industry?
10      MR. LAWRENCE:  Object.
11      A   Yes.
12      MR. LAWRENCE:  Object to the
13  form.  Go ahead.
14      A   Yes.
15      Q   So just to understand it, are
16  you providing any opinions in this case
17  where you are opining on the legal
18  application of the terms of the Washington
19  TSA RFA?
20      A   I'm sorry.  Can you repeat
21  that, please.
22      MR. TAMBE:  Please read that
23  back.
24      (Reporter read back pending
25  question.)

Page 37

Daniel Curry

1
2      A   I don't know that I can apply
3  to the legal terms because I am not a
4  lawyer.  I can look at the terms from a
5  business standpoint and make a judgment or
6  offer an opinion as to the structure of the
7  transaction, but not from a legal
8  standpoint.
9      Q   And to the extent that there
10  are particular provisions of the Washington
11  TSA RFA that you used in coming up with
12  your valuation report, have you identified
13  those in the expert report?
14      A   I believe we have the primary
15  one that I would -- I would point out.  And
16  I can't tell you exactly what page -- oh,
17  here we go.
18      The par call or the termination
19  payment on the mandatory clean-up.
20      Q   What page is that of your
21  report?
22      A   It's on page four in the -- I
23  believe we discuss a little bit in more
24  detail in the transaction itself.
25      But the termination payment on

10  (Pages 34 to 37)

Page 38

Daniel Curry

1
2  mandatory clean-up redemption par note
3  termination --
4       Q    Slow down a little bit.
5       A    So "termination payment on
6  mandatory clean-up redemption."  That's in
7  one column.
8            And then the column to the
9  right, it says "par," and then parens, or
10  open parens, "no termination amount due to
11  from" -- sorry -- "slash from either party
12  closed parens."
13            That's not a -- I would say
14  it's not necessarily a standard provision.
15       Q    So, again, I just want to make
16  sure I understand your answer.
17            One of the things I am asking
18  you to do -- the question I had asked you
19  was, have you identified in your report the
20  provisions of the agreement that were
21  relevant to your valuation report.
22            You have drawn my attention to
23  this one.  I assume -- are there others?
24       A    The deliverables themselves,
25  you know, particularly commercial paper,

Page 39

Daniel Curry

1
2  where the requirement was that it was an
3  "A-1 plus" requirement.  I believe we have
4  discussed that.
5       Q    Anything else?
6       A    I think the other provisions
7  are relatively standard in that they can
8  draw on the reserve fund if the reserve
9  fund is needed.  And then they have a
10  replenishment provision, which allows them
11  to replenish after or within a period of
12  one year, should the payments resume at a
13  level that would allow them to replenish
14  the reserve fund.
15            Those are, I would say, you
16  know, very relevant in terms of being able
17  to price this transaction.
18       Q    And if there were any other
19  provisions of the agreement that were
20  specifically relevant to your pricing of
21  this transaction, did you identify them in
22  your report?
23       A    I believe we have -- I believe
24  we put in the relevant items.
25       Q    By the way, how -- how did you

Page 40

Daniel Curry

1
2  reach that decision as to what were the
3  relevant items and which ones were not?
4            Did you do that yourself, or
5  did you have input on that?
6       A    Jeffrey and I worked on that
7  together or looked at that together and had
8  discussions on it.
9       Q    Anyone else give you input on
10  that?
11       A    No.
12       Q    Did you get any input from
13  Washington TSA on what are the relevant or
14  the irrelevant portions of the agreement
15  for purposes of your analysis?
16       A    No, I have never spoken to
17  anybody at the Washington TSA.
18       Q    Ever?
19       A    Not that I recall.
20       Q    How about Mr. Shapiro?  Did he
21  have any input on that decision?
22       A    No.
23       Q    Now, did you speak to
24  Mr. Shapiro at all in connection with your
25  report?

Page 41

Daniel Curry

1
2       A    In connection with the report,
3  no.
4       Q    Okay.  So you did speak with
5  him back when you were being considered for
6  this engagement, correct?
7       A    That is correct.
8       Q    Did you discuss any aspects of
9  your methodology or your report with
10  Mr. Shapiro at any time?
11       A    No.
12       Q    Now, have you reviewed
13  Mr. Shapiro's calculation of the early
14  termination amount?
15       A    I read through his report.
16       Q    Okay.  Do you have any opinions
17  that you are offering in this case based on
18  your reading of his report?
19       A    I don't believe we were asked
20  to opine on his report, so we did not read
21  it -- read it for the purposes of giving an
22  opinion.
23       Q    Why did you read it?
24       A    It was part of the documents
25  that we reviewed.  And we read through a

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 42

Daniel Curry

1
2  large portion of the documents and skimmed
3  through another large portion of the
4  documents.
5      Between -- I mean, we skimmed
6  every document, and there were certain ones
7  that we did read.  And that was one that we
8  read.
9      Q    Are there any aspects of his
10  report that you disagree with?
11      A    We used a different methodology
12  than he used.  You know, I would leave it
13  at that.  We used a different methodology
14  mostly because the ability to transact -- I
15  mean, his -- you know, his methodology kind
16  of used -- well, if you could -- if you
17  could have transacted -- this is the
18  methodology that you would have used.
19      And we came at it from a
20  different angle, which is, you can't
21  transact.
22      Q    You understand that at least
23  one of the building blocks of Mr. Shapiro's
24  analysis was a forward curve, correct?
25      A    I believe what he did was

Page 43

Daniel Curry

1
2  looked at the forward curve in relation to
3  hedges that -- or he looked at the result
4  of the forward curve, which would have been
5  a transaction that, in theory, you could
6  have hedged.
7      Q    And, at least, it seems to be a
8  central part of your report that -- well,
9  you reject the use of the forward curve,
10  correct?
11      A    I reject the use of the forward
12  curve because I don't believe the forward
13  curve gives you any value unless you can
14  enter into a hedge that has been priced
15  from that forward curve.
16      Q    So, in your opinion,
17  Mr. Shapiro just got that wrong?
18      MR. LAWRENCE:  Object to the
19  form.
20      A    I think -- I think he utilized
21  a way of looking at a transaction as if a
22  transaction could have been undertaken as a
23  way to show a value.
24      So he used that -- he used
25  hedges as a building block for his

Page 44

Daniel Curry

1
2  valuation, also, recognizing that -- I
3  believe, recognizing that there was no
4  market for that trade.
5      Q    Okay.  So what he did was wrong
6  then in your view?
7      MR. LAWRENCE:  Object to the
8  form.
9      A    Was it wrong?  In the absence
10  of a tradeable transaction, it would be a
11  way of estimating a value.
12      Q    I'm sorry.  So it was right, or
13  was it wrong?
14      MR. LAWRENCE:  Object to the
15  form.
16      A    I can't say that it was right
17  or wrong.  It's -- you know, you are
18  looking at a transaction that you can't
19  transact.  You are looking at a transaction
20  that required specific performance.  And
21  that specific performance can't be obtained
22  in the current market.
23      So -- but in order to place a
24  value, you need to replicate a transaction,
25  or you need to put an estimate, or you need

Page 45

Daniel Curry

1
2  to put an "as if you could trade" type
3  value on it.  And that's what he did.
4      Q    You saw that part of his
5  analysis took that curve methodology and
6  then made some changes to it, made some
7  additions and subtractions to it, correct?
8      A    Correct.
9      Q    And you saw that he purported
10  to do that to capture credit risk?
11      A    Correct.
12      Q    Okay.  Have you ever calculated
13  credit risk in that manner in your 20 years
14  of municipal finance?
15      A    I wasn't the one who would have
16  calculated credit risk.
17      Q    Okay.  Do you have any view as
18  to the way Mr. Shapiro calculated credit
19  risk?
20      A    I believe what he did is he
21  took bond spreads.  And bond spreads are an
22  input into credit models.
23      Q    Do you know whether he adjusted
24  the bond spreads at all --
25      A    I do not.

12  (Pages 42 to 45)

Page 46

```
 1            Daniel Curry
 2     Q    -- to account for exposure?
 3     A    I do not.
 4     Q    Given our discussion earlier
 5  about exposure and credit risk, is it your
 6  view that Mr. Shapiro should have taken
 7  into account exposure in calculating credit
 8  risk?
 9     A    I mean, part of that is
10  implicit in the bond spreads themselves. I
11  mean, the bond spread, part of it is to
12  compensate you for exposure that you are
13  going to take.
14           So something that's considered
15  riskier is going to have wider spreads
16  or -- wider spreads in order to compensate
17  you for the risk that you are going to
18  take.
19     Q    So what part of that bond
20  spread -- because you understand he took
21  the entire bond spread and used it to
22  adjust the curve, correct?
23     A    I don't know.
24     Q    Well, if he had used the entire
25  bond spread and used it to adjust the
```

Page 47

```
 1            Daniel Curry
 2  curve --
 3     A    How do you define -- I don't
 4  know how you are designing "spread." Is
 5  it --
 6     Q    The way he defined it.  Let's
 7  go to his report so we aren't -- so we are
 8  talking about the same thing.
 9           It's Lehman 32, which was
10  marked yesterday, and there it is.
11           So let's turn to -- I believe
12  it's a double-sided document.  It's page
13  two of his report.  And he's got a heading
14  that says:
15           "Charges for municipal tobacco
16  credit."
17           Why don't you take a moment and
18  read those two paragraphs to yourself.
19  There is more later on, but I think that's
20  where he explained what he did.  And then
21  once you are done, let me know; and I will
22  ask you some questions about it.
23           (Previously Marked Exhibit No.
24    Lehman 32, Report of Mr. Shapiro is
25    introduced into the proceedings.)
```

Page 48

```
 1            Daniel Curry
 2        MR. LAWRENCE:  Can we take a
 3  break soon?  Can we take a short
 4  break?
 5        MR. TAMBE:  No, he's reading.
 6        MR. LAWRENCE:  Well, I mean, I
 7  just wanted to go out of the room.
 8  He's still going to read it.
 9        MR. TAMBE:  Okay.  That's fine.
10  If you want to take a break -- there's
11  a question pending, so I would rather
12  you not confer with the witness.
13        MR. LAWRENCE:  Well, actually,
14  I don't think there is a question
15  pending.  All you did was ask him to
16  review the document.
17        MR. TAMBE:  Well, but I am
18  asking questions about that document.
19        MR. LAWRENCE:  I understand
20  that.  There is no question pending.
21        So are we off the record or
22  not?
23        MR. TAMBE:  I would rather
24  actually finish this line of
25  questioning before we take a break.
```

Page 49

```
 1            Daniel Curry
 2        MR. LAWRENCE:  Okay.
 3     Q    So you read those paragraphs?
 4     A    I read the two paragraphs.
 5     Q    Do you now, sir, understand
 6  what Mr. Shapiro did with the bond spreads
 7  and how he used them in his calculation?
 8     A    No.
 9     Q    Okay.  So you can't tell from
10  that description what he did?
11     A    All he's doing is describing
12  the spread.  It doesn't say how he used it.
13     Q    If you go over to the next page
14  of this report, page three, I believe you
15  will see how he uses the credit spread.
16           In the part
17  titled, "Calculation of Loss," do you see
18  that?
19     A    Um-hum.
20        MR. LAWRENCE:  You have to
21  answer "yes" or "no."
22     A    Yes.  Sorry.
23     Q    So if you see, he starts with a
24  CP spread, subtracts the credit spread,
25  subtracts the profit component, and comes
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 50

```
 1            Daniel Curry
 2  up with a total number.
 3         Do you see that?
 4    A    So that's his adjustment, I
 5  take it.
 6    Q    Yes.
 7    A    Um-hum.
 8    Q    Do you have any views as to
 9  whether that's a proper way of using the
10  credit spread to make adjustments for
11  purposes of a tobacco FPA?
12         MR. LAWRENCE:  Object to the
13  form.
14    A    Can you repeat the question,
15  please?
16         MR. TAMBE:  Can you read it
17  back, please.
18         (Reporter read back pending
19  question.)
20    A    Do I have a view?  I'm sorry.
21  Is that what it is?
22    Q    Yes.
23    A    I don't have a view.
24    Q    No views.
25         Have you ever done it the way
```

Page 51

```
 1            Daniel Curry
 2  Mr. Shapiro purports to have done it?
 3         MR. LAWRENCE:  Object to the
 4  form.
 5    A    No.  But there is a difference
 6  between a new trade that you would enter
 7  into and then a trade you would take on
 8  assignment that was deeply in the money.
 9    Q    What is that difference?
10    A    Well, you -- a trade that you
11  are looking at prospectively in theory has
12  little or no value, that mark-to-market
13  value.  So your -- your credit exposure is
14  on a projected basis.
15         Here, the trade is already deep
16  in the money.
17    Q    To whom?
18    A    A new dealer would go -- have
19  to basically do hedges that cost them a lot
20  of money to enter into.  So their exposure
21  to different than what your exposure would
22  have been if you were doing a new trade
23  kind of day one.
24    Q    Well, looking at the
25  counterparty, this is a trade that is in
```

Page 52

```
 1            Daniel Curry
 2  the money to -- just looking at the dealer
 3  and the tobacco counterparty, what's your
 4  view of who is in the money?
 5    A    Well, for the next -- for the
 6  next person who steps into it, if that
 7  person existed, you would have a situation
 8  where that other party would owe you a lot
 9  of money, and you would have to credit
10  adjust the amount of -- you would have to
11  credit adjust for the fact that you had
12  what we would call a risky counterparty
13  paying you money.
14    Q    So your understanding is, based
15  on your view of the market at this point in
16  time, a hypothetical dealer stepping into
17  the trade paying 4.484 and earning the CP
18  spread would be out of the money?
19         MR. LAWRENCE:  Object to the
20  form.
21    A    I would say that that party --
22  I mean, it would be in the money to the
23  dealer in that the other party owed them --
24  the municipality, in this case, would owe
25  them money.  So they have a risky
```

Page 53

```
 1            Daniel Curry
 2  counterparty that owes them money.
 3    Q    That's your understanding of
 4  the hypothetical situation set forth by
 5  Mr. Shapiro; is that right?
 6         MR. LAWRENCE:  Object to the
 7  form.
 8    A    I believe that's a way of
 9  viewing it.
10    Q    All right.
11         MR. TAMBE:  Why don't we take a
12  break now.
13         (A break is taken.)
14  CONTINUED DIRECT EXAMINATION
15  BY MR. TAMBE:
16    Q    Going back to the Shapiro
17  report we were looking at, which is Lehman
18  Exhibit 32, if you go back to page three of
19  his report, the third page, the next page
20  over, yes -- so in the "Calculation of
21  Loss" section, you will see Mr. Shapiro
22  begins with a CP spread, makes some
23  adjustments to it, and comes out with a
24  total number.
25         Do you see that, which IS a
```

14  (Pages 50 to 53)

Page 54

Daniel Curry

1
2    negative 3.874?  Do you see that?
3        A    Yes.
4        Q    Okay.  Do you understand that
5    as -- a negative 3.874, as an absolute
6    number or as a spread to LIBOR?
7            MR. LAWRENCE:  Object to the
8        form.
9        A    What he says is "would be
10   incorporated into the calculation of TSA's
11   loss."
12           So I would think of that as a
13   spread.
14       Q    Okay.  And if you are looking
15   at a spread to LIBOR of a negative
16   387 basis points, that would yield negative
17   interest rates, right, in the environment
18   we were in in 2009?
19           MR. LAWRENCE:  Object to the
20       form.
21       A    The way that you would apply
22   that spread would be to the fixed rate that
23   they pay.
24       Q    How do you know that?
25           MR. LAWRENCE:  Object to the

Page 55

Daniel Curry

1
2        form.
3        A    If we were paying a fixed rate
4    and we were taking reserves expressed as
5    basis points, that would be where we --
6    those would be the numbers where we, as
7    Morgan Stanley or as a provider, would
8    adjust our rate.
9            We are not adjusting a fixed
10   freight -- I'm sorry -- the floating rate
11   side.  We are paying fixed, so that would
12   be our adjustment.
13       Q    And you understand that that --
14   that's your understanding of what
15   Mr. Shapiro has done?
16           MR. LAWRENCE:  Object to the
17       form.
18       A    Just reading that first
19   paragraph under "Calculation of Loss," it
20   says:
21           "These are the components that
22   would be included."
23           So there is no swap rate there.
24   There is just a CP spread, the credit
25   spread, a profit, and total.  So that in my

Page 56

Daniel Curry

1
2    mind, based on my experience, would be an
3    adjustment.
4        Q    Okay.  No, my question is a
5    little different.  Is that -- is it your
6    understanding that that's how Mr. Shapiro
7    was using that calculation?
8            MR. LAWRENCE:  Object to the
9        form.
10       A    Based on what he says in the
11   preceding paragraph, that is what I
12   believe.
13       Q    Okay.  Would you agree with me
14   that it would be non-standard to do a
15   calculation with negative interest rates on
16   the floating leg?
17           MR. LAWRENCE:  Object to the
18       form.
19       A    Can you repeat that, please.
20       Q    Would you agree with me that it
21   would be non-standard, non-market standard,
22   to do a calculation with negative interest
23   rates for the floating leg?
24           MR. LAWRENCE:  Object to the
25       form.

Page 57

Daniel Curry

1
2        A    I can see instances where
3    something like that could be the result.
4        Q    Have you ever seen it?
5        A    Have I ever seen it, or have I
6    done transactions that I believe have
7    resulted in it?
8        Q    Have you ever seen it?
9        A    Not at initial pricing, no.
10       Q    You wouldn't enter into a
11   transaction with that scenario?
12           MR. LAWRENCE:  Object to the
13       form.
14       A    I don't see why or why not you
15   would or would not do that.  There are
16   instances where that might be applicable.
17   I don't know those instances.
18       Q    Let me see if I understand your
19   answer a different way.
20           If you are just doing an
21   interest rate swap where you're paying
22   fixed, receiving floating -- okay.  Are you
23   with me so far?
24       A    Um-hum.
25       Q    Yes?

15 (Pages 54 to 57)

Page 58

Daniel Curry
1
2       A    Paying fixed, receiving
3   floating, yes.
4           MR. LAWRENCE:  Get to a
5       question, please.
6           MR. TAMBE:  I am just trying to
7       get to an answer.  So I want to get an
8       answer "yes" or "no" as opposed to
9       "um-hum" or "hum-hum."  So that's what
10      that was about.
11      Q    So in a garden variety fixed or
12  floating swap --
13      A    "Garden variety," can you
14  explain what "garden variety" is?
15      Q    A LIBOR swap.  You are getting
16  a LIBOR floating rate of interest.  You are
17  paying a fixed rate of interest.
18      A    Is it an on-market swap, or is
19  it a --
20      Q    It's an on-market swap.
21      A    Okay.
22      Q    Anything else you want to add
23  to this assumption?
24      A    No.
25      Q    Any other -- okay.  You've

Page 59

Daniel Curry
1
2   got -- that gives you enough to sort of
3   picture a swap in your mind, right?
4       A    Okay.
5       Q    Okay.  On that swap, if you're
6   paying fixed and what you are receiving is
7   a negative floating rate, in effect, you
8   would be paying on both legs, correct?
9       A    Correct.
10      Q    Okay.  Ever seen a transaction
11  like that at inception?
12      A    Not on an on-market trade.
13      Q    Okay.  Going back to our
14  discussion of who was in the money or out
15  of the money in this hypothetical
16  transaction Mr. Shapiro was constructing in
17  his report, I believe you said the
18  hypothetical dealer was the one in the
19  money?
20      A    They are owed money.
21      Q    Oh, they are owed money.  Okay.
22          And just let me understand why,
23  in your view, they are owed money by the
24  Washington TSA in this hypothetical
25  transaction.

Page 60

Daniel Curry
1
2           MR. LAWRENCE:  Objection to the
3       form.
4       A    Wait, I'm sorry.  Let's take a
5   step back.  I reverse the side.  They owe
6   money.
7       Q    Okay.  So just to go back to
8   where we were -- what we were talking about
9   before we took the break, it's exactly the
10  other way, right?
11      A    They are owed money, correct.
12      Q    They are owed money.  And they
13  are owed money --
14      A    The issuer -- I'm sorry --
15  paying fixed -- the issuer is owed money
16  because the issuer is receiving an
17  above-market rate, a currently above-market
18  rate.
19      Q    Right.  And because the issuer
20  is owed money, the issuer is, in the
21  parlance, "in the money" on the trade,
22  correct?
23      A    Correct.
24      Q    Okay.  And so to actually enter
25  into such a transaction, which is not an

Page 61

Daniel Curry
1
2   on-market transaction, but a transaction
3   that you are stepping into, correct, a
4   dealer would have to be paid money to enter
5   into a transaction like that, correct?
6       A    That is correct.
7       Q    Okay.  And if the dealer were
8   to be paid money on a transaction like
9   that, what credit risk would the dealer
10  have at that point?
11      A    Well, the dealer presumably
12  still needs to do a hedge on the other
13  side.  So the issuer could default, and the
14  dealer could be in a situation where they
15  still have to unwind their hedges.
16          So if there is any variation in
17  the movement of rates from where they go
18  and they enter into their new trade, they
19  would have exposure.
20      Q    So that exposure, though, would
21  be on the hedge side, not a credit risk to
22  the counterparty, the Washington TSA?
23      A    Well, on the hedge side, you
24  know, usually, what you would have is
25  collateral.

16  (Pages 58 to 61)

Page 62

```
1          Daniel Curry
2          Dealer-to-dealer trades are
3   usually collateralized.  So there would be
4   minimal credit risk.  There may be some
5   re-hedging risk to rebalance your book.
6          And dealer-to-dealer trades
7   that are collateralized, generally, there
8   is not a huge amount of credit risk.  There
9   is potential risk for disruption of the
10  market, which could cause -- give you an
11  exposure as you would have to rebalance
12  your books.
13     Q    Okay.  Going back to what you
14  did on a pre-trade basis when you were
15  involved with tobacco RFAs at Morgan
16  Stanley, we have talked about credit.  We
17  have talked about legal.  We talked
18  about -- risk management was another item
19  you had mentioned.
20          What role did you play in a
21  pre-trade basis with respect to risk
22  management?
23     A    On a pre-trade basis, there is
24  no risk to manage.
25     Q    All right.  So should we take
```

Page 63

```
1          Daniel Curry
2   that item off the list of involvements you
3   had on a pre-trade basis?
4      A    There is no risk management
5   per se.  I mean, there would be discussion
6   with risk people and risk management on how
7   you would manage the exposures if you
8   entered into the trade.  But there is no
9   actual risk management.
10     Q    Okay.  And I assume that -- you
11  said you were involved in conference calls,
12  but the conference calls would have been
13  about these other matters, credit, legal,
14  risk; is that right?
15     A    Generally, yes.
16     Q    All right.  On the post-trade
17  basis, once the trade has been entered
18  into, you mentioned you would have some
19  input on the deliverables; is that right?
20     A    Correct.
21     Q    And by "deliverables," you mean
22  what eligible securities were being
23  delivered by the dealer?
24     A    Correct.
25     Q    Okay.  And you understand that,
```

Page 64

```
1          Daniel Curry
2   in the Washington TSA, the dealer, Lehman
3   or any replacement dealer, would have
4   discretion as to what eligible security to
5   deliver as long as it was eligible,
6   correct?
7      A    Correct.
8      Q    Complete discretion?
9      A    As long as it met the
10  requirements of the qualified securities.
11  In this case, they were primarily
12  delivering commercial paper.  That
13  commercial paper would have had to have
14  been "A-1 plus P-1."
15     Q    And they could have, if they
16  chose to, deliver agencies as well,
17  correct?
18     A    They could have delivered
19  agencies.
20     Q    And I believe Treasuries as
21  well?
22     A    They could have delivered
23  agencies and Treasuries provided those
24  securities matured on or prior to the date,
25  to the bond payment dates.
```

Page 65

```
1          Daniel Curry
2      Q    So if they were eligible
3   securities?
4      A    Eligible securities, as
5   defined, which I believe requires them to
6   mature on or prior to the bond payment
7   dates.
8      Q    In addition to having some
9   input -- let me go back.
10          In addition to having some
11  input on deliverables, what else did you --
12  what else was your involvement on the
13  post-trade basis?
14     A    Sorting -- sort of helping to
15  synthesize any market developments as it
16  related to tobacco, making sure that the
17  appropriate people would see the
18  information, being involved in discussions
19  around developments that they would have on
20  our book, offering advice to the trader who
21  was managing the book, speaking to bond
22  traders, speaking to portfolio managers
23  that had tobacco risks, speaking to other
24  people to kind of get their assessment of
25  that, all as it would relate to the
```

17 (Pages 62 to 65)

Page 66

```
 1         Daniel Curry
 2  exposure that we had on our book and
 3  changes that we may need to make related to
 4  hedges and things as a result of those
 5  market developments.
 6     Q    On a post-trade basis, did you
 7  have any involvement terminating tobacco
 8  FPAs?
 9     A    There was one trade that I
10  recall I had some input on, unwinding -- it
11  wasn't termination.  It was mutually agreed
12  to unwind.  It wasn't a termination that
13  needed to happen as a requirement of
14  documentation.
15     Q    And what was your
16  involvement -- what was your involvement --
17  was -- I'm sorry -- it was a tobacco FPA?
18     A    That was a tobacco FPA.
19     Q    And what was your involvement
20  in the mutually agreed unwind of that
21  tobacco FPA?
22     A    Dealing with some of the
23  funding issues that that -- and some of the
24  hedges that needed to be unwound as it
25  related to that transaction.
```

Page 67

```
 1         Daniel Curry
 2     Q    Did you have any input in the
 3  valuation of that mutually-agreed-upon
 4  unwind?
 5     A    I believe my contribution was
 6  just talking about a particular spread that
 7  created an exposure.  That went into the
 8  rate or the valuation of the unwind.
 9     Q    And was that an unwind that was
10  post the Lehman bankruptcy?
11     A    I don't believe it was post.  I
12  believe it was -- I don't believe it was
13  post.  I believe it was -- I am not sure.
14     Q    And do you remember whether
15  Morgan Stanley was paid money or paid money
16  to mutually unwind that trade?
17     A    I believe we paid money.
18     Q    And do you remember the spread
19  that that trade was unwound at?
20     A    I do not.
21     Q    Did you have any involvement
22  with providing quotations or valuations to
23  others on tobacco FPA contracts post the
24  Lehman bankruptcy?
25     A    Can you be more specific.
```

Page 68

```
 1         Daniel Curry
 2     Q    Yes.  Let me rephrase the
 3  question.
 4         While you were at Morgan
 5  Stanley, were you aware that from time to
 6  time parties in the market would call
 7  Morgan Stanley as a dealer and Morgan
 8  Stanley to provide a quote on a derivative
 9  transaction?
10     A    Yes.
11     Q    Okay.  And were you familiar
12  that parties did that with respect to
13  tobacco FPAs from time to time?
14     A    I think it would just be part
15  of the natural course of business that
16  tobacco would have been part of that.
17     Q    And are you -- do you have any
18  specific recollection of any quote having
19  been provided by Morgan Stanley post Lehman
20  bankruptcy to third parties who were
21  seeking a quotation or a valuation of a
22  tobacco FPA?
23     A    There may have been some
24  requests.  I think that one of the issues
25  around that is our rating was declining at
```

Page 69

```
 1         Daniel Curry
 2  that point; so in a lot of instances we
 3  were not an eligible counterparty.  So we
 4  were not necessarily a go-to place for
 5  those types of quotations.
 6     Q    If a request for quotations had
 7  come into Morgan Stanley, would you have
 8  been involved in fielding that request?
 9     A    The quotation for a transaction
10  where we did not have an exposure, I would
11  not have been involved in.
12     Q    Who -- again, I mean post
13  Lehman bankruptcy time period.
14         Who at Morgan Stanley would
15  have been involved in that process?
16     A    It could have come in through
17  one of two, potentially three sources.  The
18  CVA desk might have been asked for that.
19  And as this was a product that required
20  specific expertise, they would have spoken
21  to somebody on my desk.  It could have come
22  in directly to my desk, my general area,
23  most likely to either Kevin Schwartz or
24  Fabrice Pilato.
25         Potentially -- and, I mean,
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 70

Daniel Curry

1  this is probably the least likely -- but,
2  perhaps, it could have come in through the
3  banking side.  I don't recall anything
4  coming in through the banking side.  But
5  that's not to say it didn't happen.
6      Q   And you can't -- you don't know
7  one way or the other whether Morgan Stanley
8  from time to time did provide quotes to
9  tobacco FPA parties where Morgan Stanley
10  itself did not have an exposure?
11     A   I am not aware of it.  In any
12  event, if we did provide a quote, it would
13  not have been an actionable quote.
14     Q   All right.  I just want to make
15  sure I understand this better.
16         If you go back to your report,
17  which is Exhibit 30, page six of your
18  report, the second full paragraph on that
19  page, the last sentence of that paragraph
20  reads as follows:
21         "As municipal finance
22  professionals who structured and marketed
23  FPAs, we agree that quotes and, in
24  particular, actionable quotes could not be

Page 71

Daniel Curry

1  obtained at or around rejection date."
2         Do you see that?
3      A   Yep.
4      Q   You obviously -- did you write
5  that sentence?
6      A   I don't know if I wrote that or
7  Jeffrey wrote that.
8      Q   As you sit here, do you agree
9  with that sentence?
10     A   I do agree with that sentence.
11     Q   So are you saying that as -- or
12  are you opining, that, as municipal finance
13  professionals who structured and marketed
14  FPAs, quotes could not be obtained at or
15  around the rejection date?
16         MR. LAWRENCE:  Object to the
17     form.
18     A   I think we have to
19  distinguish -- or we probably should have
20  distinguished a little bit better between
21  "indications" and, "quotes."  Most
22  certainly, actionable quotes could not be
23  obtained.
24     Q   So how -- how would you edit

Page 72

Daniel Curry

1  that sentence to make that distinction?
2      A   I would say that indications,
3  very, very broad indications, ranges, were
4  obtainable for the purpose of unwinds.  I
5  don't know that anybody would give you a
6  quote or a firm indication to kind of parse
7  it a little bit on new transactions.
8         I don't know that you would
9  have gotten actionable.  I don't believe
10  you would be able to get actionable quotes
11  for taking on a transaction at that time;
12  and, actually, I believe that is still more
13  or less in effect today.
14         I don't believe you can get
15  quotes for assignments, for example, on
16  these types of transactions.
17     Q   So putting aside assignments or
18  actionable quotes, just so I'm clear, your
19  understanding is that it was possible to
20  get indicative quotes on tobacco FPAs post
21  Lehman bankruptcy?
22     A   I think you have to -- I think
23  you could get an quote on an unwind value.
24  So, for example, if somebody went in to

Page 73

Daniel Curry

1  Morgan Stanley and said, "I want to unwind
2  a trade that I have with you," those you --
3  you could quote.  You could give a price.
4         In terms of somebody calling up
5  and saying, "I have this trade on with this
6  particular dealer; what do you think this
7  thing is worth, more or less," I think you
8  could get that type of exposure.
9         But the differentiation there
10  is -- that is you are dealing with a
11  transaction where there is a hedge in place
12  and you are taking off a hedge as opposed
13  to a transaction where you are putting
14  hedges in place and taking on new
15  exposures.
16         I think that's the
17  differentiation you need to make.
18     Q   So, just again, unpackaging
19  your answer, if someone had a trade on with
20  Morgan Stanley and asked for a quote on
21  unwinding that trade, that could be
22  obtained, correct?
23     A   Sure, if somebody had a
24  transaction that they wanted to unwind, we

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Daniel Curry

1  could give them an unwind price.  I think
2  they would have been more than happy to
3  give them an unwind price because they
4  didn't want the exposure.
5      Q    That's one category where you
6  could get quotations.
7          Another category where you
8  could get quotations is if a counterparty
9  did not have a trade on with Morgan Stanley
10 but said "I have a trade on with another
11 dealer and I want to get an unwind
12 valuation or estimation of value," and
13 Morgan Stanley would provide that, correct?
14     A    They might provide an
15 indication.  It would not have been me.
16 They might provide an indication as to
17 where they thought that transaction could
18 be unwound.  I don't believe they would
19 have provided an indication as to where
20 that transaction could have been
21 transferred or replaced by another party.
22     Q    I just want to make sure I
23 understood your answer because I am not
24 sure we got it down right.

Daniel Curry

1      You said:
2      "They might provide an
3  indication.  It would not have been me."
4      Is that right?
5      A    That is correct.
6      Q    So whoever at Morgan Stanley
7  may have provided that would have been
8  someone other than you?
9      A    Someone other than me, likely
10 on my trading desk, with possible
11 involvement by other parties, or other
12 trading desks.
13     Q    All right.  So to be fair, when
14 the judge is reading this sentence in your
15 expert report, she should read it with this
16 context in terms of what types of
17 indicative quotes and levels might have
18 been obtained in the market at or around
19 the rejection date; is that right?
20     A    Correct.
21     Q    Okay.  In preparing your report
22 you worked with Mr. Hasterok, correct?
23     A    Yes, correct.
24     Q    And you had worked with him at

Daniel Curry

1  Morgan Stanley, right?
2      A    Correct.
3      Q    Can you describe sort of what
4  the relationship was working- and
5  reporting-wise at Morgan Stanley between
6  you and Mr. Hasterok?
7      A    Jeffrey was on the marketing
8  side, so he typically dealt with the
9  municipal issuers.  He reported to a
10 gentleman named Kevin Schwartz.  I was
11 on -- I sat on the trading desk.
12     I -- I was primarily a
13 structuring person, although I did have
14 certain trading positions where I was the
15 responsible trader.
16     I reported to a gentleman named
17 Fabrice Pilato.  At various points in time,
18 Jeffrey's -- the marketing group reported
19 to -- or Jeffrey's boss Kevin reported to a
20 few different people.
21     At one point they were part of
22 what they called "global capital markets"
23 which is really more the issuer-facing
24 business on the corporate side and on the

Daniel Curry

1  municipal side, and that type of thing.
2      At some point, Jeffrey's group
3  was moved back into the municipal group.
4  And I believe Kevin Schwartz reported into
5  Fabrice, or he may have had kind of a
6  dotted line reporting line into Fabrice.
7      So we worked closely together.
8  At one point, his group was upstairs from
9  ours.  At one point, they were a couple of
10 rows away from us.  At the end of our
11 tenure at Morgan Stanley, we were probably
12 about as close as I am from you.  And that
13 would have been probably the last two years
14 or so.
15     Q    So did you work from time to
16 time on matters with Jeffrey?
17     A    In terms of structuring new
18 transactions or to the extent that we had
19 exposures that we wanted to get out of, I
20 would be working with the marketing people
21 to put transactions like that together.
22     So if we wanted something, I
23 would be dealing with Kevin and Jeff and
24 others who were in that group at points in

Page 78

1          Daniel Curry
2   time saying:
3          "Okay.  This is the type of
4   trade that we want to do.  This is how we
5   want to document it."
6          And I would be working with
7   them to the extent -- so that would be kind
8   of a new exposure, if you want to think
9   about it that way.
10         If we had something on our
11  books that perhaps we had too much of it or
12  it wasn't the type -- the risk that we
13  wished, I would be putting together
14  transactions that would potentially reduce
15  that type of risk that we had on our books
16  and trying to help put it in a format that
17  a customer might have wished to have.
18     Q    Did any of those transactions
19  or matters concern tobacco FPAs?
20     A    Yes.
21     Q    And in any of your dealings
22  with Jeffrey on tobacco FPAs, did you
23  employ a valuation methodology like the one
24  you have in your report?
25     A    No.

Page 79

1          Daniel Curry
2     Q    Other than this report,
3   Exhibit 30, have you ever employed the
4   valuation methodology that is set forth in
5   Exhibit 30 on any other transaction?
6     A    It wasn't applicable to other
7   transactions.  The issue here or the
8   transactions that I would have worked on
9   with Jeffrey were places where we had
10  hedges in place and we were looking to
11  unwind a hedge or transactions where you
12  would have been able to hedge new exposure.
13  So it's not applicable, or it wouldn't have
14  been applicable.
15     Q    In any of your prior work in
16  your 20 years in municipal finance, have
17  you ever assumed for purposes of whatever
18  work you're doing -- risk management,
19  credit, valuation, hedging -- that current
20  short-term interest rates would remain
21  effective and unchanged over a period of
22  23 years?
23     A    We have shown scenarios like
24  that.
25     Q    You have.  And what types of

Page 80

1          Daniel Curry
2   situations did you show scenarios like that
3   in?
4     A    When people were buying or
5   selling short-term securities.
6     Q    And what kinds of short-term
7   securities?
8     A    That would be investors buying
9   variable rate demand bonds or buying
10  auction rate securities, for instance, or
11  issuers selling auction rate securities or
12  variable rate demand bonds, or issuers
13  going in finance -- or, sorry -- customers
14  financing bonds through tender option bond
15  programs.  So those would be scenarios that
16  we would run.
17     Q    And are those scenarios in
18  which you would value those transaction or
19  are those one of many scenarios which you
20  would run?
21     A    Those are one of many scenarios
22  that we would run.
23     Q    In your practical experience in
24  the past 20 years in municipal finance, has
25  it been your experience that short-term

Page 81

1          Daniel Curry
2   rates in CDs, government agencies,
3   Treasuries, commercial paper, have been
4   flat and unchanged for 23 years?
5     A    I don't know that they have
6   been flat and unchanged for more than a
7   day.
8     Q    Was there any particular
9   analysis that either you or Jeffrey did,
10  Mr. Hasterok, I'm sorry, did, to assume for
11  purposes of your calculation that
12  short-term rates could be projected
13  unchanged into the future for up to
14  23 years?
15         MR. LAWRENCE:  Objection to the
16  form.
17     A    There was no analysis that was
18  done that I can recall.
19     Q    When I spoke to Mr. Hasterok
20  yesterday, we discussed that there are two
21  separate calculations that you did with
22  respect to various short-term rates.  You
23  did a four-month average, and you did a
24  four-year average, round numbers.
25     A    Okay.

21 (Pages 78 to 81)

Page 82

Daniel Curry

1
2    Q    Are you familiar with that?
3    A    I'm familiar with it.
4    Q    Okay.  Did you discuss with
5  Mr. Hasterok doing longer averages, say,
6  seven-year averages, ten-year averages,
7  twenty-year averages?
8    A    Not specifically.
9    Q    Well, generally, what did you
10  discuss with Mr. Hasterok about what
11  average term you would use for purposes of
12  your report?
13    A    I think we just -- we discussed
14  short-term rates in general.  We discussed
15  the fact that we had to look at the
16  valuation as of the rejection date.  We
17  looked at the rates that they had earned
18  from the rejection date -- I'm sorry --
19  through the last -- through the failed
20  delivery date and the rejection date, so
21  what they were able to obtain then.
22      So those were, you know, more
23  or less actual damages, or damages to that
24  particular date.  And then we looked at the
25  rates that they were able to actually earn

Page 83

Daniel Curry

1
2  from that point in time to today as more or
3  less a reference point to show that,
4  even if you used that four-month period,
5  the rates have gone lower and lower and
6  lower; and they are incurring more loss
7  than those rates would have predicted.
8      You know, we had discussions
9  about potential Fed policy.  We had
10  discussions about the fact that they are in
11  money market funds and money market funds
12  are currently waiving their management
13  fees; so, if and when rates do rise, money
14  market funds are likely to trail because it
15  would be anticipated or would be expected
16  that they would go and re-implement those
17  fees.
18      So if those fees were in place
19  now, you would actually have negative
20  yields, or you would need to pay to put
21  money into a money market fund.  That would
22  not be expected to go forward, so there
23  would be, again, a lag.
24      And just the general
25  recognition that there is -- we would be

Page 84

Daniel Curry

1
2  very, very wealthy men if we could project,
3  you know, even short-term rates.  And
4  that's not necessarily possible.
5    Q    You mentioned, I think, the
6  last answer about doing the calculation as
7  of a rejection date.
8      Do you remember that?
9    A    Um-hum.
10    Q    Yes?
11    A    Yes.
12    Q    What is your understanding of
13  the valuation that you have been asked to
14  do.  Have you been asked to do a valuation
15  as of the rejection date or as of some
16  earlier date or some later date?
17    A    I believe it was as of the
18  rejection date.  Excuse me.
19    Q    And to do that type of
20  valuation -- well, how do you do something
21  like that?
22      Here you are in 2013 when you
23  get engaged, and you are being asked to do
24  something as of March of 2009.
25      How do you do that?

Page 85

Daniel Curry

1
2      MR. LAWRENCE:  Object to the
3  form.
4    A    You look at where, you know,
5  for example, rates and volatility were in
6  the particular market.  You look at -- or
7  you remember what was going on in the
8  market.  You think back about what you were
9  allowed to do from a trading perspective
10  and taking exposures.
11      You think back to what your
12  counterparties at other firms could or
13  couldn't do.  To a certain extent, you are
14  looking at what's going on today to
15  reaffirm what was going on at that period
16  of time.
17      And you apply your market
18  knowledge and your professional knowledge
19  to calculating what you believe to be a
20  proper "what if" for that period.
21    Q    I think I am with you with most
22  of your answer except for what you said
23  about looking at what's going on today to
24  reaffirm what was going on at that period.
25      How do you do that?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 86

Daniel Curry

1
2      A    Well, again, to my knowledge,
3  the market for forward purchase agreements,
4  the ability to do new transactions, the
5  ability to novate transactions, the ability
6  to lay off some of that risk in those
7  positions, still does not -- still does not
8  exist.
9      Q    You would agree with me, would
10  you not, that, as of March 25, 2009, the
11  market did not know that actual interest
12  rates would be lower than forward curve
13  implicated rates?
14          MR. LAWRENCE:  Object to the
15      form.
16      Q    Correct?
17      A    I think, if the market knew,
18  the market would have reacted; and the
19  rates would have been what the market
20  believed.
21      Q    So when you go back and you put
22  yourself back on March 25, 2009, and you
23  look at the various forward curves, that's
24  the market's view as of that date of what
25  the market expects rates to be in the

Page 87

Daniel Curry

1
2  future, correct?
3      A    No, that was the rate where
4  people would actually trade.
5      Q    Okay.  So that's where they
6  were prepared to transact?
7      A    Correct.
8      Q    And that was the view of
9  what -- they were prepared to transact at
10  those rates because that's what they
11  believed was the market clearing price
12  based on what was going to happen in the
13  future?
14          MR. LAWRENCE:  Object to the
15      form.
16      A    I mean, I believe what you said
17  before was the forward curve.
18      Q    Yes.
19      A    So nothing trades on the
20  forward curve.  People would go and enter
21  into swap transactions.  If you looked at
22  government bonds, they would go, and they
23  would buy or sell government bonds at the
24  yields that were -- that are used to
25  construct forward curves.

Page 88

Daniel Curry

1
2      Q    And that's what -- that's how
3  they would trade, and that's what they
4  would trade as of March 25, 2009, correct?
5      A    Correct, for trades that
6  adhered to whatever the market convention
7  was for that particular -- for that
8  particular item.
9          So if you are looking at swaps,
10  for example, swap rates between, you know,
11  dealer to dealer, are fully collateralized
12  transactions; so those are the rates that
13  are quoted.  The rates that are quoted are
14  for what the -- what we would call a
15  plain vanilla or a market standard
16  transaction.
17      Q    And in addition to the swap
18  rates, there are other market signals
19  available on a daily basis about what is
20  the shape and slope of the yield curve for
21  Treasuries, correct?
22      A    Correct.
23      Q    And that yield curve is
24  capturing the view of the market at that
25  point in time of what US Treasuries are

Page 89

Daniel Curry

1
2  going to pay out over various periods of
3  time, correct?
4      A    Well, that's a curve.  That's
5  where Treasuries will trade.
6      Q    Okay.
7      A    And it's an investor's view as
8  to whether or not to buy a long-term or a
9  short-term.  But that's -- if you -- you
10  know, their individual view, the
11  culmination of all of their views is the
12  interest rate curve for that particular
13  class of securities.
14      Q    Okay.  And you mentioned class
15  of securities.  There would be a different
16  yield curve for agencies, correct?
17      A    Correct.
18      Q    And maybe even within agencies,
19  for different types of agency products, you
20  might have different curves?
21      A    Sure, you would have coupon
22  bearings, and you would have discount
23  bonds; or, you know, there are floating
24  rate bonds; there are senior bonds; there
25  are subordinate bonds.  So an agency could

23  (Pages 86 to 89)

Page 90

1        Daniel Curry
2   have a whole bunch.
3        Q    And just to be clear, as you
4   said with US Treasuries, that yield curve
5   is capturing the view of the market at that
6   point in time as to what those securities
7   are going to pay out over various periods
8   of time; is that right?
9        A    What they are going to pay out
10  of what their value is.
11       Q    I am using your words, the way
12  you described it.  That's what -- that's
13  what their value is?
14       A    That's what their value is.
15       Q    Okay.  Over various periods of
16  time.  Okay.
17       A    Value can be expressed in terms
18  of dollars or yield.
19       Q    Yes, that's fine.
20            We had a discussion yesterday
21  about Mr. Peter Orr.
22       A    No, I have never met him.
23       Q    And one of the questions I had
24  was -- you quote -- I guess you cite
25  Mr. Orr in your report, correct?

Page 91

1        Daniel Curry
2        A    I believe he's cited, yes.
3        Q    And just describe to me how you
4   came to cite Mr. Orr in your report as
5   opposed to someone else or some other
6   source?
7        A    I have to find the citation.
8            MR. LAWRENCE:  Do you know what
9        page that is?
10           THE WITNESS:  I don't.
11       Q    It's on page 14, footnote 33.
12  Exhibit --
13       A    How we came to cite him?  I
14  mean, it's -- if you are a trader or a
15  structurer, somebody who's in the market
16  and somebody who uses forward rates to
17  calculate hedges or to see where things
18  would hedge, your fundamental assumption is
19  that the forward curve is really only --
20  its really only useful purpose is to
21  calculate where people would transact a
22  hedge, that it's not predictive of the
23  future movements of rates.
24            And I believe we were just
25  looking for some academic quote that

Page 92

1        Daniel Curry
2   followed that form.  I mean, that was just
3   a widely held view, a discussion that was
4   had an on a more frequent than not basis.
5            I think anybody who trades just
6   recognizes that it's just a fundamental
7   principle of swaps and rates.  And I am
8   sure, if we looked, we could have found
9   plenty of other citations that more or less
10  said the same.
11       Q    Was there any process in
12  picking that citation as opposed to some
13  other?
14       A    I don't think that there was
15  anything particularly involved there.
16       Q    Who went looking for that
17  quote?  Was it you or Mr. Hasterok?
18       A    I believe he did.
19       Q    And do you know how he did it?
20       A    He probably -- I believe he did
21  a Google search of, you know,
22  predictability of -- predictability of
23  forward rates or, you know, some other such
24  term that would produce information that
25  related to that particular topic.

Page 93

1        Daniel Curry
2        Q    You said, "probably," "I
3   believe he did," what you described.  Do
4   you know what he did?
5        A    I do not.
6        Q    Did you read his deposition
7   that was taken yesterday?
8        A    I read through it last night
9   very late sort of quickly.
10       Q    And before you read his
11  deposition, did you know that that was his
12  process in finding Mr. Orr?
13       A    We may have actually, you know,
14  discussed doing a search or, you know,
15  coming up with something.  I don't know
16  exactly.
17       Q    You may have actually done lots
18  of things.
19       A    Sure.
20       Q    What do you remember actually
21  having done?
22       A    I don't remember specifically
23  how we -- how we came up with that.
24       Q    Okay.
25       A    Excuse me.  There is plenty of

24  (Pages 90 to 93)

Page 94

Daniel Curry

1
2  academic literature around that.
3      Q    That forward rates are not a
4  crystal ball, that part?
5      A    Correct.
6      Q    And, yet, I think Mr. Hasterok
7  would agreed with me yesterday and maybe
8  you will agree with me, trillions of
9  dollars of transaction are done on the
10  basis of the forward curve, right?
11     A    I think you and I are looking
12  at the forward curve differently. The
13  forward curve is resultant as opposed to
14  something that is predictive.
15     Q    So the forward curve results
16  from the transactions that people are
17  prepared to do?
18     A    Correct.
19     Q    And so, therefore, it describes
20  the transactions that people are entering
21  into?
22     A    Correct.
23     Q    And the forward curve that
24  results from the collection of all of that
25  data as to where people are transacting is

Page 95

Daniel Curry

1
2  used for many purposes in the financial
3  industry, correct?
4      A    Correct. What you have are
5  transactions that people will do. You
6  know, for example, if you are doing
7  interest rate swaps, what are
8  referred to or known as or colloquially
9  thought of as par points. So those are the
10  liquid markets.
11         So those are usually 2, 3, 5,
12  7, 10, 12, 15 -- you can argue of -- 20s
13  and 30s are the most liquid. So those are
14  the points where if you -- those are the --
15  those are the swaps, that, if you're
16  looking at a screen that a swap trader
17  might look at and a customer might look at,
18  those are the, for lack of a better term,
19  the "on the run" swaps.
20         Those are the points that
21  everybody is quoting, you know, where they
22  will do a transaction of a certain size.
23  They will usually quote a two-side market,
24  so those are the par points.
25         If you were looking for

Page 96

Daniel Curry

1
2  something that isn't one of those points,
3  because there are those two points that you
4  can agree to, you can calculate a forward
5  price or swap that is not on those points.
6         So you are creating the curve
7  to go and create the swaps that are not the
8  "on the run" swaps. And the forwards are
9  what allow you to do that.
10         So it's not predictive of LIBOR
11  resets. It's not anything other than a way
12  to calculate swaps that are not considered
13  "on the run" swaps; or it would be a way to
14  price -- if you are talking about
15  government securities, for example, if you
16  had a -- if you had a ten-year "Govey" -- a
17  ten-year "Govey" that is, you know, trading
18  and you had a 30-year, and there was going
19  to be some new auction of, say, a 15-year,
20  it might be a way to figure out the pricing
21  of the 15-year based on those two
22  transactions.
23     Q    It's not just "maybe." I mean,
24  that's how financial professionals use this
25  market data to construct curves and

Page 97

Daniel Curry

1
2  interpolate between reported points to
3  figure out what the interim points are,
4  correct?
5      A    Correct. And then you -- you
6  know, and then there are some other, you
7  know, technical things that people will do
8  from that because sometimes you see -- and
9  this is highly technical, you know, and I
10  don't know if that is particularly
11  relevant.
12         But you would see places where
13  the curve might be, you know, up or down;
14  and I am talking about basis points, or,
15  you know, very minor amounts. And people
16  will sit there and kind of hit those points
17  to try to get them to go to a smooth point.
18  And that would actually be a trading
19  strategy. And that's where people would
20  use forward curves.
21     Q    Right. And were you involved
22  at all in the marking of derivatives
23  positions by Morgan Stanley?
24     A    Certain derivative positions.
25     Q    Okay. And which derivatives

25  (Pages 94 to 97)

Page 98

Daniel Curry

1 positions were you involved in marking?
2 What types?
3    A    Total return swaps, for
4 example, would be something that I was
5 very, very involved in.  I would have some
6 input on the forward purchase book because
7 I would be dealing somewhat, you know, with
8 the deliverables.
9    So to the extent that we could
10 do something in that market in terms of
11 hedging or whatever there -- but the
12 general swap book, no.
13    Q    The general swap book, was it
14 the traders responsible for the positions
15 who mark the book?
16    A    Yes.
17    Q    And do you know what role, if
18 any, forward curves played in the marking
19 of books?
20    A    I think forward curves would be
21 used to the extent that you -- let's say
22 that you weren't able to perfectly hedge a
23 position -- say that the customer paid
24 fixed, 11 years, and there was no direct
25

Page 99

Daniel Curry

1 hedge that you could do; maybe you had a --
2 you might bucket that trade or bracket that
3 trade with the trades that you could do,
4 which would probably be a combination of
5 maybe tens and twelves.
6    And you might use an
7 interpolated rate to figure out the risk --
8 an interpolated rate from a forward curve
9 to figure out the risk that you had to a
10 particular point because you weren't able
11 to perfectly hedge it.
12    Q    So you would use the forward
13 curve in that way.
14    A    But your -- your two positions
15 that bracketed it would move based on the
16 underlying swap market, which could go
17 in -- you know, and from that you could
18 interpolate a forward rate.
19    And you could see how that
20 particular position that you might have
21 might deviate from your position that you
22 might have.
23    Q    Back to all of this, maybe we
24 are both being overly technical in the
25

Page 100

Daniel Curry

1 forward rate.
2    But in marking derivatives
3 positions that may have durations --
4 remaining duration of five years, ten
5 years, fifteen years, twenty years, traders
6 at Morgan Stanley had to take some view on
7 the mark date of the value on that date of
8 that position, correct?
9    A    Can you repeat that, please.
10    Q    Read the question back.
11    (Reporter read back pending
12 question.)
13    A    I don't think the traders took
14 any view.
15    Q    What did they do?
16    A    They would go, and they would
17 input rates that are observed in the market
18 to recalculate the value of their books.
19    Q    Okay.  And when you are
20 inputting rates that are observed to
21 recalculate the value of their books, they
22 are inputting those rates where, into some
23 model?
24    A    Into models.
25

Page 101

Daniel Curry

1    Q    And those models are then
2 figuring out what the cash flows are going
3 to be in the future on those trades and
4 then present valuing those cash flows?
5    A    Correct.  But, typically, the
6 books were basically matched books so --
7    Q    Just because they are matched
8 books, you are not telling me that they
9 don't figure out what those cash flows are,
10 right?
11    A    They do figure out the cash
12 flows.
13    Q    They figure out cash flows for
14 both legs of the transaction, correct, the
15 hedge as well as the original trade?
16    A    Correct.
17    Q    Okay.
18    A    And they run through various
19 scenario models.
20    Q    And those scenario models have
21 Morgan Stanley's or the trader's then
22 existing view of what cash flows are going
23 to be in the future, correct?
24    A    No.  The scenario models are --
25

26 (Pages 98 to 101)

Daniel Curry

1
2  what it's doing is trying to stress the
3  model to see where your positions might
4  break.  But those are not input by the
5  traders.  Those are, you know, typically
6  input by risk management or somebody in
7  that type of a role, so to see how your
8  book would react to externalities, for
9  example.
10      Q    And just so -- are you still
11  describing the marking process?  Are you
12  describing something other than the marking
13  process?
14      A    It's part of the same process.
15  You know, at the end of the day, the trader
16  goes and he puts in -- actually, the
17  firm -- I don't know if the -- honestly, I
18  don't remember if the -- for a swap book, I
19  don't know if the trader does it or if it
20  was done by the -- I think it was actually
21  done both sides.
22          I believe the trader -- and so
23  the P&L group would both run things
24  concurrently to determine the end-of-day
25  P&L.

Daniel Curry

1
2      Q    Well, it's not just the trader
3  and the P&L group.  You have an independent
4  price control group, too; don't you?
5      A    The back office or the
6  operations group feeds them the values.
7      Q    And, ultimately, it rolls up
8  into the SEC filings, correct?
9      A    Correct.
10      Q    And people take that kind of
11  seriously, right?
12      A    I'll agree.
13          (There was a discussion off the
14      record.)
15      Q    And if you want to know what
16  Morgan Stanley's pricing policy is and how
17  they price it or its positions, you could
18  start by looking at their annual report,
19  correct?
20      A    Correct, I believe so.
21      Q    You think they would get that
22  one right in the annual report?
23      A    I would hope so.
24      Q    We would all hope so.
25          Now, when the contract was

Daniel Curry

1
2  rejected in March of 2009 or as of
3  March 25, 2009, the principal of the
4  reserve fund was in the possession of the
5  Washington TSA, correct?
6      A    That is correct.
7      Q    And --
8      A    Or I believe it was invested in
9  a money market fund.
10      Q    Correct.  But they had it;
11  Lehman didn't have it?
12      A    I don't think Lehman ever had
13  it other than the security delivery dates.
14      Q    And following the rejection of
15  the contract, Washington TSA has had the
16  ability to invest that principal of the
17  reserve fund in various ways, correct?
18      A    Correct.
19      Q    And they have chosen to
20  elect -- they have elected to invest it in
21  money market funds, correct?
22      A    That is my understanding.
23      Q    And they have received advice
24  from financial advisors from time to time
25  about alternatives to that investment,

Daniel Curry

1
2  correct?
3      A    I believe that to be correct.
4      Q    And the alternatives that they
5  were provided were alternatives that would
6  have yielded a much higher rate of interest
7  and return to the Washington TSA than what
8  they have actually earned, correct?
9          MR. LAWRENCE:  Object to the
10      form.
11      A    I believe so with
12  qualifications in that the transactions
13  were not exactly what they had with Lehman.
14  The transactions, I believe, were very,
15  very different.
16      Q    Well, I am not suggesting they
17  were the same as Lehman.
18      A    Okay.
19      Q    But they are transactions that
20  are very different than what the Washington
21  TSA has actually been doing since 2009,
22  correct?
23      A    That is correct.
24      Q    Okay.  And the Washington TSA
25  did not enter into any of those other

Page 106

```
 1        Daniel Curry
 2  transactions suggested by the financial
 3  advisors, correct?
 4     A    That to my understanding is
 5  correct.
 6     Q    Now, we have seen in discovery
 7  some of the proposals that were made by
 8  financial advisors, I believe, in 2011, to
 9  the Washington TSA; have you seen those?
10     A    I believe I read -- I believe I
11  scanned them.
12     Q    Did you do any kind of analysis
13  to see whether those same types of
14  investments that were being suggested by
15  the advisors to the Washington TSA could
16  have been done in March of 2009?
17        MR. LAWRENCE:  Object to the
18     form.
19     A    Back in 2009, we did not do
20  that analysis to my knowledge.  That was
21  not something that was being offered,
22  particularly to tobacco issuers.
23     Q    My question was a little
24  different.
25        Sometime in 2011, various
```

Page 107

```
 1        Daniel Curry
 2  folks, Swap Financial Group, I think,
 3  Barclay's, someone else, wrote proposals to
 4  the Washington TSA that proposed
 5  investments that Washington TSA could make,
 6  correct?
 7     A    I don't know if they could make
 8  them.  I don't know if they were allowed to
 9  make them.  I don't know if they adhered to
10  the form that investment of reserve funds
11  were required to take.
12        I know that they proposed
13  things that are available potentially in
14  the market.
15     Q    Did you do any analysis of
16  those proposals to compare those proposals
17  to the bond indenture to see if the
18  investments being proposed, in fact,
19  qualified under the bond indenture?
20        MR. LAWRENCE:  Object to the
21     form.
22     A    Based on my reading of the
23  documents, there are some things that may
24  have been permissible under the bond
25  documents.  I would dismiss them because I
```

Page 108

```
 1        Daniel Curry
 2  think the risk is very different than the
 3  risk that they had under the transaction
 4  that they chose to undertake.
 5     Q    Okay.  Whether or not you have
 6  a different recommendation to make, let's
 7  just put that aside.  I am just trying to
 8  figure out what you did to analyze these
 9  proposals that you saw.
10     A    Okay.
11     Q    So you did see the 2011
12  proposals, correct?
13     A    I did a summary review of
14  those, very summary -- summarily.
15     Q    And is it your understanding
16  that some of those proposals suggested
17  investments that the Washington TSA was
18  permitted to make under the then existing
19  bond indenture?
20        MR. LAWRENCE:  Object to the
21     form.
22     A    I didn't read it to the extent
23  that I looked at all of the provisions in
24  what was presented.  I don't believe
25  anybody presented a contract that they
```

Page 109

```
 1        Daniel Curry
 2  could potentially enter into to see if it
 3  adhered to those particular provisions of
 4  the bond document.
 5        All I saw were indications
 6  where somebody might enter into a trade
 7  without a firm understanding of the
 8  specifics of the specific -- specifics of
 9  the items that were proposed.
10        All I saw were kind of rates
11  and the name.
12     Q    Okay.  So you saw the rates.
13  You saw the names.  Did you do anything --
14  the focus of this question really is:
15        Did you do something, as an
16  expert hired in this case, to say was it
17  feasible for the Washington TSA to actually
18  enter into those transactions as far as the
19  bond indenture is concerned?
20        MR. LAWRENCE:  Object to the
21     form.
22     A    I did not.  We did not.  What
23  we looked at were how those proposals were
24  very different and presented very different
25  risks than the risk that they had under the
```

28  (Pages 106 to 109)

Page 110

```
 1           Daniel Curry
 2  FPA.
 3      Q    I think you have said that a
 4  trade like the FPA could not be done?
 5      A    I do not believe it can be
 6  done.
 7      Q    Couldn't be done in March of
 8  2009 and can't be done today?
 9      A    I don't believe it can be done
10  today either.
11      Q    All right.  So when you looked
12  at those proposals and the types of
13  investments that were proposed in the 2011
14  proposals, did you do anything to see
15  whether those same types of investments
16  could have been made by the Washington TSA
17  not in 2011, but in March of 2009?
18          MR. LAWRENCE:  Objection.
19      A    Did we do specific work to that
20  effect?  Did we have a discussion as to
21  what dealers were or weren't willing to do
22  at that period of time based on our
23  remembrance of the events?
24          We did have that type of
25  discussion.  And while the FPA presents --
```

Page 111

```
 1           Daniel Curry
 2  there's some very unique risks to the FPA
 3  transaction.
 4          I can say that Morgan Stanley,
 5  which is where I worked and where I can
 6  speak of, would not have done the other
 7  transactions that were suggested, which, I
 8  believe, were an uncollateralized
 9  investment agreement, with a tobacco
10  issuer; a repurchase agreement, I believe
11  was the other one; and then I believe the
12  others were some kind of swap -- swap
13  overlay type transactions.
14          I don't believe we would have
15  done any of those.
16      Q    As part of your work on this
17  matter, did you and Mr. Hasterok undertake
18  to document all of the different types of
19  replacement transactions, replacement
20  investments that have been made by
21  counterparties to Lehman following the
22  termination of their Lehman tobacco FPAs?
23      A    I believe we looked at -- we
24  did look at -- I can't remember the name
25  specifically -- parties that may have -- or
```

Page 112

```
 1           Daniel Curry
 2  parties that had transactions with Lehman,
 3  and, I think, just did a very, very summary
 4  type review of what it is that they have
 5  done in that period of time.
 6          I think, for the most part,
 7  they have been kind of in bills and CPs and
 8  money market funds.  If it was something
 9  outside of that, it wasn't something that
10  we see or something that we remembered --
11  or I saw or remembered.
12      Q    So I want to understand this
13  process a little bit more.
14          What did you do?  How did you
15  identify these parties?  And then how did
16  you figure out what it is that they have
17  invested in?
18          MR. LAWRENCE:  Object to the
19          form.
20      Q    And, finally, where did you
21  record all of this stuff?
22          MR. LAWRENCE:  Further
23          objection to the form.
24      A    I believe where did we record
25  it?  It's not recorded.  If I remember
```

Page 113

```
 1           Daniel Curry
 2  correctly, we went through the docket, and
 3  searched on tobacco; and I can't -- that
 4  provided a list of names, and I don't
 5  recall which names.
 6          And then we would go -- and you
 7  would -- you could go to "Emma," which is
 8  the MSRB recording reporting site and look
 9  up recent disclosure.  Sometimes it
10  mentioned that they were in dispute with
11  Lehman.
12          And I believe one or two --
13  this was, you know, a bit ago -- but I
14  believe one or two said that -- you know,
15  the money was basically in money markets or
16  bills or something.
17          I am not aware of anybody doing
18  any type of replacement transaction or
19  making any type of long-term investment.  I
20  think they have all kept things relatively
21  short.
22      Q    Well, you don't know what they
23  have actually done.  If they haven't put it
24  in one of the documents you looked at, you
25  don't know what they have done?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 114

Daniel Curry

1
2    A    That is correct.
3    Q    And outside of this universe of
4  folks, you don't know what dealers have
5  done with other tobacco FPAs who may have
6  sought replacement investments for their
7  reserve funds, right?
8         MR. LAWRENCE:  Object to the
9    form.
10    A    I'm sorry.  I don't understand
11  your question.
12    Q    Well, as I understand your
13  process, you started by looking at the
14  Lehman docket?
15    A    Correct.
16    Q    That's how you identified other
17  Lehman tobacco FPAs, correct?
18    A    Correct.
19    Q    You looked at their filings.
20  And then you went to public sources to see
21  what they have been doing?
22    A    Correct.
23    Q    So if there is a Lehman FPA
24  that has not filed a claim against Lehman,
25  you didn't look at them?

Page 115

Daniel Curry

1
2    A    Correct.
3    Q    If there are other tobacco FPAs
4  out there who terminated their trades for
5  various reasons with other dealers, you
6  didn't look at them?
7    A    No.
8    Q    And for the Lehman FPAs that
9  you identified by looking at the docket, if
10  they didn't put it in some other public
11  disclosure, you didn't do anything else to
12  find out what they have been doing with
13  that money?
14    A    That is correct.
15    Q    So that takes care of the names
16  that you identified by looking at the
17  Lehman docket.
18         There are tobacco FPAs out
19  there that have nothing to do with Lehman,
20  correct?
21    A    That is correct.
22    Q    And you don't know how many, if
23  any, of those have been terminated over the
24  past four or five years.  Correct?
25    A    That is correct.

Page 116

Daniel Curry

1
2    Q    And so, for those that have
3  been terminated, you don't know what those
4  settlement authorities have done with their
5  funds in term of replacements?
6         MR. LAWRENCE:  Object to the
7    form.
8    A    That is correct.
9    Q    Okay.  And you don't know what
10  types of products dealers and non-dealers
11  have been offering parties in that
12  situation to invest their money, correct?
13    A    That's not correct.
14    Q    So what do you know about what
15  types of products have been offered by
16  dealers and non-dealers to parties that are
17  similar -- similarly situated to Washington
18  TSA?
19         MR. LAWRENCE:  Object to the
20    form.  Are you stipulating there are
21    other people similarly situated, so
22    you need to now disclose a bunch of
23    documents that you haven't disclosed?
24         MR. TAMBE:  Is that an
25    objection to the form?

Page 117

Daniel Curry

1
2         MR. LAWRENCE:  Well --
3         MR. TAMBE:  I am not going to
4    argue with you.  I've got a question
5    pending to the witness.
6         MR. LAWRENCE:  I asked if
7    you're stipulating to that.
8         MR. TAMBE:  I am not
9    stipulating anything.
10         MR. LAWRENCE:  Well, your
11    question is assuming something that is
12    either accurate or not accurate,
13    and --
14         MR. TAMBE:  The witness will
15    tell me, right; if he thinks I've got
16    the market wrong, he will tell me, not
17    you.
18         MR. LAWRENCE:  This goes to the
19    validity of your objections to
20    discovery.
21         MR. TAMBE:  It goes to the
22    validity of this expert's opinion,
23    which is baseless.  But let's talk
24    about the basis for his statement.
25         MR. LAWRENCE:  Okay.  That is

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 118

```
 1          Daniel Curry
 2   really uncalled for.
 3          MR. TAMBE:  All right.  The
 4   record will speak for itself.  So
 5   let's go back to the question.
 6          MR. LAWRENCE:  Calling the
 7   witness names is something that you
 8   routinely do.
 9          MR. TAMBE:  No, it's actually
10   the report that I have a problem with.
11   I think the report is entirely
12   baseless.  I have great respect for
13   the witness himself.
14      Q    What I believe you said was you
15   are familiar with the types of products
16   that have been offered by dealers and
17   non-dealers to parties that are similarly
18   situated to Washington TSA, in that they
19   had some type of a long-term reserve
20   funding agreement, they no longer have that
21   agreement, and need to invest their money
22   in some way, whether they are related to
23   Lehman or not?
24      A    My understanding, again, is
25   that the other dealers are not offering a
```

Page 119

```
 1          Daniel Curry
 2   product.  So I have had conversations with
 3   people at other firms, and, to my
 4   knowledge, and based on conversations that
 5   I have had with other market participants,
 6   it's not a space where they offer product.
 7      Q    Okay.  No product, no
 8   transactions?
 9      A    No investment transactions.
10   And I will say that I don't speak to
11   everybody in the market.  But the people
12   that I have spoken to, it's not something
13   that they have offered.
14      Q    And is that answer limited to
15   dealers, or is it limited to -- or does it
16   extend to all other participants?
17      A    It's limited to dealers.
18      Q    Because you do understand that
19   there are insurance companies, non-dealer
20   participants, who might offer investment
21   products, understand?
22      A    Sure, yep.  I do not speak to
23   those people.
24      Q    And, arguably, that is a way of
25   investing funds if it's permitted by your
```

Page 120

```
 1          Daniel Curry
 2   bond?
 3      A    If it's permitted under the
 4   indenture, you know, whatever rating
 5   criteria, that type of thing.
 6      Q    So the only options that out
 7   there are not CDs and money market funds.
 8   There may well be other options.  You just
 9   don't know what all of those other options
10   are?
11          MR. LAWRENCE:  Object to the
12   form.
13      A    That is correct.
14      Q    Page 19 of your report,
15   Exhibit 30, you have a valuation matrix on
16   page 19?
17      A    Yes.
18      Q    And you state in your first
19   sentence under the title "Valuation
20   Matrix":
21          "Once a given replacement yield
22   is chosen, we assume that TSA would earn
23   the replacement yield from the early
24   termination date 25 March 2009 to the
25   maturity date in question."
```

Page 121

```
 1          Daniel Curry
 2      Do you see that?
 3      A    I do.
 4      Q    So what are all of the bases
 5   for that assumption?
 6      A    You know, the issue there is we
 7   couldn't assume some sort of higher rate
 8   because it would have assumed that they had
 9   to enter into a transaction, so some sort
10   of, you know, hedging transaction.
11          They would have had to enter
12   into a replacement contract to get some
13   yield higher than effectively spot rates or
14   spot rates in effect as of, I believe, the
15   9th -- or March '09.
16      Q    I am just trying to understand
17   what it is that you have done.
18          Have you given me all the
19   bases?  Are there any bases other
20   than what you just said?
21      A    I believe that's it.
22      Q    Are you assuming that the TSA
23   every six months would earn the replacement
24   yield and nothing more and nothing less
25   than the replacement yield all the way out
```

31  (Pages 118 to 121)

Page 122

1           Daniel Curry
2    to 2032?
3        A    That's what we assumed.
4        Q    Okay.  What is your assumption
5    about what CD rates are going to be two
6    years from now?
7        A    I don't have a view.
8        Q    When you wrote this report, did
9    you have a view?
10       A    No.
11       Q    What are CD rates going to be
12   20 years from now?
13           MR. LAWRENCE:  Object to the
14   form.
15       A    I couldn't tell you.
16       Q    What -- how about same thing
17   for commercial paper?
18       A    I don't know.
19       Q    So in terms of what the TSA
20   would earn on consecutive six-month
21   intervals all the way out to 2032, you
22   don't have a view?
23       A    I don't.
24       Q    But if I understand your report
25   correctly, you would like the court to

Page 123

1           Daniel Curry
2    assume that the TSA will earn no more and
3    no less than the yield set forth in your
4    grid?
5           MR. LAWRENCE:  Object to the
6    form.
7        A    I think in order to create a
8    value you have to make an assumption.  If
9    you are PV'ing something back, you need a
10   number.  And you need a number that you
11   believe they could actually earn or a
12   transaction they could actually undertake.
13           And the transactions that they
14   could actually undertake or whatever is
15   potentially buying CPs, investing in money
16   market funds, potentially investing in CDs.
17       Q    And as between the various
18   things that you believe they could do, you
19   picked one as your -- as your opinion of
20   the value, correct?
21       A    Correct.
22       Q    Okay.  And how is it that you
23   settled on that particular line item as
24   opposed to the several others?
25       A    If you think about what they

Page 124

1           Daniel Curry
2    had before administratively, they really
3    didn't need to do anything.  Lehman took
4    that -- did that on their behalf, all the
5    deliveries.  And there was nothing for them
6    to do.  And they have kind of a similar
7    situation through the money market fund.
8           So they are not running the
9    risk that the money market fund remains
10   uninvested.  They are not having to go out
11   and buy specific securities.  They are not
12   having to go out and monitor the specific
13   securities.
14           So from the point of view of
15   what they were doing prior to Lehman going
16   under, that's probably the most comparable
17   level of responsibility and action to what
18   they had prior.
19       Q    But as of March 25, 2009, had
20   they locked in a 65 basis rate, basis point
21   rate for the next 23 years?
22       A    No, they hadn't.
23       Q    So, presumably, every six
24   months, they get a different rate, either
25   in their money market fund or if they

Page 125

1           Daniel Curry
2    choose to invest in CDs or other eligible
3    securities, they get whatever that then
4    prevailing rate is?
5        A    Correct.
6        Q    So for purposes of the
7    valuation report and the claims submitted
8    in bankruptcy court, you would want the
9    court to assume they're locked into a
10   65-basis point rate, when, in reality, they
11   can enjoy whatever returns they get, either
12   now or ten years from now, fifteen years
13   from now, up to 23 years from the rejection
14   date, correct?
15           MR. LAWRENCE:  Object to the
16   form.
17       A    They are going to be earning
18   whatever it is that they can get in the
19   market.  And since March 29th, they have
20   been substantially less than the 65 basis
21   points that they put a claim in for.  And
22   that's the risk that you have with this
23   type of modeling.
24       Q    And you have no view of
25   whether -- starting today, for the next

32  (Pages 122 to 125)

Page 126

Daniel Curry

1
2  15 years on average, what they would expect
3  to earn on any of these investments?
4          MR. LAWRENCE:  Object to the
5      form of the question.
6      A    Unless I could lock something
7  in in a transaction, I don't have a view.
8          THE WITNESS:  Can we take a
9      break.
10         MR. TAMBE:  Sure, we can take a
11     lunch break now if you like.
12         (A lunch recess was taken.)
13  CONTINUED DIRECT EXAMINATION
14  BY MR. TAMBE:
15     Q    On page 12 of your report,
16  Exhibit 30, under the section under
17  "Replacement Yields," you note that you
18  have:
19         "... limited the scope of
20  potential replacement investment strategies
21  to those permitted and subject to
22  limitations in the indenture."
23         Do you see that?
24     A    Um-hum.
25         MR. LAWRENCE:  You have to

Page 127

Daniel Curry

1
2      answer yes or no.  Just --
3      A    I'm sorry.  Just --
4      Q    It's right above the quotation:
5          "For purposes of the report, we
6      have limited the scope of potential
7      replacement investment strategies to those
8      that are permitted and subject to the
9      limitations of the indenture."
10     A    I see that, yes.
11     Q    Okay.  Did you have any -- did
12  you do any analysis to see under what
13  circumstances the Washington TSA would be
14  able to enter into replacement investments
15  that were outside the scope of the
16  limitations in the indenture?
17         MR. LAWRENCE:  I am sorry.
18     Just repeat that question.
19         (Reporter read back pending
20     question.)
21     A    I don't see why we would have
22  if they weren't able to do so.  So, no.
23     Q    Did you do any analysis or
24  conduct any inquiries into whether and to
25  what extent the Washington TSA could amend

Page 128

Daniel Curry

1
2  the bond indenture to be able to invest in
3  additional investments?
4      A    We did not.
5      Q    The bond indenture that you are
6  referring to is the indenture that was
7  entered into in 2002, correct?
8      A    That is correct.
9      Q    Under different market
10  conditions?
11     A    That is correct.
12     Q    And you certainly agree that
13  the circumstances in 2009 were very
14  different than those that existed in 2002?
15     A    That is correct.  Yes.
16     Q    In your dealings in the
17  municipal sector, have you seen occasions
18  where bond indentures have been amended
19  from time to time?
20         MR. LAWRENCE:  Object to the
21     form.  Go ahead.
22     A    Yes, I have amended them
23  myself.
24     Q    Are you aware of any
25  considerations or discussions within the

Page 129

Daniel Curry

1
2  Washington TSA after September of 2008 to
3  seek to amend the 2002 bond indenture?
4      A    I am not aware of anything.  To
5  that effect, based on my experience, it's a
6  very difficult thing to do.
7      Q    We talked this morning about
8  Swap Financial Group and Mr. Shapiro and
9  the analysis that he had done.  Do you
10  remember that?
11     A    Yes.
12     Q    Are you aware, sir, that PFM,
13  another financial advisor to Washington
14  TSA, also did some valuations of the RFA at
15  issue?
16         MR. LAWRENCE:  Object to the
17     form.
18     A    Yes.  I saw that in some of the
19  documents that we had looked at.
20     Q    And did you review any PFM
21  analyses of valuation?
22     A    Did I evaluate them?  I'm
23  sorry.
24     Q    Did you review them?
25     A    I did a summary review of some

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 130

1           Daniel Curry
2   of those documents.
3       Q    And do you have a view as to
4   the methodology used by PFM to value the
5   RFA?
6           MR. LAWRENCE:  Object to the
7   form -- sorry.  Objection to the form.
8       A    I don't know what methodology
9   they used.
10      Q    Did you ask to speak with PFM?
11      A    I did not.
12      Q    Have you dealt with PFM in your
13  past 20 years?
14      A    I have.
15      Q    Are they one of the largest
16  financial advisors for municipal issuers?
17      A    Probably number one or number
18  two.
19      Q    And how about Swap Financial
20  Group?  Had you dealt with them prior to
21  any involvement you had with them in this
22  matter?
23      A    I definitely had conversations.
24  I have likely done transactions with them,
25  nothing in many years though.  I have known

Page 131

1           Daniel Curry
2   Peter for a number of years.
3       Q    How have you known Peter?
4       A    At TMG, he was a -- he was at a
5   former firm Euro Brokers; and we did some
6   transactions with him while he was at Euro
7   Brokers.  And I believe that was the point
8   more or less where he started Swap
9   Financial.
10          So at TMG I believe we had
11  done, you know, some number of trades; or
12  he was somebody that we regularly spoke to.
13  When I was at Morgan Stanley, he would
14  typically deal more with the marketers.
15  But, occasionally, I would pick up the
16  phone or I would be working on a
17  transaction where he may have been
18  involved.
19      Q    On page 15 of your report, you
20  make a statement that I want to discuss
21  with you.  At the top of the page, the
22  second full paragraph that begins, "In
23  addition" -- do you see that?
24      A    Yes.
25      Q    The -- that sentence reads:

Page 132

1           Daniel Curry
2   "In addition, historical
3   average returns are very sensitive to the
4   time period chosen."
5           And you go on to say:
6   "For example, the average yield
7   for the past year may be materially
8   different than the average yield for the
9   past three years."
10      Q    Do you see that?
11      A    I see that.
12      Q    What did you do in your
13  analysis to account for that sensitivity?
14      A    To a certain extent, we ignored
15  it by using the yields that they actually
16  received from the time that Lehman
17  defaulted on its delivery through where
18  they actually invested themselves.
19          And this was, you know, largely
20  due to the fact that, you know, at that
21  point the government was rapidly ratcheting
22  down short-term rates.
23          So if you had looked
24  historically, you would be looking at rates
25  that were effectively unachievable.

Page 133

1           Daniel Curry
2       Q    And did you form a view, as of
3   March of 2009, whether the government would
4   indefinitely keep ratcheting down
5   short-term interest rates?
6       A    Did I form a view or was there
7   a market view or or --
8       Q    No.  Did you form a view?
9       A    I did not form a view.
10      Q    And would it be a reasonable
11  view to have that the government will
12  indefinitely keep ratcheting down
13  short-term rates?
14      A    I think, kind of given the
15  turmoil at the time, people's view was that
16  rates would be very, very low for some
17  extended period of time until things
18  recovered.
19          And that seems to be what has
20  been the case from that period to today.
21  And that's basically what the government
22  has been or the Fed has been telling
23  people.
24          So I think that view has kind
25  of been supported by the actual results

34  (Pages 130 to 133)

Page 134

Daniel Curry

1    Daniel Curry
2  since that period of time.
3        Q    When you say the view of the
4  people at the time, where in your report do
5  you identify what the view of the people at
6  the time, March 25, 2009, was as to rates,
7  short-term rates in the future?
8        A    We didn't.
9        Q    Back on page 15, the paragraph
10 right above the one we were looking at, it
11 begins, "Past performance is no guarantee
12 of future results."
13       Do you see that?
14       A    Yes.
15       Q    The third sentence in that
16 paragraph, you state:
17       "Any calculation based on using
18 historical averages or past reinvestment
19 history should not assume that the yield in
20 question is guaranteed and will be actually
21 obtained by TSA in the future with
22 100 percent certainty."
23       Do you see that?
24       A    I do.
25       Q    Do you, as you sit here today,

Page 135

1    Daniel Curry
2  agree with that statement you made in your
3  expert report, dated December 16, 2013?
4        A    Yes, because I believe what we
5  assumed was about 0.65.  And that has not
6  been the rate that they've been able to
7  achieve since that point so --
8        Q    And in the future they may
9  achieve something higher than that rate or
10 something lower than that rate, right?
11       A    That's correct.
12       Q    And you make no -- you express
13 no view as to what that is?
14       A    We do not have a view on that.
15       Q    Is it fair to say that the rate
16 that you do use, the 65 basis points -- is
17 it fair to say that the court should not
18 assume that the 65-basis point rate is
19 guaranteed or will be actually obtained by
20 the TSA in the future with 100 percent
21 certainty?
22       MR. LAWRENCE:  Object to the
23       form.
24       A    We say here that it won't be
25 necessarily achieved with 100 percent

Page 136

1    Daniel Curry
2  accuracy.  And then we support that by
3  showing what they have actually received,
4  which is much less than the 65 basis
5  points; so we do qualify it.
6        Q    So both historical averages,
7  past reinvestment history, in your view
8  should not support an assumption that the
9  rate is guaranteed or will actually be
10 obtained by the TSA, correct?
11       MR. LAWRENCE:  Object to the
12       form.
13       A    That is correct.
14       Q    There is a discussion in your
15 report about the expected maturity of the
16 tobacco bonds issued by the Washington TSA.
17 And it's a discussion that begins on
18 page eight of your report.  I believe it
19 concludes on page 12.
20       A    Okay.
21       Q    Do you have an opinion as to
22 the expected maturity of the bonds, or did
23 you, when you prepared this report, have a
24 view as to the expected maturity of the
25 bonds?

Page 137

1    Daniel Curry
2        A    Our view was that they would be
3  substantially longer than they were
4  originally contemplated to be, and our view
5  was that there was -- that there is
6  uncertainty in the market, which could lead
7  to further extensions of the maturity of
8  these bonds.
9        Q    The analysis that you did on
10 page 11 of your report, the graphic that
11 appears on page 11, the chart, in a number
12 of your observations that you used to
13 calculate the future productions, a number
14 of those observations were post-March 2009
15 observations, correct?
16       A    Correct.
17       Q    And the only two observations
18 you cite that are pre-March 2009 are the
19 observations from October of 2002 and June
20 of 2006; is that right?
21       MR. LAWRENCE:  Object to the
22       form.
23       A    Well, those are the data points
24 that we used.  Those are based on
25 presentations that were prepared by TSA's

35  (Pages 134 to 137)

Page 138

Daniel Curry

1       Daniel Curry
2  bankers.  But those weren't the only
3  factors that were present in the
4  marketplace.
5       The marketplace wasn't relying
6  on a presentation that was given to the
7  TSA.  The market, you know, was basically
8  informed by where bonds were trading and
9  other discussions around tobacco-related
10 bonds because tobacco-related bonds are a
11 fairly large investment type in that
12 particular market.
13      So there is a lot of discussion
14 among market participants about those
15 particular types of bonds and the things
16 that would potentially affect the payment
17 of those types of bonds.
18      So things like -- there was
19 a -- I believe, it's the Children's
20 Insurance Tax -- I don't remember the exact
21 name -- the State Children's Health
22 Insurance Program that was put in place, I
23 believe, prior to March 9th, that people
24 believed would have a very negative impact
25 on the bonds or bonds of this type.

Page 139

1       Daniel Curry
2     Q    Did you see any analysis
3  conducted by Washington TSA itself before
4  March of 2009 through which they updated
5  their turbo redemption date?
6     A    I don't know that they ever did
7  their own analysis.
8     Q    Did you see that type of
9  analysis done for the Washington TSA prior
10 to March of 2009?
11    A    I believe there was updated
12 analysis based on the DRI projections,
13 their base case projections, which I
14 believe gave scenarios of "better than
15 expected," "worse than expected," as
16 compared to DRI.
17      I believe they go and they
18 present a bunch of different scenarios; and
19 from those scenarios, you can project what
20 the payments would be.
21      But those are by no means
22 certain because those are their projections
23 based on where they believe tobacco
24 consumption would be, based on whatever the
25 present consumption trends are in the

Page 140

1       Daniel Curry
2  market.
3     Q    And I believe my question was:
4       Did you see that type of
5  analysis done specifically for the
6  Washington TSA bonds?
7     A    I believe -- what I saw were a
8  couple of memos which I believe were
9  prepared by Bear Stearns and potentially
10 Lehman and Barclay's looking at projected
11 dates.
12    Q    Did you believe these to be
13 pre-March 2009 analyses?
14    A    I believe there may have been
15 one or two after.
16    Q    Well, do you believe there are
17 one or two before?
18    A    I believe there were one or two
19 before.  I can't say with certainty how
20 many there were or the exact dates.
21    Q    And the one or two that you
22 believe that were before are documents that
23 you have seen in connection with this case?
24    A    I believe that was part of the
25 discovery, yes.

Page 141

1       Daniel Curry
2     Q    This is not something you are
3  remembering from an independent analysis
4  that you did?
5     A    No.
6     Q    And so, as we go through the
7  documents that have been produced in this
8  case and there aren't one or two that are
9  pre-March 2009, perhaps you were mistaken
10 about the date?
11    A    That would be correct.
12    Q    You signed an engagement letter
13 with the Washington TSA, right?
14    A    I believe our engagement letter
15 was directly with Pacifica.
16    Q    With Pacifica.  Let's mark this
17 as an exhibit, please.
18      (Exhibit No. Lehman 38, Expert
19 Consulting Agreement with Pacifica, is
20 marked by the reporter for
21 identification.)
22      MR. TAMBE:  38.
23    Q    I hand you a document marked
24 Lehman Exhibit 38.  Is this your consulting
25 agreement, expert witness and litigation

36 (Pages 138 to 141)

Page 142

                Daniel Curry
1
2    support consulting agreement with the
3    Pacifica Group?
4        A    This one doesn't have my
5    signature, but I am going to assume that it
6    is.
7        Q    Have you submitted any invoices
8    to Pacifica Group for your work on this
9    matter?
10       A    I have not as of yet.
11       Q    Do you know, as of today, what
12   your incurred charges are?
13       A    Probably close to 30 -- 35,000,
14   I would think.
15       Q    The total number or the --
16       A    That would be my number.
17       Q    Do you know what Mr. Hasterok's
18   number is?
19       A    I would expect it to be
20   something similar.
21       Q    And have you been keeping track
22   of your time expended on this matter with
23   time records?
24       A    Yes, a little spreadsheet.
25       Q    And in the spreadsheet, do you

Page 143

                Daniel Curry
1
2    detail how much time you spent, but also
3    what you did during that time?
4        A    Yes.  When it came to the
5    report, at some point we had a cap on the
6    fee for preparing the report.  And I did
7    not keep time beyond where we would have
8    hit the cap.
9        Q    Who wrote the report?
10       A    We wrote it jointly.
11       Q    You wrote it jointly sitting
12   next to each other?
13       A    No, we had a document that we
14   had up on -- I believe it was Google Docs;
15   so I would -- he would work on a section.
16   I would work on a section.  And then you
17   have the ability to both be working on it
18   at the same time.
19            So there were things that he
20   spent more time on, and there were things
21   that I spent more time on.
22       Q    Okay.
23       A    But sometimes the work was
24   concurrent, and sometimes it was not.
25       Q    Okay.  As a signatory to the

Page 144

                Daniel Curry
1
2    document, is it fair to say that you are
3    comfortable with the accuracy of the
4    document in its entirety?
5        A    I wouldn't have signed it if I
6    wasn't.
7        Q    And from the time you signed it
8    until today, have you reviewed the
9    document?
10       A    I reread it.
11       Q    Okay.  Any changes that you
12   would make to it?
13       A    The only change is I think,
14   when we were talking about the quote, I
15   think we would have parsed that statement a
16   little bit better.
17       Q    Any other changes?
18       A    Not that come to mind.
19       Q    Is there any other analysis
20   that you have been asked to do that is
21   currently underway?
22       A    For this particular case?
23       Q    For this case.
24       A    No.
25       Q    There are spreadsheets that tie

Page 145

                Daniel Curry
1
2    in to some of the quantitative aspects of
3    your report that we discussed with
4    Mr. Hasterok yesterday.  Did you prepare
5    those spreadsheets?
6        A    No.
7        Q    That was his responsibility?
8        A    Yes.
9        Q    You have obviously received the
10   output of those spreadsheets, but have you
11   spent any time studying those spreadsheets?
12           MR. LAWRENCE:  Object to the
13   form.
14       A    Did I go through them line by
15   line?  I did not.
16       Q    In terms of the methodology in
17   constructing the spreadsheets and the
18   formulas, did you play any role in that?
19       A    We had discussed it, but he did
20   all of the programming and such.
21       Q    If you were calculating the
22   value of this rejected contract, the
23   Washington TSA contract, from the
24   perspective of a dealer, would you have
25   used a different methodology?

                                37  (Pages 142 to 145)

Page 146

1       Daniel Curry
2       MR. LAWRENCE:  Object to the
3  form.
4       A    Are you talking about a dealer
5  who had the transaction when the trade was
6  terminating?
7       Q    Sure.
8       A    If you're talking about a
9  dealer who had the transaction and the
10  trade was terminating, I would have looked
11  at it differently because I had hedges that
12  I would have to take off.
13       So that is -- I have the trade,
14  and, now, I'm taking the trade off of my
15  boxes, as opposed to putting risk on my
16  books.  So I would look at it differently.
17       Q    And let's try the other
18  scenario from the perspective of a trader
19  who did not have this trade on, who was
20  just coming upon this trade cold, and was
21  asked to value a terminated transaction.
22       A    Again, you would have to -- you
23  would have to look at the side of the
24  transaction.
25       Are you talking about a trader

Page 147

1       Daniel Curry
2  who is looking at this trade from the
3  perspective of the client's trying to talk
4  the trade off and the dealer has hedges in
5  place.
6       That I would look at very
7  similarly to putting on a new transaction.
8  I would look at it in terms of breaking
9  swaps and taking off hedges and things like
10  that.
11       If you're talking about doing
12  it as a new trade, I mean, the reality was
13  that we wouldn't have been able to do a new
14  trade.
15       So I don't -- I wouldn't have
16  valued it the same way.
17       MR. TAMBE:  All right.  Let's
18  take a short break.  I will review the
19  notes, and we may be close to done.
20       MR. LAWRENCE:  Great.
21       (A break is taken.)
22       MR. TAMBE:  We have no further
23  questions.
24       MR. LAWRENCE:  I have nothing.
25       (Deposition adjourned, 1:50 p.m.)

Page 148

1
2       J U R A T
3
4       I DO HEREBY CERTIFY that I have
5  read the foregoing transcript of my
6  deposition testimony.
7
8
9
10
11  SWORN TO AND SUBSCRIBED
12  BEFORE ME THIS
13  DAY OF 2014
14  _ _ _ _ _ _ _ _ _ _ _
15
16
17
18
19
20
21
22
23
24
25

Page 149

1
2       I N D E X
3
4
5  WITNESS          DIRECT      CROSS
6
7
8
9  DANIEL CURRY
10
11
12
13
14    BY MR. TAMBE       3
15
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 150

```
 1
 2        E X H I B I T S
 3
 4     NUMBER     DESCRIPTION        PAGE
 5
 6
 7     Previously Marked Exhibit No.    3
 8     Lehman 30, Expert Report
 9
10
11     Previously Marked Exhibit No.    47
12     Lehman 32, Report of Mr. Shapiro
13
14
15     Exhibit No. Lehman 38, Expert    141
16     Consulting Agreement with
17     Pacifica
18
19
20
21
22
23
24
25
```

Page 151

```
 1
 2             CERTIFICATE
 3
 4        I, TAB PREWETT, A Registered
        Professional Reporter, Notary Public,
 5      Certified LiveNote Reporter, and Certified
        Shorthand Reporter, do hereby certify that
 6      prior to the commencement of the
        examination DANIEL CURRY was sworn by the
 7      notary public to testify the truth, the
        whole truth and nothing but the truth.
 8
 9
            I DO FURTHER CERTIFY that the
10      foregoing is a true and accurate transcript
        of the testimony as taken stenographically
11      by and before me at the time, place and on
        the date hereinbefore set forth.
12
13
            I DO FURTHER CERTIFY that I am
14      neither a relative nor employee nor
        attorney nor counsel of any of the parties
15      to this action, and that I am neither a
        relative nor employee of such attorney or
16      counsel, and that I am not financially
        interested in the action.
17
18
19      _____
20
21      Notary Public
22
        My Commission expires February 9, 2014
23      Dated:  January 23, 2014
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022