**EXHIBIT 6 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For
An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Chapter 11
CASE NO. 08-13555 (JMP)
Jointly Administered


IN RE:  LEHMAN BROTHERS
        HOLDINGS, INC. et al.

        Debtors,

-----------------------------------------


                TRANSCRIPT OF
         DEPOSITION OF PETER SHAPIRO



        TRANSCRIPT of the stenographic
notes of the proceedings in the
above-entitled matter, as taken by and
before TAB PREWETT, a Registered
Professional Reporter, a Certified
Shorthand Reporter, a Certified LiveNote
Reporter, and Notary Public, held at the
Offices of JONES DAY, 222 East 41st Street,
New York, New York, on Wednesday, March 5,
2014, commencing at 10:15 a.m.

Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5      JONES DAY
 6      BY:  LAURI W. SAWYER, ESQ.
 7          REBEKAH BINGER, ESQ.
 8      222 East 41st Street
 9      New York, New York  10017-6702
10      Attorneys for Lehman Brothers
11
12
13
14
15
16      PACIFICA LAW GROUP
17      BY:  PAUL J. LAWRENCE, ESQ.
18      1191 2nd Avenue
19      Seattle, Washington  98101-2945
20      Attorneys for Washington TSA
21
22
23
24
25
```

Page 3

```
                 Peter Shapiro
 1
 2         P R O C E E D I N G S
 3   P E T E R   S H A P I R O ,
 4   having been sworn by the notary public to
 5   testify to the truth, testified as follows:
 6   DIRECT EXAMINATION
 7   BY MS. SAWYER:
 8      Q    As you know, Mr. Shapiro, this
 9   is a deposition, and I wanted to go over
10   some ground rules just to make sure that we
11   start off on a good note.  So we want to
12   make sure that we both speak slowly so the
13   court reporter can take down what we are
14   saying.
15           We also want to try to wait
16   until I finish my questions before you give
17   answers; and, likewise, I will try to wait
18   until you finish your answers before I ask
19   the next question.
20           And if you don't understand a
21   question I ask, I really do want you to ask
22   me to rephrase it or let me know that you
23   don't understand the question.  If you
24   answer a question I've asked, I am going to
25   assume that you knew what I meant.
```

Page 4

```
                 Peter Shapiro
 1
 2           And as you just mentioned, you
 3   were deposed by my colleague Jay Tambe in
 4   December in this case, correct?
 5      A    Correct.
 6      Q    And in that deposition you were
 7   designated by Washington TSA to discuss
 8   certain topics; is that correct?
 9      A    That's correct.
10      Q    And you also testified as a
11   fact witness at that time, correct?
12      A    Correct.
13      Q    After that deposition, did you
14   discuss your deposition with anybody?
15      A    I discussed it with counsel.
16      Q    Okay.  Anybody else?
17      A    In the most general terms with
18   my wife and one of my colleagues at work.
19      Q    And who did you discuss it with
20   at work?
21      A    Nat Singer.
22      Q    And what did you discuss with
23   Mr. Singer?
24      A    I discussed just generally how
25   long it was, and how -- you know, how I
```

Page 5

```
                 Peter Shapiro
 1
 2   felt it went.
 3      Q    And how did you think it went?
 4      A    I thought it went well.
 5      Q    Did you discuss any of the
 6   substance of the questions that you were
 7   asked with Mr. Singer?
 8      A    No.
 9      Q    How long was the conversation
10   with Mr. Singer?
11      A    It was in the context of a
12   conversation that would have covered many
13   other matters.  You know, we talk multiple
14   times a day.  I wouldn't have made a note
15   of how long it was.
16      Q    Do you recall approximately how
17   long you discussed your deposition with
18   Mr. Singer?
19      A    I would say it was less than
20   two minutes.
21      Q    Other than Mr. Singer and your
22   wife and counsel, did you discuss the
23   substance of your deposition that took
24   place in December with anyone else?
25      A    Not that I -- not that I can
```

Page 6

1        Peter Shapiro
2    recall.
3        Q    Did you discuss it with anybody
4    from Washington TSA?
5        A    No.
6        Q    Did you discuss it with Jeffrey
7    Hasterok?
8        A    No.
9        Q    Did you discuss it with Dan
10   Curry?
11       A    No.
12       Q    And have you testified in any
13   other deposition since that deposition in
14   December?
15       A    Could you repeat that.
16       Q    Have you sat for any other
17   depositions since that deposition in
18   December?
19       A    No.
20       Q    And you understand that today
21   you're testifying as an expert witness for
22   Washington TSA?
23       A    That's my understanding.
24       Q    And what is your understanding
25   of the differences between an expert

Page 7

1        Peter Shapiro
2    witness and a fact witness?
3        MR. LAWRENCE:  Objection to the
4    form.
5        A    I am not a lawyer.  So, you
6    know, my layman's understanding is a fact
7    witness is supposed to testify about things
8    they know that are factual in nature that
9    pertain to the case; and an expert witness
10   is supposed to testify with regard to areas
11   where they have expertise that would
12   pertain to issues that are involved in the
13   case.
14       Q    And what areas of expertise are
15   you planning to testify about today?
16       A    Agreements of this nature, like
17   the RFA.
18       Q    And you consider yourself to be
19   an expert in agreements like the RFA?
20       A    Yes.
21       Q    And where did you obtain the
22   expertise regarding agreements like the
23   RFA?
24       A    Through many years of
25   experience in the market.

Page 8

1        Peter Shapiro
2        Q    And, specifically, where did
3    you obtain the experience relating to
4    reserve fund agreements?
5        A    As I previously testified, you
6    know, from what has been provided, you
7    know, I have been involved in a variety of
8    different jobs within the financial
9    services industry.
10       My initial positions were with
11   Citigroup.  And at that point, this
12   instrument had not -- at the point I worked
13   at Citigroup, this instrument in its
14   specific form that we are talking about
15   didn't exist, but predecessor types of
16   instruments did exist there.
17       But it was not really until
18   later when I was at Euro Brokers that we
19   first started to see these types of
20   agreements in significant numbers.  I was
21   exposed to Euro Brokers and then again at
22   Swap Financial Group.
23       Q    When you say "these types of
24   agreements," you are referring to reserve
25   fund agreements?

Page 9

1        Peter Shapiro
2        A    Reserve fund agreements would
3    fall under a much broader category of
4    agreements that are generally referred to
5    as either forward purchase agreements or
6    forward delivering agreements.
7        And the reserve fund agreement
8    only differs by the fact of what it's
9    applied to.  There are similar agreements
10   which are used for many, many other aspects
11   that relate to municipal finance.
12       Q    And at Euro Brokers, were you
13   exposed to the subset of forward purchase
14   agreements referred to as reserve fund
15   agreements?
16       A    Yes.
17       Q    And how many reserve fund
18   agreements did you work on while you were
19   at Euro Brokers?
20       A    I don't have any record of
21   that.  It's long enough ago that it has
22   faded into the cobwebs of my mind.
23       Q    What type of work did you do in
24   connection with reserve fund agreements at
25   Euro Brokers?

Page 10

```
 1            Peter Shapiro
 2      A    At Euro Brokers, I was the
 3  supervisor of the desk, which handled all
 4  municipal financial products.  And forward
 5  delivery agreement, forward purchase
 6  agreements were a subset of that.
 7            So you saw the -- you know,
 8  within the general flow of business, there
 9  was -- there were forward delivery
10  agreements including reserve fund
11  agreements.
12            As I have previously testified,
13  within the broader scope of municipal
14  financial products, all of these products
15  that I would characterize as "forward
16  purchase agreements" constitute a fall
17  subset of the total.
18      Q    And Euro Brokers, what type of
19  work did the desk do that you supervised at
20  Euro Brokers?
21      A    Euro Brokers' specialty was
22  brokering between financial institutions.
23  It was, at the time I was there, one of the
24  top ranked intra-dealer brokers.
25            We expanded during the time I
```

Page 11

```
 1            Peter Shapiro
 2  was there and even a little bit before I
 3  got there into directly serving
 4  non-financial counterparties like municipal
 5  entities.  So we served both as
 6  intermediary between financial institutions
 7  and as an advisor broker on behalf of the
 8  municipal entities.
 9      Q    And while the desk was working
10  as a broker in between financial
11  institutions, did you see reserve fund
12  agreements as part of that flow?
13      A    I am not -- I am not recalling
14  if we ever had that Lauri because these
15  aren't -- these vehicles are not traded in
16  significant quantities from financial
17  institution to financial institution.
18            What is traded between the
19  financial institutions are the underlying
20  hedges.
21      Q    And when you served the
22  municipalities as a financial advisor,
23  would you assist in placing reserve fund
24  agreements or bidding reserve fund
25  agreements?
```

Page 12

```
 1            Peter Shapiro
 2      A    Correct.
 3      Q    And so you would solicit
 4  dealers for -- to be served as a
 5  counterparty for a reserve fund agreement?
 6      A    Yes, or providers as we would
 7  call them.
 8      Q    And did Euro Brokers itself
 9  ever provide a reserve fund agreement or
10  respond to a bid for a reserve fund
11  agreement?
12      A    No.  No, Euro Brokers was an
13  intermediary only, not a broker, not a
14  dealer, if you think about it in those
15  terms.
16      Q    So at Euro Brokers you weren't
17  responsible for bidding on reserve fund
18  agreements?
19      A    No, we would put them out for
20  the bid.
21      Q    And you weren't responsible for
22  pricing reserve fund agreements?
23      A    Not in the -- we are not -- not
24  a provider.
25      Q    And do you recall -- and you
```

Page 13

```
 1            Peter Shapiro
 2  would have been engaged by the
 3  municipalities themselves?
 4      A    Yes.
 5      Q    And do you recall --
 6      A    Or sometimes someone on their
 7  behalf.  But, yes, you were serving a
 8  municipal entity.
 9      Q    Do you recall how many reserve
10  fund agreements you assisted municipalities
11  with?
12      A    I do not.
13      Q    Would it have been more than
14  50?
15      A    No.  The market is not that
16  big.
17      Q    So less than ten?
18      A    I can't recall.  I really
19  honestly can't recall, but it would
20  definitely be less than 50.
21      Q    Did you ever assist a tobacco
22  securitization agency with placing a
23  reserve fund agreement?
24      A    No.
25      Q    Stepping back a few steps, what
```

Page 14

```
 1              Peter Shapiro
 2  did you do to prepare for this expert
 3  deposition today?
 4       A    I tried to think through some
 5  of the questions you might have, so I would
 6  anticipate them.  I reread my deposition
 7  from last time.
 8       Q    Did you meet with counsel?
 9       A    Yeah, we just had breakfast
10  together.
11       Q    And that was your only meeting
12  or only discussion with counsel in advance
13  of this deposition?
14       A    We had some E-Mail
15  correspondence and phone calls just in
16  general that had to do with the case.
17       Q    All total, getting -- preparing
18  for this expert deposition with counsel,
19  how much time do you think you spent?
20       A    Well, rereading the deposition
21  took a while because it was a long
22  deposition.  That would have taken up the
23  most time.  You know, you had the pleasure
24  of sitting through the deposition, so you
25  know how long it took.
```

Page 15

```
 1              Peter Shapiro
 2         And, you know, Paul and I just
 3  had breakfast together for 35 minutes.  And
 4  we, you know, discussed other matters in
 5  the course of our phone calls.  I would say
 6  we probably spent on the phone call
 7  regarding this deposition in all respects
 8  less than 15 minutes.
 9       Q    Other than reviewing your
10  deposition transcript, did you review any
11  other documents to prepare for today's
12  deposition?
13       A    No.
14       Q    Did you have any discussions
15  with anyone else at Swap Financial to
16  prepare for today's deposition?
17       A    No.
18       Q    When was the decision made, if
19  you know, to designate you as an expert in
20  this case?
21       A    I'm not sure.  You know, it's
22  probably better asked of counsel.
23       Q    Do you know if that decision
24  happened before or after you were deposed
25  in December?
```

Page 16

```
 1              Peter Shapiro
 2       A    It was around that time.  I am
 3  not sure exactly when.
 4            MS. SAWYER:  Can you mark this
 5       as Shapiro 10.
 6            (Exhibit No. Shapiro 10,
 7       Document, is marked by the reporter
 8       for identification.)
 9       Q    The court reporter has handed
10  you what has been marked as Shapiro
11  Exhibit 10.  I would ask if you have seen
12  this document before.
13       A    I don't believe I have.
14       Q    Do you recall whether or not
15  you were involved in preparing this
16  document?
17       A    I mean, I haven't seen the
18  document before.  I can't really speak to
19  that.
20       Q    Do you recall having any
21  discussions with counsel about an expert
22  disclosure being made and providing
23  information that might be reflected in that
24  disclosure?
25       A    You know, you are using legal
```

Page 17

```
 1              Peter Shapiro
 2  terminology that's not necessarily ones
 3  that I use on a regular basis.  So I can't
 4  recall if we had any specific discussion on
 5  this.
 6         I see now, in reading the
 7  document which you just handed me, certain,
 8  you know, statements, factual statements
 9  that I provided to counsel.
10       Q    And what factual statements do
11  you recall providing to counsel that you
12  are seeing in this document?
13       A    Just in that very initial quick
14  scan I did in these last few seconds, I
15  notice under Roman numeral IV, you know,
16  the mention of the chapter I provided in a
17  book, and the references to cases where I
18  have testified.
19       Q    And you provided that
20  information to counsel?
21       A    Correct.
22       Q    When were you hired as an
23  expert witness by Washington TSA?
24       A    When was I hired as an expert
25  witness, you know, yeah, not hired -- I
```

Page 18

```
 1          Peter Shapiro
 2   don't believe I have been hired separately
 3   as for that purpose.  I have a general
 4   contract with them.
 5       Q    You have a general contract
 6   with Washington TSA?
 7       A    Yes.
 8       Q    To provide advisory and
 9   valuation services associated with the
10   reserve fund agreement?
11       A    It may go beyond that.  I'd
12   have to look at the contract in front of
13   me.
14       Q    Okay.
15       A    In fact, I think it does go
16   beyond that, too, to provide other
17   services.
18           MS. SAWYER:  Let's mark them
19   all.
20       Q    In fact, you have executed a
21   number of contracts with Washington TSA?
22       A    I believe so.  That is --
23   Lauri, just to clarify that, when you say a
24   number of contracts, I think it may be a
25   contract and a number of extensions to be
```

Page 19

```
 1          Peter Shapiro
 2   more accurate.
 3       Q    Okay.
 4           (There was a discussion off the
 5   record.)
 6       Q    The court reporter has handed
 7   you for the record Shapiro Exhibits 11
 8   through 16.
 9           (Exhibit No. Shapiro 11,
10   Agreement between Peter Shapiro and
11   Washington TSA for consulting and
12   expert services, is marked by the
13   reporter for identification.)
14           (Exhibit No. Shapiro 12,
15   Agreement between Peter Shapiro and
16   Washington TSA for consulting and
17   expert services, is marked by the
18   reporter for identification.)
19           (Exhibit No. Shapiro 13,
20   Agreement between Peter Shapiro and
21   Washington TSA for consulting and
22   expert services, is marked by the
23   reporter for identification.)
24           (Exhibit No. Shapiro 14,
25   Agreement between Peter Shapiro and
```

Page 20

```
 1          Peter Shapiro
 2   Washington TSA for consulting and
 3   expert services, is marked by the
 4   reporter for identification.)
 5           (Exhibit No. Shapiro 15,
 6   Agreement between Peter Shapiro and
 7   Washington TSA for consulting and
 8   expert services, is marked by the
 9   reporter for identification.)
10           (Exhibit No. Shapiro 16,
11   Agreement between Peter Shapiro and
12   Washington TSA for consulting and
13   expert services, is marked by the
14   reporter for identification.)
15       A    Let me check to see.
16       Q    A big pile for you.
17       A    11, 12, 13, 14, 15, and 16.
18   Yes, I have got them all.
19       Q    I would like you to review
20   these and let me know if these are the
21   agreements you have with Washington TSA for
22   your services.
23       A    Okay.  Let me spend a few
24   minutes.
25       Q    Sure.
```

Page 21

```
 1          Peter Shapiro
 2           MR. LAWRENCE:  Off the record
 3   for a second.
 4           (There was a discussion off the
 5   record.)
 6           MS. SAWYER:  We are back on the
 7   record.
 8       Q    So you have had a chance to
 9   look at Shapiro Exhibits 11 through 16,
10   correct?
11       A    16.
12       Q    And you noted off of the record
13   that Shapiro Exhibit 12 appeared to be
14   missing Exhibit B, correct?
15       A    Correct.
16           (Exhibit No. Shapiro 17,
17   Exhibit B to Agreement between Peter
18   Shapiro and Washington TSA for
19   consulting and expert services, is
20   marked by the reporter for
21   identification.)
22       Q    If you could look at Shapiro
23   Exhibit 17, which is before you, and let me
24   know if you believe that to be Exhibit B
25   that corresponds with Shapiro Exhibit 12.
```

Page 22

1    Peter Shapiro
2    A    It appears to be.
3    Q    And Shapiro Exhibits 11 through
4    16, do those represent the extent of the
5    agreements that you have with Washington
6    TSA in connection with your services
7    provided in connection with this matter?
8    A    I believe so, Lauri.
9    Q    You are not aware of any other
10   agreements that you have with Washington
11   TSA that would relate to your testimony you
12   are giving here today?
13   A    No.
14   Q    Do you have any separate
15   agreements with counsel regarding your
16   testimony that you are giving here today?
17       MR. LAWRENCE:  Only if you
18   know.
19   A    I don't believe so.  I don't
20   believe so.
21   Q    And the scope of the services
22   that you were engaged to perform on behalf
23   of Washington TSA, they would be reflected
24   in Shapiro Exhibits 11 through 17, correct?
25   A    I believe so.

Page 23

1    Peter Shapiro
2    Q    Was there an RFP process run in
3    connection with your engagement as an
4    expert witness for Washington TSA?
5        MR. LAWRENCE:  Object to the
6    form.
7    Q    You can answer.
8    A    I can answer?  Okay.  Not that
9    I'm aware of.
10   Q    Were you aware of any RFP
11   process run to hire any of the experts that
12   Washington TSA has designated in connection
13   with this case?
14   A    I'm not aware of any.
15   Q    In your expert disclosure,
16   which is Shapiro Exhibit 10, if you look at
17   paragraph Roman numeral VI on page two, the
18   very last line of page two.
19   A    Page two.  Yes.
20   Q    And that indicates that you
21   have been paid approximately $155,300 in
22   connection with the litigation mediation of
23   this matter since your retention in
24   December of 2008, correct?
25   A    Yes.

Page 24

1    Peter Shapiro
2    Q    Since this disclosure was sent
3    in 2013, have you engaged and incurred
4    additional fees on behalf of Washington
5    TSA?
6    A    Yes.
7    Q    And what amount?
8    A    I have to look it up.
9    Q    Have you sent invoices to
10   Washington TSA for those funds?
11   A    We invoice monthly.
12   Q    Of this $155,300, how much of
13   those fees would have been incurred in
14   connection with the preparation of your
15   expert opinion in this case?
16       MR. LAWRENCE:  Object to the
17   form.
18   A    I don't believe we have ever
19   broken that out.
20   Q    Do you have a sense of what
21   percentage of your time you would attribute
22   to your expert -- formulating your expert
23   opinion in this case?
24       MR. LAWRENCE:  Object to the
25   form.

Page 25

1    Peter Shapiro
2    A    I do not.
3    Q    Does that $155,000 does that
4    include the analysis of reinvestment
5    options that you did for Washington TSA?
6    A    I would have to go back and
7    look at how that number was derived, but,
8    you know, we have charged also for that.
9    It may be within that number.  It may not
10   be.
11   Q    So you don't -- do you know
12   what's included in this number?  You have
13   provided a number of services for
14   Washington TSA.  Do you know if this is a
15   cumulative number or a number just
16   associated with some subset?
17   A    It says here that it's
18   associated with the litigation and
19   mediation.  It's possible that the -- that
20   the issues that you are asking about,
21   looking for a substitute reinvestment
22   options fell within that.  It's also
23   possible it fell outside of that.
24   Q    Do you know who calculated this
25   number?

Page 26

```
 1          Peter Shapiro
 2      A    I believe that we did at the
 3  request of the agency or at the request of
 4  counsel.  That's what I would believe.
 5      Q    And when you say "we," you are
 6  referring to Swap Financial?
 7      A    Yes.
 8      Q    And do you recall what you were
 9  requested to calculate?
10      A    Not off the top of my head.
11      Q    Do you know if that number
12  includes amounts incurred by Swap Financial
13  in responding to the subpoena in connection
14  with this matter?
15      A    Yes.
16      Q    It does include those?
17      A    It would include that, yes.
18      Q    So you are just not sure if it
19  includes the analysis of reinvestment
20  options?
21      A    Right.
22      Q    Are there other services that
23  you provide to Washington TSA that you
24  don't know whether are covered in this
25  number?
```

Page 27

```
 1          Peter Shapiro
 2      A    It reads, "in connection with
 3  litigation and mediation of this matter,"
 4  so that there were prior services that we
 5  were doing around the termination, which
 6  may not be covered by that, before the
 7  commencement of the dispute by Lehman.
 8      Q    When would you indicate that
 9  the dispute with the Lehman commenced?
10      A    I have to look back at my
11  records; but, you know, there was at some
12  point the Lehman estate said it was going
13  to dispute.  Whether we -- whether this
14  includes when that first occurred verbally
15  or any indications of that or whether this
16  was after the first legal documents would
17  have indicated that, you know, I'd have to
18  go back and look.
19      Q    But you would have records that
20  would indicate what is included in that
21  number?
22      A    Correct.  I would be able to
23  look back at what date it began.
24      Q    And you would be able to look
25  back and see what you included in the
```

Page 28

```
 1          Peter Shapiro
 2  calculation of this number?
 3      A    Yes.
 4          MS. SAWYER:  I'd request a copy
 5  of those records so we can try to
 6  ascertain what went into the
 7  calculation of this number.
 8          MR. LAWRENCE:  Well, I guess,
 9  just to clarify, is there -- did you
10  do a separate document to calculate
11  this number, or did you look at your
12  invoices?
13          THE WITNESS:  Just look at the
14  invoices.
15          MR. LAWRENCE:  I think you have
16  the invoices.
17          MS. SAWYER:  We will mark the
18  invoices we have.  There are seven of
19  them.
20          (Exhibit No. Shapiro 18,
21  Invoice from Mr. Shapiro to Washington
22  TSA for services performed, is marked
23  by the reporter for identification.)
24          (Exhibit No. Shapiro 19,
25  Invoice from Mr. Shapiro to Washington
```

Page 29

```
 1          Peter Shapiro
 2  TSA for services performed, is marked
 3  by the reporter for identification.)
 4          (Exhibit No. Shapiro 20,
 5  Invoice from Mr. Shapiro to Washington
 6  TSA for services performed, is marked
 7  by the reporter for identification.)
 8          (Exhibit No. Shapiro 21, 7/8/13
 9  Invoice from Mr. Shapiro to Washington
10  TSA for services performed, is marked
11  by the reporter for identification.)
12          (Exhibit No. Shapiro 22,
13  7/12/13 Invoice from Mr. Shapiro to
14  Washington TSA for services performed,
15  is marked by the reporter for
16  identification.)
17          (Exhibit No. Shapiro 23,
18  Invoice from Mr. Shapiro to Washington
19  TSA for services performed, is marked
20  by the reporter for identification.)
21          (Exhibit No. Shapiro 24,
22  9/287/13 invoice from Mr. Shapiro to
23  Washington TSA for services performed,
24  is marked by the reporter for
25  identification.)
```

Page 30

```
 1            Peter Shapiro
 2      Q    The court reporter has handed
 3  you a set of exhibits marked Shapiro 18
 4  through Shapiro 24, which are copies of
 5  invoices that have been produced in this
 6  litigation to us from Swap Financial Group.
 7      A    Um-hum.
 8      Q    The last one we have, Shapiro
 9  24, is dated September 27, 2013; do you see
10  that?
11      A    Yes.
12      Q    Have subsequent invoices been
13  provided to Washington TSA since
14  September 27, 2013?
15      A    Yes -- I'm sorry to interrupt
16  you. Yes.
17          MS. SAWYER:  I would request a
18      copy of invoices subsequent to
19      September 27, 2013.
20          MR. LAWRENCE:  Yes.
21      Q    You indicated that you invoiced
22  on a monthly basis, correct?
23      A    We began to invoice on a
24  monthly basis sometime, I think, in late
25  2013.
```

Page 31

```
 1            Peter Shapiro
 2      Q    Okay.  And Shapiro Exhibit 18
 3  through 24, do you believe these to be
 4  accurate copies of the invoices you
 5  provided to Washington TSA?
 6      A    I can't imagine anyone would
 7  have gone through the effort to try to
 8  forge our invoices, so I would believe they
 9  are accurate.
10      Q    They look to be in the form
11  that you would have provided them to
12  Washington TSA?
13      A    Exactly.
14      Q    Can you turn to Shapiro
15  Exhibit 22.  I'm sorry.  Yes.  Shapiro
16  Exhibit 22, which is dated July 12, 2013,
17  do you see that?
18      A    Yes.
19      Q    It indicates it's for advisory
20  services for the period March 1, 2013, to
21  June 30, 2013; do you see that?
22      A    Yes.
23      Q    If you look back at Shapiro
24  Exhibit 21, that one is dated July 8, 2013,
25  and also indicates that it's for advisory
```

Page 32

```
 1            Peter Shapiro
 2  services for the period March 1, 2013, to
 3  June 30, 2013.
 4      Q    Do you see that?
 5      A    Yes.
 6      Q    Are both Shapiro Exhibit 21 and
 7  Shapiro Exhibit 22 operative invoices?
 8      A    I don't know.  You know, my
 9  colleague Lillian Chern has handled the
10  invoicing, you know, to the Authority.
11          So, you know, when I look at
12  these two side-by-side, they are covering
13  the same period.  They have different
14  amounts of hours.  I would have to figure
15  out what is going on here.
16      Q    You don't know if they are
17  cumulative or if Shapiro 22 replaces
18  Shapiro 21?
19      A    I would only be guessing.
20      Q    And Ms. Chern would know the
21  answer to that?
22      A    Yes.
23      Q    Okay.  And if you look at
24  Shapiro Exhibit 22, it indicates that
25  68 hours were spent by a managing director;
```

Page 33

```
 1            Peter Shapiro
 2  do you see that?
 3      A    Correct.
 4      Q    Does that refer to you,
 5  Mr. Shapiro?
 6      A    Lillian's title is also
 7  managing director.  She was promoted to
 8  that title, I think, at the end of 2012.
 9  So she would also be included in that.
10      Q    So that 68 hours would both
11  include both yours and Ms. Chern's hours?
12      A    Yes.
13      Q    Since she became a managing
14  director?
15      A    Correct.
16      Q    If you look on the second page
17  of Shapiro Exhibit 22, I think it's on the
18  backside.
19      A    Okay.
20      Q    It's a breakdown of hours by
21  category; do you see that?
22      A    Yes.
23      Q    And the third category is
24  "document review"; and it appears to be
25  12 hours?
```

Page 34

Peter Shapiro

1
2    A    Right.
3    Q    What documents were being
4    reviewed in the period of March 1, 2013, to
5    June 30, 2013?
6    A    I would have to go back and
7    look.  As I sit here, I have no idea what I
8    did that month --
9    Q    Okay.
10   A    -- or that multi-month period.
11   Q    And what would you need to look
12   at -- to determine what documents you
13   reviewed?
14   A    Normally, what I would look at
15   is my E-Mail records and my calendar.
16   Q    And you have no idea at all
17   what you spent 12 hours reviewing during
18   that time period?
19   A    No, as I sit here, no.
20   Q    Okay.  The next category is
21   "quantitative analysis"?
22   A    Right.
23   Q    And you spent -- you and
24   Mrs. Chern sent 11 hours doing quantitative
25   analysis during that time period.  What

Page 35

Peter Shapiro

1
2    analysis was being done?
3    A    I have the same answer I would
4    just be speculating, Lauri.
5    Q    Okay.  And then the last
6    category is "communication with mediator";
7    do you see that?
8    A    Correct.
9    Q    Two hours spent on that?
10   A    Right.
11   Q    Were those communications that
12   you had with the mediator?
13   A    Communications that we would
14   have been involved in in some way.
15   Q    Okay.  My question was:
16        Were those communications that
17   you personally had with the mediator?
18   A    Those would have -- you know,
19   again, I would be speculating, but the --
20   logically, they would be me, not Lillian.
21   Q    Okay.  Were other members of
22   Washington TSA or counsel involved at those
23   calls with the mediator?
24   A    It doesn't say "call."
25   Q    Communications?

Page 36

Peter Shapiro

1
2    A    It was most likely E-Mails.
3    Q    Do you know for sure whether
4    those were E-Mails or calls?
5    A    No, I am just looking at the
6    fact that "communication" would normally
7    imply they were E-Mails or not calls.
8    Otherwise, it would say "discussion" or
9    something like that.
10   Q    And you recall spending two
11   hours E-Mailing with the mediator?
12   A    Reading, reviewing, composing,
13   that would all come within that.
14   Q    And those would have been
15   communications that you personally had the
16   mediator?
17   A    Yeah, or that I was involved in
18   with the mediator, with lawyers, or others.
19   Q    So it would include
20   communications with others, not just you
21   personally?
22   A    Correct.
23   Q    What would you need to look at
24   to identify what quantitative analysis took
25   place from the period of March 1, 2013, to

Page 37

Peter Shapiro

1
2    June 30, 2013?
3    A    The same thing, E-Mail records,
4    calendar log, stuff like that, and my
5    calendar.  That's how I would do it.
6    Q    What sort of calendar log do
7    you keep?
8    A    I keep it in Outlook, just a --
9    you know, basically a listing of what the
10   events were that day.
11   Q    And do you keep track of the
12   time spent on certain matters?
13   A    Not with the same detail that a
14   law firm does.
15   Q    But do you keep track of the
16   time spent on certain matters?
17   A    Only -- only generally.
18   Q    And how do you keep track of
19   that?
20   A    I indicate on my calendar
21   virtually always the start time.  It may
22   not have the end time accurately.  If you
23   have used Outlook, it normally -- it
24   normally -- as it defaults, selects
25   half-hour intervals, or it may select hour

Page 38

```
 1             Peter Shapiro
 2   intervals.
 3             And, you know, if a -- if a
 4   call was scheduled for 11:00 a.m., I'd put
 5   it in to start at 11:00 a.m.; but I
 6   wouldn't -- it wouldn't indicate the end
 7   time.  I would never go back and say:
 8        "Gee, that call didn't take a
 9   half an hour.  It took an hour and a half."
10        Q    So in preparing your invoices
11   to determine that 12 hours were spent by
12   you and Mrs. Chern reviewing documents,
13   what records would you look at to determine
14   that?
15             MR. LAWRENCE:  Now, or you are
16   asking now, or -- are you asking then
17   or now?
18        Q    At the time, when you were
19   preparing this invoice?
20        A    The same answer as before.
21        Q    You would look at your calendar
22   to determine how much time was spent doing
23   the document review?
24        A    And the E-Mails, yeah.
25        Q    And do you keep track of that
```

Page 39

```
 1             Peter Shapiro
 2   on a daily basis or just at the time that
 3   the invoice is to be prepared?
 4        A    At the time the invoice is
 5   prepared.
 6        Q    Do you know how Ms. Chern keeps
 7   track of her time to be invoiced?
 8        A    No, I don't.
 9        Q    If you look at the next
10   exhibit, Shapiro Exhibit 23, this appears
11   to be advisory services for a single month
12   of July of 2013.
13             Do you see that?
14        A    That's how it reads.
15        Q    And it indicates two hours of
16   document review took place in that month.
17   Do you see that?
18        A    Yes.
19        Q    Do you know what documents were
20   being reviewed in that month?
21        A    Last July, I don't know.
22        Q    And then the next invoice we
23   have, Shapiro Exhibit 24, also indicates
24   that it provides advisory services for
25   July 2013 in the "Re:" line.
```

Page 40

```
 1             Peter Shapiro
 2   Do you see that?
 3        A    Yes.
 4        Q    Although the description of
 5   work appears to be August dates.  Do you
 6   see that?
 7        A    Yes.
 8        Q    Do you know whether or not this
 9   invoice applies to July or August of 2013?
10        A    My suspicion is that it applies
11   to August that the -- Lillian, when she
12   submitted, just failed to change the date
13   on the line that says "Re" colon.
14        Q    Since September 2013, you have
15   indicated that there have been additional
16   invoices submitted to Washington TSA,
17   correct?
18        A    You asked that already, and I
19   answered that already.
20        Q    And you believe those to be on
21   a monthly basis?
22        A    I know we went to monthly at
23   some point in late 2013.
24        Q    You have been designated as an
25   expert witness before?
```

Page 41

```
 1             Peter Shapiro
 2        A    Yes.
 3        Q    In what matters?
 4        A    In a number of matters, some of
 5   which did not go through, you know, to
 6   litigation.
 7        Q    There are two disclosed in
 8   your -- in the expert disclosure which is
 9   Shapiro Exhibit 10, if we could look at
10   that.
11        A    Get back to 10, again.  Is this
12   10?  Yes.  Keep these in order.
13        Q    5A refers to a case that starts
14   "Heyman Investment Associates."  What was
15   this case about?
16        A    This case was about a credit
17   derivative.
18        Q    A single credit derivative?
19        A    It was actually two -- two
20   credit derivatives.  It covered two major
21   credits.  There may have been multiple
22   contracts, but, you know, they had to deal
23   with two specific corporate credits.
24        Q    What was the dispute?
25        A    The dispute was having to do
```

Page 42

Peter Shapiro

1       Peter Shapiro
2  with -- let me express this correctly.
3          Heyman had failed to post
4  collateral upon a collateral call, at which
5  point Credit Suisse had terminated the
6  contract; and Heyman was contesting the
7  termination and the amount that was owed.
8      Q    And you testified on behalf of
9  Credit Suisse?
10     A    That's correct.
11     Q    And what was the subject of
12 your testimony?
13     A    Practices under ISDA agreements
14 and, you know, looking at the -- some of
15 the issues involved with the valuation.
16     Q    Did you calculate a valuation?
17     A    I did part of that, part of the
18 practices on that.  There was a second
19 expert also involved.
20     Q    And this was a FINRA
21 arbitration?
22     A    That's correct.
23     Q    And did it go to hearing before
24 either a single arbitrator or a panel of
25 arbitrators?

Page 43

1       Peter Shapiro
2     A    A three -- a three-judge panel.
3     Q    And where was that?
4     A    In New York.
5     Q    And did you testify before the
6  panel?
7     A    Yes.
8     Q    How long did you testify?
9     A    It was about half a day.
10     Q    Do you have a copy of your
11 testimony?
12     A    I believe I do.
13     Q    Were you also deposed in
14 connection with this arbitration?
15     A    I am trying to remember.  I am
16 not certain.  It may have just been the
17 actual testimony.
18     Q    Were there any challenges
19 raised to your qualifications as an expert?
20     A    Yes.
21     Q    And what were those challenges?
22     A    The opposing counsel was, as
23 opposing counsel virtually always does, was
24 trying to, you know, find any way they
25 could say that you, you know, weren't

Page 44

1       Peter Shapiro
2  qualified to do this.
3          As I recall, the major thing
4  that they were trying to do was that we
5  didn't have specific experience in the
6  London equity derivatives market because
7  these were London-traded contracts.
8      Q    When you said "we," were you,
9  Mr. Shapiro, designated as an expert?
10     A    Yes, I was.  So when I say
11 "we," I meant my firm; but, you know, my
12 expertise came from my work at the firm.
13     Q    And was this challenge to your
14 qualifications, was that made in writing or
15 orally?
16     A    Orally.
17     Q    And did the panel rule on that
18 challenge?
19     A    No.
20     Q    Why didn't they rule on it?
21     A    It resulted -- the result was a
22 settlement.
23     Q    So the panel didn't make a
24 decision in the arbitration?
25     A    Not at all.  And -- nor, Lauri,

Page 45

1       Peter Shapiro
2  was the panel -- was any -- was anything
3  asked of the panel to rule on any kind of a
4  question like this.
5          This was simply what I would
6  call the normal jousting that goes on
7  between opposing counsel and any expert to
8  try to in some way lessen the impact of
9  testimony by the opposing side's experts.
10     Q    The second listing under
11 paragraph five of Shapiro Exhibit 10 refers
12 to a SEC case involving LaCroix and
13 McFadden?
14     A    Correct.
15     Q    And you testified there on
16 behalf of the SEC as an expert?
17     A    Correct.
18     Q    And what was the subject of
19 your expert testimony?
20     A    It was with regard to the
21 composition and basis of a floating rate.
22     Q    What was the context that a
23 floating rate needed to be determined?
24     A    The floating rate was already
25 determined.  It was -- it was really just

Page 46

```
 1           Peter Shapiro
 2  questions about what was the nature of that
 3  floating rate.
 4      Q    What was the nature of the case
 5  that you were involved with?
 6      A    This has -- had to do with a --
 7  a famous controversy in the market,
 8  Jefferson County, Alabama, one of -- you
 9  know, the single largest scandal in the
10  municipal market.
11      Q    And specifically what was this
12  dispute involving Mr. LaCroix and
13  Mr. McFadden about?
14      A    SEC has asserted that LaCroix
15  and McFadden, two senior employees of JP
16  Morgan, were -- had committed fraud, which
17  would be covered under the SEC's
18  jurisdiction.
19      Q    And what was the nature of the
20  fraud alleged against them?
21      A    The fraud, I'd have -- I'd have
22  to look back at how they spell out the
23  legal nature of the fraud.  It's not -- not
24  my expertise.
25          The thing they were -- the
```

Page 47

```
 1           Peter Shapiro
 2  issue had to do with whether SEC had
 3  jurisdiction, and that jurisdiction was
 4  determined by the nature of the floating
 5  rate.
 6      Q    Explain to me why the nature of
 7  the floating rate implicated the SEC's
 8  jurisdiction.
 9      A    There is a split jurisdiction
10  over -- among which federal agency matters,
11  depending upon whether the swap is deemed
12  to be a security-based swap or a
13  non-security-based swap.
14          In the case of this swap -- and
15  there were actually multiple swaps here --
16  the swap that was germane to this specific
17  argument was a swap based on the SIFMA
18  index, S-I-F-M-A, which is an acronym is
19  that stands for the Securities Industry and
20  Financial Markets Association Index -- was
21  previously known as the BMA Index or Bond
22  Market Association Index.  Prior to that,
23  it was called PSA Index or Public
24  Securities Association Index.
25      Q    So what was your testimony
```

Page 48

```
 1           Peter Shapiro
 2  about the nature of the floating rate?
 3      A    The issue is whether the index
 4  is an index of interest rates or an index
 5  of securities.  If it's deemed to be an
 6  index of securities, then the swap can be
 7  thought of as a security-based swap.
 8          If it's merely an index of
 9  interest rates, then questions are raised
10  about the SEC -- whether the SEC has
11  jurisdiction and whether they can assert
12  fraud against these two individuals.
13      Q    And your opinion was what?
14      A    My opinion was that this is a
15  security-based index and the SEC therefore
16  has jurisdiction.
17      Q    And did the court adopt your
18  view?
19      A    It is still pending.
20      Q    And was there any challenge,
21  has any challenge been raised to your
22  qualifications as an expert in this case?
23      A    I'm not recalling, but I can't
24  imagine there is not.  Opposing counsel
25  always tries to find something.
```

Page 49

```
 1           Peter Shapiro
 2      Q    And you said that this case is
 3  still pending?
 4      A    Yes.
 5      Q    And where is it pending?
 6      A    Is it in here?  You could look
 7  that up.  It's -- I testified in
 8  Washington.  I think jurisdiction is under
 9  whatever courts cover Florida -- it
10  could -- you know, Florida, Louisiana.  I'm
11  not sure.  You have to look.
12      Q    Okay.  We actually have looked.
13  So do you know where this case is pending?
14      A    No.  Why don't you tell me?
15      Q    I don't know.  We haven't been
16  able to locate it.
17      A    You haven't been able to locate
18  it.  Oh, really.  Okay.  That's
19  interesting.  I can --
20      Q    So do you have records that
21  would indicate where it's pending?
22      A    Yes, yes.
23          MS. SAWYER:  I'd request that
24  we be provided that information.
25          MR. LAWRENCE:  Sure.
```

Page 50

Peter Shapiro

1
2    Q    Other than --
3    A    You know, if I can, you know,
4  this case is tied up in a -- this is a very
5  large scandal. You know, JP Morgan itself
6  has already paid close to billion dollars
7  related to this scandal.
8         It's caught up between -- to a
9  certain extent, there have been delays that
10  have had to do with criminal versus civil
11  charges in this case. So, you know, there
12  are reasons this has gone on and is as
13  complicated as I am describing.
14         MR. LAWRENCE:  Just for your
15     information, it looks like from a
16     brief Google search. It's in the
17     Northern District of Alabama.
18         THE WITNESS:  Makes sense.
19         MR. LAWRENCE:  Number CV 09 U/V
20     2238-S.
21    Q    Other than these two cases,
22  have you also testified as an expert
23  before?
24    A    It says here these were the
25  ones in the last four years. I am trying

Page 51

Peter Shapiro

1
2  to remember if there was something more
3  than four years ago, and I am not
4  remembering.
5    Q    You don't recall any other time
6  that you have been designated as an expert
7  witness?
8    A    "Designated" would be different
9  than "testified."
10    Q    Do you recall other times that
11  you have been designated as an expert
12  witness in litigation?
13    A    When you are designated -- just
14  to clarify your question -- when you are
15  retained by a client to serve as expert
16  witness?
17    Q    No, when a formal disclosure
18  has been made, as we have seen in this
19  case. Have there been other instances
20  where you have been designated as an
21  expert?
22         MR. LAWRENCE:  Like disclosed
23     to the other party.
24    Q    Yes, disclosed to the other
25  side.

Page 52

Peter Shapiro

1
2    A    I'm not certain because, you
3  know, that's part of the legal process. I
4  know we have been retained as expert
5  witnesses in other cases.
6    Q    And have you been retained as
7  expert witnesses in other cases within the
8  last four or five years?
9    A    Yes.
10    Q    And what cases are those?
11    A    I have to try to pull that
12  together for you.
13    Q    Okay. That's not information
14  that you know sitting here?
15    A    Off the top of my head, I'd
16  have to go back. The truth is, since the
17  financial crisis, there have been so many
18  disputes where I get contacted so
19  frequently on this kind of stuff.
20    Q    And have you testified other
21  than these two instances as an expert
22  witness?
23    A    No.
24    Q    Either within or without four
25  years?

Page 53

Peter Shapiro

1
2    A    Not that I can recall prior to
3  four years ago.
4    Q    And when you were deposed in
5  December, you indicated that you have
6  testified in financial matters
7  approximately five to ten times?
8    A    Yes.
9    Q    And in those other financial
10  matters, you weren't testifying as an
11  expert witness?
12    A    I think generally as a fact
13  witness.
14    Q    And how would the testimony
15  come about that you would be testifying as
16  a fact witness?
17    A    There would be a lawsuit
18  brought by one party or the other, and I
19  would be deposed.
20    Q    And those would have been
21  situations where you have been engaged as a
22  financial advisor?
23    A    Generally.
24    Q    What other situations?
25    A    Besides as a financial advisor,

Page 54

Peter Shapiro

1  I can't think of -- I can't think of other
2  ones.  I am just trying to think if there
3  is a case where that would be.
4        There was one case that I
5  mentioned in my deposition.  It involved
6  the Port Authority of New York and
7  New Jersey, where I wasn't a financial
8  advisor.
9     Q    In what capacity were you
10 testifying in that case?
11    A    In that case, it went back to
12 my days as a governmental officer; but it
13 was a dispute that occurred much later.
14    Q    And what cases --
15    A    It was a financial issue.  It
16 was much later.
17    Q    And in the other cases where
18 you have testified as a financial advisor,
19 how many cases has that been?
20    A    I would have to go back and
21 look.
22    Q    Do you recall any of those
23 cases sitting here today?
24    A    Where I have been deposed, I

Page 55

Peter Shapiro

1  have been deposed a number of times.  And
2  I'm not recalling.  I really would have to
3  go back.
4     Q    So you don't recall sitting
5  here today any other specific instances
6  where you have been deposed?
7     A    I know there have been other
8  instances, but I'm not recalling.
9     Q    Do you recall any other
10 instances where you have testified at an
11 arbitration hearing or trial?
12    A    Arbitration or trial, I don't
13 believe so.
14    Q    I want to ask you some
15 questions about your background.  Where did
16 you go to college?
17    A    Harvard University.
18    Q    And when did you graduate?
19    A    1974.
20    Q    And what's your degree in?
21    A    My degree is a -- is a
22 bachelor's degree.  It's rou -- Harvard has
23 a funny practice in that it's -- I was in
24 a -- a -- what you call -- Harvard calls a

Page 56

Peter Shapiro

1  "concentration," what most of the world
2  calls a "major" -- called social studies,
3  which was an honors department.
4        If you had did write a thesis,
5  they would make your degree what they
6  called "general studies"; so the way my
7  degree reads in the record is, "Cum laude
8  general studies," which was the practice
9  then if you didn't write a thesis.
10       My department, though, that I
11 was in, was called social studies, which
12 was economics, history, social theory, a
13 con -- an interdisciplinary department.
14 That's why it's called social studies.
15    Q    And how many economics classes
16 did you take as part of your undergraduate
17 program?
18    A    I would guess four.  I would
19 have to go back and look, but I am guessing
20 four.
21    Q    Did you take any finance
22 classes at Harvard?
23    A    Harvard, as an undergraduate,
24 didn't offer finance classes.  It was

Page 57

Peter Shapiro

1  considered to be a -- a, you know, crude
2  and mean and dirty practice that had to do
3  with a career and not intellectual studies.
4     Q    So you didn't take any
5  financial classes?
6     A    No.  You had to go to graduate
7  school to do that or, as they would see it,
8  a trade school.
9     Q    What about mathematics?  How
10 many of --
11    A    I am being sarcastic for the
12 record.
13       Mathematics?  All of my
14 mathematics courses were in high school.
15    Q    Did you take any classes in
16 econometrics at Harvard?
17    A    Econometrics was part of what
18 my economics curriculum included.
19    Q    Did you take a specific class
20 in econometrics?
21    A    Not one that was designated as
22 econometrics, per se.
23    Q    And in these classes, economics
24 classes you took, did you cover valuation

Page 58

```
 1            Peter Shapiro
 2  methodologies for financial contracts?
 3       A    No.
 4       Q    And did you discuss concepts
 5  such as yield curves or forward curves?
 6       A    Only in general terms.  It's
 7  interesting you should ask this because one
 8  of the things that I have gone back and
 9  done is look at the Harvard curriculum
10  since I've graduated and said:
11            "Do they offer anything in that
12  area for undergraduates?"
13            And by and large, they do not.
14       Q    And after your undergraduate
15  studies at Harvard, did you go on to a
16  trade school?
17       A    No.
18       Q    Did you go on to any graduate
19  school?
20       A    I did a special summer program
21  for state and local government officials at
22  Harvard, at the Harvard Kennedy School, you
23  know, the Kennedy School of Government.
24       Q    And that was just a summer
25  program?
```

Page 59

```
 1            Peter Shapiro
 2       A    Correct, what they call, you
 3  know, a senior executives program.
 4       Q    And when did you do that?
 5       A    Summer of '79 is my
 6  recollection.
 7       Q    And what types of courses did
 8  you take during that senior executive
 9  program?
10       A    They ran an integrated
11  curriculum with the Kennedy School and some
12  participation from the business school.
13  And it covered a broad range of topics from
14  decision-making to finance to -- to other
15  topics that they thought were germane for a
16  senior executive to know.
17       Q    Do you have an MBA?
18       A    No.
19       Q    And after you graduated from
20  Harvard, what did you do in terms of
21  employment?
22       A    I was elected to the state
23  legislature in New Jersey.  Then I
24  subsequently was elected as the county
25  executive of Essex County, New Jersey.  And
```

Page 60

```
 1            Peter Shapiro
 2  then I went into finance after that.  And
 3  then I went to work for Citigroup after
 4  that.
 5       Q    When you were -- what year were
 6  you elected to the state legislature?
 7       A    1975.
 8       Q    And what was your role at the
 9  state legislature?
10       A    Member of the state, the
11  general assembly, you know, the lower
12  house.  I was too young to be a member of
13  the upper house.
14       Q    Did you serve on any
15  committees?
16       A    Yes.
17       Q    Which committees?
18       A    I served on the joint
19  appropriations committee, which is the
20  budget committee.  I served on the housing
21  committee.  I am trying to remember.  There
22  was a -- there was probably one other
23  committee I served on.
24       Q    Were you involved in any bond
25  issuances while a member of the state
```

Page 61

```
 1            Peter Shapiro
 2  legislature?
 3       A    The legislature doesn't get
 4  involved in bond issuances, and the closest
 5  would be -- on appropriations, you're
 6  involved in finance; and, you know, that
 7  was one of the reasons I was on that is
 8  because I was thought of as being good with
 9  numbers.
10       Q    Any exposure to the municipal
11  reinvestment market while at the state
12  legislature?
13       A    No, I'm not even sure it
14  existed when I was in the state
15  legislature.
16       Q    And then you said you became a
17  county executive?
18       A    Yes.
19       Q    At an elected position?
20       A    Correct.
21       Q    And what was your -- what were
22  your duties as county executive?
23       A    A county executive is like a
24  mayor or a governor of the county.  So it's
25  a -- for those who are experts in
```

Page 62

Peter Shapiro

1     government, what is called a "strong mayor"
2     form of government.  I was the chief
3     executive officer elected.
4     Q     And you served that for two
5     terms?
6     A     Two terms.
7     Q     Did you have any exposure to
8     bonds issuances in that role?
9     A     Yes.
10    Q     And what type of exposure?
11    A     Essex County is the largest
12    local government in New Jersey.  It issued
13    bonds itself as well as through an
14    authority, whose members I appointed.
15    Q     And in connection with those
16    bond issuances, did it enter into
17    reinvestment agreements?
18    A     I believe so.  But I would have
19    to go back and look.
20    Q     What would --
21    A     You know, by the -- by the
22    period of time I was county executive, some
23    of the tools that we would consider to be
24    modern tools of public financing had just

Page 63

Peter Shapiro

1     begun to be used.
2     Q     What do you mean by "modern
3     tools of public financing"?
4     A     Things like GICs and, you know,
5     reinvestments, G-I-C.
6     Q     What role as county executive
7     would you have played in connection with
8     these reinvestment alternatives?
9     A     I would have been involved in
10    discussions about them.  You know, the
11    appointed officials who were responsible of
12    these areas knew I had a keen interest in
13    these things; so they would have discussed
14    with me in some detail the -- you know, the
15    specifics of the financing.
16    Q     Do you recall specific
17    discussions of certain financings?
18    A     Yes.
19    Q     What do you recall?
20    A     I recall specifically a couple
21    of complex financings that we were involved
22    in.
23    Q     Which ones?
24    A     One had to do with a pooled

Page 64

Peter Shapiro

1     loan program.  And another one had to do
2     with a complex sale leaseback.
3     Q     And these would have been
4     financings not related to bond issuances?
5     A     No, these were related to bond
6     issuances.
7     Q     And how --
8     A     The first related to a bond
9     issuance.  The second would have had a
10    number of different pieces that may have
11    included a bond issuance.  But that second
12    one never advanced.
13    Q     How did the pooled loan program
14    interact with the bond issuance?
15    A     The pooled loans were financed
16    through a bond issuance.
17    Q     So these weren't reinvestment
18    type contracts?
19    A     There would have been a
20    reinvestment contract within the pooled
21    loan program.
22    Q     Do you recall being involved in
23    those discussions?
24    A     In general.

Page 65

Peter Shapiro

1     Q     And do you recall what type of
2     reinvestment vehicle was used?
3     A     No.
4     Q     And then you said after that
5     you joined Citibank?
6     A     Correct.
7     Q     And what was your role at
8     Citibank?
9     A     I was brought in as vice
10    president in the municipal bond slash
11    public finance department.
12    Q     And what specifically did you
13    do?
14    A     I was hired in the spring of
15    1987.  And my mandate was to try to help
16    the bank build its negotiated public
17    finance effort to get more -- to be
18    retained to bring more negotiated bond
19    offerings to market.  That was, you know,
20    my initial job, and that changed
21    subsequently.
22    Q     And what did it change to?
23    A     There was a financial crisis,
24    not like our modern one, that occurred in

Page 66

1        Peter Shapiro
2  that fall.  You will recall probably -- I'm
3  not going to presume what -- how old you
4  are, Lauri.
5        But you will either recall from
6  your history books or personal experience
7  that there was a big meltdown in the
8  markets in late '87, the largest crash in
9  point terms in the -- in the stock markets.
10       It was actually preceded a
11  month earlier by a similar crash in the
12  bond markets.
13       That resulted in a big series
14  of changes that many of the major
15  Wall Street banks went through.  And when
16  that occurred at Citibank, they decided to
17  shake up the municipal bond area, similar
18  to what Salomon Brothers had done.
19       And they fired the guy who was
20  the head of the public finance department,
21  fired the guy who was the head of the
22  municipal bond department; and I was
23  promoted to be head of the public finance
24  department.
25       Q    And what was your role once you

Page 67

1        Peter Shapiro
2  were promoted to be the head of the public
3  finance department?
4        A    I was to supervise all the area
5  in terms of the -- what would be referred
6  to as the banking function on municipal
7  bonds.
8        Q    The banking function being the
9  issuance and underwriting of municipal
10  bonds?
11       A    Origination of bonds, securing
12  bond mandates, all of the work that a
13  banker does.  So it was -- you know, it was
14  flattering after having only been there for
15  less than a year that they promoted me to
16  head of the department.
17       Q    Were -- was there a municipal
18  derivatives desk at this time?
19       A    There was not a separate
20  municipal derivatives desk, but we had a
21  very active presence in municipal
22  derivatives.
23       Q    And would that have been under
24  your heading?
25       A    Yes.  General, my heading and a

Page 68

1        Peter Shapiro
2  head of the bond department, the two of us
3  working together.
4        Q    And what sort of municipal
5  derivatives were you involved with while
6  you were at Citibank?
7        A    Both swaps and something called
8  tender option bonds.
9        Q    But no reserve fund agreements
10  yet?
11       A    The area of reinvest had been
12  separate when I was hired.  But as I
13  mentioned, the head of the public finance
14  department, the head of the municipal bond
15  department, were both fired and both
16  replaced.  I was brought in as the head of
17  public finance.
18       The fellow who had run the
19  municipal re-investor, he was brought in as
20  head of the bond department.  We worked --
21       (There was a discussion off the
22  record.)
23       A    -- had run the reinvest
24  business was brought in as head of the bond
25  department.  The head of the bond

Page 69

1        Peter Shapiro
2  department, the head of public finance
3  are -- are -- go together on a day-to-day
4  basis.  You are working hand in glove.
5        And so at that point,
6  reinvestment was brought in so that was
7  where my first familiarization came in.
8  Again, that's late '87, early '88.
9        Q    And at that time was the
10  reinvestment -- municipal reinvestment
11  group at Citibank, were they actively
12  becoming providers of reserve fund
13  agreements?
14       A    My recollection is that reserve
15  fund agreements were -- as I mentioned
16  earlier, the broader category of forward
17  purchase agreements, forward supply
18  agreements, forward delivery agreements --
19  call them what you will -- really began in
20  the early '90s.  And Citi was an early
21  mover in that business.
22       Q    And were you involved in
23  securing those early reserve fund
24  agreements?
25       A    To a certain extent.  It was a

Page 70

1          Peter Shapiro
2    team effort, but I was involved in, you
3    know, early discussions on that.
4         Q    And early discussions as to
5    whether or not that was something Citibank
6    wanted to be involved with?
7         A    Product design, you know, risk
8    analysis, how much business there would be,
9    how we would go about selling them, all of
10   those kinds of things.
11        Q    Were you involved in any actual
12   agreements that Citibank entered into?
13        A    Yes.
14        Q    And when did those start?
15        A    My recollection again is early
16   '90s.
17        Q    And what role did you play in
18   connection with those reserve fund
19   agreements that Citibank entered into?
20        A    What I have already described.
21        Q    Would you have been responding
22   to bids?
23        A    At that point, my recollection
24   is they weren't being bid, that we could
25   still get them on an exclusive basis.

Page 71

1          Peter Shapiro
2         Q    So there would be exclusive
3    discussions on counterparty to dealer to
4    try to put them in place?
5         A    Yes, or, often, it wasn't
6    counterparty to dealer as much as a
7    counterparty to intermediary, like a banker
8    from another firm, a financial advisor, and
9    the like.
10        Q    And were you personally
11   involved in those discussions with either
12   the counterparty or its intermediary
13   regarding reserve fund agreements at
14   Citibank?
15        A    As part of a team at Citibank.
16        Q    And so you recall actually
17   being involved with the execution of
18   reserve fund agreements at Citibank?
19        A    Again, reserve fund agreements,
20   I would correct you just to use that
21   generic category of "forward purchase
22   agreements," yes.
23        Q    Yes. My question was actually
24   very specific about reserve fund
25   agreements.

Page 72

1          Peter Shapiro
2         Q    Do you recall being involved
3    with any reserve fund agreements?
4         A    We didn't call them "reserve
5    fund agreements" at that time.  They could
6    be used for a variety of purposes.  I'm not
7    recalling whether or not there was a
8    specific -- there were specific ones that
9    were for reserve funds or float funds or
10   other funds.
11        Q    But you do recall being
12   involved with forward purchase agreements?
13        A    Yes.
14        Q    And which counterparties do you
15   recall being involved with?
16        A    I'm not remembering specific
17   names.  We are going back more than
18   20 years.
19        Q    How many forward purchase
20   agreements were you involved with at
21   Citibank?
22        A    My recollection is it
23   wouldn't -- it wouldn't have been a big
24   number, fewer than ten.
25        Q    And then when did you leave

Page 73

1          Peter Shapiro
2    Citibank?
3         A    I left in 1993.
4         Q    Why did you leave Citibank?
5         A    How long do you have?
6         Q    All day.
7         A    Working at Citibank had -- it
8    had good parts and bad parts.  By 1993 the
9    bad parts had come to outweigh the good
10   parts.  And I had another opportunity and
11   thought it would be better to work in a
12   different place.  I left, you know, my own
13   volition.
14        Q    And --
15        A    As did by the way, I mentioned,
16   we -- you know, I basically worked as a
17   partner with the head of the municipal bond
18   area.  We both left together.
19        Q    And where did you go?
20        A    I went to Euro Brokers.
21        Q    With the colleague you just
22   mentioned?
23        A    No, he went off to work on
24   another project.
25        Q    And what was your role at Euro

Page 74

1        Peter Shapiro
2   Brokers?
3        A    I was a senior vice president
4   at Euro Brokers.  I was responsible for
5   supervising their municipal financial
6   products desk and for developing other
7   lines of business.
8        Q    And how long did you stay at
9   Euro Brokers?
10       A    Until 1997.
11       Q    And what did you do at that
12  point?
13       A    I set up Swap Financial Group.
14       Q    Why did you leave Euro Brokers?
15       A    Management had changed at Euro
16  Brokers.  The -- and I thought it would be
17  better to start up my own firm.  I didn't
18  like the direction management was taking.
19  I also thought that there was a big
20  opportunity if I set up my own firm.
21       Q    And you have been at Swap
22  Financial Group since then?
23       A    Correct.
24       Q    Do you have any certifications
25  or licenses?

Page 75

1        Peter Shapiro
2        A    At Swap Financial Group, as I
3   think I testified previously, we fell into
4   an unregulated area until the Dodd-Frank
5   Act occurred.  As an unregulated financial
6   entity, there were no licensing
7   requirements.
8        And moreover, more important,
9   any prior licenses you had would lapse
10  because you were no longer part of a
11  registered or licensed entity.  So the
12  various NASD licenses or certifications
13  that someone has in the securities industry
14  lapse after two years if you're not being
15  with a registered firm.
16       So I had previously, you know,
17  various registrations, what are known as
18  series followed by a number.  But those all
19  lapsed.
20       Q    So at some point you did have a
21  Series Seven or something like that?
22       A    I had 52, 53, and 63.  I think.
23       Q    And when did you have those?
24       A    I think I had 52 and 53 from my
25  Citi days.  I think I added 63 at Euro

Page 76

1        Peter Shapiro
2   Brokers.
3        Q    And then after -- two years
4   after you left Euro Brokers, those licenses
5   lapsed?
6        A    Yes.
7        Q    Any other certifications or
8   licenses that you've held?
9        A    Of what type.
10       Q    Of a professional nature, like
11  a Series 52 or some other license that you
12  may have?
13       A    Not that I -- not that I --
14       Q    Financial planner license?
15  There are all sorts of different licenses.
16       A    There are -- there are lots of
17  designations like financial planner that
18  you are given by, you know, organizations
19  that you can, you know, get a stamp.  But I
20  didn't go after any of those.
21       Q    Are you a member of any
22  professional organizations?
23       A    A variety.  I am trying to
24  think of all of the ones I think you have
25  my -- my full CV, and that would probably

Page 77

1        Peter Shapiro
2   represent that accurately.  That should
3   represent that accurately.
4        Q    The CV that's located on your
5   Swap Financial web site?
6        A    Yeah, and anything else that
7   has been supplied to you.
8        Q    Do you recall, sitting here,
9   what professional organizations you are a
10  member of?
11       A    You know, I am thinking of a
12  few of them.  But the NCSHA, National
13  Council of State Housing Agencies --
14       (There was a discussion off the
15  record.)
16       A    National Council of State
17  Housing Agencies.  What other ones?  You
18  know, we are registered with the MSRB, with
19  the SEC, but those aren't -- you know, you
20  know, I have -- I'd have to go back and
21  look.
22       If you have a copy, I can go --
23  I can refer to that rather than trying to
24  do it from memory.
25       Q    Okay.  What publications or

Page 78

Peter Shapiro

1    what articles or books have you published?
2    A    As mentioned in Exhibit --
3    Q    -- 10?
4    A    10, yes.  I did a chapter for
5    the Feldstein and Fabozzi book in 2008.
6    You know, I have -- I'm not somebody that
7    contributes articles as a part of my
8    profession.
9         I am quoted very frequently in
10   the press as any Google search would show.
11   And, you know, I am quoted very often by
12   Bloomberg, the Wall Street Journal, the
13   Bond Buyer, you know, often by the
14   mainstream press, you know, New York Times,
15   various publications around the country.
16       I have been on CNBC, Bloomberg
17   TV, things like that.
18       Q    Other than this article, have
19   you published any other articles or books?
20       A    I'm not -- part of my business
21   is not publishing.  I'm not an academic or
22   a commentator.
23       Q    So you haven't published any
24   other articles?

Page 79

Peter Shapiro

1    A    Not that I -- not that I can --
2    you know what?  That's not correct.  I know
3    a talk I gave was converted into an article
4    by the National Association of College and
5    University Business Officers, which is the
6    organization that -- that represents
7    financing by higher education entities in
8    this country, NACUBO, as that's called.
9         I know they converted something
10   into an article there.
11       Q    When was that?
12       A    Within the last two or
13   three years.
14       Q    Do you have a copy of that
15   article?
16       A    I could dig one up.
17       Q    And was your article or your
18   chapter, "Good Swap, Bad Swap," was that a
19   peer-reviewed process to get placed in that
20   book?
21       A    No, this is -- this is
22   published by -- if you know Frank Fabozzi,
23   he's a very, you know, well-respected
24   writer and compiler, you know, editor of

Page 80

Peter Shapiro

1    financial books.
2         And he asked me -- he and his
3    colleague, Sylvan Feldstein, who is a very
4    well-respected commentator and analyst in
5    the municipal, asked me to do the chapter.
6         Q    But it wasn't a peer-reviewed
7    chapter that was --
8         A    It's not a -- peer review, I
9    think, only applies in academia.  This is
10   not -- this is not an academic book.  This
11   is much more of a practitioner's book.
12       Q    So it didn't go through any
13   peer-review process that you're aware of?
14       A    I have never heard of peer
15   review out -- applied to anything outside
16   of academia; have you?
17       Q    I am just -- I am just trying
18   to understand if this was an article that
19   went through a peer review process or not,
20   so just trying to confirm.
21       A    Peer review only applies in
22   academia as far as I know.
23       Q    So you don't think this was
24   peer reviewed?

Page 81

Peter Shapiro

1    A    Unless by "peer reviewed" you
2    would consider, you know, Feldstein and
3    Fabozzi to be peers who read it and decided
4    whether or not it was suitable.  It's not
5    -- not by -- the term "peer review," as I
6    think you are using it, is what applies in
7    academia.
8         MS. SAWYER:  I can keep going,
9    but it's a good time for a break if
10   anybody needs to stretch their legs.
11       (A break is taken.)
12       (Exhibit No. Lehman 15,
13   April 25, 2009 memorandum from Swap
14   Financial Group, previously marked
15   Document, is introduced into the
16   proceedings.)
17       (Exhibit No. Lehman 19,
18   September 10, 2009 Memorandum from
19   Swap Financial Group, previously
20   marked Document, is introduced into
21   the proceedings.)
22       Q    Before you are two exhibits
23   that have been previously marked as Lehman
24   Exhibit 15, Lehman Exhibit 19, right here.

Page 82

```
 1              Peter Shapiro
 2      A    Okay.
 3      Q    Which are memoranda from Swap
 4  Financial Group dated April 21, 2009, and
 5  September 10, 2009, respectively.
 6          Looking first at Lehman
 7  Exhibit 15, which is the April 25, 2009
 8  memorandum --
 9      A    Yes.
10      Q    -- when you were deposed in
11  December, you did not recall precisely how
12  this memorandum was prepared.  Did you do
13  anything in preparation for this deposition
14  to refresh your recollection as to how this
15  memorandum was prepared?
16      A    I read over the deposition as I
17  said.
18      Q    You didn't do anything, didn't
19  look at any other documents or look back
20  your E-Mails or anything to try to get an
21  understanding as to how this document was
22  prepared?
23      A    No.
24      Q    And then, if you look at the
25  September 10, 2009 memorandum, Lehman
```

Page 83

```
 1              Peter Shapiro
 2  Exhibit 19, this is essentially an
 3  identical memorandum to the April 21st,
 4  memorandum except for it's only for a
 5  single valuation date, correct?
 6      A    I know it's for a different
 7  valuation date.  That's right.
 8      Q    If you look at Lehman
 9  Exhibit 15, it has valuation dates of
10  October 2, 2008, and March 25, 2009.
11          Do you see that?
12      A    Yes.
13      Q    If you look at Lehman
14  Exhibit 19, it just has a valuation date of
15  March 25th, 2009.
16          Do you see that?
17      A    Correct.
18      Q    And in Lehman Exhibit 19 you
19  reach the conclusion that the "Loss,"
20  capital L -- "Loss valuation should be
21  $46,437,610."
22          Correct?
23      A    Correct.
24      Q    And to reach that valuation you
25  used essentially a LIBOR plus spread --
```

Page 84

```
 1              Peter Shapiro
 2  plus the spread analysis; is that fair?
 3      A    Right.
 4      Q    If you look at the credit
 5  spread that you --
 6      A    I would say, if I can, LIBOR
 7  plus or minus spread, just so we are being
 8  fully accurate.  When we say "LIBOR plus
 9  spread," we would -- it's probably better
10  to say "LIBOR including spread," because it
11  can go either way.
12      Q    In fact, your spread is a
13  negative spread?
14      A    That's why I'm -- I corrected
15  you there, yes.
16      Q    All right.  If you look at the
17  third page of the September 10, 2009
18  memorandum, it has a credit spread of
19  negative 429 basis points, correct?
20      A    Correct.
21      Q    How many times prior to the
22  preparation of this memorandum had you
23  calculated a credit charge for a forward
24  purchase agreement?
25      A    Can I ask you to clarify the
```

Page 85

```
 1              Peter Shapiro
 2  question?  Do you mean in conjunction with
 3  a termination or with an original purchase,
 4  or with a hypothetical, or --
 5      Q    We can break it into three
 6  separate questions.
 7          How many times prior to
 8  September 10, 2009, had you calculated a
 9  credit charge for forward purchase
10  agreement for purposes of pricing it?
11      A    For purposes of an initial
12  pricing?
13      Q    Initial pricing.
14      A    I would say we would have done
15  that, you know, somewhere in the 10 to 20
16  times.
17      Q    And when you say "we," who are
18  you referring to?
19      A    The firm.
20      Q    Swap Financial Group?
21      A    Yes, yeah, and, you know, I
22  would be involved as the boss to see what
23  the work consisted of.
24      Q    And that would have been
25  services you provided for a municipal
```

Page 86

1          Peter Shapiro
2   client in connection with the origination
3   of one of their reserve fund agreements or
4   forward --
5       A    Forward purchase agreement,
6   yes.
7       Q    And how many times did you come
8   up with a credit charge for an initial --
9   initial pricing of a reserve fund
10  agreement?
11      A    I can't recall how many of
12  those were reserve fund agreements, but we
13  would always have a credit charge in --
14  built in there.  The bank always built a
15  credit charge.
16          And we would have to make an
17  estimate of what the bank should charge,
18  what was fair, all of that sort of thing.
19      Q    And how in those ten instances
20  that Swap Financial Group calculated those
21  initial -- initial pricing credit charges,
22  how did you go about doing that?
23      A    The key thing to do would be
24  based upon:
25          What is market practice?  That

Page 87

1          Peter Shapiro
2   is, what were other banks charging at the
3   time?  You know, what would be considered
4   to be fair under the circumstances?
5           Our job on an initial pricing
6   is to try to push that credit spread down,
7   of course, because we want to get a better
8   deal for our client, and to try to say, you
9   know, "you are charging too much."  But we
10  always know -- knew, of course, there would
11  be a charge there.
12      Q    So your involvement with the
13  credit charge in these situation on behalf
14  of your client was to essentially try to
15  negotiate those credit charges down?
16      A    If we were originating, yes.
17      Q    Yes.
18          In connection with the
19  termination of a forward purchase
20  agreement, how many times have you
21  calculated credit charges in connection
22  with that situation?
23      A    During what period of time?
24      Q    Since 2008.
25          (There was a discussion off the

Page 88

1          Peter Shapiro
2   record.)
3       A    Since 2008?
4       Q    I'm sorry.  I'm sorry.  Prior
5   to 2009.
6       A    Prior --
7       Q    2009, September of 2009.
8       A    Prior to 2009, how many times
9   in connection with the termination?
10      Q    Um-hum?
11      A    An actual termination or a --
12  a -- you know, again, we do a lot of
13  scenario analysis.  What if, if somebody
14  were to terminate?
15      Q    Let's talk about an actual
16  termination first.
17      A    In conjunction with actual
18  terminations, my guess -- my guess would be
19  about five.
20      Q    Okay.  And how would you go
21  about determining a credit charge in that
22  situation where there was an actual
23  termination of a contract?
24      A    You would have to look at what
25  credit circumstances were like at the time

Page 89

1          Peter Shapiro
2   of the termination.
3       Q    And what would you look at to
4   determine the credit circumstances?
5       A    Ideally, you'd look at live
6   trades that occurred at the same time.
7       Q    You'd look for comparables in
8   the market?
9       A    Correct.  And I say that,
10  ideally, in the absence, you have to do --
11  of a live trade, you have to do something
12  else.
13      Q    And prior to 2009 in a
14  termination scenario, were there
15  circumstances where you were not able to
16  look at other comparable live trades to
17  determine the credit charge?
18      A    I can think of one.
19      Q    And what was that circumstance?
20      A    This had to do with a
21  termination that occurred in 2007.
22      Q    And how did you go about
23  calculating that credit charge?
24      A    This was a case where we were
25  involved after the fact, and, you know, we

Page 90

Peter Shapiro

1  were brought in to assist a customer in
2  a -- you know, in a confidential mediation,
3  with another non-Lehman financial
4  institution, where our client had -- had
5  terminated voluntarily.  And we had to
6  estimate the credit charge in that case.
7      Q    And how did you go about
8  estimating the credit charge?
9      A    The issue was that -- just like
10 in this -- in this contract, the burdened
11 party was the one responsible for doing
12 that initially, of course.
13         The burdened party in that
14 case, because our client had volitionally
15 terminated, was the bank.  The bank was
16 supposed to determine that via market
17 quotation, and the bank failed --
18         (There was a discussion off the
19         record.)
20     A    -- do that, to do the
21 determination via market quotation, and
22 they failed to do that.
23         So then we had to get into a
24 mediation to look at what credit charges

Page 91

Peter Shapiro

1          would have been at that time.
2      Q    And, specifically, how did Swap
3  Financial Group go about calculating the
4  credit charge in that circumstance?
5      A    Dealer survey.
6      Q    And you called how many, about
7  how many dealers?
8      A    I wasn't -- I wasn't the one
9  who did it, so I wouldn't know.
10     Q    But you don't recall anything
11 being done at Swap Financial Group to
12 actually calculate a credit charge?
13     A    I just said, yes, we did that
14 by doing the other survey.
15     Q    There wasn't a CVA analysis or
16 Monte Carlo analysis or anything done by
17 Swap Financial Group itself?
18     A    No, because this was a
19 termination that had occurred in 2007 when
20 it was a live market.
21     Q    Okay.
22     A    So you had a -- you had, you
23 know, a market that was going on at the
24 time of termination.  You didn't have a

Page 92

Peter Shapiro

1  you, you know, a nonexistent market like we
2  face in this case.
3      Q    But in this case, you also did
4  a dealer survey as to credit charges,
5  correct?
6      A    In this case, we knew that
7  there wasn't a live market.  You know,
8  there was -- there is no dispute about
9  that.  So, you know, you are trying to get
10 a sense of where a dealer should charge, so
11 we didn't -- you know, there is nothing we
12 could -- we could really use there.
13         Nobody could really say, "If I
14 were doing something I'm not doing, here is
15 what I would charge."
16     Q    And did you ask dealers that?
17     A    Throughout this period of time,
18 we had multiple cases going on.  So I am
19 certain we had conversations with dealers
20 about -- about this market.  But it's
21 almost pointless, Lauri, to say:
22         "What would you have charged if
23 you could have charged on something you say
24 you cannot do?"

Page 93

Peter Shapiro

1      Q    My question is simply:
2          Do you recall having
3  conversations with dealers about what an
4  appropriate credit charge would be for the
5  Washington RFA?
6      A    Not -- on -- specifically on
7  this case, I'm not recalling.  In prior
8  testimony, did we cover this?
9      Q    I think that you covered that
10 you had contacted dealers.
11     A    We did contact dealers, and we
12 were turned down.  If you want to go back
13 to my deposition or anything else that --
14     Q    This is not -- this is not an
15 area that was covered in your prior
16 deposition about whether or not you
17 solicited and asked for information about
18 credit charges from dealers.
19     A    And you are asking specifically
20 for Washington, yeah.  And, you know, my --
21 to the best of my recollection, you know,
22 our conversation with dealers specifically
23 around Washington was, "We can't do this."
24     Q    In the fall of 2009 at the time

Page 94

```
1           Peter Shapiro
2   that this memorandum was drafted, did you
3   survey dealers about what typical credit
4   charges would be in the market at this
5   time?
6       A    You mean typical and not
7   pertaining to Washington.
8       Q    Right, like you said, you did
9   in this other instance.  You surveyed the
10  market to see what the charges would be.
11  Did you survey the market in September of
12  2009?
13      A    In September 2009, we knew we
14  had a dead market.  Now, you know, we are
15  in continual touch with dealers as a firm
16  on all sorts of issues trying to find out
17  what they can do, what they can't do, if
18  they could do it, where are they on
19  pricing, and stuff like that.
20          But you know, if somebody says,
21  "I can't do this at any price," any
22  additional information you're going to
23  glean from them is probably not of much
24  value.
25      Q    So did you survey the dealers
```

Page 95

```
1           Peter Shapiro
2   in September of 2009 about --
3       A    Washington, no --
4       Q    -- about typical credit charges
5   at that time?
6          (There was a discussion off the
7   record.)
8       Q    -- about typical credit charges
9   at that time?
10      A    As I said, we are in constant
11  touch with dealers.  We are talking to
12  major dealers virtually everyday.  There
13  was no formal survey, per se.
14      Q    Do you recall receiving
15  information from dealers in September of
16  2009 about typical credit charges?
17      A    I recall them saying that they
18  wouldn't do these deals, and that was out
19  of primarily a credit concern.
20      Q    Do you recall discussing with
21  them what a credit charge might be in
22  September of 2009?
23      A    On a deal they could not do?
24      Q    I am just asking if you recall
25  having those conversations.
```

Page 96

```
1           Peter Shapiro
2       A    Not about what they would
3   charge for something they could not do.
4   That would be meaningless.
5       Q    So you didn't have those
6   conversations?
7       A    No.
8          (Exhibit No. Shapiro 25, Copy
9       of the expert information provided to
10      Jones Day on December 16, 2013, a copy
11      of Mr. Shapiro's September 10, 2009,
12      memorandum with an additional cover
13      sheet, is marked by the reporter for
14      identification.)
15      Q    The court reporter has handed
16  you a document that has been marked as
17  Shapiro Exhibit 25, which is a copy of the
18  expert information that was provided to us
19  on December 16, 2013.  It appears to be a
20  copy of your September 10, 2009, memorandum
21  that we were just looking at, with an
22  additional cover sheet.
23          Do you see that?
24      A    Correct.
25      Q    And in your cover sheet which
```

Page 97

```
1           Peter Shapiro
2   you signed, you indicated that you needed
3   to correct the September 10, 2009,
4   valuation memo, right?
5       A    Correct.
6       Q    And you needed to correct it to
7   correlate it to the scheduled maturity of
8   the reserve fund agreement of 2032, right?
9       A    Correct.
10      Q    When did you learn that the
11  scheduled maturity of the reserve fund
12  agreement was 2032?
13      A    Subsequent to our original
14  opinion on this.
15      Q    Subsequent to September 10,
16  2009?
17      A    Yes.
18      Q    When between September 10,
19  2009, and December 13, 2013, did you learn
20  that it had been, that the scheduled
21  maturity was 2032?
22      A    I can't recall the exact date,
23  but, you know, as you know, we had
24  originally been furnished with a document
25  that was originally furnished by Lehman
```

Page 98

1           Peter Shapiro
2    that had said 2042.  And then it was
3    subsequently amended.
4           The one that we originally
5    received was the unamended version, which
6    is what our valuation was based on.  Then,
7    subsequently, it was discovered that it
8    had, in fact, been amended to 2032.
9       Q    Do you remember the context in
10   which you learned that it had been amended
11   to 2032?
12      A    My recollection is it was
13   during the phone call with the agency.
14      Q    That someone from the agency
15   advised you of the amendment to 2032?
16      A    Yeah, I think there were people
17   from the authority on the phone as well as
18   counsel.
19      Q    And do you recall whether that
20   happened before or after the mediation of
21   this matter?
22      A    It was before the mediation.
23      Q    And do you recall any
24   discussion about why the management wasn't
25   included in your September 10, 2009,

Page 99

1           Peter Shapiro
2    memorandum?
3       A    It hadn't been furnished to us.
4       Q    And furnished to you by Lehman?
5       A    No, no, by the Authority.
6       Q    When did the Authority give you
7    a copy of the amendment?
8       A    Around the time of that phone
9    conversation.
10      Q    But you at some point did see
11   that --
12      A    Yes.
13      Q    -- amendment?
14      A    Oh, yes.
15      Q    And how did you -- in your last
16   deposition, you testified that you
17   calculated this new number, this
18   $38,007,347 by knocking off the last ten
19   years?
20      A    Correct.
21      Q    Explain to me what you mean by
22   "knocking off the last ten years."
23      A    You have to make the assumption
24   that instead it went to 2032, that the date
25   that we included between 2032 and 2042 was

Page 100

1           Peter Shapiro
2    obviously not relevant; and the contract,
3    in fact, did not extend that long.
4       Q    Did you -- did you do that
5    calculation?
6       A    No.
7       Q    Someone at your firm?
8       A    Right.
9       Q    And did they -- is it -- was it
10   done in a spreadsheet or with a calculator?
11      A    It would have been done with
12   a -- most likely with a spreadsheet or on a
13   Bloomberg screen or in one -- in one of our
14   models.
15      Q    Okay.
16      A    You know, I'm not the one who
17   did that, but those are the three ways that
18   it gets done.
19      Q    And -- but you don't know which
20   way it was done?
21      A    I don't know, no.
22      Q    Do you know whether any
23   documents were created like an Excel
24   spreadsheet showing how it was done?
25      A    I don't know.

Page 101

1           Peter Shapiro
2           MS. SAWYER:  To the extent
3    there is such a spreadsheet reflecting
4    its calculation --
5           MR. LAWRENCE:  I think we would
6    have provided it if there is one, but
7    we can confirm.
8           THE WITNESS:  That is correct.
9    That is correct.
10      Q    So if there was a spreadsheet
11   or a model, literally, there would be a
12   list of delivery dates and numbers
13   corresponding to delivery dates, correct?
14      A    There would be -- there would
15   be each of the dates that would go out
16   until 2032, and a present value calculation
17   that would go backward if it were in a
18   spreadsheet.
19          If it were in a model, it might
20   just show start date, end date, because,
21   you know, the model will not necessarily
22   display a spreadsheet.  It will just -- if
23   will have it behind it in some manner if
24   you have ever worked with these models.
25      Q    Other than changing the

26 (Pages 98 to 101)

Page 102

1      Peter Shapiro
2  maturity date from 2042 to 2032, did you
3  change any other assumptions in reaching
4  this revised calculation?
5      A    Not that I can recall.  You
6  know, the model would normally build in,
7  you know, a series of curves.  And those
8  curves would take into account interest
9  rates at different points so that the
10  interest rate at 2032 could very well be
11  different from the interest rate at 2042,
12  depending upon the steepness of the curve
13  at the latter part of the maturity
14  spectrum.
15      In most yield curve
16  environments, it's relatively flat on the
17  long end from 2032 to 2042 in the current
18  example.
19      So they may -- that may not
20  have changed.  It may have changed.  But it
21  would have been embedded in the model.
22      Q    But that would have been
23  embedded in the model, correct?
24      A    Correct.
25      Q    But if you had done the

Page 103

1      Peter Shapiro
2  calculation by using a spreadsheet and just
3  removing the last ten years, that -- that
4  assumption might not be included?
5      A    It should be in there as well.
6      Q    And how would that be included
7  in the spreadsheet?
8      A    The spreadsheet shouldn't use a
9  just simple flat interest rate.  It should
10  use, you know, a curve.
11      Q    So the spreadsheet, if it was
12  done in that method, should be somehow
13  tied -- tied to the yield curve?
14      A    Correct.
15      Q    Did you adjust the credit
16  charge in -- at the same time that you
17  reduced the maturity date?
18      A    No.
19      Q    Did you adjust the profit
20  charge?
21      A    No.
22      (Exhibit No. Shapiro 26, Excel
23  spreadsheet Bates stamped SFG 2009, is
24  marked by the reporter for
25  identification.)

Page 104

1      Peter Shapiro
2      Q    The court reporter is handing
3  you a document that has been marked as
4  Shapiro Exhibit 26, which, for the record,
5  is an Excel spreadsheet Bates stamped
6  SFG 2009.
7      Have you seen this document
8  before?  Have you seen this spreadsheet
9  before?
10      A    I can't recall.
11      Q    It was produced by counsel --
12  from the Swap Financial privilege log,
13  indicated it was created on April 27, 2010.
14      Does that refresh your
15  recollection as to this document?
16      A    April 27, 2010, it doesn't
17  really.  No.
18      Q    Do you -- do you know who would
19  have prepared this document in 2010?
20      A    It would be either James
21  Vergara -- James Vergara, V-e-r-g-a-r-a, or
22  Lillian Chern, C-h-e-r-n.
23      Q    And do you know why they would
24  have been preparing this spreadsheet in
25  2010?

Page 105

1      Peter Shapiro
2      A    It's showing, you know, values
3  for -- you know, for a -- for the agreement
4  going out to 2042, so it's -- you know, it
5  looks like it's showing how the
6  calculations could be made.
7      Q    And it -- the total at the
8  bottom of $46,437,610, that's the same
9  number as found in your September 10, 2009,
10  memo?
11      A    Correct.
12      Q    Do you have any -- can you
13  explain to me what is reflected on this
14  spreadsheet?
15      A    I am looking at -- as I look at
16  it, what it is showing is a column D --
17  column B shows semi-annual dates.  Column D
18  shows a stream of fixed payments.  And
19  column F shows the discounted value of
20  those payments reflecting a present value
21  rate.
22      Q    So column F is just a
23  discounted value of the fixed leg payments?
24      A    Correct.
25      Q    And what discount rate is used

Page 106

                Peter Shapiro
1
2    if you know?
3        A    I can't tell by eyeballing it.
4    I am looking at -- at what's shown here,
5    and there is -- if you look at row four, it
6    says PV rate, 2.413.
7            Now, Lauri, if we do a quick
8    seat-of-the-pants PV calculation, you will
9    notice the -- you know, the drop as of --
10   as of 12/1/09 goes from 1,020,875 to
11   1,004,275.  That's a differential of
12   $16,000, plus, on a -- you know, on the
13   12/1/09 date.  And the calculation appears
14   to begin in March of '09, less than a full
15   year.
16           So, you know, just using rough
17   and easy math, the $16,000 differential on
18   roughly a million dollars would be a
19   1.6 percent rate for a partial year.  So it
20   looks like it corresponds with about that
21   2.413 PV rate.
22       Q    So that PV rate in column C4 of
23   2.413 could be the discount rate reflected
24   in this?
25       A    It appears to be what's

Page 107

                Peter Shapiro
1
2    reflected in this.
3        Q    And why -- why would this
4    analysis be done?  Why would you discount
5    the fixed -- you know, the fixed payment of
6    the RFA by that discount rate?
7        A    Well, as you can see, if you
8    summed the gross values, in -- in column D
9    you get to a $67 million amount that Lehman
10   would owe.
11           That's not right because that's
12   including the future value of those
13   dollars, what they would be at those
14   points.  For it to make a claim based upon
15   today's value, you have to discount back to
16   present value dollars.  And that produces a
17   lower cost for Lehman.
18       Q    And is that 2.413, is that the
19   discount rate that was used in the
20   September 10, 2009 memo?
21       A    It's the one that is used in
22   this and arrives at the same number.
23   It's -- normally, the model is not going to
24   discount at a single rate.  It's going to
25   discount at a curve.  But you could also

Page 108

                Peter Shapiro
1
2    solve for the same average rate that will
3    produce the same dollar number.
4        Q    But this spreadsheet doesn't
5    contain any information about a floating
6    leg like you describe in your September 10,
7    2009 memo, right?
8        A    Right.  As I described in my
9    deposition at length, normally, if you are
10   looking at the difference between two fixed
11   rates, you know, that's what you are
12   basically solving for.
13           That is:
14           What is the fixed rate that
15   Lehman contracted to provide Washington?
16   What is the fixed rate that Washington,
17   after Lehman defaulted on its agreement?
18   What is the -- what is the fixed rate that
19   Washington could then replace at?
20           So it's a comparison, really,
21   if you think about it, between two fixed
22   rates.  That's the right way to think about
23   the loss.
24       Q    So in your expert opinion, what
25   is the fixed rate that Washington could

Page 109

                Peter Shapiro
1
2    replace at?
3        A    The -- what we calculated out
4    was at a fixed rate that was lower by the
5    amount which is shown in the exhibits that
6    we have gone over, you know, having reduced
7    what Washington would have received by a
8    total as shown on page three of Exhibit 19,
9    reducing it by 300, 3.874 percent, much
10   lower.
11       Q    So reducing the 4.484 less than
12   3.874?
13       A    Correct.
14       Q    Not -- not that that's a spread
15   to LIBOR?
16       A    That's not a spread to LIBOR
17   because if you do it -- if you did it as a
18   spread to LIBOR, you get a nonsense result
19   with almost any spread.
20       Q    So --
21       A    You know, just simply because
22   LIBOR got so low -- you don't normally
23   spread this to the floating rate.  You
24   spread it -- you look at it as the spread
25   in the agreement which in this case the

## Page 110

Peter Shapiro

1
2  applicable thing to look at is reducing the
3  fixed rate.
4      Q    So your expert opinion is that
5  the replacement rate that Washington could
6  have experienced was 61 basis points?
7      A    Correct.
8      Q    And --
9      A    If -- that's 61 basis points if
10  your math is right, Lauri, and I am
11  trusting that you did your math well.
12      Q    And so what does this
13  spreadsheet that we are just looking at,
14  Shapiro 26? What does that have to do with
15  that 61 basis points?
16      A    We could look and do the math
17  quickly right here. Take 61 basis points
18  and multiply times 45.59. You want -- you
19  want to do it right now?
20      Q    Sure, I am just not -- I'm not
21  sure how that is reflected in this
22  spreadsheet.
23      A    Let's do it and see if we can
24  get to the same numbers.
25      Q    Okay.

## Page 111

Peter Shapiro

1
2      A    Okay. Do you have a
3  calculator, or do you want me to use one?
4      Q    You can do it. We can check.
5  Maybe that you can check while you're doing
6  it. I don't -- I didn't bring a calculator
7  with me today.
8      A    Most cell phones have them in
9  them.
10      Q    I didn't bring my cell phone.
11      A    Oh, my God.
12      Q    I'm focused.
13      A    Okay.
14      (There was a discussion off the
15  record.)
16      A    So let's look -- 45 -- and I am
17  just going to round here for sake of speed,
18  44.5 million as our principal amount.
19  Okay. And what was the --
20      Q    45.5 is the principal amount.
21      A    Right. And we -- you
22  calculated 61 basis points.
23      Okay. So I am going to
24  multiply that, okay, times .0061, right.
25      Q    No. 61 basis points, so 0.61?

## Page 112

Peter Shapiro

1
2      A    No, 0.61 would be 61 percent.
3      Q    Okay. Then --
4      A    0.0061 is 61 basis points.
5      Q    Maybe I am lost. If you take
6  4.484 and minus 3.874, you come up with
7  0.61?
8      A    0.61 percent. But if you want
9  to express it as a decimal, you have to put
10  it 0.00061, because 0.1 is 10 percent, of
11  course.
12      Q    Okay. Sure.
13      A    Okay. And that gives me a
14  number of 2 million -- I mean, of -- that
15  gives me a number of 277,550. Okay. Now,
16  why are we -- so we are not -- we are
17  getting a different number here.
18      That would be the annual number
19  we would get if it were being done at 67.
20  So this is -- 61 basis points. So this
21  number is probably more the differential.
22      Q    Which -- which number did you
23  just point to to say it's "probably more
24  the differential"?
25      A    The number -- the number in

## Page 113

Peter Shapiro

1
2  column D, which is what you wanted to solve
3  for, which is the 1,020,875 number.
4      Q    The -- it's -- that 1 million
5  number is the differential of what?
6      A    Between the two fixed rates
7  that we are looking at. It's not the
8  absolute level. So based upon my
9  assumption -- let's run it again, and we
10  will see if I am right.
11      Q    Let's hold on one second. I
12  thought you told me column D was the amount
13  that Washington TSA would expect to earn
14  under 4.484 percent. And then column F was
15  that expected amount discounted?
16      A    No.
17      Q    No?
18      A    I think that's what you were
19  saying. The column D represents the loss
20  per year.
21      Q    Okay.
22      A    Okay. So in other words,
23  the -- that should be what is, so let's --
24  let's run it that way.
25      Okay. What -- remember, what

Page 114

1          Peter Shapiro
2    did we say the loss number was, the loss
3    amount in basis points?
4          Let's look at -- look at --
5    look at our document on page three.  And
6    what it shows the loss was -- how many
7    basis points -- 387, right?
8      Q    I am just listening to what you
9    are telling me.
10     A    I want to make sure you are
11   getting this, though, okay.
12         So let's take 45.5, okay, and
13   got it typed wrong.  45.5, and let's see if
14   this gets to us that number.  And what's
15   sour differential there -- is 0.0387?  Is
16   that correct?
17     Q    0.03874.
18     A    We are rounding anyhow, so we
19   are just trying to make sure we are close.
20   Okay.  And that will produce a number of --
21   I am getting a number of there 1.76 million
22   per year.  Remember, these are semiannual
23   payments.
24         So it's not -- this is not
25   solving to exactly that number.  You know,

Page 115

1          Peter Shapiro
2    this is -- let's -- let's solve it
3    backwards just to see where the number
4    would have come from.
5          Okay.  We have got 102 --
6    1020875 semiannually here.  Okay.  1020 --
7    okay.  So, annually, it's times two, right,
8    so it's a 2040 number.
9          Okay.  And let's divide that,
10   okay, by the principal amount, which is
11   45.5.  Okay.  And we can see there -- my
12   calculator went backwards on here.  Let's
13   do it again the other way.
14         Okay.  Let me just -- let me
15   clear that one back.  We have two -- we
16   have 2040.  Okay.  Okay.  And I divide that
17   by the principal amount, which is 45 -- I
18   will put in 534.  Okay.
19         Okay.  And that produces --
20   yeah, here is what -- the number produces
21   it here is -- sound like a familiar
22   number -- 0.0448.
23     Q    Okay.
24     A    Okay.  So that's -- in other
25   words.  That's the fixed rate on the deal.

Page 116

1          Peter Shapiro
2      Q    Right.  That's what -- that's
3    what column D is --
4      A    Yeah.
5      Q    -- is it's what the fixed rate
6    earnings --
7      A    That's correct --
8      Q    -- would be for Washington TSA?
9      A    That's correct.
10     Q    Okay.
11     A    Okay.  And -- and, you know, so
12   that that -- that is where it's showing
13   with the fixed rate.  So this is what --
14   the other column is showing what the loss
15   is, it looks like.
16     Q    The loss?
17     A    And we're just trying -- we're
18   trying to back-solve what's here.
19     Q    And the loss as calculated in
20   Shapiro Exhibit 26 was just determined by
21   discounting that fixed leg, the 4.484 leg?
22     A    It appears to be.  I can't -- I
23   can't say that for sure.  You know, again,
24   as we are sitting here, we are trying to --
25   as the -- as our discussion reveals, we are

Page 117

1          Peter Shapiro
2    trying to go through and figure this out.
3      Q    And do you recall being the
4    analysis that was done to reach the loss
5    calculation?
6      A    No.
7      Q    So this spreadsheet doesn't
8    reflect the analysis that was done?
9      A    I don't believe so.
10     Q    Do you -- and you don't know
11   why this spreadsheet was created?
12     A    I would have to -- I don't
13   really know.
14     Q    Do you recall reviewing a
15   spreadsheet in 2010 regarding Washington
16   TSA's loss?
17     A    No.
18     Q    So going back to Shapiro
19   Exhibit 25, which is the one that has your
20   note on the front of it, what discount rate
21   did you use in your September 10, 2009,
22   memo to present value the future cash
23   flows?
24     A    The -- in the 2009, you know,
25   James Vergara would have done the

Page 118

```
 1          Peter Shapiro
 2   calculations, not me, so I can't tell -- I
 3   can't tell what it was.
 4       Q    And do you have any records at
 5   Swap Financial Group that would reflect
 6   what the discount -- the discounting
 7   method, whether it was a rate or a curve,
 8   to do this?
 9       A    Anything -- anything that we
10   had, we would have produced.  So if you
11   haven't seen it, we didn't preserve it.
12   You know, it may have been the case it was
13   used in a model which was reused again and
14   again.
15       Q    Does Swap Financial Group use a
16   standard discounting curve for these
17   valuations it does?
18       A    Yes.
19       Q    And what is that?
20       A    The normal discounting curve
21   that would be used is the LIBOR swap curve.
22       Q    Do you have any reason to
23   suspect a different curve was used to
24   discount for the purposes of the valuation
25   done in the Washington RFA?
```

Page 119

```
 1          Peter Shapiro
 2       A    No.  Just to go back --
 3       THE WITNESS:  Can you read back
 4   the question, Tab, that I answered
 5   that Lauri asked right before that:
 6       "What curve do we use for
 7   discounting?"
 8       I just want to make sure that I
 9   answered that accurately.
10       (Reporter read back requested
11   question and answer:
12       QUESTION:  "Does Swap Financial
13   Group use a standard discounting curve
14   for these valuations it does?"
15       ANSWER:  "Yes."
16       QUESTION:  "And what is that?")
17       A    I would add to that, that, in
18   the last two years, there has been a change
19   in market practice on the discounting curve
20   that's used, but not during the time that
21   we're discussing.
22       Q    So at the time we are
23   discussing, it would have been the LIBOR
24   swap --
25       A    LIBOR swap curve, since, you
```

Page 120

```
 1          Peter Shapiro
 2   know, in the last couple of years, there
 3   has been a major shift in the market
 4   towards what is called the OIS curve.
 5       It's not relevant to our
 6   discussions, but I just wanted to make sure
 7   my answer was complete and accurate.
 8       Q    Have you done an analysis of
 9   the Washington TSA valuation using the OIS
10   curve as A discounting curve?
11       A    No.
12       Q    Has anybody under your
13   direction done that?
14       A    No.
15       For the record, the OIS curve
16   would produce a slightly larger loss that
17   Lehman would owe because the OIS curve is a
18   slighter lower discount rate.
19       Q    I am handing you a document
20   that has been marked as Shapiro Exhibit 27.
21   And for the record, this is a copy of the
22   Swap Financial privilege log that has been
23   produced to us in this litigation.
24       (Exhibit No. Shapiro 27, Copy
25   of the Swap Financial privilege log,
```

Page 121

```
 1          Peter Shapiro
 2   is marked by the reporter for
 3   identification.)
 4       Q    Have you seen this privilege
 5   log before, Mr. Shapiro?
 6       A    I don't think so.
 7       Q    Okay.  Were you involved in the
 8   preparation of the privilege log for this
 9   case?
10       A    No.
11       Q    Did you know that a privilege
12   log had been prepared for this case?
13       A    Yes.
14       Q    Do you know how that privilege
15   log was prepared for Swap Financial?
16       A    How?  I know -- I just know
17   lawyers were involved in it.
18       Q    And did you address any
19   questions the lawyers had while they were
20   preparing the privilege log?
21       A    Many conversations with
22   lawyers.  I can't tell whether or not they
23   pertain to their preparation of the
24   privilege log.
25       Q    Okay.  And when you say the
```

Page 122

```
 1          Peter Shapiro
 2  "lawyers," which lawyers are you referring
 3  to?
 4      A    The lawyers who are working on
 5  behalf of Washington TSA.
 6      Q    Specifically, like Pacifica Law
 7  Group?
 8      A    Yes, I think you know there are
 9  two firms that are working on it, those two
10  firms.
11      Q    Do you know which firm was
12  responsible for preparing this, the Swap
13  Financial privilege log?
14      A    No.
15      Q    If you turn to page 22, I
16  double-sided it for conservation purposes.
17      A    I give you a "green" award.
18      Q    Thank you.
19          The first column lists Bates
20  number, and there is a number there.
21  That's what I am going to refer to.
22          If you look at the second entry
23  there, 132291, do you see that?
24      A    Yes.
25      Q    It indicates it's an Excel
```

Page 123

```
 1          Peter Shapiro
 2  spreadsheet from June 2010 prepared by Swap
 3  Financial Group staff. And it describes a
 4  chart illustrating claim amounts for
 5  litigation.
 6          Do you see that?
 7      A    Yes.
 8      Q    Do you recall what this
 9  spreadsheet was that was prepared?
10      A    Not for the life of me.
11      Q    Do you know who would have
12  prepared it from Swap Financial Group's
13  staff?
14      A    Without even looking at the
15  document, I couldn't venture a guess.
16      Q    And would it have been
17  something you would have reviewed?
18      A    Possibly.
19      Q    And if you go down to the next
20  page, entry 132317 indicates there is
21  another Excel spreadsheet from October of
22  2009 that said, "Spreadsheet valuations of
23  the RFA."
24          Do you see that?
25      A    Yes.
```

Page 124

```
 1          Peter Shapiro
 2      Q    And do you know who would have
 3  prepared this spreadsheet in October of
 4  2009?
 5      A    The same answer to this
 6  exactly. I have no -- you know, no idea.
 7  I could venture a guess, Lauri, just
 8  because I know James Vergara would have
 9  been the person working on it at that
10  point.
11      Q    And this would have been
12  prepared just about a month after the
13  September memo that we saw?
14      A    Correct.
15      Q    Do you know why Swap Financial
16  Group was preparing a spreadsheet shortly
17  after that memorandum was prepared showing
18  the valuations of the RFA?
19      A    I could venture a guess, but
20  guessing is not really the right way to
21  approach this.
22      Q    What would be your guess? Why
23  would there be a valuation spreadsheet
24  prepared shortly after the memorandum was
25  prepared?
```

Page 125

```
 1          Peter Shapiro
 2      A    If there had been further
 3  discussions that we had with the Authority,
 4  with counsel, internally, you know, you
 5  know -- you know, we are constantly curious
 6  about our own work, going back and looking
 7  at things and speculating on "what if
 8  this," "what if that."
 9      Q    And that was a regular practice
10  done at Swap Financial Group, to consider
11  other alternatives?
12      A    Yeah.
13      Q    Including after you prepared
14  the memorandum in September of 2009?
15      A    Perhaps.
16      Q    If you turn to the -- to page
17  44.
18      A    44. Yes.
19      Q    If you look at entry 132477,
20  the last one on the page, it's from Lillian
21  Chern to yourself, describing, "Chart for
22  tomorrow, illustrating TSA's claim loss."
23          Do you see that?
24      A    Yes.
25      Q    Do you recall what that chart
```

Page 126

```
 1           Peter Shapiro
 2  was?
 3       A    Not from looking at this.
 4  Again, just for the record, it's the first
 5  time I have looked at this, so --
 6       Q    Okay.  Do you recall a chart
 7  being prepared in May of 2012?
 8       A    Do I recall, a chart of any
 9  kind or a chart meaning this description?
10       Q    Relating to TSA's claim loss?
11       A    You know, I would have to
12  refresh -- when was the mediation?
13       Q    It was on May 8, 2012.
14       A    And this would correspond with
15  exactly that, so we would have been working
16  on a lot of things in preparation for the
17  mediation.
18       Q    And do you recall working on
19  charts for the mediation?
20       A    I recall working -- that we
21  worked on charts for the mediation,
22  illustrations that we may or may not have
23  wanted to use.
24       Q    And what sort of things did you
25  consider in these illustrations?
```

Page 127

```
 1           Peter Shapiro
 2       A    We used it to try to explain to
 3  an intelligent layman like the mediator how
 4  these complex agreements work.
 5       Q    And do you recall any specific
 6  concepts that were used to try to present
 7  those -- present that to the mediator?
 8           MR. LAWRENCE:  Hold on.  Are we
 9  now going to agree that we are
10  exchanging stuff that was prepared for
11  mediation, because I thought that
12  we -- both sides had taken the
13  position that mediation materials were
14  not subject to discovery.  Maybe I am
15  wrong.
16           MS. SAWYER:  I think our
17  position is that we did not designate
18  the expert we used for mediation as a
19  testifying expert, which opens him up
20  to know what he considered and what he
21  learned as part of that process.
22           MR. LAWRENCE:  You know, I
23  think you are potentially -- and I
24  don't mean that in a bad way -- but I
25  think you understand perfectly well
```

Page 128

```
 1           Peter Shapiro
 2  that when a person like Mr. Shapiro
 3  does work that was used in support of
 4  a claim, which he did, he is both
 5  bringing to the fore some degree of
 6  factual and expert testimony.
 7           For the purposes of trying to
 8  make sure there was no dispute about
 9  using what he had done to support the
10  claim, we designated him so that you
11  wouldn't argue about whether or not we
12  should have designated him or not
13  because, obviously, some expertise
14  went into that April -- I think it
15  was, I guess -- I forget it was a
16  September date.
17           So I don't think that that has
18  anything to do with waiving the use of
19  him at mediation, so we are not going
20  to -- you know, unless you are willing
21  to say mediation is open ground, we
22  can agree to disagree about this
23  subject.
24           But we are not going to get
25  into mediation matters so --
```

Page 129

```
 1           Peter Shapiro
 2           MS. SAWYER:  You can instruct
 3  him not to answer.  I think I am
 4  entitled to lay my record.  And, you
 5  know --
 6           MR. LAWRENCE:  Sure.
 7           MS. SAWYER:  -- we are not --
 8  we are not agreeing that mediation is
 9  open ground because we were careful as
10  to the expert we used at mediation
11  versus the expert we designated here.
12           MR. LAWRENCE:  I didn't realize
13  you used an expert at mediation, but
14  that's fine.
15           MS. SAWYER:  So are you
16  instructing him not to answer that
17  question?
18           MR. LAWRENCE:  Why don't we go
19  back to the question, and then we
20  can -- I can or you can -- if you're
21  going to continue to ask the
22  questions, you need to either restate
23  it or go back.  Either way, that's
24  fine.
25           MS. SAWYER:  I think I had
```

Page 130

Peter Shapiro

1  asked a question, so I think there was
2  a question pending.
3  
4       (Reporter read back pending
5  question:
6       QUESTION: "And do you recall
7  any specific concepts that were used
8  to try to present those -- present
9  that to the mediator?")
10     A   Yes.
11     Q   And what were those concepts?
12         MR. LAWRENCE:  And I will
13  instruct you not to answer that
14  question.
15         MS. SAWYER:  On the grounds of
16  work product or mediation?
17         (There was an instruction not
18  to answer.)
19         MR. LAWRENCE:  Mediation.
20     Q   If you could turn to page 68,
21  entry number 132608.
22     A   Yes.
23     Q   It talks about "Lehman
24  alternative loss calculation from June of
25  2012."

Page 131

Peter Shapiro

1       Do you see that?
2  
3     A   Yes.
4     Q   Do you recall what alternative
5  loss calculation was done in June of 2012?
6     A   I recall alternative loss
7  calculations that we did.  I can't tell
8  whether those were being done in June or
9  prior to that date.
10     Q   And what alternative loss
11  calculations do you recall doing?
12         MR. LAWRENCE:  If they were
13  with regard to the mediation, I would
14  instruct you not to answer.
15  Otherwise, you can answer.
16     A   Then I will say I can't answer.
17         (There was an instruction not
18  to answer.)
19     Q   You don't recall doing any
20  alternative loss calculation other than in
21  connection with the mediation?
22     A   No.
23     Q   Including the one that we
24  potentially looked at from October of 2009
25  with Mr. Vergara prepared another

Page 132

Peter Shapiro

1  spreadsheet?
2  
3     A   I wouldn't characterize that as
4  an alternative loss calculation.  He was
5  using the same methodology.
6     Q   And you had testified, I
7  believe, earlier that Swap Financial Group
8  constantly looks back at the valuations it
9  had done and reassessed them, correct?
10     A   I said that -- I didn't say we
11  constantly did that.  I said, as part of
12  our work, we would continually review
13  various aspects of our work, always curious
14  to try to make sure we were thinking of
15  every angle and thinking about things
16  correctly and updating assumptions for new
17  thoughts we might have.
18     Q   And in connection with the
19  Washington TSA dispute, do you recall
20  updating your assumptions?
21         MR. LAWRENCE:  Again, to the
22  extent that it was not done for
23  purposes of the mediation, I don't
24  have a problem with him answering the
25  question.  I don't know if you want to

Page 133

Peter Shapiro

1  break the question down to make the
2  record clearer.
3  
4         MS. SAWYER:  I think I just
5  asked if he recalled.  Maybe I
6  didn't --
7         MR. LAWRENCE:  That's fine.
8  You can answer that question.
9     A   Yes.
10     Q   Do you recall updating your
11  assumptions for purposes of the mediation?
12     A   Yes.
13     Q   And do you recall updating your
14  assumptions other than for purposes of the
15  mediation?
16     A   When you say "updating," Lauri,
17  what do you mean there?  Do you mean where
18  we -- you know, an "update" could mean you
19  reran a model based upon those assumptions,
20  or it means you questioned them,
21  reconsidered them, thought about them some
22  more.
23     Q   It's difficult for me clarify
24  because I don't know what your process was
25  in preparing your expert opinion, so you

Page 134

```
1           Peter Shapiro
2  had indicated that you --
3       A    Preparing the expert opinion,
4  no.
5       Q    And so the only updating of any
6  assumptions that you did would have been in
7  connection with the mediation?
8       A    And in thinking through the
9  issue with regard to litigation.
10      Q    And did you learn anything as
11 part of the mediation process that caused
12 you to update your assumptions?
13      A    When you use the word
14 "assumptions" there, do you mean -- when an
15 analyst thinks about assumption, they often
16 mean the literal inputs that they use,
17 inputs like, for example, the one you have
18 asked a lot of questions about, about the
19 credit spread.
20           There is another way to think
21 of the word "assumptions"; and that is
22 assumptions in a bigger sense than just
23 inputs, about how you value a complex
24 illiquid contract like this.
25      Q    I would say in the more broad
```

Page 135

```
1           Peter Shapiro
2  sense?
3       A    In the broader sense
4  absolutely.
5       Q    And what did you learn as part
6  of the mediation process that impacted your
7  analysis?
8           MR. LAWRENCE: I think -- I
9       instruct him not to answer that
10      question.
11           (There was an instruction not
12      to answer.)
13           MS. SAWYER: On the grounds?
14           MR. LAWRENCE: Mediation
15      privilege.
16           MS. SAWYER: I think, just --
17      just for purposes of clarity, I think
18      that the law is quite clear that any
19      facts or data that he considered in
20      reaching his opinion are a subject for
21      us to know.
22           MR. LAWRENCE: I --
23           MS. SAWYER: I understand your
24      position.
25           MR. LAWRENCE: I am not
```

Page 136

```
1           Peter Shapiro
2  guessing agreeing.
3           MS. SAWYER: I am just -- I am
4      stating ours clearly for the record.
5           MR. LAWRENCE: And I don't
6      disagree with that generally, but I
7      don't see how, since his opinion was
8      prior to the mediation, how the
9      question implicates that. But I think
10     we can argue about that later.
11          (There was a discussion off the
12     record.)
13      Q    If you turn to page 37 of the
14 privilege log --
15          MR. LAWRENCE: Going back to
16     37.
17      Q    Sorry. I skipped ahead too
18 far. There is two entries 132430, and
19 132431. And these both appear to be Word
20 documents created by yourself in June of
21 2013, which indicate that they're notes
22 regarding Lehman discovery.
23          Do you see that?
24      A    Yes.
25      Q    And do you recall creating
```

Page 137

```
1           Peter Shapiro
2  notes about the Lehman discovery?
3       A    Yes.
4       Q    And what -- what were you
5  taking notes on?
6       A    Discussions about the Lehman
7  discovery.
8       Q    So there were notes of
9  discussions that were had, or were there
10 notes of reviewing the discovery?
11      A    I can't tell from this.
12      Q    Do you recall looking at the
13 Lehman discovery and taking notes?
14      A    When you say "looking at the
15 Lehman discovery," tell me what you mean by
16 that term.
17      Q    Like the documents that were
18 being produced by Lehman or the questions
19 that were being asked by Lehman.
20      A    The questions being asked by
21 Lehman of TSA or the questions being asked
22 of Lehman by TSA?
23      Q    Either way.
24      A    I recall discussing those, you
25 know, those -- both of those issues.
```

Page 138

Peter Shapiro

1
2    Q    Specifically, what do you
3    recall taking notes on?
4    A    I -- my -- I am just trying to
5    recall to the best of my ability now.  But
6    I recall specifically taking notes on what
7    we requested of Lehman.
8    Q    And what were you noting?
9    A    I was noting all of the things
10   that I would want to see.
11   Q    So do you believe these are
12   notes of things that you would want
13   Washington TSA to request from Lehman?
14   A    I can't tell from this.
15   Q    But you recall making such
16   notes?
17   A    I recall making notes on that
18   subject specifically.  I don't know if they
19   are these notes.
20   Q    Do you recall looking at the
21   documents Lehman produced in discovery?
22   THE WITNESS:  Could you say --
23   read that back, please, for me.
24   (Reporter read back pending
25   question.)

Page 139

Peter Shapiro

1
2    A    When you say the "documents,"
3    do you mean all of the documents?
4    Q    Any of the documents.
5    A    Yes.
6    Q    Okay.  And how did you get
7    access to those documents?
8    A    Through the -- through counsel.
9    Q    And were you given specific
10   documents by counsel?
11   A    Yes.  I can't be given
12   nonspecific documents, I don't believe.
13   Q    Well, you could be given access
14   to a database of documents that you could
15   have looked at.
16   A    No, I wasn't give access to a
17   database.
18   Q    And how where the documents you
19   were given by counsel, how were they
20   identified?  Did you request them?
21   A    I believe so.
22   Q    And what sort of requests would
23   you make for documents?
24   A    Ones that piqued my curiosity.
25   Q    And do you recall the specific

Page 140

Peter Shapiro

1
2    categories of documents you asked for?
3    A    Somewhat.
4    Q    What are those?
5    MR. LAWRENCE:  Go ahead.
6    THE WITNESS:  Should I answer
7    that?
8    MR. LAWRENCE:  Yes.
9    A    Specific documents as to -- as
10   to how Lehman would have valued the
11   document -- the agreement when it was
12   entered into.
13   Q    Anything else?
14   A    Not that I can recall.
15   Q    And what documents do you
16   recall being given?
17   A    I would have to go back and
18   look.  I haven't -- you know, I have to
19   refresh my memory.
20   Q    Do you recall sitting here any
21   specific documents you were given that
22   Lehman produced?
23   A    As I am sitting here, I'm not
24   recalling any -- anything specifically.
25   Q    And --

Page 141

Peter Shapiro

1
2    A    I know we have been back and
3    forth on this.
4    Q    How were the documents given to
5    you?
6    A    They may have been shown to me
7    by counsel or E-Mailed to me by counsel, I
8    think.  I have to go back and refresh my
9    memory.  I think -- you know, I have to go
10   back and check.
11   Q    What would you check?
12   A    I'd check, you know, my
13   E-Mails; and to the extent that they are
14   not there, I'd have to assume anything I
15   saw was shown to me by counsel.
16   Q    And do you recall seeing any
17   documents that address the issue about
18   Lehman would have valued the contract?
19   A    At inception?
20   Q    Um-hum.
21   A    We have talked about this.  I
22   have talked about this back and forth.  You
23   know, I have to refresh to see what we --
24   what -- how much I am recalling based upon
25   conversations with counsel and how much

## Page 142

Peter Shapiro

1  based upon documents I saw.
2  
3      Q    Do you recall seeing any
4  documents that gave you any insight into
5  that issue?
6      A    If I -- if I had, it would have
7  been, you know, more than a couple of
8  months ago.  So my recollection is a little
9  fuzzy on this.
10      You know, I took a long
11  vacation between when that happened and
12  when I came back, and I allowed my mind to
13  go a little blank during the vacation.
14      Q    Do you recall approximately
15  when you would have seen these documents?
16      A    I went away on vacation January
17  14th, so it would have been prior to that.
18      Q    Would it have been prior to
19  your last deposition?
20      A    I can't recall.
21      Q    If you could turn to page 55 of
22  the privilege log, entry 132533.
23      A    Okay.  Hang on just one second.
24      533?
25      Q    Yes.  It indicates it's a PDF

## Page 143

Peter Shapiro

1  
2  of notes of Lillian Chern from October of
3  2013 --
4      A    Right.
5      Q    -- regarding maturity date
6  valuation and termination date.
7      Do you see that?
8      A    Yes.
9      Q    Do you recall seeing any of
10  Ms. Chern's handwritten notes in the fall
11  of 2013?
12      A    No.
13      Q    Have you at any time seen any
14  of Ms. Chern's handwritten notes regarding
15  the RFA?
16      A    No.
17      Q    Have you seen any handwritten
18  notes by any of your other colleagues
19  regarding this RFA?
20      A    No.
21      Q    And do you personally keep
22  handwritten notes?
23      A    I don't.
24      Q    The notes we looked at before,
25  they were Word documents?

## Page 144

Peter Shapiro

1  
2      A    Correct.
3      Q    Is that the way you generally
4  would keep your notes regarding a matter?
5      A    Yes.
6      Q    And do you take notes on
7  specific topics, or do you kind of keep
8  running notes on a -- on a given matter?
9      A    It's ad hoc.  It depends on
10  what's going on.
11      Q    Do you recall in this situation
12  how you kept track of your notes?
13      A    Which aspects of this
14  situation?
15      Q    The Washington RFA dispute
16  which has been going on for many years,
17  have you kept track of your notes?
18      A    In a variety of different ways.
19  Often, I am traveling for business, so I'm
20  not in a position to take notes; so, you
21  know, you have circumstances like that.
22      When I am in a position to take
23  notes in the office, sometimes I do;
24  sometimes I don't.  Sometimes I pop up a
25  blank Word screen and just write out some

## Page 145

Peter Shapiro

1  
2  things just to keep track of the
3  conversation so I don't forget to return to
4  a topic I want to -- have something I want
5  to mention to the person I am speaking
6  with.
7      In that case, usually, I just
8  will, you know, not retain those, just
9  erase them after the conversation has gone
10  over, or, rather than erase them, just not
11  save them.
12      In other cases, I may actually
13  keep some notes like the ones that you see
14  references to.
15      Q    Do you have a file where you
16  keep notes relating to the Washington TSA
17  dispute?
18      A    You know, I keep them in -- I
19  will save them to that folder if I am
20  retained, yes.
21      Q    Is that an E-Mail folder, or do
22  you have another folder on your computer?
23      A    It's a -- it's a Word document.
24  It's not saved.  It's an E-Mail.  It's
25  saved in a folder that is dedicated to that

Page 146

Peter Shapiro

1
2  client.
3      Q    And would you save Excel
4  spreadsheets or other things there as well?
5      A    Yes, assuming, Lauri, I chose
6  to save them, of course.
7      Q    Of course.
8          If you could turn to page 78,
9  entry 132682, which is the second line,
10 it's a Word document created by you.  And
11 it says:
12         "Notes on Wash Tobacco,
13 internal notes discussing TSA claim with
14 Lehman, Lehman bankruptcy."
15         Do you see that?
16     A    Correct.
17     Q    And this was created in the
18 summer of 2010; do you see that?
19     A    You know, you are saying
20 "created."  That's just the date that's on
21 it.  Yeah, that may have been the last
22 update.  It may have been created earlier.
23     Q    So it might have been a running
24 document that you updated?
25     A    I can't tell.

Page 147

Peter Shapiro

1
2      Q    All right.
3      A    I just -- you used the word
4  "created."  I didn't want to agree with
5  that word.
6      Q    Do you know -- do you know what
7  you were noting in the summer of 2010 in
8  this Word document?
9      A    No.
10     Q    And then the next entry,
11 132684, it's an Excel spreadsheet from
12 April 2012 from Bob Cook, regarding "Lehman
13 mediation statement."
14         Do you see that?
15     A    Yes.
16     Q    Do you recall what that
17 spreadsheet was for Mr. Cook?
18     A    Based upon this entry with a
19 date and a time, no idea.
20     Q    Do you recall Mr. Cook
21 providing Excel spreadsheets to you?
22     A    Yes, I do.
23     Q    Okay.  And this is not an
24 isolated incident of the spreadsheet
25 showing up or spreadsheets for Mr. Cook

Page 148

Peter Shapiro

1
2  showing up in this log.  Do you recall what
3  those spreadsheets discussed or contained?
4      A    What this spreadsheet was?
5      Q    In general, you said you
6  recalled receiving spreadsheets from
7  Mr. Cook?
8      A    Yes.
9      Q    What topics were those
10 spreadsheets on?
11     A    He was looking at -- the ones
12 that I recall had to do with Lehman -- with
13 TSA's accumulative loss due to Lehman's
14 failure to honor its agreement.
15     Q    And do you recall him providing
16 that spreadsheet on a regular basis?
17     A    No.
18     Q    Occasional basis?
19     A    Occasional.
20     Q    Do you recall him providing
21 spreadsheets containing any other
22 information?
23     A    I'm not recalling.  There may
24 have been, but I'm not recalling.
25     Q    And you can't tell from this

Page 149

Peter Shapiro

1
2  entry whether that is that spreadsheet or
3  not?
4      A    Yeah, I don't think anybody
5  could unless they had, you know, an idiot
6  savant like memory for dates and time.
7      Q    I would agree.  I would agree.
8          THE WITNESS:  "Idiot savant,"
9  Tab, you have that one?
10         THE REPORTER:  Yes.
11     Q    If you go to page 86, entry
12 132755, which is a Word document dated
13 June 2010, which is your internal notes
14 again.
15         Do you recall what these
16 internal notes were about?
17     A    I can't tell.
18     Q    The next entry is 132760, which
19 is an Excel spreadsheet created by Lillian
20 Chern in August of 2010.  It's an internal
21 spreadsheet on "termination amount in
22 claim."
23         Do you see that?
24     A    Yes.
25     Q    Do you recall what analysis she

Page 150

```
 1            Peter Shapiro
 2  was conducting in the summer of 2010?
 3       A    I don't.
 4       Q    Would you have -- were you
 5  working with Ms. Chern in the summer of
 6  2010 as to the Washington matter?
 7       A    She -- as I -- as I have
 8  testified before, all of us sit together as
 9  a team; so everyone has to juggle multiple
10  tasks continually.  So I would have been
11  working with her throughout that period on
12  matters that pertain to something as
13  important as this claim.
14       Q    And then if you look down at
15  132768, the last entry on this page, it's
16  from May of 2012.  It's a Word document of
17  Lillian Chern.  It says:
18            "Internal notes regarding RFA
19  and bond."
20            Do you see that?
21            Did you ever see any of her
22  typewritten notes that she prepared
23  regarding this matter?
24       A    No.
25       Q    Would you have discussed -- but
```

Page 151

```
 1            Peter Shapiro
 2  you would have discussed this matter with
 3  her?
 4       A    Yes.
 5       Q    On a -- on a regular basis,
 6  when appropriate basis?
 7       A    On a "when appropriate" basis,
 8  you know, over a -- obviously, a very
 9  extended period of time on a continual
10  basis.
11       Q    If you turn to page 89 --
12       A    Yes.
13       Q    -- the first entry 132784,
14  which is an Excel spreadsheet from
15  September of 2012, from -- created by
16  Lillian Chern.  It says:
17            "Spreadsheet of claim variables
18  in components for calculation of claim."
19            Do you see that?
20       A    Right.
21       Q    Do you recall what that
22  spreadsheet is about?
23       A    I can't tell from this.
24       Q    Do you know what "claim
25  variables" might refer to?
```

Page 152

```
 1            Peter Shapiro
 2       A    I don't know what she would
 3  have meant by that.
 4       Q    Do you recall in the summer
 5  of -- or September of 2012, so after the
 6  mediation, do you recall there being
 7  analysis of the claim variables and the
 8  calculation of the claim?
 9       A    I can't recall.  I really --
10  you know, as I said, this is subject of
11  continual on-and-off discussions.
12       Q    But does this refresh your
13  memory that, even after the mediation,
14  there was still discussions about the
15  valuation of the claim going on at Swap
16  Financial?
17       A    You know, as I have said, we
18  have had -- we continually have discussed
19  this subject when the mediation failed --
20  and I'm not sure if the mediation had even
21  failed by -- at this point.
22            The mediation still may have
23  been open, Lauri.  Do you know the date it
24  was declared closed?
25       Q    I don't sitting here.
```

Page 153

```
 1            Peter Shapiro
 2       A    You know, it's possible there
 3  were -- if the mediation remained open, and
 4  there were still queries about it, we would
 5  have been thinking about it in that regard.
 6            Once the mediation closed, we
 7  may have been anticipating litigation and
 8  thinking about that.
 9       Q    What sort --
10       A    You know, it's an important
11  matter.  This is, you know -- you know,
12  more than 40 million, you know, which a
13  public entity has not been paid.  It's owed
14  to them.
15       Q    Do you recall any of the
16  internal discussions that took place at
17  Swap Financial Group about the valuation of
18  the claims, the types of discussions that
19  you are talking about?
20            MR. LAWRENCE:  At any time
21       or --
22       A    Do I recall the internal
23  discussions?
24       Q    Yes.
25       A    As I said, we have had
```

Page 154

1         Peter Shapiro
2    continual discussions on this.
3         Q    And what sorts of things have
4    you discussed?
5         A    We have discussed, you know,
6    all of the -- all of elements of how you
7    think about valuing something like this
8    which is illiquid, you know, where there is
9    a closed market, where the market didn't
10   exist, how would you would properly value.
11        We, you know, looked at the
12   questions which Lehman has posed and
13   discussed them internally.  And we take
14   them very seriously.
15        We look at the questions of how
16   you -- how you value it using alternative
17   methodologies in the absence of the ability
18   to replicate the agreement.
19        You know, we have discussed how
20   you would look to reinvest the funds, in
21   the agg -- you know, on a continual basis.
22        As you know, we have discussed
23   ways in which we might crystallize the
24   claim or even sell the claim absent
25   crystallization, you know, all of those

Page 155

1         Peter Shapiro
2    kinds of things.
3         Q    What elements of valuation do
4    you recall discussing with members of Swap
5    Financial Group?
6         A    All of the ones I have just
7    outlined.
8         Q    You indicated that the first
9    thing you remember discussing would be the
10   different elements of the valuation.
11        What are those different
12   elements of the valuation of an illiquid
13   product like this?
14        A    In terms -- when you ask the
15   question in terms of the elements of
16   valuation, using the hypothetical
17   replication method that was used in the
18   loss memo, using alternative loss
19   calculations --
20        Q    I am trying to ascertain what
21   discussions took place at Swap Financial
22   Group.  So if you did both of those, we can
23   take them one at time.
24        A    Yes, we have done all of those.
25        Q    So what elements of valuation

Page 156

1         Peter Shapiro
2    have you discussed at Swap Finance Group
3    regarding your hypothetical swap valuation
4    methodology?
5         A    We revisit all of our inputs
6    and look at those inputs, and, when there
7    are questions, scratch our heads again and
8    legitimately go back and say:
9         "You know, do -- does Lehman's
10   counsel have a point here that they are
11   trying to make?  How do we look at that
12   point?  How do we beat it up and think
13   about it every which way?"
14        We look at the credit spread.
15   We look at the CP spread, you know, the
16   deliverables spread to express it
17   correctly, "deliverables" with a plural.
18        You know, we look at the profit
19   margin.  We look and see if we have left
20   out anything that we should be thinking
21   about.  We try to be meticulous and
22   thorough in our work here and revisit and
23   not to be arrogant that we know all the
24   answers.
25        Q    What discussions do you recall

Page 157

1         Peter Shapiro
2    having about the credit spread?
3         A    You know, we have looked at the
4    credit spread, you know, multiple ways.  We
5    have looked at:
6         How do you -- how do we try to
7    get to a credit spread?
8         And we look at, also:
9         What do we mean by a "credit
10   spread" in this set of circumstances, where
11   there is no market?
12        Q    So what are the multiple ways
13   you looked at the credit spread in this
14   situation?
15        A    We look at -- you know, look
16   at:
17        How do you -- how do you
18   determine a credit spread?
19        You don't have a CDS market.
20   You don't have dealers saying where they
21   would do this or live quotes because you
22   have a closed market, a market that's shut
23   down.
24        And, you know, then how do
25   you -- how do you look at it?  You look at

Page 158

1    Peter Shapiro
2  the bond spread, which is what we used,
3  what's that bond spread appropriately. We
4  spread it from -- as you know, a -- you
5  know, a strong credit, but not a triple A
6  credit.
7         If you looked at other ways to
8  do it, you could have spread it to a triple
9  A credit. That would have made the credit
10  spread even wider. So, you know, we looked
11  at that question.
12         We looked at the question of,
13  you know:
14         How appropriate is it to use
15  the -- to use the bond spread, one of the
16  questions which your people had raised
17  questions about extensively?
18         What are the pros and cons of
19  using a bond spread and reexamining that?
20  What is contained within a bond spread, and
21  what's not contained within a bond spread?
22         You know, and then looking
23  beyond that, when we say "credit spread" --
24  and I said this in my prior deposition
25  testimony.

Page 159

1    Peter Shapiro
2         To a certain extent, there are
3  multiple concepts which get introduced
4  through the aggregate spread, meaning
5  credit spread, deliverable spread, profit
6  margin.
7         There is a certain extent to
8  which there is a fungibility between those
9  elements. In other words, the firm -- a
10  bank itself would look at its aggregate
11  spread and say:
12         "Are we compensating ourselves
13  all-in for all of the risks we are taking,
14  and the profit we should be paid for taking
15  on those risks?"
16         And looking at it as a whole
17  and saying:
18         "Okay. Are we close on this?
19  Should we cover ourselves? Should we be
20  wider because we can't hedge these risks?
21  We don't really know if it's being
22  appropriately priced. We don't have an
23  active market. Where do we put that
24  spread?"
25         So we have reexamined all of

Page 160

1    Peter Shapiro
2  those assumptions again and again to look
3  at whether or not our number felt right.
4    Q    In terms of the credit spread
5  specifically, other than comparing the bond
6  to a triple A index, did you calculate a
7  credit spread in any other alternate ways?
8    A    I don't think so. There is no
9  alternate way to calculate it.
10    Q    Have you seen Mr. Greuer's
11  expert report?
12    A    Yes.
13    Q    And he calculates a credit
14  spread based on the Bloomberg CVA function?
15    A    Right.
16    Q    Did you consider calculating a
17  credit charge based on that?
18    A    No, we think he's wrong.
19    Q    And why do you think he's
20  wrong?
21    A    He doesn't -- doesn't --
22  doesn't account for lots of elements in
23  here.
24    Q    Account for lots of elements in
25  the credit spread?

Page 161

1    Peter Shapiro
2    A    Yes, he misses -- he misses --
3  you know -- and I'm not going to
4  characterize why he misses them; he's
5  obviously on your side and trying to
6  minimize what you owe the public in this
7  case.
8         The -- but, you know, he's come
9  up with numbers which exaggerate very much
10  and inaccurately on the low side.
11    Q    Using the Bloomberg CVA
12  function?
13    A    Using that is well as other
14  inputs.
15    Q    And did you consider using the
16  Bloomberg CVA function to determine a
17  credit charge?
18    A    I don't know if James did. He
19  might have thought about that. But I
20  didn't specifically go back to him and say:
21         "Hey, what if you fed this into
22  Bloomberg CVA?"
23         I am trying to remember when
24  Bloomberg initiated CVA function, if they
25  even had it in place in '09. CVA may be

Page 162

                Peter Shapiro
1
2    newer than that.
3        Q    But in your subsequent
4    discussions, did you ever consider using
5    the Bloomberg CVA function?
6        A    No.
7            MS. SAWYER:  We can take a
8    break.  Thank you.
9            (There was a discussion off the
10    record.)
11            (There was a lunch break off
12    the record.)
13        Q    So before the break you had
14    listed several things that you had
15    discussed internally at Swap Financial
16    relating to the Washington valuation after
17    the memo was prepared in September of 2009.
18            One of the things you mentioned
19    that was discussed internally at Swap
20    Financial was alternative methodologies.
21    What alternative methodologies did you
22    discuss among your colleagues at Swap
23    Financial?
24        A    Alternative ways to value the
25    contract is what you mean by "alternative

Page 163

1            Peter Shapiro
2    methodologies," I assume.
3        Q    Okay.
4        A    And, you know, we called the
5    base methodology, the one that's used in
6    the loss memorandum, hypothetical
7    replication, in the absence of any true
8    replication, because, as both sides have --
9    have pretty much agreed, there was no
10    market.
11            So we say that's a hypothetical
12    replication, so you are trying to say, if
13    there were a market, where would it be
14    priced.  It's a -- you know, you are
15    getting out on a -- on a long branch that
16    could get thin as you start to think about
17    that obviously, so then you look at other
18    ways to do it.
19            We looked principally at two
20    other ways.  One is to say:
21            Is there a similar financial
22    contract type of financial agreement that
23    would replicate in most respects the RFA.
24            And the other way we look at it
25    was to say:

Page 164

1            Peter Shapiro
2            Okay.  Assume there is no other
3    way to replicate closely.  What would be
4    Washington's loss?  What would be TSA's
5    loss if it could only stay in short-term
6    investments as are permitted under its
7    indenture?
8            Those -- those were the two
9    principal alternative methodologies we
10    examined.
11        Q    And in looking at the first
12    one, a similar financial contract that
13    would replicate the terms of the RFA, did
14    you reach a conclusion as to whether there
15    was such a similar financial contract
16    available?
17        A    We looked at -- at the
18    alternative of using two different kinds of
19    swaps.  Remember what a swap does.  A swap
20    pays one party fixed, and the other party
21    floating, right.
22        Q    Right.
23        A    And under the RFA, you are
24    having the same kind of cash flows; that
25    is, Washington is receiving fixed and

Page 165

1            Peter Shapiro
2    giving up the floating that it's earning on
3    its continually revested short-term
4    investments.
5            So we said:
6            What if instead -- if we can't
7    do a forward purchase agreement, if instead
8    what we do is say:
9            "Okay.  Washington, you
10    reinvest the funds yourself in short-term
11    instruments that are permitted under your
12    indenture.  And then, in addition -- in
13    order to try to create a fixed yield, you
14    enter into a swap where you receive fixed
15    from a dealer and pay floating to the
16    dealer."
17            Simple as that, to think about
18    the underlying structure.
19            And then we had to say:
20            Okay.  How do we deal with the
21    various risks in that, to make it so it is
22    like the deal, that it had like the
23    bargain, if I put it that way, that it had
24    with Lehman?
25            One of the -- probably, the

Page 166

```
 1          Peter Shapiro
 2  most fundamental issue you have to look at
 3  is the RFA very importantly gave TSA the
 4  right to be able to invade it at any time,
 5  to cash out of it at any time without
 6  paying a premium or a penalty.
 7          And, you know, it's basically
 8  thinking of that at six-month intervals
 9  because you have got six-month instruments
10  underlying.  So we said:
11          Let's construct a swap that
12  looks like that.  How much would TSA get
13  paid under a swap where it had the right to
14  be able to cash out of that swap at par at
15  each six-month interval?
16          So we priced that up.
17          We looked at that, at the
18  critical issue of credit spread; that is:
19          What would the dealer charge as
20  a credit spread for facing a tobacco entity
21  where it came at the bottom of the
22  waterfall?
23          Okay.  In other words, the
24  bank, anything it needed to collect in the
25  event there was a default, would be --
```

Page 167

```
 1          Peter Shapiro
 2  would be subordinated to other obligations
 3  of the Authority.
 4          And what we found in
 5  conversations with dealers and what makes
 6  sense to us intellectually, was, if we had
 7  the six-month par put or par call, if you
 8  want to look at it that way, if they had
 9  the right -- if TSA had an up-front right
10  to terminate at par every six months, the
11  dealers would view that as not -- as
12  insignificant credit exposure because
13  credit exposure derives from the
14  circumstance, where, upon termination, TSA
15  would owe the dealer something.
16          If every six months they can
17  terminate at par, there is almost no
18  circumstance where there is a substantial
19  amount that could be owed to a dealer.
20          So we knew that would not have
21  a credit problem.  They wouldn't have this
22  credit spread issue, which was otherwise a
23  real impediment to finding an alternative.
24          So that -- that was scenario --
25  that was swap one that we looked at.
```

Page 168

```
 1          Peter Shapiro
 2  Q    Okay.
 3  A    Okay.
 4  Q    Did you put a value on that?
 5  A    Yes.
 6  Q    And what was that value?
 7  A    I don't have it in front of me,
 8  but it produced a value substantially
 9  similar to what the loss was.  It was very
10  close.
11  Q    Do you have -- do you have
12  records showing what that value would be?
13  A    We have materials that we used
14  in the mediation on this because we
15  actually did this as part the mediation.
16          So to the extent this gets into
17  the mediation privilege, I defer to counsel
18  on this.
19  Q    Did you do it before the
20  mediation?
21  A    In preparation for the
22  mediation.
23  Q    And why did you do it in
24  preparation for the mediation?
25  A    As we thought about these
```

Page 169

```
 1          Peter Shapiro
 2  questions more deeply.
 3  Q    And, again, do you have records
 4  that would show what the valuation --
 5  A    Yes.
 6  Q    -- is?
 7  A    Yes.
 8  Q    And what would those records
 9  be?
10  A    What would they be?
11  Q    Is there a memorandum that was
12  prepared?
13  A    I believe so.  Yeah.
14  Q    That was given to TSA?
15  A    For the mediation, for the
16  mediation.
17  Q    Let me ask my question again.
18          So there was a memorandum
19  prepared for Washington TSA at or about the
20  time of the mediation?
21  A    Yes.
22  Q    That was actually given to
23  them?
24      MR. LAWRENCE:  You can say
25  whether it was or not.
```

Page 170

```
 1            Peter Shapiro
 2       A    Yes.
 3            MS. SAWYER:  Okay.  I would
 4    request a copy of that memorandum.
 5            MR. LAWRENCE:  Take that under
 6    consideration.
 7            (Memorandum prepared for
 8    mediation requested.)
 9       Q    You said that was the first of
10    the swaps you considered.  What was the
11    second swap you considered?
12       A    The second swap we said is:
13            Okay.  Just for the sake of it,
14    let's ignore the legal provisions of the --
15    of the indenture and the FPA, the critical
16    provision being the need to invade the
17    reserve fund, in other words, the need to
18    be able to have a par cancellation option
19    on the swap.
20            And let's say we don't really
21    need that for the first several years, and
22    that the first event that we would need
23    that at would be at the expected -- the
24    earliest expected redemption date on the
25    bonds, assuming that -- contrary to the
```

Page 171

```
 1            Peter Shapiro
 2    history that has been experienced so far,
 3    we would end up with an early redemption
 4    due to what are referred to as the "super
 5    sinkers," if you know what I -- what I mean
 6    there.
 7       Q    The turbo bonds?
 8       A    The turbo bonds, yeah, yeah,
 9    exactly.
10            And, you know, the turbo bonds
11    depended on a certain level of receipts
12    under the tobacco settlement, which has
13    been slower and slower as -- you know,
14    thank goodness smoking has declined, you
15    know, generally -- and as there have been
16    problems with participating manufacturers
17    under the master settlement agreement.
18            But we said:
19            Let's look at that as just a
20    hypothetical.  What if we really thought:
21            Okay.  We don't really
22    quote-unquote need that par cancellation
23    option in this swap structure until the
24    earliest possible date that we think is
25    realistic for early redemption of the
```

Page 172

```
 1            Peter Shapiro
 2    bonds, in the event that we have, you know,
 3    realized tobacco revenues that would allow
 4    are those turbo bonds to take effect.
 5            So we said:
 6            Let's -- let's examine a swap
 7    that would look like this, no call.  The
 8    first par call would not be until a
 9    designated date, 2019, 2022, whatever we
10    thought was the earliest reasonable date.
11            And then subsequent to that, it
12    would be every six months.  And we examined
13    that also, an alternative.
14            Now, that, Lauri, presents a
15    different issue with regard to credit,
16    because, now, the swap dealer is going to
17    be concerned about its credit exposure to
18    Washington TSA.  It's going to say:
19            "Hey, there is not a par call
20    until whatever that first day is.  And
21    during that period of time, I, Mr. Bank, am
22    exposed to the risk that Washington
23    would -- would be unable to pay me.
24            Okay.  So we discussed that
25    with a number of dealers in the market and
```

Page 173

```
 1            Peter Shapiro
 2    said:
 3            "How much of a credit spread
 4    would you need on that?"
 5            And what came back was very
 6    little enthusiasm for the structure.  And
 7    if it were to be done, they would basically
 8    hypothecate an early termination option at
 9    around two years.  In other words, they
10    would build it, the pricing of it as though
11    Washington had a par termination at two
12    years, in other words, to limit their
13    credit exposure to TSA to only two years by
14    embedding an implied par call at that
15    two-year point.
16            Guess what?  It produces a
17    similar loss amount once you do that to the
18    first swap structure that had six-month
19    calls anyhow.
20            So we didn't get the -- we were
21    hoping we could get a lower loss amount, a
22    higher replacement value by that structure,
23    but we couldn't.
24       Q    And which dealers did you talk
25    to about the second swap?
```

Page 174

Peter Shapiro

1
2      A    I'm not recalling offhand, but
3  we talked to a number of dealers that we
4  thought might participate.
5      Q    Okay.  And did you -- did you
6  actually calculate a valuation associated
7  with this hypothetical?
8      A    Yes.
9      Q    And what time period was that?
10     A    That was, again, immediately
11  prior to the mediation.
12     Q    And, again, did you prepare a
13  memorandum or something reflecting this
14  valuation?
15     A    Yes.
16     Q    And that was for Washington
17  TSA?
18     A    Yes.
19        MS. SAWYER:  And then, again, I
20  would request a copy of that.
21        MR. LAWRENCE:  Sure.
22     Q    Do you recall what the
23  valuation was for this swap?
24     A    As I said, it was remarkably
25  close to the other scenarios.

Page 175

Peter Shapiro

1
2      Q    Do you recall what the credit
3  charge was associated with this swap?
4      A    The credit charge was entirely
5  derived from looking at two-year
6  termination options, so you'd calculate the
7  option that would produce the equivalent of
8  what a credit reserve would be.
9      Q    And for the first swap, the par
10  call every six months, was there any credit
11  charge imposed in connection with that?
12     A    We didn't -- we didn't think
13  there was even -- there was any but the
14  most incidental of credit charges.  You
15  know, we put it in the aggregate spread at
16  a small number, six-month exposure
17  premiums.
18     Q    And it's your understanding
19  that the -- excuse me -- the reserve fund
20  agreement provides for a par call every six
21  months?
22     A    The reserve fund agreement
23  allows Washington TSA to be able to invade
24  that for specified reasons every six
25  months.

Page 176

Peter Shapiro

1
2      Q    And so that -- that's why you
3  interpreted it as a par call availability?
4      A    Yes, in terms of a swap, you
5  have to view it as a par call.  You
6  can't -- unlike a reinvestment vehicle
7  where you can detail the causes that would
8  allow for a -- for funds to be drawn from
9  the agreement at no charge, in the swap
10  market, you can't tailor an option like
11  that.
12        You have to have what would be
13  referred to in market practice as a -- a
14  full economic option.
15        You know, in a -- in a -- in
16  the reinvestment universe, it's a
17  commonplace to have -- have options
18  embodied in agreements that are dependent
19  upon certain events that would occur
20  affecting the underlying bonds.
21        In swaps, there is no such
22  market for that.  You can't do that, so you
23  have to put in, you know, what would be
24  a -- just a standard option, you know,
25  which we would refer to in the business as

Page 177

Peter Shapiro

1
2  a full economic option.
3      Q    So you considered these two
4  swaps and came up with alternative
5  valuations based on either of these swap
6  assumptions?
7      A    Correct.
8      Q    And then you said you also
9  calculated what would be Washington TSA's
10  actual losses given its investment
11  restrictions required under the indenture?
12     A    Correct.
13     Q    And when was that valuation
14  done?
15     A    That was done again at the
16  same -- in the same period.
17     Q    For purposes of the mediation?
18     A    Yes.
19     Q    And did you actually place a
20  value on what you are calling Washington
21  TSA actual losses?
22     A    Yes, anticipated actual losses,
23  yeah.
24     Q    And you --
25     A    And we looked at losses to date

Page 178

1          Peter Shapiro
2   and then anticipated in the future.
3       Q    And how did you project the
4   anticipated losses in the future?
5       A    That's the most difficult part
6   to do, to say what are going -- what is
7   going to happen with future floating rates.
8         Jay asked questions about this
9   extensively in my first deposition, and he
10  wanted to, by virtue of his questions,
11  repeatedly, you know, slavishly follow
12  what's called the forward curve.
13        We know however -- and every
14  market participant knows this -- the
15  forward curve is overwhelmingly wrong in
16  projecting future floating rates.  So we
17  can't use the forward curve for projecting
18  what something like an -- an agency like
19  Washington would actually experience.
20        The -- we have to say:
21        What, instead, would we say is
22  the reasonable assumption?  So we looked at
23  it at the period of time in question, and
24  we said:
25        What has been the experience so

Page 179

1          Peter Shapiro
2   far?  Okay.  We know the experience so far
3   has been during the financial crisis when
4   the Fed has held floating rates at
5   historically low levels.
6         And we can see that the losses
7   to date created an experience which was
8   above what Lehman was offering as its -- as
9   its -- as what it would pay for the entire
10  next, you know, whatever it was, you know,
11  25 years or whatever it was remaining at
12  the time we discussed it.
13        So, you know, we knew that
14  it -- it showed how absurd Lehman's number
15  was.
16        But we said:
17        What would we reasonably say --
18  based upon adding to what has already been
19  experienced, what we could say might happen
20  in the future.  So we tried to think out
21  that question.
22        When you think of that
23  question, you can use intelligence to try
24  to figure that out, broken into the
25  following components.

Page 180

1          Peter Shapiro
2         In the near term, we have a --
3   in the market, a significant amount of
4   projected data that comes from the
5   community of Fed watchers.  And Fed
6   watchers, you know, are basically
7   economists, of which there are many, many,
8   many, who publish their projected rate
9   forecasts for periods typically up to two
10  years, some beyond.
11        And based upon that data, you
12  could say:
13        What is the expectation of
14  people who study the Fed and look at
15  markets and economies to say where interest
16  rates should be?
17        So you could see that with --
18  you know, with some degree of intelligence.
19  You are predicting the future.  You can't
20  say anything with certainty.  You can just
21  try to apply intelligence to it.
22        When we look at that question
23  today or over these last few years, we have
24  greater knowledge about this than we have
25  had in the past simply because the Fed has

Page 181

1          Peter Shapiro
2   become much more transparent.
3         It has provided what in the
4   Fed's terminology what is called a "forward
5   guidance," saying they do not intend to
6   change the Fed funds rate, which, you know,
7   is the key rate which would govern this
8   thing, you know, the projection of where
9   short-term rates will go.
10        They do not intend to move that
11  until 2014, 2015, whatever they happen to
12  be saying in their forward guidance at the
13  time.
14        That's a break with past
15  history.  In the past the Fed was much more
16  opaque.  So the fact we have greater
17  transparent allows to be able to project in
18  the intermediate future with greater
19  intelligence.
20        Again, I'm not going to use the
21  word "certainty."  There is no such thing.
22        Then beyond that we have to
23  say:
24        All right.  What do we know to
25  be able to think about the blue sky that

Page 182

Peter Shapiro

1 comes beyond that?
2 And what we know is a starting
3 point reasonably, and we know a history
4 that goes before that. When we try to
5 extrapolate from history, we have
6 questions.
7 Do we look at history and
8 exclude extraordinary periods such as the
9 one that we have gone through since
10 Lehman's bankruptcy and say, "Rates were
11 just too low; that's an extraordinary
12 period, and it shouldn't be used for making
13 a forecast based on history"?
14 Do we exclude the period from
15 1979 to 1982, the period of time when the
16 prime went up to 20 percent, when, you
17 know, oil prices had quadrupled and caused
18 massive worldwide inflation and ultra-high
19 interest rates?
20 Do we try to find a benign
21 average?
22 This gets into crystal ball
23 gazing to a certain extent. And what we
24 kind of prefer to do is to say:

Page 183

Peter Shapiro

1 All right. If we know two
2 years out from now with some degree of
3 intelligence where we think floating rates
4 will be. And we believe they will revert
5 more towards a historical mean over an
6 extended period of time.
7 And we can draw a line on a
8 graph and say:
9 Let's assume that we -- that,
10 after this reasonably -- this reasonable
11 interim period -- let's say it goes to
12 2015 -- that rates will then slowly revert
13 towards norm.
14 We could draw a line in that
15 graph and say:
16 They will revert to norm after
17 two years, five years, and then flat line
18 it after that. That's how we would look at
19 it.
20 Others could look at it
21 differently. You have seen the expert
22 reports, who could say:
23 "No, we think we are going to
24 be in prevailing short-term rates at low

Page 184

Peter Shapiro

1 levels like this conceivably for the
2 future."
3 Others could say:
4 "We have to be very
5 conservative and assume that today's rates
6 could persist."
7 When we looked at it, we looked
8 at instead and said:
9 Let's assume a slow reversion
10 to mean.
11 Q    What was the mean that you were
12 reverting to?
13 A    I would have to go back and
14 look.
15 Q    But you have records that would
16 show that?
17 A    Yeah.
18 Q    And so you took the historical
19 investment rate, the Fed projection for
20 some interim time period, and then an
21 upward sloping curve to revert to the mean?
22 A    Not the Fed -- the Fed watch
23 projection.
24 Q    The Fed watch --

Page 185

Peter Shapiro

1 A    You know, if you think about
2 it, you can see there's a Bloomberg page
3 called OUTL, Outlook, which gives you
4 projections for all sorts of rates
5 everywhere.
6 Q    And then after that time
7 period, then you had a slow upward curve to
8 revert to the mean over some time period?
9 A    "Curve" would be too fancy. It
10 was just a straight line.
11 Q    And do you recall the time
12 period in which you assumed that there
13 would be a reversion to the mean?
14 A    I don't. It was -- you know,
15 we didn't want to make it too long because
16 too long would be unreasonable, you know.
17 And, remember, we are trying to
18 be reasonable. We are trying to think:
19 "What would a fair person try
20 to say here, not trying to favor Lehman,
21 not trying to fair TSA?"
22 We are really trying to say
23 what's reasonable. We are not trying to
24 make a -- an advocate's argument here.

Page 186

```
 1              Peter Shapiro
 2       Q    And where did you get the
 3  information about what the mean would be?
 4       A    I think we derived that by
 5  looking back at interest rate history like
 6  we do all the time.
 7            And, you know, again, part of
 8  that question, Lauri, is:
 9            What's the relevant period, and
10  do you knock out extraordinary periods?
11       Q    And do you recall what -- how
12  you answered those assumptions in doing
13  this analysis?
14       A    I would have to look back.  I
15  think we said we knock out extraordinary
16  periods.
17       Q    And did you actually do this
18  analysis and come up with a concluding
19  valuation?
20       A    Yes.
21       Q    And what was that number?
22       A    You are going to be shocked.
23  It comes very close to the other numbers we
24  looked at.  It -- you know, we are -- they
25  are all within a few million dollars of
```

Page 187

```
 1              Peter Shapiro
 2  each other.  And that says something to me.
 3       Q    When did you conduct this
 4  analysis?
 5       A    Pre-mediation.
 6       Q    At what point before the
 7  mediation?
 8       A    You know, in the weeks or days
 9  leading up to the mediation.
10       Q    Just because there is, you
11  know, three years between the time the
12  claim was filed and the mediation, so it's
13  closer to the mediation than the claim.
14       A    It was toward -- yeah -- it was
15  for -- it was initially done for the
16  mediation.
17       Q    And did you prepare a
18  memorandum outlining this analysis for
19  Washington TSA?
20       A    In the same memorandum we
21  previously referred to.
22       Q    So this is -- this is one
23  memorandum that contains all of these
24  alternative valuations?
25       A    Correct.
```

Page 188

```
 1              Peter Shapiro
 2       MS. SAWYER:  I'd request a copy
 3  of that.
 4       MR. LAWRENCE:  You have done
 5  that.
 6       (Memorandum containing
 7  valuations requested.)
 8       Q    Are there any other alternative
 9  methodologies that have been considered by
10  anyone at Swap Financial for valuing this
11  reserve fund agreement?
12       A    I can't say what anybody else
13  has thought in their heads, but these are
14  the ones that we have discussed.
15       Q    And you -- you have not thought
16  of any others?
17       A    You know, I rack my brain on
18  these things because it's obviously not
19  just Washington.  You know, we have got
20  other, similar contracts that are in
21  dispute with the Lehman Estate, as you are
22  aware.
23            And, you know, I try think if
24  there is some other way to reasonably look
25  at this.
```

Page 189

```
 1              Peter Shapiro
 2            You know, our goal here never
 3  is to try to, quote-unquote, take advantage
 4  of a bankrupt counterparty.
 5            Our goal here is to make it so
 6  that the public, which has been deprived of
 7  what they had bargained for with a major
 8  financial institution, is able to establish
 9  a claim as accurately as possible.
10       Q    So sitting here today, you
11  don't recollect any other alternative
12  methodologies that you considered?
13       A    I can't think of any.  Are
14  you -- are you thinking of one that -- that
15  you know of?
16       Q    There was a discussion about
17  the use of the Lehman inception charges
18  that you discussed at your last deposition.
19            Did you do an analysis based on
20  that?
21       A    No.  We -- the use of the
22  Lehman inception charges was really more to
23  give the lie to Lehman's contention that no
24  credit charge should be included here, to
25  show that Lehman, of course, had itself put
```

Page 190

1          Peter Shapiro
2   a credit charge in when it first entered in
3   the contract in a functioning healthy
4   market.
5          And, obviously, any rational
6   person would say:
7          "If there is a credit charge in
8   that market, that credit charge is going to
9   be a heck of a lot bigger in a
10  non-functioning, you know, unhealthy
11  market."
12     Q    Did you -- is that your expert
13  opinion?
14     A    Yes.
15     Q    And what is that based upon?
16     A    That credit charges expand
17  during unhealthy markets?
18     Q    The credit charge charged by a
19  dealer in this situation would expand?
20     A    Yes.  It's based upon the fact
21  that -- that a history of financial markets
22  shows that credit charges tend to expand
23  during financial crises and particularly
24  ones that are motivated or that have at
25  their core credit crisis.

Page 191

1          Peter Shapiro
2          You can see it across the
3   board.  In this credit crisis, we went back
4   and looked at the -- at the widening of
5   spreads for virtually every
6   credit-sensitive instrument in the market.
7   And you see credit spreads not just
8   widening, but in many cases exploding.
9      Q    You did an analysis of the
10  widening of credit spreads as has happened
11  since the financial crisis?
12     A    Yes.
13     Q    And when did you do that
14  analysis?
15     A    I can't remember, but I
16  remember at some point we did that.  And I
17  can't remember if it was in conjunction
18  with this case or with another case.  But
19  it's something that we looked at closely to
20  say:
21         "Let's look at any other
22  instrument we can look at and see what
23  happened to credit spreads."
24     Q    And you looked at it and
25  concluded that, obviously, the credit

Page 192

1          Peter Shapiro
2   charge from your perspective would be
3   larger than the one at Lehman's inception?
4      A    At the inception of this
5   agreement, yeah.
6      Q    And the analysis you did of the
7   widening of credit charges in the market,
8   is that reflected in some work papers
9   somewhere?
10     A    It -- when you say "is it
11  reflected in a work paper," tell me what
12  you mean by that.
13     Q    Did you prepare a memo
14  summarizing the analysis you did?  Are
15  there E-Mails exchanged detailing the
16  analysis?
17     A    I don't believe so.  I believe
18  we -- I know we -- I know at some point
19  this was written up for some purpose.  It
20  may have been in another case.
21     Q    But you recall that there was a
22  written analysis of the widening of
23  spreads?
24     A    Yes.
25         MS. SAWYER:  I would request a

Page 193

1          Peter Shapiro
2   copy of that analysis, too, Paul.
3          MR. LAWRENCE:  If it's a TSA
4      thing, otherwise, we won't have access
5      to it.
6          (Analysis of widening of
7      spreads requested.)
8      Q    I have a couple of questions
9   off of the privilege log, and then we will
10  be done with that.
11     A    Okay.
12     Q    Did you determine what Lehman's
13  inception spread was for the RFA?
14     A    I have discussed this with
15  counsel.
16     Q    Did you determine what the
17  Lehman inception spread was at the time of
18  the inception of the RFA?
19     A    When you say, did we determine
20  it --
21         MR. LAWRENCE:  I think she's
22      asking whether you personally
23      determined, not whether I interpreted
24      a document, right?
25         THE WITNESS:  Oh.

Page 194

1          Peter Shapiro
2     Q    Right, no.
3          Does Swap Financial have an
4   opinion as to what Lehman's spread was at
5   the inception of the RFA?
6     A    Do we have an opinion about
7   what it was?
8          You know, if I -- I have a
9   general opinion about what it was; but, you
10  know, I'm not -- I don't need certainty on
11  this.
12    Q    Was there any analysis done by
13  Swap Financial?
14    A    We -- I don't -- I don't
15  believe so.
16    Q    What's your opinion as to what
17  the spread was at inception?
18    A    My spread -- my -- my opinion
19  is based upon conversations I have had that
20  it was somewhere between 50 and 100 basis
21  points.
22    Q    If you could turn to page 30 of
23  the privilege log, the first entry 132357,
24  which indicates that it's from Lillian
25  Chern, and its subject is, "TSA inception

Page 195

1          Peter Shapiro
2   spread"; do you see that?
3     A    Yeah.
4     Q    It says, "Internal note."
5          Do you recall whether
6   Ms. Chern --
7          MR. LAWRENCE:  What was the
8     number?
9          MS. SAWYER:  132357.
10    Q    Do you recall whether Ms. Chern
11  determined what the inception spread was
12  for the RFA?
13    A    It looks like she may have run
14  some analysis on this looking at this.
15    Q    Okay.
16    A    You know, it reflects this is
17  an E-Mail message.  It may have been just
18  discussing general terms.
19    Q    Do you recall what her
20  conclusion was?
21    A    No.
22    Q    If you could turn to page 35,
23  entry 132410.
24    A    Yep.
25    Q    This appears to be -- the

Page 196

1          Peter Shapiro
2   subject line of this 2010 E-Mail appears
3   to -- says:
4          "TSA loss memo V four."
5          Do you see that?
6     A    Yes.
7     Q    Do you know what the "TSA loss
8   memo" is?
9     A    I believe it's the one that
10  looks -- you know, would look like one of
11  the prior exhibits that we have discussed.
12    Q    So it looks like the
13  September 10, 2009, memorandum?
14    A    Yes, yes.
15    Q    Lehman Exhibit 19?
16    A    Right.
17    Q    Do you believe it to be that
18  document?
19    A    I don't know about what the --
20  you know, what the suffix "V four" would
21  indicate.
22    Q    Do you recall there being
23  amendments made to this memorandum after
24  September of 2009?
25    A    Is September of 2009 the last

Page 197

1          Peter Shapiro
2   of the two versions?
3     Q    Yes.
4     A    I don't believe so.  I think
5   that's the final.
6     Q    Okay.  Now, this message is
7   from July of 2010?
8     A    Right.
9     Q    Does that refresh your
10  recollection that there were amendments
11  made subsequent to September of 2009?
12    A    No, my guess is it's just
13  attaching the same -- you know, the same
14  attachment.  They're referring to that same
15  document.
16    Q    Do you recall whether or not
17  this was version four of the memorandum?
18    A    I do not.  I do not.
19    Q    If you could turn to page 75,
20  entry 132666, which appears to be an E-Mail
21  from April of 2012 between Lillian Chern
22  and James Vergara.
23          Do you see that?
24    A    Yes.
25    Q    Do you recall when James

Page 198

Peter Shapiro
1
2 Vergara left Swap Financial Group?
3     A    2010.  I can't remember the
4 month, but I know it was 2010.
5     Q    So this would have been after
6 he had departed?
7     A    Yes.
8     Q    Do you recall what was being
9 discussed with Mr. Vergara after he left
10 Swap Financial Group?
11     A    I recall a set of conversations
12 with James having to do with trying to get,
13 you know, E-Mails off of his computer that
14 you were requesting.
15     Q    Now, of course, this describes
16 it as being a discussion regarding loss
17 calculation?
18     A    Right.
19     Q    Do you recall having
20 discussions with Mr. Vergara after he left
21 Swap Financial about the calculation of
22 loss?
23     A    No.
24     Q    Do you know if anybody at Swap
25 Financial Group had conversations with

Page 199

Peter Shapiro
1
2 Mr. Vergara after he left about the
3 calculation of loss?
4     A    I don't have personal knowledge
5 of that.  No.
6     Q    If you could turn to page 79,
7 the first two entries 132691 and 132692 are
8 E-Mails between you and Lillian Chern from
9 February 2013 regarding "TSA Alt loss Calc
10 memo."
11         Do you see that?
12     A    The second one is on the "alt
13 loss calc memo."
14     Q    The first one is on the
15 "revised RFA interest rate loss" memo?
16     A    Correct.
17     Q    Are those two different
18 memorandum that were being worked on in
19 February of 2013?
20     A    It appears.  You know, they may
21 not have been both being worked on by us.
22     Q    Who could they have been being
23 worked on?
24     A    As we previously discussed, you
25 know, Bob Cook had been looking at interest

Page 200

Peter Shapiro
1
2 loss.
3     Q    Do you recall Mr. Cook
4 preparing a memorandum about interest loss?
5     A    No.  I'm -- wait, excuse me.  I
6 do recall seeing a memorandum.  I mean, I
7 don't know if he prepared it.  But I recall
8 that he produced an analysis -- it would
9 have been in memo form -- that we
10 previously discussed.
11     Q    We previously discussed a
12 spreadsheet he had kept of loss interest.
13 Do you believe that he also prepared a
14 memorandum regarding loss interest?
15     A    I don't know.  I'm not -- not
16 sure if what I saw was in spreadsheet form
17 or memorandum form, of which -- not
18 registering in my mind which form I looked
19 at.
20     Q    So looking at the first entry,
21 the one about the RFA interest loss memo,
22 do you recall whether anyone at Swap
23 Financial Group was involved in preparing a
24 memo on that topic?
25     A    To the extent we were, we would

Page 201

Peter Shapiro
1
2 have probably just been using his data.
3     Q    Do you recall whether or not
4 Swap Financial Group was involved in the
5 preparation of such a memo?
6     A    I can't recall, but it would
7 have -- we would have wanted to include
8 that in any calculations that we looked at
9 of loss and in preparation for mediation.
10     Q    But you don't specifically
11 recall whether or not Swap Financial
12 prepared such a memorandum?
13     A    Whether we ran numbers -- fresh
14 numbers on it or checked Bob's numbers, is
15 that what you are asking?
16     Q    No, I am asking whether or not
17 a memorandum was prepared by Swap Financial
18 Group that discussed this.
19     A    It's possible.  It refers here
20 specifically to a memo.
21     Q    And then the second entry about
22 the "TSA alt loss calc" memo from 2013,
23 what memorandum is that?
24     A    It's -- I believe that would be
25 the memorandum discussing the matters that

Page 202

1          Peter Shapiro
2   we had the lengthy discussion back and
3   forth that you requested from -- from Paul.
4       Q    You indicated that that
5   memorandum was prepared before the
6   mediation which took place in May of 2012?
7       A    Correct.
8       Q    And, now, this time frame is
9   February 2013.  Do you believe that your --
10  it's the same memorandum or a different
11  memorandum?
12      A    My belief is it would be the
13  same memorandum.  Notice under the subject,
14  hence the letters, "FW colon," which means
15  it's forwarding something; so it would have
16  been, in other words, something that would
17  have been prepared prior to that time.
18      Q    And you --
19      A    That subject line obviously was
20  not a new subject line at the time -- on
21  the date that it states here.
22           You know how Outlook works in
23  that sense, or most E-Mail systems work?
24      Q    Are you -- do you -- are you
25  aware of whether or not more than one

Page 203

1          Peter Shapiro
2   memorandum was produced by Swap Financial
3   Group regarding alternative loss
4   calculations?
5       A    I can't -- I can't -- I'm
6   not -- I can't recall.
7       Q    But your records at Swap
8   Financial Group would tell us whether there
9   was one memorandum or more than one
10  memorandum on that topic, correct.
11      A    Yes.  And we -- again, there
12  would be -- it would be reflected in the
13  privilege log.
14      Q    But looking at this, you can't
15  tell if it's the same memorandum that was
16  prepared in advance of the mediation or a
17  different one?
18      A    No way.
19      Q    If you turn to page 81, entry
20  132721, this is dated May 2012.  And it's a
21  draft memorandum regarding "alternative
22  calculation of loss for TSA's RFA with
23  Lehman Brothers."
24           Do you see that?
25      A    Yes.

Page 204

1          Peter Shapiro
2       Q    That appears to have a
3   different title than the -- than the E-Mail
4   we were just looking at for purposes of the
5   memorandum.
6           Do you see that?
7       A    Right.
8       Q    Does that refresh your
9   recollection as to whether there is more
10  than one memorandum on alternative
11  calculations of loss?
12      A    It doesn't, no.
13      Q    If you could turn to page 85,
14  entry 132748, which is an Excel spreadsheet
15  created by Bob Cook in May of 2012.  And
16  it's described as "a spreadsheet of claim
17  variables and components for calculations
18  of a claim."
19           Do you see that?
20      A    Yes.
21      Q    Do you recall Mr. Cook
22  preparing a spreadsheet of claim variables
23  and components for calculation of a claim?
24      A    I recall him doing something
25  similar.  It may not have been exactly

Page 205

1          Peter Shapiro
2   that, but, yes, I do recall that.
3       Q    What do you recall him doing?
4       A    He was having -- having to
5   brief his board on the potential
6   variability of outcomes, like any, you
7   know, responsible senior executive would do
8   with his board.
9       Q    So "variability of outcomes"
10  meaning:
11           "We will put in a claim for
12  $47 million, but we might not get
13  $47 million"?
14      A    Yeah, what a judge could come
15  out with under various scenarios.
16      Q    And do you recall the analysis,
17  what the variability was?
18           MR. LAWRENCE:  I am going to
19  instruct you not to answer that
20  question.
21           MS. SAWYER:  On the grounds of.
22           MR. LAWRENCE:  On the grounds
23  of privilege, attorney/client
24  privilege.
25           (There was an instruction not

Page 206

```
1            Peter Shapiro
2  to answer.)
3        (Exhibit No. Shapiro 28,
4  Washington TSA privilege log from
5  10/4/13, is marked by the reporter for
6  identification.)
7      Q    The court reporter has handed
8  you a document that has been marked as
9  Shapiro Exhibit 28.  For the record, it's a
10 copy of the Washington TSA privilege log
11 from October 1, 2013 -- I -- October 4th --
12 thank you -- 2013.
13      I assume, based on your earlier
14 answer, that you didn't have any
15 involvement in the preparation of
16 Washington TSA's privilege log; is that
17 correct?
18     A    That's correct.
19     Q    If you could turn to page 40 of
20 the log -- actually, I will skip that.
21 Never mind.
22      If you could turn to page 96 of
23 the log.
24     A    96.
25     Q    The entry is 14829.
```

Page 207

```
1            Peter Shapiro
2      A    14829, yep.
3      Q    It appears to be a
4  Microsoft Word document dated April 22,
5  2009, so the day after the first valuation
6  memo was prepared by Swap Financial,
7  written by you and James Vergara.
8      It's described as:
9      "Alternative calculations of
10 loss for TSA's reserve fund agreement."
11     Do you see that?
12     A    Yes.
13     Q    Do you recall what alternative
14 valuations were done by Swap Financial
15 Group the day after it prepared its first
16 valuation memo for Washington TSA?
17     A    I don't.
18     Q    Do you recall doing alternative
19 valuations for the reserve fund agreement
20 at or about the time that the initial
21 valuation memos were done?
22     A    I'm not recalling that.  I'd
23 have to refresh my memory.
24     Q    But to refresh your memory, you
25 would have to look at this document?
```

Page 208

```
1            Peter Shapiro
2      A    Correct.
3      Q    That's it for that one.
4        (Exhibit No. Shapiro 29,
5  Document, E-Mail chain, first E-Mail
6  in the chain from Peter Shapiro to
7  Sandy Garr and James Vergara on
8  July 14, 2010, Bates stamp TSA 042479
9  through 042481, is marked by the
10 reporter for identification.)
11     Q    The court reporter has handed
12 you a document that has been marked as
13 Shapiro Exhibit 29, which, for the record,
14 is an E-Mail chain, Bates stamp TSA 042479
15 through 042481.
16     My questions are on the very
17 first E-Mail in the chain at the top from
18 you to Sandy Garr and James Vergara on
19 July 14, 2010; do you see that?
20     A    Yes.
21     Q    I will give you a moment to
22 read it.
23     A    Yes, I read it.
24     Q    Do you recall a discussion with
25 Lehman in the summer of 2010 on behalf of
```

Page 209

```
1            Peter Shapiro
2  Washington TSA?
3      A    I recall at some point in
4  time -- I'm not remembering the exact
5  date -- that we had discussions with them
6  of trying to come up with a -- you know,
7  trying to come up with a settlement amount
8  so we could get a crystallized claim and
9  sell it.
10     Q    And in the second sentence of
11 your E-Mail, you say:
12     "It was really very helpful."
13     And I am referring to the call
14 that you had had with them, correct?
15     A    Right.
16     Q    Do you recall learning anything
17 on the call that you found to be helpful?
18     A    I'm not recalling the call.  I
19 am looking down at the rest of the E-Mail
20 chain, Lauri, to see if something would
21 help me refresh memory or help me at least
22 make some logical conclusions as to that.
23     Q    Okay.  Sure.
24     MS. SAWYER:  Can you read back
25 the question.
```

Page 210

1          Peter Shapiro
2          (Reporter read back pending
3    question.)
4          A    I'm not specifically recalling
5    the call.  My -- looking at the prior
6    message, which, for some reason, is dated
7    the same day at a later time -- I guess
8    there is a time zone thing going on here.
9          The -- it was -- obviously,
10   Lehman was showing an openness to
11   discussing credit charges, profit charges,
12   et cetera.
13         Q    You don't have any specific
14   recollections?
15         A    No.
16         Q    Okay.  And then in the second
17   paragraph --
18         A    I just know we were trying
19   hard.
20         Q    In the second paragraph, you
21   write:
22         "We have already spent some
23   time since the call pulling together our
24   analysis of the issue you raised about the
25   use of the forward curve with regard to the

Page 211

1          Peter Shapiro
2    LIBOR spread as it pertains to the delivery
3    of eligible securities."
4          Do you see that?
5          A    Yes.
6          Q    Do you recall doing an analysis
7    about the forward curve and the LIBOR
8    spread and the delivery of eligible
9    securities?
10         A    I know that we went back and
11   looked at the -- at the hedgable spreads
12   that existed at the time.  We -- I spent
13   some time discussing this in my prior
14   deposition, you know, the way in which you
15   hedge forward on non-LIBOR bases.
16         And, you know, when you look at
17   non-LIBOR bases like Treasury or CP, you
18   can look at what those spreads are.
19         And I remember we went back and
20   tried to look at them again.
21         Q    And you remember doing that in
22   the summer of 2010 at or about the time you
23   talked to Lehman?
24         A    The date is very fuzzy in my
25   recollection.  It has been going on for so

Page 212

1          Peter Shapiro
2    long.  But I know we went back and looked
3    at that several times.
4          Q    And you looked, you said, back
5    at CP and Treasury as hedgable spreads?
6          A    Yes, correct.
7          Q    Did you conduct a valuation
8    involving Treasuries?
9          A    We did not look at Treasuries
10   as a deliverable because it would have
11   produced a larger claim or a worse number
12   for Lehman and would have moved us further
13   from the settlement.
14         Q    So you looked at it, but didn't
15   do the entire valuation because it would
16   have moved the opposite direction?
17         A    Correct, it wouldn't have been
18   helpful in trying to come to a meeting of
19   the minds.
20         Q    Okay.
21         (Exhibit No. Shapiro 30, Copy
22   of the Expert Witness Valuation Report
23   submitted on December 16, 2013, by
24   Mr. Curry and Mr. Hasterok, is marked
25   by the reporter for identification.)

Page 213

1          Peter Shapiro
2          Q    I have handed you a document
3    that has been marked as Shapiro Exhibit 30,
4    which, for the record, is a copy of the
5    expert witness valuation report submitted
6    on December 16, 2013, by Mr. Curry and
7    Mr. Hasterok.
8          Have you seen this document
9    before?
10         A    Yes, I have.
11         Q    When did you first see this
12   document?
13         A    I have to go back and look.
14   You know, it was after it was completed.
15         Q    Did you see any drafts of it?
16         A    No.
17         Q    Did you discuss with Mr. Curry
18   or Mr. Hasterok the approach they were
19   going to take for their valuation of the
20   reserve fund agreement?
21         MR. LAWRENCE:  In advance of
22   the report?
23         Q    In advance of the report?
24         A    I had a discussion with them
25   before they were engaged, you know, about

54  (Pages 210 to 213)

Page 214

1        Peter Shapiro
2    the -- in general, about the agreement, but
3    not about -- not while they were preparing
4    their report.
5        Q    And what was the discussion
6    that you had with them in advance about the
7    agreement in general?
8        A    About the challenges in trying
9    to value an agreement like this, that we
10   have already discussed.
11       Q    Did you have a conversation
12   with both of them at the same time or did
13   you speak to them each separately?
14       A    I think both.  I had telephone
15   conversation, and we actually got together
16   at one point.
17       Q    Was anybody else present when
18   the three of you got together to discuss
19   the agreement in advance?
20       A    I don't believe so.
21       Q    And where did that meeting take
22   place?
23       A    At my office.
24       Q    And how long did that meeting
25   last?

Page 215

1        Peter Shapiro
2        A    Oh, it -- it had to have gone
3    on for about an hour, maybe a little less.
4        Q    Did you show them a copy of the
5    reserve fund agreement?
6        A    I can't recall.
7        Q    Did you show them that copy of
8    your valuation memo?
9        A    Again, I can't recall.
10       Q    Do you recall whether or not
11   you discussed the valuation approach you
12   had taken?
13       A    Yes.
14       Q    Okay.  And did they give you
15   any feedback on your valuation methodology?
16       A    I can't recall if they gave --
17   when you say, "feedback," you know, again,
18   yes, I was candid about what I saw as the
19   challenges in this, you know, in valuing a
20   complex contract in a -- in a market that
21   was not functioning.
22       Q    Did they identify any concerns
23   about the valuation that you had done as
24   reflected in your September 10, 2009, memo?
25       A    It was a pretty general

Page 216

1        Peter Shapiro
2    conversation.
3        Q    They didn't look at any of the
4    specific spreads that you had assumed?
5        A    No.  Mostly just, you know,
6    discussing what an intellectual challenge
7    is in doing something like this.
8        Q    And did they identify any
9    challenges with the valuation?
10       A    We -- everyone who looks at
11   this honestly, I think, identifies the
12   challenge of:
13       "How do you value something
14   when you can't get it?  You know, how do
15   you put a price on something that is
16   impossible to buy," if you think of it that
17   way?
18       That was the biggest thing that
19   we spent time talking about.
20       Q    And they identified that issue?
21       A    Yes.
22       Q    Did they identify any other
23   concerns or issues they saw?
24       A    Not that I can recall.
25       Q    And this was before they were

Page 217

1        Peter Shapiro
2    engaged as experts by Washington?
3        A    That's correct.
4        Q    And why did you meet with them
5    in advance?
6        A    Both of them were looking for
7    what they were going -- their next step was
8    going to be in their careers.  You know, I
9    wanted -- you know, as I say, I knew both
10   of them.  They had worked together at
11   Morgan Stanley.  You know, I thought there
12   might be some opportunities.
13       Q    And you had known both of them
14   for some time?
15       A    Yes.
16       Q    And then based on the initial
17   meeting then, did you decide to introduce
18   them to Washington TSA?
19       A    Yes.
20       Q    And what fostered that decision
21   to introduce them to Washington TSA?
22       A    Their expertise, you know, the
23   fact that Morgan Stanley was one of the
24   largest and most active providers of
25   forward purchase agreements.

Page 218

1           Peter Shapiro
2      Q    And their particular expertise
3   in providing those agreements?
4      A    Right.
5      Q    After that initial meeting that
6   you had with Mr. Curry and Mr. Hasterok,
7   did you have subsequent discussions about
8   the valuation approach they were going to
9   take?
10     A    No.
11     Q    Did you have subsequent
12  discussions with them about the matter?
13     A    About the "matter"?
14     Q    About the dispute with
15  Washington -- with Lehman and Washington?
16     A    No.
17     Q    So you had no further
18  conversations with them?
19     A    Not -- no, not in -- for
20  preparing for this report, no.
21     Q    But did you -- between your
22  initial meeting and the submission of their
23  report in December of 2013, did you have
24  discussions with them?
25     A    I am trying to think if we

Page 219

1           Peter Shapiro
2   talked at all, about, you know, unrelated
3   business matters.  That is the only thing I
4   could think about.  I may have had another
5   call on something unrelated with Mr. Curry,
6   but not with Mr. Hasterok.
7      Q    So you don't recall having any
8   further discussions about Washington TSA?
9      A    No, you know, I felt this --
10  the concept was they're supposed to look at
11  this themselves.  I didn't want to feel
12  like we were in anywhere -- in any way
13  trying to point them in one direction or
14  the other.
15     Q    And after this report was
16  submitted in December of 2013, did you have
17  discussions with them about their report?
18     A    Can I talk to counsel on this?
19     Q    Sure.
20          MR. LAWRENCE:  Sure.
21          (There was a discussion off the
22     record in which the witness conferred
23     with counsel.)
24          MR. LAWRENCE:  Can you read
25     back the last question?

Page 220

1           Peter Shapiro
2      (Reporter read back pending
3   question.)
4      A    No.
5      Q    You did not have any discussion
6   with Mr. Curry or Hasterok about their
7   report after December of 2013?
8      A    No.
9      Q    Have you had any discussions
10  with -- at any time with Mr. Curry and
11  Hasterok about their report?
12     A    No.
13     Q    If you turn to page 20 of their
14  report --
15     A    Yes.
16     Q    -- their conclusion, which is
17  bolded and underlined, is that the
18  termination amount due from LBSF and LBHI
19  should be approximately 37.5 million.
20          Do you see that?
21     A    Where, on which page is that?
22     Q    Page 20.  And its bolded.
23     A    Yes, I do see it bolded, yes.
24     Q    Do you have an understanding of
25  how they reached that termination amount

Page 221

1           Peter Shapiro
2   valuation?
3      A    Yes, I do.
4      Q    And what is your understanding?
5      A    They looked at that last
6   scenario I described to you, which is
7   trying to look at what the total
8   accumulated loss would be in the absence of
9   a replacement vehicle.
10     Q    And they looked at what
11  Washington TSA could invest in?
12     A    Yes.
13     Q    And what their anticipated
14  earnings could be from those potential
15  investments?
16     A    Correct.
17     Q    And they assumed that, for
18  purposes of this calculation, that the
19  expected return that Washington TSA would
20  earn would be 65 basis points?
21     A    Right.
22     Q    And that was from investing in
23  a money market fund?
24     A    I believe so.
25     Q    And do you agree with their

Page 222

1         Peter Shapiro
2  methodology of assuming that Washington TSA
3  will earn 65 basis points from here until
4  2032?
5      A    It's a -- as I explained
6  earlier, there is this -- there is this
7  difficult intellectual problem of trying to
8  project future interest rates beyond the
9  next two or three years.
10        And you have to make certain
11 reasonable assumptions.  This is one set of
12 defensible assumptions.
13     Q    It's not the set of assumptions
14 you made when you did that analysis?
15     A    No.
16     Q    And do you believe your
17 assumption was more accurate than theirs?
18     A    "Accurate," there is no
19 accurate forecast of the future until you
20 get to that future date.  And because we
21 are talking about dates that we haven't
22 gotten to yet, you know, it's impossible to
23 use the word "accurate."
24     Q    For purposes of the court,
25 which assumption do you think the court

Page 223

1         Peter Shapiro
2  should employ?
3         MR. LAWRENCE:  Objection to the
4  form.
5      Q    You can answer.
6      A    If I were the judge and I was
7  trying to say what's reasonable, I would
8  look at -- at something that would take a
9  look at what they have lost already, what
10 they reasonably could be projected to lose
11 over the next couple of years, and then
12 make some supposition about future interest
13 rates based upon a common sense standard,
14 knowing that out forecasting tools are very
15 imperfect.
16     Q    And based upon the common sense
17 standard that you employed, you increased
18 that interest rate going forward?
19     A    Right.  I pray and hope we are
20 not in dire financial and economic
21 circumstances forever.
22     Q    Now, the approach taken by
23 Mr. Curry and Mr. Mr. Hasterok is different
24 than the approach as outlined in your
25 September 10, 2009, memo to valuing the

Page 224

1         Peter Shapiro
2  reserve fund agreement?
3      A    Correct.
4      Q    If the court were to try to
5  determine which approach it should use,
6  whether it should be your September 10,
7  2009 methodology or Mr. Curry and
8  Hasterok's methodology, which approach
9  should the court adopt?
10        MR. LAWRENCE:  Objection to the
11 form.
12     A    You know, I think you are
13 getting above my expertise in terms of what
14 a court should do, you know, in terms of a
15 judge.  A judge is going to weigh facts and
16 circumstances and the law and lots of
17 arguments like that.
18        The hypothetical replication
19 methodology that we used in our memo from
20 2009 that you referenced, you know, is a --
21 is a reasonable approach; but it includes
22 those important, you know, unknowns,
23 those -- those admitted areas where you
24 have to make estimates that you focused on
25 very well, which are the credit spread, the

Page 225

1         Peter Shapiro
2  profit spread, and the deliverable spread.
3         And on each of those, you have
4  to make some kinds of -- some kinds of
5  estimates.  And, you know, all of these
6  reasonable people could have some
7  disagreement about.
8      Q    So are you saying that the --
9  that in your expert opinion, the Curry and
10 Hasterok approach is the preferred
11 approach?
12     A    No, I am saying it's a
13 reasonable approach.  And any one of these
14 are reasonable approaches in a very
15 difficult valuation question.
16     Q    In your expert opinion, which
17 approach is the market-accepted approach?
18        MR. LAWRENCE:  Objection to the
19 form.
20     A    In my -- in my expert opinion,
21 the most common approach used in the market
22 is hypothetical replication.
23     Q    Have you ever seen a valuation
24 done like Mr. Curry and Hasterok's in the
25 market?

Page 226

```
1              Peter Shapiro
2      A    Yes.
3      Q    And when have you seen that?
4      A    The one that we prepared as an
5  alternative loss calculation.
6      Q    And other than that
7  circumstance, in the market, in the event
8  of a termination of a forward purchase
9  agreement, have you seen this valuation
10  approach as outlined in the Curry and
11  Hasterok report?
12      A    Not that I can think of.
13      Q    Now, Mr. --
14      A    Let me -- I'm sorry.  Let me
15  correct that.
16          There are other Lehman disputes
17  where, again, we have looked at it, at this
18  as an alternative way to do it.  So I would
19  say, you know, with regard to those other
20  Lehman disputes, we have looked at it this
21  way as well.
22          And it's, again:
23          In the absence of a functioning
24  market, what do you do?
25      Q    Now, Curry and Hasterok, in
```

Page 227

```
1              Peter Shapiro
2  their expert report, they suggest that the
3  hypothetical swap approach should be
4  rejected because Washington TSA could not
5  transact at that level?
6      A    Exactly.
7      Q    And you are familiar with that,
8  that assertion they make; do you agree with
9  it?
10      A    It's a -- it is a reasonable
11  contention.
12      Q    It's a reasonable criticism of
13  your approach?
14      A    Yes.
15      Q    And, yet, even in the face of
16  that criticism, you still believe that your
17  approach is the market approach to valuing
18  these contracts?
19      A    What I'd say is not the market
20  approach because there is not a market.  I
21  am saying, historically, this has been the
22  way in which you value these agreements.  The
23  problem with doing it post 2009 is the
24  market shut down.
25      Q    When you say this has been the
```

Page 228

```
1              Peter Shapiro
2  approach to valuing these, you are
3  referring to your approach?
4      A    Yes, the hypothetical
5  replication.
6      Q    Yes.
7          In Mr. Curry's and Hasterok's
8  report, they assume that TSA will continue
9  to invest in money market funds for the
10  life of the RFA, correct?
11      A    I believe so.
12      Q    Do you believe that to be a
13  proper assumption?
14      A    In the absence of any
15  alternative, you know, that would allow
16  them to get a longer term rate, they are
17  stuck with short-term securities.
18      Q    But there are other short term
19  securities besides money market accounts;
20  you would agree?
21      A    Yes, there are ones that
22  would -- that yield significantly less.
23      Q    And there are some that yield
24  significantly more?
25      A    Perhaps.
```

Page 229

```
1              Peter Shapiro
2      Q    And do you believe it's a
3  proper assumption to use a money market
4  account or money market fund even though
5  that's not an eligible security under the
6  RFA?
7      A    Is -- is -- money market --
8  money market fund allowed under the RFA if
9  it's high enough rated?  I'd have to go
10  back and look at the list of eligible
11  securities.
12      Q    If it were not an eligible
13  security?
14      A    If it -- if it -- are you
15  saying you believe it not to be an eligible
16  investment?
17      Q    I'm asking -- I can actually
18  ask you a hypothetical question.
19      A    Yes.
20      Q    If money market accounts were
21  not an eligible security under the RFA,
22  would you believe it's appropriate to base
23  a valuation of the RFA upon an investment
24  in them?
25          MR. LAWRENCE:  Object to the
```

Page 230

```
 1          Peter Shapiro
 2    form.
 3       A    Again, if they were not
 4    allowed, they shouldn't be -- you wouldn't
 5    use them.  It's not appropriate to use
 6    them.
 7       Q    At your last deposition, you
 8    testified that, in valuing the RFA, you
 9    should use the cheapest to deliver of the
10    eligible securities.
11         Do you recall that?
12       A    Correct.
13       Q    Which means the highest
14    yielding of the eligible securities, fair
15    enough?
16       A    Correct.
17       Q    And you have testified today
18    and last time that you have done analyses
19    for Washington TSA about investments they
20    could make that would be higher yielding
21    than a money market account?
22       A    I don't think I ever said in
23    comparison to a money market account.
24       Q    You did an analysis in November
25    of 2011 that recommended investments that
```

Page 231

```
 1          Peter Shapiro
 2    would yield significantly more than
 3    65 basis points.
 4         Do you recall that?
 5       A    Yes, but I was never comparing
 6    specifically to a money market account.
 7    You know, whether or not it was more
 8    than -- more or less than 65 basis points
 9    is a different question.
10         But we didn't look at, I don't
11    think, a comparison with the money market
12    account.
13       Q    But you recall making
14    recommendations of investments that
15    Washington TSA could make that would yield
16    more than 65 basis points?
17       A    Correct.
18       Q    And are you aware that
19    Washington TSA was presented with other
20    alternatives from Barclay's or Grant Street
21    that would yield significantly more than 65
22    basis points?
23         MR. LAWRENCE:  Objection to the
24    form.
25       A    Yes, yes.
```

Page 232

```
 1          Peter Shapiro
 2       Q    Did you discuss those alternate
 3    reinvestment options, either yours or
 4    others, with Washington TSA?
 5       A    Yes.
 6       Q    And do you know why Washington
 7    TSA has not invested in any of those higher
 8    yielding options?
 9       A    They felt in most cases like
10    they represented too much risk.
11       Q    And who did you have that
12    discussion with?
13       A    My recollection is we had -- I
14    had discussions with the senior staff, and
15    they may have involved at least one board
16    member, maybe a couple of board members.
17       Q    Do you recall having more than
18    one discussion about this?
19       A    Yes.
20       Q    How many discussions do you
21    recall?
22       A    I would say it would be
23    somewhere between three and five.
24       Q    When was the last time you
25    discussed the possibility of investing in
```

Page 233

```
 1          Peter Shapiro
 2    something that would yield more than 65
 3    basis points with Washington TSA?
 4       A    I believe it was more than two
 5    years ago.  It could have extended into
 6    2012.  I don't think there were any
 7    discussions in 2013.
 8       Q    You are not aware of them
 9    recently considering reinvestment options?
10       A    The only thing I am aware of is
11    that there -- when they did a refinancing,
12    there may have been some discussion about
13    that.  But we weren't involved in that
14    discussion.
15       Q    Other than Mr. Curry and
16    Mr. Hasterok, do you know if Washington TSA
17    considered hiring anyone else to serve as
18    an expert in this case?
19       A    I can't recall.
20       Q    Did you recommend anyone else
21    to be considered as potential experts in
22    this case?
23       A    I know he had a conversation
24    about various places to go for experts on
25    this.
```

Page 234

Peter Shapiro

1
2      Q    And did you recommend any other
3  individuals?
4      A    I may have discussed them.
5      Q    Who do you recall?
6      A    I'm not recalling.
7      Q    Okay.  Do you recall where else
8  you suggested they might look for experts?
9      A    You know, I recall generally
10  saying that I thought the best thing would
11  be to have somebody who would provide a
12  good balance to my expertise by having
13  somebody who had recent dealer experience.
14      Q    Because that was something you
15  were lacking?
16      A    Yes, because I haven't been on
17  the dealer side, you know, as you have gone
18  over, since 1993, which is a little while
19  ago.
20      Q    And the market was relatively
21  young at that point?
22      A    Correct.
23      Q    In your last deposition, Jay
24  asked a couple of questions about the
25  market quotation process that you did in

Page 235

Peter Shapiro

1
2  March of 2009 relating to the Washington
3  RFA.
4         Do you recall that?
5      A    Yes.
6      Q    And you had indicated that you
7  weren't able to obtain anything either
8  actionable or indicative in terms of quotes
9  at that time?
10      A    Right.
11      Q    And you said you also didn't
12  retain any records relating to that
13  process?
14      A    Right.
15      Q    You also ran a market quotation
16  process for Tobacco New York; is that
17  correct?
18      A    Yes, for New York State Tobacco
19  Securitization Financing Corporation.
20      Q    And do you recall the results
21  of that market quotation process?
22      A    No -- no bid, you know, no
23  quotes.
24      Q    Do you recall whether you kept
25  records of that process?

Page 236

Peter Shapiro

1
2      A    I believe we kept a list of who
3  we contacted.  We put it a in memo form for
4  them.
5         MS. SAWYER:  Mark this one.
6      A    I think -- do you have that?
7  Yes.
8      Q    31.
9         (Exhibit No. Shapiro 31, Swap
10         Financial Group memorandum,
11         October 19, 2009, relating to
12         calculation of loss for TSFC's two
13         reserve fund agreements with Lehman
14         Brothers Special Financing, Inc., is
15         marked by the reporter for
16         identification.)
17      Q    I am handing you a document
18  that has been marked as Shapiro Exhibit 31,
19  which is a Swap Financial Group memorandum,
20  October 19, 2009, relating to calculation
21  of loss for TSFC's two reserve fund
22  agreements with Lehman Brothers Special
23  Financing, Inc.
24         And is this a memorandum that
25  you prepared?

Page 237

Peter Shapiro

1
2      A    I prepared with James Vergara.
3  My guess is James did the first cut.
4      Q    And this was prepared on
5  October 19, 2009, so after the loss
6  valuation memo for Washington, correct?
7      A    Correct.
8      Q    And it indicates in the -- in
9  the paragraph above the chart, it says:
10         "On September 11, 2009, SFG on
11  behalf of TSFC distributed a term sheet,
12  execution copies of RFAs, and credit and
13  financial information on TSFC to 14
14  dealers."
15      A    Correct.
16      Q    Do you recall doing that
17  process for TSFC New York?
18      A    I'm not recalling specifically
19  doing them.  My guess is James did.
20      Q    Okay.  And did you distribute
21  similar information to the dealers for
22  Washington TSA?
23      A    I don't believe we did.  I
24  believe we made -- we reached out to them
25  all by telephone and got turned down right

Page 238

1        Peter Shapiro
2   away.
3        Q    Why the difference between
4   Washington and New York?
5        A    New York had -- New York made
6   different requests of us.
7        Q    Who made different requests of
8   you?
9        A    The New York agency.
10       Q    So the New York agency insisted
11  upon a market quotation process?
12            MR. LAWRENCE:  Objection to the
13       form.
14       A    No.  Both required a market
15  quotation process.  This one, New York
16  asked for us to take specific steps in a
17  specific manner.
18       Q    So someone from the New York
19  Tobacco Settlement Agency asked for you to
20  run the process in this way?
21       A    Correct.
22       Q    And a similar request wasn't
23  made by Washington?
24       A    Right.
25       Q    Did you discuss with Washington

Page 239

1        Peter Shapiro
2   whether or not a formal process where
3   information was distributed should be run?
4        A    No.
5        Q    That discussion never occurred?
6        A    Not that I can recall.
7        Q    And did -- and did New York
8   raise the issue with you to run a formal
9   process?
10       A    I'm not remembering the
11  details.  I just know New York had more of
12  a desire to paper things.
13       Q    Than Washington did?
14       A    Yes.
15       Q    What do you mean by "a desire
16  to paper things"?
17       A    To create a specific paper
18  record.
19       Q    And is that why then you
20  recorded the results of your contacts?
21       A    Correct.
22       Q    But you didn't feel it
23  necessary to keep any sort of records like
24  this for Washington TSA?
25       A    No.  And when -- you know, if

Page 240

1        Peter Shapiro
2   you read the ISDA agreement, it
3   specifically allows you -- you know, it
4   says, "Your records will be" -- you know,
5   will -- it doesn't use the word
6   "dispositive."
7            But it says the record of the
8   party taking them is all that's required.
9   You don't have to have records coming back
10  from the dealers and all of those kinds of
11  things.  New York wanted it to go a little
12  further.
13       Q    You referred to the "ISDA
14  agreement"?
15       A    The ISDA agreement, yeah.
16       Q    We are dealing with the reserve
17  fund agreement here.
18       A    Yes, exactly, but it's the --
19  because the reserve fund agreement is based
20  upon ISDA, we kind of look at that as a
21  standard reference.
22       Q    But there is no such language
23  in the reserve fund agreement like there is
24  in the ISDA?
25       A    I'll accept your -- your

Page 241

1        Peter Shapiro
2   statement there.
3        Q    So you never discussed with
4   Washington TSA potentially that they might
5   want to paper their records a little bit?
6        A    We didn't, no.
7        Q    Okay.
8        A    And as you know, there is no
9   contention that anyone is making that there
10  was -- there was a live market.
11       Q    But you are aware that Lehman
12  obtained an indicative quote in March of
13  2009?
14       A    We have seen that indicative
15  quote; and if you read it closely, you
16  would agree with me that it's as far from
17  actionable as you can get.
18       Q    But they did obtain an
19  indicative quote, correct?
20       A    Yeah, I would call it a "junk
21  quote."
22       Q    Did you contact Wachovia?
23       A    Yes.
24       Q    And they said:
25            "We are going to give one to

Page 242

Peter Shapiro
1 
2 Lehman, but not to you"?
3    A    No.  Wachovia said they
4 couldn't quote on it.
5    Q    And why do you think Lehman was
6 able to get an indicative quote then?
7    A    My guess is Lehman coaxed a
8 quote out of them with all the caveats that
9 they put in it, which we think make it
10 useless.
11    Q    Now, of course, when you
12 solicited quotes for Tobacco New York, the
13 solicitation packet contained all of those
14 caveats as well, correct?
15    A    Caveats such as?
16    Q    That they didn't need to
17 provide indicative quotes, correct?
18    A    They didn't need to provide
19 indicative quotes?
20    Q    Or they were -- or they were
21 seeking -- I'm sorry -- they didn't need to
22 provide actionable quotes.
23    A    Correct.
24    Q    All that was being sought was
25 an indicative quote?

Page 243

Peter Shapiro
1 
2    A    That is correct.  That is
3 correct.  That is correct.  It doesn't --
4 that we weren't seeking to transact.
5    Q    And when you contacted the
6 dealer --
7    A    But we did say these entity,
8 you know, quotes, which would be real -- we
9 tried to characterize it in as much
10 language as we -- as we could that this --
11 that these have to be real.
12       You know, these can't be, you
13 know, "Do us a favor and give us a quote."
14    Q    So in New York, you solicited
15 indicative quotes for New York, correct?
16    A    "Indicative" I don't think is
17 the word we -- that I would really use.  I
18 would say that these are not live quotes
19 that the agency would take action on.
20    Q    Did you communicate that to
21 Washington -- to the dealers you solicited
22 in Washington as well?
23    A    Yes, they knew full well the
24 process.
25    Q    And even though you indicated

Page 244

Peter Shapiro
1 
2 you were not seeking an actionable quote,
3 they still refused to provide even
4 indicative levels?
5    A    Absolutely.
6    Q    And which dealers did you
7 contact for Washington?
8    A    We went exhaustively, just like
9 we did here.
10    Q    You contacted these exact same
11 dealers?
12    A    You know, it would have been
13 everybody on the system.  I am trying to
14 think if it would be anybody else we would
15 have extended out to beyond this.  I'm not
16 sure.  I'd have to go back and look at who
17 was in the -- potentially in the market at
18 that time.
19       You know, remember, there are
20 mergers going on at this time; so you
21 notice on this one, Wachovia and Wells are
22 both listed separately because they had
23 separate desks still at that time, and even
24 though they were in the midst of a merger.
25       You know, so there are -- there

Page 245

Peter Shapiro
1 
2 are situations like that where you have to
3 look -- at different dates, you may have
4 multiple counterparties.
5    Q    Have you reviewed both of the
6 expert reports submitted by Lehman in this
7 matter?
8    A    Yes.
9    Q    And do you know David Babble?
10    A    No, I don't.
11    Q    And what's your opinion of
12 Mr. Babble expert report?
13    A    You know, I didn't come here
14 today to discuss that in detail.  So I'd
15 need to spend more time formulating it.  My
16 first impression of it was it wasn't very
17 useful.
18    Q    Why didn't you find it useful?
19    A    It has an illogical, slavish
20 adherence to the forward yield curve being
21 a good predictor of where markets will go,
22 despite evidence -- despite the majority of
23 the evidence to the contrary.
24    Q    Do you know Mr. Greuer?
25    A    Yes.

Page 246

```
 1              Peter Shapiro
 2      Q    And how do you know Mr. Greuer?
 3      A    He's been an active participant
 4  in this market for many years.
 5      Q    And what is your opinion of
 6  Mr. Greuer?
 7      A    I like him.
 8      Q    And do you have any comments on
 9  his report?
10      A    Yeah, I -- you know, I think he
11  was presenting an inaccurate portrait of
12  what a hypothetical replacement would be.
13      Q    In terms of his comments on
14  your hypothetical replacement transaction
15  analysis?
16      A    Yeah, he's -- I think he's very
17  wrong.
18      Q    Anything else?
19      A    There are a lot of reasons he's
20  wrong, but he's very wrong, yeah.
21      Q    What are the reasons he's
22  wrong?
23      A    Well, you know, he is looking
24  at -- his biggest single reasons he's wrong
25  are on the spread calculation.  You know,
```

Page 248

```
 1              Peter Shapiro
 2      THE WITNESS:  Sure.
 3      MS. SAWYER:  I don't have
 4  anything further.
 5      MR. LAWRENCE:  Thanks.
 6  (Deposition adjourned, 3:05 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 247

```
 1              Peter Shapiro
 2  he's way off on the spread.
 3          If his spread calculations are
 4  correct, banks would have been tripping
 5  over each other to do this business and
 6  making a bundle doing it because they could
 7  have written these agreements at rates
 8  which were far above what he was proposing,
 9  and expanded their profit margins
10  drastically.
11          But nobody was wanting to do
12  it.  That tells you his numbers are no
13  good.
14      Q    And when you refer to the
15  spread, he adopted your profit spread of 25
16  basis points, correct?
17      A    Right.
18      Q    So you are referring to his
19  credit spread?
20      A    I am referring to his credit
21  spread principally.
22      MS. SAWYER:  If you just want
23  to give me a second, I'm going to look
24  over my notes and we might be
25  finished.
```

Page 249

```
 1
 2          J U R A T
 3
 4      I DO HEREBY CERTIFY that I have
 5  read the foregoing transcript of my
 6  deposition testimony.
 7
 8
 9
10
11  SWORN TO AND SUBSCRIBED
12  BEFORE ME THIS
13  DAY OF 2014
14  _ _ _ _ _ _ _ _ _ _
15
16
17
18
19
20
21
22
23
24
25
```

## Page 250

```
 1
 2          I N D E X
 3   WITNESS        DIRECT      CROSS
 4
 5
 6
 7   PETER SHAPIRO
 8
 9
10
11   BY MS. SAWYER    3
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 251

```
 1
 2       E X H I B I T S
 3
 4   NUMBER   DESCRIPTION       PAGE
 5
 6   Exhibit No. Shapiro 10, Document  16
 7   Exhibit No. Shapiro 11, Agreement  19
     between Peter Shapiro and
 8   Washington TSA for consulting and
     expert services
 9
     Exhibit No. Shapiro 12, Agreement  19
10   between Peter Shapiro and
     Washington TSA for consulting and
11   expert services
12   Exhibit No. Shapiro 13, Agreement  19
     between Peter Shapiro and
13   Washington TSA for consulting and
     expert services
14
     Exhibit No. Shapiro 14, Agreement  19
15   between Peter Shapiro and
     Washington TSA for consulting and
16   expert services
17   Exhibit No. Shapiro 15, Agreement  20
     between Peter Shapiro and
18   Washington TSA for consulting and
     expert services
19
     Exhibit No. Shapiro 16, Agreement  20
20   between Peter Shapiro and
     Washington TSA for consulting and
21   expert services
22   Exhibit No. Shapiro 17, Exhibit B  21
     to Agreement between Peter
23   Shapiro and Washington TSA for
     consulting and expert services
24
25
```

## Page 252

```
 1
 2
 3   Exhibit No. Shapiro 18, Invoice   28
     from Mr. Shapiro to Washington
 4   TSA for services performed
 5   Exhibit No. Shapiro 19, Invoice   28
     from Mr. Shapiro to Washington
 6   TSA for services performed
 7   Exhibit No. Shapiro 20, Invoice   29
     from Mr. Shapiro to Washington
 8   TSA for services performed
 9   Exhibit No. Shapiro 21, 7/8/13
     Invoice from Mr. Shapiro to
10   Washington TSA for services
     performed
11
     Exhibit No. Shapiro 22, 7/12/13   29
12   Invoice from Mr. Shapiro to
     Washington TSA for services
13   performed
14   Exhibit No. Shapiro 23, Invoice   29
     from Mr. Shapiro to Washington
15   TSA for services performed
16   Exhibit No. Shapiro 24, 9/287/13  29
     invoice from Mr. Shapiro to
17   Washington TSA for services
     performed
18
     Exhibit No. Lehman 15, April 25,  81
19   2009 memorandum from Swap
     Financial Group, previously
20   marked Document
21   Exhibit No. Lehman 19, September  81
     10, 2009 Memorandum from Swap
22   Financial Group, previously
     marked Document
23
24
25
```

## Page 253

```
 1
 2
 3   Exhibit No. Shapiro 25, Copy of   96
     the expert information provided
 4   to Jones Day on December 16,
     2013, a copy of Mr. Shapiro's
 5   September 10, 2009, memorandum
     with an additional cover sheet
 6
     Exhibit No. Shapiro 26, Excel    103
 7   spreadsheet Bates stamped
     SFG 2009
 8
     Exhibit No. Shapiro 27, Copy of  120
 9   the Swap Financial privilege log
10   There was an instruction not to  130
     answer.
11
     There was an instruction not to  131
12   answer.
13   There was an instruction not to  135
     answer.
14
     Memorandum prepared for mediation 170
15   requested
16   Memorandum containing valuations  188
     requested
17
     Analysis of widening of spreads  193
18   requested
19   There was an instruction not to  205
     answer.
20
     Exhibit No. Shapiro 28,          206
21   Washington TSA privilege log from
     10/4/13
22
     Exhibit No. Shapiro 29, Document, 208
23   E-Mail chain, first E-Mail in the
     chain from Peter Shapiro to Sandy
24   Garr and James Vergara on
     July 14, 2010, Bates stamp TSA
25   042479 through 042481
```

Page 254

```
 1
 2
 3     Exhibit No. Shapiro 30, Copy of    212
       the Expert Witness Valuation
 4     Report submitted on December 16,
       2013, by Mr. Curry and
 5     Mr. Hasterok
 6     Exhibit No. Shapiro 31, Swap       236
       Financial Group memorandum,
 7     October 19, 2009, relating to
       calculation of loss for TSFC's
 8     two reserve fund agreements with
       Lehman Brothers Special
 9     Financing, Inc.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 255

```
 1
 2              CERTIFICATE
 3
 4        I, TAB PREWETT, A Registered
       Professional Reporter, Notary Public,
 5     Certified LiveNote Reporter, and Certified
       Shorthand Reporter, do hereby certify that
 6     prior to the commencement of the
       examination PETER SHAPIRO was sworn by the
 7     notary public to testify the truth, the
       whole truth and nothing but the truth.
 8
 9
          I DO FURTHER CERTIFY that the
10     foregoing is a true and accurate transcript
       of the testimony as taken stenographically
11     by and before me at the time, place and on
       the date hereinbefore set forth.
12
13
          I DO FURTHER CERTIFY that I am
14     neither a relative nor employee nor
       attorney nor counsel of any of the parties
15     to this action, and that I am neither a
       relative nor employee of such attorney or
16     counsel, and that I am not financially
       interested in the action.
17
18
       _____
19
20     Notary Public
21
22
       My Commission expires February 9, 2019
23     Dated:  March 16, 2014
24
25
```