**EXHIBIT 7 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For
An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

- PETER SHAPIRO -

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------- X

In Re:                           )

LEHMAN BROTHERS                  )   Chapter 11

HOLDINGS INC., et al.,           )   Case No. 08-13555 (JMP)

        Debtors.        )   (Jointly Administered)


----------------------------------------- X

DATE:  December 13, 2013

TIME:  9:40 a.m.


        Videotaped DEPOSITION OF PETER

SHAPIRO, a 30(b)(6) witness, held at the offices of

Jones Day, 222 East 41st Street, New York, New

York, pursuant to Notice, before Hope Menaker, a

Shorthand Reporter and Notary Public of the State

of New York.

Page 2

```
 1              - PETER SHAPIRO -
 2      A P P E A R A N C E S :
 3
 4      JONES DAY
 5      Attorneys for the Debtors
 6          222 East 41st Street
 7          New York, New York  10017
 8      BY: JAYANT W. TAMBE, ESQ.
 9          LAURA SAWYER, ESQ.
10          REBEKAH BINGER, ESQ.
11
12      PACIFICA LAW GROUP
13      Attorneys for the Washington Tobacco Settlement
14      Authority and the Witness
15          1191 Second Avenue, Suite 2100
16          Seattle, Washington 98101-2945
17      BY: PAUL J. LAWRENCE, ESQ.
18
19
20
21
22
23
24
25
```

Page 3

```
 1              - PETER SHAPIRO -
 2          THE VIDEOGRAPHER:  This is Tape
 3      Number 1 of the videotaped deposition of
 4      Mr. Peter Shapiro in the matter of In Re:
 5      Lehman Brothers Holdings Inc., et al,
 6      Debtors, in the United States Bankruptcy
 7      Court, Southern District of New York, Case
 8      Number 08-13555 (JMP).
 9          This deposition is being held at
10      Jones Day, 222 East 41st Street, New York,
11      New York, on December 13, 2013, at
12      approximately 9:42 a.m.
13          My name is Ilitch Peters from the
14      firm of Elisa Dreier Reporting Corporation
15      and I'm the legal video specialist.
16          The court reporter is Hope Menaker in
17      association with Elisa Dreier Reporting
18      Corporation, located at 950 Third Avenue, New
19      York, New York.
20          For the record, will counsel please
21      introduce themselves.
22          MR. LAWRENCE:  Paul Lawrence for the
23      Washington State Tobacco Settlement
24      Authority.
25          MR. TAMBE:  Jay Tambe for the Debtor,
```

Page 4

```
 1              - PETER SHAPIRO -
 2      Lehman Brothers Holdings Inc.
 3          MS. SAWYER:  Laurie Sawyer from Jones
 4      Day for the Debtor.
 5          MS. BINGER:  Rebekah Binger, Jones
 6      Day for the Debtor.
 7          THE VIDEOGRAPHER:  Now will the court
 8      reporter please swear in the witness.
 9          PETER SHAPIRO, called as a witness,
10      having been duly sworn on December 13, 2013,
11      by a Notary Public, was examined and
12      testified as follows:
13              76 South Orange Ave.
14              South Orange, NJ
15
16      EXAMINATION BY MR. TAMBE:
17      Q.    Good morning, Mr. Shapiro.
18      A.    Good morning.
19      Q.    By whom are you currently employed?
20      A.    Swap Financial Group.
21      Q.    Is that a company that you have an
22      ownership interest in?
23      A.    Yes.
24      Q.    What's the nature of your ownership?
25      A.    I'm the principal owner of the firm.
```

Page 5

```
 1              - PETER SHAPIRO -
 2      Q.    Are there other owners?
 3      A.    Yes.
 4      Q.    Who are the other owners?
 5      A.    The other owners are Nat -- Nathaniel
 6      Singer, Bryna Linett and James Murphy.
 7          Bryna, B-R-Y-N-A, last name Linett,
 8      L-I-N-E-T-T and James Murphy, standard spellings
 9      on that.
10          (Whereupon, a brief discussion was
11      held off record.)
12      Q.    When was Swap Financial Group
13      founded?
14      A.    1997.
15      Q.    Okay.  You founded it?
16      A.    Yes.
17      Q.    Okay.  And at the time it was
18      founded, who were the owners?
19      A.    Myself, Bryna Linett, and John
20      Keenan, K-E-E-N-A-N.
21      Q.    And Bryna is your wife, I take it?
22      A.    Correct.
23      Q.    What is your ownership interest in
24      Swap Financial Group?
25      A.    Seventy-nine percent.
```

Page 6

1           - PETER SHAPIRO -
2      Q.   And has it been 79 percent throughout
3   the --
4      A.   Correct.
5      Q.   -- existence of Swap Financial Group?
6      A.   Correct.
7      Q.   Let's just talk about the size and
8   employees.
9           So when you started out in 1996, who
10  were the employees of Swap Financial Group?
11     A.   We -- we sometimes make a distinction
12  between employees and partners, just because it's
13  a limited liability company but I'm just going to
14  use the word staff.
15     Q.   And you include both in that?
16     A.   Yes, including both.
17     Q.   That's fine.
18     A.   Okay.  And there were three when we
19  initially started.
20     Q.   And those were the three partners?
21     A.   Correct.
22     Q.   How many folks are staff at Swap
23  Financial Group now?
24     A.   Right now, six.
25     Q.   In 2008, in the fall of 2008, how

Page 7

1           - PETER SHAPIRO -
2   many staff did Swap Financial Group have?
3      A.   We had people come and go bit by bit.
4   It was either six -- it was -- it must have been
5   six, right around that.  We don't -- we have been
6   as high as seven and we have been as low as five,
7   but it's in that range.
8      Q.   That answers my question.
9           You've never had more than seven
10  staff at any given time?
11     A.   I think not.  We may have gone to
12  eight for a -- momentarily, but that's about it.
13     Q.   And your offices, Swap Financial
14  Group's offices, where are those located?
15     A.   Our principal office is in South
16  Orange, New Jersey.
17     Q.   By your answer, I -- I assume that
18  you probably have offices that are not principal
19  offices?
20     A.   Correct.
21     Q.   Okay.  So where are those offices?
22     A.   We have people who have -- who work
23  out of other locations in suburban Philadelphia
24  and in San Diego.
25     Q.   Okay.

Page 8

1           - PETER SHAPIRO -
2      A.   During the time in question, you were
3   asking about 2008, it was in South Orange, though.
4      Q.   Okay.  That's good, thank you.
5           I'm going to hand you some documents
6   that have been marked as exhibits.  I'm first
7   handing you a document marked as Shapiro Exhibit
8   1.
9           (Whereupon, Shapiro Exhibit 1 was
10  tendered to the witness for identification.)
11     Q.   Do you recognize that document?
12     A.   I do.
13     Q.   Okay.  And that's a subpoena that was
14  served on Swap Financial Group, correct?
15     A.   Yes.
16     Q.   Who was responsible at Swap Financial
17  Group for responding to the subpoena?
18     A.   I would have principal
19  responsibility, although I might very well ask
20  others to assist me with that.
21     Q.   So with respect to this subpoena, you
22  did, in fact, have principal responsibility to
23  respond --
24     A.   Yes.
25     Q.   Yes?

Page 9

1           - PETER SHAPIRO -
2      A.   I'm a -- you know, I supervise.  I
3   take principal responsibility.
4      Q.   Okay.  And who helped you with
5   responding to this subpoena?
6      A.   Jay, what's the date on the subpoena?
7   Just to help me out here.
8           MS. SAWYER:  August 27th.
9      Q.   August 27, 2013.
10     A.   August 27, 2013, the other person who
11  would have assisted me on this would have been
12  Lillian Chern.
13     Q.   And that's a non-partner staff
14  member?
15     A.   Correct.
16     Q.   Now, one of things that this subpoena
17  calls for is the production of electronic
18  documents, correct?
19     A.   Correct.
20     Q.   What did you do to look for and
21  produce electronic documents in response to this
22  subpoena?
23     A.   We -- we went through our various
24  computers to make sure that we produced everything
25  that was requested, that was not privileged.

Page 10

- PETER SHAPIRO -

2  Q.    When you say "various computers,"
3  does that include the laptop computer that was
4  used by James Vergara?
5  A.    Yes.
6  Q.    Okay.  And you were able to access
7  that laptop?
8  A.    Yes.
9  Q.    Did you locate any responsive
10 documents on that laptop?
11 A.    Lillian would have done it.  Anything
12 that she thought was responsive, she would have
13 included.
14 Q.    Were there documents or files on the
15 Vergara laptop that you were unable to access?
16 A.    Not that I'm aware of.
17 Q.    And do you still have the Vergara
18 laptop --
19 A.    Yes.
20 Q.    -- in your possession?
21 A.    Yes.
22 Q.    Now, Swap Financial Group, does it
23 have a document retention policy?
24 A.    No.
25 Q.    It's never had one?

Page 11

- PETER SHAPIRO -

2  A.    It -- we -- we -- we did not have one
3  during the time in question.  Now, I -- at this
4  point, we -- the firm is in various stages of
5  becoming subject to regulation under the
6  Dodd-Frank Act.  Those regulations kick in in
7  various stages and they have been subject to
8  rule-making which has been put forward and then
9  pulled back.  So it's -- it's been a little bit
10 tricky in terms of how we actually deal with the
11 various rule-making on this.
12        We have drafted a documentation
13 retention policy.  I think I mentioned this in
14 some previous correspondence with your firm.  But
15 whether or not it's -- you know, we're -- we're
16 waiting to make sure we get final rule making on
17 all of this.
18        Remember, in the time in question,
19 there was no regulatory framework that we were
20 subject to.
21 Q.    And so, in the time in question,
22 again, let's just define the time in question as
23 2008 to the present.  All right?
24 A.    Or 2 -- I was thinking more 2008-2009
25 when -- during the period of time of the

Page 12

- PETER SHAPIRO -

2  termination.  But, you know, if you went up to the
3  present, that's fine by me, too.
4  Q.    Well, let's -- let's say 2008 through
5  2010.
6  A.    Okay.
7  Q.    To the end of 2010.
8        Am I right from your previous answers
9  that there was no formal document retention policy
10 during that time period?
11 A.    We began to work on one, I believe,
12 in 2010 because that was when the first of the
13 Dodd-Frank rule started to -- seemed like they
14 were going to emerge.
15        I don't want to be technical here,
16 but there are various levels of Dodd-Frank
17 regulations that we start to become subject to.
18 There are ones that apply to under -- what's
19 called Title 7, the derivatives title.  There are
20 also are ones that apply in our role as an advisor
21 to municipal entities, and that's a separate set
22 of rules; which is MSRB and SEC related, as
23 opposed to Title 7, which is CFTC and SEC related.
24        And we try to be very careful to make
25 sure we go -- you know, that we not just comply,

Page 13

- PETER SHAPIRO -

2  that we try to make sure that we're anticipating
3  what the spirit of these regs are.
4  Q.    Other than any policies you may have
5  begun to draft or consider in response to
6  Dodd-Frank, in the relevant time period between
7  2008 and the end of 2010, did you have any other
8  policies in place with respect to document
9  retention?
10 A.    We have spoken -- you know, we're a
11 small shop, as you can tell from my description of
12 the staff.  We're all basically within earshot of
13 each other.  We don't look like a lot of firms
14 that you may be accustomed to seeing; that is,
15 everyone can see each other, we sit within a
16 trading room together.  We don't e-mail each other
17 back and forth, it would be silly because we can
18 see and hear each other, unless somebody is
19 traveling or something like that.
20        The -- so, on things like this, we
21 have spoken rules and one of the spoken rules,
22 obviously, is that we retain client
23 communications.  So it's not -- it's not like we
24 have a written policy, but we've always had a
25 spoken rule to retain client communications.

Page 14

                    - PETER SHAPIRO -
1
2        Q.    Okay.  So again, just so I'm clear,
3   putting aside anything you may have done in
4   anticipation of Dodd-Frank regulations, is it your
5   testimony that you've always had a spoken policy
6   to retain all client communications?
7        A.    That's correct.
8        Q.    Okay.  Other than --
9        A.    I should say -- let me clarify.
10  There's a common sense to it; that is, we have
11  lots of client communications that go back and
12  forth like this:  I can do the call on Monday at
13  2:30, I can't do it at Tuesday at 3:00.  I don't
14  think anybody retains that kind of e-mail.
15       Q.    Putting that aside -- again, so
16  putting aside the Dodd-Frank related efforts, and
17  putting aside this spoken policy about retaining
18  client communication, any other spoken or written
19  policies that were in place in the relevant time
20  period?
21       A.    You're asking very broadly there.
22       Q.    Yes, I am.  It's not a very big shop,
23  as you said --
24       A.    Yeah.
25       Q.    -- so what were the policies?

Page 15

                    - PETER SHAPIRO -
1
2            MR. LAWRENCE:  Object to the form of
3   the question.
4        Q.    What were the policies?
5        A.    Any other --
6            MR. LAWRENCE:  Same objection.
7        A.    -- we have policies which go to
8   making sure we're honest, ethical --
9        Q.    I think I asked you about policies
10  related to document retention.
11       A.    Oh, I --
12           MR. LAWRENCE:  Excuse me.  You can't
13  talk over each other.  So let him answer,
14  finish his answer before you interrupt him.
15       A.    I didn't -- you said any other
16  policies, so I thought you were asking very
17  broadly.
18       Q.    So let's -- let's ask much more
19  specifically.
20           Other than any efforts related to
21  Dodd-Frank, other than the spoken policy
22  concerning client communications that you
23  testified about, can you identify any other spoken
24  or written policies Swap Financial Group had about
25  document retention in the 2008 through end of 2010

Page 16

                    - PETER SHAPIRO -
1
2   time period?
3        A.    No.
4        Q.    Starting sometime in September 2008,
5   you became involved in various engagements in
6   connection with the Lehman bankruptcy, correct?
7        A.    Correct.
8        Q.    In connection with any of those
9   engagements, any of them, did you adopt any
10  document retention policies --
11       A.    Not --
12       Q.    -- written or spoken?
13       A.    Not that I can recall.  And not that
14  differ in any way from what I've already testified
15  to.
16       Q.    Approximately how many engagements
17  related to the Lehman bankruptcy has Swap
18  Financial Group entered into?
19           MR. LAWRENCE:  I'm going to interpose
20  an objection as to relevancy as to anything
21  other than the Washington TSA engagement.  If
22  we have an understanding that I have that
23  objection preserved, I'll let you go into
24  this a little bit.
25           MR. TAMBE:  I hear your objection.

Page 17

                    - PETER SHAPIRO -
1
2        Q.    Can you answer the question?
3            MR. LAWRENCE:  Well, the -- the
4   answer is either you accept that my objection
5   is reserved or I instruct the witness not to
6   answer about other engagements.
7            So, if -- if you will agree that by
8   having -- allowing the witness to answer, I'm
9   not waiving the objection as to the scope of
10  your questioning, that's fine.  If you want
11  me to -- if you're not willing to preserve
12  that objection, then I think we have to have
13  another discussion.
14           MR. TAMBE:  Right.  So I'm not
15  willing to waive -- I'm not willing to agree
16  to your proposal.  I want an answer to my
17  question.
18           And if you can read the question
19  back, let's be clear about what the question
20  is.
21           (The question requested was back by
22  the reporter.)
23           MR. LAWRENCE:  Same objection.  You
24  can answer that question.
25       A.    What do you mean by "engagements"?

Page 18

1         - PETER SHAPIRO -
2      Q.    How many different counterparties to
3   Lehman have retained you to provide any advice in
4   connection with the Lehman bankruptcy?
5             MR. LAWRENCE:  I guess you can only
6      answer that to the extent that you're
7      disclosed as a person by that entity.
8             MR. TAMBE:  No, that's not the
9      question.  The question is --
10            MR. LAWRENCE:  Then I'll instruct him
11     not to answer.
12            MR. TAMBE:  Let me finish.  Let me
13     respond to your objection so we can have a
14     clean record as to what's going on here.
15     Q.    What I'm asking is a very specific
16   question:  How many counterparties to Lehman have
17   retained Swap Financial Group to provide any kind
18   of advice -- start that again.
19            How many counterparties to Lehman
20   have engaged Swap Financial Group to advise them,
21   in any capacity, with respect to the Lehman
22   bankruptcy?
23            MR. LAWRENCE:  And I will instruct
24     you to answer only to the extent that you can
25     without waiving any privileges related to any

Page 19

1         - PETER SHAPIRO -
2   of those engagements.
3      A.    I don't have -- I don't have an exact
4   number at my fingertips.  I know we have been
5   involved very extensively in all aspects.
6            I'd ask you also, when you say
7   "Lehman," what do you mean by "Lehman"?  Because
8   we've had -- there are many, many Lehman entities,
9   as you know.
10     Q.    I mean all of the Lehman U.S.
11   Debtors.
12     A.    So excluding international --
13     Q.    Yes.
14     A.    Are you including LBCB --
15     Q.    Yes.
16     A.    -- Lehman Brothers Commercial Bank,
17   because that's been treated separately.
18     Q.    Yes, I'm including that.
19     A.    You know, it's been -- you know, in
20   the, you know -- it's a large number of entities.
21   I can --
22     Q.    More than 50?
23     A.    Yes, more than 50.
24     Q.    More than a hundred?
25     A.    It -- your -- somewhere in that

Page 20

1         - PETER SHAPIRO -
2   ballpark.
3      Q.    About a hundred?
4      A.    Plus or minus 50, I would say, Jay.
5      Q.    All right.  That's fair.
6      A.    Okay.  You know, just -- just to -- I
7   don't want to -- want to -- I want to make sure
8   I'm clear on this.  With many of those entities,
9   we've had multiple Lehman transactions involved.
10     Q.    So if you're representing a
11   counterparty that had 10 separate swap
12   transactions with Lehman, is that what you mean by
13   multiple transactions?
14     A.    Yes.  Some of them have more than a
15   hundred.
16     Q.    I think my question is really not
17   looking at the number of transactions, but numbers
18   of entities.
19     A.    Yes.  Yes.  Elsewhere I know we've
20   stated we've handled, you know, roughly a thousand
21   transactions.  That's where you get that number
22   from.
23     Q.    So that thousand transactions is not
24   a thousand counterparties?
25     A.    Correct.  That's correct.

Page 21

1         - PETER SHAPIRO -
2            THE VIDEOGRAPHER:  Can you shift --
3            THE WITNESS:  I'm sorry, want me to
4      face more towards you?
5            THE VIDEOGRAPHER:  You're getting
6      close to the machine.
7            THE WITNESS:  Why don't I shut this?
8      Okay.  Very good.
9   BY MR. TAMBE:
10     Q.    Now, one of the partners you've
11   identified at Swap Financial Group is Nat Singer,
12   correct?
13     A.    Correct.
14     Q.    When did he become a partner at Swap
15   Financial Group?
16     A.    He joined us in -- end of 2007, early
17   2008, somewhere in there.
18     Q.    He joined from you Bear, Stearns; is
19   that right?
20     A.    Yes.  Prior to Bear, Stearns', you
21   know, acquisition by JPMorgan.
22     Q.    Just generally, what role has
23   Mr. Singer played with respect to the Washington
24   TSA engagement?
25     A.    We have a general approach in the

Page 22

```
 1              - PETER SHAPIRO -
 2    firm of discussing transactions throughout.  We --
 3    you know, we try to make it so that because we're
 4    a small team, that everybody knows a little bit
 5    about everything and Nat's been in the circle of
 6    people with -- with whom we discuss this.
 7         Q.    Was he an author of the valuation
 8    memos that were done, that have been produced in
 9    this case by Swap Financial Group?
10         A.    I wouldn't call him an author, no.
11         Q.    Can you describe what his involvement
12    was in any of those valuation memos that have been
13    produced in this case?
14         A.    He would discuss the elements that
15    would go into it.
16         Q.    And do you have any recollection of
17    what elements of those valuation memos he
18    contributed to?
19              MR. LAWRENCE:  Object to the form of
20    the question.
21         Q.    You can answer.
22         A.    The elements would have been the ones
23    I would characterize as substantive, not
24    grammatical review.
25         Q.    And other than Nat Singer, who else
```

Page 23

```
 1              - PETER SHAPIRO -
 2    worked on the valuations done by Swap Financial
 3    Group that have been produced in this case?
 4         A.    Can you give me the date of the ones
 5    that you're talking about?
 6         Q.    I'm thinking primarily of ones in
 7    April and September of 2009.
 8         A.    James Vergara would be the other one
 9    that would be involved.
10         Q.    Anyone else?
11         A.    I don't believe so.
12         Q.    Other than the valuations that were
13    done in April and September of 2009, are you aware
14    of any other valuations done by the Washington
15    TSA, let's say, in the time period January 2013 to
16    the present?
17         A.    This January?  You mean just over the
18    last twelve months?
19         Q.    Yes.
20              MR. LAWRENCE:  I'm going to instruct
21    him not to answer that question.
22              MR. TAMBE:  I think the question was
23    whether he's aware.
24              MR. LAWRENCE:  Right.
25              MR. TAMBE:  And what is the basis of
```

Page 24

```
 1              - PETER SHAPIRO -
 2    the objection?
 3              MR. LAWRENCE:  Since in that time
 4    period, Mr. Shapiro has only acted as a
 5    consulting witness, so anything that he has
 6    knowledge or he's learned, has done is
 7    protected by attorney work product.
 8         Q.    Mr. Shapiro, have you been retained
 9    as a testifying expert by Washington TSA?
10              MR. LAWRENCE:  Other than to the
11    extent in responding to your subpoena here.
12    Obviously he's doing that.
13              MR. TAMBE:  Yeah.  Fair objection.
14    Fair objection.  Let me be clear.
15         Q.    Have you been retained by Washington
16    TSA to provide an expert report and expert
17    testimony at trial in this matter?
18         A.    Just so I'm -- I'm not tripping up on
19    the legal definitions.
20         Q.    Yeah.
21              THE WITNESS:  Counsel, I think --
22              MR. LAWRENCE:  If I can clarify.
23    He -- he -- in the sense of preparing an
24    expert report that will be disclosed under
25    the expert disclosure guidelines here, no, he
```

Page 25

```
 1              - PETER SHAPIRO -
 2    has not been retained for that.
 3              Obviously, there's some degree of
 4    expertise that went into the loss
 5    calculations he's done to date and the proof
 6    of claims and those calculations.
 7              And -- and so to be clear, there's an
 8    element of expertise that went into that and
 9    those, obviously, you can ask about and those
10    are what they are.
11              But in terms a testify -- in terms of
12    an expert report that we're going to produce,
13    I think next week, no.
14         Q.    Do you know who Washington TSA has
15    retained as a testifying expert to provide a
16    report next week?
17              MR. LAWRENCE:  I will instruct the
18    witness not to answer that question.
19         Q.    Putting aside the identity of the
20    person, do you understand that there is a person
21    who has been retained as a testifying expert?
22              MR. LAWRENCE:  Instruct the witness
23    not to answer that question.
24         Q.    Have you had any --
25              MR. TAMBE:  Again, on what basis?
```

Page 26

- PETER SHAPIRO -

1
2     MR. LAWRENCE:  Same basis; that he's
3  a consulting expert, that would invade the
4  attorney work product.
5     Q.    Okay.  Have you had any discussions
6  with the person who may or may not have been
7  retained by the Washington TSA to be a testifying
8  expert in this case?
9     MR. LAWRENCE:  Same objection and
10  same instruction.
11     Q.    So -- has Swap Financial Group been
12  retained as a testifying expert in this matter?
13     MR. LAWRENCE:  The answer is no.
14     MR. TAMBE:  I could swear you in and
15  have you answer questions.
16     MR. LAWRENCE:  I know.  But in terms
17  of those types of issues, I think that's more
18  appropriately addressed to the attorneys.
19     MR. TAMBE:  Okay.
20     MR. LAWRENCE:  Again, they -- they
21  can and will testify about the calculations
22  that they did, that you're aware of.
23     MR. TAMBE:  Just to be clear, Paul,
24  any interactions, written, spoken, et cetera,
25  that Mr. Shapiro may or may not have had with

Page 27

- PETER SHAPIRO -

1
2  your testifying expert, your position is I
3  can't examine him on any of those issues; is
4  that right?
5     MR. LAWRENCE:  That's correct.  To
6  the extent that the testifying expert relied
7  on any information from Mr. Shapiro in terms
8  of their expert opinion.  You're certainly
9  free to ask the expert about that.
10     MR. TAMBE:  I don't agree with you,
11  but we can move on.  I understand your
12  position.  So --
13     Q.    I'm going to hand you, Mr. Shapiro, a
14  document marked Shapiro Deposition Exhibit 2.
15     A.    Would you like this one back?
16     Q.    You can just keep that in front of
17  you.  That would be fine, thank you.
18     (Whereupon, Shapiro Exhibit 2 was
19     tendered to the witness for identification.)
20     Q.    Mr. Shapiro, you've seen this
21  document before today, correct?
22     A.    How does this differ from the first
23  one that you gave me?
24     Q.    If you can answer my question, I'll
25  let you know how it differs.

Page 28

- PETER SHAPIRO -

1
2     You have seen this document before
3  today, haven't you?
4     A.    11/1/13 -- I believe so.  It's
5  addressed to me, but, you know, I'm honestly
6  having difficulty distinguishing it from the other
7  one.
8     Q.    Okay.  Again, my question was:  Have
9  you seen this before today?
10     A.    I can only say I believe so.  You
11  know, we get a lot of documents.
12     Q.    You get a lot of subpoenas?
13     A.    We get a fair number.  Since the
14  financial crisis, you know, there are lots of
15  controversies that go on where, you know, we're
16  involved in lots -- lots of client matters.
17     Q.    How many times have you testified in
18  the Lehman bankruptcy?
19     A.    Testified.  What is -- how do you --
20     Q.    This is kind of a set up; you sit
21  down, take an oath, promise to tell the truth, the
22  whole truth.
23     A.    I'm not -- I don't think I have in
24  another case in a Lehman bankruptcy.  But I'm not
25  -- I'm just trying to think if I have.

Page 29

- PETER SHAPIRO -

1
2     You know, as you know, I've been in
3  many, many mediations, but that doesn't constitute
4  this kind of thing.  That didn't fall into your
5  question, right?
6     Q.    That's right.  I'm thinking of
7  situations where you actually are under oath and
8  promise to tell the truth.
9     A.    Yeah -- yeah.
10     Q.    Can't think of any other?
11     A.    I don't think so.  I don't think so.
12     Q.    How about outside of a Lehman
13  bankruptcy, how many times have you testified
14  under oath?
15     A.    It's got to be in the range of 10 to
16  20.
17     Q.    Has it been generally in connection
18  with litigations or in other matters?
19     I know you were a politician earlier
20  on in your life, so --
21     A.    Yes.
22     Q.    Do you remember testifying under oath
23  as a politician?
24     A.    Yes.
25     Q.    Putting all that stuff aside.  Since

Page 30

1           - PETER SHAPIRO -
2    you went into the financial sector --
3        A.    Finance, yes.
4        Q.    -- how many times have you testified
5    under oath?
6        A.    It would -- I would think it's --
7    it's in the range of 5 to 10.
8        Q.    And has -- and those have all been in
9    connection with the financial crisis or do some of
10   them predate the financial crisis?
11       A.    I can think of one that predates the
12   financial crisis.
13       Q.    Which one was that?
14       A.    It was a case involving the Port
15   Authority of New York and New Jersey.
16       Q.    Were you a party to that litigation?
17       A.    No.
18       Q.    Just a witness?
19       A.    Yes.
20       Q.    If you can turn to Page 4 of Exhibit
21   2. If you look at Page 4 and Page 5 of Exhibit 2,
22   you'll see a series of topics for examination.
23            Do you see that?
24       A.    Yes.
25       Q.    Have you seen that list before today?

Page 31

1           - PETER SHAPIRO -
2        A.    Yes, I believe so.
3        Q.    What did you do to prepare for your
4    deposition today?
5        A.    I met with -- with Paul. We had
6    discussions, made sure I refreshed my memory.
7        Q.    When did you meet with Paul to
8    prepare for your deposition?
9        A.    Yesterday.
10       Q.    Okay. Other than meeting with Paul
11   to prepare for your deposition, what else did you
12   do to prepare for your deposition?
13       A.    I reviewed some of the documents.
14       Q.    Other than meeting with Paul
15   yesterday and reviewing some documents, what else
16   did you do to prepare for your deposition today?
17       A.    I tossed and turned during my sleep
18   last night slightly and I thought during the
19   shower this morning.
20       Q.    Okay. Did you speak with anyone
21   other than Paul to prepare for your deposition?
22       A.    No.
23       Q.    What documents did you review?
24            MR. LAWRENCE: I'll instruct the
25   witness not to answer that question;

Page 32

1           - PETER SHAPIRO -
2    attorney-client, attorney work product
3    privilege.
4        Q.    Let me be more precise.
5            Other than any documents you may have
6    reviewed by Paul, what documents did you review by
7    yourself to prepare for your deposition?
8            MR. LAWRENCE: I will instruct the
9    witness to the extent there are documents
10   other than the ones identified by us, you can
11   answer that question, if you looked at
12   additional documents in addition to whatever
13   documents were provided by us to prepare for
14   the deposition.
15            You can go ahead and answer to the
16   extent there were any additional documents.
17       A.    No, no additional documents other
18   than what's been produced.
19       Q.    Now, you understand that you are here
20   in a couple of different capacities, correct?
21       A.    I -- you're getting into legalities
22   that are beyond my expertise so --
23       Q.    Maybe we should talk about that a
24   little bit, then.
25       A.    Okay.

Page 33

1           - PETER SHAPIRO -
2        Q.    I'm going to hand you a document
3    marked Shapiro Exhibit 3.
4            (Whereupon, Shapiro Exhibit 3 was
5            tendered to the witness for identification.)
6        Q.    Take a moment to review that document
7    and let me know when you're done. I'll ask you
8    some questions about it.
9        A.    You want me to read through this
10   whole thing?
11       Q.    Not the whole thing, you can flip
12   through it. We'll get to it that I'll
13   give you time to read.
14            I just want to get a sense if you
15   recognize the document. That's really going to be
16   my first question. Take a few minutes, flip
17   through it.
18       A.    Go on.
19       Q.    Do you recognize the document?
20       A.    No, I don't.
21       Q.    Do you understand that you've been
22   designated by the Washington TSA as a so-called
23   30(b)(6) witness?
24       A.    I -- I don't -- I wouldn't say I have
25   memorized that citation, but I know I'm designated

Page 34

```
1              - PETER SHAPIRO -
2    by them as a -- as a witness under this, you know,
3    of some type.
4              THE WITNESS:  Is 30 -- is that the
5    correct cite?
6              MR. LAWRENCE:  That is the correct
7    cite.
8              THE WITNESS:  Okay.  Thank you.
9         Q.    And what is your understanding of
10   what it means to be designated as such a witness
11   by the Washington TSA?
12        A.    My understanding is that part of my
13   testimony is basically on behalf of the authority.
14        Q.    Do you know what topics you've been
15   designated as the 30(b)(6) witness on?
16        A.    I've seen a list of those, I don't
17   know them by heart.
18        Q.    If we flip to Page 8 of Exhibit 3,
19   you'll see there's a series of deposition topics
20   on Pages 8 and 9 and 10.  We can start going down
21   the list.
22             Do you understand --
23             MR. LAWRENCE:  Well, rather than
24   that, I can tell you we sent you --
25             MR. TAMBE:  Well, no, actually I want
```

Page 35

```
1              - PETER SHAPIRO -
2    to ask the witness --
3              MR. LAWRENCE:  No, no --
4              MR. TAMBE:  I want to ask the witness
5    what his understanding is.
6              MR. LAWRENCE:  You can ask the
7    witness whatever, but I'm going to state what
8    the record is.
9              MR. TAMBE:  No, you're not going to
10   clutter my record with speaking with
11   objections.
12             MR. LAWRENCE:  Okay.  Then I'll
13   instruct him not to answer the question.
14             MR. TAMBE:  Okay.  We'll do it that
15   way.
16             MR. LAWRENCE:  You know exactly what
17   subjects he's been designated on.
18             MR. TAMBE:  No, I want to know what
19   this witness knows, not what you know, Paul.
20             MR. LAWRENCE:  It doesn't matter what
21   he knows, it matters what we've designated.
22   So...
23             MR. TAMBE:  It's fairly remarkable
24   that you take the position it doesn't matter
25   what the witness knows, when he's the one --
```

Page 36

```
1              - PETER SHAPIRO -
2              MR. LAWRENCE:  The witness knows the
3    subjects that he knows about, has prepared
4    for the subjects that we've designated him
5    on.
6         Q.    So let's go to Page 8 of Exhibit 3.
7              Have you been designated with respect
8    to Paragraph 1?
9              MR. LAWRENCE:  I'm going to object
10   and you know the answer to that question so
11   it's -- I'm going to instruct the witness not
12   to answer.
13        Q.    Have you been designated as the
14   witness on number 2?
15             MR. LAWRENCE:  Same objection.  Same
16   instruction.
17        Q.    How about number 3?
18             MR. LAWRENCE:  Same objection.  Same
19   instruction.
20        Q.    How about number 4?
21             MR. LAWRENCE:  Same -- same
22   objection.  Same instruction.
23        Q.    How about number 5?
24             MR. LAWRENCE:  Same objection.  Same
25   instruction.
```

Page 37

```
1              - PETER SHAPIRO -
2         Q.    How about number 6?
3              MR. LAWRENCE:  Same objection.  Same
4    instruction.
5         Q.    How about number 7?
6              MR. LAWRENCE:  Same objection.  Same
7    instruction.
8         Q.    Topic number 8?
9              MR. LAWRENCE:  Same objection.  Same
10   instruction.
11        Q.    Number 9?
12             MR. LAWRENCE:  Same objection.  Same
13   instruction.
14        Q.    Number 10?
15             MR. LAWRENCE:  Same objection.  Same
16   instructions.
17        Q.    Number 11?
18             MR. LAWRENCE:  Same objection.  Same
19   instruction.
20        Q.    Number 12?
21             MR. LAWRENCE:  Same objection.  Same
22   instruction.
23        Q.    Number 13?
24             MR. LAWRENCE:  I feel like this is
25   one of those limericks where you have to say
```

Page 38

- PETER SHAPIRO -
1
2  things fast.
3       Same objection.  Same instruction.
4  Q.    Number 14?
5       MR. LAWRENCE:  Same objection.  Same
6  instruction.
7  Q.    Number 15?
8       MR. LAWRENCE:  Same objection.  Same
9  instruction.
10 Q.    Now, putting aside the topics here,
11 what is your understanding of the topics that you
12 believe you've been designated to testify about?
13      You've got to have some sense of what
14 you are supposed to talk about, right?
15 A.    You know, I have -- you know, a
16 general sense in terms of, you know, discussing
17 the valuation of contract, some of the things that
18 went into the methodological considerations and
19 the like.  And you know, again, if -- if I -- if
20 you wanted counsel to tell me what was designated,
21 we can do that, obviously.  You know that.
22 Q.    Well, I was hoping he would have told
23 you that in preparation for your deposition.
24 A.    Well, I didn't memorize that, you
25 know, which sections.

Page 39

- PETER SHAPIRO -
1
2  Q.    So you understand it's something to
3  do with the valuation of the contract, some method
4  -- methodological considerations.
5       What else?
6  A.    You know, I'd have to go down -- go
7  down the list.
8  Q.    We just went down the list.
9  A.    Is there a reason for having a memory
10 contest on this?
11 Q.    It's not a question of a memory
12 contest.
13      The issue is subpoenas --
14 A.    Right.
15 Q.    -- deposition notices are serious
16 things.
17      MR. LAWRENCE:  Do you have a
18 question --
19      MR. TAMBE:  He asked me a question.
20      MR. LAWRENCE:  -- are you making a
21 speech?
22      MR. TAMBE:  He asked me a question,
23 I'm telling him.
24      MR. LAWRENCE:  It doesn't matter.
25      MR. TAMBE:  You want him to be

Page 40

- PETER SHAPIRO -
1
2  uninformed on the topics, you want him to be
3  uninformed on the process, and you think it
4  doesn't matter what he knows.
5       MR. LAWRENCE:  He's fully informed on
6  the topics --
7       MR. TAMBE:  I think the record
8  suggests otherwise, Paul.
9       MR. LAWRENCE:  Well, that's fine, we
10 can argue that.  But he's fully informed on
11 the topics.  You know what the topics are and
12 you're playing a game.  So if you want to
13 continue to play games, we'll continue to
14 have the same colloquy.
15      MR. TAMBE:  Go back to my question
16 before an objection was interposed.
17      (The question requested was read back
18 by the reporter.)
19 Q.    So as I was answering your question,
20 Mr. Shapiro, these are serious things.  You've
21 been designated by the Authority as a witness on
22 certain topics and you have an obligation, and the
23 TSA has an obligation to make sure you understand
24 what that means, so you're adequately prepared to
25 answer questions based on those things.

Page 41

- PETER SHAPIRO -
1
2       That's why I'm asking you what's your
3  understanding is, what is it that you've been
4  designated for --
5  A.    And let me --
6       MR. LAWRENCE:  Hold on a second.  If
7  you're making speeches, I'll make a speech,
8  too.
9       MR. TAMBE:  Well, you shouldn't stop
10 now because you have been making speeches all
11 morning.
12      MR. LAWRENCE:  You said the TSA is
13 obligated and we are obligated.  And we've
14 identified to you, and I'm going to identify
15 on the record, you can object to it, what
16 subjects we've identified Mr. Shapiro for and
17 he's fully prepared to testify on the
18 subject.
19      Some of them are co-designations.
20 But 4B, 5A and B --
21      MR. TAMBE:  Hold on a second.  Go
22 slowly.
23 Q.    Mr. Shapiro, you have Exhibit 3 in
24 front of you.  Why don't you circle, as Paul
25 speaks --

Page 42

- PETER SHAPIRO -

1
2   A.   That's what I'm doing.
3   Q.   -- that way we're not testing or
4   taxing your memory.
5        MR. TAMBE:  So go ahead, Paul.  I
6   object to your process, but go ahead.
7        MR. LAWRENCE:  Appreciate it.  4B; 5A
8   and B; 7 to the extent it relates to the
9   declaration of Peter Shapiro; 8 as it -- with
10  respect to the loss calculation memorandum; 9
11  with respect to the loss calculation
12  memorandum; and 11B.
13       And in some of those instances we've
14  co-designated other people, either Kim Herman
15  or Bob Cook as our 30(b)(6).
16  Q.   All right.  You got all those,
17  Mr. Shapiro?
18  A.   I do.
19  Q.   Okay.  So again, with those topics
20  identified for you at this deposition, if you
21  could search your memory and tell me if you did
22  anything different to prepare with respect to
23  those topics than what you've already talked
24  about?
25  A.   No.

Page 43

- PETER SHAPIRO -

1
2   Q.   So you spoke with Paul and you looked
3   at some documents?
4   A.   Correct.
5   Q.   You spoke with Paul the one time?
6   Yesterday?
7   A.   We -- we had telephone conversations
8   prior to that, but we sat down together to prepare
9   for this.
10  Q.   Okay.  So other than the sit down to
11  prepare for this deposition, were any of your
12  other telephone conversations with Paul in
13  preparation to testify at this deposition?
14       MR. LAWRENCE:  Again, you can't
15       reveal the content, just -- you can answer
16       that question.
17  A.   Yes.
18  Q.   So how many such preparatory
19  telephone conversations did you have with Paul?
20  A.   I can't recall how many telephone
21  conversations, honestly.
22  Q.   Many?
23  A.   No.
24  Q.   And was there anyone other than Paul
25  on any of those calls?

Page 44

- PETER SHAPIRO -

1
2   A.   There may have been.
3   Q.   Maybe?  Do you know who that was?
4   A.   Other lawyers.
5   Q.   Anyone?
6   A.   Other people on Paul's end, not on my
7   end.
8   Q.   Other people on Paul's end.  Do you
9   know any of them?
10  A.   Do I know them?  I know he has other
11  attorneys that work with him.
12  Q.   Do you know their names?
13  A.   I know from, you know, various
14  e-mails that there are other attorneys who are
15  working on this assignment.
16  Q.   Well, I have -- we got here with a
17  slightly more specific focus.
18       Those telephone calls that you were
19  in, that you were on with Paul, that were in
20  preparation for this deposition, were there other
21  people on those calls from Paul's end?
22  A.   There -- again, I'm saying there may
23  have been.
24  Q.   Do you remember anyone who was on any
25  of those calls, those preparatory calls?

Page 45

- PETER SHAPIRO -

1
2   A.   Not clearly.  I'm not recalling
3   specifically.
4   Q.   So you can't recall specifically if
5   any of those people provided any information to
6   you when you were preparing for this deposition on
7   those preparatory calls?
8   A.   I don't want to sound at all evasive
9   on this, I'm just trying to remember.  There were,
10  you know, there were communications regarding the
11  timing of the deposition, the location of the
12  deposition, some of those were done by e-mail.
13  You know, some were done by telephone.  I didn't
14  make a distinct mental note about which ones were
15  done which way.
16  Q.   I'm still trying to figure out
17  whether you have a memory of someone other than
18  Paul being on any of the preparatory calls that
19  you had.  Do you have such a memory?
20  A.   Not -- not with regard to anything
21  meaningful.
22  Q.   You said there weren't many such
23  preparatory calls.  Can you give me an
24  approximation of how long you spent in total
25  across all those preparatory calls?

Page 46

```
 1              - PETER SHAPIRO -
 2      A.    On telephone calls?
 3      Q.    Yes, telephone calls.
 4      A.    My guess is if it were 15 minutes it
 5 would be a lot.
 6      Q.    That's helpful.  I understand it's
 7 not precise, but it's helpful in terms of order of
 8 magnitude.
 9            Okay, fine.  Do you keep a working
10 file of this matter in your office?
11      A.    You mean like a paper file?
12      Q.    Yes.
13      A.    No.
14      Q.    Do you keep an electronic file?
15      A.    I -- I have electronic -- I keep, you
16 know, electronic documents and everything like
17 that that gets sent, any e-mails, as I've
18 mentioned.
19      Q.    So do you keep a set of all of the
20 documents that have been filed in Court or in the
21 mediation, for example?
22      A.    Sometimes I do, sometimes I don't.
23 If I think they're able to be accessed from
24 another source I might not save them myself.
25      Q.    So what other sources do you have to
```

Page 47

```
 1              - PETER SHAPIRO -
 2 access documents related to this matter?
 3      A.    I go back to Paul or one of the other
 4 people involved.
 5      Q.    Okay.  I guess what I'm trying to
 6 figure out is who are the other people involved.
 7            If it's not Paul that you're getting
 8 documents from, who else are you getting documents
 9 from?
10      A.    Do -- do you have a list of the other
11 lawyers involved?
12      Q.    Are they all other lawyers?
13            MR. LAWRENCE:  I'm not quite sure
14      what you're asking.
15            MR. TAMBE:  I'm trying to figure out
16      where he goes to get documents.
17            MR. LAWRENCE:  Other than Pacifica
18      and R3-M.
19      Q.    Other than Pacifica and R3-M, other
20 than the lawyers acting for Washington TSA?
21      A.    Those are two that I would go to,
22 yes.
23      Q.    Did you ever go directly to the TSA
24 to get documents?
25      A.    I -- if it were something that
```

Page 48

```
 1              - PETER SHAPIRO -
 2 preceded the, you know, involvement of the lawyers
 3 I might.  You know, we deal with TSA on kind of a
 4 variety of things.
 5      Q.    Well, the first time you ever dealt
 6 with the TSA on an engagement was December 2008,
 7 correct?
 8      A.    Say again?  I didn't get the year.
 9      Q.    December 2008.
10      A.    December 2008, it would be around
11 that time.  It may have been November, I can't
12 remember precisely.
13      Q.    Post-Lehman bankruptcy?
14      A.    Post-Lehman bankruptcy.
15            Now, let me just for the record make
16 sure it's clear about one thing.  Remember the
17 staffing for the TSA is the same as the staffing
18 for the Washington State Housing Finance
19 Commission which was a client prior to that.  So
20 the person who would be on the telephone or in an
21 e-mail, you know, wouldn't be saying, now I'm
22 talking to you as a member of the -- as a staffer
23 for the TSA, as opposed to for Housing.
24      Q.    Yeah, but let's be clear.  Before the
25 Lehman bankruptcy, you'd never been engaged by the
```

Page 49

```
 1              - PETER SHAPIRO -
 2 Washington TSA, that authority, for any purpose;
 3 is that correct?
 4      A.    That is correct.
 5      Q.    That's kind of important, isn't it,
 6 which authority you're working for?
 7            MR. LAWRENCE:  Objection.  That's
 8      argumentative.  I'll instruct the witness not
 9      to answer.
10      Q.    Sir, is it important to know what
11 authority you're working for?
12            MR. LAWRENCE:  Same objection.
13      A.    Sure.
14      Q.    It's municipal finance, these things
15 are kind of sensitive, aren't they?
16      A.    I -- I'm just listening to you
17 lawyers go back and forth.
18      Q.    You shouldn't really.  You should
19 listen to the questions and answer them.
20      A.    It's interesting for me.  I don't get
21 to hear this kind of stuff that often.
22      Q.    Let's go back.  In municipal finance,
23 is it important, sir, to know what authority
24 you're working for?
25      A.    Of course.
```

Page 50

- PETER SHAPIRO -

1
2    Q.    It's important, right, it's checks
3    and balances?
4    A.    I said of course, yes.
5    Q.    Earlier you'd said --
6    A.    I don't know about checks and
7    balances, by the way, but that's a different
8    question.
9    Q.    You don't think there's checks and
10   balances?
11   A.    Checks and balances I interpret as
12   branches of government checking one another and
13   stuff like that.  But that's my -- my history
14   lesson; the judiciary versus the legislature
15   versus the executive branch.
16        I don't think there are any checks
17   and balances between the staff of the Housing
18   Commission and the Tobacco Settlement Authority in
19   this case.
20   Q.    But there are some checks and
21   balances about how that staff goes about hiring
22   consultants and contractors, correct?
23   A.    My understanding of checks and
24   balances means that -- means between different
25   branches of government.  So I would have to say

Page 51

- PETER SHAPIRO -

1
2    no, on that.
3    Q.    Are there any checks on the authority
4    of the staff of the TSA to hire consultants and
5    contractors?
6    A.    What do you mean by --
7        MR. LAWRENCE:  Object to the form of
8    the question, but you can clarify.
9    Q.    Sir, you were in local government?
10   A.    Yeah.  But what do you mean by
11   "checks," Jay?  You're confusing me.
12   Q.    I'll tell you what -- I'll tell you
13   what I mean by checks, okay.
14        But you were in local government,
15   weren't you, sir?
16   A.    I was correct.
17   Q.    You were in state government?
18   A.    Correct.
19   Q.    You were an elected official?
20   A.    Correct.
21   Q.    And when state agencies are spending
22   money, they're generally spending taxpayer money,
23   correct?
24        MR. LAWRENCE:  Object to the form of
25   the question.

Page 52

- PETER SHAPIRO -

1
2    A.    No.
3    Q.    They're not spending taxpayer money?
4    A.    They're often spending ratepayer
5    money, they're spending, you know, other sources
6    of revenue.  There are many other sources of
7    revenue besides taxes that go through state and
8    local governments.
9    Q.    And should --
10   A.    They're public monies, but they're
11   not necessarily taxpayer monies.
12   Q.    Okay.  That's better, public monies.
13   A.    Yes.
14   Q.    And to the extent they're spending
15   public monies, states like Washington have rules
16   about how those public monies get spent, correct?
17        MR. LAWRENCE:  Objection.
18   Argumentative.  And to the form of the
19   question.
20   A.    Generally, yes.
21   Q.    And part of that process which I will
22   call a check is those public monies can't be
23   given, for example, to consultants and contractors
24   without making sure some process is followed in
25   retaining those consultants and contractors,

Page 53

- PETER SHAPIRO -

1
2    correct?
3    A.    In my --
4        MR. LAWRENCE:  Object to the form of
5    the question.
6    A.    In my experience, it varies
7    extensively from jurisdiction to jurisdiction.
8    Q.    You know that the Washington TSA has
9    used an RFP process to hire consultants and
10   contractors in the past, correct?
11        MR. LAWRENCE:  Objection to the form.
12   If you know, can you answer.
13   A.    Generally, yes.
14   Q.    Was an RFP process followed in
15   retaining your services in November and December
16   of 2008?
17   A.    I don't believe so.
18   Q.    You did respond to an RFP process in
19   2010, I believe; is that right?
20   A.    Yes, I do -- yes, that's correct.
21   Q.    And has anyone ever told you why an
22   RFP process was not used to retain your services
23   in November and December of 2008?
24   A.    It's very frequent that RFP processes
25   aren't used when there's some degree of time

Page 54

- PETER SHAPIRO -
1
2   urgency.
3       Q.   So let me ask my question, again.
4           Has anyone ever told you why an RFP
5   process was not used to retain your services in
6   November and December of 2008?
7       A.   No.
8       Q.   Have you ever asked anyone?
9       A.   No.
10      Q.   Now, at the time you provided or
11  began to provide your services to the Washington
12  TSA in November/December 2008, the TSA had a
13  financial advisor, correct?
14      A.   I had no knowledge of that.
15      Q.   When is the first time you found out
16  that the TSA had a financial advisor?
17      A.   I don't have any recollection of when
18  I found out that out.
19      Q.   But at some point you did find that
20  out, correct?
21      A.   Yes.
22      Q.   And you found out that that financial
23  advisor was PFM, correct?
24      A.   Correct.
25          MR. TAMBE:  PFM.

Page 55

- PETER SHAPIRO -
1
2          MR. LAWRENCE:  All caps.
3          MR. TAMBE:  All caps.
4       Q.   That's a name that's familiar to you?
5       A.   Very.
6       Q.   It's a well-known financial advisor
7   for municipalities, correct?
8       A.   Yes.
9       Q.   And someone that you've probably
10  worked with on and off over the course of your
11  years?
12      A.   Yes.
13      Q.   While you were at Citibank you had
14  experience with them, correct?
15      A.   I can't recall any experience at
16  Citibank.
17      Q.   Okay.  And while you've been at Swap
18  Financial Group, you've had experience with them?
19      A.   Yes.
20      Q.   Okay.  Are they a competitor of
21  yours?
22      A.   In certain respects.
23      Q.   In what respects are they your
24  competitor?
25      A.   In certain of our lines of business,

Page 56

- PETER SHAPIRO -
1
2   they go after the same, you know, client business
3   that we do.
4       Q.   I just want to understand that a
5   little bit better.
6           Is it types of clients or types of
7   products or both?
8       A.   Principally by type of client.
9       Q.   What is that type of client where
10  both you and PFM go after the same type of client
11  business?
12      A.   Governmental tends to be the most
13  common.
14      Q.   An example of that would be the
15  Washington TSA?
16      A.   Yes.
17      Q.   I've seen some documents showing that
18  PFM was involved from time to time in preparing
19  bid packages for RFAs.  Is it your understanding
20  that they play that role?
21          MR. LAWRENCE:  Objection to the form
22      of the question.
23      A.   Is it my understanding today, as I
24  sit here?
25      Q.   Yes.

Page 57

- PETER SHAPIRO -
1
2       A.   Yes.
3       Q.   Has Swap Financial Group ever
4   prepared bid packages for its clients to obtain an
5   RFA?
6       A.   When you say "an RFA," there's -- an
7   RFA is a -- is a -- a term that is sometimes used
8   for a financial product which is really broader
9   than an RFA.  You know, RF -- so, yes, the answer
10  would be yes.
11          RFA, the term technically just says
12  reserve fund agreement and that could be defined
13  as anything.  I think -- I shouldn't say this.
14  I'd ask to you clarify what you're really asking.
15      Q.   I was about to clarify that.  That's
16  a helpful answer.
17          So let's look at tobacco
18  securitization reserve funds.  Prior to September
19  2008, did the Swap Financial Group ever assist any
20  of its clients in preparing bid packages
21  concerning tobacco reserve fund agreements?
22      A.   No.
23      Q.   Prior to September 2008, had Swap
24  Financial Group ever assisted any of its clients
25  in tobacco revenue bond securitization?

Page 58

```
 1              - PETER SHAPIRO -
 2      A.   No.
 3      Q.   When you were at Citigroup, did you
 4  work on any tobacco bond securitizations?
 5      A.   No.
 6      Q.   And while you were at Citigroup, did
 7  you work on any tobacco bond reserve fund
 8  agreements?
 9      A.   No.
10      Q.   Have you analyzed any of the
11  valuations done by PFM of this RFA?
12          MR. LAWRENCE:  You're talking about
13  for the Washington --
14      Q.   The Washington RFA.
15      A.   I'd ask you to clarify your question,
16  if I could.
17      Q.   Is it the word analyzed that concerns
18  you?
19      A.   It's both analyzed and valuation.
20      Q.   As you sit here, you're aware that
21  there were instances in and after October of 2008
22  where PFM purported to ascribe some value to the
23  Washington TSA RFA; is that right?
24          MR. LAWRENCE:  You're asking him if
25  he's aware of that?
```

Page 59

```
 1              - PETER SHAPIRO -
 2          MR. TAMBE:  Yes.  I could have the
 3  question read back if --
 4      A.   What was the date that you mentioned?
 5      Q.   Sure.
 6          MR. TAMBE:  Why don't you read back
 7  the question, please.
 8          (The question requested was read back
 9  by the reporter.)
10      A.   I'm -- I know I'm aware of a
11  valuation number that PFM came up with around the
12  time of the bankruptcy.  It may have been
13  September of '08.
14      Q.   That's a helpful answer.
15          So starting from September 2008 until
16  the present, you're aware of at least one
17  valuation ascribed by PFM to the RFA agreement,
18  right?
19      A.   A valuation number, right.
20      Q.   A valuation number?
21      A.   Yes.
22      Q.   Are you aware of more than that --
23  that one valuation number?
24      A.   There may have been another one.
25      Q.   And so on either of those numbers,
```

Page 60

```
 1              - PETER SHAPIRO -
 2  the one you remember and the one --
 3      A.   Maybe.
 4      Q.   -- that may have existed, did you
 5  study those numbers?
 6      A.   You're -- I'd ask to you just clarify
 7  what talk mean by studying a number.
 8      Q.   Well, that number is a very different
 9  number than the numbers that Swap Financial Group
10  has calculated with respect to the same RFA.
11          Did you --
12      A.   When you say "that number," you
13  mentioned a couple of things, what are you
14  referring to?
15      Q.   The PFM numbers.  Let's just call
16  them PFM numbers.  There may be one such number,
17  there may be more than one number.  You don't
18  remember, right?
19      A.   Right.
20      Q.   So the PFM numbers, you remember them
21  being quite different than Swap Financial Group
22  numbers, correct?
23      A.   I testified I remembered only one
24  number for certain and --
25      Q.   Fine.  Let's just say the number.
```

Page 61

```
 1              - PETER SHAPIRO -
 2      A.   Right.
 3      Q.   Do you remember the PFM number being
 4  different from the Swap Financial Group numbers?
 5      A.   Yes.
 6      Q.   Given that difference, did you
 7  inquire into how the PFM number was obtained?
 8      A.   No.
 9      Q.   Did you ask anyone at the TSA to
10  explain that number to you?
11      A.   No.
12      Q.   Did you speak with PFM to find out
13  how that number had been derived?
14      A.   No.
15      Q.   Did you ask any of the staff that
16  worked for you to look into the PFM number and
17  examine it and study it?
18      A.   Only to the extent that we did our
19  own value and it differed.  In other words, we
20  didn't look at the PFM number, we looked at what
21  we thought the value of the contract was.
22      Q.   And once you'd figured out what you
23  thought the value of the contract was, you didn't
24  instruct anyone on your staff to go back and see
25  why it was different than the PFM number?
```

Page 62

```
 1              - PETER SHAPIRO -
 2     A.    No, we -- no.
 3     Q.    Do you think PFM just got it wrong?
 4     A.    Absolutely.
 5     Q.    How about your number, do you think
 6  that's the right number?
 7     A.    Yes.
 8     Q.    So --
 9           MR. LAWRENCE:  I don't know, Jay, if
10  you're switching off of PFM, maybe we could
11  just take a five-minute break.
12           MR. TAMBE:  That's fine.
13           THE VIDEOGRAPHER:  The time is
14  10:40 a.m.  We're going off the record.
15           (Whereupon, there was a brief recess
16  in the proceedings.)
17           THE VIDEOGRAPHER:  The time is
18  11:03 a.m.  We're back on the record.
19  BY MR. TAMBE:
20     Q.    Sir, I'm handing you what's been
21  previously marked as Lehman Exhibit 8.  Take a
22  minute to review those pages.  Let me know when
23  you're done.
24           My first question to you is going to
25  be, do you recognize that document?
```

Page 63

```
 1              - PETER SHAPIRO -
 2     A.    Just give me a minute.
 3           I'm ready on this.
 4     Q.    Okay.  Do you recognize this
 5  document?
 6     A.    No.
 7     Q.    If you look at this e-mail chain, on
 8  the bottom of the e-mail chain on Page 1 of
 9  Exhibit 8, you'll see an e-mail from Rowan
10  Blacker; do you see that?
11     A.    Yes.
12     Q.    Do you know Rowan Blacker?
13     A.    No.
14     Q.    You see he purports to be someone
15  from PFM.  Do you see that?
16     A.    Yeah.  I can't tell if it's a he or
17  she.
18     Q.    Okay.  That person purports to be
19  from PFM and attached to this e-mail chain is a
20  schedule with a bunch of numbers on it, correct?
21     A.    Yes.
22     Q.    Okay.  And it culminates on the last
23  page of the exhibit with a number, 1.2 million
24  roughly.
25           Do you see that?
```

Page 64

```
 1              - PETER SHAPIRO -
 2     A.    Correct.
 3     Q.    Is this the PFM number that you had
 4  in mind when we were talking about the PFM
 5  analysis earlier?
 6     A.    I don't think so.
 7     Q.    Okay.  What do you remember about the
 8  PFM number that you had in your mind when we were
 9  speaking of earlier?
10     A.    I'm -- I'm recalling a PFM number
11  that actually even had a payment of the opposite
12  direction.
13     Q.    So a payment to Lehman?
14     A.    Yeah.
15     Q.    You can put that one down.  I'm
16  handing you a document marked Lehman Exhibit 4.
17           I'm not going to ask you to read the
18  whole document, but is this a document you've seen
19  before today?
20     A.    I don't believe so.
21     Q.    Okay.  I'm going to draw your
22  attention to the third paragraph on Page 1.
23     A.    It jumped out at me right way.
24     Q.    So the third paragraph of Page 1 of
25  Exhibit 4, there's a sentence about half the way
```

Page 65

```
 1              - PETER SHAPIRO -
 2  down that paragraph that says, "We have been told
 3  by PFM that a termination amount calculated as of
 4  the date of the call would obligate the authority
 5  to pay Lehman approximately $1.2 million."
 6           Do you see that?
 7     A.    Yes.
 8     Q.    Okay.  Have you ever seen any
 9  calculations or backup relating to this number?
10     A.    To that number?
11     Q.    Yeah.
12     A.    No.
13     Q.    And having seen this memo and having
14  seen that number, does that refresh your
15  recollection that you may have, in fact, seen that
16  number in this document, Exhibit 4?
17     A.    I don't believe I saw this document,
18  but I saw a number that was in that area.
19     Q.    All right.  Now, right before we took
20  our break, I asked you did PFM get it wrong and
21  you said absolutely.  How do you know they got it
22  wrong?
23     A.    It's -- it's a horribly wrong number.
24     Q.    So the number tells you everything
25  you need to know about --
```

Page 66

- PETER SHAPIRO -

1
2    A.    Correct.
3    Q.    -- them getting it wrong?
4    A.    Yeah.
5    Q.    It's fair to say you know nothing
6    about their methodology, it's just the number you
7    look at it and you say that's just wrong?
8    A.    Yes.
9    Q.    Showing you a document that has been
10   marked Lehman Exhibit 19 and that's a document
11   you're familiar with, correct?
12   A.    Yes.
13   Q.    That is the valuation memo prepared
14   by Swap Financial Group dated September 10, 2009,
15   correct?
16   A.    Yes.
17   Q.    And it has a number on Page 3 at the
18   end there's phrase towards the end that says total
19   loss off 46,900 and change.
20         Do you see that?
21   A.    Correct.
22   Q.    And that number is absolutely wrong,
23   correct?
24   A.    Absolutely wrong?
25   Q.    Yeah.

Page 67

- PETER SHAPIRO -

1
2    A.    That number has an error, yes.
3    Q.    And what's the nature of the error in
4    that number?
5    A.    This number was based -- number was
6    based upon a document which we were originally
7    furnished that showed the agreement terminating in
8    2042.
9    Q.    Now, your -- Exhibit 19, the Swap
10   Financial Group valuation, that's the document
11   that was used to support the Proof of Claim,
12   correct?
13   A.    Yes.
14   Q.    That's what was filed in court?
15   A.    I believe so.
16   Q.    Are you aware of any corrected Proof
17   of Claim having been filed in the Bankruptcy Court
18   correcting for the error that you just identified?
19   A.    I don't -- I don't know if there was.
20   The lawyers may have, I don't know.
21   Q.    Did you prepare an updated
22   calculation with the correct date in your view,
23   the 2032 date?
24   A.    Is our discussions which went on in
25   mediation part of this discussion today?

Page 68

- PETER SHAPIRO -

1
2    Q.    I don't want you to say anything that
3    happened in mediation.
4          I just want you to tell me, did you
5    do the valuation?
6          MR. LAWRENCE:  You can answer that
7    question.
8    A.    Okay.  Yes.
9    Q.    Okay.  And what was the number you
10   obtained when you did that calculation?
11   A.    I'd need to refer to a document to
12   see that.
13   Q.    What document would you refer to?
14   A.    It's -- whatever we had in mediation.
15   Because we -- we had a number based upon a 2032
16   date, I know.
17   Q.    Other than correcting for that error
18   in Exhibit 19, since the time you prepared this
19   document, Exhibit 19, are there any other errors
20   that you have discovered in the calculation?
21   A.    No.
22   Q.    So as far as you're concerned, once
23   you make that correction for the date, everything
24   else about this document is accurate, correct?
25   A.    Yes.

Page 69

- PETER SHAPIRO -

1
2    Q.    So we'll come back to this a little
3    bit later.
4          MR. TAMBE:  Next exhibit.
5          (Whereupon, Shapiro Exhibit 4 was
6    marked at this time.)
7    Q.    I've handed you a one-page document
8    marked Shapiro Exhibit 4.  Take a moment to review
9    it.  Let me know when you're done.
10   A.    Done.
11   Q.    You're familiar with this document,
12   correct?
13   A.    Yes.
14   Q.    Okay.  It's an e-mail that you
15   received from Bob Cook at the Authority, right?
16   A.    Correct.
17   Q.    Although, as I look at this document,
18   he's e-mailing you with State Housing Financing
19   Commission address, correct?
20   A.    I think that's just his standard
21   address stamp.  But yeah, you get the idea of all
22   these hats that can be somewhat confusing.
23   Q.    Sure.
24   A.    Yeah.
25   Q.    Now --

Page 70

1              - PETER SHAPIRO -
2       A.    Remember the State Housing Finance
3    Commission does a lot more work.
4       Q.    This e-mail, exhibit -- Shapiro
5    Exhibit 4, is dated Monday, December 8, 2008.
6              Do you see that?
7       A.    Correct.
8       Q.    Do you have any recollection of
9    having any communications, written or oral, with
10   anyone at the Washington TSA prior to this e-mail?
11      A.    This would have been the first
12   contact.  If -- if I go back I think previously I
13   testified it might have been in November, but now
14   that I see this, this was the initial contact.
15      Q.    Okay.  At the time you received this
16   e-mail from Bob Cook, December 8th, had you
17   already been engaged by any other any other Lehman
18   counterparty with respect to a tobacco RFA matter?
19      A.    I don't believe so.
20      Q.    Again, without going into specifics,
21   subsequent to this point in time you were engaged
22   by one or more other counterparties to a tobacco
23   RFA with Lehman, correct?
24      A.    Yes.
25      Q.    I think you told us earlier that you

Page 71

1              - PETER SHAPIRO -
2    had worked with the Washington State Housing
3    Finance Commission.  Did you know Bob Cook prior
4    to December 8th --
5       A.    Yes.
6       Q.    -- 2008?  Okay.
7              But you had not spoken to him about
8    the TSA's relationship with Lehman prior to this
9    date, December 8, 2008; is that correct?
10      A.    That's correct.
11      Q.    So what did you do when you got this
12   e-mail?
13      A.    I believe I responded affirmatively
14   to say I'd be happy to talk as he was requesting.
15      Q.    Did you do any kind of valuation
16   analysis between the time you received this e-mail
17   and the time you spoke with Bob Cook and others?
18      A.    Between the time of this e-mail and
19   the initial conversation with Bob, certainly not.
20      Q.    Do you know when that initial call
21   with Bob Cook and others took place?
22      A.    As I sit here, I don't, no.
23      Q.    Was it weeks after this point in
24   time, days?
25      A.    My guess it would -- I'm not going to

Page 72

1              - PETER SHAPIRO -
2    speculate.
3       Q.    What do you remember about that first
4    call that you had with Bob Cook and others?
5       A.    I don't have specific recollection as
6    we sit here.  I'd just be guessing at what was
7    discussed.
8       Q.    Okay.  So just to be clear, you don't
9    remember any of the things that were discussed in
10   that call?
11      A.    No.
12      Q.    Do you remember who was on the call?
13      A.    No.
14      Q.    From your side, was it just you or
15   were there others on the call?
16      A.    I don't remember.
17      Q.    You'll see Bob Cook says to you in
18   this e-mail, Exhibit 4, "I have attached for your
19   reference a copy of the agreement."
20              Do you see that?
21      A.    Yes.
22      Q.    Do you remember reviewing the
23   agreement at the time you received this e-mail?
24      A.    I'm certain that I would have.
25      Q.    You received the e-mail, you have a

Page 73

1              - PETER SHAPIRO -
2    conversation and at some point you prepare a
3    contract for services that you're going to render
4    to the Authority in connection with this
5    transaction, correct?
6       A.    Okay.  Your assumptions may be wrong
7    there.
8       Q.    Well, tell me the sequence between
9    receiving this e-mail and the time that you --
10   you, Swap Financial Group, prepared the terms of
11   what services you were going to provide the TSA in
12   connection with this agreement.
13      A.    I would -- I'd be speculating because
14   I'm not remembering -- you know, there were many
15   engagements going on at the time.  I don't -- I
16   don't know the sequence of events; did they tell
17   us the services, did we suggest services.  I would
18   just be speculating, Jay.
19      Q.    Do you remember any discussions about
20   PFM on any of the initial calls with the
21   Washington TSA?
22      A.    Not at all.
23      Q.    Okay.  What do you remember telling
24   the TSA, if anything, in those initial calls with
25   the TSA about this contract?

Page 74

- PETER SHAPIRO -

1    A.    They knew of our capabilities and I
2  -- you know, I'm sure I discussed our firm's
3  capabilities.
4    Q.    Did you ask the TSA if they
5  terminated the contract?
6    MR. LAWRENCE:  I'm sorry, terminated
7  which contract?
8    MR. TAMBE:  The RFA.
9    A.    Did I ask if they terminated -- I
10 think they were clear that they had not yet
11 terminated.
12   Q.    Okay.  Did you give any advice to the
13 TSA about terminating the contract?
14   A.    Not that I can recall.
15   Q.    When -- when do you first recall
16 having valued the termination amount of this
17 contract?
18   A.    We -- we would have begun valuation
19 work almost immediately.
20   Q.    And was it your sense in the early
21 days of this assignment that Lehman would owe
22 boatloads of money to Washington TSA?
23   A.    Yes.
24   MR. LAWRENCE:  Object to the form.

Page 75

- PETER SHAPIRO -

1  Go ahead.
2    A.    Yes.
3    Q.    What is a boatload of money?
4    A.    A boatload of money would be the
5  amount of cash that you could put in a boat.
6    Q.    Big boat or small boat?
7    A.    It would vary, depending upon your
8  skills as a yachtsman.
9    Q.    You wouldn't want to capsize the boat
10 with too much money in it.
11   A.    That's correct.
12   Q.    So pretty early on, your sense at
13 Swap Financial Group was that there are boatloads
14 of money to be made here; is that right?
15   A.    Not to be made, no, that would be a
16 false characterization.  This is a question of --
17 of Lehman having defaulted on an agreement and
18 owing money to a public entity for an important
19 public purpose.
20   Q.    Let's take a look at the next
21 exhibit.
22   MR. TAMBE:  Would you mark this,
23 please.
24   (Whereupon, Shapiro Exhibit 5 was

Page 76

- PETER SHAPIRO -

1  marked at this time.)
2    Q.    So I've placed before you an e-mail
3  exchange marked Shapiro Exhibit 5.  That's an
4  e-mail you've seen before today, correct?
5    A.    Yes.
6    Q.    It starts on the second page of the
7  exhibit with the e-mail we were talking about,
8  Shapiro Exhibit 4, correct?
9    A.    Correct.
10   Q.    And then it continues.
11   So, after you received the e-mail
12 from Bob Cook on December 8th, looks like the next
13 day you communicated with James Vergara about the
14 e-mail, correct?
15   A.    Late that night.  You know, it's
16 1:14 a.m.
17   Q.    Yeah.  Is it safe to say with that
18 e-mail you are instructing one of your staff
19 members to value this transaction?
20   A.    I say, "Figure out how we put a value
21 on this."
22   Q.    Fine.  So, that is an instruction to
23 one of your staff members to value the trade,
24 correct?

Page 77

- PETER SHAPIRO -

1    MR. LAWRENCE:  Objection to the form.
2    A.    It's how we put a value on it.  It's
3  talking -- is it talking about the value or how we
4  would put a value?  It's really saying what's the
5  proper methodology.
6    Q.    Is there a reason to believe that
7  Mr. Vergara knew the proper methodology to value
8  this trade?
9    A.    Yes.
10   Q.    Why did you believe that?
11   A.    It was a, you know, a person familiar
12 with these agreements and understood the structure
13 and how you value.
14   Q.    How did you know that he was familiar
15 with these agreements?
16   A.    We'd spoken with -- we've -- I've
17 spoken about these agreements with him.
18   Q.    When?
19   A.    In -- during the time of his
20 employment.
21   Q.    Okay.  And where had he become
22 familiar with these types of agreements?
23   A.    He had been at several different
24 shops, but most recently at Lehman.

Page 78

- PETER SHAPIRO -

1
2    Q.    And was it your understanding that
3  these types of agreements were a central part of
4  his work at Lehman?
5    A.    He was working on the swap desk.  At
6  all swap desks these types of agreements are a
7  smaller part of the work.  Forward purchase
8  agreements which is -- or forward supply
9  agreements, forward payment agreements, whatever
10  you want to call them, are a small subset of
11  swaps, and he would have worked on a small number
12  of them, but they are valued on a swap
13  methodology.
14    Q.    All right.  So my question was:  Was
15  it your understanding that these types of
16  agreements were a principal part of his work at
17  Lehman?
18        MR. LAWRENCE:  Object to the form.
19    Q.    I take it the answer to that question
20  is no, they weren't?
21    A.    Let me ask you what you meant by a
22  "principal part."
23    Q.    That he spent a lot of his time
24  working on it.
25    A.    Does principal mean to you 50 percent

Page 79

- PETER SHAPIRO -

1
2  or greater?
3    Q.    I'd say even 20 percent or greater.
4    A.    No swap desk would have 20 percent or
5  greater on FPAs.
6    Q.    So of all of the FPAs that Lehman
7  worked on --
8    A.    Right.
9    Q.    -- right, what percentage of those do
10  you think Mr. Vergara worked on?
11        MR. LAWRENCE:  Object to the form of
12    the question.
13    A.    I've never had that conversation with
14  him.
15    Q.    Do you know whether there were other
16  people at the Lehman swap desk when Mr. Vergara
17  was there who had principal responsibility for
18  these types of agreements?
19    A.    Yes.
20    Q.    And you understood that he was not
21  the person with principal responsibility for these
22  types of agreements, correct?
23    A.    He was the number three guy on the
24  desk.
25    Q.    And when you say "the number three

Page 80

- PETER SHAPIRO -

1
2  guy," third in line in terms of responsibility?
3    A.    Right.
4    Q.    Other than his work at Lehman, had he
5  told you that he had worked with forward purchase
6  agreements or reserve fund agreements of this type
7  previously?
8    A.    I don't recall.
9    Q.    And since he'd been at Swap Financial
10  Group prior to December 9, 2008, he'd never worked
11  on or valued an RFA or an FPA, correct?
12    A.    I can't say that.
13    Q.    Well, can you name one that he did
14  work on?
15    A.    I can't -- you know, we -- we handle
16  hundreds and hundreds of transactions so I can't
17  say did he not work on any FPAs.  I -- I have no
18  idea.
19    Q.    We should ask him?
20    A.    Beg --
21    Q.    We should ask him?
22    A.    You could ask him, yeah.
23    Q.    Well, have you asked him recently?
24    A.    No.
25    Q.    Have you read his deposition in this

Page 81

- PETER SHAPIRO -

1
2  case?
3    A.    No, I have not.
4    Q.    Have you talked to him about his
5  deposition in this case?
6    A.    I did run into him at, you know, on
7  an -- in an unrelated setting and he did tell me
8  he was giving a deposition.
9    Q.    So sounds from the answer that you
10  ran into him at some point before he gave his
11  deposition in this case; is that right?
12    A.    I believe so, yes.
13    Q.    Have you talked to him since he's
14  given a deposition in this case?
15    A.    Yes.
16    Q.    And what did you talk about?
17    A.    We talked about an unrelated matter.
18    Q.    Okay.  Now, you understand that he's
19  been deposed more than once by the Lehman Estate,
20  correct?
21    A.    Correct.
22    Q.    Have you read either deposition?
23    A.    Yes.
24    Q.    Which -- so you read the first
25  deposition?

Page 82

```
 1              - PETER SHAPIRO -
 2       A.    Let me just -- I'm -- I'm not a
 3  lawyer, one of them was given in a confidential
 4  mediation matter, I believe, where we were under
 5  confidentiality.
 6       Q.    But you read that deposition
 7  transcript?
 8       A.    Yes.
 9       Q.    Okay.  Did you speak with Mr. Vergara
10  about his testimony after you read that deposition
11  transcript?
12       A.    I don't believe so.
13       Q.    All right.  Going back to Exhibit 5,
14  e-mail exchange.  At the bottom of Page 1 you have
15  the e-mail to Mr. Vergara, right above that
16  there's an e-mail from Nat Singer, Nathaniel
17  Singer to you and Mr. Vergara.
18            Do you see that?
19       A.    Yes.
20       Q.    You'll see Mr. Singer says in the
21  middle of his e-mail, "Lehman owes them an
22  enormous amount of money."
23            Do you see that?
24       A.    Yes.
25       Q.    Other than what's in this e-mail, are
```

Page 83

```
 1              - PETER SHAPIRO -
 2  you aware of any analysis that Mr. Singer had done
 3  to conclude that Lehman owes them an enormous
 4  amount of money?
 5       A.    No.
 6       Q.    Then you go to the top of the e-mail
 7  chain and it's again another one from Mr. Singer
 8  to you and Mr. Vergara.  Towards the end of his
 9  e-mail chain he writes, "Any way you go about it,
10  Lehman will owe the issuer a boatload of money."
11            Do you see that?
12       A.    Yes.
13       Q.    And again, were you aware of any
14  analysis that he had done, other than what you see
15  in this e-mail, to support that statement that he
16  makes?
17       A.    No.
18       Q.    Did you ever ask him?
19       A.    We would have -- we would have had
20  conversations continually, we always do.
21       Q.    And the valuation that you did come
22  up with, that was in the exhibit we looked at
23  earlier, the roughly $47 million valuation, is
24  that a boatload of money?
25            MR. LAWRENCE:  Object to the form.
```

Page 84

```
 1              - PETER SHAPIRO -
 2       A.    The term "boatload" was Nat's term,
 3  not my term.
 4       Q.    I'm asking you, do you -- do you
 5  consider that to be a boatload of money?
 6       A.    I don't quantify money in terms of
 7  the cargo holdings of boats.
 8       Q.    Would you say that's an enormous
 9  amount of money?
10            MR. LAWRENCE:  Object to the form.
11       A.    No, I would say it's an appropriate
12  amount of money.
13       Q.    Now, you'll see that Mr. Singer makes
14  reference in his e-mail to an uncollateralized
15  GIC, G-I-C --
16       A.    Yes.
17       Q.    -- from ING Bank.  Do you see that?
18       A.    He just says ING, he doesn't say ING
19  Bank.
20       Q.    You understand that to be ING Bank,
21  correct?
22       A.    No, ING is an insurance company as
23  well.
24       Q.    Okay.
25       A.    So it's hard to say what he meant.
```

Page 85

```
 1              - PETER SHAPIRO -
 2       Q.    Okay.  So ING?
 3       A.    Yes.
 4       Q.    Do you know whether the Washington
 5  TSA ever invested with ING?
 6       A.    Do I know if they --
 7       Q.    Ever invested with ING?  Did they
 8  give money to ING?
 9       A.    I know they did not.
10       Q.    Did you provide any advice with
11  respect to that decision not to give money to ING?
12       A.    They -- they discussed it but it was
13  -- they discussed it with me, but it was
14  definitely their decision.
15       Q.    Did you provide input into that
16  decision?
17       A.    Generally.
18       Q.    What input did you provide?
19       A.    We discussed whether or not they
20  wanted to take principal risk with regard to this
21  large reserve fund to a -- to a bank.  It would --
22  it put them in a very different credit posture.
23       Q.    You did advise the TSA on a later
24  date about some investments that they could make
25  with the reserve fund, correct?
```

Page 86

1           - PETER SHAPIRO -
2    A.    Correct.
3           MR. TAMBE:  Next exhibit.
4           (Whereupon, Shapiro Exhibit 6 was
5    marked at this time.)
6    Q.    I've handed you a document that has
7    been marked Shapiro Exhibit 6, and this is a memo
8    that was prepared by you and provided to the
9    Washington TSA in November 2011, correct?
10   A.    Yes.
11   Q.    And broadly speaking, this is a memo
12   that concerns the reinvestment of the reserve
13   fund, correct?
14   A.    Correct.
15   Q.    Because following Lehman's default,
16   the Authority had possession of the reserve fund,
17   correct?
18   A.    The Authority always had possession
19   of the reserve fund.
20   Q.    And they had the ability, following
21   Lehman's default to invest that fund in various
22   ways, correct?
23   A.    Yes.
24   Q.    And what your memo sets out are some
25   options for investing that fund, correct?

Page 87

1           - PETER SHAPIRO -
2    A.    Correct.
3    Q.    Now, ultimately on Page 3 of this
4    memo, Pages 2 and 3 of the memo, you make a
5    recommendation that's laid out on Pages 2 and 3
6    carry over to 4.
7           Do you see that?
8    A.    Yes.
9    Q.    Okay.  And on Page 3, in the
10   recommendation, you provide some indicative
11   levels.
12          Do you see that?
13   A.    Correct.
14   Q.    And when you say "indicative levels,"
15   those are returns that as of the date of this memo
16   the Authority could have achieved by investing in
17   those different types of investments, correct?
18   A.    Correct.
19   Q.    And you recommend sizes for the
20   investments, correct?
21   A.    Correct.
22   Q.    Okay.  Broadly speaking, the rates
23   might vary and your allocation might vary, but
24   were these three different types of investments
25   also available to the Authority in March of 2009?

Page 88

1           - PETER SHAPIRO -
2    A.    Let me be careful on this.
3    Q.    You should be careful with all the
4    questions.
5    A.    Thank you.
6    Q.    Take your time.  Do you have my
7    question in mind?  Answer it when you're ready.
8    A.    Your question was as of March 2009,
9    right?
10   Q.    Yes.
11   A.    Market conditions were changing very
12   rapidly during the time in question.  By 2011, the
13   date of this memo, there was clearly more
14   stability in the markets than there was in March
15   of 2009.
16          You may recall this, but March of
17   2009 was the absolute low point for the stock
18   market.  It was when the S&P 500 and the Dow Jones
19   Industrial Averages hit their cyclical lowest, on
20   March 6, as I recall that date being.
21          So market conditions at that point,
22   as -- and I'm using the stock market as just one
23   indicator -- were severely disrupted.  By the end
24   of 2011, there was much more stability in the
25   market, although still -- I would -- you know, I

Page 89

1           - PETER SHAPIRO -
2    would characterize even the market in 2011 as a
3    disrupted market.
4    Q.    So I want to go back to my question,
5    see if you can answer that.
6           Broadly speaking, the rates might
7    vary and your allocation might vary, but were
8    these three different types of investments also
9    available to the Authority in March of 2009?
10   A.    Broadly -- your question is broadly
11   speaking, were they merely available?
12   Q.    That's right.
13   A.    Right?
14   Q.    Yeah.
15   A.    Okay.  I'm not certain.
16   Q.    Did you ever examine that to see if,
17   broadly speaking, the types of investments that
18   you set out in Shapiro Exhibit 6 and recommend to
19   the Authority, whether those types of investments
20   were available to the Authority in March of 2009?
21   A.    I don't believe we were charged with
22   that task at that point.
23   Q.    So the answer is you have not
24   examined that?
25   A.    We -- if we examined it, it would

Page 90

```
 1              - PETER SHAPIRO -
 2   only have been in another context.
 3       Q.    That confuses me a little bit.  So
 4   did you examine that for the Authority?
 5       A.    No.
 6       Q.    Did you examine that for other
 7   clients?
 8       A.    It is -- it's possible in that
 9   interval, we were doing lots of things.
10       Q.    As you sit here --
11            One other question about your
12   analysis from November 2011, Shapiro Exhibit 6,
13   were the types of investments you were
14   recommending to the Authority, were those
15   permissible investments for the Authority?
16            MR. LAWRENCE:  Object to the form of
17   the question.
18       A.    I believe so.
19       Q.    How would you go about determining
20   what was and was not a permissible investment for
21   the Authority with the reserve fund?
22       A.    You're asking me to speculate how we
23   would have done --
24       Q.    No --
25       A.    -- we would do it.
```

Page 91

```
 1              - PETER SHAPIRO -
 2       Q.    No, as someone who practices on the
 3   public finance base, you're trying to figure out,
 4   I have a municipal client with a reserve fund, I'm
 5   going to make an investment recommendation, I
 6   wonder what the constraints are on this client's
 7   ability to invest in the instrument.
 8            Where would you look to get the
 9   answer to that question?
10            MR. LAWRENCE:  Object to the form of
11   the question.
12       A.    The indenture.
13       Q.    The indenture for the bonds?
14       A.    Yes.
15       Q.    Do you recall doing that with respect
16   to this memorandum that you prepared?
17       A.    Yes.
18       Q.    So it's safe to say you would not be
19   recommending investments to the Authority that you
20   knew they could not make?
21       A.    Unless we thought there was a
22   mechanism for amending the indenture.
23       Q.    You can look at the memo, but I don't
24   think you recommend any amendments to the
25   indenture.
```

Page 92

```
 1              - PETER SHAPIRO -
 2       A.    Exactly.
 3       Q.    I don't see credit charges in this
 4   memo.  Why not?
 5       A.    They're embedded in the price.
 6       Q.    Your prices that you have on your
 7   indicative levels, let me be clear, on Page 3
 8   include whatever credit charges there might be?
 9       A.    Where they would be applicable.
10       Q.    I don't see profit charges either.
11       A.    They are all -- those all are
12   embedded.
13       Q.    This is all in?
14       A.    Yes, of course.  We wouldn't put a
15   non-actionable price.  We wouldn't put a -- there
16   wouldn't be a mid market value.  It would be an
17   all in value, inclusive of the relevant spread
18   components.
19            (Whereupon, Shapiro Exhibit 7 was
20   marked at this time.)
21            THE VIDEOGRAPHER:  The time is
22   11:40 a.m., and we're going off the record.
23            (Whereupon, there was a brief recess
24   in the proceedings.)
25            THE VIDEOGRAPHER:  The time is
```

Page 93

```
 1              - PETER SHAPIRO -
 2   11:56 a.m., December 13th, 2013.  This is
 3   Tape Number 2 in the video deposition of
 4   Peter Shapiro.
 5   BY MR. TAMBE:
 6       Q.    Mr. Shapiro, I'm going to hand you
 7   what's been marked as Shapiro Exhibit 9.
 8            (Whereupon, Shapiro Exhibit 9, marked
 9   off the record, was tendered to the witness
10   for identification.)
11       Q.    Do you recognize this as a memo you
12   prepared on or about December 22nd, 2008?
13       A.    Yes.
14       Q.    And this is a memo you provided to
15   the TSA, setting out the scope services that you'd
16   be providing, correct?
17       A.    Yes.
18       Q.    Can you tell from this memo whether
19   as of the date of this memo a decision had been
20   made whether or not to terminate the RFA
21   agreement?
22       A.    Based upon this document, it -- it
23   appears that there was an intention to terminate.
24       Q.    Now, who prepared this memo?
25       A.    I -- it would have been me probably
```

Page 94

```
 1              - PETER SHAPIRO -
 2   in consultation with James Vergara.
 3       Q.    Anyone else?
 4       A.    No.
 5       Q.    Point 2 of your memo, Strategy --
 6       A.    Yes.
 7       Q.    -- provides that in consultation with
 8   counsel you would assist in -- I'm going to quote
 9   now -- "development of strategy for making
10   whatever claim against Lehman is warranted, with a
11   goal to maximizing the Authority's potential
12   financial benefit."  And it goes on.
13           Do you see that?
14       A.    Yes.
15       Q.    "The goal of maximizing the
16   Authority's potential financial benefit," whose
17   idea was it that that would be the goal?
18       A.    It's common sense.  You know, simple
19   English would tell you that that phrase is a
20   modifier to the prior one where it says the claim
21   is warranted, okay.  And obviously, in terms of a
22   warranted claim, you want to maximize the benefit;
23   how much you actually get out of what is
24   warranted.
25       Q.    Who would decide what's warranted or
```

Page 95

```
 1              - PETER SHAPIRO -
 2   not warranted?
 3       A.    You know, that's -- to me, that's a
 4   relatively common sense standard.  You're trying
 5   to do what is fair, what is right.
 6       Q.    Since December of 2008, has that goal
 7   been modified or changed in any respect?
 8           MR. LAWRENCE:  Are you talking about
 9       with respect to his work or generally or --
10           MR. TAMBE:  Generally.
11           MR. LAWRENCE:  Object to the form.
12       A.    And I'm going to ask you as a -- as a
13   part-time English teacher, that when you use the
14   passive voice "has it been modified," you know, if
15   you could give me who, what the subject of that
16   sentence should be.
17       Q.    Has the goal been modified?
18       A.    It's still passive voice.
19       Q.    Has anyone modified the goal?
20       A.    Has anyone modified the goal?
21       Q.    Yes.
22       A.    Not that I'm aware of.
23       Q.    Have you modified the goal?
24       A.    I'm anyone, so I would have to say
25   the same answer would apply.
```

Page 96

```
 1              - PETER SHAPIRO -
 2       Q.    So it is still your goal at Swap
 3   Financial Group to maximize the Authority's
 4   financial potential benefit?
 5       A.    For the warranted claim.
 6       Q.    Handing you a document that has been
 7   marked Shapiro Exhibit 7.
 8           MR. TAMBE:  It's -- just check the
 9       number because I remarked one of them.  So
10       it's the final --
11           MS. SAWYER:  1885.
12           MR. TAMBE:  1885.
13           MR. LAWRENCE:  1885?
14           MR. TAMBE:  Yes.
15           MR. LAWRENCE:  I do not have that.
16       Thank you.
17           MR. TAMBE:  You do not?  Okay.  All
18       right.
19       Q.    Sir, do you recognize Shapiro
20   Exhibit 7 as the response to the TSA's response
21   for proposals dated on or about March 2010?
22       A.    Yes, I do.
23       Q.    And that document, the Swap Financial
24   Group response, was that a document that you
25   prepared?
```

Page 97

```
 1              - PETER SHAPIRO -
 2       A.    I would have supervised its
 3   preparation.
 4       Q.    Okay.  Who else would you have worked
 5   with to prepare this?
 6       A.    James Vergara and possibly others,
 7   but James Vergara would have had the principal
 8   responsibility.  You can see on the cover e-mail,
 9   Jay, that there are three others cc'd.
10       Q.    And so do you believe that the three
11   others cc'd also played a role in preparing this
12   response?
13       A.    Normally when we respond to RFPs,
14   everyone has an opportunity to weigh in.  Often
15   that's just with regard to proofreading.
16       Q.    Now, do you know who else responded
17   to this request for proposals from the TSA?
18       A.    As I sit here today, do I know?
19       Q.    Yes.
20       A.    Yes.
21       Q.    Who was that?
22       A.    PFM.
23       Q.    Anyone else?
24       A.    Not that I'm aware of.
25       Q.    Have you seen PFM's response to this
```

Page 98

- PETER SHAPIRO -

1  request for proposals -- proposal?
2      A.    I -- I did see in preparing for the
3  deposition, for the first time, a PowerPoint
4  document that PFM had done.
5      Q.    So at the time back in 2010, when
6  this process was underway, the RFP process was
7  underway, you had not seen a copy of PFM's
8  response to --
9      A.    No.
10     Q.    And between 2010 and sometime
11 recently, you had not seen that response?
12     A.    No.
13     Q.    Do you understand that that response
14 from PFM that was submitted in 2010 had a
15 valuation in it?
16     A.    I don't recall if there was one.
17     Q.    All right.  In your -- so there's the
18 cover e-mail and as you open up the response,
19 there's a letter on the page that's -- that has a
20 number at the bottom, 1887, SFG 1887.
21     A.    Yes.
22     Q.    And that was sort of your cover
23 letter on this response, correct?
24     A.    Yes.

Page 99

- PETER SHAPIRO -

1      Q.    In the second paragraph of the
2  letter, you refer to "over a thousand terminated
3  transactions."
4      Do you see that?
5      A.    Yes.
6      Q.    That's what we were talking about
7  earlier, it's a thousand terminated transactions,
8  but about a hundred plus or minus 50
9  counterparties?
10     A.    Exactly.
11     Q.    Okay.  Then in the last sentence of
12 that paragraph you write, "SFG also has direct
13 relevant experience with the Lehman claims'
14 crystallization process, having recently
15 successfully crystalized a claim against Lehman."
16     Do you see that?
17     A.    Yes.
18     Q.    And now, the claim you were talking
19 about there, was that for a third-party client or
20 was that your own claim?
21     A.    Our own claim.
22     Q.    What kind of claim did you have
23 against Lehman?
24     A.    Lehman had failed to make payments to

Page 100

- PETER SHAPIRO -

1  us that were required as a result of them
2  intermediating fees on behalf of our clients.
3      Q.    And do you recall on what types of
4  transactions those fees had been incurred?
5      A.    Interest rate swaps.  It's a very
6  common thing that the swap dealer will
7  intermediate the fee.
8      Q.    When you talk about the claim --
9  withdraw that.
10     When you refer to having recently
11 successfully crystallized a claim against Lehman,
12 do you mean that you had reached an agreement with
13 Lehman as to what the size of Swap Financial
14 Group's claim would be?
15     A.    An agreed-upon amount, yes.  That's
16 what crystallization means.
17     Q.    I'm going to hand you what's been
18 marked as Shapiro Exhibit 8.
19     (Whereupon, Shapiro Exhibit 8, marked
20 off the record, was tendered to the witness
21 for identification.)
22     MR. LAWRENCE:  Is that what the other
23 document is?
24     Q.    And do you recognize Shapiro Exhibit

Page 101

- PETER SHAPIRO -

1  8 as a draft of the Swap Financial Group response
2  to the Washington RFP?
3      A.    I do.
4      Q.    You'll see that there's what appears
5  to be bullets of a clean and black-lined copy of
6  the RFP response attached to your cover e-mail.
7      Do you see that?
8      A.    Yes.
9      Q.    And as you say in the cover e-mail,
10 what you're attaching are clean and red-lined
11 versions.
12     Do you see that?
13     A.    Yes.
14     Q.    So if we go on the red-lined version,
15 which I believe begins on Page labeled 1869 -- are
16 you there?
17     A.    Yes.
18     Q.    You'll see there's some formatting
19 changes on Pages 1869.  When you flip over to the
20 next page, 1870, and that's that cover letter from
21 you to the TSA.
22     Do you see that?
23     A.    Yeah.
24     Q.    And there's some strike out there.

Page 102

1          - PETER SHAPIRO -
2          Do you see that?
3     A.    Yeah.
4     Q.    That's an edit that you made,
5 correct?
6     A.    I -- I believe so, simply because of
7 what the cover e-mail says.
8     Q.    And part of what you strike out is
9 the statement that says, "Note, I don't want to
10 refer to the fact that our experience with
11 crystallization was with our own claim, but just
12 with a just with 'a recent successfully
13 crystalized claim.'"
14          Do you see that?
15    A.    Correct.
16    Q.    Why did you not want the TSA to know
17 that your experience with crystallization was with
18 your own claim?
19    A.    It's basically confidentiality in
20 terms of the firm's business.  If --
21    Q.    Anything else?
22    A.    No.
23    Q.    That experience that you had had with
24 crystallization was in a far different context
25 than what the TSA was looking to hire you for,

Page 103

1          - PETER SHAPIRO -
2 correct?
3          You had a claim for fees?
4     A.    Yeah.  Every claim is distinct, Jay.
5     Q.    You would agree with me that the
6 TSA's claim is not a claim for fees?
7     A.    Not apples to apples.
8     Q.    All right.  Let's go back to an
9 exhibit we were looking at before and that's
10 Shapiro Exhibit 5.  It's the e-mail exchange
11 beginning with Bob Cook's e-mail and the boatload
12 e-mail.
13    A.    You like that one.
14    Q.    It's an interesting document.  So
15 let's ask about that some more.
16          In the top e-mail from Nathaniel
17 Singer on December 10th, he makes a reference to
18 the levels for the last real executions for these
19 agreements.
20          Do you see that?  It's in the top
21 e-mail.
22    A.    Yeah, he makes a similar reference in
23 his message two below as well.
24    Q.    Okay.  Let's deal with both, then.
25    A.    Yeah.

Page 104

1          - PETER SHAPIRO -
2     Q.    Let's go to the message at the top of
3 the e-mail chain, that's Nat Singer to you,
4 December 10th, 2008.  And the statement I refer
5 you to begins with the sentence, "We could try to
6 get MQs..."
7          Do you see that?
8     A.    Yes.
9     Q.    That's a reference to market
10 quotations, correct?
11    A.    Correct.
12    Q.    And he goes on to say, "We could try
13 to get MQs, but we may be better off finding out
14 the levels of the last real executions for these
15 agreements."
16          Do you see that?
17    A.    Right.
18    Q.    Did you ever try to get MQs, market
19 quotations, for the Washington TSA swap?
20    A.    Yes.
21    Q.    Okay.  And what did you do to try to
22 get market quotations for the Washington TSA
23 agreement?
24    A.    We contacted every conceivable dealer
25 in this product.

Page 105

1          - PETER SHAPIRO -
2     Q.    And how did you contact them?
3     A.    By telephone.
4     Q.    Okay.  And who did that?
5     A.    James Vergara and myself and perhaps
6 another staff member may have assisted, but
7 principally James and me.
8          I think we're okay.
9     Q.    And did you keep a record of who you
10 contacted and what they said?
11    A.    When we get a no response, we don't
12 generally keep a record unless there's a reason we
13 want to say to the client this guy turned us down
14 for X, Y, Z.  Typically we don't make a record on
15 no when we have negative responses.
16    Q.    And is it safe to say that when Nat
17 Singer wrote this e-mail on December 10, 2008, you
18 hadn't contacted any dealers to try and get market
19 quotations for the Washington agreement, correct?
20    A.    That's correct.
21    Q.    Now, at that point in time, December
22 10, 2008, Mr. Singer says, "We may be better off
23 finding out the levels of the last real executions
24 for these agreements."
25          Do you know what he meant by "We may

Page 106

- PETER SHAPIRO -

1    be better off"?
2    A.    Yes.  He would have meant we'd
3    actually have a data point to be able to work
4    with, rather than the lack of data points than an
5    attempt to do an MQ would give you.
6    Q.    Well, had you tried to get any market
7    quotations for these agreements in December 2008?
8    A.    At that point, no.
9    Q.    And were you aware of any real
10   executions for these agreements having taken place
11   in December of 2008?
12   A.    No.
13   Q.    How about November of 2008?
14   A.    No.
15   Q.    How about October of 2008?
16   A.    Not that I'm aware of.
17   Q.    September of 2008?
18   A.    I -- I wouldn't know.  It would be --
19   it would be most likely prior to that and Nat
20   would have his pulse on it more than me.  I should
21   say have his a finger on the pulse more than me.
22   Q.    Going back to the dealers you said
23   you contacted to get market quotations, when would
24   you have done that?

Page 107

- PETER SHAPIRO -

1    A.    For -- for Washington TSA?
2    Q.    For Washington, yeah.
3    A.    We would have done it at several time
4    intervals.
5    Q.    So tell me every point in time when
6    you sought market quotations.
7    A.    We would have initially done it when
8    we were first looking to provide a valuation.
9    Q.    When's that?
10   A.    You'd have to look in the documents
11   to see what the first date is.  I think you've got
12   all those.  I believe it was January or somewhere
13   in there.
14   Q.    January of what year?
15   A.    '09.  And then we would have
16   refreshed it on the termination day.
17   Q.    Any other points in time when you
18   would have done that?
19   A.    I don't believe so.  We knew we were
20   getting unambiguous turn downs; you know, that is,
21   we're not doing this product, not for -- not for
22   this category of client.
23   Q.    Other than roughly January and date
24   of termination, when else would you have sought

Page 108

- PETER SHAPIRO -

1    market quotations for the Washington trade?
2    A.    I don't -- I can't recall any other
3    times.
4    Q.    I believe you told me earlier that it
5    was either you or both you and Mr. Vergara who
6    would have made those calls; is that right?
7    A.    It would have certainly been the two
8    of us and it may have been another person.
9    Q.    Now, you told us that if you had
10   received a no interest indication from the dealers
11   you contacted, you were unlikely to have recorded
12   that fact, correct?
13   A.    Right.
14   Q.    Would you ever have kept any records
15   of having made the calls, having made a decision
16   to seek market quotations?
17   A.    When you say would we have ever or
18   are you saying in this case?
19   Q.    In this case?
20   A.    We did not.
21   Q.    Why not?
22   A.    Why not?  I'd have to speculate on my
23   state of mind at that time.
24   Q.    Well, as you sit here, what's your

Page 109

- PETER SHAPIRO -

1    best understanding of why you did not make any
2    kind of notation that you were seeking market
3    quotations?
4    A.    The market for this product was dead.
5    We were trying to find any glimmer of hope in it,
6    any way of getting anyone to provide a bona fide
7    quote.  And we applied a standard on that to make
8    sure it's a bona fide quote.  We don't want
9    anybody to do a quote as a quote/unquote favor, an
10   imaginative quote.  We want real quotes.  And we
11   found no glimmers of hope.  So, you know, there
12   was nothing to note down.
13   Q.    And when you say you wanted -- I want
14   to make sure I use your words -- you said you want
15   a bona fide quote, you wanted real quotes.
16   Did you provide any one of the
17   dealers that you contacted with a copy of the
18   reserve fund agreement for the Washington TSA?
19   A.    I can't recall.  We may never have
20   gotten that far.  They may have simply the door
21   saying forget about it.
22   Q.    But you don't remember one way or the
23   other if you did?
24   A.    I can't remember.  My -- you know,

Page 110

```
1              - PETER SHAPIRO -
2    I'd be speculating.
3        Q.    And if you had provided copies of the
4    reserve fund agreement to any of those dealers,
5    you would have records of that, correct?
6        A.    Yeah.  We would have an e-mail
7    because we would have transmitted by e-mail.
8        Q.    So if we found no such e-mails in
9    your production, that suggests, to us at least,
10   that you didn't do that?
11       A.    That's a good conclusion.
12       Q.    Going back to Exhibit 5.  The middle
13   of -- the other Nat Singer e-mail that you
14   referred to before.  And he states in that e-mail,
15   "I would assume that a current FPA would be priced
16   well below LIBOR, as the last trades were
17   occurring around L minus 150ish."
18           Do you see that?
19       A.    Yes.
20       Q.    There were no current FPAs, correct?
21       A.    What does "current" mean in your
22   mind?
23       Q.    There was no one entering into new
24   FPAs in the fall of 2008?
25       A.    I don't believe so.  Tobacco FPAs.
```

Page 111

```
1              - PETER SHAPIRO -
2        Q.    Tobacco FPAs.
3        A.    Yes.
4        Q.    And when you see his reference to
5    "last trades were occurring around L minus
6    150ish," you see that as a reference to LIBOR
7    minus 150ish, correct?
8        A.    Absolutely.  Yes.
9        Q.    The 150 is 150 basis points, correct?
10       A.    Yes.  And the "ish" means
11   approximately.
12       Q.    Right.  But the last trades that he
13   was referring to, do you know when any of those
14   last trades had occurred?
15       A.    No.
16       Q.    Handing you a document that has been
17   marked previously as Lehman 15.
18           MR. LAWRENCE:  I think we have two
19   copies.
20       Q.    And you recognize Lehman 15 as a memo
21   that you and Mr. Vergara prepared in April of
22   2009, correct?
23       A.    Correct.
24       Q.    So we're going to -- I'm going to ask
25   you some questions that are specific to the
```

Page 112

```
1              - PETER SHAPIRO -
2    30(b)(6) deposition at this point.
3           One of the topics you have been
4    identified as the witness on is the April 21, 2009
5    loss calculation memo, okay?
6           Got it?
7        A.    I -- I guess so.  I don't know the
8    cite, but you're -- I'm trusting that you're
9    citing correctly.
10       Q.    I'm sure Paul would tell me if I was
11   not.
12           MR. LAWRENCE:  I would.
13       Q.    First thing I'd like you to do is
14   describe for me generally the process that
15   resulted in the preparation of this memorandum.
16       A.    The process in general?
17       Q.    Yeah.
18       A.    I think it describes it very well in
19   the memo.  You know, it cites the relevant portion
20   of the document as to how value is supposed to be
21   determined, you know, that's basically the process
22   that we go through.  And then we went and looked
23   at -- in the absence of market quotations, we
24   looked at where you would come up with a
25   hypothetical replacement transaction, knowing the
```

Page 113

```
1              - PETER SHAPIRO -
2    elements that would go into pricing were a
3    provider of the market available.
4        Q.    Okay.  Were there drafts of this
5    document?
6        A.    Whatever has been produced.
7        Q.    Well, are you aware of any drafts
8    that have not been produced?
9        A.    Only if there's something that where
10   privilege has been asserted, I don't believe
11   that's the case.  I can look through the privilege
12   log, but I don't think so.
13       Q.    And do you recall this document,
14   Lehman Exhibit 15, going through review and rounds
15   of edits before it was submitted to the Washington
16   TSA?
17       A.    I'm not recalling specifics on it.
18       Q.    Have you -- well, what have you done
19   to try and find out how this document was
20   prepared?
21       A.    You know, I've read through it and
22   the like, the document -- it speaks for itself.
23       Q.    Not only does the document speaks for
24   itself, but I guess what the document doesn't
25   speak for is how it came to be, what steps did it
```

Page 114

```
1              - PETER SHAPIRO -
2    go through, did it change over time.  And that's
3    what I want to find out from you.  How --
4         A.   There was a, you know, an earlier
5    draft.  I -- I'm sorry, this is the earlier draft.
6    There were two valuation documents.  You have --
7    you have both of them.
8         Q.   Okay.  And when you say "there were
9    two valuation documents," there's this one dated
10   April 21, 2009 and there's another one dated
11   September 2009?
12        A.   That's correct.  So you have both of
13   them, yes.
14        Q.   Well, I guess my question is, was
15   this document, when it was initially prepared and
16   reviewed by you, in exactly this format, every
17   word, every number?
18        A.   It's -- you know, it's entirely
19   possible that I stood at James' screen or he stood
20   at my screen and we looked it over together.  But,
21   you know, we're sitting right next to each other
22   in the same room.
23        Q.   Well, lots of things are entirely
24   possible.  What actually happened, sir?
25        A.   I'm not recalling.
```

Page 115

```
1              - PETER SHAPIRO -
2         Q.   Okay.  Do you recall -- well, do you
3    recall anything about who provided the wording,
4    the structure or the context for this memorandum?
5         A.   I believe James did, yes.
6         Q.   Now, you will see that, as far as I
7    can tell, this document makes no reference to
8    market quotation that I can see anywhere in it, MQ
9    that we referred to before.
10             MR. LAWRENCE:  Is that a question or
11   a statement?
12             MR. TAMBE:  Well, he can correct me
13   if he thinks it addresses MQ somewhere.
14             MR. LAWRENCE:  The question is does
15   it address MQ?
16             MR. TAMBE:  Yes.
17        A.   It does not.  It says on the
18   concerning line, calculation of Loss -- on the
19   quote/unquote concerning line, calculation of Loss
20   with a capital L, because loss is a defined term.
21        Q.   You'll see that there's no
22   description or explanation in this memo that
23   market quotations were sought but not obtained,
24   correct?
25        A.   Correct.
```

Page 116

```
1              - PETER SHAPIRO -
2         Q.   Now, there's -- the first paragraph
3    of this document cites the -- a provision from the
4    RFA, correct?
5         A.   Correct.
6         Q.   Were there any other provisions of
7    the RFA that were relevant to this analysis?
8         A.   Many.
9         Q.   Okay.  Which other provisions of the
10   RFA do you believe are relevant to the analysis
11   set forth in Lehman 15?
12        A.   The ones that describe all the
13   economics.
14        Q.   And generally, what are those?
15        A.   Fixed rate on the deal, the mechanism
16   for delivery of the eligible securities, the
17   amortization schedule, all of the -- all of the
18   factors that have to go into doing an economic
19   calculation.
20        Q.   Did you receive any advice on how to
21   interpret the RFA for purposes of doing this
22   valuation?
23        A.   Are you asking if we received legal
24   advice?
25        Q.   Yes.  Did any lawyers tell you how
```

Page 117

```
1              - PETER SHAPIRO -
2    you should interpret certain provisions of the RFA
3    for purposes of doing your calculation?
4             MR. LAWRENCE:  You can answer that
5    yes or no.
6             THE WITNESS:  That doesn't fall under
7    attorney-client?
8             MR. LAWRENCE:  You can answer yes or
9    no.
10        A.   Okay.  Yes.
11        Q.   Which lawyers were they that advised
12   you on that topic?
13             MR. LAWRENCE:  If you remember the
14   law firm, that's fine.
15        A.   It would have been TSA's lawyers.
16        Q.   You say "it would have been," do you
17   actually have a recollection of the TSA's lawyers
18   advising you on this?
19        A.   Yes.
20        Q.   Who at the TSA's lawyers?  Which
21   lawyers?
22        A.   The --
23             THE WITNESS:  I can go into all of
24   this?
25             MR. LAWRENCE:  You can state who they
```

Page 118

- PETER SHAPIRO -

1  are. You cannot state anything they said.
2
3     A.    Okay. The principal lawyer was Faith
4  Pettis, P-E-T-T-I-S.
5     Q.    You said the principal lawyer was
6  Faith Pettis. Anyone else?
7     A.    She's the one I recall. Let me --
8  let me add one other. Stacey Crawshaw-Lewis, I
9  believe I'm saying the name correctly.
10       MR. LAWRENCE: Right. There's a
11       hyphen between Crawshaw and Lewis.
12    Q.    Anyone else?
13    A.    No.
14    Q.    In doing -- go ahead.
15    A.    There was one other lawyer, but he
16  may have left already. I believe he had left at
17  that time.
18    Q.    Was that Jay Rich?
19    A.    Jay Rich, yeah. I -- I can't recall
20  the date when Jay left the firm to join -- to go
21  to Washington.
22    Q.    But before Jay left the firm to go to
23  Washington, was he one of the TSA's lawyers that
24  you consulted with on the interpretation of the
25  RFA?

Page 119

- PETER SHAPIRO -

1     A.    He -- I --
2        MR. LAWRENCE: Wait, wait.
3     A.    -- I can't recall.
4        MR. LAWRENCE: I want to interpose an
5        objection because you've now added a
6        substantive component to the question. So if
7        it's limited to consulted with, then he can
8        answer that question.
9        MR. TAMBE: Well, without agreement
10       with you, I can -- I can amend my question to
11       say:
12    Q.    Did you ever consult with Jay Rich
13  before he left the firm to go to Washington, about
14  the Washington TSA?
15    A.    I can't recall. There -- and if I
16  can, there was one -- I'm remembering now one
17  other lawyer, I can't remember the name, but they
18  had a bankruptcy guy on it, too.
19    Q.    Okay. There's a provision in the RFA
20  that has the phrase "as if it were Lehman." Are
21  you familiar with that phrase?
22    A.    Yes.
23    Q.    Did that phrase play any role in your
24  calculation of the termination amount?

Page 120

- PETER SHAPIRO -

1     A.    It played a role in how we read the
2  role of the various parties.
3     Q.    Maybe I need a little more
4  explanation on that then.
5        Did that phrase -- as a result of
6  that phrase, did you adjust your calculation in
7  any way?
8     A.    No.
9     Q.    As a result of that phrase, did you
10  make any determinations as to what the proper
11  deliverable securities would be?
12       THE WITNESS: Could you read that
13       back?
14       (The question requested was read back
15       by the reporter.)
16    A.    No.
17    Q.    Now, at the bottom of Page 1, over to
18  Page 2, there's the beginnings of the discussion
19  of how the calculation is done.
20       Do you see that?
21    A.    Yes.
22    Q.    Yes. Just again for the record, I
23  think these questions expand beyond just the April
24  21 memo to both the September memo, as well as the

Page 121

- PETER SHAPIRO -

1  calculation of the Washington TSA's termination
2  amount. I think those are overlapping topics. So
3  I'm asking you questions that pertain to all of
4  those topics in the 30(b)(6) notice.
5        When it comes to valuing the
6  termination amount, you state, Swap Financial
7  Group states: The appropriate method to use -- is
8  to use a similar interest rate swap in which one
9  payer, LBSF, would pay a fixed rate of 4.484
10  percent, and the other payer, TSA, would pay a
11  floating rate.
12       Do you see that?
13    A.    Yes.
14    Q.    Are you sure about that?
15    A.    Yes.
16    Q.    That's the right way to do it?
17    A.    Yes.
18    Q.    Why?
19    A.    That's the base that is used for
20  valuing contracts like this. That's how they're
21  traded. You trade them looking at them first as
22  though they were a swap, then you make adjustments
23  off of the swap.
24    Q.    Did you ever consider any other

31 (Pages 118 to 121)

Page 122

1          - PETER SHAPIRO -
2    methodology to try and value this agreement other
3    than treating it as an interest rate swap?
4        A.    Ever?
5        Q.    Ever.
6        A.    Yes.
7        Q.    What other methodologies did you
8    consider?
9        A.    Cumulative cash flow loss.
10       Q.    What do you mean by that?
11       A.    It means how much TSA lost in terms
12   of the money it was owed by virtue of the fact
13   that it could only reinvest in very low-yielding
14   instruments without taking on additional unwanted
15   risk.
16       Q.    And that number that was yielded by
17   the other methodology, was that a number that was
18   greater or smaller than your $47 million number?
19       A.    It would depend on the assumptions
20   you'd make for future floating rates.  It could be
21   significantly larger.  It could be smaller, but
22   you'd have to make an assumption where future
23   floating rates would go.
24       Q.    I think I lost you somewhere in those
25   answers.

Page 123

1          - PETER SHAPIRO -
2        In this document, Lehman Exhibit 15,
3    and in the September document, Lehman Exhibit 19,
4    you value two payment flows, correct; a fixed
5    payment flow and a floating payment flow?
6        A.    Correct.
7        Q.    I've then asked you whether you had
8    used a methodology other than that type of a swap
9    methodology for valuation purposes and I believe
10   you said that what you had done was you valued the
11   cumulative cash flows lost, correct?
12       At least I understood that to mean
13   that what you had done is calculated all of the
14   fixed rate losses that would be incurred by the
15   Authority.
16       Where do the floating rates fit into
17   that?
18       A.    To calculate the loss you have to
19   compare the fixed rate, which is known, versus the
20   floating rate that they have to -- that they're
21   stuck with investing in.  So you have to make
22   assumptions with regard to the floating rate.
23       Q.    Okay.
24       A.    It's not the difference between 4
25   point -- what's our number, 4.484?

Page 124

1          - PETER SHAPIRO -
2        Q.    Yeah, 4.484.
3        A.    It would be 4.484 and zero, Jay.
4    It's the difference between 4.484 and short-term
5    instruments that they would have invested, I
6    believe.  So you have to make an assumption about
7    where those short-term instruments would be
8    invested.
9        Q.    Then at one point I believe you said
10   that if you take those floating rates into
11   account, the number could be higher or lower than
12   your $47 million number; is that right?
13       A.    Correct.
14       Q.    Okay.  Could the number ever be
15   higher than just the fixed set of payments, just
16   4.484 versus zero, could it ever be higher than
17   that?
18       A.    Under a hypothetical negative
19   interest rate scenario, it could be higher than
20   that.
21       Q.    How common is a negative interest
22   rate scenario?
23       A.    Very uncommon.
24       Q.    Now, you said -- you believe that the
25   PFM analysis was absolutely wrong.  Did they at

Page 125

1          - PETER SHAPIRO -
2    least begin with an interest rate swap approach?
3        A.    I have no idea.
4        Q.    So you remember their number, you
5    remember it was absolutely wrong, but you don't
6    remember if they even began with a fixed or
7    floating analysis?
8        A.    It's all I saw was their number.
9        Q.    And you didn't ask to see anything
10   else?
11       A.    No.
12       Q.    Okay.  All right.  Let's go back to
13   the April document, Lehman 15.  If you want, if
14   it's easier, you can have the September document
15   open as well.  I think on these questions the text
16   is exactly the same.
17       A.    I've looked at them side by side.
18       Q.    So paragraph -- the first full
19   paragraph on Page 2, you begin by stating, "The
20   use of a LIBOR plus spread analysis with an
21   interest rate swap to value agreements like the
22   RFA is the broadly accepted market methodology."
23       Do you see that?
24       A.    Yes.
25       Q.    How did you know that was the broadly

Page 126

- PETER SHAPIRO -

1  accepted market methodology?
2  A.    Because of our participation in the
3  market.
4  Q.    Okay.  And did Mr. Vergara provide
5  any input on that aspect of this memo?
6  A.    That was actually his wording.
7  Q.    And you accepted that wording,
8  correct?
9  A.    Correct.
10  Q.    Because you believed him to be
11  experienced in valuing agreements like the RFA,
12  correct?
13  A.    No, because of my own independent
14  knowledge.  He had it correct.
15  Q.    He had it correct?
16  A.    Yeah.
17  Q.    Then you go on to say, In the case --
18  "In the case of the RFA, the value of the floating
19  leg is of great importance, since the value of the
20  fixed leg is already known."  Correct?
21  A.    Correct.
22  Q.    So, tell me everything that you or
23  Mr. Vergara did to determine what the floating leg
24  should be.

Page 127

- PETER SHAPIRO -

1  A.    When you say everything we did,
2  you're asking a very expansive question.  I can,
3  you know, give you the -- you know, what the key
4  steps are.
5  Q.    All right.  I mean, this is -- you
6  said "the value of the floating leg is of great
7  importance," so I want know what you did to
8  determine the floating leg which is of such great
9  importance.
10  A.    The floating leg that we look at has
11  to look at what the deliverable security will be.
12  And that's the key component in determining the
13  floating leg.
14  Q.    Okay.
15  A.    And in addition to that, you have to
16  put in spreads.
17  Q.    Okay.  But before you put on the
18  spread, then, as I understand your methodology,
19  the first thing you did was determine what this
20  floating would be without spreads, correct?
21  A.    Correct.
22  Q.    And then you added on the spreads to
23  see what the impact was?
24  A.    Correct.

Page 128

- PETER SHAPIRO -

1  Q.    So let's stick with finding out what
2  that floating leg is.
3  A.    You used the word everything, I was
4  just trying to be a little more responsive.
5  Q.    That's fair.
6  So, sticking with the floating leg,
7  before you get to the spreads and add-ons, you
8  said it would be based on what the deliverable
9  obligations would be, correct?
10  A.    Correct.
11  Q.    And prior to default, it was --
12  Lehman had the discretion in deciding what
13  eligible security it would deliver, correct?
14  A.    Correct.
15  Q.    And you understand now that Lehman
16  had entered into a hedging transaction where it
17  obtained commercial paper that it could deliver
18  into this deal, correct?
19  A.    I do understand that, yes, I
20  understand there has been some production on that.
21  I don't know for a fact that they've actually did
22  it, I just have seen documents saying that they
23  did.
24  Q.    And you understand that even with the

Page 129

- PETER SHAPIRO -

1  availability of that commercial paper, if Lehman
2  found it advantageous to deliver agencies, it
3  could have delivered agencies, correct?
4  A.    It could have delivered agencies,
5  treasuries or commercial -- highest rate
6  commercial paper.
7  Q.    As you thought about valuing the
8  termination amount for the TSA agreement, did you
9  consider all of those different eligible
10  securities?
11  A.    Yes.
12  Q.    How did you consider all of those
13  eligible securities?  What did you do to consider
14  them?
15  A.    It's the standard in valuing any of
16  these agreements that you consider all of the
17  deliverables, but that you value it based upon the
18  quote/unquote cheapest to deliver.
19  Q.    Is it fair to say when you used the
20  phrase "cheapest to deliver," that what you're
21  trying to identify is the highest yielding of the
22  eligible securities?
23  A.    Exactly.
24  Q.    Now, that requires some number

Page 130

- PETER SHAPIRO -

1
2  crunching, right?
3      A.    To determine which would be cheapest?
4      Q.    Yes.
5      A.    No.
6      Q.    You just know that sitting at your
7  desk?
8      A.    No.  You can look at a screen and
9  just see the difference between prices, that's
10  all, you know.
11      Q.    So maybe not number crunching, it
12  needs some examination of data?
13      A.    Correct.
14      Q.    Okay.  So what data did you examine
15  to determine what would be the cheapest to deliver
16  securities over the remaining life of this
17  contract?
18      A.    We would look -- look at screens of
19  where rates are on treasuries, agencies and
20  commercial paper.
21      Q.    You say "we would look," what did you
22  look at?
23      A.    We would -- I'd say obviously we
24  looked at screens to compare treasuries, agencies
25  and commercial paper.  This is not rocket science.

Page 131

- PETER SHAPIRO -

1
2      Q.    Then you said "we would."  Who is
3  "we"?
4      A.    James and myself and anybody else who
5  looked at it.
6      Q.    Let's be really specific.  Did you
7  sit down at a computer terminal and look at the
8  expected yields on the eligible securities for the
9  remainder of the life of this contract?
10      A.    We looked at the yields.  You're
11  using the term "expected yields," it's a different
12  thing.
13      Q.    All right.  I'll change my question,
14  but I want to focus in on what you, Peter Shapiro,
15  did, not what we did.
16          What did you, Peter Shapiro, do?
17          MR. LAWRENCE:  So you're leaving the
18      30(b)(6)?
19          MR. TAMBE:  No, I'm still in the
20      30(b)(6).  I'm trying to find out who did
21      what within the 30(b)(6).  It's still fair.
22      Q.    So within the 30(b)(6), right, what
23  did you, Peter Shapiro, do to examine what the
24  yields would be on the different eligible
25  securities?

Page 132

- PETER SHAPIRO -

1
2      A.    I looked at a Bloomberg screen.
3      Q.    And what Bloomberg screen did you
4  look at?
5      A.    One that would compare yields.
6      Q.    Does that screen have a name?  Does
7  it have a page number?  How do you get to that
8  screen?
9      A.    There are multiple screens that show
10  these yields.
11      Q.    There's more than one?
12      A.    Yeah, there are many data sources for
13  these kinds of yields.
14      Q.    One of the eligible securities is
15  commercial paper, correct?
16      A.    Correct. Now, remember, not just any
17  commercial paper.
18      Q.    Of a certain rate?
19      A.    Highest rated, yes.
20      Q.    So there is a screen that you look
21  to --
22      A.    Correct.
23      Q.    -- to find out what the yield was for
24  the highest rated commercial paper?
25      A.    Right.

Page 133

- PETER SHAPIRO -

1
2      Q.    Did you record that anywhere?
3      A.    Record it?
4      Q.    Yeah.  What you saw on that screen?
5      A.    It -- it was included in the
6  calculations, you can see that.
7      Q.    Well, actually, I can't see that.  So
8  I'm asking you:  Was it recorded anywhere what you
9  saw on that screen?
10      A.    We -- I'm trying to see what you mean
11  by the term "record."
12      Q.    Well, as I see what appears in this
13  memo --
14      A.    Right.
15      Q.    -- with respect to commercial paper,
16  I see a reference to CP spread.
17      A.    Right.
18      Q.    Which is a constant .666 percent.
19      A.    Correct.
20      Q.    Right.  That's a constant spread you
21  used for the remaining life of this deal.
22      A.    Correct.
23      Q.    In fact, until 2042 as you did this
24  analysis, right?
25      A.    Correct.

Page 134

- PETER SHAPIRO -

1
2    Q.    Is there a screen, is there data that
3 you pulled off of Bloomberg that supports that
4 part of the memo?
5    A.    Yes.
6    Q.    And what screen is that?
7    A.    That would be the pre-bond
8 interdealer broker screen that showed where you
9 could hedge long-term commercial paper rates
10 versus LIBOR. It's what's called a basis swap
11 screen.
12    Q.    Did you take any screen prints off
13 that screen at the time you did this analysis?
14    A.    Not that I'm aware of.
15    Q.    Now, in addition to you, did
16 Mr. Vergara also do this type of screen analysis
17 or is that you that did the screen analysis?
18    A.    He did the screen analysis.
19    Q.    In addition to you?
20    A.    Yeah, I would have looked at it.
21 Remember, we're sitting close to each other, the
22 Bloomberg is between us.
23    Q.    Okay. All right. So that's a screen
24 you look at that you just identified to come up
25 with the constant CP spread that you use?

Page 135

- PETER SHAPIRO -

1
2    A.    Correct.
3    Q.    Right. What screen did you look at
4 to look at the yields on U.S. Government
5 obligations, treasuries?
6    A.    The Treasury to LIBOR basis is on the
7 same page.
8    Q.    So you looked at that?
9    A.    Correct.
10    Q.    Again, you didn't make any screen
11 prints of that screen?
12    A.    No. Not that I'm aware of.
13    Q.    The third category, broadly speaking,
14 of eligible securities are government agency
15 securities, correct?
16    A.    Correct.
17    Q.    What screen did you look at to
18 determine the yields on government agency
19 securities?
20    A.    You cannot hedge forward agencies,
21 there is no agency basis market. So, on that
22 screen you don't have LIBOR versus agencies. So
23 it's -- all you can look at with agencies is spot,
24 where it's currently trading at.
25    Q.    Other than looking at Bloomberg, what

Page 136

- PETER SHAPIRO -

1
2 else did you do to determine what yields on
3 agencies are expected to be starting with the
4 early termination date into the future?
5    A.    We wouldn't look at it that way.
6 You'd look at spot yields on agencies to see if
7 they were ever cheaper to deliver. You don't have
8 a hedgeable market on agencies.
9    Q.    But you would agree with me that if
10 agencies were cheaper to deliver, Lehman would
11 have the right to deliver them, right?
12    A.    Of course. The treasuries were -- if
13 you had an anomaly, a shutdown in the CP market,
14 you could always deliver those things.
15    Q.    So -- all right. The question I
16 asked you previously was what screen did you look
17 at to determine the yield on government agencies
18 securities. You gave me a long answer and said
19 there were spot yields.
20    A.    Spot yields, right.
21    Q.    What screen did you look at to look
22 at spot yields?
23    A.    There are -- there are multiple
24 screens on that. The screen we normally keep open
25 by default is one called USSW and that shows you

Page 137

- PETER SHAPIRO -

1
2 where agencies are rated right way. That's always
3 open in our Bloomberg.
4    Q.    Did you try to construct a forward
5 agency curve?
6    A.    No.
7    Q.    Did you discuss constructing a
8 forward agency curve with James Vergara?
9    A.    No.
10    Q.    How about with Nat Singer?
11    A.    No.
12    As -- you're saying as part of a
13 valuation, Jay.
14    Q.    As part of a valuation?
15    A.    Yeah.
16    Q.    Have you ever constructed a forward
17 agency curve for any of your engagements?
18    MR. LAWRENCE: I'm sorry, for any of
19 the securities or just for --
20    MR. TAMBE: For any engagements, has
21 he ever done it.
22    MR. LAWRENCE: For any eligible
23 security?
24    MR. TAMBE: Yes.
25    A.    We looked at this only when Lehman

Page 138

                - PETER SHAPIRO -
1
2  raised this idea in conjunction with this. We see
3  this as a fantasy. No one has ever done it. It's
4  not an accepted market practice. We see it only
5  as Lehman's effort to try not to pay what it owes
6  to Washington.
7      Q.    I believe in one of the earlier
8  answers on agencies you also said you looked at
9  the spot rates, but the forward agency market is
10  not hedgeable, or words to that effect.
11     A.    Correct.
12     Q.    And is that the reason -- is that a
13  reason why you did not use a forward agency curve,
14  because you believe the forward agency market to
15  be not hedgeable?
16     A.    Correct.
17           And your question was, is that a
18  reason, right?
19     Q.    Is that a reason?
20     A.    Yes.
21     Q.    There may be other reasons, but that
22  is a reason?
23     A.    Yes.
24     Q.    All right. Now, I think you've told
25  us how you determined what the commercial paper

Page 139

                - PETER SHAPIRO -
1
2  spreads were going to be; you based it off of the
3  LIBOR screen?
4      A.    Correct. LIBOR screen, basis screen.
5      Q.    You based it off of a Bloomberg
6  screen that had this information on it?
7      A.    Correct.
8      Q.    And just -- just to be clear, what
9  you're doing is adding 666 basis -- no, 66.6 basis
10  points to a LIBOR curve; is that right?
11     A.    Correct.
12     Q.    What LIBOR curve?
13     A.    The -- when we look at the LIBOR
14  curve for the base swap, we have to take into
15  account the amortization in the contract, you
16  know, looking at what it would look like based
17  upon the, you know, the principal schedule, the
18  notional value schedule that's in the contract.
19  You build a base curve off that.
20     Q.    Okay. So, it's a curve of what,
21  six-month intervals or is it a three-month LIBOR?
22  What's the curve based on?
23     A.    It's a curve that goes all the way
24  out.
25     Q.    Okay. So all the way out to, in your

Page 140

                - PETER SHAPIRO -
1
2  case, to 2042?
3      A.    2042 on the initial valuation, the
4  ones we're talking about.
5      Q.    And then you add 66.6 basis points to
6  every step along that curve?
7      A.    Right, which works in Lehman's favor.
8      Q.    Okay. You believe that curve to be a
9  hedgeable curve?
10     A.    That is correct.
11     Q.    All right. The next thing that I see
12  in your analysis is charges for municipal tobacco
13  credit. I think that analysis is largely the same
14  in both April and September memos, correct?
15           MR. LAWRENCE: Answer that question
16  then at some point we need to break for
17  lunch. If you're going to a different
18  subject, we can certainly go there. I just
19  don't know how long you're going to be.
20           MR. TAMBE: No, that's fine. We can
21  break for lunch now.
22           THE VIDEOGRAPHER: The time is
23  12:56 p.m. We're going off the record.
24           (Whereupon, a lunch break was taken
25  from 12:56 p.m. to 2:31 p.m.)

Page 141

                - PETER SHAPIRO -
1
2           THE VIDEOGRAPHER: The time is
3  2:13 p.m. We're back on the record.
4  BY MR. TAMBE:
5      Q.    All right. Mr. Shapiro, before we
6  broke for lunch we had been discussing Lehman
7  Exhibit 15, the April 2009 valuation, and we were
8  discussing commercial paper spreads.
9      A.    Correct.
10     Q.    I believe at one point you testified
11  that adding the 66.6 basis points to the LIBOR
12  curve would work in Lehman's favor, correct?
13     A.    Yes.
14     Q.    Now, you didn't use that calculation
15  because you were trying to do a favor for Lehman,
16  correct?
17     A.    No, we're not trying -- you know, as
18  a firm we have a real discipline to try to do
19  things accurately, fairly, correctly, defensively.
20  That's our goal.
21     Q.    And so that was your reasoned opinion
22  as to what the right floating curve was before
23  adjustments were made?
24     A.    Yes, at that time.
25     Q.    You believe that to be a hedgeable

Page 142

- PETER SHAPIRO -

1
2  product commercial paper product; is that right?
3     A.   It is hedgeable, yes.
4     Q.   It is hedgeable.  Okay.
5     A.   And there is an active basis market.
6     Q.   Okay.  So it's possible to transact
7  in the commercial paper market that's depicted by
8  that CP curve that you constructed; is that right?
9     A.   To state it accurately, it is to --
10  it is possible to transact in the swap market
11  where the floating leg is based on CP.
12     Q.   Okay.
13     A.   Okay.
14     Q.   All right.  So now let's come down to
15  the next section in -- and I believe it's largely
16  the same section, there's some differences between
17  April and September, but the section that is
18  titled, Charges for Municipal Tobacco Credit.
19     A.   Correct.
20     Q.   Do you see that?
21          Now, was this section drafted by
22  Mr. Vergara?
23     A.   Yes.
24     Q.   If I understand correctly, the first
25  step in determining what the charges for municipa

Page 143

- PETER SHAPIRO -

1
2  tobacco credit would be, was you did some
3  examination of what the bond spreads were; is that
4  right?
5     A.   Right.  You don't have a -- a CDS
6  market, so you're only going to look at bonds.
7     Q.   And once you had figured out what
8  that bond spread was, what did you do with that
9  next?
10     A.   We looked at that bond spread as a
11  way of replicating a credit spread.
12     Q.   How did you replicate the credit
13  spread?
14     A.   I think it's explained pretty clearly
15  in the memo.  You want me to read the relevant
16  section?
17     Q.   No.  If you could tell me sort of in
18  lay -- lay terms, what is the process or the
19  thinking by which you take that bond spread and
20  use it to compute a credit spread for the
21  agreement?
22     A.   Credit spreads are, you know, an
23  important component of any kind of derivative
24  agreement and figuring out what that credit spread
25  should be in the absence of a matter is a tricky

Page 144

- PETER SHAPIRO -

1
2  thing.
3          We know we do not have market here,
4  as we've discussed earlier.  So what we're trying
5  to do here is look at what that credit spread
6  should be on what I call hypothetical replication;
7  where it would be.
8          And what we look at here is what is
9  the spread in the market between a more
10  creditworthy bond -- and we didn't pick a super
11  creditworthy bond, we picked an A rated, 30-year,
12  general purpose revenue bond.  Right?  Okay.  We
13  could have picked a AAA rated general obligation
14  bond and the spread would have been bigger.  But
15  we picked that as sort of a reasonable benchmark
16  and we spread it to where these bonds were
17  actually trading.  So that's -- that's a way to
18  try to replicate.
19          Realistically, on execution, every
20  bank is a little different in terms of how they
21  calculate credit.
22     Q.   Are you aware of any bank that ever
23  utilized a bond spread analysis to determine a
24  credit spread on an RFA agreement?
25     A.   If the -- we don't see the inner

Page 145

- PETER SHAPIRO -

1
2  workings of the sausage factory at any of the
3  banks.  We just see the results, and we hear them
4  discuss where they get to.  So it's not like we're
5  sitting in on their credit committee meetings,
6  obviously.
7     Q.   So let me go back to my question.
8          Are you aware of any bank that ever
9  utilized a bond spread analysis to determine a
10  credit spread on an RFA agreement?
11     A.   Why was my response not responsive
12  there?
13     Q.   Well, either you're aware of that or
14  you're not.
15     A.   I said we're not sitting in on their
16  credit meetings.  So I can't say that we have
17  firsthand awareness of what went into it.
18     Q.   Did you ask Mr. Singer whether he was
19  ever aware or he had ever used a bond spread
20  analysis in determining the credit spread on an
21  RFA?
22     A.   During his time when he worked at
23  Bear, Stearns?
24     Q.   Yes.
25     A.   Yes.

Page 146

```
                    - PETER SHAPIRO -
 1
 2      Q.    Did he tell you he'd ever done that?
 3      A.    Yes.
 4      Q.    Okay.  And what was the maximum such
 5   bond spread that he had ever used in determining
 6   the credit spread on an RFA?
 7      A.    We never had that discussion.
 8      Q.    Is it your understanding, based on
 9   your discussions with Mr. Singer, that it was
10   appropriate to use several hundred basis points of
11   spread from the bond market to determine a credit
12   spread for the RFA agreement?
13      A.    There was no discussion about whether
14   or not at some point the number of basis points
15   would be appropriate or inappropriate.
16      Q.    Now, if I understand what you've done
17   is after determining what the bond spread is,
18   which you determined was a spread of 4.29 percent
19   or 429 basis points, you simply took that 429
20   basis points and added it to the LIBOR or deducted
21   it from the LIBOR plus 66.6 basis point floating
22   curve, correct?
23      A.    It goes in the opposite direction,
24   that's correct.
25      Q.    So basis point for basis point, you
```

Page 147

```
                    - PETER SHAPIRO -
 1
 2   went from the bond spread to the RFA spread
 3   without any adjustments?
 4      A.    Correct.
 5      Q.    Again, if I understand what you're
 6   doing here correctly, you knew as far back as
 7   certainly December of 2008 that there was no
 8   active market for RFAs, correct?
 9      A.    Tobacco RFAs.
10      Q.    Tobacco RFAs.
11      A.    Yes.
12      Q.    No one was entering into these
13   agreements?
14      A.    Right.
15      Q.    And so what you're doing in this part
16   of your analysis is coming up with a credit charge
17   that some hypothetical dealer might impose if it
18   were to enter into some transaction with the
19   Washington TSA; is that right?
20      A.    Yes, as soon as you don't have a
21   market you have to go with hypotheticals.
22      Q.    And if such a hypothetical
23   transaction had taken place, the credit charge
24   that you've computed, 429 basis points, that would
25   be a charge that would go to the hypothetical
```

Page 148

```
                    - PETER SHAPIRO -
 1
 2   dealer that had entered into the transaction,
 3   correct?
 4      A.    No.  You can't really look at it that
 5   way.  You have to look at it all in, in terms of
 6   where the -- you know, where the pricing would be.
 7           All of the components, when they come
 8   together, you know, we're saying 66 up, you know,
 9   429 down and 25 down, you look at them -- you
10   know, a dealer looks at these as fungible
11   components, they don't actually get that money,
12   Jay.
13      Q.    Well, they offer -- well, let me
14   ask --
15      A.    They'd offer a much lower yield,
16   that's all.
17      Q.    Okay.  Do they -- the Washington TSA
18   doesn't get that money either, correct?
19      A.    There's no money, those are basis
20   points in the deal.  You know, that's how much
21   somebody would be hypothetically willing to pay if
22   we were replicating the deal.  They wouldn't be
23   willing to pay 4.484.  They'd be willing to pay
24   what we're saying is here is 387.4 basis points
25   less.
```

Page 149

```
                    - PETER SHAPIRO -
 1
 2      Q.    Is it the case that under your
 3   calculation, if you actually constructed a
 4   transaction that had these features, that the
 5   Tobacco Finance Authority would be receiving
 6   payments both under the fixed leg and the floating
 7   leg?
 8      A.    It doesn't work that way.  You just
 9   receive a fixed rate.
10      Q.    Well, they would effectively be
11   getting more money under your calculations than
12   they would have received if all they ever got was
13   the fixed leg?
14      A.    No, that's bad math.
15      Q.    Well, it's your math, sir.
16      A.    No, that's your math.  You just made
17   that statement.  Our math would be saying it's
18   3.874 below 4.484.  Do that math.  4.484 minus 3.7
19   -- 3.874, still leaves you with positive yield.
20      Q.    So what you're saying is it's 3.874
21   absolute?
22      A.    No, that's the deduction.
23      Q.    From what?
24      A.    4.484.
25      Q.    You're sure it's not 3.874 deducted
```

Page 150

- PETER SHAPIRO -

1  - PETER SHAPIRO -
2  from the LIBOR curve?
3      A.    No.
4      Q.    You're sure about that?
5      A.    Yes.
6      Q.    Positive?
7      A.    Well, is there -- you -- you sound
8  like you're very skeptical here.
9      Q.    I'm rather skeptical, yeah, because
10  what you started off was the CP spread, right?
11  It's spread to LIBOR.
12      A.    Correct.  That goes positive.
13      Q.    Okay.  Then you have a negative?
14      A.    Other one goes negative.
15      Q.    What happens to LIBOR in all of this?
16  Isn't this still a deduction from LIBOR?
17      A.    It's -- you know, you're looking at
18  trying to deduct it off the floating leg.  If you
19  did that, you'd get to negative interest rates all
20  the time because the floating leg on LIBOR at this
21  period of time is extraordinarily low.
22      Q.    I submit to you, sir, the math you've
23  done gets you a negative --
24          MR. LAWRENCE:  Excuse me, excuse me.
25  He was still answering his question -- your

Page 151

- PETER SHAPIRO -

1  - PETER SHAPIRO -
2  question.  So wait until he finishes his
3  answer, then ask your question.
4      A.    You know, by you're theory of how to
5  read this, if LIBOR is at 25 basis point, you'd
6  have to cap out the spread at 25 basis point,
7  regardless of how crappy the credit was -- excuse
8  me, how bad the credit was, how much the profit
9  margin is.  It doesn't work that way.
10          It's -- what these -- the way these
11  work these are deductions off the fixed rate that
12  would be offered.
13      Q.    Okay.  And just to be clear, that's
14  what you believe your calculation show and your
15  mathematics show the deduction off the fixed rate?
16      A.    That's what they do show.
17      Q.    And so if I understand what you've
18  done then, what you're telling me you've done,
19  you've taken the fixed leg which is 4.484, that's
20  money to be received by the TSA, correct?
21      A.    They were legally supposed to
22  receive.
23      Q.    Less on each payment date a payment
24  calculated on the basis of 3.874 going the other
25  way; is that right?

Page 152

- PETER SHAPIRO -

1  - PETER SHAPIRO -
2      A.    What we're saying is that would be
3  what a replacement transaction would provide,
4  would be that much lower a yield.
5      Q.    And you believe that is what -- if
6  you look at those two cash flows, that's what
7  yields the $47 million number --
8      A.    Correct.
9      Q.    Okay.  Now, let's go back to some of
10  the basics of credit charges.
11          If a dealer believed that it would
12  never be exposed to credit risk, default risk by
13  the TSA, would it be appropriate for that dealer
14  to charge a credit charge?
15      A.    If they were totally insulated from
16  any type of default risk, I'm not sure if you can
17  ever construct a world where that exists.
18      Q.    Well, let me ask the question a
19  little differently.
20          Did you or Mr. Vergara look at
21  scenarios as to whether a dealer entering into
22  this hypothetical replacement transaction, would
23  be exposed to the credit risk of the TSA?
24          THE WITNESS:  Could you read that
25  back, please?

Page 153

- PETER SHAPIRO -

1  - PETER SHAPIRO -
2      (Requested question was read back by
3  the reporter.)
4      A.    Yes.  This looks at it as though they
5  were exposed to the credit risk of the TSA.
6      Q.    Okay.  So did you look at different
7  points in time how much money the TSA would owe
8  the dealer in this hypothetical model that you'd
9  constructed?
10      A.    Look at how much they would owe?
11  That's not really the right way to think about it.
12      Q.    That's not the way you thought about
13  it?
14      A.    No, that's not the right way to think
15  about it.
16      Q.    If at every payment date starting in
17  March of 2009 until the end of the contract, your
18  calculation showed you that would it would always
19  be the dealer making a payment to the TSA, is it
20  your view that a credit charge is still
21  appropriate?
22      A.    When you're saying at each of those
23  calculation dates, are you meaning for the ongoing
24  payments or for a termination payment?
25      Q.    Ongoing payments.  You're -- you're

Page 154

- PETER SHAPIRO -

1  calculating what a hypothetical transaction
2  beginning in March 2009 and stretching until 2042
3  would look like, correct?  How it would be priced?
4     A.   Right.
5     Q.   Okay.  That hypothetical transaction
6  has future cash flows that you're discounting to
7  present value, correct?
8     A.   Right.
9     Q.   Okay.  For each of those payments in
10  a hypothetical future cash flows, did you do a
11  calculations to see if it was the dealer paying
12  the TSA or the TSA paying the dealer?
13     A.   You -- you don't look at credit
14  spread that way.
15     Q.   I know.  I'm asking you a very
16  specific question:  Did you do that?
17     A.   Would we look at it the way that
18  somebody would not look at credit spread?  No.
19     Q.   No.  Go back to my question --
20     A.   That's not -- that's not how you look
21  at credit spread.
22     Q.   Let me go back to the question.  My
23  question was simply:  Did you look to see if on
24  every future payment date it was the TSA paying

Page 155

- PETER SHAPIRO -

1  this hypothetical dealer or the hypothetical
2  dealer paying the TSA?  Did you look at that
3  question?
4     A.   No, because that would be an improper
5  way to look at credit spread.
6     Q.   I'm not asking about credit spread.
7          I'm asking did you look at that fact;
8  who is paying whom on each of the future dates?
9     A.   No.  That's totally a hypothetical.
10     Q.   Well, your entire calculation is
11  hypothetical, right?
12     A.   Yeah.  But that -- but when you're
13  looking at future interest rates, you have to look
14  at the reasonable band of future interest rates.
15  You're not going to look at we expect we'll always
16  pay less.  That would be an absurd way to look at
17  it, Jay.
18     Q.   Well, you look -- you did make some
19  assumptions about future interest rates, correct?
20          You used commercial paper spreads and
21  you assumed that those commercial paper spreads
22  would be a constant 66.6 basis points in excess of
23  LIBOR, right?
24     A.   You can hedge that, that you can lay

Page 156

- PETER SHAPIRO -

1  off on a third party.  You can't lay off the
2  credit risk.
3     Q.   Again, I'm not asking you about
4  credit risk.  Okay.  I'm asking about what
5  calculations you did on the different cash flows.
6          You did calculate what the interest
7  rates would be for the floating leg, correct?
8  That's what -- that's what the commercial paper
9  spread calculation was all about, wasn't it, sir?
10     A.   No, the commercial paper spread
11  calculates a steady spread to LIBOR.  It's not
12  calculating each floating rate.  It's just saying
13  what the spread to LIBOR would be.
14     Q.   Now you've lost me because we got
15  into this whole discussion by you saying the only
16  way to value this contract, the proper way to
17  value this contract is treat it as an interest
18  rate swap, correct?
19     A.   Correct.
20     Q.   In fact, although you may have done
21  -- so your -- your view is while there may be
22  other ways to value it, you think the right way to
23  do it is the way you've done it, correct?
24     A.   I don't think I said "the right way

Page 157

- PETER SHAPIRO -

1  to do it," but the market accepted way to value
2  these contracts is based upon swaps.  If you're
3  doing it based upon swaps, this is how you do it.
4     Q.   Well, I've got to go back over that
5  because it says right here in your memo at the top
6  of Page 2, "To value the cash flows under the RFA,
7  the appropriate method is to use a similar
8  interest rate swap in which one payer would pay a
9  fixed rate and the other payer would pay a
10  floating rate."
11          Do you see that?
12     A.   Yes.
13     Q.   That's what you said was the
14  appropriate method?
15     A.   Yes, we believe that's the
16  appropriate way.  It's not the only way.
17     Q.   But of all the ways that might be out
18  there, this is the one you picked, right?
19     A.   Yes.
20     Q.   This is the one you called the
21  appropriate way?
22     A.   Correct.
23     Q.   You're sure about that, right?  No
24  wobbling on that one?

Page 158

```
1              - PETER SHAPIRO -
2        A.    I'm sitting here as solid as a rock,
3   no wobble.
4        Q.    All right.  So after you said that,
5   the next thing you said, "The use of a LIBOR plus
6   spread analysis with an interest rate swap to
7   value agreements like the RFA is the broadly
8   accepted market methodology."
9              Correct?
10       A.    Correct.
11       Q.    So you have two rates that you're
12  comparing when you do that type of interest rate
13  swap analysis, right?
14       A.    Right.
15       Q.    One is the fixed interest rate and
16  the other is the floating rate?
17       A.    Right.
18       Q.    The floating rate is depicted by, in
19  your case, the spread to LIBOR, correct?
20       A.    No, the floating rate is LIBOR plus
21  or minus the spread.  The spread itself is not the
22  floating rate.
23       Q.    Okay.  So LIBOR plus your 66.6 basis
24  points is the floating rate that you determined
25  would be the appropriate floating rate here,
```

Page 159

```
1   correct?
2        A.    It's -- you know, we're looking at it
3   in terms of all of the spread components.  So when
4   I -- when we look at it, we say, Here is a LIBOR
5   swap.  All right?  We look at the value of that
6   swap and then we say we make the following
7   adjustments; the adjustment for deliverable
8   security, the adjustment for the credit spread and
9   the adjustment for the profit margin.
10       Q.    Okay.
11       A.    And you know, if you look at those,
12  as I said, those back into as on the March 25th
13  number, 3.874.  And that you deduct off, you know,
14  you compare it to the float -- to the fixed rate
15  on the -- on the contract and present value that
16  and that's how you'd get, you know, what the --
17  the loss.
18       Q.    Okay.  So what you're telling me is
19  that for each of the future payment dates, the
20  math that you did was 4.484 minus 3.874 times the
21  principal and then you present value that?
22       A.    I'm simplifying it, but that's how
23  the models work.
24       Q.    That's how the models work?
```

Page 160

```
1              - PETER SHAPIRO -
2        A.    That's correct.
3              You know, the -- the simplest way to
4   look at it is if you looked at one of the exhibits
5   you showed me before how PFM did it, because they
6   showed the spreadsheet column by column, you can
7   see it's done that way.
8        Q.    But they were absolutely wrong.
9        A.    They had the math wrong, yes.
10       Q.    Okay.  They had the right approach,
11  but they had the wrong math?
12       A.    Absolutely.
13       Q.    Let's go back to the floating rate.
14             The thing that you said was
15  hedgeable, the thing that you said was your
16  attempt to identify the cheapest deliverable
17  eligible securities was the LIBOR plus spread
18  which you referred to as the commercial paper
19  spread, correct?
20       A.    Correct.
21       Q.    Okay.  And what was hedgeable there
22  you said was you could hedge it to the LIBOR swap
23  curve, correct?
24       A.    Correct.
25       Q.    And the LIBOR swap curve, that's a
```

Page 161

```
1              - PETER SHAPIRO -
2   set of products or contracts that you can actually
3   enter into to hedge exposure, correct?
4        A.    Correct.
5        Q.    That LIBOR swap curve doesn't have
6   charges for credit, correct?
7        A.    Correct.
8        Q.    And that LIBOR swap curve doesn't
9   have any charges for profit components, correct?
10       A.    Correct.
11       Q.    So, using that hedgeable LIBOR swap
12  curve as your floating rate, did you do a
13  calculation to determine who would be paying whom
14  on each of the subsequent payment dates in your
15  hypothetical transaction?
16       A.    No, and you don't need to.
17       Q.    Okay.  If you had done that analysis,
18  and I know you didn't, and it showed that on every
19  subsequent payment period, if you did that table
20  the way PFM did as to what the payments would be
21  six months out, 12 months out, 18 months out, 24
22  months out, on every single one of those payment
23  periods, it was a payment being made to the TSA,
24  not by the TSA, is it your view that it's still
25  appropriate to charge any credit charge?
```

Page 162

```
1              - PETER SHAPIRO -
2       A.    You're clearly misunderstanding how
3  this works.  That -- the table that PFM has
4  doesn't talk about future floating rates, that
5  what I'm talking about is always comparing the
6  fixed rates on that.
7            So you're clearly missing this, Jay.
8  I wish I could explain this better.
9       Q.    I think you've done a good job of
10 explaining it.
11      A.    Thank you.
12      Q.    So let's do the following:  In your
13 hypothetical transaction at six-month intervals,
14 there's an obligation owed to the TSA to pay 4.484
15 percent; is that right?
16      A.    On the fixed leg.
17      Q.    On the fixed leg.  So you could come
18 up with a schedule of however many payments there
19 are --
20      A.    That's --
21      Q.    -- each those would be identical.
22            You could also come up with a similar
23 column of figures for what the floating leg would
24 be on each of those dates, correct?
25      A.    No.
```

Page 163

```
1              - PETER SHAPIRO -
2       Q.    Okay.  Can it be done?
3       A.    They're floating.  You cannot know
4  with certainty where they're going to be, that's
5  the essence of what floating means.
6       Q.    Mr. Shapiro, when you do a valuation
7  as of an early termination date, are you not using
8  market data as to what the market expects future
9  rates to be?
10      A.    Yes.
11      Q.    Could you not prepare a column of
12 those figures?
13      A.    Yes.
14      Q.    Did you do that?
15      A.    No, you don't need to do that and
16 this has -- you know, well, I'll let you finish,
17 I'm sorry.
18      Q.    I understand that it's your view that
19 you don't need to do it.  But it can be done,
20 correct?
21      A.    Yes.
22      Q.    Using your methodology, your LIBOR
23 plus commercial paper spread analysis, one could
24 prepare such a column of figures, correct?
25      A.    Correct.
```

Page 164

```
1       Q.    And those wouldn't all be the same,
2  they would change based on where the LIBOR curve
3  was expected to be, correct?
4       A.    Correct.
5       Q.    And therefore, if you prepared that
6  column of figures, you would have a floating leg
7  payment and you'd have a fixed leg payment?
8       A.    Correct.
9       Q.    Okay.  You could compare those two
10 numbers and figure out for each subsequent payment
11 period whether it's the TSA that's expected to
12 make a payment or the hypothetical dealer,
13 correct?
14      A.    Correct.
15      Q.    And if you had done all of those
16 things and you saw that on every single one of
17 those payment dates the payments were being made
18 to the TSA, not by the TSA, is it your view that a
19 credit charge would still be appropriate?
20      A.    Absolutely.
21      Q.    And what exactly is the credit
22 exposure that you're hypothetical dealer faces in
23 this situation?
24      A.    The credit exposure looks not at what
```

Page 165

```
1              - PETER SHAPIRO -
2  the forward curve says which is where you've been
3  going with these questions.  It looks at what the
4  risk is.  The risk is that the forward curve is
5  wrong.
6            And can I tell you, the forward curve
7  is mostly wrong.  When you look at what forward
8  rate -- the forward curve predicts as rates versus
9  what is actually experienced as rates,
10 historically, again and again, you see the forward
11 curve misses.
12           A bank has to protect itself from
13 credit risk, not based upon a theory that the
14 forward curve is going to be correct, but based
15 upon the probability that it's going to be wrong.
16      Q.    So what -- what calculations did you
17 do to determine that the forward curve was
18 probably going to be wrong?
19      A.    You don't need to do that
20 calculation.  You have that calculation built into
21 instruments like bonds.
22      Q.    Is it your testimony, sir, that the
23 bond spreads that you used are predicting that the
24 forward curve for interest rates is going to be
25 wrong, that's what those bond spreads are based
```

Page 166

- PETER SHAPIRO -

1  - PETER SHAPIRO -
2  on?
3      A.    No.
4      Q.    Okay.  They're based on the
5  probability that a tobacco securitization agency
6  is not going to be able to pay principal and
7  interest on the bonds as it comes due, correct?
8      A.    They're based upon the credit risk
9  that the bond holder feels that they're taking on.
10     Q.    Right.  In fact, those spreads have
11  nothing to do with interest rate movements,
12  correct?
13     A.    It's a theoretical question that I'd
14  have to mull on.
15     Q.    It's a hypothetical construct that
16  we're working with.
17     A.    Yeah.  You know, so I'd have to think
18  about that.  You know, how sensitive bond credit
19  spreads are and interest rate movements, they
20  probably are, but I'd have to think about that.
21     Q.    But that's not something you had
22  given thought to when you used the bond spreads as
23  the basis for your credit adjustment in the RFA?
24     A.    Right.
25     Q.    At the bottom of Page 2 over on to

Page 167

1      - PETER SHAPIRO -
2  Page 3, the section -- again this is Exhibit --
3  Lehman Exhibit 15, you have a section titled
4  Profit Component.
5          Do you see that?
6      A.    Yes.
7      Q.    And I believe that's the same in both
8  the April and September memos.
9      A.    You are correct.
10     Q.    And you state that you have a profit
11  component because your analysis takes into account
12  the profit of spread component that would be
13  included in any replacement investment if TSA were
14  to replace the economic bargain afforded to it by
15  the RFA.
16     A.    Yes.
17     Q.    The profit component you're referring
18  to here is the profit component that would be
19  included not in any replacement investment, but in
20  a replacement RFA transaction similar to the one
21  that was terminated, correct?
22     A.    Correct.
23     Q.    For example, if the TSA were doing a
24  replacement investment in six-month securities,
25  every six months, you're not saying this is the

Page 168

1      - PETER SHAPIRO -
2  profit component you'd use there, correct?
3      A.    No.
4      Q.    Similarly, if the TSA were doing
5  replacement investments in six-month investments,
6  you wouldn't be including the credit charges that
7  you've calculated in the section right before
8  that, correct?
9      A.    You're correct.
10     Q.    All right.  We turn to Page 3 of
11  Lehman Exhibit 15.
12     A.    Lehman Exhibit 15, yes.
13     Q.    That's the April 2009 --
14     A.    Yeah, the one we're still in.
15     Q.    Okay.  And There you have a
16  calculation of Loss, capital L, Loss.  And we go
17  to table with two different dates, October 2nd and
18  March 25th, correct?
19          Why did you pick those two dates?
20     A.    March 25th was the designated
21  termination date.  Isn't that correct?
22     Q.    It was.  How about October 2nd?
23     A.    I believe we were requested to
24  provide a calculation on that date as well.  I'm
25  not recalling what the rationale was for that

Page 169

1      - PETER SHAPIRO -
2  date.  You know, I could refer to documents and
3  figure it out, but I'm not -- as I sit here, I'm
4  not recalling.
5      Q.    Just again to -- we were talking
6  about the March 25th numbers, let's just talk a
7  little bit about the October 2 numbers.
8          So, as of -- so you did this
9  calculation sometime in April of 2009, correct?
10     A.    Correct.
11     Q.    And you looked back and you
12  determined that as of October 2nd, the appropriate
13  CP spread that you would use for your hypothetical
14  transaction was 1.436 percent, correct?
15     A.    Correct.
16     Q.    And that's what you add to the LIBOR
17  curve to determine the floating leg, correct?
18     A.    You could look at it that way, yes.
19     Q.    Well, that's kind of what you did,
20  right?
21     A.    You know, we look at it all together,
22  as I said before, to get a total spread.  You can
23  see it on the right side of the column.
24     Q.    Well, you said that a couple of
25  times.  Do you start with 1.37 percent and work

Page 170

- PETER SHAPIRO -

1  backwards or do you start --
2  A.    No.
3  Q.    -- 1.436 and build up?
4  A.    Yeah.  No, you start with 1.436 as a
5  plus, 2.557 as a minus and 25 as a minus and you
6  get to 1.371.  But, you know, you're going back
7  and saying you're adding to the floating.  You can
8  could add to the floating or subtract from the
9  fixed.
10        You know, as a matter of reality, we
11  add them together and make the adjustment on the
12  fixed side.
13  Q.    So you start with 1.436, you make
14  your credit adjustment, you make your profit
15  adjustment, you come up with a number 1.371.
16  That's within parenthesis, right?  So that's a
17  negative number, right?
18  A.    Yes.
19  Q.    And what do you do next in your
20  calculation?
21  A.    Next we -- we, you know, we're using
22  these within modeling systems, so that we can
23  produce, you know, whatever a number is.  So that
24  James would have run the model that would show
25

Page 171

- PETER SHAPIRO -

1  this.  You know, would take that -- would take
2  that model and translate it into dollars.
3  Q.    Okay.  And just again, in layman's
4  terms because we don't have the model in the room,
5  what is that the model does?  It has 1.371 percent
6  representing the floating leg in some way, it has
7  4.484 representing the fixed leg --
8  A.    No, no, no.
9  Q.    What does it do?
10  A.    It's looking at what the cost of that
11  1.371 percent is on this amortization schedule
12  present valued.
13        In other words, if you think about
14  it, what this is really saying is at the contract
15  fixed rate is 4.484, in the current market based
16  upon these adjustments, the substitute, the
17  hypothetical replacement would be 1.371 percent
18  lower.  So you have to present value that
19  differential.
20  Q.    Okay.  And under that calculation,
21  the TSA's loss you believe is calculated by taking
22  4.484 minus 1.371, times the principal for each
23  payment date present valued; is that right?
24  A.    You didn't quite get it right.  It
25

Page 172

- PETER SHAPIRO -

1  really is -- it's really the 1.371 differential.
2        You can look at it by saying it's the
3  difference between a contract at 4.484 with this
4  amortization schedule and a contract with a fixed
5  rate that is 1.371 percent lower than 4.484.  Or
6  you could simply say, let's just take the
7  amortization, multiply it times that differential
8  of 1.371, and you're going to get the same result.
9  Does that work?
10  Q.    I understand your math.
11  A.    Okay.
12  Q.    Below the -- the numbers we were just
13  looking at, again this is Exhibit 15, last page,
14  the second last paragraph which begins, "Using the
15  spreads to LIBOR..."
16        Do you see that?
17  A.    Right.
18  Q.    The second sentence of that paragraph
19  reads:  "Please note that a significant part of
20  this difference is attributable to the different
21  rate environments of each valuation date, in
22  addition to the different spread assumptions."
23        Do you see that?
24  A.    Correct.
25

Page 173

- PETER SHAPIRO -

1  Q.    What does that mean?
2  A.    Interest rates between the two dates
3  had changed dramatically.  You can see that in the
4  next sentence.
5        Do you see where I'm pointing to?
6  Q.    Yes.
7  A.    Okay.  As well as spreads had
8  changed.  And you can --
9  Q.    And on what spreads are you referring
10  to when you say "spreads had changed"?
11  A.    Look at the table above, you can see
12  we talk about three spread components; CP spread,
13  credit spread and profit.  Two of three of those
14  had changed.
15  Q.    As part of the work that you've done
16  for the Washington TSA, have you made any efforts,
17  other than your discussions with Nat Singer, to go
18  back and determine what the credit charges were
19  that were actually imposed by dealers on tobacco
20  securitization agencies in connection with RFAs?
21  A.    Yes.
22  Q.    And what work had you done in that
23  respect?
24  A.    We asked if in discovery against
25

Page 174

- PETER SHAPIRO -

1 Lehman, that Lehman disclose what credit spread
2 they included when they initially did the
3 agreement in 2002.
4     Q.    Okay.  And other than that, what else
5 have you done?
6     A.    Since this time?
7     Q.    At any time since 2008 to the
8 present, what else have you done to determine --
9 to make that inquiry on credit charges?
10     A.    The inquiry on credit charges in
11 regard to this agreement?
12     Q.    Yeah.
13     A.    Well, on this agreement, this was an
14 agreement between Lehman and TSA, so that's the
15 only relevant, you know, indicator you'd have.
16         What did Lehman charge as its credit
17 spread in 2002?  There's an answer to that
18 question.
19     Q.    Okay.  And do you know the answer to
20 that question?
21     A.    I haven't seen that produced.  Has
22 that been produced?
23     Q.    You're the one under oath answering
24 questions.

Page 175

- PETER SHAPIRO -

1         Did you try and determine what it is
2 that Lehman had included as a credit charge?
3 Could you figure that out from the interest rate
4 environment?
5     A.    At the time?
6     Q.    At the time that Lehman entered into
7 the RFA with Washington.
8     A.    We could back into a gross spread;
9 that is, all of the spread components that Lehman
10 would have come up with in '02.
11     Q.    And what would that tell you?
12     A.    I'm not recalling what that was.  But
13 the process to do it is fairly straightforward.
14     Q.    Okay.  And again, when you say
15 "spread" that gross spread would be the spread to
16 LIBOR?
17     A.    It would be the spread embedded in
18 the agreement.  You can call it the spread to
19 LIBOR, the spread to the fixed rate.  It doesn't
20 matter.  You know, call it spread to LIBOR, if
21 you'd like to.
22     Q.    And you said you don't recall what
23 that was.  Did you write down somewhere where
24 you'd figured out the gross spread?

Page 176

- PETER SHAPIRO -

1     A.    No, it would have been much more
2 relevant in the mediation phase when we were in
3 dispute, when Lehman was trying to make this
4 argument, which is an absurd one, that there
5 should not be a credit spread.  Because obviously
6 they included a credit spread.  But it wasn't a
7 relevant consideration at the time we were
8 valuing.
9         Well, it was just to rebut what,
10 frankly, we were astonished Lehman would try to
11 maintain, that there would be no credit spread.
12     Q.    In your astonishment and amazement --
13     A.    Yes.
14     Q.    -- did you try and find out from
15 other dealers in other transactions what the
16 spreads were that they had charged in entering
17 into RFAs with other -- other tobacco authorities?
18     A.    I'm not recalling we did.  This would
19 be in preparation for mediation which is, we're
20 probably getting a little far afield.
21     Q.    Well, I don't care when you did it.
22 Did you do it at all?
23     A.    It would have only been in -- in part
24 of the mediation process.

Page 177

- PETER SHAPIRO -

1     Q.    Okay.  And if you didn't do it then,
2 you didn't do it?
3     A.    Yes.
4     Q.    So you didn't do it?
5     A.    Hum?
6     Q.    So you didn't do it?
7     A.    I didn't say that I don't think.
8     Q.    Well, if you did look at other
9 dealers and figure out what spreads they charged
10 other tobacco authorities, tell me what you did.
11     A.    I'm -- as I said, I'm not -- I can't
12 recall on this.
13     Q.    Okay.  So you may have done
14 something, but you can't recall anything about it?
15     A.    In terms of surveying other dealers
16 for what they would have charged in credit spreads
17 prior to the financial crisis.
18     Q.    Yes.
19     A.    Yeah, I can't recall on that.
20     Q.    I guess what I'm trying to figure out
21 is do you recall ever having done that survey?
22     A.    We -- I know we had discussions with
23 dealers about typical credit spreads on these
24 things prior to the financial crisis.  I'm just

Page 178

```
 1              - PETER SHAPIRO -
 2    not recalling details.
 3        Q.    So, after the financial crisis, after
 4    September 2008, you didn't survey any dealers to
 5    determine what typical credit spreads would be on
 6    these types of arrangements?
 7        A.    "Would be" is a -- is tricky wording
 8    there.  You're saying would be in the aftermath of
 9    the financial crisis, post Lehman, when there was
10    no market?  Or are you saying prior to the
11    financial crisis when they executed?
12        Q.    Let's be clear on this.  All right.
13              At any time after the financial
14    crisis, did you do the following:  Did you ask any
15    dealers what credit charges they had charged at
16    any time on these kinds of arrangements?
17        A.    We talked -- we -- we talked to
18    dealers in terms of gross spread and this was
19    really, again, in mediation prep.
20        Q.    Okay.  And in mediation prep, the
21    mediation in this matter or for some other matter?
22        A.    For this matter and there are two
23    other mediations that we have been involved in
24    that involve Lehman and tobacco.  I think you're
25    aware of both of them.
```

Page 179

```
 1              - PETER SHAPIRO -
 2        Q.    What dealers did you talk to in terms
 3    of gross spreads?
 4        A.    I can't recall.  It's not something I
 5    was prepared for.
 6        Q.    Okay.  Did you get any -- well, did
 7    you write down the information you got from those
 8    dealers?
 9        A.    I can't recall.  I don't -- I'm
10    really not remembering.
11        Q.    Well, can you go back and check your
12    files after this deposition to see if you have?
13        A.    On mediation prep?  For mediation
14    prep?  It's confidential mediation matters.
15        Q.    Well, you can put it in your log.
16    But did you do it?
17              You're claiming that you did
18    something --
19        A.    Yeah.
20        Q.    -- you may have written it down --
21        A.    I can check --
22        Q.    Let me finish my question.
23        A.    Sorry.
24        Q.    If you believe that it's protected
25    and it's privileged, you can put it in your log.
```

Page 180

```
 1              - PETER SHAPIRO -
 2              What I want to know is, did you do it
 3    and if you did it, did you write it down?
 4              MR. LAWRENCE:  Let me say for the
 5        record, obviously we provided an extensive
 6        privilege log that related to swaps
 7        documents, that if such a document were
 8        provided in response to your subpoena for our
 9        review, it would have been marked as
10        privileged.  So just to clarify that point.
11              MR. TAMBE:  Okay.  All I'll say is
12        it's not entirely clear from the entries on
13        the privilege log whether any of those items
14        might be the results of your speaking to
15        dealers.  So we may have some follow up with
16        you on that.
17              MR. LAWRENCE:  You should come
18        through us on that one.
19              MR. TAMBE:  Absolutely.
20        Q.    Did you speak to PFM to see if PFM
21    had begun any analysis -- did you speak to PFM to
22    see if PFM had done any analysis about Lehman's
23    credit charges at the time that Lehman had entered
24    into the transaction with Washington TSA?
25        A.    No.
```

Page 181

```
 1              - PETER SHAPIRO -
 2        Q.    You know that PFM was involved in the
 3    bid process, correct?
 4        A.    Yes.
 5        Q.    You know that PFM had advised the TSA
 6    with respect to the entry into the RFA, correct?
 7        A.    Correct.
 8        Q.    Have you spoken with PFM at all about
 9    any of the conclusions you have reached concerning
10    the termination value of the Washington RFA?
11        A.    No.
12              MR. TAMBE:  Let's take a short break.
13              THE VIDEOGRAPHER:  The time is
14        3:00 p.m.  We're going off the record.
15              (Whereupon, there was a brief recess
16        in the proceedings.)
17              THE VIDEOGRAPHER:  The time is
18        3:27 p.m., December 13th, 2013.  This is Tape
19        Number 3 in the videotaped deposition of
20        Mr. Peter Shapiro.
21    BY MR. TAMBE:
22        Q.    So Mr. Shapiro, let's go back to
23    Lehman Exhibit 15, which is the April 21, 2009
24    memorandum.
25              Now, we discussed earlier that it
```

|  |  |
|---|---|
| Page 182 | Page 184 |

Page 182

```
1              - PETER SHAPIRO -
2   calculates values through 2042 and you realize
3   that's wrong; it should be 2032, right?
4       A.   Correct.
5       Q.   And you're aware that -- you've done
6   some calculation you said in connection with the
7   mediation to account for that?
8       A.   Correct.
9       Q.   Okay.  Just mechanically, what was
10  the calculation you did to go from 2042 to 2032?
11      A.   Basically knock off the last ten
12  years' amortization.
13      Q.   You didn't run new curves and new
14  spread analyses, did you?
15      A.   No, because you had -- you have the
16  old curve that would be in there, you know.  It's
17  -- you're doing -- you're basically getting the
18  same thing.
19      Q.   So if you had a schedule year by
20  year, effectively what you did was knock out the
21  last ten years, right?
22      A.   Correct.
23      Q.   Now, in running the analysis the way
24  you did, whether it's 2042 or 2032, you believe
25  the right analysis is to run it to the stated
```

Page 183

```
1              - PETER SHAPIRO -
2   maturity of the underlying bonds; is that right?
3       A.   Correct.
4       Q.   Okay.  When -- pre-financial crisis,
5   when dealers entered into transactions like this,
6   is it your understanding that they hedged these
7   transactions out to stated maturity?
8       A.   My understanding is that they hedged
9   however they felt they were protecting themselves
10  from that risk.  My -- from what I understand,
11  some of them may have looked at whether or not
12  they should have embedded an option for the
13  potential that it would have, you know, that it
14  would have terminated earlier due to the turbo
15  bonds, if I can use that term.
16           You know, some of them may have
17  looked at taking a -- you know, doing what
18  sometimes referred to, Jay, as dynamic hedging
19  which you can also call taking a flier on whether
20  that risk would be out there.  By "taking a flier"
21  I mean leaving some portion unhedged and just
22  making a guess at it.
23           Different banks allowed different
24  kinds of things on it.
25      Q.   Okay.  And those variations on dealer
```

Page 184

```
1              - PETER SHAPIRO -
2   characteristics is not something that you included
3   in the analysis that you did in Lehman Exhibit 15,
4   correct?
5       A.   No.  We went out on the assumption
6   that Lehman was legally obliged out through the
7   final termination day and that it certainly could
8   not count on any expectation of it coming in
9   earlier.
10      Q.   The offering document for the bonds
11  had a disclosure about expected maturity as
12  opposed to stated maturity, correct?
13      A.   Correct.
14      Q.   Let's take a look at that document.
15  It's been previously marked as Lehman Exhibit 1.
16           That's an excerpt from the offering
17  document for the bonds at issue, correct?
18      A.   It appears to be.
19      Q.   Now I want to draw your attention to
20  what is Page 2 of Exhibit 1 which is the inside
21  front cover of the offering document.
22           Are you there?
23      A.   Yes.
24      Q.   You'll see maturity schedules listed
25  there.  Do you see that?
```

Page 185

```
1              - PETER SHAPIRO -
2       A.   Correct.
3       Q.   For the two different portions of
4   this bond offering, the first one for the 279
5   million portion, there's a projected final turbo
6   redemption date of June 2016.
7           Do you see that?
8       A.   Yes.
9       Q.   Then for the other portion of 179
10  million, there's a projected final turbo
11  redemption date of June 1, 2019.
12           Do you see that?
13      A.   Correct.
14      Q.   In both instances there's sort of a
15  projected average life disclosure.
16           Do you see that?
17      A.   Correct.
18      Q.   And these are not dates that you
19  factored into your analysis, correct?
20      A.   No.
21      Q.   Now, since the offering in 2002, the
22  Washington TSA has from time to time had
23  discussions at the board level about any expected
24  early payoff of these bonds, correct?
25           Yes?
```

Page 186

- PETER SHAPIRO -

1
2      A.    Yes.  From only -- I haven't been
3  there for discussions, I just get the minutes.
4      Q.    Okay.  But you know that's a topic
5  that's discussed, not at every board meeting but
6  many board meetings?
7      A.    I've seen it reflected in the minutes
8  I receive in the mail.
9      Q.    So when you did your analysis in
10  April 2009, did you look at the most recent
11  discussion of when the Authority expected the
12  bonds to be paid off?
13      A.    No.
14      Q.    Not relevant to your analysis?
15      A.    We didn't think so.
16      Q.    Now just the way the math works in
17  your model, so let's go back to Lehman Exhibit 15.
18  If one were to use a maturity date of 2019 as
19  opposed to 2042 or 2032, the loss number that your
20  model would calculate would be smaller than 47
21  million, correct?
22      A.    Yes.
23      Q.    Have you calculated that number?
24      A.    No.
25      Q.    Now, have you calculated any other

Page 187

- PETER SHAPIRO -

1
2  loss number based on the expected maturities in
3  the Washington TSA's board minutes in 2009, 2010,
4  2011?
5      A.    We did look at some hypotheticals.
6      Q.    When did you look at some
7  hypotheticals?
8      A.    Subsequently, you know, looking at
9  the time -- around the mediation.
10      Q.    Okay.  And what hypotheticals did you
11  look at?
12      A.    One of the things we looked at was --
13  and this was -- am I allowed to disclose stuff
14  that went on in the mediation?
15      Q.    You can disclose stuff that went on
16  in the mediation, but if there are analyses that
17  you did outside of the mediation, you can talk
18  about those.  I'm sure Paul will tell you what you
19  can't talk about.
20      A.    These were all in the context of the
21  mediation, prompted by some of the questions which
22  Lehman had raised in the mediation regarding
23  credit spread.  You may not see the connection,
24  but there is a connection.
25      Q.    What is the connection?

Page 188

- PETER SHAPIRO -

1
2      A.    The connection is, if we want to
3  remove credit spread from the discussion, there's
4  a way to do that and there's a way sometimes
5  dealers have done that, which is, make it so that
6  the agreement is one which has a par call every
7  six months.  You know, if you do that, you stick a
8  par call in the agreement every six months, you
9  have six months' worth of credit exposure, not,
10  you know, 30 years' worth of credit exposure.
11            You also, by introducing a par call,
12  severely reduce the yield that a dealer would
13  offer on it because callable at par every six
14  months.  So in essence, you make it like it's
15  almost a six-month deal.
16            So we did look at that as a way of
17  saying if we wanted to get to a zero credit risk
18  or near zero credit risk, a six-month credit risk
19  kind of arrangement, how much would that change
20  the valuation.  Okay?
21      Q.    So you ran analyses on that basis,
22  hypothetical analyses on that basis?
23      A.    That's correct.  And then we ran
24  another analysis saying, okay, the six-month call
25  would be necessary if we were going to do a swap

Page 189

- PETER SHAPIRO -

1
2  that would conform with the requirements, the
3  legal requirements that Washington is under, it
4  had to have the right to a par call every six
5  months.  But we ran a further analysis to say,
6  okay, what if we said we didn't start that
7  callability until an earliest possible redemption
8  date on bonds, looking at the turbo element alone,
9  because there are other reasons these bonds could
10  be redeemed other than the turbo, of course; you
11  know, defaults and stuff like that.  But we looked
12  at that also.
13            Is that responsive to your question?
14      Q.    Yeah.  I'm just reading what you
15  said.
16            THE WITNESS:  How does that machine
17  work?
18            MR. LAWRENCE:  It's real time.
19            MR. TAMBE:  In mysterious ways.
20            (Whereupon, a brief discussion was
21  held off record.)
22      Q.    All right.  On the topic of credit
23  spreads.  Again, if I understand your model
24  correctly, once you had calculated the bond
25  spreads, 4.29 percent, you took that entire bond

Page 190

- PETER SHAPIRO -
1
2   spread and factored it into your valuation of the
3   RFA, correct?
4       A.    Correct.
5       Q.    You didn't discount that bond spread
6   or adjust that bond spread in any way, correct?
7       A.    No.
8       Q.    We talked a little bit about the
9   credit risk that you believe dealers would be
10  anticipating and imposing this credit charge for,
11  correct?
12      A.    Correct.
13      Q.    It's the -- credit risk, in your
14  view, was the concern that dealers would have that
15  the actual future interest rates would be
16  different than the forward curve implied rates,
17  correct?
18      A.    No, that was what you had asked
19  about.
20      Q.    Okay.  Well, what is the credit risk,
21  then, that dealers faced that they needed a credit
22  charge for?
23      A.    There are multiple places where it
24  can come up.  One is the illustration you gave.
25  Another one would be that -- remember that the

Page 191

- PETER SHAPIRO -
1
2   dealer does a hedge on this contract.  If
3   Washington defaults on the contract and the dealer
4   still has the offsetting hedge in place, he owes
5   on that offsetting hedge.  So you have to look at
6   it in that way as well.
7       Q.    I'm just trying to understand the
8   credit charge that you're adding here.  Just tell
9   me all the reasons why you put the credit
10  charge --
11      A.    Why credit charges --
12      Q.    No, no, no.  Let me -- tell me all
13  the reasons why you have imposed a 4.29 percent
14  credit charge in valuing this transaction.
15      A.    You know, you word it in a way you're
16  saying all the reasons so I'm worried about not
17  being absolutely complete.  I'm trying to the best
18  of my ability to think of the major reasons, but I
19  don't want to -- you know, if something occurs to
20  me later that I left out in recounting all of the
21  reasons, I might not be as complete as I should
22  be, but let me just try to summarize.
23           Every swap agreement has a credit
24  charge that needs to be built into it.  That
25  credit charge will -- will vary from something

Page 192

- PETER SHAPIRO -
1
2   which would be a superlative credit, a AAA credit,
3   down to one which would be a weaker credit, going
4   down to BBB or you can sub investment grade.
5           It will be based upon all kinds of
6   facts and circumstances regarding swap; what the
7   structure is like, what the potential risks are
8   like one way or another.  You know, on it -- how
9   deeply in the money or out of the money it is,
10  whether there are any up front cash flows that
11  changed hands at the beginning of it.  All kinds
12  of elements could go on in that.
13           So you look at a credit charge on
14  that in the context of the transaction.
15           MR. TAMBE:  Can you read back my
16  question.
17      Q.    Try to answer my question as opposed
18  to a generality.
19           I want to know why you did it in this
20  case.
21      A.    We would have done all of that in
22  this case.
23      Q.    Okay.  The question is not what you
24  would have done.  What did you actually do?  Did
25  you actually do all of those analyses in deciding

Page 193

- PETER SHAPIRO -
1
2   to apply a 4.29 percent credit charge in this
3   case?
4       A.    No.  We would look, this -- in this
5   case, when you're saying where do we get the
6   number from, we got the number from the bond
7   market.  There's no other good indicator of credit
8   spread on this one.  There's no, as I mentioned,
9   no CDS, no credit default swap in -- in reference
10  to this credit.
11      Q.    In your previous answer you said one
12  of the factors that would play into the credit
13  charge is how much in the money or out of the
14  money the swap was, correct?
15      A.    Correct.
16      Q.    Okay.  Did you do any kind of
17  analysis in this case in determining how much of a
18  credit charge to apply to determine how much in or
19  out of the money a dealer would be stepping into
20  this transaction?
21      A.    On this one?  No, we're looking at
22  the bond spread.  We're using that as our best
23  indicator.
24      Q.    A few minutes ago we went down this
25  path of discussion when I asked you a question

Page 194

```
 1              - PETER SHAPIRO -
 2    about the probability of or the possibility that
 3    actual interest rates in the future would be
 4    different than future interest rates depicted by a
 5    forward curve.
 6              Do you remember that?
 7       A.   Yes.
 8       Q.   Before we took our last break we had
 9    some discussion on that point.
10              Do you remember that?
11       A.   Yes.
12       Q.   And I believe one of the things you
13    said is the forward curve very often doesn't get
14    it right.
15       A.   Usually doesn't get it right.  The
16    forward curve is usually wrong.
17       Q.   That's because no one can really
18    predict the future, correct?
19       A.   Exactly.  If we could, we wouldn't be
20    sitting here.
21       Q.   And notwithstanding that, forward
22    curves of the type that you've described and used,
23    are used every day in the financial markets to
24    price and trade securities, correct?
25       A.   And --and there's an active hedging
```

Page 195

```
 1              - PETER SHAPIRO -
 2    market used in forward curves, for most forward
 3    curves.
 4       Q.   So the fact that the forward curve
 5    doesn't get it right as time marches on, isn't a
 6    reason not use those forward curves, correct?
 7       A.   Depend -- it's -- it's important to
 8    use them appropriately for certain purposes.  You
 9    know, as I've mentioned in prior testimony, you
10    can't use them for forecasting credit risk.  You
11    can't use them for hedging agencies.  You can use
12    them for other things.
13       Q.   And just rough estimates in terms of
14    notional values of transactions in a given year,
15    how -- what's the size of transactions that are
16    entered into on the basis of forward curve
17    assumptions?
18              MR. LAWRENCE:  Object to the form of
19       the question.
20       Q.   Is it trillions of dollars?
21       A.   It would have to be.  The -- the
22    entire swap market is based upon forward curves.
23    You know, that's when you're looking at interest
24    rate hedging, hedgeable forward curve market, you
25    know, the total outstandings is estimated at
```

Page 196

```
 1              - PETER SHAPIRO -
 2    something on the order of 400 trillion.
 3       Q.   That's a big number.
 4       A.   That's outstanding.  And that's for
 5    many, many years.  You asked each year.  Yeah.
 6       Q.   All right.  I'm handing you, sir,
 7    what's been marked previously as Lehman Exhibit
 8    22.
 9              MS. SAWYER:  I think it's 12.
10       Q.   I'm sorry, 12.  Lehman Exhibit 12.
11    And this is also I believe covered by one of the
12    30(b)(6) topics, so this is a 30(b)(6) series of
13    questions I'm going to be asking you.
14              You recognize this as the declaration
15    you submitted in this case, correct?
16       A.   Yes.
17       Q.   I want to draw your attention to Page
18    3 of your declaration and Paragraph 7 in
19    particular.
20              Do you see that?
21       A.   Yes.
22       Q.   Okay.  You state in this declaration
23    that as of January 12th, 2009, LBSF was out of the
24    money under the RFA and the RFA was terminated on
25    that date.  The termination amount owed to TSA
```

Page 197

```
 1              - PETER SHAPIRO -
 2    under the RFA would be roughly 27.5 million.
 3              Do you see that?
 4       A.   Correct.
 5       Q.   What was the analysis that you did to
 6    determine that number?
 7       A.   Same analysis that you're seeing on
 8    the -- in Exhibit 15.
 9       Q.   Okay.  So to be clear, in calculating
10    the $27.5 million number, you started with a CP
11    spread, correct?  Yes?
12       A.   We included a CP spread, a credit
13    spread and a profit spread.  I'm not going to
14    testify which one we started with.  I don't -- you
15    know, all three were included, Jay.  Yeah.
16       Q.   So if all three were included, what
17    CP spread was included?
18       A.   I -- I don't have it in front of me.
19       Q.   Okay.  What did you do to prepare for
20    this part of your deposition?
21       A.   What did I do?
22       Q.   Yeah.
23       A.   I just -- I read over the
24    declaration.  I didn't go back and look at whether
25    we had any record on this and whether I
```

Page 198

```
 1          - PETER SHAPIRO -
 2  remembered.  You know, we would have calculated
 3  this the same way.
 4      Q.    And where would you have calculated
 5  this?
 6      A.    Just the way I've described before;
 7  we would have looked at a Bloomberg screen, looked
 8  at where CP spreads were at that point.
 9      Q.    Okay.  What credit spread would you
10  have used?
11      A.    It would have been the same
12  methodology, it would have looked at again the
13  bond credit spread as described in the loss memo.
14      Q.    And when you say we would have done
15  it, would you have done it or would --
16      A.    No, James would have done it.
17      Q.    James would have done it?
18      A.    Yeah.
19      Q.    And if James didn't do it, who else
20  would have done it?
21      A.    That's very -- that requires me to
22  make a lot of suppositions.  If James did not do
23  it?  He did it.
24      Q.    So if James said at his deposition he
25  didn't do it, he's either mistaken or lying or
```

Page 199

```
 1          - PETER SHAPIRO -
 2  something else?
 3      A.    I would assume he's mistaken.
 4      Q.    You didn't do it?
 5      A.    I didn't do it, no.  You know, is
 6  there a possibility that James is correct and that
 7  there was some other staff person that filled in
 8  who he instructed about what his methodology had
 9  been because he was absent or sick that day?
10  Absolutely, that's possible.  But that's not what
11  I remember.  That would -- that would catch me by
12  surprise.
13      Q.    And just so I'm clear, other than
14  what you've done to prepare for this deposition,
15  is there any other information that you believe
16  the Washington TSA has as to how that number that
17  appears in your declaration was derived?
18      A.    Not that I'm aware of.
19      Q.    Further up in your declaration you
20  state the following, in Paragraph 6, second
21  sentence:  "The rights and obligations of
22  termination are highly sensitive to fluctuations
23  in market rates of interest."
24          Do you see that?
25      A.    Yes.
```

Page 200

```
 1          - PETER SHAPIRO -
 2      Q.    Then you say, "Interest rates are the
 3  primary determinant of the replacement cost of the
 4  RFA."
 5          Was that an accurate statement when
 6  you made it?
 7      A.    Yes.
 8      Q.    Do you believe that to be an accurate
 9  statement today?
10      A.    Yes.
11      Q.    All right.  Starting in December --
12  starting in December 2008 to the present, Swap
13  Financial Group has had a series of contracts with
14  the Washington TSA, correct?
15          THE WITNESS:  Read that back, if I
16      could.
17          (The question requested was read back
18      by the reporter.)
19      A.    Yes.
20      Q.    What are the total amount of fees
21  that Swap Financial Group has been paid by the
22  Washington TSA from December 2008 to the present?
23      A.    I haven't summed that up.
24      Q.    There are records that exist at Swap
25  Financial Group that certainly would tell you
```

Page 201

```
 1          - PETER SHAPIRO -
 2  that?
 3      A.    Certainly, yes.
 4      Q.    You believe that number to be more
 5  than 200,000 or less than 200,000?
 6      A.    I don't want to guess.  Okay.
 7      Q.    Well, let's leave a blank and you can
 8  provide us with the total amount of fees paid by
 9  the Washington TSA to Swap Financial Group from
10  December 2008 to the present, okay?
11  INSERT_____
12          MR. LAWRENCE:  If you put the request
13      through me.
14          MR. TAMBE:  All right.
15      Q.    You are currently under a contract
16  with Washington TSA?
17      A.    Correct.
18      Q.    What's the nature of that contract?
19      A.    You know, it's an advisory contract
20  to Washington TSA.
21      Q.    Is it a continuation of the contract
22  that was entered into in 2010 following the RFP?
23      A.    I believe so.  I believe it's an
24  extension of that contract.
25      Q.    When was the last time you spoke with
```

## Page 202

- PETER SHAPIRO -

1
2    Greg Schlionsky?
3        A.    It would have been within the past
4    few months.  It would not have been within the
5    past one month.
6        Q.    Did you discuss anything having to do
7    with Lehman or this matter?
8        A.    Yes.
9        Q.    What did you discuss with Mr.
10    Schlionsky?
11        A.    You know, I let him know that, as a
12    courtesy, that he was going to be requested to
13    give a deposition rather than have him get a
14    subpoena.  I know him very well personally, so I
15    wanted to make sure, rather than have him just get
16    a cold subpoena, he would get the courtesy of a
17    call.
18        Q.    Other than giving him this heads up,
19    any other matters of substance that you discussed
20    with him?
21        A.    We have other unrelated dealings and
22    we probably touched on some of other things.
23        Q.    I don't want to ask you about your
24    unrelated dealings.  Anything of substance related
25    to this matter?

## Page 203

- PETER SHAPIRO -

1
2        A.    No, no, I'd be very, very careful on
3    something like that.
4        Q.    How about Jaime Lister, is that
5    someone you know?
6        A.    Yes.
7        Q.    When's the last time you spoke to
8    Jaime Lister?
9        A.    Probably the same day.
10        Q.    For the same purpose?
11        A.    Exactly.
12        Q.    Did you discuss anything of substance
13    with that, related to this matter?
14        A.    No.
15        Q.    Were there any other former Lehman
16    employees that you spoke with?
17        A.    Yes.
18        Q.    Who else?
19        A.    Anatoly Zelikoff.
20        Q.    Was it again for the same purpose?
21        A.    Exactly.
22        Q.    Again, you didn't discuss anything of
23    substance related to this matter did you?
24        A.    On that call he raised an issue.
25        Q.    What issue did he raise?

## Page 204

- PETER SHAPIRO -

1
2        A.    He said, I barely remember this deal.
3    I was just hired there.  He was a little bit
4    nervous that this thing coming in, you know.  And
5    I said, you know, it doesn't -- I tried to
6    reassure him, it doesn't matter, just answer to
7    the best of your ability.
8        Q.    Do you remember anything else from
9    that call?
10        A.    No, he's an extremely nice guy.
11        Q.    I'd agree with you on that.
12            Have you spoken with anyone from PFM
13    about this matter at all at any time?
14        A.    Not that I can recall, no.  I don't
15    think at all.  You know, we have lots of dealings
16    with PFM, as I've spoken, I don't think I've ever
17    spoken about this.
18        Q.    Earlier on in the deposition, maybe
19    in the morning, you talked about a cumulative cash
20    flow analysis.
21            Do you remember that?
22        A.    We've talked about so many things,
23    Jay, help me out here.
24        Q.    There was a point in time I said
25    other than the interest rate swap methodology --

## Page 205

- PETER SHAPIRO -

1
2        A.    Right.
3        Q.    -- Did you use any other methodology
4    to try and value the swap and I believe a phrase
5    you used then was you did something that you
6    referred to as a cumulative cash flow analysis.
7        A.    Cash flow losses, right.
8        Q.    When did you do that?
9        A.    I think I said this earlier, but we
10    did this around the mediation.
11        MR. TAMBE:  We can take a short
12    break, I think we're almost done.
13        THE VIDEOGRAPHER:  The time is
14    3:56 p.m.  We're going off the record.
15        (Whereupon, there was a brief recess
16    in the proceedings.)
17        THE VIDEOGRAPHER:  The time is
18    4:09 p.m.  We're back on the record.
19        MR. TAMBE:  Thank you very much for
20    your time, Mr. Shapiro.
21        MR. LAWRENCE:  Before you finish.  In
22    response to the 30(b)(6), 5B calculation, the
23    termination amount --
24        MR. TAMBE:  Yeah.
25        MR. LAWRENCE:  You'd asked a question

Page 206

- PETER SHAPIRO -

1    that Peter had forgotten the answer to and I
2    asked him to confirm what the proper answer
3    to and that is, his revised calculation based
4    on the 2032 date as opposed to the 2042 date.
5          MR. TAMBE:  Okay.
6          MR. LAWRENCE:  So I would like him to
7    state that on the record.  If you need
8    further follow-up questions, obviously you
9    understand the basis for it.
10         Can you state that on the record
11   please?
12         THE WITNESS:  $38,007,347.  So just
13   to state it in numerals; 38,007,347.
14   BY MR. TAMBE:
15        Q.    And that does that include failed
16   deliveries?
17        A.    I believe that does not.  I think
18   failed deliveries are tacked on to that.  I can
19   turn back to look at that.  I think that's a --
20   that's a direct comparison with the 40-odd million
21   dollar number we were talking about before.
22        Q.    Well, the 40-odd million dollar
23   number was the $47 million number --
24        A.    Yes.
25

Page 207

- PETER SHAPIRO -

1        Q.    Do you know if that number includes
2    fails or not?
3        A.    If it did, then both numbers do.  I'd
4    have to look back.  They're in the same place in
5    their calculations.
6          MR. TAMBE:  Give me just one second.
7        Q.    Let's just -- so if you'd look at the
8    September -- if you look at the September 19 --
9    September 10th document which is Lehman Exhibit
10   19.
11         Do you have that?
12         MR. LAWRENCE:  I think that was
13   handed to you earlier.
14         THE WITNESS:  I'm sure it was.  But
15   give me a second.  I left these things
16   folded, so...
17        A.    Yeah.
18        Q.    So, if you look at the third page of
19   Exhibit 19 at the end of that document, there's a
20   reference to a difference of 553,080.
21        A.    Correct.
22        Q.    Do you see that?
23        A.    Yes.
24        Q.    Do you recognize that as an amount
25

Page 208

- PETER SHAPIRO -

1    relating to the unpaid amounts?
2        A.    Yes, that's where Lehman's failure to
3    pay on the contract in the interim period, that's
4    the fails.
5        Q.    So now that you see that there --
6    your $38 million number that you just testified
7    to, do you believe that includes Lehman's failure
8    to perform or it does not include?
9        A.    No, I don't believe it does.  It
10   backs up to the 46,437,610 number.
11        Q.    So, to get to the -- to your
12   calculation of loss, all in loss as of 2032, you
13   take the number you just testified to and add the
14   533 to that?
15        A.    533 or 553?
16        Q.    553.
17        A.    Okay.
18        Q.    Is that right?
19        A.    Yes.
20         MR. TAMBE:  Thank you.  Any other
21   corrections?
22         Thank you.  Thanks for your time.
23         THE WITNESS:  Thank you.  Nice
24   spending the day with you.
25

Page 209

- PETER SHAPIRO -

1          THE VIDEOGRAPHER:  The time is
2    4:12 p.m., December 13, 2013.  This completes
3    the videotaped deposition of Mr. Peter
4    Shapiro.
5          (Whereupon, the deposition concluded
6    at 4:12 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 210

1

2        A C K N O W L E D G E M E N T

3

4    STATE OF NEW YORK        )

5                            ) ss.

6    COUNTY OF NEW YORK       )

7

8        I, PETER SHAPIRO, hereby certify that I have

9    read the transcript of my testimony taken under

10   oath in my deposition of December 13, 2013; that

11   the  transcript is a true, complete and correct

12   record of my testimony, and that the answers on

13   the record as given by me are true and correct.

14

15   _____

16       PETER SHAPIRO

17

18   Subscribed and sworn

19   to before me on this the

20   _____ day of _____, 2013.

21   Notary Public, State of New York

22

23

24

25

## Page 211

1

2        C E R T I F I C A T E

3    STATE OF NEW YORK        )

4                            ) ss.

5    COUNTY OF NEW YORK       )

6

7        I, HOPE LYNN MENAKER, a Notary Public within

8    and for the State of New York, do hereby certify:

9        That PETER SHAPIRO, the witness whose

10   deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true

12   record of the testimony given by the witness.

13       I further certify that I am not related to

14   any of the parties to this action by blood or

15   marriage, and that I am in no way interested in

16   the outcome of this matter.

17       IN WITNESS WHEREOF, I have hereunto

18   set my hand this December 18, 2013.

19

20   _____

21       HOPE LYNN MENAKER

22

23

24

25

## Page 212

1

2                    INDEX

3    WITNESS:  PETER SHAPIRO

4    EXAMINATION BY                    PAGE

5    MR. TAMBE                  4

6

7    REQUEST FOR ADDITIONAL INFORMATION        PAGE

8

9    Total amount of fees paid by the Washington    201
     TSA to Swap Financial Group from December
10   2008 to the present

11   INSTRUCTED NOT TO ANSWER              PAGE

12   MR. LAWRENCE              23

13   MR. LAWRENCE              25

14   MR. LAWRENCE              25

15   MR. LAWRENCE              26

16   MR. LAWRENCE              31

17   MR. LAWRENCE              36

18   MR. LAWRENCE              36

19   MR. LAWRENCE              36

20   MR. LAWRENCE              36

21   MR. LAWRENCE              36

22   MR. LAWRENCE              37

23   MR. LAWRENCE              37

24   MR. LAWRENCE              37

25

## Page 213

1

2               INDEX (cont'd)

3    MR. LAWRENCE              37

4    MR. LAWRENCE              37

5    MR. LAWRENCE              37

6    MR. LAWRENCE              37

7    MR. LAWRENCE              38

8    MR. LAWRENCE              38

9    MR. LAWRENCE              38

10

11   EXHIBITS FOR IDENTIFICATION

12

13   NUMBER     DESCRIPTION           PAGE

14   1    PREMARKED:  Subpoena dated      8
          8/27/13
15   2    PREMARKED:  Subpoena dated      27
          11/1/13
16

17   3    PREMARKED: 30(b)(6) Notice     33

18   4    SGF 001917            69

19   5    SFG 001916 - 917       75

20   6    TSA 038481 - 483       86

21   7    SFG 001885 - 899       92

22   9    PREMARKED: SFG 001920     93

23   8    PREMARKED: SFG001855     100

24

25

**CAPTION:** *In Re:  Lehman Brothers Holdings, Inc., et al*    **DEPOSITION DATE:**  December 13, 2013
**Case No.:**  Chapter 11 Case No. 08-13555 (JMP)

I have read the transcript of my deposition taken on December 13, 2013, at New York, New York,
and make the following corrections:

| PAGE | LINE | CHANGE | TO | REASON FOR CHANGE |
|------|------|--------|----|-----------------|
| 105 | 15 | no | (delete) | mistake |
| 109 | 21 | Insert "shut" following "simply" | | " |
| 118 | 18 | Rich | Reich | spelling error |
| 121 | 20 | Base | basis | mistake |
| 128 | 22 | They've | They | " |
| 134 | 7 | pre-bond | Prebon | " |
| 137 | 2 | trated right way | Traded right away | " |
| 151 | 4 | you're | your | " |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Witness Signature: _____

Subscribed and sworn to me before this _____ day of ____Jan____, 2014

Notary Signature _____    JAMES B. GORDON
NOTARY PUBLIC OF NEW JERSEY
Print Name _____    My Commission Expires Feb. 19, 2017
Notary Public for the State of ___NJ___
Residing at 71 So. Orange Ave, S.O, NJ
My commission expires _____

Seal

**WITNESS NAME:**  Peter Shapiro