**EXHIBIT 9 to the Declaration Of Laura W. Sawyer In Support Of Debtors' Motion For
An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok**

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: LEHMAN BROTHERS HOLDINGS,     ) Chapter 11
INC., et al.,                       ) Case No. 08-13555 (JMP)
                                    )
         Debtors,                   ) (Jointly Administered)


30(b)(6) DEPOSITION OF BOB COOK
December 6, 2013
Seattle, Washington

Page 2

```
 1              BOB COOK
 2            APPEARANCES
 3    For Debtors:
 4          LAURA W. SAWYER, ESQ.
            JONES DAY
 5          222 East 41st Street
            New York, NY 10017-6702
 6
 7
 8
 9    For Washington Tobacco Settlement Authority:

10          KYMBERLY K. EVANSON, ESQ.,
            PAUL J. LAWRENCE, ESQ.
11          PACIFICA LAW GROUP
            1191 2nd Avenue
12          Suite 2100
            Seattle, WA 98101-2945
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              BOB COOK
 2         EXAMINATION INDEX
 3    EXAMINATION BY:          PAGE NO.
 4    Ms. Sawyer              5
 5
 6         EXHIBIT INDEX
 7    EXHIBIT NO.    DESCRIPTION       PAGE NO.
 8    Cook Exhibit 1   10-page Rule 30(b)(6)    7
                   Deposition Notice
 9
      Cook Exhibit 2   2-page TSA Board of Directors   79
10                 Special Meeting Minutes dated
                   5/3/12
11
      Lehman Exhibit 2  40-page Reserve Fund    19
12                 Agreement; SFG_000649-688
13    Cook Exhibit 3   1-page email chain ending   93
                   11/7/08 at 7:48 a.m.;
14                 USBANK000724
15    Cook Exhibit 4   2-page email chain ending   107
                   3/31/11 at 11:10 a.m.;
16                 TSA_024540-541
17
      Lehman Exhibit 4  4-page memorandum to     30
18                 Mr. Herman, et al., from
                   Mr. Reich dated 9/25/08;
19                 TSA_013248-325
20    Cook Exhibit 5   3-page email chain ending   110
                   6/20/11 at 11:51 a.m.;
21                 USBANK000686-688
22    Cook Exhibit 6   4-page memo to Mr. Cook and   114
                   Ms. Johnson from Mr. Shapiro
23                 dated 11/16/11; TSA_038481-484
24    Lehman Exhibit 8  4-page email chain and     34
                   attachment ending 11/17/08
25                 at 10:54 a.m.; TSA_024147-150
```

Page 4

```
 1              BOB COOK
 2       EXHIBIT INDEX (Continuing)
 3    EXHIBIT NO.    DESCRIPTION       PAGE NO.
 4    Lehman Exhibit 12 6-page Declaration of Peter   46
                   Shapiro; LBHI_WTSA_00016384-
 5                 389
 6    Lehman Exhibit 15 3-page memo to Mr. Cook from   56
                   Messrs. Shapiro and Vergara
 7                 dated 4/21/09; TSA_021616-618
 8    Lehman Exhibit 17 1-page email to Mr. Herman,   97
                   et al., from Mr. Cook dated
 9                 6/3/09; TSA_008827
10    Lehman Exhibit 19 3-page memo to Mr. Cook from   69
                   Messrs. Shapiro and Vergara
11                 dated 9/10/09;
                   LBHI_WTSA_00016814-816
12
      Lehman Exhibit 20 91-page Proof of Claim     76
13
      Lehman Exhibit 26 2-page email to Mr. Cook from  103
14                 Mr. McCarthy dated 3/04/11;
                   TSA_002726-727
15
      Lehman Exhibit 27 2-page memo to Tobacco      112
16                 Settlement Authority from
                   Barclays Capital dated 11/4/11
17
18
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 5

BOB COOK

1     BE IT REMEMBERED that on Friday,
2  December 6, 2013, at 1191 2nd Avenue, Seattle,
3  Washington, at 9:30 a.m., before Cindy M. Koch, Certified
4  Court Reporter, RPR, CRR, CLR, appeared BOB COOK, the
5  witness herein;
6                    WHEREUPON, the following proceedings
7  were had, to wit:
8
9
10                    <<<<<< >>>>>>
11
12  BOB COOK,          having been first duly sworn
13                    by the Certified Court Reporter,
14                    testified as follows:
15
16              EXAMINATION
17  BY MS. SAWYER:
18  Q  Good morning, Mr. Cook.
19  A  Good morning.
20  Q  I wanted to go through a few instructions before we get
21     started, just to make sure we're all on the same sheet of
22     music.
23  A  Okay.
24  Q  There's a court reporter here today who's going to be
25     taking down everything we say, so we need to try to speak

Page 6

BOB COOK

1  slowly and clearly for her so she can get what we're
2  saying.
3  A  Okay.
4  Q  You also need to try to wait until I finish my question
5     before you give an answer.  Likewise, I'll try to wait
6     until you finish your answer before I ask the next
7     question.
8        You'll need to answer my questions out loud.  She
9     can't take down a shake of the head or a nod.
10        And if you don't understand a question I ask, please
11     ask me to rephrase it or let me know that you don't
12     understand it.  I'll do my best to try to rephrase it in
13     a way that you understand.
14  A  Okay.
15  Q  I want you to understand the questions I'm asking
16     because, if you answer a question, I'm going to assume
17     you understood what I meant.
18  A  Uh-huh.
19  Q  If you need a break at any time, either of you, just be
20     sure and let me know.  I will ask that you answer any
21     pending questions before we take that break.
22  A  Okay.
23  Q  And have you been deposed before?
24  A  No.

Page 7

BOB COOK

1  Q  Okay.  This is your first deposition ever?
2  A  First deposition, yes.
3  Q  Okay.  And do you understand that you've been designated
4     as a -- what we call a 30(b)(6) witness, to testify on
5     behalf of the Tobacco Settlement Authority of the State
6     of Washington?
7  A  Yes, I do.
8  Q  Okay.  And if I call the Tobacco Settlement Authority the
9     "TSA," will you understand what I'm referring to?
10  A  I certainly will.
11  Q  Be sure and ask me if you need any clarifications on
12     anything.
13  A  Okay.
14              (Exhibit No. 1 marked for
15              identification.)
16  Q  (By Ms. Sawyer)  The court reporter has handed you a
17     document that's been marked as Cook 30(b)(6) Exhibit 1,
18     and this appears to be a deposition notice from Lehman --
19     sorry; just one second -- deposition notice from Lehman
20     regarding a Rule 30(b)(6) deposition.
21        Do you see that?
22  A  I do.
23  Q  And have you seen this document before?
24  A  I have.

Page 8

BOB COOK

1  Q  And did you review it in preparation for your deposition
2     here today?
3  A  I have.
4  Q  And you've been designated as a 30(b)(6) witness on a few
5     topics; correct?
6  A  That is correct.
7  Q  And let's look at those topics, which are next to the
8     last page of the document, is where they start.
9        My understanding is that you've been designated as
10     the 30(b)(6) witness for Deposition Topic 1E, which is
11     valuations of the reserve fund agreement prepared at any
12     time, whether internally by you and/or by your advisors
13     for any purpose.
14        Is that consistent with your understanding?
15  A  Yes.
16  Q  And my understanding is that you've been designated as
17     the 30(b)(6) witness on Topic 1F, which is all losses you
18     report to have suffered as a result of the termination of
19     the reserve fund agreement.
20        Is that --
21  A  Yes.
22  Q  -- consistent with your understanding?
23  A  That's correct.
24  Q  I also have that you've been designated as the 30(b)(6)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 9

BOB COOK

1
2   witness on Topic No. 6, which is communications with any
3   person, including Swap Financial, PFM, Barclays, U.S.
4   Bank, or any governmental body concerning the redemption
5   of the bonds and all analyses and projections relating to
6   an earlier scheduled redemption of the bonds.
7       Is that correct?
8   A  Yes.
9   Q  I also have you designated in connection with Topic 11A,
10  which starts, any strategies, plans, efforts, and/or
11  actions taken by you or any of your advisors to mitigate
12  your purported losses with respect to the reserve fund
13  agreement, including your consideration of or entry into
14  any replacement transactions, including proposals from
15  any third party.
16      Is that consistent with your understanding?
17  A  Yes.
18  Q  I also have you designated for 11B, which is your
19  consideration of alternative investment options to
20  maximum Washington TSA's return on the reserve fund.
21  Is that consistent with your understanding?
22  A  Yes.
23  Q  I also had you designated on 11D, which is the monetary
24  results of any such mitigation efforts.
25      Is that consistent with your understanding?

Page 10

BOB COOK

1
2   A  Yes.
3   Q  Are you aware of whether you've been designated in
4   connection with any of these other topics?
5   A  Not that I recall. I don't have a list in front of me,
6   but --
7   Q  Okay. And what did you do to get ready to testify on
8   behalf of Washington TSA on these topics?
9   A  I reviewed, to the best of my ability, the documents that
10  were relevant to these topics.
11  Q  And did you collect those documents that you reviewed,
12  yourself?
13  A  Counsel from the -- from the documents that we provided
14  as part of the discovery process.
15  Q  So Counsel went through the documents that were collected
16  and provided as part of the discovery process, and
17  identified those that you needed to review?
18  A  That's correct.
19  Q  Did you do any independent investigation on your own,
20  aside from the documents provided to you by Counsel?
21  A  I asked some questions of Counsel, and we did actually
22  look at some other documents as well that seemed to be
23  relevant.
24  Q  And what other documents did you look at?
25  A  Personal notes that were work product.

Page 11

BOB COOK

1
2   Q  Whose work product?
3   A  The -- TSA's.
4   Q  And whose notes were they?
5   A  In some cases they were -- primarily they were Kim
6   Herman's.
7   Q  And those were his handwritten notes?
8   A  Yes.
9   Q  And those documents have not been produced in discovery
10  because they're work product?
11  A  That is correct.
12  Q  And how many pages of notes did you look at?
13  A  In total?
14  Q  Yes.
15  A  A binder about the size of the binder that you have
16  there.
17  Q  Just to clarify for the record --
18  A  I didn't count the pages.
19  Q  I'm asking --
20  A  That's a four-inch binder of typographically produced
21  documents.
22  Q  I think you may have misunderstood my question. It
23  probably wasn't clear, so let me try it again.
24      How many pages of handwritten notes of Mr. Herman's
25  did you review in preparation for your testimony here

Page 12

BOB COOK

1
2   today?
3   A  I didn't count them. I would say maybe ten.
4   Q  Okay. And does Mr. Herman have a habit of taking notes?
5   A  Yes.
6   Q  And how does he keep his notes, if you know?
7   A  I don't know.
8   Q  Okay. You don't know if he keeps a notebook or keeps
9   them on individual pieces of paper?
10  A  He took them on a -- pieces of paper from a small pad.
11  Q  Okay. And other than looking at the documents that your
12  counsel put together for you, as well as some documents
13  that weren't produced in discovery, did you look at any
14  other documents to prepare for this deposition here
15  today?
16  A  No.
17  Q  And did you -- you obviously met with Counsel to prepare
18  for the deposition here today?
19  A  That's correct.
20  Q  And when did that happen?
21  A  Wednesday of this week.
22  Q  And how long did you meet with Counsel?
23  A  Approximately four hours, including lunch.
24  Q  And who was -- participated in that preparation session?
25  A  Kymberly.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 13

BOB COOK

1
2    Q    Was there anyone else in attendance?
3    A    Not during the preparation portion.
4    Q    Did other --
5    A    There was at lunchtime.
6    Q    Thank you.
7         And did anyone dial in or participate in the
8         preparation by phone?
9    A    No.
10   Q    Did you make any phone calls to ask any questions of
11        anyone?
12   A    No.
13   Q    And other than meeting with Counsel on Wednesday for
14        approximately four hours, did you discuss the 30(b)(6)
15        topics on which you've been designated with anyone else
16        to prepare for your deposition testimony here today?
17   A    No.
18   Q    You didn't make any inquiries of any finance staff or
19        anybody at Washington TSA regarding these topics?
20   A    I didn't feel it was necessary.
21   Q    Okay.  And you didn't discuss any of these topics with
22        Peter Shapiro before coming here today?
23   A    No.
24   Q    What's your position at TSA?
25   A    I am senior director of finance at the Washington State

Page 14

BOB COOK

1
2    Housing Finance Commission.  And as part of my role
3    there, we have been contracted -- or we contracted with
4    the Washington Tobacco Settlement Authority to provide
5    the same types of services that we do in our capacity at
6    the Washington State Housing Finance Commission, for the
7    Tobacco Settlement Authority as directed by the
8    legislation that created the Tobacco Settlement
9    Authority.
10   Q    So you serve as senior director of finance for the
11        Tobacco Settlement Authority as well?
12   A    That is correct.
13   Q    And what are your duties as senior director of finance?
14   A    Typical duties for a director of finance.  I oversee the
15        accounting and financial functions, including general
16        operations, as well as in terms of being a finance --
17        finance division representative in the development of the
18        bond issue, in the creation of the Tobacco Settlement
19        Authority when it was created in 2002, as well as any
20        relevant financial transactions that might be considered
21        or done by the Authority.
22   Q    Are you responsible for the accounting for the Authority?
23   A    Yes.
24   Q    And who assists you with that?
25   A    I have a staff of ten finance division people.  For the

Page 15

BOB COOK

1
2    Housing Finance Commission, those that are necessary to
3    fulfill functions for the Tobacco Settlement Authority do
4    so and charge hours to the Authority as appropriate.
5    Q    And what, in your educational or employment background,
6         prepared you to become the director of finance at the
7         Washington TSA?
8    A    I have a bachelor of science of business administration
9         from the University of Missouri Columbia, specializing in
10        accountancy, and I have a master's in business
11        administration from Northern Illinois University.
12   Q    And when did you receive your master's in business
13        administration?
14   A    1990.
15   Q    What was your focus in your studies at Northern
16        Illinois --
17   A    Finance and information systems.
18   Q    I want to go to the first topic that you've been
19        designated, which is regarding the valuations of the
20        reserve fund agreement.
21   A    Uh-huh.
22   Q    And prior to Lehman's bankruptcy in the fall of 2008,
23        what valuations of the reserve fund agreement had TSA
24        performed?
25   A    None.

Page 16

BOB COOK

1
2    Q    And why had no valuations of the reserve fund agreement
3         been performed prior to Lehman's bankruptcy?
4    A    Because the agreement was specifically to be at par, so
5         the amount that was in the reserve fund agreement had
6         been established at the time of the bond issue and
7         continued to be at par throughout the -- until the term
8         of -- time of bankruptcy.
9    Q    And what do you mean when you say the agreement was
10        intended to be at par?
11   A    One dollar for each share.  The shares equaled the number
12        of the dollars outstanding.  "Share" may not be the
13        correct term, but in any event, the dollar amount that
14        was originally deposited was to be the dollar amount in
15        the reserve fund throughout the life of the reserve fund.
16   Q    Can you give me your understanding of what an agreement
17        is?
18   A    What the reserve fund is for or what the agreement was
19        for?
20   Q    The agreement.
21   A    The agreement was to provide the Authority with an
22        amount, specifically 45 million 700-some thousand
23        dollars, that was to be invested, such that the principal
24        was available for any kind of use that would be
25        necessary, a draw on the reserve fund on bond payment

4  (Pages 13 to 16)

Page 17

BOB COOK

1
2  dates, which were semiannual.
3     And for that, Lehman would post collateral to the
4  trustee that the trustee would hold in the name of the
5  bond issue, such that the reserve fund was secure and
6  collateralized.  And as a part of that agreement, Lehman
7  Brothers agreed to pay to us 4.84 percent interest on the
8  amount outstanding.
9  Q  And that's your understanding of the -- I'm sorry.
10    That's the Tobacco Settlement Authority's
11  understanding of the actual mechanics of how the reserve
12  fund agreement works?
13 A  The mechanics?  The mechanics are for Lehman Brothers to
14  provide -- that was the -- my understanding of how the
15  agreement was supposed to work, from the Tobacco
16  Settlement Authority's side.
17 Q  And you understood that the -- and when I say "you," I'm
18  referring to the Tobacco Settlement Authority.  Tobacco
19  Settlement Authority understood that Lehman Brothers was
20  posting collateral in connection with the reserve fund
21  agreement?
22 A  That is correct.
23 Q  You did not understand that Lehman Brothers was in fact
24  delivering securities pursuant to the reserve fund --
25 A  Securities that were collateral for the obligation.

Page 18

BOB COOK

1
2  Q  Did the Tobacco Settlement Authority understand that if
3  there was a default under those securities, that the
4  Tobacco Settlement Authority and the trustee bore the
5  risk of loss?
6  A  No.
7  Q  And --
8  A  And we did not.
9  Q  And what's the basis for your understanding that you did
10  not?
11 A  Because the reason that -- because the reason that we had
12  collateral, and the trustee had it, was to be sure that
13  the principal was safe.  And the trustee, in fact, at the
14  time of bankruptcy, when Lehman Brothers failed on its
15  obligation, we retained the principal and continue to
16  have the principal intact at this time.
17 Q  So it is your -- it is Washington TSA's understanding of
18  the agreement that they -- that they did not own the
19  securities that Lehman delivered?
20 A  I did not say that.  Those are your words.  I said that
21  the Tobacco Settlement Authority, the trustee had the
22  securities as collateral and had those in event of
23  default, to be able to fund the principal and maintain
24  the principal in the reserve fund.
25 Q  What if the securities that Lehman Brothers had delivered

Page 19

BOB COOK

1
2  to the trustee, what if those securities had defaulted?
3     MS. EVANSON:  Object to the form.
4     THE WITNESS:  Pardon?
5     MS. EVANSON:  I just said object to
6  the form.
7     You can answer.
8     THE WITNESS:  We would have sued
9  Lehman Brothers for breach of contract.
10 Q  (By Ms. Sawyer)  Okay.  Maybe we should look at the
11  reserve fund agreement --
12 A  Okay.
13 Q  -- make sure that we are talking about the same thing.
14    I'm showing you a document that's been previously
15  marked as Lehman Exhibit 2, which is an executed copy of
16  a reserve fund agreement between Tobacco Settlement
17  Authority and Lehman Brothers Special Financing, Inc.
18    And can you show me where in this agreement there's
19  the posting of collateral by Lehman Brothers?
20 A  It will take me some time to find things in this
21  agreement.
22    MS. EVANSON:  And just for the record,
23  I feel like we're getting a little outside the scope of
24  valuations and losses.  Kim Herman is going to be
25  speaking to the purpose and formation and expectations

Page 20

BOB COOK

1
2  under the reserve fund agreement.  So if we could keep it
3  to the -- to the designated topics, I think that would be
4  appropriate.
5     MS. SAWYER:  I think that's fair
6  enough, but I think, to be able to speak to valuations of
7  the reserve fund agreement, we need to ensure that he has
8  an understanding of the mechanics of the reserve fund
9  agreement.
10    MS. EVANSON:  Fair enough.
11    THE WITNESS:  The specific term in the
12  agreement is delivery of qualified securities, and
13  collateral is referred to in the case that there's a
14  downgrade.
15    So my use of the term "collateral" is a term that I
16  would internalize as the fact that they were posting
17  the -- what in here is called qualified securities.
18 Q  (By Ms. Sawyer)  But to be precise, the language of the
19  agreement provides for the delivery of qualified
20  securities, as opposed to the posting of collateral;
21  correct?
22 A  That is correct.  Unless there's a downgrade, in which
23  case collateral can be posted.
24 Q  Okay.  And if you look at Section 5.4 of the agreement,
25  which is on Page 14 --

5 (Pages 17 to 20)

Page 21

BOB COOK

1
2    A   Uh-huh.
3    Q   -- it actually contemplates that the earning of the fixed
4        rate of return comes from the purchase of the qualified
5        securities at the purchase price on each deposit --
6    A   Sorry.  What section again, please?
7    Q   5.4.
8    A   Okay.  Thank you.
9    Q   It says that, "The issuer understands that in
10       consideration of its purchasing qualified securities at
11       the purchase price on each deposit date, the issuers
12       minimize the risks from fluctuations and interest rates
13       during the term of this agreement."
14          Do you see that?
15   A   Let me read it.  5.4?
16   Q   Uh-huh.
17   A   Your question again?
18   Q   My question is, is that this provision describes the
19       issuer purchasing the qualified securities; correct?
20   A   It mentions in consideration of purchasing qualified
21       securities at the purchase price and deposit date.
22   Q   And it is your under- -- it is Washington TSA's
23       understanding that it did purchase the qualified
24       securities pursuant to this agreement prior to Lehman's
25       bankruptcy?

Page 22

BOB COOK

1
2    A   This section doesn't say that.  It says in consideration
3        of for purchasing qualified securities, so it implies
4        that the purchasing of qualified securities could have
5        happened.  It doesn't say that it did.
6    Q   So just to be clear, it is Washington TSA's position that
7        they did not purchase qualified securities pursuant to
8        this --
9    A   I did not say that.
10   Q   Okay.
11   A   I said that this section does not make that implicit.
12   Q   All right.  I'm --
13   A   It's implicit.  It is not stated directly.
14   Q   Okay.  Pursuant to the reserve fund agreement, prior to
15       the termination of it with Lehman's bankruptcy, did
16       Washington TSA purchase qualified securities from Lehman
17       Brothers?
18   A   The mechanics of it may have been that way.  You know,
19       how it is defined legally, I know the -- how the
20       mechanics of it worked.  How it's defined legally, I
21       can't comment on.
22   Q   And you had indicated that the reserve fund agreement was
23       a par agreement; is that fair?
24   A   That, again, is perhaps not a term that is in the
25       agreement.  That is how I would describe it to other

Page 23

BOB COOK

1
2        people so that they could commonly understand it.
3    Q   And what's your understanding of how this agreement was a
4        par agreement?
5    A   That the amount of -- that was posted in the agreement
6        was the amount that we had agreed would be in the
7        agreement at all times, unless there was a draw on the
8        agreement.
9    Q   And --
10   A   So that the 45 million 700-whatever thousand dollars was
11       the amount of the agreement.
12   Q   So on -- in Washington TSA's books and records, prior to
13       Lehman's bankruptcy, how did you account for the reserve
14       fund agreement?
15   A   The reserve fund was booked --
16   Q   Not the reserve fund, sir.  The reserve fund agreement.
17   A   The agreement doesn't enter into the books and records.
18       The amount of the reserve fund enters into the books and
19       records.
20   Q   So for purposes of valuing the reserve fund agreement,
21       prior to bankruptcy, did Washington TSA take any steps to
22       value the agreement?
23   A   None other than to record the amount that was in the
24       agreement according to the records of the trustee.
25   Q   When you say was in the agreement, you actually mean what

Page 24

BOB COOK

1
2        was in the reserve fund; correct?
3    A   In the deposit, in the fund, held by the trustee.
4    Q   And did you under- -- did Washington TSA understand that
5        pursuant to the reserve fund agreement, that, in certain
6        circumstances, a termination payment would be required?
7    A   Yes.
8    Q   And did Washington TSA understand, prior to bankruptcy,
9        that the termination payment could be payable to
10       Lehman --
11   A   Yes.
12   Q   -- or payable to Washington TSA?
13   A   Yes.
14   Q   That there could be a payment made either direction?
15   A   That is correct.
16   Q   And did Washington TSA, prior to bankruptcy, ever attempt
17       to determine what that termination payment would be in
18       the event of a termination?
19   A   No.
20   Q   And why not?
21   A   Because it wasn't necessary, required, according to
22       accounting standards.
23   Q   And are you aware, sir, that in some states there are
24       accounting standards that require derivative contracts,
25       such as a reserve fund agreement, to be valued and

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 25

BOB COOK

1  recorded?
2  A  Absolutely.  But this is not the kind of reserve -- this
3     kind of agreement was not determined to be that kind of
4     derivative contract in our books and records.
5  Q  And who made that determination?
6  A  The staff, in consultation with our auditors.
7  Q  And so prior to bankruptcy, Washington TSA had not
8     categorized the reserve fund agreement as a derivative
9     contract that required to be given a value pursuant to
10    accounting standards?
11 A  Not at that time.  Because there were none of the risks,
12    or there was no default on the contract.
13 Q  And do the accounting standards require a valuation of a
14    derivative contract only in circumstances where there's a
15    risk, or is it, by definition, certain contracts are
16    required to be valued?
17 A  It was the opinion of TSA staff and our accountants that
18    this did not meet the requirements to be valued at the
19    point in time that the agreement was in process and
20    working.
21 Q  And were you personally involved in those discussions?
22 A  Yes.
23 Q  And who made the decision that the reserve fund agreement
24    did not qualify as a derivatives contract for purposes of
25

Page 26

BOB COOK

1  your --
2  A  I didn't say it didn't require a derivatives contract.  I
3     said that it did not require valuation as one during the
4     time that the agreement was in place.
5  Q  I think, just for purposes of the court reporter, we
6     should try to wait until I finish a question to finish --
7  A  All right.
8  Q  -- to answer.
9  A  I just want to make sure that I clarify misstatements
10    that you're making on my behalf.
11 Q  Well, I appreciate that, sir.  It would be -- that was
12    not going to be my question.  So at times you are
13    answering a question other than what I intend to pose.
14 A  Then I would like to not -- you not to say things that
15    are in -- unfactual that I'm not saying, putting them on
16    record.
17 Q  Okay.  We can certainly continue this way.
18 A  Sure.
19 Q  I have all day to do so.
20 A  So do I.
21 Q  Okay.  So we can try to move through this.  We can come
22    back for a second deposition day.  I'm trying to be as
23    efficient as possible, and I think --
24 A  Understood.
25

Page 27

BOB COOK

1  Q  -- from experience, if we wait until I finish my question
2     before you answer --
3  A  Okay.
4  Q  -- it will go a little bit quicker.
5  A  Okay.
6         MS. SAWYER:  Can you go back to my
7     question I started when he spoke?
8         (Question on Page 25, Line 24
9         read by the reporter.)
10 Q  (By Ms. Sawyer)  All right.  So who made the decision
11    that the reserve fund agreement did not need to be valued
12    as a derivatives contract, before bankruptcy, for
13    purposes of the accounting records?
14 A  I believe I answered that before.  It was staff, in
15    consultation with our auditors.
16 Q  Specifically who made that decision?
17 A  Myself, Debra Stephenson, and auditors that would have
18    been on -- on our engagement at that time, and I don't
19    recall specific names at that time, in 2002.
20 Q  Who were your outside auditors in 2002?
21 A  It was either Deloitte & Touche or Moss Adams.  We had a
22    change during that time.  And -- but we've had some of
23    the same people involved; they've moved firms.
24 Q  Did you seek legal advice on that decision?
25

Page 28

BOB COOK

1  A  I do not recall whether or not a bond counsel or any
2     other counsel was consulted as part of that discussion.
3  Q  So prior -- just to make sure we're clear, prior to the
4     Lehman bankruptcy, at no time did Washington TSA place a
5     value on the reserve fund agreement?
6  A  None.  Other than the actual amount that was on deposit
7     at the trustee, which was 45 million 700 thousand,
8     whatever it was.
9  Q  And in a line entry in some accounting record, would it
10    say, "reserve fund agreement," and then that amount --
11 A  Yes.
12 Q  -- or would it just -- or would there just be no entry at
13    all?
14 A  On the reserve fund agreement, there would be a line that
15    has the amount of the reserve fund agreement, which is
16    45 million 700 thousand, the amount that's stated in the
17    agreement.
18 Q  Just to make sure I'm clear, in your accounting books and
19    records, prior to the Lehman bankruptcy, there was an
20    entry in those accounting records for the reserve fund
21    agreement that stated the amount contained in the reserve
22    fund agreement as the value of the agreement?
23 A  That is correct.
24 Q  Okay.  Thank you.
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 29

BOB COOK

1
2      And then after the Lehman bankruptcy, did there come
3  a point in time that a value was placed on the reserve
4  fund agreement?
5      MS. EVANSON:  And I'm just going to
6  object to this line of questioning to the extent it's
7  asking for work product or attorney-client
8  communications.
9      You can go ahead, but just don't disclose
10  discussions with counsel.
11      THE WITNESS:  Okay.  So state the
12  question again, please.
13  Q  (By Ms. Sawyer) After Lehman's bankruptcy, did there
14  come a point in time that the TSA placed a value on the
15  reserve fund agreement?
16  A  The reserve fund continued to be funded at the amount
17  that was stated in the agreement, because we had those
18  proceeds.  And then we began to do a valuation that
19  included consideration of the lost earnings over time
20  that Lehman Brothers would have paid the TSA, had the
21  agreement remained in place.
22  Q  Specifically my question was, was a value placed on the
23  reserve fund agreement by Washington TSA?
24  A  I don't know how -- what you mean by placing a -- a value
25  on the agreement.  We did -- yes, we did valuations of

Page 30

BOB COOK

1
2  future losses.
3  Q  Future losses in terms of the guaranteed rate?
4  A  That is correct.
5  Q  And who did those analyses?
6  A  Peter Shapiro at Swap Financial.
7  Q  Anyone else?
8  A  There were no other actual valuations done.  PFM, at the
9  time that bankruptcy was declared, had looked at the fact
10  that what -- depending upon the termination date and if
11  it had been the date of the bankruptcy, that we could
12  have been in a position to owe approximately $1 million,
13  $1.2 million.
14  Q  Showing you a document that's been marked as Lehman
15  Exhibit 4, which, for the record, is a memorandum dated
16  September 25th, 2008, from K&L Gates.  It's Bates-stamped
17  as TSA 13248 through 13251.
18      Have you seen this document before?
19  A  I have.
20  Q  And if you look at the third paragraph of the document,
21  the middle of that paragraph, starting toward the end of
22  the line, it says, "We have been told by PFM that a
23  termination amount calculated as of the date of the call
24  would obligate the Authority to pay Lehman approximately
25  $1.2 million."

Page 31

BOB COOK

1
2      Do you see that?
3  A  I do.
4  Q  And is that what you were just referring to, that PFM --
5  A  Yes.
6  Q  -- PFM did a valuation shortly after bankruptcy?
7  A  I do not know how they arrived at the number.  I don't
8  know what the product was that came to this number.  But
9  they did provide this number.
10  Q  But you, sir, have been designated as Washington TSA's
11  representative to understand all -- any valuations that
12  were done on behalf of TSA regarding the reserve fund
13  agreement.
14  A  I did not get a work product that said this.  I simply
15  got a number.  And I didn't investigate further at that
16  time.
17  Q  But you understand that you were designated to testify
18  here today about any valuations of the reserve fund
19  agreement --
20  A  I do understand that.  And I don't have any of this.
21  Q  And you didn't take any steps to understand how PFM
22  determined that the termination amount as of the date of
23  the call was approximately $1.2 million?
24  A  We had probably discussions on the phone about it, but I
25  don't have any contemporaneous notes that can help me

Page 32

BOB COOK

1
2  remember, other than the fact that the number was put out
3  there.
4  Q  In preparation for today's deposition, where you're to
5  testify as to the valuations of the reserve fund
6  agreement, what did you do to understand the -- this
7  valuation?
8  A  I understood that, in general, that interest rates spiked
9  during the time that the Lehman bankruptcy happened
10  because of the disruption in the market, such that the
11  valuation could have possibly been negative at that time,
12  and this was a range that was given by PFM.
13  Q  My question, sir, was, what did you do in preparation for
14  this deposition to understand the $1.2 million valuation
15  that PFM had done?
16  A  I have no further understanding, other than knowing that
17  this number is here.
18  Q  Did you do anything in preparation for this deposition to
19  understand the $1.2 million valuation?
20  A  I did not.
21  Q  Do you know what methodology PFM used to reach this
22  $1.2 million valuation?
23  A  I do not.
24  Q  Did you ask anybody at PFM, in preparation for this
25  deposition, how that $1.2 million value was determined?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 33

BOB COOK

1   A  I did not.
2   Q  Do you understand generally how PFM valued the TSA's
3      reserve fund agreement?
4   A  I know the environmental effects that were going on at
5      that time that resulted in this number, and that was the
6      spike in interest rates due to the disruption in the
7      marketplace that I mentioned earlier.
8   Q  And did you reach that understanding on or about the time
9      of this memorandum and this call?
10  A  Yes.
11  Q  And so you recall there being a discussion with PFM about
12     this valuation and why it would have required TSA to pay
13     money to Lehman?
14  A  Yes.
15  Q  And did it come as a surprise to TSA that it would
16     actually owe money to Lehman following the Lehman's
17     bankruptcy?
18  A  I don't think it would have come as a surprise one way or
19     the other.
20  Q  You knew -- TSA knew there was a possibility that in the
21     event of the termination of the agreement, that it might
22     owe money to Lehman?
23  A  That is correct.
24  Q  And so the fact that PFM indicated that as of this date

Page 34

BOB COOK

1      it might owe $1.2 million, that was something that could
2      be expected?
3   A  Yes.
4   Q  And prior to this call, which was on September 19th,
5      2008, a few days after Lehman's bankruptcy, had TSA
6      received any other valuations of the reserve fund
7      agreement from PFM or anyone else?
8   A  No.
9   Q  So from the date of Lehman's bankruptcy on
10     September 15th, 2008, to September 19th, 2008, you had no
11     indication as to the value of the reserve fund agreement?
12  A  That is correct.
13  Q  Now showing you a document that's been marked as Lehman
14     Exhibit 8, which is a multipage document Bates-stamped
15     TSA 24147 through 24150, and it appears to be an email
16     from you to Debra Stephenson, dated November 17th, 2008,
17     at the top, forwarding chain and an attachment to one
18     of the emails.
19     Do you recognize this document?
20  A  Sure.  Yes.
21  Q  And in the middle of the first page, there's an email
22     from Roan Blacker to Kim Herman, Bob Cook, and others,
23     that says, "Attached is the valuation calculation that
24     was forwarded back to Bob."

Page 35

BOB COOK

1      Do you see that?
2   A  Uh-huh.
3   Q  And does "Bob" refer to you?
4   A  I presume so.
5   Q  And it says the termination value is $1,237,902 owed to
6      Washington TSA.
7      Do you see that?
8   A  I do.
9   Q  And he's underlined the word "to."
10  A  That is correct.
11  Q  And do you recall TSA receiving this valuation from PFM
12     on or about November 12th, 2008?
13  A  Yes.
14  Q  And tell me how this valuation was determined by PFM.
15  A  PFM performed the valuation.  I believe it was with data
16     that -- after kind of the financial markets had settled
17     down a little bit, and they really had time to actually
18     do a valuation.
19     As you see, there wasn't a document that we could
20     find related to the prior number of $1.2 million the
21     other direction.  This was the product that they
22     produced.  This shows November 10th of 2008, the amount
23  Q  And did you ask, in connection with the prior valuation,
24     to get some backup for it?

Page 36

BOB COOK

1   A  I don't recall that we did.
2   Q  And can you explain to me the methodology that PFM has
3      used here to value the reserve fund agreement?
4   A  They have used LIBOR over a period of time, in
5      projections going forward, and a spread, to come up with
6      a yield, present valued it, and compared that to the
7      guaranteed rate of return.
8   Q  And what is LIBOR?
9   A  London Interbank Offering Rate.
10  Q  And you said they used projections of LIBOR?
11  A  Because these are dates in the future, it had to be
12     projections.
13  Q  And do you know how they determined those projections?
14  A  I do not.
15  Q  And did you ask anybody?
16  A  I did not.
17  Q  Either at the time of this valuation or now?
18  A  No.
19  Q  Okay.  And you said that they used a spread to these
20     projections rates?
21  A  That is correct.  It's a consistent ten basis points.
22  Q  And so they added ten basis points to that projected
23     LIBOR rate?
24  A  Again, the numbers are small.  I have to make sure that

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

BOB COOK

2  they've been added, and it appears that they have been.
3  Q  And did you say they added ten basis points?
4  A  That's what's in the column that says "Spread to LIBOR
5     curve."
6  Q  So that 0.10 percent is ten basis points?
7  A  That is correct.
8  Q  And then they -- then you said that they compared that
9     yield with the guaranteed rate?  Is that what -- I'm just
10    trying to make sure I recall what you said correctly.
11 A  That's what my presumption is.  I'm going to need to do
12    math in order to prove that to myself.  I should have
13    brought glasses.  Sorry.  I don't usually use this
14    calculator, so . . .
15 Q  I don't have a better one to offer you.
16 A  Actually, the ten basis points doesn't appear to have
17    been added to that rate.  It's a variable factor that
18    goes into the calculation, but I -- I can't see how it's
19    been used here.
20 Q  So you don't know how the spread to LIBOR has been used
21    here?
22 A  Not specifically without doing some additional work.
23 Q  And you understood that you've been designated to testify
24    here today on behalf of Washington TSA?
25 A  I do understand that.

BOB COOK

2  Q  Regarding the valuations of the reserve fund agreement?
3  A  I do understand that.
4  Q  In preparation for your deposition here today, did you
5     review this valuation of the reserve fund agreement that
6     had been performed by PFM?
7  A  I did not.
8  Q  So do you know what methodology PFM is using to value the
9     reserve fund agreement on or about November 10th, 2008?
10 A  In general terms, yes.
11 Q  Okay.  What's TSA's general understanding?
12 A  That -- again, that they have used future values expected
13    to be earned based upon LIBOR, compared that to the
14    guaranteed rate, come up with the difference, present
15    valued that, and totaled the factors, to come to a
16    1.2 million owed to the TSA.
17 Q  And why would PFM determine the future values expected to
18    be earned, and compare that against the guaranteed rate?
19 A  In order to determine the amount -- the value of the
20    agreement at that point in time, since the agreement was
21    no longer in place, that there were going to be lost
22    earnings.
23 Q  Fair enough.
24    Why is that the appropriate methodology to use to
25    value the termination amount?

BOB COOK

2  A  It is a methodology.  I wouldn't say it's the appropriate
3     one.  There are many different ways that can be
4     considered to come up with an estimate of what the future
5     losses might be.  And again, because these contain future
6     projections of rates, it has projections in it.
7  Q  Why did PFM believe that this was the appropriate method
8     to value the reserve fund agreement?
9  A  PFM could answer that question.
10 Q  Did you ask PFM why they used this methodology to perform
11    the valuation of the reserve fund agreement in
12    November 2008?
13 A  I do not recall that I did.
14 Q  And did you ask PFM recently why they used this
15    methodology to value the reserve fund agreement?
16 A  I did not.
17 Q  Not in preparation for today's deposition?
18 A  I did not.
19 Q  And do you know why PFM has dates running all the way
20    through 2042?
21 A  Because that was the term through which the initial
22    agreement was documented.
23 Q  But the agreement was amended shortly after execution;
24    correct?
25 A  It was.

BOB COOK

2  Q  Providing for a shortened period through 2032?
3  A  That's correct.
4  Q  But PFM used a period through 2042?
5  A  They did.
6  Q  And do you know why?
7  A  Because -- I can make a presumption.  I can't know why.
8  Q  Did you -- when you received this valuation from PFM, did
9     you advise them that they had conducted the analysis
10    through 2042 instead of 2032?
11 A  I did not.
12 Q  Did you ask them to address or correct that?
13 A  I did not.
14 Q  At any time?
15 A  Not this -- not this projection, no.
16 Q  In between the valuation that we looked at from
17    September of 2008 and this valuation in November of 2008,
18    did Washington TSA receive any other valuations of the
19    reserve fund agreement?
20 A  None that I can recall.
21 Q  From PFM or anyone else?
22 A  I don't remember when we got our first valuation, when we
23    engaged Swap Financial, so --
24 Q  It might have been during this period?
25 A  I'd need to look at the documents.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 41

BOB COOK

1
2  Q  At any time during this period, up until November 10th,
3     2008, did Washington TSA, itself, perform a valuation of
4     the reserve fund agreement?
5  A  No.
6  Q  At any time has Washington TSA, itself, performed a
7     valuation of the reserve fund agreement?
8  A  No.
9  Q  And why was PFM valuing the reserve fund agreement at
10    this time?
11 A  PFM was our financial advisor on the transaction from the
12    initial point of time when we started to enter into the
13    bond transaction, so they were our financial advisor.
14 Q  Since 2002, roughly?
15 A  That's correct.
16 Q  Okay.  And in fact, PFM had bid out the reserve fund
17    agreement when it was placed in 2002; correct?
18 A  That is correct.
19 Q  And after receiving -- strike that.  I'm going to move
20    on.
21           THE WITNESS:  Can I get some water?
22           MS. SAWYER:  Absolutely.
23           MS. EVANSON:  You know, this would be
24    great time to take just like a two-minute bathroom break,
25    if you don't mind.

Page 42

BOB COOK

1
2           (Recess from 10:20 a.m. to
3             10:25 a.m.)
4           EXAMINATION (Continuing)
5  BY MS. SAWYER:
6  Q  I have a couple more questions on the last document we
7     were looking at.
8  A  Okay.
9  Q  Do you know why PFM used spread to LIBOR to compare it to
10    the guaranteed rate?
11 A  By "spread to LIBOR," you mean the ten basis points?
12 Q  Sure.
13 A  Well, that's what's shown here, so is that what you are
14    asking?
15 Q  You had indicated they had used spread to LIBOR to
16    compare to the guaranteed rate, and so I'm asking why
17    they used the spread to LIBOR.
18 A  A spread to LIBOR is often used because a future
19    valuation does not trade directly with LIBOR because of
20    credit risk and some other factors in the market.  So
21    they have chosen a ten basis points variance here.
22 Q  And why did they choose a ten basis points variance?
23 A  This is their calculation.  I generally know that they
24    performed the calculation, but we hired them as experts
25    to do it.  They may have explained it at the time, but I

Page 43

BOB COOK

1
2     don't recall the reason.
3  Q  And they performed this valuation for Washington TSA;
4     correct?
5  A  They provided it to us, yes.
6  Q  They didn't perform it for you?
7  A  Can you explain the distinction?
8  Q  I had asked the question and you made that distinction in
9     your answer, so why did you make that distinction?
10          Can you read it back, please?
11              (Question on Page 43, Line 3
12               read by the reporter.)
13          MS. SAWYER:  And the answer?
14              (Answer on Page 43, Line 5,
15               read by the reporter.)
16          THE WITNESS:  They provided it for us.
17 Q  (By Ms. Sawyer)  They did not perform it for Washington
18    TSA?
19 A  They performed it.  We have it.
20 Q  And they were engaged as your experts at the time?
21 A  They were.
22 Q  And did you, at the time, ask them why they used a spread
23    to LIBOR of ten basis points?
24 A  I don't recall asking that question.
25 Q  And in preparation for today's deposition, did you

Page 44

BOB COOK

1
2     inquire as to why they used a spread to LIBOR of ten
3     basis points?
4  A  I did not.
5  Q  And do you have any understanding at all why they used a
6     spread to LIBOR of ten basis points?
7  A  I believe I explained that earlier.  If you could read
8     that back, please.
9  Q  I'd rather not have things read back.  To be --
10 A  Well, I had answered the question.
11 Q  This is a process which you may find frustrating --
12 A  I do.
13 Q  -- but I get to ask the questions and you get to answer
14    them.
15 A  Okay.
16 Q  So my question is, do you have an understanding as to why
17    they selected ten basis points as the spread to LIBOR to
18    use?
19 A  I do not know specifically why they used ten basis
20    points.
21 Q  You answered earlier that you would use a spread to
22    incorporate things such as credit or profit?
23 A  That is correct.
24 Q  But you don't know particularly why PFM selected ten
25    basis points?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 45

BOB COOK

1    A  I do not.
2    Q  And you didn't inquire, in preparation for today's
3       deposition?
4    A  I did not.
5    Q  And do you know why PFM used LIBOR as the base rate?
6    A  I need to refer back to the agreement to see if LIBOR was
7       mentioned in the agreement.  If it wasn't, then LIBOR is
8       typically a rate that is used in this kind of
9       calculation.
10   Q  And is that your assumption, or did you discuss that with
11      PFM?
12   A  We would have had general discussions about this process
13      at the -- in 2008, when this was performed.  I have not
14      refreshed that memory.
15   Q  And in 2008, when PFM did this calculation, what do you
16      recall of those discussions with PFM regarding these
17      calculations?
18   A  Very little specifically, other than the documentation
19      that is here that shows the two dates when they did these
20      different calculations, the fact that they had given us a
21      $1.2 million number shortly after the bankruptcy, and
22      this 1.3 that was to the TSA later.
23   Q  So the first number they gave you was Washington paying
24      $1.2 million, and the second number was Lehman paying

Page 46

BOB COOK

1       approximately $1.2 million?
2    A  Correct.
3    Q  So a difference of roughly $2 + million?
4    A  Correct.
5    Q  And do you recall any aspects of that change in
6       valuation -- let me start that question again.
7          Do you recall discussions in 2008 with PFM about
8       that change in valuation?
9    A  I don't recall specific discussions.
10   Q  Do you recall generally discussing that topic with P- --
11   A  I do recall generally discussing the fact that the
12      interest rate environment had somewhat stabilized from
13      the spikes that were occurring right after the time of
14      the Lehman bankruptcy and the disruption of the financial
15      markets.
16   Q  And recall that being a discussion that you had with PFM?
17   A  In general, with the finance team, which includes PFM.
18   Q  I'm now showing you a document that's been previously
19      marked as Lehman Exhibit 12, which is a multipage
20      document Bates-stamped LBHI_WTSA 16384 through 16389.
21      And it appears -- it's titled a Declaration of Peter
22      Shapiro, which goes on, and appears to be a court filing.
23         Have you seen this document before?
24   A  I have.

Page 47

BOB COOK

1    Q  And when have you seen this before?
2    A  At the time that it was filed and subsequent to that.
3    Q  And were you -- did you review it at the time it was
4       filed?
5    A  Yes.
6    Q  Did you review it before it was filed?
7    A  Yes.
8    Q  Did you provide any comments on it before it was filed?
9    A  I don't recall specific comments.  If I did, they were in
10      general terms.
11   Q  And who is Peter Shapiro?
12   A  Peter Shapiro is the principal at Swap Financial Group.
13   Q  And how -- scratch that.
14         Let's turn to Paragraph 7 -- or Paragraph 3 of the
15      document.  It indicates that SFG has been retained to
16      assist the Washington State Tobacco Settlement Authority,
17      TSA, in connection with the above-captioned bankruptcy
18      cases.
19         How did Peter -- how did SFG come to be retained to
20      assist the Washington TSA in connection with these --
21      this bankruptcy case?
22             MS. EVANSON:  And I'm going to object.
23      This is a topic that's been designated for Kim Herman.
24      Retention of the Swap Financial is outside the scope of

Page 48

BOB COOK

1       valuation.
2    Q  (By Ms. Sawyer)  We'll go to Paragraph 7 then.  It says,
3       As of January 12th, 2009, LBSF was, quote, out of the
4       money under the RFA.
5          Do you understand what it means to be "out of the
6       money"?
7    A  Yes, I do.
8    Q  And what's that mean?
9    A  That means that Lehman Brothers owed the TSA in this
10      case.
11   Q  Okay.  And it goes on, it says, And if the RFA was
12      terminated on January 12th, 2009, the, quote, termination
13      amount owed to TSA under the RFA would be roughly
14      $27.5 million.
15         Do you see that?
16   A  I do.
17   Q  And how did Mr. Shapiro reach that valuation, that it
18      would be roughly $27.5 million?
19   A  We had asked him to perform this calculation, and this
20      was the result of his calculation.  Similar to the ones
21      that had been done before by PFM.
22   Q  And it is your understanding that Mr. Shapiro used the
23      same methodology that PFM had used?
24   A  It may not have been exactly the same methodology, but it

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 49

BOB COOK

1
2  was using a methodology that is industry accepted as --
3  as determining what a termination amount would be.
4  Q  And what methodology did Mr. Shapiro and Swap Financial
5      Group use in January 2009 to perform this calculation?
6  A  I don't have a word to describe it, but it's in the
7      document that he's provided.
8  Q  And there was a document created in or about January 2009
9      that supported this document- -- this valuation?
10 A  It certainly seems that there must be.
11 Q  And do you, on behalf of TSA, recall reviewing a document
12     that Mr. Shapiro or Swap Financial Group had prepared in
13     January 2009 supporting this valuation of $27.5 million?
14 A  I don't recall the document specifically, but I'm sure
15     I've seen it.
16 Q  Okay.  And do you recall reviewing that in preparation
17     for your deposition here today?
18 A  I don't recall the specific document.
19             MS. SAWYER:  I don't think that we've
20     been provided any documents that support this valuation,
21     so I'd just note for the record that I'd make a request
22     that those documents be produced.
23 Q  (By Ms. Sawyer) Did Mr. Shapiro, in preparing this
24     valuation, review the valuations that had been performed
25     by PFM?

Page 50

BOB COOK

1
2             MS. EVANSON:  And I'm going to object.
3      That is also outside of the scope.  Calculation of the
4      termination amount, Peter Shapiro's been designated for
5      that under 5B.
6             MS. SAWYER:  Well, this is a valuation
7      of the reserve fund agreement, which is Topic 1E.
8             MS. EVANSON:  Right.  But this is --
9      you're asking the basis and the methodology for the
10     calculation, which is listed in Paragraph 7 as
11     termination amount.
12            MS. SAWYER:  Okay.  I mean, I think
13     that you've designated Mr. Cook to testify as to the
14     valuations of the reserve fund agreement.  This is --
15            MS. EVANSON:  Sure.
16            MS. SAWYER:  -- a valuation of the
17     reserve fund agreement.  You could have designated
18     Mr. Shapiro to testify as to this as well, and you did
19     not.  And so I think it's fair for me to explore the
20     basis of -- of Washington TSA's understanding of the
21     valuations of the reserve fund agreement with this
22     designee.
23            MS. EVANSON:  I'm just saying, to the
24     extent we're getting into calculations, I believe that's
25     covered under another topic, for which Mr. Shapiro's been

Page 51

BOB COOK

1
2  designated.
3  Q  (By Ms. Sawyer)  Was it your understanding that --
4      Mr. Cook, that you were not going to discuss how the
5      valuations were determined?
6  A  As far as the technical aspects of the valuations, I was
7      not under the impression that I was speaking to that.
8  Q  At the time this number was created by Swap Financial
9      Group, did Washington TSA inquire as to how the valuation
10     was made?
11 A  I am sure that we reviewed the assumptions that were made
12     in this valuation.
13 Q  Okay.  And your recollection is that those assumptions
14     were provided to you in written form; correct?
15 A  I can't say that for sure.
16 Q  This number is substantially more than the PFM number
17     that we had just seen; correct?
18 A  It is.
19 Q  And what's the explanation for the increase?
20 A  Primarily because the environment continued to evolve
21     very quickly after the Lehman Brothers bankruptcy.  As
22     you can see, within a period of a couple months, the
23     amount of the valuation had changed $2 + million, and
24     credit continued to be tightening.
25             Availability of agreements such as this evaporated

Page 52

BOB COOK

1
2  as a result of the bankruptcy, again distorting the
3      market very significantly.  And in fact, to the point
4      that sometimes other alternatives had to be used instead
5      of actual bidding of an agreement because bids could not
6      be obtained.
7       So the market continued to evolve very dramatically
8      over the six months or so after the fact.
9  Q  So between November 10th, 2008, and January 12th, 2009,
10     the market had changed so dramatically that the valuation
11     changed from $1.2 million, approximately, to
12     $27.5 million?
13 A  That's correct.
14 Q  And that was primarily due to a change in interest rates?
15 A  Interest rates.  There was also credit spread.  Factors
16     in the tobacco market, because there was so much
17     disruption, tobacco was also priced at a very different
18     rate, such that that risk exacerbated this kind of change
19     as well.
20 Q  And so --
21 A  So there were a number of factors involved.
22 Q  I apologize.
23     So during the two months between November 10th,
24     2008, and January 12th, 2009, the interest rates changed
25     dramatically, as well as a tightening in the tobacco

13  (Pages 49 to 52)

Page 53

BOB COOK

1
2   credit market, and that is what results in this
3   valuation?
4   A   There is also the fact that credit was much less
5   available by banks.  There was much less lending going
6   on.  So the general interest rate environment had changed
7   dramatically as well.
8   Q   And that impact -- was impacted in the general interest
9   rate environment, you said?
10  A   It -- yes.  It impacted all interest rates basically, but
11  that's what I meant by "general."
12  Q   And when you received the valuation from Swap Financial
13  Group of $27.5 million, did you discuss it with
14  Mr. Shapiro or someone else from Swap Financial Group?
15  A   I'm sure that we reviewed that with a group of us, yes.
16  Q   And did you discuss with Swap Financial Group the
17  difference between the prior valuation that TSA had
18  received?
19  A   In the -- I don't know if we discussed the exact
20  25 point -- no, $26.3 million difference, but we
21  definitely discussed factors that made the market change,
22  and that was exacerbating changes in this kind of
23  valuation.
24  Q   And what was that discussion?
25  A   I believe I -- the kinds of things that I had mentioned

Page 54

BOB COOK

1
2   before:  interest rate environment changing; credit in
3   general being much less available to all kinds of
4   entities; the fact that tobacco market spreads in the
5   bond market for tobacco markets was changing dramatically
6   as well.  All of those were factors that were
7   contributing to this kind of change.
8   Q   Do you recall anything else being discussed that
9   contributed to the difference in valuation?
10  A   I don't recall other things.  There may be -- may have
11  been other things discussed.
12  Q   But sitting here today, you don't recall?
13  A   I don't recall.
14  Q   And do you know whether Swap Financial Group, in
15  preparing this January 12th, 2009, valuation, used a
16  spread to LIBOR that they compared against the guaranteed
17  rate?
18  A   I believe that they did.
19  Q   And do you know why Swap Financial Group used a spread to
20  LIBOR methodology to come up with a valuation for the
21  reserve fund agreement?
22  A   I don't recall that specifically.
23  Q   Okay.
24  A   I don't recall the specifics of the calculation.  I
25  recall the general discussion about the calculation.

Page 55

BOB COOK

1
2   They're the experts.  We hired them to do the
3   calculations.
4   Q   But you understood that they were using a spread to LIBOR
5   calculation at this time, in January 2009?
6   A   Actually, without seeing the document, I can't recall
7   what it -- what it is or was.
8   Q   It may have been, but it may not have been?
9   A   I don't recall.
10  Q   Okay.  And in preparation for today's testimony, did you
11  inquire as to the methodology used to calculate the
12  $27.5 million valuation?
13  A   I did not specifically, no.
14  Q   Do you know what the spread number of the spread to LIBOR
15  was in reaching this calculation in January 2009?
16  A   I don't.
17  Q   Did you inquire at the time, in 2009, as to what the
18  spread to LIBOR was that was being used?
19  A   I don't recall.
20  Q   Okay.  And in preparation for today's testimony, did you
21  ask what the spread to LIBOR that was being used in
22  terms -- to reach this January 2009 valuation?
23  A   I did not.
24  Q   In between November 10th, 2008, and this valuation in
25  January 12th, 2009, did TSA receive any other valuations

Page 56

BOB COOK

1
2   of the reserve fund agreement?
3   A   I do not recall that there were.
4   Q   And did TSA, itself, perform any valuations of the
5   reserve fund agreement --
6   A   No.
7   Q   -- during that time period?
8       I'm now showing you a document that's been marked as
9   Lehman Exhibit 15, which is Bates-stamped TSA 21616
10  through 21618.  It appears to be a memorandum from Swap
11  Financial Group to Bob Cook, dated April 21st, 2009.
12      Do you recognize this document?
13  A   Yes.
14  Q   Is it fair to say, this contains a valuation of the
15  reserve fund agreement prepared by Swap Financial Group
16  on or about April 21st, 2009?
17  A   Yes.
18  Q   And the valuations reflected in this memorandum are
19  prepared as of two valuation dates; correct?
20  A   That is correct.
21  Q   October 2nd, 2008, and March 25th, 2009?
22  A   That's correct.
23  Q   Do you understand the methodology that Swap Financial
24  Group used in calculating the termination amounts
25  reflected in this memorandum?

14  (Pages 53 to 56)

Page 57

BOB COOK

1
2  A  As it's described in the memorandum, yes.
3  Q  And tell me your general understanding of the methodology
4     used by Swap Financial Group as reflected in this
5     memorandum.
6  A  I'll need to review it a little bit.
7  Q  Fair enough.
8  A  And could you restate your question?
9  Q  Tell me your general understanding of the methodology
10    used by Swap Financial Group as reflected in this
11    memorandum.
12 A  As described in this memo, the method that they used was
13    to look at a similar kind of a swap transaction, even
14    though this wasn't a swap transaction, where Lehman would
15    pay a fixed rate, while we would be paid a floating rate.
16       They did use a LIBOR plus spread analysis. We know
17    the fixed rate, obviously leg. The floating rate should
18    represent the value of the securities to be delivered.
19    Then there are a number of factors that are identified:
20    commercial paper spreads, changes in the municipal
21    tobacco credit, and of course there was a profit
22    component figured into the agreement as well, in order to
23    use those variables to calculate the loss.
24 Q  Would it be fair to say that Swap Financial Group was
25    essentially comparing the guaranteed rate to a rate that

Page 58

BOB COOK

1
2     was generated by some sort of spread to LIBOR?
3  A  Well, that's a particular factor that they mention, but
4     there are also other factors involved here.
5  Q  What other factors --
6  A  Commercial paper spreads, changes to the municipal
7     tobacco market, all of these things factor in and make a
8     difference in the way that the calculation is done
9     because events change over time.
10 Q  And are those factors incorporated into the spread to
11    LIBOR analysis, or are they separate from that?
12 A  They're enumerated in the table that's shown on Page 3.
13 Q  And so that table on Page 3, that total column, is that
14    the total spread to LIBOR?
15 A  It's a spread from what -- yes, it is.
16 Q  And so --
17 A  As described in the paragraph below the table.
18 Q  And so the table contains headings titled "CP Spread,"
19    "Credit Spread," and "Profit"; correct?
20 A  That is correct.
21 Q  It appears that those spreads are totaled to reach a
22    final spread to LIBOR; correct?
23 A  That is correct.
24 Q  And so those individual factors, such as commercial
25    paper, credit, and profit, those are incorporated into

Page 59

BOB COOK

1
2     the spread to LIBOR?
3  A  That is correct.
4  Q  The total column, that reflects the spread to LIBOR that
5     Swap Financial Group was using on each of these valuation
6     dates?
7  A  According to the statement in the paragraph below that,
8     that's correct.
9  Q  So in terms of basis points, on October 2nd, 2008, the
10    basis points for the spread to LIBOR would be 137.1 basis
11    points; correct?
12 A  That's correct.
13 Q  And for March 25th, 2009, it would be 387.4 basis points?
14 A  That's correct.
15 Q  Those numbers are each in parentheses. Does that have
16    any significance?
17 A  That means that the effect is positive to the Tobacco
18    Settlement Authority.
19 Q  Or in other words, the spread to LIBOR would be a
20    negative spread to LIBOR?
21 A  That's correct.
22 Q  When you received this memorandum -- I'm sorry.
23       Did you receive this memorandum on or about
24    April 21st, 2009?
25 A  Yes.

Page 60

BOB COOK

1
2  Q  When you received this memorandum, did you discuss it
3     with Swap Financial Group?
4  A  I'd have to review my calendar, but I presume that we
5     probably did, yes.
6  Q  Who would you have discussed it with at Swap Financial
7     Group?
8  A  Peter.
9  Q  Okay. And --
10 A  Perhaps others on his team.
11 Q  The authors of the memorandum are Peter Shapiro and James
12    Vergara.
13       Do you see that?
14 A  I do.
15 Q  Do you recall discussing the valuation with Mr. Vergara?
16 A  I don't recall specifically. Peter was the primary
17    person on the account, the person that we most identified
18    with.
19 Q  And do you know who at Swap Financial Group actually
20    performed the calculations reflected in this memorandum?
21 A  I don't.
22 Q  Do you know if it was Mr. Shapiro or Mr. Vergara?
23 A  I don't.
24 Q  Do you know Mr. Vergara's experience?
25 A  I remember that he was experienced in this kind of

15 (Pages 57 to 60)

Page 61

BOB COOK

1
2  transaction, and I'd have to speculate beyond that
3  because I don't recall specifically without seeing a
4  resume.
5  Q  Who told you that he was experienced in this type of
6     transaction?
7  A  Mr. Shapiro.
8  Q  Were you aware that this was the first RFA that
9     Mr. Vergara had ever valued?
10 A  No.
11 Q  Were you aware that this was the first RFA that Peter
12    Shapiro had ever valued?
13 A  No.
14 Q  If you look at the first page of the memorandum --
15 A  Uh-huh.
16 Q  -- in the end of the second paragraph, it says, "Under
17    the RFA, which had a scheduled termination date of
18    May 30, 2042, the final scheduled bond payment date per
19    Exhibit A of the RFA, LBSF provided TSA with a guaranteed
20    rate of return of 4.484 percent."
21       Do you see that?
22 A  I do.
23 Q  Do you know if Swap Financial Group performed this
24    analysis assuming a scheduled termination date of the RFA
25    as May 30th, 2042?

Page 62

BOB COOK

1
2  A  It's my presumption that they do because that's the date
3     that they mention there.
4  Q  In fact, the RFA was amended to replace Exhibit A,
5     showing a scheduled termination date of May 30th, 2032;
6     correct?
7  A  Right.
8  Q  Do you know -- did you discuss that with Swap Financial
9     Group, that the actual term of the agreement was through
10    2032?
11 A  Not at this time.
12 Q  At some point you did?
13 A  Yes.
14 Q  But these numbers reflected in this memorandum would be
15    through 2042; correct?
16 A  They mention that the scheduled term and -- is May 30th
17    of 2042.  So yes, I presume that is the date that they
18    used.
19 Q  If you go down -- still on the first page, to the
20    beginning of the fourth paragraph, it says, "In order to
21    calculate TSA's loss we begin by analyzing the RFA cash
22    flows."
23       Do you see that?
24 A  Uh-huh.
25 Q  What cash flows are there under the RFA?

Page 63

BOB COOK

1
2  A  Under the terms of the agreement, we would have received
3     4.84 percent on the principal amount in the reserve fund
4     agreement on a monthly basis through the termination --
5     or through the end date of the agreement.
6  Q  And were there any other cash flows contemplated by the
7     agreement?
8  A  Not that I recall.
9  Q  Were there cash flows as reflected in Mr. -- I'm sorry --
10    reflected in Swap Financial's analysis of going towards
11    Lehman?
12 A  Could you rephrase the question?
13 Q  In Swap Financial's analysis, do they contemplate two
14    series of cash flows, one going to Washington TSA and the
15    other going to Lehman?
16 A  In terms of the fact that this is being looked at as a
17    swap transaction as an alternative method to value it,
18    yes, there would be.  Because the fixed rate would be
19    going to the TSA; the variable rate side of the, in
20    essence, swap transaction, as a marker for the RFA, in
21    terms of valuation, would go to Lehman, the variable
22    rate.
23 Q  And what does the variable rate going to Lehman reflect?
24 A  A current market rate for their ability to invest those
25    dollars.

Page 64

BOB COOK

1
2  Q  And where did you get that understanding?
3  A  That's just a general understanding that I have.
4  Q  Not from discussions with Swap Financial Group?
5  A  Well, that's the way swaps work, and this mentions that
6     it's looking at a -- as a swap transaction.
7  Q  Fair enough.
8        I'm just trying to understand if it's your personal
9     understanding or something that you were told.
10 A  And it mentions it specifically in here, that it's looked
11    at with the fixed rate going to the Tobacco Settlement
12    Authority and Lehman being the party that would get the
13    variable rate.
14 Q  A little bit later in that same paragraph, at the bottom
15    of Page 1, it says, "The scheduled term of the RFA
16    extended through May 30, 2042, though the agreement could
17    have been terminated prior to that date, in the event
18    that TSA's tobacco settlement securitization bonds are
19    redeemed prior to their scheduled maturities."
20       Do you see that?
21 A  I do.
22 Q  And was there an intention on the part of TSA to redeem
23    the tobacco settlement securitization bonds prior to
24    their scheduled maturity?
25 A  We were using all revenues that we received pursuant to

16  (Pages 61 to 64)

Page 65

BOB COOK

1
2      our agreement with the State of Washington to pay off the
3      bonds as quickly as possible.
4    Q   And indeed, at the time the bonds were issued, they were
5      projected to be fully redeemed by 2019?
6    A   I believe that's correct.
7    Q   And TSA was diligently trying to pay off those bonds as
8      quickly as possible, given the revenues it received?
9    A   Absolutely.
10   Q   And do you agree with the statement that the agreement
11     could have been terminated if the bonds were redeemed
12     prior to their scheduled maturity?
13   A   If they had been redeemed in total, yes.
14   Q   Okay.  And do you know how that was factored into the
15     valuation done by Swap Financial Group?
16   A   I don't know that it was relevant to the valuation
17     because the terms of the agreement were to 2032.
18   Q   Did you discuss with Swap Financial Group if it had
19     factored in the potential early redemption of the bonds?
20   A   I believe this clearly doesn't factor that in.
21   Q   Setting aside this memorandum, did you have discussions
22     on or about April 2009 about whether the valuation should
23     reflect this potential early redemption of the bonds?
24   A   I don't recall.  We have discussed a number of times what
25     the possible payoff date of the bonds would be.  It

Page 66

BOB COOK

1
2      continued to extend because tobacco smoking is down, the
3      revenues that we projected to receive continue to fall.
4      So the payoff was stretching out further and further and
5      further, as was disclosed a number of times, in a number
6      of ways, to a number of different parties.
7          Peter was probably aware of that, but I believe, at
8      this point in time, we determined that the termination of
9      the agreement was, at this point in time, we thought,
10     2042.  Subsequently we did realize the mistake and it was
11     2032.  And so the valuation was done to the termination
12     of the agreement.
13   Q   Do you recall, in April 2009, discussing that explicitly
14     with Swap Financial Group, that you were going to value
15     the agreement through the stated maturity date and not
16     factor in any potential early bond redemption?
17   A   I know that we discussed valuing through the term- --
18     through the maturity date.  I don't recall if we talked
19     about earlier dates or not.
20   Q   Okay.  At any point have you had discussions with Swap
21     Financial Group about valuing the reserve fund agreement
22     by taking into account the potential early redemption of
23     the bonds?
24   A   I don't recall specifically.
25   Q   You don't recall having that conversation?

Page 67

BOB COOK

1
2    A   I don't recall specifically having that conversation.
3    Q   And this is dated April 2009.  Between January 2009, the
4      last document we looked at, and this one, did TSA receive
5      any additional valuations of the reserve fund agreement?
6    A   Not that I recall.
7    Q   Okay.  And TSA did not have anybody else do --
8    A   No.
9    Q   -- calculations of the reserve fund agreement between
10     January and April 2009?
11   A   No.
12   Q   At any point in time, has the Tobacco Settlement
13     Authority, either itself or one of its advisors,
14     calculated how much TSA would have earned if it had
15     received 4.484 percent for every period through 2032?
16   A   Well, we know that the amount per month was about
17     $170,000, as I recall, so you can extrapolate from there.
18   Q   So has that calculation been done, $170,000 a month
19     through 2032?
20   A   Whether it's been done specifically or not, I don't
21     recall.
22   Q   Do you rough---
23   A   I certainly have it in a spreadsheet.
24   Q   Do you know --
25   A   I could multiply.

Page 68

BOB COOK

1
2    Q   Do you know, sitting here today, roughly how much that
3      is?
4    A   I don't.
5    Q   And that 170,000 -- is that correct?
6    A   I believe that's correct.
7    Q   No, no.  I just wanted to make sure I didn't say the
8      wrong number.  You said 170,000?
9    A   I said 170,000, although I'd have to refer to a document
10     to be absolutely sure of the dollar amount.
11   Q   If you were to take $170,000 a month for every period
12     through 2032, you would need to discount that to present
13     value to know a present value of --
14   A   Sure.
15   Q   -- that loss; correct?
16   A   That is correct.
17   Q   But you don't recall anyone actually doing that
18     calculation for you?
19   A   I don't recall anyone doing it, no.
20   Q   Do you know if Swap Financial Group has ever done that
21     calculation, itself?
22   A   I have no idea.
23   Q   They haven't told you that number?
24   A   No.
25   Q   I'm now showing you a document that's been marked as

17  (Pages 65 to 68)

Page 69

BOB COOK

1
2  Lehman Exhibit 19, which appears to be a September 10th,
3  2009, memorandum from Swap Financial Group to Bob Cook.
4  Its Bates stamp is LBHI_WTSA 16814 through 16816.
5    And have you seen this document before?
6  A  Yes.
7  Q  And you recall this document?
8  A  Yes.
9  Q  And did you receive it on or about September 10th, 2009?
10 A  Yes.
11 Q  Did you review it at the time?
12 A  Yes.
13 Q  If you look at the last document we were looking at,
14   Lehman Exhibit 15, it's substantially similar to that
15   document; correct?
16 A  In terms of layout and factors, yes.
17 Q  And the major difference -- and you can certainly review
18   them, but the major difference is, the September 10th,
19   2009, memorandum, is only done as of one valuation date,
20   as opposed to two valuation dates?
21 A  That's correct.
22 Q  The October 2nd, 2008, valuation date's been removed?
23 A  That's correct.
24 Q  Do you know why that valuation date was removed?
25 A  Yes.  Because, as of March 25th, 2009, we agreed, and

Page 70

BOB COOK

1
2  through the bankruptcy court had a termination of the
3  agreement effective that date.
4  Q  Okay.  And that was effective as of March 25th, 2009;
5    correct?
6  A  That's correct.
7  Q  Prior to the preparation of the first memorandum by Swap
8    Financial Group; correct?
9  A  It would have been, yes.
10 Q  So why are there two valuation dates reflected in the
11   April 21st, 2009, Swap Financial Group memorandum?
12 A  I believe, if I recall, that the -- October 2nd is the
13   date of the bankruptcy filing of the second Lehman
14   guaranteeing entity.
15 Q  It's the -- actually, I think, the day before the
16   bankruptcy of LBSF, the --
17 A  Okay.  Yeah, the second entity.
18 Q  Do you know why that valuation date is included in the
19   April 21st, 2009, memorandum?
20 A  Had we not had a -- had we had an initial termination
21   date of that date, that would have been the value then,
22   if, for some reason, we had to value it at that point in
23   time.  But then we determined that the true termination
24   of the agreement was March 25th, 2009, so that was the
25   appropriate date to use.

Page 71

BOB COOK

1
2  Q  And at the start of the April 21st memorandum, it says,
3    "Per your request."
4      Do you see that?
5  A  Uh-huh.
6  Q  Did you request Swap Financial Group conduct this
7    valuation reflected in the April 21st, 2009, memorandum?
8  A  Yes.
9  Q  Okay.  And did you request that Swap Financial Group
10   conduct the valuation as of those two valuation dates?
11 A  I believe that I did.
12 Q  Okay.  And then the second memorandum, the
13   September 10th, 2009, memorandum, also starts, "Per your
14   request."
15     Do you see that?
16 A  Uh-huh.
17 Q  And did you then request that they only conduct the
18   valuation as of one valuation date?
19 A  Well, it's the same calculation and so on, and I believe
20   that we had a determination by counsel, and our consensus
21   at that point in time, that the true termination date was
22   the date for -- that was appropriate for the calculation.
23   The other had been speculative and was no longer
24   relevant.
25 Q  So between April 21st, 2009, and September 10th, 2009,

Page 72

BOB COOK

1
2  there had been a legal decision or something else --
3  A  Yes.
4  Q  -- indicating that March 25th was the appropriate
5    valuation date?
6  A  That's correct.
7  Q  And there's also an additional section in the
8    September 10th, 2009, memorandum.  At the very end, it
9    says, "Cost of nonperformance."
10 A  Uh-huh.
11 Q  Can you tell me what the cost of nonperformance is?
12 A  This is the actual losses sustained by the Authority that
13   were demonstrated by the results of actual investment
14   versus what would have been earned, had the agreement
15   stayed in place as it was supposed to be.
16 Q  And actual losses up and until March 25th, 2009?
17 A  That's what it states, yes.
18 Q  And after that point, there is no calculation as to
19   actual loss?
20 A  That's not correct.
21 Q  Why --
22 A  There are --
23 Q  -- is that not correct?
24 A  Because there are calculations subsequent to this.
25 Q  So there are calculations of actual loss subsequent to

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 73

BOB COOK

1
2  March 25th, 2009, that TSA has sustained under the RFA?
3  A  Yes.
4  Q  Where are those calculations?
5  A  We have them.
6         MS. EVANSON:  He prepared some
7  calculations yesterday, which we're happy to produce.
8         THE WITNESS:  Yes.
9  Q  (By Ms. Sawyer)  And how did you prepare those
10 calculations?
11 A  I took, by using Excel, the amount of the reserve fund
12 agreement times the rate, and compared that to actual
13 earnings that we received on the investments for the same
14 period of time, took the difference, and did a future
15 value to the -- to September 30th of 2013, which was the
16 most recent data that I had at the time.
17 Q  So you -- just to make sure I'm following what you did,
18 is, you figured out what the earnings would have been if
19 you had received 4.484 percent for a given time period?
20 A  That is correct.
21 Q  And then you looked at what TSA actually earned on its
22 reserve fund during that same time period?
23 A  That is correct.
24 Q  And then you subtracted them?
25 A  That is correct.

Page 74

BOB COOK

1
2  Q  And then added up all those totals you received?
3  A  Plus factored in for the fact that we have lost those
4  earnings in the past, so that they would be more valuable
5  now, such that I discounted them for future value to the
6  current date.
7  Q  And --
8  A  So I have both the actual losses sustained over time, as
9  well as a future value projection.
10        MS. SAWYER:  I would request a copy
11 of --
12        MS. EVANSON:  Sure.
13        MS. SAWYER:  -- those calculations.
14        MS. EVANSON:  That's fine.  I just got
15 it yesterday.
16 Q  (By Ms. Sawyer)  And you did that yourself?
17 A  I did.
18 Q  And prior to you conducting that analysis recently, had
19 that analysis been performed prior to that date by anyone
20 at Washington TSA?
21 A  Which date specifically?
22 Q  I don't know what date you did it, so two days ago --
23 A  Oh, yes.  That's been something I've maintained since
24 approximately -- I believe I started it sometime in 2012.
25 And then periodically refreshed it.

Page 75

BOB COOK

1
2  Q  So is it a spreadsheet that you kind of add to as time --
3  A  Yes.
4  Q  -- goes on?
5  A  Uh-huh.  Once I have actual -- actual earnings for a
6  period of time, yeah.
7  Q  So there might not be a 2012 version of it, a, you know,
8  2013 version --
9  A  No.
10 Q  -- it would be a --
11 A  It's cumulative.
12 Q  -- live document --
13 A  It's cumulative.
14 Q  -- that you're updating?
15 A  Yeah.
16 Q  We're both getting a little bit -- we're talking over
17 each other a little bit, so --
18 A  Okay.
19 Q  We're both guilty of it.
20 A  I'm impatient.
21 Q  Between April 21, 2009, and September 10th, 2009, did
22 Washington TSA receive any other valuations of the
23 reserve fund agreement?
24 A  No.
25 Q  And did Washington TSA ask anyone else to do any

Page 76

BOB COOK

1
2  valuations of the reserve fund agreement between
3  April 21st, 2009, and September 10th, 2009?
4  A  Not that I recall.
5  Q  And the memorandum -- the September 10th, 2009,
6  memorandum, as we noted, is substantially similar to the
7  April 21st, 2009, memorandum.
8         Does it reflect the same methodology, to the best of
9  your understanding?
10 A  At brief glance, yes, it does.
11 Q  And the total spread reflected on the third page of the
12 September 10th memorandum is consistent with the
13 March 25th, 2009, spread as reflected on the April 21st,
14 2009, memorandum; correct?
15 A  That's correct.
16 Q  I'm now showing you a document that's been marked as
17 Lehman Exhibit 20, which, for the record, appears to be
18 and is intended to be the proof of claim filed by
19 Washington TSA against Lehman Brothers Special Financing,
20 Inc., dated October 12th, 2009.
21 A  Pardon me.  If it makes any difference, this is an
22 original sticker.  I didn't think I'd seen those before.
23 Q  They are original stickers on this document because we
24 had to cover up --
25 A  Okay.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 77

```
                    BOB COOK
 1
 2    Q  -- an erroneous sticker underneath.
 3    A  I just wanted to make sure I didn't have something I
 4       wasn't supposed to have.
 5    Q  No.  Fair enough.  I appreciate you noting that.
 6          Did you have any involvement in putting together the
 7       proof of claim?
 8    A  I reviewed, I am certain, at various times drafts of the
 9       document itself, and again, probably made suggestions
10       either in the organization or the -- maybe some verbiage.
11    Q  And on the first page of the document, under sort of a
12       box that has a name and address of a creditor, there is a
13       number 1, and it says, "Amount of claim as of date case
14       filed," and it says $47,063,714.01.
15          Do you see that?
16    A  I do.
17    Q  And do you know where that number came from?
18    A  That came from a valuation of Swap Financial.
19    Q  If you turn a few pages into the document -- I apologize
20       they don't have page numbers, but you'll see that
21       September 10th, 2009, memorandum.
22    A  Further?
23    Q  I think it's -- it's right after the --
24    A  Here we go.  This is the document.
25    Q  And that's the same memorandum to you that we were just
```

Page 78

```
                    BOB COOK
 1
 2       looking at in Lehman Exhibit 15?
 3    A  It certainly appears to be, yes.
 4    Q  In between September 10th, 2009, and October 12th, 2009,
 5       did TSA receive any other valuations of the reserve fund
 6       agreement?
 7    A  No.
 8    Q  And subsequent to the September 10th valuation memorandum
 9       that we in Lehman Exhibit 15, has TSA conducted any other
10       valuations of the reserve fund agreement?
11    A  Yes.  We noted the correction of the date in a subsequent
12       filing to the 2032 date, which reduced the size of the
13       claim.
14    Q  And you believe that there's been a filing in the
15       bankruptcy court reflecting that?
16    A  I believe so.
17    Q  And that would --
18    A  It was a statement of some sort changing that, yes.
19    Q  And that change was to reflect the actual stated
20       termination date of the contract of 2032?
21    A  The amended and corrected date, yes.
22    Q  And do you know what that valuation number is?
23    A  It's in the 30-some million dollar range.  I don't recall
24       the exact number.  36 million, something like that.
25       ////
```

Page 79

```
                    BOB COOK
 1
 2       (Exhibit No. 2 marked for
 3        identification.)
 4    Q  (By Ms. Sawyer)  The court reporter's handing you a
 5       document that's been marked as Cook 30(b)(6) Exhibit
 6       No. 2, which is a two-page document, appears to be the
 7       unsigned minutes of the May 3rd, 2012, TSA board meeting.
 8    A  Yes.
 9    Q  And if you turn to the second page of the memorandum --
10       of the minutes, it says, "Mr. Herman pointed out a
11       correction to the memo which was handed out to the board.
12       He noted that the last sentence in the second paragraph
13       of the second page noted the termination payment as
14       46,437,610.  The correct figure should be 38,633,451."
15          Do you see that?
16    A  I do.
17    Q  Is that your understanding as to the valuation of the
18       reserve fund agreement through 2032?
19    A  That appears to be correct.
20    Q  Do you know how -- when an adjustment was made to the
21       valuation to reflect a 2032 maturity, do you know how
22       that reduction was translated in terms of valuation, or
23       how it was done to change the valuation?
24    A  I'm not sure I'm clear on your question.
25    Q  It wasn't a great question.
```

Page 80

```
                    BOB COOK
 1
 2          Do you know -- who did the calculation to -- once
 3       you adjusted for the maturity date being 2032?
 4    A  Swap Financial Group.
 5    Q  And do you know how Swap Financial Group adjusted the
 6       valuation to reflect the new stated maturity date of
 7       2032?
 8    A  I don't know specifically how they adjusted the
 9       calculation.  The effect is the fact that the -- that ten
10       years, the -- the loss was con- -- calculated for ten
11       fewer years.
12    Q  And do you have a general understanding that a spread to
13       LIBOR analysis is based upon projected LIBOR rates?
14       Correct?
15    A  Uh-huh.
16    Q  And would those projected LIBOR rates used, could they
17       change if you were looking at a 2042 versus 2032
18       maturity?
19    A  Well, it depends on the date that the LIBOR baseline was
20       conducted.  There -- there are calculations related to
21       this, so it would be documented in there.
22    Q  Okay.  And have you seen the calculations related to the
23       $38.6 million valuation?
24    A  I don't know if I've seen the calculations, other than
25       seeing the effect of the calculations reflected in a
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 81

BOB COOK

1

2    revised number.
3    Q  So you've seen this number before?
4    A  Yes.  Well, presuming this is the same number that's --
5       that was accurately reflected in the minutes as compared
6       to the filings that we created.
7    Q  Just -- I'll just note for the record, there has not been
8       a court filing reflecting an amended number, so we're
9       using this to try to --
10   A  Ah.
11   Q  -- estimate what TSA's valuation is reflecting the 2032
12      maturity.
13   A  Okay.
14   Q  Do you know if Swap Financial Group, in adjusting for
15      this maturity, adjusted its LIBOR curves that it used?
16   A  I do not know.
17   Q  Okay.  And in preparation for today's testimony, did you
18      ask if that -- those LIBOR curves had been changed?
19   A  I did not.
20   Q  In preparation for today's testimony -- let me back up.
21        Do you have an understanding as to what LIBOR curve
22      Swap Financial Group used in its April 21st, 2009,
23      memorandum?
24   A  I don't have those calculations.
25   Q  And did you ask at the time?

Page 82

BOB COOK

1

2    A  We may have discussed in general how it -- how it was
3       done and the impact of it, but there wasn't -- I don't
4       recall anything specific, other than the actual documents
5       that we've seen.
6    Q  And do you know, in calculating this $38.6 million
7       valuation, do you know if the spread to LIBOR changed
8       that Swap Financial Group used?
9    A  I don't know.
10   Q  Okay.  And did you inquire, at the time of the
11      calculation of the $38.6 million, as to what the spread
12      to LIBOR was that Swap Financial Group --
13   A  No.
14   Q  -- was using?
15        And why didn't you inquire?
16   A  Because we were -- we were talking in general about the
17      effect of the ten-year reduction in term.  We felt
18      comfortable with the explanations that we were given,
19      without getting into the details, which aren't our
20      responsibility, and we've asked Swap Financial Group to
21      do on our behalf, as experts in the field.
22   Q  And in preparation for today's testimony, did you inquire
23      as to whether the spread to LIBOR changed in calculating
24      the $38.6 million?
25   A  I did not.

Page 83

BOB COOK

1

2    Q  Do you recall this valuation of the $38.6 million being
3       done in or about May 2012?
4    A  Obviously it was done before the date of this meeting,
5       which was May 3rd, 2012.  So yes, it would have been done
6       before that time.
7    Q  Do you know how close in time it happened to these
8       September and April 2009 memoranda that we had looked at
9       before?
10   A  I don't recall.  It came, I believe -- I don't recall.
11      It was between those times, obviously.
12   Q  Okay.  You don't recall if it was closer to this 2012
13      time frame, or 2009?
14   A  I believe it may have been in early 2012.
15   Q  Okay.  Do you recall the circumstances upon which this
16      adjustment was made?
17   A  It was, I believe, in either preparation or as a result
18      of some of the initial mediation discussions we had with
19      Lehman Brothers.
20   Q  Which took place in 2012?
21   A  Right.
22   Q  And did you receive any memoranda -- written memorandum
23      or anything from Swap Financial Group reflecting this new
24      valuation?
25   A  I would think we would have, but I don't recall it

Page 84

BOB COOK

1

2    specifically.
3        MS. SAWYER:  And I would just note for
4    the record that we don't have any documentation
5    supporting the $38.6 million valuation number, and would
6    request that.
7    Q  (By Ms. Sawyer)  In between the time of the
8       September 10th, 2009, valuation memorandum and the
9       adjustment made to reflect the 2032 maturity of the RFA,
10      did Washington TSA receive any other valuations of the
11      reserve fund agreement?
12   A  No.
13   Q  And did Washington TSA calculate any other valuations of
14      the reserve fund agreement during that time period?
15   A  No.
16   Q  And since the determination of the $38.6 million, maybe
17      in 2012, since that time has Washington TSA received any
18      other valuations of the reserve fund agreement?
19   A  No.
20   Q  Okay.  And has Washington TSA, itself, calculated any
21      valuation since that time period?
22   A  No.
23        Is it appropriate to stipulate that the TSA has
24      never done its own calculation so it doesn't need to be
25      asked repeatedly?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 85

BOB COOK

1
2  Q  Luckily I'm almost done with that topic.
3  A  Oh.  I waited too long to ask.
4  Q  Going back to the deposition topics, which was the very
5     first document I handed you --
6  A  Uh-huh.
7  Q  -- Topic 1F is the losses Washington TSA purports to have
8     suffered as a result of the termination of the reserve
9     fund agreement.
10        Do you see that?
11 A  I do.
12 Q  And what losses does Washington TSA purport to have
13    suffered as a result of the termination of the reserve
14    fund agreement?
15 A  $38,633,451.
16 Q  Are there any additional losses that Washington TSA
17    purports to have suffered as a result of the termination?
18 A  I believe we have claim for attorney fees and other kinds
19    of things in here.
20 Q  Attorney fees and advisor fees?
21 A  Yes.
22 Q  Other than the amount of the -- amount reflected in Cook
23    30(b)(6) Exhibit 2, the $38.6 million, and attorneys'
24    fees and other fees, are there any other losses the TSA
25    purports to have suffered as a result of the termination

Page 86

BOB COOK

1
2     of the reserve fund agreement?
3  A  Nothing that wasn't in the proof of claim.
4  Q  Turning to Topic 6, this is a topic dealing with the
5     early projections relating to the earlier scheduled
6     redemption of the bonds.
7  A  Uh-huh.
8  Q  Do you see that?
9  A  Uh-huh.
10 Q  And we had talked a little bit about that, at the time
11    the bonds were issued, there was a projected redemption
12    date of the -- early redemption date of the bonds as
13    being 2019; correct?
14 A  Right.
15 Q  And you, I believe, said at times those projections have
16    changed, over time?
17 A  Yes.
18 Q  And how have those projections changed over time?
19 A  As the rate of smoking has decreased more quickly than
20    was projected in the DRI-WEFA report that was part of the
21    bond issue in 2002, receipts have gone down more quickly
22    resulting in less re- -- smoking has gone down, resulting
23    in less receipts on the MSA, which come to the TSA in
24    order to pay off bonds.  So as less money is available to
25    pay off bonds, the ultimate redemption date has been

Page 87

BOB COOK

1
2     extended.
3  Q  The projected redemption date has been --
4  A  The projected redemption date, yes.
5  Q  And does TSA track that information somehow as the
6     settle- -- the tobacco settlement revenues decrease, the
7     projected redemption date increases, is that information
8     somehow tracked to TSA?
9  A  It's -- we ask our underwriters to provide their expert
10    information as best guesses on that, and receive that
11    periodically and report it to the board.
12 Q  And which underwriters do you rely upon for that
13    information?
14 A  Barclays Capital, which formerly was Bear Stearns at the
15    point in time when the tobacco bonds were issued.
16 Q  And that -- primarily Kym Arnone?
17 A  Kym Arnone, yes.
18 Q  Arnone.  Thank you.
19       And does that report that she and her group
20    generate, does it explicitly say when the projected bond
21    redemption date is now X date?  Does it explicitly say
22    that?
23 A  To a -- to the year, but nothing more specific than that.
24 Q  In preparation for today's testimony, did you review
25    those projected redemption dates over time?

Page 88

BOB COOK

1
2  A  I haven't reviewed them specifically such that I can say
3     on this date, this was the date; this date, this was the
4     date.  We have documents to that effect.
5  Q  And what documents would those be?
6  A  Either minutes that were -- where it was reported to the
7     board, or in some cases perhaps documents from Barclays.
8  Q  And is there -- there is not a sort of continual -- let
9     me start that over.
10       There's not an easily accessible way to say on X
11    date the projection was Y?  You would have to look at the
12    minutes and see what the projection was as of the date of
13    the minutes?
14 A  Would have to accumulate that from all the documents we
15    have.
16 Q  It's not as if you had a spreadsheet that you were --
17 A  No.
18 Q  -- keeping that information --
19 A  No.
20 Q  -- up to date?
21 A  It's continually, over time, gotten further out.
22 Q  And do you know, sitting here, without the documents,
23    what the projection in terms of early bond redemption was
24    at the time of Lehman's bankruptcy in 2008?
25 A  I don't recall.  It would have been in the early 2020s.

22  (Pages 85 to 88)

Page 89

BOB COOK

1
2  Q  And would it have substantially changed between the dates
3     of the two Lehman bankruptcies, in September and
4     October of 2008?
5  A  I don't believe so.
6  Q  And would it have substantially changed between
7     September 2008 and the termination date of the reserve
8     fund agreement in March 2009?
9  A  At some point in time, it would have slipped a year, but
10    I don't know --
11 Q  So --
12 A  -- exactly at what point in time.
13 Q  So it would have been approximately sometime in the early
14    2020s --
15 A  Yes.
16 Q  -- would have been the projected redemption date?
17 A  Uh-huh.
18 Q  And do you know how that projected redemption date is
19    determined?
20 A  It is taking what is known at this point in time and then
21    continuing to project out the impact of smoking declines
22    and smoking declines that are known at that time, and
23    then future smoking declines.
24 Q  The next topic on -- that you've been designated for is
25    the 11A, which is the consideration of an entry into any

Page 90

BOB COOK

1
2     replacement transactions --
3  A  Uh-huh.
4  Q  -- including proposals from third parties.
5  A  Uh-huh.
6  Q  What's your understanding of replacement transactions?
7  A  Replacement transactions would have been entering into
8     another reserve fund agreement after the termination
9     date.
10 Q  Would it include things like entering into a guaranteed
11    investment contract?
12 A  Possibly.
13 Q  Okay.  And tell me what Washington TSA considered in
14    terms of replacement transactions following the Lehman
15    bankruptcy.
16 A  Well, there have been a number of things over time.
17    Initially, the money was held in a money market fund.
18    We -- that was provided by the trustee.  Over a period of
19    time, we moved into a different money market fund that
20    was paying a higher return.
21       We received periodic quotes from the trustee on
22    alternative investments.  We have received proposals,
23    from time to time, on other possible structures to
24    replace the agreement, one from Barclays that I can think
25    of particularly.

Page 91

BOB COOK

1
2  Q  And has Washington TSA entered into any alternate
3     investment arrangements for the reserve fund?
4  A  Nothing other than maintaining a money market.
5  Q  And why not?
6  A  There are a lot of -- okay.  We'll just start.  Many of
7     the proposals that we received from the trustee, for
8     instance, did not provide, at the time that they were
9     provided, an additional interest amount that was
10    significant compared to the amount of risk that might
11    have been undertaken.
12       Some of the other transactions, specifically the
13    Barclays structure that was proposed later in 2011,
14    involved a swap.  The Tobacco Settlement Authority and
15    the Housing Finance Commission, where we all come from,
16    is very conservative in the -- terms of entering into
17    swaps.  There are state law issues that affect our
18    ability to enter into a swap.  We have to have a swap
19    policy.  We have to consider all of the risks.
20       And given the fact that the Tobacco Settlement
21    Authority had already sustained a situation that was
22    unforeseeable, a bankruptcy of a counterparty, the fact
23    that counterparties have been downgraded significantly
24    over time, those are the general reasons that we haven't
25    entered into any alternative investment.

Page 92

BOB COOK

1
2  Q  So the -- you didn't -- some of the investments proposed,
3     the interest rate didn't justify the risks associated
4     with it?
5  A  That's right.  For the short period of time, they would
6     have been available.  Also, the interest rate environment
7     was a consideration.  We certainly thought interest rates
8     would come back and be higher than they have been.
9       They've continued at a very low level for a very
10    long time, which was -- at various stages during this
11    time, we thought within six months, 12 months, that
12    interest rate environment was going to begin to recover,
13    so we didn't want to lock ourselves into an artificially
14    low rate.  And we locked in for a long period of time at
15    a much lower rate than the guaranteed rate of 4.484
16    percent that we had on the initial investment.
17 Q  Were some of the proposals that you received long-term
18    contracts that would have locked you in, as you said?
19 A  Some of them were, yes.
20 Q  And the rate wasn't sufficiently high to be locked in at
21    that rate?
22 A  Given the risks, and also the fact that the principal had
23    to be maintained at the -- at the level that was there,
24    so we did feel the swap transaction, for instance, would
25    have to be booked as far as gain or loss, and we could

23  (Pages 89 to 92)

Page 93

BOB COOK

1    not sustain that in a reserve fund, which -- where we had
2    said through the indenture would be maintained at a -- at
3    a particular amount.
4  Q  And who was involved in the discussions about not being
5    interested in entering into a swap transaction?
6  A  In general, all of these transactions were internal
7    Tobacco Settlement Authority staff, in consultation with
8    advisors.
9  Q  Were these proposals discussed with the board?
10  A  None of them passed muster with the staff, so none of
11    them were taken to the board, that I can recall.
12             (Exhibit No. 3 marked for
13               identification.)
14  Q  (By Ms. Sawyer)  The court reporter's handed you a
15    document that's been marked as Cook 30(b)(6) Exhibit
16    No. 3, which is a single-paged document Bates-stamped
17    U.S. Bank 724.  It appears to be an email from Kim Herman
18    on November 7th, 2008, to Bob Cook and others, and the
19    subject is "Lehman investment and tobacco reserves."
20  A  Uh-huh.
21  Q  Have you had a chance to glance at this document?
22  A  Uh-huh.
23  Q  Do you recall this email?
24  A  Not specifically, but I probably have seen it.  Yes, I'm

Page 94

BOB COOK

1    CC'd, so of course I've seen it.
2  Q  And in the middle -- it's from Kym Arnone is --
3  A  Arnone.
4  Q  Arnone -- Kym Arnone at Barclays Capital, and she says,
5    "We have been approached by an AA-rated insurer who is
6    willing to take tobacco risk on an uncollateralized GIC.
7    I would be happy to discuss further with you tomorrow if
8    you'd like."
9        Do you see that?
10  A  I do.
11  Q  This is in the fall of 2008.
12  A  Uh-huh.
13  Q  Is this the GIC proposal that you were talking about that
14    involved a swap?
15  A  No.
16  Q  And did you engage -- did TSA engage in discussions with
17    Barclays about this uncollateralized GIC in the fall of
18    2008?
19  A  I don't know if we had more discussion than this or not,
20    but we wouldn't have entered into an uncollateralized
21    GIC.
22  Q  Why not?
23  A  Because of the -- I -- first of all, I'm not sure it
24    would have met the terms of the indenture in order to

Page 95

BOB COOK

1    keep the reserve fund in a -- an appropriately rated
2    category.  Plus at that point in time, while there may
3    have been a bond insurer that was AA rated at that time,
4    there was such turmoil in the market that there were no
5    highly rated bond insurers that I can recall shortly
6    after this.  So there was a lot of market risk going on,
7    still a lot of turmoil in the market because of the
8    events of the fall of 2008.
9  Q  Did you discuss this proposal in the fall of 2008 with
10    TSA staff?
11  A  We would have within staff, yeah.
12  Q  But you would not have discussed it with the board?
13  A  No.
14  Q  And did you, the staff, in fact consult to see whether or
15    not the funds could be placed in an uncollateralized GIC?
16  A  We would have had discussions with the finance team at
17    that point in time.
18  Q  And who's --
19  A  I don't recall -- I don't recall specifically the
20    discussions.
21  Q  Who's the finance team?
22  A  The finance team are bond counsel, underwriters,
23    financial advisors, and the TSA staff.
24  Q  So bond counsel -- you're sometimes getting in the sun.

Page 96

BOB COOK

1    I don't --
2  A  Yeah.
3  Q  If you need to scoot somewhere, you can.
4  A  No, I'm fine actually.
5  Q  Okay.  Bond counsel, who was bond counsel in 2008?
6  A  Faith Pettis and Jay Reich at K&L Gates.
7  Q  And you said underwriters.  Do you know who would have
8    been the underwriters --
9  A  Barclays.
10  Q  -- on the financing?
11        Barclays?
12  A  Uh-huh.
13  Q  The woman who sent this GIC?
14  A  Yes.
15  Q  And then the financial advisors at this time?  Who would
16    have been part of this --
17  A  PFM.
18  Q  PFM would have been part of this discussion regarding
19    this --
20  A  Likely.  If it even raised to that level, frankly.
21  Q  The court reporter just sighed at us because we were
22    talking over each other.
23        And TSA did not enter into, at any time, a GIC,
24    collateralized or otherwise?

24  (Pages 93 to 96)

Page 97

BOB COOK

1
2  A   That's correct.
3  Q   I'm now showing you a document that's been marked as
4     Lehman Exhibit 17, which is a single-page document
5     Bates-stamped TSA 8827, and it -- email -- appears to be
6     an email from you to TSA staff, dated June 2009.
7  A   Uh-huh.
8  Q   And do you recognize this email?
9  A   I do.
10 Q   And you had told me, before we started looking at some of
11    these documents, that you had placed the funds in a money
12    market account, the reserve fund in a money market
13    account?
14 A   That's correct.
15 Q   Okay.  And from the -- at the time of Lehman's
16    bankruptcy, did -- TSA did not have the funds, the
17    reserve fund; correct?
18            MS. EVANSON:  Object to the form.
19            THE WITNESS:  At the -- at the --
20            MS. EVANSON:  Sorry.
21            THE WITNESS:  At the time of the
22    bankruptcy, we held -- the trustee held the securities.
23 Q   (By Ms. Sawyer)  Then at some point a few months after
24    the bankruptcy, those securities matured, and then TSA
25    had its reserve fund again; correct?

Page 98

BOB COOK

1
2  A   When Lehman failed to perform on the contract, the
3     securities, when they matured, were the property and --
4     turned into cash for the Authority, held by the trustee.
5  Q   And turned into cash equaling the reserve fund plus
6     4.484 percent for that time period; correct?
7  A   Yes, up to that time period.
8  Q   And that was December 1st, 2008?
9  A   Yes.  Actually, I need to go back -- I would need to look
10    to see whether we actually got paid interest up through
11    that date at the 4.484 percent because, after the
12    bankruptcy, I'm not sure if we continued to receive that
13    interest.  I don't recall offhand.
14 Q   But in any event, you at least got the --
15 A   We did get the principal.  Sorry.
16 Q   So as of December 1st, 2008, at least TSA had gotten its
17    reserve fund back?
18 A   We had the principal intact.
19 Q   Okay.  And then following December 1st, 2008, you placed
20    the reserve fund into a money market account?
21 A   That's correct.
22 Q   And it's stayed in a money market account, maybe a
23    different money market account, since that time?
24 A   That's correct.
25 Q   And in this email you lay out some strategies of

Page 99

BOB COOK

1
2     available investment options from someone named Debbie
3     Kuykendall?
4  A   That's correct.
5  Q   And who's Debbie Kuykendall?
6  A   Debbie Kuykendall is the trustee at U.S. Bank who
7     administers the Tobacco Settlement Authority's bonds.
8  Q   And you'd indicated that -- before, that the trustee had
9     given you options from time to time?
10 A   That is correct.
11 Q   And is this the options she had provided you at this
12    time?
13 A   At this time.
14 Q   And underneath sort of the options, she has variable rate
15    options and fixed rate options here, you have, "Finally,
16    Roan Blacker from PFM and I chatted about this issue, and
17    he is going to poll their asset management group to see
18    if they have any ideas."
19 A   Uh-huh.
20 Q   Do you recall what ideas PFM had to invest the reserve
21    fund?
22 A   I don't recall specifically whether there was a follow-up
23    to this from them.
24 Q   Do you recall at any time receiving suggestions or
25    proposals from PFM as to what to do with the reserve

Page 100

BOB COOK

1
2     fund?
3  A   I'd have to review all of the documents again.  I don't
4     recall specifically.
5  Q   In preparation for today's testimony, do you recall
6     reviewing any proposals from PFM as to how to invest the
7     reserve fund?
8  A   I don't recall specifically.
9  Q   And the next sentence, you say, With rates so low, I am
10    hesitant to, quote, chase rates and money market funds.
11       Do you see that?
12 A   I do.
13 Q   What do you mean by that?
14 A   I meant moving from one money market fund to another on a
15    continual basis as maybe this week one has a higher rate,
16    this week another one has a higher rate.
17    Administratively, it would be a nightmare to maintain and
18    track, and frankly find -- find them.
19 Q   Who would be responsible for doing that administrative
20    work?
21 A   The Tobacco Settlement Authority staff.
22 Q   Not the trustee?
23 A   The trustee can provide options, but again, that would be
24    beyond their purview.
25 Q   So that -- you were hesitant to do that because of the

25  (Pages 97 to 100)

Page 101

BOB COOK

1               BOB COOK
2   administrative work?
3   A  Partly.
4   Q  And what else?
5   A  Well, we did actually change money market funds, so we
6     did that, but we were not going to be changing them on a
7     frequent basis.  We maintained it into a fund that we
8     changed because it maintained rates that were fairly
9     competitive, and the most competitive in many cases, over
10    a period of time.
11  Q  And where did you get the information about the money
12    market accounts that you placed the reserve fund?
13  A  The initial was First American Prime Obligation money
14    market mutual fund, which is quoted in this exhibit.  It
15    is a fund provided by the trustee.  And we, as staff, had
16    previous exposure to the Fidelity prime money market
17    fund, which is where we did move the proceeds.
18  Q  And have the -- has the reserve fund only been in those
19    two money market accounts?
20  A  Yes.
21  Q  No others?
22  A  No others.
23  Q  At any point following Lehman's bankruptcy, has TSA
24    developed a strategy to try to maximize its return on the
25    reserve fund?

Page 102

BOB COOK

1               BOB COOK
2   A  We have reviewed proposals over time.  We continue to get
3     some different rates from the trustee over time.  So
4     we've continued to review the situation.
5   Q  Have you asked any of your financial advisors to put
6     together proposals on how to maximize returns on the
7     reserve fund?
8   A  We have had discussions to that effect at various times,
9     to the point where we determined that we weren't willing
10    to go with some of the more esoteric things that might be
11    out there, more risky.
12  Q  And with whom did you have discussions about such
13    strategies?
14  A  Primarily internally, and periodically we may have
15    certainly talked to U.S. Bank and Debbie Kuykendall, and
16    possibly Roan at various times at PFM.
17  Q  Did you ever discuss it with Swap Financial Group?
18  A  We did eventually later, in two thousand -- after they
19    had been engaged at some point in time, we did talk about
20    possible reinvestment.
21  Q  But you hadn't -- you didn't take any of the actions
22    suggested by any of those advisors?
23  A  When we considered all the factors, we didn't feel that
24    it was appropriate.
25  Q  I'm showing you a document that's been marked as Lehman

Page 103

BOB COOK

1               BOB COOK
2   Exhibit 26, I believe.
3   A  Okay.
4   Q  Do you recognize this document?
5   A  I do.
6   Q  It's a single-page document, for the record.  Actually, I
7     think it's double -- two pages.
8   A  Yes.
9   Q  Do you recognize this document?
10  A  I do.
11  Q  What is this document?
12  A  It's an email from John McCarthy to me and some other
13    parties to -- "Attached are secured and unsecured
14    investment agreement rate indications."
15  Q  And did you receive this in or about March 2011?
16  A  I did.
17  Q  Do you know John McCarthy?
18  A  I do.
19  Q  How do you know him?
20  A  He has been a person that has called on me as our -- in
21    my capacity at the Washington State Housing Finance
22    Commission, as well as Tobacco Settlement Group -- or
23    Authority.
24  Q  What sort of work does Mr. McCarthy do?
25  A  They have a proprietary bid platform for investment

Page 104

BOB COOK

1               BOB COOK
2   agreements.
3   Q  What does that mean?
4   A  They have a Web-based platform on which they bid
5     investment agreements.
6   Q  And he says, "Bob, attached are the secured and unsecured
7     investment agreement rate indications we discussed."
8      Do you recall having a discussion with him about
9     investment agreements in March 2011?
10  A  Yes.
11  Q  And what was that discussion?
12  A  On the back page, he's indicated some different
13    institutions' ratings, and options as to rates on various
14    investment agreements, uncollateralized and
15    collateralized.
16  Q  Did you reach out to Mr. McCarthy, or did he reach out to
17    you?
18  A  I don't recall how the communication -- we chat
19    periodically, so I don't recall how it came up
20    specifically.
21  Q  You had a discussion before receiving this email?
22  A  Yes.
23  Q  And it looks to me as if he's run some sort of bid
24    process for Washington TSA?
25  A  I think he calls them indicative indications.

26 (Pages 101 to 104)

Page 105

BOB COOK

1
2  Q  Rate indications?
3  A  Right.
4  Q  He lists actual providers and the --
5  A  Yes.
6  Q  -- rates they would give for an investment agreement for
7     a deposit of $47 million?
8  A  That's correct.
9  Q  Approximately the size of the reserve fund; correct?
10 A  That's correct.
11 Q  He has them both for uncollateralized and collateralized
12    investment --
13 A  That's correct.
14 Q  And what did Washington TSA do with this information once
15    it received it?
16 A  We looked at it internally.  I'm not sure that we would
17    have necessarily consulted other people.  This was in,
18    again, 2011.  We would not have considered an
19    uncollateralized agreement, so the top box is irrelevant
20    to us.
21    The second group are various banking institutions,
22    again, given the crisis of confidence in the market,
23    these institutions have been downgraded, even though they
24    were still in the A category, and they have a five-year
25    maturity quote and a 12-year maturity quote.

Page 106

BOB COOK

1
2  Q  And for example, the CitiGroup quote, the 5-year maturity
3     quote's 1.63 percent?
4  A  Right.
5  Q  And the 12-year maturity quote's 2.95 percent?
6  A  That's correct.
7  Q  And did Washington TSA consider, you know, the A-rated
8     CitiGroup quote for 12 years at 12.95 percent?
9  A  We would have considered all of these and dismissed them
10 Q  And why would you dismiss them?
11 A  Because, first of all, we were concerned about the
12    ratings of the institutions.  The institutions were still
13    in various states of crisis, if you will.  We were also
14    concerned at this point in time, we believed that
15    interest rates were likely going to head up within six to
16    twelve months of this period, so we were reluctant to
17    lock into these low rates for a period of time.
18    In retrospect, they look better than they did at the
19    time, simply because, again, we thought the interest rate
20    environment was going to be improving more quickly than
21    it's proved to be so far.
22 Q  And what was the -- on what basis did you believe the
23    interest rates were going to be improving?
24 A  Just general knowledge of the industry, talking with
25    different -- just in terms of what we were hearing in the

Page 107

BOB COOK

1
2     industry.
3          (Mr. Paul Lawrence enters.)
4  Q  Did you have any discussions with Swap Financial Group at
5     this time about projections for interest rates to
6     increase?
7  A  I don't recall that we did.
8  Q  Do you recall discussing with Swap Financial Group this
9     proposal or other proposals received in 2011?
10 A  I don't with this one.
11 Q  Do you recall discussing other proposals you received in
12    2011 with --
13 A  I think the Barclays one, we did discuss with them.
14 Q  Again, try to wait until I finish my question before you
15    answer.  Thank you.
16          (Exhibit No. 4 marked for
17            identification.)
18 Q  (By Ms. Sawyer)  The court reporter's handing you a
19    document that's been marked as Cook 30(b)(6) Exhibit
20    No. 4, which is a two-page document Bates-stamped TSA
21    24540 to --
22 A  May I ask something?
23 Q  Yes.
24 A  I think you said this was the only copy of this.  Did you
25    need this -- does somebody else need this?

Page 108

BOB COOK

1
2  Q  It can stay in your pile.  Thank you.
3          MS. EVANSON:  I'll take care of it.
4     Thank you, though, Bob.
5  Q  (By Ms. Sawyer)  Cook Exhibit 4 -- 30(b)(6) Exhibit 4 is
6     24540 through 24541.  It's an email chain dated
7     March 31st, 2011.
8  A  Uh-huh.
9  Q  And the bottom email appears to be the same email that we
10    just were looking at from John McCarthy on March 4th,
11    2011.
12    Do you see that?
13 A  I do.
14 Q  And then it appears to be a discussion -- or email
15    discussion among individuals at the TSA.
16 A  That's correct.
17 Q  And Kim Herman tells you at 10:22, he says, "I presume we
18    don't want an uncollateralized investment"; is that
19    correct?
20 A  That's correct.
21 Q  And we discussed that TSA was not interested in an
22    uncollateralized investment; correct?
23 A  That's correct.
24 Q  And you write back, "I agree, however, even the
25    collateralized ones are significantly above money market

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 109

BOB COOK

1
2  and other current options"?
3  A  I do.
4  Q  Do you know approximately what TSA was earning in its
5     money market account in March of 2011?
6  A  I'd have to look at the record.  I don't recall.
7  Q  Less than 2.75 percent?
8  A  Yes.
9  Q  Significantly less?
10 A  Yes.
11 Q  Do you recall any further discussion about those rates,
12    now that you've looked at this email chain?
13 A  I don't recall additional discussion.
14 Q  Okay.  This proposal from Grant Street Group, this bid
15    process, this was never discussed with the board?
16 A  Absolutely not.
17 Q  Okay.
18 A  It did not rise -- did not go past the staff level.
19 Q  And why not?
20 A  Because the board wouldn't make decisions on that.
21 Q  Why wouldn't the board make decisions on how the reserve
22    fund should be invested?
23 A  Because that had been delegated as part of the delegation
24    of the bond issue at the time the bond issue was made.
25 Q  Was that an express delegation that was made at the time

Page 110

BOB COOK

1
2  the bond issue was made?
3  A  It was a broad delegation to administer the bond issue.
4  Q  And pursuant to administering the bond issue, the TSA had
5     been delegated authority to invest the reserve fund as it
6     saw fit?
7  A  Not as it saw fit.  As it met the needs of the Authority
8     and the terms of the indenture.
9  Q  Had the board ever expressed interest in how the reserve
10    fund was being invested after Lehman's bankruptcy?
11 A  We probably discussed it at some point in time, that it
12    continued to be in money markets.
13 Q  Do you recall, at any point in time, any board members
14    asking to be part of the decision-making process on how
15    the reserve fund was invested?
16 A  I don't believe so.
17 Q  Do you --
18 A  I don't -- I should say I don't recall.
19 Q  If a board member had asked to be part of that process,
20    would you have included that board member?
21 A  That would have been up to Mr. Herman.  He's the
22    executive director.
23              (Exhibit No. 5 marked for
24              identification.)
25 Q  (By Ms. Sawyer)  The court reporter's handed you a

Page 111

BOB COOK

1
2  document that's been marked as 30(b)(6) -- Cook 30(b)(6)
3  Exhibit No. 5.  It's a multipage document Bates-stamped
4  U.S. Bank's 686 through 688, and it appears to be an
5  email chain among you and Deborah Kuykendall and others
6  from June of 2011.
7     Do you see that?
8  A  I do.
9  Q  And do you recall this email exchange with
10    Ms. Kuykendall?
11 A  Yes.
12 Q  Okay.  And tell me what you recall about it.
13 A  I have to refresh my memory by looking at it.  This was a
14    continuing pattern of discussion between U.S. Bank and
15    ourselves in bringing alternative investments for the
16    reserve fund agreement to our attention from time to
17    time.
18 Q  So just another email from U.S. Bank about potential
19    options for the reserve fund?
20 A  That's correct.
21 Q  And she says in the next to the top email, it says, "I am
22    just checking in to see if you wanted to make any
23    investments in the TSA reserve or leave the funds in the
24    money market."
25    Do you see that?

Page 112

BOB COOK

1
2  A  I do.
3  Q  And you write back, "Let's leave them for now.  We're
4     trying to work on a longer term strategy"?
5  A  That's correct.
6  Q  What's the longer-term strategy?
7  A  That would provide us a secure, longer-term term that we
8     felt would, in the term of the agreement, exceed what
9     interest rates might rise to.
10 Q  And at TSA did you have an internal threshold as to what
11    that interest -- what that number would be?
12 A  We did not have a strike point.
13 Q  Higher than 2.75 percent?
14 A  There are many variables that are affected in this, so I
15    would not speculate on a rate because there are many
16    options that we would consider in addition to rate.
17 Q  But at this point you hadn't seen anything that met your
18    qualifications?
19 A  That's correct.
20 Q  I'm now showing you a document that's been marked as
21    Lehman Exhibit 27.  It's a two-page document Bates-
22    stamped TSA 15322 through 15323.
23    Have you seen this document before?
24 A  I have.
25 Q  Is this the Barclays proposal that you had mentioned

28  (Pages 109 to 112)

Page 113

BOB COOK

1
2  earlier?
3  A  I believe it is, yes.
4  Q  And you mentioned that it involved some sort of a swap?
5  A  This is not a swap.  This is a GIC.
6  Q  And it's a GIC providing for a fixed rate of
7     2.75 percent, or a variable rate over a three-month LIBOR
8     of 1.5 percent?
9  A  I can't read the headings, but the 1.5 percent and
10    2.75 percent are there.
11 Q  Okay.  And do you recall discussing -- this is in
12    November 2011.
13    Do you recall discussing this proposed GIC from
14    Barclays?
15 A  Not specifically.  This is an uncollateralized GIC, so we
16    wouldn't have considered it.
17 Q  And why would you not consider an uncollateralized GIC?
18 A  Because we had been through, at this point in time, the
19    bankruptcy of a counterparty.  And we were not confident
20    of the viability of some financial institutions, or any
21    financial institution during the period of time.
22 Q  And did you -- was that -- who made the decision about
23    that, the not wanting to take the risk of an
24    uncollateralized GIC?
25 A  Staff.

Page 114

BOB COOK

1
2  Q  Did staff discuss that decision with any financial
3     advisors?
4  A  I can't say specifically.
5  Q  Did staff discuss with any advisors at all protections
6     that could be put in place in connection with an
7     uncollateralized GIC that would reduce some of those
8     risks?
9  A  I don't recall those discussions.
10 Q  Did TSA ever inquire of anyone of other protections that
11    might be available in the case of an uncollateralized
12    GIC?
13 A  I believe not.
14              (Exhibit No. 6 marked for
15              identification.)
16 Q  (By Ms. Sawyer)  The court reporter's handing you a
17    document that's been marked as Cook 30(b)(6) Exhibit 6,
18    which is Bates-stamped TSA 38481 through 38484.  And it
19    appears to be a memorandum from Swap Financial Group to
20    you and Carol Johnson, dated November 16th, 2011.
21    Do you recognize this memorandum?
22 A  Yes.
23 Q  And it says -- it starts by saying, "Following up on our
24    discussions."
25    Do you see that?

Page 115

BOB COOK

1
2  A  Uh-huh.
3  Q  What discussions had you had with Swap Financial Group at
4     this time regarding the reinvestment of TSA's reserve
5     fund?
6  A  It appears that we had asked for thoughts of Swap
7     Financial Group, if they had thoughts in terms of how
8     might we invest the reserve.
9  Q  And do you recall the discussions with Swap Financial
10    Group about how to invest the reserve fund?
11 A  Prior to this memo?
12 Q  Yes.
13 A  Not specifically.
14 Q  Do you recall them generally?
15 A  I can only presuppose that we asked for this kind of
16    discussion.
17 Q  Do you recall receiving this memorandum?
18 A  Not specifically, but I'm sure I've seen it and read it.
19 Q  The recommendations made by Swap Financial Group is to
20    kind of break the reserve fund into three tranches, he
21    says, and invest part of it into some sort of GIC, a
22    guaranteed investment contract --
23 A  Uh-huh.
24 Q  -- put some of it into a CD --
25 A  Uh-huh.

Page 116

BOB COOK

1
2  Q  -- and then put some of it into a swap.
3  A  Uh-huh.
4  Q  And if you turn to Page 3 of the memorandum, right under,
5     he breaks up the sizes of the different tranches, he
6     says, combined we would anticipate an average yield of
7     approximately 2.6 percent.
8     Do you see that?
9  A  Uh-huh.
10 Q  Do you recall Swap Financial Group making this proposal
11    to TSA?
12 A  Yes.
13 Q  And what was the discussion about this proposal at TSA?
14 A  We had a discussion internally, and as I recall, we did
15    have a follow-up call regarding this.
16 Q  And what was the internal discussion?
17 A  The discussion was that we should have a call with Peter
18    Shapiro to discuss this in more detail.
19 Q  Then tell me about the discussion with Mr. Shapiro.
20 A  As I recall, we walked through the memo to make sure that
21    we understood the various pieces, asked some questions
22    about it, and then considered the alternative as a staff.
23 Q  And what were the considerations the staff took into
24    account?
25 A  Well, there were several.  Because, again, we're talking

29 (Pages 113 to 116)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 117

BOB COOK

1
2  about a number of different tranches here, and given the
3  complexity of the different tranches and the implicit
4  complexity, specifically with the swap portion, on the
5  swap portion, for instance, state law, we would have
6  required a swap policy, which we did not have in place.
7        We'd have to consider all of the swap risks, of
8  which about eight or ten are identified in the state swap
9  guidelines.  Counterparty risk, basis risk, a myriad of
10 different things.
11       We weren't comfortable going into a swap kind of
12 transaction on this at this point in time.  Again, there
13 was a lot of credit risk in the market.  The combined
14 rate overall, even at the two -- what was the rate you
15 quoted?
16 Q  It's on the third page, 2.6 percent.  It's like a
17 stand-alone sentence.
18 A  Oh, there it is, yeah.  The 2.6 percent rate we felt in
19 November of 2011, again, we felt that in 2012 was when
20 interest rates were going to begin to rebound, and we
21 were concerned about entering into any kind of long-term
22 agreement that would lock us into a -- a rate that would
23 not be advantageous within a year or two.
24 Q  Were there any other considerations that led you not to
25 follow the recommendations reflected in this memorandum

Page 118

BOB COOK

1
2  from Swap Financial Group?
3  A  Again, when it comes to CD's and banks, we were -- would
4  not be protected by FDIC.  We weren't really excited
5  about being exposed to a lot of credit risk to any
6  particular bank or institution.
7        Again, we weren't interested in a noncollateralized
8  GIC.  We had to have all of the principal available every
9  six months.  So a myriad of reasons, we weren't
10 interested ultimately in the proposal.
11 Q  Did you ever discuss with the finance team or bond
12 counsel the possibility of amending the indenture to not
13 have the funds be liquid every six months?
14       MS. EVANSON:  And I'm going to object
15 to the extent you're asking for communications with
16 counsel.
17       MS. SAWYER:  I'm just asking if he
18 ever asked that question, but if you want to instruct,
19 that's fine.
20       MS. EVANSON:  You can answer if they
21 took place, but --
22       THE WITNESS:  I don't recall any.
23       MS. SAWYER:  I don't have any further
24 questions for the 30(b)(6) part of the deposition.
25       MS. EVANSON:  Okay.

Page 119

BOB COOK

1
2       MS. SAWYER:  We can go off the record.
3       (Signature reserved.)
4       (Deposition concluded at
5       12:03 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF WASHINGTON )   I, Cindy M. Koch, CCR, RPR, CRR,
                         ) ss CLR, a certified court reporter
2  County of Pierce    )   in the State of Washington, do
                         hereby certify:
3
4
       That the foregoing deposition of BOB COOK was
5  taken before me and completed on December 6, 2013, and
   thereafter was transcribed under my direction; that the
6  deposition is a full, true and complete transcript of the
   testimony of said witness, including all questions, answers,
7  objections, motions and exceptions;
8       That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and that the witness reserved the
   right of signature;
10
       That I am not a relative, employee, attorney or
11 counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
12 financially interested in the said action or the outcome
   thereof.
13
14
15       IN WITNESS WHEREOF, I have hereunto set my
16 signature on December 11, 2013.
17
18
19
20
21
22
23
   _____
   Cindy M. Koch, CCR, RPR, CRR, CLR
24 Certified Court Reporter No. 2357.
25

30  (Pages 117 to 120)