Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555(SCC)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                 U.S. Bankruptcy Court

14                 One Bowling Green

15                 New York, New York

16

17                 September 16, 2014

18                 11:15 AM

19

20  B E F O R E :

21  HON SHELLEY C. CHAPMAN

22  U.S. BANKRUPTCY JUDGE

23

24

25

1    Hearing re:   Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Dawn South and Sherri L. Breach

1    A P P E A R A N C E S :

2    JONES DAY

3        Attorneys for the Debtor

4        222 East 41st Street

5        New York, NY 10017-6702

6

7    BY:  LAURI W. SWAYER, ESQ.

8        JAYANT W. TAMBE, ESQ.

9

10   PACIFICA LAW GROUP

11       Attorney for TSA

12       1191 2nd Avenue

13       Suite 2100

14       Seattle, WA 98101-2945

15

16   BY:  PAUL J. LAWRENCE, ESQ.

17

18   RICH MICHAELSON MAGALIFF MOSER, LLP

19       340 Madison Avenue

20       19th Floor

21       New York, NY 10173

22

23   BY:  ERIC T. MOSER, ESQ.

24

25

Page 4

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Hi, good morning everyone.
 3        (A chorus of good morning)
 4            THE COURT:  All right.  So, let's talk about how
 5    we should do this, all right, just procedurally and in terms
 6    of a record.  We're going to -- we're on the record at the
 7    moment.
 8            So, one of the things that was raised in the run
 9    up to today I think was raised by Mr. Moser, there was a
10    little bit of a disconnect about letter briefing and the
11    like.  Do you recall that letter?  Mr. Moser wrote a letter
12    -- let me see if I can find it in my stack.  Mr. Moser wrote
13    a letter on June 25th basically saying you have to file a
14    motion, you're violating the limit of letter briefs, it was
15    a communication indicating that he hadn't been in the loop
16    on the way we had agreed to proceed.
17            That being said, there was then a vacation and a
18    subsequent letter was submitted by Mr. Lawrence.
19            Okay.  So, my question for you so, I'm going to
20    give you dispositions today, but I need to talk to you, I
21    have some questions regarding the documents, questions that
22    remain unanswered after I've reviewed them and I've reviewed
23    the legal authority.
24            So, obviously I have to ask those questions in a
25    way that doesn't reveal what the document says, but I don't
```

Page 5

1    know of any other way to do this other than I've got the

2    documents, you don't -- you folks don't, you folks do, I'm

3    going to ask the questions without revealing the content of

4    the documents just as a kind of -- in some instances I have

5    factual questions and in some instances we're going to have

6    to have legal argument, and then I'm going to give you a

7    disposition on every one of the documents on the sampling

8    sheet, but I want to (a), preserve appellate rights, and

9    (b), give you enough of a basis so that you can extrapolate

10   to the remainder of the documents.  Because we're proceeding

11   today on a sampling basis, but to the extent that I order

12   production today, you folks are going to have to go back and

13   relook at what you've withheld and apply the rulings today

14   to those documents.

15          So, does that make sense?  I'm happy to work with

16   you on something that makes more sense, and I'm particularly

17   concerned that procedurally I have no missteps that would

18   impair your appellate rights if that becomes an issue down

19   the road.

20          So, remember, there is no motion to compel that's

21   pending, but ordinarily I wouldn't -- you know, there

22   wouldn't be a motion to compel because you've met and

23   conferred, you can't agree, and now we're here.

24          So, if you have an objection to this I need to

25   hear it now.

Page 6

1          MR. LAWRENCE:  I think -- Paul Lawrence for the --

2          THE COURT:  Yes.

3          MR. LAWRENCE:  -- TSA.

4          The concern is simply one of making sure that if

5    there's a need for an appeal that the appellate record is

6    clear --

7          THE COURT:  Right.

8          MR. LAWRENCE:  -- and if your -- if the

9    disposition is going to -- obviously going to be the basis

10   of any appeal on either side --

11         THE COURT:  Right.

12         MR. LAWRENCE:  -- if that's clear, and my only

13   other concern was whether or not the letter briefs, so to

14   speak, letters constitute the equivalent of a motion such

15   that issues about whether matters were raised or waived by

16   being discussed in the letter as opposed to a motion brief,

17   whether that's still before the Court.

18         THE COURT:  Well, if you want to -- if you want to

19   on this record convert it to a motion, I mean I'm just

20   not --

21         MR. LAWRENCE:  I don't think --

22         THE COURT:  -- I don't know all the tricks of the

23   trade --

24         MR. LAWRENCE:  Yeah.

25         THE COURT:  -- that you litigators have with each

Page 7

1   other, but I'm trying to not make this -- I'm trying not to

2   accidentally have this be a game of gotcha in any respect,

3   and that being said, I don't want to move the trial, I'm not

4   going to move the trial, and therefore if I had nothing but,

5   you know, leisure time I would be happy to write a

6   definitive opinion on, you know, the revised Rule 26.  As a

7   practical matter it's just not going to happen.

8            MR. LAWRENCE:  No.

9            THE COURT:  So, can I give you, you know, reasoned

10  decisions on the specific categories of documents, and if

11  you think -- if either of you thinks I'm wrong it's

12  preserved for appeal.  I mean that's the way I was thinking

13  about it.

14           MR. LAWRENCE:  That's fine, Your Honor.

15           MS. SAWYER:  From our perspective I think the

16  letters are functionally equivalent to a motion to compel --

17           THE COURT:  That's --

18           MS. SAWYER:  -- and they lay out of our arguments

19  and a reasoned --

20           THE COURT:  Right.

21           MS. SAWYER:  -- decision from the bench is --

22           THE COURT:  So just to be crystal clear.

23           MS. SAWYER:  -- acceptable.

24           THE COURT:  Neither of you is going to raise as a

25  procedural bar on a subsequent appeal, oh, there was never a

Page 8

1    motion to compel.

2            MR. LAWRENCE:  Correct.

3            THE COURT:  Okay.

4            MS. SAWYER:  Not from our side.

5            THE COURT:  So, to the extent that an appellate

6    court ever sees this record we have that understanding that

7    we are doing just the expedient, efficient move to the

8    documents so that you can keep your trial dates.

9            MS. SAWYER:  Agreed.

10           MR. LAWRENCE:  Agreed.

11           THE COURT:  Okay?

12           MR. LAWRENCE:  Yes.

13           THE COURT:  Okay.  Excellent.

14           So, what I'm going work from is -- and you're

15   going to have to help me along, I'm going to go very slowly

16   -- the Jones Day folks have this chart, correct?

17           MS. SAWYER:  Is it -- is that the one that was

18   attached to the July 28th letter?

19           THE COURT:  Let's see.  Yes.  It's a two-page

20   chart, it -- the first group of documents is TSA numbering,

21   and the second group is Swap.

22           MS. SAWYER:  And just to make sure I'm looking at

23   the right thing, the first document listed would be TSA-

24   6636?

25           THE COURT:  Correct.

Page 9

1          MS. SAWYER:  Dated January 9th, 2009?

2          THE COURT:  Exactly right.

3          MS. SAWYER:  Okay.  Thank you.

4          THE COURT:  Okay?  So let me turn to those

5     documents, and I have a little cheat sheet of who the -- who

6     the players are.  So, Mr. Lawrence, I'm going to go to you

7     first.

8          MR. LAWRENCE:  Sure.

9          THE COURT:  This document has, which consists of a

10    series of emails and an attachment -- and if at any point

11    you think I'm giving away too much, Mr. Lawrence, you need

12    to stop me.

13         MR. LAWRENCE:  Sure.

14         THE COURT:  Okay?  So this is a series of emails

15    and a draft attachment.  So the draft attachment properly

16    withheld, and the first email -- and I thought the rules of

17    -- well, the documents have been entirely withheld, there's

18    been no redacted form of this document produced, correct?

19         MR. LAWRENCE:  Right.  Some of the documents have

20    been redacted.

21         THE COURT:  Yes, that much I know, but not this

22    one.

23         So the very first email -- and by the first email

24    I'm referring to one that's dated December 19th, 2008 sent

25    at 1:48 p.m.  It's at the bottom --

Page 10

```
 1              MR. LAWRENCE:  Yes.

 2              THE COURT:  -- of the third page.  So that's

 3    attorney/client communication.  After that I don't believe

 4    that any of the subsequent emails are attorney/client

 5    communication.

 6              So if you read up from the bottom December 19th,

 7    December 19th, December 21, December 23, it's getting to

 8    look a lot like Christmas, December 25th, it is Christmas,

 9    and then January 9th.

10              MR. LAWRENCE:  Okay.

11              THE COURT:  I don't think that any of the

12    subsequent emails on those two pages are protected

13    attorney/client communications.

14              MR. LAWRENCE:  And that's fine, and I don't think

15    we need to discuss that, I think I understand the ruling,

16    but I have a question.

17              THE COURT:  Okay, that's the point of this.

18              MR. LAWRENCE:  I believe -- I believe that most,

19    if not all of those emails, have been produced in response

20    to other --

21              THE COURT:  Okay.

22              MR. LAWRENCE:  -- other versions, and I just want

23    to clarify that if in fact they have been produced we just

24    need to tell them what they are so that there's not

25    duplicate.
```

Page 11

1          THE COURT:  Well, but --

2          MR. LAWRENCE:  Or we can duplicate.

3          THE COURT:  Okay.  But it's right here.

4          MR. LAWRENCE:  No, I understand.

5          THE COURT:  So all you can -- you could literally

6    take a Sharpie and black out what I just said --

7          MR. LAWRENCE:  Sure.

8          THE COURT:  -- as redacted and hand it to them.

9          MS. SAWYER:  We'd prefer that, because there's

10   been a lot of confusion about what was been produced --

11         THE COURT:  Yeah.

12         MS. SAWYER:  -- and hasn't been, so.

13         THE COURT:  Okay.

14         MR. LAWRENCE:  Okay.

15         THE COURT:  Okay.  All right?  So that's with

16   respect to TSA document ID 6636.

17         Okay.  And with -- moving on to document ID 6812,

18   same idea.  In fact this appears to be duplicate forms of

19   earlier emails.

20         MR. LAWRENCE:  So again, the December 19th, 2008

21   is not being produced, but the rest of the document would

22   be.  The first one -- or the last one on -- which is the

23   first in time.

24         THE COURT:  Yes.

25         MR. LAWRENCE:  Right.

Page 12

1              THE COURT:  Exactly right.  And the -- has the

2    attachment already been produced?

3              MR. LAWRENCE:  The -- I believe the final form of

4    the attachments, or if they want to -- if you want us to

5    produce this draft of the contract that's fine.

6              THE COURT:  Yes.

7              MR. LAWRENCE:  Okay.

8              THE COURT:  So that -- the memorandum, which is

9    dated December 22nd, which is included in the group of

10   documents at TSA-6812 should also be produced.

11             Now, the next document, 6841, I think it has been

12   produced in redacted form.

13             MR. LAWRENCE:  Correct.

14             THE COURT:  Right?

15             MR. LAWRENCE:  Yes.

16             MS. SAWYER:  Just to be clear, that's been

17   produced to us in redacted form?

18             MR. LAWRENCE:  Yes.

19             THE COURT:  Yeah.  Well, that -- that's what

20   they're -- that's what they're telling me.  Okay.

21             MS. SAWYER:  Right.

22             THE COURT:  The document that I'm looking at says

23   redacted, and it's redacted -- I don't know how to make it

24   clearer.

25             MS. SAWYER:  Okay.

Page 13

1           THE COURT:  There's a document 6841 that they've

2    represented to me has been produced to you in redacted form.

3           MS. SAWYER:  Okay.  All right.  And you have --

4    and you have not, Your Honor, seen the redacted aspect of

5    this.

6           THE COURT:  Yes, I have the -- I have it --

7           MR. LAWRENCE:  But she has it.

8           MS. SAWYER:  Okay.

9           THE COURT:  -- and it's in yellow.

10           MS. SAWYER:  All right.  Perfect.

11           THE COURT:  So I can see what's been redacted.

12           MS. SAWYER:  All right, thank you.

13           THE COURT:  Yes.

14           MS. SAWYER:  Just wanted to clarify that.

15           THE COURT:  Okay.  So, Mr. Lawrence, if you look

16    at the -- on the first page of this document there's a

17    communication, Cook to Shapiro, February 19th, 2009.

18           MR. LAWRENCE:  Okay.

19           THE COURT:  Why was that one redacted?

20           MR. LAWRENCE:  I believe that's a follow up to the

21    previous email, which is from K&L Gates to Cook and Shapiro.

22    It's -- that's the reason.

23           THE COURT:  But it's from --

24           MR. LAWRENCE:  If you want to produce it that's

25    fine.

```
 1              THE COURT:  Yes, it ought to be produced.

 2              MR. LAWRENCE:  Sure.

 3              THE COURT:  It does not -- it's not privileged,

 4    it's from Mr. Cook to Mr. Shapiro, there's no attorney

 5    copied, and the communication I don't believe reflects

 6    privileged material.  All right?

 7              And then --

 8              MR. LAWRENCE:  The other -- the other

 9    communication is from Kristin Elliott (ph) to Bob Cook, and

10    et cetera, she's an attorney with K&L.

11              THE COURT:  Right.

12              MS. SAWYER:  I'm sorry, there's two things that

13    are redacted?

14              THE COURT:  We're not done yet.  So --

15              MS. SAWYER:  Excuse me.

16              THE COURT:  So --

17              MS. SAWYER:  I'm sorry, the redacted document I

18    looked at has just one email covered up.

19              THE COURT:  Okay.  So the --

20              MS. SAWYER:  Or maybe the header is covered for

21    the one.  That's what I'm not --

22              THE COURT:  Okay.  So the --

23              MS. SAWYER:  -- it's not clear.

24              THE COURT:  -- the header ought not be to

25    redacted, okay?  On the second page the Kristin Elliott to
```

1    Bob Cook header should be produced.

2              MR. LAWRENCE:  Okay.

3              THE COURT:  Okay?  Then the Bob Cook to Peter

4    Shapiro, February 19th communication should be unredacted

5    and produced.

6              And then working our way back up the page all of

7    that is just remarkably uninteresting and that was already

8    produced to you, right?

9              MS. SAWYER:  It was.

10             THE COURT:  Okay.

11             MR. LAWRENCE:  So, I'm -- just is the

12   communication from Kristin Elliott to Bob Cook, is that --

13             THE COURT:  That's -- that is protected.

14             MR. LAWRENCE:  Okay.

15             THE COURT:  The header should be --

16             MR. LAWRENCE:  Just the header.

17             THE COURT:  -- unredacted.

18             MR. LAWRENCE:  Okay.  Got it.  Got it.

19             THE COURT:  Okay?

20             MR. LAWRENCE:  Sure.

21             THE COURT:  Okay.  That brings us to 3166.  So in

22   this one the header has been already revealed in the --

23             MR. LAWRENCE:  The redaction.

24             THE COURT:  Right.  And then the substance of the

25   Bob Cook to Peter Shapiro email ought to be unredacted.

Page 16

1              MR. LAWRENCE:  Okay.

2              THE COURT:  All right, everybody with me?

3              MR. LAWRENCE:  Yes.

4              MS. SAWYER:  So far.

5              THE COURT:  Okay.  All right.  Now we get to the

6    next -- we get to the next group, and let's take them --

7    let's take it as a group, which is TSA ID number 14968,

8    14979, 17234, and 14829, and these are claimed to be draft

9    expert reports.

10             So, this strikes me as being rather the crux of an

11   important point to both sides, and in the Jones Day letter a

12   number of points are made with respect to this.

13             On this one the -- so the argument is all around

14   whether this falls within the protection for draft expert

15   reports or nonetheless, even though it would appear to be a

16   draft report, whether it's otherwise discoverable.  And the

17   June 20th Jones Day letter makes a number of points about

18   this, including the fact that a version of it was produced,

19   and there's a number of other points.

20             Based upon that and my reading of the amendment to

21   the expert report provisions of Rule 26, I believe that all

22   of these documents need to be produced.

23             MR. LAWRENCE:  May I address that?

24             THE COURT:  Yes.

25             MR. LAWRENCE:  Do you want me to stand or to sit

1   down?

2           THE COURT:  Well, it's fine.

3           MR. LAWRENCE:  I think the starting point, as I

4   think Your Honor has recognized, these are all various --

5           THE COURT:  Iterations.

6           MR. LAWRENCE:  -- iterations of the final report.

7           THE COURT:  Well, let's -- let's be very precise.

8   The final report is what you have produced in connection

9   with the fact that Mr. Shapiro is now the testifying expert,

10  right?

11          MR. LAWRENCE:  Right, there's no difference

12  between the loss calculation memo that was produced to the

13  Court as part of the claim filing and the loss calculation

14  memo that was identified as an expert report because we

15  didn't --

16          THE COURT:  Well, but I don't agree -- I don't

17  agree with you on that point.  I mean that's your position,

18  right?

19          MR. LAWRENCE:  Well, I guess I don't understand

20  what -- is --

21          THE COURT:  So in --

22          MR. LAWRENCE:  Maybe I'm not understanding the

23  Court's --

24          THE COURT:  Okay.

25          MR. LAWRENCE:  -- rationale if it's a --

Page 18

 1              THE COURT:  There was a proof of claim, right?

 2              MR. LAWRENCE:  Yes.

 3              THE COURT:  To which was attached a loss

 4    calculation memorandum.

 5              MR. LAWRENCE:  Right.

 6              THE COURT:  Right.  So -- and I don't -- yes, you

 7    have -- I don't know off the top of my head what the

 8    requirements were in connection with proofs of claim filed

 9    on account of Swap terminations, but be that as it may there

10    was a memo filed, and now the author of that memo has been

11    designated as your testifying expert.

12              So the question is, do the prior drafts of that

13    proof of claim memorandum loss calculation, which was born

14    between Washington TSA and Swap Financial and does not

15    reflect privileged attorney/client communications, which as

16    I've read every version of it I don't believe that it does,

17    whether the fact that you've now designated the author of

18    that -- earlier versions of that memo as a testifying

19    expert, whether that sweeps in everything, notwithstanding

20    the fact that as of the time the relationship was born, and

21    if you look at the advisory committee notes to the rules

22    amendment, the purpose of the no more producing draft

23    reports amendment was because the '93 amendments had been

24    read -- they're renovating in there -- had been read to

25    require and indeed did require that attorney/client

Page 19

1    protected communications, which were given to an expert and

2    included in iterative drafts, be disclosed, and everybody

3    then backed off and said, oh, no, no, no, that's not the way

4    it should be.

5             But if you read, for example, in the Republic of

6    Ecuador versus McKay Kays, the Ninth Circuit I thought does

7    a good job -- and I just have the slip opinion at page 21 --

8    it quotes from the advisory committee notes indicating how

9    the scope of permissible disclosure and discovery otherwise

10   remains broad, notwithstanding the protections of 26(b)(4)

11   for draft reports and attorney expert communications.

12            So, for that reason alone, combined with the fact

13   that a version of it was attached to the proof of claim,

14   combined with the fact that a version of it seems to have

15   already been produced, which feels waiverish, if not an

16   explicit waiver, and because these drafts are back and forth

17   between Cook and Shapiro and/or Vergara (ph), no lawyer in

18   sight, no reference to anything lawyerly in them, I believe

19   they need to be produced.

20            But I'm happy to keep hearing you.

21            MR. LAWRENCE:  Okay.  Let me -- let me give our

22   perspective --

23            THE COURT:  Sure.

24            MR. LAWRENCE:  -- and then -- so, first of all, I

25   think you have to start with the question, and we struggled

Page 20

1    with this, this is why we ended up submitting this as an

2    expert report, that under the federal rules if somebody is

3    retained by a client, i.e., retained by the TSA for the

4    purposes of litigation and produces a document based on his

5    expertise you are supposed to disclose that as an expert

6    report.

7           And I think at the end of the day we decided that

8    Swap was retained by the client for the purposes of

9    litigation that is making a claim against the bankruptcy

10   estate of Lehman using its expertise so that we were

11   obligated under CR 26 to disclose him as an expert, even

12   though all he was doing in his disclosure was justifying the

13   proof of claim.  But we felt that we would be subject to a

14   potential motion to strike him from his 30(b)(6) status,

15   from his potentially fact status because he was retained

16   specifically for the litigation, that is to value a claim,

17   he applied his expertise, and therefore he fell within the

18   designation of an expert under CR 26 who has the produce a

19   report.

20          So, that was the call we made as to why we decided

21   to not have him do a separate report, but to have his

22   existing report, his valuation -- loss valuation memo

23   designated as an expert report, because we were concerned if

24   we didn't do that it would be subject to being stricken,

25   because I think that he fell within the criteria of 26(b).

Page 21

```
 1              So our starting point in thinking is that in fact

 2    he an expert who needs to produce a report if he's going to

 3    testify at all --

 4              THE COURT:  Okay.

 5              MR. LAWRENCE:  -- because he's not -- he's not a

 6    TSA employee who was asked to do a loss value, he's not Bob

 7    Cook who's the financial guy who was asked to do something,

 8    he was a retained expert.

 9              THE COURT:  He's a -- so you're drawing the

10    distinction between retained experts and non-retained

11    experts.

12              MR. LAWRENCE:  Right, as opposed to a non-retained

13    expert being an employee like Bob Cook at TSA.

14              THE COURT:  Okay.

15              MR. LAWRENCE:  So once we were concerned about

16    that we disclosed the loss calculation as an expert report.

17              So, that's our starting point, and if you don't

18    buy that we can -- that's an issue we can take up on appeal

19    or not, I mean I don't think these documents are that

20    critical one way or the other, but I will say that that's

21    our starting point.

22              THE COURT:  Okay.

23              MR. LAWRENCE:  And in fact the case law that we

24    cited, Greenwood 950 LLC, notes that an initial -- an

25    initial report of a consulting expert --
```

Page 22

1           THE COURT:  That's the Louisiana case.

2           MR. LAWRENCE:  Right.

3           THE COURT:  Right?

4           MR. LAWRENCE:  Right.  It notes that it doesn't

5     really matter whether they originally were identified as a

6     testifying expert or not, an expert report is an expert

7     report, it doesn't matter what you -- when he was designated

8     as a testifying expert.

9           THE COURT:  Well -- yeah, I mean there's lots of

10    -- there's lots of stuff baked into this because -- and

11    there was no briefing on this point -- but one interesting

12    issue is whether or not the retention of Swap Financial back

13    in the proof of claim time period is -- I don't know if

14    there's case law that that qualifies as in anticipation of

15    litigation.  So that's kind of an interesting -- that's an

16    interesting issue.

17          MR. LAWRENCE:  I --

18          THE COURT:  Okay.

19          MR. LAWRENCE:  -- it seemed clear to me, but if

20    it's -- I'm happy to brief it if that's --

21          THE COURT:  No, no, I don't -- I don't want

22    anymore briefing because I believe that notwithstanding your

23    citation to that one case I've undertaken a very thorough

24    review, there's not that much out there, and I believe

25    that --

1           MR. LAWRENCE:  If I --

2           THE COURT:  -- a better answer --

3           MR. LAWRENCE:  Right.

4           THE COURT:  -- in this circumstance is that the

5    designation of Mr. Shapiro as a testifying expert shouldn't

6    preclude the discovery of prior alternative valuations or

7    versions of that report because it then falls within the

8    facts or data notion that's embodied in (b)(3), among other

9    things, with the exception of that if these materials had

10   explicitly made clear -- hypothetically, not based in

11   reality -- but hypothetically, oh, we spoke to the guys at

12   K&L Gates and they told us X and we're modeling it

13   differently now based on that, you -- under my reading of

14   the 2010 amendments that's exactly the kind of thing that

15   ought to be protected so that there's not this paranoia

16   about experts working together.  But that whole rationale to

17   me doesn't apply to this group of documents.

18           MR. LAWRENCE:  If I could just speak to that

19   briefly.

20           THE COURT:  Sure.

21           MR. LAWRENCE:  Our position is that under the

22   rule, the rule -- I understand what you -- the Ninth Circuit

23   case, I've certainly read that as well, but the Ninth

24   Circuit case is not saying the rule is subject to judicial

25   interpretation.  The rule is very clear, the rule is

Page 24

1    unambiguous, the rule says draft reports are not subject to

2    production.  It doesn't say draft reports containing

3    attorney/client -- attorney work product, it doesn't say

4    draft reports containing attorney/client communications, it

5    says draft reports period, are not subject to being

6    produced.  So, that -- we're relying on the rule.

7            And in fact I don't believe that either the

8    Ecuador case or any of the cases that were cited take the

9    route that oh, this is a draft report, but I'm going to

10   produce it any way because I don't see enough attorney stuff

11   in it.  There are no cases that say that.

12           What the case of Ecuador is looking at, is okay,

13   we have something that is claim I think in Ecuador, for

14   example, we have some notes that were taken by an expert,

15   they're being claimed as a draft report.  Well, that's not a

16   draft report.  And part of the reason we know that is

17   because, you know, there's nothing work product in that.

18           But I think the rule in our view is unambiguous,

19   it says draft reports of any kind in any form are not to be

20   produced.

21           And as Your Honor has seen, all of these documents

22   are iterations of what ultimately was filed as a loss

23   calculation memo and what was therefore identified as an

24   expert report for the rationale we said.

25           So, we don't think the rule is subject to if type

Page 25

1    of interpretation that you're providing on, and we don't

2    think there's any case that allows a court to deviate from

3    the strict clarity of the rule because they take a hard and

4    fast look at a particular draft and say, oh, is there

5    attorney work product in here or not?

6              THE COURT:  So let me ask -- let me just follow

7    up, and one -- and let's go back to the broader backdrop of

8    this, is that there seems to be a lot of back and forth

9    about what was said.  Could you excuse me one minute?

10             MR. LAWRENCE:  Sure.

11             THE COURT:  About what was said about, oh, they're

12   work papers, we'll give you the work papers, never mind

13   there aren't work papers.  Oh, there were -- the witness

14   testified that there were alternative analyses, but nothing

15   has ever been produced.

16             Where I -- one concern that I have is what has

17   been presented to me as a picture of here's my report,

18   that's it, I'm not -- we're not giving you anything else.

19             So the fact that these earlier iterations contain

20   alternative analyses it seems to me that that's -- and I

21   hear you loud and clear about that I don't have discretion

22   to interpret the rule, but I also believe that I'm entitled

23   to apply -- I'm entitled to read it and determine whether

24   it's applicable to this --

25             MR. LAWRENCE:  Sure.

1          THE COURT:  -- set of circumstances, and if the

2     end result is that you have a final expert report and it's

3     been -- it's grand fathered in everything that's ever been

4     said and that it then means that there are no facts or data

5     that get produced that just seems to me to be the wrong

6     result.

7          MR. LAWRENCE:  Okay.  I think we're jumping ahead

8     a little bit to an important issue though.  The facts and

9     data, and we'll use Mr. Gruer (ph) as an example, there are

10    really in terms of the expert's interpretation and I think

11    Currie (ph) and Hastricker (ph) are in a different situation

12    because they did a very different analysis, but involves an

13    expert's determination of what elements go into a valuation,

14    that is what is the appropriate spread based on what --

15          THE COURT:  Right.

16          MR. LAWRENCE:  -- securities, whether a credit

17    spread, whether a profit spread.  Those issues are

18    fundamentally not -- fundamentally a matter of a machine, a

19    program.

20          THE COURT:  I'm sorry?

21          MR. LAWRENCE:  They're fundamentally a matter of a

22    program or a machine.

23          THE COURT:  Right.

24          MR. LAWRENCE:  In other words, there's expertise

25    in Mr. Shapiro saying, see commercial paper ought to be

Page 27

```
1    used --

2              THE COURT:  Sure.  Right.

3              MR. LAWRENCE:  -- versus agency securities.  But

4    once you make that decision then you just plug it into a

5    machine, a program, Bloomberg in the case of Mr. Gruer,

6    Principia (ph) in the case of Mr. Shapiro, and you plug

7    in --

8              THE COURT:  But let me --

9              MR. LAWRENCE:  -- well basically stipulated

10   variables and then come out with the number.

11             THE COURT:  Sure.  But the -- but everybody knows

12   the -- you know, what goes in drives comes out.  So -- and

13   here's where you have to help me, and I'm not going to

14   get --

15             MR. LAWRENCE:  Sure.

16             THE COURT:  -- too granular, because I don't have

17   a clear picture of what folks already know, nor do I know

18   what was said in the deposition.

19             MR. LAWRENCE:  Sure.

20             THE COURT:  But part of the testing the opinion of

21   the expert is why did you use this date versus that date?

22   Why did you use --

23             MR. LAWRENCE:  Well --

24             THE COURT:  -- this rate versus that rate?

25             MR. LAWRENCE:  Well --
```

Page 28

1          THE COURT:  And to the extent that an earlier

2     draft did it differently --

3          MR. LAWRENCE:  Well, I think --

4          THE COURT:  -- what you're saying is that that --

5     that deserves protection under this notion that gee, an

6     expert and a lawyer ought not to have to worry about working

7     together and putting everything down because of course the

8     opinion is going to develop over time and you shouldn't have

9     to worry about drafts.

10          And I don't think that what started with a process

11     of, you know, we calculated this, we want you guys to

12     calculate it for us, we have a proof of claim deadline

13     coming up, and culminating in a designation as a testifying

14     expert after a 30(b)(6) deposition, I --

15          MR. LAWRENCE:  Well, I mean do you want us to

16     dedesignate him and just have him testify as --

17          THE COURT:  No, I'm not --

18          MR. LAWRENCE:  I mean, you know, but let me just

19     -- let me just address, so at the end of the day the date

20     issue is something that's determined by the law and was

21     directed by the attorney to use the date of the rejection.

22     And, for example, it was not clear what the date was.  You

23     could either use the date right before -- the day before

24     the --

25          THE COURT:  You're not waiving anything right

Page 29

```
 1    here, right?

 2              MR. LAWRENCE:  No, no, because this was in the --

 3    one of the versions that was --

 4              THE COURT:  Yes.

 5              MR. LAWRENCE:  -- given out to the public.

 6              THE COURT:  Right.

 7              MR. LAWRENCE:  It's the same analysis, it just has

 8    two dates in it.

 9              THE COURT:  Right.

10              MR. LAWRENCE:  It has the date, October 2nd I

11    think was the day before the bankruptcy, and then

12    March 23rd, if I'm remembering right --

13              THE COURT:  The rejection date.

14              MR. LAWRENCE:  -- which is the date of the

15    rejection date.

16              THE COURT:  Right.

17              MR. LAWRENCE:  So, yes, there were variation on

18    the dates --

19              THE COURT:  Right.

20              MR. LAWRENCE:  -- and I'm not sure what the

21    significance of that is --

22              THE COURT:  Okay.

23              MR. LAWRENCE:  -- but that is -- that was --

24              THE COURT:  Okay.

25              MR. LAWRENCE:  -- that's reflected.
```

Page 30

```
 1                THE COURT:  But I'm --

 2                MR. LAWRENCE:  That's reflected in this, and

 3      that's fine.

 4                THE COURT:  Right.  Okay.

 5                MR. LAWRENCE:  But I don't think there's any --

 6      once you find the date then the rest of it is relatively

 7      mechanical, except what's been testified to about, that is

 8      how he calculated the credit spread and how he calculated

 9      the profit spread, which he explained fully, and there is --

10      you know, there's nothing beyond that that's in the -- other

11      than what's in the file valuation memo.

12                THE COURT:  Well, in one of these documents -- it

13      might be in the Swap --

14                MR. LAWRENCE:  They're all variations of the same.

15                THE COURT:  They're all -- yeah, they're all

16      variations of the same thing, but in one of the variations

17      there's parenthetical commentary.  I believe -- and I'm

18      struggling to find it.  There's one version in which there

19      are comments from the one party to the other that are in

20      brackets.  Do you know which one I'm talking about?

21                MR. LAWRENCE:  Are you talking about comments from

22      Mr. Shapiro to Mr. Vergara within Swap?

23                THE COURT:  Yes.

24                MR. LAWRENCE:  Okay.  And let me just speak

25      specifically to that, because it was --
```

1            THE COURT:  Is that -- that's a --

2            MR. LAWRENCE:  -- it was addressed in In re:

3    Application of Ecuador where the court was asked to compel

4    communications between Kelsh (ph), the --

5            THE COURT:  Can you get -- can you get me to the

6    document first?

7            MR. LAWRENCE:  I don't know exactly -- I remember

8    the document, but I can't -- I can't give you the exact

9    document.

10       (Pause)

11            THE COURT:  132866.

12            MR. LAWRENCE:  And is that in the Swap or in

13    the --

14            THE COURT:  It's in the Swap.

15            THE COURT:  132866.  Right?  So, and I realize I'm

16    jumping around --

17            MR. LAWRENCE:  I don't even know --

18            THE COURT:  -- I'm jumping around a little bit.

19    Are you there, Mr. Lawrence?

20            MR. LAWRENCE:  No, but that's --

21            THE COURT:  Okay, I'll wait for you.

22            MR. LAWRENCE:  -- that's my fault.

23            THE COURT:  Oh, no, no, no, I'll wait for you.

24            MR. LAWRENCE:  132866?

25            THE COURT:  I'll wait for you.

1            MS. SAWYER:  Where are we, I'm sorry?  What

2    document?

3            THE COURT:  132866, which is --

4            MS. SAWYER:  On the Swap list?

5            THE COURT:  -- on the Swap list, and the author is

6    Peter Shapiro, and that -- and the designation is draft

7    expert report.

8        (Pause)

9            THE COURT:  I think those are -- they're in

10   alphabetical order -- no, in numerical order, but -- they're

11   actually not oddly enough.

12           MR. LAWRENCE:  For whatever reason --

13           THE COURT:  Maybe they're in date order.

14           MR. LAWRENCE:  -- I don't -- I don't know --

15           THE COURT:  I'm going wait for you, take your

16   time.

17           MR. LAWRENCE:  All right.

18       (Pause)

19           THE COURT:  It's got a header in little font

20   that's Shapiro to Vergara.

21           MR. LAWRENCE:  It --

22           THE COURT:  I think you're too far back if I'm

23   looking at what you're looking at.

24           MR. LAWRENCE:  Oh, here, 132866, okay.

25           THE COURT:  See it?

Page 33

1          MR. LAWRENCE:  Well, I see it on my chart --

2          THE COURT:  Okay.

3          MR. LAWRENCE:  -- and I'm trying to now go back to

4    where it is in my chart.  Ah, okay.  So these are comments

5    by Peter Shapiro.

6          THE COURT:  Right.

7          MR. LAWRENCE:  Okay.  So --

8          THE COURT:  So --

9          MR. LAWRENCE:  -- if I can turn now to the case.

10         THE COURT:  Okay.

11         MR. LAWRENCE:  In In re: Application of Republic

12   of Ecuador one of the categories that the -- were sought to

13   be compelled were communications between Kelsh, who's the

14   testifying expert --

15         THE COURT:  Yes.

16         MR. LAWRENCE:  -- and other Exponent employees,

17   that is employees of Kelsh, who was with Exponent.  And the

18   court said, "Such internal communications are protected work

19   product."

20         So this is -- to me this is controlled by Kelsh,

21   which says that when you have internal communications about

22   a draft report between an expert and his employee, i.e.,

23   between Shapiro and Vegara, it's protected work product, and

24   that was the holding of In re: Republic of Ecuador.

25         THE COURT:  Let me hear --

1          MS. SAWYER:  Well, fundamentally the premise is as

2     in that case that there was -- the attorneys were driving

3     the expert work that was being done.  So the work being done

4     by this testifying expert was being done at the direction of

5     attorneys.

6          THE COURT:  Well, but that --

7          MS. SAWYER:  Here we have a different situation.

8     We have Mr. Shapiro being retained by the TSA to provide

9     valuations that they're going use internally, then fast

10     forward three years they want to designate him as a

11     testifying expert and then draw a cloak over everything he

12     did before, and that's not the purpose of the rule, and it

13     prevents us from being able to see the facts and data.

14          So in that --

15          THE COURT:  So is that -- is that work product,

16     what --

17          MS. SAWYER:  If Mr. Shapiro's work had been

18     directed by attorneys it could have been work product, but

19     Mr. Cook testified that Mr. Shapiro was not being directed

20     by attorneys.  Mr. Shapiro himself sends an email to

21     Mr. Vegara that's been produced saying we need to figure out

22     how to do this.  It's not an attorney directed thing.

23          THE COURT:  Well, that --

24          MS. SAWYER:  Mr. Rich, who testified said --

25          THE COURT:  -- this is where I need help with.

1              MS. SAWYER:  -- I don't know anything about it.

2              THE COURT:  I always thought that you had to have

3       an attorney somewhere in the mix, and this is -- there --

4       there are no attorneys anywhere here.  They were retained by

5       Washington TSA, right?

6              MR. LAWRENCE:  Right.  They were -- there's a

7       difference between -- and this is why I find it ironic that

8       we're in this position.  There's a difference between -- an

9       expert is supposed to be an expert who's bringing those

10      independent professional judgment to a matter, they're not

11      supposed to be a mouthpiece for the attorneys.  So the idea

12      that an attorney tells an expert what to say and only then

13      is it privileged is contrary to the whole notion of what an

14      expert witness is.

15             It is clear that Jay Rich and other members of K&L

16      Gates, including the bankruptcy attorneys, Mark Greca (ph),

17      were involved.  Granted there were communications directly

18      with Mr. Cook as well, I don't -- and I don't deny that

19      Mr. Cook and the TSA retained Shapiro in the first place --

20      but the notion that only when the attorney is telling the

21      expert what to do does it fall within a drafted court.

22             THE COURT:  Can you show me in the Ecuador case --

23             MR. LAWRENCE:  So, I have --

24             THE COURT:  And again, I have -- you know, we

25      don't have --

```
 1                 MR. LAWRENCE:  I -- maybe --

 2                 THE COURT:  -- fancy --

 3                 MR. LAWRENCE:  -- page 8.  I have it on page 8,

 4      it's paragraph 9 in my version of it.

 5                 THE COURT:  Is it in Roman I or Roman II?

 6                 MR. LAWRENCE:  It's -- so it's II -- well, it's

 7      Roman I --

 8                 THE COURT:  Uh-huh.

 9                 MR. LAWRENCE:  -- Section C or -- no, Section 2.

10      Roman -- sorry.  Roman I, Section 2, Subsection (a),

11      communication between Kelsh and other Exponent employees.

12                 THE COURT:  I have no idea what you're -- I'm

13      looking at the Ninth Circuit opinion or --

14                 MR. LAWRENCE:  The Ninth Circuit opinion, there's

15      -- there's section -- the first tie level is (d), work

16      product for expert witness materials.

17                 THE COURT:  Are we talking about the same case?

18                 MR. LAWRENCE:  We're talking about In re:

19      Application of Ecuador, 280 FRD 506?

20                 THE COURT:  I'm talking about Republic of --

21      Republic of Ecuador versus McKay?

22                 MR. LAWRENCE:  No,.  Well that, there were

23      several --

24                 THE COURT:  Okay.

25                 MR. LAWRENCE:  -- cases.
```

```
 1              THE COURT:  All right.  Well --

 2              MR. LAWRENCE:  The case that they cited in their

 3   brief --

 4              THE COURT:  Yes.

 5              MR. LAWRENCE:  -- in their letter, sorry, is the

 6   case that I'm referring to which is In re: Application of

 7   Republic of Ecuador --

 8              THE COURT:  I don't -- I don't have that before

 9   me, so --

10              MR. LAWRENCE:  Okay, I will -- and it goes through

11   in a subcategory A:

12              "Communication between Kelsh and other Exponent

13   employees.

14              Respondents assert that communication between

15   Kelsh, his assistance, and other Exponent employees are

16   privileged work product."

17              And then there a list of documents.

18              And then the Court states:

19              "Because the term expert includes assistance of

20   the experts, such internal communications, as well as those

21   between Kelsh's assistant's and Chevron attorneys, are

22   protected work product.

23              The republic's motion to compel as to this

24   category of documents is denied."

25              THE COURT:  But let me -- and I'm trying to stay
```

Page 38

1    with you.

2              MR. LAWRENCE:  Yeah.

3              THE COURT:  Okay?  And when I read the Republic

4    of Ecuador decision that I'm looking at from the Ninth

5    Circuit they give an example.  For example, the rule -- and

6    this is within the context of 26(b)(4) -- "The rule allows

7    for discovery of (a), the testing of material involved in

8    litigation and notes concerning any such testing."

9              MR. LAWRENCE:  Right.

10             THE COURT:  "(b), alternative analyses, and (c),

11   communications the expert had with anyone other than the

12   party's counsel about the opinions expressed."

13             So why doesn't this squarely fall -- why doesn't a

14   communication between Shapiro and Vegara or Shapiro and Cook

15   fall exactly within that?

16             MR. LAWRENCE:  Well, I would -- I would say that

17   the case law is clear as mud, because I think that there

18   is --

19             THE COURT:  Thank you.  Well, that makes me feel a

20   little less stupid.

21             MR. LAWRENCE:  It is -- I would -- I understand

22   the issue in that the case law is not entirely clear because

23   there are statements like that in many of the cases, and

24   then when you get down --

25             THE COURT:  This is from the advisory committee no

1    less.

2                MR. LAWRENCE:  No, no, I understand that, but I

3    think the gist of it is if the communications were for the

4    purposes of doing a draft report then they should be

5    privileged because the nature of the draft report.

6                Again, I think it goes back to the question of

7    whether or not the court haves the discretion to look

8    behind --

9                THE COURT:  Okay.

10                MR. LAWRENCE:  -- to determine whether or not --

11                THE COURT:  I hear you.  But then the bottom line

12    is, if I -- if I agree with you -- and I'm obviously -- I

13    obviously am trying to get this right.

14                MR. LAWRENCE:  Yeah.

15                THE COURT:  I hope that for better or worse --

16                MR. LAWRENCE:  Sure.

17                THE COURT:  -- you can appreciate it.

18                But where I -- if I follow you on that path I

19    truly get to the point that you designate someone as a

20    testifying expert who's been in from the beginning and you

21    get nothing.  You get him for a deposition and you get

22    nothing.  Because under your version -- remember, you

23    designated this document 132866 --

24                MR. LAWRENCE:  Yes.

25                THE COURT:  -- as a draft expert report.

```
 1              MR. LAWRENCE:  Yes.
 2              THE COURT:  Well, what about -- forget about the
 3    fact that there is, you know, an iteration, I'll call it
 4    generically an iteration attached to it, you have emails
 5    from -- you know, from Vegara to Shapiro and back again.
 6    That -- that's not a draft expert report, that's a
 7    communication between these two guys with not a lawyer in
 8    sight or -- and no reference to a lawyer.
 9              So, I -- either you're right or -- either you're
10    right or I'm right, and I'm struggling.
11              MR. LAWRENCE:  Yeah.  And all I would say is that
12    the rule is in our view clear, it doesn't distinguish
13    between drafts that reflect expert -- sorry -- drafts that
14    reflect attorney input versus drafts that don't reflect
15    attorney input, and frankly it would seen counterproductive
16    to the notion of why you have the rule and why you have
17    experts if we're going to hide from the world the fact that
18    the attorneys are telling the experts what to do but we're
19    not allowing the experts to think within the context of
20    their draft coming up with their own -- their own edits to a
21    report.
22              So, again, I understand the tension between the
23    rationale of the rule and the literal stricture of the rule,
24    but it seems to me I think without a doubt that the
25    memorandum part, and maybe the email between Vegara and
```

Page 41

1    Shapiro are different, but the memorandum edits are an

2    iteration of the final report, albeit it is therefore a

3    draft report, albeit therefore under the literal, clear,

4    unambiguous rule it is not producible.

5            THE COURT:  So what happened in the deposition?  I

6    don't --

7            MR. LAWRENCE:  I didn't -- I didn't tell him not

8    to answer any questions.

9            THE COURT:  So what happened --

10           MS. SAWYER:  What happened -- what happened in the

11   deposition --

12           THE COURT:  Thank you, Mr. Lawrence.

13           MS. SAWYER:  -- is he couldn't answer all of the

14   questions that were put to him.  We put questions to him

15   that he couldn't answer.  We were unable to test some of his

16   assumptions.

17           THE COURT:  Well, what do you mean -- what do you

18   mean by that he couldn't answer?  He couldn't remember?

19           MS. SAWYER:  He couldn't explain his own

20   methodology.  We asked him -- the methodology from our

21   perspective implies a negative interest rate being the

22   version that Mr. Shapiro has calculated results in a

23   negative interest rate, and we asked him to explain how that

24   negative interest rate came about.  He couldn't do it.  I

25   mean he could not explain it.

Page 42

1           And the reality, as we know from other depositions

2    that Mr. Vegara, the one who did the actual calculations,

3    that there was a lot of back and forth between Mr. Shapiro

4    and Mr. Vegara before the final results came out, but we

5    don't have any of that, we can't test any of that.

6    Mr. Shapiro also testified --

7           THE COURT:  So is it -- but Mr. Lawrence is going

8    to tell me I'm guessing is that, okay, then I will at trial

9    won't be able to afford his opinion -- if I believe that

10   that's of concern I won't be able to afford his opinion a

11   tremendous amount of weight if he can't explain the basis

12   for his conclusion.

13          I mean it just seems to me that it's not the way

14   it's supposed to work, that you have an expert who has been

15   on the scene for years and years and years and --

16          MS. SAWYER:  I mean Mr. Shapiro also testified

17   that over this time span he and his staff as part of their

18   regular process reevaluated their determinations, discussed

19   it, whether or not the assumptions were correct, that's all

20   information that's the facts and data that went to his

21   ultimate conclusion in December 2013 that X number was the

22   correct number.  Five years of work --

23          THE COURT:  So how do we -- how do we rationalize

24   the clear prohibition in the rules Mr. Lawrence is urging me

25   against the disclosure of draft reports with the notion that

Page 43

1    it seems clear that, you know, the focus on facts and data

2    was not intended to, you know, to cut off being able to test

3    it?

4              MS. SAWYER:  You start with what the report says.

5    The report is what Mr. Shapiro submitted December 2013.

6    What happened in April of 2009 was never contemplated to be

7    a draft expert report for purposes of the rule.

8              THE COURT:  No, but it was also -- a form of it

9    was produced, right?

10             MS. SAWYER:  Publicly online.

11             THE COURT:  So, I think on that alone there's a

12   waiver.  And it was attached to the proof of claim.

13             MR. LAWRENCE:  Are you talking to me now or to --

14             THE COURT:  Kind of both of you.

15             MR. LAWRENCE:  Okay.

16             THE COURT:  I'm kind of thinking out loud.  And I

17   go back to the notion of the, you know, the work product.

18             MS. SAWYER:  From our perspective --

19             THE COURT:  Again, there's no -- there's no

20   protected communication isn't what we're talking about

21   because there's -- a protected communication requires that

22   there be an attorney in this context, I think.

23             MS. SAWYER:  I mean the purpose of Rule 26 is

24   to --

25             THE COURT:  You're being very patient,

Page 44

```
 1   Mr. Lawrence.

 2              MS. SAWYER:  -- protect attorney --

 3              THE COURT:  I really -- I very much appreciate --

 4              MR. LAWRENCE:  Sure.

 5              THE COURT:  -- I've had a lot of impatient

 6   attorneys around here in the last couple days, so I

 7   appreciate your pleasant and patient demeanor very much.

 8              Go ahead.

 9              MS. SAWYER:  The purpose of Rule 26 is to protect

10   attorney work product, so work an attorney is doing in

11   anticipation of litigation.

12              The reason the rules were amended was to make

13   clear that that attorney thought process should not be

14   revealed --

15              THE COURT:  Right.

16              MS. SAWYER:  -- through draft expert reports.

17              THE COURT:  That's what I said an hour ago, right?

18              MS. SAWYER:  Exactly.

19              THE COURT:  I got that right.

20              MS. SAWYER:  So the initial drafts of a report,

21   which was then made available online, which was then made

22   available as part of the proof of claim, those initial

23   drafts of report an attorney wasn't involved with are not

24   protected --

25              THE COURT:  So then why didn't the --
```

Page 45

1          MS. SAWYER:  -- under Rule 26.

2          THE COURT:  -- why didn't the rule say prior

3    drafts of a report that reflect attorney/client

4    communication shouldn't be produced?

5          MS. SAWYER:  I suspect that the attorney advisory

6    notes, which make clear that those are what they're trying

7    to protect, should be read in conjunction with the rule to

8    make clear that it's not the situation where somebody can

9    just literally five years down the road look back and say,

10   oh, that thing we drafted back in 2009, that was actually a

11   draft expert report that we're going to designate four years

12   later, so everything surrounding that work we did in 2009

13   should be protected.

14         THE COURT:  Look, I mean I think that -- I think

15   they get produced, and --

16         MR. LAWRENCE:  Okay.  Can I just make two --

17         THE COURT:  Sure.

18         MR. LAWRENCE:  -- comments, because I think that

19   there's been a substantial misrepresentation of the record

20   that I need to clarify.

21         THE COURT:  Okay.  Go ahead.

22         MR. LAWRENCE:  First of all, what was -- the

23   document that was made public is exactly the same document

24   that was used for the filing with the exception that it used

25   the two dates instead of the one that was directed by the

Page 46

1   attorney to use just the -- so we're not talking about

2   changes other than that between the two documents.  I want

3   that clear on the record, that there was a decision made at

4   the direction of the attorney, which has been testified

5   about, to only use the rejection date because that's what

6   the Bankruptcy Court --

7              THE COURT:  Okay.

8              MR. LAWRENCE:  -- will say.

9              But the other -- the document that was made public

10  included two dates, that is the date prior to the bankruptcy

11  filing.

12             THE COURT:  Uh-huh.

13             MR. LAWRENCE:  So to the extent there's a change

14  it was attorney directed, but we have not objected to

15  something that was published.

16             Secondly, I want to make sure that in terms of

17  what we're talking about, the alternative valuations that I

18  believe that they referenced are valuations that were done

19  in the context of mediation, and I don't know if we're

20  talking about those.

21             THE COURT:  No, I'm not.

22             MR. LAWRENCE:  Okay.

23             THE COURT:  I'm not -- the documents that you've

24  designated as mediation documents I'll get to entirely

25  separately.

1           MR. LAWRENCE:  Okay.

2           THE COURT:  Right now --

3           MR. LAWRENCE:  And we'll stand on our objection

4    that the draft reports means what -- you know, the rule

5    means what it says, and that any draft report and that it

6    would be nonsensical to say that only -- that you have --

7    that only where attorneys are telling experts what to do, I

8    mean it seems like that's what actually the courts would

9    want to know and the jury would want to know when an

10   attorney told an expert you have to say X, that is actually

11   most damaging we think to an attorney's credible, the idea

12   that an expert can't think independently and therefore loses

13   the protection of the rule doesn't make any sense, and I

14   don't think it's consistent with what the rules are trying

15   to protect, which is free thought flow of drafting by an

16   expert.

17          THE COURT:  Okay.  Anything more?  I mean this is

18   kind of a big point, right?  Because --

19          MS. SAWYER:  I mean I think -- I think the

20   purpose --

21          THE COURT:  I mean just to be --

22          MS. SAWYER:  Sorry.

23          THE COURT:  -- I mean I really want to like put it

24   squarely to you.  I mean there are many, many versions of --

25   there are many, many iterations -- to use a defined term --

Page 48

1    there are many, many iterations in the March/April time

2    frame of the document, defined terms iterations.

3              Mr. Lawrence's view is that all the iterations are

4    draft expert reports that by the clear terms of 26(b)(4)

5    don't get produced.

6              Your position is that can't be right, those are

7    alternative valuations, and the -- the designation of the

8    author of the document as a testifying expert shouldn't

9    protect those communications which citing Ecuador versus

10   McKay, Ninth Circuit, among other things, and some

11   combination of the law as reflected in that opinion and the

12   waiver argument, you believe ought to be produced.

13             MS. SAWYER:  That's correct.

14             THE COURT:  Right.  Understanding that if -- if

15   I'm wrong and this doesn't come out the way Mr. Lawrence

16   hopes, so he's got this point on appeal, he's got this point

17   preserved no appeal.

18             MS. SAWYER:  No, I understand, I understand.  And

19   we think the rule is clear, that draft expert reports

20   pursuant to the rule are protected.  Something an expert may

21   have done in a different capacity years before are not

22   protected.

23             THE COURT:  Okay.

24             MS. SAWYER:  So a draft of what he submitted in

25   December 2013, the cover letter or whatever, or you know, he

Page 49

1    submitted another report in March of 2014, drafts of those

2    might be protected because those would have been revealing

3    attorney work product, attorney strategies, what the purpose

4    of the rule is designed to protect.  But the work that he

5    did for the TSA to value this in connection with the claim

6    filing is not contemplated by Rule 26 and not protected by

7    it.

8              MR. LAWRENCE:  Well, that -- now this is a

9    slightly different argument than the basis upon which you

10   are going to rule, because she's saying that they're not --

11   the argument now -- the argument being made principally is

12   that an expert -- and I don't think there's any doubt that

13   Swap was not -- prior to their retention to do valuations

14   Swap was not employed by TSA, none of the Swap people are

15   employees by TSA.

16             THE COURT:  Prior to the proof of claim valuation.

17             MR. LAWRENCE:  Prior to retention to do the proof

18   of claim Swap was --

19             THE COURT:  Retention by TSA.

20             MR. LAWRENCE:  TSA.

21             THE COURT:  Yes.

22             MR. LAWRENCE:  They were -- they were -- I think

23   under any definition of the CR 26 expert rules they are --

24   and I guess there is an open question which Your Honor

25   raised, is hiring an expert to do proof of claim an

Page 50

1    expertise or not?  It seems like if you hire somebody

2    independently outside your company who's an expert,

3    otherwise holds himself out as an expert, and to do a proof

4    of claim that is an expert.

5              THE COURT:  You know, forgive me for going off --

6              MR. LAWRENCE:  Sure.

7              THE COURT:  -- on a tangent, but in the bankruptcy

8    world generally -- okay, welcome to our world -- in the

9    bankruptcy world generally you see attorneys retaining the

10   law firm retains the expert.  K&L Gates did not retain Swap,

11   TSA retained Swap.  Nobody really talked about that.

12             MR. LAWRENCE:  I -- let me say first of all I was

13   not involved in the case at that point --

14             THE COURT:  Okay.

15             MR. LAWRENCE:  -- so I'm not privy to the

16   rationale of why --

17             THE COURT:  You know --

18             MR. LAWRENCE:  -- I'm not privy to why --

19             THE COURT:  You know, Barak (ph) is now one of my

20   colleagues.

21             MR. LAWRENCE:  Yes.

22             THE COURT:  You know that, right?

23             MR. LAWRENCE:  You should ask Mark, he's very --

24             THE COURT:  Did cases with him back in the --

25             MR. LAWRENCE:  -- astute.

```
 1              THE COURT:  -- the day.

 2              MR. LAWRENCE:  Yeah.

 3              THE COURT:  He's a good guy.

 4              MR. LAWRENCE:  He's is very good guy and he was a

 5    very good partner.

 6              But, you know, I think Your Honor has taken into

 7    consideration that this is a public entity, this is not a

 8    private company, and they're required to retain people in a

 9    certain way, and I -- you know, I won't pretend that I know

10    exactly what their thinking was, but I think that there

11    could be rationale related to the fact that they are a

12    public entity.

13              THE COURT:  Well, for the reasons that Ms. Sawyer

14    I think articulated better than I had, that's the rationale

15    for my ordering that the iterations and communications

16    between Vegara and Shapiro and Cook for that matter --

17              MR. LAWRENCE:  Right.

18              THE COURT:  -- without -- even if in some

19    instances an attorney is copied, that does -- because that

20    doesn't elevate it to protected attorney/client

21    communication.

22              MR. LAWRENCE:  And we don't take that position.

23    We don't -- we're not -- just to be clear, we have never

24    taken the position --

25              THE COURT:  Okay.
```

Page 52

1          MR. LAWRENCE:  -- that just because an attorney is

2     copied --

3          THE COURT:  Sure.

4          MR. LAWRENCE:  -- that makes it privileged.

5          THE COURT:  Okay.  All right.

6          So, this is an cross the board ruling then with

7     respect to what we've been calling here iterations and

8     communications between and among Cook, Vegara, Shapiro, and

9     I think Stevenson goes into that --

10         MR. LAWRENCE:  Okay.

11         THE COURT:  -- grouping, those need to be

12    produced.

13         MR. LAWRENCE:  We object and preserve our

14    objection --

15         THE COURT:  Very good.

16         MR. LAWRENCE:  -- for the record.

17         THE COURT:  Okay, Ms. Sawyer?

18         MS. SAWYER:  Thank you.

19         THE COURT:  Okay.  All right.  So, maybe that

20    allows us to skip around a bit, and I'm going to skip to --

21    let's talk about the mediation, okay?  And there's a group

22    of documents.  So we're going to talk about the mediation

23    privilege documents and then we'll talk about the irrelevant

24    documents and we'll conclude with the final group of

25    documents, which are alleged to be attorney/expert

Page 53

1    communication.

2            So let's talk about the mediation.  You have to

3    help me out a little bit.  Was there a stipulated order that

4    governed the mediation that was conducted here that spoke to

5    the confidentiality of the documents?

6            MS. SAWYER:  There was a general order issued by

7    PAP (sic) that covered the mediation --

8            THE COURT:  Okay.

9            MS. SAWYER:  -- that contained a standard

10   confidentially clause.

11           THE COURT:  Okay.  I just -- okay.  So -- so

12   that's one level.

13           So then you get to the actual documents, and the

14   problem that I had -- and let's turn to them -- or at least

15   I can turn to them, you can't -- we start with -- we're at

16   62904 under the --

17           MR. LAWRENCE:  It's a TSA document.

18           THE COURT:  -- TSA, right?

19       (Pause)

20           THE COURT:  And what was the time frame of the

21   mediation?

22           MS. SAWYER:  It was May 2012 to that April 2013.

23           THE COURT:  Okay.  So, Mr. Lawrence, you say this

24   is right in that wheelhouse, correct?  I don't know if

25   you're there yet.

 1            MR. LAWRENCE:  Yes, I'm still having trouble

 2   finding the document.

 3            THE COURT:  Okay.

 4            MR. LAWRENCE:  What number is it again?

 5            THE COURT:  62904.

 6            MR. LAWRENCE:  Okay.  Yeah.  Yes.  Yes, and it's

 7   referenced in the communications, and you know, I think what

 8   we've explained has happened is that as is typical in the

 9   course of the mediation TSA presented its view of the

10   world --

11            THE COURT:  Right.

12            MR. LAWRENCE:  -- to the mediator, Lehman

13   presented its view of the world to the mediator, and one of

14   the questions came up is -- and I think this is very typical

15   of how at least how we mediate generally -- is that you say,

16   okay, well, let's look at their view of the world and see if

17   we play with some different variations on that --

18            THE COURT:  Right.

19            MR. LAWRENCE:  -- we can come up with a number

20   that everybody can live with.

21            THE COURT:  Right.

22            MR. LAWRENCE:  And that's what's going on.

23            THE COURT:  Okay.  All right.  So, Ms. Sawyer, I'm

24   inclined to agree with that.

25            MS. SAWYER:  I mean our view is that these -- that

Page 55

1   setting aside the mediation confidentiality, these are

2   undoubtedly facts and data that Mr. Shapiro considered in

3   reaching his expert opinion.  So he considered all these

4   alternative valuations that they admit he did it, and yet he

5   still reached the conclusion he did in December 2013

6   rejecting all those alternatives that he went through.

7           I mean from our perspective this is a problem that

8   they created themselves by designating Mr. Shapiro as a

9   testifying expert, that he -- you know, he considered all

10  those facts and data, broadly construed, they know he

11  considered all those facts and data, yet they still with

12  that full knowledge designated him as a testifying expert.

13          I mean there are solutions they could have

14  employed.  They could have used a consulting expert --

15          THE COURT:  Yeah.

16          MS. SAWYER:  -- during the mediation as Lehman

17  did.  I mean Lehman used an expert that we did not designate

18  as a testifying expert --

19          THE COURT:  Sure.

20          MS. SAWYER:  -- for purposes of that because we

21  knew that that expert would be considering lots of different

22  alternative valuations that we then did not want our

23  testifying expert to be burdened with.

24          THE COURT:  Yeah.  I just -- I hear you, but I

25  just think that that creates hurdles to, you know, full-

Page 56

1    throated participation in a mediation that I just don't

2    think were appropriate.  If the alternatives are explored in

3    and for the purpose of participating in the mediation I

4    think those have to be protected.

5            MS. SAWYER:  And just to make sure I understand

6    the parameters, I mean is it things that are -- because the

7    mediation did span a period of nearly a year, yet there were

8    only two separate mediation sessions that happened.  So --

9            THE COURT:  Sure.  Anything --

10           MS. SAWYER:  -- our concern is, is that there was

11   other alternative valuations --

12           THE COURT:  Yeah.

13           MS. SAWYER:  -- done during that year, but did not

14   relate to the mediation.

15           THE COURT:  But -- right.  But what I'm looking at

16   -- what I'm looking at is clear that it's specifically for

17   the purpose of the mediation.

18           MS. SAWYER:  Well, you have the benefit of that

19   that I do not.

20           THE COURT:  I do.  Right, so there I have the

21   advantage on you, and the documents that I'm looking at are

22   specifically with reference to the mediation, and therefore,

23   I believe they're protected and ought not be produced.

24           I quite agree with you if there's a document that

25   hypothetically, you know, Shapiro and Vegara go out for a

Page 57

1    couple of beers and they're talking about alternative

2    valuation methodologies, really fun, right, and there's no

3    reference to the mediation then I would agree with you,

4    but --

5              MS. SAWYER:  But I think that's our concern in

6    terms of a general ruling from you, because we do think

7    based on Shapiro's testimony that he and his staff

8    continually reevaluated, even outside the context of the

9    mediation, their assumptions.  And so if they did an

10   alternative, even though it maybe within the time frame of

11   the mediation --

12             THE COURT:  Right.

13             MS. SAWYER:  -- we would argue that --

14             THE COURT:  So one of the --

15             MS. SAWYER:  -- that would be --

16             THE COURT:  -- one of the takeaways of the last

17   series of documents was the ruling that communications

18   between and among Vegara, Cook, Shapiro, and Stevenson, that

19   in this time period that are not specifically related to the

20   mediation or for the purpose of the mediation have to be --

21   have to be produced.  And so --

22             MR. LAWRENCE:  And we understand that.  We

23   understand that.

24             THE COURT:  And I -- okay.

25             MR. LAWRENCE:  We get it.

```
 1              THE COURT:  Okay.  All right.  So let's go now to

 2    -- let's stick with this category, jump around to the second

 3    page of the spreadsheet and we go to a series of documents

 4    that begins with Lillian Churn (ph) 132650.

 5              MR. LAWRENCE:  Is this a TSA or a Swap document?

 6              THE COURT:  A swap.

 7              MS. SAWYER:  I'm sorry, 132650?

 8              THE COURT:  132650, date 4/30/2013, Lillian Churn.

 9         (Pause)

10              THE COURT:  You got it?

11              MR. LAWRENCE:  Yes.

12              THE COURT:  It's just a little -- it's an email

13    Churn to Shapiro.

14              MR. LAWRENCE:  Yes.

15              THE COURT:  So, this goes right to the issue that

16    we literally were just talking about.

17              MR. LAWRENCE:  Actually it doesn't, but you

18    know --

19              THE COURT:  Well --

20              MR. LAWRENCE:  -- I'll explain what it's about.

21              THE COURT:  Okay.  Go ahead.

22              MR. LAWRENCE:  And certainly as a category you can

23    talk about it.

24              There was a document -- there was a time where TSA

25    considered what alternative investments might be available
```

Page 59

1    to it, and this was a document prepared with respect to

2    that.

3              THE COURT:  Churn is -- I don't have her on my

4    little guide here.

5              MR. LAWRENCE:  She is an employee of Swap.

6              THE COURT:  Of Swap.

7              MR. LAWRENCE:  Yeah.

8              THE COURT:  Okay.

9              MR. LAWRENCE:  So it's an internal memorandum

10   talking about -- and I believe this is actually during the

11   time of the mediation.

12             THE COURT:  Right, but just remember, just

13   apropos --

14             MR. LAWRENCE:  Right.

15             THE COURT:  -- what we just said, if there happens

16   to be a document that is during the time period but there's

17   no indication on this particular document that it's in

18   connection with the mediation, it just happens to be a

19   communication in the right time period.

20             MS. SAWYER:  I'd also note, I mean if it has to do

21   with TSA's consideration of alternative investments, I mean

22   that has nothing to do with Mr. Shapiro's expert opinions.

23             MR. LAWRENCE:  If I could -- if I -- I think

24   actually now I can make clarity.

25             If you look at 132775 by Swap, which is titled --

Page 60

1    this is clearly an alternative calculation done with respect

2    to non-binding mediation proceedings.  Do you see that

3    document?

4              THE COURT:  Uh-huh.

5              MR. LAWRENCE:  If you turn to the second page,

6    there are scenarios with Swap cancelables in them.

7              THE COURT:  Uh-huh.

8              MR. LAWRENCE:  This document, from Lillian Chen

9    (sic), reference -- is a part of the calculation that went

10   into that memorandum.  It was part of their analysis they

11   were doing for an alternative during the course of

12   mediation.

13        (Pause)

14             MR. LAWRENCE:  And if there's any concern I can

15   confirm that with Lillian Chen (sic), but I think it's

16   pretty self-evident looking at the content and the time

17   frame of the two documents.

18             THE COURT:  Was Churn -- it says Churn.  You said

19   Chen.

20             MR. LAWRENCE:  I'm sorry.  Churn.  Correct.

21             THE COURT:  Okay.  Was she on the internal team

22   who was working on the --

23             MR. LAWRENCE:  Yes.

24             THE COURT:  -- on this at -

25             MR. LAWRENCE:  Yes, Your Honor.

Page 61

1           THE COURT:  -- the time?

2           MR. LAWRENCE:  Yes.

3           THE COURT:  Okay.  I'm going to accept your

4    explanation on that --

5           MS. SAWYER:  Just -- I mean --

6           THE COURT:  -- one, Mr. Lawrence.

7           MS. SAWYER:  -- I obviously have no documents --

8           THE COURT:  Yes.

9           MS. SAWYER:  -- in front of me.

10          I would just note that there's almost a month time

11   period between those two communications.  So I just --

12   that's -- it's all I can flag.

13          THE COURT:  Right.  But I -- I think I'm

14   satisfied, based on the cross-references that Mr. Lawrence

15   pointed out between the two documents that the document that

16   generated by Ms. -- from Churn to Shapiro is, in fact, in

17   connection with the mediation.  So I'm -- the -- withholding

18   the privilege is going to stick on that one.

19          Okay.  So the next document is the very next

20   document, Mr. Lawrence and Ms. Sawyer, is 132749 dated April

21   30th, 2012, author Bob Cook.  So this is kind of at a high

22   level numbers on a page.  And the footer in the world's

23   tiniest font --

24      (Laughter)

25              THE COURT:  -- indicates that it was a

Page 62

1    document for in camera review and it's got an August date.

2    So, obviously, it generates the date where --

3                    MR. LAWRENCE:  Sure.

4                    THE COURT:  -- it printed.

5                    So do you have metadata on -- on what can I

6    rely for the assertion of the fact that this was produced

7    when you say it was and for the purpose that you say it was

8    produced?  Is there metadata?

9                    MR. LAWRENCE:  I -- I would --

10                   THE COURT:  How do you know is what --

11                   MR. LAWRENCE:  I would --

12                   THE COURT:  -- I'm saying.

13                   MR. LAWRENCE:  I would assume so.  This is --

14                   THE COURT:  You see my point, right?  There's

15   not --

16                   MR. LAWRENCE:  Right.

17                   THE COURT:  There's nothing on the face of

18   the document --

19                   MR. LAWRENCE:  Well, that -- I mean, I think

20   that on the face -- well, first of all, I confirmed with

21   Swap about what this document is about, so I have that piece

22   of information.

23                   Secondly, I think on the face of it, it is

24   clear, in my mind, maybe not in your mind, that these are

25   different ways of looking at the claim for --

```
 1                    THE COURT:  Okay.  I --
 2                    MR. LAWRENCE:  -- purposes of mediation.
 3                    THE COURT:  I just found -- I -- I just found
 4     something.  Let me direct your attention --
 5                    MR. LAWRENCE:  All right.
 6                    THE COURT:  -- to it.  Do you have a problem
 7     with my mentioning random words --
 8               (Laughter)
 9                    THE COURT:  -- from the document?
10                    MR. LAWRENCE:  It -- no.  No.  No.  Go ahead.
11                    THE COURT:  Okay.  There's a -- in the --
12     there's a word in bold on the left hand side that says,
13     "variability."  Do you see that word?
14                    MR. LAWRENCE:  Yes.
15                    THE COURT:  Okay.  And you see what it says
16     after that word?  There --
17                    MR. LAWRENCE:  Yes.
18                    THE COURT:  Okay.  So that -- that which I
19     hadn't noticed before, that would be secondary evidence of
20     the fact that this document is prepared in connection with
21     mediation.
22                    MR. LAWRENCE:  Yes.
23                    THE COURT:  Inasmuch as it's a specific
24     reference to something a mediator might consider.
25                    So I'm accepting Mr. Lawrence's
```

Page 64

1   representation that he investigated when this document was

2   produced by talking to a person as opposed to examining

3   metadata which I assume exists, plus independently there

4   appears on the face of the document a reference to the

5   mediator and, therefore, I'm going to say that this does not

6   get produced as being covered by the mediation privilege.

7               MS. SAWYER:  I would just note that this is not a

8   Swap Financial document.  This is one created by Bob Cook.

9   So just -- I gave -- you had mentioned -- Mr. Lawrence had

10  mentioned that it was, you know, he confirmed with Swap and

11  this is Bob Cook's --

12              MR. LAWRENCE:  Well, this is produced from Swap so

13  I'm not really quite sure --

14              THE COURT:  It's produced from Swap, but the

15  author is Bob Cook.

16              MS. SAWYER:  Is that on there?  Okay.  So I guess

17  from our perspective --

18              MR. LAWRENCE:  I -- it's still being used for

19  mediation.

20              THE COURT:  So it still would be - I don't think

21  that that changes the mediation, the coverage for --

22              MS. SAWYER:  Okay.  I think just -- just so I

23  could be heard just for a moment.

24              THE COURT:  Sure.

25              MS. SAWYER:  I think if Mr. Cook prepared

Page 65

1    something that ended up in Swap Financials files, even if it

2    says prepared for mediation, that might have been something

3    Mr. Shapiro used as facts of data in purposes of his

4    opinion.

5            So I know it kind of ties to that -- the argument

6    we had before --

7            THE COURT:  Right.

8            MS. SAWYER:  -- but, you know, this is something

9    that was in his files, but created by somebody else.  So it

10   had to have been communicated to him for some --

11           THE COURT:  Well, I'm going to --

12           MS. SAWYER:  -- reason.

13           THE COURT:  -- draw an analogy that you might

14   think doesn't hold water, but all of the conversation that

15   we had in the first hour was about kind of attorney/client

16   privilege being the driver.  And here we have a privilege

17   that's created so that the parties can engage in mediation.

18   I just don't think it would be appropriate to invade that on

19   the altar of the facts and data -- the requirement that

20   facts and data be produced.

21           MS. SAWYER:  Okay.  Understood.

22           THE COURT:  Okay.  I might --

23           MS. SAWYER:  I understand.

24           THE COURT:  I might be wrong.

25           MS. SAWYER:  I understand.

1              THE COURT:  Okay.  So, Mr. Lawrence, we're on a

2     roll.  Let's keep going here.

3              MR. LAWRENCE:  You'll see on the next two

4     documents the --

5              THE COURT:  The same --

6              MR. LAWRENCE:  They're the same thing.  And

7     there's --

8              THE COURT:  Okay.  So this --

9              MR. LAWRENCE:  The M word does show up.

10             THE COURT:  Okay.  So for Ms. Sawyer's purposes

11    we're at 132677, same; 132748, same.

12             And now we're at something new, 132775, a

13    different -- a document that has both words and numbers, but

14    makes specific reference to the mediation.  So that does not

15    get produced.

16             Okay. Now we're at 132784.

17             MR. LAWRENCE:  I think if you look at the previous

18    -- immediately prior 775 document and the scenarios outlined

19    at the end of that document this is a spreadsheet that

20    references those scenarios.

21             THE COURT:  Okay.  I agree with you.  So 132784 --

22             MS. SAWYER:  Just -- can I be heard once on --

23             THE COURT:  Yes.

24             MS. SAWYER:  -- 132784.  But that is scenarios

25    she's running six months after the mediation session.  My

Page 67

1    132784 is dated September 10th, 2012 versus the memorandum

2    that -- or I'm not sure if it's a memorandum -- the document

3    132775 is May 24th, 2012.

4              THE COURT:  Okay.

5              MS. SAWYER:  So if --

6              THE COURT:  So that --

7              MS. SAWYER:  -- Swap Financial --

8              THE COURT:  That's a --

9              MS. SAWYER:  -- you know --

10             THE COURT:  So that's a good point.  So --

11             MR. LAWRENCE:  It's the exact -- I think it's the

12   same -- it's the exact same numbers that are in the --

13             THE COURT:  I understand.

14             MR. LAWRENCE:  -- prior.

15             THE COURT:  So where does the -- where does the

16   September date come from in your log for this one?  So we're

17   in 132784 which you're giving a September 2012 date.  But

18   you're tying it back to a May 24th document.

19             MR. LAWRENCE:  I -- to be fair and honest, I can't

20   answer that question, whether that's a print date or I -- I

21   imagine --

22             THE COURT:  The --

23             MR. LAWRENCE:  -- it's a print date, but I think,

24   again, if you look at the two documents --

25             THE COURT:  Yeah.  No.  I see --

Page 68

1            MR. LAWRENCE:  -- the information is --

2            THE COURT:  I --

3            MR. LAWRENCE:  -- exactly the same.

4            THE COURT:  I see the tie.  I -- when did the

5   mediation conclude?

6            MS. SAWYER:  It didn't conclude until April 2013

7   --

8            THE COURT:  Okay.

9            MS. SAWYER:  -- but there was a session in May and

10  then another session -- in May 2012 there was a session --

11           THE COURT:  Right.

12           MS. SAWYER:  -- and then another session in

13  January 2013, and then there was a long period of time where

14  there was nothing.

15           THE COURT:  Okay.  But it's -- it's certainly

16  possible that during that period of time people continued to

17  work in preparation for the next session.  I mean, the -- I

18  will tell you that there is an exact tie -- there's an exact

19  tie between what I'm looking at in 132784 and what I'm

20  looking at in the May document.

21           MS. SAWYER:  And I'm obviously at a disadvantage.

22  I would just note that Mr. Shapiro did testify, though, that

23  they also continuously reevaluated all of the scenarios and

24  --

25           THE COURT:  Sure.

Page 69

1              MS. SAWYER:  -- things at Swap, and so --

2              THE COURT:  Okay.

3              MS. SAWYER:  -- just because it falls within that

4    year time period it's not necessarily --

5              THE COURT:  Understood.

6              MS. SAWYER:  -- tied to the mediation.

7              THE COURT:  Well, I'm satisfied based on the exact

8    overlap of the -- some of the numbers that appear in the May

9    document with numbers that appear in the 132784 document,

10   that the 132784 document ought to be protected from being

11   produced.

12             So let's move on to 132801 which is -- again,

13   specifically references the mediation so that doesn't get

14   produced.

15             MS. SAWYER:  I would just note, again, there's the

16   -- a large period of time between a mediation session and

17   132801.

18             THE COURT:  Well, 132801, interestingly enough, in

19   my book is dated May 29th and on the chart it has -- it's

20   September 11th.  So the document itself, Mr. Lawrence, is

21   dated May 29th, 2012.

22             MR. LAWRENCE:  I see that.  Yes.

23             THE COURT:  Okay.

24             MS. SAWYER:  All right.  So I am --

25             THE COURT:  Okay.

1          MS. SAWYER:  I was relying solely on the list.

2          THE COURT:  All right.

3          MR. LAWRENCE:  And I think if you see the next

4     document that explains a little bit of the date.

5          THE COURT:  Okay.  132644 --

6          MR. LAWRENCE:  Which is another revision to the

7     mediation supporting --

8          THE COURT:  Right.

9          MR. LAWRENCE:  -- thing --

10         THE COURT:  Right.

11         MR. LAWRENCE:  What -- and we -- this has been

12    explored in deposition as well as disclosed many times; that

13    during the course of the mediation it was a -- and a mistake

14    in the loss memo -- in the loss calculation memo using the

15    wrong end date.

16         THE COURT:  Uh-huh.

17         MR. LAWRENCE:  So there was a revision to the

18    mediation memo using the 23rd to date.

19         THE COURT:  Okay.  All right.  Well, I think that

20    -- I see the tie among the documents and the -- withholding

21    it on the basis of the mediation privilege is going to

22    stick.

23         So that brings us to 213733, same.  Mediation

24    privilege.  Mediation -- you know, it's not really a

25    mediation privilege.  It's confidential pursuant to the

Page 71

1    mediation and I don't want there to -- anyone -- whoever

2    reads this to come away with the fact that in Bankruptcy

3    Court there's some sort of special mediation privilege.

4    There's not.  The parties agree to keep confidential

5    materials in connection with the mediation.

6            Okay.  That brings us to 2132691 which is --

7            MR. LAWRENCE:  This is a drafting process of a

8    mediation statement for the second mediation in 2013.

9            THE COURT:  Okay.  And it does indeed also contain

10   internal client communications so that -- that one is not

11   going to be produced.

12           And then we're skipping to 132692 -- we're turning

13   to 132692 --

14           MR. LAWRENCE:  Which is the same as the earlier

15   one.  It just indicates that the mediation --

16           THE COURT:  Correct.

17           MR. LAWRENCE:  -- proceeding memorandum is being

18   revised --

19           THE COURT:  Correct.

20           MR. LAWRENCE:  -- (indiscernible).

21           THE COURT:  Okay.  So that one doesn't get

22   produced.

23           And then we go to 132430.  So this one, Mr.

24   Lawrence, and 132433 and 132431, we can deal with these as a

25   group.  We'll call these --

Page 72

1          MS. SAWYER:  I'm sorry.  Which numbers, just to

2     make sure I have the right ones?

3          THE COURT:  The last three.

4          MS. SAWYER:  Okay.

5          THE COURT:  132430, 433 and 431, which don't

6     indicate the dates, but they seem to be given June 2013

7     dates.  So --

8          MR. LAWRENCE:  At least -- at least at this point

9     I can speak personally --

10         THE COURT:  Okay.

11         MR. LAWRENCE:  -- to my involvement because of

12    this.  Yeah.  These were generated at my request

13    specifically at -- through conversations with Mr. Shapiro on

14    -- to help us draft discovery to Lehman.  So I think they

15    can --

16         THE COURT:  Okay.  So these weren't spontaneous

17    ruminations on his part.

18         MR. LAWRENCE:  Exactly.

19         THE COURT:  So the documents reflect thoughts of

20    Mr. Shapiro that Mr. Lawrence is saying, although the

21    document on its face doesn't indicate it, were specifically

22    in response to his request in order to aid in formulating

23    discovery.  And it's --

24         MR. LAWRENCE:  Yes.

25         THE COURT:  -- that's -- it's consistent -- what's

Page 73

1    on the page is consistent with that.

2              MS. SAWYER:  But I think the expert's thoughts

3    about valuations -- I mean, I have no idea what these

4    thoughts are.  The expert's thoughts about facts and data

5    and how he reaches his conclusion, even if requested by any

6    attorney, doesn't necessarily --

7              THE COURT:  That's not what's at --

8              MS. SAWYER:  -- what's --

9              THE COURT:  That's not what's in these documents.

10             MS. SAWYER:  Okay.  But the rule is intended to

11   protect attorney work product, so attorney's thoughts, not

12   the expert's own personal notes or the expert's own personal

13   thoughts.

14             So if an expert is in a meeting with an attorney

15   taking notes on the case, preparing to write the expert

16   report, those notes will be protected.  If the expert is

17   sitting or doing some other assignment not related to their

18   testifying expert report, I would think that that would not

19   necessarily be protected because it's going to be stuff that

20   -- I mean, I don't know what it is so it's hard for me to

21   argue.

22             But if it reflects his facts or data that he got

23   from other people in his office, any alternative

24   calculations, those types of things, any alternative

25   thoughts, that those would be things that he considered, and

1   if it's reflected in his notes those would be things that

2   should be produced.

3           MR. LAWRENCE:  A --

4           MS. SAWYER:  It's very hard to argue without

5   knowing what --

6           THE COURT:  I --

7           MR. LAWRENCE:  A --

8           THE COURT:  I understand.  But, you know --

9           MR. LAWRENCE:  A, this has nothing to do with his

10  valuation --

11          THE COURT:  It doesn't have anything to do with --

12          MR. LAWRENCE:  -- of Swap and --

13          THE COURT:  -- his valuation --

14          MR. LAWRENCE:  -- and this is a result --

15          THE COURT:  -- whatsoever.

16          MR. LAWRENCE:  -- and this is a result of my

17  having a conversation with him about these issues generated

18  this fax.

19          MS. SAWYER:  I mean, I think the case law, the

20  limited case law there is is very clear to caution if --

21  caution parties not to use a consulting expert for all sorts

22  of purposes and then designate them as a testifying expert

23  because it does open them up to broad discovery, the facts

24  and data considered by that expert.

25          And so that's our concern here, is that they have

Page 75

1   used Mr. Shapiro as a consulting expert, either with TSA or

2   someone else, and then four years down the road they

3   designate him as a testifying expert to try to cloak

4   everything that he did in any capacity before that.  And so

5   that's our concern.

6           Maybe these notes in particular don't reflect

7   anything about valuations or his methodologies or anything

8   like that, but if he has other notes, even if they were, you

9   know, parts of a -- parts that he was asked to write down

10  for a lawyer, if they're his notes as opposed to reflecting

11  attorney work product, those are facts and data that should

12  be produced.

13          THE COURT:  It --

14          MR. LAWRENCE:  Unless you --

15          THE COURT:  First of all, I will tell you that I

16  can't tell a difference between 132430 and 132433.  They

17  look to me to be the same document.

18          MR. LAWRENCE:  They are.

19          MS. SAWYER:  Which two are the same?

20          THE COURT:  132430 and 433 are the same document.

21          MR. LAWRENCE:  Yes.

22          THE COURT:  Okay.  So just to make this seem less

23  painful to you that you're not getting three documents,

24  those two documents are identical.

25          Then the other document, I think it's protected.

Page 76

1    Moreover, I also think it's irrelevant.  I think that what's

2    in these documents is irrelevant.

3              MS. SAWYER:  I under --

4              THE COURT:  But, Mr. Lawrence, we're next going to

5    talk about irrelevance and you can't cite me to myself when

6    I get to the next part.

7              MR. LAWRENCE:  I promise, Your Honor.

8              THE COURT:  All right.

9              MS. SAWYER:  I understand the Court's ruling.  I

10   just want to note for the record that if there are notes

11   that Mr. Shapiro has written regarding his valuations and

12   his expert opinions in the four years prior to his opinion,

13   our position is --

14             THE COURT:  I hear --

15             MS. SAWYER:  -- is that those documents should be

16   produced and they --

17             THE COURT:  Okay.  We're --

18             MS. SAWYER:  -- obviously aren't these documents.

19             THE COURT:  Okay.  These documents do not fit

20   within that description --

21             MS. SAWYER:  Okay.

22             THE COURT:  -- is my --

23             MS. SAWYER:  Thank you.

24             THE COURT:  -- based on my reading of them.

25             MS. SAWYER:  Thank you.

 1              THE COURT:  Okay.  All right.  Moving right along,

 2    folks, let's go to the group of documents that are deemed to

 3    be irrelevant.  And those are in the Swap documents.  I

 4    think we're in the home stretch, or I think we're actually

 5    -- we might be done.  Are we done?  Is anyone keeping track?

 6              MR. LAWRENCE:  I think that --

 7              THE COURT:  I think it --

 8              MR. LAWRENCE:  I think that once you do these you

 9    are done.

10              THE COURT:  The irrelevant documents I think we're

11    done.  Okay.

12              Okay.  So going over to the irrelevant -- so-

13    called irrelevant documents, 132760.

14              MR. LAWRENCE:  So --

15              THE COURT:  Hold on.  Now you have to wait for me

16    to get there.

17        (Pause)

18              THE COURT:  Okay.  132760 numbers -- it's a

19    numbers on a page document.

20              MR. LAWRENCE:  I'll just --

21              THE COURT:  Okay.  And this is --

22              MR. LAWRENCE:  That --

23              THE COURT:  So it's the same --

24              MR. LAWRENCE:  One --

25              THE COURT:  -- it's the same issue as the other

```
 1    documents, correct?

 2              MR. LAWRENCE:  Yeah.  All the documents --

 3              THE COURT:  All the --

 4              MR. LAWRENCE:  -- relate to the same basic issue

 5    of whether or not other --

 6              THE COURT:  Right.

 7              MR. LAWRENCE:  -- tobacco RFAs --

 8              THE COURT:  Right.

 9              MR. LAWRENCE:  -- are relevant.

10              THE COURT:  Okay.  And what you say on this is --

11    well, Lehman says that this is irrelevant, right?

12              MR. LAWRENCE:  Right.

13              THE COURT:  So, therefore, it's irrelevant.

14              MR. LAWRENCE:  That is --

15              THE COURT:  It --

16              MR. LAWRENCE:  That is the gist of -- that is the

17    gist of --

18              THE COURT:  That's the --

19              MR. LAWRENCE:  -- of our argument.

20              THE COURT:  Okay.  But the --

21              MR. LAWRENCE:  But the --

22              THE COURT:  But the logic of that doesn't

23    withstand scrutiny in my mind because Lehman thinks it's

24    irrelevant, but this is a factor data that you -- that your

25    expert looked at.
```

1           MR. LAWRENCE:  If I can --

2           THE COURT:  Sure.

3           MR. LAWRENCE:  The -- but taken to that logical --

4           THE COURT:  Right.

5           MR. LAWRENCE:  -- conclusion, which I'm willing to

6    do --

7           THE COURT:  Okay.

8           MR. LAWRENCE:  -- at least to the other issue that

9    we've raised; that is, we should be able to get from Lehman

10   its valuations of the other tobacco RFAs.

11          THE COURT:  No, but I -- but this is where --

12          MR. LAWRENCE:  We asked -- we --

13          THE COURT:  -- but this is where I disagree.

14   Okay.  Don't get to the other thing yet.

15          MR. LAWRENCE:  Well, then that --

16          THE COURT:  Stick with me.  Stick with me on this

17   one.  All right.  I'm going to give you an example that I

18   used to analyze this issue.

19          MR. LAWRENCE:  You don't have -- I understand your

20   reasoning.  I'm not going to --

21          THE COURT:  Okay.

22          MR. LAWRENCE:  -- disagree with it.  I just think

23   it -- I disagree with the fact that it's not -- doesn't

24   carry --

25          THE COURT:  That it's --

1                MR. LAWRENCE:  -- through --

2                THE COURT:  That there's no sauce for the goose

3     rule.

4                MR. LAWRENCE:  Right.  That if the tobacco --

5     other tobacco RFAs are relevant to this proceeding, we

6     should --

7                THE COURT:  Lehman says they're not relevant.  So

8     for example --

9                MR. LAWRENCE:  I understand.

10               THE COURT:  -- let me -- I'm going to use the

11    example that -- my working example.  All right.  We have an

12    expert who believes that you calculate a Swap termination

13    valuation by reference to the chart of the tides in New York

14    Harbor.

15               MR. LAWRENCE:  Right.

16               THE COURT:  That's his methodology.  Lehman says,

17    the tides have nothing to do with the calculation of Swap.

18    But you have an expert who is going to show that.  So you're

19    not going to have -- that's something that your expert

20    looked at.  It's a factor data.  They say it's irrelevant.

21    So if they say it's irrelevant, the notion that they might

22    have looked at it.  You say it's irrelevant.  They say it's

23    irrelevant.

24               MR. LAWRENCE:  I -- but the problem that that puts

25    us in is that our expert would like to have all the similar

1    information about the other tobacco RFAs.  We requested it

2    after --

3              THE COURT:  We're going to -- but we're going to

4    --

5              MR. LAWRENCE:  So I'm just saying --

6              THE COURT:  -- we're going to get to that once --

7              MR. LAWRENCE:  -- I'm just saying that it -- it's

8    hard for me to understand -- I mean, we believe that they

9    are relevant, so, yes, it is relevant.  But we don't believe

10   that --

11             THE COURT:  But you've segwayed --

12             MR. LAWRENCE:  -- it's something --

13             THE COURT:  -- to the other --

14             MR. LAWRENCE:  Yeah.

15             THE COURT:  -- to the other argument.

16             MR. LAWRENCE:  But that's --

17             THE COURT:  So this is --

18             MR. LAWRENCE:  But that's my --

19             THE COURT:  This is a fact --

20             MR. LAWRENCE:  -- that's our position.

21             THE COURT:  This is producible as a factor data.

22             MR. LAWRENCE:  Okay.

23             THE COURT:  Okay, these four documents.

24             MR. LAWRENCE:  Do they actually want the -- one of

25   the documents is simply --

Page 82

```
1              THE COURT:  They don't --

2              MR. LAWRENCE:  -- the New Jersey --

3              THE COURT:  They don't know.  It's a very big

4    document.

5              MR. LAWRENCE:  It's the New Jersey RFA, so.  It's

6    the New Jersey schedule of claims.

7              MS. SAWYER:  I mean, that would be interesting

8    because other discussions with New Jersey they said they've

9    never worked with Mr. Shapiro before.  So --

10             THE COURT:  Oh, I don't know that this reflects

11   that they've worked with him.  It's just a document that --

12             MR. LAWRENCE:  No.  It's just a filing.

13             THE COURT:  It's just a filing, the document that

14   they have.

15             So I think that completes --

16             MR. LAWRENCE:  Yes.

17             MS. SAWYER:  Would it be safe to just maybe go

18   through the list so there's no ambiguity as to what's been

19   produced and what's going to be --

20             THE COURT:  Okay.  But --

21             MS. SAWYER:  -- produced and not --

22             THE COURT:  But that assumes that I've been

23   keeping track of everything I've said for the last two hours

24   and I -- we can do that.

25             MR. LAWRENCE:  I mean, if you have the list, it's
```

1    fine.  I mean, it's basically the --

2              THE COURT:  Hold on.  What did I --

3         (Pause)

4              THE COURT:  Good point.  Okay.  We have missed

5    something.

6              MR. LAWRENCE:  Okay.

7              THE COURT:  Thank you.  Thank you to Ms. Lefkiss

8    (ph).

9              The beginning group of Swap documents, 132868,

10   132869, we missed those, right?

11             MR. LAWRENCE:  No.

12             UNIDENTIFIED SPEAKER:  I don't think so.

13             THE COURT:  132868.

14             MR. LAWRENCE:  I only say that we haven't missed

15   those because we dealt with them in the TSA production.  So

16   if I can -- the way that Your Honor ruled --

17             THE COURT:  Okay.

18             MR. LAWRENCE:  -- earlier on the --

19             THE COURT:  I see what you're saying.

20             MR. LAWRENCE:  -- on the documents from at least

21   the first one is --

22             THE COURT:  You're right.

23             MR. LAWRENCE:  -- the last --

24             THE COURT:  You're right.

25             MR. LAWRENCE:  -- the last email was not produced

Page 84

1    while the rest are.

2         MS. SAWYER:  So it might be helpful just to go

3    down the list just so there's no ambiguity --

4         THE COURT:  Sure.

5         MS. SAWYER:  -- in a week to say, that should have

6    been produced or --

7         THE COURT:  Okay.

8         MS. SAWYER:  -- that shouldn't have been produced.

9         THE COURT:  Let's do it.  Okay.

10        MS. SAWYER:  Okay.  I appreciate it.  Thank you.

11        THE COURT:  But why don't -- let one -- one of you

12   should take the lead.

13        MS. SAWYER:  Okay.  I mean --

14        THE COURT:  All right.

15        MS. SAWYER:  -- I think -- I don't know if you

16   want to, Paul.

17        MR. LAWRENCE:  Go -- go ahead.  I -- because I've

18   been using mostly our alternative list, but --

19        MS. SAWYER:  I mean, my impression was everything

20   was going to be produced except for the ones that are marked

21   mediation privilege.

22        MR. LAWRENCE:  With a couple of exceptions.  There

23   were --

24        THE COURT:  Couple.

25        MR. LAWRENCE:  There were --

Page 85

1            THE COURT:  There were some -- yeah.

2            MR. LAWRENCE:  -- parts of other documents --

3            THE COURT:  Yes.

4            MS. SAWYER:  So --

5            MR. LAWRENCE:  -- that were --

6            MS. SAWYER:  Okay.  So maybe we can identify those

7    parts.  Is that -- because I think that's -- that would be

8    maybe the most efficient way to try and --

9            THE COURT:  Okay.  I just don't want to, in the

10   spirit of being thorough change anything that we've already

11   done.

12           MR. LAWRENCE:  In 636 which is also the same as

13   some other document.  Well, there are several email chains

14   like 636, a communication from Mr. Rich, the lawyer at K&L

15   Gates dated December 19th, 2008 is not to be produced.  The

16   attachment to that email chain which is a draft motion is

17   not to be produced, but the other parts of the email chain

18   are to be produced.

19           MS. SAWYER:  I thought the attachment was to be

20   produced.

21           MR. LAWRENCE:  No, not that attachment.

22           MS. SAWYER:  Okay.

23           MR. LAWRENCE:  There's another attachment later.

24           MS. SAWYER:  Okay.

25           MR. LAWRENCE:  In 6812, again, we have -- here,

1    again, the December 19th, 2008 email was not to be produced.

2    The other emails are to be produced, and then the draft

3    contract, which is this draft contract, is to be produced.

4              THE COURT:  Yes.  I'm nodding my head yes.

5              MR. LAWRENCE:  Okay.  On 6841 the first -- again,

6    it's always hard -- we -- the Bob Cook to Peter Shapiro

7    email is to be produced.  The heading, I guess, that shows

8    the next email is from Christine Elliot to Bob Cook is to be

9    reduced (sic), but the subject of the email is not to be

10   produced.

11             THE COURT:  Yes.

12             MR. LAWRENCE:  On 3166, the top email from Bob

13   Cook to Peter Shapiro copied Mark Brecca (ph) is to be

14   produced.  The second email from Christine Elliot to Bob

15   Cook is not to be produced.  The rest was already produced.

16   Those were the only two that were --

17             THE COURT:  Okay.

18             MR. LAWRENCE:  -- redacted.

19             968 is a draft report which you ordered produced.

20             979 is a draft report you ordered produced.

21             234 is a draft report -- I'll just say draft

22   report and --

23             THE COURT:  I understand.

24             MR. LAWRENCE:  -- don't think -- 829 is a draft

25   report.

1            THE COURT:  It's an iteration.

2            MR. LAWRENCE:  It's an iteration of a draft

3    report.

4            968 was produced.

5            904, this is mediation privilege.

6            MS. SAWYER:  Did we discuss this document, 62904?

7            MR. LAWRENCE:  I think we did under the Swap

8    documents, but --

9            MS. SAWYER:  Okay.

10           THE COURT:  Yes.

11           MS. SAWYER:  Okay.

12           MR. LAWRENCE:  And 570 we also discussed in the

13   Swap documents is also a mediation document.

14           For the Swap document 868, as we previously

15   discussed, the January -- sorry -- the December 19th email

16   from J. Rich to Peter Shapiro is not to be produced, and the

17   rest are to be produced.

18           Same thing with respect to 132869 and then there's

19   an attachment which is produced.  Again, it's the same

20   document previously talked about.

21           132839, again, is -- let's see.  Did we talk about

22   839?

23           THE COURT:  839?

24           MR. LAWRENCE:  132839, there are -- I'm sure that

25   we talked about this one.

1               THE COURT:  Okay.  Hold on.  Let me get there.

2       132839.

3           (Pause)

4               MR. LAWRENCE:  So the -- all the email chains

5       starting with the J. Rich to Christine Elliot February 3rd,

6       2009 and the ones that follow or precede in time are all

7       between the attorney and -- between the --

8               THE COURT:  What date are you starting at, Mr.

9       Lawrence?  We missed this one.

10              MR. LAWRENCE:  And, again, we're going -- you

11      know, we have --

12              THE COURT:  From the bottom up.

13              MR. LAWRENCE:  -- to go backwards.

14              THE COURT:  Right.

15              MR. LAWRENCE:  Oh, so from the bottom all the

16      documents -- all the emails from the bottom which starts

17      January 16th, 2009 through the email dated February 3rd from

18      J. Rich to Christine Elliot are all between --

19              THE COURT:  Right.

20              MR. LAWRENCE:  -- the attorneys.

21              THE COURT:  But everything above that --

22              MR. LAWRENCE:  And then I guess the one question

23      that we didn't address in the Bob Cook to Peter Shapiro

24      email, February 4th, 139, there is a quote taken from the

25      email dated February 3rd, 2009 between Christine Elliot and

Page 89

```
1      Faith Pettite (ph), both of K&L Gates, and I think that that

2      ought to be -- that --

3                 THE COURT:  Redact --

4                 MR. LAWRENCE:  -- that email should not be

5      produced because it's --

6                 THE COURT:  Or that --

7                 MR. LAWRENCE:  Or we can --

8                 THE COURT:  That could be redacted.

9                 MR. LAWRENCE:  We'll just redact it, Your Honor.

10                THE COURT:  Okay.  And then everything else --

11                MR. LAWRENCE:  Yes.

12                THE COURT:  -- completely uninteresting, but

13     should be produced.

14                MR. LAWRENCE:  Yes.

15                THE COURT:  Sorry.

16         (Laughter)

17                MR. LAWRENCE:  I think that on 8 -- sorry -- 842,

18     the email from Christine Elliot to Bob Cook is -- will be --

19     continue to be redacted.

20                The email from Bob Cook to Peter Shapiro is going

21     to be produced.

22                THE COURT:  Yes, or unredact -- it's going to be

23     unredacted.

24                MR. LAWRENCE:  Yeah.

25                THE COURT:  Okay.
```

1              MR. LAWRENCE:  Yes.  Yes.

2              THE COURT:  Right.

3              MR. LAWRENCE:  Sorry.

4              132845 I think is covered with the iteration

5    ruling.

6              THE COURT:  Right.

7              MS. SAWYER:  So it will be produced?

8              MR. LAWRENCE:  Yes.

9              THE COURT:  Yes.  As will --

10             MR. LAWRENCE:  901 is another iteration.  323 is

11   an iteration.  866 is an iteration.  867 is an iteration.

12   899 is an iteration.

13             THE COURT:  I'm taking you at your word on the

14   already produced.

15             MR. LAWRENCE:  Okay.

16             THE COURT:  There are a couple on here that are --

17   have -- only have the designation, already produced.

18             MS. SAWYER:  We have to take them at their word,

19   too.  We've had trouble reconciling --

20             THE COURT:  Okay.

21             MS. SAWYER:  -- produced documents --

22             THE COURT:  Well --

23             MS. SAWYER:  -- with the log.

24             THE COURT:  -- if it is already produced and -- I

25   mean, as courtesy among counsel, I would suggest that they

Page 91

1    be shown to them --

2              MR. LAWRENCE:  Sure.

3              THE COURT:  -- just so they can be satisfied --

4              MS. SAWYER:  Thank you.

5              THE COURT:  -- and they do not have to do a

6    treasure hunt.

7              MS. SAWYER:  Thank you.

8              THE COURT:  Okay.

9              MR. LAWRENCE:  I don't think that we talked about

10   132317.  I'm sorry --

11             THE COURT:  It's already produced.

12             MR. LAWRENCE:  132317, but I -- it's been produced

13   and made a format, so I don't know if -- do you want this?

14   I mean, I'll give it to you.

15             MS. SAWYER:  Thank you.

16             THE COURT:  Okay.

17             MR. LAWRENCE:  Let's see.  441 is an iteration to

18   be produced.   420 has been produced.  325 has been

19   produced.  291, I don't know if we talked about 291.

20             MS. SAWYER:  I don't think we have talked about

21   it.

22             MR. LAWRENCE:  It's -- it -- this is a -- I

23   believe and just to confirm this is the -- when it talks

24   about negotiation it's --

25             THE COURT:  Okay.  Hold -- let me get there.

Page 92

1              MR. LAWRENCE:  Yeah.

2              THE COURT:  This is 291?

3         (Pause)

4              THE COURT:  Oh, yes.  Another numbers on a page

5    document.

6              MR. LAWRENCE:  Yeah.  But I think if you look at

7    the last set of numbers it's revealing that this was for

8    mediation purposes and you also look at the expected -- the

9    negotiated --

10             THE COURT:  Where am I looking to tie it to the

11   mediation?

12             MR. LAWRENCE:  So the second column called,

13   expected Lehman --

14             THE COURT:  Right.

15             MR. LAWRENCE:  -- and third column negotiate

16   (indiscernible).

17             THE COURT:  Block as opposed to column, right?

18             MR. LAWRENCE:  Right.  Right.

19             THE COURT:  Block, up and down the page?

20             MR. LAWRENCE:  Yes.  Yes.  Yes.  Sorry.

21             THE COURT:  And when do you think that this was

22   produced?

23             MS. SAWYER:  The log says 6/22/2010.

24             MR. LAWRENCE:   Well, if that's what it says, I'm

25   sure that's what it says.

1           THE COURT:  Then it couldn't be for mediation.

2           MS. SAWYER:  Exactly.

3           Also, I would note on the chart I'm looking at,

4    which is the attachment to Mr. Lawrence's July 28th letter,

5    he's indicated this is attorney/expect communication. It's

6    not mediation --

7           THE COURT:  Right.

8           MS. SAWYER:  -- privilege.

9           THE COURT:  Right.  So just to be clear, we're at

10   132291 --

11          MR. LAWRENCE:  So if I can --

12          THE COURT:  -- which --

13          MR. LAWRENCE:  -- if I can -- let -- can we leave

14   it like this?  If it's not an attorney/client -- if does not

15   contain attorney thoughts it will be produced.  If it does

16   contain attorney thoughts, I will confirm that with Lehman

17   because you can't tell.

18          THE COURT:  Why -- it would seem to me, number

19   one, that if the time frame is as indicated, which you would

20   have to have independent evidence of or metadata, it's

21   definitely not covered by mediation so we're taking that off

22   the table.  It's designated --

23          MR. LAWRENCE:  I would --

24          THE COURT:  -- here as attorney/expert --

25          MR. LAWRENCE:  I would agree that it's not a

1    mediation.

2              THE COURT:  Okay.

3              MR. LAWRENCE:  I think --

4              THE COURT:  Okay.

5              MR. LAWRENCE:  -- that this --

6              THE COURT:  I'm sorry.

7              MR. LAWRENCE:  -- was a discussion between the

8    attorney --

9              THE COURT:  Right.

10             MR. LAWRENCE:  -- and the expert.

11             THE COURT:  Okay.

12             MR. LAWRENCE:  That's all I'm saying.

13             THE COURT:  So specifically on this one, you're

14   going to have to revert -- I would ask you to do so in a

15   letter form.  I believe, based on what I'm seeing on the

16   page, I would find it hard to believe that this reflects

17   attorney/client communication.

18             MR. LAWRENCE:  Okay.  Well, I can confirm the

19   letter to --

20             THE COURT:  Okay.

21             MR. LAWRENCE:  -- (indiscernible).

22             MS. SAWYER:  I think I would want to know for sure

23   who the attorney was given the nature of these --

24             MR. LAWRENCE:  Yeah.  Sure.

25             THE COURT:  Yes.

Page 95

1        MR. LAWRENCE:  Sure.

2        THE COURT:  Yeah.  Okay.  So what we'll do, just

3   to keep it procedurally neat, is we'll get that letter and

4   we're going to have to somehow incorporate it into this

5   record.  I don't have any way of testing the assertion.  I

6   -- it seems to me that this is going to need to be produced.

7        MR. LAWRENCE:  I understand Your Honor's --

8        THE COURT:  Okay.

9        MR. LAWRENCE:  And I'm not saying it doesn't.  I'm

10  just saying I just need to confirm whether this is

11  information from the attorney to Swap and, if it's not, it

12  will be produced.

13       THE COURT:  Okay.  All right, Ms. Sawyer?  I know

14  it's very hard, but this is in the nature of --

15       MS. SAWYER:  That's fine.  We'll just wait and see

16  what the letter says.

17       THE COURT:  Okay.

18       MS. SAWYER:  That's fine.

19       THE COURT:  All right.

20       MR. LAWRENCE:  760 is the relevancy thing which

21  will be produced.

22       384, same; 385, same; 409, same.

23       650 is mediation.

24       749 is mediation.

25       677 is mediation.

Page 96

1              748 is mediation.

2              775 is mediation.

3              784 is mediation.

4              801 is mediation.

5              644 is mediation.

6              733 is mediation.

7              691 is mediation.

8              692 is mediation.

9              430, 433 and 431 are attorney work product

10   (indiscernible).

11              THE COURT:  Okay.  Very well done.

12              All right.  So those rulings will have -- will

13   need to be extrapolated to the remainder of the pool.

14              What remains, though, and I'm going to ask Ms.

15   Sawyer the question, is what was raised for the first time

16   in your letter is the Principia, the screenshot issue.

17              MS. SAWYER:  Yes.

18              THE COURT:  So do we have to talk about that as

19   well?

20              MS. SAWYER:  Yes.  We have --

21              THE COURT:  Okay.

22              MS. SAWYER:  I mean, we've been provided no work

23   papers from Mr. Shapiro.  He claims it was done by the

24   computer software called, Principia, which reflects

25   screenshots of the different --

Page 97

1                THE COURT:  Right.

2                MS. SAWYER:  -- versions and alternative

3     valuations --

4                THE COURT:  Okay.

5                MS. SAWYER:  -- that were done.  We have only been

6     provided with the screenshot for Version 16 confirming that

7     there are 15 prior versions.

8                THE COURT:  Or suggesting that there are.

9                MR. LAWRENCE:  If I can cut to the short --

10               THE COURT:  Sure.  Please.

11               MR. LAWRENCE:  -- of this.  Based on Your Honor's

12    rulings, we'll need to go back to Swap and see if they can

13    generate out these other screenshots.  And we -- based on

14    your ruling about iterations of drafts we will produce that.

15               THE COURT:  Okay.

16               MS. SAWYER:  And we've actually had discussions

17    with makers of Principia and those versions can be

18    generated.

19               THE COURT:  They can --

20               MS. SAWYER:  We believe they can --

21               THE COURT:  You believe they can be generated.

22               MR. LAWRENCE:  So they just may not -- we -- they

23    just may need to consult with Principia to learn how to --

24               MS. SAWYER:  Absolutely.

25               MR. LAWRENCE:  -- do it.

1             MS. SAWYER:  Absolutely.

2             THE COURT:  Okay.

3             MS. SAWYER:  Swap Financial may need to ask them

4    some questions --

5             MR. LAWRENCE:  Yeah.

6             MS. SAWYER:  -- to figure out how to do it.

7             THE COURT:  Okay.

8             MR. LAWRENCE:  Okay.

9             THE COURT:  All right.  Thank you very much.

10            MR. LAWRENCE:  Sure.

11            THE COURT:  Okay.  So I think that that -- but now

12   I'm going to raise another issue, okay, and try to

13   anticipate.

14            So there -- you're going to send them these

15   documents and they're going to either say, oh, happy day,

16   or, boy, that was a big to do about nothing much.  But if

17   they say, oh, happy day, then they might say to you, you

18   need to reproduce your expert to ask him about these newly

19   produced documents.  I might be putting words in your mouth,

20   but I'm trying to be efficient.

21            MS. SAWYER:  No.  Absolutely.  I was going to ask

22   in terms of timing, given the fact we --

23            THE COURT:  Well, that --

24            MS. SAWYER:  -- have November 4th hearing --

25            THE COURT:  -- that's where --

```
 1              MS. SAWYER:  -- when we're going to get the --

 2              THE COURT:  So that's --

 3              MS. SAWYER:  -- rest of the documents.

 4              THE COURT:  I'm trying to keep ahead of you a

 5    little bit.

 6              MS. SAWYER:  Okay.  Thank you.

 7              THE COURT:  So that's where I'm going with that

 8    observation, is that what's the timing and do we agree that

 9    they would have the right to recall him based on the newly

10    produced documents if they're as interesting as they might

11    be.

12              MR. LAWRENCE:  We --

13              THE COURT:  You have an exceedingly good nature

14    for a litigator I have to say.

15              MR. LAWRENCE:  I think it's one of the benefits

16    moving to Seattle from New York, perhaps.

17         (Laughter)

18              MR. LAWRENCE:  We -- I see no reason why we can't

19    produce these this week, so that should be the answer to

20    that.

21              THE COURT:  Okay.

22              MR. LAWRENCE:  And, you know, maybe I'm being too

23    cooperative here, but we wouldn't object to a deposition of

24    Peter Shapiro limited to the newly produced documents --

25              THE COURT:  Of course.  It's not a --
```

Page 100

```
 1              MR. LAWRENCE:  -- if they want.

 2              THE COURT:  It's not a do-over.  It's in no way is

 3    it a do-over --

 4              MR. LAWRENCE:  Thank you.

 5              THE COURT:  -- of the --

 6              MR. LAWRENCE:  My sense is they -- they're more in

 7    the so what than a lucky day, but I'm sure that they will

 8    find things to ask about, so we're -- we will coordinate on

 9    a date.

10              THE COURT:  But you agree that it's not a do-over.

11    It just would be --

12              MS. SAWYER:  No.  Absolutely.

13              THE COURT:  -- limited to --

14              MS. SAWYER:  We are limited to the reproduced

15    documents and questions arising from those documents.

16              In terms of the production this week, would that

17    include going back to the other, you know, several hundred

18    documents we claim were improperly withheld in applying

19    these --

20              THE COURT:  Well, that --

21              MS. SAWYER:  -- principals to them?

22              THE COURT:  That's what we're talking about.

23    Applying these --

24              MR. LAWRENCE:  I can certainly -- I guess I should

25    make -- I have in my mind the scope of documents which I
```

Page 101

1    think are going to be doable within this week.  I think,

2    basically, it's just reiterations and copies of the same

3    thing.  But if for some reason we -- we'll do as best we can

4    this week and if there's some reason we can't, Monday, I'm

5    sure, or Tuesday.

6              THE COURT:  Okay.  I mean, I guess I'll look for

7    your guidance on this, but to the extent that there are

8    documents in the pool of 350 --

9              MR. LAWRENCE:  Yeah.

10             THE COURT:  -- as to which you have questions

11   about which way the ruling cuts and you dill (sic) air on

12   the side of producing and you believe in the exercise of

13   your -- you know, your duties or however you want to phrase

14   it, you -- I mean, you'll have to come back to me.  I don't

15   know how -- what else to do --

16             MR. LAWRENCE:  I think --

17             THE COURT:  -- other than -- I assume you're going

18   to honestly and faithfully do what you need to do.

19             MR. LAWRENCE:  Yes, because I -- one of the things

20   that I haven't objected to so far, but I would say that the

21   notion that we somehow are trying to block or do something

22   inappropriate by designating Mr. Shapiro as an expert is

23   wrong.  And so I just want that for the record.

24             And we'll -- I explained to you why we designated

25   him --

Page 102

1          THE COURT:  Sure.

2          MR. LAWRENCE:  -- because we felt we had to.  But

3    we certainly, I think, will -- I understand the Court's

4    rulings and we'll comply.

5          THE COURT:  Okay.

6          MS. SAWYER:  I don't -- we didn't mean anything

7    pejorative by the designation of Mr. Shapiro as an expert.

8          THE COURT:  No.  I --

9          MS. SAWYER:  We just meant there were consequences

10   --

11         THE COURT:  Sure.

12         MS. SAWYER:  -- to designating --

13         THE COURT:  No.  And that's --

14         MS. SAWYER:  -- him.

15         THE COURT:  And that's the way I took it.  I

16   didn't take it as any sort of an athwart attempt to do

17   anything.  It's just litigation.

18         MS. SAWYER:  Thank you.

19         THE COURT:  Okay.  All right.  So now we get to

20   the September 8th letter and the September 10th letter with

21   respect to documents that you wanted from me and, I mean --

22   go ahead.

23         MR. LAWRENCE:  Okay.  I -- you know, I'll just say

24   that there -- and I'm not sure exactly where we end up with

25   them.  They are saying on the one hand that there's an

Page 103

1    industry standard that applies to any forward purchase

2    agreement, which is a huge universe above and beyond simply

3    the tobacco refinancing -- to tobacco RFAs; that their

4    expert is applying a standard methodology to in terms of

5    valuation.

6           We have asked for their valuations of how Lehman,

7    in fact, evaluated -- valued, sorry, how Lehman, in fact,

8    valued these contracts.  And when they asked us we've tried

9    to limit the scope to the tobacco RFA.  So while maybe not

10   exactly the same because some interest rates are going to be

11   different, Mr. Gruer, their expert, testified, well, these

12   are all the same documents.  These are just standard forward

13   purchase agreements.  They're all valued the same way in the

14   industry.

15          What we have seen in the documents that Lehman

16   produced with respect to the Washington tobacco RFA they did

17   not value that contract in the way that Mr. Gruer is valuing

18   it.  They valued it in a different way.

19          So we think we should be entitled to understand --

20   to get documents about how Lehman valued at least the other

21   tobacco RFAs, and we're limiting it to the other tobacco

22   RFAs to test whether or not the methodology that Mr. Gruer

23   employed is, in fact, a standard in the industry because if

24   it was we would expect Lehman to use it.

25          Now one way to short circuit this is if Lehman

Page 104

1    will stipulate that Lehman did not value the RFAs in the way

2    that Mr. Gruer is suggesting is standard in the industry;

3    that they valued it in a different way, then we don't need

4    that.  That's fine.  Then that's -- that proves our point.

5            But they're claiming on the one hand that there's

6    a standard that applies to all forward purchase agreements,

7    but on the other hand they're saying, well, none of these

8    other forward purchase agreements, not even the tobacco RFAs

9    are relevant and, in fact, they're so different that

10   Washington's is so different it has nothing to do with any

11   of these others.

12           So there's an internal contradiction between the

13   position that Lehman is taking.  And if they're going to

14   take the position that there's a standard that applies to

15   all forward purchase agreements, we should at least get

16   their valuation for the tobacco RFAs.  But if they're

17   willing to stipulate that Lehman did not value their tobacco

18   RFAs using the standard methodology of Mr. Gruer, then we

19   can just short circuit this.

20           THE COURT:  So Gruer, is that the name of the

21   gentleman?

22           MR. LAWRENCE:  Mr. Samuel Gruer.  Yes.

23           THE COURT:  Gruer.  So what -- your point is, if I

24   could try to restate it, is that Gruer comes in and says,

25   here's the methodology.  You're saying that there are

Page 105

1    internal Lehman documents that show that Lehman itself never

2    used that methodology.

3            THE COURT:  Not to value the contracts.  Right.

4            THE COURT:  Okay.

5            MS. SAWYER:  To be honest, this is the first I've

6    heard that there's internal Lehman documents that show

7    Lehman did not value the RFAs or its forward purchase

8    agreements consistent with the industry standard.  I mean,

9    all of the experts agree that there is an industry standard

10   approach to valuing the FPAs.  You look at the eligible

11   securities.  If you're a dealer you might include some

12   dealer charges.  The questions aren't for Mr. Shapiro to

13   Lehman dispute what those charges should be.

14           Mr. Currie and Mr. Hastrick (ph) believe that the

15   industry standard approach shouldn't apply at all because

16   Washington TSA is not a dealer in the market.  But there's

17   no dispute that there is an industry standard approach.

18           And so I'm not aware of any document that Lehman

19   has or has produced that says we've done it --

20           THE COURT:  Okay.  But --

21           MS. SAWYER:  -- inconsistent with the industry

22   standard approach.

23           THE COURT:  The smile on Mr. Lawrence's face

24   suggests that he is aware of --

25           MS. SAWYER:  Okay.

Page 106

1          THE COURT:  -- such documents.

2          MR. LAWRENCE:  And they are aware of it.  I mean,

3    the -- so one of the basic disputes in the case is what do

4    you do in this situation where there's no actual market out

5    there so that --

6          THE COURT:  Right.

7          MR. LAWRENCE:  -- the TSA can go out and get a

8    replacement contract.

9          THE COURT:  Yeah.

10         MR. LAWRENCE:  What Lehman -- how Lehman valued

11   the Washington TSA was based not on running a forward curve.

12   It was based on transactions that they actually conducted.

13   So, in other words, when they entered into the contract they

14   went out and hedged, bought futures, you know --

15         THE COURT:  Is this what they did or this is what

16   Gruer --

17         MR. LAWRENCE:  This is what they did.

18         THE COURT:  This is what Gruer --

19         MR. LAWRENCE:  This is what they -- no.  Gruer --

20         THE COURT:  No, but what's --

21         MR. LAWRENCE:  Gruer doesn't do this.  Gruer

22   doesn't do this.  Gruer says we don't need to do that.  See,

23   part of the problem is you can't -- there are no

24   transactions that TSA can make --

25         THE COURT:  Okay.  Okay.  So the --

Page 107

1          MR. LAWRENCE:  So --

2          THE COURT:  I understand what you're saying.

3          MR. LAWRENCE:  And then they went out and entered

4     into another agreement with a -- with Sun America which

5     basically secured a flow of cash to meet the obligations of

6     this and other TSAs.  And they relied on that actual

7     transaction.

8          So our point is that they don't value based on

9     running a hypothetical forward (indiscernible).  They value

10    based on actual transactions --

11         THE COURT:  I'm not -- I'm going to tell you right

12    off the bat, and I'll ask Ms. Sawyer to help me out here.

13    What you just said with respect to actual transactions, it's

14    unclear to me what the nexus is between that, if it, in

15    fact, occurred -- I take you at your word -- with the notion

16    that there's an expert now who is giving an opinion about

17    you do evaluations based on industry standard.  I'm having a

18    hard time connecting up those two pieces.

19         MR. LAWRENCE:  Because --

20         MS. SAWYER:  I actually -- now that I've heard

21    what Mr. Lawrence --

22         THE COURT:  Okay.  Let --

23         MS. SAWYER:  -- has identified, I think --

24         THE COURT:  Okay.

25         MS. SAWYER:  -- maybe I can help unpack this.

Page 108

```
 1              THE COURT:  Great.  Okay.

 2              MS. SAWYER:  So Mr. Lawrence has identified a

 3    couple of different things.  The first is that Lehman pre-

 4    bankruptcy had a unique way of hedging its tobacco reserve

 5    funds agreements which I think surprised Mr. Shapiro and

 6    others --

 7              THE COURT:  I see.

 8              MS. SAWYER:  -- about that.

 9              THE COURT:  Okay.

10              MS. SAWYER:  So the actual transaction with Sun

11    America, that is relate -- that is describing the hedge that

12    Lehman had on pre-bankruptcy for the Washington TSA RFA --

13              THE COURT:  Okay.

14              MS. SAWYER:  -- which was unique.  It wasn't sort

15    of an industry standard hedge.  That's not how Lehman valued

16    the contract.  I mean, there would be -- there would be mark

17    to markets of that hedge.  There would be valuations of that

18    hedge --

19              THE COURT:  Okay.

20              MS. SAWYER:  -- things like that.  All of --

21              THE COURT:  Okay.

22              MS. SAWYER:  -- that's been produced.  But that's

23    -- that is a unique hedge --

24              THE COURT:  Okay.

25              MS. SAWYER:  -- but it's not saying that's the way
```

Page 109

1    Lehman valued the contract.  There would be mark to markets

2    of that hedge.

3            The other thing that Mr. Lawrence was talking

4    about was actual transactions in the market and that's how

5    Lehman did it.  That is referring to testimony that Mr.

6    Conheilm (ph) gave who was Lehman's 30(b)(6) witness

7    describing how Lehman could construct an agency forward

8    curve when there's not a published agency forward curve.  he

9    described historically how Lehman would base upon their

10   actual transactions to create the agency forward curve, and

11   that's -- I mean, that's obviously still a Lehman specific

12   (indiscernible).

13           None of this denies the fact that there is an

14   industry standard methodology that Lehman used to value its

15   RFAs every day.  I mean, every day that Lehman's RFAs --

16           THE COURT:  So if there are documents that reflect

17   that Lehman used a different methodology to value its RFAs,

18   right, that's what Mr. Lawrence is after, then that would be

19   something that would need to be -- in other words, Lehman

20   says this is the industry standard, and in its files it

21   can't have 16 other cases in which it did it another way.

22   That's what he --

23           MS. SAWYER:  I --

24           THE COURT:  -- wants to know.

25           MS. SAWYER:  I hear that.  But the burden of that,

Page 110

```
 1    when we're talking about 1,500 --

 2              THE COURT:  Okay.

 3              MS. SAWYER:  -- transactions --

 4              THE COURT:  But give --

 5              MS. SAWYER:  -- I mean --

 6              THE COURT:  -- give me -- but I thought it was

 7    more limited.  I thought it was just --

 8              MR. LAWRENCE:  I'm limiting it to --

 9              THE COURT:  -- tobacco.

10              MR. LAWRENCE:  -- tobacco, which should be a

11    discreet number of transactions.  And, also, I think they

12    should probably have familiarity with since there's so many

13    claims.

14              THE COURT:  But, Ms. Sawyer, what you're saying,

15    though, is that it ought to be an empty set.  It ought to be

16    an --

17              MS. SAWYER:  Right.  It should be an empty set.  I

18    should be able to --

19              THE COURT:  Right.

20              MS. SAWYER:  -- look at the tobacco RFAs, if we're

21    just limiting it to tobacco RFAs --

22              THE COURT:  Tobacco RFAs.

23              MS. SAWYER:  -- that Lehman had, I should be able

24    to look at it --

25              THE COURT:  Yes.
```

1           MS. SAWYER:  -- and see if they did anything

2    different to value any of those and then let them know if

3    they did.

4           THE COURT:  Right.

5           MR. LAWRENCE:  That's fine.

6           THE COURT:  Right.

7           MS. SAWYER:  I mean, that's different than the

8    request --

9           THE COURT:  Okay.

10          MS. SAWYER:  -- that's been made.  But I'm happy

11   to do that.

12          THE COURT:  Okay.

13          MS. SAWYER:  I'm happy to --

14          MR. LAWRENCE:  Yeah.  That's a reasonable

15   compromise and --

16          THE COURT:  I think it --

17          MR. LAWRENCE:  -- assuming that there would be

18   something, if it's not an empty set, then --

19          THE COURT:  Okay.

20          MR. LAWRENCE:  -- getting the documents.  Right.

21          THE COURT:  We --

22          MS. SAWYER:  And that's -- and we're talking about

23   pre-bankruptcy.

24          MR. LAWRENCE:  Yes.

25          THE COURT:  Yes.

```
 1              MS. SAWYER:  Okay.  Sure.

 2              THE COURT:  Perfect.

 3              MS. SAWYER:  We can do that.

 4              THE COURT:  Okay.

 5              MS. SAWYER:  It might take us some time.  I mean,

 6   I don't know exactly --

 7              THE COURT:  Okay.

 8              MS. SAWYER:  -- but we will --

 9              THE COURT:  All right.  And that -- that's putting

10   aside that -- that obviates the need to have an extensive

11   conversation about you slept on your rights.  It's too late.

12   All of those --

13              MR. LAWRENCE:  Thank you.

14              THE COURT:  -- things.

15              MS. SAWYER:  Yes.  That's fine.  We will do that.

16              THE COURT:  Are we done?

17              MS. SAWYER:  I actually had a couple of issues to

18   raise, but I know it's late.

19              THE COURT:  Okay.

20              MS. SAWYER:  But since we have Your Honor here I

21   had some logistical questions about the upcoming evidentiary

22   hearing --

23              THE COURT:  Okay.  Sure.

24              MS. SAWYER:  -- that I would love to discuss.

25              THE COURT:  We can't go on too long.  I've got
```

Page 113

1    first day hearings in a case -- what's the name of that law

2    firm, Jones Day, at two o'clock.

3            MS. SAWYER:  Yes.  I've heard.  I've heard.  But

4    we won't be attending those.

5            THE COURT:  Okay.

6            MS. SAWYER:  The first issue we had was relating

7    to witnesses, so the parties have -- and we have submitted

8    to Your Honor a proposed pretrial schedule that has not yet

9    been entered.  It's presented -- it's being presented today

10   to be entered, but we have been exchanging things pursuant

11   to --

12           THE COURT:  Okay.

13           MS. SAWYER:  -- that schedule.  So we have

14   exchanged witness lists.  Thirteen witnesses have been

15   identified.  Lehman's identified two witnesses.  TSA has

16   identified 11 witnesses, eight of whom are fact witnesses

17   which we found surprising given the fact that TSA argued

18   that this was a summary judgment case that should be

19   resolved on summary judgment and the fact that we have a

20   three-day hearing scheduled.

21           So I'm not sure how to resolve that issue, but --

22           MR. LAWRENCE:  If we're going to be quick about

23   it, we need to stick to the point and not do that kind of

24   thing.

25           THE COURT:  Okay.  We've been doing so well up to

 1    now.  Let's keep -- let's keep it up.

 2              MS. SAWYER:  Okay.

 3              THE COURT:  All right.  So -- okay.  So the --

 4              MS. SAWYER:  So I'm not sure how --

 5              THE COURT:  So how are we --

 6              MS. SAWYER:  -- to move forward given that --

 7              THE COURT:  Okay.

 8              MS. SAWYER:  -- like whether we are going to

 9    proceed with 13 witnesses in three days.

10              THE COURT:  Well --

11              MS. SAWYER:  Whether we want to do written directs

12    or something to try to --

13              THE COURT:  Well, let's talk --

14              MS. SAWYER:  -- streamline it.

15              THE COURT:  -- let's talk about it a little bit.

16    Okay.  It -- my general rule is that -- and, again, I -- I'm

17    not anywhere remote -- I'm nowhere near the merits other

18    than as much as was necessary to get through today.

19              So to the extent that the issues -- as a general

20    matter I prefer -- I like to hear witnesses, particularly in

21    the case of when credibility is at issue, and I don't know

22    enough to know whether credibility issues are here.  And,

23    also, I -- even though there are expert reports, I like to

24    hear from the experts as well.

25              But maybe, Mr. Lawrence, you can help us cut to

Page 115

1     the chase here.

2             If the eight witnesses -- eight witnesses sounds

3     like a big number, but if they're each going to be on the

4     stand for 20 minutes, then it's not such a big number.

5     Otherwise we're going to have to come up with some

6     scheduling understanding.

7             MR. LAWRENCE:  And I'll say two things.  One, I

8     would say that most of the witnesses would be 20 minutes or

9     less.

10            THE COURT:  Okay.

11            MR. LAWRENCE:  In fact, part -- probably the

12    reason that we identified as many witnesses as we did is

13    because we did not have the benefit of, at the time, of

14    understanding which depositions of our people they might

15    want to use at the trial.

16            So in some sense, we were anticipating that, oh,

17    if you use the deposition of X, then we'll probably want to

18    call X.  So, again, I think that --

19            THE COURT:  Okay.

20            MR. LAWRENCE:  I understand the constraints of the

21    trial and I'm efficient, and we will not put on witnesses

22    for hours.

23            THE COURT:  So how do you folks propose we do

24    this?  Are you going to do -- are we going to have imposed

25    time limitations?  I mean, how do you want to do this?  I

Page 116

1    like to let lawyers draw up their own game plan for the

2    trial.  So you folks either -- you need to agree on a game

3    plan, only if you can't agree am I going to put my two cents

4    in.

5            MS. SAWYER:  So we can consult with each other and

6    see if we can come up with --

7            THE COURT:  Why don't you do that?

8            MS. SAWYER:  -- a way to fit it all into the three

9    days.

10           THE COURT:  Right.

11           MS. SAWYER:  Okay.

12           THE COURT:  Right.  You want closings and

13   openings, right?

14           MR. LAWRENCE:  That's what I was going to ask you.

15           THE COURT:  You want opening - I would -- I need

16   openings in this case.

17           MS. SAWYER:  Okay.

18           THE COURT:  And then I am going to need post-trial

19   submissions.

20           MS. SAWYER:  And we also, as part of our schedule,

21   agreed upon pretrial submissions to Your Honor that --

22           THE COURT:  Okay.

23           MS. SAWYER:  -- would be submitted on October

24   21st, so a couple of weeks before the hearing.

25           THE COURT:  Simultaneous submissions.

Page 117

1              MR. LAWRENCE:  Yes.  Yes.

2              THE COURT:  That's fine.  Okay.  And then it's

3      helpful to me for there to be post-trial findings of fact.

4              Now what do you want to do -- you can either stand

5      up at the end and, after a break do closings, or you can

6      rest, do your post-trial findings of fact and come back in

7      for closing argument or do a closing brief and an argument

8      in which you, you know, you tell me what you proved and

9      apply it to the law.

10             MS. SAWYER:  Our preference would be to submit the

11     post-trial briefs and then have argument because it gives us

12     time to digest everything.

13             THE COURT:  That's the most helpful thing to me.

14             MR. LAWRENCE:  That's -- I was going to answer.

15     If that's what's helpful to you, that's fine.

16             THE COURT:  That's what's most helpful to me, to

17     have straight up findings of fact which are not advocate's

18     pieces, just straight up findings of fact with a post-trial

19     brief, which I get to read first, and then I get to have you

20     come back and tell me, here's what I proved and here's why I

21     win.  And then we'll take it under submission and get you a

22     decision.

23             Is that all --

24             MS. SAWYER:  I have a --

25             THE COURT:  -- okay with you?

Page 118

1            MR. LAWRENCE:  That's good.

2            MS. SAWYER:  That's good.  I have a couple of

3    other --

4            THE COURT:  Okay.

5            MS. SAWYER:  -- quick things.

6            One is, is we intended to move on -- move to

7    preclude the testimony of their expert witnesses on the

8    grounds of Daubert.  Our view is, is that their expert

9    witnesses have deviated from the generally accepted

10   methodology; that they have adopted a novel methodology

11   which is black letter law.  You should not be permitted to

12   do.

13           THE COURT:  Okay.  So when do you --

14           MS. SAWYER:  And so I didn't know if you wanted us

15   to brief that in advance or how you wanted to handle that?

16   And so we're just looking for guidance.  We could brief that

17   in very short order if that's the Court's preference.  If --

18   we're just presenting it to you to see how you want to

19   proceed.

20           THE COURT:  What do you think, Mr. Lawrence?

21           MR. LAWRENCE:  Well, I mean, typically, if you're

22   going to really do a Daubert proceeding you would have a

23   hearing where you would hear from the experts.  I guess --

24           THE COURT:  Yeah.  I think you ought to do -- what

25   -- the way that I've done this in the past is you make the

Page 119

1    Daubert motion.  You respond to the Daubert motion.  He gets

2    on the witness stand and then in real time, after I've heard

3    his qualifications, et cetera, then I'll give you a ruling

4    on the Daubert motion.

5              MS. SAWYER:  That's fine.

6              MR. LAWRENCE:  That's great.

7              THE COURT:  Okay.

8              MR. LAWRENCE:  Yeah.

9              MS. SAWYER:  So we can consult on a schedule on

10   that if that's --

11             MR. LAWRENCE:  Yes.

12             THE COURT:  Sure.

13             MS. SAWYER:  Is there any particular time that you

14   want the motion submitted in advance of the hearing?

15             THE COURT:  I mean, right around the 21st.

16             MS. SAWYER:  Okay.  Perfect.

17             THE COURT:  You know, that would be helpful.  I'm

18   on trial in another matter the entire week of the 20th, the

19   entire week of the 27th as far as I'm aware.  So it helps me

20   that it's the 21st because then that gives me lead time and

21   it gives me the weekend before you folks come in.

22             All right.  I have limited ability to run late,

23   not because of my energy level, but because of the court

24   staff.  So, you know, we'll try to get to a good stopping

25   point every day, but as a general matter we need to stop at

Page 120

1    five.  If after you confer about the schedule you feel

2    really jammed, we can start earlier.  We don't have to start

3    at, you know, ten o'clock.  We can start at nine o'clock.

4    So that gives you three extra hours.

5           But it's -- I don't like to make it an endurance

6    test for you or your witnesses.  So you can -- you can just

7    let us know.  I can do earlier with the staff, but I can't

8    do -- I'm limited on how much later I can go.  I can fudge

9    it around the edges five or 5:30, but I prefer not to do

10   much more than that so as not to burden the staff.

11           MS. SAWYER:  Understood.  Thank you.

12           MR. LAWRENCE:  Thank you.

13           THE COURT:  Can we call it a day?

14           Thank you very much.

15      (A chorus of thank you)

16      (Whereupon, these proceedings concluded at 1:19 p.m.)

17

18

19

20

21

22

23

24

25

Page 121

1               C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri L          Digitally signed by Sherri L Breach
                        DN: cn=Sherri L Breach, o, ou,
7    Breach            email=digital1@veritext.com, c=US
                        Date: 2014.09.18 17:51:55 -04'00'
8

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13

14   Dawn              Digitally signed by Dawn South
                        DN: cn=Dawn South, o, ou,
                        email=digital1@veritext.com,
15   South            c=US
                        Date: 2014.09.18 17:52:28 -04'00'
     _____

16   Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

17

18

19   Veritext

20   330 Old Country Road

21   Suite 300

22   Mineola, New York 11501

23

24

        Date: September 15, 2014

25