WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

**PLAN ADMINISTRATOR'S OBJECTION TO MOTION OF CLAIMANTS SYLVIA VEGA-SUTFIN, MICHELLE SEYMOUR, CHERYL MCNEIL, LINDA HOWARD-JAMES, ISABEL GUADJARDO AND COLEEN DENISE COLOMBO FOR RELIEF FROM STAY AND INJUNCTION PROVIDED UNDER PLAN**

# TABLE OF CONTENTS

**Preliminary Statement** .......... 1

**Background** .......... 2

*BNC's Employment Practices Liability Insurance Policy* .......... 5

*The Stay Relief Motion* .......... 5

**The Stay Relief Motion Should be Denied** .......... 6

A. The Protections of the Plan Injunction and the Automatic Stay Apply to the California Action .......... 6

B. The Claimants Have Failed to Establish Cause for Relief from the Automatic Stay or the Plan Injunction .......... 8

(i) *Whether Relief Would Result in a Partial or Complete Resolution of the Issues* .......... 10

(ii) *Lack of Any Connection With or Interference With the Bankruptcy Case* .......... 11

(iii) *Whether the Other Proceeding Involves the Debtor as a Fiduciary* .......... 13

(iv) *No Specialized Tribunal Has Been Established to Hear the Actions* .......... 13

(v) *No Insurer Has Assumed Responsibility for Any of the Actions* .......... 16

(vi) *Whether The Action Primarily Involves Third Parties* .......... 17

(vii) *Whether litigation in another forum would prejudice the interests of other creditors* .......... 17

(viii) *Whether the Judgment Claim Arising From the Other Action is Subject to Equitable Subordination* .......... 18

(ix) *Whether the Movant's Success in the Other Proceeding Would Result in a Judicial Lien Avoidable by the Debtor* .......... 18

(x) *The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation* (tenth *Sonnax* factor), and *Whether the Parties Are Ready for Trial in the Other roceeding* (eleventh *Sonnax* factor) ....................18

(xi) *Impact of the Stay on the Balance of Harms*....................20

**Conclusion** ....................22

**Exhibit A**

**Exhibit B**

**Exhibit C**

**Exhibit D**

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*CAE Indus. Ltd. v. Aerospace Holdings Co.*,
116 B.R. 31, 32 (S.D.N.Y. 1990)....................7

*City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l),*
28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983)....................17

*In re A.H. Robins Co., Inc.*,
89 B.R. 555, 562 (E.D. Va. 1988)....................11

*In re Arnott*,
512 B.R. 744, 751 (Bankr. S.D.N.Y. 2014)....................15

*In re Bally Total Fitness of Greater N.Y., Inc.*,
402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009)....................12, 14, 19

*In re Bally Total Fitness of Greater N.Y., Inc.*,
411 B.R. 142, 147 (S.D.N.Y. 2009)....................13

*In re Beck Industries, Inc.*,
725 F.2d 880, 892 (2d Cir. 1984)....................10

*In re Chateaugay Corp.*,
111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990)....................15

*In re Curtis*,
40 B.R. 795, 799 (Bankr. Utah 1984)....................13, 20

*In re Cuyahoga Equip. Corp.*,
980 F.2d 110, 117 (2d Cir. 1992)....................17

*In re Johns-Manville Corp.*,
68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988)....................10, 11

*In re Lehman Bros. Holdings Inc.*,
433 B.R. 113, 120-21 (Bankr. S.D.N.Y. 2010), *aff'd*, 445 B.R. 137 (S.D.N.Y. 2011)....................12

*In re Lehman Bros. Holdings Inc.*,
435 B.R. 122, 138 (S.D.N.Y. 2010), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.*, 402 F. App'x 634 (2d Cir. 2010)....................8

*In re Lord*,
325 B.R. 121, 129 (Bankr. S.D.N.Y. 2005)....................8

*In re Motors Liquidation Company f/k/a General Motors Corp.*,
Chapter 11 Case No. 09-50026 (REG), H'rg Tr. (Nov. 5, 2009) ....................................14, 20

*In re Northwest Airlines Corp.*,
No. 05-17930 (ALE), 2006 WL 687163, at *2 (Bankr. S.D.N.Y. 2006) 12

*In re Pioneer Commercial Funding Corp.*,
114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990)....................................................................7

*In re RCM Global Long Term Capital Appreciation Fund, Ltd.*,
200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996)...................................................................9

*In re Residential Capital*, Ch. 11 Case No. 12-12020 (MG),
Memorandum Opinion and Order Denying the Jackson
Motion to Lift the Automatic Stay, Aug. 16, 2012..................................................19

*In re Worldcom, Inc.*,
Case No. 02-13533, 2007 WL 841948, at *8 (Bankr. S.D.N.Y. 2007)..................................19

*In re WorldCom, Inc.*,
No. 05 Civ. 5704, 2006 U.S. Dist. LEXIS 55284, at *31-32 (S.D.N.Y. Aug. 4, 2006)..........13

*Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection*,
474 U.S. 494, 503 (1986)..........................................................................................7

*SEC v. Brennan*,
230 F.3d 65, 71 (2d Cir. 2000)....................................................................................7

*Sonnax v. Tri-Component Prods. Corp (In re Sonnax Indus., Inc.)*,
907 F.2d 1280, 1285 (2d Cir. 1990)........................................................................ passim

*United States Lines, Inc. v. United States Lines Reorganization Trust (In re U.S. Lines, Inc.)*,
262 B.R. 223, 234-35 (S.D.N.Y. 2001) .......................................................................15

**STATUTES**

11 U.S.C. § 362(d)(1) .......................................................................................................8

11 U.S.C. § 362(a)(1)...................................................................................................6, 7

11 U.S.C. § 362(a)(3).......................................................................................................6

11 U.S.C. § 362(a)(6) of the Bankruptcy Code ....................................................................6, 7

28 U.S.C. § 157(b)(5) .....................................................................................................14

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9014 ..... 2

General Order M-390 ..... 2

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22737] (the "Plan"), on behalf of BNC Mortgage Inc. ("BNC"), submits this objection to the (i) *Motion for Relief from Stay and Injunction Provided Under Plan*, filed on June 24, 2014 [ECF No. 4484] (the "Initial Stay Relief Motion"), and (ii) *Supplemental Motion for Relief from Stay and Injunction Provided Under Plan*, filed on August 28, 2014 [ECF No. 46189] (the "Supplemental Stay Relief Motion," and together with the Initial Stay Relief Motion, the "Stay Relief Motion"), filed by claimants Sylvia Vega-Sutfin, Michelle Seymour, Cheryl McNeil, Linda (Weeks) Howard-James, Isabel Guajardo and Coleen Denise Colombo (collectively, the "Claimants"), and respectfully represents as follows:

**Preliminary Statement**

1. The Claimants assert that they are entitled to relief from the automatic stay set forth in section 362 of title 11 of the United States Code (the "Bankruptcy Code") and relief from the stay or injunction set forth in paragraph 13.7 of the Plan (the "Plan Injunction"), in order to proceed with an action pending in the Superior Court of the State of California, County of Sacramento (the "California Court"), assigned Case No. 05AS05161 (the "California Action"). The Claimants cannot, however, sustain their burden of demonstrating that relief from the stay is appropriate under the test set forth in *Sonnax v. Tri-Component Prods. Corp (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). On the contrary, the Stay Relief Motion is an impermissible attempt by the Claimants to wrest from this Court one of its principal responsibilities – the allowance of claims.

2. The claims that are the subject of the Stay Relief Motion are but six of the approximately 3,300 disputed claims that the Plan Administrator is attempting to resolve. Granting the Stay Relief Motion and allowing the California Action to proceed at this time would saddle the Plan Administrator with the delay, cost, and distraction associated with litigating in another jurisdiction. Claimants should not be permitted to do an end-run around the Court-approved claims reconciliation process. The prejudice to BNC and the entities in the above-referenced chapter 11 cases (collectively, the "Chapter 11 Entities") outweighs any prejudice to the Claimants resulting from the automatic stay.

3. For the foregoing reasons and as set forth more fully below, the Plan Administrator respectfully requests that the Stay Relief Motion be denied.

**Background**

4. Commencing on September 15, 2008 and periodically thereafter, (as applicable, the "Commencement Date"), LBHI and the other Chapter 11 Entities commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. BNC commenced its Chapter 11 Case on January 9, 2009.

5. On April 19, 2010, the Court entered the *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors* (as amended and/or modified, the "Claims ADR Procedures Order") [ECF No. 8474].

6. On December 6, 2011, the Court entered the order confirming the Plan (the "Confirmation Order"). The Plan became effective on March 6, 2012 (the "Effective Date"). Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to

claims filed against the Chapter 11 Entities. Distributions under the Plan commenced on April 17, 2012.

7. While, initially, distributions to holders of allowed claims against BNC did occur, the Plan Administrator has determined to suspend distributions under the Plan with respect to claims against BNC due to certain unliquidated claims which, if liquidated and allowed, would have a material impact on the recoveries to BNC claimants. The prior distributions made from the BNC estate were reversed. *See Notice Regarding Sixth Distribution Pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 46365] (the "Sixth Distribution Notice").

*The California Action and the Claims*

8. Claimants are six former BNC employees who allege sexual and racial harassment by a former BNC employee. On September 7, 2005, shortly after having made a formal complaint, five of the six Claimants orchestrated a mass resignation and simultaneously submitted virtually identical resignation letters to BNC. On the same day, Claimants and their counsel held a press conference in which they announced their intention to sue BNC for racial and sexual harassment.

9. On November 18, 2005, the Claimants commenced the California Action against BNC and several former BNC employees asserting claims for employment discrimination, harassment, failure to prevent discrimination, retaliation, intentional infliction of emotional distress, defamation, wrongful termination, breach of implied and/or express contract of continued employment, and breach of implied convent of good faith and fair dealing. A copy of the Complaint is annexed hereto as Exhibit A.

10. In October 2007, BNC ceased operations and proceeded to lay off all of its employees. When BNC commenced its Chapter 11 Case, the California Action was still in

its initial stages. While the parties had exchanged interrogatories and document requests, discovery had not been completed. Only one deposition (of Claimant Sylvia Vega-Sutfin) had been conducted. No trial schedule had been proposed.

11. On July 7, 2009, each Claimant filed a proof of claim asserting a general unsecured claim against BNC. A list setting forth the claim numbers and claim amounts for each Claimant is annexed hereto as Exhibit B (collectively, the "Claims"). The Claims assert both compensatory and punitive damages against BNC in the aggregate amount of $35 million.

12. On August 20, 2013, the Plan Administrator filed the Four Hundred Thirty-First Omnibus Objection to Claims (Reduce and Allow Claims) [ECF No. 39569] (the "431st Omnibus Objection"). The 431st Omnibus Objection sought to reduce and allow certain claims, including the Claims, because the amounts listed on the proofs of claim are greater than the fair, accurate, an reasonable values of the amounts for which any of the Chapter 11 Entities, including BNC, are liable. Claimants filed a response to the 431st Omnibus Objection on September 17, 2013 [ECF No. 40127].

13. On October 31, 2013, in accordance with the Claims ADR Procedures Order, the Plan Administrator filed the *Notice of ADR Procedures and Scheduling of Claims Objection Hearing With Respect to Objection to Proof of Claim Nos. 5222, 5223, 5224, 5225, 5226 and 5227* [ECF No. 40923]. BNC and the Claimants participated in mediation on May 5, 2014 (the "Initial Mediation"). In a gesture of good will and as a concession to the Claimants' demands, BNC agreed that the Initial Mediation would take place in San Francisco, California, rather than in New York as mandated by the Claims ADR Procedures Order. The Initial Mediation did not result in resolution of the Claims and concluded at an impasse.

14. Before the Initial Mediation was terminated, and in violation of the Claims ADR Procedures Order, the Claimants filed the Stay Relief Motion. Subsequently, BNC and the Claimants agreed to continue the Initial Mediation in order to try to resolve the Claims without the need for litigation of the Stay Relief Motion. The second mediation, which occurred on August 13, 2014 (together, with the Initial Mediation, the "Mediations"), similarly concluded at an impasse.

*BNC's Employment Practices Liability Insurance Policy*

15. At the time the Claimants sustained the alleged injuries set forth in the Claims, BNC was insured under an employment practices liability insurance policy issued by XL Insurance (Bermuda) Ltd. ("XL Insurance"), Policy No. BM00020483EP05A (the "BNC Employment Policy"), the relevant pages of which are attached hereto as "Exhibit C." Pursuant to the BNC Employment Policy, BNC is required to satisfy a $5 million retention per "claim" (as defined in the BNC Employment Policy) before the insurer is obligated to pay any amounts (the "Retention"). *See* BNC Employment Policy, Declarations at 2 and Section VI(C) Limits of Liability and Retentions. On December 20, 2012, a copy of the BNC Employment Policy was provided to Claimants' counsel at their request.

16. To date, BNC has not exceeded the Retention and, consequently, XL Insurance has not taken over the defense of the Claims or the California Action.

*The Stay Relief Motion*

17. In the Stay Relief Motion, Claimants seek relief from the automatic stay so that they can resume the California Action. Claimants articulate a litany of reasons why they believe relief is appropriate. Essentially, Claimants' argument is that the California Action is pending in California and is governed by California law, and the Claimants are located in California. *See* Stay Relief Motion at ¶¶ 13, 65 and 67. None of the reasons cited by Claimants,

however, individually or together justify granting relief from the automatic stay or the Plan Injunction. Instead, the Claims should be litigated and resolved through this Court's claim resolution process.

**The Stay Relief Motion Should be Denied**

18. The Claimants seek to evade the established claims reconciliation procedures approved by this Court and the rulings of courts in this district that hold the automatic stay applies in similar circumstances. The Plan Injunction and sections 362(a)(1), (3) and (6) of the Bankruptcy Code provide independent grounds for prohibiting Claimants from resuming the California Action in the California Court.

A. The Protections of the Plan Injunction and the Automatic Stay Apply to the California Action

19. Paragraph 13.7 of the Plan states as follows:

> Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

Plan at 13.7; *see also* Plan at 13.5 (the Plan Injunction); Confirmation Order at ¶ 54.

20. Section 362(a)(1) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition:

> operates as a stay, applicable to all entities, of –
>
> (1) the commencement or continuation, including the issuance of employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1) (commonly referred to as the "automatic stay").

21. The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection*, 474 U.S. 494, 503 (1986). The purpose of the automatic stay is to allow a debtor to focus all attention on reorganization efforts without the distraction of having to defend against outside litigation. *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 32 (S.D.N.Y. 1990). It maintains the status quo to protect the debtor's ability to control the sale or other disposition of property of the estate. Collier on Bankruptcy ¶ 362.03 (16th ed. rev. 2012). The automatic stay prevents the state-law "race to the courthouse," and is intended to "allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (internal quotation omitted). In this regard, the automatic stay "promot[es] equal creditor treatment and giv[es] the debtor a breathing spell." *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990). It is axiomatic that the automatic stay applies to cases such as this, where a party is seeking the continuation of a judicial action or proceeding against a debtor that was commenced before the commencement of the chapter 11 case. *See* 11 U.S.C. § 362(a)(1).

22. Furthermore, section 362(a)(3) of the Bankruptcy Code specifically provides for the automatic stay of any action seeking to obtain possession or exercise control over property of a debtor's estate. *See* 11 U.S.C. § 362(a)(3). If the California Action is permitted to proceed, due to the Retention, BNC will not have the benefit of any insurance coverage until the amount of any judgment exceeds $5 million. In a similar vein, BNC will have to bear its defense costs. Thus, allowing the Claimants to resume prosecution of the California Action would effectively constitute an act seeking to obtain possession or exercise control over property of

BNC's estate, and, therefore, should continue to be stayed. Given the Retention, the Claimants are patently incorrect in stating that any losses sustained by BNC will be paid entirely by insurance proceeds, and that there will be no harm or effect on BNC's estate or its operations as a result of granting the relief requested in the Stay Relief Motion. *See* Supplemental Stay Relief Motion at ¶ 10.

B. The Claimants Have Failed to Establish Cause for Relief from the Automatic Stay or the Plan Injunction

23. Courts will only modify the automatic stay pursuant to section 362(d)(1) upon a showing of cause. 11 U.S.C. § 362(d)(1); *Sonnax*, 907 F.2d at 1285; *In re Lord*, 325 B.R. 121, 129 (Bankr. S.D.N.Y. 2005). The Second Circuit established a set of twelve factors in *Sonnax* (the "*Sonnax* Factors") that have become the standard by which courts in the Second Circuit consider whether to modify the automatic stay.[1] *See In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138 (S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief from stay precedent in this Circuit."), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.*, 402 F. App'x 634 (2d Cir. 2010).

[1] The *Sonnax* Factors are:

(1) whether relief would result in a partial or complete resolution of the issues;
(2) lack of any connection with or interference with the bankruptcy case;
(3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
(5) whether the debtor's insurer has assumed full responsibility for defending it;
(6) whether the action primarily involves third parties;
(7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
(10) the interests of judicial economy and the expeditious and economical resolution of litigation;
(11) whether the parties are ready for trial in the other proceeding; and
(12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

24. Although the *Sonnax* Court outlined twelve factors, courts need not consider each factor, but may consider only the factors that are relevant to the particular case. *See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) ("A court should . . . use only the factors that are deemed relevant . . . ."). In fact, the *Sonnax* Court itself considered only four of the twelve factors as relevant in that case. *Sonnax*, 907 F.2d at 1286. Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another. *RCM Global*, 200 B.R. at 526 ("A court should apply these factors on a case-by-case basis . . . assigning to each factor whatever weight the court feels is appropriate.").

25. The Second Circuit has held that the party seeking to lift or modify the automatic stay bears the initial burden to show cause as to why the stay should be modified or lifted and "[i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax*, 907 F.2d at 1285. Once the movant has shown cause, the party opposing the motion must show that it is entitled to the continuing protections of the automatic stay. *See Enron*, 306 B.R. at 476 (citing *In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993)); *see also RCM Global*, 200 B.R. at 526.

26. Claimants have failed to meet their burden of showing that cause exists to modify the automatic stay. Even assuming, *arguendo*, that Claimants have met their initial burden of establishing cause (which they have not), BNC is nonetheless entitled to the continued protections of the automatic stay and the Plan Injunction because all relevant *Sonnax* Factors weigh in its favor.

      **(i) *Whether Relief Would Result in a Partial or Complete Resolution of the Issues***

27. The first *Sonnax* factor concerns whether granting relief from the automatic stay would result in partial or complete resolution of the issues. Claimants contend that the Claims should be liquidated in the California Court because this Court has no jurisdiction over the non-debtor defendants. *See* Stay Relief Motion at ¶ 63. Even if that is the case, however, it is unclear whether the other defendants, whom Claimants have admitted are necessary parties, *see* Stay Relief Motion at ¶ 67, have been served with the Complaint. Claimants have conceded in the Stay Relief Motion that "full relief cannot be afforded to the Claimants in the absence of the non-debtor defendants [Joe Pennington, Daniel Kennan and Nick Murphy]." *Id*. Consequently it is unclear whether relief from the automatic stay would result in complete resolution of the issues.

28. Moreover, Claimants are seeking to recover punitive damages from BNC. Whether or to what extent Claimants should be allowed any punitive damage claims is ultimately a question for this Court to consider. *See, e.g., In re Beck Industries, Inc.*, 725 F.2d 880, 892 (2d Cir. 1984) (finding that "[a] bankruptcy judge should be alert to maintain his power to protect the estate against extravagant punitive damages claims against a trustee" and holding that it was an abuse of discretion for bankruptcy court to enter an order that would require the Chapter X trustee to take a step that would facilitate award of punitive damages by a California court). Courts generally disallow or subordinate punitive damage claims on the basis that the policy underlying such awards, particularly the deterrent effect, does not apply in bankruptcy cases because innocent third party creditors of the debtor's estate, rather than debtor, would be punished if claims for punitive damages are allowed. *See, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) (finding that "recovery of punitive damages . . . would . . . risk

the depletion of [an asbestos trust's] assets" to the benefit of some claimants but at the expense of other claimants, and holding that such a result "is inequitable on its face."); *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 562 (E.D. Va. 1988) (holding that equity provides courts with the power to disallow punitive damages if allowance would frustrate the aims of the chapter 11 plan). Awarding punitive damages to certain unsecured creditors in cases where all unsecured creditors are not receiving full satisfaction of their claims in effect forces those impaired creditors to pay for the debtor's wrongful conduct. *See In re Johns-Manville Corp.*, 68 B.R. at 627-28 (stating "it is well within the authority of this court to disallow a claim for punitive damages…."). Punitive damages claims are particularly inappropriate in instances where, as here, the debtor is liquidating, as there is no deterrent purpose or effect to be served. Because this Court will ultimately have to decide whether punitive damages are allowable, full resolution of the Claims cannot be obtained from the California Court if its judgment includes an award of punitive damages.

29. The first *Sonnax* factor, therefore, does not weigh in favor of granting relief from the automatic stay. Further, even if the Court were to determine that the Claims may be completely resolved in the California Action, this factor alone is insufficient to justify granting the relief requested in the Stay Relief Motion.

**(ii) *Lack of Any Connection With or Interference With the Bankruptcy Case***

30. The Second *Sonnax* factor, lack of any connection with or interference with the bankruptcy case, militates against providing Claimants with relief from the automatic stay. The resolution and treatment of claims is one of the most fundamental aspects of a chapter 11 case. Following the Commencement Date, creditors filed approximately 69,000 proofs of claim asserting approximately $1.3 trillion in liabilities against the twenty-three Chapter 11 Entities. The Chapter 11 Entities have developed and proposed various protocols and procedures to address the volume, novelty, and complexity of the claims issues that have arisen throughout these chapter

11 cases. The Court entered numerous orders and granted the Chapter 11 Entities the authority "designed to maximize the efficiency" of the process and "promote the fair resolution of the tens of thousands of filed claims." *See In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 120-21 (Bankr. S.D.N.Y. 2010), *aff'd*, 445 B.R. 137 (S.D.N.Y. 2011). The claims resolution process implemented in these Chapter 11 Cases has been facilitated by entry of various orders of this Court. *See*, *e.g.*, ECF Nos. 2257, 4020, 5910, 6664, 7936, 8474 and 19120. To date, approximately 3,300 claims, less than 5% in number, remain unresolved. While the Plan Administrator and its professionals have made great progress in resolving claims against the Chapter 11 Entities, evaluating the claims has been and continues to be a monumental task. The Stay Relief Motion is an attempt by Claimants to circumvent the well-established claims procedures established in these Chapter 11 Cases.

31. If the Claimants were permitted to pursue the California Action, it is likely that claimants all over the country would file similar motions, thus disrupting the orderly conclusion of the Chapter 11 Cases. *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying a motion for relief from the automatic stay where "granting relief could open the floodgates to a multitude of similar motions causing further interference with the bankruptcy case"); *In re Northwest Airlines Corp.*, No. 05-17930 (ALE), 2006 WL 687163, at *2 (Bankr. S.D.N.Y. 2006) (denying a motion for relief from stay under the *Sonnax* factors where "lifting the automatic stay . . . would open the floodgates for similar motions and cause the Debtors to refocus their energies on litigation before other courts rather than emergence from Chapter 11."). BNC would have to bear the cost of defending against the California Action—and any similar lawsuits that followed—increasing the administrative costs of

these cases. The automatic stay was intended to precisely prevent the aforementioned consequences.

32. There is no compelling reason for the Claimants to be treated differently from other similarly situated creditors. The second *Sonnax* factor weighs in favor of continuation of the automatic stay and the Plan Injunction.

**(iii) *Whether the Other Proceeding Involves the Debtor as a Fiduciary***

33. The third *Sonnax* factor addresses whether the California Action involves BNC as a fiduciary. "[G]enerally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors." *In re Curtis*, 40 B.R. 795, 799 (Bankr. Utah 1984) (internal citation omitted). The Claimants do not contend that the California Action involves claims against BNC as a fiduciary. In fact, it does not. Consequently, the third *Sonnax* factor weighs in favor of continuation of the automatic stay and the Plan Injunction.

**(iv) *No Specialized Tribunal Has Been Established to Hear the Actions***

34. The fourth *Sonnax* factor, which concerns whether a specialized tribunal has been established to hear the California Action weighs in favor of denial of the Stay Relief Motion. Claimants attempt to avoid the fact that a specialized tribunal has not been established to address their Claims, and, rather, focus on the applicability of California state law to the Claims. *See* Stay Relief Motion at ¶ 65. This Court has recognized on numerous occasions that it can interpret and apply state law in resolving claims. See, e.g., *In re Bally Total Fitness of Greater N.Y., Inc.*, 411 B.R. 142, 147 (S.D.N.Y. 2009) (finding that even though the "Complex Litigation Panel of the Los Angeles County Superior Court possesses the necessary expertise to resolve plaintiffs' claims, there is no indication that the Bankruptcy Court is not at least as well equipped to handle plaintiffs' claims, which do not involve any arcane or complicated questions of law."); *In re*

*WorldCom, Inc.*, No. 05 Civ. 5704, 2006 U.S. Dist. LEXIS 55284, at *31-32 (S.D.N.Y. Aug. 4, 2006) (affirming bankruptcy court's holding that California state court was a court of general jurisdiction, not a "specialized tribunal" within the meaning of the fourth *Sonnax* factor and noting that "[b]ankruptcy courts are often called upon to apply state laws in resolving claims against the estate"); *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) ("[t]his Court has significant experience in applying state law ...."). The Claims are no exception – this Court has the authority to adjudicate and render judgment on such claims.

35. Moreover, unlike the California Court, this Court is actually a specialized tribunal specifically experienced in the adjudication of bankruptcy claims. The Bankruptcy Code specifically contemplates that claims against a debtor will be resolved through a centralized claims resolution process shepherded by the bankruptcy courts. Judge Gerber noted in *In re General Motors Corp.*, that "[b]ankruptcy litigation is typically as efficient or more efficient than litigation in the district courts in connection with plenary litigation."[2]

36. Claimants also assert that the automatic stay and the Plan Injunction should be lifted because the Claims are considered "personal injury tort" claims and this Court lacks jurisdiction to hear and determine the Claims. *See, e.g.*, Stay Relief Motion at ¶ 13. First, the Plan Administrator does not concede that the Claims fall within the statutory exception for a personal injury tort. Indeed, Claimants have mischaracterized the Claims without any regard for the fact that the causes of action set forth in the Complaint primarily assert statutory and contractual claims. Second, even if section 157(b)(5) is applicable, that provision relegates jurisdiction over the matter in the first instance to "the district court in which the bankruptcy case is pending," *not* the California Court.

[2] Hr'g Tr. 41:18 – 20 (Nov. 5, 2009), *In re Motors Liquidation Company f/k/a General Motors Corp.*, Chapter 11 Case No. 09-50026 (REG) (denying motion to lift stay because Sonnax Factors weigh against lifting the stay).

37. Finally, it is well established that section 157(b)(5) of the Bankruptcy Code does not preclude pre-trial proceedings (including rendering summary judgment in the debtor's favor) in the bankruptcy court, and a bankruptcy court may enter a final summary judgment in the debtor's favor on the issue of the debtor's liability on a "personal injury tort claim." *See, e.g., United States Lines, Inc. v. United States Lines Reorganization Trust (In re U.S. Lines, Inc.)*, 262 B.R. 223, 234-35 (S.D.N.Y. 2001) ("[A] bankruptcy court may disallow a personal injury claim based on that court's determination that the claim, if litigated, would not be viable in light of the estate's available defenses."). Accordingly, even if the Claims sound in personal injury tort, this Court has jurisdiction to make the threshold determination of whether as a matter of law, Claimants have asserted valid claims against BNC. *See, e.g., In re Arnott*, 512 B.R. 744, 751 (Bankr. S.D.N.Y. 2014) (citing to *In re Chateaugay Corp*., 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990) ("[T]he bankruptcy court must have jurisdiction to make the threshold determination of whether as a matter of law, a claim exists which can be asserted against the debtor, even if that claim sounds in personal injury tort or wrongful death.").

38. Claimants have to overcome significant hurdles in order to establish the validity of the Claims. For example, Claimants must contend with the fact that (i) BNC ceased operating in October 2007 and, therefore, their claims for lost wages necessarily ends on that date; (ii) BNC took immediate corrective action once Claimants made their complaint of sexual harassment; (iii) Claimants cannot establish that they were constructively discharged given that Mr. Keenan, the alleged harasser, was no longer an employee of BNC at the time of Claimants' orchestrated resignation; and (iv) Claimants have already admitted in interrogatory responses that they were at-will employees, thus, they breach of contract claims would fail as a matter of law.

The automatic stay and the Plan Injunction should not be lifted to permit Claimants to prosecute claims that lack factual basis and fail as a matter of law.

39. Given the jurisdiction of this Court and the fact that no specialized tribunal has been established to hear the Claims, the fourth *Sonnax* factor also weighs in favor of denying relief from the automatic stay and the Plan Injunction.

**(v) *No Insurer Has Assumed Responsibility for Any of the Actions***

40. Contrary to the Claimants' assertions, XL Insurance has not assumed responsibility for defending the California Action. *See* Supplemental Stay Relief Motion at ¶¶ 5, 8 and 10. In an attempt to further obfuscate the issues, Claimants state that BNC was represented by insurance counsel at the Initial Mediation. *See* Supplemental Stay Relief Motion at ¶ 5. As set forth in the Declarations of Robert S. Shwarts and Scott Allan in support of this Objection, neither XL Insurance nor any other insurer has provided BNC with counsel to defend it in the California Action or in the claims objection process, including with respect to either of the Mediations. *See* Shwarts Declaration at ¶ 5; Allan Declaration at ¶ 6. Claimants' unsupported statements to the contrary are simply wrong.

41. If the automatic stay and the Plan Injunction are lifted, BNC will be forced to expend monies to defend the California Action at a time when BNC's cash reserves are being depleted by other administrative expenses, thereby undermining one of the key objectives of the automatic stay. Additionally, BNC's estate will directly bear the financial burden if the Claimants prevail in the California Action, through BNC's liability for the Retention. Any amounts awarded to the Claimants and legal defense costs incurred by their counsel, up to $5 million, will be born directly by BNC's estates. The fifth *Sonnax* factor alone should be sufficient to warrant denial of the Stay Relief Motion.

**(vi) *Whether The Action Primarily Involves Third Parties***

42. Although the California Action asserts claims against several individuals in addition to BNC, BNC is the main target for every cause of action asserted in the Complaint. *See* Complaint, Exhibit A. Thus, this is not a situation in which the debtor/defendant functions only as a bailee or conduit for the proceeds in question. BNC is a main party to the California Action and it would be required to participate actively in the California Action in order to avoid facing an adverse judgment. *See In Residential Capital, LLC*, 2012 WL 3556912, at *3 (Bankr. S.D.N.Y. 2012) ("The court should not grant relief from the stay under the sixth *Sonnax* Factor if the debtor is the main party to the litigation.") (internal citations omitted).

43. Lifting the automatic stay and the Plan Injunction in order to allow the California Action to proceed would, as discussed above, directly impact BNC's Chapter 11 Case because BNC would be required incur the expenses of litigation and to contribute towards any recovery on the Claimants behalf, up to the amount of the Retention. *See City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l)*, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the [automatic] stay was proper.").

44. Accordingly, the sixth *Sonnax* factor weighs in favor of BNC and the relief requested in the Stay Relief Motion should be denied.

**(vii) *Whether litigation in another forum would prejudice the interests of other creditors***

45. Requiring the Plan Administrator to defend the California Action in another forum would upset the "strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110,

117 (2d Cir. 1992). The disruption, delay and expense attendant to litigating the Claims in California would effectively be borne by all of BNC's other creditors.

46. Moreover, if relief from the automatic stay were granted at this time, the Plan Administrator would have to decide whether to allocate resources to defend the California Action before it has determined whether such defense is worthwhile. As referenced in the Sixth Distribution Notice, there are two unliquidated claims the allowance of which may materially impact the distributions to holders of unsecured claims against BNC. Even if the Court is inclined to grant Claimants relief from the automatic stay at some point, any such relief should be deferred until the Plan Administrator is better able to assess the benefits to BNC and its other creditors of vigorously defending the California Action.

47. The seventh *Sonnax* factor, therefore, leads to the conclusion that relief from the stay and the Plan Injunction would not be appropriate.

**(viii) *Whether the Judgment Claim Arising From the Other Action is Subject to Equitable Subordination***

48. The eighth *Sonnax* factor is inapplicable.

**(ix) *Whether the Movant's Success in the Other Proceeding Would Result in a Judicial Lien Avoidable by the Debtor***

49. The ninth *Sonnax* factor is also inapplicable.

**(x) *The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation* (tenth *Sonnax* factor), and *Whether the Parties Are Ready for Trial in the Other Proceeding* (eleventh *Sonnax* factor)**

50. Claimants imply that the California Action has progressed further than it has, representing to the Court that the parties engaged in extensive discovery between November 2007 and January 9, 2009. *See* Stay Relief Motion at ¶ 4. In fact, the California Action is in its early stages and far from ready for trial. There has been no scheduling conference, only a fraction of the relevant documents have been produced, and no dispositive motions have been filed. Only

limited discovery occurred in the California Action in the four years prior to BNC's Commencement Date. Litigating the California Action to its conclusion would take a considerable amount of time and require BNC to draft a potential motion for summary judgment, present oral argument and, if summary judgment is not granted, conduct written discovery, depositions, possibly engage expert witnesses and prepare for and conduct trial. Accordingly, the parties to the California Action are far from ready to proceed to trial.

51. Additionally, it is the Plan Administrator's understanding that the whereabouts of Mr. Keenan, the former BNC employee who is the alleged wrongdoer, are unknown and that he has never been served or appeared in the California Action. Due to the absence of necessary parties, it is not certain that lifting the automatic stay and the Plan Injunction as it relates to BNC will result in expeditious or economical resolution of the California Action.

52. Given the status of the California Action, the California Court has not expended significant judicial resources. *See Bally Total Fitness*, 402 B.R. at 624 (denying stay relief where the parties had not started conducting extensive discovery and were not ready for trial); *In re Worldcom, Inc.*, Case No. 02-13533, 2007 WL 841948, at *8 (Bankr. S.D.N.Y. 2007) ("[U]pon a showing that the parties are not ready for trial . . . the Court finds that [the] Sonnax [Factor] weighs in favor of the Debtors.").

53. The situation here is much like the situation in *In re Residential Capital, LLC*, Ch. 11 Case No. 12-12020 (MG), in which the court denied a movant's motion to lift the automatic stay in order to resume prepetition litigation because, even though relief may eventually result in partial or complete resolution of the issue at hand, the resolution might not be immediate due to the nascent stage of the litigation. *See In re Residential Capital*, Memorandum Opinion and Order Denying the Jackson Motion to Lift the Automatic Stay, Aug. 16, 2012 [ECF No. 1184]

(stating "the Jackson Litigation is in its early stages. Discovery, trial preparation and, absent a settlement, trial all remain to be done. Therefore, the first and eleventh *Sonnax* Factors weigh against lifting the stay."). A copy of Judge Glenn's opinion is annexed hereto as "Exhibit D".

54. The resolution of the Claims will be more expeditious in this Court. Moreover, the interests of judicial economy and the economical resolution of litigation are best served by resolving the Claims against BNC through the uniform bankruptcy claims process. As noted above, the Chapter 11 Entities have an established and court approved claims reconciliation process. *See In re Motors Liquidation Company f/k/a General Motors Corp*., No. 09-50026 (REG), H'rg Tr. at 44:20-25 (Nov. 5, 2009) (denying relief from the stay and stating that "[t]he economical way of doing [prepetition litigation] is dealing with [prepetition litigation] by the claims allowance process, as all of the other thousands of claims against this estate are."). Further, as noted above, this Court is better suited to rule on the various issues in the California Action and appropriately take into consideration the impact of the inflated Claims, including the excessive request for punitive damages, on BNC's estate.

55. The tenth and eleventh *Sonnax* factors, therefore, militate in favor of denying relief from the automatic stay and the Plan Injunction.

**(xi) *Impact of the Stay on the Balance of Harms***

56. The balance of the harms ultimately weighs against granting relief from the automatic stay and the Plan Injunction. Given the tremendous amount of time and energy that must be devoted to administering these unprecedented and complex Chapter 11 Cases and complying with all bankruptcy-related requests, the Plan Administrator has limited resources available at this time to litigate the California Action. Granting relief from the automatic stay and the Plan Injunction at this time would undermine the fundamental purpose of the automatic stay and serve only to hinder and delay the ultimate conclusion of the Chapter 11 Cases. *See In re*

*Curtis*, 40 B.R. at 806 ("The most important factor in determining whether to grant relief from the automatic stay to permit litigation against the debtor in another forum is the effect of such litigation on the administration of the estate. Even slight interference with the administration may be enough to preclude relief in the absence of a commensurate benefit.").

57. Claimants' alleged harms in having the automatic stay and Plan Injunction remain in place, namely that there would be a financial burden for Claimants if an extended trial were to occur in New York, are unpersuasive. BNC would incur significant administrative expenses in litigating the Claims in the California Court. BNC's increased administrative expenses would adversely affect the resources available for distribution to its creditors, thereby greatly prejudicing holders of allowed claims. Any delay in these Chapter 11 Cases and any additional money expended by BNC on the California Action would further erode creditor recoveries. On the other hand, enforcing the automatic stay would permit the Claims to be liquidated by this Court, utilizing procedures that have been used to resolve thousands of claims in the cases of BNC and its affiliates. Indeed, Claimants ignore the aforementioned harms and prejudices that would be imposed upon BNC's estate if the Stay Relief Motion is granted and solely cite the financial burden they would have if trial were to occur in New York. *See, e.g.*, Stay Relief Motion at ¶ 13. The harm to all of BNC's creditors outweighs the harms cited by Claimants.

58. The twelfth *Sonnax* factor weighs against granting relief from the automatic stay and the Plan Injunction.

## Conclusion

59. For all the foregoing reasons, no cause exists for relief from the automatic stay or the Plan Injunction and the Stay Relief Motion should be denied.

WHEREFORE the Plan Administrator respectfully request that the Court sustain its Objection, deny the Stay Relief Motion in its entirety, and grant the Plan Administrator such other and further relief as may be just.

Dated: September 30, 2014
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL. GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc. and Certain of its Affiliates

**EXHIBIT A**

Complaint

11/8/05

J. GARY GWILLIAM, Esq. (State Bar No. 33,430)
MONIQUE G. MORALES, Esq. (State Bar No. 229,533)
GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
1999 Harrison Street, Suite 1600
Oakland, CA 94612-3528
Telephone: (510) 832-5411
Facsimile: (510) 832-1918

Attorney for Plaintiffs

FILED
ENDORSED
NOV 8
By M. Cifuentes
Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

COLEEN DENISE COLOMBO; ISABEL GUAJARDO; LINDA HOWARD-JAMES; CHERYL McNEIL; MICHELLE SEYMOUR; SYLVIA VEGA-SUTFIN

Plaintiffs,

vs.

BNC MORTGAGE INC.; JOE PENNINGTON; DANIEL KEENAN; NICK MURPHY; and Does 1-100, inclusive,

Defendants.

Case No.: 05AS05161

**COMPLAINT FOR DAMAGES BASED ON:**

1. **EMPLOYMENT DISCRIMINATION**
2. **HARASSMENT**
3. **FAILURE TO PREVENT DISCRIMINATION**
4. **RETALIATION**
5. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
6. **DEFAMATION**
7. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
8. **BREACH OF IMPLIED AND/OR EXPRESS CONTRACT OF CONTINUED EMPLOYMENT**
9. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

## PARTIES

***Plaintiffs***

1. Coleen Colombo is an individual, a female, and formerly an employee of BNC MORTGAGE INC., ("BNC").

2. Isabel Guajardo is an individual, a Hispanic-American female, and formerly an employee of BNC.

3. Linda Howard-James is an individual, an African-American female, and formerly an employee of BNC.

4. Cheryl McNeil is an individual, an African-American female, and formerly an employee of BNC.

5. Michelle Seymour is an individual, a female, and formerly an employee of BNC.

6. Sylvia Vega-Sutfin is an individual, a Hispanic-American female, and formerly an employee of BNC.

***Defendants***

7. Plaintiffs are informed and believe and herein allege that Defendant, BNC, is and at all relevant times hereto was a corporation doing business in the State of California.

8. Defendant Daniel Keenan is an individual and on information and belief resides in the State of California.

9. Defendant Nick Murphy is an individual and on information and belief resides in the State of California.

10. Defendant Joe Pennington is an individual and on information and belief resides in the State of California.

11. Reference made in this complaint to Defendants' acts shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

12. Plaintiffs are ignorant of the true names or capacities of the Defendants sued here under the fictitious names DOE ONE through DOE ONE HUNDRED, inclusive. Plaintiffs are informed and believe that each of DOE defendants was responsible in some manner for the occurrences and injuries alleged in this complaint.

13. At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each and every defendant was the agent, servant, joint venturer or employee of each and every other defendant. In doing the things alleged in the causes of action into which this paragraph is incorporated by reference, each and every defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission, and authorization of each of the remaining Defendants. All actions of each defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other defendant.

## JURISDICTION AND VENUE

14. Defendants' acts that form the basis for the causes of action in this complaint occurred in the County of Sacramento, State of California.

## CONDITIONS PRECEDENT

15. Each of the Plaintiffs, within one year of their respective terminations, filed complaints against Defendants with the Department of Fair Employment and Housing ("DFEH"), received right to sue notices, served copies of the complaints and right to sue notices on Defendants and filed this action within one year of those right to sue notices.

16. Plaintiff Coleen Colombo's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure and right to sue letters are dated September 14, 2005.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

17. Plaintiff Isabel Guajardo's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure letters are dated September 14, 2005.

18. Plaintiff Linda Howard-James's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure and right to sue letters are dated September 14, 2005.

19. Plaintiff Cheryl McNeil's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure and right to sue letters are dated September 13, 2005.

20. Plaintiff Michelle Seymour's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure and right to sue letters are dated September 9, 2005.

21. Plaintiff Sylvia Vega-Sutfin's DFEH complaints against BNC, Daniel Keenan, Nick Murphy and Joe Pennington were filed on September 7, 2005. Her notice of closure and right to sue letters are dated September 9, 2005.

## FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION

***Defendant Daniel Keenan's Sexual and Racial Harassment of Plaintiffs***

22. Defendant Daniel Keenan began working at BNC's Sacramento Branch in approximately March 2005.

23. Almost immediately after he started working at the Sacramento branch, Daniel Keenan began to sexually and racially harass plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin as detailed below.

24. Plaintiffs' repeated complaints to Defendants were ignored. Branch manager Defendant Joe Pennington even referred to Keenan's offensive and unwelcome behavior as "just

fun and games" and nicknamed him "Chester Molester."

***Plaintiff Coleen Colombo***

25. Plaintiff Coleen Colombo began working at BNC on or about September 22, 2003 as a senior underwriter.

26. At all times herein mentioned, Plaintiff was fully competent to perform the duties to which she was assigned. In March 2005, Plaintiff received a work performance rating of "exceeds expectations."

27. In approximately April or May 2005, Plaintiff emailed the regional Vice President of Operations, Kim Bugay, about company practices which she believed to be fraudulent and/or illegal, including sexual harassment and hostile work environment. Plaintiff informed Ms. Bugay that defendant Joe Pennington was pressuring her to push through questionable loans and that his actions were taking a toll on her physical and emotional health. Rather than thank Plaintiff for bringing the fraud to her attention, Ms. Bugay responded by berating her for not finding and reporting the fraud sooner. Plaintiff left the office in tears. After Plaintiff's protected disclosure, BNC retaliated against Plaintiff.

28. The day of Plaintiff's protected disclosure to Ms. Bugay, defendant Joe Pennington tried to bribe Plaintiff to allow a loan with fraudulent information to go through. This added to her emotional and physical distress.

29. The day of Plaintiff's protected disclosure to Ms. Bugay, Plaintiff's doctor advised her to take a short leave of absence to alleviate her stress.

30. During Plaintiff's short leave of absence in or about May 2005, BNC Human Resources personnel questioned the BNC Sacramento branch employees about Plaintiff's complaints. Plaintiff Linda Howard-James confirmed the complaints, including the fraud and hostile work environment. After this, BNC retaliated against Plaintiffs, including but not limited to plaintiff Howard-James and continued to retaliate against plaintiff Colombo.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

31. BNC told plaintiff Michelle Seymour not to associate with plaintiffs Colombo and Howard-James.

32. When Plaintiff returned from her short leave of absence, defendant Joe Pennington informed her that defendant Nick Murphy wanted her terminated for making the complaints.

33. After Plaintiff's protected disclosure about the company practices which she believed to be fraudulent and/or illegal, defendant Daniel Keenan began a campaign of harassing Plaintiff, through unwelcome touching and inappropriate behavior including but not limited to entering Plaintiff's office and intentionally rubbing his body against hers. Defendant Daniel Keenan made Plaintiff very uncomfortable and fearful.

34. In May 2005, Plaintiff renewed her complaint about the company practices which she believed to be fraudulent and/or illegal. This time, she emailed Regional Sales Manager Casey Copeland and Regional Account Manager Martha Stevens. She informed them that defendant Joe Pennington and Linda Harris had been putting pressure on her to "look the other way" on fraudulent loan documentation. She complained of the hostile work environment, harassment and management's failure to address previous complaints. Plaintiff advised them of the stress the work environment was putting on her and the physical manifestations of that stress. Plaintiff expressed her fear of continued harassment and retaliation.

35. After months of being subjected to Defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on September 7, 2005.

36. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

37. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

SWILLIAM, IVARI, CHROSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

***Plaintiff Isabel Guajardo***

38. Plaintiff Isabel Guajardo is a survivor of childhood sexual abuse.

39. On or about April 18, 2005 BNC hired Plaintiff as an account manager and promised to train her. BNC never gave Plaintiff the training promised and later placed her in a receptionist position. At that time, Defendants again promised her training. Defendants failed to do so.

40. At all times herein mentioned, Plaintiff was fully competent to perform the duties to which she was assigned. She received commendations for her work.

41. When Plaintiff was first hired she was told not to associate with the other women in the office. Plaintiff later learned that these women had complained about company practices which they believed to be fraudulent or illegal and a hostile work environment. After Plaintiff began to associate with the women in the office who had complained, Defendants retaliated against her.

42. Defendant Daniel Keenan and Linda Harris gave work instructions to Plaintiff including but not limited to requesting her to report on what plaintiffs Colombo and Howard-James were doing throughout the day.

43. Almost immediately after Plaintiff started working at BNC, Mr. Keenan began a campaign of sexually and racially harassing her through unwelcome touching and inappropriate behavior including but not limited to pressing his body against hers, grabbing his crotch and simulating masturbation in front of Plaintiff, looking down her blouse, making inappropriate and offensive comments about her body and yelling at and berating Plaintiff.

44. In apparent reference to her ethnicity, defendant Daniel Keenan made tasteless jokes about Ms. Guajardo and her family using illegal drugs.

45. Daniel Keenan made Plaintiff very uncomfortable and fearful.

46. Plaintiff complained to Linda Harris and defendant Joe Pennington about defendant Daniel Keenan's actions. Plaintiff was aware that similar complaints by other

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

Plaintiffs had been ignored by Defendants.

47. After months of being subjected to Defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on September 7, 2005.

48. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

49. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

*Plaintiff Linda Howard-James*

50. Plaintiff Linda Howard-James is a rape survivor.

51. Plaintiff began working at BNC on or about April 2004 as a senior underwriter.

52. At all times herein mentioned, Plaintiff was fully competent to perform the duties to which she was assigned.

53. As set forth above, plaintiff Coleen Colombo complained to BNC about the company practices which she believed to be fraudulent or illegal, including sexual harassment and hostile work environment. BNC questioned Plaintiff about plaintiff Colombo's complaints. Plaintiff confirmed the complaints, including fraud and hostile work environment. BNC retaliated against Plaintiff.

54. Defendant Daniel Keenan began racially and sexually harassing Plaintiff soon after he started working at the BNC Sacramento branch in March 2005 through unwelcome touching and inappropriate behavior including but not limited to, repeatedly pressing his body against hers, yelling at and berating Plaintiff, making racially charged remarks to her and using offensive and vulgar language in Plaintiff's presence. She complained to branch manager, Joe Pennington. He did nothing.

55. In June 2005, defendant Daniel Keenan made a remark that Plaintiff should not

have some antique coins because "that was before [her] people were freed." Plaintiff complained to branch manager, defendant Joe Pennington. He did nothing. Plaintiff told plaintiff Sylvia Vega-Sutfin, about the racially offensive remark defendant Daniel Keenan made. Plaintiff Vega-Sutfin caused the matter to be brought to corporate management's attention, as detailed below.

56. In September 2005, defendant Daniel Keenan cornered Plaintiff in a file room and forced himself up against her buttocks. Plaintiff broke down and left the workplace in tears.

57. Defendant Daniel Keenan made Plaintiff very uncomfortable and fearful.

58. Defendant Joe Pennington expressed a desire to terminate Plaintiff but an inability to do so because of a fear of liability for Defendants' actions.

59. After months of being subjected to defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on September 7, 2005.

60. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

61. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

***Plaintiff Cheryl McNeil***

62. Plaintiff Cheryl McNeil began working as an account manager for BNC in January 2004. She managed and processed loans for defendant Nick Murphy.

63. At all times herein mentioned, Plaintiff was fully competent to perform the duties to which she was assigned. Plaintiff received numerous awards for "Excellence in Performance."

64. In approximately April 2005 Plaintiff reported defendant Nick Murphy's actions which she believed to be fraudulent and/or illegal to regional account manager, Martha Stevens.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

Plaintiff suffered retaliation as a result. Before she complained, Plaintiff always met the required performance quotas. After she complained, defendant Nick Murphy stopped giving Plaintiff loans to process. As a result, Plaintiff missed her quotas which negatively affected her performance statistics and income. Eventually, Plaintiff had no loans to process.

65. Defendant Daniel Keenan began racially and sexually harassing Plaintiff soon after he started working at the BNC Sacramento branch in March 2005 through unwelcome touching and inappropriate behavior including but not limited to making tasteless and offensive remarks about "black people and their music," Plaintiff's clothes, the way they fit, and the "pleasure" they provided him, asking Plaintiff about her sex life, trying to trip Plaintiff as she walked past and yelling at and berating Plaintiff.

66. In June 2005, defendant Daniel Keenan made a racially offensive remark to co-worker plaintiff Linda Howard-James, for which Plaintiff chastised him.

67. Plaintiff knew that plaintiffs Coleen Colombo and Linda Howard-James had complained to Defendants about sexual harassment and hostile work environment and that Defendants ignored these complaints.

68. After months of being subjected to Defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on July 22, 2005.

69. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

70. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

***Plaintiff Michelle Seymour***

71. Plaintiff Michelle Seymour began working at BNC on or about May 16, 2005 as an underwriter.

[illegible] ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

72. At all times herein mentioned, Plaintiff was fully competent to perform the duties to which she was assigned. Plaintiff was given commendations for her work.

73. On multiple occasions beginning in or about May 20, 2005, Plaintiff discovered fraudulent documents in mortgage application files. Plaintiff reported the fraud to the corporate credit manager, Thadi Abujasier, who finally responded "It takes a lot to have a loan declined." Plaintiff suffered retaliation as a result of her protected disclosure.

74. In or about May 2005 Defendant Daniel Keenan began a campaign of sexually harassing Plaintiff through unwelcome touching and inappropriate behavior including but not limited to pressing his body against hers, touching her inappropriately, telling her that he loved her, looking down her blouse and trying to hug and kiss her.

75. Defendant Daniel Keenan made Plaintiff very uncomfortable and fearful.

76. When Plaintiff complained about defendant Daniel Keenan's harassment to defendant Joe Pennington in or about August 2005, he acknowledged that he had witnessed defendant Daniel Keenan's offensive behavior and that he thought it was just "fun and games."

77. After months of being subjected to Defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on September 7, 2005.

78. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

79. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

***Plaintiff Sylvia Vega-Sutfin***

80. Plaintiff Sylvia Vega-Sutfin began working as an accounts executive for BNC on or about July 15, 2004.

81. At all times herein mentioned, Plaintiff was fully competent to perform the duties

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

to which she was assigned. BNC informed Plaintiff that she had job security because of her work performance.

82. In or about January 2005 Plaintiff complained to defendant Nick Murphy about the sexually hostile work environment at the Sacramento branch. Defendant Nick Murphy discouraged Plaintiff from complaining about sexual harassment, and told her he would rather not go through the bother of filling out the appropriate paperwork.

83. After Plaintiff complained about the sexual harassment in January, branch manager Nick Murphy retaliated against Plaintiff when he gave many of Plaintiff's accounts on her protected broker list to others. This substantially impacted Plaintiff's income.

84. In or about January 2005, Plaintiff complained to Nick Murphy about this practice. The practice continued so in or about March 2005, Plaintiff complained to Sales Vice President Gary Vander-Haeghen about this practice. Shortly after this, Regional Sales Vice President Casey Copeland sent out a mass email stating that this practice was unacceptable. The next day, Casey Copeland, and branch managers defendant Nick Murphy and defendant Joe Pennington retaliated against Plaintiff when they took away Plaintiff's account manager disrupting her closings.

85. After Plaintiff made complaints to the corporate office, defendant Nick Murphy began referring to her as "that bitch" and said he "hate[s] that bitch."

86. After Plaintiff made complaints, Gary Vanderhagen, Nick Murphy, Joe Pennington, branch manager Bill Smalley and Casey Copeland plotted to "make [Ms. Vega-Sutfin] pay." Defendant Nick Murphy and Casey Copeland yelled at, berated and otherwise discriminated against Plaintiff.

87. In March 2005, defendant Daniel Keenan began working at the Sacramento branch and almost immediately began a campaign of sexually harassing Plaintiff including but not limited to pressing his body against hers, breathing on her neck and making offensive and sexually-charged comments to Plaintiff. When Plaintiff complained and relayed defendant

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

Daniel Keenan's acts to branch manager defendant Joe Pennington, he laughed.

88. Defendant Daniel Keenan's offensive and unwelcome actions made Plaintiff so uncomfortable and fearful that she went home and looked on the internet to see if he was a registered sex offender.

89. In an effort to escape the hostile environment at the Sacramento branch, Plaintiff asked for a transfer to the Santa Rosa office. Regional Sales Vice President Casey Copeland transferred her to the Concord office in March 2005.

90. After she left, BNC management threatened other plaintiffs in the Sacramento office with termination if they associated with Plaintiff. In Concord, Plaintiff faced retaliation from her account manager until her termination.

91. In June 2005, plaintiff Linda Howard-James told Plaintiff about racially offensive remarks made to her by defendant Daniel Keenan. Plaintiff caused the matter to be brought to corporate management's attention. Minutes later, Regional Sales Vice President Casey Copeland informed her that he was unhappy with her for having made a complaint.

92. After months of being subjected to defendants' retaliation and harassment, work conditions became so intolerable that Plaintiff was left with no reasonable alternative but to resign on September 7, 2005.

93. Defendants' actions caused and continue to cause Plaintiff great emotional distress.

94. Defendants engaged in a continuing course of tortious and discriminatory conduct culminating in Plaintiff's constructive termination.

**FIRST CAUSE OF ACTION**

**HARASSMENT**

**[All Plaintiffs Against All Defendants]**

95. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 94 as though fully set forth herein.

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

96. At all times relevant to this complaint, Government Code § 12900 *et seq.* and its implementing regulations were in full force and effect.

97. It is unlawful for an employer to harass an employee on account of race, color, ancestry or sex and to fail to take all reasonable steps necessary to prevent harassment. (Cal. Govt. Code § 12940(j)).

98. Defendants created an intolerable, hostile work environment and failed to take steps to correct such environment.

99. Plaintiff Coleen Colombo's sex was a motivating factor in Defendants' unwanted harassment.

100. Plaintiff Isabel Guajardo's sex, race, color and/or ancestry was a motivating factor in Defendants' unwanted harassment.

101. Plaintiff Linda Howard-James's sex, race, color and/or ancestry was a motivating factor in Defendants' unwanted harassment.

102. Plaintiff Cheryl McNeil's sex, race, color and/or ancestry was a motivating factor in Defendants' unwanted harassment.

103. Plaintiff Michelle Seymour's sex was a motivating factor in Defendants' unwanted harassment.

104. Plaintiff Sylvia Vega-Sutfin's sex was a motivating factor in Defendants' unwanted harassment.

105. The unwanted harassment by Defendants was so severe, widespread, and/or persistent that a reasonable woman in any of plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin's circumstances would have considered the work environment to be hostile and/or abusive.

106. Plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin considered the work environment to be hostile and/or abusive.

107. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

108. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each plaintiff to awards of punitive damages.

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

## SECOND CAUSE OF ACTION

## DISCRIMINATION

**[All Plaintiffs Against Defendant BNC Mortgage Inc.]**

109. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 108 as though fully set forth herein.

110. At all times relevant to this complaint, Government Code § 12900 *et seq.* and its implementing regulations were in full force and effect.

111. It is unlawful for an employer to terminate or otherwise discriminate against a person in compensation or in terms, conditions or privileges of employment on account of race, color, ancestry or sex. (Cal. Govt. Code § 12940(a)).

112. As set forth above, Defendants discriminated against Plaintiffs, harassed Plaintiffs, subjected Plaintiffs to a hostile work environment and eventually, terminated their employment.

113. Plaintiff Coleen Colombo's sex was a motivating factor in Defendants' decision to terminate her employment.

114. Plaintiff Isabel Guajardo's sex, race, color and/or ancestry was a motivating factor in Defendants' decision to terminate her employment.

115. Plaintiff Linda Howard-James's sex, race, color and/or ancestry was a motivating factor in Defendants' decision to terminate her employment.

116. Plaintiff Cheryl McNeil's sex, race, color and/or ancestry was a motivating factor in Defendants' decision to terminate her employment.

117. Plaintiff Michelle Seymour's sex was a motivating factor in Defendants' decision to terminate her employment.

118. Plaintiff Sylvia Vega-Sutfin's sex was a motivating factor in Defendants' decision to terminate her employment.

119. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

120. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each plaintiff to awards of punitive damages.

**THIRD CAUSE OF ACTION**

**FAILURE TO PREVENT DISCRIMINATION**

**[All Plaintiffs Against Defendant BNC Mortgage Inc.]**

121. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 120 as though fully set forth herein.

122. At all times relevant to this complaint, Government Code § 12900 *et seq.* and its implementing regulations were in full force and effect.

123. It is unlawful for an employer to fail to prevent discrimination and harassment on account of race, color, ancestry or sex from occurring in the workplace. (Cal. Govt. Code §

[illegible] ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

12940(k)).

124. In engaging in the conduct described above, Defendants failed to engage in any reasonable steps to prevent discrimination in the workplace.

125. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

126. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each plaintiff to awards of punitive damages.

## FOURTH CAUSE OF ACTION

## RETALIATION

**[All Plaintiffs Against All Defendants]**

127. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 126 as though fully set forth herein.

128. At all times relevant to this complaint, Government Code § 12900 *et seq.* and its implementing regulations were in full force and effect.

129. It is unlawful for an employer to retaliate, terminate or discriminate against a person in compensation or in the terms, conditions or privileges of employment because that person has opposed any practices forbidden by the Fair Employment and Housing Act. (Cal. Govt. Code § 12940(h)).

130. As set forth above, plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin complained about pervasive discrimination on behalf of themselves and each other.

131. As set forth above, Plaintiffs' participation in protected activities was a motivating factor in Defendants decision to harass, retaliate against and/or otherwise discriminate against Plaintiffs.

132. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

133. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each plaintiff to awards of punitive damages.

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

**FIFTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**[All Plaintiffs Against All Defendants]**

134. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 through 133 as though fully set forth herein.

135. Defendants, in the conduct set forth above, engaged in outrageous behaviors. By such conduct, Defendants intended to cause each Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiffs emotional distress, or both.

136. As to plaintiff Coleen Colombo, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff emotional distress, or both.

137. As to plaintiff Isabel Guajardo, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with

reckless disregard of the probability of causing Plaintiff emotional distress, or both.

138. As to plaintiff Linda Howard-James, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff emotional distress, or both.

139. As to plaintiff Cheryl McNeil, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff emotional distress, or both.

140. As to plaintiff Michelle Seymour, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff emotional distress, or both.

141. As to plaintiff Sylvia Vega-Sutfin, Defendants' conduct was outrageous, and by such conduct, Defendants intended to cause Plaintiff emotional distress, or engaged in conduct with reckless disregard of the probability of causing Plaintiff emotional distress, or both.

142. Each of the plaintiffs suffered severe emotional distress.

143. The outrageous conduct of the Defendants was a substantial factor of the severe emotional distress suffered by Plaintiffs.

144. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

145. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each plaintiff to awards of punitive damages.

ATTORN AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

**SIXTH CAUSE OF ACTION**

**DEFAMATION**

**[All Plaintiffs Against BNC, DOES 1-50, Nick Murphy and Joe Pennington]**

146. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 145 as though fully set forth herein.

147. During the course and scope of their employment, BNC employees including but not limited to Sacramento branch supervising account manager, Linda Harris and branch managers defendant Nick Murphy and defendant Joe Pennington recklessly and intentionally published false information to others disparaging plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Sylvia Vega-Sutfin and on information and belief Michelle Seymour's work performance and abilities.

148. These false publications are per se defamatory.

149. Third persons to whom BNC employees recklessly and intentionally published defamatory statements about Plaintiffs include, but are not limited to persons within the company and others within the professional community.

150. The false and defamatory statements directly injured Plaintiffs' personal, business and professional reputations.

151. Defendants' false publications about Plaintiffs were made with malice and with intent to injure Plaintiffs, damage their reputations, and interfere with their employment.

152. As a proximate result of Defendants' false publications, Plaintiffs have suffered injury to their personal, business and professional reputations, and have suffered severe emotional distress, loss of employment and significant economic loss in the form of lost wages and future earnings.

153. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiffs with malice, oppression, fraud, and with willful and conscious disregard to Plaintiffs' rights, entitling each Plaintiff to an award of punitive damages.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

**SEVENTH CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

**[All Plaintiffs Against Defendant BNC Mortgage Inc.]**

154. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 153 as though fully set forth herein.

155. It is the public policy of the State of California to prohibit employers from discharging employees in a discriminatory manner, harassing employees, or retaliating against employees for participating in legally protected activities. (Cal. Govt. Code, § 12900 *et seq.*)

156. It is the public policy of the State of California to encourage employees to complain about fraudulent, deceptive, unfair or unethical business practices. (Cal. Bus. & Prof. Code §§ 17200, 17500 *et. seq.*; Cal. Civ. Code §§ 1572, 1709, 1710; Cal. Pen. Code §§ 484, 536.)

157. As set forth above, discrimination was a motivating factor in the terminations, harassment and retaliation suffered by plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin.

158. As set forth above, Plaintiffs' participation in protected activities was a motivating factor in Defendants decision to harass, retaliate against and/or otherwise discriminate against Plaintiffs.

159. Defendants' wrongful conduct has caused plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages.

160. In doing the things alleged herein, Defendants' conduct was despicable. Defendants acted toward Plaintiffs Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin with malice, oppression and fraud and with willful and conscious disregard to Plaintiffs' rights, entitling each Plaintiff to awards of

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

punitive damages.

## EIGHTH CAUSE OF ACTION

## BREACH OF IMPLIED AND/OR EXPRESS CONTRACT OF CONTINUED EMPLOYMENT

**[All Plaintiffs Against Defendant BNC Mortgage Inc.]**

161. Plaintiff re-incorporates and repeat the allegations in paragraphs 1 to 160 as though fully set forth herein.

162. Based on oral and/or written representations, promises and/or conduct of the defendant, Plaintiffs had employment contracts with Defendant that they would be employed by Defendant so long as their performance was satisfactory and that Defendant would not discharge them without good cause.

163. The terms of the employment contract included but were not limited to, the following: Defendant would not constructively discharge Plaintiff without good cause and fair warning, based on objective, reasonable job evaluations of Plaintiff.

164. As set forth above, notwithstanding the promise to terminate the employment contract only for good cause, Plaintiffs' employment was constructively terminated.

165. Defendants' wrongful conduct has caused Plaintiffs to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages which they would have received had Defendants not breached the employment agreement with Plaintiffs, in an amount to be established at trial.

## NINTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**[All Plaintiffs Against Defendant BNC Mortgage Inc.]**

166. Plaintiffs re-incorporate and repeat the allegations in paragraphs 1 to 165 as though fully set forth herein.

ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

167. The employment agreement referred to above contained an implied covenant of good faith and fair dealing, which obligated Defendants to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act which would prevent or impede Plaintiffs from performing any or all of the conditions of the agreement to be performed by them, and to refrain from any act that would prevent, impede or deprive Plaintiffs of the benefits of the employment agreement.

168. Defendants were required to fairly, honestly and reasonably perform the terms and conditions of the employment agreement.

169. Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing under the employment agreement when they harassed, discriminated and retaliated against Plaintiffs and created a work environment so hostile that Plaintiffs could not perform their jobs.

170. Plaintiffs performed all the duties and conditions of the employment agreement.

171. Defendants knew that Plaintiffs had fulfilled all duties and conditions of the employment agreement.

172. Plaintiffs' constructive discharge from employment by Defendants was wrongful, in bad faith, arbitrary and unfair, and therefore in breach of said covenant because Plaintiffs were discharged without just, good or legitimate cause and/or because Plaintiffs were discharged from their employment for making protected disclosures and for discriminatory reasons.

173. Defendants' wrongful conduct has caused plaintiffs Sylvia Vega-Sutfin and Isabel Guajardo to suffer and continue to suffer injury including, but not limited to, loss of income and benefits, severe emotional distress and other damages which they would have received had Defendants not breached the employment agreement with Plaintiffs, in an amount to be established at trial.

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079
Oakland, CA 94604-2079

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS Coleen Colombo, Isabel Guajardo, Linda Howard-James, Cheryl McNeil, Michelle Seymour and Sylvia Vega-Sutfin respectfully request relief as follows:

1. For special and economic damages, including back pay and front pay, benefits and for consequential damages, for all causes of action;

2. For general and non-economic damages for all causes of action;

3. For punitive damages;

4. For costs and attorneys fees, under California Government Code § 12965, or Cal. Civ. Proc. Code § 1021.5, or both, including a contingency fee enhancement beyond the lodestar in accordance with *Ketchum v. Moses* (2001) 24 Cal.4th 1122, and related authorities;

4. For prejudgment interest at the prevailing legal rate;

5. For such other and further relief as the Court may deem proper.

DATED: November 7, 2005

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

By: [signature]
J. GARY GWILLIAM
MONIQUE G. MORALES
Attorneys for Plaintiffs

72865

J. GARY GWILLIAM, Esq. (State Bar No.33430)
RANDALL E. STRAUSS, Esq. (State Bar No. 168363)
GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
1999 Harrison Street, Suite 1600
Oakland, CA 94612-3528
Telephone: (510) 832-5411
Facsimile: (510) 832-1918

Attorney for Plaintiffs

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

COLEEN DENISE COLOMBO; ISABEL GUAJARDO; LINDA HOWARD-JAMES; CHERYL McNEIL; MICHELLE SEYMOUR; SYLVIA VEGA-SUTFIN,

Plaintiffs,

vs.

BNC MORTGAGE INC.; JOE PENNINGTON; DANIEL KEENAN; NICK MURPHY; and DOES 1-100, inclusive,

Defendants . /

Case No.: 05AS05161

**PLAINTIFFS' DOE AMENDMENT REGARDING LEHMAN BROTHERS INC. AS DOE 1**

Plaintiffs COLEEN DENISE COLOMBO; ISABEL GUAJARDO; LINDA HOWARD-JAMES; CHERYL McNEIL; MICHELLE SEYMOUR; SYLVIA VEGA-SUTFIN, hereby amend the Complaint as follows: Lehman Brothers, Inc. as Doe 1.

DATED: February 28, 2008

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

By: [signature]
J. GARY GWILLIAM
Attorneys for Plaintiffs

90595

GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079, Oakland, CA 94604-2079



GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER
ATTORNEYS AT LAW
A Professional Corporation
P.O. Box 2079, Oakland, CA 94604-2079

**PROOF OF SERVICE**

I, Marilyn Gee-Cartwright, declare:

I am employed in the city of Oakland, County of Alameda , California. I am over the age of 18 years and not a party to the within action. My business address is GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER 1999 Harrison Street, Suite 1600, Oakland, CA 94612-3528.

On March 17, 2008, I served the attached:

- **PLAINTIFFS' DOE AMENDMENT REGARDING LEHMAN BROTHERS INC. AS DOE 1 (WITH PROOF OF SERVICE)**

on the parties in this action by placing true and correct copies thereof in sealed packages, addressed as follows:

Robert S. Shwarts, Esq.
Orrick, Herrington & Sutliffe
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Telephone: 415/773-5700
Fax: 415/773-5759

Alexander M. Sperry, Esq.
Orrick, Herrington & Sutcliffe
400 Capitol Mall
Suite 3000
Sacramento, CA 95814-4497

Telephone: 916/447-9200
Fax: 916/329-4900

[ X ] (BY U.S. MAIL) I placed such sealed envelope, with postage thereon fully prepaid for first-class mail, for collection and mailing at GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER, Oakland, California, following ordinary business practices. I am readily familiar with the practice of GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER for collection and processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

[ ] (BY PERSONAL SERVICE) I caused each such envelope to be delivered by hand to the addressee as noted above.

[ ] (VIA FEDERAL EXPRESS) I caused each such envelope to be delivered via Federal Express overnight service to the addressee(s) noted above.

[ ] (VIA FACSIMILE) I caused each such document to be sent via facsimile to the above facsimile number(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on March 17, 2008.

Marilyn Gee-Cartwright

75998

# EXHIBIT B

Claims

| Claim Number | Claimant | Claim Amount Asserted |
|---|---|---|
| 5222 | Michelle Seymour | $5,000,000 |
| 5223 | Sylvia Vega-Sutfin | $5,000,000 |
| 5224 | Cheryl McNeil | $5,000,000 |
| 5225 | Linda (Weeks) Howard James | $10,000,000 |
| 5226 | Isabel Guajardo | $5,000,000 |
| 5227 | Coleen Denise Colombo | $5,000,000 |

Total Amount Asserted: $35,000,000

# EXHIBIT C

BNC Employment Policy

Form XL EPL-007 (1/04)

Policy No. **BM00020483EP05A**

# XL INSURANCE (BERMUDA) LTD

Producer: **MARSH GLOBAL MARKETS (BERMUDA) LTD.**

In favor of: **LEHMAN BROTHERS HOLDINGS INC.**

Address: **745 7TH AVENUE**
**NEW YORK, NY 10019**
**U.S.A.**

Type of Coverage: **BROAD FORM EMPLOYMENT PRACTICES LIABILITY INSURANCE**

In the amount as stated in Item 4 of the Declarations.

IN WITNESS WHEREOF, this Policy has been made, entered into and executed by the undersigned in Hamilton, Bermuda, **APRIL 15, 2005**.

By: Wm M. Wharton
**WILLIAM M. WHARTON**

Title: **VICE PRESIDENT**

# DECLARATIONS

## BROAD FORM EMPLOYMENT PRACTICES LIABILITY INSURANCE

| | | |
|---|---|---|
| Item 1. | NAMED INSURED: | LEHMAN BROTHERS HOLDINGS INC. |
| Item 2. | ADDRESS: | 745 7TH AVENUE<br>NEW YORK, NY 10019<br>U.S.A. |
| Item 3. | POLICY PERIOD: | APRIL 14, 2005, 12:01 A.M., TO APRIL 14, 2006, 12:01 A.M. AT THE ADDRESS SHOWN ABOVE |
| Item 4. | LIMIT OF LIABILITY: | A) $100,000,000<br>EACH CLAIM<br>B) $100,000,000<br>AGGREGATE FOR ALL CLAIMS OR CIRCUMSTANCES REPORTED DURING THE POLICY PERIOD. |
| Item 5. | RETENTION: | $5,000,000 EACH CLAIM |
| Item 6. | PREMIUM: | A) GROSS: $597,500 NET: $567,625<br>FOR THE POLICY PERIOD<br>B) i. $ 896,250<br>ii. $1,344,375<br>FOR THE EXTENDED REPORTING PERIOD |
| Item 7. | EXTENDED REPORTING PERIOD: | i. 12 months<br>ii. 24 months |

D. Once the applicable retention has been exceeded, the Insurer shall provide indemnity payments for **Loss Amounts** on a periodic basis prior to the final disposition of a **Claim**. Interim payments shall be made when the total of unreimbursed **Loss Amounts** reaches $250,000 and proper documentation of these **Loss Amounts** has been provided to the Insurer. Such payments shall be repaid to the Insurer by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** are not ultimately entitled under the terms and conditions of this Policy to payment of such amounts.

E. In the event a plaintiff offers a settlement, and we recommend that such settlement offer be accepted but any **Insured** does not so settle, and the **Claim** later results in a judgment or settlement in excess of the amount of the recommended settlement offer with respect to such plaintiff, then the **Insured** shall be subject to a 25% coinsurance obligation with respect to all **Loss Amounts** in excess of the greater of 1) the retention or 2) the amount of such settlement offer and **Defense Costs** incurred to that time.

F. **Defense Costs** are not in addition to, but rather are included within, the **Policy Period Limit of Liability**.

## IV. DEFINITIONS

A. "**Additional Insured Organization**" means:

(1) any subsidiary or limited liability corporation in which the **Named Insured**, at the beginning of the **Policy Period**, either directly or indirectly, through one or more majority owned entities, owns more than 50% of the authorized voting stock; and

(2) any entity which is acquired or merged with an **Insured** and becomes an **Insured** pursuant to Section VII K of this Policy; and

(3) any subsidiary or limited liability corporation in which the **Named Insured**, during the policy period of any prior policy of which this Policy is the latest of a series of continuous renewals but not as of the beginning of the **Policy Period**, either directly or indirectly, through one or more majority owned entities, owned more than 50% of the authorized voting stock, but only as respects **Claims** involving such **Additional Insured Organization** that arise from facts and circumstances occurring during the time such **Additional Insured Organization** was owned by the **Named Insured** as set forth above in this subsection (3).

B. "**Claim**" means a lawsuit, or a demand for arbitration or an alternative dispute resolution proceeding, or an administrative proceeding or a written demand for payment of money or other redress or a written threat of legal action or request to toll or waive any statute of limitations or other potential defense based on timeliness against an **Insured** which alleges **Employment Practice Liability** to an **Employee**.

For the purpose of determining both the applicable **Limits of Liability** and retentions, all **Claims** attributable to the same event, condition, practice, policy, cause or series of interrelated circumstances shall be considered to be one **Claim**, regardless of the number of **Claims** made, claimants, or **Insureds** against whom such **Claims** are made and regardless of the length of the period over which such **Claims** are made or the circumstances giving rise thereto took place, including class action litigation, and only the Policy, if any in effect upon the first notice of **Claim** or circumstances which may give rise thereto to the Insurer shall apply to all such **Claims**.

**EXHIBIT D**

*In re Residential Capital*, Ch. 11 Case No. 12-12020 (MG)
Memorandum Opinion and Order Denying the Jackson
Motion to Lift the Automatic Stay

Docket #1184 Date Filed: 8/16/2012

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**NOT FOR PUBLICATION**

In re:

RESIDENTIAL CAPITAL, LLC, *et al*.

Debtors.

Case No. 12-12020 (MG)

Jointly Administered

**MEMORANDUM OPINION AND ORDER DENYING THE JACKSON MOTION TO LIFT THE AUTOMATIC STAY**

***A P P E A R A N C E S:***

CORLA JACKSON
*Pro Se*
13230 Tom Gaston Road
Mobile, Alabama 36695
By: Corla Jackson

MORRISON & FOERSTER LLP
*Counsel for the Debtors*
1290 Avenue of the Americas
New York, New York 10104
By: Norman S. Rosenbaum, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

On June 8, 2012, Corla Jackson ("Jackson") filed her *Motion for Relief of Stay*. (ECF Doc. # 264.) On July 19, 2012, Jackson filed an *Amended Motion to Lift the Automatic Stay* (the "Amended Motion," and together with the *Motion for Relief of Stay*, the "Motion"). (ECF Doc. # 856.) The Debtors opposed the Motion. (ECF Doc. # 682.) The Motion initially came on for hearing on July 10, 2012, but the Court, on consent of all the parties, adjourned the hearing to August 14, 2012. *See* Agenda for July 10, 2012 Hearing (ECF Doc. # 707). For the reasons explained below, the Court denies the Motion to lift the automatic stay.

1212020120816000000000008

## I. BACKGROUND

Jackson commenced a lawsuit (the "Jackson Litigation") against GMAC Mortgage Corporation ("GMAC Mortgage") earlier this year in Alabama state court before GMAC Mortgage filed its chapter 11 petition in this Court. After Jackson filed her complaint, the Debtors proceeded to foreclose on Jackson's home (the "Property").[1] GMAC Mortgage removed the Jackson Litigation to the United States District Court for the Southern District of Alabama based on diversity jurisdiction. The Debtors then filed a motion to dismiss Jackson's claims. The motion to dismiss remains pending and no discovery schedule has been set. Declaration of Jennifer Scoliard (the "Scoliard Declaration") ¶ 14 (ECF Doc. # 1022, Ex. 1). The case has now been stayed as a result of GMAC Mortgage's bankruptcy filing. Jackson's Motion seeks to modify the automatic stay to allow her to pursue the Jackson Litigation against GMAC Mortgage.

## II. DISCUSSION

The Court concludes that Jackson has not established cause to lift the stay. Jackson can, of course, file a proof of claim in the bankruptcy case. Jackson's allegations about misconduct by GMAC Mortgage are serious, and the Court's decision that the stay remains in place reflects no judgment that her claims lack merit. Like many others asserting claims against the Debtors, Jackson cannot jump to the head of the line to pursue her damages claims in another forum.[2]

[1] At the August 14, 2012 hearing, Debtors' counsel stated that Alabama is a non-judicial foreclosure state, and that GMAC Mortgage has already completed foreclosure of the Property. Debtors' counsel also stated that Jackson's right to redeem the property under state law after foreclosure has lapsed. Whether these statements are accurate is not material to the Motion or to this decision.

[2] Debtors' counsel acknowledged at the hearing that Jackson remains in possession of the Property, and that unless she voluntarily relinquishes possession, a judicial proceeding in Alabama will have to be brought to evict Jackson. Debtors' counsel further acknowledged that Jackson can assert any *defenses* to eviction permitted by state law if and when anyone seeks to recover possession of the Property.

**A. Jackson Has Not Established Cause to Lift the Automatic Stay**

Section 362(a)(1) of the Bankruptcy Code provides that the filing of a bankruptcy petition:

> operates as a stay, applicable to all entities, of –
>
> > (1) the commencement or continuation, including the issuance of employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause." In determining whether "cause" exists to lift the stay for prepetition litigation, courts consider the following factors (the "*Sonnax* Factors"):

(1) whether relief would result in a partial or complete resolution of the issues,
(2) the lack of any connection with or interference with the bankruptcy case,
(3) whether the other proceeding involves the debtor as a fiduciary,
(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action,
(5) whether the debtor's insurer has assumed full responsibility for defending the action,
(6) whether the action primarily involves third parties,
(7) whether litigation in another forum would prejudice the interests of other creditors,
(8) whether the judgment claim arising from the other action is subject to equitable subordination,
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor,

(10) the interests of judicial economy and the expeditious and economical resolution of litigation,
(11) whether the parties are ready for trial in the other proceeding, and
(12) the impact of the stay on the parties and the balance of harms.

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990); *In re N.Y. Med. Grp., PC*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001). Not all of the *Sonnax* Factors are relevant in every case, and "cause" is a broad and flexible concept that must be determined on a case-by-case basis. *Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999)).

The moving party bears the initial burden to demonstrate that "cause" exists to lift the stay. *See Sonnax*, 907 F.2d at 1285; *Capital Comm. Fed. Credit Union v. Boodrow* (*In re Boodrow*), 126 F.3d 43, 48 (2d Cir. 1997) ("We have emphasized that a bankruptcy court should deny relief from the stay if the movant fails to make an initial showing of cause.") (internal quotation marks omitted). If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested. "[T]he general rule is that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief." *In re Leibowitz*, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); *see also Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 10 Civ. 36 (RJH), 2010 WL 4966018, at *4 (S.D.N.Y. Nov. 17, 2010).

Under section 362(d)(1), Jackson bears the initial burden of showing "cause" to lift the stay. *In re Mazzeo*, 167 F.3d at 142. "If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *In re Sonnax*, 907 F.2d at 1285. Not all of the *Sonnax* Factors

apply in Jackson's case, but the relevant *Sonnax* Factors weigh strongly in favor of maintaining the automatic stay of the Jackson Litigation.

*1. Relief Might Not Result in a Partial or Complete Resolution of the Issues and the Movant's Case Is Not Ready for Trial (Sonnax Factor Nos. 1 and 11)*

While relief may eventually result in partial or complete resolution of the issue at hand, the resolution may not be immediate. The Jackson Litigation is in its early stages. Discovery, trial preparation and, absent a settlement, trial all remain to be done. Therefore, the first and eleventh *Sonnax* Factors weigh against lifting the stay.

*2. Lifting the Automatic Stay Will Interfere with the Debtors' Chapter 11 Cases (Sonnax Factor No. 2)*

Lifting the stay to allow Jackson to proceed with her damages claims in another forum could open the floodgates for other movants who also seek stay relief; many creditors assert similar claims in state and federal courts across the country. Such litigation in non-bankruptcy courts would hinder the Debtors' attempts to reorganize, forcing the Debtors to utilize time and resources that would otherwise be spent resolving these chapter 11 cases. Accordingly, the second *Sonnax* factor strongly weighs in favor of keeping the stay in place; lifting the stay will interfere with the Debtors' chapter 11 cases.

*3. The Jackson Litigation Does Not Involve the Debtors as Fiduciaries (Sonnax Factor No. 3)*

Jackson does not assert that the Debtors are liable as fiduciaries. Even if she did, however, that alone would not be a basis for lifting the stay in this matter. "[G]enerally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors." *In re Curtis*, 40 B.R. 795, 799 (Bankr. D. Utah 1984) (internal citation omitted). The Motion did

not include any evidentiary showing that GMAC was acting as a fiduciary. Therefore, the third *Sonnax* Factor weighs against lifting the stay.

4. *Foreclosure of Jackson's Property Has Already Been Completed but the State Court Will Be Best Situated to Address State Law Defenses to Any Efforts by GMAC Mortgage to Recover Possession of the Property (Sonnax Factor No. 4)*

Jackson remains in possession of the Property. Unless she voluntarily relinquishes possession, the Debtors' counsel acknowledged that a judicial proceeding in Alabama will be required to recover possession. On July 13, 2012, the Court entered the *Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (the "Supplemental Servicing Order"). (ECF Doc. # 774.) Under the Supplemental Servicing Order, Jackson will be able to assert any available state law defenses (but not affirmative damages claims) in any action by GMAC Mortgage to recover possession. Jackson's damages claims will have to be pursued in this Court as part of the claims allowance process.

The fourth *Sonnax* Factor at this point is at best neutral; if and when GMAC Mortgage seeks to recover possession, a state court will be the more appropriate forum to consider state law defenses. *See Memorandum Opinion Granting in Part and Denying in Part the Taggart Motion to Lift the Automatic Stay*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. August 14, 2012), slip op. at 13 (ECF Doc. # 1148) ("While this Court may interpret and apply state law in resolving claims through the bankruptcy process, *see, e.g.*, *In re Bally*

*Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) ('This Court has significant experience in applying state law . . . .'), a defendant in a state court action brought by the Debtors should be able to assert defenses to the relief sought by the Debtors. The state court is in the best position to determine whether a counterclaim is properly asserted as a defense to the foreclosure claim under applicable state law.")

*5. No Insurer Has Assumed Responsibility for the Action (Sonnax Factor No. 5)*

No insurer has assumed responsibility for the action here, and the Debtors would therefore need to pay all expenses in litigating the action with out-of-pocket funds from the bankruptcy estate. *See* Scoliard Declaration ¶ 12. As a result, the fifth *Sonnax* Factor does not support relief from the stay.

*6. The Jackson Litigation Does Not Primarily Involve Third Parties (Sonnax Factor No. 6)*

GMAC Mortgage, a Debtor in this Court, is the defendant in the Jackson Litigation, and no other third parties appear to be involved. The court should not grant relief from the stay under the sixth *Sonnax* Factor if the debtor is the main party to the litigation. *See City Ins. Co. v. Mego Int'l Inc.* (*In re Mego Int'l Inc.*), 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the stay was proper"). Thus, the sixth *Sonnax* Factor does not support granting relief from the stay.

*7. The Jackson Litigation Seeks to Recover Damages in Another Forum; Other Creditors Would be Prejudiced (Sonnax Factor No. 7)*

Requiring the Debtors to defend Jackson's damages claims in another forum would upend the "strong bankruptcy code policy that favors centralized and efficient administration of

all claims in the bankruptcy court . . . ." *Public Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 117 (2d Cir. 1992). It would be unfair to other creditors who must bring their claims in this Court. Jackson should be treated as other similarly situated unsecured creditors; doing so also minimizes the risks of inconsistent results. The seventh *Sonnax* Factor thus weighs against relief from stay.

*8. The Interests of Judicial Economy and Economical Resolution of the Actions Are Best Served by Maintaining the Automatic Stay (Sonnax Factor No. 10)*

The Debtors' counsel acknowledged at the hearing that Jackson can assert state court defenses to any state court action to recover possession of the Property. In addition, Jackson's damages claims should be heard in this Court as part of the claims allowance process. Accordingly, the tenth *Sonnax* Factor supports maintaining the stay in the Jackson Litigation.

*9. The Balance of Harms Favors Maintaining the Automatic Stay (Sonnax Factor No. 12)*

For many of the reasons stated above, the twelfth *Sonnax* Factor, the balance of the harms, weighs in favor of continuing the stay of the Jackson Litigation.

**B. Policies Underlying the Automatic Stay Favor Giving the Debtors a Breathing Spell**

The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986). It maintains the status quo and protects the debtor's ability to formulate a plan for the sale or other disposition of property of the estate. 3 COLLIER ON BANKRUPTCY ¶ 362.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). The automatic stay is intended to "allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (internal quotation omitted). In this

regard, the automatic stay "promot[es] equal creditor treatment and giv[es] the debtor a breathing spell." *In re Pioneer Commercial Funding Corp.*, 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990). The automatic stay allows debtors to focus on their reorganization instead of litigation. *Id*. at 48.

Damages claims against the Debtors, as in the Jackson Litigation, are the usual grist for the bankruptcy claims allowance process; absent unusual circumstances the bankruptcy court remains the appropriate forum to resolve such claims. Permitting courts around the country to adjudicate claims risks diverting the attention of Debtors' personnel from pressing issues in the chapter 11 case and increases the risk of inconsistent decisions affecting similarly situated creditors.

## III. CONCLUSION

For the foregoing reasons, Jackson's motion to lift the automatic stay is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 16, 2012
New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge