SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Bruce E. Clark
Matthew A. Schwartz
Thomas C. White

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | : |
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (SCC) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

**RESPONSE OF GIANTS STADIUM LLC TO DEBTORS' OBJECTION**
**TO PROOF OF CLAIM NUMBERS 64070 AND 64071**

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ...........................................................................................8

    A.  The Financing of the New Meadowlands Stadium ...........................8

    B.  The Swap Agreements.....................................................................10

    C.  The Downturn in the ARS Market and Lehman's Deteriorating Position on the Swaps ..........................................................................11

    D.  Debtors' Bankruptcy, the Termination of the Swaps, and the Calculation of the Settlement Amounts ..................................................16

    E.  Debtors' Effort to Frustrate the Claims and Prepare for Litigation................................22

    F.  Debtors' Plan of Reorganization ....................................................23

STANDARD OF REVIEW .........................................................................24

RESPONSE ..................................................................................................26

I.    GIANTS STADIUM PROPERLY TERMINATED THE SWAPS AND REASONABLY CALCULATED ITS LOSS......................................26

II.    DEBTORS' THEORY THAT THEY ARE OWED A RECEIVABLE IS WRONG UNDER THE SWAP AGREEMENTS AND APPLICABLE LAW..................................................................................................29

    A.  The Liquidation Framework of the Swap Falls Squarely Within the Safe Harbor of Bankruptcy Code § 560 ................................................29

    B.  The Floating Rate Did Not Convert from the Actual Bond Rate to a LIBOR-based Rate Because LBI Was Never "Terminated or Replaced" ....................30

III.  DEBTORS' REMAINING ALLEGATIONS OF BREACH OF CONTRACT ARE JUST AS MERITLESS....................................34

    A.  Debtors' Failure to Perform Their Contractual Duties Regarding Market Quotation Does Not Transform Giants Stadium's Loss Calculation into a Contractual Breach ......................................................34

    B.  The Amendment of the Indenture's Minimum Hedging Requirement Did Not "Prejudice in Any Material Respect the Rights" of Debtors ....................35

**IV.  GIANTS STADIUM REASONABLY DETERMINED ITS LOSS IN GOOD FAITH** .................................................................................................**39**

    A.    As Already Determined By This Court's Prior Ruling, Giants Stadium's Projected Auction Rate on the Bonds Is Conservative ....................................................40

    B.    Debtors' Alternative Loss Theories Do Not Undermine the Reasonableness of Giants Stadium's Loss Calculation and Are, in Any Event, Objectively *Less* Reasonable ..............................................................................46

**V.    DEBTORS' EQUITABLE SUBORDINATION CLAIM IS BASELESS** .....................**48**

**CONCLUSION** ....................................................................................................................**52**

# TABLE OF AUTHORITIES

*Page*

**Cases**

*80 Nassau Assocs.* v. *Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.*),
169 B.R. 832 (Bankr. S.D.N.Y. 1994) .................................................................50

*AAR Allen Servs. Inc.* v. *Feil 747 Zeckendorf Blvd LLC*,
No. 13 Civ. 3241 (JMF), 2014 WL 1807098 (S.D.N.Y. May 6, 2014)..................38

*In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ...........25

*In re Allegheny Int'l, Inc.*,
954 F.2d 167 (3d Cir. 1992)....................................................................................25

*In re Alper Holdings USA*,
No. 07-12148 (BRL), 2008 WL 160203 (Bankr. S.D.N.Y.  Jan. 15, 2008)...........24

*Ashkenazi* v. *Kent S. Assocs.*,
857 N.Y.S.2d 693 (2d Dep't 2008)........................................................................39

*Benjamin* v. *Diamond (In re Mobile Steel Corp.)*,
563 F.2d 692 (5th Cir. 1977) ........................................................................... 49-50

*Bussa* v. *Educ. Alliance*,
No. 14 Civ. 449 (GBD), 2014 WL 744556 (S.D.N.Y. Sept. 24, 2014)..................45

*CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*,
No. 07 Civ. 11078 (LTS), 2011 WL 4526132 (S.D.N.Y. Sept. 29, 2011) .............27

*CFIP Master Fund, Ltd.* v. *Citibank, N.A.*,
738 F. Supp. 2d 450 (S.D.N.Y. 2010)....................................................................39

*Chateaugay Corp.* v. *Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*,
No. 93-8444A, 1993 WL 563068 (Bankr. S.D.N.Y. Dec. 27, 1993) ...............51, 52

*In re DJK Residential LLC*,
416 B.R. 100 (Bankr. S.D.N.Y. 2009) ...................................................................24

*In re Enron Corp.*,
306 B.R. 465 (Bankr. S.D.N.Y. 2004) ..............................................................20, 52

*In re Greene*,
71 B.R. 104 (Bankr. S.D.N.Y. 1987)......................................................................25

*In re Kalisch,*
    413 B.R. 115 (Bankr. S.D.N.Y. 2008) ...................................................................49

*In re LBHI,*
    445 B.R. 143 (Bankr. S.D.N.Y. 2011) .............................................................44, 45

*LightSquared Inc.* v. *SP Special Opportunities LLC* (*In re LightSquared Inc.*),
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) .............................................................49, 50

*Lipper Holdings, LLC* v. *Trident Holdings, LLC* (*In re Lipper Holdings, LLC*),
    766 N.Y.S.2d 561 (1st Dep't 2003) .....................................................................33

*Madison Ave. Leasehold, LLC* v. *Madison Bentley Assocs. LLC,*
    811 N.Y.S.2d 47 (1st Dep't 2006) ......................................................................35

*Michigan State Hous. Dev. Auth.* v. *Lehman Bros. Derivative Prods. Inc.,*
    502 B.R. 383 (Bankr. S.D.N.Y. 2013) .............................................................29, 30

*Newmont Mines Ltd.* v. *Hanover Ins. Co.,*
    784 F.2d 127 (2d Cir. 1986)..................................................................................38

*Postlewaite* v. *McGraw-Hill, Inc.,*
    411 F.3d 63 (2d Cir. 2005)....................................................................................32

*In re Rockefeller Ctr. Props.,*
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) .............................................................24, 25

*S. Rd. Assocs., LLC* v. *Int'l Bus. Machs. Corp.,*
    4 N.Y.3d 272 (2005) .............................................................................................32

*Samba Enters., LLC* v. *iMesh, Inc.,*
    No. 06 Civ. 7660 (DC), 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) ...................33

*Sec. Inv. Prot. Corp.* v. *LBI,*
    No. 08 Civ. 8119 (GEL) (S.D.N.Y. Sept. 19, 2009)..............................................17

*In re Spiegel, Inc.,*
    No. 06 Civ. 13477 (CM), 2007 WL 2456626 (S.D.N.Y. Aug. 22, 2007) ...............25

*Tractabel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.,*
    487 F.3d 89 (2d Cir. 2007)....................................................................................27

*World Trade Ctr. Props., LLC* v. *Hartford Fire Ins. Co.,*
    345 F.3d 154 (2d Cir. 2003)..................................................................................33

*In re W.T. Grant Co.,*
    4 B.R. 53 (Bankr. S.D.N.Y. 1980) ........................................................................49

**Statutes, Rules, and Regulations**

11 U.S.C. § 502 ........................................................................................................................ 24

11 U.S.C. § 510 ........................................................................................... 7-8, 24, 50, 51

11 U.S.C. § 560 .......................................................................................................... 29, 30

FED. R. BANKR. P.
    Rule 2004 ...................................................................................................... 22, 23
    Rule 3001(f) ......................................................................................................... 24
    Rule 9014 ...................................................................................................... 25, 52

LOCAL R. BANKR. P. 9014-2 ..................................................................................... 52

Securities Investor Protection Act .................................................................... 16, 17, 31

**Other Authorities**

COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2014) .............. 25

Giants Stadium LLC ("Giants Stadium") submits this response ("Response") to the Objection to Proof of Claim Numbers 64070 and 64071 (ECF No. 46050) ("Objection") filed by Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator for LBHI and affiliated debtors, including Lehman Brothers Special Financing Inc. ("LBSF") (LBHI, together with LBSF, "Debtors").

## PRELIMINARY STATEMENT

1.    Giants Stadium is a private, family-owned and conservatively run business. When the owning families looked to finance the construction of the New Meadowlands Stadium in 2007, they instructed their financial advisors that they were seeking a long-term, conservative financing, which would limit their exposure to increased interest rates.  In particular, Giants Stadium was looking to mitigate interest rate risks that could result from a change in Giants Stadium's creditworthiness (or its guarantors') or any external factor such as market turmoil or illiquidity.  Giants Stadium initially sought to finance its portion of the stadium construction through the issuance of 40-year floating rate notes, which would vary based on market index, together with a traditional interest rate swap also varying based on that index.  Accordingly, Giants Stadium had sought to effectively fix the interest rate it would have to pay for the entire 40-year life of the notes.

2.    Unfortunately, the market for long-term floating rate notes dried up before Giants Stadium was able to access the debt markets and, as a result, Giants Stadium was forced to consider other, less conservative, financing structures.  Although the owning families continued to be extremely concerned with the risks associated with the monthly remarketing of notes inherent in the structure of auction rate securities ("ARS")—risks that would not have existed had Giants Stadium been able to use floating rate notes and related

swaps—with construction deadlines looming, Giants Stadium made plans to issue ARS entirely through Goldman, Sachs & Co. (with its affiliates, "Goldman").

3.      To mitigate some of the risk associated with the structure of the ARS, Goldman agreed to hedge Giants Stadium's risk of increasing rates by entering into a classic fixed-for-floating interest rate swap, whereby (i) Giants Stadium would pay Goldman a fixed interest rate on the bonds, and (ii) Goldman would pay Giants Stadium a rate on the bonds based on the London Interbank Offered Rate ("LIBOR"). This proposed swap agreement with Goldman was designed to have the effect of protecting Giants Stadium from a general rise in interest rates (reflected by an increase in LIBOR), though not other risks, including a decline in Giants Stadium's credit rating or a general downturn in the ARS market, the latter of which was a continuing concern for Giants Stadium and its owners.

4.      Then LBSF offered Giants Stadium a better deal. The very day before Giants Stadium was to enter into the agreement with Goldman, LBSF actively solicited Giants Stadium and its representatives, and proposed to them what LBSF characterized as the solution to the concerns expressed by Giants Stadium and its owners with respect to the ARS: an actual bond-rate swap to achieve what LBSF called a synthetic long-term fixed-rate note that eliminated Giants Stadium's remarketing or rollover risk. In this structure, (i) Giants Stadium would pay LBSF a higher fixed rate on the swaps than it would have paid Goldman, but (ii) LBSF would pay Giants Stadium the *actual rate* on the bonds as determined at each auction. Thus, payment of the higher fixed rate (which translated into millions of dollars of greater expense to Giants Stadium over the life of the swaps) offered Giants Stadium full insulation from not only a general rise in interest rates

-2-

(as Goldman's proposal did), but also the additional risks of (i) Giants Stadium (including the surety) becoming a less creditworthy counterparty during the life of the bonds and (ii) future disruptions in the market for ARS.  In other words, in return for this multimillion dollar premium payment to LBSF, LBSF would assume all of the associated market risks so that, from Giants Stadium's perspective, its bonds would effectively be at a fixed rate.

5.    In light of Giants Stadium's consistent concerns about eliminating as much market risk as possible, Giants Stadium agreed to pay LBSF this multimillion dollar premium.   Accordingly, on July 27, 2007, Giants Stadium financed $408,325,000, approximately two-thirds of the stadium cost, through ARS bonds ("Bonds") and actual bond-rate swaps ("Swaps") pursuant to LBSF's proposal, and only one-third of the stadium cost through Goldman, to whom Giants Stadium continued to feel some commitment in light of LBSF's overbid at the last minute.

6.    As the financial crisis began to unfold, the rates on the Bonds began to spike, exposing LBSF to significant losses on the Swaps.  ████████ Redacted ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

7.    By February 2008, ARS market conditions—and thus the auction results for the Bonds—had become so unfavorable, and generated such high interest rates, that Lehman Brothers Inc. ("LBI")—the LBSF affiliate and broker-dealer charged with conducting the auctions—pulled the Bonds from the market altogether and held them at an artificially low interest rate, thus saving LBSF from paying Giants Stadium a high rate of interest under the Swaps, but costing LBI significant amounts of money.

8.      At the end of March 2008, LBI tried to put the Bonds out to auction again, but the auction failed, triggering, under the terms of the indenture for the Bonds, a provision that automatically set the interest rate at 22%.  In order to protect LBSF from having to pay 22% to Giants Stadium under the Swaps, LBI pulled the Bonds from auction yet again, holding them in its own portfolio, and never put them back out to market.  As one LBSF employee observed in May 2008—well before LBHI's bankruptcy fully disrupted the financial markets— █████████████████ Redacted ███████████████

███████████████████████████████████████████████████████

██████████████████████

9.      Debtors do not contest that the September 2008 bankruptcy filing of LBHI, as LBSF's credit support provider on the Swaps, constituted a default by LBSF.  Rather, Debtors proffer a series of highly technical but patently flawed (and commercially absurd) efforts to avoid the consequences of their default.

10.     *First*, Debtors contend that LBI's September 19, 2008 *resignation* as broker-dealer for the Bonds triggered a provision in the Swaps that applied only in the event that LBI was "terminated or replaced" as broker-dealer, and under which the actual bond-rate swaps for which Giants Stadium had paid a multimillion dollar premium converted into far less valuable LIBOR-based swaps.  (*See* Obj. ¶¶ 30-33.)  But Debtors' contention tortures the Swaps' plain language:  LBI's resignation was not a "terminat[ion]" or "replace[ment]" of LBI as the broker-dealer, and the structure of the Swaps makes clear that this provision existed to protect LBI if it were terminated or replaced as broker-dealer *by Giants Stadium.*

11.    *Second*, Debtors contend that Giants Stadium was the breaching party under the Swaps, because Giants Stadium "denied" LBSF its "right," upon Giants Stadium's termination of the Swaps, to obtain quotations from reputable broker-dealers ("Reference Market-makers") to value the Swaps. (Obj. ¶¶ 35-36.) But as Debtors know from the discovery they have taken, Giants Stadium provided LBSF the opportunity to select and reach out to Reference Market-makers to calculate the loss under the Swaps, but LBSF declined to do so (in breach of the Swap Agreements (a term defined below)). (*See infra* ¶¶ 37-39.) Giants Stadium never prevented Debtors from doing anything.

12.    *Third*, Debtors contend that Giants Stadium breached the Swaps by not procuring LBSF's consent before amending a provision of the Bonds' indenture requiring that a minimum percentage of the ARS be hedged at different times. (Obj. ¶¶ 37-39.) But Debtors had no right to block this amendment by refusing to consent to it, because the minimum hedging requirement existed at the insistence of, and for the benefit of, the bond holders and insurers—not Debtors. (*See infra* ¶¶ 84-86.) Indeed, Debtors' theory would lead to the absurd result under which Giants Stadium would always have needed LBSF's consent to terminate the Swaps, regardless of LBSF's breach of the Swaps.

13.    *Fourth*, Debtors' remaining arguments largely amount to second-guessing Giants Stadium's calculation of its damages stemming from LBSF's default. (*See* Obj. ¶¶ 40-64.) Debtors contend, for example, that Giants Stadium should have used lower interest rates and different discount rates and assumptions about bond payments going forward. (Obj. ¶¶ 57-61.) None of these arguments is relevant under the Swap Agreements: by virtue of LBSF's default, Giants Stadium's only obligation under the contract was to calculate its loss in good faith and in a manner that was commercially

reasonable at the time of default (in which case such a calculation was dispositive). Giants Stadium's calculations, which looked primarily to rates on comparable bonds issued to finance the same stadium (but with Goldman as the broker-dealer), were made in good faith and were conservative. Indeed, they were more conservative than rates based both on Debtors' own valuation of the Bonds and on a valuation of the Bonds determined by Judge Peck to be commercially reasonable in a prior litigation brought by Debtors against Barclays. (*See infra* ¶¶ 90-101.) Nothing in the Objection demonstrates that the calculations fell outside the range of commercial reasonableness mandated by the Swap Agreements.

14.     Indeed, Debtors are effectively and impermissibly trying to challenge Judge Peck's earlier holding—made on a challenge LBHI brought to an earlier asset sale that LBI made to Barclays—that a valuation of the Bonds reflecting interest rates *higher* than those used by Giants Stadium to calculate its Loss (and thus suggesting a larger claim than Giants Stadium is making) were commercially reasonable. (*See infra* ¶ 99.)

15.     None of this is a surprise to Debtors, ███████ Redacted ███████

██████████████████████████████████████████

████████████  ████████  ██  ████████████████

██████████████████████████

16.     *Finally*, the latest iteration of Debtors' Objection makes the baseless argument that Giants Stadium's claims should be equitably subordinated to those of other creditors because Giants Stadium amended its originally filed claims to seek a higher

---

[1]     Citations to "Ex.__" are to the Declaration of Matthew A. Schwartz dated October 7, 2014 ("Schwartz Declaration"), filed herewith.

amount.  (Obj. ¶¶ 65-70.)   But Giants Stadium's original claims set forth in detail how Giants Stadium calculated its Loss arising out of LBSF's default, expressly noting that the dollar figure presented at that time did not include "important and bargained-for benefits of the [t]ransaction to the Non-Defaulting Party," including damages relating to (i) an increase in Giants Stadium's cost of capital and (ii) additional reserves that would have been maintained by a counterparty in a replacement transaction to the Swaps.  Giants Stadium later quantified these damages in amended proofs of claim filed in December 2011, as Giants Stadium previously stated it would do.   After Debtors subsequently objected to Giants Stadium's amended claims as, among other things, untimely, Giants Stadium entered into a stipulation *waiving* its rights to recover under these damages theories in an effort to avoid a costly dispute over their measurement and move this litigation toward a resolution.

17.     Now, notwithstanding the parties' stipulation (which reinstated Giants Stadium's earlier-filed claims), Debtors seek to equitably subordinate Giants Stadium's claims—solely on the ground of Giants Stadium's now-withdrawn claims amendment. Debtors' theory is utterly meritless because, among other reasons, they do not come close to identifying any "unconscionable" misconduct that is a prerequisite to obtaining the extremely rare relief of equitable subordination against a non-insider.  (*See infra* ¶¶ 111-13.)  In any event, the operative plan of reorganization bars Debtors' attempt to equitably subordinate Giants Stadium's claims.  All claims against each Debtor must fall within one of the classes established  under the plan and receive the treatment that the plan specifies for claims within that class.  Because the plan here does not provide for a separate class for claims that might otherwise be subject to equitable subordination under § 510(c)

of the Bankruptcy Code, Giants Stadium's claims cannot be reclassified otherwise than in the class applicable to those claims on the basis of equitable subordination. Moreover, Giants Stadium's claims cannot be treated disparately from other claims in the same plan class, *i.e.*, through equitable subordination. (*See infra* ¶¶ 114-17.)

## BACKGROUND

### A. The Financing of the New Meadowlands Stadium

18.     In mid-2007, Giants Stadium issued $650,000,000 of 40-year ARS in order to finance its share of the construction of the New Meadowlands Stadium. At the time, ARS, which had their interest rates set at periodic auctions (*i.e.*, the "auction rate"), offered issuers such as Giants Stadium the advantage of issuing long-term debt at short-term rates.

19.     Goldman was initially going to provide an imperfect hedge. Given Giants Stadium's highly risk-averse nature, it sought to minimize its exposure to fluctuations in the auction rate on these securities. Originally, Giants Stadium intended to issue the securities entirely through Goldman, which offered to enter into a fixed-for-floating LIBOR-based swap, whereby Giants Stadium could partially hedge its exposure to the auction rate by paying to Goldman a fixed rate of 5.659% in exchange for receiving a floating rate based on LIBOR from Goldman. Because Giants Stadium expected the interest rate on its ARS to fluctuate generally in line with LIBOR, this classic swap provided a hedge to Giants Stadium against the risk of an increase in interest rates generally, but not the risks of (i) an increase in rates on ARS specifically (due to ARS market turmoil or illiquidity) or (ii) a deterioration in the creditworthiness of Giants Stadium or its guarantors.

20.     Shortly before Giants Stadium was to enter into this agreement with Goldman, however, Lehman Brothers swooped in with a more attractive option. In the

preceding months, LBSF and LBI (and together with LBHI, "Lehman") had served as advisors to Giants Stadium on the stadium financing and continued in that limited role until the week that the Goldman deal was set to close, even reviewing terms from Goldman on behalf of Giants Stadium as late as July 23, 2007. ███████ Redacted ███████ ███████████████████████████████████ Within days of reviewing those terms, however, Lehman was attempting to take some of the business away from Goldman by pitching an alternative financing structure centered on an *actual* bond-rate swap. Following a meeting on July 26, 2007 in which both Goldman and Lehman participated, both financial institutions submitted term sheets to Giants Stadium on July 27, 2007 ███████ Redacted ███████

21.    Under the actual bond-rate swap that Lehman proposed—and which Goldman refused to match—Giants Stadium could *entirely* hedge its exposure to an increase in the auction rate, including an increase caused by market turmoil or illiquidity, and a deterioration in Giants Stadium's credit quality (or that of its guarantors), by paying a premium (a fixed rate of 6.1885%, as compared to Goldman's proposed 5.659% fixed rate) in exchange for receiving the actual auction rate from LBSF. In other words, by paying LBSF a higher interest rate than it was to pay Goldman, Giants Stadium was able to shift *all* risk of an increase in its ARS interest rates from itself to LBSF. As Christine Procops, the Chief Financial Officer of Giants Stadium, has explained, Lehman's proposal "took all of the risk off of Giants Stadium [ ] for the auction rate securities," and permitted Giants Stadium to "effectively lock[ ] in a long-term fixed rate bond which was at that period of time not [otherwise] available [to Giants Stadium]." (Ex. D (Procops Dep. Tr. 34:9-13, May 25, 2011).)

22.    Based on the competing proposals, Giants Stadium financed $408,325,000 of its portion of the New Meadowlands Stadium with LBSF through the Bonds (hedged by the accompanying Swaps), and financed the remaining $241,675,000 with Goldman (out of recognition of its long-term involvement in the transaction).  (*See id.* at 34:14-35:6.)

## B.  The Swap Agreements

23.    The Swaps between Giants Stadium and LBSF were documented in two separate confirmations[2] dated August 16, 2007, which are part of two separate standard form 1992 ISDA Master Agreements and the schedules thereto, dated July 27, 2007 ("ISDA Master Agreements," "Schedules," and "Confirms," collectively "Swap Agreements").[3]

24.    Section 5 of the ISDA Master Agreements lists certain "Events of Default," including, among other things, the bankruptcy of LBSF's "Credit Support Provider" (here, LBHI).  (ISDA Master Agreement §§ 5(a), (b).)  Section 6 of the ISDA Master Agreements, in turn, provides for termination rights upon an Event of Default and sets out alternative methods for valuing the payment obligations under this scenario, from which Giants Stadium and LBSF chose "Market Quotation" and "Second Method" in the Schedules.  (ISDA Master Agreement §§ 6(a), (b), (e); Schedule Pt. 1(j).)

---

[2]    Giants Stadium and LBSF entered into two separate swaps because two separate monoline insurers, Financial Security Assurance Inc. ("FSA") and Financial Guaranty Insurance Co. ("FGIC"), insured Giants Stadium's obligations to pay LBSF under the Swaps.  This split insurance arrangement for the Swaps was mirrored in the Bonds, where FSA and FGIC separately insured the tranches to which each of the Swaps related with FGIC insuring the Series A-4, A-5, and A-6 Bonds and FSA insuring the Series A-7 Bonds.

[3]    Exhibits E and F to the accompanying Schwartz Declaration are true and correct copies of the ISDA Master Agreements, Schedules, and Confirms, which are hereinafter cited as "ISDA Master Agreement," "Schedule," and "Confirm."

25.     In Paragraphs 5 and 6 of the Confirms ("Liquidation Clause"), Giants Stadium and LBSF modified the method of calculating the liquidation of the Swaps provided for under Section 6 of the ISDA Master Agreements.  In particular, Paragraph 6 specified that under this modified approach to Market Quotation, Giants Stadium and LBSF would each designate two reputable broker-dealers or "Reference Market-makers" from which LBSF would solicit quotations for replacement swaps, the lowest of which would serve as the Market Quotation.  (*Id.*)[4]

## C. The Downturn in the ARS Market and Lehman's Deteriorating Position on the Swaps

26.     As 2007 progressed, LBSF became highly exposed through the Swaps to a deteriorating and increasingly volatile ARS market.  [Redacted]

27.     However, Paragraph 4 of the Confirms specified certain significant restrictions on a request by LBSF that Giants Stadium convert or otherwise refinance the Bonds.  Giants Stadium had no obligation to agree to convert if such a transaction would

---

[4]     Capitalized terms not defined herein are ascribed the meaning in the Swap Agreements.

"result in any additional cost, risk or loss of financial or business flexibility." (Confirm

¶ 4.) Moreover, LBSF needed to pay "all costs and expenses of any conversion[ or]

refinancing" to Giants Stadium. (*Id.*) ██████████ Redacted ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████

28.    ████████████ Redacted ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

29.    ████████████ Redacted ████████████

████████████████████  ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████  ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Redacted

30.    Lehman's problem with the Bonds only worsened in the fall of 2007, as credit rating agencies downgraded the monoline insurers that had guaranteed issuers' payment obligations on ARS (including Giants Stadium's obligations on its Bonds).[5]  This downgrade adversely affected the credit ratings of the ARS market as a whole, thus driving up rates on ARS in general and further exposing LBSF under the Swaps to high payments to Giants Stadium.

31.    Lehman's position on the Swaps had become so bad that, by late 2007, LBI was withholding approximately 90% of the Bonds from auction on a monthly basis in order to avoid the risk of a failed auction.  Under the terms of the indentures, an auction "failed" where there were insufficient bids to purchase the Bonds being offered for sale, which would have required the payment at the maximum rate of 22% to compensate bond holders for their inability to sell the Bonds in an illiquid market.  As one employee of LBI explained with regard to this approach on December 27, 2007, "[t]his [step of withholding

---

[5]    Reflective of the mounting financial crisis in general and the downturn in the ARS market in particular, the credit rating for one of the monoline insurers that insured both the Bonds and Swaps was downgraded beginning at the start of 2008.  In January and February 2008, S&P, Moody's, and Fitch all cut FGIC from triple-A, and further downgrades followed during the course of the year.  By the end of September 2008, S&P gave a CCC rating to FGIC.  In 2012, after significant financial troubles at FGIC, the New York Department of Financial Services placed FGIC into a "rehabilitation" process from which it emerged in 2013.  Though much stronger than FGIC, FSA too suffered, albeit less severely, and later during the year.  In November 2008, Moody's downgraded FSA from Aaa to Aa3.

-13-

90% of the Bonds from market] was initiated after investor confidence in auction rate

securities started waning a few months ago relating to bond insurers, etc. (the bonds are

insured by FSA and FGIC)." (Ex. L (HHR_LBI_PST_00262550).)  As the employee said,

under this approach, the transaction from Lehman's perspective "is not in any way a swap

at this point, simply a receipt of payment" in the form of the fixed payment from Giants

Stadium to LBSF—LBI's receipt and LBSF's payment of the auction rate cancelled

against each other.  (*Id.*)

    32.    Entering 2008, the ARS market worsened further.



Amidst these conditions, on February 11, 2008, LBI itself

began to hold on its books *all* of the Bonds at each auction.  Pursuant to the terms of the

indentures, in an "all hold" auction—where none of the existing bond holders sought to

auction their Bonds—the applicable "all hold" interest rate was automatically set at 90% of

LIBOR, a rate that, at this point in time, was under 3%.  ()[6]

    33.    No rational investor acting solely in its own self-interest would have held

the Bonds at the all hold rate at this time because the all hold rate was far below what the

market would have established as the auction rate for the Bonds.  LBI only accepted this

---

[6]    This "all hold" rate existed for the protection of the issuer, Giants Stadium, to
prevent a scenario where an investor purchased all the ARS at a high interest rate and
refused to put the Bonds out to auction, despite the fact that market demand might
otherwise drive down the rate if an auction were held.

below-market rate on the Bonds because it was protecting LBSF from having to pay the auction rate to Giants Stadium.

34.    In March 2008, after having consistently followed this approach for multiple auctions, LBI decided to test again the demand for the Bonds in the market by putting a small number of Bonds in one tranche out to auction. Redacted

35.    In other words, the very risk that LBSF had accepted, even sought, and for which Giants Stadium had agreed to pay LBSF a multimillion dollar premium under the Swaps—a situation in which Giants Stadium otherwise would have been forced to pay high rates on the Bonds—had materialized. Redacted

Redacted

36.    Redacted

**D. Debtors' Bankruptcy, the Termination of the Swaps, and the Calculation of the Settlement Amounts**

37.    On September 15, 2008, LBHI filed a voluntary petition with the Court under Chapter 11 of the Bankruptcy Code, which constituted an Event of Default under the Swap Agreements.  (ISDA Master Agreement § 5(a)(vii).)  On September 18, 2008, about two weeks before LBSF filed its own Chapter 11 petition, Giants Stadium hand-delivered and faxed to LBSF a notice of termination of the Swaps based on LBHI's bankruptcy filing, and designated that date as the "Early Termination Date" with respect to the Swaps.

38.    On September 19, 2008, LBI resigned as broker-dealer for the Bonds. ▮

Redacted

███████████████████████████ Redacted ███████████████████████████

███████████████████████████████████████████████████████ As anticipated, later that same day, the liquidation proceedings against LBI began. *See* Order Commencing Liquidation, *Sec. Inv. Prot. Corp.* v. *LBI*, No. 08 Civ. 8119 (GEL) (S.D.N.Y. Sept. 19, 2009), ECF No. 3.

39.    Upon the termination of the Swaps on September 18, 2008, Christine Procops of Giants Stadium contacted Mr. Taylor to designate Giants Stadium's two Reference Market-makers and to request that LBSF solicit quotations from those and the other Reference Market-makers selected by LBSF.  Ms. Procops reached Mr. Taylor on the telephone, who candidly told Ms. Procops, "[t]here is really nobody here at Lehman.  Go out and get [the bids] on your own."  (Ex. D (Procops Dep. Tr. 173:18-20, May 25, 2011).)

40.    LBSF's refusal to designate and solicit quotations from Reference Market-makers rendered the Market Quotation method of valuing Giants Stadium's Loss unavailable under the Swap Agreements, which provided that "Lehman shall solicit quotations" from the Reference Market-makers.  (Confirm ¶ 6.)  As a result, Giants Stadium's only obligation was to try to calculate, on its own, the size of its Loss on the Swaps.  (ISDA Master Agreement § 12.)

41.    Nevertheless, attempting to provide an objective benchmark regarding the magnitude of its Loss, Giants Stadium sought quotations from three leading broker-dealers:  Bank of America, JPMorgan, and Goldman.  Each of these institutions informed Giants Stadium that it was unwilling to provide the legally binding bid mandated by the Swap Agreements under the Market Quotation method. ████████ Redacted ████████

███████████████████████████████████████████████████████████████

████████████████████████ Redacted ████████████████████████

████████████████████████████████████   When asked on the telephone to make a bid

amidst the collapsing marketplace, "JP Morgan laughed" at Giants Stadium.  (Ex. D

(Procops Dep. Tr. 218:9, May 25, 2011).)   Goldman likewise refused.  (*See id.* at

220:6-10.)  These responses were not altogether surprising given the structure of the Swaps

and the market turmoil.  As Giants Stadium noted in its calculation statement on October 2,

2008, "[t]he primary reasons that were cited by the dealers [for not providing a quotation]

[we]re: (1) the tenor of the transaction, (2) the absence of liquidity and unpredictability of

pricing in the market for auction rate securities, (3) the downgrade of and other

developments at FGIC, (4) the uncertainty about the creditworthiness of any traditional

bond insurer in the long-term, and (5) the absence in the [Swaps] of credit protections

and/or collateralization triggers in the event of a downgrade, or even the insolvency, of the

bond insurer."  (Ex. U (Calculation Statement of Oct. 2, 2008, Schedule 1).)

42.     Given the unavailability of quotes with which to measure Loss, Giants

Stadium proceeded to calculate its Loss under the Swap Agreements in good faith and in a

commercially reasonable manner.  The calculation involved two principal variables: (i) an

auction rate for the Bonds insured by one of the two monoline insurers, FSA and FGIC,

which could be used to calculate the floating payments owed to Giants Stadium in

exchange for its fixed payments under the Swaps, and (ii) a discount rate to bring the

difference between the floating and fixed streams of payments to net present value.

43.     With respect to (i), Giants Stadium looked to the actual market rates for the

FSA-insured bonds that it issued through Goldman, ARS that were still being put to

auction, whose rate for the current auction period blended to 9.75%.  This methodology

was extremely conservative. ███████████ Redacted ███████████

████████████████████████████████████    ██████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████    ██████████████████████████████████████████

███████████████

44.     Giants Stadium had one other data point, which was the 22% rate—the most current rate on the Bonds (due to the recent failed auction).  Thus the 9.75% rate selected by Giants Stadium was less than half the rate that LBSF would have actually owed to Giants Stadium under the Swaps at the time of termination, had the Bonds been offered at auction.  Because none of the Goldman bonds was insured by FGIC, which was a much weaker insurer than FSA at the time and subsequently went into rehabilitation, while FSA did not, *see supra* n.5, Giants Stadium included a very conservative adjustment of 75 basis points for the FGIC-insured component of the Bonds to account for their significant difference in creditworthiness, thereby applying a rate of 10.5% to the portion of the Swaps that corresponded to the FGIC-insured Bonds.

45.     Giants Stadium used this blended rate for the 40-year life of the Swaps because the terminated transaction required LBSF to pay the actual rate of interest on the Bonds plus related costs and expenses over the entire 40-year term of the financing (in exchange for a fixed rate payable by Giants Stadium), and any replacement swap would have had to offset the same payment obligations on the Bonds.  Accordingly, to value the Loss, Giants Stadium was required to value the expected stream of payments for the life of

the Swaps.  At the time, in the midst of an unprecedented credit crisis, it was wholly impossible for anyone to know the actual rates that would apply over the subsequent 40-year period, and, although interest rates could have dropped, future rates could just as easily have been significantly higher than the then-prevailing rates applied by Giants Stadium.  The Swap Agreements expressly recognize this, and thus define Loss to mean "an amount that [a] party reasonably determines *in good faith* to be its total losses and costs . . . including any loss of bargain."  (ISDA Master Agreement § 12 (emphasis added).)  Further, the Swap Agreements specify that a "[a] party will determine its Loss *as of* the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable."  (*Id.* (emphasis added).)  *See also In re Enron Corp.,* 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004) (stating that the amount due after a swap is terminated is calculated "at the time of termination").  As such, it was wholly appropriate to use the interest rates prevailing at the time, in the manner applied by Giants Stadium two weeks after terminating the Swaps.  Indeed, in the face of the additional uncertainty caused to the ARS markets by Lehman's bankruptcy—which had just been corroborated by the outright refusal of three of the world's largest broker-dealers to offer *any* bid to replace the Swaps on any terms—Giants Stadium's assumption that auction rates would continue at then-current levels (and not increase) was an exceedingly reasonable assumption in October 2008.  ████████████████████ Redacted ████████████████████

████████████████████████████████████████

46.    With respect to (ii), the discount rate that Giants Stadium applied to the two streams of projected payments under the Swaps, Giants Stadium selected LIBOR as the discount rate.  Giants Stadium was entitled to recover the loss of its bargain in the

terminated Swaps and thus have a counterparty with creditworthiness comparable to Debtors' perceived creditworthiness in August 2007. As a result, LIBOR, the rate at which financial institutions can borrow funds, was an appropriate discount rate for the floating-rate payments from the counterparty in a replacement swap and a conservative measure for the fixed-rate payments from Giants Stadium, which Moody's rated Baa3 in September 2008 and which accordingly had a much higher cost of capital than a replacement counterparty.

47.    On October 2, 2008, pursuant to Section 6(d) of the ISDA Master Agreements, Giants Stadium provided LBSF with statements of the Settlement Amount owed to Giants Stadium pursuant to this straightforward calculation, which totaled $301,025,197.12.

48.    On October 3, 2008, LBSF filed a voluntary petition under Chapter 11 of the Bankruptcy Code. *See In re LBSF*, Chapter 11 Case No. 08-13888 (SCC) (Bankr. S.D.N.Y. Oct. 3, 2008).

49.    On October 17, 2008, Giants Stadium filed proofs of claim against LBSF and LBHI (as LBSF's guarantor) in their respective bankruptcy cases for $301,828,087.35 each.[7] On October 29, 2009, Giants Stadium filed amended proofs of claim ("Claims") against LBSF and LBHI for $301,804,617.14 each, making a minor correction to their interest calculation that favored Debtors.

---

[7]    The difference between $301,148,936.47 and $301,828,087.35 is attributable to incorporating interest owed to Giants Stadium.

### E.  Debtors' Effort to Frustrate the Claims and Prepare for Litigation

50.    Four years prior to lodging their Objection to the Claims, Debtors began utilizing Federal Rule of Bankruptcy Procedure 2004—offering the charade that they needed a massive self-described "fishing expedition" of Giants Stadium to "decide" whether to object to Giants Stadium's claims—while simultaneously objecting to and obstructing any effort by Giants Stadium to obtain parallel discovery from Debtors (on the ostensible basis that Rule 2004 was available only to Debtors, and not to Giants Stadium). Lehman's manifest purpose in invoking Rule 2004 and refusing simply to file an objection to Giants Stadium's claims was to obtain extensive discovery from Giants Stadium, while denying Giants Stadium the concurrent discovery that would have been available had Debtors initiated a "contested matter" against Giants Stadium.

51.    On May 19, 2010, Debtors served their initial subpoena requesting the production of documents, in response to which Giants Stadium ultimately produced nearly 64,000 pages.  On March 10, 2011, Debtors served a deposition subpoena on Ms. Procops. Pursuant to this subpoena, on May 25, 2011, Debtors deposed Ms. Procops for more than seven hours regarding the Swaps.

52.    On July 27, 2011, a mere two months after Ms. Procops sat for her deposition, Debtors served yet another deposition subpoena seeking the testimony of a representative of Giants Stadium on the *very same topics* on which Debtors had just deposed Ms. Procops and with the knowledge that Ms. Procops was the only conceivable deponent in light of her involvement in the Swaps.  Debtors followed this transparent effort to conduct a *de facto* Rule 30(b)(6) deposition with a further document subpoena, which they served on April 9, 2012 and which contained, among other things, a series of requests clearly designed to invade the attorney-client privilege and work-product protection,

including requests for communications between Giants Stadium and Goal Line Partners LLC—parties to a joint defense agreement.

53.     In light of the breadth, burden, and irrelevance of the second set of subpoenas, which made clear that Debtors were using Rule 2004 as a litigation and harassment tool, Giants Stadium objected to them and moved for the right to begin taking its own discovery of Debtors.  At a hearing on November 14, 2012, the Court correctly perceived that Debtors were engaging in a charade and, after concluding that "there is no foreseeable outcome here in which Lehman is not objecting, or bringing affirmative claims relief," and emphasizing that "[t]his is not a situation in which Lehman is engaging in a 2004 process to later shake hands, and say here's the money," ordered the parties to develop an agreed and reciprocal discovery protocol that would allow this dispute to move forward.  (Ex. W (Omnibus Hr'g Tr. 58:5-10, Nov. 14, 2012).)  On April 1, 2013, Giants Stadium and Debtors entered into such a protocol.

54.     On October 23, 2013, just over five years after Giants Stadium originally filed its Claims, Debtors filed their Adversary Proceeding Complaint ("Complaint") (ECF No. 1), the allegations of which are incorporated by reference into the Objection.  (*See* Obj. ¶ 2.)

### F.  Debtors' Plan of Reorganization

55.     On December 6, 2011, the Court entered its Order Confirming the Debtors' "Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors"  (ECF No. 23023) ("Plan" and "Confirmation Order").   Under the Plan, once Giants Stadium's claims become "allowed claims":  (i) to the extent allowed against LBHI, they constitute either "Senior Third-Party Guarantee Claims" that are classified and treated in  LBHI Class 5 (Plan  §§ 1.144, 4.6) or "Third-Party Guarantee

Claims" that are classified and treated in LBHI Class 9A (Plan §§ 1.163, 4.11), depending

on whether these Guarantee Claims are entitled to contractual subordination of the claims

in LBHI Classes 10A-10C; and (ii) to the extent allowed against LBSF, they constitute

"General Unsecured Claims" that are classified and treated in LBSF Class 4A (Plan

§§ 1.60, 5.21).  Although the Plan creates separate classes for the treatment of claims that

are contractually subordinated and subject to § 510(a) of the Bankruptcy Code (LBHI

Classes 10A-10C) and securities-related claims that are subordinated under § 510(b) of the

Bankruptcy Code (LBHI Class 11), the Plan does not provide for any separate class for

claims that might otherwise be equitably subordinated under § 510(c) of the Bankruptcy

Code.  Furthermore, the Plan contains no reservation of any right to equitably subordinate

claims under § 510(c), nor even any mention of § 510(c).

### STANDARD OF REVIEW

56.    "The filing of a proof of claim constitutes 'prima facie evidence of the

validity and amount of a claim.'"  *In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr.

S.D.N.Y. 2009) (quoting FED. R. BANKR. P. 3001(f)).  *See also In re Alper Holdings USA*,

No. 07-12148 (BRL), 2008 WL 160203, at *3 (Bankr. S.D.N.Y.  Jan. 15, 2008) ("[i]t is

well settled that a proof of claim executed and filed in accordance with the Federal

Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the

claim").  A claim for which such a proof of claim is executed and filed is accordingly

"allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  "Once an objection to

a claim is made the court, after notice and a hearing, is to determine the amount of the

claim." *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

57.    Because a proof of claim is deemed allowed in the absence of an objection, this "'allowance compels the [objector] to go forward and produce sufficient evidence to rebut the claimant's *prima facie* case.'"  *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007) (quoting *In re Greene*, 71 B.R. 104, 106 (Bankr. S.D.N.Y. 1987)).  *See also* 9 COLLIER ON BANKRUPTCY, ¶ 3001.09[2] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2014) ("COLLIER") ("[t]he [objector] has the burden of going forward and of introducing evidence sufficient to rebut the presumption of validity.  Such evidence must be sufficient to demonstrate a true dispute and must have probative force equal to the contents of the claim").  Although "'[i]t is often said that the objector must produce evidence equal in force to the *prima facie* case[, i]n practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'"  *In re Spiegel, Inc.*, No. 06 Civ. 13477 (CM), 2007 WL 2456626, at *15 n.6 (S.D.N.Y. Aug. 22, 2007) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)).

58.    "Once an object[or] offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim."  *In re Rockefeller*, 272 B.R. at 539.  *See also* COLLIER ¶ 3001.09[2] (clarifying that "[u]pon introduction of sufficient evidence by the [objector], the burden of proof will fall on whichever party would bear that burden outside of bankruptcy," before noting that "[i]n most cases, the burden of proof will have to be met by the claimant by a preponderance of the evidence").  "When an objection to a claim is contested, a contested matter is created" for which Federal Rule of Bankruptcy Procedure 9014 "dictates the procedure to be followed."  *In re Rockefeller*, 272 B.R. at 540.

-25-

**RESPONSE**

I. **GIANTS STADIUM PROPERLY TERMINATED THE SWAPS AND REASONABLY CALCULATED ITS LOSS.**

59.    As noted *supra* ¶ 37, LBHI's Chapter 11 filing constituted an Event of Default under the Swap Agreements.  This default gave Giants Stadium the right to terminate the Swaps, which it did, three days later, on September 18, 2008, designating that date as the Early Termination Date for the Swaps.

60.    The unavailability of the Market Quotation method of calculating Loss—due to LBSF's refusal to designate its Reference Market-makers and solicit quotations, *see supra* ¶¶ 39-42—meant that Giants Stadium was obligated to use "Loss" to calculate its damages.  Under that definition (the definition in the standard form 1992 ISDA Master Agreement "1992 ISDA Form"):

> "Loss" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).  Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies.  Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9.  A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.  A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

(ISDA Master Agreement § 12.)

61.    This Loss provision captures the classic contract-law measure of damages as the lost "benefit of the bargain." "Loss," under the 1992 ISDA Form, "does not require an evaluation of [ ] *actual* loss," *CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*, No. 07 Civ. 11078 (LTS), 2011 WL 4526132, at *2 (S.D.N.Y. Sept. 29, 2011); rather, Loss may represent "loss of bargain" or replacement costs in "reestablishing any hedge." (ISDA Master Agreement § 12.) *See also CDO Plus Master Fund Ltd.*, 2011 WL 4526132, at *2 (accepting Loss calculation under credit default swap ISDA Form Agreement because "'[t]he law of New York is clear that once the fact of damages has been established, the non-breaching party need only provide a "stable foundation" for a reasonable estimate [of damages]'") (quoting *Tractabel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc*., 487 F.3d 89, 111 (2d Cir. 2007) (alteration in original)).

62.    Giants Stadium's Loss calculation—delivered to LBSF on October 2, 2008—was both reasonable and in good faith, which is all that the Swap Agreements required. As described *supra* ¶¶ 42-46, Giants Stadium used pricing on comparable bonds and made minor adjustments. First, Giants Stadium looked to the market rate for the materially identical tranches of bonds issued through Goldman, which included the FSA-insured Series A-2 and A-3, whose blended average market rate for the auction period at the time of LBSF's default was 9.75%. In calculating Loss for the similarly FSA-insured Series A-7 Bonds, Giants Stadium used a market rate at a point close in time (September 2008), but *prior to Lehman's bankruptcy* and the concomitant disruption and uncertainty Lehman's bankruptcy introduced into the financial markets. Second, in order to calculate Loss for the FGIC-insured Series A-4, A-5, and A-6 Bonds, Giants Stadium applied a small upward adjustment of 75 basis points to the contemporaneous market rate

tied to FSA to account for the vastly different credit quality of FGIC, *see supra* ¶ 44, which affected their respective bond pricing. Third, Giants Stadium completed the Loss calculation by comparing (i) the payments LBSF would have made to Giants Stadium for the life of the Swaps under the rates applicable to the FSA and FGIC-insured Bonds (9.75% and 10.5%, respectively) to (ii) the fixed rate of 6.1885% Giants Stadium would have made to LBSF under the life of the Swaps. This approach—which yielded a Loss of $301,025,197.10—was the simplest calculation of Loss, made very early in the Lehman bankruptcy case, and before the subsequent aggravated disruptions in the world's financial markets, which would have increased the calculation.

63.    As Giants Stadium noted in its Loss calculation statement, this was, indeed, an "exceedingly conservative" calculation. (Ex. U (Calculation Statement of Oct. 2, 2008, Schedule 1).) As a threshold matter, the separate rates Giants Stadium used for the FGIC- and FSA-insured Bonds were below the maximum rate of 22%, which LBSF actually paid when it was unable to sell the securities and which, in separate litigation concerning the Bonds, an expert witness *for Debtors* concluded was a realistic rate for valuing the Bonds. (*See infra* ¶ 94.) As discussed *infra* ¶¶ 90-92, 96, the rates were also conservative in light of the minimal adjustment employed for the difference in the creditworthiness of FSA and of FGIC (a company that regulators ordered one year later to stop issuing insurance policies and that declared bankruptcy less than two years later), the refusal of other major broker-dealers to even bid to replace the Swaps on any payment terms, and the collapse of the entire market for auction-rate securities.

## II.  DEBTORS' THEORY THAT THEY ARE OWED A RECEIVABLE IS WRONG UNDER THE SWAP AGREEMENTS AND APPLICABLE LAW.

64.    Debtors contend that Giants Stadium owes LBSF approximately $94 million, plus interest, and that the Court should disallow and expunge the Claims in their entirety for this reason.  (*See* Obj. ¶¶ 31-32.)  In objecting on this ground, Debtors refer to their Complaint, which in five relevant counts alleges that Giants Stadium owes LBSF money because: (i) the Liquidation Clause is an impermissible *ipso facto* clause (Count I); (ii) the floating rate of the Swaps converted from the actual bond rate to a LIBOR-based rate at the resignation of LBI as broker-dealer (Count II); (iii) Giants Stadium breached the Swap Agreements by failing to adhere to the Market Quotation process (Count III); and (iv) Giants Stadium breached a term in the indenture governing the Bonds ("Indenture") that was incorporated in the Swap Agreements by terminating the Swaps on September 18, 2008 without first seeking LBSF's permission to do so (Counts IV and V).  In each instance, Debtors misinterpret the Swap Agreements and/or applicable law.

### A.  The Liquidation Framework of the Swap Falls Squarely Within the Safe Harbor of Bankruptcy Code § 560.

65.    In *Michigan State Housing Development Authority* v. *Lehman Brothers Derivative Products Inc.*, 502 B.R. 383 (Bankr. S.D.N.Y. 2013), this Court rejected Debtors' contention that a swaps provision like the Swaps provision under which Giants Stadium calculated Loss is a "prohibited *ipso facto* provision . . . that purported to modify the methodology for calculating Settlement Amounts."  (Obj. ¶ 31.)  As this Court explained in rejecting a materially indistinguishable *ipso facto* argument advanced by Debtors in that action, "the protected right to liquidate [a swap under the safe harbor of

Bankruptcy Code § 560] must include a way to execute the liquidation in order to infuse the safe harbored right with meaning."  502 B.R. at 386.

66.    Pursuant to the stipulation between Giants Stadium and Debtors that this Court so ordered on July 8, 2014, Debtors agreed that *Michigan State Housing Development Authority* required dismissal of Count I of the Complaint.  (*See* Stipulation (ECF No. 32).)

### B.    The Floating Rate Did Not Convert from the Actual Bond Rate to a LIBOR-based Rate Because LBI Was Never "Terminated or Replaced."

67.    Debtors also wrongly object that Giants Stadium "ignor[ed] then-current facts vital to valuing the Swaps, such as the impending termination and replacement of LBI as broker-dealer for the Bonds," an argument that they elaborate upon in Counts II and IV of the Complaint.  (Obj. ¶ 31.)

68.    Paragraph 7 of the Confirms provides, in relevant part, that "[i]n the event that LBI is, at any time, *terminated or replaced* in its capacity as broker-dealer" with respect to the Bonds when the floating-rate payment is the actual bond rate determined at auction, "[Giants Stadium] shall, immediately and without further action by any party, be deemed to have exercised its [option to convert the floating rate on the Swaps from the actual bond rate to a LIBOR-based rate]."  (Confirm ¶ 7 (emphasis added).)  Debtors torture this language to contend that LBI's September 19, 2008 *resignation* as broker-dealer constituted a "termination or replacement" of LBI such that LBSF immediately became entitled to a LIBOR-based floating-rate payment on September 19, 2008 and a receivable of $94 million.  (*See* Compl. ¶¶ 71-78.)  Debtors' theory fails for at least four reasons.

69.    *First*, the plain meaning of "terminated or replaced" does not encompass LBI's resignation.  The words themselves denote that LBI is the object—not subject—of the "terminat[ion] or replace[ment]" being contemplated by this provision.  Had the parties *also* intended for this clause to apply to a scenario where LBI *resigns*, they could have easily so stated.  Of course, the parties did not have that expectation because it would make no economic sense.  (*See infra* ¶ 72.)  The words surrounding the phrase, whereby the conversion to LIBOR is triggered only if LBI "*is* . . . terminated or replaced"—a passive construction—further evidences that the parties expected this provision to apply only if *Giants Stadium* "terminated" or "replaced" LBI as the broker-dealer for the auctions.  The distinction between resigning versus being "terminated" is as plain as the difference between quitting a job and being fired.

70.    Furthermore, Debtors cannot contend that LBI was "terminated or replaced" by the commencement of liquidation proceedings against LBI and the application of the Securities Investor Protection Act of 1970.  ██████ Redacted ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ ; Complaint and Application of SIPC,  *SIPC* v. *LBI*, No. 08 Civ. 8119 (GEL) (S.D.N.Y. Sept. 19, 2008), ECF No. 1 (filed Sept. 19, 2008, 1:23 PM); Order Commencing Liquidation, *SIPC* v. *LBI*, ECF No. 3 (entered Sept. 19, 2008, 3:46 PM).)

71.      *Second*, a "[c]ontract[ ] must be read as a whole, and if possible, courts must interpret [it] to effect the general purpose of the contract . . . 'ensur[ing] that excessive emphasis is not placed upon particular words or phrases.'"  *Postlewaite* v. *McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (quoting *S. Rd. Assocs., LLC* v. *Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (2005)).  Paragraph 7, when read in its entirety, confirms that the risk against which LBSF was protecting itself in this provision was Giants Stadium's decision to terminate or replace LBI.  This provision, which provides for the retention of LBI as the broker-dealer for the Bonds, grants "Counterparty" (*i.e.*, Giants Stadium) "the right to terminate the services of LBI under [the] broker-dealer agreement at any time upon reasonable notice, provided that *Counterparty* shall not terminate the services of LBI [ ] with respect to any portion of the [ ] Bonds that are in [a]uction [m]ode."  (Confirm ¶ 7 (emphasis added).)  Paragraph 7 then goes on to supply the remedial provision on which Debtors now rely:  an automatic conversion to a LIBOR-based swap in the event that Giants Stadium exercised its right to replace LBI when the Bonds were in auction mode.  Thus, the concept of LBI's termination is introduced in Paragraph 7 in the context of *Giants Stadium* terminating LBI, and the remedial provision existed as a means to protect LBI against the risk that Giants Stadium would take away LBI's ability to manage the auctions (and thereby take away LBI's ability to play a role in managing its affiliate LBSF's exposure under the Swaps).

72.      *Third*, Debtors' argument that "terminated or replaced" includes LBI's resignation would create the absurd result of negating the entire economic and business purpose to the Swaps, as it would have given LBSF (acting in concert with LBI) the unilateral option to convert the Swaps from actual bond-rate swaps to LIBOR-based swaps

whenever it wished, simply by having LBI resign as broker-dealer.  If this were indeed what the parties intended, Giants Stadium would have had no incentive to pay a multimillion dollar premium to LBSF (in the form of a higher fixed-rate payment) in exchange for LBSF's assumption of the risk of increasing auction rates.  *See World Trade Ctr. Props., LLC* v. *Hartford Fire Ins. Co.*, 345 F.3d 154, 183-84 (2d Cir. 2003) ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."); *Samba Enters., LLC* v. *iMesh, Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) ("A court should not interpret a contract such that the result would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" (quoting *Lipper Holdings, LLC* v. *Trident Holdings, LLC* (*In re Lipper Holdings LLC*), 1 A.D.3d 170, 171 (1st Dep't 2003)).

73.     Furthermore, if through LBI's unilateral resignation Lehman could have flipped the Swaps from actual bond-rate swaps to LIBOR-based swaps, then it would certainly have taken this step during 2007 and 2008 to avoid the costs imposed by LBI's ownership of the Bonds at the all hold rate.  (*See supra* ¶¶ 32-36.)

74.     *Fourth*, even if Debtors' reading of the Swaps were correct, the Swaps were properly terminated *before* LBI's resignation as broker-dealer, *see supra* ¶ 37, rendering interpretation of the phrase "terminated or replaced" moot in this context.

75.     Although discovery is still ongoing, Giants Stadium fully expects the relevant negotiators of the Swaps from both sides (Giants Stadium and Lehman) to testify that the parties never intended LBI's resignation to flip the Swaps from actual bond-rate swaps to LIBOR rate swaps.

### III. DEBTORS' REMAINING ALLEGATIONS OF BREACH OF CONTRACT ARE JUST AS MERITLESS.

76.     Debtors next object that the Claims should be disallowed and expunged (but not that Debtors are entitled to a receivable) for the alternative reason that Giants Stadium "cannot seek to enforce a contract [*i.e.*, the Swap Agreements] that it materially breached." (Obj. ¶ 34.)  Debtors base this objection on two alleged contractual breaches, from which they also claim that they are entitled to damages in their Complaint.  (*See* Compl. ¶¶ 79-90.)  These arguments likewise fail.

#### A. Debtors' Failure to Perform Their Contractual Duties Regarding Market Quotation Does Not Transform Giants Stadium's Loss Calculation into a Contractual Breach.

77.     Under Paragraph 6 of the Confirms, where the Swaps are terminated and LBSF is the "Defaulting Party," Giants Stadium and LBSF "shall each designate two [ ] Reference Market-makers," and LBSF "shall solicit quotations from the Designated Dealers."  As noted *supra* ¶¶ 38-40, LBSF refused to perform this contractual obligation when Giants Stadium provided it with notice that it was terminating the Swaps on September 18, 2008 (and LBSF has, to this day, never sought quotations with respect to the Swaps).

78.     Six years later, Debtors now argue that Giants Stadium "strategically shut[ ] LBSF out of the Market Quotation process" insofar as "Giants Stadium did not allow LBSF to select two Reference Market-makers . . . [or] solicit quotations from any Reference Market-maker." (Obj. ¶¶ 35-36.)  But Debtors know that this is contrary to fact, because Giants Stadium never took any action designed to hinder LBSF from discharging its contractual obligations.  Indeed, Giants Stadium provided LBSF with formal written notice of termination and requested that LBSF solicit quotations in light of that

termination.    ████████████████████████ Redacted ████████████████████████

███████████████    LBSF then told Giants Stadium it was "on [its] own," *supra* ¶ 39, thus waiving any "right" to designate and solicit quotations from Reference Market-makers.[8] Moreover, LBSF's failure to take the contractually mandated action of designating Reference Market-makers prevented the determination of a Market Quotation under Paragraph 6 and *obligated* Giants Stadium to use a Loss calculation. The fact that Giants Stadium then sought valuations from Reference Market-makers in no way prevented LBSF from doing the same, either with the same Reference Market-makers Giants Stadium contacted or with others.

79.    Moreover, even if Debtors could establish that Giants Stadium's actions somehow prevented Debtors from seeking Market Quotations, Debtors never explain how Debtors could have procured such quotations in the midst of such market turmoil, where the leading industry market-makers said that it would be impracticable to value the Swaps (and refused to do so).  Indeed, the unwillingness of three leading broker-dealers to even consider providing quotations at that time reinforces the immateriality of this alleged "breach."  (*See* Obj. ¶¶ 35-36; Compl. ¶¶ 79-83.)

**B.  The Amendment of the Indenture's Minimum Hedging Requirement Did Not "Prejudice in Any Material Respect the Rights" of Debtors.**

80.    As noted *supra* n.2, in 2007, Giants Stadium procured insurance on the Bonds from two monoline insurers, FSA and FGIC, as a way of making the financing even

---

[8]    Debtors' argument that Giants Stadium failed to "obtain[] a contractually required *written waiver from LBSF* of its rights with respect to the Market Quotation process" (Obj. ¶ 46 (emphasis added)) ignores that, under settled New York law, "a contractual provision against oral waiver may itself be waived."  *Madison Ave. Leasehold, LLC* v. *Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 6 (1st Dep't 2006),  *aff'd*, 861 N.E.2d 69 (N.Y. 2006).

more attractive to investors.  As was customary, *the insurers* negotiated for, and obtained, certain rights over provisions of the financing and hedging arrangements.

81.    One such right was contained in Section 609(nn) of the Indenture, which contained a minimum hedging requirement, whereby 40% of the Bonds were required to have a fixed rate or a synthetic fixed rate (by way of a swap) through the Bonds' maturity and 67% of the Bonds required the same protection for 15 years following the completion of the New Meadowlands Stadium.[9]

82.    Absent an amendment to the Indenture, Giants Stadium's termination of the Swaps on September 18, 2008, would, therefore, have violated the minimum hedging provision.  Accordingly, in the days immediately following LBHI's bankruptcy on September 15, 2008, Giants Stadium sought the consent of FSA, FGIC, and the NFL, which likewise had the right to object to any amendment to the Indenture.  With the consent of these parties, on September 18, 2008, Giants Stadium requested that BoNY, as trustee, enter into a supplemental indenture of trust ("Supplemental Indenture") that amended Section 609(nn) ███████████ Redacted ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████      ████████

████████████████████

---

[9]    Exhibits Y, N, and Z to the accompanying Schwartz Declaration are true and correct copies of the Indenture and certain supplemental indentures of trust governing the Bonds.

83.    Debtors now contend that LBSF too—not just the bond insurers and the NFL—was entitled to the right to object to the amendment to the Indenture, and that the failure to procure that consent rendered the Supplemental Indenture ineffective.  (Obj. ¶¶ 37-39.)  But this argument is wrong as a matter of fact and law.

84.    *First*, the minimum hedging requirement in the Indenture existed solely for the benefit of the *bond insurers and bond holders*, not LBSF.  This is logical as an economic matter, because it was the insurers—not LBSF or LBI—who stood behind Giants Stadium's payment obligations on the Bonds, and thus stood to lose money in the event of any default on those payment obligations by Giants Stadium.  Indeed, at the time of termination, it would have been in Lehman's economic interest for Giants Stadium to have little or no hedging on the Bonds, because such hedging would reduce the credit risk undertaken by Lehman—the party providing the hedge.

85.    The parties' mutual understanding of the function of this provision—that it inured to the benefit of the insurers—is expressly reflected in the Swap Agreements themselves, which acknowledge that Section 609(nn) of the Indenture was "expressly made to and *for the benefit of the Insurer*," whether FSA or FGIC.  (ISDA Master Agreement Schedule Pt. 1(l)(ix) (emphasis added).)  Accordingly, Debtors' position that the minimum hedging requirement "expressly was incorporated into the Swaps as a condition precedent to termination" of the Swaps (Obj. ¶ 37) is simply wrong.

86.    Debtors' interpretation would also lead to absurd results:  if Debtors were correct, then LBSF's consent was required to terminate the Swaps *even after LBSF defaulted*.  This is inconsistent with the language of the Swap Agreements, which acknowledge each party's  "[*r*]*ight* to [t]erminate [f]ollowing [an] Event of Default."

-37-

(ISDA Master Agreement § 6(a) (emphasis added).)  Debtors' position is also contradicted

by the "well-established principle" of New York contract law that "[a] contract should not

be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary

to the reasonable expectations of the parties." *AAR Allen Servs. Inc.* v. *Feil 747 Zeckendorf

Blvd LLC*, No. 13 Civ. 3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014)

(alterations in original) (internal quotation omitted).  "Put slightly differently, 'the meaning

of particular language found in [a contract] should be examined in light of the business

purposes sought to be achieved by the parties and the plain meaning of the words chosen by

them to effect those purposes.'" *Id.* (quoting *Newmont Mines Ltd.* v. *Hanover Ins. Co.*, 784

F.2d 127, 135 (2d Cir. 1986) (internal quotation marks omitted)) (alteration in original).

87.    *Second*, even assuming the parties reasonably expected that LBSF be

afforded the right to consent to an amendment of the minimum hedging

requirement—which they did not—Debtors tellingly fail to explain how they were

materially and adversely *prejudiced* by the amendment, and thus could reasonably have

withheld their consent under Section 1101(a)(viii) of the Indenture.  The Objection's

theory of prejudice is:

> Any removal of the Minimum Hedging Requirement absent LBSF's
> consent materially and adversely affected LBSF because LBSF obtained
> the right, as an express term of the Agreements, that the Swaps not be
> terminated if doing so would violate the Minimum Hedging Requirement.
> This contractual right would be illusory if Giants Stadium unilaterally could
> change the Minimum Hedging Requirement without LBSF's consent. Thus,
> Giants Stadium breached the Agreements and the Indenture by purporting
> to amend the Minimum Hedging Requirement without LBSF's consent.

(Obj. ¶ 38.)  In other words, the only prejudice Debtors claim to have suffered was the

inability to exercise an alleged contractual right to "consent" to any amendment to the

Indenture.  But that contractual right could only be exercised if LBSF was "materially and adversely affected" by the amendment.  Debtors' argument is, therefore, entirely circular.[10]

88.    Finally, Debtors cite Section 1102(a)(7) of the Indenture as an additional basis under which their consent to the Supplemental Indenture was required.  (*See* Obj. ¶ 38.)  However, if the Supplemental Indenture did "not prejudice in any material respect the rights of" LBSF under Section 1101(a)(viii) of the Indenture, then Section 1102 does not apply because it addresses supplemental indentures exclusive of those covered in Section 1101.  Thus the beginning and end of the inquiry into whether LBSF can claim that its consent was required to the Supplemental Indenture is Section 1101(a)(viii).  And pursuant to Section 1101(a)(viii), their consent was not required.

## IV.    GIANTS STADIUM REASONABLY DETERMINED ITS LOSS IN GOOD FAITH.

89.    Debtors assert that "Giants Stadium's calculation of the Settlement Amounts using the Loss methodology is not commercially reasonable."  (Obj. ¶ 40.)  As confirmed by Judge Peck's prior ruling and Debtors' own expert witness, however, Giants Stadium calculated its Loss in a commercially reasonable manner.  In addition, Giants Stadium properly calculated its Loss in this manner "as of the earliest date [after the Early

---

[10]    Even if there might be some colorable argument that notice to Debtors was somehow a condition to the Supplemental Indenture's effectiveness, black-letter New York law would be to the contrary.  New York law (which governs the contracts pursuant to Section 1307 of the Indenture) has a strong presumption against such conditions, especially where immaterial technical breaches would lead to drastic forfeitures.  *See Ashkenazi* v. *Kent S. Assocs.*, 51 A.D.3d 611, 611 (2d Dep't 2008) ("If the [contract's] language is in any way ambiguous, the law does not favor a construction which creates a condition precedent."); *CFIP Master Fund Ltd.* v. *Citibank, N.A.*, 738 F. Supp. 2d 450, 466-67 (S.D.N.Y. 2010) (excusing a particular error in a swap valuation as the failure of an immaterial condition).  Accordingly, any failure of the indenture trustee to send notice of the amendment to LBSF cannot invalidate Giants Stadium's termination of the Swaps.

Termination Date] as [was] reasonably practicable" under the circumstances, as is required under the definition of Loss.  (ISDA Master Agreement § 12.)

**A. As Already Determined By This Court's Prior Ruling, Giants Stadium's Projected Auction Rate on the Bonds Is Conservative.**

90.     In order to determine the auction rate on the Bonds for the remaining life of the Swaps—and thus the amount of money that LBSF would have owed Giants Stadium under the Swaps had LBSF not defaulted—Giants Stadium looked to the auction rate for the current auction period of the materially identical tranches of bonds that Giants Stadium issued at the same time through Goldman, the FSA-insured Series A-2 and A-3, which was 9.75%.  In light of the fact that LBSF had not put out the Bonds for auction since March 2008, there was no better point of reference for determining the projected auction rate on these bonds.  The only adjustment that Giants Stadium made to this contemporaneous market rate was an upward adjustment of 75 basis points for the FGIC-insured Bonds.  This adjustment was very conservative in light of the difference between FSA's and FGIC's credit ratings and credit default swap spreads as of the Early Termination Date.[11]

91.     In their Objection, Debtors argue that "using as a proxy th[is] short-term interest rate" was "not a reasonable assumption," because "the failure of the auction rate securities market caused the Goldman [b]onds to be auctioned at artificially high rates." (Obj. ¶¶ 54-55.)  But by September 2008, the ARS market had collapsed altogether, potentially requiring Giants Stadium to pay a maximum rate of 22% for the remaining

---

[11]     On September 18, 2008, Bloomberg reported that the 10-year interest-rate swap spreads on FSA and FGIC was 588 basis points and 4,393 basis points, respectively.  Even accounting for the maximum interest rate on the ARS of 22% and a common base interest rate of LIBOR, these spreads demonstrate the conservativeness of a differential of 75 basis points.

40-year life of the Bonds.  During that low point of the worst credit crisis since the Great

Depression, it was by no means apparent that Giants Stadium—or any borrower—would

be able to borrow money at stable long-term interest rates within the foreseeable future, as

LBSF now argues six years after the fact.  And it certainly was not obvious that, at that

point in time, the credit markets would *improve* rather than deteriorate in the weeks,

months, and years that would follow.[12]  Under the ISDA Master Agreements, Giants

Stadium was required to "determine its Loss as of the [ ] Early Termination Date, or, if that

is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable."

(ISDA Master Agreement § 12.)  Thus, Giants Stadium was contractually required to

calculate its Loss when it did shortly after the Early Termination Date, and the valuation

that it undertook necessarily was based on the information then available.  Debtors'

arguments, therefore, amount to little more than a second guessing of economic forecasts

during an extended tumultuous time period.[13]

92.    This Court has already confirmed that the rates Giants Stadium used to

calculate its Loss were reasonable.  By way of context, in the immediate wake of LBHI's

filing for bankruptcy on September 15, 2008, Barclays bought from Debtors, among other

---

[12]    By way of example:  in 1931, in the midst of the Great Depression, the stock market
had dropped by 50% from its high in 1929.  By Debtors' thinking, market participants
should have expected, at this point in time, that markets would improve in the coming
months and years.  By the middle of 1932, however, the market had dropped *another 70%.*
(*See* Ex. AA.)

[13]    Tellingly, in their Disclosure Statement filed in support of the Third Amended Joint
Chapter 11 Plan, Debtors concede that their "Chapter 11 Cases were followed by a period
of global turmoil in the financial markets, the effects of which have been persistent."
Debtors' Disclosure Statement for Third Amended Joint Ch. 11 Plan of LBHI & Its
Affiliated Debtors 19 (ECF No. 19629).

assets, the North American broker-dealer business of LBI.   In connection with this transaction, which Judge Peck approved on September 20, 2008, the Bonds were transferred to Barclays.   On September 22, 2008, the closing date of this asset sale, Barclays assigned the Bonds a collective value of $58,995,135, significantly below their par value of $408,325,000.   This below-par valuation meant that the market was demanding a rate in *excess* of 22% on the Bonds at this time (because any purchaser could have obtained 22% if it purchased the Bonds at par, put them out to auction, and the auction failed).

93.    On September 15, 2009, LBHI moved pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for an order modifying the order that had approved the transaction.  Over the next two years, LBHI aggressively litigated against Barclays.

94.    One of the central arguments that LBHI advanced in the course of these proceedings was that Barclays had undervalued the assets transferred to it in connection with the transaction, including the Bonds, and thereby obtained an unfair gain.  On this point, John Olvany, who served as Debtors' expert witness, used an auction rate of 16% going forward (far in excess of the 9.75% and 10.5% rates Giants Stadium used to calculate its Loss) to value the Bonds.  He also acknowledged that a rate as high as the maximum rate of 22% was not unlikely in light of the potential for continuing failed auctions in the future. (*See* Ex. BB (Expert Report of John Olvany) ¶¶ 19, 25.)

95.    Barclays presented the expert opinion of Professor Paul Pfleiderer, who examined Barclays' valuation of a sample of approximately 300 assets purchased by Barclays to determine the reasonableness of the overall value that Barclays assigned to the portfolio of 10,743 of assets Barclays acquired from Debtors.  Included in the sample were

the very Bonds of Giants Stadium at issue here.  (*See* Ex. CC (Expert Report of Paul Pfleiderer).)  Professor Pfleiderer concluded that the $58,995,135 valuation of the Bonds was commercially reasonable.

96.    The significantly-below-par valuation of the Bonds in the Barclays sale also reflects another dynamic in the ARS market at this time that supports the reasonableness of Giants Stadium's Loss calculation.  As Professor Pfleiderer explained in January 2010, "[m]arkets for auction rate securities encountered severe difficulties beginning early in 2008, with increasing numbers of auctions 'failing.'  These difficulties continued through 2008, and these markets have yet to revive." (Ex. CC (Expert Report of Paul Pfleiderer) at 112.)  Because "auctions had been the primary mechanism by which holders could reduce (or increase) their holdings," Professor Pfleiderer emphasized that "these auction failures made it difficult  [ ] for holders of auction rate securities to dispose of their positions." (*Id.*) The illiquidity of the ARS market in general and the market for the Bonds in particular, which is reflected in the Bonds' court-approved valuation at significantly below par value, supports the argument that in September 2008, the likelihood of failed auctions and, in turn, an auction rate of 22% for the Bonds, was a real possibility, demonstrating the reasonableness of the rate of less than half that much that Giants Stadium used to calculate Loss.

97.    In addressing the valuation of the Bonds, Judge Peck squarely rejected LBHI's argument and accepted the position of Barclays and, in particular, Professor Pfleiderer, that Barclays had not received a windfall and that the valuations were reasonable:

> The Court accepts Professor Pfleiderer's conclusions regarding the value of
> the assets sold to Barclays and the valuation of the repo collateral.  He was

> persuasive in pointing out that these hard to value assets were being valued by persons who were intimately familiar with both the assets and the relevant markets at a time of unusual market disruptions, and that such valuations were independently audited by a third-party auditor and found to be reasonable. His cogent and coherent testimony also supports the ultimate conclusion that Barclays did not receive an unfair advantage when it purchased the Broker–Dealer Business and further demonstrates that there is no cause to grant 60(b) relief.

*In re LBHI*, 445 B.R. 143, 184 (Bankr. S.D.N.Y. 2011).

98.    Accordingly, Judge Peck's willingness to conclude that Barclays' valuation of *all* of the assets it purchased from Lehman was reasonable based on his examination of the valuation of a small subset of those assets, including the Giants Stadium Bonds in particular, bars Debtors from arguing that approximately $59 million, the value that Barclays assigned to the Bonds—a valuation that would result in a claim size well in excess of the $301 million Claims Giants Stadium is seeking here[14]—was not a reasonable valuation at the time of the asset sale, which coincided with the Early Termination Date.

99.    Recognizing the preclusive harm Judge Peck's decision does to their position in this case, Debtors misleadingly imply that Judge Peck stated that he "'made no findings of specific valuations, and could not have made any such findings given the character and description of the assets and the emergency nature of the hearing.'" (Obj. ¶ 63 (quoting 445 B.R. at 179).) But Debtors quote from the portion of Judge Peck's opinion in which the Court was recounting his conclusions from the September 19, 2008 emergency hearing on Lehman's motion to approve the sale of its broker-dealer business to

---

[14]    As noted *supra* ¶ 92, the $59 million valuation of the Bonds necessarily assumed that the market was demanding a rate on the Bonds in excess of 22%. Giants Stadium's calculation of its Loss, however, assumed a rate of less than half of that in arriving at the $300 million claim amount it is seeking here.

Barclays. *See* 445 B.R. at 150, 179. In contrast, as explained above, Judge Peck's finding, *i.e.*, that the valuation of the Giants Bonds was reasonable, was made in the context of Debtors' later 60(b) motion, and only after a "lengthy trial." Debtors are barred by the doctrine of collateral estoppel from relitigating this issue. *See*, *e.g.*, *Bussa* v. *Educ. Alliance*, No. 14 Civ. 449 (GBD), 2014 WL 4744556, at *2 (S.D.N.Y. Sept. 24, 2014) ("The doctrine of collateral estoppel . . . bars relitigation of a claim for relief where: (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the first proceeding.") (alterations and internal quotation marks omitted).

100.    Consistent with their valuation-by-hindsight approach, Debtors now contend that "Giants Stadium's reliance on Barclays' valuation of the Bonds . . . ignores that Barclays wrote the value of the Bonds up by a factor of six within weeks of their purchase." (Obj. ¶ 64.) But this does not help Debtors because even a valuation of the Bonds at par is consistent with the interest rates Giants Stadium used to calculate its Loss. In any event, as Judge Peck observed, in previously crediting Professor Pfleiderer's valuations over those of Debtors, "[t]he Court agrees with Professor Pfleiderer's observation that a 'de novo after the fact valuation' given in a litigation context is of limited merit in determining whether contemporaneous valuation judgments performed by Barclays were reasonable." 445 B.R. at 186. The question here is whether Giants Stadium's calculation of Loss on September 18, 2008—not at some arbitrary point thereafter—was reasonable and in good faith. (*See supra* ¶ 45.)[15]

---

[15]    Debtors separately argue that using the discount rate of LIBOR for both the floating-rate and fixed-rate payments is flawed because it "assumes essentially no risk of

*(footnote continued . . .)*

101.    Given Judge Peck's holding and the representation of Debtors' own expert, Debtors should not now be allowed to challenge Giants Stadium's use of 9.75% (for the FSA-insured Bonds) and 10.5% (for the FGIC-insured Bonds) as unreasonable.

**B.    Debtors' Alternative Loss Theories Do Not Undermine the Reasonableness of Giants Stadium's Loss Calculation and Are, in Any Event, Objectively *Less* Reasonable.**

102.    Given Judge Peck's earlier holding, the inherent reasonableness of Giants Stadium's calculation of Loss, and the absence of any evidence (or well-pled allegation) of bad faith—Debtors' alternative methods of calculating Loss are irrelevant under the Swap Agreements.    (*See* Obj. ¶¶ 40-64.)    In any event, these methodologies are highly flawed—as Debtors themselves appear to acknowledge by internally valuing the amount that they owe Giants Stadium under the Swaps as over $250 million.  (*See supra* ¶ 15.)

103.    For example, Debtors argue that Giants Stadium failed to account for "LBSF's right . . . to cause Giants Stadium to refinance or convert the Bonds, provided that LBSF paid the [associated] costs and expenses." (Obj. ¶ 41.)  However, as discussed *supra* ¶ 96, assuming the $59 million valuation of the Bonds Judge Peck deemed to be reasonable, any such refinancing would have created a *larger* claim amount than the one Giants Stadium currently seeks.

104.    Although Giants Stadium did subsequently refinance the Bonds with Goldman, this refinancing in a much-improved credit environment is irrelevant to whether Giants Stadium valued the Swaps reasonably and in good faith in October 2008.  In the

---

(*...continued footnote*)

an early termination of those payments."  (Obj. ¶ 60.)  That risk of termination seemingly rests on Debtors' speculation that Giants Stadium would either default or refinance the Bonds prior to the end of the term of the Swaps.  (*See* Obj. ¶¶ 57-59.)

same way that Giants Stadium has not relied on the spike to 15% in the rates generated on the FSA-insured, Goldman-underwritten bonds in February 2009, *see supra* ¶ 43, to revise its Loss calculation upwards, Debtors cannot rely on a subsequently improved credit environment to revise Giants Stadium's October 2008 Loss calculation downward.

105.    In any event, the terms of the Goldman refinancing were much worse for Giants Stadium.  Paragraph 4 of the Confirms only permitted LBSF to force a refinancing of the Bonds "with another series of securities of identical maturity."  (Confirm ¶ 4.) Because the term of the Bonds was 40 years and the term of that refinancing with Goldman was one year, Debtors would have had no right to impose the terms of the refinancing on Giants Stadium.  In addition, Giants Stadium was not obliged to consent to a refinancing under Paragraph 4 that would "result in any additional cost, risk or loss of financial or business flexibility."  (*Id.*)  Because the refinancing with Goldman involved terms that resulted in a considerable loss of financial and business flexibility (*e.g.*, the owners of Giants Stadium guaranteed the refinancing and accepted significant restrictions on their dividends and financial covenant protections to Goldman), Debtors could not have forced the transaction for this further reason.[16]

106.    Indeed, Debtors also fail to explain how they or any other counterparties during the midst of the rolling financial crisis would have been able to bear the significant

---

[16]    Debtors appear to base their refinancing argument not only on the refinancing with Goldman in 2009 but on a further refinancing with Goldman in 2010. (*See* Obj. ¶ 49.) Misplaced with respect to the refinancing in 2009, Debtors' refinancing argument with regard to the further refinancing equally strays from the mark insofar as the terms of this refinancing are similarly dissimilar from the Bonds, occurred close to *two years after September 2008*, and involved materially different types of bonds that had several features less favorable to Giants Stadium than the Bonds.

costs associated with refinancing "with another series of securities of identical maturity,"

which the terms of Paragraph 4 would have required them to bear. ██████ Redacted ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

107.    In short, Debtors' argument based on Paragraph 4 in general, and in particular with regard to the refinancing with Goldman, ignores the contractual and practical requirements of exercising any right therein.[17]

## V.    DEBTORS' EQUITABLE SUBORDINATION CLAIM IS BASELESS.

108.    Debtors predicate their novel equitable subordination claim on Giants Stadium's alleged "bad faith and inequitable conduct" in filing amended proofs of claim ("Amended Claims") on December 6, 2011 that increased Giants Stadium's claim amount from $301,804,617.14 to $585,210,327.94.    (Obj. ¶ 65.)    As noted *supra* ¶ 16, these

---

[17]    Debtors' argument that the NFL's agreements with Giants Stadium and the New York Football Giants that were tied to the financing of the New Meadowlands Stadium would have made any refinancing more attractive to potential lenders (*see* Obj. ¶¶ 45-48) rests on speculation about the weight such potential lenders would have placed on those agreements, all of which were in place while LBI was frantically (and unsuccessfully) searching for refinancing in 2007 and 2008, and were clearly not sufficient incentive for any lender to enter into the refinancing transaction prior to the Lehman bankruptcies.    In any event, Debtors misconstrue and overstate the nature of the agreements involving the NFL and New York Football Giants that purportedly strengthened the attractiveness of the Bonds.    For example, the right that the NFL possessed to cure any default on the Bonds was not a guarantee that any holder of the Bonds could enforce, and its future exercise was far from certain.

Amended Claims quantified previous categories of damages identified in Giants Stadium's October 2008 calculation of Loss served on LBSF.

109.    In light of Judge Peck's concern that the increased claim amount arising out the amendments would likely be a source of "exasperation" for those at the "negotiating table" (*see* Obj. ¶ 27), and in response to Debtors' argument that the amended claims were untimely and Debtors' agreement to drop their meritless *ipso facto* argument, Giants Stadium entered into a stipulation expressly *waiving* its right to pursue these higher damages theories and reinstating the originally filed Claims. (*See* Stipulation ¶ 5 (ECF No. 32).)

110.    Unsatisfied with the reduction in potential liability that accrued to Debtors' estate as a result of Giants Stadium's concession, Debtors perversely have used the parties' stipulation as an opportunity to file a revised Objection to advance their baseless equitable subordination theory. (Obj. ¶¶ 65-70.)

111.    This claim is meritless on its face. Equitable subordination is "an extraordinary remedy that is to be used sparingly." *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009). Where, as here, the creditor is not an insider, Debtors must establish that Giants Stadium "committed fraud, overreaching or spoliation to the detriment of others." *In re W.T. Grant Co.*, 4 B.R. 53, 75 (Bankr. S.D.N.Y. 1980), *aff'd*, 699 F.2d 599, 609 (2d Cir. 1983). As this Court recently recognized, the *sine qua non* of an equitable subordination claim is a showing that "'[t]he claimant . . . engaged in some type of inequitable conduct.'" *LightSquared Inc.* v. *SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 347 (Bankr. S.D.N.Y. 2014) (quoting *Benjamin* v. *Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692,

700 (5th Cir. 1977)).  "[I]nequitable conduct means, among other things, 'a secret or open fraud'" or "'enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.'"  *Id.* at 347-48 (quoting *80 Nassau Assocs.* v. *Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).

112.    Debtors attempt to meet this high bar with the conclusory allegation that the mere act of filing the Amended Claims was inconsistent "with the 'basic concepts of good faith that are fairly to be expected of chapter 11 creditors.'"   (Obj. ¶ 66 (quoting *LightSquared*, 511 B.R. at 360).)  Amending a proof of claim in the ordinary course to quantify damages theories expressly identified and reserved in the original proof of claim, and providing a fulsome explanation for those theories, manifestly does not "shock[ ] one's good conscience."  *LightSquared*, 511 B.R. at 347.  This is particularly so here, where Debtors' own expert's valuation of the Bonds would result in a higher claim amount for Giants Stadium.  (*See supra* ¶ 94.)

113.    Moreover, Giants Stadium's willingness to waive these theories evidences its *good* faith in this litigation—a stark contrast to Debtors' scorched earth litigation posture.

114.    In any event, the terms of the confirmed Plan preclude the Debtors from attempting to equitably subordinate the Giants Stadium claims under § 510(c) of the Bankruptcy Code,  because the Plan fails to establish a class for equitably subordinated claims.  Under the Plan, as noted *supra* ¶ 55, once Giants Stadium's claims become "allowed claims," they fall within certain clearly defined classes of claims established

under the Plan for claims against LBSF and LBHI (Senior Third-Party Guarantee Claim or Third-Party Guarantee Claims for LBHI, and General Unsecured Claims for LBSF).

115.    The Plan contemplates that claims can be contractually subordinated (under § 510(a) of the Bankruptcy Code) (*see* Plan §§ 4.13-15) or statutorily subordinated (under § 510(b) of the Bankruptcy Code) (*see* Plan § 4.16).  But the Plan does *not* provide for any parallel separate class for claims that are equitably subordinated under Bankruptcy Code § 510(c), necessitating that the claims remain in the classes described *supra* ¶ 114. Moreover, the Confirmation Order provides that the classification of claims and interests for purposes of Distributions under the Plan "shall be governed *solely* by the terms of the Plan" (Confirmation Order at 25 ¶ 7), and the "solely-governing" terms nowhere provide for the sub-classification and disparate treatment of claims within a Plan class through equitable subordination.

116.    Section 1123(a)(4) of the Bankruptcy Code expressly requires that a plan "provide for the same treatment of each claim . . . of a particular class . . . unless the holder of a particular claim . . . agrees to a less favorable treatment of such particular claim."  This provision embodies the  cardinal principle of bankruptcy law that "each claim in the same class must receive the same treatment"—a principle that equitably subordinating Giants Stadium's claims would violate. *Chateaugay Corp.* v. *Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, No. 93-8444A, 1993 WL 563068, at *4 (Bankr. S.D.N.Y. Dec. 27, 1993).  Equitable subordination of some claims within a given class, but not others, is barred as impermissible disparate treatment. *See id.* ("To allow subordination of [a creditor's] claims would result in the disparate treatment of [that creditor's] claims as compared to claims that were in the same class under the Plan.").

117.    Thus, if claims are to be equitably subordinated and separately classified following confirmation of a plan, the applicable plan must establish a separate class for equitably subordinated claims, as was done, for example, in the Enron case.  *See*, *e.g.*, Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, and Related Relief 28, 78, *In re Enron Corp.*, Chapter 11 Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15, 2004), ECF No. 19759.  As the Plan here established no separate class for claims that are equitably subordinated, Debtors "cannot succeed in implementing this disparate treatment now that the Plan has been voted on and is confirmed."  *In re Chateaugay Corp.*, 1993 WL 563068, at *4.

## CONCLUSION

118.    For the foregoing reasons, the Court should overrule Debtors' Objection and allow Giants Stadium's Claims as filed.  Giants Stadium reserves its right to seek discovery pursuant to the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Procedure, any other applicable provisions of law, and the discovery protocol between Giants Stadium and Debtors, dated April 1, 2013.  Giants Stadium further reserves its right to request an evidentiary hearing for which this Court provides notice pursuant to Federal Rule of Bankruptcy Rule 9014(e) and Local Rule of Bankruptcy Procedure 9014-2.

Dated:  New York, New York
       October 7, 2014

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

By:   /s/ _____

     Bruce E. Clark
     Matthew A. Schwartz
     Thomas C. White
     SULLIVAN & CROMWELL LLP
     125 Broad Street
     New York, New York 10004
     Telephone: (212) 558-4000
     Facsimile: (212) 558-3588

     *Attorneys for Giants Stadium LLC*