# EXHIBIT Y PT. 2

### EXHIBIT A

Form of Requisition

**REQUISITION NO.**

TO: _____
as Trustee

FROM:    Giants Stadium LLC

Ladies and Gentlemen:

You are requested to draw from the Construction Fund, established by Section 502 of the Indenture of Trust, dated as of August 1, 2007, as supplemented and amended (the "Indenture"), between Giants Stadium LLC (the "Company") and yourself, a check or checks, or to make a wire transfer or transfers, in the amounts, payable to the order of those persons and for the purpose of paying those costs set forth on Schedule A attached hereto. All capitalized terms used in this Requisition not otherwise defined herein shall have the meanings given such terms by the Indenture.

I hereby certify that

(1)    I am an Authorized Representative of StadCo;

(2)    the number of this Requisition is ___;

(3)    no Event of Default has occurred and is continuing under the Indenture, the Bonds, or any Parity Obligation;

(4)    the requested amount will be used solely to pay Costs of the Project or for other uses permitted by the Indenture or any Supplemental Indenture, and no part nor the whole of such amount will be taken by StadCo as a fee;

(5)    if the requisition is to pay third-party invoices from contractors, then based solely on reports received from the Design-Builder or another applicable contractor, the work for which the requisitioned funds are sought has been satisfactorily performed in all material respects in a good and workmanlike manner and according to the Design-Build Contract or other applicable contract, or if not, the amounts to be withdrawn are amounts StadCo is legally obligated to pay with respect to the current condition of the work;

(6)    to the best of StadCo's knowledge, the sum of (i) undisbursed funds in the Construction Fund, together with funds from other available sources, the remaining series of Initial Bonds not yet issued and any Completion Bonds (whether or not yet issued), and (ii) funds available to Other StadCo (including sources of Other StadCo comparable to those listed in clause (i)), are reasonably expected to be sufficient to substantially complete the Project in accordance with the Project Budget within one year of the Outside Substantial Completion Date (as the Outside Substantial Completion Date may be extended as a result of any Force Majeure Event).

10662025.17

CONFIDENTIAL                                    GStad_LB_0006972

Attached to this Requisition is a schedule of or copy of the bills, invoices or other documents evidencing and supporting this Requisition.

Dated: _____

**GIANTS STADIUM LLC**

By: _____
Name:
Title:

10662025

**CONFIDENTIAL**

GStad_LB_0006973

## SCHEDULE A TO REQUISITION NO.

| Amount | Payee (with address and, if applicable, wire instructions) | Purpose |
|--------|------------------------------------------------------------|---------|

10662025

**CONFIDENTIAL**

GStad_LB_0006974

Receipt is hereby acknowledged of a payment in the amount of $_____
in connection with the submission of the attached Requisition.

Giants Stadium LLC


By: _____
Name:
Title:

Date: _____


10662025

**CONFIDENTIAL**                                              **GStad_LB_0006975**

## EXHIBIT A-1

### Form of IE Confirmation of Requisition

TO:    _____
     as Trustee

FROM:_____
     as Independent Engineer

Ladies and Gentlemen:

     In connection with Requisition No. [ ], dated as of [ ] (the "Requisition"), we hereby certify that (i) we have performed such inspections, analyses and other procedures as necessary, in our reasonable judgment, for the purposes of delivering this certificate to _____, as Trustee, and (ii) based on such procedures, we have no reason to believe (A) that the certifications of StadCo set forth in paragraph (5) of the Requisition are not true and correct in all material respects as of the date of the Requisition or (B) that the Project Budget used for purposes of the certifications of StadCo set forth in paragraph (6) of the Requisition is not an adequate budget for the Substantial Completion of the Project based on the facts and circumstances known to us at this time.

               Dated: _____

               _____,
               as Independent Engineer

               By: _____
                   Authorized Representative

10662025

CONFIDENTIAL

## EXHIBIT B

### Insurance Requirements

With respect to the Project, to the extent not maintained by the JV Company, StadCo shall maintain or cause to be maintained the following types of insurance in accordance with the terms of this Exhibit B, until all obligations of StadCo pursuant to the Indenture have been fully discharged, in each case to the extent such insurance is both (a) available on commercially reasonable terms and (b) with respect to the insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, typically purchased by private owners or private lessees/licensees of other professional sports stadiums. All policies will include a waiver of the insurer's rights of subrogation against the Trustee and each Bond Insurer, and provide the Trustee, each Bond Insurer and StadCo with at least thirty (30) days prior written notice of cancellation or non-renewal. All policies will name the Trustee, StadCo and each Bond Insurer as additional insureds, except for any policies where it is not commercially customary or practicable to so name them. Insurance required to be provided hereunder may be effected by so-called "blanket" or umbrella policies of insurance covering the Project and other properties owned or leased by StadCo, the JV Company and/or their respective Affiliates, provided that such policies otherwise comply with the requirements set forth below and specifically allocate to the Project the amount of coverage herein required without risk of reduction or coinsurance by reason of, or damage to, such other properties insured thereunder, or by policies made available by the NFL or its Affiliates. Insurance required by this Exhibit B will be placed only with insurers with Required Ratings (as defined below). The Controlling Bond Insurer shall act reasonably when reviewing the request for an insurer without Required Ratings, having regard to the then current state of the insurance market. (Capitalized terms used herein and not otherwise defined are defined in the Ground Lease.)

"Required Ratings" means, with respect to any insurance company, that such company has at the time of the placement or renewal of insurance a financial strength rating of (a) 'AA-' or better by S&P, (b) 'Aa3' or better by Moody's, or (c) both (1) 'A(IX)' or better from A.M. Best and (2) either 'A' or better by S&P, 'A2' or better by Moody's or 'AA-' or better by Fitch.

A. INSURANCE REQUIRED PRIOR TO SUBSTANTIAL COMPLETION

1.    Commercial General Liability (CGL) in an amount not less than $2,000,000 per occurrence. The policy shall cover liability arising from Premises, operations, independent contractors, products-completed operations, personal injury and advertising injury and liability assumed under an insured contract including, but not limited to, the Ground Lease. If the policy contains a pollution exclusion, StadCo shall maintain or cause the JV Company's general contractor to maintain a separate pollution legal liability policy in such amount covering clean-up costs, bodily injury and property damage.

2.    Automobile liability insurance for all owned, non-owned and hired vehicles insuring against bodily injury, including death, and property damage in an amount not less than $1,000,000 per occurrence.

10662025.17

CONFIDENTIAL

3.    Umbrella and/or Excess Liability insurance sufficient to provide total liability limits of $100,000,000 for General Liability, Auto Liability and Employer's Liability. The coverage of the excess liability policy shall follow the form or otherwise correspond to the form of the primary policy.

4.    Statutory Worker's Compensation coverage including Employer's Liability limits of not less than $1,000,000 each accident for bodily injury by accident and $1,000,000 per employee for bodily injury by disease.

5.    Builder's Risk insurance covering the Improvements in an amount not less than the full completed value of the Project. The policy shall be written on an "All Risk" form and provide coverage for the perils of flood and earthquake, separately in an aggregate amount not less than $250,000,000. The policy shall include coverage for debris removal, demolition and increased cost of construction, interruption by civil or military authority, ingress/egress and terrorism coverage to the extent offered and available under the Federal Terrorism Risk Insurance Act (as extended under the Terrorism Risk Insurance Extension Act of 2005).

6.    Boiler & Machinery insurance covering all boilers and mechanical equipment when connected and ready for use and following electrical, hydrostatic, pneumatic or gas pressure acceptance tests, in an amount not less than $25,000,000.

7.    Owners Protective Professional Indemnity insurance with a minimum limit of $4,000,000 for each claim and annual aggregate applicable solely to the Project. The policy shall be endorsed to provide for an extended reporting period on claims for three (3) years past the Completion Date.

B. INSURANCE REQUIRED POST-CONSTRUCTION

1.    Commercial General Liability (CGL) in an amount not less than $1,000,000 per occurrence.    CGL insurance shall cover liability arising from the Premises, operations, independent contractors, product-completed operations, personal injury and advertising injury, liquor liability and liability assumed under an insured contract including this Agreement. If the Commercial General Liability (CGL) policy provided hereunder shall exclude pollution liability, StadCo shall furnish or caused to be furnished a separate pollution liability policy insuring against liability for bodily injury, property damage and clean-up costs.

2.    Automobile Liability insurance for all owned, non-owned and hired vehicles insuring against bodily injury, including death, and property damage in an amount not less than $1,000,000 per occurrence.

3.    Statutory Workers' Compensation coverage including Employer's Liability limits of not less than $1,000,000 each accident for bodily injury by accident and $1,000,000 per employee for bodily injury by disease.

4.    Umbrella and/or Excess Liability insurance sufficient to provide total liability limits of $100,000,000 for Commercial General Liability, Automobile Liability and Employer's Liability. The coverage of the excess liability policy shall follow the form, or otherwise correspond to the form, of the primary policy or policies.

10662025.17

CONFIDENTIAL

GStad_LB_0006978

5.    "All Risk of Physical Loss" property insurance on all Improvements in an amount not less than the full replacement cost (determined without regard to depreciation of any Improvements and exclusive of foundations and footings) of the insured property. The policy shall provide coverage for loss or damage by fire, lightning, windstorm, hail, explosion, riot, civil commotion, aircraft, vehicles, smoke, other risks from time to time included under "all risk" or "extended coverage" policies, earthquake, flood (provided, that earthquake and flood coverage may be subject to an annual aggregate limit of not less than $100,000,000), certified and/or non-certified terrorism (provided that terrorism coverage may be subject to an annual aggregate limit of not less than $500,000,000), sabotage, collapse, sinkhole, subsidence and such other similar perils. The policy shall also include coverage for debris removal, demolition and increased cost of construction, interruption by civil or military authority, and ingress/egress.

6.    Business interruption insurance shall be maintained under the property and the boiler and machinery insurance (or separate business interruption insurance shall be maintained by StadCo covering all the same risks as the property and boiler and machinery insurance) in an amount not less than Annual Fixed Expenses (as defined below), *provided* that if, at any time, the amount of Annual Fixed Expenses exceeds the difference between (a) contractually-committed Pledged Revenue for the current fiscal year minus (b) any portion of such contractually-committed Pledged Revenue that would not have been due or would have been refundable during such fiscal year assuming no games were played at the Stadium during such fiscal year because of a casualty event (such excess, the "BI Shortfall"), the minimum amount of business interruption insurance required pursuant to this paragraph 6 shall be increased by the BI Shortfall. Under no circumstances will the minimum amount of business interruption insurance required pursuant to this paragraph 6 exceed an amount equal to 200% of Annual Fixed Expenses. "Annual Fixed Expenses" means, at any time, 50% of the aggregate projected amount of Debt Service and operating expenses (assuming no football games are played at the Stadium) for the then current and immediately succeeding fiscal year.

7.    Boiler and Machinery Insurance, applying to the entire heating, ventilating and air-conditioning systems in an amount not less than the full replacement value of such heating, ventilating and air conditioning systems, located on any portion of the Stadium and other machinery located on such portion of the Stadium. Such boiler and machinery insurance can be included in the all risk property policy described above. In the event that the boiler and machinery is not included in the all risk property policy, then both the all risk property policy and the boiler and machinery policy shall contain a joint loss agreement, if applicable.

8.    Garagekeeper's liability insurance with aggregate and per occurrence limits of at least $1,000,000.

C. PROBABLE MAXIMUM LOSS STUDY

At least six months prior to Substantial Completion, StadCo shall procure or cause to be procured a Probable Maximum Loss (PML) study from an independent third-party insurance consultant reasonably approved by the Controlling Bond Insurer to assess appropriate levels of earthquake and flood insurance. If such study concludes that the limits or amounts required above are insufficient or excessive, then the applicable provisions of Part B of this Exhibit shall be amended accordingly.

10662025.17

## D. AVAILABILITY OF INSURANCE COVERAGE

StadCo will notify each Bond Insurer promptly in the event of any determination that it will not procure the insurance listed in Part A or Part B of this Exhibit because StadCo has concluded that such insurance is at any time (a) not available on commercially reasonable terms or (b) with respect to any insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, not typically purchased by private owners or lessees of other professional sports stadiums. Upon the request of the Controlling Bond Insurer, StadCo shall (or shall cause the JV Company to) engage an independent third-party insurance consultant reasonably approved by the Controlling Bond Insurer to advise StadCo and the Controlling Bond Insurer whether such coverage is obtainable on commercially reasonable terms and/or is typically purchased by private owners or lessees of other professional sports stadiums. The advice of the independent third-party insurance consultant shall be for informational purposes and not binding on any party. Notwithstanding anything to the contrary, StadCo shall continue to be obligated to promptly obtain the maximum insurance listed in Part A or B, as applicable, that is both (a) obtainable on commercially reasonable terms and (b) with respect to any of the insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, typically purchased by private owners or lessees/licensees of other professional sports stadiums.

## E.    CURE PERIOD

Notwithstanding any contrary provision of the Indenture, no failure to obtain or maintain any insurance specified in Part A or Part B of this Exhibit, or to comply with the other provisions of this Exhibit B, shall constitute an Event of Default unless such failure is material and has continued uncured for a period of 30 days.

10662025.17

CONFIDENTIAL

GStad_LB_0006980

**EXHIBIT C**

[Form of Deposit Account Control Agreement]

10662025.17

**CONFIDENTIAL**

GStad_LB_0006981

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Agreement is entered into and effective as of _____, 20__ among JETS STADIUM DEVELOPMENT, LLC, a Delaware limited liability company ("Company"), THE BANK OF NEW YORK, a New York banking corporation having an office at 101 Barclay Street, New York, New York 10286, as trustee under the Indenture (as defined below) (together with any successor trustee, the "Trustee"), and _____ ("Bank") with respect to the following:

A.    Bank has agreed to establish and maintain for Company deposit account numbers _____ (together with all cash and other items of value deposited, credited or otherwise held in such accounts and proceeds of any of the foregoing, collectively, the "Account").

B.    Company has granted to Trustee a security interest in the Account and in checks and other payment instructions ("Checks") deposited in the Account pursuant to the Pledge, Assignment and Security Agreement dated as of _____, 2007 for the Trustee's benefit and the benefit of the bondholders under that certain Indenture of Trust, dated as of _____, 2007, between the Company and the Trustee (the "Indenture").

C.    Company, Trustee and Bank are entering into this Agreement, as required by the Indenture, to perfect Trustee's security interest in the Account and such Checks and to provide for the disposition of funds in the Account.

Accordingly, Company, Trustee and Bank agree as follows:

1.    (a)    This Agreement evidences Trustee's control over the Account. Notwithstanding anything to the contrary in the agreement between Bank and Company governing the Account, Bank will comply with instructions originated by Trustee as set forth herein directing the disposition of funds in the Account without further consent of the Company.

(b)    Company represents and warrants to Trustee and Bank that it has not assigned or granted a security interest in the Account or any Check deposited in the Account, except to Trustee.

(c)    Company will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Trustee's security interest referred to herein.

2.    During any Activation Period (as defined below), Bank shall prevent Company from making any withdrawals from the Account. When no Activation Period is in effect, Company may operate and transact business through the Account in its normal fashion, including making withdrawals from the Account, but covenants to Trustee it will not close the Account unless the

10629859

CONFIDENTIAL                                        GStad_LB_0006982

- 2 -

provisions of Section 501 of the Indenture are complied with. Bank shall have no liability in the event Company breaches this covenant to Trustee.

Company and Trustee acknowledge and agree that Bank may debit the Account for any ACH credit entries (the "Entries") that may have been originated by Company but that have not settled at the time of Bank's receipt of any Activation Notice (defined below) or for any Entries that are subsequently returned thereafter.

Promptly following the commencement of any Activation Period and in any event within two Business Days after such date, and continuing on each Business Day thereafter until the next following Deactivation (as defined below), if any, Bank shall transfer all collected and available balances in the Account to Trustee at the following account (as also specified in the Activation Notice (as defined below)):

| | |
|---|---|
| Bank Name: | _____ |
| Bank Address: | _____ |
| ABA No.: | _____ |
| Account Name: | _____ |
| Account No.: | _____ |
| Beneficiary's Name: | _____ |

Such transfers to be made even if they result in the dishonoring by the Bank of items presented for payment from the Account or the Bank not complying with the instructions of the Company.

The "Activation Period" means the period which commences within a reasonable period of time not to exceed two Business Days after Bank's receipt of a written notice from Trustee in the form of Exhibit A (the "Activation Notice") and ends upon Bank's receipt of a written notice from Trustee in the form of Exhibit B (the "Deactivation Notice" and, such ending, "Deactivation"). A "Business Day" is each day except Saturdays, Sundays and Bank holidays. Funds are not available if, in the reasonable determination of Bank, they are subject to legal process preventing their withdrawal. Trustee covenants to Company that it will only give Bank an Activation Notice upon the occurrence and during the continuance of an event described in Section 509(a) of the Indenture; that it will immediately give Bank a Deactivation Notice upon the waiver, cure or other cessation of such event; and that it will give Company a contemporaneous copy of any such notice it gives to Bank.

Notwithstanding anything in this Agreement to the contrary, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy issued by it) may exercise any of the rights and remedies of Trustee hereunder, and shall have the right, at any time, to direct the method and place of conducting all actions to be taken by the Trustee in connection with the enforcement of the terms and conditions of this Agreement; provided, however, that such direction shall not be otherwise than in accordance with the provisions of the NFL Agreement (as defined in the Indenture), Applicable Law (as defined in the Indenture) and the Indenture.

10629859

CONFIDENTIAL                                    GStad_LB_0006983

- 3 -

3.    Bank agrees it shall not offset, charge, deduct or otherwise withdraw funds from the Account for its own benefit, except as permitted by Section 4, until it has been advised in writing by Trustee that all of Company's obligations that are secured by the Checks and the Account are paid in full.  Trustee shall notify Bank promptly in writing upon payment in full of Company's obligations.

4.    Bank is permitted to charge the Account:

(a)    for its normal service charges or fees in connection with the Account as agreed to with Company;

(b)    for the face amount of any Check deposited into the Account and returned unpaid for any reason; and

(c)    for its reasonable fees and expenses in connection with the administration of this Agreement by the Bank as agreed to with Company.

5.    (a)    If the balances in the Account are not sufficient to compensate Bank for any fees or charges due Bank in connection with the Account or this Agreement as agreed to with Company, Company agrees to pay Bank on demand the amount due Bank.

(b)    If the balances in the Account are not sufficient to compensate Bank for any returned Check, Company agrees to pay Bank on demand the amount due Bank.

6.    (a)    Bank will send information regarding deposits to the Account to the address specified below for Company or as otherwise specified in writing by Company to Bank.

(b)    Concurrent with the original Bank statement periodically provided to Company, Bank will provide Trustee with a duplicate of such statement.

(c)    Company authorizes Bank to provide to the Trustee any other information concerning the Account that the Bank may agree to provide to the Trustee at the Trustee's request.

7.    (a)    Bank will not be liable to Company or Trustee for any expense, claim, loss, damage or cost ("Damages") arising out of or relating to its performance under this Agreement other than those Damages which result directly from its acts or omissions constituting negligence or intentional misconduct.

(b)    In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits.

(c)    Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private, or common

10629859

CONFIDENTIAL                                                    GStad_LB_0006984

- 4 -

carrier communications or transmission facilities, equipment failure, or negligence or default of Company or Trustee or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any guideline, rule or regulation of any governmental authority.

(d)    Bank shall have no duty to inquire or determine whether Company's obligations to Trustee are in default or whether Trustee is entitled to provide any Activation Notice or Deactivation Notice to Bank. Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

(e)    Notwithstanding any of the other provisions in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Company, Bank may act as Bank deems necessary to comply with all applicable provisions of governing statutes and shall not be in violation of this Agreement as a result.

(f)    Bank shall be permitted to comply with any order, judgment, decree or injunction or a restraining order or other legal process directing or prohibiting or otherwise restricting the disposition of funds in the Account or any Check and shall not be in violation of this Agreement for so doing.

8.    Company shall indemnify Bank against, and hold it harmless from, any and all liabilities, claims, costs, expenses and damages of any nature (including but not limited to allocated costs of staff counsel, other reasonable attorneys' fees and any fees and expenses) in any way arising out of or relating to disputes or legal actions concerning Bank's provision of the services described in this Agreement. This section does not apply to any cost or damage attributable to the gross negligence or intentional misconduct of Bank. Company's obligations under this section shall survive termination of this Agreement.

9.    Company shall pay to Bank, upon receipt of Bank's invoice, all reasonable third party costs, expenses and attorneys' fees incurred by Bank in connection with the enforcement of this Agreement and any instrument or agreement required hereunder, including but not limited to any such costs, expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a case arising under Title 11, United States Code. Company agrees to pay Bank, upon receipt of Bank's invoice, all reasonable third party costs, expenses and attorneys' fees incurred by Bank in the preparation and administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder).

10.    Termination and Assignment of this Agreement shall be as follows:

(a)    Trustee may terminate this Agreement by providing notice to Company and Bank that all of Company's obligations which are secured by Checks and the Account are paid in full. Bank may terminate this Agreement upon 30 days' prior written notice to Company, Trustee and Controlling Bond Insurer; provided that, prior to the effective date of termination, (i) Bank (x) transfers to Trustee all funds in the Account to the Trustee Revenue Fund established by Trustee pursuant to the terms of the Indenture or (y) transfers all funds in the Account to an account

10629859

CONFIDENTIAL    GStad_LB_0006985

- 5 -

designated by the Company which is subject to a Deposit Account Control Agreement to which Trustee, Company and the relevant depository bank are parties; and (ii) Bank and Company close the Account. Company may not terminate this Agreement unless the provisions of Section 501 of the Indenture are complied with.

(b)    Notwithstanding subsection 10(a), Bank may terminate this Agreement at any time after ten (10) Business Days' written notice to Company and Trustee if either Company or Trustee breaches any of the terms of this Agreement in favor of Bank and such breach is not cured prior to the end of such ten (10) Business Day period; provided that, prior to the effective date of termination, clauses (i) and (ii) in subsection 10(a) are complied with. The Trustee shall forward to the Controlling Bond Insurer (as defined in the Indenture) a copy of the termination notice.

11.    Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of incorporation or formation, by-laws or partnership, limited liability company or operating agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (B) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and (iii) all approvals and authorizations required to permit the execution, delivery, performance and consummation of this Agreement and the transactions contemplated hereunder have been obtained.

12.    (a)    This Agreement may be amended only by a writing complying with Section 1202 of the Indenture and signed by Company, Trustee and Bank.

(b)    This Agreement may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)    This Agreement controls in the event of any conflict between this Agreement and any other document or written or oral statement. This Agreement supersedes all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof.

(d)    If a provision of this Agreement is held invalid or unenforceable in any respect, the validity or enforceability of the remaining provisions will not in any way be affected, it being understood that the invalidity or unenforceability of an affected provision in a particular jurisdiction will not in and of itself affect the validity or enforceability of the provision in any other jurisdiction.

(e)    This Agreement shall be governed by and interpreted in accordance with the laws of the State of _____ (without reference to conflicts of laws principles). Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code as in effect from time to time in any relevant state (the "UCC"), New Jersey shall be deemed to be the Bank's jurisdiction (within the meaning of Section 9-304 of the UCC).

10629859

CONFIDENTIAL    GStad_LB_0006986

- 6 -

(f)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH
PARTY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM OR
PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE ARISING OUT
OF OR DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT.

13.     Any written notice or other written communication to be given under this Agreement shall
be addressed to each party at its address set forth on the signature page of this Agreement or to
such other address as a party may specify in writing. Except as otherwise expressly provided
herein, any such notice shall be effective upon receipt.

14.     Nothing contained in the Agreement shall create any agency, fiduciary, joint venture or
partnership relationship between Bank and Company or Trustee. Company and Trustee agree
that nothing contained in this Agreement, nor any course of dealing among the parties to this
Agreement, shall constitute a commitment or other obligation on the part of Bank to extend
credit to Company or Trustee.

15.     In the event that the Bank has or subsequently obtains by agreement, by operation of law or
otherwise a security interest in the Account or any Checks, the Bank hereby agrees that such
security interest shall be subordinate to the security interests of the Trustee under the Indenture
and this Agreement. Except as permitted under Section 4 of this Agreement, Checks and other
items credited to the Account will not be subject to deduction, set-off, banker's lien, recoupment
or any other right in favor of any person other than the Trustee.   Nothing herein shall affect
Company's obligations under the Indenture to (i) keep and maintain the Account and Checks free
from all liens, security interests and encumbrances other than in favor of the Trustee and as
permitted by the Indenture, and (ii) to do all acts which the Trustee reasonably deems
necessary or desirable to create, perfect, maintain and protect the Trustee's security interest in
and lien on the Account and Checks and the priority thereof.

16. NFL Requirements.  It is acknowledged, understood and agreed that, so long as the letter
agreement, dated as of _____, 2007, by and among the NFL and Jets Stadium
Development, LLC, New Meadowlands Stadium Company, LLC, Secured Party, each Bond
Insurer and the other parties thereto (the "NFL Letter Agreement"; all capitalized terms used in
this NFL Requirements Section and not defined in this Section are defined in the NFL Letter
Agreement) is in effect, and notwithstanding anything in this document or any other Operative
Document to the contrary, (a) the exercise by the Trustee of remedies with respect to the
Collateral under any Operative Document will be made in accordance with the terms and
provisions of the NFL Letter Agreement, the terms, conditions and provisions of which each of
the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the
event of any conflict or inconsistency between the terms of the NFL Letter Agreement and the
terms of any Operative Document (including without limitation this Agreement), the terms of the
NFL Letter Agreement will control.

10629659

CONFIDENTIAL                                    GStad_LB_0006987

*[Signature Page to Deposit Account Control Agreement]*

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

**Jets Stadium Development, LLC**
**("Company")**

By: _____          Address for notices:
Name: Thad Sheely
Title:   Vice President and Treasurer

10629859

CONFIDENTIAL

GStad_LB_0006988

[Signature Page to Deposit Account Control Agreement]

      In Witness Whereof, the parties hereto have executed this Agreement by their duly
authorized officers as of the day and year first above written.

**The Bank of New York, as Trustee**
**("Trustee")**

By: _____           Address for notices:
Name: _____
Title: _____

10629859

**CONFIDENTIAL**                                 **GStad_LB_0006989**

[Signature Page to Deposit Account Control Agreement]

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

_____

("**Bank**")

By: _____        Address for notices:
Name: _____
Title: _____

10629859

CONFIDENTIAL

GStad_LB_0006990

## EXHIBIT A
## DEPOSIT ACCOUNT CONTROL AGREEMENT

[Letterhead of Trustee]

To:    [Bank]
       [Address]
       Attention:  [Person or department]


       Re:    [Name of Company]
              Account No.:_____


Ladies and Gentlemen:

       Reference is made to the Deposit Account Control Agreement dated _____
(the "Agreement") among Jets Stadium Development, LLC, us and you regarding the above-
described account (the "Account").  Please be advised that (a) an event has occurred under
Section 509(a) of the Indenture, (b) the undersigned is entitled, under the Indenture, to deliver this
Activation Notice and (c) our delivery of this Activation Notice is consistent with the NFL
Agreement (as defined in the Indenture).  You are hereby instructed not to accept any direction,
instructions or orders with respect to the Account or the assets credited thereto from any person
other than the undersigned unless otherwise ordered by a court of competent jurisdiction.  In
accordance with Section 2 of the Agreement, we hereby give you notice of our exercise of control
of the Account and we hereby instruct you to transfer funds to our account as follows:

Bank Name:          _____
Bank Address:       _____
ABA No.:            _____
Account Name:       _____
Account No.:        _____
Beneficiary's Name: _____

10629359

CONFIDENTIAL

- 11 -

Very truly yours,


THE BANK OF NEW YORK
as Trustee

By: _____
Name: _____
Title: _____

10629859

CONFIDENTIAL

## EXHIBIT B
## DEPOSIT ACCOUNT CONTROL AGREEMENT


[Letterhead of Trustee]


To:    [Bank]
       [Address]
       Attention:  [Person or department]

           Re:    [Name of Company]
                  Account No._____


Ladies and Gentlemen:

           Reference is made to the Deposit Account Control Agreement dated _____
(the "Agreement") among Jets Stadium Development, LLC, us and you regarding the above-
described account (the "Account").    You are hereby notified that the Notice dated
_____ and previously delivered to you has ceased to be in effect.    Effective
immediately, you may accept direction, instructions or orders with respect to the Account or the
assets credited thereto from the Company unless and until you receive a further Notice from us.

                          Very truly yours,


                          THE BANK OF NEW YORK
                          as Trustee

                          By: _____
                          Name: _____
                          Title: _____


10629859

CONFIDENTIAL

GStad_LB_0006993

## EXHIBIT D

### Indebtedness

Bridge loan pursuant to a Credit Agreement, dated as of April 30, 2007, with an outstanding principal balance of $51,500,000.00 and interest thereon in the amount of $591,611.93 from Goldman Sachs Credit Partners, L.P. to Giants Stadium LLC.

10662025.17

CONFIDENTIAL

GStad_LB_0006994

# EXHIBIT E

[Consents & Approvals]

10662025.17

CONFIDENTIAL

CONFIDENTIAL

GStad_LB_0006996

**NEW MEADOWLANDS STADIUM PROJECT**
**STATUS OF PERMITS AND APPROVALS**

**NMS DRAFT - August 10, 2007**

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 1. U.S. Army Corps of Engineers, New York District (USACE) Jurisdictional Determination | John Duffy | 6/29/06 | 7/11/06 & 7/12/06 | N/A | To USACE on 7/28/06 | Site visit held with USACE 11/22/06. Formal JD letter to be issued by USACE. | No permit required |
| 2. Federal Aviation Administration (FAA) Notice of Proposed Construction or Alteration | John Duffy | 10/27/06 | 11/7/06 | N/A | To FAA on 11/13/06 | Application submitted for stadium building. Public notice issued by FAA on 12/29/06 for ongoing aeronautical study; public comment period ended 2/9/07. Application submitted for construction cranes on 7/25/07. | Determination of No Hazard to Air Navigation issued for Stadium building 2/14/07 Determination of No Hazard to Air Navigation issued for construction cranes 8/6/07 |
| 3. New Jersey Meadowlands Commission (NJMC) and New Jersey Department of Environmental Protection (NJDEP) Consultation Process | John Duffy | Various | Various | Various | PEIS to NJDEP and NJMC on 10/23/06 FEIS to NJDEP and NJMC on 2/2/07 | PEIS submitted 10/23/06. Public hearing with NJMC/NJDEP held 12/13&14/06. Public comment period 11/6/06 through 1/15/07. FEIS submitted to NJMC and NJDEP on 2/2/07. Public notice of FEIS availability issued by NJMC/NJDEP 2/16/07. Coordination meeting held with NJDEP on 2/14/07. | Hearing Officer's Report issued 4/30/07 |
| 4. Master Plan Approval Process | John Duffy | Various | Various | Various | September 2006 (Preliminary Master Plan) March 2007 (Final Master Plan) | Preliminary and Final Master Plan approvals have been granted by NJSEA Board in October 2006 and April 2007 respectively. Resolution authorizing NMS to begin construction approved July 2007. Additional final submissions pending. | N/A |

CONFIDENTIAL

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 5.  NJDEP Stream Encroachment Permit | John Duffy | 11/22/06 | 12/6/06 & 12/15/06 | N/A | To NJDEP on 12/29/06 | Application submitted 12/29/06. Jurisdictional Determination request submitted to NJDEP concerning Waterfront Development and Coastal Zone Management Consistency Determination on 1/25/07.  Meeting held with NJDEP 1/23/07.  Application complete 1/2/07; under 90-day rule decision required by 4/2/07. | Stream Encroachment Permit issued 3/21/07; Jurisdictional Determination letter confirming no need for Waterfront Development permit issued 3/7/07 |
| 6.  NJDEP Water Quality Management Plan Consistency Determination | John Duffy | 10/27/06 | 11/7/06 | N/A | To NJDEP on 1/4/07 | Application submitted 1/4/07.  Letter from NJDEP received 3/28/07 requesting evaluation of feasibility of using wastewater recycling treatment system. | Consistency determination issued 6/1/07 |
| 7.  NJDEP Remedial Action Work Plan Approval (Preliminary Assessment, Site Investigation Report, Remedial Action Work Plan, Soil Reuse Plan, Methane Investigation, HazMat Report for Giants Stadium) | John Duffy | 4/17/06 | 5/8/06 | 5/12/06 | PA, SI/RAWP, Soil Reuse Plan and Methane Investigation to NJDEP on 5/12/06 | NJDEP comment letter issued 8/9/06. Response to NJDEP letter submitted 12/12/06.  Supplemental Site Investigation Report drafted; sent to NJSEA 3/1/07 for review.  Perimeter Air Monitoring Plan submitted to NJDEP 4/9/07.  Verbal approvals provided by NJDEP to move forward. | Approval of Remedial Action Work Plan issued 6/28/07 |
| 8.  Brownfields Redevelopment Agreement Application | Ed Shea / Steve Gray | 12/15/06 | 12/20/06 | | To NJCEGTC on 1/12/07 | Agreement submitted to the NJ Commerce, Economic Growth and Tourism Commission on 1/12/07.  Meeting held 2/15/07 with NJCEGTC and NJ Dept of Treasury.  Amended application submitted 3/14/07. | Application approved 5/2/07 |
| 9.  TWA1 - NJDEP Treatment Works Approval (TWA) for sewer line relocation for early construction | John Duffy | 8/4/06 | 8/11/06 | 9/5/06 | To NJDEP on 9/12/06 | Application completed and signed by NJSEA.  Sent to NJDEP 9/12/06. Application sent to East Rutherford for endorsement on 9/12/06.  Endorsement from East Rutherford obtained 2/19/07.  Revised application submitted to NJDEP 4/2/07. | TWA permit issued 4/20/07 |

Page 2 of 6

GStad_LB_0006997

CONFIDENTIAL

GStad_LB_0006998

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 10. TWA2 - NJDEP TWA for additional project flows and revised sanitary collection system | John Duffy | 9/1/06 | 9/19/06 | 10/13/06 | To NJDEP on 1/19/07 | Application submitted to NJDEP on 1/19/07. Application submitted to East Rutherford for endorsement on 1/19/07. Revised application sent to East Rutherford 3/19/07. Application sent to BCUA on 3/23/07 for endorsement. East Rutherford and BCUA endorsements received 4/26/07 and sent to NJDEP. | TWA permit issued 6/21/07 |
| 11. NJDEP New Jersey Pollutant Discharge Elimination System (NJPDES) Permit and TWA for construction dewatering | John Duffy | 12/20/06 | 1/8/07 | N/A | To NJDEP 1/17/07 | NJPDES application submitted to NJDEP 1/17/07. TWA application submitted 3/8/07 to NJDEP and to East Rutherford for endorsement. Endorsement received from East Rutherford 4/26/07 and sent to NJDEP. | NJPDES permit issued 2/22/07; TWA issued 5/24/07 |
| 12. NJDEP Water Main Extension Certification | John Duffy | 10/30/06 | 11/17/06 | | To NJDEP on 1/31/07 | Application submitted to NJDEP and United Water on 1/31/07. Revised application submitted 4/5/07 to United Water. Final application submitted to NJDEP 6/15/07. | Water Main certification approval expected August 2007 |
| 13. New Jersey Department of Community Affairs (NJDCA) Boring Variation Request and Plan Approvals | John Duffy | | | | | Site utility and pile/pile cap packages submitted to DCA in March 2007; additional packages to be prepared and submitted. | DCA issued approvals for pile work and site utilities |
| 14. Bergen Soil Conservation District Soil Erosion and Sediment Control Plan Certification and NJPDES General Permit for Construction Activity Stormwater | John Duffy | 1/23/07 | 1/29/07 | N/A | | Application submitted to BCSCD 2/26/07. Revised plans submitted 3/30/07. | Certification approval issued 5/1/07 |
| 15. New Jersey Department of Transportation (NJDOT) Major Access Permit | John Duffy | | | | Application submitted to DOT 8/8/06 | Major Access Permit Application/Scope of Study documentation submitted 8/8/06 to NJDOT; revised Scope of Study submitted 11/7/06; NJDOT approved Scope of Study by letter dated 12/20/06; revised Traffic Study submitted to NJDOT 2/2/07; deed submitted. | Approval expected August 2007 |

Page 3 of 6

CONFIDENTIAL

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Page 4 of 6

GStad_LB_0006999

CONFIDENTIAL

GStad_LB_0007000

| PERMIT/APPROVAL | LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 16. NJ DCA<br>Site Underground Electrical Utilities Permit | Tom Webb | 2/15/07 | | | 5/11/07 | Permit # 07-0262 | 5/11/07 |
| 17. NJ DCA<br>Pile Permit | Tom Webb | 3/16/07 | 5/4/07 | 5/10/07 | 5/21/07 | Permit #07-0262 | 5/21/07 |
| 18. NJ DCA<br>Trailer Permits – Electrical & Plumbing | Tom Webb | | | | 5/31/07 | Permits #07-0302 (Safety Trailer), 07-0296 (#1), 07-0297 (#2), 07-0298 (#3), 07-0299 (#4), 07-0300 (#5), 07-0301 (#6), 07-0361 (Conf Rm) | 5/31/07 – Offices<br>6/19/07 – Conf Rm |
| 19. NJ DCA<br>Temporary Electric Permit | Tom Webb | 5/4/07 | 5/9/07 | 5/16/07 | 6/6/07 | Permit #07-0284 | 6/6/07 |
| 20. NJ DCA<br>Footing/Foundation Permit | Tom Webb | 3/16/07 | 5/4/07 | | 6/6/07 | Permit #07-0262A | 6/6/07 |
| 21. NJ DCA<br>Building Underground Electrical Permit | Tom Webb | 3/1/07 | 4/5/07 | 4/11/07 | 6/25/07 | Permit #07-0262+B | 6/25/07 |
| 22. NJDCA<br>Building Underground Plumbing Permit | Tom Webb | 3/16/07 | Numerous, latest 8/1/07 | Numerous, latest 8/3/07 | | Ewing Cole met with Plumbing plan reviewer at DCA on 8/1/07 | Anticipated week of 8/6/07 |
| 23. NJ DCA<br>Underground Electrical Ductbank Permit | Tom Webb | | | | 6/27/07 | Permit #07-0262+C | 6/27/07 |
| 24. NJDCA<br>Escalator Demolition – Gate B | Tom Webb | | | | 6/20/07 | Permit #07-0365 | 6/20/07 |
| 25. NJDCA<br>Electrical – Rackout Switch at TSS-2 SS | Tom Webb | | | | 7/6/07 | Permit #07-0284+A | 7/6/07 |
| 26. NJDCA<br>Electrical Work – Trailer Lot | Tom Webb | | | | 7/12/07 | Permit #07-0418 | 7/12/07 |
| 27. NJDCA<br>Trailer Decks | Tom Webb | | | | 7/18/07 | Permits #07-0296 (#1), 07-0297 (#2), 07-0298 (#3), 07-0299 (#4), 07-0300 (#5), 07-0301 (#6), 07-0361 (Conf Rm) | 7/18/07 |
| 28. NJDCA<br>Structural Permit – Structural Steel | Tom Webb | 7/10/07 | | | | | |

CONFIDENTIAL

| PERMIT/APPROVAL | LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| PROJECTED Plan Reviews/Permits (Approx.) | | | | | | | |
| 29. NJDCA Exterior Wall (Building Envelope) | Tom Webb | 10/22/07 | | | | | |
| 30. NJDCA Building HVAC | Tom Webb | 10/01/07 | | | | | |
| 31. NJDCA Building Plumbing | Tom Webb | 10/01/07 | | | | | |
| 32. NJDCA Building Electrical | Tom Webb | 10/01/07 | | | | | |
| 33. NJDCA Specialty Interior MEP | Tom Webb | Numerous 12/1/07 – 2/1/08 | | | | | |
| 34. NJDCA Building Underground Electrical (Remainder of Site) | Tom Webb | Spring 2008 | | | | | |
| 35. NJDCA Existing Stadium Demolition | Tom Webb | Spring 2010 | | | | | |
| 36. NJDCA COO – Temporary and Permanent | Tom Webb | Spring/ Summer 2010 | | | | | |

• Permit conditions and requirements will need to be addressed upon issuance of permits.

C:\Documents and Settings\dglover\Local Settings\Temporary Internet Files\OLK20\StadiumProjectPermitsApprovalsStatus(08 10 07).doc

Page 6 of 6

GStad_LB_0007001

**EXHIBIT F**

[Reserved]

10662025.17

CONFIDENTIAL                                    GStad_LB_0007002

# EXHIBIT G

## [Reserved]

10662025.17

CONFIDENTIAL

**EXHIBIT H**

[Form of NFL Agreement]

10662025.17

CONFIDENTIAL

GStad_LB_0007004

[            ], 2007

Giants Stadium LLC (the "StadCo")
New York Football Giants, Inc. (the "Club")
John K. Mara (the "Club Controlling Owner")
John K. Mara (the "StadCo Controlling Owner")
Meadowlands Sports Complex
50 State Route 120
East Rutherford, New Jersey 07073

New Meadowlands Stadium Company, LLC (the
"JV Company")
Meadowlands Sports Complex
50 State Route 120
East Rutherford, New Jersey 07073

The Bank of New York, as trustee under the Indentur
executed by StadCo (the "Trustee")
[Address]
[Address]

Financial Guaranty Insurance Company (in its
capacity as Bond Insurer and as Swap Insurer, the
"Controlling Insurer")
[Address]
[Address]
Attention: [        ]

Financial Security Assurance, Inc. (in its capacity
as Bond Insurer and as Swap Insurer, the "Other
Insurer" and together with the Controlling Insurer,
the "Insurers")
[Address]
[Address]
Attention: [        ]

Goldman Sachs Capital Markets, L.P. (in its
capacity as a Swap Counterparty)
85 Broad Street
New York, New York 10004
Attention: Swap Operations

Lehman Brothers Special Financing Inc. (in its
capacity as a Swap Counterparty, and together with
Goldman Sachs Capital Markets, L.P., the "Swap
Counterparties")
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention: Municipal Financial Products - Middle
Office

Re:    Up to $715,000,000 in Senior Secured Bonds of StadCo

Ladies and Gentlemen:

StadCo is entering into the Indenture (as defined below) pursuant to which up to $650,000,000 in bonds
and up to $65,000,000 in Completion Bonds as necessary to fund cost overruns in accordance with the terms of
Paragraph 1(c) hereof (together, the "Bonds") may be issued by StadCo to finance, directly or through the JV
Company, Costs of the Project (as defined in the Indenture). In addition, the Swap Counterparties and StadCo
are entering into certain Qualified Swaps, and the Insurers are providing insurance in respect of certain of
StadCo's obligations under the Indenture and the Qualified Swaps. StadCo's obligations under the Indenture and
the Qualified Swaps are secured by the Security Documents (as defined below). The Requesting Parties
acknowledge and agree that the NFL is, concurrently with the execution and delivery of this Letter Agreement
and the Financing Documents (as defined below), entering into the League G-3 Loan agreement and the related
NFL Support Documents (as such terms are defined below) pursuant to which the League G-3 Loan will be made
by the NFL to StadCo in order to assist in financing the development, design and construction of the New
Stadium.

DC: 2580915-2

Requesting Parties
Page 2

## LIST OF FINANCING DOCUMENTS

In connection therewith, the following documents are being executed and delivered, each (except as otherwise provided) dated of even date herewith (as the same may be amended, modified, supplemented, or replaced from time to time in accordance with the terms hereof, each a "Financing Document" and collectively the "Financing Documents"):

(a)     Indenture of Trust (as amended, modified, supplemented, or replaced from time to time in accordance with the terms hereof, and including any Supplemental Indenture entered into in accordance with the terms hereof, the "Indenture"), by and between StadCo and the Trustee, pursuant to which StadCo may issue Bonds in an aggregate principal amount not to exceed $715,000,000 (any amount of which in excess of $650,000,000 shall be in the form of Completion Bonds as necessary to fund cost overruns pursuant to the terms of Paragraph 1(c) below);

(b)     the Bonds;

(c)     any Qualified Swap;

(d)     the Leasehold Mortgage;

(e)     the Assignment of Leases and Rents;

(f)     the Pledge, Assignment and Security Agreement;

(g)     the Non-Relocation Agreement;

(h)     any Bond Support Facility, Reserve Account Credit Facility, Reserve Account Surety Bond, Reserve Account Surety Guaranty, Debt Service Reserve Surety Bond or Strike Reserve Surety Bond;

(i)     each Insurer's Bond Insurance Policy;

(j)     the Swap Insurance provided by each Insurer;

(k)     each Insurer's Bond Insurance Agreement;

(l)     the Non-Disturbance Agreement from the JV Company in favor of StadCo and the Trustee; and

(m)     any Deposit Account Control Agreements (as each of the documents listed in clauses (b) through this clause (m) is defined in the Indenture).

Each of the Financing Documents evidences or secures the Bonds and/or interest rate swap/protection or insurance arrangements with the Secured Parties to or for the benefit of StadCo. The aggregate principal of the Bonds outstanding at any time shall not exceed $715,000,000 (any amount of which in excess of $650,000,000 shall be in the form of Completion Bonds as necessary to fund cost overruns pursuant to the terms of Paragraph 1(c) below) and the aggregate notional amount of any Qualified Swaps outstanding at any time shall not exceed $715,000,000, in each case without (i) such consents as are required pursuant to the Financing Documents and (ii) the consent of the NFL as required hereunder, which consent the NFL may provide or withhold in its sole and absolute discretion.

**CONFIDENTIAL**

Requesting Parties
Page 3

## DEFINED TERMS AND CERTAIN RELATED AGREEMENTS

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Indenture (or, where not defined therein, then as so defined in the relevant Financing Documents). The following defined terms shall have the meanings specified below:

"Additional Agreements" shall mean any present and future lease, including the StadCo Sublease, the Ground Lease and the Team Sublease, and any other material license or agreement to use or occupy any building, improvement, land, training, practice or other facility, or other real property necessary for or otherwise used in the operation of the Club or the performance by the Club of NFL games or other NFL-related events and to which the JV Company or any Club Party is a party or otherwise is bound, other than any such lease, license or agreement that is: (a) not material to the financing, revenues, or other operations of the Club or the ability of the Club to play its football games in accordance with the NFL Constitution; or (b) entered into in connection with the grant of naming rights, Advertising (as such term is defined in the StadCo Sublease), or other local sponsorship rights, Suites, Club Seats and other seating rights, Concession Agreements or other similar rights to use or occupy the New Stadium during NFL games or events, or for non-NFL events, in each case in the ordinary course of the operation of the New Stadium or otherwise of the type customarily or reasonably expected by NFL member clubs or owners, operators or master lessees of stadiums in connection with the economic exploitation of their stadiums, but in each case only to the extent that the same do not interfere with the operations of the Club or the ability of the Club to admit ticketed fans and play its football games in accordance with the NFL Constitution.

"Additional Premises" shall mean those premises (other than the Existing Stadium and the New Stadium) that are the subject of any Additional Agreement.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For purposes of this Letter Agreement, (a) StadCo, the JV Company and the Club, on the one hand, and the NFL, on the other hand, shall not be considered to be Affiliates of each other, (b) the member clubs of the NFL (other than the Club) and other NFL-related entities (including the Affiliated NFL Parties) shall not be considered to be Affiliates of the Club, the JV Company or StadCo, (c) the JV Company shall not be considered an Affiliate of StadCo or the Other StadCo (and accordingly StadCo shall not be considered an Affiliate of the Other StadCo) and (d) StadCo shall not be considered an Affiliate of the Club.

"Affiliated NFL Parties" shall mean, collectively, NFL Ventures, NFL Productions, NFL Enterprises, NFL Properties, NFL International, all of the NFL member clubs (except the Club), any successor or future entity that is, directly or indirectly, jointly owned and/or controlled by all or substantially all of the NFL member clubs, or owns assets that produce revenues that are required to be shared with other NFL member clubs under the NFL Constitution (including any such entity controlled by the NFL member clubs and the Club collectively) and each and all of their respective Affiliates, subsidiaries, successors and assigns, and their respective direct or indirect owners, directors, officers, agents, consultants, investment bankers, advisors, attorneys, trustees and employees (including the Commissioner of the NFL).

"Authority" shall mean the New Jersey Sports and Exposition Authority, a body corporate and politic existing under the laws of the State of New Jersey.

"Bond Insurance Termination Event" shall mean a termination by the Trustee of the Bond Insurance Policies in accordance with the terms thereof.

"Business Day" shall mean any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in New York City, New York.

 GStad_LB_0007007

Requesting Parties
Page 4

"City" shall mean the City of East Rutherford of the State of New Jersey.

"Club" shall mean the addressee identified above as such, which is the holder of the Franchise.

"Club Assessments" shall mean any assessments, fines, charges and other levies and payment obligations (including without limitation sharing payments of gate receipts as required under the NFL Constitution) imposed on the Club, or (to the extent so permitted by the NFL Constitution) on the JV Company, or on StadCo or any other Club Party, by the Commissioner or the NFL Management Council.

"Club Debt" shall mean the aggregate debt (as defined in NFL Finance Committee Resolution FC-3, adopted March 16, 1988, as the same may be amended from time to time) incurred directly or indirectly by:

(a)    the Club; and/or

(b)    StadCo, the Club Controlling Owner, the StadCo Controlling Owner, the JV Company and/or any other principal and/or controlling owner of the Club or StadCo (which, for purposes of this Letter Agreement shall be deemed to include the ultimate beneficial holder as well as any intermediate holders of any principal and/or controlling ownership interests in the Club or StadCo, as applicable) or other Affiliated entity of any of them, to the extent such debt incurred directly or indirectly by the principal and/or controlling owner or Affiliated entity is (A) secured, directly or indirectly, by such owner's or holder's interests in the Club, StadCo or the JV Company, (B) secured in any manner by any asset(s) of the Club or StadCo or any other Football Related Assets (including without limitation by way of a direct obligation upon, or the guaranty of such obligation by, any such Affiliated entity that owns Football Related Assets), or (C) in any manner (including by way of guaranty, suretyship or other contingent liability) a liability or obligation of the Club or StadCo or any such Affiliated entity that owns Football Related Assets.

"Club Parties" shall mean, collectively, StadCo, the Club, the Club Controlling Owner, the StadCo Controlling Owner and any other Person holding a direct or indirect ownership interest in the Club (or any direct or indirect subsidiary of the Club) or StadCo. References herein to "interests" in any Club Party (including without limitation the Club and StadCo) shall include all direct or indirect ownership interests in the applicable Club Party, including, without limitation, ownership interests in any and all intermediary entities holding direct or indirect ownership interests in such Club Party.

"Collateral" shall mean, at any time and from time to time, any and all current or future assets of, and any and all interests, direct or indirect, in StadCo, any other Club Party or the JV Company that secure or purport to secure (or are at any time or from time to time hereafter obtained in satisfaction of) any of the Obligations, including, without limitation (a) those assets and interests pledged as security to or on behalf of the Secured Parties pursuant to any of the Financing Documents and (b) any and all such interests or assets, if any, against which a lien is obtained (or which are realized against) by or on behalf of a Secured Party pursuant to a judgment lien or Judgment Order.

"Commissioner" shall mean the Office of the Commissioner of the NFL established pursuant to the NFL Constitution.

"Consent Date" shall mean the fifth (5th) Business Day following the delivery by the Trustee, the Controlling Insurer or any other Secured Party to the NFL of a Foreclosure Notice, or, in the event that neither the Trustee, the Controlling Insurer nor any other Secured Party shall have delivered such Foreclosure Notice as required by the terms of this Letter Agreement, then the fifth (5th) Business Day following the delivery by the

CONFIDENTIAL

Requesting Parties
Page 5

NFL of a notice to the Trustee and the Controlling Insurer pursuant to Paragraph 5(c) hereof (unless the Foreclosure to which such NFL notice related shall have been cured as permitted thereby).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Damages" shall mean any and all damages (including all charges, claims, costs, expenses, liabilities, and losses of any kind whatsoever, together with reasonable legal fees in respect of any such matters).

"Debt Limit" shall mean, at any time, the maximum aggregate principal amount of Club Debt from time to time permitted to be outstanding pursuant to the terms of the NFL Constitution, taking into account any exceptions (including without limitation that certain debt ceiling waiver contained in 2007 NFL Resolution JC-5 and referred to in Paragraph 1 of this Letter Agreement) made by the Commissioner, the NFL or any of its duly authorized committees (in each case as applicable under the NFL Constitution) to permit a particular NFL member club, its Affiliates and/or stadium company(ies) to incur Indebtedness in excess of such maximum amount or any temporary increases in such amount permitted at the discretion of the Commissioner for NFL member clubs generally.

"Default" means any event which, with the giving of notice or the lapse of time or both, could constitute an Event of Default.

"Event of Default" shall mean any Event of Default under the Indenture or any other Financing Document.

"Existing Stadium" shall mean that certain stadium known as Giants Stadium and described in the Existing Stadium Lease.

"Existing Stadium Lease" shall mean that certain Lease Agreement dated August 26, 1971, by and between the Club and the Authority, as amended by those certain First through Nineteenth Amendments thereto, dated as of June 30, 1972, October 14, 1972, November 28, 1972, December 31, 1972, February 28, 1973, March 31, 1973, May 30, 1973, June 30, 1973, July 30, 1973, September 17, 1973, September 20, 1973, October 24, 1973, November 15, 1973, December 28, 1973, October 17, 1995, October 17, 1995, September 27, 1996, November ___, 1996, and July 13, 2000, respectively, as supplemented by that certain letter agreement, dated October 17, 1995, and as further amended, restated, modified or supplemented from time to time in accordance with the terms thereof.

"Final Order" shall mean a final, non-appealable determination by a court or other entity having jurisdiction over the matter of the right of the Secured Parties to commence Foreclosure or the right of the NFL to conduct the sale process as set forth herein.

"Financing Documents" is defined in the list of Financing Documents under the heading "List of Financing Documents."

"Football Collateral" shall mean any and all Football Related Assets that may at any time or from time to time constitute Collateral, whether owned by StadCo, the StadCo Controlling Owner, any other Club Party or the JV Company and including any and all interests, direct or indirect, in the Club, StadCo, or any other party that owns Football Related Assets that may at any time or from time to time be pledged or in any manner secure (or be obtained in satisfaction of) any of the Obligations, including such assets or interests obtained pursuant to a judgment lien.

CONFIDENTIAL

Requesting Parties
Page 6

"Football Related Assets" shall mean the Franchise and/or any and all of the assets (i) related to the operation of the Club or the performance or exhibition by the Club of NFL games in which it is a participant, or (ii) arising out of, created or issued by virtue of, as a result of, or in connection with the admission or current status of the Club as a member club of the NFL. Football Related Assets shall include, by way of example and not of limitation, all: player contracts; uniforms; playing and practice equipment; the Existing Stadium Lease; all interests in the New Stadium, including without limitation the StadCo Sublease, Team Sublease, Ground Lease, any other Additional Agreements and any agreements of the type excluded from the definition of the term Additional Agreements pursuant to clause (b) thereof that relate to the performance or exhibition by the Club of the Team's NFL games or NFL events; and any other rights of the Club Parties (or any of them) or the JV Company arising out of the use of or access to the New Stadium for the Team's games or events; ticket revenues, club seat premium revenues and suite revenues relating to NFL games or NFL events; revenues from naming rights, advertising and other local sponsorship rights relating to the Team or NFL games or NFL events; parking and concessions revenues (other than any such rights or revenues paid solely in respect of non-football events); rights to receive television, radio, online and other media distribution rights, revenues or contracts in respect of NFL games or NFL events; rights to participate in revenue sharing or other NFL programs; rights granted under any NFL collective bargaining agreements; equity interests in or rights to receive distributions from any entity that is jointly owned by all or substantially all of the NFL member clubs, or any other assets that produce revenues that are required to be shared with other NFL member clubs under the NFL Constitution. For the avoidance of doubt, the term Football Related Assets shall be deemed also to include the Club Parties' rights to use the Existing Stadium and all Additional Premises for the operation of the Club or the performance or exhibition by the Club of the Team's NFL home games or other NFL-related events, and the Club Parties' and the JV Company's interest in all Project revenues (excluding only (x) Project revenues received by the JV Company or StadCo to the extent attributable to the Other StadCo, Other Club or their respective Affiliates and (y) Project revenues attributable to non-NFL football events). "Football Related Assets" shall in no event include any rights or revenues relating solely to an Ancillary Component or the Racetrack (each as defined in the Ground Lease), which rights or revenues shall be exploited exclusively through an Ancillary Newco (as defined in the JV Company's Operating Agreement).

"Foreclosure" shall mean the foreclosure upon (including by voluntary delivery of a deed in lieu thereof), the seizure, sale of, set-off or other realization upon or against, the enforcement (or, other than in accordance with the consent given herein and each of the terms hereof, any assertion) of a security interest or other Lien on, or any other attempted disposition of or exercise of dominion or control over, or exercise of any remedies with respect to, all or any portion of the Collateral, or the commencement of an involuntary proceeding against, or the filing of an involuntary petition in a court of competent jurisdiction seeking relief under the United States Bankruptcy Code (as now constituted or hereafter amended), or any other federal or state bankruptcy, insolvency, receivership or similar law, against StadCo, or the JV Company or any other Club Party that now or hereafter owns, holds or controls any Collateral, whether pursuant to or in accordance with any Operative Document or otherwise, or any other conveyance (including without limitation a conveyance made pursuant to a lease or sublease other than the Ground Lease, StadCo Sublease or Team Sublease) of an interest in the Collateral that the Secured Parties may be entitled to effect following obtaining a judgment lien or Judgment Order or as a remedy under or in connection with any Operative Document or otherwise (including without limitation any such conveyance or other disposition as the result of the Trustee or any other Secured Party having filed an involuntary proceeding, or StadCo or the JV Company or any other Club Party that now or hereafter owns, holds or controls any Collateral having filed a voluntary petition, under any federal or state bankruptcy, insolvency, receivership or other similar law). For the avoidance of doubt:

    (a)    the term "Foreclosure" shall include, without limitation:

        (i)    except as otherwise expressly permitted by clause (b) of this definition, at any time, the transfer or other disposition, during any Standstill Period and whether effected by StadCo, the Trustee, at the direction of the Controlling Insurer, or by mandatory

GStad_LB_0007010

Requesting Parties
Page 7

operation of the Indenture, of the monies in any Fund to any other Fund or Account
pursuant to any or all of Articles IV or V, or Sections 902, 905, or 909 of the Indenture
including without limitation any mandatory redemption (other than scheduled principal
amortization structured as a mandatory redemption) or any transfers by the Trustee of the
monies in the Trustee Revenue Fund or out of the Trustee Operating Fund (other than in
payment of the Operating Expenses of StadCo);

(ii)    except as otherwise expressly permitted by clause (b) of this definition, the
exercise by the Trustee of its control rights under any Deposit Account Control
Agreement (established pursuant to Section 501 of the Indenture or otherwise);

(iii)    except as otherwise expressly permitted in clause (b) of this definition, any
transfers by or at the direction of StadCo pursuant to Section 503 (unless and solely to the
extent that the NFL shall have expressly so consented to such transfers in respect of
Improvements made after Substantial Completion, at the time of the Supplemental
Indenture authorizing such Improvement), Sections 504(c)(iii) through 504(c)(x), 504(f),
the funding of any deficiency in the Senior Lien Debt Service Reserve Fund from the
Operating Fund of other Funds, Accounts, and Subaccounts under the Indenture, as
contemplated in Sections 506(a)(iv) or (v), Section 506A(e), the funding of any
deficiency in the Second Lien Debt Service Reserve Fund from the Operating Fund or
other Funds, Accounts, and Subaccounts under the Indenture, as contemplated in Section
507(a)(iv), the substitution or new provision of any Reserve Account Credit Facility
pursuant to Sections 506(b) or 507(b), Sections 508(b), 509(b), 509(d)(i) or 609(p)(ii), in
each case during any Standstill Period, unless, as of the date of such transfer, neither the
Trustee nor the Insurers shall have known of the existence of such Event of Default and
provided that upon receipt of notice of such Event of Default, the Trustee shall promptly
reinstate all such Funds and transfers as have been effected pursuant to such Sections
since the date on which such Event of Default shall have first occurred to the extent that
such Funds are in the possession of the Trustee, the Insurers or any of their respective
Affiliates at the time the Trustee or the Insurers receives notice of such Event of Default;

(iv)    the exercise by the Trustee and/or the Controlling Insurer of their respective
remedies (including without limitation the exercise of any right to assume control of the
Project construction) pursuant to Sections 902, 903 and/or 905 of the Indenture (other
than actions (x) pursuant to Section 903(a) solely to the extent necessary to assert or
perfect the validity of the Trustee's interest in the Collateral, or (y) permitted pursuant to
the first proviso of paragraph 2(b)(i) hereof), unless the NFL has consented to the
exercise of such rights;

(v)    any exercise by the Trustee or any other Secured Party of any right to assume
management or control of the construction of the Project or the operation of the New
Stadium (or any portion thereof);

(vi)    any early termination (other than in connection with a refinancing approved in
writing by the NFL or a voluntary prepayment or redemption of the Bonds by StadCo) or
acceleration of all or any part of the Obligations; and

(vii)    subject to the express terms of Paragraph 5(r), collecting money damages from
the Club for breach of the Club's obligations under the Non-Relocation Agreement; but

(b)    such term shall not include:

CONFIDENTIAL    GStad_LB_0007011

Requesting Parties
Page 8

      (i)    Permitted Standstill Period Payments (the making of which shall not, of itself, constitute a Foreclosure hereunder); or

      (ii)    any transfer of funds pursuant to the provisions of the Indenture (other than Permitted Standstill Period Payments) following the occurrence of an Event of Default of which the Trustee is unaware; provided that upon receipt of notice of such Event of Default, the Trustee shall (unless impossible) promptly reinstate all such transfers of funds among the Accounts as shall have been effected pursuant to the Indenture since the date on which such Event of Default shall have first occurred.

The term "Foreclose" shall also include any conduct or other action taken in furtherance of, or otherwise attempting to effect or cause, Foreclosure.

"Foreclosure Cure Expiration Date" shall mean the date which is the earliest to occur of (a) sixty (60) calendar days following the NFL Foreclosure Notice Date; (b) the date on which any Foreclosure Notice is delivered by a Secured Party hereunder; and (c) the date on which any of the conditions in clauses (A), (B), or (C) of Paragraph 5(c)(ii) shall no longer be met.

"Foreclosure Notice" shall mean any notice sent by or on behalf of any Secured Party to StadCo, any other Club Party, the JV Company, their counsel, or any of the other agents or representatives of StadCo or any other Club Party or the JV Company, in respect of any default (including without limitation any Default or Event of Default) with respect to the Operative Documents and setting forth such Secured Party's intention to effect a Foreclosure or other proceeding against any Collateral or otherwise against StadCo, any other Club Party or the JV Company with respect to a Default or Event of Default; provided that a notice by the Trustee or the Controlling Insurer to StadCo or another Club Party or the JV Company demanding that StadCo or the JV Company or such other Club Party perform or comply with one or more of its obligations under the Financing Documents without setting forth an intention to effect a Foreclosure or initiate another similar proceeding shall not constitute a Foreclosure Notice.

"Franchise" shall mean the membership of the Club in the NFL and any rights of the Club to be, or receive benefits as, a member club of the NFL, whether or not evidenced by a written franchise agreement (including, without limitation, the authority to operate a professional football club of the NFL in a designated city).

"Ground Lease" shall mean the Ground Lease and Development Agreement, dated December 21, 2006, by and between the JV Company and the Authority as amended from time to time in accordance with this Letter Agreement. For the avoidance of doubt, "Ground Lease" shall not include any partition, amendment or modification thereof that satisfies clause (i) of the "Permitted Transfer" definition.

"Indebtedness" of any Person shall mean, without duplication, (a) all indebtedness representing money borrowed which is created, assumed, incurred or guaranteed in any manner by such Person or for which such Person is responsible or liable (whether by guarantee of such indebtedness, agreement to purchase indebtedness of, or to supply funds to or invest in, others or otherwise), (b) all indebtedness of another entity secured by any Lien existing on property or assets owned by such Person, and (c) with respect to any NFL member club, any past due unfunded obligations of such NFL member club under the NFL Constitution with respect to the deferred compensation reserve mechanism established pursuant to the resolution of the NFL dated March 22, 1983, as amended October 23, 1984, October 20, 1992 and March 23, 1993, and as the same may be amended from time to time thereafter, together with any successor fund, account, trust or other similar mechanism established by the NFL or the NFL member clubs (individually or collectively) in substitution or replacement thereof.

**CONFIDENTIAL**

Requesting Parties
Page 9

"Judgment Order" shall mean an order implementing the confession of judgment against any Club Party or the JV Company that has been signed by such Club Party or by the JV Company, respectively.

"League G-3 Loan" shall mean that certain loan facility in a principal amount not to exceed $150,000,000 (and the funds advanced and committed to be advanced from time to time to StadCo thereunder), made by the NFL for the benefit of StadCo pursuant to 1999 NFL Resolution G-3, as the same has been and may, in accordance with the terms thereof, be amended, modified, supplemented, or replaced from time to time (including by 2003 NFL Resolution JC-1), and evidenced by: (a) that certain NFL Resolution G-3 Stadium Credit Agreement, dated as of the date hereof, by and among the NFL, StadCo and the Club, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time; (b) any and all promissory notes executed in connection therewith by StadCo, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time; and (c) such other and/or successor documents, notes and/or other instruments evidencing such loan as may hereafter be executed by StadCo, the Club, the StadCo Controlling Owner, the Club Controlling Owner, the JV Company and/or any Affiliates of the Club Parties or the NFL, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time.

"League G-3 Support Agreement" shall mean the G-3 Loan Obligations Support Agreement described in the definition of NFL Support Documents.

"Lender" or Lenders" shall mean the Trustee, the Controlling Insurer, the Other Insurer, the Swap Counterparties, the Beneficial Owners (as defined in the Indenture), and all other Persons (excluding the NFL, the JV Company and the Club Parties) from time to time party to the Financing Documents or otherwise having rights as an assignee of such Person, or having third-party beneficiary rights under, or otherwise having rights in any other manner as a lender, noteholder, or as a Secured Party under, any Financing Documents (including, without limitation, the Insurers, and any banks and lending institutions which may participate in any syndication of the Bond Support Facility or any other indebtedness evidenced or secured by any Financing Documents or may become a party to any Financing Documents subsequent to the date thereof, whether as additional lenders, by way of assignment or otherwise), and any and all agents thereof.

"Lien" shall mean any mortgage, leasehold mortgage, pledge, security interest, lien, attachment, levy, charge or other encumbrance.

"Material Modification" shall mean any amendment, supplement or other modification to any provision of any of the Operative Documents or the Additional Agreements which does or may be reasonably expected to:

(a)    increase the Maximum Amount;

(b)    affect any operating and/or financial covenants of the Operative Documents or the Additional Agreements;

(c)    cause StadCo to become liable under any Additional Bonds, Completion Bonds (except as expressly contemplated in the definition of the Maximum Amount and solely in the event that such Completion Bonds are issued in accordance with Paragraph 1(c) hereof), or any other additional bonds issued under any Supplemental Indenture, other than (x) the issue, pursuant to Section 204 of the Indenture, of Refunding Bonds in replacement of Bonds deemed paid upon the issue of such Refunding Bonds on terms substantially identical to the Bonds so replaced (provided that such Refunding Bonds may provide for different terms than the Bonds so replaced in respect of (i) customary call protections or the interest rate or rates of such Refunding Bonds and the manner of determining such rate or rates, (ii) ordinary course modifications relating to administration of any auction rate securities, (iii) the creation or termination of sinking funds or

GStad_LB_0007013

Requesting Parties
Page 10

other reserves with respect to such Refunding Bonds and (iv) changes in the mix and type of debt instruments (e.g., auction rate securities, fixed rate securities, etc.) outstanding from time to time) and (y) the entry into, modification, supplement or termination of any Qualified Swap Transaction in connection with any such issue of Refunding Bonds, in each case to the extent permitted by the Indenture and the other Financing Documents;

(d)    cause any of the Requesting Parties to be in violation of the covenants and agreements set forth in this Letter Agreement;

(e)    expand or increase, in any way, the obligations of any of the Club Parties or the JV Company under any of the Operative Documents or the Additional Agreements (provided that the Club, the JV Company and StadCo may, subject always to the NFL Constitution, any applicable NFL rules and policies and any applicable restrictions set forth in the Indenture, enter into Additional Agreements on arms' length terms with the Other StadCo, the JV Company and/or the Other Club);

(f)    cause any Obligations or other obligations arising under the Operative Documents to be:

(i)    secured, directly or indirectly, by any interests in any of the Club Parties or the JV Company;

(ii)    secured in any manner by any asset(s) of the Club Parties or the JV Company, the Collateral or any other Football Related Assets; or

(iii)    in any manner recourse (including by way of guarantee, suretyship or other contingent liability) to any Club Party or the JV Company other than the primary obligor,

in each case other than the security interests in the interests in the Club Parties, the assets of StadCo and the Collateral and the obligations of the Club Parties that are expressly contemplated by the Financing Documents as in effect as of the date hereof;

(g)    effect the release of any security interest in the Collateral, including without limitation the exercise of any rights by StadCo pursuant to Section 608 of the Indenture; provided that the release of a security interest in any item of Collateral that does not constitute Football Collateral shall not constitute a Material Modification pursuant to this clause (g) if and to the extent that such non-football Collateral does not materially contribute, and has not materially contributed, to the operation of, or the financial results of condition of, the JV Company or StadCo;

(h)    permit PSL Proceeds to be used for any purpose (including distribution to owners of equity interests in StadCo or any other Club Party) other than payment or reimbursement of PSL Eligible Project Costs or repayment of the Obligations incurred in payment of PSL Eligible Project Costs or refunds of such PSL Proceeds to PSL licensees if and to the extent such PSL Proceeds will not be so applied towards the payment or reimbursement of PSL Eligible Project Costs;

(i)    permit the net proceeds of the offering of Bonds to be used other than to fund Costs of the Project or to repay or refinance Obligations;

(j)    change the Trustee (or paying, collateral or other agent, if any) under the Financing Documents (provided that the resignation or removal of the Trustee as Trustee (or other agent), under and in accordance with the Financing Documents shall not constitute a Material

CONFIDENTIAL

Requesting Parties
Page 11

Modification provided that the substitute trustee or agent shall execute and deliver to the NFL an agreement in form and substance reasonably acceptable to the NFL, assuming and agreeing to be bound by the terms of this Letter Agreement);

(k)    cause or recognize a Change of Control or Material Ownership Change (as such terms are defined in the NFL Resolution G-3 Credit Agreement executed in connection with the League G-3 Loan) of StadCo or any other Club Party or of the JV Company;

(l)    with respect to any Additional Agreement, change the amount of any rent, the length of any term (other than the exercise of any renewal term as provided under the existing terms thereof), the nature of (or the remedies in the event of) any event of default, the permitted uses under (other than in connection with increases in retail, sponsorship and entertainment space outside of the New Stadium seating bowl), and the rights and privileges granted therein;

(m)    otherwise modify any provisions of the Operative Documents or the Additional Agreements relating to payments, maturity dates, prepayments, Collateral or other security interests or defaults that are applicable during the period when the Obligations are outstanding;

(n)    amend or modify any Additional Agreement in a manner which would require the consent of the NFL or the NFL member clubs pursuant to the NFL Constitution;

(o)    amend or modify the operating agreement and other governing documents of the JV Company (other than to reflect changes in StadCo's and/or the Other StadCo's capital accounts arising out of otherwise-permitted actions); and/or

(p)    otherwise affect the provisions of the Operative Documents or Additional Agreements (including, but not limited to, the provisions thereof pertaining to Foreclosure, to any Collateral pledged as security for the Obligations, or to Events of Default) in each case in any manner materially adverse to the interests or rights of the NFL.

"Maximum Amount" shall mean $715,000,000, in the aggregate, and shall represent the maximum principal (and in the case of Qualified Swaps, notional) amount (not including accrued but unpaid interest, fees, premiums to the Insurers, reimbursable costs, other swap payments, swap termination payments or similar exposure under interest rate protection agreements, indebtedness incurred in connection with letters of credit or other sureties to fund debt service or special liquidity/work stoppage reserves, and other similar obligations, and any replacement or extension of any of the foregoing) of the Bonds and the Qualified Swaps hereafter permitted to remain outstanding under the Financing Documents at any time; provided, that any amount in excess of $650,000,000 in aggregate principal amount of such Bonds shall be solely in the form of Completion Bonds and may be issued only in compliance with the terms of the Indenture and Paragraph 1(c) below. For the avoidance of doubt, in the event that there are no such cost overruns, or the aggregate amount of any such cost overruns is less than $65,000,000, the Maximum Amount shall be reduced accordingly.

"Memoranda of New Stadium Leases" shall mean those certain Memoranda of New Stadium Leases to be separately recorded in the Bergen County Clerk's Office, Hackensack, New Jersey, in order to provide public record and notice of the Ground Lease, StadCo Sublease, and the Team Sublease.

"New Stadium" shall mean the approximately 82,000 seat, open-air stadium to be constructed on the West Side of the Meadowlands Sports Complex in East Rutherford, New Jersey.

"New Stadium Estoppel" shall mean that certain certificate to be executed by the Authority and attached hereto and made a part hereof as Exhibit E.

CONFIDENTIAL

Requesting Parties
Page 12

"NFL" shall mean the National Football League, a not-for-profit association currently having its principal executive office at 280 Park Avenue, New York, New York.

"NFL Constitution" shall mean the Constitution and Bylaws of the NFL and the Articles of Association and Bylaws of the NFL Management Council, including any amendments to either such document and any interpretations of either such document issued from time to time by the Commissioner which are in the Commissioner's jurisdiction; all operative NFL or NFL Management Council resolutions that are within the NFL's or the NFL Management Council's respective jurisdictions; any existing or future agreements entered into by the NFL or the NFL Management Council, including, without limitation, any television agreements or any collective bargaining or other labor agreements (including, without limitation, any NFL player salary guarantees and pension fund agreements), and any agreements made in settlement of any litigation against the NFL, the NFL Management Council, or the NFL member clubs (including litigation against such clubs, or agreements made by such clubs, jointly or collectively); and such other rules or policies as the NFL, the NFL Management Council, or the Commissioner may issue from time to time that are within the issuing party's jurisdiction.

"NFL Enterprises" shall mean NFL Enterprises LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Foreclosure Notice Date" shall mean the date on which the NFL shall have delivered to the Trustee and the Controlling Insurer, pursuant to Paragraph 5(c)(ii) hereof, written notice of the NFL's reasonable belief that a Foreclosure has commenced or occurred (which notice shall include a description of the issues giving rise to such belief).

"NFL International" shall mean NFL International LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Management Council" shall mean the not-for-profit association formed by the member clubs of the NFL to act as the representative of such member clubs in the conduct of collective bargaining and other player relations activities of mutual interest to such member clubs.

"NFL Priming Loans" shall mean loans by the NFL (or an Affiliated NFL Party) to StadCo or the Club for the purpose of enabling StadCo or the Club to meet their respective obligations, whether in respect of the Obligations, the operation and maintenance of the New Stadium or any Additional Premises, other expenses incurred in connection with the conduct of home games of the Team in the Existing Stadium (at any time prior to Substantial Completion), the New Stadium or any Additional Premises, or otherwise.

"NFL Productions" shall mean NFL Productions LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Properties" shall mean NFL Properties LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Standstill Period Collateral Rights" shall have the meaning set forth in Paragraph 5(c)(i)(B) hereof.

"NFL Support Documents" shall mean each and all documents executed in connection with the League G-3 Loan and/or this Letter Agreement, and such other and/or successor documents and/or instruments evidencing the obligations thereunder as may hereafter be executed by the parties thereto, including that certain G-3 Loan and VTS Obligations Support Agreement, dated as of even date herewith, by the Club in favor of the NFL in relation to the performance by StadCo of each and all of its obligations under the League G-3 Loan and the Supplementary VTS Payment Agreement, that certain Supplementary VTS Payment Agreement, dated as of even date herewith, by and among the NFL, StadCo, and the StadCo Controlling Owner, that certain Adjacency

CONFIDENTIAL

GStad_LB_0007016

Requesting Parties
Page 13

Guaranty Agreement, by and among the NFL, StadCo, the Club and the Club Controlling Owner and, if executed in accordance with the terms of the League G-3 Loan, any PSL Proceeds Security Agreement, by StadCo in favor of the NFL, pursuant to which the NFL is (if so executed) granted a Lien on the PSL Proceeds (subject to the release provisions set forth therein), as each of the foregoing may be amended, modified, supplemented, or replaced from time to time.

"NFL Ventures" shall mean each of NFL Ventures, Inc., a Delaware corporation, and NFL Ventures, L.P., a Delaware limited liability partnership, or any successor to the business of either such entity.

"Non-Relocation Agreement" shall have the meaning ascribed thereto in the Indenture.

"Obligations" shall mean any indebtedness or other obligations of StadCo, any of the other Club Parties or the JV Company owing to any Secured Party under any Financing Document or any other document or agreement executed in connection therewith, and any indebtedness or other obligations of the JV Company or any Club Party that are, under the terms of any such document or agreement, secured by the Liens granted for the benefit of any Secured Party thereunder, together with any commitment by any Secured Party to extend loans or other indebtedness pursuant to said documents or agreements, including, without limitation, all indebtedness and obligations in respect of principal, premium and interest under the Indenture and the other Financing Documents (including, without limitation, any Series of Bonds issued under a Supplemental Indenture).

"Operating Expenses" shall mean (a) Operating and Maintenance Expenses, as such term is defined in the Indenture, (b) all other Rent (as defined in the StadCo Sublease), (c) all capital contributions due from StadCo to the JV Company pursuant to the terms of the JV Company's Operating Agreement to the extent necessary to enable the JV Company to fund its operating expenses, and (d) such other operating expenses of StadCo as the NFL shall reasonably deem necessary and appropriate to facilitate the sound operation of the New Stadium for the continuation of the Club's football operations consistent with the customary operating standards of NFL stadiums generally.

"Operative Documents" shall mean the Financing Documents together with any and all other documents and agreements related to the indebtedness of StadCo, any other Club Party or the JV Company to any Secured Party that may be made, executed or delivered from time to time in connection with, supplementation of or in substitution for any of the Financing Documents, but for the avoidance of doubt such term shall not include this Letter Agreement, any similar NFL consent agreement relating to any other financing of the Club Parties or the JV Company, the Other StadCo Consent Letter, or any similar operative or financing documents to which the JV Company is a party and relating primarily to the Other StadCo or the Other Club, the NFL Support Documents, or any other documents relating to the League G-3 Loan (including without limitation the NFL Resolution G-3 Stadium Credit Agreement, the associated promissory note, or the other documents or agreements with the NFL or any Affiliated NFL Parties executed in connection therewith).

"Operative Project Documents" shall mean the Design-Build Consent and Acknowledgement and the Project Agreements under and as defined in the Indenture; provided that the StadCo Sublease, Team Sublease and Ground Lease shall not be deemed to be Operative Project Documents.

"Ordinary Course Sales" shall mean (a) sales of tickets, seat licenses, suite rights, concessions, inventory, advertising, naming or other sponsorship rights, and other sales of items or rights in each case in the ordinary course of the JV Company's or the selling Club Party's business, (b) sales of obsolete and/or replaced or surplus equipment that in JV Company's or StadCo's reasonable judgment (as applicable based on ownership of such equipment) is not necessary for the operation of the New Stadium, and (c) sales or licenses of other property or rights with an aggregate book value not in excess of $1,000,000 during any twelve (12) month period.

Requesting Parties
Page 14

"Other Club" shall mean New York Jets LLC, the holder of the New York Jets NFL franchise, and any successor.

"Other StadCo" shall mean Jets Stadium Development, LLC, and any successor.

"Other StadCo Consent Letter" shall mean that certain letter agreement, of even date herewith, by and among the NFL, the Trustee, the Insurers, the Swap Counterparty, the JV Company, the Other StadCo, the Other Club and the controlling owner of the Other Club and Other StadCo.

"Permitted Standstill Period Payments" shall mean the payment by StadCo (or the Trustee, as may be applicable under the terms of the Indenture) during the Standstill Period, to the extent otherwise permitted by the terms of the Indenture and the other Operative Documents, of:

(a) Operating Expenses;

(b) the initial transfer of funds from the Operating Fund to the Trustee Revenue Fund in the circumstances described in Section 509(a) and thereafter the continuing deposit of Stadium Revenues pursuant to Section 509(b) of the Indenture, other than any deposit of monies into the Redemption Fund in excess of scheduled amortization contemplated thereunder (and for the avoidance of doubt, during the Standstill Period, all such funds otherwise designated for the Redemption Fund shall instead be deposited instead to the Trustee Revenue Fund and applied as otherwise provided therein);

(c) transfers from the Trustee Revenue Fund to the Trustee Operating Fund, for payment of Operating Expenses pursuant to Section 509(c)(i) of the Indenture, and payment of Operating Expenses pursuant to Section 510(b) of the Indenture;

(d) transfers from the Trustee Revenue Fund or the Operating Fund, as applicable, to the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund pursuant to Sections 509(c)(ii) and (iii) and Section 504(c)(iii); Sections 504(c)(vi), 505(b)(ii), 505(b)(iv) and 505(g)(ii) (excluding in each case any payments in respect of Swap Termination Payments or Other Swap Payments thereunder); Sections 505(c)(ii), 505(h)(ii) of the Indenture, in each case for the payment of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations, Regularly Scheduled Swap Payments (but not Swap Termination Payments or Other Swap Payments), and the associated and ordinary course fees and expenses of the Trustee and the Insurers, from funds deposited into the Senior Lien Debt Service Fund and the Second Lien Debt Service Fund, and transfers from the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund, if applicable, pursuant to Section 505(b)(iv) and pursuant to Section 505(c)(iii) for the purpose of making the payments referred to above, subject to the Trustee's continuing compliance with the requirements of Sections 412 and 510(c) of the Indenture;

(e) transfers under Sections 506, 506A and 507 of the Indenture to the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund for the payment of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations, and the associated and ordinary course fees and expenses of the Trustee, and the Insurers, from funds deposited prior to the initiation of the Standstill Period into the Senior Lien Debt Service Reserve Fund and the Second Lien Debt Service Reserve Fund, and transfers from the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund, if applicable, for the purpose of making the payments referred to above (but not, for the avoidance of doubt, any transfers during a Standstill Period from the Operating Fund, the Trustee Revenue Fund or any other fund or account established under the Indenture fund to such Senior Lien Debt Service Reserve Fund or Second Lien Debt Service Reserve Fund);

Requesting Parties
Page 15

(f) ordinary course transfers pursuant to Section 508(a) of the Indenture;

(g) the payment (whether pursuant to Sections 504(c)(ix) or 509(d) of the Indenture) of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on Permitted Subordinated Indebtedness or Non-Indenture Permitted Debt in respect of which the NFL has previously and specifically consented in writing to such payment during the Standstill Period;

in each case subject to Paragraph 5(l) hereof. For the avoidance of doubt, the term Permitted Standstill Period Payments shall not include (x) any other Trustee payment or transfer of funds from the Operating Account or the Trustee Revenue Account for the purposes set forth in Sections 504(c), 504 or 509 of the Indenture, or (y) any equity or other distributions by the Borrower to its members, except for cash distributions to the Borrower's members in respect of tax payments, to the extent otherwise permitted following a Default or Event of Default pursuant to Section 504(c)(ii) of the Indenture (but solely on dates prior to the date on which a Secured Party shall be required to deliver a Foreclosure Notice hereunder), subject always to the condition that the members receiving such distributions following and during the continuance of a Default or Event of Default shall have agreed in writing with the NFL, in a form satisfactory to the NFL, to repay to the Trustee or the Borrower, as applicable for deposit into the Trustee Revenue Fund or the Operating Fund, as applicable, the amount so distributed within fifteen (15) Business Days after receipt of notice from the NFL that a funding shortfall (of other funds necessary to meet the operating expenses and/or ordinary course payment of principal and interest (as so provided in Section 504 of the Indenture) has occurred.

"Permitted Transfers" means (i) any sale, assignment or transfer by a Club Party of any assets or property that do not constitute Football Related Assets (including by means of a partition, amendment or modification of the Ground Lease), so long as such sale, assignment or transfer (A) is made to a transferee that is not a Club Party and is without recourse to any Club Party, (B) does not relate to the use of, and will not in any way prevent or hinder the exhibition and performance of NFL games or NFL events at, the New Stadium and (C) does not, at the time such sale, assignment or transfer is made, include any assets, properties or rights that materially contribute to the operation of, or the financial results of condition of, the JV Company or StadCo; and (ii) any sale, assignment or transfer of Football Related Assets by any Club Party (other than the Club) to the Club or to another Club Party that is made in accordance with Paragraph 6(b).

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"Project" shall mean development, design, construction and operation of the New Stadium.

"PSL" shall mean a personal seat license or other license granted for a period of years for the right to purchase (after the license grant) one or more specified seats for all Club home games (other than the Super Bowl) held in the New Stadium.

"PSL Proceeds" shall mean all payments, revenues, rents, royalties, issues, profits, fees and other proceeds paid or payable for any PSLs, net of costs of issuance or sale.

"PSL Eligible Project Costs" shall mean the costs and expenses incurred in connection with the Project and eligible for consideration in the determination of project costs under 1999 NFL Resolution G-3, 2003 NFL Resolution JC-1 and the NFL's Stadium Facility Program Guidelines, which Guidelines are attached to the League G-3 Loan Agreement. PSL Eligible Project Costs shall, subject to the preceding sentence, include hard and soft construction costs, site preparation (e.g., environmental), infrastructure improvements, financing costs specifically related to the New Stadium, other miscellaneous New Stadium

CONFIDENTIAL

Requesting Parties
Page 16

development costs (subject to any "cap" applicable to costs of such nature under the Stadium Facility
Program Guidelines, as applied and interpreted by the NFL in its sole discretion), payment of taxes
directly attributable to the issuance of the applicable PSLs and capitalized rent obligations owed to the
Authority under the Ground Lease, subject to any deductibles and other limits established pursuant to the
Stadium Facility Program Guidelines, as applied and interpreted by the NFL in its sole discretion. For the
avoidance of doubt, PSL Eligible Project Costs shall not include: (1) miscellaneous New Stadium
development costs in excess of any "cap" applicable to costs of such nature under the Stadium Facility
Program Guidelines, as applied and interpreted by the NFL in its sole discretion; (2) any funds derived
from the Obligations or otherwise that are distributed to the direct or indirect equity owners of the Club or
StadCo, except and to the extent distributed to repay the applicable equity owner for PSL Eligible Project
Costs previously incurred by such owner; (3) any funds derived from the Obligations or otherwise that are
loaned, paid, or advanced to or for the benefit of any Affiliate of the Club or StadCo for any purpose other
than the reimbursement of third-party payments directly made by the recipient Affiliate in connection
with the Project prior to the date hereof or repayment to the recipient Affiliate of funds advanced by such
recipient Affiliate to or for the benefit of the Club or StadCo prior to the date hereof to fund payments by
the Club or StadCo for qualified Project purposes under the terms of the Stadium Facility Program
Guidelines, as applied and interpreted by the NFL in its sole discretion; (4) any costs (including
reimbursement obligations) associated with any letters of credit or other credit enhancements (including
sureties) posted by the Club or StadCo or any Affiliate thereof in support of the Project that are subject to
withdrawal or termination under the terms of the Financing Documents, regardless of whether such
withdrawal or termination is subject to financial contingencies or other conditions under the Financing
Documents; (5) construction costs related to non-NFL activities, team offices, excessive New Stadium
amenities or furnishings and any football practice or training facility not located at the New Stadium site;
or (6) any funds derived from the Obligations or otherwise that are applied to the repayment of
indebtedness of the Club, StadCo or any Affiliate thereof incurred in connection (direct or indirect) with
the acquisition, or the renovation prior to the date hereof, of the Existing Stadium.

    "Qualifying Sale Transaction" shall mean the consolidation of StadCo with or the merger of StadCo into
any other Person or the sale, conveyance, assignment, license, transfer, lease or other disposal of all or
substantially all of StadCo's assets or business to any Person, whether in a single transaction or a series of related
transactions and whether or not the Franchise and/or other assets of or interests in the Club shall be disposed of in
connection with such transaction, provided that any such transaction shall meet the following conditions:

        (i)    the Trustee shall have received notice of such transaction at least 30 days prior to
the effectiveness thereof;

        (ii)    the acquiring or successor entity shall be organized and validly existing under the
laws of the United States of America or any state thereof or the District of Columbia;

        (iii)    the acquiring or successor entity shall have the same obligations, duties,
liabilities rights, powers and benefits as StadCo had with respect to the use and possession of the
New Stadium under the Ground Lease, the StadCo Sublease, the Team Sublease and Operative
Project Documents immediately prior to such transaction;

        (iv)    upon or prior to the effectiveness of such transaction, unless all StadCo
obligations, duties and liabilities under the Financing Documents are fully assumed by the
acquiring or successor entity by operation of law, the acquiring or successor entity shall have
executed and delivered to each party hereto an assignment and assumption agreement, in form
and substance reasonably satisfactory to the Trustee and the Controlling Insurer, whereby the
acquiring or successor entity assumes all of StadCo's obligations, duties and liabilities under the

**CONFIDENTIAL**

GStad_LB_0007020

Requesting Parties
Page 17

Financing Documents and Operative Project Documents and all other agreements and instruments
to which StadCo is a party in connection with the transactions;

(v)    with effect from and after giving effect to the closing of such transaction:

(A)    any and all financial Events of Default shall have been cured;

(B)    any and all financial damages, expenses, and other amounts to which the
Secured Parties would otherwise be entitled from the Borrower arising out of any non-
financial Events of Default shall have been paid to the applicable Secured Parties (or
arrangements reasonably satisfactory to such Secured Parties in respect of such payments
shall have been made);

(C)    all representations and warranties made by the Borrower under the
Indenture shall be made by the acquiring or successor entity to the Secured Parties and
shall be true as of the date of closing of the Qualifying Sale Transaction (and thereafter as
otherwise provided by the terms of the Indenture);

(D)    as of the date of the Qualifying Sale Transaction, the acquiring or
successor entity shall provide evidence reasonably satisfactory to the Controlling Bond
Insurer that it can comply, and thereafter shall comply, with all conditions, covenants and
other obligations of StadCo under the Indenture applicable to periods following such
closing;

(vi)    at the time of such transaction, the acquiring or successor entity shall generally
be meeting its obligations as they become due;

(vii)    StadCo and the acquiring or successor entity, as the case may be, shall have
obtained all required approvals of the NFL to such transaction;

(viii)    StadCo or the acquiring or successor entity shall have paid on or prior to the
closing date of any such transaction all reasonable costs and expenses (including reasonable legal
fees) incurred by any Secured Party in connection with any such transaction; and

(ix)    the Club (or other entity then owning the Franchise) shall have reaffirmed in
writing to the Trustee and the Controlling Insurer its obligations under the Non-Relocation
Agreement.

"Requesting Parties" shall mean all of the undersigned parties other than the NFL.

"Secured Parties" shall exclude the NFL, but shall include (all of whom shall be bound by the
terms hereof) (a) the Trustee (on behalf of and including all Lenders) and the Lenders, including without
limitation the Swap Counterparties and the Insurers; (b) any Person acquiring a Lien on or any other
rights to any Collateral (whether pursuant to a judgment lien or otherwise) or any other security under the
Financing Documents, including without limitation any direct or indirect ownership interests in StadCo or
the Club; and (c) the successors and assigns of each of the foregoing. For the avoidance of doubt, the
term Secured Parties shall include any purchaser at a Foreclosure sale with respect to any existing or
future Collateral (or such purchaser's lender, trustee, agent or collateral agent therefor), but only to the
extent that the Liens of the Secured Parties in the Collateral in respect of the Obligations continue in (or
succeed to) the Collateral for the benefit of such purchaser, lender, trustee, agent or collateral agent, upon
and following the closing date of such sale, in accordance with the Financing Documents or otherwise.

GStad_LB_0007021

Requesting Parties
Page 18

"Security Documents" shall mean, individually or collectively as appropriate, the various documents and agreements, including without limitation the Assignment of Leases and Rents, the Leasehold Mortgage, the Pledge, Assignment and Security Agreement (as each of the same is defined in the Indenture), pursuant to which the Trustee or any other Secured Party, has obtained Liens on or security interests in the Collateral, as such documents and agreements may be amended, modified and/or supplemented from time to time.

"Shared Revenues" means the percentage of the receipts derived by the Club, StadCo, any other Club Party (or the JV Company in respect of NFL games or events involving the Club), in each case from the sale of club seats or premium seats and which are payable to the NFL on behalf of visiting NFL teams, together with the percentage of any other revenues received by the JV Company (in respect of NFL games or other events involving the Club) or any applicable Club Party which are payable to the NFL in respect of any NFL-administered shared revenue pools, in each case pursuant to the terms and conditions of the NFL Constitution as in effect on the date hereof. "Shared Revenues" shall not include PSL Proceeds, provided that (and to the extent that) such PSL Proceeds are applied in accordance with Paragraph 10(b) as required hereunder.

"StadCo Sublease" shall mean that certain Sublease, dated on or about the date hereof, by and between StadCo and the JV Company.

"Stadium Interests" is defined in Paragraph 4(c).

"Standstill Period" shall mean that period beginning on the date that any Secured Party has a right under the Financing Documents to commence Foreclosure (regardless of whether a Foreclosure Notice has been delivered to the NFL on such date) and ending on the later to occur of:

(a)    the date on which the event that gave rise to such Secured Party's right to Foreclose has been cured and the Secured Parties do not otherwise have any right to Foreclose, in the event that no Secured Party has delivered to the NFL a Foreclosure Notice as contemplated in Paragraph 5(a) hereof (in which case no Foreclosure may be commenced),

(b)    the date which is one hundred eighty (180) days after any Secured Party delivers a Foreclosure Notice to the NFL in accordance with Paragraph 5 hereof (or, in the event StadCo or any other Person contests, in an appropriate proceeding, the right of the Secured Parties to commence such Foreclosure or the right of the NFL to conduct the sale process as set forth herein, then on the date which is one hundred eighty (180) days following the date that any Secured Party gives notice to the NFL of the entry of a Final Order in such proceeding) (such date, the "Standstill Period Extension Notice Deadline"), and

(c)    solely in the event that the NFL notifies the Trustee and the Controlling Insurer, on or prior to the Standstill Period Extension Notice Deadline, that the NFL will, or will cause an Affiliate or a third party acceptable to the Trustee and the Controlling Insurer in their reasonable discretion to, pay the regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations during the Standstill Period (and, if the Insurers have made any regularly scheduled payment of the Obligations pursuant to the Reserve Account Surety Bond (or Reserve Account Surety Guaranty, if applicable), the Bond Insurance Policies or the Swap Insurance during the Standstill Period, to reimburse the Insurers in respect of such payments together with any interest accrued thereon during the Standstill Period under the applicable Financing Documents (at the applicable pre-default rate, and not at any default rate)), the date which is one hundred eighty five (185) days after the Standstill Period Extension Notice Deadline (the period that commences on the date after

Requesting Parties
Page 19

the Standstill Period Extension Notice Deadline and that ends on such 185th day, the "Extension Period").

"Team" shall mean the New York Giants football Franchise.

"Team Financing" shall mean any secured or unsecured financing from time to time outstanding and constituting any form of Club Debt (other than the Obligations), whether incurred by the Club, the Club Controlling Owner, or any of their respective Affiliates, including without limitation any loans made under that certain Note Purchase Agreement, dated as of April 7, 2004, by and between the Football Club Term Notes 2014 Trust, as Purchaser, and certain member clubs of the NFL (including the Club), as Issuers, as such agreement may be amended, restated, modified or supplemented from time to time, together with any replacement or refinancing therefor.

"Team Sublease" shall mean that certain Sublease, dated on or about the date hereof, by and between StadCo and the Club.

"Uniform Commercial Code" shall mean the Uniform Commercial Code of the State of New Jersey, provided, that if by reason of mandatory provisions of law, the perfection, effect of perfection or non-perfection or the priority of the security interests of Secured Party in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New Jersey, the Uniform Commercial Code as in effect in such other jurisdiction shall govern for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

## NFL CONSENT AND RELATED PROVISIONS

In consideration of (a) the NFL's agreement to permit the incurrence by the applicable Club Parties of the Obligations to the Secured Parties and the pledge of Collateral by the applicable Club Parties, in each case pursuant to the terms of the Financing Documents, (b) the mutual covenants and agreements hereinafter set forth, and (c) other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Letter Agreement, intending to be legally bound, hereby agree as follows:

1.    NFL Consent to Borrowing. (a) The NFL and the Requesting Parties hereby agree as follows:

(i)    Provided that the Requesting Parties are and remain in compliance with all of the terms and conditions set forth herein, and subject to the continuing accuracy of the representations and warranties of the Requesting Parties set forth herein, StadCo's issuance of Bonds under the Indenture and entry into the Qualified Swaps, and the pledge, mortgage and assignment by the Club Parties of the Collateral to or for the benefit of the Secured Parties, in each case pursuant to the terms of the Financing Documents, shall not be deemed by the NFL to be a violation of the Debt Limit or the NFL Constitution and are hereby consented to by the NFL.

(ii)    The consent granted herein is in connection with the limited waiver of the Debt Limit granted to the Club pursuant to (and subject to the terms of) 2007 NFL Resolution JC-5, which is attached hereto as Exhibit A, and the NFL's consent to the transactions described herein shall not be deemed to be a waiver of any other term or provision of the NFL Constitution. The Requesting Parties acknowledge and agree that the waiver of the Debt Limit granted to the Club pursuant to 2007 NFL Resolution JC-5 is specific to the Club Controlling Owner and the StadCo Controlling Owner and that, as

CONFIDENTIAL

Requesting Parties
Page 21

The Completion Bonds, and all rights and remedies in respect thereof, shall, for the avoidance of doubt, be subject to the each of the terms and conditions of this Letter Agreement applicable to the Obligations.

    2.    <u>Customary Security Interests; No Current Conveyance.</u>

        (a)    Each of the Secured Parties, the Club, StadCo and the StadCo Controlling Owner hereby represents to the NFL that StadCo's pledge, assignment and mortgage of the Collateral for the benefit of the Secured Parties is intended to be a customary granting of a leasehold mortgage, security interest and Lien within the meaning of the Uniform Commercial Code and other applicable law relating to real estate or otherwise and not a present conveyance to the Trustee or the other Secured Parties that would entitle the Trustee or the other Secured Parties to any present ownership interest (other than such security interest and Lien) in or with respect to any Club Party, the JV Company, the Collateral or the NFL. The Requesting Parties acknowledge and agree that the Collateral and the security interest and Lien of the Trustee and the other Secured Parties therein are, and at all times shall be, held subject in all respects to the NFL Constitution and the terms of this Letter Agreement. Notwithstanding the foregoing, the NFL hereby agrees that in the event that the Secured Parties shall, at any time within sixty (60) days following the date on which there becomes effective a change in the NFL Constitution under which the continuation of the security interests or Liens in the Collateral granted by StadCo pursuant to the Financing Documents would be prohibited or otherwise rendered invalid under the NFL Constitution, deliver a Foreclosure Notice in respect of a Default or Event of Default under the Financing Documents premised on such change in the NFL Constitution, then, in such event, such prohibition or invalidity effected by such change in the NFL Constitution shall not be effective with respect to the Secured Parties (or the NFL) during any Standstill Period arising in connection with such Foreclosure Notice or any subsequent Foreclosure under the terms hereof.

        (b)    The Secured Parties individually, jointly and severally (other than the Insurers, whose obligations under this Paragraph shall be several from, and not joint with, the other Secured Parties) agree that they shall exercise any rights to Foreclose upon (and any other remedies in respect of) the Collateral only upon the occurrence and during the continuance of an Event of Default under the Financing Documents, and that any such exercise by the Secured Parties of such Foreclosure rights and other remedies shall be in strict accordance with each of the terms of this Letter Agreement and, during the Standstill Period, be effected solely by and through the NFL as described more fully below. The Requesting Parties further represent, warrant, covenant and agree that, without the prior written consent of the NFL (which consent may be given or not given in the NFL's sole and absolute discretion):

            (i)    the Secured Parties have no right and shall at no time hereafter (except as the NFL may agree in writing) have any right to Foreclose on any assets of, or any direct or indirect ownership interests in, any Club Party (including, without limitation, the Club and any amounts payable to or rights otherwise held by the Club under the Team Sublease) or the JV Company, other than on Collateral (x) owned by StadCo or in which StadCo has an interest due to pledge or assignment (in which case such Collateral is pledged only to the extent of StadCo's interest therein) and (y) either pledged to the Secured Parties pursuant to the Financing Documents or against which the Secured Parties have obtained a judgment lien following an Event of Default (but subject in all cases to the terms hereof, including without limitation the restrictions on any Foreclosure against any such Collateral in Paragraph 5 hereof, and where consistent herewith, the terms of the Financing Documents); <u>provided</u> that during the Standstill Period the Trustee or the Controlling Insurer may, to the extent permitted under the Financing Documents, bring an action against StadCo, any other Club Party or the JV Company seeking an injunction or specific performance (but no other remedy whatsoever) solely in order to (A) prevent any misappropriation or conversion by StadCo for StadCo's use (other than

CONFIDENTIAL

Requesting Parties
Page 22

to support continued construction of the New Stadium or to make payments in respect of operations of the New Stadium in the ordinary course) of funds otherwise in StadCo's control in violation of its obligations under the Financing Documents, (B) enforce against the Club the specific performance of the Club's obligations under Section 1 of the Non-Relocation Agreement, (C) exercise any of their rights under Paragraph 5(r) of this Letter Agreement or (D) preserve the right of the Trustee and/or the Controlling Insurer to exercise, following the conclusion of the Standstill Period and as otherwise expressly permitted by the terms of this Letter Agreement, such remedies as the Trustee and/or the Controlling Insurer may have against the Club, the other Club Parties or the JV Company under the terms of the Non-Relocation Agreement; and

(ii)    the Secured Parties have no right and shall continue to have no right, including following the occurrence and during the continuance of an Event of Default, to Foreclose on (and shall not have any other rights whatsoever with respect to) (A) Shared Revenues, which shall at all times be paid by StadCo and/or the Club to the NFL, on behalf of the other NFL member clubs, as and to the extent required under the NFL Constitution, (B) the proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account) or (C) PSL Proceeds.

3.    Default Under Financing Documents. The NFL shall not regard the mere occurrence or continuance of any Default or Event of Default under the Financing Documents as a breach of the Club's obligations to the NFL or a violation of the NFL Constitution, or as grounds for the sale, withdrawal, termination, or forfeiture of the Franchise or any interest therein, unless the act, omission, event or condition (or any consequences arising therefrom) that gives or could give rise to the Default or Event of Default would also separately and independently constitute a default by the Club of any of its obligations to the NFL or a violation by the Club of the NFL Constitution, or would allow or permit such sale, withdrawal, termination or forfeiture of the Franchise or any interest therein under the terms of the NFL Constitution.

4.    No Transfer of Collateral; No Guarantees; Certain NFL Rights.

(a)    Notwithstanding anything in this Letter Agreement or any Financing Document to the contrary, except for the mortgage, pledge and assignment of, and the security interest and Lien granted in, the Collateral pursuant to the Financing Documents, to which consent is being given hereby subject to the terms and conditions of this Letter Agreement, the parties agree that:

(i)    no interest in the Football Collateral, in any other Football Related Assets or in any direct or indirect ownership interests in any Club Party or the JV Company, whether present or future, contingent or unconditional (including, without limitation, any direct or indirect interest in the Club, StadCo, or any rights in or to the NFL Ventures, NFL Productions, NFL Enterprises, or NFL Properties securities), may be sold, pledged, or otherwise transferred (including, without limitation, to any Affiliate of any Club Party or the JV Company or any transfer upon a Foreclosure), and no contingent or conditional assignment may be made currently effective to convey a current ownership interest in Football Collateral, any such Football Related Assets or any such ownership interests at any time without the prior written consent of such of the NFL and the NFL member clubs as may be required under the NFL Constitution, and the parties hereto hereby agree that any proposed sale, pledge or other transfer without such prior written consent shall be deemed void *ab initio* and of no force or effect; provided that this clause (i) shall not prohibit Ordinary Course Sales (or ordinary course sales of tickets, seat licenses, suite rights, concessions, inventory, advertising, naming or other

Requesting Parties
Page 23

sponsorship rights between or among the JV Company, StadCo and/or the Club, as applicable, made in accordance with the terms of the StadCo Sublease, the Team Sublease or the Naming Rights and Suite Sales Agreement) or the Trustee, following an Event of Default and subject to the terms of the Financing Documents, seeking a Judgment Order and/or judgment lien against any assets of StadCo (in each case other than Shared Revenues, the proceeds of the League G-3 Loan, PSL Proceeds, any funds in the NFL Facility Proceeds Account or the Other Proceeds Account and any assets against which recourse is prohibited by the Financing Documents) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained herein, including without limitation those set forth in Paragraph 5 hereof); and

(ii)    none of the Obligations are or will be guaranteed by, in any way a suretyship or other liability or obligation of, or secured by any assets of, the JV Company or any of the Club Parties other than StadCo (provided that the foregoing shall not be deemed to limit the Club from entering into the covenants expressly set forth in the Non-Relocation Agreement or the Club Parties from performing their obligations to the NFL hereunder).

(b)    Under no circumstances, without the NFL's prior written consent in its sole and absolute discretion, shall the StadCo Sublease, Team Sublease, Ground Lease, or any other Additional Agreement be terminated (other than by expiry in accordance with the terms thereof), cancelled, rescinded, surrendered, or amended, abridged or otherwise modified in any manner that would constitute a Material Modification, and any such termination, cancellation, rescission, surrender, amendment, abridgement, or modification of the StadCo Sublease, Team Sublease, Ground Lease, or any other Additional Agreement without such prior written consent of the NFL shall be deemed void *ab initio* and of no force or effect, provided that this clause (b) shall not apply to (i) any amendment, abridgement or modification relating to the Existing Stadium Lease that does not prevent or otherwise hinder or interfere with the exhibition and performance of the Team's NFL games at the Existing Stadium at any time prior to Substantial Completion of the New Stadium, (ii) any Permitted Transfer or (iii) the exercise by the JV Company, Club and StadCo of their early termination rights under the Ground Lease, Team Sublease and StadCo Sublease, respectively, in accordance with the terms of the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the Financing Documents and Paragraphs 4(s) and 32 of this Letter Agreement. Under no circumstances, without the NFL's prior written approval of the terms thereof in its sole and absolute discretion, shall the JV Company or any Club Party enter into any Additional Agreement not already approved by the NFL or approved (or, in the case of Additional Agreements between the Club or StadCo and the Other Club or Other StadCo, permitted pursuant to clause (e) of the definition of Material Modification) under this Agreement.

(c)    Unless waived or otherwise consented to by the NFL in writing in its sole and absolute discretion (with the NFL prior to the date hereof having consented to the Club's pledge of substantially all of its assets pursuant to certain Team Financings), each of the Club Parties and the JV Company shall not, except as already created under or, in respect of Liens on future receivables and after acquired property, contemplated by the Financing Documents, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, and the Secured Parties (to the extent the Secured Parties have consent rights) shall not consent to, any deed of trust, mortgage, voluntary or involuntary lien, whether contractual or by law (other than statutory liens securing liabilities that are not yet due and payable), any security interest, encumbrance or charge, or conditional sale or other title retention document (each a "Lien Restriction") against or covering any interest of such Club Parties or the JV Company, as applicable, in the StadCo Sublease, Team Sublease,

CONFIDENTIAL

Ground Lease, any other Additional Agreement, or any part thereof or any interest therein, including, without limitation, the rents or other revenue derived therefrom (the "Stadium Interests"), and should any of the foregoing become attached hereafter in any manner to any part of the Stadium Interests without the prior written consent of the NFL, the JV Company, the Club and StadCo shall, and the Club Controlling Owner and the StadCo Controlling Owner shall cause the Club and StadCo, respectively, to, cause the same to be promptly discharged and released at their sole expense, provided that this clause (c) shall not apply (i) to the extent that any interest of the Club Parties in the StadCo Sublease, Team Sublease, Ground Lease or any other Additional Agreement has been sold, assigned or transferred pursuant to a Permitted Transfer or (ii) to any Permitted Encumbrance (as defined in the Indenture).

(d)    Under no circumstances without the NFL's prior written consent in its sole and absolute discretion, shall any Stadium Interest be sold, pledged, assigned, sublet, or otherwise transferred (other than to the Club, but subject always to the continuing validity of any Liens of the NFL and, if required pursuant to Paragraph 6(b), any applicable lender thereon as contemplated hereby), and the parties hereto hereby agree that any proposed sale, pledge, assignment, sublease, or other transfer without such prior written consent shall be deemed void ab initio and of no force or effect; provided that the relevant Club Parties may enter into and perform: (i) Permitted Transfers, (ii) subleases and licenses (including the sale, assignment or other transfer of the revenues derived therefrom in accordance with the terms hereof) of the New Stadium for non-NFL events in the ordinary course of the operation of the New Stadium that do not prevent or interfere with the operation of the Team or the ability of the Team to play its football games in the New Stadium; and (iii) Ordinary Course Sales.

(e)    Immediately upon the closing of the transactions contemplated herein, StadCo and the StadCo Controlling Owner shall cause the Memoranda of New Stadium Leases and the Leasehold Mortgage, to be recorded, in such order, in the appropriate public records, and shall promptly deliver to the NFL, the Trustee and the Controlling Insurer evidence of such recordation. In addition to any and all other rights of the NFL set forth herein, during the Standstill Period, following the date on which a Foreclosure Notice is delivered or required to be delivered (or is otherwise deemed to have been delivered) by the Controlling Insurer or the Trustee, the NFL shall have the right (the "NFL Standstill Period Lease Rights") to exercise the rights of the Trustee under the Leasehold Mortgage, and upon such exercise the NFL shall thereafter enjoy to the extent set forth in the Leasehold Mortgage the rights and assume the obligations of StadCo under any Additional Agreement entered into by StadCo during the period of such enjoyment, unless and until the NFL provides further notice to the contrary.

(f)    The NFL's exercise of the NFL Standstill Period Lease Rights shall not preclude the Trustee from exercising its rights under the Security Documents as otherwise permitted under and in accordance herewith; provided that, for the avoidance of doubt, during the Standstill Period no Secured Party (including the Trustee) shall have any right to effect any sale or disposal (by lease, conveyance or otherwise) of any Stadium Interests, except in respect of Ordinary Course Sales.

(g)    If the NFL elects to cure an Event of Default pursuant to the terms of Paragraph 9 below by paying the Obligations in full and acquiring the Secured Parties' interests in the Operative Documents (and/or by assuming the Obligations), then the NFL shall also have the right to exercise the NFL Standstill Period Lease Rights.

(h)    Each Club Party and the JV Company shall immediately deliver or cause to be delivered to the NFL and, to the extent required under the Indenture, to the Trustee all material notices or demands under the StadCo Sublease, Team Sublease, Ground Lease, and/or any Additional Agreement that it receives or delivers (including without limitation any notice of default, violation or failure and any other material notice or notice of a material event). The Trustee shall immediately deliver to the NFL all such notices or demands under the StadCo Sublease, Team Sublease, Ground Lease, and/or any

CONFIDENTIAL

Requesting Parties
Page 25

Additional Agreement that the Trustee receives or delivers. If the Trustee receives a notice of the JV
Company's or a Club Party's default, violation or failure under the StadCo Sublease, Team Sublease,
Ground Lease, and/or any Additional Agreement and the Trustee elects not to exercise a right of the
Trustee to cure such default, violation or failure, the NFL shall have the right to direct the Trustee to cure
such default, violation or failure at the NFL's expense to the extent of the Trustee's rights. If the NFL
exercises this right to cure at its expense, then if the Trustee exercises its rights of Foreclosure under the
Leasehold Mortgage (which Foreclosure shall be subject to the restrictions contained herein), the NFL
shall be entitled to payment for any costs that it incurs in curing such default, violation or failure on a *pari
passu* basis with the Trustee for any costs that the Trustee may incur in curing any such default, violation
or failure.

(i)    So long as any Club Party, or any Person controlling, controlled by, or under
common control with any Club Party, is the holder of the Team, neither any Club Party nor the JV
Company shall accept or make a voluntary surrender or cancellation of its interests in the StadCo
Sublease, Team Sublease or Ground Lease without the prior written consent of the NFL in the NFL's sole
and absolute discretion, other than pursuant to and in accordance with the early termination rights set
forth in the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the terms of the Financing
Documents and Paragraphs 4(s) and 32 of this Letter Agreement.

(j)    Each of the Club and the Club Controlling Owner represents, warrants and
covenants that the Team now has, and, subject to force majeure events and future breaches of the Ground
Lease by the Authority over which such parties have no control, at all times until the New Stadium is
available for such purpose shall have, the right to play all of its home football games at the Existing
Stadium for the term set forth in the Existing Stadium Lease. The Club, the Club Controlling Owner and
each Secured Party acknowledges and agrees that the NFL is a third party beneficiary of, and may enforce
against the Club (including without limitation by seeking an injunction, specific performance and other
equitable remedies), each of the representations, warranties, covenants, agreements and obligations of the
Club under the Non-Relocation Agreement, including without limitation the Club's obligations under
Section 1 thereof.

(k)    Each of the JV Company and each Club Party that is party to the applicable
Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner,
represents and warrants that: (i) attached hereto as Exhibits B-1 to B-3, respectively, are true, complete,
and accurate copies of the fully executed StadCo Sublease, Team Sublease and Ground Lease; and (ii)
attached hereto as Exhibit B-4 are true, complete, and accurate copies of the fully executed Memoranda of
New Stadium Leases, each of which is in recordable form (and which, in the case of the JV Company's
interest in the Ground Lease, includes a negative pledge in form and substance satisfactory to the NFL).

(l)    Each of the JV Company and each Club Party that is party to the applicable
Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner,
hereby represents and warrants that: (i) each of the StadCo Sublease, the Team Sublease and the Ground
Lease is in full force and effect in accordance with its terms, no default by it has occurred thereunder, and,
to the best of the JV Company's and such Club Party's knowledge, no default by any other party to such
Leases has occurred thereunder; (ii) none of the StadCo Sublease, Team Lease or Ground Lease has been
amended or modified except as otherwise stated herein (and as reflected in the exhibits attached hereto);
(iii) such Club Party, and, to the best of its knowledge, all other parties to the StadCo Sublease, Team
Sublease and Ground Lease have performed all of their obligations under such Leases that are required to
be performed as of the date hereof; (iv) no facts or circumstances exist that would, but for the passage of
time, the giving of notice, or both, constitute a default by the JV Company or such Club Party, or, to the
best of its knowledge, any other party to the StadCo Sublease, Team Sublease or Ground Lease under
such Leases; and (v) each of the StadCo Sublease, Team Sublease and Ground Lease was duly executed

CONFIDENTIAL

Requesting Parties
Page 26

and delivered by the JV Company or such Club Party, and to the best of its knowledge, by the other parties thereto.

(m)    Immediately after the date hereof, the JV Company and each Club Party party to the applicable Additional Agreement shall cause a negative covenant to be recorded in the Bergen County Clerk's Office, Hackensack, New Jersey, which negative covenant shall provide that the JV Company and the Club Parties acknowledge and covenant that they shall not, without the NFL's prior written consent in the NFL's sole and absolute discretion (A) place or permit to be placed any Liens on the StadCo Sublease, Team Sublease or Ground Lease or any interest therein (other than Permitted Encumbrances) or (B) sublet, assign, or otherwise transfer the StadCo Sublease, Team Sublease or Ground Lease or any interest therein, other than (i) any such subletting, assignment, or other partial transfer as is expressly contemplated by the StadCo Sublease, Team Sublease or Ground Lease to permit the JV Company and the Club Parties to exploit the rights granted thereunder (but in no event any such transfer or assignment of the entire leasehold estate granted thereby) or (ii) in connection with a Permitted Transfer.

(n)    The JV Company and each undersigned Club Party hereby covenants and agrees to use its best efforts (which shall not require the payment of any compensation or other consideration (except for legal fees and related expenses) to the Authority or the City, as applicable) to do the following:

(i)    simultaneously with the entering into of any amendment, modification, or supplement to the Ground Lease, the JV Company shall enter into or consent to, as appropriate and as requested by the NFL in the NFL's sole and absolute discretion, and shall cause the Authority to enter into, a formal agreement amending the Ground Lease, each of which agreements and/or consents shall be in form satisfactory to the NFL in its sole and absolute discretion, shall be subject to NFL approval prior to execution, and shall, without limitation, provide that (A) the NFL is a third-party beneficiary under the Ground Lease, and such amendment, modification or supplement, with the power (but not the obligation) to enforce JV Company's rights and obligations thereunder; and (B) any notice or demand under the Ground Lease (including any notice of default, violation or failure and any other material notice or notice of a material event), and such amendment, modification or supplement shall be delivered simultaneously to the NFL; and

(ii)    as soon as practicable after the date hereof, cause the Authority to execute and deliver the New Stadium Estoppel.

(o)    JV Company shall not, without the NFL's prior written consent, provide any consent to the City or the Authority under Section 14.01 of the Ground Lease unless the failure to provide such consent prior to receipt of such NFL written consent would reasonably be expected to constitute a breach of the Ground Lease.

(p)    The Trustee shall not, without the NFL's prior written consent in the NFL's sole and absolute discretion, provide any consent to the Club or the Authority as a Leasehold Mortgagee under either of the StadCo Sublease (including without limitation under Section 9.03 thereof) or the Ground Lease (including without limitation under Section 16.03 thereof); provided that such NFL consent shall not be unreasonably withheld, conditioned, or delayed if the Trustee's consent under the applicable provision of the StadCo Sublease or Ground Lease, as applicable, may not be unreasonably withheld, conditioned, or delayed pursuant to the terms thereof.

CONFIDENTIAL

Requesting Parties
Page 27

(q)       StadCo and the Trustee shall immediately deliver to the NFL a copy of any notice sent to StadCo or the Trustee pursuant to Section 9.03 of the StadCo Sublease and, upon the NFL's request, StadCo and/or the Trustee shall deliver timely to the JV Company an objection notice under the StadCo Sublease.

(r)       The JV Company and each undersigned Club Party (i) represents and warrants that, to its knowledge, no Liens, encumbrances or other exceptions to title (other than Permitted Exceptions, as defined in the Ground Lease) affecting the City's and/or the Authority's title to, or interests in, the Premises (as defined in the Ground Lease) or any portion thereof (including, without limitation, the Ground Lease, or any of the superior leases to which the City and the Authority are party with respect to the New Stadium) currently exist (except as otherwise disclosed by the Authority in the Ground Lease) and (ii) covenants and agrees that it shall (x) use commercially reasonable efforts to enforce against the Authority the provisions of the Ground Lease relating to the maintenance of the Authority's title to the Premises, including without limitation the provisions of Section 14 of such Ground Lease and (y) not consent to the encumbrance of the Authority's title to the Premises pursuant to Section 14.02 of the Ground Lease without the NFL's prior written consent (not to be unreasonably withheld or delayed) unless the failure to so consent would constitute a breach of the Ground Lease (in which event the NFL shall be provided with notice and a copy of such consent).

(s)       The JV Company and each Club Party that is party to the applicable Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner, acknowledges and agrees that, so long as any Obligations are outstanding, it shall not exercise its early termination rights under the Ground Lease, StadCo Sublease or the Team Sublease relating to the New Stadium without either (i) the prior written consent of the NFL or (ii) (A) the repayment in full of the Obligations by StadCo (or the defeasance of all of the Obligations or other provision for such repayment pursuant to transactions and on such terms as may be satisfactory to the NFL in its sole and absolute discretion) and (B) the Club having secured an alternative venue for playing NFL games pursuant to a lease that has been approved by the NFL in its sole and absolute discretion. For the avoidance of doubt, the JV Company and the Club Parties further acknowledge and agree that any consent by the NFL to such an exercise of early termination rights or approval of a lease for an alternative venue shall not, unless otherwise expressly consented to by the NFL and/or such of the NFL member clubs as may be applicable under the NFL Constitution in each case in their sole and absolute discretion, constitute consent by the NFL and/or NFL member clubs to a relocation of the Team outside of its existing territory.

5.       Foreclosure and Standstill Provisions.  Any proposed Foreclosure or other proceeding by any Secured Party following a Default or Event of Default shall be subject to the terms and conditions set forth in this Paragraph 5:

(a)       If a Default or Event of Default shall have occurred and shall be continuing and a Secured Party shall have the right under the Financing Documents and shall seek to commence a Foreclosure on any Collateral or any other Football Related Assets, the Secured Parties shall, prior to the commencement of any Foreclosure, deliver a Foreclosure Notice to StadCo (and such other parties as may be required under the Financing Documents and applicable law).  In the event a Secured Party shall furnish to StadCo or any other Person any Foreclosure Notice, such Secured Party shall simultaneously furnish to the NFL a copy of such Foreclosure Notice, and each Secured Party hereby agrees that notwithstanding any provision herein or in the Financing Documents to the contrary, no such Foreclosure Notice shall be effective (and no Foreclosure shall be commenced) until such Foreclosure Notice has been delivered to the NFL in accordance with the provisions of Paragraph 16 hereof.  In connection with its delivery of any Foreclosure Notice, if reasonably requested by the NFL following an Event of Default, such Secured Party shall take any and all actions necessary to effect such Foreclosure and, without limiting the foregoing, shall file and use its reasonable efforts promptly to obtain entry of a judgment lien

CONFIDENTIAL

Requesting Parties
Page 28

and/or a Judgment Order, including against any assets of StadCo that do not then constitute Collateral, and upon its entry by a court the Trustee and such Secured Party shall deliver a copy of evidence to the NFL that such judgment lien or Judgment Order has been obtained.

(b)    Notwithstanding the commencement and continuation of a Standstill Period, in the event that (x) the Trustee or any other Secured Party shall have the right at any time prior to Substantial Completion to deliver a Foreclosure Notice and (y) at such time, the Trustee or any other Secured Party (or any successor thereto) shall have the right, under the terms of the Financing Documents, to elect whether to complete the Project, then, in such event and without prejudice to the remaining provisions of this Letter Agreement (including without limitation Paragraph 5(n) hereof), the Trustee or such other Secured Party shall have the right, at any time thereafter, to make such election (subject to such terms as are otherwise provided under the Financing Documents and subject always to and in accordance with the terms of this Paragraph 5 and Paragraph 9 of this Letter Agreement). In the event that the Trustee or such other Secured Party shall fail so to elect, within ninety (90) days, to exercise such rights and to complete the Project, the provisions of Paragraph 5(b)(i) shall apply; provided that in the event that the JV Company and the Club Parties during such ninety (90)-day period are diligently and actively completing the Project then, in such event, such period shall be extended until the date which is thirty (30) days following the date on which the JV Company and the Club Parties shall have ceased diligently and actively completing the Project. The Secured Parties shall be deemed to have given notice to the NFL of their election not to complete the Project upon the earliest to occur of: (1) the expiration of such ninety (90)-day period (as extended by the proviso in the foregoing sentence); and (2) the delivery by the Secured Parties of a Foreclosure Notice (or the date on which a Foreclosure Notice shall be deemed to have been delivered as provided in Paragraph 5(c)(ii) in respect of a Foreclosure prior to Substantial Completion). In the event that the Trustee or such other Secured Party elects to complete the Project, the provisions of Paragraph 5(b)(ii) shall apply (provided that if, at any time following such election, the Trustee or other Secured Party abandons or otherwise fails to timely complete the Project, the provisions of Paragraph 5(b)(i) shall apply).

(i)    In the event that the Trustee and the other Secured Parties fail timely to elect to complete the Project as contemplated in this Paragraph 5(b), then not less than sixty (60) days prior to effecting any transfer (with any such transfer being made only to the extent otherwise permitted by the terms hereof and the Indenture) of any monies in the Bond Proceeds Account (and such other monies and Funds as the terms of the Financing Documents shall permit to be transferred to the Senior Lien Debt Service Fund or other applicable debt service funds or accounts) for application to the repayment of the Obligations (other than Permitted Standstill Period Payments, the payment of which shall be permitted hereunder to the extent otherwise permitted in the Indenture), the Trustee and the other Secured Parties shall give the NFL written notice of such intention not to complete the Project and to seek such transfer for application to the repayment of the Obligations; provided that such transfers shall in all cases be subject to the terms of the Financing Documents and this Letter Agreement. Upon receipt of such notice, the NFL shall have the right, at any time during the sixty (60)-day period following receipt of such notice, (x) to exercise the cure rights afforded to the NFL pursuant to Paragraph 9 hereof and to direct StadCo, the other Club Parties and the JV Company to complete the Project and/or (y) to assume the rights and obligations of StadCo under the Financing Documents (such obligations and rights (other than the maximum commitment and notional amounts, interest rates, amortization schedule and payment terms thereunder) being so modified as may be reasonably necessary to permit the NFL to perform as StadCo under the Indenture and to make the borrowings necessary under the Financing Documents to complete the Project) and to assume and exercise the rights of StadCo, the other Club Parties and the JV Company to complete the Project. Regardless of whether the NFL shall so elect to

CONFIDENTIAL

Requesting Parties
Page 29

exercise such cure and/or assumption rights, (1) neither the Trustee nor any other Secured Party shall effect any Foreclosure upon or other disposition of any monies in or other properties credited to any Account except as otherwise expressly provided herein, other than in respect of, and solely to the extent required to make Permitted Standstill Period Payments, and in no event shall any monies in or other properties credited to any Account be used for any other purpose or otherwise transferred or disposed of by the Trustee or any other Secured Party and (2) in no event shall any proceeds of the League G-3 Loan (including any such proceeds contained in the NFL Facility Proceeds Account) be applied to repay the Obligations or otherwise Foreclosed upon by the Secured Parties.

(ii)    In the event that the Trustee or any other Secured Party elects to complete the Project and to enforce, subject to the terms of the Financing Documents, all rights of StadCo, the other Club Parties and the JV Company under and pursuant to any Operative Project Documents, then, in such event:

(A)    during the Standstill Period, but only as otherwise permitted by the terms of the Financing Documents, the Trustee shall have the right to administer the Accounts and to apply any and all monies therein or other properties credited thereto only to the payment of (x) Costs of the Project (but, for the avoidance of doubt, excluding any payments of principal, interest, fees, costs or expenses arising under any Financing Document that are not Permitted Standstill Period Payments); provided that, for the avoidance of doubt, the Trustee shall at no time have the right to administer or apply any proceeds of the League G-3 Loan or any PSL Proceeds, which shall be administered and applied during the Standstill Period, if at all, only by the NFL, and (y) Permitted Standstill Period Payments; and

(B)    to the extent any such monies or properties are not disbursed to pay such Costs of the Project or Permitted Standstill Period Payments, then during the Standstill Period the Trustee shall retain the same in the Accounts and shall not transfer or dispose of the same and the same shall remain subject to the limitations set forth herein in respect of the Standstill Period.

(iii)    In addition to its rights with respect to the Accounts under this Paragraph 5(b), the NFL shall also have all of the rights set forth in Paragraph 5(l) below with respect to the payment of Operating Expenses.

(iv)    In the event that the Trustee or the Controlling Insurer has the right to do so under the terms of the Financing Documents and this Letter Agreement and shall, following consultation in good faith with the NFL, elect to cause the issuance of additional Bonds under the Indenture, and/or uses monies or other properties in the Accounts to complete the Project in accordance with this Paragraph 5(b) following a Default or Event of Default, then, in such event and notwithstanding the occurrence of a commitment termination event under clause (d)(ii) of the definition thereof contained in the League G-3 Loan that arises solely as a result of such Default or Event of Default (other than such a commitment termination event that arises subsequent to or in connection with any other commitment termination event thereunder), at the request of, and for the benefit only of, the Insurers (but not the Club Parties, the JV Company or the other Secured Parties), the NFL shall continue to make loans under and in accordance with the other terms of the League G-3 Loan in an amount not to exceed the NFL's then-remaining commitment that would otherwise have been available to StadCo under such

CONFIDENTIAL

Requesting Parties
Page 30

League G-3 Loan) to provide funds for the completion of the Project as contemplated in this Paragraph 5(b).

(c)    The parties hereby agree that the initiation of any Foreclosure and delivery of any Foreclosure Notice shall be subject to the following terms:

(i)    During the Standstill Period, in addition to the rights provided to the NFL herein (and except as otherwise expressly provided in Paragraph 5(b) hereof):

(A)    no Secured Party shall take any steps to effect Foreclosure (except as the NFL in its sole and absolute discretion may consent); provided that the foregoing shall not prohibit the Secured Parties from delivering a Foreclosure Notice or, subject to the assumption and cure rights of the NFL hereunder, from: (w) providing a notice of acceleration to StadCo at any time or from time to time as permitted under the Financing Documents; (x) taking such other actions (e.g., filing proofs of claim, but, for the avoidance of doubt, expressly excluding the filing of an involuntary proceeding or petition) as are necessary to preserve the Secured Parties' rights to exercise their remedies under the Financing Documents upon the termination of the Standstill Period; (y) seeking a Judgment Order and/or judgment lien against any assets of StadCo (other than Shared Revenues, proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account), PSL Proceeds and amounts on deposit in the Other Proceeds Account) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained herein); or (z) bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof;

(B)    following the date on which any Secured Party shall be required hereunder to deliver a Foreclosure Notice, the NFL shall have the right to direct the Trustee and the other Secured Parties in the exercise of their rights under and in accordance with the Financing Documents (the "NFL Standstill Period Collateral Rights");

(C)    the NFL shall have the rights set forth in Paragraph 9 hereof; and

(D)    following the date on which any Secured Party shall be required hereunder to deliver a Foreclosure Notice to the NFL, the NFL shall have the exclusive and unrestricted right, subject to the terms of this Letter Agreement but without the prior consent of the Secured Parties or any other Requesting Party, to select the purchaser to whom the Collateral (or any portion thereof and, at the NFL's election, including some or all Football Related Assets not then pledged to the Secured Parties) shall be sold and to establish the terms and conditions of any sale that is consummated or agreed upon in writing within the Standstill Period, which sale will occur within a reasonable period of time thereafter.

(ii)    If at any time or from time to time the NFL shall reasonably believe that a Foreclosure has commenced, but the NFL shall not have received a Foreclosure Notice from the Secured Parties as required hereunder, then the NFL may so notify the Trustee

CONFIDENTIAL

and the Controlling Insurer in writing and the NFL shall, for the avoidance of doubt, have all of the NFL Standstill Period Collateral Rights (and the rights under Paragraph 5(b), as applicable), except that the NFL shall not, prior to the Foreclosure Cure Expiration Date, have the right to sell the Collateral without the prior written consent of the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee). Upon receipt of such notice from the NFL, and subject always to (A) such Foreclosure being capable of cure (e.g., through the suspension or termination of any associated judicial proceedings, cross-acceleration, cross-defaults, or other collateral results of such Foreclosure), (B) the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) having undertaken reasonably diligent efforts to effect such a cure of such Foreclosure within three (3) Business Days following delivery of such notice from the NFL (and having continued such efforts thereafter), (C) the Controlling Insurer, the Trustee or any other Secured Party not having delivered a Foreclosure Notice or otherwise engaged in, undertaken, or directed the actions or other conduct leading the NFL to have issued such notice, and (D) such cure having been effected in full on or before the Foreclosure Cure Expiration Date, the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall have the right, upon timely delivery of written notice of such intention to the NFL to attempt to effect the cure of such Foreclosure. If the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall successfully effect a cure of such Foreclosure as contemplated in clauses (A) through (D) hereof, then, in such event, such Foreclosure shall be deemed to have been avoided, and the NFL Standstill Period Collateral Rights in respect of such cured Foreclosure (but no subsequent Foreclosure) shall terminate; provided that, for the avoidance of doubt, any subsequent Foreclosure by the Controlling Insurer, the Trustee or any other Secured Party shall be subject to the terms of this Letter Agreement.

(iii)    The parties acknowledge and agree that (A) the cure rights granted to the Secured Parties under Paragraph 5(c)(ii) shall terminate on the Foreclosure Cure Expiration Date, and (B) in the event that a Foreclosure shall have occurred and the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall not have effected such cure on or before the Foreclosure Cure Expiration Date, then for purposes of this Letter Agreement a Foreclosure Notice shall be deemed to have been delivered by the Secured Parties on such Foreclosure Cure Expiration Date.

(iv)    In connection with an Event of Default in respect of which a Foreclosure Notice shall have been issued (or deemed to have been issued) hereunder, then, in such event, the NFL shall consult with the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) with respect to the sales process proposed to be used by the NFL, including the role of any potential purchasers to be identified by the Secured Parties in connection therewith; will consider in good faith the use of a competitive bidding process if the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) shall so request; will conduct any sale or other disposition of the Collateral (or any portion thereof and, if the NFL shall so elect, other Football Related Assets) in good faith; and will use reasonable efforts to keep the Controlling Insurer, or following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) informed with respect to the progress of any such sale. Each Requesting Party acknowledges and agrees, to the maximum extent permitted under applicable law, that (A) any sale or other disposition of the Collateral (or any portion thereof and, at the NFL's sole option, other Football Related Assets) conducted in accordance with the procedures and policies set forth in this Paragraph 5 and the NFL's then-existing

Requesting Parties
Page 32

ownership and other policies shall be deemed to be commercially reasonable, regardless of whether any of the owners of direct or indirect interests in the Club or StadCo receive any return on equity as a result of such sale or other disposition; (B) although it is the intention of the NFL to realize reasonable value for the Collateral in any sale or other disposition by the NFL thereof, each Requesting Party acknowledges and agrees that there is a substantial possibility that, in connection with any such sale or other disposition and following distribution of the proceeds of the sale or other disposition to all parties with priority over StadCo, the other Club Parties and/or the JV Company and the application of the proceeds pursuant to the terms hereof, the Obligations may not be repaid in full and/or no amounts will be left available for distribution to the Club Parties, the JV Company and/or any other owners of the Collateral so sold or disposed of; and (C) neither the Secured Parties nor any other Requesting Party shall have the right to object to any sale or other disposition of Collateral by the NFL as aforesaid if either: (x) adequate provision for the satisfaction and settlement of the outstanding Obligations shall have been made by reasonable mutual agreement between the applicable Secured Party and the NFL, (y) the net cash proceeds therefrom payable on the closing date to the Secured Parties would be sufficient to satisfy all of the Obligations then outstanding or (z) such sale is a Qualifying Sale Transaction; provided that in any such event described in the foregoing clauses (x), (y) and (z), and regardless of any shortfall in such proceeds, the NFL shall under no circumstances be obligated (1) to accept the highest price offered for any of the Collateral; (2) to waive any then-existing NFL ownership and other policies in connection with any such sale or other disposition; (3) to sell or otherwise dispose of the Collateral to a purchaser who proposes to relocate the Franchise to another city; or (4) to sell or otherwise dispose of any portion of the Collateral in any transaction that does not also involve a sale or other disposition of all of the Collateral (together with, at the NFL's sole election, all or any portion of the other Football Related Assets held by StadCo and/or any other Club Party, including without limitation the Club and/or StadCo's interests in the JV Company).

(d)    Subject to the second sentence of Paragraph 5(c)(iv), which shall have continuing applicability following the expiration of the Standstill Period, if a sale or other disposition of the Collateral following a Foreclosure by the Trustee or any other Secured Party meeting the requirements of Paragraph 5(c) above is not agreed upon within the Standstill Period, the NFL and the Secured Parties agree to use reasonable efforts thereafter to locate a purchaser acceptable to such of the NFL or the NFL member clubs as may be applicable under the NFL Constitution for the Collateral being Foreclosed upon (and, at the NFL's sole election, other Football Related Assets designated by the NFL) and otherwise to cooperate with each other to find a purchaser for the Collateral (and such Football Related Assets, if any) acceptable to such of the NFL or the NFL member clubs as may be applicable under the NFL Constitution.

(e)    If, after the conclusion of the Standstill Period, the Trustee or any other Secured Party independently locates a prospective purchaser for the Collateral (and any other Football Related Assets designated by the NFL), the NFL will promptly consider, in accordance with the NFL Constitution and other established procedures of the NFL, a written application for the consent of such of the NFL and the NFL member clubs as may be applicable under the NFL Constitution to such proposed sale or other disposition. The NFL shall use good faith efforts, but under no circumstances be obligated, to accept or reject such application within one hundred twenty (120) days after the NFL's receipt of such application. The NFL will use reasonable efforts to keep the Secured Parties informed with respect to the NFL's progress in reviewing such application, and will notify the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) promptly upon any final determination with respect thereto. The Requesting Parties acknowledge and agree that in no event shall the NFL have any obligations to

GStad_LB_0007036

Requesting Parties
Page 33

accept any such application for the sale of any portion of the Collateral in any transaction that does not also involve a sale or other disposition of all of the Collateral.

        (f)     If the NFL approves a purchaser of the Collateral following the delivery of a Foreclosure Notice by a Secured Party as contemplated by Paragraph 5(c) above, and provided that provision is made for payment of all of the outstanding Obligations (or, in connection with a Foreclosure sale or other disposition of the Collateral following the termination of the Standstill Period to a party designated by a Secured Party and approved by the NFL, if either: (x) adequate provision for the satisfaction and settlement of the outstanding Obligations shall have been made by reasonable mutual agreement between the applicable Secured Party and the NFL, or (y) the net cash proceeds therefrom payable on the closing date to the Secured Parties would be sufficient to satisfy all of the Obligations then outstanding), each Secured Party shall, upon such payment of the Obligations as and to the extent contemplated in such Paragraph 5(c), release its Liens (including any judgment lien) on the Collateral (or, if such Secured Party then owns the Collateral, execute appropriate bills of sale or other conveyance documents necessary to transfer title to the Collateral), and cooperate with the NFL by taking such other steps and executing such other documents as may be reasonably requested by the NFL, to the extent necessary to permit as promptly as possible the proposed conveyance free and clear of any claims by such Secured Party (and provided that, for purposes of clarity, it is acknowledged and agreed that the Secured Parties' Liens in the Collateral shall survive a Qualifying Sale Transaction under which the Obligations are not repaid).

        (g)     The JV Company and each undersigned Club Party hereby agrees that (i) on or before the Consent Date (and, if no Final Order has been reached, for so long as it does not dispute in good faith the propriety of the Foreclosure Notice), it shall deliver to the NFL executed originals of all consents, waivers, and agreements of third parties (including any Club-Affiliated or StadCo-Affiliated parties) necessary to permit the sale or other disposition by the NFL of Collateral (and other Football Related Assets designated by the NFL, if any) owned by the JV Company and/or such Club Party pursuant to this Paragraph 5, together with a certificate representing and warranting to the NFL that the consents, waivers and agreements delivered with such certificate constitute all such consents, waivers, and agreements necessary to permit such sale or other disposition, except as specifically disclosed on a disclosure schedule attached to such certificate and (ii) within five (5) business days of any request from the NFL made after the delivery of a Foreclosure Notice (and, if no Final Order has been reached, for so long as none of the JV Company and such Club Party disputes in good faith the propriety of the Foreclosure Notice), the JV Company and such Club Party shall execute and deliver such documentation to the NFL, make such filings and take such other actions as the NFL shall request in order to grant the Trustee (or other party designated by the NFL) a Lien on Football Related Assets designated by the NFL and not then constituting Collateral. The JV Company and each undersigned Club Party further agrees that in the event that any consents, waivers, or agreements are listed on the disclosure schedule to the certificate referenced in the preceding sentence, each of them hereby irrevocably authorizes the NFL and any officer or agent thereof, from and after the Consent Date, and, if no Final Order has been reached, for so long as neither the JV Company nor a Club Party disputes in good faith the propriety of the Foreclosure Notice, to contact all necessary third parties directly and to obtain such consents, waivers, or agreements on terms and conditions satisfactory to the NFL in its sole and absolute discretion. The JV Company and each undersigned Club Party hereby agrees (i) to defend, indemnify and hold harmless the NFL from and against any and all Damages that the NFL and any officer or agent thereof may incur or suffer as the result of any breach of the representation and warranty made in such party's certificate, or any action taken or consent given by the NFL in reliance thereon, and (ii) irrevocably to waive any claims that it may have against the NFL and any officer or agent thereof arising out of actions taken or omitted to be taken in connection with the NFL's obtaining third-party consents, waivers, and agreements as authorized by this Paragraph 5 other than, in any such event, those arising from the gross negligence or willful misconduct of the NFL or such officer or agent acting on behalf of the NFL.

CONFIDENTIAL

Requesting Parties
Page 34

(h)     The JV Company and each undersigned Club Party hereby irrevocably appoints
the NFL, and any officer or agent thereof, as its attorney-in-fact, with full authority in the place and stead
of such party and in the name of such party or otherwise, from time to time in the NFL's discretion
following the receipt by the NFL of a Foreclosure Notice, and, if no Final Order has been reached, for so
long as such party do not dispute in good faith the propriety of the Foreclosure Notice, to take any and all
actions and to execute any agreement, instrument or other assurance (including, without limitation any
agreement for the pledge of Football Related Assets as contemplated in subsection (g) above or
agreement of sale or related document with respect to any Collateral or Football Related Assets
designated by the NFL) which the NFL may deem necessary or advisable in order to consummate a sale
in accordance with the provisions of this Paragraph 5 and to otherwise carry out the terms of this Letter
Agreement, including, without limitation, (i) to execute, perform and provide all such documents, acts
and further assurances which such party is required to execute, perform and provide under the covenants
and provisions of this Letter Agreement in order more fully to effectuate the intent of such covenants and
provisions and (ii) to take all such actions as may be necessary or advisable to ensure that the business
and affairs of the Club, the other Club Parties, the JV Company and any other football entity (if
applicable), and the operation, construction and maintenance of the New Stadium, are continued in the
ordinary course and that the Collateral and Football Related Assets of such party are maintained,
preserved and protected; provided that the foregoing shall not be construed to permit the NFL or any
officer or agent thereof to execute any instrument on behalf of the Club Controlling Owner or the StadCo
Controlling Owner that constitutes a guaranty or suretyship by such Controlling Owner or that is not
customarily executed by the controlling owner of an NFL team in a third-party sale. To the fullest extent
permitted by law, each of the JV Company and the undersigned Club Parties hereby ratifies and approves
all acts of any such attorney-in-fact. The foregoing power-of-attorney, being coupled with an interest, is
irrevocable until the Obligations have been repaid in full. The powers conferred on the NFL and any
officer or agent thereof, as its attorney-in-fact hereunder, are solely to protect its ability to fulfill the
manner of sale provisions contained in this Paragraph 5 and shall not impose any duty on the NFL and
any officer or agent thereof to any of the Requesting Parties to exercise such powers, or any obligation on
the NFL and any officer or agent thereof beyond those expressly set forth herein, nor shall such grant of
powers prevent the exercise by the Trustee or by any other Secured Party (subject always to the
limitations set forth in this Letter Agreement in respect of the exercise by the Trustee and the Secured
Parties of their rights under the Financing Documents), of its rights to act as the attorney-in-fact for
StadCo in order to file, perfect, or maintain, or to enforce to the extent permitted under this Letter
Agreement, the liens of the Secured Parties in the Collateral under the Security Documents. In
connection with and in furtherance of the terms and provisions hereof, the JV Company, each
undersigned Club Party and each holder of an ownership interest in the Club or StadCo has executed and
delivered to the NFL an Irrevocable Proxy, dated as of the date hereof and in the form attached hereto as
Exhibit G.

(i)     The Requesting Parties agree that if a Secured Party has provided a Foreclosure
Notice contemplated by Paragraph 5(a) above (or is deemed to have provided a Foreclosure Notice
pursuant to Paragraph 5(c)(ii) above) and more than one potential purchaser of the Collateral acceptable
to the NFL under the NFL Constitution is identified by the Requesting Parties or the NFL, the right of the
Requesting Parties to object to the selection by the NFL or the NFL member clubs, as the case may be, of
an acceptable purchaser shall be subject to Paragraph 5(c)(iv) hereof.

(j)     Nothing herein shall affect the Secured Parties' rights, to the extent that they
have such rights under the Financing Documents, to continue as the holders of a security interest in the
Collateral in accordance with the terms of the Financing Documents and this Agreement consistent with
then-existing NFL ownership and other policies until a purchaser for such Collateral is obtained pursuant
to the provisions hereof and a Secured Party is required to release its Liens in accordance with the
provisions of Paragraph 5(f) hereof; provided that to the extent the occurrence or continuance of an event

Requesting Parties
Page 35

that would permit Foreclosure by or on behalf of any Secured Party gives or could give the Secured Parties a right to select the management of the Club or otherwise make decisions with regard to the operation of the Club (including, without limitation, by the exercise of any voting rights with respect to any interests in, or the making of any determinations or decisions regarding, any of NFL Ventures, NFL Productions, NFL Properties, or NFL Enterprises), such right shall be exercised solely by the NFL or, if the NFL so determines, by a designee of the NFL, which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee); and provided further, that following the date on which any Secured Party shall be required to deliver a Foreclosure Notice or otherwise exercises or attempts to exercise a right to select the management of StadCo and/or the New Stadium or otherwise to make decisions with regard to the operation of StadCo and/or the New Stadium (whether pursuant to the Financing Documents or otherwise, it being acknowledged by the Secured Parties that they do not have, and shall not assert, any right, or right of recourse, with respect to the Existing Stadium or any practice, training or other facility under the Financing Documents), the NFL shall have the right, at any time or from time to time thereafter (for so long as any Secured Party or any successor in interest thereto shall have such rights under the Financing Documents or otherwise), in the sole and absolute discretion of the NFL, to exercise, or, if the NFL so determines, to appoint a designee to exercise (which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee)) the Secured Party's right (to the exclusion of the Secured Party(ies)) to select such management or otherwise so to make decisions with regard to the operation of StadCo and, subject to the terms of the JV Company's Operating Agreement relating to the rights of the Other StadCo, the New Stadium. Nothing herein shall require the Secured Parties to make further loans and advances to or for the benefit of any Club Party following a Default or Event of Default, unless otherwise required by the terms of the Financing Documents or as contemplated under Paragraph 5(b) of this Letter Agreement.

        (k)    In the event of any Foreclosure or attempted Foreclosure by a Secured Party, the Secured Parties shall at all times (including at any time during the Standstill Period) cooperate with the NFL in preserving the Club's and StadCo's ability to meet their respective obligations, if any, to the NFL and the other NFL member clubs. Notwithstanding the foregoing sentence:

        (i)    such obligation to cooperate shall not require the Secured Parties to make any advances whatsoever to the Club or any advances to StadCo that are not otherwise required under the terms of the Financing Documents or contemplated in Paragraph 5(b) hereof; and

        (ii)    solely as between the Secured Parties on the one hand and StadCo, the other Club Parties and the JV Company on the other, the foregoing shall not be construed to require the Secured Parties to waive any Default or Event of Default or modify the terms of any Financing Document.

        (l)    In the event that the NFL shall so elect to exercise the management rights with respect to the Club and/or StadCo referred to in Paragraph 5(j) hereof:

        (i)    such rights shall be exercised solely by the NFL or, if the NFL so determines, by a designee of the NFL, which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee);

        (ii)    the NFL or such designee shall perform its duties in a manner consistent with the NFL Constitution and this Letter Agreement, and, subject to the terms of this Letter Agreement, consistent with the rights of the Secured Parties under the Financing

CONFIDENTIAL

Requesting Parties
Page 36

Documents and the rights of the Club Parties and the JV Company under the applicable Additional Agreements;

(iii)    the NFL or such designee shall have the right to make or direct any and all payments in respect of Operating Expenses (in each case in accordance with the ordinary course of other NFL stadia or as may otherwise be reasonably required to continue operating the New Stadium in a manner consistent with the maintenance and ongoing operation of the New Stadium as a suitable venue for professional football games) and, to the extent applicable, operating expenses of the Club; and

(iv)    notwithstanding any term in the Financing Documents to the contrary, the Secured Parties, StadCo, the StadCo Controlling Owner and the Trustee shall permit the NFL, or its designee, in such capacity, to draw Operating Expenses or otherwise to direct the Trustee to make payments of Operating Expenses, from any monies from time to time contained in or other properties credited to any of the Accounts; provided that the NFL shall not have the right to withdraw funds from the Senior Lien Debt Service Reserve Fund.

(m)    Prior to an affirmative election by the NFL to manage StadCo or the New Stadium pursuant to Paragraph 5(j), in the event that any Secured Party shall have or acquire (under the Financing Documents or otherwise) management rights in respect of StadCo or the New Stadium as contemplated in Paragraph 5(j), the Trustee shall be permitted, to the extent provided in the Financing Documents, to make payments of Operating Expenses from the Accounts (other than the Construction Fund and any Accounts contained therein, unless the NFL shall otherwise consent in writing). Following such affirmative election by the NFL, the Trustee shall make such payments only as the NFL may direct.

(n)    In the event of a Default or Event of Default and the exercise by the Secured Parties of any remedy under the Financing Documents, the Team shall be permitted to continue to play its home games at the Existing Stadium or the New Stadium, as applicable, on the same terms and conditions as are contained in the Existing Stadium Lease or the Team Sublease, as applicable, as then in effect for so long as the Club complies with its obligations under such lease.

(o)    Notwithstanding any provisions of the Financing Documents to the contrary, the Requesting Parties and the Trustee hereby agree that (i) at all times, any funds in any Account may be applied as permitted, and shall be applied as required, under this Letter Agreement, (ii) during any Standstill Period, the Trustee shall disperse or withhold funds in the Accounts strictly in accordance with the terms of this Letter Agreement, and (iii) upon the exercise by the NFL of its rights to manage StadCo or the New Stadium in accordance with the terms of Paragraphs 5(j) and 5(l) of this Letter Agreement, the NFL shall have the right to direct the Trustee in writing, with a copy to the Controlling Insurer, to, and in such event the Trustee shall, transfer, apply and otherwise dispose of funds in the Accounts in accordance with the provisions of such direction and this Letter Agreement. In the event of any dispute between the NFL and the Requesting Parties over the disposition of funds in any Account or the terms of this Letter Agreement, the Trustee shall have the right to refuse to act upon any direction for the transfer or disposition of such funds until the Requesting Parties and the NFL shall agree and jointly direct the Trustee in writing or until so ordered by a court of competent jurisdiction.

(p)    The Requesting Parties hereby expressly acknowledge and agree that in the event of a sale or other disposition of any Collateral in Foreclosure or otherwise pursuant to the terms of this Agreement (other than a Qualifying Sale Transaction, with respect to which the Secured Parties shall not be entitled to receive proceeds of sale), the proceeds of such sale or disposition, whether received by the NFL or such Requesting Party, shall be applied as follows:

CONFIDENTIAL

Requesting Parties
Page 37

    (i)    first, to the satisfaction of any amounts having priority at law or in equity over the amounts due to the NFL or the Secured Parties;

    (ii)    second, to the satisfaction of amounts (if any) then due to the NFL from the Club Parties or the JV Company in respect of (x) Shared Revenues and (y) Club Assessments (other than Club Assessments constituting fines or other penalties imposed under the disciplinary provisions of the NFL Constitution imposed as the result of rules infractions under the NFL Constitution), provided that:

    (A)    in the case of Club Assessments, such Club Assessments are generally applicable to all NFL member clubs; provided that with respect to any such Club Assessments initially imposed on the Club that the NFL seeks to collect from StadCo as contemplated hereunder:

    (1)    the NFL shall first attempt to collect such Club Assessments from the Club (including the exercise of all available offset rights and remedies under standing NFL resolutions) and shall seek to collect from the Collateral the deficiency (if any) in such Club Assessments: (x) only after the exercise of such collection and remedies against the Club and (y) only after the NFL shall have determined in its reasonable discretion that the Club does not or will not have sufficient funds to pay the aggregate amount of such Club Assessments and all other obligations for which the Club is liable; and

    (2)    the NFL shall assert priority under this clause (A) with respect to Club Assessments initially imposed on the Club only for that amount by which such Club Assessments exceed the amount that the NFL shall have determined as contemplated in sub-clause (x) of Paragraph 5(p)(ii)(A)(1) that the NFL is able to collect first from the Club; or

    (B)    in the case of Club Assessments, such Club Assessments are specifically imposed on any Club Party or the JV Company pursuant to other non-disciplinary provisions of the NFL Constitution (e.g., assessments relating to overdue or unpaid revenue sharing obligations in respect of visiting team gate receipts and club seat premium payments),

provided that the NFL shall assert and be entitled to receive priority payment in respect of Shared Revenues and Club Assessments under this Paragraph 5(p)(ii), only to the extent and/or in the event that either: (x) the remaining available proceeds of the sale or other disposition of the Collateral shall be sufficient to satisfy in full the Obligations of StadCo to the Secured Parties as described in clauses fifth and seventh of this Paragraph 5(p), or (y) the NFL shall have conducted or otherwise caused, in connection with the sale or other disposition of the Collateral hereunder, the concurrent sale or other disposition of the Franchise and all or a substantial majority of the Football Related Assets of (or equity interests in) the Club in the same or a related and contemporaneous sale or other disposition transaction, but for the avoidance of doubt nothing herein shall be deemed to require the NFL to elect at any time (whether following a Default or Event of Default or following an event of default under any financing relating to the Club) to sell or otherwise dispose of the Collateral together with the Franchise and other Football Related Assets of (or equity interests in) the Club;

CONFIDENTIAL

Requesting Parties
Page 38

     (iii)    third, to the payment of out-of-pocket costs incurred by the NFL in conducting the sale or other disposition of the Collateral (and any other Football Related Assets sold along with such Collateral), including, without limitation, legal and accounting fees, and investment bank or other sale consultants' commissions; provided that the expenses subject to the priority in this Paragraph 5(p)(iii) shall not exceed an amount equal to three percent (3%) of the aggregate sales price (or fair market value equivalent thereof) received upon such disposition of the Collateral and other Football Related Assets, if any;

     (iv)    fourth, to the satisfaction of the amounts then due to the NFL with respect to NFL Priming Loans; provided that such priority shall be limited to NFL Priming Loans with an aggregate principal amount not to exceed the sum of $50,000,000 and the amount of then accrued and unpaid interest and all reasonable related administrative costs incurred by the NFL in connection with such NFL Priming Loans; and provided further that (A) with respect to any NFL Priming Loans initially made to the Club that the NFL seeks to collect from StadCo as contemplated hereunder the NFL shall first attempt to collect such NFL Priming Loans from the Club (provided that the NFL shall not be obligated to take any actions against the Club that would reasonably be expected to directly or indirectly cause a default under any Team Financing or render the Club insolvent or otherwise unable to pay its debts as they come due) and shall seek to collect such NFL Priming Loans from StadCo only after the NFL shall have determined in its reasonable discretion that the Club does not or will not have sufficient funds to pay the aggregate amount of such NFL Priming Loans and all other obligations for which the Club is liable, and (B) the NFL shall assert priority under this clause (iv) with respect to NFL Priming Loans initially imposed on the Club only that amount by which such NFL Priming Loans exceed the amount that the NFL shall have determined as contemplated in sub-clause (A) of Paragraph 5(p)(iv) that the NFL is able to collect first from the Club;

     (v)    fifth, to the satisfaction of all amounts then due to the Secured Parties with respect to the Obligations (other than any amounts payable in respect of accrued but unpaid interest at the default rate under the Financing Documents or termination payments under the Qualified Swaps, as described in clause seventh below) as provided under the Financing Documents, at law, in equity or otherwise;

     (vi)    sixth, to the satisfaction of all unpaid obligations then due to the NFL in respect of the League G-3 Loan and the NFL Support Documents;

     (vii)    seventh, to the satisfaction of the amounts then due with respect to termination payments then due under the Qualified Swaps and any accrued but unpaid interest at the default rate under the Financing Documents; provided that, without in any way changing the aggregate amounts payable pursuant to either clause (v) or this clause (vii), the Secured Parties may allocate amounts payable to one or more of them pursuant to such clauses in such manner as they have agreed amongst themselves in the Indenture;

     (viii)    eighth, to the satisfaction of any remaining amounts then due to the NFL with respect to NFL Priming Loans;

     (ix)    ninth, any other amounts then payable with respect to the NFL in respect of Club Assessments (including Club Assessments constituting fines or other penalties imposed under the disciplinary provisions of the NFL Constitution imposed as the result of rules infractions under the NFL Constitution), expenses of sale or other amounts due

CONFIDENTIAL

Requesting Parties
Page 39

from StadCo to the NFL (and not otherwise paid pursuant to clauses second, third and/or
fourth above); and

(x)    the remainder, if any, to or as directed by StadCo or as otherwise
provided by law.

The JV Company and the undersigned Club Parties agree that (and, provided that in any sale or other
disposition of Collateral other than in connection with a Qualifying Sale Transaction, the Obligations
shall be fully satisfied from the proceeds of such sale or other disposition, the Secured Parties agree that),
to the extent that Collateral is sold or otherwise disposed of along with other Football Related Assets
(including, possibly, Football Related Assets pledged to other lenders), the NFL shall have sole discretion
to allocate the proceeds of such sale or disposition in good faith amongst the Collateral and Football
Related Assets so sold for the purposes of determining the amounts to be applied pursuant to clauses (i)
through (ix) of the foregoing paragraph and any similar rules for the application of proceeds among
creditors under any agreement between the NFL and one or more Club Parties or the JV Company with
respect to any other financing. The NFL shall have the right, in its sole and absolute discretion, to deposit
the proceeds of any such sale or disposition with a third party escrow agent or court of competent
jurisdiction pursuant to an interpleader or similar proceeding if the applicable Requesting Parties and any
other interested parties claiming rights in such proceeds do not agree as to the allocation of such amount
among the NFL, the applicable Requesting Parties and such other party or parties. Upon the deposit of
such amount with such third party escrow agent or court of competent jurisdiction, the NFL shall have no
liabilities or obligations thereafter with respect to the payment of such amount to, or the apportionment of
such amount among, the parties hereto or any other party claiming rights in such proceeds.

(q)    This Letter Agreement shall not be construed to require the Secured Parties to
take any action which would cause them to invalidate their Liens under applicable provisions of the
Uniform Commercial Code or other applicable law relating to such Liens or prohibit the Secured Parties
from taking any action which is required to maintain (but not enforce) their Liens under the Financing
Documents (except upon a release of Liens as required hereunder). Without derogating the rights of the
NFL or the restrictions on the Secured Parties contained herein, nothing in this Letter Agreement shall be
deemed to annul the rights of the Secured Parties, solely as between StadCo and the Secured Parties, to
exercise their remedies to enforce the express terms of the Financing Documents in accordance with the
terms hereof, including (but subject always to, and following the applicable "Standstill Period"
requirements of, Paragraph 5 hereof in respect of any such Foreclosure) the commencement of an
involuntary proceeding or filing an involuntary petition in a court of competent jurisdiction seeking relief
under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other federal
or state bankruptcy, insolvency, receivership or similar law.

(r)    This Paragraph 5 shall not prohibit any Secured Party, whether during the
Standstill Period or thereafter, from:

(i)    filing, defending or protecting its claim under a statute or rule for the sole
purpose of preserving its rights as a creditor in such proceeding (but, for the avoidance of
doubt, expressly excluding the filing of an involuntary proceeding or petition) in the
event that StadCo becomes subject to any proceeding under the United States Bankruptcy
Code, or any similar federal or state law for the relief of debtors, as a result of any action
taken by a party other than a Secured Party;

(ii)    accelerating the Obligations of, or demanding any payment or
performance from, StadCo as permitted under the Financing Documents in accordance
with Paragraph 9 hereof (provided that the Secured Parties may enforce any such

acceleration or demand only to the extent otherwise permitted by, and otherwise in accordance with the terms of, this Letter Agreement);

(iii)    seeking a Judgment Order and/or judgment lien against any assets of StadCo (other than Shared Revenues and the proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account)) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained in this Letter Agreement);

(iv)    in the event of and following a sale or other disposition of the Collateral in accordance with the terms of this Letter Agreement, thereafter exercising all such rights and remedies with respect to the proceeds of such sale or disposition which are due to the Secured Parties after taking into account the application of the proceeds as contemplated herein (and provided that, if the Secured Parties are required to release their liens on such Collateral pursuant to the terms hereof upon such sale or disposition, the Secured Parties shall have no rights or remedies against the Collateral so sold or disposed of as opposed to the proceeds received with respect to such sale unless otherwise ordered by a court of competent jurisdiction or required by applicable law);

(v)    bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof; and

(vi)    in the event that the Collateral has been sold or otherwise disposed of in accordance with the terms of this Letter Agreement, the Obligations have not been paid in full, and the Club is in breach of the Non-Relocation Agreement, thereafter exercising all rights and remedies against the Club which are available to the Secured Parties as a result of such breach of the Non-Relocation Agreement, including bringing a judgment for money damages; provided that in connection with any such exercise, any Foreclosure against the Club and/or any Football Related Assets shall be subject to the terms, conditions and restrictions set forth in this Letter Agreement (including the standstill provisions set forth in this Paragraph 5).

6.    Notice of Default, Event of Default or Material Modification; Limitations on Material Modifications.

(a)    Each of the Requesting Parties agrees that it shall give prompt written notice to the NFL of the occurrence of any Default or Event of Default (whether or not waived by or on behalf of any Secured Party). Each of the Requesting Parties (other than the Controlling Insurer, which shall be required to deliver to the NFL only such notices or other written communications as the Controlling Insurer may send to any Requesting Party with respect to a Default or Event of Default under the Financing Documents) shall deliver to the NFL copies of any notices or other communications sent to any Club Party, the JV Company or any other Requesting Party regarding any Default or Event of Default (whether or not waived by the Secured Parties), or any Foreclosure, and shall promptly notify the NFL if any Default or Event of Default of which the NFL previously has been notified shall have been cured. Each of the Requesting Parties further agrees that (x) there shall be no Material Modification of any Operative Document or Additional Agreement without the prior written approval of the NFL, which approval may be withheld in the NFL's absolute and sole discretion and (y) the Requesting Parties shall promptly deliver to the NFL a copy of any amendment, supplement, waiver or other modification to any

CONFIDENTIAL

Requesting Parties
Page 41

Operative Document or Additional Agreement which does not constitute a Material Modification. Any proposed Material Modification of any Operative Document or Additional Agreement shall (i) be notified in writing to the NFL and shall be the subject of a consent request to the NFL in respect thereof, and (ii) if not approved in writing by the NFL, shall be deemed void *ab initio* and of no force or effect. The NFL will use reasonable efforts to respond promptly to requests for consent to Material Modifications.

(b)    Without limitation of the foregoing, the Requesting Parties acknowledge and agree that, in the event that the NFL elects to provide its consent to a Material Modification that involves the release of the Secured Parties' Liens on any portion of the Football Collateral (and subject always to the terms of Paragraph 9(b)), then the applicable Football Collateral shall, if not distributed or transferred to the Club, be distributed or otherwise transferred to another Person approved by the NFL promptly upon release of such Liens pursuant to documents acceptable to the NFL (and the Club or such other Person shall thereafter hold title to such Football Collateral and any Person other than the Club receiving Football Collateral shall execute and deliver a counterpart signature page to this Letter Agreement agreeing to be bound as a "Club Party" hereunder together with such other agreements related thereto as the NFL may reasonably request). The Club Parties acknowledge and agree that, in the event of any such distribution or transfer, the applicable Football Collateral shall be held by the Club or the new Club Party subject to the NFL Constitution and, without limitation of the foregoing and unless the NFL otherwise agrees in writing, shall be subject to the Liens of the lenders in respect of any Team Financing or other applicable Club Party's financing (which financing will, in turn, be subject to an NFL debt financing consent letter containing, among other things, cure and "bundling" rights on behalf of the NFL that are substantially similar to those set forth in Paragraph 9 hereof).

7.    Default in Club Party Obligations to NFL. In the event of a breach by any Club Party or the JV Company of any provision of the NFL Constitution or any agreement between such party and the NFL (including, without limitation, this Letter Agreement) or a default in any such party's obligations to the NFL under any of the same, the NFL shall, prior to its undertaking final action to enforce its rights or remedies with respect to any such breach or default where such proposed action would reasonably be expected materially and adversely to affect the value of the Collateral, furnish notice of such proposed action to the Trustee and the Controlling Insurer (such notice, the "NFL Notice"). To the extent permitted by the Indenture and applicable law, and provided the NFL determines that the NFL's interests and rights are not materially adversely affected and that the breach or default can be remedied by the Trustee or the Controlling Insurer without any material or adverse effect on the NFL's interests and rights, the Trustee and the Controlling Insurer shall have a period of up to thirty (30) days from and after the date on which the Trustee and the Controlling Insurer receive the NFL Notice (or such shorter period as the NFL may notify the Trustee and the Controlling Insurer in writing that the NFL deems appropriate in order to protect its interests and rights) to remedy such breach or default. If the Trustee or the Controlling Insurer elects to cure such breach or default, the NFL shall be notified as soon as practicable, but in no event later than fifteen (15) days after the Trustee or the Controlling Insurer, as applicable, receives the NFL Notice, in which event the NFL agrees not to enforce its rights and remedies with respect to the breach or default during such thirty (30)-day period (or such shorter period as may be applicable pursuant to the second sentence of this Paragraph 7); provided that the foregoing shall in no event prevent the NFL from seeking an injunction or other equitable relief. Any failure by the Trustee and the Controlling Insurer to notify the NFL within such fifteen (15)-day period of its election to use best efforts to cure such breach or default shall be deemed a waiver by the Trustee and the Controlling Insurer of their rights under this Paragraph 7.

8.    Agreement to Cooperate. The parties agree, subject to the provisions of this Letter Agreement, to cooperate reasonably with each other (a) to enable the Secured Parties, if and when they have the right under the Financing Documents and this Letter Agreement, to dispose of the Collateral in accordance with the terms hereof and thereof, and (b) subject to Paragraph 5(k) hereof, to permit the sound operation and maintenance of the Franchise and the fulfillment of the obligations of the Club

Requesting Parties
Page 42

Parties and the JV Company to the NFL (including, without limitation, the timely payment of Club
Assessments), at all times while the Obligations are outstanding, including, without limitation, at any time
or from time to time after Foreclosure.

        9.     <u>NFL Cure Rights</u>.

        (a)     The NFL has executed this Letter Agreement, among other things, to permit the
pledge and collateral assignment of the Collateral to the Secured Parties in accordance with the Financing
Documents and this Letter Agreement, and to evidence the intention of the NFL to cooperate with the
Secured Parties to enable the Secured Parties to realize reasonable value in any disposition of the
Collateral in accordance with the terms of this Letter Agreement. This Letter Agreement shall not be
construed in any respect as a guaranty or indemnity by the NFL, or any NFL member club, of any debts,
liabilities or obligations whatsoever (including, without limitation, any of the Obligations) of any Club
Party, the JV Company or any other Person. Notwithstanding the foregoing, the NFL shall have the right,
in its sole and absolute discretion, but shall be under no obligation:

        (i)     to elect to cure any Event of Default (whether or not waived by or on
behalf of the Secured Parties) in accordance with the terms set forth below;

        (ii)     to elect to enforce the rights of StadCo and/or the JV Company in
accordance with the terms set forth below and the power of attorney attached hereto as
<u>Exhibit C</u> (the "<u>Power of Attorney</u>") following: (A) the occurrence and continuance of
any Third Party Default (as defined in the Power of Attorney) under any of the Operative
Documents (in the case of StadCo) or Operative Project Documents (in the case of the JV
Company) and (B) the expiration of the thirty (30)-day period following a subsequent
written notice and demand by the NFL to the applicable Club Parties and/or the JV
Company as contemplated in the Power of Attorney; and/or

        (iii)     from and after the occurrence of an Event of Default (until and unless
such Event of Default shall have been cured prior to the Foreclosure Cure Expiration
Date in respect of such Event of Default), to elect (or to designate an Affiliated NFL
Party reasonably acceptable to the Controlling Insurer) to assume the obligations of
StadCo under the Qualified Swap (including future liabilities in respect of Swap
Termination Payments, if any, and without regard to whether the Swap Insurance is or
has been terminated); provided that the debt obligations of the NFL or such Affiliated
NFL Party with term(s) comparable to the remaining term on the Qualified Swaps are
then rated (or are promptly thereafter rated) at least BBB- by Standard & Poors (or a
comparable investment grade rating by any other nationally recognized credit rating
agency), and upon such election, the Swap Provider shall continue to observe its
obligations under the Qualified Swaps, and StadCo (x) shall cease to have any obligations
to the Qualified Swap Provider under such Qualified Swap (but, for the avoidance of
doubt, all covenants, agreements and other obligations of StadCo to the Qualified Swap
Provider shall continue to exist and the NFL or such Applicable NFL Party shall be
subrogated to the rights of such Qualified Swap Provider in respect thereof (and the
Qualified Swap Provider shall enter into such assignment or other documents as may be
reasonably acceptable to the NFL or such Applicable NFL Party and the Qualified Swap
Provider to evidence such subrogation)) and (y) shall not become liable for Swap
Termination Payments in respect of such Event of Default.

        (b)     In the event that the NFL elects, by written notice given to the Trustee within
thirty (30) days following the NFL's receipt from any Secured Party of notice of an Event of Default, to

CONFIDENTIAL

Requesting Parties
Page 43

use the NFL's best efforts to cure such Event of Default, and provided that the NFL begins its efforts to cure such Event of Default within such thirty (30)-day period and thereafter diligently continues to pursue such cure, the NFL shall be permitted forty-five (45) days (or such longer period as the NFL may reasonably request) after the date that the NFL receives notice of the Event of Default, to cure any such Event of Default (for the avoidance of doubt, notwithstanding whether the Insurers have, following such Event of Default, made any payments under the Bond Insurance Policies, Swap Insurance, any Reserve Account Surety Bond, Debt Service Reserve Surety Bond or any Strike Reserve Surety Bond or any of such policies or surety bonds has been terminated in respect of such Event of Default), and each Secured Party shall during such period refrain from initiating any Foreclosure or otherwise exercising any of its rights or remedies under the Operative Documents (other than the right solely to deliver to one or more Club Parties and the NFL a Foreclosure Notice and the right solely to take such actions in accordance with this Letter Agreement and the Financing Documents to the limited extent necessary to preserve the Secured Parties' Liens in respect of the Collateral (but, for the avoidance of doubt, such actions shall not include seeking a judgment lien or Judgment Order against StadCo or any other Club Party or the JV Company or the filing of an involuntary proceeding or petition)). Except as expressly provided herein (and in Paragraph 5(b) in respect of any such Event of Default prior to Substantial Completion), the cure rights granted to the NFL herein (and the Secured Parties' agreement to refrain from initiating Foreclosure or the exercise of such rights or remedies with respect to such Event of Default under the Operative Documents) shall not restrict or limit the right of the Secured Parties, if applicable pursuant to the terms of the Financing Documents and this Letter Agreement, to refuse to make additional loans or advances to StadCo as a result of and during the continuance of an Event of Default or, subject to the terms of this Letter Agreement (including without limitation Paragraph 5(c) hereof), to take other actions against any Club Party or the JV Company that are permitted under the Operative Documents and this Letter Agreement, including bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof and the making of Permitted Standstill Period Payments, and that do not involve any interest in the Collateral, any other direct or indirect interest in StadCo, the Club, any of the other Club Parties or the JV Company, or any asset of StadCo, the Club, the JV Company or any other Football Related Assets, as a result of and during the continuance of such Event of Default. Subject to the terms of this Letter Agreement, the exercise by the NFL of the right to effect such cure shall include the right of the NFL to assume the Obligations (or to cause the Obligations to be assumed by a designated Affiliated NFL Party) in connection with the curing of such Event of Default (in which event the NFL or its designee may elect to assume the obligations of StadCo under the Qualified Swaps, without regard to whether the Swap Insurance is or has been terminated, as and to the extent referenced in Paragraph 9(a)(iii)) and, with respect to an Event of Default prior to Substantial Completion, to complete the Project under the terms of the Operative Documents and the Operative Project Documents. Any failure by the NFL to notify the Trustee of its election to cure such Event of Default within such thirty (30)-day notice period shall be deemed a waiver by the NFL of its rights under this Paragraph 9 to cure such Event of Default.

(c)    The Secured Parties further agree that:

(i)    in the event the NFL elects to cure an Event of Default pursuant to the terms of this Paragraph 9 by providing funds for the payment of a portion of the Obligations, then such payment shall be deemed to have been made by StadCo, for the purpose of determining whether the Event of Default has been cured, but such payment shall not reduce the Obligations of StadCo and the NFL shall assume and be subrogated to the rights of the holders of such Obligations (and the Secured Parties shall enter into such assignment, participation or other documents as may be reasonably acceptable to the NFL and the Secured Parties to evidence such assumption and subrogation); provided that the obligations of the Insurers under the Bond Insurance Policies, the Swap

CONFIDENTIAL

Requesting Parties
Page 44

Insurance, the Reserve Account Surety Bonds and the Strike Reserve Surety Bonds shall
be deemed to have been satisfied to the extent of any such payment, as applicable; and

(ii)    in the event the NFL elects to cure an Event of Default pursuant to the
terms of this Paragraph 9 by providing funds for the payment of the Obligations in full, or
in the event that such Event of Default is incapable of being cured and the NFL otherwise
elects to buy the Obligations by paying the Obligations in full, then, at the direction of the
NFL in connection with such payment, each Secured Party shall (A) release or assign to
the NFL or its designee its Liens on the Collateral and assign (without recourse) to the
NFL, pursuant to assignment agreements reasonably acceptable to the NFL and the
Secured Parties, all rights and obligations of each Secured Party in, under, and with
respect to the Obligations and the Operative Documents and (B) the NFL shall have the
right to exercise the NFL Standstill Period Collateral Rights following payment of all
such Obligations or the purchase price of all Obligations to the Secured Parties.

(d)    Upon each and any partial or full payment of the Obligations by the NFL (as
contemplated in Paragraph 9(c) hereof) upon the exercise of its cure rights as provided hereunder: (i) the
Bonds shall remain Outstanding (as defined in the Indenture) for all purposes and shall not be deemed to
be defeased or otherwise satisfied (except for the limited purpose of determining whether the Event of
Default has been cured), and the obligations of the Insurers under the Bond Insurance Policies, the Swap
Insurance, the Reserve Account Surety Bonds and the Strike Reserve Surety Bonds shall be deemed to
have been satisfied to the extent of any such payment of Obligations, and (ii) the NFL shall be subrogated
to and assume the rights of the Secured Parties receiving payments from funds so provided by the NFL
and the assignment and pledge of the Trust Estate (as defined in the Indenture) and all covenants,
agreements and other obligations of StadCo to the Secured Parties shall continue to exist and shall, to the
extent of such cure, run to the benefit of the NFL and the NFL shall become the beneficial owner thereof,
entitled to all of the rights and benefits of a Secured Party to the extent of such cure.

(e)    The Requesting Parties each hereby acknowledge and agree that upon any
default, event of default or other similar event affecting any Team Financing or any other financing
provided to StadCo or the JV Company, in each case in respect of which either (i) the lenders shall deliver
a foreclosure notice to the NFL evidencing their intention to Foreclose upon assets of StadCo, the JV
Company or any Club Party securing such financing (or the NFL elects to conduct any sale or other
disposition of the assets of the Club, StadCo, the JV Company or applicable Club Party in
satisfaction of such financing), or (ii) the NFL elects to exercise, under the terms of any NFL debt consent
letter applicable to such financing, the rights of the NFL to cure such default by its exercise of rights
under the applicable financing consent letter of a substantially similar nature to those rights granted under
Paragraph 5 hereof or this Paragraph 9 then, in connection with the NFL's exercise of any such rights, and
notwithstanding the terms of any of the Operative Documents, the NFL shall have the further right, upon
written notice to StadCo and the Trustee, (x) to pay and satisfy the Obligations in full, (y) provided that
the debt obligations of the NFL (or its designated Affiliated NFL Party) having term(s) comparable to the
remaining term of the Bond Insurance Policies are then rated (or are promptly thereafter rated) at least
BBB- by Standard & Poors (or a comparable investment grade rating by any other nationally-recognized
credit rating agency), to cause the Obligations (or to cause the Obligations to be assumed by a
designated Affiliated NFL Party) in accordance with the terms of the Financing Documents and this
Paragraph 9, in each case as if the exercise of any such rights of the NFL in relation to any such financing
were an Event of Default under the Obligations to which the terms of this Paragraph 9 otherwise applied
and/or (z) in a transaction involving the concurrent sale of assets of or interests in the Club and/or StadCo
arising as a result of the NFL's exercise of its rights under any applicable NFL debt consent letter
following delivery of a foreclosure notice (as defined in such other NFL debt consent letter) under the
financing or other applicable obligation that is the subject of such other NFL debt consent letter, to sell or

CONFIDENTIAL

Requesting Parties
Page 45

dispose of the Collateral pursuant to this Letter Agreement as if an Event of Default has occurred and a
Foreclosure Notice has been delivered hereunder; provided, that in any such sale other than a Qualifying
Sale Transaction, the Obligations shall be repaid and satisfied in full and, in any Qualifying Sale
Transaction, the Secured Parties' Lien in the Collateral shall survive such sale. Upon an assumption by
the NFL of the Obligations under subsection (y) of the preceding sentence, StadCo and the Trustee shall
provide notice of such assumption to Standard & Poors and any other applicable rating agencies.

(f)     In the event that the NFL exercises its right pursuant to Paragraph 9(e) to assume
the Obligations and to keep the Obligations outstanding in connection with any default, event of default
or other similar event affecting any Team Financing or any other financing provided to StadCo, then, in
such event:

(i)     provided that the debt obligations of the NFL (or its designated Affiliated
NFL Party) having term(s) comparable to the remaining term of the Qualified Swap are
then rated (or are promptly thereafter rated) at least BBB- by Standard & Poors (or a
comparable investment grade rating by any other nationally-recognized credit rating
agency), then the NFL (or such designated Affiliated NFL Party) shall have the right to
assume all of StadCo's rights and obligations under the Qualified Swaps (including future
liabilities in respect of Swap Termination Payments, if any), and the Insurers shall remain
liable under the Swap Insurance and StadCo (x) shall cease to have any obligations to the
Swap Provider under such Qualified Swap as and to the extent of the assumption of
obligations by the NFL (but, for the avoidance of doubt, all covenants, agreements and
other obligations of StadCo to the Qualified Swap Provider shall continue to exist and the
NFL or such Applicable NFL Party shall be subrogated to the rights of such Qualified
Swap Provider in respect thereof (and the Qualified Swap Provider shall enter into such
assignment or other documents as may be reasonably acceptable to the NFL or such
Applicable NFL Party and the Qualified Swap Provider to evidence such subrogation))
and (y) shall not become liable for Swap Termination Payments in respect of the
Qualified Swaps so assumed by the NFL or Applicable NFL Party; and

(ii)     in the event, but solely in the event, that (A) the Insurers shall no longer
be liable under the Swap Insurance and (B) the NFL (or a designated Affiliated NFL
Party) shall not, prior to the release of the Swap Insurance, put into place arrangements,
through the execution and delivery of documents and agreements, satisfactory to the
applicable Swap Counterparty in its reasonable discretion as to the acceptability of the
counterparty under the Qualified Swaps upon the release of the Swap Insurance, then, in
such event, the Swap Counterparty upon such assumption by the NFL (or its designated
Affiliated NFL Party) shall be released from its obligations under the Qualified Swaps,
such agreement shall be terminated and there shall be due and owing by the NFL (or its
designated Affiliated NFL Party) thereunder such termination payments as are due as a
result of such termination; provided that the payment of any such termination payments
shall be deferred until all of the Collateral has been sold to one or more third parties
(excluding the JV Company and Affiliates of any Club Party) in accordance with the
terms of this Letter Agreement and the NFL Constitution.

(g)     For the avoidance of doubt, in any sale or other transfer of the Collateral under
this Letter Agreement pursuant to a Qualifying Sale Transaction (including, without limitation, following
an Event of Default under the Financing Documents (without regard to whether the Obligations have been
accelerated as a result thereof) and/or in the event that the NFL exercises its right pursuant to Paragraph
9(e) to sell or dispose of the Collateral pursuant to this Letter Agreement as if an Event of Default has
occurred and a Foreclosure Notice has been delivered hereunder in a transaction involving the concurrent

CONFIDENTIAL

Requesting Parties
Page 46

sale of assets of or interests in the Club and/or StadCo arising as a result of the NFL's exercise of its
rights under any applicable NFL debt consent letter following delivery of a foreclosure notice (as defined
in such other NFL debt consent letter) under the financing or other applicable obligation that is the subject
of such other NFL debt consent letter), the acquiring person or entity in such sale shall have the right to
assume all of StadCo's rights and obligations under the Obligations, including without limitation the
Qualified Swaps, and the Insurers shall remain liable under the Swap Insurance and the Bond Insurance
Policies (and the Secured Parties' Liens in the Collateral shall survive such sale) and StadCo shall cease
to have any obligations to the Secured Parties with respect to the Obligations assumed.

(h)    For the avoidance of doubt, this Paragraph 9 shall not prohibit the Secured
Parties from issuing a Foreclosure Notice under the terms of this Letter Agreement and as permitted under
the Financing Documents, and such Foreclosure Notice, if Foreclosure is so permitted under the
Financing Documents in such circumstances, may be issued by the Secured Parties notwithstanding the
cure rights given to the NFL under this Paragraph 9 and prior to the expiration of the cure election period
or the cure period provided herein. If any Event of Default with respect to which a Foreclosure Notice
was issued is thereafter cured (including, without limitation, by actions of the NFL), then the Standstill
Period in respect of such Event of Default shall end, and if any subsequent Event of Default shall occur
and/or any subsequent Foreclosure Notice shall be issued with respect to such subsequent Event of
Default, a new Standstill Period shall begin.

10.    Maintenance of the Franchise; Application of PSL Proceeds; Compliance With NFL Debt
Limit; Existing Stadium.

(a)    The NFL agrees that upon any sale, withdrawal, forfeiture, revocation or
termination, or other retaking of the Franchise by the NFL due to any Club Party's breach of or default in
any Club Party's obligations to the NFL, the Franchise shall, until the Obligations of StadCo are paid in
full, continue to exist so that the Club may perform its obligations under the Non-Relocation Agreement
for the benefit of the Secured Parties; provided that each of the Requesting Parties agrees that (i) such
Franchise shall at all times be subject to the rights of the NFL to arrange for a sale thereof as described
herein and as otherwise provided in the NFL Constitution, and (ii) this Paragraph 10(a) shall in no way
limit the rights of the NFL, its member clubs or the Commissioner to exercise their respective rights or
remedies or to take permitted disciplinary action under the NFL Constitution (or otherwise), it being
acknowledged by the parties hereto that the sole purpose of this Paragraph 10(a) is to recognize
specifically that, so long as there are Obligations of the Club Parties outstanding and the Secured Parties
are committed pursuant to the Financing Documents to make loans and advances to the Club Parties or
the Obligations remain outstanding, the Franchise shall continue to exist during the pendency of any sale,
withdrawal, forfeiture, revocation or termination, or other retaking, or action at law, suit in equity or other
appropriate proceeding in respect thereof. In the event of any final, non-appealable sale, withdrawal,
forfeiture, revocation or termination, or other retaking, of the Franchise by the NFL, and as the result of
which the Club is no longer a member club of the NFL, (A) the Club shall have the right to receive the
proceeds of any sale, reissuance or other disposition of the Franchise or any replacement franchise only
after the satisfaction (to the extent required pursuant to Section 3.8 of the NFL Constitution) of any
obligations of the Club Parties and/or the JV Company to the NFL and to the Secured Parties in
accordance with Paragraph 5(p) hereof, or to any other party or as required by law and (B) the Secured
Parties shall no longer be restricted under this Letter Agreement in the exercise or other enforcement of
any of their rights, powers, privileges, remedies and interests under the Operative Documents with respect
to the Collateral.

(b)    The JV Company, each of the Club Parties that receives any PSL Proceeds, and
each of the Club Controlling Owner and the StadCo Controlling Owner, represents, warrants, covenants
and agrees that all PSL Proceeds received by it will be applied by it solely to the payment or

CONFIDENTIAL

Requesting Parties
Page 47

reimbursement of PSL Eligible Project Costs (including, without limitation, to repay Bonds, the proceeds of which have been applied solely to the payment or reimbursement of PSL Eligible Project Costs and to the extent necessary to reimburse direct or indirect owners of interests in the applicable Club Parties who have incurred PSL Eligible Project Costs).

(c)    Each of the Club Parties represents, warrants and covenants that Costs of the Project relate solely to the New Stadium, the Improvements and Premises and other New Stadium development efforts as more fully set forth in the Financing Documents, and the term Costs of the Project does not and shall not include any costs in respect of the operation, financing, or debt service of (x) the practice and training facility used by the Club, and (y) any facilities or sites near or adjacent to the New Stadium (other than parking, tailgating and outdoor concessions facilities for use in connection with NFL games and other events at the Meadowlands Sports Complex) that are not primarily and directly related to the New Stadium and/or the exhibition of NFL games and NFL events at the Meadowlands Sports Complex (e.g., Xanadu or any racing facilities), and that any use of the proceeds of the Bonds for such purpose would require the prior written consent of the NFL. Nothing herein shall be deemed or construed as relieving StadCo of any liability or responsibility that StadCo may have for any breach by it of, or default by it in, any non-monetary obligations or responsibilities of StadCo to the Secured Parties that are set forth in the Financing Documents or that arise by operation of law (to the extent that the Secured Parties are damaged by such breach or default).

(d)    Each of the Club and the Club Controlling Owner agrees that it shall not amend, modify or terminate its lease with respect to the Existing Stadium in a manner that would prevent the Club from, or interfere with or otherwise hinder the Club in, playing its home NFL games at the Existing Stadium prior to Substantial Completion of the New Stadium. Each of the Club and the Club Controlling Owner represents and warrants to the NFL that no default by the Club has occurred under the Existing Stadium Lease, and that the Existing Stadium Lease has not been amended or modified except as otherwise stated herein (and as reflected in the exhibits attached hereto).

(e)    StadCo represents and warrants to the NFL that all of the loans made pursuant to that certain Credit Agreement, dated as of April 30, 2007, as amended, between StadCo, as borrower, and the lenders signatory thereto, have been repaid and satisfied in full on or prior to the date hereof and such Credit Agreement has been terminated.

11.    Ownership of Club Parties. Each of the undersigned Club Parties and the JV Company represents and warrants to the NFL that as of the date hereof (i) the direct and indirect ownership interests in the JV Company, the Club and each other Club Party (the "Organizational Structure") set forth on Exhibit D-1 hereto is true and complete, (ii) true and complete copies of the Operating Agreements, organizational documents and all other documents relating to the voting control of the JV Company and StadCo have been provided to the NFL on the date hereof and are attached hereto as Exhibits D-2 to D-[__], respectively (collectively, the "Organizational Documents"), (iii) each of such Club Parties and the JV Company agrees that, except in respect of ownership changes for which NFL consent is not required under the NFL Constitution, it shall not amend, and shall not agree to or otherwise permit any amendment to, the Organizational Structure, in each case without the prior written consent of the NFL, and (iv) each of the Club Parties and the JV Company further agrees that (a) except for amendments made solely to reflect ownership changes for which NFL consent is not required under the NFL Constitution, it shall not amend, and shall not agree to or otherwise permit any amendment to, the Organizational Documents of the JV Company, such Club Party or of any Club Party in which such Club Party has an ownership interest, in each case without the prior written consent of the NFL, and (b) it shall comply with all of the terms and provisions regarding distributions that are contained in such Organizational Documents.

CONFIDENTIAL

Requesting Parties
Page 48

12.    <u>Conditions to Transfers of Football Related Assets.</u> The Requesting Parties acknowledge and agree that any transfer of Football Related Assets (excluding Ordinary Course Sales or Permitted Transfers), or any transfer or issuance of direct or indirect equity interests in the JV Company or any Club Party at any time while the JV Company or that Club Party directly or indirectly holds any interest in Football Related Assets, requires the prior written consent of the NFL pursuant to the NFL Constitution and this Letter Agreement, which consent may be granted or withheld in the NFL's sole and absolute discretion. Accordingly the Requesting Parties further acknowledge and agree that, in connection with its determination to grant or withhold such consent the NFL may, among other things (a) impose such terms and conditions on such transfer or issuance (including without limitation terms and conditions that must be satisfied by the Club Parties and/or the other parties to such transfer or issuance as a condition precedent to receipt of the NFL's consent) as the NFL may require in its sole and absolute discretion and (b) require that the JV Company, the Club Parties and/or the other parties to such transfer or issuance execute and deliver such undertakings with respect to subsequent transfers of Football Related Assets or direct or indirect equity interests in Persons owning Football Related Assets as the NFL requires in its sole and absolute discretion.

13.    <u>Operation of Stadium; Gaming.</u>

(a)    Each of StadCo and the JV Company hereby represents to and covenants with the NFL that its business purposes are limited to the purposes set forth in (and are subject to the limitations contained in) its Limited Liability Company Agreement, as in existence on the date hereof, and that it shall not engage in any other purposes without the prior consent of the NFL. Without limitation of the foregoing and notwithstanding any provision of any such Limited Liability Company Agreement, each of the Club Parties and the JV Company acknowledges and agrees that, without the prior written consent of the NFL in its sole and absolute discretion, neither StadCo nor the JV Company will engage in any Ancillary Uses (including without limitation the development and/or operation of Xanadu (as defined in the JV Company's Operating Agreement) or form, within the Organizational Structure (i.e., as a direct or indirect owner of an interest in any Club Party or the JV Company), an Ancillary Newco (as such terms are defined in the JV Company's Operating Agreement) and that in any event no Football Related Assets may be transferred or otherwise assigned to any Ancillary Newco that is so formed. Each of StadCo and the JV Company further agrees to maintain the field and the New Stadium in a condition acceptable for the conduct of NFL games in accordance with all applicable terms of the NFL Constitution.

(b)    The JV Company and, for purposes of Paragraph 13(b)(ii), each of the Club Parties, covenants and agrees that, in the event that the Racetrack (as defined in the Ground Lease) site is at any time used for gaming activities other than pari-mutuel betting on horse races, then (i) the JV Company shall promptly notify the NFL of such activities and (ii) if so required by the NFL, to the extent that the JV Company or any of the Club Parties is entitled to any revenues relating to the site of such gaming activities, the JV Company or such Club Party will transfer or otherwise assign the right to receive such revenues to an Ancillary Newco that does not own Football Related Assets and that is not an entity within the Organizational Structure (i.e., that does not own a direct or indirect interest in any Club Party or the JV Company). Each of the JV Company, StadCo and the StadCo Controlling Owner further covenants and agrees that, to the extent that its consent is sought in connection with any such gaming activities (the NFL acknowledges that, pursuant to the Ground Lease, such consent of the Club Parties is not required), they will notify the NFL of such request and will consult in good faith with the NFL prior to responding to such request. Nothing in this Paragraph 13(b) is intended to, and each of the Club Parties and the JV Company acknowledges and agrees that it does not, in any way limit, supersede, alter or modify any provisions of the NFL Constitution or other applicable NFL rules or policies relating to restrictions on gambling activities and/or restrictions on ownership of interests in, or association with, entities engaged in gambling activities; provided that the NFL acknowledges that the NFL Constitution and other applicable NFL rules do not currently prohibit ownership of interests in, or association with, an

CONFIDENTIAL

Requesting Parties
Page 49

entity that owns rights to advertising revenues generated through a building or racetrack in which pari-mutuel betting on horse races occurs and/or which is the site of other gaming in the form of video lottery terminals, so long as such site does not include a sports book or other sports betting.

    14.   No Third Party Beneficiaries; Beneficiaries of Certain Promises; Limitation on Recourse by Secured Parties.

        (a)   This Letter Agreement constitutes an agreement among the parties hereto only, and no rights, benefits, duties or obligations of any kind whatsoever are created by this Letter Agreement on behalf of any other Person except as noted in Paragraphs 20 and 24 hereof. Further, the parties hereto acknowledge and agree that this Letter Agreement does not create and shall not be deemed to create any obligations of any nature whatsoever of (i) the Secured Parties to any Club Party, the JV Company or any Person not a party to this Letter Agreement, except as specifically provided in this Letter Agreement or (ii) except to the extent expressly set forth in this Letter Agreement, the NFL to any Requesting Party or any Person not a party to this Letter Agreement except as noted in Paragraphs 20 and 24 hereof.

        (b)   The parties further agree that the restrictions and other limitations imposed by this Letter Agreement on the exercise of the rights and remedies of the Secured Parties under the terms of the Operative Documents, including without limitation the restrictions imposed during the Standstill Period, are solely for the benefit of the NFL and not for the JV Company or any of the Club Parties.

        (c)   The parties further agree that all representations, warranties, covenants and obligations of the JV Company and the Club Parties in this Letter Agreement or in any other agreement with the NFL or any Affiliated NFL Parties (i) are for the sole and exclusive benefit of the NFL or such Affiliated NFL Parties, as applicable, and may not be enforced or relied upon in any manner, directly or indirectly, by any Secured Party or any other person and (ii) may be modified, amended or waived at any time and from time to time with the consent of the NFL pursuant to Section 21, but without the consent of any Secured Party or any other person. Each Secured Party reaffirms the limited recourse nature of the Obligations of StadCo and agrees for the benefit of the NFL, the JV Company and each Club Party that (i) neither any Club Party (other than StadCo and, to the extent set forth in the Non-Relocation Agreement, the Club), nor the JV Company nor any other person shall have any liability with respect to the Obligations or any failure of the Obligations to be timely paid except to the extent of any separate contractual obligations arising under and expressly contemplated by the Financing Documents and (ii) no provision of this Letter Agreement or any other agreement with the NFL or any Affiliated NFL Parties shall be applied in a manner that would have the effect of creating directly or indirectly any recourse by or right or remedy of any Secured Party against the JV Company or any Club Party (or the assets of the JV Company or any Club Party) other than as would arise under the Financing Documents in the absence of this Letter Agreement.

        (d)   Except as otherwise expressly provided herein, all representations, warranties, covenants and obligations (a) of the Requesting Parties shall be several, but not joint, (b) of the JV Company and the Club Parties or any of them shall be independent of the obligations of the Secured Parties to the NFL and/or to the JV Company or the Club Parties, (c) of the Club shall be joint and several with the Club Controlling Owner, (d) of StadCo shall be joint and several with the StadCo Controlling Owner and (e) of the Secured Parties or any of them shall be independent of the obligations of the JV Company and the Club Parties to the NFL and/or to the Secured Parties.

    15.   Counterparts; Survival of Representations and Warranties; Termination. This Letter Agreement shall be effective upon execution and delivery hereof by all the parties hereto. This Letter Agreement may be executed in two or more counterparts, each of which may be executed by one or more of the parties hereto, but all of which when taken together shall constitute one agreement binding upon all

Requesting Parties
Page 50

of the parties hereto. Delivery of an executed counterpart of a signature page of this Letter Agreement by
facsimile shall be effective as delivery of a manually executed counterpart of this Letter Agreement.
Each of the representations, warranties, covenants, and other agreements of the parties contained in this
Letter Agreement shall survive the advance, repayment, and readvance of any funds disbursed by the
Secured Parties (or by the Trustee on behalf of the Secured Parties) under the Operative Documents and
shall continue in full force and effect until the Obligations (including any renewals and extensions
thereof) have been fully repaid, satisfied and terminated in accordance with the terms hereof and the
Operative Documents, and the commitments relating thereto have expired or been terminated and the
Liens on the Collateral secured thereunder shall have been released in full, upon which the obligations of
the parties under this Letter Agreement shall terminate (except as provided in the following sentence).
Notwithstanding the foregoing, the provisions of Paragraphs 24 and 25 hereof shall survive the
termination of this Letter Agreement. The NFL shall be under no obligation to the Requesting Parties, or
any other party, to renew or replace this Letter Agreement following such repayment, satisfaction, and
termination.

        16.    Notices. Any notice, request, demand, or other communication permitted or required to
be given hereunder shall be (a) in writing, (b) signed by the party giving it, and (c) sent by hand, first-
class United States mail (postage prepaid and return receipt requested), overnight carrier, or by telex,
facsimile, graphic scanning or other telegraphic communications equipment of the sender. If sent to a
Requesting Party, such notice shall be sent to the address for such party set forth on the first page of (or
elsewhere in) this Letter Agreement and, if sent to the NFL, such notice shall be sent to:

                        National Football League
                        280 Park Avenue
                        New York, New York  10017
                        Attention: Treasurer
                        Facsimile:  (212) 681-7587

(or to such other address as the receiving party shall have designated by notice that has not been revoked
to the other parties hereto), (d) with respect to the NFL only, deemed to have been given only when
received or refused and (e) with respect to any party hereto other than the NFL, deemed to have been
given only when received or the date of receipt if delivered by hand or overnight carrier service or sent by
telex, facsimile, graphic scanning or other telegraphic communications equipment of the sender, or on the
date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered,
sent or mailed (properly addressed) to such party as provided in this Paragraph 16 or in accordance with
the latest unrevoked direction from such party given in accordance with this Paragraph 16.

        17.    Subordination of Subrogation and Reimbursement Claims. If and to the extent that any
of the JV Company, the Club Parties and/or Affiliates thereof contributes any funds or other property on
behalf of StadCo to any Secured Party or otherwise makes payments in satisfaction of any of StadCo's
obligations under the Financing Documents (whether pursuant to a cure right or otherwise), any exercise
of claims for reimbursement or other similar claim (whether by way of subrogation or otherwise) which
such parties may have against StadCo by reason thereof or as they may separately agree in writing shall,
in addition to the restrictions set forth herein in respect of such parties, be subject and subordinate to the
same terms and conditions of this Letter Agreement as are applied to the Secured Parties. The NFL
acknowledges that it would not have consented to the transactions contemplated by the Financing
Documents without each of the representations, warranties and covenants of the JV Company and the
Club Parties (including with respect to matters to which certain of such Club Parties would not otherwise
have been responsible or legally obligated) and each of the JV Company and the Club Parties
acknowledges that it will derive substantial benefit from the NFL's consent. The Club Parties affected by
this Letter Agreement may agree from time to time to allocate as among themselves and their owners the

Requesting Parties
Page 51

financial and other consequences of the actions of the NFL taken pursuant to this Letter Agreement, any similar agreement with the NFL, whether in connection with a Team Financing or other StadCo financing or otherwise, the NFL Constitution or otherwise, provided that no such agreement shall restrict or modify in any manner the rights of the NFL against the JV Company or the Club Parties, whether pursuant to the terms of this Letter Agreement, the NFL Constitution or otherwise.

18.    Obligations Absolute.  Nothing contained in this Letter Agreement is intended to or shall impair, as between the Club Parties and the Secured Parties, the obligation of StadCo, which is absolute and unconditional, to pay the Secured Parties, as and when the same shall become due and payable in accordance with the provisions of the Indenture and as hereafter amended in accordance with this Letter Agreement, the principal of, interest on and other amounts due with respect to the Obligations.

19.    Governing Law; Construction; Headings.  This Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.  This Letter Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party. Paragraph headings used herein are for convenience of reference only, are not part of this Letter Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Letter Agreement.

20.    Successor and Assigns.  Whenever in this Letter Agreement reference is made to any party, such reference shall be deemed to include the successors, transferees, assigns, heirs, and legal representatives of such party and, without limiting the generality of the foregoing, all representations, warranties, covenants and other terms and provisions made by, on behalf of or for the benefit of any parties hereto in this Letter Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of such party and, in the case of the Secured Parties, to Persons which may become party to any of the Operative Documents (whether as an additional party as contemplated therein, by assignment or otherwise) subsequent to the date hereof or which otherwise succeed or are entitled to the rights or remedies of the Secured Parties under any of the Operative Documents.  Notwithstanding the foregoing, this Letter Agreement may not be assigned by any of the Requesting Parties (except in connection with ordinary course transfers of Bonds among Beneficial Owners) without the prior written consent of the NFL, which consent may be withheld in the NFL's sole and absolute discretion, provided that (a) the Trustee may assign all of its rights and obligations under this Letter Agreement to a substitute trustee that is a financial institution customarily engaged to act as a trustee in financing transactions similar to those set forth in the Operative Documents in connection with a concurrent assignment of all of the Trustee's rights and obligations under all of the Operative Documents to such substitute and (b) each of the Insurers may assign all of its rights and obligations under this Letter Agreement to a substitute AAA-rated financial insurer that is customarily engaged to act as an insurer in respect of financing transactions similar to those set forth in the Operative Documents in connection with a concurrent assignment of all of such Insurer's rights and obligations under all of the Operative Documents to such substitute, provided that the substitute trustee or insurer shall execute and deliver to the NFL an agreement (containing the terms set forth in Exhibit F hereto) to be bound by each and every term set forth in this Letter Agreement applicable to a Secured Party (and to the Trustee, Insurer or Controlling Insurer, as the case may be) as fully as if it were a signatory hereto.  The Secured Parties shall not assign any of their security interests or Liens in the Collateral (except in connection with assignment of their interests under the Operative Documents as described above) without the prior written consent of the NFL, which consent may be withheld in the NFL's reasonable discretion.

21.    Amendment.  Each and every modification and amendment of this Letter Agreement shall be in writing and signed by the parties hereto affected thereby or their respective representatives or

GStad_LB_0007055

Requesting Parties
Page 52

attorneys-in-fact; and each and every waiver of, and consent to any departure from, any representation, warranty, covenant or other term or provision of this Letter Agreement shall be in writing and signed by the party affected by such waiver or consent or such party's representative or attorney-in-fact.

22.   Entire Agreement: Letter Agreement Controls.  This Letter Agreement contains the entire agreement of the parties hereto with respect to the subject matter herein and supersedes all other representations, warranties, undertakings, agreements, and understandings, oral or otherwise, between the parties hereto with respect to the subject matter hereof.  In the event of any inconsistency or conflict between the various terms and provisions of any Financing Document and those contained in this Letter Agreement, the terms and provisions of this Letter Agreement shall control.

23.   Control Language.  Except as otherwise approved by the NFL, each Secured Party agrees to include the following provision on any financing or continuation statements securing the Collateral, in the Indenture (including, for the avoidance of doubt, any Supplemental Indenture), the Financing Documents and (upon request of the NFL) in the other Operative Documents related to the Obligations, and to furnish the NFL, upon request, a copy of such Operative Documents after their execution or a copy of such statements upon their filing.  Subject to Paragraph 20, each Secured Party further agrees to provide written notice (containing the terms set forth below) to any party purchasing an interest in the Obligations (other than sales of Bonds subject to an Indenture expressly incorporating such language) that the rights of each Secured Party to enforce its rights and remedies with respect to any Collateral are subject to the rights of the NFL under this Letter Agreement.

> Section    .  NFL Requirements.  It is acknowledged, understood and agreed that, so long as the letter agreement, dated as of [    ], 2007 by and among the NFL, Giants Stadium LLC, New Meadowlands Stadium Company, LLC, New York Football Giants, Inc., and their respective Affiliates party thereto, the Trustee and the Insurers (as the same may hereafter be amended, the "NFL Letter Agreement"; all capitalized terms used in this Section and not defined are defined in the NFL Letter Agreement) is in effect and notwithstanding anything in this document or any other Operative Document to the contrary, (a) the exercise by the Secured Parties of remedies under any Operative Document will be made in accordance with the terms and provisions of the NFL Letter Agreement, the terms, conditions and provisions of which each of the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the event of any conflict or inconsistency between the terms of the NFL Letter Agreement and the terms of any Operative Document (including without limitation this document/agreement), the terms of the NFL Letter Agreement will control.

24.   No NFL Liability.  Each Requesting Party, on its own behalf and on behalf of its respective Affiliates and subsidiaries, and their heirs, executors, administrators, trustees, legal representatives, successors and assigns hereby agrees that the NFL and the Affiliated NFL Parties shall have no liability whatsoever for actions taken or omitted to be taken with respect to the subject matter of this Letter Agreement, including, without limitation, actions taken or omitted to be taken as proxy, agent, or attorney-in-fact for any Requesting Party pursuant to Paragraph 5 hereof, except to the extent such actions or omissions constitute gross negligence or willful misconduct.  In furtherance of and in addition to the foregoing, each Requesting Party, on its own behalf and on behalf of its respective Affiliates and subsidiaries, and their heirs, executors, administrators, trustees, legal representatives, successors and assigns, hereby covenants not to sue in connection with or assert, and hereby forever releases, and agrees to cause its respective Affiliates and subsidiaries not to sue in connection with or assert, any claims,

**CONFIDENTIAL**

Requesting Parties
Page 53

demands, causes of action or liabilities of any kind whatsoever (including, without limitation, all claims,
causes of action, or liabilities, if any, arising under federal or state antitrust law), whether known or
unknown, which they or any other party may now or hereafter have in connection with any actions taken
or omitted to be taken by the NFL or any Affiliated NFL Party with respect to the subject matter of this
Letter Agreement; provided that such actions or omissions do not constitute gross negligence or willful
misconduct on the part of the NFL or the Affiliated NFL Party. Each Requesting Party represents and
warrants that, in consenting to the terms contained in this Letter Agreement, including, without limitation,
the terms contained in this Paragraph 24, they have proceeded voluntarily and with the advice of attorneys
of their own respective choosing, that they have read the terms of this Letter Agreement, including
without limitation, the terms of this Paragraph 24 and reviewed such terms with their respective attorneys,
that the terms of this Letter Agreement, including, without limitation, the terms of this Paragraph 24, have
been fully and completely read and explained to them by their respective attorneys, and that such terms
are fully understood and voluntarily accepted by them, with no duress or coercion of any kind. The NFL
hereby agrees, solely with and for the benefit of the Insurers and for no other Requesting Party or any
other Person, that the release and covenant not to sue set forth in this Paragraph 24 shall not apply to the
breach by the NFL of any specific covenant, obligation or undertaking set forth in this Letter Agreement,
to the extent that such specific covenant, obligation or undertaking (a) is expressly set forth herein; and
(b) gives rise to an obligation under which the NFL has no discretion in the performance of such
obligation hereunder.

25.    Limited Review; No Waiver of NFL Constitution.  Each Requesting Party acknowledges
and agrees that the NFL has reviewed the Operative Documents that have been supplied to it for certain
limited purposes only and that the NFL is not charged with knowledge of, or deemed to have any
independent obligations under, any such documents. Each Requesting Party further acknowledges that
neither the NFL's review of any of the Operative Documents and other materials submitted to the NFL in
connection herewith, nor the NFL's consent to the borrowing by StadCo of monies as described herein
and to the grant by StadCo of security in respect of such borrowings, (a) except to the extent expressly set
forth in Paragraph 1 hereof and in 2007 Resolution JC-5 constitutes a waiver of any NFL
rule or policy (or the NFL Constitution), or the past, current or future applicability thereof, or affects the
status of any other ruling, consent or formal or informal interpretation or agreement now or hereafter in
effect between the NFL and the Club, any owner thereof, the Franchise or any other Requesting Party or
any resolution or policy of the NFL now or hereafter affecting the Club, any owner thereof, the Franchise
or any Requesting Party, or (b) limits, impairs or in any way affects the NFL's rights, as against such
party, to enforce compliance with the NFL Constitution or impose sanctions for any violations thereof.

26.    Accurate and Complete Documents.  The Requesting Parties (other than the Secured
Parties) hereby represent and warrant to the NFL that the NFL, on or prior to the date hereof, has been
provided with true, accurate and complete copies of all of the material Operative Documents (including,
without limitation, all of the Financing Documents and any amendments to any such Financing
Documents executed on or prior to the date hereof) and that there are no agreements by or among the
Requesting Parties to which the Requesting Parties (other than the Secured Parties) are party, have
knowledge, or should in the exercise customary due diligence have knowledge, with respect to the subject
matter of the Operative Documents not reflected in such copies. The Secured Parties hereby represent and
warrant to the NFL that the NFL, on or prior to the date hereof, has been provided with true, accurate and
complete copies of all of the material Operative Documents (including, without limitation, all of the
Financing Documents and any amendments to any such Financing Documents executed on or prior to the
date hereof) to which any of them are a party or of which any of them are aware, and there are no
agreements by or among the Requesting Parties with respect to the subject matter of such Financing
Documents not reflected in such copies. The Requesting Parties acknowledge and agree that (a) the
representations and warranties set forth in this Paragraph 26 are material inducements to the NFL to grant
the consent granted hereby and (b) any Material Modification of the Operative Documents or any of the

CONFIDENTIAL

Requesting Parties
Page 54

Obligations arising thereunder that is hereafter made without the NFL's consent or that has heretofore
been made but not disclosed to the NFL in writing (or any breach of any representation or warranty set
forth in this Paragraph) may, at the NFL's option, be deemed a default under this Letter Agreement and/or
the NFL Constitution, as the case may be, which default shall entitle the NFL to exercise its rights and
remedies against any of the Requesting Parties in respect thereof under the NFL Constitution and/or any
and all applicable documents or agreements and/or withdraw its consent hereunder and/or exercise any
rights that it may have hereunder with respect to any Secured Party.

27.    Additional Representations.

(a)    The NFL represents and warrants to the Secured Parties that (i) the NFL has the
power and authority under the NFL Constitution to execute, deliver and perform its obligations under this
Letter Agreement, the League G-3 Loan and the NFL Support Documents, (ii) this Letter Agreement, the
League G-3 Loan and the NFL Support Documents have been duly authorized by all requisite action on
the part of the NFL and its member clubs and duly executed and delivered by the NFL, and (iii) this
Letter Agreement, the League G-3 Loan and the NFL Support Documents are valid and binding
obligations of the NFL and are enforceable against the NFL in accordance with their respective terms,
subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or
affecting the rights and remedies of creditors generally and to general principles of equity (regardless of
whether at equity or at law).

(b)    Each of the Requesting Parties hereby represents and warrants to the NFL that (i)
such Requesting Party has the individual or other capacity, power and authority under its organizational
documents or otherwise under applicable law to execute, deliver and perform its obligations under this
Letter Agreement and such of the NFL Support Documents as such Requesting Party is a party, (ii) this
Letter Agreement, and, if such Requesting Party is a party to any NFL Support Documents, then such
NFL Support Documents, have been duly authorized by all requisite action on the part of, and duly
executed and delivered by, such Requesting Party, and (iii) this Letter Agreement and, in respect of any
NFL Support Documents to which such Requesting Party is a party, such NFL Support Documents are
valid and binding obligations of such Requesting Party enforceable against such Requesting Party in
accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization,
moratorium or other laws relating to or affecting the rights and remedies of creditors generally and to
generally-applicable principles of law and equity.

28.    Other StadCo Consent Letter. Each of the Requesting Parties acknowledges that, in
connection with the construction and financing of the Project, the NFL is entering into the Other Team
Consent Letter concurrently with its execution of this Letter Agreement and that such Other StadCo
Consent Letter provides the NFL with rights and remedies that are similar in nature to those provided to
the NFL hereunder. Each of the Requesting Parties covenants and agrees that it shall use commercially
reasonable efforts (a) not to take any action (or refuse to take any action that it is otherwise obligated to
take, whether pursuant to the terms of this Letter Agreement or otherwise) that is intended to, or that
could reasonably be expected to, interfere with any exercise by the NFL of its rights and/or remedies
under the Other StadCo Consent Letter, (b) in the event that a foreclosure or other sale occurs in respect
of the Other StadCo, or in the event that the NFL exercises (or directs the Trustee to exercise) any of the
NFL's rights thereunder that are similar to the rights provided to the NFL in Paragraphs 4, 5 and 9 hereof,
to enter into such reasonable agreements and arrangements (including without limitation agreements
substituting the new owner and its Affiliates for the owner of the Other StadCo and its Affiliates, as
applicable, in the JV Company and in any leases or subleases relating to the Existing Stadium, the New
Stadium and any Additional Premises, as the case may be, but only to the extent a Requesting Party has
applicable rights thereunder) as are deemed necessary or desirable by the NFL in connection with such
sale and (c) to cooperate with the NFL in connection with any exercise by the NFL of its rights and/or

CONFIDENTIAL

Requesting Parties
Page 55

remedies under the Other StadCo Consent Letter and in the NFL's administration thereof. The NFL acknowledges that the relationship between StadCo and the Other StadCo is an arm's-length relationship between unaffiliated entities and that (i) this Section 28 shall not be construed to restrict, modify, delay, waive or estop any Club Party in connection with the exercise of any right or remedy such Club Party may have or hereafter acquire against the Other StadCo, Other Team, any successor, assign or creditor, or any of their respective assets or property (including without limitation in connection with any default under any agreement or any violation of any applicable law) or to require any Club Party to forgive, set aside, modify or agree to any extension or accommodation with respect to any rent, indebtedness or other obligation due from the Other StadCo or Other Team to such Club Party; provided, that if and to the extent that any Club Party, in the exercise of its rights or remedies against the Other StadCo, Other Team or their respective successors or assigns, obtains any Lien or other security interest against the assets of, or interests in, the JV Company, such Other StadCo, Other Team, or any successor or assign, then any foreclosure or other exercise of rights or remedies against the JV Company or such Other StadCo, Other Team, successor or assign (or its assets or interests, as applicable) in respect thereof shall be subject to each and all of the terms of the Other StadCo Consent Letter applicable to a Secured Party thereunder (and such Club Party shall execute such other documents and agreements as the NFL may request in connection therewith, including without limitation an NFL debt financing consent letter); provided, further, that the foregoing proviso shall not, subject to any applicable restrictions contained in the Indenture, preclude StadCo from being repaid directly by the JV Company on behalf of a Capital Defaulting Member as provided for under (and as such term is defined in) the JV Company's Operating Agreement in respect of a Member Loan (as defined in the JV Company's Operating Agreement) deemed made by StadCo to the Capital Defaulting Member thereunder, solely from amounts that would otherwise be distributed or paid to the Capital Defaulting Member pursuant thereto) and (ii) no Club Party shall be required to enter into any agreement or arrangement permitting any activities at the New Stadium or the performance or exhibition of games by any professional sports franchise other than the franchise of the Other Team (or an NFL-approved successor Franchise) except as it may agree in its sole and absolute discretion.

29.   Waiver of Right to Jury Trial.  Each party to this Letter Agreement agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any party hereto or any successor or assignee of any party on or with respect to this Letter Agreement or which in any way relates, directly or indirectly, to the agreements of the parties or the transactions described herein shall be tried only by a court and not by a jury. **EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING.**

30.   Injunctive Relief.  The Requesting Parties acknowledge and agree that the NFL will suffer immediate and irreparable harm in the event of a breach of this Letter Agreement by any other party hereto or any of its obligations hereunder and will not have an adequate remedy at law, and therefore, the NFL shall, in addition to any other remedy available to it at law or in equity, be entitled to temporary, preliminary and permanent injunctive relief and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any security.

31.   Authority of Trustee.  The Trustee represents, warrants, covenants and agrees that the Indenture and the other Operative Documents fully authorize (unless and until the Trustee has been replaced pursuant to the terms of the Operative Documents) the Trustee, in its capacity as Trustee and collateral agent under the Security Documents, to take such actions on behalf of the holders of the Bonds, including, without limitation, the execution of this Letter Agreement, and, subject to the required approvals set forth in the Indenture, the granting of waivers under this Letter Agreement after the date hereof and to exercise such powers and to perform such duties as are required under the provisions of the Operative Documents, this Letter Agreement, and any other instruments or agreements referred to therein

Requesting Parties
Page 56

or as are reasonably incidental thereto. Whether or not expressly stated in any provision of this Letter Agreement, and to the extent the Trustee is so empowered under the Operative Documents, the representations, warranties, covenants and agreements of the Trustee set forth in this Letter Agreement, shall be deemed made on behalf of, and by, each Secured Party and holder of Bonds that is not a signatory hereto, each of which shall be fully bound by the provisions of this Letter Agreement that are applicable to the Trustee. The Trustee hereby covenants and agrees that it shall immediately provide notice to the NFL of its resignation or removal as Trustee (or as collateral agent) under any of the Operative Documents. As a condition precedent to any Person serving as a successor trustee or agent, such Person shall execute and deliver to the NFL an agreement in form and substance reasonably acceptable to the NFL, assuming and agreeing to be bound by the terms of this Letter Agreement.

32.    No Relocation.   Until the earlier of (i) the date on which occurs the end of the fifteenth regular playing season of the NFL (including any post-season playoff games in which the Club may participate in such fifteenth season) in which the Club has occupied the New Stadium for purposes of playing its NFL regular season home games, (ii) the date on which the League G-3 Loan shall have been paid or satisfied in full, and (iii) the exercise by the JV Company, the Club and StadCo of their early termination rights under the Ground Lease, StadCo Sublease and Team Sublease, respectively, in accordance with the terms of the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the Financing Documents and Paragraphs 4(s) of this Letter Agreement, the Club Parties covenant and agree that the Club shall not relocate the playing of its home games from the New Stadium except due to any event that permits termination of the Ground Lease, StadCo Sublease or Team Sublease, and the NFL hereby agrees to diligently enforce such covenant as made by the Club so long as such covenant shall not have been avoided or otherwise set aside by a court of competent jurisdiction. Nothing in this Paragraph 32 is intended to limit the obligations of the Club under the Non-Relocation Agreement.

*[Intentionally Left Blank]*

CONFIDENTIAL

Requesting Parties
Page 57

  If the terms and conditions set forth herein are acceptable to you, please indicate your acceptance by executing and returning to me a signed and dated counterpart of this Letter Agreement.

Very truly yours,

NATIONAL FOOTBALL LEAGUE


Roger Goodell
Commissioner


*[Intentionally Left Blank]*

CONFIDENTIAL

The undersigned hereby agree to the foregoing terms and conditions and each undersigned Club Party also specifically agrees that the method of disposing of the Collateral contemplated in this Letter Agreement would not make a sale or other disposition of the Collateral commercially unreasonable.

GIANTS STADIUM LLC

By: _____
        Name:
        Title:

NEW YORK FOOTBALL GIANTS, INC.

By: _____
        Name:
        Title:

Club Controlling Owner:


_____
John K. Mara

StadCo Controlling Owner:


_____
John K. Mara

NEW MEADOWLANDS STADIUM COMPANY, LLC

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

[Signature Page to Giants Stadium Financing Consent Letter]

CONFIDENTIAL                              

THE BANK OF NEW YORK, AS TRUSTEE

By: _____
      Name:
      Title:

FINANCIAL GUARANTY INSURANCE COMPANY, as Controlling Insurer

By: _____
      Name:
      Title:

FINANCIAL SECURITY ASSURANCE, INC., as Other Insurer

By: _____
      Name:
      Title:

GOLDMAN SACHS CAPITAL MARKETS, L.P., as Swap Counterparty

By: Goldman Sachs Capital Markets, L.L.C., its General Partner

By: _____
      Name:
      Title:

LEHMAN BROTHERS SPECIAL FINANCING INC., as Swap Counterparty

By: _____
      Name:
      Title:

**CONFIDENTIAL**

EXHIBIT A

2007 RESOLUTION JC-5

*Whereas,* in connection with the joint undertaking of the stadium companies associated with the New York Giants and the New York Jets (each, a "Stadium Company" and together, the "Stadium Companies") to participate in a public-private partnership for the construction of a new stadium to be located in East Rutherford, New Jersey, the membership, taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium), approved in 2006 Resolution JC-1 (i) a stadium construction contribution from the League of up to $150 million per Stadium Company (up to $300 million in total for the project) pursuant to, and in accordance with, the G-3 Program and (ii) a related PSL visiting team share ("VTS") waiver, in order to support the construction of such new stadium;

*Whereas,* the Stadium Companies are in the process of finalizing financing agreements that would permit each Stadium Company to incur debt to be applied towards construction of the new stadium;

*Whereas,* in anticipation of such financing, a temporary and limited waiver of the debt ceiling has been requested to allow the Stadium Companies to incur the debt described herein; and

*Whereas,* the financial terms of (i) the Ground Lease and Development Agreement between the New Jersey Sports and Exposition Authority and New Meadowlands Stadium Company, LLC (the "JV Company"), (ii) the separate subleases between the JV Company and each of the Stadium Companies, and (iii) the separate sub-subleases between the Stadium Companies and the Clubs (collectively, the "Lease Documents") have been submitted for Executive Committee approval as required by 1988 Resolution FC-5.

Be it *Resolved,* that the financial terms of the Lease Documents for the new stadium be, and hereby are, approved, provided, however, that such approval does not constitute a waiver of or authorize noncompliance with any generally applicable gate-sharing or other League policies;

Further *Resolved,* that, again taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium) and on a non-precedential basis, the Giants and the Giants' Stadium Company be, and hereby are, granted a temporary and limited debt ceiling waiver on the terms described in presentations to the membership, including the accelerated repayment schedule that requires the debt of the Giants' Stadium Company to be reduced to not more than $575 million no later than the end of the seventh season (commencing with the first full season) of operations at the new stadium (which waiver will permit the Giants and the Giants' Stadium Company to incur debt in an aggregate amount of $865 million, which amount (i) includes $715 million of Giants Stadium Company debt ($65 million of which may be incurred solely as and to the extent necessary to fund overruns in the cost of constructing the new stadium) and (ii) is net of indebtedness incurred by the Giants' Stadium Company in connection with its delivery of letters of credit or other sureties to fund debt service or work stoppage reserves pursuant to the terms of the Giants Stadium Company's financing agreements), subject to the condition that the Giants and any of their affiliates holding football-related assets shall, no later than the end of the twenty-fifth season (commencing with the first full season) of operations at the new stadium, reduce the outstanding indebtedness of the Giants, their Stadium Company and all affiliates thereof that hold football-related assets to the lesser of (i) $350 million and (ii) the amount of the then-generally applicable League debt ceiling (compliance with such reduction (and the Giants' compliance with other League rules) to be determined on a consolidated basis for the Giants, the Giants' Stadium Company and all affiliates thereof

that hold football-related assets), but without prejudice to their right to borrow up to the debt ceiling thereafter;

Further *Resolved,* that again taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium) and on a non-precedential basis the Jets and the Jets' Stadium Company be, and hereby are, granted a temporary and limited debt ceiling waiver on the terms described in presentations to the membership, including the accelerated repayment schedule that requires the debt of the Jets' Stadium Company to be reduced to not more than $575 million no later than the end of the seventh season (commencing with the first full season) of operations at the new stadium (which waiver will permit the Jets and the Jets' Stadium Company to incur debt in an aggregate amount of $865 million, which amount (i) includes $715 million of Jets Stadium Company debt ($65 million of which may be incurred solely as and to the extent necessary to fund overruns in the cost of constructing the new stadium) and (ii) is net of indebtedness incurred by the Jets' Stadium Company in connection with its delivery of letters of credit or other sureties to fund debt service or work stoppage reserves pursuant to the terms of the Jets Stadium Company's financing agreements), subject to the condition that the Jets and any of their affiliates holding football-related assets shall, no later than the end of the twenty-fifth season (commencing with the first full season) of operations at the new stadium, reduce the outstanding indebtedness of the Jets, their Stadium Company and all affiliates thereof that hold football-related assets to the lesser of (i) $350 million and (ii) the amount of the then-generally applicable League debt ceiling (compliance with such reduction (and the Jets' compliance with other League rules) to be determined on a consolidated basis for the Jets, the Jets' Stadium Company and all affiliates thereof that hold football-related assets), but without prejudice to their right to borrow up to the debt ceiling thereafter;

Further *Resolved,* that the foregoing debt ceiling waivers are specific to the current controlling owners of the Giants and the Jets and that, as a result, if (i) either the Giants or the Giants' Stadium Company, or a controlling interest in either entity, is sold or otherwise transferred other than to a member or members of the Giants' current principal owners' immediate families (as defined in the NFL Constitution), then the debt ceiling waiver granted to the Giants pursuant to the preceding resolutions shall be terminated and (ii) either the Jets or the Jets' Stadium Company, or a controlling interest in either entity, is sold or otherwise transferred other than to a member or members of the Jets' current controlling owner's immediate family (as defined in the NFL Constitution), then the debt ceiling waiver granted to the Jets pursuant to the preceding resolutions shall be terminated (unless otherwise approved by the membership in its sole discretion);

Further *Resolved,* that the membership confirms that, in granting the debt ceiling waivers granted hereunder, it has accepted and acknowledged, and relied upon, the Clubs' representation that any further cost overruns will be funded from sources other than borrowed money (e.g., equity injections, PSL sales, other dedicated pre-sales of stadium new revenue streams);

Further *Resolved,* PSL proceeds (if any) shall be used solely and entirely to fund stadium construction (including through retirement of stadium debt) through a dedicated structure or other means satisfactory to the Commissioner and the Finance Committee and Stadium Committee, and that all PSL-related approvals are subject to the NFLPA granting Salary Cap credits and exclusions from Total Revenues attributable to the stadium project (provided that this condition shall be deemed to be satisfied if the NFLPA action does not occur solely due to, or as limited by, the "1.8%/2.3%" limit on Salary Cap credits and exclusions);

Further *Resolved,* all terms and conditions set forth in 2006 Resolution JC-1 and all G-3 Program guidelines shall remain unchanged including, but not limited to, the Club's guarantees, and the approvals herein shall not be deemed to address matters not expressly addressed herein; and

CONFIDENTIAL

Further *Resolved*, that the terms and conditions of the approvals granted hereby (i) are subject to submission to the League Office of documentation satisfactory to the Commissioner, the Finance Committee and the Stadium Committee documenting the terms, conditions, and arrangements related to the financing agreements for the construction of the stadium (including without limitation final versions of the Lease Documents and the operating agreement and other relevant documents relating to the JV Company), and (ii) the execution of consent letters and other documents with all relevant parties acceptable in form and substance to the Commissioner, the Finance Committee and the Stadium Committee, and that the Commissioner shall execute and deliver such agreements on behalf of the League, which shall contain such additional specific terms and conditions (including League "bundling" rights and related collateral pledges on terms generally utilized and required under such consent letters and other documents) as the Commissioner, the Finance Committee or the Stadium Committee (or their respective designees) may deem necessary or appropriate (including without limitation any documentation related to the accelerated payment schedule described herein).

CONFIDENTIAL

Exhibit B-1

New Stadco Sublease

(In this transcript as Item # 3)

CONFIDENTIAL

GStad_LB_0007067

Exhibit B-2

Team Sublease

(In this transcript as Item # 5)

CONFIDENTIAL

GStad_LB_0007068

Exhibit B-3

Ground Lease

(In this transcript as Item # 1)

**CONFIDENTIAL**

**GStad_LB_0007069**

Exhibit B-4

Memoranda of New Stadium Leases

(In this transcript as Items # 4 and #6)

CONFIDENTIAL

EXHIBIT C

Power of Attorney

For value received, the undersigned hereby assigns and transfers to the National Football League (the "NFL") all rights that the undersigned may have to enforce and exercise all rights and remedies of the undersigned in and under the Operative Documents/Operative Project Documents (provided that for the avoidance of doubt, neither the StadCo Sublease nor the Team Sublease shall be deemed to be an Operative Project Document) in the event of a Third Party Default (as defined below) and the undersigned hereby irrevocably appoints the NFL as its agent and attorney-in-fact to act for the undersigned (in any way that the undersigned could act in person) to exercise such rights and remedies.

The powers of the NFL granted hereunder shall include, but not be limited to, the following powers (including such powers as they may be defined under applicable state law): (a) real estate transactions; (b) banking and other financial institution transactions; (c) stock and bond transactions; (d) tangible personal property transactions; (e) safe deposit box transactions; (f) insurance transactions; (g) claims and litigation; (h) commodity and option transactions; (i) business operations and business operation transactions; (j) borrowing transactions; (k) estate transactions; (l) tax matters relating to the foregoing and (m) all other property powers and transactions, in each case as and to the extent relating to the exercise of the rights and remedies of the undersigned under the Operative Documents/Operative Project Documents.

Terms used herein and not otherwise defined herein shall have the meaning set forth in that certain Letter Agreement, dated as of _____, 2007, among the National Football League, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "Club"), Giants Stadium LLC (the "StadCo"), John K. Mara (the "Club Controlling Owner"), John K. Mara (the "StadCo Controlling Owner"), and New Meadowlands Stadium Company, LLC (the "JV Company" and, together with the Club, StadCo, the Club Controlling Owner and the StadCo Controlling Owner, the "Club Parties").

This power of attorney shall be effective upon its execution, but the rights of the NFL to exercise the rights of the Club Parties to enforce and exercise all rights and remedies of the undersigned in and under the Operative Documents/Operative Project Documents in the event of a Third Party Default (as defined below) hereunder (the "League Exercise Rights") shall be subject to the satisfaction of the following conditions on or before the date on which the NFL shall seek to exercise such power of attorney; provided that the satisfaction of these conditions with respect to one default shall not give the NFL the right to enforce remedies as to any other Third Party Default (as defined below) until the conditions applicable to that Third Party Default (as defined below) are satisfied:

1.    There shall exist a default or other breach by one or more parties (other than StadCo or any other Club Party) of one or more material obligations of such party(ies) under the Operative Documents/Operative Project Documents (a "Third Party Default");

2.    All relevant cure periods in respect of the performance by the breaching party(ies) of the relevant obligations (in respect of which a Third Party Default shall have occurred) under the Operative Documents/Operative Project Documents shall have expired;

3.    The parties to the Operative Documents/Operative Project Documents shall have failed on or before the conclusion of such cure periods to have reached agreement or other accommodation with StadCo and/or any other Club Party, as the case may be, regarding the cure of any such Third Party Default, which agreement or other accommodation shall provide for the

construction of a first-class professional football stadium with capacity and amenities substantially similar to those specified in the current design in the Project Agreements, suitable for the playing and national media broadcast of NFL games, with ground lease rights provided at not substantially less than the levels contemplated in such Operative Documents/Operative Project Documents and on a timetable reasonably consistent with the respective terms of the Operative Documents/Operative Project Documents (except for such delays in the timing of such performance as shall have occurred as the result of such Third Party Default prior to the date of such agreement or other accommodation); and

4.      StadCo and/or any other Club Party, as applicable, shall have failed, within thirty (30) days following written notice and demand from the NFL, to initiate the diligent exercise of their remedies under or in respect of the Operative Documents/Operative Project Documents with respect to such Third Party Default (or, in the event that StadCo and/or any other Club Party, as applicable, shall have initiated the exercise of such remedies, either with or without notice and demand from the NFL, StadCo or another Club Party, as the case may be, shall thereafter have ceased or otherwise failed, at any time or from time to time after receipt of such NFL notice and demand, diligently to pursue the exercise of such remedies, including, without limitation, any such rights as StadCo and/or any other Club Party, as the case may be, may have under the Operative Documents/Operative Project Documents to seek specific performance by, or other appropriate relief with respect to, the other parties thereto of their obligations under such Operative Documents/Operative Project Documents).

In the exercise of its rights pursuant to this Power of Attorney, the NFL shall have due regard for the fundamental objective of completing a first-class professional football stadium with capacity and amenities substantially similar to those specified in the Project Agreements. The NFL's power and authority hereunder with respect to any Third Party Default shall cease when the applicable Third Party Default has been remedied to the satisfaction of the NFL.

This Power of Attorney may not be amended or modified, nor may any additional Power of Attorney be granted by the undersigned Club Party in favor of the NFL and relating to the exercise of the rights of the undersigned Club Party in relation to the Operative Documents/Operative Project Documents, without the prior written consent of [COUNTERPARTY], in each to the extent so legally required.

GStad_LB_0007072

IN WITNESS WHEREOF, the parties hereto have set their hands as of the date indicated below.

[            ]

By: _____     Date: _____
      Name:
      Title:


State of _____  )
                          ) SS.
County of _____ )

The undersigned, a notary public in and for the above county and state, certifies that
_____, known to me to be the same person whose name is subscribed as principal to the foregoing
power of attorney, appeared before me in person and acknowledged signing and delivering the instrument
as the free and voluntary act of the principal, for the uses and purposes therein set forth.

Dated: _____ (SEAL)


                                            _____
                                            Notary Public


My commission expires_____.


CONFIDENTIAL                                            GStad_LB_0007073

[        ]

**By:** _____        Date: _____
      Name:
      Title:


State of_____    )
                   ) SS.
County of_____)

     The undersigned, a notary public in and for the above county and state, certifies that
_____, known to me to be the same person whose name is subscribed as principal to the foregoing
power of attorney, appeared before me in person and acknowledged signing and delivering the instrument
as the free and voluntary act of the principal, for the uses and purposes therein set forth.

Dated:_____ (SEAL)


                                 _____
                                 Notary Public


     My commission expires_____.

**CONFIDENTIAL**

**EXHIBIT D-1**

[Attach Organizational Structure]

**CONFIDENTIAL**

**GStad_LB_0007075**

EXHIBIT D-2 - D-[___]

[Attached Organizational Documents]

CONFIDENTIAL

EXHIBIT E

[Attach New Stadium Estoppel Certificate]

CONFIDENTIAL

## EXHIBIT F

[Form of Assignment Consent]

[Name of Financial Institution] (["Trustee"/ "Insurer"]) has been provided with a copy of that certain letter agreement, dated as of [        ], by and among the National Football League, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "Club"), Giants Stadium LLC (the "StadCo"), John K. Mara (the "Club Controlling Owner"), John K. Mara (the "StadCo Controlling Owner"), and New Meadowlands Stadium Company, LLC (the "JV Company") (the "NFL Letter Agreement"; all capitalized terms used herein and not defined are defined in the NFL Letter Agreement) with respect to the Operative Documents governing and/or related to the Obligations, and has been advised that such NFL Letter Agreement affects certain rights of, and imposes certain obligations on, the Secured Parties under the Operative Documents. [Trustee/Insurer] hereby agrees that upon its acquisition of, or acceptance of an assignment in respect of the rights and obligations of the [Trustee/Insurer] in respect of the Obligations (or other acquisition or transfer to the undersigned of any interest therein), it shall be bound in all respects by each term or condition of the NFL Letter Agreement applicable to a Secured Party and to the [Trustee/Insurer/Controlling Insurer] thereunder as fully as though it were a signatory to such NFL Letter Agreement itself.

EXHIBIT G

Form of Irrevocable Proxy

This irrevocable proxy, which is coupled with an interest, is granted by the undersigned to the Commissioner of the National Football League (the "NFL") pursuant to and in connection with that certain letter agreement, dated as of the date hereof (as amended from time to time, the "NFL Letter Agreement"), by and among the NFL, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "Club"), Giants Stadium LLC (the "StadCo"), John K. Mara (the "Club Controlling Owner"), John K. Mara (the "StadCo Controlling Owner"), and New Meadowlands Stadium Company, LLC (the "JV Company" and, together with the Club, StadCo, the Club Controlling Owner and the StadCo Controlling Owner, the "Club Parties"), and in furtherance of the NFL's undertakings in such NFL Letter Agreement in order, among other things, to further and protect the interests of the NFL and its member clubs in the reputation and integrity of the NFL and professional football, and to preserve and enhance the value of its member clubs. Reference is hereby made to that certain letter agreement, dated as of April 7, 2004 (as amended, modified, supplemented, replaced and/or restated from time to time, the "Club Consent Letter"), by and among the NFL, the Club, Bank of America, N.A., JPMorgan Chase Bank, New York Life Insurance Company, New York Life Insurance and Annuity Corporation and New York Life Insurance and Annuity Corporation Institutionally Owned Life Insurance Separate Account.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the NFL Letter Agreement. In addition, for purposes of this irrevocable proxy, the term "Entities" shall mean StadCo, the Club and the JV Company, and any direct or indirect parent company or subsidiary of the same.

The undersigned is the legal and beneficial owner of [    ]% of the issued and outstanding membership interests of [_____] (the "Interests," which term shall be deemed to include all ownership interests of any Entity that, in the future, may be registered in the name of the undersigned). The undersigned hereby irrevocably appoints the Commissioner of the NFL (whoever he or she from time to time hereafter may be), as its true and lawful attorney and proxy in respect of the Interests, with all powers the undersigned possesses, and with full power of substitution:

1. Effective immediately, to vote or express consent or dissent in the sole discretion of such proxy in respect of any or all of the Interests, to the extent the holder of the Interests is entitled to vote or express consent or dissent (whether by operation of law or otherwise), in each case with respect to the following: (i) the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any Entity's assets (including, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); (ii) any amendment to the limited liability company agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation or other organizational documents of any Entity that affects in any way the requirement of prior shareholder, manager, member or partner approval, as the case may be, with respect to the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any of such Entity's assets (including, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); or (iii) any amendment to the limited liability company agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation or other organizational documents of any Entity that alters or modifies, or purports to alter or modify, the voting or consent or dissent rights of the Interests.

GStad_LB_0007079

2.   To vote or express consent or dissent in the sole discretion of such proxy in respect of any or all of the Interests, to the extent the holder of the Interests is entitled to vote or express consent or dissent (whether by operation of law or otherwise), in each case for any and all purposes and upon any and all subjects, matters and issues, including, without limitation, the approval of any sale of any Collateral (as defined in both the NFL Letter Agreement and the Club Consent Letter), the approval of the sale of all or any part of the assets of, or interests in, any Entity, and the removal and election of directors, officers and/or managers of any Entity, provided, however, that, as to any and all matters other than those specified in paragraph 1, the proxy shall only be entitled to vote or express consent or dissent in respect of the Interests effective immediately upon the earliest to occur of the following:

(a)    the determination by the NFL to exercise: (i) its sale rights pursuant to Paragraphs 2 and 5 or its cure rights pursuant to Paragraph 9 of the NFL Letter Agreement or (ii) its sale rights pursuant to Paragraphs 2 and 5 or its cure rights pursuant to Paragraphs 8 and 24 of the Club Consent Letter;

(b)    the delivery to the NFL: (i) by any Secured Party of a Foreclosure Notice pursuant to Paragraph 5(a) of the NFL Letter Agreement or (ii) by any Lender (as defined in the Club Consent Letter) of a Foreclosure Notice (as defined in the Club Consent Letter) pursuant to Paragraph 5(a) of the Club Consent Letter;

(c)    the acceleration: (i) either automatically or at the Secured Parties' discretion, of the Obligations or (ii) either automatically or at the Lenders' (as defined in the Club Consent Letter) discretion, of the Obligations (as defined in the Club Consent Letter);

(d)    the submission to a vote of the shareholders, managers, members or partners of any Entity of any matter permitting the proxy to exercise voting rights under Paragraph 1 hereof;

(e)    the submission to a vote of the shareholders, managers, members or partners of any Entity of any matter permitting the proxy to exercise voting rights under Paragraph 1 of, or the occurrence of any events or circumstances that would trigger voting rights in the proxy under and pursuant to Paragraph 2 of, any of those certain Irrevocable Proxies, of even date herewith, granted by each of the other Club Parties to the Commissioner of the NFL;

(f)    the reasonable expectation of the Commissioner of the NFL of any imminent event or occurrence that may make or render invalid or unenforceable the power or authority of the proxy hereunder to exercise any of the voting, consent or dissent rights granted herein, including, without limitation, the expiration of any statutorily prescribed period of validity without the prior delivery to the proxy of a new irrevocable proxy identical in form and substance to this irrevocable proxy except for its date of execution and delivery; or

(g)    any challenge, directly or indirectly, by the undersigned to the validity or enforceability of this irrevocable proxy or any other irrevocable proxy granted by the undersigned to the Commissioner of the NFL.

This proxy is irrevocable and coupled with an interest and shall survive to the maximum extent permitted by law (and is expressly intended to survive beyond the period provided in Section 212(b) of the Delaware General Corporation Law or any similar provision, whether under the Delaware Limited Liability Company Act, the New Jersey Limited Liability Company Act or otherwise). This irrevocable proxy shall terminate upon, and only upon, the date upon which (i) all of the Obligations, as defined in both the NFL Letter Agreement and the Club Consent Letter, have been irrevocably repaid in full (in each case, other than by or on behalf of the NFL), (ii) neither any Secured Party nor any Lender (as defined in

CONFIDENTIAL

the Club Consent Letter) has any further obligations to advance funds under the Operative Documents, as defined in both the NFL Letter Agreement and the Club Consent Letter, (iii) all Liens of the Secured Parties and/or the NFL in the Collateral have been released and (iv) all Liens of the Lenders (as defined in the Club Consent Letter) and/or the NFL in the Collateral (as defined in the Club Consent Letter) have been released. The voting, consent or dissent rights granted by this irrevocable proxy may be exercised by the proxy at any time and from time to time at any meeting or in writing or in any other form or forum permitted by law. This proxy revokes any other proxy granted by the undersigned at any time with respect to the Interests.

The undersigned represents and warrants that the undersigned is signing this irrevocable proxy exactly as the undersigned's name appears on any and all certificates representing the Interests.

*[Remainder of Page Intentionally Left Blank.]*

CONFIDENTIAL

GStad_LB_0007081

IN WITNESS WHEREOF, the undersigned[, by its duly authorized representative,] hereby executes and delivers this irrevocable proxy as of the __ day of _____, 2007.

[_____]


By:_____
    Name:
    Title:

CONFIDENTIAL

**Annex A to Indenture**

[Form of Confidentiality Agreement]

10662025.17

CONFIDENTIAL

Annex A
to Indenture

Form of Confidentiality Agreement

[StadCo]
[StadCo Address 1]
[StadCo Address 2]

[Date]

PERSONAL AND CONFIDENTIAL

[Name of Recipient] (the "Recipient")
[Address of Recipient]

Ladies and Gentlemen:

Reference is made to the [proposed] issuance and sale by [StadCo], a [Delaware][New Jersey] limited liability company (the "Company"), of Project Revenue Bonds, [Series 2007] in an aggregate principal amount of $[650,000,000] (such [proposed] issuance referred to herein as the "Transaction") pursuant to that certain Indenture of Trust, dated as of _____ 1, 2007, by and between the Company and _____, as trustee (the "Trustee") (as amended, modified or supplemented from time to time (including as supplemented by the First Supplemental Indenture of Trust, dated as of _____ 1, 2007, by and between the Company and the Trustee), the "Indenture"). The Company may be required, in connection with the Transaction, to provide certain information to the Recipient. In connection with the Transaction, the Company is requiring that the Recipient agree to treat such information confidentially, as set forth herein.

1. As used in this letter agreement (this "Agreement"), "Covered Information" means any information about the Company furnished before, on or after the date of this Agreement to the Recipient by or on behalf of the Company in connection with the Transaction and, in the case of written information furnished after the date of this Agreement, which is identified to the Recipient as confidential, and also includes any notes, analyses, compilations, studies and other materials prepared by the Recipient or its Advisors (as defined below) containing or based in whole or in part on any such information. Covered Information does not include information which (i) is already in the Recipient's possession as evidenced by written records, if such information was not provided to the Recipient by the Company prior to the date of this Agreement and is not known by the Recipient to be subject to another confidentiality agreement with the Company or another party, or (ii) becomes generally available to the public other than as a result of a disclosure by the Recipient or its Advisors, or (iii) becomes available to the Recipient on a non-confidential basis from a source other than the Company or its agents or Advisors, provided that such source has represented to the Recipient (which representation the Recipient has no reason to disbelieve) that it is entitled to disclose such information, or (iv) is generated or prepared by the Recipient or its Advisors without using the Covered Information.

2. (a) The Recipient hereby agrees that the Covered Information will be used only in connection with the Transaction, will be kept confidential by the Recipient and its officers,

CONFIDENTIAL

-2-

employees, directors and Advisors and will not be disclosed to any other person, except as expressly permitted in this Agreement.

(b) Such disclosure may be made (i) to the Recipient's directors, officers and employees who have a reasonable need to know the contents thereof in connection with the Transaction, (ii) to the Recipient's attorneys, accountants, financial advisors, insurance advisors, regulators, rating agencies and other representatives and agents (collectively, "Advisors") who are assisting the Recipient in connection with its [proposed] relationship with the Company, (iii) subject to paragraph 3 below, to the extent such disclosure is required by applicable law, to any competent regulatory authority or governmental agency, or a court of competent jurisdiction, including, without limitation, in response to any subpoena or summons, (iv) to any insurance company, reinsurance company or other financial institution in connection with the reinsurance or proposed reinsurance of any financial guaranty insurance or surety the Recipient may provide or propose to provide in connection with the Transaction, (v) to the extent reasonably necessary to defend any legal proceeding brought against the Recipient by the Company, and (vi) to any other person to whom the Company agrees in advance in writing, provided in the cases of clauses (ii), (iv) and (vi) that such person to whom the Recipient provides Covered Information is informed by the Recipient of the confidential nature of such information and of the Recipient's obligations with respect thereto under this Agreement and such person is required by the Recipient or otherwise agrees to keep it confidential in accordance with this Agreement. The Company reserves the right to request that any such person described in clauses (ii), (iv) or (vi) above join in this Agreement directly. The Company shall have the right to hold the Recipient responsible for any breach of this Agreement by any person to whom the Recipient furnishes Covered Information, it being understood that the term "person" as used in this Agreement shall be broadly interpreted to include any entity, group or individual.

3. To the extent legally permissible, the Recipient will provide the Company with prompt written (or, if not practicable to do so, oral) notice of any legal obligation on the Recipient's part to disclose any Covered Information so the Company may, at the Company's expense, seek an appropriate protective order or otherwise take steps to minimize such disclosure.

4. The Recipient understands that, other than as may be provided in any other agreement or contract, neither the Company nor any of its representatives, agents or advisors has made or makes any representation or warranty as to the accuracy or completeness of the Covered Information and that, other than as may be provided in any other agreement or contract, they shall have no liability to the Recipient or any of the Recipient's agents or Advisors resulting from the use of the Covered Information. It is further understood and agreed that damages would not be a sufficient remedy for breach of this Agreement by the Recipient or its Advisors and that the Company shall be entitled to specific performance and/or injunctive relief as non-exclusive remedies for any such breach.

5. The Recipient agrees that no disclosure of any Covered Information to Recipient shall be deemed to create any express or implied license in favor of Recipient with respect to the Covered Information.

6. This Agreement shall terminate on the date on which all of the Company's obligations are no longer outstanding and all Covered Information held by the Recipient has been returned to the Company or destroyed.

CONFIDENTIAL

GStad_LB_0007085

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey. This Agreement may not be amended, terminated or rescinded except pursuant to a written agreement duly executed by the parties hereto. Please indicate the Recipient's agreement to the foregoing by signing and returning one copy of this Agreement, whereupon this Agreement will constitute our entire agreement with respect to the subject matter hereof.

Very truly yours,

**[StadCo]**

By: _____
    Name:
    Title:

Accepted and Agreed:

**[NAME OF RECIPIENT]**

By: _____
    Name:
    Title:

CONFIDENTIAL

## Schedule 1 to Indenture

Financing Agreements

1.    All Collateral Documents (as defined in the Indenture).

2.    The Non-Disturbance Agreement (as defined in the Indenture).

3.    Each Insurance and Indemnity Agreement (as defined in the Indenture).

10662025.17

**CONFIDENTIAL**

GStad_LB_0007087

**Schedule 2 to Indenture**

Project Real Estate Agreements

1.    Ground Lease and Development Agreement, dated December 21, 2006 (the "Ground Lease"), by and between New Meadowlands Stadium Company, LLC and New Jersey Sports and Exposition Authority.

2.    Sublease Agreement, dated as of August 16, 2007, by and between New Meadowlands Stadium Company, LLC and Giants Stadium LLC.

3.    Sublease Agreement, dated as of August 16, 2007, by and between Giants Stadium LLC and The New York Football Giants, Inc.

10662025.14

**CONFIDENTIAL**

# EXHIBIT Z

**FILED UNDER SEAL**

# EXHIBIT AA



**EXHIBIT BB**

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | Case No. 08-013555 |
| Debtors. | (Jointly Administered) |

**EXPERT REPORT OF JOHN J OLVANY**

**MARCH 15, 2010**

**Contains Highly Confidential Information**

Nevertheless, as the holder, Barclays had a number of attractive alternatives at subsequent rate setting auctions, including:

  i.    Offering their securities for sale to another bidder at any rate lower than the maximum rate of 22%, thereby redeeming the full principal amount;

  ii.   Electing to bid to hold the entire position at any rate up to a maximum rate of 22%;

  iii.  Electing to bid for a portion of the position at any rate up to a maximum rate of 22% while offering the balance of their securities to any potential bidder willing to bid at any rate up to a maximum of 22%.

19.    Barclays could receive rates as high as 22% for each period those bonds were either not redeemed by Giants or other potential bidders did not submit bids lower than Barclays in the auctions.   In either scenario where the bonds were redeemed, Barclays would receive the full principal value.

20.    It is also highly likely that Barclays was aware of the Giants willingness to redeem the bonds in the event of extremely high periodic coupon rate.  According to Barclays' trading records and publically available sources, the Giants did in fact redeem many, and possibly all of the remaining notes held by Barclays at the full principal value between April 28, 2009 and May 21, 2009.[16]   The Giants also had redeemed $100,000,000 of the bonds on April 15, 2008.[17]   The Giants likely took these actions to avoid high interest costs resulting from the lack of sufficient bidders willing to hold these securities at these rates.[18]   Additionally, Barclays reduced its holdings of Giants Stadium Bonds by $102,000,000 between September 19, 2008 and December 31, 2008 and recorded a gain of $349,329,865.[19]

---

[16] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541 (Bloomberg Security Descriptions and Corporate Actions).

[17] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[18] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[19] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep. Ex 533A) (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

**Contains Highly Confidential Information**

23.     Establishing Barclays' ability to set a high periodic coupon rate up to 22% on all four Giants Stadium Bonds and Giants' ability to meet its financial obligation to pay the periodic interest payments is the first step toward valuation of these bonds. The remaining step for valuation is to determine how long the Giants would be willing to pay the high coupon or, alternatively, when would they refinance the Giants Stadium Bonds held by Barclays.

24.     Based on the Giants' previous actions with other failed auctions, I have valued the securities under various redemption scenarios.[24]  Given the Giants' prior actions, the investment grade credit rating and profile of the project, it is reasonable to conclude that the Giants would use their option to redeem the bonds now. As discussed above, the Giants did redeem the notes Barclays held at the full principal value between April 28, 2009 and May 21, 2009.[25]

25.     It is my opinion that a reasonable market participant would have expected the Giants Stadium Bonds to be refinanced and repaid at par, and I have valued them accordingly.  I priced the bonds at various rates from up to 16% with a variety of redemption timing scenarios.[26]  All the redemption and coupon rate scenarios resulted in valuations of *at least* the full principal value.

26.     It is plausible that market conditions for ARS could be expected to change, and that other potential buyers would be willing to bid for the Giants Stadium Bonds.   Under these conditions, Barclays would also receive full principal value if the new investor's bid was lower than Barclays' and the bids were sufficient to purchase all the bonds held by Barclays.[27]  In this scenario, the value of the bonds would be of equal value as if redeemed by the Giants.

---

[24] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[25] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541- (Bloomberg Security Descriptions and Corporate Actions).

[26] November 19, 2008, Email from Sean Teague to Paul Copson within document Bates- stamped PwC-BarCapWP_00022935.

[27] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep Ex 533A), (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

---

# EXHIBIT  CC

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

# Expert Report of Professor Paul Pfleiderer

in the matter of

**In Re:  Lehman Brothers Holdings Inc.,** *et al.*, **Debtor**

**and**

**In Re:  Lehman Brothers Inc., Debtor**

**January 8, 2010**

**Volume 1 of 2**

Contains Highly Confidential Information

APPENDIX THREE

ASSET TYPES TRANSFERRED TO BARCLAYS

| Security Type (per Bloomberg) | Count | Market Value ($) [/1] Sept. 22, 2008 |
|---|---|---|
| ABS Home | 27 | 29,653,767 |
| ABS Other | 138 | 386,292,283 |
| Adjustable, Convertible to Fixed | 1 | 14,100 |
| Adjustable | 105 | 237,237,043 |
| Adjustable, OID | 1 | 9,880,000 |
| ADR | 169 | 560,692,726 |
| Agency ABS Other | 2 | 651,399 |
| Agency CMO FLT | 38 | 427,677,557 |
| Agency CMO INV | 27 | 81,276,478 |
| Agency CMO IO | 347 | 768,931,696 |
| Agency CMO Other | 149 | 1,012,447,610 |
| Agency CMO PO | 214 | 1,638,712,495 |
| Agency CMO Z | 16 | 53,563,468 |
| Basket WRT | 1 | - |
| CF | 6 | 641,358,622 |
| Closed-End Fund | 88 | 38,489,382 |
| CMBS | 76 | 271,641,937 |
| Common Stock | 2,686 | 5,531,020,176 |
| CPI Linked | 1 | 38,000 |
| Domestic MTN | 175 | 411,691,381 |
| Equity WRT | 54 | 693,346 |
| ETP | 138 | 1,624,824,194 |
| Euro MTN | 4 | 20,948,213 |
| | | (continued on next page) |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value ($) [/1] Sept. 22, 2008 |
|---|---|---|
| Euro-Dollar | 22 | 25,023,677 |
| Fixed | 301 | 98,069,886 |
| Fixed, OID | 125 | 22,137,099 |
| Floating | 1 | 750 |
| GDR | 3 | 8,293 |
| Global | 329 | 1,821,841,389 |
| Inter. Appreciation, OID | 1 | 605,900 |
| Ltd Partnership | 68 | 558,599,690 |
| MBS 10yr | 48 | 34,126,078 |
| MBS 15yr | 659 | 1,959,125,312 |
| MBS 20yr | 166 | 415,067,033 |
| MBS 30yr | 1,832 | 4,527,357,468 |
| MBS ARM | 134 | 891,404,118 |
| MBS Balloon | 5 | 395,019 |
| MBS Other | 164 | 1,213,405,644 |
| Misc. | 7 | 3,555,664 |
| NY Registered Shares | 2 | 4,864,241 |
| Private Placement | 156 | 1,088,373,174 |
| Private | 11 | 11,729,655 |
| Private Comp. | 3 | - |
| Private CMO Floating | 183 | 476,504,578 |
| Private CMO Inverse | 1 | 3,099,649 |
| Private CMO Interest Only | 122 | 123,478,028 |
| | | (continued on next page) |

Expert Report of Professor Paul Pfleiderer

Contains Highly Confidential Information

| Security Type (per Bloomberg) | Count | Market Value ($) [1]<br>Sept. 22, 2008 |
|---|---|---|
| Private CMO Other | 394 | 463,063,281 |
| Private CMO Principal Only | 24 | 15,886,521 |
| Public | 174 | 127,044,377 |
| REIT | 81 | 120,649,228 |
| Right | 2 | - |
| Royalty Trust | 8 | 317,197 |
| Tracking Stock | 5 | 8,874,412 |
| Unit | 22 | 92,712,099 |
| U.S. Domestic | 504 | 3,577,436,771 |
| U.S. Government | 380 | 10,791,323,954 |
| Yankee | 26 | 69,454,201 |
| Zero Coupon | 2 | 4,269 |
| Zero Coupon, OID | 18 | 34,571,763 |
| N/A (Field Not Applicable) | 9 | 147,842 |
| N/A (Invalid Security) | 288 | 540,862,983 |
| **Grand Total** | **10,743** | **42,868,857,116** |

Sources:  Spreadsheet titled "Acquisition Detail (PWC Day1) 09-22 Final Nu5.xls," *attached to* E-mail from Sean Teague to Tal Litvin et al., re: "Acquisition balance sheet" (Feb. 12, 2009); Bloomberg.

Contains Highly Confidential Information

## APPENDIX FOUR

### INFORMATION ON SELECTED SECURITIES TRANSFERRED TO BARCLAYS

In this appendix, I briefly summarize available information about selected securities or groups of similar securities acquired by Barclays in the Transaction. The indicated values of most of these securities based on Barclays exit price marks for September 22, 2008, differ significantly from indicated values based on BoNY's marks for September 19, 2008. While my investigation of individual positions and groups of similar positions is on-going, I have formed three preliminary conclusions based on work completed to date:

- First, for many positions of significant indicated value in the Repo Collateral, there is no generally recognized pricing source available and, in fact, there is surprisingly little information available in the public domain (e.g., from the SEC, or from financial websites, or in the financial press) or even from proprietary (i.e., available for purchase) sources of financial information.

- Second, virtually all of the specific securities included in the Repo Collateral (with significant indicated values) for which there are significant differences between Barclays' exit price marks and BoNY's marks represent extremely complex claims on cash flows from bundles of underlying assets that themselves are complex, opaque, and hard to assess.

- Third, based on my initial work, there appears to be strong support and justification for the differences between Barclays' exit price marks and BoNY's marks.

Contains Highly Confidential Information

I begin this appendix by analyzing several sets of similar securities that Barclays sold shortly after closing the Transaction. These sales allow a direct comparison of BoNY's marks (and in some but not all cases, Barclays' marks) to actual results obtainable in the marketplace in late September of 2008. I then present information on a number of additional positions that contribute significantly to the overall difference between the indicated value of the Repo Collateral based on BoNY's marks and the indicated value of the Repo Collateral based on Barclays exit price marks.

1.  **Collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust**

The initial inventory acquired by Barclays in the Transaction included positions in 125 different CMOs issued by the Structured Adjustable Rate Mortgage Loan Trust. All are identified in the detailed listing of initial inventory as "US Non-Agency CMOs" backed by ALT-A mortgages (of various vintages). Altogether, at BoNY marks, these positions had an aggregate indicated value of $237.7 million.

Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but instead valued them for financial accounting purposes at their actual sales value. However, before selling the positions, Barclays had estimated preliminary mid-point marks for these positions as of September 19; the indicated value of the positions at Barclays' preliminary mid-point marks was $197.1 million, which is a reduction of about 20% from the indicated value using BoNY marks.[100]

---

[100] Barclays typically reduced mid-point prices for ALT-A mortgage backed securities by 10% or 15% to adjust them to exit prices, with the size of the adjustment varying across different types of ALT-A products. Thus, had Barclays prepared September 22 exit price marks for these securities, they likely would have been at least 10% lower than these preliminary mid-point marks for September 19.

Contains Highly Confidential Information

obligations, and given the lack of ready buyers for these securities following LBHI's bankruptcy, this write off of the BoNY-marks indicated value of Lehman-issued equity linked notes and warrants was reasonable and appropriate.

## 6.  Giants Stadium Bonds

The initial inventory acquired by Barclays in the Transaction included positions in four related notes issued to provide funding for a new Meadowlands stadium, a joint venture between the New York Giants and the New York Jets. The stadium was financed by \$1.3 billion of bond debt, which was shared equally by the two teams (\$650 million each). The bonds issued by the Giants had maturity dates of 2029, 2037 and 2047,[102] and consisted of seven series of auction rate securities with interest rates to be set every month.[103] According to Barclays' position detail spreadsheets, Barclays valued the Giants auction rate securities it acquired, for accounting purposes, at their indicated values using BoNY's marks (which ranged from about \$10 per \$100 of face value to about \$44 per \$100 of face value), without further downward adjustment.

Markets for auction rate securities encountered severe difficulties beginning early in 2008, with increasing numbers of auctions "failing." These difficulties continued through 2008, and these markets have yet to revive. Since auctions had been the primary mechanism by which holders could reduce (or increase) their holdings, these auction failures made it difficult to for holders of auction rate securities to dispose of their positions.

Conditions in markets for auction rate securities made these securities particularly difficult to value. Some analysts argued that investors who could hold for the long term

---

[102] Project Finance Magazine, February 2008 Deals of the Year – North American Leisure Deal of the Year, Meadowlands Stadium: Split decision.

[103] Aaron Kuriloff and Michael McDonald, NFL's Giants Redeeming \$100 Million in Auction Debt (Update3), www.bloomberg.com, last updated April 15, 2008 18:22 EDT.

Contains Highly Confidential Information

eventually would be paid in full; the crisis in auction rate markets was said to be an issue of lack of liquidity rather than deteriorating creditworthiness of the borrowers. But for Barclays purposes, the issue was not what the value of these securities might be in the long run assuming a return to normal conditions, but the value of the positions in an orderly sale under current conditions. Given conditions in the markets for auction rate securities, Barclays exit-price marks were reasonable and appropriate.

### 7. Insurance-related asset backed securities

