1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555(SCC)

4    - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9              Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    October 7, 2014

18                    10:13 AM

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1    Doc #44848 Motion for Relief from Stay and Injunction

2    Provided Under Plan filed by Elizabeth Berke-Dreyfuss on

3    behalf of Coleen Denise Colombo, Isabel Guajardo, Linda

4    Howard-James, Cheryl McNeil, Michelle Seymour, Sylvia Vega-

5    Sutfin

6

7    Doc #46173 Motion to Designate Diaz Reus & Targ, LLP as

8    Agent for Receipt of All Distributions and Honor Change of

9    Address in the LBHI and LBI Proceedings.

10

11   Adversary Proceeding: 08-01420-scc Lehman Brothers Inc.

12   Doc #9737 Motion to Impose Automatic Stay/Trustee's Motion

13   for an Order Enforcing the Automatic Stay with Respect to a

14   Civil Action Commenced by Barbara Newman Against the Debtor

15   Pending Before the United States District Court for the

16   District of Massachusetts

17

18   Adversary Proceeding: 14-02095-scc Bania Brothers, LLC et

19   al. v Lehman Brothers OTC Derivatives Inc. et al.

20   Pretrial Conference

21

22   Adversary Proceeding: 14-02030-scc Lehman Brothers Special

23   Financing, Inc. v. Merrill Lynch Capital Services, Inc.

24   Doc #8 Motion of Merrill Lynch Capital Services, Inc. To

25   Dismiss Complaint (related document(s)5)

1  Doc #35787 Four Hundredth Omnibus Objection to Claims (No

2  Liability Employee Claims)

3

4  Doc #36874 Application for FRBP 2004 Examination of Lehman

5  Brothers, Inc.

6

7  Doc #37168 Four Hundred Thirteenth Omnibus Objection to

8  Claims (Valued Derivative Claims)

9

10  Doc #38050 Four Hundred Twenty-Second Omnibus Objection to

11  Claims (Employment Claims)

12

13  Doc #39348 Objection to Proof of Claim No. 22605 Filed by

14  Sanford A. and Tina A. Mohr

15

16  Doc #39898 Motion to Allow Giants Stadium, LLC to Issue

17  Third-Party Deposition Subpoenas Under Federal Rules of

18  Bankruptcy Procedure 2004 and 9016

19

20  Doc #42516 Claims Objection Hearing with Respect to Debtors'

21  Objection to Proof of Claim Nos. 21487 and 21488

22

23  Doc #42105 Four Hundred Fifty-Fifth Omnibus Objection to

24  Claims (No Liability Claims)

25

1    Doc #44489 The Plan Administrator's Four Hundred Sixty-

2    Eighth Omnibus Objection to Claims (No Liability Claims)

3

4    Doc #44488 The Plan Administrator's Four Hundred Sixty-

5    Seventh Omnibus Objection to Claims (No Liability Claims)

6

7    Doc #44450 Motion for Alternative Dispute Resolution

8    Procedures Order for Indemnification Claims of the Debtors

9    Against Mortgage Loan Sellers

10

11   Doc #45446 Four Hundred Seventy-Seventh Omnibus Objection to

12   Claims (No Liability Claims)

13

14   Doc #45448 Four Hundred Seventy-Ninth Omnibus Objection to

15   Claims (No Liability Claims)

16

17   Adversary Proceeding: 14-02021-scc Moore Macro Fund, LP et

18   al. v. Lehman Brothers Holdings, Inc., et al.

19   Doc #15 Motion to Dismiss Defendant's First, Fifth, Sixth

20   and Seventh Counterclaims

21

22   Adversary Proceeding: 14-02234-scc  Lehman Brothers

23   Derivative Products, Inc. v U.S. Bank Trust National

24   Association, et al.

25   Pretrial Conference

```
                                              Page 5

 1    Adversary Proceeding: 14-02236-scc Lehman Brothers Holdings,

 2    Inc., in its capacity as v. Granite Finance Limited and HSBC

 3    Trustee (C.I.) Li

 4    Pretrial Conference

 5

 6    Adversary Proceeding:  08-01420-scc Lehman Brothers, Inc.

 7    Doc #7382 One Hundred Forty-Sixth Omnibus Objection to

 8    General Creditor Claims (Insufficient Documentation Claims)

 9

10    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

11    Doc #6758 Trustee's One Hundred Second Omnibus Objection to

12    General Creditor Claims (Satisfied Claims)

13

14    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

15    Doc #7666 Trustee's One Hundred Second Omnibus Objection to

16    General Creditor Claims (No Liability Claims)

17

18    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

19    Doc #8428 Two Hundred Fifteenth Omnibus Objection to General

20    Creditor Claims (No Liability Claims)

21

22

23

24

25
```

Page 6

1    Adversary Proceeding: 08-01420-scc  Lehman Brothers, Inc.

2    Doc #8483 Two Hundred Eighteenth Omnibus Objection Seeking

3    to Allow Certain Filed Proofs of Claim in Reduced Amounts

4    and with Proper Classification as Unsecured General Creditor

5    Claims (FX Claims)

6

7    Adversary Proceeding: 08-01420-scc  Lehman Brothers, Inc.

8    Doc #8533 Two Hundred Twenty-Second Omnibus Objection to

9    General Creditor Claims Seeking to (I) Reduce and/or

10   Reclassify Certain Claims and to Allow Such Claims as

11   Modified, and (II) Disallow and Expunge Certain Claims

12   (Accounts Payable Claims)

13

14   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

15   Doc #8567 Two Hundred Twenty-Third Omnibus Objection to

16   General Creditor Claims (No Liability Claims)

17

18   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

19   Doc #8858 Two Hundred Thirty-Third Omnibus Objection to

20   General Creditor Claims (No Liability Claims)

21

22   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

23   Doc #8966 Two Hundred Thirty-Fifth Omnibus Objection to

24   General Creditor Claims (Satisfied Claims, No Liability

25   Claims, and Subordinated Claims)

Page 7

1    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2    Doc #9013 Two Hundred Thirty-Seventh Omnibus Objection to

3    General Creditor Claims (Employee Claims)

4

5    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

6    Doc #9059 Two Hundred Fortieth Omnibus Objection to General

7    Creditor Claims Seeking to (I) Reduce Certain Claims and

8    Allow Such Claims as Modified, and (II) Disallow and Expunge

9    Certain Claims (Accounts Payable Claims)

10

11   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

12   Doc #9161 Two Hundred Forty-Second Omnibus Objection to

13   General Creditor Claims (Employee Claims)

14

15   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

16   Doc #9257 Two Hundred Forty-Fifth Omnibus Objection to

17   General Creditor Claims (No Liability Indemnity Claims)

18

19   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

20   Doc #9394 Two Hundred Forty-Seventh Omnibus Objection to

21   General Creditor Claims (Employee Claims)

22

23

24

25

Page 8

1    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2    Doc #9442 Two Hundred Forty-Ninth Omnibus Objection to

3    General Creditor Claims (No Liability and Insufficient

4    Documentation Claims)

5

6    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

7    Doc #9470 Two Hundred Fiftieth Omnibus Objection Seeking to

8    Allow Certain Filed Proofs of Claim in Reduced Amounts and

9    with Proper Classification as Unsecured General Creditor

10   Claims (Financial Product Claims)

11

12   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

13   Doc #9478 Two Hundred Fifty-First Omnibus Objection to

14   General Creditor Claims (Employee Claims)

15

16   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

17   Doc #9482 Two Hundred Fifty-Second Omnibus Objection Seeking

18   to Allow in Reduced Amounts and with Proper Classification

19   as Unsecured General Creditor Claims Certain Filed Proofs of

20   Claim After Application of Setoff

21

22   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

23   Doc #9529 Trustee's Two Hundred Fifty-Fifth Omnibus

24   Objection to General Creditor Claims (No Liability Claims)

25

Page 9

1    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2    Doc #9525 Two Hundred Fifty-Fourth Omnibus Objection to

3    General Creditor Claims (Insufficient Documentation Claims)

4

5    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

6    Doc #9530 Two Hundred Fifty-Sixth Omnibus Objection to

7    General Creditor Claims (Employee Claims)

8

9    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

10   Doc #9583 Two Hundred Fifty-Seventh Omnibus Objection to

11   General Creditor Claims (No Liability Claims, Insufficient

12   Claims, and Claims Allowed in Reduced Amounts with the

13   Proper Classification)

14

15   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

16   Doc #9584 Two Hundred Fifty-Eighth Omnibus Objection to

17   General Creditor Claims (No Liability Indemnity Claims

18   (WaMu))

19

20   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

21   Doc #9601 Two Hundred Fifty-Ninth Omnibus Objection to

22   General Creditor Claims

23

24

25

Page 10

1    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2    Doc #9605 Two Hundred Sixtieth Omnibus Objection to General

3    Creditor Claims (No Liability Claims)

4

5    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

6    Doc #9658 Two Hundred Sixty-First Omnibus Objection to

7    General Creditor Claims (No Liability, Insufficient and

8    Subordinated Claims)

9

10   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

11   Doc #9667 Two Hundred Sixty-Third Omnibus Objection Seeking

12   to Allow Certain Filed Proofs of Claim in Reduced Amounts

13   and With Proper Classification as Unsecured General Creditor

14   Claims (Financial Product Claims)

15

16   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

17   Doc #9712 Motion of FFI Fund, Ltd., FYI, Ltd. and Olifant

18   Fund, Ltd. For Entry of an Order to Permit a Late Claim

19   Filing Pursuant to Federal Rule of Bankruptcy Procedure

20   9006(b)(1)

21

22   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

23   Doc #9736 Two Hundred Sixty-Fourth Omnibus Objection to No

24   Liability Claims

25

Page 11

1    Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2    Doc #9744 Two Hundred Sixty-Fifth Omnibus Objection to

3    General Creditor Claims (No Liability and Insufficient

4    Claims)

5

6    02:00 PM

7    Adversary Proceeding: 11-02403-scc Lehman Brothers Special

8    Financing, Inc. et al v. Americredit Financial Services,

9    Inc., et al.

10   Doc #14 Motion to Dismiss Adversary Proceeding / Notice of

11   Motion and Motion to Dismiss Adversary Complaint (related

12   document(s)10)

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach and Sheila Orms

Page 12

1   A P P E A R A N C E S :

2   WEIL, GOTSHAL & MANGES, LLP

3        Attorneys for LBHI & Affiliates

4        767 Fifth Avenue

5        New York, NY   10153

6

7   BY:   JACQUELINE MARCUS, ESQ.

8        GARRETT A. FAIL, ESQ.

9

10   WEIL, GOTSHAL & MANGES, LLP

11        Attorneys for LBHI & Affiliates

12        1300 Eye Street, N.W.

13        Suite 900

14        Washington, D.C.   20005

15

16   BY:   RALPH I. MILLER, ESQ.

17

18   HUGHES HUBBARD & REED

19        Attorneys for SIPA Trustee

20        One Battery Park Plaza

21        New York, NY   10004

22

23   BY:   JAMES FITZPATRICK, ESQ.

24        ERIN E. DIERS, ESQ.

25        MEAGHAN C. GRAGG, ESQ.

```
 1    SHEARMAN & STERLING, LLP

 2         Attorneys for Merrill Lynch, Capital Services, Inc.

 3         599 Lexington Avenue

 4         New York, New York 10022

 5

 6    BY:  WILLIAM J.F. ROLL, III, ESQ.

 7         ADAM J. GOLDSTEIN, ESQ.

 8         FREDRIC SOSNICK, ESQ.

 9

10    GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER

11         Attorneys for Coleen Colombo, Isabel Guajardo, Linda

12         Howard-James, Cheryl McNeil, Michelle Seymour & Sylvia

13         Vega-Sutfin

14         1999 Harrison Street, Suite 1600

15         P.O. Box 2079

16         Oakland, California 94604

17

18    BY:  J. GARY GWILLIAM, ESQ.

19

20    Z CAPITAL PARTNERS

21         Attorneys for (Unknown)

22         1330 Avenue of the Americas, Suite 1100

23         New York, New York 10019

24

25    BY:  MATTHEW KANE, ESQ.
```

Page 14

```
 1   DIAZ REUS & TARG, LLP

 2         Attorneys for (Unknown)

 3         100 SE 2nd Street

 4         3400 Miami Tower

 5         Miami, Florida 33131

 6

 7   BY:  MARTA COLOMAR GARCIA, Esq.

 8         NICHOLAS B. BANGOS, ESQ.

 9

10   WHITE & CASE, LLP

11         Attorneys for (Unknown)

12         1155 Avenue of the Americas

13         New York, New York 10036

14

15   BY:  DOUGLAS P. BAUMSTEIN, ESQ.

16

17   WOLLMUTH MAHER & DEUTSCH, LLP

18         Attorneys for LBHI

19         500 Fifth Avenue, 12th Floor

20         New York, New York 10110

21

22   BY:  WILLIAM A. MAHER, ESQ.

23         PAUL DEFILIPPO, ESQ.

24

25
```

1   ROPES & GRAY, LLP

2         Attorneys for (Unknown)

3         1211 Avenue of the Americas

4         New York, New York 10036

5

6   BY:  MARK I. BANE, ESQ.

7

8   ALSO APPEARING:

9   ETHAN BRECHNER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 16

1              P R O C E E D I N G S

2         THE COURT:  Good morning.

3         MR. GWILLIAM:  Good morning, Your Honor.

4         THE COURT:  Good morning, Ms. Marcus.

5         MS. MARCUS:  Good morning, Your Honor.  Jacqueline

6    Marcus, Weil, Gotshal & Manges, LLP on behalf of Lehman

7    Brothers Holdings, Inc. and its related debtors.

8         Your Honor, the first matter on the calendar this

9    morning is a motion for relief from stay and Mr. Gwilliam

10   will be handling that.

11        MR. GWILLIAM:  Good morning, Your Honor.

12        THE COURT:  Hi.

13        MR. GWILLIAM:  My name is Gary Gwilliam.  I've

14   come out here from Oakland, California for this hearing --

15        THE COURT:  Welcome.

16        MR. GWILLIAM:  -- and I'm very pleased and honored

17   to make this appearance in the court.  I represent six

18   creditors, Coleen Colombo, et al.  We have set forth in some

19   detail in our papers and our reply brief --

20        THE COURT:  Yes.

21        MR. GWILLIAM:  -- the reasons that we think that

22   relief from stay is appropriate.

23        I would only say as a general matter this, Your

24   Honor:  I think all of us are interested in resolving these

25   claims after all these years.  Certainly, my clients are.

1            THE COURT:  Sure.

2            MR. GWILLIAM:  Obviously, the Court is, and I

3    believe that the debtor is, too.  And I believe that the

4    best and most efficient way to do that is to send it back to

5    the Sacramento Superior Court.

6            THE COURT:  Well, let -- first -- one thing that

7    is not clear from the papers is notwithstanding the fact

8    that the claims have been pending for as long as they have,

9    what exactly has occurred in California in the California

10   litigation.

11           MR. GWILLIAM:  The California litigation started

12   -- huh?

13           THE COURT:  No.  I'm just waiting for your answer.

14           MR. GWILLIAM:  Yes.  Well, as you know, there was

15   a motion to arbitrate the cases which was ruled in our

16   favor, in the plaintiffs' favor.  There -- the arbitration

17   was denied.  We had an appeal that took about two years.

18   That appeal also came down in favor of the plaintiffs.  Then

19   the litigation started.  It went on for about a year and a

20   half.  There were about 10,000 documents that were

21   exchanged, extensive interrogatories.  The first plaintiffs'

22   deposition was taken and completed.  We were in the process

23   of setting and moving forward the rest of them when the stay

24   occurred in January of '09.

25               So there has been a good start towards this.  And

Page 18

1    I would tell you, Your Honor, I'm quite familiar with the

2    Sacramento Superior Court.  They're very efficient in moving

3    their cases along.  They demand that we have good settlement

4    conferences beforehand.  They move them along.  They try and

5    get their cases out within about a year.  I think if we did

6    that we could get a trial date well within the year in the

7    Sacramento Superior Court.

8            But our objective, obviously, is to resolve the

9    cases and I think by returning them to the Superior Court

10   they'll resolve them.  This courtroom retains jurisdiction,

11   of course.

12           THE COURT:  I don't know what that statement means

13   that I would retain jurisdiction.  All -- what you're

14   suggesting is that everything would occur out there and then

15   to the extent that there were a liquidated claim, that would

16   be presented as an allowed claim in the case.  So you're

17   asking me actually to relinquish jurisdiction over the

18   liquidation of the claim.  And everything that you've gone

19   through short of a trial, short of a trial can be done at

20   least as quickly here.  If the plaintiffs are -- the

21   plaintiffs are all California residents?

22           MR. GWILLIAM:  Yes, they are.

23           THE COURT:  And the -- if the debtor is willing to

24   travel to California, as they undoubtedly would have to in

25   order to take their depositions, then that's a wash,

1    correct?

2            MR. GWILLIAM:  If the litigation takes place in

3    California, of course.

4            THE COURT:  Well, what difference does it make

5    whether the litigation takes place in California or here if

6    the burden would be on the debtors to go to the home state

7    of the plaintiffs and take their depositions.  That's --

8    that's a wash.  That's --

9            MR. GWILLIAM:  Well, my understanding -- these are

10   tort cases.  My understanding they're tort cases.  We have a

11   right to a jury trial; that they're not typically litigated

12   in Bankruptcy Court.

13           Now I have bankruptcy counsel to --

14           THE COURT:  Well --

15           MR. GWILLIAM:  -- assist me in this matter.

16           THE COURT:  You're -- I'm asking one question and

17   you're asking -- you're making another point.

18           MR. GWILLIAM:  All right.

19           THE COURT:  My point right now is about -- your

20   statement was that there was additional depositions that

21   would need to be taken.

22           MR. GWILLIAM:  Correct.

23           THE COURT:  And I'm balancing, as I'm required to

24   do under the Sonnax factors.  So the debtor is saying, keep

25   the litigation here for now and those depositions would

Page 20

1    presumably be conducted by counsel representing the debtors

2    in California.  No additional burden to your clients,

3    correct?

4              MR. GWILLIAM:  Well, they would be -- would they

5    be litigated under the rules of procedure in California

6    because it's a California Court, Superior Court?

7              THE COURT:  No.  I'm talking -- I'm only talking

8    about the burden -- your papers are -- the cardinal -- one

9    of the cardinal points is the inconvenience to your clients

10   of having to travel here.  I'm taking travel off the table.

11             MR. GWILLIAM:  Well, I appreciate that, Your

12   Honor.  And I don't want to have us be talking across

13   purposes here.  My understanding is that the litigation and

14   the discovery needs to be done under the rules of the

15   California Superior Court.  But if --

16             THE COURT:  Why is that?

17             MR. GWILLIAM:  -- the Court's concern, Your Honor

18   -- maybe I'm getting ahead of myself.  But if the Court's

19   concern is that you are losing jurisdiction and control over

20   this claim, you can certainly have us report in anytime on

21   the status of the case.  But if depositions are to be taken

22   and there's a stay of discovery in the Superior Court, how

23   do we proceed with discovery?

24             THE COURT:  We're not communicating very well.

25             MR. GWILLIAM:  I'm sorry.  I apologize.

Page 21

```
 1              THE COURT:  What I'm talking about is the scenario
 2      in which I deny your motion.
 3              MR. GWILLIAM:  Right.
 4              THE COURT:  If I deny your motion --
 5              MR. GWILLIAM:  Uh-huh.
 6              THE COURT:  -- what I've analyzed is the burden --
 7      is the -- among other things is the balancing of the
 8      burdens.  And --
 9              THE COURT:  Fair enough.
10              THE COURT:  Okay.  And one of your key points was
11      that your folks ought not to have to travel to New York.
12      And what I'm saying to you is that's fine because if I keep
13      the case for all pretrial purposes, then they do not have to
14      travel to New York.  The difference, whatever it may be
15      between taking a deposition under the California Rules of
16      Procedure and the Federal Rules is frankly not something
17      that's going to be outcome determinative for me.  I don't
18      think I'm required to consider that.
19              I'm simply trying to say to you that if one of
20      your concerns is that -- as articulated is the burden on
21      your clients, I can have the debtors confirm that that's off
22      the table.  They're not going to have to travel.
23              MR. GWILLIAM:  Well, that certainly was a
24      consideration that we put into having the mediations done in
25      San Francisco.  And that was an issue that we went forth on
```

Page 22

1   that, and that certainly would be an issue if the Court were

2   to ask us to litigate the case in the District Court in New

3   York.  That would be a hardship and we would probably make a

4   motion for a forum non-convenience if we had to litigate the

5   case in the District Court.

6          But I don't understand exactly how we can start

7   discovery if there's still a stay in place in the action in

8   the Superior Court.  That's confusing to me.

9          THE COURT:  You would start discovery because I

10  would deny the motion for relief from the stay and the

11  litigation would remain here until such time, if ever, it

12  was trial ready at which point you would either renew your

13  motion for relief from the stay or there would be a

14  withdrawal of the reference and it would be tried in the

15  District Court.

16         MR. GWILLIAM:  I understand what the Court is

17  saying and I appreciate that.  I still think the best way to

18  resolve the case, if we -- that's what we all want, is to

19  have the same thing happen except that we move forward

20  towards a trial date in the Superior Court which is where we

21  have to --

22         THE COURT:  Right.  But if that --

23         MR. GWILLIAM:  -- try the case.

24         THE COURT:  -- if that were the standard, then

25  there a central -- the notion of a central claims resolution

1    process in a bankruptcy would never pertain.  Every

2    plaintiff similarly situated to your clients would prefer to

3    go home to a home court to litigate.  The Sonnax factors and

4    the application of the Sonnax factors directs that I

5    consider a number of factors in balancing the interest of

6    all concerned.

7              MR. GWILLIAM:  I understand.

8              THE COURT:  What I'm saying to you is I got you

9    covered on inconvenience and burden in terms of your clients

10   having to travel.

11             MR. GWILLIAM:  Right.

12             THE COURT:  I got you covered in terms of

13   expedition, the expeditious proceedings because I move

14   really fast.

15             MR. GWILLIAM:  Okay.

16             THE COURT:  Okay.  You can ask anyone that's

17   sitting around you.  I move really --

18             MR. GWILLIAM:  Your reputation --

19             THE COURT:  -- fast.

20             MR. GWILLIAM:  -- precedes you, Your Honor.

21             THE COURT:  Okay.  So that part.  Then we would

22   get to dispositive motions, if any, here which I would get

23   to really fast, and then to the extent that there's

24   something to either send back to California or send up to

25   the District Court subject to forum non-convenience.  Maybe

Page 24

1   it gets moved to the District Court in California, that just

2   seems like it addresses everybody's needs and concerns.

3              MR. GWILLIAM:  Well, Your Honor, I will say this.

4   We're certainly on the same page when it comes to moving

5   this case on as quickly and expeditiously as possible.

6              THE COURT:  Sure.  And, you know --

7              MR. GWILLIAM:  Our case has been going for nine

8   years.

9              THE COURT:  Absolutely.

10             MR. GWILLIAM:  So, I mean, anything that this

11  Court can do to assist us in bringing this case to a final

12  resolution, I'm 100 percent okay with.  I have a little

13  concern procedurally about how we do this, but those things

14  can be worked out.  And if you want us to engage in some

15  discovery and report back to this Court and do so, that's --

16             THE COURT:  Well, it's more than that.  It's --

17  what I'm saying to you isn't -- and perhaps we -- I can hear

18  from the debtors -- is denying your motion and getting on

19  with it here at least through dispositive motions and/or

20  until there's a moment where it's trial ready and you are

21  ready for a jury trial, and then we would deal with that --

22  we would cross that bridge when we come to it.

23             MR. GWILLIAM:  Okay.  But I -- when you say

24  dispositive motions --

25             THE COURT:  The debtors have indicated that they

Page 25

1   believe that there might be a dispositive motion, a motion

2   to dismiss or a motion for summary judgment --

3          MR. GWILLIAM:  Right.

4          THE COURT:  -- which I have the ability to

5   adjudicate, notwithstanding the jury trial right.

6          MR. GWILLIAM:  Well, I would prefer that, of

7   course, it would be under the rules of California, but I'm

8   not here to tell the Court that you can't adjudicate it.  I

9   think you want to move the case along expeditiously and I

10  appreciate that.

11         But I -- and I also think that the Court could

12  have us report back in on a regular basis even if we went

13  back to California.  I don't think you would lose any

14  control over the case as I see it.

15         THE COURT:  It's -- there's no job sharing.  It's

16  either me or, you know, or another judge in those

17  circumstances.  It's not a -- it would be delightful to work

18  with a California judge, but it's just not the way.  It's

19  not the way that it works.

20         Let me hear from the debtors for a moment if you

21  would.

22         Thank you.

23         MS. MARCUS:  Good morning, again, Your Honor.

24  Jacqueline Marcus.

25         THE COURT:  So, Ms. Marcus, notwithstanding

Page 26

1    everything I just said, you know, it's awfully difficult to

2    have folks sitting around for nine years.  So what can we do

3    to move this along?

4             MS. MARCUS:  I understand that, Your Honor.  There

5    are -- the thing that's unusual about this case is that the

6    litigation was commenced several years before --

7             THE COURT:  Before --

8             MS. MARCUS:  -- BNC's case was even filed.

9             THE COURT:  Right.

10            MS. MARCUS:  But as Your Honor is no doubt aware

11   there are thousands and thousands of creditors who have been

12   waiting at least six years for the most part.

13            THE COURT:  Right.

14            MS. MARCUS:  And we're certainly sympathetic.  We

15   -- as Mr. Gwilliams said, we've had two rounds of

16   litigation.  We did go to California to try to accommodate

17   the plaintiffs.

18            I would note that not all of the claimants live --

19   are California residents.  I believe there's one from Utah

20   and one from somewhere else in the Midwest.

21            You know, this is a process, Your Honor.  You're

22   well aware of that and we are managing claims in the best

23   way that we think what's best for the estates.  As eluded to

24   in our papers and in Mr. Gwilliams' papers, there are some

25   very large claims in the BNC case that may have the effect

Page 27

```
1    of consuming, basically, what's available for unsecured

2    creditors.

3            So from the plan administrator's point of view

4    it's not quite sure how many -- how much in resources to

5    devote to defending these claims because if it turns out

6    that the recovery is virtually zero or nothing meaningful,

7    then it wouldn't make sense to spend a lot of money

8    litigating over these claims because this litigation can be

9    costly.

10           THE COURT:  So how much has been spent already

11   towards the $5 million retention?  Do you have any idea?

12           MS. MARCUS:  I do actually.  I don't have it as of

13   today, October 7th, but when we were preparing for the

14   mediation or shortly thereafter we did a calculation and it

15   came out to something like $795,000.  So we're still quite a

16   bit away from the $5 million retention.

17           And in terms of the insurance issue, which is an

18   important one under the Sonnax factors, the insurer has not

19   accepted responsibility for defending these claims, again

20   because we haven't hit the $5 million limit.  So unlike many

21   of the cases cited by the claimants, this is not a situation

22   where there will be no impact on the estate if --

23           THE COURT:  Right.  Well, that's the classic --

24           MS. MARCUS:  -- relieved from the stay.

25           THE COURT:  That's the classic easy one where
```

Page 28

1    relief from the automatic stay is granted because the

2    plaintiffs are going to only look to insurance and there's

3    no impact --

4            MS. MARCUS:  That's correct.

5            THE COURT:  -- on the general estate.

6            But what you're saying gives me pause because it

7    suggests that part of what the debtor would seek to do

8    would, in fact, be to delay in order -- understandably from

9    the debtors' standpoint in order to wait to see if there's

10   any money available for distribution to unsecureds.

11           MS. MARCUS:  Given the choice we would like to do

12   that, but if we don't have the choice then obviously we'll

13   have to make a different decision.  We would fall back to

14   the claims procedures orders.  We did file an objection to

15   the claims and that's what instigated mediation.  We haven't

16   had a sufficiency hearing on these claims.  And so we would

17   fall back to the -- what I'll call the normal procedure for

18   dealing with these claims.

19           THE COURT:  And the debtors would be prepared to

20   do that with all deliberate speed?

21           MS. MARCUS:  I suppose so.

22           Your Honor, we've gone through the Sonnax factors

23   in our pleadings.

24           THE COURT:  Yes.

25           MS. MARCUS:  I had a rather long presentation

Page 29

1    going through some of the responses in the reply, but,

2    frankly, based upon what I've heard the Court say I'm not

3    sure that there is very much that I need to add.  I think I

4    would just emphasize again the insurance issue and the fact

5    that in the first instance numerous courts have held, both

6    in this district and outside this district, resolution of

7    claims is one of the principal responsibilities of this

8    Court and we think it should remain here.

9              THE COURT:  All right.  Thank you.

10             MR. GWILLIAM:  Your Honor, I would like to address

11   this insurance issue.  This is the first time we've heard

12   anything about what the retention was.  And as you know --

13             THE COURT:  It was -- it was in the papers.

14             MR. GWILLIAM:  Not the $795,000.

15             THE COURT:  Oh, the 7 --

16             MR. GWILLIAM:  The amount of the --

17             THE COURT:  Yes.  Yes.  I agree.

18             MR. GWILLIAM:  Yeah.  The --

19             THE COURT:  I agree with you.  Yes.

20             MR. GWILLIAM:  And I don't know how that's

21   calculated and I'm concerned as to where we're going with

22   that.  But --

23             THE COURT:  Well, I'll tell you exactly where

24   we're going with that.  I mean, the -- if we were at $4.6

25   million, then we would be within, you know, a little bit of

Page 30

1    distance of the retention being exhausted and, therefore,

2    the defense would be assumed by the insurance company and it

3    would be -- there would be no risk to the estate and you

4    would be -- things would be good for you because then you

5    would have a source of recovery.

6              What 795 means is hypothetically if you were to go

7    to trial tomorrow, right, and get a judgment for $4.2

8    million, what Ms. Marcus is saying, I believe, is that at

9    the end of the day -- you would have that as an allowed

10   claim.  But at the end of the day the way that other claims

11   may fall out in that case, there may be no money available

12   for distribution to unsecured creditors like your clients.

13   And because you would not have gotten over the $5 million

14   retention, which I think of as a deductible --

15             MR. GWILLIAM:  Right.

16             THE COURT:  -- there would be no insurance

17   proceeds.  So it would be a (indiscernible) victory because

18   you would have gotten an allowed claim in a big amount, but

19   as is sadly happens in bankruptcy sometimes, there's no

20   value available to pay the claim.

21             MR. GWILLIAM:  I'm very clear on that.  I'm 100

22   percent clear --

23             THE COURT:  Okay.

24             MR. GWILLIAM:  -- on that.

25             THE COURT:  Okay.

Page 31

1           MR. GWILLIAM:  What I'm uncertain about, and we

2     did -- we never submitted a policy to you.  It was given to

3     us confidentially.  A small part of it has been given to

4     you.  I have the entire policy that I can give you for an in

5     camera review.

6           But what -- and I've reviewed the policy

7     carefully.  But what I don't understand about these defense

8     costs is I thought I heard Ms. Marcus say that $795,000 had

9     been incurred by the Orick firm which was the firm defending

10    the case in the Sacramento Superior Court.  What I don't

11    know is whether there is a defense claim for all the work

12    that the Weil Gotshal firm has done.  They've been defending

13    this company for years.  They've come out and done two

14    mediations.  Why isn't all the work they've done a part of

15    that retention deductible?

16          So I don't know how that's been --

17          THE COURT:  Well --

18          MR. GWILLIAM:  -- calculated, the $795,000 figure.

19          THE COURT:  Okay.  Well, let -- we have Ms. Marcus

20    here.  Maybe she knows the answer to that.

21          MR. GWILLIAM:  Yeah.  I don't -- this -- because

22    this is the first time I've heard 795.  That's --

23          MS. MARCUS:  I can clarify that.

24          THE COURT:  Okay.

25          MS. MARCUS:  795 is composed of the Orick fees and

Page 32

```
 1    the Weil Gotshal fees, and there's another firm that was

 2    recently involved in the first mediation.

 3              MR. GWILLIAM:  Right.

 4              MS. MARCUS:  Weil wasn't at the first mediation.

 5              THE COURT:  Okay.

 6              MS. MARCUS:  So it's the aggregate.

 7              MR. GWILLIAM:  Okay.

 8              MS. MARCUS:  Yes.

 9              MR. GWILLIAM:  But, again, that's the first time

10    I've heard that figure.  I haven't heard it calculated.

11              THE COURT:  Okay.  But does -- but does that --

12    does that make a difference --

13              MR. GWILLIAM:  well --

14              THE COURT:  -- in your understanding?

15              MR. GWILLIAM:  Well, what happened -- I -- we

16    can't get too much into what happened in the mediation

17    because I don't want to violate the privilege.  But my

18    understanding was after the mediation we're going to have

19    the carrier, who I've had experience with I might add in

20    settling other cases, see if they were interested in coming

21    to the table to contribute something.  I think the value of

22    these claims exceeds the deductible and there's no reason

23    that they might not want to contribute.

24              But -- so --

25              THE COURT:  Well, I don't think that -- I mean,
```

Page 33

1    we're off the -- rather off the path of analyzing the Sonnax

2    factors.  I don't think that keeping it here or sending it

3    there precludes -- the debtors would be delighted if the

4    insurance carrier wants to come in and contribute.  I don't

5    know under what scenario the insurance carrier would be

6    interested in having that conversation when are, frankly, so

7    far away from the retention amount.

8            And, of course, I have no concept at all of what

9    the damages are that you're -- you know, that you're seeking

10   in the action.

11           MR. GWILLIAM:  Right.  Well, you know --

12           THE COURT:  And there are also other legal

13   impediments which have been mentioned including the

14   individuals who were the supervisors --

15           MR. GWILLIAM:  That's right.  I mean --

16           THE COURT:  -- involved and the existence and the

17   conduct of those individual or individuals may serve as a

18   factor that would preclude liability of the debtor here.

19   All of those issues, I think, would be properly raised in a

20   sufficiency hearing before this Court which is what Ms.

21   Marcus was referring to.

22           MR. GWILLIAM:  Well, I do understand.  So there's

23   two points I want to make.

24           First, I think that if the case were to go back to

25   Sacramento the insurance company could be ordered to at

Page 34

1     least appear at a settlement conference, which is typically

2     done.  Now you may have jurisdiction to do that here.

3             But the second point that I do want to raise, and

4     I think this is an important point, is that the individual

5     defendants are not a part of the bankruptcy case.  They

6     never have been.  The (indiscernible).  They're important

7     people, but they are not a part of the stay order.  The stay

8     order is only as to BNC, not as to the named individual

9     defendants and there are three named individual defendants

10    in the case which is another factor as to why we thought if

11    we need full resolution, which I understand is the first and

12    maybe most important Sonnax factor, can't really be resolved

13    here.

14            So, again, I am fully in favor of trying to do

15    anything we can to move this case along on behalf of my

16    clients.  But I just see some procedural issues here that

17    concern me a little bit.  But I -- I --

18            THE COURT:  Ms. Marcus, what about the --

19            MR. GWILLIAM:  -- I know that this Court is trying

20    to --

21            THE COURT:  -- what about the issue of the other

22    defendants in the action?  How do I deal with that, the

23    individual defendants?

24            MS. MARCUS:  I think one way to deal with it would

25    be for Mr. Gwilliams to try to sever BNC from the other

Page 35

1    defendants in the California action and then he could

2    proceed against those other defendants in California without

3    any delay.

4            MR. GWILLIAM:  Well, Your Honor, (a) I don't --

5            THE COURT:  And you wouldn't seek -- obviously

6    would not seek an extension of the stay to stay that?

7            MS. MARCUS:  I -- I can't imagine that we would.

8    We would not.

9            THE COURT:  That --

10           MR. GWILLIAM:  I don't' think that's good -- a

11   good tactic for us.  I wouldn't voluntarily sever them.

12   I've never done that with individual defendants.  I think we

13   need them and we need them together.  And then, you know,

14   we've got to lift the stay to do that anyway.  We can't do

15   anything in --

16           THE COURT:  No.  You don't need to lift the stay.

17   She's going to say that she's going to consent to a lifting

18   of the stay for the purpose of your severing that action.

19   And you can proceed along against those individual

20   defendants, in other words, the actors who allegedly

21   performed the acts and engaged in the conduct of which you

22   complain.  And that's going to be --

23           MR. GWILLIAM:  But their acts were in the course

24   and scope of their employment and BNC is liable for their

25   conduct whether we sever them or don't sever them.  So I --

```
 1              THE COURT:  Well, that -- that's a question --
 2    that's not something that I can agree with you or not agree
 3    with you.  I have no idea whether their actions were within
 4    the scope of --
 5              MR. GWILLIAM:  Well, they were employees of -- all
 6    their actions were employees.  We (indiscernible) -- I'll
 7    represent that to the Court. But I don't think that's a good
 8    approach for us is to pull out individual defendants in an
 9    employment action such as this.  I mean, I do a lot of
10    employment work.  That's just not the appropriate way to go
11    in my opinion.  It's not in the best interest of my clients
12    to do that.
13              But I just raise that as another procedural
14    problem here that we run into.  But, again, Your Honor, I'm
15    here.  I came out here to --
16              THE COURT:  Okay.  Well, I think that there's no
17    perfect solution.  I think that your clients are entitled to
18    have this be moved along and that it should not be -- your
19    clients should not be prejudiced unduly by the fact that
20    it's unclear whether or not there will be a recovery for
21    them.
22              But I would focus you very strongly on the reality
23    of the situation which is the wide gap between what's been
24    incurred in defending the action at this point and the
25    retention amount.  If we can -- if you can bring the
```

Page 37

1  insurance company to the table, wonderful.  I think that the

2  debtors wouldn't mind that in the least.

3         But in the meantime, I think that going through

4  all the Sonnax factors, and it is a close call, I think that

5  for the time being the action stays here.  The stay is not

6  listed -- lifted.  We're going to move onto in the claims

7  procedure.  We will have a sufficiency hearing, and at such

8  time as there's nothing more that I can do you can renew

9  your motion and the proceed to trial either in California or

10  in the Federal District Court, either here or in California.

11  But we're a couple of steps away from that.

12         MR. GWILLIAM:  All right.  So the next step at

13  this Court then would be for us to move forward with the

14  sufficiency hearing, right?

15         THE COURT:  Ms. Marcus?

16         MS. MARCUS:  That's correct, Your Honor.

17         THE COURT:  Yes.

18         MR. GWILLIAM:  All right.

19         THE COURT:  All right.

20         MR. GWILLIAM:  I appreciate your --

21         THE COURT:  I appreciate your coming out here.

22         MR. GWILLIAM:  -- wanting to resolve this and I

23  thank you very much, Your Honor.

24         THE COURT:  I very much do.  All right.  Thank you

25  very much.

Page 38

1            Ms. Marcus, you'll share an order with counsel and

2    send it to us?

3            MS. MARCUS:  Yes, I will, Your Honor.

4            THE COURT:  Thank you.

5            MS. MARCUS:  Your Honor, the next matter on the

6    agenda was listed as contested, but late last night I think

7    that the objection was withdrawn.  It's (indiscernible)

8    motion to designate Dias Reus & Targ.

9            THE COURT:  Good morning.

10           MR. BANGOS:  Good morning, Your Honor.  My name is

11   Nick Bangos appearing for (indiscernible).  With me present

12   in the courtroom is also Marta Colomar.

13           THE COURT:  Okay.  Is anybody here from the

14   Chadborne (ph) firm?

15           Well, that's unfortunate because if they were here

16   I would tell them that it's far preferable to withdraw a

17   somewhat frivolous objection before the Court and chamber

18   staff have literally spent hours trying to figure out how to

19   dispose of it.

20           So if someone would be kind enough to pass that

21   along to the Chadborne firm, I would appreciate it.

22           MS. MARCUS:  We will do that, Your Honor.

23           THE COURT:  All right.  So you folks need to tell

24   me what the order is going to look like with respect to both

25   LBHI and LBI.

Page 39

1              MR. FITZPATRICK:  Good morning, Your Honor.

2              THE COURT:  Good morning.

3              MR. FITZPATRICK:  Jim Fitzpatrick for the LBI

4    trustee.

5              THE COURT:  And I meant that in the nicest

6    possible way.

7         (Laughter)

8              MR. FITZPATRICK:  Your Honor, at least on behalf

9    of LBI, and we summarized this briefly in a statement, what

10   we would request in addition to Your Honor's order

11   essentially granting the motion in terms of who the proper

12   distributee is --

13             THE COURT:  Right.

14             MR. FITZPATRICK:  -- would be at least for the LBI

15   trustee, and I don't know if the LBHI trustee needs this or

16   not, but for the LBI trustee just to include a provision in

17   the order that makes clear that the trustee is released from

18   any liability as to any competing claims for this same

19   amount as part of the determination that's --

20             THE COURT:  Right.

21             MR. FITZPATRICK:  -- properly paid.

22             THE COURT:  I mean, it's a curious thing, right,

23   because somebody shows up and says, oh, you can't give it to

24   them because of the existence of me.  And yet when you go

25   about your everyday business of distributing funds, you

Page 40

1   don't have that kind of protection.  So it's kind of a funny

2   thing, right?

3           MR. FITZPATRICK:  It's true.  Your Honor, the only

4   difference here being that we were put on notice of compete

5   -- potentially completing claims and that's --

6           THE COURT:  Right.

7           MR. FITZPATRICK:  -- that's the only reason we

8   would make that request.

9           THE COURT:  So as part of the withdrawal of the

10  objection they're agreeing in an order that they're done?

11          MR. FITZPATRICK:  Well, we would -- what we would

12  propose is we would draft an order with that provision and

13  circulate it so that there would be no doubt.  That's how I

14  interpret it, but we would give them --

15          THE COURT:  Okay.

16          MR. FITZPATRICK:  -- that last chance.

17          THE COURT:  That would seem to be only fair.

18          MR. FITZPATRICK:  Yes.  If -- that's what we -- we

19  would volunteer to do the order and circulate it if that's

20  acceptable --

21          THE COURT:  Okay.

22          MR. FITZPATRICK:  -- to Your Honor.

23          THE COURT:  So that there's going to be one order

24  for LBI and one order for LBHI?

25          MR. FITZPATRICK:  I just don't want to speak for

Page 41

1    LBHI.

2            MR. FAIL:  Good morning, Your Honor.  Garret Fail

3    from Weil, Gotshal and Manges for Lehman Brothers Holdings,

4    Inc.  The plan administrator makes distributions twice a

5    year to the record holder that has completed the requisite

6    tax forms and other certifications that are required.

7            To the extent that there's an order that is

8    entered directing payment to his party, we're happy to

9    review it and provide comments --

10           THE COURT:  Okay.

11           MR. FAIL:  -- so that it's submitted on consent.

12           THE COURT:  Okay.  All right.

13           Yes.

14           MR. BANGOS:  Judge, Nick Bangos for

15   (indiscernible).  I have nothing to add on the comments to

16   the LBI issue.

17           THE COURT:  Okay.

18           MR. BANGOS:  On the LBHI case, there's two

19   distributions that are sort of backlogged.  There's the

20   fifth distribution that was supposed to be in April and the

21   sixth distribution, I believe, in September.  Rather than

22   waiting for the semi-annual distributions, we would ask the

23   Court to authorize the plan administrator to release those

24   two distributions immediately or within a short period after

25   the entry of --

Page 42

1            THE COURT:  Does the plan administrator agree to

2       that?

3            MR. FAIL:  No, Your Honor.  The plan administrator

4       does not.  The plan administrator provides catch up payments

5       in accordance with the plan semi-annually and to break

6       precedent at this point --

7            THE COURT:  Yeah.  It's just one of those things.

8       I think that as claims get resolved it would pose an undue

9       burden on the plan administrator to do one off

10      distributions.  So I'm going to deny that request and you'll

11      just get a very large sum of money next time around.

12           All right.  Thank you so much for coming in.

13           MR. BANGOS:  Thank you for allowing me to appear.

14           MS. MARCUS:  Your Honor, that concludes the LBHI

15      part of the agenda.  I guess there are some matters on the

16      LBI calendar, and if I --

17           THE COURT:  Okay.

18           MS. MARCUS:  -- and then there's the adversary

19      proceeding calendar --

20           THE COURT:  Yes.

21           MS. MARCUS:  -- yet to come.  May I be excused?

22           THE COURT:  Yes.  Thank you --

23           MS. MARCUS:  Thank you.

24           THE COURT:  -- Ms. Marcus.

25           (Pause)

Page 43

1          THE COURT:  Good morning.

2          MS. GRAGG:  Good morning, Your Honor.  Meaghan

3    Gragg of Hughes, Hubbard & Reed, counsel for the SIPA

4    trustee.  The first item on our agenda is an uncontested

5    matter that will be handled by my colleague, Erin Diers.

6    But before we start with the agenda, Mr. Baumstein from

7    White & Case has requested that I inform the Court that he

8    wishes to address a letter that was filed last week, but is

9    not on the agenda.

10          THE COURT:  I'm not hearing you today.

11          MR. BAUMSTEIN:  Okay, Your Honor.  I just wanted

12    to address the (indiscernible)_ adjournments to see if --

13          THE COURT:  It's not on the agenda.  I'm not

14    hearing you today.

15          MR. BAUMSTEIN:  Okay.  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MS. GRAGG:  So we'll proceed with the agenda.

18          THE COURT:  Go ahead.

19          MS. DIERS:  Good morning, Your Honor.  My name is

20    Erin Diers.  I'm with Hughes, Hubbard & Reed and I'm here on

21    behalf of the SIPA trustee for Lehman Brothers, Inc.

22          The next matter on the agenda is an uncontested

23    matter, the trustee's motion for an order enforcing the

24    automatic stay with respect to an action filed by Barbara

25    Newman in the Massachusetts District Court which is at ECF

Page 44

1    9737 and is supported by the declaration of Mary Pierce

2    (ph).  Ms. Pierce is here in the courtroom today to the

3    extent you have any questions for her.

4              THE COURT:  All right.

5              MS. DIERS:  The motion was served on both Ms.

6    Newman and her counsel in the Massachusetts action.  Neither

7    party has responded or otherwise contacted us.  As the

8    motion is uncontested, I can give a brief walk through of it

9    if you would prefer.

10             THE COURT:  That -- I think that's fine.  Let me

11   ask if anybody is in the courtroom who would like to be

12   heard on the trustee's motion for an order enforcing the

13   automatic stay with respect to an action commenced by

14   Barbara Newman?

15             All right.  Let the record reflect no response.

16   I'll grant the motion.

17             MS. DIERS:  Thank you, Your Honor.

18             THE COURT:  Thank you.

19             Okay.  I think the Ortigon (ph) matter is next.

20        (Pause)

21             THE COURT:  Ready when you are.

22             MS. GRAGG:  Good morning, Your Honor.  Meaghan

23   Gragg with Hughes, Hubbard & Reed, counsel for the SIPA

24   trustee.  We're here on the trustee's motion for summary

25   judgment on the trustee's objection to the general creditor

Page 45

1   claim filed by Mary Ortigon.  The claim is for $350,000 plus

2   interest.

3            Briefly, upon the trustee's objection the claimant

4   responded and the claimant dispute went to mediation

5   pursuant to the ADR procedures established by the Court.

6   The mediation occurred in April of 2014 and concluded

7   without resolution.  The trustee was served with discovery

8   requests and produced all documents responsive to the

9   request that we were able to locate based on a reasonable

10  search.

11           Your Honor, summary judgment is appropriate here

12  because it is undisputed that the $350,000 bonus Ms. Ortigon

13  is claiming was contained in an offer of at will employment.

14  LBI was entitled to rescind its offer of employment or

15  terminate her for -- at any time for any reason.  LBI

16  rescinded its offer of employment and Ms. Ortigon never

17  actually began work at LBI or performed any work whatsoever

18  for LBI.

19           Given these undisputed facts, the only issue for

20  the Court to decide is whether, under the terms of the offer

21  letter, the claimant is entitled to the $350,000 bonus

22  regardless of the fact that she never performed any work for

23  LBI.

24           THE COURT:  What about the fact that there's been

25  an allegation that the rescission of the offer was wrongful

Page 46

1   inasmuch as there were issues raised over whether or not she

2   had completed her executive MBA and how much time that would

3   take?  Is that not a factual issue that precludes the

4   summary disposition?

5           MS. GRAGG:  Your Honor, the trustee's position is

6   that the claimant hasn't actually raised an issue of fact on

7   that point.  In the statement of facts submitted in support

8   of Ms. Ortigon's response there's no allegation supported by

9   any evidence that there was any wrongful rescission of the

10  contract or termination of Ms. Ortigon.  The only potential

11  issues of fact that she's raised have to do with the degree

12  to which she discussed her -- the MBA program with Lehman

13  personnel who interviewed her, the degree to which they were

14  aware of it, and why they decided to rescind her offer.  But

15  there's nothing indicating that it had -- that decision had

16  anything to do with anything other than this executive MBA

17  program.

18          Our position is that any issues of fact

19  surrounding that are immaterial because regardless of

20  whether they knew -- the degree to which they knew about it

21  they concluded that they didn't want to go forward with

22  hiring her because they had concerns about those

23  discussions.

24          Again, we don't think there's a genuine factual

25  dispute regarding that because it's -- in our minds it

Page 47

1   doesn't matter unless she's able to come forward with

2   something showing that the rescission was wrongful which she

3   hasn't.

4           THE COURT:  All right.  Thank you.

5           MS. GRAGG:  So turning to the terms of the offer

6   letter which it's our position that that is the issue to be

7   decided here, the offer letter makes clear that the bonus is

8   to be for compensation for the performance year of 2007 and

9   that would be payable on or about January 31st, 2008, which

10  is more than a year after her expected started date which

11  would have been in January 2007 but never occurred.

12          The offer letter further specifies that the bonus

13  amount would be paid at the time stated unless, amount other

14  things, before the date of the scheduled payment the

15  claimant resigned or was terminated for various reasons

16  including the failure to satisfactorily perform work for

17  LBI.  Again, there's no dispute here that she never did any

18  work for LBI.

19          There's nothing in the offer letter that indicates

20  that the bonus was a sign on bonus or that it would be

21  payable regardless of whether she performed any work.  In

22  fact, the terms of the offer letter, again, make quite clear

23  that this is compensation for work.

24          I -- unless the Court has any other questions

25  we're prepared to rest on our papers.

Page 48

1            THE COURT:  Thank you.

2            MR. BRECHNER:  Good morning, Your Honor.  Ethan

3    Brechner for Ms. Ortigon.

4            I believe that there are numerous issues of fact

5    that preclude summary judgment here.

6            First, there's an issue of fact as to whether she

7    was an employee of the firm.

8            THE COURT:  She was -- she was never an employee

9    of the firm.  There's no issue of fact.

10           MR. BRECHNER:  Well, the -- for example, the

11   filings that Lehman Brothers made with FINRA indicated that

12   she was an employee of the firm on January 17th, 2007.  That

13   was a record that was filed.  Those are documents that were

14   filed by Lehman Brothers with the --

15           THE COURT:  Did Ms. Ortigon ever work a day for

16   LBI?

17           MR. BRECHNER:  She was there.  She was ready,

18   willing and able to work --

19           THE COURT:  Did Ms. Ortigon ever work a day for

20   LBI?

21           MR. BRECHNER:  She was barred from performing any

22   work.  The question, we believe, is whether she was legally

23   an employee or not.  There are documents that we submitted

24   with our papers that Lehman Brothers then tried to figure

25   out how to unhire her.  There are several emails from

Page 49

1    employees in human resources saying, how do we unhire an

2    employee, and then they proceed to try and --

3            THE COURT:  Doesn't the offer letter say that the

4    -- it's not a contract of continuing employment?

5            MR. BRECHNER:  It is, but we don't believe that

6    that's relevant.  If she was an at will employee and they

7    fired her after four months or after three weeks of work or

8    after one week of work, she still would be entitled to the

9    bonus if the termination was not for cause.

10           So whether she was an at will employee --

11           THE COURT:  Didn't the offer letter say that your

12   employment by the firm is for no fixed term and either you

13   or the firm may terminate the employment relationship at any

14   time for any reason?

15           MR. BRECHNER:  Absolutely it did.  But the portion

16   regarding the guaranteed bonus was not contingent on whether

17   she was an at will employee or not.  It --

18           THE COURT:  It was contingent on her performing

19   work.  She never performed work.  She --

20           MR. BRECHNER:  It was --

21           THE COURT:  -- did not work a day for LBI.

22           MR. BRECHNER:  They decided to prevent her from

23   doing -- performing any work.

24           THE COURT:  They terminated her.

25           MR. BRECHNER:  They did terminate her employment

Page 50

1    and, therefore, they didn't have cause to terminate her

2    employment and under the terms of the contract she's

3    entitled to the bonus.  She's not entitled to continued

4    employment because she was an at will employee.

5                THE COURT:  And you -- you believe that having

6    never worked a day for LBI she's entitled to $350,000 in

7    cash?

8                MR. BRECHNER:  I believe that she signed the

9    contract with the firm --

10               THE COURT:  Answer -- would you please answer my

11   question?  You believe that she's entitled to $350,000 in

12   cash?

13               MR. BRECHNER:  She's -- I -- we believe yes.  The

14   agreement did say that there was some portion that

15   potentially could be paid in the form of equity, not all,

16   but some of it.  It wasn't determined how much it would --

17   and what's unknown is if you terminate an employee during

18   the year, for example, if she was fired after six months,

19   does she get the whole bonus in cash or does the -- the

20   stock plans, as I understand, generally contemplate some

21   continued employment and vesting.  But she -- if -- I don't

22   think there would be any dispute that --

23               THE COURT:  The debtor could stand up right now

24   and say, good news.  I'm going to give her $350,000 bonus in

25   RSU's and restricted stock units and we would be done.

 1          MR. BRECHNER:  Well --

 2          THE COURT:  There would be no -- there would be no

 3   answer to that because there are hundreds if not thousands

 4   of employees who actually worked for years and years and

 5   years who have received nothing because their bonuses were

 6   similar to this bonus at the discretion of one or more of

 7   the debtors, payable in stock.

 8          MR. BRECHNER:  Well, was it the whole bonus and

 9   another thing is if an employee is terminated, which there

10   has been no evidence that they would have given her all the

11   bonus in the form of deferred compensation where she

12   couldn't vest in any of it because she wasn't working there

13   anymore.  She wasn't -- if she had worked there for six

14   months and they fired her under these plans, which normally

15   contemplates some form of vesting over time, then --

16          THE COURT:  You're making that up.  That's not --

17   that's not necessarily the way that it worked and there's

18   nothing like that in this letter.

19          MR. BRECHNER:  Well, there's no -- that's not

20   their argument at all in this -- on this summary judgment

21   motion.

22          THE COURT:  Their argument --

23          MR. BRECHNER:  Their argument is --

24          THE COURT:  -- is that they rescinded her offer,

25   which they were entitled to do; that she never worked a day

1   for LBI; that the bonus was a bonus payable for performance

2   working for LBI and that it's not payable because her offer

3   was rescinded and she never worked for LBI.  It's very --

4           MR. BRECHNER:  Let's say she had --

5           THE COURT:  -- straightforward.

6           MR. BRECHNER:  -- started and the -- and there was

7   another candidate who was out there who they thought was a

8   better candidate.  They hire Ms. Ortigon.  The day after

9   she's given an employee pass.  She comes in and they come

10  over to her.  She hasn't done anything yet.  They say, Mary,

11  you know what, we really like you but we had another

12  candidate who we've been trying to recruit --

13          THE COURT:  If the contract says that she's

14  terminable for any reason, then she's terminable for any

15  reason.

16          MR. BRECHNER:  Then she gets the bonus.  She gets

17  the guaranteed bonus.  If she's terminated in that course of

18  that year then she's entitled to the bonus as a guaranteed

19  payment.  She's not -- might not be entitled to work, to the

20  continued employment, but she is entitled to the bonus.  If

21  after six months they're like, you know, we're -- we've

22  changed direction --

23          THE COURT:  Show me -- show me something that

24  supports that.

25          First of all and second of all, those aren't the

1    facts.  She never worked for LBI.

2            MR. BRECHNER:  She became an employee, though.  As

3    a matter of law, she completed the pre-hiring requirements.

4    There's a -- there was a checklist that they had submitted

5    that she completed all of them.  It's attached to our

6    papers.  She completed every single one of the requirements.

7            THE COURT:  And then LBI rescinded the offer.

8            MR. BRECHNER:  And they told FINRA that she was an

9    employee.  They filed with the regulators that she was an

10   employee.  It happened to be for one day, but she was an

11   employee.  According to their records --

12           THE COURT:  So -- okay.  So let's --

13           MR. BRECHNER:  -- that they filed --

14           THE COURT:  -- let's assume that she was an

15   employee for one day.  So your position is that for one day

16   of employment she should have -- she should get $350,000.

17           MR. BRECHNER:  Okay.  Maybe equitably it doesn't

18   seem fair, but the fact is is they made an agreement with

19   her.

20           THE COURT:  Maybe it seems ridiculous.

21           MR. BRECHNER:  Well, she had a contract that said

22   if they -- if she worked there a week --

23           THE COURT:  She had a contract that said that if

24   she works for LBI for the period prescribed.  She, in the

25   discretion of LBI, would be awarded a bonus that in LBI's

Page 54

1    discretion would be in different forms of consideration

2    including stock units.

3              MR. BRECHNER:  Well, Your Honor, the contract says

4    --

5              THE COURT:  You're talking about the January 12th

6    letter?

7              MR. BRECHNER:  Right.

8        (Pause)

9              MR. BRECHNER:  It says -- on the first page it

10   says that the foregoing salary -- it says, "The bonus amount

11   set forth above will be paid at the time in the amount

12   stated except it will not be payable if you fail to obtain

13   and retain in good standing all applicable license and

14   registrations or if before the date of scheduled payment you

15   have resigned or been terminated because of misconduct,

16   breach of firm policies or rules, dishonesty --

17             THE COURT:  But you're -- this is an offer,

18   though.

19             MR. BRECHNER:  It's -- she completed all the

20   conditions to -- that were required of her under the offer

21   letter and if they -- if she had started work and the day

22   after they say, you know what, we don't like how you dress.

23   We're terminating your employment she would be entitled to

24   the $350,000.  She might not be entitled to work there for

25   the -- any period of time, but she would still be entitled

Page 55

1    to the $350,000.  That was the deal that they -- unless it

2    was for misconduct or violation of policies or dishonesty or

3    violations of laws, et cetera.  That's the issue.

4           This was the deal they made; that -- and they

5    barred her from performing any services based on a complete

6    misperception of what she had told the firm during the pre-

7    hiring process.  Danielle Copolla (ph), the HR

8    representative, is sending emails on January 17th saying,

9    how come we didn't know about the EMBA program.  She never

10   told us about that in the hiring process.

11          And the record is replete with information that

12   she had disclosed that.  She had disclosed it on her resume.

13   She had disclosed it to people she interviewed with.  She

14   disclosed to Muhammad Grenai (ph), the manager who was going

15   to be her boss.  We have an affidavit from her to that

16   effect.  There's no evidence whatsoever submitted by Lehman

17   Brothers on its summary judgment motion that disputes that

18   fact.  The email that is in the record is that Ms. Copolla

19   believed that she never told them about the program, period.

20          And Ms. Ortigon had told them.  The record --

21   there's -- at a minimum there's an issue of fact about that.

22   They then rescinded it, but she had already become an

23   employee at that point.  The contract terms were met.  It

24   may seem crazy to say you can get a $350,000 payment for not

25   having done any work, but she did what was required of her.

Page 56

1     She was ready, willing and able to work.  She was ready,

2     willing and able to change the EMBAD and the human resources

3     representative was completely wrong about what she had

4     disclosed during the hiring process.  And --

5               THE COURT:  Your claim is not one for wrongful

6     termination.  Your claim is one for a bonus for work that

7     was never performed.  Your claim is one for a cash payment

8     for a bonus that by its terms was at the discretion of

9     management not entirely payable in cash.  You're asking for

10    an extraordinary, extraordinary type of relief.  You're

11    asking for Ms. Ortigon to be treated better than employees

12    who have worked at Lehman Brothers for years and years and

13    years and lost everything because their bonuses year in and

14    year out for work they actually performed was paid to them

15    in the form of equity.

16              It would be wrong, it would be -- even if you were

17    to survive this motion, which I do not believe that the

18    claim can, there would then be a trial in which you would

19    face the task of somehow proving hypothetically that had she

20    worked this is how she would have performed and that had she

21    performed that hypothetical way, then hypothetically she

22    would have been awarded a certain amount in cash and a

23    certain amount in equity.

24              That's not a path that we're going to go down.

25              MR. BRECHNER:  Well, there's no argument that --

Page 57

1    by Lehman that all of it would have been paid in equity.

2    And that's an issue of fact as to how much it would have

3    been awarded in equity.

4             THE COURT:  We don't even get there.  I'm --

5             MR. BRECHNER:  And if she had worked one day and

6    they said, we don't like your hairstyle and we terminate

7    you, she's entitled to a bonus under the contract because it

8    says you get that unless you're terminated for some cause

9    that's defined in the contract.

10            So she -- there's no requirement for her to get

11   the $350,000 that she work the entire year.  There's no --

12   otherwise there would have been no reason to have included

13   in the contract the language about misconduct or violation

14   of policies or whatever.  There's nothing that says she has

15   to work the whole year.  They are the ones --

16            THE COURT:  Why haven't you filed a claim for

17   wrongful rescission?  It's not your claim.

18            MR. BRECHNER:  This is a contract.  She had a

19   valid contract.

20            THE COURT:  It was rescinded.

21            MR. BRECHNER:  They didn't -- well, they breached

22   it.  They terminated her after there was a contract that was

23   executed, enforced contract, and they decided not to honor

24   the provisions.  They say it was rescinded, but the fact is

25   that they then terminated her after she was an employee,

Page 58

1    after they tell FINRA, their regulator, that she's an

2    employee.

3              THE COURT:  Okay.  Let me ask the counsel about --

4    what about the FINRA point?

5              Thank you.

6              MR. BRECHNER:  Thank you.

7              MS. GRAGG:  Well, Your Honor --

8              THE COURT:  Was she -- was she an employee?

9              MS. GRAGG:  She wasn't an employee, Your Honor.

10   The -- she never began work at LBI.  We have a rescission

11   letter that was sent to her before she ever began work at

12   LBI.

13             Claimant's counsel is referring to -- I'm just --

14   a snapshot from a FINRA system that mentions her for a day.

15   Your Honor, I don't know the significance of her being in

16   the FINRA system and claimant's counsel hasn't explained

17   that or provided any evidence that -- beyond the screenshot

18   what this is or what this means.

19             In our view, you know, claimant is trying to

20   overcome the fact that she didn't work for LBI.  Her offer

21   was rescinded.  It was rightfully rescinded.  Claimant

22   hasn't come up with any evidence to the contrary.  And to

23   overcome the fact that she never worked for LBI she's trying

24   to grasp onto anything she can to show that she was an

25   employee.

Page 59

1          But the fact remains that she didn't work for LBI

2     and the bonus was compensation for work performed.  There's

3     nothing in the offer letter that indicates that this would

4     be a guaranteed bonus.  We attached to our reply papers

5     Lehman's policy on bonuses which clearly provides that it

6     doesn't pay to employees if they're not working at the time

7     that the bonus is payable.  The offer letter clearly shows

8     that that -- clearly provides that the bonus would have been

9     payable on January 31st, 2008, over a year after the

10    claimant would have started work, if she ever started work,

11    which she didn't.

12          So, I mean, it's trying to turn -- the claimant's

13    trying to turn this into a guaranteed bonus situation and

14    there's just no indication in any -- in anything that's

15    before the Court that that's the case.

16          THE COURT:  All right.  Thank you.

17          Anything else?

18          MR. BRECHNER:  I would refer Your Honor to the

19    January 12th contract.  The language --

20          THE COURT:  I'm sorry.

21          MR. BRECHNER:  I would refer Your Honor to the

22    January 12th contract.  There would be no --

23          THE COURT:  January 12th letter, it's not a

24    contract.  It's a letter.

25          MR. BRECHNER:  There would be no reason in that

Page 60

1   document to have language regarding termination for various

2   reasons unless the --

3            THE COURT:  Just let's get on the same page.

4   Right.  The January 12th letter is not a contract.  It's an

5   offer letter.

6            MR. BRECHNER:  It was accepted by Ms. Ortigon

7   signed by both parties.

8            THE COURT:  Okay.  Go ahead.  I'm sorry.

9            MR. BRECHNER:  And there would be no language --

10   there would be no reason for the language in the agreement

11   for Lehman having a right not to pay the bonus on January

12   31, 2008 under circumstances where she was terminated for

13   cause or she resigned.  The --

14            THE COURT:  Well, you've got to help me get past

15   the language that says, third paragraph on the second page:

16            "Your employment by the firm is for no fixed term

17   and either you or the firm may terminate the employment

18   relationship at any time for any reason subject to any

19   applicable notice requirement."

20            MR. BRECHNER:  That doesn't address the issue of

21   the compensation portion of the letter, which is if they had

22   cause, if she worked there for six months and then she --

23            THE COURT:  So let's go -- so let's take that one

24   and then let's go back to the other page where it says that:

25            "The foregoing salary will be paid for all periods

Page 61

1    of your active employment with the firm in the performance

2    year 2007.  The bonus amount set forth above will be paid at

3    the time and in the amount stated."

4              The entire tenor of the contract is that -- is

5    that this was proposed compensation for work that would be

6    performed.  She never performed any work.  The offer letter

7    was -- might have been accepted, but it was rescinded.  Your

8    claim is not for wrongful rescission.  You're making a claim

9    for the contractually guaranteed $350,000 bonus for the year

10   2007.  She was never an employee.  She never worked for LBI,

11   notwithstanding the screenshot.

12             I think that based on all the arguments made by

13   the trustee as -- and specifically as articulated here

14   today, the trustee is entitled to judgment.  I'm sorry that

15   this happened to Ms. Ortigon.  I hope that she found other

16   employment and has become successful.  But there is

17   absolutely no basis for this claim to proceed any further

18   and I appreciate your efforts.

19             MR. BRECHNER:  Well, I mean, I -- we reserve all

20   rights with respect to that order.  I would ask -- I haven't

21   investigated a wrongful rescission claim and I'm not sure

22   what the elements of that are, but I would like an

23   opportunity to amend the claim to assert that.

24             THE COURT:  You have what -- you have whatever

25   rights that you have.

Page 62

1           MR. BRECHNER:  All right.  Well, I would just

2    point out to Your Honor that the contract itself talks about

3    situation where if she's working for six months and then

4    they fire her and they say you -- you were tardy in coming

5    into work for weeks and weeks so we're going to terminate

6    you for violating our policies with respect to, you know,

7    when you have to be at work.  They could say, we're firing

8    you and we're not paying you the bonus because we're firing

9    you for cause.  Right.  Under that circumstance under this

10   letter they would be entitled to do that assuming they could

11   establish cause.

12           If she came in to work every day on time and

13    they're just like, Mary, we don't like your hair and they

14   terminate her, under this document that she signed she would

15   be entitled to her bonus payable on January 31, 2008.  That

16   would not be cause.  Otherwise, it would be completely

17   superfluous to have that language in the letter with respect

18   to the circumstances under which you could be divested of

19   the bonus.  The bonus is divested if she resigns or she's

20   terminated for cause.  She could work there -- she could

21   have been there for --

22           THE COURT:  Can I interrupt you to point out one

23   thing?   I've ruled.

24           MR. BRECHNER:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1          MR. BRECHNER:  Can we ask that the -- an order, I

2     take it, will be submitted?

3          THE COURT:  They'll circulate an order to you.

4          MR. BRECHNER:  Thank you.

5          THE COURT:  Thank you.

6          MR. BRECHNER:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8     (Pause)

9          THE COURT:  I believe the next matter is the

10    pretrial conference in Bania Brothers.

11          Hello, Mr. Miller.

12          MR. MILLER:  Good morning, Your Honor.  May it

13    please the Court, I'm Ralph Miller here in Adversary

14    Proceeding Number 14-02095 for the plan administrator,

15    Lehman Brothers Holdings, Inc., known as LBHI, and for the

16    other defendant in this adversary proceeding, Lehman

17    Brothers OTC Derivatives, Inc. known as LOTC.

18          We need this Court's guidance in this pretrial

19    conference on a scheduling issue concerning the motion to

20    dismiss that has been filed by the defendants, LBHI and

21    LOTC.  But a little background is necessary to put that

22    issue in --

23          THE COURT:  Okay.

24          MR. MILLER:  -- context.

25          Briefly, the plaintiffs have proposed to convert

Page 64

1    the defendants' motion to summary judgment into dueling --

2    I'm sorry -- the defendants' motion to dismiss into dueling

3    motions for summary judgment and want to set a briefing

4    schedule.  But --

5             THE COURT:  Do -- say that again.

6             MR. MILLER:  Yes, Your Honor.

7             THE COURT:  Say that again.

8             MR. MILLER:  The plaintiffs who have brought this

9    declaratory --

10            THE COURT:  Yes.

11            MR. MILLER:  -- judgment action have proposed to

12   convert the defendants' motion to dismiss into dueling

13   motions for summary judgment and to set a briefing schedule

14   on two cross motions, but the plaintiffs have not yet, so

15   far, been ready to comply with Local Rule 7056-1(a) which

16   requires them to stay the "issues to be presented" or "the

17   grounds for relief."

18            THE COURT:  Okay.

19            MR. MILLER:  And as I will explain to the Court

20   there's an awful lot of issues and there's an awful lot of

21   grounds, but there are a couple of focused issues that

22   really ought to go first.

23            And so if I may briefly explain the plan

24   administrator --

25            THE COURT:  That want to go first in the vessel of

Page 65

1    a motion to dismiss you say?

2              MR. MILLER:  Yes, Your Honor.  And they also

3    should -- are issues that are going to be very helpful to

4    the administration of all of these post-petition interest

5    claims and the plan administrator would like to put that in

6    context --

7              THE COURT:  Okay.

8              MR. MILLER:  -- very briefly.

9              To date there are four solvent debtors in the

10   Lehman group:  LOTC, one class of Lehman Brothers Commercial

11   Corporation known as LBCC and those are the two largest

12   solvent debtors, and then Lehman Brothers Derivatives

13   Products known as LBDP and Lehman Brothers Financial

14   Products known as LBFP.  And under the plan those solvent

15   debtors, under certain circumstances, will pay post-petition

16   interest.

17             The majority of these claims are derivatives

18   claims in LOTC, and typically those derivatives claims are

19   based on master agreements published by the International

20   Swaps and Derivatives Association known as ISDA masters, and

21   two sample ISDA masters were attached.  And as I'm sure the

22   Court knows, under the printed terms of derivatives

23   contracts there are some fairly complicated interest

24   provisions in which termination payments have interest rates

25   that depend on the cost of funds of the relevant payee.

Page 66

1    Sometimes they depend on that.

2              In their declaratory complaint, the plaintiffs

3    seek to have the Court determine whether the cost of funds

4    of original holders of each derivative or the cost of funds

5    of the current holders should apply.  And that's an

6    interesting question that someday this Court may need to

7    decide.

8              However, these parties don't happen to have

9    standing to create an actual case or controversy on that

10   issue.

11             Now that issue is important because Your Honor

12   will recognize, of course, that the cost of funds of a

13   commercial derivatives holder in the ordinary course, like a

14   big bank, is considerably lower than the cost of funds of

15   special purpose vehicles like these that were formed

16   essentially to buy claims.

17             As I will explain in a moment, the plan

18   administrator believes that this issue cannot be presented

19   in this particular proceeding because these three plaintiffs

20   have two characteristics in common.  First, all of them

21   entered into release documents, at least their predecessor

22   in interest did, on the six claims at issue.  And that, we

23   believe, set a fixed amount for each of these allowed

24   claims.

25             And, second, Your Honor, the ownership of all six

Page 67

1      of these allowed claims was transferred from the original

2      holder at a time when the automatic stay was in effect in

3      this proceeding, and there is a legal issue presented in the

4      motion to dismiss about whether a party can increase the

5      value of a claim when the stay is in place by transferring

6      it; that that is a stay violation.

7              Now let me give the Court some idea of the

8      significance of the release issue.  Over 80 percent of the

9      LOTC derivatives claims have been allowed for amounts set in

10     release documents.  So 80 percent of the LOTC claims have a

11     release in one of the two forms that are before the Court.

12             The plan administrator believes the scope of these

13     release documents is the first threshold issue that should

14     be resolved, and that's squarely presented by the motion to

15     dismiss.  This motion to dismiss, I should stress, cites and

16     refers to the release documents and its integral to the

17     recovery and the releases have been provided in the

18     declaration, which I signed, and we don't think there's any

19     dispute about what the releases say.

20             Obviously, if these plaintiffs have released their

21     claims for post-petition interest, actually their

22     predecessors, they don't have an actual case or controversy

23     on how to calculate something they've already released.  And

24     we cite cases that are clear.

25             Now, Your Honor, let me talk a little bit about

Page 68

1    the transfer issue.  The plan administrator believes that

2    over 90 percent of the LOTC derivatives claims are held by

3    claims purchasers rather than the original holders.  That

4    means that there were transfers of claims and each of these

5    three plaintiffs achieved their claims through transfers and

6    there was no lifting of the stay.  And we believe that all

7    of the cost of funds are higher (indiscernible) at least

8    allege that (indiscernible), and there's a legal issue in

9    some cases that we cited that says you can't take a claim

10   and increase its value by selling it to somebody --

11             THE COURT:  That would be --

12             MR. MILLER:  -- just because --

13             THE COURT:  That would be quite a cottage

14   industry, would it not?

15             MR. MILLER:  It would not be a cottage industry,

16   Your Honor.  We're talking about hundreds of millions of

17   dollars here.  This is not a small issue.

18             Now these three plaintiffs can present an actual

19   case or controversy for declaratory relief on the

20   calculation of pre -- post-petition interest only if both of

21   these legal questions in defendant's motion to dismiss are

22   answered in the negative; that is, if the Court finds that

23   there was no release and the Court finds that there was no

24   violation of the stay through a transfer that would increase

25   the value of the claim.

Page 69

 1          With that background, we've had some scheduling

 2   conversations.  We've reached agreement on an extension of

 3   time on the motion to dismiss itself.  We -- the plaintiffs

 4   would have 35 days until October 22nd to respond, and the

 5   plaintiffs agree the defendants may have three weeks.

 6          The difficulty we have, though, is when we started

 7   working on a proposed order, the plaintiffs wanted to file a

 8   cross-motion for summary judgment at the same time that they

 9   responded to the motion to dismiss.

10          Now we think that Your Honor has to decide whether

11   they're going to get a cross-motion.  We don't think that

12   Rule 12(d) -- which is, of course, incorporated by 7012 --

13   envisions that this means all summary judgments are

14   certainly -- suddenly opened up if the Court decides to

15   convert a motion to dismiss into a motion for summary

16   judgment.  The motion to dismiss, of course, serves the

17   function of Rule 7056(1)(a) because you have the grounds.

18   You have the issues.  The only question is do you consider

19   the releases attached to my declaration or do you want just

20   say they're entered with the complaint and, therefore,

21   they're on a motion to dismiss.

22          I will let counsel explain their position further.

23   We have sought information on the contents of a proposed

24   cross-motion and were told those contents had not been

25   decided yet.  So there was plenty of time for the plaintiffs

1    to comply with Local Rule 7056(1)(a) if they wanted to

2    submit a two-page letter and say what the grounds are, and

3    then we would be able to decide that today.  We don't think

4    that that can be resolved today.  And we suggest that the

5    Court should schedule briefing on the motion to dismiss

6    only, review the papers, and then decide whether it wishes

7    to convert that motion into a motion for summary judgment or

8    not and we would then have a further briefing --

9            THE COURT:  Even --

10           MR. MILLER:  -- schedule.

11           THE COURT:  Even if I were to decide that I want

12   to convert it into a summary judgment motion that wouldn't

13   necessarily mean under 7056 or otherwise that I would have

14   to allow them to do cross-motion --

15           MR. MILLER:  Of course, Your Honor.

16           THE COURT:  -- of summary judgment, right?

17           MR. MILLER:  And that is our precise point,

18   particularly since we don't know what the cross-motion is.

19   If the cross-motion, for example, is on the calculation --

20   and I will just be -- I won't even have --

21           THE COURT:  Right.

22           MR. MILLER:  -- full disclosure with the Court, we

23   think there are fact issues on the calculation question that

24   is three layers down here.  One of the fact issues is we

25   don't have copies of the transfer documents and it's

Page 71

1    possible the (indiscernible) transfer documents has some

2    relevance here.  So there would have to be discovery to get

3    to a cross-motion on that.  A mirror image cross-motion

4    would be a different issue, but they haven't told us

5    anything.

6              THE COURT:  Right.  The mirror image cross-motion

7    would be -- would be different, would be for all the reasons

8    they say we win instead of you win.

9              MR. MILLER:  If it's truly --

10             THE COURT:  Right.

11             MR. MILLER:  -- a mirror image, Your Honor.

12             THE COURT:  Okay.  Okay.

13             MR. MILLER:  Anyway, Your Honor, that --

14             THE COURT:  All right.  Thank you.

15             MR. MILLER:  -- that's the guidance that we seek

16   from the Court today is to --

17             THE COURT:  All right.

18             MR. MILLER:  -- to go forward with briefing on the

19   motion to dismiss.

20             THE COURT:  All right.  Thank you, Mr. Miller.

21             MR. MILLER:  Thank you.

22             MR. BANE:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MR. BANE:  Mark Bane of Ropes & Gray on behalf of

25   the plaintiffs.  I'm a little mystified by the presentation

Page 72

1    that counsel made because I had understood that we had

2    reached agreement on all the terms of a scheduling order.

3    We were merely presenting it as a courtesy to the Court to

4    make sure the Court was accepted (sic) the schedule we were

5    presenting.  So I'm certainly not in a position today to

6    battle over local rules and this application.  That wasn't

7    my understanding as to the purpose of --

8            THE COURT:  How can there be --

9            MR. BANE:  -- this morning.

10           THE COURT:  I'm mystified as to -- that you're

11   mystified.

12           MR. BANE:  We had a draft stipulation on

13   scheduling that we thought was agreeable to both sides and

14   we were appearing today -- this morning to present it on a

15   consensual basis.  That's what I'm mystified by.  That was

16   my understanding.

17           THE COURT:  Okay.

18           MR. BANE:  So --

19           THE COURT:  Mr. Miller, what -- can you clear the

20   mystification?

21           MR. MILLER:  I would be happy to, Your Honor.

22           THE COURT:  Just -- I'm not -- I'm not accustom to

23   two such experienced practitioners such as yourselves having

24   this kind of a disconnect.  So --

25           MR. MILLER:  Well, Your Honor, I would have -- I

Page 73

1   have only one copy, but I have a copy of the proposed

2   stipulation that was sent to us yesterday by a colleague of

3   Mr. Bane and it has four paragraphs in it.  The first two

4   paragraphs are agreeable and I have recited those.  The

5   third paragraph is a briefing schedule on filing a cross-

6   motion for summary judgment from the plaintiffs, and the

7   fourth paragraph is on the reply and responses to that

8   cross-motion.

9            THE COURT:  So --

10           MR. MILLER:  So it's the --

11           THE COURT:  Okay.

12           MR. MILLER:  -- it's the second -- it's the third

13   and --

14           THE COURT:  Okay.

15           MR. MILLER:  -- fourth paragraphs which we said we

16   could not agree to --

17           THE COURT:  Okay.

18           MR. MILLER:  -- and they said, well, we want to do

19   that and we said, we're going to have to talk to the Court

20   about that.

21           THE COURT:  Okay.

22           MR. MILLER:  And so we said, let's go ahead --

23           THE COURT:  All right.

24           MR. MILLER:  -- and talk with the Court.

25           THE COURT:  So here we are.

1          MR. BANE:  Okay, Your Honor.  Well, that wasn't

2     our understanding.  But be that as it may --

3          THE COURT:  Okay.  So here we are.

4          MR. BANE:  I -- just a couple of preliminary

5     comments in response to counselor's summary of where we are.

6          The motion -- the complaint that was brought was

7     not brought in a vacuum out of the blue.  It was brought in

8     the context of discovery being served upon the original

9     sellers of these positions.  And the discovery was in order

10    to determine what the cost of funds would be in order to

11    determine what the post-petition interest rate should be.

12         So when the debtor says that they now believe

13    there should be no payment of post-petition interest because

14    there are set amounts in documents that determine the amount

15    of the claims that should preclude post-petition interest,

16    that seems to be very inconsistent with their issuance of a

17    laundry list of subpoenas upon parties trying to get a

18    determination as to what the post-petition interest should

19    be.  So that's number one.

20         So the first point that's being made by counsel

21    that they believe that there is no entitlement to post-

22    petition interest is a little bit belied by the fact that

23    they were serving discovery to determine what the

24    appropriate rate would be.

25         Number two --

Page 75

1          THE COURT:  Well, but where am I supposed to go

2    with that; that Mr. Miller's making it up; that he really is

3    not in good faith proceeding on a motion to dismiss on the

4    grounds that he's outlined?

5          MR. BANE:  Your Honor, I'm just presenting facts.

6    Those are the facts.  We work -- the impetus for us to file

7    these subpoena -- this complaint was that you had sellers

8    who have absolutely no interest in these issues any more.

9    They sold their claims.  They have no residual interest in

10   the claims.

11         THE COURT:  Okay.  So he's --

12         MR. BANE:  The amount -- the amount of what --

13         THE COURT:  So Mr. Miller is saying that he is

14   moving to dismiss first on the grounds that there were

15   releases.

16         MR. BANE:  And I'm just suggesting to Your Honor

17   that that is a position being taken after he subpoenaed a

18   large number of people to determine that.

19         THE COURT:  But what am I -- am I supposed to --

20   but I don't understand what I'm supposed to do with that

21   statement.  Am I then supposed to infer that the motion to

22   dismiss based on the release is frivolous or non-

23   meritorious.  I just don't understand the point of your

24   telling me that they took all this discovery and now they've

25   come up with a motion to -- I don't understand the point of

1    that.

2            MR. BANE:  Okay, Your Honor.  When I came here

3    this morning I did not intend to discuss anything that has

4    to do with the merits of the respective positions.

5            THE COURT:  Okay.

6            MR. BANE:  Mr. Miller made it a presentation as to

7    what the position of the debtors are --

8            THE COURT:  Okay.

9            MR. BANE:  -- on the merits, not on the issue

10   before the Court on procedure on a scheduling order.  I'm

11   merely commenting on that presentation to the Court.  The

12   same question that Your Honor could be asking me, Your Honor

13   could have asked Mr. Miller, why are you presenting to me

14   the merits of your position this morning --

15           THE COURT:  Because the -- he didn't -- he

16   presented the merits in the context of explaining to me that

17   it's the debtors' position that they have a fully

18   dispositive motion to dismiss on two grounds:  One, the

19   release and, two, the -- I'll call it the violation of the

20   automatic stay and the step up in the cost of funds.  And he

21   gave me the merits in the context -- to enable me to

22   understand why it is that that, as a threshold matter, ought

23   to go first before some as yet to be described cross-motion

24   for summary judgment.  I think that that's entirely

25   appropriate.

Page 77

1          If you're telling me that on the merits you didn't

2    -- you will disagree that, number one, you're not -- your

3    clients are not precluded by a release and, number two, that

4    there was no violation of the stay, that's delightful and

5    I'll see your papers on that.

6          So I just don't understand --

7          MR. BANE:  Your Honor had seen Mr. Miller's papers

8    as well and he repeated what was in his papers.  I was

9    giving Your Honor a preview as to what would be --

10          THE COURT:  Okay.

11          MR. BANE:  -- in our papers.

12          THE COURT:  What -- what -- okay.  Tell me why I

13    shouldn't agree with Mr. Miller that his motion to dismiss

14    on the grounds that he has articulated should go forward

15    without embellishment, cross-motion, et cetera because it

16    seems very logical to me.

17          MR. BANE:  Well, Your Honor, there may be -- first

18    of all, we haven't decided what pleadings to file.  We

19    certainly are going to file responses to the motion to

20    dismiss.  As we told Mr. Miller and as he reported to you,

21    we have not told him what we have decided with regard to any

22    other issue.  Frankly, till I arrived this morning I thought

23    we had agreed on a schedule as I mentioned before.

24          THE COURT:  But that -- but, you see, this is the

25    part that --

 1             MR. BANE:  I understand, Your --

 2             THE COURT:  But this is the part that doesn't make

 3     sense to me.  You stood up and you said, I'm mystified.  We

 4     had a deal.  Here's a piece of paper and yet you just said

 5     that essentially what you wanted Mr. Miller to agree to was

 6     a scheduling order and a briefing schedule on something you

 7     hadn't even decided --

 8             MR. BANE:  Exactly.

 9             THE COURT:  -- what it was going to say.

10             MR. BANE:  And that paper addressed that, Your

11     Honor.  The paper said that the amount of time they will

12     have to respond will be dependent on what we file.  That

13     unknown was in the agreement --

14             THE COURT:  Well, why --

15             MR. BANE:  -- that we had thought we had reached.

16             THE COURT:  Lawyers aren't -- lawyers aren't

17     really big on agreeing to unknowns.  So the rules here are

18     that you have to -- to file a motion for summary judgment,

19     you have to essentially ask under 7056.  So why don't you

20     take us all -- let's do away with the mystery.  I mean, do

21     you know?

22             MR. BANE:  No.  I'm not prepared to do that this

23     morning.

24             THE COURT:  Okay.  Then I'm not prepared to depart

25     from the schedule that Mr. Miller has suggested.

1          MR. BANE:  And that's fine, Your Honor.  But I

2    would like to reserve my right to make that request.

3          THE COURT:  Of course you --

4          MR. BANE:  And that's fine.  I'm not -- as I said

5    before, I did not come here to advocate.

6          THE COURT:  Okay.

7          MR. BANE:  I came here for what I thought was a

8    different purpose.  If Your Honor is saying, well, now we

9    know there is no agreement.  Let's go forward in the

10   ordinary course subject to your ability to come into court

11   and request, I'm fine --

12         THE COURT:  I just --

13         MR. BANE:  -- with that, Your Honor.

14         THE COURT:  There's nothing else that I would be

15   able to do.  I'm not going to order Mr. Miller to abide by a

16   schedule for some mystery motion.

17         MR. BANE:  I agree.

18         THE COURT:  So -- and certainly you have your

19   rights down the road if you believe you have an additional

20   motion, and I'll consider it at that time.  But --

21         MR. BANE:  I agree totally, Your Honor.

22         THE COURT:  Okay.  Then it was delightful to see

23   you and, Mr. Miller, is there anything else we need to do?

24         MR. MILLER:  No, Your Honor.  We'll be happy to

25   submit the proposed order, paragraphs 1 and 2, but not with

Page 80

1   paragraphs 3 and 4.  I do want to respond to this issue

2   about discovery just so there's not a loose end left on

3   that.

4          Your Honor, the majority of the post-petition

5   interest claims for some of these debtors have been settled

6   and the plan administration, though, is always interested in

7   settlement.  In order to talk settlement, you need to know

8   the cost of funds of the original party.  And the fact that

9   there is a release issue and people say, well, I'm -- I want

10  to dispute the release issue.  You've got to know what the

11  bookends are.

12         THE COURT:  Right.

13         MR. MILLER:  So the purpose of this discovery was

14  to determine the maximum that we believe could possibly be

15  claimed and then to --

16         THE COURT:  Okay.

17         MR. MILLER:  -- talk about the effect of the

18  releases and the effect of other things --

19         THE COURT:  Okay.

20         MR. MILLER:  -- to go forward.  So --

21         THE COURT:  Okay.

22         MR. MILLER:  So that's -- that was 20 -- it was

23  2004 discovery, so Your Honor recognizes that that can be

24  used to settle claims --

25         THE COURT:  Right.

1           MR. MILLER:  -- as well as to litigate claims.

2           THE COURT:  All right.

3           MR. MILLER:  And so --

4           THE COURT:  Okay.

5           MR. MILLER:  -- we'll be happy to submit to the

6    Court the first two paragraphs of the scheduling order that

7    we've agreed on, and we --

8           THE COURT:  Okay.

9           MR. MILLER:  -- and we won't put in the other two.

10          THE COURT:  All right.

11          MR. MILLER:  Thank you, Your Honor.

12          THE COURT:  Thank you very much.  Have a great

13   day.

14       (Pause)

15          THE COURT:  All right.  I think that brings us to

16   MLCS, which I think is the last matter for this morning.

17          Thank you, folks, for waiting so patiently.

18          MR. ROLL:  It's our pleasure.

19          Good morning, Your Honor.

20          THE COURT:  Moring.

21          MR. ROLL:  William Roll of Shearman & Sterling,

22   appearing --

23          THE COURT:  Nice to see you.

24          MR. ROLL:  Nice to see you, too, Your Honor.  I'm

25   appearing on behalf of Merrill Lynch Capital Services, Inc.,

Page 82

1    the defendant in the adversary proceeding that brings us

2    here today.  I would note that we've also appeared from time

3    to time in the Chapter 11 cases on behalf of Bank of

4    America, Merrill Lynch as creditor.  And in particular in

5    connection with the settlement agreement that I'm sure Your

6    Honor has read about and will hear about in the discussion

7    this morning.

8           We are here on MC -- MLCS's motion to dismiss the

9    complaint filed by LBSF.  I think this is a relatively

10   straight-forward matter as these things go.  But with the

11   Court's indulgence I would like to take 60 seconds or so to

12   describe the background and then get into our -- the grounds

13   for our request for dismissal.

14          As Your Honor probably knows, LBSF asserts six

15   causes of action here:  Three each relating to two payments

16   or sets of payments, I should say, alleged to have come

17   Merrill's way as a result of two derivatives trades, two

18   interest rate swaps registered by Merrill to a clearing

19   entity called LCH.Clearnet Limited in June of 2008.

20          The complaint alleges that those trades were put

21   on by Merrill in error and I'll accept that as true for

22   purposes of this motion.  We'll even accept their

23   characterization of them as the erroneous transactions for

24   purposes of this discussion.

25          The complaint alleges those were put on in error

Page 83

```
1    following the parties having voluntarily and knowingly

2    terminated two trades that did not involve LCH with

3    identical terms, absolutely identical terms two months

4    earlier in April of 2008.  Those are referred to as the

5    "similar transactions" in the papers, and I'll use that same

6    terminology this morning.

7              A couple of important things to note at this

8    point.  The similar transactions, the original transactions,

9    the ones that were terminated, were unquestionably done

10   pursuant to a master ISDA agreement from 2001.  We refer to

11   that as the original ISDA.  That's an important term as we

12   go through this discussion.

13             Another thing I do want to note is that once the

14   erroneous -- the so-called erroneous transactions were

15   registered with the LCH, whether they were put on in error

16   or not, they were treated as live transactions by LCH

17   following their obtaining consent for that from the two

18   counterparties, Merrill and LBSF.

19             So even though the complaint -- I'm sorry, not the

20   complaint, the opposition to our motion, and importantly not

21   the complaint itself, but just the opposition to the motion

22   refers to these erroneous transactions as fictitious or

23   counterfeit.  They were, in fact, and are, in fact, still

24   live transactions, very real transactions with real economic

25   terms between these parties.  In fact, the complaint in
```

Page 84

1    paragraphs 20 -- 19, 20, 21 thereabouts goes through in some

2    detail the economic terms of these supposedly erroneous

3    transactions, the ones they are now calling in their papers

4    the fictitious transactions.

5         And they admit in the complaint itself that these

6    erroneous transactions mimic the economic terms of the

7    similar transactions.  So that's all in the complaint

8    itself.

9         Once the trades are registered with LCH -- LCH

10   does not facilitate original trades.  LCH acts as a clearing

11   entity.  So once LCH is involved, it stands between the two

12   former counterparties with each other, and what is created

13   in that circumstance are two separate new contracts.  It's,

14   in effect, an ovation.  There is a contract between LCH and

15   LBSF on one hand and a contract between LBH and MLCS on the

16   other hand.  And payments back and forth go through LCH, go

17   to and from LCH and the respective counterparties.  They do

18   not go directly between LCH -- I'm sorry -- MLCS and LBSF.

19        The complaint, to sum it all up, the complaint

20   seeks the return by Merrill to LBSF of the net amount of

21   payments made to -- made to MLCS under the arrangement I

22   just described between June 2008 and the petition date some

23   three months later.

24        THE COURT:  But let me -- I mean, did -- there's a

25   lot in the papers about erroneous, fictitious, et cetera.

Page 85

1    But, in fact, there was no live swap transaction that

2    existed, correct?

3              MR. ROLL:  As of -- well, as of the petition date?

4    Yes, there was.  There was a live transaction between MLCS

5    and LCH.  There were two live transactions:  One between

6    Merrill and LCH and the other between LBSF and LCH.  So the

7    two previous bilateral transactions that were terminated

8    were -- and for the sake of argument we'll accept their

9    approach to the facts.  They were mistakenly put back on as

10   live trades, but this time through a clearing entity in

11   light of the financial situation that Lehman found itself in

12   in the summer of 2008.

13             These clearing entities exist for the purpose of

14   eliminating counterparty risk or at least reducing it in a

15   circumstance like that.  So Merrill took these trades,

16   mistakenly thought they were live and put them back on

17   through this clearing entity.  That clearing entity doesn't

18   facilitate new trades.  It just does an ovation that takes

19   each one trade and turns it into two, you know, with two

20   different legs if you will where previously there was just

21   one.

22             So on the petition date there was, in fact, a live

23   transaction.  And there's still a live transaction today

24   involving Merrill.  Merrill still hasn't --

25             THE COURT:  I guess I'm making a distinction and

1     you'll have to indulge me --

2           MR. ROLL:  Sure.

3           THE COURT:  -- because this is -- I have to

4     disagree with your statement at the beginning that this is

5     pretty easy.  I don't think it's that easy.

6           MR. ROLL:  Okay.

7           THE COURT:  Okay.

8           MR. ROLL:  Perhaps I was too hopeful.

9           THE COURT:  But was it a live swap transaction?

10          MR. ROLL:  It was a live swap transaction that --

11    the transaction between LCH and LBSF was live.  The

12    transaction between LCH and Merrill was live.

13          THE COURT:  But was it a live swap --

14          MR. ROLL:  Those are live --

15          THE COURT:  -- transaction?

16          MR. ROLL:  -- swap transactions.

17          THE COURT:  Okay.

18          MR. ROLL:  They are, in fact.

19          So they're asking for monies to come back --

20          THE COURT:  Right.

21          MR. ROLL:  -- monies that came to us as --

22          THE COURT:  Now --

23          MR. ROLL:  Monies flowed through and, you know,

24    sometimes payments made, sometimes payments received by both

25    parties over the course of the three months that these two

Page 87

1    transactions were in place before the petition date.  The

2    Lehman side was closed out on the petition date and shortly

3    thereafter.

4              We have now moved to dismiss --

5              THE COURT:  So I'm going to -- I'm just going to

6    stay on this point for a minute.

7              MR. ROLL:  Of course.

8              THE COURT:  So there was a "live swap

9    transaction."  Its economics existed.

10             MR. ROLL:  Yes.

11             THE COURT:  But there were no underlying documents

12   reflecting it.

13             MR. ROLL:  The underlying documents reflecting it

14   -- this is hardly an inference, but I think it's the only

15   inference that can be drawn.  I say, inference.  That's not

16   spelled out in the complaint, but this has to, be based on

17   what is the complaint, this has to be the case; that the

18   live -- that the documents spelling out those terms were the

19   original ISDA, were the terms under the original ISDA that

20   underlay the so-called similar transactions.

21             THE COURT:  The -- right.

22             MR. ROLL:  Yes.  So those documents -- and we've

23   attached to our motion the trade confirmations related --

24             THE COURT:  Right.

25             MR. ROLL:  -- to those.

Page 88

1          THE COURT:  So the -- so that's the answer.  The

2     answer is that there were no actual real underlying

3     documents, but you could discern the terms of the

4     transaction by reference to the documents that governed the

5     similar transaction.

6          MR. ROLL:  That's right.  And, in fact -- and I

7     don't want to quibble with the term "real" in there, but the

8     -- I think the better way perhaps to look at it, or another

9     way to look at this is that the only way that the plaintiffs

10    could have described the economic terms of the so-called

11    erroneous transactions in the complaint, which they do in

12    depth, would be to --

13          THE COURT:  Is by reference --

14          MR. ROLL:  -- refer to --

15          THE COURT:  -- to the --

16          MR. ROLL:  Exactly.  To the --

17          THE COURT:  Okay.

18          MR. ROLL:  -- similar transactions and the terms

19    under the ISDA that underlay those.  So --

20          THE COURT:  Okay.

21          MR. ROLL:  So that's the only way it could be done

22    and that's -- that's, in fact, how it happens in the real

23    world.  If you put aside the bankruptcy and everything

24    that's happened since September 2008, I mean, the parties

25    would have looked to the terms from the prior transactions

1    if they were -- if the new ones were intended to replace the

2    old ones, which is what appears to have been the case.

3              THE COURT:  Okay.

4              MR. ROLL:  So --

5              THE COURT:  Okay.

6              MR. ROLL:  So that brings us to where we are

7    today.  There's a net amount of something on the order of

8    $20 plus million --

9              THE COURT:  Right.

10             MR. ROLL:  -- that LBSF says should come back.

11   And they've asserted six causes of action, three relating to

12   two different sets of payments, all of them common law

13   based, stated in common law terms.

14             We have moved to dismiss all of them on the basis

15   -- on three grounds, basically.  The first is -- and this is

16   ironic in light of what Mr. Miller was just saying on behalf

17   of the estates a few months ago.  First on the basis of the

18   release --

19             THE COURT:  Right.

20             MR. ROLL:  -- granted --

21             THE COURT:  Irony noted.

22             MR. ROLL:  Yes.  It's very ironic.  The release

23   granted to Merrill in connection with the settlement that

24   Merrill -- that Bank of America and Merrill Lynch reached

25   with the estates in the fall of 2001 with -- or 2011 rather

Page 90

1     with respect to all of their derivatives transactions,

2     thousands and thousands of them.  And as I'm sure Your Honor

3     knows, it was that settlement with B of A combined with

4     settlements that the estates reached with other major

5     financial institutions that paved the way for the plan to be

6     -- which was then confirmed in late 2012 if I recall

7     correctly.

8            So our view is that the release given to Merrill

9     in that settlement agreement, in connection with that

10    settlement, bars these claims.  That's point one.

11           Point two, another what I'll structural

12    impediment, structural bar before you even get to the actual

13    words of the complaint, we claim that the -- all these

14    claims, all six of these claims are barred by the safe

15    harbor provision under Section 546(g) of the code.  As I'm

16    sure Your Honor knows, that section protects from avoidance

17    actions payments made "under or in connection with any swap

18    agreement" made before the petition date except for those

19    that can be characterized or claim to be actually fraud --

20    actual fraud-based fraudulent conveyance claims.

21           So avoidance actions relating to swap transactions

22    are safe harbored under 546(g).  We contend that these

23    transactions, the claims that they're making based on these

24    transactions are, in fact, safe harbored because they fit

25    under the terms of the statute even though they speak the

Page 91

1    language of common law, you know, state common law claims.

2    Money had and received and unjust enrichment and so forth.

3          And our third ground for dismissal, somewhat more

4    prosaic, not a structural bar in the same way, is that

5    because these claims are asserting under state law are, in

6    fact, quasi contract claims, they fail because of the

7    existence of an actual contract that governs the subject

8    matter of the claims themselves.

9          That last, I think, is dealt with pretty

10   adequately in the papers.  I'm not going to spend a lot of

11   time on that this morning unless Your Honor wishes me to.

12   I'm going to spend most of my time on the first two on the

13   settlement and the safe harboring.

14          THE COURT:  So let's talk about the release --

15          MR. ROLL:  Okay.

16          THE COURT:  -- because I think that there are

17   circumstances under which a -- the existence of a release

18   would be dispositive on a motion to dismiss, but the papers

19   seem to raise factual issues, seem to raise factual issues

20   regarding the scope of the release and the applicability of

21   the release.  And that's what gives me pause because while

22   you say, here's the release.  It's plain as the nose on my

23   face that it applies, they say, no it's not.

24          MR. ROLL:  Right.

25          THE COURT:  So I begin to feel very much like I'm

1    making a factual determination notwithstanding the fact

2    that, yes, there's a release and there are those words.

3              MR. ROLL:  Right.

4              THE COURT:  Because you've got the issues that

5    have been raised with respect to its applicability and also

6    the relating to.  Those are --

7              MR. ROLL:  Uh-huh.  Right.

8              THE COURT:  And those are separate points.

9              MR. ROLL:  They are separate points and I think,

10   if I'm hearing the Court correctly, the first of those goes

11   to -- and correct me if I'm misstating what Your Honor is

12   getting at -- goes to whether you can even consider --

13   whether the Court can even consider the release on a motion

14   to dismiss as opposed to summary judgment for --

15             THE COURT:  I think --

16             MR. ROLL:  -- some related point.

17             THE COURT:  Well, I think I can.

18             MR. ROLL:  I think you can, too.

19             THE COURT:  Yeah.

20             MR. ROLL:  Yeah.  So I think --

21             THE COURT:  I think I can.

22             MR. ROLL:  Okay.  So we're clear.  I think we're

23   on the same page.

24             THE COURT:  So I don't think we have to spend much

25   time on that.  What I'm more concerned with is the feeling

Page 93

1    that I'm deciding disputed issues of fact with respect to

2    the coverage of the release.

3              MR. ROLL:  Okay.  I -- let me go right to that.

4              THE COURT:  That's the main -- to be entirely

5    showing all of my cards --

6              MR. ROLL:  Okay.

7              THE COURT:  -- that's my main, my main issue.  I

8    have some other questions that I find fascinating about the

9    safe harbor, but my main issue is this feeling that the

10   interpretation and the applicability of the release feels

11   facty (sic) to me.

12             MR. ROLL:  I understand the issue, Your Honor, and

13   let me deal some cards of my own that --

14             THE COURT:  Okay.

15             MR. ROLL:  -- maybe can help fill out Your Honor's

16   hand.

17             THE COURT:  Okay.

18             MR. ROLL:  If I can take the card matter a little

19   further.

20             Let me start with a point that's actually made by

21   LBSF in their motion papers themselves.  And I -- it's an

22   admission and I think it's a dispositive admission --

23             THE COURT:  Okay.

24             MR. ROLL:  -- on this particular point.  We do

25   elude to it in our reply papers.  Perhaps we could have

Page 94

1    highlighted it more.  I don't know.  I'll highlight it now.

2    They said -- they say, LBSF says the purpose of the release

3    in that settlement agreement was to eliminate controversy,

4    to create peace, to release claims relating to live

5    derivative transactions exist --  actual live derivative

6    transactions existing on the date of the petition.  That's

7    what we have based on the conversation that Your Honor and I

8    had earlier.  We have a live -- we have two live

9    transactions in existence on the petition date.

10             So by their own admission, even if it is a facty

11    (sic) kind of determination the Court has to make, that's a

12    dispositive admission that the Court can take into account

13    at this particular stage.

14             The second thing I would point to is that as --

15    again, following from the discussion we had earlier, it's

16    absolutely plain from the face of the pleading itself, not

17    requiring Your Honor to make any factual determination, that

18    the erroneous transactions are, in fact, a later incarnation

19    of the similar transactions.  They are, in fact, the same

20    transactions economically and have the same impact on the

21    parties as the prior transactions did from an economic and a

22    financial standpoint.

23             And the similar transactions are mentioned

24    throughout the complaint for the simple reason that they

25    have to do that to set up the existence of these so-called

Page 95

1    erroneous transactions because that's where the terms come

2    from.

3         The reason that's important is that -- is that the

4    similar transactions, and there should be no dispute about

5    this, are, in fact, so-called Lehman transactions in the

6    language of the release.  So it should be pretty clear that

7    those were released.  It would have been released if they

8    were still alive.  Transactions like those were clearly

9    released when the settlement agreement was signed.

10        The erroneous transactions just need to be -- I

11   guess one other thing.  It should be clear that the similar

12   transactions are -- were also released because they were

13   done under so-called Lehman transaction documents or Lehman

14   -- Lehman agreements, I guess.  I don't have the exact term

15   in front of me.  But the term in the release language itself

16   that goes to the documents creating the agreement.

17        So there's no question that the similar

18   transactions --

19        THE COURT:  Well, in connection --

20        MR. ROLL:  -- were under that ISDA.

21        THE COURT:  -- in connection with the settlement

22   -- and this might be a very naïve question -- but there was

23   no schedule of any sort called released actions?

24        MR. ROLL:  No.  Well, not per se.  There was a --

25   there was -- the settlement was actually part of our motion

1    papers so Your Honor has the whole thing.  And we've all --

2    we can also refer the Court to the motion by which the

3    estate sought approval of the settlement.  It's one of the

4    exhibits to the --

5              THE COURT:  Right.  So it's -- the -- it's in

6    here, right, and then there's Exhibit A, remaining bank

7    counterparties.

8              MR. ROLL:  Right.

9              THE COURT:  Right.  So that doesn't really help,

10   right?

11             MR. ROLL:  It does not.  But there was no -- to

12   get to Your Honor's question, there was -- there was no

13   schedule that said, these are the claims that this agreement

14   releases.  The reason for that is that there were thousands

15   and thousands of these transactions.

16             THE COURT:  Right.  That's why I knew it was

17   probably a naïve question.

18             MR. ROLL:  Right.  So it was -- and that's why --

19   it's because of that and because of the multitude of

20   transactions that the parties needed to cover that they

21   arrived at the language that they did.  And it's -- it's

22   quite broad.  It's a very broad release.  It says that the

23   estates were releasing all claims now or in the future,

24   known or unknown arising under or related to the asserted

25   Lehman claims, which is a defined term meaning those

1    embodied in proofs of claim that Merrill and B of A have

2    filed, thousands of those; or arising under or related to

3    Lehman agreement documents, i.e. those arising under ISDAs

4    like the original ISDA.  That's why the similar transactions

5    would be covered by this; or arising under or related to

6    Lehman transactions.  And so that's the -- that's what picks

7    up things like the similar transactions here.

8            So it -- I think it's fairly clear just from an

9    examination of that text and taking into account the

10   thousands of transactions that the parties were dealing with

11   at the time that the intent had to be broad.  It had to be

12   intended to pick up lots more than what the parties could

13   have, even if they had wanted to, try to put down on a piece

14   of paper that was part of the settlement agreement itself.

15           So -- and all these connections that I've talked

16   about at this point one can say they are fact-based.  They

17   are fact issues.  They are facty (sic) to use the Court's

18   term, but they all come up.  They all are capable of or

19   susceptible of resolution, if indeed a resolution is

20   required, from the face of the complaint itself, from the

21   face of the --

22           THE COURT:  But you said --

23           MR. ROLL:  -- agreement itself.

24           THE COURT:  -- you said one word that in

25   particular caught my attention which was intent.

Page 98

```
 1              MR. ROLL:  Correct.

 2              THE COURT:  Right.  So intent always makes me --

 3              MR. ROLL:  And I --

 4              THE COURT:  -- really nervous because if you're --

 5    if what they're saying is that the release was not intended

 6    -- you're saying the release was intended to cover their

 7    claim -- this claim and they're saying that the release was

 8    not intended to cover it and there's competing

 9    interpretations and, therefore, it's not appropriate on a

10    motion to dismiss.

11              MR. ROLL:  There are competing interpretations for

12    purposes of the advocacy here, but if you really look at the

13    intent, here's what the Court, as a matter of law, I think

14    is entitled to do.

15              The Court, number one, is entitled to look at

16    their dispositive admission as to what the intent of this

17    was.  It was to cover live transactions existing on the

18    petition date.  I think, boom, we're done.

19              The other thing -- another thing the Court can

20    consider with respect to intent is what's apparent from the

21    face of the document itself and the actual words, the four

22    corners of the document as lawyers and law professors like

23    to say.  The term related to which we have a host of case

24    law on is interpreted broadly.  It has always been

25    interpreted broadly.  It's intended to sweep broadly.  It's
```

Page 99

1    seen as unforgiving.  In one case if I recall it correctly,

2    the Court can look at that and make a determination itself

3    as to what the intent was, and that's pretty standard

4    contractual interpretation stuff if Your Honor will --

5            The other thing the Court can do is take note of

6    the fact that they have not claimed that that term is

7    ambiguous.  They have not claimed that those terms related

8    to are ambiguous.  They just say they don't work.  That's an

9    important distinction.  That's not just a lawyer's or a law

10   professor's distinction.  It's important because they would

11   have to convince Your Honor that there was ambiguity in that

12   term in order to get Your Honor to rule, and it's the

13   Court's province, not the -- not anyone else.  It's a legal

14   issue that there is ambiguity thus calling for extrinsic

15   evidence to get at the intent.

16           They haven't shown ambiguity.  There's nothing

17   ambiguous about that term at all.  It's just a he said she

18   said as to whether it applies or not.  That's all they've

19   given Your Honor.  They haven't shown ambiguity and I submit

20   they can't.  Without their being able to do that, they've

21   got no entitlement to put extrinsic evidence before the

22   Court.  It's the extrinsic evidence that would take us into

23   a realm beyond the motion to dismiss.

24           And I submit, respectfully, Your Honor, we don't

25   have to do that because of their admission, because of the

Page 100

 1    textual analysis that the Court can do of the document

 2    itself, but the host of cases talking about related to

 3    language, the host of -- and indicating its broad.  The host

 4    of cases saying on a related point that when parties release

 5    unknown claims, that's going to be enforced.  They really

 6    should be held to mean that.  I mean, that's really part of

 7    what they're saying.  This was unknown; that they didn't --

 8    you know, if they had known this was going to be put on

 9    erroneously, you know, or had been put on erroneously they

10    wouldn't have released it.

11            But that's -- but the -- I think the lay person's

12    answer to that based on this contract is, even if you accept

13    that the answer is, tough.  I mean, they -- they've agreed

14    to release that by the terms of this particular release

15    language and now they have to live with it.

16            You know, and let's -- since we're talking about a

17    contract here, an agreement, the settlement agreement

18    itself, it's a two-way street.  This wasn't something that

19    Merrill or Bank of America was being given for free.  Bank

20    of America and Merrill, as the record of these Chapter 11

21    cases would reflect, gave up what it saw as billions of

22    dollars in claims asserted against the estates in return

23    for, you know, a settlement, in return for, among other

24    things, this particular release and the ability to know

25    going forward that these kinds of things that are coming up

Page 101

```
 1    now reflected in this complaint won't come up; that they've

 2    been released because the derivatives transactions of all

 3    sorts were intended to be released at that point, at the

 4    point of the signing of the agreement and the approval of

 5    the --

 6              THE COURT:  You're --

 7              MR. ROLL:  -- agreement by the Court.

 8              THE COURT:  You're relying on the related to

 9    language.

10              MR. ROLL:  That's correct, Your Honor.

11              THE COURT:  You're relying on the related to

12    language.

13              MR. ROLL:  We are.  And -- because it's -- it's

14    also -- well, primarily --

15              THE COURT:  But if it's not -- if it's not an

16    asserted Lehman claim, and if it's not a Lehman agreement

17    document, and if it's not a Lehman transaction, right, if

18    it's not --

19              MR. ROLL:  It's --

20              THE COURT:  -- one of those three, right, but

21    you're saying it's related to it --

22              MR. ROLL:  Well, we --

23              THE COURT:  -- because it -- because of the nexus

24    through similar transactions.

25              MR. ROLL:  I -- I think -- and, again, some of
```

Page 102

1    this is semantics, but if the Court's --

2                THE COURT:  Yeah.

3                MR. ROLL:  -- semantics, I think it is.  It is not

4    Lehman-asserted claims because that was intended to mean

5    proof of claim --

6                THE COURT:  Right.

7                MR. ROLL:  -- claims.

8                THE COURT:  Right.

9                MR. ROLL:  But it is the other two.  And here's

10   how.  It's a Lehman transaction because it is a

11   reincarnation of something -- the similar transactions which

12   were unquestionable Lehman transactions based on these

13   definitions.  They arise from the original ISDA.

14                That's what also makes them, these erroneous

15   transactions claims arising under Lehman agreement

16   documents, the other term that Your Honor mentioned, the

17   second of the three because, again, they relate to the

18   original ISDA which is clearly a Lehman agreement document

19   as the term is defined.

20                So these transactions, they don't exist in a

21   vacuum and they didn't exist in a vacuum.  They existed by

22   reason of the original ISDA which set forth the economic

23   terms, which is itself a Lehman agreement document, and the

24   existed as a Lehman transaction because they were, in fact,

25   as they say -- as they admit they mimicked the economic

Page 103

1      terms of the prior transactions.

2              There's no question that had the original

3      transactions remained alive until the petition date those

4      would have been released.  This is essentially the same

5      thing, just in different clothing if you will.

6              THE COURT:  Okay.

7              MR. ROLL:  But they arose from the same genesis.

8      They arose from the same documents and they arose from the

9      same economic bargain that the counterparties made in

10     connection with these transactions.  So that -- and that was

11     the -- and that's the way they existed on the petition date.

12             So I think the -- to come back to a direct answer

13     to Your Honor's question, I think they are, using these

14     terms, they are, in fact, Lehman transactions and they are,

15     in fact, based on Lehman agreement documents.

16             THE COURT:  Okay.

17             MR. ROLL:  And they are also related to in a

18     broader sense.

19             So, you know, maybe it's not as straightforward as

20     I might have thought, but I think it's -- it is nevertheless

21     relatively clear that the complaint itself, the allegations

22     made in the complaint, statements made by LBSF in their

23     motion papers, their opposition to the motion, they make it

24     clear that the intent here is something Your Honor can

25     decide for -- the Court can decide for itself without

Page 104

1   resorting to any extrinsic evidence, and that the Court can

2   readily find that these transactions, just based on what's

3   been alleged, arise, you know, from documents and

4   transactions that are clearly covered by the release.

5                THE COURT:  Okay.

6                MR. ROLL:  So --

7                THE COURT:  All right.  I think --

8                MR. ROLL:  -- that's the release.

9                THE COURT:  I think with respect to the 546(g) I

10  don't think I need anything further on that.

11               MR. ROLL:  I'm sorry.  You --

12               THE COURT:  I don't need to hear you on the 546.

13               MR. ROLL:  On the 546.  Okay.

14               THE COURT:  Yes.

15               MR. ROLL:  Then I think that's it.

16               THE COURT:  Thank you.

17               MR. ROLL:  I will sit down.  Thank you, Your

18  Honor.

19               MR. MAHER:  Your Honor, Bill Maher on behalf of

20  Lehman Brothers Special Financing, Inc.

21               THE COURT:  So Mr. Roll is very persuasive.

22               MR. MAHER:  Yes.  He's very persuasive if you make

23  his assumptions and inferences and factual assumptions and

24  leaps he's very persuasive.  But this is a motion to dismiss

25  based upon the statements that are contained in the

Page 105

1    complaint, not as he would like them, but as they are.  And

2    there are two important points that I want to make to you,

3    Your Honor, about factual misstatements that Merrill Lynch

4    has made both in the reply brief and here today before you.

5              THE COURT:  Okay.

6              MR. MAHER:  And I think it's outcome determinative

7    with respect to those issues.

8              First of all, they say that the erroneous

9    transactions are genuine contracts and that we've --

10             THE COURT:  Well, I --

11             MR. MAHER:  -- changed --

12             THE COURT:  -- I went through this a number of

13   times.  So I said the answer is that they are -- that they

14   dispute that they're fictitious and they say that they are

15   live; that they were live swap transactions.

16             MR. MAHER:  And we dispute that.

17             THE COURT:  Okay.

18             MR. MAHER:  And that's the fact issue, Your Honor,

19   that he is assuming.  That is not alleged in the complaint.

20   What is alleged in the complaint in paragraph 2 is that in

21   June 2008 Merrill, MLCS erroneously identifying two non-

22   existent interest rate swaps, which we have -- which we

23   define as the erroneous transactions.

24             In paragraph 15 we allege no original contracts

25   existed for the erroneous transactions.  We are at -- so we

Page 106

1    are saying and have said all along that the transactions are

2    fictitious.  They are counterfeit.  They are not bona fide.

3           Counsel is telling you they are genuine.  They are

4    legitimate.  Your Honor, that is a basic factual dispute

5    that cannot be resolved by the Court on a motion to dismiss.

6    Our allegations are that they are counterfeit and not

7    genuine.  They are saying they are.  That's a basic actual

8    dispute that you cannot resolve.  This issue abounds with

9    fact issues.  What we really need to do, Your Honor, is find

10   out what happened here, take the discovery --

11          THE COURT:  But --

12          MR. MAHER:  -- present it to you --

13          THE COURT:  But the -- they're not fictitious in

14   the Bernie Madoff sense, right?  They're not fictitious in

15   the sense that there was actually nothing that occurred.

16          MR. MAHER:  Correct.

17          THE COURT:  Right?

18          MR. MAHER:  Yes.

19          THE COURT:  There was -- there fictitious in the

20   sense of -- or they're erroneous in the sense that -- how

21   can I try to explain this?  Somebody pushed a button twice

22   when they should have only pushed it once and generated a

23   second transaction that had the terms of the first

24   transaction.  So it -- there -- so --

25          MR. MAHER:  Maybe.

1          THE COURT:  When you say fictitious I think Bernie

2    Madoff.

3          MR. MAHER:  Okay.

4          THE COURT:  Completely made up, no darn cat, no

5    darn cradle, right, to quote (indiscernible).  Okay.  There

6    was just nothing there.  There -- what Mr. Roll was telling

7    me is that they had their genesis in an error, but they

8    actually -- there was economic substance and, therefore,

9    they then became live and actual --

10          MR. MAHER:  That's what he's saying.

11          THE COURT:  -- as opposed to fictitious.

12          MR. MAHER:  That's what he's saying.

13          THE COURT:  That is what he's saying.

14          MR. MAHER:  And there's no facts to support that.

15    That's all invented in his head.  What we have are two

16    transactions, the similar transactions, that were terminated

17    by mutual agreement in April of 2008.  Then we have invented

18    fictitious transactions created by Merrill Lynch that were

19    sought to be connected to the London Clearinghouse LCH.

20    Thereafter, things happened as a result of that that

21    resulted in --

22          THE COURT:  Right.

23          MR. MAHER:  -- $21 million of Lehman's money being

24    given to Merrill Lynch.  That doesn't mean his suppositions

25    about what might have happened and what went forward is

Page 108

1    correct.  They are disputed.  They are unknown, Your Honor.

2    Nobody really knows what happened here.  And what we need to

3    do is figure out what happened here, bring it to you as a

4    factual record for you to make a determination as a matter

5    of law based upon a full factual record what happened here.

6              The second point I want to make to you, Your

7    Honor, with respect to what I think was a clear misstatement

8    by counsel and he -- he even called it the dispositive

9    admission --

10             THE COURT:  Right.

11             MR. MAHER:  -- that we made.

12             THE COURT:  Talk about the dispositive admission.

13             MR. MAHER:  All right.  That relates to Exhibit D

14   to the motion which is the termination and settlement

15   agreement.  That's the operative document that he wants you

16   to consider.  And he misstated what we stated about that

17   document.

18             The termination and settlement agreement, Your

19   Honor -- and it's a termination and settlement agreement, it

20   resolved claims between Lehman Brothers and Merrill Lynch,

21   direct transactions between Lehman Brothers and Merrill

22   Lynch that were live as of September 15th, 2008.

23             If you look in the preamble the parties to the

24   agreement are the Merrill counterparties and the Lehman

25   entities, and they're all defined as parties.  Note who is

1    not included as a party, LCH or any other intermediary.

2           Counsel stated to you that the erroneous

3    transactions were alive on September 15, 2008 and,

4    therefore, are covered by this document.  They are not.

5    Only direct dealings between Merrill Lynch and Lehman

6    Brothers are covered by this agreement.

7           There's a second caveat.  Only agreements that

8    were live between Merrill and Lehman Brothers as of

9    September 15th, 2008, the petition date, are covered by this

10   agreement.  How do we know that?  It says on page 3, the

11   first whereas clause, "Whereas the Merrill counterparties

12   and the Lehman entities acknowledge the termination of their

13   respective Lehman transactions to which they were a party

14   under the applicable Lehman agreement documents on September

15   15, 2008."

16          And then we go forward about an allowed valuation

17   and framework for that.  If you read this document, Your

18   Honor, the entire agreement is about valuing within the

19   framework that Lehman is applying to all the bank

20   counterparties the claims that Merrill Lynch has, direct

21   claims between Lehman and Merrill live on September 15th,

22   2008 to determine a framework value and an ultimate

23   resolution of those claims.

24          What does -- and I want to talk about Exhibit A in

25   a minute, but what does that mean?  That means that the

Page 110

1    erroneous transactions are not part of this termination and

2    settlement agreement despite what counsel says.  It all --

3            THE COURT:  Because LCH is not a party.

4            MR. MAHER:  Exactly.  And there -- all the things

5    that are referred to as the proofs of claim --

6            THE COURT:  Mr. Roll, if you're keeping track

7    that's a good one that you're going to have to address when

8    you stand up.

9            MR. ROLL:  Okay.  That LCH is not a party.

10           THE COURT:  Yes.

11           MR. MAHER:  And this relates to proofs of claim

12   asserted by Merrill entities against Lehman, not LCH.  LCH

13   had nothing --

14           THE COURT:  So --

15           MR. MAHER:  -- to do with this agreement.

16           THE COURT:  So I think -- so not to steal Mr.

17   Roll's thunder, but I think what he might tell me is that,

18   well, that's all well and good, but there's that related to

19   language.

20           MR. MAHER:  I get that, Your Honor.  My point is

21   that this agreement has nothing to do with the erroneous

22   transactions.  He said the dispositive admission I made is

23   that if the LCH transactions were live on the settlement --

24   on the petition date, that they were, therefore, covered by

25   this document and released.  They're not.  He's totally

1   wrong about that.  And if you read the document you will get

2   that.

3                If you go to Exhibit A, Exhibit A, the first page

4   of Exhibit A refers to counterparties and valuation issues.

5   And if you look down on the second line, Your Honor, there's

6   -- the bank is Merrill Lynch.  The counterparty is Merrill

7   Lynch Capital Services.  The debtor is LBSF.  The asserted

8   claims are an amount stated which relate to the claims that

9   were submitted in proofs of claims by Merrill Lynch.  Then

10  there is a framework value which is less and then there is a

11  contract ID and contract date which refers to the ISDA

12  document.

13               This is all about settling claims between --

14  direct claims between Merrill Lynch and Lehman Brothers.

15  That has nothing to do with the erroneous transactions or

16  them being live or not live on September 15, 2008.  This

17  agreement has no bearing on that.

18               Also, his second point was that the similar

19  transactions are covered by this agreement.  They are not.

20  They are not live on September 15, 2008.  They were

21  terminated in April of 2008.  And, therefore, there was no

22  proof of claim submitted by Lehman with respect to that if

23  we ultimately get to the facts of this matter.

24               So he is trying to claim that the erroneous

25  transactions are covered by this document and the similar

Page 112

1    agreements are covered by this document.  Neither is true.

2    Neither is true.  What he is saying is if you pull out the

3    definition of Lehman transactions and Lehman agreement

4    documents in the first recital --

5              THE COURT:  Right.

6              MR. MAHER:  -- and look at nothing else in this

7    agreement, just look at that, telescope in on that, that he

8    can somehow fit the similar transactions into being a Lehman

9    transaction or a Lehman agreement document and, therefore,

10   not have to deal with the rest of this document which says

11   it had to be live on September 15, 2008 for this -- any of

12   this to be applicable.

13             THE COURT:  It had to be live as between LBSF on

14   the one hand and Merrill on the other.

15             MR. MAHER:  Exactly.  That's why the erroneous

16   transactions involving LCH is a complete red herring and has

17   nothing to do with this document.  Once you understand those

18   realities, his argument completely falls away and has zero

19   merit.  It is, in fact, a misleading argument.

20             Turning if I could to the merits of the legal

21   argument on the complaint and their motion to dismiss

22   addressing the release, Your Honor, I understand that you're

23   inclined to consider the release on a motion to dismiss.  I

24   will tell you the distinction between what was referred to

25   as the ironic distinction between Lehman being up here in

Page 113

1      the prior case saying you should consider a settlement

2      agreement on a motion to dismiss.  The distinction, Your

3      Honor, is very important.  In that case the pleading

4      specifically referenced the settlement agreement and,

5      therefore, under clear law the Chambers v. Time Warner case,

6      it is deemed incorporated into the complaint and you can

7      consider it on a motion to dismiss.

8                That's not the situation here.  There's no way

9      under traditional analysis under the Second Circuit's

10     controlling decision in Chambers v. Time Warner that you can

11     consider the motion -- the settlement agreement on a motion

12     to dismiss because it's not referenced in, it's not

13     incorporated in, it's not attached to the pleading.

14               What they say is you can take judicial notice of

15     it.  And there's a dispute about that.  I understand you're

16     inclined to do that, Your Honor.  But you did say --

17               THE COURT:  Well, I don't -- don't read too much

18     into what I said.  I'm still --

19               MR. MAHER:  All of their cases, all of their cases

20     deal with courts being frustrated by recidivate litigants

21     and prisoners who are repeatedly litigating, litigating and

22     they've signed releases, or a class action opt-out party

23     where there's a class action settlement and they're

24     asserting new claims.  They're saying, well, I'm just going

25     to take judicial notice of the general release.

Page 114

1           And there are cases that do say that, Your Honor.

2    But all of them, not one of their cases I'm aware of is a

3    narrow limited release which they're asking you to construe

4    in the guise of giving judicial notice to it on a motion to

5    dismiss.

6           THE COURT:  So isn't it the same thing as if they

7    had moved for summary judgment on the release point?

8           MR. MAHER:  Yes, except we would be entitled to

9    discovery before they did that.  And I would like to know a

10   whole host of things about what happened here and the scope

11   of what the parties knew or didn't know and what was

12   intended by this thing before you would be able to rule on

13   that motion, Your Honor.

14          But that's my point is we should bring that -- we

15   should collect that factual record.  We should bring that

16   factual record to you so you can ultimately make the

17   determination.

18          One further point on the release, Your Honor, they

19   have not cited a single case that says, assuming that you

20   take judicial notice of the settlement agreement, the

21   termination and settlement agreement and, therefore,

22   interpret the scope of it, there's no document -- no case

23   that they have given you that says, it's appropriate to

24   interpret a narrow release under the guise of judicial

25   notice on a motion to dismiss.  We've cited two --

Page 115

1          THE COURT:  Well, I think what they're saying is

2     that I can read and it says what it says and there's no

3     legitimate factual or legal issue that it's -- but that it

4     covers the erroneous transactions.

5          MR. MAHER:  Right.

6          THE COURT:  And what you're saying is -- and what

7     I said to Mr. Roll was that I feel like there are any number

8     of facts that are baked into that determination --

9          MR. MAHER:  Exactly, Your Honor.  Whenever you

10    talk about something is connected to and something is

11    related to, it is very fact-oriented, fact-specific as Your

12    Honor's initial instinct was.  You cannot decide what is or

13    isn't related to without taking into account the context of

14    what's going on.  And what I'm telling you is this agreement

15    has nothing to do with the LCH transactions.  This agreement

16    has nothing to do with the similar transactions.  So how can

17    something that is fictitious be related to something that

18    has nothing to do with these categories?

19          They admit that the erroneous transactions do not

20    fall within the Lehman asserted claims which are the claims

21    that were proofs of claims that were asserted doesn't fit

22    within the Lehman transactions or the Lehman agreement

23    documents --

24          THE COURT:  Well, they say that it does.

25          MR. MAHER:  No.  No.  They say that it does only

Page 116

1    because of the similar transactions.

2              THE COURT:  Correct.  That's exactly right.

3              MR. MAHER:  No.  No.  But they're not saying the

4    fictitious -- the erroneous transactions do, Your Honor.

5    They're not saying that there is any ISDA that relates to

6    that.  They're not saying that there's any --

7              THE COURT:  They're saying --

8              MR. MAHER:  -- trade documents --

9              THE COURT:  -- that there's an ISDA -- that

10   they're saying that the nexus is through the similar

11   transactions because --

12             MR. MAHER:  And --

13             THE COURT:  -- the erroneous transactions mimic or

14   follow the --

15             MR. MAHER:  Right.

16             THE COURT:  -- terms of the similar transactions

17   that, therefore, they fit within the -- those two latter

18   categories.

19             MR. MAHER:  Right.  And in order to make that

20   determination, what counsel has told you is, in their papers

21   and here, they are the same trades.  What factual record do

22   you have to make a determination that they're the same

23   trades, Your Honor?  We've alleged to the contrary.  We have

24   alleged that they're new trades.  They happen to have the

25   same terms, but they're new trades.  They're saying they're

Page 117

1   the same trades; that they're just the reinstated by mistake

2   same trades.  We don't know that.  You don't know that.

3   Nobody knows that.  You can't know it on a motion to

4   dismiss.

5           So his talk about related to, it's none of these

6   categories.  It's related to because the similar

7   transactions are Lehman transactions or Lehman agreement

8   documents, according to him, which I disagree with.

9           And then he's saying, take the leap and say the

10  erroneous transactions are really the similar transactions

11  and, therefore, collapse it all together, Judge, no

12  discovery, no figuring out what happened here factually,

13  that's the end of the story.  You can't do that on a motion

14  to dismiss, Judge.  And that's essentially why you said and

15  came out here and said the interpretation and applicability

16  of the release seems facty (sic).  It does because it is.

17          THE COURT:  Okay.  Let me hear from Mr. Roll.

18          Thank you.

19          By the way, I know that facty (sic) is not a word.

20      (Laughter)

21          MR. ROLL:  Although I -- I've adopted it.

22          THE COURT:  It's a good word, right?

23          MR. ROLL:  It's a very good word.  I love it.

24          Let me just assure Mr. Maher that with respect to

25  his statement that these things came just out of my head, I

Page 118

1    can assure him I'm not that clever.  None of this came out

2    of my head.  It came out of my reading of their pleadings

3    and their opposition papers.

4            LCH, he mentioned LCH.  Your Honor asked me to

5    address LCH.  As I -- and I'm happy to do that.  As I

6    listened to Mr. Maher's presentation it's clear their

7    complaint relates to their separate new transaction,

8    erroneous or not, with LCH.  LCH is not here.  LCH was not

9    named as a party.  That's not our fault.  They could have

10   named them.  And if they're saying that LCH -- that the only

11   thing that stands between them and recovery is getting at

12   that LCH transaction, then LCH is an indispensable party

13   that should have been named.

14           What he's basically saying is they have a problem

15   because they made payments to LCH and those weren't

16   released.

17           THE COURT:  No.  That's not what he's saying.

18   He's saying that the settlement agreement on which you base

19   your argument settles claims between -- settles trades

20   between -- live trades --

21           MR. ROLL:  Right.

22           THE COURT:  -- between LBSF on the one hand and

23   MLCS or other Merrill parties on the other hand, and LCH is

24   not a party to that agreement so, therefore, since the

25   erroneous transaction involved LCH, it could not have been

Page 119

1     released.

2          MR. ROLL:  Then -- and maybe this is a better way

3     for me to have stated it --

4          THE COURT:  Yeah.

5          MR. ROLL:  -- coming up.  Then the remedy is not

6     to sue us.  It's to seek rescission of their agreement, that

7     leg of the notated transaction that constitutes their

8     agreement with LCH.  They didn't do that.  They still have

9     -- they have until the petition date a live transaction with

10    LCH.  We had a live transaction with LCH, too.  It still

11    exists, by the way.  We're still on the hook.

12         So for us to be giving them money, which is what

13    they're asking for and still be on the hook to our

14    counterparty in the face of a live transaction today is

15    also, you know, an equitable point that ought to be

16    considered.  I don't mean to digress, but it -- this point

17    about LCH, it's a lot of --

18         THE COURT:  So isn't that -- I'm a little

19    perplexed.  Might not you bring in LCH as a third party

20    defendant?

21         MR. ROLL:  Why would we?  We're -- we don't have a

22    beef with LCH.  They're the ones who have a beef with LCH.

23    What they're --

24         THE COURT:  Okay.

25         MR. ROLL:  -- complaining about is they gave money

Page 120

1    to LCH and they're alleging LCH gave it to us improperly.

2    And, you know, monies went back and forth between --

3            THE COURT:  Right.

4            MR. ROLL:  -- those two legs a lot.  They're

5    asking for the net amount given to us --

6            THE COURT:  Right.

7            MR. ROLL:  -- by LCH.  That's not money they gave

8    to us.  It's money they gave to LCH.  We have no complaint

9    with LCH.  We still have a live agreement with them.  They

10   don't.  But they say they're owed money.  They should have

11   sought to rescind that agreement instead of suing us.  Who

12   knows if they still can.  I don't know.

13           I think the -- I think that -- the Lehman

14   portfolio was sold by LCH to a third party.  So there's

15   probably some third party out there, some counterparty they

16   could go after.  But that's not -- that's not our concern.

17           Without LCH here, based on what he said, they

18   ought to be dismissed for failure to join an indispensable

19   party.

20           THE COURT:  That's not your --

21           MR. ROLL:  So they --

22           THE COURT:  That's not your motion.

23           MR. ROLL:  That's not our motion.  But I'm saying

24   based on what he's saying, he's creating a whole host of

25   other problems for them.  I'm saying we don't even have to

Page 121

1    get to that because since they have sued us I do think a

2    fair reading of the release language in the agreement does

3    encompass these trades.  It does show an intent to cover

4    these trades because they do mimic the terms of the -- to

5    use their words of the prior transactions.

6              And, you know, he says they -- there were no live

7    trades as of the petition date.  Their complaint describes

8    in great detail, in paragraphs 19, 20 and 21, what the

9    economic terms were.  And millions of dollars in cash moved

10   back and forth because of these live transactions on the

11   petition date.  And it happened to be that LCH was their

12   counterparty by reason of --

13             THE COURT:  Right.  But the settlement agreement

14   covers transactions that were live between the parties to

15   the settlement agreement which is not LCH.

16             MR. ROLL:  And it covers -- well, the release --

17             THE COURT:  And related to.

18             MR. ROLL:  And related to.  And I'm not trying to

19   back away from that.  And related to.  These are clearly

20   related to.  The only way they can tell the story about the

21   erroneous transactions is by telling a story about the

22   related transactions, the similar transactions which

23   supplied -- which were the only source of economic terms for

24   any of these transactions.

25             So all I'm saying -- but it should be sufficient,

Page 122

1    I think, is that the intent of the parties apparent from

2    that broad language, it was to cover something like this in

3    terms of a claim against Merrill.

4            Separately, if they have a complaint about the

5    transaction, the contract they had going with LCH at the

6    time of the petition, their remedy was rescission against

7    that party, not a claim against us.

8            With -- if -- and I could say more on that if Your

9    Honor wishes or I can go to the judicial notice point

10   because Mr. Maher did talk about that.  I do want to make

11   plain that this court clearly can take judicial notice of

12   the settlement agreement.  The cases that Mr. Maher referred

13   to as casting some doubt on that all involve situations

14   where the Court had to engage in some inquiry with respect

15   to whether the document in question was authentic, whether

16   parties had performed other parts of it, things like that.

17   There were facty (sic) kinds of issues with respect to

18   those.

19           In this case -- and -- or to put it differently,

20   but to put it in somewhat more legal terms, they failed the

21   test for judicial notice under Federal Rule of Evidence 201.

22   That rule, which we haven't heard anything about yet, but it

23   governs this ultimately, says a Court may take judicial

24   notice of facts readily ascertainable and that are not --

25   that are not fairly in dispute.

Page 123

1          In this circumstance we have a document that meets

2     that test because it's clear on its face that it's

3     authentic.  It was approved by this Court.  It says what it

4     says, and the only issue is not performance there under or

5     any aspect of the settlement --

6          THE COURT:  It's applicability.

7          MR. ROLL:  It's applicability.  And that's a pure

8     legal question.

9          So judicial notice, I think Mr. Maher used the

10    words, the Courts were frustrated in those other

11    circumstances.  They were frustrated because the documents

12    they were being asked to notice judicially were not Federal

13    Rule of Evidence 201 worthy.  They were not -- they were not

14    without some dispute as to their underlying content or their

15    underlying authenticity.  Here we don't have that at all.

16         I would also note, and this is not insignificant.

17    It does pay to look at these rules once in a while.  Federal

18    Rule of Evidence 201 also says that the Court may take

19    judicial notice of a fact that's otherwise noticeable at any

20    time, at any time, which to me encompasses the 12(b)(6)

21    context wherein it doesn't require summary judgment.

22         And it also says that if the Court is presented

23    with the materials to take judicial notice of a fact that

24    meets the standard, I was actually surprised to be reminded

25    of this, the rule says the Court must take judicial notice

Page 124

1    of it.

2            So I --

3            THE COURT:  Well, I had -- I don't have any issue

4    with the concept of taking judicial notice of a settlement

5    agreement entered in connection with the case.

6            But I do feel that to grant the motion to dismiss

7    here would be to engage in fact-finding and I do not believe

8    that that would be appropriate.  There was a recent case in

9    Residential Capital in which for the first time in eight

10   years Judge Glenn was reversed in circumstances that were

11   not entirely dissimilar to those here that caused me to

12   really think about what it means to grant a motion to

13   dismiss.

14           And here I think, at least for the last hour,

15   you've heard a lot from me about issues that I have

16   identified that I believe do -- would require me to make

17   some factual determinations and, therefore, preclude my

18   granting the motion to dismiss.

19           That being said it may well be perhaps the

20   complaint could have been pleaded a little differently or a

21   little better.  Perhaps there's an additional motion to

22   dismiss that you have.  I don't know what's going to happen

23   next.  But the motion to dismiss that's before me I'm

24   denying.

25           MR. ROLL:  All right.  Your Honor, I saw what

Page 125

1   happened when counsel in a prior case continued to speak

2   after the Court had ruled and I'm not going to make that

3   same mistake.  So --

4              THE COURT:  All right.

5              MR. ROLL:  -- I will simply say thank you.

6              THE COURT:  Thank you very much.

7              MR. ROLL:  Thank you, Your Honor, for your time.

8              THE COURT:  Your arguments were very thoughtful

9   and I appreciate all your preparation and hard work.

10             MR. ROLL:  Thank you, Your Honor.

11             THE COURT:  Will you share an order with each

12  other?

13             MR. MAHER:  Yes, Your Honor.

14             THE COURT:  All right.

15             MR. MAHER:  Thank you very much, Your Honor.

16             THE COURT:  Thank you.

17             I think that concludes the calendar this morning.

18             Thank you.

19       (Recess taken at 12:25 p.m.; resume at 2:08 p.m.)

20             THE COURT:  Familiar faces on both sides today.

21  How are you folks.  Good afternoon

22             ALL:  Good afternoon.

23             THE COURT:  All right.  I'm ready when you are.  A

24  familiar face sitting back there too, how are you, Mr.

25  Neier?

Page 126

1          MR. NAIER:  Good afternoon, Your Honor.

2          MR. REINTHALER:  Your Honor, Richard Reinthaler

3    from Winston and Strawn on behalf of the Defendants,

4    AmeriCredit Financial Services, Inc., AmeriCredit Automobile

5    Receivables Trust 2007 BF, and AmeriCredit Automobile

6    Receivables Trust 2007 DF.  As we mentioned in our papers,

7    we're not here on behalf of the 2005 Trust, which is no

8    longer in existence.

9          With me today is Evan Koster from Hogan and

10   Lovells who is co-counsel, and my partners David Neier who

11   you know and John Schreiber.

12         We're here today, Your Honor, on a case six years

13   after the events in question took place, filed by two Lehman

14   entities that have been in and out of bankruptcy against

15   three auto loan securitization trusts that no longer exist

16   for all intents and purposes, and their sponsor and servicer

17   AmeriCredit.

18         Lehman seeks a judgment requiring the defendants

19   to pay money they never received.  When following Lehman's

20   bankruptcy, they were forced to terminate six interest rate

21   swaps and scrambled to find a ready, willing, and able

22   replacement counter party which was not an easy task in

23   those chaotic days.

24         Lehman, although it had the right to replace

25   itself, didn't do anything at the time to offer its

1    assistance.  It accepted the money that was tendered to it,

2    and then sued us two and a half years later, which was the

3    first time anyone knew that there was a problem.

4           This is at bottom a case of contract

5    interpretation.  It's a complicated contract, and it

6    involves multiple documents, but the principles of contract

7    construction are relatively straight forward, and we've laid

8    them out in our briefs.  But very briefly, these contracts,

9    these three documents for the 2007 Trusts and for the 2005

10   Trust, they have to be read as a whole.

11          The terms of the contracts have to be harmonized

12   wherever possible to avoid inconsistencies, and to try to

13   give meaning to all of the terms.  The Courts thus have a

14   duty to reconcile terms that may at first glance appear

15   inconsistent to avoid rendering any clause superfluous or

16   meaningless.

17          And they have a duty to avoid interpreting a

18   contract in a manner that would be absurd, commercially

19   unreasonable, or contrary to the reasonable expectations of

20   the parties.

21          Now, Lehman doesn't really quarrel with those

22   principles of contract interpretation but argues that the

23   inclusion of a tiebreaker clause, which is their term, in

24   the 2007 swap agreements trumps them all.  Our position is

25   that it doesn't trump anything.  The tiebreaker clause only

Page 128

1    comes into play when all of the other rules of contract

2    interpretation are not of assistance to the Court in

3    reconciling a conflict.

4              You only break the tie when there is a tie, and as

5    I shall explain, and as we explained in our papers, there is

6    no irreconcilable conflict here in the language.

7              Now, we have different language for the 2007 swaps

8    and for the 2005 swap.  And if -- with Your Honor's

9    permission, I'm going to deal with the 2007 swaps first --

10             THE COURT:  Okay.

11             MR. REINTHALER:  -- because that's where the real

12   money lies.

13             And again, with Your Honor's permission, I have

14   brought with me a set of the swap agreements --

15             THE COURT:  So did we.

16             MR. REINTHALER:  A thin set.

17             THE COURT:  A -- okay.

18             MR. REINTHALER:  That is yellow highlighted with

19   all of the language that both sides have cited.

20             THE COURT:  Perfect.

21             MR. REINTHALER:  To make it easier for you.

22             THE COURT:  Read my mind.

23             MR. REINTHALER:  Mr. Schreiber.  And we also have

24   two other documents, one is an early termination timeline,

25   which has all the relevant dates --

Page 129

1            THE COURT:  And Mr. Cohen has the benefit of all

2    of these?

3            MR. COHEN:  Not yet.

4            MR. REINTHALER:  Yes.  Give him one.

5            MR. COHEN:  Thank you.

6            THE COURT:  Thank you.

7            MR. REINTHALER:  So one of them is an early

8    termination timeline which is the heading on it, which is

9    just the relevant dates that events occurred here.

10           THE COURT:  Okay.

11           MR. REINTHALER:  And the other two sheets are

12   decision treaties, one under the 2007 swaps and one under

13   the 2005 swap which lay out, in our view, the way in which

14   those agreements are to be read in the context, in either a

15   default by AmeriCredit --

16           THE COURT:  Okay.

17           MR. REINTHALER:  -- or a default by Lehman.

18           THE COURT:  And now we've got the ISDAs.  All

19   right.

20           MR. REINTHALER:  Everything starts with the 2007

21   ISDA master agreement, and which is a preprinted standard

22   form and you should have that in front of you, Your Honor.

23           THE COURT:  Okay.

24           MR. REINTHALER:  The key provisions in the ISDA

25   master agreement are found in Sections 5, 6 and 14.  Section

Page 130

1   5, and I don't think there's any dispute here, in Section 5

2   it provides for events of default.

3          And Section 5(a)(7)(i)(IV) which is on page 6 of

4   what I handed out, says "That as an event of default where

5   the party," which in this case is LBSF, "institutes or has

6   instituted against it a proceeding seeking a judgment of

7   insolvency or bankruptcy or any other relief under any

8   bankruptcy or insolvency law or a similar law and in the

9   case of any such proceeding or petition instituted or

10  presented against it, such proceeding or petition B) is not

11  dismissed, discharged, stayed or restrained in each case

12  within 30 days of the institution of or presentation

13  thereof."

14         So the event of default provision that was cited

15  by AmeriCredit here in its notice of early termination

16  provided for a 30 day cure period.  Which meant that the

17  earliest date on which AmeriCredit could have declared an

18  event of default is October 15, 2008.

19         Now, we got to Section 6.  Section 6(a) of the

20  ISDA master agreement begins with "If at any time an event

21  of default with respect to a party, the defaulting party has

22  occurred and is then continuing the other party, the non-

23  defaulting party may," says may, "by not more than 20 days'

24  notice to the defaulting party specify in the relevant event

25  of default, designate a day not earlier than the day such

Page 131

1   notice is effective as an early termination date in respect

2   out of all outstanding transactions."

3           So under the language I just read, termination is

4   not automatic, it's optional.  And the non-defaulting party

5   here, AmeriCredit may at any time following that event of

6   default send a notice to the defaulting party, Lehman,

7   designating an early termination date, which may be as early

8   as the date of the notice, or as late as the day 20 days

9   thereafter.  So there's a 20-day window there.

10          In this case, it's undisputed that AmeriCredit

11  sent that notice to Lehman on November 20th.  And it also

12  designated that day and not a later day as the early

13  termination date.

14          We then go to Section 6(d).  In Section 6(d) which

15  is entitled calculations it says, "On or as soon as

16  reasonably practical following the occurrence of an early

17  termination date," so that's on or as soon as practical

18  after November 20 in this case, each party will make the

19  calculations on its part contemplated by Section 6(c) and

20  provide to the other party a statement laying it all out.

21          It's undisputed again in this case, Your Honor,

22  that AmeriCredit performed that calculation and provided it

23  to Lehman on November 21, the following day.

24          You then move to Section 6(d).  Section 6(d) is

25  entitled payments on early termination.  And it states that

Page 132

1    the party shall determine the amount payable pursuant to a

2    payment measure, which is either market quotation or loss,

3    and a payment method either the first method or the second

4    method specified in the schedules.

5              Here, again it's undisputed that the parties in

6    part 1(c) of the schedules for both the 2007 and the 2005

7    swaps elected the second method and market quotation as the

8    default process to be used.

9              This then takes us to the definitions, and if you

10   turn to Section 14, the definition of market quotation on

11   the bottom of page 15 and the definition of loss, which is

12   above that, on their face, these definitions apply

13   regardless of who the defaulting party is.

14             Market quotation means with respect to one or more

15   terminated transactions, an amount determined on the basis

16   of quotations from reference market makers, and reference

17   market makers is defined on the following page to mean four

18   leading dealers in the relevant market having the highest

19   credit rating.

20             So you need to seek market quotations from at

21   least four reference market makers.  Each quotation will be

22   for an amount, if any, that would be paid to such party in

23   consideration of an agreement between such party and the

24   quoting reference market maker to enter into a transaction

25   defined to be the replacement transaction which is an

Page 133

1    important definition, that would have the effect of

2    preserving for such party the economic equivalent of any

3    payment or delivery that would but for the occurrence of the

4    relevant early termination date have been required after

5    that date.

6           So it's clear that Section 6(e) of the ISDA master

7    agreement under the definition of market quotation that I

8    just read would have required had it applied in the context

9    of the 2007 swaps, would've required AmeriCredit to have

10   sought market quotations from at least four referenced

11   market makers for what I will call an apples to apples

12   replacement transaction, which in this case, is a guaranteed

13   balance swap, as opposed to another type of swap.

14          The definition of market quotation then goes on to

15   tell you how to determine the amount payable based on the

16   number of quotations that you receive.  If you receive

17   three, two, or fewer than three, then you're relegated to

18   the loss method, and that's relevant here, Your Honor, only

19   with respect to the 2005 swap because there, there were less

20   -- fewer than three market quotations that were received.

21   And I think everyone agrees that the loss method applied to

22   the 2005 swap, so we'll get back to that later.

23          You next need to then go to the definition of

24   settlement amount, which is on the bottom of page 16, and

25   that's defined to mean, and I'm going to paraphrase, it's

Page 134

1   essentially the amount payable either by or to the

2   replacement counterparty under the market quotation method

3   in our case.

4          So again, it's tied to an apples to apples

5   replacement transaction.  And all of this makes perfect

6   sense because it equates replacement and settlement values.

7   And that is important for trusts like the AFS Trust which

8   are bankruptcy remote vehicles, they have no assets, no

9   recourse, and therefore, they need to have this match.

10         Now, we go to the schedules.  If you'd turn to the

11  schedules for the 2007 swap, Part 1(k) of the schedules is

12  the key, which begins on the bottom of page 4 and carries

13  over to page 6.  Unlike the ISDA master agreement, the

14  schedules for the 2007 swaps are not preprinted forms.  They

15  are arm's length negotiated agreements.

16         Here I want to highlight or focus on the

17  highlighted language in Part 1(k) in which the parties

18  rewrote the process set forth in Section 6 of the ISDA

19  master agreement that we just went through for determining

20  the amount payable upon an early termination, but only where

21  Lehman was the defaulting party.

22         And I don't think Part 1(k) could be any clearer

23  about this, because it begins with "notwithstanding Section

24  6 of this agreement, for so long as party A which is Lehman

25  is the sole affected party or B, the defaulting party in

Page 135

1    respect of any event of default."

2          So as long as Lehman is the defaulting party in

3    respect to an event of default the following shall apply.

4          It then goes on in subparagraphs (i) and (ii) to

5    delete in their entirety and replace the definitions of

6    market quotation and settlement amount.  It deletes --

7          THE COURT:  Hold on.  Hold on one second.

8          MR. REINTHALER:  Yes.

9          THE COURT:  Okay.  Go ahead.

10         MR. REINTHALER:  Okay?

11         THE COURT:  Yep.

12         MR. REINTHALER:  What it does, is it says that the

13   definitions of market quotation shall be deleted in its

14   entirety and replaced with the following.  It doesn't amend

15   the definitions, it deletes them and replaces them in this

16   document with new definitions.

17         And the new definition of market quotations set

18   forth below says, "Where Lehman is the defaulting party,

19   instead of requiring quotes from four leading reference

20   market makers for an apples to apples replacement

21   transaction, all it requires instead is that AFC or

22   AmeriCredit obtain a single firm offer," which is a defined

23   term, which is defined on page 11 in part 5(b)(iv)(D) on

24   page 12.  I'm sorry, it's on page 12, not page 11.  To be an

25   offer which when made was capable of becoming legally

Page 136

1   binding upon acceptance.

2           So going back to the new definition of market

3   quotation, it requires AmeriCredit to obtain a single firm

4   offer for a replacement transaction.  In other words, an

5   apples to apples guaranteed balance (indiscernible).

6           And if you go then to the new definition of

7   settlement amount, which is in (ii) again it deletes the

8   definition in its entirety and replaces it with an entirely

9   new definition that says, "The amount of any market

10  quotation for the relevant terminated transaction that is

11  accepted by party B," which is AmeriCredit, "so as to become

12  legally binding."

13          So, in other words, the settlement amount is the

14  amount of the firm offer that is actually accepted by

15  AmeriCredit for an apples to apples replacement transaction.

16  And those latter words, accepted, it has to be accepted are

17  very important, because it deals with one of Lehman's

18  arguments that I'll get to.

19          THE COURT:  Well, so there's no option to not

20  accept.

21          MR. REINTHALER:  There is an option not to accept

22  it.  Because if you don't get a firm offer and haven't

23  accepted a firm offer by the early termination date, the

24  agreement goes on to explain what happens.

25          THE COURT:  Okay.

Page 137

1          MR. REINTHALER:  That didn't happen here.  There

2     was a firm offer, it was accepted on the early termination

3     date, so we don't need to get into subparagraphs A and B on

4     page 5 in the definition of settlement amount, which talk

5     about how you deal with it in other circumstances.

6          THE COURT:  Okay.

7          MR. REINTHALER:  And again, just like the

8     definitions in the ISDA master agreement where Lehman was

9     the defaulting party, the process that I just described for

10    market quotation with a single firm offer for an apples to

11    apples replacement makes perfect economic sense, because we

12    have to replace the swaps when Lehman defaults; otherwise,

13    there would've been a default under our own notes to our own

14    noteholders.  They had financial ratings that had to be

15    maintained in order to avoid defaults.  So you had to have a

16    reputable swap counterparty, and you have financial

17    guarantors that are sitting there and they're exercising

18    rights of control and looking over your shoulder and making

19    sure that you have hedged completely your interest rate

20    risk.

21          THE COURT:  Just pause --

22          MR. REINTHALER:  Okay.

23          THE COURT:  -- for one second.  Help me out with

24    respect to just the mechanics and the economic incentives or

25    factors that may come to bear when you're in the single firm

Page 138

1   offer mode as opposed to the three or four market quotation

2   mode.

3           In other words, and this might be a naïve or a

4   dumb question, but you all indulge me.  If you're in -- what

5   are the motivations of the party to elicit a firm offer that

6   are more favorable to it and less favorable to the

7   defaulting party or at -- if that's a nonsensical

8   question --

9           MR. REINTHALER:  It -- no, it's not nonsensical.

10  There is no incentive.  AmeriCredit doesn't have an

11  incentive to get a higher or lower bid.  It's the same no

12  matter what, because the economic terms of the swap are

13  required to be essentially the same as the swap that's

14  replacing it.

15          THE COURT:  Right.  But in the other scenario

16  where you're getting different market quotations, right, and

17  the settlement amount is arrived at as a result of those --

18          MR. REINTHALER:  Uh-huh.

19          THE COURT:  -- in that, presumably, there are

20  different numbers.

21          MR. REINTHALER:  Right.

22          THE COURT:  So what I'm -- so against the back

23  drop of their being a requirement of getting a single firm

24  offer, are you picking one and making that a firm offer when

25  you have other choices?

1          MR. REINTHALER:  You can.  You can.

2          THE COURT:  But you're --

3          MR. REINTHALER:  The -- I think I understand the

4     source of the question.  And it does require some

5     understanding of why the language changed --

6          THE COURT:  Okay.

7          MR. REINTHALER:  -- okay.  The language in these

8     agreements changed in 2006 and 2007 which is why we don't

9     have this issue with the 2005 swap.  And it was changed and

10    all you have to do is read what we've cited in our brief,

11    which is Moody's guidelines for swap agreements, and they've

12    explained -- they're trying to make it easier for non-

13    defaulting parties to replace the swaps.

14          So instead of requiring them to go out and get

15    four, they're saying, if you can only get -- you only need

16    to get one instead of four, so you don't have the problems

17    with averaging, we're trying to eliminate the disputes that

18    exist.  We're trying to make it easier for the non-

19    defaulting party to replace because --

20          THE COURT:  So what I'm focusing on is, okay, I

21    get that, that makes perfect sense.

22          MR. REINTHALER:  Uh-huh.

23          THE COURT:  But then there you are, lo and behold,

24    look, there are two market quotations that are out there,

25    and you only have to -- under the ISDA now, the schedule,

Page 140

1    you only have to pick one.  And there's a difference between

2    the two and it's better for you to pick one, but worse for

3    Lehman to pick the other.  Is there an ability to -- I would

4    say game the system, but to select in a way that's to your

5    economic advantage and to the defaulting counterparties

6    economic disadvantage.

7              That's a question, it might be a nonsensical

8    question --

9              MR. REINTHALER:  Uh-huh.

10             THE COURT:  -- but that's what I'm trying to

11   understand.

12             MR. REINTHALER:  Yeah.  And in this case, I don't

13   think that question comports with the facts --

14             THE COURT:  Okay.

15             MR. REINTHALER:  -- because we didn't have two

16   firm offers here.  We only had one, and that was the

17   Wachovia offer, and which didn't become a firm offer until

18   November 20th.

19             THE COURT:  Okay.  So continue my general

20   education here.  What --

21             MR. REINTHALER:  If you have two firm offers, if

22   you've gone out and solicited more than one --

23             THE COURT:  Right.

24             MR. REINTHALER:  -- which you're able to do

25   clearly --

Page 141

1              THE COURT:  Right.

2              MR. REINTHALER:  -- you don't have to go to only

3     one.

4              THE COURT:  Okay.

5              MR. REINTHALER:  And they're identical terms, only

6     one is a higher price than the other, you will have -- I

7     would assume that the non-defaulting party would accept the

8     one that would result in the higher termination payment

9     either to it or by the replacement counterparty to the

10    other.

11             But that's only where the economic terms of the

12    swaps are identical.  If the economic terms of the swaps are

13    not identical --

14             THE COURT:  Because the other one is offering --

15             MR. REINTHALER:  -- because one of them is not a

16    replacement swap on the exact same terms --

17             THE COURT:  Right.

18             MR. REINTHALER:  -- as the one it is --

19             THE COURT:  Right.

20             MR. REINTHALER:  -- you could have a situation

21    where it's more beneficial to one and less beneficial to the

22    other.

23             THE COURT:  Okay.

24             MR. REINTHALER:  There, I think the non-defaulting

25    party has discretion to determine whether or not the

1    different quote --

2              THE COURT:  Uh-huh.

3              MR. REINTHALER:  -- is in fact a firm offer for an

4    apples to apples replacement as opposed to an apples to

5    oranges replacement.

6              THE COURT:  Okay.  All right.

7              MR. REINTHALER:  Which is I think we're getting a

8    little beyond the facts here, but it's really what ended up

9    happening --

10             THE COURT:  Okay.

11             MR. REINTHALER:  -- here with regard to RBS.

12             THE COURT:  Okay.  Keep going, thank you.

13             MR. REINTHALER:  The schedules require it in Part

14   1(k)(ii)(A) which is again on page 5, that the settlement

15   amount which we've now defined, shall be determined no later

16   than the early termination date.

17             In other words, to avail itself of the market

18   quotation method, and this is different from the ISDA master

19   agreement, under the 2007 schedules, AmeriCredit had to

20   solicit offers, and indeed was expressly permitted to accept

21   a firm offer it received prior to the early termination

22   date, because the last date it can accept an offer is on the

23   early termination date.

24             THE COURT:  That's in A?

25             MR. REINTHALER:  That's in (ii)(A).

Page 143

1                 THE COURT:  (ii)(A).

2                 MR. REINTHALER:  Because it says if on the --

3                 THE COURT:  Day following ten business days --

4                 MR. REINTHALER:  -- day following ten business

5       days after the date on which the early termination date is

6       designated or such later date as party B may specify in

7       writing to party A, but this is the critical part in the

8       parens, but in either case, no later than the early

9       termination date.

10                In other words, the last day that you can accept a

11      firm offer is the early termination date.  And that is also

12      the date on which you are to calculate your loss of the

13      settlement amount payable, and then when you make that

14      calculation, you actually have to pay the money out that

15      day.

16                So this is not a process that you can drag out and

17      begin the day you send a notice of early termination.  This

18      expressly contemplates that the parties are going to go out

19      and begin the process of finding a replacement counterparty

20      before declaring the early termination date because

21      otherwise it would be a physical impossibility to do

22      everything necessary to obtain that firm offer, accept it,

23      paper it --

24                THE COURT:  So go over the words with me again.

25                MR. REINTHALER:  Yeah.

Page 144

1          THE COURT:  "If on the day following ten local

2     business days, after the day on which the early termination

3     date --"

4          MR. REINTHALER:  Uh-huh.

5          THE COURT:  "-- is designated."

6          MR. REINTHALER:  Right.

7          THE COURT:  So in other words, you're earlier in

8     the process and you say that's going to be the early --

9          MR. REINTHALER:  No, it's actually later in the

10    process.  Remember, you can --

11         THE COURT:  The day following ten business days --

12    the day on which the early termination date is designated --

13         MR. REINTHALER:  Right.

14         THE COURT:  -- is different from and earlier than

15    the early termination date, correct?

16         MR. REINTHALER:  The early termination date can be

17    the date that you notice it, or it can be up to 20 days

18    later, if you remember.

19         THE COURT:  Right.

20         MR. REINTHALER:  So this is dealing with a

21    situation in which you sent a notice out, let's say on

22    November 1, and designated November 20 as the early

23    termination date.

24         THE COURT:  Right.  Right.

25         MR. REINTHALER:  And this says --

1            THE COURT:  I got it.

2            MR. REINTHALER:  -- if during that 20-day period

3    or within the 10 days --

4            THE COURT:  Right.

5            MR. REINTHALER:  -- before November 20 you accept

6    something.

7            THE COURT:  Okay.  I got it.

8            MR. REINTHALER:  It expressly contemplates that

9    you're going to accept something before the date that you

10   designated as the early termination date.

11           THE COURT:  Okay.

12           MR. REINTHALER:  Okay.  And the final relevant

13   provision in the schedules here is in (iii) in Part 1(k) on

14   page 5, and in an obvious effort to minimize or avoid future

15   disputes, what this clause says is that the non-defaulting

16   party, party B in this case, AFS, shall determine in its

17   sole discretion acting in a commercially reasonably manner

18   whether a firm offer is made in respect of a replacement

19   transaction with commercial terms substantially the same as

20   those of this agreement.

21           Okay.  Provided, however, that notwithstanding the

22   provisions of this Part 1(k), nothing in this agreement

23   shall preclude party A, Lehman, from obtaining market

24   quotations.  Lehman never availed itself of the right to

25   seek market quotations on its own here.

Page 146

1              I did cite finally and I meant -- I should've said

2      there is one other.  If you look at the next page of Part

3      1(1), designation of early termination date.  It says

4      notwithstanding any other provision of this agreement, party

5      B shall not designate an early termination date unless such

6      rating agency has been given prior written notice of such

7      amendment designation or transfer.

8              This is important because, as we explained in our

9      briefs, under the Section 4.5 of each of the insurance

10     indemnity agreements, which govern the financial guarantees,

11     et cetera, the trusts were required to enter into an

12     economically equivalent replacement transaction in form and

13     substance satisfactory to them and to the rating agencies,

14     and the failure to have done so would have constituted an

15     event of default under Section 5.1(n) of those agreements,

16     which would in turn have led to a cascading series of cross

17     defaults in all of AFS's financing agreements.

18             If all we had was the ISDA master agreement and

19     the schedules, I don't think we'd be here today.  Because I

20     don't think Lehman really disputes anything that I've just

21     said in bringing those provisions to your attention.

22             We now have to go into the confirmation.  Like the

23     schedules, the 2007 confirmations were negotiated and

24     executed at the same time as the schedules.  Again, they're

25     not preprinted forms.

Page 147

1          And according to Lehman, the parties inserted a

2    single sentence on the bottom of page 2 into these

3    confirmations that were intended, that was intended without

4    explicitly saying so to delete Part 1(k) of the schedules

5    and replace it with a provision that required AmeriCredit

6    upon a Lehman default to determine the settlement amount not

7    by reference to a single firm offer, for an economically

8    equivalent replacement, but an entirely different animal and

9    fixed amortization swap, which is a swap that everyone

10   concedes would not have satisfied the language in the ISDA

11   master agreement, or the schedules or AmeriCredit's

12   securitization agreements, would not have been acceptable to

13   the financial guarantors or the rating agencies, and would

14   have led to a clear mismatch between the replacement amounts

15   and the settlement amounts, which would've left the trusts

16   which had no assets or wherewithal to make up the difference

17   out of its own money, in an impossible bind.

18          Now, there's so many problems with that

19   interpretation of the language, it's hard to know where to

20   begin, but I think we should begin with the language itself.

21          Preliminarily, though, let's just note that it's

22   hard to believe that parties would have spent the time

23   negotiating at arm's length two plus single spaced pages to

24   insert into the schedules that dealt expressly and

25   explicitly with a Lehman default, only to completely

Page 148

1    displace those pages the same day without explicitly saying

2    so with a single sentence in a confirmation that references

3    Section 6 of the ISDA master agreement, but not Part 1(k) of

4    the schedules.

5             Now, the language that Lehman cites is in a

6    section on page 2, in section 2 entitled notional amount.

7    It's not entitled calculation, it's not entitled payments on

8    early termination.

9             The section begins with a discussion of how the

10   notional amount is to be determined and reset on each

11   distribution date.  And that amount changes in a guaranteed

12   balance swap based on variables, such as prepayments and

13   defaults on the underlying auto loans that are in the pool.

14            Much of the first three paragraphs in this section

15   on notional amount are devoted to a discussion about what

16   happens upon a default on the part of one of the AmeriCredit

17   trusts, resulting in an acceleration event.  Where the

18   underlying notes would become immediately due and payable,

19   thereby reducing the principal balance of the notes to zero.

20            In that event, Lehman has two choices.  It can

21   either terminate the swap or if the swap is in the money, it

22   can allow the swap to proceed with the financial guarantor

23   stepping into AmeriCredit shoes.

24            In either event, the parties would need to know

25   what notional amount to use for purposes of calculating

Page 149

1    either the payments due on future distribution dates, or the

2    amounts payable on termination.

3           And that's where this language and Schedule A

4    which is attached to this comes into play.  Because the

5    stated purpose of Schedule A and the definition of scheduled

6    notional amount which is in that first paragraph is to help

7    Lehman reset the notional amounts following an AmeriCredit

8    default, whether or not it chooses to terminate the swap or

9    continue with it.

10           It's a substitute, it's a surrogate for the actual

11    notional amount that would be easily calculable at each

12    distribution date if the swap continued, if there had been

13    no default, if the principal amount of the notes continued

14    in existence.

15           There's no mention anywhere in this entire section

16    on notional amount of a Lehman default anywhere.  Nor would

17    there need to be, because there's no need to reset the

18    notional amount where Lehman is the defaulting party.  The

19    replacement swap would take care of that.  There's no need

20    to use Schedule A.

21           And therefore, when you read the fourth paragraph

22    here, in the context of what this entire section is doing,

23    and what the first three paragraphs say, the fourth

24    paragraph makes sense.  It says, and I quote, "For purposes

25    of determining the settlement amount in the event of an

Page 150

1   early termination of this transaction pursuant to Section 6

2   of this agreement."

3          It doesn't say pursuant to Section 6 and/or Part

4   1(k) of this agreement.  It only says Section 6.  It

5   continues with, "Notwithstanding anything to the contrary

6   contained in the agreement, market quotation will be

7   determined as if this transaction were a fixed amortization

8   swap transaction with an initial notional amount as of the

9   early termination date equal to the scheduled notional

10  balance."  That's a key term.  "Corresponding to the

11  calculation period in which such early termination date

12  occurs, and amortizing according to Schedule A," also a key

13  phrase in this sentence.  "Subject to adjustment to the

14  scheduled notional amount in accordance with the methodology

15  set forth above."

16         And the methodology set forth above in the two

17  proceeding paragraphs tells you what to do to Schedule A,

18  depending on whether or not the actual notional amount

19  immediately preceding the AFS default was higher or lower

20  than the amount that's on Schedule A.  In one case, you

21  adjust it, in the other, you don't.

22         Again, this sentence makes sense where AmeriCredit

23  is the defaulting party because there, Lehman doesn't have

24  an actual notional amount left that it can use to solicit

25  quotes or to base its calculation of future payments.

Page 151

1          Without that sentence that I just read, Lehman

2    would have been relegated to Section 6 of the ISDA master

3    agreement, because remember the schedules don't apply where

4    AFS is the defaulting party.  And what Lehman would have

5    been required under the language we read earlier, it would

6    have had to go out and try to solicit market quotations from

7    four reference market makers for an apples to apples

8    replacement swap, which is almost a physical impossibility.

9          Because there's no one in the market that's going

10   to be able to, let alone willing to give you a market quote

11   for a replacement transaction with a notional amount of

12   zero.  You just can't do it.

13          And that's where I think the reference to Schedule

14   A and the reference to schedule notional balance in this

15   sentence really tells you what the parties intended.

16   Because the scheduled notional amount, which is defined in

17   the first paragraph is only an amount that is defined where

18   there has been a Lehman -- an AmeriCredit default followed

19   by an acceleration event.

20          Okay.  This sentence doesn't talk about the

21   notional amount, it talks about the scheduled notional

22   balance and the scheduled notional amount, which are defined

23   terms that only apply where AmeriCredit is the defaulting

24   party.

25          And Schedule A as I mentioned only makes sense

Page 152

1    because it's a proxy for what the notional amounts would be

2    where it has actually been reduced to zero.  So in our view,

3    Your Honor, the tie breaker clause here breaks the tie

4    between Section 6 of the ISDA master agreement and this

5    language.  It makes it very clear for the sake of avoidance

6    that this is the way that Lehman would go about pricing a --

7    determining the settlement amount if it decided to terminate

8    the swap following an AmeriCredit default.

9              There's no way that AFS or its noteholders or

10   financial insurers or its rating agencies would've allowed

11   the trust to have entered into a swap that would've created

12   the risk of a mismatch between replacement values and

13   settlement values.  Okay.

14             THE COURT:  So you're -- there's a schedule.

15             MR. REINTHALER:  Yep.

16             THE COURT:  And it's got U.S. -- it's got the

17   notional amount.

18             MR. REINTHALER:  Correct.

19             THE COURT:  But then here it says a fixed

20   amortization swap transaction with an initial notional

21   amount equal to the scheduled notional balance.

22             MR. REINTHALER:  Right.

23             THE COURT:  Where -- how do I find that?

24             MR. REINTHALER:  Okay.  You need to go back to the

25   first paragraph under notional amount.  Where it says

1    that --

2              THE COURT:  Got it, okay.

3              MR. REINTHALER:  Okay.  The notional amount shall

4    reset on each distribution date and will be at all times

5    equal to the outstanding principal balance provided however

6    that if an event of default occurs under Section 5.1 of the

7    indenture, that's an AFS default, that's a trust default,

8    the insurer exercises its rights to declare the notes

9    immediately due and payable.  So there's been an

10   acceleration of the notes by the financial guarantor.  And

11   as a result, the principal balance of the notes is reduced

12   to zero, which is an acceleration event defined.

13             The notwithstanding the foregoing, the notional

14   amount for the calculation period in which such distribution

15   date falls, and for each calculation period thereafter,

16   through and including the termination date, shall mean the

17   notional amount set forth on Schedule A, the scheduled

18   notional amount.  Okay.

19             So this -- the scheduled notional amount is a

20   defined term that only applies --

21             THE COURT:  But in the --

22             MR. REINTHALER:  I know, it says scheduled

23   notional balance.

24             THE COURT:  Yes, okay.

25             MR. REINTHALER:  Okay.  I'll get to that.

Page 154

1            THE COURT:  I just followed what you just said.

2            MR. REINTHALER:  Okay.

3            THE COURT:  Okay.

4            MR. REINTHALER:  The next two paragraphs talk

5    about how you adjust the numbers on Schedule A depending on

6    whether or not immediately prior to the acceleration event

7    the actual notional amount of the notes was either higher or

8    lower --

9            THE COURT:  Uh-huh.

10           MR. REINTHALER:  -- than the number on Schedule A

11   that corresponds with that date.

12           THE COURT:  So --

13           MR. REINTHALER:  If the amount is lower --

14           THE COURT:  Uh-huh.

15           MR. REINTHALER:  -- it's very complicated.

16           THE COURT:  Okay.  But -- so there is no --

17           MR. REINTHALER:  It calls it the note balance

18   notional amount.  They don't define the words scheduled

19   notional balance.

20           THE COURT:  Scheduled notional balance.

21           MR. REINTHALER:  But it is clear from the context

22   that it is the adjusted number from the prior two paragraphs

23   in the one instance in the second paragraph on which you

24   would adjust the numbers on Schedule A where the numerator

25   would be the actual notional amount on the date proceeding

Page 155

1    the acceleration event.  And the denominator would be the

2    number that corresponds to that date on Schedule A, and you

3    would then take that fraction and multiply it on every

4    future distribution date by the number that is shown on

5    Schedule A.

6              THE COURT:  Not to be coy, but then what you're

7    telling me is that whatever very smart person that wrote

8    this document didn't do it perfectly.  Because there's a

9    defined term that is, in fact, not defined, and I have to

10   rely on, although it's not particularly relevant, your

11   explanation.  And where I'm going with that is simply to go

12   into the paragraph that you're saying is crystal clear --

13             MR. REINTHALER:  Your Honor, I've had the benefit

14   of two and a half years of reading this over and over and

15   over again.

16             THE COURT:  You're two and a half years ahead of

17   me.

18             MR. REINTHALER:  So what's clear to me, I agree,

19   may not be clear to everybody else in the room.  But --

20             THE COURT:  I understand your point.  I totally --

21   I absolutely follow your point, you're making them very,

22   very clearly for which I'm grateful.  What I'm focusing on,

23   I understand the point about context, I also understand the

24   point that transactional lawyers tell me all the time that

25   headings don't matter.  But you're going beyond the heading,

Page 156

1    right?

2            MR. REINTHALER:  Oh, I'm definitely going beyond

3    the heading.

4            THE COURT:  You're going beyond the heading.

5            MR. REINTHALER:  I'm talking about what all of

6    this means in context.

7            THE COURT:  In context.

8            MR. REINTHALER:  Because you have to read it in

9    context.

10           THE COURT:  Right.

11           MR. REINTHALER:  And you have to try to discern

12   what the parties' intent was, from reading the language in

13   context.  And not only in this context, but in the context

14   of the three documents, two of which were negotiated and

15   executed simultaneously.  And contain very different

16   language that deal with a default by Lehman.

17           And what I submit, Your Honor, is that if you have

18   sophisticated parties represented by sophisticated counsel,

19   sometimes they do make mistakes.  But defies logic to think

20   that sophisticated parties with sophisticated counsel would

21   have negotiated and including -- included two plus full

22   pages of very explicit language on what you do in the

23   schedules when Lehman defaults, and then to just wipe it all

24   out with a single reference to something that never mentions

25   a Lehman default in the confirmations.

Page 157

1          If they really wanted to do that, they shouldn't

2     have put the language in Part 1(k) in the schedules to begin

3     with.  They could have referenced right in here

4     notwithstanding Section 6 of the agreement and Part 1(k) of

5     the schedules.  They could have explicitly deleted and

6     replaced Part 1(k) in the confirms.

7          THE COURT:  So why was this put in, and why the

8     reference to the fixed amortization swap transaction?  Why

9     was this done?

10          MR. REINTHALER:  Well, Lehman in its complaint

11     says that fixed amortization swaps are more readily

12     available, and it's easier to determine things.  But keep in

13     mind, there's no need to replace something at the time.  And

14     again, the whole method and mode here, everything that's

15     going on at this time in the market, is to try to make it

16     easier for the non-defaulting party to terminate and to

17     figure out what it owes or what is owed to it.

18          And again, in the context of an AmeriCredit

19     default, substituting fixed amortization swap would make it

20     easier, and also it's easier to rationalize why they would

21     do that because they are not required to have an apples to

22     apples replacement swap because they'd never be able to get

23     a bid for it.

24          So here is something they can go to a station --

25          THE COURT:  So this is --

1            MR. REINTHALER:  -- and they can get quotes the

2       same day.

3            THE COURT:  So this would've been --

4            MR. REINTHALER:  At least that's what they

5       represented in the past.

6            THE COURT:  So this would've been a negotiated

7       provision insisted upon by AmeriCredit?

8            MR. REINTHALER:  No.  Again, this is outside the

9       four corners of the complaint, but I think we are in

10      agreement that this language was inserted by Lehman into

11      this agreement.

12           THE COURT:  Okay.  But then I'm confused.  But

13      then why?

14           MR. REINTHALER:  Why?  Because Lehman wants to

15      protect itself in the event of an AFS default.  The last

16      thing on Lehman's mind in 2007 was that it was going to go

17      into bankruptcy a year later.  It was worried about what it

18      should do if its counterparty defaulted.

19           THE COURT:  Okay.

20           MR. REINTHALER:  Okay.  So this -- it's protecting

21      itself.

22           THE COURT:  Okay.

23           MR. REINTHALER:  Which is why I think the

24      schedules make sense, commercial sense from AmeriCredit

25      standpoint with Lehman defaults, and this language makes

Page 159

```
 1    commercial sense to Lehman on AmeriCredit defaults, but it
 2    doesn't make any sense whatsoever if you were to apply it to
 3    a Lehman default.
 4              I can now to move to 2005 swap unless you have
 5    some more questions about --
 6              THE COURT:  Why don't -- it would be helpful for
 7    me to -- for you to pause, and for me to hear the arguments
 8    on the other side.
 9              MR. REINTHALER:  Now, Lehman has an alternative
10    argument on the 2007 swaps, which I can address now or
11    later, they're all --
12              THE COURT:  Why don't you do that.
13              MR. REINTHALER:  Okay.
14              THE COURT:  And then we'll deal with 2007 and then
15    we'll go to --
16              MR. REINTHALER:  Their alternative argument is if
17    you assume that we're right and the schedules control, we
18    nevertheless didn't act in a commercially reasonably way in
19    accepting the one firm offer that we had.  And it's -- this
20    is a breach of contract claim, Your Honor.  This is -- so
21    you have to look at the language in the contract, and if you
22    look at the language in the schedules which I read to you
23    earlier in Part 1(k)(iii) on page 5, it says "For purposes
24    of clause 4 of the definition of market quotation."  So it's
25    only in that limited respect, party B, AmeriCredit shall
```

Page 160

1   determine in its sole discretion acting in a commercially

2   reasonably manner, whether a firm offer is made in respect

3   of a replacement transaction with commercial terms

4   substantially the same as those in this agreement.

5          So the acting in a commercially reasonable manner

6   modifies the exercise of discretion in determining whether a

7   firm offer has been made for an apples to apples

8   transaction.  Now, Lehman says it's got to be more than

9   that, because apples to apples is easy to determine.

10          Well, these are very complicated documents as

11   we've seen, and it says substantially the same.  It doesn't

12   say they have to be identical.  So the swap counterparty

13   gets to propose its terms, and then it's up to the non-

14   defaulting party to make a judgment as to whether it fits

15   neatly within the definition of the firm offer.  That's the

16   exercise of discretion in which it has to act in a

17   commercially reasonable way.  And there's no disagreement in

18   this case that the firm offer that came from Wachovia here

19   was for an apples to apples replacement.

20          Lehman's argument is that commercial

21   reasonableness should be read far more broadly than what it

22   literally says in this contract, and should encompass when

23   they solicit, how many they solicit, and what they do.

24   That's not what this language says.

25          THE COURT:  Well, that was the point of my

Page 161

1    question to you before when you're in firm offer land,

2    right, you're not --

3              MR. REINTHALER:  Right, I'm in firm offer land.

4              THE COURT:  Right.

5              MR. REINTHALER:  And I think --

6              THE COURT:  And not required to get 20 quotes.

7              MR. REINTHALER:  We're not required to get more

8    quotes, and in this case, there was only one firm offer, and

9    it's dated November 20th --

10             THE COURT:  So you can pick up the phone --

11             MR. REINTHALER:  -- and it's attached to the

12   notice.

13             THE COURT:  -- you get a firm offer, and you're

14   saying all that's required is for you to look at that, and

15   determine whether it's --

16             MR. REINTHALER:  Right.  Right.  It says, sole

17   discretion.

18             THE COURT:  Sole discretion.

19             MR. REINTHALER:  I mean, this is really giving

20   wide latitude to the non-defaulting party to make that

21   determination to make again consistent with the goal of

22   trying to make termination easier, simpler, less expensive

23   with fewer disputes going forward.

24             THE COURT:  Okay.

25             MR. REINTHALER:  Okay.  Why don't I stop with

1     that, and then we can do the 2005 --

2              THE COURT:  Sure.

3              MR. REINTHALER:  -- afterwards, and any questions

4     about Bankruptcy Code claims.

5              THE COURT:  Okay.

6              MR. REINTHALER:  Which is why I have Mr. Neier

7     here.  Thank you.

8              MR. COHEN:  Your Honor, may I approach?

9              THE COURT:  Sure.

10             MR. COHEN:  We've done more abbreviated on the

11    ISDA.

12             THE COURT:  Your own charts, how exciting.

13             MR. COHEN:  With the big fonts.

14             THE COURT:  All right.  Very good.  This -- you

15    gave me three copies, Mr. Cohen.

16             MR. COHEN:  I have one for your clerk and --

17             THE COURT:  Okay.  And two for me, excellent.

18    Okay.  But we're going to talk about 2007, right?

19             MR. COHEN:  We are going to talk about 2007 which

20    are at the end of the slides, and so we'll turn you to the

21    right pages as they're relevant.

22             But I think before we start I want to remind

23    myself and everyone that we're here on a motion to dismiss

24    hearing.

25             THE COURT:  Yes.

Page 163

1          MR. COHEN:  We are not here on a summary judgment

2     hearing.  And the response, my reaction when I got

3     AmeriCredit's motion to dismiss and its reply brief, is it

4     chocked full of evidence that is not in the complaint.

5          So before I jump into the 2007 agreement, I just

6     want to remind the Court of the standards that we should be

7     looking at.  When the plaintiff pleads factual content that

8     allows the Court to draw the reasonable inference that the

9     defendant is liable for the alleged misconduct, the motion

10    to dismiss should be denied.

11         The Court must accept as true all factual

12    allegations as set out in the plaintiff's complaint, draw

13    inferences from those allegations in the light most

14    favorable to the plaintiff, and construe the complaint

15    liberally, black letter law, and any ambiguity in the

16    contract at issue must be resolved in favor of the

17    plaintiff.  I think there are cases that stand for that

18    proposition in both their briefs and our briefs.  Those are

19    sort of bedrock principles.

20         THE COURT:  Okay.

21         MR. COHEN:  In order to rule in AFS's favor,

22    though, the Court would have to find that AFS and the Trust

23    neither profited nor obtained any advantage from entering

24    into the Wachovia deal.  What has raised Lehman's flag here,

25    and we've had no discovery on it, is the relationship with

Page 164

1    Wachovia, one of the other facts that shows up in the AFS

2    brief is it's undisputed that Wachovia is the leading swap

3    dealer for this kind of swap in the world.  Therefore,

4    that's where they went.

5           When you look at sole discretion, you have to tie

6    that to commercially reasonable.  There were other bids that

7    were received but were never pursued.  And one of the

8    central themes in the complaint, this one cuts against

9    across both the 2005 and the 2007 transactions, is a stale

10   dated number between October and November when you actually

11   had the termination, the market moved decisively in Lehman's

12   behavior.

13          And while Wachovia or AFS claims it refreshed the

14   number, anybody that we've had look at it, says the number

15   doesn't make any sense, given the market movement.  AFS'

16   only response in the papers, and again, this is all

17   extraneous evidence, none of it is in the complaint is,

18   we're not sophisticated, we're not swap dealers, how should

19   we know.  And I think we're entitled to discovery on those

20   issues before we get to issues like did they operate in a

21   commercially reasonable manner, did they honor the contract.

22          THE COURT:  Well, but that was what I was trying

23   to get at very unartfully, and haltingly when I was focusing

24   on with Mr. Reinthaler the firm offer language.

25          MR. COHEN:  Right.

Page 165

1          THE COURT:  Because as opposed to you get

2     quotations and you draw up a (indiscernible) loan whatever

3     you do, what Mr. Reinthaler said was read the language, it

4     doesn't say anything about what you're saying, stale, old,

5     you get to just pick up the phone, get a firm -- get

6     something that you do your apples to apples, determine that

7     it's a firm offer, and make a determination that that is

8     commercially reasonable in your sole discretion, not that

9     it's the best, not that if you made three more phone calls

10    there would be something better.  See that's --

11          MR. COHEN:  So --

12          THE COURT:  I still may not have it right, but

13    that's what I'm struggling with, because you're going right

14    to what I was thinking about.

15          MR. COHEN:  Exactly.  And I think there are two

16    points to that.  One, I agree that that and Section 1(k) --

17          THE COURT:  Right.

18          MR. COHEN:  -- the going out to four and if you

19    have less than three, reverting to loss.  But we streamlined

20    all of that.

21          THE COURT:  Right.

22          MR. COHEN:  The idea of going out to one it is the

23    new concept.

24          THE COURT:  Right.

25          MR. COHEN:  But the timing of it remains critical

Page 166

1   because we're also constrained by Section 562 of the

2   Bankruptcy Code which says, you have to value this on the

3   termination date or as reasonably practical thereafter if

4   you can't do it on the termination date.  And as we all

5   know, you can't contract around the Bankruptcy Code.

6          Now, there's a safe harbor argument that they make

7   that I think is totally inapposite.  They cite the Michigan

8   Housing Development Authority decision, which had to do with

9   who got to do the calculation --

10          THE COURT:  Right.

11          MR. COHEN:  -- as opposed to when you get to do

12   the calculation.

13          THE COURT:  Right.

14          MR. COHEN:  And there are plenty of cases that

15   deal with when you do the calculation.  And their idea that

16   even if this was safe harbor, this calculation, that you'd

17   throw Section 562 out the window in favor of the contract,

18   would be unprecedented.

19          So that's where the stale baiting comes in.

20          THE COURT:  I got it, okay.

21          MR. COHEN:  And when the market moves

22   significantly in that 30-day period, and they have, as

23   acknowledged, the right, but not the obligation to

24   terminate, so they kicked their date, and the Bankruptcy

25   Code says you have to value on your termination date, you

Page 167

```
 1    can't use the stale number, and you can't say redate this

 2    number, and we're going to use that as the right number.  I

 3    think that's where you fail commercially reasonableness.

 4              I think the other thing that the Court would have

 5    to find as a factual matter is why this provision was put

 6    in.  The Court asked the question sort of in a very broad

 7    way about the intent of the parties.  There's no evidence of

 8    that.  And what you heard is counsel basically telling you

 9    what he thinks makes sense.

10              THE COURT:  Well, I think what he was trying to

11    say was, I agree with you, but I think what he was saying

12    was that to pick up on where you started, you know, an Iqbal

13    versus Twombly kind of analysis --

14              MR. COHEN:  Exactly.

15              THE COURT:  -- it would be implausible to read it

16    any other way of the way that Mr. Reinthaler said it ought

17    to be read.  That's the way I think he tells me to get

18    around your point.

19              MR. COHEN:  Well, and I think we can go back to

20    sophisticated lawyers.  I mean, AFS was represented by Dewey

21    Valentine at the time.  If they wanted Section 6, the

22    confirm to say, in the event of an AFS default they

23    should've written that.  That's not what it says.

24              Let's look exactly at what the contract says.  So

25    I'm on page 7 of the master agreement.  So first of all,
```

1    what it says is, "For purposes of determining the settlement

2    amount in the event of an early termination of this

3    transaction pursuant to Section 6 of the agreement."

4            Now, what we know is Section 1(k) changed the

5    definition of market quotation.

6            THE COURT:  Market quotation.

7            MR. COHEN:  But it didn't strike out Section 6, it

8    just changed the definition of market quotation, and in

9    relevant part, what it did, was it got rid of going out to

10   four, and substituting for one.  That's what it dealt with.

11           So this says, "notwithstanding anything to the

12   contrary contained in the agreement, market quotation will

13   be determined as if this transaction were a fixed

14   amortization swap transaction."  Those are the clear words

15   in the contract.  It says nothing about whether it's an AFS

16   default or a Lehman default.

17           And what counsel would like to do is take the

18   provision, you know, the idea that -- because it doesn't say

19   a Lehman default, therefore, it doesn't apply to a Lehman

20   default, it applies to generally.  That is the way it was

21   written, that is the way it was put in.

22           I think it's agreed by both sides that determining

23   and getting a replacement for a fixed amortization swap is

24   easier than a guaranteed balance swap in terms of speed,

25   efficiency, that's in everybody's interest, if speed and

Page 169

1     efficiency is actually what they're looking for.

2              Now, we heard a lot of argument, I would say

3     evidence or testimony about what rating agencies, what

4     noteholders, what other people would have accepted, and what

5     would have been commercially reasonable at that time in

6     these circumstances, but none of that is evidence.  I think

7     we are at a minimum on this, entitled to discovery because

8     Section 7 or rather the confirm says what it says.  What we

9     have pled is exactly what the complaint says.

10             And you heard 45 minutes, 50 minutes of a walk-

11    through a very complicate convoluted contract which clearly

12    by its own terms contemplated inconsistencies within it

13    because we included language like notwithstanding anything

14    to the contrary contained in the agreement.  If you didn't

15    think there were going to be inconsistencies, you would

16    never need to put language like that in.

17             New York law is very clear, that that language

18    should be respected and enforced.  We think the contract is

19    unambiguous and should be enforced on its terms.  The Court

20    clearly has questions about how the quotes were obtained,

21    what were the parties thinking, how was this negotiated, why

22    was it done, and counsel has given you all kinds of answers,

23    none of which are evidence.

24             We don't think on Section 7 or on the 2007 rather

25    that the plain reading of the contract supports a motion to

1  dismiss.  We think the plain reading of the contract

2  supports our position.  We win.

3          In terms of the timing I think the stale dating

4  goes to the commercial reasonableness and it's a Bankruptcy

5  Code obligation, and that's clearly going to override the

6  contract.

7          THE COURT:  Okay.

8          MR. COHEN:  Okay.

9          THE COURT:  Thank you.  All right.  You can go to

10  2005.

11          MR. REINTHALER:  Before I forget just one

12  postscript --

13          THE COURT:  Yes.

14          MR. REINTHALER:  -- commercial reasonableness only

15  comes into play if the schedules control the process.

16  Because the language is in the schedules.  So he has to be

17  conceding that the confirms don't govern for him to be

18  arguing that there's a commercial reasonableness issue with

19  respect to the 2007 swaps.

20          THE COURT:  I'm not sure about that.  I hear you,

21  but I'm not sure about that.  Let's keep going.

22          MR. REINTHALER:  Okay.  2005, the issues here are

23  a little more straight forward because there's no Part 1(k)

24  and there's no magic as if clause in the confirms for this

25  relatively small swap, which is sort of the tail wagging the

Page 171

1    dog in this case.

2         I think if the 2005 swap were the only issue in

3    the case, we probably wouldn't be here, we would've resolved

4    this a long time ago.

5         So under the 2005 swap, we're governed by the ISDA

6    master agreement again, which would have required

7    AmeriCredit upon the Lehman default to solicit quotes from

8    at least four referenced market makers for an apples to

9    apples replacement.

10        Here, the complaint asserts that we more than met

11   that requirement, because we solicited more than four

12   reference market makers.  We did not receive the minimum of

13   three quotations necessary to determine the early

14   termination payment.

15        So under the ISDA master agreement, everyone

16   concedes that we were required to follow the loss method

17   pursuant to which the settlement amount is defined to mean

18   the amount that the non-defaulting party, AmeriCredit quote,

19   reasonably determines in good faith to be its total losses

20   and costs or gains in which case expressed as a negative

21   number.  The non-defaulting party is given wide berth to

22   make this determination as the definition of loss goes on to

23   make clear that the non-defaulting party may, but not -- but

24   need not determine its loss by reference to quotations of

25   relevant rates or prices for one or more leading dealers in

Page 172

1    the relevant markets.

2            So if we've solicited market quotations, haven't

3    gotten the requisite three, we can still use the ones that

4    we did get if we choose.  We don't have to.  But we can use

5    those for purposes of determining the loss.

6            Here, the 2005 trust determined its loss by

7    reference to the one and only firm offer it received and

8    accepted from Wachovia.  Now, the definition of loss does

9    require the non-defaulting party to determine the loss as of

10   the relevant early termination date, or if that is not

11   reasonably practical, as of the earliest date thereafter,

12   that is reasonably practical.

13           That date here is November 20.  Lehman quibbles

14   with the timing of the Wachovia quote, but in doing so, it

15   must misreads the contract.  The Wachovia offer that AFS

16   accepted, which is attached to the complaint was dated

17   November 20, 2008.  It's Exhibit E to the complaint.

18           Exhibit E to the complaint is the -- begins with

19   the November 21, 2008 notice of calculation of early

20   termination payment that was sent the day after the notice

21   of the declaration of the early termination date.  Attached

22   to that, the third page of Exhibit E is something called

23   Exhibit B to that, which is the firm offer.

24           Quotation date, November 20, 2008, so it's clear

25   from Lehman's own complaint and the documents attached to it

Page 173

1     that the market quotation that it used for the purposes of

2     determining the early settlement amount is, in fact, one

3     that was dated the early termination date.

4              Now, Lehman argues that well, yeah, it might have

5     been dated that date, but it's really a stale number.  It's

6     really a number that Wachovia determined back in October

7     when you initially asked it to submit an indicative offer.

8              It also complains that we acted prematurely in

9     going out into the marketplace before November 20 to solicit

10    bids to try to find out whether we could replace this

11    transaction.  And they argue that the contract required that

12    the trusts seek bids from dealers on or after the early

13    termination date, not before.

14             In other words, their argument is that we were not

15    even entitled prior to November 20 to go out into the

16    marketplace and solicit quotations.  That's not what the

17    master agreement says.  There's nothing in the ISDA master

18    agreement that precluded the AmeriCredit Trust from

19    soliciting quotes before the early termination date as long

20    as the firm offer or the bid that it accepted bore an as of

21    date on or as soon as reasonably practical after the early

22    termination date.  And that's exactly what the offer

23    attached to the complaint does.

24             And again, we talk about common sense, we talk

25    about plausibility.  It is implausible for Lehman to suggest

Page 174

1   that it would've been possible for AmeriCredit to have gone

2   out solicited quotes from four reference market makers,

3   obtain the quotes that it could, compared them, shared them

4   with the rating agencies and the financial guarantors, and

5   with the trustee of the notes, negotiated contracts,

6   determined which of them, if any, were acceptable.  And then

7   realizing they don't have three, to then have to calculate

8   its loss to do it all starting on November 20 when the

9   contract required you not only to determine the settlement

10  loss as of that date, but to actually make the payment that

11  day.  It's impossible.

12          In order to declare an early termination date, you

13  have to have your ducks in a row.  You have to go out before

14  the early terminate date and try to solicit quotes.

15          THE COURT:  So what if -- so you have -- from the

16  time that you've designated an early termination date to the

17  early termination date the maximum period of time is 20

18  days?

19          MR. REINTHALER:  Twenty days.

20          THE COURT:  Okay.  So what's to stop you again,

21  just trying to understand how this actually works, you --

22  it's November 1st, you say my early termination date is

23  November 20th.

24          MR. REINTHALER:  Uh-huh.

25          THE COURT:  What stops if you the market is moving

1    between November 1st and November 20th, yes, you have to

2    have your ducks in order.  So on November 2nd, you get a

3    quote it's not great.  Each day it changes, you get

4    something on November 2nd that's dated as of November 20th,

5    but had you gone back out, it might have been more

6    advantageous to the defaulting party.

7              I might be making this up, and it's reflecting --

8              MR. REINTHALER:  It's an interesting hypothetical,

9    Your Honor, that would apply in a situation where it

10   would've been advantageous to AmeriCredit to have gamed the

11   system so to speak that way.  But here, we weren't talking

12   about money coming from Lehman to us upon termination.

13             Here we were talking about money that Wachovia was

14   going to pay to Lehman.  AmeriCredit wasn't going to be

15   writing a check or receiving a check.  Again, it has no

16   incentive to game the system.  What it does have is it has

17   contractual obligations to its noteholders, and to its

18   financial guarantors to replace this within a certain number

19   of days after it declares a default.

20             THE COURT:  Uh-huh.

21             MR. REINTHALER:  In this case, one of the

22   agreements required 40 days, and the other required -- it

23   took them 60 days from the date they first went out to start

24   locating potential counterparties to actually get a final

25   firm quote dated November 20th.

Page 176

1           I mean, it took that long.  Now, remember, we're

2     in an unprecedented market --

3           THE COURT:  Right.

4           MR. REINTHALER:  -- where there's chaos.

5           THE COURT:  Chaos, right.

6           MR. REINTHALER:  And the financial guarantors and

7     the rating agencies are being swamped with hundreds or

8     thousands of early termination notices.  And they don't have

9     the personnel to deal with them.  I mean, this is not

10    something that could have been done overnight under those

11    extraordinary conditions under which people were living at

12    the time.

13          So what is -- so that really makes Lehman's

14    argument boil down to, well, the November 20 quote, if it is

15    a quote as of that date, is stale because it's so similar to

16    and so close to the amount that you provided earlier.  And

17    in the intervening period, there has been a change in live

18    or rates that should have worked according to them to result

19    in a higher settlement amount being paid to them.

20          So they say that either we accepted a stale quote,

21    or we needed to go out and resolicit people because of the

22    change in interest rates.  But the non-defaulting party has

23    no way of knowing why Wachovia or others priced their

24    replacement swaps the way they do.

25          There were all kinds of things happening in the

Page 177

1    market here.  Wachovia, I mean, the reference market makers

2    were under financial stress tests.  Some of them were not

3    quoting for replacements at all.  You had the automobile

4    industry was in chaos at the time, and AmeriCredit's own

5    financial ratings were under serious stress.  There are a

6    lot of things that go -- get factored into how much someone

7    is willing to pay to replace Lehman as a swap counterparty

8    here.

9            So I don't think you can just simply take one

10   isolated factor that could've influenced swap prices on a

11   given day as Lehman has done, to the exclusion of all

12   others, and say, ah-ha, that means that the November 20

13   offer really isn't the November 20 offer when it's dated

14   that on its face.

15           Lehman argues that the Wachovia offer was below

16   market.  But it was the only offer.  By definition, it was

17   the market.  It's not a situation where on November 20

18   AmeriCredit was sitting with multiple quotations.  The only

19   one it had is the one that it attached.  It was the only

20   game in town, and it could ill afford on November 20, given

21   its obligations under its other documents to lose the bird

22   in the hand before it flew away.  I mean, it really had to

23   accept that offer then or it was in serious risk of not

24   being able to accept any offer, and therefore, it would've

25   started this cascading series of defaults.

Page 178

1             Why don't I turn this now over.

2             THE COURT:  Yes, thank you.

3             MR. REINTHALER:  Okay.

4             MR. COHEN:  One more thing before I go to 2005, I

5    want to address.  The alleged concession that I made that

6    the confirm doesn't control the 2007, my point was, the

7    confirm was not inconsistent with the Schedule 1(k), because

8    what 1(k) does is it takes out four and puts in one.

9             THE COURT:  Understood.

10            MR. COHEN:  And we concede that.

11            THE COURT:  All right.  So 2005.

12            MR. COHEN:  So 2005 is really the timing issue.

13   And without getting into evidence, and I think counsel did a

14   lot with respect to 2005, I'd like the Court to think

15   hypothetically that the live or rate fell from 4.18 to 1.39

16   in the period between October 13th and November 20th.  And

17   it is strange credulity to suggest that AmeriCredit which is

18   a sophisticated financial entity didn't appreciate that that

19   would have an impact on the obligation.

20            It also strains --

21            THE COURT:  But what if they did?  What if they

22   did and if the contract enabled to ignore that?

23            MR. COHEN:  I don't think the contract does enable

24   them to ignore that, because it has to be commercially

25   reasonable, and the market undertook a massive move during

Page 179

1    that period.  I also thought that the choice of words that

2    what had to be accepted or a date as of the early

3    termination date is interesting.  It doesn't have to bear

4    the date as of the early termination date, it has to be an

5    evaluation as of the early termination date.

6            So the fact that it may say November 20th if it's

7    an October 15th valuation that doesn't pass the test.  The

8    other issue --

9            THE COURT:  Well, the language -- we're in the

10   ISDA, and we're in the definition of loss, right?  Because

11   there --

12           MR. COHEN:  Right.

13           THE COURT:  -- weren't multiple quotations.  And

14   the sentence says, "A party will determine its loss as of

15   the relevant early termination date or if that is not

16   reasonably practical, as of the earliest date thereafter,"

17   so that doesn't apply.  "A party may, but need not determine

18   its loss by reference to quotations of relevant rates or

19   prices from one or more leading dealers in the relevant

20   markets."  That's what you're focusing on?

21           MR. COHEN:  That is.  And what my argument is that

22   when you terminate on November 20th and October 15th rate is

23   not a relevant rate.  The ISDA and the Bankruptcy Code make

24   crystal clear that it is on the termination date, or if, for

25   example, on September 11th when the markets were closed, the

Page 180

1    stock market shutdown, you couldn't get dates as soon as

2    reasonably practical thereafter.

3         I mean, given your experience in the Lehman case,

4    and your experience with derivatives, I think you've seen

5    that people were able to function in these markets.

6         You know, one of the arguments that we heard is,

7    well, the Wachovia number may have stayed the same because

8    there's all kinds of factors, and it's not just live or.

9    Well, that to me suggests you need discovery on that too,

10   and that's expert discovery.  We believe that that was the

11   largest driver, they have suggested a parade of other things

12   that it might have been, but have not identified them.

13        THE COURT:  Are you also implicating the fact that

14   the definition recites that the loss must be determined in

15   good faith?

16        MR. COHEN:  Correct.  And moreover, there's a more

17   fundamental problem is we heard all kinds of reasons that

18   AmeriCredit said it couldn't possibly comply with the

19   literal terms of the contract, which to me sounded like

20   conceding a breach.  But at a minimum what they were

21   supposed to do when they set the early termination date of

22   November 20th was go out to the market and attempt market

23   quotation and reach out to four dealers then, and they

24   didn't.

25        And their explanation is, you know, it took us 60

Page 181

1  days to put this together, which there's no evidence of

2  that, and we would've lost the bird in the hand.  There's no

3  evidence of that.

4          So what you've got here is a failure to follow the

5  market quotation process and admission here, that they were

6  unable to follow the terms of the contract that they agreed

7  to using what we believe to be an outdated number by months,

8  which had an in excess of $14 million move on the money that

9  Lehman would have received just by that alone, and all of

10 that ties into lack of good faith, not commercially

11 reasonable.

12         I mean, good faith at a minimum attempted them --

13 required them to attempt to comply with the contract.  And

14 what's clear with respect to the 2005 transaction is they

15 just threw it out the window.

16         THE COURT:  Okay.  Thank you.  Mr. Reinthaler, any

17 last thoughts?

18         MR. REINTHALER:  May I ask Mr. Neier to address

19 the 562 argument --

20         THE COURT:  Okay.

21         MR. REINTHALER:  -- if that's okay.

22         THE COURT:  Yes, but briefly.  I think we've --

23 it's well covered in the papers.

24         MR. NEIER:  Good afternoon, Your Honor, David

25 Neier --

Page 182

1          THE COURT:  Good afternoon, Mr. Neier.

2          MR. NEIER:  -- on behalf of AFS.  I think it is

3    well covered in our papers.  Mr. Cohen said that you can't

4    contract around the Bankruptcy Code --

5          THE COURT:  Right.

6          MR. NEIER:  -- but, of course, Section 560

7    specifically allows you to sign a contract notwithstanding

8    anything in the Bankruptcy Code with respect to how you net

9    out, offset, or terminate a swap agreement.  So it's pretty

10   -- and Judge Peck ruled in this case that in fact Section

11   560 allows you to precisely ignore the Sections in 562 to

12   allow you -- for parties to contract their way and find

13   their own method of termination of a swap agreement.

14          So that's really all I can add on that point.

15          THE COURT:  Okay.  All right.

16          MR. NEIER:  This is, as Mr. Reinthaler has said, a

17   breach of contract case.

18          THE COURT:  Right.

19          MR. NEIER:  It's not a Bankruptcy Code case.

20          THE COURT:  Mr. Cohen, anything more?

21          MR. COHEN:  No, Your Honor.

22          THE COURT:  Okay.  All right.  Thank you very

23   much.  You've given even more to think about than I had

24   before I came out this afternoon.  So we will be back to you

25   in due course.  Thank you very much.

Page 183

1          (Proceedings concluded at 3:35 PM)

2                                    *   *   *   *   *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3                      RULINGS

 4     DESCRIPTION                           PAGE        LINE

 5     Doc #44848 Motion for Relief from Stay and

 6     Injunction Provided Under Plan filed by

 7     Elizabeth Berke-Dreyfuss on behalf of Coleen

 8     Denise Colombo, Isabel Guajardo, Linda

 9     Howard-James, Cheryl McNeil, Michelle

10     Seymour, Sylvia Vega-Sutfin              37           3

11

12     Doc #46173 Motion to Designate Diaz Reus &

13     Targ, LLP as Agent for Receipt of All

14     Distributions and Honor Change of Address

15     in the LBHI and LBI Proceedings          --          --

16

17     Adversary Proceeding: 08-01420-scc Lehamn

18     Brothers Inc. Doc #9737 Motion to Impose

19     Automatic Stay/Trustee's Motion for an Order

20     Enforcing the Automatic Stay with Respect to

21     a Civil Action Commenced by Barbara Newman

22     Against the Debtor Pending Before the United

23     States District Court for the District of

24     Massachusetts                            44          15

25
```

```
 1                      I N D E X

 2

 3                       RULINGS

 4   DESCRIPTION                      PAGE      LINE

 5   Adversary Proceeding: 14-02030-scc Lehman

 6   Brothers Special Financing, Inc. v. Merrill

 7   Lynch Capital Services, Inc. Doc #8 Motion

 8   of Merrill Lynch Capital Services, Inc. To

 9   Dismiss Complaint (related document(s)5)      124        23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 186

1                    C E R T I F I C A T I O N

2

3    We, Sherri L. Breach and Sheila Orms, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri L          Digitally signed by Sherri L Breach
                        DN: cn=Sherri L Breach, o, ou,
7    Breach            email=digital1@veritext.com, c=US
                        Date: 2014.10.08 16:01:51 -04'00'
8

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13

14   Sheila            Digitally signed by Sheila Orms
                        DN: cn=Sheila Orms, o, ou,
                        email=digital1@veritext.com,
15   Orms              c=US
                        Date: 2014.10.08 16:02:27
16                      -04'00'

     Signature of Approved Transcriber

17

18

     Veritext

19

     300 Old Country Road

20

     Suite 330

21

     Mineola, New York 11501

22

23

24     Date: October 8, 2014

25

[& - 45446]                                                                    Page 1

**&**

**&**   2:7 12:2,3,10,11
12:18 13:1,10,12
14:1,10,17 15:1
16:6 38:8 43:3,7,20
44:23 71:24 81:21
184:12 186:10

**0**

**02:00**   11:6
**08-01420**   2:11 5:6
5:10,14,18 6:1,7,14
6:18,22 7:1,5,11,15
7:19 8:1,6,12,16,22
9:1,5,9,15,20 10:1,5
10:10,16,22 11:1
184:17
**08-13555**   1:3
**09**   17:24

**1**

**1**   10:20 69:17 70:1
79:25 132:6 134:11
134:17,22 142:14
144:22 145:13,22
146:3 147:4 148:3
150:4 157:2,4,6
159:23 165:16
168:4 170:23 178:7
178:8
**1.39**   178:15
**10**   11:12 145:3
**10,000**   17:20
**100**   14:3 24:12
30:21
**10004**   12:21
**10019**   13:23
**10022**   13:4
**10036**   14:13 15:4
**10110**   14:20
**10153**   12:5
**10:13**   1:18
**11**   82:3 100:20
135:23,24
**11-02403**   11:7
**1100**   13:22
**11501**   186:21

**1155**   14:12
**11th**   179:25
**12**   69:12 123:20
135:24,24
**1211**   15:3
**124**   185:9
**12:25**   125:19
**12th**   14:19 54:5
59:19,22,23 60:4
**1300**   12:12
**1330**   13:22
**13th**   178:16
**14**   11:10 129:25
132:10 181:8
**14-02021**   4:17
**14-02030**   2:22
185:5
**14-02095**   2:18
63:14
**14-02234**   4:22
**14-02236**   5:1
**15**   4:19 105:24
109:3,15 111:16,20
112:11 130:18
132:11 184:24
**15th**   108:22 109:9
109:21 179:7,22
**16**   133:24
**1600**   13:14
**17th**   48:12 55:8
**19**   84:1 121:8
**1999**   13:14
**1st**   174:22 175:1

**2**

**2**   79:25 105:20
147:2 148:6,6
**20**   80:22 84:1,1 89:8
121:8 130:23 131:8
131:9,18 144:17,22
145:2,5 161:6
172:13,17,24 173:9
173:15 174:8,17
176:14 177:12,13
177:17,20
**20005**   12:14
**2001**   83:10 89:25

**2004**   3:4,18 80:23
**2005**   126:7 127:9
128:8 129:13 132:6
133:19,22 139:9
159:4 162:1 164:9
170:10,22 171:2,5
172:6 178:4,11,12
178:14 181:14
**2006**   139:8
**2007**   47:8,11 48:12
61:2,10 126:5,6
127:9,24 128:7,9
129:12,20 132:6
133:9 134:11,14
139:8 142:19
146:23 158:16
159:10,14 162:18
162:19 163:5 164:9
169:24 170:19
178:6
**2008**   47:9 59:9
60:12 62:15 82:19
83:4 84:22 85:12
88:24 105:21
107:17 108:22
109:3,9,15,22
111:16,20,21
112:11 130:18
172:17,19,24
**201**   122:21 123:13
123:18
**2011**   89:25
**2012**   90:6
**2014**   1:17 45:6
186:24
**2079**   13:15
**20th**   131:11 140:18
161:9 174:23 175:1
175:4,25 178:16
179:6,22 180:22
**21**   84:1 107:23
121:8 131:23
172:19
**21487**   3:21
**21488**   3:21
**22605**   3:13

**22nd**   69:4
**23**   185:9
**2:08**   125:19
**2nd**   14:3 175:2,4

**3**

**3**   80:1 109:10
184:10
**30**   130:12,16 166:22
**300**   186:19
**31**   60:12 62:15
**31st**   47:9 59:9
**330**   186:20
**33131**   14:5
**3400**   14:4
**35**   69:4
**350,000**   45:1,12,21
50:6,11,24 53:16
54:24 55:1,24 57:11
61:9
**35787**   3:1
**36874**   3:4
**37**   184:10
**37168**   3:7
**38050**   3:10
**39348**   3:13
**397**   186:11
**39898**   3:16
**3:35**   183:1

**4**

**4**   80:1 134:12
159:24
**4.18**   178:15
**4.2**   30:7
**4.5**   146:9
**4.6**   29:24
**40**   175:22
**42105**   3:23
**42516**   3:20
**44**   184:24
**44450**   4:7
**44488**   4:4
**44489**   4:1
**44848**   2:1 184:5
**45**   169:10
**45446**   4:11

**45448**  4:14
**46173**  2:7 184:12

**5**

**5**  2:25 27:11,16,20
  30:13 129:25 130:1
  130:1,3 135:23
  137:4 142:14
  145:14 159:23
  185:9
**5.1**  146:15 153:6
**50**  169:10
**500**  14:19
**546**  90:15,22 104:9
  104:12,13
**560**  182:6,11
**562**  166:1,17 181:19
  182:11
**599**  13:3

**6**

**6**  123:20 129:25
  130:3,19,19 131:14
  131:14,19,24,24
  133:6 134:13,18,24
  148:3 150:1,3,4
  151:2 152:4 157:4
  167:21 168:3,7
**60**  82:11 175:23
  180:25
**6758**  5:11

**7**

**7**  1:17 29:15 130:3
  167:25 169:8,24
**7012**  69:12
**7056**  69:17 70:1,13
  78:19
**7056-1**  64:15
**7382**  5:7
**7666**  5:15
**767**  12:4
**795**  30:6 31:22,25
**795,000**  27:15 29:14
  31:8,18
**7th**  27:13

**8**

**8**  2:24 185:7 186:24
**80**  67:8,10
**8428**  5:19
**8483**  6:2
**8533**  6:8
**8567**  6:15
**8858**  6:19
**8966**  6:23

**9**

**90**  68:2
**900**  12:13
**9006**  10:20
**9013**  7:2
**9016**  3:18
**9059**  7:6
**9161**  7:12
**9257**  7:16
**9394**  7:20
**9442**  8:2
**94604**  13:16
**9470**  8:7
**9478**  8:13
**9482**  8:17
**9525**  9:2
**9529**  8:23
**9530**  9:6
**9583**  9:10
**9584**  9:16
**9601**  9:21
**9605**  10:2
**9658**  10:6
**9667**  10:11
**9712**  10:17
**9736**  10:23
**9737**  2:12 44:1
  184:18
**9744**  11:2

**a**

**aaert**  186:10
**abbreviated**  162:10
**abide**  79:15
**ability**  25:4 79:10
  100:24 140:3
**able**  45:9 47:1
  48:18 56:1,2 70:3

79:15 99:20 114:12
  126:21 140:24
  151:10 157:22
  177:24 180:5
**abounds**  106:8
**absolutely**  24:9
  49:15 61:17 75:8
  83:3 94:16 155:21
**absurd**  127:18
**acceleration**  148:17
  151:19 153:10,12
  154:6 155:1
**accept**  82:21,22
  85:8 100:12 136:20
  136:21 141:7
  142:20,22 143:10
  143:22 145:5,9
  163:11 177:23,24
**acceptable**  40:20
  147:12 174:6
**acceptance**  136:1
**accepted**  27:19 60:6
  61:7 72:4 127:1
  136:11,14,16,16,23
  137:2 169:4 172:8
  172:16 173:20
  176:20 179:2
**accepting**  159:19
**accommodate**
  26:16
**account**  94:12 97:9
  115:13
**accounts**  6:12 7:9
**accurate**  186:4
**accustom**  72:22
**achieved**  68:5
**acknowledge**
  109:12
**acknowledged**
  166:23
**act**  159:18 160:16
**acted**  173:8
**acting**  145:17 160:1
  160:5
**action**  2:14 22:7
  33:10 34:22 35:1,18
  36:9,24 37:5 43:24

44:6,13 64:11 82:15
  89:11 113:22,23
  184:21
**actions**  36:3,6 90:17
  90:21 95:23
**active**  61:1
**actors**  35:20
**acts**  35:21,23 84:10
**actual**  66:9 67:22
  68:18 88:2 90:12,20
  91:7 94:5 98:21
  106:7 107:9 149:10
  150:18,24 154:7,25
**adam**  13:7
**add**  29:3 32:19
  41:15 182:14
**addition**  39:10
**additional**  19:20
  20:2 79:19 124:21
**address**  2:9 29:10
  43:8,12 60:20 110:7
  118:5 159:10 178:5
  181:18 184:14
**addressed**  78:10
**addresses**  24:2
**addressing**  112:22
**adequately**  91:10
**adjournments**
  43:12
**adjudicate**  25:5,8
**adjust**  150:21 154:5
  154:24
**adjusted**  154:22
**adjustment**  150:13
**administration**
  65:4 80:6
**administrator**  41:4
  41:23 42:1,3,4,9
  63:14 64:24 65:5
  66:18 67:12 68:1
**administrator's**  4:1
  4:4 27:3
**admission**  93:22,22
  94:10,12 98:16
  99:25 108:9,12
  110:22 181:5

**admit** 84:5 102:25
115:19
**adopted** 117:21
**adr** 45:5
**advantage** 140:5
163:23
**advantageous**
175:6,10
**adversary** 2:11,18
2:22 4:17,22 5:1,6
5:10,14,18 6:1,7,14
6:18,22 7:1,5,11,15
7:19 8:1,6,12,16,22
9:1,5,9,15,20 10:1,5
10:10,16,22 11:1,7
11:10,11 42:18
63:13,16 82:1
184:17 185:5
**advocacy** 98:12
**advocate** 79:5
**afc** 135:21
**affidavit** 55:15
**affiliates** 12:3,11
**afford** 177:20
**afs** 134:7 145:16
150:19 151:4 152:9
153:7 158:15
163:22 164:1,13
167:20,22 168:15
172:15 182:2
**afs'** 164:15
**afs's** 146:17 163:21
**afternoon** 125:21
125:22 126:1
181:24 182:1,24
**agencies** 146:13
147:13 152:10
169:3 174:4 176:7
**agency** 146:6
**agenda** 38:6 42:15
43:4,6,9,13,17,22
**agent** 2:8 184:13
**aggregate** 32:6
**ago** 89:17 171:4
**agree** 29:17,19 36:2
36:2 42:1 69:5
73:16 77:13 78:5

79:17,21 155:18
165:16 167:11
**agreeable** 72:13
73:4
**agreed** 77:23 81:7
100:13 168:22
181:6
**agreeing** 40:10
78:17
**agreement** 50:14
53:18 60:10 69:2
72:2 78:13 79:9
82:5 83:10 90:9,18
94:3 95:9,16 96:13
97:3,14,23 100:17
100:17 101:4,7,16
102:15,18,23
103:15 107:17
108:15,18,19,24
109:6,10,14,18
110:2,15,21 111:17
111:19 112:3,7,9
113:2,4,11 114:20
114:21 115:14,15
115:22 117:7
118:18,24 119:6,8
120:9,11 121:2,13
121:15 122:12
124:5 129:21,25
130:20 132:23
133:7 134:13,19,24
136:24 137:8
142:19 145:20,22
146:4,18 147:11
148:3 150:2,4,6
151:3 152:4 157:4
158:10,11 160:4
163:5 167:25 168:3
168:12 169:14
171:6,15 173:17,18
182:9,13
**agreements** 65:19
95:14 109:7 112:1
127:24 128:14
129:14 134:15
139:8,11 146:10,15
146:17 147:12

175:22
**agrees** 133:21
**ah** 177:12
**ahead** 20:18 43:18
60:8 73:22 135:9
155:16
**al** 2:19,19 4:18,18
4:24 11:8,9 16:18
**alive** 95:8 103:3
109:3
**allegation** 45:25
46:8
**allegations** 103:21
106:6 163:12,13
**allege** 68:8 105:24
**alleged** 82:16 104:3
105:19,20 116:23
116:24 163:9 178:5
**allegedly** 35:20
**alleges** 82:20,25
**alleging** 120:1
**allow** 3:16 6:3,10
7:8 8:8,18 10:12
70:14 148:22
182:12
**allowed** 9:12 18:16
30:9,18 66:23 67:1
67:9 109:16 152:10
**allowing** 42:13
**allows** 163:8 182:7
182:11
**alternative** 4:7
159:9,16
**ambiguity** 99:11,14
99:16,19 163:15
**ambiguous** 99:7,8
99:17
**amend** 61:23
135:14
**amendment** 146:7
**america** 82:4 89:24
100:19,20
**americas** 13:22
14:12 15:3
**americredit** 11:8
126:4,4,5,17 129:15
130:15,17 131:5,10

131:22 133:9
135:22 136:3,11,15
138:10 142:19
147:5 148:16,23
149:7 150:22
151:18,23 152:8
157:18 158:7,24
159:1,25 171:7,18
173:18 174:1
175:10,14 177:18
178:17 180:18
**americredit's**
147:11 163:3 177:4
**amortization** 147:9
150:7 152:20 157:8
157:11,19 168:14
168:23
**amortizing** 150:12
**amount** 29:16 30:18
33:7 36:25 39:19
47:13,13 54:10,11
56:22,23 61:2,3
66:23 74:14 75:12
75:12 78:11 84:20
89:7 111:8 120:5
132:1,15,22 133:15
133:24 134:1,20
135:6 136:7,9,13,14
137:4 138:17
142:15 143:13
147:6 148:6,10,11
148:15,25 149:6,11
149:13,16,18,25
150:8,14,18,20,24
151:11,16,17,21,22
152:7,17,21,25
153:3,14,17,18,19
154:7,13,18,25
168:2 171:17,18
173:2 176:16,19
**amounts** 6:3 8:8,18
9:12 10:12 67:9
74:14 147:14,15
149:2,7 152:1
**analysis** 100:1
113:9 167:13

**analyzed**  21:6
**analyzing**  33:1
**animal**  147:8
**annual**  41:22
**annually**  42:5
**answer**  17:13 31:20
  50:10,10 51:3 88:1
  88:2 100:12,13
  103:12 105:13
**answered**  68:22
**answers**  169:22
**anybody**  38:13
  44:11 164:14
**anymore**  51:13
**anytime**  20:20
**anyway**  35:14 71:13
**apologize**  20:25
**apparent**  98:20
  122:1
**appeal**  17:17,18
**appear**  34:1 42:13
  127:14
**appearance**  16:17
**appeared**  82:2
**appearing**  15:8
  38:11 72:14 81:22
  81:25
**appears**  89:2
**apples**  133:11,11
  134:4,4 135:20,20
  136:5,5,15,15
  137:10,11 142:4,4,4
  151:7,7 157:21,22
  160:7,7,9,9,19,19
  165:6,6 171:8,9
**applicability**  91:20
  92:5 93:10 117:15
  123:6,7
**applicable**  54:13
  60:19 109:14
  112:12
**application**  3:4 8:20
  23:4 72:6
**applied**  133:8,21
**applies**  91:23 99:18
  153:20 168:20

**apply**  66:5 132:12
  135:3 151:3,23
  159:2 168:19 175:9
  179:17
**applying**  109:19
**appreciate**  20:11
  22:17 25:10 37:20
  37:21 38:21 61:18
  125:9 178:18
**approach**  36:8 85:9
  162:8
**appropriate**  16:22
  36:10 45:11 74:24
  76:25 98:9 114:23
  124:8
**approval**  96:3
  101:4
**approved**  123:3
  186:16
**april**  41:20 45:6
  83:4 107:17 111:21
**arbitrate**  17:15
**arbitration**  17:16
**argue**  173:11
**argues**  127:22
  173:4 177:15
**arguing**  170:18
**argument**  51:20,22
  51:23 56:25 85:8
  112:18,19,21
  118:19 159:10,16
  160:20 166:6 169:2
  173:14 176:14
  179:21 181:19
**arguments**  61:12
  125:8 136:18 159:7
  180:6
**arising**  96:24 97:2,3
  97:5 102:15
**arm's**  134:15
  147:23
**arose**  103:7,8,8
**arrangement**  84:21
**arrived**  77:22 96:21
  138:17
**articulated**  21:20
  61:13 77:14

**ascertainable**
  122:24
**aside**  88:23
**asked**  76:13 118:4
  123:12 167:6 173:7
**asking**  18:17 19:16
  19:17 56:9,11 76:12
  86:19 114:3 119:13
  120:5
**aspect**  123:5
**assert**  61:23
**asserted**  89:11
  96:24 100:22
  101:16 102:4
  110:12 111:7
  115:20,21
**asserting**  91:5
  113:24
**asserts**  82:14
  171:10
**assets**  134:8 147:16
**assist**  19:15 24:11
**assistance**  127:1
  128:2
**association**  4:24
  65:20
**assume**  53:14 141:7
  159:17
**assumed**  30:2
**assuming**  62:10
  105:19 114:19
**assumptions**  104:23
  104:23
**assure**  117:24 118:1
**attached**  53:5 59:4
  65:21 69:19 87:23
  113:13 149:4
  161:11 172:16,21
  172:25 173:23
  177:19
**attempt**  180:22
  181:13
**attempted**  181:12
**attention**  97:25
  146:21
**attorneys**  12:3,11
  12:19 13:2,11,21

14:2,11,18 15:2
**authentic**  122:15
  123:3
**authenticity**  123:15
**authority**  166:8
**authorize**  41:23
**auto**  126:15 148:13
**automatic**  2:12,13
  28:1 43:24 44:13
  67:2 76:20 131:4
  184:19,20
**automobile**  126:4,5
  177:3
**avail**  142:17
**available**  27:1
  28:10 30:11,20
  157:12
**availed**  145:24
**avenue**  12:4 13:3,22
  14:12,19 15:3
**averaging**  139:17
**avoid**  127:12,15,17
  137:15 145:14
**avoidance**  90:16,21
  152:5
**awarded**  53:25
  56:22 57:3
**aware**  26:10,22
  46:14 114:2
**awful**  64:20,20
**awfully**  26:1

**b**

**b**  1:20 10:20 14:8
  90:3 97:1 123:20
  130:10 134:25
  135:23 136:11
  137:3 143:6 145:16
  146:5 159:25
  172:23
**back**  17:4 23:24
  24:15 25:12,13
  28:13,17 33:24
  60:24 84:16 85:9,16
  86:19 89:10 103:12
  120:2 121:10,19
  125:24 133:22
  136:2 138:22

152:24 167:19
173:6 175:5 182:24
**background** 63:21
69:1 82:12
**backlogged** 41:19
**baiting** 166:19
**baked** 115:8
**balance** 133:13
136:5 148:12,19
150:10 151:14,22
152:21 153:5,11,23
154:17,19,20
168:24
**balancing** 19:23
21:7 23:5
**bane** 15:6 71:22,24
71:24 72:9,12,18
73:3 74:1,4 75:5,12
75:16 76:2,6,9 77:7
77:11,17 78:1,8,10
78:15,22 79:1,4,7
79:13,17,21
**bangos** 14:8 38:10
38:11 41:14,14,18
42:13
**bania** 2:18 63:10
**bank** 4:23 66:14
82:3 89:24 96:6
100:19,19 109:19
111:6
**bankruptcy** 1:1,13
1:22 3:18 10:19
19:12,13 23:1 30:19
34:5 88:23 126:14
126:20 130:7,8
134:8 158:17 162:4
166:2,5,24 170:4
179:23 182:4,8,19
**bar** 90:12 91:4
**barbara** 2:14 43:24
44:14 184:21
**bargain** 103:9
**barred** 48:21 55:5
90:14
**bars** 90:10
**base** 118:18 150:25

**based** 29:2 45:9
55:5 61:12 65:19
75:22 87:16 89:13
90:20,23 94:7 97:16
100:12 102:12
103:15 104:2,25
108:5 120:17,24
133:15 148:12
**basic** 106:4,7
**basically** 27:1 89:15
118:14 167:8
**basis** 25:12 61:17
72:15 89:14,17
132:15
**battery** 12:20
**battle** 72:6
**baumstein** 14:15
43:6,11,15
**bear** 137:25 179:3
**bearing** 111:17
**becoming** 135:25
**bedrock** 163:19
**beef** 119:22,22
**began** 45:17 58:10
58:11
**beginning** 86:4
**begins** 130:20
134:12,23 148:9
172:18
**behalf** 2:3 16:6
34:15 39:8 43:21
71:24 81:25 82:3
89:16 104:19 126:3
126:7 182:2 184:7
**behavior** 164:12
**behold** 139:23
**belied** 74:22
**believe** 17:3,3 25:1
26:19 30:8 41:21
48:4,22 49:5 50:5,8
50:11,13 56:17 63:9
66:23 68:6 74:12,21
79:19 80:14 124:7
124:16 147:22
180:10 181:7
**believed** 55:19

**believes** 66:18
67:12 68:1
**beneficial** 141:21
141:21
**benefit** 129:1
155:13
**berke** 2:2 184:7
**bernie** 106:14 107:1
**berth** 171:21
**best** 17:4 22:17
26:22,23 36:11
165:9
**better** 52:8 56:11
88:8 119:2 124:21
140:2 165:10
**beyond** 58:17 99:23
142:8 155:25 156:2
156:4
**bf** 126:5
**bid** 138:11 157:23
173:20
**bids** 164:6 173:10
173:12
**big** 30:18 66:14
78:17 162:13
**bilateral** 85:7
**bill** 104:19
**billions** 100:21
**bind** 147:17
**binding** 136:1,12
**bird** 177:21 181:2
**bit** 27:16 29:25
34:17 67:25 74:22
**black** 163:15
**blue** 74:7
**bnc** 26:25 34:8,25
35:24
**bnc's** 26:8
**boil** 176:14
**bona** 106:2
**bonus** 45:12,21
47:7,12,20,20 49:9
49:16 50:3,19,24
51:6,8,11 52:1,1,16
52:17,18,20 53:25
54:10 56:6,8 57:7
59:2,4,7,8,13 60:11

61:2,9 62:8,15,19
62:19
**bonuses** 51:5 56:13
59:5
**bookends** 80:11
**boom** 98:18
**bore** 173:20
**boss** 55:15
**bottom** 127:4
132:11 133:24
134:12 147:2
**bowling** 1:14
**box** 13:15
**breach** 11:25 54:16
159:20 180:20
182:17 186:3,9
**breached** 57:21
**break** 42:5 128:4
**breaker** 152:3
**breaks** 152:3
**brechner** 15:9 48:2
48:3,10,17,21 49:5
49:15,20,22,25 50:8
50:13 51:1,8,19,23
52:4,6,16 53:2,8,13
53:17,21 54:3,7,9
54:19 56:25 57:5,18
57:21 58:6 59:18,21
59:25 60:6,9,20
61:19 62:1,24 63:1
63:4,6
**brewer** 13:10
**bridge** 24:22
**brief** 16:19 44:8
105:4 139:10 163:3
164:2
**briefing** 64:3,13
70:5,8 71:18 73:5
78:6
**briefly** 39:9 45:3
63:25 64:23 65:8
127:8 181:22
**briefs** 127:8 146:9
163:18,18
**bring** 36:25 108:3
114:14,15 119:19

**bringing**  24:11
146:21
**brings**  81:15 82:1
89:6
**broad**  96:22,22
97:11 100:3 122:2
167:6
**broader**  103:18
**broadly**  98:24,25
98:25 160:21
**brothers**  1:7 2:11
2:18,19,22 3:5 4:18
4:22 5:1,6,10,14,18
6:1,7,14,18,22 7:1,5
7:11,15,19 8:1,6,12
8:16,22 9:1,5,9,15
9:20 10:1,5,10,16
10:22 11:1,7 16:7
41:3 43:21 48:11,14
48:24 55:17 56:12
63:10,15,17 65:10
65:12,13 104:20
108:20,21 109:6,8
111:14 184:18
185:6
**brought**  64:8 74:6,7
74:7 128:14
**burden**  19:6 20:2,8
21:6,20 23:9 42:9
**burdens**  21:8
**business**  39:25
143:3,4 144:2,11
**button**  106:21
**buy**  66:16

---

**c**

**c**  1:21 12:1,25 16:1
131:19 132:6 186:1
186:1
**c.i.**  5:3
**calculable**  149:11
**calculate**  67:23
143:12 174:7
**calculated**  29:21
31:18 32:10
**calculating**  148:25
**calculation**  27:14
68:20 70:19,23

131:22 143:14
148:7 150:11,25
153:14,15 166:9,12
166:15,16 172:19
**calculations**  131:15
131:19
**calendar**  16:8 42:16
42:19 125:17
**california**  13:16
16:14 17:9,9,11
18:21,24 19:3,5
20:2,5,6,15 21:15
23:24 24:1 25:7,13
25:18 26:16,19 35:1
35:2 37:9,10
**call**  28:17 37:4
76:19 133:11
**called**  82:19 83:14
87:20 88:10 94:25
95:5,13,23 108:8
172:22
**calling**  84:3 99:14
**calls**  154:17 165:9
**camera**  31:5
**candidate**  52:7,8,12
**can't**  151:12 166:4
166:5 167:1,1 182:3
**capable**  97:18
135:25
**capacity**  5:2
**capital**  2:23,24 13:2
13:20 81:25 111:7
124:9 185:7,8
**card**  93:18
**cardinal**  20:8,9
**cards**  93:5,13
**care**  149:19
**carefully**  31:7
**carrier**  32:19 33:4,5
**carries**  134:12
**cascading**  146:16
177:25
**case**  1:3 14:10
18:16 20:21 21:13
22:2,5,18,23 24:5,7
24:11 25:9,14 26:5
26:8,25 30:11 31:10

33:24 34:5,10,15
41:18 43:7 59:15
66:9 67:22 68:19
87:17 89:2 98:23
99:1 113:1,3,5
114:19,22 122:19
124:5,8 125:1
126:12 127:4 130:5
130:9,11 131:10,18
131:21 133:12
134:3 140:12 143:8
145:16 150:20
160:18 161:8 171:1
171:3,20 175:21
180:3 182:10,17,19
**cases**  17:15 18:3,5,9
19:10,10 27:21
32:20 67:24 68:9
82:3 100:2,4,21
113:19,19 114:1,2
122:12 163:17
166:14
**cash**  50:7,12,19
56:7,9,22 121:9
**casting**  122:13
**cat**  107:4
**catch**  42:4
**categories**  115:18
116:18 117:6
**caught**  97:25
**cause**  49:9 50:1
57:8 60:13,22 62:9
62:11,16,20
**caused**  124:11
**causes**  82:15 89:11
**cavalli**  13:10
**caveat**  109:7
**central**  22:25,25
164:8
**cert**  186:11
**certain**  6:3,10,11
7:7,9 8:8,19 10:12
56:22,23 65:15
175:18
**certainly**  16:25
20:20 21:23 22:1
24:4 26:14 69:14

72:5 77:19 79:18
**certifications**  41:6
**certified**  186:10
**certify**  186:3
**cetera**  55:3 77:15
84:25 146:11
**chadborne**  38:14,21
**chamber**  38:17
**chambers**  113:5,10
**chance**  40:16
**change**  2:8 56:2
176:17,22 184:14
**changed**  52:22
105:11 139:5,8,9
168:4,8
**changes**  148:11
175:3
**chaos**  176:4,5 177:4
**chaotic**  126:23
**chapman**  1:21
**chapter**  82:3 100:20
**characteristics**
66:20
**characterization**
82:23
**characterized**  90:19
**charts**  162:12
**check**  175:15,15
**checklist**  53:4
**cheryl**  2:4 13:12
184:9
**chiosso**  13:10
**chocked**  163:4
**choice**  28:11,12
179:1
**choices**  138:25
148:20
**choose**  172:4
**chooses**  149:8
**circuit's**  113:9
**circulate**  40:13,19
63:3
**circumstance**  62:9
84:13 85:15 123:1
**circumstances**
25:17 60:12 62:18
65:15 91:17 123:11

124:10 137:5 169:6
**cite** 67:24 146:1
166:7
**cited** 27:21 68:9
114:19,25 128:19
130:14 139:10
**cites** 67:15 148:5
**civil** 2:14 184:21
**claim** 3:13,21 6:3
8:8,20 10:12,18
18:15,16,18 20:20
30:10,18,20 31:11
45:1,1 56:5,6,7,18
57:16,17 61:8,8,17
61:21,23 67:5 68:9
68:25 90:13,19 97:1
98:7,7 101:16 102:5
110:5,11 111:22,24
122:3,7 159:20
**claimant** 45:3,4,21
46:6 47:15 58:19,21
59:10
**claimant's** 58:13,16
59:12
**claimants** 26:18
27:21
**claimed** 80:15 99:6
99:7
**claiming** 45:13
**claims** 3:1,2,8,8,11
3:11,20,24,24 4:2,2
4:5,5,8,12,12,15,15
5:8,8,12,12,16,16
5:20,20 6:5,5,9,10
6:10,11,12,16,16,20
6:20,24,24,25,25
7:3,3,7,7,8,9,9,13
7:13,17,17,21,21
8:3,4,10,10,14,14
8:19,24,24 9:3,3,7,7
9:11,11,12,12,17,17
9:22 10:3,3,7,8,14
10:14,24 11:3,4
16:25 17:8 22:25
26:22,25 27:5,8,19
28:14,15,16,18 29:7
30:10 32:22 37:6

39:18 40:5 42:8
65:5,17,18,18 66:16
66:22,24 67:1,9,10
67:21 68:2,3,4,5
74:15 75:9,10 80:5
80:24 81:1 90:10,14
90:14,20,23 91:1,5
91:6,8 94:4 96:13
96:23,25 100:5,22
102:4,7,15 108:20
109:20,21,23 111:8
111:8,9,13,14
113:24 115:20,20
115:21 118:9 162:4
162:4 164:13
**clarify** 31:23
**class** 65:10 113:22
113:23
**classic** 27:23,25
**classification** 6:4
8:9,18 9:13 10:13
**clause** 109:11
127:15,23,25
145:15 152:3
159:24 170:24
**clear** 17:7 30:21,22
39:17 47:7,22 67:24
72:19 92:22 95:6,11
97:8 103:21,24
108:7 113:5 118:6
123:2 133:6 147:14
152:5 154:21
155:12,18,19
168:14 169:17
171:23 172:24
179:24 181:14
**clearer** 134:22
**clearing** 82:18
84:10 85:10,13,17
85:17
**clearinghouse**
107:19
**clearly** 59:5,7,8
95:8 102:18 104:4
121:19 122:11
140:25 155:22
169:11,20 170:5

**clerk** 162:16
**clever** 118:1
**clients** 16:25 20:2,9
21:21 23:2,9 30:12
34:16 36:11,17,19
77:3
**close** 37:4 176:16
**closed** 87:2 179:25
**clothing** 103:5
**code** 90:15 162:4
166:2,5,25 170:5
179:23 182:4,8,19
**cohen** 129:1,3,5
162:8,10,13,15,16
162:19 163:1,21
164:25 165:11,15
165:18,22,25
166:11,14,21
167:14,19 168:7
170:8 178:4,10,12
178:23 179:12,21
180:16 182:3,20,21
**coleen** 2:3 13:11
16:18 184:7
**collapse** 117:11
**colleague** 43:5 73:2
**collect** 114:15
**colomar** 14:7 38:12
**colombo** 2:3 13:11
16:18 184:8
**combined** 90:3
**come** 16:14 24:22
31:13 33:4 42:21
47:1 52:9 55:9
58:22 75:25 79:5,10
82:16 86:19 89:10
95:1 97:18 101:1
103:12 137:25
**comes** 24:4 52:9
128:1 149:4 166:19
170:15
**coming** 32:20 37:21
42:12 62:4 100:25
119:5 175:12
**commenced** 2:14
26:6 44:13 184:21

**commenting** 76:11
**comments** 41:9,15
74:5
**commercial** 65:10
66:13 145:19
158:24 159:1 160:3
160:20 170:4,14,18
**commercially**
127:18 145:17
159:18 160:1,5,17
164:6,21 165:8
167:3 169:5 178:24
181:10
**common** 66:20
89:12,13 91:1,1
173:24
**communicating**
20:24
**company** 30:2
31:13 33:25 37:1
**compared** 174:3
**compensation** 47:8
47:23 51:11 59:2
60:21 61:5
**compete** 40:4
**competing** 39:18
98:8,11
**complain** 35:22
**complaining** 119:25
**complains** 173:8
**complaint** 2:25
11:11 66:2 69:20
74:6 75:7 82:9,20
82:25 83:19,20,21
83:25 84:5,7,19,19
87:16,17 88:11
90:13 94:24 97:20
101:1 103:21,22
105:1,19,20 112:21
113:6 118:7 120:8
121:7 122:4 124:20
157:10 158:9 163:4
163:12,14 164:8,17
169:9 171:10
172:16,17,18,25
173:23 185:9

**complete** 55:5
112:16
**completed** 17:22
41:5 46:2 53:3,5,6
54:19
**completely** 56:3
62:16 107:4 112:18
137:19 147:25
**completing** 40:5
**complicate** 169:11
**complicated** 65:23
127:5 154:15
160:10
**comply** 64:15 70:1
180:18 181:13
**comports** 140:13
**composed** 31:25
**concede** 178:10
**concedes** 147:10
171:16
**conceding** 170:17
180:20
**concept** 33:8 124:4
165:23
**concern** 20:17,19
24:13 34:17 120:16
**concerned** 23:6
29:21 92:25
**concerning** 63:19
**concerns** 21:20 24:2
46:22
**concession** 178:5
**concluded** 45:6
46:21 183:1
**concludes** 42:14
125:17
**conditions** 54:20
176:11
**conduct** 33:17
35:21,25
**conducted** 20:1
**conference** 2:20
4:25 5:4 34:1 63:10
63:19
**conferences** 18:4
**confidentially** 31:3

**confirm** 21:21
167:22 169:8 178:6
178:7
**confirmation**
146:22 148:2
**confirmations**
87:23 146:23 147:3
156:25
**confirmed** 90:6
**confirms** 157:6
170:17,24
**conflict** 128:3,6
**confused** 158:12
**confusing** 22:8
**connected** 107:19
115:10
**connection** 82:5
89:23 90:9,17 95:19
95:21 103:10 124:5
**connections** 97:15
**consensual** 72:15
**consent** 35:17 41:11
83:17
**consider** 21:18 23:5
69:18 79:20 92:12
92:13 98:20 108:16
112:23 113:1,7,11
**considerably** 66:14
**consideration** 21:24
54:1 132:23
**considered** 119:16
**consistent** 161:21
**constituted** 146:14
**constitutes** 119:7
**constrained** 166:1
**construction** 127:7
**construe** 114:3
163:14
**consuming** 27:1
**contacted** 44:7
**contain** 156:15
**contained** 45:13
104:25 150:6
168:12 169:14
**contemplate** 50:20
**contemplated**
131:19 169:12

**contemplates** 51:15
143:18 145:8
**contend** 90:22
**content** 123:14
163:7
**contents** 69:23,24
**contested** 38:6
**context** 63:24 65:6
74:8 76:16,21
115:13 123:21
129:14 133:8
149:22 154:21
155:23 156:6,7,9,13
156:13,13 157:18
**contingent** 49:16,18
**continue** 140:19
149:9
**continued** 50:3,21
52:20 125:1 149:12
149:13
**continues** 150:5
**continuing** 49:4
130:22
**contract** 46:10 49:4
50:2,9 52:13 53:21
53:23 54:3 55:23
57:7,9,13,18,19,22
57:23 59:19,22,24
84:14,15 91:6,7
100:12,17 111:11
111:11 122:5 127:4
127:5,6,18,22 128:1
159:20,21 160:22
163:16 164:21
166:5,17 167:24
168:15 169:11,18
169:25 170:1,6
172:15 173:11
174:9 178:22,23
180:19 181:6,13
182:4,7,12,17
**contracts** 65:23
84:13 105:9,24
127:8,11 174:5
**contractual** 99:4
175:17

**contractually** 61:9
**contrary** 58:22
116:23 127:19
150:5 168:12
169:14
**contribute** 32:21,23
33:4
**control** 20:19 25:14
137:18 159:17
170:15 178:6
**controlling** 113:10
**controversy** 66:9
67:22 68:19 94:3
**convenience** 22:4
23:25
**conversation** 33:6
94:7
**conversations** 69:2
**convert** 63:25 64:12
69:15 70:7,12
**conveyance** 90:20
**convince** 99:11
**convoluted** 169:11
**copies** 70:25 162:15
**copolla** 55:7,18
**copy** 73:1,1
**corners** 98:22 158:9
**corporation** 65:11
**correct** 19:1,22 20:3
28:4 37:16 85:2
92:11 98:1 101:10
106:16 108:1 116:2
144:15 152:18
180:16
**correctly** 90:7
92:10 99:1
**corresponding**
150:10
**corresponds** 154:11
155:2
**cost** 65:25 66:3,4,12
66:14 68:7 74:10
76:20 80:8
**costly** 27:9
**costs** 31:8 171:20
**cottage** 68:13,15

[couldn't - creating]                                                                 Page 9

| | | | |
|---|---|---|---|
| **couldn't** 180:1,18 | 25:4,8,11,15,25 | 85:25 86:3,7,9,13 | 154:12,14,16,20 |
| **could've** 177:10 | 26:7,9,13 27:10,23 | 86:15,17,20,22 87:5 | 155:6,16,20 156:4,7 |
| **counsel** 19:13 20:1 | 27:25 28:5,19,24 | 87:8,11,21,24 88:1 | 156:10 157:7,25 |
| 38:1 43:3 44:6,23 | 29:2,8,9,13,15,17 | 88:13,15,17,20 89:3 | 158:3,6,12,19,22 |
| 58:3,13,16 69:22 | 29:19,23 30:16,23 | 89:5,9,19,21 91:14 | 159:6,12,14 160:25 |
| 72:1 74:20 106:3 | 30:25 31:10,17,19 | 91:16,25 92:4,8,10 | 161:4,6,10,13,18,24 |
| 108:8 109:2 110:2 | 31:24 32:5,11,14,25 | 92:13,15,17,19,21 | 162:2,5,9,12,14,17 |
| 116:20 125:1 | 33:12,16,20 34:18 | 92:24 93:4,7,14,17 | 162:25 163:6,8,11 |
| 126:10 156:18,20 | 34:19,21 35:5,9,16 | 93:23 94:11,12 | 163:20,22 164:22 |
| 167:8 168:17 | 36:1,7,16 37:10,13 | 95:19,21 96:2,5,9 | 165:1,12,17,21,24 |
| 169:22 178:13 | 37:15,17,19,21,24 | 96:16 97:22,24 98:2 | 166:10,13,20 167:4 |
| **counselor's** 74:5 | 38:4,9,13,17,23 | 98:4,13,15,19 99:2 | 167:6,10,15 168:6 |
| **counter** 126:22 | 39:2,5,13,20,22 | 99:5,22 100:1 101:6 | 169:19 170:7,9,13 |
| **counterclaims** 4:20 | 40:6,9,15,17,21,23 | 101:7,8,11,15,20,23 | 170:20 174:15,20 |
| **counterfeit** 83:23 | 41:10,12,17,23 42:1 | 102:2,6,8 103:6,16 | 174:25 175:20 |
| 106:2,6 | 42:7,17,20,22,24 | 103:25 104:1,5,7,9 | 176:3,5 178:2,9,11 |
| **counterparties** | 43:1,7,10,13,16,18 | 104:12,14,16,21 | 178:14,21 179:9,13 |
| 83:18 84:12,17 96:7 | 43:25 44:4,10,18,21 | 105:5,10,12,17 | 180:13 181:16,20 |
| 103:9 108:24 | 45:5,20,24 47:4,24 | 106:5,11,13,17,19 | 181:22 182:1,5,15 |
| 109:11,20 111:4 | 48:1,8,15,19 49:3 | 107:1,4,11,13,22 | 182:18,20,22 |
| 140:5 175:24 | 49:11,18,21,24 50:5 | 108:10,12 110:3,6 | 184:23 |
| **counterparty** 85:14 | 50:10,23 51:2,16,22 | 110:10,14,16 112:5 | **court's** 20:17,18 |
| 111:6 119:14 | 51:24 52:5,13,23 | 112:13 113:17 | 63:18 82:11 97:17 |
| 120:15 121:12 | 53:7,12,14,20,23 | 114:6 115:1,6,24 | 99:13 102:1 |
| 134:2 137:16 141:9 | 54:5,17 56:5 57:4 | 116:2,7,9,13,16 | **courtesy** 72:3 |
| 143:19 158:18 | 57:16,20 58:3,8 | 117:17,22 118:17 | **courtroom** 18:10 |
| 160:12 177:7 | 59:15,16,20,23 60:3 | 118:22 119:4,18,24 | 38:12 44:2,11 |
| **country** 186:19 | 60:8,14,23 61:24 | 120:3,6,20,22 | **courts** 29:5 113:20 |
| **couple** 37:11 64:21 | 62:22,25 63:3,5,7,9 | 121:13,17 122:11 | 123:10 127:13 |
| 74:4 83:7 | 63:13,23 64:5,7,10 | 122:14,23 123:3,6 | **cover** 96:20 98:6,8 |
| **course** 18:11 19:3 | 64:18,19,25 65:7,22 | 123:18,22,25 124:3 | 98:17 121:3 122:2 |
| 25:7 33:8 35:23 | 66:3,6 67:7,11 | 125:2,4,6,8,11,14 | **coverage** 93:2 |
| 52:17 66:12,13 | 68:11,13,22,23 | 125:16,20,23 128:2 | **covered** 23:9,12 |
| 69:12,16 70:15 79:3 | 69:14 70:5,9,11,16 | 128:10,15,17,20,22 | 97:5 104:4 109:4,6 |
| 79:10 86:25 87:7 | 70:21,22 71:6,10,12 | 129:1,6,10,16,18,23 | 109:9 110:24 |
| 182:6,25 | 71:14,16,17,20,23 | 135:7,9,11 136:19 | 111:19,25 112:1 |
| **court** 1:1,13 2:15 | 72:3,4,8,10,17,19 | 136:25 137:6,21,23 | 181:23 182:3 |
| 16:2,4,12,15,17,20 | 72:22 73:9,11,14,17 | 138:15,19,22 139:2 | **covers** 115:4 121:14 |
| 17:1,2,5,6,13 18:2,7 | 73:19,21,23,24,25 | 139:6,20,23 140:10 | 121:16 |
| 18:9,12,23 19:4,12 | 74:3 75:1,11,13,19 | 140:14,19,23 141:1 | **coy** 155:6 |
| 19:14,16,19,23 20:6 | 76:5,8,10,11,15 | 141:4,14,17,19,23 | **cradle** 107:5 |
| 20:6,7,15,16,22,24 | 77:10,12,24 78:2,9 | 142:2,6,10,12,24 | **crazy** 55:24 |
| 21:1,4,6,9,10 22:1,2 | 78:14,16,24 79:3,6 | 143:1,3,24 144:1,5 | **create** 66:9 94:4 |
| 22:5,8,9,15,16,20 | 79:10,12,14,18,22 | 144:7,11,14,19,24 | **created** 84:12 |
| 22:22,24 23:3,8,12 | 80:12,16,19,21,25 | 145:1,4,7,11 152:14 | 107:18 152:11 |
| 23:16,19,21,25 24:1 | 81:2,4,6,8,10,12,15 | 152:16,19,23 153:2 | **creating** 95:16 |
| 24:6,9,11,15,16,25 | 81:20,23 84:24 | 153:21,24 154:1,3,9 | 120:24 |

**credit** 132:19
**creditor** 5:8,12,16
  5:20 6:4,9,16,20,24
  7:3,7,13,17,21 8:3,9
  8:14,19,24 9:3,7,11
  9:17,22 10:3,7,13
  11:3 44:25 82:4
**creditors** 16:18
  26:11 27:2 30:12
**credulity** 178:17
**critical** 143:7
  165:25
**cross** 24:22 64:14
  69:8,11,24 70:14,18
  70:19 71:3,3,6 73:5
  73:8 76:23 77:15
  146:16
**crystal** 155:12
  179:24
**cure** 130:16
**curious** 39:22
**current** 66:5
**cuts** 164:8

**d**

**d** 16:1 69:12 108:13
  131:14,14,24,24
  135:23 184:1 185:1
  186:11
**d.c.** 12:14
**damages** 33:9
**danielle** 55:7
**darn** 107:4,5
**date** 18:6 22:20
  47:10,14 54:14 65:9
  84:22 85:3,22 87:1
  87:2 90:18 94:6,9
  98:18 103:3,11
  109:9 110:24
  111:11 119:9 121:7
  121:11 130:17
  131:1,7,8,13,17
  133:4,5 136:23
  137:3 142:16,22,22
  142:23 143:5,5,6,9
  143:11,12,20 144:3
  144:12,15,16,17,23
  145:9,10 146:3,5

148:11 149:12
  150:9,11 153:4,15
  153:16 154:11,25
  155:2,4 166:3,4,24
  166:25 172:10,11
  172:13,21,24 173:3
  173:5,13,19,21,22
  174:10,12,14,16,17
  174:22 175:23
  176:15 179:2,3,4,4
  179:5,15,16,24
  180:21 186:24
**dated** 161:9 164:10
  172:16 173:3,5
  175:4,25 177:13
**dates** 128:25 129:9
  149:1 180:1
**dating** 170:3
**david** 126:10
  181:24
**day** 30:9,10 48:15
  48:19 49:21 50:6
  51:25 52:8 53:10,15
  53:15 54:21 57:5
  58:14 62:12 81:13
  130:16,25,25 131:8
  131:9,12,12,23
  143:3,4,10,15,17
  144:1,2,11,12 145:2
  148:1 158:2 166:22
  172:20 174:11
  175:3 177:11
**days** 69:4 126:23
  130:12 131:8 143:3
  143:5 144:2,11,17
  145:3 174:18,19
  175:19,22,23 181:1
**days'** 130:23
**deal** 24:21 34:22,24
  55:1,4 78:4 93:13
  112:10 113:20
  128:9 137:5 156:16
  159:14 163:24
  166:15 176:9
**dealer** 164:3
**dealers** 132:18
  164:18 171:25

173:12 179:19
  180:23
**dealing** 28:18 97:10
  144:20
**dealings** 109:5
**deals** 136:17
**dealt** 91:9 147:24
  168:10
**debtor** 1:9 2:14
  17:3 18:23 19:24
  28:7 33:18 50:23
  74:12 111:7 184:22
**debtors** 3:20 4:8
  16:7 19:6 20:1
  21:21 24:18,25
  25:20 28:9,19 33:3
  37:2 51:7 65:9,12
  65:15 76:7,17 80:5
**decide** 45:20 66:7
  69:10 70:3,6,11
  103:25,25 115:12
**decided** 46:14 47:7
  49:22 57:23 69:25
  77:18,21 78:7 152:7
**decides** 69:14
**deciding** 93:1
**decision** 28:13
  46:15 113:10
  129:12 166:8
**decisively** 164:11
**declaration** 44:1
  67:18 69:19 172:21
**declaratory** 64:9
  66:2 68:19
**declare** 153:8
  174:12
**declared** 130:17
**declares** 175:19
**declaring** 143:20
**deductible** 30:14
  31:15 32:22
**deemed** 113:6
**default** 129:15,17
  130:2,4,14,18,21,25
  131:6 132:8 135:1,3
  137:13 146:15
  147:6,25 148:16

149:8,13,16 150:19
  151:18 152:8 153:6
  153:7,7 156:16,25
  157:19 158:15
  159:3 167:22
  168:16,16,19,20
  171:7 175:19
**defaulted** 158:18
**defaulting** 130:21
  130:23,24 131:4,6
  132:13 134:21,25
  135:2,18 137:9
  138:7 139:13,19
  140:5 141:7,24
  145:15 149:18
  150:23 151:4,23
  157:16 160:14
  161:20 171:18,21
  171:23 172:9 175:6
  176:22
**defaults** 137:12,15
  146:17 148:13
  156:23 158:25
  159:1 177:25
**defendant** 63:16
  82:1 119:20 163:9
**defendant's** 4:19
  68:21
**defendants** 34:5,9,9
  34:22,23 35:1,2,12
  35:20 36:8 63:20
  64:1,2,12 69:5
  126:3,18
**defending** 27:5,19
  31:9,12 36:24
**defense** 30:2 31:7
  31:11
**deferred** 51:11
**defies** 156:19
**defilippo** 14:23
**define** 105:23
  154:18
**defined** 57:9 96:25
  102:19 108:25
  132:17,25 133:25
  135:22,23 142:15
  151:16,17,22

153:12,20 155:9,9
171:17
**definitely**  156:2
**definition**  112:3
132:10,11 133:1,7
133:14,23 135:17
136:2,6,8,9 137:4
149:5 159:24
160:15 168:5,8
171:22 172:8
177:16 179:10
180:14
**definitions**  102:13
132:9,12 135:5,13
135:15,16 137:8
**degree**  46:11,13,20
**delay**  28:8 35:3
**delete**  135:5 147:4
**deleted**  135:13
157:5
**deletes**  135:6,15
136:7
**deliberate**  28:20
**delighted**  33:3
**delightful**  25:17
77:4 79:22
**delivery**  133:3
**demand**  18:3
**denied**  17:17
163:10
**denise**  2:3 184:8
**denominator**  155:1
**deny**  21:2,4 22:10
42:10
**denying**  24:18
124:24
**depart**  78:24
**depend**  65:25 66:1
**dependent**  78:12
**depending**  150:18
154:5
**deposition**  3:17
17:22 21:15
**depositions**  18:25
19:7,20,25 20:21
**depth**  88:12

**derivative**  3:8 4:23
66:4 94:5,5
**derivatives**  2:19
63:17 65:12,17,18
65:20,22 66:13 67:9
68:2 82:17 90:1
101:2 180:4
**describe**  82:12
**described**  76:23
84:22 88:10 137:9
**describes**  121:7
**description**  184:4
185:4
**designate**  2:7 38:8
130:25 146:5
184:12
**designated**  131:12
143:6 144:5,12,22
145:10 174:16
**designating**  131:7
**designation**  146:3,7
**despite**  110:2
**detail**  16:19 84:2
121:8
**determination**
39:19 74:18 92:1
94:11,17 99:2 108:4
114:17 115:8
116:20,22 161:21
165:7 171:22
**determinations**
124:17
**determinative**
21:17 105:6
**determine**  66:3
74:10,11,14,23
75:18 80:14 109:22
132:1 133:15
141:25 145:16
147:6 157:12 160:1
160:9 161:15 165:6
171:13,24 172:9
174:9 179:14,17
**determined**  50:16
132:15 142:15
148:10 150:7
168:13 172:6 173:6

174:6 180:14
**determines**  171:19
**determining**  134:19
149:25 152:7 160:6
168:1,22 172:5
173:2
**deutsch**  14:17
**development**  166:8
**devote**  27:5
**devoted**  148:15
**dewey**  167:20
**df**  126:6
**dias**  38:8
**diaz**  2:7 14:1
184:12
**didn't**  126:25 137:1
140:15,17 155:8
159:18 168:7
169:14 178:18
180:24
**diers**  12:24 43:5,19
43:20 44:5,17
**difference**  19:4
21:14 32:12 40:4
140:1 147:16
**different**  28:13 54:1
71:4,7 79:8 85:20
89:12 103:5 128:7
138:16,20 142:1,18
144:14 147:8
156:15
**differently**  122:19
124:20
**difficult**  26:1
**difficulty**  69:6
**digress**  119:16
**direct**  103:12
108:21 109:5,20
111:14
**directing**  41:8
**direction**  52:22
**directly**  84:18
**directs**  23:4
**disadvantage**  140:6
**disagree**  77:2 86:4
117:8

**disagreement**
160:17
**disallow**  6:11 7:8
**discern**  88:3 156:11
**discharged**  130:11
**disclosed**  55:12,12
55:13,14 56:4
**disclosure**  70:22
**disconnect**  72:24
**discovery**  20:14,22
20:23 22:7,9 24:15
45:7 71:2 74:8,9,23
75:24 80:2,13,23
106:10 114:9
117:12 163:25
164:19 169:7 180:9
180:10
**discretion**  51:6
53:25 54:1 56:8
141:25 145:17
160:1,6,16 161:17
161:18 164:5 165:8
**discuss**  76:3
**discussed**  46:12
**discussion**  82:6,24
83:12 94:15 148:9
148:15
**discussions**  46:23
**dishonesty**  54:16
55:2
**dismiss**  2:25 4:19
11:10,11 25:2 63:20
64:2,12 65:1 67:4
67:15,15 68:21 69:3
69:9,15,16,21 70:5
71:19 75:3,14,22
76:18 77:13,20 82:8
87:4 89:14 91:18
92:14 98:10 99:23
104:24 106:5
112:21,23 113:2,7
113:12 114:5,25
117:4,14 124:6,13
124:18,22,23
162:23 163:3,10
170:1 185:9

**dismissal** 82:13
91:3
**dismissed** 120:18
130:11
**displace** 148:1
**dispose** 38:19
**disposition** 46:4
**dispositive** 23:22
24:19,24 25:1 76:18
91:18 93:22 94:12
98:16 108:8,12
110:22
**dispute** 4:7 45:4
46:25 47:17 50:22
67:19 80:10 95:4
105:14,16 106:4,8
113:15 122:25
123:14 130:1
**disputed** 93:1 108:1
**disputes** 55:17
139:17 145:15
146:20 161:23
**dissimilar** 124:11
**distance** 30:1
**distinction** 85:25
99:9,10 112:24,25
113:2
**distributee** 39:12
**distributing** 39:25
**distribution** 28:10
30:12 41:20,21
148:11 149:1,12
153:4,14 155:4
**distributions** 2:8
41:4,19,22,24 42:10
184:14
**district** 1:2 2:15,16
22:2,5,15 23:25
24:1 29:6,6 37:10
43:25 184:23,23
**divested** 62:18,19
**doc** 2:1,7,12,24 3:1
3:4,7,10,13,16,20
3:23 4:1,4,7,11,14
4:19 5:7,11,15,19
6:2,8,15,19,23 7:2,6
7:12,16,20 8:2,7,13

8:17,23 9:2,6,10,16
9:21 10:2,6,11,17
10:23 11:2,10 184:5
184:12,18 185:7
**document** 2:25
11:12 60:1 62:14
98:21,22 100:1
101:17 102:18,23
108:15,17 109:4,17
110:25 111:1,12,25
112:1,9,10,17
114:22 122:15
123:1 135:16 155:8
185:9
**documentation** 5:8
8:4 9:3
**documents** 17:20
45:8 48:13,23 66:21
67:10,13,16 70:25
71:1 74:14 87:11,13
87:18,22 88:3,4
95:13,16 97:3
102:16 103:8,15
104:3 109:14 112:4
115:23 116:8 117:8
123:11 127:6,9
128:24 156:14
160:10 172:25
177:21
**doesn't** 127:21,25
135:14 138:10
150:3,23 151:20
159:2 160:11
164:15 165:4
168:18,19 178:6
179:3,7,17
**dog** 171:1
**doing** 49:23 149:22
172:14
**dollars** 68:17
100:22 121:9
**don't** 35:10 75:20
130:1 134:22
136:22 137:3 139:8
139:16 140:12
141:2 146:19,20
150:21 151:3

154:18 155:25
159:6,12 161:25
169:24 170:17
172:4 174:7 176:8
177:9 178:1,23
**doubt** 26:10 40:13
122:13
**douglas** 14:15
**draft** 40:12 72:12
**drag** 143:16
**draw** 163:8,12
165:2
**drawn** 87:15
**dress** 54:22
**dreyfuss** 2:2 184:7
**driver** 180:11
**drop** 138:23
**ducks** 174:13 175:2
**due** 148:18 149:1
153:9 182:25
**dueling** 64:1,2,12
**dumb** 138:4
**duty** 127:14,17

**e**

**e** 1:20,20 12:1,1,24
16:1,1 133:6 172:17
172:18,22 184:1
185:1 186:1
**earlier** 83:4 94:8,15
130:25 144:7,14
151:5 159:23
176:16
**earliest** 130:17
172:11 179:16
**early** 128:24 129:7
130:15 131:1,7,7,12
131:16,25 133:4
134:20 136:23
137:2 142:16,21,23
143:5,8,11,17,20
144:2,8,12,15,16,22
145:10 146:3,5
148:8 150:1,9,11
168:2 171:13
172:10,19,21 173:2
173:3,12,19,21
174:12,14,16,17,22

176:8 179:2,4,5,15
180:21
**easier** 128:21
139:12,18 157:12
157:16,20,20
161:22 168:24
**easily** 149:11
**easy** 27:25 86:5,5
126:22 160:9
**ecf** 43:25
**economic** 83:24
84:2,6 88:10 94:21
102:22,25 103:9
107:8 121:9,23
133:2 137:11,24
138:12 140:5,6
141:11,12
**economically** 94:20
146:12 147:7
**economics** 87:9
**education** 140:20
**effect** 26:25 55:16
67:2 80:17,18 84:14
133:1
**effective** 131:1
**efficiency** 168:25
169:1
**efficient** 17:4 18:2
**effort** 145:14
**efforts** 61:18
**eight** 124:9
**eighteenth** 6:2
**eighth** 4:2 9:16
**either** 22:12 23:24
25:16 37:9,10 49:12
60:17 129:14 132:2
132:3 134:1 141:9
143:8 148:21,24
149:1 154:7 176:20
**elected** 132:7
**electronic** 186:10
**elements** 61:22
**elicit** 138:5
**eliminate** 94:3
139:17
**eliminating** 85:14

**elizabeth** 2:2 184:7
**elude** 93:25
**eluded** 26:23
**email** 55:18
**emails** 48:25 55:8
**emba** 55:9
**embad** 56:2
**embellishment** 77:15
**embodied** 97:1
**emphasize** 29:4
**employee** 3:2 7:3,13 7:21 8:14 9:7 48:7 48:8,12,23 49:2,6 49:10,17 50:4,17 51:9 52:9 53:2,9,10 53:11,15 55:23 57:25 58:2,8,9,25 61:10
**employees** 36:5,6 49:1 51:4 56:11 59:6
**employment** 3:11 35:24 36:9,10 45:13 45:14,16 49:4,12,13 49:25 50:2,4,21 52:20 53:16 54:23 60:16,17 61:1,16
**enable** 76:21 178:23
**enabled** 178:22
**encompass** 121:3 160:22
**encompasses** 123:20
**ended** 142:8
**enforced** 57:23 100:5 169:18,19
**enforcing** 2:13 43:23 44:12 184:20
**engage** 24:14 122:14 124:7
**engaged** 35:21
**enrichment** 91:2
**enter** 132:24 146:11
**entered** 41:8 66:21 69:20 124:5 152:11

**entering** 163:23
**entire** 31:4 57:11 61:4 109:18 149:15 149:22
**entirely** 56:9 76:24 93:4 124:11 136:8 147:8
**entirety** 135:5,14 136:8
**entities** 85:13 108:25 109:12 110:12 126:14
**entitled** 36:17 45:14 45:21 49:8 50:3,3,6 50:11 51:25 52:18 52:19,20 54:23,24 54:25 57:7 61:14 62:10,15 98:14,15 114:8 131:15,25 148:6,7,7 164:19 169:7 173:15
**entitlement** 74:21 99:21
**entity** 82:19 84:11 85:10,17,17 178:18
**entry** 10:18 41:25
**envisions** 69:13
**equal** 150:9 152:21 153:5
**equates** 134:6
**equitable** 119:15
**equitably** 53:17
**equity** 50:15 56:15 56:23 57:1,3
**equivalent** 133:2 146:12 147:8
**erin** 12:24 43:5,20
**erroneous** 82:23 83:14,14,22 84:2,6 84:25 88:11 94:18 95:1,10 102:14 105:8,23,25 106:20 109:2 110:1,21 111:15,24 112:15 115:4,19 116:4,13 117:10 118:8,25 121:21

**erroneously** 100:9,9 105:21
**error** 82:21,25 83:15 107:7
**esq** 12:7,8,16,23,24 12:25 13:6,7,8,18 13:25 14:7,8,15,22 14:23 15:6
**essentially** 39:11 66:16 78:5,19 103:4 117:14 134:1 138:13
**establish** 62:11
**established** 45:5
**estate** 27:22 28:5 30:3 96:3
**estates** 26:23 89:17 89:25 90:4 96:23 100:22
**et** 2:18,19 4:17,18 4:24 11:8,9 16:18 55:3 77:15 84:25 146:11
**ethan** 15:9 48:2
**evaluation** 179:5
**evan** 126:9
**event** 130:4,14,18 130:20,24 131:5 135:1,3 146:15 148:17,20,24 149:25 151:19 153:6,12 154:6 155:1 158:15 167:22 168:2
**events** 126:13 129:9 130:2
**everybody** 155:19
**everybody's** 24:2
**everybody's** 168:25
**everyday** 39:25
**evidence** 46:9 51:10 55:16 58:17,22 99:15,21,22 104:1 122:21 123:13,18 163:4 164:17 167:7 169:3,6,23 178:13 181:1,3

**exact** 95:14 141:16
**exactly** 17:9 22:6 29:23 78:8 88:16 110:4 112:15 115:9 116:2 165:15 167:14,24 169:9 173:22
**examination** 3:4 97:9
**example** 48:10 50:18 70:19 179:25
**exceeds** 32:22
**excellent** 162:17
**excess** 181:8
**exchanged** 17:21
**exciting** 162:12
**exclusion** 177:11
**excused** 42:21
**executed** 57:23 146:24 156:15
**executive** 46:2,16
**exercise** 160:6,16
**exercises** 153:8
**exercising** 137:17
**exhausted** 30:1
**exhibit** 96:6 108:13 109:24 111:3,3,4 172:17,18,22,23
**exhibits** 96:4
**exist** 85:13 94:5 102:20,21 126:15 139:18
**existed** 85:2 87:9 102:21,24 103:11 105:25
**existence** 33:16 39:24 91:7,17 94:9 94:25 126:8 149:14
**existent** 105:22
**existing** 94:6 98:17
**exists** 119:11
**expectations** 127:19
**expected** 47:10
**expedition** 23:13
**expeditious** 23:13
**expeditiously** 24:5 25:9

**expensive** 161:22
**experience** 32:19
180:3,4
**experienced** 72:23
**expert** 180:10
**explain** 64:19,23
66:17 69:22 106:21
128:5 136:24
**explained** 58:16
128:5 139:12 146:8
**explaining** 76:16
**explanation** 155:11
180:25
**explicit** 156:22
**explicitly** 147:4,25
148:1 157:5
**expressed** 171:20
**expressly** 142:20
143:18 145:8
147:24
**expunge** 6:11 7:8
**extension** 35:6 69:2
**extensive** 17:21
**extent** 18:15 23:23
41:7 44:3
**extraneous** 164:17
**extraordinary**
56:10,10 176:11
**extrinsic** 99:14,21
99:22 104:1
**eye** 12:12

**f**

**f** 1:20 186:1
**face** 56:19 91:23
94:16 97:20,21
98:21 119:14 123:2
125:24 132:12
177:14
**faces** 125:20
**facilitate** 84:10
85:18
**fact** 17:7 28:8 29:4
36:19 45:22,24 46:6
46:11,18 47:22 48:4
48:6,9 53:18 55:18
55:21 57:2,24 58:20
58:23 59:1 70:23,24

74:22 80:8 83:23,23
83:25 85:1,22 86:18
88:6,22 90:24 91:6
92:1 93:1 94:18,19
95:5 97:16,17 99:6
102:24 103:14,15
105:18 106:9
112:19 115:11,11
123:19,23 124:7
142:3 155:9 173:2
179:6 180:13
182:10
**factor** 33:18 34:10
34:12 177:10
**factored** 177:6
**factors** 19:24 23:3,4
23:5 27:18 28:22
33:2 37:4 137:25
180:8
**facts** 45:19 46:7
53:1 75:5,6 85:9
107:14 111:23
115:8 122:24
140:13 142:8 164:1
**factual** 46:3,24
91:19,19 92:1 94:17
104:23 105:3 106:4
108:4,5 114:15,16
115:3 116:21
124:17 163:7,11
167:5
**factually** 117:12
**facty** 93:11 94:10
97:17 117:16,19
122:17
**fail** 12:8 41:2,2,11
42:3 54:12 91:6
167:3
**failed** 122:20
**failure** 47:16
120:18 146:14
181:4
**fair** 21:9 40:17
53:18 121:2
**fairly** 65:23 97:8
122:25

**faith** 75:3 171:19
180:15 181:10,12
**fall** 28:13,17 30:11
89:25 115:20
**falls** 112:18 153:15
**familiar** 18:1
125:20,24
**far** 33:7 38:16
64:15 160:21
**fascinating** 93:8
**fast** 23:14,19,23
**fault** 118:9
**favor** 17:16,16,18
34:14 163:16,21
166:17
**favorable** 138:6,6
163:14
**federal** 3:17 10:19
21:16 37:10 122:21
123:12,17
**feel** 91:25 115:7
124:6
**feeling** 92:25 93:9
**feels** 93:10
**fees** 31:25 32:1
**fell** 178:15
**fewer** 133:17,20
161:23
**ffi** 10:17
**fictitious** 83:22 84:4
84:25 105:14 106:2
106:13,14,19 107:1
107:11,18 115:17
116:4
**fide** 106:2
**fifteenth** 5:19
**fifth** 3:23 4:19 6:23
7:16 8:23 11:2 12:4
14:19 41:20
**fiftieth** 8:7
**fifty** 3:23 8:13,17,23
9:2,6,10,16,21
**figure** 31:18 32:10
38:18 48:24 108:3
157:17
**figuring** 117:12

**file** 28:14 69:7 75:6
77:18,19 78:12,18
**filed** 2:2 3:13 6:3
8:8,19 10:12 26:8
43:8,24 45:1 48:13
48:14 53:9,13 57:16
63:20 82:9 97:2
126:13 184:6
**filing** 10:19 73:5
**filings** 48:11
**fill** 93:15
**final** 24:11 145:12
175:24
**finally** 146:1
**finance** 5:2
**financial** 8:10 10:14
11:8 65:13 85:11
90:5 94:22 126:4
137:14,16 146:10
147:13 148:22
152:10 153:10
174:4 175:18 176:6
177:2,5 178:18
**financing** 2:23 11:8
104:20 146:17
185:6
**find** 93:8 104:2
106:9 126:21
152:23 163:22
167:5 173:10
182:12
**finding** 124:7
143:19
**finds** 68:22,23
**fine** 21:12 44:10
79:1,4,11
**finra** 48:11 53:8
58:1,4,14,16
**fire** 62:4
**fired** 49:7 50:18
51:14
**firing** 62:7,8
**firm** 31:9,9,12 32:1
38:14,21 48:7,9,12
49:12,13 50:9 54:16
55:6 60:16,17 61:1
135:22 136:3,14,22

| | | | g |
|---|---|---|---|

136:23 137:2,10,25
138:5,23,24 140:16
140:17,21 142:3,21
143:11,22 145:18
147:7 159:19 160:2
160:7,15,18 161:1,3
161:8,13 164:24
165:5,7 172:7,23
173:20 175:25
**first** 4:19 8:13 10:6
16:8 17:6,21 29:5
29:11 31:22 32:2,4
32:9 33:24 34:11
43:4 48:6 52:25
54:9 64:22,25 66:20
67:13 73:3 74:20
75:14 76:23 77:17
81:6 89:15,17 91:12
92:10 105:8 106:23
109:11 111:3 112:4
124:9 127:3,14
128:9 132:3 148:14
149:6,23 151:17
152:25 167:25
175:23
**fit** 90:24 112:8
115:21 116:17
**fits** 160:14
**fitzpatrick** 12:23
39:1,3,3,8,14,21
40:3,7,11,16,18,22
40:25
**fixed** 49:12 60:16
66:23 147:9 150:7
152:19 157:8,11,19
168:13,23
**flag** 163:24
**flew** 177:22
**floor** 14:19
**florida** 14:5
**flowed** 86:23
**focus** 36:22 134:16
**focused** 64:21
**focusing** 139:20
155:22 164:23
179:20

**folks** 21:11 26:2
38:23 81:17 125:21
**follow** 116:14
155:21 171:16
181:4,6
**followed** 151:18
154:1
**following** 83:1,17
94:15 126:19 131:5
131:16,23 132:17
135:3,14 143:3,4
144:1,11 149:7
152:8
**fonts** 162:13
**forced** 126:20
**foregoing** 54:10
60:25 153:13 186:4
**forget** 170:11
**form** 50:15 51:11
51:15 56:15 129:22
146:12
**formed** 66:15
**former** 84:12
**forms** 41:6 54:1
67:11 134:14
146:25
**forth** 16:18 21:25
54:11 61:2 84:16
91:2 102:22 120:2
121:10 134:18
135:18 150:15,16
153:17
**fortieth** 7:6
**forty** 5:7 7:12,16,20
8:2
**forum** 22:4 23:25
**forward** 17:23
22:19 37:13 46:21
47:1 71:18 77:14
79:9 80:20 82:10
100:25 107:25
109:16 127:7
161:23 170:23
**found** 61:15 85:11
129:25
**four** 3:1,7,10,23 4:1
4:4,11,14 49:7 65:9

73:3 98:21 132:17
132:21 133:10
135:19 138:1
139:15,16 151:7
158:9 165:18
168:10 171:8,11
174:2 178:8 180:23
**fourth** 9:2 10:23
73:7,15 149:21,23
**fraction** 155:3
**framework** 109:17
109:19,22 111:10
**francisco** 21:25
**frankly** 21:16 29:2
33:6 77:22
**fraud** 90:19,20
**fraudulent** 90:20
**frbp** 3:4
**fredric** 13:8
**free** 100:19
**frivolous** 38:17
75:22
**front** 95:15 129:22
**frustrated** 113:20
123:10,11
**full** 34:11 70:22
108:5 156:21 163:4
**fully** 34:14 76:17
**function** 69:17
180:5
**fund** 4:17 10:17,18
**fundamental**
180:17
**funds** 39:25 65:25
66:3,4,12,14 68:7
74:10 76:20 80:8
**funny** 40:1
**further** 47:12 61:17
69:22 70:8 93:19
104:10 114:18
**future** 96:23 145:14
149:1 150:25 155:4
**fx** 6:5
**fyi** 10:17

**g** 16:1 90:15,22
104:9
**gains** 171:20
**game** 140:4 175:16
177:20
**gamed** 175:10
**gap** 36:23
**garcia** 14:7
**garret** 41:2
**garrett** 12:8
**gary** 13:18 16:13
**general** 5:8,12,16
5:19 6:4,9,16,20,24
7:3,6,13,17,21 8:3,9
8:14,19,24 9:3,7,11
9:17,22 10:2,7,13
11:3 16:23 28:5
44:25 113:25
140:19
**generally** 50:20
168:20
**generated** 106:22
**genesis** 103:7 107:7
**genuine** 46:24
105:9 106:3,7
**getting** 20:18 24:18
92:12 118:11
138:16,23 142:7
168:23 178:13
**giants** 3:16
**give** 31:4 39:23
40:14 44:8 50:24
67:7 127:13 129:4
151:10
**given** 28:11 31:2,3
45:19 51:10 52:9
90:8 99:19 100:19
107:24 114:23
120:5 146:6 164:15
169:22 171:21
177:11,20 180:3
182:23
**gives** 28:6 91:21
**giving** 77:9 114:4
119:12 161:19

glance 127:14
glenn 124:10
go 19:6 23:3 26:16
  30:6 33:24 36:10
  39:24 43:18 46:21
  56:24 60:8,23,24
  64:22,25 71:18
  73:22 75:1 76:23
  77:14 79:9 80:20
  82:10 83:12 84:16
  84:16,18 93:3
  109:16 111:3
  120:16 122:9
  131:14 133:23
  134:10 135:9 136:6
  139:14 141:2
  143:18,24 146:22
  151:6 152:6,24
  155:11 157:24
  158:16 159:15
  167:19 170:9
  173:15 174:13
  176:21 177:6 178:4
  180:22
goal 161:21
goes 84:1 92:10,12
  95:16 133:14 135:4
  136:24 170:4
  171:22
going 21:17,22 24:7
  28:2 29:1,21,24
  32:18 35:17,17,22
  37:3,6 38:24 40:23
  42:10 50:24 55:14
  56:24 62:5 65:3
  69:11 73:19 77:19
  78:9 79:15 87:5,5
  91:10,12 100:5,8,25
  110:7 113:24
  115:14 122:5
  124:22 125:2 128:9
  133:25 136:2
  142:12 143:18
  144:8 145:9 151:9
  155:11,25 156:2,4
  157:15 158:16
  161:23 162:18,19

165:13,18,22 167:2
  168:9 169:15 170:5
  170:21 173:9
  175:14,14
goldstein 13:7
good 16:2,3,4,5,11
  17:25 18:3 25:23
  30:4 35:10,11 36:7
  38:9,10 39:1,2 41:2
  43:1,2,19 44:22
  48:2 50:24 54:13
  63:12 71:22,23 75:3
  81:19 110:7,18
  117:22,23 125:21
  125:22 126:1
  162:14 171:19
  180:15 181:10,12
  181:24 182:1
gotshal 12:2,10
  16:6 31:12 32:1
  41:3
gotten 30:13,18
  172:3
govern 146:10
  170:17
governed 88:4
  171:5
governs 91:7
  122:23
gragg 12:25 43:2,3
  43:17 44:22,23 46:5
  47:5 58:7,9
granite 5:2
grant 44:16 124:6
  124:12
granted 28:1 89:20
  89:23
granting 39:11
  124:18
grasp 58:24
grateful 155:22
gray 15:1 71:24
great 81:12 121:8
  175:3
green 1:14
grenai 55:14

ground 91:3
grounds 64:17,21
  69:17 70:2 75:4,14
  76:18 77:14 82:12
  89:15
group 65:10
guajardo 2:3 13:11
  184:8
guaranteed 49:16
  52:17,18 59:4,13
  61:9 133:12 136:5
  148:11 168:24
guarantees 146:10
guarantor 148:22
  153:10
guarantors 137:17
  147:13 174:4
  175:18 176:6
guess 42:15 85:25
  95:11,14
guidance 63:18
  71:15
guidelines 139:11
guise 114:4,24
gwilliam 13:10,18
  16:3,9,11,13,13,16
  16:21 17:2,11,14
  18:22 19:2,9,15,18
  19:22 20:4,11,17,25
  21:3,5,23 22:16,23
  23:7,11,15,18,20
  24:3,7,10,23 25:3,6
  29:10,14,16,18,20
  30:15,21,24 31:1,18
  31:21 32:3,7,9,13
  32:15 33:11,15,22
  34:19 35:4,10,23
  36:5 37:12,18,20,22
gwilliams 26:15,24
  34:25

h

ha 177:12
hair 62:13
hairstyle 57:6
half 17:20 127:2
  155:14,16

haltingly 164:23
hand 84:15,16
  93:16 112:14
  118:22,23 177:22
  181:2
handed 130:4
handled 43:5
handling 16:10
happen 22:19 66:8
  116:24 124:22
  137:1
happened 32:15,16
  53:10 61:15 88:24
  106:10 107:20,25
  108:2,3,5 114:10
  117:12 121:11
  125:1
happening 142:9
  176:25
happens 30:19
  88:22 136:24
  148:16
happy 41:8 72:21
  79:24 81:5 118:5
harbor 90:15 93:9
  166:6,16
harbored 90:22,24
harboring 91:13
hard 125:9 147:19
  147:22
hardship 22:3
harmonized 127:11
harrison 13:14
haven't 136:22
  172:2
head 107:15 117:25
  118:2
heading 129:8
  155:25 156:3,4
headings 155:25
hear 24:17 25:20
  82:6 104:12 117:17
  159:7 170:20
heard 29:2,11 31:8
  31:22 32:10,10
  44:12 122:22
  124:15 167:8 169:2

169:10 180:6,17
**hearing** 3:20 16:14
  28:16 33:20 37:7,14
  43:10,14 92:10
  162:24 163:2
**hedged** 137:19
**held** 29:5 68:2
  100:6
**hello** 63:11
**help** 60:14 93:15
  96:9 137:23 149:6
**helpful** 65:3 159:6
**herring** 112:16
**hi** 16:12
**higher** 68:7 138:11
  141:6,8 150:19
  154:7 176:19
**highest** 132:18
**highlight** 94:1
  134:16
**highlighted** 94:1
  128:18 134:17
**hire** 52:8
**hiring** 46:22 53:3
  55:7,10 56:4
**hit** 27:20
**hogan** 126:9
**hold** 135:7,7
**holder** 41:5 66:13
  67:2
**holders** 66:4,5 68:3
**holdings** 1:7 4:18
  5:1 16:7 41:3 63:15
**home** 19:6 23:3,3
**hon** 1:21
**honor** 2:8 16:3,5,8
  16:11,24 18:1 20:12
  20:17 23:20 24:3
  25:23 26:4,10,21
  28:22 29:10 35:4
  36:14 37:16,23 38:3
  38:5,10,22 39:1,8
  40:3,22 41:2 42:3
  42:14 43:2,11,15,19
  44:17,22 45:11 46:5
  48:2 54:3 57:23
  58:7,9,15 59:18,21

62:2,24 63:6,12
64:6 65:2 66:11,25
67:25 68:16 69:10
70:15 71:11,13,22
72:21,25 74:1 75:5
75:16 76:2,12,12
77:7,9,17 78:11
79:1,8,13,21,24
80:4,23 81:11,19,24
82:6,14 90:2,16
91:11 92:11 93:12
94:7,17 96:1 99:4
99:11,12,19,24
101:10 102:16
103:24 104:18,19
105:3,18 106:4,9
108:1,7,19 109:18
110:20 111:5
112:22 113:3,16
114:1,13,18 115:9
116:4,23 118:4
122:9 124:25 125:7
125:10,13,15 126:1
126:2,12 129:22
131:21 133:18
152:3 155:13
156:17 159:20
162:8 164:21 175:9
181:24 182:21
184:14
**honor's** 39:10 93:15
96:12 103:13
115:12
**honored** 16:16
**honor's** 128:8,13
**hook** 119:11,13
**hope** 61:15
**hopeful** 86:8
**host** 98:23 100:2,3,3
114:10 120:24
**hour** 124:14
**hours** 38:18
**housing** 166:8
**howard** 2:4 13:12
184:9
**hr** 55:7

**hsbc** 5:2
**hubbard** 12:18 43:3
43:20 44:23
**hughes** 12:18 43:3
43:20 44:23
**huh** 17:12 21:5 92:7
138:18 139:22
140:9 142:2 144:4
154:9,14 174:24
175:20
**human** 49:1 56:2
**hundred** 3:7,10,23
4:1,4,11,14 5:7,11
5:15,19 6:2,8,15,19
6:23 7:2,6,12,16,20
8:2,7,13,17,23 9:2,6
9:10,16,21 10:2,6
10:11,23 11:2
**hundreds** 51:3
68:16 176:7
**hundredth** 3:1
**hypothetical** 56:21
175:8
**hypothetically** 30:6
56:19,21 178:15

**i**

**i.e.** 97:3
**idea** 27:11 36:3
67:7 165:22 166:15
168:18
**identical** 83:3,3
141:5,12,13 160:12
**identified** 124:16
180:12
**identifying** 105:21
**ignore** 178:22,24
182:11
**ii** 6:11 7:8 135:4
136:7 142:14,25
143:1
**iii** 13:6 145:13
159:23
**image** 71:3,6,11
**imagine** 35:7
**immaterial** 46:19
**immediately** 41:24
148:18 150:19

153:9 154:6
**impact** 27:22 28:3
94:20 178:19
**impediment** 90:12
**impediments** 33:13
**impetus** 75:6
**implausible** 167:15
173:25
**implicating** 180:13
**important** 27:18
34:4,6,12 66:11
83:7,11 95:3 99:9
99:10 105:2 113:3
133:1 134:7 136:17
146:8
**importantly** 83:20
**impose** 2:12 184:20
**impossibility**
143:21 151:8
**impossible** 147:17
174:11
**improperly** 120:1
**inapposite** 166:7
**inasmuch** 46:1
**incarnation** 94:18
**incentive** 138:10,11
175:16
**incentives** 137:24
**inclined** 112:23
113:16
**include** 39:16
**included** 57:12
109:1 156:21
169:13
**including** 33:13
47:16 54:2 153:16
156:21
**inclusion** 127:23
**inconsistencies**
127:12 169:12,15
**inconsistent** 74:16
127:15 178:7
**inconvenience** 20:9
23:9
**incorporated** 69:12
113:6,13

increase 67:4 68:10 68:24
incurred 31:9 36:24
indemnification 4:8
indemnity 7:17 9:17 146:10
indenture 153:7
indicated 24:25 48:11
indicates 47:19 59:3
indicating 46:15 100:3
indication 59:14
indicative 173:7
indiscernible 30:17 34:6 36:6 38:7,11 41:15 43:12 68:7,8 71:1 107:5 136:5 165:2
indispensable 118:12 120:18
individual 33:17 34:4,8,9,23 35:12 35:19 36:8
individuals 33:14 33:17
indulge 86:1 138:4
indulgence 82:11
industry 68:14,15 177:4
infer 75:21
inference 87:14,15 87:15 163:8
inferences 104:23 163:13
influenced 177:10
inform 43:7
information 55:11 69:23
initial 115:12 150:8 152:20
initially 173:7
injunction 2:1 184:6
inquiry 122:14
insert 147:24

inserted 147:1 158:10
insignificant 123:16
insisted 158:7
insolvency 130:7,8
instance 29:5 154:23
instigated 28:15
instinct 115:12
instituted 130:6,9
institutes 130:5
institution 130:12
institutions 90:5
insufficient 5:8 8:3 9:3,11 10:7 11:3
insurance 27:17 28:2 29:4,11 30:2 30:16 33:4,5,25 37:1 146:9
insurer 27:18 153:8
insurers 152:10
integral 67:16
intend 76:3
intended 89:1 97:12 98:5,6,8,25 101:3 102:4 114:12 147:3 147:3 151:15
intent 97:11,25 98:2 98:13,16,20 99:3,15 103:24 121:3 122:1 156:12 167:7
intents 126:16
interest 23:5 36:11 45:2 65:4,16,23,24 66:22 67:21 68:20 74:11,13,15,18,22 75:8,9 80:5 82:18 105:22 126:20 137:19 168:25 176:22
interested 16:24 32:20 33:6 80:6
interesting 66:6 175:8 179:3
intermediary 109:1
international 65:19

interpret 40:14 114:22,24
interpretation 93:10 99:4 117:15 127:5,22 128:2 147:19
interpretations 98:9,11
interpreted 98:24 98:25
interpreting 127:17
interrogatories 17:21
interrupt 62:22
intervening 176:17
interviewed 46:13 55:13
invented 107:15,17
investigated 61:21
involve 83:2 122:13
involved 32:2 33:16 84:11 118:25
involves 127:6
involving 85:24 112:16
iqbal 167:12
ironic 89:16,22 112:25
irony 89:21
irreconcilable 128:6
isabel 2:3 13:11 184:8
isda 65:20,21 83:10 83:11 87:19,19 88:19 95:20 97:4 102:13,18,22 111:11 116:5,9 129:21,24 130:20 133:6 134:13,18 137:8 139:25 142:18 146:18 147:10 148:3 151:2 152:4 162:11 171:5 171:15 173:17 179:10,23

isdas 97:3 129:18
isn't 177:13
isolated 177:10
issuance 74:16
issue 3:16 21:25 22:1 27:17 29:4,11 34:21 41:16 45:19 46:3,6 47:6 48:6,9 55:3,21 57:2 60:20 63:19,22 66:10,11 66:18,22 67:3,8,13 68:1,8,17 71:4 76:9 77:22 80:1,9,10 93:7,9,12 99:14 105:18 106:8 115:3 123:4 124:3 139:9 163:16 170:18 171:2 178:12 179:8
issues 33:19 34:16 46:1,11,18 48:4 64:16,20,21 65:3 69:18 70:23,24 75:8 91:19,19 92:4 93:1 97:17 105:7 106:9 111:4 122:17 124:15 164:20,20 170:22
item 43:4
it's 127:5 131:4,10 131:21 132:5 133:6 133:25 134:4 135:24 138:9,11 140:2 141:21 142:8 144:9 147:19,21 148:7,7 149:10,10 152:1,16,16 154:15 155:10 157:12,20 158:20 159:19,24 160:8,13 161:9,11 161:15 164:2 165:7 165:9 168:15,22 170:4 172:17,24 173:5,5 174:11,22 175:3,7,8 176:15 177:13,17 179:6 180:8 181:23 182:9 182:19

**iv** 130:3 135:23
**ivary** 13:10
**i'd** 178:14
**i'll** 136:18 153:25
**i'm** 20:18 75:5
  125:23 128:9
  133:25 135:24
  138:22 139:20
  140:10 155:11,22
  155:22 156:2,5
  158:12 161:3
  165:13 167:25
  170:20,21
**i've** 146:20 155:13

**j**

**j** 13:7,18
**j.f.** 13:6
**jacqueline** 12:7
  16:5 25:24
**james** 2:4 12:23
  13:12 184:9
**january** 17:24 47:9
  47:11 48:12 54:5
  55:8 59:9,19,22,23
  60:4,11 62:15
**jim** 39:3
**job** 25:15
**john** 126:11
**join** 120:18
**judge** 1:22 25:16,18
  41:14 117:11,14
  124:10 182:10
**judgment** 25:2 30:7
  44:25 45:11 48:5
  51:20 55:17 61:14
  64:1,3,11,13 69:8
  69:16 70:7,12,16
  73:6 76:24 78:18
  92:14 114:7 123:21
  126:18 130:6
  160:14 163:1
**judgments** 69:13
**judicial** 113:14,25
  114:4,20,24 122:9
  122:11,21,23 123:9
  123:19,23,25 124:4

**judicially** 123:12
**jump** 163:5
**june** 82:19 84:22
  105:21
**jurisdiction** 18:10
  18:13,17 20:19 34:2
**jury** 19:11 24:21
  25:5

**k**

**k** 134:11,17,22
  142:14 145:13,22
  147:4 148:3 150:4
  157:2,4,6 159:23
  165:16 168:4
  170:23 178:7,8
**kane** 13:25
**keep** 19:24 21:12
  142:12 157:12
  170:21
**keeping** 33:2 110:6
**key** 21:10 129:24
  134:12 150:10,12
**kicked** 166:24
**kind** 38:20 40:1,1
  72:24 94:11 164:3
  167:13
**kinds** 100:25
  122:17 169:22
  176:25 180:8,17
**knew** 46:20,20
  96:16 114:11 127:3
**know** 17:14 18:12
  24:6 25:16 26:1,21
  29:12,20,25 31:11
  31:16 33:5,9,11
  34:19 35:13 39:15
  52:11,21 54:22 55:9
  58:15,19 62:6 70:18
  78:21 79:9 80:7,10
  85:19 86:23 91:1
  94:1 100:8,9,16,23
  100:24 103:19
  104:3 109:10 114:9
  114:11 117:2,2,3,19
  119:15 120:2,12
  121:6 124:22
  126:11 147:19

148:24 153:22
  164:19 166:5
  167:12 168:4,18
  180:6,25
**knowing** 176:23
**knowingly** 83:1
**known** 63:15,17
  65:11,13,14,20
  96:24 100:8
**knows** 31:20 65:22
  82:14 90:3,16 108:2
  117:3 120:12
**koster** 126:9

**l**

**l** 11:25 146:3 186:3
  186:9
**lack** 181:10
**laid** 127:7
**land** 161:1,3
**language** 57:13
  59:19 60:1,9,10,15
  62:17 91:1 95:6,15
  96:21 100:3,15
  101:9,12 110:19
  121:2 122:2 128:6,7
  128:19 131:3
  134:17 139:5,7
  147:10,19,20 148:5
  149:3 151:5 152:5
  156:12,16,22 157:2
  158:10,25 159:21
  159:22 160:24
  164:24 165:3
  169:13,16,17
  170:16 179:9
**large** 26:25 42:11
  75:18
**largest** 65:11
  180:11
**late** 10:18 38:6 90:6
  131:8
**latitude** 161:20
**laughter** 39:7
  117:20
**laundry** 74:17
**law** 53:3 89:12,13
  91:1,1,5 98:13,22

98:24 99:9 108:5
  113:5 130:8,8
  163:15 169:17
**laws** 55:3
**lawyer's** 99:9
**lawyers** 78:16,16
  98:22 155:24
  167:20
**lay** 100:11 129:13
**layers** 70:24
**laying** 131:20
**lbcc** 65:11
**lbdp** 65:13
**lbfp** 65:14
**lbh** 84:15
**lbhi** 2:9 12:3,11
  14:18 38:25 39:9
  40:24 41:1,18 42:14
  63:15,20 184:15
**lbi** 2:9 38:25 39:3,9
  39:14,16 40:24
  41:16 42:16 45:14
  45:15,17,18,23
  47:17,18 48:16,20
  49:21 50:6 52:1,2,3
  53:1,7,24,25 58:10
  58:12,20,23 59:1
  61:10 184:15
**lbi's** 53:25
**lbsf** 82:9,14 83:18
  84:15,18,20 85:6
  86:11 89:10 93:21
  94:2 103:22 111:7
  112:13 118:22
  130:5
**lch** 83:2,15,16 84:9
  84:9,10,11,14,16,17
  84:18 85:5,6,6
  86:11,12 107:19
  109:1 110:3,9,12,12
  110:23 112:16
  115:15 118:4,4,5,8
  118:8,8,10,12,12,15
  118:23,25 119:8,10
  119:10,17,19,22,22
  120:1,1,7,8,9,14,17
  121:11,15 122:5

lch.clearnet 82:19
leading 132:18
135:19 164:2
171:25 179:19
leap 117:9
leaps 104:24
led 146:16 147:14
left 80:2 147:15
150:24
leg 119:7
legal 33:12 67:3
68:8,21 99:13
112:20 115:3
122:20 123:8
legally 48:22 135:25
136:12
legitimate 106:4
115:3
legs 85:20 120:4
lehamn 184:17
lehman 1:7 2:11,19
2:22 3:4 4:18,22
5:1,6,10,14,18 6:1,7
6:14,18,22 7:1,5,11
7:15,19 8:1,6,12,16
8:22 9:1,5,9,15,20
10:1,5,10,16,22
11:1,7 16:6 41:3
43:21 46:12 48:11
48:14,24 55:16
56:12 57:1 60:11
63:15,16 65:10,10
65:12,13 85:11 87:2
95:5,13,13,14 96:25
97:3,6 101:16,16,17
102:4,10,12,15,18
102:23,24 103:14
103:15 104:20
108:20,21,24 109:5
109:8,12,13,14,19
109:21 110:12
111:14,22 112:3,3,8
112:9,25 115:20,22
115:22 117:7,7
120:13 126:13,18
126:24 127:21
129:17 131:6,11,23

134:21,24 135:2,18
137:8,12 140:3
145:23,24 146:20
147:1,6,25 148:5,20
149:7,16,18 150:23
151:1,4,18 152:6
156:16,23,25
157:10 158:10,14
158:25 159:1,3,9
160:8 168:16,19,19
171:7 172:13 173:4
173:25 175:12,14
177:7,11,15 180:3
181:9 185:5
lehman's 59:5
107:23
lehman's 126:19
136:17 158:16
160:20 163:24
164:11 172:25
176:13
length 134:15
147:23
letter 43:8 45:21
47:6,7,12,19,22
49:3,11 51:18 54:6
54:21 58:11 59:3,7
59:23,24 60:4,5,21
61:6 62:10,17 70:2
163:15
let's 144:21 147:21
167:24 170:21
lexington 13:3
li 5:3
liability 3:2,24 4:2,5
4:12,15 5:16,20
6:16,20,24 7:17 8:3
8:24 9:11,17 10:3,7
10:24 11:3 33:18
39:18
liable 35:24 163:9
liberally 163:15
license 54:13
lies 128:12
lift 35:14,16
lifted 37:6

lifting 35:17 68:6
light 85:11 89:16
163:13
limit 27:20
limited 5:2 82:19
114:3 159:25
linda 2:3 13:11
184:8
line 111:5 184:4
185:4
liquidated 18:15
liquidation 18:18
list 74:17
listed 37:6 38:6
listened 118:6
literal 180:19
literally 38:18
160:22
litigants 113:20
litigate 22:2,4 23:3
81:1
litigated 19:11 20:5
litigating 27:8
113:21,21
litigation 17:10,11
17:19 19:2,5,25
20:13 22:11 26:6,16
27:8
little 24:12 29:25
34:17 63:21 67:25
71:25 74:22 93:18
119:18 124:20,21
142:8 170:23
live 26:18 83:16,24
85:1,4,5,10,16,22
85:23 86:9,10,11,12
86:13,14 87:8,18
94:4,5,8,8 98:17
100:15 105:15,15
107:9 108:22 109:8
109:21 110:23
111:16,16,20
112:11,13 118:20
119:9,10,14 120:9
121:6,10,14 176:17
178:15 180:8

living 176:11
llc 2:18 3:16
llp 2:7 12:2,10 13:1
14:1,10,17 15:1
16:6 184:13
lo 139:23
loan 4:9 126:15
165:2
loans 148:13
local 64:15 70:1
72:6 144:1
locate 45:9
locating 175:24
logic 156:19
logical 77:16
london 107:19
long 17:8 28:25
134:24 135:2 171:4
173:19 176:1
longer 126:8,15
look 28:2 38:24
88:8,9 98:12,15
99:2 108:23 111:5
112:6,7 123:17
139:24 146:2
159:21,22 161:14
164:5,14 167:24
looked 88:25
looking 137:18
163:7 169:1
loose 80:2
lose 25:13 177:21
losing 20:19
loss 132:2,11
133:18,21 143:12
165:19 171:16,22
171:24 172:5,6,8,9
174:8,10 179:10,14
179:18 180:14
losses 171:19
lost 56:13 181:2
lot 27:7 36:9 64:20
64:20 84:25 91:10
119:17 120:4
124:15 169:2 177:6
178:14

**lotc** 63:17,21 65:10
65:18 67:9,10 68:2
**lots** 97:12
**love** 117:23
**lovells** 126:10
**lower** 66:14 138:11
150:19 154:8,13
**lp** 4:17
**lynch** 2:23,24 13:2
81:25 82:4 89:24
105:3 107:18,24
108:20,22 109:5,20
111:6,7,9,14 185:7
185:8

**m**

**macro** 4:17
**madoff** 106:14
107:2
**magic** 170:24
**maher** 14:17,22
104:19,19,22 105:6
105:11,16,18
106:12,16,18,25
107:3,10,12,14,23
108:11,13 110:4,11
110:15,20 112:6,15
113:19 114:8 115:5
115:9,25 116:3,8,12
116:15,19 117:24
122:10,12 123:9
125:13,15
**maher's** 118:6
**main** 93:4,7,7,9
**maintained** 137:15
**major** 90:4
**majority** 65:17 80:4
**maker** 132:24
**makers** 132:16,17
132:21 133:11
135:20 151:7 171:8
171:12 174:2 177:1
**making** 19:17 51:16
61:8 75:2 85:25
90:23 92:1 137:18
138:24 155:21
175:7

**management** 56:9
**manager** 55:14
**managing** 26:22
**manges** 12:2,10
16:6 41:3
**manner** 127:18
145:17 160:2,5
164:21
**marcus** 12:7 16:4,5
16:6 25:23,24,25
26:4,8,10,14 27:12
27:24 28:4,11,21,25
30:8 31:8,19,23,25
32:4,6,8 33:21
34:18,24 35:7 37:15
37:16 38:1,3,5,22
42:14,18,21,23,24
**mark** 15:6 71:24
**market** 132:2,7,10
132:14,16,17,18,20
132:21,24 133:7,10
133:11,14,20 134:2
135:6,13,17,20
136:2,9 137:10
138:1,16 139:24
142:17 145:23,25
150:6 151:6,7,9,10
157:15 159:24
164:11,15 166:21
168:5,6,8,12 171:8
171:12 172:2 173:1
174:2,25 176:2
177:1,1,16,17
178:25 180:1,22,22
181:5
**marketplace** 173:9
173:16
**markets** 172:1
179:20,25 180:5
**marta** 14:7 38:12
**mary** 44:1 45:1
52:10 62:13
**massachusetts** 2:16
43:25 44:6 184:24
**massive** 178:25
**master** 65:19 83:10
129:21,25 130:20

133:6 134:13,19
137:8 142:18
146:18 147:11
148:3 151:2 152:4
167:25 171:6,15
173:17,17
**masters** 65:20,21
**match** 134:9
**materials** 123:23
**matter** 1:5 16:8,23
19:15 38:5 43:5,22
43:23 44:19 47:1
53:3 63:9 76:22
81:16 82:10 91:8
93:18 98:13 108:4
111:23 138:12
155:25 167:5
**matters** 42:15
**matthew** 13:25
**maximum** 80:14
174:17
**mba** 46:2,12,16
**mc** 82:8
**mcneil** 2:4 13:12
184:9
**meaghan** 12:25
43:2 44:22
**mean** 24:10 29:24
32:25 33:15 36:9
39:22 59:12 61:19
70:13 78:20 84:24
88:24 100:6,6,13
102:4 107:24
109:25 119:16
132:17 133:25
153:16 161:19
167:20 171:17
176:1,9 177:1,22
180:3 181:12
**meaning** 96:25
127:13
**meaningful** 27:6
**meaningless** 127:16
**means** 18:12 30:6
58:18 68:4 69:13
109:25 124:12
132:14 156:6

177:12
**meant** 39:5 130:16
146:1
**measure** 132:2
**mechanics** 137:24
**mediation** 27:14
28:15 32:2,4,16,18
45:4,6
**mediations** 21:24
31:14
**meets** 123:1,24
**mention** 149:15
**mentioned** 33:13
77:23 94:23 102:16
118:4 126:6 151:25
**mentions** 58:14
156:24
**merely** 72:3 76:11
**merit** 112:19
**meritorious** 75:23
**merits** 76:4,9,14,16
76:21 77:1 112:20
**merrill** 2:23,24 13:2
81:25 82:4,18,21
83:18 84:20 85:6,15
85:24,24 86:12
89:23,24,24 90:8
97:1 100:19,20
105:3,21 107:18,24
108:20,21,24 109:5
109:8,11,20,21
110:12 111:6,6,9,14
112:14 118:23
122:3 185:6,8
**merrill's** 82:17
**met** 55:23 171:10
**method** 132:3,3,4,7
133:18,21 134:2
142:18 157:14
171:16 182:13
**methodology**
150:14,16
**miami** 14:4,5
**michelle** 2:4 13:12
184:9
**michigan** 166:7

midwest  26:20
miller  12:16 63:11
  63:12,13,24 64:6,8
  64:11,19 65:2,8
  68:12,15 70:10,15
  70:17,22 71:9,11,13
  71:15,18,20,21
  72:19,21,25 73:10
  73:12,15,18,22,24
  75:13 76:6,13 77:13
  77:20 78:5,25 79:15
  79:23,24 80:13,17
  80:20,22 81:1,3,5,9
  81:11 89:16
miller's  75:2 77:7
million  27:11,16,20
  29:25 30:8,13 89:8
  107:23 181:8
millions  68:16
  121:9
mimic  84:6 116:13
  121:4
mimicked  102:25
mind  37:2 128:22
  157:13 158:16
minds  46:25
mineola  186:21
minimize  145:14
minimum  55:21
  169:7 171:12
  180:20 181:12
minute  87:6 109:25
minutes  169:10,10
mirror  71:3,6,11
misconduct  54:15
  55:2 57:13 163:9
misleading  112:19
mismatch  147:14
  152:12
misperception  55:6
misreads  172:15
misstated  108:16
misstatement  108:7
misstatements
  105:3
misstating  92:11

mistake  117:1
  125:3
mistakenly  85:9,16
mistakes  156:19
mlcs  81:16 84:15,18
  84:21 85:4 105:21
  118:23
mlcs's  82:8
mode  138:1,2
  157:14
modified  6:11 7:8
modifies  160:6
mohr  3:14
moment  24:20
  25:20 66:17
money  27:7 28:10
  30:11 42:11 91:2
  107:23 119:12,25
  120:7,8,10 126:19
  127:1 128:12
  143:14 147:17
  148:21 175:12,13
  181:8
monies  86:19,21,23
  120:2
months  49:7 50:18
  51:14 52:21 60:22
  62:3 83:3 84:23
  86:25 89:17 181:7
moody's  139:11
moore  4:17
moring  81:20
morning  16:2,3,4,5
  16:9,11 25:23 38:9
  38:10 39:1,2 41:2
  43:1,2,19 44:22
  48:2 63:12 71:22,23
  72:9,14 76:3,14
  77:22 78:23 81:16
  81:19 82:7 83:6
  91:11 125:17
mortgage  4:9
motion  2:1,7,12,12
  2:24 3:16 4:7,19
  10:17 11:10,11,11
  16:9 17:15 21:2,4
  22:4,10,13 24:18

  25:1,1,2 37:9 38:8
  39:11 43:23 44:5,8
  44:12,16,24 51:21
  55:17 56:17 63:19
  64:1,2,12 65:1 67:4
  67:14,15 68:21 69:3
  69:8,9,11,15,15,16
  69:21,24 70:5,7,7
  70:12,14,18,19 71:3
  71:3,6,19 73:6,8
  74:6 75:3,21,25
  76:18,23 77:13,15
  77:19 78:18 79:16
  79:20 82:8,22 83:20
  83:21 87:23 91:18
  92:13 93:21 95:25
  96:2 98:10 99:23
  103:23,23 104:24
  106:5 108:14
  112:21,23 113:2,7
  113:11,11 114:4,13
  114:25 117:3,13
  120:22,23 124:6,12
  124:18,21,23
  162:23 163:3,9
  169:25 184:5,12,18
  184:19 185:7
motions  23:22
  24:19,24 64:3,13,14
motivations  138:5
move  18:4 22:19
  23:13,17 25:9 26:3
  34:15 37:6,13
  131:24 159:4
  178:25 181:8
moved  24:1 36:18
  87:4 89:14 114:7
  121:9 164:11
movement  164:15
moves  166:21
moving  17:23 18:2
  24:4 75:14 174:25
muhammad  55:14
multiple  127:6
  177:18 179:13
multiply  155:3

multitude  96:19
mutual  107:17
mystery  78:20
  79:16
mystification  72:20
mystified  71:25
  72:10,11,15 78:3

**n**

n  12:1 16:1 146:15
  184:1 185:1 186:1
n.w.  12:12
naier  126:1
name  16:13 38:10
  43:19
named  34:8,9 118:9
  118:10,13
narrow  114:3,24
national  4:23
naïve  95:22 96:17
  138:3
neatly  160:15
necessarily  51:17
  70:13
necessary  63:21
  143:22 171:13
need  19:21 29:3
  34:11 35:13,13,16
  38:23 63:18 66:2
  79:23 80:7 95:10
  104:10,12 106:9
  108:2 132:20
  133:23 134:9 137:3
  139:15 148:24
  149:17,17,19
  152:24 157:13
  169:16 171:24
  179:17 180:9
needed  96:20
  176:21
needs  20:14 24:2
  39:15
negative  68:22
  171:20
negotiated  134:15
  146:23 156:14,21
  158:6 169:21 174:5

negotiating 147:23
neier 125:25 126:10
  162:6 181:18,24,25
  182:1,2,6,16,19
neither 44:6 112:1
  112:2 163:23
nervous 98:4
net 84:20 89:7
  120:5 182:8
never 23:1 31:2
  34:6 35:12 45:16,22
  47:11,17 48:8 49:19
  50:6 51:25 52:3
  53:1 55:9,19 56:7
  58:10,23 61:6,10,10
  126:19 145:24
  156:24 157:22
  164:7 169:16
nevertheless 103:20
  159:18
new 1:2,15,15 12:5
  12:21 13:4,4,23,23
  14:13,13,20,20 15:4
  15:4 21:11,14 22:2
  84:13 85:18 89:1
  113:24 116:24,25
  118:7 135:16,17
  136:2,6,9 165:23
  169:17 186:21
newman 2:14 43:25
  44:6,14 184:21
news 50:24
nexus 101:23
  116:10
nice 81:23,24
nicest 39:5
nicholas 14:8
nick 38:11 41:14
night 38:6
nine 24:7 26:2
ninth 4:14 8:2 9:21
non 22:4 23:25
  75:22 105:21
  130:22 131:4
  139:12,18 141:7,24
  145:15 157:16
  160:13 161:20

171:18,21,23 172:9
  176:22
nonsensical 138:7,9
  140:7
normal 28:17
normally 51:14
nos 3:21
nose 91:22
notated 119:7
note 26:18 82:2
  83:7,13 99:5 108:25
  123:16 147:21
  154:17
noted 89:21
noteholders 137:14
  152:9 169:4 175:17
notes 137:13 148:18
  148:19 149:13
  153:8,10,11 154:7
  174:5
notice 11:10 40:4
  60:19 113:14,25
  114:4,20,25 122:9
  122:11,21,24 123:9
  123:12,19,23,25
  124:4 130:15,24
  131:1,6,8,11 143:17
  144:17,21 146:6
  161:12 172:19,20
noticeable 123:19
notices 176:8
notion 22:25
notional 148:6,10
  148:15,25 149:6,7
  149:11,16,18 150:8
  150:9,14,18,24
  151:11,14,16,21,21
  151:22 152:1,17,20
  152:21,25 153:3,13
  153:17,18,19,23
  154:7,18,19,20,25
notwithstanding
  17:7 25:5,25 61:11
  92:1 134:23 145:21
  146:4 150:5 153:13
  157:4 168:11
  169:13 182:7

november 131:11
  131:18,23 140:18
  144:22,22 145:5
  161:9 164:10
  172:13,17,19,24
  173:9,15 174:8,22
  174:23 175:1,1,2,4
  175:4,25 176:14
  177:12,13,17,20
  178:16 179:6,22
  180:22
number 23:5 63:14
  74:19,25 75:18 77:2
  77:3 98:15 105:12
  115:7 133:16
  154:10,22 155:2,4
  164:10,14,14 167:1
  167:2,2 171:21
  173:5,6 175:18
  180:7 181:7
numbers 138:20
  154:5,24
numerator 154:24
numerous 29:5 48:4
ny 12:5,21

**o**

o 1:20 16:1 186:1
oakland 13:16
  16:14
objection 3:1,7,10
  3:13,20,21,23 4:2,5
  4:11,14 5:7,11,15
  5:19 6:2,8,15,19,23
  7:2,6,12,16,20 8:2,7
  8:13,17,24 9:2,6,10
  9:16,21 10:2,6,11
  10:23 11:2 28:14
  38:7,17 40:10 44:25
  45:3
objective 18:8
obligation 166:23
  170:5 178:19
obligations 175:17
  177:21
obtain 54:12 135:22
  136:3 143:22 174:3

obtained 163:23
  169:20
obtaining 83:17
  145:23
obvious 145:14
obviously 17:2 18:8
  28:12 35:5 67:20
occur 18:14
occurred 17:9,24
  45:6 47:11 106:15
  129:9 130:22
occurrence 131:16
  133:3
occurs 150:12 153:6
october 1:17 27:13
  69:4 130:18 164:10
  173:6 178:16 179:7
  179:22 186:24
offer 45:13,14,16,20
  45:25 46:14 47:5,7
  47:12,19,22 49:3,11
  51:24 52:2 53:7
  54:17,20 58:20 59:3
  59:7 60:5 61:6
  126:25 135:22,25
  136:4,14,22,23
  137:2,10 138:1,5,24
  138:24 140:17,17
  142:3,21,22 143:11
  143:22 145:18
  147:7 159:19 160:2
  160:7,15,18 161:1,3
  161:8,13 164:24
  165:7 172:7,15,23
  173:7,20,22 177:13
  177:13,15,16,23,24
offering 141:14
offers 140:16,21
  142:20
offset 182:9
oh 29:15 39:23
  156:2
okay 21:10 23:15
  23:16,21 24:12,23
  30:23,25 31:19,24
  32:5,7,11 36:16
  38:13 40:15,21

41:10,12,17 42:17
43:11,15 44:19
53:12,17 58:3 60:8
63:23 64:18 65:7
71:12,12 72:17
73:11,14,17,21 74:1
74:3 75:11 76:2,5,8
77:10,12 78:24 79:6
79:22 80:16,19,21
81:4,8 86:6,7,17
88:17,20 89:3,5
91:15 92:22 93:3,6
93:14,17,23 103:6
103:16 104:5,13
105:5,17 107:3,5
110:9 117:17
119:24 128:10,17
129:10,16,23 135:9
135:10 136:25
137:6,22 139:6,7,20
140:14,19 141:4,23
142:6,10,12 145:7
145:11,12,21
151:20 152:13,24
153:2,3,18,24,25
154:2,3,16 158:12
158:19,20,22
159:13 161:24,25
162:5,17,18 163:20
166:20 170:7,8,22
174:20 178:3
181:16,20,21
182:15,22
**old** 89:2 165:4
186:19
**olifant** 10:17
**omnibus** 3:1,7,10
3:23 4:2,5,11,14 5:7
5:11,15,19 6:2,8,15
6:19,23 7:2,6,12,16
7:20 8:2,7,13,17,23
9:2,6,10,16,21 10:2
10:6,11,23 11:2
**once** 83:13 84:9,11
106:22 112:17
123:17

**ones** 57:15 83:9
84:3 89:1,2 119:22
172:3
**opened** 69:14
**operate** 164:20
**operative** 108:15
**opinion** 36:11
**opportunity** 61:23
**opposed** 92:14
107:11 133:13
138:1 142:4 165:1
166:11
**opposition** 83:20,21
103:23 118:3
**opt** 113:22
**option** 136:19,21
**optional** 131:4
**oranges** 142:5
**order** 2:13 4:8
10:18 18:25 28:8,9
34:7,8 38:1,24
39:10,17 40:10,12
40:19,23,24 41:7
43:23 44:12 61:20
63:1,3 69:7 72:2
74:9,10 76:10 78:6
79:15,25 80:7 81:6
89:7 99:12 116:19
125:11 137:15
163:21 174:12
175:2 184:19
**ordered** 33:25
**orders** 28:14
**ordinary** 66:13
79:10
**orick** 31:9,25
**oriented** 115:11
**original** 66:4 67:1
68:3 74:8 80:8 83:8
83:11 84:10 87:19
87:19 97:4 102:13
102:18,22 103:2
105:24
**orms** 11:25 186:3
**ortigon** 44:19 45:1
45:12,16 46:10 48:3
48:15,19 52:8 55:20

56:11 60:6 61:15
**ortigon's** 46:8
**otc** 2:19 63:17
**ought** 21:11 64:22
76:22 119:15
120:18 167:16
**outcome** 21:17
105:6
**outdated** 181:7
**outlined** 75:4
**outside** 29:6 158:8
**outstanding** 131:2
153:5
**ovation** 84:14 85:18
**overcome** 58:20,23
**overnight** 176:10
**override** 170:5
**owed** 120:10 157:17
**owes** 157:17
**ownership** 66:25

**p**

**p** 12:1,1 14:15 16:1
**p.m.** 125:19,19
**p.o.** 13:15
**page** 24:4 54:9 60:3
60:15,24 70:2 92:23
109:10 111:3 130:3
132:11,17 133:24
134:12,13 135:23
135:24,24,24 137:4
142:14 145:14
146:2 147:2 148:6
159:23 167:25
172:22 184:4 185:4
**pages** 147:23 148:1
156:22 162:21
**paid** 39:21 47:13
50:15 54:11 56:14
57:1 60:25 61:2
132:22 176:19
**paper** 78:4,10,11
97:14 143:23
**papers** 16:19 17:7
20:8 26:24,24 29:13
47:25 48:24 53:6
59:4 70:6 77:5,7,8
77:11 83:5 84:3,25

91:10,18 93:21,25
96:1 103:23 116:20
118:3 126:6 128:5
164:16 181:23
182:3
**parade** 180:11
**paragraph** 60:15
73:5,7 105:20,24
149:6,21,24 151:17
152:25 154:23
155:12
**paragraphs** 73:3,4
73:15 79:25 80:1
81:6 84:1 121:8
148:14 149:23
150:17 154:4,22
**paraphrase** 133:25
**parens** 143:8
**park** 12:20
**part** 23:21 26:12
28:7 31:3,14 34:5,7
39:19 40:9 42:15
77:25 78:2 95:25
97:14 100:6 110:1
131:19 132:6
134:11,17,22
135:23 142:13
143:7 145:13,22
146:2 147:4 148:3
148:16 150:3 157:2
157:4,6 159:23
168:9 170:23
**particular** 66:19
82:4 93:24 94:13
97:25 100:14,24
**particularly** 70:18
155:10
**parties** 60:7 66:8
74:17 83:1,25 86:25
88:24 94:21 96:20
97:10,12 100:4
108:23,25 114:11
118:23 121:14
122:1,16 127:20
132:5 134:17
139:13 143:18
147:1,22 148:24

151:15 156:18,20
167:7 169:21
182:12
**parties'** 156:12
**partners** 13:20
126:10
**parts** 122:16
**party** 3:17 41:8
44:7 67:4 80:8
109:1,13 110:3,9
113:22 118:9,12,24
119:19 120:14,15
120:19 122:7
126:22 130:5,21,21
130:22,23,24 131:4
131:6,18,20 132:1
132:13,22,23 133:2
134:21,24,25,25
135:2,18 136:11
137:9 138:5,7
139:19 141:7,25
143:6,7 145:16,16
145:23 146:4
149:18 150:23
151:4,24 157:16
159:25 160:14
161:20 171:18,21
171:23 172:9 175:6
176:22 179:14,17
**pass** 38:20 52:9
179:7
**path** 33:1 56:24
**patiently** 81:17
**paul** 14:23
**pause** 28:6 42:25
44:20 54:8 63:8
81:14 91:21 137:21
159:7
**paved** 90:5
**pay** 30:20 59:6
60:11 65:15 123:17
126:19 143:14
175:14 177:7
**payable** 6:12 7:9
47:9,21 51:7 52:1,2
54:12 56:9 59:7,9
62:15 132:1 133:15

134:1,20 143:13
148:18 149:2 153:9
**payee** 65:25
**paying** 62:8
**payment** 41:8 47:14
52:19 54:14 55:24
56:7 74:13 132:2,3
133:3 141:8 171:14
172:20 174:10
**payments** 42:4
65:24 82:15,16
84:16,21 86:24,24
89:12 90:17 118:15
131:25 148:7 149:1
150:25
**peace** 94:4
**peck** 182:10
**pending** 2:15 17:8
184:22
**people** 34:7 55:13
75:18 80:9 169:4
176:11,21 180:5
**percent** 24:12 30:22
67:8,10 68:2
**perfect** 36:17
128:20 134:5
137:11 139:21
**perfectly** 155:8
**perform** 47:16
**performance** 47:8
52:1 61:1 123:4
**performed** 35:21
45:17,22 47:21
49:19 56:7,14,20,21
59:2 61:6,6 122:16
131:22
**performing** 48:21
49:18,23 55:5
**period** 41:24 53:24
54:25 55:19 130:16
145:2 150:11
153:14,15 166:22
174:17 176:17
178:16 179:1
**periods** 60:25
**permission** 128:9
128:13

**permit** 10:18
**permitted** 142:20
**perplexed** 119:19
**person** 155:7
**person's** 100:11
**personnel** 46:13
176:9
**persuasive** 104:21
104:22,24
**pertain** 23:1
**petition** 65:4,15
67:21 68:20 74:11
74:13,15,18,22 80:4
84:22 85:3,22 87:1
87:2 90:18 94:6,9
98:18 103:3,11
109:9 110:24 119:9
121:7,11 122:6
130:9,10
**ph** 38:14 44:2,19
55:7,14
**phone** 161:10 165:5
165:9
**phrase** 150:13
**physical** 143:21
151:8
**pick** 97:12 140:1,2
140:3 161:10 165:5
167:12
**picking** 138:24
**picks** 97:6
**piece** 78:4 97:13
**pierce** 44:1,2
**place** 19:2,5 22:7
67:5 87:1 126:13
**plain** 91:22 94:16
122:11 169:25
170:1
**plaintiff** 23:2 163:7
163:14,17
**plaintiffs** 17:16,18
17:21 18:20,21 19:7
26:17 28:2 63:25
64:8,14 66:2,19
67:20 68:5,18 69:3
69:5,7,25 71:25
73:6 88:9

**plaintiff's** 163:12
**plan** 2:2 4:1,4 27:3
41:4,23 42:1,3,4,5,9
63:14 64:23 65:5,14
66:17 67:12 68:1
80:6 90:5 184:6
**plans** 50:20 51:14
**plausibility** 173:25
**play** 128:1 149:4
170:15
**plaza** 12:20
**pleaded** 124:20
**pleading** 94:16
113:3,13
**pleadings** 28:23
77:18 118:2
**pleads** 163:7
**please** 50:10 63:13
**pleased** 16:16
**pleasure** 81:18
**pled** 169:9
**plenty** 69:25 166:14
**plus** 45:1 89:8
147:23 156:21
**pm** 11:6 183:1
**point** 19:17,19
22:12 27:3 34:3,4
36:24 42:6 46:7
55:23 58:4 62:2,22
70:17 74:20 75:23
75:25 83:8 87:6
90:10,11 92:16
93:20,24 94:14
97:16 100:4 101:3,4
108:6 110:20
111:18 114:7,14,18
119:15,16 122:9
155:20,21,23,24
160:25 167:18
178:6 182:14
**points** 20:9 21:10
33:23 92:8,9 105:2
165:16
**policies** 54:16 55:2
57:14 62:6
**policy** 31:2,4,6 59:5

**pool** 148:13
**portfolio** 120:14
**portion** 49:15 50:14
  60:21
**pose** 42:8
**position** 46:5,18
  47:6 53:15 69:22
  72:5 75:17 76:7,14
  76:17 127:24 170:2
**positions** 74:9 76:4
**possible** 24:5 39:6
  71:1 127:12 174:1
**possibly** 80:14
  180:18
**post** 65:4,15 67:21
  68:20 74:11,13,15
  74:18,21 80:4
**postscript** 170:12
**potential** 46:10
  175:24
**potentially** 40:5
  50:15
**practical** 131:16,17
  166:3 172:11,12
  173:21 179:16
  180:2
**practitioners** 72:23
**pre** 53:3 55:6 68:20
**preamble** 108:23
**precedent** 42:6
**precedes** 23:20
**preceding** 150:19
**precise** 70:17
**precisely** 182:11
**preclude** 33:18 48:5
  74:15 124:17
  145:23
**precluded** 77:3
  173:18
**precludes** 33:3 46:3
**predecessor** 66:21
**predecessors** 67:22
**prefer** 23:2 25:6
  44:9
**preferable** 38:16
**prejudiced** 36:19

**preliminarily**
  147:21
**preliminary** 74:4
**prematurely** 173:8
**preparation** 125:9
**prepared** 28:19
  47:25 78:22,24
**preparing** 27:13
**prepayments**
  148:12
**preprinted** 129:21
  134:14 146:25
**prescribed** 53:24
**present** 38:11 68:18
  72:14 106:12
**presentation** 28:25
  71:25 76:6,11 118:6
  130:12
**presented** 18:16
  64:16 66:18 67:3,14
  76:16 123:22
  130:10
**presenting** 72:3,5
  75:5 76:13
**preserving** 133:2
**presumably** 20:1
  138:19
**pretrial** 2:20 4:25
  5:4 21:13 63:10,18
**pretty** 86:5 91:9
  95:6 99:3 182:9
**prevent** 49:22
**preview** 77:9
**previous** 85:7
**previously** 85:20
**price** 141:6
**priced** 176:23
**prices** 171:25
  177:10 179:19
**pricing** 152:6
**primarily** 101:14
**principal** 29:7
  148:19 149:13
  153:5,11
**principles** 127:6,22
  163:19

**printed** 65:22
**prior** 88:25 94:21
  103:1 113:1 121:5
  125:1 142:21 146:6
  154:6,22 173:15
**prisoners** 113:21
**privilege** 32:17
**probably** 22:3
  82:14 96:17 120:15
  171:3
**problem** 36:14
  118:14 127:3
  180:17
**problems** 120:25
  139:16 147:18
**procedural** 34:16
  36:13
**procedurally** 24:13
**procedure** 3:18
  10:19 20:5 21:16
  28:17 37:7 76:10
**procedures** 4:8
  28:14 45:5
**proceed** 20:23 35:2
  35:19 37:9 43:17
  49:2 61:17 148:22
**proceeding** 2:11,18
  2:22 4:17,22 5:1,6
  5:10,14,18 6:1,7,14
  6:18,22 7:1,5,11,15
  7:19 8:1,6,12,16,22
  9:1,5,9,15,20 10:1,5
  10:10,16,22 11:1,7
  11:10 42:19 63:14
  63:16 66:19 67:3
  75:3 82:1 130:6,9
  130:10 150:17
  154:25 184:17
  185:5
**proceedings** 2:9
  23:13 183:1 184:15
  186:5
**proceeds** 30:17
**process** 17:22 23:1
  26:21 55:7,10 56:4
  132:8 134:18 137:9
  143:16,19 144:8,10

  170:15 181:5
**produced** 45:8
**product** 8:10 10:14
**products** 4:23 65:13
  65:14
**professor's** 99:10
**professors** 98:22
**profited** 163:23
**program** 46:12,17
  55:9,19
**proof** 3:13,21 102:5
  111:22
**proofs** 6:3 8:8,19
  10:12 97:1 110:5,11
  111:9 115:21
**proper** 6:4 8:9,18
  9:13 10:13 39:11
**properly** 33:19
  39:21
**propose** 40:12
  160:13
**proposed** 61:5
  63:25 64:11 69:7,23
  73:1 79:25
**proposition** 163:18
**prosaic** 91:4
**protect** 158:15
**protecting** 158:20
**protection** 40:1
**protects** 90:16
**provide** 41:9 131:20
**provided** 2:2 58:17
  67:17 130:16
  131:22 145:21
  153:5 176:16 184:6
**provides** 42:4 59:5
  59:8 130:2
**province** 99:13
**proving** 56:19
**provision** 39:16
  40:12 90:15 130:14
  145:13 146:4 147:5
  158:7 167:5 168:18
**provisions** 57:24
  65:24 129:24
  145:22 146:21

**proxy** 152:1
**published** 65:19
**pull** 36:8 112:2
**purchasers** 68:3
**pure** 123:7
**purpose** 35:18
 66:15 72:7 79:8
 80:13 85:13 94:2
 149:5
**purposes** 20:13
 21:13 82:22,24
 98:12 126:16
 148:25 149:24
 159:23 168:1 172:5
 173:1
**pursuant** 10:19
 45:5 83:10 132:1
 150:1,3 168:3
 171:17
**pursued** 164:7
**pushed** 106:21,22
**put** 21:24 40:4
 63:21 65:5 81:9
 82:20,25 83:15 85:9
 85:16 88:23 97:13
 99:21 100:8,9
 122:19,20 157:2,7
 167:5 168:21
 169:16 181:1
**puts** 178:8

**q**

**quarrel** 127:21
**quasi** 91:6
**question** 19:16 36:1
 48:22 50:11 66:6
 69:18 70:23 76:12
 95:17,22 96:12,17
 103:2,13 122:15
 123:8 126:13 138:4
 138:8 139:4 140:7,8
 140:13 161:1 167:6
**questions** 44:3
 47:24 68:21 93:8
 159:5 162:3 169:20
**quibble** 88:7
**quibbles** 172:13

**quickly** 18:20 24:5
**quite** 18:1 27:4,15
 47:22 68:13 96:22
**quotation** 132:2,7
 132:10,14,21 133:7
 133:14 134:2 135:6
 135:13 136:3,10
 137:10 138:1
 142:18 150:6
 159:24 168:5,6,8,12
 172:24 173:1
 180:23 181:5
**quotations** 132:16
 132:20 133:10,16
 133:20 135:17
 138:16 139:24
 145:24,25 151:6
 165:2 171:13,24
 172:2 173:16
 177:18 179:13,18
**quote** 107:5 142:1
 149:24 151:10
 171:18 172:14
 175:3,25 176:14,15
 176:20
**quotes** 135:19
 150:25 158:1 161:6
 161:8 169:20 171:7
 173:19 174:2,3,14
**quoting** 132:24
 177:3

**r**

**r** 1:20 12:1 16:1
 186:1
**raise** 34:3 36:13
 91:19,19
**raised** 33:19 46:1,6
 46:11 92:5 163:24
**ralph** 12:16 63:13
**rate** 74:11,24 82:18
 105:22 126:20
 137:19 178:15
 179:22,23
**rates** 65:24 171:25
 176:18,22 179:18
**rating** 132:19 146:6
 146:13 147:13

**152:10 169:3 174:4
 176:7
**ratings** 137:14
 177:5
**rationalize** 157:20
**rbs** 142:11
**reach** 180:23
**reached** 69:2 72:2
 78:15 89:24 90:4
**reaction** 163:2
**read** 82:6 109:17
 111:1 113:17 115:2
 127:10 128:22
 129:14 131:3 133:8
 139:10 149:21
 151:1,5 156:8
 159:22 160:21
 165:3 167:15,17
**readily** 104:2
 122:24 157:11
**reading** 118:2 121:2
 155:14 156:12
 169:25 170:1
**ready** 22:12 24:20
 24:21 44:21 48:17
 56:1,1 64:15 125:23
 126:21
**real** 83:24,24 88:2,7
 88:22 128:11
**realities** 112:18
**reality** 36:22
**realizing** 174:7
**really** 23:14,17,23
 34:12 52:11 64:22
 75:2 78:17 96:9
 98:4,12 100:5,6
 106:9 108:2 117:10
 124:12 127:21
 142:8 146:20
 151:15 157:1
 161:19 173:5,6
 176:13 177:13,22
 178:12 182:14
**realm** 99:23
**reason** 32:22 40:7
 45:15 49:14 52:14
 52:15 57:12 59:25

**60:10,18 94:24 95:3
 96:14 102:22
 121:12
**reasonable** 45:9
 127:19 160:5,17
 163:8 164:6,21
 165:8 169:5 178:25
 181:11
**reasonableness**
 160:21 167:3 170:4
 170:14,18
**reasonably** 131:16
 145:17 159:18
 160:2 166:3 171:19
 172:11,12 173:21
 179:16 180:2
**reasons** 16:21 47:15
 60:2 71:7 180:17
**recall** 90:6 99:1
**receipt** 2:8 184:13
**receivables** 126:5,6
**receive** 133:16,16
 171:12
**received** 51:5 86:24
 91:2 126:19 133:20
 142:21 164:7 172:7
 181:9
**receiving** 175:15
**recess** 125:19
**recidivate** 113:20
**recital** 112:4
**recited** 73:4
**recites** 180:14
**reclassify** 6:10
**recognize** 66:12
**recognizes** 80:23
**reconcile** 127:14
**reconciling** 128:3
**record** 41:5 44:15
 48:13 55:11,18,20
 100:20 108:4,5
 114:15,16 116:21
 186:4
**records** 53:11
**recourse** 134:9
**recovery** 27:6 30:5
 36:20 67:17 118:11

recruit 52:12
red 112:16
redate 167:1
reduce 6:9 7:7
reduced 6:3 8:8,18
9:12 10:12 152:2
153:11
reducing 85:14
148:19
reed 12:18 43:3,20
44:23
refer 59:18,21
83:10 88:14 96:2
reference 22:14
88:4,13 132:16,16
132:21,24 135:19
147:7 151:7,13,14
156:24 157:8
171:12,24 172:7
174:2 177:1 179:18
referenced 113:4,12
133:10 157:3 171:8
references 148:2
referred 83:4 110:5
112:24 122:12
referring 33:21
58:13
refers 67:16 83:22
111:4,11
reflect 44:15 100:21
reflected 101:1
reflecting 87:12,13
175:7
refreshed 164:13
regard 77:21
142:11
regarding 46:25
49:16 60:1 91:20
regardless 45:22
46:19 47:21 132:13
registered 82:18
83:15 84:9
registrations 54:14
regular 25:12
regulator 58:1
regulators 53:9

reincarnation
102:11
reinstated 117:1
reinthaler 126:2,2
128:11,16,18,21,23
129:4,7,11,17,20,24
135:8,10,12 136:21
137:1,7,22 138:9,18
138:21 139:1,3,7,22
140:9,12,15,21,24
141:2,5,15,18,20,24
142:3,7,11,13,25
143:2,4,25 144:4,6
144:9,13,16,20,25
145:2,5,8,12 152:15
152:18,22,24 153:3
153:22,25 154:2,4
154:10,13,15,17,21
155:13,18 156:2,5,8
156:11 157:10
158:1,4,8,14,20,23
159:9,13,16 161:3,5
161:7,11,16,19,25
162:3,6 164:24
165:3 167:16
170:11,14,22
174:19,24 175:8,21
176:4,6 178:3
181:16,18,21
182:16
relate 102:17 111:8
related 2:25 11:11
16:7 87:23 92:16
96:24 97:2,5 98:23
99:7 100:2,4 101:8
101:11,21 103:17
110:18 115:11,13
115:17 117:5,6
121:17,18,19,20,22
185:9
relates 108:13
110:11 116:5 118:7
relating 82:15
89:11 90:21 92:6
94:4
relationship 49:13
60:18 163:25

relatively 82:9
103:21 127:7
170:25
release 41:23 66:21
67:8,10,11,13,16
68:23 75:22 76:19
77:3 80:9,10 89:18
89:22 90:8 91:14,17
91:20,21,22 92:2,13
93:2,10 94:2,4 95:6
95:15 96:22 98:5,6
98:7 100:4,14,14,24
104:4,8 112:22,23
113:25 114:3,7,18
114:24 117:16
121:2,16
released 39:17
67:20,23 95:7,7,9
95:12,23 100:10
101:2,3 103:4
110:25 118:16
119:1
releases 67:17,19
69:19 75:15 80:18
96:14 113:22
releasing 96:23
relegated 133:17
151:2
relevance 71:2
relevant 49:6 65:25
128:25 129:9
130:24 132:18
133:4,18 136:10
145:12 155:10
162:21 168:9
171:25 172:1,10
179:15,18,19,23
relief 2:1 16:9,22
22:10,13 28:1 56:10
64:17 68:19 130:7
184:5
relieved 27:24
relinquish 18:17
rely 155:10
relying 101:8,11
remain 22:11 29:8

remained 103:3
remaining 96:6
remains 59:1
165:25
remedy 119:5 122:6
remember 144:10
144:18 151:3 176:1
remind 162:22
163:6
reminded 123:24
remote 134:8
rendering 127:15
renew 22:12 37:8
repeated 77:8
repeatedly 113:21
replace 89:1 126:24
135:5 137:12
139:13,19 147:5
157:13 173:10
175:18 177:7
replaced 135:14
157:6
replacement 126:22
132:25 133:12
134:2,5,6 135:20
136:4,15 137:11
141:9,16 142:4,5
143:19 145:18
146:12 147:8,14
149:19 151:8,11
152:12 157:22
160:3,19 168:23
171:9 176:24
replacements 177:3
replaces 135:15
136:8
replacing 138:14
replete 55:11
reply 16:19 29:1
59:4 73:7 93:25
105:4 163:3
report 20:20 24:15
25:12
reported 77:20
reporter 186:10
represent 16:17
36:7

**representative** 55:8
  56:3
**represented** 156:18
  158:5 167:20
**representing** 20:1
**reputable** 137:16
**reputation** 23:18
**request** 39:10 40:8
  42:10 45:9 79:2,11
  82:13
**requested** 43:7
**requests** 45:8
**require** 123:21
  124:16 139:4
  142:13 172:9
**required** 19:23
  21:18 41:6 54:20
  55:25 97:20 133:4,8
  133:9 138:13
  146:11 147:5 151:5
  157:21 161:6,7,14
  171:6,16 173:11
  174:9 175:22,22
  181:13
**requirement** 57:10
  60:19 138:23
  171:11
**requirements** 53:3
  53:6
**requires** 64:16
  135:21 136:3
**requiring** 94:17
  126:18 135:19
  139:14
**requisite** 41:5 172:3
**rescind** 45:14 46:14
  120:11
**rescinded** 45:16
  51:24 52:3 53:7
  55:22 57:20,24
  58:21,21 61:7
**rescission** 45:25
  46:9 47:2 57:17
  58:10 61:8,21 119:6
  122:6
**reserve** 61:19 79:2

**reset** 148:10 149:7
  149:17 153:4
**residential** 124:9
**residents** 18:21
  26:19
**residual** 75:9
**resigned** 47:15
  54:15 60:13
**resigns** 62:19
**resolicit** 176:21
**resolution** 4:7 22:25
  24:12 29:6 34:11
  45:7 97:19,19
  109:23
**resolve** 18:8,10
  22:18 37:22 106:8
**resolved** 34:12 42:8
  67:14 70:4 106:5
  108:20 163:16
  171:3
**resolving** 16:24
**resorting** 104:1
**resources** 27:4 49:1
  56:2
**respect** 2:13 3:20
  38:24 43:24 44:13
  61:20 62:6,17 90:1
  92:5 93:1 98:20
  104:9 105:7 108:7
  111:22 117:24
  122:14,17 130:21
  131:1 132:14
  133:19 135:1,3
  137:24 145:18
  159:25 160:2
  170:19 178:14
  181:14 182:8
  184:20
**respected** 169:18
**respectfully** 99:24
**respective** 76:4
  84:17 109:13
**respond** 69:4 78:12
  80:1
**responded** 44:7
  45:4 69:9

**response** 44:15 46:8
  74:5 163:2 164:16
  77:19
**responses** 29:1 73:7
  77:19
**responsibilities**
  29:7
**responsibility** 27:19
**responsive** 45:8
**rest** 17:23 47:25
  112:10
**restrained** 130:11
**restricted** 50:25
**result** 82:17 107:20
  138:17 141:8
  153:11 176:18
**resulted** 107:21
**resulting** 148:17
**resume** 55:12
  125:19
**retain** 18:13 54:13
**retains** 18:10
**retention** 27:11,16
  29:12 30:1,14 31:15
  33:7 36:25
**return** 84:20 100:22
  100:23
**returning** 18:9
**reus** 2:7 14:1 38:8
  184:12
**reversed** 124:10
**reverting** 165:19
**review** 31:5 41:9
  70:6
**reviewed** 31:6
**rewrote** 134:18
**richard** 126:2
**rid** 168:9
**ridiculous** 53:20
**right** 19:11,18,19
  21:3 22:22 23:11
  25:3,5 26:9,13
  27:23 29:9 30:7,15
  32:3 33:11,15 37:12
  37:14,18,19,24
  38:23 39:13,20,22
  40:2,6 41:12 42:12
  44:4,15 47:4 50:23

  54:7 59:16 60:4,11
  62:1,9 70:16,21
  71:6,10,14,17,20
  73:23 79:2 80:12,25
  81:2,10,15 86:20
  87:21,24 88:6 89:9
  89:19 91:24 92:3,7
  93:3 96:5,6,8,9,10
  96:16,18 98:2
  101:17,20 102:6,8
  104:7 106:14,17
  107:5,22 108:10,13
  112:5 115:5 116:2
  116:15,19 117:22
  118:21 120:3,6
  121:13 124:25
  125:4,14,23 126:24
  129:19 138:15,16
  138:21 140:23
  141:1,17,19 142:6
  144:6,13,19,24,24
  145:4,24 152:22
  156:1,10 157:3
  159:17 161:2,3,4,16
  161:16 162:14,18
  162:21 164:25
  165:12,13,17,21,24
  166:10,13,23 167:2
  170:9 176:3,5
  178:11 179:10,12
  182:5,15,18,22
**rightfully** 58:21
**rights** 61:20,25
  79:19 137:18 153:8
**risk** 30:3 85:14
  137:20 152:12
  177:23
**road** 79:19 186:19
**roll** 13:6 81:18,21
  81:21,24 85:3 86:2
  86:6,8,10,14,16,18
  86:21,23 87:7,10,13
  87:22,25 88:6,14,16
  88:18,21 89:4,6,10
  89:20,22 91:15,24
  92:3,7,9,16,18,20
  92:22 93:3,6,12,15

93:18,24 95:20,24
96:8,11,18 97:23
98:1,3,11 101:7,10
101:13,19,22,25
102:3,7,9 103:7,17
104:6,8,11,13,15,17
104:21 107:6 110:6
110:9 115:7 117:17
117:21,23 118:21
119:2,5,21,25 120:4
120:7,21,23 121:16
121:18 123:7
124:25 125:5,7,10
**roll's** 110:17
**room** 155:19
**ropes** 15:1 71:24
**rounds** 26:15
**row** 174:13
**rsu's** 50:25
**rule** 10:19 64:15
69:12,17 70:1 99:12
114:12 122:21,22
123:13,18,25
163:21
**ruled** 17:15 62:23
125:2 182:10
**rules** 3:17 20:5,14
21:15,16 25:7 54:16
72:6 78:17 123:17
128:1
**rulings** 184:3 185:3
**run** 36:14

**s**

**s** 2:25 11:12 12:1
16:1 185:9
**sacramento** 17:5
18:2,7 31:10 33:25
**sadly** 30:19
**safe** 90:14,22,24
91:13 93:9 166:6,16
**sake** 85:8 152:5
**salary** 54:10 60:25
**sample** 65:21
**san** 21:25
**sanford** 3:14
**satisfactorily** 47:16

**satisfactory** 146:13
**satisfied** 5:12 6:24
147:10
**saw** 100:21 124:25
**saying** 19:24 21:12
22:17 23:8 24:17
28:6 30:8 49:1 55:8
75:13 79:8 89:16
98:5,6,7 100:4,7
101:21 106:1,7
107:10,12,13 112:2
113:1,24 115:1,6
116:3,5,6,7,10,25
117:9 118:10,14,17
118:18 120:23,24
120:25 121:25
139:15 147:4 148:1
155:12 161:14
165:4 167:11
**says** 39:23 52:13
54:3,9,10,10 57:8
57:14 60:15,24 68:9
74:12 89:10 94:2
96:22 109:10 110:2
112:10 114:19,23
115:2,2 121:6
122:23 123:3,4,18
123:22,25 130:4,23
131:15 135:12,18
136:9 143:2 144:25
145:15 146:3
149:24 150:4
152:19,25 153:22
157:11 159:23
160:8,11,22,24
161:16 164:14
166:2,25 167:23,24
168:1,11,15 169:8,8
169:9 173:17
179:14
**scc** 1:3 2:11,18,22
4:17,22 5:1,6,10,14
5:18 6:1,7,14,18,22
7:1,5,11,15,19 8:1,6
8:12,16,22 9:1,5,9
9:15,20 10:1,5,10
10:16,22 11:1,7

184:17 185:5
**scenario** 21:1 33:5
138:15
**schedule** 64:4,13
70:5,10 72:4 73:5
77:23 78:6,25 79:16
95:23 96:13 139:25
149:3,5,20 150:12
150:17,20 151:13
151:14,25 152:14
153:17 154:5,10,24
155:2,5 178:7
**scheduled** 47:14
54:14 149:5 150:9
150:14 151:16,21
151:22 152:21
153:17,19,22
154:18,20
**schedules** 132:4,6
134:10,11,11,14
142:13,19 145:13
146:19,23,24 147:4
147:11,24 148:4
151:3 156:23 157:2
157:5 158:24
159:17,22 170:15
170:16
**scheduling** 63:19
69:1 72:2,13 76:10
78:6 81:6
**schreiber** 126:11
128:23
**scope** 35:24 36:4
67:12 91:20 114:10
114:22
**scrambled** 126:21
**screenshot** 58:17
61:11
**se** 14:3 95:24
**search** 45:10
**second** 3:10 5:11,15
6:8 7:12 8:17 34:3
52:25 60:15 66:25
73:12 94:14 102:17
106:23 108:6 109:7
111:5,18 113:9
132:3,7 135:7

137:23 154:23
**seconds** 82:11
**section** 90:15,16
129:25 130:1,3,19
130:19 131:14,14
131:19,24,24
132:10 133:6
134:18,23 146:9,15
148:3,6,6,9,14
149:15,22 150:1,3,4
151:2 152:4 153:6
157:4 165:16 166:1
166:17 167:21
168:3,4,7 169:8,24
182:6,10
**sections** 129:25
182:11
**securitization**
126:15 147:12
**see** 25:14 28:9
32:20 34:16 43:12
77:5,24 79:22 81:23
81:24 165:10
**seek** 28:7 35:5,6
66:3 71:15 119:6
132:20 145:25
173:12
**seeking** 6:2,9 7:7
8:7,17 10:11 33:9
130:6
**seeks** 84:20 126:18
**seen** 77:7 99:1
160:11 180:4
**select** 140:4
**sellers** 4:9 74:9 75:7
**selling** 68:10
**semantics** 102:1,3
**semi** 41:22 42:5
**send** 17:4 23:24,24
38:2 131:6 143:17
**sending** 33:2 55:8
**sense** 27:7 78:3
103:18 106:14,15
106:20,20 134:6
137:11 139:21
149:24 150:22
151:25 158:24,24

159:1,2 164:15
167:9 173:24
**sent** 58:11 73:2
131:11 144:21
172:20
**sentence** 147:2
148:2 150:13,22
151:1,15,20 179:14
**separate** 84:13 92:8
92:9 118:7
**separately** 122:4
**september** 41:21
88:24 108:22 109:3
109:9,14,21 111:16
111:20 112:11
179:25
**series** 146:16
177:25
**serious** 177:5,23
**serve** 33:17
**served** 44:5 45:7
74:8
**serves** 69:16
**servicer** 126:16
**services** 2:23,24
11:8 13:2 55:5
81:25 111:7 126:4
185:7,8
**serving** 74:23
**set** 16:18 54:11 61:2
64:3,13 66:23 67:9
74:14 94:25 102:22
128:14,16 134:18
135:17 150:15,16
153:17 163:12
180:21
**setoff** 8:20
**sets** 82:16 89:12
**setting** 17:23
**settle** 80:24
**settled** 80:5
**settlement** 18:3
34:1 80:7,7 82:5
89:23 90:3,9,10
91:13 94:3 95:9,21
95:25 96:3 97:14
100:17,23 108:14

108:18,19 110:2,23
113:1,4,11,23
114:20,21 118:18
121:13,15 122:12
123:5 124:4 133:24
134:6 135:6 136:7
136:13 137:4
138:17 142:14
143:13 147:6,15
149:25 152:7,13
168:1 171:17 173:2
174:9 176:19
**settlements** 90:4
**settles** 118:19,19
**settling** 32:20
111:13
**seventh** 4:5,11,20
7:2,20 9:10
**seventy** 4:11,14
**sever** 34:25 35:11
35:25,25
**severing** 35:18
**seymour** 2:4 13:12
184:10
**share** 38:1 125:11
**shared** 174:3
**sharing** 25:15
**shearman** 13:1
81:21
**sheets** 129:11
**sheila** 11:25 186:3
**shelley** 1:21
**sherri** 11:25 186:3
186:9
**shoes** 148:23
**short** 18:19,19
41:24
**shortly** 27:14 87:2
**shoulder** 137:18
**shouldn't** 157:1
**should've** 146:1
167:23
**show** 52:23,23
58:24 121:3
**showing** 47:2 93:5
**shown** 99:16,19
155:4

**shows** 39:23 59:7
164:1
**shutdown** 180:1
**sic** 72:4 93:11 94:11
97:17 117:16,19
122:17
**side** 87:2 159:8
**sides** 72:13 125:20
128:19 168:22
**sign** 47:20 182:7
**signature** 186:16
**signed** 50:8 60:7
62:14 67:18 95:9
113:22
**significance** 58:15
67:8
**significantly** 166:22
**signing** 101:4
**similar** 51:6 83:5,8
84:7 87:20 88:5,18
94:19,23 95:4,11,17
97:4,7 101:24
102:11 107:16
111:18,25 112:8
115:16 116:1,10,16
117:6,10 121:22
130:8 176:15
**similarly** 23:2
**simple** 94:24
**simpler** 161:22
**simply** 21:19 125:5
155:11 177:9
**simultaneously**
156:15
**single** 53:6 114:19
135:22 136:3
137:10,25 138:23
147:2,7,23 148:2
156:24
**sipa** 12:19 43:3,21
44:23
**sit** 104:17
**sitting** 23:17 26:2
125:24 137:17
177:18
**situated** 23:2

**situation** 27:21
36:23 59:13 62:3
85:11 113:8 141:20
144:21 175:9
177:17
**situations** 122:13
**six** 16:17 26:12
50:18 51:13 52:21
60:22 62:3 66:22,25
82:14 89:11 90:14
126:12,20
**sixth** 4:19 5:7 9:6
41:21
**sixtieth** 10:2
**sixty** 4:1,4 10:6,11
10:23 11:2
**slides** 162:20
**small** 31:3 68:17
170:25
**smart** 155:7
**snapshot** 58:14
**sold** 75:9 120:14
**sole** 134:25 145:17
160:1 161:16,18
164:5 165:8
**solicit** 142:20
150:24 151:6
160:23,23 171:7
173:9,16 174:14
**solicited** 140:22
171:11 172:2 174:2
**soliciting** 173:19
**solution** 36:17
**solvent** 65:9,12,14
**somebody** 39:23
68:10 106:21
**someday** 66:6
**somewhat** 38:17
91:3 122:20
**sonnax** 19:24 23:3,4
27:18 28:22 33:1
34:12 37:4
**soon** 131:15,17
173:21 180:1
**sophisticated**
156:18,18,20,20
164:18 167:20

178:18

**sorry** 20:25 59:20
    60:8 61:14 64:2
    83:19 84:18 104:11
    135:24

**sort** 41:19 95:23
    163:19 167:6
    170:25

**sorts** 101:3

**sosnick** 13:8

**sought** 69:23 96:3
    107:19 120:11
    133:10

**sounded** 180:19

**source** 30:5 121:23
    139:4

**southern** 1:2

**spaced** 147:23

**speak** 40:25 90:25
    125:1 175:11

**special** 2:22 11:7
    66:15 104:20 185:6

**specific** 115:11

**specifically** 61:13
    113:4 182:7

**specified** 132:4

**specifies** 47:12

**specify** 130:24
    143:6

**speed** 28:20 168:24
    168:25

**spelled** 87:16

**spelling** 87:18

**spend** 27:7 91:10,12
    92:24

**spent** 27:10 38:18
    147:22

**sponsor** 126:16

**squarely** 67:14

**stadium** 3:16

**staff** 38:18

**stage** 94:13

**stale** 164:9 165:4
    166:19 167:1 170:3
    173:5 176:15,20

**stand** 50:23 110:8
    163:17

**standard** 22:24
    99:3 123:24 129:21

**standards** 163:6

**standing** 54:13 66:9

**standpoint** 28:9
    94:22 158:25

**stands** 84:11 118:11

**start** 17:25 22:6,9
    43:6 93:20 162:22
    175:23

**started** 17:11,19
    47:10 52:6 54:21
    59:10,10 69:6
    167:12 177:25

**starting** 174:8

**starts** 129:20

**state** 19:6 91:1,5

**stated** 47:13 54:12
    61:3 89:13 108:16
    109:2 111:8 119:3
    149:5

**statement** 18:12
    19:20 39:9 46:7
    75:21 86:4 117:25
    131:20

**statements** 103:22
    104:25

**states** 1:1 2:15
    131:25 184:23

**station** 157:24

**status** 20:21

**statute** 90:25

**stay** 2:1,12,13 16:9
    16:22 17:23 20:22
    22:7,10,13 27:24
    28:1 34:7,7 35:6,6
    35:14,16,18 37:5
    43:24 44:13 64:16
    67:2,5,6 68:6,24
    76:20 77:4 87:6
    184:5,19,20

**stayed** 130:11 180:7

**stays** 37:5

**steal** 110:16

**step** 37:12 76:20

**stepping** 148:23

**steps** 37:11

**sterling** 13:1 81:21

**stipulation** 72:12
    73:2

**stock** 50:20,25 51:7
    54:2 180:1

**stood** 78:3

**stop** 161:25 174:20

**stops** 174:25

**story** 117:13 121:20
    121:21

**straight** 82:10
    127:7 170:23

**straightforward**
    52:5 103:19

**strains** 178:20

**strange** 178:17

**strawn** 126:3

**streamlined** 165:19

**street** 12:12 13:14
    14:3 100:18

**stress** 67:15 177:2,5

**strike** 168:7

**strongly** 36:22

**structural** 90:11,12
    91:4

**struggling** 165:13

**stuff** 99:4

**subject** 23:25 60:18
    79:10 91:7 150:13

**submit** 70:2 79:25
    81:5 99:19,24
    156:17 173:7

**submitted** 31:2
    41:11 46:7 48:23
    53:4 55:16 63:2
    111:9,22

**subordinated** 6:25
    10:8

**subparagraphs**
    135:4 137:3

**subpoena** 75:7

**subpoenaed** 75:17

**subpoenas** 3:17
    74:17

**substance** 107:8
    146:13

**substantially**
    145:19 160:4,11

**substitute** 149:10

**substituting** 157:19
    168:10

**successful** 61:16

**suddenly** 69:14

**sue** 119:6

**sued** 121:1 127:2

**sufficiency** 28:16
    33:20 37:7,14

**sufficient** 121:25

**suggest** 70:4 173:25
    178:17

**suggested** 78:25
    180:11

**suggesting** 18:14
    75:16

**suggests** 28:7 180:9

**suing** 120:11

**suite** 12:13 13:14,22
    186:20

**sum** 42:11 84:19

**summarized** 39:9

**summary** 25:2
    44:24 45:11 46:4
    48:5 51:20 55:17
    64:1,3,13 69:8,13
    69:15 70:7,12,16
    73:6 74:5 76:24
    78:18 92:14 114:7
    123:21 163:1

**summer** 85:12

**superfluous** 62:17
    127:15

**superior** 17:5 18:2
    18:7,9 20:6,15,22
    22:8,20 31:10

**supervisors** 33:14

**supplied** 121:23

**support** 46:7
    107:14

**supported** 44:1
    46:8

**supports** 52:24
    169:25 170:2

**suppose** 28:21
**supposed** 41:20
  75:1,19,20,21
  180:21
**supposedly** 84:2
**suppositions** 107:24
**sure** 17:1 24:6 27:4
  29:3 61:21 65:21
  72:4 82:5 86:2 90:2
  90:16 137:19 162:2
  162:9 170:20,21
**surprised** 123:24
**surrogate** 149:10
**surrounding** 46:19
**survive** 56:17
**susceptible** 97:19
**sutfin** 2:5 13:13
  184:10
**swamped** 176:7
**swap** 85:1 86:9,10
  86:13,16 87:8 90:17
  90:21 105:15
  127:24 128:8,14
  129:13 133:13,13
  133:19,22 134:11
  137:16 138:12,13
  139:9,11 141:16
  147:9,9 148:12,21
  148:21,22 149:8,12
  149:19 150:8 151:8
  152:8,11,20 157:8
  157:19,22 159:4
  160:12 164:2,3,18
  168:14,23,24
  170:25 171:2,5
  177:7,10 182:9,13
**swaps** 65:20 82:18
  105:22 126:21
  128:7,9 129:12
  132:7 133:9 134:14
  137:12 139:13
  141:12,12 157:11
  159:10 170:19
  176:24
**sweep** 98:25
**sylvia** 2:4 13:12
  184:10

**sympathetic** 26:14
**system** 58:14,16
  140:4 175:11,16

              **t**

**t** 186:1,1
**table** 20:10 21:22
  32:21 37:1
**tactic** 35:11
**tail** 170:25
**take** 18:25 19:7
  46:3 60:23 63:2
  68:9 78:20 82:11
  93:18 94:12 99:5,22
  106:10 113:14,25
  114:20 117:9
  122:11,23 123:18
  123:23,25 149:19
  155:3 168:17 177:9
**taken** 17:22 19:21
  20:21 75:17 125:19
**takes** 19:2,5 85:18
  132:9 178:8
**talk** 67:25 73:19,24
  80:7,17 91:14
  108:12 109:24
  115:10 117:5
  122:10 137:4
  151:20 154:4
  162:18,19 173:24
  173:24
**talked** 97:15
**talking** 20:7,7,12
  21:1 54:5 68:16
  100:2,16 156:5
  175:11,13
**talks** 62:2 151:21
**tardy** 62:4
**targ** 2:7 14:1 38:8
  184:13
**task** 56:19 126:22
**tax** 41:6
**telescope** 112:7
**tell** 18:1 25:8 29:23
  38:16,23 58:1 77:12
  110:17 112:24
  121:20 133:15
  155:24

**telling** 75:24 77:1
  106:3 107:6 115:14
  121:21 155:7 167:8
**tells** 150:17 151:15
  167:17
**ten** 143:3,4 144:1
  144:11
**tendered** 127:1
**tenor** 61:4
**term** 49:12 60:16
  83:11 88:7 95:14,15
  96:25 97:18 98:23
  99:6,12,17 102:16
  102:19 127:23
  135:23 150:10
  153:20 155:9
**terminable** 52:14
  52:14
**terminate** 45:15
  49:13,25 50:1,17
  57:6 60:17 62:5,14
  126:20 148:21
  149:8 152:7 157:16
  166:24 174:14
  179:22 182:9
**terminated** 47:15
  49:24 51:9 52:17
  54:15 57:8,22,25
  60:12 62:20 83:2,9
  85:7 107:16 111:21
  132:15 136:10
**terminating** 54:23
**termination** 46:10
  49:9 56:6 60:1
  65:24 108:14,18,19
  109:12 110:1
  114:21 128:24
  129:8 130:15 131:1
  131:3,7,13,17,25
  133:4 134:20
  136:23 137:2 141:8
  142:16,21,23 143:5
  143:9,11,17,20
  144:2,12,15,16,23
  145:10 146:3,5
  148:8 149:2 150:1,9
  150:11 153:16

  161:22 164:11
  166:3,4,25 168:2
  171:14 172:10,20
  172:21 173:3,13,19
  173:22 174:12,16
  174:17,22 175:12
  176:8 179:3,4,5,15
  179:24 180:21
  182:13
**terminology** 83:6
**terms** 23:9,12 27:17
  39:11 45:20 47:5,22
  50:2 55:23 56:8
  65:22 72:2 83:3,3
  83:25 84:2,6 87:18
  87:19 88:3,10,18,25
  89:13 90:25 95:1
  99:7 100:14 102:23
  103:1,14 106:23
  116:16,25 121:4,9
  121:23 122:3,20
  127:11,13,14
  138:12 141:5,11,12
  141:16 145:19
  151:23 160:3,13
  168:24 169:12,19
  170:3 180:19 181:6
**test** 122:21 123:2
  179:7
**testimony** 169:3
**tests** 177:2
**text** 97:9
**textual** 100:1
**thank** 25:22 29:9
  37:23,24 38:4 42:12
  42:13,22,23 43:15
  43:16 44:17,18 47:4
  48:1 58:5,6 59:16
  62:24,25 63:4,5,6,7
  71:14,20,21 81:11
  81:12,17 104:16,17
  117:18 125:5,6,7,10
  125:15,16,18 129:5
  129:6 142:12 162:7
  170:9 178:2 181:16
  182:22,25

**that's** 128:11
131:17 133:18,25
138:7,13 140:4,7,10
141:11 142:24,25
144:8 149:3 150:10
150:20 151:9,13
153:7,7 157:14
158:4 160:15,24
161:14 164:4
165:10,13 166:19
167:3,17,23 168:10
168:25 170:5
173:16,22 175:4
179:20 180:10
181:21 182:14
**themes** 164:8
**thereabouts** 84:1
**thereof** 130:13
**there's** 130:1 131:9
136:19 140:1
147:18 149:15,17
149:19 151:9 152:9
152:14 153:9 155:8
157:13 160:17
166:6 167:7 170:18
170:23,24 173:17
176:4 180:8,16
181:1,2
**they'd** 157:22
**they're** 137:17
139:12,15 141:5
146:24 159:11
162:21 169:1
**they've** 139:11
**thin** 128:16
**thing** 17:6 22:19
26:5 39:22 40:2
51:9 62:23 83:13
94:14 95:11 96:1
98:19,19 99:5 103:5
114:6,12 118:11
158:16 167:4 178:4
**things** 21:7 24:13
30:4 42:7 47:14
80:18 82:10 83:7
97:7 100:24,25
107:20 110:4

114:10 117:25
122:16 157:12
176:25 177:6
180:11
**think** 16:21,24 18:5
18:9 21:18 22:17
25:9,11,13 26:23
29:3,8 30:14 32:21
32:25 33:2,19,24
34:4,24 35:10,12
36:7,16,17 37:1,3,4
38:6 42:8 44:10,19
46:24 50:22 61:12
67:18 69:10,11 70:3
70:23 76:24 81:15
81:16 82:9 86:5
87:14 88:8 91:9,16
92:9,15,17,18,20,21
92:22,24 93:22 97:8
98:13,18 100:11
101:25 102:3
103:12,13,20 104:7
104:9,10,15 105:6
107:1 108:7 110:16
110:17 115:1
120:13,13 121:1
122:1 123:9 124:12
124:14 125:17
130:1 133:21
134:22 139:3
140:13 141:24
142:7 146:19,20
147:20 151:13
156:19 158:9,23
161:5 162:22
163:17 164:19
165:15 166:7 167:3
167:4,10,11,17,19
168:22 169:6,15,18
169:24 170:1,3
171:2 177:9 178:13
178:14,23 180:4
181:22 182:2,23
**thinking** 165:14
169:21
**thinks** 167:9

**third** 3:17 6:15,19
10:11 60:15 73:5,12
91:3 119:19 120:14
120:15 172:22
**thirteenth** 3:7
**thirty** 6:19,23 7:2
**thought** 31:8 34:10
52:7 72:13 77:22
78:15 79:7 85:16
103:20 179:1
**thoughtful** 125:8
**thoughts** 181:17
**thousands** 26:11,11
51:3 90:2,2 96:14
96:15 97:2,10 176:8
**three** 34:9 49:7
66:19 68:5,18 69:5
70:24 82:15 84:23
86:25 89:11,15
101:20 102:17
126:15 127:9
133:17,17,20 138:1
148:14 149:23
156:14 162:15
165:9,19 171:13
172:3 174:7
**threshold** 67:13
76:22
**threw** 181:15
**throw** 166:17
**thunder** 110:17
**tie** 128:4,4 152:3,3
164:5
**tiebreaker** 127:23
127:25
**tied** 134:4
**ties** 181:10
**till** 77:22
**time** 22:11 29:11
31:22 32:9 37:5,8
42:11 45:15 46:2
47:13 49:14 51:15
54:11,25 59:6 60:18
61:3 62:12 67:2
69:3,8,25 78:11
79:20 82:2,3 85:10
91:11,12 92:25

97:11 113:5,10
122:6 123:20,20
124:9 125:7 126:25
127:3 130:20 131:5
146:24 147:22
155:24 157:13,15
167:21 169:5 171:4
174:16,17 176:12
177:4
**timeline** 128:24
129:8
**times** 105:13 153:4
**timing** 165:25 170:3
172:14 178:12
**tina** 3:14
**today** 27:13 43:10
43:14 44:2 61:14
70:3,4 71:16 72:5
72:14 82:2 85:23
89:7 105:4 119:14
125:20 126:9,12
146:19
**told** 53:8 55:6,10,19
55:20 69:24 71:4
77:20,21 116:20
**tomorrow** 30:7
**tort** 19:10,10
**total** 171:19
**totally** 79:21 110:25
155:20 166:7
**tough** 100:13
**tower** 14:4
**town** 177:20
**track** 110:6
**trade** 85:19 87:23
116:8
**trades** 82:17,20
83:2 84:9,10 85:10
85:15,18 116:21,23
116:24,25 117:1,2
118:19,20 121:3,4,7
**traditional** 113:9
**transaction** 85:1,4
85:23,23 86:9,10,11
86:12,15 87:9 88:4
88:5 95:13 101:17
102:10,24 106:23

106:24 112:9 118:7
118:12,25 119:7,9
119:10,14 122:5
132:24,25 133:12
134:5 135:21 136:4
136:10,15 145:19
146:12 150:1,7,8
151:11 152:20
157:8 160:3,8 168:3
168:13,14 173:11
181:14
**transactional**
155:24
**transactions** 82:23
83:5,8,8,14,16,22
83:24,24 84:3,4,6,7
85:5,7 86:16 87:1
87:20 88:11,18,25
90:1,21,23,24 94:5
94:6,9,18,19,20,21
94:23 95:1,4,5,8,10
95:12,18 96:15,20
97:4,6,7,10 98:17
101:2,24 102:11,12
102:15,20 103:1,3
103:10,14 104:2,4
105:9,15,23,25
106:1 107:16,16,18
108:21 109:3,13
110:1,22,23 111:15
111:19,25 112:3,8
112:16 115:4,15,16
115:19,22 116:1,4
116:11,13,16 117:7
117:7,10,10 121:5
121:10,14,21,22,22
121:24 131:2
132:15 164:9
**transcribed** 11:25
**transcriber** 186:10
186:16
**transcript** 186:4
**transfer** 68:1,24
70:25 71:1 146:7
**transferred** 67:1
**transferring** 67:5

**transfers** 68:4,5
**travel** 18:24 20:10
20:10 21:11,14,22
23:10
**treated** 56:11 83:16
**treaties** 129:12
**trial** 18:6,19,19
19:11 22:12,20
24:20,21 25:5 30:7
37:9 56:18
**tried** 22:14 48:24
**true** 40:3 82:21
112:1,2 163:11
186:4
**truly** 71:9
**trump** 127:25
**trumps** 127:24
**trust** 4:23 126:5,6,7
127:10 134:7
152:11 153:7
163:22 172:6
173:18
**trustee** 5:3 12:19
39:4,15,15,16,17
43:4,21 44:24 45:7
61:13,14 174:5
**trustee's** 2:12 5:11
5:15 8:23 43:23
44:12,24,25 45:3
46:5 184:19
**trusts** 126:15 127:9
134:7 146:11
147:15 148:17
173:12
**try** 18:4 22:23
26:16 34:25 49:2
97:13 106:21
127:12 151:6
156:11 157:15
173:10 174:14
**trying** 21:19 34:14
34:19 38:18 52:12
58:19,23 59:12,13
74:17 111:24
121:18 139:12,17
139:18 140:10
161:22 164:22

167:10 174:21
**turn** 59:12,13
132:10 134:10
146:16 162:20
178:1
**turning** 47:5 112:20
**turns** 27:5 85:19
**twenty** 3:10 6:8,15
174:19
**twice** 41:4 106:21
**two** 5:19 6:2,8,15
6:19,23 7:2,6,12,16
7:20 8:2,7,13,17,23
9:2,6,10,16,21 10:2
10:6,11,23 11:2
17:17 26:15 31:13
33:23 41:18,24
64:14 65:11,21
66:20 67:11 70:2
72:23 73:3 74:25
76:18,19 77:3 81:6
81:9 82:15,17,17
83:2,3,17 84:11,13
85:5,7,19,19 86:25
89:12 90:11 91:12
94:8 100:18 102:9
105:2,21 107:15
114:25 116:17
120:4 126:13 127:2
128:24 129:11
133:17 139:24
140:2,15,21 147:23
148:20 150:16
154:4,22 155:14,16
156:14,21 162:17
165:15
**twombly** 167:13
**type** 56:10 133:13
**typically** 19:11 34:1
65:18

## u

**u.s.** 1:13,22 4:23
152:16
**uh** 21:5 92:7 138:18
139:22 140:9 142:2
144:4 154:9,14
174:24 175:20

**ultimate** 109:22
**ultimately** 111:23
114:16 122:23
**unable** 181:6
**unambiguous**
169:19
**unartfully** 164:23
**uncertain** 31:1
**unclear** 36:20
**uncontested** 43:4
43:22 44:8
**underlay** 87:20
88:19
**underlying** 87:11
87:13 88:2 123:14
123:15 148:13,15
**understand** 22:6,16
23:7 26:4 31:7
33:22 34:11 50:20
75:20,23,25 76:22
77:6 78:1 93:12
112:17,22 113:15
139:3 140:11
155:20,23,23
174:21
**understandably**
28:8
**understanding** 19:9
19:10 20:13 32:14
32:18 72:7,16 74:2
139:5
**understood** 72:1
178:9
**undertook** 178:25
**undisputed** 45:12
45:19 131:10,21
132:5 164:2
**undoubtedly** 18:24
**undue** 42:8
**unduly** 36:19
**unforgiving** 99:1
**unfortunate** 38:15
**unhire** 48:25 49:1
**united** 1:1 2:15
184:22
**units** 50:25 54:2

**unjust** 91:2
**unknown** 13:21
  14:2,11 15:2 50:17
  78:13 96:24 100:5,7
  108:1
**unknowns** 78:17
**unprecedented**
  166:18 176:2
**unquestionable**
  102:12
**unquestionably**
  83:9
**unreasonable**
  127:19
**unsecured** 6:4 8:9
  8:19 10:13 27:1
  30:12
**unsecureds** 28:10
**unusual** 26:5
**use** 83:5 97:17
  121:5 148:25
  149:20 150:24
  167:1,2 172:3,4
**utah** 26:19

**v**

**v** 2:19,23 4:18,23
  5:2 11:8 113:5,10
  185:6
**vacuum** 74:7
  102:21,21
**valentine** 167:21
**valid** 57:19
**valuation** 109:16
  111:4 179:7
**value** 30:20 32:21
  67:5 68:10,25
  109:22 111:10
  166:2,25
**valued** 3:8
**values** 134:6 152:12
  152:13
**valuing** 109:18
**variables** 148:12
**various** 47:15 60:1
**vega** 2:4 13:13
  184:10

**vehicles** 66:15
  134:8
**veritext** 186:18
**versus** 167:13
**vessel** 64:25
**vest** 51:12
**vesting** 50:21 51:15
**victory** 30:17
**view** 27:3 58:19
  90:8 129:13 152:2
**violate** 32:17
**violating** 62:6
**violation** 55:2 57:13
  67:6 68:24 76:19
  77:4
**violations** 55:3
**virtually** 27:6
**voluntarily** 35:11
  83:1
**volunteer** 40:19

**w**

**wachovia** 140:17
  160:18 163:24
  164:1,2,13 172:8,14
  172:15 173:6
  175:13 176:23
  177:1,15 180:7
**wagging** 170:25
**wait** 28:9
**waiting** 17:13 26:12
  41:22 81:17
**walk** 44:8 169:10
**wamu** 9:18
**want** 20:12 22:18
  24:14 25:9 32:17,23
  33:23 34:3 40:25
  46:21 64:3,25 69:19
  70:11 73:18 80:1,9
  83:13 88:7 105:2
  108:6 109:24
  122:10 134:16
  162:22 163:6 178:5
**wanted** 43:11 69:7
  70:1 78:5 97:13
  157:1 167:21
**wanting** 37:22

**wants** 33:4 108:15
  158:14
**warner** 113:5,10
**wash** 18:25 19:8
**washington** 12:14
**wasn't** 175:14
**way** 17:4 22:17
  25:18,19 26:23
  30:10 34:24 36:10
  39:6 51:17 56:21
  82:17 88:8,9,9,21
  90:5 91:4 100:18
  103:11 113:8
  117:19 119:2,11
  121:20 129:13
  140:4 152:6,9
  159:18 160:17
  167:7,16,16,17
  168:20,21 175:11
  176:23,24 182:12
**we've** 26:15 28:22
  29:11 35:14 52:12
  52:21 69:1,2 81:7
  82:2 87:22 96:1
  105:9 114:25
  116:23
**week** 43:8 49:8
  53:22
**weeks** 49:7 62:5,5
  69:5
**weil** 12:2,10 16:6
  31:12 32:1,4 41:3
**welcome** 16:15
**went** 17:19 21:25
  25:12 45:4 105:12
  107:25 120:2
  134:19 164:4
  175:23
**weren't** 175:11
  179:13
**we'd** 146:19
**we'll** 133:22 159:14
  159:15 162:20
**we're** 126:7,12
  139:17,18 142:7
  159:17 161:7
  162:18,23 164:18

  164:18,19 166:1
  167:2 171:5 176:1
  179:9,10
**we've** 127:7 129:18
  139:10 142:15
  160:11 162:10
  163:25 164:14
  172:2 181:22
**whatsoever** 45:17
  55:16 159:2
**what's** 155:18
  174:20 181:14
**wherewithal** 147:16
**white** 14:10 43:7
**wide** 36:23 161:20
  171:21
**william** 13:6 14:22
  81:21
**willing** 18:23 48:18
  56:1,2 126:21
  151:10 177:7
**win** 71:8,8 170:2
**window** 131:9
  166:17 181:15
**winston** 126:3
**wipe** 156:23
**wishes** 43:8 70:6
  91:11 122:9
**withdraw** 38:16
**withdrawal** 22:14
  40:9
**withdrawn** 38:7
**wollmuth** 14:17
**wonderful** 37:1
**word** 97:24 117:19
  117:22,23
**words** 35:20 90:13
  92:2 98:21 121:5
  123:10 136:4,13,16
  138:3 142:17
  143:10,24 144:7
  154:18 168:14
  173:14 179:1
**work** 25:17 31:11
  31:14 36:10 45:17
  45:17,22 47:16,18
  47:21,23 48:15,18

48:19,22 49:7,8,19
49:19,21,23 52:19
54:21,24 55:25 56:1
56:6,14 57:11,15
58:10,11,20 59:1,2
59:10,10 61:5,6
62:5,7,12,20 75:6
99:8 125:9
**worked**  24:14 50:6
51:4,13,17,25 52:3
53:1,22 56:12,20
57:5 58:23 60:22
61:10 176:18
**working**  51:12 52:2
59:6 62:3 69:7
**works**  25:19 53:24
174:21
**world**  88:23 164:3
**worried**  158:17
**worse**  140:2
**worthy**  123:13
**wouldn't**  35:5
171:3
**would've**  133:9
137:13 147:15
152:10,11 158:3,6
171:3 174:1 175:10
177:24 181:2
**writing**  143:7
175:15
**written**  146:6
167:23 168:21
**wrong**  56:3,16
111:1
**wrongful**  45:25
46:9 47:2 56:5
57:17 61:8,21
**wrote**  155:7

**x**

**x**  1:4,11 184:1 185:1

**y**

**yeah**  29:18 31:21
42:7 92:19,20 102:2
119:4 140:12
143:25 173:4

**year**  17:19 18:5,6
41:5 47:8,10 50:18
52:18 56:13,14
57:11,15 59:9 61:2
61:9 158:17
**years**  16:25 17:17
24:8 26:2,6,12
31:13 51:4,4,5
56:12,12,13 124:10
126:12 127:2
155:14,16
**yellow**  128:18
**yep**  135:11 152:15
**yesterday**  73:2
**york**  1:2,15,15 12:5
12:21 13:4,4,23,23
14:13,13,20,20 15:4
15:4 21:11,14 22:3
169:17 186:21
**you'd**  134:10
166:16
**you're**  133:17
137:25 138:4,16
139:2 140:24 144:7
145:9 152:14 155:6
155:12,16,21,25
156:4 161:1,2,13
165:4,13 179:20
**you've**  140:22
174:16 180:4 181:4
182:23

**z**

**z**  13:20
**zero**  27:6 112:18
148:19 151:12
152:2 153:12