Paul J. Lawrence
Kymberly K. Evanson
PACIFICA LAW GROUP
1191 2nd Avenue, Suite 2100
Seattle, Washington 98101
Tel: (206) 245-1700
Fax: (206) 245-1750

Robert N. Michaelson
Eric T. Moser
RICH MICHAELSON MAGALIFF MOSER, LLP
340 Madison Avenue, 19th Floor
New York, New York 11073
Tel: (212) 220-9404
Fax: (212) 913-9642

*Attorneys for Washington State Tobacco Settlement Authority*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>LEHMAN BROTHERS HOLDINGS, INC., *et al.*,<br><br>           Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |

**WASHINGTON STATE TOBACCO SETTLEMENT AUTHORITY'S OPPOSITION TO MOTION TO EXCLUDE EXPERTS**

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 1

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     BACKGROUND.........................................................................................2

        A.      The Reserve Fund Agreement .......................................................2

        B.      The Termination Amount ..............................................................3

        C.      TSA's Expert Valuations ...............................................................4

III.    STANDARD OF REVIEW .........................................................................8

IV.     ARGUMENT .............................................................................................8

        A.      The Termination Amount Includes TSA's Total Losses and
                Costs, as Determined By TSA. ......................................................9

        B.      Measuring TSA's Total Losses and Costs is a Unique and
                Difficult Task Which Necessitates a Novel Methodology. ...........11

        C.      An "Industry Standard" Forward-Curve Valuation Does
                Not Measure TSA's Total Losses and Costs. ...............................13

        D.      Curry and Hasterok's Projected Return Method is Reasonable
                and Adequately Explained. ...........................................................15

                1.      Valuation Matrix ...................................................16
                2.      Rate of Return .......................................................17
                3.      Discount Rate........................................................20

V.      CONCLUSION..........................................................................................21

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - i

TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..................................................................... 19

*Bank of New York Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012)...................................................... 20

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996)......................................................................... 19

*Bregman v. Meehan*,
   125 Misc.2d 332 (N.Y. Sup. Ct. 1984) ................................................... 19

*Carmichael v. City of New York*,
   No. 06-cv-1913 (NG)(VVP), 2014 WL 3818192 (E.D.N.Y. Aug. 1, 2014) ........................... 20

*Cayuga Indian Nation of New York v. Pataki*,
   83 F. Supp. 2d 318 (N.D.N.Y. 2000)............................................... 10, 14

*Coleman v. Dydula*,
   139 F. Supp. 2d 388 (W.D.N.Y. 2001) .................................................. 18

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001)......................................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)............... 2, 7, 10

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007)..................................................... 11

*In re Delmarine, Inc.*,
   535 F. Supp. 2d 318 (E.D.N.Y. 2008) .................................................... 19

*In re Loews Cineplex Ent'm't Corp.*,
   No. 04 Civ. 612(HB), 2004 WL 875819 (S.D.N.Y. Apr. 23, 2004)........ 17

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   No. M21-88, 2008 WL 1971538 (S.D.N.Y. May 7, 2008)............... 14, 20

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)..................... 13

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - ii

*Lippe v. Bairnco Corp.*,
  99 Fed. App'x 274 (2d Cir. 2004) ......................................................................... 19

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ................................................................................. 19

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ................................................................................... 19

*Silivanch v. Celebrity Cruises, Inc.*,
  171 F. Supp. 2d 241 (S.D.N.Y. 2001) .................................................................. 10

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
  487 F.3d 89 (2d Cir. 2007) ........................................................................ 11, 12, 16

*U.S. Commodity Futures Trading Comm'n v. Moncada*,
  No. 12 Civ. 8791(CM), 2014 WL 2945793 (S.D.N.Y. June 30, 2014) .................. 20

*Zaremba v. Gen. Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004) ................................................................................. 19

## Rules

Federal Rule of Evidence 702 ......................................................................... 7, 10, 14

Wash. Rev. Code § 43.340.005 ............................................................................... 2

## Articles

Charles A. E. Goodhard and Wen Bin Lim, *Interest Rate Forecasts: A Pathology*,
  7 INT'L J. OF CENTRAL BANKING 135 (2011) ......................................................... 17

Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?*,
  WWW.INTUITIVE-ANALYTICS.COM (2013) ................................................................ 17

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - iii

## I.    INTRODUCTION

This dispute concerns the calculation of the "Termination Amount" resulting from the default and rejection by Debtors Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc. (collectively, "Lehman") of a reserve fund agreement ("RFA") with the Washington State Tobacco Settlement Authority ("TSA").  The RFA's definition of Termination Amount sets forth the applicable method of calculation.  The RFA provides first that the Termination Amount be calculated by obtaining and averaging at least three market bids for a replacement RFA.  Here, neither Lehman nor TSA was able to obtain market bids because, as all experts agree, there was no market for RFAs at the date of the RFA rejection, and there remains no market today.  The RFA further provides that if market bids cannot be obtained, then the burdened party, here without dispute TSA, determines "the Burdened Party's total losses and costs . . . or gains . . . including any loss of bargain . . . ."  Docket No. 46383 (the "Sawyer Decl.") Ex. 1 (the "RFA") at 5.  Assuming that the Burdened Party's calculation is "reasonable" and in "good faith" it "shall be conclusive and binding on the parties absent manifest error." *Id.* at 6.  Apart from these three requirements – reasonable, "good faith," and "absent manifest error" – the RFA does not require the Burdened Party to use any industry standard or otherwise prescribe any specific method of calculating the Termination Amount.

TSA has presented two alternative methodologies in support of its loss calculation.  Under the first method, TSA's expert Peter Shapiro calculates TSA's losses by considering what a hypothetical willing dealer would have charged TSA to step into Lehman's shoes on the rejection date and provide a replacement RFA, notwithstanding the fact that no dealer was in fact willing to do so.  Under the second method, TSA's experts Daniel Curry and

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 1

Jeffrey Hasterok determined TSA's losses by looking at TSA's history of investing between the date of Lehman's breach and the date of rejection, evaluating the restrictions on TSA's ability to invest, and then projecting TSA's rate of return on its probable investments going forward and comparing that rate to the rate Lehman had guaranteed under the RFA.

Lehman's motion to exclude Curry and Hasterok's opinion is based on a misunderstanding of the applicable law and a faulty reading of both the RFA and of Curry and Hasterok's loss calculation methodology. Under the express terms of the RFA, TSA is entitled to determine its total losses and costs that result from Lehman's breach of the contract. Nothing in the contract requires TSA to calculate an abstract so-called "market valuation" or calculate TSA's losses as if TSA were a dealer. Moreover, under the prevailing *Daubert* standard and unique circumstances occasioned by Lehman's unprecedented default, TSA is entitled to use a methodology to quantify its losses unique to the circumstances. Finally, Lehman's Motion distorts Curry and Hasterok's opinion and ignores the reasoned explanation of their methodology. Lehman's motion to exclude should be denied.

## II.    BACKGROUND

### A.    The Reserve Fund Agreement

TSA is an instrumentality of the state of Washington, created by the Washington State Legislature in 2002 to monetize a portion of the 1998 settlement between tobacco manufacturers and several states. *See* WASH. REV. CODE § 43.340.005. Washington assigned 29.2% of its annual tobacco settlement revenues ("TSRs") to TSA, which in turn issued bonds secured by that revenue stream in order to plug a substantial shortfall in the state budget. *See* Decl. of Paul J. Lawrence in Supp. TSA's Opp. ("Lawrence Decl."), Ex. 1 at 76:13-77:11. The bonds and

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 2

Indenture required TSA to hold $45.53 million in a Reserve Fund to ensure payment to bondholders in the event that the TSRs were ever insufficient to make bond payments. The Reserve Fund (like all TSR related money flowing to TSA) was subject to strict limits on both the term and safety of its investments, to ensure the $45.53 million was available on each semi-annual bond payment date if needed. *See* Lawrence Decl., Ex. 2 (Indenture) at 4-7, 20-23, 26-28.

In October 2002, TSA issued a Request for Bids to qualified financial institutions, seeking a fixed rate of return on the Reserve Fund through 2032, in exchange for the institution's ability to deliver permissible, low-risk, short-term investments to the Reserve Fund on a semiannual basis. The bid responses ranged widely from 3.510% to 4.484%. Lehman submitted the highest bid at a fixed rate of 4.484%, which TSA accepted on October 24, 2002. Lehman proceeded to draft a proposed contract and after negotiations the parties finalized and entered into the RFA on November 5, 2002.

**B.      The Termination Amount**

The RFA expressly requires the payment of a "Termination Amount" in the event that one party defaults and the agreement is terminated. The Termination Amount is defined as "an amount, as determined *by the Burdened Party* reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount . . . such Dealer would require . . . or would pay . . . [for] an agreement . . . preserving for the Burdened Party the economic equivalent of its rights under this Agreement . . . ." Sawyer Decl., Ex. 1 at 5 (emphasis added). The RFA further provides that "if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 3

*by the Burdened Party*, to be the Burdened Party's total losses and costs . . . or gains . . .

including any loss of bargain . . . ." *Id.* at 5 (emphasis added).   Regardless of whether the

"market quotations" method or the "total losses" method is used, the Termination Amount is

determined by the Burdened Party, which is TSA.   *See id.* at 1.  Moreover, the RFA provides that

"[a]ny determination of the Termination Amount by the Burdened Party shall be conclusive and

binding on the parties hereto absent manifest error." *Id.* at 6.

Other than the reliance on market quotations, if available, the RFA does not adopt a

specific means for calculating the Burdened Party's "total losses and costs . . . or gains."   The

RFA does not adopt an industry standard or other reference.  Instead, the RFA requires that the

calculation be reasonable and determined in good faith.  Because Lehman defaulted and rejected

the RFA, TSA is the Burdened Party.  Lehman does not dispute that fact.

TSA canvassed the market but no dealer was willing to replace the RFA at any price.  *See*

Sawyer Decl., Ex. 7 at 104:18-105:15, 107:6-109:13.  Lehman was likewise unable to obtain

three market quotations.  *See, e.g.*, Lawrence Decl., Ex. 3.  Accordingly, under the RFA, the

Termination Amount is TSA's total losses and costs as of the rejection date, including any loss

of bargain.

**C.**      **TSA's Expert Valuations**

TSA retained two sets of experts to tackle the question how reasonably to determine

TSA's total losses or gains.  There is not a single answer to the question.  One expert, Peter

Shapiro, approached the question by trying to replicate a market quotation for a replacement

RFA taking into consideration the market for commercial paper swaps (the only investment that

Lehman ever delivered under the RFA), the negative market perception of tobacco-related instruments, and other components such as profit that a hypothetical issuer would include.

Another set of experts, Curry and Hasterok, felt that market conditions in March 2009 were too unusual to try to replicate the cost of a replacement RFA, as no dealer was willing to actually transact in a replacement RFA (which remains true today).   Instead, they calculated TSA's losses by opining on the expected rate of return that TSA was likely to obtain on its own investment of the Reserve Fund without the RFA through 2032, and comparing that expected return to the 4.484% Lehman had guaranteed.  Curry and Hasterok are both veteran finance professionals with many years of experience with complex derivative agreements, including actual transactional experience with forward purchase agreements such as the RFA.   Lehman has not challenged Curry and Hasterok's experience or qualifications, rather, Lehman objects only to Curry and Hasterok's chosen methodology for calculating TSA's total losses and costs.  *See* Mem. of Law in Supp. Lehman's Mot. for Ord. Excluding Test. of Curry and Hasterok ("Motion") at ¶¶ 20-23.

In order to determine the expected rate of return that TSA likely would achieve on its Reserve Fund investments absent the RFA, Curry and Hasterok evaluated (1) the limitations imposed on TSA by the Indenture; (2) the investment limitations attributable to the public nature of TSA; (3) TSA's reinvestment obligations under the RFA subsequent to Lehman's default; (4) the actual investments made by TSA from the date of default to the date of rejection; and (5) the hypothetical investments that TSA could make on a semiannual basis into the future.  *See* Sawyer Decl., Ex. 2 (Curry/Hasterok Report) at 12-20.  They also explored the use of cancellable long dated swaps and explain the shortfalls of this methodology and how it does not compensate

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 5

the TSA for its loss of bargain. *Id.* at 18-19. Their opinion notes the impacts of the various legal and practical limits on TSA's ability to explore each of these options. For example, the Reserve Fund must be liquid and accessible every six months, thus restricting TSA to only short-term investments. *Id.* at 12-13. Further, TSA can make only low-risk investments permitted under the Indenture and consistent with prudent practices for handling public money. *Id.* at 12-13, 18. This contrasts with Lehman's experts who propose using unhedgeable forward curves derived from long dated securities.

The projection of TSA's expected rate of return is also complicated by limited and imperfect data. Specifically, available data on rates of return tend to group investments permitted under the Indenture with lower-rated or otherwise ineligible investments, with no way to isolate the permitted investments. *Id.* at 15-16. Moreover, data on average returns often reflect a wide range of circumstances with wide-ranging yields, further limiting the usefulness of such data. *Id.*

For these reasons, Curry and Hasterok concluded that TSA's actual history of investing its Reserve Fund in low-risk money market funds (as permitted under the Indenture and the RFA, and consistent with prudent practices for handling public money) provides the least speculative and most useful indication of TSA's actual future investments. *Id.* at 17, 20.

Curry and Hasterok next consider how best to project TSA's expected return on its investments through 2032[1]. *Id.* at 16-17, 19-20. In doing so, they acknowledge that there is no

---

[1] The RFA's contractual end date was 2032, which coincided with the final maturity date of the 2002 bonds. Though the bonds included a turbo provision that enabled TSA to pay them down more quickly, falling TSRs over time resulted in continual adjustment (and extension) of the

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 6

reliable way to predict the future. *Id.* at 15, 20. Each period of history is distinct and presents unique economic circumstances—such as unprecedented and increasing globalization, or the bankruptcy of Lehman, and countless other unforeseeable factors. On March 25, 2009, no one could have known that interest rates would continue to drop and remain at substantially lower levels up to the present day, over five years later. *Id.* at 14; Sawyer Decl., Ex. 8 (Curry/Hasterok Rebuttal Report) at 17-18. Because future rates of return are unknown, and any such rates could be greater or less than the status quo, Curry and Hasterok adopt a "no change" assumption from the rejection date, projecting the data from TSA's actual investment of the Reserve Fund into the future. Sawyer Decl., Ex. 2 at 20; *see also* Ex. 8 at 15-16. From the time of Lehman's default on December 1, 2008 to the date of rejection on March 25, 2009, TSA earned a 0.65% rate of return on its investment of the Reserve Fund. Sawyer Decl., Ex. 2 at 19-20. Curry and Hasterok thus project an expected 0.65% rate of return through 2032, indicating total losses of approximately $37.5 million. *Id.* Curry and Hasterok used 0.65% even though TSA's actual rate of return on its money market investment was much lower than 0.65% for the period from the rejection date to the date of their expert report.[2] *Id.* Implicit in their calculation is the fact that because TSA has been earning substantially less than 0.65%, rates in the future must be substantially higher than 0.65% for TSA to actually earn 0.65% for the term of the RFA.

---

expected bond payoff dates. Lehman's experts have based their calculation on an RFA end date of 2032 and have not objected to Curry and Hasterok's use of that same date.

[2] Curry and Hasterok note that TSA's actual rate of return from December 2008 through September 2013 is only 0.18%. ECF No. 46383-2 at 17.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 7

### III.    STANDARD OF REVIEW

A witness who is qualified as an expert "may testify in the form of an opinion or otherwise" if (1) the expert's knowledge "will help the trier of fact", (2) the testimony is "based on sufficient facts or data", (3) the testimony "is the product of reliable principles and methods", and (4) the expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The Supreme Court has emphasized that the Federal Rules of Evidence favor admissibility of expert testimony and this inquiry is "a flexible one."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  The "Second Circuit espouses a particularly broad standard for the admissibility of expert testimony" and such testimony should be admitted "unless purely conjectural or based on totally unfounded assumptions."  *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001) (citing cases).

### IV.    ARGUMENT

Lehman asks this Court to exclude Curry and Hasterok's expert opinion because it is "novel" and rejects the use of "industry standard" methods for valuation.  But Lehman's motion relies on a misreading of the RFA which provides that TSA, as the non-defaulting burdened party, determine the Termination Amount as TSA's "total losses and costs" without reference to a specific formula or to any industry standard.   Moreover, Lehman ignores that the extraordinary circumstances occasioned by Lehman's unprecedented bankruptcy necessitate a methodology for calculating TSA's substantial losses different from a methodology that may have been appropriate in a normal market.  Unlike Lehman's approach, Curry and Hasterok's expert opinion appropriately reflects the RFA's definition of the Termination Amount, rejects an

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 8

inapplicable forward curve methodology which does not calculate TSA's losses and costs, and is adequately explained and reasonably supported.  Lehman's motion should be denied.

**A.**     **The Termination Amount Includes TSA's Total Losses and Costs, as Determined By TSA.**

As a threshold matter, Lehman's Motion should be denied because it misinterprets the RFA.  The ultimate question before the Court is the appropriate Termination Amount owed to TSA for Lehman's breach.   Because neither TSA nor Lehman was able to secure market quotations, the Termination Amount under the RFA is defined as "the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs . . . including any loss of bargain . . . ."  Sawyer Decl., Ex. 1 at 5.  Contrary to this definition, Lehman seeks to value the RFA in the abstract with a mid-market analysis, which Lehman's experts admit has nothing to do with TSA's losses and costs.  *See* Lawrence Decl., Ex. 4 at 60:12-61:10, 131:7-132:20; *id.*, Ex. 5 at 30:6-14, 140:2-20.  While Lehman concedes that "[a]ny opinion that fails to consider the requirements of the RFA is simply of no probative value", Motion at ¶ 28, it insists on a valuation theory that is contrary to the RFA's terms.  Moreover, if Lehman wanted to propose including its so-called "industry standard" valuation into the RFA, it could have done so, but did not.  Because Lehman's favored method is not adopted by the RFA and does not seek to determine TSA's losses and costs, it cannot serve as a basis by which to exclude Curry and Hasterok.

Moreover, the Termination Amount must be determined by TSA, as the Burdened Party, not by Lehman or TSA "as if it were Lehman."  In arguing the contrary, Lehman cites to section 7.6 of the RFA, which states that in the event of a Lehman default, "if Lehman fails to determine the Termination Amount within three Business Days . . . then [TSA] shall make such

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 9

determination as if it were Lehman . . . ." Sawyer Decl., Ex. 1 at 19-20. Lehman claims this clause requires TSA to value the RFA "like a dealer", but were this the case, the definition of the Termination Amount "by the Burdened Party" as the "Burdened Party's total losses and costs" would make no sense. Moreover, the "as if it were Lehman" provision does not purport to change the RFA's definition of "Termination Amount" which is the only operative language instructing the parties how to make the calculation. A far more reasonable reading of this provision is that this clause simply indicates that TSA will determine the Termination Amount instead of Lehman, if Lehman fails to do so within three days of its default. *See id.* at 20. Indeed, both Lehman's 30(b)(6) witness and its expert do not calculate the "Termination Amount" in reference to the "as if it were Lehman" provision. *See* Lawrence Decl., Ex. 6 at 48:14-49:2; *id.*, Ex. 4 at 92:7-93:4.

Moreover, as TSA will show at the evidentiary hearing, the negotiations surrounding the RFA demonstrate that this provision was held over from Lehman's preliminary draft only as an oversight and the parties intended that the Termination Amount would be calculated by the Burdened Party. TSA and Lehman specifically negotiated and agreed that the Burdened Party (here, TSA) would determine the Termination Amount and that that determination is binding and conclusive upon the parties absent "manifest error". Sawyer Decl., Ex. 1 at 6.

In sum, Curry and Hasterok's opinion is appropriately rooted in TSA's actual losses and costs, as defined in the RFA. To the extent Lehman's Motion demands an "industry-standard" hypothetical valuation from a dealer's perspective, it is inconsistent with the terms of the RFA and must be denied.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 10

**B.      Measuring TSA's Total Losses and Costs is a Unique and Difficult Task Which Necessitates a Novel Methodology.**

Lehman claims that Curry and Hasterok's opinion should be excluded because it is "novel" and contrary to "generally accepted" industry standards.   Motion at ¶ 4.  In *Daubert*, however, the United States Supreme Court specifically rejected "a rigid 'general acceptance' requirement" for expert methodologies as "at odds with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony."  509 U.S. at 588 (internal quotations omitted).  The Court cautioned that the "austere standard" Lehman promotes "should not be applied in federal trials."  509 U.S. at 589.   Instead, the key question is whether the expert's methodology is reliable, and general acceptance is only one of many potential factors that might be considered depending on the circumstances.  *See id.* at 597; Fed. R. Evid. 702(c).  Accordingly, in cases involving unique circumstances or tasks, as here, novel methodologies often must be developed and applied.  *Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 323, 327-28 (N.D.N.Y. 2000) (admitting valuation methodologies developed for first-time use in pending litigation); *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 269 (S.D.N.Y. 2001) (novel methodology that had not been peer-reviewed or gained wide acceptance remained admissible in absence of any indication that method lacked reliability).

Determining TSA's total losses and costs as of the rejection date is a unique and difficult task that requires expertise and ingenuity.  There was and is no market for a replacement RFA, and TSA was and is very limited in its ability to transact.  There is no genuine dispute that determining the value of such "a highly illiquid, complex financial contract . . . [with] no market . . . is unusually difficult."  Lawrence Decl., Ex. 7 at ¶ 1; *see also Fraternity Fund Ltd. v. Beacon*

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 11

*Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2007) (noting that even as to

investments "traded between investors and dealers rather than on exchanges" valuation "is not a

precise science" and "may be considerably more a statement of opinion than a report of an

objectively determinable fact").  Indeed, it is rare for finance experts to be asked to make such a

particular determination of losses.  *See* Lawrence Decl., Ex. 5 at 140:24-141:4 ("Q.  Have you

ever been asked to give an opinion about a party's total losses? . . .  A.  I don't know.  I don't

think so."); Sawyer Decl., Ex. 6 at 216:5-17 ("[E]veryone who looks at this honestly, I think,

identifies the challenge of . . . how do you put a price on something that is impossible to buy . . .

?").

       In light of the difficulty of determining TSA's total losses and costs, Lehman should not

benefit from the uncertainty inherent in calculating them.  When "it is certain that damages have

been caused by a breach of contract," but there is "uncertainty [] as to their amount," the "burden

of uncertainty as to the amount of damage" falls on the breaching party.  *Tractebel Energy*

*Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal

quotations omitted) (citing cases).  Here, the breaching party is Lehman.  TSA, the non-

breaching party, "need only show a stable foundation for a reasonable estimate", which

"necessarily requires some improvisation, and the party who has caused the loss may not insist

on theoretical perfection." *Id.* at 110-11 (internal quotations omitted).  As such, Curry and

Hasterok may adopt a novel approach to the unique and difficult task of measuring TSA's losses

and costs, and their method of projecting TSA's returns going forward is a reasonable way to

make that determination.  Lehman's Motion should be denied.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 12

C.    **An "Industry Standard" Forward-Curve Valuation Does Not Measure TSA's Total
Losses and Costs.**

Lehman claims the Court should exclude Curry and Hasterok's opinion because its

"rejection of forward yield curves [] flies in the face of industry practice and valuation

theory."  Motion at ¶ 23.  But a basic forward-curve valuation would be inappropriate and

unreliable here for numerous reasons.

First, nowhere in the RFA is the Burdened Party directed to use a forward-curve-based

valuation methodology.  Lehman could have suggested drafting that valuation method into the

RFA, but did not.  Instead, the RFA directs TSA to determine its "total losses and costs."

Second, a basic forward-curve valuation is not a method of measuring losses and costs.

Lehman's experts concede that they did not opine on TSA's losses, and that the forward curve is

not a predictive tool, does not measure TSA's likely rate of return on its semiannual investments

going forward, and provides trading information useful only to market players who can transact

freely on the date of valuation, unlike TSA.  Though Lehman argues that TSA's ability to

transact is irrelevant, its experts testified to the contrary, conceding that the rates reflected in the

forward curve on the rejection date are relevant only for transactions executed that day and

cannot be considered a reflection of TSA's losses:

> Q.  You're not actually using the forward curve to predict with accuracy what
> interest rates will be out five years, ten years, fifteen years, correct?
> A.  That's correct.
> . . .
> Q.  Is it fair, then, that you did not attempt to calculate TSA's loss . . . ?
> . . .
> A.  . . . I attempted to calculate the value of the transaction. . . .  [W]hether or not
> that represents a loss or not, I was not asked to opine on that.
> . . .

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 13

Q.  So the only day that we can actually obtain the benefit of the rates that are
reflected in the forward curve that you used would be to transact on March 25th,
2009, correct?
. . .
A.  Yes, . . . to capture March 25th data, yeah, you would have had to transact on
March 25th.

Lawrence Decl., Ex. 4 at 14:6-10, 19:6-20:16, 60:21-61:10, 131:22-132:20.

Q. . . . [Y]ou're not using market data to predict future rates.  You're using
market data to understand the market as of a given day.  Correct?
A.  That's correct.
. . .
Q. . . . [I]f I don't have the capability to invest in the ways that are necessary to
lock in the rates derived from the forward curve . . . [the forward curve] doesn't
tell you what the value is to me . . . .  Correct?
A.  It doesn't tell you that.
. . .
Q. . . . How do you valuate what [TSA's] total losses will be?
A. . . . I'm not the damages expert.  I don't know the definition of damages. . . .  I
know something about valuing swaps, fixed pieces, and floating pieces.  My
testimony is really restricted to methodology and how swaps are . . . valued by
forward rates of interest.  So I wasn't asked to really do this, what you're asking
me now.

Lawrence Decl., Ex. 5 at 18:3-9, 29:4-30:14, 92:2-93:11, 97:17-98:9, 107:9-18, 140:2-141:4; *see
also* Motion at ¶ 24 ("Forward rates are not designed to predict future rates.").

Third, any given expert's method must be a reliable way "to draw a conclusion regarding

*the particular matter to which the expert testimony* [*is*] *directly relevant.*"  *Kumho Tire Co., Ltd.*

*v. Carmichael*, 526 U.S. 137, 153-54, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (emphasis in

original).  While Lehman asserts that Curry and Hasterok have departed from their substantial

experience in the finance industry by taking a new approach, it is precisely because of this

experience that they conclude that basic forward-curve valuation is not a useful or reliable

method *for determining TSA's total losses and costs*, regardless of the standard use of forward

curves in the industry for evaluating risk and conducting related transactions.  *See* Sawyer Decl.,

Ex. 2 at 13-15.  Curry and Hasterok explain that unlike in their years at Morgan Stanley, here,

they must calculate TSA's losses on the RFA without a functioning market and in the wake of

Lehman's unprecedented bankruptcy and resultant financial crisis.  Their experience informs

their approach to the unique facts of this case, and their report demonstrates the same intellectual

rigor that characterizes their substantial work in this field.  *See Cayuga*, 83 F. Supp. 2d at 327-

28.

        This sort of application of "experience to [] facts in a reasoned manner" more than

satisfies Rule 702.  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-

88, 2008 WL 1971538, at *6-7 (S.D.N.Y. May 7, 2008) (test for reliability is flexible where

expertise is based on experience).  As such, TSA is not required to employ a basic forward-curve

methodology to determine its total losses and costs.  Lehman's motion should be denied.

**D.      Curry and Hasterok's Projected Return Method is Reasonable and Adequately
         Explained.**

        Projecting TSA's predicted returns on its future investments is a reasonable way to

measure TSA's total losses and costs resulting from Lehman's breach.  Curry and Hasterock,

rather than attempting to hypothesize a market which did not exist in March 2009 (and which

does not exist today) simply are attempting to calculate the actual losses that TSA likely will

incur.  Though Lehman accuses Curry and Hasterok of relying "solely upon their *ipse dixit*",

Curry and Hasterok have in fact thoroughly explained their calculation of the Termination

Amount in their initial report, rebuttal report, and depositions.  In particular, Curry and Hasterok

more than sufficiently explain: (1) their selection of a final calculation among numerous

alternative calculations shown in the "Valuation Matrix" in their report; (2) their projection of

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 15

TSA's future rate of return on their predicted actual investments at 0.65%; and (3) their use of that same projected rate of return to discount TSA's future losses to present value. Lehman's motion ignores these reasonable explanations, *see* Motion at ¶¶ 30-39, and should be denied.

### 1.    Valuation Matrix

Curry and Hasterok have included, as part of their expert report, a "Valuation Matrix" providing numerous alternative calculations of the Termination Amount. *See* Sawyer Decl., Ex. 2 at 19. These alternative calculations vary by the projected maturity date of TSA's bonds (from 2019 to 2032) and by the projected rate of return on TSA's future investment of the Reserve Fund (from 0.18 to 1.25%). *See id.* As Hasterok explained at his deposition, the purpose of the Valuation Matrix is to "show[] multiple methods, multiple inputs," to give "the user of the report some . . . depth of knowledge [] and comfort" and to provide a "comparison" of potential calculations. Sawyer Decl., Ex. 3 at 83:23-84:21.

Contrary to Lehman's assertions, Curry and Hasterok do not blindly select their final calculation from the Valuation Matrix. Motion at ¶ 32. The Valuation Matrix merely illustrates the various alternatives explained in detail in the text of their report. Curry and Hasterok thoroughly explain their selection of a final maturity date of 2032 and their determination of a projected rate of return of 0.65%. *See* Sawyer Decl., Ex. 2 at 8-12, 12-18, 20. They likewise explain why each of the other proposed types of securities and maturity dates listed in the matrix were rejected. They opine to a loss calculation that is not the largest in the matrix. Lehman's Motion ignores this entire section of Curry and Hasterok's report in order to claim that Curry and Hasterok have failed to explain their methodology, but the explanations could not be plainer.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 16

## 2. Rate of Return

As noted above, Curry and Hasterok explain in detail their projection of TSA's rate of return at 0.65%. This is the rate that TSA actually earned on its post-Lehman investment of the Reserve Fund up to the rejection date. *Id.* at 17. Curry and Hasterok reason that because of the various limitations on available market data, the difficulty of determining which theoretical investments will be consistent with TSA's investment policies and restrictions going forward, and the inability to reliably predict any future changes in interest rates, "the actual reinvestment yield" TSA earned without the RFA should be used to project TSA's rate of return into the future. *Id.* at 15-20. This "no-change thereafter assumption" finds support in both academic literature and case law. Sawyer Decl., Ex. 8 at 15 ("'When forecast precision is effectively zero . . . it is perhaps best to acknowledge this, e.g., by . . . using [] a 'no-change' thereafter assumption . . . .'" (quoting from Charles A. E. Goodhard and Wen Bin Lim, *Interest Rate Forecasts: A Pathology*, 7 INT'L J. OF CENTRAL BANKING 135, 153 (2011))); *see also* Lawrence Decl., Ex. 7 (Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?*, WWW.INTUITIVE-ANALYTICS.COM (2013)) at 1 ("How badly do forwards do? Well over this 50 year span, and this holds over most subperiods as well, you'd be better off as a forecaster just assuming today's yield curve stays constant i.e. a perfectly random walk."); *Tractebel*, 487 F.3d at 112 ("It is not the case that all [long-term] contracts may be breached with impunity because of the difficulty of accurately calculating damages. . . . To the extent certain variables must be assumed in order to arrive at a reasonable estimate . . . if there is currently no evidence of an impending change [one] may assume these environments will remain stable.").

Curry and Hasterok also use interest rate data from after the rejection date to confirm the reasonableness of their projected rate of return.  In particular, Curry and Hasterok note that during almost five years after the rejection date, TSA earned a rate of only 0.18%, far below the 0.65% Curry and Hasterok project.  Sawyer Decl., Ex. 2 at 17; Sawyer Decl., Ex. 8 at 17-18.  TSA's actual losses after the rejection date confirm the reasonableness of Curry and Hasterok's projection as of that date.  *See, e.g.*, *In re Loews Cineplex Ent'm't Corp.*, No. 04 Civ. 612(HB), 2004 WL 875819, at *4 (S.D.N.Y. Apr. 23, 2004) (upholding bankruptcy claim valuation that included use of "subsequent events" to "corroborate an independently formed conclusion" as to value).   Indeed, for TSA to earn the predicted 0.65% over the term of the RFA, it will have to earn substantially more than 0.65% in the future to offset the earned rate of 0.18% to date.

Lehman's additional criticisms of the projected rate of return also lack merit.  First, Lehman complains that "[forward] curves were predicting that interest rates would rise over time . . . ."  Motion at ¶¶ 34-35.  Yet Lehman elsewhere in its Motion admits that forward curves "are not designed to predict future rates."  Motion at ¶ 24.  As already discussed above, forward curves do not provide a reliable basis for projecting TSA's rate of return going forward since TSA cannot actually transact in the products that Lehman uses as the basis for its forward rate predictions.

Second, Lehman points out that Curry and Hasterok project a 0.65% rate through 2032 while interest rates have not remained "steady for more than a single day."  Motion at ¶ 36.  This claim misunderstands the no-change thereafter assumption, which accounts for the fact that any predictions about future changes in interest rates, whether up or down, are speculative.  Curry

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 18

and Hasterok do not suggest that TSA's rate of return actually will be constant during the relevant period. *See, e.g.*, Sawyer Decl., Ex. 4 (Curry deposition) at 81:5-7. Instead, they reason that TSA's average rate of return from before the rejection date provides a reasonable average rate going forward from that date (especially when considered in light of TSA's actual earnings) and is the least speculative rate that can be projected into the future.

Third, Lehman notes that at some point in time, Peter Shapiro and TSA representative Bob Cook each believed that interest rates would rise after the rejection date. *See* Motion at ¶ 36. However, the fact that after the rejection date interest rates did not rise—and instead declined—only confirms the reasonableness of Curry and Hasterok's no-change assumption and the speculative nature of such predictions.

Finally, Lehman asserts that Curry and Hasterok have not explained their use of four months of data to project TSA's rate of return going forward. *See* Motion at ¶ 37. But Curry and Hasterok have explained that as of the rejection date, only four months of data was available on TSA's actual investment of the Reserve Fund without the RFA, and that use of such data provides the least speculative means of projecting TSA's future rate of return. Sawyer Decl., Ex. 2 at 17-18, 20; *see also* Sawyer Decl., Ex. 3 (Hasterok deposition) at 179:9-180:15, 193:10-194:10. This explanation is more than sufficient to support Curry and Hasterok's opinion and calculation. *See, e.g.*, *Coleman v. Dydula*, 139 F. Supp. 2d 388, 394-95 (W.D.N.Y. 2001) ("[I]t is enough that [an expert] identifies the number . . . he used and offers a reasonable explanation as to why he used that number . . . ."); *Silivanch*, 171 F. Supp. 2d at 270 ("Generally arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 19

admissibility of the evidence."). If Lehman believes the rate of return is inaccurate, it may raise the issue on cross-examination. *MTBE*, 2008 WL 1971538 at *8.

### 3. Discount Rate

Curry and Hasterok also adequately support their proposed discount rate of .65%. *See* Sawyer Decl., Ex. 2 at 19. Curry and Hasterok use the same rate as the projected average rate of return so as to mimic "the market convention when purchasing [a security]" of using "the yield at which you buy that particular instrument as the discount factor in the price formula." Sawyer Decl., Ex. 3 at 154:19-155:22. This method is reasonable and supported under the law. *Cf.* Lawrence Decl., Ex. 5 at 29:4-30:14 (Lehman's expert acknowledging that the proper discount rate "depends on the damage theory . . . appropriate in this case"). In general, future losses are discounted to present value to account for the fact that an award of compensation can be invested from the time of the award up to the time of the future losses. *See, e.g.*, *In re Delmarine, Inc.*, 535 F. Supp. 2d 318, 320 (E.D.N.Y. 2008). The precise rate to be used in each case is a matter of discretion. *See id.* at 321. The rate chosen can and should reflect the injured party's actual ability to invest the award going forward. *See Bregman v. Meehan*, 125 Misc.2d 332, 340-41 (N.Y. Sup. Ct. 1984) (rejecting high discount rate that would "result in real inequity" where plaintiffs needed to make certain mortgage payments each month and could not "let [the] money remain invested for 30 years"). Because Curry and Hasterok expect TSA to earn a 0.65% rate of return on its investments going forward, it is reasonable for them to discount TSA's future losses at that rate.

In sum, Curry and Hasterok's valuation is reasonable, reliable and admissible. The cases cited by Lehman are distinguishable, as they exclude expert testimony that is fundamentally

unreasonable or unexplained, which is not the case here.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (expert failed to consider the variables he himself had identified as highly important); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (expert's unexplained factual assumptions were a "complete break" with recent history).[3]

## V.    CONCLUSION

TSA is entitled to determine the Termination Amount, in the form of its own total losses and costs, reasonably and in good faith.  In order to measure TSA's total losses and costs, Curry and Hasterok have projected the rate of return that TSA will earn on its predicted investment of the Reserve Fund going forward, and compared that to the rate that Lehman had guaranteed under the RFA.  This is a reasonable and reliable method for determining TSA's total losses and costs, and at each step of their analysis, Curry and Hasterok provide reasonable explanations of

---

[3] See also *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) (expert assumed contested facts and was then "driven by the need to find a way of explaining" those facts in reaching his conclusions); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-59 (2d Cir. 2004) (expert had no drawings, models, calculations, or tests supporting conclusion that alternative car design would have prevented loss of "T-tops and windows" in a crash); *Lippe v. Bairnco Corp.*, 99 Fed. App'x 274, 278-79 (2d Cir. 2004) (noting presence of 18 reasons why experts were unreliable including failure to give any meaningful explanation of critical steps); *Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (expert used inapposite data set, made elementary statistical error, and made no attempt to account for important variables); *U.S. Commodity Futures Trading Comm'n v. Moncada*, No. 12 Civ. 8791(CM), 2014 WL 2945793, at *3-4 (S.D.N.Y. June 30, 2014) (expert disclosed no methodology, "eye-balled" partial data set, and made admissions contrary to his own conclusions); *Bank of New York Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 647-48 (S.D.N.Y. 2012) (damages expert applied assumption contrary to terms of governing agreement); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. M21-88, 2008 WL 2324112, at *3-7 (S.D.N.Y. June 5, 2008) (court could discern no method behind or explanation for expert's conclusions); *Carmichael v. City of New York*, No. 06-cv-1913 (NG)(VVP), 2014 WL 3818192, at *9-11 (E.D.N.Y. Aug. 1, 2014) (expert acknowledged unreliability of data used, failed to explain why data was applicable, and drew limited conclusions of minimal relevance).

the decisions made and conclusions reached.  For these reasons, Lehman's motion to exclude

Curry and Hasterok should be denied.

DATED this 14th day of October, 2014.

PACIFICA LAW GROUP, LLP


By  /s/ *Paul J. Lawrence*
    Paul J. Lawrence, WSBA # 13557
Admitted Pro Hac Vice
    Kymberly K. Evanson, WSBA # 39973
Admitted Pro Hac Vice
Attorneys for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 22

10000 00001 dj14bm10rr

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2014, I caused the document to which

this Certificate is attached to be served upon the following:

Jayant W. Tambe                          ☐ via facsimile
Laura W. Sawyer                          ☐ via overnight courier
Jennifer L. Del Medico                   ☐ via first-class U.S. mail
Benjamin Rosenblum                       ☐ via email
Jones Day                                ☒ via electronic court filing
222 East 41st Street                     ☐ via hand delivery
New York, New York 10017
Email:  jtambe@jonesday.com
Email:  lwsawyer@jonesday.com
Email:  jdelmedico@jonesday.com
Email:  brosenblum@jonesday.com
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for the Debtors and Debtors in
Possession

Signed at Seattle, Washington this 14th day of October, 2014.

/s/  Kymberly K. Evanson
     Kymberly K. Evanson
Attorney for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S OPPOSITION TO MOTION TO
EXCLUDE EXPERTS - 23