# EXHIBIT 2

EXECUTION COPY

---

---

# INDENTURE

by and between

## TOBACCO SETTLEMENT AUTHORITY

and

## U.S. BANK, N.A.,

as Indenture Trustee

Dated as of October 1, 2002

---

---

## TABLE OF CONTENTS

**Page**

### ARTICLE I

### INTRODUCTION AND DEFINITIONS

SECTION 101.   This Indenture and the Parties ..........................................................................1
SECTION 102.   Definitions and Interpretation ............................................................................1
SECTION 103.   Directors and State Not Liable on Bonds; Limited Obligation of Issuer ..........13

### ARTICLE II

### GRANT OF SECURITY INTEREST

SECTION 201.   Security Interest and Pledge ..............................................................................13
SECTION 202.   Defeasance ..........................................................................................................15

### ARTICLE III

### THE BONDS

SECTION 301.   Bonds of the Issuer. ............................................................................................17
SECTION 302.   Transfer and Replacement of Bonds. ..................................................................18
SECTION 303.   Securities Depositories. ......................................................................................19

### ARTICLE IV

### ACCOUNTS; FLOW OF FUNDS

SECTION 401.   Establishment of Accounts ..................................................................................20
SECTION 402.   Application of Collections ...................................................................................20
SECTION 403.   Rebate ..................................................................................................................23
SECTION 404.   Redemption of the Bonds. ..................................................................................24
SECTION 405.   Investments ..........................................................................................................26
SECTION 406.   Unclaimed Money ...............................................................................................28
SECTION 407.   Costs of Issuance Account ..................................................................................28

### ARTICLE V

### COVENANTS

SECTION 501.   Contract; Obligations to Bondholders. ...............................................................29
SECTION 502.   Operating Expenses .............................................................................................31
SECTION 503.   Tax Covenants ....................................................................................................31

SECTION 504.    Non-Petition Covenant ........................................................................32
SECTION 505.    Accounts and Reports...........................................................................32
SECTION 506.    Continuing Disclosure Undertaking .....................................................32
SECTION 507.    Ratings..................................................................................................36
SECTION 508.    Affirmative Covenants. .......................................................................36
SECTION 509.    Negative Covenants..............................................................................38
SECTION 510.    Prior Notice ..........................................................................................39

## ARTICLE VI

## RESIDUAL CERTIFICATE

SECTION 601.    Sources of Payment ..............................................................................40
SECTION 602.    Delivery to Indenture Trustee...............................................................40

## ARTICLE VII

## THE FIDUCIARIES

SECTION 701.    Indenture Trustee's Organization, Authorization, Capacity and
                Responsibility. ......................................................................................40
SECTION 702.    Rights and Duties of the Fiduciaries. ...................................................42
SECTION 703.    Paying Agents.......................................................................................44
SECTION 704.    Resignation or Removal of the Indenture Trustee.................................44
SECTION 705.    Successor Fiduciaries. ..........................................................................44
SECTION 706.    Distribution Reports by Indenture Trustee ...........................................46
SECTION 707.    Compliance Certificates and Opinions..................................................46
SECTION 708.    Form of Documents Delivered to the Indenture Trustee........................46

## ARTICLE VIII

## THE BONDHOLDERS

SECTION 801.    Action by Bondholders..........................................................................47
SECTION 802.    Registered Holders ...............................................................................47

## ARTICLE IX

## DEFAULT AND REMEDIES

SECTION 901.    Events of Default...................................................................................48
SECTION 902.    Remedies. ..............................................................................................48
SECTION 903.    Remedies Cumulative............................................................................50
SECTION 904.    Delay or Omission Not Waiver. ............................................................50

# ARTICLE X

## MISCELLANEOUS

SECTION 1001. Supplements and Amendments to this Indenture. ..............................................50
SECTION 1002. Supplements and Amendments to the Sales Agreement ...................................52
SECTION 1003. Rating Confirmation .............................................................................................52
SECTION 1004. Notices...................................................................................................................52
SECTION 1005. Beneficiaries .........................................................................................................53
SECTION 1006. Successors and Assigns ........................................................................................53
SECTION 1007. Severability............................................................................................................53
SECTION 1008. Legal Holidays ......................................................................................................53
SECTION 1009. Governing Law......................................................................................................53
SECTION 1010. Limitation of Liability ..........................................................................................53
SECTION 1011. No Recourse to Issuer............................................................................................53
SECTION 1012. Ability to Issue Bonds Secured by Other Assets..................................................54
SECTION 1013. Signatures and Counterparts.................................................................................54
SECTION 1014. Non-Petition Covenant .........................................................................................54


EXHIBIT A – SERIES 2002 SUPPLEMENT .......................................................................... A-1
EXHIBIT B – RESIDUAL CERTIFICATE................................................................................B-1

# ARTICLE I

## INTRODUCTION AND DEFINITIONS

SECTION 101. <u>This Indenture and the Parties</u>.    This INDENTURE (this "Indenture") dated as of October 1, 2002, is by and between TOBACCO SETTLEMENT AUTHORITY (the "Issuer"), a public instrumentality and agency of the State of Washington (the "State"), separate and distinct from the State, exercising public and essential governmental functions, and U.S. BANK, N.A., as Indenture Trustee (the "Indenture Trustee").

The Issuer recites and represents to the Indenture Trustee for the benefit of the Bondholders that it has authorized this Indenture.

This Indenture provides for the following transactions:

(a)    the Issuer's issue of the Bonds; and

(b)    the Issuer's assignment and pledge to the Indenture Trustee in trust for the benefit of the Bondholders of the Collateral, the Accounts and the assets thereof to be received and held hereunder, the rights to receive the same, and the other rights assigned and pledged herein, to the extent specified in this Indenture.

In consideration of the mutual agreements contained in this Indenture and other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer and the Indenture Trustee agree as set forth herein for their own benefit and for the benefit of the Bondholders, as aforesaid.

SECTION 102. <u>Definitions and Interpretation</u>.    Capitalized terms have the respective meanings set forth below, unless the context otherwise requires:

"Accounts" means the accounts established and maintained by the Indenture Trustee hereunder.

"Act" means the Laws of 2002, Chapter 365, of the State, codified as RCW 43.340.005, *et seq.*, as amended.

"Authorized Officer" means: (i) in the case of the Issuer, the Chairperson, the Secretary, and any other person authorized to act by the Board hereunder by appropriate Written Notice to the Indenture Trustee, and (ii) in the case of the Indenture Trustee, any officer assigned to the Corporate Trust Office, including any managing director, vice president, assistant vice president, assistant treasurer, assistant secretary or any other officer of the Indenture Trustee customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Indenture, and also, with respect to a particular matter, any other officer, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Basic Documents" means this Indenture, the Sales Agreement, and the Issuer Tax Certificate.

"Board" means the governing body of the Issuer.

"Bondholders" and "Holders" mean the registered owners of the Bonds from time to time as shown on the books of the Indenture Trustee.

"Bonds" means the Series 2002 Bonds and any Refunding Bonds issued pursuant to Section 301.

"Bond Year" means, for so long as Bonds are Outstanding, the twelve-month period ending each May 31; provided, that the first Bond Year shall commence on the Closing Date and end on May 31, 2003.

"Business Day" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in New York, New York or where the Corporate Trust Office is otherwise located, are required or authorized by law to be closed.

"Capitalized Interest Subaccount" means the subaccount of that name established and maintained within the Debt Service Account by the Indenture Trustee pursuant to Section 401.

"Closing Date" means November 5, 2002, the date on which the Issuer will acquire the Tobacco Assets from the State.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning ascribed thereto in Section 201.

"Collections" means the Pledged TSRs and all fees, charges, payments, proceeds, collections, investment earnings and other income and receipts paid or payable to the Issuer or the Indenture Trustee for the account of the Bondholders (including, without limitation, amounts paid to the Indenture Trustee for the account of the Issuer under any Swap Contract).

"Collections Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Consent Decree" means the Consent Decree and Final Judgment of the Superior Court of the State of Washington, King County, dated entered November 23, 1998, as the same has been and may be corrected, amended or modified, in the class action styled State of Washington v. American Tobacco *et al.*, No. 96-2-15056-8SEA.

"Corporate Trust Office" means (i) the office of the Indenture Trustee at which the corporate trust business of the Indenture Trustee related hereto shall, at any particular time, be principally administered, which office is, at the date of this Indenture, located at 1420 5th Ave. – 7th Floor, Seattle, Washington 98101, and (ii) with respect to payments on the Bonds and any exchange, transfer or surrender of the Bonds, means 180 East 5th Street, St. Paul, Minnesota

55101 or such other location designated by the Indenture Trustee in writing to the Issuer, DTC and each Rating Agency.

"Costs of Issuance" means any item of expense directly or indirectly payable or reimbursable by the Issuer and related to the authorization, sale and issuance of Bonds, including but not limited to, underwriting fees, auditors' or accountants' fees, printing costs, costs of reproducing documents, filing and recording fees, fees and expenses of fiduciaries, legal fees and charges, professional consultants' fees, costs of credit ratings, fees and charges for execution, transportation and safekeeping of Bonds, governmental charges and other costs, charges and fees in connection with the foregoing.

"Costs of Issuance Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Counsel" means nationally recognized bond counsel or such other counsel as may be selected by the Issuer for a specific purpose hereunder.

"Debt Service Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Default" means an Event of Default without regard to any declaration, notice or lapse of time.

"Defeasance Collateral" means money and any of the following:

(i) non-callable direct obligations of the United States of America, non-callable and non-prepayable direct federal agency obligations the timely payment of principal of and interest on which are fully and unconditionally guaranteed by the United States of America, non-callable direct obligations of the United States of America which have been stripped by the United States Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS" unless the Issuer obtains Rating Confirmation with respect thereto) and the interest components of REFCORP bonds for which the underlying bond is non-callable (or non-callable before the due date of such interest component) for which separation of principal and interest is made by request to the Federal Reserve Bank of New York in book-entry form, and shall exclude investments in mutual funds and unit investment trusts;

(ii)    obligations timely maturing and bearing interest (but only to the extent that the full faith and credit of the United States of America are pledged to the timely payment thereof);

(iii)    certificates evidencing ownership of the right to the payment of the principal of and interest on obligations described in clause (ii), provided, that such obligations are held in the custody of a bank or trust company satisfactory to the Indenture Trustee in a segregated trust account in the trust department separate from the general assets of such custodian;

(iv)    bonds or other obligations of any state of the United States of America or any agency, instrumentality or local governmental unit of any such state (y) which are not callable at the option of the obligor or otherwise prior to maturity or as to which irrevocable notice has been given by the obligor to call such bonds or obligations on the date specified in the notice, and (z) timely payment of which is fully and irrevocably secured by a fund consisting only of cash or obligations of the character described in clause (i), (ii) or (iii) which fund may be applied only to the payment when due of such bonds or other obligations; and

(v)    investment arrangements that are rated, or with providers whose senior unsecured debt obligations are rated, in the highest long-term and short-term rating categories by each Rating Agency.

"Defeased Bonds" means Bonds that remain in the hands of their Holders but are no longer deemed Outstanding.

"Defeased Turbo Term Bonds" means Turbo Term Bonds for which a defeasance escrow has been established pursuant to Section 202(b) hereof.

"Deposit Date" means the date of each deposit of Collections in the Collections Account.

"Distribution Date" means each June 1 and December 1, commencing on June 1, 2003.

"DTC" means The Depository Trust Company, a limited-purpose trust company organized under the laws of the State of New York, and includes any nominee of DTC in whose name any Bonds are then registered.

"Eligible Investments" means (in each case to the extent that such is a legal investment for moneys of the Issuer):

(i)    Defeasance Collateral;

(ii)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal Home Loan Mortgage Corporation, Fannie Mae, the Federal Home Loan Bank, the Federal Farm Credit System, the Export-Import Bank of the United States, the Federal Financing Bank, the Government National Mortgage Association, the Farmers' Home Administration, the Federal Housing Administration, the Private Export Funding Corporation, the Resolution Trust Company, or the Student Loan Marketing Association;

(iii)    demand and time deposits in or certificates of deposit of, or bankers' acceptances issued by, any bank or trust company, savings and loan association, or savings bank, payable on demand or on a specified date no more than three months after the date of issuance thereof, if such deposits or instruments are rated "A-1+" by S&P, "P-1" by Moody's, and "F1" by Fitch;

-4-

(iv)    certificates, notes, warrants, bonds, obligations, or other evidences of indebtedness of a state or a political subdivision thereof rated by each Rating Agency rating such bonds in one of its three highest rating categories;

(v)    commercial or finance company paper (including both non-interest-bearing discount obligations and interest bearing obligations) having short-term ratings of "A-1+" by S&P, "P-1" by Moody's and "F1" by Fitch and that are either (x) payable at par on demand or on a specified date at least 191 days, but not more than 270 days, after the date of issuance thereof and that have long-term ratings of "AA" by S&P, "Aa1" by Moody's and "AA" by Fitch, (y) payable at par on demand or on a specified date at least 100 days, but not more than 190 days, after the date of issuance thereof and that have long-term ratings of "A" by S&P, "A1" by Moody's and "A" by Fitch, or (z) payable at par on demand or on a specified date not more than 99 days after the date of issuance thereof;

(vi)    repurchase obligations with respect to any security described in clauses (i), (ii), or (iii) above entered into with a primary dealer, depository institution, or trust company (acting as principal) rated "A-1+" by S&P, "P-1" by Moody's, and "F1" by Fitch (if payable on demand or on a specified date no more than three months after the date of issuance thereof), or rated by each Rating Agency rating such bonds in one of its three highest long-term rating categories, or collateralized by securities described in clauses (i), (ii), or (iii) above with any registered broker/dealer or with any domestic commercial bank whose long-term debt obligations are rated "investment grade" by each Rating Agency; provided, that (1) a specific written agreement governs the transaction, (2) the securities are held, free and clear of any lien, by the Indenture Trustee or an independent third party acting solely as agent for the Indenture Trustee, and such third party is (a) a Federal Reserve Bank, or (b) a member of the Federal Deposit Insurance Corporation that has combined surplus and undivided profits of not less than $25 million, and the Indenture Trustee shall have received written confirmation from such third party that it holds such securities, free and clear of any lien, as agent for the Indenture Trustee, (3) the agreement has a term of thirty days or less, or the Indenture Trustee will value the collateral securities no less frequently than monthly and will liquidate the collateral securities if any deficiency in the required collateral percentage is not restored within five Business Days of such valuation, and (4) the fair market value of the collateral securities in relation to the amount of the obligation, including principal and interest, is equal to at least 102% or, if greater, the amount then required by S&P in order that the ratings then assigned by S&P to the Bonds will not be lowered or suspended;

(vii)    securities bearing interest or sold at a discount (payable on demand or on a specified date no more than three months after the date of issuance thereof) that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and rated "P-1" by Moody's, "A-1+" by S&P, and "F1" by Fitch at the time of such investment or contractual commitment providing for such investment; provided, that securities issued by any such corporation will not be Eligible Investments to the extent that investment therein would cause the then outstanding principal amount

of securities issued by such corporation that are then held to exceed 20% of the aggregate principal amount of all Eligible Investments then held;

(viii)   units of taxable or tax-exempt money market funds which funds are regulated investment companies and seek to maintain a constant net asset value per share and have been rated by each Rating Agency rating such funds in one of its three highest rating categories, including if so rated any such fund which the Indenture Trustee or an affiliate of the Indenture Trustee serves as an investment advisor, administrator, shareholder, servicing agent and/or custodian or sub-custodian, notwithstanding that (x) the Indenture Trustee or an affiliate of the Indenture Trustee charges and collects fees and expenses (not exceeding current income) from such funds for services rendered, (y) the Indenture Trustee charges and collects fees and expenses for services rendered pursuant to this Indenture, and (z) services performed for such funds and pursuant to this Indenture may converge at any time (the Issuer specifically authorizes the Indenture Trustee or an affiliate of the Indenture Trustee to charge and collect all fees and expenses from such funds for services rendered to such funds, in addition to any fees and expenses the Indenture Trustee may charge and collect for services rendered pursuant to this Indenture);

(ix)   investment agreements or guaranteed investment contracts rated, or with any financial institution or corporation whose senior long-term debt obligations are rated, or guaranteed by a financial institution whose senior long-term debt obligations are rated, at the time such agreement or contract is entered into, by each Rating Agency rating such agreements, contracts, or obligations, as the case may be, in one of its three highest rating categories, if the Issuer has an option to terminate such agreement in the event that such rating is downgraded below the rating on the Bonds, or if not so rated, then collateralized by securities described in clauses (i), (ii), or (iii) above with any registered broker/dealer or with any domestic commercial bank whose long-term debt obligations are rated "investment grade" by each Rating Agency; provided, that (1) a specific written agreement governs the transaction, (2) the securities are held, free and clear of any lien, by the Indenture Trustee or an independent third party acting solely as agent for the Indenture Trustee, and such third party is (a) a Federal Reserve Bank, or (b) a member of the Federal Deposit Insurance Corporation that has combined surplus and undivided profits of not less than $25 million, and the Indenture Trustee shall have received written confirmation from such third party that it holds such securities, free and clear of any lien, as agent for the Indenture Trustee, (3) the agreement has a term of thirty days or less, or the Indenture Trustee will value the collateral securities no less frequently than monthly and will liquidate the collateral securities if any deficiency in the required collateral percentage is not restored within five Business Days of such valuation, and (4) the fair market value of the collateral securities in relation to the amount of the obligation, including principal and interest, is equal to at least 102% or, if greater, the amount then required by S&P in order that the ratings then assigned by S&P to the Bonds will not be lowered or suspended; the investment agreements described in this paragraph include the Reserve Fund Agreement dated as of November 5, 2002 by and among the Issuer, the Indenture Trustee, and Lehman Brothers Special Financing Inc, a Delaware corporation; and

(x)     other obligations or securities that are non-callable and that are acceptable to each Rating Agency;

provided, that no Eligible Investment may (a) except for Defeasance Collateral, evidence the right to receive only interest with respect to the obligations underlying such instrument, or (b) be purchased at a price greater than par if such instrument may be redeemed at a price less than its purchase price prior to its stated maturity. Any references to Fitch in this definition shall apply only if and to the extent that the obligations described are then rated by Fitch.

"Event of Default" means an event specified in Section 901.

"Excess" shall have the meaning set forth therefor in Section 202(b).

"Fiduciary" means the Indenture Trustee and each Paying Agent, if any.

"Fiscal Year" means each 12-month period ending each June 30.

"Fitch" means Fitch Ratings or its successor; references to Fitch are effective so long as Fitch is a Rating Agency.

"Holders" and "Bondholders" mean the registered owners of the Bonds from time to time as shown on the books of the Indenture Trustee.

"Indenture" means this Indenture, as originally executed and as it may be amended or supplemented from time to time in accordance with the terms hereof.

"Indenture Trustee" means U.S. Bank, N.A., a national banking association organized and existing under the laws of the United States of America, acting in its capacity as trustee under this Indenture, or its successor, as provided in this Indenture.

"Inflated Operating Cap Component" means the amount determined from time to time pursuant to clause (i) of the definition of the term "Operating Cap."

"Issuer" means the Tobacco Settlement Authority, a public instrumentality and agency of the State, separate and distinct from the State, exercising public and essential governmental functions. The Issuer is a public body within the meaning of RCW 39.53.010.

"Issuer Tax Certificate" means the Issuer Tax Certificate executed by the Issuer at the time of the issuance of the Series 2002 Bonds, as originally executed and as it may be amended or supplemented from time to time in accordance with the terms thereof.

"Liquidity Reserve Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Liquidity Reserve Requirement" means an amount equal to $45,534,106.25.

"Litigation Expense Reimbursements" means the reimbursements and payments made or to be made to the State or any department or agency of the State pursuant to Section XVII(a) and (b) of the MSA.

"Lump Sum Payment" means a final payment from a Participating Manufacturer that results in, or is due to, a release of that Participating Manufacturer from all of its future payment obligations under the Master Settlement Agreement. The term "Lump Sum Payment" does not include any payments that are Partial Lump Sum Payments.

"Master Settlement Agreement" or "MSA" means the Master Settlement Agreement entered into on November 23, 1998, among the attorneys general of 46 states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the U.S. Virgin Islands, American Samoa and the Commonwealth of the Northern Mariana Islands and the Original Participating Manufacturers described therein, as originally executed and as it may be amended or supplemented from time to time in accordance with the terms thereof.

"Maturity Date" means, with respect to any Bond, the final date on which all remaining principal of such Bond is due and payable.

"Moody's" means Moody's Investors Service or its successor; references to Moody's are effective so long as Moody's is a Rating Agency.

"Officer's Certificate" means a certificate signed by an Authorized Officer of the Issuer.

"Operating Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Operating Cap" means (i) $250,000 in the Fiscal Year ending June 30, 2003, inflated in each following Fiscal Year by the percentage representing the fraction "x" over "y", where "x" equals the Inflation Adjustment Percentage (as defined in the MSA) applicable to MSA payments due in the calendar year ending in such Fiscal Year, and "y" equals the Inflation Adjustment Percentage applicable to MSA payments due in the preceding Fiscal Year, plus (ii) in each Fiscal Year, arbitrage payments, rebate, and  penalties specified in an Officer's Certificate, plus (iii) for the Fiscal Year ending June 30, 2003 only, an additional amount of $500,000.

"Operating Contingency Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Operating Expenses" means operating and administrative expenses of the Issuer (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on the Bonds, arbitrage payments and rebate penalties, insurance premiums, costs and expenses of indemnification pursuant to Section 702(i) hereof, and costs of annual meetings or other required activities of the Issuer), fees and expenses incurred for the Indenture Trustee (including the reasonable fees and expenses of its counsel), any Paying Agents, professional consultants and fiduciaries, termination payments on Swap Contracts, on investment contracts or investment agreements for Accounts, or on forward purchase contracts

for investments in Accounts, enforcement related costs with federal and state agencies incurred, as determined by the State, in order to preserve the tax-exempt status of any Tax-Exempt Bonds, and the costs related to enforcement of the Issuer's or the Indenture Trustee's enforcement rights with respect to the Basic Documents or the Bonds, and all other expenses so identified as Operating Expenses in this Indenture.

"Outstanding," when used as to Bonds, or a series thereof, as the context requires, means Bonds issued under this Indenture, excluding: (i) Bonds that have been exchanged or replaced, or delivered to the Indenture Trustee for credit against a principal payment; (ii) Bonds that have been paid in full; (iii) Bonds that have become due and for the payment of which money has been duly provided to the Indenture Trustee for deposit in the Debt Service Account; (iv) Bonds the payment of which shall have been provided for pursuant to Section 202; and (v) for purposes of any consent or other action to be taken by a specified percentage of Bondholders hereunder, Bonds held by or for the account of the Issuer, or any Person controlling, controlled by or under common control with the Issuer. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Partial Lump Sum Payment" means a payment from a Participating Manufacturer that results in, or is due to, a release of that Participating Manufacturer from a portion, but not all, of its future payment obligations under the Master Settlement Agreement.

"Partial Lump Sum Payment Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Participant" means a broker-dealer, bank or other financial institution for which DTC holds Bonds as a Security Depository.

"Participating Manufacturer" shall have the meaning ascribed thereto in the MSA.

"Paying Agent" means each Paying Agent designated from time to time pursuant to Section 703.

"Person" means any individual, corporation, estate, partnership, joint venture, association, joint stock company, limited liability company, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity of any type.

"Pledged TSRs" means the sum of (a) the first thirty million dollars ($30,000,000) of payments received by the State under the MSA on and after the Closing Date and before July 1, 2003, and (b) twenty-nine and two-tenths percent (29.20%) of (i) the payments (other than Litigation Expense Reimbursements) received by the State under the MSA on and after July 1, 2003 (and all adjustments thereto), (ii) all amounts received by the State under the MSA on and after July 1, 2003 consisting of adjustments to payments made to the State under the MSA prior to July 1, 2003, and (iii) all Lump Sum Payments, Partial Lump Sum Payments and Total Lump Sum Payments, including those received prior to July 1, 2003. Pledged TSRs do not include Unpledged TSRs.

"Projected Turbo Redemption" means, for a series of Bonds, each respective Turbo Redemption projected to be made pursuant to Section 404(d) of this Indenture, as such projections are set forth on the Projected Turbo Schedule.

"Projected Turbo Schedule" means, for a series of Bonds that includes Turbo Term Bonds, the schedule of projected Outstanding balances of such Turbo Term Bonds set forth in the related Series Supplement or in an exhibit thereto.

"Pro Rata" means, for an allocation of available amounts to any payment of interest, principal or Swap Payments to be made under this Indenture, the application of a fraction to such available amounts (a) the numerator of which is equal to the amount due to the respective Holders, and any party who has entered into a Swap Contract with the Issuer, to whom such payment is owing, and (b) the denominator of which is equal to the total amount due to all Holders and Swap Contract counterparties to whom such payment is owing.

"Pro Rata Defeasance Redemption Schedule" shall have the meaning set forth therefor in Section 202(b) hereof.

"Qualifying Statute" means Laws of 1999, Ch. 393, codified at Ch. 70.157 RCW, enacted 1999, in conformity with Exhibit T of the Master Settlement Agreement.

"Rating Agency" means, with respect to the Bonds, each nationally recognized securities rating service that has, at the request of the Issuer, a rating then in effect for the unenhanced Bonds.

"Rating Confirmation" means, with respect to the Bonds, written confirmation from each Rating Agency which, at the request of the Issuer, assigned a rating and continues to have a rating assigned to the Bonds, to the effect that the then-current rating assigned by such Rating Agency to the Bonds, without regard to any bond insurance or any other form of credit enhancement, will not be withdrawn, reduced or suspended solely as a result of the proposed action for which a written confirmation is sought.

"Rebate Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 403.

"Rebate Requirement" shall have the meaning ascribed thereto in the Issuer Tax Certificate.

"Record Date" means the 15th day of the calendar month preceding a Distribution Date, and the Issuer or the Indenture Trustee may in its discretion establish special record dates for the determination of the Bondholders for various purposes hereof, including giving consent or direction to the Indenture Trustee.

"Refunding Bonds" means Bonds, other than the Series 2002 Bonds, issued pursuant to Section 301 for the purposes of refunding any Outstanding Bonds.

"Required Defeasance Amortization" means the mandatory redemption of Defeased Turbo Term Bonds required by the provisions of Section 202(b)(iv) hereof.

"Residual Certificate" means an instrument in the form of Appendix C to this Indenture.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or its successor; references to S&P are effective so long as S&P is a Rating Agency.

"Sales Agreement" means the Purchase and Sale Agreement, dated as of October 1, 2002, between the State and the Issuer, as originally executed and as it may be amended or supplemented from time to time in accordance with the terms thereof.

"Securities Depository" means DTC, or if DTC resigns from its functions as depository of the Bonds or the Issuer discontinues the use of DTC as a depository of the Bonds, then any other securities depository designated in an Officer's Certificate.

"Serial Bonds" means the Bonds so identified in a Series Supplement.

"Serial Maturity" means the principal payment required to be made on a Serial Bond on its Maturity Date.

"Series Supplement" means the Series 2002 Supplement, and any other Supplemental Indenture providing for the issuance of a series of Refunding Bonds in accordance with Section 301.

"Series 2002 Bonds" means the Issuer's $517,905,000 Tobacco Settlement Asset-Backed Bonds, Series 2002, dated November 5, 2002, including any Bonds issued in exchange or replacement therefor.

"Series 2002 Supplement" means the Series Supplement authorizing the Series 2002 Bonds.

"Sinking Fund Installments" means sinking fund installments with respect to Turbo Term Bonds, as described in a Series Supplement.

"Special Conditions" shall have the meaning ascribed thereto in Section 509(e).

"State" means the State of Washington.

"Supplemental Indenture" means a Series Supplement or other supplement hereto executed and delivered in accordance with the terms hereof. Any provision that may be included in a Series Supplement or a Supplemental Indenture is also eligible for inclusion in the other subject to the provisions hereof.

"Swap Contract" means an interest rate exchange, cap, collar, hedge or similar agreement entered into by the Issuer.

"Swap Payment" means any payment from Collateral with respect to a Swap Contract, except that such payments shall not include any payment to be made by the Issuer to a counterparty with respect to the termination of the Swap Contract.

"Tax-Exempt Bonds" means all Bonds so identified in any Series Supplement.

"Tobacco Assets" means the sum of (a) the first thirty million dollars ($30,000,000) of payments received by the State under the MSA on and after the Closing Date and before July 1, 2003, and (b) twenty-nine and two-tenths percent (29.20%) of (i) the payments (other than Litigation Expense Reimbursements) received by the State under the MSA on and after July 1, 2003 (and all adjustments thereto), (ii) all amounts received by the State under the MSA on and after July 1, 2003 consisting of adjustments to payments made to the State under the MSA prior to July 1, 2003, and (iii) all Lump Sum Payments, Partial Lump Sum Payments and Total Lump Sum Payments, including those received prior to July 1, 2003.

"Tobacco Securitization Trust Account" means the account by such name established pursuant to Section 13 of the Act.

"Total Lump Sum Payment" means a final payment from all of the Participating Manufacturers that results in, or is due to, a release of all of the Participating Manufacturers from all of their future payment obligations under the Master Settlement Agreement.

"Turbo Redemption Account" means the Account of that name established and maintained by the Indenture Trustee pursuant to Section 401.

"Turbo Redemptions" means the redemption of Turbo Term Bonds from amounts on deposit in the Turbo Redemption Account pursuant to Section 404(d) of this Indenture.

"Turbo Term Bond Maturity" means the principal payment required to be made on a Turbo Term Bond on its Maturity Date.

"Turbo Term Bonds" means Bonds so identified in a Series Supplement.

"Undertaking" shall have the meaning ascribed thereto in Section 506(a)(4).

"Unpledged TSRs" means the sum of (a) the payments received by the State under the MSA on and after the Closing Date and before July 1, 2003, other than the first thirty million dollars ($30,000,000) of such payments, and (b) all Litigation Expense Reimbursements received by the State under the MSA on and after July 1, 2003, and (c) seventy and eight-tenths percent (70.80%) of (i) the payments (other than Litigation Expense Reimbursements) received by the State under the MSA on and after July 1, 2003 (and all adjustments thereto), (ii) all amounts received by the State under the MSA on and after July 1, 2003 consisting of adjustments payments made to the State under the MSA prior to July 1, 2003, and (iii) all Lump Sum Payments, Partial Lump Sum Payments and Total Lump Sum Payments, including those received prior to July 1, 2003.

"Written Notice", "written notice" or "notice in writing" means notice in writing which may be delivered by hand or first class mail and also means facsimile transmission.

(a)     Articles and Sections referred to by number shall mean the corresponding Articles and Sections of this Indenture.

(b)     Words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa.

(c)     The terms "hereby", "hereof", "herein", "hereunder" and any similar terms, as used in this Indenture, refer to this Indenture; and the term "date hereof" means, the term "hereafter" means after, and the term "heretofore" means before, the date of execution and delivery of this Indenture.

(d)     The word "including" means "including without limitation".

(e)     The word "or" is used in its inclusive sense.

(f)     Any headings preceding the texts of the several Articles and Sections of this Indenture, and any table of contents, shall be solely for convenience of reference, and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect.

(g)     As used in this Indenture and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Indenture or in any such certificate or other document, and accounting terms partly defined in this Indenture or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Indenture or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Indenture or in any such certificate or other document shall control.

SECTION 103.  Directors and State Not Liable on Bonds; Limited Obligation of Issuer.  The Board and any person executing the Bonds are not liable personally on the indebtedness or subject to any personal liability or accountability by reason of the issuance thereof.

The Bonds shall not be obligations of the State and shall be obligations only of the Issuer, payable solely from the special fund or funds created by the Issuer for their payment.  Payment of the principal of, interest on, and redemption or prepayment premium, if any, on the Bonds shall be a valid claim only as against the special fund or funds relating thereto.  Neither the faith and credit nor the taxing power of the State or any municipal corporation, subdivision, or agency of the State, other than the Issuer as set forth in the Act, is pledged to the payment of the principal of, interest on, and premium, if any, on the Bonds.

## ARTICLE II

## GRANT OF SECURITY INTEREST

SECTION 201.  Security Interest and Pledge.  The Issuer assigns and pledges to the Indenture Trustee and grants a first lien on and a first priority security interest in, in trust

upon the terms hereof, the "Collateral," consisting of all of the Issuer's right, title and interest, whether now owned or hereafter acquired, in, to and under all of the following property: (a) the Collections (including all Pledged TSRs), (b) all rights to receive the Collections and the proceeds of such rights, (c) the Accounts (except for the Rebate Account) and assets thereof, including money, contract rights, general intangibles or other personal property, held by the Indenture Trustee hereunder, (d) subject to the following sentence, all rights and interest of the Issuer under the Sales Agreement, including the representations, warranties and covenants of the State in the Sales Agreement, (e) any payment received by the Indenture Trustee pursuant to a Swap Contract, (f) all present and future claims, demands, causes and things in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, general intangibles, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing, (g) all proceeds of the foregoing, and (h) any and all other property of every kind and nature from time to time hereafter, by delivery or by writing of any kind, conveyed, pledged, assigned or transferred as and for additional security hereunder. Except as specifically provided herein, this assignment and pledge does not include: (i) the Unpledged TSRs, (ii) the rights of the Issuer pursuant to provisions for consent or other similar action by the Issuer, notice to the Issuer, indemnity or the filing of documents with the Issuer, or otherwise for its benefit and not for that of the Bondholders or parties to Swap Contracts, or (iii) any right or power reserved to the Issuer pursuant to the Act or other law; nor does this Section 201 preclude the Issuer's enforcement of its rights under and pursuant to the Sales Agreement for the benefit of the Bondholders or parties to Swap Contracts as provided herein.

The Unpledged TSRs, and the proceeds of the Bonds, other than the amounts deposited in one or more of the Accounts, do not constitute any portion of the Pledged TSRs, are not pledged to the Bondholders or parties to Swap Contracts and are not subject to the lien of this Indenture. The right of the Issuer to receive the first thirty million dollars of payments received by the State under the MSA on and after the Closing Date and before July 1, 2003, as Pledged TSRs, is prior to the claim of the State to all other payments received by the State under the MSA on and after the Closing Date and before July 1, 2003. The right of the Issuer to receive twenty-nine and two-tenths percent (29.20%) of (i) the payments (other than Litigation Expense Reimbursements) received by the State under the MSA on and after July 1, 2003 (and all adjustments thereto), (ii) all amounts received by the State under the MSA on and after July 1, 2003 consisting of adjustments to payments made to the State under the MSA prior to July 1, 2003, and (iii) all Lump Sum Payments, Partial Lump Sum Payments and Total Lump Sum Payments, including those received prior to July 1, 2003, as Pledged TSRs, is valid and enforceable and on a parity with the claim of the State to seventy and eight-tenths percent (70.80%) of said revenues. Neither the Issuer nor the Indenture Trustee shall have the right to make a claim to make up all or any portion of a perceived deficiency in Pledged TSRs from the Unpledged TSRs and, likewise, the State shall have no right to make a claim to make up all or any portion of a perceived deficiency in the Unpledged TSRs from the Pledged TSRs.

The Issuer will implement, protect and defend this assignment and pledge by all appropriate legal action, the costs thereof to be Operating Expenses. The pledge and assignment made by this Indenture and the covenants and agreements to be performed by or on behalf of the Issuer shall be for the equal and ratable benefit, protection and security of the Holders of any and all of the Outstanding Bonds and the counterparties to Swap Contracts, all of which, regardless of the time or times of their execution, issue or maturity, shall be of equal rank without preference, priority or distinction of such Bonds or Swap Contracts over any other Bonds or Swap Contracts, except as expressly provided herein or permitted hereby. The lien of such pledge shall be valid and binding as against all parties having claims of any kind against the Issuer, whether or not such parties have notice of the lien, and shall have priority over any or all other obligations and liabilities of the Issuer secured by the Collections. The Issuer shall not incur any obligations, except as authorized hereby, secured by a lien equal or prior to the lien hereof.

SECTION 202.  Defeasance.  (a)  *Total Defeasance.*  When (i) there is held by or for the account of the Indenture Trustee Defeasance Collateral in such principal amounts, bearing fixed interest at such rates and with such maturities, including any applicable redemption premiums, as will provide sufficient funds to pay or redeem all obligations to Bondholders in full (to be verified by a nationally recognized firm of defeasance escrow verification agents), and the Indenture Trustee shall have received an opinion of nationally recognized bond counsel to the effect that such defeasance (x) is authorized or permitted by the Indenture and (y) will not adversely affect the exclusion of interest on the Bonds from gross income for federal income tax purposes, (ii) any required notice of redemption shall have been duly given in accordance with this Indenture or irrevocable instructions to give notice shall have been given to the Indenture Trustee, (iii) all Swap Payments have been made, (iv) all Operating Expenses due and payable constituting termination payments on Swap Contracts, on investment contracts or investment agreements for Accounts, or on forward purchase contracts for investments in Accounts, shall have been paid, (v) the Residual Certificate shall have been surrendered to the Indenture Trustee for cancellation in exchange for a transfer of the Collateral, and (vi) all the rights hereunder of the Fiduciaries have been provided for, then upon written notice from the Issuer to the Indenture Trustee, the Bondholders and counterparties to Swap Contracts shall cease to be entitled to any benefit or security under this Indenture except the right to receive payment of the funds so held and other rights which by their nature cannot be satisfied prior to or simultaneously with termination of the lien hereof, the security interests created by this Indenture (except in such funds and investments) shall terminate, and the Issuer and the Indenture Trustee shall execute and deliver such instruments as may be necessary to discharge the Indenture Trustee's lien and security interests created hereunder and to make the Pledged TSRs and other Collateral payable to the order of the Issuer.  Upon such defeasance, the funds and investments required to pay or redeem the Bonds and other obligations to such Bondholders shall be irrevocably set aside for that purpose, subject, however, to Section 406, and money held for defeasance shall be invested only as provided above in this section and applied by the Indenture Trustee and other Paying Agents, if any, to the retirement of the Bonds and such other obligations. Upon the discharge of the Indenture Trustee's lien and security interests created hereunder, the Indenture Trustee shall execute and deliver such instruments as may be necessary to discharge the Indenture Trustee's lien and security interests created hereunder.

-15-

(b)    *Partial Defeasance.* Subject to the requirements of Section 503(a) of this Indenture, the Issuer may create a defeasance escrow for the retirement and defeasance of any Bonds, and for Swap Payments under Swap Contracts related to such Bonds to be defeased, in accordance with Sections 202(a)(i) and 202(a)(ii) hereof. Thereafter, the Holders of such Defeased Bonds and counterparties to such related Swap Contracts shall cease to be entitled to any benefit or security under this Indenture except the right to receive payment of the funds held in such defeasance escrow and other rights which by their nature cannot be satisfied prior to or simultaneously with termination of the lien hereof of this Indenture.

(c)    *Defeasance of Turbo Term Bonds.* When the Issuer shall have determined to create a defeasance escrow pursuant to this Section 202 for the retirement and defeasance of Turbo Term Bonds, the Issuer shall determine for each such Defeased Turbo Term Bond of the same Maturity Date and series the optional redemption date (as provided for in the applicable Series Supplement) or Maturity Date to which amounts in such defeasance escrow shall be applied for the payment of principal of, premium (if any) and interest on such Defeased Turbo Term Bond. In addition to payment of interest on each such Defeased Turbo Term Bond on each Distribution Date prior to such redemption date or Maturity Date, as applicable, the Issuer shall redeem Defeased Turbo Term Bonds of such Maturity Date and series by:

(i)    determining the pro rata portion of each Bond principal balance shown in the Projected Turbo Schedule for such series of Bonds that is allocable to the Defeased Turbo Term Bonds having such Maturity Date (such pro rata portion to be determined using the ratio of (x) the principal amount of the Defeased Turbo Term Bonds of that series and Maturity Date at the time such defeasance escrow is created to (y) the original principal amount of all Turbo Term Bonds of that series and Maturity Date as of the date of original issuance of such Turbo Term Bonds) (the "Pro Rata Defeasance Redemption Schedule"),

(ii)    for the purpose of adjusting the Projected Turbo Schedule for any subsequent defeasances of Turbo Term Bonds of such series having such Maturity Date, permanently subtracting from each of the amounts set forth in the Projected Turbo Schedule for such Turbo Term Bonds the related amounts set forth in the Pro Rata Defeasance Redemption Schedule,

(iii)    determining on such date of defeasance the earliest future Distribution Date (or the date of defeasance, if applicable) from and after which the Outstanding principal amount of the Defeased Turbo Term Bonds of such series and Maturity Date is or will be greater than the Bond principal balance set forth in the Pro Rata Defeasance Redemption Schedule for such Distribution Date or date of defeasance, if applicable (such earliest date, or date of defeasance, if applicable, herein called the "First Defeasance Redemption Date"), and

(iv)    reducing the principal amount of such Defeased Turbo Term Bonds to equal, but not lower than, the related Bond principal balance set forth in the Pro Rata Defeasance Redemption Schedule by redeeming such Defeased Turbo Term Bonds on the First Defeasance Redemption Date (unless such date is the

date of defeasance, in which case within 31 days after such date of defeasance), at a redemption price equal to one hundred percent (100%) of the Outstanding principal amount thereof, plus interest accrued to the date fixed for redemption, such redemption to be applied Pro Rata to all Defeased Turbo Term Bonds of such Maturity Date.

## ARTICLE III

## THE BONDS

SECTION 301.    Bonds of the Issuer.

(a)    By Series Supplements complying procedurally and in substance with this Indenture, the Issuer may authorize, issue, sell and deliver the Series 2002 Bonds and one or more series of Refunding Bonds from time to time in such principal amounts as the Issuer shall determine. The Bonds of each series shall bear such dates, mature at such times, subject to such terms of payment, bear interest at such fixed rates, be in such form and denomination, carry such registration privileges, be executed in such manner, and be payable in such medium of payment, at such place and subject to such terms of redemption, as the Issuer may provide herein and in the related Series Supplement. The proceeds of each series of Bonds shall be applied as provided in the related Series Supplement.

(b)    With Rating Confirmation, one or more series of Refunding Bonds may be issued to refund Bonds (including the funding of defeasance escrows and and deposits to Accounts in connection with such issuance) but only if upon the issuance of such Refunding Bonds (i) the amount on deposit in the Liquidity Reserve Account will be at least equal to the Liquidity Reserve Requirement; (ii) no Event of Default shall have occurred; and (iii) the expected base case debt service on the proposed Refunding Bonds shall be less than or equal to the expected base case debt service on the refunded Bonds, as of their date of original issuance, in all years in which such refunded Bonds debt service is payable.

(c)    The Bonds shall be executed in the name of the Issuer by the signature or facsimile signature of its Chairperson, and attested by the signature or facsimile signature of its Secretary.    The authenticating certificate of the Indenture Trustee shall be manually signed. Bonds executed as set forth above shall be valid and binding obligations when duly delivered, notwithstanding the fact that before the delivery thereof the persons executing the same shall have ceased to be in office or others may have been designated to perform such functions.

(d)    The Issuer may from time to time request the authentication and delivery of a series of Bonds by providing to the Indenture Trustee (at or prior to such authentication and delivery) the following: (i) copies of the applicable Series Supplement, certified by an Authorized Officer of the Issuer; (ii) in the case of Refunding Bonds, an Officer's Certificate showing compliance with Section 301(b); (iii) an opinion of Counsel (A) as to the due authorization, execution and delivery by the Issuer of this Indenture and each relevant Supplemental Indenture, (B) to the effect that the Bonds being issued are valid and binding obligations of the Issuer payable from the sources specified in the Indenture, (C) to the effect that the Indenture creates the valid pledge of, and first-priority lien on, the Collateral (including,

without limitation, the Pledged TSRs) that it purports to create, and (D) in the case of Refunding Bonds, to the effect that the issuance of such Refunding Bonds will not adversely affect the exclusion from gross income for federal income tax purposes of interest on Tax-Exempt Bonds theretofore issued (as set forth in the opinions delivered with such prior Bonds); (iv) such other documents as may be required by the applicable Series Supplement; and (v) an Officer's Certificate to the effect that the applicable conditions to the issuance of Bonds set forth herein and in each applicable Series Supplement have been met, and requesting the Indenture Trustee's authentication of the series of Bonds.

SECTION 302.  Transfer and Replacement of Bonds.

(a)  *Transfer*.  A registered Bond shall be transferable upon presentation to the Indenture Trustee with a written transfer of title of the registered owner.  Such transfer shall be dated, and signed by such registered owner, or such registered owner's legal representatives, and shall be signature guaranteed by a guarantor institution participating in a guarantee program acceptable to the Indenture Trustee.  The name of the transferee shall be entered in the books kept by the Indenture Trustee and:

(1)  the transferee shall be provided with a new Bond, of substantially the same form and tenor as the Bond presented, except as provided below;

(2)  the new Bond shall be signed and attested, either (a) by manual or facsimile signature by the appropriate persons in office at the time of delivery to the transferee, or (b) by facsimile signature of the appropriate persons in office at the time of issuance;

(3)  the new Bond shall be executed as of the date of the Bond presented and shall be authenticated as of the date of delivery of the new Bond;

(4)  the Bond presented shall be cancelled and destroyed and a certificate of destruction shall be filed with the Issuer and the Indenture Trustee;

(5)  no interest shall be paid on a Bond issued in registered form until the name of the payee has been inserted therein and such Bond has been registered as provided herein; and

(6)  the principal of, premium, if any, and interest on a Bond which has been registered shall be payable only to the registered owner, or such registered owner's legal representatives, successors or transferees.

(b)  *Replacement*.  The Issuer and the Indenture Trustee may issue a new Bond to replace one lost, stolen, destroyed, partially destroyed or defaced, in accordance with the following:

(1)  If the Bond is claimed to be lost, stolen or destroyed, the owner shall furnish:

(a)  Proof of ownership.

-18-

(b)      Proof of loss, theft or destruction.

(c)      Payment of the cost of preparing, issuing, mailing, shipping or insuring the new Bond.

(2)      If the Bond is defaced or partially destroyed, the owner shall surrender such Bond and pay the cost of preparing and issuing the new Bond.

(3)      The new Bond shall be of substantially the same form and tenor as the one originally issued, except that it shall be signed either by (a) the manual or facsimile signature of the appropriate person or persons in the office at the time of the reissuance, or (b) the facsimile signature of the appropriate person or persons in office at the time of the original issuance or any time between original issuance and reissuance. The new Bond shall be authenticated in the manner provided herein. If the Bond is issued in the place of one claimed to be lost, stolen or destroyed, it shall in addition state upon the back thereof that it is issued in the place of such Bond claimed to have been lost, stolen or destroyed, and, where applicable, that adequate security or indemnity for its payment in full at maturity is filed with the Indenture Trustee. The Indenture Trustee shall make an appropriate entry in its records of any new Bond issued pursuant to this section.

SECTION 303.  Securities Depositories.

(a)      *Immobilized Bonds.*  The Bonds, upon original issuance, will be issued in the form of typewritten Bonds, to be delivered to the order of DTC by or on behalf of the Issuer. Such Bonds shall initially be registered in the name of Cede & Co., as nominee of DTC, and no beneficial owner will receive a certificate representing an interest in any Bond, except as provided in Section 303(b). Unless and until Bonds have been issued to Bondholders other than DTC:

(1)      the Issuer and each Fiduciary shall be entitled to deal with DTC for all purposes of this Indenture (including the payment of such Bonds and the giving of notices, instructions or directions hereunder) as the sole Bondholder; and

(2)      the rights of beneficial owners shall be exercised only through DTC.

(b)      *Withdrawal from DTC.*  If (1) DTC is no longer willing or able to properly discharge its responsibilities with respect to the Bonds or other portion thereof, and the Issuer advises the Indenture Trustee in writing that it is unable to locate a qualified successor Securities Depository, (2) the Issuer at its option advises the Indenture Trustee in writing that it elects to terminate the book-entry system through DTC or (3) after the occurrence of any Event of Default, beneficial owners representing a majority of the principal amount of the Bonds held by DTC advise DTC in writing that the continuation of a book-entry system through DTC is no longer in the best interests of the beneficial owners, then DTC shall notify its Participants and the Indenture Trustee of the occurrence of any such event and of the availability of Bonds to registered owners requesting the same. Upon surrender to the Indenture Trustee of the typewritten Bonds held by DTC, accompanied by registration instructions, the Issuer shall

-19-

execute and provide to the Indenture Trustee, and the Indenture Trustee shall authenticate, Bonds in accordance with the instructions of DTC. Neither the Issuer nor the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be fully protected in relying on, such instructions. Unless otherwise specified in an Officer's Certificate, the regular record date shall in that event be the close of business on the tenth Business Day preceding a Distribution Date.

## ARTICLE IV

## ACCOUNTS; FLOW OF FUNDS

SECTION 401. Establishment of Accounts. The Indenture Trustee shall establish and maintain the following segregated trust accounts in the Indenture Trustee's name:

(a)     the Collections Account;

(b)     the Operating Account;

(c)     the Debt Service Account, and therein the Capitalized Interest Subaccount;

(d)     the Liquidity Reserve Account;

(e)     the Partial Lump Sum Payment Account;

(f)     the Operating Contingency Account;

(g)     the Turbo Redemption Account: and

(h)     the Costs of Issuance Account.

SECTION 402. Application of Collections.

(a)     All Collections received by the Indenture Trustee, excluding investment earnings on amounts on deposit with the Indenture Trustee under this Indenture, shall be promptly deposited by the Indenture Trustee into the Collections Account. All Collections that have been identified by an Officer's Certificate as consisting of Partial Lump Sum Payments received by the Indenture Trustee shall be promptly (and in any event, no later than the Business Day immediately preceding the next Distribution Date) transferred to the Partial Lump Sum Payment Account, in accordance with the instructions received by the Indenture Trustee pursuant to an Officer's Certificate. All Collections that have been identified by an Officer's Certificate as consisting of Total Lump Sum Payments received by the Indenture Trustee shall be promptly (and in any event, no later than the Business Day immediately preceding the next Distribution Date) applied as described in subsection (f) of this Section 402, in accordance with the instructions received by the Indenture Trustee pursuant to an Officer's Certificate. In addition, on the Business Day immediately preceding each Distribution Date, the Indenture Trustee shall deposit in the Collections Account, and apply as described in the following paragraph, (i) all Collections consisting of investment earnings on amounts on deposit with the Indenture Trustee under this Indenture (excluding amounts in the Costs of Issuance Account, the Rebate Account

-20-

and the Partial Lump Sum Payment Account), and (ii) all Collections consisting of realized gains from investments (other than investment earnings) determined in accordance with Section 405 (excluding such gains in the Costs of Issuance Account, the Rebate Account and the Partial Lump Sum Payment Account). To the extent that the Indenture Trustee shall receive an amount constituting Unpledged TSRs (as confirmed in writing to the Indenture Trustee in an Officer's Certificate), the Indenture Trustee shall promptly remit such amount to or upon the order of the State and thereupon notify the State of such remittance in accordance with an Officer's Certificate.

As soon as is possible following each deposit of Collections to the Collections Account, but in any event no later than the earlier of (a) the fifth Business Day following each Deposit Date, or (b) the start of business of the Indenture Trustee on the Distribution Date following each Deposit Date, the Indenture Trustee shall withdraw the funds on deposit in the Collections Account and transfer such amounts in the priority set forth below:

(1)    to the Operating Account, after June 30, 2004, an amount sufficient to cause the amount therein to equal the amount specified by the Officer's Certificate most recently delivered (or deemed delivered) pursuant to Section 502(a) of this Indenture in order to pay, for the Fiscal Year applicable to such Officer's Certificate, the Operating Expenses to the extent that the aggregate amount thereof does not exceed the Operating Cap in effect as of the date of such deposit (as certified or deemed certified in accordance with Section 502(a));

(2)    to the Debt Service Account, until June 1, 2003, all remaining Collections and thereafter an amount sufficient to cause the amount therein to equal the sum of (a) interest on the Outstanding Bonds and all Swap Payments that will come due (i) in the next succeeding Bond Year, if the Deposit Date is on or after December 1 and on or before May 31 of any Bond Year, or (ii) in the then-current Bond Year, if the Deposit Date is on or after June 1 and on or before November 30 of any Bond Year, plus (b) any such unpaid interest on the Bonds and Swap Payments from prior Distribution Dates (including interest at the stated rate on such unpaid interest, to the extent legally permissible); provided that the amount to be deposited pursuant to this Section 402(a)(2) shall be calculated assuming that principal of the Bonds will have been paid as described in clauses (2), (3), and (4) of Section 402(b) of this Indenture;

(3)    to the Debt Service Account, an amount sufficient to cause the amount therein to equal the amount specified in clause (2) above plus the sum of (i) if the Deposit Date is on or after December 1 and on or before May 31 of any Bond Year, the Serial Maturities, Turbo Term Bond Maturities and Sinking Fund Installments, if any, due in or scheduled for the next succeeding Bond Year, plus (b) any such Serial Maturities, Turbo Term Bond Maturities or Sinking Fund Installments unpaid from prior Distribution Dates, provided that the amount of each Sinking Fund Installment shall first be adjusted as described in Section 404(e) of this Indenture;

(4)    unless an Event of Default has occurred, to the Liquidity Reserve Account an amount sufficient to cause the amount on deposit therein to equal the Liquidity Reserve Requirement;

-21-

(5)    to the Operating Contingency Account an amount specified by an Officer's Certificate delivered pursuant to Section 502(a)(i) of this Indenture in order to pay, for the Fiscal Year applicable to such Officer's Certificate, the Operating Expenses in excess of the Operating Cap;

(6)    to the Turbo Redemption Account until Turbo Term Bonds are no longer Outstanding, the amount remaining in the Collections Account; and

(7)    from and after such time that no Turbo Term Bonds remain Outstanding, the remaining amount shall be retained in the Collections Account and applied as required herein.

(b)    Unless an Event of Default has occurred, on each Distribution Date, the Indenture Trustee will apply amounts in the various Accounts in the following order of priority:

(1)    from the Capitalized Interest Subaccount, the Debt Service Account, the Partial Lump Sum Payment Account, and the Liquidity Reserve Account, in that order, to pay interest on the Bonds and Swap Payments due on such Distribution Date;

(2)    from the Debt Service Account, the Partial Lump Sum Payment Account, and the Liquidity Reserve Account, in that order, to pay, in the following order, the Serial Maturities, Turbo Term Bond Maturities and the Sinking Fund Installments, if any, due on or scheduled for such Distribution Date, plus any Sinking Fund Installments unpaid from prior Distribution Dates, provided that the amount of such Sinking Fund Installments shall first have been adjusted as described in Section 404(e) of this Indenture, and further provided that the Indenture Trustee shall not pay a Sinking Fund Installment pursuant to this subsection unless the Debt Service Account will contain, after giving effect to such payment, sufficient funds to pay interest due on the next succeeding Distribution Date;

(3)    from the Turbo Redemption Account, to redeem Turbo Term Bonds on such Distribution Date in accordance with Section 404(d) of this Indenture; and

(4)    from the Partial Lump Sum Payment Account, but only as directed in an Officer's Certificate delivered by the Issuer and accompanied by Rating Confirmation, to redeem Turbo Term Bonds on such Distribution Date in accordance with Section 404(d) of this Indenture.

(c)    Funds deposited in the Operating Account shall be transferred, immediately upon such deposit, to or upon the order of the Issuer and shall be used by the Issuer to pay Operating Expenses (other than termination payments on Swap Contracts, on investment contracts or investment agreements for Accounts, or on forward purchase contracts for investments in Accounts).

(d)    Funds in the Operating Contingency Account shall be applied by the Indenture Trustee at any time, in accordance with directions in an Officer's Certificate, to pay Operating Expenses not otherwise paid from the Operating Account (or to fund an account of the

-22-

Issuer free and clear of the lien of this Indenture for the purpose of paying such Operating Expenses).

(e)    Upon the occurrence of any Event of Default and on each succeeding Distribution Date, the Indenture Trustee shall apply all funds in the Debt Service Account, the Liquidity Reserve Account, the Partial Lump Sum Payment Account, and the Turbo Redemption Account to pay Pro Rata, first, the accrued interest on the Bonds and Swap Payments (including, in each case, interest at the stated rate on any unpaid interest, to the extent legally permissible) and, second, principal on all Bonds then Outstanding, whether or not such principal is then scheduled to be paid.

(f)    Upon the receipt of a sum that has been identified by an Officer's Certificate as a Total Lump Sum Payment, the Indenture Trustee shall, after making provision for the amounts required to be deposited pursuant to subsection (a)(1) of this Section 402, use all remaining proceeds of such Total Lump Sum Payment to pay Pro Rata, first, the accrued interest on the Bonds and Swap Payments (including, in each case, interest at the stated rate on any unpaid interest, to the extent legally permissible) and, second, principal on all Bonds then Outstanding, whether or not such principal is then scheduled to be paid.

(g)    After making all deposits and payments set forth above, and provided that there are no Outstanding Bonds and no obligations to make Swap Payments under a Swap Contract, the Indenture Trustee shall deliver any amounts remaining in an Account to the registered owner of the Residual Certificate.

SECTION 403.  Rebate.    The Indenture Trustee shall establish and maintain when required an account separate from any other account established and maintained hereunder designated as the Rebate Account. Subject to the transfer provisions provided in paragraph (d) below, all money at any time deposited in the Rebate Account shall be held by the Indenture Trustee in trust, to the extent required to satisfy the Rebate Requirement (as defined, computed and provided to the Indenture Trustee in accordance with the Issuer Tax Certificate), for payment to the federal government of the United States of America.  Neither the Issuer nor any Bondholder shall have any rights in or claim to such money.  All amounts deposited into or on deposit in the Rebate Account shall be governed by this Section, by Section 503 hereof and by the Issuer Tax Certificate (which is incorporated herein by reference). The Indenture Trustee shall be deemed conclusively to have complied with such provisions if it follows such directions of the Issuer, including supplying all necessary information specified in Article IV of the Issuer Tax Certificate to the extent the Indenture Trustee possesses such information, in the manner provided in the Issuer Tax Certificate, and shall have no liability or responsibility to enforce compliance by the Issuer with the terms of the Issuer Tax Certificate.

(a)    Upon the Issuer's written direction, an amount shall be deposited to the Rebate Account by the Indenture Trustee from amounts on deposit in the Operating Account or from other amounts provided by the Issuer so that the balance in the Rebate Account shall equal the Rebate Requirement.  Computations of the Rebate Requirement shall be furnished by or on behalf of the Issuer in accordance with the Issuer Tax Certificate.  The Indenture Trustee shall supply to the Issuer all information required to be provided by the Issuer Tax Certificate to the extent such information is reasonably available to the Indenture Trustee.

(b)     The Indenture Trustee shall have no obligation to rebate any amounts required to be rebated pursuant to this Section other than from moneys held in the Operating Account, the Operating Contingency Account or the Rebate Account created under this Indenture.

(c)     At the written direction of the Issuer, the Indenture Trustee shall invest all amounts held in the Rebate Account in Eligible Investments, subject to the restrictions set forth in the Issuer Tax Certificate. Moneys shall not be transferred from the Rebate Account except as provided in paragraph (d) below.

(d)     Upon receipt of the Issuer's written directions, the Indenture Trustee shall remit part or all of the balances in the Rebate Account to the United States, as directed in writing by the Issuer. In addition, if the Issuer so directs, the Indenture Trustee will deposit money into or transfer money out of the Rebate Account from or into such accounts or funds as directed by the Issuer's written directions; provided, that such directions are in accordance with the provisions of this Indenture and that only moneys in excess of the Rebate Requirement may, at the written direction of the Issuer, be transferred out of the Rebate Account to such other accounts or funds or to anyone other than the United States in satisfaction of the arbitrage rebate obligation. Any funds remaining in the Rebate Account after each five year remittance to the United States, redemption and payment of all of the Bonds and payment and satisfaction of any Rebate Requirement, or provision made therefor satisfactory to the Indenture Trustee, shall be withdrawn and deposited in the Collections Account.

(e)     Notwithstanding any other provision of this Indenture, the obligation to remit the Rebate Requirement to the United States and to comply with all other requirements of this Section, Section 503 and the Issuer Tax Certificate shall survive the defeasance or payment in full of the Series 2002 Bonds.

SECTION 404.   Redemption of the Bonds.

(a)     The Issuer may redeem Bonds at its option in accordance with their terms and the terms of this Indenture and shall redeem Bonds as provided herein and therein. When Bonds are called for redemption, the accrued interest on the principal portion thereof being redeemed shall become due on the redemption date. To the extent not otherwise provided, the Issuer shall deposit with the Indenture Trustee on or prior to the redemption date a sufficient sum to pay principal of, redemption premium, if any, and accrued interest on, the Bonds to be redeemed on such redemption date.

(b)     Except as otherwise provided in a Series Supplement, when a Bond is to be redeemed prior to its stated Maturity Date, the Indenture Trustee shall give notice in the name of the Issuer, which notice shall identify the Bonds to be redeemed, state the date fixed for redemption and state that such Bonds will be redeemed at the Corporate Trust Office of the Indenture Trustee or a Paying Agent. The notice shall further state that on such date there shall become due and payable upon each Bond to be redeemed the redemption price thereof, together with interest accrued to the redemption date, and that money therefor having been deposited with the Indenture Trustee or Paying Agent, from and after such date, interest thereon shall cease to accrue. The Indenture Trustee shall give 30 days' notice by mail, or otherwise transmit the

-24-

redemption notice in accordance with any appropriate provisions hereof, to the registered owners of any Bonds which are to be redeemed, at their addresses shown on the registration books of the Issuer. Such notice may be waived by any Bondholders holding Bonds to be redeemed. Failure by a particular Bondholder to receive notice, or any defect in the notice to such Bondholder, shall not affect the redemption of any other Bond. The Indenture Trustee shall not send notice to Bondholders of any optional redemption of Bonds unless the Indenture Trustee has on deposit a sum sufficient to pay the redemption price of, and accrued interest on, the Bonds to be redeemed on such redemption date. Any notice of redemption given pursuant to this Indenture may be rescinded by written notice to the Indenture Trustee by the Issuer no later than 15 days prior to the date specified for redemption. The Indenture Trustee shall give notice of such rescission as soon as thereafter is practicable in the same manner and to the same persons, as notice of such redemption was given as described in this subsection (b). In making the determination as to how much money will be available in the Turbo Redemption Account on any Distribution Date for the purpose of giving notice of redemption under this subsection (b), the Indenture Trustee shall take into account investment earnings which it reasonably expects to be available for application pursuant to Section 402 hereof. In the event that DTC has rules or procedures such that, or the custom and practice of DTC are such that, the meaning or intent of this Indenture may be frustrated, the Indenture Trustee shall comply with the rules, procedures, custom or practices of DTC in order to achieve a result consistent with the meaning and intent of this Indenture.

(c)     To the extent funds are available therefor pursuant to the terms of Section 402(b)(2), the Turbo Term Bonds shall be redeemed in whole or in part on any Distribution Date prior to their Maturity Date, at a price equal to 100% of the principal amount being redeemed, in accordance with the schedule of Sinking Fund Installments set forth in applicable Series Supplements (adjusted as set forth in Section 402(b)(2)). Sinking Fund Installments shall be credited as described in subsection (e) of this Section 404. If less than all of the Turbo Term Bonds are to be redeemed pursuant to this subsection, the Holders of the Turbo Term Bonds shall be paid in accordance with subsection (h) of this Section 404.

(d)     The Turbo Term Bonds shall be redeemed in whole or in part on any Distribution Date prior to their Maturity Date, at a price equal to 100% of the principal amount being redeemed, from amounts on deposit in the Turbo Redemption Account (and from amounts on deposit in the Partial Lump Sum Payment Account in accordance with Section 402(b)(4) of this Indenture). Turbo Redemptions shall be credited as described in subsection (e) of this Section 404. If less than all of the Turbo Term Bonds are to be redeemed pursuant to this subsection, the Holders of such Turbo Term Bonds shall be paid in accordance with subsection (h) of this Section 404. Moneys in any Account shall not be used to make open market purchases of Turbo Term Bonds.

(e)     For all purposes of this Indenture, including without limitation calculating the deposits required by Section 402(a)(3) hereof, calculating the payments required by Section 402(b)(2) hereof, and determining whether an Event of Default has occurred pursuant to Section 901(b) hereof, the amount of any Sinking Fund Installments made hereunder shall be credited against Turbo Term Bond Maturities in chronological order, and the amount of any Turbo Redemptions shall be credited against both Sinking Fund Installments and Turbo Term Bond Maturities in chronological order.

(f)     The Bonds maturing on or prior to June 1, 2012 are not subject to optional redemption. The Bonds maturing on June 1, 2026 and June 1, 2032 are subject to redemption (from sources other than Collections or from the proceeds of Refunding Bonds) at the option of the Issuer: (1) with respect to Turbo Term Bonds, in whole or in part at any time, but only in an amount that may not exceed the amount of the Projected Turbo Redemptions that were projected to be paid but, as of the date of such redemption, have not been paid with respect to such Turbo Term Bonds, and (2) with respect to all Bonds, in whole or in part on or after June 1, 2013, from any maturity selected by the Issuer in its discretion and Pro Rata within a maturity, in each case at a redemption price equal to 100% of the principal amount being redeemed.

All redemptions made pursuant to this subsection (f) shall be credited as described in subsection (e) of this Section 404. If less than all of the Bonds having any Maturity Date are to be redeemed pursuant to this subsection (f), the Holders of the Bonds having such Maturity Date shall be paid in accordance with subsection (h) of this Section 404.

(g)     The Defeased Turbo Term Bonds shall be subject to mandatory redemption, at a redemption price equal to 100% of the principal amount being redeemed, in accordance with the Pro Rata Defeasance Redemption Schedule provisions contained in Section 202(c) hereof.

(h)     Subject to the other provisions of this Section 404 and Section 202, if less than all the Outstanding Bonds are to be redeemed pursuant to subsection (c), (d), or (f) of this Section 404, the particular Bonds of a Maturity Date and series to be redeemed shall be selected by the Indenture Trustee by such method as it shall deem fair and appropriate, and the Indenture Trustee may provide for the selection for redemption of portions (equal to any authorized denominations) of the principal of Bonds of a denomination larger than the minimum authorized denomination.

(i)     The Bonds are subject to mandatory redemption in whole only, at a redemption price equal to 100% of the principal amount being redeemed, at any time that the available amounts on deposit in the Accounts (other than the Rebate Account, the Operating Account, the Operating Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued interest on, all Outstanding Bonds.

SECTION 405. Investments.

(a)     Pending its use under this Indenture, money in the Accounts may be invested by the Indenture Trustee in Eligible Investments and shall be so invested pursuant to written direction of the Issuer if there is not then an Event of Default actually known to an Authorized Officer of the Indenture Trustee. The proceeds of the Series 2002 Bonds to be used by the Issuer to purchase the Tobacco Assets from the State under the Sales Agreement continue to be proceeds of the Series 2002 Bonds in the hands of the State and the State has agreed in the Sales Agreement to invest such proceeds subject to the restrictions of the Issuer Tax Certificate to the extent that such proceeds are subject to the investment limitation requirements of the Issuer Tax Certificate. Eligible Investments shall mature or be redeemable at the option of the Issuer on or before the Business Day preceding each next succeeding Distribution Date, except to the extent that other Eligible Investments timely mature or are so redeemable in an amount

sufficient to make payments under clauses (1) and (2) of Section 402(b) on each such next succeeding Distribution Date. Investments shall be held by the Indenture Trustee in the respective Accounts and shall be sold or redeemed to the extent necessary to make payments or transfers from each Account. The Indenture Trustee shall be entitled to assume, absent receipt by the Indenture Trsutee of written notice to the contrary, that any investment that, at the time of purchase, is an Eligible Investment remains an Eligible Investment thereafter.

The Indenture Trustee may make any and all investments permitted by the provisions of this Section 405 through its own investment department or that of its affiliates. As and when any amount invested in any Account pursuant to this Article IV may be required for disbursement, the Indenture Trustee may cause a sufficient amount of such investments to be sold and reduced to cash to the credit of such Account. The Issuer acknowledges that to the extent that regulations of the Comptroller of the Currency or other applicable regulatory agency grant the Issuer the right to receive brokerage confirmations of securities transactions, the Issuer waives receipt of such confirmations. The Indenture Trustee shall furnish to the Issuer periodic statements that include detail of all investment transactions made by the Indenture Trustee.

(b)    In computing the amount in any Account, the value of Eligible Investments shall be determined as of each Deposit Date and shall be calculated as follows:

(1)    Except as otherwise specifically provided in this Section 405(b) or in Section 405(d), all Eligible Investments shall be valued at fair market value based on accepted industry standards by accepted industry providers, which shall include, but are not limited to, pricing services provided by Bear, Stearns & Co. Inc., Goldman, Sachs & Co., or Financial Times Interactive Data Corporation;

(2)    As to investments the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, then in The New York Times): the average of the bid and asked prices for such investments so published on or most recently prior to such time of determination;

(3)    As to investments the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times: the average bid price at such time of determination for such investments by any two nationally recognized government securities dealers (selected by the Indenture Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service;

(4)    As to certificates of deposit and bankers acceptances: the face amount thereof, plus accrued interest; and

(5)    As to any investment not specified above: the value thereof established by agreement (prior to the making of such investment) between the Issuer and the Indenture Trustee (with written notice to each Rating Agency of such agreement).

(c)    The Indenture Trustee may hold undivided interests in Eligible Investments for more than one Account (for which they are eligible, but not including the Rebate Account) and may make interfund transfers in kind.

(d)    In respect of Defeasance Collateral held for Defeased Bonds, this Section 405 shall be effective only to the extent it is consistent with other applicable provisions of this Indenture or any separate escrow agreement.

(e)    If the Issuer shall have failed to give investment directions to the Indenture Trustee, then the Indenture Trustee shall invest the funds in the Accounts in investments specified in subsection (viii) of the definition of Eligible Investments.

(f)    All income or other gain from investments in an Account held by the Indenture Trustee shall be deposited in such Account immediately on receipt, and any loss resulting from such investments shall be charged to such Account.

SECTION 406.  Unclaimed Money. In the event any Bond shall not be presented for payment when the principal thereof becomes due, either at maturity, or at the date fixed for redemption thereof, or otherwise, if funds sufficient to pay the principal and interest accrued thereon to such date shall have been made available to the Indenture Trustee for the benefit of the owner thereof, the Indenture Trustee shall hold such principal and interest accrued thereon to such date without liability to the Bondholder for further interest thereon, for the benefit of the Holder of such Bond, for a period of five years from the date such Bond shall have become due, either at maturity or upon earlier redemption, and thereafter the Indenture Trustee shall remit said funds pursuant to the Uniform Unclaimed Property Act, RCW 63.29, as amended, or its successor. In the event the Uniform Unclaimed Property Act, as amended, or its successor, should require by law other action to be taken by the Indenture Trustee, then the Indenture Trustee shall comply with such law and this Section 406 shall be deemed amended to require such compliance. After the payment pursuant to the Uniform Unclaimed Property Act as herein provided, the Indenture Trustee's liability for payment to the Holder of such Bond shall forthwith cease, terminate and be completely discharged and thereafter the Bondholder shall be restricted exclusively to his or her rights of recovery provided under the Uniform Unclaimed Property Act.

SECTION 407.  Costs of Issuance Account. The Indenture Trustee shall disburse funds from the Costs of Issuance Account as directed by the Issuer.  At such time as the Issuer notifies the Indenture Trustee that the Costs of Issuance have been fully paid, or at such time as no funds remain in the Costs of Issuance Account, the Indenture Trustee may close and terminate the Costs of Issuance Account.  The funds remaining therein, if any, shall then be transferred to the Collections Account and applied as Collections in accordance with Section 402(a) of this Indenture.  The Indenture Trustee is conclusively entitled to rely on all directions given by the Issuer with respect to the Costs of Issuance Account.

ARTICLE V

COVENANTS

SECTION 501. Contract; Obligations to Bondholders.

(a)     In consideration of the purchase and acceptance by those who hold any or all of the Bonds from time to time, the provisions of this Indenture shall be a part of the contract of the Issuer with the Bondholders. The pledge and grant of a security interest made in this Indenture and the covenants herein set forth to be performed by the Issuer shall be for the equal benefit, protection and security of the Bondholders. All of the Bonds, regardless of the time or times of their Maturity Date, shall be of equal rank without preference, priority or distinction of any thereof over any other except as expressly provided pursuant hereto.

(b)     The Issuer covenants to pay when due all sums payable on the Bonds, but only from the Collections and other money designated herein, subject only to this Indenture. The obligation of the Issuer to pay principal, interest and premium, if any, to the Bondholders from the Collections and other money designated herein, subject only to this Indenture, shall be absolute and unconditional, shall be binding and enforceable in all circumstances whatsoever, and shall not be subject to setoff, recoupment or counterclaim.

(c)     The Issuer represents that it is duly authorized pursuant to law to issue, sell and deliver the Bonds, to enter into this Indenture and to pledge and grant a security interest in the Collections and other Collateral as provided in Section 201 hereof. The Collections and other Collateral are and will be free and clear of any pledge, lien, security interest, charge or encumbrance thereon or with respect thereto prior to, or of equal rank with, the pledge and security interest created hereby, and all action on the part of the Issuer to that end has been duly and validly taken. The Bonds and the provisions hereof are and will be the valid and binding obligations of the Issuer, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization, arrangement, fraudulent conveyance, moratorium and other laws relating to or affecting creditors' rights, to the application of equitable principles and to the exercise of judicial discretion in appropriate cases.

(d)     The State has covenanted and agreed with the Issuer in the Sales Agreement, and the Issuer is authorized to include such covenant and agreement in this Indenture for the benefit of the Bondholders, any party who has entered into a Swap Contract with the Issuer or other parties receiving the express benefit of the security for the Bonds ("Beneficiaries"), that the State will (i) irrevocably direct the Escrow Agent and Independent Auditor (as such terms are defined in the MSA) to transfer all Pledged TSRs, pursuant to paragraph 5 of section 7 of the Act, directly to the Indenture Trustee, (ii) enforce, at the expense of the State, the Issuer's rights to receive the Pledged TSRs to the full extent permitted by the MSA (it being understood that the State may satisfy its obligation hereunder by taking such enforcement action through individual or joint or cooperative efforts with other states and their Attorneys General in a manner that it determines as most appropriate), (iii) not agree to any amendment of the MSA in any manner that would materially and adversely affect the ability of the Issuer to receive the Pledged TSRs, (iv) not limit or alter the rights of the Issuer to fulfill the terms of its agreements with Beneficiaries until the Bonds, together with the interest thereon and

-29-

all costs and expenses in connection with any action or proceeding by or on behalf of the Bondholders, are fully paid and discharged, (v) enforce the Qualifying Statute, and (vi) not amend, supersede or repeal the Qualifying Statute in any way that would materially and adversely affect the ability of the Issuer to receive the Pledged TSRs.

(e)     The State has covenanted and agreed with the Issuer in the Sales Agreement, and the Issuer is authorized to include such covenant and agreement in the Indenture for the benefit of the Bondholders, any party who has entered into a Swap Contract with the Issuer or other parties receiving the express benefit of the security for the Bonds ("Beneficiaries"), that until the Bonds, together with interest thereon and all costs and expenses in connection with any action or proceeding by or on behalf of Bondholders, are fully paid and discharged pursuant to the Indenture (i) the State will promptly pay to the Indenture Trustee any Pledged TSRs received by the State, (ii) the State shall take all actions as may be required by law and the MSA fully to preserve, maintain, defend, protect and confirm the interest of the Issuer in the Pledged TSRs and in the proceeds thereof in all material respects, (iii) the State will not take any action that will materially and adversely affect the Issuer's legal right to receive the Pledged TSRs, and (iv) the State will not (x) release any Participating Manufacturer from any of its covenants or obligations to make payment under the MSA or (y) agree to the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, or waive timely performance or observance by Participating Manufacturers under, the MSA, in each case if the effect thereof would be to materially and adversely affect the Issuer's ability to receive the Pledged TSRs; provided, however, that if a Rating Confirmation is received relating to such proposed action then such proposed action will be deemed not to be material or adverse. The State shall deliver to the Issuer and to the Indenture Trustee written notice of any action described in clause (iii) and (iv) of the preceding sentence which it intends to take. The State shall deliver such written notice a reasonable period of time before taking any such action.

(f)     The State has provided through the MSA, the Consent Decree and the Sales Agreement for the (i) Issuer's ownership and receipt of the Pledged TSRs, (ii) the receipt or other application of the net proceeds of the Bonds and (iii) the resulting benefits to the people of the State. The Issuer acknowledges that the MSA, the Consent Decree and the Sales Agreement constitute important security provisions of the Bonds and waives any right to assert any claim to the contrary and agrees that it shall neither in any manner directly or indirectly assert, nor in any manner directly or indirectly support the assertion by the State or any other person of, any such claim to the contrary. By acknowledging that the MSA, the Consent Decree and the Sales Agreement constitute important security provisions of the Bonds, the Issuer also acknowledges that, in the event of any failure or refusal by the State to comply with its agreements included in the MSA, the Consent Decree and the Sales Agreement, the Holders of the Bonds may have suffered monetary damages, the extent of the remedy for which may be, to the fullest extent permitted by applicable federal and State law, determined, in addition to any other remedy available at law or in equity, in the course of any action taken pursuant hereto; and the Issuer hereby waives any right to assert any claim to the contrary and agrees that it shall neither in any manner directly or indirectly assert, nor in any manner directly or indirectly support the assertion by the State or any other person of, any claim to the effect that no such monetary damages have been suffered.

-30-

SECTION 502. <u>Operating Expenses</u>.

(a)    (i) The Issuer may deliver an Officer's Certificate to the Indenture Trustee on or before April 15 of each year during which Bonds are Outstanding, commencing with the Fiscal Year commencing July 1, 2003, (i) certifying the amount of the Operating Cap for the upcoming Fiscal Year, and (ii) specifying the amount of Operating Expenses estimated to be incurred or paid by the Issuer during the upcoming Fiscal Year. Such Officer's Certificate may also set forth Operating Expenses that have already been incurred by the Issuer but that have not yet been paid or repaid, <u>provided</u> that the Operating Cap shall nonetheless continue to apply to all such amounts.

(ii) In the event that the Issuer does not deliver an Officer's Certificate on or prior to any April 15 as described above, the Issuer shall be deemed to have delivered an Officer's Certificate on such April 15 certifying and specifying that, for purposes of Section 402 hereof and this Section 502(a), both the amount of the Operating Cap for the upcoming Fiscal Year and the amount of the Operating Expenses estimated to be incurred or paid by the Issuer during the upcoming Fiscal Year shall be equal to the Inflated Operating Cap Component in effect as of such April 15 (as certified or as deemed certified by previous operation of this Section 502(a)).

(b)    The Issuer covenants, for the benefit of the Bondholders, to pay its Operating Expenses, but only to the extent that funds are available for such purpose as provided in this Indenture.

SECTION 503. <u>Tax Covenants</u>. (a) The Issuer shall at all times do and perform all acts and things permitted by law and this Indenture which are necessary or desirable in order to assure that interest paid on the Tax-Exempt Bonds (or any of them) will be excluded from gross income for federal income tax purposes and shall take no action that would result in such interest not being excluded from gross income for federal income tax purposes. Without limiting the generality of the foregoing, the Issuer agrees that it will comply with the provisions of the Issuer Tax Certificate which are incorporated by this reference herein. This covenant shall survive defeasance or redemption of the Bonds.

(b)    Pursuant to the Act, the State shall at all times do and perform all acts and things permitted by law and necessary or desirable to assure that interest paid by the Issuer on the Series 2002 Bonds shall be excludable from gross income for federal income tax purposes pursuant to Section 103(a) of the Tax Code;

(c)    Pursuant to the Act, the State will not directly or indirectly use or permit the use of any of the proceeds of the Series 2002 Bonds that would cause the Series 2002 Bonds to be "private activity bonds" within the meaning of Section 141(a) of the Tax Code or would cause interest on the Series 2002 Bonds to not be excludable from gross income for federal income tax purposes pursuant to Section 103(a) of the Tax Code; and

(d)    Pursuant to the Act, the State agrees that no gross proceeds (as such term is defined in Section 1.148-1 of the Treasury Regulations promulgated under Section 148 of the Tax Code, as such Treasury Regulations and the Tax Code may be amended from time to time) of the Series 2002 Bonds shall at any time be used directly or indirectly to acquire securities or obligations the acquisition or holding of which would cause any Series 2002 Bond to be an "arbitrage bond" as defined in the Tax Code or any applicable Treasury Regulations promulgated thereunder.

SECTION 504.    Non-Petition Covenant. Prior to the date which is three hundred sixty-six days after the date on which the Issuer no longer has any Bonds outstanding, the Issuer shall not file a voluntary petition under Chapter 9 of the United States Bankruptcy Code or such corresponding law as may, from time to time, be in effect, and neither any public official nor any other organization, entity, or other person shall authorize the Issuer to be or become a debtor under the United States Bankruptcy Code or any corresponding law during such periods. Pursuant to the Act, the State agrees with the Bondholders that it shall not modify or delete these provisions prior to the date which is three hundred sixty-six days after the date on which the Issuer no longer has any Bonds outstanding.

SECTION 505.    Accounts and Reports.    The Issuer will (1) cause to be kept books of account in which complete and accurate entries will be made of its transactions relating to all funds and accounts under the Indenture, which books will at all reasonable times be subject to the inspection of the Indenture Trustee and the Holders or their representatives duly authorized in writing; and (2) annually, within 210 days after the close of each Fiscal Year, deliver to the Indenture Trustee and each Rating Agency, a copy of its financial statements for such Fiscal Year, as audited by an independent certified public accountant or accountants.

SECTION 506.    Continuing Disclosure Undertaking.    The Issuer covenants (any obligations of the Issuer to disseminate reports herein shall be undertaken by the Indenture Trustee on behalf of the Issuer and the Indenture Trustee shall in all respects cooperate with the Issuer in assisting the Issuer to fulfill its duties contained in this Section to disseminate reports) for the sole benefit of the Holders of the Series 2002 Bonds (and, to the extent specified in this Section 506, the beneficial owners) and subject (except to the extent otherwise expressly provided in this Section 506) to the remedial provisions of this Indenture, that:

(a)    The Issuer shall provide:

(1)    within 210 days after the end of each Fiscal Year, to each nationally recognized municipal securities information repository and to any State information depository, (a) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, (b) material historical quantitative data on the Issuer's revenues, expenditures, financial operations and indebtedness, generally of the types discussed in "SUMMARY OF BOND STRUCTURING ASSUMPTIONS AND AMORTIZATION" under the last column in the table captioned "Projection of Total Payments to be Received by the Authority" in the Issuer's offering circular dated October 25, 2002, and (c) the debt service coverage for the most recent Fiscal Year for the Outstanding Bonds, after giving credit for any Turbo Redemptions that have been paid; and

(2)     in a timely manner, to each nationally recognized municipal securities information repository or to the Municipal Securities Rulemaking Board, and to any State information depository, notice of a failure to comply with clause (i) of this Section 506(a) and, if material, notice of any of the following events with respect to the Outstanding Bonds:

(i)     principal, scheduled mandatory redemption and interest payment delinquencies;

(ii)     non-payment related Defaults;

(iii)     unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)     unscheduled draws on credit enhancements reflecting financial difficulties;

(v)     substitution of credit or liquidity providers, or their failure to perform;

(vi)     adverse tax opinions or events affecting the tax-exempt status of the Series 2002 Bonds;

(vii)     modifications to rights of Holders;

(viii)   bond calls;

(ix)     defeasances;

(x)     release, substitution or sale of property securing repayment of the Bonds; and

(xi)     rating changes.

(b)     The Issuer does not undertake to provide such notice with respect to:

(1)     credit enhancement if:

(i)     the enhancement is added after the primary offering of the Bonds,

(ii)     the Issuer does not apply for or participate in obtaining the enhancement and

(iii)     the enhancement is not described in the applicable offering circular of the Issuer;

(2)     a mandatory, scheduled redemption not otherwise contingent upon the occurrence of an event, if:

-33-

(i)     the terms, dates and amounts of redemption are set forth in detail in the offering circular,

(ii)    the only open issue is which Bonds will be redeemed in the case of a partial redemption,

(iii)   notice of redemption is given to the Holders as required under the terms of this Indenture and

(iv)    public notice of the redemption is given pursuant to Release No. 23856 of the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "1934 Act"), even if the originally scheduled amounts may be reduced by prior optional redemptions or purchases; or

(3)     tax exemption other than pursuant to §103 of the Code.

(c)     No Bondholder may institute any suit, action or proceeding at law or in equity ("Proceedings") for the enforcement of the continuing disclosure undertaking ("Undertaking") or for any remedy for breach thereof, unless such Bondholder shall have filed with the Issuer evidence of ownership and a written notice of a request to cure such breach, and the Issuer shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified herein, in accordance with Section 902(d), and for the equal benefit of all Holders of the Outstanding Bonds, and no remedy shall be sought or granted other than specific performance of the covenant at issue. Any beneficial owner of Series 2002 Bonds may bring a Proceeding to enforce the Undertaking set forth in this section without acting in concert if:

(1)     such beneficial owner shall have filed with the Issuer:

(i)     evidence of beneficial ownership, and

(ii)    written notice of, and request to cure, the alleged breach,

(2)     the Issuer shall have failed to comply within a reasonable time, and

(3)     such beneficial owner stipulates that no remedy is sought other than substantial performance of the Undertaking. To the extent permitted by law, each beneficial owner agrees that all Proceedings shall be instituted only for the equal benefit of all beneficial owners of the Outstanding Bonds benefited by the same or a substantially similar undertaking.

No default under this Section 506 shall constitute an Event of Default under the Indenture.

(d)     For the purposes of this section, a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding,

-34-

relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such security, except that a person who in the ordinary course of business is a pledgee of securities under a written pledge agreement shall not be deemed to be the beneficial owner of such pledged securities until the pledgee has taken all formal steps to declare a default and determines that the power to dispose or to direct the disposition of such pledged securities will be exercised, provided that:

(1)    the pledge agreement is bona fide;

(2)    the pledgee is:

    (i)    a broker or dealer registered under § 15 of the 1934 Act;

    (ii)    a bank as defined in § 3(a)(6) of the 1934 Act;

    (iii)    an insurance company as defined in § 3(a)(19) of the 1934 Act;

    (iv)    an investment company registered under § 8 of the Investment Company Act of 1940;

    (v)    an investment adviser registered under § 203 of the Investment Advisers Act of 1940;

    (vi)    an employee benefit plan, or pension fund which is subject to the provisions of the Employee Retirement Income Security Act of 1974 or an endowment fund;

    (vii)    a parent holding company, provided the aggregate amount held directly by the parent, and directly and indirectly by its subsidiaries which are not persons specified in items (i) though (vi) of this clause (b) does not exceed 1% of the securities of the subject class; or

    (viii)    a group, provided that all the members are persons specified in items (i) through (vii) of this clause (b); and

(3)    the pledge agreement, prior to default, does not grant to the pledgee the power to dispose or direct the disposition of the pledged securities, other than the grant of such power(s) pursuant to a pledge agreement under which credit is extended subject to Regulation T (12 CFR 220.1 to 220.8) and in which the pledgee is a broker or dealer registered under § 15 of the 1934 Act.

(e)    Any Supplemental Indenture amending the Undertaking may only be entered into if all or any part of Rule 15c2-12 (the "Rule") of the SEC under the 1934 Act, as interpreted by the staff of the SEC at the date hereof, ceases to be in effect for any reason and the Issuer elects that this Undertaking shall be deemed terminated or amended (as the case may be) accordingly, or if:

-35-

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Issuer, or type of business conducted,

(2)     the Undertaking, as amended, would have complied with the requirements of the Rule at the date hereof, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances,

(3)     the amendment does not materially impair the interests of the Holders or beneficial owners of the Series 2002 Bonds, as determined by parties unaffiliated with the Issuer (such as, but without limitation, the Issuer's financial advisor or bond counsel) or by Holder consent pursuant to Section 1001 of this Indenture, and

(4)     the annual financial information containing (if applicable) the amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the "impact" (as that word is used in the letter from the staff of the SEC to the National Association of Bond Lawyers dated June 23, 1995) of the change in the type of operating data or financial information being provided.

SECTION 507. Ratings. The Issuer shall pay such reasonable fees and provide such available information as may be necessary to obtain and keep in effect ratings on all the Outstanding Bonds from at least two nationally recognized statistical rating organizations.

SECTION 508. Affirmative Covenants.

(a)     *Punctual Payment.* The Issuer shall duly and punctually pay debt service on the Bonds in accordance with the terms of the Bonds and this Indenture.

(b)     *Maintenance of Existence.* Unless the Special Conditions are met, the Issuer shall keep in full effect its existence, rights and franchises as a public entity under the laws of the State.

(c)     *Protection of Collateral.* The Issuer shall from time to time execute and deliver all documents and instruments, and will take such other action, as is necessary or advisable to: (1) maintain or preserve the lien and security interest (and the priority thereof) of this Indenture; (2) perfect or protect the validity of any grant made or to be made by this Indenture; (3) preserve and defend title to the Collections and the other Collateral and the rights of the Indenture Trustee, on behalf of the Bondholders, in the Collateral against the claims of all Persons and parties, including the challenge by any party to the validity or enforceability of the MSA, the Basic Documents or the performance by any party thereunder; (4) enforce the Sales Agreement; (5) pay any and all taxes levied or assessed upon all or any part of the Collateral; or (6) carry out more effectively the purposes of this Indenture.

(d)     *Performance of Obligations.* The Issuer (1) shall diligently pursue any and all actions to enforce its rights under each instrument or agreement included in the Collateral; (2) shall not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's covenants or obligations under any such instrument or agreement or that would result in the amendment,

-36-

hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except, in each case, as expressly provided in the Basic Documents; and (3) with respect to Pledged TSRs, the Issuer shall direct the Attorney General to enforce, in the name of the State and, if permissible, to enforce directly through the Issuer's own attorneys in the name of the State, with notice to the Attorney General, the Master Settlement Agreement.

(e)     *Notice of Events of Default*.  The Issuer shall give the Indenture Trustee and the Rating Agencies prompt written notice of each Event of Default under this Indenture.

(f)     *Other*.  The Issuer shall:

(i)     conduct its own business in its own name and not in the name of any other Person and correct any known misunderstandings regarding its separate identity;

(ii)     maintain or contract for a sufficient number of employees and compensate all employees, consultants and agents directly, from the Issuer's bank accounts, for services provided to the Issuer by such employees, consultants and agents and, to the extent any employee, consultant or agent of the Issuer is also an employee, consultant or agent of another Person, allocate the compensation of such employee, consultant or agent between the Issuer and such Person on a basis that reflects the services rendered to the Issuer and such Person;

(iii)     conduct all transactions with any other Person strictly on an arm's-length basis, allocate all overhead expenses (including, without limitation, telephone and other utility charges) for items shared between the Issuer and such Person on the basis of actual use to the extent practicable and, to the extent such allocation is not practicable, on a basis reasonably related to actual use;

(iv)     observe all formalities as a distinct entity, and ensure that all actions relating to (1) the dissolution or liquidation of the Issuer or (2) the initiation of, participation in, acquiescence in or consent to any bankruptcy, insolvency, reorganization or similar proceeding involving the Issuer, are duly authorized by unanimous vote of its members;

(v)     maintain its books and records separate from those of any other Person and maintain its assets readily identifiable as its own assets rather than assets of any other Person and not commingle its assets with those of any other Person;

(vi)     prepare its financial statements separately from those of any other Person and not prepare any financial statements that are consolidated with those of any other Person;

(vii)    maintain only those bank accounts or other depository accounts to which the Issuer alone is the account party, and from which only the Issuer has the power to make withdrawals;

(viii)    pay all of the Issuer's operating expenses from the Issuer's own assets (except for expenses incurred prior to the date of issuance of the Series 2002 Bonds);

(ix)    operate its business and activities such that: it does not engage in any business or activity of any kind, or enter into any transaction or indenture, mortgage, instrument, agreement, contract, lease or other undertaking, other than the transactions contemplated and authorized by its organizational documents; and does not create, incur, guarantee, assume or suffer to exist any indebtedness or other liabilities, whether direct or contingent, other than (1) as a result of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business, (2) the incurrence of obligations under the Basic Documents, (3) the incurrence of operating expenses in the ordinary course of business of the type otherwise contemplated by the Basic Documents, and (4) the incurrence of obligations payable solely from specified assets of the Issuer not subject to the lien of this Indenture and the holders of which expressly have no recourse to any other assets of the Issuer in the event of non-payment;

(x)    maintain its organization in conformity with this Indenture; and

(xi)    object in any relevant bankruptcy case to the consolidation of the assets of the Issuer with those of the State.

SECTION 509. Negative Covenants.

(a)    *Sale of Assets.* Except as expressly permitted by this Indenture, the Issuer shall not sell, transfer, exchange or otherwise dispose of any of its properties or assets that are subject to the lien of this Indenture.

(b)    *No Setoff.* The Issuer shall not claim any credit on, or make any deduction from the principal or premium, if any, or interest on, the Bonds or assert any claim against any present or former Bondholder by reason of payment of taxes levied or assessed upon any part of the Collateral.

(c)    *Liquidation.* Unless the Special Conditions are met, the Issuer shall not terminate its existence or dissolve or liquidate in whole or in part.

(d)    *Limitation of Liens.* The Issuer shall not (1) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Bonds under this Indenture except as may be expressly permitted hereby, (2) permit any lien, charge, excise, claim, security interest, mortgage

-38-