# EXHIBIT 4

1

```
 1

 2     UNITED STATES BANKRUPTCY COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     --------------------------x

 4          In re:              Chapter 11
       LEHMAN BROTHERS HOLDINGS,    Case No. 08-13555
 5          INC., et al,              (JMP)

 6                       Debtors.   (Jointly Administered)
       --------------------------x
 7                       March 6, 2014
                         10:01 a.m.
 8

 9            Deposition of SAMUEL M. GRUER,

10      pursuant to Notice, at the offices of Jones

11      Day, 222 East 41st Street, New York, New

12      York, before David Levy, CSR, RPR, CLR, a

13      Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2      S A M U E L      M.      G R U E R ,  having been

3           duly sworn by the Notary Public, was

4           examined and testified as follows:

5      EXAMINATION BY

6      MR. LAWRENCE:

7           Q.     Could you state your name and spell

8      your last name for the record, please?

9           A.     Sure, it's Samuel Michael Gruer,

10     G-r-u-e-r.

11          Q.     And what's your business address?

12          A.     321 Millburn Avenue, that's

13     M-i-l-l-b-u-r-n, New Jersey, 07041, Suite 4.

14          Q.     We met earlier.  My name is Paul

15     Lawrence and I represent the Washington State TSA

16     in this matter.  I'm going to start by asking you

17     a few questions about your background.

18               You understand you've been hired as an

19     expert in this matter?

20          A.     I do.

21          Q.     When were you first contacted to act

22     as an expert in this matter?

23          A.     It would have been sometime last

24     summer, 2013.  I don't remember the specific

25     dates.

1                          Gruer

2    curve as a way to identify, you used the term

3    "market expectation as to future interest rates,"

4    is that right?

5         A.    Correct.

6         Q.    You're not actually using the forward

7    curve to predict with accuracy what interest rates

8    will be out five years, ten years, fifteen years,

9    correct?

10        A.    That's correct.

11               MR. TAMBE:  Objection to form.

12               You can answer.

13        Q.    And in fact, the forward curve is

14   generally a poor predictor of the actual interest

15   rates you'll see out three, five, ten years,

16   correct?

17        A.    I've seen certain studies that have

18   shown that.  I haven't done my own analysis as to

19   whether it's a poor predictor over history or over

20   a certain window.

21        Q.    So you have no reason or basis to

22   disagree with the construct that a forward curve

23   is going to be an incorrect predictor of actual

24   future interest rates more than 90 percent of the

25   time?

19

1                        Gruer

2    the transaction.

3         Q.    And how do you take into account the

4    hedge transactions in valuation, if at all?

5         A.    We don't.

6         Q.    What events -- so you enter into a

7    forward purchase agreement, you value it as of the

8    date you entered into it.  What are the types of

9    events that would cause you to re-value on the

10   books that forward purchase agreement?

11        A.    Swings in market.  Basically, the

12   requirement was, every day, at the end of the day,

13   you valued -- the book, which is the portfolio,

14   that transaction as well as other transactions, is

15   valued.  And hedges in aggregate, which is part of

16   the book, are also valued, and the net change in

17   position versus the previous night's close is

18   reported up to senior management.

19        Q.    And that may result in additional

20   hedge transactions being entered into; is that

21   right?

22        A.    Or removed, correct.

23        Q.    The purpose of valuing is to

24   understand the -- on a daily basis -- is to

25   understand the shift in risk so that you can, as

1                              Gruer
2     you say, either add or remove hedges to take into
3     account the shifts in risk; is that right?
4                    MR. TAMBE:   Objection to form of the
5         question.
6                    You can answer.
7         A.    Yes, in part.  It's also to determine
8     whether or not the -- there's validity to the
9     valuation methodology.
10                   If you have policies and procedures in
11    place, and you follow those policies and
12    procedures in place, and as markets move and the
13    value of the portfolio moves significantly outside
14    of the accepted tolerances, positive or negative,
15    it's indicative that there might be something
16    wrong with the valuation methodology.
17        Q.    Did anything occur while you were at
18    Chase Securities and its predecessors that
19    resulted in a change in the valuation methodology?
20        A.    Not through that process.  There were
21    times when we identified changes that we thought
22    were advantageous, but that were also consistent
23    with proper financial accounting.  And we would
24    run those up the flagpole.
25        Q.    Do you consider yourself an expert in

1                          Gruer

2     Gruer 1, do you recognize that to be -- and I

3     guess I should --

4                    MR. LAWRENCE:  Can we go off the

5               record for a second?

6                    MR. TAMBE:  Yes.

7                    (Discussion off the record.)

8          Q.    Going back to Gruer 1, would you look

9     at paragraph 4, the scope of analysis performed.

10                   Do you have that in front of you?

11         A.    Yes.

12         Q.    Okay.  You state you've been asked by

13    Jones Day to value the reserve fund agreement

14    using, "In my experience, industry standard

15    valuation methodology for reserve fund

16    agreements."

17                   Do you see that?

18         A.    Yes.

19         Q.    Is that what you did?

20         A.    Yes.

21         Q.    Is it fair, then, that you did not

22    attempt to calculate TSA's loss as a result of the

23    default by Lehman Brothers?

24                   MR. TAMBE:  Objection to the form of

25               the question.

1                          Gruer

2               You can answer.

3        A.    I determined -- I estimated -- sorry.

4   I attempted to calculate the value of the

5   transaction.  The loss that I calculated

6   specifically was the 7.7B loss amount which is

7   included, you know, in the valuation.

8               As a legal matter, whether or not that

9   represents a loss or not, I was not asked to opine

10  on that.

11       Q.    So let's put aside the 7.7B.  We'll

12  talk about that specifically.

13       A.    Sure.

14       Q.    But have you read a copy of the

15  Tobacco Settlement Authority RFA?

16       A.    Yes.

17       Q.    And you've seen the definition of the

18  termination amount in that agreement?

19       A.    I have.

20       Q.    And did you review that for purposes

21  of your report?

22       A.    Yes.

23       Q.    And do you understand that the first

24  step in the process to come to a termination

25  amount is to seek bids from dealers for a

1                          Gruer

2          A.    Well, I interpret that language to

3    mean that, as if it was Lehman or any other dealer

4    in an industry-consistent manner, is how

5    Washington TSA should value the agreement, not

6    introduce a new methodology.

7          Q.    So let me make sure I understand.  So

8    am I correct, first of all, that in your report,

9    your expert report, you don't anywhere quote the

10   "as if it were Lehman" language in your report,

11   correct?

12         A.    Correct.

13         Q.    So in your report, you didn't tell us

14   that that was important or critical language,

15   correct?

16              MR. TAMBE:  Objection to the form of

17         the question.

18         A.    I don't, because I believe there's

19   only one way to value the agreement.

20         Q.    And so based on what you just said,

21   the "as if it were Lehman" language is not

22   determinative in how you value the agreement.  If

23   that language is in the RFA or not, you'd still

24   value the RFA the same way.

25         A.    I would --

1                           Gruer

2               MR. TAMBE:   Objection to the form of

3          the question.

4          A.    I would value it the same way.

5          Q.    Now, certainly, Lehman could have

6     written into the agreement the specific valuation

7     methodology that you are utilizing, correct?

8               MR. TAMBE:   Object to the form of the

9          question.

10         A.    It would have been awkward language,

11    but I guess theoretically it could have been

12    incorporated.

13         Q.    What would be --

14         A.    I've never seen language like that.

15         Q.    They could have said, "You should use

16    forward curves," correct?

17         A.    They could have.

18         Q.    They didn't, correct?  You have to

19    answer yes or no.

20         A.    No, they did not.

21         Q.    And they could have stated that you

22    have to assume that the TSA would in fact be

23    obligated to invest in the highest-yielding

24    eligible securities, correct?

25         A.    Well, I wouldn't say that they were

1                          Gruer

2    the current market conditions for ten-year and the

3    current market conditions for nine-and-a-half

4    year, and then it extrapolates out the difference,

5    is what you're saying.

6          A.    Precisely.

7          Q.    Now, one way the TSA could actually

8    have obtained the benefit of the market as of

9    March 25th, 2009, would actually go out and buy

10   government securities for all the points of

11   delivery; but that wouldn't be permitted, correct?

12               MR. TAMBE:  Objection to form.

13         A.    That's correct.  I don't believe that

14   would be permitted.

15         Q.    And to get the benefit of the market

16   perception of the rates reflected in these forward

17   curves, you would have to transact on March 25th,

18   2009, correct?

19               MR. TAMBE:  Objection to the form of

20         the question.

21         A.    Just, can you repeat?

22         Q.    To get the benefit of what the market

23   is predicting here in these forward curves, you

24   would have to transact on March 25th, 2009,

25   correct?

1                        Gruer

2               MR. TAMBE:  Objection.

3        A.     To get that benefit?  Perhaps.

4        Q.     I mean, it typically changes day to

5    day, correct?

6        A.     Yes.

7        Q.     So if we were, and I think if we were

8    to look at the forward curve today, it would look

9    very different than these forward curves, correct?

10       A.     I haven't looked at it for this but I

11   assume that to be true.

12       Q.     So the only day that we can actually

13   obtain the benefit of the rates that are reflected

14   in the forward curve that you used would be to

15   transact on March 25th, 2009, correct?

16               MR. TAMBE:  Objection to the form.

17               You can answer.

18       A.     Yes, to get to -- to capture March

19   25th data, yeah, you would have had to transact on

20   March 25th.

21       Q.     If you turn to the next page, there's

22   a chart there that purports to show the yields on

23   government agencies as of March 25th, 2009 for a

24   period up to thirty years, correct?

25       A.     Correct.