**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.* | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------------------x

## NOTICE OF LEHMAN BROTHERS HOLDINGS INC.'S CROSS-MOTION TO ESTABLISH A PROTOCOL TO RESOLVE CLAIMS FILED BY RMBS TRUSTEES

**PLEASE TAKE NOTICE** that, on December 10, 2014 at 10:00 a.m. (EST), or as soon thereafter as the matter may be heard, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623 of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004 (the "Hearing"), Lehman Brothers Holdings Inc. ("LBHI") will cross-move for an order, substantially in the form attached as Exhibit D to *LBHI's (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims For Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees* (filed contemporaneously herewith), establishing a protocol to resolve claims filed by the RMBS Trustees (the "Cross-Motion").  The Cross-Motion is made pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan") and sections 105(a) and 105(d) of the United States Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Cross-Motion must be made in writing, state with particularity the grounds therefor, conform to

the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern

District of New York, be filed electronically in text searchable portable document format (PDF)

with the Court in accordance with General Order M-399 (General Order M-399 can be found at

www.nysb.uscourts.gov, the official website for the Court), by registered users of the Court's

case filing system and by all other parties in interest (with a hard-copy delivered directly to the

Judge's Chambers), and be served in accordance with General Order M-399, and upon (A) the

chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York

10004, Courtroom 623; (B) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153 (Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Jacqueline Marcus, Esq., Shai

Y. Waisman, Esq. and Robert J. Lemons, Esq.), attorneys for Debtors; (C) the Office of the

United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201

Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq.,

Susan D. Golden, Esq., and Andrea B. Schwartz, Esq.); (D) Milbank, Tweed, Hadley & McCloy

LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq.,

Wilbur F. Foster, Jr., Esq., Dennis C. O'Donnell, Esq., and Evan R. Fleck. Esq.), attorneys for

the official committee of unsecured creditors; (E) Willkie Farr & Gallagher LLP, 787 Seventh

Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. and Todd G. Cosenza,

Esq.), attorneys for LBHI and certain of its affiliates; (F) Jones & Keller, P.C., 1999 Broadway,

Suite 3150, Denver, Colorado 80202 (Attn: Michael A. Rollin, Esq. and Maritza Dominguez

Braswell, Esq.), attorneys for LBHI and certain of its affiliates; (I) the attorneys for any other

official committee(s) that may be appointed in these cases; and (H) any person or entity with a

particularized interest in this Cross-Motion; and so as to be actually filed and received no later

than November 14, 2014 at 4:00 p.m. (EST) (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses or objections are received by the Objection Deadline, the relief may be granted as requested in the Cross-Motion without further notice or a hearing.

**PLEASE TAKE FURTHER NOTICE** that you need not appear at the Hearing if you do not object to the relief requested in the Cross-Motion.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

Dated:  October 15, 2014
         New York, New York

/s/ Todd G. Cosenza
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-9000

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Telephone: (303) 573-1600
Facsimile: (303) 573-8133

*Attorneys for Debtors Lehman Brothers Holdings Inc. and certain of its affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                           :
In re:                                                     :          Chapter 11 Case No.
                                                           :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*                :          08-13555 (SCC)
                                                           :
                              Debtors.                     :          (Jointly Administered)
                                                           :
------------------------------------------------------------------x


**LEHMAN BROTHERS HOLDINGS INC.'S (A) OBJECTION TO RMBS TRUSTEES'
MOTION TO (I) INCREASE THE RESERVE TO $12.143 BILLION AND
(II) ESTIMATE AND ALLOW THEIR CLAIMS FOR COVERED LOANS
AT $12.143 BILLION PURSUANT TO SECTION 502(C) OF THE
BANKRUPTCY CODE, AND (B) CROSS-MOTION TO ESTABLISH A
<u>PROTOCOL TO RESOLVE CLAIMS FILED BY RMBS TRUSTEES</u>**

WILLKIE FARR & GALLAGHER LLP          JONES & KELLER, P.C.

787 Seventh Avenue                    1999 Broadway, Suite 3150

New York, New York 10019              Denver, Colorado 80202

Telephone: (212) 728-8000             Telephone: (303) 573-1600

Facsimile: (212) 728-9000             Facsimile: (303) 573-8133

Paul V. Shalhoub                      Michael A. Rollin

Todd G. Cosenza                       Maritza Dominguez Braswell (*pro hac vice*)


*Attorneys for Debtors Lehman Brothers*
*Holdings Inc. and Certain of its Affiliates*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION ..........................................................................................11

FACTUAL AND PROCEDURAL BACKGROUND.................................................11

RELIEF REQUESTED..................................................................................16

THE RMBS UNDERLYING THE CLAIMS..........................................................16

    A.    The Make-Up of an RMBS...................................................16

    B.    The Repurchase Claims Against LBHI...................................16

    C.    The Document Defect Claims Against SASCO. ......................19

    D.    The Motion Subverts the Governing Agreements' Claims Process. ....................20

ARGUMENT ..............................................................................................21

I.    THE RESERVE MOTION, WHICH SEEKS TO MORE THAN DOUBLE THE PREVIOUSLY AGREED UPON AND SO ORDERED RESERVE, SHOULD BE DENIED.........................................................................................21

    A.    The Stipulated Reserve Order Amounts to a Contract Wherein the Parties Agreed to a $5 Billion Reserve for the RMBS Claims, and the RMBS Trustees Should Be Held to Their Bargain............................22

    B.    The Reserve Motion Does Not Meet the Applicable Standard for Reconsideration Under Rule 60(b). .......................................25

    C.    Even if the Reserve Order Is Deemed to Be Interlocutory, the Reserve Motion Should be Denied. ....................................33

II.    THE ESTIMATION MOTION SHOULD BE DENIED AS ESTIMATION IS AN IMPROPER METHODOLOGY FOR CLAIM RESOLUTION. ..........................35

    A.    Estimation Is Not Permitted Under Section 502(c). .............35

    B.    The Governing Agreements Do Not Permit Estimation........38

    C.    The Underlying Economics Do Not Permit Estimation. ........40

III.    THE COURT SHOULD GRANT LEHMAN'S CROSS-MOTION TO ESTABLISH A CLAIMS RESOLUTION PROTOCOL. .........................................42

NOTICE...................................................................................................45

<u>CONCLUSION</u>...................................................................................................................................46

# TABLE OF AUTHORITIES

## CASES

*ACE Secs. Corp. v. DB Structured Prods. Inc.*,
    112 A.D.3d 522 (1st Dep't 2013) ...................................................................35

*In re AL & LP Realty Co.*,
    164 B.R. 231 (Bankr. S.D.N.Y. 1994) ...............................................26, 30, 31

*Ally v. F.E.D. Concrete Co.*,
    No. 88 Civ. 8552 (SWK), 1993 WL 452523 (S.D.N.Y. Nov. 4, 1993) .........................30

*Aronoff v. Dwyer*,
    913 F. Supp. 286 (S.D.N.Y. 1996) ...........................................................33, 34

*Bird v. Crown Convenience (In re NWFX, Inc.)*,
    864 F.2d 588 (8th Cir. 1988) ..........................................................................43

*Blackrock Allocation Target Shares v. U.S. Bank Nat'l Ass'n*,
    No. 651864/2014 (N.Y. Sup. Ct. June 18, 2014) ...........................................37

*Blackrock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*,
    No. 651865/2014 (N.Y. Sup. Ct. June 18, 2014) ...........................................37

*Central Vermont Pub. Serv. Corp. v. Herbert*,
    341 F.3d 186 (2d Cir. 2003) ...........................................................................30

*In re Chemtura Corp.*,
    No. 09-11233 (REG), 2010 WL 4638898 (Bankr. S.D.N.Y. Nov. 8, 2010) ............26, 33

*In re Chemtura Corp.*,
    448 B.R. 635 (Bankr. S.D.N.Y. 2011) ............................................................23

*Chinichian v. Campolongo (In re Chinichian)*,
    784 F.2d 1440 (9th Cir. 1986) ........................................................................43

*In re Cooper Props. Liquidating Trust, Inc.*,
    61 B.R. 531 (Bankr. W.D. Tenn. 1986) ..........................................................43

*Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n*
    *(In re Croton River Club, Inc.)*,
    52 F.3d 41 (2d Cir. 1994) ...............................................................................43

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich. 1997) .........................................................38

*First City Beaumont v. Durkay (In re Ford)*,
    967 F.2d 1047 (5th Cir. 1992) ........................................................................35

*In re Forde*,
    507 B.R. 509 (Bankr. S.D.N.Y. 2014) ...........................................................23

*Hnot v. Willis Grp. Holdings Ltd.*,
    241 F.R.D. 204 (S.D.N.Y. 2007) ....................................................................33

*Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett St., LLC (In re Hoti Enters., L.P.)*,
    No. 12-CV-5341 (CS), 2012 WL 6720378 (S.D.N.Y. Dec. 27, 2012)......................26, 28

*Hsi v. Bank of Montreal*,
    No. 95 Civ. 2806 JESKNF, 1999 WL 504915 (S.D.N.Y. July 16, 1999) ......................30

*Illinois Dep't of Revenue v. U.S. Energy Biogas Corp. (In re U.S. Energy Sys., Inc.)*,
    No. 12 Civ. 7107, 2013 WL 5204010 (S.D.N.Y. Sept. 16, 2013) ..........................26, 28

*Klapprott v. United States*,
    335 U.S. 601 (1949)..........................................................................29

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988)..........................................................................29

*LinkCo, Inc. v. Akikusa*,
    615 F. Supp. 2d 130 (S.D.N.Y. 2009)........................................................29

*Liquidators of Lehman Bros. of Australia Ltd. v. Lehman Bros. Special Fin.
    (In re Lehman Bros. Holdings Inc.)*,
    697 F.3d 74 (2d Cir. 2012)..................................................................25

*LTV Steel Corp. v. Shalala (In re Chateaugay Corp.)*,
    53 F.3d 478 (2d Cir. 1995)..................................................................44

*Momentum Mfg. Co. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994)..................................................................42

*In re Old Carco LLC*,
    No. 10 Civ. 2493 (AKH), 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010)..............26, 28

*O'Neill v. Cont'l Airlines (In re Cont'l Airlines)*,
    981 F.2d 1450 (5th Cir. 1993) .............................................................35

*Residential Funding Co., LLC v. Americash*,
    No. 13-3460 (DSD/JJG), 2014 WL 3577312 (D. Minn. July 21, 2014) ........................6

*Residential Funding Co., LLC v. Mortg. Outlet, Inc.*,
    No. 13-CV-3447 (PJS/JSM), 2014 WL 4954645 (D. Minn. Oct. 1, 2014) .............6, 7, 9

*In re Royster Co.*,
    132 B.R. 684 (Bankr. S.D.N.Y. 1991) ....................................................23, 30

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992)............................................................25

*Silverman v. Miranda*,
    No. 06-CV-13222 (ER), 2014 WL 3728622 (S.D.N.Y. July 28, 2014) ........................30

*United States v. Dist. Council of N.Y.C. &*
    *Vicinity of the United Brotherhood of Carpenters & Joiners of Am.*,
    No. 90 Civ. 5722 (CSH), 1992 WL 111100 (S.D.N.Y. May 4, 1992) .........................30

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005)............................................................25

*Warren v. Garvin*,
    219 F.3d 111 (2d Cir. 2000)............................................................27

## **STATUTES**

11 U.S.C. § 105(d) ............................................................................43

11 U.S.C. § 502(c) .......................................................................8, 9, 35

Fed. R. Bankr. P. 9006(b)(2)..................................................................27

Fed. R. Bankr. P. 9024....................................................................6, 25

Fed. R. Civ. P. 60 ............................................................................6

Fed. R. Civ. P. 60(b) .................................................................21, 22, 25

Fed. R. Civ. P. 60(b)(2) ......................................................................27

Fed. R. Civ. P. 60(b)(6)......................................................................29

Fed. R. Civ. P. 60(c)(1)...................................................................27, 29

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator") and Structured Assets Securities Corporation ("SASCO") (together, and collectively with their affiliated debtors in the above-captioned cases, "Lehman" or the "Debtors"), hereby object to that certain RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion (the "Reserve Motion") and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code (the "Estimation Motion," together with the Reserve Motion, the "Motions"), filed August 22, 2014. Lehman also cross-moves to implement a claims resolution protocol to expeditiously reconcile and resolve the RMBS Claims (the "Cross-Motion"). In support of the relief sought herein, Lehman respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Nearly five years ago, various trustees for certain residential mortgage-backed securitization trusts (the "RMBS Trustees") filed proofs of claim asserting approximately $37 billion in repurchase claims against LBHI and SASCO for damages allegedly incurred by the trusts that issued residential mortgage-backed securities (the "RMBS Claims"). The RMBS Trustees allege that LBHI and SASCO breached various representations and warranties and provided deficient mortgage loan files when they sold approximately 1.8 million mortgage loans into 405 residential mortgage-backed securitization trusts (the "RMBS Trusts"), and that these purported breaches give rise to billions and billions of dollars of claims. The RMBS Trustees have had at least seven years to comply with the letter and spirit of the underlying governing agreements (the "Governing Agreements"),[1] which required the RMBS Trustees to

---

[1]     The Governing Agreements include the underlying Trust Agreements and Mortgage Loan Sale and Assignment Agreements.

identify and present to LBHI or SASCO those loans containing alleged deficiencies. Yet, the RMBS Trustees repeatedly failed to do so. Instead, they filed the Reserve Motion and the Estimation Motion.

2.     Together, the RMBS Trustees' Motions present the RMBS Trustees' new twofold strategy. First, the RMBS Trustees will attempt to tie up Lehman's distributable cash — thus imperiling significant distributions to other creditors — by reneging on the parties' court-ordered agreement to a $5 billion reserve for the RMBS Claims ("Reserve Order") (Docket No. 25643). They now seek to require that Lehman more than double its existing reserve. Second, having persistently failed to meet their burden to provide individualized proof for their claims — proof that is expressly required by the Governing Agreements and to which Lehman is contractually entitled — the RMBS Trustees now ask the Court to relieve them of that burden altogether by summarily estimating their claims at $12.143 billion for ***allowance*** purposes, based on an opinion articulated in a flawed expert report. Given that they have failed for seven years to abide by their obligations, the RMBS Trustees should not at this advanced stage be permitted to disrupt the distribution of the Lehman estate, or to take an estimation-based short cut toward claim allowance in violation of the Governing Agreements. As a result, both Motions should be denied.

3.     The time has come to resolve the RMBS Claims. As set forth below, the Plan Administrator proposes a loan-by-loan claim reconciliation protocol. In June of this year, the Court established an alternative dispute resolution process to facilitate the resolution of Lehman's claims against thousands of counter-parties that sold Lehman deficient mortgage loans.[2] These claims were based upon loan files that Lehman sold to the Federal National

---

[2]     *See generally* Alternative Disputes Resolution Procedures Order for Indemnification Claims of the Debtors Against Mortgage Loan Sellers (Dkt. No. 45277) (approving ADR procedures for estate claims against loan

Mortgage Association ("FNMA") and the Federal Home Loan Mortgage Corporation ("FHLMC," together with FNMA, the "GSEs"). As required by the agreements at issue in such claims, the Plan Administrator is pursuing — **on a loan-by-loan basis** — its claims against the sellers of those loans. Similarly, by this Cross-Motion, the Plan Administrator asks the Court to impose this same approach (which is required by the Governing Agreements) on the RMBS Trustees.

The Reserve Motion

4. The first prong of the RMBS Trustees' most recent strategy is to reopen an agreement the parties reached and this Court ordered, which fixed the reserve for the RMBS Claims. Presumably, the RMBS Trustees believe that they can coerce a favorable resolution of their claims by freezing billions of dollars of Lehman's distributable cash and interfering with distributions to other creditors.

5. In January 2012, having not yet been provided with any additional substantiation for the RMBS Claims (and recognizing the need to facilitate distributions to creditors holding allowed claims), Lehman brought a motion to estimate the RMBS Claims at $2.4 billion solely for purposes of establishing a claims reserve pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan") (the "Lehman Estimation Motion" (Dkt. No. 24254)). The Lehman Estimation Motion was based on Lehman's analysis valuing the RMBS Claims — if all proven — at between $1.1 billion and $2.4 billion.

6. Various RMBS Trustees filed written objections asserting that the claims should be estimated at $15.3 billion for reserve purposes. (*See* Dkt. Nos. 24476, 24483, 24484, 24485,

---

sellers arising from RMBS claim settlements with the GSEs). (Exhibit A)

24491 & 24492)  After oral argument before Judge Peck on January 26, 2012 (Dkt. No. 24756), the parties consensually resolved the Lehman Estimation Motion, agreeing to estimate the RMBS Claims at $5 billion for reserve purposes.  The Court then entered the Reserve Order embodying the parties' agreement to an estimated $5 billion claim for reserve purposes on February 22, 2012.

7.       Had the Plan Administrator believed that the actual reserve amount should have been set higher than its projections of $1.1 billion to $2.4 billion, or believed that the reserve should have been set higher than the agreed upon $5 billion, it would have agreed to a higher reserve.  The Plan Administrator's goal in connection with the establishment of reserves is to ensure that the estate reserves appropriate amounts for all claims, meaning that such reserves can be set neither too high nor too low.  It is this mandate that guided the agreement to the $5 billion reserve for the RMBS Claims, and that continues to guide the Plan Administrator's actions in this matter.  The $5 billion figure was accepted as a compromise value for reserve purposes, even if it was substantially higher than what its internal calculations project as the actual value of the RMBS Claims.  Nothing has changed that affects the Plan Administrator's view that a $5 billion reserve is much more than necessary for the RMBS Claims.

8.       Based on the parties' agreement and the Reserve Order, the issue of the size of the reserve is closed.  Now, the RMBS Trustees — having failed for years to provide any additional support for their claims — have filed the Reserve Motion and improperly seek to revisit the issue.  Citing purported new and improved expert analyses, the RMBS Trustees seek to more than double the existing $5 billion reserve to $12.143 billion.

9.       The absurdity of the RMBS Trustees' proposed reserve is seen clearly through the lens of settlements of other RMBS claims that the RMBS Trustees themselves have

endorsed as reasonable. In recent years, other RMBS sponsors (including most recently JPMorgan and Citibank) have agreed to settlements whereby claims would be allowed against those sponsors that fell within a range of 1.5% - 1.9% of the original principal balance of the underlying trusts. If applied to the $127 billion of original principal balance of the subject Lehman sponsored trusts, the RMBS Trustees' claim would benchmark between $1.96 billion and $2.44 billion, which is well below the amount being sought by the RMBS Trustees in this case. By suggesting that the RMBS claims should be valued at $12.143 billion, the RMBS Trustees would have the Court believe that they accepted settlements with the other banks that are five to six times less than the value of their actual claims.[3]

10.     Having sat on their rights for years, the RMBS Trustees now seek to overturn the parties' so ordered compromise on a $5 billion reserve. The Reserve Motion is inappropriate and should be denied.

11.     <u>First</u>, the Reserve Motion improperly seeks to re-litigate the issue of the reserve amount, notwithstanding the fact that the existing reserve was previously agreed to by the parties and so ordered by this Court following briefing, a hearing, and negotiations among the parties. In connection with the Lehman Estimation Motion, the RMBS Trustees made a deliberate choice — to settle with Lehman and set the reserve at $5 billion, rather than submit proof for, and seek immediate resolution of, their claims. Thus, the RMBS Trustees are contractually bound by the terms of the Reserve Order to which they agreed, and the Reserve Order precludes further litigation concerning the reserve.

12.     <u>Second</u>, to the extent the Court even considers the RMBS Trustees' requested adjustment to the reserve, given the stipulated Reserve Order, the Motion must be evaluated

---

[3]     Lehman's analysis of these benchmarks is based upon the best publicly available information regarding the JPMorgan and Citibank settlements.

under Federal Rule of Civil Procedure 60 — Relief from Judgment or Order.[4]   Under Rule 60(b) — which has been applied to stipulated orders, as well as bankruptcy court orders setting the size of disputed claims reserves — the Reserve Motion must be denied.  Not only is it untimely, but it also woefully fails to meet the onerous legal standard for relief from a stipulated order.  Moreover, even if the Court were to view the Reserve Order as interlocutory in nature (and potentially outside the ambit of Rule 60), the Reserve Motion nonetheless fails to demonstrate any of the bases upon which interlocutory orders may be modified.

<u>The Estimation Motion</u>

13.     The second prong of the RMBS Trustees' strategy is to seek a fast track toward a massive and inflated recovery by requesting that their claims be estimated at $12.143 billion not merely for reserve purposes, but also for purposes of **allowance**.  The RMBS Trustees' professed need for a truncated claims resolution process at this stage is particularly remarkable given that they have had years to present alleged loan deficiencies to Lehman as required by the Governing Agreements, and have failed to do so.  They now seek to deprive the Lehman estate, the estate, and ultimately other creditors, of the full loan-level claims reconciliation process mandated by the Governing Agreements.  That process is necessary so as to not jeopardize what may be billions of dollars of downstream claims that the Plan Administrator may bring (as described below).[5]

---

[4]     Federal Rule of Civil Procedure 60 is made applicable here by Federal Rule of Bankruptcy Procedure 9024.

[5]     In the *ResCap* bankruptcy, ResCap settled with its RMBS creditors without any loan-by-loan proof, despite the fact that such proof was required by the applicable governing agreements.  In subsequent downstream litigation, the loan originators (against whom ResCap has the contractual right to put-back the claim amounts and receive indemnification) have defended on grounds that ResCap must prove its downstream claims loan-by-loan.  *See, e.g., Residential Funding Co., LLC v, Mortg. Outlet, Inc.*, No. 13-CV-3447 (PJS/JSM), 2014 WL 4954645, at *2 (D. Minn. Oct. 1, 2014).  Most Minnesota courts addressing the ResCap downstream claims have generally allowed ResCap to plead claims without identifying all defective loans; importantly, however, those courts have also stated that ResCap will be required to prove its claims loan-by-loan.  (*See, e.g., Residential Funding Co., LLC v. Americash*,  No. 13-3460 (DSD/JJG),

14.     Beginning in February 2011, Lehman objected to the RMBS Claims because they lacked support and were grossly inflated.  In connection with Lehman's objection, Judge Peck issued a clear admonition that allowance of the RMBS Claims would ultimately depend on the RMBS Trustees' ability to marshal the necessary proof to establish the elements of such claims.  As Judge Peck noted,  "if there are claims, ***the trustees would be put to their proof***, and whether they can actually succeed in carrying a burden of proof establishing residential and mortgage loan breaches . . . would be extraordinarily difficult."[6]  (*See* 6/30/11 Hr'g. Tr. (Dkt. No. 18251) at 71:11-16 (emphasis added) (Exhibit B))

15.     This conclusion presented the RMBS Trustees with a problem.  They undertook and priced their role of RMBS Trustee as they would have any other indenture trustee assignment.  The Governing Agreements, however, imposed greater responsibilities on the RMBS Trustees with higher attendant costs.  Rather than getting to the business of fulfilling their contractual responsibility to identify either specific loans containing alleged breaches of representations and warranties, or deficient loan files, and to present the same to Lehman for (i) review, (ii) rebuttal, and (iii) if valid, repurchase and subsequent mitigation of any loss through recovery from the loan originator, the RMBS Trustees elected to avoid that obligation.  Now they come forward and request estimation of their claims for the purpose of allowance, which is

---

2014 WL 3577312, at *3, n.5 (D. Minn. July 21, 2014); *Mortg. Outlet, Inc.*, 2014 WL 4954645, at *2).  Lehman has always acknowledged that as it must be presented with loan-level proof before it incurs liability, so too must it prosecute its downstream claims only with loan-level proof.  Accordingly, Lehman has — from the outset of these cases — insisted that repurchase claimants present their claims for loan-level reconciliation to ensure that: (i) Lehman does not disburse more estate assets than those claimants are entitled to under the Governing Agreements and (ii) Lehman's downstream indemnification litigation may proceed expeditiously.

[6]     At the same June 30, 2011 hearing before Judge Peck, counsel to the creditors committee also voiced support for the notion that the RMBS Trustees should be required to provide loan-level proof for their claims.  (*See* 6/30/11 Hr'g. Tr. at 70:2-7 ("But I think ultimately it should be the claimants' burden . . . to determine which claims they could ultimately prove, and not put that burden on the estate and the Court to establish some kind of process where they would essentially get a free pass to prove that over a period of time. . . .") (Ex. B))

a short-circuited claims resolution process to avoid compiling the loan-level proof required by the Governing Agreements.

16.     In short, the RMBS Trustees accepted a responsibility when they agreed to serve in the role of "Trustee."  They cannot now shirk that responsibility because the cost or complications exceeded their expectations.  Their request to estimate the RMBS Claims at $12.143 billion for allowance purposes disregards — and indeed eviscerates — the bargains struck in the Governing Agreements with respect to claim reconciliation.  With the Estimation Motion, the RMBS Trustees impermissibly seek to pick and choose those aspects of the Governing Agreements they find advantageous.  They want to recover losses associated with breached representations and warranties, as well as deficient loan files, but they want to avoid the costs of identifying them.

17.     Notably, unlike the RMBS Trustees, FNMA and FHLMC, chose to follow the agreed upon process for proving loan deficiencies.  The GSEs delivered thousands of defective loan files to the Plan Administrator in support of their claims.  Even though they are quasi-governmental agencies in receivership and are under pressure to expeditiously resolve all legacy issues with limited resources, the GSEs properly chose to proceed on that path.  Ultimately, the GSEs choice to comply with their obligations under the governing agreements (rather than avoid them) paved the way for a fair settlement of their claims.  Conversely, the RMBS Trustees have chosen to ignore their very same obligations, and now ask the Court to endorse that choice and estimate their claims.

18.     The Estimation Motion should be denied for a variety of reasons.  First, estimation is not applicable in this context because the RMBS Claims do not meet the requirements of section 502(c)(1) of title 11 of the United States Code (the "Bankruptcy Code")

- 8 -

that a claim be either contingent or unliquidated in order for estimation to apply. While estimation of the RMBS Claims previously was appropriate for purposes of establishing a disputed claims reserve, it is impermissible where, as here, the RMBS Trustees are seeking to estimate and allow the claims for distribution purposes. Section 502(c) also does not apply because resolving the claims will not unduly delay administration of the case, notwithstanding the RMBS Trustees' assertions to the contrary. This is particularly true if an expedited, achievable loan-level review process is implemented, as requested by the Cross-Motion.

19.     _Second_, granting the Estimation Motion would materially and adversely affect the Plan Administrator's ability to mitigate the losses represented by the RMBS Claims by pursuing Lehman's claims against the downstream originators who made mortgage loan-level representations to Lehman.[7] The Plan Administrator will only be in a position to mitigate its losses _if_ a loan-level review process is implemented; without such a process, Lehman could, much like ResCap (_supra_ n.5), be faced with numerous, needless and costly challenges to its contractual mitigation rights. Additionally, estimation would also allow the RMBS Trustees to avoid the cost of that process, arguably rewarding them for their failure to expeditiously prove their claims in the first place.

20.     _Third_, any delay has been of the RMBS Trustees' making. Their rationale for estimation is that complying with the underlying Governing Agreements would take a long time. However, had the Trustees done what they committed to do in a timely manner from the outset, the review would have already been completed. In other words, the RMBS Trustees created the delay on which they base their requested relief. And now, to speed up a process they delayed — and to avoid costs they contractually agreed to incur — they insist estimation is the only way to proceed. As a consequence, the RMBS Trustees' requested $12.143 billion

---

[7]        _See supra_ notes 2 & 5.

estimation for claim allowance should be denied.

Lehman's Cross-Motion

21.     By this Cross-Motion, the Plan Administrator requests that the Court impose a detailed timeline and claims resolution protocol, in the form attached as <u>Exhibit C</u> to this Objection ("<u>RMBS Protocol</u>").  The RMBS Protocol, among other things, includes a requirement that the RMBS Trustees deliver to the Plan Administrator within sixty (60) days, any and all loan files that the RMBS Trustees believe may be put back to Lehman under the Governing Agreements.  The Plan Administrator also requests that the Court disallow any claim amount not substantiated by the loan files delivered within the sixty (60) day period.

22.     A deadline for requiring the RMBS Trustees to produce proof of their claims in this particular instance is fair and reasonable.  While the Plan Administrator does not know what the RMBS Trustees have been doing for the past five years, the answer is one of two things.  Either the RMBS Trustees have been collecting, reviewing, and compiling loan files associated with defaulted loans, or they have not.  If they have been compiling the loan files, then submitting proof by delivering loan files will not impose any hardship.  If, as the Plan Administrator suspects, the RMBS Trustees have not been fulfilling their responsibilities to identify deficient loan files, then it is fair and equitable to now impose a cut-off date on the RMBS Trustees.  Indeed, the Plan Administrator has been asking the RMBS Trustees to produce loan files for review and reconciliation since 2010.

23.     If the RMBS Trustees have been avoiding their responsibilities and the associated costs, this failure now threatens to delay the Plan Administrator's efforts to continue to make meaningful distributions to all creditors.  For this reason, the RMBS Trustees should be required to comply with an expedited schedule for presenting deficient loan files or suffer

claim disallowance.

24.    Accordingly, in addition to denying both the Reserve Motion and the Estimation Motion, the Plan Administrator respectfully cross-moves for an order establishing the RMBS Protocol.  Not only will implementation of the Plan Administrator's requested RMBS Protocol effectuate the contractual repurchase and indemnity requirements of the Governing Agreements, but it will also facilitate an efficient claims resolution process that will obviate the need for extensive and expensive fact and expert discovery.  The proposed protocol is an alternative to extensive litigation concerning the RMBS Claims, and it is the mechanism provided for by the Governing Agreements.  To the extent the Court does not implement the protocol, it will need to determine the amount at which the RMBS Claims will be allowed.  However, that issue is not currently before the Court as Lehman has not had an opportunity to provide substantive responses to the RMBS Trustees' flawed analysis and purported expert reports.

## JURISDICTION

25.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334, Article XIV of the Plan, and ¶ 77 of the order confirming the Plan.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## FACTUAL AND PROCEDURAL BACKGROUND

26.    Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only, and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

27.    On July 2, 2009, this Court entered an order setting forth the procedures and

deadlines for filing proofs of claim in these cases (the "Bar Date Order").  (Dkt. No. 4271)  The

Debtors provided notice of the September 22, 2009 bar date (the "Bar Date") to all known

creditors and potential creditors in accordance with the requirements of the Bar Date Order.

28.     On or around the Bar Date, the RMBS Trustees filed the RMBS Claims

asserting approximately $37 billion in repurchase claims premised on allegations that LBHI or

SASCO: (i) breached various representations and warranties regarding the quality and

characteristics of hundreds of thousands of mortgage loans, and (ii) provided deficient

mortgage loan files to the RMBS Trusts, when they sold approximately 1.8 million mortgage

loans into 405 residential mortgage-backed securitization trusts.[8]

29.     The RMBS Claims include broad allegations regarding the obligations of LBHI

and SASCO under the Governing Agreements, but only identified approximately 4,700 specific

mortgage loans containing alleged breaches totaling approximately $209 million — a miniscule

portion of the alleged $37 billion in alleged claims.  None of the remaining claims identify any

damages or provide any documentation supporting liability, as is required by the Bar Date

Order and the underlying Governing Agreements.[9]

30.     In a good faith effort to quantify the RMBS Trustees' *valid* claims, the Plan

Administrator began contacting each of the RMBS Trustees during the summer of 2010 and

requested that mortgage loan-level evidentiary support be delivered no later than December

31st of that year.  The RMBS Trustees supplied some limited mortgage loan data, but otherwise

admitted that they had not identified many specific breaches and chose not to expend any

further effort to identify those purported breaches.

---

[8]     At issuance, the mortgage loans had a collective unpaid principal balance of approximately $344.4 billion.
As of September 25, 2014, approximately 299,698 such loans remained outstanding, with an unpaid
principal balance of approximately $58.2 billion.

[9]     A more detailed description of the RMBS Claims is set forth below.

31.     Except as to those relatively few loans for which the RMBS Trustees provided some documentary support, the RMBS Claims otherwise failed to satisfy the documentary support requirements of the Bar Date Order and the Bankruptcy Code, as well as the Governing Agreements, thus preventing the Debtors from evaluating the merits of the claims.  As a result, on March 14, 2011, the Plan Administrator filed the One Hundred Ninth Omnibus Objection to Claims (Insufficient Documentation) ("Insufficient Documentation Objection") (Dkt. No. 15008) seeking to disallow and expunge the RMBS Claims on the basis that the RMBS Trustees violated the Bar Date Order by not providing sufficient supporting documentation. The Insufficient Documentation Objection was just one of a number of objections LBHI filed based on similar violations by the RMBS Trustees.  (*See, e.g.*, Dkt. Nos. 14492, 14493, 14494, & 16079)

32.     In response to the Plan Administrator's objections, (i) the Bank of New York Mellon, as trustee ("BNYM"), permitted all of its claims to be expunged, (ii) Hongkong and Shanghai Banking Corporation, as trustee ("HSBC"), permitted all of its claims to be expunged except for those relating to identified breaches in 15 loans and (iii) Bank of America, N.A., as trustee, transferred nearly all of its claims to U.S. Bank, N.A. ("U.S. Bank") and Citibank, N.A./Wilmington Trust Company ("Citibank/Wilmington") as successor trustees.   Only Citibank/Wilmington, Deutsche Bank National Trust Company ("Deutsche Bank"), U.S. Bank, and Wells Fargo Bank, N.A. ("Wells Fargo") challenged the objections.

33.     On June 30, 2011, the Court held a hearing on the Plan Administrator's motions to disallow U.S. Bank and Citibank/Wilmington's claims, and ultimately dismissed more than 130 claims.[10]  (*See* 6/30/11 Hr'g. Tr. (Dkt. No. 18251) (Exhibit B))  At the conclusion of that

---

[10]     At that time, LBHI only pressed its objections against U.S. Bank and Citibank/Wilmington as they comprised the largest claims.

hearing, the Court reserved decision as to the remaining claims, noting that "if there are claims, *the trustees would be put to their proof*, and whether they can actually succeed in carrying a burden of proof establishing residential and mortgage loan breaches . . . would be extraordinarily difficult." (*Id.* at 71:12-17 (emphasis added))

34.    On December 6, 2011, the Court approved the Plan, under which available cash is to be distributed to LBHI's unsecured creditors. (Dkt. No. 23023)

35.    In January 2012, the Plan Administrator moved to estimate the RMBS Claims for reserve purposes only. (Dkt. No. 24254) Using a seven-step methodology, the Plan Administrator estimated that the amount of the RMBS Claims — *if able to be proven* — would fall between $1.1 and $2.4 billion. Accordingly, the Plan Administrator proposed a reserve of $2.4 billion. (*Id.* at 12-13) This estimate was solely for purposes of establishing a reserve, and it was not an estimate of the Debtors' likely or potential liability. The RMBS Trustees objected, contending that the reserved amount should be at least $15.3 billion. The parties ultimately agreed to estimate the RMBS Claims at $5 billion for the purpose of establishing reserves under the Plan, and that such amount would be allocated 95% to LBHI and 5% to SASCO. On February 22, 2012, this Court entered the Reserve Order, finding that it was "in the best interests of [the Debtors], their creditors and all parties in interest." (Dkt. No. 25643)

36.    When the Reserve Order was entered in February 2012, the Plan Administrator believed that the actual amount of the RMBS Claims would be significantly less than $5 billion. However, the $5 billion reserve was consented to by the Plan Administrator to advance the chapter 11 proceedings and to allow LBHI to make meaningful distributions to creditors under the Plan.

37.    The Plan became effective on March 6, 2012. Pursuant to the Plan, the Plan

Administrator is authorized to reconcile claims asserted against the Debtors and to make distributions to creditors.

38.     On August 22, 2014, the RMBS Trustees spontaneously filed the Reserve Motion requesting that the existing $5 billion reserve be more than doubled to $12.143 billion. Seeking to circumvent the loan-by-loan claims process prescribed by the Governing Agreements, the Motion also requests — based on sampling performed by the RMBS Trustees' experts and a series of flawed assumptions — that the RMBS Claims be summarily estimated and allowed in the amount of $12.143 billion.  As discussed above, however, both the Reserve Motion and Estimation Motion apply to only 255 of the 405 trusts at issue, meaning that the Motions do not offer a final adjudication of all of the RMBS Claims.[11]

39.     In response to the Motions, the Plan Administrator files this Objection and Cross-Motion.  The RMBS Trustees' Motions should be denied in their entirety because they are improper and otherwise set forth no supportable basis upon which to increase the reserve or to estimate the RMBS Claims for allowance purposes.  Moreover, the reserve should remain at $5 billion as required by the stipulated Reserve Order.  Pursuant to the Bar Date Order and the Governing Agreements, the RMBS Trustees should be compelled — pursuant to Lehman's proposed RMBS Protocol and on an expedited but reasonable timeframe — to put forth the proof required by the underlying documentation (and the Bankruptcy Code and Bankruptcy Rules) to establish the validity of their claims.  If they are unable to do so within the timeline established by the Court, the RMBS Claims should be automatically disallowed and expunged without the need for further proceedings.

---

[11]     By confining their Reserve and Estimation Motions to Covered Loans, the RMBS Trustees have effectively abandoned claims concerning Transferor-Loans (*infra* ¶¶ 46-52).

40.     Lehman respectfully requests that the RMBS Trustees' Motions to immediately increase the reserve to $12.143 billion, and to estimate and allow the RMBS Claims in the amount of $12.143 billion, be denied in their entirety.

41.     Lehman also requests that the Court enter an order, substantially in the form attached hereto as Exhibit D and pursuant to Section 8.4 of the Plan and sections 105(a) and 105(d) of the Bankruptcy Code, implementing the RMBS Protocol and requiring timely resolution of the RMBS Claims.

## THE RMBS UNDERLYING THE CLAIMS

**A.      The Make-Up of an RMBS.**

42.     A residential mortgage-backed security or "RMBS" is an asset-backed security secured by a discrete pool of residential mortgage loans aggregated by sponsors and sold into trusts.  The proceeds from the underlying mortgage loans are utilized to make payments of interest and principal on the RMBS.  In connection with the sale of mortgage loans into trusts, numerous representations and warranties are made by the selling entities to the trust relating to the quality and nature of the mortgage loans, the borrowers and the underlying mortgaged properties.  The Governing Agreements for these transactions (Mortgage Loan Sale and Assignment Agreements, and Trust Agreements or Sale and Servicing Agreements) set forth the respective rights and obligations of the parties to the agreements,[12] such as providing for repurchase obligations and establishing the requirements that trigger such obligations.

**B.      The Repurchase Claims Against LBHI.**

43.     The gravamen of the RMBS Claims against LBHI is that LBHI breached

---

[12]     Typical examples of these agreements are attached hereto in relevant part as Exhibit E and Exhibit F respectively.

mortgage loan-level representations and warranties in the Governing Agreements. To require LBHI to compensate the trusts for their losses, the Governing Agreements specifically require RMBS Trustees to prove **each** of the following for **each mortgage loan**: (1) a breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was provided to LBHI. (Ex. E § 1.04(d), Ex. F § 2.04) Importantly, the Governing Agreements unambiguously provide that these elements must be proven for each mortgage loan. As a result, LBHI is contractually entitled to demand this individualized loan level proof from the RMBS Trustees.

44. By way of example, each mortgage loan sale and assignment agreement includes a voluminous list of representations and warranties regarding the mortgage loans. A trustee could have an actionable claim where a mortgage loan seller breached a specific representation, *e.g.* the borrower lied about borrower's income or debts or made other misrepresentations on the borrower's mortgage loan application. However, a breach alone does not trigger a claim. The trust only has a valid claim if the breach has a material and adverse effect on the value of the related mortgage loan. This claim element can be viewed as similar to traditional "but-for" causation. Importantly, any number of factors exclusive to alleged breaches may cause mortgage loans to lose value, such as (i) borrower loss of income sources, (ii) borrower illness or other financial hardship, or (iii) a borrower decision to walk away from "upside down" mortgages.

45. The RMBS Trustees ignore the impact of economic factors affecting the performance of the mortgage loans in the trusts. Instead, they attribute the cause of the trusts' losses to hypothetical, undocumented and unproven breaches of representations and warranties by LBHI and SASCO.

46.     The Governing Agreements also identify and determine the particular party that is obligated to repurchase a mortgage loan in the event of a breach.  Depending on which party made certain representations to the trusts, the originator or seller unaffiliated with LBHI of the mortgage loan is liable.  In other situations, LBHI, or an affiliate, as the seller of the mortgage loan may be liable.  In fact, with respect to approximately 65% of all mortgage loans for which the RMBS Trustees asserted a claim, the material representations were made by parties unaffiliated with LBHI, and accordingly, LBHI bears no, or extremely limited, potential liability.

47.     Generally, LBHI acquired mortgage loans that were subsequently sold to the trusts from two sources: (1) the majority of mortgage loans in the LBHI-sponsored securitizations came from third-party originators referred to as "Transferors" who sold mortgage loans on an on-going or "flow" basis to LBHI through Aurora Bank, FSB (f/k/a Lehman Brothers Bank, FSB) (LBHI refers to these mortgage loans as "Transferor Loans"); and (2) LBHI either purchased a smaller group of mortgage loans from local and regional lenders (including in some cases its own affiliated lenders BNC Mortgage Company and Finance America LLC) referred to as "Correspondents" on an individual basis or in "minibulk" deals or purchased mortgage loans originated or funded through brokers by Lehman Brothers Bank FSB (f/k/a Aurora Bank, FSB) (collectively, "Bank-Originated Loans").

48.     When LBHI purchased mortgage loans on the secondary mortgage market from Transferors, Correspondents, or affiliates, it received representations and warranties as to the quality and characteristics of the mortgage loans from the originators.  Generally speaking, LBHI individually *re-made* the representations and warranties to the trusts for Bank-Originated Loans but only *assigned or passed on* representations and warranties to the trusts for Transferor

Loans (*e.g.*, LBHI assigned the representations made regarding the mortgage loans and the corresponding put-back rights under the applicable transfer agreement to the trust, but made very limited representations or warranties itself regarding the mortgage loans). (Ex. E §§ 1.01(a), 1.04(b); Ex. F §§ 2.01(a), 2.03(b)) LBHI passed on the representations and warranties of affiliates in the vast majority of other deals. The Plan Administrator has reviewed the mortgage loans included in the trusts giving rise to the RMBS Claims and determined that approximately 65% of the mortgage loans are Transferor Loans for which LBHI and SASCO have either no, or extremely limited, potential liability.[13]

### C. The Document Defect Claims Against SASCO.

49.     The gravamen of the RMBS Claims against SASCO is that SASCO failed to deliver complete Mortgage Files for each mortgage loan.[14] To require SASCO to compensate the trusts for their losses, the Governing Agreements require the RMBS Trustees to prove each of the following for each mortgage loan: (1) a document or documents constituting part of a Mortgage File is missing, does not appear regular on its face or appears to be unrelated to the mortgage loans (a "Material Defect"); (2) the Material Defect has not been cured; and (3) a loss has been incurred with respect to such mortgage loan, which loss is attributable to the failure of the depositor to cure such Material Defect. (Ex. F § 2.02(c)) The Governing Agreements unambiguously provide that these elements must be proven for each mortgage loan, and thus SASCO is contractually entitled to demand such proof.

50.     The Governing Agreements identify and determine the particular party that is obligated to repurchase a mortgage loan in the case of a Material Defect in the Mortgage File

---

[13]     For Transferor Loans, LBHI or SASCO may have made certain general corporate representations and limited mortgage-loan level representations. These representations, however, are unlikely to result in damage claims and do not appear to be the type of claims asserted by RMBS Trustees.

[14]     As used in this Objection, the term Mortgage Files has the meaning set forth in Exhibit F § 2.01(b).

and a related loss as a result. In certain circumstances, SASCO, as the depositor, may be liable for such material defects.

51.     The following graphic depicts the flow of potential liability for the mortgage loans that LBHI securitized:



52.     In practice, the RMBS Trustees were perfectly familiar with the flow of liability and the difference between LBHI and SASCO liability, on one hand, and the liability of Transferors, on the other hand. Pre-bankruptcy, the RMBS Trustees conformed to the following practices: (i) repurchase demands were made on behalf of the trustees and then carefully validated by Lehman on a loan-by-loan basis; (ii) the trustees knew that liability for Transferor Loans was to be borne by the Transferors — not LBHI — even authorizing the master servicer to commence repurchase litigation directly against the Transferors[15]; and (iii) pre-petition, it was not LBHI's practice to repurchase a Transferor Loan.

**D.     The Motion Subverts the Governing Agreements' Claims Process.**

53.     Prior to the Motions, the RMBS Trustees have not provided (or even assembled, to the Debtors' knowledge) the required loan-level evidence necessary to support the Claims in the more than six years since LBHI's bankruptcy filing, the more than five years from the Bar

---

[15]     Exhibit G is an example of such litigation.

Date, the more than three years from Lehman's objection to the RMBS Claims and Judge Peck's admonition that the RMBS Trustees' would be "put to their proof", and the more than two and a half years from the establishment of the existing reserve. Instead, the RMBS Trustees continue to avoid their obligations by putting forth the Motions, through which they improperly advocate for an increase to the reserve and the application of an estimation methodology to calculate the value of the RMBS Claims. The RMBS Trustees' attempt to avoid proving the various and specific purported breaches and exceptions for which the RMBS Trustees contend that LBHI and SASCO bear liability, is contrary to the requirements of the Governing Agreements, and will materially and adversely affect LBHI's ability to pursue downstream litigation against the truly responsible parties (to the extent liability exists in the first instance).

## ARGUMENT

## I. THE RESERVE MOTION, WHICH SEEKS TO MORE THAN DOUBLE THE PREVIOUSLY AGREED UPON AND SO ORDERED RESERVE, SHOULD BE DENIED.

54.     The RMBS Trustees' Motion to increase the estimated claim for reserve purposes from $5 billion to $12.143 billion improperly seeks to reopen an issue the parties agreed to definitively resolve in February 2012 following briefing, a hearing, and Court-directed negotiations. The parties' compromise to estimate the Claims at $5 billion for reserve purposes was memorialized in the Reserve Order. Because the Reserve Motion is an attempted end run around the binding effect of the agreed upon Reserve Order, it should be rejected outright on that basis alone. Notwithstanding, to the extent the Court entertains the RMBS Trustees' request for a reserve increase, the Reserve Motion fails because it is untimely and otherwise falls well short of the onerous standard for relief from stipulated orders under Federal Rule of Civil Procedure 60(b). Although the RMBS Trustees attempt to jettison these inconvenient procedural hurdles by

simply ignoring them, their Motion must be evaluated under a Rule 60(b) standard, and when so viewed, its deficiencies are obvious.

A.    **The Stipulated Reserve Order Amounts to a Contract Wherein the Parties Agreed to a $5 Billion Reserve for the RMBS Claims, and the RMBS Trustees Should Be Held to Their Bargain.**

55.    The Reserve Motion is really a request that the parties and this Court engage in a "do over."  Indeed, the issue of the proper reserve amount for the RMBS Claims was already briefed, heard, negotiated, agreed upon, and so ordered in connection with the Lehman Estimation Motion.  With respect to the reserve amount, the parties struck a deal.  Two and a half years later, the RMBS Trustees now seek to change its terms.

56.    In January 2012, Lehman sought, based on its analysis, to estimate the RMBS Claims (which were then alleged to be as high as $37 billion) at $2.4 billion solely for reserve purposes.  At the time, Lehman's analysis indicated the RMBS Claims could be valued as low as $1.1 billion.  For the sake of conservatism, however, Lehman proposed to estimate the RMBS Claims at $2.4 billion merely to establish a more than sufficient reserve under the Plan.  The RMBS Trustees disagreed, asserting through a series of written objections (*see* Dkt. Nos. 24476, 24483, 24484, 24485, 24491 & 24492) and based on the analyses of their experts, that the allowed amount of their claims should be estimated at $15.3 billion, and that Lehman should be required to reserve accordingly.  Following oral argument before Judge Peck on January 26, 2012, the parties undertook efforts, in consultation with their experts, to settle the Lehman Estimation Motion, ultimately agreeing to entry of the Reserve Order.  (Dkt. No. 25563)  This Court entered the parties' agreed upon Reserve Order on February 22, 2012, finding that the establishment of a reserve for the RMBS Claims at the agreed upon amount of $5 billion was "in the best interests of [the Debtors], their creditors and all parties in interest."  (Dkt. No. 25643)

57.    Having expressly agreed in February 2012 that setting a $5 billion reserve for the

RMBS Claims was in the "best interests" of "all parties in interest," the RMBS Trustees have decided to perform an end run around the parties' agreement to create leverage for themselves by seeking to lock up billions of dollars at the expense of other creditors. Accordingly, the RMBS Trustees now seek to rewrite the agreed upon Reserve Order by more than doubling the size of reserve to $12.143 billion. However, the stipulated Reserve Order amounts to a contract between the parties, and the RMBS Trustees are bound by its terms. Indeed, as courts in this district have noted, "[a] Stipulation and Order is a binding agreement between the parties to a dispute which has been so ordered by the presiding court. When parties enter into a stipulation, the agreement is enforceable as a contract." *In re Royster Co.*, 132 B.R. 684, 687-88 (Bankr. S.D.N.Y. 1991); *see also In re Forde*, 507 B.R. 509, 519-20 (Bankr. S.D.N.Y. 2014) (noting that stipulations are enforceable contracts and may be modified by courts only where necessary to prevent manifest injustice).

58.    The $5 billion figure in the Reserve Order reflects just the type of balanced compromise between "competing concerns" that this Court has advocated in connection with estimating claims for reserve purposes. *See In re Chemtura Corp.*, 448 B.R. 635, 651, 669 (Bankr. S.D.N.Y. 2011). To be conservative and protect the RMBS Trustees' claims, Lehman agreed to a reserve that was more than double in size to the $2.4 billion reserve proposed by its estimation motion, and almost five times Lehman's low end estimate for the RMBS Claims. Two and a half years later, and despite new expert analysis that *decreases* the RMBS Trustees' claim amount from $15.3 billion to $12.143 billion, the RMBS Trustees now take the position that the reserve should be *increased* by over $7 billion, and substantiate their "redo" of their reserve position without support. The RMBS Trustees are contractually bound to, and must

abide by, the parties' so ordered agreement to a $5 billion reserve.[16]

59.     Express language in the Reserve Order, quoted in a footnote in the RMBS Trustees' Motion (*see* Motion at 4 n.6), further underscores that it was intended to conclusively resolve the parties' dispute concerning the proper reserve amount, and to foreclose further litigation concerning the discrete issue of the reserve.  Specifically, the Reserve Order provides, among other things:

- that the estimation was "not deemed to determine or affect in any respect ***the allowed amount, validity or priority*** of the [RMBS] Trustees' Claims for any purpose ***other than establishing the reserve amounts for such claims under the Plan***";

- that the estimation was "without prejudice to the rights of the Indenture Trustees to assert that ***the allowed amount*** of the [RMBS] Trustees' Claims should be greater than the Estimated Claim"; and

- all rights of the [RMBS] Trustees and Lehman "with respect to the [RMBS] Trustees' ***Claims*** are fully preserved."

(Reserve Order at 3 (emphases added))  Notably, the Reserve Order only speaks to reserving rights with respect to the allowed amount, validity, and priority of the Claims.  Nowhere does the Reserve Order permit the RMBS Trustees to seek an increased reserve at a later date.  Quite the contrary, the only reasonable construction of the Reserve Order is that subsequent attempts to adjust the reserve were to be precluded.  Indeed, the Reserve Order does not purport to finally determine any Claim-related matters "***other than [to] establish[] the reserve amounts for such claims under the Plan***."  (*Id.* (emphasis added))  Given this plain language, the RMBS Trustees

---

[16]     Because Lehman is bound just as strictly by the Reserve Order's $5 billion agreed-upon reserve as are the RMBS Trustees, Lehman has not sought a downward adjustment in the reserve.  Notwithstanding, there are compelling arguments for ***lowering the reserve by at least 50%***, including comparisons with benchmarks set in prior settlements of similar claims brought by the same RMBS Trustees against different RMBS sponsors.  Indeed, the RMBS Trustees' proposed reserve amount is entirely disproportionate to the benchmarks set by the RMBS Trustees' most recent prior settlements with J.P. Morgan Chase Bank, N.A. and Citibank, N.A.  Should the Court permit the RMBS Trustees to now reopen the issue of the reserve amount — and it should not — Lehman fully reserves its rights to move for a significant downward adjustment in the reserve based on this and other arguments.

are estopped from now attempting to re-litigate the reserve issue. *Cf. Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146-47 (2d Cir. 2005) ("we have specified that where parties intend a stipulation to be binding in future litigation, issues to which the parties have stipulated will be considered 'actually litigated' for collateral estoppel purposes").[17]

## B. The Reserve Motion Does Not Meet the Applicable Standard for Reconsideration Under Rule 60(b).

60. Should the Court entertain the RMBS Trustees' efforts to reopen the reserve issue, the Reserve Motion should be denied because it meets neither the requirements of Federal Rule of Civil Procedure 60(b) nor the onerous legal standard for reconsideration. Made applicable here by Federal Rule of Bankruptcy Procedure 9024, Rule 60(b) governs a party's efforts to seek relief from a final judgment, order, or proceeding. Fed. R. Civ. P. 60(b). Because the Reserve Order disposed of a discrete dispute within the broader context of Lehman's bankruptcy proceedings — *i.e.*, Lehman's Estimation Motion to determine the amount Lehman would be required to reserve for the RMBS Claims under the Plan — the instant Reserve Motion to modify the Reserve Order's terms is governed by Federal Rule of Civil Procedure 60(b). *See SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 289 (2d Cir. 1992) ("an order in a bankruptcy case is appealable if the order finally disposes of a *discrete dispute within the larger case*") (emphasis in original) (internal quotations and citation omitted); *see also Liquidators of Lehman Bros. Australia Ltd. v. Lehman Bros. Special Fin. (In re Lehman Brothers Holdings Inc.)*, 697 F.3d 74, 77 (2d Cir. 2012) ("in the bankruptcy context, the standard for finality is more flexible than in other civil litigation . . .

---

[17] Indeed, the Reserve Motion is analogous to a request for a mandatory injunction. *See generally In re Chemtura Corp.*, No. 09-11233 (REG), 2010 WL 4638898, at *3 (Bankr. S.D.N.Y. Nov. 8, 2010) (determining that a disputed claim holder's request to order debtor to put more cash and stock into previously ordered claim reserve was akin to a mandatory injunction). The RMBS Trustees are seeking a Court order requiring LBHI to reserve $7.123 billion *more* than what was previously agreed to and so ordered. It is a proposed change to the status quo, and if permitted, the increase will be detrimental to the rights and interests of other creditors.

Because bankruptcy cases frequently entail protracted proceedings involving many parties, finality is viewed functionally, focusing on pragmatic considerations rather than on technicalities.")

61.     Particularly instructive here is *In re Chemtura Corp.*, in which this Court considered a claimant's request — akin to the Reserve Motion — that a previously ordered disputed claims reserve be increased by $20 million. *See In re Chemtura Corp.*, No. 09-11233 (REG), 2010 WL 4638898, at *3 (Bankr. S.D.N.Y. Nov. 8, 2010). Denying the request, Judge Gerber noted that the claimant was "effectively seeking . . . reconsideration of [the] earlier orders setting the size of the Disputed Claims Reserve, without satisfying the requirements of [Bankruptcy Rules] 9023 and 9024, which make [Federal Rules of Civil Procedure] 59 and 60 applicable in cases under the Code." *Id.* As Judge Gerber observed:

> The Equity Committee is quite right in its observation that if I were to grant the relief [the claimant] requests here — supplemental funding of the Disputed Claims Reserve when I already decided the Disputed Claims Reserve's appropriate size — it would be in the nature of reconsideration of that earlier decision.

*Id.* Consistent with the *Chemtura* decision, which also concerned a motion to increase a previously ordered disputed claims reserve, the Reserve Order must similarly be treated as a final order from which the RMBS Trustees now seek Rule 60 relief.[18] Consequently, not only must the Reserve Motion comply with the procedural strictures of Rule 60, but it must also "meet a very heavy burden of proof" to satisfy the exceedingly onerous legal standard for reconsideration

---

[18]     Courts have regularly assessed motions for relief from prior bankruptcy court orders — including stipulated orders — under the Rule 60(b) rubric. *See, e.g.*, *Hoti Enters., L.P. v. GECMC 2007 C-1 Burnett St., LLC (In re Hoti Enters., L.P.)*, No. 12-CV-5341 (CS), 2012 WL 6720378, at *4 (S.D.N.Y. Dec. 27, 2012) (affirming denial of Rule 60(b) reconsideration of stipulated cash collateral order); *In re AL & LP Realty Co.*, 164 B.R. 231, 234 (Bankr. S.D.N.Y. 1994) (denying Rule 60(b) relief from stipulated order modifying the automatic stay); *see also In re Old Carco LLC*, No. 10 Civ. 2493(AKH), 2010 WL 3566908, at *2 (S.D.N.Y. Sept. 14, 2010) (affirming denial of reconsideration under Rule 60(b) of order allowing debtor to reject certain dealership agreements); *Illinois Dep't of Revenue v. U.S. Energy Biogas Corp. (In re U.S. Energy Sys., Inc.)*, No. 12 Civ. 7107, 2013 WL 5204010, at *5 (S.D.N.Y. Sept. 16, 2013) (affirming bankruptcy court's denial of Rule 60(b) motion for relief from administrative bar order).

of stipulated orders.  Under the weight of such scrutiny, the Reserve Motion fails.

### 1.    The Reserve Motion Is Untimely.

62.    Although Rule 60(b) lists a number of grounds for relief, the Reserve Motion is most aptly viewed as a motion based on "newly discovered evidence that, with reasonable diligence, could not have been discovered" at the time the Reserve Order was issued under Rule 60(b)(2).  Fed. R. Civ. P. 60(b)(2).  The Reserve Motion notes that for more than two years since July 2012, "the RMBS Trustees have engaged experts, had a sample of nearly 5,000 Covered Loans re-underwritten, and had experts analyze and assess the nature of breaches of representations and warranties for materiality in accordance with the underlying trust documents."  (Reserve Motion ¶ 16)

63.    The Reserve Motion further argues that "[b]ased on the RMBS Trustees' evidence that the allowed amount of the RMBS Claims for Covered Loans is not less than $12.143 billion . . . the reserve must be increased immediately."  (*Id.* at ¶ 18.)  In essence, the RMBS Trustees assert that newly developed evidence and analyses from their purported experts over the course of more than two years warrants a reevaluation of the previously ordered reserve.

64.    The Reserve Motion, however, comes way too late.  Under Rule 60(c)(1), any motion for relief from an order based on purported newly discovered evidence under Rule 60(b)(2) "must be made within a reasonable time—and . . . ***no more than a year after the entry of the . . . order***."  Fed. R. Civ. P. 60(c)(1) (emphasis added).[19]  This one-year time limit is a strict deadline and may not be extended by the Court.  *See* Fed. R. Bankr. P. 9006(b)(2) ("The court may not enlarge the time for taking action under [Rule] . . . 9024"); *see also Warren v.*

---

[19]    The one-year time limit under Rule 60(c)(1) also applies to motions made pursuant to Rule 60(b)(1) (motions for relief from orders based on "mistake, inadvertence, surprise, or excusable neglect") and Rule 60(b)(3) (motions for relief from orders on grounds of fraud).  To the extent the RMBS Trustees would assert the Reserve Motion falls under either of those prongs of Rule 60(b), the Reserve Motion would similarly be untimely.

*Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) (the one-year limitation period governing Rule 60(b) motions for relief from a judgment or order is "absolute").

65. The Reserve Order was entered on February 22, 2012. The RMBS Trustees' Reserve Motion was not filed until August 22, 2014 — two and a half years later. During this time, and accounting for the agreed upon $5 billion reserve for the RMBS Claims, the Plan Administrator has undertaken a careful plan of distribution to creditors. For their part, creditors have relied upon the Plan Administrator's ability to make distributions as scheduled. The RMBS Trustees' untimely Reserve Motion now threatens to disrupt the distribution process — precisely the type of consequence the one-year limitation under Rule 60(b) is intended to avoid. Because the RMBS Trustees waited too long to replace their prior experts, marshal new expert opinions, and press their arguments for modifications to the Reserve Order, their Reserve Motion must be denied. *See, e.g.*, *In re U.S. Energy Sys.*, 2013 WL 5204010, at *5 (affirming denial of untimely Rule 60(b) motion); *In re Hoti Enters., L.P.*, 2012 WL 6720378, at *4 (same); *In re Old Carco LLC*, 2010 WL 3566908, at *2 (same).

66. Further, the RMBS Trustees have had since at least 2008 to retrieve loan files and actually substantiate their claims. Their claims were neither contingent nor unliquidated. All the RMBS Trustees had to do to avoid any reserve issues was to fulfill their contractual obligations. While the effort would have been substantial, there has been a sufficient amount of time to complete the task. Nevertheless, unlike the GSEs, the RMBS Trustees elected not to attempt to prove up their claims.

67. In an effort to sidestep the strict one-year limitation for motions pursuant to Rule 60(b)(2), the RMBS Trustees may attempt to avail themselves of Rule 60(b)(6), a catch-all provision which permits motions for reconsideration for "any other reason that justifies relief."

Fed. R. Civ. P. 60(b)(6). The law, however, is "well-established that Rule 60(b)(6) should not be used to circumvent the one-year limitations period that applies to the specific clauses [of Rules 60(b)(1-3)]." *LinkCo, Inc. v. Akikusa*, 615 F. Supp. 2d 130, 136 (S.D.N.Y. 2009). Therefore, an action "may not be brought under Rule 60(b)(6) if it is premised on one of the grounds for relief enumerated in the specific clauses of Rule 60(b)." *Id.* (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988)); *see also Klaprott v. United States*, 335 U.S. 601, 613 (1949) (a party may "not avail himself of the broad 'any other reason' clause of 60(b)" if its motion is based on grounds specified in the other clauses of Federal Rule 60(b)). Given the RMBS Trustees' express statements that the Reserve Motion is "[b]ased on [their] evidence that the allowed amount of the RMBS Claims for Covered Loans is not less than $12.143 billion" (Motion ¶ 18), the Reserve Motion necessarily falls within the ambit of Rule 60(b)(2) and the one-year limitation period, which expired on February 22, 2013, a full year and a half before it was filed.

68. In any event, even if the Court considers the Reserve Motion under Rule 60(b)(6), the Reserve Motion was nevertheless required to have been brought "within a reasonable time." Fed. R. Civ. P. 60(c)(1). Notwithstanding the RMBS Trustees' engagement of purported experts to substantiate their request to more than double the reserve, and the time allegedly taken by those experts to perform their superficial and sample-based analyses, nowhere do the RMBS Trustees — themselves sophisticated financial institutions with no dearth of resources — attempt to justify the full ***two and a half years*** it took, after the Reserve Order was entered, for them to bring this matter to Lehman's or this Court's attention. Such a lengthy delay is not only unreasonable, but also inexplicable. The RMBS Trustees have had unfettered access to the same information their experts claim to have analyzed since the loans were first securitized — at least

seven years ago or more — yet failed to identify more than $209 million in loan-level claims against LBHI.  Accordingly, no matter how it is sliced under Rule 60(b), the Reserve Motion must be denied as untimely.

> **2.**     **The Reserve Motion Does Not Meet the Exceptionally High Standard for Reconsideration of Stipulated Orders Under Rule 60(b).**

69.     Beyond the fact that it was brought too late, the Reserve Motion should also be denied for the independent reason that it falls well short of the onerous standard for relief from stipulated orders under Rule 60(b).  As this Circuit has noted, "[s]ince Rule 60(b) allows extraordinary relief, it is invoked only upon a showing of exceptional circumstances." *Central Vermont Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003) (citation omitted); *see also Silverman v. Miranda*, No. 06-CV-13222 (ER), 2014 WL 3728622, at *3 (S.D.N.Y. July 28, 2014) ("Motions for relief under Rule 60(b) are disfavored and reserved for exceptional cases.")

70.     Importantly, "[w]here, as here, the parties submitted to an agreed upon disposition instead of seeking a resolution on the merits[,] the burden to obtain Rule 60(b) relief is heavier . . . ." *In re AL & LP Realty Co.*, 164 B.R. at 234 (denying reconsideration of agreed order modifying the automatic stay); *see also In re Royster Co.*, 132 B.R. at 689 (movant for Rule 60(b) "relief from a stipulation agreement must meet a very heavy burden of proof").  "Generally this burden is only met upon the clear showing of a grievous wrong that has resulted from unforeseen conditions." *Id.; see also Hsi v. Bank of Montreal*, No. 95 Civ. 2806 JESKNF, 1999 WL 504915, at *4 (S.D.N.Y. July 16, 1999) ("A party seeking Rule 60(b)(1) relief from a stipulation agreement must meet a very heavy burden of proof."); *Ally v. F.E.D. Concrete Co.*, No. 88 Civ. 8552 (SWK), 1993 WL 452523, at *2 (S.D.N.Y. Nov. 4, 1993) (movant's "change of heart" was no grounds upon which to vacate settlement to which all parties, represented by counsel, agreed); *United States v. Dist. Council of N.Y.C. & Vicinity of the United Brotherhood*

*of Carpenters & Joiners of Am.*, No. 90 Civ. 5722 (CSH), 1992 WL 111100, at *5 (S.D.N.Y. May 4, 1992) (Rule 60(b) movant's burden is heavier when parties submit an agreed-upon disposition). Thus, to the extent the Reserve Motion is considered under Rule 60(b)(6), the Motion "should not be granted unless [the RMBS Trustees have shown] exceptional or extraordinary circumstances . . . or extreme or undue hardship." *In re AL & LP Realty Co.*, 164 B.R. at 234.

71. The Reserve Motion fails to meet the high standard to which it must be held under Rule 60(b). While purportedly based on new evidence developed through the work of the RMBS Trustees' experts over the past two and a half years, the Reserve Motion offers nothing new or extraordinary in terms of argument. The RMBS Trustees' primary — and indeed only — justification for the alleged need to immediately more than double the reserve is that "[i]f the RMBS Claims are not addressed promptly, the $5 billion reserve will soon serve as a cap on the claims, which is contrary to the intent of the Court's Reserve Order." (Motion ¶ 18) This, however, is the same argument these very RMBS Trustees made in opposing the Lehman Estimation Motion in early 2012.[20] Fully cognizant of these risks, the RMBS Trustees nonetheless agreed to settle Lehman's Estimation Motion, and to the stipulated Reserve Order setting the reserve at the compromise $5 billion figure. The RMBS Trustees chose not to insist that this Court decide the issue at that point (when they sought an even higher reserve amount), and they remained silent regarding the reserve for two and a half years. That Lehman's estate has been periodically distributed to other creditors during this time is not extraordinary, nor was

---

[20] *See, e.g.*, Wilmington Trust Co. Obj. (Dkt. No. 24483) at 5 ("If the Motion is granted at this time in its present form, it is likely that the reserve amounts to be established for Claims held by the WTC Trusts and the other securitization trusts will be grossly inadequate."); U.S. Bank Obj. (Dkt. No. 24491) at 2 ("The Trustees are concerned that an estimate that is too low will prejudice investors in the RMBS Trusts since there is no guarantee that proceeds available for future distributions will be sufficient to make up the difference.").

it unforeseen to the RMBS Trustees when they agreed to a $5 billion reserve.

72.     The RMBS Trustees similarly cannot contend that their experts' current $12.143 billion estimate for the claims constitutes an extraordinary, exceptional, or unforeseen circumstance, particularly given that they previously presented $15.3 billion as a "conservative" estimate to this Court.  (*See id.*)  Simply put, nothing in the Reserve Motion justifies the RMBS Trustees' requested extraordinary relief from the agreed upon Reserve Order.

73.     Nor have the RMBS Trustees' sustained their "very heavy burden" to demonstrate that failure to adjust the reserve would constitute a "grievous wrong" or cause them to suffer any "extreme or undue hardship."  Despite their insistence that without a reserve increase, the current $5 billion reserve will serve as a "cap" on their claims (*see* Motion ¶ 18), such concerns are unsubstantiated.  Consistent with the express terms of the Reserve Order, the RMBS Trustees may continue "to assert that the allowed amount of [their] Claims should be greater than the Estimated Claim."  (Reserve Order at 3)  However, the likely injury to the Plan Administrator should it now be required to more than double the RMBS Claims reserve (while it is attempting to execute an orderly plan of distribution) is far more imminent.  Other Lehman creditors relying upon the timely receipt of their distribution payments will be similarly and adversely affected. This further warrants the denial of the RMBS Trustees' improper and untimely Reserve Motion.[21]

---

[21]     In any event, should the Court entertain further litigation concerning the reserve, Lehman and its experts will demonstrate that the RMBS Trustees' $12.143 billion estimate is wildly overstated, unreliable, and premised on a series of flawed assumptions and inputs.  The myriad problems with the RMBS Trustees' and their experts' analyses include, but are not limited to:  (1) their use of biased sampling to generate and apply an artificially inflated breach rate; (2) their failure to consider any liability limitations which might impact their ability to validate the alleged breaches; (3) their failure to account for an array of factors that may sever the causal link between the alleged breaches and claimed losses; (4) their disregard of the requirement that any alleged breaches have had a material adverse effect on the loans; and (5) their apparent inclusion of documentation breaches that would have been cured absent the RMBS Trustees' failures to comply with document deficiency identification provisions in the Governing Agreements.

### C. Even if the Reserve Order Is Deemed to Be Interlocutory, the Reserve Motion Should be Denied.

74. Having failed to bring the Reserve Motion before the one-year deadline, and unable to meet the exceptionally high legal standard for reconsideration under Rule 60, the RMBS Trustees may contend that the Reserve Order was merely interlocutory in nature, and therefore that the Reserve Motion is not governed by Rule 60 at all. For the reasons outlined above (*see supra* ¶¶ 60-61; *see also In re Chemtura Corp.*, 2010 WL 4638898, at *3), any such contention would be meritless as the Reserve Order is most aptly viewed as a final order under Rule 60 and the related case law.

75. Notwithstanding, even if the Court were to consider the Reserve Order interlocutory, the RMBS Trustees still have not demonstrated any entitlement to relief from the Reserve Order. The Court's discretion to modify interlocutory orders is not unbounded. As Judge Lynch has observed, "[a]n interlocutory order may be reconsidered when there is an intervening change of controlling law, newly available evidence, or the need to correct a clear error or prevent manifest injustice." *Hnot v. Willis Grp. Holdings Ltd.*, 241 F.R.D. 204, 207 (S.D.N.Y. 2007) (internal quotations and citation omitted); *cf. Aronoff v. Dwyer*, 913 F. Supp. 286, 289 (S.D.N.Y. 1996) ("The court's exercise of its power to reconsider its own decisions is guided by the strictures of the law of the case doctrine . . . where litigants have once battled for the court's decision they should neither be required, nor without good reason permitted, to battle for it again.") (internal quotations and citation omitted)).

76. The Reserve Motion demonstrates none of these typical predicates to reconsideration. The RMBS Trustees have made no showing of a change in controlling law. As the RMBS Trustees themselves agreed to the Reserve Order, they are hard-pressed to claim it arose from clear error. Nor have the RMBS Trustees discovered any new evidence. Rather, they

have merely analyzed the same breach claims they previously filed by employing different experts and methodology. *See Aronoff*, 913 F. Supp. at 289 (rejecting argument that new evidence warranted modification to interlocutory order). In fact, as noted above, the RMBS Trustees' earlier experts opined that their claims were worth as much as $15.3 billion. Their current experts value the claims at just $12.143 billion. An expert opinion that the RMBS Claims are worth ***less*** than a previous expert's opinion is not newly discovered evidence justifying a ***higher*** reserve amount.

77.     Furthermore, denying the RMBS Trustees' improper request to undo the agreed upon Reserve Order would create no manifest injustice to the RMBS Trustees. Quite the contrary, granting the request would permit the RMBS Trustees — who allowed years to pass without raising the issue of the reserve or taking meaningful steps to advance their claims — to effectively hijack LBHI's ongoing efforts to fulfill its responsibilities as Plan Administrator, and to proceed with orderly and planned distributions to holders of allowed claims. At this stage, should the Plan Administrator be required to more than double the size of the RMBS Claims reserve, most adversely affected will be other creditors, who could suddenly and without justification find their distributions either imperiled or delayed.

78.     Importantly, as Plan Administrator, LBHI is a responsible fiduciary, with obligations to the entire Lehman estate. If the Plan Administrator believed that a higher reserve was necessary to ensure the RMBS Claims received adequate distributions, it would increase the reserve. The Plan Administrator, however, also must try not to ***over-reserve*** for the RMBS Claims so that other creditors' distribution payments are not delayed. To require LBHI to do otherwise would effectively permit the RMBS Trustees to leverage delayed distributions to other creditors in order to achieve a higher claim amount than that to which they are entitled.

79.     For the foregoing reasons, the Reserve Motion should be denied.

## II.     THE ESTIMATION MOTION SHOULD BE DENIED AS ESTIMATION IS AN IMPROPER METHODOLOGY FOR CLAIM RESOLUTION.

### A.     Estimation Is Not Permitted Under Section 502(c).

80.     Section 502(c) of the Bankruptcy Code provides:

> (c) There shall be estimated for purpose of allowance under this section —
>
>  (1)  any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
>
>  (2)  any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c).

81.     As the plain language of section 502(c)(1) makes clear, an estimation methodology only applies to claims for which fixing the amount of the claim is not possible — *i.e.*, it is contingent or unliquidated — and would unduly delay the administration of the case. *See O'Neill v. Cont'l Airlines (In re Cont'l Airlines)*, 981 F.2d 1450, 1461 (5th Cir. 1993) ("In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice"); *First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992) ("where a claim, premised upon the debtor's joint and several liability as co-maker of a note, is neither 'contingent' nor 'unliquidated,' estimation pursuant to section 502(c)(1) is simply inappropriate").

82.     However, the RMBS Trustees' attempts to convert the RMBS Claims into contingent, unliquidated amounts are not persuasive.  First, based upon recent developments under New York case law, the repurchase claims should not be deemed "contingent" because a repurchase claim arises, if at all, at the time of the loans' original sale.  *ACE Secs. Corp. v. DB*

*Structured Prods. Inc.*, 112 A.D.3d 522, 523 (1st Dep't 2013).  In fact, the RMBS Trustees'

own determination that each breach materially and adversely affected the value of the loans

means that, in their view, all elements of the RMBS Claims existed at the time of sale.

Therefore, by the RMBS Trustees' own admission, their claims are not contingent on a future

event.

83.    Second, the RMBS Claims are not unliquidated because any actual, quantifiable

losses incurred as a result of a breach of a representation or warranty that has a material and

adverse effect on the value of the underlying mortgage loan are determinable by "simple

calculation."  (Motion ¶ 36)  The Governing Agreements provide that any loans subject to

repurchase must be repurchased at the "Purchase Price," which is generally defined as follows:

> With respect to the repurchase of a Mortgage Loan pursuant to this Agreement, an
> amount equal to the sum of (a) 100% of the unpaid principal balance of such
> Mortgage Loan,[22] (b) accrued interest thereon at the Mortgage Rate, from the date
> as to which interest was last paid to (but not including) the Due Date immediately
> preceding the related Distribution Date, (c) any costs and damages incurred by the
> Trust Fund with respect to such Mortgage Loan in connection with any violation
> of any federal, state or local predatory or abusive lending laws or other similar
> laws and (d) any unreimbursed Servicing Advances with respect to such
> Mortgage Loan.  (Ex. E § 1.01)

84.    Thus, the purchase price is a liquidated damages equation — *i.e.*, a "simple

calculation" — that effectively puts the parties back in the positions they would have been had

the loan not been sold in the first place, and that can be calculated through loan-by-loan review.

Because the Purchase Price equation can be applied to a loan at any point in its life-cycle

(performing, non-performing, pre-liquidation, post-liquidation), by simply applying loan-level

inputs, the RMBS Trustees' claims cannot be said to be unliquidated.  That the RMBS Trustees

are unwilling to engage in the loan-by-loan analysis and calculations that are mandated by the

---

[22]    Lehman notes for the Court that the unpaid principal balance gives effect to any collateral liquidation
proceeds or other amounts received or reductions agreed to in mitigation of the RMBS Claims.

Governing Agreements, does not transform such calculations into an unfathomable, unascertainable and unliquidated amount.

85.     Section 502(c) also does not apply because resolving the claims will not unduly delay administration of the case, notwithstanding the RMBS Trustees' assertions to the contrary.  This is particularly true if an expedited, achievable loan-level review process is implemented, as requested by the Cross-Motion.

86.     Moreover, any delay associated with engaging in a loan-by-loan claim reconciliation process is entirely of the RMBS Trustees' own making.  More than five years have passed since the RMBS Claims were filed.  During that entire period, the RMBS Trustees could have engaged in the loan-by-loan claim reconciliation process, but chose not to.  Now, at the eleventh hour, and seemingly under legal pressure from their certificate-holders,[23] they present the Estimation Motion before this Court and suggest that any claim methodology other than estimation would be too time consuming and costly.  But the costs to the Lehman estate from such an approach are extreme.  In addition to grossly inflated claims being possibly allowed, the Lehman estate would also suffer from a severely hindered right to pursue downstream litigation against the ultimately responsible parties.

87.     The general rule and practice in bankruptcy proceedings is to liquidate a claim rather than to estimate it.  As the court observed in *In re Dow Corning Corp.*, "[f]rom the plain language of § 502(c), it is clear that estimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case.  Liquidation of a

---

[23]     In June 2014, a large group of RMBS Trust certificate holders filed a series of derivative lawsuits for billions of dollars in damages against certain of the RMBS Trustees, alleging that they abdicated their responsibilities as trustees, and "wholly failed to discharge [their] duties and obligations to protect their Trusts."  (*See, e.g.*, Complaint in *Blackrock Allocation Target Shares v. U.S. Bank Nat'l Ass'n*, No. 651864/2014 (N.Y. Sup. Ct. June 18, 2014) ¶ 1; *see also* Complaint in *Blackrock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*, No. 651865/2014 (N.Y. Sup. Ct. June 18, 2014) ¶ 1)  The certificate-holders asserted a variety of legal claims against the RMBS Trustees including breach of contract, breach of fiduciary duty, negligence, and violations of the Trust Indenture Act of 1939.  (*See id.*)

claim, in fact, will almost always be more time consuming than estimation. Nonetheless, bankruptcy law's general rule is to liquidate, not to estimate." *In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997).

88.     Further, there is another alternative that comports with the Bankruptcy Code's liquidation mandate, is efficient, and consistent with the Governing Agreements between the parties:  the RMBS Protocol.  The RMBS Protocol would allow the Court to address *all* of the Claims asserted by the RMBS Trustees.  As discussed in Section III below, the RMBS Protocol is well suited to claims resolution in this case because it preserves the benefit of the parties' bargain while simultaneously producing accurate recovery amounts on the RMBS Claims on a timely schedule.

**B.     The Governing Agreements Do Not Permit Estimation.**

89.     As discussed in detail above (*supra* ¶¶ 43-52), the Governing Agreements set forth a specific and detailed mechanism through which the RMBS Trustees must pursue claims on defective loans.  This mechanism is the *only* method that the Governing Agreements, which were negotiated and agreed to by the RMBS Trustees, contemplate for recovery on defective loans.  Estimation (by sampling or otherwise) is not contemplated by the Governing Agreements and is therefore an extra-contractual remedy the RMBS Trustees have proposed as a means of avoiding the loan-by-loan claims reconciliation process prescribed by the Governing Agreements, and consequently depriving Lehman of its contractual rights.  Additionally, the proposed estimation methodology is nothing more than an attempt to recover a higher amount than would otherwise be available under the Governing Agreements through the loan-by-loan reconciliation process.

90.     For LBHI to compensate the trusts for their losses, the Governing Agreements specifically require that the RMBS Trustees prove each of the following *for each mortgage loan*:

(1) a breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that Lehman had prompt notice of the material and adverse breach.[24] (Ex. E § 1.04(d), Ex. F § 2.04)

91. Importantly, the Governing Agreements unambiguously provide that the three aforementioned required elements must be satisfied for each mortgage loan to recover under each such mortgage loan.[25] Under the Governing Agreements, the repurchase remedy is set forth as follows:

> Upon discovery by any of the Depositor, the Master Servicer or the Trustee of a breach of any such representations and warranties *that adversely and materially affects the value of the related Mortgage Loan*, the party discovering such breach shall give prompt written notice to the other parties…. Within 90 days of the discovery of a breach of any representation and warranty given to the Trustee by the Depositor, any Transferor or Lehman Holdings . . . the Depositor, such Transferor or Lehman Holdings shall either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan . . . at the Purchase Price, or (c) . . . substitute a Qualifying Substitute Mortgage Loan for the affected Mortgage Loan. (Ex. F § 2.04 (emphasis added))

As shown above, the defined term, Mortgage Loan, is singular and the repurchase remedy applies to such Mortgage Loan (*i.e.*, a specific mortgage loan).

92. Moreover, the defined term, Purchase Price, can only be applied at the loan level because it requires loan-level inputs:

> With respect to the repurchase of a Mortgage Loan pursuant to this Agreement, an amount equal to the sum of (a) 100% of the unpaid principal balance of such

---

[24] The requirement that the RMBS Trustees prove the breach claims on a loan-by-loan basis is amplified by the provision of the Governing Agreements that provides their remedy, the "Purchase Price," which cannot be calculated without loan-specific inputs such as unpaid principal balance, accrued interest, and unreimbursed servicing advances (*supra* ¶¶ 83-84). (Ex. E § 1.01)

[25] In addition to these conditions, the Governing Agreements generally require the RMBS Trustees to (i) provide Lehman with notice, within 45 days of delivery of the mortgage-loans file to the Trusts, of any alleged defects in the SASCO-related mortgage-loan files ("45 Day Notice"); and (ii) deliver a final certification to Lehman, within 180 days of the closing date of the securitization of the mortgage-loans being placed into a given trust, evidencing the completeness of the mortgage-loan files and noting any exceptions ("180 Day Certification"). (Ex. F § 2.02(b), (c) and (d))

Mortgage Loan, (b) accrued interest thereon at the Mortgage Rate, from the date as to which interest was last paid to (but not including) the Due Date immediately preceding the related Distribution Date, (c) any costs and damages incurred by the Trust Fund with respect to such Mortgage Loan in connection with any violation of any federal, state or local predatory or abusive lending laws or other similar laws and (d) any unreimbursed Servicing Advances with respect to such Mortgage Loan. *Id.* § 1.01.

93.     Therefore, as a practical matter, a breach rate of "x"% in a sample population (such as that proposed by the RMBS Trustees (*see* Motion ¶ 4)), could not be applied to the contractual remedy because each of the inputs are loan level and loan specific.  Additionally, the relevant RMBS Trust only has a valid claim if the breach had a material and adverse effect on the value of the related mortgage loan, meaning that a trustee would have to establish that the breach caused the mortgage loan to lose value.

94.     Using an estimation methodology to reach a figure for the RMBS Claims, therefore, does not comport with either the Governing Agreements' requirements for claim reconciliation, or the fact that all the mortgage loans at issue in the RMBS Claims are not mortgage loans for which LBHI bears liability (provided that the RMBS Trustees have been able to demonstrate that there was a breach of the representations and warranties related to such mortgage loan that had a material and adverse effect on the value of such mortgage loan).  Under even this most simple of analyses, estimation is an entirely improper method for calculating the actual amounts recoverable by the RMBS Trustees in connection with the claims.

**C.     The Underlying Economics Do Not Permit Estimation.**

95.     When LBHI entered into the Governing Agreements, it specifically bargained for a claim reconciliation process that would allow it to pursue claims, if and where applicable, against downstream mortgage-loan originators.  As discussed above (*supra* Section III.B), many of the mortgage loans were acquired by LBHI from loan originators that made representations and warranties about the quality of these loans — loans that LBHI then

packaged and sold into the RMBS Trusts. A key component of this process was that LBHI duplicated the representations and warranties made by the mortgage-loan originators, meaning that the representations and warranties made by LBHI to the Trusts were the same as the representations and warranties made by the mortgage-loan originators to LBHI.

96.     The key facet of this process was that if, after following the loan reconciliation process provided in the Governing Agreements, LBHI was found liable for a breach of the representations and warranties related to a particular mortgage loan that had a material and adverse effect on the value of such mortgage loan, then LBHI could seek indemnification from the downstream originator for the claimed amount. LBHI could seek this indemnification precisely because the original representations and warranties on the mortgage-loan were made by the original downstream originator to LHBI, not by LBHI. As a result, in its agreements with the downstream originators, LBHI preserved the right to seek indemnification from the downstream originators for liability that resulted from breaches.

97.     For LBHI to obtain indemnification from the downstream originators, the RMBS Trustees must prove their claims have been reviewed and reconciled at the loan level. Without the Governing Agreements and adherence by the RMBS Trustees to the claim reconciliation process set forth therein, the Debtors — and hence the estates and their creditors — may be left with no remedy with respect to their own indemnification rights against the downstream mortgage-loan originators.

98.     LBHI bargained for and agreed with the RMBS Trustees to the loan-by-loan claim reconciliation process, set forth in the Governing Agreements. To suddenly — after years of waiting for the RMBS Trustees to prove-up their claims in accordance with the Governing Agreements — shift gears in contravention of the parties' bargain, and endorse an

estimation methodology, would not only improperly disregard the parties' bargain, but also create a summarily inequitable process. Through estimation, the RMBS Trustees would flout the requirements of their agreed upon bargain in the Governing Agreements. By so doing, the RMBS Trustees would also endanger LBHI's downstream remedy against the mortgage-loan originators.

99. Estimation cannot be upheld as an applicable claim determination methodology because it denies LBHI the benefit of its bargain — to be accountable only for breaches that caused losses and to pursue its indemnification rights against downstream mortgage loan originators. Where the RMBS Trustees are asserting billions of dollars in liability, this would lead to a greatly inequitable result.

## III. THE COURT SHOULD GRANT LEHMAN'S CROSS-MOTION TO ESTABLISH A CLAIMS RESOLUTION PROTOCOL.

100. Lehman cross-moves for entry of an order establishing a detailed and binding timeline and claims resolution protocol, in the form attached as <u>Exhibit C</u> hereto, for an efficient RMBS Claims resolution process. If the Court enters an order establishing such protocol, resolution of the RMBS Trustees' claims will not require protracted discovery and litigation, but can instead be accomplished on a loan-by-loan basis, as mandated by the Governing Agreements.

101. Section 105(a) of the Bankruptcy Code provides that the "Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a), the Bankruptcy Court has expansive equitable powers to achieve fairness and justice in the reorganization process. *See, e.g., Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke equitable

principles to achieve fairness and justice in the reorganization process."); *Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n (In re Croton River Club, Inc.)*, 52 F.3d 41 (2d Cir. 1994) (holding that bankruptcy courts have broad equity power to manage affairs of debtors); *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

102.    Section 105(d) of the Bankruptcy Code provides:

> The court, on its own motion or on the request of a party in interest, (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and (2) *and unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically* . . . .

11 U.S.C. § 105(d) (emphasis added).

103.    The unique circumstances of this case warrant implementation of the RMBS Protocol.  The RMBS Trustees are obligated to provide loan-level proof of their claims pursuant to the repurchase clauses in the Governing Agreements.  Prior to Lehman's bankruptcy, repurchase demands on LBHI-sponsored RMBS trusts were made and carefully validated on a loan-by-loan basis, as required by the Governing Agreements.  Neither Lehman's bankruptcy, nor the filing of their proofs of claim, enables the RMBS Trustees to

recover without the required proof.  *See LTV Steel Corp. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir. 1995) ("A [valid bankruptcy] claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and creditor contained *all of the elements* necessary to give rise to a legal obligation — 'a right of payment' — under the relevant non-bankruptcy law.") (emphasis added, quotations omitted).  In this case, the legal relationship between Lehman and the RMBS Trustees is governed by the Governing Agreements.  Pursuant to the Governing Agreements, loan-level proof is a predicate to any repurchase recovery.

104.    Yet, more than six years have passed since the Debtors' bankruptcy filing, more than five years have passed since the Bar Date, and over three years have passed since the Court notified the RMBS Trustees that they will be required to produce individual loan files and prove up their Claims.   Implementation of an expeditious and economic process is necessary.  The RMBS Protocol meets these criteria by creating a clear and consistent process that will facilitate the resolution of the RMBS Trustees' Claims in an expeditious manner.

105.    Specifically, the RMBS Protocol proposes the following steps:

Step 1:  *Production and review of claims files process.*  In this first step, the RMBS Trustees, within sixty (60) days of the entry of the order establishing the RMBS Protocol, shall deliver to the Plan Administrator complete claim files on a loan-by-loan basis.  The Plan Administrator will then determine whether it agrees with the alleged material breaches identified in each claim file.  Approved claim files will proceed directly to claim allowance (Step 3 below).  Rejected claim files will proceed to a claim facilitation process (Step 2 below).  Any RMBS Claims related to claim files not delivered within the sixty (60) day deadline would be disallowed.

Step 2:  *Non-binding dispute resolution procedure to resolve claim files disputes.* In this second step, a Court-appointed claim facilitator will oversee a non-binding claims resolution process.  The process will involve submission by each party of a brief statement laying out its position with respect to a disputed claim file.  The claim facilitator will then review the disputed file and make a determination on the validity of the claimed breach, which shall be filed with the Court.

<u>Step 3</u>: *Court review and approval of claims*. In this third and final step, the Plan Administrator will proceed with distributions on approved and/or agreed upon claims. With respect to disputed claim files reviewed by the claim facilitator (described in Step 2), if there is no objection to the claim facilitator's decision, the Court would then proceed with approval or rejection of those claim files. For claim files where there is a dispute over the claim facilitator's decision, the Court would allow a further objection process, at the end of which any outstanding disputed claim files will be resolved and distributions from the estate, if any, shall proceed.

106. Implementation of the RMBS Protocol will not unduly delay administration of the estate, as the RMBS Protocol contemplates an expedited, but achievable, resolution of the RMBS Claims. Further, implementation of the RMBS Protocol will not prejudice the RMBS Trustees' substantive rights as the RMBS Protocol provides the RMBS Trustees with sufficient opportunity to prosecute the RMBS Claims, especially in light of the number of years that have passed since the claims were filed. If the RMBS Trustees have been fulfilling their obligations under the Governing Agreements, they should be in a position to produce the necessary files under the RMBS Protocol within 60 days. If not, the delay is of their own doing, and this estate should not be penalized for their inactivity.

## **NOTICE**

107. No trustee has been appointed in these Chapter 11 cases. Lehman has or will provide notice of this Objection and Cross-Motion on (i) the U.S. Trustee for Region 2; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for each of the RMBS Trustees; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the Second Amended Order, entered on June 17, 2010, governing case management and administrative procedures for these cases. (Dkt. No. 9635) The Plan Administrator submits that no other or further notice is necessary or required.

108.     Except as set forth herein, no previous request for the relief sought herein has been made to this or any other Court.

109.     The Plan Administrator has cited to the legal authorities upon which it relies within the body of this Objection and Cross-Motion.  Accordingly, the Plan Administrator respectfully submits that the Objection and Cross-Motion satisfy the requirement of Local Bankruptcy Rule 9013-1(b) that a memorandum of law be submitted herewith.

## **CONCLUSION**

110.     WHEREFORE Lehman respectfully requests:  (a) entry of an order denying the Motion; (b) entry of an order, substantially in the form annexed hereto as Exhibit D approving the RMBS Protocol; and (c) and further relief as may be just or proper.

Dated:  October 15, 2014
        New York, New York

/s/ Todd G. Cosenza
Paul V. Shalhoub
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-9000

Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)
JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Telephone: (303) 573-1600
Facsimile: (303) 573-8133

*Attorneys for Debtors Lehman Brothers Holdings Inc. and certain of its affiliates*