Paul J. Lawrence
Kymberly K. Evanson
PACIFICA LAW GROUP
1191 2nd Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 245-1700
Fax: (206) 245-1750

Robert N. Michaelson
Eric T. Moser
RICH MICHAELSON MAGALIFF MOSER, LLP
340 Madison Avenue, 19th Floor
New York, New York 11073
Tel: (212) 220-9404
Fax: (212) 913-9642

*Attorneys for Washington State Tobacco Settlement Authority*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**WASHINGTON STATE TOBACCO SETTLEMENT AUTHORITY'S**
**PRE-HEARING BRIEF**

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND..........................................2

        A.      TSA and its Reserve Fund ..........................................................2

        B.      TSA's Request for Bids ..............................................................3

        C.      The Reserve Fund Agreement ...................................................4

        D.      The Termination Amount ..........................................................5

        E.      Lehman's Valuation and Hedges ...............................................7

        F.      Lehman's Breach .......................................................................9

        G.      TSA's Claim ..............................................................................9

        H.      TSA's Reinvestment of the Reserve Fund Since Lehman's Breach..........10

III.    EXPERT VALUATIONS...............................................................................12

        A.      TSA's Expert Valuations .........................................................13

                1.      First Method: Hypothetical Replication.........................13

                2.      Second Method: Projected Return ................................14

        B.      Lehman's Expert Valuation: Mid-Market Forward Curve ......................17

IV.     STATEMENT OF ISSUES ..........................................................................20

V.      STANDARD OF REVIEW ..........................................................................20

VI.     POINTS AND AUTHORITIES ...................................................................21

        A.      TSA is Entitled to Determine the Amount it is Owed for Lehman's
                Breach of the RFA. ..................................................................21

        B.      TSA's Determination of the Termination Amount is Binding on the
                Parties Absent Manifest Bad Faith or Unreasonableness. ........................22

        C.      TSA May Determine its Total Losses by Estimating the Hypothetical
                Price for Replacing the RFA, Projecting its Future Return Without the
                RFA, and/or Incorporating its Actual Losses to Date..............................24

                1.      Hypothetical replacement and projecting future return are both
                        reasonable ways of calculating TSA's losses. .............................24

2. TSA's actual losses support its determination of the Termination Amount .......................................................................................25

3. Lehman's mid-market valuation is not an appropriate method to determine TSA's total losses and costs..........................................27

4. TSA is not required to calculate its total losses and costs "as if it were Lehman". ................................................................28

D. TSA's Experts Have Conducted Their Valuations Without Manifest Bad Faith or Unreasonableness................................................29

1. Lehman cannot demonstrate that Peter Shapiro's calculation of the Termination Amount via hypothetical replication constitutes manifest error. ..............................................30

2. Lehman cannot demonstrate that Curry and Hasterok's projected return methodology constitutes manifest error. ..........................31

3. Gruer's calculation of TSA's Section 7.7(b) losses conflicts with the RFA.................................................................34

VII. CONCLUSION....................................................................35

## TABLE OF AUTHORITIES

### Cases

*67 Wall St. Co. v. Franklin Nat'l Bank,*
  37 N.Y.2d 245 (1975) ........................................................................................ 22

*Atl. Term. Urban Renewal Area Coal. v. N.Y. City Dep't of Envtl. Prot.,*
  740 F. Supp. 989 (S.D.N.Y. 1994) ..................................................................... 31

*Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.,*
  910 F. Supp. 2d 629 (S.D.N.Y. 2012) ........................................................ 21, 25

*Boyce v. Soundview Tech. Group, Inc.,*
  464 F.3d 376 (2d Cir. 2006) .............................................................................. 26

*Bregman v. Meehan,*
  125 Misc.2d 332 (N.Y. Sup. Ct. 1984) .............................................................. 36

*DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l,*
  80 A.D.3d 448 (N.Y. App. Div. 2011) ............................................................... 23

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
  479 F. Supp. 2d 349 (S.D.N.Y. 2007) ............................................................... 25

*Harris v. Provident Life and Acc. Ins. Co.,*
  310 F.3d 73 (2d Cir. 2002) ................................................................................ 31

*In re Am. Home Mortg. Holdings, Inc.,*
  637 F.3d 246 (3d Cir. 2011) .............................................................................. 26

*In re Arcapita Bank B.S.C.(c),*
  508 B.R. 814 (S.D.N.Y. 2014) ........................................................................... 20

*In re Bradlees Stores, Inc.,*
  313 B.R. 565 (S.D.N.Y. 2004) ........................................................................... 21

*In re Delmarine, Inc.,*
  535 F. Supp. 2d 318 (E.D.N.Y. 2008) ............................................................... 35

*In re Loews Cineplex Ent'm't Corp.,*
  No. 04 Civ. 612(HB), 2004 WL 875819 (S.D.N.Y. Apr. 23, 2004) ..................... 27

*Kalisch-Jarcho, Inc. v. City of New York,*
  58 N.Y.2d 377 (1983) ........................................................................................ 23

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - iii

*O'Neil Supply Co. v. Petroleum Heat & Pwr. Co.*,
 280 N.Y. 50 (1939) ......................................................................................... 22

*People ex rel. Four Park Ave. Corp. v. Lilly*,
 37 N.Y.S.2d 733 (N.Y. App. Div. 1942) ....................................................... 26

*Rattigan v. Commodore Int'l Ltd.*,
 739 F. Supp. 167 (S.D.N.Y. 1990) .......................................................... 21, 29

*Richland v. Crandall*,
 262 F. Supp. 538 (S.D.N.Y. 1967) ................................................................ 27

*Schron v. Troutman Sanders LLP*,
 20 N.Y.3d 430 (2013) ..................................................................................... 22

*Sharma v. Skaarup Ship Mgmt. Corp.*,
 916 F.2d 820 (2d Cir. 1990).......................................................................... 28

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
 289 U.S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933)................................ 27, 28

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
 487 F.3d 89 (2d Cir. 2007)................................................................. 24, 26, 34

*Travelers Cas. and Sur. Co. of Am. v. Pac. Gas and Elec. Co.*,
 549 U.S. 443, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007)...................... 20, 21

Statutes and Regulations

11 U.S.C. § 502.................................................................................................... 21

11 U.S.C. § 562.............................................................................................. 11, 26

Fed. R. Bankr. Pro. 3001..................................................................................... 20

Wash. Rev. Code § 43.340.005............................................................................ 2

Wash. Rev. Code § 43.340.080............................................................................ 2

Wash. Rev. Code § 43.340.110............................................................................ 2

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - iv

Other Authorities

BLACK'S LAW DICTIONARY (9th ed. 2009) .................................................................................. 23

Charles A. E. Goodhard and Wen Bin Lim, *Interest Rate Forecasts: A Pathology*,
7 INT'L J. OF CENTRAL BANKING 135 (2011) .......................................................................... 33

Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?*, WWW.INTUITIVE-
ANALYTICS.COM (2013)............................................................................................................ 34

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - v

## I.  INTRODUCTION

This dispute concerns the calculation of the "Termination Amount" resulting from the default and rejection by Debtors Lehman Brothers Special Financing Inc. and Lehman Brothers Holdings Inc. (collectively, "Lehman") of a reserve fund agreement ("RFA") with the Washington State Tobacco Settlement Authority ("TSA").  In that contract, Lehman agreed to pay TSA a guaranteed rate of return of 4.484% on TSA's $45.53 million reserve fund until 2032 in exchange for Lehman's right to invest the reserve fund in high-grade, short-term (less than six-month) eligible securities.

The RFA provides how to determine the "Termination Amount".  The preferred method is a market-based process whereby bids are obtained to find a replacement RFA.  Since Lehman's rejection, however, no other dealer has been willing to offer TSA a replacement investment contract that preserved the economic equivalent of TSA's rights under the RFA.  Alternatively, where the requisite bids are not available, the burdened party (i.e., the non-defaulting party) is entitled to determine its total losses and costs reasonably and in good faith.  Such determination is binding absent manifest error.

Here, TSA, the burdened party, has determined its losses and costs reasonably and in good faith, without manifest error.  TSA's experts will explain their methods of valuation designed to accomplish the difficult task of measuring TSA's losses as of the rejection date in the absence of a functioning market for Tobacco RFAs.  TSA will also describe the substantial actual losses it has suffered to date.  In contrast, Lehman's experts will opine on finance industry practices irrelevant to TSA, including the use of forward curves for which no functioning hedge market existed or now exists.  Because TSA has determined the Termination Amount reasonably and in good faith, the Court should allow TSA's claim for that amount.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 1

## II.  FACTUAL AND PROCEDURAL BACKGROUND

**A.**    **TSA and its Reserve Fund**

In 2002, the Washington State Legislature created TSA in order to monetize future annual payments from tobacco manufacturers to Washington State as part of the national tobacco litigation settlement.  *See* Wash. Rev. Code § 43.340.005.  Washington assigned a portion of its ongoing tobacco revenue stream to TSA, which in turn issued bonds secured by that revenue stream.  *See id.*; Docket No. 46543 ("Undisputed Facts") at ¶¶ 2-4.  TSA has been paying back bondholders since that time and will continue to receive a specified portion of Washington's tobacco revenue stream so long as bonds remain outstanding.  *See* Wash. Rev. Code § 43.340.080(2).  Once TSA's bonds are paid off, TSA's portion of the tobacco revenue stream will revert to the State of Washington for further use in promoting public purposes in Washington.  *See* Wash. Rev. Code § 43.340.110.

In conjunction with issuing the Bonds, TSA entered into an "Indenture".  The Indenture required the establishment of a $45.53 million Liquidity Reserve Account (the "Reserve Fund") to insure the semi-annual payment obligations under the Bonds.  The Indenture further restricted how TSA's portion of Washington's tobacco revenue stream could be invested including the $45.53 million Reserve Fund.  *See* Joint Ex. 3 at 4-7, 20-23, 26-28; Undisputed Facts at ¶ 10.  In addition to the Indenture requirements, TSA as an instrumentality of the State of Washington is subject to restrictions on its investment activities and the use of public funds.  For example, state law expressly prohibits TSA from engaging in any swap agreements without an established policy to address numerous identified risks.  TSA also has limited administrative resources, requiring avoidance of overly burdensome or complex investment instruments.  Kim Herman,

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 2

the executive director of TSA, and Bob Cook, its senior finance director, will testify regarding the TSA, the bond, the Indenture and its investment activities.

**B.     TSA's Request for Bids**

After issuing its bonds, TSA's financial advisor identified that a number of similar state agencies had invested their Reserve Funds in forward purchase agreements.  On October 22, 2002, TSA distributed a "Request for Bids" ("RFB") to qualified financial institutions, "seeking bids for a fixed rate" of return on the Reserve Fund through 2032, in exchange for the financial institution's ability to make permissible, low-risk short term investments with the Reserve Fund, and with a third-party trustee serving as depository for the assets and investments. Joint Ex. 4. The Reserve Fund would need to be liquid and accessible in full every six months.  *Id.* at ¶ 2. And TSA would be allowed to withdraw the Reserve Fund if necessary to make bondholder payments or in the event that bondholders would be repaid in full.  *See id.* at ¶ 19.  The RFB also contained a number of contract conditions.

TSA requested bids for both a "market break" structure and a "par break" structure.  The "market break" structure would have required that TSA make termination payments to the dealer under certain circumstances, such as a faster than anticipated redemption due to unexpected variations in tobacco settlement revenues.  The "par break" structure allowed TSA to terminate the transaction with no breakage fee in the event that the bonds were retired early due to greater than anticipated tobacco revenues, default, late payments, etc.  In effect, the par break structure transferred all risk of Tobacco Settlement related credit and market events to the dealer.  *See id.* at ¶¶ 11, 19.  TSA chose to pursue the "par break" structure.

In response to the Request for Bids, TSA received five bids, with proposed fixed rates of return ranging from 3.510% from Salomon SB to 4.484% from Lehman for the par break

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 3

structure.  Joint Ex. 5 at 1.  TSA accepted Lehman's bid of 4.484%, which had been made

without any proposed change in conditions.  Bob Cook will confirm that at the time, TSA

believed that its agreement with one of the largest investment banks in the world, at a guaranteed

rate of return for 30 years, was a very low-risk and well-protected investment.  Indeed, TSA had

accepted bids only from financial institutions with very high long-term credit ratings.

Although the RFB identified three eligible securities that could be delivered, Lehman

priced its bid based on the delivery of commercial paper rated P-1 by Moody's and A-1+ by

Standard and Poor's.  The pricing of a bid response based on the expectation to deliver

commercial paper as opposed to other eligible securities was standard in the industry.

## C.    The Reserve Fund Agreement

After Lehman's bid was selected, Lehman drafted a proposed contract.  The parties then

entered into negotiations concerning the various terms of the proposed contract.  As a result of

negotiations, various terms of the contract were changed.  The parties finally entered into the

RFA on November 5, 2002.  Undisputed Facts at ¶ 12.

Under the RFA, Lehman agreed to provide TSA a fixed rate of return of 4.484% through

2032.  *See* Joint Ex. 1 at 2; Joint Ex. 2 at 5.  Lehman further agreed that it would invest TSA's

Reserve Fund on a semiannual basis in a narrow list of low-risk "Eligible Securities" and that the

funds would be liquid and accessible every six months to correspond with bond payment dates;

that the parties would use a third party trustee, U.S. Bank, to oversee and protect the assets and

investments; and that TSA had the ability to withdraw the Reserve Fund without a termination

payment if and when necessary to pay bondholders.  Joint Ex. 1 at 1-2, 4, 6-8, Ex. A.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 4

**D.    The Termination Amount**

The parties agreed on certain terms to govern in the event of a default and termination. The RFA specifies that if one party defaults and the agreement is terminated as a result, a "Termination Amount" must be paid. *Id.* at 18-20.  In the RFA, the Termination Amount is defined as "an amount, as determined *by the Burdened Party* reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount . . . such Dealer would require . . . or would pay . . . [for] an agreement . . . preserving for the Burdened Party the economic equivalent of its rights under this Agreement . . . ." *Id.* at 5 (emphasis added).  The RFA further provides that "if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs . . . or gains . . . including any loss of bargain . . . ." *Id.*

Regardless of whether the preferred market "quotations" method or the alternative "total losses" method is used to determine the Termination Amount, the final calculation "shall also include . . . amounts due under Section 7.7 [i.e., losses from nonperformance prior to termination] . . . [and] any incidental costs and expenses incurred by the Burdened Party . . . (including costs of collection and reasonable attorneys' fees)." *Id.* at 5-6.

Finally, the RFA's definition of the "Termination Amount" states that "[a]ny determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error." *Id.* at 6.

TSA, as the burdened party, has calculated the Termination Amount based on this definition.  Lehman's position on the definition of the Termination Amount is not entirely clear. Lehman has on occasion cited to an RFA provision providing that in case of a Lehman default

and resulting termination, "Lehman shall determine the Termination Amount" and "pay such amount," and "if Lehman fails to determine the Termination Amount within three Business Days . . . then [TSA] shall make such determination as if it were Lehman . . . ." *Id.* at 19-20. This provision does not purport to change the definition of "Termination Amount" in the RFA. Neither Lehman nor its experts rely on the "as if it were Lehman" provision in making Lehman's alternative calculation of the Termination Amount. So Lehman's criticism of TSA's refusal to rely on the "as if it were Lehman" language is difficult to understand. Regardless, the only method specified in RFA for calculating the "Termination Amount" is that in the RFA definition above.

The drafting history of the RFA confirms that TSA is entitled to determine the Termination Amount in accordance with the definition of that term in the RFA. Initially, TSA's Request for Bids specified that a "Termination Amount" would be payable in case of a default and resulting termination. Joint Ex. 4 at ¶¶ 22, 29. The Termination Amount was defined as "[a]n amount determined by the burdened party, or a third party acceptable to both parties, in good faith and on the basis of the arithmetic mean of quotations from at least three Dealers of the . . . [price for] an agreement . . . preserving for the burdened party the economic equivalent of its rights under the Agreement . . . ." *Id.* at ¶ 22.

In contrast, Lehman's initial draft of the RFA defined the Termination Amount as "an amount, as determined *by Lehman* reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers . . . ." TSA Ex. E at 4-5 (emphasis added). Lehman's draft elsewhere included the "as if it were Lehman" provision. *Id.* at 18-19.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 6

TSA noticed that Lehman had altered the definition of the Termination Amount from that found in the Request for Bids and requested that appropriate revisions be made. In emails, TSA specifically asked for the Termination Amount to be determined either by the "Burdened Party"—i.e., the non-defaulting party—or by a third party, consistent with the Request for Bids. TSA Ex. F at 2; Ex. H at 2. In response, Lehman assured TSA that it would "change" this aspect of the contract "to a determination by [the] Burdened Party . . . ." TSA Ex. F at 2; *see also* Ex. H at 2. Lehman's subsequent draft changed the definition of "Termination Amount," as requested, to be consistent with the RFB. *See* TSA Ex. I at 5-6. The revised definition was agreed upon and is now found in the RFA. *Id.*; Joint Ex. 1 at 5-6. But contrary to the agreement between the TSA and Lehman, Lehman left in the RFA the "as if it were Lehman" provision. The clear intent of the parties, however, was that the burdened party would determine the "Termination Amount" as per the definition in the RFA.

**E.    Lehman's Valuation and Hedges**

In conjunction with the execution of the RFA, Lehman entered into four transactions to hedge the risks associated with the deal. Lehman would typically hedge risk on transactions, including risk of interest rate fluctuation, risk that a counterparty might draw on its reserve fund, thus causing the RFA to terminate—commonly referred to as "credit risk"—and other such risks. Specifically, Lehman executed three interest rate swaps, including a hedge to receive a rate of 5.243% on $30 million for 15 years, a hedge to receive a rate of 5.5475% on $15 million for 30 years, and a hedge to pay 5.23% on $5 million for 15 years. Additionally, the municipal desk bought a "straddle" which gave it the option to enter into a swap in which it would make a one-time election to pay or receive a rate of 6.60% for 10 years starting 10/28/09 through 10/28/19. Apparently, this was done to protect against interest rate risks due to the variability of tobacco

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 7

settlement revenues.  While the documents produced in discovery do not specify, presumably the floating rate in these swap transactions was 3-month LIBOR.

When Lehman valued the RFA upon execution, it included several elements: (1) the anticipated cash flow to Lehman earned from buying commercial paper to be delivered under the RFA, (2) the cost to Lehman of paying TSA the guaranteed rate of 4.484%, (3) a credit mitigation specific to the risk associated with tobacco bonds, (4) the value of the hedges placed in connection with the RFA, (5) profit, (6) basis risk between the LIBOR floating leg on its swaps and the rate at which it could purchase A-1+/P-1 Commercial Paper, and (7) other costs associated with the trade.  The valuation was not a mid-market calculation of the type used by Lehman's expert in this case, Samuel Gruer.

Moreover, in 2003, Lehman negotiated a new transaction to hedge the risk from the RFA. Specifically, Lehman negotiated with SunAmerica Life Insurance Company, a subsidiary of AIG, for the creation of the Briarwood Trust.  Pursuant to the Briarwood transaction, Lehman would purchase Briarwood commercial paper with a guaranteed fixed rate of 4.95% using the proceeds of TSA's Reserve Fund in accordance with the RFA and Indenture.  The agreement was also contingent on the continuing viability of the RFA and the other underlying tobacco deals involved.  Lehman thus hedged the RFA, guaranteeing it would earn the difference between 4.484% and 4.95% on a semiannual basis and shifting all interest rate risk and credit risk to SunAmerica.  Upon the Briarwood transaction Lehman unwound its interest rate swap and straddle transactions and remarked the valuation of the RFA based on the Briarwood transaction.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 8

**F.** **Lehman's Breach**

Until Lehman filed for bankruptcy in the fall of 2008, Lehman fulfilled its obligations under the RFA by solely delivering high-grade commercial paper to be purchased with TSA's Reserve Fund on a semiannual basis. Undisputed Facts at ¶ 18. Subsequent to the Briarwood transaction, Lehman only delivered commercial paper issued by Briarwood. But on December 1, 2008, Lehman failed to deliver any Eligible Securities. *Id.* at ¶ 24. Lehman took no further actions in furtherance of its obligations. On March 25, 2009, the Court authorized Lehman's rejection and termination of the RFA. Lehman's failure to deliver and rejection of the RFA constitute a default and termination entitling TSA as the Burdened Party to determine the Termination Amount that must be paid. Joint Ex. 1 at 5.

**G.** **TSA's Claim**

TSA has filed its claim against Lehman for the "Termination Amount" owed under the RFA. To make its initial determination of the Termination Amount, TSA retained the services of Swap Financial Group, a leading independent swap advisor with experience in public finance and financial derivative products. As Kim Herman will explain, TSA selected Swap Financial to assist with the determination because Swap Financial was highly qualified, had substantial prior experience with investment instruments similar to the RFA, and also because TSA wanted a financial services provider not previously involved with the underlying agreement, in part to avoid any potential appearance of bias.

Pursuant to the RFA's definition of "Termination Amount," TSA's first step was to seek market quotations for a replacement agreement. As Peter Shapiro will testify, Swap Financial sought market quotations from every conceivable dealer but found that no dealer was willing to enter into a replacement transaction. No investment bank or other dealer was willing to offer, at

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 9

any price, the terms that Lehman had agreed to under the RFA.  TSA Ex. Y at ¶ 17.  Lehman

also attempted to obtain three market quotations but was unable to do so.  *See* TSA Ex. R.  The

parties' experts "agree . . . that the market for new reserve fund agreements was inactive" on the

rejection date.  Lehman Prop. Ex. 124 at ¶ 39.  The parties also acknowledge that even today,

this product is not offered and the market is inactive.

Because no market existed (or exists today) for a replacement agreement and quotes were

unavailable, TSA's next step was to determine reasonably and in good faith its "total losses and

costs . . . or gains" resulting from Lehman's termination of the RFA.  Joint Ex. 1 at 5.  TSA

eventually calculated its total losses to be $38,560,427 and has filed a claim for that amount plus

costs and expenses incurred with the termination and enforcement of its rights (including

reasonable attorneys' fees).  Lehman objected, indicating that it believed TSA's claim is worth

only $4.3 million.

## H.    TSA's Reinvestment of the Reserve Fund Since Lehman's Breach

TSA has suffered substantial actual losses in the wake of Lehman's bankruptcy and

breach of the RFA.  As Bob Cook will explain, TSA has invested the Reserve Fund in two

money market accounts, a permissible investment under the Indenture.  In fact, other than the

RFA, all Tobacco Settlement moneys received by TSA have been invested in money market

accounts since day one.

From Lehman's initial failure to perform in December 2008 through the termination date

on March 25, 2009, these investments provided TSA with a 0.65% rate of return, representing a

loss of $553,080 when compared to the RFA's guaranteed rate of 4.484%.  From December 2008

through September 2013, these investments provided TSA with an even lower average rate of

0.18%.  This represents a loss of $9,467,680.84 when compared to the 4.484% rate that Lehman

guaranteed to TSA through September 2013.

Bob Cook also will testify that TSA has considered alternative investments proposed by

its financial advisors to increase returns, but these alternatives all have been deemed

inappropriate investments for TSA.  They would have involved increased risk of loss compared

to the Lehman RFA; potential complications or conflicts with the Indenture, state law, and/or

TSA's own investment policies; and substantial administrative costs.  Some contained overly

complex and esoteric terms or structures; the inability to ensure sufficient protections (including

bankruptcy opinions) for the Reserve Fund itself; and raised concern over the institutional ratings

and reliability of relevant parties (especially in light of Lehman's bankruptcy); among other

concerns.  Unlike an investment bank, TSA does not specialize in financial trading, does not

have a portfolio of investments or unrestricted capital available for investment, does not have

staff or administrative resources to conduct regular trading, must invest conservatively as a

custodian of public funds, and is limited in the types of investments it can make.  Unlike

Lehman, TSA cannot simply enter into a series of transactions to hedge against the risk

associated with its ongoing semiannual investment of the Reserve Fund, particularly under terms

and conditions that allow it to access its funds in the event they are needed to make a debt

service payment without penalty and without the need to post additional collateral, all of which

factor into TSA's "loss of bargain".  TSA cannot do something as simple as buying a 1-year

treasury because it is limited to purchasing securities with a maturity of six months or less.  In

sum, TSA is not a financial dealer, cannot replace the RFA, cannot enter into hedge transactions,

and is suffering substantial losses as a result of Lehman's breach.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 11

### III. EXPERT VALUATIONS

TSA's damages are to be measured as of the date Lehman rejected the RFA: March 25, 2009. *See* 11 U.S.C. § 562(a).

Peter Shapiro of Swap Financial Group will testify that he tried, but TSA could not obtain quotations from dealers for replacement contracts because there was no market for contracts such as the RFA. All the other experts including Lehman's agree there was no active market for RFAs at the time. And Lehman tried but could not obtain the required three market quotations from dealers. (Lehman did obtain one response from the multiple dealers it contacted, but the response barely qualifies as a quotation. Wachovia's indicative quote was labeled as "expired" and "null and void" upon issuance.) Lehman may insinuate that Peter Shapiro is lying and that quotes were available, but the evidence does not support that insinuation. Accordingly, the relevant task is to determine TSA's total losses and costs (or gains) as of the rejection date.

TSA has retained two sets of experts with substantial experience in financial markets and investment instruments such as the RFA. These experts have selected different methodologies to measure TSA's loss or gain, but have arrived at the same general conclusion: Lehman owes TSA approximately $38 million. In contrast, Lehman has retained an expert to employ a third methodology, which evaluates TSA's loss or gain as if TSA were an active and unrestricted market participant evaluating its portfolio on the rejection date. Lehman's expert has arrived at a very different conclusion: that the RFA was advantageous to Lehman on the rejection date and therefore TSA owes Lehman $1.1 million. Each expert's method is described below.

A.      **TSA's Expert Valuations**

   1.  **First Method: Hypothetical Replication**

TSA's first expert is Peter Shapiro, founder of Swap Financial Group.  Shapiro has 20

years of experience as a senior financial markets professional in the areas of public finance and

financial derivative products, including substantial experience with investment instruments

similar to the RFA.  TSA Ex. W, Attach.  Shapiro will explain that, while not the only

appropriate method, in his opinion, the best method for calculating TSA's total losses is to

construct a hypothetical replacement transaction, knowing the elements that would go into

pricing, and using the price of such a hypothetical transaction as an indication of TSA's loss of

bargain.  In other words, Shapiro has sought to determine the fixed interest rate a hypothetical

willing dealer would have offered TSA for an RFA on the same economic terms as TSA's

original RFA with Lehman.  And the difference between payments on the hypothesized interest

rate and the 4.484% formerly provided by Lehman represents TSA's loss.

   Shapiro's calculation involves two essential steps in pricing.  These steps are the same as

Lehman's when it originally priced the RFA in 2002.  First, he considers the long-term rates of

return that a dealer would have been able to secure as of the rejection date in exchange for

delivering the Eligible Securities under the RFA.  TSA Ex. W at 2; TSA Ex. Y at ¶ 8.  Shapiro

opines that a hypothetical dealer would have used the market for commercial paper to price a

replacement RFA, largely because (unlike government agency securities) there was a market for

related transactions that would have allowed the hypothetical dealer to hedge the risk of interest

rate fluctuations over the term of the deal.  TSA Ex. Y at ¶ 30.  Indeed, the evidence will show

that Lehman used commercial paper both to price the RFA initially and to evaluate the RFA as a

position on its books on an ongoing basis, and that Lehman delivered commercial paper

throughout the history of performance of the RFA.  *See* Undisputed Facts, ¶18.

Shapiro then makes "adjustments," as any dealer would have done, to account for

relevant variables, and to "reflect the special nature of an RFA transaction."  *Id.* at ¶ 8.  These

adjustments include principally a "credit spread," related to the risks associated with the RFA

being a tobacco related risk; and the hypothetical dealer's profit and costs.  *Id.*  After accounting

for such variables, Shapiro opines that the difference between what TSA would have earned

under the RFA and what TSA hypothetically would earn under the replicated replacement RFA

as of March 25, 2009 is $38,007,347.  *See* TSA Ex. W.  Shapiro then adds TSA's actual loss of

$553,080 from the period between Lehman's initial nonperformance up to the termination date,

arriving at a total loss of $38,560,427 plus attorney's fees and costs.

### 2.  Second Method: Projected Return

TSA obtained a second opinion.  TSA's second set of experts are Daniel Curry and

Jeffrey Hasterok, who have spent many years working on problematic financial transactions and

exposures, including for many years at the investment bank Morgan Stanley, with substantial

experience in municipal finance, repurchase agreements, interest rate swaps, hedging

transactions, and reserve fund forward purchase agreements similar to the RFA.  TSA Ex. X,

Exs. 1-2.  As Curry and Hasterok will explain, they have taken a different approach to

determining TSA's losses.  In particular, Curry and Hasterok believe TSA's losses should not be

determined from the perspective of a hypothetical dealer given that, in fact, there was no market

for a replacement RFA and therefore inadequate reliable market information.  Instead, Curry and

Hasterok evaluate the predicted rate of return that TSA was likely to obtain from its actual

alternative investment of the Reserve Fund without the RFA through 2032, and compare that

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 14

projected return to the 4.484% rate that Lehman guaranteed under the RFA. *Id.* at 20.

Notwithstanding the difficulty of predicting TSA's likely return on future investments, Curry and

Hasterok believe that this is the best way to arrive at a bona fide calculation of TSA's total

losses, based on actual market data available to TSA as of the rejection date.

Curry and Hasterok's calculation first acknowledges legal and practical limits on TSA's

ability to reinvest the Reserve Fund. TSA could not be expected to make investments with the

Reserve Fund inconsistent with the Indenture, state law, or with TSA's own investment policies.

*Id.* at 12-13. For example, the Reserve Fund has to be liquid and accessible every six months.

*See* Joint Ex. 3 at 26-27. Accordingly, TSA will be able to make only short-term investments

and will not be able to take advantage of higher long-term investment returns. TSA Ex. X at 12-

13. Further, TSA can make only low-risk investments permitted under the Indenture and

consistent with prudent practices for handling public money. *Id.* at 12-13, 18.

Curry and Hasterok then evaluate various types of potential investments TSA could make

on a semiannual basis into the future, including securities such as commercial paper and

certificates of deposit. *Id.* at 15-16. Curry and Hasterok find various problems and limitations

associated with assessing such investments. *Id.* For one, available data on rates of return tend to

group investments permitted under the Indenture with lower-rated or otherwise ineligible

investments, with no way to isolate the permitted investments. *Id.* Further, data on average

returns often reflect a wide range of circumstances with wide-ranging yields, further limiting the

usefulness of such data. *Id.* Most importantly, there are numerous considerations TSA must take

into account when deciding how to invest its Reserve Fund, in addition to the restrictions found

in the Indenture, making it difficult to predict which investments will be acceptable to TSA on an

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 15

ongoing basis into the future.  *Id.* at 20.  For these reasons, Curry and Hasterok conclude that

TSA's actual history of investing its Reserve Fund in low-risk money market funds (as permitted

under the Indenture) provides the least speculative and most useful indication of TSA's likely

future investments.  *Id.* at 17, 20.

Finally, Curry and Hasterok consider how best to project TSA's likely return on its

investments through 2032.  *Id.* at 16-17, 19-20.  In doing so, Curry and Hasterok acknowledge

that there is no reliable way to predict the future.  *Id.* at 15, 20.  Each period of history is distinct

and presents unique economic circumstances—such as unprecedented and increasing

globalization, or the bankruptcy of Lehman, and countless other unforeseeable factors.  Curry

and Hasterok cannot tell us if or when the economy will improve, or if interest rates will get

worse before they get better (and if so by how much and for how long).  On March 25, 2009, no

one could have known that rates would proceed to drop and remain at substantially lower levels

up to the present day, over five years later.  *Id.* at 14; TSA Ex. Z at 17-18.

Because future rates of return are unknown, and any such rates could be greater or less

than the status quo, and because TSA is unable to transact in long term investments such as

swaps that are used as the basis of short term interest rate prediction models, Curry and Hasterok

adopt a "no change" assumption from the rejection date, projecting the data from TSA's actual

investment of the Reserve Fund into the future.  TSA Ex. X at 20; *see also* Ex. Z at 15-16.  From

the time of Lehman's default on December 1, 2008 to the date of rejection on March 25, 2009,

TSA earned a 0.65% rate of return on its investment of the Reserve Fund.  TSA Ex. X at 19-20.

Curry and Hasterok thus project a 0.65% rate of return through 2032, indicating total losses of

approximately $37.5 million, plus TSA's prior loss of $553,080 from December 1, 2008 to

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 16

March 25, 2009, for a total of $38,053,080. *Id.* at 20. Curry and Hasterok note that the 0.65%

rate of return substantially exceeds TSA's actual rate of return from March 25, 2009 to the date

of their report; thus it is implicit in their analysis that in order to achieve a rate of 0.65%, rates in

the future must be higher than 0.65%.

**B.      Lehman's Expert Valuation: Mid-Market Forward Curve**

Lehman has retained its own expert, Samuel Gruer of Cityview Capital Solutions, LLC,

to value the RFA using a third methodology. In particular, Lehman directed Gruer "to value the

[RFA] . . . using . . . industry-standard valuation methodology for reserve fund agreements."

Lehman Prop. Ex. 124 at ¶ 4. Gruer claims this methodology "is the methodology [he] always

used when valuing reserve fund agreements at JP Morgan and Deutsche Bank for over a decade."

*Id.* at ¶ 37.

As a threshold matter, the results of TSA's request for bids for the RFA refute the notion

that there is an "industry standard methodology". In a time when the markets were significantly

more stable than they were after Lehman's bankruptcy, the range of bid results for the "par

break" contract chosen by TSA was approximately 97 basis points. *See* Joint Ex. 5 at 1. The

fact that five market participants in a then active market were showing such disparate levels

raises doubts as to whether an industry standard methodology ever existed.

According to Gruer's expert report, there are three steps a dealer allegedly takes to value

a "position" such as the RFA that is part of the dealer's "portfolio." Lehman Prop. Ex. 124 at ¶¶

39-40. First, based on a review of market transactional data, the dealer identifies which eligible

security the market suggests will produce the greatest returns over the entire term of the relevant

agreement. *Id.* at ¶¶ 40, 42. Second, as to the highest yielding eligible security, the dealer

develops a "forward curve" based on the same market transactional data. *Id.* at ¶ 40. The

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 17

varying rates of interest offered in the present on short- versus long-term securities are used to

infer "the market's consensus as to the rates that [one] could expect to receive [in the future]" on

such securities. *Id.* at ¶¶ 40, 45-46. Third, based on the "forward rates" indicated by the forward

curve, the dealer calculates the cash flows that the forward curve projects will be earned from the

regular purchase of securities over the life of the agreement, and compares those cash flows to

the dealer's guaranteed future payments. *Id.* at ¶¶ 40, 47-48. The difference between these two

"cash flows," discounted to present value, represents the mid-market forward-curve valuation of

the dealer's position. *Id.* at ¶ 40.

Gruer's expert report provides a mid-market valuation of the RFA based on a forward

curve of projected yields of U.S. Agency Securities every six months from March 25, 2009

through 2032. *Id.* at ¶ 42. Notwithstanding the facts that no hedging market exists for any party

to hedge this forward agency risk, and no dealer was actually willing to offer a replacement

transaction at any price, Gruer concludes that by applying basic industry valuation, the RFA was

advantageous to Lehman on the rejection date and that the termination value of the RFA is

$1,359,394.59—payable to Lehman. Gruer used agency securities although (1) Lehman always

valued the RFA using commercial paper as the deliverable, (2) Lehman always delivered

commercial paper to TSA under the RFA, and had economically obligated itself to do so under

its agreement with Briarwood; and (3) there is no hedge market for agency securities so dealers

do not use forward agency curves to value RFAs or any contract for that matter. Gruer's

methodology reaches the absurd result of valuing the RFA at a value more advantageous to

Lehman than what the market was in fact willing to pay (the preferred method of valuation under

the RFA). Gruer's valuation as he admits does not calculate TSA's losses or gains as of the date

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 18

of the rejection as required under the RFA. Gruer's method implies that a dealer would have been willing to pay a fixed rate higher than the guaranteed rate, even though no dealer was willing to replace that trade at any rate.

The "forward curve" is at the heart of Gruer's methodology. In fact, Lehman has retained a second expert, Professor David Babbel, to opine solely on the alleged significance of forward curves and their relevance to valuing investment agreements in the finance industry. Lehman Prop. Ex. 123. But Gruer and Babbel both acknowledged at their depositions that forward curves are *not* predictive tools and are not used by dealers or other market participants for that purpose. Indeed, empirical research has shown that forward curves do not provide accurate indications of actual future rates of return. TSA Ex. X at 14-15; Ex. Z at 15-17.

Forward curves are used in financial markets only for participants who can transact freely in the market. Market participants transact on the basis of the forward rates reflected in the curve and dealers can use the forward curve to enter into transactions designed to hedge risk associated with a given position. *See, e.g.*, Lehman Prop. Ex. 123 at 9. But as Gruer acknowledged at his deposition, a dealer must transact on the valuation date in order to take advantage of the curve.

The forward curve is not applicable to TSA, however, because TSA does not have the requisite ability to enter in to long term or hedge transactions based on the forward curve. First, as noted above, there is no market for replacement RFAs. Second, the limits on TSA's ability to invest make it impossible for TSA to purchase hedges or otherwise engage in long-term swap transactions based on the forward curve. TSA Ex. X at 14-15; Ex. Z at 9. TSA cannot capture the values embedded in the curve to protect against long-term interest rate risk. In fact, attempting to hedge its interest rate exposure on its Reserve Fund potentially exposes TSA to

loss in the event that it needs to draw funds to pay debt service on its bonds and terminate any hedging transactions.  TSA can only invest the Reserve Fund in accordance with the Indenture for fixed six-month periods on a rolling basis through 2032.

Gruer and Babbel admittedly have not attempted to determine and do not opine on TSA's damages or actual losses as of the rejection date.  Gruer's forward-curve valuation does not reflect, for example, the costs a hypothetical dealer would have charged to transact (inclusive of TSA's right to a par break in the event it needed to draw on its Reserve Fund), the administrative and transaction costs TSA would incur through reinvestment, or what actual rates of return will be available to TSA on a semiannual basis into the future.

## IV. STATEMENT OF ISSUES

To determine TSA's claim, the Court, after hearing all the evidence presented in this matter, will be asked to decide three key issues under the RFA:

1.      Whether TSA is entitled to calculate its total losses and costs to establish the Termination Amount.

2.      Whether TSA's determination of the Termination Amount fixes the value of TSA's claim absent manifest bad faith or unreasonableness.

3.      Whether TSA has determined its total losses and costs reasonably and in good faith.

## V.  STANDARD OF REVIEW

A properly filed proof of claim is "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. Pro. 3001(f).  An objecting party "bears the initial burden of production and must provide evidence showing the claim is legally insufficient."  *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014).  If the objecting party meets this initial burden,

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 20

the claimant then "must prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.* (internal quotations omitted). The "basic federal rule in bankruptcy is that state law governs the substance of claims" and will determine whether a claim should be allowed. *Travelers Cas. and Sur. Co. of Am. v. Pac. Gas and Elec. Co.*, 549 U.S. 443, 450, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007). And a claim should be allowed "in such amount" as is warranted under applicable law. 11 U.S.C. § 502(b).

## VI. POINTS AND AUTHORITIES

### A.    TSA is Entitled to Determine the Amount it is Owed for Lehman's Breach of the RFA.

State contract law "governs the nature and amount" of TSA's claim here. *In re Bradlees Stores, Inc.*, 313 B.R. 565, 570 (S.D.N.Y. 2004); *Travelers*, 549 U.S. at 450-51. Specifically, New York law governs. Joint Ex. 1 at 25. Under New York law, the parties to a contract may agree on a method of calculating uncertain damages so long as public policy is not violated and the method chosen provides a reasonable estimation of actual damages. *See, e.g.*, *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) (citing cases). In particular, the parties to a complex financial instrument can decide that in case of breach, the non-defaulting party may determine its own damages reasonably and in good faith. *See, e.g.*, *Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 635, 653, 655 (S.D.N.Y. 2012) (enforcing, under New York law, provision of financial contract authorizing non-defaulting party to determine damages reasonably and in good faith).

The "fundamental rule" of contract interpretation is fulfilling "the substantial intent of the parties" to the contract. *O'Neil Supply Co. v. Petroleum Heat & Pwr. Co.*, 280 N.Y. 50, 55 (1939). A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Schron v. Troutman Sanders LLP*, 20

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 21

N.Y.3d 430, 436 (2013) (internal quotations omitted). If multiple reasonable constructions of the plain language are possible, then "the court can look to the surrounding facts and circumstances," including "evidence of [] negotiations", to determine the intent of the parties. *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-49 (1975).

The RFA is unambiguous as to the respective roles of the parties in determining damages. If the contract is terminated, a "Termination Amount" must be paid. Joint Ex. 1 at 18-20. The Termination Amount is to be "determined by the Burdened Party reasonably and in good faith," under the "market quotation" method, or if market quotations are unavailable, then under the "total losses" method, either of which provides a reasonable estimation of damages. *Id.* at 5. In turn, the RFA's definition of "Burdened Party" expressly provides that "in the case of a Lehman Event of Default," TSA is the Burdened Party. *Id.* at 1. The contemporaneous negotiations of the parties also confirm beyond any doubt that the parties intended for TSA to determine the Termination Amount in case of a Lehman default and resulting termination. *See supra*, at 6. In sum, TSA is entitled to calculate the value of its claim.

**B.      TSA's Determination of the Termination Amount is Binding on the Parties Absent Manifest Bad Faith or Unreasonableness.**

TSA's determination of the Termination Amount is entitled to deference in accordance with the terms of the RFA. The RFA establishes both the standards of conduct by which TSA is to determine the Termination Amount, and also the proper standard of review for any challenge to such conduct. The RFA first authorizes TSA, as the Burdened Party, to determine the Termination Amount reasonably and in good faith. Joint Ex. 1 at 5. Good faith entails "honesty in fact." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 n.5 (1983). And a "reasonable" determination is one that is "fair, proper or moderate under the circumstances."

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 22

*DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*, 80 A.D.3d 448, 450 (N.Y. App. Div. 2011) (internal quotations omitted) (interpreting contractual requirement of reasonableness). The RFA thus directs and empowers TSA to make an honest and fair determination of its losses.

The RFA then separately provides that TSA's determination "shall be conclusive and binding on the parties [] absent manifest error." Joint Ex. 1 at 6. The RFA thus requires that a "manifest error" standard of review be applied if Lehman challenges TSA's determination. A "manifest error" is one that is "plain and indisputable, and that amounts to a complete disregard of the controlling law or [available] evidence . . . ." BLACK'S LAW DICTIONARY (9th ed. 2009). Under the RFA's deferential standard of review, the burden falls on Lehman to demonstrate that TSA has calculated its losses with indisputable dishonesty (so as to be manifestly in bad faith), or in complete disregard of the law or facts (so as to be manifestly unreasonable).

The underlying law of damages supports the wide discretion TSA has been provided under the RFA to determine the amount of its losses. Under New York law, "when it is certain that damages have been caused by a breach of contract," but there is "uncertainty [] as to their amount," the "burden of uncertainty as to the amount of damage" falls on the breaching party. *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotations omitted) (citing cases). Thus, the non-breaching party "need only show a stable foundation for a reasonable estimate", which "necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Id.* at 110-11 (internal quotations omitted). In sum, Lehman should not benefit from the uncertainty inherent

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 23

in determining TSA's total losses and costs. TSA should be given latitude for improvisation in making that difficult determination.

**C.    TSA May Determine its Total Losses by Estimating the Hypothetical Price for Replacing the RFA, Projecting its Future Return Without the RFA, and/or Incorporating its Actual Losses to Date.**

**1.    Hypothetical replacement and projecting future return are both reasonable ways of calculating TSA's losses.**

Determining TSA's losses as a result of Lehman's breach is a difficult task. There was no market for a replacement RFA on the rejection date and thus no reliable market data (i.e., three dealer quotes) with which to value the RFA, and there remains no such market today. As one of TSA's experts has put it, determining the value of "a highly illiquid, complex financial contract . . . [with] no market . . . is unusually difficult." TSA Ex. Y at ¶ 1; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2007) (noting that even as to investments "traded between investors and dealers rather than on exchanges," valuation "is not a precise science" and "may be considerably more a statement of opinion than a report of an objectively determinable fact"); *Bank of N.Y. Mellon*, 910 F. Supp. 2d at 645 (noting "the dearth of legal authority regarding the calculation of termination payments"). There is no perfect method available to determine TSA's losses.

The two methods of valuation that TSA's experts have pursued, which they will explain at the upcoming hearing, are reasonable ways to assess the total losses that TSA suffered as of the rejection date. Shapiro's hypothetical replication tries to mimic the preferred market quotation method set forth in the RFA. The approach provides an indication of what price a hypothetical willing dealer would have charged on the rejection date to step into Lehman's shoes under the RFA, as a proxy for the economic advantage TSA enjoyed on that date, prior to termination. Curry and Hasterok have projected TSA's predicted rate of return on its likely

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 24

future investment of the Reserve Fund and compared it to the return that Lehman guaranteed, in order to estimate TSA's actual losses through 2032. Each set of experts recognizes the reasonableness of the others' method. And each method has yielded a similar value, notwithstanding the fact that the two sets of experts did not collaborate in conducting their valuations. Although neither method is perfect, "theoretical perfection" cannot be expected or demanded here. *Tractebel*, 487 F.3d at 111.

### 2. TSA's actual losses support its determination of the Termination Amount

In addition to the use of its experts' valuations, TSA also should be allowed to present its actual losses in support of its determination of the Termination Amount. The Bankruptcy Code directs that TSA's claim is to be measured as of the rejection date, using "commercially reasonable determinants of value . . . ." 11 U.S.C. § 562(a), (b). A fixed date for valuation "does not bar proof of occurrences after the [valuation] date which may shed light upon the actual value as of the [valuation] date." *People ex rel. Four Park Ave. Corp. v. Lilly*, 37 N.Y.S.2d 733, 736 (N.Y. App. Div. 1942); *see also Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 386 (2d Cir. 2006) (noting that general disfavor of valuation by hindsight is not a "bright line" or "mechanical" rule and depends upon circumstances, evidence at issue, and its intended purpose). A commercially reasonable determinant of value is "the market price . . . when the market is functioning properly," but must include "other determinants of value" when "the market is dysfunctional . . . ." *In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 257 (3d Cir. 2011).

TSA's actual losses can properly inform its determination of the Termination Amount in two ways. First, TSA's actual losses to date confirm the reasonableness of its experts' assumptions and valuations. TSA's rate of return in the five years since the rejection date has been significantly *lower* than the 0.65% rate that Curry and Hasterok project as part of their

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 25

valuation.  Actual subsequent events thus confirm the reasonableness of Curry and Hasterok's

projections.  *See In re Loews Cineplex Ent'm't Corp.*, No. 04 Civ. 612(HB), 2004 WL 875819, at

*4 (S.D.N.Y. Apr. 23, 2004) (upholding bankruptcy claim valuation that included use of

"subsequent events" to "corroborate an independently formed conclusion" as to value); *Richland

v. Crandall*, 262 F. Supp. 538, 548 n.8 (S.D.N.Y. 1967) ("Evidence of events subsequent to the

sale was [] admitted . . . as confirmation of judgments made at the time of sale about anticipated

losses . . . .").  Moreover, the amount of actual losses to date confirms the reasonableness of both

the Shapiro and the Curry and Hasterok valuations and the unreasonableness of the Gruer

valuation.

Second, TSA's actual losses to date also serve as direct evidence of the extent of TSA's

total losses as of the rejection date.  In *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289

U.S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933), the United States Supreme Court explained why

subsequent actual losses may reveal and fix contractual damages that were uncertain on the date

on which a contract is to be valued:

> The law will make the best appraisal that it can, summoning to its service whatever aids it
> can command.  At times the only evidence available may be that supplied by testimony of
> experts . . . .  This will generally be the case if the trial follows quickly . . . .  But a
> different situation is presented if years have gone by before the evidence is offered.
> Experience is then available to correct uncertain prophecy.  Here is a book of wisdom
> that courts may not neglect.  We find no rule of law that sets a clasp upon its pages, and
> forbids us to look within.
>
> . . . To correct uncertain prophecies [when measuring the damages for a breach of
> contract or a tort] is not to charge the offender with elements of value nonexistent at the
> time of his offense.  It is to bring out and expose of light the elements of value that were
> there from the beginning.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 26

289 U.S. at 697-98 (citations omitted).  In other words, TSA's actual losses up to the date of the

hearing reflect a true portion of TSA's total losses as of the rejection date.[1]

### 3. Lehman's mid-market valuation is not an appropriate method to determine TSA's total losses and costs.

TSA is *not* required to use Gruer's mid-market methodology to determine its total losses

and costs, for numerous reasons.  First, nowhere in the RFA is the Burdened Party directed to use

a forward-curve-based so-called "standard" valuation methodology.  Lehman could have

suggested drafting Gruer's valuation method into the RFA, but did not.

Second, the required determination of TSA's "total losses *and costs*" encompasses not

only TSA's loss of bargain, but its transaction costs,  and any other actual costs TSA could incur

in mitigating damages or otherwise.  Joint Ex. 1 at 5-6 (emphasis added).  The fact that the

Termination Amount expressly includes costs in addition to losses confirms that the Termination

Amount should reflect the actual economic harm to TSA in particular, not an abstract calculation

divorced from TSA's reality.  Gruer's mid-market forward-curve valuation does not calculate

TSA's losses *and* costs.

Third, using Gruer's mid-market method would be contrary to the terms of the RFA.  The

RFA directs the Burdened Party to determine "*the Burdened Party's* total losses and costs,"

including "any loss of bargain . . . ."  Joint Ex. 1 at 5 (emphasis added).  That phrase

---

[1] New York courts generally disfavor hindsight valuation in contract cases, but that is because a contracting party usually can hedge against the risk that a given asset will gain or lose value over time.  *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) ("[U]ncertainties . . . may cause an asset to be under- or over-valued at any particular time.  At that time, however, either party has an opportunity to hedge according to his or her judgment about the future stream of income.").  As already has been explained, there was no market for the RFA on the rejection date and TSA is not a dealer with the ability to hedge risk associated with the ongoing investment of its Reserve Fund.  Thus, considering TSA's actual losses as direct evidence of damages remains reasonable and appropriate here.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 27

unambiguously describes economic harm specific to the Burdened Party, i.e., TSA.  The RFA, in other words, directs a calculation based on TSA's circumstances.  In contrast, a mid-market forward-curve valuation does not account for a given party's ability to transact in the market and does not reflect any particular party's actual losses.  Both of Lehman's experts have expressly disclaimed using forward-curve valuation to estimate TSA's actual losses.  Moreover, Gruer's mid-market valuation (without adjustment for credit charges, profit and costs) is inconsistent with the RFA's preference for use of market quotations if available.

Finally, New York law requires contractual damages to be a "reasonable measure of [] anticipated probable harm . . . ."  *Rattigan*, 739 F. Supp. at 169 (internal quotations omitted).  A mid-market forward-curve valuation, however, is used for specific purposes unique to investment portfolios and unrelated to assessing injury from breach of an investment contract.  Accordingly, it would not be an appropriate method of determining contract damages.

### 4.  TSA is not required to calculate its total losses and costs "as if it were Lehman".

Lehman has argued TSA must determine the Termination Amount "as if it were Lehman" and that TSA must use a mid-market forward-curve methodology on that basis.  But this interpretation of the RFA is untenable, for numerous reasons.

First, Lehman's own experts acknowledged that the "as if it were Lehman" language has no relevance to the use of forward curves.  Indeed, Lehman has admitted that this provision was not incorporated into its own calculation of the Termination Amount for purposes of objecting to TSA's claim.  Lehman's experts also have acknowledged that a forward-curve valuation is not a measure of losses.  TSA agrees.

Second, when read in context, the "as if it were Lehman" clause simply indicates that TSA will determine the Termination Amount instead of Lehman, if Lehman fails to do so within

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 28

three days of its default.  The clause does not purport to change the RFA's definition of "Termination Amount"—which is the only operative language instructing the parties how to make the calculation—nor does the clause require TSA to calculate its losses and costs in a particular way.

Third, the definition of "Termination Amount," which the parties specifically negotiated, empowers TSA, rather than Lehman, to determine the Termination Amount.  *See supra*, at 6.  Because Lehman is not authorized to make that determination in the first place, the "as if it were Lehman" provision—which applies only "*if* Lehman fails to determine the Termination Amount within three Business Days"—is moot.  Joint Ex. 1 at 20 (emphasis added).  This provision was held over from Lehman's preliminary draft only as an oversight.

Finally, even if TSA were required to determine the Termination Amount "as if it were Lehman," Shapiro's calculation of a hypothetical dealer price for a replacement RFA satisfies that requirement.  Lehman's own expert has acknowledged that Shapiro's method reflects dealer practices in the finance industry.  Lehman Prop. Ex. 124 at ¶ 62.  In sum, TSA is not required to conduct a mid-market forward-curve valuation to determine its total losses and costs.

**D.    TSA's Experts Have Conducted Their Valuations Without Manifest Bad Faith or Unreasonableness.**

TSA's experts have performed their valuations reasonably and in good faith.  The expert reports supporting TSA's claim reflect the "careful efforts of skilled professionals to grapple with complex technical issues."  *Atl. Term. Urban Renewal Area Coal. v. N.Y. City Dep't of Envtl. Prot.*, 740 F. Supp. 989, 995 (S.D.N.Y. 1994).  Lehman's experts may criticize TSA's experts, but mere disagreement among experts does not demonstrate unreasonableness, let alone manifest error, and is to be expected in the context of a difficult and complicated damages

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 29

valuation.  *See, e.g.*, *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 83 (2d Cir. 2002)

("[T]he existence of a significant disagreement between [experts] does not render . . . [an]

expert's opinion unreasonable."); *Atl. Term.*, 740 F. Supp. at 994 (noting that when reviewing for

reasonableness, expert disagreements "demonstrate the existence of a [] dispute" but the court's

role is not "to resolve that dispute").  The criticisms that Lehman's experts have leveled against

TSA's experts to date are meritless and, at the very least, do not come close to demonstrating

manifest error.

     **1.**   **Lehman cannot demonstrate that Peter Shapiro's calculation of the Termination Amount via hypothetical replication constitutes manifest error.**

     As to Peter Shapiro's hypothetical replication, only Gruer has protested, and he has

presented only two criticisms.  First, Gruer has complained that Shapiro's calculation is based on

market data for commercial paper as opposed to agency securities.  Lehman Prop. Ex. 124 at ¶

73.  Shapiro has explained that in practice, and for various reasons, commercial paper is the

security that dealers consistently would use to price forward purchase agreements such as the

RFA.  TSA Ex. Y at ¶ 28.  Indeed, Lehman has admitted that it priced the RFA based on the

market for commercial paper and committed itself via the Briarwood transaction to delivering

Briarwood commercial paper throughout the life of the RFA.  Curry and Hasterok agree with

Shapiro and have explained in detail that dealers generally do not consider agencies to be higher-

yielding for a "rolling series" of purchases, in part because of the inability to "hedge" the

delivery risk by finding a counterparty who will agree to sell agency securities at a specified

price or yield in the form of a long dated contract.  TSA Ex. Z at 23-28.  Shapiro's approach is

reasonable.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 30

Second, Gruer has taken issue with Shapiro's specific adjustment for "credit spread"—which accounts for the possibility that the other party to the agreement might later owe the dealer money but be unable to pay.  Lehman Prop. Ex. 124 at ¶¶ 63-66.  In his report, Gruer urged a lower credit charge resulting in a much lower dealer price.  *Id.* at ¶¶ 65, 68-70.  Gruer opines that an appropriate credit charge would be 16.9 basis points, or approximately $1.2 million, but ignores the fact that when Lehman actually priced the RFA in 2002, it charged approximately 67 basis points, or $4.5 million.  *See* TSA Ex. Y at ¶14.  Given the financial crisis and the dramatic increase in perceived tobacco risk, it is inconceivable that a dealer would charge *less* for credit risk on the rejection date than it would have in 2002 when the markets were functioning well.  Moreover, Gruer admitted at his deposition that he failed to consider the unique credit risks associated with the RFA, including the subordination of the dealer to TSA's bondholders.  Shapiro has explained that this subordination implicates a total loss to the dealer if TSA experiences credit problems—as the Reserve Fund would be depleted to compensate bondholders—and creates a "unique additional risk" that the dealer would be forced to resume its obligations once the Reserve Fund became replenished, after the dealer already had unwound its related hedges.  TSA Ex. Y at ¶¶ 20-24.  The fact that "no dealer was interested in touching [the RFA] . . . at any price" confirms that "the market perception of tobacco risk had gone off the charts."  *Id.* at ¶ 17.  Indeed, dealers indicated to Shapiro in March 2009 that the primary reason they would not price the RFA was credit concern.  Shapiro's credit charge is reasonable.

### 2. Lehman cannot demonstrate that Curry and Hasterok's projected return methodology constitutes manifest error.

Gruer and Babbel have made a total of four criticisms of Curry and Hasterok's projected return methodology, none of which is persuasive.  First, Gruer and Babbel have objected to

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 31

Curry and Hasterok's no-change assumption, in lieu of using a forward curve, to estimate TSA's

future rate of return through 2032.  Lehman Prop. Ex. 124 at ¶¶ 75-80, 83-96; Ex. 123 at 10.  But

Gruer and Babbel admitted in their depositions that the use of a forward curve would not provide

a more accurate prediction of future rates and TSA's losses.  Further, the no-change assumption

finds support in both academic literature and case law.  *See* TSA Ex. Z at 15 ("'When forecast

precision is effectively zero . . . it is perhaps best to acknowledge this, e.g., by . . . using [] a 'no-

change' thereafter assumption . . . .'" (quoting from Charles A. E. Goodhard and Wen Bin Lim,

*Interest Rate Forecasts: A Pathology*, 7 INT'L J. OF CENTRAL BANKING 135, 153 (2011)); *see also*

TSA Ex. U (Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?*,

WWW.INTUITIVE-ANALYTICS.COM (2013)) at 1 ("How badly do forwards do?  Well over this 50

year span, and this holds over most subperiods as well, you'd be better off as a forecaster just

assuming today's yield curve stays constant i.e. a perfectly random walk."); *Tractebel*, 487 F.3d

at 112 ("It is not the case that all [long-term] contracts may be breached with impunity because

of the difficulty of accurately calculating damages. . . .  To the extent certain variables must be

assumed in order to arrive at a reasonable estimate . . . if there is currently no evidence of an

impending change [one] may assume these environments will remain stable.").  Finally, Curry

and Hasterok's opinion uses a predicted rate that is higher than the actual rate earned by TSA up

to the rejection date which necessarily presumes TSA's anticipated rates of return will not be

flat, but will move upward in the future.  Curry and Hasterok's no-change assumption was and is

reasonable.

Second, Gruer has objected to the use of data from after the rejection date.  Lehman Prop.

Ex. 124 at ¶¶ 81-82.  But Curry and Hasterok properly use such data to confirm the

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 32

reasonableness of their projections. *See* TSA Ex. Z at 17-18. The fact that rates fell sharply after March 25, 2009, and have remained at such low levels for over five years, demonstrates exactly why Curry and Hasterok's no-change assumption is reasonable and indicates that in reality, their calculation may undervalue TSA's losses. Gruer conceded at his deposition that using data after the rejection date to conduct such a "reality check" is appropriate.

Third, Gruer has objected to Curry and Hasterok's projection of TSA's investment in low-risk money market accounts. Lehman Prop. Ex. 124 at ¶¶ 97-100. Gruer reasons that TSA was required to "accept any Eligible Securities delivered by Lehman" under the RFA. *Id.* at ¶ 98. But TSA accepted those securities with a guaranteed rate of return from Lehman, which TSA no longer enjoys. TSA is now entitled to invest the Reserve Fund in the investments it deems to be most appropriate in light of its obligations to the public and to bondholders. Numerous factors are relevant to making that determination on an ongoing basis. Gruer has admitted he is entirely unaware of these relevant considerations. As discussed above, TSA is not a dealer in financial instruments, must invest conservatively, and is limited in the types of investments it can make. Curry and Hasterok's assumption that TSA will continue to invest its Reserve Fund in a responsible manner is reasonable.

Finally, Gruer and Babbel have objected to the rate at which Curry and Hasterok have discounted to present value TSA's projected future cash flows—i.e., using a discount rate of 0.65%, which is the rate Curry and Hasterok have projected TSA to earn going forward. *Id.* at ¶¶ 101-03; Lehman Prop. Ex. 123 at 10-15. Future losses are sometimes discounted to present value to account for the fact that an award of compensation can be invested from the time of the award up to the time of the future losses. *See, e.g.*, *In re Delmarine, Inc.*, 535 F. Supp. 2d 318,

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 33

320 (E.D.N.Y. 2008).  The precise rate to be used in each case is a matter of discretion.  *See id.* at 321.  The rate chosen can and should reflect the injured party's actual ability to invest the award going forward.  *See Bregman v. Meehan*, 125 Misc.2d 332, 340-41 (N.Y. Sup. Ct. 1984) (rejecting high discount rate that would "result in real inequity" where plaintiffs needed to make certain mortgage payments each month and could not "let [the] money remain invested for 30 years").  Because Curry and Hasterok expect TSA to earn a 0.65% rate of return on its investments going forward, it is reasonable for them to discount TSA's future losses at that rate. In sum, the valuation of Curry and Hasterok is reasonable.

### 3.  Gruer's calculation of TSA's Section 7.7(b) losses conflicts with the RFA.

Gruer critiques both of TSA's experts for using TSA's actual prior losses from December 1, 2008 to March 25, 2009 as a component of the Termination Amount.  Lehman Prop. Ex. 124 at ¶¶ 50-56.  Under the RFA, the Termination Amount payable to TSA includes any prior losses resulting from Lehman's prior failure to deliver Eligible Securities.  *See* Joint Ex. 1 at 5.  Gruer dismisses the amount TSA actually earned during the relevant period and instead calculates the maximum amount TSA could have earned with the "highest yielding" Eligible Securities available.  Lehman Prop. Ex. 124 at ¶¶ 53-55.  But the RFA provides that upon Lehman's failure to deliver, the Reserve Fund should be invested "to the extent directed by [TSA] pursuant to the Indenture," and that TSA's losses are the difference between the guaranteed rate of 4.484% and the rate "*actually* earned" on the substitute investments.  Joint Ex. 1 at 7, 20-21 (emphasis added).  TSA is not required to invest in the highest yielding securities available, is free to exercise discretion in determining appropriate investments, and is owed its actual losses. Incorporating TSA's actual losses of $553,080 as part of the Termination Amount is both reasonable and required under the RFA.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 34

## VII.    CONCLUSION

TSA is entitled to determine the value of its claim reasonably and in good faith.  TSA's

experts have made good faith attempts to determine TSA's total losses and costs,

notwithstanding the lack of any market for the RFA, and the uncertainty of future rates of return.

Both sets of TSA's experts have selected reasonable methods and have conducted reasonable

calculations.  Lehman cannot meet its initial burden to provide evidence suggesting that TSA's

claim is legally insufficient.  And TSA will present evidence at the hearing confirming the

validity of its claim.  As a result, the Court should allow TSA's claim against Lehman for at least

$38,560,427, plus the additional attorneys' fees, incidental costs, and expenses incurred in

enforcing its rights.

DATED this 21st day of October, 2014.


PACIFICA LAW GROUP, LLP



By  /s/  Paul J. Lawrence
    Paul J. Lawrence, WSBA # 13557
Admitted Pro Hac Vice
    Kymberly K. Evanson, WSBA # 39973
Admitted Pro Hac Vice
Attorneys for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 35

10000 00001 dj21c41042

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of October, 2014, I caused the document to which

this Certificate is attached to be served upon the following:

Jayant W. Tambe
Laura W. Sawyer
Jennifer L. Del Medico
Benjamin Rosenblum
Jones Day
222 East 41st Street
New York, New York 10017
Email:  jtambe@jonesday.com
Email:  lwsawyer@jonesday.com
Email:  jdelmedico@jonesday.com
Email:  brosenblum@jonesday.com
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

☐ via facsimile
☐ via overnight courier
☐ via first-class U.S. mail
☐ via email
☒ via electronic court filing
☐ via hand delivery

Attorneys for the Debtors and Debtors in
Possession

Signed at Seattle, Washington this 21st day of October, 2014.

/s/  Kymberly K. Evanson
    Kymberly K. Evanson
Attorney for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PRE-HEARING BRIEF - 36