**Paul Edwards**

---

From:     Jenkins, Courtney
Sent:     Thu 10/31/2002 1:58 PM (GMT -8)
To:       'ravandusen@hdw.com'
Cc:       'pmead@wshfc.org'; 'pedwards@wshfc.org'; 'jayr@prestongates.com'; 'rjbagley@hdw.com'; 'Jjcross3@hdw.com';
          'bonowj@publicfm.com'; 'majorsg@publicfm.com'; 'torrettij@publicfm.com'; 'gslater@csgadvisors.com';
          'karnone@bear.com'; 'Bruce.colwell@usbank.com'; 'thomas.zrust@usbank.com'; 'Jordan.greg@dorseylaw.com';
          Lister, James G; 'david.taub@cliffordchance.com'; 'douglas.youngman@cliffordchance.com'
Bcc:
Subject:  Tobacco Settlement Authority - Reserve Fund Agreement

Richard:

Thank you for the comments.   Please see our responses below.    We expect to distribute a revised draft of the
agreement later today.    If you or anyone in the working group have any questions, please call me.
  Courtney Jenkins
Vice President
Lehman Brothers
Municipal Derivative Finance
745 Seventh Avenue, 30th Floor
New York, NY 10019
Telephone:  212-526-7143
Fax:    212-520-0384
E-mail:   cjenkins@lehman.com
-----Original Message-----
**From:** Richard A. VanDusen [mailto:RAVanDusen@HDW.com]
**Sent:** Thursday, October 31, 2002 10:42 AM
**To:** Jenkins, Courtney
**Cc:** jayr@prestongates.com; kherman@wshfc.org; majorsg@publicfm.com; gslater@csgadvisors.com; karnone@bear.com;
jordan.greg@dorseylaw.com; mgreenough@orrick.com; pedwards@wshfc.org; pmead@wshfc.org; Richard L. Sigal; Howard
Zucker; Roger J. Bagley
**Subject:** Working group comments on Wash. tobacco forward agreement

>The following are comments on the draft forward investment
>agreement for the Washington tobacco securitization:
>
1.   [Jenkins, Courtney]  Previously made in draft of 10/29. "Closing Date":   correct to November 5.

2.   [Jenkins, Courtney]      This change will be made. "Dealer":   Should be one "selected by Lehman
in
>good faith and reasonably acceptable to the Issuer..."

3.   [Jenkins, Courtney]  This change will be made. Redraft "Debt Service Payment" to read:
"...means (i) a
>scheduled payment of maturing principal of or interest on the Bonds,
>including any such payment in connection with Sinking Fund
>Installments (as defined in the Indenture), but not including any
>such payment designated in the Indenture as a Turbo Redemption (as
>defined in the Indenture) and excluding any such payment in
>connection with any other redemption of the Bonds, other than a
>mandatory clean-up redemption described in Section 404(i) of the
>Indenture, or (ii) a payment of principal of or interest on the
>Bonds in connection with an Extraordinary Prepayment (as defined in
>the Indenture) following an event of default under the Indenture."

4.   [Jenkins, Courtney]   We are modifying to conform with RFB. "Eligible Securities" does not match
the description in the RFB.

5.   [Jenkins, Courtney]  This change will be made.  "Indenture":   dated as of October 1, 2002.

**TSA_034752**

6.    [Jenkins, Courtney]  This change will be made.`"Reserve Fund":   designated the "Liquidity Reserve Account" in`
`>the Indenture.`

7.    [Jenkins, Courtney]  This change will be made. `"Scheduled Reserve Amount":   Why bother with a cross-reference`
`>to Exhibit A?   Just state $45,534,106.25.`

8.    [Jenkins, Courtney]  We will change to Burdened Party. `"Termination Amount":   The party determining the Termination Amount should be the Burdened Party or, as stated in the RFB, a "Third Party"`

`>acceptable to both parties making this determination.`

9. [Jenkins, Courtney]  This change will be made. `Section 2.2:   Add at the end of (a) the phrase "and`
`>shall be sold without recourse and free and clear of all liens,`
`>claims and encumbrances of Lehman or any Qualified Dealer or any`
`>third party".`

10.    [Jenkins, Courtney]  This change will be made. `Section 2.3:   The RFB called for 2 Business Days' notice of`
`>maturity of securities and restricts this provision to 2 occurrences`
`>in each payment period.   There should also be an affirmative`
`>statement that there is no right of substitution (see the RFB).`

11.    [Jenkins, Courtney]  We are modifying to clarify this point. `Section 2.5:   According to PFM, the Business deal is that there is never a Termination Amount required >to be calculated or paid pursuant to this section.`

12.    [Jenkins, Courtney]  This change will be made. `Section 2.7:   Remove reference to "consent" of S&P; it`
`>is by way of the rating letter.`

13.    [Jenkins, Courtney] We will modify to make clear this applies to Mandatory Cleanup Call. `Section 2.8: This appears to be a misunderstanding of the no-termination-amount-for-mandatory-cleanup-call provision of the`

`>RFB.     If the Authority can >terminate without penalty for any reason, then much of the rest of >the document has little meaning (for instance, the defeasance or >refunding restrictions of Section 3.1 can be overridden simply by >terminating the agreement; the prohibition in 5.1(e) on draining the`

`>account to substitute a surety bond can also be overridden).   The allowance for the mandatory clean-up termination without penalty is accomplished, we believe, by the language shown in item 3 above for the definition of "Debt Service Payment".`

14.    [Jenkins, Courtney]  This change will be made. `Section 3.1:   This provision should add after "if`
`>the Issuer takes any such action" the words "the result of which`
`>will cause the reduction of the Scheduled Reserve Amount".   On the`
`>other hand, in light of a transaction where the Scheduled Reserve`
`>Amount is a fixed dollar amount that does not reduce, this provision`
`>as to refundings has little meaning except to the extent_all_   of the`
`>Bonds are refunded and Lehman is being requested to transfer the`
`>agreement to cover the reserve for the refunding bonds.`

15.    [Jenkins, Courtney]  We will add the provision to Section 7.8. `Section 5.6:   There should be an overriding statement`
`>(replacing the last sentence of Section 7.8) here as follows:   "The`

>payment of any amounts owed by the Issuer hereunder (including,
>without limitation, Termination Amounts) shall be a subordinate
>obligation under the Indenture, payable solely as an Operating
>Expense (as defined in the Indenture) and only to the extent of
>amounts on deposit in the Operating Contingency Account maintained
>under the Indenture."

16.    [Jenkins, Courtney]   I am unclear as to where in the section this additional language should be placed.   Can
you please clarify? Section 5.7:   The one year/one day term should be after the
>termination of the Agreement.   The prohibition should be more
>extensive:   "...acquiesce, petition or
>otherwise invoke or cause the Issuer to invoke the process of any
>court or government authority for the purpose of commencing or
>sustaining a case against the Issuer under any Federal or state
>bankruptcy, insolvency or similar law or appointing a receiver,
>liquidator, assignee, trustee, custodian, sequestrator or other
>similar official of the Issuer or any substantial part of its
>property, or ordering the winding up or liquidation of the affairs
>of the Issuer."

17.    [Jenkins, Courtney]   This change will be made to our right to terminate the agreement until three failures.
We still view the failure to purchase  as a default, however,  until the third failure we would expect to be paid for our
losses as stated in Section 7.7. Section 7.1(a):   The RFB speaks of this Trustee failure
>occurring 3 times before a default occurs.

18. [Jenkins, Courtney]   We would like to review this further . In 7.2(e) delete (ii) because the
general creditworthiness of the Issuer is not at issue here, unless it amounts to bankruptcy.

19.    [Jenkins, Courtney]   This change will be made. Section 7.6(a):   change "Permitted Investments"
to read
>"Qualified Securities".

20.    [Jenkins, Courtney]   We will clarify this section. Section 7.7(a):   The RFB stated that there
would be no defaults
>for failures to purchase securities due to insufficient funds being
>available.   This section would impose a Loss Amount calculation.
>The RFB also speaks of the Default Rate for Trustee misfeasance
>being Fed Funds plus 1%, but the draft does not.

21.    [Jenkins, Courtney]    We will change this provision to allow Lehman to transfer to any entity that is rated at
least the same as us (Lehman Brothers Holdings Inc. is rated A2 by Moody's, A by Fitch and A by S&P). Section
9.2:   The RFB simply said the provider could transfer,
>but only with the consent of the Issuer (which consent would not be
>unreasonably withheld).   The working group proposes a modification-- text that would allow
transfers, without Issuer consent, to an entity that is rated higher than the rating of Lehman
going into the agreement, but anything at the same or lower level would require Issuer consent
(not unreasonably withheld).

22.    [Jenkins, Courtney]   This change will be made. Section 9.5:   Add ", with copies delivered by
the Trustee to Moody's and S&P".

23.    [Jenkins, Courtney]   This change was made in the previous draft. Revise (if not already done so) to
provide for split governing law (NY/Wash. as to authority of the Issuer).

24.    [Jenkins, Courtney]   This  will  need to be reviewed by internal counsel. In the Lehman opinion, it is
only fair to get from Lehman's counsel what Lehman requires from the Authority's counsel--
namely, that execution and performance do not conflict with or violate agreements or laws, and
that no consents are needed.