**Samuel Gruer**
**Cityview Capital Solutions, LLC**
321 Millburn Avenue, Suite 4
Millburn, New Jersey 07041



## I.    OVERVIEW

1.      This report is submitted by Samuel Gruer of Cityview Capital Solutions, LLC. My qualifications are detailed in Section III and my Curriculum Vitae is included at Appendix 1 to this report.

2.      I have prepared this report at the request of Jones Day, counsel for Lehman Brothers Holdings Inc., and Lehman Brothers Special Financing Inc. (collectively, "Lehman"). I have been retained by Jones Day on behalf of Lehman in connection with the claims submitted by the Tobacco Settlement Authority, an independent instrumentality of the State of Washington ("Washington TSA"), in *In re Lehman Brothers Inc. et al.,* Chapter 11 Case No. 08-13555 (Bankr. S.D.N.Y. filed 2008).

3.      I have set forth in this report my opinions on the matters about which I expect to testify.  The basis for each of my opinions is found in either the footnotes to this report or in Appendix 2, which lists the various documents that I have considered in preparing my report.

## II.    SCOPE OF ANALYSIS PERFORMED

4.      I have been asked by Jones Day to value the reserve fund agreement between Washington TSA, Lehman and U.S. Bank, N.A., as trustee, dated November 5, 2002 (the "RFA"), using, in my experience, industry-standard valuation methodology for reserve fund agreements.  I used March 25, 2009 as the date as of which such valuation should be made.

5.      Washington TSA has retained Swap Financial Group LLC ("Swap Financial"), and Daniel Curry and Jeffery Hasterok ("Curry" and "Hasterok," respectively, and, together with Swap Financial, collectively "Washington TSA's Experts") to provide expert reports in support of Washington TSA's bankruptcy claims.  I have also been asked to review and respond to    (1)

the expert report of Swap Financial (the "Swap Financial Report") and (2) the expert report of Curry and Hasterok (the "Curry/ Hasterok Report").

6.      I will be compensated for this engagement pursuant to the following terms: $85,000 for the preparation of this report and $24,000 for deposition and trial testimony.  If either my deposition or trial testimony extends beyond one day, I will be compensated at $10,000 per day for each additional day.  My compensation is not contingent upon the opinions I reach or upon the outcome of this matter.[1]

7.      The remainder of this report is organized as follows:

- Section III provides a summary of my qualifications.

- Section IV summarizes the documents that I considered in preparing my expert report, which are listed at Appendix 2.

- Section V sets forth a summary of my key opinions.

- Section VI contains relevant information concerning the RFA.

- Section VII provides my valuation methodology and my conclusions.

- Section VIII sets forth my analysis of the Swap Financial Report.

- Section IX contains my analysis of the Curry/Hasterok Report.

- Section X provides a summary of my conclusions.

## III.    SUMMARY OF QUALIFICATIONS

8.      I am the co-founder and Managing Director of Cityview Capital Solutions, LLC ("Cityview"), a municipal advisory firm.  My firm specializes in advising municipalities and other issuers and borrowers with respect to the use of derivatives and structured investments relating to municipal bonds.

---

[1]      *See* Letter of Engagement between Cityview Capital Solutions LLC, Samuel Gruer, & Jones Day, dated December 13, 2013, at Appendix 5.

9.      I have over 25 years of experience working in the municipal derivatives and reinvestment market.  During my career, I have held key managerial roles in the municipal derivatives departments at both JP Morgan Chase and its predecessor companies (1994-2006) and Deutsche Bank (2006-2008).  I estimate that I have been involved in, to date, derivative and bond transactions totaling more than $30 billion.

10.      As part of my responsibilities at Cityview, I routinely advise clients on a variety of structures, including reserve fund agreements, interest rate swaps, and call options on bonds.  I regularly advise clients on the termination and valuation of structures similar to the RFA.

11.      I co-founded the municipal derivatives group at Chemical Bank (which then became The Chase Manhattan Bank, and ultimately, JP Morgan Chase Bank, collectively "JP Morgan").  The municipal derivatives group was responsible for, among other things, bidding on and structuring municipal derivatives products for JP Morgan and its clients.  During my tenure at JP Morgan, I bid on, executed, restructured and/or terminated hundreds, if not thousands, of derivative transactions, including reserve fund agreements.

12.      At JP Morgan, I was responsible for developing and implementing the internal approval process so that the municipal derivatives desk would have the authority to begin to enter into reserve fund agreements.  I had to secure authorization from various departments at JPMorgan, including Risk Management, Credit, Legal and Accounting.  Obtaining such authorizations often entailed my educating senior personnel in these departments as to the potential risks and rewards of entering into reserve fund agreements, as well as the methodology that would be utilized to value the reserve fund agreements on a daily basis.  I played a key role in establishing the internal approval process for reserve fund agreements at JP Morgan.

13.      Prior to my departure from JP Morgan, I had overall responsibility for reinvestment activity on the municipal derivatives desk, which was conducted by approximately seven professionals.  In addition to my focus on reinvestment activities, I also routinely engaged in interest rate swaps, interest rate exotics (binaries, barrier options, compound options, etc.), total return swaps and real estate/housing-related business.

14.     After leaving JPMorgan, I was a municipal structurer at Deutsche Bank, where I had responsibilities similar to those that I had at JP Morgan. I also had overall responsibility for derivatives marketing for the Midwest region. In addition, I managed a proprietary interest rate swap relationship with Fannie Mae where Deutsche Bank provided subordinated swap solutions for Fannie Mae's multi-family borrowers.

15.     I have an undergraduate degree in Electrical Engineering from the Massachusetts Institute of Technology.

16.     My CV is attached at Appendix 1.

## IV.    DOCUMENTS CONSIDERED

17.     In preparing my report, I reviewed documents produced in this litigation, as well as transcripts of deposition testimony taken in connection with this dispute. A list of documents that I have considered in forming my opinion is included at Appendix 2.

## V.    SUMMARY OF KEY OPINIONS

18.     Based upon my experience and knowledge of established industry practices and conventions, I am of the opinion that:

(a)     The commercially reasonable mid-market valuation of the RFA, as of March 25, 2009 (including Washington TSA's 7.7(b) loss amount described below), is $1,132,772.61 payable by Washington TSA to Lehman.

(b)     The Swap Financial Report is fatally flawed and results in an erroneous valuation of the RFA. Assuming Swap Financial's methodology and the consideration of dealer charges is appropriate in the absence of an actual replacement transaction, Swap Financial erroneously used a "credit charge" substantially in excess of any commercially reasonable credit charge for comparable transactions at the time of rejection.

(c)     The Curry/Hasterok Report should not be considered because it evidences a fundamental misunderstanding of the well-established industry practice for valuing reserve fund agreements and relies upon unsupportable assumptions that result in an inflated valuation of the RFA.

19.     I reserve the right to supplement the foregoing opinions in response to any new evidence or information produced by Washington TSA, including any supplemental opinions from any of the Washington TSA Experts.

## VI.    THE RFA WITH WASHINGTON TOBACCO SETTLEMENT AUTHORITY

20.     In 2002, Washington TSA issued $517,905,000 Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "Bonds").  In connection with the Bonds, Washington TSA was required to maintain a Reserve Fund of $45,534,106 in the event that Washington TSA could not obtain sufficient funds from other sources to meet its scheduled debt service obligations.[2]

21.     Washington TSA entered into the RFA with Lehman and U.S. Bank, N.A., as trustee, as of November 5, 2002.  The RFA provided for the continuous reinvestment of the Reserve Fund at a guaranteed rate of return.

22.     Under the terms of the RFA, on each June 1 and December 1 interest payment date, Lehman was required to deliver, or cause to be delivered, Eligible Securities with a maturity amount equal to the Scheduled Reserve Amount.  Washington TSA was required to pay a purchase price for such Eligible Securities in an amount equal to the sum of the Scheduled Reserve Amount and an amount that produced an effective yield to Washington TSA of 4.484% per annum (the "Guaranteed Rate").

23.     The RFA defined Eligible Securities as "non-callable and non-prepayable

(a) direct obligations of the United States of America including only notes, bonds, bills or certificates of indebtedness,

(b) senior debt and/or guaranteed mortgage pass-through obligations of the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, any Federal Home Loan Bank , and the Federal Farm Credit System, or

(c) commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer is subject to U.S. law; additionally, if the maturity date of the

---

[2]     *See* Official Statement at S-8.

commercial paper tendered is 100 days or more, the issuer thereof must have long term ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch."[3]

24.    Under the RFA, Lehman was permitted to deliver any "Eligible Security" that had a stated maturity date no later than the next interest payment date.  In connection with each such delivery date, Lehman would realize the difference in value (positive or negative) between the price at which Washington TSA purchased the securities from Lehman and the price (or yield)[4] at which Lehman purchased the Eligible Securities in the market.  In other words, Lehman would realize the difference between the yield of the Eligible Securities and the Guaranteed Rate.

25.    It was always in Lehman's interest to deliver to Washington TSA Eligible Securities that had the highest yield (and therefore the lowest price), commonly referred to as the "cheapest to deliver," in order to maximize its profit from the transaction.[5]  Correspondingly, Washington TSA was required to purchase such securities, so long as the securities met the definition of Eligible Securities and other requirements of the RFA at the time of delivery.

26.    The RFA set forth the circumstances under which the RFA could be terminated and the terms for calculating the Termination Amount in connection with any such termination. The definition of Termination Amount provided that the first step in calculating the Termination Amount required Washington TSA to solicit quotations from Dealers as to what the Dealer would pay or require to be paid "in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date . . . ."[6]

27.    I understand that there is no documentary evidence that Washington TSA solicited quotations on which to base the Termination Amount.  I understand that Peter Shapiro testified that Swap Financial (a) contacted Dealers in January 2009, but kept no records relating

---

[3]    RFA § 1, "Eligible Securities."
[4]    In this report, I have used the terms rate and yield interchangeably.  In practice, the yield of a security is a level calculated based upon the actual coupon rate on a particular security and the price at which it is valued in the market.
[5]    Section 5.2 of the RFA explicitly states that Lehman did not have a fiduciary relationship with Washington TSA.
[6]    RFA § 1, "Termination Amount."

to this process and (b) did not attempt to contact any Dealers in March 2009.[7]  Washington TSA's experts Hasterok and Curry claim that it would not have been possible to obtain any quotations in March 2009.[8]  I note that Lehman, in fact, received a quotation from Wachovia Bank with respect to the RFA in March 2009.[9]

28.    Notwithstanding having a stated maximum maturity date of May 28, 2032, the RFA would terminate prior to such date, without any termination payment being payable by either party to the other party in the event of a Mandatory Cleanup Call.[10]  Under the offering documents for the Bonds and Washington TSA's own internal projections, Washington TSA estimated that all of the Bonds would be redeemed in 2019.[11]

29.    In December 2008, Lehman failed to deliver Eligible Securities to Washington TSA for purchase by it.  As a result, Washington TSA retained possession and control of the entire Reserve Fund and has at all times since then had the ability to reinvest the Reserve Fund in Eligible Securities and other investments.  Washington TSA does not dispute that it has retained the entire amount of the Reserve Fund.

30.    On March 25, 2009 (the "Rejection Date"), Lehman rejected the RFA.

31.    The value of the RFA as of the Rejection Date is simply the difference (discounted to present value) between the earnings that Washington TSA could reasonably have expected to realize by investing the moneys in the Reserve Fund in the highest yielding Eligible Securities available and the earnings that it would have realized at the Guaranteed Rate of 4.484% if Lehman had continued to perform its obligations under the RFA.  This represents the benefit of the bargain that Washington TSA lost when Lehman rejected the RFA.

---

[7]    Shapiro Dep. at 104:18-105:15; 106:23-109:13; *see also* Curry/Hasterok Report at 6; Hasterok Dep. at 72:15-73:2.

[8]    Curry/Hasterok Report at 6.

[9]    In his deposition, Mr. Hasterok acknowledged that he knew about the Wachovia quote that Lehman had obtained.  Hasterok Dep. at 119:13-18.

[10]    *See* RFA § 2.8.  The Bond Indenture provided that excess revenues not needed to pay debt service and maintain various accounts relating to the Bonds would be used to retire outstanding Bonds prior to their maturity. *See* Bond Indenture §§ 402, 404(d); *see also* Official Statement at S-8, 82.  If enough Bonds were retired early, a time would come when the funds available would exceed the balance of the principal and interest due on the outstanding Bonds.  *See* Bond Indenture § 404(i); *see also* Official Statement at 85. In that event, all available funds including the Reserve Fund would be drawn down in full to retire the last remaining bonds – a so-called "Mandatory Cleanup Call."  Official Statement at S-8, 85.

[11]    *See id.*, "Maturities"; *see also* Curry/Hasterok Report at 10.

## VII.  METHODOLOGY

32.     I have spent approximately 20 years of my career pricing and transacting countless agreements similar to the RFA.  Determining the value of a reserve fund agreement is a fairly straightforward exercise that many capital markets professionals routinely perform on a daily basis.

33.     Under a reserve fund agreement, there are essentially two streams of cash flows. There is the "fixed leg," which is comprised of the fixed-rate earnings guaranteed under the agreement that are realized by the issuer in connection with the eligible securities.  The second stream of cash flows, the "floating leg," consists of the floating rate earnings realized by the dealer.  The floating rate earnings are generated each time the dealer purchases, at then prevailing rates, the eligible securities prior to delivering them to the issuer.

34.     Each and every time I have valued a reserve fund agreement, regardless of whether it was to execute a new transaction, place a value on an existing transaction, or to terminate a transaction, and regardless of whether the valuation was on behalf of a dealer or an issuer, the methodology I used to determine the value was always the same.  Specifically, I would calculate the future cash flows associated with each of the fixed leg and the floating leg. Then I would compare the cash flows of each of the fixed and floating legs for each time period and discount the difference between those cash flows for that given period to present value.  To determine the value of the reserve fund agreement, I would then sum those discounted amounts. To the extent that resulting sum was a positive number, the value of the agreement would be in the issuer's favor in that amount.  If the resulting sum was a negative number, the value of the agreement would be in the dealer's favor in that amount.

35.     As noted above, the "Guaranteed Rate" under a reserve fund agreement is used to calculate the future cash flows for the fixed leg of the agreement.

36.     The value of the floating leg is tied to the anticipated yield of the eligible securities to be delivered over the remaining term of the given reserve fund agreement.  Since a dealer has the right to deliver the "cheapest to deliver" (or highest yielding) eligible securities, the forward curve for the "cheapest to deliver" eligible securities as of the valuation date is used

to calculate the future cash flows for the "floating leg." This forward curve represents the market's expectation of future earnings on those eligible securities, as of a given date.

37.    The valuation procedure described above is the established standard methodology that is used by both dealers and customers (including bond issuers) to value reserve fund agreements and other similar types of financial agreements. This methodology is fundamental to the market. It is the methodology I always used when valuing reserve fund agreements at JP Morgan and Deutsche Bank for over a decade. It is still the methodology I use at Cityview in connection with valuing these types of transactions on behalf of issuers and other market participants.

38.    Using a forward curve to value long-dated financial instruments is not a controversial methodology. Although I disagree with Swap Financial Group's valuation, as detailed in Section VIII, Swap Financial's analysis is based on the use of forward curves. Washington TSA's other experts, Curry and Hasterok, disagree with Swap Financial's approach and decline to use forward curves, arguing that forward curves should not be used. But even Washington TSA's Expert Jeffrey Hasterok agrees that using forward curves is a way to value forward delivery agreements (which includes reserve fund agreements),[12] and that during his tenure at Morgan Stanley he routinely used forward curves to value reserve fund agreements.[13]

39.    Although I agree with Washington TSA's Experts that the market for new reserve fund agreements was inactive around the Rejection Date, this has no relevance to the valuation analysis. Even in the absence of an active market for new reserve fund agreements, the market was still providing sufficient information for parties to determine the value of their existing reserve fund agreements based upon the use of forward curves. Indeed, all dealers in this market for reserve fund agreements had portfolios of these agreements on their books, which had to be valued (or "marked") each day. Dealers and other market participants regularly determined the value of their positions during that period based on forward curves.

---

[12]    Hasterok Dep. at 27:7-23; 197:21-198:12.
[13]    *Id.* at 27:18-23.

**Valuation of the RFA**

40.     Using the established industry-standard methodology, the valuation of the RFA can be broken down into three steps:

<u>Step One</u>:     Identify the "Cheapest to Deliver" Eligible Securities as of the Rejection Date by comparing the yield curves on such date for each type of Eligible Securities.

<u>Step Two</u>:     Develop the forward curve on the basis of the yield of the Eligible Securities identified in Step One.

<u>Step Three</u>:     Value the RFA by calculating the future cash flows of the two legs of the transaction and discounting the difference between such cash flows to present value.

41.     As explained in detail below, using the industry-standard methodology, the mid-market value of the Reserve Fund as of March 25, 2009 is $1,359,394.59 payable by Washington TSA to Lehman, prior to any adjustment for a Section 7.7(b) Loss Amount.

**<u>Step One</u>:  Identify the Cheapest to Deliver Securities as of March 25, 2009, the Rejection Date.**

42.     I reviewed the yield curves for each category of Eligible Securities (Treasuries, Agencies and Commercial Paper) as of March 25, 2009, using information published by Bloomberg for each category as shown in the chart below.  By looking at these yield curves, I determined that U.S. Agency Securities were the highest yielding or cheapest to deliver Eligible Securities on such date (see green line on the chart).  Accordingly, the forward curve to be used in calculating the floating rate should be based upon the yield curve for U.S. Agency Securities, as in effect on March 25, 2009.



43.     The US Agency market is a liquid market in which quotes can be readily obtained for securities (e.g., FNMA, FHLMC and FHLB) for many different maturity dates.  Bloomberg publishes a yield curve that comprises all three of these agencies into one composite curve.  The curve can be found on a Bloomberg Terminal by typing F84<CORP>< GO>.

44.     The chart below shows the Agency yield curve for March 25, 2009 and the data points of which it is comprised.



**Step Two: Develop an Agency Forward Curve**

45.    Utilizing the data contained in Bloomberg, I calculated the forward curve as of March 25, 2009.  Such forward curve is understood by the financial derivatives market to represent the market's consensus as to the rates that Washington TSA could expect to receive on U.S. Agency Securities for each delivery date during the remaining term of the RFA.

46.    To perform these calculations, I used FINCAD Analytics Suite for Excel ("FINCAD"), which is a commercially available analytics library that is an add-in to Microsoft Excel.  The results of this analysis can be found in Appendix 3.

**Step Three:  Value the RFA by Calculating the Future Cash Flows of the Two Legs of the Transaction and Discounting the Difference Between such Cash Flows to Present Value.**

47.    Once I determined the Agency forward rates for each of the delivery dates using FINCAD, I used FINCAD to calculate the cash flows for each of the legs of the RFA, on each of

the future delivery dates.  The calculation of future cash flows based upon forward rates is fundamental to the valuation of long-term financial instruments, such as reserve fund agreements.  I used the following inputs in connection with FINCAD to determine the relevant cash flows of the RFA:

| | |
|---|---|
| Notional Amount: | $45,534,106 |
| Effective Date: | March 25, 2009 |
| Termination Date: | May 28, 2032 |
| Fixed Rate Payor: | Lehman |
| Fixed Rate: | 4.484% |
| Fixed Rate Payments: | 30/360, semi-annually |
| Floating Rate Payor: | Washington TSA |
| Floating Rate: | Agency Forward Rates |
| Floating Rate Payments: | Act/360, semi-annually |
| Discount Curve: | USD LIBOR |

48.     As reflected in Appendix 3, FINCAD generates the cash flows for each delivery period for both the fixed leg and floating leg of the RFA.   FINCAD compares these cash flows for each period and discounts the difference to present value using the LIBOR curve as of March 25, 2009, the Rejection Date. This approach is consistent with established market practice and convention.

49.     Based on the terms in paragraph 47, I calculated a mid-market value of these cash flows of $1,359,394.59, payable by Washington TSA to Lehman as shown in Appendix 3.[14]

**Section 7.7(b) Loss Amount**

50.     In addition to the mid-market value that I calculated, the RFA requires that TSA must be compensated for Lehman's failure to deliver Eligible Securities on December 1, 2008 through the valuation date, March 25, 2009.  The RFA details how to calculate this amount in Section 7.7(b), which requires a comparison of what Washington TSA could have earned by investing pursuant to the terms of the RFA from December 1, 2008 to March 25, 2009 to what

---

[14]     "Mid-market value" refers to the valuation of a financial instrument or derivative without the inclusion of any charges such as dealer profit or credit charges.

Washington TSA would have earned pursuant to the Guaranteed Rate during that same time period.

51.    Under the terms of the RFA, if Lehman did not deliver Eligible Securities to Washington TSA, the Trustee was required to invest the Reserve Fund in overnight securities for the first five business days (the Lehman Cure Period).[15]  Thereafter, the RFA required Washington TSA to invest the Reserve Fund in Eligible Securities with the longest maturity date, but maturing no later than the next Bond Payment Date of June 1, 2009.[16]

52.    From December 1, 2008 (the first interest payment date on which Lehman failed to make a delivery of Eligible Securities) until December 8, 2008 (five business days), Washington TSA was required to invest in overnight securities.  As a proxy for this type of investment, I assumed that Washington TSA would have earned the Fed Funds rate because that is the rate at which depository institutions charge one another for overnight loans at the Federal Reserve Bank.  From December 1, 2008 to December 8, 2008, this rate averaged 0.273%.[17]

53.    On December 8, 2008, Washington TSA was required to invest the Reserve Fund in Eligible Securities with the longest maturity date, but maturing no later than the next Bond Payment Date of June 1, 2009.[18]  For purposes of this calculation, I assumed that Washington TSA should have purchased A-1+/P-1 rated asset backed commercial paper, which was included in the definition of Eligible Securities.  I made this assumption because during this particular time period, asset-backed commercial paper was the highest yielding (on a spot basis) of Eligible Securities.[19]

54.    To determine what Washington TSA would have earned by investing in A-1+/P-1 rated asset backed commercial paper, I looked at the Bloomberg 180-day Asset Backed Commercial Paper Index (the "Index").  The Index is made up of a composite of A1+/ P-1/ F1+ rated U.S. asset backed commercial paper programs and can be found on a Bloomberg Terminal by typing in ACPA180Y<INDEX><GO>.  Because Bloomberg did not publish information on

---

[15]    RFA § 2.4(a).  *See generally* RFA § 7.3(a).
[16]    *See* RFA § 2.4(a).
[17]    Source: Bloomberg L.P.
[18]    *See* RFA § 2.4(a).
[19]    Note that the spot rate is not the same as a yield curve, which was used above to determine the "cheapest to deliver" over the life of the RFA.

the Index on December 8, 2008, I used the best information available and interpolated between the rate for December 4, 2008 (3.33%) and December 10 (2.84%) and estimated the rate to be 3.085%.[20]  I then calculated Washington TSA's hypothetical earnings from December 8, 2008 and March 25, 2009, using the rate of 3.085%.

55.    If Washington TSA invested in accordance with the RFA after Lehman failed to deliver securities on December 1, 2008, Washington TSA could have earned $419,931.97 from December 1, 2008 to March 25, 2009.

56.    I then compared the amount that Washington TSA could have earned versus what it would have earned - $646,553.95 – if Lehman had delivered Eligible Securities yielding the Guaranteed Rate for the period from December 1, 2008 to March 25, 2009.  The chart below illustrates this analysis:

**ASSUMED INVESTMENT**

| Start Date | End Date | Days | Rate | Earnings |
|---|---|---|---|---|
| 12/1/2008 | 12/8/2008 | 7 | 0.273% | 2,415.84 |
| 12/8/2008 | 3/25/2009 | 107 | 3.085% | 417,516.13 |
| | | | | 419,931.97 |

**FOREGONE INVESTMENT**

| Start Date | End Date | Days | Rate | Earnings |
|---|---|---|---|---|
| 12/1/2008 | 3/25/2009 | 114 | 4.484% | 646,553.95 |
| **7.7 (b) Loss Amount** | | | | 226,621.98 |

---

[20]    December 4 and 10 were the two closest data points published before and after December 8, 2008.

57.     As shown above, Washington TSA's Section 7.7(b) Loss Amount is $226,621.98 ($646,533.95 - $419,931.97).

58.     **Based on the analysis described in this Section VII, I have valued the RFA at $1,132,772.61, payable by Washington TSA to Lehman.**

| | |
|---|---|
| Mid Market Value | 1,359,394.59 |
| 7.7 (b) Loss | (226,621.98) |
| Mid-Market Value of RFA, including 7.7(b) Loss | 1,132,772.61 |

## VIII. OBSERVATIONS ON THE SWAP FINANCIAL REPORT

59.     I have reviewed the Swap Financial Report, which is comprised of a memorandum, dated September 10, 2009, and an affidavit from Peter Shapiro, dated December 13, 2013.  The Swap Financial Report calculates the Termination Amount for the RFA to be $38,007,347, owed by Lehman to Washington TSA.  In addition, the Swap Financial Report calculates the Section 7.7(b) loss amount to be $553,080.  I have the following expert opinions on the Swap Financial Report.

60.     To determine the Termination Amount pursuant to the RFA, Swap Financial "analyz[ed] the RFA cash flows."[21]  Swap Financial indicated that "[t]o value the cash flows under the RFA, the appropriate method is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 4.484% and the other payer (Washington TSA) would pay a floating rate."[22]  I do not disagree with Swap Financial's fundamental approach to treat the RFA as an interest rate swap where the fixed rate is the Guaranteed Rate of the RFA.

---

[21]     Swap Financial Memo at 1.
[22]     Swap Financial Memo at 2.

61.     Swap Financial then noted that "the value of the floating leg is of great importance, since the value of the fixed leg is already known."[23]  According to Swap Financial, "[t]he value of the floating leg should represent the value of the securities which are going to be delivered . . . ."[24]  I agree with Swap Financial's statement that the floating rate should represent the value of the securities to be delivered pursuant to the RFA.  Indeed, that is precisely the analysis I have undertaken in Section VII and is consistent with my experience as to how reserve fund agreements are valued in the market.

62.     Swap Financial included in its floating leg calculation the amounts purportedly attributable to the "ongoing credit risk of the RFA" and a "profit or spread component that would be charged by another provider to replace the RFA." [25]  By including a "credit charge" and "profit component," Swap Financial appears to be attempting to value the RFA on the basis of what it would cost Washington TSA to enter into a hypothetical replacement reserve fund agreement that had identical terms to the RFA.  I do not opine on whether such hypothetical dealer charges are appropriate to include in the Termination Amount calculation as a matter of law.  However, to the extent one wanted to create a price for a hypothetical replacement transaction, I agree, based upon my experience in the industry, that the inclusion of credit and profit charges would be appropriate.  But as discussed below, I do not agree with Swap Financial's approach in calculating credit and profit charges.

**Swap Financial's Erroneous Credit Charge**

63.     Swap Financial has made a fundamental mistake in connection with the credit charge used for its Termination Amount calculation, which materially distorts the value of the RFA in favor of Washington TSA.  In my expert opinion, Swap Financial's approach to determining the credit charge and the magnitude of the resulting credit charge are not consistent with market practice.

64.     In my experience, a dealer imposes a credit charge when pricing or bidding on a reserve fund agreement for the purpose of protecting itself against the risk of a counterparty

---

[23]     Swap Financial Memo at 2.
[24]     Swap Financial Memo at 2.
[25]     Swap Financial Memo at 2; *see also* Swap Financial Memo at 3 (including a table that "summarize[s] the various components that would be included in calculating the floating rate for the RFA" including commercial paper, credit and profit).

default. A reserve fund agreement fluctuates in value over time as market conditions change. At times, the reserve fund agreement will be more valuable to the dealer than the issuer, in which case the dealer is "in the money." At other times, the reserve fund agreement will be more valuable to the issuer than the dealer, in which case the issuer is "in the money" (and the dealer will be "out of the money"). In imposing a credit charge, the dealer is concerned about the circumstance where the dealer is "in the money" and the issuer defaults and is not able to make the requisite termination payment to the dealer. Given the possibility that this might occur, the dealer has credit exposure to the issuer and typically charges the issuer for this credit exposure.

65. To determine a credit charge, the dealer first attempts to assess the creditworthiness of the issuer. Typically credit default swaps for municipal issuers do not exist so an alternative mechanism to assess the creditworthiness of the bond issuer is to look at the spread at which its bonds are trading to some index. This is commonly referred to as a "credit spread." Another significant consideration in determining a credit charge is an assessment of the circumstances when the dealer would be exposed to the credit of the issuer. In other words, how often did the dealer expect to be "in the money" under the reserve fund agreement. The dealer would then apply default probabilities (derived from the credit spread) to each of the possible credit exposures. Based upon my experience, this is a standard market practice done by all dealers to determine credit exposure and a corresponding credit charge.

66. Swap Financial did not follow standard market practice in determining the credit charge a dealer might have imposed in connection with a hypothetical replacement reserve fund agreement for the RFA. Instead, Swap Financial appears to have calculated the credit spread by comparing the actual trading yields of the Bonds against an A-rated municipal-bond index.[26] Then, without considering possible credit exposures and probability of default, Swap Financial inappropriately applied the credit spread of 429 basis points directly as an adjustment to the LIBOR curve.[27] This is a fundamentally flawed approach that results in a grossly inflated credit charge. It further implies that Swap Financial concluded there was a 100% chance that the dealer in the hypothetical replacement reserve fund agreement would be substantially "in the

---

[26]     *See* Swap Financial Memo at 2.
[27]     Swap Financial Memo at 3; Shapiro Dep. at 146:16-147:4.

money" under the RFA at all times, which is inconsistent with the significant claim Washington TSA has asserted.

67.    I have determined, based upon established market practice and using publicly available market data from Bloomberg, that the appropriate credit charge for the hypothetical replacement reserve fund agreement would be 20.3 basis points.[28]  To determine this credit charge, I used the CVA function that is available in Bloomberg swap analytics.[29]  Using Swap Financial's assumptions, I created a hypothetical swap in Bloomberg and relied upon Bloomberg's analytic models, historic rate and volatility data.  This calculated a CVA of $1,274,926.47, which translates to approximately 16.9 basis points.

**Recalculated "Swap Financial Termination Amount" Correcting The Erroneous Credit Charge**

68.    To be clear, I do not adopt Swap Financial's replacement transaction methodology.  However, to demonstrate the dramatic impact resulting from Swap Financial's erroneous credit charge, I have recalculated below the Termination Amount using Swap Financial's methodology.  For the limited purpose of this analysis, I accept Swap Financial's use in its calculation of LIBOR + 66.6 basis points as the return on the asset-backed commercial paper and a profit charge of 25 basis points.

---

[28]    I used the credit spread of 429 basis points, as determined by Swap Financial, to reach this conclusion. However, I believe that Swap Financial incorrectly determined the credit spread.  I believe that the credit spread should have been determined by comparing Washington TSA's bond yield to the AAA rated bond index, which results in a credit spread of 490.4 basis points.  Using the proper credit spread of 490.4 basis points, results in a credit charge of 19.4 basis points.  I have detailed this analysis in Appendix 4.

[29]    The Bloomberg Credit Valuation Adjustment function performs a so-called  "Monte Carlo" simulation which evaluates thousands of potential scenarios across multiple time periods based upon prevailing interest rates and volatility.

|  | Swap Financial Termination Amount | Recalculated Swap Financial Termination Amount |
| --- | --- | --- |
| Mid Market | (3,685,691.56) | (3,685,691.56) |
| Credit | (32,431,696.44) | (1,274,926.47) |
|  | 429 bps | 16.9 bps |
| Section 7.7 (b) | (553,080.00) | (553,080.00) |
| Dealer profit charge | (1,889,959.00) | (1,889,959.00) |
|  | 25 bps | 25 bps |
| Net Value | (38,560,427.00) payable by Lehman | (7,403,657.03) payable by Lehman |

69.     The use of an appropriate credit charge would reduce the Termination Amount calculated by Swap Financial from $38,560,427 to $7,403,657.03.

70.     Although I do not opine, as a legal matter, as to whether or not it is appropriate to include an adjustment for a credit charge and for dealer profit charge, I did make such an adjustment to the valuation that I calculated in paragraph 58.  Based upon the mid-market valuation that I determined, I calculated that the CVA for this valuation would have been $2,055,115.33.  When further adjusted for an assumed dealer profit charge of $1,889,959, I calculate that a hypothetical replacement trade would have been valued at $2,812,301.72, payable by Lehman to TSA, including the Section 7.7 (b) Loss Amount.

71.     The impact of the erroneous credit charge is reflected in the below chart, which reveals that the credit charge alone comprises the majority of Swap Financial's Termination Amount calculation.



72.     I note that my recalculated Swap Financial Termination Amount does not reflect the mid-market valuation of the RFA, as I have calculated in Section VII. Instead, the recalculated Swap Financial Termination Amount reflects a hypothetical price that a dealer might charge to enter into a replacement reserve fund agreement with identical terms as the RFA, on March 25, 2009, including hypothetical dealer charges based upon Swap Financial's assumptions.

73.     Looking in more detail at the Swap Financial calculation, one can determine that Swap Financial has determined that the mid-market valuation (including Section 7.7(b) loss) of the RFA (i.e., without the inclusion of hypothetical dealer charges) is $4,238,771.56, payable by Lehman to Washington TSA. The difference between the mid-market valuation I determined and that determined by Swap Financial is driven by the selection of the Eligible Securities to be used to create the forward curve. Consistent with market practice and Lehman's right under the RFA, I used the "cheapest to deliver" of the Eligible Securities as of the valuation date – U.S. Agency Securities.[30] In contrast, Swap Financial impermissibly used asset-backed commercial paper as the basis for its forward curve. Additionally, I disagree with Swap Financial's calculation of the Section 7.7(b) loss.

---

[30]     *See* chart, *supra* page 10 (demonstrating that U.S. Agency Securities were the cheapest to deliver on March 25, 2009). Both of Swap Financial's professionals involved with the valuation of the RFA agree that the "cheapest to deliver" securities should form the basis of the valuation. *See* Shapiro Dep. at 129:13-131:12; Vergara Dep. at 169:15-169:24. However, Swap Financial did not use the "cheapest to deliver" securities in their valuation.

## IX.    OBSERVATIONS ON THE CURRY/HASTEROK REPORT

74.    I have reviewed the "Expert Witness Valuation Report" of Daniel Curry and Jeffrey Hasterok, dated December 16, 2013 (the "Curry/Hasterok Report"). In my expert opinion, the Curry/Hasterok Report must be disregarded in its entirety because its valuation methodology is fundamentally flawed and contravenes accepted market practice in several important respects:

(i)    The Curry/Hasterok Report rejects the use of "forward curves" in calculating termination amounts despite the fact that the use of forward curves is the established market methodology to value financial instruments and is used by issuers and dealers in calculating termination and similar amounts. In fact, Swap Financial utilizes this very methodology in valuing the RFA for Washington TSA, although I disagree with many aspects of Swap Financial's actual calculations.

(ii)    The Curry/Hasterok Report impermissibly utilizes market data after March 25, 2009, the Rejection Date. The use of such market data is totally inconsistent with market practice.

(iii)    The Curry/Hasterok Report relies largely upon an assumption of future yields that is inconsistent with its own analysis and violates established industry practice.

**The Curry/Hasterok Report Rejects the Forward Curve**

75.    A fundamental flaw in the Curry/Hasterok Report is that it rejects the well-established market practice of valuing financial instruments on the basis of the forward curves, as of the date for which the calculation is being made (in this case, March 25, 2009).

76.    The Curry/Hasterok Report rejects the industry-standard valuation methodology. According to the Curry/Hasterok Report, the use of forward curves is inappropriate because the implied "forward rates … are not generally accurate representatives of the actual path the rates will actually follow over time."[31] But forward curves are not intended to be infallible predictors of future rates, but rather are intended only to reflect, based upon the best information available for a given valuation date, the consensus of the market as to anticipated future rates.

77.    The Curry/Hasterok approach is inconsistent with the established practice in the financial industry. I know of no market participants that value for any purpose financial instruments, such as the RFA, on any basis other than forward curves. As noted above, the Swap

---

[31]    Curry/Hasterok Report at 14.

Financial Report uses the forward curve methodology, rather than the methodology put forward in the Curry/Hasterok Report. Moreover, even Curry and Hasterok acknowledge that market participants regularly utilize forward curves to value transactions and their positions. [32]

78.    It is my opinion, based on my experience in the market and generally accepted methodology, that financial instruments, such as the RFA, are valued based on forward curves. Virtually all market participants transact business and value their positions daily based upon forward curves. The fundamental nature of forward curves to value financial instruments is not controversial. I am not aware of any basis that would justify the rejection of forward curves for valuing financial instruments, as was done in the Curry/Hasterok Report.

79.    The only source that the Curry/Hasterok Report cites in support of its position that forward curves should not be used to value reserve fund agreements is a discussion in a blog.[33] The cited blog, however, actually underscores the appropriateness of using forward curves for valuation purposes, concluding that

> "…**if you're in a financial services environment as a trader or you're looking to perform a fair price analysis of an interest rate derivative using an interest rate model, you *better* use forward rates. If you've got complete and relatively efficient markets, you'll get your head removed if you don't.**"[34]

I believe that the market for U.S. Agency Securities is the very type of market referenced in the blog, a market that is "complete and relatively efficient."

80.    Curry and Hasterok attempt to justify their rejection of forward curves by claiming that an issuer, like Washington TSA, should not be required to value the RFA in the same manner as the rest of the market because the calculation should be done "on [Washington]

---

[32]    Hasterok testified that using forward curves is the way to value forward delivery agreements, and that during his 11 years at Morgan Stanley he routinely used forward curves to value reserve fund agreements. Hasterok Dep. at 27:7-23; 197:21-198:12. Curry agreed that forward curves are essential tools for the structuring and pricing of derivative instruments. Curry Dep. at 11:17-12:13; 13:2-12; 23:16-23.

[33]    Curry/Hasterok Report at 14.

[34]    Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?* INTUITIVE ANALYTICS (May 17, 2013, 6:30 AM), http://www.intuitive-analytics.com/blog/; *see also* Hasterok Dep. at 141:12-142:5 (emphasis in original).

TSA's side of the market … not the dealer's side of the market."[35]  This justification, however, has no basis in market practice.  In my experience, all market participants, both dealers and issuers alike use forward curves to value their financial contracts.  In my current practice, I represent issuers and always use forward curves to value their financial instruments, including reserve fund agreements.

**The Curry/Hasterok Report Relies On Data Subsequent To The Valuation Date**

81.    The Curry/Hasterok Report recognizes that the RFA must be valued as of March 25, 2009,[36] but still relies upon data from after that date.  For example, on page 17, the Curry/Hasterok Report examines Washington TSA's actual earnings on its Reserve Fund after March 25, 2009 and uses that limited history to justify the use of their assumption that Washington TSA will only earn 65 basis points on the Reserve Fund for the remainder of the RFA.[37]

82.    The use of market data for dates after March 25, 2009 is simply inconsistent with market practice and reflects Curry and Hasterok's apparent misunderstanding of the intended purpose for using forward yield curves.[38]  In my experience, market participants do not use market data ascertained after the valuation date for purposes of valuing a reserve fund agreement, upon termination or otherwise, or for valuing other derivatives contracts.  Instead, market participants value their positions and mark their books based upon the best available data at the time of valuation.

---

[35]    Hasterok Dep. at 35:7-14.  The concept of the "dealer's side of the market" would refer to the bid/ask spread and other charges that might be included by a dealer when valuing a transaction, but does not refer to the fundamental methodology to be used to value a transaction.

[36]    Curry/Hasterok Report at 1

[37]    *Id.* at 17; s*ee also id.* at 10-12 (utilizing internal Washington TSA bond redemption projections from after the Rejection Date); *id.* at 16-17 (reviewing historical yields since the date of first failed delivery "up to the present"); *id.* at 19 (using average yield data through, in some instances, September and June 2013 to calculate the replacement yield for various scenarios on the Valuation Matrix).  Curry and Hasterok acknowledged use of post-rejection data at their depositions.  S*ee* Curry Dep. at 82:13-83:7; 137:9-16; Hasterok Dep. at 145:6-9; 180:3-20.  Notwithstanding their reliance on post-rejection data, they maintain that every scenario on the Valuation Matrix is a "reasonable" valuation.  *See* Hasterok Dep. at 14:12-15:11; 24:3-9; 83:25-84:15.

[38]    I also understand that reliance on post-rejection data is inappropriate under the Bankruptcy Code, although I offer no opinion as to this issue.

**The Curry/Hasterok Report Relies on an Unjustifiable Assumption That is Inconsistent with its Own Analysis**

83.    The Curry/Hasterok Report discusses the limitations of using historical averages as a basis for a valuation and notes that this approach can be skewed based upon the time period chosen to sample.[39]  Yet this is precisely the approach the Curry/Hasterok Report uses to value the RFA.[40]  The Curry/Hasterok Report assumes, based upon past performance, that Washington TSA will not be able to reinvest the Reserve Fund at a rate in excess of 65 basis points through 2032.

84.    The Curry/Hasterok Report includes what it refers to as a "Valuation Matrix," pursuant to which Curry and Hasterok purport to value the RFA using different metrics.  The Valuation Matrix purports to contain yield information for a number of different investment options for different time periods.  Specifically, the Curry/Hasterok Report provides information regarding (a) commercial paper; (b) certificates of deposit; (c) FNMA/FHLMC discount notes; (d) actual and projected reinvestment and (e) cancellable swap plus invest floating portfolio.[41] The time periods included are (1) December 2008 to March 25, 2009; (2) December 2008 – September 2013; and (3) December 2008 to June 2013.[42]

85.    Using these metrics, the Curry/Hasterok Report provides 10 different "Replacement Yields" which purport to be amounts that Washington TSA could earn by investing the Reserve Fund.  These "Replacements Yields" were determined by looking at

---

[39]    Curry/Hasterok Report at 15.

[40]    *See* Hasterok Dep. at 179:9-22; 186:19-188:23.

[41]    In calculating the Termination Amount of the RFA, Curry and Hasterok purport to consider "replacement yields" for a select number of investments Washington TSA could invest in pursuant to the Bond Indenture.  *See generally* Curry/Hasterok Report at 12-19.  Yet, the Curry/Hasterok Report provides no analysis as to why any investments other than the Eligible Securities, as defined in the RFA, should be considered.  As discussed in Section VII, *supra*, the industry-standard methodology for valuing a reserve fund agreement begins with an evaluation of the applicable eligible securities specified in the reserve fund agreement to determine which is the "cheapest to deliver."

[42]    Curry/Hasterok Report at 19.  Even in their depositions, Hasterok and Curry did not provide sufficient bases for selecting these time frames.  Hasterok stated that the first range begins at the date of Lehman's first failed delivery (December 2008) and goes through the Rejection Date (March 2009).  Hasterok Dep. at 180:3-22.  The second range spans from the first failed delivery date (December 2008) through the refunding of the bonds (September 2013).  *Id.* at 162:6-21.  The third range spans the first failed delivery date (December 2008) through June 2013.  *Id.* at 180:3-22.  Hasterok further stated that the third time period would have "ideally" encompassed data through the date of the Curry/Hasterok Report (December 2013); however, this window was cut short because certain historical data was only available through June 2013.  *Id.*  Aside from these descriptive statements as to the time periods, no other reasons were offered as to why these time periods were chosen.

average actual returns for relatively short periods of time, both before and after the valuation date of March 25, 2009.

86.     From among these "Replacement Yields," Curry and Hasterok selected the Replacement Yield that corresponded to the average rate that Washington TSA actually earned by placing the Reserve Fund in a money market account from December 2008 to March 2009. The Curry/Hasterok Report then assumes that such average yield will be the yield that Washington TSA can expect to obtain during the remaining life of the RFA – no more and no less – until May 2032.[43]

87.     The graph below illustrates the Curry/Hasterok Report's expectations of Washington TSA's yield through 2032



88.     Even Curry and Hasterok acknowledged the limitations of their own proposed methodology when they caution that "[p]ast performance is no guarantee of future results."[44] But that is exactly the methodology used in the Curry/Hasterok Report:  looking at the historical average yield earned by Washington TSA to predict earnings in the future.  The only justification

---

[43]     Even Washington TSA rejects the Curry/Hasterok Report's assumption that interest rates will remain low for the indefinite future.  As explained by Washington TSA's Senior Director of Finance Bob Cook, he was not interested in locking Washington TSA into alternative investment arrangements that might yield a fixed rate of 2.75 percent because of his belief that interest rates were likely to rise.  Cook 30(b)(6) Dep. at 111:21-112:19; *see also* Memorandum from Barclays Capital on Alternatives to Improve TSA's Cash Flow (November 4, 2011) (on file as TSA_015322).
[44]     Curry/Hasterok Report at 15; Curry Dep. at 134:9-136:13.

given for this approach is that it was the actual yield Washington TSA received in connection with its money market investment for four months from December 2008 - March 2009.[45]

89.     To the best of my knowledge, the Curry/Hasterok valuation methodology has not been used by any participant in the financial markets.  As noted above, the established standard market approach to valuing financial contracts, such as the RFA, is to use the applicable forward curves in effect as of the date of valuation.[46]

90.     The use of the Curry/Hasterok methodology significantly inflates the resulting valuation in favor of Washington TSA.  As the Curry/Hasterok Report recognizes, at the time the RFA was terminated, short-term interest rates were at or near historic lows.  In fact, the Federal Reserve Bank's highly publicized policy of quantitative easing was intended to increase monetary supply to force interest rates down to near zero.  Simply taking the average of historically low rates and assuming that the average will remain in effect for over twenty years is highly unrealistic, contrary to actual market expectations and not an appropriate or informative valuation exercise.

91.     The Curry/Hasterok Report also recognizes that "historical average returns are very sensitive to the time period chosen."[47]  Yet neither Curry nor Hasterok have provided any justification for the time period they have chosen.  Looking at historical rates over a broader period of time confirms how critical the selection of the relevant time period is and how easily it can be manipulated.

92.     When one looks back historically from March 25, 2009 at interest rates for the approximately 23 preceding years (i.e., the same time period that would have been remaining to be performed under the RFA if it had not been terminated),[48] historical interest rates were much higher than the recent ones upon which Curry and Hasterok relied.

---

[45]     Hasterok Dep. at 180:3-22; Curry Dep. at 82:9-83:7.
[46]     Indeed, Hasterok admits he never used this methodology in valuing these types of contracts while working at Morgan Stanley.  See Hasterok Dep. at 35:7-17; 91:7-22.
[47]     Curry/Hasterok Report at 15.
[48]     There are 8,465 days from March 25, 2009 to the stated maturity of the RFA on May 28, 2032.  The graph actually reflects a few days longer (8,468) than this due to the use of weekly data.

93.     Treasury Bills ("TBIlls") are generally considered to be among the most secure and liquid investments and were Eligible Securities under the RFA.  Bloomberg publishes a 6-month TBill index which can be found on a Bloomberg Terminal by typing USGG6M<INDEX><GO>.  I observed this index for the approximately 23 year period, and as expected, interest rates varied significantly over this period of time, but were historically much higher than the time window selected by Curry and Hasterok.  Curry and Hasterok assumed a rate of 0.65%, whereas the TBill average for this historic period was 4.6611%.

94.     There is simply no justification for assuming that even if Washington TSA continued to invest in money market investments for the remaining life of the RFA, its investment would only yield 65 basis points annually.  To the contrary, looking at a slightly broader time horizon suggests that the yield would likely be substantially higher.

95.     Looking more specifically at the money market investment made by Washington TSA, Curry and Hasterok ignore the historical rate of return for that money market fund, First American Prime Obligations.  I reviewed the historical data available for First American Prime Obligations (Ticker FPDXX) from January 10, 1996[49] to March 25, 2009.  Even with this limited data, which excludes the high interest rates of the late 1980's and early 1990's, the historic returns still averaged 3.503% as shown in the chart below.

---

[49]     Historical data was only available from January 10, 1996.



Source, Bloomberg L.P

96.    Using the historic average of 3.503% instead of 0.65% in the Curry/Hasterok approach results in a loss calculation of approximately $7.30 million (in contrast to the $37,500,000 calculated by Curry and Hasterok), payable by Lehman to Washington TSA.

**The Curry/Hasterok Report Assumes that Washington TSA Will Continue to Invest in One of the Lowest-Yielding Investments for the Life of the RFA**

97.    In calculating the "Termination Amount," the Curry/Hasterok Report assumes that Washington TSA will continue to invest the Reserve Fund only in money market funds, which is not an Eligible Security under the RFA, despite the availability of Eligible Securities in which Washington TSA could invest.[50]

98.    The Curry/Hasterok Report does not address the reality that – pursuant to the RFA – Washington TSA was required to accept any Eligible Securities delivered by Lehman.

---

[50]    Indeed, even under the skewed analysis of the Curry/Hasterok Report, commercial paper, one of the Eligible Securities of the RFA, would produce higher returns for Washington TSA.  *See generally* Curry/Hasterok Report at 19.

While after the termination of the RFA, Washington TSA is certainly permitted to invest its funds anyway it chooses, that choice cannot form the basis of the valuation of the RFA. [51]

99.    Even using the Curry/Hasterok approach (which I reject as inconsistent with market practice and fundamentally flawed), considering the Eligible Securities of the RFA and a more reasonable time period, the results are materially different from those determined by Curry and Hasterok. For example, the average yield on Treasury Bills, which are an Eligible Security under the RFA (and typically the lowest yielding of the Eligible Securities),[52] for more than 20 years prior to the rejection of the RFA on March 25, 2009, was 4.6611%. Applying that historical rate of return to the Curry/Hasterok approach results in the RFA having a value of $1.33 million, payable by Washington TSA to Lehman.

100.    The self-serving selection of money market funds for measuring losses underscores the inappropriateness of the Curry/Hasterok methodology. In contrast to their approach, the use of forward curves for the Eligible Securities of the RFA to calculate termination amounts assures that market conditions are actually taken into account in connection with such calculations. Under the Curry/Hasterok approach, a party can arbitrarily select an investment strategy and a sampling window that will result in the maximum valuation, which is both inconsistent with the intention of the parties to the RFA and market practice.

**The Curry/Hasterok Report Does Not Use An Appropriate Discount Rate**

101.    After Curry and Hasterok determine the cash flows to be earned from the Guaranteed Rate and anticipated to be earned in connection with their "Replacement Yield" analysis, they discount those future cash flows to present value. The Curry/Hasterok Report uses the "Replacement Yield" as the discount rate.[53] In other words, the Curry/Hasterok Report assumes that a short-term investment interest rate average from a short time window is also the appropriate rate with which to discount cash flows occurring more than 20 years in the future.

---

[51]    In addition to the other reasons contained in this report, the consideration of money market yields has no relation to the value of the RFA since money market investments are not one of the Eligible Securities of the RFA.
[52]    The information was calculated based upon Bloomberg six-month Treasury Bills (TBill) index. USGG6M,<INDEX><GO> on a Bloomberg terminal.
[53]    Curry/Hasterok Report at 19.

102.    In my opinion, such an assumption is inconsistent with market practice.  It is standard market practice to discount future cash flows using the zero coupon rates derived from the LIBOR yield curve.  This is how I always discounted cash flows when I worked at JP Morgan and Deutsche Bank, and it is the way I discount cash flows at Cityview.  I believe that it is also the established practice of other participants in the market.

103.    Setting aside all of the other issues with the Curry/Hasterok Report and correcting only this assumption by discounting the "Actual Yield" results by LIBOR zero coupon rates, the resulting valuation would be reduced from $37.5 million to $28.56 million payable to Washington TSA by Lehman.

## X.    SUMMARY

104.    Based on my experience and expertise in valuing reserve fund agreements and other long-term financial instruments**, I am of the opinion that the commercially reasonable mid-market valuation of the RFA (including Washington TSA's 7.7(b) loss amount) is $1,132,772.61, and that such amount is payable by Washington TSA to Lehman.**

105.    In my opinion, the Swap Financial Report, while purporting to adhere to the established market valuation methodology, makes a fundamental mistake in its determination of the credit charge that a dealer would impose in connection with a hypothetical replacement reserve fund transaction.  If the credit charge were consistent with market practice and convention (and leaving all other assumptions made by Swap Financial intact), the Swap Financial valuation should be reduced from $38,560,427.00 to $7,403,657.03 payable by Lehman to Washington TSA.  I do not contend that this recalculated valuation is an accurate valuation of the RFA, but merely underscores the egregious impact of Swap Financial's use of an inflated credit charge.

106.    In my opinion, the Curry/Hasterok Report must be disregarded in its entirety as its fundamental approach is inconsistent with market practice and has never been used to my knowledge.  Additionally, the Curry/Hasterok Report makes a number of unjustified assumptions, including assumption that Washington TSA will be able to invest in money market funds that earn only 0.65% over the remaining term of the RFA.  Such an impermissible assumption significantly inflates the bankruptcy claim of Washington TSA.

_____

Samuel M. Gruer

Managing Director

Cityview Capital Solutions, LLC

March 5, 2014

# Appendix 1

**Curriculum Vitae  - Samuel Gruer**

Mr. Gruer has approximately 28 years of experience in the municipal marketplace, serving in a variety of capacities at many of Wall Street's leading firms.  During his career, he has worked on both derivative and bond transactions totaling in excess of $30 billion.  At Cityview Capital Solutions, Mr. Gruer assists clients in navigating the capital markets.  He both advises them on strategies for structuring debt to sell into both the public and private markets.  He also advises them with strategies and execution for both the reinvestment of bond proceeds and interest rate hedges.  Prior to co-founding Cityview, Mr. Gruer was a Director of derivative structuring at Deutsche Bank, with responsibility for managing its mid-west client base and housing sector transactions.  During this time, he initiated transactions across a wide variety of products including swaps, options and private placements.

Before joining Deutsche Bank, Mr. Gruer was a co-founder of JPMorgan's municipal derivatives department, where, among other responsibilities, he managed its municipal reinvestment business.  In this capacity, Mr. Gruer was responsible for structuring and pricing numerous reinvestment products including forward purchase agreements.  In those situations where JPMorgan was the successful bidder, Mr. Gruer was responsible for executing the transactions and managing any subsequent restructurings and/or terminations.  Prior to joining JPMorgan, he was a Vice President at Prudential Securities where he was the head of new products for its municipal securities division. Earlier in his career, Mr. Gruer was a banker in the municipal finance departments at both Goldman Sachs and Morgan Stanley.

Mr. Gruer earned a Bachelor's Degree in Electrical Engineering from the Massachusetts Institute of Technology.

| | |
|---|---|
| 2008 – Present | Co-Founder and Managing Director<br>Cityview Capital Solutions, Millburn, NJ |
| 2006-2008 | Director, Rates Structuring<br>Deutsche Bank Securities, New York, NY |
| 2000-2006 | Vice President, Municipal Swaps Marketing<br>JPMorgan Securities, New York, NY |
| 1994-2000 | Vice President, Municipal Financial Products<br>Chase Securities (successor by merger to Chemical Securities) New York, NY |
| 1992-1994 | Vice President, Municipal Securities<br>Prudential Securities |

| | |
|---|---|
| 1989-1992 | Associate, Public Finance<br>Morgan Stanley, New York, NY |
| 1986-1989 | Analyst, Municipal Finance<br>Goldman Sachs & Co., New York, NY |

# Appendix 2

## Documents Considered

### Documents in the Record

#### Depositions

| Deponents | Date |
| --- | --- |
| Robert Cook 30(b)(6) | 12/06/2013 |
| Peter Shapiro | 12/13/2013 |
| Jeffrey Hasterok | 1/16/2014 |
| Daniel Curry | 1/17/2014 |

#### Deposition Exhibits

| Exhibits | Beginning Bates | Ending Bates |
| --- | --- | --- |
| Lehman 2 – Reserve Fund Agreement between Washington TSA, Lehman Brothers Special Financing and U.S. Bank, N.A., 11/05/2002 | SFG_000649 | SFG_000688 |
| Lehman 3 – Reserve Fund Agreement Amendment, 3/26/2003 | SFG_000997 | SFG_001002 |
| Lehman 13 – Rejection Order, 3/25/2009 | TSA_028653 | |
| Lehman 14 – Wachovia Quote, 3/26/2009 | LBHI_WTSA_00000342 | LBHI_WTSA_00000345 |
| Lehman 30 – Expert Report of Daniel Curry and Jeffrey Hasterok, 12/16/2013 | | |
| Lehman 32 – Expert Report of Peter Shapiro, 12/16/2013 | | |

#### Other Documents

| Description |
| --- |
| Official Statement of the Tobacco Settlement Asset-Backed Bonds, Series 2002, 10/25/2002 |
| Indenture between Washington TSA, and U.S. Bank, N.A., 10/01/2002 |

### Documents that are Publicly Available

Bloomberg.com

Peter Orr, *50 Years of UST Yields – How Well do Forwards Predict?* Intuitive Analytics (May 17, 2013, 6:30 AM), http://www.intuitive-analytics.com/blog/

### Other Documents Not Cited in the Record and Not Publicly Available

Bloomberg LP Data

# Appendix 3

## Summary of Cash Flows

| Start Date | End Date | Notional Amount | Fixed Rate | Fixed Rate Flows | Floating Rate | Floating Rate Flows | Difference | Discount Factor | Present Value |
|---|---|---|---|---|---|---|---|---|---|
| 3/25/2009 | 6/1/2009 | 45,534,106 | 4.484% | 374,321 | 0.459% | 39,478 | 334,843 | 0.998243 | 334,254 |
| 6/1/2009 | 12/1/2009 | 45,534,106 | 4.484% | 1,020,875 | 1.299% | 300,589 | 720,285 | 0.991926 | 714,470 |
| 12/1/2009 | 6/1/2010 | 45,534,106 | 4.484% | 1,020,875 | 0.837% | 192,706 | 828,168 | 0.984930 | 815,687 |
| 6/1/2010 | 12/1/2010 | 45,534,106 | 4.484% | 1,020,875 | 2.580% | 597,065 | 423,809 | 0.976728 | 413,946 |
| 12/1/2010 | 6/1/2011 | 45,534,106 | 4.484% | 1,020,875 | 2.617% | 602,432 | 418,442 | 0.966292 | 404,338 |
| 6/1/2011 | 12/1/2011 | 45,534,106 | 4.484% | 1,020,875 | 2.512% | 581,469 | 439,406 | 0.954464 | 419,397 |
| 12/1/2011 | 6/1/2012 | 45,534,106 | 4.484% | 1,020,875 | 3.194% | 739,334 | 281,541 | 0.941799 | 265,155 |
| 6/1/2012 | 12/3/2012 | 45,534,106 | 4.484% | 1,032,218 | 1.887% | 441,482 | 590,736 | 0.927497 | 547,906 |
| 12/3/2012 | 6/3/2013 | 45,534,106 | 4.484% | 1,020,875 | 2.882% | 663,545 | 357,330 | 0.913126 | 326,287 |
| 6/3/2013 | 12/2/2013 | 45,534,106 | 4.484% | 1,015,203 | 5.982% | 1,377,018 | (361,815) | 0.898253 | (325,001) |
| 12/2/2013 | 6/2/2014 | 45,534,106 | 4.484% | 1,020,875 | 5.222% | 1,202,120 | (181,245) | 0.883173 | (160,071) |
| 6/2/2014 | 12/1/2014 | 45,534,106 | 4.484% | 1,015,203 | 3.297% | 758,952 | 256,251 | 0.867740 | 222,359 |
| 12/1/2014 | 6/1/2015 | 45,534,106 | 4.484% | 1,020,875 | 4.872% | 1,121,470 | (100,595) | 0.852438 | (85,751) |
| 6/1/2015 | 12/1/2015 | 45,534,106 | 4.484% | 1,020,875 | 4.281% | 990,790 | 30,085 | 0.837284 | 25,189 |
| 12/1/2015 | 6/1/2016 | 45,534,106 | 4.484% | 1,020,875 | 5.081% | 1,176,184 | (155,309) | 0.822181 | (127,692) |
| 6/1/2016 | 12/1/2016 | 45,534,106 | 4.484% | 1,020,875 | 3.994% | 924,381 | 96,494 | 0.807170 | 77,887 |
| 12/1/2016 | 6/1/2017 | 45,534,106 | 4.484% | 1,020,875 | 4.984% | 1,147,344 | (126,469) | 0.792373 | (100,211) |
| 6/1/2017 | 12/1/2017 | 45,534,106 | 4.484% | 1,020,875 | 6.384% | 1,477,582 | (456,708) | 0.777728 | (355,193) |
| 12/1/2017 | 6/1/2018 | 45,534,106 | 4.484% | 1,020,875 | 6.173% | 1,420,937 | (400,063) | 0.763285 | (305,362) |
| 6/1/2018 | 12/3/2018 | 45,534,106 | 4.484% | 1,032,218 | 1.977% | 462,679 | 569,539 | 0.748833 | 426,490 |
| 12/3/2018 | 6/3/2019 | 45,534,106 | 4.484% | 1,020,875 | 4.506% | 1,037,295 | (16,420) | 0.734672 | (12,063) |
| 6/3/2019 | 12/2/2019 | 45,534,106 | 4.484% | 1,015,203 | 5.618% | 1,293,171 | (277,968) | 0.720605 | (200,305) |
| 12/2/2019 | 6/1/2020 | 45,534,106 | 4.484% | 1,015,203 | 5.296% | 1,219,091 | (203,888) | 0.706539 | (144,055) |
| 6/1/2020 | 12/1/2020 | 45,534,106 | 4.484% | 1,020,875 | 5.686% | 1,316,007 | (295,132) | 0.692395 | (204,348) |
| 12/1/2020 | 6/1/2021 | 45,534,106 | 4.484% | 1,020,875 | 5.828% | 1,341,669 | (320,794) | 0.678771 | (217,746) |
| 6/1/2021 | 12/1/2021 | 45,534,106 | 4.484% | 1,020,875 | 5.920% | 1,370,378 | (349,504) | 0.665891 | (232,731) |
| 12/1/2021 | 6/1/2022 | 45,534,106 | 4.484% | 1,020,875 | 6.242% | 1,437,025 | (416,150) | 0.653082 | (271,780) |
| 6/1/2022 | 12/1/2022 | 45,534,106 | 4.484% | 1,020,875 | 6.235% | 1,443,202 | (422,327) | 0.640202 | (270,375) |
| 12/1/2022 | 6/1/2023 | 45,534,106 | 4.484% | 1,020,875 | 6.629% | 1,525,904 | (505,029) | 0.627393 | (316,852) |
| 6/1/2023 | 12/1/2023 | 45,534,106 | 4.484% | 1,020,875 | 6.586% | 1,524,467 | (503,593) | 0.614513 | (309,464) |
| 12/1/2023 | 6/3/2024 | 45,534,106 | 4.484% | 1,032,218 | 6.980% | 1,633,356 | (601,138) | 0.602505 | (362,189) |
| 6/3/2024 | 12/2/2024 | 45,534,106 | 4.484% | 1,015,203 | 4.474% | 1,029,830 | (14,626) | 0.592406 | (8,665) |
| 12/2/2024 | 6/2/2025 | 45,534,106 | 4.484% | 1,020,875 | 6.173% | 1,420,954 | (400,080) | 0.582306 | (232,969) |
| 6/2/2025 | 12/1/2025 | 45,534,106 | 4.484% | 1,015,203 | 5.201% | 1,197,197 | (181,994) | 0.572206 | (104,138) |
| 12/1/2025 | 6/1/2026 | 45,534,106 | 4.484% | 1,020,875 | 6.008% | 1,382,957 | (362,082) | 0.562106 | (203,529) |
| 6/1/2026 | 12/1/2026 | 45,534,106 | 4.484% | 1,020,875 | 5.559% | 1,286,786 | (265,911) | 0.551951 | (146,770) |
| 12/1/2026 | 6/1/2027 | 45,534,106 | 4.484% | 1,020,875 | 6.068% | 1,396,859 | (375,984) | 0.541851 | (203,728) |
| 6/1/2027 | 12/1/2027 | 45,534,106 | 4.484% | 1,020,875 | 5.794% | 1,341,216 | (320,342) | 0.531696 | (170,324) |
| 12/1/2027 | 6/1/2028 | 45,534,106 | 4.484% | 1,020,875 | 6.168% | 1,427,607 | (406,733) | 0.521541 | (212,128) |
| 6/1/2028 | 12/1/2028 | 45,534,106 | 4.484% | 1,020,875 | 6.017% | 1,392,743 | (371,868) | 0.511386 | (190,168) |
| 12/1/2028 | 6/1/2029 | 45,534,106 | 4.484% | 1,020,875 | 6.365% | 1,465,267 | (444,393) | 0.502017 | (223,093) |
| 6/1/2029 | 12/3/2029 | 45,534,106 | 4.484% | 1,032,218 | 4.734% | 1,107,824 | (75,606) | 0.493801 | (37,334) |
| 12/3/2029 | 6/3/2030 | 45,534,106 | 4.484% | 1,020,875 | 5.870% | 1,351,341 | (330,467) | 0.485718 | (160,514) |
| 6/3/2030 | 12/2/2030 | 45,534,106 | 4.484% | 1,015,203 | 5.141% | 1,183,379 | (168,176) | 0.477635 | (80,327) |
| 12/2/2030 | 6/2/2031 | 45,534,106 | 4.484% | 1,020,875 | 5.753% | 1,324,420 | (303,546) | 0.469552 | (142,531) |
| 6/2/2031 | 12/1/2031 | 45,534,106 | 4.484% | 1,015,203 | 5.348% | 1,231,164 | (215,961) | 0.461469 | (99,659) |
| 12/1/2031 | 5/28/2032 | 45,534,106 | 4.484% | 998,560 | 5.733% | 1,297,880 | (299,319) | 0.453342 | (135,694) |
| | | | | 47,312,241 | | 52,196,546 | (4,884,306) | | (1,359,395) |

# Appendix 4

To determine the appropriate credit spread, I observed the actual trading history for Washington TSA's 6.625% bonds maturing June 1, 2032 (CUSIP 88880MAJ).  On March 25, 2009, these bonds traded at an average yield of 10.133% as shown in the chart below.



I then looked at the Bloomberg General Purpose Revenue Bond Index (AAA-Rated) as a proxy for the credit riskless rate for tax exempt bonds.



Because there is no data point for 23 years, I linearly interpolated between the 20-year and 30-year point.  The interpolated rate for a 23 year bond is 5.229%.  The differential of 490.4 basis points (10.133% minus 5.229%) implies a market-based credit spread of 490.4 bps.  When this credit spread is put into the CVA model on Bloomberg, the resulting CVA is 19.4 basis points.

# Appendix 5

# Engagement Letter

# JONES DAY

222 EAST 41ST STREET  ·  NEW YORK, NEW YORK 10017.6702
TELEPHONE: +1.212.326.3939  ·  FACSIMILE: +1.212.755.7306

Direct Number:  (212) 326-3898
lwsawyer@JonesDay.com

December 13, 2013

105143-605009

PRIVILEGED & CONFIDENTIAL

Samuel M. Gruer
Managing Director
Cityview Capital Solutions, LLC
321 Millburn Avenue, Suite 4
Millburn, NJ  07041

Re:    In re Lehman Brothers Inc. et al., Chapter 11 Case No. 08- 13555
(JMP) (Bankr. S.D,N,Y.)

Dear Mr. Gruer:

This will confirm that Jones Day has retained the services of Cityview Capital Solutions, LLC and Samuel Gruer, effective December 2, 2013, to provide consulting and expert witness services and to assist us in representing Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc. (collectively, "Lehman"), in connection with certain claims filed by the Tobacco Settlement Authority of Washington ("Washington TSA") against Lehman (Claim Nos. 37355 and 37356) in the above-captioned bankruptcy case (the "Engagement").  The terms "You" and "Your," as used herein, refer to Cityview Capital Solutions, LLC and/or Samuel Gruer.

**Confidentiality and Client Information**

You agree that all of the work You generate pursuant to this Agreement will be treated as strictly confidential and shall not be disclosed to anyone other than Jones Day and Lehman. Your work may be shared with third parties at Lehman's sole discretion.  You agree that any part of Your work will not be disclosed to any third party at any time without the prior permission of Lehman or Jones Day, except to the extent such disclosure is required pursuant to statute or court order, with five days notice to Lehman or Jones Day prior to any such disclosure.  Furthermore, all communications concerning this Engagement will be regarded as covered by the attorney-client privilege and/or work product doctrine.  In addition, please do not begin preparation of or draft any written materials until we have discussed it and specifically authorized You to do so.

ALKHOBAR  ·  ATLANTA  ·  BEIJING  ·  BOSTON  ·  BRUSSELS  ·  CHICAGO  ·  CLEVELAND  ·  COLUMBUS  ·  DALLAS  ·  DUBAI
FRANKFURT  ·  HONG KONG  ·  HOUSTON  ·  IRVINE  ·  JEDDAH  ·  LONDON  ·  LOS ANGELES  ·  MADRID  ·  MEXICO CITY
MILAN  ·  MOSCOW  ·  MUNICH  ·  NEW DELHI  ·  NEW YORK  ·  PARIS  ·  PITTSBURGH  ·  RIYADH  ·  SAN DIEGO
SAN FRANCISCO  ·  SÃO PAULO  ·  SHANGHAI  ·  SILICON VALLEY  ·  SINGAPORE  ·  SYDNEY  ·  TAIPEI  ·  TOKYO  ·  WASHINGTON

**JONES DAY**

All work product You prepare pursuant to this Agreement shall be owned by Lehman. You will fully cooperate and assist with the transfer of any work product prepared in this Engagement to other parties at the request of Jones Day or Lehman. It is understood and agreed that You shall retain all of Your rights in Your methodologies and methods of analysis (including ideas, models, tools, techniques, skills, generic industry information, knowledge and experience) and You shall not be restricted in any way with respect to their use, subject to the restrictions in this Agreement.

You reserve the right to retain copies of Your own work product, with suitable protection of confidential information; provided, however, that You will comply with any protective orders that may govern the use or retention of any information You review or receive during the course of the Engagement. We enclose, for your reference, a copy of the current Protective Order.

**Fees and Budgeting**

You will be compensated for Your work as follows and in accordance with the below schedule: (1) $85,000 for all work associated with the preparation of an expert report (setting forth your expert opinions as well as expert criticisms of the report to be submitted by Washington TSA's expert), which is required to be submitted on February 3, 2014 and drafts to be delivered on a schedule to be agreed among You, Lehman and Jones Day; (2) $24,000 for all work associated with preparation for a deposition and attendance at a deposition to provide testimony; and (3) $24,000 for the preparation for and attendance at a court proceeding to provide expert testimony.

Expert Report Compensation: You will be paid $85,000 for the expert report in two installments. The first installment of $25,000 will be made with seven business days following the execution of this agreement. The second installment of $60,000 will be paid upon delivery of a final expert report to be submitted in connection with this Engagement. This fee will not be contingent upon the results of Your analysis, valuation and calculations. No additional fee will be payable by Lehman or Jones Day for reasonably requested follow-up information or clarification regarding report. However, any additional analysis beyond that required for the expert report, which is requested by Lehman or Jones Day shall be billable at $1,100 per hour.

Deposition Compensation: You will be paid a flat rate of $24,000 to prepare for and provide testimony at a deposition. This rate includes one day (7 hours) of deposition testimony; each subsequent day will be billed at $10,000 per day, in half-day increments. Once a deposition is scheduled, You will be flexible with regard to any changes in schedule necessitated by the Court or by mutual agreement among the involved parties. You will be paid for the deposition after You provide deposition testimony. To the extent a deposition is cancelled after being scheduled (not merely rescheduled) within ten business days of its scheduled date, You will be paid a cancellation fee for Your work in preparing for the deposition of up to $12,000 depending on when the deposition is cancelled pursuant to the following schedule: 1 business day = $12,000; 2 business days = $11,000; 3 business days = $10,000, 4 business days = $9,000; 5 business days = $8,000; 6 business days = $7,000; 7 business days = $6,000; 6 business days = $5,000; 7 business days = $4,000; 8 business days = $3,000; 9 business days = $2,000; 10 business days = $1,000.

NYI-4558783                                                        -2-

Trial/Hearing Compensation: You will be paid a flat rate of $24,000 to prepare for and provide testimony at any hearing or trial related to the Engagement. This rate includes one day (7 hours) of testimony; each subsequent day will be billed at $10,000 per day, in half-day increments. You agree to be flexible with regard to any schedule necessitated by the Court or by mutual agreement among the involved parties concerning the date on which You provide such testimony. You will be paid for Your in-court testimony after You provide such testimony. To the extent Your trial testimony is not cancelled after being scheduled (not merely rescheduled) within ten business days of its scheduled date, You will be paid a cancellation fee for Your work in preparing for Your trial testimony on the same schedule as set forth above for deposition testimony.

You will be compensated for reasonable out-of-pocket expenses and You agree to invoice Jones Day in a timely manner for such expenses.

You agree to keep Jones Day reasonably informed as to the progress of the analysis being performed, and to provide a written budget for any additional work you are asked to conduct. You also agree to provide written or oral explanations of work performed if requested to do so by Jones Day.

**Work for Other Clients**

You represent that You have performed a reasonable conflicts check regarding this Engagement and have no conflict.

**Liability**

Neither You and Jones Day, or You and Lehman, will be liable to the other in connection with Your services or any matter relating to Your services for any indirect, special, punitive, consequential or incidental damages, including loss of profits. In addition, neither You and Jones Day, or You and Lehman, will be liable to the other for any claim or claims which individually or in the aggregate exceed the total professional fees paid to You for Your services pursuant to this Engagement. The foregoing sentence shall not apply to any claims against You or liability incurred by You related to a breach of the confidentiality or conflict provisions of this Agreement.

**Governing Law**

All aspects of the relationship arising out of or related to this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. All actions and proceedings arising out of or relating to this agreement shall be heard and determined exclusively in any state or federal court sitting in the Borough of Manhattan of the City of New York.

**Assignment; Severability**

No party hereto may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other parties. If any term or provision of this Agreement shall be held to be invalid, void or unenforceable by a court of competent jurisdiction (not subject to further appeal),

**JONES DAY**

then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**Cancellation**

At any point, Jones Day or Lehman may cancel this agreement with prior written notice, provided that You are paid all fees and expenses incurred through the date of cancellation and any unavoidable expenses (but not fees) that are incurred as a result of the cancellation. If either party terminates this relationship, You will provide assistance as necessary to avoid undue cost or prejudice to Lehman.

The provisions under "Confidentiality and Client Information," "Liability" and "Governing Law" will survive termination of this Agreement.

This letter sets forth the entire agreement between You and Jones Day relating to the subject matter set forth herein and supersedes any prior agreements written or oral and may only be modified in a writing signed by the parties.

If the terms of the Engagement set forth herein are acceptable, please execute the enclosed duplicate original where indicated below and return it to me.

If you have any questions, please contact me directly. We look forward to working with you on this matter.

Very truly yours,

Lauri W. Sawyer
*Counsel for Lehman*

ACCEPTED AND AGREED:

Samuel M. Gruer
Cityview Capital Solutions, LLC

Dated: December 16, 2013

NYI-4558783                                    -4-

43

**JONES DAY**

ACCEPTED AND AGREED:

Thomas Hommel
Lehman Brothers Holdings Inc.

_____

Dated:

ACCEPTED AND AGREED:

Lauri W. Sawyer
Jones Day.

_____

Dated: