Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

# Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony

## Summary

Due to the 2008 bankruptcy filings of LBSF Brothers Special Financing Inc. ("LBSF") and its guarantor LBSF Brothers Holdings Inc. ("LBHI"), and subsequent rejection of the Reserve Fund Agreement ("RFA"), the Washington State Tobacco Settlement Authority ("TSA") suffered a significant loss of income and loss of bargain on the investment of its $45.5MM Liquidity Reserve Account[1].

TSA was unable to obtain actionable termination quotes and/or replacement RFA providers after LBSF and LBHI defaulted.  Under the terms of the RFA (most notably the definition of Termination Amount), TSA is entitled to then calculate and claim its total losses and costs arising from LBSF and LBHI's rejection of the RFA.

TSA is limited by the terms of its Indenture to invest the $45.5MM Liquidity Reserve Account in conservative investments, either short term investments or investments offering the ability to withdraw funds without penalty.  TSA cannot purchase long term securities to replace the RFA.  TSA cannot enter into long term hedging transactions with terms (especially termination and draw provisions) similar to the RFA. TSA will likely invest the Liquidity Reserve Account in money market funds or similar investments for the foreseeable future, as permitted by the RFA and its Indenture.

TSA's loss should equal what it would have earned at the Guaranteed Rate[2] of 4.484% less what it is expected to earn by continuing to invest in short term Eligible Investments[3] until maturity.  We assume TSA will earn a replacement yield of 0.65%, which is equal to the rate it actually earned up to the Rejection Date (despite actual earnings being well below 0.65% since the Rejection Date).

As discussed in this rebuttal report, we disagree with many of the LBHI witness[4] assumptions and conclusions.  Notably we disagree with the LBHI witnesses regarding the following conclusions and concepts:

- That a non-transactable forward curve should be used to calculate TSA's loss.
- That a forward curve is the appropriate method to project what TSA's future earnings will be in short term Eligible Investments.
- With employing any valuation method that requires TSA to undertake transactions, real or hypothetical, which are in conflict with its Indenture.
- With Gruer's calculation of TSA's lost earnings under RFA Section 7.7(b).

Our conclusion remains unchanged from our initial report: The Termination Amount owed to TSA by

---

[1] RFA, Page 4 ("Reserve Fund") and Indenture, Page 7 ("Liquidity Reserve Account")
[2] RFA, Page 2
[3] Indenture, Page 4-7
[4] Samuel Gruer ("Gruer") and David Babbel ("Babbel")

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

LBSF and LBHI is $37.5 million, plus $553,080 of lost earnings under RFA Section 7.7(b), plus incidental costs and expenses, cost of collection, and reasonable attorneys' fees, all as permitted by the definition of Termination Amount in the RFA.

# Failed Quotation Process and Subsequent Loss Calculation

## Failed Quotation Process

Upon default by LBSF/LBHI, the definition of Termination Amount in the RFA permits the Burdened Party (TSA) to seek quotations for a replacement transaction from at least three Dealers. Swap Financial Group on behalf of TSA tried and failed to obtain quotes.[5] In his deposition, Gruer noted that he had "no specific reason to doubt" Swap Financial "sought dealer quotations but was unable to obtain any."[6]

As noted in our original report, we believe actionable quotes for a replacement RFA could not be obtained at or around the Rejection Date.[7]

LBSF also tried to obtain quotes, as Gruer notes: "I note that LBSF, in fact, received a quotation from Wachovia Bank with respect to the RFA in March 2009."[8] LBSF obtained a "quote" from Wachovia, however it was not an actionable quote. Indeed, the "quote" from Wachovia was worded so as to be immediately null and void, as clearly indicated in the Wachovia "quote" submission:

> "Please note that the Quote Transaction was not entered into. If Wachovia made an offer to enter into the Quote Transaction, such offer has expired and is null and void. Our quotation may have been subject to credit approval, should not be construed as a commitment, and did not include any unpaid amounts."[9]

In his deposition Gruer admits that he does not believe the Wachovia quote is actionable and states, "I don't believe that they could have moved forward at that level, as that makes it clear."[10]

A single, standalone "quote" that TSA could not actually transact has little or no meaning in calculating TSA's loss. It is notable that neither Gruer, Babbel nor LBSF point to the Wachovia "quote" as a fair arbiter of the RFA's termination value, although presumably Wachovia used "industry-standard valuation methodology."[11]

Most significantly, in his report Gruer states, "...I agree with Washington TSA's Experts that the market for new reserve fund agreements was inactive around the Rejection Date..."[12] Gruer also confirms that assertion in his deposition, agreeing with the statement that "the market for new reserve fund

---

[5] Shapiro Deposition, 102:13 – 103:9, 104:17 – 105:17 and 106:19 – 107:08
[6] Gruer Deposition, 65: 9-14
[7] Curry-Hasterok Report, Page 6, Paragraph 2
[8] Gruer Report, Page 6, Paragraph 27
[9] Wachovia quote, LBHI_WTSA_00000345
[10] Gruer Deposition, 82:22 - 83: 8.
[11] Gruer Report, Page 1, Paragraph 4
[12] Gruer Report, Page 9, Paragraph 39

agreements was inactive around the rejection date."[13]  In his deposition Gruer also notes: "Q. Let me ask this way: None of your clients did in fact enter into a forward purchase agreement while you've been at Cityview, correct? A. That I'm aware of, or that I was involved in."[14]  (Gruer co-founded Cityview Capital Solutions in 2008.[15])

The quotation requirements under the definition of Termination Amount in the RFA could not be met. Therefore, under the RFA with TSA as the sole Burdened Party, the Termination Amount  calculation reverts to TSA's total loss.

## TSA's Subsequent Loss Calculation

In the event of default, if quotations are unable to be obtained, the Termination Amount is calculated as follows:

> (iii) If the Burdened party is unable to obtain three such quotations, <u>the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs</u> (expressed as a positive number if the Burdened Party is LBSF and a negative number if the Burdened Party is the Issuer, or gains (expressed as a negative number if the Burdened Party is LBSF and a positive number if the Burdened Party is the Issuer) <u>in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of the Burdened party but without duplication, any loss or cost incurred as a result of its terminating liquidating, obtaining or reestablishing any hedge or related trading position</u>, and;  provided further, however that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorney's fees). <u>Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.</u>[16]  [emphasis added]

### "Standard Methodology"

The Termination Amount does not specify the use of any particular methodology nor the use of the forward curve nor does it specify the use (to quote Gruer's report) of an "established standard methodology that is used by both dealers and customers (including bond issuers) to value reserve fund agreements and other similar types of financial agreements."[17]  When asked if there was a "...written

---

[13] Gruer Deposition, 124: 6-9
[14] Gruer Deposition, 56: 8-13
[15] Gruer Report, Page 33
[16] RFA, Page 5-6
[17] Gruer Report, Paragraph 37

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

document that we can look to, to confirm your testimony of what is industry-standard methodology"
Gruer replied, "I don't know that there's any official policy published by any of the regulators that says,
"This is how you calculate a forward curve, this is how you calculate" -- but this is the methodology by
which dealers transact and value their books and records."[18]  When pressed further with the following
question, "I understand that's your testimony. I'm just trying to understand if there's any way you could
test that by looking at a written document as opposed to talking to a dealer about his or her experience,
to your knowledge." Gruer replied, "Not to my knowledge."[19]

Gruer and Babbel refer to language such as "industry standard" multiple times in their reports and
depositions assuming a standard used in one context (valuing an RFA in a vibrant, active market) can be
used universally when discussing how to calculate TSA's loss after a failed quote process:

> Gruer Report, Paragraph 4: "...industry-standard valuation methodology for reserve fund
> agreements."

> Gruer Report, Paragraph 37: "...established standard methodology..."

> Gruer Report, Paragraph 40: "...established industry-standard methodology..."

> Gruer Report, Paragraph 41: "...using the industry-standard methodology..."

> Gruer Report, Paragraph 76: "...industry-standard valuation methodology."

> Gruer Report, Paragraph 89: "...the established standard market approach..."

> Gruer Deposition, 39: 24 - 40:4: "Q. Now, as I read your expert report, the valuation process that
> you're describing for these RFAs is something that is standard in the industry, is that fair? A.
> Yes."

> Gruer Deposition, 140: 6-9: "Q. You talk relatively consistently throughout the expert opinion
> about established industry standard methodology, correct? A. Correct."

> Babbel Report, Page 4 Paragraph 5: "...market and industry standard..."

> Babbel Report, Page 9, Section 3.2: "... standard valuation principles..."

> Babbel Deposition, 139: 4-5: "...standard valuation procedures..."

> Babbel Deposition, 146: 16-20: "Q. Well, your financial theory is that there's a standard market
> methodology for valuing contracts such as the RFA.  Correct?  A. There is a standard
> methodology, yes."

We agree with Gruer and Babbel that dealers generally priced new RFAs and unwinds via the LIBOR
swap curve plus or minus basis adjustments for credit, funding, collateral, delivery risk and profit.  As

---

[18] Gruer Deposition, 140: 10-21
[19] Gruer Deposition, 140:22 - 141:3

former members of the municipal derivatives desk of Morgan Stanley, an active provider of forward purchase agreements ("FPAs")[20] that structured and priced similar RFAs, we are well aware how FPAs (including the RFA) were priced[21]. Our initial report in fact discussed the use of swaps and/or forward curves as a possible way to value the RFA[22].  We discarded this method, however, as we believe that using a value based on a replacement investment strategy TSA cannot enter into is unfair to TSA and dramatically understates its loss.

Even Gruer admits related market data is lacking:

> "Q. Regardless of why it was inactive, it was inactive. And doesn't that add a level of complexity because there's no market data specific to the RFA that we can utilize here to come up with the valuation? A. Yes, I would agree with that statement."[23]

From the Babbel Deposition:

> "Q. But you're not proposing an alternative methodology as to how to arrive at the number that would put TSA back in the same position it would have enjoyed had the RFA not been terminated? A. I didn't do that calculation."[24]

Babbel claims there is a "standard methodology" for valuing the contract, but fails to actually value the RFA.

In their reports, Gruer and Babbel ignore the fundamental assumptions of when it is appropriate to apply a valuation method reliant on forward curves.  Forward curves are appropriate to use for valuation only when there is an active market in which participants can enter into market transactions mirroring the securities assets being valued.  Here, TSA cannot enter into the equivalent LIBOR (or other) swaps or otherwise enter into a long maturity replacement transaction.  Moreover, Gruer and Babbel's experience only relate to situations where the dealer/provider was a going concern, obviously not the case with LBSF/LBHI.  The dealer/provider in marking the value of deals would have the ability to transact swaps and other equivalent long term trades to hedge and thereby lock in the value of the RFA.

## Range of Bidding Results

Even during period of relative liquidity in the market, there was substantial disagreement among dealers as to how this particular contract should be priced.  In Gruer's deposition he agrees that in 2002 the

---

[20] Reserve funds (like TSA's Liquidity Reserve Account) were historically invested by municipalities in a variety of investments, including structured reinvestment products like investment agreements, guaranteed investment contracts, repurchase agreements, and FPAs.  Additionally, not all FPAs necessarily invested the proceeds of reserve funds.  Construction funds, escrow float funds and debt service funds were also sometimes invested in FPAs.  Therefore, not all reserve funds were FPAs, and not all FPAs were reserve funds.

[21] Hasterok Deposition, 28: 9-25.

[22] Curry-Hasterok Report, "Forward Curves Are Not Applicable Unless TSA Can Transact", Page 14

[23] Gruer Deposition, 215: 17-23

[24] Babbel Deposition, 101: 14-22

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

market for agreements such as the RFA were competitive[25] and more robust[26].  When asked: "So everybody is using the same market information to develop forward curves, to determine the risks involved, the credit charges, etc. Correct?" He responds: "I believe that to be the case. I haven't done an exhaustive study but when I would look at the results of the bids over time, they generally tended to fall within a fairly tight band; which means for the most part, everybody's using the same methodology and probably similar data. They may be using slightly different data, which would result in some variance in the bids. They may be more aggressive or conservative with respect to their profit assumptions, you know, agreed. And that often accounts for who wins or who loses."

The follow-up question to his response was: " When you say "tight band," would you explain what you -- how you would define "tight band"?" To which Gruer responded:  "If there's a particular reserve fund agreement, and let's say my bid comes in at 4.50, just hypothetically, for a contract, you know, I may win, I may lose. You know, the results would generally be somewheres within five to ten basis points above or below that number. That tells me that people are using the same methodology. If I came in at 4.50 and others were at six and others were at two, you know, that would tell me that there's a very -- a divergence in approach. Every once in a while you might see some -- one number that's way off and that's usually more indicative of just a computational error than anything else."[27]

In 2002, a time when the market was more competitive and robust than the Rejection Date, as the bids received by Public Financial Management ("PFM") on behalf of TSA shown below demonstrate, there was quite a "divergence in approach", particularly for the "Par" structure selected by TSA and awarded to LBSF.  The spread between LBSF's winning bid and the last place bid was 97 basis points.  If you wish to be generous and attribute the last place bid to a computational error, the spread between the high and low bids of the remaining participants was 48.4 basis points - outside of the "tight band" Gruer states should be expected if "people are using the same methodology."  This calls into question Gruer's contention that there is in fact a standard "methodology", particularly when trying to apply that methodology to a highly structured financing.

---

[25] Gruer Deposition, 119: 3-6
[26] Gruer Deposition, 118: 13-17
[27] Gruer Deposition, 40: 5 - 41: 17

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

| Bidder | Par | Market[28] |
|---|---|---|
| Lehman | 4.484% | 4.784% |
| HypoVereinsbank | 4.350% | 4.680% |
| Bear Stearns | 4.320% | 4.760% |
| Morgan Stanley | 4.000% | 4.820% |
| Salomon SB | 3.510% | 4.450% |

RFA Bid Results, 24-Oct-2002[29]

## Missing Language to Codify "Standard Methodology"

To avoid any doubt as to how the Termination Amount was to be calculated in the event of the inability to get quotations, LBSF could have simply crafted language that employed the formulaic methodology as espoused by Gruer and Babbel. When Gruer was asked in his deposition if such language could have been included in the RFA he responded, "It would have been awkward language, but I guess theoretically it could have been incorporated."[30]

We do not agree that the language would have been particularly "awkward". Both Gruer and Babbel explain clearly and concisely in their expert reports and depositions how they believe the Termination Amount should be calculated; this language could have been adapted to the particular terms of the RFA. This type of language is fairly common in structured finance transactions in instances such as "make whole calls" and structured notes with formulaic coupons. To avoid any doubt, LBSF could have or should have included an alternative calculation methodology to be employed in the event that quotations were unavailable, particularly if they believed there was a market standard that could be employed.

The likely reason LBSF/LBHI did not include such language is that prior to the LBHI default, the dealer community generally did not assume that they would be the defaulting party to a contract. Generally the assumption would be that the client would be the defaulting party, not the dealer, and therefore language that offered flexibility in calculating loss was preferable to a formulaic calculation method, especially for customized securities transactions (such as the RFA). Upon a client default and a failure to

---

[28] "Par" vs. "Market": the bid results refer to the fact that PFM requested bids under two different structuring assumptions. "Market" means TSA would be required to pay or receive a calculated Termination Amount on the termination of the RFA in the event tobacco revenues were adequate to retire the bonds early. Despite receiving higher yielding bids on the Market structure, it was rejected in favor of the "Par" structure which allowed TSA to terminate the RFA with no Termination Amount due if tobacco revenues were adequate to retire the bonds early, described in the Indenture as a "Mandatory Clean-up Call." See PFM Final Request for Bids, Page 2, Paragraph 11, LBHI_WTSA_00002861

[29] RFA Bid Results

[30] Gruer Deposition, 93: 5-12

obtain quotes, the dealer would want to claim loss based on where the transaction was marked on their books, not versus a pricing formula embedded in the contract.

## Good Faith Calculation

The contract requires that the Burdened Party (TSA) in good faith calculate its total losses including any loss of bargain and cost of funding. We believe that our calculations of the Termination Amount were reasoned and done in good faith, reflecting TSA's costs and loss of bargain. Babbel disagrees and declares our calculations demonstrate manifest error.[31] Babbel fails to provide a valuation of his own, however.[32]

Babbel states: "And to make a claim for millions and millions of dollars from people who are not trained in economic things and who come up with a model that's ludicrous to valuate something, to me, that's a manifest error."[33] We disagree. Curry, for example, has a degree in economics. Both Curry and Hasterok also have practical, hands-on, professional experience structuring, documenting, pricing and risk managing transactions identical to the RFA, experience that Babbel lacks. Babbel's lack of experience is shown, for example, by his failure to acknowledge the use of a loss calculation due to the absence of quotations,[34] or by his misunderstanding/willful ignorance of the importance of the customized termination and draw provisions in the RFA.[35] In contrast to Babbel, we have been responsible for the execution of billions of dollars of swap contracts, interest rate caps, interest rate floors, credit default swaps, forward purchase agreements, securities purchases, liquidity facilities, funding transactions and lending commitments on behalf of our former firms. In addition, to address Babbel's concerns, both Curry and Hasterok have successfully completed Finance 101.[36]

# The RFA Is Not A Swap[37]

Throughout their reports and depositions, both Gruer and Babel posit that TSA should value the RFA using "industry-standard methodology" based on forward rates and interest rate and securities spread assumptions as if TSA had a swap transaction in place with LBSF. These arguments are based on the mischaracterization of the RFA as a simple derivatives contract. Rather, the RFA is a highly structured securities contract based on the limitations of the types of transactions that the TSA Indenture permits.

Babbel's testimony related to calculating TSA's loss:

"Q. I'm not suggesting you know. I'm just asking how do you determine what their total losses

---

[31] Babbel Deposition, 137: 22 - 138: 6

[32] Babbel Deposition, 101: 14-22

[33] Babbel Deposition, 138: 23 - 139: 3

[34] Babbel Deposition, 140: 2-20

[35] Babbel Deposition, 153: 19 - 154: 6

[36] Babbel Deposition, 121: 13-14

[37] Babbel Deposition, 39: 4-7: Babbel actually says "...Reserve Fund Agreements are different from, fundamentally different from other sorts of swap arrangements." We agree, but we think his statement differs so much from the rest of his testimony it must be an error in the transcript. If it is a correct transcript, we agree. RFAs are fundamentally different from other sorts of swap arrangements.

will be.  As you said, there may not be losses.  You have to go through the valuation first.  How do you valuate what the total losses will be?

A.   ....I know something about valuing swaps, fixed pieces, and floating pieces.

My testimony is really restricted to methodology and how swaps are -- take advantage of or valued by forward rates of interest.  So I wasn't asked to really do this, what you're asking me now."[38]

Nowhere is the term "swap" used in the RFA.  The terms "forward rate" and "forward curves" also do not appear in the RFA.[39]  Babbel's report and testimony may speak to how a dealer may have its own risks, but it does not pertain to the TSA because TSA cannot transact in the swap market under terms that mimic those in the RFA.  The need for a dealer (such as LBSF) to intermediate and execute swaps and hedges in lieu of TSA doing so on its own is a major part of the loss of bargain that resulted from the rejection of the RFA and is completely ignored by Gruer and Babbel.

Gruer and Babbel want to view the transaction as a swap because the market for swaps is very robust and liquid with trillions of dollars in notional amounts outstanding.  We agree that swap transactions are traded and valued among sophisticated market participants using forward rates utilizing "industry-standard methodology", especially when the mark-to-market of the swap is fully collateralized by both parties.

However, TSA did not have a swap agreement in place with LBSF and LBHI.  The RFA was a securities agreement that required TSA to send $45.5MM to LBSF representing the principal amount of its Liquidity Reserve Account.  In exchange TSA received "Eligible Securities" with various restrictions patterned from the Indenture, including a maturity limit of six months.  These securities were delivered to the TSA at a fixed annualized yield of 4.484%.  When the short term securities matured, TSA would take the proceeds from the maturing securities and re-deliver them to LBSF in exchange for new "Eligible Securities" priced to yield 4.484%.

In the event that TSA needed to use its Liquidity Reserve Account to make up for revenue shortfalls, it would use the proceeds of the maturing "Eligible Securities" to make its required debt service payment and could terminate its contract with LBSF with no subsequent termination payment.  These are not characteristics of a standard swap and subsequently the transaction was not documented under standard ISDA documentation.[40]

---

[38] Babbel Deposition, 140: 2-20

[39] Gruer Deposition 213: 8-16: Gruer admits:  "Q. Well, there's no -- I'm sorry. There's no terminology like "forward curve utilized" in the termination amount, correct? A. Correct. Q. There is no terminology that suggests you should use a mid market value, correct? A. Correct. Although I -- I offer no opinion as to whether mid, with or without adjustments, is appropriate."

[40] Dealers and sophisticated derivative users typically sign an "ISDA" (templates are created by the International Swaps and Derivatives Association) which consists of an ISDA Master and a Schedule, plus typically a Credit Support Annex ("CSA").  The Master outlines defined terms and the basics of the relationship between parties. The Schedule outlines elements from the Master that are waived and/or modified by the parties.  The CSA defines

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

The provider of an RFA (i.e. a dealer in the position of LBSF) typically would hedge some of its obligations under the RFA by entering into fully collateralized swaps and options with other dealers under an ISDA. Like other dealers, this was the strategy originally employed by LBSF. LBSF subsequently modified its hedges after entering into an offsetting Forward Purchase Agreement with Briarwood Commercial Paper Trust.[41] In this transaction LBSF received commercial paper at a fixed rate and delivered that commercial paper to TSA. As a result of the transaction LBSF itself no longer had the fixed/floating exposure upon which Gruer and Babbel base their valuations.

Aside from LBSF's Briarwood hedge[42], a provider of an RFA typically would hedge some of its obligations under the RFA by using swaps and options. It is the role of a dealer in a structured finance transaction (such as LBSF's role in the RFA) to "transform" a series of contracts and hedges that an entity such as TSA is not permitted to undertake into a contract or product that is permissible to enter.

Both Gruer and Babbel ignore the value and the necessity of the transformative role of the dealer in a transaction of this type and would like the Court simply to value the contract as if the TSA itself were allowed to engage in the transactions and hedges that LBSF may have put in place. But TSA was not allowed to and did not have the resources to enter into hedges and other similar transactions that could "lock in" market expectations of long term interest rates as of March 25, 2009. It is this inability to find a qualified "transformer" that leads to the need for TSA to perform a loss calculation. A proper loss calculation takes into account the fact that TSA is unable to enter into transactions that would generate a long term fixed rate taking into account the various provisions (especially termination and draw provisions) required under its Indenture.

Babbel shows a lack of understanding of the contract terms and focuses solely on the cash flows. He ignores the restrictions under TSA's Indenture and other features in the RFA that constitute the loss of TSA's bargain. In addition to losing its rate of investment, the TSA lost the contractual provisions that allowed TSA to pass on the risks of associated credit events, interest rate movements, variability in Master Settlement Agreement ("MSA") payments[43], or the ability to source Eligible Securities, among others. Babbel is incorrectly focused on valuing the RFA as a swap and only a swap[44]:

> "Q. In this case, does your opinion depend upon the specific risk associated with the RFA, Reserve Fund Agreement, at issue? A. My specific opinion is that forward rates are used in

---

how the parties will collateralize their exposures to one another. A Master with a Schedule and CSA generally works well when the two parties trade liquid, commoditized, non-custom products and post collateral to each other equal to the mark to market of the overall portfolio of transactions. The RFA was not one of these agreements.

[41] LBHI_WTSA_00014852

[42] As former participants in the market who attempted (and failed) to enter into a highly structured hedge like Briarwood, we believe most dealers were unable to put in place a hedge package similar to Briarwood

[43] Collectively TSA was charged 33.6 basis points for this ability. See RFA Bid Results

[44] Perhaps the Abraham Maslow quote is appropriate for Babbel's approach: "I suppose it is tempting, if the only tool you have is a hammer, to treat everything as if it were a nail." *The Psychology of Science,* Abraham H. Maslow

valuation of swaps, and that doesn't change."[45]

Had it been permitted under its Indenture, instead of entering the RFA with Lehman TSA could have pursued the various investment strategies proposed by Babbel and Gruer in their reports and depositions.  Instead they undertook a transaction for which LBSF recorded a profit even after taking into account charges for credit and market risk as well as certain reserves.[46]  That profit was LBSF's compensation for undertaking the role of not only paying TSA a fixed rate but also adhering to the terms set forth in the RFA, which adhere to the terms of its Indenture.  It is the fixed rate and the contractual terms that constitute TSA's bargain.

Both Babbel and Gruer attempt to produce scenarios/strategies/curves which are outside of the contractual terms and are in conflict with TSA's Indenture. Even if the strategies and scenarios presented by Gruer and Babbel produced equivalent cash flows, they do not remotely do so with the same level of flexibility and risk and do not sufficiently compensate TSA for its loss of bargain.

## The Value of TSA's Loss is Not Independent of TSA's Reinvestment Limitations

Per Babbel's report:

> "Messrs. Curry and Hasterok entitle a section of their Report as follows: "Inapplicability of Forward Curves." They explain that "The major difficulty in using forward curves to calculate replacement yields is the inability of TSA to actually transact in these products under economic terms that mimic the existing terms of the RFA." According to Messrs. Curry and Hasterok, any replacement security would need to offer a similar periodic payment, or its equivalent in market or present value terms. The present value of such an instrument, however, does not depend upon the ability of any party valuing the instruments to replicate the terms thereof. The fact that any particular investor cannot afford or is not permitted to hold a particular instrument has no bearing upon its market or present value, which is established independent of any given party. [emphasis added] For example, I cannot personally afford to buy and undertake the necessary market positions to synthetically create an instrument that would return similar payments, yet that does not affect the value of such an instrument."[47]

We agree that in the case of a tradable, marketable and liquid security, if a particular investor cannot afford or is not permitted to hold a particular instrument there should be no bearing upon its market or present value.  In the case of such a security, in the event that an investor's funding costs are in excess of the yield on a particular security, they can sell it to another investor at the prevailing market price.

When, however, a particular type of investor that had been a market participant exits that market or market participants face increased costs relating to a particular type of security, the valuation for that

---

[45] Babbel Deposition, 70: 9-14
[46] LBHI_WTSA_00005582
[47] Babbel Report, Page 10, Section 3.5

type of security can and will change to reflect the change in demand driven by these costs. A timely example would be a bank regulator's attempts to reduce systemic risk by adopting increased Basel Risk Weightings on certain securities and financial transactions[48]. Higher risk weightings reduce a bank's return on equity (which in turn affects a bank's financial performance) unless the return on the financial transaction widens to compensate for the additional capital which must be reserved. This can have a profound effect on the price of a security or the cost of a transaction as prices are adjusted to reflect changes in demand. Similarly, the inability to finance a security through a repurchase agreement or other financing method can dramatically affect the price of that particular security.

Factoring in one's costs in order to provide structured financial products is even more pronounced in the case of financial instruments such as the RFA. The fact that these are not tradable, marketable or liquid instruments, and that the agreement requires performance from both parties, necessitates factoring in one's particular circumstances when valuing these types of transactions to calculate one of the parties' loss.

In their paper, "Valuing Derivatives: Funding Value Adjustments and Fair Value," two noted academics John Hull and Alan White make the same argument as made by Babbel and conclude that a financial institution's own costs should not be factored in. However, Hull and White also concede "But, in practice, many dealers find these theoretical arguments unconvincing and choose to make the adjustment anyway."[49] We believe that the market is correct and failure to account for costs reflects a shortcoming in the academic analysis.

Babbel's argument is similarly without merit and ignores the economic terms of the RFA. The RFA has provisions that can increase the dealer's cost of undertaking a transaction such as the RFA. For example Section 2.7 of the RFA details the remedies available to TSA in the event of a LBHI downgrade below A3 by Moody's or A- by S&P. These remedies include the option by TSA to: 1) require LBSF to assign the transaction to another dealer rated A1 and A+; 2) arrange for a guarantor rated Aa2 and AA or 3) require Lehman to post collateral equal to 104% of the Termination Amount. Failure to remedy the downgrade would result in TSA having the option to start the termination process and calculate a Termination Amount by soliciting quotations and in the event these were unavailable, reverting to the loss calculation.

The practical implication is that only certain parties (those rated equal to or above A3 and A-) are qualified to provide a replacement RFA to TSA without posting collateral or incurring the cost of a guarantor (if available at the required ratings threshold). Accepting a lower rated counterparty presents more risk to TSA, constituting a loss of TSA's bargain. Regardless, accepting a lower rated counterparty for a replacement RFA is prohibited by their Indenture. Only providers in the top three ratings

---

[48] Banks are required by regulation to hold different amounts of capital to protect against potential losses (common stock is one type of "capital") depending on the riskiness of the investment. US Treasuries, for example, have a lower risk weighting than below investment grade corporate bonds, so an investment in US Treasuries requires less capital held in reserve. "Capital" is generally some of the most expensive type of funding for a bank, and therefore banks try as much as possible to maximize their return on capital, a precious resource.
[49] Hull and White, Page 2

categories can act as replacement RFA providers.[50]

From our own experience with our previous employer, if we were required to post collateral we would reserve for the cost of posting collateral and reflect that cost in our pricing.  Due to the RFA's collateral posting requirement below an A3 or A- rating, at the time of the Rejection Date we would have treated the RFA as a transaction where we would be required to post collateral while not being in a position to ever receive collateral from TSA.   This could and would lead to price discrepancies with parties valuing the same contract with similar internal policies, but with different ratings than our own.

## TSA is Not a Market Professional

Babbel states in his report: "The forward rates of interest appropriate for valuing forward commitments are readily available in numerous market sources, or can be easily computed from basic fixed income securities pricing data. These forward rates are not merely some abstract expectation.  Market professionals can lock [emphasis added] in any of these forward rates by taking offsetting positions on securities maturing on the front end and back end of the forward period of concern."[51]

While "market professionals" may have been able to "lock-in forward rates...using offsetting positions on securities," the TSA cannot.  Per the RFA, the TSA is only able to purchase "Eligible Securities" as defined below:

> "Eligible Securities" means non-callable and non-prepayable (a) direct obligations of the United States of America including only notes, bonds, bills or certificates of indebtedness, (b) senior debt and/or guaranteed mortgage pass-through obligations of the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, any Federal Home Loan Bank, and the Federal Farm Credit System, or (c) commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer thereof is subject to U.S. law; additionally, if the maturity date of the commercial paper tendered is 100 days of more, the issuer thereof must have long-term debt ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch.[52]

Eligible Securities are further qualified by the following definition:

> "Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date[53] and (ii) have an aggregate Purchase Price

---

[50] Indenture limits investment agreement providers to the "three highest rating categories." Indenture, Page 6, (ix).
[51] Babbel Report, Page 9, Section 3.3
[52] See RFA
[53] Bond Payment Date are semiannual, limiting maturity to six months or less

which is as close as possible to but does not exceed the related Scheduled Reserve Amount.[54]

Any action beyond the purchase of Eligible Securities is beyond the scope of the RFA and would constitute a loss of bargain.  In addition to not being "market professionals" who could not be expected to lock in rates by taking offsetting positions, the TSA would not be permitted enter into a swap or similar hedge transaction for a period longer than the definition of Eligible Securities, as qualified.  Thus, TSA could not transact on March 25, 2009 any longer term trades that would reflect the forward curve.

From Babbel's Deposition:

> "Q. Well, is it your understanding that TSA has the ability to lock in interest rates for a 23-year period during the remainder of the term of the contract? A. TSA would have the ability, as anyone would. I can lock in the interest rate. You could too. They could too. Now, if you ask whether they could with these particular funds that were in a particular bucket, maybe not. But the market can lock in these cash flows."[55]

This statement is additional proof that Babbel ignores limitations on TSA's next best reinvestment option (short term Eligible Investments) due to Indenture restrictions. He believes they can lock in 23 year rates, when they cannot.  Their inability to lock in long term 23 year rates has a material effect on their calculation of loss.

## "Arbitrageurs"

In his report Babbel argues:

> "Valuing projected cash flows by some other method that is at variance with the forward rates is inconsistent with finance theory and practice, and would subject investors using such alternative methods to huge losses against arbitrageurs.....If dealers were to project any other cash flows, they would derive values inconsistent with traded/market values and open themselves to huge losses when trading against informed investors and arbitrageurs."[56]

TSA is not a "market professional" or a "dealer" and certainly is not an "arbitrageur."  TSA is  a public instrumentality and agency of the State of Washington.[57]  Again Babbel makes the mistake of ignoring the reinvestment limitations under TSA's Indenture, and groups TSA with global investment banks and hedge funds.

TSA is not acting as a dealer and "trading against informed investors and arbitrageurs."  TSA is trying to calculate their loss of bargain after LBHI defaulted and no dealers were willing to step forward and provide a replacement RFA.  We are at a loss to understand how TSA is arbitraging the market by investing in a money market fund, an alternative reinvestment strategy they were permitted to employ by the RFA and their Indenture.

---

[54] See RFA
[55] Babbel Deposition, 105: 11-21
[56] Babbel Report, Page 10,  Section 3.4, first paragraph
[57] Indenture, Page 1

# The Implied Path of Rates Derived from the Forward Curve Is Usually Inaccurate Compared to Ex-Post Actual Rates

Gruer and Babbel both allege that TSA should value the RFA by using a curve derived from transactions in long term instruments such as US Treasuries, US Agencies or USD LIBOR swaps. The yields obtained on these transactions are termed "spot rates."[58] Observers of these transactions can construct an implied path of short term rates, the forward curves, such as where the 6M rate is expected to be 5 years from now, or 10 years, or 12.5 years, etc. They make this argument despite the fact that TSA cannot transact in long term investments and thus cannot earn the spot rates used to derive the forward curves. Gruer and Babbel also make this argument despite the fact that the forward curve is not an accurate predictor of future rates.

## Additional Examples From Financial Research

The financial literature we have reviewed seems to be in agreement that the spot (and related implied forward curves) have a poor track record of predicting the actual path of future rates. For example:

"Interest Rate Forecasts: A Pathology", Charles A. E. Goodhart and Wen Bin Lim, London School of Economics:

> "This paper examines how well forecasters can predict the future time path of (policy-determined) short-term interest rates. Most prior work has been done using U.S. data; in this exercise we use forecasts made for New Zealand by the Reserve Bank of New Zealand (RBNZ) and those derived from money market yield curves in the United Kingdom. We broadly replicate recent U.S. findings for New Zealand and the United Kingdom, to show that such forecasts in New Zealand and the United Kingdom have been excellent for the immediate forthcoming quarter, reasonable for the next quarter, and useless thereafter."[59] [emphasis added]

Further, from the same Goodhart and Bin Lim study:

> "The official and market forecasts of interest rates that we have studied here have significant predictive power over the next two quarters, but virtually none thereafter. When forecast precision is effectively zero, as after two quarters hence, it is perhaps best to acknowledge this, e.g., by the central bank using either a "no-change" thereafter assumption, [emphasis added] or the implied market forecast, for the more distant forecasts."[60]

Note that Babbel in his deposition described our approach of projecting TSA's actual, transacted money market returns into the future on a "no-change thereafter assumption" as a method that "...all the experts would agree that this is something that they've never seen before..."[61] and that we "...came up

---

[58] Babbel Report, Page 6, final paragraph: "... forward rates are definitional, and very simply derived from the underlying spot rates of interest."
[59] Goodhart and Bin Lim, Page 135
[60] Goodhart and Bin Lim, Page 153
[61] Babbel Deposition, 138: 17 - 139: 3

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

with a model that's ludicrous to valuate something…"[62]  Goodhart and Bin Lim's piece indicates our "no-change thereafter assumption has in fact been considered by "the experts"[63] and might be the appropriate method to use.

"Monetary Policy Inertia: Fact or Fiction?" Glenn D. Rudebusch, Federal Reserve Bank of San Francisco:

"Specifically, if policy is highly inertial, as the single-equation reaction functions suggest, then financial markets should anticipate the future partial adjustment of the funds rate. In that case, a regression of actual changes in the funds rate on predicted changes embedded in the yield curve should provide a good explanatory fit and a fairly high $R^2$. In fact, researchers have found the opposite. They have estimated a variety of interest rate forecasting regressions and, using financial market expectations, have found little predictive information at quarterly frequencies with $R^2$s very close to zero. [emphasis added]  For example, Rudebusch (2002b) shows that eurodollar futures from 1988 to 2000 have very little ability to predict the quarterly change in the funds rate two quarters ahead. The $R^2$ of such a regression is .11, which from figure 8 suggests that ρ is probably close to zero. "[64]

"Are forward rates a good predictor of actual interest rates" Vanguard, 3-Jun-2013:

"The bond market's expectations for the future shape of the yield curve may seem reasonable but, as history has shown, rates are likely to evolve differently from what is expected today. The forward yield curve as with other interest rate forecasts maybe a poor predictor of actual future rates."[65] [emphasis added]

"Anticipations Of Monetary Policy In Financial Markets," Joe Lange, Brian Sack, and William Whitesell, Staff of the Board of Governors of the Federal Reserve System, April 10, 2001

"The variation in the findings of these papers partly reflects differences in their empirical approaches, specifications, and data.  Nevertheless, a general conclusion seems to have emerged from this literature, as articulated by Cook and Hahn (1990) and Rudebusch (1995): The very short end of the yield curve displays some ability to predict changes in short-term interest rates, but this predictive power fades fairly quickly as the horizons lengthens."[66] [emphasis added]

We assume TSA will continue to invest in short term Eligible Investments[67] (such as money market funds) for the remaining life of the Liquidity Reserve Account as required by its Indenture.  Short term Eligible Investments typically track short term interest rates such as the Fed Funds Target Rate or 3M LIBOR; thus, the future path of short term interest rates is relevant to TSA's future projected earnings.

---

[62] Babbel Deposition, 138: 17 - 139: 3
[63] We assume the London School of Economics can be considered one of "the experts"
[64] Rudebusch, Page 116
[65] Vanguard, website
[66] Lange, Sack and Whitesell, Page 3
[67] Indenture, Page 4-7

The predictive inaccuracy of the implied forwards is crucial to understanding why it is inappropriate to use long term rates to calculate what TSA is expected to earn by investing in a series of short term Eligible Investments.

When the spot rates are used to calculate a forward rate, such as a 3 month rate starting 10 years from now, you cannot assume that the 3 month rate will actually equal the calculated rate 10 years from now.  The forward curve simply indicates where willing and eligible counterparties could transact today in long term contracts, locking in a 3 month rate with a forward starting effective date 10 years from now, for example.   Gruer and Babbel both assume that the 3 month rate will actually equal (or at least approximately equal) the forward 3 month rate in the future, which the example financial literature above shows to be an erroneous assumption.

## Path of Rates Implied by March 2009 Spot/Forward Curves Already Shown to be Materially Incorrect

On Page 14 of the Curry-Hasterok Report, we demonstrated that the the implied path of rates from the 25-Mar-2009 LIBOR swap market has turned out to be materially incorrect.  The LIBOR swap market implied 3M LIBOR would rise steadily from approximately 1.00% in March 2009 to 3.40% by November 2013.  3M LIBOR actually fell and only averaged approximately 0.40% from March 2009 to November 2013.[68]

Gruer agreed in his deposition that the March 2009 forward curves incorrectly predicted the future path of short term rates:

> "Q. Fair enough.  I just want to make sure that we're on the same page.  You would agree, would you not, that the actual interest rate experience since March 2009 has been substantially different than market expectations as of March 25th, 2009, correct?  A. Yes."[69]

and

> "Q. With respect to the calculated values from your forward curve, where we are today is radically different from where your forward curve predicts we are, correct? MR. TAMBE: Objection to the form of the question. A. Yes. I agree.[70]

We do not believe that it was appropriate to use the path of rates implied by spot and forward rates because:

- TSA could not transact and lock in the long term fixed rate equivalent to the implied path
- The sampled financial research above and our professional experience indicates that the spot and forward curves generally do a poor job estimating the path of rates, and often materially overestimate the path of rates/yields/earnings.
- The hard data available post the Rejection Date (short term rates have been far less than

---

[68] Curry-Hasterok Report, Page 14, first and second paragraph and chart
[69] Gruer Deposition, 72: 19-25
[70] Gruer Deposition, 151: 20 - 152: 2

implied by Rejection Date forward curves) only serves to reinforce the first two bullet points. Note that even if we ignored or did not have access to this post Rejection data set, our conclusion would be the same based on the first two bullet points. We are not relying on post-Rejection data to form our opinions as Gruer asserts[71], but we do note that the post-Rejection data supports our opinions.

Gruer admits it is appropriate to check the results with additional post-Rejection data:

> "Q. And you think it's inappropriate to conduct a reality check to look at what's happened over the past, coming on four, five years now, coming on five years, to see whether the valuations that the respective adversaries have come up with are even in the ballpark, given what actually happened with interest rates? A. No, I don't."[72]

Given this fact pattern, we argue that TSA's actual reinvestment experience based on actual realized transactions prior to the Rejection Date was the more appropriate basis for projecting a replacement yield; hence we used TSA's actual yield of 0.65% projected to maturity to calculate a more conservative Termination Amount, an amount that more realistically calculates TSA's loss.

In his deposition Babbel states:

> "Q. And how is Curry and Hasterok's calculation of the termination amount going to yield more than what TSA contracted for?
>
> A. We don't know what it's going to yield. We only know one thing -- and I'd stake my reputation on this -- that it's not going to be -- that the markets are not going to provide 0.65 percent from now for the next 23 years. There's zero percent chance of that happening."[73]

According to Babbel's logic, there is a "zero percent chance" of TSA earning approximately 0.65%, but he posits that TSA's earnings will more likely follow an upwardly sloping path of yields as implied by the spot and forward curves, forward yields that have already been shown[74] to be wildly inaccurate by overestimating what TSA would earn.

According to Babbel's logic, it is preferable for the Court to assume an aggressive path of TSA earnings that potentially grossly overstates TSA's earnings from short term Eligible Investments, particularly when compared to its meager earnings since the Rejection Date.

While the inability of the spot and forward curves to accurately predict the actual path of short term rates might be irrelevant if TSA could transact and lock in long term rates, TSA cannot transact a long term agreement (like the RFA) to lock in long term rates. Accordingly, long term spot rates and the resultant forward curves are not relevant to valuation of the RFA.

---

[71] Gruer Report, Page 24, Footnote 38
[72] Gruer Deposition, 200: 22 - 201: 5
[73] Babbel Deposition, 164: 22 - 165: 7
[74] Curry-Hasterok Report, Page 14

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

## "Locking In A New Commitment"

From Babbel's Deposition:

> "Q. And how would you distinguish forward rates from future rates? A. Forward rates are today's price for <u>locking in a new commitment</u>. [emphasis added] Q. Because the market -- you're not using market data to predict future rates. You're using market data to understand the market as of a given day. Correct? A. That's correct."[75]

From Gruer's deposition:

> "Q. Are forward curves that you utilized in this report, and also when you were a dealer, all those forward curves are based on market transactions as of the date that you were assessing the forward curve? A. The forward curves are calculated from data that reflects market transactions."[76]

We agree with their definitions, particularly as it states forward rates are used for locking in a commitment, or that the forward curves use actual market transactions as the basis of their calculations.

However, Babbel is being logically inconsistent. Babbel notes forward rates are the price for "locking in a new commitment," i.e.: willing and able participants transact today and "lock in" long term rates. He notes in this section of his deposition that he does not use the forward rates to predict future rates. This, however, is exactly what he is expecting TSA to do when calculating its loss. He expects TSA to use forward rates to predict future rates and assume its earnings will follow this implied path of future rates, a path that has already been shown to overstate TSA's earnings.

Also from Babbel's Deposition, continuing the line of questioning above:

> Q. And the ability to use market data to understand forward rates assumes that there's an active market that you can trade in. Correct? MR. TAMBE: Objection to the form of the question. Q. In other words, if you're deciding about buying T-Bills and you're deciding about the different rates that are available and the different terms and you're analyzing forward rates, you're using market data on the assumption that you can then go out and transact in T-Bills in the market. Correct? MR. TAMBE: Same objection. A. In both versions of your question, you used the word "you." Q. I'm not talking about you, personally. A. <u>Somebody in the marketplace needs to be able to transact</u>."[77] [emphasis added]

According to Babbel's logic the ability to enter into actual transactions is a fundamental assumption of the construction of his spot and forward curves, but for some reason not being able to transact in long term products should not be important to TSA when calculating their loss. We disagree with his flawed

---

[75] Babbel Deposition, 17: 25 - 18: 9
[76] Gruer Deposition, 124: 16-22
[77] Babbel Deposition, 18: 10 - 19: 6

logic.

As Babbel said, and we agree: "Somebody in the marketplace needs to be able transact." TSA cannot transact in the long term spot and forward markets Babbel wants TSA to use as the basis of the loss calculation.

# Dealer Use of Forward Curves

Gruer reasons that forward curves must be used for valuation of the RFA because the dealers themselves are dependant on forward rates for marking their portfolios of existing RFA transactions. He states: "Even in the absence of an active market for new reserve fund agreements, the market was still providing sufficient information for parties to determine the value of their existing reserve fund agreements based upon the use of forward curves. Indeed, all dealers in this market for reserve fund agreements had portfolios of these agreements on their books, which had to be valued (or "marked") each day. Dealers and other market participants regularly determined the value of their positions during that period based on forward curves."[78]

We agree with Gruer that at the time of the Rejection dealers determined the value of their positions using forward curves; moreover we believe they continue to do so. With the exception of certain non-mark-to-market items, dealers are required to determine a "Fair Value" on their assets and liabilities in conformance with Generally Accepted Accounting Principles ("GAAP")[79]. GAAP, as governed by the Financial Accounting Standards Board ("FASB"), provides guidance as to how "Fair Value" is to be calculated under Fair Value Measurements as proscribed in Pronouncement No. 157 ("FAS 157")[80]. In this instance, "Fair Value" does not mean a price at which an entity such as TSA could expect to enter into a new or replacement contract.

In the absence of observable trades a dealer's assets and liabilities do not disappear, but they still need to be valued. In cases such as this FAS 157 provides guidance as to how to calculate the Fair Value of an asset or liability using models with observable and unobservable inputs. This is commonly known as "mark-to-model".

Because there are no observable transactions, we believe that at the time of the Rejection, most dealers would have classified a transaction such as the TSA RFA as Level III assets or liabilities because they require valuation inputs that are not readily observable or verifiable. A few of the relevant terms from FAS 157 used in calculating Level III assets and liabilities are presented below:

> "The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant that holds the asset or owes the liability. Therefore, the definition focuses on the price that would be received to sell the asset or paid to transfer the liability (an exit price), <u>not the price that would be paid to</u>

---

[78] Gruer Report, Page 9, Paragraph 39
[79] Curry and Hasterok are not accounting experts
[80] FASB, FAS 157

acquire the asset or received to assume the liability (an entry price)."[81] [emphasis added]

"Definition of Fair Value: Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction [emphasis added] between market participants at the measurement date."[82]

"An orderly transaction is a transaction that assumes exposure to the market for a period prior to the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets or liabilities; it is not a forced transaction (for example, a forced liquidation or distress sale). [emphasis added] The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant that holds the asset or owes the liability. Therefore, the objective of a fair value measurement is to determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price)."[83]

"Level 3 inputs are unobservable inputs for the asset or liability. Unobservable inputs shall be used to measure fair value to the extent that relevant observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. However, the fair value measurement objective remains the same, that is, an *exit price* from the perspective of a market participant that holds the asset or owes the liability. Therefore, unobservable inputs shall reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability [emphasis added] (including assumptions about risk). Unobservable inputs shall be developed based on the best information available in the circumstances, which might include the reporting entity's own data."[84]

What is important to recognize is that for the purposes of FAS 157, "Fair value" is the "exit price" that the dealer would expect to pay or receive "in an orderly transaction". This "Fair Value" would be the valuation that would appear on books and records and be reflected in a firm's audited financial statements. In a non-default scenario, the "Fair Value" would also be the starting point in determining a value when a customer wanted to unwind a transaction. As transactions such as the RFA are non-transferrable without consent and as previously noted, providers are currently unwilling to provide actionable quotations to effect unwinds, a customer wishing to exit a transaction would receive a termination price reflective of the "fair value" on a bank's books and records. To transact at a lower price would produce a loss for the dealer, which they were unlikely to absorb if it is at the issuer's request that the transaction be unwound.

We agree with Gruer, that in the case of a customer wishing to unwind a transaction that this is the

---

[81] FASB, FAS 157, Page 2-3
[82] FASB, FAS 157, Page 8
[83] FASB, FAS 157, Page 8
[84] FASB, FAS 157, Page 15

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

"industry-standard methodology."[85]  However, it is simply not appropriate to use this methodology to calculate TSA's loss.  The loss incurred by TSA needs to be calculated based on what TSA can actually obtain in the market based on entering  into a new transaction that retains the economic substance of the RFA; absent a new transaction it needs to be based on TSA continuing to invest in short-dated Eligible Investments.

## Section 7.7(b) Loss Calculation

In his report Gruer miscalculates TSA's Section 7.7(b) Loss Amount. Section  7.7(b) reads as follows:

> "If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefor pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Scheduled Reserve Amount had the Scheduled Reserve Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Permitted Investments[86] in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Scheduled Reserve Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Scheduled Reserve Amount had the Trustee complied with the requirements of Section 2.4 (hereof)."[87]

Gruer contends in his report: "For purposes of this calculation, I assumed that Washington TSA should have purchased A-1+/P-1 rated asset backed commercial paper, which was included in the definition of Eligible Securities. I made this assumption because during this particular time period, asset-backed commercial paper was the highest yielding (on a spot basis) of Eligible Securities."  Gruer's assumption is wrong for, among other reasons, there is no requirement that in 7.7(b) that TSA purchase the "highest yielding" Eligible Security.[88]  Rather, TSA is allowed to invest and did invest in Eligible Investments as allowed under its Indenture.

While Gruer's assertion is erroneous in light of the requirements of RFA Section 7.7(b) we note that Gruer also takes very broad discretion in determining the available yield on the Eligible Securities that TSA *should* have bought.  Rather than look at specific securities, he makes use of an index that may or may not contain Eligible Securities.  The index he used is described as follows: the Bloomberg 180-day Asset Backed Commercial Paper Index (the "Index"). The Index is made up of a composite of A1+/ P-1/ F1+ rated U.S. asset backed commercial paper programs and can be found on a Bloomberg Terminal by

---

[85] Gruer Report, Page 10, Paragraph 40

[86] The RFA does not require TSA to invest in "Eligible Securities" as argued by Gruer.  Instead, the RFA references the term "Permitted Investments" which is not otherwise defined in the RFA or the Indenture.  However, RFA Section 2.4(a) mentions "Eligible Investments" as defined in the Indenture.  We believe that "Permitted Investments" means "Eligible Investments."

[87] RFA, Page 20-21

[88] Gruer Report, Page 14, Paragraph 53

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

typing in ACPA180Y<INDEX><GO>.[89]

 TSA's requirements for CP are more restrictive than what is described in the index.  The RFA requires "commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer thereof is subject to U.S. law; additionally, if the maturity date of the commercial paper tendered is 100 days of more, the issuer thereof must have long-term debt ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch."[90]

We have no way of knowing whether or not any of the securities referenced in the Index are on credit watch, subject to US law or as this a 180 day index, or in possession of Long Term Ratings of "A1" by Moody's, "A+" by Standard and Poor's and "A" by Fitch.  The index, however, by definition includes non-Eligible Securities.

We agree with TSA's claim of 7.7(b) loss in the amount of $553,080 and reject Gruer's calculation and methodology.

# Errors in Gruer Valuation Methodology

Gruer's methodology of calculating the Termination Amount is, as demonstrated above, inappropriate. In addition, there are several errors, missteps and overly optimistic assumptions contained in Gruer's analysis if it were employed.

## Six-Month Agencies Usually Yield Less than Six Month LIBOR, not More

In Paragraphs 42-46 of his report, Gruer purports to "Identify the Cheapest to Deliver Securities as of March 25, 2009, the Rejection Date."[91]  Gruer incorrectly selects an Agency curve that displays the yields of long term Agencies, such as the yield on a 5 year or 10 year Agency security, not the yield on what an investor might earn by locking in a long term transaction on March 25, 2009 and receiving a rolling series of short term Agencies for the life of the trade.

For example, Gruer's chart shows a yield of 4.577% for 20 year Agencies.[92]  This chart does not mean a rolling series of six month Agencies will earn an investor 4.577% over 20 years.  It means that a willing and able investor who can purchase long term Agencies should expect to earn approximately 4.577% by purchasing a 20 year Agency on March 25, 2009.  This fundamental error leads Gruer to incorrectly project overinflated yields on the floating leg of his model.

Gruer's model calculated "...a mid-market value of these cash flows of $1,359,394.59, payable by Washington TSA to Lehman..."[93]  Gruer's calculations approximately equate to marking the floating leg

---

[89] Gruer Report, Page 14, Paragraph 54
[90] RFA, Page 2
[91] Gruer Report, Page 10, title before Paragraph 42
[92] Gruer Report, Page 12, Bloomberg screenshot, F84 curve
[93] Gruer Report, Page 13, Paragraph 49

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

of the transaction at 6M LIBOR + 114.25 bps[94], or, in other words, an expectation that the short term Agency securities delivered under a replacement RFA would yield 6M LIBOR + 1.1425% to the dealer. This is equivalent to saying the "mid market" replacement yield that TSA should have been able to lock in (at least according to Gruer) was 4.66%[95], a yield even greater than the rate TSA locked in 2002.

As a point of comparison, when LBSF bid and won on the original transaction in 2002, their winning level of 4.484% was roughly equivalent to LIBOR minus 105 bps.[96] Although Gruer claims his level of LIBOR + 114.25 bps is a mid-market level and does not include charges for a hypothetical dealer's credit reserves and profit, his calculation is approximately 220 bps higher (on a spread to LIBOR basis) than the level at which LBSF actually transacted in 2002.

From a dealer's point of view, bidding LIBOR plus a spread is a much more aggressive (less dealer profit, less reserve for credit) bid than bidding LIBOR minus a spread (more dealer profit, more reserve for spread). We believe It is reasonable to assume that any hypothetical dealer level in 2009 would be far less aggressive (LIBOR minus an even larger spread) than LBSF's LIBOR minus 105 bps bid from 2002. By March 2009, profit and credit spreads were wider and more volatile due to increased uncertainty in the market. Gruer's LIBOR + 114.25 calculation is unreasonable and dramatically understates TSA's loss.



The Bloomberg screenshot above indicates "Market Value" of $1.36MM approximately equal to Gruer's calculation of $1.359MM. Note the trade is modeled as "Pay Fixed", which is from the dealer's point of view.

---

[94] 0.01% = 1 bp = 1 basis point. 114.25 bps = 1.1425%

[95] Gruer Deposition, 157: 11-12

[96] Zelikoff email, LBHI_WTSA_00002673. 30 Year LIBOR swaps were approximately 5.55%. 5.55% - 0.025% (broker fees are backed out for spread comparison purposes) - 4.484% = approximately 105 bps spread

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

From Gruer's Deposition:

> "Q. If I wanted to go out in the market an [sic] March 25th, 2009, to obtain a 4.66 percent return using government agencies, I would have to buy some combination of 20- and 25-year government agencies, correct? A. Yes. Q. Okay. And again, neither 20- or 25-year government agencies were qualified securities under the indenture of the RFA, correct? A. I don't believe so, correct. Q. You believe they are not. A. I believe they are not."[97]

Yet this 4.66% hypothetical replacement yield is what Gruer uses for the end result of his mid market Agency forward curve calculation, a rate that TSA cannot earn because it cannot purchase these long term securities.

In contrast to Gruer's flawed method, a dealer would instead look at the historical time series data of 6M Agencies yields versus 6M LIBOR resets. This time series data would give the dealer a better idea as to where the dealer would be able to purchase short term Agencies instead of just receiving 6M LIBOR.



Source: Federal Reserve Bank of St. Louis, Fannie Mae ("FNMA"), Freddie Mac ("FHLMC")

The chart above shows that 6M Agency discount notes issued by Fannie Mae and Freddie Mac have yielded less than 6M LIBOR over time, and during some periods of time significantly less. For example,

---

[97] Gruer Deposition, 135: 5-18

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

in March 2009 (around the time of the Rejection Date) 6M Agencies yielded approximately 0.51% on average for the month while 6M LIBOR averaged 1.83%.

Despite this historical data, Gruer argues a hypothetical dealer would price a replacement RFA assuming 6M Agencies would earn 114.25 bps more than 6M LIBOR on average for the life of the transaction. In our experience at our former employer, we never assumed Agency-only FPA transactions would yield more than LIBOR; in fact, all Agency-only trades were marked with a negative spread on the floating rate LIBOR leg, not 114.25 bps above LIBOR. Gruer's valuation, therefore, contains a fundamental error because he tries to use long term Agency yields to approximate where 6M Agencies will yield versus 6M LIBOR over time, and ends up with a materially excessive 114.25 bp positive spread on the floating LIBOR leg.

This material, errant miscalculation has a direct impact on Gruer's calculated "mid-market" value, as a higher spread on the floating rate leg results in a higher calculated fixed rate replacement yield, and therefore a lower calculated "mid-market" value, so low in fact he suggests TSA should pay LBHI, not LBHI should pay TSA.

Gruer states that: "It was always in Lehman's interest to deliver to Washington TSA Eligible Securities that had the highest yield (and therefore the lowest price), commonly referred to as the "cheapest to deliver," in order to maximize its profit from the transaction."[98] In fact, Lehman always delivered commercial paper and after its customized hedge with Briarwood CP Trust, it always delivered Briarwood commercial paper. At our former employer, we always delivered commercial paper for FPAs/RFAs that allowed us to deliver commercial paper and Agencies; we would generally not deliver Agencies because in most cases commercial paper (even A-1+/P-1 commercial paper not on negative Credit Watch) was cheaper than Agencies. Gruer's use of Agencies rather than commercial paper is an error.

## Dealer Cannot Book the Profit of the Cheapest to Deliver Option Without A Hedge Similar to Briarwood

Notwithstanding the fact that Lehman always delivered Briarwood commercial paper; monetizing[99] the cheapest to deliver option requires more than the mere construction of a non-transactable forward curve.

The value that a dealer places on a trade in its books and records is the result of discounting cash-flows using forward curves, as we explain in our FAS 157 analysis above. Once a transaction is placed on the firm's books and records the daily changes in value are measured, producing daily profit and loss reports which ultimately generate quarterly and annual financials. In order to preserve any profit and/or protect against any loss, the dealer engages in hedging transactions, which attempt to "lock-in" the

---

[98] Gruer Report, Page 6, Paragraph 25

[99] "Monetizing" means calculating the present value of a future stream of projected cash flows and using that present value as a current revenue or cost figure in your profit and loss statement. This is different than accrual, which means although the future cash flows might be able to be projected, regulations or internal policies do not allow the future cash flows to be "monetized" as a present value for revenue or cost purposes.

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

stream of cash-flows representing the dealer's profit. The locked-in differential is what the dealer shows as its profits on the trade and forms the basis upon which the trader is compensated.

In order to recognize on its books and records the value of the "cheapest to deliver option" a trader would need to lock-in the ability to receive the yield derived from "cheap" securities. Typically this would be done as two transactions, the first being a conventional fixed for floating LIBOR swap and the second being a "basis trade".

Basis trades are floating/floating transactions that require parties to exchange the spot indices. For example, two parties can exchange 3 month LIBOR for a 3 month US T-Bill index. A party wishing to lock-in T-Bill rates would first receive a fixed rate on a LIBOR swap (assume 4.00% for example) and then engage in second trade whereby it would receive 3 month LIBOR minus 5 bps, in exchange for paying a 3 month T-Bill index. As the floating LIBOR leg in the interest rate swap is offset by the floating LIBOR leg in the basis swap, the party's net position is that of receiving a fixed rate of 3.95% and paying a 3 month T-Bill index.

Without an actual long term transaction that "locks-in" the spread associated with "cheap" securities, a dealer cannot "monetize" or recognize any current profit and loss associated with the "cheapest to deliver option".

A dealer could take advantage of future spreads between US Agency rates and LIBOR by purchasing each long term Agency bond that a dealer would potentially deliver into the RFA and pay fixed-rate on a swap on each security until the time it is delivered. This also requires the ability to finance each of these securities until they are needed for delivery.[100]

We know of no financing market where it is possible to purchase each long term Agency bond that a dealer would potentially deliver into the RFA and pay a fixed rate on a swap on each security until the time it is delivered. We are not aware of anyone hedging a transaction such as the RFA in this fashion. On top of the impracticality, this package of transactions would balloon a dealer's balance sheet, generating in excess of $2Bn of assets and liabilities ($45.5million per each six month period through 2032), not to mention capital charges associated with the positioning. This strikingly is the same methodology Babbel espouses in his expert report, suggesting that "Market professionals can lock in any of these forward rates by taking offsetting positions on securities maturing on the front end and back end of the forward period of concern."[101] As already discussed above, TSA is not a "market professional" and could never enter into such a series of transactions.

While we do not purport to know the marking policies of every other firm, we note that while with our former firm we did not recognize the value of the cheapest to deliver option in our books and records because we could not put in place a long term hedge transaction similar to Briarwood which allowed us

---

[100] For example, if a dealer purchases a 10 year Agency today, hedges it with a fixed rate swap, and finances the purchase of the Agency for 9.5 years using long term financing, in 9.5 years the 10 year Agency will finally become a 6 month Agency eligible for delivery into the RFA.
[101] Babbel Report, p. 9:3.3

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

to lock-in value. On the contrary, when the commercial paper restriction was A-1+ rather than A-1 the floating legs of the existing RFAs were marked at LIBOR minus a spread.

Gruer potentially assumed "monetizing" or calculating the present value of the cheapest to deliver option when he assumed LIBOR + 114.25 bps for the floating leg of his model. Without a long term hedge lined up at the time of pricing, no dealer would likely be able to monetize the option at trade date. This is another independent reason why use of Agencies as the cheapest to deliver is improper. Gruer's spread assumption is materially incorrect and dramatically understates TSA's loss.

## TSA is Not Obligated to Purchase the "Highest Yielding" Securities Going Forward

Gruer states in his report:

> "The value of the RFA as of the Rejection Date is simply the difference (discounted to present value) between the earnings that Washington TSA could reasonably have expected to realize by investing the moneys in the Reserve Fund in the highest yielding Eligible Securities [emphasis added] available and the earnings that it would have realized at the Guaranteed Rate of 4.484% if Lehman had continued to perform its obligations under the RFA."[102]

TSA is not under any obligation to invest the fund in the "highest yielding" securities, just short term investments that are defined to be Eligible Investments[103].

The definition of Termination Amount[104] makes no mention of TSA being required to buy the "highest yielding Eligible Securities available." Indeed, during his deposition, Gruer admits that once the RFA was rejected by LBSF TSA was not obligated to purchase the highest yielding securities.[105] Continuously seeking the cheapest to deliver securities for each future delivery is an obligation TSA is not equipped to undertake. TSA would only be subject to purchasing the cheapest to deliver securities (selected by a dealer) had they been able to find a replacement provider; they were not able to do so.

TSA's losses should be calculated based on their expected investment in Eligible Investments. Specifically, given the indenture restrictions and TSA conservative investment strategies, TSA total loss should be calculated assuming TSA continues its current investment strategy of investing in money market funds.

## Incorrect Credit Valuation Adjustment Calculation

Gruer purports to correct "Swap Financial's Erroneous Credit Charge"[106], but instead miscalculates the

---

[102] Gruer Report, Page 7, Paragraph 31
[103] Gruer's term "Eligible Securities" from his Paragraph 31 is a defined term in the RFA, Page 2. However it appears more logical that TSA would have the right to invest in "Eligible Investments" as defined in the Indenture (Page 4-7) going forward once LBSF defaulted, the RFA was terminated, and no replacement provider could be found.
[104] RFA, Page 5-6
[105] Gruer Deposition, 93:21 - 94:6.
[106] Gruer Report, Page 17, title before Paragraph 63

cost of the Credit Valuation Adjustment ("CVA").  CVA is the cost of a potential loss in an over the counter ("OTC"), or negotiated, customized transaction (like the RFA).  In simple terms, models are run to calculate the value of a transaction in various future interest rate scenarios.  In scenarios where a client would owe a dealer money on a mark to market basis,[107] the theoretical mark to market values are each multiplied by the probability of default through time.[108]  The projected losses are reduced by the expectation of some recovery through the bankruptcy process, known as the Loss Given Default ("LGD")[109].  These projected losses are summed up on a present value basis to calculate a CVA charge or reserve.

Gruer employed the CVA function in Bloomberg's swap analytics.[110]  There appear to be fundamental errors in Gruer's calculation as a result of incorrect assumptions.

The first error is Gruer's recovery assumption used in the LGD.  In the event of a TSA default, TSA is not required to make any payments to LBSF.  This means that the recovery rate is 0%, and the LGD is 100% of the transaction's value.  Gruer's deposition indicates he used a recovery rate of "60 or 70"[111] in his calculation; Gruer actually appears to have used the corporate assumption of 40%[112].  Using a 0% recovery rate would materially increase the CVA charge as the model would predict higher net losses, all else equal.  Gruer therefore understates the CVA charge.

When this is pointed out in his deposition, Gruer correctly states that in his deposition that there is the possibility that under some CVA scenarios LBSF would owe TSA.[113]  Gruer incorrectly asserts using a lower recovery rate (0%) does not take this into account and would overvalue the CVA.[114]  CVA charges only take into account a dealer's potential for loss, not its potential for gain.  CVA only looks at the instances where the dealer is owed money, not instances where it can walk away from an obligation.  As such, the recovery rate should be set at 0%.

The second error is Gruer's calculated credit spread.  Gruer's credit spread was too low, resulting in a lower probability of default which would underestimate the CVA charge.  Gruer used the bond spread as an input to the Bloomberg CVA pricer.  However, the RFA is drawn upon before the TSA's bonds default; indeed it is possible that the reserve fund is fully drawn and there is no bond default.[115]  A hypothetical replacement provider would look at the Liquidity Reserve Account as a subordinate obligation of the TSA (it defaults before the bonds default), which would imply a higher, albeit unknown credit spread.  Gruer's valuation uses an inappropriately low credit charge that results in a material misevaluation of

---

[107] Expected Positive Exposures ("EPE")

[108] The default probabilities are generated by comparing the client credit spreads vs. a "risk free" return

[109] For example, if the model predicted a $100 mark to market in Year 5, and the client then defaulted, a recovery rate of 40% would assume the dealer would recover $40 via the bankruptcy process and lose $60.

[110] Gruer Report, Page 19, Paragraph 67

[111] Gruer Deposition, 181: 16-20

[112] Gruer CVA calculation screenshot, LBHI_WTSA_00024308

[113] Gruer Deposition, 183: 2-6

[114] Gruer Deposition, 183: 18 - 184: 6

[115] The purpose of the Liquidity Reserve Account is to provide a buffer for bondholders in case revenues are inadequate for the payment of debt service.

the RFA in LBSF/LBHI's favor.

## "Mid Market" Is Not Transactable and Understates TSA's Loss

Gruer Report Paragraph 49:

> "Based on the terms in paragraph 47, I calculated a mid-market value of these cash flows of $1,359,394.59, payable by Washington TSA to Lehman as shown in Appendix 3."

Gruer calculates TSA actually owes LBSF $1.359MM, despite the fact TSA's lost interest from 1-Dec-2008 to the Rejection Date was already $553,080 (the correct Section 7.7(b) loss), and from 1-Dec-2008 to 30-Sep-2013 TSA had already lost $9.462MM in interest[116]. A common sense review of Gruer's figure shows his calculation to grossly understate TSA's actual loss, even before considering its future projected losses.

In Paragraph 70 of his report, Gruer clearly states that: "… I do not opine, as a legal matter, as to whether or not it is appropriate to include an adjustment for a credit charge and for dealer profit charge…" We are not legal bankruptcy experts, either, but we can assert that dealers rarely transact at "mid market" with clients, especially in highly structured transactions like the RFA. Trading in highly liquid, low counterparty risk markets such as US Treasuries or USD LIBOR swaps does on occasion occur at "mid market" but the RFA is not such a transaction. Dealers have already shown their unwillingness to enter into a replacement RFA with TSA at any price, yet Gruer's "mid market" price seems to imply that we should use an even worse price (from TSA's point of view) to calculate TSA's loss.

Gruer in his deposition at least does admit that he does not believe "mid-market" is a transactable level:

> "A. I calculated mid market value, I believe it was 4.66. It's in one of the spreadsheets that we produced to you. I don't believe a dealer would have executed at that level. That represented mid market levels that a dealer that was going to execute would likely charge credit and profit."[117]

In Paragraph 70 of his report Gruer adds:

> "Based upon the mid-market valuation that I determined, I calculated that the CVA for this valuation would have been $2,055,115.33. When further adjusted for an assumed dealer profit charge of $1,889,959, I calculate that a hypothetical replacement trade would have been valued at $2,812,301.72, payable by Lehman to TSA, including the Section 7.7 (b) Loss Amount."[118]

$2.812MM payable by LBHI to TSA does not come close to making TSA whole for their already incurred losses; Gruer's calculation should be dismissed as inaccurately representing TSA's true losses.

---

[116] Curry-Hasterok Report, Page 17
[117] Gruer Deposition, 157: 11-17
[118] Gruer Report, Page 20, Paragraph 70

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

Dated: March 24, 2014

_____          _____
Daniel P. Curry                                                     Jeffrey A. Hasterok

# Appendix A

*Referenced Source Materials*

## The Agreement

Reserve Fund Agreement (including the March 2003 Amendment Agreement below, "RFA"), 5-Nov-2002, LBHI_WTSA_00002800

   Amendment Agreement, 26-Mar-2003, LBHI_WTSA_00000280

Final Request for Bids, PFM, 22-Oct-2002, LBHI_WTSA_00002861

RFA Bid Results, email from Greg Shlionsky, 24-Oct-2002, LBHI_WTSA_00006278

## The Series 2002 Bonds

Indenture by and between Tobacco Settlement Authority and U.S. Bank, N.A., as Indenture Trustee ("Indenture"), 1-Oct-2002, LBHI_WTSA_00005173

## Expert Witness Reports

Daniel Curry and Jeffrey Hasterok, 16-Dec-2013, ("Curry-Hasterok Report")

Samuel Gruer, Cityview Capital Solutions, LLC, Revised version, dated 5-Mar-2014, ("Gruer Report")

Report of Prof. David F. Babbel in Washington State Tobacco Settlement Authority against Lehman Brothers Holdings Inc., dated 24-Feb-2014, ("Babbel Report")

## Depositions

Deposition of Peter Shapiro, Rough Draft, 13-Dec-2013

Deposition of Jeffrey Hasterok, Final, 16-Jan-2014

Deposition of Samuel Gruer, Final, 6-Mar-2014

Deposition of David Babbel, Final, 7-Mar-2014

## LBHI's Attempt to Obtain Termination Indications, March 2009

Response from Wachovia with non-actionable quote, email from Casey Rogers, 26-Mar-2009, LBHI_WTSA_00000342 and LBHI_WTSA_00000345

## Implied Forward Rates Not An Accurate Predictor of the Future Path of Rates

"Monetary Policy Inertia: Fact or Fiction?" Glenn D. Rudebusch, Federal Reserve Bank of San Francisco, International Journal of Central Banking, Vol. 2 No. 4, December 2006 http://www.frbsf.org/economic-

Curry-Hasterok Rebuttal Report of LBSF/LBHI Expert Witness Reports and Testimony
March 24, 2014

research/files/ijcb06q4a4.pdf

"Interest Rate Forecasts: A Pathology," Charles A. E. Goodhart and Wen Bin Lim, London School of Economics, International Journal of Central Banking, Vol. 7 No. 2, June 2011, http://www.ijcb.org/journal/ijcb11q2a5.pdf

"Are forward rates a good predictor of actual interest rates?", Vanguard, 3-Jun-2013, https://www.vanguardinvestments.com.au/adviser/adv/articles/insights/commentary/markets-economy/Are-forward-rates-a-good-predictor-of-actual-interest-rates.jsp

"Anticipations Of Monetary Policy In Financial Markets," Joe Lange, Brian Sack, and William Whitesell, Staff of the Board of Governors of the Federal Reserve System, April 10, 2001, http://www.federalreserve.gov/pubs/feds/2001/200124/200124pap.pdf

# Time Series Data

Federal Reserve Bank of St. Louis: 6M LIBOR resets:
http://research.stlouisfed.org/fred2/series/USD6MTD156N/

Fannie Mae Historic Discount Notes Rates Compared to Treasury Bills,
http://www.fanniemae.com/resources/file/debt/pdf/other-debt/historicdiscountnotes.pdf

Freddie Mac Reference Bills Securities History by Auction Date,
http://www.freddiemac.com/debt/data/cgi-bin/refbillaucres.cgi?order=AD

# Other

Briarwood Commercial Paper Trust, LBHI_WTSA_00014852

"Valuing Derivatives: Funding Value Adjustments and Fair Value" by John Hull and Alan White, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2245821

Statement of Financial Accounting Standards No. 157, Fair Value Measurements, Financial Accounting Standards Board "FASB"), http://www.fasb.org/pdf/aop_FAS157.pdf

LBHI Day 1 Profit and Loss, LBHI_WTSA_00005582

Gruer CVA Calculation, LBHI_WTSA_00024308

Internal email from Anatoly Zelikoff informing colleagues LBSF won the TSA bid, 24-Oct-2002, LBHI_WTSA_00002673