**JONES DAY**
Jayant W. Tambe
Laura W. Sawyer
222 East 41st Street
New York, New York 10017

*Attorneys for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | : | **Case No. 08-13555 (SCC)** |
| **Debtors.** | : | **(Jointly Administered)** |

----------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LEHMAN'S MOTION FOR AN ORDER EXCLUDING THE TESTIMONY OF <u>DANIEL CURRY AND JEFFREY HASTEROK</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 3

    A.    Federal Rule of Evidence 702 Only Permits The Admission of Reliable Expert Testimony .................................................................... 3

    B.    Lehman's Bankruptcy And The Economic Crisis Do Not Justify An Abandonment Of The Industry Standard ............................................... 6

    C.    Curry And Hasterok's Opinions Are Inconsistent With The Express Language Of The RFA ........................................................................... 9

    D.    Curry and Hasterok's Rejection Of Forward Curves Has No Basis ................... 11

    E.    Curry And Hasterok's Projection That Washington TSA Will Earn No More Than 0.65% For The Next 23 Years Is Admittedly Speculative ............... 13

    F.    Curry And Hasterok's Discount Rate Has No Basis In Either Market Practice Or Finance Theory ................................................................... 14

CONCLUSION ................................................................................................... 16

## TABLE OF AUTHORITIES

<b>Page</b>

CASES

*24/7 Records, Inc. v Sony Music Entm't, Inc.*,
    514 F. Supp. 2d 571 (S.D.N.Y. 2007)...................................................................13

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).................................................................3, 4, 6

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012)................................................................10

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) ................................................................14

*Bourjaily v. United States*,
    483 U.S. 171 (1987)................................................................3

*Carmichael v. City of New York*,
    No. 06-cv-1913, 2014 U.S. Dist. LEXIS 106563 (E.D.N.Y. Aug. 1, 2014) ............................8

*Cayuga Indian Nation of New York v. Pataki*,
    83 F. Supp. 2d 318 (N.D.N.Y. 2008)................................................................7

*Colon ex. rel. Molina v. BIC USA, Inc.*,
    199 F. Supp. 2d 53 (S.D.N.Y. 2001).................................................................4, 5

*Crowley v. Chait*,
    322 F. Supp. 2d 530 (D.N.J. 2004) ................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*
    43 F.3d 1311 (9th Cir. 1995) ................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................6

*GE v. Joiner*,
    522 US 136 (1997)................................................................14

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    No. M21-88, 2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008)...................................9

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
No. M21-88, 2008 U.S. Dist. LEXIS 44216, (S.D.N.Y. June 5, 2008)....................................8

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)........................................................................................6, 8, 9, 15

*Lippe v. Bairnco Corp.*,
99 F. App'x 274 (2d Cir. 2004) ...........................................................................8

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)..............................................................................3, 4, 8

*Silivanch v. Celebrity Cruises, Inc.*,
171 F. Supp. 2d 241 (S.D.N.Y. 2001).................................................................8

*SR Int'l Bus. Ins. Co. v. World Trade Or. Props., LLC*,
467 F. 3d 107 (2d Cir. 2006)..............................................................................8

*Tractebel Energy Marketing Inc. v. AEP Power Marketing Inc.*,
487 F.3d 89 (2d Cir. 2007)................................................................................13

*U.S. CFTC v. Moncada*,
No. 12 Civ. 8791, 2014 U.S. Dist. LEXIS 88884 (S.D.N.Y. June 30, 2014)...........................8

*Zaremba v. GMC*,
360 F. 3d 355 (2d Cir. 2004)..............................................................................8

OTHER AUTHORITIES

Federal Rule of Evidence 702....................................................................................1, 3

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF" and collectively with LBHI, "Lehman"), by and through their undersigned counsel, respectfully submit this reply brief in further support of the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the proposed expert testimony of Daniel Curry and Jeffrey Hasterok being proffered by the Tobacco Settlement Authority of the State of Washington ("Washington TSA") from being considered in connection with Proofs of Claim Nos. 37355 and 37356.

## INTRODUCTION

1.      Federal Rule of Evidence 702 and Supreme Court precedent only permit the admission of expert evidence if the witness has specialized knowledge and provides testimony resulting from reliable methods.  In the case where the purported expert's expertise arises from his experience (as here), the opinion rendered by that expert must be consistent with that expert's experience.  Washington TSA simply cannot demonstrate that the expert opinions of Messrs. Curry and Hasterok meet the standard for admissibility.  Instead, Washington TSA asks this Court to distort the law to create a standard for expert admissibility, which is no standard at all, to slip in Washington TSA's inadmissible opinion testimony.

2.      Washington TSA freely admits that Messrs. Curry and Hasterok have rejected market practice (from which their purported expertise derives) and have instead crafted a "novel" approach to determine the value of the reserve fund agreement.  Recognizing that this admission alone is likely fatal to Messrs. Curry and Hasterok's opinions, Washington TSA attempts to justify their departure from industry norms by discussing the "unique" and "unprecedented" environment in March 2009 following the Lehman bankruptcy.  But there is absolutely nothing

unique about valuing a forward delivery agreement like the Reserve Fund Agreement ("RFA").[1]

Financial participants – both dealers and counterparties alike – value forward delivery

agreements on a daily basis using the industry-standard methodology, and did so in March 2009.

Even Washington TSA's other expert, Peter Shapiro, admits that there was sufficient market

information to value the RFA in March 2009.[2]  Declaration of Laura W. Sawyer, dated October

21, 2014 (hereafter, "Sawyer Reply Decl."), Ex. A, Shapiro Tr. (Oct. 16, 2014) 273:23-275:23.

       3.       Washington TSA also attempts to defend Messrs. Curry and Hasterok's admitted

departure from market practice by claiming there is "nothing" in the RFA that requires

Washington TSA to determine the Termination Amount in a manner consistent with market

practice.  But this too must be rejected as the RFA expressly requires that if Washington TSA

were to determine the Termination Amount, it must do so "as if it were Lehman."  Washington

TSA – for the first time in this litigation – claims it will prove at the evidentiary hearing that this

provision was included in the RFA as a result of a drafting error, (Opp'n at 10), however, there

has not been a scintilla of evidence, either documentary or testimonial, adduced to support such a

contention.  Instead, this express language of the RFA details how Washington TSA is to

determinate the Termination Amount and works to prevent precisely the claim before the Court –

where a counterparty disregards market practice in favor of an untested valuation methodology

and which, not surprisingly, results in an extremely favorable valuation for the counterparty.

       4.       Finally, Washington TSA simply ignores the specific problems Lehman identified

with the missing critical steps in the Curry/Hasterok analysis, the use of a four-month average

yield to project decades into the future and the inappropriate discount rate.  All of these

---

[1]     The RFA was submitted to the Court as Exhibit 1 to Movants' Moving Brief.  *See* Docket No. 46383,
Declaration of Laura W. Sawyer, dated September 26, 2014 (hereafter, "Sawyer Moving Decl."), Ex. 1.

[2]     While Shapiro used the framework of the standard methodology to value the RFA, he imposed unjustifiable
charges to inflate his valuation in Washington TSA's favor.

assumptions are inconsistent with market practice and each of them independently renders

Messrs. Curry and Hasterok's opinions unreliable.

5.      Ultimately, Washington TSA's strategy is obvious.  Freed from the shackles of

the Federal Rules, Supreme Court precedent, market practice and the express language of the

RFA, Washington TSA seeks to claim losses in any amount it wishes.  The law bars such tactics

at the courthouse door.

## ARGUMENT

### A.      Federal Rule Of Evidence 702 Only Permits The Admission Of Reliable Expert Testimony

6.      Washington TSA concedes that the Federal Rule of Evidence 702 only permits

the admission of expert testimony if the following four requirements are met:  (1) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact; (2) the testimony

is based upon sufficient facts or data; (3) the testimony is the product of reliable principles and

methods; and (4) the witness has applied the principles and methods reliably to the facts of the

case.  *See* Fed. R. Evid. 702 (emphasis added).  Nor does Washington TSA deny that it bears the

burden of demonstrating that the testimony is admissible.  *See Bourjaily v. United States*, 483

U.S. 171, 175 (1987).

7.      Second Circuit law is clear that when a challenge has been raised to the

admissibility of expert testimony, the Court "should undertake a rigorous examination of the

facts on which the expert relies, the method by which the expert draws an opinion from those

facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos v.

Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  When there is not "a sufficiently

rigorous analytical connection between [an expert's] methodology and the expert's conclusions,"

*Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005), such that an expert's data or

methodology "are simply inadequate to support the conclusions reached, *Daubert* and Rule 702

3

*mandate* the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (emphasis added).

8.      Seeking to dodge the clear application of Rule 702 and Second Circuit law, Washington TSA cherry picks sound bites from a District Court case that predates the Second Circuit's leading case on the admissibility of expert testimony.  Opp'n at 8 (citing *Colon ex. rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001)).  As an initial matter *Colon* must be read within the context of Second Circuit precedent.  Further, Washington TSA has distorted *Colon* in an attempt to create a new standard for expert admissibility that has no basis in law (and which, indeed, is no standard at all).  Contrary to Washington TSA's interpretation, the court in *Colon* rigorously examined the proffered expert opinion and concluded that it should be excluded primarily because it was untested and unreliable, *id.* at 78-80, not because it was "purely conjectural" or based on "totally unfounded assumptions."  An examination of *Colon* beyond the snippets in Washington TSA's Opposition reveals that *Colon* is actually on all fours with Second Circuit precedent.  *Compare Colon* 199 F. Supp. 2d 53 with *Amorgianos*, 303 F.3d at 265-66; *Nimely*, 414 F.3d at 395-96.

9.      Indeed, an application of the analysis in *Colon* to the present dispute reinforces the conclusion that the testimony of Messrs. Curry and Hasterok should be excluded.  As with Messrs. Curry and Hasterok, the expert in *Colon* gained his expertise through his experience. *See id.* at 72.  In assessing the reliability of the expert's testimony, the court in *Colon* found that "the key question is whether it can be (and has been) tested."  *Id.* at 75.  The court explained that "[w]hile testing is not an absolute prerequisite for an expert's theory . . . it is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work."  *Id.* at 76.  Since the expert had not presented a methodology that could be tested, the court concluded it was not sufficiently reliable to be admitted.  *Id.* at 78.  In addition,

the court found it significant that the expert's approach had no general acceptance in the relevant academic community and since the theory had not been "tested in the marketplace," its reliability was unknown. *Id.* at 78-79.

10.    Applying the considerations set forth in *Colon* compels the exclusion of Messrs. Curry and Hasterok.  Washington TSA freely admits that Messrs. Curry and Hasterok's approach is a rejection of the market methodology for valuing reserve fund agreements.  Messrs. Curry and Hasterok themselves confirmed that they have never used the approach found in their expert report in their nearly combined forty-five years in finance.  *See* Sawyer Moving Decl., Ex. 3, Hasterok Tr. 91:19-21; Sawyer Moving Decl., Ex. 4, Curry Tr. 79:2-7.  Nor have Lehman's experts ever seen this approach used in the industry.  *See* Sawyer Reply Decl., Ex. B, Babbel Tr. 121:12-13 ("I haven't seen anything like this in my thirty years"); Sawyer Reply Decl., Ex. C, Gruer Report at ¶ 89 ("To the best of my knowledge, the Curry/Hasterok valuation methodology has not been used by any participant in the financial markets.").  Messrs. Curry and Hasterok's approach not only lacks "general acceptance," it is inconsistent with market practice.  Moreover, Curry and Hasterok admit that their theory is untested in the market, and even more egregious, they did not even test their own theory to assess its reliability.[3]

---

[3]    Greater scrutiny must be applied to Messrs. Curry and Hasterok's methodology because they admittedly have created their purported methodology especially for this litigation.  The court in *Colon* commented on the fact that the expert in that case did not design his method solely for litigation purposes, which weighed in favor of the admissibility of the expert's opinion. *Colon*, 199 F. Supp. 2d at 80.  The court in *Colon* explained that "greater scrutiny is to be applied to" a method designed solely for purposes of litigation and suggested that methods "born in litigation" should be rejected as unreliable. *Id.* at 80 n.19. *See also Daubert v Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (citations omitted) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. … That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.  For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests.  Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support.").

11.    Washington TSA cannot deny the applicable legal standard.  In order for an expert's opinion to be admissible, it must be reliable.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Amorgianos*, 303 F.3d at 267.  Where, as here, an expert turns his back on his experience to propound a novel, untested method, designed solely for litigation, that method is inherently unreliable.  Washington TSA cannot meet its burden of proving that Messrs. Curry and Hasterok's testimony is admissible.

**B.    Lehman's Bankruptcy And The Economic Crisis Do Not Justify An Abandonment Of The Industry Standard**

12.    Washington TSA attempts to excuse its experts' blatant disregard of market practice by pointing to the "unique" circumstances created by Lehman's bankruptcy and the economic crisis.  *See* Opp'n at 11-12.  But the Lehman bankruptcy and economic crisis do not justify Messrs. Curry and Hasterok inventing a new valuation approach for purposes of this litigation.

13.    There were commercially reasonable determinants of value on March 25, 2009 that Messrs. Curry and Hasterok could have used to value the RFA as of that date.  Thousands – if not tens of thousands – of forward purchase agreements just like the RFA were valued on that date, as were millions of other long-dated financial contracts.  Indeed, Messrs. Curry and Hasterok, who were sitting at Morgan Stanley on March 25, 2009, presumably used the industry standard methodology and available market data to value their books on that day.  *See* Sawyer Moving Decl., Ex. 3, Hasterok Tr. 27:18-25 (confirming that during the entirety of their employment at Morgan Stanley, both Mr. Hasterok and Mr. Curry "absolutely" used forward curves to value Morgan Stanley's positions); Sawyer Moving Decl., Ex. 4, Curry Tr. 11:17-12:17 (confirming use of forward curves to value derivatives positions at Morgan Stanley).  If the market had been so disrupted on March 25, 2009 that the industry-standard methodology and

market data was not available, such that values could not be obtained and books could not be marked, it would have been headline news.

14.     It is disingenuous for Washington TSA to argue that the Lehman bankruptcy and economic crisis justifies Messrs. Curry and Hasterok's unprincipled approach.  This purported excuse is raised for the first time in Washington TSA's opposition brief and has never been presented by either Mr. Curry or Mr. Hasterok.  Instead, Messrs. Curry and Hasterok explained that they rejected the industry-standard approach because they believe it is "unfair to TSA."  *See* Sawyer Moving Decl., Ex. 8, Curry/Hasterok Rebuttal Report at 5.

15.     Moreover, even if the Lehman bankruptcy and economic crisis were "unique" circumstances that might warrant a novel valuation, that does not give Messrs. Curry and Hasterok free license to create any valuation approach they wish.  Instead their opinions still must be reliable in order to be admissible.  This is confirmed by the central case on which Washington TSA relies for the proposition that "unique" circumstances may warrant the use of a novel valuation theory, *Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2008).[4]  The valuation issue presented in *Cayuga Indian Nation* was to determine the appropriate damages for a tribe of Native Americans who were robbed of their ancestral land over 200 years ago.  Indeed, the court in *Cayuga Indian Nation*, even with faced with a truly unique valuation issue, still rigorously evaluated each of the expert's proposed methodologies to confirm their reliability before admission and excluded the opinions from one of the experts. There, as here, the excluded expert (i) failed to collect data in accordance with industry-standard methodology; (ii) failed to make appropriate adjustments in accordance with industry-standard

---

[4]     The valuation issue presented in *Cayuga Indian Nation* emphasizes that the dispute between Lehman and Washington TSA is a "run-of-the-mill" valuation dispute.  There simply is no comparison between two centuries of dispossession suffered by a tribe of Native Americans and the calculation of a termination payment under a market standard financial contract, which Messrs. Curry and Hasterok presumably have done many times in their careers.

practice; and (iii) relied on data arising after the date of valuation.  Under the analysis in *Cayuga Indian Nation*, the testimony of Messrs. Curry and Hasterok should be excluded.

16.     In a similar vein, Washington TSA cites *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241 (S.D.N.Y. 2001), for the proposition that testimony based on a novel methodology may still be admitted as reliable.  However, in *Silivanch*, the "novel" methodology involved only a minor variation on a commonly accepted methodology, *id*. at 269, which stands in stark contrast to the complete abandonment of the industry standard advocated by Messrs. Curry and Hasterok.

17.     Regardless of the excuse for their unprecedented opinions, Messrs. Curry and Hasterok, who have acquired their expertise through experience, must demonstrate "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*, 526 U.S. at 152.  *See also Nimely*, 414 F.3d at 399; *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 278-279 (2d Cir. 2004); *Zaremba v. GMC*, 360 F. 3d 355, 358 (2d Cir. 2004); *U.S. CFTC v. Moncada*, No. 12 Civ. 8791, 2014 U.S. Dist. LEXIS 88884, at *4 (S.D.N.Y. June 30, 2014); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, M21-88, 2008 U.S. Dist. LEXIS 44216, at *10 (S.D.N.Y. June 5, 2008); *Carmichael v. City of New York*, No. 06-cv-1913, 2014 U.S. Dist. LEXIS 106563, at *30-31 (E.D.N.Y. Aug. 1, 2014); *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004).

18.     An expert who bases his expertise on experience must "show how his or her experience . . . led to his conclusion."  *SR Int'l Bus. Ins. Co. v. World Trade Or. Props., LLC*, 467 F. 3d 107, 132 (2d Cir. 2006) (admitting testimony where the expert relies on his familiarity with industry practices to identify the industry practice appropriate for the facts of the case).  The test for reliability in such instances is that the expert "apply[ ] his extensive experience to the facts of the case."  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21-88, 2008 U.S.

Dist. LEXIS 37331, at *37-38 (S.D.N.Y. May 7, 2008).  By turning their back on their experience, Messrs. Curry and Hasterok cannot show how that experience leads to their conclusion.  They have invented a method that they neither acquired through their experience nor ever used during their experience.  While their experience at Morgan Stanley may qualify them to value forward delivery agreements using the industry-standard methodology, that experience does not, however, qualify them to develop entirely new valuation approaches based on their perceptions of purported fairness.

19.     Messrs. Curry and Hasterok's opinion concerning the value of the RFA is inadmissible.  It is based on an approach that abandons any connection to the training and experience through which they purported to have acquired their expertise.  As such, their opinion simply bears no relation to the practice of the expert in the relevant field, which is the touchstone for reliability under *Kumho Tire*, 526 U.S. at 152.

## C.     Curry And Hasterok's Opinions Are Inconsistent With The Express Language Of The RFA

20.     Washington TSA argues that there is "nothing" in the RFA that requires Washington TSA "to calculate an abstract so-called 'market valuation' or calculate TSA's losses as if TSA were a dealer."  Opp'n at 2.  Washington TSA contends that it is free to abandon standard industry techniques and adopt any method whatsoever to determine the Termination Amount.[5]  *See* Opp'n at 9-10.

---

[5]     Washington TSA presents experts that have fundamentally inconsistent and mutually exclusive opinions. This is confirmed by Washington TSA's argument that "a hypothetical valuation from a dealer's perspective . . . is inconsistent with the terms of the RFA."  Opp'n at 10.  Yet, Washington TSA's other expert, Peter Shapiro, purports to do exactly that.  As Mr. Shapiro explains in his Expert Rebuttal Report, he has determined Washington TSA's "Loss" under the RFA by using a method he calls "hypothetical replication," which is the creation of a hypothetical price a dealer would be willing to pay to assume the RFA.  Docket 46511 (the "Lawrence Decl."), Ex. 7 at ¶ 5.  Mr. Shapiro continues:  "This is the methodology that was used by TSA  to value its claim, and is the basis for my expert report.  It is also the methodology that Lehman's expert Samuel Gruer has used."  *Id.*

21.     However, the RFA expressly provides that upon the occurrence of a Lehman

Event of Default (which occurred here), Lehman had the right to calculate the Termination

Amount.  Sawyer Moving Decl., Ex. 1, RFA at § 7.6.  However, Section 7.6(c) continues that:

> if Lehman fails to determine the Termination Amount within three
> Business Days of written notice from the Issuer or the Trustee of
> the occurrence of a Lehman Event of Default ***then the Issuer shall
> make such determination as if it were Lehman*** and the amount as
> so determined by the Issuer shall for purposes of this Section 7.6
> be deemed the Termination Amount.

Sawyer Moving Decl., Ex. 1, RFA, § 7.6(c) (emphasis added).

22.     Messrs. Curry and Hasterok confirmed that if they were to calculate a

Termination Amount from the perspective of a dealer, they would have used the industry-

standard methodology.  Sawyer Moving Decl., Ex. 3, Hasterok Tr. 35:8-12; 196:10-18.

Recognizing that the express language of the RFA precludes their ability to reject the industry-

standard methodology, Washington TSA resorts to the argument that Section 7.6(c) was some

sort of drafting error for the first time in its Opposition brief.  Opp'n at 10.  However, not a shred

of evidence has been adduced to confirm any such drafting error.[6]

23.     Messrs. Curry and Hasterok's disregard of the RFA's express requirement that

any valuation to be done by Washington TSA must be done "as if it were Lehman,"[7] combined

with their admission that if they had done the valuation from Lehman's perspective, they would

not have used the approach outlined in the Curry/Hasterok Report, warrants a complete rejection

of their opinions.  *See Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp.

2d 629, 640 (S.D.N.Y. 2012).

---

[6]     Washington TSA promises this drafting error will be proven during the evidentiary hearing.  Opp'n at 10.

[7]     Washington TSA tries to make much of the fact that Lehman's expert did not factor in "as if it were Lehman" when calculating the Termination Amount.  However, that is simply irrelevant to whether the opinions of Messrs. Curry and Hasterok are reliable and admissible.  Since Lehman's expert was not conducting the valuation for Washington TSA, the provision simply does not apply.  But more importantly, since the valuation done by Lehman's expert was done using the industry-standard methodology, it was done in a manner consistent with Section 7.6(c).

### D.    Curry and Hasterok's Rejection Of Forward Curves Has No Basis

24.    Washington TSA attempts to justify Messrs. Curry and Hasterok's disregard of forward curves by claiming (a) there is no requirement in the RFA that forward curves should be used; (b) that forward curves will not accurately predict what Washington TSA would earn in the future; and (c) forward curves cannot be used because no new reserve fund agreements were being executed in March 2009.  Opp'n at 13-14.  But none of these justifications warrant rejecting industry-standard methodologies, particularly by experts who base their expertise on their experience.  More importantly, though, Curry and Hasterok's failure to use forward curves renders their opinions unreliable.

25.    Despite Washington TSA's argument to the contrary, forward curves must be used to value the RFA.  As noted above, (*see* supra ¶¶ 21-22), the RFA requires that Washington TSA perform the valuation "as if it were Lehman."  Lehman, and other market participants valuing forward delivery instruments including reserve fund agreements used – and continue to use – forward curves as part of the standard methodology.  Messrs. Curry and Hasterok used forward curves to value reserve fund agreements and other related transactions at Morgan Stanley, as does every other professional in the market.  Sawyer Moving Decl., Ex. 3, Hasterok Tr. 27:18-25 (confirming that during the entirety of their employment at Morgan Stanley, both Mr. Hasterok and Mr. Curry "absolutely" used forward curves to value Morgan Stanley's positions); Sawyer Moving Decl. Ex. 4, Curry Tr. 11:17-12:17 (confirming use of forward curves to value derivatives positions at Morgan Stanley); Sawyer Reply Decl., Ex. C, Gruer Report at ¶¶ 34-38.  Indeed, Mr. Hasterok confirmed that whenever a counterparty asked him the price to terminate a trade while he was at Morgan Stanley, he used forward curves to determine that price.  Sawyer Moving Decl. Ex. 3, Hasterok Tr. 31:5-25; 34:16-25.

26.    Washington TSA asserts that because forward curves are not a predictive tool, it is inappropriate to use these curves to value the RFA.  Opp'n at 22.  This argument has no merit. The valuation at issue here involves the calculation of the Termination Amount, which is achieved by determining the market value for the RFA as of March 25, 2009.  This valuation can, and must, be completed using forward curves, consistent with market practice.

27.    Similarly, Washington TSA's argument that forward curves are inappropriate here because there is no market for reserve fund agreements is simply irrelevant.  Opp'n at 13-15.  As Messrs. Curry and Hasterok well know, the forward curves that are used in the market to value a contract such as the RFA are forward interest rate curves related to the delivery of the Eligible Securities of the RFA.  As Washington TSA's other expert recently confirmed, there was sufficient market data to determine a termination value for the RFA on March 25, 2009, even if new reserve fund agreements were not being entered into.  Sawyer Reply Decl., Ex. A, Shapiro Tr. (Oct. 16, 2014) 273:23-275:23.

28.    Values are placed on financial instruments on a daily basis, even if there is no active market for the specific financial product.  Indeed, through the use of forward curves, values are placed on financial instruments before they are on the market.  As Lehman's expert Dr. David Babbel has explained, the market data used to develop the forward curve consists of

> prices on securities and their cousin yields.  And those yields on securities are particular to the instrument in question and cannot be used to value instruments that don't have those precise characteristics and exact replicas.  **So what economists do and what market participants do is extract . . . the underlying spot rates of interest, which in turn, can be used to value anything that has cash flows occurring at different times along the spectrum.**

Sawyer Reply Decl., Ex. D, Babbel Tr. 12:16 - 13:4 (emphasis added); *see also* Sawyer Reply Decl., Ex. D, Babbel Tr. 20:3-9.

### E.    Curry And Hasterok's Projection That Washington TSA Will Earn No More Than 0.65% For The Next 23 Years Is Admittedly Speculative

29.    Washington TSA admits that the projection Messrs. Curry and Hasterok make is speculative. They attempt to justify this speculative assumption by claiming it is the "least speculative" assumption they considered. Opp'n at 6. But that does not make it reliable or admissible. Even Messrs. Curry and Hasterok recognize the problematic nature of the assumption they have made in noting that "historical average returns are very sensitive to the time period chosen." Sawyer Moving Decl., Ex. 2, Curry/Hasterok Report at 15. Yet, even in the face of this admission, Messrs. Curry and Hasterok made no effort to demonstrate that somehow the period they selected was more reliable than other periods. To the contrary, Messrs. Curry and Hasterok admit they did not do any analysis to confirm that their projection of 0.65% as the future interest rate Washington TSA could earn was reliable. *See* Sawyer Moving Decl., Ex. 3, Hasterok Tr. 182:4-11 ("depending on the date range, you are probably going to get very different answers, and – but we did not do a thorough investigation of back-testing every possible range and how that then fit to future results. We did not do that."); *id.* at 179:23-180-2 (Mr. Hasterok testifying, "So did we do a specific analysis that says, 'Four months of data is the best predictor of future results?' we did not do that analysis.").

30.    In its Opposition, Washington TSA insists that Messrs. Curry and Hasterok's "no change assumption" is appropriate and reliable.[8] Opp'n at 18-19. But there is nothing other than the *ipse dixit* of Messrs. Curry and Hasterok to support their assertion that 0.65% is a "reasonable average rate going **forward**." *Id.* at 19 (emphasis added). Messrs. Curry and Hasterok espouse

---

[8]    Washington TSA claims that its "no change assumption" is accepted in academic literature and case law, Opp'n at 19, but the citations provided do not demonstrate any such acceptance as a reliable assumption. One of the citations is to a blog post and other courts have noted that *Tractebel Energy Marketing Inc. v. AEP Power Marketing Inc.*, 487 F.3d 89 (2d Cir. 2007), does not "address the admissibility of expert testimony, and they do not displace the reliability requirements of Fed. R. Evid. 702." *24/7 Records, Inc. v Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007).

an opinion as to the reasonableness of 0.65% as a forward rate that is contrary to the market

practice for determining forward rates and inconsistent with their own experience with forward

rates.  Messrs. Curry and Hasterok make a bare request that the Court trust their opinions

because of their purported expertise, despite the fact that their opinion is not grounded in their

experience or expertise.  But, as *GE v. Joiner*, 522 US 136 (1997), teaches:

> nothing in either *Daubert* or the Federal Rules of Evidence
> requires a district court to admit opinion evidence which is
> connected to existing data only by the *ipse dixit* of the expert.  A
> court may conclude that there is simply too great an analytical gap
> between the data and the opinion proffered.

*Id.*, at 146.

31.    Further, basing a projection of Washington TSA's likely earnings on a four-month

average, while admitting that they conducted no study to justify the use of a four-month average,

(*see* Motion at ¶ 37), constitutes one of several instances of reliance on speculative or faulty

assumptions.  The Second Circuit has found that the "[a]dmission of expert testimony based on

speculative assumptions is an abuse of discretion."  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d

18, 22 (2d Cir. 1996).  Moreover, in the Second Circuit, expert testimony "should be excluded if

it is speculative or conjectural . . ."  *Id.* at 21.

**F.    Curry And Hasterok's Discount Rate Has No Basis In Either Market
Practice Or Finance Theory**

32.    Washington TSA attempts to justify the discount rate used by Messrs. Curry and

Hasterok by claiming that their discount rate "mimic[s] the market convention when purchasing

a security of using the yield at which you buy that particular instrument as the discount factor."

Opp'n at 24.  But the discounting of future cash flows resulting from a forward purchase

agreement is very different than determining the present value of a security – with a known value

– that has been purchased.  All of the experts, including Washington TSA's other expert Peter

Shapiro, agree that market practice is to use LIBOR as the discount rate.  *See* Sawyer Moving

14

Decl., Ex. 6, Shapiro Tr. (Mar. 5, 2014) 118:20-21; Sawyer Reply Decl., Ex. C, Gruer Report, at

¶ 102; Sawyer Reply Decl., Ex. B, Babbel Tr. 33:3-22.  Presumably, Messrs. Curry and

Hasterok, who gained their purported expertise from their combined 40+ years in finance, know

that discounting with LIBOR is the market convention, but choose not to do so in order to inflate

Washington TSA's Claim.

**CONCLUSION**

33.     Washington TSA cannot hide the fundamental flaws embedded in the approach

developed by Messrs. Curry and Hasterok.  Though both gentlemen developed an expertise in

the valuation of long-dated instruments through the use of standard industry methods while

working in the market for decades, they turned their back on this expertise.  In doing so, they

turned their back on what qualifies them as experts.  Their rejection of standard industry

techniques that incorporate forward curves ignores the fact that these techniques are perfectly

suited to the forward delivery agreements like the RFA.

34.     Washington TSA seeks to gloss over these shortcomings by disregarding  the

operative standard set forth by the United States Supreme Court in *Kumho Tire* that an expert

must "use the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field."  526 U.S. at 152.  This is the fundamental test of reliability for experts qualified

by experience.  It is what Messrs. Curry and Hasterok cannot do.  Their testimony should not be

admitted.

35.     For the reasons set forth in its moving brief and above, Lehman respectfully

requests that the Court (a) enter an order substantially in the form attached to the moving brief as

Exhibit A, granting the relief requested herein; and (b) grant such other and further relief to

Lehman as the Court may deem appropriate.

Dated: October 21, 2014
     New York, New York

JONES DAY

/s/ Laura W. Sawyer
Jayant W. Tambe
Laura W. Sawyer
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Debtors*

## <u>CERTIFICATE OF SERVICE</u>

I, I-Heng Hsu, certify that on October 21, 2014, I caused a true copy of the foregoing Reply Memorandum Of Law In Further Support Of Lehman's Motion For An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok to be served via ECF and electronic mail upon:

> Paul J. Lawrence
> Kymberly K. Evanson
> PACIFICA LAW GROUP LLP
> 1191 Second Avenue, Suite 2100
> Seattle, WA 98101
>
> Eric T. Moser
> Robert N. Michaelson
> RICH MICHAELSON MAGALIFF MOSER, LLP
> 340 Madison Avenue, 19th Floor
> New York, NY 10173
>
> *Attorneys for Washington State*
> *Tobacco Settlement Authority*

Dated: October 21, 2014
　　　　New York, New York

_____ /s/ I-Heng Hsu
　　　　I-Heng Hsu