# EXHIBIT A to the Declaration Of Laura W. Sawyer In Further Support Of Debtors' Motion For An Order Excluding The Testimony Of Daniel Curry And Jeffrey Hasterok

Page 256

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Chapter 11
CASE NO. 08-13555 (JMP)
Jointly Administered


IN RE: LEHMAN BROTHERS
    HOLDINGS, INC. et al.

    Debtors,

------------------------------------------

    VIDEOTAPED TRANSCRIPT OF
    DEPOSITION OF PETER SHAPIRO


    TRANSCRIPT of the stenographic
notes of the proceedings in the
above-entitled matter, as taken by and
before TAB PREWETT, a Registered
Professional Reporter, a Certified
Shorthand Reporter, a Certified LiveNote
Reporter, and Notary Public, held at the
Offices of JONES DAY, 222 East 41st Street,
New York, New York, on Thursday, October
16, 2014, commencing at 10:07 a.m.

Page 257

 1
 2   A P P E A R A N C E S :
 3
 4   JONES DAY
 5   BY: LAURA W. SAWYER, ESQ.
     REBEKAH BINGER, ESQ.
     222 East 41st Street
 6   New York, New York 10017-6702
     Attorneys for Lehman Brothers
 7
 8
 9   PACIFICA LAW GROUP
     BY: PAUL J. LAWRENCE, ESQ.
10   1191 2nd Avenue
     Seattle, Washington 98101-2945
11   Attorneys for Washington TSA
12
13
14   ALSO PRESENT:
15
16   Ilitch Peters, Videographer
17
18   Thomas Hommel, Esq.
     Counsel
19   Office of the General Counsel
     Lehman Brothers Holdings, Inc.
20   1271 Avenue of the Americas
     New York, New York 10020
21
22
     Dean Melchior, Lehman Brothers
23
24   Mr. Hommel and Mr. Melchior
     left at the first break.
25

Page 258

 1        Peter Shapiro
 2   P R O C E E D I N G S
 3        THE VIDEOGRAPHER:  This is tape
 4   number one of the videotaped
 5   deposition of Mr. Peter Shapiro in the
 6   matter of In Re: Lehman Brothers
 7   Holdings, Inc., et al., Debtors, in
 8   the United States Bankruptcy Court,
 9   Southern District of New York, case
10   number 08-13555 (JMP).
11        This deposition is being held
12   at Jones Day, 222 East 41st Street, on
13   October 16, 2014, at approximately
14   10:07 a.m.
15        My name is Ilitch Peters from
16   the firm of Elisa Dreier Reporting
17   Corporation, and I am the legal video
18   specialist.  The court reporter is
19   Tab Prewett in association with Elisa
20   Dreier Reporting Corporation, located
21   at 950 Third Avenue, New York,
22   New York.
23        For the record will counsel
24   please introduce themselves.
25        MS. SAWYER:  Lauri Sawyer and

Page 259

 1        Peter Shapiro
 2   Rebekah Binger from Jones Day on
 3   behalf of the Debtors.
 4        MR. LAWRENCE:  Paul Lawrence
 5   for the Washington State Tobacco
 6   Settlement Authority.
 7        THE VIDEOGRAPHER:  Now, will
 8   the court reporter please swear in the
 9   witness.
10   P E T E R    S H A P I R O,
11   having been sworn by the notary public to
12   testify to the truth, testified as follows:
13   DIRECT EXAMINATION
14   BY MS. SAWYER:
15        Q    Good morning, Mr. Shapiro.
16        A    Good morning.
17        Q    I know you have been deposed
18   before, but I want to remind you of a few
19   things before we get started.  First, we
20   need to speak slowly and carefully for the
21   court reporter, who is trying to take down
22   everything we say.
23        As part of that you should try
24   to wait until I finish a question before
25   you answer.  And likewise I will try to

1 (Pages 256 to 259)

Page 260

Peter Shapiro

1
2  wait until you finish an answer before I
3  ask my next question.
4      You also need to answer my
5  questions out loud, even though we do have
6  a videographer today, so that the court
7  reporter can take your answers down.
8      Do you understand?
9      A    Yes.
10     Q    And if you don't understand a
11  question I ask, I'd ask you to tell me and
12  ask me to rephrase it.  If you answer one
13  of my questions, I am going to assume that
14  you understood what I meant, so please be
15  careful.
16     A    Thank you for the warning.
17     Q    And if you need a break at any
18  time, please let me know, and we can take
19  one.  I would ask that you answer any
20  pending question before we take a break
21  unless it involves a matter of privilege.
22     Understood?
23     A    Yes.
24     (Exhibit No. Shapiro 32, E-Mail
25  chain, top E-Mail dated 1/9/09 from

Page 261

Peter Shapiro

1
2  Bob Cook to Peter Shapiro, Subject:
3  TSA, Bates Nos. TSA 42725 to 42727, is
4  marked by the reporter for
5  identification.)
6      Q    The court reporter has handed
7  you a document that has been marked as
8  Shapiro Exhibit 32.  For the record, it's a
9  multi-page E-Mail, Bates stamped TSA 042725
10  through 042727.  I will give you a chance
11  to look at the document.  My first question
12  is:
13     Do you recognize the document?
14     A    Let me look through it before I
15  answer that, please.  And I should read
16  this in reverse order, I assume, right.
17     Q    That's generally the way it
18  makes the most sense to people.
19     A    Yes.  I finished reading it,
20  yes.
21     Q    Start with the bottom E-Mail
22  that's not redacted, so the one on the last
23  page, at 2:58 p.m., from you to Mr. Rich,
24  Bob Cook, and James Vergara.
25     Do you see that one?

Page 262

Peter Shapiro

1
2      A    Correct.
3      Q    The second sentence, you say:
4      "My colleague James Vergara
5  will be doing the modeling on the
6  Agreement" -- with a capital "A."
7      Do you see that?
8      A    Yes.
9      Q    What does that mean that
10  Mr. Vergara would be doing the modeling on
11  the agreement?
12     A    When you are looking for
13  valuation, you use a model, and he would be
14  the one operating the model.
15     Q    Okay.  And what model was
16  Mr. Vergara going to be using?
17     A    Whatever would be appropriate.
18  We had a variety of models.
19     Q    And had you had a discussion
20  with Mr. Vergara at this time about what
21  model would be appropriate?
22     A    No.
23     Q    Did you discuss at any time
24  with Mr. Vergara what model would be
25  appropriate for determining the value of

Page 263

Peter Shapiro

1
2  the RFA?
3      A    I may have.  I can't remember.
4      Q    Did you leave it up to
5  Mr. Vergara to select the model for the
6  agreement?
7      A    Yes, subject to my looking at
8  the output and assumptions and stuff like
9  that.
10     Q    And why did you leave it up to
11  Mr. Vergara to select the model to be used
12  to value the RFA?
13     A    I don't operates models myself.
14  That's what we have a team to do.
15     Q    And that's what you had
16  Mr. Vergara to do?
17     A    He was part of that team.  Yes.
18  And on this specific agreement, he was the
19  guy charged with it.
20     Q    And just to make sure we are
21  clear, when I say "RFA," I am referring to
22  the reserve fund agreement between
23  Washington State Tobacco Settlement
24  Authority and Lehman Brothers.
25     Do you understand that?

2 (Pages 260 to 263)

Page 264

Peter Shapiro

2    A    We have had the good luck of
3  talking about this before.  So, yes, I do.
4    Q    Okay.  Thank you.
5         If you look at the E-Mail on
6  the page TSA 42726 at the bottom of the
7  page, which is another E-Mail from you to
8  Bob Cook on December 21 at 8:16 p.m., do
9  you see where I am at?
10   A    Yes, I do.
11   Q    In the last paragraph of that
12  E-Mail, the third sentence, you say:
13       "My colleague James Vergara is
14  doing the financial analysis parentheses he
15  spent some time on the Lehman swap desk and
16  knows the Agreement" -- again, with a
17  capital "A" -- "very well."
18       Do you see that?
19   A    Yes.
20   Q    What had you told TSA at this
21  time about Mr. Vergara's experience with
22  reserve fund agreements, again?
23   A    I think I told them literally
24  what it says in this E-Mail.
25   Q    And --

Page 265

Peter Shapiro

2    A    If it weren't the exact same
3  words, it was the same meaning, the same
4  import.
5    Q    And did you tell Washington TSA
6  Mr. Vergara had experience with the
7  specific RFA at issue?
8    A    This RFA?
9    Q    Yes.
10   A    No.
11   Q    You did use the capital "A"
12  "Agreement" in this E-Mail referring to
13  that RFA, correct?
14   A    Correct.
15   Q    And you said that Mr. Vergara
16  knows the agreement very well?
17   A    Right.
18   Q    So you were referring to --
19  what are you referring to when you refer to
20  that?
21   A    Agreements of this type and
22  style.  So looking at this agreement, it
23  wouldn't be something that would be
24  unfamiliar to him.
25   Q    You aren't implying that he

Page 266

Peter Shapiro

2  worked on the Lehman desk in connection
3  with this RFA?
4    A    Not with this specific one.  In
5  fact, I know for certain -- I don't think
6  he was on the Lehman desk at the time this
7  agreement was entered into.
8    Q    Did you at any time ever tell
9  TSA that he did have personal knowledge of
10  the Washington RFA from his time at Lehman?
11       MR. LAWRENCE:  Sorry.  Did you
12  say he did or he did not?
13   A    Did or didn't?  Yeah.
14   Q    That he did.
15   A    That he did have personal
16  knowledge from the inception of the
17  agreement?
18   Q    No.  That based upon -- let me
19  ask the question again.
20       Did you ever tell Washington
21  TSA that Mr. Vergara had personal knowledge
22  of the agreement, whether at the inception
23  or some other time, based upon his
24  experience at the Lehman desk?
25   A    No.

Page 267

Peter Shapiro

2    Q    And if you look at the second
3  paragraph of that E-Mail, you say:
4        "We have quoted our fees as per
5  market convention in terms of basis point
6  of yield value."
7        Do you see that?
8    A    Correct.
9    Q    "And for your information, our
10  analysis of the agreement shows that one
11  basis point is equal to approximately
12  $105,000"?
13   A    Right.
14   Q    How was that determined that
15  one basis point equaled approximately
16  $105,000?
17   A    From the model that James would
18  have been using.
19   Q    So that would have been a
20  valuation or determination made by
21  Mr. Vergara?
22   A    It wouldn't have been a
23  valuation.  It would have been a
24  determination.  Yes.
25   Q    But he was the one responsible

3 (Pages 264 to 267)

Page 268

Peter Shapiro

1    Peter Shapiro
2  for determining the value of basis points?
3      A   Correct.
4      Q   And you believe that
5  Mr. Vergara determined the value of a basis
6  point accurately?
7      A   My sense, Lauri, is this was a
8  preliminary determination, and that that
9  '01 value, when I have looked at subsequent
10  documents, doesn't -- it looks like it's a
11  little bit off to me.
12      Q   But you were basing your fees
13  on that calculation determined by
14  Mr. Vergara at this time, correct?
15      MR. LAWRENCE:  Object.  Object
16  to the form.
17      Q   You can answer.
18      A   We weren't basing our fees on
19  it.  We were basing a proposal on it.  As
20  you can see by the subsequent E-Mails, that
21  was not the fee arrangement that was
22  accepted.
23      Q   But you quoted your fees in
24  terms of basis points, and the basis points
25  was based on the determination made by

Page 269

1    Peter Shapiro
2  Mr. Vergara, correct?
3      A   In that initial proposal,
4  correct.
5      Q   So at this time you believed
6  this to be an accurate determination as to
7  the value of a basis point?
8      A   I believed it to be a
9  preliminary determination.
10      Q   And at what point did you
11  revisit the determination of the value of a
12  basis point?
13      A   I can't recall.
14      Q   But you have revisited it?
15      A   Yes.
16      Q   Okay.  Did you personally
17  revisit the issue of the value of a basis
18  point?
19      A   How does one "personally
20  revisit" the value of a basis point?
21      Q   Are you the one that
22  recalculated what you believed a basis
23  point to be worth?
24      A   No.
25      Q   Who did that?

Page 270

1    Peter Shapiro
2      A   It would have been done by
3  James or another member of the staff.
4      Q   Do you recall the value of a
5  basis point?
6      A   Yes.
7      Q   What is that?
8      A   The value of a basis point
9  depended upon the point in time that you
10  looked at it.  The value at the inception
11  of the agreement in '02 would have been one
12  number.  If we had -- if you had looked at
13  it on the -- you know, based upon the, you
14  know, the market environment that existed
15  in December of '08 would have been another
16  number.
17      In March of '09 when the actual
18  termination took place, it would have been
19  still another number.
20      And as you will recall from
21  prior depositions and because of your
22  familiarity with this case, the value of an
23  '01 would change based upon the correction
24  that was brought to our attention in the
25  final maturity date of the agreement

Page 271

1    Peter Shapiro
2  because that moves the '01.
3      Q   Perhaps you should explain to
4  me how you determined the value of a basis
5  point?
6      A   The value of a basis point is
7  determined by a model.  The inputs into
8  determining the value of one basis point
9  is:
10      How much would the value of the
11  transaction in question -- and this would
12  be any type of transaction -- change based
13  upon shifting interest rates across the
14  yield curve by one basis point?
15      Now, you can think of this in
16  relatively simplified ways.  This is --
17  this is not rocket science by any means.
18  You can think of it this way, and that is:
19      For -- if the agreement never
20  changed in terms of its principal value,
21  its size, what we usually refer to in the
22  swap world as its notional amount, if it --
23  so if that amount didn't change, you
24  wouldn't have to factor in amortization or
25  anything like that -- for each year, one

4  (Pages 268 to 271)

Page 272

```
1          Peter Shapiro
2   basis point would be worth something.
3          Let's simplify it just to
4   illustrate, okay, on this.  If the
5   agreement had a size of $10,000, okay,
6   1 percent of $10,000 would be $100.  One
7   basis point would be 1/100th of that or $1.
8          Okay.  So for each year,
9   $10,000 in '01 would be $1.  If the
10  agreement went on for 15 years, it would be
11  worth $15 gross.  Okay.  That is 15 times
12  one would get you to $15.
13          But to determine the DV '01,
14  dollar value of an '01, you would have to
15  take the present value of that $15, and
16  carry it back to right now.
17          A dollar right now on that
18  first year's 10,000 is worth about dollar
19  because there is not much of a present
20  value factor in the first year.  But a
21  dollar in year 15 is worth considerably
22  less.
23          So for that reason, it would
24  not equal 15, but, let's say
25  hypothetically, it would equal ten, which
```

Page 273

```
1          Peter Shapiro
2   just by the seat of the pants calculation
3   is about right.  Typically, 15 years PV is
4   back to about ten times.
5      Q    How do you determine the
6   present value of those 15 years in your
7   example?
8      A    The normal -- the norm is to
9   use a discount rate.  And that discount
10  rate can vary based upon your inputs.  But
11  the normal thing you are going to look at
12  is the market's cost of funds, which is
13  deemed to be LIBOR based upon the LIBOR
14  swap curve.
15          So the discounting based upon
16  that curve going out -- if you had a
17  payment in each one of 15 years in my
18  illustration, you would apply a different
19  discount rate based upon what the LIBOR
20  swap rate would do -- kind of a cumbersome
21  thing to sit and do on a scratch pad, but a
22  model does it like this for you.
23      Q    And you said that you could --
24  you determined the DV '01 or the value of a
25  basis point at various points in time, for
```

Page 274

```
1          Peter Shapiro
2   example, on inception, or December of 2008,
3   or March of 2009, correct?
4      A    Correct.
5      Q    And you didn't have any trouble
6   calculating the DV '01 at any of those time
7   periods?
8      A    What do you mean by "trouble"?
9      Q    I mean, you had the available
10  information to be able to determine the DV
11  '01 at those time periods?
12      A    As you are aware, initially we
13  had wrong information.
14      Q    But the "wrong information"
15  being the maturity date of the RFA?
16      A    That's correct.
17      Q    But other than that, did you
18  have any difficulty determining the value
19  of a basis point in December of 2008?
20      A    We should not have.  No.
21      Q    Okay.  Or --
22      A    Again, you know, again, I don't
23  run the model.  I am telling you how the
24  model -- the fundamentals of how the model
25  works.  But there shouldn't be any problem
```

Page 275

```
1          Peter Shapiro
2   determining an '01.
3          You can get a wrong output,
4   just so you know.  It's very frequently the
5   case that, when we are checking price on a
6   transaction in a live market as well as
7   just a hypothetical, and checking price
8   against one of the big swap dealer firms,
9   whether it be JP Morgan or Goldman Sachs or
10  Deutsche Bank, that one of our first stops
11  in making sure that both firms are seeing
12  things the same is that we confirm the '01
13  values against each other.
14          So before we do any kind of
15  valuation work or pricing work, our first
16  thing is to say what's the '01 you're
17  coming up with per the agreement.  And if
18  we have a difference on that, we know there
19  is an input problem, a typographical error,
20  a modeling issue of some kind.
21          But that's usually step number
22  one in the ABCs of pricing a derivative
23  transaction.
24          And there are differences,
25  Lauri.  You do pick up errors there.  So I
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 276

```
 1           Peter Shapiro
 2   am not saying we always get it right
 3   100 percent of the time.  But, you know,
 4   that's one of the things you check.
 5       Q    If you look at the E-Mail at
 6   the top of page 42726, which is an E-Mail
 7   from Bob Cook to you and others.
 8       A    That's the one that begins at
 9   the bottom of 42725?
10       Q    Right.  The first line of the
11   E-Mail is:
12           "Peter, thanks for preparing
13   this."
14       A    Yes.
15       Q    And he says:
16           "We may not have been clear
17   enough in our earlier communications."
18       Do you see that?
19       A    Yes.
20       Q    The last paragraph of this
21   E-Mail, he says:
22           "Any possible replacement
23   process for the agreement is down the road
24   and will have to be undertaken once we have
25   a definitive settlement."
```

Page 277

```
 1           Peter Shapiro
 2       Do you see that?
 3       A    Yes.
 4       Q    So at this point in time
 5   Washington TSA was not looking to replace
 6   the agreement?
 7       A    I don't think you can say that
 8   from this E-Mail.
 9       Q    They weren't looking to engage
10   you to replace the agreement?
11           MR. LAWRENCE:  Object.  Calls
12       for speculation.
13       A    You know, I would have to look
14   back at the attachment that would have
15   accompanied the earlier E-Mail.  You know,
16   otherwise, I would just be speculating.
17           (Exhibit No. Shapiro 33,
18       Memorandum dated 12/22/09 from Peter
19       Shapiro to Tobacco Settlement
20       Authority, Bob Cook, Subject:  Reserve
21       Fund Agreement Advisory Services,
22       Scope of Services, Bates Nos. TSA
23       42818 to 42819, is marked by the
24       reporter for identification.)
25       Q    The court reporter has handed
```

Page 278

```
 1           Peter Shapiro
 2   you a document that has been marked as
 3   Shapiro Exhibit 33, which is a two-page
 4   document, Bates stamped TSA 42818 through
 5   42819.
 6           It appears to be draft
 7   memorandum from the Swap Financial Group,
 8   dated December 22, 2008, with some black
 9   lining on that.  Have you had a chance to
10   look at this?
11       A    Yes, I have.
12       Q    And was this prepared -- who
13   prepared this document?
14       A    I can't tell from looking at
15   it.
16       Q    Did you -- did Swap Financial
17   Group prepare it?
18       A    I believe so.
19       Q    Do you know if you prepared it?
20       A    I'd be -- as I said, I can't
21   tell from looking at it.  I would be
22   speculating, but, yeah, it could have been
23   me.  It could have been James.
24       Q    And these were the services
25   that Swap Financial was proposing to do for
```

Page 279

```
 1           Peter Shapiro
 2   Washington TSA in December of 2008?
 3       A    When you are referring to
 4   "these"?
 5       Q    The services reflected in this
 6   draft memorandum.
 7       A    With the black lining or
 8   without the black lining?
 9       Q    What did you initially propose
10   to Washington TSA to be the services to be
11   provided by Swap Financial Group?
12       A    Do you have another exhibit
13   that shows the initial proposal?
14       Q    No.
15       A    Then I would have to just
16   assume, looking at this -- and I am saying
17   this is an assumption -- that it would have
18   been what existed prior to the black
19   lining.
20       Q    So you would have been
21   proposing the services that Swap Financial
22   would provide to TSA, being, one,
23   valuation, two, strategy, three,
24   replacement, as the initial proposal made
25   by Swap Financial?
```

6 (Pages 276 to 279)

Page 280

Peter Shapiro

1
2      A     Yes, and that makes sense
3    obviously from the E-Mail that -- the
4    dialogue that is going on within the
5    E-Mails in the prior exhibit that you
6    referenced.
7      Q     Right, that Swap Financial
8    Group had initially proposed one of the
9    things it could do for Washington TSA would
10   be to give them a replacement transaction?
11     A     Correct.
12     Q     And Mr. Cook advised you that
13   Washington TSA wasn't interested in using
14   Swap Financial's services in December of
15   2008 to secure a replacement transaction?
16          MR. LAWRENCE:  Object.
17     Argumentative.
18     A     I think it's clear from what he
19   says in his E-Mail.  I can read that out
20   loud if you want.
21     Q     What is clear from his E-Mail?
22     A     The response to your question.
23     Q     That Washington TSA did not
24   want to use Swap Financial's services to
25   finds a replacement transaction in December

Page 281

Peter Shapiro

1
2    of 2008?
3          MR. LAWRENCE:  Objection.
4     Argumentative.
5     A     Rather than use your words, I
6    would use his words here.
7     Q     That "any possible replacement
8    process for the agreement would be
9    undertaken once we have a definitive
10   settlement"?
11     A     That's what his E-Mail says.
12     Q     And you understood --
13     A     He doesn't say he doesn't want
14   to use Swap Financial Group to do it.
15     Q     You understood that Washington
16   TSA wasn't interested in a replacement
17   transaction until after it had a definitive
18   settlement with Lehman?
19          MR. LAWRENCE:  Objection.
20     Asked and answered.  Argumentative.
21     And calls for speculation.
22     A     I would just say I understood
23   what the words of this E-Mail say.
24     Q     And so you -- did you revise
25   Shapiro Exhibit 33 to remove replacement as

Page 282

Peter Shapiro

1
2    being one of the services to be provided?
3     A     You asked me that question
4    earlier.
5     Q     Did Swap Financial Group revise
6    the memorandum, or did TSA revise the
7    memorandum?
8     A     I believe we revised it.
9     Q     And you replaced the -- you
10   replaced the word "replacement" with the
11   phrase "negotiation and litigation
12   assistance"?
13     A     That's what -- that's what the
14   black line shows.
15     Q     Consistent with the E-Mail in
16   Shapiro Exhibit 32 as to what Mr. Cook
17   wanted you to do?
18     A     Being responsive to the
19   client's request.
20     Q     And going back to Mr. Cook's
21   E-Mail, the first paragraph, he says in the
22   third sentence:
23          "PFM was the TSA's financial
24   advisor on the initial bond transaction
25   included the bidding and the selection of

Page 283

Peter Shapiro

1
2    Lehman as the forward purchase agreement
3    provider.  They continue to serve US in the
4    role of FA."
5     Q     Do you see that?
6     A     Yes.
7     Q     Did you understand in
8    December 2008 that Washington TSA was still
9    using PFM for financial advisory services?
10     A     That's what this says clear as
11   a bell.
12     Q     Okay.  And you were aware of
13   that in December of 2008?
14     A     I was aware --
15          MR. LAWRENCE:  You're asking
16     him he independently from what was in
17     the E-Mail.
18     Q     I want to confirm that you did
19   know PFM was serving as TSA's financial
20   advisor in December of 2008.
21          MR. LAWRENCE:  Okay.
22     Objection.  Argumentative and
23     cumulative and asked and answered.
24          (There was a discussion off the
25     record.)

7 (Pages 280 to 283)

Page 284

1        Peter Shapiro
2        MR. LAWRENCE:  Argumentative,
3    cumulative, and asked and answered.
4    The last two the same objection.
5        A    I would ask you to clarify.
6    Are you saying prior to this E-Mail, based
7    upon this E-Mail, subsequent to this
8    E-Mail?
9        Q    When did you learn that PFM was
10   serving as Washington TSA'S financial
11   advisors?
12       A    I can't recall.
13       Q    But you certainly knew it as of
14   this date?
15       A    Exactly.  I certainly would
16   have known it from reading this E-Mail.
17       Q    Did you ask Mr. Cook in or
18   around December of 2008 if PFM had done a
19   valuation of the reserve fund agreement for
20   Washington TSA?
21       A    I can't recall.  I don't
22   believe so.
23       Q    Did you ask Mr. Cook at any
24   time if PFM had done a valuation of the
25   reserve fund agreement for Washington TSA?

Page 285

1        Peter Shapiro
2        A    I don't believe so.
3        Q    Did you ask anybody at
4    Washington TSA that question?
5        A    I don't believe so.
6        Q    If you go to the very first
7    E-Mail on the very first page, the third
8    paragraph from Mr. Cook says -- refers
9    to -- it says:
10       "In the meantime, K&L Gates has
11   drafted a motion for the court which I have
12   attached.  They will also be looking for a
13   signed declaration from us as well as you
14   stating that the agreement is, quote, in
15   the money to us."
16       Do you see that?
17       A    Yes.
18       Q    And prior to January 9, 2009,
19   had Swap Financial Group done a valuation
20   of the reserve fund agreement for
21   Washington TSA?
22       A    We -- I believe we had done
23   preliminary valuation work.
24       Q    And how did -- what preliminary
25   valuation work had been done by Swap

Page 286

1        Peter Shapiro
2    Financial at this time?
3        A    We had -- we had attempted to
4    do some estimates on the value.
5        Q    And how did Swap Financial
6    Group go about doing estimates of the value
7    prior to January 9, 2009?
8        A    The initial estimate would be
9    something you could do just from your
10   knowledge of the market on the face of it.
11   And that is you could look at the agreement
12   with the stated fixed rate that Lehman had
13   committed to pay Washington of 4.484
14   percent --
15       (There was a discussion off the
16   record.)
17       A    -- 4.484 percent, and know that
18   in the current market, with rates much
19   lower, that the agreement would be in the
20   money to Washington, i.e., that Lehman
21   would owe money on the agreement --
22       Q    So your --
23       A    -- just simply because rates
24   had dropped sharply.
25       Q    So Swap Financial Group's

Page 287

1        Peter Shapiro
2    initial assessment prior to January 9,
3    2009, was an estimate based upon looking at
4    the guaranteed rate and current rates in
5    the market?
6        A    I said that was one way you
7    could do it.
8        Q    How did Swap Financial Group do
9    this initial estimate?
10       A    That was the initial thing when
11   we looked at the agreement.  You know,
12   any -- anybody who looked at the agreement
13   in our shop would have come to that
14   conclusion.  To try to refine the number
15   would take more modeling.
16       Q    Did anybody look at any forward
17   curves to make that initial estimate that
18   Washington TSA would be in the money?
19       A    The models incorporate all
20   market information, including forward
21   curves.
22       Q    But this estimate was done not
23   using a model, correct?
24       A    Which estimate?
25       Q    Prior to January 9, 2009, that

8  (Pages 284 to 287)

Page 288

Peter Shapiro

1       Peter Shapiro
2  you are discussing with me.
3       A    I would have to look back at
4  the record to look at when we -- when we
5  first indicated any numbers to Washington
6  TSA or if you have, in any of the documents
7  which you have got, something that
8  indicates a number.
9       Q    At this point, Mr. Cook is
10  asking you for a declaration stating the
11  agreement is in the money.  Do you believe
12  you had told Mr. Cook by this point that
13  Washington TSA was in the money?
14      A    Yes.
15      Q    Okay.  And that would have been
16  based on your initial estimate, or it would
17  have been based on a model?
18      A    I can't recall it.  Again, I
19  have to look at the documents to say when
20  the first, you know, model -- even rough
21  model base number was.  I think you have
22  got those documents.
23      Q    And when you say "those
24  documents," are you referring to screen
25  shots from Swap Financial's Principia

Page 289

Peter Shapiro

1       Peter Shapiro
2  software?
3       A    No, I am more referring to any
4  kind of internal -- you know, any kind of
5  internal or external communications that
6  you have.  But you also have -- you know, I
7  know you also have an abundant number of
8  screen shots.  You can probably see it
9  there, too.
10      Q    And when you are referring to
11  the model that Swap Financial Group used,
12  that is the Principia software that we have
13  the screen shots from?
14      A    It's Principia.
15      Q    That's Principia?
16      A    That's one.  And then we, you
17  know, also can use other systems.  But I
18  think Principia was the -- looking at what
19  has been produced, you know, again, I
20  don't -- I don't -- as I explained, I don't
21  look -- I don't run the model myself.  But
22  based upon what you have seen in the
23  production, it looks like Principia was the
24  principal model that the other members of
25  my staff were using.

Page 290

Peter Shapiro

1       Peter Shapiro
2       Q    Are you aware of any other
3  models that any staff members of Swap
4  Financial Group might have used to
5  determine the value of the Washington TSA
6  RFA.
7       A    When you say "might have
8  used" --
9       Q    Well, you are saying that they
10  principally would have used Principia, but
11  there might have been something else.  What
12  would these other things have been that
13  were available to them?
14      A    The firm has available to it
15  principally two other modeling systems it
16  uses it.  But I am not -- here, I'm talking
17  about is general practice, not the
18  specifics in this case.
19      Q    What other models systems does
20  Swap Financial Group use?
21      A    We use Excel as a -- you know,
22  Excel is often used as what I refer to as a
23  scratch pad for trying to confirm --
24  confirm numbers and look at what things
25  would approximately be.

Page 291

Peter Shapiro

1       Peter Shapiro
2       You can, you know, get from a
3  very simplified to a very robust basis
4  using Excel, depending upon how much, you
5  know -- how much -- how much you want to
6  put into it.  But, again, I am speaking in
7  generalities here, not on a specific case.
8       And then there is also a
9  Bloomberg-based system called Swap Manager,
10  and that's -- that's within the Bloomberg
11  system.  And you can set this up and value
12  it as a swap using Swap Manager.  You can
13  set a transaction of this type up.
14      So I'm talking in generalities
15  here.
16      Q    And have you checked Swap
17  Financial's records to see if any Excel
18  spreadsheets showing a modeling or a value
19  of the Washington RFA?
20      A    I either checked myself or
21  caused others to check.
22      Q    So if there were such Excel
23  spreadsheets, they would have been produced
24  in this litigation subject to certain
25  privileges?

9 (Pages 288 to 291)

Page 292

Peter Shapiro

1
2     A    Yes.
3     Q    And what about Swap Manager?
4  Did anybody take any steps to see if there
5  were any records within Swap Manager
6  showing that it had been used for
7  determining the value of the Washington TSA
8  RFA?
9     A    I think that would have been
10  covered under your prior question.  You
11  didn't isolate out saying not Swap Manager.
12    Q    My prior question was looking
13  for Excel spreadsheets.
14    A    Just Excel?
15    Q    Yes.
16        (There was a discussion off the
17  record.)
18    Q    My prior question was simply
19  asking if somebody had looked to see if
20  there were any Excel spreadsheets in Swap
21  Financial's possession reflecting a
22  valuation or analysis of the Washington
23  RFA.
24        And you said that those had
25  been looked for and produced if

Page 293

Peter Shapiro

1
2  appropriate, correct?
3     A    Correct.
4     Q    Now, I am asking:
5        Did anybody look at Bloomberg
6  Swap Manager to see if there was any
7  indication that it had been used to
8  determine any value or analysis of the
9  Washington RFA?
10    A    Yes.
11    Q    And if there were any records
12  reflecting that, they would have been
13  produced?
14    A    Correct.
15    Q    And do you recall whether there
16  were any Swap -- any evidence that Swap
17  Manager had been used to conduct any
18  analysis of the Washington RFA?
19    A    I don't recall.
20    Q    Who checked Swap Manager to see
21  if there was any evidence it had been used
22  for the Washington RFA?
23    A    The person who did the
24  principal checking and rechecking on
25  this -- because, you know -- as you know,

Page 294

Peter Shapiro

1
2  Lauri, you have asked this question, many,
3  many times in many different varieties --
4  the person who would have -- who would have
5  done the principal work on that was Lilian
6  Chern.
7     Q    Looking at Shapiro Exhibit 33,
8  which is the draft memorandum in the
9  black-lined, when you proposed to
10  Washington TSA that you could provide
11  valuation and strategy and replacement
12  services to Washington TSA, did you feel
13  that Swap Financial Group was capable of
14  providing those services?
15    A    Yes.
16    Q    That it had adequate staff and
17  information to provide such services?
18    A    Yes.
19    Q    I am handing you a document
20  that has been marked as Shapiro Exhibit 34,
21  which, for the record, is a multi-page
22  E-Mail, Bates stamped TSA 042624 through
23  042626.  The top E-Mail is dated
24  February 23, 2009.  I will give you a
25  chance to look at this.

Page 295

Peter Shapiro

1
2        (Exhibit No. Shapiro 34, E-Mail
3  chain, top E-Mail dated 2/23/09 from
4  Bob Cook to Peter Shapiro, cc to James
5  Vergara and Debra Stephenson, Subject:
6  Lehman, Bates Nos. TSA 42624 to 42626,
7  is marked by the reporter for
8  identification.)
9     A    I have looked at it.
10    Q    If you look at the second page
11  of the E-Mail in the middle of the page,
12  there is an E-Mail from Bob Cook to you on
13  February 19, 2009, at 12:17 p.m.
14        Do you see that?
15    A    Yes.
16    Q    And Mr. Cook is asking for
17  "offline confirmation from you that this
18  makes sense"; do you see that?
19    A    Yes.
20    Q    Do you recall having a
21  conversation with Mr. Cook around
22  February 19, 2009, to give him some
23  "offline confirmation" about something
24  related to the valuation of the RFA?
25    A    I can't tell what this is

10  (Pages 292 to 295)

Page 296

```
1            Peter Shapiro
2   about, so it's very hard to refresh my
3   recollection on this.
4       Q    You do recall having a
5   discussion in February of 2009 with
6   Mr. Cook about the valuation of the RFA?
7       A    No.  I don't.
8       Q    You don't have any specific
9   recollections?
10      A    No, five and a half years ago,
11  hard to remember.
12      Q    So you don't know what he's
13  referring to when he is asking if it "makes
14  sense"?
15      A    No.
16      Q    The court reporter is handing
17  you a document that has been marked as
18  Shapiro Exhibit 35, which is, for the
19  record, Bates stamped TSA 42713 through
20  42715.
21          (Exhibit No. Shapiro 35, E-Mail
22  chain, top E-Mail dated 3/4/09 from
23  Bob Cook to Peter Shapiro, Subject:
24  Lehman, Washington State TSA, Bates
25  Nos. TSA 42713 to 42715, is marked by
```

Page 297

```
1            Peter Shapiro
2   the reporter for identification.)
3       Q    It is -- and the top E-Mail is
4   dated March 4, 2009, at 3:50 p.m.  I will
5   give you a chance to look at this.
6       A    I finished going through it.
7       Q    If you look at the first E-Mail
8   Mr. Cook is sending to you on March 4,
9   2009, he says:
10          "Do you have any concerns
11  market-wise with fixing the termination
12  date as of next Wednesday, March 11th?"
13          Do you see that?
14      A    Yes.
15      Q    Did you have any concerns about
16  fixing the termination date on March 11,
17  2009?
18      A    I can't remember.  I assume
19  there -- I don't know -- if you would have
20  shown me -- if there was a reply from me,
21  but I can't remember.
22      Q    Do you know what he's asking
23  about, about whether you have "concerns
24  market-wise" with fixing the termination
25  date?
```

Page 298

```
1            Peter Shapiro
2       A    No.
3       Q    Do you recall having any
4   discussion with him about any market
5   concerns about fixing a termination date on
6   March 11, 2009?
7       A    No.
8       Q    Did you have any concerns about
9   fixing a -- about having a termination date
10  on March 11, 2009?
11      A    You mean, are you asking me now
12  if --
13      Q    Yes.
14      A    -- I can remember five and a
15  half years ago if I had a concern about
16  that specific date?
17      Q    Well, sitting here now, do you
18  have any concerns about a termination date
19  on March 11, 2009, for any reason?
20          MR. LAWRENCE: I'm sorry.  Are
21  you asking now, or are you asking
22  then?
23      Q    I said:
24          Sitting here now, do you have
25  any concerns about setting a termination
```

Page 299

```
1            Peter Shapiro
2   date of March 11, 2009?
3       A    I can't tell.  In order to look
4   at a market concern on something, you have
5   to look at calendar information as of that
6   date, you know, that might create a
7   concern.
8       Q    What would you need to look at
9   to see if there was a concern about
10  March 11, 2009?
11      A    The market was closed.
12      Q    Being like a --
13      A    Holiday.
14      Q    -- bank holiday?
15      A    Yeah.
16      Q    Any other concerns?
17      A    Not that I can think of off the
18  top of my head.  But, normally, when we are
19  looking on a forward basis at the calendar
20  for pricing dates, you know, we will look
21  and see if there are other factors that
22  could cause a concern.
23          Given that this is not an
24  actual trade, but rather a valuation, the
25  concerns are different than if you are
```

11  (Pages 296 to 299)

Page 300

Peter Shapiro

1  Peter Shapiro
2  actually trying to put a transaction
3  through a market at a specific time or day.
4  But, you know, you want to consider various
5  factors.
6  Q    What factors would you want to
7  consider for purposes of putting a value on
8  a trade?
9  A    If it was purely for valuation.
10  The immediate one I would think is if the
11  market was closed, if there would be a
12  dearth of information on that date for some
13  reason.
14  Q    So the market would be closed
15  for a holiday or maybe a Sunday or
16  something like that?
17  A    Something like that.
18  Q    Did you ask Mr. Vergara to
19  prepare a memorandum reflecting his
20  valuation of the RFA?
21  A    Lauri, let me ask you to
22  clarify because, as you know, there are
23  multiple versions of memorandums that were
24  loss calculations.  Are you -- is that what
25  you are asking about?  Did I ask

Page 301

1  Peter Shapiro
2  Mr. Vergara to prepare that memorandum?
3  Q    I am more talking in general
4  terms.
5  You asked Mr. Vergara to model
6  or value the transaction.  Did you ask him
7  as part of that process to prepare
8  something in writing explaining what he had
9  done?
10  A    Yes, he would do the first cut
11  on the -- on those specific memos that I
12  referenced.
13  Q    And those "specific memos"
14  being the loss calculation memoranda?
15  A    Correct.
16  (Exhibit No. Shapiro 36,
17  Memorandum dated 3/30/09 to Bob Cook
18  from Peter Shapiro, Subject:
19  Valuation of TSA's RFA with Lehman,
20  Bates Nos. SFG 2349 to 2350, is marked
21  by the reporter for identification.)
22  Q    The court reporter has handed
23  you for the record a document that has been
24  marked as Shapiro Exhibit 36, which is a
25  two-page document, Bates stamped SFG 2349

Page 302

1  Peter Shapiro
2  and 2350.  It appears to be a memorandum
3  from you to Bob Cook dated March 30, 2009?
4  A    I finished going through this.
5  Q    Was this a document prepared
6  initially by Mr. Vergara or by you?
7  A    By Mr. Vergara.
8  Q    And do you know if this was the
9  first draft of the memorandums that were
10  prepared regarding the valuation of TSA
11  reserve fund agreement?
12  A    Do I know if this is the first
13  draft of this document or the first draft
14  of any type of valuation?  I'm not sure
15  what you are asking.
16  Q    There was a memorandum -- a
17  series of memoranda that you are referring
18  to as "the loss calculation memorandum,"
19  correct?
20  A    Yes.
21  Q    Do you know if this was the
22  first draft of that memoranda?
23  A    This was not the loss
24  calculation memorandum.  This was a
25  different version that was just looking at

Page 303

1  Peter Shapiro
2  valuation numbers.
3  Q    And what's the distinction
4  between this version just looking at
5  valuation numbers and the loss calculation
6  memorandum?
7  A    The loss calculation memorandum
8  was more rigorous.
9  Q    And what is not rigorous about
10  this analysis?
11  A    It doesn't go through each of
12  the components of spread in detail as the
13  loss calculation memorandum does.
14  Q    Is the fundamental methodology
15  between this memorandum and the loss
16  calculation memorandum the same?
17  A    The fundamental methodology
18  meaning the basic architecture that is not
19  looking at what the inputs are into spread
20  and the like.  Yes.
21  Q    That you would look by -- you
22  would start by looking at the cash flows of
23  the reserve fund agreement and analyzing
24  those?
25  A    Correct.

12  (Pages 300 to 303)

Peter Shapiro

Q And that's consistent between this memorandum and the loss calculation memorandum?

A Yes.

Q Do you know if a prior version of this valuation memo exists?

A You should have everything. Everything should have been produced --

Q But --

A -- unless it was -- you know, unless it was held back under the privilege log.

Q But sitting here today, do you recall an earlier version of this document?

A I don't, but it's -- you know, unless you are saying you have one -- you are not trying to spring a trap on me here in terms of having one that you are now going to produce dramatically and say:

"How about this?"

Right?

Q I don't really have a trap set up for this one, but I am just trying to confirm with you that you don't recall a



Peter Shapiro

draft prior to this.

A I don't.

Q Did you discuss with Mr. Vergara the methodology outlined in this valuation memorandum before he drafted it?

A You know, I can't tell. Is this a -- the draft that went out to Washington, or is this a prior draft that was reviewed internally? I can't tell by reading this.

Q I don't -- I don't know the answer either?

A You can't tell. Okay.

And you don't know from what you have got that's available to you whether this was an attachment to an E-Mail that would have gone to Bob Cook because that would show that right away?

Q I don't have such information, but I'm not sure you are answering my question.

A No, I was asking you a question.



Peter Shapiro

Q I know, but the way this process works is I ask you questions.

A I understand. I was trying to get away with asking you a question.

Q So did you discuss with Mr. Vergara before this memorandum was drafted regarding the methodology he describes in this memorandum?

A Did I discuss the methodology used in this memorandum? Yes.

Q With Mr. Vergara?

A Yes.

Q And you both agreed that it was the appropriate methodology used to value the reserve fund agreement?

A In general terms, yes, the general architecture, the general approach, yes.

Q And that general approach being to model an interest rate swap and analyze the cash flows of the reserve fund agreement, correct?

A You are using "analyze the cash flow." I would cut -- cut it off and say



Peter Shapiro

analyze it as though it were an interest rate swap.

Q Okay. If you look at the third paragraph of this memorandum, it starts by saying:

"In order to value the reserve fund agreement, we began by analyzing the cash flows."

A Yes.

Q Do you agree with that statement?

A That you begin by looking at it -- what -- the cash flow being one guy pays fixed, the other guy pays floating.

Q And then you model that fixed and floating as if it were a swap?

A Correct.

Q Now, if you look at the second page of this memorandum, the next-to-the-last paragraph that starts, "Given this dramatic widening," do you see that?

A Yes.

Q The first sentence is:

Page 308

```
 1          Peter Shapiro
 2      "Given this dramatic widening
 3  in the credit spreads for municipal tobacco
 4  bonds, we believe that the appetite to
 5  provide a replacement reserve fund
 6  agreement for TSA will be limited at best
 7  and likely non-existent."
 8      Do you agree with that
 9  statement that Mr. Vergara wrote in March
10  of 2009?
11      A   I believe, if you look through
12  the record, you will see that later on
13  there is a reworded version of that very
14  sentence.
15      Q   So you don't -- you don't agree
16  with that?
17      A   I thought we needed to
18  strengthen that sentence, and I put in, I
19  believe, the words, "severely limited."
20      Q   Okay.  And then the next
21  sentence is:
22      "And replacement counterparty
23  will likely assess the significant credit
24  charge and profit component to step into
25  the shoes of LBSF and face TSA."
```

Page 309

```
 1          Peter Shapiro
 2      Do you see that?
 3      A   Yes.
 4      Q   Do you agree with that
 5  statement that Mr. Vergara included?
 6      A   Yes.
 7      Q   And then the next sentence --
 8      A   I would -- you know, I would
 9  one qualifier, of course -- "any
10  replacement counterparty" -- if one could
11  be found, which, in the prior sentence, we
12  clearly say it's very, very unlikely.
13      Q   And then the last sentence of
14  that paragraph, Mr. Vergara writes:
15      "For these reasons, therefore,
16  we are valuing the floating leg of the swap
17  for TSA's reserve fund agreement at LIBOR
18  minus 1.5 percent."
19      Correct?
20      A   Right.
21      Q   And did you agree that, for the
22  reasons stated in that paragraph, that the
23  floating leg of the swap should be valued
24  at LIBOR minus 150 basis points?
25      A   That was James -- James's, you
```

Page 310

```
 1          Peter Shapiro
 2  know, initial estimate.  As you will see
 3  and the record shows, I subsequently came
 4  back and sharply questioned that
 5  assumption:  "Where did it come from," if
 6  you remember.  You can -- you will see this
 7  in the record.
 8      Q   So this was Mr. Vergara's
 9  initial assessment of what the spread to
10  LIBOR should be based upon his experience,
11  correct?
12      A   I don't know what he based it
13  on.
14      Q   But it was Mr. Vergara's
15  assessment?
16      A   Yes.
17      Q   And you disagreed with that
18  assessment?
19      A   I wanted backup on it.  I
20  didn't disagree with it.  I said:
21      "How did you get that number?
22  We have got to be rigorous here."
23      Q   Did you agree with that number?
24      A   I had no basis to say I agreed
25  or disagreed with it without more work
```

Page 311

```
 1          Peter Shapiro
 2  being done on it.
 3      Q   What additional work did you
 4  ask Mr. Vergara to do?
 5      A   I think you will see it in the
 6  record.
 7      Q   But I am asking you to tell me:
 8      What additional work did you
 9  ask Mr. Vergara to do?
10      A   I wanted -- I wanted to look at
11  the spread components in detail.
12      Q   And the "spread components"
13  being profit and credit?
14      A   Yes, as we have gone over in
15  huge length in prior deposition -- profit,
16  credit, deliverable spread.
17      Q   And --
18      A   And when we say "profit" and
19  "credit," we are including within that all
20  of the various miscellaneous spread
21  components in terms of the administrative
22  costs the dealer takes on, the hedge costs
23  and the like; so, you know, there is --
24  there is a accumulation of issues that goes
25  into the dealer spread here.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Peter Shapiro

Q And at this point in time, Mr. Vergara thought that profit and credit comprised 150 basis points?

MR. LAWRENCE: Object to the form of the question. Calls for speculation.

A I couldn't read his mind.

Q But that's what he wrote here?

MR. LAWRENCE: Objection. Argumentative.

A You can read it as well as I can.

Q Do you understand that 150 basis points to include both profit and credit components?

MR. LAWRENCE: Objection. Calls for speculation.

A I really -- again, I can't tell.

Q Did you ever discuss it with Mr. Vergara, whether that 150 basis points included both profit and credit?

A I think the record will show I even put it in writing.



Peter Shapiro

Q And what did you put into writing?

A I put the word:

"Whoa, where did you get this number from," or "whoa" and some additional words that were indicating that.

Q And why did you white "whoa"?

A Because it looked like -- you know, one of -- one of the things you get in practice in this business is you start to look at numbers and you say:

"Where did that come from?"

One of the, you know, yellow flags is when a number is very round. 150 is a very round number. Rarely did -- do rigorous estimates come out very round.

Q So you were concerned that it was too round of a number?

A I was concerned that it was just a number that you he was pulling out of air based upon feel. And that was insufficient for the rigor that would be needed for making a claim against the Lehman estate in the largest bankruptcy in



Peter Shapiro

the US history.

Q So if he had put LIBOR minus 1.47 percent, that would have given you more comfort?

MR. LAWRENCE: Objection. Argumentative.

A It would have made me go back and say, "Where did you get the number from?"

The 150 number, you know, to me, I look at it on the page, and that's -- that's as I said a yellow flag.

Q Did you have any other concerns about the 150 number?

A What kind of concerns would you mean?

Q You were concerned that it looked like too round of a number, and you wanted to assess it more rigorously, correct?

A I had one concern -- accuracy -- that it be done rigorously and accurately and fairly.

Q And you didn't think the LIBOR



Peter Shapiro

minus 150 basis points was any of those?

A I couldn't tell. There was no backup for it.

Q And if you look at the last paragraph of this memorandum, it says:

"As of March 25, 2009, the value of TSA's reserve fund agreement with LBSF was $23,664,383 in TSA's favor."

Do you see that?

A Yes.

Q And did -- and Mr. Vergara determined that number using the model?

A Correct.

Q And he used the assumption of LIBOR minus 150 basis points?

A It's self-evident from the memo.

Q That he indeed used LIBOR minus 150 to reach that valuation?

A Yes.

Q And assuming a maturity of 2042 for the reserve fund agreement?

A At this point that was our understanding.

Page 316

1        Peter Shapiro
2        (Exhibit No. Shapiro 37, E-Mail
3    chain, top E-Mail dated 4/20/09 from
4    Peter Shapiro to James Vergara,
5    Subject:  TSA memo, Bates Nos. SFG
6    2370 backwards to 2369, including 2371
7    and 2368, is marked by the reporter
8    for identification.)
9        Q    The court reporter has handed
10   you a document that has been marked as
11   Shapiro Exhibit 37, which is an E-Mail and
12   an attachment.  Its Bates range is SFG
13   2370 -- it's stapled -- it's backwards.  So
14   it starts 2368 through 2371.
15       So the -- we stapled the
16   attachment behind putting them out of Bates
17   number order.
18       A    I am deeply troubled by the
19   stapling issue.
20       Q    We can fix it if you'd like.
21       A    No.
22       Q    I will give you a chance to
23   look at this; and then, when you are ready,
24   I will have some questions.
25       A    Okay.  Sure.

Page 317

1        Peter Shapiro
2        I am ready.
3        Q    And if you look at the --
4        A    By the way, for the record, I
5    think you stapled it correctly.  I think
6    you numbered it incorrectly.
7        Q    I wasn't the numbering, so you
8    will have to take that up with
9    Mr. Lawrence.
10       A    Okay.
11       Q    If you look at the E-Mail, in
12   the middle of the first page on Sunday,
13   April 19, 2009, 4:32, you are writing to
14   Mr. Vergara and telling him you're finally
15   getting to this.
16       Do you see that?
17       A    Yes.
18       Q    Was this your first set of
19   comments on the draft memorandum that we
20   looked at at Shapiro Exhibit 36?
21       A    I believe so.
22       Q    And you continue by saying:
23       "I have made a bunch of
24   language changes to it, which I didn't
25   red-line; but, if you read through it, you

Page 318

1        Peter Shapiro
2    will probably get them."
3        Do you see that?
4        A    Yes.
5        Q    Meaning that you went directly
6    into the document he had sent you and
7    revised some of the words, correct?
8        A    Without clicking the "track
9    changes" button in Microsoft word to show
10   what I had changed.  I obviously started to
11   change them and just said, you know, "Read
12   through.  You will pick it up."
13       Q    And then you also inserted a
14   number of comments in brackets to
15   Mr. Vergara.
16       A    Right.
17       Q    And aside from this E-Mail
18   exchange, did you have discussions with
19   Mr. Vergara about his draft memorandum that
20   we saw in Shapiro Exhibit 36?
21       A    It looks -- and I just have to
22   say how it looks from this discussion.  I
23   can't -- I can't recall whether we had a
24   follow-up discussion as I sit here.  It
25   would be hard to believe that I didn't.

Page 319

1        Peter Shapiro
2        Q    But you don't recall the
3    specifics of any such discussion?
4        A    No.
5        Q    But the -- is it fair to say
6    that the thrust of your comments in this
7    E-Mail and the attachment is that you are
8    pushing Mr. Vergara to take a more rigorous
9    and defensible approach to the valuation?
10       A    Yes, I think I am very clear in
11   here.
12       Q    As you said, it's important to
13   get that valuation correct, right?
14       A    Yes, and I even say -- Lauri,
15   you will be entertained by how bad my
16   estimate was in terms of the time it would
17   take you guys to contest this.
18       I say:
19       "Remember, we have to be
20   prepared to defend this six months or, who
21   knows, two years from now."
22       At that point, I didn't
23   envision that it would be five and a half
24   years from "now."
25       Q    But the point is that to do

16  (Pages 316 to 319)

Page 320

Peter Shapiro

1    this rigorously and to make sure you got it
2    right was quite important?
3        A    Absolutely.  Our discipline
4    always was:
5            How do we do this in a fair and
6    reasonable way?
7            It was very explicitly
8    spilled -- spelled out by me repeatedly to
9    our staff, that:
10           "There aren't good guys and bad
11   guys here.  Lehman had a bankruptcy.  They
12   went into default.  We have to value this
13   fairly.  We will have clients on both sides
14   of the Lehman bankruptcy.  And it's just
15   fair that it be done right."
16           When I mean "both sides,"
17   clients who owe money to the Lehman estate
18   and clients who are owed money by the
19   Lehman estate.
20           So the important thing was
21   doing it fairly and reasonably and
22   defensible, knowing that Lehman was likely
23   to spend millions -- we didn't realize
24   hundreds of millions -- on legal -- you

Page 321

Peter Shapiro

1    know, legal expenses to challenge.
2        Q    If you look at the attached
3    memorandum that you revised, the third
4    paragraph, the last sentence of that, talks
5    about -- tell me when you are there.
6        A    Yes.
7        Q    It says:
8            "To value the cash flows on the
9    agreement, the appropriate method is to use
10   a similar interest rate swap, in which one
11   payer, i.e., Lehman would pay a fixed rate
12   of 4.484 percent, and the other payer would
13   pay a floating rate."
14           Do you see that?
15       A    Correct.
16       Q    And is that language you added
17   to the memorandum?
18       A    Let's compare it if we could to
19   Exhibit 36, just so we are clear we are
20   looking at this.  It looks clear that I
21   would have added that.
22       Q    And if you continue to the --
23       A    Just to -- just to make it
24   clear to the client what was going on.

Page 322

Peter Shapiro

1        Q    And if you continue to the
2    start of the fourth paragraph in Shapiro
3    Exhibit 37, it looks like you added that
4    sentence as well:
5            "The use of a swap to value
6    agreements of this type is the broadly
7    accepted market methodology"?
8        A    Yes.
9        Q    And you did, in fact, add that
10   language?
11       A    That's -- yes, that was my
12   English teacher in me because James began
13   the paragraph -- the original draft with
14   the word, "This," which to me is bad
15   writing.  When you are starting a new
16   paragraph, you should explain what the
17   "This" is.
18       Q    You also added the notion that
19   valuing it in this manner is the way -- is
20   the broadly accepted market methodology,
21   correct?
22       A    Correct.
23       Q    And then, if you turn to the
24   second page of the memorandum, the

Page 323

Peter Shapiro

1    penultimate paragraph, that is where you
2    have the "whoa" that you referred to
3    before.
4            Do you see that?
5        A    Yes.
6        Q    Okay.  And did Vergara's
7    valuation come as surprise to you, of LIBOR
8    minus 150 basis points?
9        A    By "surprise" do you mean did I
10   think it was -- in terms of its magnitude
11   surprising, that is, that it was too big,
12   too small?  No.  That was not what
13   surprised my.
14           The "whoa" is:
15           "Back this up.  Defend this.
16   Explain how you got to that."
17           It didn't say to me:
18           "Gee, that's too small,"
19   or, "Gee, that's too big."
20           It's just:
21           "Where did you get this number
22   from?  Did you pull it out of a hat?"
23       Q    And did you ever ask him where
24   he got the number from?

17  (Pages 320 to 323)

Page 324

Peter Shapiro

1      A    I just asked him to back it up.
2  I said to him, "How do you" -- to answer
3  your question directly, did I ask him how
4  he got the number, right after the word
5  "whoa" it says:
6          "How" did you -- "How do you
7  get this number?"
8          So the answer is, yes, I asked
9  him.
10     Q    And what was his answer?
11     A    His answer was to go back and
12  do it more rigorously.
13     Q    Do you recall any other
14  discussion as to where he got the number
15  LIBOR minus 150 basis points?
16     A    No.
17         (Exhibit No. Shapiro 38, E-Mail
18         with attachment, E-Mail dated 4/21/09
19         from James Vergara to Peter Shapiro,
20         Subject: TSA Loss Calc, Bates Nos.
21         SFG 2381 to 2384, is marked by the
22         reporter for identification.)
23     Q    The court reporter has handed
24  you a document that has been marked as

Page 325

Peter Shapiro

1  Shapiro Exhibit 38, which is a cover E-Mail
2  and an attached memorandum.
3          The cover E-Mail is dated
4  April 21, 2009.  It's Bates stamped for the
5  record SFG 2381 through 2384.
6          Let me know when you have had a
7  chance to review this document.
8      A    Yes, completed reading it.
9      Q    Okay.  Do you recognize this
10  revised version of the memorandum?
11     A    Yes.
12     Q    And this is a revised version
13  reflecting your comments that we saw in
14  Shapiro Exhibit 37?
15     A    I believe it certainly would
16  have reflected those to make it more
17  rigorous to go into the spread components
18  in detail.
19     Q    Do you recall any drafts of the
20  memorandum between what we looked at in
21  Shapiro Exhibit 37 and Shapiro Exhibit 38?
22     A    I don't.
23     Q    Okay.  Do you recall any
24  discussions with Mr. Vergara or any other

Page 326

Peter Shapiro

1  Swap Financial staff as to the revisions
2  that were taking place in the memorandum at
3  this time?
4      A    I don't.
5      Q    Do you -- look at the attached
6  memorandum.  The "Concerning" line has been
7  changed from, "Valuation of TSA's reserve
8  fund agreement with Lehman Brothers Special
9  Financing, Inc.," which is seen in Shapiro
10  Exhibit 37, to, "Calculation of loss for
11  TSA's reserve fund agreement with Lehman
12  Brothers Special Financing, Inc."
13         Do you see that?
14     A    Yes.
15     Q    Why was that change made?
16     A    I don't remember.
17     Q    Do you believe that to be an
18  accurate description of what's contained in
19  this memorandum, a calculation of loss for
20  TSA's reserve fund agreement?
21     A    "Loss" is a defined term.
22  "Loss," I believe, needs to include an
23  additional component of the unpaid amounts;
24  that is, you know, Lehman's failure on the

Page 327

Peter Shapiro

1  agreement between the time of its last
2  deliveries and -- and the valuation date.
3          And I don't think this includes
4  that, so this is -- this is missing that
5  component.  It may be missing some other
6  things if I went back over it.  But that's
7  the one that jumps off the page to me.
8      Q    But the purpose of this
9  memorandum was to calculate loss of TSA's
10  reserve fund agreement?
11     A    Yes, to calculate -- to
12  calculate it as of that date.  You know,
13  we -- there is a slang expression that you
14  use in the swap market, that is, a clean
15  valuation or a dirty valuation.
16         "Dirty" sounds like it's
17  somehow nefarious.  It's not in any way.
18  It's just that "dirty" would include the
19  accrued interest or unpaid amounts.  And
20  this -- this only gives the clean, you
21  know, not -- not the dirty valuation.
22     Q    Because it doesn't include
23  those amounts from the date of the last
24  delivery to the termination date, you

18  (Pages 324 to 327)

1        Peter Shapiro
2  believe that's missing from this
3  memorandum, correct?
4        A    Yes, it's short.  It needs to
5  have that in there to meet the full
6  definition of "loss."
7        Q    If you look at the first
8  paragraph, the second -- starting with the
9  second sentence, "Under the terms of the
10  RFA," do you see that?
11        A    This is -- second paragraph of
12  the first page of the memo.
13        Q    First paragraph, second
14  sentence starting, "Under the terms."
15        A    I'm sorry.  It says, "Under the
16  terms of the RFA" in the beginning of the
17  second paragraph, too.
18        Q    Do you see where I am?
19        A    Yes.
20        Q    First paragraph, second
21  sentence?
22        A    Yes.
23        Q    That from there to the end of
24  the paragraph has been added in Shapiro
25  Exhibit 38.  Do you know why that was

1        Peter Shapiro
2  added?
3        A    If I compared that with which
4  one?
5        Q    Shapiro Exhibit 37.
6        A    Okay.  Let me just compare.
7  Where is the equivalent section 37, Lauri,
8  that you are -- that you are comparing this
9  against?
10        Q    There is not an equivalent
11  section.  The section regarding the
12  definition of the "termination amount" is
13  new in Exhibit 38.
14        A    Yes.  I don't know why -- you
15  know, I would just be speculating.
16        Q    That was not a comment you gave
17  to Mr. Vergara, to add a reference to the
18  definition of the "termination amount"?
19        A    I can't recall.
20        Q    Do you know why -- I assume
21  Mr. Vergara drafted this draft that we are
22  looking at in Shapiro Exhibit 38?
23        A    Yes.
24        Q    Do you know why Mr. Vergara did
25  not mention the market quotation process

1        Peter Shapiro
2  when quoting from the definition of the
3  termination amount?
4        A    No.
5        Q    Do you know why he didn't
6  include the section that said, "Any
7  calculation made by Washington TSA must be
8  made as if it were Lehman" when describing
9  the termination process?
10        A    No.
11        Q    If you go to the fourth
12  paragraph of Shapiro Exhibit 38, it
13  starts, "In order to calculate TSA's Loss,"
14  with a capital "L"; do you see that?
15        A    In the fourth paragraph, yes.
16        Q    And if you look at the third
17  paragraph of Shapiro Exhibit 37, to put
18  your finger on that.
19        A    Okay.  This is 37.  Yep.
20        Q    If you compare those first two
21  sentences from Shapiro Exhibit 38 to the
22  fourth paragraph in Shapiro Exhibit 37,
23  Shapiro Exhibit 38 says:
24            "In order to calculate TSA's
25  Loss," with a capital "L," "we begin by

1        Peter Shapiro
2  analyzing the RFA cash flows."
3        Do you see that?
4        A    Yes.
5        Q    If you look at Shapiro
6  Exhibit 37, it says at the beginning of the
7  third paragraph:
8            "In order to value the reserve
9  fund agreement, we begin by analyzing the
10  cash flows."
11        Do you see that?
12        A    Yes, I do.
13        Q    So depending -- it doesn't make
14  any difference whether you are calculating
15  TSA's loss or whether you are determining
16  the value of the reserve fund agreement,
17  you start by analyzing the reserve fund
18  agreement's cash flows, correct?
19            MR. LAWRENCE:  Objection.
20  Argumentative.
21        Q    You can answer.
22        A    I would say that's correct.
23        Q    And that there are two cash
24  flows that need to be analyzed as we
25  discussed, the fixed leg and the floating

Page 332

Peter Shapiro

1  leg, correct?
2  A    Correct.
3  Q    Regardless of whether you are
4  valuing the reserve fund agreement or
5  calculating loss, correct?
6  A    Right.
7  Q    If you go to the fifth
8  paragraph of the memorandum -- sorry -- of
9  Shapiro 38, which is on page SFG 2383, it's
10  the first full paragraph on that page.  It
11  says, "The use of a LIBOR plus spreadsheet
12  analysis" -- do you see that?
13  A    Yes.
14  Q    And then if you look at the
15  fourth paragraph of Shapiro Exhibit 37, it
16  starts -- it says:
17             "The use of a swap to value
18  agreements of this type is a broadly
19  accepted market methodology."
20        Versus Shapiro Exhibit 38 says:
21             "The use of a LIBOR plus spread
22  analysis with an interest rate swap to
23  value agreements like the RFA is the
24  broadly accepted market methodology."

Page 333

Peter Shapiro

1        Do you see that?
2  A    I do see that.
3  Q    Why was that change made
4  between Exhibit 37 and Exhibit 38?
5  A    I can't recall.
6  Q    Do you recall any discussion
7  about that change?
8  A    Not at all.
9  Q    And if you look at Exhibit 38,
10  in general, compared to Exhibit 37, we see
11  new headings being added like "Commercial
12  Paper Spreads" and "Charges For Municipal
13  Tobacco Credit," correct?
14  A    Yes.
15  Q    And why are those headings
16  added?
17  A    I would only be speculating
18  about why headings were added.
19  Q    Was there a substantive reason,
20  or was it more of an organizational
21  decision?
22  A    I believe it would be -- and I
23  am speculating here -- it would be more
24  organizational to make the memo easier to

Page 334

Peter Shapiro

1  read, make it look better.
2  Q    Okay.  And that's something --
3  A    We weren't paid by the word, so
4  we didn't have any incentive to make it
5  longer.
6  Q    And that would be something
7  Mr. Vergara did, adding those headings?
8  A    Yes.
9  Q    If you look at the bottom of
10  the second page of the memorandum, which is
11  Shapiro Exhibit 38, Bates stamp SFG 2383,
12  the very last line, he -- well, the very
13  last paragraph, he's talking about the
14  credit charge for the RFA.
15        Do you see where I am at?
16  A    "In order to assess a proper
17  credit charge"?
18  Q    Yes.
19  A    Yes, I do see that.
20  Q    And Mr. Vergara discusses the
21  spread between the Washington TSA bonds and
22  the Bloomberg 30-year General Purpose
23  Revenue Bond Index, correct?
24  A    Correct.

Page 335

Peter Shapiro

1  Q    And he says that that spread is
2  4.29 percent, correct?
3  A    On March 25th.
4  Q    Yes.  And then he writes:
5             "For purposes of our analysis
6  on March 25th, we have conservatively used
7  a credit spread of 3 percent."
8        Do you see that?
9  A    Correct.
10  Q    And was that Mr. Vergara's
11  conclusion or your conclusion?
12  A    That was Mr. Vergara's
13  conclusion, I believe.
14  Q    And what was that conclusion
15  based on?
16  A    I know it came out in the final
17  version -- and that was not included, so,
18  you know -- again, you know, I am not
19  remembering as we sit here.  But, you know,
20  it seemed to be a random assumption.  We
21  needed to be rigorous, not have a random
22  assumption.
23  Q    And you communicated that to
24  Mr. Vergara, that it seemed to be a random

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 336

Peter Shapiro

1    Peter Shapiro
2  assumption?
3      A    As I said, I can't recall.
4      Q    Did Mr. Vergara adjust the
5  number of the credit spread himself, or did
6  he stay with 3 percent?
7      A    In the subsequent analysis, he
8  adjusted it.
9      Q    Okay.  And you don't know why
10 he adjusted that?
11     A    Because we took out this
12 3 percent ceiling.
13     Q    And why did you take out the
14 3 percent ceiling?
15     A    I can't recall as I sit here.
16 You know, I just gave you to the best of my
17 ability what I think would have gone on.
18     Q    Was it an adjustment he made?
19     A    Was what an adjustment he made?
20     Q    You said the adjustment to take
21 out the 3 percent ceiling.
22     A    I can't recall what the exact
23 sequence was.  But the 3 percent was taken
24 out, and then he based it upon the actual
25 spread, not putting a 3 percent cap in.

Page 337

Peter Shapiro

1    Peter Shapiro
2      Q    And that was a decision
3  Mr. Vergara made, to take out the 3 percent
4  ceiling?
5      A    It would have been -- again, I
6  am not -- I am -- it calls for me to
7  speculate.  I am not recalling.
8      Q    You don't recall having any
9  discussions with Mr. Vergara about the
10 3 percent ceiling?
11     A    No.
12     Q    And you don't recall whether --
13     A    It's all -- you know, as I said
14 again and again, our emphasis was doing
15 this rigorously, based upon -- you know,
16 upon actual data that we had in the market.
17     Q    And you don't recall whether
18 the decision to change the credit spread
19 from 3 percent to 4.29 percent was
20 Mr. Vergara's or yours?
21     A    No.
22     Q    And do you think a 3 percent
23 credit spread, assuming that bond spread of
24 4.29 percent, is a conservative
25 determination of a credit charge?

Page 338

Peter Shapiro

1    Peter Shapiro
2      A    The word "conservative" could
3  have different meanings to different
4  people.  It understates the credit charge
5  compared to what the bond market showed.
6  The bond market showed 4.29.
7      Q    And that's your conclusion that
8  it understates the credit charge?
9      A    As compared to the bond spread.
10     Q    And did you communicate that to
11 Mr. Vergara?
12     A    Again, I already answered and
13 said I can't recall the conversations.
14         (Previously Marked Exhibit No.
15     Lehman 15, 4/21/09 Memorandum from
16     Peter Shapiro, James Vergara to Bob
17     Cook, Concerning:  Calculation of
18     Loss, Bates Nos. TSA 21616 to 21618 is
19     introduced into the proceedings.)
20     Q    I am showing you a document
21 that has been previously marked as Lehman
22 Exhibit 15, which is a multi-page
23 memorandum, dated April 21, 2009, Bates
24 stamped TSA 021616 through 021618.  I'll
25 give you a chance to look at it.  Let me

Page 339

Peter Shapiro

1    Peter Shapiro
2  know when you are comfortable.
3      A    Thank you.
4         I finished going through it.
5      Q    I noticed as you were going
6  through it you were comparing it to Shapiro
7  Exhibit 38?
8      A    Very perceptive.
9      Q    And there are not very many
10 changes between Shapiro Exhibit 38 and
11 Lehman Exhibit 15; is that fair?
12     A    Depends on how you -- what you
13 mean by "very many," but I only saw a few.
14     Q    And Lehman Exhibit 15, I
15 believe you testified in earlier
16 depositions, that this is the version of
17 the memorandum that went to the Washington
18 Tobacco Settlement Authority, correct?
19     A    I believe so.
20     Q    Okay.  And do you recall
21 whether the memorandum in Lehman
22 Exhibit 15, dated April 21, 2009, was, in
23 fact, sent to Washington Tobacco Settlement
24 Authority on or around April 21, 2009?
25     A    Do I recall if it was, just as

21  (Pages 336 to 339)

Page 340

Peter Shapiro

1   I am sitting here?  I have to look back at
2   the record.
3        Q    Do you have any doubt that it
4   was sent to them on or about that date?
5        A    Not as we sit here.  I assume
6   you have an E-Mail that would go along with
7   it or something like that.
8        Q    Do you have any reason to doubt
9   that it wasn't sent to them on or around
10  April 21, 2009?
11       A    No, it makes sense.
12       Q    If you look at Shapiro
13  Exhibit 38, Mr. Vergara is sending you the
14  draft of the memorandum at 3:12 p.m.; do
15  you see that?
16       A    Correct.
17       Q    So any changes that were made
18  between Shapiro Exhibit 38 and the version
19  in Lehman Exhibit 15 that was sent to the
20  client would have been made in a matter of
21  hours on April 21, 2009; is that fair?
22       A    That's correct.
23           (There was a discussion off the
24  record.)

Page 341

Peter Shapiro

1        Q    If you look at Lehman
2   Exhibit 15 as compared to Shapiro
3   Exhibit 38, you will see under the section
4   "Charges For Municipal Tobacco Credit," the
5   very last sentence from Shapiro Exhibit 38
6   has been removed, correct?
7        A    Yes.
8        Q    And nothing has been put in its
9   place?
10       A    No.
11       Q    So you have removed -- the
12  sentence has been removed that:
13           "For purposes of our analysis
14  on March 25th we have conservatively used a
15  credit spread of 3 percent."
16           Correct?
17       A    Correct.
18       Q    And then instead you used a
19  credit spread of 4.29 percent in Lehman
20  Exhibit 15, correct?
21       A    Correct.
22       Q    And that change is reflected on
23  the third page of Lehman Exhibit 15 in the
24  chart showing that the credit spread is a

Page 342

Peter Shapiro

1   negative 4.29 percent, correct?
2        A    Yes.
3        Q    And that's a change from
4   Shapiro Exhibit 38, where, in that same box
5   on the last page, it shows a credit spread
6   of a negative 3 percent, correct?
7        A    Yes.
8        Q    And that change is consistent
9   with the removal of that sentence at the
10  end of the tobacco credit section, correct?
11       A    Exactly.
12           MS. SAWYER:  If we could take
13  just a short break, I would appreciate
14  it.
15           MR. LAWRENCE:  Sure.
16           THE VIDEOGRAPHER:  The time is
17  11:30 a.m.; we are going off the
18  record.
19           (There was a discussion off the
20  record.)
21           (A break is taken.)
22           THE VIDEOGRAPHER:  The time is
23  11:43 a.m., October 16, 2014.  This is
24  tape number two in the videotaped

Page 343

Peter Shapiro

1   deposition of Mr. Peter Shapiro.
2           (Exhibit No. Shapiro 39, Claim
3   Amount Document, Bates No. SFG 2348,
4   is marked by the reporter for
5   identification.)
6        Q    The court reporter has handed
7   you a document that has been marked as
8   Shapiro Exhibit 39.  It's a single-page
9   document, printout of an Excel spreadsheet.
10  Its Bates stamp is SFG 02348.  Not too much
11  information -- but I will ask you if you
12  recognize this document.
13       A    I don't.
14       Q    Do you know what this document
15  is at all?
16       A    Are you asking me, even though
17  I don't recognize it, do I know what it is?
18       Q    Yes.
19       A    If I don't recognize it -- I'm
20  not sure the distinction you are making
21  between knowing what it is.
22       Q    Do you know -- do you know the
23  information -- what the information is that
24  is being communicated in this spreadsheet?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 344

Peter Shapiro

1
2     A    Could I figure it out by
3  looking at it?
4     Q    Sure.  Can you figure it out?
5     A    I think so.
6     Q    Okay.
7     A    Some of the numbers.
8         MR. LAWRENCE:  Well, I would
9  ask you not to speculate.
10    A    Okay.
11    Q    Is this a -- do you recall a
12 spreadsheet being kept at Swap Financial
13 Group that contained information as
14 reflected in Shapiro Exhibit 39?
15    A    No.
16    Q    Do you recall preparing a
17 spreadsheet yourself that contained
18 information such as that found in
19 Exhibit 39?
20    A    No.
21    Q    At the top, it says "Washington
22 TSA and current claim."
23        Do you see that?
24    A    Yes.
25    Q    Do you know what that's

Page 345

Peter Shapiro

1
2  referring to?
3     A    I can -- the numbers say
4  45,715,055.  And then is says "L minus
5  387.4."
6     Q    And you have no idea what that
7  means?
8     A    "L minus 387.4" would normally
9  mean LIBOR 387.4.
10    Q    And do you know what "current
11 claim" refers to?
12    A    Well, let's take a look, Lauri,
13 at Lehman 15.  And if we look on
14 page three, it uses negative spread of
15 387.4.  And the number here is forty-five
16 seven one five five -- it's very close to
17 the number in Lehman 15.  That's all I can
18 say.
19    Q    The next line is "Expected
20 Lehman" 11 million 589 -- 11,589,000, and
21 then "L minus 20.0"; do you see that?
22    A    Yes.
23    Q    Do you know what that lines
24 refers to?
25    A    No.

Page 346

Peter Shapiro

1
2     Q    Did Swap Financial Group ever
3  calculate what they expected the Lehman
4  valuation of the RFA to be?
5     A    Somebody prepared this
6  spreadsheet.  So when you say Swap
7  Financial, I assume what you mean:
8         Did anyone in Swap Financial
9  calculate this?  Obviously, somebody did.
10    Q    And so you believe that to be a
11 calculation of what the expected Lehman
12 valuation of the RFA would be?
13    A    I can't tell by "Expected
14 Lehman" whether that meant what we expected
15 Lehman to calculate, or what, you know.
16    Q    What else do you think it might
17 be?
18        MR. LAWRENCE:  Objection.
19 Calls for speculation.
20    A    What else could it be besides
21 what?  You know, it's hard to tell.
22    Q    And do you recall any
23 discussions at -- with Washington TSA about
24 what you expected Lehman to value the
25 reserve fund agreement at?

Page 347

Peter Shapiro

1
2     A    I do not recall.
3     Q    Do you recall any discussions
4  with Washington TSA or internally at Swap
5  Financial Group that Lehman would value the
6  reserve fund agreement at LIBOR minus
7  20 basis points?
8     A    No.
9     Q    Do you recall having that
10 discussion with anyone at Swap Financial
11 Group about Lehman valuing the reserve fund
12 agreement at LIBOR minus 20 basis points?
13    A    No.
14    Q    Did Swap Financial Group ever
15 value the reserve fund agreement assuming a
16 spread to LIBOR of LIBOR minus 20 basis
17 points?
18    A    Did who?
19    Q    Swap Financial Group.
20    A    Someone in the firm.
21 Evidently, from this spreadsheet, someone,
22 you know, did a scenario at LIBOR minus 20.
23    Q    And so you believe that the
24 11,589,000 number is equivalent to LIBOR
25 minus 20?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 348

Peter Shapiro

1
2     A    I can't do that math in my
3  head, but it looks like it would be in that
4  range.
5     Q    So you believe there is some
6  sort of relationship between those two
7  numbers?
8     A    I would guess.
9     Q    And then the next two lines say
10  "net"; and then it says 22,857,528. And
11  the next line is 5,794,500.
12        Do you know what those are?
13     A    I can't tell. You know, "net"
14  looks like it's approximately twice the
15  number above it. But it's not exactly
16  twice. You could tell that. And the
17  blank, who knows what that is? Is it half?
18  It's not.
19     Q    Is the 22,857,528, is that half
20  of 45,715,055?
21     A    I would have to do the math.
22     Q    Do you have a calculator?
23     A    I do. Would you like me to
24  perform the calculation?
25     Q    Yes, please.

Page 349

Peter Shapiro

1
2     A    Okay. Please note I am using a
3  very sophisticated piece of technology here
4  that is a Samsung cell phone.
5        So the question was: Is it
6  half the current claim number, right?
7     Q    Is the first net number half of
8  the current claim number?
9     A    So let's take 22,857,528 times
10  two, and it gives me 45,715,056. So it's
11  within a quibble of half.
12     Q    And the next net number of
13  $5,794,500, is that half of the expected
14  Lehman number?
15     A    Let's take a look. Okay. I
16  will do it in the reverse this time. Let's
17  do 11,589, okay, divide by two. And it
18  gives me 57,945, exactly half.
19     Q    Do you know why net numbers
20  were being determined that were half of the
21  "Current Claim" and "Expected" Lehman
22  numbers?
23        MR. LAWRENCE: Objection.
24  Calls for speculation.
25     A    I don't have a clue.

Page 350

Peter Shapiro

1
2     Q    You don't -- you don't recall
3  any discussion of any net numbers being
4  calculated at Swap Financial Group?
5     A    I don't even know what "net"
6  means in this context.
7     Q    And you have no idea who
8  prepared this spreadsheet at Swap Financial
9  Group?
10     A    No.
11     Q    But someone did prepare this
12  spreadsheet at Swap Financial Group?
13     A    Rarely do spreadsheets spring
14  up on their own, so I would have to say it
15  would have been prepared by a human.
16     Q    And then the next category is
17  "Negotiating Range"; do you see that?
18     A    Yes.
19     Q    It has four numbers. It has 15
20  million, 8 million, 30 million, and
21  16 million.
22        Do you see that?
23     A    Yes.
24     Q    What do those negotiating range
25  numbers refer to?

Page 351

Peter Shapiro

1
2        MR. LAWRENCE: Objection.
3  Calls for speculation.
4     A    I would again just be
5  speculating.
6     Q    You have no -- do you have any
7  recollection of a discussion with
8  Washington TSA about negotiation range?
9     A    We had discussions back and
10  forth with the Lehman estate at various
11  times, so this may have been numbers that
12  people were playing with.
13        But as I'm recalling, there was
14  some discussions back and forth looking
15  at -- looking at whether or not there was
16  some range which they could have settled
17  them. And I'm not recalling any specifics
18  on that.
19        We had so many discussions with
20  various people who'd float in and out of
21  the Lehman estate at that point.
22     Q    My question was:
23        Do you recall discussions with
24  Washington TSA about a negotiation,
25  negotiating range?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 352

```
 1          Peter Shapiro
 2      A   I'm not recalling.
 3      Q   You don't recall any such
 4  discussions?
 5      A   I do recall some discussions
 6  around crystal --
 7          MR. LAWRENCE: Stop. Okay. I
 8  just want to interpose an objection.
 9  Obviously, for the purposes of --
10  purposes of mediation, you should not
11  answer a question, any discussions you
12  had for purposes of mediation.
13  Outside of that range, answer.
14      A   Okay. Let me say, you know,
15  for purposes of mediation, I have to, at
16  direction of counsel, you know, not include
17  anything there.
18          There were some discussions
19  around crystallization of the claim. And
20  so, you know, there were some discussions
21  at certain points about what we could come
22  up with, you know, in that area, what were
23  hypo -- strictly hypotheticals.
24      Q   And what was the range of
25  numbers being discussed with Washington TSA
```

Page 353

```
 1          Peter Shapiro
 2  around the crystallization of the claim?
 3      A   I can't recall.
 4      Q   Do you recall any discussions
 5  with Washington TSA about a negotiating
 6  range between $15 million and $8 million?
 7      A   No.
 8      Q   Do you recall any discussions
 9  with Washington TSA about having a
10  negotiating range between $30 million, and
11  $16 million?
12      A   30 million and 60?
13      Q   16.
14      A   16, no.
15      Q   Do you recall any discussions
16  with Washington TSA about expecting to
17  recover 50 percent on its claims?
18          MR. LAWRENCE: Again, outside
19  of mediation.
20      A   Outside of mediation, I am not
21  recalling that specifically, but 50 percent
22  at that time interval would have been a,
23  you know, a good, very rough ball park
24  number.
25      Q   So it wouldn't surprise you if
```

Page 354

```
 1          Peter Shapiro
 2  you did have such discussions?
 3      A   Exactly.
 4      Q   It wouldn't surprise you if you
 5  did have such discussions with Washington
 6  TSA?
 7      A   Correct.
 8      Q   And just to make sure the
 9  record is clear, you have no idea what the
10  net numbers on this Shapiro Exhibit 39
11  mean?
12      A   No. But, Lauri, in your line
13  of questioning, you are suggesting that
14  perhaps that would have been the recovery
15  that you would have gotten had a Lehman
16  claim paid out at $0.50 on the dollar.
17          And that's a pretty good guess
18  on your part.
19      Q   Do you agree with that guess?
20      A   I can't tell.
21          MR. LAWRENCE: Objection.
22  Calls for speculation.
23      Q   It's a reasonable guess,
24  though?
25      A   Yes, I think -- I hadn't
```

Page 355

```
 1          Peter Shapiro
 2  thought of that. I think you are making a
 3  pretty good guess.
 4      Q   Do you -- then if you look on
 5  the right side of Exhibit 39, there's some
 6  much larger numbers, one that starts 2.67
 7  and one that is 53 billion 400 million.
 8          Do you see that?
 9      A   Those would have been great
10  recoveries to get, particularly the
11  $2.67 trillion.
12      Q   Do you -- do you know why those
13  numbers are on the sheet?
14      A   No, those are the -- as I
15  mentioned, pretty wild numbers.
16      Q   Do you have any idea what
17  relation they might have to the Washington
18  reserve fund agreement or its claim against
19  Lehman?
20      A   For the life of me, you
21  can't -- I can't figure out how you could
22  get to 2.67 trillion.
23      Q   You don't -- do you recall any
24  discussions with Washington TSA about
25  numbers in the billions or trillions?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 356

Peter Shapiro

1     A    No.
2         (Exhibit No. Shapiro 40, E-Mail
3     chain, top E-Mail dated 8/23/10 from
4     Nathaniel Singer to Peter Shapiro and
5     Lilian Chern, Subject:  Tobacco, Bates
6     No. SFG 2352, is marked by the
7     reporter for identification.)
8     Q    The court reporter has handed
9     you a document that has been marked as
10    Shapiro Exhibit 40.  For the record it's a
11    single-page document, Bates stamped SFG
12    2352. It's an E-Mail chain.  The top
13    E-Mail is on August 23, 2010, from Nat
14    Singer.
15         Do you see that?
16    A    Right.
17    Q    Let me know when you have had a
18    chance to review this.
19    A    Yeah, I have read it.
20    Q    Okay.  Do you recall this
21    E-Mail exchange?
22    A    I do not.  It's -- you know,
23    when I read this -- if you're asking, does
24    it refresh my memory, it really doesn't.

Page 357

Peter Shapiro

1     You know, there is nothing in here that
2     surprises me.  But I don't have, as I sit
3     here, any record of that, any recollection
4     of that, of this back and forth.
5     Q    Do you recall the analysis
6     being done at looking at the New Jersey
7     claim and comparing it to the Washington
8     claim?
9     A    No, I don't.
10    Q    Do you recall you watching the
11    other claims being filed by the other
12    tobacco entities and seeing how they
13    compared with the Washington claim?
14    A    I recall looking at the other
15    claims that were filed quite a bit for many
16    reasons.
17    Q    Do you recall looking at those
18    other claims specifically in connection
19    with your work you were doing for
20    Washington TSA?
21    A    Washington TSA was part of our
22    work, so I would have obviously been
23    looking at a comparison with Washington.
24    But as you're aware, in the confidential

Page 358

Peter Shapiro

1     mediation process, we worked with multiple
2     other tobacco claimants.
3     Q    And why would you look at the
4     other claims being filed by the other
5     tobacco entities in the Lehman bankruptcy?
6     A    Comparison, look at how other
7     people would have looked at them -- look
8     at, you know, as a very, very crude
9     estimate of reasonableness.
10    Q    And you would have looked at
11    their spreads to LIBOR as is reflected in
12    Shapiro Exhibit 40?
13    A    As one of many indicators.
14    Q    What else would you look at?
15    A    What else would I look at for
16    an indication of reasonableness?
17    Q    Um-hum.
18    A    All the other things we have
19    discussed, you know, bond spreads in the
20    bond market, spreads in the CP market, any
21    other indications we have of profit
22    margins, all of the things that we have
23    gone over in great detail.
24    Q    So you would look at these

Page 359

Peter Shapiro

1     other claims to get a sense of their views
2     of the spreads in the bond market?
3     A    No, because you can't tell from
4     these claims what the -- how they derived
5     their spreads.
6     Q    So what other indications from
7     the other claims were you looking at other
8     than the spread to LIBOR to assess the
9     reasonableness of Washington's claim?
10    A    The other thing you would look
11    at in the claims is how they calculated, to
12    the extent you could see that.  In some of
13    the claims, you could; like, for example,
14    it says here that in the New Jersey -- in
15    the New Jersey claim, it has one really
16    unusual feature.
17         And I am quoting from my E-Mail
18    to Nat and Lillian on -- at the bottom of
19    Exhibit 50 [sic]:
20         "Their FA parens per southwest
21    got market quotations."
22         So that was obviously a source
23    of some interest.
24    Q    And why was that a source of

26  (Pages 356 to 359)

Page 360

Peter Shapiro

1 some interest?
2     A    Because our experience had been
3 that market quotations were not obtainable.
4     Q    And when you say "market
5 quotations," you are referring to the
6 process outlined in the RFA to solicit
7 quotations from dealers, correct?
8     A    Correct.
9     Q    And were you aware of any other
10 tobacco reserve fund agreement claimants
11 that had been able to obtain market
12 quotations?
13         MR. LAWRENCE:  Are you talking
14 about then or at any time?
15         MS. SAWYER:  At any time.
16     A    I can't recall.  I would have
17 to go back and look.
18     Q    Have you ever reviewed the
19 Virginia claim?
20     A    I know I reviewed the Virginia
21 claim, and I can't recall what was in it.
22     Q    Have you ever reviewed the
23 Buckeye claim?
24     A    Yes.

Page 361

Peter Shapiro

1     Q    And do you recall what the
2 basis was for their loss calculation -- I
3 am sorry -- their termination amount
4 calculation?
5     A    I can't recall.  You know,
6 there are a bunch of these claims, and I
7 wouldn't want to try to do it as a memory
8 contest.  I would have to go back and look.
9     Q    But there were other tobacco
10 claimants that were able to obtain market
11 quotations?
12     A    I can't recall.  I'd really
13 have to go back and look.  I should state
14 for the record that on New Jersey, as you
15 are aware, our firm has been retained to
16 work with them on the mediation process.
17 And that mediation process is coming up
18 shortly.
19     Q    In the analysis that was done
20 here by Ms. Chern of the New Jersey claim,
21 she had taken the claim numbers and the
22 quotations and converted them to a spread
23 to LIBOR; is that fair?
24     A    That's fair.

Page 362

Peter Shapiro

1     Q    And then used -- then she used
2 those spreads to LIBOR and applied them to
3 the Washington reserve fund agreement
4 inputs, if you would, the notional amount,
5 the termination date, those types of
6 things, correct?
7     A    Correct.
8     Q    And she at this time would have
9 assumed the maturity date of 2042?
10     A    This is now August 2010.  When
11 was the mediation for Washington?
12     Q    Started in May of 2012.
13     A    The mediation was 2012.  You
14 probably know this, Lauri, or maybe Paul
15 knows this from the record, when we became
16 aware of the earlier termination date of
17 the agreement, the fact that the original
18 agreement had been amended to 2032.
19         I don't know what date offhand
20 we became aware of that.
21     Q    So you don't know, looking at
22 this document, Shapiro Exhibit 40, whether
23 or not Ms. Chern assumed a maturity date of
24 2032 or 2042 in applying those spreads to

Page 363

Peter Shapiro

1 LIBOR to the Washington reserve fund
2 agreement?
3     A    I thought my prior answer was
4 very clear on that.  I can't tell.
5     Q    Did you discuss this
6 analysis -- do you recall any discussion
7 with Washington TSA about this analysis of
8 the New Jersey claim?
9     A    I do not.
10     Q    Do you recall any discussion
11 internally at Swap Financial Group about
12 this analysis of the New Jersey claim and
13 its implications for the Washington claim?
14     A    As I look at this, I can see
15 that there was discussion, if discussion is
16 broadly defined to include E-Mail back and
17 forth.
18     Q    Do you recall any other
19 discussion other than what is reflected in
20 Shapiro Exhibit 40?
21     A    No.
22     Q    And then numbers Ms. Chern has
23 calculated in her 2:14 p.m. E-Mail range
24 from $9 million to $25 million roughly; do

27  (Pages 360 to 363)

Page 364

Peter Shapiro

1
2   you see that?
3       A   Yes.
4       Q   And those would have been
5   moneys payable to Washington TSA, correct?
6       A   Correct.
7       Q   And those are substantially
8   less than the claim being calculated at
9   Washington -- by Swap Financial Group at
10  this time of $45 million, right?
11      A   And substantially larger than
12  the claim that Lehman was offering to go
13  for, so they are in between.
14      Q   So in between the claim
15  calculated by Swap Financial Group of
16  approximately $45 million and Lehman's
17  valuation?
18      A   Right, which, as I recall, was
19  around 4 million.
20      Q   All right.
21      (Exhibit No. Shapiro 41, Word
22      Document, Notes taken by Mr. Shapiro,
23      Bates Nos. SFG 2314 to 2318, is marked
24      by the reporter for identification.)
25      Q   The court reporter has handed

Page 365

Peter Shapiro

1
2   you a document that has been marked as
3   Shapiro Exhibit 41. It's a multi-page
4   document, looks like a Word document, Bates
5   stamped SFG 2314 through 2318.
6       It doesn't have a heading or
7   anything. You can certainly read it all,
8   Mr. Shapiro, but there are certain areas I
9   want to focus on. But you should glance it
10  over and see if you recognize the document.
11      A   I do recognize the document.
12      Q   Okay. What is this document?
13      A   These are my notes.
14      Q   And how were these notes
15  prepared by you?
16      A   I would be talking to people
17  and typing on my screen.
18      Q   And you would be typing like a
19  Word document?
20      A   In a Word document, yeah.
21      Q   And would you -- there are
22  certain aspects of this document that are
23  covered up, redacted, and they say "work
24  product"; would you record the notes of
25  conversations that you had with counsel or

Page 366

Peter Shapiro

1
2   your client as well?
3       A   I may have.
4       Q   Is that sort of your normal
5   practice in handling one of your matters to
6   keep sort of running notes like this?
7       A   Sometimes.
8       Q   And did you do this in
9   connection with Washington?
10          MR. LAWRENCE:  Objection.
11      A   Was this in connection with
12  Washington?
13      Q   Yes.
14      A   Shapiro 41?
15      Q   Yes.
16      A   Yes, this was -- this looks
17  like it's clearly in connection with
18  Washington. But maybe I should read over
19  it just to make sure.
20      Q   I think we can -- we can
21  revisit that, if you have a concern as we
22  go through it, that this doesn't have to do
23  with Washington Tobacco.
24          You can let me know, if, as we
25  go through the examination, you think it

Page 367

Peter Shapiro

1
2   does not relate to Washington Tobacco.
3       A   Okay.
4       Q   Would there be other sets of
5   notes that you would have prepared other
6   than this set of notes?
7       A   Not if we didn't produce --
8   everything that we had we produced.
9       Q   Okay. If you turn to the
10  second page, which has a very large
11  blacked-out section at the top, and then it
12  says, "7/14/10, call with LB."
13          Do you see that?
14      A   Right.
15      Q   Is this notes of your call with
16  Lehman Brothers on July 14, 2010?
17      A   "LB" is what I would normally
18  refer to -- use to refer to Lehman
19  Brothers. And the names in the parens --
20  in the parentheses following "LB" are all
21  Lehman names that I recognize with the
22  exception of Richard Harper. I don't
23  remember that name.
24      Q   And so would these be notes of
25  your call that you had with Lehman Brothers

28  (Pages 364 to 367)

Page 368

Peter Shapiro

1
2 on July 14, 2010?
3     A    That's correct.
4     Q    And would these notes have been
5 made contemporaneously with that call?
6     A    Yes.
7     Q    So as you were on the phone
8 call, you would have been making notes?
9     A    Exactly, which -- it would
10 explain, you know, spelling errors and lack
11 of grammatical rigor.
12     Q    Would you share these notes
13 with anybody?
14     A    Generally not.
15     Q    And in this call, it seems like
16 you are reporting that Lehman discussed the
17 notion of the use of the agency curve.  Is
18 that a fair thing to draw out of these
19 notes?
20     A    Let me read it over.
21     Q    Okay.
22     A    You know, as you remarked
23 earlier, rather than spend time reading the
24 whole thing, you were going to highlight
25 sections.  And I will just read that

Page 369

Peter Shapiro

1
2 section over.
3     Q    Sure.
4     A    I am done reading it.
5     Q    My question was -- is:
6         Do you recall in this
7 discussion, July 2010, Lehman raising the
8 idea that it was using the agency curve to
9 value the reserve fund agreement?
10     A    I don't have any
11 contemporaneous recollection as I am
12 sitting here.  But it says here:
13         "Thinks if we can generate all
14 the curves on all eligible securities,
15 won't tell us the level, use agency curve
16 to derive it."
17         From reading those words, it
18 sounds like he was pushing for using -- you
19 know, when I say he, Sandeep or whoever the
20 Lehman representative was, was saying:
21         "Look at agencies, and look at
22 the agency forward curve."
23     Q    After reading these notes from
24 the July 14, 2010, call, do you recall any
25 other aspects of the discussion that are

Page 370

Peter Shapiro

1
2 not reflected in your notes?
3     A    No.  On that specific
4 discussion, you are saying no.
5     Q    And why did you start taking
6 notes -- you know, we don't have any note
7 of your earlier calls with Lehman Brothers.
8 Why did you start taking notes at this
9 particular point in time?
10     A    We were looking at this issue
11 of how we would sell the claim; and, you
12 know, if it were possible to get something
13 for the claim.  So there were a lot of new
14 players.
15         If you look at how the notes
16 start, the beginning is a whole list of
17 potential claim purchasers.  Some of those
18 are firms that we deal with everyday.  But
19 many of those are firm that are not swap
20 dealers.
21         So just simply to keep track of
22 a lot of new and different names, I
23 obviously said I better begin to commit
24 this to writing and not rely upon my
25 memory.

Page 371

Peter Shapiro

1
2     Q    So this memorandum was your
3 notes regarding kind of the claims sale
4 process that you were undertaking for
5 Washington TSA?
6     A    It would be wrong to call this
7 a memorandum.  These are just notes.  It's
8 a scratch pad really.  That's what you
9 think of this as, Lauri, very -- very
10 informal.
11     Q    But your notes relating to that
12 claim sale process that you were involved
13 with on behalf of Washington TSA?
14     A    That would be accurate.
15     Q    If you turn to the page marked
16 2316 at the bottom, which is the next page,
17 and it has "Peter Colquitt DB" at the top;
18 do you see that?
19     A    Yes.
20     Q    I see:  Peter Colquitt DB."
21 Then the next paragraph starts with "Dan
22 Daly, Citi."  Then the last paragraph --
23 next-to-the-last paragraph starts with
24 "Greg S."  Then the last paragraph starts
25 with "Kevin Schwartz."

29  (Pages 368 to 371)

Page 372

```
 1          Peter Shapiro
 2     Do you see that?
 3     A    Yes, right.
 4     Q    And are these notes of
 5 conversations that you had with those
 6 individuals?
 7     A    That's correct.
 8     Q    And Dan Daly at Citi, was he
 9 sitting on the Citi desk when you talked to
10 him?
11     A    Yes.
12     Q    And did you know Dan Daly
13 before you had this conversation reflected
14 in these notes?
15     A    Yes.
16     Q    And how long have you known
17 Mr. Daly?
18     A    I don't know.
19     Q    Okay.  If you look five lines
20 down in the paragraph with Mr. Daly, toward
21 the end of that line, it says:
22          "The mid is probably LIBOR less
23 40 or 50."
24          Do you see that?
25     A    Yes.
```

Page 373

```
 1          Peter Shapiro
 2     Q    And then:
 3          "Unwind going the other way."
 4          Do you see where I am?
 5     A    Yes.
 6     Q    What do your notes -- what did
 7 Mr. Daly tell you that you wrote down as
 8 being, "The mid is probably LIBOR less 40
 9 or 50"?
10     A    Say that, again, because I was
11 trying to read while you were talking so I
12 didn't quite follow.
13     Q    What was the discussion with
14 Mr. Daly that prompted you to write down in
15 your notes:
16          "The mid is probably LIBOR less
17 40 or 50"?
18     A    Let me read over the whole
19 thing okay.  Okay.  I am just going to read
20 over that paragraph right now, although I
21 should say it's important to put that
22 paragraph in the context of what I was
23 doing from these notes, you know, what you
24 can see.
25          So if you could, just give me a
```

Page 374

```
 1          Peter Shapiro
 2 few minutes.  I want to read over the
 3 paragraphs for Colquitt, Daly, Greg S., and
 4 Kevin Schwartz.  Let me just see.
 5     Q    You certainly can read at your
 6 leisure.  You certainly can read.  I want
 7 you to understand the context.
 8     A    Okay.  Thank you.
 9          Okay.  Sorry.
10     Q    That's all right.
11     A    It was very interesting to read
12 backup.
13     Q    Okay.  So going back to the
14 paragraph for Mr. Daly --
15     A    Yes.
16     Q    -- of your conversation -- your
17 notes of your conversation with Mr. Daly,
18 we were talking about the fifth line where
19 you had written:
20          "The mid is probably LIBOR less
21 40 or 50."
22          Do you see that?
23     A    Right, yep.
24     Q    What were you referring to when
25 you wrote:
```

Page 375

```
 1          Peter Shapiro
 2          "The mid is probably LIBOR less
 3 40 or 50"?
 4     A    That's his starting point for
 5 valuing the termination.  You know, he
 6 works off of that as the mid, and then he
 7 adds on to that or does further
 8 subtraction -- is really what you are
 9 doing.
10          So you widen the spread from
11 LIBOR minus 40 or 50 to include tobacco
12 long-dated funding, all of these things
13 that he listed.
14     Q    So the mid refers to what the
15 industry calls the "mid market value"?
16     A    Yes.
17     Q    And that would be the value
18 before you added on whatever dealer charges
19 need to be added on for things like the
20 credit and the funding and the hedging, et
21 cetera?
22     A    That's correct.
23     Q    And he was telling you that the
24 mid is probably LIBOR less 40 or 50 basis
25 points?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 376

Peter Shapiro

1      A   That's correct.
2      Q   Okay.  And if you look at the
3  line before that, it says:
4      "If we looked at a 30-year FPA,
5  we would look at LIBOR minus 50 minus 42."
6      Do you see that?
7      A   Yes.
8      Q   Is that kind of the same
9  concept as what we were just looking at
10 that that --
11     A   40 to 50 -- he's thinking out
12 loud here.
13     Q   Okay.  Just to make sure the
14 record is clear, so he's telling you:
15     "If we looked at a 30-year FPA,
16 we would start with LIBOR minus 50 or minus
17 42 as sort of the mid market value."
18     Correct?
19     A   Correct.
20     And then, you know, Lauri, as
21 you go ahead, he is saying:
22     "Really wide, very expensive,
23 no appetite for credit exposure."
24     Q   After the portion we were

Page 377

Peter Shapiro

1
2  looking at where he says, "The mid is
3  probably LIBOR less 40 or 50," you write
4  "unwind going the other way."
5      Do you see that?
6      A   Yes.
7      Q   What is that referring to?
8      A   Not positive, negative.
9      Q   What do you mean "not positive,
10 negative"?
11     A   In other words, when you're --
12 in terms of the unwind, you are saying
13 LIBOR minus 40, and then further costs down
14 lower.
15     Q   So in the event of an unwind or
16 in other words a termination --
17     A   Yes.
18     Q   -- you would -- you interpret
19 that to be an -- in the case of an unwind,
20 you would go further into negative
21 territory?
22     A   Correct.
23     Q   Even though you write "unwind
24 going the other way"?
25     A   Yes, meaning negative.  It's

Page 378

Peter Shapiro

1
2  typical in an unwind.  When you think of
3  unwinds, usually, you are thinking:
4      "Okay.  I have got add on to
5  it."
6      But here you have to subtract
7  off.
8      Q   Why do you have to subtract off
9  here?
10     A   Because you have further -- you
11 get further from mid.  In other words, they
12 would -- what they are saying is -- is when
13 they calculate this, how much would they be
14 willing to pay as a fixed rate?  So that's
15 really what you are looking at.
16     Remember, Lehman, in 2002 was
17 willing and contracted to pay
18 4.484 percent.  What they are saying here
19 is they would start looking at the mid
20 LIBOR rate, subtract off 40 to 50, and then
21 begin the process of doing other
22 subtractions for spread, "spread" defined
23 broadly to include credit, hedging costs,
24 funding, profit, all of those things.
25     Q   And this is what Citibank would

Page 379

Peter Shapiro

1
2  do -- when you say "they," you are
3  referring to Citibank?
4      A   Correct.
5      Q   So then moving down to the --
6  where it says "Greg S"; do you see that?
7      A   Yes.
8      Q   Do you know who that is
9  referring to?
10     A   Absolutely.
11     Q   Who is that?
12     A   Greg Shlionsky --
13     Q   Who formerly --
14     (There was a discussion off the
15 record.)
16     A   Shlionsky.  Let me spell it for
17 you, S-h-l-i-o-n-s-k-y.
18     Q   Mr. Shlionsky formerly sat on
19 the Lehman desk?
20     A   Correct.  He was formerly the
21 head of the Lehman desk.
22     Q   And at this time he was at
23 Barclays?
24     A   At some time in -- around here,
25 he moved from -- let me think.  I'm not

31  (Pages 376 to 379)

Page 380

          Peter Shapiro
1          Peter Shapiro
2    sure.  He -- you know, he set up his own
3    firm, Rosemawr, at a certain point.  So I'm
4    not sure if he would have been at Barclays
5    at this point or if he would have been at
6    Rosemawr.
7          I am trying to remember, Lauri,
8    if he even stopped at Barclays, or if he
9    went straight to Rosemawr, if he left
10   Lehman before the Lehman bankruptcy.  I
11   could look it up.
12       Q   If you go down maybe eight
13   lines --
14       A   Yes.
15       Q   -- it's -- the start of the
16   line says, "An end to it" -- do you see
17   where that line is?
18       A   Yep.
19       Q   And then to the end of that
20   line, where it says, "No basis"?
21       A   Yep.
22       Q   Okay.
23          "No basis in" -- "No basis
24   market in A's discount notes.  With agency
25   you could reverse inquiry for six months,

Page 381

          Peter Shapiro
1          Peter Shapiro
2    but not 20 years, did it once, but it was
3    unique."
4          Do you see that?
5       A   Yes.
6       Q   What do you recall
7    Mr. Shlionsky telling you that you
8    reflected in these notes?
9       A   That -- that the Lehman
10   estate's idea of going out LIBOR forward --
11   sorry -- the agency forward curve was
12   nonsensical.  It would not work, that it
13   was a fantasy.
14          And this is what all of these
15   notes basically are saying.  They're saying
16   you can't do that.  And, you know, they go
17   into it.  If you look at it, "with A's,
18   their argument is silly."
19          It's not -- it's not -- he's
20   not using mild language on this.  He's
21   using -- he's saying the Lehman estate's
22   notion here is a crackpot idea.
23       Q   But the section I was looking
24   at, let's just focus on that.
25       A   I understand, but this is --

Page 382

          Peter Shapiro
1          Peter Shapiro
2    this is in that context.
3       Q   Okay.  So he says there is "no
4    basis market in A's discount notes,"
5    referring to "agencies," I assume?
6       A   Yes.
7       Q   "With agency you could reverse
8    inquiry for six months, but not 20 years."
9          So he's referring to
10   difficulties in hedging; is that fair?
11       A   Correct.
12       Q   But he then says:
13          "I did it once, but it was
14   unique."
15       A   Yes.
16       Q   Do you see that?
17       A   Yes.
18       Q   And do you recall Mr. Shlionsky
19   telling you that he had hedged agency
20   discount notes once before?
21       A   He -- I can't tell from my note
22   here what he meant for how long he did it
23   for.
24       Q   But he did do it for some
25   period of time?

Page 383

          Peter Shapiro
1          Peter Shapiro
2       A   For something.
3       Q   And then if you could see where
4    Kevin Schwartz's name shows up, do you see
5    that?
6       A   Yep.
7       Q   If you go up a few -- three
8    lines above that, it says, "Lehman was the
9    big guy.  MS was the next one."
10          Do you see that?
11       A   Yep.
12       Q   What does that mean?
13       A   Who was -- who were the most
14   active players in this -- in the FPA
15   market, or RFPA -- RFA market we are
16   calling this.
17       Q   And Lehman was the big guy
18   followed by --
19       A   Morgan Stanley.
20       Q   Then going to "Kevin Schwartz,
21   MS," do you see that?
22       A   Yes.
23       Q   Was Mr. Schwartz at Morgan
24   Stanley?
25       A   Yes.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 384

Peter Shapiro

1
2     Q    And was he sitting on the desk?
3     A    Yes.
4     Q    And did you speak with
5  Mr. Schwartz?
6     A    Yes.
7     Q    The next line after -- or next
8  words after that says:
9          "Jeff Hasterok will call back."
10         Do you see that?
11    A    Yes.
12    Q    And is that -- is that the same
13  Jeff Hasterok who is an expert witness on
14  behalf of Washington TSA?
15    A    Yes.
16    Q    And did Mr. Hasterok call you
17  back?
18    A    From these notes, it doesn't
19  look like it.  It looks like instead:
20         "Maybe should call Fabrice,
21  too," and then it says "Fabrice."
22         And then starts to be notes on
23  what Fabrice was saying.  Fabrice was their
24  head trader.  You know, Jeff was a
25  derivatives structural marketer.

Page 385

Peter Shapiro

1
2     Q    And so the notes starting with
3  "Kevin Schwartz, MS," the notes of the
4  conversation are actually notes of a
5  conversation with Fabrice?
6     A    Yes.
7          And if you will notice here,
8  again, I'll just point out to you -- he's
9  saying you can't do this -- this Lehman
10  estate strategy of using -- as he says, you
11  get completely killed.  You know, he goes
12  through it -- you know, I just read this
13  through -- you know, about how -- how this
14  would not work.
15    Q    So right after the word
16  "Fabrice," you have a dash, and then it
17  says:
18         "One dealer was using long
19  dated A's to hedge and marking the FPA at
20  the A spread minus something."
21         Do you see that?
22    A    Yes.
23    Q    So Mr. -- is Fabrice his first
24  name?
25    A    Yes.

Page 386

Peter Shapiro

1
2     Q    So Fabrice was telling you that
3  he was aware --
4     A    His last name is, just for the
5  record, is Pilato, P-i-l-a-t-o.
6     Q    So Fabrice was telling you that
7  he was aware of one dealer in the market
8  that was using long-traded agencies to
9  hedge and marking the FPA at the agency
10  spread minus something?
11    A    Yes.
12    Q    Did you ask who -- what dealer
13  that was?
14    A    I don't believe so.  I would
15  have noted.
16    Q    Okay.
17    A    But, again, he's saying you get
18  completely killed.  He was saying -- he was
19  saying whoever did this was -- well, you
20  know, was an amateur.
21    Q    That he thought it was a risky
22  strategy?
23    A    Worse.  He said you would get
24  killed.
25    Q    But he was aware of somebody

Page 387

Peter Shapiro

1
2  that was doing in the market?
3     A    Yes.
4          MR. LAWRENCE:  Objection.
5     Argumentative.  Asked and answered.
6     A    And I point out above, it's --
7  Lauri, it's very much confirmed by what
8  Greg Shlionsky says in the line right above
9  where it says "Kevin Schwartz":
10         "Less than sincere traders made
11  this argument to a less than expert product
12  control in order to book more profits."
13    Q    If you turn the page --
14    A    So you know what that means,
15  what he's saying:
16         "This is a fraudulent strategy
17  that somebody would try to use to inflate
18  their bonus."
19    Q    Of course, some dealer did it
20  according to Mr. Fabrice?
21    A    Got away with doing it
22  internally in order to inflate their profit
23  numbers.  But it was highly hazardous, not
24  thought of as a -- as a -- as a legitimate
25  practice.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 388

Peter Shapiro

1
2    Q    And Mr. Shlionsky did it once?
3    A    Mr. Shlionsky did not say he
4  did it once.
5    Q    He said he hedged agencies
6  once?
7    A    He said he hedged agencies.  He
8  didn't say how long.  And he said -- he
9  said it was unique and not applicable.
10   Q    Where does he say it's not
11 "applicable," that the --
12   A    He was saying:
13        "But it was unique."
14        What he's saying there is it
15 wouldn't have applied in this case.
16   Q    What do you recall him saying
17 about the hedge that he had done at Lehman
18 and how it would not be applicable in this
19 case?
20   A    When he's saying it was unique,
21 he would have -- you know, that's what he's
22 -- when I am writing the word "unique,"
23 he's saying it wouldn't have applied.
24   Q    And did Mr. Shlionsky tell you
25 that he had put the hedge in place while he

Page 389

Peter Shapiro

1
2  was at Lehman?
3    A    It would -- you know, he just
4  said he did it once.  You know, he's not
5  saying, "I did it at Lehman."
6        But I know -- my relationship
7  with him started when he was at Lehman.
8    Q    If you turn to the page marked
9  2317, the third line starts, "Swap at
10 implies" -- do you see which line I am at?
11   A    Yes.
12   Q    After the semi-colon, you
13 write:
14        "Cheapest-to-deliver option
15 increases in value as the economic
16 situation deteriorates."
17        Do you see that?
18   A    Yes.
19   Q    What's the "cheapest-to-deliver
20 option"?
21   A    "Cheapest-to-deliver option"
22 means you can deliver whichever eligible
23 security, CP agencies or Treasuries, at,
24 you know -- at each of the six-month
25 intervals.

Page 390

Peter Shapiro

1
2    Q    And that's the option held by
3  the dealer?
4    A    That's correct.
5    Q    And Fabrice is telling you that
6  the "cheapest-to-deliver option actually
7  increases in value as the economic
8  situation deteriorates"?
9    A    Correct.
10   Q    And how did you factor in the
11 cheapest-to-deliver option in the valuation
12 that you did on behalf of Washington TSA?
13   A    As -- you know, as we have
14 discussed, we increased the value of the
15 deliverable of CP from a norm, which I
16 think I described in one of the prior
17 documents, of 10 to 20 basis points, up to
18 66.6.  It's a big increase.
19   Q    But then in your rebuttal
20 report, you reduced it to 3.1 basis points,
21 correct?
22   A    You know, that we said that
23 that 66.6 was too wide.
24   Q    Right.  So you have reduced it
25 now to 3.1 basis points?

Page 391

Peter Shapiro

1
2    A    We believe it was too wide --
3    Q    And so --
4    A    -- to be fair.
5    Q    And you believe that 3.1 basis
6  points is where the dealer's
7  cheapest-to-deliver option is given value?
8    A    When we went back and looked at
9  the basis market at that time, rather than
10 the spot market, the basis market seemed to
11 indicate a much lower number.
12   Q    I don't think that answered my
13 question.
14        Is that 3.1 basis points taking
15 it -- is that the valuation of the
16 cheapest-to-deliver option held by the
17 dealer?
18   A    It's the value of what was
19 cheapest-to-deliver, which is CP, and
20 implies the value of the option.
21   Q    So that 3.1 basis points is
22 Swap Financial's opinion as to the value of
23 the cheapest-to-deliver option held by the
24 dealer?
25   A    Includes that, yes.

34  (Pages 388 to 391)

Page 392

Peter Shapiro

```
1          Peter Shapiro
2      Q    And do you --
3          MR. LAWRENCE:  Lauri, I am --
4  you know, I have let you go on for a
5  while.  This was not a newly produced
6  document.  You are beyond the scope of
7  what we were allowed to depose --
8          MS. SAWYER:  I thought this was
9  one of the documents that was produced
10 in the last batch.
11         MR. LAWRENCE:  I was looking at
12 this list, and it doesn't appear to
13 be.  I could be wrong.
14         MS. SAWYER:  I could be wrong,
15 too.  It was in the set that was given
16 to me as a newly produced document.
17 So I can certainly wrap it up, and we
18 can move on.  I have been trying to
19 focus on the documents newly produced.
20         MR. LAWRENCE:  It's fine.  It's
21 fine.  If you could finish up with
22 this document -- I am not saying you
23 have to stop this second, but I
24 just -- looking at my list, it wasn't
25 on it, but I could be wrong, too,
```

Page 393

Peter Shapiro

```
1  so --
2      Q    If you could go down to right
3  before where it says "Chris Petronas CS,"
4  do you see that?
5      A    Right before, yes.
6      Q    Two sentences before it, it
7  says:
8         "Thinks the fair spread is
9  something in the mid double digits LIBOR
10 plus 50, giving value to the
11 cheapest-to-deliver option."
12         Do you see that?
13     A    Yes.
14     Q    What do you recall about the
15 discussion with Fabrice about that?
16     A    I'm not sure.  I am looking at
17 that -- you know, whether I -- whether I
18 made a typo and should have said "minus,"
19 rather than "plus," because "plus" makes no
20 sense.
21     Q    And he -- he told you that he
22 thinks a fair spread would be something in
23 the mid double digits?
24     A    Yeah, he's giving a mid,
```

Page 394

Peter Shapiro

```
1          Peter Shapiro
2  because, remember, he's the trader; so that
3  would correlate with the earlier number
4  that -- that you saw on Dan Daly in the 40
5  to 50 range.
6      Q    And you wrote down "LIBOR plus
7  50"?
8      A    Yeah, it's got to be a typo.
9      Q    You believe it to be a typo?
10     A    I said it's got to be a typo.
11     Q    And you believe that that --
12 you believe that, even though he says
13 "giving value to the cheapest-to-deliver
14 option" --
15     A    Yeah.
16     Q    -- you still believe that to be
17 a mid?
18     A    Yeah.
19     Q    So you believe that the
20 cheapest-to-deliver option is incorporated
21 into the mid market value?
22     A    Yes, because, remember, the --
23 a mid is going to incorporate all the
24 economic terms before you apply spreads.
25     Q    If you could look after the --
```

Page 395

Peter Shapiro

```
1          Peter Shapiro
2      A    Notice what he says after that,
3  "a long-term A hedge," meaning agency
4  hedge, "is complete garbage."
5         That's not a -- that's not a
6  mild phraseology.
7      Q    I understand that you have a
8  lot of points to make off of this document.
9  And I am happy to sit here and do that, but
10 we would finish up sooner if we just
11 focused on the questions I have.
12     A    My apologies.
13     Q    If you look in the middle of
14 the page, there is a number one, do you see
15 that, just number one --
16     A    Yes.
17     Q    -- that is set in.
18     A    Yes.
19     Q    Right below that, it says:
20         "MS quote sheets during"
21 this -- "during the time period show no
22 movement in FPA prices."
23         Do you see that?
24     A    Yes.
25     Q    What is that referring to?
```

35  (Pages 392 to 395)

Page 396

```
 1        Peter Shapiro
 2    A    This was something in
 3 preparation for mediation, I believe.  One
 4 of the things, if we went through, was
 5 trying to look at various quote sheets that
 6 are provided to us and other market
 7 participants, generally, on a weekly basis
 8 by certain dealer firms, that circulate
 9 quote sheets saying:
10        "For this product, here is
11 where their levels are, and for that
12 product here is where their levels are."
13        And one of those was Morgan
14 Stanley.  They produced a weekly quote
15 sheet that quoted on FPAs and/or FDAs,
16 whatever you want to call them, similar to
17 the RFA, you know, this exact same
18 architecture.
19    Q    And is this something that Swap
20 Financial had in its possession, these
21 quote sheets?
22    A    Yes.
23    Q    And if you go down a few lines,
24 did you -- it says, "Call on 8/18/10."
25        Did you share those quote
```

Page 397

```
 1        Peter Shapiro
 2 sheets with Lehman?
 3    A    I don't believe so.
 4    Q    Okay.  It says --
 5    A    It says actually -- it says --
 6 no, it says here:
 7        "I have reviewed survey of FPA
 8 providers, MS sheet history."
 9        So I would have.  It's saying I
10 did, so I trust that I did.
11        MS. SAWYER:  And I don't think
12    we have copies of these MS quote
13    sheets, so I would just make a request
14    for those since you indicated they're
15    in your files.
16        THE WITNESS:  Yes.
17        (Documents, MS Quote Sheets,
18    requested.)
19        (Exhibit No. Shapiro 42, E-Mail
20    dated 5/24/11 from Carol Johnson to
21    Kim Herman, Bob Cook, Subject:  TSA --
22    Lehman Brothers, TSA Reserve Agreement
23    Investments and Status Review with
24    Peter Shapiro, Bates No. TSA 42744, is
25    marked by the reporter for
```

Page 398

```
 1        Peter Shapiro
 2    identification.)
 3    Q    Mr. Shapiro, I am handing you a
 4 document that has been marked as Shapiro
 5 Exhibit 42.  It's a single-page document,
 6 Bates stamped TSA 42744.  It's an E-Mail
 7 dated May 24, 2011, from Carol Johnson to
 8 Kim Herman and Bob Cook.
 9        And then the -- it starts by
10 saying:
11        "Peter Shapiro called me this
12 afternoon.
13    A    I have reviewed it.
14    Q    Do you recall this conversation
15 that -- with Ms. Johnson that she's
16 recounting in this E-Mail?
17    A    I don't.
18    Q    Okay.  And it starts by saying:
19        "Peter Shapiro called me this
20 afternoon.  He wants to talk to us about
21 our reserve fund investments.  He has had
22 discussions with other tobacco clients in
23 similar circumstances and believes there's
24 some other forms of investment with better
25 returns parentheses fixed rate that we
```

Page 399

```
 1        Peter Shapiro
 2 could be taking advantage of."
 3        Do you recall what you were
 4 referring to in May of 2011 about these
 5 other investments that other tobacco
 6 clients had been taking advantage of?
 7    A    I said I don't recall the call
 8 itself, so I can't recall the contents of
 9 the call if I don't recall the call.
10    Q    Do you recall ever speaking to
11 Washington TSA about other investments that
12 other tobacco clients were using for their
13 reserve funds that you thought Washington
14 should be doing?
15    A    Yes.  We had other
16 conversations, but not necessarily -- let
17 me -- just to clarify -- not necessarily
18 other tobacco clients were using, but that
19 they were considering.
20    Q    And what were these other
21 investments that your other clients were
22 considering that you thought Washington TSA
23 should consider?
24    A    In prior deposition, we've
25 reviewed this -- this question, I believe,
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Peter Shapiro

1
2  that is, you know, what were the other
3  alternatives to look at.  And we -- you
4  know, I think we reviewed some memos on
5  this -- but, you know, various alternative
6  products, in the absence of the
7  available -- you know, the long-dated
8  reserve fund agreement.
9       (Previously Marked Exhibit No.
10  Shapiro 6, 11/16/11 Memorandum from
11  Peter Shapiro to Bob Cook and Carol
12  Johnson, Bates Nos. TSA 38481 to 38484
13  is introduced into the proceedings.)
14    Q   I am handing you what has been
15  previously marked as Shapiro Exhibit 6,
16  which is a memorandum from you to TSA on
17  November 16, 2011.
18       Is this what you were referring
19  to about the discussions you had with
20  Washington TSA about other investment
21  opportunities?
22    A   Help me out here.  The fact
23  that it's called Shapiro 6, does that mean
24  that we discussed this in a prior
25  deposition?

Peter Shapiro

1
2    MR. LAWRENCE:  Yes.
3    Q   Yes.
4    A   Okay.  That's what I was
5  guessing.  This is exactly what I was
6  referring to.
7    Q   And other than what's reflected
8  in Shapiro Exhibit 6, do you recall having
9  any other discussions with Washington TSA
10  about alternative investment strategies
11  that they should consider?
12    A   I am sure we had other
13  discussions than just this memo.
14    Q   What do you recall of those
15  discussions?
16    A   We reviewed these options.
17    Q   Do you recall presenting any
18  other investment alternatives to Washington
19  TSA other than what's reflected in Shapiro
20  Exhibit 6?
21    A   Let me review just to make
22  sure.
23       MR. LAWRENCE:  Again, I think
24  you are -- while Shapiro 42 was newly
25  produced, it seems like you are going

Peter Shapiro

1
2  beyond that at this point.
3       MS. SAWYER:  I am just trying
4  to understand if there was a
5  discussion relating to Shapiro
6  Exhibit 42 other than -- I am trying
7  to either connect them and say that
8  was that the same or not.  And they
9  are six months different in time.
10       MR. LAWRENCE:  I understand
11  that.  But your most recent question
12  clearly wasn't that focused.
13    Q   Do you recall any discussions
14  with Washington TSA between May 2011 and
15  November of 2011 discussing any other
16  alternative investments other than those
17  reflected in November -- in Shapiro
18  Exhibit 6?
19    A   I do not recall.
20       MR. LAWRENCE:  You need to
21  restate your question -- you say May
22  of 2011 and May of 2011.
23       MS. SAWYER:  No, to November of
24  2011.
25       MR. LAWRENCE:  Okay.  Sorry.

Peter Shapiro

1
2    A   That's how I understood it.
3       I don't recall anything other
4  than this, other than these alternatives, I
5  should say.
6    Q   And did you have any other
7  tobacco clients, as you refer to in Shapiro
8  Exhibit 42, that took advantage of any of
9  the investment alternatives you outlined in
10  Shapiro Exhibit 6?
11    A   As I sit here, I am not
12  recalling who did what.
13    Q   Do you recall that some of them
14  did pursue some of those alternatives you
15  outlined in Shapiro Exhibit 6?
16       MR. LAWRENCE:  Again, I think
17  that's beyond the scope of what is
18  permitted at this point.
19    A   I am really not recalling, or I
20  have to go back.  I am racking my memory
21  now, and I didn't expect you were going ask
22  what other tobacco agencies did to
23  reinvest.
24    Q   As part of your discussions
25  with Washington TSA about its investment

Page 404

1      Peter Shapiro
2  alternatives, did you discuss what other
3  tobacco clients of yours had done?
4      A   We discussed what other tobacco
5  clients had considered --
6      Q   You don't recall --
7      A   -- or were considering.
8      Q   And do you recall whether any
9  of those other tobacco clients were
10  considering alternatives other than what
11  you set forth in Shapiro Exhibit 6?
12      A   I don't believe so.
13      Q   Okay.
14      MS. SAWYER:  Can we go off of
15  -- on the record or off, I am going to
16  shift gears and go to the screen
17  shots.  It will take me a little bit
18  of time, but if we want to take a
19  break lunch break, whatever, that's
20  fine.  I don't have much after that,
21  though.  So I am kind of to saying it.
22      MR. LAWRENCE:  It's up to you.
23      (There was a discussion off the
24  record.)
25      THE VIDEOGRAPHER:  The time is

Page 405

1      Peter Shapiro
2  12:42 p.m.; we are going off of the
3  record.
4      (A lunch recess was taken.)
5      THE VIDEOGRAPHER:  The time is
6  1:40 p.m.; we are back on the record.
7      (Exhibit No. Shapiro 43,
8  Version 1 Screen Shot from Principia
9  Software, Bates Nos. SFG 2394 to 2395,
10  is marked by the reporter for
11  identification.)
12      Q   The court reporter has handed
13  you a document -- or I handed you a
14  document that has been marked as Shapiro
15  Exhibit 43, which is a computer screen
16  shot.  Its Bates stamp is SFG 2394 to 2395.
17      Do you recognize this document,
18  Mr. Shapiro?
19      A   I don't.
20      Q   Have you used the Principia
21  software?
22      A   No.
23      Q   So you are not able to tell us
24  what any of the inputs or entries are on
25  these documents?

Page 406

1      Peter Shapiro
2      A   Generally not.  I -- you know,
3  the Principia operation is all done by my
4  staff, not by me.
5      Q   Okay.
6      A   I went through a very brief
7  introductory on it many years ago; but,
8  because I don't use it, I am -- you know,
9  half the time, I am just trying to figure
10  out what are -- what are the inputs in
11  here.
12      Q   Okay.  Do you use it from time
13  to time?
14      A   No.
15      Q   So looking at just Exhibit 43,
16  let's turn to -- let's -- actually, let's
17  look at the first page.  On the far right
18  corner, it says "position," and it says
19  "position date"; do you see that?
20      A   No, I'm looking.  "Position
21  date."
22      MR. LAWRENCE:  Talking about
23  the front page.
24      A   Yes, do you mean in the lower
25  right-hand corner there?

Page 407

1      Peter Shapiro
2      Q   Yes.
3      A   Yes.
4      Q   Do you know what "position
5  date" refers to?
6      A   No.  You know, it looks like
7  it's a valuation date, but I don't know.
8      Q   Okay.  And if you turn to the
9  second page of the screen shot, which is
10  2395 --
11      A   Yep.
12      Q   -- have you -- have you ever
13  seen this type of -- have you ever seen
14  this in the software on the Principia
15  screen?
16      A   I have seen this just generally
17  on the screen, but never examined it
18  closely.
19      Q   Okay.  So in the upper
20  left-hand corner, it says "start and
21  maturity"; do you see that?
22      A   Yes.
23      Q   And do you know what those
24  dates refer to?
25      A   You know, we are talking about

38  (Pages 404 to 407)

Peter Shapiro

the RFA.  They look like the start date on
the RFA and the maturity date as we
understood it prior to the correction.
  Q   Okay.  So maturity date of the
RFA is the one for maturity, where it says
30 May 2042?
  A   Yes.
  Q   And then there is a green box
that says RCV.
  A   Yeah.
  Q   And a couple of boxes down,
there is a blue box that says "pay."
      Do you see that?
  A   Yes.
  Q   And do you understand what
those sections refer to?
  A   Receive and pay.
  Q   In connection with like an
interest rate swap?
  A   Yes.
  Q   So the "RCV" would be the
receiving of the fixed amount, and the
"pay" would be the paying of the floating
amount?

Peter Shapiro

  A   Yes.  The way -- the way it's
set up here, you can see RCV has a fixed
amount in it.  You can even see that the
button "fixed" is indicated.  And then
"pay," you can see it's referencing USD
three-month LIBOR minus 150.
  Q   And in that "receive," that
fixed amount, it's 4.8484 percent, which is
the guaranteed rate of the RFA?
  A   A very familiar rate to us in
our discussions, Lauri.
  Q   And just to make sure the
record is clear, that is the guaranteed
rate of RFA?
  A   That's what -- that's what it
appears to be.
  Q   Right.  And then the "pay"
section is indicated "USD three-month
LIBOR."  That's what you just told me,
correct?
  A   Yes.
  Q   And then it says plus and
negative 1.5 percent?
  A   Correct.

Peter Shapiro

  Q   And would that represent the
spread to LIBOR used for the floating leg
of the swap?
  A   Yes.
  Q   And so would this valuation be
the one done consistent with Mr. Vergara's
E-Mail where he assumed a spread to LIBOR
of minus 150 basis points?
  A   It looks that way.  Now, if you
look at the date, too, on the bottom, it
says "entered at Monday, March 30th," you
know, "11-01-14 2009."
  Q   And so that date at the bottom
you just directed me to, that's the date
that the calculation was done using the
software?
  A   Probably.  I don't know how
often it updates those dates, you know, if
it's like the original date or -- you know,
sometimes people take software and
overwrite.  And you don't know if maybe it
was a date from another one and it was just
overwritten on.
      It's hard to tell, but probably

Peter Shapiro

not.  Probably, it was a stand-alone.
  Q   And looking at the "pay"
section where it says "pay USD three-month
LIBOR plus the negative 1.5 percent," that
means to subtract 1.5 percent from the
applicable LIBOR rate, correct?
  A   Yes.
  Q   And so if the LIBOR rate was
1 percent, you would subtract 1.5 percent;
and you would have a negative interest rate
of half a percent?
  A   Not really, because negative
interest rates are not something that we
normally think of.  You know, the way you
really have to look at the spread to LIBOR
in these agreements is though it's a spread
to a long-term structure.
      So, you know, when a trader
says, "Where is ten-year LIBOR," okay,
or, "Where is 30-year LIBOR," technically,
there is no real LIBOR at ten years or
30 years.
      But what they always mean
is, "Where is the ten-year swap," ten-year

Page 412

Peter Shapiro

1  Peter Shapiro
2  LIBOR swap or a 30-year LIBOR swap.
3  So if they say, "I am 30 years
4  LIBOR minus 150," they are not saying that
5  they expect on the pay side or on the
6  floating rate side that you would look at
7  today's LIBOR at 24 basis points and make
8  that a 24 minus 150 to make it a negative
9  interest rate of, say -- you know, what
10  does that equal -- you know, negative
11  1.26 percent.
12  Q   But this is the USD three-month
13  LIBOR?
14  A   Correct.
15  Q   And that would be at various
16  points in time it would change, correct?
17  A   It will change every three
18  months.
19  Q   Right.  And so you are saying
20  the software does not subtract 1.5 percent
21  from the USD three-month LIBOR rate?
22  A   No, it really subtracts it from
23  the structure as a whole because it's not
24  going to tell you:
25  "All right.  On -- you know, on

Page 413

1  Peter Shapiro
2  this date, you are paying negative 1.26 and
3  on this another date."
4  Jay Tambe, in one of the
5  earlier depositions with me, went over this
6  in great detail, and he kept getting it
7  wrong, that is, though -- it's as though
8  it's saying LIBOR is going to be a negative
9  number.
10  It's not.  It's the structure.
11  Its going to have a negative spread
12  embedded in it, and it gets put in that
13  box.
14  Q   I am trying to understand how
15  the software works.
16  A   Yes.
17  Q   And so the software has an
18  input of USD three-month LIBOR, and
19  subtracted from that is 1.5 percent,
20  correct?
21  A   Yeah, we have already said
22  that, yes.
23  Q   So how does -- how does the
24  software account for the long-term
25  discussion you are having?  Does it not use

Page 414

1  Peter Shapiro
2  USD three-month LIBOR?
3  A   Yeah, it does.  It looks at a
4  LIBOR swap for this period of time and
5  looks at it as though you took 150 off the
6  value of the swap.  So you could put it on
7  either leg and get the same result really.
8  Q   So does the software use the
9  USD three-month LIBOR curve or not?
10  A   Yes, it does.
11  Q   Okay.  And from --
12  A   And when it's looking at the
13  curve -- remember, what you are saying
14  there.  The curve is not USD three-month
15  LIBOR.  USD three-month LIBOR is a floating
16  rate set up every three months in US
17  dollars.
18  But the curve -- and the fact
19  that you use the curve is actually
20  important.  What the curve says is:
21  What rate could you swap
22  USD three-month LIBOR for as you went
23  longer maturities, not at three, not the
24  three-month, but as you went one year, five
25  years, ten years, thirty years?

Page 415

1  Peter Shapiro
2  And so that's really looking at
3  the fixed rate.  So, you know, you are
4  right when you think of this as a deduction
5  off the curve.  It's a deduction off of
6  those fixed rates.
7  Q   It's a deduction off the USD
8  three-month LIBOR curve?
9  A   "Curve" meaning fixed rates,
10  yeah.
11  Q   Meaning the 4.484 fixed rate?
12  A   Or really, if you looked at the
13  fixed rates, they are implied in swapping
14  LIBOR out long-term, the term structure of
15  LIBOR, as we call it.
16  Q   Right.  It would be -- but it
17  would be not the fixed rate of the
18  contract, but the USD three-month LIBOR
19  forward curve, correct?
20  A   The fixed rates that are yield
21  date for LIBOR swaps on the day that this
22  is run.  So in other words, on the day that
23  this is run, you are not going to get a
24  30-year rate of 4.484 because interest
25  rates are much lower by the time you get to

40  (Pages 412 to 415)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 416

1           Peter Shapiro
2    2009.
3        Q    But you don't deduct that
4    1.5 percent from the 4.484?
5        A    You know, you can look at it
6    either way.
7        Q    But that's not --
8        A    It's going to get you the same
9    thing.
10       Q    But that's not what this
11   software does?
12       A    You know, it does it all
13   combined together, so it's like -- it's
14   like you are -- it's not like you are
15   saying it only does it one way or the
16   other.  It's a big series of calculations.
17           The best way to think about
18   valuation -- the best way to put it in
19   layman's terms and common sense and not get
20   mixed up with "at what point do you do what
21   calculation" is really to say:
22           We have a contract with the
23   stated fixed rate.  We now have a different
24   interest rate environment that is higher or
25   lower within the same parameters of the --

Page 417

1           Peter Shapiro
2    of the original swap.  And what's the
3    difference between the current market and
4    the market at the time that the contract
5    was entered into?
6           If the market at the time the
7    inception rate was 4.484, and, in the
8    current market, for something structured
9    the same way, it would be 1 percent, then
10   we have a differential of 3.484.
11           And that differential, if you
12   PVed it back to today, would be the value.
13       Q    And that is how you understand
14   how the software works?
15       A    That's how the software does
16   work.
17       Q    Okay.  But you also told me you
18   weren't familiar with the software and you
19   didn't use the software?
20       A    No, I know how the models work.
21   I know the underlying principles --
22       Q    And so why --
23       A    So I don't know the details of
24   how you operate it.
25       Q    So why even reference USD

Page 418

1           Peter Shapiro
2    three-month LIBOR?
3        A    Because that's -- that's
4    where -- what you are doing your base curve
5    on.  That's what you are saying -- the
6    fixed rate that you are comparing on.  You
7    could do six-month LIBOR.  You could do it
8    against EURIBOR, you know Euro LIBOR.
9           You could do it against any
10   number of different kinds of indexes that
11   will produce different fixed rates.
12       Q    But you just told me to take
13   the first fixed rate of 4.484 percent,
14   subtract the spread, 150 basis points.
15   Then you PV that.  So where does the LIBOR
16   curve come in at all?
17       A    I said you said to define the
18   parameters.  And that is -- the floating
19   rate is one of those parameters.
20       Q    Okay.  So the floating rate,
21   just for purposes of this, is 1.5 percent.
22   You are saying that comes off of the
23   4.484 percent?
24       A    It comes off the structure is
25   what I said.

Page 419

1           Peter Shapiro
2        Q    And the structure is
3    4.484 percent?
4        A    The structure is 4.484 versus
5    three-month LIBOR.  What you -- you don't
6    want to get to this issue where you get
7    into this repeated logical conundrum that
8    Jay kept getting caught in, which is
9    saying:
10           "Well, if you spread 150 off of
11   LIBOR, you'd get a nonsense result.  You'd
12   get negative interest rates."
13           He wasn't asking about 150.  He
14   was asking about the larger spread if we
15   put in the valuation, and the loss
16   calculation.
17           But the reality is, even if you
18   put a little spread in these days, you are
19   going to get to a negative interest rate.
20           (There was a discussion off the
21       record.)
22       A    Get to a negative interest
23   rate.
24           So you don't want to look at
25   this and get caught in the impression that

41  (Pages 416 to 419)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 420

Peter Shapiro

1
2   you are having some kind of absurd result
3   with negative interest rates.
4        Q   I just want to make sure I
5   understand.  So you say this software,
6   despite setting up a receive leg and a pay
7   leg, it, in fact, takes 4.484 percent in
8   version one, subtracts 1.5 percent from
9   that, and discounts the result to present
10  value?
11       A   I am not saying that.  I am
12  saying it does it off the structure.  And
13  the structure as a whole looks at two legs:
14  One that we define as 4.484; and one that
15  it defines here as USD three-month LIBOR
16  minus 150, and looks at it as a whole.
17       Q   And compares those two legs?
18       A   Yeah, it doesn't go out and
19  say:
20       "Okay.  On the -- on the
21  floating rate, it's going to be negative
22  interest rate until LIBOR exceeds 150."
23       It never does that.
24       Q   And how do you know it never
25  does that?

Page 421

Peter Shapiro

1
2        A   Because it would be a nonsense
3   result.  Negative interest rates are
4   something that creates all sorts of
5   problems.
6        (Exhibit No. Shapiro 44,
7        Version 2 Screen Shot from Principia
8        Software, Bates Nos. SFG 2396 to 2397,
9        is marked by the reporter for
10       identification.)
11       Q   I am handing you what the court
12  reporter has marked as Shapiro Exhibit 44,
13  which is Bates stamped SFG 2396 through
14  2397, which is version two of the
15  Principia --
16       A   Principia.
17       Q   -- Principia screen shots.
18  These -- this screen shot was -- reflects
19  an analysis done on April 21, 2009.
20       A   It says, "Entered as of
21  April 21st."
22       Q   2009?
23       A   2009.
24       Q   And if you look at the spread
25  to LIBOR on the second page of this

Page 422

Peter Shapiro

1
2   document, it's negative 3.874.
3        MR. LAWRENCE:  Objection to the
4   form of the question.
5        A   It shows a negative 3.874 on
6   that pay leg, yes.
7        Q   And that's consistent with the
8   valuation that you did in Lehman 15 that we
9   looked at?
10       A   I believe it is.  But let's
11  just reference back to Lehman 15, which
12  is -- Lehman 15 -- the spread on Lehman 15
13  is a negative 3.874, which is the same
14  number.
15       Q   So do you believe version two
16  reflects the analysis that is contained in
17  Lehman Exhibit 15?
18       A   Let's take a look again.  Okay.
19  The number that shows in the little
20  window -- do we have a -- do we have a
21  value that's shown here?
22       Q   No, the values weren't provided
23  with these screen shots.
24       A   Okay.  You know, we have a
25  notional.  We have that spread.  Yes, it

Page 423

Peter Shapiro

1
2   looks like it.
3        Q   So you believe that version two
4   reflects the analysis that's captured in
5   Lehman Exhibit 15?
6        A   It doesn't it's not reflecting
7   a value as you just pointed out to me.
8        Q   But it's the inputs?
9        A   It looks like it's got the
10  inputs, yes.
11       Q   It looks like it would be the
12  inputs connected with Lehman Exhibit 15,
13  correct?
14       A   Correct.
15       (Exhibit No. Shapiro 45,
16       Version 3 Screen Shot from Principia
17       Software, Bates Nos. SFG 2398 to 2399,
18       is marked by the reporter for
19       identification.)
20       Q   I am handing you a document
21  what the court reporter has marked as
22  Shapiro Exhibit 45, which is titled
23  "Version Three" of the Principia screen
24  shots, Bates Nos. SFG 2398 through 2399.
25  This analysis was done -- it appears --

42  (Pages 420 to 423)

Page 424

```
 1           Peter Shapiro
 2  based on the InterDat [phonetic] date on
 3  April 28, 2010; do you see that?
 4      A   Yes.
 5      Q   And next to that, it says "by
 6  Shapiro"; do you see that?
 7      A   Yes.
 8      Q   Did you do this analysis?
 9      A   No.
10      Q   No.  Then why is your name
11  written in there?
12      A   I suspect that there is -- I
13  suspect that there are parts of the
14  Principia system that say -- that have a
15  user name.  And you start with the user
16  name.  And they set up one that was in my
17  name originally.
18      Q   And if you look at Exhibit 44,
19  where it says "by," there is nothing in
20  there.
21      A   Yes.
22      Q   So why -- why is it -- when you
23  set it up, is your user name not showing up
24  in Exhibit 44?
25      A   I have no idea.
```

Page 425

```
 1           Peter Shapiro
 2      Q   And if you look at Exhibit 43,
 3  your user name is not showing up in that
 4  one either?
 5      A   No idea.
 6      Q   Do you recall your user name
 7  being added between 2009 and 2010?
 8      A   No, my user name would have
 9  been added when they originally put it in
10  because I think somebody had an imaginative
11  idea that I might, you know, run the
12  modeling myself.
13      Q   But it's not showing up in the
14  first two screen shots?
15      A   No.
16      Q   And if you look at the second
17  page of Exhibit 45, it has a maturity date
18  stated as 30 May 2032.  Do you see that?
19      A   Yes.
20      Q   Do you recall being aware that
21  the maturity date of the Washington RFA was
22  May 20, 2032, in April 2010?
23      A   I don't recall what -- I think
24  you asked this earlier.  I don't recall
25  what day we became aware of that.
```

Page 426

```
 1           Peter Shapiro
 2      Q   Do you believe that this
 3  reflects that you became aware that the --
 4  in April of 2010 that the maturity date was
 5  May 2032?
 6      MR. LAWRENCE:  Object to the
 7      form of the question.
 8      A   It's a -- you know, it's hard
 9  to tell.  It looks like that.  But it could
10  be a data entry error that somebody made as
11  well.  I doubt it.  It looks like it's the
12  rate date.  So it looks like somebody
13  became aware of it on that date in our
14  shop.
15      Q   Now, does the software save the
16  different versions -- the software saves
17  the different versions that we are looking
18  at, correct?
19      A   I don't know.  I don't know, to
20  the extent you can overwrite, you save, if
21  it saves everything.
22      Q   So you don't know, if you pull
23  up version two and you want to make version
24  three, whether you have to type in
25  everything from scratch or whether you
```

Page 427

```
 1           Peter Shapiro
 2  affirmatively -- there are some defaults
 3  already in there?
 4      A   I have no clue.
 5      Q   And so you don't know how that
 6  2032 date arrived in version three?
 7      A   No.
 8      Q   But you believe it -- you
 9  believe it to be when you learned that the
10  RFA actually matured in 2032?
11      A   When I look at it sitting here,
12  it would be an odd coincidence if it were a
13  typo, so, you know, to get the exact right
14  date on it.  So I would just say guessing,
15  speculating, all of the things that I am
16  not supposed to do, that somebody at some
17  point prior to that found out that 2032 was
18  the right date because we know we did find
19  that out.
20      You know, there was nothing
21  nefarious about the change to 2042 to 2032.
22  As you know, we weren't originally supplied
23  with the correct date.
24      Q   I'm now handing you a document
25  the court reporter has marked as
```

43  (Pages 424 to 427)

Page 428

1          Peter Shapiro
2  Exhibit 46, which is version four of the
3  screen shots.
4          (Exhibit No. Shapiro 46,
5      Version 4 Screen Shot from Principia
6      Software, Bates Nos. SFG 2400 to 2401,
7      is marked by the reporter for
8      identification.)
9      Q   It's Bates stamped SFG 2400
10  through 2401.  This is also dated April 28,
11  2010, and indicates your name in the "by"
12  line; do you see that?
13     A   Yes.
14     Q   I don't see any differences
15  between version three and version four.  Do
16  you know why two versions of the analysis
17  was done on the same day in April of 2010?
18     A   I have no clue.
19         (Exhibit No. Shapiro 47,
20     Version 5 Screen Shot from Principia
21     Software, Bates Nos. SFG 2402 to 2403,
22     is marked by the reporter for
23     identification.)
24     Q   Handing you what has been
25  marked as Shapiro Exhibit 47, which is

Page 429

1          Peter Shapiro
2  version five of the screen shot, Bates
3  stamped SFG 2402 through 2403.  This is
4  dated June 15, 2010.
5          Do you see that?
6      A   Yes.
7      Q   And do you -- and it appears to
8  be -- it's the same analysis, the same
9  inputs as we saw in version three and in
10  version four which were done in April 2010.
11         Do you know any reason that the
12  analysis was again run in June of 2010?
13     A   No idea.
14         (Exhibit No. Shapiro 48,
15     Version 6 Screen Shot from Principia
16     Software, Bates Nos. SFG 2404 to 2405,
17     is marked by the reporter for
18     identification.)
19     Q   And on -- I'm sorry.  On
20  Shapiro Exhibit 47, it does say "by
21  Shapiro"; but you did not run that
22  analysis?
23     A   No, I have never -- as I
24  said -- I just repeat.  I have never run an
25  analysis in Principia, not on this and not

Page 430

1          Peter Shapiro
2  on anything else.
3      Q   I am handing you a document
4  that has been marked as Shapiro Exhibit 48,
5  which is version six of the screen shots.
6  Its Bates stamp is SFG 2404 through 2405.
7  It's also dated on June 15, 2010, which is
8  the same date as version five.
9          Do you see that?
10     A   Yes.
11     Q   Do you know why two versions of
12  the analysis were run on the same day in
13  June 15th, 2010?
14     A   You know, I answered previously
15  I don't know why the first one was run.  I
16  certainly don't know why the second one was
17  run.
18     Q   Okay.
19         (Exhibit No. Shapiro 49,
20     Version 7 Screen Shot from Principia
21     Software, Bates Nos. SFG 2406 to 2408,
22     is marked by the reporter for
23     identification.)
24     Q   I am handling you what has been
25  marked as Shapiro Exhibit 49, which is

Page 431

1          Peter Shapiro
2  version seven of the screen shots.  Its
3  Bates stamp is SFG 2406 through 2408.  Do
4  you see that?
5      A   Yes.
6      Q   And this analysis indicates
7  that it was run on June 16, 2010.  Do you
8  see that?
9      A   Yes.
10     Q   And if you turn to the second
11  page of the screen shot, the maturity date
12  has been changed to 30 May 2042.  Do you
13  see that?
14     A   I can't say it has been changed
15  to that.  I can just say it shows that.
16     Q   Okay.  In version six it shows
17  2032, correct?
18     A   Right, yes.
19     Q   So you don't think it's a
20  change from 2032 to 2042?
21     A   You characterize -- you can see
22  that it has been changed, you know.  I
23  can't characterize it.  I can just say it
24  says 2042.
25     Q   Okay.  Do you know why it was

44  (Pages 428 to 431)

Page 432

Peter Shapiro

1
2  changed to 2042?
3       A   I'm not --
4       MR. LAWRENCE:  Objection --
5  object to the form of the question.
6  It's argumentative.  It's assuming
7  facts not in evidence.
8       Q   Do you believe that there was a
9  change in the maturity date between version
10  six and version seven of the software?
11      A   I believe it's self-evident
12  from reading it that one of them has 2042
13  and one of them has 2032.  That's all I can
14  say.
15      Q   And why was the analysis in
16  version seven of the software Exhibit 49
17  run as of 2042?
18      A   I have no clue.
19      Q   Why wasn't it run as of 2032?
20      MR. LAWRENCE:  Object to the
21  form.
22      A   If I didn't have a clue as to
23  2042, I couldn't have an idea about what
24  was in 2032.  I think you are badgering me
25  here.

Page 433

Peter Shapiro

1
2       Q   Who would know why the maturity
3  date changed between version six to version
4  seven of 2032 to 2042?
5       A   I don't know.  You know,
6  whoever did this, you know, logged in under
7  Shapiro, you know my name, so you can't
8  tell.
9       Q   And who was doing the analysis
10  of the RFA in June of 2010?
11      A   It would have most likely been
12  either James Vergara or Lilian Chern, but I
13  can't tell.
14      Q   And you had -- do you recall
15  any discussions about the need to value the
16  RFA in June of 2010 assuming a maturity of
17  2042?
18      A   Not that I can recall.
19      Q   And if you look at page 2407,
20  it assumes a spread to LIBOR of minus
21  3.874 percent; do you see that?
22      A   Yes.
23      Q   And that's consistent with the
24  numbers we have seen in versions three
25  through six, correct?

Page 434

Peter Shapiro

1
2       A   Let me just confirm that before
3  I answer.  Six, yes.  Five, yes.  Four,
4  yes.  Three, yes.
5       Q   And if you turn the page to
6  Bates stamp 2408, it does the analysis --
7  it reflects the analysis was done assuming
8  a spread to LIBOR of minus 20 basis points;
9  do you see that?
10      MR. LAWRENCE:  Object to the
11  form.
12      A   Yes.  I see that.
13      Q   Why was that analysis done?
14      A   I have no idea.
15      Q   You don't recall any
16  discussions of the need to value the
17  reserve fund agreement assuming LIBOR minus
18  20 basis points?
19      A   I don't.
20      Q   Would your staff have run an
21  analysis of the reserve fund agreement
22  without discussing it with you.
23      MR. LAWRENCE:  Objection.
24  Calls for speculation.
25      A   They certainly could.  They

Page 435

Peter Shapiro

1
2  don't clear with me ever running an
3  analysis.  Their job is to be mature
4  people, thinking on their feet, and going
5  through anything they think might be
6  relevant.
7       Q   And you don't recall any
8  discussion with anyone about valuing the
9  reserve fund agreement at LIBOR minus
10  20 basis points?
11      A   I can't recall anything like
12  that.
13      Q   Either internally or with
14  Washington TSA?
15      A   No.
16      You did introduce previously
17  another exhibit that I think had a LIBOR
18  minus 20 indication; didn't you?
19      Q   Yes, there is one.
20      A   Yeah, so it could have been --
21  it could have been along with that.  But
22  it's just speculating for me.  I don't
23  know.
24      Q   So you don't have any
25  discussion of needing to value the LIBOR

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 436

Peter Shapiro

1
2    minus 20?
3        A    Not that I can recall.
4        Q    You don't recall any discussion
5    of -- let me restate that.
6            Do you recall valuing the
7    reserve fund agreement and any other
8    spreads to LIBOR other than LIBOR minus 150
9    and LIBOR minus 3.874?
10       A    I generally recall we looked at
11   lots of scenarios.
12       Q    And why did you look at those
13   other scenarios?
14       A    Trying to see where Lehman
15   might come in.  Trying to look at what, you
16   know, other concepts might be, how much
17   would it affect the, you know, the
18   valuation level.
19       Q    Where did you think Lehman
20   would come in?
21       A    I don't recall forming an
22   opinion on that.  You know, we had --
23   remember, I recorded in those notes that
24   you read in the prior exhibit some
25   discussions with the Lehman team.

Page 437

Peter Shapiro

1
2            And at that point, maybe they
3    threw out a spread number.  You know, we
4    would have to go back to my notes if I
5    reflected that.  It's possible that it was
6    something they threw out.  I don't know.
7        Q    And you said you did other
8    spreads to LIBOR to see how they would
9    affect the valuation?
10       A    I said we may have done that.
11       Q    And do you recall what other
12   spreads to LIBOR you considered?
13       A    No, we wanted to look at what
14   we thought was the proper spread based upon
15   rigorously examined inputs that would be
16   fair and reasonable.
17       Q    And you looked at LIBOR minus
18   20 basis points?
19       A    No, we -- if we looked at LIBOR
20   minus 20, it certainly wasn't based upon a
21   rigorous analysis as to what was fair and
22   reasonable.  It was based upon what Lehman
23   would try to assert in their own
24   self-interest to try to minimize the amount
25   they had to pay on the legitimate claims of

Page 438

Peter Shapiro

1
2    Washington TSA, to get paid fairly for
3    Lehman's failure to fulfill its contract.
4            And we know Lehman had a strong
5    incentive to short-change Washington TSA
6    and continues to this date to try to do so.
7        Q    And so you assume that LIBOR
8    minus 20 was your attempt to reflect where
9    you thought Lehman would value the
10   contract?
11       A    Perhaps.
12           (Exhibit No. Shapiro 50,
13       Version 8 Screen Shot from Principia
14       Software, Bates Nos. SFG 2409 to 2411,
15       is marked by the reporter for
16       identification.)
17       Q    I am handing you what the court
18   reporter has marked as Shapiro Exhibit 50,
19   which is version eight of the screen shots,
20   Bates stamped SFG 2409 through 2411.  It's
21   also dated June 16, 2010, as is version
22   seven.
23           Do you have any idea why
24   initial analyses were run on June 16, 2010?
25       A    No.

Page 439

Peter Shapiro

1
2        Q    And it indicates it's "by
3    Shapiro."  But you did not run this
4    analysis?
5        A    Exactly.
6        Q    And it also reflects on pages
7    2410 and 2411 that the maturity date is
8    May 2042?
9        A    Correct.
10       Q    And do you recall there being
11   discussion about the appropriateness of
12   using May 2042 as the analysis date in
13   June 2010?
14       A    I have -- again, I don't recall
15   what date it was when we looked at -- when
16   we realized that it should be 2032.
17       Q    And if you look at page 2410,
18   it shows a spread to LIBOR of minus
19   1.1 percent; do you see that?
20       A    Yes.
21       Q    What does that spread to LIBOR
22   represent?
23       A    It doesn't -- it doesn't ring
24   any bells with me.
25       Q    And do you believe that to be

46  (Pages 436 to 439)

Page 440

1        Peter Shapiro
2  an evaluation of where you thought Lehman
3  might come in?
4        A    I have no -- I really have no
5  clue.
6        Q    And do you believe that it was
7  an analysis that Swap Financial did to
8  assess the reasonableness of its valuation?
9        A    Reasonable of Swap Financial's
10 valuation?
11       Q    Yes.
12       A    No.
13       Q    You have no idea why Swap
14 Financial used 1.1 percent in this analysis
15 done on June 10, 2010?
16       A    That's what I said.
17       Q    And then if you turn to
18 page 2411, it shows the swap -- I'm
19 sorry -- the spread to LIBOR being minus
20 20 basis points; do you see that?
21       A    Yes.
22       Q    And why was that analysis run
23 again on June 2010?
24       A    I have no clue.
25            (Exhibit No. Shapiro 51,

Page 441

1        Peter Shapiro
2       Version 9 Screen Shot from Principia
3       Software, Bates Nos. SFG 2412 to 2414,
4       is marked by the reporter for
5       identification.)
6        Q    I am handing you a document
7  that has been marked as Shapiro Exhibit 51,
8  which is version nine of the screen shots,
9  Bates stamped SFG 2412 through 2414.  It
10 reflects that the analysis was done also on
11 June 16, 2010.  And it appears to be
12 identical with version eight of the screen
13 shot.
14            Do you know why the analysis
15 was run yet again on June -- June 16, 2010?
16       A    I can see this was done
17 36 minutes after the last one you asked me
18 the questions about.  The answers are going
19 to be the same.
20       Q    So you have no idea why --
21       A    Same answers from last time.
22       Q    I'm sorry.
23            You have no idea why three sets
24 of analyses were done on June 16, 2010?
25       A    No.

Page 442

1        Peter Shapiro
2        Q    And do you know -- and do you
3  recall anything going on in connection with
4  TSA or its discussions with Lehman in
5  June 2010 that would necessitate this
6  analysis?
7        A    I could go back and look at my
8  calendar if there was some discussion going
9  on; or, if you have another exhibit that
10 shows that there were E-Mails going back
11 and forth, that would help, but nothing I
12 can recall as I sit here.
13            (Exhibit No. Shapiro 52,
14       Version 10 Screen Shot from Principia
15       Software, Bates Nos. SFG 2415 to 2417,
16       is marked by the reporter for
17       identification.)
18       Q    Now handing you a document that
19 has been marked as Shapiro Exhibit 52,
20 which is version ten of the analysis done
21 by the Principia software screen shots, so
22 it's Bates stamped SFG 2415 through 2417.
23 It appears, based upon the first page, that
24 that analysis was done on June 22, 2010.
25            Do you see that?

Page 443

1        Peter Shapiro
2       A    Yes.
3        Q    Do you have any idea why
4  additional analyses were run six days later
5  of the RFA?
6        A    No.
7        Q    And do you recall discussions
8  on June 22, 2010, about the need for the
9  analysis to be run through May 2042?
10       A    I have no such recollection.
11       Q    And in this analysis the two
12 spreads to LIBOR that were being considered
13 are 3.874 and the minus 20 basis points,
14 correct?
15       A    Correct.
16            (Exhibit No. Shapiro 53,
17       Version 11 Screen Shot from Principia
18       Software, Bates Nos. SFG 2418 to 2420,
19       is marked by the reporter for
20       identification.)
21       Q    I am handing you a document
22 that has been marked as Shapiro Exhibit 53,
23 which is version 11 of the screen shots.
24 It's Bates stamped 2418 through 2420.
25 According to the cover sheet, this analysis

47  (Pages 440 to 443)

Page 444

Peter Shapiro

1   was run on June 23, 2010.
2   Do you see that?
3   A   Yes.
4   Q   Do you have any ideas why this
5   analysis was run a day after the analysis
6   done in version ten?
7   A   No.
8   Q   And the analysis here also
9   contains the two spreadsheets to LIBOR seen
10  in version ten, the 3.874 and the 20 basis
11  points, correct?
12  A   I see that.
13  Q   And both of those are negative
14  spreads to LIBOR, correct?
15  MR. LAWRENCE:  Objection to the
16  form.
17  A   Both of them say -- have a
18  minus sign in front of them.
19  Q   And you did not do this
20  analysis either?
21  A   What did I say earlier?
22  Q   You haven't done any of these
23  analyses, but I just want to make sure
24  because they have your name on them.

Page 445

Peter Shapiro

1   A   Okay.  What did I say about
2   that issue, though?
3   Q   I'd prefer you testify that
4   none of these --
5   A   I have never logged onto this
6   system for doing analyses.  I'll just make
7   sure that's clear, not just for this, but
8   for any other analysis.
9   (Exhibit No. Shapiro 54,
10  Version 12 Screen Shot from Principia
11  Software, Bates Nos. SFG 2421 to 2422,
12  is marked by the reporter for
13  identification.)
14  Q   The court reporter has handed
15  you a document that has been marked as
16  Shapiro Exhibit 54, which is version 12 of
17  the screen shots, Bates numbered SFG 2421
18  through 2423.  It appears that this
19  analysis was done on June 23, 2010.
20  Do you see that?
21  A   Yes.
22  Q   Which is the same day as the
23  analysis done on version 11?
24  A   Three hours later.

Page 446

Peter Shapiro

1   Q   And it also contains the same
2   spreads to LIBOR, the minus 3.874 and the
3   minus 20 basis points, correct?
4   A   Correct.
5   Q   And you don't know why this
6   analysis was done?
7   A   No, all I can speculate at this
8   point is that perhaps it was to kill trees
9   on all of these printouts that have been
10  done.
11  That was an attempt at humor
12  just for the record.
13  (Exhibit No. Shapiro 55,
14  Version 13 Screen Shot from Principia
15  Software, Bates Nos. SFG 2424 to 2426,
16  is marked by the reporter for
17  identification.)
18  Q   The court reporter has handed
19  you a document that has been marked as
20  Shapiro Exhibit 55, which is Bates stamped
21  SFG 2424 through 2426, version 13 of the
22  screen shots.  It appears to have been done
23  on July 14, 2010.
24  Do you see that?

Page 447

Peter Shapiro

1   A   Yes.
2   Q   Do you have any idea why the
3   analysis was run again on July 14, 2010?
4   A   No.
5   Q   And as with version 11 and
6   version 12, the same spreads to LIBOR are
7   used of the minus 3.874 percent and the
8   minus 20 basis points; do you see that?
9   A   I see that.
10  Q   And the maturity date is the
11  same as seen in version 11 and version 12
12  showing May 2042, correct?
13  A   That's what it says.
14  Q   And you don't know why this was
15  done?
16  A   No.
17  MR. LAWRENCE:  Can we take a
18  two-minute break?
19  MS. SAWYER:  Sure.
20  THE VIDEOGRAPHER:  Off of the
21  record.  The time is 2:17 p.m.; we are
22  going off the record.
23  (A break is taken.)
24  THE VIDEOGRAPHER:  The time is

48  (Pages 444 to 447)

Page 448

```
 1            Peter Shapiro
 2      2:22 p.m., October 16, 2014.  This is
 3      tape number three in the videotaped
 4      deposition of Mr. Peter Shapiro.
 5  CONTINUED EXAMINATION
 6  BY MS. SAWYER:
 7      Q    The screen shots that we were
 8  looking at in 2010 where your name is
 9  listed in the "by" line -- do you recall?
10      A    Yes.
11      Q    And who would have been doing
12  that analysis on the Principia software?
13      A    It would have to be -- you
14  know, there are three people who used this
15  system primarily, or would have been using
16  it at that time:  James Vergara, Lilian
17  Chern, and Jim Murphy.
18      Jim Murphy didn't work on this
19  at all, so it would be one of those, one of
20  the first two.
21      Q    And was Mr. Vergara still at
22  Swap Financial in July of 2010?
23      A    I can't remember the date he
24  left.  We -- did we establish that
25  previously?
```

Page 449

```
 1            Peter Shapiro
 2      Q    I am asking you the question if
 3  you know if he was there in July of 2010.
 4      A    I answered I can't remember.
 5      Q    So looking at Shapiro
 6  Exhibit 55, which is dated July 2010, where
 7  it says "Shapiro," that analysis either
 8  would have been done by Ms. Chern or
 9  Mr. Vergara?
10      A    I believe so.
11      (Exhibit No. Shapiro 56,
12      Principia Screen Shot:  Termination
13      Date 2042, Market Value as of 3/25/09,
14      Bates Nos. SFG 2388 to 2389, is marked
15      by the reporter for identification.)
16      Q    I am handing you a document
17  that has been marked as Shapiro Exhibit 56,
18  which is -- if you look at the bottom, it's
19  version 16 of the screen shots.  And its
20  Bates stamps are 2388 and 2389.
21      Do you see that?
22      A    Correct.
23      Q    And according to the InterDat
24  date, this analysis was done on May 7,
25  2012; do you see that?
```

Page 450

```
 1            Peter Shapiro
 2      A    Yes.
 3      Q    And if you look at the "by"
 4  line, it's by Chern; do you see that?
 5      A    Yes.
 6      Q    If Ms. Chern had done the
 7  earlier analyses, do you know why she
 8  wouldn't have logged in as herself?
 9      MR. LAWRENCE:  Objection.
10      Calls for speculation.
11      A    She -- if she -- if she was
12  trying to open something that had already
13  been created under a different log, then
14  she might have logged in as somebody else.
15      Q    But this is version 16 of the
16  same analysis, correct?
17      A    Yes, it looks like it.
18      Q    Okay.  I mean, it says
19  version -- it says "rev 16"; do you see
20  that?
21      A    Yes.
22      Q    Do you have any reason to doubt
23  that's not version 16 of the same analysis?
24      A    I don't know how that -- how it
25  works down there.
```

Page 451

```
 1            Peter Shapiro
 2      Q    Okay.  And here the analysis is
 3  done of a LIBOR spread of a minus
 4  3.874 percent on both pages; do you see
 5  that?
 6      MR. LAWRENCE:  Object to the
 7      form.
 8      A    I see that.
 9      Q    And it's done as of two
10  different maturity dates; do you see that?
11      A    Yes.
12      Q    Why the two maturity dates?
13      A    My guess is, looking at the
14  date.  This was around the time that we
15  found out -- this is right around the time
16  of the mediation.  And I think that was
17  around the time we found out about the
18  change in the dates.
19      But, you know, again, as I
20  testified earlier, I'm not certain when we
21  fount out about it.  But I am remembering
22  it being around the time of the mediation.
23      MR. LAWRENCE:  Just to make
24      sure the record is clear, these are
25      the two that I sent you.  And they
```

49 (Pages 448 to 451)

Page 452

Peter Shapiro

```
 1          Peter Shapiro
 2    were printed by Lilian Chern around
 3    the date that you received them.
 4          MS. SAWYER:  Okay.
 5          MR. LAWRENCE:  Just because
 6    these are not -- these were -- you
 7    know, the stuff on the top here was
 8    put on by Ms. Chern, not by Principia.
 9          MS. SAWYER:  There is a
10    different format of these versus the
11    other screen shots we looked at.
12          MR. LAWRENCE:  Only that
13    there's a narrative on the top line.
14    That's -- I just want to make that
15    clear.
16          MS. SAWYER:  Okay.
17     Q    And you believe that in
18    May 2012 was around the time that Swap
19    Financial learned that the maturity date of
20    the RFA was 2032?
21     A    We have gone over this before.
22    I am trying to remember.  You know, we
23    look -- I, you know -- sitting -- sitting
24    here for me to try to recall from my memory
25    as I sit here doesn't really help.
```

Page 453

Peter Shapiro

```
 1          Peter Shapiro
 2          Obviously, we found out
 3    factually on a certain date when the
 4    maturity changed.  I know we knew it before
 5    the mediation because it was an issue going
 6    into the mediation, you know, that we had
 7    found out about.
 8     Q    And since version 16 that
 9    was --
10     A    You had said earlier, Lauri --
11    what was the date of the mediation?
12     Q    This isn't -- this isn't a
13    situation where we ask questions -- you ask
14    questions of me.  I ask questions of you.
15     A    Could I ask him to read back
16    the record to find what you said the date
17    of the mediation was.
18     Q    I think you have answered my
19    question.  I will ask my next question.
20     A    Okay.
21          MR. LAWRENCE:  You have given
22    him that information before, but
23    whatever.
24          MS. SAWYER:  I mean, my
25    question was why two maturity dates.
```

Page 454

Peter Shapiro

```
 1          Peter Shapiro
 2    So if him needing to know the date of
 3    the mediation is critical for him to
 4    explain why there are two maturity
 5    dates, we can go back and look and
 6    spend the time to do that; or we could
 7    move on to my next question.
 8          MR. LAWRENCE:  Well, I think,
 9    as I said, 56 was printed out at my
10    request in whatever -- 2013, or
11    whenever I sent it to you, 2014.  So
12    that's why these two particular ones
13    were created and printed.
14     Q    Are you aware of any subsequent
15    versions to the version of the analysis
16    done, reflected in Shapiro Exhibit 16,
17    which was done on or around May 7, 2012?
18          MR. LAWRENCE:  Shapiro 16.
19     A    16?
20     Q    56, sorry.
21     A    Am I aware -- could you read
22    that back, please.
23     Q    I will just restate it.
24          Okay.  Are you aware of any
25    subsequent valuations using the Principia
```

Page 455

Peter Shapiro

```
 1          Peter Shapiro
 2    software by Swap Financial after May 7,
 3    2012, as reflected in Shapiro Exhibit 56?
 4     A    No.
 5     Q    So since that time no one has
 6    logged onto the software to conduct a
 7    subsequent analysis?
 8     A    I can't say that.  You asked me
 9    if I was aware of it.  I am not aware of
10    it.
11     Q    You are not aware of any?
12     A    No, I don't track this -- you
13    know, the software as I mentioned before.
14     Q    So there has been no analysis
15    done of the new spread to LIBOR implied by
16    your rebuttal report?
17     A    Not that -- I am not certain.
18    I don't know.
19     Q    Who would know?
20     A    Lilian might know.
21     Q    But you are not aware of a
22    valuation being done in connection with
23    your rebuttal report?
24     A    I have to look back at the
25    rebuttal report and read it over because
```

50  (Pages 452 to 455)

Page 456

Peter Shapiro

1 the rebuttal report indicated something had
2 been done. You know, it would indicate a
3 new value. If it shows a new value, it
4 would imply that a new valuation had been
5 done.
6     Q   I am handing you a document
7 that has been premarked Lehman Exhibit 12,
8 which is a -- for the record, is a
9 declaration from you, Peter Shapiro, dated
10 January 14, 2009. And, specifically, I
11 wanted to turn to paragraph seven of your
12 declaration where you provide a valuation
13 of the RFA as of January 12, 2009.
14     Do you see that?
15     A   Yes, I see that.
16     (Previously Marked Exhibit No.
17     Lehman 12, Declaration of Peter
18     Shapiro, Bates Nos. LBHI WTSA 16384 to
19     16389 is introduced into the
20     proceedings.)
21     Q   And if you look at Shapiro
22 Exhibit 43, which is version one of the
23 screen shots --
24     A   I have got it.

Page 457

Peter Shapiro

1     Q   That was done, we established,
2 on or around March 30, 2009; do you see
3 that?
4     A   It says "entered" on that date.
5     Q   Was the valuation found in
6 Shapiro -- or I'm sorry -- in Lehman
7 Exhibit 12, was that calculated with the
8 use of the Principia software?
9     A   I don't know.
10     Q   You don't know how it was
11 calculated?
12     A   No.
13     Q   You weren't aware of any screen
14 shots that might reflect the spread to
15 LIBOR implied in that valuation?
16     A   No.
17     (Exhibit No. Shapiro 57, E-Mail
18     chain, top E-mail dated 4/30/12 from
19     Peter Shapiro to Carol Johnson and
20     Lilian Chern; Subject: TSA -- Lehman
21     Call Today, Bates Nos. SFG 2322 to
22     2324, is marked by the reporter for
23     identification.)
24     Q   The court reporter has handed

Page 458

Peter Shapiro

1 you a document that has been marked as
2 Shapiro Exhibit 57, which is Bates stamped
3 SFG 2322 through 2324, which is an E-Mail
4 chain. And the first E-Mail is dated
5 April 30, 2012.
6     Let me know when you have had a
7 chance to review it.
8     A   Okay.
9     MR. LAWRENCE: I don't think
10 this was a document that was recently
11 produced.
12     MS. SAWYER: Really? I feel
13 quite certain that this one was
14 recently produced.
15     MR. LAWRENCE: I am going -- I
16 am going off the index that was
17 provided to you.
18     MS. SAWYER: I mean -- I mean,
19 if you want -- I probably have a
20 couple of questions on it. If you
21 want tell me not to, we can --
22     MR. LAWRENCE: No, I mean, if
23 you just have a couple of questions,
24 it's fine. I am looking at the index.

Page 459

Peter Shapiro

1 I don't see it on it. So --
2     MS. SAWYER: I tried to -- I
3 tried to focus only on the documents
4 that we had gotten. So --
5     A   I have read through it.
6     Q   If you look at the third E-Mail
7 down from Lilian Chern to Carol Johnson and
8 Peter Shapiro that starts, "Carol, I have
9 incorporated our analysis"; do you see
10 that?
11     A   Yes.
12     Q   "Carol, I have incorporated our
13 analysis on the LIBOR spread components
14 into Bob's spreadsheet so we can see some
15 actual numbers under different scenarios
16 and tweak any assumptions if we need to."
17     Do you see that?
18     A   Yes.
19     Q   Do you know what "Bob's
20 spreadsheet" is?
21     A   No.
22     Q   Do you know what analysis Swap
23 Financial was doing on LIBOR spread
24 components?

51 (Pages 456 to 459)

Page 460

Peter Shapiro

1
2     MR. LAWRENCE:  I am going to
3  instruct him not to answer because
4  this relates to analysis that was done
5  for purposes of mediation.  These
6  particular documents -- it doesn't
7  reveal the substance, but your
8  question goes into the substance of
9  what was done for purposes of the
10  mediation.
11     (There was an instruction not
12  to answer.)
13     MS. SAWYER:  Either one of you
14  answer this.
15     But just to be clear, so there
16  was a LIBOR spread component analysis
17  done for purposes of the mediation, or
18  is that a question that --
19     MR. LAWRENCE:  I don't -- I
20  don't know.  But if it was done, which
21  Lilian -- I don't have any reason to
22  doubt Lilian's veracity.
23     MS. SAWYER:  Okay.  So we are
24  cutting off further questions or --
25     MR. LAWRENCE:  I mean, I guess,

Page 461

Peter Shapiro

1
2  if you want to ask him, "Do you know
3  whether or not a LIBOR spread
4  component was done," you can ask that.
5  What I don't want to get into is any
6  substantive questions about what was
7  in either Bob's spreadsheet or the
8  LIBOR components that were done for
9  purposes of the mediation.
10     So if you can ask a question
11  that draws -- whatever, walks that
12  line, that's fine.
13     Q    Are you aware that Mr. Cook
14  prepared a spreadsheet where he purported
15  to calculate TSA's actual losses?
16     A    By "actual losses," can I ask
17  you what you mean?
18     Q    Well, that's what Mr. Cook
19  calls the spreadsheet.  So are you familiar
20  with the spreadsheet where Mr. Cook
21  purports to calculate actual losses as he
22  defines them?
23     A    I'm aware of a spreadsheet
24  where Mr. Cook calculated the actual losses
25  you through a certain date.  Yes.

Page 462

Peter Shapiro

1
2     Q    And do you know if that
3  spreadsheet that Mr. Cook prepared
4  projected any future losses past that
5  specific date?
6     A    I don't believe so.
7     Q    And has Swap Financial done any
8  analysis of that spreadsheet relating to
9  its LIBOR spread?
10     A    Relating to whose LIBOR spread?
11     Q    Relating to the LIBOR spread of
12  those assumptions that Mr. Cook has.
13     A    His weren't assumptions.  They
14  were actual losses.
15     Q    Do you know what this phrase
16  means that -- "our analysis on the LIBOR
17  spread components into Bob's
18  spreadsheet" -- do you have any
19  understanding of how the LIBOR spread
20  components would interact with Mr. Cook's
21  spreadsheet?
22     A    In terms of the reference to
23  "Bob's spreadsheet" here?  You asked me a
24  different question.  Maybe -- there may
25  have been -- this may not have been the

Page 463

Peter Shapiro

1
2  same spreadsheet I was aware of that was
3  calculating actual cash losses to date.
4     That would not have required
5  any LIBOR spread analysis.  That was based
6  on hard numbers.
7     Q    And do you -- are you -- do you
8  recall any analysis done by Swap Financial
9  relating to the spreadsheet that you are
10  describing Mr. Cook calculated of actual
11  losses?
12     A    Any analysis we would have done
13  on it, I don't believe so.  This was --
14  that was his analysis looking at the actual
15  cash losses.
16     Q    And so you don't know what this
17  is referring to in terms of Lilian's report
18  about "incorporating our analysis" into the
19  spreadsheet?
20     A    Into Bob's spreadsheet, no.
21     Q    Okay.
22     MS. SAWYER:  If we just take a
23  break, because I want to look at the
24  documents you sent me, but then I am
25  close to done.

52  (Pages 460 to 463)

Page 464

Peter Shapiro

1        Peter Shapiro
2        MR. LAWRENCE:  Sure.
3        THE VIDEOGRAPHER:  The time is
4    2:38 p.m.; we are going off the
5    record.
6        (There was a discussion off the
7    record.)
8        (A break is taken.)
9        THE VIDEOGRAPHER:  The time is
10   2:50 p.m.; we are back on the record.
11       (Exhibit No. Shapiro 58, E-Mail
12   chain, top E-Mail dated 7/14/10 from
13   Peter Shapiro to Kim Herman; Subject:
14   Washington TSA, Four-Page Document, No
15   Bates numbers, is marked by the
16   reporter for identification.)
17       Q    I am handing you a document
18   that has been marked as Shapiro Exhibit 58,
19   which I just realized does not have a Bates
20   number on it.  But was just produced by
21   counsel to us.
22       MR. LAWRENCE:  Yes.
23       MS. SAWYER:  We can get the
24   Bates number and --
25       Q    It is an E-Mail chain.  The top

Page 465

Peter Shapiro

1        Peter Shapiro
2    E-Mail is dated July 14, 2010.  It's a
3    multi-page document.  I will give you a
4    chance to look through this.
5        Do you recall this E-Mail
6    exchange?
7        A    I do.
8        Q    What do you -- do you recall
9    having discussions in addition to this
10   E-Mail exchange?
11       A    I don't.
12       Q    And this E-Mail exchange seems
13   to arise in connection with a call that
14   Swap Financial and TSA had with Lehman in
15   July of 2010; is that fair?
16       A    Part of it does deal with that.
17   Yes.
18       Q    And do you recall that call
19   that took place in July of 2010?
20       A    I don't recall the specific
21   call.
22       Q    Okay.  Do you recall during
23   that discussion with Lehman in July of 2010
24   Lehman raising the notion that TSA may owe
25   it a termination amount?

Page 466

Peter Shapiro

1        Peter Shapiro
2        A    Only from reading this.
3    Obviously, I reflected that part of the
4    conversation, and Kim reflected it very
5    strongly.
6        Q    And Kim was outraged that the
7    notion that he might have to pay Lehman
8    something, correct?
9        MR. LAWRENCE:  Objection to the
10   form.
11       A    I am just reading here the
12   wording that he uses at the bottom of his
13   July 14, 5:47 p.m. E-Mail.  When he says
14   "It will be a cold day in hell that we pay
15   Lehman anything" does connote some degree
16   of outrage.
17       Q    And do you -- you don't recall
18   how the concept of TSA owing Lehman a
19   termination payment arose -- if it was
20   raised --
21       A    How.
22       Q    I mean, how did that come up in
23   the conversation?
24       A    You know, I can't recall.  It's
25   clear from what's written here that Sandeep

Page 467

Peter Shapiro

1        Peter Shapiro
2    raised it.
3        Q    And you respond to Mr. Herman
4    by saying:
5        "There is less than a zero
6    chance that you will have to pay Lehman
7    anything."
8        Correct?
9        A    Yes.
10       Q    And why do you feel that?
11       A    Why do I feel that or why --
12       Q    Do you feel that's true?
13       A    Yes, given the fact that the
14   Lehman estate has offered something more
15   than zero and we are -- we are claiming
16   something more than what they have offered.
17   I don't think there is any way we get to
18   zero.
19       Q    And so your statement made in
20   the top of the E-Mail on Shapiro Exhibit 58
21   is based upon the settlement proposal made
22   by Lehman?
23       A    On the telephone call?
24       Q    Yes.
25       A    I don't think so.

53  (Pages 464 to 467)

Page 468

Peter Shapiro

1
2      Q    So what is the basis of your
3  conclusion that it's less than zero chance
4  that TSA will have to pay Lehman anything?
5      A    That the contention -- that
6  Lehman would have to -- that Washington
7  would have to pay Lehman was so absurd
8  that -- as to be almost laughable.
9      Q    What is the basis of your
10 contention that it's "absurd"?
11      A    If you guys are saying your
12 offer is 4 million, then, obviously, a
13 contention that Washington should pay you
14 is absurd.
15      Q    And so your recollection of the
16 call was that there was an offer to pay --
17 that -- that Lehman would pay Washington
18 $4 million?
19      A    No, my knowledge now because
20 you were asking as of now.
21      Q    In July of 2010 --
22      A    Yes.
23      Q    -- there was a phone call with
24 Lehman where apparently the notion was
25 raised that Washington TSA might have to

Page 469

Peter Shapiro

1
2  pay Lehman something; is that correct?
3      A    No, there was a -- not that
4  they might have to pay.  No.  There was --
5      Q    What --
6      A    There was an argument being
7  made by a Lehman representative that he
8  felt that fair value would be such that
9  Washington TSA would have to pay.
10      Q    And that was raised in this
11 July 2010 call?
12      A    According to this E-Mail chain.
13      Q    Okay.  And also on that
14 July 2010 call, was there an offer of
15 settlement made by Lehman to settle the
16 matter for $4 million payable to
17 Washington?
18      A    I don't see that.
19      Q    So what's the basis of your
20 conclusion in July 2010 that there is a
21 zero chance that TSA would have to pay
22 Lehman anything?
23      A    It was such an absurd notion
24 that the payment would go in that
25 direction, in the direction from Washington

Page 470

Peter Shapiro

1
2  to Lehman -- I'd say there is no chance
3  that that would ever prevail.
4      Q    And what's the basis of your
5  contention that it's an absurd -- absurd
6  notion?
7      A    Based upon everything we know
8  about value.
9      Q    Based upon your expertise?
10      A    Based upon expertise, knowledge
11 of the markets, experience, understanding
12 of that and the like.  And, you know, if
13 you look, you will see what I say here:
14      "This is really just part of
15 the negotiations."
16      That is, we read this as a
17 strategy by Lehman to try to scare the
18 client.
19      Q    And in the second paragraph of
20 your E-Mail at the first page of Shapiro
21 Exhibit 58, you say in parentheses:
22      "... and are, in fact, serving
23 as expert witnesses on similar issue on a
24 Federal court case unrelated to Lehman."
25      A    Correct.

Page 471

Peter Shapiro

1
2      Q    What court case were you an
3  expert witness in connection with the
4  arguments relating to the forward curve?
5      A    I was not the expert witness
6  there.  When I say "we," I am referring to
7  the firm.
8      Q    And who was the witness?
9      A    Nat Singer.
10      Q    And what case was that?
11      A    I am trying to remember the
12 name of it.
13      Q    Did Mr. Singer testify in
14 court?
15      A    I can't remember how far along
16 it got, you know, whether it settled.  I am
17 not remembering the details.
18      MS. SAWYER:  Okay.  I would
19 make a request for information
20 regarding Mr. Singer's testimony, if
21 there is any, related to the forward
22 curve in that case.
23      (Request for information
24 regarding Mr. Singer's testimony
25 related to the forward curve in other

54  (Pages 468 to 471)

Page 472

Peter Shapiro

1
2  case.)
3          MR. LAWRENCE:  Can you follow
4  up with an E-Mail?
5          MS. SAWYER:  Yes, absolutely.
6      Q    Then in the next paragraph you
7  say:
8          "We made a small amount of
9  progress in what I call quote etting the
10  table" -- "etting," I think it's a typo,
11  but e-t-t-i-n-g -- "for more serious
12  discussions."
13          What did you mean by that?
14      A    Yeah, I -- you know, it looks
15  like there was something wrong in the
16  printing of this because there are multiple
17  places where first letters are dropped.
18  You know, so that is obviously "setting the
19  table."
20          What did I mean by we made
21  progress in "setting the table"?
22      Q    Yes.
23      A    That we, you know, got the
24  discussion going in terms of what the
25  spread should be.  As you'll see in the

Page 473

Peter Shapiro

1
2  prior paragraph, I said:
3          "I asked the same question with
4  different wordings about ten times before I
5  got a direct answer."
6          That implies that I did after
7  asking enough times get a direct answer, so
8  we made some progress.
9      Q    And you finally did get a sense
10  of what the spread to LIBOR that Lehman
11  believed would be merited -- was "merited"?
12      A    It says here:
13          "He said what spread to LIBOR
14  he believed would be merited."
15      Q    And when -- the "he" is
16  referring to one of the Lehman
17  representatives on the call?
18      A    It looks like it's referring to
19  Sandeep because he's the only person that
20  is referred to in that paragraph by name.
21      Q    And if you look at Shapiro
22  Exhibit 55, which is the version 13 of the
23  screen shots.
24      A    Yes.
25          MR. LAWRENCE:  55, you said.

Page 474

Peter Shapiro

1
2          MS. SAWYER:  Um-hum.
3      A    I have got it in front of me.
4      Q    And this has a -- it says it
5  was entered at, what, July 14, 2010; do you
6  see that?
7      A    Yes.
8      Q    And it has the analysis being
9  done of a spread to LIBOR -- two spreads to
10  LIBOR, a minus 3.874 and a minus 20 basis
11  points; do you see that?
12      A    Yes.
13      Q    And looking at Shapiro
14  Exhibit 56 -- 58, the E-Mail we were just
15  looking at, does that help you understand
16  why those two spreads to LIBOR were being
17  analyzed on July 14, 2010?
18      A    If we looked back at the
19  numerous exhibits you gave me on the
20  Principia screen shots, is that the first
21  time that the minus 20 emerges?
22      Q    It is not.
23      A    It's not.  So a minus 20 was
24  used earlier?
25      Q    Yes.

Page 475

Peter Shapiro

1
2      A    Okay.  So then it's probably
3  not a good conclusion to assume that --
4  that that minus 20 emerged in that call.
5      Q    And do you have any
6  recollection as to the spread to LIBOR that
7  Lehman communicated in that call in July of
8  2010?
9      A    No.
10      Q    And if you don't reach the
11  conclusion that the minus 20 reflected in
12  Shapiro Exhibit 56 -- 55 came from Lehman,
13  do you have any idea where that valuation
14  came from?
15      A    Which valuation?
16      Q    That spread to LIBOR came from?
17      A    The minus 20 that shows up in
18  55?
19      Q    Yes.
20      A    You know what, we would have to
21  -- I don't know.  You have asked me that
22  before, where it came from, and I don't
23  know.  You know, I think you just said
24  earlier you believed the minus 20 showed up
25  earlier, which I am looking.

55 (Pages 472 to 475)

Page 476

Peter Shapiro

1    It shows up in 54.  And it
2  probably shows up numerous other times if
3  we retrace the discussion we have already
4  had to today.  It shows up in 53, which
5  was, you know, again June 23rd --
6  June 22nd, which is Exhibit 52.
7       It looks like probably shows up
8  there, too.  These pages, it shows up
9  there, too.  So, obviously, it emerged
10  prior to this call.
11     Q    Did Swap Financial do any
12  analysis as to the valuation for the spread
13  to LIBOR disclosed by Lehman on this
14  July 14, 2010, call?
15     A    Did we do an analysis based
16  on -- and the spread, which I am saying I
17  don't know -- on this call?  I can't tell
18  you that.
19     Q    So Lehman --
20     A    I don't even know what the
21  spread was.  I can't tell from this.
22     Q    But Lehman gave you a spread to
23  LIBOR number.  But you don't recall whether
24  or not Swap Financial tried to analyze that

Page 477

Peter Shapiro

1  to determine the value that correlated with
2  that?
3     A    So all I can tell you for sure
4  is we finally got a little bit of one, and
5  when he said what spread to LIBOR he
6  believed would be merited.
7     Q    My question is --
8     A    I don't know what that number
9  was, and I don't know if we took his number
10  and ran some analysis based on it.  It's
11  clear from everything I say in this memo to
12  Bob that we didn't think that was the final
13  number we would be looking at.
14     Q    Do you recall whether or not
15  Swap Financial did any analysis of the
16  spread to LIBOR number provided by Lehman
17  in the July 2010 call?
18     A    No.
19        MS. SAWYER:  I don't have any
20     further questions.
21        MR. LAWRENCE:  I have one.
22        (There was a discussion off the
23     record.)
24  CROSS EXAMINATION

Page 478

Peter Shapiro

1  BY MR. LAWRENCE:
2     Q    If you could look at Shapiro
3  41, your notes, it's your note, not
4  Principia.
5     A    Back before all of this pretty
6  color printing.
7        MS. SAWYER:  I will just
8     reiterate your objection to this use
9     of the exhibit.
10        MR. LAWRENCE:  Well, you
11     already used.  It's too late.
12     Q    It's a simple question when you
13  get there.
14     A    Yes, I am working my way back
15  there.  42.
16     Q    There it is.
17     A    Bingo.
18     Q    If you look at the page stamped
19  2315, a notation about a July 14, 2010,
20  call with LB; do you see that?
21     A    Yes.
22     Q    That's a call you've been --
23  were asked about with respect to Lehman 58?
24     A    Lehman 58 is the one we just

Page 479

Peter Shapiro

1  finished discussing it?
2     Q    Yes.
3     A    It looks like that, yes.  You
4  know, it has to be the same call.  There
5  can't have been two large calls involving
6  Washington Tobacco, the Lehman cast of
7  characters.
8        So that's -- that's obviously
9     notes on that call, so it may be worth it
10     just to read that over.
11     Q    Well, I just wanted to confirm
12  that.  If you want to follow up on that,
13  that's fine.  Otherwise, you don't have to
14  bother to read it.
15  REDIRECT EXAMINATION
16  BY MS. SAWYER:
17     Q    Does it refresh your
18  recollection that the spread to LIBOR
19  disclosed by Lehman was either 48 basis
20  points positive or 130 basis points
21  positive?
22     A    That's what it looks like.
23     Q    And did Swap Financial ever
24  analyze the corresponding termination

56  (Pages 476 to 479)

Page 480

1          Peter Shapiro
2   amounts that would be resulting from
3   assuming a spread to LIBOR of positive 48
4   basis points?
5        A    I -- my guess is we didn't,
6   that we found it was so absurd.  And you
7   are not seeing -- there's no -- nothing
8   that has been in any of the production with
9   spreads that were like that, positive
10  spreads to forty -- you know, plus 48 or
11  plus 130.
12       Q    So you don't think Swap
13  Financial ever determined termination
14  amounts that corresponded to those spreads
15  to LIBOR?
16       A    I don't think so.
17            MS. SAWYER:  I don't have any
18  further questions.
19            THE VIDEOGRAPHER:  Anything
20  further, Counsel?
21            MR. LAWRENCE:  That's it.
22            (There was a discussion off the
23  record.)
24            THE VIDEOGRAPHER:  The time is
25  3:07 p.m., October 16, 2014.  This

Page 481

1          Peter Shapiro
2   completes the videotaped deposition of
3   Mr. Peter Shapiro.
4            (Deposition adjourned, 4:29.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 482

1
2              J U R A T
3
4        I DO HEREBY CERTIFY that I have
5   read the foregoing transcript of my
6   deposition testimony.
7
8
9
10
11  SWORN TO AND SUBSCRIBED
12  BEFORE ME THIS
13  DAY OF 2014
14  _ _ _ _ _ _ _ _ _ _ _
15
16
17
18
19
20
21
22
23
24
25

Page 483

1
2            I N D E X
3
4
5   WITNESS          DIRECT        CROSS
6
7
8   PETER SHAPIRO
9
10
11    BY MS. SAWYER     259, 479
12
13
14
15    BY MR. LAWRENCE            478
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 484

```
 1
 2
 3           DOCUMENTS REQUESTED
 4   Documents, MS Quote Sheets,    397
     requested
 5
     Request for information regarding 471
 6   Mr. Singer's testimony related to
     the forward curve in other case
 7
 8
 9
10        E X H I B I T S
11   NUMBER   DESCRIPTION      PAGE
12
13   Exhibit No. Shapiro 32, E-Mail   260
     chain, top E-Mail dated 1/9/09
14   from Bob Cook to Peter Shapiro,
     Subject:  TSA, Bates Nos. TSA
15   42725 to 42727
16   Exhibit No. Shapiro 33,      277
     Memorandum dated 12/22/09 from
17   Peter Shapiro to Tobacco
     Settlement Authority, Bob Cook,
18   Subject:  Reserve Fund Agreement
     Advisory Services, Scope of
19   Services, Bates Nos. TSA 42818 to
     42819
20
     Exhibit No. Shapiro 34, E-Mail   295
21   chain, top E-Mail dated 2/23/09
     from Bob Cook to Peter Shapiro,
22   cc to James Vergara and Debra
     Stephenson, Subject:  Lehman,
23   Bates Nos. TSA 42624 to 42626
24
25
```

Page 485

```
 1
 2
 3   Exhibit No. Shapiro 35, E-Mail   296
     chain, top E-Mail dated 3/4/09
 4   from Bob Cook to Peter Shapiro,
     Subject:  Lehman, Washington
 5   State TSA, Bates Nos. TSA 42713
     to 42715
 6
     Exhibit No. Shapiro 36,      301
 7   Memorandum dated 3/30/09 to Bob
     Cook from Peter Shapiro, Subject:
 8   Valuation of TSA's RFA with
     Lehman, Bates Nos. SFG 2349 to
 9   2350
10   Exhibit No. Shapiro 37, E-Mail   316
     chain, top E-Mail dated 4/20/09
11   from Peter Shapiro to James
     Vergara, Subject:  TSA memo,
12   Bates Nos. SFG 2370 backwards to
     2369, including 2371 and 2368
13
     Exhibit No. Shapiro 38, E-Mail   324
14   with attachment, E-Mail dated
     4/21/09 from James Vergara to
15   Peter Shapiro, Subject:  TSA Loss
     Calc, Bates Nos. SFG 2381 to 2384
16
     Previously Marked Exhibit No.   338
17   Lehman 15, 4/21/09 Memorandum
     from Peter Shapiro, James Vergara
18   to Bob Cook, Concerning:
     Calculation of Loss, Bates Nos.
19   TSA 21616 to 21618
20   Exhibit No. Shapiro 39, Claim   343
     Amount Document, Bates No. SFG
21   2348
22   Exhibit No. Shapiro 40, E-Mail   356
     chain, top E-Mail dated 8/23/10
23   from Nathaniel Singer to Peter
     Shapiro and Lilian Chern,
24   Subject:  Tobacco, Bates No. SFG
     2352
25
```

Page 486

```
 1
 2
 3   Exhibit No. Shapiro 41, Word   364
     Document, Notes taken by Mr.
 4   Shapiro, Bates Nos. SFG 2314 to
     2318
 5
     Exhibit No. Shapiro 42, E-Mail   397
 6   dated 5/24/11 from Carol Johnson
     to Kim Herman, Bob Cook, Subject:
 7   TSA -- Lehman Brothers, TSA
     Reserve Agreement Investments and
 8   Status Review with Peter Shapiro,
     Bates No. TSA 42744
 9
     Previously Marked Exhibit No.   400
10   Shapiro 6, 11/16/11 Memorandum
     from Peter Shapiro to Bob Cook
11   and Carol Johnson, Bates Nos. TSA
     38481 to 38484
12
     Exhibit No. Shapiro 43, Version 1 405
13   Screen Shot from Principia
     Software, Bates Nos. SFG 2394 to
14   2395
15   Exhibit No. Shapiro 44, Version 2 421
     Screen Shot from Principia
16   Software, Bates No. SFG 2396 to
     2397
17
     Exhibit No. Shapiro 45, Version 3 423
18   Screen Shot from Principia
     Software, Bates No. SFG 2398 to
19   2399
20   Exhibit No. Shapiro 46, Version 4 428
     Screen Shot from Principia
21   Software, Bates No. SFG 2400 to
     2401
22
     Exhibit No. Shapiro 47, Version 5 428
23   Screen Shot from Principia
     Software, Bates No. SFG 2402 to
24   2403
25
```

Page 487

```
 1
 2
 3   Exhibit No. Shapiro 48, Version 6  429
     Screen Shot from Principia
 4   Software, Bates Nos. SFG 2404 to
     2405
 5
     Exhibit No. Shapiro 49, Version 7  430
 6   Screen Shot from Principia
     Software, Bates Nos. SFG 2406 to
 7   2408
     Exhibit No. Shapiro 50, Version 8  438
 8   Screen Shot from Principia
     Software, Bates Nos. SFG 2409 to
 9   2411
10
     Exhibit No. Shapiro 51, Version 9  440
11   Screen Shot from Principia
     Software, Bates Nos. SFG 2412 to
12   2414
13   Exhibit No. Shapiro 52, Version   442
     10 Screen Shot from Principia
14   Software, Bates Nos. SFG 2415 to
     2417
15
     Exhibit No. Shapiro 53, Version   443
16   11 Screen Shot from Principia
     Software, Bates Nos. SFG 2418 to
17   2420
18   Exhibit No. Shapiro 54, Version   445
     12 Screen Shot from Principia
19   Software, Bates Nos. SFG 2421 to
     2422
20
     Exhibit No. Shapiro 55, Version   446
21   13 Screen Shot from Principia
     Software, Bates Nos. SFG 2424 to
22   2426
23
24
25
```

58 (Pages 484 to 487)

Page 488

```
1
2
3      Exhibit No. Shapiro 56, Principia  449
       Screen Shot:  Termination Date
4      2042, Market Value as of 3/25/09,
       Bates Nos. SFG 2388 to 2389
5
       Previously Marked Exhibit No.      456
6      Lehman 12, Declaration of Peter
       Shapiro, Bates Nos. LBHI WTSA
7      16384 to 16389
8      Exhibit No. Shapiro 57, E-Mail     457
       chain, top E-Mail dated 4/30/12
9      from Peter Shapiro to Carol
       Johnson and Lilian Chern;
10     Subject:  TSA -- Lehman Call
       Today, Bates Nos. SFG 2322 to
11     2324
12     There was an instruction not to    460
       answer.
13
       Exhibit No. Shapiro 58, E-Mail     464
14     chain, top E-Mail dated 7/14/10
       from Peter Shapiro to Kim Herman;
15     Subject:  Washington TSA,
       Four-Page Document, No Bates
16     numbers
17
18
19
20
21
22
23
24
25
```

Page 489

```
1
2                  CERTIFICATE
3
4          I, TAB PREWETT, A Registered
       Professional Reporter, Notary Public,
5      Certified LiveNote Reporter, and Certified
       Shorthand Reporter, do hereby certify that
6      prior to the commencement of the
       examination PETER SHAPIRO was sworn by the
7      notary public to testify the truth, the
       whole truth and nothing but the truth.
8
           I DO FURTHER CERTIFY that the
9      foregoing is a true and accurate transcript
       of the testimony as taken stenographically
10     by and before me at the time, place and on
       the date hereinbefore set forth.
11
           I DO FURTHER CERTIFY that I am
12     neither a relative nor employee nor
       attorney nor counsel of any of the parties
13     to this action, and that I am neither a
       relative nor employee of such attorney or
14     counsel, and that I am not financially
       interested in the action.
15
16
17     _____
18
19     Notary Public
20
       My Commission expires February 9, 2019
21     Dated:  October 19, 2014
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

## A

abcs 275:22
ability 336:17
able 274:10 360:12
  361:11 405:23
aboveentitled
  256:18
absence 400:6
absolutely 320:4
  379:10 472:5
absurd 420:2 468:7
  468:10,14 469:23
  470:5,5 480:6
abundant 289:7
accepted 268:22
  322:8,21 332:20
  332:25
accompanied
  277:15
account 413:24
accrued 327:20
accumulation
  311:24
accuracy 314:23
accurate 269:6
  326:19 371:14
  489:9
accurately 268:6
  314:24
action 489:13,14
active 383:14
actual 270:17
  299:24 336:24
  337:16 459:16
  461:15,16,21,24
  462:14 463:3,10
  463:14
add 322:10 329:17
  378:4
added 321:17,22
  322:4,19 328:24
  329:2 333:12,17
  333:19 375:18,19
  425:7,9
adding 334:8
addition 465:9
additional 311:3,8

313:6 326:24
  443:4
adds 375:7
adequate 294:16
adjourned 481:4
adjust 336:4
adjusted 336:8,10
adjustment 336:18
  336:19,20
administered 256:4
administrative
  311:21
advantage 399:2,6
  403:8
advised 280:12
advisor 282:24
  283:20
advisors 284:11
advisory 277:21
  283:9 484:18
affect 436:17 437:9
affirmatively 427:2
afternoon 398:12
  398:20
agencies 369:21
  382:5 386:8 388:5
  388:7 389:23
  403:22
agency 368:17
  369:8,15,22
  380:24 381:11
  382:7,19 386:9
  395:3
ago 296:10 298:15
  406:7
agree 307:11 308:8
  308:15 309:4,21
  310:23 354:19
agreed 306:14
  310:24
agreement 262:6
  262:11 263:6,18
  263:22 264:16
  265:12,16,22
  266:7,17,22
  267:10 270:11,25
  271:19 272:5,10

275:17 276:23
  277:6,10,21 281:8
  283:2 284:19,25
  285:14,20 286:11
  286:19,21 287:11
  287:12 288:11
  302:11 303:23
  306:16,23 307:8
  308:6 309:17
  315:8,23 321:10
  326:9,12,21 327:2
  327:11 331:9,16
  332:5 346:25
  347:6,12,15
  355:18 360:11
  362:4,18,19 363:3
  369:9 397:22
  400:8 434:17,21
  435:9 436:7
  484:18 486:7
agreements 264:22
  265:21 322:7
  331:18 332:19,24
  411:17
ahead 376:22
air 313:22
al 256:7 258:7
allowed 392:7
alternative 400:5
  401:10 402:16
alternatives 400:3
  401:18 403:4,9,14
  404:2,10
amateur 386:20
amended 362:19
americas 257:20
amortization
  271:24
amount 271:22,23
  329:12,18 330:3
  343:4 361:4 362:5
  408:23,25 409:4,9
  437:24 465:25
  472:8 485:20
amounts 326:24
  327:20,24 480:2
  480:14

analyses 438:24
  441:24 443:4
  444:24 445:7
  450:7
analysis 264:14
  267:10 292:22
  293:8,18 303:10
  332:13,23 335:6
  336:7 341:14
  357:6 361:20
  363:7,8,13 421:19
  422:16 423:4,25
  424:8 428:16
  429:8,12,22,25
  430:12 431:6
  432:15 433:9
  434:6,7,13,21
  435:3 437:21
  439:4,12 440:7,14
  440:22 441:10,14
  442:6,20,24 443:9
  443:11,25 444:6,6
  444:9,21 445:9,20
  445:24 446:7
  447:4 448:12
  449:7,24 450:16
  450:23 451:2
  454:15 455:7,14
  459:10,14,23
  460:4,16 462:8,16
  463:5,8,12,14,18
  474:8 476:13,16
  477:11,16
analyze 306:21,24
  307:2 476:25
  479:25
analyzed 331:24
  474:17
analyzing 303:23
  307:8 331:2,9,17
answer 259:25
  260:2,4,12,19
  261:15 268:17
  305:14 324:3,9,11
  324:12 331:21
  352:11,13 363:4
  434:3 460:3,12,14

473:5,7 488:12
answered 281:20
  283:23 284:3
  338:12 387:5
  391:12 430:14
  449:4 453:18
answering 305:22
answers 260:7
  441:18,21
anybody 285:3
  287:12,16 292:4
  293:5 368:13
apologies 395:12
apparently 468:24
appear 392:12
appears 278:6
  302:2 409:17
  423:25 429:7
  441:11 442:23
  445:19 446:23
appetite 308:4
  376:24
applicable 388:9
  388:11,18 411:7
applied 362:3
  388:15,23
apply 273:18
  394:24
applying 362:25
appreciate 342:14
approach 306:18
  306:20 319:9
appropriate 262:17
  262:21,25 293:2
  306:15 321:10
appropriateness
  439:11
approximately
  258:13 267:11,15
  290:25 348:14
  364:16
april 317:13 325:5
  338:23 339:22,24
  340:11,22 421:19
  421:21 424:3
  425:22 426:4
  428:10,17 429:10

458:6
**architecture**
303:18 306:18
396:18
**area** 352:22
**areas** 365:8
**arent** 265:25
320:11
**argument** 381:18
387:11 469:6
**argumentative**
280:17 281:4,20
283:22 284:2
312:11 314:7
331:20 387:5
432:6
**arguments** 471:4
**arose** 466:19
**arrangement**
268:21
**arrived** 427:6
**aside** 318:17
**asked** 281:20 282:3
283:23 284:3
294:2 301:5 324:2
324:9 387:5
425:24 441:17
455:8 462:23
473:3 475:21
478:24
**asking** 283:15
288:10 292:19
293:4 295:16
296:13 297:22
298:11,21,21
300:25 302:15
305:24 306:5
311:7 343:17
356:24 419:13,14
449:2 468:20
473:7
**aspects** 365:22
369:25
**assert** 437:23
**assess** 308:23
314:20 334:17
359:9 440:8

**assessment** 287:2
310:9,15,18
**assistance** 282:12
**association** 258:19
**assume** 260:13
261:16 279:16
297:18 329:20
340:6 346:7 382:5
438:7 475:3
**assumed** 362:10,24
410:8
**assumes** 433:20
**assuming** 315:22
337:23 347:15
432:6 433:16
434:7,17 480:3
**assumption** 279:17
310:5 315:15
335:21,23 336:2
**assumptions** 263:8
459:17 462:12,13
**attached** 285:12
321:3 325:3 326:6
**attachment** 277:14
305:18 316:12,16
319:7 324:19
485:14
**attempt** 438:8
446:12
**attempted** 286:3
**attention** 270:24
**attorney** 489:12,13
**attorneys** 257:6,11
**august** 356:14
362:11
**authority** 259:6
263:24 277:20
339:18,24 484:17
**available** 274:9
290:13,14 305:17
400:7
**avenue** 257:10,20
258:21
**aware** 274:12
283:12,14 290:2
357:25 360:10
361:16 362:17,21

386:3,7,25 425:20
425:25 426:3,13
454:14,21,24
455:9,9,11,21
457:14 461:13,23
463:2

**B**

**b** 484:10
**back** 272:16 273:4
277:14 282:20
288:3 304:12
310:4 314:8
323:16 324:2,12
327:7 340:2 351:9
351:14 357:5
360:18 361:9,14
363:17 374:13
384:9,17 391:8
403:20 405:6
417:12 422:11
437:4 442:7,10
453:15 454:5,22
455:24 464:10
474:18 478:6,15
**backup** 310:19
315:4 374:12
**backwards** 316:6
316:13 485:12
**bad** 319:15 320:11
322:15
**badgering** 432:24
**ball** 353:23
**bank** 275:10
299:14
**bankruptcy** 256:2
258:8 313:25
320:12,15 358:6
380:10
**barclays** 379:23
380:4,8
**base** 288:21 418:4
**based** 266:18,23
268:25 270:13,23
271:12 273:10,13
273:15,19 284:6
287:3 288:16,17

289:22 310:10,12
313:22 335:16
336:24 337:15
424:2 437:14,20
437:22 442:23
463:5 467:21
470:7,9,10 476:16
477:11
**basic** 303:18
**basically** 381:15
**basing** 268:12,18
268:19
**basis** 267:5,11,15
268:2,5,24,24
269:7,12,17,20,22
270:5,8 271:4,6,8
271:14 272:2,7
273:25 274:19
291:3 299:19
309:24 310:24
312:4,15,22 315:2
315:16 323:9
324:16 347:7,12
347:16 361:3
375:24 380:20,23
380:23 382:4
390:17,20,25
391:5,9,10,14,21
396:7 410:9 412:7
418:14 434:8,18
435:10 437:18
440:20 443:13
444:11 446:4
447:9 468:2,9
469:19 470:4
474:10 479:20,21
480:4
**batch** 392:10
**bates** 261:3,9
277:22 278:4
294:22 295:6
296:19,24 301:20
301:25 316:5,12
316:16 324:21
325:5 334:12
338:18,23 343:4
343:11 356:6,12

364:23 365:4
397:24 398:6
400:12 405:9,16
421:8,13 423:17
423:24 428:6,9,21
429:2,16 430:6,21
431:3 434:6
438:14,20 441:3,9
442:15,22 443:18
443:24 445:12,18
446:16,21 449:14
449:20 456:19
457:22 458:3
464:15,19,24
484:14,19,23
485:5,8,12,15,18
485:20,24 486:4,8
486:11,13,16,18
486:21,23 487:4,6
487:9,11,14,16,19
487:21 488:4,6,10
488:15
**began** 307:8 322:13
**beginning** 328:16
331:6 370:16
**begins** 276:8
**behalf** 259:3
371:13 384:14
390:12
**believe** 268:4
278:18 282:8
284:22 285:2,5,22
288:11 308:4,11
308:19 317:21
318:25 325:16
326:18,23 328:2
333:23 335:14
339:15,19 346:10
347:23 348:5
386:14 391:2,5
394:9,11,12,16,19
396:3 397:3
399:25 404:12
422:10,15 423:3
426:2 427:8,9
432:8,11 439:25
440:6 449:10

452:17 462:6
463:13
**believed** 269:5,8,22
473:11,14 475:24
477:7
**believes** 398:23
**bell** 283:11
**bells** 439:24
**best** 308:6 336:16
416:17,18
**better** 334:2 370:23
398:24
**beyond** 392:6
402:2 403:17
**bidding** 282:25
**big** 275:8 323:12,20
383:9,17 390:18
416:16
**billion** 355:7
**billions** 355:25
**binger** 257:5 259:2
**bingo** 478:18
**bit** 268:11 357:16
404:17 477:5
**black** 278:8 279:7,8
279:18 282:14
**blackedout** 367:11
**blacklined** 294:9
**blank** 348:17
**bloomberg** 291:10
293:5 334:23
**bloombergbased**
291:9
**blue** 408:13
**bob** 261:2,24 264:8
276:7 277:20
295:4,12 296:23
301:17 302:3
305:19 338:16
397:21 398:8
400:11 477:13
484:14,17,21
485:4,7,18 486:6
486:10
**bobs** 459:15,20
461:7 462:17,23
463:20

**bond** 282:24
334:24 337:23
338:5,6,9 358:20
358:21 359:3
**bonds** 308:4 334:22
**bonus** 387:18
**book** 387:12
**bother** 479:15
**bottom** 261:21
264:6 276:9
334:10 359:19
371:16 410:11,14
449:18 466:12
**box** 342:5 408:9,13
413:13
**boxes** 408:12
**brackets** 318:14
**break** 257:24
260:17,20 342:14
342:22 404:19,19
447:19,24 463:23
464:8
**brief** 406:6
**broadly** 322:7,21
332:19,25 363:17
378:23
**brothers** 256:7
257:6,19,22 258:6
263:24 326:9,13
367:16,19,25
370:7 397:22
486:7
**brought** 270:24
**buckeye** 360:24
**bunch** 317:23
361:7
**business** 313:11
**button** 318:9 409:5

---

**C**

**c** 257:2 258:2
**calc** 324:21 485:15
**calculate** 327:10,12
327:13 330:13,24
346:3,9,15 378:13
461:15,21
**calculated** 350:4

359:12 363:24
364:8,15 457:8,12
461:24 463:10
**calculating** 274:6
331:14 332:6
463:3
**calculation** 268:13
273:2 301:14
302:18,24 303:5,7
303:13,16 304:3
326:11,20 330:7
338:17 346:11
348:24 361:3,5
410:16 416:21
419:16 485:18
**calculations** 300:24
416:16
**calculator** 348:22
**calendar** 299:5,19
442:8
**call** 367:12,15,25
368:5,8,15 369:24
371:6 384:9,16,20
396:16,24 399:7,9
399:9 415:15
457:22 465:13,18
465:21 467:23
468:16,23 469:11
469:14 472:9
473:17 475:4,7
476:11,15,18
477:18 478:21,23
479:5,10 488:10
**called** 291:9 398:11
398:19 400:23
**calling** 383:16
**calls** 277:11 281:21
312:6,18 337:6
346:19 349:24
351:3 354:22
370:7 375:15
434:24 450:10
461:19 479:6
**cant** 263:3 269:13
278:14,20 284:12
284:21 288:18
295:25 297:18,21

299:3 305:8,11,15
312:19 318:23,23
329:19 333:6
336:3,15,22
338:13 346:13
348:2,13 353:3
354:20 355:21,21
359:4 360:17,22
361:6,13 363:5
381:16 382:21
385:9 399:8
431:14,23 433:7
433:13 435:11
448:23 449:4
455:8 466:24
471:15 476:18,22
479:6
**cap** 336:25
**capable** 294:13
**capital** 262:6
264:17 265:11
330:14,25
**captured** 423:4
**careful** 260:15
**carefully** 259:20
**carol** 397:20 398:7
400:11 457:20
459:8,9,13 486:6
486:11 488:9
**carry** 272:16
**case** 256:3 258:9
270:22 275:5
290:18 291:7
377:19 388:15,19
470:24 471:2,10
471:22 472:2
484:6
**cash** 303:22 306:22
306:24 307:9,14
321:9 331:2,10,18
331:23 463:3,15
**cast** 479:7
**category** 350:16
**caught** 419:8,25
**cause** 299:22
**caused** 291:21
**cc** 295:4 484:22

**ceiling** 336:12,14
336:21 337:4,10
**cell** 349:4
**certain** 266:5
291:24 352:21
365:8,22 380:3
396:8 451:20
453:3 455:17
458:14 461:25
**certainly** 284:13,15
325:16 365:7
374:5,6 392:17
430:16 434:25
437:20
**certificate** 489:2
**certified** 256:20,21
489:5,5
**certify** 482:4 489:5
489:8,11
**cetera** 375:21
**chain** 260:25 295:3
296:22 316:3
356:4,13 457:19
458:5 464:12,25
469:12 484:13,21
485:3,10,22 488:8
488:14
**challenge** 321:2
**chance** 261:10
278:9 294:25
297:5 316:22
325:8 338:25
356:19 458:8
465:4 467:6 468:3
469:21 470:2
**change** 270:23
271:12,23 318:11
326:16 333:4,8
337:18 341:23
342:4,9 412:16,17
427:21 431:20
432:9 451:18
**changed** 271:20
318:10 326:8
431:12,14,22
432:2 433:3 453:4
**changes** 317:24

318:9 339:10 340:18
**chapter** 256:3
**characterize** 431:21,23
**characters** 479:8
**charge** 308:24 334:15,18 337:25 338:4,8
**charged** 263:19
**charges** 333:13 341:5 375:18
**chart** 341:25
**cheapesttodeliver** 389:14,19,21 390:6,11 391:7,16 391:19,23 393:12 394:13,20
**check** 276:4 291:21
**checked** 291:16,20 293:20
**checking** 275:5,7 293:24
**chern** 294:6 356:6 361:21 362:24 363:23 433:12 448:17 449:8 450:4,6 452:2,8 457:21 459:8 485:23 488:9
**chris** 393:4
**circulate** 396:8
**circumstances** 398:23
**citi** 371:22 372:8,9
**citibank** 378:25 379:3
**claim** 313:24 343:3 344:22 345:11 349:6,8,21 352:19 353:2 354:16 355:18 357:8,9,14 359:10,16 360:20 360:22,24 361:21 361:22 363:9,13 363:14 364:8,12 364:14 370:11,13

370:17 371:12 485:20
**claimants** 358:3 360:11 361:11
**claiming** 467:15
**claims** 353:17 357:12,16,19 358:5 359:2,5,8 359:12,14 361:7 371:3 437:25
**clarify** 284:5 300:22 399:17
**clean** 327:15,21
**clear** 263:21 276:16 280:18,21 283:10 319:10 321:20,21,25 354:9 363:5 376:15 409:14 435:2 445:8 451:24 452:15 460:15 466:25 477:12
**clearly** 309:12 366:17 402:12
**clicking** 318:8
**client** 321:25 340:21 366:2 470:18
**clients** 282:19 320:14,18,19 398:22 399:6,12 399:18,21 403:7 404:3,5,9
**close** 345:16 463:25
**closed** 299:11 300:11,14
**closely** 407:18
**clue** 349:25 427:4 428:18 432:18,22 440:5,24
**coincidence** 427:12
**cold** 466:14
**colleague** 262:4 264:13
**color** 478:7
**colquitt** 371:17,20

374:3
**combined** 416:13
**come** 287:13 310:5 313:13,17 323:8 352:21 418:16 436:15,20 440:3 466:22
**comes** 418:22,24
**comfort** 314:5
**comfortable** 339:2
**coming** 275:17 361:18
**commencement** 489:6
**commencing** 256:25
**comment** 329:16
**comments** 317:19 318:14 319:6 325:14
**commercial** 333:12
**commission** 489:20
**commit** 370:23
**committed** 286:13
**common** 416:19
**communicate** 338:10
**communicated** 335:24 343:25 475:7
**communications** 276:17 289:5
**compare** 321:19 329:6 330:20
**compared** 329:3 333:11 338:5,9 341:3 357:14
**compares** 420:17
**comparing** 329:8 339:6 357:8 418:6
**comparison** 357:24 358:7
**complete** 395:4
**completed** 325:9
**completely** 385:11 386:18
**completes** 481:2

**component** 308:24 326:24 327:6 460:16 461:4
**components** 303:12 311:11,12,21 312:16 325:18 459:14,25 461:8 462:17,20
**comprised** 312:4
**computer** 405:15
**concept** 376:10 466:18
**concepts** 436:16
**concern** 298:15 299:4,7,9,22 314:22 366:21
**concerned** 313:18 313:20 314:18
**concerning** 326:7 338:17 485:18
**concerns** 297:10,15 297:23 298:5,8,18 298:25 299:16,25 314:14,16
**conclusion** 287:14 335:12,12,14,15 338:7 468:3 469:20 475:3,11
**conduct** 293:17 455:6
**confidential** 357:25
**confirm** 275:12 283:18 290:23,24 304:25 434:2 479:12
**confirmation** 295:17,23
**confirmed** 387:7
**connect** 402:7
**connected** 423:12
**connection** 266:2 357:19 366:9,11 366:17 408:19 442:3 455:22 465:13 471:3
**connote** 466:15
**conservative**

337:24 338:2
**conservatively** 335:7 341:15
**consider** 300:4,7 399:23 401:11
**considerably** 272:21
**considered** 404:5 437:12 443:12
**considering** 399:19 399:22 404:7,10
**consistent** 282:15 304:2 342:9 410:7 422:7 433:23
**contained** 326:19 344:13,17 422:16
**contains** 444:10 446:2
**contemporaneous** 369:11
**contemporaneou...** 368:5
**contention** 468:5 468:10,13 470:5
**contents** 399:8
**contest** 319:17 361:9
**context** 350:6 373:22 374:7 382:2
**continue** 283:3 317:22 321:23 322:2
**continued** 448:5
**continues** 438:6
**contract** 415:18 416:22 417:4 438:3,10
**contracted** 378:17
**control** 387:12
**conundrum** 419:7
**convention** 267:5
**conversation** 295:21 372:13 374:16,17 385:4,5 398:14 466:4,23
**conversations**

338:13 365:25
372:5 399:16
**converted** 361:23
**cook** 261:2,24
264:8 276:7
277:20 280:12
282:16 284:17,23
285:8 288:9,12
295:4,12,16,21
296:6,23 297:8
301:17 302:3
305:19 338:17
397:21 398:8
400:11 461:13,18
461:20,24 462:3
462:12 463:10
484:14,17,21
485:4,7,18 486:6
486:10
**cooks** 282:20
462:20
**copies** 397:12
**corner** 406:18,25
407:20
**corporation** 258:17
258:20
**correct** 262:2
265:13,14 267:8
268:3,14 269:2,4
274:3,4,16 280:11
287:23 293:2,3,14
301:15 302:19
303:25 306:23
307:18 309:19
310:11 314:21
315:14 318:7
319:13 321:16
322:22,23 328:3
331:18,22 332:2,3
332:6 333:14
334:24,25 335:3
335:10 339:18
340:17,23 341:7
341:17,18,21,22
342:2,7,11 354:7
360:8,9 362:7,8
364:5,6 368:3

372:7 375:22
376:2,19,20
377:22 379:4,20
382:11 390:4,9,21
409:21,25 411:7
412:14,16 413:20
415:19 423:13,14
426:18 427:23
431:17 433:25
439:9 443:14,15
444:12,15 446:4,5
447:13 449:22
450:16 466:8
467:8 469:2
470:25
**correction** 270:23
408:4
**correctly** 317:5
**correlate** 394:3
**correlated** 477:2
**corresponded**
480:14
**corresponding**
479:25
**cost** 273:12
**costs** 311:22,22
377:13 378:23
**couldnt** 312:8
315:3 432:23
**counsel** 257:18,19
258:23 352:16
365:25 464:21
480:20 489:12,14
**counterparty**
308:22 309:10
**couple** 408:12
458:21,24
**course** 309:9
387:19
**court** 256:2 258:8
258:18 259:8,21
260:6 261:6
277:25 285:11
296:16 301:22
316:9 324:24
343:7 356:9
364:25 405:12

421:11 423:21
427:25 438:17
445:15 446:19
457:25 470:24
471:2,14
**cover** 325:2,4
443:25
**covered** 292:10
365:23
**cp** 358:21 389:23
390:15 391:19
**crackpot** 381:22
**create** 299:6
**created** 450:13
454:13
**creates** 421:4
**credit** 308:3,23
311:13,16,19
312:3,16,23
333:14 334:15,18
335:8 336:5
337:18,23,25
338:4,8 341:5,16
341:20,25 342:6
342:11 375:20
376:24 378:23
**critical** 454:3
**cross** 477:25 483:5
**crude** 358:9
**crystal** 352:6
**crystallization**
352:19 353:2
**cs** 393:4
**cumbersome**
273:20
**cumulative** 283:23
284:3
**current** 286:18
287:4 344:22
345:10 349:6,8,21
417:3,8
**curve** 271:14
273:14,16 368:17
369:8,15,22
381:11 414:9,13
414:14,18,19,20
415:5,8,9,19

418:4,16 471:4,22
471:25 484:6
**curves** 287:17,21
369:14
**cut** 301:10 306:25
306:25
**cutting** 460:24

---

## D

**d** 258:2 483:2
**daly** 371:22 372:8
372:12,17,20
373:7,14 374:3,14
374:17 394:4
**dan** 371:21 372:8
372:12 394:4
**dash** 385:16
**data** 337:16 426:10
**date** 270:25 274:15
284:14 297:12,16
297:25 298:5,9,16
298:18 299:2,6
300:12 327:3,13
327:24,25 340:5
362:6,10,17,20,24
406:19,21 407:5,7
408:2,3,5 410:11
410:14,15,20,23
413:2,3 415:21
424:2 425:17,21
426:4,12,13 427:6
427:14,18,23
430:8 431:11
432:9 433:3 438:6
439:7,12,15
447:11 448:23
449:13,24 451:14
452:3,19 453:3,11
453:16 454:2
457:5 461:25
462:5 463:3 488:3
489:10
**dated** 260:25
277:18 278:8
294:23 295:3
296:22 297:4
301:17 302:3

316:3 324:19
325:4 338:23
339:22 356:4
385:19 397:20
398:7 428:10
429:4 430:7
438:21 449:6
456:10 457:19
458:5 464:12
465:2 484:13,16
484:21 485:3,7,10
485:14,22 486:6
488:8,14 489:21
**dates** 299:20
407:24 410:19
451:10,12,18
453:25 454:5
**day** 256:23 257:4
258:12 259:2
300:3 415:21,22
425:25 428:17
430:12 444:6
445:23 466:14
482:13
**days** 419:18 443:4
**db** 371:17,20
**deal** 370:18 465:16
**dealer** 275:8
311:22,25 375:18
385:18 386:7,12
387:19 390:3
391:17,24 396:8
**dealers** 360:8
370:20 391:6
**dean** 257:22
**dearth** 300:12
**debra** 295:5 484:22
**debtors** 256:8
258:7 259:3
**december** 264:8
270:15 274:2,19
278:8 279:2
280:14,25 283:8
283:13,20 284:18
**decision** 333:22
337:2,18
**declaration** 285:13

288:10 456:10,13
456:18 488:6
**deduct** 416:3
**deduction** 415:4,5
415:7
**deemed** 273:13
**deeply** 316:18
**default** 320:13
**defaults** 427:2
**defend** 319:20
323:16
**defensible** 319:9
320:23
**define** 418:17
420:14
**defined** 326:22
363:17 378:22
**defines** 420:15
461:22
**definition** 328:6
329:12,18 330:2
**definitive** 276:25
281:9,17
**degree** 466:15
**deliver** 389:22
**deliverable** 311:16
390:15
**deliveries** 327:3
**delivery** 327:25
**depended** 270:9
**depending** 291:4
331:13
**depends** 339:12
**depose** 392:7
**deposed** 259:17
**deposition** 256:13
258:5,11 311:15
343:2 399:24
400:25 448:4
481:2,4 482:6
**depositions** 270:21
339:16 413:5
**derivative** 275:22
**derivatives** 384:25
**derive** 369:16
**derived** 359:5
**described** 390:16

**describes** 306:9
**describing** 330:8
463:10
**description** 326:19
484:11
**desk** 264:15 266:2
266:6,24 372:9
379:19,21 384:2
**despite** 420:6
**detail** 303:12
311:11 325:19
358:24 413:6
**details** 417:23
471:17
**deteriorates** 389:16
390:8
**determination**
267:20,24 268:8
268:25 269:6,9,11
337:25
**determine** 272:13
273:5 274:10
290:5 293:8 477:2
**determined** 267:14
268:5,13 271:4,7
273:24 315:13
349:20 480:13
**determining**
262:25 268:2
271:8 274:18
275:2 292:7
331:15
**deutsche** 275:10
**dialogue** 280:4
**didnt** 266:13
271:23 274:5
292:11 310:20
314:25 317:24
318:25 319:22
320:24 323:18
330:5 334:5 367:7
373:12 388:8
403:21 417:19
432:22 435:18
448:18 477:13
480:5
**difference** 275:18

331:14 417:3
**differences** 275:24
428:14
**different** 273:18
294:3 299:25
302:25 338:3,3
370:22 402:9
416:23 418:10,11
426:16,17 450:13
451:10 452:10
459:16 462:24
473:4
**differential** 417:10
417:11
**difficulties** 382:10
**difficulty** 274:18
**digits** 393:10,24
**direct** 259:13 473:5
473:7 483:5
**directed** 410:15
**direction** 352:16
469:25,25
**directly** 318:5
324:4
**dirty** 327:16,17,19
327:22
**disagree** 310:20
**disagreed** 310:17
310:25
**discipline** 320:4
**disclosed** 476:14
479:20
**discount** 273:9,9,19
380:24 382:4,20
**discounting** 273:15
**discounts** 420:9
**discuss** 262:23
305:4 306:6,10
312:21 363:6
404:2
**discussed** 331:25
352:25 358:20
368:16 390:14
400:24 404:4
**discusses** 334:21
**discussing** 288:2
402:15 434:22

479:2
**discussion** 262:19
283:24 286:15
292:16 296:5
298:4 318:22,24
319:3 324:15
333:7 340:24
342:20 347:10
350:3 351:7 363:7
363:11,16,20
369:7,25 370:4
373:13 379:14
393:16 402:5
404:23 413:25
419:20 435:8,25
436:4 439:11
442:8 464:6
465:23 472:24
476:4 477:23
480:22
**discussions** 318:18
325:25 337:9
346:23 347:3
351:9,14,19,23
352:4,5,11,18,20
353:4,8,15 354:2
354:5 355:24
398:22 400:19
401:9,13,15
402:13 403:24
409:12 433:15
434:16 436:25
442:4 443:7 465:9
472:12
**distinction** 303:3
343:21
**district** 256:2 258:9
**divide** 349:17
**document** 261:7,11
261:13 278:2,4,13
294:19 296:17
301:23,25 302:5
302:13 304:15
316:10 318:6
324:25 325:8
338:20 343:4,8,10
343:13,15 356:10

356:12 362:23
364:22 365:2,4,4
365:10,11,12,19
365:20,22 392:6
392:16,21 395:8
398:4,5 405:13,14
405:17 422:2
423:20 427:24
430:3 441:6
442:18 443:21
445:16 446:20
449:16 456:7
458:2,11 464:14
464:17 465:3
485:20 486:3
488:15
**documents** 268:10
288:6,19,22,24
390:17 392:9,19
397:17 405:25
459:4 460:6
463:24 484:2,4
**doesnt** 268:10
281:13,13 303:11
327:23 331:13
356:25 365:6
366:22 384:18
392:12 420:18
423:6 439:23,23
452:25 460:6
**doing** 262:5,10
264:14 286:6
320:22 337:14
357:20 373:23
375:9 378:21
387:2,21 399:14
418:4 433:9 445:7
448:11 459:24
**dollar** 272:14,17,18
272:21 354:16
**dollars** 414:17
**dont** 260:10 263:13
266:5 274:22
277:7 284:21
285:2,5 289:20,20
289:20,21 293:19
296:7,8,12 297:19

304:16,23,25
305:3,13,13,16,21
308:15,15 310:12
319:2 325:23
326:5,17 327:4
329:14 336:9
337:8,12,17
343:14,18,20
349:25 350:2,2,5
352:3 355:23
357:3,10 362:20
362:22 367:22
369:10 370:6
372:18 386:14
391:12 397:3,11
398:17 399:7,9
403:3 404:6,12,20
405:19 406:8
407:7 410:18,22
416:3 417:23
419:5,24 425:23
425:24 426:19,19
426:22 427:5
428:14 430:15,16
431:19 433:5
434:15,19 435:2,7
435:22,24 436:4
436:21 437:6
439:14 446:6
447:15 450:24
455:12,18 457:10
457:11 458:10
459:2 460:19,20
460:21 461:5
462:6 463:13,16
465:11,20 466:17
467:17,25 469:18
475:10,21,22
476:18,21,24
477:9,10,20
479:14 480:12,16
480:17
**double** 393:10,24
**doubt** 340:4,9
426:11 450:22
460:22
**draft** 278:6 279:6

294:8 302:9,13,13
302:22 305:2,9,10
317:19 318:19
322:14 329:21
340:15
**drafted** 285:11
305:6 306:8
329:21
**drafts** 325:20
**dramatic** 307:22
308:2
**dramatically**
304:20
**draw** 368:18
**draws** 461:11
**dreier** 258:16,20
**dropped** 286:24
472:17
**dv** 272:13 273:24
274:6,10

E
**e** 257:2,2 258:2,2
259:10,10 286:20
321:12 483:2
484:10
**earlier** 276:17
277:15 282:4
304:15 339:15
362:17 368:23
370:7 394:3 413:5
425:24 444:22
450:7 451:20
453:10 474:24
475:24,25
**easier** 333:25
**east** 256:23 257:5
258:12
**economic** 389:15
390:7 394:24
**eight** 380:12
438:19 441:12
**either** 291:20
305:14 402:7
414:7 416:6 425:4
433:12 435:13
444:21 449:7

460:13 461:7
479:20
**eligible** 369:14
389:22
**elisa** 258:16,19
**email** 260:24,25
261:9,21 264:5,7
264:12,24 265:12
267:3 276:5,6,11
276:21 277:8,15
280:3,19,21
281:11,23 282:15
282:21 283:17
284:6,7,8,16
285:7 294:22,23
295:2,3,11,12
296:21,22 297:3,7
305:18 316:2,3,11
317:11 318:17
319:7 324:18,19
325:2,4 340:7
356:3,4,13,14,22
359:18 363:17,24
397:19 398:6,16
410:8 457:18,19
458:4,5 459:7
464:11,12,25
465:2,5,10,12
466:13 467:20
469:12 470:20
472:4 474:14
484:13,13,20,21
485:3,3,10,10,13
485:14,22,22
486:5 488:8,8,13
488:14
**emails** 268:20
280:5 442:10
**embedded** 413:12
**emerged** 475:4
476:10
**emerges** 474:21
**emphasis** 337:14
**employee** 489:12
489:13
**engage** 277:9
**english** 322:13

**entered** 266:7
410:12 417:5
421:20 457:5
474:5
**entertained** 319:15
**entities** 357:13
358:6
**entries** 405:24
**entry** 426:10
**environment**
270:14 416:24
**envision** 319:23
**equal** 267:11
272:24,25 412:10
**equaled** 267:15
**equivalent** 329:7
329:10 347:24
**error** 275:19
426:10
**errors** 275:25
368:10
**esq** 257:4,5,9,18
**establish** 448:24
**established** 457:2
**estate** 313:25
320:18,20 351:10
351:21 385:10
467:14
**estates** 381:10,21
**estimate** 286:8
287:3,9,17,22,24
288:16 310:2
319:16 358:10
**estimates** 286:4,6
313:17
**et** 256:7 258:7
375:20
**etting** 472:9,10,11
**euribor** 418:8
**euro** 418:8
**evaluation** 440:2
**event** 377:15
**everyday** 370:18
**evidence** 293:16,21
432:7
**evidently** 347:21
**exact** 265:2 336:22

396:17 427:13
**exactly** 284:15
342:12 348:15
349:18 354:3
368:9 401:5 439:5
**examination**
259:13 366:25
448:5 477:25
479:16 489:6
**examined** 407:17
437:15
**example** 273:7
274:2 359:14
**exceeds** 420:22
**excel** 290:21,22
291:4,17,22
292:13,14,20
343:10
**exception** 367:22
**exchange** 318:18
356:22 465:6,10
465:12
**exhibit** 260:24
261:8 277:17
278:3 279:12
280:5 281:25
282:16 294:7,20
295:2 296:18,21
301:16,24 316:2
316:11 317:20
318:20 321:20
322:4 324:18
325:2,15,22,22
326:11 328:25
329:5,13,22
330:12,17,21,22
330:23 331:6
332:16,21 333:5,5
333:10,11 334:12
338:14,22 339:7
339:10,11,14,22
340:14,19,20
341:3,4,6,21,24
342:5 343:3,9
344:14,19 354:10
355:5 356:3,11
358:13 359:20

362:23 363:21
364:21 365:3
397:19 398:5
400:9,15 401:8,20
402:6,18 403:8,10
403:15 404:11
405:7,15 406:15
421:6,12 422:17
423:5,12,15,22
424:18,24 425:2
425:17 428:2,4,19
428:25 429:14,20
430:4,19,25
432:16 435:17
436:24 438:12,18
440:25 441:7
442:9,13,19
443:16,22 445:10
445:17 446:14,21
449:6,11,17
454:16 455:3
456:8,17,23 457:8
457:18 458:3
464:11,18 467:20
470:21 473:22
474:14 475:12
476:7 478:10
484:13,16,20
485:3,6,10,13,16
485:20,22 486:3,5
486:9,12,15,17,20
486:22 487:3,5,8
487:10,13,15,18
487:20 488:3,5,8
488:13
**exhibits** 474:19
**existed** 270:14
279:18
**exists** 304:7
**expect** 403:21
412:5
**expected** 345:19
346:3,11,13,14,24
349:13,21
**expecting** 353:16
**expenses** 321:2
**expensive** 376:23

**experience** 264:21
265:6 266:24
310:10 360:3
470:11
**expert** 384:13
387:11 470:23
471:3,5
**expertise** 470:9,10
**expires** 489:20
**explain** 271:3
322:17 323:17
368:10 454:4
**explained** 289:20
**explaining** 301:8
**explicitly** 320:8
**exposure** 376:24
**expression** 327:14
**extent** 359:13
426:20
**external** 289:5

### F

**fa** 283:4 359:21
**fabrice** 384:20,21
384:23,23 385:5
385:16,23 386:2,6
387:20 390:5
393:16
**face** 286:10 308:25
**fact** 266:5 322:10
339:23 362:18
400:22 414:18
420:7 467:13
470:22
**factor** 271:24
272:20 390:10
**factors** 299:21
300:5,6
**facts** 432:7
**factually** 453:3
**failure** 326:25
438:3
**fair** 319:5 320:6,16
339:11 340:22
361:24,25 368:18
382:10 391:4
393:9,23 437:16

437:21 465:15
469:8
**fairly** 314:24
320:14,22 438:2
**familiar** 409:11
417:18 461:19
**familiarity** 270:22
**fantasy** 381:13
**far** 406:17 471:15
**favor** 315:9
**fdas** 396:15
**feature** 359:17
**february** 294:24
295:13,22 296:5
489:20
**federal** 470:24
**fee** 268:21
**feel** 294:12 313:22
458:13 467:10,11
467:12
**fees** 267:4 268:12
268:18,23
**feet** 435:4
**felt** 469:8
**fifth** 332:8 374:18
**figure** 344:2,4
355:21 406:9
**filed** 357:12,16
358:5
**files** 397:15
**final** 270:25 335:17
477:13
**finally** 317:14
473:9 477:5
**financial** 264:14
278:7,16,25
279:11,21,25
280:7 281:14
282:5,23 283:9,19
284:10 285:19
286:2,5,25 287:8
289:11 290:4,20
294:13 326:2
344:12 346:2,7,8
347:5,10,14,19
350:4,8,12 363:12
364:9,15 396:20

440:7,14 448:22
452:19 455:2
459:24 462:7
463:8 465:14
476:12,25 477:16
479:24 480:13
**financially** 489:14
**financials** 280:14
280:24 288:25
291:17 292:21
391:22 440:9
**financing** 326:10
326:13
**find** 427:18 453:16
**finds** 280:25
**fine** 392:20,21
404:20 458:25
461:12 479:14
**finger** 330:18
**finish** 259:24 260:2
392:21 395:10
**finished** 261:19
297:6 302:4 339:4
479:2
**firm** 258:16 290:14
347:20 361:16
370:19 380:3
471:7
**firms** 275:8,11
370:18 396:8
**first** 257:24 259:19
261:11 272:18,20
275:10,15 276:10
282:21 285:6,7
288:5,20 297:7
301:10 302:9,12
302:13,22 307:25
317:12,18 328:7
328:12,13,20
330:20 332:11
349:7 385:23
406:17 418:13
425:14 430:15
442:23 448:20
458:5 470:20
472:17 474:20
**five** 296:10 298:14

319:23 345:16,16
372:19 414:24
429:2 430:8 434:3
**fix** 316:20
**fixed** 286:12
307:15,16 321:12
331:25 378:14
398:25 408:23
409:3,5,9 414:21
415:3,6,9,11,13
415:17,20 416:23
418:6,11,13
**fixing** 297:11,16,24
298:5,9
**flag** 314:13
**flags** 313:15
**float** 351:20
**floating** 307:15,17
309:16,23 321:14
331:25 408:24
410:3 412:6
414:15 418:18,20
420:21
**flow** 306:25 307:14
**flows** 303:22
306:22 307:9
321:9 331:2,10,18
331:24
**focus** 365:9 381:24
392:19 459:4
**focused** 395:11
402:12
**follow** 373:12
472:3 479:13
**followed** 383:18
**following** 367:20
**follows** 259:12
**followup** 318:24
**foregoing** 482:5
489:9
**form** 268:16 312:6
422:4 426:7 432:5
432:21 434:11
444:17 451:7
466:10
**format** 452:10
**formerly** 379:13,18

379:20
**forming** 436:21
**forms** 398:24
**forth** 351:10,14
357:5 363:18
404:11 442:11
489:10
**forty** 480:10
**fortyfive** 345:15
**forward** 283:2
287:16,20 299:19
369:22 381:10,11
415:19 471:4,21
471:25 484:6
**found** 309:11
344:18 427:17
451:15,17 453:2,7
457:6 480:6
**fount** 451:21
**four** 350:19 428:2
428:15 429:10
434:3
**fourpage** 464:14
488:15
**fourth** 322:3
330:11,15,22
332:16
**fpa** 376:5,16
383:14 385:19
386:9 395:22
397:7
**fpas** 396:15
**fraudulent** 387:16
**frequently** 275:4
**front** 406:23
444:19 474:3
**fulfill** 438:3
**full** 328:5 332:11
**fund** 263:22 264:22
277:21 284:19,25
285:20 302:11
303:23 306:16,22
307:8 308:5
309:17 315:8,23
326:9,12,21
327:11 331:9,16
331:17 332:5

346:25 347:6,11
347:15 355:18
360:11 362:4
363:2 369:9
398:21 400:8
434:17,21 435:9
436:7 484:18
**fundamental**
303:14,17
**fundamentals**
274:24
**funding** 375:12,20
378:24
**funds** 273:12
399:13
**further** 375:7
377:13,20 378:10
378:11 460:24
477:21 480:18,20
489:8,11
**future** 462:4

### G

**g** 258:2
**garbage** 395:4
**gates** 285:10
**gears** 404:16
**gee** 323:19,20
**general** 257:19
290:17 301:3
306:17,18,18,20
333:11 334:23
**generalities** 291:7
291:14
**generally** 261:17
368:14 396:7
406:2 407:16
436:10
**generate** 369:13
**getting** 317:15
413:6 419:8
**give** 261:10 280:10
294:24 295:22
297:5 316:22
338:25 373:25
465:3
**given** 299:23

307:22 308:2
314:4 391:7
392:15 453:21
467:13
**gives** 327:21
349:10,18
**giving** 393:11,25
394:13
**glance** 365:9
**go** 285:6 286:6
303:11 314:8
324:12 325:18
330:11 332:8
340:7 360:18
361:9,14 364:12
366:22,25 376:22
377:20 380:12
381:16 383:7
392:4 393:3
396:23 403:20
404:14,16 420:18
437:4 442:7 454:5
469:24
**goes** 311:24 385:11
460:8
**going** 260:13
262:16 273:11,16
280:4 282:20
297:6 302:4
304:20 321:25
339:4,5 342:18
368:24 373:3,19
374:13 377:4,24
381:10 383:20
394:23 401:25
403:21 404:15
405:2 412:24
413:8,11 415:23
416:8 419:19
420:21 435:4
441:18 442:3,8,10
447:23 453:5
458:16,17 460:2
464:4 472:24
**goldman** 275:9
**good** 259:15,16
264:2 320:11

353:23 354:17
355:3 475:3
**gotten** 354:15
459:5
**grammatical**
368:11
**great** 355:9 358:24
413:6
**green** 408:9
**greg** 371:24 374:3
379:6,12 387:8
**gross** 272:11
**group** 257:9 278:7
278:17 279:11
280:8 281:14
282:5 285:19
286:6 287:8
289:11 290:4,20
294:13 344:13
346:2 347:5,11,14
347:19 350:4,9,12
363:12 364:9,15
**groups** 286:25
**guaranteed** 287:4
409:10,14
**guess** 348:8 354:17
354:19,23 355:3
451:13 460:25
480:5
**guessing** 401:5
427:14
**guy** 263:19 307:14
307:15 383:9,17
**guys** 319:17 320:11
320:12 468:11

### H

**h** 259:10 484:10
**hadnt** 354:25
**half** 296:10 298:15
319:23 348:17,19
349:6,7,11,13,18
349:20 406:9
411:12
**handed** 261:6
277:25 301:22
316:9 324:24

343:7 356:9
364:25 405:12,13
445:15 446:19
457:25
**handing** 294:19
296:16 398:3
400:14 421:11
423:20 427:24
428:24 430:3
438:17 441:6
442:18 443:21
449:16 456:7
464:17
**handling** 366:5
430:24
**happy** 395:9
**hard** 296:2,11
318:25 346:21
410:25 426:8
463:6
**harper** 367:22
**hasterok** 384:9,13
384:16
**hat** 323:23
**havent** 444:23
**hazardous** 387:23
**head** 299:18 348:3
379:21 384:24
**heading** 365:6
**headings** 333:12,16
333:19 334:8
**hedge** 311:22
385:19 386:9
388:17,25 395:3,4
**hedged** 382:19
388:5,7
**hedging** 375:20
378:23 382:10
**held** 256:22 258:11
304:12 390:2
391:16,23
**hell** 466:14
**help** 400:22 442:11
452:25 474:15
**hereinbefore**
489:10
**herman** 397:21

398:8 464:13
467:3 486:6
488:14
**hes** 296:12 297:22
334:14 376:12,15
381:19,20,21
382:9 385:8
386:17 387:15
388:14,20,21,23
389:4 393:25
394:2 473:19
**higher** 416:24
**highlight** 368:24
**highly** 387:23
**history** 314:2 397:8
**holdings** 256:7
257:19 258:7
**holiday** 299:13,14
300:15
**hommel** 257:18,24
**hours** 340:22
445:25
**huge** 311:15
**human** 350:15
**humor** 446:12
**hundreds** 320:25
**hypo** 352:23
**hypothetical** 275:7
**hypothetically**
272:25
**hypotheticals**
352:23

**I**

**id** 260:11 278:20
361:13 445:4
470:2
**idea** 345:6 350:7
354:9 355:16
369:8 381:10,22
424:25 425:5,11
429:13 432:23
434:14 438:23
440:13 441:20,23
443:3 447:3
475:13
**ideas** 444:5

**identical** 441:12
**identification**
261:5 277:24
295:8 297:2
301:21 316:8
324:23 343:6
356:8 364:24
398:2 405:11
421:10 423:19
428:8,23 429:18
430:23 438:16
441:5 442:17
443:20 445:14
446:18 449:15
457:24 464:16
**ilitch** 257:16
258:15
**ill** 338:24 385:8
445:7
**illustrate** 272:4
**illustration** 273:18
**im** 290:16 291:14
298:20 302:14
305:22 328:15
343:20 351:13,17
352:2 379:25
380:3 393:17
406:20 427:24
429:19 432:3
440:18 441:22
451:20 457:7
461:23
**imaginative** 425:10
**immediate** 300:10
**implications**
363:14
**implied** 415:13
455:15 457:16
**implies** 389:10
391:20 473:6
**imply** 456:5
**implying** 265:25
**import** 265:4
**important** 319:12
320:3,21 373:21
414:20
**impression** 419:25

**incentive** 334:5
438:5
**inception** 266:16
266:22 270:10
274:2 417:7
**include** 312:15
326:23 327:19,23
330:6 352:16
363:17 375:11
378:23
**included** 282:25
309:5 312:23
335:18
**includes** 327:4
391:25
**including** 287:20
311:19 316:6
485:12
**incorporate** 287:19
394:23
**incorporated**
394:20 459:10,13
**incorporating**
463:18
**incorrectly** 317:6
**increase** 390:18
**increased** 390:14
**increases** 389:15
390:7
**independently**
283:16
**index** 334:24
458:17,25
**indexes** 418:10
**indicate** 391:11
456:3
**indicated** 288:5
397:14 409:5,19
456:2
**indicates** 288:8
428:11 431:6
439:2
**indicating** 313:7
**indication** 293:7
358:17 435:18
**indications** 358:22
359:7

**indicators** 358:14
**individuals** 372:6
**industry** 375:15
**inflate** 387:17,22
**informal** 371:10
**information** 267:9
274:10,13,14
287:20 294:17
299:5 300:12
305:21 343:12,24
343:24 344:13,18
453:22 471:19,23
484:5
**initial** 269:3 279:13
279:24 282:24
286:8 287:2,9,10
287:17 288:16
310:2,9 438:24
**initially** 274:12
279:9 280:8 302:6
**input** 275:19
413:18
**inputs** 271:7
273:10 303:19
362:5 405:24
406:10 423:8,10
423:12 429:9
437:15
**inquiry** 380:25
382:8
**inserted** 318:13
**instruct** 460:3
**instruction** 460:11
488:12
**insufficient** 313:23
**interact** 462:20
**interdat** 424:2
449:23
**interest** 271:13
306:21 307:2
321:11 327:20
332:23 359:24
360:2 408:20
411:11,14 412:9
415:24 416:24
419:12,19,22
420:3,22 421:3

**interested** 280:13
281:16 489:14
**interesting** 374:11
**internal** 289:4,5
**internally** 305:11
347:4 363:12
387:22 435:13
**interpose** 352:8
**interpret** 377:18
**interval** 353:22
**intervals** 389:25
**introduce** 258:24
435:16
**introduced** 338:19
400:13 456:20
**introductory** 406:7
**investment** 398:24
400:20 401:10,18
403:9,25
**investments** 397:23
398:21 399:5,11
399:21 402:16
486:7
**involved** 371:12
**involves** 260:21
**involving** 479:6
**isnt** 453:12,12
**isolate** 292:11
**issue** 265:7 269:17
275:20 316:19
370:10 419:6
445:3 453:5
470:23
**issues** 311:24

**J**

**j** 257:9 482:2
**james** 261:24 262:4
264:13 267:17
270:3 278:23
295:4 309:25
316:4 322:13
324:20 338:16
433:12 448:16
484:22 485:11,14
485:17
**jamess** 309:25

**january** 285:18
286:7 287:2,25
456:11,14
**jay** 413:4 419:8
**jeff** 384:9,13,24
**jersey** 357:7 359:15
359:16 361:15,21
363:9,13
**jim** 448:17,18
**jmp** 256:3 258:10
**job** 435:3
**johnson** 397:20
398:7,15 400:12
457:20 459:8
486:6,11 488:9
**jointly** 256:4
**jones** 256:23 257:4
258:12 259:2
**jp** 275:9
**july** 367:16 368:2
369:7,24 446:24
447:4 448:22
449:3,6 465:2,15
465:19,23 466:13
468:21 469:11,14
469:20 474:5,17
475:7 476:15
477:18 478:20
**jumps** 327:8
**june** 429:4,12
430:7,13 431:7
433:10,16 438:21
438:24 439:13
440:15,23 441:11
441:15,15,24
442:5,24 443:8
444:2 445:20
476:6,7

**K**

**k** 285:10
**keep** 366:6 370:21
**kept** 344:12 413:6
419:8
**kevin** 371:25 374:4
383:4,20 385:3
387:9

**kill** 446:9
**killed** 385:11
386:18,24
**kim** 397:21 398:8
464:13 466:4,6
486:6 488:14
**kind** 273:20 275:14
275:20 289:4,4
314:16 371:3
376:9 404:21
420:2
**kinds** 418:10
**knew** 284:13 453:4
**know** 259:17
260:18 266:5
270:13,14 274:22
275:4,18 276:3
277:13,15 278:19
283:19 286:17
287:11 288:20
289:4,6,7,17,19
290:21 291:2,5
293:25,25 296:12
297:19,22 299:6
299:20 300:4,22
302:8,12,21 304:6
304:11,16 305:8
305:13,16 306:2
309:8 310:2,12
311:23 313:10,14
314:11 318:11
321:2 325:7
326:25 327:13,22
328:25 329:14,15
329:20,24 330:5
335:17,19,19,20
336:9,16 337:13
337:15 339:2
343:15,18,23,23
344:25 345:10,23
346:15,21 347:22
348:12,13 349:19
350:5 352:14,16
352:20,22 353:23
355:12 356:18,23
357:2 358:9,20
360:21 361:6

362:15,20,22
366:24 368:10,22
369:19 370:6,12
372:12,18 373:23
375:5 376:21
379:8 380:2
381:16 384:24
385:11,12,13
386:20 387:14
388:21 389:3,4,6
389:24 390:13,22
392:4 393:18
396:17 400:2,4,5
400:7 406:2,8
407:4,6,7,23,25
410:13,18,19,20
410:22 411:15,19
412:9,10,25 415:3
416:5,12 417:20
417:21,23 418:8
420:24 422:24
425:11 426:8,19
426:19,22 427:5
427:13,18,20,22
428:16 429:11
430:11,14,15,16
431:22,25 433:2,5
433:5,6,7 435:23
436:16,17,22
437:3,6 438:4
441:14 442:2
446:6 447:15
448:14 449:3
450:7,24 451:19
452:7,22,23 453:4
453:6 454:2
455:13,18,19,20
456:3 457:10,11
458:7 459:20,23
460:20 461:2
462:2,15 463:16
466:24 470:7,12
471:16 472:14,18
472:23 475:20,21
475:23,23 476:6
476:18,21 477:9
477:10 479:5

480:10
**knowing** 320:23
343:22
**knowledge** 266:9
266:16,21 286:10
468:19 470:10
**known** 284:16
372:16
**knows** 264:16
265:16 319:21
348:17 362:16

**L**

**l** 285:10 330:14,25
345:4,8,21
**lack** 368:10
**language** 317:24
321:17 322:11
381:20
**large** 367:10 479:6
**larger** 355:6
364:11 419:14
**largest** 313:25
**late** 478:12
**laughable** 468:8
**laura** 257:4
**lauri** 258:25 268:7
275:25 294:2
300:21 319:14
329:7 345:12
354:12 362:15
371:9 376:21
380:7 387:7 392:3
409:12 453:10
**law** 257:9
**lawrence** 257:9
259:4,4 266:11
268:15 277:11
280:16 281:3,19
283:15,21 284:2
298:20 312:5,10
312:17 314:6
317:9 331:19
342:16 344:8
346:18 349:23
351:2 352:7
353:18 354:21

360:14 366:10
387:4 392:3,11,20
401:2,23 402:10
402:20,25 403:16
404:22 406:22
422:3 426:6 432:4
432:20 434:10,23
444:16 447:18
450:9 451:6,23
452:5,12 453:21
454:8,18 458:10
458:16,23 460:2
460:19,25 464:2
464:22 466:9
472:3 473:25
477:22 478:2,11
480:21 483:15
**laymans** 416:19
**lb** 367:12,17,20
478:21
**lbhi** 456:19 488:6
**lbsf** 308:25 315:9
**learn** 284:9
**learned** 427:9
452:19
**leave** 263:4,10
**left** 257:24 380:9
448:24
**lefthand** 407:20
**leg** 309:16,23
331:25 332:2
410:3 414:7 420:6
420:7 422:6
**legal** 258:17 320:25
321:2
**legitimate** 387:24
437:25
**legs** 420:13,17
**lehman** 256:7
257:6,19,22 258:6
263:24 264:15
266:2,6,10,24
281:18 283:2
286:12,20 295:6
296:24 301:19
313:25 320:12,15
320:18,20,23

321:12 326:9,12
330:8 338:15,21
339:11,14,21
340:20 341:2,20
341:24 345:13,17
345:20 346:3,11
346:14,15,24
347:5,11 349:14
349:21 351:10,21
354:15 355:19
358:6 364:12
367:16,18,21,25
368:16 369:7,20
370:7 378:16
379:19,21 380:10
380:10 381:9,21
383:8,17 385:9
388:17 389:2,5,7
397:2,22 422:8,11
422:12,12,17
423:5,12 436:14
436:19,25 437:22
438:4,9 440:2
442:4 456:8,18
457:7,21 465:14
465:23,24 466:7
466:15,18 467:6
467:14,22 468:4,6
468:7,17,24 469:2
469:7,15,22 470:2
470:17,24 473:10
473:16 475:7,12
476:14,20,23
477:17 478:24,25
479:7,20 484:22
485:4,8,17 486:7
488:6,10
**lehmans** 326:25
364:16 438:3
**leisure** 374:6
**length** 311:15
**letters** 472:17
**level** 369:15 436:18
**levels** 396:11,12
**libor** 273:13,13,19
309:17,24 310:10
314:3,25 315:16

315:19 323:8
324:16 332:12,22
345:9 347:6,12,16
347:16,22,24
358:12 359:9
361:24 362:3
363:2 372:22
373:8,16 374:20
375:2,11,24 376:6
376:17 377:3,13
378:20 381:10
393:10 394:6
409:7,20 410:3,8
411:5,7,9,16,20
411:21,22 412:2,2
412:4,7,13,21
413:8,18 414:2,4
414:9,15,15,22
415:8,14,15,18,21
418:2,7,8,15
419:5,11 420:15
420:22 421:25
433:20 434:8,17
435:9,17,25 436:8
436:8,9 437:8,12
437:17,19 438:7
439:18,21 440:19
443:12 444:10,15
446:3 447:7 451:3
455:15 457:16
459:14,24 460:16
461:3,8 462:9,10
462:11,16,19
463:5 473:10,13
474:9,10,16 475:6
475:16 476:14,24
477:6,17 479:19
480:3,15
**life** 355:20
**likewise** 259:25
**lilian** 294:5 356:6
433:12 448:16
452:2 455:20
457:21 459:8
460:21 485:23
488:9
**lilians** 460:22

463:17
**lillian** 359:19
**limited** 308:6,19
**line** 276:10 282:14
326:7 334:13
345:19 348:11
354:12 372:21
374:18 376:4
380:16,17,20
384:7 387:8 389:9
389:10 428:12
448:9 450:4
452:13 461:12
**lines** 345:23 348:9
372:19 380:13
383:8 396:23
**lining** 278:9 279:7
279:8,19
**list** 370:16 392:12
392:24
**listed** 375:13 448:9
**literally** 264:23
**litigation** 282:11
291:24
**little** 268:11 404:17
419:18 422:19
477:5
**live** 275:6
**livenote** 256:21
489:5
**located** 258:20
**log** 304:13 450:13
**logged** 433:6 445:6
450:8,14 455:6
**logical** 419:7
**long** 372:16 382:22
385:18 388:8
**longdated** 375:12
400:7
**longer** 334:6
414:23
**longterm** 395:3
411:18 413:24
415:14
**longtraded** 386:8
**look** 261:11,14
264:5 267:2

273:11 276:5
277:13 278:10
286:11 287:16
288:3,4,19 289:21
290:24 293:5
294:25 295:10
297:5,7 299:3,5,8
299:20 303:21
307:4,19 308:11
311:10 313:12
314:12 315:5
316:23 317:3,11
321:3 326:6 328:7
330:16 331:5
332:15 333:10
334:2,10 338:25
340:2,13 341:2
345:12,13 349:15
355:4 358:4,7,8
358:15,16,25
359:11 360:18
361:9,14 363:15
369:21,21 370:15
372:19 376:3,6
380:11 381:17
384:19 394:25
395:13 396:5
400:3 406:17
408:2 410:11
411:16 412:6
416:5 419:24
421:24 422:18
424:18 425:2,16
427:11 433:19
436:12,15 437:13
439:17 442:7
449:18 450:3
452:23 454:5
455:24 456:22
459:7 463:23
465:4 470:13
473:21 478:3,19
**looked** 268:9
270:10,12 287:11
287:12 292:19,25
295:9 313:9
314:19 317:20

325:21 358:8,11
376:5,16 391:8
415:12 422:9
436:10 437:17,19
439:15 452:11
474:18
**looking** 262:12
263:7 265:22
277:5,9 278:14,21
279:16 285:12
287:3 289:18
292:12 294:7
299:19 302:25
303:4,19,22
307:13 321:21
329:22 344:3
351:14,15 357:7
357:15,18,24
359:8 362:22
370:10 376:10
377:2 378:15,19
381:23 392:11,24
393:17 406:15,20
411:3 414:12
415:2 426:17
448:8 449:5
451:13 458:25
463:14 474:13,15
475:25 477:14
**looks** 268:10
289:23 318:21,22
321:21 322:4
348:3,14 365:4
366:16 384:19
407:6 410:10
414:3,5 420:13,16
423:2,9,11 426:9
426:11,12 450:17
472:14 473:18
476:8 479:4,23
**loss** 300:24 301:14
302:18,23 303:5,7
303:13,15 304:3
324:21 326:11,20
326:22,23 327:10
328:6 330:13,25
331:15 332:6

338:18 361:3
419:15 485:15,18
**losses** 461:15,16,21
461:24 462:4,14
463:3,11,15
**lot** 370:13,22 395:8
**lots** 436:11
**loud** 260:5 280:20
376:13
**lower** 286:19
377:14 391:11
406:24 415:25
416:25
**luck** 264:2
**lunch** 404:19 405:4

**M**

**m** 256:25 258:14
261:23 264:8
295:13 297:4
340:15 342:18,24
363:24 405:2,6
447:22 448:2
464:4,10 466:13
480:25
**magnitude** 323:11
**making** 275:11
313:24 343:21
355:2 368:8
**manager** 291:9,12
292:3,5,11 293:6
293:17,20
**manner** 322:20
**march** 270:17
274:3 297:4,8,12
297:16 298:6,10
298:19 299:2,10
302:3 308:9 315:7
335:4,7 341:15
410:12 457:3
**margins** 358:23
**marked** 261:4,7
277:23 278:2
294:20 295:7
296:17,25 301:20
301:24 316:7,10
324:22,25 338:14

338:21 343:5,8
356:7,10 364:23
365:2 371:15
389:8 397:25
398:4 400:9,15
405:10,14 421:9
421:12 423:18,21
427:25 428:7,22
428:25 429:17
430:4,22,25
438:15,18 441:4,7
442:16,19 443:19
443:22 445:13,16
446:17,20 449:14
449:17 456:17
457:23 458:2
464:15,18 485:16
486:9 488:5
**market** 267:5
270:14 275:6
286:10,18 287:5
287:20 298:4
299:4,11 300:3,11
300:14 322:8,21
327:15 329:25
332:20,25 337:16
338:5,6 358:21,21
359:3,22 360:4,5
360:12 361:11
375:15 376:18
380:24 382:4
383:15,15 386:7
387:2 391:9,10,10
394:21 396:6
417:3,4,6,8
449:13 488:4
**marketer** 384:25
**markets** 273:12
470:11
**marketwise** 297:11
297:24
**marking** 385:19
386:9
**math** 348:2,21
**matter** 256:18
258:6 260:21
340:21 469:16

**matters** 366:5
**mature** 435:3
**matured** 427:10
**maturities** 414:23
**maturity** 270:25
274:15 315:22
362:10,24 407:21
408:3,5,6 425:17
425:21 426:4
431:11 432:9
433:2,16 439:7
447:11 451:10,12
452:19 453:4,25
454:4
**mean** 262:9 274:8,9
298:11 314:17
320:17 323:10
339:13 345:9
346:7 354:11
377:9 383:12
400:23 406:24
411:24 450:18
453:24 458:19,19
458:23 460:25
461:17 466:22
472:13,20
**meaning** 265:3
303:18 318:5
377:25 395:3
415:9,11
**meanings** 338:3
**means** 271:17
345:7 350:6
387:14 389:22
411:6 462:16
**meant** 260:14
346:14 382:22
**mediation** 352:10
352:12,15 353:19
353:20 358:2
361:17,18 362:12
362:14 396:3
451:16,22 453:5,6
453:11,17 454:3
460:5,10,17 461:9
**meet** 328:5
**melchior** 257:22,24

**member** 270:3
**members** 289:24
290:3
**memo** 304:7
315:18 316:5
328:12 333:25
401:13 477:12
485:11
**memoranda**
301:14 302:17,22
**memorandum**
277:18 278:7
279:6 282:6,7
294:8 300:19
301:2,17 302:2,16
302:18,24 303:6,7
303:13,15,16
304:3,4 305:6
306:7,9,11 307:5
307:20 315:6
317:19 318:19
321:4,18 322:25
325:3,11,21 326:3
326:7,20 327:10
328:3 332:9
334:11 338:15,23
339:17,21 340:15
371:2,7 400:10,16
484:16 485:7,17
486:10
**memorandums**
300:23 302:9
**memory** 356:25
361:8 370:25
403:20 452:24
**memos** 301:11,13
400:4
**mention** 329:25
**mentioned** 355:15
455:13
**merited** 473:11,11
473:14 477:7
**method** 321:10
**methodology**
303:14,17 305:5
306:8,10,15 322:8
322:21 332:20,25

**microsoft** 318:9
**mid** 372:22 373:8
373:16 374:20
375:2,6,14,15,24
376:18 377:2
378:11,19 393:10
393:24,25 394:17
394:21,23
**middle** 295:11
317:12 395:13
**mild** 381:20 395:6
**million** 345:20
350:20,20,20,21
353:6,6,10,11,12
355:7 363:25,25
364:10,16,19
468:12,18 469:16
**millions** 320:24,25
**mind** 312:8
**minimize** 437:24
**minus** 309:18,24
314:3 315:2,16,19
323:9 324:16
345:4,8,21 347:6
347:12,16,22,25
375:11 376:6,6,17
376:17 377:13
385:20 386:10
393:19 409:7
410:9 412:4,8
420:16 433:20
434:8,17 435:9,18
436:2,8,9 437:17
437:20 438:8
439:18 440:19
443:13 444:19
446:3,4 447:8,9
451:3 474:10,10
474:21,23 475:4
475:11,17,24
**minutes** 374:2
441:17
**miscellaneous**
311:20
**missing** 327:5,6
328:2
**mixed** 416:20

model 262:13,14,15
262:21,24 263:5
263:11 267:17
271:7 273:22
274:23,24,24
287:23 288:17,20
288:21 289:11,21
289:24 301:5
306:21 307:16
315:13
modeling 262:5,10
275:20 287:15
290:15 291:18
425:12
models 262:18
263:13 287:19
290:3,19 417:20
monday 410:12
money 285:15
286:20,21 287:18
288:11,13 320:18
320:19
moneys 364:5
months 319:20
380:25 382:8
402:9 412:18
414:16
morgan 275:9
383:19,23 396:13
morning 259:15,16
motion 285:11
move 392:18 454:7
moved 379:25
movement 395:22
moves 271:2
moving 379:5
multipage 261:9
294:21 338:22
365:3 465:3
multiple 300:23
358:2 472:16
municipal 308:3
333:13 341:5
murphy 448:17,18

**N**

n 257:2 258:2 483:2

name 258:15
367:23 383:4
385:24 386:4
424:10,15,16,17
424:23 425:3,6,8
428:11 433:7
444:25 448:8
471:12 473:20
names 367:19,21
370:22
narrative 452:13
nat 356:14 359:19
471:9
nathaniel 356:5
485:23
necessarily 399:16
399:17
necessitate 442:5
need 259:20 260:4
260:17 299:8
331:24 375:19
402:20 433:15
434:16 443:8
459:17
needed 308:17
313:24 335:22
needing 435:25
454:2
needs 326:23 328:4
nefarious 327:18
427:21
negative 342:2,7
345:14 377:8,10
377:20,25 409:24
411:5,11,13 412:8
412:10 413:2,8,11
419:12,19,22
420:3,21 421:3
422:2,5,13 444:14
negotiating 350:17
350:24 351:25
353:5,10
negotiation 282:11
351:8,24
negotiations
470:15
neither 489:12,13

net 348:10,13 349:7
349:12,19 350:3,5
354:10
never 271:19
407:17 420:23,24
429:23,24 445:6
new 256:2,24,24
257:6,6,20,20
258:9,21,22
322:16 329:13
333:12 357:7
359:15,16 361:15
361:21 363:9,13
370:13,22 455:15
456:4,4,5
newly 392:5,16,19
401:24
nexttothelast
307:21 371:23
nine 441:8
nonexistent 308:7
nonsense 419:11
421:2
nonsensical 381:12
norm 273:8 390:15
normal 273:8,11
366:4
normally 299:18
345:8 367:17
411:15
nos 261:3 277:22
295:6 296:25
301:20 316:5
324:21 338:18
364:23 400:12
405:9 421:8
423:17,24 428:6
428:21 429:16
430:21 438:14
441:3 442:15
443:18 445:12
446:16 449:14
456:19 457:22
484:14,19,23
485:5,8,12,15,18
486:4,11,13,16,18
486:21,23 487:4,6

487:9,11,14,16,19
487:21 488:4,6,10
notary 256:22
259:11 489:4,7,19
notation 478:20
note 349:2 370:6
382:21 478:4
noted 386:15
notes 256:17
364:22 365:13,14
365:24 366:6
367:5,6,15,24
368:4,8,12,19
369:23 370:2,6,8
370:15 371:3,7,11
372:4,14 373:6,15
373:23 374:17
380:24 381:8,15
382:4,20 384:18
384:22 385:2,3,4
436:23 437:4
478:4 479:10
486:3
notice 385:7 395:2
noticed 339:5
notion 322:19
368:17 381:22
465:24 466:7
468:24 469:23
470:6
notional 271:22
362:5 422:25
november 400:17
402:15,17,23
number 258:4,10
270:12,16,19
275:21 287:14
288:8,21 289:7
310:21,23 313:6
313:15,16,19,21
314:9,11,15,19
315:13 316:17
318:14 323:22,25
324:5,8,15 336:5
342:25 345:15,17
347:24 348:15
349:6,7,8,12,14

353:24 391:11
394:3 395:14,15
413:9 418:10
422:14,19 437:3
448:3 464:20,24
476:24 477:9,10
477:14,17 484:11
numbered 317:6
445:18
numbering 317:7
numbers 288:5
290:24 303:2,5
313:12 344:7
345:3 348:7
349:19,22 350:3
350:19,25 351:11
352:25 354:10
355:6,13,15,25
361:22 363:23
387:23 433:24
459:16 463:6
464:15 488:16
numerous 474:19
476:3

**O**

o 258:2 259:10
object 268:15,15
277:11 280:16
312:5 426:6 432:5
432:20 434:10
451:6
objection 281:3,19
283:22 284:4
312:10,17 314:6
331:19 346:18
349:23 351:2
352:8 354:21
366:10 387:4
422:3 432:4
434:23 444:16
450:9 466:9 478:9
obtain 360:12
361:11
obtainable 360:4
obviously 280:3
318:10 346:9

352:9 357:23
359:23 370:23
453:2 466:3
468:12 472:18
476:10 479:9
**october** 256:24
258:13 342:24
448:2 480:25
489:21
**odd** 427:12
**offer** 468:12,16
469:14
**offered** 467:14,16
**offering** 364:12
**offhand** 362:20
**office** 257:19
**offices** 256:23
**offline** 295:17,23
**okay** 262:15 264:4
269:16 272:4,5,8
272:11 274:21
283:12,21 288:15
305:15 307:4
308:20 316:25
317:10 323:7
325:10,24 329:6
330:19 334:3
336:9 339:20
344:6,10 349:2,15
349:17 352:7,14
356:21 365:12
367:3,9 368:21
372:19 373:19,19
374:8,9,13 376:3
376:14 378:4
380:22 382:3
386:16 397:4
398:18 401:4
402:25 404:13
406:5,12 407:8,19
408:5 411:20
414:11 417:17
418:20 420:20
422:18,24 430:18
431:16,25 445:2
450:18 451:2
452:4,16 453:20

454:24 458:9
460:23 463:21
465:22 469:13
471:18 475:2
**once** 276:24 281:9
381:2 382:13,20
388:2,4,6 389:4
**ones** 454:12
**open** 450:12
**operate** 417:24
**operates** 263:13
**operating** 262:14
**operation** 406:3
**opinion** 391:22
436:22
**opportunities**
400:21
**option** 389:14,20
389:21 390:2,6,11
391:7,16,20,23
393:12 394:14,20
**options** 401:16
**order** 261:16 299:3
307:7 316:17
330:13,24 331:8
334:17 387:12,22
**organizational**
333:21,25
**original** 322:14
362:18 410:20
417:2
**originally** 424:17
425:9 427:22
**outlined** 305:5
360:7 403:9,15
**output** 263:8 275:3
**outrage** 466:16
**outraged** 466:6
**outside** 352:13
353:18,20
**overwrite** 410:22
426:20
**overwritten** 410:24
**owe** 286:21 320:18
465:24
**owed** 320:19
**owing** 466:18

| **P** |
| --- |

**p** 257:2,2 258:2
259:10,10 261:23
264:8 295:13
297:4 340:15
363:24 405:2,6
447:22 448:2
464:4,10 466:13
480:25
**pacifica** 257:9
**pad** 273:21 290:23
371:8
**page** 261:23 264:6
264:7 276:6 285:7
295:10,11 307:20
314:12 317:12
322:25 327:8
328:12 332:10,11
334:11 341:24
342:6 345:14
367:10 371:15,16
387:13 389:8
395:14 406:17,23
407:9 421:25
425:17 431:11
433:19 434:5
439:17 440:18
442:23 470:20
478:19 484:11
**pages** 439:6 451:4
476:9
**paid** 334:4 354:16
438:2
**pants** 273:2
**paper** 333:13
**paragraph** 264:11
267:3 276:20
282:21 285:8
307:5,21 309:14
309:22 315:6
321:5 322:3,14,17
323:2 328:8,11,13
328:17,20,24
330:12,15,17,22
331:7 332:9,11,16
334:14 371:21,22
371:23,24 372:20

373:20,22 374:14
456:12 470:19
472:6 473:2,20
**paragraphs** 374:3
**parameters** 416:25
418:18,19
**parens** 359:21
367:19
**parentheses** 264:14
367:20 398:25
470:21
**park** 353:23
**part** 259:23 263:17
301:7 354:18
357:22 403:24
465:16 466:3
470:14
**participants** 396:7
**particular** 370:9
454:12 460:6
**particularly** 355:10
**parties** 489:12
**parts** 424:13
**paul** 257:9 259:4
362:15
**pay** 286:13 321:12
321:14 378:14,17
408:13,18,24
409:6,18 411:3,4
412:5 420:6 422:6
437:25 466:7,14
467:6 468:4,7,13
468:16,17 469:2,4
469:9,21
**payable** 364:5
469:16
**payer** 321:12,13
**paying** 408:24
413:2
**payment** 273:17
466:19 469:24
**pays** 307:15,15
**pending** 260:20
**penultimate** 323:2
**people** 261:18
338:4 351:12,20
358:8 365:16

**percent** 272:6
276:3 286:14,17
309:18 314:4
321:13 335:3,8
336:6,12,14,21,23
336:25 337:3,10
337:19,19,22,24
341:16,20 342:2,7
353:17,21 378:18
409:9,24 411:5,6
411:10,10,12
412:11,20 413:19
416:4 417:9
418:13,21,23
419:3 420:7,8
433:21 439:19
440:14 447:8
451:4
**perceptive** 339:8
**perform** 348:24
**period** 382:25
395:21 414:4
**periods** 274:7,11
**permitted** 403:18
**person** 293:23
294:4 473:19
**personal** 266:9,15
266:21
**personally** 269:16
269:19
**peter** 256:13 258:1
258:5 259:1 260:1
261:1,2 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1,12
277:1,18 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1,4

296:1,23 297:1
298:1 299:1 300:1
301:1,18 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1,4
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1,20
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1,16
339:1 340:1 341:1
342:1 343:1,2
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1,5 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1,17,20
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1
396:1 397:1,24
398:1,11,19 399:1
400:1,11 401:1
402:1 403:1 404:1
405:1 406:1 407:1
408:1 409:1 410:1
411:1 412:1 413:1
414:1 415:1 416:1
417:1 418:1 419:1
420:1 421:1 422:1
423:1 424:1 425:1

426:1 427:1 428:1
429:1 430:1 431:1
432:1 433:1 434:1
435:1 436:1 437:1
438:1 439:1 440:1
441:1 442:1 443:1
444:1 445:1 446:1
447:1 448:1,4
449:1 450:1 451:1
452:1 453:1 454:1
455:1 456:1,10,18
457:1,20 458:1
459:1,9 460:1
461:1 462:1 463:1
464:1,13 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1 476:1 477:1
478:1 479:1 480:1
481:1,3 483:8
484:14,17,21
485:4,7,11,15,17
485:23 486:8,10
488:6,9,14 489:6
**peters** 257:16
258:15
**petronas** 393:4
**pfm** 282:23 283:9
283:19 284:9,18
284:24
**phone** 349:4 368:7
468:23
**phonetic** 424:2
**phrase** 282:11
462:15
**phraseology** 395:6
**pick** 275:25 318:12
**piece** 349:3
**pilato** 386:5,5
**place** 270:18 326:3
341:10 388:25
465:19 489:10
**places** 472:17
**players** 370:14
383:14
**playing** 351:12

**please** 258:24
259:8 260:14,18
261:15 348:25
349:2 454:22
**plus** 332:12,22
393:11,20,20
394:6 409:23
411:5 480:10,11
**point** 267:5,11,15
268:6 269:7,10,12
269:18,20,23
270:5,8,9 271:5,6
271:8,14 272:2,7
273:25 274:19
277:4 288:9,12
312:2 315:24
319:22,25 351:21
370:9 375:4 380:3
380:5 385:8 387:6
402:2 403:18
416:20 427:17
437:2 446:9
**pointed** 423:7
**points** 268:2,24,24
273:25 309:24
312:4,15,22 315:2
315:16 323:9
324:16 347:7,12
347:17 352:21
375:25 390:17,20
390:25 391:6,14
391:21 395:8
410:9 412:7,16
418:14 434:8,18
435:10 437:18
440:20 443:13
444:12 446:4
447:9 474:11
479:21,21 480:4
**portion** 376:25
**position** 406:18,19
406:20 407:4
**positive** 377:8,9
479:21,22 480:3,9
**possession** 292:21
396:20
**possible** 276:22

281:7 370:12
437:5
**potential** 370:17
**practice** 290:17
313:11 366:5
387:25
**prefer** 445:4
**preliminary** 268:8
269:9 285:23,24
**premarked** 456:8
**preparation** 396:3
**prepare** 278:17
300:19 301:2,7
350:11
**prepared** 278:12
278:13,19 302:5
302:10 319:20
346:5 350:8,15
365:15 367:5
461:14 462:3
**preparing** 276:12
344:16
**present** 257:14
272:15,19 273:6
420:9
**presenting** 401:17
**pretty** 354:17
355:3,15 478:6
**prevail** 470:3
**previously** 338:14
338:21 400:9,15
430:14 435:16
448:25 456:17
485:16 486:9
488:5
**prewett** 256:19
258:19 489:4
**price** 275:5,7
**prices** 395:22
**pricing** 275:15,22
299:20
**primarily** 448:15
**principal** 271:20
289:24 293:24
294:5
**principally** 290:10
290:15

**principia** 288:25
289:12,14,15,18
289:23 290:10
405:8,20 406:3
407:14 421:7,15
421:16,17 423:16
423:23 424:14
428:5,20 429:15
429:25 430:20
438:13 441:2
442:14,21 443:17
445:11 446:15
448:12 449:12
452:8 454:25
457:9 474:20
478:5 486:13,15
486:18,20,23
487:3,6,8,11,13
487:16,18,21
488:3
**principles** 417:21
**printed** 452:2
454:9,13
**printing** 472:16
478:7
**printout** 343:10
**printouts** 446:10
**prior** 270:21
279:18 280:5
284:6 285:18
286:7 287:2,25
292:10,12,18
304:6 305:2,10
309:11 311:15
363:4 390:16
399:24 400:24
408:4 427:17
436:24 473:2
476:11 489:6
**privilege** 260:21
304:12
**privileges** 291:25
**probably** 289:8
318:2 362:15
372:22 373:8,16
374:20 375:2,24
377:3 410:18,25

411:2 458:20
475:2 476:3,8
**problem** 274:25
275:19
**problems** 421:5
**proceedings** 256:17
338:19 400:13
456:21
**process** 276:23
281:8 301:7 306:3
329:25 330:9
358:2 360:7
361:17,18 371:4
371:12 378:21
**produce** 304:20
367:7 418:11
**produced** 289:19
291:23 292:25
293:13 304:9
367:8 392:5,9,16
392:19 396:14
401:25 458:12,15
464:20
**product** 365:24
387:11 396:10,12
**production** 289:23
480:8
**products** 400:6
**professional**
256:20 489:4
**profit** 308:24
311:13,15,18
312:3,15,23
358:22 378:24
387:22
**profits** 387:12
**progress** 472:9,21
473:8
**projected** 462:4
**prompted** 373:14
**proper** 334:17
437:14
**proposal** 268:19
269:3 279:13,24
467:21
**propose** 279:9
**proposed** 280:8

294:9
**proposing** 278:25
279:21
**provide** 279:22
294:10,17 308:5
456:13
**provided** 279:11
282:2 396:6
422:22 458:18
477:17
**provider** 283:3
**providers** 397:8
**providing** 294:14
**public** 256:22
259:11 489:4,7,19
**pull** 323:23 426:22
**pulling** 313:21
**purchase** 283:2
**purchasers** 370:17
**purely** 300:9
**purported** 461:14
**purports** 461:21
**purpose** 327:9
334:23
**purposes** 300:7
335:6 341:14
352:9,10,12,15
418:21 460:5,9,17
461:9
**pursue** 403:14
**pushing** 319:8
369:18
**put** 291:6 300:2
308:18 312:25
313:2,4 314:3
330:17 341:9
373:21 388:25
413:12 414:6
416:18 419:15,18
425:9 452:8
**putting** 300:7
316:16 336:25
**pv** 273:3 418:15
**pved** 417:12

**Q**

**qualifier** 309:9

**question** 259:24
260:3,11,20
261:11 266:19
271:11 280:22
282:3 285:4
292:10,12,18
294:2 305:23,25
306:5 312:6 324:4
349:5 351:22
352:11 369:5
391:13 399:25
402:11,21 422:4
426:7 432:5 449:2
453:19,19,25
454:7 460:8,18
461:10 462:24
473:3 477:8
478:13
**questioned** 310:4
**questioning** 354:13
**questions** 260:5,13
306:3 316:24
395:11 441:18
453:13,14,14
458:21,24 460:24
461:6 477:21
480:18
**quibble** 349:11
**quite** 320:3 357:16
373:12 458:14
**quotation** 329:25
**quotations** 359:22
360:4,6,8,13
361:12,23
**quote** 285:14
395:20 396:5,9,14
396:21,25 397:12
397:17 472:9
484:4
**quoted** 267:4
268:23 396:15
**quoting** 330:2
359:18

**R**

**r** 257:2 258:2
259:10,10 482:2

**racking** 403:20
**raised** 466:20
467:2 468:25
469:10
**raising** 369:7
465:24
**ran** 477:11
**random** 335:21,22
335:25
**range** 316:12 348:4
350:17,24 351:8
351:16,25 352:13
352:24 353:6,10
363:24 394:5
**rarely** 313:16
350:13
**rate** 273:9,10,19,20
286:12 287:4
306:21 307:3
321:11,12,14
332:23 378:14,20
398:25 408:20
409:10,11,15
411:7,9,11 412:6
412:9,21 414:16
414:21 415:3,11
415:17,24 416:23
416:24 417:7
418:6,13,19,20
419:19,23 420:21
420:22 426:12
**rates** 271:13
286:18,23 287:4
411:14 415:6,9,13
415:20,25 418:11
419:12 420:3
421:3
**rcv** 408:10,22
409:3
**reach** 315:20
475:10
**read** 261:15 280:19
312:8,12 317:25
318:11 334:2
356:20,24 365:7
366:18 368:20,25
373:11,18,19

374:2,5,6,11
385:12 436:24
453:15 454:21
455:25 459:6
470:16 479:11,15
482:5
**reading** 261:19
284:16 305:12
325:9 368:23
369:4,17,23
432:12 466:2,11
**ready** 316:23 317:2
**real** 411:22
**reality** 419:17
**realize** 320:24
**realized** 439:16
464:19
**really** 304:23
312:19 356:25
359:16 361:13
371:8 375:8
376:23 378:15
403:19 411:13,16
412:22 414:7
415:2,12 416:21
440:4 452:25
458:13 470:14
**reason** 272:23
298:19 300:13
333:20 340:9
429:11 450:22
460:21
**reasonable** 320:7
354:23 437:16,22
440:9
**reasonableness**
358:10,17 359:10
440:8
**reasonably** 320:22
**reasons** 309:15,22
357:17
**rebekah** 257:5
259:2
**rebuttal** 390:19
455:16,23,25
456:2
**recalculated**

269:22
**recall** 269:13 270:4
270:20 284:12,21
288:18 293:15,19
295:20 296:4
298:3 304:15,25
318:23 319:2
324:14 325:20,24
329:19 333:6,7
336:3,15,22 337:8
337:12,17 338:13
339:20,25 344:11
344:16 346:22
347:2,3,9 350:2
351:23 352:3,5
353:3,4,8,15
355:23 356:21
357:6,11,15,18
360:17,22 361:2,6
361:13 363:7,11
363:19 364:18
369:6,24 381:6
382:18 388:16
393:15 398:14
399:3,7,8,9,10
401:8,14,17
402:13,19 403:3
403:13 404:6,8
425:6,20,23,24
433:14,18 434:15
435:7,11 436:3,4
436:6,10,21
437:11 439:10,14
442:3,12 443:7
448:9 452:24
463:8 465:5,8,18
465:20,22 466:17
466:24 476:24
477:15
**recalling** 337:7
351:13,17 352:2
353:21 403:12,19
**receive** 408:18
409:8 420:6
**received** 452:3
**receiving** 408:23
**recess** 405:4

**rechecking** 293:24
**recognize** 261:13
325:10 343:13,18
343:20 365:10,11
367:21 405:17
**recollection** 296:3
351:7 357:4
369:11 443:10
468:15 475:6
479:19
**recollections** 296:9
**record** 258:23
261:8 283:25
286:16 288:4
292:17 294:21
296:19 301:23
308:12 310:3,7
311:6 312:24
317:4 325:6 340:3
340:25 342:19,21
354:9 356:11
357:4 361:15
362:16 365:24
376:15 379:15
386:5 404:15,24
405:3,6 409:14
419:21 446:13
447:22,23 451:24
453:16 456:9
464:5,7,10 477:24
480:23
**recorded** 436:23
**records** 291:17
292:5 293:11
**recounting** 398:16
**recover** 353:17
**recoveries** 355:10
**recovery** 354:14
**redacted** 261:22
365:23
**redirect** 479:16
**redline** 317:25
**reduced** 390:20,24
**refer** 265:19
271:21 290:22
350:25 367:18,18
403:7 407:24

408:17
**reference** 329:17
417:25 422:11
462:22
**referenced** 280:6
301:12
**referencing** 409:6
**referred** 323:3
473:20
**referring** 263:21
265:12,18,19
279:3 288:24
289:3,10 296:13
302:17 345:2
360:6 374:24
377:7 379:3,9
382:5,9 395:25
399:4 400:18
401:6 463:17
471:6 473:16,18
**refers** 285:8 345:11
345:24 375:14
407:5
**refine** 287:14
**reflect** 438:8
457:15
**reflected** 279:5
325:17 341:23
344:14 358:12
363:20 370:2
372:13 381:8
401:7,19 402:17
437:5 454:16
455:3 466:3,4
475:11
**reflecting** 292:21
293:12 300:19
325:14 423:6
**reflects** 421:18
422:16 423:4
426:3 434:7 439:6
441:10
**refresh** 296:2
356:25 479:18
**regarding** 302:10
306:8 329:11
371:3 471:20,24

484:5
**regardless** 332:4
**registered** 256:19
489:4
**reinvest** 403:23
**reiterate** 478:9
**relate** 367:2
**related** 295:24
471:21,25 484:6
**relates** 460:4
**relating** 371:11
402:5 462:8,10,11
463:9 471:4
**relation** 355:17
**relationship** 348:6
389:6
**relative** 489:12,13
**relatively** 271:16
**relevant** 435:6
**rely** 370:24
**remarked** 368:22
**remember** 263:3
296:11 297:18,21
298:14 310:6
319:19 326:17
367:23 378:16
380:7 394:2,22
414:13 436:23
448:23 449:4
452:22 471:11,15
**remembering**
335:20 451:21
471:17
**remind** 259:18
**removal** 342:10
**remove** 281:25
**removed** 341:7,12
341:13
**repeat** 429:24
**repeated** 419:7
**repeatedly** 320:9
**rephrase** 260:12
**replace** 277:5,10
**replaced** 282:9,10
**replacement**
276:22 279:24
280:10,15,25

281:7,16,25
282:10 294:11
308:5,22 309:10
**reply** 297:20
**report** 390:20
455:16,23,25
456:2 463:17
**reporter** 256:20,21
256:22 258:18
259:8,21 260:7
261:4,6 277:24,25
295:7 296:16
297:2 301:21,22
316:7,9 324:23,24
343:5,7 356:8,9
364:24,25 397:25
405:10,12 421:9
421:12 423:18,21
427:25 428:7,22
429:17 430:22
438:15,18 441:4
442:16 443:19
445:13,15 446:17
446:19 449:15
457:23,25 464:16
489:4,5,5
**reporting** 258:16
258:20 368:16
**represent** 410:2
439:22
**representative**
369:20 469:7
**representatives**
473:17
**request** 282:19
397:13 454:10
471:19,23 484:5
**requested** 397:18
484:2,4
**required** 463:4
**reserve** 263:22
264:22 277:20
284:19,25 285:20
302:11 303:23
306:16,22 307:7
308:5 309:17
315:8,23 326:8,12

326:21 327:11
331:8,16,17 332:5
346:25 347:6,11
347:15 355:18
360:11 362:4
363:2 369:9
397:22 398:21
399:13 400:8
434:17,21 435:9
436:7 484:18
486:7
**respect** 478:24
**respond** 467:3
**response** 280:22
**responsible** 267:25
**responsive** 282:18
**restate** 402:21
436:5 454:23
**result** 414:7 419:11
420:2,9 421:3
**resulting** 480:2
**retained** 361:16
**retrace** 476:4
**returns** 398:25
**rev** 450:19
**reveal** 460:7
**revenue** 334:24
**reverse** 261:16
349:16 380:25
382:7
**review** 325:8
356:19 397:23
401:21 458:8
486:8
**reviewed** 305:11
360:19,21,23
397:7 398:13
399:25 400:4
401:16
**revise** 281:24 282:5
282:6
**revised** 282:8 318:7
321:4 325:11,13
**revisions** 326:2
**revisit** 269:11,17
269:20 366:21
**revisited** 269:14

**reworded** 308:13
**rfa** 263:2,12,21
265:7,8,13 266:3
266:10 274:15
290:6 291:19
292:8,23 293:9,18
293:22 295:24
296:6 300:20
301:19 328:10,16
331:2 332:24
334:15 346:4,12
360:7 383:15
396:17 408:2,3,6
409:10,15 425:21
427:10 433:10,16
443:5 452:20
456:14 485:8
**rfpa** 383:15
**rich** 261:23
**richard** 367:22
**right** 261:16
265:17 267:13
272:16,17 273:3
276:2,10 280:7
304:22 305:20
309:20 318:16
319:13 320:3,16
324:5 332:7 349:6
355:5 356:17
364:10,18,20
367:14 372:3
373:20 374:10,23
385:15 387:8
390:24 393:3,6
395:19 406:17
409:18 412:19,25
415:4,16 427:13
427:18 431:18
451:15
**righthand** 406:25
**rigor** 313:23
368:11
**rigorous** 303:8,9
310:22 313:17
319:8 325:18
335:22 437:21
**rigorously** 314:20

314:23 320:2
324:13 337:15
437:15
**ring** 439:23
**risky** 386:21
**road** 276:23
**robust** 291:3
**rocket** 271:17
**role** 283:4
**rosemawr** 380:3,6
380:9
**rough** 288:20
353:23
**roughly** 363:25
**round** 313:15,16,17
313:19 314:19
**run** 274:23 289:21
415:22,23 425:11
429:12,21,24
430:12,15,17
431:7 432:17,19
434:20 438:24
439:3 440:22
441:15 443:4,9
444:2,6 447:4
**running** 366:6
435:2

---

**S**

**s** 257:2 258:2
259:10 371:24
374:3 379:6
484:10
**sachs** 275:9
**sale** 371:3,12
**samsung** 349:4
**sandeep** 369:19
466:25 473:19
**sat** 379:18
**save** 426:15,20
**saves** 426:16,21
**saw** 318:20 325:14
339:13 394:4
429:9
**sawyer** 257:4
258:25,25 259:14
342:13 360:16

392:8,14 397:11
402:3,23 404:14
447:20 448:6
452:4,9,16 453:24
458:13,19 459:3
460:13,23 463:22
464:23 471:18
472:5 474:2
477:20 478:8
479:17 480:17
483:11
**saying** 276:2
279:16 284:6
290:9 292:11
304:17 307:6
317:22 369:20
370:4 376:22
377:12 378:12,18
381:15,15,21
384:23 385:9
386:17,18,19
387:15 388:12,14
388:16,20,23
389:5 392:22
396:9 397:9
398:10,18 404:21
412:4,19 413:8
414:13 416:15
418:5,22 419:9
420:11,12 467:4
468:11 476:17
**says** 264:24 276:15
276:21 280:19
281:11 282:21
283:10 285:8,9
297:9 315:6 321:8
324:6 328:15
330:23 331:6
332:12,17,21
335:2 344:21
345:4 348:10
359:15 367:12
369:12 372:21
376:4 377:2 379:6
380:16,20 382:3
382:12 383:8
384:8,21 385:10

385:17 387:8,9
393:4,8 394:12
395:2,19 396:24
397:4,5,5,6
406:18,18 407:20
408:6,10,13
409:23 410:12
411:4,20 414:20
421:20 424:5,19
431:24 447:14
449:7 450:18,19
457:5 466:13
473:12 474:4
**scare** 470:17
**scenario** 347:22
**scenarios** 436:11
436:13 459:16
**schwartz** 371:25
374:4 383:20,23
384:5 385:3 387:9
**schwartzs** 383:4
**science** 271:17
**scope** 277:22 392:6
403:17 484:18
**scratch** 273:21
290:23 371:8
426:25
**screen** 288:24
289:8,13 365:17
404:16 405:8,15
407:9,15,17 421:7
421:17,18 422:23
423:16,23 425:14
428:3,5,20 429:2
429:15 430:5,20
431:2,11 438:13
438:19 441:2,8,12
442:14,21 443:17
443:23 445:11,18
446:15,23 448:7
449:12,19 452:11
456:24 457:14
473:23 474:20
486:13,15,18,20
486:23 487:3,6,8
487:11,13,16,18
487:21 488:3

| | | | | |
|---|---|---|---|---|
| **seat** 273:2 | 374:4,22 376:7 | 340:5,10,20 | **sfg** 301:20,25 316:5 | 320:1 321:1 322:1 |
| **seattle** 257:10 | 377:5 379:6 | 451:25 454:11 | 316:12 324:22 | 322:3 323:1 324:1 |
| **second** 262:3 267:2 | 380:16 381:4 | 463:24 | 325:6 332:10 | 324:18,20 325:1,2 |
| 295:10 307:19 | 382:16 383:3,4,10 | **sentence** 262:3 | 334:12 343:4,11 | 325:15,22,22 |
| 322:25 328:8,9,11 | 383:21 384:10 | 264:12 282:22 | 356:7,12 364:23 | 326:1,10 327:1 |
| 328:13,17,20 | 385:21 389:10,17 | 307:25 308:14,18 | 365:5 405:9,16 | 328:1,24 329:1,5 |
| 334:11 367:10 | 393:5,13 395:14 | 308:21 309:7,11 | 421:8,13 423:17 | 329:22 330:1,12 |
| 392:23 407:9 | 395:23 406:19 | 309:13 321:5 | 423:24 428:6,9,21 | 330:17,21,22,23 |
| 421:25 425:16 | 407:21 408:14 | 322:5 328:9,14,21 | 429:3,16 430:6,21 | 331:1,5 332:1,10 |
| 430:16 431:10 | 409:3,4,6 424:3,6 | 341:6,13 342:10 | 431:3 438:14,20 | 332:16,21 333:1 |
| 470:19 | 425:18 428:12,14 | **sentences** 330:21 | 441:3,9 442:15,22 | 334:1,12 335:1 |
| **section** 329:7,11,11 | 429:5 430:9 431:4 | 393:7 | 443:18 445:12,18 | 336:1 337:1 338:1 |
| 330:6 341:4 | 431:8,13,21 | **sequence** 336:23 | 446:16,22 449:14 | 338:16 339:1,6,10 |
| 342:11 367:11 | 433:21 434:9,12 | **series** 302:17 | 457:22 458:4 | 340:1,13,19 341:1 |
| 369:2 381:23 | 436:14 437:8 | 416:16 | 485:8,12,15,20,24 | 341:3,6 342:1,5 |
| 409:19 411:4 | 439:19 440:20 | **serious** 472:11 | 486:4,13,16,18,21 | 343:1,2,3,9 344:1 |
| **sections** 368:25 | 441:16 442:25 | **serve** 283:3 | 486:23 487:4,6,9 | 344:14 345:1 |
| 408:17 | 444:3,13 445:21 | **services** 277:21,22 | 487:11,14,16,19 | 346:1 347:1 348:1 |
| **secure** 280:15 | 446:25 447:9,10 | 278:24 279:5,10 | 487:21 488:4,10 | 349:1 350:1 351:1 |
| **securities** 369:14 | 449:21,25 450:4 | 279:21 280:14,24 | **shapiro** 256:13 | 352:1 353:1 354:1 |
| **security** 389:23 | 450:19 451:4,8,10 | 282:2 283:9 | 258:1,5 259:1,15 | 354:10 355:1 |
| **see** 261:25 262:7 | 456:15,16 457:3 | 294:12,14,17 | 260:1,24 261:1,2 | 356:1,3,5,11 |
| 264:9,18 267:7 | 459:2,10,15,18 | 484:18,19 | 261:8 262:1 263:1 | 357:1 358:1,13 |
| 268:20 276:18 | 469:18 470:13 | **serving** 283:19 | 264:1 265:1 266:1 | 359:1 360:1 361:1 |
| 277:2 283:5 | 472:25 474:6,11 | 284:10 470:22 | 267:1 268:1 269:1 | 362:1,23 363:1,21 |
| 285:16 289:8 | 478:21 | **set** 291:11,13 | 270:1 271:1 272:1 | 364:1,21,22 365:1 |
| 291:17 292:4,19 | **seeing** 275:11 | 304:23 317:18 | 273:1 274:1 275:1 | 365:3,8 366:1,14 |
| 293:6,20 295:14 | 357:13 480:7 | 367:6 380:2 | 276:1 277:1,17,19 | 367:1 368:1 369:1 |
| 295:18 297:13 | **seen** 289:22 326:10 | 392:15 395:17 | 278:1,3 279:1 | 370:1 371:1 372:1 |
| 299:9,21 307:23 | 407:13,13,16 | 404:11 409:3 | 280:1 281:1,25 | 373:1 374:1 375:1 |
| 308:12 309:2 | 433:24 444:10 | 414:16 424:16,23 | 282:1,16 283:1 | 376:1 377:1 378:1 |
| 310:2,6 311:5 | 447:12 | 489:10 | 284:1 285:1 286:1 | 379:1 380:1 381:1 |
| 315:10 317:16 | **select** 263:5,11 | **sets** 367:4 441:23 | 287:1 288:1 289:1 | 382:1 383:1 384:1 |
| 318:3 321:15 | **selection** 282:25 | **setting** 298:25 | 290:1 291:1 292:1 | 385:1 386:1 387:1 |
| 323:5 326:14 | **selfevident** 315:17 | 420:6 472:18,21 | 293:1 294:1,7,20 | 388:1 389:1 390:1 |
| 328:10,18 330:14 | 432:11 | **settle** 469:15 | 295:1,2,4 296:1 | 391:1 392:1 393:1 |
| 331:3,11 332:13 | **selfinterest** 437:24 | **settled** 351:16 | 296:18,21,23 | 394:1 395:1 396:1 |
| 333:2,3,11 334:16 | **sell** 370:11 | 471:16 | 297:1 298:1 299:1 | 397:1,19,24 398:1 |
| 334:20 335:9 | **semicolon** 389:12 | **settlement** 259:6 | 300:1 301:1,16,18 | 398:3,4,11,19 |
| 340:16 341:4 | **sending** 297:8 | 263:23 276:25 | 301:24 302:1 | 399:1 400:1,10,11 |
| 344:23 345:21 | 340:14 | 277:19 281:10,18 | 303:1 304:1 305:1 | 400:15,23 401:1,8 |
| 350:17,22 355:8 | **sense** 261:18 268:7 | 339:18,23 467:21 | 306:1 307:1 308:1 | 401:19,24 402:1,5 |
| 356:16 359:13 | 280:2 295:18 | 469:15 484:17 | 309:1 310:1 311:1 | 402:17 403:1,7,10 |
| 363:15 364:2 | 296:14 340:12 | **seven** 345:16 431:2 | 312:1 313:1 314:1 | 403:15 404:1,11 |
| 365:10 367:13 | 359:2 393:21 | 432:10,16 433:4 | 315:1 316:1,2,4 | 405:1,7,14,18 |
| 371:18,20 372:2 | 416:19 473:9 | 438:22 456:12 | 316:11 317:1,20 | 406:1 407:1 408:1 |
| 372:24 373:4,24 | **sent** 318:6 339:23 | **severely** 308:19 | 318:1,20 319:1 | 409:1 410:1 411:1 |

412:1 413:1 414:1
415:1 416:1 417:1
418:1 419:1 420:1
421:1,6,12 422:1
423:1,15,22 424:1
424:6 425:1 426:1
427:1 428:1,4,19
428:25 429:1,14
429:20,21 430:1,4
430:19,25 431:1
432:1 433:1,7
434:1 435:1 436:1
437:1 438:1,12,18
439:1,3 440:1,25
441:1,7 442:1,13
442:19 443:1,16
443:22 444:1
445:1,10,17 446:1
446:14,21 447:1
448:1,4 449:1,5,7
449:11,17 450:1
451:1 452:1 453:1
454:1,16,18 455:1
455:3 456:1,10,19
456:22 457:1,7,18
457:20 458:1,3
459:1,9 460:1
461:1 462:1 463:1
464:1,11,13,18
465:1 466:1 467:1
467:20 468:1
469:1 470:1,20
471:1 472:1 473:1
473:21 474:1,13
475:1,12 476:1
477:1 478:1,3
479:1 480:1 481:1
481:3 483:8
484:13,14,16,17
484:20,21 485:3,4
485:6,7,10,11,13
485:15,17,20,22
485:23 486:3,4,5
486:8,10,10,12,15
486:17,20,22
487:3,5,8,10,13
487:15,18,20

488:3,6,8,9,13,14
489:6
share 368:12
396:25
sharply 286:24
310:4
sheet 355:13
396:15 397:8
443:25
sheets 395:20 396:5
396:9,21 397:2,13
397:17 484:4
shes 398:15
shift 404:16
shifting 271:13
shlionsky 379:12
379:16,17,18
381:7 382:18
387:8 388:2,3,24
shoes 308:25
shop 287:13 426:14
short 328:4 342:14
shortchange 438:5
shorthand 256:21
489:5
shortly 361:19
shot 405:8,16 407:9
421:7,18 423:16
428:5,20 429:2,15
430:20 431:11
438:13 441:2,13
442:14 443:17
445:11 446:15
449:12 486:13,15
486:18,20,23
487:3,6,8,11,13
487:16,18,21
488:3
shots 288:25 289:8
289:13 404:17
421:17 422:23
423:24 425:14
428:3 430:5 431:2
438:19 441:8
442:21 443:23
445:18 446:23
448:7 449:19

452:11 456:24
457:15 473:23
474:20
shouldnt 274:25
show 305:20
312:24 318:9
395:21
showed 338:5,6
475:24
showing 291:18
292:6 338:20
341:25 424:23
425:3,13 447:13
shown 297:20
422:21
shows 267:10
279:13 282:14
310:3 342:6 383:4
422:5,19 431:15
431:16 439:18
440:18 442:10
456:4 475:17
476:2,3,5,8,9
sic 359:20
side 355:5 412:5,6
sides 320:14,17
sign 444:19
signed 285:13
significant 308:23
silly 381:18
similar 321:11
396:16 398:23
470:23
simple 478:13
simplified 271:16
291:3
simplify 272:3
simply 286:23
292:18 370:21
sincere 387:10
singer 356:5,15
471:9,13 485:23
singers 471:20,24
484:6
singlepage 343:9
356:12 398:5
sit 273:21 318:24

335:20 336:15
340:6 357:3 395:9
403:11 442:12
452:25
sitting 298:17,24
304:14 340:2
369:12 372:9
384:2 427:11
452:23,23
situation 389:16
390:8 453:13
six 319:20 380:25
382:8 402:9 430:5
431:16 432:10
433:3,25 434:3
443:4
sixmonth 389:24
418:7
size 271:21 272:5
slang 327:14
slowly 259:20
small 323:13,19
472:8
software 289:2,12
405:9,21 407:14
410:17,21 412:20
413:15,17,24
414:8 416:11
417:14,15,18,19
420:5 421:8
423:17 426:15,16
428:6,21 429:16
430:21 432:10,16
438:14 441:3
442:15,21 443:18
445:12 446:16
448:12 455:2,6,13
457:9 486:13,16
486:18,21,23
487:4,6,9,11,14
487:16,19,21
solicit 360:7
somebody 292:19
346:5,9 386:25
387:17 425:10
426:10,12 427:16
450:14

sooner 395:10
sophisticated 349:3
sorry 266:11
298:20 328:15
332:9 361:4 374:9
381:11 402:25
429:19 440:19
441:22 454:20
457:7
sort 348:6 366:4,6
376:18
sorts 421:4
sounds 327:17
369:18
source 359:23,25
southern 256:2
258:9
southwest 359:21
speak 259:20 384:4
speaking 291:6
399:10
special 326:9,13
specialist 258:18
specific 263:18
265:7 266:4 291:7
296:8 298:16
300:3 301:11,13
370:3 462:5
465:20
specifically 353:21
357:19 456:11
specifics 290:18
319:3 351:17
speculate 337:7
344:9 446:8
speculating 277:16
278:22 329:15
333:18,24 351:5
427:15 435:22
speculation 277:12
281:21 312:7,18
346:19 349:24
351:3 354:22
434:24 450:10
spell 379:16
spelled 320:9
spelling 368:10

spend 320:24
    368:23 454:6
spent 264:15
spilled 320:9
spot 391:10
spread 303:12,19
    310:9 311:11,12
    311:16,20,25
    325:18 332:22
    334:22 335:2,8
    336:5,25 337:18
    337:23,23 338:9
    341:16,20,25
    342:6 345:14
    347:16 359:9
    361:23 375:10
    378:22,22 385:20
    386:10 393:9,23
    410:3,8 411:16,17
    413:11 418:14
    419:10,14,18
    421:24 422:12,25
    433:20 434:8
    437:3,14 439:18
    439:21 440:19
    451:3 455:15
    457:15 459:14,24
    460:16 461:3
    462:9,10,11,17,19
    463:5 472:25
    473:10,13 474:9
    475:6,16 476:13
    476:17,22,23
    477:6,17 479:19
    480:3
spreads 308:3
    333:13 358:12,20
    358:21 359:3,6
    362:3,25 394:24
    436:8 437:8,12
    443:12 444:15
    446:3 447:7 474:9
    474:16 480:9,10
    480:14
spreadsheet 332:12
    343:10,25 344:12
    344:17 346:6

347:21 350:8,12
    459:15,21 461:7
    461:14,19,20,23
    462:3,8,18,21,23
    463:2,9,19,20
spreadsheets
    291:18,23 292:13
    292:20 350:13
    444:10
spring 304:18
    350:13
staff 270:3 289:25
    290:3 294:16
    320:10 326:2
    406:4 434:20
stamp 334:12
    343:11 405:16
    430:6 431:3 434:6
stamped 261:9
    278:4 294:22
    296:19 301:25
    325:5 338:24
    356:12 365:5
    398:6 421:13
    428:9 429:3
    438:20 441:9
    442:22 443:24
    446:21 458:3
    478:19
stamps 449:20
standalone 411:2
stanley 383:19,24
    396:14
stapled 316:13,15
    317:5
stapling 316:19
start 261:21 303:22
    313:11 322:3
    331:17 370:5,8,16
    376:17 378:19
    380:15 407:20
    408:2 424:15
started 259:19
    318:10 362:13
    389:7
starting 322:16
    328:8,14 375:4

385:2
starts 307:5,22
    316:14 330:13
    332:17 355:6
    371:21,23,24
    384:22 389:9
    398:9,18 459:9
state 259:5 263:23
    296:24 361:14
    485:5
stated 286:12
    309:22 416:23
    425:18
statement 307:12
    308:9 309:5
    467:19
states 256:2 258:8
stating 285:14
    288:10
status 397:23 486:8
stay 336:6
stenographic
    256:16
stenographically
    489:9
step 275:21 308:24
stephenson 295:5
    484:22
steps 292:4
stop 352:7 392:23
stopped 380:8
stops 275:10
straight 380:9
strategies 401:10
strategy 279:23
    294:11 385:10
    386:22 387:16
    470:17
street 256:23 257:5
    258:12
strengthen 308:18
strictly 352:23
strong 438:4
strongly 466:5
structural 384:25
structure 411:18
    412:23 413:10

415:14 418:24
    419:2,4 420:12,13
structured 417:8
stuff 263:8 452:7
style 265:22
subject 261:2 263:7
    277:20 291:24
    295:5 296:23
    301:18 316:5
    324:21 356:6
    397:21 457:21
    464:13 484:14,18
    484:22 485:4,7,11
    485:15,24 486:6
    488:10,15
subscribed 482:11
subsequent 268:9
    268:20 284:7
    336:7 454:14,25
    455:7
subsequently 310:3
substance 460:7,8
substantially 364:7
    364:11
substantive 333:20
    461:6
subtract 378:6,8,20
    411:6,10 412:20
    418:14
subtracted 413:19
subtraction 375:8
subtractions
    378:22
subtracts 412:22
    420:8
suggesting 354:13
sunday 300:15
    317:12
supplied 427:22
supposed 427:16
sure 263:20 275:11
    302:14 305:22
    316:25 320:2
    342:16 343:21
    344:4 354:8
    366:19 369:3
    376:14 380:2,4

393:17 401:12,22
    409:13 420:4
    444:24 445:8
    447:20 451:24
    464:2 477:4
surprise 323:8,10
    353:25 354:4
surprised 323:14
surprises 357:3
surprising 323:12
survey 397:7
suspect 424:12,13
swap 264:15
    271:22 273:14,20
    275:8 278:7,16,25
    279:11,21,25
    280:7,14,24
    281:14 282:5
    285:19,25 286:5
    286:25 287:8
    288:25 289:11
    290:3,20 291:9,12
    291:12,16 292:3,5
    292:11,20 293:6
    293:16,20 306:21
    307:3,17 309:16
    309:23 321:11
    322:6 326:2
    327:15 332:18,23
    344:12 346:2,6,8
    347:4,10,14,19
    350:4,8,12 363:12
    364:9,15 370:19
    389:9 391:22
    396:19 408:20
    410:4 411:25
    412:2,2 414:4,6
    414:21 417:2
    440:7,9,13,18
    448:22 452:18
    455:2 459:23
    462:7 463:8
    465:14 476:12,25
    477:16 479:24
    480:12
swapping 415:13

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

swaps 415:21
swear 259:8
sworn 259:11
482:11 489:6
system 291:9,11
424:14 445:7
448:15
systems 289:17
290:15,19

**T**

t 259:10 482:2
484:10
tab 256:19 258:19
489:4
table 472:10,19,21
take 259:21 260:7
260:18,20 272:15
287:15 292:4
317:8 319:8,17
336:13,20 337:3
342:13 345:12
349:9,15 404:17
404:18 410:21
418:12 422:18
447:18 463:22
taken 256:18
336:23 342:22
361:22 364:22
405:4 447:24
464:8 486:3 489:9
takes 311:22 420:7
talk 398:20
talked 372:9
talking 264:3
290:16 291:14
301:3 334:14
360:14 365:16
373:11 374:18
406:22 407:25
talks 321:5
tambe 413:4
tape 258:3 342:25
448:3
teacher 322:13
team 263:14,17
436:25

technically 411:21
technology 349:3
telephone 467:23
tell 260:11 265:5
266:8,20 278:14
278:21 295:25
299:3 305:8,11,15
311:7 312:20
315:3 321:6
346:13,21 348:13
348:16 354:20
359:4 363:5
369:15 373:7
382:21 388:24
405:23 410:25
412:24 426:9
433:8,13 458:22
476:18,22 477:4
telling 274:23
317:14 375:23
376:15 381:7
382:19 386:2,6
390:5
ten 272:25 273:4
411:22 414:25
442:20 444:7,11
473:4
tenyear 411:20,25
411:25
term 326:22 415:14
termination 270:18
297:11,16,24
298:5,9,18,25
327:25 329:12,18
330:3,9 361:4
362:6,17 375:5
377:16 449:12
465:25 466:19
479:25 480:13
488:3
terms 267:5 268:24
271:20 301:4
304:19 306:17
311:21 319:16
323:11 328:9,14
328:16 377:12
394:24 416:19

462:22 463:17
472:24
territory 377:21
testified 259:12
339:15 451:20
testify 259:12
445:4 471:13
489:7
testimony 471:20
471:24 482:6
484:6 489:9
thank 260:16 264:4
339:3 374:8
thanks 276:12
thats 261:17,22
263:14,15 274:16
275:21 276:4,8
281:11 282:13,13
283:10 289:15,16
291:10,10 304:2
305:17 312:9
314:12,13 322:12
323:19,20 327:7
328:2 331:22
334:3 338:7
340:23 342:4
344:25 345:17
354:17 361:25
368:3 371:8 372:7
374:10 375:4,22
376:2 378:14
388:21 390:2,4
395:5,5 401:4
403:2,17 404:19
409:16,16,20
410:15 415:2
416:7,10 417:15
418:3,3,5 422:7
422:21 423:4
432:13 433:23
440:16 445:8
447:14 450:23
452:14 454:12
461:12,18 467:12
478:23 479:9,9,14
479:23 480:21
theres 355:5

398:23 452:13
480:7
theyre 381:15
397:14
thing 273:11,21
275:16 287:10
320:21 359:11
368:18,24 373:19
416:9
things 259:19
275:12 276:4
280:9 290:12,24
313:10 327:7
358:19,23 362:7
375:12,19 378:24
396:4 427:15
think 264:23 266:5
271:15,18 277:7
280:18 288:21
289:18 292:9
299:17 300:10
311:5 312:24
314:25 317:5,5
319:10 323:11
327:4 336:17
337:22 344:5
346:16 354:25
355:2 366:20,25
371:9 378:2
379:25 390:16
391:12 397:11
400:4 401:23
403:16 411:15
415:4 416:17
425:10,23 431:19
432:24 435:5,17
436:19 451:16
453:18 454:8
458:10 467:17,25
472:10 475:23
477:13 480:12,16
thinking 376:12
378:3 435:4
thinks 369:13
393:9,23
third 258:21
264:12 282:22

285:7 307:4 321:4
330:16 331:7
341:24 389:9
459:7
thirty 414:25
thomas 257:18
thought 308:17
312:3 355:2 363:4
386:21 387:24
392:8 399:13,22
437:14 438:9
440:2
three 279:23
345:14 383:7
412:17 414:16,23
423:23 426:24
427:6 428:15
429:9 433:24
434:4 441:23
445:25 448:3,14
threemonth 409:7
409:19 411:4
412:12,21 413:18
414:2,9,14,15,22
414:24 415:8,18
418:2 419:5
420:15
threw 437:3,6
thrust 319:6
thursday 256:24
time 260:18 262:20
262:23 264:15,21
266:6,8,10,23
268:14 269:5
270:9 273:25
274:6,11 276:3
277:4 284:24
286:2 300:3 312:2
319:16 326:4
327:2 342:17,23
349:16 353:22
360:15,16 362:9
364:10 368:23
370:9 379:22,24
382:25 391:9
395:21 402:9
404:18,25 405:5

406:9,12,13
412:16 414:4
415:25 417:4,6
441:21 447:22,25
448:16 451:14,15
451:17,22 452:18
454:6 455:5 464:3
464:9 474:21
480:24 489:10
times 272:11 273:4
294:3 349:9
351:11 473:4,7
476:3
titled 423:22
tobacco 259:5
263:23 277:19
308:3 333:14
339:18,23 341:5
342:11 356:6
357:13 358:3,6
360:11 361:10
366:23 367:2
375:11 398:22
399:5,12,18 403:7
403:22 404:3,4,9
479:7 484:17
485:24
today 260:6 304:14
417:12 457:22
476:5 488:10
todays 412:7
told 264:20,23
288:12 393:22
409:20 417:17
418:12
top 260:25 276:6
294:23 295:3
296:22 297:3
299:18 316:3
344:21 356:4,13
367:11 371:17
452:7,13 457:19
464:12,25 467:20
484:13,21 485:3
485:10,22 488:8
488:14
track 318:8 370:21

455:12
trade 299:24 300:8
trader 384:24
394:2 411:19
traders 387:10
transaction 271:11
271:12 275:6,23
280:10,15,25
281:17 282:24
291:13 300:2
301:6
transcript 256:13
256:16 482:5
489:9
trap 304:18,23
treasuries 389:23
trees 446:9
tried 459:3,4
476:25
trillion 355:11,22
trillions 355:25
trouble 274:5,8
troubled 316:18
true 467:12 489:9
trust 397:10
truth 259:12 489:7
489:7,7
try 259:23,25
287:14 361:8
387:17 437:23,24
438:6 452:24
470:17
trying 259:21
290:23 300:2
304:18,24 306:4
373:11 380:7
392:18 396:5
402:3,6 406:9
413:14 436:14,15
450:12 452:22
471:11
tsa 257:11 261:3,3
261:9 264:6,20
265:5 266:9,21
277:5,22 278:4
279:2,10,22 280:9
280:13,23 281:16

282:6 283:8
284:20,25 285:4
285:21 287:18
288:6,13 290:5
292:7 294:10,12
294:22 295:6
296:19,24,25
302:10 308:6,25
316:5 324:21
330:7 334:22
338:18,24 344:22
346:23 347:4
351:8,24 352:25
353:5,9,16 354:6
355:24 357:21,22
363:8 364:5 371:5
371:13 384:14
390:12 397:21,22
397:24 398:6
399:11,22 400:12
400:16,20 401:9
401:19 402:14
403:25 435:14
438:2,5 442:4
457:21 464:14
465:14,24 466:18
468:4,25 469:9,21
484:14,14,19,23
485:5,5,11,15,19
486:7,7,8,11
488:10,15
tsas 282:23 283:19
284:10 301:19
309:17 315:8,9
326:8,12,21
327:10 330:13,24
331:15 461:15
485:8
turn 322:24 367:9
371:15 387:13
389:8 406:16
407:8 431:10
434:5 440:17
456:12
tweak 459:17
twice 348:14,16
two 279:23 284:4

290:15 319:21
330:20 331:23
342:25 348:6,9
349:10,17 393:7
420:13,17 421:14
422:15 423:3
425:14 426:23
428:16 430:11
443:11 444:10
448:20 451:9,12
451:25 453:25
454:4,12 474:9,16
479:6
twominute 447:19
twopage 278:3
301:25
type 265:21 271:12
291:13 302:14
322:7 332:19
407:13 426:24
types 362:6
typical 378:2
typically 273:3
typing 365:17,18
typo 393:19 394:8
394:9,10 427:13
472:10
typographical
275:19

U

u 482:2
umhum 358:18
474:2
underlying 417:21
understand 260:8
260:10 263:25
283:7 306:4
312:14 374:7
381:25 395:7
402:4,10 408:16
413:14 417:13
420:5 474:15
understanding
315:25 462:19
470:11
understates 338:4

338:8
understood 260:14
260:22 281:12,15
281:22 403:2
408:4
undertaken 276:24
281:9
undertaking 371:4
unfamiliar 265:24
unique 381:3
382:14 388:9,13
388:20,22
united 256:2 258:8
unpaid 326:24
327:20
unrelated 470:24
unusual 359:17
unwind 373:3
377:4,12,15,19,23
378:2
unwinds 378:3
updates 410:19
upper 407:19
usd 409:6,19 411:4
412:12,21 413:18
414:2,9,14,15,22
415:7,18 417:25
420:15
use 262:13 265:11
273:9 280:24
281:5,6,14 289:17
290:20,21 321:10
322:6 327:15
332:12,18,22
367:18 368:17
369:15 387:17
406:8,12 413:25
414:8,19 417:19
457:9 478:9
user 424:15,15,23
425:3,6,8
uses 290:16 345:14
466:12
usually 271:21
275:21 378:3

V

valuation 262:13
267:20,23 275:15
279:23 284:19,24
285:19,23,25
292:22 294:11
295:24 296:6
299:24 300:9,20
301:19 302:10,14
303:2,5 304:7
305:6 315:20
319:9,13 323:8
326:8 327:3,16,16
327:22 346:4,12
364:17 390:11
391:15 407:7
410:6 416:18
419:15 422:8
436:18 437:9
440:8,10 455:22
456:5,13 457:6,16
475:13,15 476:13
485:8
valuations 454:25
value 262:25
263:12 267:6
268:2,5,9 269:7
269:11,17,20
270:4,8,10,22
271:4,6,8,10,20
272:14,15,20
273:6,24 274:18
286:4,6 290:5
291:11,18 292:7
293:8 300:7 301:6
306:15 307:7
315:8 320:13
321:9 322:6 331:8
331:16 332:18,24
346:24 347:5,15
369:9 375:15,17
376:18 389:15
390:7,14 391:7,18
391:20,22 393:11
394:13,21 414:6
417:12 420:10
422:21 423:7
433:15 434:16

435:25 438:9
449:13 456:4,4
469:4 470:8 477:2
488:4
valued 309:23
values 275:13
422:22
valuing 309:16
322:20 332:5
347:11 375:5
435:8 436:6
varieties 294:3
variety 262:18
various 273:25
300:4 311:20
351:10,20 396:5
400:5 412:15
vary 273:10
veracity 460:22
vergara 261:24
262:4,10,16,20,24
263:5,11,16
264:13 265:6,15
266:21 267:21
268:5,14 269:2
295:5 300:18
301:2,5 302:6,7
305:5 306:7,12
308:9 309:5,14
311:4,9 312:3,22
315:12 316:4
317:14 318:15,19
319:8 324:20
325:25 329:17,21
329:24 334:8,21
335:25 336:4
337:3,9 338:11,16
340:14 433:12
448:16,21 449:9
484:22 485:11,14
485:17
vergaras 264:21
310:8,14 323:7
335:11,13 337:20
410:7
version 302:25
303:4 304:6,15

308:13 325:11,13
335:18 339:16
340:19 405:8
420:8 421:7,14
422:15 423:3,16
423:23 426:23,23
427:6 428:2,5,15
428:15,20 429:2,9
429:10,15 430:5,8
430:20 431:2,16
432:9,10,16 433:3
433:3 438:13,19
438:21 441:2,8,12
442:14,20 443:17
443:23 444:7,11
445:11,17,24
446:15,22 447:6,7
447:12,12 449:19
450:15,19,23
453:8 454:15
456:23 473:22
486:12,15,17,20
486:22 487:3,5,8
487:10,13,15,18
487:20
versions 300:23
426:16,17 428:16
430:11 433:24
454:15
versus 332:21
419:4 452:10
video 258:17
videographer
257:16 258:3
259:7 260:6
342:17,23 404:25
405:5 447:21,25
464:3,9 480:19,24
videotaped 256:13
258:4 342:25
448:3 481:2
views 359:2
virginia 360:20,21
_____
W
w 257:4
wait 259:24 260:2

walks 461:11
want 259:18 280:20
280:24 281:13
283:18 291:5
300:4,6 352:8
361:8 365:9 374:2
374:6 396:16
404:18 419:6,24
420:4 426:23
444:24 452:14
458:20,22 461:2,5
463:23 479:13
wanted 282:17
310:19 311:10,10
314:20 437:13
456:12 479:12
wants 398:20
warning 260:16
washington 257:10
257:11 259:5
263:23 265:5
266:10,20 277:5
279:2,10 280:9,13
280:23 281:15
283:8 284:10,20
284:25 285:4,21
286:13,20 287:18
288:5,13 290:5
291:19 292:7,22
293:9,18,22
294:10,12 296:24
305:10 330:7
334:22 339:17,23
344:21 346:23
347:4 351:8,24
352:25 353:5,9,16
354:5 355:17,24
357:8,14,21,22,24
362:4,12 363:2,8
363:14 364:5,9
366:9,12,18,23
367:2 371:5,13
384:14 390:12
399:11,13,22
400:20 401:9,18
402:14 403:25
425:21 435:14

438:2,5 464:14
468:6,13,17,25
469:9,17,25 479:7
485:4 488:15
washingtons
359:10
wasnt 280:13
281:16 317:7
340:10 392:24
402:12 419:13
432:19 437:20
watching 357:11
way 261:17 271:18
287:6 306:2 317:4
320:7 322:20
327:18 373:3
377:4,24 409:2,2
410:10 411:15
416:6,15,17,18
417:9 467:17
478:15
ways 271:16
wednesday 297:12
weekly 396:7,14
went 272:10 305:9
318:5 320:13
327:7 339:17
380:9 391:8 396:4
406:6 413:5
414:22,24
weve 399:24
whats 275:16 303:3
326:19 389:19
401:7,19 417:2
466:25 469:19
470:4
whichever 389:22
white 313:8
whoa 313:5,6,8
323:3,15 324:6
whod 351:20
wide 376:23 390:23
391:2
widen 375:10
widening 307:22
308:2
wild 355:15

willing 378:14,17
window 422:20
witness 259:9
384:13 397:16
471:3,5,8 483:5
witnesses 470:23
wont 369:15
word 282:10 313:4
318:9 322:15
324:5 334:4 338:2
364:21 365:4,19
365:20 385:15
388:22 486:3
wording 466:12
wordings 473:4
words 263:5 281:5
281:6,23 308:19
313:7 318:7
369:17 377:11,16
378:11 384:8
415:22
work 275:15,15
285:23,25 294:5
310:25 311:3,8
357:20,23 361:17
365:23 381:12
385:14 417:16,20
448:18
worked 266:2
358:2
working 478:15
works 274:25
306:3 375:6
413:15 417:14
450:25
world 271:22
worse 386:23
worth 269:23 272:2
272:11,18,21
479:10
wouldnt 265:23
267:22 271:24
353:25 354:4
361:8 388:15,23
450:8
wrap 392:17
write 373:14 377:3

377:23 389:13
writes 309:14
335:5
writing 301:8
312:25 313:3
317:13 322:16
370:24 388:22
written 374:19
424:11 466:25
wrong 274:13,14
275:3 371:6
392:13,14,25
413:7 472:15
wrote 308:9 312:9
373:7 374:25
394:6
wtsa 456:19 488:6

**X**

x 483:2 484:10

**Y**

yeah 266:13 278:22
299:15 356:20
365:20 393:25
394:8,15,18
408:11 413:21
414:3 415:10
420:18 435:20
472:14
year 271:25 272:8
272:20,21 414:24
years 272:10,18
273:3,6,17 296:10
298:15 319:21,24
381:2 382:8 406:7
411:22,23 412:3
414:25,25,25
yellow 313:14
314:13
yep 330:19 374:23
380:18,21 383:6
383:11 407:11
yield 267:6 271:14
415:20
york 256:2,24,24
257:6,6,20,20
258:9,21,22

youd 316:20
419:11,11
youll 472:25
youre 275:16
283:15 317:14
356:24 357:25
377:11
youve 478:23

**Z**

zero 467:5,15,18
468:3 469:21

**0**

0 345:21 354:16
000 267:12,16
272:5,6,9,18
345:20 347:24
01 268:9 270:23
271:2 272:9,13,14
273:24 274:6,11
275:2,12,16
02 270:11
021616 338:24
021618 338:24
02348 343:11
042624 294:22
042626 294:23
042725 261:9
042727 261:10
055 345:4 348:20
056 349:10
07 256:25 258:14
480:25
08 270:15
0813555 256:3
258:10
09 260:25 270:17
277:18 295:3
296:22 301:17
316:3 324:19
338:15 449:13
484:13,16,21
485:3,7,10,14,17
488:4

**1**

1 260:25 272:6,7,7

272:9 309:18
314:4 390:20,25
391:5,14,21 405:6
405:8 409:24
411:5,6,10,10
412:11,20 413:2
413:19 416:4
417:9 418:21
420:8 439:19,19
440:14,14 484:13
486:12
10 256:25 258:14
272:5,6,9,18
356:4 367:12
390:17 396:24
440:15 442:14
464:12 485:22
487:13 488:14
100 272:6 276:3
100176702 257:6
10020 257:20
100th 272:7
105 267:12,16
11 256:3 297:16
298:6,10,19 299:2
299:10 342:18,24
345:20,20 347:24
349:17 397:20
400:10,10 443:17
443:23 445:24
447:6,12 486:6,10
486:10 487:16
110114 410:13
1191 257:10
11th 297:12
12 277:18 295:13
340:15 405:2
445:11,17 447:7
447:12 456:8,14
456:18 457:8,19
484:16 487:18
488:6,8
1271 257:20
13 446:15,22
473:22 487:21
130 479:21 480:11
14 363:24 367:12

367:16 368:2
369:24 446:24
447:4 456:11
464:12 465:2
466:13 474:5,17
476:15 478:20
488:14
15 272:10,11,11,12
272:15,21,24
273:3,6,17 338:15
338:22 339:11,14
339:22 340:20
341:3,21,24
345:13,17 350:19
353:6 422:8,11,12
422:12,17 423:5
423:12 429:4
430:7 485:17
150 309:24 312:4
312:14,22 313:15
314:11,15 315:2
315:16,20 323:9
324:16 409:7
410:9 412:4,8
414:5 418:14
419:10,13 420:16
420:22 436:8
15th 430:13
16 256:25 258:13
264:8 342:24
350:21 353:11,13
353:14 400:10,17
431:7 438:21,24
441:11,15,24
448:2 449:19
450:15,19,23
453:8 454:16,18
454:19 480:25
486:10
16384 456:19 488:7
16389 456:20 488:7
17 295:13 447:22
18 396:24
19 295:13,22
317:13 489:21

**2**

**2** 261:23 295:3
355:6,11,22
363:24 421:7
447:22 448:2
464:4,10 484:21
486:15
**20** 316:3 345:21
347:7,12,16,22,25
381:2 382:8
390:17 425:22
434:8,18 435:10
435:18 436:2
437:18,20 438:8
440:20 443:13
444:11 446:4
447:9 474:10,21
475:17,24 485:10
**2002** 378:16
**2008** 274:2,19
278:8 279:2
280:15 281:2
283:8,13,20
284:18
**2009** 274:3 285:18
286:7 287:3,25
294:24 295:13,22
296:5 297:4,9,17
298:6,10,19 299:2
299:10 302:3
308:10 315:7
317:13 325:5
338:23 339:22,24
340:11,22 410:13
416:2 421:19,22
421:23 425:7
456:11,14 457:3
**2010** 356:14 362:11
367:16 368:2
369:7,24 424:3
425:7,22 426:4
428:11,17 429:4
429:10,12 430:7
430:13 431:7
433:10,16 438:21
438:24 439:13
440:15,23 441:11

441:15,24 442:5
442:24 443:8
444:2 445:20
446:24 447:4
448:8,22 449:3,6
465:2,15,19,23
468:21 469:11,14
469:20 474:5,17
475:8 476:15
477:18 478:20
**2011** 398:7 399:4
400:17 402:14,15
402:22,22,24
**2012** 362:13,14
449:25 452:18
454:17 455:3
458:6
**2013** 454:10
**2014** 256:25 258:13
342:24 448:2
454:11 480:25
482:13 489:21
**2019** 489:20
**2032** 362:19,25
425:18,22 426:5
427:6,10,17,21
431:17,20 432:13
432:19,24 433:4
439:16 452:20
**2042** 315:22 362:10
362:25 408:7
427:21 431:12,20
431:24 432:2,12
432:17,23 433:4
433:17 439:8,12
443:9 447:13
449:13 488:4
**21** 264:8 324:19
325:5 338:15,23
339:22,24 340:11
340:22 421:19
485:14,17
**21616** 338:18
485:19
**21618** 338:18
485:19
**21st** 421:21

**22** 277:18 278:8
348:10,19 349:9
442:24 443:8
482:4 484:16
**222** 256:23 257:5
258:12
**22nd** 476:7
**23** 294:24 295:3
315:9 356:4,14
444:2 445:20
484:21 485:22
**23rd** 476:6
**24** 397:20 398:7
412:7,8 486:6
**2400** 428:6,9
486:21
**2401** 428:6,10
486:21
**2402** 428:21 429:3
486:23
**2403** 428:21 429:3
486:24
**2404** 429:16 430:6
487:4
**2405** 429:16 430:6
487:4
**2406** 430:21 431:3
487:6
**2407** 433:19
**2408** 430:21 431:3
434:6 487:7
**2409** 438:14,20
487:9
**2410** 439:7,17
**2411** 438:14,20
439:7 440:18
487:9
**2412** 441:3,9
487:11
**2414** 441:3,9
487:12
**2415** 442:15,22
487:14
**2417** 442:15,22
487:14
**2418** 443:18,24
487:16
**2420** 443:18,24

**2395** 405:9,16
407:10 486:14
**2396** 421:8,13
486:16
**2397** 421:8,14
486:16
**2398** 423:17,24
486:18
**2399** 423:17,24
486:19
**23rd** 476:6
**24** 397:20 398:7
412:7,8 486:6
**2400** 428:6,9
486:21
**2401** 428:6,10
486:21
**2402** 428:21 429:3
486:23
**2403** 428:21 429:3
486:24
**2404** 429:16 430:6
487:4
**2405** 429:16 430:6
487:4
**2406** 430:21 431:3
487:6
**2407** 433:19
**2408** 430:21 431:3
434:6 487:7
**2409** 438:14,20
487:9
**2410** 439:7,17
**2411** 438:14,20
439:7 440:18
487:9
**2412** 441:3,9
487:11
**2414** 441:3,9
487:12
**2415** 442:15,22
487:14
**2417** 442:15,22
487:14
**2418** 443:18,24
487:16
**2420** 443:18,24

487:17
**2421** 445:12,18
487:19
**2422** 445:12 487:19
**2423** 445:19
**2424** 446:16,22
487:21
**2426** 446:16,22
487:22
**25** 315:7 363:25
449:13 488:4
**259** 483:11
**25th** 335:4,7
341:15
**26** 412:11 413:2
**260** 484:13
**277** 484:16
**28** 424:3 428:10
**29** 335:3 337:19,24
338:6 341:20
342:2 481:4
**295** 484:20
**296** 485:3
**2nd** 257:10

---
**3**

**3** 296:22 297:4
301:17 335:8
336:6,12,14,21,23
336:25 337:3,10
337:19,22 340:15
341:16 342:7
390:20,25 391:5
391:14,21 417:10
422:2,5,13 423:16
433:21 436:9
443:13 444:11
446:3 447:8
449:13 451:4
474:10 480:25
485:3,7 486:17
488:4
**30** 301:17 302:3
342:18 350:20
353:10,12 408:7
411:23 412:3
425:18 431:12

457:3,19 458:6
485:7 488:8
**301** 485:6
**30th** 410:12
**30year** 334:23
376:5,16 411:21
412:2 415:24
**316** 485:10
**32** 260:24 261:8
282:16 317:13
484:13
**324** 485:13
**33** 277:17 278:3
281:25 294:7
484:16
**338** 485:16
**34** 294:20 295:2
484:20
**343** 485:20
**35** 296:18,21 485:3
**356** 485:22
**36** 301:16,24
317:20 318:20
321:20 441:17
485:6
**364** 486:3
**37** 316:2,11 322:4
325:15,22 326:11
329:5,7 330:17,19
330:22 331:6
332:16 333:5,11
485:10
**38** 324:18 325:2,22
328:25 329:13,22
330:12,21,23
332:10,21 333:5
333:10 334:12
339:7,10 340:14
340:19 341:4,6
342:5 464:4
485:13
**383** 315:9
**38481** 400:12
486:11
**38484** 400:12
486:11
**387** 345:5,8,9,15

**39** 343:3,9 344:14
344:19 354:10
355:5 485:20
**397** 484:4 486:5

**4**
**4** 286:13,17 296:22
297:4,8 316:3
317:13 321:13
324:19 335:3
337:19,24 338:6
338:15 341:20
342:2 345:5,8,9
345:15 364:19
378:18 409:9
415:11,24 416:4
417:7 418:13,23
419:3,4 420:7,14
428:5 457:19
468:12,18 469:16
481:4 485:3,10,14
485:17 486:20
488:8
**40** 356:3,11 358:13
362:23 363:21
372:23 373:8,17
374:21 375:3,11
375:24 376:12
377:3,13 378:20
394:4 405:6
485:22
**400** 355:7 486:9
**405** 486:12
**41** 364:21 365:3
366:14 478:4
486:3
**41st** 256:23 257:5
258:12
**42** 376:6,18 397:19
398:5 401:24
402:6 403:8 405:2
478:16 486:5
**421** 486:15
**423** 486:17
**42624** 295:6 484:23
**42626** 295:6 484:23
**42713** 296:19,25

485:5
**42715** 296:20,25
485:5
**42725** 261:3 276:9
484:15
**42726** 264:6 276:6
**42727** 261:3 484:15
**42744** 397:24 398:6
486:8
**428** 486:20,22
**42818** 277:23 278:4
484:19
**42819** 277:23 278:5
484:19
**429** 487:3
**43** 342:24 405:7,15
406:15 425:2
456:23 486:12
**430** 487:5
**438** 487:8
**44** 421:6,12 424:18
424:24 486:15
**440** 487:10
**442** 487:13
**443** 487:15
**445** 487:18
**446** 487:20
**449** 488:3
**45** 345:4 348:20
349:10 364:10,16
423:15,22 425:17
486:17
**456** 488:5
**457** 488:8
**46** 428:2,4 486:20
**460** 488:12
**464** 488:13
**47** 314:4 428:19,25
429:20 466:13
486:22
**471** 484:5
**478** 483:15
**479** 483:11
**48** 429:14 430:4
479:20 480:3,10
487:3
**484** 286:13,17

321:13 378:18
415:11,24 416:4
417:7,10 418:13
418:23 419:3,4
420:7,14
**49** 430:19,25
432:16 487:5

**5**
**5** 309:18 348:11
349:13 397:20
409:24 411:5,6,10
412:20 413:19
416:4 418:21
420:8 428:20
466:13 486:6,22
**50** 297:4 353:17,21
354:16 359:20
372:23 373:9,17
374:21 375:3,11
375:24 376:6,12
376:17 377:3
378:20 393:11
394:5,7 438:12,18
464:10 487:8
**500** 348:11 349:13
**51** 440:25 441:7
487:10
**52** 442:13,19 476:7
487:13
**528** 348:10,19
349:9
**53** 355:7 443:16,22
476:5 487:15
**54** 445:10,17 476:2
487:18
**55** 446:14,21 449:6
473:22,25 475:12
475:18 487:20
**56** 449:11,17 454:9
454:20 455:3
474:14 475:12
488:3
**57** 349:18 457:18
458:3 488:8
**58** 261:23 464:11
464:18 467:20

470:21 474:14
478:24,25 488:13
**589** 345:20,20
347:24 349:17

**6**
**6** 390:18,23 400:10
400:15,23 401:8
401:20 402:18
403:10,15 404:11
429:15 486:10
487:3
**60** 353:12
**66** 390:18,23
**664** 315:9
**67** 355:6,11,22

**7**
**7** 367:12 430:20
449:24 454:17
455:2 464:12
487:5 488:14
**715** 345:4 348:20
349:10
**794** 348:11 349:13

**8**
**8** 264:8 350:20
353:6 356:4
396:24 438:13
485:22 487:8
**8484** 409:9
**857** 348:10,19
349:9
**874** 422:2,5,13
433:21 436:9
443:13 444:11
446:3 447:8 451:4
474:10

**9**
**9** 260:25 285:18
286:7 287:2,25
363:25 441:2
484:13 487:10
489:20
**945** 349:18
**950** 258:21

**981012945** 257:10