JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Laura W. Sawyer

*Attorneys for Debtors*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

In re:                                                                          :

**LEHMAN BROTHERS HOLDINGS INC., et al.**                :

Debtors.                                   :

                                                                                :

-------------------------------------------------------------- X

**Chapter 11**

**Case No. 08-13555 (SCC)**

**(Jointly Administered)**


## DEBTORS' PRE-EVIDENTIARY HEARING STATEMENT
## REGARDING CLAIMS NUMBER 37355 AND NUMBER 37356

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ............................................................................. 3

I.    WASHINGTON TSA AND ITS TOBACCO SETTLEMENT BONDS ......................... 3

II.   THE RESERVE FUND AGREEMENT ............................................................. 4

III.  LEHMAN'S BANKRUPTCY AND THE TERMINATION OF THE RFA ................... 8

    A.    Washington TSA's Financial Advisor Calculates a Termination Amount in
Lehman's Favor ....................................................................................... 9

    B.    Washington TSA Hires a New Financial Advisor, Swap Financial, to
Maximize Its Claim................................................................................. 10

    C.    Washington TSA Moves to Compel Lehman to Assume or Reject the RFA ...... 11

    D.    Washington TSA Fails to Maximize Returns on the Reserve Fund ................... 12

IV.   WASHINGTON TSA'S CLAIM ................................................................. 13

V.    WASHINGTON TSA'S CALCULATIONS OF THE TERMINATION
AMOUNT ............................................................................................ 14

    A.    Curry and Hasterok Reject the Standard Methodology for Valuing RFAs ......... 15

    B.    Swap Financial's Improper Assumptions Inflate The Termination Amount
In Washington TSA's Favor ................................................................... 16

VI.   LEHMAN'S CALCULATIONS ................................................................. 16

ARGUMENT .............................................................................................. 18

I.    WASHINGTON TSA CANNOT SATISFY ITS BURDEN OF PROOF .................... 19

II.   SECTION 562 OF THE BANKRUPTCY CODE ............................................. 19

III.  WASHINGTON TSA'S DETERMINATION OF THE TERMINATION
AMOUNT FAILS TO MEET THE REQUIREMENTS OF THE RFA ...................... 21

    A.    Washington TSA Failed To Seek Market Quotations ......................................... 22

    B.    Washington TSA Did Not Determine the Termination Amount
Reasonably and in Good Faith.............................................................. 24

IV.   LEHMAN'S VALUATION IS REASONABLE AND BASED ON INDUSTRY
STANDARD METHODOLOGY................................................................. 26

CONCLUSION........................................................................................... 28

## TABLE OF AUTHORITIES

**Page**

No table of authorities entries found.

**No table of authorities entries found.**No table of authorities entries found.

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF," collectively with LBHI, "Lehman") respectfully submit this pre-evidentiary hearing statement regarding Proofs of Claim Nos. 37355 and 37356 submitted by Tobacco Settlement Authority of the State of Washington ("Washington TSA," collectively with Lehman, the "Parties.").

## PRELIMINARY STATEMENT

This dispute centers on the proper valuation of the "Termination Amount" for a terminated Reserve Fund Agreement ("RFA") between Lehman and Washington TSA.[1] Discovery has revealed and evidence at trial will demonstrate that the TSA determined the Termination Amount in a manner that departs markedly from market practice and violates the express terms of the contract and the governing law. Washington TSA has admitted that it manufactured a methodology to value the RFA for this litigation, which has inflated its claim at the expense of Lehman's other creditors. Washington TSA's unreasonable calculation of the Termination Amount must be rejected and the Proofs of Claim disallowed in their entirety.

Upon LBHI's filing for bankruptcy on September 15, 2008, Washington TSA commenced a calculated strategy to "maximize" the amount of its claim without regard to the governing contract, applicable law or commercial reasonableness. In the immediate aftermath of LBHI's filing, Washington TSA's long-time financial advisor, PFM, advised Washington TSA that it would owe Lehman approximately $1.2 million if the RFA were terminated early. But in

---

[1]   The RFA is dated November 5, 2002, by and among Washington TSA, as Issuer, U.S. Bank, as Trustee, and LBSF, and was subsequently amended by the Amendment Agreement, dated March 26, 2003, among Washington TSA, U.S. Bank, and LBSF. Capitalized terms not otherwise defined shall have their respective meanings under the RFA.

Washington TSA's view, as articulated by its top executive, "it would be a cold day in hell [before Washington TSA] pay[s] Lehman anything!"  Debtors' Ex. 98, E-mail from K. Herman, dated July 14, 2010, TSA_042829-42835.  Even after the market moved in Washington TSA's favor, and PFM advised Washington TSA that Lehman would now owe it $1.2 million, Washington TSA was not satisfied.  It cast PFM aside and hired a new financial advisor, Swap Financial, who dramatically increased the size of Washington TSA's claim against Lehman. Ultimately, Swap Financial declared that Lehman owed Washington TSA more than $38 million.

In determining the Termination Amount, Swap Financial wanted to ensure that Lehman would owe Washington TSA "a boat load of money."  Debtors' Ex. 31, E-mail from N. Singer, dated December 10, 2008, SFG_001916-1917.  As a first step, Swap Financial strategically avoided the market quotation process, in an effort to claim refuge in a more subjective "losses and gains" analysis.  Swap Financial next sought to abuse that process by including fictitious "dealer charges" in its calculation – charges that were never incurred by Washington TSA.  One of these hypothetical charges – a commercially unreasonable "credit charge" – alone comprises nearly 85% of Washington TSA's Claim.

Recognizing that Swap Financial's approach was indefensible, Washington TSA hired another pair of experts, Daniel Curry and Jeffrey Hasterok, to calculate the Termination Amount. Instead of reassurance, however, these experts have offered only further confusion.  Curry and Hasterok freely criticize the method used by Swap Financial to determine the Termination Amount and instead propound a "novel" and "ingenious" approach to value the RFA that they created solely for purposes of this litigation.  In doing so, Curry and Hasterok turn their backs on their over forty years of professional experience, where they spent decades valuing thousands of forward delivery agreements like the RFA.  Yet, conveniently, by using an unprecedented

-2-

valuation methodology, Curry and Hasterok manufacture almost exactly the same Termination

Amount valuation as Swap Financial.

The evidence will demonstrate not only the fundamental flaws in Washington's TSA's

valuation, but will also demonstrate, through the expert testimony of Lehman's witnesses, that

the valuation of the RFA requires nothing more than the application of well-settled and widely

accepted valuation principles that each and every expert in this case agree upon.  Using those

accepted valuation principles, and commercially reasonable data inputs available to the market

on the relevant valuation date, Lehman's expert Sam Gruer has determined that the Termination

Amount is actually $1,132,772.61 in favor of Lehman.  In other words, Washington TSA is

entitled to recover nothing on its Proofs of Claim and instead owes Lehman $1.13 million, plus

interest as applicable.

## FACTUAL BACKGROUND

### I.    WASHINGTON TSA AND ITS TOBACCO SETTLEMENT BONDS

On November 23, 1998, Attorneys General of 46 states and the four largest tobacco

manufacturers settled claims that the states had brought relating to the use of, or exposure to,

tobacco products.  As part of that settlement, the tobacco manufacturers agreed to pay the states

an estimated $206 billion through 2025.  The State of Washington was entitled to approximately

2.05% of the initial and annual payments, and approximately 5.76% of the payments made to

states for their contributions to the tobacco litigations.

In order to deal with a severe budget shortfall in 2002, the State of Washington

established Washington TSA in 2002 to issue bonds secured by the tobacco manufacturers'

obligation to make future payments.  Herman Tr. 77:4-11.  Washington TSA is an independent

public instrumentality of the State of Washington, established pursuant to Chapter 365 of Laws

of 2002 of the State of Washington, codified as RCW 43.340.005, *et seq.*  Dkt. 46543, Joint

Statement of Uncontested Facts ("Uncontested Facts"), dated October 20, 2014, at ¶ 1; Debtors'

Ex. 15, Official Statement of the Tobacco Settlement Authority Series 2002 Bonds, at S-6.  After

establishing Washington TSA, the State of Washington sold 29.2% of its tobacco settlement

revenues to Washington TSA, which issued $517,905,000 of Tobacco Settlement Authority

Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "Bonds") pursuant to an Indenture

dated as of October 1, 2002, between Washington TSA and U.S. Bank N.A., as Indenture

Trustee (the "Indenture").  Joint Ex. 3, Indenture, LBHI_WTSA_00005034 - 5099, at 1; Herman

Dep. Tr. 77:4-11.

On the Bonds were scheduled to mature in 2032, and the Indenture gave Washington TSA

the right, upon the satisfaction of certain conditions, to partially or fully redeem the Bonds prior

to their scheduled maturity.  Uncontested Facts at ¶ 6, Joint Ex. 3, Indenture, Section 404(a).

When the Bonds were issued, their "projected final turbo redemption date" was June 1, 2019.

Uncontested Facts at ¶ 7.

On October 17, 2013, Washington TSA refinanced the Bonds by issuing $334.7 million

in tax-exempt refunding revenue bonds, which resulted in all of the Bonds being refunded.

Debtors' Ex. 15, Official Statement at S-1; Debtors' Ex. 134, Washington TSA Press Release,

October 17, 2013.  Washington TSA's interest savings relating to the refunding amounted to

"just under $90 million, or $58 million in today's dollars when adjusted for inflation."  Debtors'

Ex. 134, Washington TSA Press Release, October 17, 2013.

## II.   THE RESERVE FUND AGREEMENT

The Indenture related to the 2002 Bonds established a Liquidity Reserve Account in the

amount of $45,534,106.25 to provide additional credit support in the event of a temporary

revenue shortfall (the "Reserve Fund").  Joint Ex. 3, Indenture at § 102.  While the Reserve Fund

was established to ensure that debt service payments could be made even if there was a revenue shortfall, Washington TSA sought to maximize its return on the Reserve Fund itself. Based in part upon the advice of its financial advisor, Public Financial Management, Inc. ("PFM"), Washington TSA decided to enter into a form of an investment agreement referred to as a reserve fund agreement. Herman Tr. 43:8-15. In general terms, a reserve fund agreement is a type of forward delivery agreement that provides the holder of a reserve fund the opportunity to earn a guaranteed return on the reserve fund while still maintaining the liquidity necessary to cover debt service payments if necessary.

On Washington TSA's behalf, PFM solicited bids from various financial institutions on October 24, 2008. Cook 30(b)(6) Tr. 41:16-18; Joint Ex. 4, Request For Bids from PFM, dated October 22, 2002, LBHI_WTSA_00002861-2873. A number of bidders responded to PFM's solicitation. Washington TSA ultimately accepted Lehman's bid, which was the highest bid.

Subsequently, Washington TSA, Lehman, and U.S. Bank, as the Indenture Trustee, entered into a Reserve Fund Agreement on November 5, 2002 (the "RFA"). Uncontested Facts at ¶ 12. Under the RFA, LBSF provided a Guaranteed Rate of 4.484% on a Scheduled Reserve Amount of $45,534,106.25, which equaled the entirety of the Reserve Fund. Joint Ex. 1, RFA, Section 1.

Because debt service payments are payable to the bondholders periodically, any investments made with the Reserve Fund had to mature on or before the periodic payment dates so that there would be cash in the Reserve Fund on those dates in case Washington TSA needed such cash to make the requisite debt service payments. Accordingly, the RFA provided that every six months Washington TSA would deliver $45,534,106.25 to Lehman (the "Scheduled Reserve Amount"). In exchange for the delivery of the Scheduled Reserve Amount, Lehman

-5-

was required to deliver short-term "Eligible Securities" that would mature on or before the next

Bond Payment Date. *Id.*, Section 2.1, Exhibit A.

The RFA defined "Eligible Securities" as follows:

> [N]on-callable and non-prepayable (a) direct obligations of the
> United States of America including only notes, bonds, bills or
> certificates of indebtedness, (b) senior debt and/or guaranteed
> mortgage pass-through obligations of the Federal National
> Mortgage Association, Federal Home Loan Mortgage Corporation,
> Government National Mortgage Association, any Federal Home
> Loan Bank, and the Federal Farm Credit System, or (c)
> commercial paper rated "P-1" by Moody's and "A-1+" by
> Standard & Poor's; provided that, at the time of delivery, any such
> commercial paper is not on negative credit watch and the issuer
> thereof is subject to U.S. law; additionally, if the maturity date of
> the commercial paper tendered is 100 days or more, the issuer
> thereof must have long-term debt ratings of at least "A1" by
> Moody's, "A+" by Standard & Poor's and "A" by Fitch.

Uncontested Facts at ¶ 16. In other words, Eligible Securities included treasury securities,

agency securities and commercial paper.

Under the RFA, Lehman had the right to select which Eligible Securities to deliver on

each delivery date, so long as the Eligible Securities were also Qualified Securities under the

terms of the RFA. Joint Ex. 1, RFA, § 2.1. The RFA defined "Qualified Securities" to include

Eligible Securities that mature on or before the next debt service payment date and have an

aggregate purchase price as close as possible to but does not exceed the Scheduled Payment

Amount. *Id.*, Section 1. Lehman's ability to select the Qualified Securities to be delivered to

Washington TSA was crucial to Lehman, as it afforded Lehman the opportunity to maximize its

profit or minimize its loss from such deliveries. To the extent Lehman could acquire Qualified

Securities for delivery at a price lower than the purchase price required to be paid by Washington

TSA, Lehman would earn a profit equal to such difference. Conversely, if Lehman could only

acquire Qualified Securities at a price that exceeded the purchase price to be paid by Washington

TSA, Lehman would suffer a loss equal to such excess amount.

Due to a drafting error, the RFA initially stated that it would terminate on May 30, 2042,

ten years after the scheduled maturity date of the Bonds. Uncontested Facts at ¶¶ 6, 19. To

correct this error, the RFA was amended on March 26, 2003 to change the termination date to

May 28, 2032. Id. at ¶ 20.

The RFA could be terminated upon the occurrence of certain defined events of default.

Joint Ex. 1, RFA, Sections 7.1-7.3. Depending on the type of default, the RFA specifies the

available remedies, which include, *inter alia*, the payment of a "Termination Amount." *Id.*,

Sections 7.4-7.6. In the event of a "Lehman Event of Default" (which occurred here), the RFA

provides that "Lehman shall determine the Termination Amount," but:

> if Lehman fails to determine the Termination Amount within three
> Business Days of written notice from the Issuer or the Trustee of
> the occurrence of a Lehman Event of Default **then the Issuer shall
> make such determination as if it were Lehman** and the amount as
> so determined by the Issuer shall for purposes of this Section 7.6
> be deemed the Termination Amount.

*Id.*, Section 7.6(c) (emphasis added).

The RFA defines Termination Amount as:

> [A]n amount, as determined by the Burdened Party reasonably and
> in good faith on the basis of the arithmetic mean of quotations
> from at least three Dealers of the amount, if any, that each such
> Dealer would require the Burdened Party to pay the Dealer . . . in
> consideration of such Dealer entering into an agreement with the
> Burdened Party . . . which would have the effect of preserving for
> the Burdened Party the economic equivalent of its rights under [the
> RFA] . . . . if the Burdened Party is unable to obtain three such
> quotations, the Termination Amount shall be the amount, as
> reasonably determined in good faith by the Burdened Party, to be
> the Burdened Party's total losses and costs (expressed as a positive
> number if the Burdened Party is Lehman and a negative number if
> the Burdened Party is the Issuer), or gains (expressed as a negative

> number if the Burdened Party is Lehman and a positive number if
> the Burdened Party is the Issuer) in connection with a termination
> of this Agreement . . . . Any determination of the Termination
> Amount by the Burdened Party shall be conclusive and binding on
> the parties hereto absent manifest error.

*Id.*, Section 1.

The definition of Termination Amount sets out a hierarchy under which the Termination

Amount is to be calculated:  first, a calculation should be sought on the basis of market

quotations; and *only* if no quotations satisfying the requirements of the RFA can be obtained,

then the Termination Amount may be calculated on the basis of Washington TSA's total losses

or gains.  The RFA explicitly warns that "a Termination Amount may be due Lehman" and that

under "certain market conditions the amount of any Termination Amount owed to Lehman. . .

could be substantial."  *Id.*, RFA, Section 5.5.  Washington TSA was well aware of the possibility

that, in certain circumstances, it could owe a termination payment to Lehman.  *See* Cook

30(b)(6) Tr. 24:8-15; 33:21-24; Herman Tr. 37:20-23.

## III.    LEHMAN'S BANKRUPTCY AND THE TERMINATION OF THE RFA

On September 15, 2008, LBHI filed a voluntary petition for relief under Title 11 of the

United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District

of New York.  Uncontested Facts at ¶ 22.  In response to LBHI's bankruptcy, Washington TSA's

staff and advisors participated in a conference call on September 19, 2008 to "assess

[Washington TSA's] options" (the "September 19 Call").[2]  Debtors' Ex. 18, September 25

Memo, TSA_013248-13251, at 2.  On September 25, 2008, Jay Reich of K&L Gates LLP

---

[2]    Washington TSA staff members Kim Herman, Bob Cook and Carol Johnson, representatives from PFM,
U.S. Bank, Hawkins Delafield & Wood LLP and K&L Gates LLP participated on the September 19 Call.  Debtors'
Ex. 18, at 2.  No members of the Washington TSA Board were on the September 19 Call.

prepared a memorandum summarizing the discussion and decisions made on the September 19

Call (the "September 25 Memo").[3]  *Id.*

### A.    Washington TSA's Financial Advisor Calculates a Termination Amount in Lehman's Favor

On the September 19 Call, PFM advised Washington TSA that "a Termination Amount

calculated as of [September 19, 2008] would obligate [Washington TSA] to pay Lehman

approximately $1,200,000."  *Id.* at 1; Herman Tr. 167:24-168:7.  In light of the fact that

Washington TSA would owe a substantial payment to Lehman, the participants on the September

19 Call decided that Washington TSA "should not terminate the [RFA] and trigger the payment

of the Termination Amount."  *Id.* at 3.  Instead, Washington TSA decided to "not terminate the

Agreement unless and until the legal or factual context changes, e.g. the Termination Amount

would be no less than $0."  *Id.*

By November 10, 2008, however, PFM informed Washington TSA that the Termination

Amount had moved in Washington TSA's favor, and that if the RFA was terminated Lehman

would owe $1,237,902.06 to Washington TSA.  Debtors' Ex. 25, Attachment to e-mail from Bob

Cook to Debra L. Stephenson, November 17, 2008, TSA-024147-24150.  Notwithstanding the

fact that the market moved in favor of Washington TSA, Washington TSA still took no action

with respect to the RFA.  During a Special Meeting of Washington TSA's Board on November

12, 2008, Washington TSA staff advised the board that it recommended "leaving the [RFA] in

place and waiting to see what happens when the new collateral is scheduled to be posted in

---

[3]    Washington TSA has agreed that any privilege found in the September 25 Memo has been waived, *inter alia*, because the September 25 Memo was subsequently disclosed publicly in Washington TSA's board meeting materials.  *See* Debtors' Ex. 23, November 12, 2008 Board Meeting packet, TSA_013227-13287;  Herman Tr. 178:25-179:5 (Counsel for TSA describing the "limited waiver taking place that we have agreed to with respect to the September 25th memo.").

December.  The decision of whether or not to leave the investment agreement in place will be based on the market value of the termination at that time."  Debtors' Ex. 24, November 12, 2008 Board Meeting minutes, TSA_013337-13348, at 4.

On November 21, 2008, Washington TSA, through its attorneys, sent a letter to Lehman's attorneys and demanded that Lehman stipulate to the rejection of the RFA.  Debtors' Ex. 27, Letter from K&L Gates, November 21, 2008, LBHI_WTSA_0016312-16313.  In response, Lehman's attorneys proposed a termination of the RFA with a mutual waiver of claims.  Debtors' Ex. 28, E-mail from Robert Lemons, November 28, 2008, LBHI_WTSA_00000360.

On December 1, 2008, the previously-delivered Qualified Securities matured under the RFA.  Lehman did not deliver any Qualified Securities to Washington TSA on December 1, 2008, nor did Washington TSA tender the Scheduled Reserve Amount to Lehman.[4] Subsequently, Washington TSA has maintained control of the full amount of the Reserve Fund from December 1, 2008 until the refunding of the Bonds in October 2013.  Simply put, Washington TSA has not lost a dollar of the Reserve Fund.

**B.    Washington TSA Hires a New Financial Advisor, Swap Financial, to Maximize Its Claim**

Apparently dissatisfied with the valuations that its trusted financial advisor PFM provided, Washington TSA engaged Peter Shapiro of Swap Financial Group LLC ("Swap Financial") on an "emergency basis" in December 2008 to "maximize" Washington TSA's claim against Lehman.  Debtors' Ex. 34, Memorandum from Swap Financial, SFG_001920-1921, at 1;

---

[4]    Neither Washington TSA nor the Trustee delivered the "Scheduled Reserve Amount" to Lehman on December 1, 2008, as required by the RFA.

Herman Tr. 44:19-45:7; Cook Tr. 76:16-22.  Swap Financial appears to have disregarded the

terms of the RFA from the start and decided early on that "[a]ny way you go about it, Lehman

will owe the issuer a boat load of money."  Debtors' Ex. 31, Internal Swap Financial e-mails,

SFG_001916-1917.  Swap Financial believed that "we might be better off" not getting market

quotations for Washington TSA, *id.* at SFG_001916, even though the RFA explicitly requires

that a market quotation process be undertaken to determine the Termination Amount.

### C.    Washington TSA Moves to Compel Lehman to Assume or Reject the RFA

On December 18, 2008, Washington TSA notified Lehman in writing that as a result of

the bankruptcy filings and LBSF's failure to deliver Qualified Securities, Lehman Events of

Default had occurred under the RFA (the "December 18 Letter").  Uncontested Facts at ¶ 25.  In

its letter, Washington TSA did not exercise its rights to terminate the RFA, but reserved all of its

rights and remedies under applicable law and the RFA.  Joint Ex. 6, Notice of Event of Default,

LBHI_WTSA_00016357-16358.

On January 14, 2009, Washington TSA filed a motion to compel Lehman to assume or

reject the RFA pursuant to 11 U.S.C. § 365(d)(2) or, alternatively, to modify the automatic stay

to allow Washington TSA to terminate the RFA (the "Motion to Compel").  Uncontested Facts at

¶ 26.  Attached to the Motion to Compel was a declaration submitted by Swap Financial's Peter

Shapiro, which stated that the Termination Amount due Washington TSA as of January 12, 2009

was $27.5 million,[5] a stark jump from the $1.2 million PFM calculated just two months earlier.

Debtors' Ex. 40, Declaration of Peter Shapiro, LBHI_WTSA_00016384-

---

[5]    Neither Swap Financial nor Washington TSA has produced any work papers showing how this valuation
was made.

LBHI_WTSA_00016389.  Lehman and Washington TSA attempted to agree upon a mutual

termination of the RFA, but were unsuccessful.  *See* Debtors' Ex. 37, E-mails among Courtney

Jenkins of Lehman and Peter Shapiro, Bob Cook and others, February 9, 2009,

LBHI_WTSA_00000541-43, Debtors' Ex. 39, E-mail from Bob Cook to U.S. Bank and

Washington TSA staff, March 2, 2009, TSA_021100-01; Cook Tr.. 87:7-96:12.  On March 25,

2009, the Court entered an order deeming the RFA rejected.  Dkt. Entry No. 3221.  The parties

agree that the Termination Amount should be determined as of March 25, 2009.

### D.    Washington TSA Fails to Maximize Returns on the Reserve Fund

Washington TSA has had possession of the entire Reserve Fund since December 1, 2008.

However, Washington TSA had made no effort to maximize its returns on the Reserve Fund.

Instead, Washington TSA has kept the Reserve Fund in low-yielding money market accounts,

Cook 30(b)(6) Tr. 98:19-24; Herman Tr. 306:25- 307:14, despite being presented with many

investment alternatives that would provide substantially higher returns, yet still meet Washington

TSA's need to have access to the Reserve Fund in the event of a revenue shortfall, including:

- In November 2008, PFM gave Washington TSA a detailed memorandum on reinvestment options.  *See* Debtors' Ex. 22, Memorandum from PFM dated November 11, 2008, TSA_024152-24156.  PFM advised that Washington TSA had the opportunity to enter into a long-term, fixed rate investment at a rate of 3.73%, and furthermore, 3-year Agency security was available at a rate of 3.38%. *Id.*

- In November 2008, an insurance company offered a guaranteed investment contract ("GIC") from an insurance company.  *See* Debtors' Ex. 20, E-mail from Kim Herman to Washington TSA staff and K&L Gates attorneys dated November 7, 2008, USBANK000724.

- In March 2011, the Grant Street Group solicited and received GIC proposals on Washington TSA's behalf.  *See* Debtors' Ex. 105, E-mail from John McCarthy to Bob Cook and attachment, dated March 4, 2011, TSA_002726-2727.  The proposals received by Grant Street Group provided rates of returns ranging from 1.40% to 4.00% depending on collateralization and maturity.  *Id.*

- In November 2011, Barclays Capital, one of Washington TSA's underwriters, provided a GIC proposal that would provide 2.75% of return for 5 years. Debtors' Ex. 109, Memorandum from Barclays Capital to Washington TSA, dated November 4, 2011, TSA_015322-15323. In addition to a proposal memorandum, Barclays also provided a draft term sheet. Debtors' Ex. 113, E-mail from Kym Arnone to Washington TSA staff with attachment, dated November 28, 2011, TSA_034121-34129.

- Swap Financial analyzed Washington TSA's investment options in November 2011 and outlined an investment strategy that would provide an anticipated average yield of 2.60%. Debtors' Ex. 111, Memorandum from Swap Financial dated November 16, 2011, TSA_038481-38484, at 3.

Washington TSA did not take advantage of any of these investment opportunities.

## IV.    WASHINGTON TSA'S CLAIM

On October 12, 2009, Washington TSA filed an amended Proof of Claim for $47,063,714.01 (Claim Number 37355) ("Proof of Claim") with this Court.[6] Uncontested Facts at ¶ 30. The Proof of Claim set forth the following components of the $47,063,714.01 claim made by Washington TSA:

- $46,437,610: Washington TSA's calculation of the Termination Amount, as of March 25, 2009;

- $553,080.02: Washington TSA's lost earnings associated with the failure to delivery Qualified Securities on December 1, 2008; and

- $73,023.99: Costs and expenses incurred by Washington TSA in connection with the termination of the RFA.

See id. at ¶ 32. The Proof of Claim did not account for the Amendment of the RFA and calculated the Termination Amount based on a final maturity date of 2042 instead of 2032.

---

[6]    Washington TSA filed its initial proof of claim on September 17, 2009 in the amount of $47,046,214.01 (Claim Number 15016). That same day, Washington TSA also filed a duplicate proof of claim in the LBHI bankruptcy (Claim Number 14871). Such proof of claim was amended on October 12, 2009 (Claim Number 37356). On September 22, 2009, the Trustee, U.S. Bank, N.A., also filed proofs of claim in the Lehman and LBHI bankruptcies (Claim Numbers 31016 and 31026, respectively).

Lehman objected to the Proof of Claim on September 12, 2012.[7] Dkt. Entry No. 19888.  The

parties are in the process of negotiating a stipulation to allow Washington TSA to amend its

claim to account for a final maturity date of 2032.

## V.   WASHINGTON TSA'S CALCULATIONS OF THE TERMINATION AMOUNT

In support of its claim, Washington TSA has presented two expert reports:  one jointly

prepared by Daniel Curry and Jeffrey Hasterok, and the other from Peter Shapiro.  While these

experts have employed fundamentally different – and inconsistent − methodologies for valuing

the Termination Amount, both expert reports conveniently conclude that Washington TSA's

claim should be approximately $38.5 million.

All of the experts – both those designated by Lehman and those designated by

Washington TSA – agree that there is an industry-standard methodology to value reserve fund

agreements.  *See* Shapiro Tr. (Dec. 13, 2013) 121:6-24; Gruer Tr. 60:12-20; Babbel Tr. 134:10-

19; Curry/Hasterok Rebuttal Report at 4-5.  Despite their recognition of the industry-standard

methodology, Washington TSA's experts have materially deviated from this method in

determining their respective Termination Amount.  In the case of Curry and Hasterok, the

industry-standard methodology is discarded entirely in favor of an *ad hoc* approach crafted only

for this litigation.  *See* Curry/Hasterok Rebuttal Report at 4-5 (emphasis added) ("we are well

aware how FPAs (including the RFA) were priced . . . .  *We discarded this method* . . ."); 

Hasterok Tr. 91:18-22 (admitting he had never used his proffered valuation approach to value

similar contracts while working at Morgan Stanley); Hasterok Tr. 196:8-18, Curry Tr. 11:17-

12:17 (admitting that they would have used forward curves to value contracts similar to the RFA

---

[7]    Subsequently, the parties engaged in an unsuccessful mediation process that lasted more than a year.

had they been valuing the RFA while working for a dealer like Morgan Stanley).  Shapiro, on the other hand, employs the basic framework of the industry-standard methodology, but utilizes key assumptions that are markedly inconsistent with market practice that substantially inflates his valuation of the RFA in Washington TSA's favor.  *See* Peter Shapiro Rebuttal Report at ¶ 4.

### A.    Curry and Hasterok Reject the Standard Methodology for Valuing RFAs

Curry and Hasterok are financial industry professionals whose purported expertise derives solely from their experience.  However, in reaching their expert opinions, Curry and Hasterok have turned their backs on their experience.  They have rejected the industry-standard methodology and instead have purported to determine the Termination Amount in a manner that they freely admit they have never used in their combined nearly 45 years of experience in the financial industry.[8]  Hasterok Tr. 91:18-92:10; Curry Tr. 78:21-79:14.  As part of their unprecedented approach, Curry and Hasterok reject the use of forward yield curves for valuing a long-dated financial instrument and opine – with no justifiable or rational basis – that Washington TSA will only earn 0.65% on its Reserve Fund for the next 23 years.  *See* Curry/Hasterok Expert Witness Valuation Report at 20.  To determine the Termination Amount, Curry and Hasterok merely deduct 0.65% from the Guaranteed Rate of 4.484% and discount the result to present value.  *Id*. at 19.  Curry and Hasterok attempt to justify their unprincipled approach by claiming it would be "unfair" for Washington TSA to have to value the RFA consistent with the industry standard.  Curry/Hasterok Rebuttal Report at 5.  However, there is nothing unfair about determining the value of the RFA in accordance with the industry standard.

---

[8]    Curry and Hasterok worked in tandem to develop the approach used in their Report.  *See* Curry Tr. 144:25-145:20.

Indeed, the use of the industry standard is the only way to ensure that all of Lehman's creditors

are treated fairly.  Moreover, the RFA requires that any valuation done by Washington TSA must

be done "as if it were Lehman."  Joint Ex. 1, RFA, Section 7.6(c).

**B.    Swap Financial's Improper Assumptions Inflate The Termination Amount
In Washington TSA's Favor**

Notwithstanding that Swap Financial starts with the basic framework of the industry-

standard approach, Swap Financial adds on fictitious "dealer charges" that inflate the resulting

Termination Amount beyond that which is seen in the market.  *See* Peter Shapiro Expert

Disclosure.  Most egregious of these hypothetical charges is a "credit charge" that alone

represents nearly 85% of Washington TSA's claim and has no basis in market practice or reality.

Additionally, Swap Financial does not use the highest yielding or "cheapest to deliver" securities

in calculating the Termination Amount – despite the fact that the RFA provides Lehman the right

to chose the "cheapest to deliver securities."  To further undermine the reliability of Swap

Financial's opinions, neither Washington TSA nor Swap Financial has produced any work

papers explaining or showing the analysis that was done in connection with either the credit

charge or the evaluation of the "cheapest to deliver" securities.

**VI.    LEHMAN'S CALCULATIONS**

Lehman's expert Samuel Gruer, who has more than 20 years of experience pricing

agreements similar to the RFA, employed the industry-standard approach to value forward

delivery agreements like the RFA.  In making his determination of the Termination Amount,

Gruer used a three-step methodology that he, and other market participants, used to value reserve

fund agreements or other similar agreements.  This methodology is used each time a reserve fund

or similar agreement is valued regardless of whether it was to execute a new transaction, place a

-16-

value on an existing transaction, or to terminate a transaction, and regardless of whether the

valuation was on behalf of a dealer or an issuer.

This industry-standard methodology to value forward delivery agreements such as the

RFA is as follows:

- Step One:  Identify the "Cheapest to Deliver" Eligible Securities as of the Valuation Date.  An analysis of the yield curves for each type of Eligible Securities, as of March 25, 2009, is done.  Debtors' Ex. 139, Revised Expert Report of Samuel Gruer at ¶ 40.  The RFA provided Lehman with the right to deliver the "cheapest to deliver" securities, meaning those securities that would have produced the best economic result for Lehman. *See* Joint Ex. 1, RFA at §§ 1, 2.1-2.2.   Gruer reviewed the yield curves for each category of Eligible Securities (Treasuries, Agencies and Commercial Paper) as of March 25, 2009, using information published by Bloomberg.  Debtors' Ex. 139, Gruer Report at ¶ 42.  After looking at these yield curves, Gruer determined that U.S. Agency Securities were the highest yielding or "cheapest to deliver" Eligible Securities as of March 25, 2009. *Id*.

- Step Two:  Develop the forward curve on the basis of the yield of the Eligible Securities identified in Step One.  Since Gruer determined that U.S. Agency Securities were the "cheapest to deliver" on March 25, 2009, Gruer calculated a forward curve for those securities, using Bloomberg data. *Id.* at ¶¶ 40, 45.  Such a forward curve is understood by the market to represent the market's consensus as to the rates that Washington TSA could expect to receive on U.S. Agency Securities for each delivery date during the remaining term of the RFA. *Id*.  To perform these calculations, Gruer used FINCAD Analytics Suite for Excel ("FINCAD"), which is a commercially available analytics library that is an add-in to Microsoft Excel. *Id.* at ¶ 46.

- Step Three:  Value the RFA by calculating the future cash flows of the two legs of the transaction and discount the difference between such cash flows to present value.  There are essentially two "legs" of the RFA:  (1) a "fixed leg," which is determined by using the Guaranteed Rate of the RFA (4.484%) and (2) a "floating leg," which is determined using the forward curve for the "cheapest to deliver" securities.  Again, using FINCAD, Gruer calculated the cash flows for each of the legs, compared these cash flows and discounted the result to present value using the applicable LIBOR rate. *Id.* at ¶ 48, Appendix A.

Using this methodology, Gruer determined that the mid-market value of the RFA was

$1,359,394.59 payable by Washington TSA to Lehman. *Id.* at ¶ 49.

In calculating the Termination Amount, Gruer also considered section 7.7(b) of the RFA,

which required Lehman to compensate Washington TSA for its lost earnings, from December 1,

-17-

2008 through March 25, 2009. *Id.* at ¶ 50. The RFA required that after Lehman's failure to deliver Qualified Securities, Washington TSA invest the Reserve Fund in Eligible Investments with the longest maturity date but maturing no later than the next Bond Payment Date of June 1, 2009. *Id.* at ¶51. Had Washington TSA complied with the RFA, its lost earnings from December 1, 2008 through March 25, 2009, would have been $226,622 payable to Washington TSA from Lehman. *Id.* at ¶¶ 56, 57. Gruer then added the 7.7(b) loss to the mid-market valuation of the RFA ($1,359,395 payable by Washington TSA to Lehman) and concluded that the Termination Amount of the RFA should be $1,132,773 due from Washington TSA to Lehman. *Id.* at ¶ 58.

## **ARGUMENT**

Washington TSA's Claim must be rejected because it was calculated in violation of both the Bankruptcy Code and the explicit terms of the RFA governing the procedure for valuing the RFA.

First, Washington TSA's valuation violates the plain language of § 562 of the Bankruptcy Code, and must be rejected. Since commercially reasonable determinants of value were available as of the Termination Date, they must be used to determine the Termination Amount. One of Washington TSA's experts (Shapiro) grossly manipulated the industry standard methodology to inflate his result in favor of Washington. Meanwhile, Washington TSA's other experts (Curry and Hasterok) unequivocally discard the industry standard methodology based on a subjective view that the method is unfair to Washington TSA. Neither course of action is permissible.

Second, even if Washington TSA's valuation did not violate the Bankruptcy Code, its claim should still be rejected for violating the plain language of the RFA. The RFA is clear that

-18-

upon the occurrence of a Lehman Event of Default, Lehman is to determine the Termination

Amount.  To the extent that Lehman does not determine the Termination Amount, the RFA

allows Washington TSA to determine it, so long as it makes the determination "as if it were

Lehman."  Moreover, the definition of the Termination Amount outlines a specific procedure

that must be followed to determine the Termination Amount and further requires that the

Termination Amount be determined reasonably and in good faith.  Washington TSA failed to

comply with any of these requirements contained in the RFA.  Instead, Washington TSA hired

experts to inflate its claim at the expense of the other creditors of the Lehman Estate.

Washington TSA's inflated claim must be rejected.

## I.    WASHINGTON TSA CANNOT SATISFY ITS BURDEN OF PROOF

Washington TSA bears the burden of proof in connection with its claim.  Fed. R. Bankr.

P. 3001(f) advisory committee's note; s*ee also Sherman v. Novak (In re Reilly)*, 245 B.R. 768,

773-74 (B.A.P. 2d Cir. 2000).  In order to meet this burden, Washington TSA must demonstrate

that it determined its claim in accordance with the Bankruptcy Code and the language of the

RFA.  As will be demonstrated at the evidentiary hearing, Washington TSA will be unable to

meet its burden of proof.

## II.   SECTION 562 OF THE BANKRUPTCY CODE

Section 562 of the Bankruptcy Code provides that the RFA should be valued using

"commercially reasonable determinants of value" on the rejection or termination date, and if

"commercially reasonable determinants of value" are not available on that date, then the

valuation must be done "as of the earliest subsequent date or dates on which there are

commercially reasonable determinants of value."  11 U.S.C. § 562.  The parties agree that,

pursuant to Section 562, the valuation date for the RFA is March 25, 2009, the date on which the

RFA was rejected.  Section 562 requires the Court to determine the value of the RFA

independent of anything that may have happened subsequent to March 25, 2009.

    The Delaware Bankruptcy Court in *In re Am. Home Mortg. Holdings, Inc.*, warned of the

"moral hazard" that would be created if Section 562 were disregarded:

> If damages were measured at some future date, the [counterparty]
> could hold the asset at little or no risk.  If the price of the asset
> were to rise, the [counterparty] participant would capture that
> increase up to the full amount owed under the agreement.  If the
> price were to fall, however, the [counterparty's] losses would be
> covered because its deficiency claim would rise accordingly.  Even
> if such a claim were not to be paid at 100%, there would certainly
> be instances where the discounted claim is sufficiently large to
> motivate the [counterparty] to shift the risk to the debtor.  In effect,
> this would make the debtor an insurer of the [counterparty's]
> investment even though the debtor has no control over the
> management of the asset—thus, the moral hazard.

411 B.R. 181, 191 (Bankr. D. Del. 2009).

    There is no real dispute that "commercially reasonably determinants of value" for the

RFA existed on March 25, 2009.  All of the experts proffered by both Washington TSA and

Lehman, as well as Washington TSA's long-time financial advisor, PFM, agree that it is standard

practice in the market to determine the value of a reserve fund agreement based upon the forward

curves in effect on the date of the valuation.[9]

    There is no dispute that market data from which forward curves could be constructed was

available on March 25, 2009.  Indeed, both Lehman's expert, Gruer, and Washington TSA's

expert, Shapiro, rely upon forward curves, as of March 25, 2009, in determining their respective

---

[9]    While two of Washington TSA's experts, Curry and Hasterok, argue that the industry-standard approach
should be "discarded" because it is "unfair" to Washington TSA, they concede, as they must, that the market would
value the RFA with the use of forward curves in effect on the date of the valuation.  *See* Curry/Hasterok Rebuttal at
5.

views as to the value of the RFA.[10]  Given that "commercially reasonable determinants of value"

existed on March 25, 2009, they must be used to determine the value of the RFA as of that date.

Nothing in the Bankruptcy Code permits a party to reject available "commercially reasonable

determinants of value" based upon that party's subjective criticism of the market approach.

III.    WASHINGTON TSA'S DETERMINATION OF THE TERMINATION AMOUNT
        FAILS TO MEET THE REQUIREMENTS OF THE RFA

        The RFA expressly provides how the Termination Amount is to be determined in the

event of early termination of the RFA based upon a Lehman Event of Default.  Upon a Lehman

Event of Default, "Lehman shall determine the Termination Amount."  Joint Ex. 1, RFA,

§ 7.6(c).  If Lehman does not make the determination within three business days, then

Washington TSA can proceed to determine the Termination Amount, so long as it makes the

determination "as if it were Lehman."  *Id*.

        The definition of the Termination Amount requires that it be "calculated in good faith"

and "on the basis of the arithmetic mean of quotations from at least three Dealers of the amount,

if any, that each such Dealer would require the Burdened Party to pay the Dealer . . . in

consideration of such Dealer entering into an agreement with the Burdened Party . . . which

would have the effect of preserving for the Burdened Party the economic equivalent of its rights

under [the RFA] . . . ."  Joint Ex. 1, RFA, § 1.

        Only in the event that three market quotations cannot be obtained, can the Termination

Amount then be based upon a calculation of the Washington TSA's "total losses or … gains."

---

[10]    As discussed *infra*, Shapiro has used the industry-standard methodology in his determination of the
Termination Amount, but has used inputs in that methodology that inflate the resulting valuation dramatically and
unreasonably in favor of Washington TSA.

*Id*. Any determination of the Termination Amount – whether it is based upon market quotations or a loss calculation – must be "reasonably determined in good faith." *Id*. If Washington TSA determines the Termination Amount in accordance with the requirements of the RFA, its determination is then binding "absent manifest error." *Id*.

### A.    Washington TSA Failed To Seek Market Quotations

Without a shred of documentary evidence in support, Washington TSA insists that Swap Financial solicited market quotations from fourteen dealers, but did not receive any quotes in response. *See* Letter from Paul Lawrence to the Hon. Shelley C. Chapman, April 14, 2014, p. 2 ("TSA pursued market quotations, as required by the RFA, from 14 sources, none of whom provided a quote"). Moreover, the testimony that was adduced during depositions is inconsistent about any alleged quote solicitation process.

In an attempt to excuse the absence of any documentary evidence of a quote process, Washington TSA argues that it would have been futile to solicit quotations because the market for reserve fund agreements was dead. Yet this bald assertion that is contradicted by the fact that Lehman was able to obtain a market quotation from Wachovia for the RFA in March 2009 for $6,225,000. Debtors' Ex. 44, e-mail from Casey Rogers to Sergey Arefiev, March 26, 2009, LBHI_WTSA_00000342-345. Additionally, many other tobacco reserve fund agreement counterparties have filed claims against Lehman purportedly based upon quotations that they received in the market around the same time Washington TSA claims it would have been futile to solicit quotations. *See, e.g.*, Debtors' Ex. 74, Proof of Claim no. 21488 for the Tobacco Settlement Finance Corporation of New Jersey (quotations solicited in January 2009); Exs. 72, 73, Proofs of Claim Nos. 17406 and 17407 from the Commonwealth of Virginia Tobacco Settlement Financing Corporation (quotations solicited in March 2009). Indeed, PFM, who has represented a number of claimants in the Lehman bankruptcy with terminated reserve fund

agreements, testified that in every instance, the claims asserted against Lehman were based on market quotations.  Harris Dep. Tr. 74:4-10.

Instead of confirming a good faith quote solicitation process, the documentary evidence reveals a deliberate intention to avoid the market quotation process.  Shortly after Washington TSA first contacted Swap Financial about the RFA, internal emails among Swap Financial staff note that Washington TSA "might be better off" not getting market quotations for Washington TSA.  Debtors' Ex. 31, Internal Swap Financial e-mails (Dec. 10, 2008), SFG_001916-1917.  Instead, Swap Financial concluded that a "loss" calculation using certain assumptions would create a claim where "Lehman will owe [Washington TSA] a boat load of money."  *Id.*  Washington TSA's deliberate strategy to avoid the market quotation process so that it could put forth a claim inconsistent with market practice is neither reasonable nor in good faith.  Any Termination Amount determined as part of this strategy is not entitled to any deference.

Washington TSA simply hopes that the Court will disregard the RFA's requirement that it solicit market quotations and instead let it calculate its "losses or gains."  But the language of the RFA is unambiguous that Washington TSA can only resort to a determination of "losses and gains" in the event that it is "unable" to secure at least three market quotations.  Washington TSA cannot disregard certain provisions of a contract and selectively decide which provisions of the contract it wishes to follow.  *See NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259 (2011) ("when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms") (citation omitted); *Pavarini McGovern, LLC v. Tag-Court Square, LLC*, 62 A.D.3d 680, 680 (2d Dep't 2009) ("[w]hen interpreting [a] contract negotiated by and entered into at arm's length between sophisticated business people, represented by an attorney, a court [would be obligated to] enforce the agreement according to its

-23-

terms"); *Maroney v. Hawkins*, 50 A.D.3d 862, 863 (2d Dep't 2008) (refusing to enforce a valuation agreed to by the parties, which was not consistent with the valuation mechanism of the contract*); ESPN, Inc. v Off. of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 400 (S.D.N.Y. 1999) (impermissible to selectively enforce some clauses of a contract and not others). Contracts must be interpreted in such a manner so as to give "reasonable, lawful and effective meaning to all the terms." Restatement (Second) of Contracts, § 203 (1981); *see also Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."). Washington TSA's cavalier disregard of this requirement so that it can resort to its subjective valuations that are inconsistent with market practice cannot be permitted.

### B.    Washington TSA Did Not Determine the Termination Amount Reasonably and in Good Faith

The RFA expressly requires that any Termination Amount determination must be done "reasonably" and "in good faith." Joint Ex. 1, RFA, § 1. Yet Washington TSA's Termination Amount was not determined reasonably and in good faith. Instead, Washington TSA adopted a "wait-and-see" strategy with the goal of maximizing any potential claim against Lehman. As part of that strategy, Washington TSA cast aside its trusted long time (and current) financial advisor and engaged a "hired gun," Swap Financial, who lacked the expertise to value the RFA.

Notwithstanding Swap Financial's lack of expertise, Swap Financial accomplished the task it had been assigned – to "maximize" Washington TSA's claim against Lehman – by calculating a Termination Amount that bears no relation to the RFA's market value. Swap Financial imposed hypothetical "dealer charges" to purportedly represent what a dealer would require to replace the RFA. However, such theoretical dealer charges that were never incurred

by Washington TSA are not properly recoverable by Washington TSA. The definition of the

Termination Amount is expressly limited to losses and costs actually incurred. Joint Ex. 1, RFA,

§ 1. Because Washington TSA did not replace its RFA, it should not be entitled to recover these

"dealer charges" that it did not, in fact, incur. Moreover, the hypothetical "credit charge"

imposed by Swap Financial has no grounding in market practice, yet alone constitutes the vast

majority of Washington TSA's Claim.

        In an attempt to bolster the outlandish Termination Amount presented by Swap Financial,

Washington TSA proceeded to engage two additional "experts," Curry and Hasterok, who

concocted a novel valuation methodology for the RFA – one they admit they have never used in

their combined 40+ years of experience in the market – which coincidentally results in a

Termination Amount nearly identical to that determined by Swap Financial. *See* Docket No.

46383, Lehman's Motion for an Order Excluding the Testimony of Daniel Curry and Jeffrey

Hasterok.[11]

        If Washington TSA had calculated the Termination Amount in good faith, it would have

used the industry-standard methodology, using market-accepted assumptions. Washington

TSA's failure to do so makes any resulting Termination Amount calculated meaningless. The

evidence presented at the evidentiary hearing will demonstrate that not only was Washington

TSA not acting reasonably or in good faith in determining the Termination Amount, but that it

committed manifest error. *See Matter of Hermance v. Bd. of Supervisors of Ulster County* 71

N.Y. 481, 486 (1877) (a "manifest" error is "evident, visible, plain, obvious to the understanding

---

[11]    For the multiple, independent reasons presented in Lehman's Motion for an Order Excluding the Testimony of Daniel Curry and Jeffrey Hasterok, opinion testimony from Curry and Hasterok should not be admitted.

from an examination of the roll or document; or, at the most, only requiring a mathematical calculation to demonstrate it."); *see also Szczepanek v. Dabek*, No. 10-cv-2459, 2011 U.S. Dist. LEXIS 23458 (E.D.N.Y. Mar. 7, 2011) (finding "manifest error" in calculation of attorney's fees due to lack of "documentary backup" and excessive amount of fees), *aff'd, Szczepanek v. Dabek*, 465 Fed. Appx. 74, 75 (2d Cir. Mar. 28, 2012).

## IV. LEHMAN'S VALUATION IS REASONABLE AND BASED ON INDUSTRY STANDARD METHODOLOGY

Lehman's valuation is based on a sound methodology that is used by market participants to value forward delivery agreements like the RFA every day. Market participants use the same methodology as Lehman's expert Gruer regardless of whether valuing a new transaction, placing a value on an existing transaction, or terminating a transaction, and regardless of whether the valuation was on behalf of a dealer or an issuer. None of Washington TSA's experts dispute that there is a generally accepted methodology for valuating forward delivery agreements like the RFA; however, they have rejected this methodology here to provide Washington TSA with an inflated calculation. Washington TSA's criticisms of the standard methodology are baseless and are contrary to market practice.

In addition to being generally accepted, Lehman's methodology is consistent with the terms of the RFA that provided Lehman with the absolute right to deliver the cheapest to deliver Eligible Securities as of the Rejection Date. Gruer reviewed the yield curves on such date for each type of Eligible Securities using information published by Bloomberg and determined that U.S. Agency Securities were the highest yielding or cheapest to deliver Eligible Securities on such date. Debtors' Ex. 139, Gruer Report at ¶ 40. Therefore, the forward curve to be used in calculating the floating rate should be based upon the yield curve for U.S. Agency Securities, as in effect on March 25, 2009. *Id.* at ¶ 42.

Next, Gruer developed a forward curve on the basis of the yield of U.S. Agencies, the cheapest to deliver of the Eligible Securities, as of March 25, 2009. The forward curve is understood by the financial derivatives market to represent the market's consensus as to the rates that Washington TSA could expect to receive on U.S. Agency Securities for each delivery date. Simply put, it is market practice to use forward rates of interest to value forward commitments like the RFA. Debtors' Ex. 138, Babbel Report at 10. Despite Washington TSA's implication to the contrary, the market data necessary on which to base the forward curve has *nothing* to do with transaction data for reserve fund agreements.[12] Instead, the market data is based on the cheapest to deliver of the Eligible Securities and is readily available in the market.

Finally, Gruer completed his mid-market valuation by calculating the future cash flows of the two legs of the transaction and discounting the difference between such cash flows to present value. Debtors' Ex. 139, Gruer Report at ¶ 40. Using that forward yield curve, Gruer used FINCAD – to calculate the floating rate amounts that would have been payable to it for each six month period during the remaining term of the RFA, if the RFA had not been terminated. *Id.* at ¶ 47. Gruer then determined the present value of each such amount by discounting that amount by applicable LIBOR rate. *Id.* at ¶ 48. Then, the total value of the floating payment leg was calculated by taking the sum of such discounted amounts. Finally, Gruer then compared the present value of the floating leg and the fixed leg and determined that the mid-market value of the cash flows was $ 1,359,394.59, payable by Washington TSA to Lehman. *Id.* at ¶ 49.

---

[12]    Washington TSA's argument that the standard methodology for valuing RFAs should be rejected because of the lack of a market for tobacco reserve fund agreements as of the Termination Date has no basis. Even if there was not a single tobacco reserve fund agreement entered into during that time, market participants still had to mark their books and value their positions in tobacco reserve fund agreements on a daily basis using the standard methodology. Washington TSA's experts do not claim – because they cannot – that market participants stopped valuing the reserve fund agreements on their books at any point in time.

## <u>CONCLUSION</u>

For the foregoing reasons, which will be demonstrated at the evidentiary hearing on

Claim Numbers 37355 and 37356, Lehman respectfully requests the Court to deny Washington

TSA's Proof of Claim Numbers 37355 and 37356.

Dated: October 21, 2014                     JONES DAY
      New York, New York

                                   /s/ Laura W. Sawyer
                                   Jayant W. Tambe
                                   Laura W. Sawyer
                                   222 East 41st Street
                                   New York, New York  10017
                                   Telephone:  (212) 326-3939
                                   Facsimile:  (212) 755-7306

                                   *Attorneys for Debtors*

## <u>CERTIFICATE OF SERVICE</u>

I, I-Heng Hsu, certify that on October 21, 2014, I caused a true copy of the foregoing

*Debtors' Pre-Evidentiary Statement Regarding Claims Number 37355 and Number 37356* to be

served via ECF and electronic mail upon:

> Paul J. Lawrence
> Kymberly K. Evanson
> PACIFICA LAW GROUP LLP
> 1191 Second Avenue, Suite 2100
> Seattle, WA 98101

> Eric T. Moser
> Robert N. Michaelson
> RICH MICHAELSON MAGALIFF MOSER, LLP
> 340 Madison Avenue, 19th Floor
> New York, NY 10173

*Attorneys for Washington State Tobacco Settlement Authority*

Dated:  October 21, 2014
        New York, New York

                                        /s/ I-Heng Hsu
                                        I-Heng Hsu