**Hearing Date and Time: November 7, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time: October 31, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Bruce E. Clark
Matthew A. Schwartz
Thomas C. White

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (SCC) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

|  |  |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and | : Adversary Proceeding |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : |
| | : No. 13-01554 (SCC) |
| Plaintiffs-Counterclaim Defendants, | : |
| | : |
| v. | : |
| | : |
| GIANTS STADIUM LLC, | : |
| | : |
| Defendant-Counterclaim Plaintiff. | : |

**NOTICE OF GIANTS STADIUM LLC'S MOTION TO CONSOLIDATE CONTESTED
MATTER WITH ADVERSARY PROCEEDING AND FOR RELATED RELIEF**

**PLEASE TAKE NOTICE** that on October 24, 2014, Giants Stadium LLC

("Giants Stadium") filed a Motion to Consolidate Contested Matter with Adversary Proceeding

and for Related Relief ("Motion").  A hearing to consider the Motion will be held before the

Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623 of the

United States Bankruptcy Court for the Southern District of New York, One Bowling Green,

New York, New York 10004, on **November 7, 2014 at 10:00 a.m. (Prevailing Eastern Time)** or as soon thereafter as counsel may be heard.

        **PLEASE TAKE FURTHER NOTICE** that any response to the Motion must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF) or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and served in accordance with General Order M-399, on (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii) attorneys for Giants Stadium, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Bruce E. Clark, Matthew A. Schwartz, and Thomas C. White); (iii) attorneys for the above-captioned debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Richard W. Slack, Robert J. Lemons, Richard P. Krasnow, Lori R. Fife, Shai Y. Waisman, and Jacqueline Marcus); (iv) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Susan D. Golden, and Andrea B. Schwartz); (v) attorneys for the official committee of unsecured creditors in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Wilbur Foster, Jr., Dennis O'Donnell, and Evan R. Fleck); so as to be filed and received by no later than **October 31, 2014 at 4:00 p.m. (Prevailing Eastern Time)** ("Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and serviced with respect to the Motion, Giants Stadium may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form attached to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
       October 24, 2014

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

By:    /s/ Bruce E. Clark
       Bruce E. Clark
       Matthew A. Schwartz
       Thomas C. White
       SULLIVAN & CROMWELL LLP
       125 Broad Street
       New York, New York 10004
       Telephone: (212) 558-4000
       Facsimile: (212) 558-3588

       *Attorneys for Giants Stadium LLC*

**Hearing Date and Time: November 7, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Date and Time: October 31, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Bruce E. Clark
Matthew A. Schwartz
Thomas C. White

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and LEHMAN BROTHERS SPECIAL FINANCING INC., | |
| Plaintiffs-Counterclaim Defendants, | |
| v. | Adversary Proceeding |
| GIANTS STADIUM LLC, | No. 13-01554 (SCC) |
| Defendant-Counterclaim Plaintiff. | |

**MOTION TO CONSOLIDATE CONTESTED MATTER**
**WITH ADVERSARY PROCEEDING AND FOR RELATED RELIEF**

Giants Stadium LLC ("Giants Stadium"), by its undersigned counsel, hereby moves to consolidate for all purposes (i) a pending contested matter ("Contested Matter") involving an objection by Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI," together with LBSF, "Debtors") to Giants Stadium's claims ("Claims"), with (ii) the above-referenced adversary proceeding ("Adversary Proceeding") commenced by Debtors against Giants Stadium arising out of the same swap transactions giving rise to the Claims.  Giants Stadium also seeks related relief from the Claims Procedures Order,[1] to the extent that order could be construed as applying to the consolidated proceeding (or barring the assertion and prosecution of Giants Stadium's counterclaims in the Adversary Proceeding).

## PRELIMINARY STATEMENT

1.      Pending before the Court are two related proceedings:  (i) the Contested Matter, arising out of Giants Stadium's Claims, filed on October 29, 2009, to which Lehman served an objection on August 22, 2014 ("Objection") (No. 08-13555, ECF No. 46050) and (ii) the Adversary Proceeding Debtors initiated on October 23, 2013 (No. 13-01554, ECF No. 1).  Both proceedings involve substantially identical and overlapping questions of fact and law concerning (i) the interpretation of the terms of the swaps, and (ii) the valuation of the swaps when they were terminated (upon LBSF's default).

2.      For four years prior to lodging their Objection to the Claims, Debtors used Federal Rule of Bankruptcy Procedure 2004 to engage in a self-described "fishing expedition" of Giants Stadium, with the purported purpose of "deciding" whether to object to Giants Stadium's

---

[1]      The "Claims Procedures Order" refers to the Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors.  (No. 08-13555, ECF No. 8474.)

claims (while simultaneously objecting to and obstructing any effort by Giants Stadium to obtain parallel discovery from Debtors). In fact, Debtors' objective was to procure asymmetrical discovery of Giants Stadium to gear up for this inevitable litigation, which Debtors succeeded in doing before Judge Peck identified Debtors' misbehavior and put a stop to it.

3.      Now, with discovery underway and depositions set to commence in a month and a half under this Court's scheduling order, Debtors have once again reverted to their old playbook. After Giants Stadium sent Debtors a plain vanilla draft stipulation consolidating the Adversary Proceeding and Contested Matter—consistent with this Court's expectation, stated at the parties' last conference, that these matters would be resolved in "one proceeding" (Pre-Trial Conf. Hr'g Tr. 134:10, Jul. 16, 2014)—Debtors refused to sign. Not only that, Debtors refused even to meet and confer about the consolidation proposal until the end of fact discovery. Shortly thereafter, in response to the counterclaims asserted in Giants Stadium's Answer to Debtors' Adversary Complaint—counterclaims that seek nothing more than a resolution of all common issues in a single proceeding—Debtors invoked the 2010 Claims Procedures Order and asserted (incorrectly) that the counterclaims were "null and void."

4.      Debtors' litigation strategy has thus become plain: they are attempting to create a dual-track litigation whereby they can prosecute their Adversary Proceeding while simultaneously leaving the resolution of Giants Stadium's Claims for some later date and time (notwithstanding the substantial overlap of factual and legal issues). Debtors' refusal to consolidate two related proceedings confers no material benefit and threatens to waste the time and money of all parties (the Court, Giants Stadium, and the estate alike), by potentially requiring separate trials on what should be a single matter. The Court should reject Debtors'

machinations and order consolidation now, consistent with Judge Peck's decision in *LBHI* v.

*Citibank, N.A.* (discussed below) and common sense.

## BACKGROUND[2]

### A. Giants Stadium and LBSF Enter into the Swaps.

5.    This dispute arises out of two materially identical 40-year interest rate swap

transactions ("Swaps") between Giants Stadium and LBSF, entered into as part of the financing

of the New Meadowlands Stadium ("Stadium") in 2007.  (Response ¶¶ 1, 23.)

6.    Before entering into the Swaps with LBSF,  Giants Stadium—a family-owned and

conservatively run business—planned to issue auction rate securities ("ARS") through Goldman,

Sachs & Co. ("Goldman"), and simultaneously enter into a classic fixed-for-floating interest rate

swap with Goldman, whereby (i) Giants Stadium would pay Goldman a fixed interest rate on the

bonds, and (ii) Goldman would pay Giants Stadium a rate on the bonds based on LIBOR.  (*Id.*

¶¶ 1, 3.)

7.    The very day before Giants Stadium was to enter into this agreement with

Goldman, however, LBSF offered Giants Stadium a better deal.  To assuage Giants Stadium's

concern with risks inherent in ARS, LBSF offered to enter into an actual bond-rate swap to

achieve what LBSF called a synthetic long-term fixed-rate note that eliminated Giants Stadium's

remarketing or rollover risk.  (*Id.* ¶ 4.)  In this structure, (i) Giants Stadium would pay LBSF a

higher fixed rate on the swaps than it would have paid Goldman (a fixed rate of 6.1885%, as

compared to Goldman's proposed 5.659% fixed rate), but (ii) LBSF would pay Giants Stadium

---

[2]    The background to the dispute over Giants Stadium's Claims is set forth more fully in
Giants Stadium's Response to Debtors' Objection (No. 08-13555, ECF No. 46463) ("Response")
¶¶ 18-55 and the supporting documents annexed thereto in the Declaration of Matthew A.
Schwartz dated October 7, 2014 (No. 08-13555, ECF No. 46464).  Citations to "Ex._" are to the
exhibits to that Declaration.

the *actual rate* on the bonds as determined at each auction. (*Id.* ¶¶ 4, 21.) In other words, in return for a multimillion dollar premium payment to LBSF, LBSF would assume all of the associated market risks so that, from Giants Stadium's perspective, its bonds would effectively be at a fixed rate. (*Id.*)

8.    In light of Giants Stadium's consistent concerns about eliminating as much market risk as possible, Giants Stadium agreed to LBSF's proposal. (*Id.* ¶ 5.) Accordingly, on July 27, 2007, Giants Stadium financed $408,325,000, approximately two-thirds of the Stadium cost, through ARS bonds ("Bonds") and actual bond rate swaps pursuant to LBSF's proposal, and only one-third of the Stadium cost through Goldman. (*Id.*)

9.    The Swaps were documented in two separate confirmations[3] dated August 16, 2007, which are part of two separate standard form 1992 ISDA Master Agreements and the schedules thereto, dated July 27, 2007 ("ISDA Master Agreements," "Schedules," and "Confirms," collectively "Swap Agreements"). (*See* Response ¶ 23, Exs. E and F.)

10.    Section 6 of the ISDA Master Agreements provides for termination rights upon an Event of Default[4] and sets out alternative methods for valuing the payment obligations under this scenario, from which Giants Stadium and LBSF chose "Market Quotation" and "Second Method" in the Schedules. (ISDA Master Agreement §§ 6(a), (b), (e); Schedule Pt. 1(j).) In Paragraphs 5 and 6 of the Confirms, Giants Stadium and LBSF modified the method of

---

[3]    Giants Stadium and LBSF entered into two separate swaps because two separate monoline insurers, Financial Security Assurance Inc. ("FSA") and Financial Guaranty Insurance Co. ("FGIC"), insured Giants Stadium's obligations to pay LBSF under the Swaps. This split insurance arrangement for the Swaps was mirrored by the Bonds, where FSA and FGIC separately insured the tranches to which each of the Swaps related with FGIC insuring the Series A-4, A-5, and A-6 Bonds and FSA insuring the Series A-7 Bonds. (Response ¶ 23 n.2.)

[4]    Capitalized terms not defined herein are ascribed the meaning in the Swap Agreements.

calculating the liquidation value of the Swaps provided for under Section 6 of the ISDA Master Agreements, specifying that, under a modified approach to Market Quotation, Giants Stadium and LBSF would each designate two reputable broker-dealers or "Reference Market-makers" from which LBSF would solicit quotations for replacement swaps, the lowest of which would serve as the Market Quotation. (Response ¶ 25.)

11.    Almost immediately after the parties signed the Swap Agreements, LBSF began to explore ways to restructure the deal such that it could request, pursuant to Paragraph 4 of the Confirms, that Giants Stadium convert the Bonds from ARS to variable rate demand bonds through another financial institution. (Response ¶¶ 26-27.) LBSF's position on the Swaps had become so bad that, by late 2007, Lehman Brothers Inc. ("LBI") (with its affiliates, "Lehman")—which was charged with conducting the auctions for the Bonds—was withholding approximately 90% of the Bonds from auction on a monthly basis in order to avoid the risk of a failed auction. (*Id.* ¶¶ 7, 31.)[5] On February 11, 2008, LBI itself began to hold on its books all of the Bonds at each auction thereby earning for itself a below-market "all hold" rate on the Bonds.[6] LBI did this to protect LBSF from having to pay a high actual bond rate to Giants Stadium under the Swaps if the Bonds were put out to auction on the market. (*Id.* ¶¶ 32-33.)

12.    As explained more fully in the Response (at ¶¶ 27, 36), despite substantial effort, Lehman was unable to find a single financial institution that would provide the liquidity

---

[5]    Under the terms of the indenture governing the issuance of the Bonds ("Indenture"), an auction "failed" where there were insufficient bids to purchase the Bonds being offered for sale, which would have required payment at the maximum rate of 22% to compensate bond holders for their inability to sell the Bonds in an illiquid market. (Response ¶ 31.)

[6]    Pursuant to the terms of the Indenture, in an "all hold" auction—where none of the existing bond holders sought to auction their Bonds—the applicable "all hold" interest rate was automatically set at 90% of LIBOR, a rate that, at this point in time, was under 3%. (Response ¶ 32.)

necessary to request any conversion of the Swaps to some other instrument such that Giants Stadium would receive materially the same terms as under the Swaps.

**B. LBSF Defaults and Giants Stadium Calculates Its Loss.**

13.     On September 15, 2008, LBHI—LBSF's credit support provider on the Swaps— filed a voluntary petition with the Court under Chapter 11 of the Bankruptcy Code, which constituted an Event of Default under the Swap Agreements. (ISDA Master Agreement § 5(a)(vii).) On September 18, 2008, about two weeks before LBSF filed its Chapter 11 petition, Giants Stadium hand-delivered and faxed to LBSF a notice of termination of the Swaps based on LBHI's bankruptcy filing, and designated that date as the "Early Termination Date" with respect to the Swaps. (Response ¶¶ 37, 77.)

14.     Upon termination of the Swaps on September 18, 2008, Christine Procops of Giants Stadium contacted Lehman's Robert Taylor—who was responsible for LBSF's relationship with Giants Stadium—to designate Giants Stadium's two Reference Market-makers and to request that LBSF solicit quotations from those and other Reference Market-makers on behalf of LBSF. (*Id.* ¶¶ 39, 77.) Ms. Procops reached Mr. Taylor on the telephone, who candidly told Ms. Procops, "There is really nobody here at Lehman. Go out and get [the bids] on your own." (*Id.*)

15.     LBSF's refusal to designate and solicit quotations from Reference Market-makers rendered the Market Quotation method of valuing Giants Stadium's Loss unavailable under the Swap Agreements, which provided that "Lehman shall solicit quotations" from the Reference Market-makers. (Confirm ¶ 6.) As a result, Giants Stadium's only obligation was to calculate, on its own, the size of its Loss on the Swaps. (ISDA Master Agreements § 12.) Nevertheless, attempting to provide an objective benchmark regarding the magnitude of its Loss, Giants Stadium sought quotations from three leading broker-dealers: Bank of America, JPMorgan, and

-6-

Goldman. (Response ¶ 41.) Each of these institutions informed Giants Stadium that it was unwilling to provide the legally binding bid mandated by the Swap Agreements under the Market Quotation method. (*Id.*)

16.    Giants Stadium therefore proceeded to calculate its Loss under the Swap Agreements in good faith and in a commercially reasonable manner. The calculation involved two principal variables: (i) an auction rate for the Bonds insured by one of the two monoline insurers, FSA and FGIC, which could be used to calculate the floating payments owed to Giants Stadium in exchange for its fixed payments under the Swaps, and (ii) a discount rate to bring the difference between the floating and fixed streams of payments to net present value. (*Id.* ¶ 42.)

17.    With respect to (i), Giants Stadium looked to the actual market rates for the FSA-insured bonds that it issued through Goldman, ARS that were still being put to auction, whose rate for that current auction period blended to 9.75%. This methodology was extremely conservative. These auctions occurred on September 8 and 10, 2008, pre-dating Debtors' bankruptcy and concomitant disruption to the markets. (*Id.* ¶ 43.)

18.    Giants Stadium had one other data point, which was the 22% rate—the most current rate on the Bonds (due to a recent failed auction). Thus the 9.75% rate selected by Giants Stadium was less than half the rate that LBSF would have actually owed to Giants Stadium under the Swaps at the time of termination, had the Bonds been offered at auction. Because the Goldman auction rate bonds were insured by FSA and not by FGIC (which was the much weaker insurer at the time and subsequently went into rehabilitation, while FSA did not, *see id.* ¶ 30 n.5), Giants Stadium included a very conservative adjustment of 75 basis points for the FGIC-insured component of the Bonds to account for their significant difference in creditworthiness, thereby

applying a rate of 10.5% to the portion of the Swaps that corresponded to the FGIC-insured Bonds. (*Id.* ¶ 44.)

19.    With respect to (ii), the discount rate that Giants Stadium applied to the two streams of projected payments under the Swaps, Giants Stadium selected LIBOR as the discount rate. Giants Stadium was entitled to recover the loss of its bargain in the terminated Swaps including equivalent terms and thus have a counterparty with Debtors' perceived creditworthiness as of August 2007. As a result, LIBOR, the rate at which financial institutions can borrow funds, was an appropriate discount rate for the floating-rate payments from the counterparty in a replacement swap and a conservative measure for the fixed-rate payments from Giants Stadium, which Moody's rated Baa3 in September 2008 and which accordingly had a much higher cost of capital than a replacement counterparty. (*Id.* ¶ 46.)

20.    On October 2, 2008, pursuant to Section 6(d) of the ISDA Master Agreements, Giants Stadium provided LBSF with statements of the Settlement Amount owed to Giants Stadium pursuant to this straightforward calculation, which totaled $301,025,197.12. On October 3, 2008, LBSF filed a voluntary petition under Chapter 11 of the Bankruptcy Code. *See In re LBSF*, Chapter 11 Case No. 08-13888 (SCC) (Bankr. S.D.N.Y. Oct. 3, 2008). On October 17, 2008, Giants Stadium filed proofs of claim against LBSF and LBHI (as LBSF's guarantor) in their respective bankruptcy cases for $301,828,087.35 each. On October 29, 2009, Giants Stadium filed the operative Claims against LBSF and LBHI for $301,804,617.14 each, making a minor correction to their interest calculation that favored Debtors. (Response ¶¶ 47-49.)

## C.   Debtors Conduct a Purported Rule 2004 Investigation and File Their Adversary Complaint and Objection.

21.    Four years prior to lodging their objection to the Claims, Debtors began utilizing Federal Rule of Bankruptcy Procedure 2004—the purpose of which is to assist a party in interest

in determining the nature and extent of the bankruptcy estate—as a means of conducting an improper campaign to procure burdensome, one-sided discovery for this litigation.  (*Id.* ¶¶ 50-53.)  After the Court ended Debtors' multi-year charade that they needed extensive Rule 2004 discovery to "decide" whether to object to Giants Stadium's Claims (or to sue Giants Stadium)—with the Court stating that "there is no foreseeable outcome here in which Lehman is not objecting, or bringing affirmative claims relief" (*id.* ¶ 53 & Ex. W)—Debtors filed an Adversary Proceeding Complaint ("Complaint" or "Compl.") against Giants Stadium on October 23, 2013.

22.    On August 22, 2014, Debtors filed their Objection (or "Obj.") to Giants Stadium's Proofs of Claim, which incorporates the allegations of the Complaint by reference.  (*See* Obj. ¶ 2.)  Both documents object to Giants Stadium's Claims on the same four grounds:

23.    *First*, Debtors argue that LBI's resignation as broker-dealer for the ARS converted the Swaps to LIBOR-based swaps (as opposed to actual bond rate swaps) because, under Paragraph 7 of the Confirms, "[i]n the event that LBI is, at any time, terminated or replaced in its capacity as broker-dealer," Giants Stadium is deemed to exercise its right to convert the Swaps to LIBOR-based swaps under Paragraph 9.  (Compl. ¶¶ 72-74; Obj. ¶ 31.) The plain language of the Swap Agreements, along with testimony about the intent of the parties, will show, however, that, under this provision, the rate LBSF was required to pay Giants Stadium under the Swaps shifted to a LIBOR-based rate only *when Giants Stadium* "terminated or replaced" LBI as the broker-dealer.  (Response ¶¶ 67-70.)  The provision was not triggered by LBI's resignation as broker-dealer.   Indeed, Debtors' interpretation would negate the entire

economic and business purpose of the Swaps by placing the risk on Giants Stadium if LBI resigned as broker-dealer. (*Id.* ¶ 72.)[7]

24.    *Second*, Debtors claim that when Giants Stadium contacted three broker-dealers to measure its Loss arising out of LBSF's default, Giants Stadium "denied" LBSF its "right" to obtain quotations from Reference Market-makers to value the Swaps. (Compl. ¶¶ 80-83; Obj. ¶¶ 35-36.)    Giants Stadium will show that it never did anything to prevent LBSF from designating its Reference Market-makers; instead, LBSF told Giants Stadium that Giants Stadium was "on its own" and declined to designate its two Reference Market-makers due to the chaos arising out of Lehman's bankruptcy, thereby waiving any "right" to designate Reference Market-makers and *obligating* Giants Stadium to calculate its Loss. (Response ¶ 78.)

25.    *Third*, Debtors argue that Giants Stadium breached the Swap Agreements by not obtaining LBSF's consent before amending a provision of the Indenture requiring that a minimum percentage of the ARS be hedged at different times. (Compl. ¶¶ 85-94; Obj. ¶¶ 36-38.)    Giants Stadium will show that Debtors' theory that the Indenture "expressly was incorporated into the Swaps" (Obj. ¶ 37) is wrong because, as the Swap Agreements themselves acknowledge, this minimum hedging provision existed for the benefit of the bond insurers, not LBSF. (Response ¶¶ 84-86.)    And, even assuming the parties somehow expected that a provision "expressly made to and for the benefit of the Insurer" (ISDA Master Agreement Schedule Pt. 1(l)(ix)), afforded LBSF the right to consent to an amendment of the Indenture's minimum hedging requirement, Debtors will be unable to show how they were materially and

---

[7]    If this were indeed what the parties intended, Giants Stadium would have had no incentive to pay a multimillion dollar premium to LBSF (in the form of a higher fixed-rate payment) in exchange for LBSF's assumption of the risk of increasing auction rates, and Lehman would not have canvassed all of Wall Street in its effort to identify a refinancing alternative for the Bonds. (*See* Response ¶¶ 72-73.)

adversely prejudiced by the amendment such that LBSF could reasonably have withheld its consent. (Response ¶ 87.)

26.    *Fourth*, Debtors dispute Giants Stadium's Loss calculation methodology. They, for example, argue that Giants Stadium:  failed to adequately account for LBSF's ability to request a refinancing of the Bonds; used "excessively high auction rates"; and "incorrectly use[d] the LIBOR curve as its discount rate for the projected cash flows." (Compl. ¶¶ 95-98; Obj. ¶¶ 41-49, 55-56, 60.)  As Giants Stadium will show, Debtors' effort to second-guess Giants Stadium's calculations, which, under the Swap Agreements, must be done only in good faith and in a commercially reasonable manner, with the benefit of hindsight, fails. Debtors already litigated the value of these very Bonds in a case against Barclays, during which Debtors valued the Bonds using an interest rate of *16%* going forward (far in excess of the 9.75% and 10.5% rates by Giants Stadium here). (*See* Response ¶¶ 92-101.)  In any event, Giants Stadium will show through expert and other evidence that its valuation methodology was fundamentally conservative, and well within the range of commercial reasonableness contemplated by the Swap Agreements. (*Id.*)

### D.  Procedural Posture

27.    At a status conference held on July 16, 2014, Debtors informed the Court that the parties agreed to consolidation for pretrial purposes, and further stated that Debtors "would think that the parties will continue to talk about [consolidation]" for all purposes. (*Id.* at 134:2-7.)  In response, the Court stated its expectation that all parties "would want to [adjudicate the Adversary Proceeding and the Contested Matter] in one proceeding." (Pre-Trial Conf. Hr'g Tr. 134:8-15, Jul. 16, 2014.)

28.    In light of that conference, on July 21, 2014, this Court entered its Stipulation and Scheduling Order ("Scheduling Order") (No. 13-01554, ECF No. 33).  The Scheduling Order

expressly recognized that these proceedings are related, and that "the Parties agree that the adversary proceeding and resolution of the Proofs of Claim would be best served by consolidating the actions at least for the purposes of pretrial discovery." (Scheduling Order at 2.) The Court ordered that "all discovery by Lehman and Giants Stadium pursuant to Rule 2004 in this bankruptcy case is available to be used in connection with the adversary proceeding and resolution of the Proofs of Claim," consolidated all future discovery for both proceedings, and set the applicable discovery deadlines. (*Id.* at 2-4.)

29.    On September 8, 2014, Giants Stadium filed its Answer and Counterclaim ("Answer"), asserting two counterclaims ("Counterclaims") to Debtors' Complaint. (*See* No. 13-01554, ECF No. 35.) First, Giants Stadium alleged Debtors "breached the Swap Agreements by failing to pay Giants Stadium the amount of $301,804,617.14 set forth in the Proofs of Claim." (Counterclaims ¶ 46.) Second, Giants Stadium sought a declaratory judgment that the Claims "should be accepted and allowed and paid by Debtors." (*Id.* ¶ 54.)

30.    On September 11, 2014, Giants Stadium wrote Debtors, proposing consolidation for all purposes of the Adversary Proceeding and the Contested Matter in light of Debtors' previously stated interest in "'promot[ing] orderly administration of litigation,' fostering 'non-duplicative, streamlined discovery,' and 'uncluttering the docket.'" (*See* White Decl. Ex. A (submitted herewith).) The letter attached a draft stipulation to consolidate the proceedings and withdraw two pending Rule 2004 discovery motions as moot, and invited Debtors' comments on the draft stipulation.

31.    On October 2, 2014, Debtors responded to Giants Stadium's proposal by not only refusing to stipulate to consolidation, but also refusing to even meet and confer about the subject. Specifically, Debtors asserted that "the Court has already for all practical purposes consolidated

the adversary proceeding and claims objection for purposes of pretrial discovery," and that they would be willing to meet and confer about consolidation for the purposes of trial "at or near the end of fact discovery when the parties have seen the developed record."  (White Decl. Ex. B.) Debtors offered no explanation of how the developed record resulting from consolidated discovery in two lawsuits arising out of the same transaction, each of which seeks to determine which party owes how much to the other, might undermine the appropriateness of consolidating the two intertwined actions for trial.

32.    On October 2, 2014, Debtors filed their Response to the Counterclaims ("Debtors' Response to the Counterclaims") (No. 13-01554, ECF No. 39), wherein Debtors asserted that no response to the Counterclaims was necessary, because, according to Debtors, the Claims Procedures Order "expressly preclude[d]" Giants Stadium from asserting these Counterclaims, rendering them "null and void."

## JURISDICTION AND VENUE

33.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

34.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

35.    The statutory bases for the relief requested herein are §§ 105(a) and 1109(b) of Title 11 of the United States Code ("Bankruptcy Code"), Rules 7042 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Rule 42 of the Federal Rules of Civil Procedure ("Federal Rules"), and the Court's inherent powers.

## RELIEF REQUESTED

36.    Giants Stadium requests the entry of an order (a) consolidating the Contested Matter and the Adversary Proceeding, and (b) holding that the Claims Procedures Order does not

apply to the consolidated proceeding (or, in the alternative, does not foreclose Giants Stadium's assertion and prosecution of the Counterclaims in the Adversary Proceeding).

## ARGUMENT

37.     Debtors' argument, in their Response to the Counterclaims, that the Claims Procedures Order "precludes" Giants Stadium from asserting the Counterclaims that basically mirror the Claims to which Debtors have objected, reveals a strategic purpose behind their refusal to consolidate the Claims and Adversary Complaint proceedings:  Apparently Debtors believe that they can prosecute their Adversary Complaint in a one-sided "dry run" to test their novel contractual theories, while simultaneously holding Giants Stadium's Claims in abeyance for resolution at some later date and time of Debtors' own choosing.  Putting the inherent inequity in Debtors' position to one side, the notion that these two proceedings, which present nearly identical issues of fact and law, should be adjudicated separately is an inefficient adjudicative construct that makes no sense.  Nor have Debtors explained how this construct would make any more sense after the completion of consolidated discovery.

38.     Accordingly, the Adversary Proceeding and Contested Matter should be consolidated pursuant to Federal Rule of Civil Procedure 42(a), *see also* FED. R. BANKR. P. 7042 (applying Federal Rule 42 in adversary proceedings); FED R. BANKR. P. 9014(c) (applying Bankruptcy Rule 7042 in contested matters), and this Court should grant related relief from the Claims Procedures Order.

## I.      THE ADVERSARY PROCEEDING AND THE CONTESTED MATTER SHOULD BE CONSOLIDATED.

39.     There can be no serious question that these two proceedings "involve *a* common question of law *or* fact." FED. R. CIV. P. 42(a) (emphasis added).  In fact, there are at least four common questions of law and fact:  the four issues raised in Debtors' Adversary Complaint and

-14-

Objection (discussed more fully *supra* ¶¶ 21-26) and Giants Stadium's Response (at ¶¶ 59-107) and Answer and Counterclaims:

- Whether Giants Stadium properly terminated the Swaps upon LBSF's default?

- Whether the Swaps remained, at the time of termination, actual bond rate swaps (for which Giants Stadium bargained and paid a multimillion dollar premium) or, instead, converted to LIBOR-based swaps due to LBI's resignation as broker-dealer (over which Giants Stadium had absolutely no control)?

- Whether Giants Stadium breached the Swap Agreements by contacting leading dealers in the relevant market (as was expressly permitted under the Swap Agreements) after LBSF refused to perform its contractual obligation to designate Reference Market-makers?

- Whether Giants Stadium calculated its Loss in good faith and in a commercially reasonable manner as of the Early Termination Date when it used observable market data to calculate Loss (particularly where the Bonds to which the Swaps were linked were being sold for pennies on the dollar, suggesting Giants Stadium could have calculated a much higher Loss amount)?

40. The efficiencies of adjudicating these questions in a consolidated proceeding are obvious: their resolution will require examining the same documents and taking the same fact and expert testimony. Separating the two interrelated proceedings would be a waste of this Court's resources, as well as those of the parties.[8] The Court has "broad discretion" to determine whether consolidation is appropriate, as well as the inherent power to order consolidation. *See Johnson* v. *Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990). In making this determination, courts consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single

---

[8] The parties and the Court, of course, may later determine that the consolidated proceeding should held in more than one stage (for example, holding separate liability and damages phases).

one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Id.* (quoting *Hendrix* v. *Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985)). Debtors have not identified any prejudice they will suffer by consolidation, and the Court, Giants Stadium, and Debtors' other creditors all would be prejudiced by the parties' wasting their time and resources by litigating the same issues twice. Indeed, Debtors have declined to identify even a single *theoretical* reason why these proceedings should not be consolidated, despite the fact that document discovery is nearly complete.

41.    Moreover, as Debtors themselves observed in *seeking* consolidation of various contested matters and two adversary proceedings in another set of litigations in this bankruptcy, "[i]n bankruptcy proceedings, both contested matters and adversary proceedings are routinely consolidated." (*LBHI Inc.* v. *Nomura Int'l plc*, Adv. Pro. No. 10-03228 (Bankr. S.D.N.Y. Apr. 23, 2010), ECF No. 2 ("*Nomura* Motion To Consolidate") ¶ 19.)[9]

42.    Although Debtors have staked out the position that the determination should be made "at the end of fact discovery," there is no reason to believe that there will no longer remain a single "common question of law or fact" once consolidated fact discovery is complete, which is all that Rule 42(a) requires. To quote, once again, from Debtors' earlier position: "the fact that

---

[9]    In the *Nomura* cases, the parties ultimately stipulated to consolidation, as well as an express "exempt[ion]" from the Claims Procedures Order. (*See* No 10-03228, ECF No. 11 ¶¶ 1, 7 ("*Nomura* Consolidation Order").) Although consolidation was for pretrial purposes, the *Nomura* case—in stark contrast to this one—involved three different Nomura entities (with disparate claims and defenses). (*See, e.g.*, No. 08-13555, ECF No. 9481 ¶ 2 (noting that "Each [Nomura entity] will have its own witnesses and produce its own documents; there will be little overlap, if any. Moreover, whereas the vast majority of [one entity's] terminated transactions are interest rate swaps, the vast majority of terminated transactions in the adversary proceedings involve credit default swaps, a completely different type of derivative transaction.").) The *Nomura* cases, moreover, involved over 4,000 transactions, as opposed to the two materially identical transactions at issue here. (*See Nomura* Motion To Consolidate at 1 and ¶ 10.)

additional issues may be involved in either action, should not operate to defeat a consolidation under Rule 42." (*Nomura* Motion To Consolidate ¶ 17; *id.* ¶ 20 ("[C]onsolidation is appropriate . . . due to the *common thread* tethering the[se] Proceedings.") (emphasis added).)

43.     To the extent that Debtors' presupposition is that a meaningful distinction between the issues presented by the Adversary Proceeding and Contested Matter could somehow manifest itself upon a "fully developed record," that possibility is entirely speculative.  Indeed, the Court can safely assume that Debtors, after taking four years of asymmetrical document and deposition discovery during their Rule 2004 "evaluation" of the merits of Giants Stadium's Claims, have included what they believe to be the relevant issues in their Adversary Complaint and Objection.

44.     Judge Peck ordered consolidation of a contested matter and adversary proceeding in a case involving far fewer common issues of law and fact than there are here.  In *LBHI, Inc.* v. *Citibank, N.A.*, Adv. Pro. No. 12-01044 (Bankr. S.D.N.Y., Mar. 28, 2013), Debtors asserted various claims concerning nine-hundred transactions (and proposed transactions) that took place shortly before LBSF's bankruptcy filing, and the value of related derivatives.  (*See generally In re LBHI*, No. 08-13555, ECF No. 35519  ¶¶ 8-9, 13.)  Debtors' adversary complaint in that action alleged that Citibank's "most egregious conduct" concerned transactions involving a third party, the Bracebridge-Managed Funds, with whom Citibank allegedly "conspired" to charge LBSF "exorbitant" charges for various trades.  (*Id*. ¶ 21.)  After Debtors filed their adversary complaint, the Funds moved to (i) intervene in the Citibank proceeding and (ii) consolidate the contested matter relating to the Funds' own proofs of claim into the consolidated proceeding (despite the fact that the adversary proceeding in its entirety involved 30,000 different trades and transactions, and not all of the Funds' claims involved Citibank).  (*Id*. ¶ 19.)

-17-

45.     Overruling Debtors' objection, Judge Peck consolidated all of the claims, recognizing that "all issues with Bracebridge might be effectively resolved . . . in the context of [the adversary proceeding] as opposed to some stipulation or mediated outcome." (Hr'g Tr. 27:15-19, Mar. 13, 2013.) Judge Peck noted the "relatively inconsequential nature of the burden associated with the incremental unrelated trades," that "[Bracebridge-Managed Funds] themselves are perfectly comfortable dealing with what amounts to a little bit of extra work," and that there would be no "particular burden on [Debtors] in consolidating the entire dispute as one dispute." (*Id*. 28:3-8.)

46.     The same logic applies here, but even more so, given the fact that there is almost complete overlap between the issues in the Adversary Proceeding and Contested Matter. Consolidation would not involve any complicating "unrelated trades" or "extra work." Nor would it impose any "particular burden" on Debtors.

47.     For all these reasons, the Court should enter the Proposed Order of Consolidation attached hereto.

## II.     THIS COURT SHOULD EXEMPT THE CONSOLIDATED PROCEEDING FROM THE CLAIMS PROCEDURES ORDER (OR, AT A MINIMUM, HOLD THAT THE CLAIMS PROCEDURES ORDER DOES NOT BAR THE ASSERTION OF THE COUNTERCLAIMS).

48.     Giants Stadium also seeks related relief from the Claims Procedures Order, to the extent that, even after entry of the Scheduling Order by this Court, the Claims Procedures Order still could be construed as applying to the Adversary Proceeding and foreclosing the assertion and prosecution of Giants Stadium's Counterclaims.

49.     The Claims Procedures Order, on its face, does not apply to adversary proceedings. (*See* Claims Procedures Order at 2 ("[U]pon service of an objection . . . the Debtors, [and] each Claimant . . . shall be enjoined from commencing or continuing any action or

proceeding, or engaging in any discovery, in any manner or any place, including this Court,

seeking to establish, liquidate, collect on, or otherwise enforce any *Contested Claims* (emphasis

added)).)

50.    Nevertheless, Debtors have invoked language in this 2010 Order to attempt to

prevent Giants Stadium from asserting its Counterclaims.    Specifically, Debtors unilaterally

declared the Counterclaims "null and void" by pointing to language on pages two and three of

the Order stating that:

> "[U]pon service of an objection, omnibus or otherwise, to a Proof of Claim filed
> by a Claimant . . . the Debtors, each Claimant, and each Indenture Trustee with
> Authority (as defined herein) to whom such objection applies (or who filed an
> objection to the Scheduled Claim amount for any LBHI Issued LPS) shall be
> enjoined from commencing or continuing any action or proceeding, or engaging
> in any discovery, in any manner or any place, including this Court, seeking to
> establish, liquidate, collect on, or otherwise enforce any Contested Claims
> identified in such objection other than (i) through the Claims Hearing Procedures
> and ADR Procedures or (ii) pursuant to a plan or plans confirmed in the
> applicable Debtors' chapter 11 cases (the '<u>Temporary Litigation Injunction</u>');
> <u>provided</u>, <u>however</u>, that the Temporary Litigation Injunction shall expire with
> respect to a Contested Claim only (i) when the Contested Claim has been resolved
> by virtue of a settlement between the parties, reached through these ADR
> Procedures or otherwise, or (ii) upon the parties' mutual agreement (or entry of a
> Court order, which either party may seek, if the parties are unable to agree) on a
> Claims Litigation Schedule."

*(Id*. at 2-3.)

51.    In the present circumstances, the rationale for the Temporary Litigation

Injunction—preserving estate resources by reducing litigation costs—does not apply.    Under the

Claims Procedures Order, the Court's entry of a Claims Litigation Schedule (like the Scheduling

Order here) automatically dissolves the Temporary Litigation Injunction—an acknowledgment

that the injunction serves no useful purpose once Debtors have elected to litigate a claim.    Here,

the parties are moving at full speed with discovery in both the Adversary Proceeding and the

Contested Matter.    Under the Scheduling Order, initial disclosures are to be served by November

3, 2014, fact depositions commence on December 8, 2014, and all fact discovery will be completed by April 1, 2015. Just this week, Debtors served extremely broad subpoenas on New York Football Giants, Inc. and Sullivan & Cromwell LLP (Giants Stadium's counsel). (White Decl. Exs. C, D.) The subpoenas seek documents plainly relevant to the Contested Matter, including, for example, documents concerning "any valuation of the Transactions," and "the valuation(s) contained in the Calculation Statements or the Proofs of Claim." (*Id.* Ex. D at 8.)

52.    Accordingly, to the extent that the Claims Procedures Order could be construed as applying to the consolidated proceeding, Giants Stadium requests that the consolidated proceeding be deemed "exempt from the Order." (*See Nomura* Consolidation Order ¶ 7.)

53.    Alternatively, if the Court denies (or defers consideration of) the instant motion to consolidate, Giants Stadium respectfully requests that the Court hold that the Claims Procedures Order shall not foreclose the assertion and prosecution of the Counterclaims in the Adversary Proceeding. The Counterclaims seek nothing more than resolution of all issues in a single proceeding in which both the Claims and the Counterclaims are the logical extension of Giants Stadium's defenses to the Adversary Proceeding. For example, in order for Giants Stadium to defend itself against Debtors' contention that the Swaps at issue here became LIBOR-based Swaps upon LBI's resignation, Giants Stadium will establish that the Swaps remained actual bond rate swaps as of the Early Termination Date (because LBI was not "terminated or replaced" as broker-dealer for the Bonds). There is thus no reason to bar the assertion and prosecution of the Counterclaims.

## NOTICE

54.    Notice of this Motion has been provided to (i) counsel to Debtors, (ii) counsel to the Creditors' Committee, (iii) the Office of the United States Trustee, and (iv) all other parties required to be served under Bankruptcy Rule 2002 or the case management orders of this Court.

-20-

In light of the relief requested, Giants Stadium submits that no other or further service of this Motion is necessary.

## NO PRIOR REQUEST

55.     No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

56.     For the reasons stated herein, Giants Stadium respectfully requests that the Court enter an order, substantially in the form attached hereto, consolidating the Contested Matter with the Adversary Proceeding and holding that the consolidated proceeding is exempt from the Claims Procedures Order, or, alternatively, does not bar the assertion of the Counterclaims.

Dated: New York, New York
         October 24, 2014

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

By:    /s/_____
         Bruce E. Clark
         Matthew A. Schwartz
         Thomas C. White
         SULLIVAN & CROMWELL LLP
         125 Broad Street
         New York, New York  10004
         Telephone:  (212) 558-4000
         Facsimile:  (212) 558-3588

*Attorneys for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (SCC) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

_____

|  |  |  |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and | : | Adversary Proceeding |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : |  |
|  | : | No. 13-01554 (SCC) |
| Plaintiffs-Counterclaim Defendants, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| GIANTS STADIUM LLC, | : |  |
|  | : |  |
| Defendant-Counterclaim Plaintiff. | : |  |

_____

## [PROPOSED] ORDER CONSOLIDATING
## CONTESTED MATTER WITH ADVERSARY PROCEEDING

Upon the motion ("Motion") of Giants Stadium LLC ("Giants Stadium") for an

order ("Order") consolidating the above-captioned Contested Matter[1] with the above-captioned

Adversary Proceeding and for related relief; and it appearing that this Court has jurisdiction to

consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of the

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that

this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b); and this Court having

determined that the relief requested in the Motion is in the best interests of Debtors, Giants

---

[1]    Capitalized terms used but not defined in this Order shall have the meanings given in the
Motion.

Stadium, and all other parties in interest; and it appearing that proper and adequate notice of the

Motion has been given and that no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  The Contested Matter and the Adversary Proceeding are hereby consolidated pursuant
    to Rule 42 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy
    Rule 7042.

3.  In light of the consolidation of the above-referenced actions, Giants Stadium's
    pending motions for (i) discovery pursuant to Rule 2004 of the Federal Rules of
    Bankruptcy Procedure (No. 08-13555, ECF No. 36874) and (ii) authorizations to
    depose certain former employees of Debtors who have personal knowledge relevant
    Giant Stadium's claims (No. 08-13555, ECF No. 39898), are hereby denied as moot,
    without prejudice.

4.  Giants Stadium may obtain both document and deposition discovery related to both
    the Contested Matter (including, without limitation, to Giants Stadium's proofs of
    claim) and the Adversary Proceeding in accordance with Part VII of the Federal
    Rules of Bankruptcy Procedure, including, without limitation, Rules 7026-37.

5.  The consolidated proceeding shall be exempt from the Order Pursuant to Section 105
    of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390
    Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative
    Dispute Resolution Procedures for Claims Against Debtors (No. 08-13555, ECF No.
    8474).

-2-

6.    This Order shall appear on the docket of the Contested Matter, Case No. 08-13555,

and the docket of the Adversary Proceeding, Case No. 13-01554.

7.    This Court shall retain jurisdiction to hear and determine all matters arising from or

related to the interpretation, implementing, or enforcement of this Order.


Dated:  November __, 2014
        New York, New York

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE