JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Kelly A. Carrero

*Attorneys for the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
:
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No. 08-13555 (SCC)
:
Debtors. : (Jointly Administered)
:
------------------------------------------------------------ X
:
LEHMAN BROTHERS HOLDINGS INC. and :
WOODLANDS COMMERCIAL CORPORATION :    Adv. Proc. No. 14-_____
f/k/a WOODLANDS COMMERCIAL BANK f/k/a :
LEHMAN BROTHERS COMMERCIAL BANK :
:
Plaintiffs, :
:
  -against- :
:
ELLA E.M. BROWN CHARITABLE CIRCLE :
d/b/a OAKLAWN HOSPITAL. :
:
Defendant. :
------------------------------------------------------------X

## ADVERSARY COMPLAINT AND OBJECTION

Lehman Brothers Holdings Inc. ("LBHI") and Woodlands Commercial Corporation f/k/a/

Woodlands Commercial Bank f/k/a Lehman Brothers Commercial Bank (collectively, "WCC,"

and together with LBHI, "Plaintiffs"), by and through their attorneys, Jones Day, for their

complaint hereby allege as follows:

# PRELIMINARY STATEMENT[1]

1. WCC was party to an interest rate swap agreement with Ella E.M. Brown Charitable Circle d/b/a Oaklawn Hospital ("Oaklawn") under which it was required to make monthly *floating-rate* interest payments (guaranteed by LBHI) and Oaklawn was required to make monthly *fixed-rate* interest payments.

2. When LBHI filed for bankruptcy on September 15, 2008, it triggered an Event of Default under that agreement, which entitled Oaklawn to terminate the Transaction. When Oaklawn terminated the Transaction effective December 19, 2008, the floating-rate of interest that Oaklawn would be paid under the Transaction was *lower* than the fixed-rate of interest that Oaklawn was required to pay under the Transaction. Accordingly, WCC was substantially "in the money" by approximately $11 million as of December 19, 2008, when taking the present value of the expected fixed-rate interest payments that Oaklawn would have made over the remaining life of the Transaction, net of any floating-rate interest payments owed by WCC. Therefore, under the terms of the parties' agreement, upon terminating the Transaction, Oaklawn was required to calculate and then pay this amount to WCC.

3. Instead, with no basis in law or economic reality, Oaklawn has calculated a payment purportedly owed to it (not by it) of $6,120,919. It then, on September 18, 2009, filed Proof of Claim No. 18036 (the "Claim") against LBHI, as guarantor of non-debtor WCC's obligations under the Transaction, claiming this amount plus interest and fees.

4. Oaklawn's calculation is unreasonable, in bad faith, and in violation of the terms of the Transaction. Plaintiffs seek redress against Oaklawn for improperly calculating and demanding payment in direct detriment to the Debtor's estate and its creditors, and hereby bring

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.

this action to obtain: (a) the disallowance of the Claim in its entirety, and (b) a judgment against Oaklawn for amounts owed in connection with termination of the Transaction not less than $11 million, plus interest, attorneys' fees, costs and expenses.

## PARTIES

5. Plaintiff WCC, formerly known as Woodlands Commercial Bank ("WCB") and Lehman Brothers Commercial Bank ("LBCB"), is a corporation organized and existing under the laws of the State of Utah, with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. WCC is a wholly-owned non-debtor subsidiary of Lehman Bancorp, Inc., which itself is a debtor subsidiary of LBHI.

6. Plaintiff LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On September 15, 2008, LBHI commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estates and interpose and prosecute objections to claims against the estates. Oaklawn has asserted a proof of claim against LBHI, as guarantor of the obligations of LBCB n/k/a WCC under the swap agreement at issue here.

7. Defendant Oaklawn is a domestic not-for-profit corporation organized and existing under the laws of Michigan with its principal place of business in Marshall, Michigan.

## JURISDICTION AND VENUE

8. The statutory predicates for the relief requested herein are (a) sections 105, 502, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), (b) Rules 3007 and 7001

3

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and (c) sections 2201 and 2202 of title 28 of the United States Code.

9.  This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This proceeding contains both core and non-core matters within the meaning of 28 U.S.C. § 157. This is a civil proceeding related to a bankruptcy case as authorized under 28 U.S.C. § 1334(b). This action is related to a bankruptcy case because it directly affects the Debtors' liabilities and the distribution of property of the bankruptcy estate to creditors.

10.  This Court has personal jurisdiction over Oaklawn due to the filing of Oaklawn's claims in the Debtors' chapter 11 cases.

11.  Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

*The Swap Agreement and Transaction Thereunder*

12.  On April 11, 2006, LBCB n/k/a WCC entered into an interest rate swap transaction with Oaklawn (the "Transaction"). The Transaction was governed by a single contract between LBCB and Oaklawn, and that contract consisted of: (i) a 1992 ISDA Master Agreement, dated as of April 11, 2006, as amended (the "Master Agreement"), (ii) a Schedule, dated as of April 11, 2006 (the "Schedule") that amended and supplemented the terms of the Master Agreement, (iii) a Credit Support Annex, dated as of April 11, 2006 (the "CSA"), and (iv) a Confirmation, dated as of April 11, 2006, further documenting the Transaction (the "Confirmation") (collectively, the "Swap Agreement").

13.  Part 3(f) of the Schedule specified that the Swap Agreement "will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." Section 11 of the Master Agreement, in turn, specified "…each party

4

irrevocably (i) submits to the . . . non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York."

14. Under the Transaction, Oaklawn was required to make monthly fixed-rate payments of 3.724% per annum to LBCB, in exchange for LBCB's obligation to make monthly floating-rate payments to Oaklawn. The floating rate was "[t]he product of 67.00% *and* USD-LIBOR-BBA." Both sets of payments were based on an original notional amount of $32,525,000.

15. Under the Swap Agreement, LBHI had served as Credit Support Provider[2] to LBCB. In this capacity, LBHI issued a guarantee, dated as of April 26, 2006, guaranteeing LBCB's obligations under the Swap Agreement (the "LBCB Guarantee").

16. Oaklawn, in turn, insured its obligations to LBCB n/k/a WCC through a Financial Guaranty Insurance Policy issued by Radian Asset Assurance Inc., dated as of April 27, 2006 (the "Radian Policy"), under which LBCB could make a claim for the amount of any Defaulted Amount.

17. LBCB subsequently changed its name to Woodlands Commercial Bank and later to Woodlands Commercial Corporation. WCC retains all rights and duties under the Swap Agreement and any and all transactions thereunder.

*Overview of Relevant Contractual Provisions*

18. On September 15, 2008, LBHI, the Credit Support Provider under the Swap Agreement, filed a voluntary petition for relief under the United States Bankruptcy Code, 11

---

[2] All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the respective agreements governing the Transaction.

5

U.S.C. §§ 101 et seq. This was an Event of Default under Section 5(a) of the Master Agreement, whereby an Early Termination Date could be designated pursuant to Section 6(a) of the Master Agreement.

19. Section 6(c)(ii) of the Master Agreement provided that "[u]pon the occurrence or effective designation of an Early Termination Date . . . [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e) [of the Master Agreement]."

20. The parties also agreed in Section 6(d)(i) of the Master Agreement that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," the Non-defaulting Party would make calculations according to Section 6(e) of the Master Agreement and would provide to the other party a statement "showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e))."

21. Section 6(e) of the Master Agreement included a menu of methodologies for calculating termination payments upon the occurrence of an Early Termination Date. In Part 1(f) of the Schedule, the parties elected and agreed upon Market Quotation and Second Method (Full Two-Way Payments) as the methodology for calculating termination payments upon the occurrence of an Early Termination Date (the "Early Termination Payment").

22. Section 6(e)(i)(3) of the Master Agreement set out the equation for calculating the Early Termination Payment where Second Method and Market Quotation apply:

> . . . an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. . . if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

6

In other words, if upon the Early Termination the Non-defaulting Party enjoyed a gain, it would be required to pay the amount of the gain to the Defaulting Party.

23.    Settlement Amount was defined in Section 12 of the Master Agreement as an amount equal to the sum of the Market Quotations procured by the Non-defaulting Party for each of the Transactions outstanding as of the Early Termination Date, in instances where a Market Quotation can be determined.  Unpaid Amounts, in turn, was defined in Section 12 of the Master Agreement as amounts owing to any party that "became payable . . . on or prior to [the] Early Termination Date and which remain unpaid as at [the] Early Termination Date."

24.    Market Quotation likewise was expressly defined in Section 12 of the Master Agreement.  The Master Agreement also specifically contemplated in Sections 6(e)(iv) and 12 the possibility that Market Quotations could not be determined or that they might not, in certain circumstances, "produce a commercially reasonably result."  In such circumstances, in the definition of Settlement Amount in Section 12, the Master Agreement provided that the Settlement Amount would be equal to the Non-Defaulting Party's Loss.

25.    Loss similarly was expressly defined in Section 12 of the Master Agreement.  In calculating Loss, the Non-defaulting Party was required not only to calculate its total losses and costs in connection with the Terminated Transaction; its calculation also had to include what it "reasonably determine[d] in good faith to be its total … gain, in which case expressed as a negative number . . . ."

***Oaklawn's Termination and Calculation Under the Swap Agreement***

26.    In a letter dated September 26, 2008 from Oaklawn to LBCB, Oaklawn provided notice "of the occurrence and continuation of an Event of Default under Section 5(a)(vii) of the ISDA Master Agreement resulting from the institution of a proceeding under Chapter 11 of the United States Bankruptcy Code by your Credit Support Provider, Lehman Brothers Holdings Inc.,

7

on September 15, 2008, in the United States Bankruptcy Court in the Southern District of New York."

27. Later, in a letter dated December 18, 2008 from Oaklawn to LBCB n/k/a WCC and Lehman Brothers Special Financing Inc. ("LBSF"), Oaklawn designated December 19, 2008 as the Early Termination Date.

28. Subsequently, in a letter dated January 29, 2009 from Oaklawn to WCC and LBSF, Oaklawn incorrectly asserted that the Early Termination Payment due to Oaklawn under the Swap Agreement was $6,120,919 plus potential default interest purportedly in accordance with the Master Agreement. To arrive at its Early Termination Payment, Oaklawn calculated the Settlement Amount to be $6,103,865 owing from LBCB to Oaklawn, Unpaid Amounts to be $182,157 owing from Oaklawn to LBCB, and out-of-pocket expenses and fees (i.e., swap advisory, legal, financial advisory and trustee and counsel) of $199,211 owing from LBCB to Oaklawn.

29. Further, in the January 29, 2009 letter, Oaklawn admitted it did not calculate the Settlement Amount in accordance with Market Quotation, the method elected by the parties, but instead reverted to a Loss calculation. Oaklawn stated that on December 19, 2008, the Early Termination Date, it "requested quotations for a Replacement Transaction … [and] did not receive any quotations for Replacement Transaction from any of the Reference Market-makers . . . " Upon information and belief, the Reference Market-makers approached for Market Quotes were not informed about the existence of the Radian Policy insuring against a default by Oaklawn.

30. In ostensible compliance with Section 6(d)(i) of the Master Agreement, Oaklawn enclosed as Annex D to the January 29, 2009 letter "Details of Oaklawn's Loss Determination."

8

The statement not only failed to provide "reasonable detail" of Oaklawn's Loss calculation, as required under Section 6(d)(i) of the Master Agreement, but also made no assertion that Oaklawn actually incurred any losses or damages as a result of the Early Termination.

***Oaklawn Incorrectly Calculated the Early Termination Payment Without Regard to Contract Damages or Actual Loss***

31.     Rather than use an industry recognized methodology to calculate an Early Termination Payment in good faith, in breach of its obligation Oaklawn concocted a Loss calculation methodology to convert what should have been a liability owed by Oaklawn into a receivable owed to it. The Loss calculation bears no resemblance to the actual value of the Transaction.

32.     Oaklawn's alleged Loss calculation disregards the strictures of the Master Agreement and well-settled principles of New York contract law. Oaklawn's Loss calculation must be based on gains or losses and costs that Oaklawn has actually incurred. Oaklawn's Loss calculation does not accurately reflect its actual "losses and costs (or gain. . . ) … incurred" as of the Early Termination Date. Because Oaklawn's calculation bears no reasonable relationship to the actual economic effect of the terminated Transaction, Oaklawn breached the Swap Agreement and determined its Early Termination Payment in bad faith.

33.     For at least this reason, Oaklawn's Early Termination Payment calculation is defective and WCC is entitled to an Early Termination Payment under the Swap Agreement of over $11 million, plus interest, attorneys' fees, costs and expenses. Sections 6(d)(ii) and 12 of the Master Agreement also require Oaklawn to pay interest to WCC on the portion of the Early Termination Payment that Oaklawn has not paid to WCC, at the Applicable Rate specified in the Master Agreement, from and after the Early Termination Date up to (but excluding) the date on which the Early Termination Payment is paid in full.

34. Furthermore, the Claim should be disallowed and expunged. LBHI has no liability because there is no payment owing to Oaklawn as a result of the swap termination.

## FIRST CAUSE OF ACTION

### (Breach of Contract by WCC)

35. WCC hereby incorporates the foregoing paragraphs as if fully restated herein.

36. The Swap Agreement constituted a valid contract between Oaklawn and LBCB.

37. Oaklawn breached the Swap Agreement by failing to calculate the Early Termination Payment in accordance with the procedures set forth in the Swap Agreement.

38. Oaklawn breached the Swap Agreement by calculating Loss in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to the actual gain it realized upon terminating the Transaction.

39. Under the Swap Agreement, Oaklawn was required to pay WCC for any gains it enjoyed as a result of termination. This payment owed by Oaklawn to WCC was never made and has been outstanding since January 29, 2009.

40. As a direct and proximate result of Oaklawn's breach of the Swap Agreement, WCC has been deprived of a substantial sum of money in an amount to be determined at trial not less than $11 million, plus interest, attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment by LBHI)

41. LBHI hereby incorporates the foregoing paragraphs as if fully restated herein.

42. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

43. This action is within the jurisdiction of this Court and LBHI is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

44. An actual controversy exists between LBHI and Oaklawn, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

45. Oaklawn's calculation of the Early Termination Payment was not in compliance with the Swap Agreement, nor did it have any legitimate commercial or economic basis.

46. The Early Termination Payment, when calculated properly under the Swap Agreement, is an amount owing from Oaklawn to WCC. Accordingly, Oaklawn has no claim against LBHI pursuant to the LBCB Guarantee and Oaklawn's Claim should be disallowed and expunged.

47. Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, LBHI will continue to suffer substantial harm, including but not limited to requiring LBHI to continue to maintain a cash reserve in connection with Oaklawn's invalid claim.

48. A declaratory judgment will resolve the entire dispute between LBHI and Oaklawn and save the parties substantial costs and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that judgment be entered against Oaklawn as follows:

(1) Sustaining objections to the Claim and disallowing and expunging the Claim in its entirety as set forth herein;

(2) Determining Oaklawn has breached the Swap Agreement and owes damages, applicable interest, and reasonable attorneys' fees, costs, and expenses in an amount to be determined at trial; and

(3) Granting such further relief as the Court deems just and proper.

Dated: October 29, 2014
New York, New York

    */s/ Jayant W. Tambe*
Jayant W. Tambe
Kelly A. Carrero
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Plaintiffs*
*Lehman Brothers Holdings Inc. and*
*Woodlands Commercial Corporation*