WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Lauren B. Hoelzer
David J. Schwartz

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>     Plaintiff,<br><br> v.<br><br>Franklin W. Olin College of Engineering, Inc.,<br><br>     Defendant. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator

(in this capacity, the "Plan Administrator" or "Plaintiff"), under the Modified Third Amended

Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"),

and on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), alleges the following, on

knowledge as to LBSF's and LBHI's own acts and upon information and belief as to all other

matters, against defendant Franklin W. Olin College of Engineering, Inc. ("Olin College" or

"Defendant"):

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action seeking to recover millions of dollars in principal –

plus significant interest amounts – that Olin College owes to LBSF as a result of Olin College's

early termination of three interest-rate swap transactions between the parties (the "Swaps").  At

the time that it terminated the Swaps, Olin College knew that LBSF was substantially "in the

money" – i.e., the present value of the expected payments that Olin College would have made to

LBSF over the remaining life of the Swaps, net of any payments owed by LBSF, was over $10

million.

2.      The agreement between the parties required Olin College to determine the amount

it owed to LBSF as a result of Olin College's early termination of the Swaps through a

commercially reasonable bidding process under which Olin College would request from four

leading dealers the amount the dealer would pay to step into LBSF's shoes in the terminated

Swap(s) (the "Market Quotation" process).  The Market Quotation process performed by Olin

College, however, was commercially unreasonable, breached the parties' agreement, and resulted

in a commercially unreasonable and artificially low termination payment.

3.      As part of its Market Quotation process, Olin College requested that the solicited

dealers provide "indicative" bids – what they *theoretically* would pay to step into LBSF's shoes

as the in-the-money counterparty on the Swaps, although the dealers would not actually be entering into a new transaction. While seeking these indicative quotations from ten dealers for purposes of Market Quotation, Olin College ran a simultaneous parallel process, requesting actual bids from the same, or virtually the same, group of dealers on potential replacement transactions, where the dealer *actually* would pay to step into LBSF's shoes as the in-the-money counterparty on the Swaps and *actually* would execute documentation regarding the new swaps, with the required legal and credit approvals.

4.    Olin College derived an approximately $5.8 million valuation from its Market Quotation process, an amount far below the market value of the terminated Swaps.

5.    On the same day that Olin College received the Market Quotation bids, it entered into trades to replace the terminated Swaps (based on its replacement trade solicitation) with two of the three dealers from which it received Market Quotation bids, and a third dealer, for an up-front aggregate payment of roughly $7.9 million – an amount over $2 million greater than the $5.8 million Market Quotation figure Olin College used in calculating what it owed to LBSF. Olin College simply pocketed that difference instead of passing it on to LBSF, reflecting it as a "gain" on its financial statements.

6.    Given that the Market Quotation process was commercially unreasonable and violated the parties agreement, because it yielded a valuation far below both the mid-market value of the terminated Swaps and what Olin College received for entering into the replacement trades, the parties' agreement required that Olin College use another methodology, the "Loss" method, to determine reasonably and in good faith its total "gain" resulting from the termination of the Swaps and pay that properly calculated gain to LBSF. Olin College failed to do either.

WEIL:\44536896\21\58399.0011

7.       LBSF has properly determined Olin College's Loss, here, its gain, resulting from the termination of the Swaps by calculating their mid-market value, a market standard and objective measurement of the financial obligations avoided and financial rights not obtained as a consequence of the termination of the Swaps.  Had Olin College so calculated its Loss, as it was contractually obligated to do, it would have determined that it owed LBSF millions of dollars more than what it paid.  Olin College thus must now pay what it still owes LBSF, which amount will continue to accrue interest until payment is made in full.

## JURISDICTION AND VENUE

8.       Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of title 11 of the United State Code (the "Bankruptcy Code").

9.       This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 362(a)(3), 365(e)(1), 502(b), 541(a), 541(c)(1), and 542(b) of the Bankruptcy Code and New York law.

10.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

11.      This Court has personal jurisdiction over Olin College.

12.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

13.      Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

WEIL:\44536896\21\58399.0011

14.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the chapter 11 cases of LBHI and LBSF were filed in this district and because the parties irrevocably waived any venue objection in the Master Agreement.

## THE PARTIES

15.     LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

16.     LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

17.     Upon information and belief, Olin College is a private, not-for-profit undergraduate engineering college incorporated under the laws of the Commonwealth of Massachusetts.  Olin College's principal place of business is located in Massachusetts.

## BACKGROUND FACTS

**A.     The Governing Documents**

18.     On May 24, 2006, LBSF and Olin College entered into the Swaps pursuant to a 1992 form (Local Currency-Single Jurisdiction) ISDA Master Agreement (with the associated schedule (the "Schedule") and Credit Support Annex, the "Master Agreement").

19.     The Master Agreement provides the basic terms of the parties' contractual relationship and contemplates supplementation by "confirmations" that provide the economic terms of the specific transactions entered into under the Master Agreement.

4

20.    Each of the terminated Swaps was documented by such a confirmation (collectively, the "Confirmations").

21.    Under the Confirmations, Olin College agreed, with respect to one of the Swaps, to make payments to LBSF based on a fixed interest rate in exchange for LBSF's agreement to make payments to Olin College based on a floating interest rate, and with respect to the other two Swaps, Olin College agreed to make payments to LBSF based on the Bond Market Association Municipal Swap Index in exchange for LBSF's agreement to make payments to Olin College based on the London Interbank Offered Rate ("LIBOR").

22.    If during the life of the Swaps, the interest rates LBSF was obligated to pay were higher than the interest rates Olin College was obligated to pay, Olin College would be the party that was "in the money."  If, however, over the life of the Swaps, the interest rates LBSF was obligated to pay were lower than the interest rates Olin College was obligated to pay, LBSF would be the party that was "in the money."  As it turned out, as of the Early Termination Date, LBSF was very substantially "in the money" because the interest rates Olin College agreed to pay were much higher than those owed by LBSF.

23.    The governing documents are all governed by New York law.

**B.    Olin College's Termination Of The Swaps**

24.    On September 15, 2008, LBHI, LBSF's ultimate corporate parent and its "Credit Support Provider" under the Master Agreement, commenced a case under chapter 11 of the Bankruptcy Code.  LBSF filed its own chapter 11 petition on October 3, 2008.  Pursuant to the terms of the Master Agreement, the bankruptcy filings of each of LBHI and LBSF constituted an Event of Default that permitted Olin College to terminate the Swaps.  *See* Master Agreement at §§ 5(a)(vii), 6(a).  The Master Agreement further provides the Non-defaulting Party with the discretion to designate an "Early Termination Date" of its choosing following the occurrence of

5

an Event of Default and requires it to determine the amount owed by or to it as a result of the early termination (the "Early Termination Payment").  *See id.* at § 6(a).

25.      On October 30, 2008, well after LBHI's and LBSF's chapter 11 filings, Olin College delivered a notice of early termination to LBSF (the "Termination Notice"), which designated October 30, 2008, as the "Early Termination Date" for all three Swaps.

**C.      The Master Agreement Required Olin College To Use "Second Method" And Market Quotation To Determine The Settlement Amount It Owed To LBSF**

26.      Section 6(e) of the Master Agreement governs the Early Termination Payment owed.  *See* Master Agreement at § 6(e).  It allows the parties to elect in the Schedule to the Master Agreement the payment measure that will apply should an early termination date occur. *Id.*  The parties have the option of selecting "Market Quotation" or "Loss" to determine the "Settlement Amount" and "First Method" or "Second Method."  *Id.*  The "Settlement Amount" represents the value of the terminated Swaps, determined on the basis of Loss or Market Quotation, or, if Market Quotation is selected but is unavailable or renders a commercially unreasonable result, as it did here, on the basis of the alternative "Loss" measure.  *See id.* at § 12. The Settlement Amount is the primary component of the Early Termination Payment.

27.      Here, the Schedule provides that the payment owed upon early termination will be calculated based upon "Market Quotation" and "Second Method."  *See* Schedule to the Master Agreement at Part 1(f).  Second Method means that the party that is "in the money" on the Early Termination Date, whether or not it is the "Defaulting Party" – here LBSF – has a right to receive an early termination payment.  *See* Master Agreement at § 6(e)(i).  (In contrast, under "First Method," payment would be made only if it were owed to the Non-defaulting Party.) Thus, the termination payment provisions these parties agreed to are designed to provide each of the parties with their gains and losses under the Swaps as of the Early Termination Date

WEIL:\44536896\21\58399.0011

regardless of which party defaulted.  Here, early termination was a very substantial benefit to

Olin College because of what it was expected to owe to LBSF over the remaining terms of the

Swaps.

28.    "Market Quotation" is defined in the Master Agreement as follows:

> **"*Market Quotation*"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers.  Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. . . .  If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations.  For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded.  If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

Master Agreement at § 12.  Thus, each quotation is intended to reflect "an amount . . . that would

have the effect of preserving for such party the economic equivalent of any payment or delivery .

. . by the parties under Section 2(a)(i) . . . that would, but for the occurrence of the relevant Early

Termination Date, have been required after that date."  *Id.*

29.    "Reference Market-makers," in turn, is defined in the Master Agreement as

follows:

> **"*Reference Market-makers*"** means **four** leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

Master Agreement at § 12 (emphasis supplied).

30.      Section 12 of the Master Agreement provides that if Market Quotation fails or the Market Quotation process does not "produce a commercially reasonable result," as occurred in this case, the Non-defaulting Party must instead utilize Loss.  *See* Master Agreement at § 12 (defining "Settlement Amount").

31.      Thus, the Market Quotation measure the parties selected when they entered into the Master Agreement requires that, upon early termination of a transaction, the Non-defaulting Party (here, Olin College) solicit quotations from exactly four Reference Market-makers – four leading swap dealers – for the amount that each would pay, or demand as payment, to step into the shoes of the Defaulting Party (here, LBSF); the valuation is determined by taking the mean of the middle two quotations if four quotations are received or the middle quotation if only three quotations are received.  *See* Master Agreement at § 12.  If less than three of the four Reference Market-makers solicited provide a quotation or the result is not commercially reasonable, then the Non-defaulting Party must use the Loss measure instead of Market Quotation.  *Id.* (defining "Settlement Amount").

**D.      Olin College Conducted A Flawed And Commercially Unreasonable Market Quotation Process That Failed To Produce A Commercially Reasonable Result**

32.      Olin College hired several professionals, including attorneys, as well as Swap Financial Group, LLC ("Swap Financial Group"), as financial advisor, to advise it on the termination of the Swaps.

33.      Although the Master Agreement dictates that quotations be sought from exactly "four leading dealers," on October 30, 2008, Olin College, through Swap Financial Group, solicited Market Quotation bids from ten swaps dealers.  This constituted a clear breach of the Master Agreement, and it caused material harm to LBSF because it alerted the market that Olin

8

College was not relying on only four dealers to determine a Settlement Amount, which

necessarily tainted the process and reduced the reliability of the Market Quotation bids received

as indicators of market value.  In other words, by seeking Market Quotation bids from more than

the requisite four dealers, Olin College breached a provision of the Master Agreement intended

to insure the reliability of the Market Quotation bids it received.

34.    In response to its solicitation of the ten dealers through its advisor, Swap

Financial Group, Olin College received Market Quotations "bids" from only three: Well Fargo

Bank, N.A. ("Wells Fargo"), Deutsche Bank, and JPMorgan Chase Bank, N.A ("JPMorgan").

35.    At the same time as it sought Market Quotation bids, Olin College ran a parallel

replacement trade process, also through Swap Financial Group, for bids to enter into replacement

transactions, inviting the same, or substantially the same, dealers to bid on replacement

transactions at the same time as they made Market Quotation bids.  This breached Olin College's

contractual obligations because it signaled to the dealers that the Market Quotation process was

only being used to determine what Olin College owed to LBSF.  The running of the parallel

replacement trade process may have suggested to the dealers that the Market Quotation bids

should be understated and that the "real bidding" was for the replacement trades.

36.    On the same day that it received its Market Quotation bids, as a result of its

parallel solicitation of replacement trades, Olin College entered into replacement transactions

with two of the three dealers from which it had received Market Quotation bids – Wells Fargo

and JPMorgan – and with a third dealer, Goldman Sachs Capital Markets, L.P., on swap terms

that were functionally identical to those governing the terminated Swaps.  Together, these

replacement transactions netted Olin College an upfront payment of roughly $7.9 million – an

amount more than $2 million greater than the Market Quotation figure Olin College used in

calculating the amount payable to LBSF, as it effectively admitted in its financial statements.[1]  In any event, because Olin College received from these three dealers millions more than its Market Quotation calculation, Olin College knew that its Settlement Amount based on Market Quotation did not reflect the true market value of the terminated Swaps and, therefore, was not commercially reasonable and was a breach of the parties' agreement.

37.    Because Olin College's Market Quotation process (i) failed to comply with the Master Agreement's contractual requirements and was commercially unreasonable and (ii) produced a commercially unreasonable result, Olin College was required to revert to the Loss measure.  Olin College failed to do so, however.

38.    On November 4, 2008, notwithstanding that it had replaced the terminated Swaps at a profit of millions of dollars more than its approximately $5.8 million Market Quotation calculation, Olin College delivered a valuation statement to LBSF (the "Calculation Statement"), dated November 3, 2008, in which Olin College calculated the total amount it owed to LBSF to be approximately $6 million.  This amount was comprised of: (i) Olin College's Market Quotation-based Settlement Amount figure of approximately $5.8 million in favor of LBSF; *plus* (ii) net unpaid (pre-termination) amounts owing to LBSF of $401,265.94; *plus* (iii) accrued interest from the Early Termination Date of $546.31; *minus* (iv) legal fees of $32,500; *minus* (v) a purported "Bank amendment fee" of $5,000; and *minus* (vi) a purported "Swap Financial Fee" of $209,600.

---

[1] According to Olin College's audited financial statements as of June 30, 2010, "[a] *net gain of $2,275* [in thousands] was realized on the early termination of the LBSF swaps and the entrance into the new swaps, and is reflected in change in fair value of interest rate agreement on the 2009 statement of activities as a nonoperating item."  *See* Olin College Audited Financial Statements as of June 30, 2010 at 17 (emphasis supplied).  The referenced $2,275,000 gain constituted a windfall to Olin College and is the minimum amount (before interest) that Olin College owes to LBSF.

39.     On November 4, 2008, Olin College wired the approximately $6 million amount to LBSF (the "Partial Payment").

40.     In sum, Olin College knew that its Market Quotation calculation did not reflect the true market value of the terminated Swaps and that its Market Quotation calculation was commercially unreasonable.  Nevertheless, Olin College used the approximately $5.8 million Market Quotation figure in calculating the Early Termination Payment, pocketing a cash windfall that it recorded on its financial statements as a gain.

**E.      Because It Conducted A Flawed And Commercially Unreasonable Market Quotation Process, Olin College Was Required To Calculate The Settlement Amount Using Loss**

41.     Under the Master Agreement, even if the parties have selected the Market Quotation measure, if less than three of the four dealers submit bids or if Market Quotation renders a commercially unreasonable result, the Settlement Amount must be determined using the "Loss" measure.  *See* Master Agreement at § 12 (definition of "Settlement Amount").  "Loss" is defined in the Master Agreement, in relevant part, as follows:

> ***"Loss"*** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party **reasonably determines in good faith** to be its **total** losses and costs (or **gain**, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (**or any gain resulting from any of them**). . . .

Master Agreement at § 12 (emphasis supplied).  Loss thus attempts to put the parties in the same economic position that they would have been in but for the termination of the transactions and any gain resulting from termination must be paid to the other party.  Like the Market Quotation measure, Loss must be determined "reasonably" and "in good faith."  *Id.*

11

42.    Because Olin College's Market Quotation process was not in compliance with the letter and spirit of the Market Quotation provisions of the Master Agreement in that it (i) failed to solicit the contractually required number of dealers and (ii) was conducted simultaneously with a replacement bid solicitation ensuring that the Market Quotation process was inherently unreliable and commercially unreasonable (while allowing Olin College to receive a windfall at the expense of LBSF), a reasonable Settlement Amount must be determined based on Loss.

43.    The best measurement of Loss here is the end-of-day, mid-market value of the terminated Swaps on the Early Termination Date.  "Mid-market" represents the net present value of a party's expected future payment obligations and receipts over the life of a transaction.  It is an objective method of determining the Early Termination Payment because it is an accurate measurement of the financial rights and obligations that were lost and avoided due to the termination of a transaction using standard market inputs (and is therefore not easily subject to manipulation).

44.    The end-of-day, mid-market value of the terminated Swaps on the Early Termination Date (October 30, 2008) was approximately $10.75 million using a market standard methodology and market standard inputs, which inputs are available to any market professional with expertise in derivatives.

**F.    Because Its Flawed And Commercially Unreasonable Market Quotation Process Produced A Commercially Unreasonable Result, Olin College Was Required To Calculate The Settlement Amount Using Loss**

45.    As alleged above, Market Quotation and Loss are specifically designed to leave the parties in the same economic position they would have been in had the trades not been terminated.   The definition of Market Quotation states that "[e]ach quotation will be for an amount . . . that would be paid to such party . . . that would have the effect *of preserving for such party the economic equivalent of any payment or delivery . . . that would, but for the occurrence*

*of the relevant Early Termination Date, have been required after that date*."  Master Agreement at § 12 (emphasis added).  Likewise, Loss means, with respect to the terminated transactions, what "a party . . . *reasonably* determines in *good faith* to be its *total* losses and costs (*or gain . . .*) . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them)." *Id.* (emphasis added).

46.    Olin College knew that the Settlement Amount it calculated based on its flawed Market Quotation process produced a commercially unreasonable result because (i) the quotations it received on the terminated Swaps were far removed from the market value of the terminated Swaps as of the Early Termination Date and (ii) Olin College received payments for entering into the replacement transactions that were millions of dollars more than its calculated Settlement Amount.

47.    Specifically, Olin College's new counterparties paid Olin College an upfront payment (in the aggregate) of approximately $7.9 million to enter into the replacement transactions – an amount more than $2 million greater than the Settlement Amount Olin College used in calculating the amount payable to LBSF.  This more than $2 million gain on the part of Olin College was not transferred to LBSF but rather was kept by Olin College as an unjustified windfall which it recorded on its financial statements.[2]

48.    Because Olin College's Settlement Amount calculation under Market Quotation did not produce a commercially reasonable result, it is a nullity, and a reasonable Settlement

---

[2] Under Loss, Olin College must pass along to LBSF any "gain" obtained as a result of terminating the Swaps and thus the more than $2 million it received from the replacement transactions provides the minimum amount that LBSF is entitled to recover in this action.

WEIL:\44536896\21\58399.0011

Amount must be determined based on Loss.  The best measurement of Loss here is the end-of-day, mid-market value of the terminated Swaps on the Early Termination Date, which is approximately $10.75 million.

### G. Olin College Purported To Charge LBSF Unreasonable Banking And Financial Advisory Fees

49.     In determining the net Early Termination Payment, Section 9 of the Master Agreement allows the Non-Defaulting Party to deduct from (or add to) the Settlement Amount only "*reasonable*" out-of-pocket expenses incurred in connection with the "*enforcement and protection of its rights* under th[e] [Master] Agreement."  Master Agreement at § 9 (emphasis added).

50.     Olin College, however, deducted from its Settlement Amount $5,000 for a "Bank amendment fee" and $209,600 in financial advisory fees in determining the Partial Payment it paid to LBSF.

51.     Such deductions are in breach of the Master Agreement.  <u>First</u>, LBSF has no obligation to pay for a "Bank amendment fee" given that such fee never has been properly documented nor substantiated by Olin College and given that such a fee cannot be considered something incurred in the enforcement and protection of Olin College's rights.  <u>Second</u>, the financial advisory fees were grossly excessive compared to industry norms and they have not been, and cannot be, justified by Olin College as incurred for the "enforcement and protection of its rights."  Indeed, on information and belief, the only reason such banking and advisory fees were incurred was because Olin College engaged in a process intended to minimize its payment to LBSF in breach of its contractual obligations.

14

**H.**    **Olin College Must Pay Default Interest**

52.    Section 6 of the Master Agreement governs payments upon early termination and provides that any amount payable thereunder will be paid inclusive of interest at the "Applicable Rate." *See* Master Agreement at §§ 6(d)(ii) and 6(e).  Applicable Rate is defined as the "Termination Rate" between the Early Termination Date and receipt of the Calculation Statement and the "Default Rate" following the date upon which sums become payable under Section 6(d)(ii), which is the date that the Calculation Statement is received.  *Id.* at § 12.

53.    Section 12 of the Master Agreement defines the "Termination Rate" as "a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts."  Master Agreement at § 12.  That same section of the Master Agreement defines the "Default Rate" as equal to "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amounts plus 1% per annum."  *Id.*

54.    LBSF has certified that its cost of funds on each date from and after September 15, 2008, was greater than or equal to overnight LIBOR plus 12.5%, compounded daily.

55.    Under the express terms of the Master Agreement and controlling law, therefore, overnight LIBOR plus 12.5% plus 1% per annum – a total of LIBOR plus 13.5% – is the interest rate to be applied for all periods during which the Default Rate is applicable.

56.    Olin College designated October 30, 2008 as the Early Termination Date and delivered its Calculation Statement on November 4, 2008.  Accordingly, the Termination Rate applied from and including October 30, 2008, through, but excluding, November 4, 2008.  The Default Rate applies from November 4, 2008 until LBSF receives payment in full from Olin College.

## COUNT I

### (Breach of the Master Agreement)

57.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-56 of this Complaint as though fully set forth in this cause of action.

58.    The Swaps were entered into pursuant to a valid and enforceable contract with adequate consideration and LBSF fully performed its obligations thereunder.

59.    On the Early Termination Date, LBSF was the "in-the-money" party and thus entitled to receive an Early Termination Payment from Olin College pursuant to the terms of the Master Agreement.

60.    The Master Agreement required Olin College to determine the Settlement Amount component of the Early Termination Payment it owed using a Market Quotation process that complied with the Master Agreement and was conducted in a commercially reasonable manner and which produced a commercially reasonable result.

61.    As more fully set forth above, Olin College breached the Master Agreement because the Market Quotation process conducted by Olin College did not comply with the terms of the Master Agreement, was not run in a commercially reasonable manner, and did not produce a commercially reasonable result.  Indeed, Olin College knew on October 30, 2008 – the day it entered into the replacement transactions and before it delivered its Calculation Statement to LBSF – that its Market Quotation calculation did not reflect the market value of the terminated Swaps and that its Market Quotation calculation necessarily was commercially unreasonable.

62.    Given all of the foregoing, Olin College was required under the Master Agreement to revert to the Loss measure.  Olin College's failure to revert to the Loss measure to calculate the Settlement Amount further breached the Master Agreement.

WEIL:\44536896\21\58399.0011

63.     Olin College was allowed under the Master Agreement to deduct only reasonable out-of-pocket expenses related solely to enforcing and protecting its rights under the Master Agreement from the amount owed to LBSF.  Olin College, however, deducted banking and financial advisory fees which were not documented, grossly excessive, and/or unrelated to enforcing and protecting its rights in yet a further breach of the Master Agreement.

64.     As a result of the foregoing breaches of contract, LBSF has been damaged in an amount to be proven at trial, but no less than $2 million, plus Termination Rate interest and Default Interest.

## COUNT II

### (Breach of the Master Agreement Based on Olin College's Breach of the Implied Covenant of Good Faith and Fair Dealing)

65.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-64 of this Complaint as though fully set forth in this cause of action.

66.     By calculating an Early Termination Payment using a Settlement Amount that resulted from a Market Quotation bid process which was commercially unreasonable and in bad faith, and that resulted in a windfall to Olin College to the detriment of LBSF and its creditors, and by failing to pay LBSF a properly calculated, commercially reasonable Early Termination Payment in accordance with the Loss measure in the Master Agreement, Olin College violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

67.     As a result of this breach, LBSF has been damaged in an amount to be proven at trial, but no less than $2 million, plus Termination Rate interest and Default Interest.

WEIL:\44536896\21\58399.0011

**COUNT III**

**(Unjust Enrichment)**

68.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-67 of this Complaint as though fully set forth in this cause of action.

69.     As a result of Olin College's failure to pay LBSF an Early Termination Payment reflecting the amount LBSF was "in the money" under the Swaps, Olin College obtained an unjust windfall at the expense of LBSF given the value of the payments to LBSF that Olin College was able to avoid by terminating the Swaps and its receipt of more money as a result of entering into the replacement transactions than it paid to LBSF.

70.     Olin College thus has been improperly and unjustly enriched at LBSF's expense. Equity and good conscience require that Olin College pay to LBSF that to which LBSF was entitled, plus prejudgment interest.

**COUNT IV**

**(Declaratory Judgment that Olin College Is Willfully Violating the Automatic Stay)**

71.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-70 of this Complaint as though fully set forth in this cause of action.

72.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11 U.S.C. § 362(a)(3).

73.     As fully alleged above, Olin College's Early Termination Payment was improperly calculated and Olin College owes a multi-million-dollar payable to LBSF that constitutes property of LBSF's estate.  Olin College's withholding of such payable constitutes an

18

"act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

74.      Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  This Court also may grant damages to punish violations of the automatic stay.

75.      There is an actual controversy between the parties on this issue because Olin College is actively withholding property of the estate from LBSF and denies that it conducted the Market Quotation bid process in a commercially unreasonable manner or that it failed to pay LBSF the full amount that was due and payable.

76.      Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF is entitled to (i) a declaration that Olin College has acted in violation of section 362 of the Bankruptcy Code; and (ii) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages in an amount to be proven at trial and including (but not limited to) LBSF's actual damages, costs, contractual interest, and attorneys' fees and expenses on account of Olin College's knowing and willful violation of the automatic stay.

## <u>COUNT V</u>

### (Turnover of the Properly-Calculated Early Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code)

77.      Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as though fully set forth in this cause of action.

78.      Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. §

WEIL:\44536896\21\58399.0011

542(b).  As fully alleged above, Olin College was obligated to pay LBSF the properly calculated Early Termination Payment, plus interest; its failure to do so in the absence of a proper set-off made the amount due and owing a matured debt.

79.    The amount due and owing to LBSF from Olin College as of October 30, 2008, the Early Termination Date, is property of LBSF's estate under section 541(a) of the Bankruptcy Code.

80.    Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing Olin College to turn over the properly-calculated Early Termination Payment net of the Partial Payment to LBSF as it constitutes property of LBSF's bankruptcy estate under section 541(a) of the Bankruptcy Code.

## COUNT VI

### (Termination Rate And Default Interest)

81.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-80 of this Complaint as though fully set forth in this cause of action.

82.    Olin College not only owes LBSF an outstanding principal balance in the amount of not less than $2 million, but interest thereon.

83.    By failing to make the payment due to LBSF under the terms of the Master Agreement, Olin College must pay accrued interest on the amount it owes to LBSF as set forth above, with interest continuing to accrue until payment to LBSF is made in full.

84.    The Master Agreement explicitly provides that the Applicable Rate of interest is the "Termination Rate" on sums calculated pursuant to section 6(e) of the Master Agreement from the Early Termination Date to the date the Calculation Statement is delivered and the Default Rate from the date the Calculation Statement is delivered to the date of payment.  Master Agreement § 12.  The Default Rate is based on the receiving party's cost of funds "without proof

or evidence of any actual cost" and "as certified by it" plus 1%. *See id.* The Termination Rate is the average cost of funds of the two parties.

85.    LBSF has certified that its cost of funds on each date from and after September 15, 2008, was greater than or equal to overnight LIBOR plus 12.5%, compounded daily.  The Master Agreement executed by Olin College precludes any challenge to the Default Rate because LBSF has certified its cost of funds.

86.    Consequently, Olin College owes LBSF interest on the proper Settlement Amount at the Termination Rate for the period from October 30, 2008 (the Early Termination Date) to but excluding November 4, 2008 (the date of delivery of the Calculation Statement), plus interest on the difference between the proper Settlement Amount and the Partial Payment at the Default Rate from and including November 4, 2008, through, but excluding, the date of full payment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

A.    As to Counts I and II, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than $2 million, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is made to LBSF;

B.    As to Count III, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than that to which LBSF is entitled, plus prejudgment interest;

C.    As to Count IV, a declaratory judgment that, in withholding the properly calculated Early Termination Payment payable by Olin College to LBSF under the Master Agreement plus interest, Olin College has acted in violation of section 362 of the Bankruptcy Code and that, pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an award of damages in an amount to be determined at trial and including (but not limited to) LBSF's

actual damages, contractual interest, costs, and attorneys' fees and expenses incurred on account

of Olin College's knowing and willful violation of the automatic stay;

D.     Also as to Count IV, an award of the actual damages, contractual interest, costs,

and attorneys' fees and expenses as set forth in the declaratory judgment entered pursuant to

Count IV;

E.     As to Count V, a declaratory judgment that the properly-calculated Early

Termination Payment is property of the LBSF bankruptcy estate under section 541 of the

Bankruptcy Code and a judgment requiring Olin College to turn over, under section 542 of the

Bankruptcy Code, the principal amount of such receivable in an amount to be determined at trial;

F.     Pre-judgment and post-judgment interest; and

G.     For such other and further relief, including interest, costs, and attorneys' fees, as

the Court deems just and proper.

Dated: New York, New York
        October 29, 2014

                                        By:  /s/ Richard L. Levine
                                             Richard L. Levine
                                             Lauren B. Hoelzer
                                             David J. Schwartz

                                             WEIL, GOTSHAL & MANGES LLP
                                             767 Fifth Avenue
                                             New York, New York 10153
                                             Telephone: (212) 310-8000
                                             Facsimile: (212) 310-8007

                                             *Attorneys for Lehman Brothers Holdings Inc.
                                             and Lehman Brothers Special Financing Inc.*

WEIL:\44536896\21\58399.0011