**JONES DAY**
Jayant W. Tambe
Laura W. Sawyer
222 E. 41st Street
New York, New York 10017

*Attorneys for Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x
                                                                   :       **Chapter 11**
In re:                                                             :
                                                                   :       **Case No. 08-13555 (SCC)**
**LEHMAN BROTHERS HOLDINGS INC., et al.**                          :
                                                                   :       **(Jointly Administered)**
            Debtors.                                               :
                                                                   :
------------------------------------------------------------------ X

**DEBTORS' RESPONSE TO WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S MOTIONS IN LIMINE**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT .........................................................................................................................1

    A.  Washington TSA's Attempt To Distort The Reserve Fund Agreement Such That Industry Standard Valuation Methods Would Be Irrelevant Must Be Rejected (Response to Motions in Limine #1 and #2) .........................................................................1

    B.  Mr. Gruer's Opinions Regarding Section 7.7(b) Losses Should Not Be Excluded (Response to Motion in Limine #1) ......................................................................................6

    C.  Evidence and Arguments Pertaining to the Proofs of Claims Filed by Other States is Relevant to Washington TSA's Contention that Market Quotations Were Not Available In March 2009 (Response to Motion in Limine #3) ...........................................8

    D.  Federal Rule of Evidence 408 Does Not Warrant the Exclusion of Relevant Discussions Regarding the Potential Sale of Washington TSA's Claim (Response to Motion in Limine #4) ....................................................................................11

    E.  If the Court Allows Washington TSA To Introduce Evidence Regarding Events Occurring After the Termination Date, then Lehman Should Not Be Precluded from Presenting Evidence Relating to the Refunding of the 2002 Bonds (Response to Motion in Limine #5) ....................................................................................12

III. CONCLUSION ....................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

Cases

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ........................................................ 1, 4, 8

*Haddad v. Rav Bahamas Ltd.*, 589 F. Supp. 2d 1302 (S.D. Fla. 2008) .......................................... 5

*In re Blech Sec. Litig.* No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650 (S.D.N.Y. Mar. 26, 2003) 5

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1976) ...................................................... 5

*See Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, No. 11 Civ. 5039, 2011 U.S. Dist. LEXIS 134539 (S.D.N.Y. Nov. 22, 2011) ...................................................................... 11

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................................... 5

*United States v. Russo*, 74 F.3d 1383 (2d Cir 1996) ....................................................................... 4

Statutes

11 U.S.C. § 562 ................................................................................................................................. 2

Rules

Fed. R. Evid. 402 .............................................................................................................................. 1

Fed. R. Evid. 408 ............................................................................................................................ 10

Fed. R. Evid. 702 .......................................................................................................................... 4, 7

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF" and collectively with LBHI, "Lehman" or "Debtors"), by and through their undersigned counsel, respectfully submit this memorandum in opposition to the motions in limine filed by the Washington State Tobacco Settlement Authority ("Washington TSA"). For the following reasons, the Court should deny Washington TSA's motions.

## I. INTRODUCTION

Washington TSA distorts the record, the documents and its own arguments beyond recognition in its motions in limine. Apparently desperate, Washington TSA is willing to take any position necessary to try to limit the evidence to just that which it believes supports its case – deeming everything else "irrelevant." But that is not the law. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 587 (1993) (quoting Fed. R. Evid. 401). The Federal Rules' standard of relevance "is a liberal one." *Id*. All relevant evidence is admissible unless proscribed by the Constitution, Congress, the Federal Rules of Evidence, or the Supreme Court. Fed. R. Evid. 402.

## II. ARGUMENT

**A. Washington TSA's Attempt To Distort The Reserve Fund Agreement Such That Industry Standard Valuation Methods Would Be Irrelevant Must Be Rejected (Response to Motions in Limine #1 and #2)**

As the Court is aware, this dispute centers on the proper valuation of the "Termination Amount" for a terminated Reserve Fund Agreement ("RFA") between Lehman and Washington TSA.[1] Both Lehman and Washington TSA intend to offer expert testimony at the hearing on that

---

[1] The RFA is dated November 5, 2002, by and among Washington TSA, as Issuer, U.S. Bank, as Trustee, and LBSF, and was subsequently amended by the Amendment Agreement, dated March 26, 2003, among

ultimate issue.  Lehman's experts and Washington TSA's expert, Peter Shapiro, will be presenting opinions based upon the industry-standard approach to value reserve fund and similar agreements.  Washington TSA's other experts – Messrs. Curry and Hasterok – opine that the industry-standard approach should be rejected because it is "unfair" to Washington TSA.  Ex. 9 to Sawyer Decl., Washington TSA Ex. Z, Curry / Hasterok Rebuttal Report ("Rebuttal Report") at 5.  But there is no dispute among all of the experts that there is, in fact, a generally accepted industry methodology to determine the valuation of the RFA.  In fact, in support of both the claims of Washington TSA and the Tobacco Settlement Financing Corporation of New York, Washington TSA's expert, Peter Shapiro, has definitively stated that "***the*** broadly accepted market methodology" is to create an interest rate swap comparing the Guaranteed Rate of the RFA to a "floating leg" that represents the value of the securities to be delivered.  *See* Ex. 14 to Sawyer Decl., excerpt of Debtors' Ex. 71, Proof of Claim no. 18990 by the New York Tobacco Settlement Financing Corporation against LBSF; Ex. 21 to Sawyer Decl., Proof of Claim no. 37355 by Washington TSA against LBSF.

Recognizing that conformity with market practice will not yield the Termination Amount that Washington TSA desires, Washington TSA now argues that there is nothing in the RFA that requires the Termination Amount to be determined in accordance with market practice.  Instead, Washington TSA claims that the RFA requires a calculation of Washington TSA's "losses and costs," which, according to Washington TSA, apparently is something other than the value of the RFA.  Washington TSA's Motions in Limine ("Motions in Limine") at 7.  But Washington TSA deliberately and misleadingly quotes the RFA, which provides that in the event that the requisite market quotations are not secured, the Burdened Party's "total losses and costs . . . ***or gains***"

---

Washington TSA, U.S. Bank, and LBSF.  It is attached as Exhibit 11 to the Declaration of Laura W. Sawyer, dated October 31, 2014, (hereinafter "Sawyer Decl.")

2

must be determined. Ex. 11 to Sawyer Decl., RFA, § 1 (definition of "Termination Amount") (emphasis added). The phrase "or gains" recognizes that the Termination Amount is designed to reflect the consequences of losing the RFA for the Burdened Party and that the loss of the RFA could be either beneficial or detrimental to the Burdened Party, depending on the interest rate environment when the RFA was terminated.[2] This is determined by considering the market value of the RFA on the termination date.[3] Indeed, Washington TSA expressly acknowledged the bi-directional nature of the Termination Amount in the RFA. Ex. 11 to Sawyer Decl., RFA, § 5.5 ("In certain market conditions the amount of any Termination Amount owed to Lehman by, as applicable, the Trustee or the Issuer could be substantial."). And Washington TSA's witnesses have consistently acknowledged that they understood that, in the event the RFA were terminated, they could owe a Termination Amount to Lehman.[4] *See* Exs. 1-2 to Sawyer Decl., Cook Tr. 31:8-12; Herman Tr. 167:24-168:17.

Despite Washington TSA's protestations, there is no difference between calculating "loss or gains" as referred to in the RFA and valuing the RFA using industry-standard methods. *See* Ex. 11 to Sawyer Decl., Joint Ex. 1, RFA, at § 1 (definition of "Termination Amount"). Washington TSA's expert, Peter Shapiro, recently verified this:

> Q: [I]t doesn't make any difference whether you are calculating TSA's loss or whether you are determining the value of the reserve

---

[2] The measure of loss is not simply a calculation of the loss of the Guaranteed Rate, but instead is a measure of the lost value of the RFA itself.

[3] Additionally, Section 562 of the Bankruptcy Code requires that the RFA should be valued using "commercially reasonable determinants of value" on March 25, 2009. 11 U.S.C. § 562. Washington TSA's attempt to ignore commercially reasonable determinants of value and seek to have the opinions of Dr. Babbel and Mr. Gruer regarding the industry standard approach to valuing reserve fund and similar agreements excluded as irrelevant simply cannot be permitted.

[4] Again Washington TSA omits any discussion of Section 7.6(c), which provides that upon a Lehman Event of Default, Lehman is to determine the Termination Amount. If Lehman fails to do so within three business days, then Washington TSA can proceed to determine the Termination Amount, but must do so "as if it were Lehman." Ex. 11 to Sawyer Decl., Joint Ex. 1, RFA, § 7.6(c). This language reinforces the conclusion that any Termination Amount must be determined using the industry-standard methodology.

3

> fund agreement, you start by analyzing the reserve fund agreement's cash flows, correct?"
>
> MR. LAWRENCE: Objection. Argumentative.
>
> Q: You can answer.
>
> A: I would say that's correct.
>
> Q: And that there are two cash flows that need to be analyzed as we discussed, the fixed leg and the floating leg, correct?
>
> A: Correct.
>
> Q: Regardless of whether you are valuing the reserve fund agreement or calculating loss, correct?
>
> A: Right.

Ex. 4 to Sawyer Decl., Shapiro Tr. 331:13-332:7 (Oct. 16, 2014). Likewise, Mr. Shapiro testified that Swap Financial Group prepared two memoranda, the "Loss Calculation Memorandum" and a series of "valuation" memoranda, but that "the fundamental methodology" to either calculate "loss" or determine the "valuation" of the RFA remained the same.[5] *See id.* at 303:14-20. In both cases, whether valuing the RFA or determining Washington TSA's loss, the proper approach is to "analyze [the RFA] as if it were an interest rate swap." *See id*. at 307:2-3. In other words, to determine Washington TSA's "loss" under the RFA, one should use the industry standard methodology as endorsed by Mr. Shapiro, Mr. Gruer and Dr. Babbel.

Yet Washington TSA seeks to exclude Mr. Gruer and Dr. Babbel's opinions as irrelevant because they rely upon the industry-standard valuation methodology.[6] However, testimony from

---

[5] Washington TSA's financial advisor also confirms that the "termination level" for reserve fund agreements is the "mid-market" value of the agreement. Ex. 3 to Sawyer Decl., Harris Tr. 43:11-14 ("Ten basis points is reflective of where we have historically seen these sorts of agreements terminate, and it's effectively reflective of what we refer to as the mid-market level for the agreement.").

[6] Washington TSA's "criticisms" of Mr. Gruer and Dr. Babbel apply with equal force to Mr. Shapiro in light of his admission that he is seeking to determine Washington TSA's "loss" by ascertaining the value of the RFA. Indeed, if the Court were to conclude that "the RFA does not call for a forward curve or 'industry' based valuation methodology," Motions in Limine at 7, it would have to also exclude Mr. Shapiro's opinions.

Mr. Gruer and Dr. Babbel, a market professional and a finance expert,[7] as to how the industry-standard methodology operates in theory and practice will certainly "assist the trier of fact to determine a fact in issue." *Daubert*, 509 U.S. at 591; *c.f.* Fed. R. Evid. 702; *see also United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996); *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991); *In re Blech Sec. Litig.* No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650, at *53-54 (S.D.N.Y. Mar. 26, 2003). Testimony concerning accepted valuation techniques goes to the heart of a dispute about the proper valuation of the RFA and should certainly be permitted.

Washington TSA then proceeds to fault Mr. Gruer and Dr. Babbel for failing to opine on an ultimate legal conclusion – what is the meaning of the phrase "losses or gain" under the RFA – conveniently ignoring the fact that it is the province of the Court to interpret the contract. Specifically, Mr. Gruer refused to opine that his valuation of the transaction amounted to a calculation of "loss," as that term is used in the RFA. *See* Motions in Limine at 3, 7. But it is black letter law that an expert may not state opinions that embody legal conclusions. *See Bilzerian*, 926 F.2d at 1294 (while an expert may opine on an issue of fact, he may not give testimony stating ultimate legal conclusions). Interpretation of the terms of a contract is the province of the Court, not of valuation experts.[8] *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510-11 (2d Cir. 1976) (expert may testify on the nature of an options contract but not as to whether a party has violated the contract). This bedrock principle is reinforced in *Dallal v. N.Y. Times Co.*, 352 Fed. Appx. 508 (2d Cir. 2009), a case cited by Washington TSA in its Motions in

---

[7] It should be noted that Washington TSA has not attacked the reliability of either Mr. Gruer's or Dr. Babbel's opinions.

[8] The cases Washington TSA cites do not suggest that either Mr. Gruer's or Dr. Babbel's opinions should be excluded. *See* Motions in Limine at 2, 4, 7 (citing *Bank of New York Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 655 (S.D.N.Y. 2012); *Haddad v. Rav Bahamas Ltd.*, 589 F. Supp. 2d 1302, 1306-07 (S.D. Fla. 2008)). In those cases, the opinions of the experts were excluded because they failed to follow either the clear guidance of the Court or the express language of the contract. Here, Washington TSA premises its argument to exclude Mr. Gruer and Dr. Babbel upon a distortion of the RFA and a rejection of the industry-standard methodology, which is not analogous to the cases cited.

Limine.  *See* Motions in Limine at 5, 7.  In *Dallal*, the Second Circuit affirmed the exclusion of an expert who sought to testify, *inter alia*, on "how industry participants interpret. . . applicable law" finding that such testimony "would have intruded on its own province or that of the jury." *Id*. at 512.  Neither Mr. Gruer nor Dr. Babbel have opined on the proper interpretation of law, a task that is in the province of the Court, but rather to the proper valuation methodology for a terminated reserve fund agreement.  By carefully refusing to overstep the boundaries of their expertise, Mr. Gruer and Dr. Babbel have ensured that the Court has sufficient information to perform its duties, including the interpretation of the RFA, and they should be permitted to testify.

### B. Mr. Gruer's Opinions Regarding Section 7.7(b) Losses Should Not Be Excluded (Response to Motion in Limine #1)

Washington TSA also argues that Mr. Gruer should not be permitted to testify about his calculation of "Section 7.7(b) losses," claiming that his calculation is inconsistent with the language of the RFA.  Motions in Limine at 6.  Again, Washington TSA distorts the language of the RFA in order to argue for the exclusion of Mr. Gruer's opinion.

Section 7.7(b) of the RFA provides for a calculation of loss for the period between the date on which Lehman failed to deliver securities (December 1, 2008) and the termination date of the RFA (March 25, 2009).  Section 7.7(b) provides that the calculation will be made by comparing what Washington TSA would have earned pursuant to the Guaranteed Rate to either what Washington TSA "actually earned" or "would have earned" if Washington TSA had invested in accordance with Section 2.4 of the RFA.  In general, Section 2.4 requires that Washington TSA should invest in overnight securities (like a money market account) for the first five business days after a missed delivery of securities, and then after that, Washington TSA

6

shall invested in permitted investments "with the longest possible maturities…" *See* Ex. 11 to Sawyer Decl., Joint Ex. 1, RFA, § 2.4.

In connection with these Section 7.7(b) losses, the dispute between the parties focuses on "actually earned" versus "would have earned." Washington TSA's experts calculated the Section 7.7(b) loss based upon what Washington TSA "actually earned" from December 1, 2008 through March 25, 2009. *See* Ex. 7 to Sawyer Decl., Shapiro Expert Witness Disclosure ("Shapiro Disclosure"), at 3; Ex. 8 to Sawyer Decl., Curry/Hasterok Expert Witness Disclosure ("Curry/Hasterok Disclosure"), at 20. Since Washington TSA initially invested its Reserve Fund in a money market account and left it in that money market account, even after five business days had passed, Washington TSA's experts simply used that money market return for purposes of their calculation. *See* Ex. 7 to Sawyer Declaration, Shapiro Disclosure, at 3; Ex. 8 to Sawyer Decl., Curry/Hasterok Disclosure, at 20. However, Mr. Gruer calculated the Section 7.7(b) loss based upon what Washington TSA "would have earned" if it had invested in accordance with Section 2.4 of the RFA. *See* Ex. 10 to Sawyer Decl., Debtors' Ex. 139, Revised Expert Report of Samuel Gruer, at ¶¶51-56. Mr. Gruer considered what Washington TSA "would have earned" if it had taken the Reserve Fund out of the money market account after five business days and invested it in permitted securities "with the longest possible maturities." *See id.* Moreover, Mr. Gruer will testify that he calculated the Section 7.7(b) losses in accord with market standards.

Lehman firmly believes that Mr. Gruer's calculation of Section 7.7(b) losses is accurate and consistent with the RFA and market practice. Even crediting Washington TSA's argument, however, at best there is a dispute as to the proper interpretation of the RFA. In light of this dispute, testimony from all experts would be relevant as it is likely to "assist the trier of fact to

7

determine a fact in issue." *Daubert*, 509 U.S. at 591; *c.f.* Fed. R. Evid. 702. Washington TSA's attempt to resolve the debate by excluding Mr. Gruer's opinions should not be permitted.

### C. Evidence and Arguments Pertaining to the Proofs of Claims Filed by Other States is Relevant to Washington TSA's Contention that Market Quotations Were Not Available In March 2009 (Response to Motion in Limine #3)

Washington TSA seeks to exclude the Proofs of Claim filed in Lehman's bankruptcy by the tobacco settlement authorities of New Jersey, Virginia and New York.[9] However, these other Proofs of Claim are directly relevant and rebut arguments raised by Washington TSA. Washington TSA has claimed that "Swap Financial sought market quotations from every conceivable dealer" but was unable to secure a single market quotation.[10] Washington TSA's Pre-Trial Br., at 9. Lehman doubts the veracity of that assertion. Instead, the evidence adduced suggests that Washington TSA and Swap Financial embarked on a deliberate path to avoid the market quotation process, concluding that Washington TSA might be "better off" without being restricted by market quotes. Ex. 13 to Sawyer Decl., E-mail from Nathaniel Singer to Peter Shapiro and James Vergara, Dec. 10, 2008 ("We could try to get MQs, but *we may be better off* finding out the levels of the last real executions for these agreements.") (emphasis added).

The New Jersey and Virginia Proofs of Claim (*see* Exs. 15, 16, 17 to Sawyer Decl.) are relevant in that they rebut Washington TSA's conclusory assertion that market quotations were not available in March 2009. The tobacco settlement authority of New Jersey based its claim against Lehman upon quotations it received in January 2009. And the tobacco settlement

---

[9] Washington TSA lists Debtors' Exs. 71, 72, 73, 74, 76 and 79 as being subject to this Motion in Limine. Debtors have withdrawn Exhibit 79 (which was not, in any event, a proof of claim) from its witness list and will not be presenting it to the Court.

[10] At other times, Washington TSA has maintained that 14 dealers were solicited for market quotations. *See* Ex. 19 to Sawyer Decl., Letter from Paul Lawrence, Pacifica Law Group, to the Honorable Judge Shelley C. Chapman, dated April 14, 2014, at 2 ("Among other things, TSA pursued market quotations, as required by the RFA, from 14 sources, none of whom provided a quote.").

authority of Virginia based its claim in the Lehman bankruptcy upon quotations it received in March 2009.

The New York Proof of Claim is relevant to Mr. Shapiro's practices and credibility as Swap Financial also served as the financial advisor for the tobacco settlement authority of New York.  In connection with both the claims filed by New York and Washington, Mr. Shapiro uses what he calls "the broadly accepted market methodology," which is, in fact, the basic methodology that all experts agree is used in the industry to determine the termination value of reserve fund agreements.  *See* Ex. 14 to Sawyer Decl.  Additionally, the memorandum prepared by Swap Financial in support of New York's claims undermines Mr. Shapiro's claim in this dispute that he solicited market quotations for Washington TSA in March 2009 and was unable to obtain any quotations.  *See, e.g.,* Ex. 5 to Sawyer Decl., Shapiro Tr. 234:23-235:14 (Mar. 5, 2014).  The "Calculation of Loss" memorandum in support of New York's claims strongly resembles the "Calculation of Loss" memoranda prepared for Washington TSA, with one significant difference.  *See* Ex. 14 to Sawyer Decl. (last five pages).  Swap Financial's New York "Calculation of Loss" memorandum details the dealers that were solicited, when the solicitation occurred and the results of that process; there is no similar language to be found in the Washington "Calculation of Loss" memoranda detailing any such process.  Indeed, Mr. Vergara, the Swap Financial employee responsible for calculating Washington TSA's loss, did not remember conducting any such solicitation process and noted that if a process had been done, it would have been recorded in the memorandum, like was done for New York.  *See* Ex. 6 to Sawyer Decl., Vergara Tr. 126:5-14; 206:10-18.

Moreover, it is clear from the discovery that has now been produced, that Swap Financial looked at these other Proofs of Claim – particularly the New Jersey Proof of Claim – to assess

9

the reasonableness of the claim being asserted by Washington TSA. *See* Ex. 18 to Sawyer Decl., Internal Swap Financial e-mails, Aug. 23, 2010. It should be noted that Washington TSA had initially objected to the production of this document as being "irrelevant" and it was only after the Court ordered the production of it on September 16, 2014, that Lehman was able to discover the extent to which Mr. Shapiro considered the other claims being filed by tobacco settlement authorities in the Lehman bankruptcy. Again, Washington TSA is attempting to limit this area of inquiry by claiming that these other Proofs of Claim are irrelevant.

Contrary to Washington TSA's accusations, Lehman is not attempting to introduce documents that it refused to produce during discovery. During discovery, Washington TSA sought information relating to all of Lehman's other reserve fund agreements and forward purchase agreements, including the pricing and valuation of those agreements, the hedges for those agreements, the negotiations of those agreements, the marketing of those agreements, all internal reports relating to these agreements and all documents relating to those agreements in general. *See* Ex. 20 to Sawyer Decl., Washington TSA Requests for Production ("RFP") 1-9, 12, 14-15, 17-18. Lehman objected to the overbroad nature of these requests and the fact that Lehman's internal, pre-bankruptcy treatment of other reserve fund agreements and forward purchase agreements was simply not relevant. Lehman's refusal to indulge Washington TSA's overbroad requests does not preclude it from introducing the New York, New Jersey and Virginia Proofs of Claim. These Proofs of Claim are not being offered as evidence relating to valuation of the RFA, but merely as to the willingness of dealers to provide quotations around the time of the Rejection and Swap Financial's own practices, both in documenting market quote solicitations and in the determination of "loss" under a reserve fund agreement. Moreover, these documents are publicly available proofs of claims filed on the Court's docket and are available to

Washington TSA.  None of the cases cited by Washington TSA involved publicly available documents and are not applicable to these Proofs of Claim.

Washington TSA also claims that these exhibits cannot be authenticated because no witness has personal knowledge "about the bids and responses."  Motions in Limine, at 9.  However, that assertion is simply false.  As noted above, Mr. Shapiro, who will be testifying at the hearing, conducted the bid process that is described in the New York Proof of Claim.  Mr. Shapiro also currently serves as the financial advisor for the tobacco settlement authority of New Jersey and in that role, he is presumably aware of the details of the bid process that New Jersey conducted in January 2009.[11]  The Court also may take judicial notice of filings in this case.  *See Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, No. 11 Civ. 5039, 2011 U.S. Dist. LEXIS 134539, at \*32-33 (S.D.N.Y. Nov. 22, 2011) ("it is appropriate to take judicial notice of filings in bankruptcy proceedings").

**D. Federal Rule of Evidence 408 Does Not Warrant the Exclusion of Relevant Discussions Regarding the Potential Sale of Washington TSA's Claim (Response to Motion in Limine #4)**

Washington TSA seeks to exclude evidence relating to its consideration of "crystallizing" or selling its Lehman claim to a third party pursuant to Federal Rules of Evidence 402 and 408.  As an initial matter, Washington TSA misconstrues Rule 408, which prohibits parties from using evidence of compromise, offers to compromise, or negotiations to prove or disprove the validity or amount of a disputed claim.  Fed. R. Evid. 408.  Washington TSA's internal Washington TSA discussions regarding the potential sale of its claims and discussions between Washington TSA and potential third party claim purchasers do not fall within the purview of Rule 408.

---

[11]   Mr. Christopher Harris from PFM advised Virginia in connection with its claim against Lehman.  Mr. Harris was listed on Washington TSA's initial witness list, but counsel for Washington TSA advised Lehman that he would not be testifying at the hearing on October 27, 2014.  Presumably, Mr. Harris would have had personal knowledge of the quotations received by Virginia in March 2009 – the same time at which Washington TSA claims quotations could not be obtained.  Mr. Harris is beyond the subpoena power of the Court and his testimony will be presented by deposition designation.

11

Washington TSA's internal discussions regarding its efforts to sell its bankruptcy claim (as well as the discussions with potential purchasers) reveal much about Washington TSA's approach to its bankruptcy claim and its motive to inflate its claim and are therefore relevant. As Washington TSA recognized, "unless the value to [Washington TSA] of the termination payment was large, it would not even have a significant discounted value on the secondary market for such obligations." Ex. 12 to Sawyer Decl., Minutes from Washington TSA's November 12, 2008 Board Meeting, at 4.

**E. If the Court Allows Washington TSA To Introduce Evidence Regarding Events Occurring After the Termination Date, then Lehman Should Not Be Precluded from Presenting Evidence Relating to the Refunding of the 2002 Bonds (Response to Motion in Limine #5)**

Washington TSA argues that evidence pertaining to the 2013 Refunding should be excluded because it is a "wholly separate event four years after termination that has no bearing on TSA's losses and costs." Motions in Limine, at 12. At the same time, Washington TSA argues extensively that it should be permitted to present evidence regarding its "actual losses" following the termination of the RFA. *See* Washington TSA's Pre-Trial Br. at 25-27. It is Lehman's position that all post-rejection date events should not be considered under Section 562 of the Bankruptcy Code. But if Washington TSA is permitted to introduce evidence of its purported "actual losses" and other events that occurred after the rejection date, then Lehman should be permitted to introduce evidence that is directly relevant to these claims of "actual losses," such as the refunding, which was tremendously beneficial to Washington TSA and eliminated the Reserve Fund upon which Washington TSA is claiming to have suffered "actual loss."

12

### III. CONCLUSION

For the reasons set forth above, Lehman requests that the Court deny Washington TSA's motions in limine.

Dated: October 31, 2014
New York, New York

By: /s/ Laura W. Sawyer
Jayant W. Tambe
Laura W. Sawyer
JONES DAY
222 E. 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Debtors*

13

**DECLARATION OF SERVICE**

I, I-Heng Hsu, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that on October 31, 2014, I caused a true and correct copy of the attached Debtors' Response to Washington State Tobacco Settlement Authority's Motions in Limine to be served by electronic mail and via the Southern District of New York Bankruptcy Court's electronic case filing system upon the following counsel of record:

>Paul J. Lawrence
>Kymberly K. Evanson
>PACIFICA LAW GROUP LLP
>1191 Second Avenue, Suite 2100
>Seattle, WA 98101
>
>Eric T. Moser
>Robert N. Michaelson
>RICH MICHAELSON MAGALIFF MOSER, LLP
>340 Madison Avenue, 19th Floor
>New York, NY 10173

>/s/ I-Heng Hsu
>I-Heng Hsu