# EXHIBIT 4

```
 1

 2   IN THE UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   Chapter 11
     CASE NO. 08-13555 (JMP)
 4   Jointly Administered

 5

 6

 7   IN RE:   LEHMAN BROTHERS
              HOLDINGS, INC. et al.
 8
              Debtors,
 9

10

11   --------------------------------------------

12

13           VIDEOTAPED TRANSCRIPT OF
             DEPOSITION OF PETER SHAPIRO
14

15

16           TRANSCRIPT of the stenographic

17   notes of the proceedings in the

18   above-entitled matter, as taken by and

19   before TAB PREWETT, a Registered

20   Professional Reporter, a Certified

21   Shorthand Reporter, a Certified LiveNote

22   Reporter, and Notary Public, held at the

23   Offices of JONES DAY, 222 East 41st Street,

24   New York, New York, on Thursday, October

25   16, 2014, commencing at 10:07 a.m.
```

1                    Peter Shapiro
2    valuation numbers.
3         Q    And what's the distinction
4    between this version just looking at
5    valuation numbers and the loss calculation
6    memorandum?
7         A    The loss calculation memorandum
8    was more rigorous.
9         Q    And what is not rigorous about
10   this analysis?
11        A    It doesn't go through each of
12   the components of spread in detail as the
13   loss calculation memorandum does.
14        Q    Is the fundamental methodology
15   between this memorandum and the loss
16   calculation memorandum the same?
17        A    The fundamental methodology
18   meaning the basic architecture that is not
19   looking at what the inputs are into spread
20   and the like.  Yes.
21        Q    That you would look by -- you
22   would start by looking at the cash flows of
23   the reserve fund agreement and analyzing
24   those?
25        A    Correct.

1                  Peter Shapiro

2         Q     I know, but the way this

3    process works is I ask you questions.

4         A     I understand.  I was trying to

5    get away with asking you a question.

6         Q     So did you discuss with

7    Mr. Vergara before this memorandum was

8    drafted regarding the methodology he

9    describes in this memorandum?

10        A     Did I discuss the methodology

11   used in this memorandum?  Yes.

12        Q     With Mr. Vergara?

13        A     Yes.

14        Q     And you both agreed that it was

15   the appropriate methodology used to value

16   the reserve fund agreement?

17        A     In general terms, yes, the

18   general architecture, the general approach,

19   yes.

20        Q     And that general approach being

21   to model an interest rate swap and analyze

22   the cash flows of the reserve fund

23   agreement, correct?

24        A     You are using "analyze the cash

25   flow."  I would cut -- cut it off and say

1                  Peter Shapiro

2     analyze it as though it were an interest

3     rate swap.

4          Q     Okay.  If you look at the third

5     paragraph of this memorandum, it starts by

6     saying:

7                "In order to value the reserve

8     fund agreement, we began by analyzing the

9     cash flows."

10         A     Yes.

11         Q     Do you agree with that

12    statement?

13         A     That you begin by looking at

14    it -- what -- the cash flow being one guy

15    pays fixed, the other guy pays floating.

16         Q     And then you model that fixed

17    and floating as if it were a swap?

18         A     Correct.

19         Q     Now, if you look at the second

20    page of this memorandum, the

21    next-to-the-last paragraph that

22    starts, "Given this dramatic widening," do

23    you see that?

24         A     Yes.

25         Q     The first sentence is:

1                     Peter Shapiro

2      analyzing the RFA cash flows."

3              Do you see that?

4         A    Yes.

5         Q    If you look at Shapiro

6      Exhibit 37, it says at the beginning of the

7      third paragraph:

8              "In order to value the reserve

9      fund agreement, we begin by analyzing the

10     cash flows."

11             Do you see that?

12        A    Yes, I do.

13        Q    So depending -- it doesn't make

14     any difference whether you are calculating

15     TSA's loss or whether you are determining

16     the value of the reserve fund agreement,

17     you start by analyzing the reserve fund

18     agreement's cash flows, correct?

19             MR. LAWRENCE:  Objection.

20        Argumentative.

21        Q    You can answer.

22        A    I would say that's correct.

23        Q    And that there are two cash

24     flows that need to be analyzed as we

25     discussed, the fixed leg and the floating

1                    Peter Shapiro
2    leg, correct?
3         A    Correct.
4         Q    Regardless of whether you are
5    valuing the reserve fund agreement or
6    calculating loss, correct?
7         A    Right.
8         Q    If you go to the fifth
9    paragraph of the memorandum -- sorry -- of
10   Shapiro 38, which is on page SFG 2383, it's
11   the first full paragraph on that page.  It
12   says, "The use of a LIBOR plus spreadsheet
13   analysis" -- do you see that?
14        A    Yes.
15        Q    And then if you look at the
16   fourth paragraph of Shapiro Exhibit 37, it
17   starts -- it says:
18              "The use of a swap to value
19   agreements of this type is a broadly
20   accepted market methodology."
21              Versus Shapiro Exhibit 38 says:
22              "The use of a LIBOR plus spread
23   analysis with an interest rate swap to
24   value agreements like the RFA is the
25   broadly accepted market methodology."

```
 1
 2                      CERTIFICATE
 3
 4         I, TAB PREWETT, A Registered
    Professional Reporter, Notary Public,
 5  Certified LiveNote Reporter, and Certified
    Shorthand Reporter, do hereby certify that
 6  prior to the commencement of the
    examination PETER SHAPIRO was sworn by the
 7  notary public to testify the truth, the
    whole truth and nothing but the truth.
 8
            I DO FURTHER CERTIFY that the
 9  foregoing is a true and accurate transcript
    of the testimony as taken stenographically
10  by and before me at the time, place and on
    the date hereinbefore set forth.
11
            I DO FURTHER CERTIFY that I am
12  neither a relative nor employee nor
    attorney nor counsel of any of the parties
13  to this action, and that I am neither a
    relative nor employee of such attorney or
14  counsel, and that I am not financially
    interested in the action.
15
16
17  _____
18
19  Notary Public
20
    My Commission expires February 9, 2019
21  Dated:  October 19, 2014
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022