# EXHIBIT 12

## TOBACCO SETTLEMENT AUTHORITY
## BOARD OF DIRECTORS
### Special Meeting
### MINUTES
### November 12, 2008

The Chair, Ms. Carla DewBerry, called the Meeting of the Tobacco Settlement Authority (the "Authority") to order at 1:05 p.m. on November 12, 2008.

The Special Meeting was held in the Boardroom of the Washington State Housing Finance Commission (the "Commission") located on the 28th floor of 1000 Second Avenue, Seattle, Washington. In addition to Ms. DewBerry, the other board member present was Ms. J. Sue Painter. Mr. Jeff Newgard was present by phone. Authority staff members present were Mr. Kim Herman, Ms. Carol Johnson, Ms. Debra Stephenson, and Mr. Cody Field. Others present were Mr. Jay Reich and Ms. Faith Pettis of K&L Gates; Ms. Deborah Kuykendall and Mr. Bruce Colwell of U.S. Bank Corporate Trust; Mr. Mike Roberts of TSA; Mr. John Bonow, Mr. Roan Blacker, Ms. Maria Coe, and Mr. Duncan Brown of Public Financial Management; Ms. Laurie Tish of Moss Adams; Mr. Tim Rattigan of Citigroup; Mr. Dick King of Barclays Capital; and Mr. Jeff Urbina of Siebert, Brandford, Shank and Co. Joining via teleconference were Ms. Kym Arnone of Barclays Capital; and Mr. Howard Zucker, Mr. Jay Eustis and Mr. Roger Bagley of Hawkins, Delafield, and Wood.

**Approval of the June 11, 2008 Minutes**

Ms. DewBerry asked for a motion to approve the minutes of the meeting held on June 11, 2008. Ms. Painter moved approval. Mr. Newgard pointed out an error on page two of the minutes noting that his name was spelled incorrectly. Mr. Herman recommended that the minutes be amended. Mr. Newgard seconded the minutes with one amendment. Ms. DewBerry asked if there were any other amendments to the minutes. There were none. The minutes of the June 11, 2008 Special Meeting were unanimously approved.

**Introduction of New Program Assistant**

Ms. Johnson introduced the new Program Assistant, Cody Field. She noted that this was the first meeting for Mr. Field. Mr. Field began work with the affiliate



Debtors' Ex. 24

EXHIBIT
Lehman 7

TSA_013337

agencies at the start of September. Previously, Mr. Field worked for the Washington State Housing Finance Commission. Prior to his work for the Commission, Mr. Field worked for the Washington State Health Care Authority. His educational background is in web design, film, and media.

**Reappointment of Mr. Tom Corley**

Ms. DewBerry moved onto the next agenda item: the reappointment of Mr. Tom Corley. Mr. Herman referred to the reappointment letter from the Governor behind tab 3 in the Board member packet. Mr. Corley has been serving on the Authority Board since May of 2004. His official appointment expired in May of 2008 but he continued to serve on the Board. On September 12, he was officially reappointed for another four year term extending his service through May 3, 2012.

**Staff Recommendations for TSA Finance Team**

Ms. DewBerry moved the meeting to the first action item: to consider and act on staff recommendations for the TSA Finance Team for fiscal year 2008 – 2010. Mr. Herman noted that the auditors for the Authority advised staff last year that the contracts for the existing finance team had expired. In order to correct the audit exception, the Authority undertook an RFP process. RFPs were sent out for bond counsel, financial advisor, underwriter, and trustee. In the area of counsel, responses were received from Hawkins, Delafield, & Wood LLP; K&L Gates LLP; Nixon Peabody LLP; Orrick, Herrington, and Sutcliffe LLP; and Hiscock & Barclay. The firms that responded to the RFP for underwriting were Barclays Capital; Citigroup Global Markets Inc.; JP Morgan Securities Inc.; Goldman Sachs and Co.; Merrill Lynch Inc.; Siebert, Brandford, Shank & Co.; Jessup and Lamont Securities Corporation, Inc.; and Prager, Sealy & Co. For trustees, responses were received from Deutsche Bank; U.S. Bank; and Bank of New York Mellon. The only response for financial advisor was from Public Financial Management.

The RFP responses were reviewed and no interviews were scheduled for financial advisor, trustee or bond counsel. Authority staff conducted telephone interviews for disclosure counsel and co-managing underwriters. Interviews for senior underwriters were done in person. Board members were asked to participate in

*November 12, 2008*                                                                                   2

TSA_013338

the interviews, although none were available. Authority staff recommends reappointing Hawkins, Delafield, & Wood and K&L Gates as co-bond counsel. The recommendation for disclosure counsel is Nixon Peabody. As book running co-senior manager, staff recommends Barclays Capital. The other co-senior manager recommendation is Citigroup Global Markets. For co-managers, staff recommends JP Morgan Securities; Goldman Sachs & Co.; Merrill Lynch Global Markets; Siebert, Brandford, Shank & Co.; and Jessup and Lamont Securities.

**Motion to Approve Staff Recommendations for TSA Finance Team**

Ms. Painter asked for a motion to accept the recommendation from staff in the selection of TSA finance team members and authorize the Executive Director to negotiate the terms and conditions of a contract with each selected team member as required by state guidelines. Ms. DewBerry made the motion and Mr. Newgard seconded. The motion was approved unanimously.

**Staff Recommendations for TSA Reserve Fund Agreement**

Ms. DewBerry moved on to the second action item, to consider and act on staff recommendations regarding the TSA Reserve Fund Agreement with Lehman Brothers. Mr. Herman noted that the Authority has a 45 million dollar reserve fund investment agreement with Lehman Brothers. This agreement was entered into at the time of the original issuance. He referred to a memorandum behind tab four in the Board member packet which summarizes the issues the Authority has looked into with regard to the investment agreement.

The contract is with a subsidiary of Lehman though the parent Lehman has guaranteed performance. The parent is in bankruptcy. The agreement should stay in place regardless of the parent Lehman bankruptcy. Currently, though there is a technical default due to the bankruptcy of the parent Lehman, there is no concern with regard to the investment amount since the Authority's trustee is holding collateral.. In December, the counterparty is scheduled to post substitute collateral.. The collateral is due to be cashed in every six months, so we have cash on hand in case we need the reserve funds to help make bond payments. In December, the counterparty may or may not post new collateral. If they do not post new collateral, the trustee will take the cash realized from the existing collateral and invest the money at our direction. Six months later, Lehman can

November 12, 2008                                                                    3

TSA_013339

post new collateral and the agreement would keep going until termination.

The Authority has the option to terminate the contract if there is no collateral posted. If we had done that about a month ago, the Authority would have had to pay a termination fee to Lehman of approximately $1.2 million. According to PFM, the market has reversed itself and at this point in time, Lehman would owe money to the Authority. There is no expectation that we could collect the money from Lehman and unless the value to us of the termination payment was large, it would not even have a significant discounted value on the secondary market for such obligations.

Authority staff recommends leaving the agreement in place and waiting to see what happens when the new collateral is scheduled to be posted in December. The decision of whether or not to leave the investment agreement in place will be based on the market value of the termination payment at that time. We will either look for a new investment agreement which will be hard to do at the same rate as the current agreement. Or, we can take action to have the trustee invest the funds at a lower rate. This recommendation will authorize Mr. Herman to continue monitoring the investment agreement and take such action as necessary to protect the Authority, given market conditions.

Mr. Reich noted that this is an investment contract which gave 45 million dollars to a Lehman subsidiary. In return, they would guarantee a rate of return of 4.48 percent. They would also provide the Authority with collateral, which comes due every six months. They replace this collateral every six months at a price that provides the rate of return. This obligation was guaranteed by Lehman Holding Company, which is now in bankruptcy. At the time the memo was written, the subsidiary with whom we had the contract was not in bankruptcy, but now they are. Mr. Reich noted that the trustee is holding the security and it is believed to be ours independent of the bankruptcy. On December 1, Lehman Brothers is obligated to replace the security. If they fail to replace it, which is likely, we would realize the value and go forward to invest the money.

*November 12, 2008*                                                                                          4

Four different variables are being monitored, which is why it's impossible to make an absolute recommendation. First, because of the various bankruptcies, we could terminate the contract. If we can terminate easily and not lose money, we may choose to do that. Second, the December 1st performance is being monitored. If Lehman does not perform, we would have to determine what to do with the money. If we lose money, we could theoretically bill Lehman. Third, the bankruptcy court is being monitored. The court is supervising all the assets and liabilities of both entities. We do not believe it has evaluated and made rulings with respect to any similar contracts to date. Also, we believe that because of the nature of the contract and due to our role, we are not subject to the automatic stay, although that is not one hundred percent clear. Thus, if we choose to terminate the agreement, we may seek permission from the bankruptcy court first. Finally, if we have to realize on the collateral, our best option would be to reinvest the 45 million dollars in the reserve fund for six months as best we can. If we are in the money and a termination payment would come to us, we may seek early termination. Depending on the advice of bankruptcy counsel, we may seek the approval of the bankruptcy court to pursue any remedy.

Ms. DewBerry asked about the 4.48 percent interest rate referenced in the memo. Mr. Reich noted that the rate is currently above market. Ms. Painter asked about the collateral and who was holding it. Mr. Reich noted that collateral is being held on behalf of the Authority by the bond trustee. It is in the form of commercial paper and becomes due on December 1. At that point the Authority will own 45 million dollars, plus several thousand in addition. This money must be invested in accordance with the requirements of the indenture. Mr. Herman noted that the rating on the bonds has not changed.

Ms. Painter asked if the 45 million was one investment. Ms. Kuykendall noted that the Authority is holding two pieces of commercial paper which includes a small piece of General Electric equaling $6,835. The majority of the investment ($45,430,000) is in Briarwood Trust Commercial Paper at a rate of 4.95%. Ms. Painter asked if the portfolio was well diversified. Ms. Kuykendall answered that it is not up to the trustee to have a well diversified portfolio. The trustee is just the

*November 12, 2008*
5

TSA_013341

collateral agent for the paper put up by Lehman. Ms. Painter asked Mr. Herman how he would invest the collateral once it matures on December 1. Mr. Herman noted that we had yet to cross that bridge. Mr. Bagley noted that on December 1, if Lehman does not perform, the collateral must be invested for five days. Ms. Painter asked if Authority staff had selected a vehicle to do this. Mr. Herman noted that no vehicle had been identified, but all the available options have been looked at for two reasons: to analyze the status of the Lehman bankruptcy and to present this information to the Board members to get authorization to move forward.

Investment options will be looked at between now and December 1. Ms. DewBerry asked if Lehman had posted collateral on 104% of the termination amount. Mr. Reich stated that Lehman had actually posted collateral worth about 45 million dollars. It is Mr. Reich's belief that when that collateral matures, a payment is made to Lehman, who then replaced the security with something comparable that will give us a net return of 4.48%. It's closer to a forward purchase contract than collateralizing an obligation. TSA owns the commercial paper free and clear. Mr. Herman stated that he would be happy to consult with any members of the Board that had suggestions about investment vehicles. Ms. Painter stated that she'd like to participate in discussions as they occur. Mr. Bagley noted that until the contract with Lehman is terminated or rejected in the bankruptcy the overnight and six month investments by TSA must be consistent with the agreement and the bond indenture. Mr. Reich stated that the investment has to be liquidated in six months and available to make payments on the bonds.

| | |
|---|---|
| **Motion to Approve Staff Recommendations Regarding TSA Reserve Fund Agreement** | Ms. Dewberry asked for a motion. Ms. Painter moved to authorize the executive director to monitor the Lehman Brother's reserve fund agreement and take such actions as are necessary to protect the interest of the Authority and to report to the Authority the action taken at the next Authority meeting. Mr. Newgard seconded the motion. The motion was approved unanimously. |
| **Review Financial Statement** | Ms. Dewberry introduced Ms. Stephenson. Ms. Stephenson referred to the financial statements behind tab five of the Board member packet for the date |

*November 12, 2008*                                                              6

TSA_013342

ending September 30, 2008. She noted that the third page contained the statement of activities and changes in net assets. Ms. Stephenson noted that the Authority has no ongoing revenue source because we have declined to take additional revenues from the bond funds. The only revenue source comes from interest on cash deposits. This revenue has declined over the last year. It is down just a little over sixty thousand dollars, which reduces interest income. Considering we haven't requested any additional revenues, the balance is relatively healthy. There have been no significant changes in the statement of activities and changes in net assets. Ms. Stephenson referred to the income statement on page 5-4. She noted that we are very comparable to last year. Revenues have dropped due to a lower available balance and dropping interest rates. The only significant difference in expenses is the timing of expenses for the audit. As of September 30, we've expensed a little less than last year.

**Discussion of potential Lehman Brothers Termination Fee**

Ms. DewBerry referenced the K&L Gates memo regarding the preparation of officer certificates and asked if we were considering taking a fee. Ms. Stephenson noted that we are planning to take a fee and that information needs to be prepared for the trustee before April. Ms. DewBerry asked if we needed a board resolution for taking the fee. Mr. Herman stated that there may have been a resolution to waive the fee as part of the budget requirement, but that a resolution had not been prepared for this meeting. Taking the fee would provide funds to pay a termination fee to Lehman Brothers to get out of the contract. Ms. DewBerry stated that it would be nice to be sitting on cash inside TSA and wondered if the cash was outside of our reach if the fee is not taken. Mr. Herman noted that the only cash we've ever had is the original five hundred thousand we took at the time of closing. We've deferred every other time we've had an opportunity to take cash. There are some provisions in the indenture that indicate what we can and can't pay from the fee. The cash would have to be taken as a payment out of TSA.

**Motion to Approve Setting Aside Funds to Pay Termination fee to Lehman Brothers**

Mr. Reich stated that it would be prudent to authorize the Executive Director to take up to the fee authorized under the indenture. If it is taken and not used, it can be put back into the indenture and used to pay down bonds. Ms. DewBerry asked

*November 12, 2008*                                                                                          7

TSA_013343

for a motion authorizing the executive director to take a fee for this year rather than waiving it to be used as the TSA further directs at another point in time. Ms. Painter so moved and Mr. Newgard seconded. The motion was approved unanimously.

Ms. Painter asked for a motion to approve the financial statement that was presented. Ms. Dewberry made the motion and Mr. Newgard seconded. The motion was approved unanimously.

**Review and consider approval of Invoice for Services**

Ms. DewBerry moved the meeting on to the next action item: consider and act on approval of the Invoice for Services for the period ending September 30, 2008. Ms. Stephenson referred to the invoice for services rendered from May through the beginning of September. The invoice totals $8,780.89. Ms. Painter made a motion to approve the invoice reimbursing the Washington State Housing Finance Commission for expenses incurred. Mr. Newgard seconded the motion. The motion was approved unanimously.

**Review Draft Audit Report**

Ms. DewBerry introduced Ms. Stephenson to present the draft audit report. Ms. Stephenson noted that the report contains some proofing edits. She introduced Ms. Tish of Moss Adams to present additional information on the draft audit report. Ms. Tish thanked Ms Stephenson and the staff and noted that the audit went very well. She stated that her team had received the draft financial statement prepared by management very early on in field work. The audit field work has been completed. Ms. Tish stated that the audit opinion would have a date signed by Friday or early the next week. They are still waiting for the second partner review. Once the audit report is signed and given approval by the Authority board, they will be ready to issue the audit opinion.

Ms. Tish noted that this year, TSA was impacted by GASB 48. This requires that any new bonds have to be accounted for by including the future revenue stream on the balance sheet as a receivable with a related deferred charge. The standard allowed TSA to choose whether to elect to use it for the existing bond issue or continue showing receivables due as we have in the past. Management has chosen to not retroactively implement this standard. In other words, the financial

*November 12, 2008* 8

TSA_013344

statements have not been changed. She noted that research showed most other Tobacco Authorities in the country were leaning toward the current presentation. Ms. Stephenson stated that a memo had been mailed out showing additional information on research done by Authority staff. Research showed that no added value was realized by making this change.

Ms. Tish stated that a number of new auditing standards are applicable to TSA this year. These standards would be invisible to almost everyone except the auditors. It was required that the auditors document system descriptions pertaining to the structure of internal control of all the TSA accounting systems. In general, the new auditing standards did not have as much of an impact as they would for a manufacturing company because there is only one bond issue. Additional time was spent on the controls in place governing each of the accounting cycles. This was documented. The Commission and the Authority share a lot of the accounting systems, which increased the efficiency of the audit. She noted that an unqualified opinion on the financial statements will be issued within one week. Also, a management letter of recommendation will be issued. No material weaknesses in internal control and no significant deficiencies were noted.

The items in the report are deemed to be minor observations. The first two pertain to financial accounting and reporting. The first relates to the actual calculation of the tobacco settlement revenues, which is a very complex estimate. In 2007, a strategic payment was added for the first time. Unfortunately, an incorrect percentage was used. This year the error was noted and an audit adjustment of 2.7 million dollars was proposed. Also, an estimated 3.5 million dollar amount that applied to 2007 was book kept into the 2008 financial statements. In order to have shown it in 2007, a reissue or restatement of the prior year financial statement would have been required. Because the amount is quite small in relation to the total assets, the auditors agreed with management that it did not make sense to recall last year's reports. It was appropriate to run the additional 3.5 million through the 2008 financial statements. The main reasons are that it is a relatively small dollar amount and an estimate. Ms. Tish noted that to the users of the

*November 12, 2008*                                                                                              9

TSA_013345

financial statement, the critical component is the repayment of the bonds. Lastly, the error is a timing error and is self-correcting. As of June 30, 2008, net assets are appropriately stated.

Ms. Painter asked for a clarification of the additional analytical tools referenced in the auditor's recommendation. Ms. Tish noted that the statement was somewhat broad and that in 2007 the error would have been difficult to catch due to a low percentage of cigarette sales. This year the amounts were higher and if analytical tests were applied, the difference could have been detected. This deficiency is not believed to be significant. Ms. Tish stated that she would be comfortable with whatever management decides. The basic recommendation is to use a tool that places emphasis on detection and control. Ms. Painter asked if there were any specific tools that she could recommend to staff. Ms. Tish stated that specific tools have been recommended.

The second recommendation pertains to formalizing the comprehensive accounting policies and procedures manual. In the past this has been a secondary concern. Now that there has been a successful implementation of new information technology to the systems, it is recommended that the policies be formalized. Ms. Stephenson noted that staff is excited to have some stability within the system. Ms. Tish briefly described the section relating to information technology. She noted that the letter will be held until they receive the management responses in writing. Ms. Tish referred to the last page of the report, which contains required communications between the auditors and the Board. It is the auditor's responsibility to audit the financial statements. Responsibility for the financial statements themselves and the notes to them rest with management. The auditors requested a management letter of representation which will be received prior to issuance.

GASB 48 will change going forward if additional bonds are issued. The TSR receivable is a complex management estimate which can swing by a few million here and there. The auditors believe that management has a very robust process in place around that estimate. Ms. Tish noted that the 3.5 million dollar audit

*November 12, 2008*                                                                                             10

TSA_013346

adjustment that applied to 2007 is shown on the statement as a past adjustment. It is not necessary to restate the 2007 adjustment, but because it affects the 2008 statements, it has been included.

Ms. Tish referred to the third note pertaining to the guaranteed investment contract (GIC). This GIC is normally considered a non-participating contract. As a result, it has been historically carried at cost. Until this year there is a rarely used phrase in the GASB statement that says: "non-participating contracts are carried at cost unless there is a change in the credit standing of the issuer." This statement does apply to the situation the Authority has with Lehman Brothers. Generally accepted accounting principles require that the Authority look through to the collateral and mark that investment to market. Market at June 30 was consistent with what it was at October 31. All of the monthly statements from U.S. Bank show that there has been no deterioration in the market since June. At June 30, the commercial paper was being carried at 97,000 dollars below cost. This is not a material amount and has not been recorded.

Ms. Tish noted that there were no disagreements with management. They are not aware of any complication that management would have held with other independent accountants. There were no major issues discussed prior to the signing of the engagement letter. There were no major difficulties encountered during the audit, although there were more issues than usual. There were no final questions on the financial statements or the audit.

| | |
|---|---|
| **Motion to Approve Draft Audit Report** | Ms. Stephenson requested the approval of the draft report with the understanding that the final report will be forwarded upon completion. Ms. DewBerry asked for a motion to approve the draft audit report. Ms. Painter moved for approval and Mr. Newgard seconded. The motion was approved unanimously. |
| **Tobacco Securitization Market Update** | Ms. Dewberry introduced Mr. Bonow to present the Tobacco Securitization Market Update. Mr. Bonow thanked the Authority on behalf of his colleagues for the selection of Public Financial Management as financial advisor. He noted that credit spreads in the Tobacco Securitization Market have widened dramatically in |

*November 12, 2008*                                                                 *11*

TSA_013347

the last several months. Bonds are being sold at a significant premium compared to issuers that have a higher credit rating. Yields in general have gone up. The market may get some renewed focus for several reasons. One reason is that in times of economic downturn, smoking rates go up which might lead to improvement in the tobacco settlement receipts. Also, many states and local jurisdictions that receive tobacco settlement receipts are considering securitizing unsecuritized portions of their payment streams. The market in general is not favorable for any bonds that have any particular credit stress or relatively low ratings. It is not a favorable market if you don't have a gilt edge credit rating.

Ms. Arnone thanked the Authority for appointing Barclays Capital as the senior manager. She stated that the tobacco securitization market, consisting of the high yield sector of a municipal market, has experienced as much pain as it has ever experienced. Anything that is not considered a high grade credit is suffering. Tobacco has underperformed as an asset class relative to other bonds. Investors who own the bonds have taken a hit and have been experiencing net redemption. A tobacco transaction done today that was unenhanced and secured exclusively by TSRs would be an incredibly difficult sale. The market continues to bear watching for any opportunity of a tightening of the credit spread.

Ms. Dewberry asked if there were any other comments. Mr. Bonow stated that he had no great news to report where the credit and capital markets are concerned.

**Trustee Report**

Ms. DewBerry introduced Ms. Kuykendall. Ms Kuykendall noted that on December 1, the trustee will do a redemption of bonds and include the projected amount of earnings. This year, due to the uncertainty of the number, they held back and are only doing a redemption for the actual cash in the redemption account. The redemption shown on the TSA update is $260,000. The amount of interest that is actually received will go to the semi-annual redemption in June of 2009. The next delivery date is December 1, 2008 and if Lehman redelivers, the Authority will be informed. Otherwise, funds from the commercial paper will be invested over night. After the five day waiting period, the Authority can give further direction on how to invest.

*November 12, 2008*                                                                                                                  12

TSA_013348