# EXHIBIT 14

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 Case No. |
|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Brothers Special Financing Inc. | 08-13888 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000018990

NOTE: This form should not be used to make a claim for an administrative expense arising *after* the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities. (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Tobacco Settlement Financing Corporation
c/o K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Attn: Eunice Rim, Esq.

Telephone number: (212) 536-4824   Email Address: Eunice.Rim@KLGates.com

☐ Check box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)
Filed on:_____

**Debtors' Ex. 71**

Name and address where payment should be sent (if different from above)
Tobacco Settlement Financing Corporation
641 Lexington Avenue, 3rd. Floor
New York. NY 10022
Attn: Genevieve D'Agostino

Telephone No.   (212) 688-4000   Email Address: GD'Agostino@nyhomes.org

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed: $_____119,690,196.70
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☒ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR. YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. Basis for Claim: NY TSF's Losses Under Reserve Fund Agreement dated June 19, 2003 and Reserve Fund Agreement dated Dec. 2, 2003 (See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor:_____
3a. Debtor may have scheduled account as:_____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of set off and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:_____
Value of Property: $_____   Annual Interest Rate_____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See instruction #6 on reverse side.)

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.
Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8)
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).
Amounts entitled to priority:
$_____

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FILED/RECEIVED
SEP 18 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
9/17/09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U.S.C. §§152 and 3571.

NY-702377-v1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
                                            :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | Case No. 08-13888 (JMP) |
| | : | |
| | : | (Jointly Administered) |
| Debtor. | : | |
| | : | |

-------------------------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF THE
## TOBACCO SETTLEMENT FINANCING CORPORATION AGAINST
## LEHMAN BROTHERS SPECIAL FINANCING INC. (CASE NO. 08-13888) (JMP)

      1.      The Tobacco Settlement Financing Corporation (the "TSF"), Lehman Brothers

Special Financing Inc. ("LBSF") and the Bank of New York ("BONY"), as trustee (the

"Trustee"), are parties to that certain Reserve Fund Agreement dated as of June 19, 2003 (the

"June 2003 RFA")[1] by and between TSF, LBSF and BONY and that certain Reserve Fund

Agreement dated as of December 2, 2003 (the "Dec. 2003 RFA" and together with the June 2003

RFA, the "RFAs") by and between, TSF, LBSF and BONY.  A copy of the RFAs will be

uploaded to http://www.lehman-claims.com (the "Claims Website"), on or before October 22,

2009 (the "Questionnaire Deadline"), as a part of the Derivatives Questionnaire required by the

Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice

Thereof and Approving the Proof of Claim Form entered by the United States Bankruptcy Court

for the Southern District of New York on July 2, 2009 in Case No. 08-13555 (the "Bar Date

Order").

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the June 2003 RFA and the Dec. 2003 RFA as specified herein.

2.      The RFAs served as the investment vehicles through which TSF invested certain reserve funds (the "Reserve Funds") that served as a source of backup payment for debt service owed on tobacco settlement bonds issued by the TSF in 2003. The RFAs allowed the TSF to manage its finances by increasing the predictability of its cash flow from earnings on TSF's investments to satisfy the liquidity reserve requirements of TSF's tobacco settlement securitization bonds.

3.      Under the terms of the June 2003 RFA, the TSF delivered a Scheduled Reserve Amount of $170,659,179.00 to LBSF, upon which LBSF purchased Qualified Securities on behalf of TSF that were delivered to the Trustee on certain set Deposit Dates. When such securities matured, the TSF would deliver the Scheduled Reserve Amount to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF was required to guarantee a rate of return to the TSF on the Scheduled Reserve Amount under the June 2003 RFA equal to a rate per annum of 3.722%, assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve 30 day months.

4.      Under the terms of the Dec. 2003 RFA, the TSF delivered a Scheduled Reserve Amount of $221,582,343.75 to LBSF, upon which LBSF purchased Qualified Securities on behalf of TSF that were delivered to the Trustee on certain set Deposit Dates. When such securities matured, the TSF would deliver the Scheduled Reserve Amount under the Dec. 2003 RFA to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF was required to guarantee a rate of return to the TSF on the Scheduled Reserve Amount equal to a rate per annum of 4.687%, assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve 30 day months.

5.      Lehman Brothers Holdings, Inc. ("LBHI") served as the credit support provider to
LBSF under both RFAs and guaranteed the payment of all amounts payable by LBSF to TSF
under the RFAs.  A copy of LBHI's guarantee of LBSF's payment obligations under the June
2003 RFA and the Dec. 2003 RFA will be uploaded to the Claims Website, on or before the
Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date
Order.

6.      LBHI filed a voluntary petition for relief under title 11 of the United States Code
on September 15, 2008.

7.      LBSF filed a voluntary petition for relief under title 11 of the United States Code
on October 3, 2008 (the "Petition Date").

8.      Under section 7.3(a) of both RFAs, a Lehman Event of Default occurs if Lehman
fails to cause a Qualified Dealer to deliver Qualified Securities on any Deposit Date, with a
Purchase Price equal to the Scheduled Reserve Amount for such Deposit Date, and such failure
is not cured within the Lehman Cure Period.  See June 2003 RFA §7.3(a) and Dec. 2003 RFA
§7.3(a).

9.      By separate letters (the "Default Notices"), each dated September 14, 2009, TSF
notified LBSF of its defaults under sections 7.3(a) and (d) of each RFA as a result of (a) LBSF's
failure to deliver or cause to be delivered Qualified Securities on November 28, 2008 and May
29, 2009 in accordance with sections 2.1 and 2.2 of the RFA, which failure has continued beyond
the applicable Lehman Cure Period, and (b) the institution by LBSF of a proceeding under title
11 of the United States Code on the Petition Date.  A copy of the Default Notices will be
uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the
Derivatives Questionnaire required by the Bar Date Order.

10.    As a result of such defaults under both RFAs, which are continuing, TSF intends
to file a motion requesting that the Court compel LBSF to assume or reject the RFAs or,
alternatively seeking a modification of the automatic stay to terminate the RFAs (the "Motion").

11.    Pursuant to section 7.6(a) of the RFAs, if a Lehman Event of Default occurs under
section 7.3(a) of the RFAs, then the TSF has the right to apply the Scheduled Reserve Amount to
purchase Qualified Securities and to make a written demand for payment of TSF's losses, as
calculated pursuant to section 7.7(b) of the RFA. See June 2003 RFA §7.6(a) and Dec. 2003
RFA §7.6(a).

12.    Section 7.7(b) of the RFAs provide:

> If there is a Lehman Event of Default as described in Section
> 7.3(a) hereof, the amount of losses payable by Lehman upon
> demand therefore pursuant to Section 7.6(a) shall equal the
> Guaranteed Interest.  In the event that Lehman has paid the
> Guaranteed Interest amount in connection with any Deposit Date,
> the Issuer shall pay to Lehman on the next succeeding Deposit
> Date an amount equal to the excess of the Guaranteed Interest so
> paid over the interest rate the Trustee actually earned by investing
> the related scheduled reserve amount in Qualified Securities on an
> overnight basis (or if the Trustee fails to invest such scheduled
> reserve amount in Eligible Investments (as defined in the
> Indenture) on an overnight basis, the amount of interest the Trustee
> would have earned on such scheduled reserve amount had the
> Trustee invested on an overnight basis).

(the "Section 7.7(b) Loss")

13.    Under section 7.6(b) of both RFAs, if a Lehman Event of Default occurs due to
Lehman becoming Insolvent or because LBHI's rating falls below "BBB-" or "Baa3" by S&P or
Moody's, respectively, the TSF can immediately terminate the RFAs by giving notice to Lehman
with a copy to the Trustee. See June 2003 RFA §7.6(b) and Dec. 2003 RFA §7.6(b).

14.     Pursuant to sections I and 7.3 of the RFAs, TSF is the Burdened Party due to the

occurrences of the Lehman Events of Default under sections 7.3(a), (d) and (f).  TSF, as the

Burdened Party, has the right to calculate the Termination Amounts.  <u>See</u> June 2003 RFA §§ I,

7.3 and Dec. 2003 RFA §§ I and 7.3.

15.     Section I of the RFAs define the Termination Amount as:

> an amount, as determined by [TSF] reasonably and in good faith
> on the basis of the arithmetic mean of quotations from at least three
> Dealers of the amount, if any, that each such Dealer would require
> [TSF] to pay to the Dealer . . . or would pay to the [TSF] . . . in
> consideration of such Dealer entering into an agreement with the
> [TSF] . . . which would have the effect of preserving for the [TSF]
> the economic equivalent of its investment rights under [the RFA]
> for the period commencing on the termination date of [the RFA]
> and terminating on the last Bond Payment Date set forth in Exhibit
> A. . .

16.     Under Section I of the RFAs, if the TSF is unable to obtain three Dealer

quotations to determine the Termination Amount due under each RFA, the Termination Amount

is:

> the amount as reasonably determined in good faith by the [TSF], to
> be [TSF's] total losses and costs . . . in connection with the
> termination of [the RFA], including any loss of bargain, cost of
> funding or, at the election of [the TSF] but without duplication,
> any loss or cost incurred as a result of its terminating, liquidating,
> obtaining or reestablishing any hedge or related trading position,
> and;
>
> <u>provided further</u>, <u>however</u>, that in any event the Termination
> Amount shall also include (A) any unpaid amounts due as of the
> date of termination of this Agreement (including any amounts due
> under Section 7.7 hereof) and (B) if such Termination Amount is
> being paid in connection with a termination of this Agreement
> following an Event of Default or if any Termination Amount
> otherwise due hereunder is not paid when due, the Termination
> Amount shall also include incidental costs and expenses incurred
> by the Burdened Party in connection with such termination and the
> enforcement of its rights hereunder (including costs of collection
> and reasonable attorneys' fees).  Any determination of the

Termination Amount by the Burdened Party shall be conclusive
and binding on the parties hereto absent manifest error. . .

(the "Total Loss").

17.    Each RFA is a "securities contract" as that term is defined under section 741(7) of

title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  Pursuant

to Section 562(a) of the Bankruptcy Code, the damages flowing from the rejection of a securities

contract is calculated as of the date that the securities contract is rejected.  See 11 U.S.C. §

562(a).

18.    If the court grants TSF's Motion, the RFAs will be deemed rejected as of the date

that the Court enters an Order compelling LBSF to reject the RFAs the ("Rejection Date").  If the

Court grants TSF's motion and compels LBSF to reject the RFAs, TSF has until the later of (a)

September 22, 2009 or (b) 45 days after the entry of the Order compelling LBSF to reject the

RFAs, to file a proof of claim against LBSF.  Out of an abundance of caution, TSF files this

proof of claim estimating the amount of its losses under both RFAs as of September 17, 2009,

which amounts the TSF will amend upon the entry of an Order compelling the rejection of the

RFAs to reflect the Total Loss as of the Rejection Date.

19.    As of September 17, 2009, TSF's Total Loss under the June 2003 RFA is

estimated to be $41,243,786.26, which includes TSF's Section 7.7(b) Loss under the June 2003

RFA in the amount of $4,758,898.26 and TSF's termination losses under the June 2003 RFA in

the amount of $36,484,888.00.

20.    As of September 15, 2009, TSF's Total Loss under the Dec. 2003 RFA is

estimated to be $78,446,410.44, which includes TSF's Section 7.7(b) Loss under the Dec. 2003

RFA in the amount of $7,878,617.44 and TSF's termination losses under the Dec. 2003 RFA in

the amount of $70,567,793.00.

21.    Accordingly, as of September 17, 2009, the estimated aggregate claim owing by LBSF under the June 2003 RFA and the Dec. 2003 RFA is $119,690,196.70 (the "Claim").  A copy of a memorandum prepared by the Swap Financial Group detailing TSF's calculation of TSF's Total Loss under each RFA as of September 17, 2009 will be uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date Order.  If the Court enters an Order compelling the rejection of the RFAs prior to the Questionnaire Deadline, the TSF will upload an updated memorandum calculating TSF's Loss under each RFA as of the date such Order is entered.

22.    TSF reserves its rights to seek incidental costs and expenses incurred in connection with the termination and enforcement of TSF's rights under the RFAs upon the entry of an Order compelling LBSF's rejection of the RFAs.

23.    The filing of this Claim shall not constitute: (a) a waiver or release of any rights of TSF against LBSF, (b) a waiver of the right of TSF to a trial by jury in any proceedings so triable in LBSF's bankruptcy proceeding or any controversy or proceedings related to LBSF's bankruptcy proceeding, (c) an election of remedies, or (d) a waiver or limitation of any procedural or substantive rights or any procedural or substantive defenses to any claim that may be asserted against TSF by LBSF, the Official Committee of Unsecured Creditors or any other party.  In addition, TSF expressly reserves the right to withdraw or amend this Claim for any reason whatsoever.

# *Swap Financial Group*

*Swap Financial Group, LLC*
*76 South Orange Avenue, Suite 6*
*South Orange, NJ 07079*
*(973) 378-5500, fax (973) 378-5575*

## MEMORANDUM

| | |
|---|---|
| To: | Gen D'Agostino<br>Tobacco Settlement Financing Corporation (New York) |
| From: | Peter Shapiro, James Vergara |
| Concerning: | Calculation of Loss for TSFC's Two Reserve Fund Agreements with Lehman Brothers Special Financing, Inc. |
| Date: | September 17, 2009 |

Per your request, Swap Financial Group ("SFG") has prepared a Calculation of Loss for the Reserve Fund Agreements ("RFAs") between the Tobacco Settlement Financing Corporation (New York) ("TSFC") and Lehman Brothers Special Financing, Inc. ("LBSF"). Under the terms of the RFAs, TSFC, as the Burdened Party, has the right to determine a Termination Amount based on "the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer or would pay to the Burdened Party in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its investment rights under this Agreement...." On September 11, 2009, SFG, on behalf of TSFC, distributed a term sheet, execution copies of the RFAs and credit and financial information on TSFC to 14 Dealers in order to collect quotations to determine the Termination Amount. Through September 16, 2009, the following responses were received from Dealers that received the quotation package:

| Dealer | Response | Dealer | Response |
|---|---|---|---|
| Bank of America | Pass | Merrill Lynch | Pass |
| Bank of New York | Pass | Morgan Stanley | Pass |
| Barclays Bank | Pass | PNC Bank | Pass |
| Citi | Pass | Royal Bank of Canada | Pass |
| Deutsche Bank | Pass | UBS | Pass |
| Goldman Sachs | Pass | Wachovia Bank | Pass |
| JPMorgan | Pass | Wells Fargo Bank | Pass |

Given that TSFC was unable to obtain quotations, the Agreement further describes the Termination Amount "as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs, or gains, in connection with a termination, including any loss of bargain, cost of funding, or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position...."

TSFC (NY) Reserve Fund Agreements – Calculation of Loss
September 17, 2009
Page 2

Under the terms of the RFAs, TSFC delivered to LBSF amounts equal to the "Scheduled Reserve Amounts" or $170,659,179 for the Series 2003A RFA and $221,582,344 for the Series 2003B RFA in exchange for Eligible Securities to deposit with the Trustee to satisfy the debt service reserve requirements of its Series 2003A and 2003B Tobacco Settlement Asset-Backed Bonds (State Contingency Contract Secured) (the "Bonds"). When the securities matured, TSFC would again deliver the "Scheduled Reserve Amounts" to LBSF in exchange for new securities. For the periodic purchase of securities, LBSF provided TSFC with guaranteed rates of return on the "Scheduled Reserve Amounts." Under the 2003A RFA, which had a scheduled termination date of June 1, 2023, LBSF provided TSFC with a guaranteed rate of return of 3.722%. Under the 2003B RFA, which had a scheduled termination date of June 1, 2023, LBSF provided a guaranteed rate of 4.687%.

Lehman Brothers Holdings, Inc., the credit support provider for LBSF filed for bankruptcy on September 15, 2008 and LBSF ceased to perform under terms of the RFA. When the securities in the RFA matured, TSFC was left to reinvest the proceeds in the open market, at significantly lower yields than the guaranteed rates originally offered by the RFAs. LBSF itself filed for bankruptcy on October 3, 2008. For the purpose of this Calculation of Loss, SFG has valued the RFAs as of the close of business on September 16, 2009.

In order to calculate TSFC's Loss, we began by analyzing the RFA cash flows. Under the RFAs, Lehman guaranteed fixed rates of return for TSFC's reserve funds, to be realized in the form of the discount on the securities that LBSF agreed to deliver to the Trustee on a periodic basis. The scheduled term of the RFAs extended through June 1, 2023, though the Agreement could be terminated prior to that date, if, among other things, any of the parties to the RFAs defaulted on their obligations. To value the cash flows under the RFAs, the appropriate method is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 3.722% for the 2003A RFA and 4.687% for the 2003B RFA and the other payer (TSFC) would pay floating rates.

The use of a LIBOR plus spread analysis with an interest rate swap to value agreements like the RFAs is the broadly accepted market methodology. In the case of the RFAs, the value of the floating leg is of great importance, since the value of the fixed leg is a given. The value of the floating leg should represent the value of the securities which are going to be delivered – short-term obligations (treasuries, agencies, commercial paper or pre-refunded municipal bonds) rated at least F-1 by Fitch Ratings and A-1 by Standard & Poor's. In addition, a concentration limit was set on the types of securities that could be delivered under the RFA. This would make deliveries more costly to the provider and more valuable to TSFC than a similar agreement with no such limitation. The value of the floating leg should also incorporate the ongoing credit risk of the RFAs as agreements in the first loss position of municipal tobacco securitizations. Though TSFC's bonds enjoy the additional security of State Contingency Contracts, the reserve funds (and their replenishment) do not. To complete the Calculation of Loss, SFG has also included the profit or spread component that would be charged by another provider to replace the RFA, if such a replacement agreement could be found.

TSFC (NY) Reserve Fund Agreements – Calculation of Loss
September 17, 2009
Page 3

## *Commercial Paper Spreads*

Given that commercial paper likely provided the "cheapest to deliver" option for LBSF
under the RFAs, we began our analysis with relevant commercial paper trading spreads.
The trading relationship between commercial paper and LIBOR has been volatile since
the beginning of the financial crisis. This has been even more dramatic in the case of the
structured commercial paper that was likely delivered under the RFAs. Since January
2008, the spread relationship between the Federal Reserve's H.15 Asset-Backed
Commercial Paper Index (H15A090Y on Bloomberg) and USD Three-Month LIBOR has
shown swings of nearly 320 basis points. (see Chart 1, below) This comes after a very
stable trading relationship during the beginning of the decade with spreads within a
band of approximately 34 basis points. (see Chart 2, below) The spread currently stands
at 2.8 basis points. Given that actual deliveries made by LBSF likely traded at a positive
spread to the H.15 Index but also taking into account the benefits to TSFC of the delivery
concentration limit, we have assumed a spread to LIBOR for commercial paper delivered
under the RFAs of 0.278% or 25 basis points greater than the current spread of the H.15
Index to LIBOR.

**Chart 1**



TSFC (NY) Reserve Fund Agreements – Calculation of Loss
September 17, 2009
Page 4

**Chart 2**



## Charges for Municipal Tobacco Credit

Over the past 18 months, the value placed on the credit risk of municipal tobacco bonds
has also show significant volatility, initially escalating sharply then easing of late. The
escalation in the valuation of risk for these assets was greater than the increases in risk
valuation that occurred for many other forms of credit-based fixed income assets during
the current financial crisis. Given the TSFC's bonds possess the enhanced security of
State Contingency Contracts, their own trading value does not provide an accurate
assessment of stand-alone municipal tobacco credit risk.

The Tobacco Settlement Financing Corporation (NJ) 5% bonds maturing in June 2041
(CUSIP: 888808DF6) represent a benchmark issue (the $3.6 billion transaction was
completed in January 2007) and provide a better illustration of the relative value of
municipal tobacco credit. The bonds are currently trading at a yield of 7.136%. The
spread of that bond compared to the Bloomberg 30-Year General Purpose Revenue Bond
Index (A-Rated) (486M30Y on Bloomberg) has also exhibited volatility and widening,
though conditions have improved of late (see Chart 3, below). On September 16, 2009
this spread was 1.666%. Given that credit protection in the form of credit default swaps
is not available for these specific bonds or any municipal tobacco bonds in the market, it
is fair to estimate that a Dealer would value municipal tobacco risk at a level greater
(wider) than the above-referenced spread. For the purposes of our analysis, we have
assumed a value for the risk of the municipal tobacco credit of 2.166% or 0.50% greater
(wider) than the current spread.

TSFC (NY) Reserve Fund Agreements – Calculation of Loss
September 17, 2009
Page 5

**Chart 3**



### Profit Component

Lastly, our analysis takes into account the profit or spread component that would be included in any replacement investments if TSFC were able to replace the economic bargain afforded to it by the RFAs. Given the challenging nature of the municipal tobacco credit, as well as the widening of bid-offer spreads in the fixed income markets in general, and in the municipal derivatives market in specific, we would expect a dealer to charge a profit component on the order of 0.25% to provide a replacement RFA, if such an agreement could even be replicated.

### Calculation of Loss

In the table below, we summarize the various components that would be included in calculating the floating rate for the RFA, which would be incorporated into the Calculation of TSFC's Loss.

|   | Fixed Leg | Floating Leg (Spread to LIBOR) | | | |
|---|---|---|---|---|---|
| RFA | Fixed Rate | CP Spread | Credit Spread | Profit | Total Spread to LIBOR |
| 2003A | 3.722% | 0.278% | (2.166%) | (0.25%) | (2.138%) |
| 2003B | 4.687% | 0.278% | (2.166%) | (0.25%) | (2.138%) |

Using the spreads to LIBOR described above for the floating leg of our LIBOR plus spread swap analysis, SFG arrived at Loss values of $36,484,888 for the 2003A RFA and $70,567,793 for the 2003B RFA, in TSFC's favor.

H
A
N
D

D
E
L
I
V
E
R
Y

_Neal Forook k_
**RECEIVED BY:**

_9/18/9_
/**DATE**

_1:21_
**TIME**