EXHIBIT 21

| | **PROOF OF CLAIM** |
|---|---|

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY  10150-5076

In Re:                                                          Chapter 11
Lehman Brothers Holdings Inc.                    Case No. 08-13555

Name of Debtor Against Which Claim is Held     Case No. of Debtor

Lehman Brothers Special Financing Inc.          08-13888

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities. (See definition on reverse side.)

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000037355

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Washington State Tobacco Settlement Authority
c/o K&L Gates LLP
925 Fourth Avenue
Suite 2900
Seattle, Washington 98104
Attn: Marc L. Barreca, Esq.

Telephone number:   (206) 370-7815  Email Address: Marc.Barreca@KLGates.com

Name and address where payment should be sent (if different from above)

Telephone No.                              Email Address:

☒ Check box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _15016_
*(If known)*

Filed on: _9/17/09_

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1.   **Amount of Claim as of Date Case Filed:** $ ___47,063,714.01___
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☒ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2.   **Basis for Claim:** ___WA Tobacco Settlement Authority's Loss Under the Reserve Fund Agreement dated Nov. 5, 2002___
(See instruction #2 on reverse side.)

3.   **Last four digits of any number by which creditor identifies debtor:**_____
3a.  Debtor may have scheduled account as:_____
(See instruction #3a on reverse side.)

4.   **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of set off and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate      ☐ Motor Vehicle      ☐ Other
Describe:_____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

6.   **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7.   **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8.   **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SENT ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

5.   **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(_____).

Amounts entitled to priority:

$_____

**FOR COURT USE ONLY**

**FILED / RECEIVED**

OCT 12 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
10/9/09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
[signature]  10/9/09

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U.S.C. §§152 and 3571.

NY-698155-v1

EXHIBIT
Lehman 20
ALL-STATE LEGAL®

Joint Ex. 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

In re                                    :        Chapter 11

LEHMAN BROTHERS SPECIAL FINANCING INC.   :        Case No. 08-13888 (JMP)

                                         :        (Jointly Administered)

                 Debtor.                 :

                                         :

-------------------------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF THE
## WASHINGTON STATE TOBACCO SETLLEMENT AUTHORITY AGAINST
## LEHMAN BROTHERS SPECIAL FINANCING INC. (CASE NO. 08-13888) (JMP)

1.      This Proof of Claim amends and supercedes Claim No. 15016 filed by the

Washington State Tobacco Settlement Authority (the "TSA") against Lehman Brothers Special

Financing Inc. ("LBSF") on September 17, 2009.

2.      The TSA, LBSF and U.S. Bank, N.A., as trustee (the "Trustee"), are parties to

that certain Reserve Fund Agreement dated as of November 5, 2002 (the "RFA")[1] by and

between TSA, LBSF and U.S. Bank, N.A.  A copy of the RFA will be uploaded to

http://www.lehman-claims.com (the "Claims Website"), on or before October 22, 2009 (the

"Questionnaire Deadline"), as a part of the Derivatives Questionnaire required by the Order

Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice

Thereof and Approving the Proof of Claim Form entered by the United States Bankruptcy Court

for the Southern District of New York on July 2, 2009 in Case No. 08-13555 (the "Bar Date

Order").

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the RFA.

3.      The RFA served as an investment vehicle through which TSA invested certain reserve funds (the "Reserve Fund") that served as a source of backup payment for debt service owed on tobacco settlement bonds issued by the TSA in 2002. The RFA allowed the TSA to manage its finances by increasing the predictability of its cash flow from earnings on TSA's investments to satisfy the liquidity reserve requirements of TSA's tobacco settlement securitization bonds.

4.      Under the terms of the RFA, the TSA delivered a Scheduled Reserve Amount of $45,534,106.25 to LBSF, upon which LBSF purchased Qualified Securities on behalf of TSA that were delivered to the Trustee on certain set Deposit Dates. When such securities matured, the TSA would deliver the Scheduled Reserve Amount to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF was required to guarantee a rate of return to the TSA on the Scheduled Reserve Amount equal to a rate per annum of 4.484%, assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve 30 day months.

5.      Lehman Brothers Holdings, Inc. ("LBHI") served as the credit support provider to LBSF under the RFA and guaranteed the payment of all amounts payable by LBSF to TSA under the RFA. A copy of LBHI's guaranty of LBSF payment obligations under the RFA will be uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date Order.

6.      LBHI filed a voluntary petition for relief under title 11 of the United States Code on September 15, 2008.

7.      LBSF filed a voluntary petition for relief under title 11 of the United States Code on October 3, 2008 (the "Petition Date").

8.      By letter dated December 18, 2008, TSA notified LBSF of its defaults under sections 7.3(a) and (d) of the RFA (the "Default Notice") as a result of (a) LBSF's failure to deliver or cause to be delivered Qualified Securities on December 1, 2008 in accordance with Sections 2.1 and 2.2 of the RFA, which failure has continued beyond the applicable Lehman Cure Period, and (b) the institution by LBSF of a proceeding under Title 11 of the United States Code on the Petition Date. A copy of the Default Notice will be uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date Order.

9.      On January 15, 2009, TSA filed the Motion of the Tobacco Settlement Authority for an Order (A) Compelling Lehman Brothers Special Financing Inc. to Assume or Reject an Executory Contract Pursuant to 11 U.S.C. §365(d)(2) or Alternatively, (B) Modifying the Automatic Stay to Allow the Tobacco Settlement Authority to Terminate the Agreement.

10.     On March 25, 2009 (the "Rejection Date"), the Court entered an Order Authorizing Rejection of Reserve Fund Agreement Pursuant to 11 U.S.C. §365(a) (the "Rejection Order") which deemed the RFA rejected. A copy of the Rejection Order will be uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date Order.

11.     Under section 7.3(a) of the RFA, a Lehman Event of Default occurs if Lehman fails to cause a Qualified Dealer to deliver Qualified Securities on any Deposit Date, with a Purchase Price equal to the Scheduled Reserve Amount for such Deposit Date, and such failure is not cured within the Lehman Cure Period. See RFA § 7.3(a).

12.     Pursuant to section 7.6(a) of the RFA, if a Lehman Event of Default occurs under section 7.3(a) of the RFA, then the TSA has the right to apply the Scheduled Reserve Amount to

purchase Qualified Securities and to make a written demand for payment of TSA's losses, as calculated pursuant to section 7.7(b) of the RFA. <u>See</u> RFA § 7.6(a).

13.    Section 7.7(b) of the RFA provides:

> If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefore pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Scheduled Reserve Amount had the Scheduled Reserve Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount in Permitted Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Scheduled Reserve Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Scheduled Reserve Amount had the Trustee complied with the requirements of Section 2.4 hereof).

(the "Section 7.7(b) Loss")

14.    Under section 7.6(c) of the RFA, if a Lehman Event of Default occurs due to Lehman becoming Insolvent, the TSA can immediately terminate the RFA by giving notice to Lehman with a copy to the Trustee. <u>See</u> RFA § 7.6(c).

15.    Section 7.6 of the RFA also provides, in relevant part:

> [I]f Lehman fails to determine the Termination Amount within three business days of written notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer shall make such determination as if it were Lehman and the amount as so determined by the Issuer shall for purposes of this Section 7.6 be deemed the Termination Amount.

16.    Pursuant to sections I and 7.3 of the RFA, TSA is the Burdened Party due to the occurrences of the Lehman Events of Default under Sections 7.3(a) and (d). TSA, as the Burdened Party, has the right to calculate the Termination Amount. <u>See</u> RFA §§ I, 7.3.

17.    Section I of the RFA defines the Termination Amount as:

an amount, as determined by [TSA] reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require [TSA] to pay to the Dealer . . . or would pay to the [TSA] . . . in consideration of such Dealer entering into an agreement with the [TSA] . . . which would have the effect of preserving for the [TSA] the economic equivalent of its rights under [the RFA] for the period commencing on the termination date of [the RFA] and terminating on the last Bond Payment Date set forth in Exhibit A. .

18.     Under Section I of the RFA, if the TSA is unable to obtain three Dealer quotations to determine the Termination Amount, the Termination Amount is:

the amount as reasonably determined in good faith by the [TSA], to be [TSA's] total losses and costs . . . in connection with the termination of [the RFA], including any loss of bargain, cost of funding or, at the election of [the TSA] but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error. . .

(the "Total Loss").

19.     The RFA is a "securities contract" as that term is defined under Section 741(7) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Pursuant to Section 562(a) of the Bankruptcy Code, the damages flowing from the rejection of a securities

contract is calculated as of the date that the securities contract is rejected. See 11 U.S.C. § 562(a).

20.    As of the Rejection Date, the TSA's Total Loss and, therefore, its net aggregate claim against LBSF, is $47,063,714.01(the "Claim"), which includes TSA's Section 7.7(b) Loss in the amount of $553,080.02, TSA's termination losses in the amount of $46,437,610.00 and TSA's incidental costs and expenses incurred in connection with the termination and enforcement of TSA's rights under the RFA of $73,023.99 (the "Costs"). A copy of a memorandum prepared by the Swap Financial Group detailing TSA's calculation of TSA's Total Loss, along with a schedule of TSA's Costs, will be uploaded to the Claims Website, on or before the Questionnaire Deadline, as a part of the Derivatives Questionnaire required by the Bar Date Order.

21.    The filing of this Claim shall not constitute: (a) a waiver or release of any rights of TSA against LBSF, (b) a waiver of the right of TSA to a trial by jury in any proceedings so triable in LBSF's bankruptcy proceeding or any controversy or proceedings related to LBSF's bankruptcy proceeding, (c) an election of remedies, or (d) a waiver or limitation of any procedural or substantive rights or any procedural or substantive defenses to any claim that may be asserted against TSA by LBSF, the Official Committee of Unsecured Creditors or any other party. In addition, TSA expressly reserves the right to withdraw or amend this Claim for any reason whatsoever.

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re:                                          : Chapter 11
                                                :
LEHMAN BROTHERS HOLDINGS, INC.,                 : Case No. 08-13555 (JMP)
et al.                                          :
                                                :
                           Debtors.             : (Jointly Administered)

-------------------------------------------------------x

## ORDER AUTHORIZING REJECTION OF RESERVE FUND
## AGREEMENT PURSUANT TO 11 U.S.C. § 365(a)

Upon the motion dated January 15, 2009 of the Washington State Tobacco

Settlement Authority ("TSA"), seeking entry of an order compelling Lehman Brother Special

Financing Inc. ("LBSF"), a chapter 11 debtor in the above-referenced jointly administered cases,

to assume or reject an executory contract pursuant to 11 U.S.C. § 365(d)(2) (the "Motion"); and

it appearing that notice of the Motion was good and sufficient under the circumstances; and

LBSF having determined to reject the executory contract identified below; and after due

deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that LBSF hereby is authorized to reject the Reserve Fund Agreement

dated as of November 5, 2002, by and among TSA, LBSF and U.S. Bank, N.A. (the "RFA"), and

the RFA be and hereby is deemed rejected pursuant to 11 U.S.C. § 365(a); and it is further

ORDERED that any claim arising from the rejection of the RFA shall be filed by

the later of (a) thirty (30) days from the date of this Order or (b) the bar date fixed by this Court

for filing Proofs of Claim in the above-referenced cases.

Dated: New York, New York
       March 25, 2009

                                   *s/ James M. Peck*
                                   UNITED STATES BANKRUPTCY JUDGE

EXECUTION COPY

# RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of November 5, 2002 by and among TOBACCO SETTLEMENT AUTHORITY, an independent public instrumentality of the State of Washington (the "Issuer"), U.S. BANK, N.A., a national banking association, as Trustee under the Indenture as defined herein (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.           DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $517,905,000 Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002.

"Burdened Party" means, (i) in the case of (A) an Issuer Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means November 5, 2002.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith and reasonably acceptable to the Issuer (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

EXECUTION COPY

"Debt Service Payment" means (i) a scheduled payment of maturing principal of or interest on the Bonds, including any such payment in connection with Sinking Fund Installments (as defined in the Indenture), but not including any such payment designated in the Indenture as a Turbo Redemption (as defined in the Indenture) and excluding any such payment in connection with any other redemption of the Bonds, other than a mandatory clean-up redemption described in Section 404(i) of the Indenture, or (ii) a payment of principal of or interest on the Bonds in connection with an Extraordinary Prepayment (as defined in the Indenture) following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately succeeding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means non-callable and non-prepayable (a) direct obligations of the United States of America including only notes, bonds, bills or certificates of indebtedness, (b) senior debt and/or guaranteed mortgage pass-through obligations of the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, any Federal Home Loan Bank, and the Federal Farm Credit System, or (c) commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer thereof is subject to U.S. law; additionally, if the maturity date of the commercial paper tendered is 100 days of more, the issuer thereof must have long-term debt ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch.

"Fitch" means Fitch Ratings, Inc, its successors and assigns.

"Guaranteed Rate" means a rate per annum equal to 4.484% assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, upon which it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or

EXECUTION COPY

delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation which the Issuer relating to this Agreement, (b) any assertion in any proceeding, forum or action by the Issuer, in respect of the Issuer or in respect of any entity located or organized under the laws of the territory in which the Issuer is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Indenture" means the Indenture dated as of October 1, 2002 by and between the Issuer and the Trustee.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman, and which, as of the date of this Agreement, has long-term senior unsecured debt rated A2 by Moody's and A by Standard & Poor's.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

RFA: 413853L/413879L/413871L

3

EXECUTION COPY

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Mandatory Cleanup Call" means a mandatory redemption of the Bonds in whole equal to 100 percent of the principal amount being redeemed at any time that the available amounts on deposit in the Accounts (as defined in the Indenture) (other than the Rebate Account, the Operating Account, the Operating Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued interest on, the Bonds.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that Qualified Security, provided that the Market Value of any Qualified Security shall in no event exceed the lesser of the Maturity Amount thereof and the Purchase Price thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Moody's" means Moody's Investors Service, Inc, its successors and assigns.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Liquidity Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, $45,534,106.25, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption; provided, however, such Scheduled Reserve Amount shall be amended with respect to this Agreement upon a withdrawal to make a Debt Service Payment or upon any replenishment of any such withdrawal.

EXECUTION COPY

"Specified Indebtedness" means any general obligation of the Issuer (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money in excess of $5,000,000.

"Standard & Poor's" means Standard & Poor's, a division of The McGraw-Hill Companies, its successors and assigns.

"Termination Amount" means an amount, as determined by the Burdened Party reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)    if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount

EXECUTION COPY

otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

## SECTION II.          PURCHASE AGREEMENT

Section 2.1     Purchase and Sale of Qualified Securities.

(a)      Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer and shall be sold without recourse and free and clear of all liens, claims and encumbrances of Lehman or any Qualified Dealer or any third party.

(b)      If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2     Delivery; Payment.

(a)      All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof or such other account designated by the Trustee in writing to Lehman from time to time, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)      (i)      Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities. The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security and any other information contained in the Delivery Notice.

EXECUTION COPY

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    Subsequent Deliveries.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that such additional Qualified Securities shall be delivered to the Trustee so that the purchase price of such Qualified Securities shall equal the Maturity Amount (at a zero yield) and the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment) and such deliveries may occur no more frequently than twice in any six month period ending on a Bond Payment Date. Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof. Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the purchase price thereof in the manner required by Section 2.2(b)(ii) hereof. Neither Lehman nor any Qualified Dealer shall have any right of substitution of any Qualified Securities previously delivered and sold to the Trustee in connection with this Agreement.

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, invest the related Scheduled Reserve Amount on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee, to the extent directed by the Issuer pursuant to the Indenture, shall invest the related Scheduled Reserve Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

RFA: 413853L/413879L/413871L

EXECUTION COPY

(b)     Except as provided in Sections 7.3 and 7.6 hereof, no failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)     If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal.

(b)     If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a) hereof, within one (1) year of such withdrawal, (i) sufficient funds are deposited into the Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Issuer has notified the Trustee in writing (with a copy to Lehman) that it intends, in compliance with the Indenture, to deposit sufficient funds in the Reserve Fund to replenish the Reserve Fund, then the Trustee shall, within two Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities (at the Guaranteed Rate) in the amount stated in the Reserve Fund Replenishment Notice duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof. In the event the Issuer fails to replenish the Reserve Fund within one year of a withdrawal and in accordance with the requirements of the Indenture, Lehman shall have the right to either accept such replenishment amount and deliver Qualified Securities to the Trustee in accordance with Section 2.2 hereof or terminate that portion of the Reserve Fund withdrawn to make a Debt Service Payment with no Termination Amount being due from any party hereto.

Section 2.6    Direction by Issuer to Trustee.  The Issuer hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.7    LBH Downgrade.

(a)     If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's or "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Issuer and the Trustee within five Business Days of such Lehman Downgrade.

(b)     Upon receipt of the written notice from Lehman of such Lehman Downgrade, the Issuer shall have the right, but not the obligation, to require Lehman within ten Business Days of Lehman's receipt of written notice from the Issuer to:

RFA: 413853L/413879L/413871L

8

EXECUTION COPY

(i)    assign and transfer this Agreement and its interests hereunder to a financial institution with the written consent of the Issuer (such consent not to be unreasonably withheld or delayed) and such financial institution has long-term unsecured debt ratings of at least A1 by Moody's and A+ by Standard & Poor's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have the obligations of Lehman hereunder guaranteed by a financial institution which has long-term debt ratings of at least Aa2 by Moody's and AA by Standard & Poor's and with the written consent of the Issuer and the Trustee(such consent not to be unreasonably withheld or delayed); or

(iii)    deliver collateral to the Trustee comprised of Qualified Securities (other than the Qualified Securities delivered to the Trustee pursuant to Section II hereof) such that (A) the market value of the collateral must be maintained at levels of 104% of the Termination Amount (in favor of the Issuer), if any, (B) in which such collateral held by the Trustee shall have a perfected first priority security interest, and (C) the value of the collateral and the Termination Amount are determined by Lehman on the first Business Day of each week.

(c)    If Lehman fails to take any of the actions specified in (i), (ii) or (iii) above, the Issuer shall have the right, but not the obligation, to terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Any amounts due from the Issuer hereunder shall be made solely from funds available under the Indenture for such purpose.

Section 2.8    <u>Issuer Optional Termination</u>.    The Issuer may terminate this Agreement, in whole or in part, at any time during the term of this Agreement only in the event of a Mandatory Cleanup Call (an "Issuer Optional Termination") upon thirty (30) days written notice to Lehman. If such Issuer Optional Termination is effected by the Issuer, no Termination Amount shall be due to any party hereto.

SECTION III.        DEFEASANCE OR REFUNDING

Section 3.1    <u>Defeasance or Refunding</u>.

(a)    The Issuer may, by giving Lehman at least ten Business Days prior notice, but without the consent of Lehman redeem, defease, repurchase, or refund the Bonds as provided in

EXECUTION COPY

the Indenture, provided that if the Issuer takes any such action the result of which will cause the reduction of the Scheduled Reserve Amount (i) if the Termination Amount (calculated as of the date of termination as set forth in Section 3.1(b) hereof) is a positive number, the Issuer shall pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Issuer. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of written notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Issuer agrees that it shall not redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date pay to Lehman the amount of such difference;

(iv)    the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

EXECUTION COPY

> (v)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues substantially similar to the revenues securing the Bonds; and

> (vi)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

## SECTION IV    REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Representations and Warranties</u>.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction of incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and perform its obligations under the Indenture);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Indenture), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

EXECUTION COPY

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Issuer,

(i)    all Deposit Dates, Bond Payment Dates and Scheduled Reserve Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer);

(iii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Issuer has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)    there does not now exist and it does not anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Issuer under one or more agreements or instruments relating to any Specified Indebtedness of the Issuer which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Issuer in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)    it is solvent and has, and expects to have after giving effect to this Agreement, sufficient funds to conduct its business and to pay its debts as they become due;

(vi)    it has not experienced any Incipient Illegality with respect to this Agreement; and

EXECUTION COPY

(vii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event which would have a material adverse effect on the Issuer's ability to perform under this Agreement.

(g)    in the case of Lehman, LBH, as of the date of this Agreement, has senior, unsecured long-term debt ratings of A by Fitch, A2 by Moody's and A by Standard & Poor's.

SECTION V.    COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants.  Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant);

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant);

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Indenture which could materially impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Issuer's ability to issue additional bonds under the Indenture;

(d)    if it is the Issuer, the Issuer agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant); and

(e)    if it is the Issuer, it shall not replace this Agreement or withdraw any amounts held in the Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2    Role of Lehman; Independent Judgment.  The Issuer acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary  or financial or investment advisor to or agent or other

EXECUTION COPY

representative of the Issuer,    (ii) the Issuer has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Issuer understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Issuer.

Section 5.3    No Liability.   Each of the Issuer and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys paid to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Issuer or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.   The Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.   The Issuer understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Issuer has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.   Each of the Issuer and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount may be due Lehman, the size of such Termination Amount and the party to whom such amount is owed will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.   In certain market conditions the amount of any Termination Amount owed to Lehman by, as applicable, the Trustee or the Issuer could be substantial.

The payment of any amounts owed by the Issuer hereunder (including, without limitation, Termination Amounts) shall be a subordinate obligation under the Indenture, payable solely as an Operating Expense (as defined in the Indenture) and only to the extent of amounts on deposit in the Operating Contingency Account maintained under the Indenture.

Section 5.6    Fees and Commissions.   The Issuer acknowledges that Lehman shall pay $_____ to Public Financial Management, on behalf of the Issuer, as a bidding agent's fee for services provided by Public Financial Management to the Issuer.   Additionally Lehman shall pay the legal costs for the Issuer and the Trustee in connection with the opinions which, pursuant to Section 6.1 (a) and (b), are required to be given, which costs shall not exceed $5,000 per opinion.

RFA: 413853L/413879L/413871L

14

EXECUTION COPY

Section 5.7    No Petition.    Lehman, by entering into this Agreement, hereby covenants and agrees that Lehman will not prior to the date that is one year and one day after the termination of this Agreement acquiesce, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Issuer. This Section 5.7 shall survive any termination of this Agreement.

SECTION VI        CLOSING CONDITIONS

Section 6.1    Closing Conditions.    On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and the Issuer of an opinion of counsel to the Trustee, in the form of Exhibit B (which Lehman has agreed to pay an amount not to exceed $5,000 to Dorsey & Whitney for its services in rendering the opinion as counsel to the Trustee);

(b)    delivery to Lehman and the Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D (which Lehman has agreed to pay an amount not to exceed $5,000 to Preston Gates & Ellis for its services in rendering the opinion as counsel to the Issuer);

(c)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)    delivery to Lehman by the Issuer of a true and correct copy of the Indenture as in full force and effect on the date hereof;

(e)    delivery to Lehman of a copy of any consent received by the Issuer to enter into this Agreement;

(f)    delivery to the Trustee and the Issuer of an opinion of inside counsel to Lehman, in the form of Exhibit C, and a bankruptcy opinion of special counsel to Lehman;

(g)    delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Issuer is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Issuer pursuant to which the Issuer is authorized to enter into this Agreement; and

(h)    delivery to the Issuer of a guarantee of LBH with respect to the obligations of Lehman hereunder, in the form of Exhibit F.

SECTION VII        DEFAULTS; TERMINATION

RFA: 413853L/413879L/413871L

15

EXECUTION COPY

Section 7.1    <u>Trustee Events of Default</u>.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail, as a result of its negligence or willful misconduct, to purchase any Qualified Securities tendered by the Qualified Dealer in accordance with this Agreement or to pay the Purchase Price therefor on any Deposit Date in accordance with Section 2.1 upon due tender of such Qualified Securities in accordance with the provisions of this Agreement, and such Qualified Securities are retendered by the Qualified Dealer for purchase by the Trustee with telephonic notice of such retender by the Qualified Dealer to the Trustee and such failure continues for two Business Days, provided, however, that the Trustee shall owe Lehman the Resale Loss Amount, if any, as defined in Section 7.7 hereof;

(b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Issuer; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    <u>Issuer Events of Default</u>.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date);

(b)    the Issuer shall default in the performance of any covenant or obligation under this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of written notice thereof from Lehman or the Trustee;

(c)    any representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect and such default is not cured within five Business Days of written notice thereof from Lehman or the Trustee;

(d)    the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its

EXECUTION COPY

winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 60 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B)(I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(e)     the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other parties to this Agreement; or

(f)     the Issuer shall default with respect to the Bonds and/or any Specified Indebtedness.

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)     Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities with a Purchase Price equal to the Scheduled Reserve Amount for such Deposit Date and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Issuer (the "Lehman Cure Period");

(b)     Lehman shall default in the performance of any covenant or obligation under this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from the Issuer or the Trustee;

EXECUTION COPY

(c)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(d)    Lehman is at any time Insolvent.

Section 7.4    <u>Remedies Upon Occurrence of a Trustee Event of Default</u>.    Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make written demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement after the third failure by the Trustee to purchase Qualified Securities hereunder by giving written notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2 hereof, (i) if the Termination Amount is a positive number, make written demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Issuer.

If the Termination Amount is payable pursuant to this Section 7.4(b), subject again to Section 8.2, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate.  Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary herein, the Trustee shall not be liable for any damages to Lehman hereunder in the event that (i) performance of the Trustee's duties hereunder is prohibited by applicable law or banking regulations, (ii) insufficient funds are on deposit in the Reserve Fund to purchase Qualified Securities and such insufficiency in not a result of the negligence or willful misconduct of the Trustee, or (iii) for any default of the Issuer.

Section 7.5    <u>Remedies Upon Occurrence of Issuer Event of Default</u>.    Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make written demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

EXECUTION COPY

(b)    immediately terminate this Agreement by giving written notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make written demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default.    Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Scheduled Reserve Amount to purchase Qualified Securities in accordance with Section 2.4 hereof and make written demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Issuer's losses (as described in Section 7.7(b)) upon written demand therefor, immediately terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman; and

(c)    if such default is a default under Sections 7.3(b), (c) or (d) hereof, immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.

If any Termination Amount is payable pursuant to clauses (b) and (c) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination

EXECUTION COPY

Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of written notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer shall make such determination as if it were Lehman and the amount as so determined by the Issuer shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    Loss Amount if Failed or Late Purchase.

(a)    Subject to Section 8.2 hereof, if the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds), the Trustee, in the case of clause (a) or the Issuer in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the deposit date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities (the "Resale Loss Amount"). Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y). Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered but were not delivered due to such shortfall in the Reserve Fund thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each date from the date such securities could have been delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above. All sales of Qualified Securities to a party other than the Trustee shall be made in a commercially reasonable manner at the available market price.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefor pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Scheduled Reserve Amount had the Scheduled Reserve Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by

RFA: 413853L/413879L/413871L

EXECUTION COPY

investing the related Deposit Amount in Permitted Investments in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Scheduled Reserve Amount in Permitted Investments in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Scheduled Reserve Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Issuer hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Issuer in connection with an Issuer Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Issuer, apply any funds available under the Indenture which otherwise be released to the Issuer to the payment of such amounts.  The payment of any amounts owed by the Issuer hereunder (including, without limitation, Termination Amounts) shall be a subordinate obligation under the Indenture, payable solely as an Operating Expense (as defined in the Indenture) and only to the extent of amounts on deposit in the Operating Contingency Account maintained under the Indenture.

Section 7.9    No Rights Against the Reserve Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts or Qualified Securities held in the Reserve Fund.

Section 7.10    No Set-Off.  Lehman agrees that any payments due by it hereunder shall not be set-off by any amounts otherwise due Lehman.

Section 7.11    No Waiver; Remedies Cumulative.  No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

SECTION VIII    THE TRUSTEE

Section 8.1    Acceptance by Trustee.  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder expressly set forth herein and no implied duties or obligations shall be read into this Agreement against the Trustee.  The Trustee is entering into this Agreement solely in its capacity as trustee under the Indenture in accordance with the terms thereof as directed by the Issuer.

Section 8.2    Liability of the Trustee; Consultation with Legal Counsel.

(a)    The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or

RFA: 413853L/413879L/413871L

EXECUTION COPY

willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c) hereof.

(b)   The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

(c)   The Trustee shall be entitled to rely conclusively upon any certificate, notice or other document delivered to it hereunder by the Issuer or Lehman or any of its affiliates as provided herein, or any Qualified Dealer as to the truth, accuracy and validity thereof which is reasonably believed by the Trustee in good faith to have been signed by an authorized officer or signatory of such entity.

(d)   The Issuer by its execution and delivery of this Agreement irrevocably directs the Trustee to enter into this Agreement and acknowledges to the Trustee that execution and delivery of this Agreement and the investments provided for hereunder is permitted under the Indenture and further acknowledges that the indemnities provided to the Trustee by the Issuer under the Indenture shall be afforded to the Trustee by the Issuer in the execution and performance by the Trustee of this Agreement,

Section 8.3   <u>Payment of Trustee Fees</u>.  Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4   <u>Trustee Cooperation</u>.

(a)   The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to the Indenture and this Agreement.

(b)   The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to make payments required by the Indenture.

Section 8.5   <u>Successor Trustee</u>.  If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture. The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee acceptable to Lehman.

RFA: 413853L/413879L/413871L

EXECUTION COPY

## SECTION IX    MISCELLANEOUS

Section 9.1    <u>Notices and Delivery Instructions</u>.    All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

<u>To Lehman:</u>

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention:    Municipal Financial Products - Middle Office
Telephone:    212-526-2240
Fax:          646-758-2988

<u>To the Trustee:</u>

U.S. Bank, N.A.
1420 5th Ave. – 7th Floor
Seattle, WA 98101
Attention:    Corporate Trust Department – Deborah Kuykendall
Telephone:    206-344-4681
Fax:          206-344-4630

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]
Federal Reserve Bank of Cleveland
For U.S. Bank, N.A.
ABA #042000013/1050
A/C # 972915503 TSA Liquidity Resv

[DELIVERY INSTRUCTIONS FOR DTC ELIGIBLE SECURITIES]
DTC Member #2803
Institution #52675 USBank, N.A. – Corporate Trust
For A/C #972915503 TSA Liquidity Resv

<u>To the Issuer:</u>

Tobacco Settlement Authority
1000 Second Avenue – Suite 2700

RFA: 413853L/413879L/413871L

23

EXECUTION COPY

Seattle, WA 98104-1046
Attention:     Paul Edwards
Telephone:     206-287-4462
Fax:           206-587-5113
Issuer Tax ID:

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer. This Agreement shall be binding upon and inure to the benefit of the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees. Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman guaranteed by LBH or rated in any category higher than "A", "A2", or "A" or higher by Standard & Poor's, Moody's or Fitch, respectively, upon written notice to the Issuer and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the written consent of the Issuer (such consent not to be unreasonably withheld or delayed); provided, however, that such consent shall not be required if such transfer is to any entity rated in any category higher than "A", "A2", or "A" or higher by Standard & Poor's, Moody's or Fitch, respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder. Neither the Issuer nor the Trustee may transfer this Agreement without the prior written consent of Lehman and the other party hereto, except that the Trustee may transfer this Agreement to any successor Trustee appointed under the Indenture.

Section 9.3    Limitation. Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability. If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    Amendments, Changes and Modifications. This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto, with copies delivered by the Trustee to Moody's and Standard & Poor's.

Section 9.6    Counterparts. This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement

RFA: 413853L/413879L/413871L

EXECUTION COPY

shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    <u>Termination</u>.  Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in <u>Exhibit A</u> and the date on which Lehman, the Trustee and the Issuer have satisfied all of their obligations hereunder.

Section 9.8    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles, except that questions regarding the Authority shall be governed by the laws of the State of Washington.

EXECUTION COPY

IN WITNESS WHEREOF, the Issuer, the Trustee and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT AUTHORITY

By: _____
Name:
Title:

U.S. BANK, N.A., AS TRUSTEE

By: _____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:    T. Courtney Jenkins
Title:    Vice President

RFA: 413853L/413879L/413871L

26

EXECUTION COPY

IN WITNESS WHEREOF, the Issuer, the Trustee and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT AUTHORITY

By:_____
Name:
Title:

U.S. BANK, N.A., AS TRUSTEE

By:_____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:    T. Courtney Jenkins
Title:    Vice President

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 11/05/02 | 06/01/03 | $45,534,106 |
| 06/01/03 | 12/01/03 | $45,534,106 |
| 12/01/03 | 06/01/04 | $45,534,106 |
| 06/01/04 | 12/01/04 | $45,534,106 |
| 12/01/04 | 06/01/05 | $45,534,106 |
| 06/01/05 | 12/01/05 | $45,534,106 |
| 12/01/05 | 06/01/06 | $45,534,106 |
| 06/01/06 | 12/01/06 | $45,534,106 |
| 12/01/06 | 06/01/07 | $45,534,106 |
| 06/01/07 | 12/01/07 | $45,534,106 |
| 12/01/07 | 06/01/08 | $45,534,106 |
| 06/01/08 | 12/01/08 | $45,534,106 |
| 12/01/08 | 06/01/09 | $45,534,106 |
| 06/01/09 | 12/01/09 | $45,534,106 |
| 12/01/09 | 06/01/10 | $45,534,106 |
| 06/01/10 | 12/01/10 | $45,534,106 |
| 12/01/10 | 06/01/11 | $45,534,106 |
| 06/01/11 | 12/01/11 | $45,534,106 |
| 12/01/11 | 06/01/12 | $45,534,106 |
| 06/01/12 | 12/01/12 | $45,534,106 |
| 12/01/12 | 06/01/13 | $45,534,106 |
| 06/01/13 | 12/01/13 | $45,534,106 |
| 12/01/13 | 06/01/14 | $45,534,106 |
| 06/01/14 | 12/01/15 | $45,534,106 |
| 12/01/15 | 06/01/16 | $45,534,106 |
| 06/01/16 | 12/01/16 | $45,534,106 |
| 12/01/16 | 06/01/17 | $45,534,106 |
| 06/01/17 | 12/01/17 | $45,534,106 |
| 12/01/17 | 06/01/18 | $45,534,106 |
| 06/01/18 | 12/01/18 | $45,534,106 |
| 12/01/18 | 06/01/19 | $45,534,106 |
| 06/01/19 | 12/01/19 | $45,534,106 |
| 12/01/19 | 06/01/20 | $45,534,106 |
| 06/01/20 | 12/01/20 | $45,534,106 |
| 12/01/20 | 06/01/21 | $45,534,106 |
| 06/01/21 | 12/01/21 | $45,534,106 |

\* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 12/01/21 | 06/01/22 | $45,534,106 |
| 06/01/22 | 12/01/22 | $45,534,106 |
| 12/01/22 | 06/01/23 | $45,534,106 |
| 06/01/23 | 12/01/23 | $45,534,106 |
| 12/01/23 | 06/01/24 | $45,534,106 |
| 06/01/24 | 12/01/24 | $45,534,106 |
| 12/01/24 | 06/01/25 | $45,534,106 |
| 06/01/25 | 12/01/25 | $45,534,106 |
| 12/01/25 | 06/01/26 | $45,534,106 |
| 06/01/26 | 12/01/26 | $45,534,106 |
| 12/01/26 | 06/01/26 | $45,534,106 |
| 06/01/26 | 12/01/27 | $45,534,106 |
| 12/01/27 | 06/01/27 | $45,534,106 |
| 06/01/27 | 12/01/28 | $45,534,106 |
| 12/01/28 | 06/01/28 | $45,534,106 |
| 06/01/28 | 12/01/29 | $45,534,106 |
| 12/01/29 | 06/01/29 | $45,534,106 |
| 06/01/29 | 12/01/30 | $45,534,106 |
| 12/01/30 | 06/01/30 | $45,534,106 |
| 06/01/30 | 12/01/31 | $45,534,106 |
| 12/01/31 | 06/01/31 | $45,534,106 |
| 06/01/31 | 12/01/32 | $45,534,106 |
| 12/01/32 | 06/01/32 | $45,534,106 |
| 06/01/32 | 12/01/33 | $45,534,106 |
| 12/01/33 | 06/01/33 | $45,534,106 |
| 06/01/33 | 12/01/34 | $45,534,106 |
| 12/01/34 | 06/01/34 | $45,534,106 |
| 06/01/34 | 12/01/34 | $45,534,106 |
| 12/01/34 | 06/01/35 | $45,534,106 |
| 06/01/35 | 12/01/35 | $45,534,106 |
| 12/01/35 | 06/01/36 | $45,534,106 |
| 06/01/36 | 12/01/36 | $45,534,106 |
| 12/01/36 | 06/01/37 | $45,534,106 |
| 06/01/37 | 12/01/37 | $45,534,106 |
| 12/01/37 | 06/01/38 | $45,534,106 |
| 06/01/38 | 12/01/38 | $45,534,106 |

* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-2

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
| --- | --- | --- |
| 12/01/38 | 06/01/39 | $45,534,106 |
| 06/01/39 | 12/01/39 | $45,534,106 |
| 12/01/39 | 06/01/40 | $45,534,106 |
| 06/01/40 | 12/01/40 | $45,534,106 |
| 12/01/40 | 06/01/41 | $45,534,106 |
| 06/01/41 | 12/01/41 | $45,534,106 |
| 12/01/41 | 05/30/42 | $45,534,106 |

* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT B**

[LETTERHEAD OF COUNSEL TO TRUSTEE]

[Date]

[Issuer]

Lehman Brothers Special Financing Inc.
New York, NY

Re:    [Name of Bonds]

Ladies and Gentlemen:

We have acted as counsel to _____ (the "Trustee") in connection with the execution and delivery by the Trustee of the Reserve Fund Agreement dated as of _____ _____ (the "Agreement") by and among the Trustee, _____ (the "Issuer") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of [state of Trustee] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Agreement.

(ii)    The Agreement has been duly authorized, executed and delivered by the Trustee.

B-1

(iii)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(v)    The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

B-2

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN]

[Date]

[Issuer]

[Trustee]

Re:

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the Reserve Fund Agreement dated as of _____ (the "Agreement") by and among Lehman _____, as Trustee (the "Trustee") and _____. (the "Issuer"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Agreement and to perform its obligations thereunder.

2.    The Agreement has been duly and validly authorized, executed and delivered by Lehman and constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

3.    Lehman's and the Guarantor's execution and delivery of the Agreement and the Guarantee and the performance of its respective obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property or any other agreement, instrument, judgment, injunction or order applicable to it or

any of its property (other than such conflicts, defaults or violations would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

4.  All consents, authorizations and approvals requisite for its execution, delivery and performance by Lehman of the Agreement and by the Guarantor of the Guarantee have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance (except for such consents, authorizations and approvals which the failure to obtain would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.  My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.  I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.  My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.  This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.  I have assumed with your permission (i) the genuineness of all signatures by the Issuer and the Trustee, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the

due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

C-3

**EXHIBIT D**

[LETTERHEAD OF COUNSEL TO ISSUER]

[Date]

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY

Re:    [NAME OF BONDS]

Ladies and Gentlemen:

    I have acted as counsel to _____ (the "Issuer") in connection with its execution and delivery of the Reserve Fund Agreement dated as of _____ (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), _____ _____, as Trustee (the "Trustee") and the Issuer and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

    In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

    In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

    In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of [state of Issuer] (the "State").

    Based upon the foregoing examination and review, we are of the opinion that:

    (i)    The Issuer has full legal right, power and authority to enter into the Reserve Fund Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the Reserve Fund Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

    (ii)    The Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)    If this Agreement were governed by Washington law, the Agreement is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)    The Issuer's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(v)    The Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vi)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(vii)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

D-2

**EXHIBIT E**

## Lehman Brothers Special Financing Inc.
### Notice of Tender
Under the [ _____ ] Agreement
Dated as of: [ _____ ]

To: _____, as [Escrow Agent/Trustee]
Attention: _____
Fax: _____
Phone: _____

From: Lehman Brothers Inc. ("LBI")
Attention: _____
Fax: _____
Phone: _____

Date: [ _____ ]
Re: [ _____ ]

**Date and Price**

Purchase Date: [ _____ ]
Specified Purchase Price: [ _____ ]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] |

**Delivery vs. Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value    [ _____ ]      [BILLS/NOTES] maturing [ _____ ]

to:
[ _____ ]
Re:
[ _____ ]

On the Purchase Date, LBI will receive [ _____ ]
Chase NYC/Lehman
ABA: 021000021
A/C #066206677

E-1

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") has entered into a Reserve Fund Agreement dated as of November 5, 2002 (the "Agreement") by and among Lehman, TOBACCO SETTLEMENT AUTHORITY (the "Issuer") and U.S. BANK, N.A., as Trustee (the "Trustee"). For value received, and in consideration of the financial accommodations accorded to Lehman by the Issuer under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to the Issuer the due and punctual payment of all amounts payable by Lehman under the Agreement when and as Lehman's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Lehman to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by the Issuer, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Lehman (other than as a result of the unenforceability thereof against the Issuer), the absence of any action to enforce Lehman's obligations under the Agreement, any waiver or consent by the Issuer with respect to any provisions thereof, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Lehman could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any default or potential default in respect of the Issuer, but only to the extent such right is provided to Lehman under the Agreement.

(d)    Guarantor shall be subrogated to all rights of the Issuer against Lehman in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Lehman under the Agreement, shall have been paid in full.

(e)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in

connection with the Agreement and this Guarantee, or (ii) any requirement that the Issuer exhaust any right to take any action against Lehman or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with the Issuer as those made by Lehman pursuant to Section 4.1 of the Agreement, at the times set forth therein, except that references therein to "Lehman" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein.  All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 399 Park Avenue, 11th Floor, New York, New York 10022 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products at 745 Seventh Avenue, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:          Oliver Budde

Title:           Vice President

Date:  November 5, 2002

# T O B A C C O   S E T T L E M E N T   A U T H O R I T Y

December 18, 2008

**Via Facsimile and Federal Express**

Richard P. Krasnow, Esq.
Weil Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attn: Municipal Financial Products—Middle
   Office

Re:   **Notice of Lehman Event of Default under Reserve Fund Agreement**

Ladies and Gentlemen:

Reference is made to the Reserve Fund Agreement (the "RFA") dated as of November 5, 2002 by and among Tobacco Settlement Authority ("TSA"), an independent public instrumentality of the State of Washington, as Issuer, U.S. Bank, N.A., a national banking association, as Trustee under the indenture defined in the RFA, and Lehman Brothers Special Financing Inc. ("LBSF"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RFA.

You are hereby notified that as a result of: (a) LBSF's failure to deliver or cause to be delivered Qualified Securities on December 1, 2008 in accordance with Section 2.1 and Section 2.2 of the RFA, which failure has continued beyond the applicable Lehman Cure Period, and (b) the institution by LBSF of a proceeding under Chapter 11 of the United States Bankruptcy Code on October 3, 2008 in the United States Bankruptcy Court for the Southern District of New York, Lehman Events of Default have occurred and are continuing under Sections 7.3(a) and 7.3(d) of the RFA.

**TSA**   1000 Second Avenue, Suite 2700, Seattle, WA 98104-1046
tel 206.464.7139  fax 206.587.5113   www.tsa-wa.org



Richard P  Krasnow, Esq.
Lehman Brothers Special Financing Inc.
December 18, 2008
Page 2

     LBSF is further notified that (i) TSA has other rights and remedies under applicable law and the RFA (including but not limited to those rights specified under Section 7.6 of the RFA), (ii) all such rights and remedies are hereby reserved and no such rights have been waived, abandoned, discontinued or in any other manner precluded from exercise, and (iii) the failure to exercise any such right or remedy shall not constitute (or be deemed to constitute) any waiver, abandonment, discontinuation or other preclusion of the exercise thereof or of any other right or remedy of TSA.

            Very truly yours,

            TOBACCO SETTLEMENT AUTHORITY,
            an independent public instrumentality of the
            State of Washington, as Issuer

            By: _____
                     Kim Herman
                     Executive Director

cc: U.S. Bank, N.A. Corporate Trust Department—Deborah Kuykendall

# *Swap Financial Group*

*Swap Financial Group, LLC*
*76 South Orange Avenue, Suite 6*
*South Orange, NJ 07079*
*(973) 378-5500, fax (973) 378-5575*

## MEMORANDUM

| | |
|---|---|
| To: | Bob Cook<br>Washington Tobacco Settlement Authority |
| From: | Peter Shapiro, James Vergara |
| Concerning: | Calculation of Loss for TSA's Reserve Fund Agreement with Lehman Brothers Special Financing, Inc. |
| Date: | September 10, 2009 |

Per your request, Swap Financial Group ("SFG") has prepared a Calculation of Loss for the Reserve Fund Agreement ("RFA") between the Tobacco Settlement Authority ("TSA") and Lehman Brothers Special Financing, Inc. ("LBSF"). Under the terms of the RFA, TSA, as the Burdened Party, has the right to calculate a Termination Amount "as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs, or gains, in connection with a termination, including any loss of bargain, cost of funding, or, at the election of the Burdened Party but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position..."

Under the terms of the RFA, TSA delivered to LBSF an amount equal to the "Scheduled Reserve Amount" or $45,534,106.25 in exchange for Eligible Securities to deposit with the trustee to satisfy the liquidity reserve account requirement of its tobacco settlement securitization bonds. When the securities matured, TSA would again deliver the "Scheduled Reserve Amount" to LBSF to purchase new securities. In exchange for the periodic purchase of securities, LBSF provided TSA with a guaranteed rate of return on the "Scheduled Reserve Amount." Under the RFA, which had a scheduled termination date of May 30, 2042 — the final scheduled Bond Payment Date per Exhibit A of the RFA — LBSF provided TSA with a guaranteed rate of return of 4.484%.

Lehman Brothers Holdings, Inc., the credit support provider for LBSF filed for bankruptcy on September 15, 2008 and LBSF ceased to perform under terms of the RFA. When the securities in the RFA matured, TSA was left to reinvest the proceeds in the open market, at significantly lower yields than the guaranteed rate of return originally offered by LBSF. LBSF itself filed for bankruptcy on October 3, 2008. For the purpose of this Calculation of Loss, SFG has looked at a valuation on March 25, 2009, the date that LBSF rejected the RFA between itself and TSA.

In order to calculate TSA's Loss, we began by analyzing the RFA cash flows. Under the RFA, Lehman guaranteed a fixed rate of return for TSA's Reserve Fund, to be realized in the form of the discount on the securities that LBSF agreed to deliver to the trustee on a periodic basis. The scheduled term of the RFA extended through May 30, 2042, though

TSA Reserve Fund Agreement - Calculation of Loss
September 10, 2009
Page 2

the Agreement could have been terminated prior to that date in the event that TSA's tobacco settlement securitization bonds are redeemed prior to their scheduled maturities, or if any of the parties to the RFA defaulted on their obligations. To value the cash flows under the RFA, the appropriate method is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 4.484% and the other payer (TSA) would pay a floating rate.

The use of a LIBOR plus spread analysis with an interest rate swap to value agreements like the RFA is the broadly accepted market methodology. In the case of the RFA, the value of the floating leg is of great importance, since the value of the fixed leg is already known. The value of the floating leg should represent the value of the securities which are going to be delivered – short-term obligations (treasuries, agencies or commercial paper) with the highest ratings from Moody's (P-1) and Standard & Poor's (A-1+) – and also incorporate the ongoing credit risk of the RFA as an agreement in the first loss position of a municipal tobacco securitization. To complete the Calculation of Loss, SFG has also included the profit or spread component that would be charged by another provider to replace the RFA, if such a replacement agreement could be found.

### Commercial Paper Spreads
The trading relationship between commercial paper and LIBOR has widened markedly over the past several months (though it has improved recently), as the overall credit markets have suffered during the financial crisis. This has been even more dramatic in the case of the structured commercial paper that was likely delivered under the RFA. Under normal, orderly market conditions, spreads for high-grade, structured commercial paper would typically be in a range of 0.20% to 0.30% over LIBOR. However, on the valuation date in question, the trading spreads were significantly greater, approximately 0.666% on March 25, 2009.

### Charges for Municipal Tobacco Credit
Over the past twelve months, the value placed on the credit risk of municipal tobacco bonds has escalated sharply. This escalation has been greater than the increase in risk valuation that has occurred for most other forms of credit-based fixed income assets during the current financial crisis. TSA's 6 5/8% bonds of June 1, 2032 demonstrated this escalation dramatically, with market yields rocketing upward from 5.75% on March 26, 2008 to over 12% in December 2008. The bonds are currently trading at yields in excess of 10%. As a point of comparison, over the same time period (March to December 2008), yields on long-term treasury bonds declined by over 200 basis points.

In order to assess a proper credit charge for the RFA, we looked at the trading levels of TSA's bonds on the valuation date and compared it to a benchmark municipal index. On March 25, 2009, the bonds traded at a yield of 10.000%, which represents a spread of 4.290% over the Bloomberg 30-Year General Purpose Revenue Bond Index (A-Rated).

### Profit Component
Lastly, our analysis takes into account the profit or spread component that would be included in any replacement investment if TSA were to replace the economic bargain

TSA Reserve Fund Agreement – Calculation of Loss
September 10, 2009
Page 3

afforded to it by the RFA. Given the challenging nature of the municipal tobacco credit, as well as the widening of bid-offer spreads in the fixed income markets in general, and in the municipal derivatives market in specific, we would expect a dealer to charge a profit component on the order of 0.25% to provide a replacement RFA, if such an agreement could even be replicated.

### Calculation of Loss

In the table below, we summarize the various components that would be included in calculating the floating rate for the RFA, which would be incorporated into the Calculation of TSA's Loss.

| Date | CP Spread | Credit Spread | Profit | Total |
|---|---|---|---|---|
| March 25, 2009 | 0.666% | (4.290%) | (0.25%) | (3.874%) |

Using the spreads to LIBOR described above, SFG arrived at Loss values of $46,437,610 for the March 25 valuation date in TSA's favor. Please note that a significant part of this difference is attributable to the rate environment on the valuation date, in addition to the spread assumptions. Illustratively, the 30-year Treasury Bond yield on March 25, 2009 was 3.742% while the 30-year LIBOR swap 3.433%. These yields are significantly lower than historical averages. The lower yield acts to increase TSA's loss.

### Cost of Non-Performance

In addition to the Loss described above, TSA was also harmed by Lehman's non-performance under the RFA from December 1, 2008 (when securities were to be delivered) until March 25, 2009. Instead of the Guaranteed Rate on the RFA, TSA's reserve fund was invested in short-term Eligible Securities yielding a significantly lower rate. Instead of 4.484%, TSA's reserve fund earned 1.1874%, 0.64%, 0.48% and 0.20% for the months of December 2008 and January, February and March 2009, respectively. TSA's reserve fund should have earned $646,553.95 from December 1, 2008 until March 25, 2009 instead of the $93,473.93 that was actually earned. The difference of $553,080.02 is therefore added the Loss amount above of $46,437,610 for a total Loss of $46,990,690.02.

SFG has based its assumptions on market data available to us and our own experience in valuing agreements similar to the RFA.

Washington State Tobacco Settlement Authority - Schedule of Other Costs

| Dates of Service | Invoice Number | Vendor | Description | Amount | Adjusted Memo |
|---|---|---|---|---|---|
| 05/04/09 | N/A | Swap Financial Group, LLC | Valuation Assignment for Termination of Lehman Reserve Agreement | $17,500.00 | |
| 09/17/08 - 09/25/08 | 1877962 | K&L Preston Gates Ellis LLP | Discussed Lehman insolvency issues; Discussed bankruptcy treatment | $2,991.00 | |
| 11/03/08 - 12/03/08 | 1905079 | K&L Preston Gates Ellis LLP | Research regarding Lehman Bankruptcy issues; Draft emails regarding contract termination | $19,655.71 | |
| 12/03/08 - 12/31/08 | 1916188 | K&L Preston Gates Ellis LLP | Preparation for contract termination; Research Lehman issues, claim timing issues, bankruptc | $19,351.25 | |
| 02/03/09 - 02/25/09 | 1939009 | K&L Preston Gates Ellis LLP | Motion to terminate Reserve Fund Agreement; Negotiate possible settlement | $4,228.20 | |
| 03/02/09 - 03/30/09 | 1957695 | K&L Preston Gates Ellis LLP | Preparation for hearing to terminate Reserve Fund Agreement | $3,924.83 | |
| 02/28/09 - 03/30/09 | 1974484 | K&L Preston Gates Ellis LLP | Review Termination Agreement | $183.60 | |
| 05/05/09 - 04/24/09 | 1987312 | K&L Preston Gates Ellis LLP | Begin preparing for Lehman claim | $1,233.00 | |
| 04/22/09 - 06/30/09 | 2002424 | K&L Preston Gates Ellis LLP | Review pleadings regarding claims procedures; Prepare Proof of Claims; Revise Proof of Cla | $3,956.40 | |
| | | Detailed time records are attached for all legal invoices | | | |
| | | | Total Other Costs | $73,023.99 | |
| | | | Valuation total - Per Swap Financial | | $46,990,690.02 |
| | | | Total Claim to date | | $47,063,714.01 |

# *Swap Financial Group*

*Swap Financial Group, LLC*
*76 South Orange Avenue, Suite 6*
*South Orange, NJ 07079*
*(973) 378-5500, fax (973) 378-5575*

May 4, 2009

State of Washington
Tobacco Settlement Authority
Attn: Bob Cook

### INVOICE

Re:    Tobacco Settlement Authority
      Valuation Assignment for Termination of Lehman Reserve Agreement

Fee for Swap Financial Group's services rendered in conjunction with the above-listed assignment.

Hours @ $500/hour (Managing Director) ....................................................... 25 hours
Hours @ $250/hour (Vice President) ............................................................. 44 hours

Total Hourly Amount:            $ 23,500.00
Less discount to remain within contract limit:   $ - 6,000.00
Total Amount Due:              $ 17,500.00

*Approved per signed contract 5/12/09*

Thank you.

Please make check payable to "Swap Financial Group" or use these wire instructions:

Wire to:            Bank of America, NA
ABA Number:    026-009-593
For account:     Swap Financial Group LLC
Acct Number:   3810-1641-1137

*RECEIVED*
*MAY 26 2009*
*A/P*

*EC 5/28/09*

*POSTED*
*MAY 26 2009*

*PIN-0 0121 IN error*

*3  PIN-00121*

*TSA Invoice – Pls pay through TSA accts This week. Thanks*

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

1 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

October 14, 2008
Invoice Number: 1877962

J.A. Reich

For Professional Services Rendered Through September 30, 2008:

2047532.99999 General

| | |
|---|---|
| Fee Amount | 2,991.00 |
| Disbursement Amount | 0.00 |
| **Total Amount Due This Matter** | **2,991.00** |

OK
11-4-08

RECEIVED
NOV 1 0 2008
A/P

POSTED
NOV 06 2008

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105. VISA and MasterCard also accepted. A late charge of one percent per month will accrue on unpaid amounts after 30 days.

PIN-00097

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

October 14, 2008
Invoice Number: 1877962
Page          2

J.A. Reich

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through September 30, 2008

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 09/17/08 | JAR | 2.00 | Review emails and documents; conference call with K. Herman, trustee and financial advisors re Lehman GIC |
| 09/18/08 | JAR | 1.50 | Review Lehman agreement; phone call with Michigan Tobacco counsel; emails with R. Bagley; meeting with M. Barreca regarding bankruptcy treatment |
| 09/18/08 | MLB | 1.10 | Conference with J. Reich regarding Lehman insolvency issues; review relevant documents |
| 09/19/08 | JAR | 2.30 | Conference call with finance team; phone call with M Barreca; draft summary memo |
| 09/19/08 | MLB | 0.50 | Conference with J. Reich regarding Lehman bankruptcy |
| 09/21/08 | FLP | 0.30 | Review draft summary of TSA call conclusions |
| 09/22/08 | JAR | 0.50 | Finalize summary of conference call |
| 09/25/08 | JAR | 0.50 | Review final summary of telephone meeting and additional comments from R. Bagley |

**Total Fees:**          **2,991.00**

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 0.30 | 290.00 | 87.00 |
| J.A. Reich | 6.80 | 340.00 | 2,312.00 |
| M.L. Barreca | 1.60 | 370.00 | 592.00 |
| **Total:** | **8.70** | | **2,991.00** |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105. VISA and MasterCard also accepted. A late charge of one percent per month will accrue on unpaid amounts after 30 days.

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

October 14, 2008
Invoice Number: 1877962
Page                3

J.A. Reich

| | |
|---|---|
| Total Amount Due This Bill | 2,991.00 |
| **Total Now Due** | 2,991.00 |

K:\204753\99999\20584_JAR\20584$22V3

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave Suite 2100, Seattle, WA 98101. ABA Routing Number 125000105. VISA and MasterCard also accepted. A late charge of one percent per month will accrue on unpaid amounts after 30 days.

# K&L|GATES

Tax ID No  25 0921018

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079

J.A. Reich

For Professional Services Rendered Through December 5, 2008:

2047532.99999 General

| | | |
|---|---|---|
| Fee Amount | 18,563.50 | |
| Disbursement Amount | 1,092.21 | |
| **Total Amount Due This Matter** | | **19,655.71** |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month.
Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557905580 US Bank, Private Financial Services, 1420 5ᵗʰ Ave. Suite 2100,
Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Tax ID No 25 0921018

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079
Page               2

J.A. Reich

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through December 5, 2008

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 11/03/08 | FLP | 0.90 | Conference with C. Weed and J. Reich regarding state debt limit issues; review email regarding same (K. Herman) |
| 11/03/08 | JAR | 1.00 | Review Goldman proposal regarding state subject to appropriations obligations; meeting with F. Pettis and C. Weed; draft email to K. Herman |
| 11/03/08 | JAR | 0.70 | Meeting with TSA staff regarding Lehman contract |
| 11/03/08 | JAR | 1.00 | Meeting with M. Barreca regarding bankruptcy issues; email to R. Bagley regarding limited term of alternative investments |
| 11/03/08 | MLB | 0.50 | Conference with J. Reich regarding Lehman issues; review contract |
| 11/04/08 | JAR | 1.50 | Edit email to K. Herman regarding constitutional issues associated with State guarantee of TSA bonds; meeting with M Barreca regarding implications of Lehman bankruptcy and offsetting obligations |
| 11/04/08 | MLB | 3.10 | Review Lehman documents; research regarding treatment of contract in bankruptcy; two conferences with J. Reich regarding securities contracts in bankruptcy |
| 11/05/08 | JR | 0.30 | Telephone call from M. Barreca regarding Lehman issues |
| 11/05/08 | MLB | 3.00 | Conference with J. Reich regarding Lehman bankruptcy, contract rejection; review contract; draft memo to J. Reich regarding Lehman bankruptcy issues; analyze Lehman issues; telephone conference with J. Rich regarding bankruptcy issues |
| 11/06/08 | FLP | 0.30 | Review bankruptcy memo from M. Barreca |
| 11/06/08 | MLB | 1.60 | Research regarding Lehman issues; revise memorandum |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 15355790658C US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079
Page            3

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 11/07/08 | MLB | 1.00 | Revise Lehman issues; telephone conference with R. Bagley regarding treatment of contract in bankruptcy |
| 11/10/08 | JAR | 1.00 | Phone calls with M Barreca regarding bankruptcy issues and Lehman GIC; participate in to prepare for TSA board meeting |
| 11/10/08 | FLP | 0.40 | Attend dress rehearsal |
| 11/10/08 | MLB | 0.20 | Telephone conference with J. Reich regarding Lehman issues |
| 11/11/08 | FLP | 0.10 | Email with C. Johnson regarding mailing of agenda |
| 11/11/08 | JAR | 0.50 | Meeting with M. Barreca regarding Lehman GIC strategies |
| 11/11/08 | MLB | 0.50 | Conference with J. Reich regarding Lehman issues and strategy |
| 11/12/08 | JAR | 1.50 | Attend and participate in TSA board meeting; review memo from PFM regarding investments |
| 11/12/08 | FLP | 1.50 | Attend TSA meeting |
| 11/12/08 | MLB | 0.20 | Review Lehman issues |
| 11/13/08 | JAR | 1.10 | Review Reserve Agreement and draft email to R. Blacker and B. Cook regarding valuation; review email from R. Bagley and petition filed in Lehman bankruptcy |
| 11/13/08 | MLB | 1.30 | Reply to e-mail regarding Lehman issues; review new Lehman motion regarding contract assignments; conference with R. Bagley regarding Lehman motion to assign contracts; review legal issues regarding new motion |
| 11/14/08 | JAR | 1.60 | Meeting with F. Pettis; draft and respond to emails with K. Herman and TSA staff regarding Lehman bankruptcy motion and implications; meeting with M. Barreca and draft summary to K. Herman |
| 11/14/08 | FLP | 0.30 | Emails regarding Lehman pleading |
| 11/14/08 | DCN | 1.90 | Research related to question of applicability of Bankruptcy Code Section 555 to customers of Financial Institutions |
| 11/14/08 | MLB | 2.40 | Research regarding Lehman matter, bankruptcy issues; |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

1 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079
Page           4

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
|      |      |       | conference with D. Neu regarding Lehman termination issues; research regarding standing to utilize bankruptcy special provisions; conference with J. Reich regarding Lehman issues; draft e-mail regarding Lehman issues |
| 11/17/08 | JAR | 1.00 | Finalize email to Kim regarding Lehman status; participate in conference call |
| 11/17/08 | FLP | 1.30 | Telephone conference with finance team regarding Lehman Reserve Fund Agreement; conference with M. Barreca and J. Reich regarding same; review Reserve Fund Agreement for M. Barreca |
| 11/17/08 | JR | 0.30 | Telephone conference with M. Barreca regarding Lehman issues regarding claims that could be made by client |
| 11/17/08 | MLB | 2.80 | Review Lehman motion; conference with J. Rich regarding Lehman motion, damages issues; prepare for and attend conference call regarding Lehman |
| 11/17/08 | DCN | 1.10 | Additional research on applicability of financial institution section of bankruptcy code to Tobacco Settlement Authority |
| 11/18/08 | JR | 0.30 | Conference call M. Barreca, R. Michaelson regarding motion issues |
| 11/18/08 | RNM | 1.50 | Telephone conference with M. Barreca; review documents |
| 11/18/08 | MLB | 0.90 | Review Lehman pleadings, research; telephone conference with J. Rich, R. Michaelson regarding potential motion; e-mail to co-counsel regarding background documents |
| 11/19/08 | JR | 0.20 | Review email from M. Barreca and respond to strategy Weil; Conference with R. Michaelson |
| 11/19/08 | MLB | 0.30 | Draft e-mails to J. Rich and to J. Reich regarding Lehman contact termination; review correspondence regarding Lehman |
| 11/20/08 | RNM | 1.50 | Draft letter to Debtor's counsel regarding rejection of agreement |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1470 5th Ave  Suite 2100, Seattle, WA 98101; ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580   www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079
Page                   5

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 11/20/08 | MLB | 0.60 | Telephone conference with R. Michaelson regarding rejection of Lehman contract; review related documents |
| 11/21/08 | JR | 0.40 | Revise letter regarding complaint |
| 11/21/08 | RNM | 0.50 | Finalize letter to R. Krasnow regarding rejection of agreement |
| 11/24/08 | MLB | 0.20 | Review correspondence to Lehman's counsel regarding contract |
| 11/26/08 | FLP | 0.50 | Email regarding Lehman filings |
| 11/26/08 | SC | 0.60 | TSA lehman contract. Review contract; email summary; review bankruptcy definitions. |
| 11/26/08 | MLB | 0.20 | Review Lehman pleadings regarding effect on securities contracts |
| 11/30/08 | JR | 0.20 | Email M. Barreca regarding stipulation to settle |
| 12/01/08 | JAR | 0.50 | Review emails regarding possible Lehman GIC options |
| 12/01/08 | FLP | 0.40 | Emails regarding status of bankruptcy hearing and options; telephone conference with M. Barreca regarding same |
| 12/01/08 | JR | 0.30 | Email M. Barreca regarding claims purchase and setups |
| 12/01/08 | JAR | 0.50 | Review emails regarding status of Lehman bankruptcy hearing and possible sale of contract |
| 12/01/08 | MLB | 1.40 | Review e-mail regarding termination stipulation; reply to J. Reich; review Lehman pleadings; conference with F. Pettis regarding bankruptcy alternatives, strategy |
| 12/03/08 | JAR | 1.00 | Meeting with M. Barreca regarding selling judgment; phone call with C. Johnson regarding Thursday conference call |

**Total Fees:**                    **18,563.50**

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125030105.

# K&L|GATES

Tax ID No. 25-0921018

Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580     www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

December 11, 2008
Invoice Number: 1905079
Page            6

J.A. Reich

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 5.70 | 320.00 | 1,824.00 |
| D. Rich | 2.00 | 765.00 | 1,530.00 |
| J.A. Reich | 12.90 | 340.00 | 4,386.00 |
| M.L. Barreca | 20.20 | 370.00 | 7,474.00 |
| R. N. Michaelson | 3.50 | 675.00 | 2,362.50 |
| S. Crawshaw | 0.60 | 320.00 | 192.00 |
| D.C. Neu | 3.00 | 265.00 | 795.00 |
| **Total:** | **47.90** | | **18,563.50** |

*N.Y. bankruptcy attorneys*

| Disbursements | Amount |
|---------------|--------|
| Copying Expense | 15.48 |
| Westlaw Research | 1,076.73 |
| **Total Disbursements:** | **1,092.21** |

| | |
|--|--|
| Total Amount Due This Bill | 19,655.71 |
| **Total Now Due** | **19,655.71** |

K:\204753\09999\20584_JAR20584$22XM

OK
P.R.E.
12-23-08

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105

PIN-00103

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

1 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

January 14, 2009
Invoice Number: 1916188

J.A. Reich

For Professional Services Rendered Through December 31, 2008:

2047532.99999 General

| | |
|---|---|
| Fee Amount | 19,342.50 |
| Disbursement Amount | 8.75 |
| **Total Amount Due This Matter** | **19,351.25** |

OK
Paul Shull
2-5-09

POSTED
FEB 06 2009

RECEIVED
FEB 05 2009
A/P

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month.
Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100,
Seattle, WA 98101, ABA Routing Number 125000105.

PIN-00106

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

т 206.623.7580   www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

January 14, 2009
Invoice Number: 1916188
Page                    2

J.A. Reich

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through December 31, 2008

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 12/03/08 | MLB | 0.40 | Conference with J. Reich regarding Lehman issues |
| 12/04/08 | JAR | 3.00 | Participate in conference call regarding Lehman reserve fund contract; draft memo summarizing conference call |
| 12/04/08 | FLP | 1.80 | Telephone conference with TSA staff and working group regarding Lehman agreement; conference with M. Barreca and J. Reich regarding same; edit memo regarding Lehman options |
| 12/04/08 | JR | 0.20 | Telephone call M. Barreca regarding Lehman questions |
| 12/04/08 | MLB | 3.60 | Telephone conference with J. Reich regarding procedural issues on contract termination motion; preparation for and conference with TSA advisors regarding Lehman issues; research regarding Lehman issues; conference with K. Swan regarding Lehman dockets, pleadings |
| 12/05/08 | JAR | 0.70 | Edit memo regarding Lehman GIC; phone calls with M. Barreca and A. Kristjansson; review email from R. Bagley and transmit |
| 12/05/08 | MLB | 1.50 | Reply to e-mail; review draft memorandum regarding Lehman issues; research regarding claim timing issues; review draft memorandum regarding bankruptcy issues |
| 12/08/08 | FLP | 0.60 | Telephone conference with finance team regarding Lehman issues and next steps |
| 12/08/08 | JAR | 0.70 | Prepare for and participate in conference call with finance team and TSA staff to discuss Lehman GIC options |
| 12/08/08 | MLB | 2.20 | Review revised memorandum; prepare for conference call regarding contract termination; conference call with J. Reich, F. Pettis, client regarding Lehman issues; telephone conference with R. Michaelson regarding Lehman motion; follow-up e-mail to co-counsel; two e-mails to R. Michaelson, J. Reich |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave  Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

January 14, 2009
Invoice Number: 1916188
Page                3

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
|  |  |  | regarding Lehman motion |
| 12/08/08 | RNM | 1.00 | Telephone conference with M. Barreca; check scheduling order; review contract |
| 12/09/08 | RNM | 1.50 | Attention to motion regarding contract rejection |
| 12/10/08 | RNM | 1.70 | Telephone conference with M. Barreca; attention to motion to compel assumption or rejection |
| 12/11/08 | JAR | 0.70 | Prepare for and participate in conference call with F. Pettis, M. Barreca, Authority staff and P. Shapiro et al |
| 12/11/08 | FLP | 0.50 | Telephone conference with TSA staff and P. Shapiro regarding Lehman default |
| 12/11/08 | RNM | 1.00 | Attention to motion regarding rejection |
| 12/11/08 | MLB | 2.80 | Telephone conference with R. Michaelson, K. Elliott regarding Lehman motion issues; review Lehman-related documents; conference call with client and consultants regarding Lehman claim, motion; follow-up e-mails regarding consultant; second telephone conference with R. Michaelson, K. Elliott regarding claim issues, Lehman motion; review and reply to e-mail from consultant; conference with F. Pettis regarding Lehman issues |
| 12/11/08 | KSE | 1.80 | Conference with R. Michaelson and M. Barecca regarding Reserve Fund Agreement; review letter to Krasnow and sample default notice; review Reserve Fund Agreement |
| 12/15/08 | JAR | 0.30 | Send email with language describing Lehman default |
| 12/15/08 | KSE | 0.80 | (Lehman/settlement authority) conference with R. Michaelson regarding motion; review RFA; e-mails regarding additional default and revise default notice accordingly |
| 12/15/08 | RNM | 0.50 | Attention to default notice |
| 12/15/08 | MLB | 1.60 | Review Lehman bankruptcy pleadings; review draft default letter; revise default letter; e-mails to J. Reich, R. Cook regarding letter; review recent pleadings |
| 12/17/08 | MLB | 0.60 | Review e-mail reports regarding Lehman SWAP sale hearing |
| 12/18/08 | JAR | 0.50 | Review and prepare letter to Lehman for execution and delivery |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month
Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave Suite 2100,
Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

January 14, 2009
Invoice Number: 1916188
Page          4

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 12/18/08 | MLB | 1.20 | Telephone conference with J. Reich regarding defaults; review letter to Lehman regarding defaults; e-mail to New York office regarding default letter; review revised court order regarding contract termination; review related pleadings |
| 12/19/08 | MLB | 0.30 | Conference with J. Reich regarding expert analysis, default by Lehman; review e-mail from P. Shapiro; telephone call to K. Elliott regarding motion |
| 12/22/08 | KSE | 1.80 | Work on motion to compel rejection of RFA |
| 12/22/08 | MLB | 0.10 | Review e-mail from expert potential witness |
| 12/23/08 | RNM | 1.00 | Attention to motion regarding safe harbor regarding rejection |
| 12/23/08 | KSE | 1.50 | Conference call with M. Barecca and R. Michaelson; review omnibus hearing order; emails with M. Barecca regarding motion |
| 12/23/08 | MLB | 1.00 | Conference with J. Reich regarding expert for Lehman dispute; telephone conference with R. Michaelson, K. Elliott regarding motion; follow-up e-mails regarding motion |
| 12/29/08 | KSE | 0.80 | Conference call with R. O'Neil regarding Lehman research (.3); review annotations and caselaw discussing enactment of Bankruptcy Code section 562 |
| 12/29/08 | JAR | 0.50 | Meeting with B. Cook and K. Herman regarding financial advisor servicers for litigation matter |
| 12/29/08 | RNO | 0.30 | Discuss project with K. Elliot via telephone |
| 12/30/08 | RNO | 4.60 | Research Bankruptcy Code Section 562 and materials interpreting it; write short memo for K. Elliot |
| 12/31/08 | RNO | 0.90 | Complete short memo for K. Elliot |
| 12/31/08 | NFM | 0.50 | Review Lehman bankruptcy docket for Procedures Order and Service list |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

: 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

January 14, 2009
Invoice Number: 1916188
Page          5

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 12/31/08 | MLB | 0.40 | Conference with J. Reich regarding motion to compel rejection; telephone conference with K. Elliott regarding preparation of motion to compel contract rejection; review Lehman pleadings |
| 12/31/08 | KSE | 1.50 | Review Reserve Fund Agreement; research regarding forward purchase contracts; begin drafting motion to compel rejection of RFA |

**Total Fees:** 19,342.50

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 2.90 | 320.00 | 928.00 |
| J. Rich | 0.20 | 765.00 | 153.00 |
| J.A. Reich | 6.40 | 340.00 | 2,176.00 |
| M.L. Barreca | 15.70 | 370.00 | 5,809.00 |
| R. N. Michaelson | 6.70 | 675.00 | 4,522.50 |
| K. S. Elliott | 8.20 | 535.00 | 4,387.00 |
| R.N. O'Neill | 5.80 | 215.00 | 1,247.00 |
| N. F. Meyers | 0.50 | 240.00 | 120.00 |
| **Total:** | **46.40** | | **19,342.50** |

|  | Amount |
|--|--------|
| Disbursements | 8.75 |
| Local Courier - Light Speed Express Delivery Systems, LLC Light Speed Express Delivery Systems, LLC- Inv# 54496 dtd 11/30/08 re R. Michaelson 11/21 from K&L to Weil Gotshal & Manges 767 5th Ave | |
| **Total Disbursements:** | **8.75** |

This invoice reflects fees and costs not previously billed  Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month  Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L | GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

March 26, 2009
Invoice Number: 1939009

J.A. Reich

For Professional Services Rendered Through February 28, 2009:

2047532.99999 General

| | |
|---|---|
| Fee Amount | 4,228.20 |
| Disbursement Amount | 353.06 |
| **Total Amount Due This Matter** | **4,581.26** |

ADM PRE

RECEIVED
MAR 3 0 2009
A/P

POSTED
APR 0 3 2009

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906590 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

P1W-00115

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

March 26, 2009
Invoice Number: 1939009
Page              2

J.A. Reich

2047532              Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through February 28, 2009

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 02/03/09 | KSE | 0.80 | Lehman: conference call with Lehman's counsel regarding motion to compel assumption or assignment of Reserve Fund Agreement; emails to client regarding motion |
| 02/03/09 | MLB | 0.20 | Review and reply to e-mail regarding Lehman negotiations; telephone conference with K. Elliott regarding Lehman response |
| 02/03/09 | NFM | 0.30 | Prepare PDF for K. Elliott of Lehman pleading to send to client |
| 02/04/09 | JAR | 0.40 | Edit minutes of TSA meeting. |
| 02/05/09 | RNM | 0.50 | Telephone conference with attorney for Lehman regarding possible settlement; review moving papers |
| 02/10/09 | AJB | 0.80 | Deliver courtesy copies to Judges Peck and Gonzalez |
| 02/10/09 | NFM | 0.50 | Prepare and electronically file Notice of Adjournment for Stay Motion; prepare courtesy copy for judge of same |
| 02/11/09 | KSE | 0.60 | Conference call regarding Lehman negotiations; confer with R. Michaelson regarding same |
| 02/11/09 | RNM | 0.50 | Conference regarding status and strategy |
| 02/11/09 | MLB | 0.20 | Review and reply to e-mail regarding Lehman response to motion |
| 02/12/09 | MLB | 0.40 | Telephone conferences with F. Pettis regarding Lehman settlement discussions; review e-mail regarding status |
| 02/13/09 | MLB | 0.50 | Two telephone conferences with F. Pettis, K. Elliott regarding negotiations with Lehman |
| 02/18/09 | KSE | 0.50 | Telephone call with M. Horowitz of Weil Gotschal regarding settlement proposal; email correspondence with M. Barecca regarding same |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921019

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

March 26, 2009
Invoice Number: 1939009
Page          3

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 02/19/09 | FLP | 0.20 | Conference with M. Barreca regarding hearing adjournment; contact B. Cook regarding same |
| 02/19/09 | KSE | 0.30 | Telephone calls and emails with R. Cook regarding pending motion in Lehman bankruptcy; telephone calls and emails with Lehman's counsel regarding same; draft notice of adjournment of motion |
| 02/19/09 | MLB | 0.40 | Reply to e-mail regarding proposed compromise |
| 02/20/09 | MLB | 0.20 | Review and respond to e-mail regarding settlement of motion |
| 02/23/09 | AJB | 1.60 | Deliver letter to Judge Peck at Bankruptcy Court-SDNY |
| 02/23/09 | NFM | 0.50 | Prepare and electronically file Notice of Adjournment; send courtesy copy of same to Judge |
| 02/24/09 | RNM | 0.30 | Review correspondence, etc. |
| 02/25/09 | KSE | 0.80 | Lehman--Review and revise draft agreement terminating Reserve Fund Agreement |

**Total Fees:**                                      **4,228.20**

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 0.20 | 324.00 | 64.80 |
| J.A. Reich | 0.40 | 342.00 | 136.80 |
| M.L. Barreca | 1.90 | 396.00 | 752.40 |
| R. N. Michaelson | 1.30 | 675.00 | 877.50 |
| K. S. Elliott | 3.00 | 535.50 | 1,606.50 |
| N. F. Meyers | 1.30 | 234.00 | 304.20 |
| A. J. Burrus | 2.40 | 202.50 | 486.00 |
| **Total:** | **10.50** | | **4,228.20** |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U S dollars upon receipt  Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5ᵗʰ Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

March 26, 2009
Invoice Number: 1939009
Page           4

J.A. Reich

| Disbursements | Amount |
|---|---|
| Long Distance Courier | 18.07 |
| Westlaw Research | 334.99 |
| **Total Disbursements:** | **353.06** |

| Total Amount Due This Bill | 4,581.26 |
|---|---|
| **Total Now Due** | **4,581.26** |

K:\20475320\99999\20584_JAR\20584$330P

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month.
Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100,
Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

: 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

April 21, 2009
Invoice Number: 1957695

J.A. Reich

For Professional Services Rendered Through March 31, 2009:

2047532.99999 General

| | |
|---|---|
| Fee Amount | 3,777.75 |
| Disbursement Amount | 147.08 |
| **Total Amount Due This Matter** | 3,924.83 |

OK
[signature] 4-23-09

POSTED
APR 30 2009

RECEIVED
APR 29 2009
A/P

EZ 4/29/09

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U S dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

PLN—00118

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580   www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

April 21, 2009
Invoice Number: 1957695
Page             2

J.A. Reich

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

**For Professional Services Rendered Through March 31, 2009**

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 03/02/09 | KSE | 0.30 | Lehman/revise termination agreement and email M. Barecca and R. Cook regarding same |
| 03/03/09 | KSE | 0.20 | Lehman: review email from Bob Cook regarding US Bank comments to termination agreement; revise termination agreement accordingly; email comments to Lehman's counsel |
| 03/04/09 | MLB | 0.20 | Review and reply to email regarding Lehman claim procedure |
| 03/04/09 | KSE | 0.30 | Lehman--telephone calls and emails regarding modification of termination agreement and Weil Gotschal's request for an adjournment |
| 03/05/09 | KSE | 0.30 | E-mail Weil Gotshal regarding terms of adjournment, draft notice of adjournment, revise termination agreement |
| 03/06/09 | NFM | 0.50 | Prepare and electronically file Notice of Adjournment |
| 03/09/09 | AJB | 1.60 | Delivered letter to Judge Peek at Bankruptcy Court - SDNY |
| 03/09/09 | NFM | 0.80 | Prepare and serve Notice of Adjournment, send courtesy copy of same to Judge |
| 03/10/09 | KSE | 0.20 | Telephone conference with Lehman's counsel regarding changes to termination agreement |
| 03/11/09 | NFM | 0.50 | Prepare and electronically file Affidavit of Service for Notice of Adjournment in Lehman bankruptcy |
| 03/13/09 | KSE | 0.20 | Lehman--emails with R. Cook regarding revised termination agreement |
| 03/13/09 | MLB | 0.30 | Review revised settlement agreement; telephone conference with K. Elliott regarding settlement |
| 03/20/09 | FLP | 1.00 | Conference with K. Herman and B. Cook and telephone conference with B. Cook regarding Lehman termination |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

1 206.623.7580     www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

April 21, 2009
Invoice Number: 1957695
Page          3

J.A. Reich

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 03/20/09 | MLB | 0.80 | Telephone conference with K. Elliott regarding Lehman motion settlement; conference with F. Pettis and telephone conference with R. Cook regarding settlement |
| 03/20/09 | KSE | 0.40 | Lehman: numerous emails and phone calls regarding rejection order for LBSF Reserve Fund Agreement |
| 03/23/09 | NFM | 0.30 | Prepare disc for order to hand up at hearing per K. Elliott's request. |
| 03/24/09 | KSE | 0.50 | Lehman-prepare for hearing on motion to compel rejection of Reserve Fund Agreement |
| 03/25/09 | MLB | 0.10 | Review status of contract rejection |
| 03/25/09 | KSE | 1.30 | Attend hearing on motion to compel rejection of Reserve Fund Agreement |
| 03/30/09 | JAR | 0.30 | Review email regarding Lehman contract value and email request to K. Elliot for background information |

**Total Fees:**          **3,777.75**

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 1.00 | 324.00 | 324.00 |
| J.A. Reich | 0.30 | 342.00 | 102.60 |
| M.L. Barreca | 1.40 | 396.00 | 554.40 |
| K. S. Elliott | 3.70 | 535.50 | 1,981.35 |
| N. F. Meyers | 2.10 | 234.00 | 491.40 |
| A. J. Burrus | 1.60 | 202.50 | 324.00 |
| **Total:** | **10.10** | | **3,777.75** |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U S dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L | GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580     www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

April 21, 2009
Invoice Number: 1957695
Page            4

J.A. Reich

| Disbursements | Amount |
|---|---|
| Postage | 3.00 |
| Westlaw Research | 144.08 |
| **Total Disbursements:** | 147.08 |

| | |
|---|---|
| Total Amount Due This Bill | 3,924.83 |
| **Total Now Due** | 3,924.83 |

K:\204753\09999\20464_FLP\20464$3208

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5ᵗʰ Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

1 206.623.7580    www.klgates.com

Tax ID No 25 0921018

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

May 18, 2009
Invoice Number: 1974484
Page          2

J.A. Reich (NLH)

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through April 30, 2009

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 02/28/09 | MLB | 0.30 | [TSA/Lehman] Review Lehman termination agreement; email to K. Elliott regarding status |
| 04/24/09 | FLP | 0.20 | Telephone conference with M. Barreca regarding filing of claim |

Total Fees:          183.60

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 0.20 | 324.00 | 64.80 |
| M.L. Barreca | 0.30 | 396.00 | 118.80 |
| **Total:** | **0.50** | | **183.60** |

Total Amount Due This Bill          183.60
**Total Now Due**          183.60

POSTED
JUN 0 4 2009

RECEIVED
JUN 0 3 2009
A/P

K:\2047532\99999\20484_FLP\20464332OV

PIN-00122

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

June 11, 2009
Invoice Number: 1987312

F.L. Pettis

For Professional Services Rendered Through May 31, 2009:

2047532.99999 General

| | | |
|---|---|---|
| Fee Amount | 1,233.00 | |
| Disbursement Amount | 0.00 | |
| **Total Amount Due This Matter** | | **1,233.00** |

RECEIVED

JUN 28 2009

A/P

RECEIVED
WSHFC
09 JUN 18 AM 10: 48

This invoice reflects fees and costs not previously billed  Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month.
Payment is due in U S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5ᵗʰ Ave. Suite 2100,
Seattle, WA 98101, A3A Routing Number 125000105.

# K&L|GATES

Tax ID No. 25-0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

1 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

June 11, 2009
Invoice Number: 1987312
Page                2

F.L. Pettis

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

**RECEIVED**
JUL 0 1 2009
A/P

For Professional Services Rendered Through May 31, 2009

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 05/05/09 | FLP | 0.40 | Attend staff meeting regarding upcoming TSA meeting and Lehman reserve discussion |
| 05/14/09 | MLB | 0.20 | Review Lehman claim preparation issues |
| 05/26/09 | FLP | 0.20 | Review agenda and discuss upcoming June meeting |
| 05/27/09 | ER | 0.20 | Call with M. Barreca regarding claim to be filed |
| 05/27/09 | MLB | 0.40 | Emails to F. Pettis, E. Rim regarding claim (.20); teleconference with E. Rim re: claim (.20) |
| 05/28/09 | NFM | 0.50 | Review files for Lehman Settlement Pleadings, retrieve same and distribute to E. Rim |
| 05/28/09 | ER | 0.50 | Review documents for proof of claim |
| 05/29/09 | ER | 0.50 | Review memorandum by R. Cook and K. Elliott file for documents related to proof of claim |
| 05/29/09 | MLB | 0.50 | Review status of Lehman case, claim analysis; email to E. Rim regarding claim |

**Total Fees:**                          1,233.00

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 0.60 | 324.00 | 194.40 |
| M.L. Barreca | 1.10 | 396.00 | 435.60 |
| E. Rim | 1.20 | 405.00 | 486.00 |
| N. F. Meyers | 0.50 | 234.00 | 117.00 |
| **Total:** | **3.40** | | **1,233.00** |

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2700, Seattle, WA 98101, ABA Routing Number 125000105.

RIN—00125

# K&L|GATES

Tax ID No 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

June 11, 2009
Invoice Number: 1987312
Page            3

F.L. Pettis

| | |
|---|---|
| Total Amount Due This Bill | 1,233.00 |
| **Total Now Due** | **1,233.00** |

K:\2047532\09999\20464_FLP\20464332PM

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave, Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

т 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

July 13, 2009
Invoice Number: 2002424

F.L. Pettis

For Professional Services Rendered Through June 30, 2009:

2047532.99999 General

| | | |
|---|---|---|
| Fee Amount | 3,956.40 | |
| Disbursement Amount | 0.00 | |
| **Total Amount Due This Matter** | | **3,956.40** |

RECEIVED

JUL 2 0 2009

A/P

POSTED

JUL 3 1 2009

09 JUL 15 AM 11: 42
RECEIVED
WSHFC

Johnson 7/20/09

aa
7/31/09

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month.
Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave, Suite 2100,
Seattle, WA 98101, ABA Routing Number 125000105

PIN-0012Z

# K&L|GATES

Tax ID No. 25 0921018

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

t 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

July 13, 2009
Invoice Number: 2002424
Page          2

F.L. Pettis

2047532          Washington State Tobacco Settlement Authori
2047532.99999    General

For Professional Services Rendered Through June 30, 2009

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 04/22/09 | ER | 0.20 | [WASHINGTON TOBACCO SETTLEMENT AUTHORITY] e-mails and call with M . Barreca regarding proof of claim |
| 05/01/09 | MLB | 0.50 | (TSA/Lehman) telephone conference with R. Michaelson regarding claims issues, :Lehman case status; review pleadings regarding claims procedures |
| 06/01/09 | ER | 2.00 | Review Reserve Fund Agreement (0.4) and draft and revise proofs of claim by the Washington TSA against Lehman Brothers Special Financing Inc. (1.6) |
| 06/02/09 | ER | 2.50 | Review Reserve Fund Agreement and revise Washington TSA's proofs of claim and addendum against Lehman Brothers Special Financing and Lehman Brothers Holdings Inc. |
| 06/05/09 | ER | 0.50 | Review and summarize Lehman procedures for proofs of claim related to derivatives transactions and guaranty claims |
| 06/05/09 | MLB | 0.60 | Review claims procedure issues; email to co-counsel regarding same |
| 06/09/09 | FLP | 0.50 | Attend dress rehearsal |
| 06/10/09 | FLP | 1.00 | Attend TSA meeting |
| 06/12/09 | XKS | 0.10 | Obtain and review Lehman docket |
| 06/19/09 | XKS | 0.10 | Obtain and review docket |
| 06/24/09 | ER | 0.90 | Attend Lehman hearing on claims procedures (0.7) and summarize same for M. Barreca (0.2) |
| 06/26/09 | XKS | 0.10 | Obtain and review docket |
| 06/29/09 | ER | 0.60 | Attend Lehman claims procedures hearing |

This invoice reflects fees and costs not previously billed  Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave. Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

K&L Preston Gates Ellis LLP
925 Fourth Avenue
Suite 2900
Seattle, WA 98104-1158

Tax ID No 75 0921018

T 206.623.7580    www.klgates.com

Washington State Tobacco Settlement Authority
Attn: Mr. Robert Cook
Director, Finance Division
1000 2nd Avenue, Suite 2700
Seattle, WA 98104-1046

July 13, 2009
Invoice Number: 2002424
Page          3

F.L. Pettis

| Date | Atty | Hours | Description of Services |
|------|------|-------|-------------------------|
| 06/30/09 | ER | 0.10 | E-mai with M. Barreca related to Lehman procedures |
| 06/30/09 | ER | 0.60 | Draft and revise summary of Lehman claims procedures for clients (0.5) and e-mail M. Barreca related to procedures (0.1) |

**Total Fees:** 3,956.40

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| F.L. Pettis | 1.50 | 324.00 | 486.00 |
| M.L. Barreca | 1.10 | 396.00 | 435.60 |
| E. Rim | 7.40 | 405.00 | 2,997.00 |
| K. Swan | 0.30 | 126.00 | 37.80 |
| **Total:** | **10.30** | | **3,956.40** |

Total Amount Due This Bill          3,956.40
**Total Now Due**          3,956.40

K:\204753Z\99999\20464_FLP\20464832QM

This invoice reflects fees and costs not previously billed. Past due balances, if any, will be shown on a separate statement of account at the beginning of the next month. Payment is due in U.S. dollars upon receipt. Funds may be wired to our account number 153557906580 US Bank, Private Financial Services, 1420 5th Ave, Suite 2100, Seattle, WA 98101, ABA Routing Number 125000105.

# K&L|GATES

K&L Gates LLP
925 Fourth Avenue
Suite 2900
Seattle, WA  98104-1158

t 206.623.7580    www.klgates.com

July 13, 2009

faith.pettis@klgates.com

Mr. Robert D. Cook
Finance Director
Washington State Tobacco Settlement Authority
1000 Second Avenue, Suite 2700
Seattle, Washington 98104

    Re:   Invoice for Services

Dear Bob:

    Enclosed is K&L's invoice for general matters through June 30, 2009.

    Please advise if you have questions or concerns.  Thank you.

Very truly yours,

K&L GATES LLP

By
   Faith Li Pettis

FLP:mn

Enclosures

K:\20475321\99999\20464_FLP\20464L32P1

RECEIVED
JUL 20 2009
A/P

RECEIVED
WSHFC
09 JUL 15 AM 11: 42

