FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors

Chapter 11
Case No. 08-13555 (SCC)
(Jointly Administered)

-------------------------------------------------------------------x

## <u>MEMORANDUM DECISION SUSTAINING OMNIBUS OBJECTIONS TO CLAIMS</u>

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
By:    Ralph I. Miller, Esq.
       Robert J. Lemons, Esq.
       Denise Alvarez, Esq.
       Teresa C. Brady, Esq.

*Attorneys for Lehman Brothers Holdings Inc.*

STAMELL & SCHAGER, LLP
One Liberty Plaza, 23rd Floor
New York, NY 10006
By:    Richard J. Schager, Jr., Esq.
       Andrew R. Goldenberg, Esq.

LAW OFFICES OF LISA M. SOLOMON
One Grand Central Place
305 Madison Avenue
Suite 4700
New York, NY 10165
By:    Lisa M. Solomon, Esq.

RICH MICHAELSON MAGALIFF MOSER LLP
340 Madison Avenue, 19th Floor
New York, NY 10173
By:    Howard P. Magaliff, Esq.
       Robert N. Michaelson, Esq.

LAW OFFICE OF A. JAMES BOYAJIAN
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
By:    A. James Boyajian, Esq.

*Attorneys for Compensation Claimants*

DAY PITNEY LLP
One Jefferson Road
Parsippany, NJ 07054
By:    Margarita Y. Ginzburg

*Attorneys for Fabio Liotti*

KAPLAN LANDAU LLP
1065 Avenue of the Americas, 27th Floor
New York, NY 10018
By:    Eugene Neal Kaplan

JULIEN & SCHLESINGER, P.C.
207 East 94th Street, Suite 303
New York, NY 10128
By:    Michael Schlesinger

*Attorneys for Neuberger Berman Claimants*

ANDREA T. JAO

*Pro Se*

ALEXANDRE CATALO MAIA

*Pro Se*

PAUL SHOTTON

*Pro Se*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Even six years later, it is difficult to forget the media images from the days in late

September 2008 of Lehman Brothers employees walking out of its gleaming corporate

headquarters at 745 Seventh Avenue with their professional lives reduced to a few belongings in

2

cardboard boxes.  Thousands of former Lehman employees were affected by the bankruptcy

filing of one of the largest investment banks in the United States; many were devastated.  The

omnibus claims objections currently before the Court concern more than 200 of these former

employees, all of whom, as a component of their compensation, received either restricted stock

units or contingent stock awards.  These awards gave employees a contingent right to own

Lehman common stock, which would be issued five years after the grant of the applicable award

upon the fulfillment of certain employment-related conditions.  The employee-claimants rely on

various legal theories but, at bottom, all seek the same outcome – for their filed proofs of claim

to be allowed in a cash amount equivalent to the amount of their respective stock awards.

Lehman submits that the claims, all of which arise from the voluntary exchange of labor

for the right to receive stock, should be classified as equity under the confirmed *Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and it Affiliated Debtors*.

[ECF No. 23023 Ex. A.]  According to Lehman, (i) section 510(b) of the Bankruptcy Code

mandates that the claims have the same priority as Lehman common equity; and (ii) the stock

awards fall within the definition of "equity security" under section 101(16) of the Bankruptcy

Code.  Lehman argues that the claimants have failed to meet their burden to prove by a

preponderance of the evidence that their claims should be allowed.

After careful consideration of the evidence submitted by both sides, including argument

and live testimony presented at a three-day evidentiary hearing, the Court has concluded that the

claimants here have failed to meet the burden imposed on them to prove that their claims should

be allowed as filed.  Accordingly, the objections are sustained.

### *Procedural History*

Under a long-established equity award program, Lehman employees were compensated for their services in both cash and equity.  *See* Stip.[1] ¶¶ 2, 5.  Part of the equity component of employee compensation was comprised of restricted stock units and contingent stock awards (collectively, the "RSU"s).[2]  RSUs gave the recipient a contingent right to own LBHI common stock, which would be issued five years after the grant upon the fulfillment of certain employment-related conditions.  Stip. ¶¶ 3, 5, 7.  As of September 15, 2008, the date on which Lehman Brothers Holdings Inc. ("LBHI") commenced its chapter 11 case, hundreds of employees were holding RSUs that had been granted to them for services performed from 2003 through 2008; due to the five-year hold period, those RSUs had not yet led to the issuance of common stock.  Stip. ¶ 5.  Many of those employees filed proofs of claim (each, an "RSU Claim," and collectively, the "RSU Claims") in the Lehman chapter 11 cases seeking payment in cash of the amounts allocated in their respective employment records to RSUs.

LBHI and certain of its affiliated debtors filed fourteen omnibus objections (the "Omnibus Objections")[3] seeking to reclassify 3,279 RSU Claims as equity and subordinating

---

[1] References to "Stip." as used herein are to the Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, With Respect to Debtors' Omnibus Objections to Proofs of Claim, dated as of September 13, 2013 (the "Stipulation") [ECF No. 40263].

[2] Lehman awarded restricted stock units to U.S. employees and contingent stock awards for overseas employees. Stip. ¶ 1.

[3] The Omnibus Objections are Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]; Debtors' Two Hundred and (sic) Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]; Three Hundred Thirteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 28433]; Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435];

them to general unsecured claims.  In a series of orders entered throughout 2011, Judge Peck[4]

granted the requested relief and reclassified as equity RSU Claims asserting a total of $2.46

billion.[5]  Certain holders of RSU Claims (collectively, the "RSU Claimants") opposed the

omnibus objection relevant to their respective claims, and, on March 28, 2011 and December 15,

2011, LBHI filed omnibus replies in connection with the contested RSU Claims.  *See* Omnibus

Reply to Responses to Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify

Proofs of Claim as Equity Interests) [ECF No. 15406]; Omnibus Reply to Responses to Debtors'

One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred

Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-

Sixth, and Two Hundred and (sic) Seventh Omnibus Objections to Claim (To Reclassify Proofs

of Claim as Equity Interests) [ECF No. 23470].

---

Three Hundred Nineteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 28777]; and Three Hundred Forty-Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 30357].

[4] The Honorable James M. Peck retired from the bench on January 31, 2014.  These cases were transferred to the Honorable Shelley C. Chapman on February 1, 2014.

[5] The orders include Order Granting Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 14025]; Supplemental Order Granting Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 14776]; Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17349]; Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19527]; Second Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 21346]; Order Granting Debtors' One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17369]; Order Granting Debtors' One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17353]; Order Granting Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18177]; Order Granting Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18187]; Order Granting Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18178]; Supplemental Order Granting Debtors' One Hundred Seventy-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 27092]; Order Granting Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20610]; Order Granting Debtors' Two Hundred Fifty-Eighth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 27101]; Order Granting Debtors' Two Hundred Seventy-Second Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 27637]; Order Granting Debtors' Two Hundred Eighty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28378]; Order Granting Debtors' Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30368]; and Order Granting Debtors' Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30370].

On December 21, 2011, Judge Peck held a hearing on nine separate omnibus claims objections to RSU Claims.[6]  At the hearing, Judge Peck walked through the "thoughtful" reasoning set forth in *In re Enron*, in which the Court ruled that "claims for damages that arise from the ownership of employee stock options … should be subordinated pursuant to section 510(b)."  *In re Enron Corp., et al.*, 341 B.R. 141, 144 (Bankr. S.D.N.Y. 2006).  Judge Peck instructed claimants to explain "what it is about [each claim] that takes it outside of the reasoning [set forth in *Enron*] that I've reviewed and that I intend to follow." 12/21/11 Tr. at 58:15-59:16.

The Court heard several hours of argument, much of it from RSU Claimants alleging that there were distinguishing characteristics among the different "subclasses" of claims.  During the course of the hearing, the Court acknowledged that there were "some questions as to what the facts actually are." 12/21/11 Tr. at 104:5-105:11.  Accordingly, at the conclusion of the hearing, the Court (i) directed LBHI to file a supplemental annotated omnibus reply to the RSU Claimants' opposition to the claims objections,[7] and (ii) directed all parties to develop a factual record in order to afford each of the RSU Claimants an opportunity to distinguish *Enron* and to demonstrate the unique nature of each of the RSU Claims and why a particular RSU Claim

---

[6]The omnibus objections heard on December 21, 2011 included Debtors' Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; and Debtors' Two Hundred and (sic) Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012].

[7] LBHI filed its Supplemental Annotated Omnibus Reply to Responses to Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and (sic) Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 24591].

should not be classified as equity.  12/22/11 Tr. 127:7-128:21.  Additional briefing by the RSU Claimants followed.

On August 27, 2012, the Court entered an Order Establishing Discovery Procedures in Connection With Omnibus Objections to Reclassify Proofs of Claim as Equity Interests [ECF No. 30421] (as amended, the "Discovery Procedures Order").[8]  Pursuant to the Discovery Procedures Order, the parties engaged in a discovery process that spanned more than a year and resulted in the execution of the Stipulation.  The RSU Claimants who participated in discovery in this matter include (i) RSU Claimants who retained counsel (the "Compensation Claimants"), (ii) RSU Claimants who became employees of Lehman as a result of the acquisition of Neuberger Berman by LBHI[9] and who retained separate counsel (the "Neuberger Berman Claimants"), and (iii) RSU Claimants who chose to participate in these proceedings *pro se* (collectively, the Pro Se Participants).[10]

The Court conducted a three-day evidentiary hearing (the "Hearing") on April 1, 2, and 3, 2014.  The Court heard live testimony from six witnesses and oral argument from counsel and two Pro Se Participants.[11]  Upon the Court's instruction, the parties agreed upon the entry of 51 exhibits into the record and submitted post-trial briefs in accordance with an agreed schedule.[12]

---

[8] The Discovery Procedures Order was amended on November 12, 2012 [ECF No. 32386]; February 13, 2013 [ECF No. 34583]; October 8, 2013 [ECF No. 40334]; and October 17, 2013 [ECF No. 40542].

[9] Neuberger Berman is an investment management firm that LBHI acquired on October 31, 2003.  4/2/14 Tr. 99:25. Pursuant to an Order dated December 14, 2011, LBHI sold its remaining equity interests in Neuberger Berman back to the firm and its employees.  *See* Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing the Monetization of Equity Interests in Neuberger Berman Group LLC [ECF No. 23348].

[10] Each of Ms. Andrea T. Jao, Mr. Arthur J. Kenney, Mr. Fabio Liotti, and Mr. Alexandre Catalao Maia filed papers on his/her own behalf.

[11] Each of Ms. Andrea Jao and Mr. Paul Shotton, appearing *pro se*, made a statement on the record of the Hearing. *See* 4/2/14 Tr. 7:4-29:3 (Jao); 29:18-55:14 (Shotton).  Counsel to LBHI cross examined Mr. Shotton at the conclusion of his statement.  *Id.* at 55:16-69:2.

[12] On August 12, 2014, Richard J. Schager, as counsel to the majority of the Compensation Claimants, sent a letter to the Court [ECF No. 45687] attaching a decision by the Fifth Circuit Court of Appeals that the Compensation Claimants urged the Court to consider together with their Proposed Findings of Fact and Conclusions of Law. By e-mail to all counsel of record dated August 14, 2014, the Court stated that inasmuch as the record in this contested matter was closed and briefing was complete, it would not consider the letter in rendering its decision in this matter.

*See* Proposed Findings of Fact and Conclusions of Law Submitted by Compensation Claimants

in Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation

Claims as Equity or Alternatively to Subordinate Claims Pursuant to Section 510(b) of the

Bankruptcy Code dated June 6, 2014 [ECF No. 44951]; Neuberger Berman Claimants' Proposed

Findings of Fact and Conclusions of Law dated June 6, 2014 [ECF No. 44567]; Letter from

Andrea T. Jao dated June 6, 2014 [ECF No. 44705]; Debtors' Proposed Findings of Fact and

Conclusions of Law [ECF No. 45026]; Debtors' Reply to RSU Claimants' Proposed Findings of

Fact and Conclusions of Law [ECF No. 45025]; Letter from Eugene Neal Kaplan on behalf of

Neuberger Berman Claimants dated July 9, 2014 [ECF No. 45093]; Letter from Richard J.

Schager on behalf of Compensation Claimants dated July 22, 2014 [ECF No. 45333].

### *Legal Standard*

A properly-filed proof of claim comprises "prima facie evidence of the validity and

amount of the claim," Fed. R. Bankr. P. 3001(f), and is "deemed allowed, unless a party in

interest … objects." 11 U.S.C. § 502(a). An objecting party "bears the initial burden of

production and must provide evidence showing the claim is legally insufficient" under 11 U.S.C.

§ 502. *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014) (citation omitted).

Once the objecting party has met its initial burden, it is up to the claimant to "prove by a

preponderance of the evidence that under applicable law the claim should be allowed." *Id.*

(citation omitted).

Here, Judge Peck's instruction to the RSU Claimants to demonstrate why the RSU

Claims should not be classified as equity evidences his finding[13] that LBHI offered sufficient

evidence to refute and overcome the *prima facie* validity of the RSU Claims. *See Arcapita Bank*

---

[13] Even without such an implied finding, the Court finds that LBHI – in the Omnibus Objections, replies, and during the Hearing – offered sufficient evidence to refute and overcome the *prima facie* validity of the RSU Claims. *See In re Oneida Ltd.*, 400 B.R. 384, 289 (Bankr. S.D.N.Y. 2009).

508 B.R. at 817.  The burden, therefore, has shifted to the RSU Claimants to prove by a

preponderance of the evidence that their claims should be allowed.  *See id.*

### Background of RSU Claims

The RSUs were granted pursuant to Lehman's Equity Award Program (the "Program"),

which was established in 1994.  Stip. ¶ 5; CLX 072 (1997 Trust Under LBHI Incentive Plans).

The Program was administered by the Compensation and Benefits Committee (the

"Compensation Committee") of LBHI's Board of Directors.  Stip. ¶10.  Only the Compensation

Committee had the authority to set the terms of the Program from year to year.  The terms of the

Program could not be changed or varied without approval of the Compensation Committee.  *Id.*

Each year, the terms of the Program and the grants of RSUs were communicated to

employees firm-wide via face-to-face communications, conference calls, the online bonus system

"LehmanLive," and/or electronic mail.  Stip. ¶ 13.  Employees also received, on an annual basis,

pre-printed packets of information containing a "Dear Colleague" letter, a summary of the

material terms, and a brochure.  *Id*.  Program brochures stated that an RSU "represents the

conditional right to receive one share of Lehman Brothers common stock" once certain

employment-related conditions have been satisfied.  Stip. Ex. 3 (2003 Senior Vice-President

Equity Award Program) at LEH-RSU 0015891.  The brochures further advised participants in

the Equity Award Program that "you can consider the RSUs as shares of Lehman Brothers

common stock that the firm holds on your behalf for five years, which you will be entitled to

receive at that time, provided you meet certain terms and conditions."  *Id*.

At all times, Lehman had the option to pay a portion[14] of employees' total compensation

in equity-based awards pursuant to the Program.  The employee handbooks distributed in the

---

[14] Near the end of each fiscal year 2003 through 2008, bonus-eligible (salaried) and production-based
(commissioned) employees typically received a brochure with a schedule attached identifying any percentage and/or

United States and the United Kingdom provide that "[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in the form of conditional equity awards (restricted stock units ('RSUs'), stock options, or other equity awards) pursuant to the Firm's Equity Award Program."  Stip. ¶ 2.  In addition, in each case in which Lehman had an employment contract with an RSU Claimant, that contract provided (with some varying language), that "[a]t the Firm's discretion, a portion of your total …compensation . . . will be [or may be] payable in conditional equity awards (restricted stock units and/or other equity awards) pursuant to the Firm's employee equity award program  … ." *Id.*  Employees were required to participate in the Program by virtue of their employment with Lehman and the implementation of Equity Award Programs by the Board of Directors.  Stip. ¶ 13.  Moreover, employees had no decisions to make under the RSU/CSA compensation plan; there were no election or enrollment forms for them to complete.  *Id.*  The discretion to pay the RSU Claimants in the form of equity-based awards belonged solely to Lehman, and the RSU Claimants could not elect to receive cash instead of the awards.  Stip. ¶10.

A grant of RSUs entitled employees to nothing more than LBHI common stock at the end of the five-year hold period upon the fulfillment of certain conditions.  CLX 073 (LBHI Employee Incentive Plan as amended through Feb. 19, 2003) at Section 8(b); LBHI0026 (Lehman Brothers 2007 Equity Award Program) at Section 5; LBHI0034 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units – Investment Representative) at Section 6; LBHI0035 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at Section 6; LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at Section 8(b); LBHI0118 (LBHI Employee Incentive Plan as

---

amount of an employee's bonus or commissions that would be paid in RSUs for those years, which was based on the level of compensation and corporate title held by the employee.  Stip. ¶ 14.

amended through Nov. 8, 2007) at Section 8(b).  Once the RSUs were granted, Lehman's

obligations were "limited solely to the delivery of shares of Common Stock on the date when

such shares of Common Stock are due to be delivered under each Agreement, and in no event

shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation.

. . ." *Id.*  There is no evidence referencing an obligation on the part of LBHI to deliver cash in

lieu of or in exchange for the RSUs.[15]  The only place in the Program documents that refers to

receiving cash in exchange for RSUs is the section discussing a friendly change of control; that

section is irrelevant to the matters at issue here.  Even in that circumstance, the Program

documents are clear that it is Lehman's option or discretion to pay cash or equity in exchange for

RSUs.  Stip. Ex. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015901;

LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at

Section 8(b).

The RSUs did not have a fixed value.  Rather, during the five-year hold period, the value

of the RSUs varied with the value of LBHI's common stock.  The ultimate value of the RSUs –

and the amount of income tax liability that RSU holders ultimately would incur – depended on

LBHI's stock price after the five-year hold period, at the time of delivery of the LBHI common

stock.  4/1/14 Tr. 250:21-251:3; *see* Stip. Ex. 3 (2003 Senior Vice-President Equity Award

Program) at LEH-RSU 0015900 ("As a result, your RSUs appreciate on a pre-tax basis for the

five-year restriction period. … Upon conversion to common stock, the fair market value of the

shares will be taxed as employment income based on the closing price of Lehman Brothers

common stock on the conversion date.").

---

[15] Ms. Karen Simon Krieger, a Compensation Claimant whose testimony is discussed in greater detail *infra*, testified
that she sold her RSUs as soon as they vested.  When asked whether that was because she "understood [that] you
didn't have an option to get money, that's why as soon as you got a share, that's why you tried to sell it?" Ms.
Krieger responded "[t]hat's right."  4/2/14 Tr. 190:7-11.

A central purpose of the Program was to strengthen LBHI by giving employees a financial stake in the company, thus giving them a sense of ownership in the firm and motivating them to secure the firm's success. *See, e.g.*, Stip. Ex. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015891. The Program brochure explained to employees that "it is important for you to have a significant stake in the firm. . . . The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time." *Id.; see also* Stip. Ex. 15 (2008 Equity Award Program Questions and Answers) at LEH-RSU 0000914 ("[A]s in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.") and LBHI0118 at LEH-RSU 0000254 ("The purpose of the Lehman Brothers Holdings Inc. Employee Incentive Plan (the 'Plan') is to strengthen Lehman Brothers Holdings Inc. (the 'Company') by providing selected employees … with the opportunity to acquire a proprietary and vested interest in the growth and performance of the Company[, and] . . . [t]he purposes of the Plan are to be achieved through the grant of various types of stock-based awards.")

Holders of RSUs benefited from any dividends that were paid during the five-year hold period. When LBHI common stock declared a dividend, the RSUs also paid dividends to the RSU holder in the form of additional RSUs; the number of additional RSUs received as a result of the dividend event was based on the share price of LBHI common stock at the time of the dividend event. Stip. Ex. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015902 ("Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount."); CLX 004 (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at LEH-RSU 0022584 (same); Stip. ¶29. If the necessary

12

conditions were satisfied, when the RSU holders were issued tradable LBHI common stock, they received additional common stock in proportion to the dividend equivalents that had accrued during the five-year period. *Id.*

RSU holders also had shareholder voting rights, even before any LBHI stock was issued. Lehman established a trust and funded it with shares to be issued upon the conversion of RSUs to common stock. That trust gave RSU holders the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees. Stip. Ex. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015902 ("You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold."); CLX 004 (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at LEH-RSU 0022584 (same).

The RSU Claimants were at-will employees and had a choice as to whether or not to accept and continue employment at Lehman. 4/1/14 Tr. 223:11-24; 255:24-256:17; 313:20-314:7; 4/2/14 Tr. 114:6-9; 215:15-22. The RSU Claimants voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs, whose value varied with the value of the LBHI common stock. 4/1/14 Tr. 316:25-317:23; 4/2/14 Tr. 14:15-18:5; 116:8-17.

### *RSU Claimants Have Failed to Establish That Their Claims Should be Allowed*

During the course of the evidentiary hearing, six witnesses – four Compensation Claimants and two Neuberger Berman Claimants – and two Pro Se Participants testified[16] before the Court. The Court heard chronicles of personal hardships and difficult choices. For example, Ms. Andrea Jao, a Pro Se Participant, described the hypothetical decision to leave employment

---

[16] The Court explained to each Pro Se Participant who made a statement that, to the extent any statement included a recitation of facts, the Court would treat such recitation as testimony given under oath. 4/2/14 Tr. 7:11-7:17; 29:22-30:3.

and, thereby, leave earnings associated with RSUs on the table as "punitive" and "extreme."
4/2/14 Tr. 13:23-14:3.  Mr. Paul Shotton, a Pro Se Participant and former global head of market
risk management, explained that he had waited for the better part of seven years for the type of
career opportunity he found at Lehman before beginning his employment there – in connection
with which he moved his family from the United Kingdom to the United States – and, as a
practical matter, there really was no option to "walk".  4/2/14 Tr. 41:20-42:16; 66:20-21.
Perhaps the most compelling testimony came from Compensation Claimant Ms. Karen Simon
Krieger.  At the time Lehman instituted the Program, Ms. Krieger had been recently widowed
and was raising two children.  4/2/14 Tr. 157:2-157:20.  She did not wish to participate in the
Program; it gave her a sense of not being in control of her money.  4/2/14 Tr. 157:11-14.  Ms.
Krieger, however, "was in no position to go to another firm and try to establish my credibility
and to try and work and build a new future.  Because at that point, I cared about day-to-day
living with my kids, and making sure they had the right caregiver when I went to work."  4/2/14
Tr. 163:19-24.  Due to her personal circumstances, and because of the support she received from
her Lehman "family," Ms. Krieger testified that "the thought of going anywhere was beyond
frightening to" her.  4/2/14 Tr. 164:19; 164:4-5.  By all accounts, Ms. Krieger devoted much of
her life to Lehman.

Despite these compelling facts and circumstances, however, it must also be noted that the
RSU Claimants are highly sophisticated individuals who were working at a prestigious
investment banking firm.  4/2/14 Tr. 30:5-10; 41:17-42:3; 86:22-87:21; 90:12-24.  Many of the
RSU Claimants, particularly the Neuberger Berman Claimants, were receiving millions of
dollars a year in cash and millions of dollars a year in stock awards.  4/1/14 Tr. 254:16-255:2;
4/2/14 Tr., 40:11-14.

Mr. Michael Gran, a Compensation Claimant employed in the United Kingdom, was asked if he "understood that the compensation system at that time included some portion of your compensation in [contingent stock awards] rather than all cash; is that correct?" to which he responded "Absolutely."  4/1/14 Tr. 223:11-14.  Ms. Jao was asked if she was told that she was getting equity awards as part of her compensation, to which she responded affirmatively.  4/2/14 Tr. 12:5-15; 17:18-18:5.  Ms. Krieger testified that as part of her supervisory responsibilities, she would attend training sessions with Lehman HR "as to how to explain what that program meant, and then subsequently each year, as compensation was ready to be announced, we had training sessions again with the HR department that required us to ensure that we understand the script that we needed to deliver to our employees so that they would understand their compensation."  4/2/14 Tr. 151:11-152:2.  Ms. Krieger explained that employees were told "this was the compensation that you were being awarded.  This was your base.  This was your bonus, and that was the breakdown of your bonus and what was actually going to be RSUs."  4/2/14 Tr. 177:16-178:21.

Moreover, the RSU Claimants understood that the value of LBHI common stock could vary even if the market was generally stable – that it could, in fact, be worth nothing – and that the value of the RSUs they received varied accordingly.  4/1/14 Tr. 257:7-259:6; 319:15-322:5; 4/2/14 Tr. 62:8-15; 184:24-185:10.

Mr. Shotton testified that he was hired as a managing director to be the global head of marketing risk management at Lehman.  4/2/14 Tr. 30:5-10.  He further testified that he received approximately $1.1 million on account of the work he performed in 2004.  4/2/14 Tr. 40:11-14.  Mr. Shotton also testified that he understood that LBHI common stock price would go up and down.

Q: Did you understand that you would receive the benefit of stock appreciation at the end of the five years if you met the conditions and remained with Lehman for five years?

A: I understood that this promise to convert the RSUs into equities after five . . . years after the grant date would happen and that had those conversions taken place that the equity when delivered would be worth whatever it is now worth with a higher or lower or whatever.

4/2/14 Tr. 62:8-15.

Compensation Claimant Ms. Sandy Fleishman Richmond testified that her total cash compensation for 2006 "would have been that year 1.8 million with 200 being the salary." 4/1/14 Tr. 254:16-22.  The Court questioned Ms. Fleishman about her understanding of the RSU program:

The Court: So let me ask you a question.  When you look at this statement that's dated as of September 12th, 2008, which as it turned out was three days before the filing, though had events unfolded differently, for example, and the government had decided to bail Lehman out, it might have been the case that Lehman continued and that as these cliffs arrived, your stock was worth a very small fraction of the numbers on this page, right?

A: Yes.

The Court: And you understood that, right?

A: Yes.

4/1/14 Tr. 257:7-17.

The Court also questioned Compensation Claimant Mr. Nicholas Howard regarding his understanding of the fluctuations of common stock.

The Court:  Then what would happen if the Lehman stock price went down … after that date? . . . Would you still be entitled to $362,000 of Lehman stock or did you get a grant of Lehman stock in the amount of $362,000 on that date and you would follow the stock price as it went down?

A: From my memory, Your Honor, what I would look at would be at the end of, for example, '08, if the firm had still been . . . in business … there was going to be $362,000 worth of cash would be translated

16

into so many units.  Those units – I would be eligible for those units in five years' time.

The Court: At what price? How many – how would you calculate the number of units? . . .

A: You will see the same that's referred to as the  . . . grant price and the grant value.  The grant price would be, from memory what it was when . . . you received the . . . strike. . . .

The Court: Right. But then – then later on if all had gone – if Lehman had continued in business, that block of stock that had a value of 362 at the time of the grant would be worth more or less depending upon … what the Lehman share price did in those ensuing years, right?

A: Correct. Yes.

4/1/14 Tr. 319:24-322:4.

Ms. Krieger also testified that she also understood that the price of LBHI common stock fluctuated and that the value of the RSUs fluctuated accordingly.

The Court: Does "skin in the game" include a risk of losing something if the game is lost?

A: Sure. . . . can you lose money – absolutely; the difference is I didn't want that risk.

Court: And that's why you sold those shares the day you could?

A: The day I could.

4/2/14 Tr. 184:24-185:10.

### Section 510(b) and Enron

Notwithstanding a demonstrated understanding of the terms of the Program and the characteristics of an RSU, each of the RSU Claimants seeks an allowed claim in a *cash* amount equivalent to the amount of RSUs due to him/her as of September 15, 2008.  The Court finds, however, that the RSU Claimants have failed to demonstrate that the RSU Claims should not be classified as equity.

The RSU Claimants have not identified a single characteristic of the RSU Claims that distinguish them from the employee claims that the *Enron* court found were subject to the subordination provisions of 11 U.S.C. § 510(b).  Section 510(b) of the Bankruptcy Code provides, in pertinent part, that

> (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, or for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).  It is well-established in the Second Circuit that section 510(b) is to be interpreted broadly.  *See In re Lehman Brothers Inc.*, 503 B.R. 778, 782 (Bankr. S.D.N.Y. 2014) (quoting *In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006)).  Moreover, "[w]ith the accumulation of precedents, it is no longer necessary that the courts relate in detail the history of section 510(b) … ."  *Enron*, 341 B.R. at 163.  Indeed, "the broad applicability of section 510(b) is now quite settled."  *Id.*  In order to resolve the issue of whether the RSU Claims are subject to subordination, the Court must look to the language of the statute and determine (i) whether an RSU is a security; (ii) whether the RSU Claimants acquired the RSUs in a purchase; and (iii) whether the damages sought by the RSU Claimants in the RSU Claims arise from the purchase of a security.  *See id.* at 149.

*Security*

Section 101(49)(A)(xv) of the Bankruptcy Code defines "security" to include a "certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security." 11 U.S.C. § 101(49)(A)(xv).[17]

---

[17] Even when interests do not precisely match the specific labels enumerated in section 101(49) of the Bankruptcy Code, courts have held that the fifteen-item list of examples of securities in section 101(49) is not exhaustive and

Under section 101(49)(A)(ii), a stock is also a security.  11 U.S.C. 101(49)(A)(ii).  The Program

documents in evidence provide that an RSU "represents the conditional right to receive one share

of Lehman Brothers common stock" once certain employment-related conditions have been

satisfied.  *See, e.g.*, Stip. Ex. 3 (2003 Senior Vice-President Equity Award Program) at LEH-

RSU 0015890; CLX 004 (2005 Equity Award Program for Bonus-Eligible and Production-Based

Employees) at LEH-RSU 0022574.  Thus, a grant of an RSU constitutes a contingent right to

participate in, receive and/or purchase common stock of LBHI, consistent with section 101(49)

of the Bankruptcy Code.  In addition, the RSUs bear key hallmark characteristics of a security –

they lacked a fixed value; were eligible for any declared dividends; provided for limited voting

rights; and allowed employees to share in the financial success of Lehman over time.  As such,

each of the RSUs warrants treatment as a "security" as that term is defined by the Bankruptcy

Code.

### *Purchase – RSU Claimants Generally*

Under relevant case law, courts routinely have held that employees who received equity

awards as part of their compensation purchased those securities with their labor.  *See Enron*, 341

B.R. at 151 ("While it is true that the Claimants did not purchase the stock options on the open

market, they nonetheless exchanged value for the options: here, their labor.  Such exchange falls

under broad reading of the term 'purchase.'"); *In re Motor Liquidation Co.*, No. 11 Civ. 7893

(DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012) ("Section 510(b) mandates

subordination when an individual receives equity securities in exchange for labor even when

---

that an interest may fall within the definition of a security if, among other things, the interest owner expects to share
in any increases in value in the enterprise to the exclusion of ordinary creditors.  *See, e.g., O'Donnell v. Tristar
Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (9th Cir. 2013) (finding that the
fifteen-item list of what constitutes a "security" in section 101(49) is non-exclusive and holding that a membership
interest in an LLC is a "security").  Similarly, the Fifth Circuit concluded that section 101(49)(A)(xiv), which
includes in the definition of security "other claim[s] or interest[s] commonly known as 'security,'" is a "broad
residual category."  *In re Am. Hous. Found.*, 2013 WL 1316723, at *18 (citing *In re SeaQuest Diving, LP*, 579 F.3d
411 (5th Cir. 2009)).

there is 'no actual sale or purchase' of securities") (citing *In re Med Diversified*, 461 F.3d at

258); *In re U.S. Wireless Corp.*, 384 B.R. 713, 719 (Bankr. D. Del. 2008) ("Therefore, under

established law, the Equity Package Wax received as a portion of his compensation, *i.e.*, in

exchange for his labor, constitutes a purchase and sale of a security for the purpose of section

510(b) of the Bankruptcy Code."); *Frankum v. Int'l Wireless Commc'ns Holdings, Inc. (In re*

*Int'l Wireless Commc'ns Holdings, Inc.)*, 279 B.R. 463, 467 (D. Del. 2002), *aff'd*, 68 Fed. Appx.

275 (3d Cir. 2003) ("That Appellants received the Debtors' stock as part of a compensation

package does not preclude the transfer from being characterized as a purchase/sale of the

Debtors' stock."); *In re Touch America Holdings, Inc.*, 381 B.R. 95, 104 (Bankr. D. Del. 2008)

(adopting a broad reading of the term "purchase" and noting that "stock given to an employee as

compensation nonetheless involves a 'bargain and exchange of value'").

Despite the RSU Claimants' assertions to the contrary, the Court finds that their

participation in the Program was entirely voluntary and that they, thereby, "purchased" the RSUs

in exchange for their labor.  Indeed, although the RSU Claimants had the option to leave

employment at Lehman, they elected voluntarily not to do so primarily because of the high cost

associated with leaving – i.e., leaving unvested equity awards "on the table" and/or the inability

to make as much money anywhere else.  4/1/14 Tr. 313:20-314:7; 4/2/14 Tr. 13:23-14:9; 40:17-

42:16; 97:17-98:5; 123:21-124:16; 137:10-20; 201:14-23; 212:18-213:12; 220:17-221:2.

The RSU Claimants submit that there was no "purchase" of RSUs by Lehman employees

because there was no bargained-for exchange to become a shareholder, but instead a transaction

calling for the possible delivery of RSUs as one mode of alternative payment of promised

compensation.  Lehman employee handbooks expressly provided, however, that "[a]t the Firm's

option, a portion of [an employee's] total compensation . . . may be payable in the form of

conditional equity awards (restricted stock units ("RSUs"), stock options, or other equity awards) pursuant to the Firm's equity award program." Stip. ¶ 2. In cases where Lehman had an employment contract with an RSU Claimant, those contracts also provided that at Lehman's option, a portion of the employee's compensation "will be" or "may be" payable in conditional equity awards. *Id.* Thus, at all relevant times, the RSU Claimants understood that they would be compensated both with cash and with rights to become holders of LBHI common stock. They had a bargaining position and a choice as to whether or not to accept and continue employment at Lehman. By accepting employment from and continuing employment with Lehman, the RSU Claimants voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs, and, particularly in light of their understanding that the value of the RSUs varied with the value of LBHI common stock, the RSU Claimants voluntarily and continuously accepted the attendant benefits and risks associated therewith. Any of the RSU Claimants could have, at any time, "voted with his feet" against the terms of the Program by leaving Lehman. Instead, the RSU Claimants made the voluntary choice to stay in the business that they had voluntarily entered as employees.

The claimants in *Enron* similarly asserted that they did not "purchase" the stock options issued as part of their compensation, arguing that there was no voluntary exchange of goods, services, or currency, but rather, that they were "required to take a minimum percentage of their annual bonus in stock option form." 341 B.R. at 150-151. Judge Gonzalez rejected this argument as flawed, reasoning that,

> [a]lthough implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, *that was a condition of employment the Claimants willingly accepted in return for their*

21

*labor*.  These Claimants, thus, "purchased" the stock options with
their labor.

341 B.R. at 151 (emphasis added).

*Purchase – Neuberger Berman Claimants*

The Neuberger Berman Claimants argue that they are distinguishable from the other RSU

Claimants because they "truly" had no choice but to accept the terms of the Program when

Neuberger Berman elected to merge with Lehman.  *See* Neuberger Berman Claimants' Proposed

Findings of Fact and Conclusions of Law at Findings of Fact ¶¶ 3-19, Conclusions of Law ¶¶ 1,

4-10, 17, 19.  The Neuberger Berman Claimants argue that their hands were tied and they had to

accept and continue employment with Lehman or risk throwing away their careers because of the

conditions of their non-compete agreements.  *Id.*  The evidence adduced (or the lack thereof, as

applicable), however, demonstrates that these arguments are unavailing.  At all times, beginning

with the merger and every day thereafter, the Neuberger Berman Claimants had the choice to

"vote with their feet" against the terms of the Program by leaving Lehman.

There is no evidence that the Neuberger Berman Claimants' non-compete agreements

were unconscionable and entered into under economic duress, and that therefore their

employment at Lehman – and participation in the Program – was involuntary.  Under New York

law, parties who attempt to set aside a contract due to economic duress face a heavy burden.  As

the Second Circuit explained in *VKK Corp. v. NFL*, some element of economic duress is present

when many contracts are formed because it is not unusual for one commercial party to have "a

decided economic advantage over the other."  244 F.3d 114, 123 (2d Cir. 2001).  As such,

successful claims of duress are "reserved for extreme and extraordinary cases."  *Id.*  In order to

prevail, a plaintiff claiming economic duress must show (1) threats of an *unlawful act* by one

party which (2) compels performance by the other party of an act which it had a legal right to

abstain from performing. *Chase Manhattan Bank v. State of New York,* 13 A.D. 3d 873 (3d

Dept. 2004). In addition, the party claiming duress must act *promptly* or be deemed to have

ratified the agreement; courts in New York have found that delays as short as six months

constituted waivers of claims for duress. *VKK Corp.*, 244 F.3d at 122-123 (*citing DiRose v. PK

Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982) (collecting cases in which delays ranging from

six months to two years constituted a forfeiture)) (holding that waiting 30 months before

challenging a contract was too long and plaintiff forfeited any right to assert duress).

There is no factual support for the Neuberger Berman Claimants' contention that they

acquiesced to employment at Lehman under economic duress. All of the RSU Claimants made a

meaningful and voluntary choice to become and remain Lehman employees subject to the terms

of the Program. Though the Neuberger Berman Claimants urge that they were faced with a take-

it-or-leave-it situation, their choice was anything but; there was nothing unconscionable about

giving the Neuberger Berman Claimants the choice between accepting employment at Lehman in

exchange for millions of dollars in both cash and RSUs or seeking employment elsewhere. The

Neuberger Berman Claimants could have sought employment elsewhere but did not; instead,

each of them made an economic decision based on rational self-interest.

The terms of the Neuberger Berman Claimants' non-compete agreements with Lehman,

which had limited one-to-three year restriction periods and were narrowly restricted to Lehman's

market, were not unlawful. *See Cardwell v. Thermo Fischer Scientific*, No. 09 Civ. 7809 (DAB),

2010 WL 3825711 at *7-8 (S.D.N.Y. Sept. 23, 2010) (citations omitted) (holding that a one-year

non-compete covenant was reasonable where plaintiff was a project manager and employed for

over four years with the defendant, and stating that "New York Courts have held restrictions of

up to five years to be reasonable depending on the circumstances"); *Crown IT Servs., Inc. v.*

*Koval-Olsen*, 11 A.D.3d 263 (1st Dep't. 2004) (finding a non-compete covenant to be reasonable in time and area where the clause prohibited a consultant from servicing the firm's former clients for one year).  The law does not recognize a claim for economic duress where there was no unlawful conduct by LBHI compelling performance by the Claimants.

Finally, there is no evidence that any of the Neuberger Berman Claimants *promptly* claimed that they entered into employment with Lehman under duress in 2003.  Instead, the Neuberger Berman Claimants agreed that the terms of their non-compete agreements with Lehman were "reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger" and that covenants and restrictions therein would not unreasonably restrict the Neuberger Berman Claimants' professional opportunities should they no longer be employed by Neuberger Berman or Lehman.  *See, e.g.,* NB B (Ramallo Retention Agreement).  The Neuberger Berman Claimants presented no evidence that they sought to repudiate the terms of their employment at Neuberger Berman or Lehman, but rather voluntarily accepted them, and were paid rather well under these arrangements.  The Second Circuit in *VKK Corp.*, which the Neuberger Berman Claimants cited in support of their argument, cautioned against finding duress where parties like the Neuberger Berman Claimants have employed a "wait and see" approach:

> The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. . . . [T]he requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced.

244 F.3d at 123-124.  More than ten years after the merger, the Neuberger Berman Claimants

have forfeited the right to complain of economic duress.  By their behavior, the Neuberger

Berman Claimants ratified the terms of the Program.

The Court finds that all of the RSU Claimants, including the Neuberger Berman

Claimants, are deemed to have purchased the RSUs for purposes of section 510(b) of the

Bankruptcy Code.

*Damages Arising from Purchase or Rescission*

The RSU Claimants argue that the RSU Claims are not subject to section 510(b) because

their claims are not for damages but, rather, for unpaid debt or services rendered.  As such, they

contend that they are creditors entitled to cash, not disappointed shareholders.  The RSU

Claimants assert a variety of theories for the liability of LBHI relating to the RSUs, including (i)

LBHI's alleged alternative performance obligations; (ii) claims that LBHI expressly stated that

RSU holders are general unsecured creditors; and (iii) claims for withheld wages under the labor

laws of various jurisdictions.  The Court rejects each of these theories.

First, it was at all times within Lehman's sole discretion whether to pay part of its

employees' total compensation in either cash or equity-based awards.  That aside, the RSU

Claimants' argument that they have claims for alternative performance ignores the fact that

Lehman already paid them the compensation they were due in the form of RSUs.  Once those

RSUs were paid, as they were here, the RSU Claimants had no right to any other mode of

performance – in the form of cash or otherwise.  The RSU Claimants' rights were solely limited

to the delivery of LBHI common stock.  It is clear, then, that the RSU Claimants have no claim

for alternative performance in the form of cash.[18]

---

[18] To the extent that any of the RSU Claimants was a commission-based employee who did not receive RSUs in
2008, the Court finds that such employee's claim amounts to one for RSUs that were not issued.  Courts have

There is no basis for Claimants' position that they are now entitled to cash or anything other than RSUs from Lehman as consideration for their labor. Claimants admit they "could not elect to receive cash instead of the awards." Stip. ¶ 10. In addition, at no point did Claimants bargain for the right to receive, and under no circumstances that existed for these Claimants did LBHI have an obligation to deliver, cash in lieu of or in exchange for the RSUs. LBHI0116 (LBHI 2005 Stock Incentive Plan) at LEH-RSU 0000176; LBHI0117 (LBHI 1996 Management Ownership Plan) at Section 8(b); LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Section 8(b); Stip. Ex. 4 (2003 Management Director Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) ¶ 6. LBHI's bankruptcy filing does not transform a claim for equity into a claim for cash.

Contrary to the RSU Claimants' assertions, there is no language in the Program documents indicating that RSU holders would have general unsecured claims in the event of insolvency. Language in select Program documents for the years 2003 and 2004 Program referenced Section 510(a) of the Bankruptcy Code (the "Subordination Provisions"). LBHI0034 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units – Investment Representatives) and LBHI0035 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at Section 10. The Subordination Provisions do not appear in the Program Documents after 2004. *See* LBHI0047 (2005 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units). There is no evidence as to why the Subordination Provisions are not contained in the Program Documents after 2004. 4/1/14 Tr. 81:10-14. There is no evidence that the decision to omit the Subordination Provisions in the

---

extended section 510(b) to claims relating to a failure to issue equity. *See In re Med Diversified Inc.*, 461 F.3d at 256 (holding that section 510(b) covers a claim based on a debtor's failure to issue common stock pursuant to the terms of an agreement between the parties). Accordingly, the Court finds a basis to treat the claim of any such employee in the same way that all other RSU Claims are treated.

Program documents arose from any intent by LBHI to declare that claims for RSUs would cease to be subject to subordination pursuant to section 510(b) of the Bankruptcy Code if a chapter 11 proceeding should ever arise.  (The law is what the law is, regardless of whether it is recited in the Program documents.)  Further, there is no evidence that the RSU Claimants relied upon the omission of the Subordination Provisions when making the choice to continue employment at Lehman.  Accordingly, nothing in or about the Program documents supports Claimants' contention that Lehman intended to grant RSU holders the status of general unsecured creditors in the event of insolvency.

Similarly, contrary to the RSU Claimants' assertions, the language in the Lehman Brothers Employee Incentive Plan as amended through November 8, 2007, LBHI0118 (the "Employee Incentive Plan"), does not indicate that holders of RSUs are general unsecured creditors of the company.  The relevant language from the Employee Incentive Plan states:

Section 8(b): With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary *may pay* to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control). …

Section 16: The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any *payments* not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company.  In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock *or payments in lieu thereof*.

LBHI0118 (Employee Incentive Plan) (emphasis added).

Section 8(b) of the Employee Incentive Plan states that there are limited situations in which Lehman could issue *payments* in cash in lieu of the restricted stock units; none of these

situations is applicable here.  Section 16 states that Lehman's obligations to deliver common stock or payments in lieu thereof are mutually exclusive obligations.  Thus, the language in Section 16 of the Employee Incentive Plan – stating that Participants who are entitled to *payments* do not have rights greater than those of a general creditor – is limited to Participants entitled to payments of cash in lieu of equity awards and is inapplicable to the Claimants here.

In addition, Section 13(b) of the Employee Incentive Plan, which states that "the grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock," merely clarifies that RSU holders are not active shareholders and, therefore, do not have all the rights of stockholders; for example, RSU holders cannot bring shareholder's derivative actions.  LBHI0118 (Employee Incentive Plan).  It does not, as Claimants contend, reasonably lead to the conclusion that Lehman intended RSU holders to have general unsecured creditor status in the event of bankruptcy.

Finally, the RSU Claimants cannot assert a claim arising under any relevant wage laws. Claimants allege that the RSU Claims are claims for unpaid wages under the labor laws of New York, Illinois, California, and the United Kingdom.  However, no earned compensation (whether characterized as wages or otherwise) remains unpaid in this matter; the RSU Claimants received the RSUs.  In addition, regardless of the labor laws upon which the RSU Claimants choose to rely, any claims for compensation owed in the form of RSUs would still be claims "arising from the purchase or sale of a . . . security" that must be subordinated under section 510(b) of the Bankruptcy Code.  *U.S. Wireless*, 384 B.R. at 719.

Because (i) each of the RSUs warrants treatment as a "security," as that term is defined by the Bankruptcy Code, that the RSU Claimants acquired in a purchase, and (ii) the RSU

Claims are for damages arising from such purchase, the RSU Claims are subject to subordination under section 510(b) of the Bankruptcy Code.

*Equity Securities*

Alternatively, the RSU Claimants assert an interest based on equity securities, and, accordingly do not assert a "claim" at all under the Bankruptcy Code. *See In re MF Global Holdings, Ltd.,* No. 11-15059 (MG), 2014 Bankr. LEXIS 3333, at *14 (Bankr. S.D.N.Y. Aug. 6, 2014). In order to assert a "claim" and be treated as a creditor, a claimant must have a "right to payment" or a right to an "equitable remedy."  11 U.S.C. § 101(5)(A)(B); *MF Global*, 2014 Bankr. LEXIS 3333 at *13. A claimant who asserts an equity interest is not a creditor and is not pursuing a "claim" under the Code. *See In re Pine Lake Vill. Apt. Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982) ("[A]n equity interest is not a claim against the debtor for which the equity holder may assert a right to payment.")

Under section 101(16) of the Bankruptcy Code, an "equity security" is

(A) [a] share in a corporation, whether or not transferable or denominated "stock", or similar security;

(B) [an] interest of a limited partner in a limited partnership; or

(C) [a] warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

11 U.S.C. § 101(16).

Here, the RSUs constitute shares in the corporation – and thus equity securities – for purposes of 101(16)(A). The value of the RSUs was not fixed but, rather, shifted based on the value of the LBHI common stock.  When the LBHI common stock declared a dividend, the RSUs also paid dividends to the RSU holder in the form of additional RSUs; the number of additional RSUs received as a result of the dividend event was based on the share price of the LBHI common stock at the time of the dividend event.  RSU holders also had the ability to vote

a proportionate share of their RSUs by way of a trust and proxy.  The RSUs, then, were in many

respects almost identical to common stock.   Indeed, the Program documents advised participants

in the Equity Award Program that "you can consider the RSUs as shares of Lehman Brothers

common stock that the firm holds on your behalf for five years, which you will be entitled to

receive at that time, provided you meet certain terms and conditions."  Stip. Ex. 3 (2003 Senior

Vice-President Equity Award Program) at LEH-RSU 0015891.  Given these attributes of the

RSUs, it is of no import that RSUs were not transferable and were not denominated "stock", as

section 101(16)(A) specifically states that transferability and denomination as "stock" are not

necessary for shares of a corporation to be treated as an equity security.  *See In the Matter of*

*Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (holding that claims to

exercise the stock option portion of a stock option plan are properly classified as equity security

interests, where stock option portion of plan consisted of five-year right, vested in full from date

of option, to purchase fixed amount of stock in debtor).

        In the alternative, the RSUs are a "warrant or right, other than a right to convert, to

purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph

(A)" and are therefore "equity securities" under section 101(16)(C) of the Bankruptcy Code.

Courts have interpreted the definition of equity security under section 101(16)(C) to include a

range of stock-based transactions.  *See, e.g., Nantahala Capital Partners, LP v. Wash. Mut., Inc.*

*(In re Wash. Mut., Inc.)*, 464 B.R. 656 (Bankr. D. Del. 2012) (holding that litigation tracking

warrants were equity securities because such warrants entitled the holders only to common stock,

not cash); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004) (holding that claimant's right

to redeem stock was an equity security); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506

(Bankr. D. Ariz. 2000) (holding that a nontransferable, non-assignable put right "falls squarely

within the contours of section 101(16)" because such put right does not include a "right to payment" in cash).   Here, there is no dispute that the common stock of LBHI was a share in a corporation within the definition of section 101(16)(A) of the Bankruptcy Code.  The RSUs, which provided Claimants with a nontransferable, non-assignable right to common stock in LBHI at a specified future time upon the satisfaction of certain conditions, fall squarely within the definition of "equity security" under section 101(16)(C) of the Bankruptcy Code.

### *Conclusion*

The RSU Claimants have failed to identify any characteristics that distinguish the RSU Claims from the employee claims at issue in *Enron*.  For the reasons stated, (i) the RSUs are securities; (ii) that the RSU Claimants purchased when they willingly engaged in the exchange of their labor for the RSUs; and (iii) the damages that the RSU Claimants seek arise from such purchase.  As such, the RSU Claims must be subordinated under section 510(b) of the Bankruptcy Code.  In the alternative, the RSUs at issue fall within the definition of "equity security" under section 101(16) of the Bankruptcy Code, and, accordingly, the RSU Claimants do not assert a "claim" under section 101(5) of the Bankruptcy Code.  The Omnibus Objections are sustained.  LBHI is directed to submit an order consistent with this Memorandum Decision.

Dated:  November 3, 2014
New York, New York

/s/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE