Page 1

1  UNITED STATES BANKRUPTCY COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  Case No. 08-13555 (SEC)
4  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
5  In the Matter of:
6
7  LEHMAN BROTHERS HOLDINGS, INC., et al.
8
9              Debtors.
10 - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
11
12                U.S. Bankruptcy Court
13                One Bowling Green
14                New York, New York
15
16                February 25, 2014
17                11:03 AM
18
19 B E F O R E :
20 HON  SHELLEY C. CHAPMAN
21 U.S. BANKRUPTCY JUDGE
22
23
24
25

Page 2

1  Hearing re: Doc #42659 Letter to the Honorable Shelley C.
2  Chapman re: Local Rule 7056-1(a) Conference for Claim Nos.
3  14824 and 14826 filed by Andrew E. Gelfand on behalf of
4  Canary Wharf Management Ltd., Heron Quays (HQ2) T2 Limited,
5  Heron Quays (HQ2) T1 Limited.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by: Jamie Gallagher

1  A P P E A R A N C E S :

2  WEIL GOTSHAL & MANGES, LLP

3       Attorneys for Debtor

4       767 Fifth Avenue

5       New York, NY 10153-0119

6

7  BY:  KEVIN F. MEADE, ESQ.

8       ARIELLE S. GORDON, ESQ.

9

10 WEIL GOTSHAL & MANGES, LLP

11      Attorneys for Debtor

12      1300 Eye Street, NW

13      Suite 900

14      Washington, D.C. 20005

15

16 BY:  PETER D. ISAKOFF, ESQ.

17

18 SULLIVAN & CROMWELL, LLP

19      Attorney for Canary Wharf Management Ltd., Heron Quays

20      (HQ2) T2 Limited, Heron Quays (HQ2) T1 Limited

21      125 Broad Street

22      New York, NY 10004

23

24 BY:  DAVID B. TULCHIN, ESQ.

25

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Good morning.
 3           ALL:  Good morning, Your Honor.
 4           THE COURT:  How are you?
 5           MR. ISAKOFF:  Very good.
 6           THE COURT:  Thank you for coming down today.  All
 7   right, who should I hear from first?
 8           MR. TULCHIN:  Your Honor, if I may --
 9           THE COURT:  Yes.
10           MR. TULCHIN:  -- this is David Tulchin from
11   Sullivan & Cromwell.
12           THE COURT:  Yes, Mr. Tulchin, how are you?
13           MR. TULCHIN:  And we represent Canary Wharf.
14           THE COURT:  Very good.
15           MR. TULCHIN:  The reason we're here is that we've
16   proposed to make a motion for summary judgment and under the
17   local rule, we need the Court's permission.
18           THE COURT:  Right.
19           MR. TULCHIN:  I just wanted to give you what I
20   hope will be a non-controversial little bit of background
21   about our claim.
22           THE COURT:  Okay, all right.  Go ahead.
23           MR. TULCHIN:  Canary Wharf is the owner of a
24   building in London, an office building that it built for the
25   Lehman entities in the mid 2000's.  And there's a lease --
```

1   the contract in question, dated in 2005.  Lehman Brothers

2   Limited, the English subsidiary of LBHI, was the tenant.

3   And the issue, the principle issue, there are others, but

4   the principle issue of law, the contract, by the way is

5   governed by the law of England.  The principle issue of law

6   is whether LBHI was an indemnitor under English law or

7   merely a guarantor.  The argument being that a guarantor's

8   obligations are co-extensive with those of the tenant,

9   Lehman Brothers Limited.

10              And in 2010, when Canary Wharf took repossession

11  of the building in order to enter into a mitigation

12  transaction, it in effect sold the building to JP Morgan

13  Chase, that that terminated the tenant's obligations, and

14  the argument by LBHI is that that terminated its obligations

15  as well.  So, there's a period of rent before that date, the

16  so-called forfeiture date.  And then there is a greater

17  period after that date.  And as I say, I think that the

18  initial issue is whether LBHI was an indemnitor or a

19  guarantor.

20              We've gone through an extensive period of

21  discovery, both fact and expert discovery.  You won't be

22  surprised that each side has an English barrister.

23              THE COURT:  I'm delighted.

24              MR. TULCHIN:  I knew you would be, Your Honor --

25  as an expert.  Depositions were taken in New York, and in

1   London, all of the discovery concluded in September.

2           And I think it's agreed, although of course, I'll

3   wait for Mr. Isakoff to say, by both sides that it's

4   appropriate now to seek a resolution on liability only by

5   means of a motion for summary judgment.  Our total claim is

6   $780 million.  There are a number of disputes about the

7   claim and its components.  I won't describe them all unless

8   the Court wants to hear about them, but to --

9           THE COURT:  Well, does the -- will the summary

10  judgment also involve, and I'm not smart enough, I'm

11  following everything that you say and I did do a fair amount

12  of reading, but I'm not smart enough yet on it to know the

13  answer, the applicability of the cap comes into play in one

14  or more of the scenarios you described?

15          MR. TULCHIN:  Our intention, Your Honor, I think

16  is to move on liability only on this --

17          THE COURT:  Okay.

18          MR. TULCHIN:  -- initial issue.  There are some

19  other issues of law, as well, that I think should be

20  covered.  We weren't intending to raise the issue of whether

21  the cap applies or not.

22          THE COURT:  Okay.

23          MR. TULCHIN:  LBHI, of course, argues that it

24  does.

25          THE COURT:  Right.

1           MR. TULCHIN:  We say that it doesn't because the

2    lease was a capital lease and accounted as a capital lease

3    by Lehman, itself.

4           THE COURT:  I see, okay.

5           MR. TULCHIN:  But our intention was to present to

6    the Court what we think are issues of law that can be

7    determined by the Court without the need for any hearing or

8    trial.  The two sides have discussed the schedule --

9           THE COURT:  Okay.

10          MR. TULCHIN:  -- which I'd like to mention to the

11   Court.  Our discussion took place, I think, a month or more

12   ago, but at least on our side, we're happy to adhere to

13   this.

14          THE COURT:  This is the March 14th/May 2nd --

15          MR. TULCHIN:  Yes.  You have this, Your Honor?

16          THE COURT:  Yes, it's in your letter.

17          MR. TULCHIN:  I knew it was, but I didn't know

18   that you had it in front of you.

19          THE COURT:  Yes, I do.  I do.

20          MR. TULCHIN:  So, we're happy to go on that

21   schedule and, of course, if the Court wants to hear oral

22   argument after the reply is submitted, we'd be happy to

23   proceed that way.  If the Court wishes to set a date for

24   that now, happy to do that, as well.

25          THE COURT:  All right.  Well, why don't I hear

1    from Mr. Isakoff?  Thank you very much.

2              MR. TULCHIN:  Thank you.

3              THE COURT:  Good morning.

4              MR. ISAKOFF:  Good morning, Your Honor.  Just for

5    the record, Peter Isakoff.

6              THE COURT:  Isakoff, I'm sorry.

7              MR. ISAKOFF:  Yes.  I would like to say a few

8    words about this case.  I didn't know whether Your Honor had

9    a chance to look over any of the prior papers and so forth,

10   but this is a very sizeable claim.  It was originally filed

11   as 4.4 billion and was reduced by --

12             THE COURT:  I'm sorry.  I'm being told that we

13   have to get you closer to the microphone.

14             MR. ISAKOFF:  Can I speak --

15             THE COURT:  You can come up to the podium,

16   absolutely.

17             MR. ISAKOFF:  It was originally 4.4 billion and

18   was reduced by a stipulation to a maximum of 780 million,

19   but that is still one of the largest claims that faces the

20   LBHI estate.  It was a 30 year lease between LBL, the London

21   subsidiary of LBHI, and Canary Wharf for about a million

22   square feet.  And there is a surety agreement that was part

23   of the lease that was signed by LBHI, which is about four

24   pages long.  It's got ten sections.  It's reasonably

25   complicated.  English law does govern.

1            So, what happened was that at the end of 2009,

2    after the bankruptcies in 2008, LBL gave notice to Canary

3    Wharf that it was going to leave and it actually did in

4    March, although some tenants continued through until about

5    September of that year.  Then in December, Canary Wharf and

6    LBL, without LBHI's participation and knowledge until

7    afterwards, entered into what's called a forfeiture

8    agreement where, as Mr. Tulchin says, Canary Wharf took back

9    the premises and that ended as a matter of law the tenant's

10   liability for any further rent.  That was well known at the

11   time.

12           They do have an argument now that English law is

13   in the process of being changed - that Your Honor should

14   assume that the English courts would change this rule.  But

15   there is a bedrock principle of English law that drives not

16   only this case, and not only the arguments, but actually

17   drove the parties' conduct during this period of time and

18   that is that when a tenant stops paying rent, a landlord

19   basically in England has two choices.  It's very different

20   from a normal, commercial contract.  It can either --

21           THE COURT:  A normal commercial contract here in

22   the United States or in England?

23           MR. ISAKOFF:  Or in England.

24           THE COURT:  Okay.

25           MR. ISAKOFF:  Is treated differently because a

1   lease is an interest in land and the rent is tied to the
2   land.  And when Your Honor hears from the Queen's Counsels
3   from both sides, and I didn't hear Mr. Tulchin suggest that
4   the Queen's Counsels come here and testify, although he had
5   so asked Judge Peck on two different occasions in open
6   Court, and in a filing, and in various letters that they
7   testify live.  They did come over for depositions here in
8   New York, and they have indicated both and indicated
9   willingness to come here.
10              You will find -- you will hear that leases in
11  England are different.  And what's different is that when a
12  tenant goes into default, the landlord can either choose to
13  keep the tenant on foot, keep the lease going, and sue --
14  can't sue for future rent.  You can sue for it as it comes
15  due forever, until it's over.  In this case, it would have
16  been a balance of another, you know, twenty-three years or
17  so.
18              And it's under no duty to mitigate, to take back
19  the land, to re-let the premises.  It's very different.  Or,
20  as Canary Wharf chose to do here, can terminate the lease
21  and that terminates the tenant's obligation to pay rent.
22              This was well known to Canary Wharf at the time.
23  You see it in e-mail correspondence that we were able to
24  obtain in discovery.
25              Now, the surety agreement, it is --

 1              THE COURT:  So, the question is -- I can -- so the
 2    question is going to be, can they basically have their cake
 3    and eat it too?
 4              MR. ISAKOFF:  That's right.  And can they get more
 5    from LBHI, as guarantor, than they could if LBHI had
 6    actually been the tenant?  That's what they're looking for.
 7              The surety agreement, as I say, is four pages, ten
 8    sections.  Section 1, which I know is going to be the
 9    subject of Mr. Tulchin's motion and I'm -- and there are --
10    there's a Section 7, which I want to describe for you
11    because it's important.  Section 1 --
12              THE COURT:  Let's not have today be the prehearing
13    on the summary judgment motion, because I'm not smart enough
14    yet to give you a good show on the merits.  So --
15              MR. ISAKOFF:  I wasn't --
16              THE COURT:  -- I don't want to create a situation
17    where unwittingly I've allowed one or the other of you to
18    say anything more than is necessary for me to figure out
19    whether or not, in fact, I should just hear a summary
20    judgment motion.  So, while I'm absolutely fascinated --
21              MR. ISAKOFF:  Okay.
22              THE COURT:  -- with the legal issues, I think we
23    ought to stick to what we were called here today to do,
24    which is to determine whether or not, for example, you agree
25    that this is amenable, at least worth a shot, so to speak,

1   and going down the summary judgment path.

2            MR. ISAKOFF:  Well, I have a few things to say on

3   that and I appreciate that Mr. Tulchin described what he was

4   doing as a non-controversial description.  Frankly, it isn't

5   -- the way he put it is, if it's a -- is it a guaranty or is

6   it an indemnity?  Now, these words have -- are in English,

7   they have different meanings here than they do in England.

8   Our QC, who has written a treatise like this, and which has

9   gone through six editions on the law of guaranties, is a

10  true expert, and Your Honor would greatly benefit from

11  hearing him live.

12           So, while it may be that certain legal issues can

13  be determined in a summary judgment context, we believe, as

14  Mr. Tulchin did think until his expert's deposition was

15  taken, that the Court would benefit greatly from hearing

16  live testimony under Federal Rule of Civil Procedure 44.1,

17  which is picked up in the Bankruptcy Rules.  I think it's

18  9017.

19           THE COURT:  But you agree, though, that as the

20  facts have been described with respect to the termination of

21  the lease and the vacature of the property, et cetera, there

22  doesn't appear to be any dispute with respect to those

23  underlying facts, right?

24           MR. ISAKOFF:  Not those underlying facts.  I --

25  you know, until we've seen what it is that Mr. Tulchin wants

1    to put in a summary judgment motion, what issues, what facts

2    he's claiming are undisputed, and so forth, it's -- I

3    suspect that we will certainly oppose the summary judgment

4    motion on the ground that they're wrong in the way they're

5    reading the surety agreement.  It's not true that it's

6    simply a matter of is it a guaranty versus an indemnity.

7    And as I was starting to say, the -- while an indemnity need

8    not necessarily be coextensive with the underlying

9    obligation, in this case, a tenant's obligation, in fact

10   this one is, just on the language of the section that

11   they're relying on the fact that there is no obligation of

12   the surety once forfeiture has occurred is confirmed by the

13   other argument that they have made, which is under Section 7

14   of the surety agreement.  I will not go into that now, Your

15   Honor, except to say that there are numerous disputed facts

16   on that.  I suppose I --

17            THE COURT:  Can I interrupt you to ask you a

18   question?

19            MR. ISAKOFF:  Sure.

20            THE COURT:  So, if we do go down the summary

21   judgment path, which -- if we do go down the summary

22   judgment path, you will still have an opportunity to present

23   your view of the law.

24            MR. ISAKOFF:  Of course.  No, I -- we can't stop

25   him from moving for summary judgment, what I'm saying is --

```
 1              THE COURT:  Well, I can but --
 2              MR. ISAKOFF:  -- people who oppose it.
 3              THE COURT:  -- the question is whether or not I
 4   ought to.  And I am generally, to be very honest, which I
 5   always am, I am generally not a fan of summary judgment
 6   motions because I think that they fail more often than they
 7   succeed.  That being said, though, this does strike me as an
 8   appropriate occasion to at least attempt a summary judgment.
 9              MR. ISAKOFF:  I would only suggest that not only
10   will we oppose it on the ground that they're wrong as a
11   matter of law, but also that Your Honor would greatly
12   benefit, before ruling, by having the two Queen's Counsels
13   come over here, be subject to direct and cross examination
14   with respect to the very issues that they're moving on.
15   Your Honor would have a chance to ask them -- the point is
16   that although these words are in English, it's kind of --
17   having been living with this case for a while, it's kind of
18   funny.  It's almost like the meaning is camouflaged until
19   you get inside it, until you've read the cases, until you
20   start thinking the way the English lawyers think about it,
21   and it's hard to do just reading the cases.  It is.  I have
22   learned a great deal about the English law of guaranties as
23   a course of this.
24              THE COURT:  Well, I hear you and I think that
25   because, and you both agree that it's a question of English
```

1  law, I think that because I'm going to be called upon to

2  issue a decision as if I were sitting in England, that to

3  the extent that I have doubts then I think I'm going to be

4  inclined to go down the path that you're suggesting, but I

5  would at least like to -- I think you're underestimating

6  your abilities to explain to me your points of law.  I mean,

7  what you're --

8           MR. ISAKOFF:  I must be.  I must be, Your Honor.

9           THE COURT:  -- saying to me in essence is that you

10 don't believe that you'll be able to convince me, and that

11 you'd do a better job convincing me by bringing in your

12 expert.  And if you at least can convince me that that

13 additional layer is something that I ought to do, then we'll

14 certainly go down that path.  But I do think that, and I

15 appreciate the magnitude of the claim, but I do think that

16 it's a relatively narrow issue and that we ought to give it

17 a shot, and that the Court would be assisted by seeing what

18 the two sides have to say on summary judgment and then we

19 can take it from there.

20          Granting the request to file summary judgment is a

21 long ways away from any indication whatsoever that I think

22 that summary judgment is meritorious.  I have no idea.

23          MR. ISAKOFF:  I full understand that, Your Honor,

24 we do.  It was our view that we couldn't stop them from

25 filing motion for summary -- we couldn't.  If they wanted to

1    do it, we will oppose.  Perhaps we can --

2            THE COURT:  Let me ask a kind of random question,

3    maybe in the spirit of Judge Peck always looking for

4    creative solutions for things, have -- and as you know, I'm

5    new.  I've only been in charge of the case for a couple of

6    weeks.  But is it ever the case when foreign law is at issue

7    in Lehman that foreign lawyers attend and participate in the

8    oral argument, like a pro hac vice lawyer would?

9            MR. ISAKOFF:  I don't know the answer to that.

10           MR. TULCHIN:  Well, yes, Your Honor, that -- I've

11   actually had that experience myself and it has happened and

12   does happen.

13           THE COURT:  In other words, you have English co-

14   counsel.  You each have -- each side has English co-counsel,

15   or you simply have a retained expert?

16           MR. ISAKOFF:  They're experts.

17           THE COURT:  Experts?

18           MR. TULCHIN:  Yes, Your Honor.  I might say, Your

19   Honor, just to discuss a creative solution, at one point

20   Judge Peck, I believe, suggested, if my memory's correct,

21   that we have an arbitration in England on the narrow

22   question that the two English barristers --

23           THE COURT:  And you were kind of reading my mind,

24   because what I was thinking was something that would be

25   analogous to the way the Second Circuit certifies a question

Page 17

1   to the Court of Appeals on an important substantive issue of
2   law.
3           MR. TULCHIN:  Yes, and we were willing to do that.
4   Not only willing, we were entirely in favor of doing that
5   and how do the two experts testify before an English lawyer
6   or former Judge, who could make a report to this Court.  By
7   my recollection, at least, at the time LBHI was not willing
8   to do that and wanted to proceed the way we've proceeded.
9   I'm happy to go back to that procedure, but at this point, a
10  lot of time has passed.  We've had all of this discovery.
11  We had a mediation in January, which was unsuccessful.  I
12  sort of feel like no good deed goes unpunished because I was
13  trying to be very non-controversial in my description of the
14  issues, and I was hoping to avoid argument about them, but
15  I'm happy to do that if we need to.
16          THE COURT:  No, I think we've gone far enough.  I
17  think that we should proceed with the summary judgment
18  motion.  If the -- Mr. Isakoff, if the schedule that's
19  proposed --
20          MR. ISAKOFF:  That's fine.
21          THE COURT:  -- is acceptable to you then we can
22  stick to that schedule.  If you need relief from that
23  schedule, I'm happy to do that as well.
24          MR. ISAKOFF:  Let's see.  I mean, we discussed the
25  schedule and that seemed like it was enough time.

1              THE COURT:  I mean, it's a healthy period of time
2    to file the opposition.
3              MR. ISAKOFF:  It is.  I think Your Honor will see
4    that the issues are not quite as narrow as Mr. Tulchin would
5    like them to be and, you know, I think there's been a very
6    different approach at different times.  But we'll address
7    all that in the papers.
8              THE COURT:  Okay, all right.  I'm not going to
9    give you a date now for a hearing given everything else that
10   I have on my docket.  I'd like to get closer into the
11   (indiscernible) time frame and then we can figure out the
12   date.  But this was very helpful.  I know that there was not
13   even agreement on whether to come down here today, but I
14   wanted to meet you and get a sense of the situation, and I'm
15   grateful that you came down, all right.
16             MR. TULCHIN:  Thank you for your time, Your Honor.
17             THE COURT:  Okay, thank you.
18             MR. ISAKOFF:  Thank you, Your Honor.
19        (Whereupon these proceedings were concluded at 11:23
20   AM)
21
22
23
24
25

C E R T I F I C A T I O N

I, Jamie Gallagher, certify that the foregoing transcript is a true and accurate record of the proceedings.

**Jamie Gallagher**

Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o=Veritext, ou, email=digital@veritext.com, c=US
Date: 2014.03.13 16:46:51 -04'00'

Veritext

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: February 27, 2014