Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    CASE NO. 08-13555-scc

4    - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8    ET AL,

9

10                    Debtors.

11   - - - - - - - - - - - - - - - - - x

12

13                         U.S. Bankruptcy Court

14                         One Bowling Green

15                         New York, New York

16

17                         April 2, 2014

18                         10:04 AM

19

20   B E F O R E :

21   HON. SHELLY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - F. FERGUSON

1    HEARING Re Evidentiary Hearing on RSU Claims

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Sheila Orms, and William

25    Garling

```
 1    A P P E A R A N C E S :

 2    WEIL, GOTSHAL & MANGES LLP

 3         Attorneys for LBHI

 4         767 Fifth Avenue

 5         New York, NY 10153-0119

 6

 7    BY:  TERESA C. BRADY, ESQ.

 8         DENISE ALVAREZ, ESQ.

 9

10    WEIL, GOTSHAL & MANGES LLP

11         Attorneys for LBHI

12         1300 Eye Street, N.W.

13         Suite 900

14         Washington, D.C.  20005

15

16    BY:  RALPH I. MILLER, ESQ.

17

18    LAW OFFICES OF

19         Attorneys for Compensation Claimants

20         305 Madison Avenue

21         Suite 4700

22         New York, NY 10165

23

24    BY:  LISA M. SOLOMON, ESQ.

25
```

Page 4

1    STAMELL & SCHAGER, LLP

2         Attorneys for Claimants

3         One Liberty Plaza

4         35th Floor

5         New York, NY  10006

6

7    BY:  ANDREW R. GOLDENBERG, ESQ.

8         RICHARD J. SCHAGER, JR.

9

10   KAPLAN LANDAU LLP

11        Attorneys for Neuberger Berman Claimants

12        1065 Avenue of the Americas

13        27th Floor

14        New York, NY  10018

15

16   BY:  EUGENE NEAL KAPLAN, ESQ.

17

18   LAW OFFICE OF

19        Attorneys for Represented Claimants

20        355 S. Grand Avenue

21        Suite 2450

22        Los Angeles, CA  90071

23

24   BY:  A. JAMES BOYAJIAN, ESQ.

25

1  JULIEN & SCHLESINGER, ESQ.

2      Attorneys for Neuberger Berman Claimants

3      207 E. 94th St.

4      Suite 303

5      New York, NY 10128

6

7  BY:  MICHAEL SCHLESINGER, ESQ.

8

9  DAY PITNEY LLP

10      Attorneys for Fabio Liotti

11      One Jefferson Road

12      Parsippany, NJ  07054

13

14  BY:  MARGARITA Y. GINZBURG, ESQ.

15

16  RICH MICHAELSON MAGALIFF MOSER, LLP

17      Attorneys for Claimants

18      340 Madison Avenue

19      19th Floor

20      New York, NY  10173

21

22  BY:  HOWARD P. MAGALIFF, ESQ.

23      ROBERT N. MICHAELSON, ESQ.

24

25

Page 6

```
 1                  P R O C E E D I N G S
 2    (DISCLAIMER:  Poor audio; attorneys away from microphones;
 3    attorneys and witness on same microphone; shuffling of
 4    papers, etc. noted as "indiscernible")
 5              THE COURT:  All right.  So we are back in session,
 6    and as we had discussed yesterday, pursuant to the agreement
 7    of the parties and the stipulation and order establishing
 8    procedures for this hearing, today is the day that we have
 9    set aside to hear from pro se parties.
10              So I think the first thing that I'd like to do is
11    to determine who's here and who would like to be heard.
12              Please come up.  Good morning.
13              MR. SHOTTON:  Good morning.
14              MS. JAO:  Good morning, Your Honor.
15              THE COURT:  All right, so there are only two here
16    as far as we can tell, two of you?  Do you have an
17    understanding if anybody else is going to be coming later
18    today?
19              MR. SHOTTON:  I'm not aware of anybody else, no.
20              THE COURT:  Okay.  Well then why don't -- yes,
21    Ms. Solomon?
22              MS. SOLOMON:  Your Honor, I just wanted to remind
23    the Court that I would be speaking on behalf of a pro se
24    upon their completion.
25              THE COURT:  Okay, that's fine.  All right.
```

Page 7

1            Okay, so then why don't we -- why don't we start

2    with you, ma'am, and then sir, you'll have your chance next.

3            All right, what is your name, please.

4            MS. JAO:  Good morning, Your Honor, my name is

5    Andrea Jao.

6            THE COURT:  Okay.

7            MS. JAO:  I'm a pro se claimant who started as a

8    junior analyst with equity research in 2000, and had

9    opportunity to take a more responsibility and stayed through

10   the bankruptcy in 2008.

11           THE COURT:  Okay.  Ms. Jao, before -- before you

12   keep going I just want to clarify procedurally that I view

13   your statement as -- I mean I'm anticipating that it will be

14   some combination of an argument and also some factual

15   matters.  Fair summary or fair guess?

16           MS. JAO:  Yeah.

17           THE COURT:  Okay.  So to the extent that you are

18   testifying and telling me things that you want me to find as

19   a fact then I'm going to treat what you're saying as

20   testimony and I'm going to treat it as having been made

21   under oath.

22           MS. JAO:  Yes, Your Honor.

23           THE COURT:  Although I won't formally administer

24   the oath.  Okay?

25           MS. JAO:  Yes, Your Honor.

Page 8

1              THE COURT:  All right, go ahead.

2              MS. JAO:  Thank you.  Well first of all thank you

3    for the chance to --

4              THE COURT:  Absolutely.

5              MS. JAO:  -- to speak.  I will apologize ahead of

6    time as I will not be able to use the same language with

7    precision and as articulate --

8              THE COURT:  Okay.  I will look -- I will look

9    forward --

10             MS. JAO:  -- as counsel.

11             THE COURT:  -- to hearing whatever you have to say

12   however you say it.

13             MS. JAO:  Okay.

14             So in 2009 I received proof of claim forms from

15   Lehman Brothers Holdings Inc. which I filed and which I

16   submitted as instructed, because I thought it only fair that

17   I should recover unpaid compensation.

18             I would like to respectfully petition the Court to

19   recognize the RSU claims as unpaid compensation and that

20   claimants should receive -- such as myself should receive

21   these payments from Lehman Brothers Holdings.

22             I will not repeat, you know, the arguments said

23   yesterday, but I do have four points that I'd like to go

24   through briefly --

25             THE COURT:  Okay.

Page 9

```
 1              MS. JAO:  -- which I think actually address or
 2    touch on some of the questions Your Honor has raised
 3    repeatedly yesterday.  So hopefully that's helpful.
 4              THE COURT:  Okay.
 5              MS. JAO:  So RSUs as a compensation scheme
 6    entailed a lot of complications as well -- entailed a lot of
 7    complications, and one of the points brought up yesterday
 8    was that RSUs make employees act as owners or shareholders,
 9    and as you yourself has mentioned, you take advantage of
10    appreciation and depreciation of the stock price.
11              I think though that we should think more deeply as
12    to what this means.  It really begs the question, did
13    holders of RSUs really have the ability to act as owners and
14    shareholders?  And for the four following reasons I would
15    argue that holders of RSUs, vested or unvested, did not have
16    the full ability to act as owners and shareholders.
17              Point number one.  One of the hallmarks of
18    ownership in a company is the ability to have an impact on
19    its policies such as what types of business to engage in,
20    how much risk to take, how much leverage to put on the
21    balance sheet, how much dividends to pay, to raise or not to
22    raise capital, or to draw down a cash reserve or to lengthen
23    debt maturities.
24              Why did I enumerate these things?  Because these
25    were the important decisions management was making and had
```

1      implemented in the months leading up to the bankruptcy.

2              And, you know, the former senior management of

3      Lehman Brothers had ongoing conversations and conference

4      calls with institutional shareholders during which

5      institutional investors could express their opinions

6      regarding these policies.

7              In addition, institutional investors could signal

8      their favor or disfavor to senior management through

9      financial markets such as through the stock price or through

10     credit default swap spreads.

11             Holders of RSUs, such as myself, would typically

12     hear about these strategies or implementation of strategies

13     the same time it came out in the public domain, the same

14     time it hit the news wires.  Holders of RSUs, such as

15     myself, did not participate in any of these -- of the

16     markets that, you know, full institutional shareholders

17     participated in.  Senior management and the board of

18     directors were the ones who crafted and made decisions for

19     Lehman brothers, not you know, rank and file employees.

20             Point number two.  Another hallmark of ownership

21     in a publicly traded company is the ability to use liquid

22     markets to express an opinion.  Typically both institutional

23     and retail equity investors make a specific choice to buy

24     shares of stock and can easily do so given liquid cash

25     equity markets.  Once they own the stock their choices are

Page 11

1     to hold or to sell, which again they can do easily.

2            The typical equity shareholder thus faces three

3     choices; buy, hold, or sell.  If equity investors carry

4     residual risk and can be wiped out it is important that they

5     have the ability to exercise all three choices first along

6     as their investors.

7            Holders of RSUs did not have these choices.  RSUs

8     have neither buy or sell choices.  All an employee can do is

9     hold.  And this goes to an important point -- or question

10    you raised yesterday about participate -- RSU holders

11    participating in appreciation and depreciation of the stock

12    price.

13           Again, your typical equity shareholder

14    institutional investor at any point in time can realize

15    gains or losses.  At any time.  And therefore making

16    participation in -- in appreciation or depreciation of stock

17    price real.

18           THE COURT:  Can I ask you a question?

19           MS. JAO:  Yes, ma'am.

20           THE COURT:  Do you think that it was illegal for

21    Lehman to have paid employees with restricted stock units?

22    Was it against the law?

23           MS. JAO:  That's a -- depends on what else is in

24    that question, how much did you know about?

25           THE COURT:  No, I'm not really asking the question

Page 12

1   about --

2           MS. JAO:  Okay.  So --

3           THE COURT:  -- how'd your know about it, I mean --

4           MS. JAO:  -- in general?  No.

5           THE COURT:  -- Lehman -- so they -- I mean it's a

6   -- it's an instrument --

7           MS. JAO:  Uh-huh.

8           THE COURT:  -- they determine what characteristics

9   --

10          MS. JAO:  Uh-huh.

11          THE COURT:  -- it would have.  They told you that

12  you were getting this as part --

13          MS. JAO:  Uh-huh.

14          THE COURT:  -- of your compensation, right?

15          MS. JAO:  Yeah.

16          THE COURT:  They gave you documents that described

17  it, and all day yesterday the only thing that I heard about

18  what you weren't told --

19          MS. JAO:  Uh-huh.

20          THE COURT:  -- was that there at one point was

21  something that said in the event of a bankruptcy you're

22  subordinated and that was taken out.

23          So the only thing that I've heard about a non-

24  disclosure --

25          MS. JAO:  Uh-huh.

Page 13

1           THE COURT:  -- was that.

2           MS. JAO:  I have points three and four --

3           THE COURT:  Okay.

4           MS. JAO:  -- regarding that.

5           THE COURT:  Okay, go ahead.

6           MS. JAO:  If I may.

7           THE COURT:  Go ahead.

8           MS. JAO:  Okay.  So -- so definitely I'll come

9   back to that.

10          THE COURT:  Okay.

11          MS. JAO:  But in the meantime regarding point two.

12  So RSU shareholders while hypothetically saw the values of

13  RSUs rise and fall with the stock price, unlike true

14  shareholders there's no way to realize the benefit or loss,

15  and I think that's a big difference, because it's also

16  related to -- for an RSU holder to vote with their feet, so

17  they already don't have the ability to realize the gain or

18  loss so long as it's an RSU, you know, before it converts.

19  But to vote with our feet is very costly because they would

20  be walking away from unpaid wages, and that's how I view,

21  you know, RSUs, unpaid wages for which labor is already

22  rendered.

23          RSUs are often described as a retention device by

24  employers and holders of RSUs do not have the full capacity

25  to vote with their feet.  Yes, there is a choice

1    hypothetically, but I don't know if the right term is

2    punitive, it's a very -- it's very --

3            THE COURT:  It's a hard choice, right?

4            MS. JAO:  It's a very -- it's an extreme choice,

5    and --

6            THE COURT:  But it is a choice.

7            MS. JAO:  Yes.

8            THE COURT:  It just has a cost, right?

9            MS. JAO:  A very high cost.

10           So it's my humble opinion that -- and I'm no

11   expert in labor law -- but it's in my humble opinion that

12   labor law should protect employees from having to walk away

13   from compensation for which they already rendered labor.  I

14   mean, you know, it's -- but that's just my opinion.

15           THE COURT:  No, I understand that, and what I'm --

16   what I'm struggling with is that when you have a situation

17   and going in to the situation each year, the first year that

18   you start, before it becomes costly --

19           MS. JAO:  Uh-huh.

20           THE COURT:  -- in other words before you have the

21   sunk cost --

22           MS. JAO:  Right.

23           THE COURT:  -- of I've gotten this and now in

24   order to realize the value of it I have to wait.  At that

25   threshold moment there's a choice.  There's a choice of

1    whether to accept this employment in which you're being told

2    that you're going to get a salary --

3                    MS. JAO:  Uh-huh.

4                    THE COURT:  -- and a bonus, and that part of it

5    will be paid in this other form of currency, this non-cash

6    currency.

7                    MS. JAO:  Right.

8                    THE COURT:  And at that moment you have a choice.

9    You -- this is not indentured servitude --

10                   MS. JAO:  Uh-huh.

11                   THE COURT:  -- it's not slavery, you can say no

12   thank you, Lehman Brothers, I don't want to work for you --

13                   MS. JAO:  Uh-huh.

14                   THE COURT:  -- I'm going go work for Credit Suisse

15   or Goldman Sachs or Citibank where they pay all in cash.

16   You have -- you have that choice.

17                   MS. JAO:  Understood, Your Honor, but let's go

18   into a bit more detail about that decision.

19                   Let's say I'm standing here January 1 making the

20   decision whether to continue working or not given the

21   current compensation structure.  So that (indiscernible -

22   00:12:17) by point three.

23                   Shareholders and institutional investors know up

24   front before they make an investment, before they make a

25   decision how much their investment would be.  Lehman

Page 16

1    employees were only told that a portion of their

2    compensation would be RSUs at the end of the year.  At the

3    start of the year we were not told -- we were not told, you

4    know, 50 percent or 10 percent.

5              THE COURT:  Right, and you --

6              MS. JAO:  We weren't told.

7              THE COURT:  You weren't told, but you -- you then

8    at that moment in time had a choice that you understood that

9    there was going to be a number, and the assortment of forms

10   of compensation was in their determination, and at that

11   point in time early on you could say I can't live with that

12   uncertainty --

13             MS. JAO:  But how do you --

14             THE COURT:  -- I'm not going to work here.  Go

15   ahead.

16             MS. JAO:  I understand what you're saying, Your

17   Honor, but how could you make a good enough decision at the

18   start of the year whether the cash flow you'll get would

19   be --

20             THE COURT:  Well you knew the cash flow that you

21   were going to get -- I mean the ones that I saw yesterday

22   there was a -- the number I kept seeing was 200,000 --

23             MS. JAO:  Uh-huh.

24             THE COURT:  -- that was the example.

25             MS. JAO:  Yeah.

1         THE COURT:  So if you're getting $200,000 a year

2    that means roughly speaking you're taking home, you know,

3    based on what -- how my taxes work -- you're taking home

4    about $10,000 a month.

5         MS. JAO:  Uh-huh.

6         THE COURT:  And then the rest of it is to be

7    determined.  And you -- on some of the compensation

8    statements that I saw at the end of the year you got a lump

9    sum of additional cash and you got some stock.

10        MS. JAO:  Right.

11        THE COURT:  And that's what -- that -- that's

12   exactly what they told you -- Lehman told you up front was

13   going to happen.  What -- what it sounded like from some of

14   the papers was that people were saying after the fact Lehman

15   took away some of that 200,000.  So --

16        MS. JAO:  No, you weren't given the exact

17   proportion until after you render labor.

18        THE COURT:  That's right, but you were told up

19   front at the firm's option we're going to pay some of this

20   compensation in -- we may pay some of this compensation in

21   this other form.

22        So going into at the first moment in time you had

23   the choice of saying, I don't like that, I want to know

24   exactly what I'm going to be paid and in what form and I'm

25   not going to work here.

Page 18

```
 1              You -- when you go to work at any

 2    -- at any firm like this before you agree to walk through

 3    the door and sit down at a desk and give your labor, that's

 4    the bargain, right?

 5              MS. JAO:  Right.

 6              THE COURT:  That's the bargain.  You could say,

 7    this is not for me, this is not for me, I'm going to -- so

 8    I'm going to go to bank across the street because at bank

 9    across the street they pay all in cash.

10              I suspect, although I don't know, that there was

11    an opportunity to earn a bigger number, a higher number of

12    more compensation at Lehman partially because some of it was

13    payable in stock.  So there's a choice, right?  I could go

14    to bank across the street where they're promising to pay me

15    $400,000 in cash --

16              MS. JAO:  Uh-huh.

17              THE COURT:  -- or I can work at Lehman and get

18    $200,000 in cash and have a chance to get this black box of

19    compensation more.  That's my only point.

20              MS. JAO:  No, I see your point, Your Honor, and

21    how you could take the -- that as a take away from

22    yesterday's discussions.  My experience has been a little

23    different.

24              THE COURT:  Okay.

25              MS. JAO:  It's not in my prepared statement, but
```

Page 19

1    you know, I joined Lehman as a junior --

2              THE COURT:  Okay.

3              MS. JAO:  -- as part of a bigger team which was

4    taken out -- which was lifted out actually from Citigroup.

5              THE COURT:  Okay.  What year was that?

6              MS. JAO:  2000.

7              THE COURT:  Okay.

8              MS. JAO:  July of 2000.  So, you know,

9    negotiations were hurried, you weren't actually -- so you

10   were -- so in the contract you were told part of your

11   compensation is going to be in RSUs, what the hell are

12   those?  Well don't worry, the senior guys are getting them,

13   you know, it's the same thing.

14             So I see what you're saying --

15             THE COURT:  Uh-huh.

16             MS. JAO:  -- my experience has just been a little

17   different.  I wish I was better informed, I wish I was less

18   naive then, but --

19             THE COURT:  Well, you know, one thing that's --

20   you know, that is striking, I mean I think you make a good

21   point that the senior guys were getting them, right?

22             MS. JAO:  Right.

23             THE COURT:  So probably a lot of the senior guys

24   had very, very, very substantial numbers of RSUs --

25             MS. JAO:  Yes.

Page 20

1                THE COURT:  -- that --

2                MS. JAO:  Certainly my -- my RSUs made claims are

3      I -- I'm pretty sure are but a fraction of what you were

4      hearing yesterday, so why would --

5                THE COURT:  I don't know about that, but I will

6      say, so if you began at Lehman in 2000 --

7                MS. JAO:  Uh-huh.

8                THE COURT:  -- then you were able to convert the

9      RSUs that you had between -- that you earned between 2000

10     and 2000 and --

11               MS. JAO:  Three?

12               THE COURT:  -- three, right?

13               MS. JAO:  Yeah, very -- it was a very small

14     amount.  You know, it was a token amount.

15               THE COURT:  Okay.  And then it rose as you became

16     more senior?

17               MS. JAO:  No, the stock converted --

18               THE COURT:  Uh-huh.

19               MS. JAO:  -- so the stock itself was a very token

20     amount, and the RSUs, eventually you know, increased

21     incrementally --

22               THE COURT:  Right.

23               MS. JAO:  -- I was still not -- you know, I never

24     made managing director so it wasn't --

25               THE COURT:  Uh-huh.

Page 21

1           MS. JAO:  But I'm still here because for me it's a

2    matter of principal.

3           THE COURT:  I absolutely --

4           MS. JAO:  Right?

5           THE COURT:  -- I absolutely understand and I --

6    you're being extremely articulate and I appreciate it.

7           So I've interrupted you, so why don't I let you

8    keep going.

9           MS. JAO:  Yeah.

10          THE COURT:  You said you had --

11          MS. JAO:  Yeah.

12          THE COURT:  -- some additional points.

13          MS. JAO:  Yeah.  Yes.

14          While the RSUs -- while the use of RSUs with

15   described as compensation mechanism their use by Lehman

16   Brothers allowed the company to defer expenses, which

17   complicated employer/employee relationship.

18          At Lehman we were given our compensation

19   statements at the end of the year based on how well we did

20   in the preceding 12 months.  We received cash compensation

21   soon after.

22          With Lehman recognizing this expense during the

23   course of the year, the cash compensation Lehman recognized

24   over the 12 months; however, Lehman recognized the expenses

25   associated to RSUs only over the next three or five years

Page 22

1    and benefited from the failure of expenses even if services

2    were rendered in the preceding 12 month, and they received

3    full benefit of my services in the preceding 12 months.

4           This accounting practice gave Lehman the incentive

5    to use compensation mechanisms that was not necessarily

6    transparent, fair, or in the best interest of their rank and

7    file employees working for the company whose emphasis was,

8    you know, to make a livelihood.

9           So to wrap up, and as I mentioned earlier, part to

10   the reason, you know, I'm making an effort to participate in

11   this process, is really a matter of fairness.

12          You know, so an outsider looking in it's very easy

13   to view the proceedings as it's procedural, you know, it's

14   very structured, but I've also come to understand that the

15   law does not exist in a vacuum and so I'd like to wrap up by

16   mentioning fairness.

17          Like other claimants who were rank and file

18   employees of Lehman Brothers my relationship with the

19   company is a way to earn a livelihood.  While I'm not a

20   lawyer and not as well informed I do understand that workers

21   are afforded certain protections under the law; however,

22   through the bankruptcy process we've been relegated to the

23   end of the line.

24          Institutional investors, as well as their legal

25   counsel, have already received significant amounts on an

1   ongoing basis.  On the other hand employees are still

2   struggling to get through the proceedings with far less

3   resources and no how to do so.

4        The best way I can describe the experience is that

5   it's been a matter of attrition.  I think others have

6   dropped their claims not because they agree that the RSUs

7   are equity interest, but because the requirements have

8   become too demanding, too confusing, and they've been

9   discouraged because of that.

10        Last but not least, and this related to fairness.

11   Yesterday you mentioned a passage from the RSU agreement

12   that states RSUs does not -- you know, RSU holders do not

13   have the rights of shareholders, and if I understood the

14   discussions correctly --

15        THE COURT:  Uh-huh.

16        MS. JAO:  -- that was described as a boilerplate

17   statement and should be disregarded.

18        While I'd like to think that, you know, I have

19   some ability to comprehend the documents, but there was no

20   way I could have made the distinction that this part of the

21   documents should be disregarded and this part should not be.

22   I mean how would --

23        THE COURT:  Yeah, I think that -- I think that

24   there was a little confusion around that part.  That

25   particular legend said that you don't have the rights of a

Page 24

1   shareholder until it converts to common stock.

2            MS. JAO:  Yes.

3            THE COURT:  And that was meant to convey exactly

4   your point that your started the day with, which was that

5   you couldn't vote, right?  You yourself as the holder of an

6   RSU were not going to get a proxy statement as you would,

7   but there were -- there were -- there were voting rights

8   that were attached to the RSUs --

9            MS. JAO:  Yeah.

10           THE COURT:  -- because of those interests being

11  put into a trust and having that trustee vote.

12           What I was arguing I believe with Ms. Solomon

13  about on that point was that -- the point was being made

14  that because it says you don't have the rights of a

15  shareholder that means that you must have been being told

16  you had the rights of a general creditor.

17           So in the -- let me explain a little -- let me

18  explain bankruptcy world, right?  So when you have a

19  bankruptcy estate the law is that the assets get distributed

20  in a --

21           MS. JAO:  Right.

22           THE COURT:  -- in an order --

23           MS. JAO:  Yes.

24           THE COURT:  -- you know, in a -- and there's a

25  very elaborate priority scheme.

Page 25

```
1              MS. JAO:  Yes.
2              THE COURT:  Right?  So that for that purpose we
3    have to -- a debtor -- a reorganized debtor or a trust has
4    to divide the world into each of those interests, and I
5    think what was being argued yesterday was you see, the
6    holders of the RSUs were told that they don't have the
7    rights of a shareholder and therefore that means that in
8    this bankruptcy they have the rights of creditors and be --
9    get to be ahead of the line.  And what I was saying was,
10   that's not a fair reading of that statement, because as you
11   said, context is everything.
12             So the context of that statement was clarifying
13   exactly your point was that you don't get to vote, you don't
14   get to demand -- make a demand on the board to bring a
15   particular action which would give rise to the right to
16   bring a shareholder suit.
17             So you're absolutely right, you -- the RSUs were
18   not equivalent in terms of all of the rights that they have
19   to a share of stock.  You are right, I agree with you.
20             MS. JAO:  When -- thank you, Your Honor.
21             THE COURT:  Okay.
22             MS. JAO:  When I started at Lehman --
23             THE COURT:  Uh-huh.
24             MS. JAO:  -- as a junior I worked 80 hundred (sic)
25   hour weeks and weekends, so even if these documents were
```

Page 26

```
1   available, you know, your priorities were a little different
2   or else you're -- you know, you're out there, but even if I
3   did read the documents I swear I would have never understood
4   them in this way.  But that -- you know, that's okay --
5              THE COURT:  No --
6              MS. JAO:  -- that's water under the bridge.
7              THE COURT:  -- I understand.
8              But I also want to respond to what you said about
9   kind of the war of attrition that you feel --
10             MS. JAO:  Uh-huh.
11             THE COURT:  -- has taken place here, because the
12  case -- we're now -- it's now 2014 and of course I took over
13  from Judge Peck in January, and I think this matter first
14  came up before him a couple of years ago and then there's
15  this elaborate procedure.
16             When the estate gets administered -- and I know
17  it's hard to accept this -- but it's the duty of those who
18  administer it to follow the law and make sure that every
19  claim falls in the right bucket and that folks who under the
20  law are supposed to be at the back of the line and in this
21  case not receive anything, don't jump up.  Because if you
22  imagine a very large RSU claim that gets turned into a cash
23  claim that then reduces the recovery of the people -- of the
24  creditors who are above that class.
25             MS. JAO:  Uh-huh.
```

1         THE COURT:  So it's a very important exercise

2    mandated by law to do this, and I know that it doesn't seem

3    fair, and I'm, you know, greatly sympathetic, I was an

4    associate at a law firm for many, many years and when you

5    get hired, you know, you get told you have a salary and a

6    bonus, and I remember thinking, well, what does that mean a

7    bonus?  Is that real, do I really get that, do I not get

8    that?

9         So -- and as you said, you know, I wouldn't have

10   really kind of like knocked on the managing partner's door

11   and said what does that really mean because you're -- you

12   know, you're starting out and you want to succeed and you go

13   along.

14        So I understand where you're coming from is the

15   easiest way for me to say it, and I just want to convey to

16   you that I'm -- will do everything -- I am obligated to

17   follow the law and do everything that I can to come to the

18   right result.

19        MS. JAO:  Your Honor, I do appreciate the value of

20   the procedure and the bankruptcy laws in this country,

21   because during the last financial crisis you could see

22   recovery encompassed here --

23        THE COURT:  Right.

24        MS. JAO:  -- more quickly with less destruction of

25   value because we do have the benefit of the bankruptcy laws

1    and Bankruptcy Court.  I do appreciate that.

2            My only question is, and maybe this isn't the

3    right venue for it, but where do labor protections fall?

4            THE COURT:  Well, I think -- I mean, you know, we

5    could spend a day --

6            MS. JAO:  Right.

7            THE COURT:  -- we could spend a day talking about

8    it.  I think that, you know, it's the classic bind that

9    labor is in because of the nature of the relationship.

10           If all of the analysts in 2002 had said to Lehman,

11   you know, we're -- we don't know what this really means, we

12   don't like this deal, we're going walk with our feet maybe

13   Lehman would have changed it or maybe Lehman would have said

14   walk with your feet.

15           But, you know, at a certain point, you know, you

16   -- in the absence of circumstances, which frankly so far I

17   don't believe are present here, I don't think there's really

18   a remedy under -- under the labor law.

19           I mean I think that bankruptcy is a -- is a

20   shocking event for people.  No one could have foreseen -- no

21   one could have foreseen the fall of Lehman Brothers.  No one

22   could have foreseen it.  Hopefully it'll never happen again,

23   and a lot of innocent folks lost a lot of -- lost a lot of

24   money, but any way.

25           MS. JAO:  Thank you, Your Honor.

Page 29

```
 1              THE COURT:  Thank you very much, I very much
 2    appreciate your taking the time to come down.
 3              MS. JAO:  Thank you.
 4              THE COURT:  Thank you, Ms. Jao.
 5              Sir?  Did I hear someone ring in on the line?
 6              I'm sorry, Mr. Miller, did you want to ask Ms. Jao
 7    some questions?
 8              MR. MILLER:  Ralph Miller for LBHI.
 9              No, Your Honor.  I just wanted to state that we
10    have no questions --
11              THE COURT:  Okay, thank you.
12              MR. MILLER:  -- or cross-examination for the
13    record.
14              THE COURT:  Thank you.
15              Is there somebody who dialed in on the telephone
16    line?
17              Okay, yes, sir.  What is your name, please.
18              MR. SHOTTON:  My name is Paul Shotton.
19              THE COURT:  How do you spell your last name?
20              MR. SHOTTON:  S-H-O-T-T-O-N.
21              THE COURT:  Okay, thank you, Mr. Shotton.
22              The same rules apply with respect to you.  I
23    assume that largely what you're going to say is in the
24    nature of argument, but to the extent that you are
25    indicating facts relating to your personal circumstances and
```

Page 30

1    situation with Lehman I will view that as sworn testimony --

2               MR. SHOTTON:   Indeed.

3               THE COURT:   -- that you're giving under oath.

4               Okay, go ahead.

5               MR. SHOTTON:   So my name is Paul Shotton.   I was

6    hired by Lehmans brothers on May the 24th of 2004 by the

7    chief risk officer of the firm, Madelyn Antoncic, who I knew

8    slightly from relationships at earlier firms that we'd both

9    worked at, and I was hired as a managing director to be the

10   global head of marketing risk management.

11              Now when I was hired it was clear that that job

12   was always going to be in New York where all of the senior

13   management, certainly in the corporation functions or the

14   risk management functions were all based in New York.   But I

15   was born in the United Kingdom and I was working in the

16   United Kingdom up until the time when I was hired.

17              So knowing that it would take some time to get a

18   visa for the U.S. immigration authorities to give me a visa

19   to move to the states I began working in London on May the

20   24th, and my visa finally -- or came through in August of

21   2004, I moved by family to the United States in August 2004,

22   I've been here every since.

23              So I continued with Lehman until the bankruptcy,

24   and then initially I was transferred to Barclays Capital,

25   but on October the 20th of 2008, I, along with most of the

Page 31

1    other senior members of risk management, that were laid out

2    of my Barclays Capital.

3           Shortly afterwards in 2009 I received at my home

4    address in Connecticut, through one of the mail delivery

5    services, I received a proof of claim form which was already

6    largely populated, it was populated with my name and

7    address, it was populated with the name of the creditor

8    Lehman Brothers Holdings Inc., and the notice of scheduled

9    claims said that it was a Schedule G, executory contract or

10   unexpired lease, the description being restricted stock unit

11   agreements.  So I completed that form and sent it in.

12          I later had cause to need to change some of the

13   figures on my form, and the form that I subsequently sent in

14   I actually had to make two amendments, and they were blank

15   forms, so I filled those in myself, but I simply copied all

16   of the information in terms of the -- in terms of the

17   creditors being LBHI.

18          I put into the court record my hiring letter that

19   I had from Lehman Brothers.  I've actually put it into the

20   record twice.  The first time on February the 13th of 2012

21   in response to an earlier attempt by Lehman to have my claim

22   reclassified as equity, and I put it into the record again

23   on March the 4th of this year because I couldn't be sure --

24   having put it in so long ago originally I couldn't be sure

25   that it would be -- it would be fresh in mind.  So that's an

Page 32

```
1    employment letter, gives me a guarantee for the performance

2    year 2004.

3              So fiscal -- Lehman's fiscal performance year is

4    identical to their fiscal year, ends on November the 30th of

5    each year.

6              THE COURT:  Okay.  Let me ask you to pause for a

7    minute.  Is Mr. Shotton's letter in the -- in the record

8    somewhere?

9              MR. SHOTTON:  I have some copies I can --

10             THE COURT:  Do you have an extra copy?

11   Ms. Alvarez, do you have a copy?

12             MS. ALVAREZ:  No.

13             THE COURT:  And, sir, you believe you filed this

14   on the docket?

15             MR. SHOTTON:  I'm sorry?

16             THE COURT:  You filed this on the docket of this

17   court you think?

18             MR. SHOTTON:  I -- yes, I actually addressed one

19   to your good self on March the 4th of this year --

20             THE COURT:  Okay.

21             MR. SHOTTON:  -- and I had already sent one to

22   Judge Peck and to other parties in --

23             THE COURT:  Ms. Solomon?

24             MS. SOLOMON:  Yes, Your Honor, it's Claimant 69 in

25   the attached joint appendix.
```

Page 33

1          (Pause)

2               THE COURT:  So at the joint appendix CL0069 is

3     Mr. Shotton's declaration, and attached to that is a proof

4     of claim, and attached to that is -- is the hiring letter.

5               MR. SHOTTON:  Indeed.

6               THE COURT:  Okay.  Very good.  Thank you.

7               MR. SHOTTON:  So you'll see in the second

8     paragraph -- as I was explaining the performance here is

9     equal to the fiscal year, which ended on November the 30th

10    each year.

11              So you'll see for the performance year 2004 my --

12    the year which I was hired -- I was going to be paid a

13    salary at annualized rate of $200,000, and that was I think

14    the maximum salary with any MD in the firm was paid --

15    managing director of the firm was paid.  And a guaranteed

16    minimum bonus of $1.55 million payable on or about January

17    the 31st in the following year.

18              And at the bottom of the letter, the one, two --

19    the fourth paragraph says:

20              "At the firm's discretion a portion of this 2004

21    and future years compensation will be payable in conditional

22    equity awards pursuant to the firm's stock award program

23    then in effect."

24              And then the next paragraph begins:

25              "Your compensation for all periods after

Page 34

1  performance of year 2004 will be determined at the firm's

2  discretion; however, referencing a run rate compensation

3  level for that of 2004 of one and three quarter million

4  dollars."

5          So my point here is that this guarantee for the

6  first year and the run rate which was referenced for future

7  years compensation was guaranteed in U.S. dollars, the legal

8  tender of this country.  That wasn't guaranteed in terms of

9  a number of hours used, the number of Lehman shares, the

10  number of share options or CSAs or anything else, it was

11  U.S. dollars.  And so I understood that to being that they

12  were -- that was the -- my -- my guarantee.

13          And I understood RSUs -- I mean many Wall Street

14  firms, most firms have similar compensation deferral

15  programs and part of that deferred compensation is paid in

16  the form of equity.

17          There were two things that were unusual about a

18  Lehman scheme in relation to other firms.  One was the

19  amount of compensation, which was paid in the form of

20  deferred equity.  So as other firms typically might have

21  been 15 to 25 percent of total compensation was deferred at

22  Lehman between -- well for the first year 33 percent of my

23  bonus was deferred in the form of RSUs, later it became 40

24  percent of the bonus, which were very high figures.

25          The other unusual future was the long length of

1    the deferral period.  So other firms, the lady spoke

2    yesterday about Barclays, my own experience at JPMorgan

3    before was that deferrals were in -- of three years -- three

4    equal transfers, paid a third, a third, a third after the

5    end of the subsequent three years, and as soon as equity

6    vested it was immediately yours free to dispose of as you

7    wished.

8            So this cliff vesting after five years was an

9    unusual feature of Lehman's terms.  And ostensibly as sort

10   of compensation for that that was why the stock was offered

11   at a discount.  That was another rare -- by that point

12   unusual feature.  Most firms had -- no longer granted their

13   equity at a discount, Lehman was one of the few that did,

14   and they finally got rid of that clause in 2008.

15           So Lehman might say, well, okay, you -- you

16   accepted this letter, perhaps initially you (indiscernible -

17   00:38:20) you didn't do enough due diligence to really

18   understand exactly what the terms of the deferral were, I

19   had assumed it was going to be similar to those other

20   typical Wall Street firms like JPMorgan, but after the first

21   year once you had experienced the first years compensation

22   that should have been clear to you, why did you continue to

23   stay?  And de facto by continuing to stay for another three

24   and a half years after the first year you had accepted the

25   terms and conditions.  If you didn't like them then you

Page 36

1    could have --

2              THE COURT:  Well, can I --

3              MR. SHOTTON:  -- you could have walked.

4              THE COURT:  -- can I just -- can I just stop you,

5    because it's a striking letter, and I'm quite glad that

6    you're here, because the situation that you describe, which

7    is making an enormous decision to move your family to the

8    United States.

9              MR. SHOTTON:  Exactly.

10             THE COURT:  An enormous decision, okay?  And you

11   get a letter -- and I'm trying to read this through your

12   eyes, right?  You get a letter that says, "At the firm's

13   discretion ..." no question what those words mean.  "At the

14   firm's discretion ..."

15             MR. SHOTTON:  Absolutely.

16             THE COURT:  "A portion of your total 2004 and

17   future years total compensation ...," and then there's a

18   parenthetical that draws down on that, "combined base

19   salary, bonus, and other compensation will be payable in

20   conditional equity awards."

21             So through my eyes if I'm reading this I say,

22   whoa, not only are they telling me that they can pay part of

23   my bonus in equity, but they're telling me that they might

24   actually be able to pay my base salary in equity.

25             I mean that to me just plain English reading would

1    set off enormous bells and -- alarm bells because it would

2    signal to me that I have no -- there's no backstop here,

3    there's nothing here -- there's no firm guarantee -- cash

4    number that's guaranteed.

5            So -- so -- and your case is also extremely

6    interesting because obviously the title, the position, you

7    weren't being hired as somebody, you know, to work in some

8    low level department, I mean you fantastically sophisticated

9    individual.

10           So I'm just trying to harmonize what you're

11   telling me with, you know, your having gotten this letter --

12           MR. SHOTTON:  Uh-huh.

13           THE COURT:  -- and made a decision to come over

14   here.

15           MR. SHOTTON:  A literal interpretation of their

16   words may well indicate that even the salary was potentially

17   -- could potentially being withheld in the form of RSUs.

18           THE COURT:  Be in play, right?

19           MR. SHOTTON:  But that was not the practice at

20   all.  Remember that it was common practice on Wall Street to

21   withhold some portion of compensation and to be deferred

22   either deferred cash or deferred equity, so that wasn't

23   unusual to me.

24           Also remember that my hiring manager, Madelyn

25   Antoncic, I knew -- I didn't know her extremely well, but I

```
 1    knew her somewhat --

 2              THE COURT:  Uh-huh.

 3              MR. SHOTTON:  -- we both worked as Golden Sachs in

 4    the past, we both shared a short period -- short experience

 5    at BSW, myself in London always and she in New York, so I

 6    didn't know her well --

 7              THE COURT:  Uh-huh.

 8              MR. SHOTTON:  -- but I knew her reasonably well

 9    and I knew standard Wall Street practices, and so to me it

10    wasn't unusual.

11              THE COURT:  Uh-huh.

12              MR. SHOTTON:  I took a certain amount on trust of

13    course, and I have to say that the first year, 2004, only 33

14    percent of the bonus was withheld in the form of RSUs, and

15    my understanding is that that had been the typical -- the

16    typical kind of percentage --

17              THE COURT:  Uh-huh.

18              MR. SHOTTON:  -- withholding for up until that

19    period.  It was only after that that it was increased to 40

20    percent.

21              THE COURT:  So that means in the first year then

22    and it's pro rata it's not a full year, but so 33 percent --

23    I'm sorry -- was the -- does that one million five represent

24    the pro rata?

25              MR. SHOTTON:  1. -- no, 1.55 was the guaranteed
```

Page 39

1    bonus for the -- for the whole year, whatever I worked of

2    it.

3              THE COURT:  For calendar -- for calendar of 2004.

4              MR. SHOTTON:  For -- well, for fiscal year, for

5    performance year 2004.

6              THE COURT:  Performance year.  So --

7              MR. SHOTTON:  1.55 million.

8              THE COURT:  So eventually --

9              MS. JAO:  The thing that was pro rata was the

10   salary, because I joined May the 24th --

11             THE COURT:  Yeah, yeah.

12             MR. SHOTTON:  -- I worked for just over six months

13   so I got just over $100,000 of salary --

14             THE COURT:  Okay.  And then how much --

15             MR. SHOTTON:  -- but the 1.55 was guaranteed.

16             THE COURT:  -- how much -- how much cash did you

17   get on January 31, 2005?  So it would have been a third

18   of --

19             MR. SHOTTON:  The --

20             THE COURT:  -- of a half of a million five?

21             MR. SHOTTON:  Of the 1.55 million bonus RSUs

22   amounted to 509,952 and the cash payment before taxes was

23   $1,040,048.

24             THE COURT:  So even though you only worked a half

25   a year that number is the -- is the actual number that is

Page 40

1    your bonus for the year 2004?

2              MR. SHOTTON:  That's correct.  That's correct.

3    Because --

4              THE COURT:  Was part of that like a signing bonus?

5              MR. SHOTTON:  Effectively because in leaving

6    JPMorgan, my previous employer, I was leaving behind a bonus

7    on the table there.

8              THE COURT:  Okay.

9              MR. SHOTTON:  So this was again standard Wall

10   Street practice at the time.

11             THE COURT:  Okay.  So all in the cash that you

12   received on account of the work that you did in 2004 was

13   approximately a million one.

14             MR. SHOTTON:  Yes.

15             THE COURT:  Okay.  Okay, go ahead, I interrupted

16   you.

17             MR. SHOTTON:  Okay.  So -- so Lehman might say,

18   well, after the first year at least by then your eyes were

19   opened, you were well aware of how much and to what extent

20   Lehman could defer compensation in the form of these RSUs,

21   so why didn't you just walk?  You had the option to go

22   somewhere else.

23             Now from a -- in principal that's correct, but I

24   had -- if you think about it any major Wall Street firm, any

25   major trading firm, capital markets firm needs only one

Page 41

1    global head of market risk management, so how many firms are

2    there?  Well we're talking about five Wall Street firms.

3    Golden Sachs, Merrill Lynch, Morgan Stanley, Lehman

4    Brothers, and (indiscernible - 00:44:23).  Then there are --

5    there were the two large (indiscernible - 00:44:26) banks,

6    JPMorgan and Citibank, that was it.  Bank of America once it

7    acquired Merrill wasn't a major capital markets player, so

8    seven names in the United States, one of which I was already

9    at Lehman.

10         In Europe you had two large Swiss banks, UBS and

11   Credit Suisse, and Deutsche Bank in Germany, and that was

12   pretty much it.  Barclays wasn't a major player, it wasn't a

13   first league player until after they brought Lehman's out of

14   bankruptcy -- North American business out of bankruptcy in

15   2008.  So there were about nine firms that I could have gone

16   to.

17         So my skill set is highly technical, highly

18   quantitative, quite rare, and therefore compensated, it's

19   also the case there's a fairly limited demand for somebody

20   with my skill set.  I had already waited -- I had been at

21   JPMorgan for seven years before moving to Lehman, I'd waited

22   for a considerable part of that period to make the next step

23   in my career progression, which at JPMorgan I was the

24   European -- Europe, Africa, Middle East head of marketing

25   risk.  So the next step in the progression was global head

Page 42

1    of market risk, and then I saw, you know, chief

2    (indiscernible - 00:45:28) after that.  So I really had to

3    wait a long time to find the Lehman opportunity.

4            And out of leaving that behind, leaving --

5    obviously over the -- over the course of the four and a half

6    years my compensation at Lehmans accumulated to, you know,

7    four and a half million dollars or so of RSU -- RSUs left on

8    the table, I would have to walk away from that.

9            The chances of finding another equivalent job as

10   head of market risk somewhere else pretty small.

11           The chances that I could persuade another firm to

12   pay out the compensation that I was leaving on the table at

13   Lehman was -- you know, was slim to none.

14           So whilst theoretically it's correct to say I had

15   the option to walk, as a practical matter I didn't really

16   have an option to walk, and that's why I stayed at the firm.

17           And as far as my understanding of RSUs, Lehman in

18   its documentation they like to conflate the idea of RSUs

19   with equity in order to encourage employees to act like

20   shareholders, and they would used terms like equity awards

21   in relation to RSUs and CSAs and so on.  But let's not let

22   that confuse us.  RSUs are RSUs.  They are not equity at

23   all.

24           The very basic -- if you think back for the

25   foundation of joint stock corporations they started because

Page 43

1    wealthy investors wanted to invest in businesses and

2    ventures, but then at some point those circumstances

3    changed, they needed liquidity or they wanted to invest at a

4    better opportunity somewhere else and so they -- they needed

5    some means of getting out of their -- of their investment,

6    and so, you know, as history tells it they gathered under a

7    buttonwood tree not too far from here and developed the idea

8    of exchanging stocks, and that was the origin of the joint

9    stock corporation and that's the origin of equity.

10           A fundamental element of equity is that it is

11   transferable.  RSUs are not sellable.  I couldn't sell them,

12   I couldn't hedge them, I couldn't do anything with them.

13           As far as I was concerned there was simply nothing

14   more than a promise that in five years time they would

15   convert into equity, and until that time all I had was a

16   promise from Lehman and nothing more, and that's why I

17   regard them not as equity, not as equivalent of equity at

18   all, they're simply promises -- unfulfilled promises and

19   that's why I regard them as being equivalent to debt claims

20   not as -- not as equity claims.

21           THE COURT:  Okay.

22           MR. SHOTTON:  There is, if you allow me --

23           THE COURT:  Yes, go ahead.

24           MR. SHOTTON:  -- there's one more matter that I'd

25   like to bring to the Court's attention.

Page 44

1          So on December the 21st, 2011 your distinguished

2     predecessor Judge James Peck invited a number of employee

3     claimants to make statements about their --

4               THE COURT:  Right.

5               MR. SHOTTON:  -- their situation, those

6     circumstances were in front of the Court.  I was there on

7     that day, I was privileged to be allowed to address the

8     Court.  And whereas Lehman had been saying, oh, these --

9     these employee claims they're all the same, they're all just

10    equity, they should all be reclassified as equity.

11          Judge Peck, having heard the people speak said,

12    no, that's not right.  He heard people talk about -- so

13    salaried employees, not myself -- speak of RSUs.  He heard

14    people in the UK and elsewhere speak of CSAs, which are

15    economically similar but legally distinct.  He heard talk of

16    equity options, which are very different from RSUs and CSAs,

17    both economically and legally.  He heard about commissioned

18    sales people part of whose sales commissions were being

19    withheld.  And he heard about the Neuberger Berman partners

20    whose partnership stakes were swapped for RSUs.

21               THE COURT:  Right.

22               MR. SHOTTON: and he said this -- there's a lot of

23    different cases here, different classes, they're not all the

24    same, and he asked the employees claimants be categorized

25    into these classes.

Page 45

1              THE COURT:  Right.

2              MR. SHOTTON:  Now realizing full well that it

3      would be almost impossible for the employees to organize

4      themselves into these classes, because after all we didn't

5      really know one another, and it also at that point it wasn't

6      clear just how many different classes there were, he charged

7      Lehman with the responsibility of defining the classes and

8      grouping the employee claimants into these classes in order

9      to ease the process for the Court to make it more efficient

10     and at the same time that would make it more efficient for

11     the employees as well.  So that each class of employees

12     could have one law firm representing them, that would avoid

13     potential conflicts of interest between different classes of

14     employees being -- their interests being represented by the

15     same law firm, and that would most importantly ease the --

16     the situation for the Court, make it more efficient.  And so

17     he charged Lehman with the responsibility to do that.

18              After he did that Lehman did absolutely nothing.

19     They completely ignored that instruction, and that's why

20     today you would see that there are half a dozen law firms

21     representing the represented claimants, but it's not nicely

22     lined up in the way that Judge Peck intended with one law

23     firm representing RSU holders and one law firm -- salaried

24     employees, one for CSAs, one for commission sales people,

25     one for (indiscernible - 00:50:32).  It's not like that at

1    all.  These law firms covering the covered employees cover

2    several different categories.

3              THE COURT:  Right.

4              MR. SHOTTON:  It's quite a -- quite a mixture.

5              THE COURT:  It is a mixture and I'm just -- I'm

6    very interested in what you're saying, because my reading of

7    what Judge Peck observed was that his inclination at the

8    initial hearing was to rule as a matter of law that RSUs and

9    CSAs across the board had to be subordinated, but as the day

10   went on and as he listened to more and more of the

11   individuals state their concerns he felt that as a matter of

12   procedural fairness, due process --

13             MR. SHOTTON:  Yes.

14             THE COURT:  -- and also to insure the ability to

15   make -- for him to make the right decision, and at that

16   moment in time of course he had no inkling that he would be

17   retiring, he then said to the debtors, we're going to have

18   to figure out a way to have an evidentiary hearing to give

19   the individual employees an opportunity to get themselves --

20   distinguish them -- their cases from the cases that led to

21   the ruling in Enron.  And that's a great simplification --

22             MR. SHOTTON:  Uh-huh.

23             THE COURT:  -- of the issues.

24             But the -- I don't think that he had -- was

25   directing, and I don't think that Weil, Gotshal would have

Page 47

1    the ability to organize the claimant pool.  The claimant

2    pool then had to unfortunately organize itself.

3            And what happens in a lot of cases, and I also --

4    I've -- among the many cases that I have heard I preside

5    over the Ambac case.  I'm sure you're familiar with --

6            MR. SHOTTON:  Uh-huh.

7            THE COURT:  -- what Ambac is.  Ambac is the second

8    largest municipal bond insurer in the United States and it

9    ended up in this court of course because of the defaults in

10   the -- the CDOs and the --

11           MR. SHOTTON:  The monoclines, yeah.

12           THE COURT:  -- CDOs squared, and the monoclines,

13   exactly.  And in that case we had claimants come in who

14   similarly were represented, not every single one of them,

15   but lawyers came in representing groups of them.  It kind of

16   became the symbol for the whole -- the whole class.

17           So -- so I don't know if you're telling me that

18   you find it troubling that each of the law firms that is

19   appearing here seems to be representing one from -- one from

20   each of the different buckets.  I don't --

21           MR. SHOTTON:  Well my -- your interpretation of

22   Judge Peck's comments is perhaps different than mine was.

23   My interpretation of what he said was that he wanted the

24   Court to be able to consider the employee claimants in their

25   distinct classes, and he -- my understanding was that he

Page 48

1    charged Lehman with the responsibility of organizing those

2    classes, and then as a side comment this would also be far

3    more efficient for the employees because then each class can

4    only -- can have one law firm representing.  You have to

5    share the cost amongst that class, that's obviously cheaper

6    and more efficient than having half a dozen law firms all

7    covering the same things.

8            THE COURT:  Right.

9            MR. SHOTTON:  I --

10           THE COURT:  Well if -- and I'll ask Mr. Miller,

11   I'm happy to go back and look at the transcript of that day,

12   but my impression of it is that he was looking for there to

13   be a process --

14           MR. SHOTTON:  Uh-huh.

15           THE COURT:  -- which there was and was heavily

16   negotiated that would serve as an opportunity for anyone and

17   everyone who wanted to be heard to be able to be heard.

18           MR. SHOTTON:  Uh-huh.

19           THE COURT:  And you and Ms. Jao before you

20   obviously rose to the occasion to appear here and then we

21   have groups of others represented by the lawyers.  And

22   beyond that it's difficult for the Court to kind of go out

23   and on an individual claimant basis, you know, ask for

24   them --

25           MR. SHOTTON:  Uh-huh.

                                                            Page 49

 1              THE COURT:  -- to participate.  We -- you know,

 2      the concept is notice and an opportunity to be heard, and

 3      today is that day.

 4              So, Mr. Miller, do you have the transcript and is

 5      there something that I'm missing in terms of what Weil,

 6      Gotshal was tasked or what Lehman was tasked with in order

 7      to get us to today?

 8              MR. MILLER:  Your Honor, Ralph Miller.

 9              We don't believe there is anything that the Court

10      is missing.  We did understand and we did undertake to serve

11      operative documents on all the pro se participants so they

12      had a flow of information.

13              THE COURT:  Uh-huh.

14              MR. MILLER:  We made suggestions during that

15      hearing that all the people on the phone expressed their

16      views about whether they wanted to be heard, and some people

17      said they would like to be heard, and there was a discussion

18      in that transcript about whether it should be bifurcated

19      into two hearings.  The one hearing --

20              THE COURT:  The represented and the non-

21      represented?

22              MR. MILLER:  Yes.  And we thought that was

23      inefficient and I think Judge Peck believed that was

24      inefficient, and some of the people who did not have an

25      order said they'd like to get to speak at the same time and

Page 50

1    they'd like to be integrated, so --

2              THE COURT:  Okay.

3              MR. MILLER:  -- Judge Peck decided that it would

4    be an integrated proceeding.

5              He also decided to give the pro se claimants the

6    opportunity to come watch the represented claimants and the

7    opening statement if they wished to do so so that they could

8    gain the background information --

9              THE COURT:  Right.

10             MR. MILLER:  -- in the first day --

11             THE COURT:  Right.

12             MR. MILLER:  -- and then in a later day if they

13   wished to speak or not speak they could do so.

14             I don't know where Mr. Shotton was here yesterday

15   or not.

16             MR. SHOTTON:  I was here yesterday.

17             THE COURT:  Okay.

18             MR. MILLER:  So he has had the benefit of that

19   process.

20             THE COURT:  Okay.

21             MR. MILLER:  And we have received inquiries from

22   people and we have consistently indicated what the options

23   were I believe to come -- you know, participate in the

24   pretrial which we also made available by telephone and let

25   people know in the notice --

1            THE COURT:  Well, we did -- we did -- our chambers

2    did receive a number of phone calls, and you know, the usual

3    rules of the court here are that if you're in Manhattan you

4    have to come, and in this case my chambers was instructed

5    that anyone who calls and wants to participate

6    telephonically in this hearing was to be given permission to

7    do so, no questions asked.

8            So I don't know -- you know, there are rules about

9    the Court communicating with the parties, so my chamber

10   staff deals with that and I was advised that anyone who

11   called was given the opportunity to call in.

12           MR. SHOTTON:  Uh-huh.

13           THE COURT:  So -- so again, Mr. Shotton, I don't

14   know where to go with your observation.  I will go back and

15   look at that transcript to see if there's some defect, but

16   you yourself are here --

17           MR. SHOTTON:  Well --

18           THE COURT:  -- and are doing --

19           MR. SHOTTON:  -- it's possible that I over

20   interpreted what he meant and I -- it's possible that I was

21   thinking that he wanted to make the process very efficient,

22   which would have been the case had each of the classes been

23   distinct classes and each class been represented by one law

24   firm, you wouldn't have had some of the kind of confusion

25   that you -- you know, you heard yesterday when a single -- a

Page 52

1    representative of a single law firm is talking about

2    multiple different claimants and different types of claims

3    that they had.  That could have been simplified a lot.

4            I mean I've -- I've appeared pro se because I

5    can't afford paying for representation, but I have taken

6    part in a large number of conference calls over the last two

7    years and so, and I have to say that they've been -- they've

8    been pretty chaotic.  And I think that that is perhaps

9    emblematic of the war of attrition that happened between

10   Lehman and the claimants, they were -- they were quite fine

11   that the process being efficient and be dragged out because

12   that would then motivate claimants -- how so many other

13   previous employee claimants had abandoned their claims

14   because they could no longer afford to continue

15   representation and they became frustrated with the process

16   so they abandoned their claims.

17           So as far as I can see it was actually part of a

18   deliberate strategy.  It wasn't just incompetence or

19   misunderstanding.  But that's -- perhaps I was over

20   interpreting Judge Peck's intentions that the process be

21   efficient.

22           THE COURT:  Well, I think it's important to react

23   somewhat to the statement that it's a deliberate strategy,

24   because certainly, you know, the suggestion that the Court

25   is somehow encouraging or tolerating something that's

1   improper is not -- is not something that I cannot -- not

2   react to.

3           My view of what Judge Peck did, as reflected in

4   the stipulation, and the folks -- and I think it bears

5   saying that -- and I actually -- I wrote a decision in the

6   Ambac case in which I did not allow the claims of the

7   shareholders, and in that decision I said -- I indicated

8   that, you know, the anger and the disappointment of the

9   shareholders --

10          MR. SHOTTON:  Uh-huh.

11          THE COURT:  -- in that case was completely

12  understandable, but that when you're obligated to apply the

13  law, right, I --

14          MR. SHOTTON:  I understand.

15          THE COURT:  -- you know, I'm not -- you wouldn't

16  want judges to be anarchists, right, and not apply the law,

17  and there's a great debate over the extent to which we

18  should do what's fair as opposed to what the law requires.

19          MR. SHOTTON:  I realize that, you know, the law

20  and justice are not one in the same thing.  I appreciate

21  that.

22          THE COURT:  And they're not -- you know, and I'm a

23  great --

24          MR. SHOTTON:  But I would like to believe that the

25  two at least have a noting acquaintance.

1          THE COURT:  Well then if you'd like to do some

2     reading then I wrote a decision in a case called Patriot

3     Coal in which I said the question was what is justice?  So

4     I've thought about this a lot.

5          MR. SHOTTON:  Uh-huh.

6          THE COURT:  And I do believe that I have to apply

7     the law and that I also do have to do justice, but I do have

8     to apply the law.

9          And what this has to do with the Lehman estate is

10    that there is this bankruptcy structure, and the folks who

11    represent Lehman are obligated to implement it, and they

12    don't have a dog in the fight in the sense of wanting to

13    allow one claimants' claim versus another.  They don't get

14    paid more or less, they just have to sort the claims so

15    that --

16          MR. SHOTTON:  Well, I can construe a possible

17    motive though, Your Honor.

18          THE COURT:  What motive would that be?

19          MR. SHOTTON:  Well the -- there are various firms

20    available in administering Lehman's estate right now, and

21    you might think as you just implied, that they are

22    dispassionate, disinterested third parties, but I believe

23    they do have a vested interest, because they -- these firms

24    confidently expect to get future business to have as future

25    clients the corporate claimants to Lehman's estate, whereas

1    they have no reason to expect to get any future business at

2    all from the employee claimants, and that creates a motive

3    for them to unfairly discriminate against the employees in

4    order to benefit the corporate claimants and to line their

5    own pockets in the process, Your Honor.

6            THE COURT:  Okay.  Well, I understand that that's

7    your view, and I don't -- I have to decide this matter and

8    every matter --

9            MR. SHOTTON:  Of course.

10            THE COURT:  -- as a question of law and listening

11    to the facts, and I'm quite happy that you came in today,

12    and I appreciate your presentation, it added a lot --

13            MR. SHOTTON:  Thank you for your indulgence, Your

14    Honor.

15            THE COURT:  -- to what I heard yesterday.

16            And let me just ask Mr. Miller if he wanted to ask

17    you any questions in the nature of cross-examination?

18            MR. MILLER:  I do briefly, Your Honor.

19            THE COURT:  All right.  It's always a little

20    unusual when we have a pro se claimant, but if I could ask

21    you to take the witness stand that would be great.

22            MR. MILLER:  And he is --

23            THE COURT:  I will now administer the oath.

24        (Witness Sworn)

25            THE COURT:  Okay.  Please have a seat,

Page 56

1   Mr. Shotton.

2   CROSS-EXAMINATION

3   BY MR. MILLER:

4   Q    Mr. Shotton, my name is Ralph Miller, I don't think you

5   and I have spoken before, but you have made a number of

6   calls I understand --

7            MR. MILLER:  Excuse me, I'm sorry, Your Honor,

8   apparently --

9            THE COURT:  Oh, try it again.

10           MR. MILLER:  Yes.

11  BY MR. MILLER:

12  Q    Mr. Shotton, my name is Ralph Miller, I don't believe

13  you and I have spoken; is that correct?

14  A    We have not.

15  Q    You have however called my colleague, Ms. Alvarez, on a

16  number of occasions and sought information as I understand?

17  A    Yes.

18  Q    Now you made reference to a series of conference calls

19  you were in.

20  A    Yes.

21  Q    Were those conference calls with other claimants and

22  counsel that you were referring to?  I don't want you to get

23  into any contents?  Yes.

24  A    Yes, they were.

25  Q    Weil, Gotshal was not in those conference calls,

Page 57

1    correct?

2    A    I think some of the conference calls Weil, Gotshal was

3    at, some they were not.

4    Q    All right.  You did file a declaration in this case; is

5    that right?

6    A    Yes.

7    Q    And this declaration appears to be based on some sort

8    of form you received; is that correct?

9    A    Yes.

10   Q    Yes.  Who did you receive that form from?

11   A    Well, I actually saw a lot of forms from the -- what's

12   the -- there's some court service which distributes all of

13   the papers from all of the claimants across -- to all of the

14   interested parties.  So I received a large number of emails

15   to my work and home email address with attached subject --

16   attached forms to them.

17        So having seen that -- those started to come

18   through I think on March the -- around March the 2nd, March

19   the 3rd.  Having seen those I decided I should put in a

20   statement of my own.

21        So I had earlier received from one of the -- one

22   of the attorneys a draft copy of an earlier version of such

23   a thing, which I, in combination of that that's where I had

24   seen other claimants make, created my own version of that

25   and submitted that to the court I think on like I said March

Page 58

```
 1    the 3rd or March the 4th.

 2    Q    So you were in contact with other claimants and their

 3    counsel?  Again, I'm not asking you for the content of

 4    that --

 5    A    Yes.

 6    Q    -- but you were able.

 7             And was there any effort made to try to organize

 8    into coherent groups in that conversation -- those

 9    conversations you had?

10    A    Not that I'm aware of, no.

11    Q    All right.  Did -- are you aware of the fact that LBHI

12    did not want to have this evidentiary hearing?

13    A    I wasn't aware of that I don't think.

14    Q    All right.  Do you know whether or not LBHI suggested

15    that it didn't want to have discovery in this case?

16    A    I can't recall, no.

17    Q    All right.  So you don't know with regard to this war

18    of attrition that you've talked about whether LBHI sought

19    the discovery and this hearing or someone else did --

20    A    No.

21    Q    -- as a matter of fact.

22             You did understand that you had the right to

23    select your own counsel if you wished to and you understand

24    that that's not up to LBHI to find counsel for you?

25    A    (Indiscernible - 01:06:19).
```

Page 59

1    Q    All right.  I want to talk just a little bit about your

2    testimony.  You are classified as a managing director?

3    A    That's correct.

4            MR. MILLER:  Your Honor, may I approach?

5            THE COURT:  Yes.

6         (Pause)

7            THE COURT:  Thank you.

8    BY MR. MILLER:

9    Q    I have handed you --

10           THE COURT:  Mr. Miller, I just -- I just want to

11   interrupt you for a second because of this -- because we've

12   gone back in time with respect to Judge Peck's tenor, and I

13   just want to illuminate a little bit about -- and I know

14   it's odd in the middle of the cross-examination, but you

15   know, when a judge retires the judge's docket of cases gets

16   distributed to colleagues.  That's what happens.  And

17   there's a process that we go through.

18           There was a determination made that I would

19   receive the Lehman body of cases and no others, because the

20   Lehman group of cases is so substantial.

21           And there's a transition period that happens in

22   which the departing judge talks to the judge who's assuming

23   the cases so that in order to insure that the parties are

24   not prejudiced by the transition.

25           That being said though it's my case now and I have

Page 60

1    attempted to respect and accommodate what Judge Peck did for

2    those five years, but I get to do my own thing, so to speak.

3            And in this case Judge Peck had indicated at the

4    previous hearing on this matter that he intended to follow

5    the Enron decision and that the further proceedings that

6    were to take place were to give folks the opportunity to

7    demonstrate why Enron should not be followed with respect to

8    them.  That's all shorthand for the ruling that he was

9    poised to make on that date.

10            So that I just wanted you to understand that I

11    understand the background, and whether or not Judge Peck

12    would ultimately have ruled one way or other and that ruling

13    is the same that I will eventually hand down here, we don't

14    know, but I don't want -- I hope people don't feel that

15    they've been prejudiced by the fact that -- prejudiced or

16    advantaged by the fact that we've gone from one to the

17    other.  I think the judges in this building pride themselves

18    on -- you know, trying to take a fairly consistent approach

19    in the application of the law.

20            So I just wanted to let you know that I am doing

21    my level best in terms of making it as non-chaotic as

22    possible, and I don't know that I'm succeeding, but I just

23    wanted to give you that little bit of background.

24            I apologize, Mr. Miller.

25            MR. MILLER:  Thank you, Your Honor.  I was going

 1    to change topics --

 2              THE COURT:  Go ahead.

 3              MR. MILLER:  -- unless there were any other issues

 4    that you want me to --

 5              THE COURT:  No.

 6              MR. MILLER:  -- explore on this issue of the right

 7    to choose counsel and --

 8              THE COURT:  Yeah, go ahead.

 9              MR. MILLER:  -- who can organize them.

10              And I have just passed out a document which is --

11    if you'll remind me what exhibit this stipulation is this?

12              UNIDENTIFIED SPEAKER:  Seven.

13              MR. MILLER:  Seven?  All right, I believe, Your

14    Honor, this is Exhibit 7 to the stipulation already, which

15    is CL001.  So it doesn't need to be remarked, but this is a

16    convenience copy.

17              THE COURT:  Okay.

18              MR. MILLER:  And I believe --

19    BY MR. MILLER:

20    Q    Would you look at this and see if you recognize this as

21    a -- a document dealing with the grant of RSUs?

22    A    It is, yes.  I don't recall this document in

23    particular, but there are many similar kinds of documents

24    that I did receive while I was at Lehman and I've seen them

25    in the evidentiary (indiscernible - 01:10:55) since.  So

Page 62

1    yes, I recognize that's what it is.

2    Q    Well, did you understand that one of the stated

3    purposes of the restricted stock unit program was to give

4    you a feeling of ownership in the firm?

5    A    I viewed the principal reason why it was held as an

6    employee retention device.  It secondarily had the role of

7    (indiscernible - 01:11:35) employees to behave like bonus.

8    Q    Did you understand that you would receive the benefit

9    of stock appreciation at the end of the five years if you

10   met the conditions and remained with Lehman for five years?

11   A    I understood that this promise to convert the RSUs into

12   equities after five -- five years after the grant date would

13   happen and that had those conversions taken place that the

14   equity when delivered would be worth whatever it is now

15   worth with a higher or lower or whatever.

16   Q    Now I understand that your position was the head of

17   global risk management; is that correct?

18   A    Global market risk management.

19   Q    Global market risk management.  Okay.  What is global

20   market risk management?  What --

21   A    Market risk is the risk that a firm experiences as a

22   result of changes in interest rates, in credit spreads, in

23   equity prices, foreign exchange prices, volatility levels.

24   It's the risk that a firm has to value its -- of its

25   exposures as a function of changes in market levels as

Page 63

1    opposed to credit risk, for example, credit risk being the

2    exposure that a firm has because of the failure to pay via a

3    counterparty.

4             So market risk is specifically to do with changes

5    in market prices and levels of volatility risks.

6    Q    Did this include such things as the derivatives

7    programs --

8    A    Yes.

9    Q    -- that were involved?

10   A    Yes.

11   Q    And this included such thing as changes in the value,

12   for example, of special purpose vehicles, so-called SPVs,

13   that held residential mortgages?

14   A    The underlying -- the changes in the value of the

15   underlying collateral is driven by market risk, but the risk

16   that the firm has then is actually counterparty credit risk,

17   so that's a more complicated case which actually covers both

18   elements of market and credit risk, but certainly there are

19   elements of market risk.

20   Q    All right.  Did you feel that as the head of a global

21   market risk management you did have some opportunity to

22   contribute to the financial success of the Lehman

23   enterprise?

24   A    Yes.

25   Q    Now did you feel that you also had some responsibility

Page 64

1    to protect it as best you could --

2    A    Yes.

3    Q    -- from misfortune?

4    A    Yes.

5    Q    In fact it did suffer misfortune?

6    A    It did indeed.

7    Q    And much of that misfortune was as a result of market

8    risk; is that not true?

9    A    Correct.

10   Q    Were you aware at all that you had a personal

11   involvement in your management of market risk when you were

12   doing it?

13   A    A personal involvement in the sense that --

14   Q    Well, I'm -- let me say a personal financial stake both

15   in the fact that your job depended on it and the fact that

16   your RSUs depended on it?

17   A    Indeed.

18   Q    Okay.  Obviously as a head of market risk management

19   you were aware of the fact that stock can go up and stock

20   can go down?

21   A    Yes.

22   Q    And you did understand, whether you liked it or not,

23   that the way the RSU program was structured the stock of

24   Lehman could go down and your RSU value at the end of five

25   years, assuming it was still in operation and you met the

Page 65

1    conditions, could go down?

2    A    Of course, but the value of the equity could go up or

3    down, but RSUs are not equity.  None of my RSUs converted.

4    My first RSUs were granted in 2004 -- November 2004, five

5    years after grant date, November 2009 is over a year after

6    the firm went bankrupt.  So none of my RSUs ever converted.

7             I am not making a claim for diminution of value of

8    equity, either granted or given to me by the firm or paid

9    for.  That's not the case.  My RSUs never converted.  RSUs

10   are not equity.  My claim is for the RSUs, not for

11   diminution of value of the equity.

12   Q    Well you say your claim is for the RSUs.

13   A    Yes.

14   Q    You have the RSUs, what do you want to do with the

15   RSUs?

16   A    I can do nothing with them.  They're simply a promise

17   by Lehman to convert them into equity five years after the

18   grant date, a promise which they failed to carry through.

19   Q    Well how do you want to measure your claim then?  What

20   is your position on how the money should be measured that

21   had you want to put in your claim?

22   A    The best estimate that I have was the value that the

23   RSUs were ascribed at the time they were granted to me, plus

24   the compensation for the fact that I was effectively being

25   asked to -- or told to lend the firm money for five years.

Page 66

1   If you loan money to somebody for five years you expect to

2   get an interest payment.

3           So there's the value of the equities when they

4   were granted, plus the interest payment on the values of

5   that debt claim, and Lehman had -- and it structured the

6   RSUs, had set that interest rate equal to the dividend

7   payable on the actual equity at the time.

8   Q    So in essence you want the money back that went into

9   the RSU program as you see it?

10  A    Yes.

11  Q    And is that because you think there was something

12  unfair about the way the agreement was reached so that it

13  should be set aside?

14  A    It was what it was.  Whether it was unfair or not I

15  couldn't say.

16          I -- had I been given option to be paid in cash I

17  could have used that cash to go out and buy Lehman equity

18  how I wanted.  It traded freely on the stock exchange every

19  business day.

20          I didn't uproot my family from England and travel

21  3,000 miles in order to become a Lehman stockholder, I came

22  for employment reasons, and the fact was that part of my

23  compensation or employment was withheld via this promise to

24  convert it to equity.  That promise Lehman failed to deliver

25  on that promise because the firm went bankrupt.

Page 67

1    Q    All right.  My question, sir, though, first let me be

2    clear.  Are you trained as a lawyer, sir?

3    A    No, I have no training as a lawyer.  My background is

4    in particle physics.

5    Q    What I'm trying to understand is as you understand your

6    claim why should though the deal that you understood you

7    made, even though you didn't like it, be set aside and you

8    should get your money back?  What is your basis for saying

9    that?

10   A    Because all that I had at the time the firm went

11   bankrupt, all that I had was the RSUs.  I had no equity,

12   none of those RSUs are converted to equity, which had it

13   done so the equity would have been worthless (indiscernible

14   - 01:18:28) if I hadn't already sold it, but that's not the

15   case.  I had the claim in case of my first year at the firm

16   the guarantee of $1.55 million in compensation, only about

17   one million of which had been paid, and so that -- the

18   additional for that year accumulated over the course of

19   several years several million dollars worth of unpaid

20   compensation.  That was what I felt that I was -- I was

21   still owed because the firm was no longer in a position to

22   carry through its promise to convert -- to convert these

23   RSUs into equity.

24   Q    So because the firm you say was no longer in a position

25   to carry through its promise to convert do you understand

Page 68

```
1    what the affect of this proceeding would be if your -- if

2    your claim was converted to equity?

3              MR. KAPLAN:  Objection, Your Honor, that's a legal

4    -- he's asking for a legal conclusion.

5              THE COURT:  What --

6              MR. MILLER:  I'm asking what he understands, Your

7    Honor.

8              THE COURT:  First of all, it's entirely clear to

9    me on what basis you're objecting.

10             MR. KAPLAN:  Well somebody has -- somebody has to.

11             THE COURT:  No, no, no, nobody actually has to.

12             First of all I want to make an observation that

13   once again, notwithstanding the highly negotiated procedure

14   that was agreed to by all the parties, that we are taking

15   what appears to be an unlimited amount of time to insure

16   that Mr. Shotton is heard.

17             There was an allocated 20 minutes, we've now been

18   here for almost an hour and a half over two witnesses.  But

19   again, in the spirit of trying to give everybody, you know,

20   an opportunity to say everything that they want to say we're

21   doing that.  I'm not going to get into a situation where the

22   group of lawyers is going to inject themselves.

23             So, Mr. Miller, I'm going let you finish with

24   Mr. Shotton and then we're going to move on.

25             MR. MILLER:  All right.  Your Honor, I think in
```

1    the interest of time I'll withdraw my question and I will

2    conclude with Mr. Shotton.

3            THE COURT:  All right.  Thank you very much,

4    Mr. Miller.

5            Okay, Mr. Shotton, is there anything that you --

6    else -- anything more you wanted to say subsequent to the

7    cross-examination by Mr. Miller?  Typically a witness -- if

8    a lawyer were representing you now the lawyer would ask you

9    some additional questions so that you could clarify --

10           THE WITNESS:  I don't think there's anything which

11   is actually germane to the --

12           THE COURT:  -- earlier statements that you made.

13           THE WITNESS:  -- situation here, but Mr. Miller

14   did ask me questions about my role and my personal

15   responsibility for market risk management at Lehman Brothers

16   and Lehman's failure.  I would simply point you to the

17   examination which (indiscernible - 01:21:06) conducted into

18   Lehman's failure, and if you read that you will see many,

19   many citations from me where I'm quoted as warning senior

20   management about the level of risk that it was taking and

21   about board presentations that I put today which was later

22   amended by other people to remove elements of warning that I

23   put there.

24           So my reputation as far as I'm concerned is

25   completely sound.

1           THE COURT:  All right.  I very much appreciate

2      that.  All right, thank you very much.

3           THE WITNESS:  Thank you.

4           THE COURT:  Okay.  We have 35 minutes left before

5      noon where I have a hard stop because I scheduled something

6      at noon in reliance on the schedule here.

7           So do any of the represented claimants want to

8      make use of this 35 minutes?

9           MS. SOLOMON:  Your Honor --

10          THE COURT:  I have a couple of volunteers.

11          MS. SOLOMON:  -- I would like to make a

12     presentation on behalf of Art Kenny who is a pro se

13     claimant.

14          THE COURT:  Yeah, see this is the part of it,

15     Ms. Solomon, that I don't understand.  We now have -- we had

16     an understanding with respect to pro ses, and now a pro se

17     has morphed into a represented claimant and is going to be

18     using time.

19          MS. SOLOMON:  Your Honor --

20          THE COURT:  So --

21          MS. SOLOMON:  -- I thought we went through this

22     yesterday --

23          THE COURT:  Well, we did go through it yesterday,

24     but --

25          MS. SOLOMON:  -- and we did have an understanding

Page 71

```
 1    --
 2              THE COURT:  -- when I had time to reflect on --
 3    you know, procedural fairness is very important to me, and I
 4    just want the folks -- the claimant folks to understand that
 5    -- that the Lehman side -- and I know you necessarily feel
 6    this way -- but the Lehman side is putting up with a
 7    complete abrogation of the negotiated process by this side
 8    of the room, and frankly --
 9              MS. SOLOMON:  I disagree with that, Your Honor.
10              THE COURT:  -- and frankly by me.
11              MS. SOLOMON:  I disagree wholly with that, Your
12    Honor.  I have fully followed the procedure and I have done
13    everything I can to follow the procedure.
14              THE COURT:  I --
15              MS. SOLOMON:  And I don't think it's correct, Your
16    Honor, to just lock everybody on this side of the table --
17              THE COURT:  The claimants were given three hours.
18    We are now going -- we are now about to enter into the
19    beginning of the sixth hour, and --
20              MS. SOLOMON:  And I've fully abided within that
21    three-hour limit, Your Honor.
22              THE COURT:  Okay.  I'm not meaning to make it
23    personal.  I'm making the observation that it would be
24    wholly within the rights of the Lehman party to say this is
25    beyond what was negotiated, the claimants are done.  And I
```

Page 72

1    have to tell you, I think if Judge Peck were sitting here he

2    would look at the stipulation and say you bargained for

3    three hours, your three hours is up, we're done.

4          So I just want to be perfectly clear that I am

5    doing this notwithstanding the fact that I read the

6    stipulation, because I do not want anyone to argue that they

7    haven't had a full and fair opportunity to be heard.

8          MS. SOLOMON:  I --

9          THE COURT:  Period, full stop.

10         MS. SOLOMON:  Your Honor, I understand perfectly

11   where you're coming from.  I'd just like to give you a

12   little more background in terms of this one particular

13   claimant and why I am intending to speak on his behalf.

14         He filed -- he appeared --

15         THE COURT:  Mr. Miller, hold on, let her finish

16   and then I'll hear from you, okay?

17         MS. SOLOMON:  He appeared -- his name is Arthur

18   Kenney, Your Honor, and he has appeared in these proceedings

19   from the start as a pro se claimant.

20         THE COURT:  Right.

21         MS. SOLOMON:  And with regard to the briefing

22   schedule Mr. Kenny also appeared as a pro se claimant and he

23   filed a brief in --

24         THE COURT:  Right.

25         MS. SOLOMON:  -- support of his position.

Page 73

1          After he filed his brief I think he became a

2     little unnerved and he was very concerned about speaking at

3     the hearing on his own behalf.  And he approached me at that

4     point.  I didn't reach out to him.  He approached me and he

5     asked me if I could represent him at the hearing.  And I

6     agreed to do so and I promised that I would represent him at

7     the hearing.  And his particular claim is different from all

8     of the claims that are encompassed within the represented

9     participants brief.

10          He has a unique issue, Your Honor, although there

11     are I understand some other claimants that have this issue

12     as well, he's a claimant that was never granted RSUs and

13     there was compensation withheld and he's a sales commission

14     person, Your Honor.

15          THE COURT:  The part that I don't understand,

16     Ms. Solomon, is that going into yesterday's hearing I would

17     have thought that all the claimants would have sat down and

18     said, okay, we have three hours, who gets what?  And that

19     your portion of that three hours at that point yesterday

20     would have then included Mr. Kenny, but apparently it

21     didn't, because now you're saying that you want to be deemed

22     to be a pro se, and apparently the three hours was never

23     divvied up among you folks, and there's just -- the three

24     hours was just completely ignored.

25          If that was the case then we shouldn't have wasted

Page 74

1    all the time and the estate resources negotiating the

2    procedure.  It just was a waste.  It was -- there was coming

3    into yesterday's hearing you guys didn't have a game plan,

4    and now basically I'm giving you a free pass and allowing

5    you to be heard, and I just think it's important for you to

6    understand that I'm doing that, because it's -- we're

7    ignoring the stipulation entirely.

8            MS. SOLOMON:  Your Honor, we each represent our

9    own clients, and I think --

10           THE COURT:  Then you should have never agreed as a

11   group to three hours, because --

12           MS. SOLOMON:  Perhaps, Your Honor, but we were

13   also asked by the Court and we made a very, very sincere

14   effort to try to streamline the procedures, Your Honor, we

15   all take that with a grain of salt of course because this

16   has not turned out to be the most streamlined, but --

17           THE COURT:  Okay.  We're now -- no, it has not

18   been streamlined at all.

19           MS. SOLOMON:  -- but the effort -- but appearing

20   as represented participants was made in response to the

21   Court that we tried to coordinate, and it was our sincere

22   effort to have the procedures streamlined as possible.

23           THE COURT:  Well, all right, let me just say that

24   I see some folks sitting in the gallery who were here

25   yesterday, and I -- if there are other folks here who want

1    to be heard and need to be heard before noon today I want to

2    know about that, because Ms. Solomon, you're going to be

3    here.

4              MS. SOLOMON:  I know, Your Honor.

5              THE COURT:  All right.  So please have a seat.

6              MS. SOLOMON:  At your convenience.

7              THE COURT:  And let me hear if there's anybody

8    who's here who needs to be heard between now and noon?

9              MR. KAPLAN:  Your Honor, Mr. Ramallo is here,

10   Mr. Reynolds is here, and Mr. Schrager has a witness --

11             THE COURT:  Okay, I --

12             MR. KAPLAN:  -- who is here, who was here

13   yesterday.

14             THE COURT:  I'm -- I don't -- I am not going pick.

15   I am asking --

16             MR. KAPLAN:  Right.  Mr. -- I will defer to

17   Mr. Schrager's witness who was -- who wanted to testify

18   yesterday in the worst way, so if he wants to go forward he

19   should.

20             THE COURT:  Mr. Miller, you had wanted to say

21   something before.

22             MR. MILLER:  Yes, Your Honor, at the appropriate

23   time I want to object to Ms. Solomon, who for the first time

24   we learned today represents Mr. Kenny, but I will do that at

25   the appropriate time --

1                    THE COURT:  All right.

2                    MR. MILLER:  -- you're going to take that up

3      later.

4                    THE COURT:  Thank you.

5                    All right.  Do we have a witness who wants to

6      testify now?  And we're going to -- there's a hard stop at

7      noon.

8                    MR. SCHRAGER:  Yes we do, Your Honor.

9                    THE COURT:  Okay.  Let's get -- let's do it.

10                   MR. MILLER:  Your Honor, just to clarify --

11                   THE COURT:  Is there anyone else in the courtroom

12     -- is there anyone else in the courtroom who is a pro se

13     claimant who wishes to be heard?  Yes, sir?

14                   MR. MAIA:  I'm a pro se, I filed a claim.

15                   THE COURT:  Come up.

16                   MR. MAIA:  Yes, thank you.  Good morning, Your

17     Honor.

18                   THE COURT:  Good morning.  Could you just --

19                   MR. MAIA:  Yes.

20                   THE COURT:  -- hold on for one second, okay?

21                   So this morning was the time that was set aside

22     for pro se claimants to be heard, and yesterday I said that

23     I would hear all the pro se claimants who wanted to be heard

24     this morning.  So if there's a witness who's appearing who

25     is represented -- who is one of the represented parties then

Page 77

1   according to the stipulation and what we said yesterday I'm

2   not going to hear that person now.

3           I'm trying very hard to not have people get

4   aggravated and annoyed at the timing issues, but I'm

5   struggling with what to do, because every time I try to get

6   things to be orderly something else happens.

7           So I think that by the rules we all agreed on

8   yesterday I need to hear from this gentleman because ten to

9   12:00 was the time set aside for pro se claims.

10          So I apologize for anyone who was told by counsel

11  to come this morning, because yesterday I believe I made it

12  very clear that the morning was set aside for pro ses and

13  that the afternoon beginning at 1 o'clock would be when we

14  would conclude the represented claimants' portion of the

15  case, notwithstanding the fact that we are completely over

16  the allotted time limit.  Okay?

17          So go ahead, sir.  Give me your name, please.

18          MR. MAIA:  Thank you, good morning.  My Alexandre

19  Catalao Maia.

20          THE COURT:  Okay.

21          MR. MAIA:  I filed --

22          THE COURT:  How do you spell your last name,

23  please.

24          MR. MAIA:  M-A-I-A.  Middle name is C-A-T-A-L-A-O.

25  I have claim number 17760.

1           THE COURT:  Okay.  Go ahead.

2           MR. MAIA:  Well, I -- in the interest of time --

3    well good morning for everyone.

4           THE COURT:  You're titled to 20 minutes and you

5    can use your full 20 minutes, all right?

6           MR. MAIA:  Thank you.

7           I had prepared some remarks, I do believe that

8    they will not add any new facts to what has been discussed

9    already here before.

10           If I'm required to make a statement in order to

11    keep my claim alive then I would like to do so.  If it is

12    not a requirement then I will not make the statements in the

13    interest of time for all of you --

14           THE COURT:  Okay.

15           MR. MAIA:  -- as I understand time is short.

16           THE COURT:  You're not required, you're certainly

17    -- can make any statement that you like.  You're not

18    required to.  This was an opportunity for any individual

19    claimant --

20           MR. MAIA:  Uh-huh.

21           THE COURT:  -- to advise the Court of what it is

22    about his or her individual claim that distinguishes it from

23    the type of claim that Judge Peck had identified as a claim

24    that would be subordinated.

25           So if there's anything in particular about your

Page 79

1   particular circumstances that you want to bring to the

2   Court's attention this is -- this is your opportunity and

3   I'm happy to listen.

4           MR. MAIA:  Thank you, Your Honor.

5           There isn't anything which is different for --

6   about my claim relative to all the claims that have been

7   discussed --

8           THE COURT:  Okay.

9           MR. MAIA:  -- both by counsel as well as by

10  individual witnesses.

11          If I need to make the same points to represent my

12  claim then I would like to do it.  If it's not a requirement

13  and the arguments which have been made already in court

14  would benefit me in the case of a ruling -- a favorable

15  ruling then I will just open this time for other people who

16  would like to be heard.

17          THE COURT:  Okay.  All right.  That's fine.

18  You -- you're not required to say anything in order to have

19  your claim considered as part of this -- as part of this

20  proceeding.

21          MR. MAIA:  Okay.  Thank you very much.

22          THE COURT:  Okay.  Thank you very much.

23          MR. MAIA:  Thank you.

24          THE COURT:  All right.  I'll ask one more time,

25  are there any pro se claimants who are in the courtroom, who

1    are on the phone -- or who are on the phone who would like

2    to speak on their own behalf?  Okay.  It's 11:36, let the

3    record reflect there have been no further responses.

4              Okay, would you like to call a witness now?

5              MR. SCHRAGER:  I would --

6              THE COURT:  Mr. Miller?

7              MR. MILLER:  Your Honor, I just want to clarify

8    particularly if he's going to call a witness I think he's

9    going to call -- I don't see that we're going to be able to

10   complete her testimony and cross between now and noon.  So

11   if we can break and make sure -- who are you gowning to

12   call, Mr. -- what's your witness?

13             THE COURT:  What witness are you --

14             MR. SCHRAGER:  Ms. Karen Krieger.

15             MR. MILLER:  Yes.

16             THE COURT:  All right.

17             MR. MILLER:  Ms. Krieger has a good deal of

18   material already, Your Honor, so I just want to note we're

19   happy to start her, but she's going to need to come back.

20             THE COURT:  All right.  What's your preference?

21   I'd prefer -- I'd prefer not to have a break in the middle

22   of direct examination.  If you don't believe you can

23   complete the direct before 11:59 then I'd prefer to come

24   back at 1 o'clock and do it then.  It's not a -- it's not a

25   procedure I follow with a witness unless I absolutely have

Page 81

1    to to have a break in the middle of the testimony.

2            MR. SCHRAGER:  May I have a moment, Your Honor?

3            THE COURT:  Sure.

4        (Pause)

5            THE COURT:  My recollection is that between 1:00

6    and 2:00 we had earmarked that time as at least one of the

7    Neuberger witnesses; is that correct?

8            MR. KAPLAN:  Ms. Stiefel is coming down at 1:00

9    because I --

10           THE COURT:  And how long do you believe her

11   examination will take?

12           MR. KAPLAN:  The direct I don't think will take 15

13   or 20 minutes --

14           THE COURT:  All right.

15           MR. KAPLAN:  -- I would think.  I mean -- or as I

16   said we can use her declaration and let Mr. Miller cross

17   from that if that will abbreviate -- you know, abbreviate --

18           THE COURT:  All right.  Well, Mr. Miller can think

19   about -- can think about that option, but then we would be

20   able to begin with this witness then at a quarter to 2:00?

21           MR. SCHRAGER:  Your Honor, the witness is

22   committed to making a contribution here and she will make

23   herself available --

24           THE COURT:  Okay.

25           MR. SCHRAGER:  -- this afternoon.

Page 82

1          THE COURT:  All right.  Well, I apologize, I'm --

2          MR. SCHRAGER:  I think the --

3          THE COURT:  -- I seem to be unable to impose an

4    order on this situation, and I am very frustrated about it,

5    and I -- at the end of the day I want everybody who wants to

6    be heard to be heard.  So that's what we're going to do.

7          MR. KAPLAN:  Your Honor, if you like Mr. Ramallo

8    is in the courtroom, I know I can get his direct done before

9    12 o'clock --

10         THE COURT:  But then -- then we're going to come

11   back and we have a witness who's going appear at 1 o'clock

12   and I don't want to have a delay between a direct and a

13   cross.  So --

14         MR. KAPLAN:  Okay.

15         THE COURT:  -- it's just not going to work.

16         So why don't I let you go now, I want you to work

17   out as best as you have every single thing about how things

18   are going to happen starting at 1 o'clock this afternoon and

19   then we'll just come back and we'll start then at 1 o'clock

20   with Mr. Ramallo and then your witness can take the stand

21   after that.

22         MR. SCHRAGER:  Well we have Ms. Stiefel at --

23   Ms. Stiefel at 1 o'clock --

24         THE COURT:  Ms. Stiefel.

25         MR. SCHRAGER:  And Mr. Ramallo --

1          THE COURT:  So we have three witnesses this

2    afternoon, right?

3          MR. KAPLAN:  We have three witnesses.

4          THE COURT:  Stiefel --

5          MR. KAPLAN:  Unless Your Honor lets me put

6    Mr. Reynolds on.

7          THE COURT:  -- Ramallo, and Ms. Krieger, is

8    that --

9          MR. SCHRAGER:  That's correct, Your Honor.

10          MR. KAPLAN:  And Mr. Reynolds if Your Honor will

11    allow it.  But we have the objection from Mr. Miller.

12          THE COURT:  I thought I said yesterday that I was

13    not allowing Mr. Reynolds.  Am I making that up?

14          MR. KAPLAN:  No, I thought you said we'd have to

15    wait and see if there was proper --

16          THE COURT:  If there was time.

17          MR. KAPLAN:  -- if there was proper rebuttal.

18          THE COURT:  Right.

19          MR. KAPLAN:  Based on the cross-examination.

20          THE COURT:  Exactly, right.

21          MR. KAPLAN:  So that we can't decide that now.

22          THE COURT:  Right.

23          MS. SOLOMON:  And then the presentation from

24    Mr. Kenny, Your Honor.

25          THE COURT:  All right.  Well, I'm going to hear

Page 84

1    from Mr. Miller about the propriety of that later.

2            MS. SOLOMON:  Okay.  And just for purposes of

3    reminding the Court I very clearly stated on the record

4    yesterday that was my intention and there was no objection

5    related to that.

6            THE COURT:  Okay.

7            MR. MILLER:  I just want to clarify, Your Honor,

8    Ms. Solomon did not tell us who she represented yesterday,

9    and Mr. Kenny is in a unique position and has submitted a

10   lot of material, and for him not to be here, I don't believe

11   he's here, and for her to speak on his behalf really is a

12   surprise to us.  He should have filed a brief, we should

13   have known something about what's going on.  If he's here

14   personally that's a different issue and I'm going to

15   encourage her to bring him in personally.

16           MS. SOLOMON:  He filed a brief and certainly they

17   had an ability to --

18           THE COURT:  He filed a brief as a pro se claimant.

19   Yesterday you said I'm going to be appearing on behalf of a

20   pro se claimant.  You did not identify who it is.  I reacted

21   yesterday to the news that somehow a pro se claimant was now

22   going to be become a represented claimant and that there was

23   going to be extra time afforded to that person.  That's

24   completely contrary to the procedure.

25           So you folks seem intent on ignoring the

1   stipulation because you want to say what you're going to

2   say.  And again, not for you, but for the sake of the

3   claimants I'm going go along with it potentially over the

4   objection of LBHI.

5          We're going to take a break now, we're going to

6   come back at 1 o'clock, and we're going to finish this

7   afternoon.  And I encourage you to work out every logistical

8   detail you can over the next hour and 15 minutes, all right?

9          Thank you.

10          MS. SOLOMON:  Thank you.

11          THE COURT:  Thanks Francis, 1 o'clock, okay?

12     (Recessed at 11:43 a.m. and reconvened at 1:11 p.m.)

13          THE COURT:  Please have a seat.  All right.  Are

14  we ready?

15          MR. KAPLAN:  We are, Your Honor.

16          THE COURT:  Okay.  I see a bag, but I don't see

17  Ms. Solomon.

18          MR. KAPLAN:  Ms. Solomon --

19          THE COURT:  Is she all right?

20          MR. KAPLAN:  -- went out -- yes, she's fine.  She

21  waived her appearance.  She's out speaking with a client,

22  and she said we could proceed in her absence.

23          THE COURT:  Okay.  All right.  So what are we

24  starting with now?

25          MR. KAPLAN:  Stephanie Stiefel on behalf of the

1   Neuberger claimants.

2          THE COURT:  Okay.  Very good.  Hold on, Mr.

3   Miller, did you have a comment first?

4          MR. MILLER:  No, assuming they're going to call

5   her live, we don't have a comment.

6          THE COURT:  Okay.

7          MR. MILLER:  That's fine.  Are you going to call

8   her as a witness live?

9          MR. KAPLAN:  Yeah.

10          THE COURT:  Okay.  All right.

11          MR. KAPLAN:  Right?  I mean, unless you want me to

12   proceed with the declaration, and you want to proceed with

13   cross.

14          THE COURT:  All right.  Ms. Stiefel, would you

15   come up, please?

16          All right.  Would you raise your right hand,

17   please?

18              STEPHANIE STIEFEL, WITNESS, SWORN

19          THE COURT:  Please have a seat.

20                  DIRECT EXAMINATION

21   BY MR. KAPLAN:

22   Q   Ms. Stiefel, how are you employed currently?

23   A   I work for Neuberger Berman and have been since 1990.

24          THE COURT:  Ms. Stiefel, I'm going to ask you to

25   move a little bit forward, and that horizontal black

Page 87

1    microphone, just move it towards you a bit and please keep

2    your voice up.   Thanks.

3    Q    Can you tell us your educational background?

4    A    Yes.  I went to college, I'm a graduate of Queens

5    College, and I'm a Certified Public Accountant.

6    Q    And you joined --

7    A    Or used to be.

8    Q    Used to be.

9    A    I haven't practiced in a long time.

10   Q    And you joined Neuberger Berman in 1990?

11   A    I joined in 1990 as they were building out their high

12   network business.  And I was hired to help them grow, and

13   establish new relationships for high net worth individuals.

14   Q    And what was -- when you initially joined Neuberger

15   Berman, what was your compensation?

16   A    So at my last year at Arthur Andersen I was there ten

17   years.  I finally made $100,000, and when I started at

18   Neuberger Berman, I got exactly the same thing, which was a

19   draw against the production of business that I would bring

20   in, and that was for two years, to keep my cash flow stable,

21   as I was starting to build a business.

22   Q    And after that two year period, how would you

23   compensated at Neuberger Berman?

24   A    Purely on production.  So if I hadn't brought in enough

25   business, my income would go down.

1    Q    Can you explain to Her Honor how production based

2    compensation worked at Neuberger Berman?

3    A    Sure.  So you come into Neuberger Berman, you are given

4    no pre-existing clients.  As a CPA, I started networking

5    with accountants and lawyers, and the hope was that they

6    would refer clients to me, and I would meet with those

7    clients.  I would discuss asset allocation.  I would discuss

8    the portfolio management resources of Neuberger Berman.  And

9    if I -- if we win the client, if they become a client of

10   Neuberger Berman, they start paying a fee.

11        Everybody who is working with clients at Neuberger,

12   whether you be the money manager or the wealth advisor,

13   receives a portion of that fee.

14        So, for example, if in the first year if I would have,

15   and this is near impossible, but if I would have brought in

16   $100 million of Ms. Smith, Mr. Jones, and all the varieties

17   thereto --

18            THE COURT:  $100 million of assets under

19   management?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.

22            THE WITNESS:  And depending on what the asset

23   allocation is because the fee for equity is more than the

24   fee for bonds, but just to make the math easy for us, if the

25   average fee is 1 percent, which is an annual fee, which is

Page 89

1    calculated quarterly, the fee to Neuberger Berman would be

2    $1 million on a $100 million of new business.

3           For the first year, as the wealth advisor, you get

4    a higher profit participation in that, because you won the

5    business.  And then in subsequent years, as you service it,

6    it goes down very significantly.

7           So the percentage is 30 percent, so of the $1

8    million, I would have made $300,000.  And if I would have

9    brought in $100 million in my first year, I would have made

10   more than my draw, and I would be making the 300,000.

11          In the subsequent year, that $100 million that's

12   generating 1 percent of revenue goes down to $100,000, so

13   it's 10 percent versus when you win, 30 percent.  However,

14   you are always earning money as long as that client remains

15   a client and is paying a fee, you are always earning money

16   against that revenue.

17          The portfolio manager also participates and shares

18   in that revenue generation.  And the portfolio manager

19   makes, there's different rates, but in general, from 25

20   percent to 40 percent for managing the money.

21          So I'm interfacing with the client, I'm bringing

22   the client to Neuberger Berman, I'm having a discussion

23   about their goals and objectives.  I am proposing the proper

24   portfolio management solution, and if we win that mandate,

25   as soon as they are fee paying, I'm entitled to a percentage

1    of that.

2    BY MR. KAPLAN:

3    Q    And is that -- was that compensation structure

4    consistent at Neuberger Berman from the time you started

5    through the time -- through today?

6    A    No, it's evolved.

7    Q    Okay.

8    A    And it's evolved in a number of different ways.  So for

9    those that have built a very significant book of business,

10   their trailer, and there was a point that I was also

11   managing the sales force, so -- let me step back.

12       I was a sales -- I'll call it a sales person.  I was a

13   wealth advisor from 1990 to 1998.  I brought in a lot of

14   business and I was very successful, and I was the first

15   sales person to be rewarded with a partnership interest.

16       So in 1998, I became a partner.  In 1999, my boss, who

17   hired me, went on the executive committee, and then I

18   started running the sales force, the whole biz, you take

19   your best sales person and that they will teach and mentor

20   other wealth advisors.

21       We were also opening offices across the country, and it

22   was my job, in addition to still managing my business, part

23   of my business, it was also my job to help open other

24   offices.

25       When I was managing, I put in a change in the

Page 91

1    compensation scheme to incentivize people to bring in more

2    money, and I would reward them if they did better than what

3    we expected.  We'd have an agreement at the beginning of the

4    year, you should bring in X, and that's how we managed the

5    business.  And if they brought in X plus, they were able to

6    increase their trailer from 10 to as much as 12 or 15

7    percent (indiscernible) on 20, depending on the degree of

8    out performance of the accounts that they won.

9        So it was a very entrepreneurial culture.  It is

10    described as eat what you kill, and there were incentives to

11    motivate people to really outperform.

12        Today, that is pretty much the construct for manage --

13    for what your participation in your revenue is.  And the

14    only difference with me is that for a period I was

15    management, and then I went back to production.  And that

16    was part of when we were acquired by Lehman.

17    Q    During the time -- jumping ahead for a moment, what was

18    the compensation structure during the time that Neuberger

19    Berman was part of Lehman?

20    A    So we had my system, which is 30 percent in the first

21    year, 10, 12, 15 and 20, depending on how you out perform.

22        There was a lot of difficulty and confusion when we

23    were merged with Lehman Brothers, because the compensation

24    scheme for brokers was different than the compensation

25    scheme for asset management professionals.

Page 92

1        So to kind of explain the difference.  So you have a 1

2    percent fee base, you have wealth advisors that have their

3    percentage, you have money managers that have their

4    percentage, and the two together manage the money, interact

5    with the client, win new business, service, roughly equals

6    55 percent, and the house keeps the rest, right, for rent,

7    and et cetera.

8        At Lehman Brothers, they were trying to transform their

9    brokerage sales force from a transactional one to more of an

10   asset management base, that was one of the reasons they

11   acquired Neuberger Berman.

12       And the payout for brokers, since they are wearing the

13   hat of managing the money, and servicing and winning is a

14   higher pay out.  It's 40 percent throughout.

15       So if you can imagine how difficult it was to manage a

16   sales force that was more successful in bringing in more

17   assets to the firm but making less money.  And the rallying

18   cry of equal work for equal pay surfaced very quickly.  So

19   that was part of the challenge in managing the small, I'll

20   call it the David sales force, to the Goliath sales force of

21   Lehman Brothers.  There was a -- two different pay schemes.

22   Q    But did the formulaic nature of your compensation

23   scheme at -- as a Neuberger employee within the Lehman

24   structure change, or did it remain a formulated structure?

25   A    So for me, for my entire 24 years at Neuberger

Page 93

1    Berman --

2    Q    Yeah.

3    A    -- there was a period when I also had management

4    responsibilities, and then it changed somewhat then.  But I

5    will tell you that -- and maybe this is what I learned from

6    Arthur Andersen, your clients are your strength, and your

7    clients are your power.  And so even when I was in

8    management, I still kept a book of business because without

9    it, you have no security.

10   Q    Now, you testified a few moments ago that in 1998, you

11   became a partner of Neuberger Berman.

12   A    Yes.

13   Q    In 1999, Neuberger Berman went -- became a public

14   corporation; is that right?

15   A    That's right, that's correct.

16   Q    And at that time, did you enter into a stockholder

17   agreement?

18   A    I did.

19   Q    And did you receive founder shares?

20   A    I did.

21   Q    Let me show you what has been marked as Neuberger

22   Berman Exhibit C and ask you if you recognize it.

23          MR. KAPLAN:  Judge, I have a standalone copy if

24   you'd like.

25          THE COURT:  Hold on, I think I -- it's in your

Page 94

1    book.

2            MR. MILLER:  I may have a copy.

3            THE COURT:  C?  All right.  I have it.

4            MR. MILLER:  Thank you, we have a copy.

5        (Counsel confer)

6            MR. MILLER:  Your Honor, we're going to object to

7    this --

8            THE COURT:  I just -- well -- I'm sorry.  Go

9    ahead, Mr. Miller.

10           MR. MILLER:  This is Ralph Miller for Lehman.  I

11   do have an objection to admissibility of this document, but

12   I can reserve that till later, if you --

13           THE COURT:  Okay.  I just -- you know, we've had a

14   lot of conversation for almost two days now about the

15   schedule and the agreement.  I appreciate that it's

16   necessary to lay some foundation and have some background,

17   but we're nowhere near the relevant time period yet in the

18   testimony of this witness, which I -- you know --

19           MR. KAPLAN:  I --

20           THE COURT:  So we just -- we need to stay focused

21   on the issue that's actually before the Court, all right?

22           THE WITNESS:  I recognize this agreement.

23   BY MR. KAPLAN:

24   Q    Is that the agreement that you entered in 1999?

25   A    Yes.

Page 95

1    Q    And did that agreement contain restrictive covenants in

2    it?

3    A    It did.

4    Q    And what were the -- as best as you can recall, what

5    were the restrictive covenants of that agreement?

6    A    That I could not solicit clients.  I believe it also

7    was I could not accept clients.  I could not take any

8    confidential information with me.  I could not interact with

9    any of the referral sources that I had cultivated over the

10   years, and I was essentially not able to do my job for a

11   period of three years.

12   Q    After leaving Neuberger?

13   A    If I would have elected to leave, I would not have been

14   able to -- you keep describing it as sitting on a beach, I

15   would have to sit on a beach for three years.

16   Q    Okay.  Now, following the initial public offering, were

17   employees of Neuberger Berman also given Neuberger Newman

18   stock?

19   A    They were.  I can speak to the group that I, you know,

20   were working with, they were.

21   Q    And were they required to enter into restrictive

22   covenants in connection with that?

23   A    They were.

24   Q    Now, moving forward to --

25              THE COURT:  So can I just clarify?  So what you

Page 96

1    just described was in connection with Neuberger Berman

2    becoming a public company?

3              THE WITNESS:  That's correct.

4              THE COURT:  And did you or anyone else file any

5    sort of an action or a lawsuit complaining of the imposition

6    of the restricted covenant that you just described at that

7    time?

8              THE WITNESS:  No, that's not my nature, but no, I

9    did not, and actually I can -- I can't answer that question,

10   Your Honor, for others.

11             THE COURT:  I'm only interested in what you did

12   and your personal knowledge.

13             THE WITNESS:  And I answered that.

14             THE COURT:  Okay.  Go ahead.

15   BY MR. KAPLAN:

16   Q    In 2003, there came a time when there was a merger

17   between Lehman Brothers and Neuberger Berman.

18   A    Yes.

19   Q    And did you enter into any -- did you enter into an

20   amended stockholder's agreement at that time?

21   A    Yes.

22   Q    And let me show you what's been marked as Neuberger

23   Berman Exhibit D, and ask you if you recognize that.

24   A    I do.

25   Q    And is that the amended stockholder agreement that was

Page 97

1    entered into the Lehman/Neuberger Berman merger?

2    A    Yes.

3    Q    And did that document contain similarly restrictive

4    covenants to the other document --

5    A    Yes.

6    Q    -- that we spoke about?

7    A    Yes.

8    Q    And did you also enter at the time of the merger a

9    retention agreement?

10   A    I did.

11   Q    Let me show you what's been marked as Neuberger Berman

12   H and ask you if you recognize this.

13   A    I do.

14   Q    And did that retention agreement also contain a

15   restrictive covenant?

16   A    It did.

17   Q    And was there a reason that you continued your

18   employment at Neuberger Berman, and in the face of the

19   restrictive covenants that you were presented with at the

20   time of the merger?

21   A    This was my life's work.  This was working with

22   individuals, giving them financial security, helping them

23   buy homes.  It had been accumulated and worked along over a

24   long period of time.  It very much fulfills me, it's a very

25   important part of who I am, and I love what I do, and at age

1   47 to stop doing it was absolutely not a possibility.

2   Q    Well, could you have gone to work someplace else, for

3   example?

4   A    If I would have gone to work at a competitor, there

5   would have been a big financial cost to that.

6            THE COURT:  If I could interrupt, please.  Do you

7   have any understanding of how the merger with Lehman came

8   about?  I mean on -- Neuberger Berman was a very successful

9   firm, and it got on the radar screen of Lehman obviously, so

10  then what happened?  How did the merger come about, what was

11  the management situation like at Neuberger that led to the

12  merger and by implication of what you're saying, put you

13  into the position that you found yourself in?

14           THE WITNESS:  I can't speak to what the management

15  considerations were, because I wasn't part of the executive

16  committee, and I wasn't privy to what was going on.  So I

17  learned about it when everybody learned about it.  Although

18  I do recall that there were rumors or quite a number of

19  rumors, but I learned about when the press release was

20  released and we got a copy on our desks.

21           THE COURT:  So what was the management of

22  Neuberger at that point in time, it was run by an executive

23  committee?

24           THE WITNESS:  So it was run by an executive

25  committee, and we had a CEO and a President.

Page 99

```
 1              THE COURT:  And there was no board of directors,

 2     the executive committee performed the function of a board of

 3     directors?

 4              THE WITNESS:  So again, I wasn't part of that

 5     process of managing the firm.

 6              THE COURT:  Uh-huh.

 7              THE WITNESS:  But I imagine since we were a public

 8     company that there was a board of directors, of course.

 9              THE COURT:  I would imagine so, right, okay.  All

10     right.  Thank you.

11     BY MR. KAPLAN:

12     Q    Now, were you aware that other employees of Neuberger

13     Berman also signed retention agreements?

14     A    Yes, I am aware of that.  I was aware of that.

15     Q    You were aware of that?

16     A    Yes, sorry.

17     Q    And were you aware of that in part because of your

18     being the head of the sales force at that time?

19     A    That's correct.

20     Q    Now, after the merger did the way that you were paid

21     change from how you were paid at Neuberger?

22     A    Yes, it did.

23     Q    Can you tell us how it changed?

24     A    Sure, sure, as best as I can recall.

25              Since the merger was announced on October 31st, 2003,
```

Page 100

1    and it was the end of the year, nothing was really done, in

2    terms of changing our compensation structure.

3        In 2004, we were weaned into the different comp

4    arrangements that they had.  And I believe that it was half

5    of what Lehman was doing.  And then from 2004 forward, we

6    were fully the same as Lehman employees, differentiated, as

7    you've heard described here by your -- the level that you

8    were, and the amount of compensation that you made.

9        So I think at some point, it was from 50 percent to

10   even more.  I think that for some levels, it was as much as

11   65 percent.

12   Q    Of the total compensation?

13   A    That's correct.

14   Q    Was deferred?

15   A    That's correct.

16   Q    And this was different from the compensation at

17   Neuberger?

18   A    Very much so.

19   Q    Because?

20   A    Because they had these -- I'll call them opportunities,

21   because they were done with the spirit of, you know,

22   employee retention but also safety of the business, but they

23   were significant amounts that were taken from your cash

24   flow, and put aside for future vesting.

25       And in the case of Neuberger Berman since it was five

Page 101

1    year vesting, we never got any of the monies that were

2    deferred, we never saw any of it.  I think we were short by

3    a month for the first possible vesting.

4    Q    Because the merger applied in October of 2003, and the

5    bankruptcy occurred in September 2008.

6    A    And we started in the program in 2004, so we were never

7    -- we never received a penny.  So all of that, all of those

8    years of deferred compensation just completely evaporated.

9    Q    Now, what happened with respect to the compensation

10   that was deferred in the year 2008?  Do you have any

11   recollection concerning that?

12   A    I absolutely do.  We got paid dollar-for-dollar of the

13   2008 compensation in 2009.

14   Q    And did you receive memoranda from Neuberger management

15   in that regard?

16   A    Yes, we did.

17   Q    And I show you what has been marked as Neuberger Berman

18   N and O, and ask you if you recognize these documents.

19              THE COURT:  Do I have them, Mr. Kaplan?

20              MR. KAPLAN:  Those are the highly redacted

21   documents.  We looked at them yesterday, but I will give you

22   a copy now.

23              THE COURT:  Thank you.

24   BY MR. KAPLAN:

25   Q    Do you remember seeing those, of course, not in

Page 102

1   redacted form --

2   A     In Q and A form, yes.

3   Q     And that that was Neuberger's management informing you

4   that you would be paid dollar-for-dollar for your deferred

5   comp in 2008?

6   A     Yes.

7   Q     And at that time --

8              THE COURT:  I'm sorry, can you be more specific

9   about where -- which statement are you referring to, Ms.

10  Stiefel?

11             THE WITNESS:  This was a document that was given

12  to us that was in Q and A format, and I don't remember

13  exactly the date that we got it when it was put on our

14  desks, but it essentially was trying to help us understand

15  what was going to be the treatment of monies that were taken

16  out of our compensation for 2008, and which ultimately were

17  going to be paid to us in 2009.

18             THE COURT:  What was the context of this document?

19  Was this in connection with -- what precipitated this

20  November 17th communication?  At this point, you were --

21  Neuberger Berman is owned by Lehman?

22             THE WITNESS:  At this point, we are -- we are not

23  -- well Lehman is bankrupt.

24             THE COURT:  Lehman -- right, so the filing was in

25  September --

Page 103

1          THE WITNESS:  Neuberger --

2          THE COURT:  -- of 2008, right.

3          THE WITNESS:  Right.  Neuberger was -- is not part

4    of the bankruptcy, we are still in our offices, we are most

5    importantly, still managing client's portfolios, and there

6    was tremendous confusion, and I think this was an attempt by

7    management to give us some clarity about us as an

8    independent -- independent in quotes, not necessarily

9    ownership, entity.

10   BY MR. KAPLAN:

11   Q    Did this have anything to do with the subsequent offers

12   of various firms to buy Neuberger from the bankrupt estate?

13   A    So I wasn't familiar with those goings on whatsoever,

14   other than what we might be reading in the newspaper.  And

15   I'm not sure of the timing of November 2008.  Before the

16   bankruptcy, there was an intention to sell Neuberger Berman

17   to Hellman & Freeman & Bayne, and I recall that then became

18   the jurisdiction, if you will, of the bankruptcy process.

19   And the -- in the bankruptcy -- and I'm not a lawyer, but in

20   the bankruptcy process, I think that they were getting in

21   bids from other private equity firms and so we knew, for

22   example, this was known to us, that Carlisle who was going

23   to bring back Jeff Lane as the CEO, he was the former CFO in

24   New Republic, that they were putting in a bid.

25          We were aware of Hellman & Freeman & Bayne because they

Page 104

1   were spending time in our offices, and I am unfamiliar with

2   what other offers might have been presented to the

3   bankruptcy.

4   Q    Going back for a moment, at the time of the merger, did

5   you feel you had a choice as to whether to work -- continue

6   working at Neuberger/Lehman or not?

7   A    For me --

8   Q    Yes.

9   A    -- I did not feel that I had a choice.  I had too much

10  to lose.  I had worked too long and too hard and had

11  established wonderful relationships, and had a great

12  business.  And as I said, it was very fulfilling to me.  I

13  was still very young, I loved what I do, and I wanted to

14  continue doing it.  It gives me great gratification and

15  satisfaction, and for my clients as well, who really rely on

16  me.

17           MR. KAPLAN:  No further questions, Your Honor.

18           THE COURT:  All right.  Thank you.  Mr. Miller.

19                    CROSS-EXAMINATION

20  BY MR. MILLER:

21  Q    Ms. Stiefel, my name is Ralph Miller, I represent LBHI.

22  We've never met or spoken before; is that right?

23  A    That's correct.

24  Q    I want to continue with the subject you were just

25  talking about and then maybe we'll work backwards a little

Page 105

1    bit through this.

2        What ultimately happened with regard to the ownership

3    of Neuberger?

4    A    To my surprise and delight, the bankruptcy court

5    approached the management of Neuberger Berman and said that

6    they needed to submit a bid as well.

7    Q    And that ultimately led to a so-called management buy-

8    out; is that correct?

9    A    We were awarded within the bankruptcy court process, we

10   were awarded that right to buy back the firm from the

11   bankruptcy court -- from the estate, sorry.

12   Q    Now, earlier you were asked about Neuberger Berman

13   Exhibits N and O which are this question and answer document

14   that refers to a payment that was promised for 2008 amounts

15   of production that had been earmarked for RSUs.  Do you

16   recall that?

17   A    I do.

18   Q    And you said that the -- you thought that was, if I

19   heard you correctly, an attempt by management to give you

20   some clarity, was that what you said, or certainty?

21   A    That's what I remember.

22   Q    All right.  And was that, do you think in part, to make

23   sure that the stability of the business, and the commitment

24   to clients continued during that period of uncertainty?

25   A    That's certainly one reason.

Page 106

1    Q    And that's the same management that ended up doing the

2    buy-out and owning 51 percent of the stock --

3    A    That's correct.

4    Q    -- correct?

5         And they were making the decisions at that point as you

6    understood it, and not the former management of Lehman that

7    had set up the RSUs program; is that true?

8    A    That's correct.

9    Q    All right.  There was some discussion about your

10   compensation, and I think to help with the Court, if I

11   might.

12            MR. MILLER:  May I approach the witness, Your

13   Honor?

14            THE COURT:  Yes.  So, Ms. Stiefel, how much -- did

15   you receive a payment in January 2009 as this Q and A

16   indicates you would?

17            THE WITNESS:  I did.  I did.

18            THE COURT:  You did.  And how much was that

19   payment?

20            THE WITNESS:  Upwards of probably pre-tax

21   $800,000, and after tax about -- I think 450 or something

22   like that.

23            THE COURT:  All right.  Thank you.

24            MR. MILLER:  Your Honor, I've passed out what's

25   been marked Lehman Brothers Exhibit 3, it's the amended

Page 107

1    Twotso declaration.  And this is a -- has attached to the

2    back a page that showed where the ten Neuberger Berman

3    claimants or at least has ten lines for Neuberger Berman

4    claimants without identifying their names, their

5    compensation in various years.

6    BY MR. MILLER:

7    Q    And if you look at that, Ms. Stiefel, can you identify

8    without saying which one it is, which line appears to be

9    yours?

10   A    I think I can guess.

11   Q    All right.  Well, I don't think you have to guess, I

12   can confirm.  Now, there are two ways we can do this, Ms.

13   Stiefel, and this is up to you and to the Court, by the way,

14   I want to make sure I pronounce it right, is it Stiefel or

15   Stiefel, how do you --

16   A    It's Stiefel.

17   Q    Stiefel, Ms. Stiefel.  One way is we can just talk

18   about the numbers in open court if you don't object to that.

19   The other way to do it is, and this is a little unusual, but

20   I've done it before, you can write the line number, we can

21   put it on a piece of -- a legal pad here, and show it to the

22   Court and the court reporter, and then we'll all talk about

23   it, but then the people -- if any other people have a copy

24   of this, which is publicly filed, they can't tell which line

25   we're talking about.

Page 108

1          THE COURT:  It's not that unusual, Mr. Miller.  I

2    just conducted a three-week trial in which there was

3    substantial testimony about someone that we referred to as

4    third party A.

5          MR. MILLER:  All right.  So --

6          THE COURT:  So, in fact, what you can do is that

7    you can and Mr. Kaplan, you can join Mr. Miller, you can

8    actually approach the witness, point to the line, and you

9    can just refer to that and the record will so reflect.

10          MR. MILLER:  All right.  Well, I want the Court to

11    be able to know which line it is.

12          THE COURT:  Yes.  And you can let me in on the

13    connection.

14    BY MR. MILLER:

15    Q    Would you prefer to do it that way, Ms. Stiefel?

16    A    That seems very dramatic.

17          THE COURT:  It's not dramatic, it's just designed

18    to protect your -- the confidentiality of your information,

19    which I already have actually elicited from you, so.  But --

20        (Counsel and witness confer quietly)

21          MR. MILLER:  If I may, the magic number --

22          THE COURT:  Very good.  Thank you very much.

23    Q    It is dramatic and it's kind of fun, so (indiscernible

24    - away from microphone).

25          THE COURT:  This is only fun to lawyers who do

Page 109

1    this for a living, it's not --

2              MR. MILLER:  It's probably --

3              THE COURT:  It's not at all --

4              MR. MILLER:  -- a strange --

5              THE COURT:  -- fun for the witness.  I was a

6    witness once many years ago, and it's --

7              MR. MILLER:  We understand that.

8              THE COURT:  -- a very hard situation.

9              MR. MILLER:  It is a way to protect, however --

10             THE COURT:  Confidential information.

11             MR. MILLER:  -- the confidentiality, and we so we

12   certainly want to do that for you.

13   BY MR. MILLER:

14   Q    If you looked at your line, and I'm going to try not to

15   ask questions that allow people to derive too much, you'll

16   see that there is what is shown as cash compensation.  It's

17   true that none of the lines show any equity deferral for

18   2003, correct?

19   A    That's correct.

20   Q    If we look at the 2004 line for you, it shows an amount

21   of cash commission, and while it may not be precise to the

22   last two digits, does that seem approximately the cash

23   commission that you received in 2004 before tax?

24   A    So it does, but I don't recall that there was no

25   deferral.  I thought --

Page 110

1    Q    All right.

2    A    -- there was a deferral in 2004.

3    Q    Well okay.

4    A    So I don't know where this John Twotso document is

5    coming from, but --

6    Q    Well --

7    A    -- my memory was that we were weaned in, and that it

8    was half of what was the customary in 2004.

9    Q    Well -- okay.

10   A    And I guess another way to cross-reference it, forgive

11   me because I'm an accountant by background, is if you look

12   on my claim and see if there was a 2004 amount, and that

13   will tell you the validity of this statement.

14   Q    All right.  Well, I'm really not going to concentrate

15   on that as much, because the purpose is not to establish

16   your claim, but I want to focus on the other parts.

17   A    Okay.

18   Q    For 2005, there is a number shown for cash commissions,

19   and you think you received that; is that the --

20   A    That's the gross number, yes.

21   Q    Gross number.  And then there is an equity deferral

22   amount, does that appear to be approximately the right

23   relationship and amount?

24   A    That's not my memory.  I don't remember that number.

25   Q    Okay.  The cash commission for 2006 looks approximately

Page 111

1    right?

2    A    On the gross basis, yes.

3    Q    Do you recall whether the equity deferral looks

4    approximately right or not?

5    A    I don't honestly.

6    Q    You don't or --

7    A    I don't, I do not remember.

8    Q    Okay.  The cash commission for 2007, does that seem to

9    be approximately what you recall?

10   A    No, that looks low.

11   Q    All right.

12   A    It definitely was lower, but that looks very low.

13   Q    All right.  And then the cash commission for 2008 and

14   the equity deferral, I think you've testified that you ended

15   up receiving both of those in cash, in fact.

16   A    In 2008 I got my deferral back for 2008's deferred

17   comp.

18   Q    In 2009 you actually received it.

19   A    In 2009.

20   Q    Does that --

21   A    And that's about close to what I thought it was,

22   it's --

23   Q    The combined total appears to be about correct.

24   A    Yes, sir.  Yes, sir.

25   Q    It does appear and I don't want to describe this in a

Page 112

1   way that is unique, but it does appear that there was a

2   significant increase at least in some of the years while you

3   were working after the Lehman merger in the cash portions

4   that you received; is that correct?

5   A    Say that again.

6   Q    Yes.

7   A    Does it appear --

8   Q    If we look at your 2004, 2005 and 2006 numbers, they

9   are significantly larger than the year 2003 cash commission;

10  is that true?

11  A    Yes.

12  Q    And actually if we look across the line, for example,

13  your 2005 is higher than 2004 also, correct, cash

14  commission?

15  A    Correct.

16  Q    So it was a success for you to go -- did you consider

17  it successful on balance that you did stay with Neuberger

18  Berman after it merged with Lehman as opposed to trying to

19  break away at the time of the merger and go somewhere else?

20  A    May I answer you as follows?  The initial idea, as I

21  understand it, of acquiring Neuberger Berman by Lehman

22  Brothers' perspective was they didn't have an asset

23  management, call it manufacturer, and yet, they had an

24  enormous, enormous network, and an enormous power in the

25  marketplace.  And the spirit of it was that they would have

Page 113

1    more opportunities to direct asset management mandates to

2    the wholly owned division of Neuberger Berman, and the

3    numbers bear out that that original spirit was effective and

4    working.

5    Q    Okay.  I think my question was --

6    A    The growth of assets occurred in the initial years when

7    Lehman acquired us.  It occurred on the portfolio management

8    side and it occurred throughout the organization.  And I

9    think at the time that we were acquired by Lehman Brothers,

10   we maybe had 50 billion -- don't hold me to this, this is

11   just an approximation, $50 billion.  And then when we were

12   part of Lehman Brothers that continued to grow every year in

13   terms of the assets under management.

14   Q    All right.  Well, I'm not sure my question was clear, I

15   think you did answer it, but let me just focus it.

16   A    Sure.

17   Q    I was not asking about whether it was a success from

18   the perspective of Neuberger Berman or Lehman, I was asking

19   from your personal perspective.  You had a choice to make

20   when the merger with Lehman occurred, and you chose to stay

21   with the merged entity, or actually merger is not exactly a

22   correct term, it was actually a subsidiary I believe all the

23   time, wasn't it, or was it merged into the unity, if you

24   know?

25   A    It was -- I think you're right, I think it was a

Page 114

1    subsidiary.

2    Q    All right.  So the subsidiary was acquired by Lehman

3    Brothers Holdings, Inc.

4    A    A public company was wholly acquired by Lehman

5    Brothers, that's correct.

6    Q    All right.  So you had to decide whether you wanted to

7    stay after the company was acquired, Neuberger Berman, or

8    whether you wanted to leave --

9    A    That's right.

10   Q    -- right?

11        Looking back over these first few years, and looking at

12   what you knew then, not what you know now, would you

13   consider it was a personal success for you to stay with

14   Neuberger Berman as opposed to, particularly with your

15   restrictive covenants at that time, going out and trying to

16   find other employment?

17   A    I was 44 years old, I loved what I did, and I love my

18   clients, and I was very excited to continue what I do.

19   Q    All right.  And you understood at that time that one of

20   the changes was that because you were going to go to work

21   for -- what was generally investment bank, was that there

22   would be a deferred component to your compensation

23   potentially at some time.  Did you understand that at some

24   point?

25   A    Well, we learned it eventually, but I didn't know that

Page 115

1    on the way in when the announcement was made.  I had no idea

2    about that.

3    Q    Well, you came to know that when, because it's not

4    clear to me whether you had deferred compensation in 2004 or

5    2005?

6    A    So the first year that we were on the program is when I

7    came to know that.

8    Q    So was that part of 2003 or was that part of 2004?

9    A    I think it was 2004.

10   Q    All right.  And you said that you made a change around

11   that same time to go back to production.

12   A    No, I made a change to go back to pure production in

13   2007, but I was always what we call a player/coach.  I was

14   production and also managing.  I was doing both.

15   Q    Okay.

16   A    So I had client responsibilities, and I also had the

17   responsibility of managing the sales force and growing the

18   sales force.

19   Q    All right.  Now, managing the sales force, that

20   component of your work is not -- doesn't involve direct

21   client contact.  It involves making sure that the managers

22   know how to make client contact, the people you're managing,

23   know how to make client contact, and coaching them to go out

24   and actually do the client contact.  Is that the way it

25   works primarily?

Page 116

1    A    No, actually no.  It -- I was meeting clients all over

2    the country because sometimes they would ask for my, you

3    know, help in a pitch, in a large pitch, so I would go all

4    over the country sometimes.

5    Q    All right.

6    A    We wore a lot of hats at Neuberger.  It was a very lean

7    and mean place.

8    Q    All right.  Thank you.  When did you become aware that

9    some of the compensation that you were -- was shown in your

10   compensation statements was going to be deferred and would

11   go into the equity awards program?

12   A    When it was -- when it came into effect, which I

13   believe was in 2004, and we were given materials to that

14   effect.

15   Q    All right.  And you chose to continue to work there as

16   opposed to go somewhere else at that time; is that true?

17   A    I did.

18            THE COURT:  Can I interrupt, Mr. Miller.  In

19   connection with the acquisition of Neuberger by Lehman, did

20   the Neuberger shareholders receive compensation?

21            (No response)

22            THE COURT:  The company was bought, right?

23            THE WITNESS:  The answer is no.

24            THE COURT:  Neuberger was bought by Lehman.

25            THE WITNESS:  That's right.

Page 117

```
 1                THE COURT:  Right?  So Neuberger -- but so Lehman

 2     paid to acquire Neuberger?

 3                THE WITNESS:  Right.  So it was just --

 4                THE COURT:  So where did that money go?

 5                THE WITNESS:  -- an exchange -- the -- if you were

 6     a shareholder of Neuberger Berman --

 7                THE COURT:  Yes.

 8                THE WITNESS:  -- you got some whatever the

 9     translated or calculated amount of Lehman shares were, and I

10     think it was 80 percent in that stock conversion, and I

11     believe, but don't hold me to it, that it was 20 percent in

12     cash.  So I have a vague memory of that.

13                THE COURT:  So the consideration Lehman paid to

14     acquire Neuberger Berman and the owners of Neuberger Berman,

15     the shareholders, for each of their shares of Neuberger

16     Berman got some combination of cash and stock?

17                THE WITNESS:  Primarily stock.

18                THE COURT:  Primarily stock of Lehman Brothers.

19                THE WITNESS:  That's correct.

20                THE COURT:  Okay.  And do you recall what you

21     received on a kind of -- you held shares in Neuberger

22     Berman?

23                THE WITNESS:  I did, because I was a partner.

24                THE COURT:  And do you recall what you received as

25     consideration for the merger?
```

THE WITNESS: I don’t, but I could get that.

THE COURT: So it was some amount of shares in stock.

THE WITNESS: Right.

THE COURT: And did you then -- do you recall, did you immediately cash out the Lehman shares, or did you hold them for a period of time?

THE WITNESS: We couldn’t immediately cash out --

THE COURT: Okay.

THE WITNESS: -- because there was a restriction, and you could only sell 10 percent per year.

THE COURT: I see. Beginning immediately? So it was like a run-off?

THE WITNESS: Beginning immediately I think.

THE COURT: Okay. Thank you very much. Go ahead, Mr. Miller.

THE WITNESS: And by the time -- if this is helpful, by the time that Lehman went bankrupt, we all got stuck with 30 percent. So I think that over that -- that would suggest there were seven opportunities to sell the stock. But none of the claims that are -- we’re discussing, Your Honor, has anything to do with that. That’s all been lost, and that’s not the basis of this --

THE COURT: No, I understand.

THE WITNESS: Okay.

Page 119

1           THE COURT:  I'm just trying to understand because

2      the claim is being made, the legal theory around the claim

3      that you're asserting, has to do with the circumstances --

4           THE WITNESS:  Right.

5           THE COURT:  -- among other things, the

6      circumstances of Lehman's acquisition of Neuberger Berman.

7      So I'm just trying to understand since I don't -- I only

8      know what, you know, what gets told to me in this context.

9      So I'm just trying to understand how the transaction took

10     place.  I'm sorry, Mr. Miller, go ahead.

11     BY MR. MILLER:

12     Q    To follow up on that, did you sell the maximum amount

13     of the Lehman stock that you received, every opportunity

14     that you had to sell it?

15     A    Unfortunately I did not.

16     Q    So how much without telling us the dollar value or the

17     number of shares, what percentage of the Lehman stock that

18     you received as a part of the merger were you left holding

19     when the music stopped, so to speak, in mid-September 2008?

20     A    (Indiscernible) a pretty significant percentage.  I

21     don't know what it was, but was probably north of 80

22     percent.

23     Q    Okay.

24     A    And unfortunately my tax background was part of that

25     decision, which in retrospect was quite foolish, which was

Page 120

1    -- had a very low cost basis, so whenever I would sell stock

2    it would cost a lot of money in taxes.

3    Q    Okay.  But it would've been capital gain taxes; is that

4    true?

5    A    That's correct.

6    Q    I have one more topic.  I wanted to talk a little bit

7    about the discussion you had earlier with Mr. Kaplan about

8    going to sit on a beach.  And for that, do you still have in

9    front of you Neuberger Berman Exhibit D, which is the

10   amended and restated stockholder's agreement?

11   A    I do.

12   Q    And this is the document that you had to agree to in

13   order to cash in your Neuberger Berman shares, is that one

14   of the things you got out of this?

15   A    I wouldn't describe it as cashing in my Neuberger

16   shares.  I would describe it as being awarded my Neuberger

17   shares.

18   Q    All right.  I'm sorry, that's perhaps a better term.

19   In order to participate in the exchange, and to continue to

20   be a Neuberger Berman -- well, in order to turn in your

21   shares, you had to sign this agreement; is that correct?

22   A    That's correct.

23   Q    Do you know if you had said I don't want to turn in my

24   shares, but I want to keep on working there, if you could've

25   gotten a different agreement at Neuberger Berman?

Page 121

1    A    I don't believe so.

2    Q    Did anyone -- do you know if there was an option for

3    you to say I just forfeit my Neuberger Berman shares, but I

4    want to keep working there, I want to get different terms,

5    you don't know one way or another if that's --

6    A    I do not.

7    Q    All right.  This --

8              THE COURT:  Do you know -- one more, one more.

9    And do you know at that moment, and I understand what you

10   said about the clientele that you had built up, so at this

11   moment in time, things are happening, things are moving

12   quickly, there's not a hundred percent nearly transparency

13   in what's going on, right.

14            At this moment in time, do you know if you had

15   done as Mr. Miller suggested, or just said, I don't want to

16   be part of Lehman Brothers, I'm voting with my feet, I'm

17   leaving.  Do you know if the restrictive covenants that you

18   were operating under as a Neuberger Berman employee, and

19   that you then had to take with you to Lehman, would they

20   have fallen away because -- and this is kind of fancy lawyer

21   talk because of the change in control?

22            In other words, you had signed up, you were

23   Neuberger Berman, you weren't Lehman Brothers.  So --

24            THE WITNESS:  Your Honor --

25            THE COURT:  -- do you know if --

Page 122

```
 1              THE WITNESS:  -- I'm not a lawyer.

 2              THE COURT:  And I understand that.

 3              THE WITNESS:  Right, and I was under the

 4    impression that these restrictive covenants still applied.

 5              THE COURT:  If you had at the moment the --

 6              THE WITNESS:  If I had voted with my feet.

 7              THE COURT:  -- mid -- your -- 11:59 a.m. before

 8    the merger takes place, you left, and went to another wealth

 9    management firm and you wanted to take your book with you,

10    you --

11              THE WITNESS:  I couldn't do that.

12              THE COURT:  -- believe --

13              THE WITNESS:  I couldn't do that.

14              THE COURT:  -- you couldn't do that.

15              THE WITNESS:  I absolutely positively believe that

16    I couldn't do that.

17              THE COURT:  And I don't know the answer, but --

18    and you believe that that the change in control that

19    Neuberger was about to be acquired by Lehman did not have --

20              THE WITNESS:  Did not liberate me.

21              THE COURT:  -- did not liberate you?

22              THE WITNESS:  That's correct.

23              THE COURT:  That's what you believed?

24              THE WITNESS:  Absolutely a hundred percent.

25              THE COURT:  Okay.  Thank you.
```

Page 123

1    BY MR. MILLER:

2    Q    All right.  So moving forward a little bit in time, you

3    did sign this agreement, and this was the agreement that was

4    in effect when you became aware of the -- you said in 2004,

5    that some of the compensation was deferred; is that right?

6    A    This was the agreement that was in effect, that's

7    correct.

8    Q    Yes, the Neuberger Berman D.

9         Now, I do want to ask, did you ever complain about the

10   restrictions that were in the -- this Exhibit D at the time

11   you were asked to sign it, to register written complaints

12   or?

13   A    (No audible response)

14   Q    No?

15   A    No.

16   Q    So you didn't file a lawsuit and say you thought that

17   this was something that shouldn't be forced on you?

18   A    That's not in my nature.

19   Q    All right.

20   A    I'm not litigious.

21   Q    When you learned that some of your compensation under

22   the Lehman system was going to be deferred, were you aware

23   of the fact that this was consistent with the way Lehman did

24   pay the people who were generally higher levels in the

25   organization, that there was some deferred compensation?

Page 124

1    A    I learned it at that time.

2    Q    All right.  Did you complain about that and say you

3    didn't know you were getting into this, and you think you

4    were being -- that this was inappropriate or unfair to you?

5    A    I wasn't happy about it, but no, I'm not someone -- I

6    keep my noise clean, I work with my clients, and I'm not

7    someone that's very vocal or a nuisance to management.

8    Q    All right.  Did you go back and look at Exhibit D and

9    try to figure out what are my options at that point, or did

10   you just decide it just wasn't really something that you

11   needed to consider seriously to leave, because there was

12   going to be some deferred compensation?

13   A    I didn't consider leaving because there was a cost to

14   leaving that was too great with all due respect from a girl

15   from Que Gardens (ph) and I loved what I did, and I wanted

16   to continue doing it.

17   Q    All right.  Well, let's talk about that point in time

18   though.  In 2004, and this is true of all Neuberger Berman

19   group, at least it was certainly true of you, there was no

20   2003 deferral that you would give up if you'd left in 2004;

21   is that true?

22   A    I think that's correct, but I had founder shares.

23   Q    All right.  So what would you give up if you left other

24   -- in the way of deferred compensation as opposed to the

25   restrictive covenants?

Page 125

1    A    If I would've gone to a competitor, I could've lost my

2    stock.

3    Q    All right.  If you'd gone to a competitor --

4    A    If I would sit on a beach, I would be able to sell 10

5    percent a year.

6    Q    Well, let's ask whether you understand that literally

7    means if you'd gone to a competitor, or do you understand

8    that it means if you went to a competitor and did certain

9    things?  Do you have that distinction in mind?

10   A    So it was my understanding again, I'm not a lawyer,

11   that there was virtually nothing I could do in the industry.

12   Q    Let's look at that if we could.  Would you turn with me

13   in Exhibit D to the definition of harmful activity, I

14   believe that's what I'm looking for.

15   A    What page?  Oh, page 4.

16   Q    The definition is on page 9 --

17   A    Oh, okay.

18   Q    -- of harmful activity.  Let's start with page 4, as

19   you say.  Page 4, I think, is where it says you won't engage

20   in harmful activity.

21   A    Okay.

22   Q    It -- Article 3 says that there is not going to be any

23   harmful activity, right?

24   A    (No audible response)

25   Q    And it talks about liquidated damages.  Paragraph B at

Page 126

1   the top of page 5 has a statement, see if you can -- I can

2   read this correctly, "It is expressly understood and agreed

3   that although each principal and the company consider the

4   restrictions contained in the Section 3.1 to be reasonable

5   if a final judicial determination is made by a court of

6   competent jurisdiction, that the time or territory, or any

7   other restriction contained in this agreement is an

8   unenforceable restriction against such principal, the

9   provisions of this agreement shall not be rendered void, but

10  shall be deemed amended to apply as to such maximum time and

11  territory, and to such maximum extent as such court may

12  judicially determine to indicate to be reasonable."

13  A    But does that mean you have to go to court?  Yes.

14  Q    Well, I'm asking you the question, first of all, if I

15  read that correctly.

16  A    That's how I read it the same.

17  Q    All right.  Do you know if anybody at Neuberger Berman

18  ever went to court to try to get a determination of whether

19  these restrictions were reasonable in terms of time or

20  territory or otherwise?

21  A    I sincerely don't know if anyone did, it's possible,

22  it's absolutely possible.

23  Q    Do you think it's likely from this small organization

24  that someone had gone to court over this issue, and you

25  would not have heard that?

Page 127

1    A    With all due respect it is possible because when

2    somebody leaves, you aren't necessarily in the flow of

3    information about them.  So I would not necessarily be aware

4    of litigation against the firm.  That isn't something that's

5    widely discussed, so I would not have been in the flow of

6    information about that.

7         And maybe to my detriment, I have a book of business, I

8    have clients, I'm responsive to them 24/7, and that's what I

9    spend my day doing.  So if -- it's possible, but it is not

10   outlandish to assume that I wouldn't know about it.

11   Q    But certainly you didn't, as you've said earlier.

12   A    I didn't.

13   Q    So let's -- there are various consequences of harmful

14   activity here, and I -- the Court can read those.  Let's go

15   over to the definition of harmful activity which begins on

16   page 9, please.

17        And the subparagraph A talks about soliciting or

18   accepting business from, and then it has a list of

19   categories we're going to talk about in a moment.  Do you

20   see that paragraph?

21   A    I do.

22   Q    And it has to do -- the first little I is "any person

23   who is a client of the company group during the one year

24   period prior to such principal's employment termination

25   date."  And it also includes the during the one year period

Page 128

1    immediately prior to the action.

2        So that clearly applies to the clients of Neuberger

3    Berman; is that true?

4    A    Yes.

5    Q    Little two I refers to "any prospective client of the

6    company group, who within the one year period prior to such

7    employment termination date had been directly solicited by

8    such principal."  Let's just stop there.

9        Do you see the term "directly solicited"?

10   A    (No audible response)

11   Q    Now, you did directly solicit some perspective clients,

12   right?

13   A    I did.

14   Q    Some of them became clients, some of them didn't.

15   A    That's correct.

16   Q    Do you -- would you understand "directly solicited"

17   means you had contacts with them, they weren't somebody that

18   somebody two offices down called on the phone?

19   A    That's correct.

20   Q    All right.  Then or it goes on "where directly,

21   indirectly, in whole or in part, such principal supervised

22   or participated in the company group solicitation activities

23   related to such perspective client."

24       Now, you did supervise or participate in some

25   solicitation activities.

1    A    I did.

2    Q    Right.  Then -- so this is talking about clients of the

3    group and prospective clients of the group so far, right?

4    A    Yes.

5    Q    The Neuberger Berman group didn't have all the people

6    who needed to have money invested as either clients or

7    perspective clients, did it?

8    A    I don't understand what you mean, what's

9    (indiscernible).

10   Q    Well, I mean, there's a lot of people in the world --

11   A    Sure.

12   Q    -- who need to have an investment manager.

13   A    Sure.

14   Q    So there were a lot of people left over in the big

15   circle --

16   A    Okay.

17   Q    -- that Neuberger Berman didn't manage to either get as

18   a client or solicit during the one year period, right?

19   A    Unfortunately.

20   Q    Right.  And there would've been some that had been

21   solicited two years ago or three years ago, and they're not

22   in this group, right?

23   A    I guess definitionally.

24   Q    This is for the one year before you decide to leave.

25   Okay.  Then subparagraph B is to solicitor except business

1    engaged in sales or marketing with a financial intermediary

2    --

3    A    Yes.

4    Q    -- and this talks about who they are, or any person

5    employed with them, with whom the principal had business

6    contact during the one year period prior to such principal's

7    employment termination date.

8         And this is --

9    A    This could be an accountant, a lawyer, all of your

10   referral sources.

11   Q    All right.  So again, this means the people that you

12   had business contact with during a one year period, but this

13   is again, your business contact, not all the business

14   contact of all the people in the office, right?  It's the

15   principal?

16   A    That's correct.

17   Q    Then it gets easier, because C has to do with hiring

18   people, it says you can't go in and employ people.  And D

19   has to do with using your record to market, promote, or

20   otherwise trade on your success while you were working at

21   Neuberger Berman, right?

22   A    It didn't apply to me, because I wasn't managing money.

23   I was -- right, I was soliciting clients and servicing

24   clients.

25   Q    All right.  And then C and D are -- I'm sorry, E and F

Page 131

1    are even easier.  E has to do with disclosing confidential

2    information, that's derived here, right?  And F has to do

3    with making disparaging or derogatory remarks about the

4    company or the people who work there, right?

5    A    (No audible response)

6    Q    So the real restriction here, first of all, you could

7    go to a competitor and let's work up from the bottom, you

8    could avoid making disparaging or derogatory comments,

9    right?

10   A    Absolutely.

11   Q    And you could avoid disclosing confidential

12   information, right?

13   A    Well -- but isn't confidential information phone

14   numbers and things of that nature, addresses?

15   Q    It may be.

16   A    Right.

17   Q    But I'm going to come back to that --

18   A    Okay.

19   Q    -- but you -- once you figure it out what it is, you

20   could avoid disclosing confidential information, right?

21   A    (No audible response)

22   Q    And then it may not be convenient, but let's say that

23   you went -- who was a big competitor?

24   A    Sanford Bernstein.

25   Q    Okay.  Sanford Bernstein, okay.  So let's say that you

Page 132

1    went to Sanford Bernstein, and you are now a manager, is

2    that what you call yourself, what would you call -- a wealth

3    manager?

4    A    A wealth advisor.

5    Q    Okay.  A wealth advisor.  So you're a wealth advisor at

6    Sanford Bernstein, you could, if you went to work there,

7    this paragraph D does not keep you from talking about the

8    success of Sanford Bernstein in managing money, it just

9    means you can't say while I was at Neuberger Berman, here's

10   what we did, right?

11   A    That part is correct.

12   Q    All right.  Now, C you couldn't hire an employee or a

13   consultant, that's okay, you could go to work for Sanford

14   Bernstein and not have to bring anybody with you, right?

15   A    So no assistant, no nothing.

16   Q    Well, that would be the -- that would be right.  It

17   would be just you.

18   A    Just me.

19   Q    Now it gets a little more complicated.  B says that you

20   couldn't solicit business from through or engage in sales

21   activity with the people you had business contact with

22   during the one year period, right?

23   A    (No audible response)

24   Q    So you'd have to go through your rolodex and figure out

25   who you had contact with over the last year.  Everybody that

Page 133

1    you had contact with 13 months ago or earlier, they'd be

2    fair game, but the people from last year, you couldn't make

3    contact through them for three years, right?

4    A    Correct.

5    Q    All right.  And now let's go back to A.  You couldn't

6    solicit or accept business from an existing client from

7    Neuberger Berman, right, or a prospective client that either

8    you directly solicited or you supervised the solicitation

9    of, right?

10   A    That's correct.

11   Q    That still left a lot of people that were on Sanford

12   Bernstein's list of prospective clients that you'd never

13   heard of before probably?

14   A    What list are you referring to, Sanford Bernstein's

15   list?

16   Q    You don't think that any competitor is going to have a

17   list of prospective clients that you've never heard of?

18   A    Absolutely not, I don't think that.

19   Q    That has that --

20   A    That's what they're hiring a wealth advisor is to

21   generate that list.

22   Q    All right.  And your belief is that all the prospective

23   clients in the world were already on your list?

24   A    That's a gross exaggeration, of course, because you

25   can't get to all of the prospective clients in the world,

Page 134

1    but what -- where you build a business is on the basis of

2    your rolodex and your network.  And for me, being in public

3    accounting, I was networking with my former Arthur Andersen

4    colleagues.  I was networking with matrimonial lawyers.  I

5    was networking with trust and estate lawyers, and I was

6    networking with ERISA lawyers, and they are the lifeblood of

7    what we do.  Nobody gives you a list, nobody gives you

8    clients, you generate all of them on your own, and they're

9    based on your own contacts.

10       And the reason I was successful is because I had

11   initially believe it or not, even though it doesn't exist

12   anymore, I had the base of Arthur Andersen as a reference to

13   refer clients to me.  And I built a business from that, and

14   you know, other related --

15   Q    All right.

16   A    -- referral sources.

17             THE COURT:  Mr. Miller, are we getting towards the

18   end here?

19             MR. MILLER:  Yes, we are.  Let me just ask a

20   follow-up, a final I guess question on this, Your Honor, I

21   think.

22   BY MR. MILLER:

23   Q    Did you make any effort to sit down and consider what

24   practicality you would have in going to a competitor and

25   saying, I can come to work here, but here are the things

Page 135

1   that I can't do based on what we've been through, but I can

2   go back more than a year, and I can work with all the

3   information that I had more than a year ago, that I built up

4   from Arthur Andersen and people I haven't had business

5   contacts with, and define what you could do?  Did you ever

6   go through that exercise in your own mind?

7   A    First of all, how do you track it, right?  You'd have

8   to go back and research your calendar and, you know, et

9   cetera, et cetera.  But in my mind, I was out of business,

10  because I could not solicit and accept clients, I could not

11  network with the intermediaries that I had cultivated, and

12  what typically happens, the way that you continue to build

13  your business is that you are trying to touch them with, you

14  know, different materials so that they think of you, if

15  there is a situation, a life cycle situation where there's

16  an asset management opportunity.

17       So the facts -- I know you believe that if you just

18  eliminated the time period that you would've been, you know,

19  open for business, and you could just continue what you do,

20  but the reality is, you're hoping to continually touch them.

21  You build a database of these referral sources, and you send

22  them a recent article, or you send them something about the

23  markets.

24       So you essentially are out of business because if

25  you're doing your job properly, and how I was successful in

Page 136

1    building my business is that I'm reaching out and touching

2    them.  It's not perfect.  The database always has to be, you

3    know, updated and adjusted and sometimes you get busy with

4    client demands, so your best intentions don't necessary get

5    executed in that way.

6         But effectively I believed that I would be out of

7    business because my base of generating a business, I would

8    go from a book of let's say in 2003, it was 700 million to

9    zero.  And when you have zero, you are valueless to your

10   competitor, because you can't bring your clients, they're

11   not going to generate revenue.  And if you go to a

12   competitor, someone has to pay you.  And if they pay you,

13   it's coming from somewhere.  And if you're not generating

14   revenue, then you are a lost leader.

15        And maybe you're a nice person and maybe you have a

16   great personality, but effectively it can take five to seven

17   years to build a business.  And if you are closed with

18   respect to all the clients that you did this wonderful work

19   for, help them buy houses, help them send their kids to

20   college, and all these wonderful things that you've been

21   responsible for, and if you eliminate that, then you are out

22   of business.

23   Q    Your --

24   A    You are worthless in the marketplace.

25   Q    You're out of business in wealth management, right?

Page 137

1   A     That's correct.

2   Q     You said you had a CPA at one time.

3   A     Oh, my goodness, that would be a scary thought, because

4   I haven't practiced, at the time, in 14 years, and so the

5   laws change all the time.  I would probably be -- what is

6   it, I would be disbarred if you're a lawyer, I would -- that

7   would be a scary thought frankly, Mr. Miller, because --

8   Q     Well, I didn't finish my question.

9   A     Sorry, I'm sorry.

10  Q     My question was, you know that there are a number of

11  large accounting firms that have consulting practices of

12  various kinds.

13  A     That's correct.

14  Q     Did you consider whether these restrictions would allow

15  you to go to work for an accounting firm, not as an

16  accountant, but to use, for example, your training

17  capabilities, your management capabilities to organize

18  groups and perhaps get them to try to provide say,

19  accounting services to somebody?

20  A     And that's worth a million dollars a year?

21  Q     That was my follow-up question, thank you.  If you'd

22  gone to any large accounting firms, do you think you

23  could've made anything like the kind of income that we see,

24  for example, on the line we've identified before 2005 in

25  cash?

Page 138

1    A    I can't answer that question because I don't what the

2    compensation scheme is for accounting firms.  I will tell

3    you that I was a tax person for ten years, I loved doing

4    that, I love giving advice, I loved that people came to me

5    to seek an answer.  I loved saving them tax money.  But at

6    the end of the day what I loved more was making them money.

7         And the idea of going to be something completely

8    different after I had built a successful business, and had

9    been acknowledged as such by being awarded the partnership,

10   was not something that I felt was viable.  I felt what I was

11   excellent at was working with clients and helping them with

12   their financial affairs.  And I continue to do that today,

13   and I love what I do.

14            THE COURT:  So picking up on that, where do you

15   work now?

16            THE WITNESS:  Neuberger Berman.

17            THE COURT:  Thank you.

18            MR. MILLER:  No further questions, Your honor.

19            THE COURT:  All right.  Thank you.  Mr. Kaplan,

20   any redirect?

21            MR. KAPLAN:  No, Your Honor.

22            THE COURT:  Okay.  Ms. Stiefel, thank you very

23   much.  I really appreciate your testimony today.

24            All right.  What's next?

25            MR. KAPLAN:  Henry Ramallo, Your Honor.

Page 139

```
 1              THE COURT:  All right.  Well, what about Ms.
 2     Krieger who has been patiently waiting?
 3              MR. KAPLAN:  Whatever your -- they've been both
 4     here.  Mr. Ramallo I think will be quick, but if --
 5              THE COURT:  I really don't want to get in the
 6     middle of the management of your witnesses.  I can just -- I
 7     do have eyes, and I can see that folks have been -- I don't
 8     know who have got other priorities elsewhere, so I don't
 9     want --
10              MR. KAPLAN:  I will --
11              THE COURT:  I'm just asking the question.
12              MR. KAPLAN:  I will yield to Mr. Schrager and Ms.
13     Krieger, and we will take Mr. Ramallo last.
14              THE COURT:  Well, let me ask, if Mr. Ramallo is
15     also a Neuberger Berman employee --
16              MR. KAPLAN:  Yes.
17              THE COURT:  -- so Mr. Miller and Ms. Krieger, I'll
18     -- we can hear from Ms. Krieger directly in terms of her
19     timing situation, but for that, there would be logic to
20     hearing from the Neuberger Berman employee now because we
21     have that story being evolved.  But if Ms. Krieger has to be
22     somewhere else, then I'll -- you know, it's a cost benefit
23     here.
24              MS. KRIEGER:  (indiscernible) Your Honor.
25              MR. KAPLAN:  She does have to go back to work.
```

1          THE COURT:  Mr. Miller, would you -- can we get

2     Ms. Krieger back to work, would you mind?

3          MR. MILLER:  Your Honor, it's the Court's

4     pleasure, we can work with it either way.  I think we'll all

5     be able to remember what was just happening --

6          THE COURT:  Okay.  All right.

7          MR. MILLER:  -- in (indiscernible - away from

8     microphone).

9          THE COURT:  Then let's have Ms. Krieger come up so

10    that she can go back to work.

11         MR. SCHRAGER:  We've done it, Your Honor, but for

12    the record, I'll say I'd like to call Karen Krieger to the

13    stand.

14         THE COURT:  All right.  Ms. Krieger, would you

15    raise your right hand please?

16              KAREN KRIEGER, WITNESS, SWORN

17         THE COURT:  Please have a seat.

18         MR. SCHRAGER:  Your Honor, before I start

19    questioning Ms. Krieger, I would like to thank the Court

20    again for its graciousness and --

21         THE COURT:  It's my job, no problem.

22         MR. SCHRAGER:  -- flexibility with the time

23    period.  So one factor that I thought may not be coming out

24    in some of the understandings is that the cross-examination

25    time doesn't count against the presenter of the witness, it

Page 141

1    counts against the cross-examiner's time, so I think we're

2    both tuned we're well --

3              THE COURT:  We are way beyond any --

4              MR. SCHRAGER:  -- over three hours at this point.

5    Right.

6              THE COURT:  -- time periods whatsoever, so I don't

7    think we need to talk about them anymore, but I would like

8    to be done before 5 o'clock today.

9              MR. SCHRAGER:  Great, thank you, Your Honor.

10                       DIRECT EXAMINATION

11   BY MR. SCHRAGER:

12   Q    Ms. Krieger, can you state your name for the record,

13   please?

14   A    Karen Simon Krieger.

15   Q    And can you tell me where you were employed at the time

16   of the Lehman bankruptcy, please?

17   A    At Lehman Brothers.

18   Q    And when did you start work at Lehman Brothers?

19   A    November 19th, 1990.

20   Q    1990, okay.  What was your position at the time of the

21   bankruptcy?

22   A    I ran the business process alignment group within the

23   IT organization, so I was responsible for business analysis

24   around tools, process, and resources, and how they were used

25   in the technology department for enterprise-wide projects.

Page 142

1          So things like incident problem, change, asset

2     management --

3               THE COURT:  I'm sorry, what was that, incident?

4               THE WITNESS:  Incident, problem, change.

5               THE COURT:  Could you explain what that means?

6               THE WITNESS:  So in a technology department, you

7     have many systems that are in production, and you also have

8     systems that are in development.  Systems that go into

9     production have problems, and they could go down.  So if

10    they go down, we have tools that manage, help incidents in

11    tools are -- that provide transparency to the organization,

12    so that the right people get involved to fix it.  So if a

13    training floor application goes down --

14              THE COURT:  I see, okay.

15              THE WITNESS:  -- the right people need to be

16    notified.

17              THE COURT:  Okay.  All right.  Thank you, thank

18    you.

19    BY MR. SCHRAGER:

20    Q    Just for shorthand reference, Ms. Krieger, do you have

21    a title that we can refer to during that -- at the time of -

22    - prior to bankruptcy?

23    A    So I was the (indiscernible - attorney speaking over)

24    head of business process alignment and my corporate title, I

25    was promoted at the end of 2007 to SVP, which is senior

Page 143

1    vice-president.

2    Q    Okay.  Did you have a number of people reporting to you

3    at that time?

4    A    At that time I had a staff of approximately 20 people

5    throughout my years at Lehman, I had varying amounts of

6    people that ranged between a dozen to 50 people at different

7    points.

8    Q    Now, you said you started work at Lehman in 1980, you

9    were working at Lehman then when it was spun-off by American

10   Express and became an independent company?

11   A    Yes.  I was responsible in 1992, 1993 for the

12   technology separation from Shearson, and then the subsequent

13   separation from American Express.  And at that point, I

14   built a business office, and that business office was

15   associated to separation of contracts, separation of

16   billing.  It was putting in the abilities in Lehman to

17   become an independent organization.

18        So I put in place a process for how we request goods

19   and services, how we receive goods and services into the

20   organization, and how they are deployed.  So when PCs came

21   in, when phones came in, any equipment, software that came

22   in, it was my responsibility or my team to actually bring

23   those goods in, inform the people whose job it was to deploy

24   them, so that they would pick them up, and that they then

25   would build the machines, they would deploy them to the

Page 144

1    user's desks, so that people could be in operational.

2    Q    And just for background, Ms. Krieger, how many people

3    did you have reporting to you at that time?

4    A    At the time, approximately 35.

5    Q    Okay.  Now, at that time, you were working out of the

6    Lehman headquarters at the World Financial Center?

7    A    I was in the World Financial Center from 1990 until

8    1995, and then I was sent over to 101 Hudson in New Jersey,

9    and then I came back to New York, and again, was in the

10   World Financial Center until the beginning of 2001.  And in

11   2001, I was then moved to the World Trade Center, where I

12   was on the fortieth floor.

13   Q    Okay.  Can you -- this is by way of introduction of

14   your background and skills, Ms. Krieger, and your role in

15   the company.  What happened with respect to your

16   responsibilities after the attack on 9/11?

17   A    My responsibility was to work on the firm's technology

18   insurance claim.  So my job was to try and understand what

19   the value of the assets were that we lost, both in the World

20   Financial Center and the World Trade Center, as well as I

21   was responsible for the capital projects to rebuild the

22   firm, and rebuild the facilities that needed to get set up

23   at 101 Hudson, 70 Hudson, 745 7th Avenue in order to -- so

24   there was a short term, steps that needed to be taken, so

25   that it would be up and operational very quickly after the

Page 145

1    terrorist attacks.  And then it was around building the

2    capital projects to actually facilitate moving into 745 7th

3    Avenue, so that we would have a headquarter building once

4    again.

5    Q    That's very helpful, thank you.  Ms. Krieger, you've

6    appeared in this court before in this proceeding; is that

7    correct?

8    A    Yes.  I appeared before Judge Peck in September of 2012

9    when I -- I was a per se claimant, and I was called by

10   someone from Weil Gotshal, his name was Angel, and I don't

11   recall his last name, who asked that I drop my objection to

12   a motion, and I said that I would not.

13        And at that time, he said that if I did not drop my

14   objection, that Judge Peck may ask that I come before the

15   Court.  So I came --

16            THE COURT:  I just want to -- you know, I want to

17   clarify because -- and I don't want to interfere with your

18   attorney/client relationship, but -- and Mr. Miller hasn't

19   objected to something which is technically what we call a

20   hearsay.  You're relating to me what someone said to you,

21   right.  And I'm not disbelieving --

22            THE WITNESS:  Okay.

23            THE COURT:  -- you, but what I'm saying is that

24   without having the speaker of those words here, there's no

25   way for me independently to ask the speaker is that what you

Page 146

```
 1    said.  Okay.  And the words that you're using have an

 2    implication that there was something improper or there was a

 3    threat -- and if you would just let me finish, and I just

 4    want to make the observation that it's standard operating

 5    procedure and the duty of the attorneys for a party when

 6    there's an objection to something ahead of time, the Court

 7    wants to know, have you tried to work this out.

 8              And so the explanation for what you've just

 9    relayed is that prior to a hearing on your objection,

10    counsel has to reach out to the objector and say, if -- you

11    know, are you going to stand on your objection, are you

12    going to come and appear.  And generally speaking, Courts,

13    Judge Peck, I can't speak for specifically what he would've

14    done, but if somebody files an objection and they don't

15    appear, it could be that the Court then says, you have to be

16    here, or your objection is going to be overruled.

17              So I just wanted to tell you that I hear what

18    you're saying, and in no way do I not believe what you're

19    saying, but there was implicit in that a characterization,

20    and there's also an element of your relating something that

21    occurred out of my hearing.  Okay?

22              THE WITNESS:  So I did appear.

23              THE COURT:  Okay.

24              THE WITNESS:  I came to court and I explained what

25    my claim was about, and that I was going to stand --
```

Page 147

1    continue to keep my claim live.

2              THE COURT:  Okay.  This claim that's here today?

3              THE WITNESS:  It was against the -- either the

4    385th or the 329th omnibus objection at the time.  And this

5    covered this claim.

6              THE COURT:  This claim here?  Okay.

7              THE WITNESS:  As well as the remainder of the

8    claim that I do have, and Judge Peck said to Mark Bernstein,

9    who was the lawyer from Weil Gotshal because I was

10   representing myself --

11             THE COURT:  Yes.

12             THE WITNESS:  -- that Weil Gotshal had an

13   obligation to continue to help me through the process.

14             THE COURT:  Uh-huh.

15             THE WITNESS:  I explained to him that in my 33-

16   year career in financial services, that the Lehman

17   bankruptcy was my third bankruptcy, and that as a result of

18   my ignorance and my inability to handle the legal matters

19   associated to it, clearly I needed some help because I

20   wanted to make sure that I would be able to see my claim

21   through from beginning to end.  And that when it was

22   ultimately either approved or denied, I would be still with

23   my claim until a decision was ultimately made.

24             So Mark Bernstein then gave me the number of

25   Denise Alvarez who helped me with some of the conactivity

Page 148

1   (ph) that --

2   BY MR. SCHRAGER:

3   Q    I'm sorry, by conactivity you mean?

4   A    Meaning a lot of the documents were being placed in a

5   repository, and I had issues with its access to be able to

6   get through to them.  Unfortunately, because of where Weil

7   Gotshal was in the case, Denise very clearly advised me that

8   her ability to advise me from a legal perspective did not

9   exist, so that I was in effect, in a lot of this on my own,

10  and it was only recently that I engaged Richard as my

11  attorney because I felt clearly overwhelmed by the legal

12  documents and whether I was continuing to be on the right

13  track or not.  So I was pro se until about three months ago.

14  Q    Okay.

15          MR. SCHRAGER:  Your Honor, may I approach the

16  witness?

17          THE COURT:  Yes.

18          MR. SCHRAGER:  I'm going to offer and hand to her

19  CLX007, which has been introduced.  It was an attachment to

20  an affidavit --

21          THE COURT:  All right.  Do you have an extra copy

22  there?

23          MR. SCHRAGER:  -- by Mr. (indiscernible - away

24  from microphone).

25          THE COURT:  Thank you.

Page 149

1    BY MR. SCHRAGER:

2    Q    Ms. Krieger, under the cover page --

3              THE COURT:  Hold on a moment, Mr. Miller is

4    standing.

5              MR. SCHRAGER:  I'm sorry.

6              MR. MILLER:  We have no objection, Your Honor, to

7    this being discussed and there are some parts of it that we

8    might object to later, but for now, it's -- we have no

9    objection to the usage.

10             THE COURT:  Okay.  All right.

11   BY MR. SCHRAGER:

12   Q    Okay.  Ms. Krieger, if you could take a look at your

13   cover page which is -- the first page of your letter which

14   is under the cover page.  That is a letter from you

15   addressed to James M. Peck and Robert J. Lemons of Weil

16   Gotshal dated March 29, 2013.

17   A    That's correct.

18   Q    And this letter was drafted by you?

19   A    That's correct.

20   Q    Okay.  So -- and that is your signature on page 11?

21   A    That is correct.

22   Q    Okay.  And that was before you retained my firm --

23   A    That's correct.

24   Q    -- as your counsel.  Okay.

25        And there were some exhibits with that letter that are

Page 150

1    not attached here; is that correct?

2    A    Yes.  They are referenced in this document, and in

3    fact, the entire package was sent to Judge Peck, as well as

4    Robert Lemons and Mark Bernstein with all of the attachment,

5    there were 23 exhibits.

6    Q    Could you give a rough idea of the total number of

7    pages in the compilation?

8    A    Probably 150.

9    Q    Okay.  When you were still pro se, Ms. Krieger, you

10   knew about this hearing?  You knew that an evidentiary

11   hearing was planned, correct?

12   A    As far as I could tell from the documents, I think that

13   there was some back and forth as to whether or not one would

14   happen.  And --

15   Q    Would it have been your intention to testify when it

16   had happened?

17   A    Absolutely.

18   Q    You would've testified --

19   A    Absolutely.

20   Q    -- on a pro se basis?

21   A    Absolutely.

22   Q    Is that correct?

23   A    Yes.

24   Q    Thank you.  I'm going to pose some questions, Ms.

25   Krieger, about the structure of the RSU program.  Do you

1    recall when you first got RSUs?

2    A    1994.

3    Q    1994.  And was that the beginning of the program?

4    A    Yes, it was.

5    Q    Did you elect to take RSUs?

6    A    Absolutely not.  I very consciously felt that it was a

7    bad decision based upon the two bankruptcies that I had gone

8    through previously, that I ever have my income and my

9    investment stream in the same place, so I very deliberately

10   ensured that whatever I could have elsewhere, I would.

11   Q    Okay.  Now, in the context that we discussed earlier

12   with your responsibilities at that time, did you have people

13   reporting to you when the RSU program was initiated?

14   A    Yes.

15   Q    Was it your responsibility to communicate with any of

16   them about the RSU program?

17   A    At the very beginning of the program, it was our

18   responsibility to provide an overview of what the program

19   would be.  We were given training sessions by HR, as to --

20   Q    HR is?

21   A    I'm sorry, human resources, as to how to explain what

22   that program meant, and then subsequently each year, as

23   compensation was ready to be announced, we had training

24   sessions again with the HR department that required us to

25   ensure we understand the script that we needed to deliver to

Page 152

1    our employees so that they would understand their

2    compensation.

3    Q    Okay.  When you were first awarded RSUs, did you have

4    any choice about the number, the percentage of your bonus

5    that would be allocated RSUs or the vesting period or any of

6    the other features of the RSU award?

7    A    No.

8    Q    When you communicated to your -- report -- the persons

9    reporting to you, did any of them question whether any of

10   these options were available?

11   A    You know, initially there were questions about how it

12   would work, and what it would mean to them, but the firm

13   very clearly marketed it as this was a new program that was

14   being implemented, and it was not up for discussion in terms

15   of people's options.

16   Q    Okay.  In here, in your experience at Lehman at the

17   time of the commencement of the program, did you have an

18   understanding of what the purpose of the RSU program was?

19   A    So I think it was two-fold.  When they started in 1994,

20   we had just completed the separation from Shearson and from

21   American Express.

22       Lehman Brothers had a huge hurdle in front of them in

23   terms of building an infrastructure that would require them

24   to be independent.  So it was very clearly explained to us

25   that in order to remain a viable organization, they needed

Page 153

1    to present comp ratios that said that the compensation ratio

2    must remain within the 49 to 51 percent, and these were

3    thing that came from the top down when --

4    Q    If I can interrupt you there a moment, Ms. Krieger.

5    Let's be sure we understand that.  We've referred to a

6    compensation ratio.  That is the ratio of the compensation

7    and benefits to employees over some other number.  What

8    would that -- what would the ratio be between what two

9    figures?

10   A    Total -- it was a ratio of compensation as a

11   relationship to the rest of the expenses of the firm.

12   Q    Okay.  And -- thank you.

13        Where was the source of your understanding -- sorry.

14   What was the compensation ratio that you understood the firm

15   to have as its goal?

16   A    So in 1994, I was chartered with managing the

17   technology expense which included telecom, networking,

18   hardware, software, and professional services.

19        So as a result of being part of these committees that

20   were to gain the transparency around the spend of the firm,

21   they talked to us about how to drive spend out of the

22   organization.  And --

23   Q    I'm sorry, how to drive --

24   A    Spend --

25   Q    How to reduce expenses.

Page 154

1    A    How to reduce expenses by looking for --

2    Q    Thank you.

3    A    -- demand reduction, renegotiation of contracts,

4    whatever was potentially plausible to help reduce the

5    expenses of the firm.

6         So with that, there was a financial component, and the

7    message from our finance organization which gave us goals as

8    to what we needed to hit, told us what was important in

9    terms of the transparency to the rating agencies that the

10   compensation ratio needed to remain between 49 and 51

11   percent.

12   Q    49 and 51 percent, okay.

13   A    Yes.

14   Q    Thank you.  Do you have any understanding of what the

15   compensation ratio would've been if the RSUs had been

16   included in the compensation?

17   A    Considerably higher.

18   Q    Uh-huh.

19        MR. MILLER:  Excuse me, Your Honor, I just want to

20   object to lack of foundation, that the answer is probably

21   vague and so I don't know if (indiscernible - away from

22   microphone).

23        THE COURT:  Okay.

24        THE WITNESS:  I will say also that Dick Fold (ph)

25   and Dave Goldfarb (ph) and Joe Gregory also, in our

Page 155

1    quarterly reviews of the firm's earnings, they would have

2    quarterly conference calls where the entire firm would

3    listen to them providing an update.  And then there were

4    also additional meetings that they called where some of the

5    more senior people would go into an auditorium, and they

6    would provide us that.

7              And as part of the statement around earnings, and

8    how the firm was doing, they also would provide us around

9    transparency around the compensation ratio and where they

10   were in terms of it, and the importance of keeping that

11   aligned to the 49 to 51 percent ratio.

12   BY MR. SCHRAGER:

13   Q    Okay.  Let me ask you this, you said you were promoted

14   to SVP, senior vice-president in 2007, correct?

15   A    Correct.

16   Q    In your capacity as SVP, did you go to any of those

17   meetings that you just discussed?

18   A    I went to some of those meetings then, and I did

19   previously as well, because my role when I had

20   responsibility was the CAO, who worked for the CIO of the

21   organization.

22        So I had responsibilities --

23   Q    So that's the chief administrative officer for the

24   chief information officer --

25   A    Chief information -- chief administrative officer to

Page 156

1    the chief information officer.  So I --

2    Q    CAO for the CIO, thank you.

3    A    That's right.  I was responsible for the day-to-day

4    operations of the IT organization.

5    Q    Right.  And then --

6              MR. SCHRAGER:  Well, Your Honor, I think that

7    addresses the foundation objection that Mr. Miller was going

8    to make.

9              THE COURT:  All right.  Well --

10             MR. SCHRAGER:  And I would --

11             THE COURT:  -- let's keep going.  I'm --

12   BY MR. SCHRAGER:

13   Q    I'm going to pose the question again, Ms. Krieger, do

14   you have any idea what the comp ratio would've been, this

15   goal of 49 to 51 percent, what the (indiscernible) would

16   have been had the RSUs been included in the comp ratio?

17   A    Significantly higher.  I mean, you know, I had done a

18   calculation based on my looking at the balance sheet, and it

19   appeared to me that it would've approached the 60 percent

20   mark.

21   Q    Was the RSU program something --

22             MR. MILLER:  Again, Your Honor, I do object to

23   that as without foundation and move to strike.

24             THE COURT:  Okay.  Let's keep going.  All right.

25             MR. SCHRAGER:  Okay.

Page 157

1    BY MR. SCHRAGER:

2    Q    Ms. Krieger, was the RSU program when announced, was it

3    something that was attractive to you as an employee?

4    A    It was not.

5    Q    Can you explain to us why?

6    A    I felt that as an employee of the firm that I operated

7    day-in/day-out like an owner.  I treated the firm's money

8    like it was my own bank book.  I was prudent about any

9    decisions that I had to make with regard to how the firm

10   invested.

11        I unfortunately felt that when they instituted this

12   program, that I was going to be handcuffed, handcuffed in

13   the prospective that I did not want anybody managing my

14   money.  I want -- I will tell you that in 1996,

15   unfortunately, my husband passed away, and Lehman Brothers

16   hired on my behalf somebody to help me figure out how to get

17   my financial life in order.

18        They worked with me to ensure that financially I was in

19   an okay position, in terms of raising my children who were

20   very young at the time.  They helped me get a financial

21   advisor.  They gave me an exception to the process that I

22   had, because the firm mandated that all purchases of stock

23   needed to go through them as an organization.  I raised an

24   objection and said to them, if you tell me I have to go to

25   somebody at Lehman Brothers to make my investment decisions,

Page 158

1    I will not be focused on my job.  I will be focused on,

2    because the people at Lehman Brothers were order takers at

3    the time.  It was a retail organization.  And you would pick

4    up the phone and say, please buy me 50 shares of AT&T.  I

5    had a job to do during the day.  I certainly couldn't figure

6    out the best way to invest my money if I wasn't going to

7    focus on the stock market and to figure out when I needed to

8    buy bonds.

9        Lehman Brothers came back to me and said, we've hired

10   somebody to help you figure out your personal set of

11   circumstances, like when I needed to -- how I needed to

12   assess the value of my home, how I needed to do things to

13   get me in place as a young widow, and then they also said

14   they would give me exception.  And they said to me, you can

15   hire an external financial advisor as long as you have every

16   confirmation, for every trade you do, sent to your manager,

17   as well as the compliance department, which I immediately

18   complied with.

19   Q    Okay.  I'm going to ask two quick questions here.  A

20   few moments ago, Ms. Krieger, you used the term owner, that

21   you felt like an owner of the business.  Was that before or

22   after the RSU program was put into place?

23   A    I am a child of immigrants.  My parents raised me that

24   the most important thing in the world was to be able to take

25   care of yourself.  So I treated my home life and my work

Page 159

1    life exact same way.

2         If the firm gave me a responsibility for a budget,

3    whatever it is, my job was to oversee it, to make sure it

4    was spent prudently, to make sure any time Lehman Brothers

5    in the technology department had an audit issue that needed

6    to get resolved, they came to me to oversee it, because they

7    knew I treated the firm like it was my own.  I was

8    financially and fiscally responsible to the enth degree.

9    Q    So as a financial and fiscally responsible employee, it

10   was not the RSU program that made you feel like an owner?

11              MR. MILLER:  Objection, leading.

12              THE COURT:  Sustained.

13   BY MR. SCHRAGER:

14   Q    Was it the RSU program, Ms. Krieger, that made you feel

15   like an owner?

16   A    No, because it handcuffed my ability, because the

17   decisions around my money were going to be managed by

18   somebody where I had no control of.

19   Q    Okay.

20   A    And having lost the money at Drexel Berman and having

21   lost it at federal government securities, I vowed I would

22   never go through this again.

23   Q    Now, let me ask a little more about the --

24              THE COURT:  So can I interrupt --

25              MR. SCHRAGER:  Sorry.

Page 160

1          THE COURT:  -- so could I ask you a question?

2          THE WITNESS:  Uh-huh.

3          THE COURT:  So when the RSU program began, and you

4     wisely didn't want to be part of it, but you stayed at

5     Lehman, right?  And I can imagine why you decided to stay.

6          But was it difficult for you to -- and you

7     remained a loyal employee, and you went through these

8     terrible things, terrible things, was it difficult for you

9     to feeling the way that you did towards the firm, the firm

10    was part of your family, right, and yet they were imposing

11    this condition of employment on you, that you recognized as

12    entailing risk, and putting yourself at risk.  So how -- I'm

13    just trying to understand how you felt about that, since you

14    -- when you went to work in the morning, and I feel the same

15    way about my job, that you know, it's that important, it's

16    not just something that you do from 9 to 5.

17         So how did you process that dissonance in your

18    mind of that condition of your employment, and yet you felt

19    that it was putting your financial security at risk because

20    part of your wealth was now tied up with the RSUs?

21         THE WITNESS:  Frankly, I was petrified.  But I

22    also was in survival mode.  I -- you know, between what

23    transpired in my personal life, what transpired on 9/11, and

24    being in the building, and the potential of leaving my kids

25    as orphans, the fact that several other people in my -- my

Page 161

1    whole network of people around me, I lost my dad, my in-laws

2    all at the same time, I had nobody to turn to.

3         The only people in my life at the time were my

4    kids and my friends at work.  I drowned myself in the

5    office, in order to survive.  However, every year that those

6    RSUs became viable to sell on day one, I sold them.  The

7    only year I did not sell them was December -- was the 2007,

8    and the reason I did not sell them is, at the time, I had

9    one daughter who was on the verge of graduating from

10   college, and a second daughter who was starting, and I was

11   slightly financially ahead of myself, and I said, I'm going

12   to sell those in September of '08 when my younger daughter

13   starts college.  Because I -- and what happened

14   unfortunately is because I lost those RSUs, Barclays brought

15   me over and kept me there employed, and I stayed there until

16   2011.

17        I had to live on one paycheck a month in order to

18   get my second daughter through college because I did not

19   have the funds to pay for her, and I swore that when both of

20   my kids were going to get out of college without a loan, so

21   I lived on one check until -- and those RSUs would've made

22   the difference in my life while she -- but now they're both

23   out of school, and I'm in a different situation, and have

24   left the industry.

25        But for me, it was a nightmare.  My financial

Page 162

1   advisor agreed with me, but my hands were tied, and I

2   couldn't -- the thought of leaving the firm, I would've been

3   emotionally destroyed.

4   BY MR. SCHRAGER:

5   Q    I'd like to come back to that personal financial

6   advisor.  You said that that was something unusual for

7   Lehman to do, that was not the normal policy; is that

8   correct?

9   A    No.

10  Q    And why do you think that exception was made in your

11  case?

12  A    They understood my ethic, they under --

13  Q    They meaning --

14  A    They meaning --

15  Q    -- (indiscernible).

16  A    -- (indiscernible - talking over each other)

17  compliance, I had to talk to the head of the IT department,

18  and I said to them, you can have whatever transparency you

19  want, I need somebody who is going to step aside, look at my

20  stuff in terms of how to take care of me, and how to take

21  care of my kids, and whatever they decide, I will feel I can

22  focus on my job, I can focus on raising of my children, and

23  the rest of it is their problem, and you can see what you

24  need to see.

25  Q    And you refer to compliance and your own IT department,

Page 163

1    so you were discussing this situation with people outside

2    your normal chain of command at Lehman Brothers?

3    A    That's correct.

4    Q    What was your personal feeling about the help you got?

5    Did it inspire you?

6    A    I was forever indebted to the fact that I needed to

7    take clear -- I mean, my children were 5 and 10.  I needed

8    to take time after work to get them through the grieving

9    process.  Lehman was incredibly supportive of my situation.

10   I mean, they knew it was coming, my husband was sick for

11   several years.  But they went out, above and beyond to help

12   me get my life back where I needed to be in order to

13   continue working and raise my children.

14   Q    Okay.  I'd like you to concur, Ms. Krieger, your fear

15   about Lehman that you've just described, with your feeling

16   about the RSU program.  Obviously they're not consistent,

17   can you explain to the Court how you reconcile them?

18   A    The choice was leave Lehman and leave the comfort of

19   what, in fact, was my family, and I realized that I was in

20   no position to go to another firm and try to establish my

21   credibility and to try and work and build a new future.

22   Because at that point, I cared about day-to-day living with

23   my kids, and making sure they had the right caregiver when I

24   went to work.  And it was very tough because working at

25   Lehman, I worked on average 15 to 18 hours a day.  My kids

Page 164

1    did not see me night after night, I had somebody living in

2    the house with me because -- and sadly, it was -- a lot of

3    it was to deal with my grief because I was comfortable

4    there, but the thought of going anywhere was beyond

5    frightening to me.

6        You know, to say that I was going to leave because of

7    the RSU program, I couldn't bear to leave people who were

8    being so supportive.

9    Q    Thank you.  Now, Ms. Krieger, I'd like to read a

10   sentence into the record from page 2 of your letter.  This

11   is on page 2, the third paragraph from the bottom.

12       "Why I most certainly thought and acted like an owner

13   during my 18 years at Lehman every day, the management

14   decision to establish the program, the RSU program

15   handcuffed my ability to manage my RSU investments, as I

16   have managed my other investments."

17       Are those your words?

18   A    Yes, they are.

19   Q    That's in your letter?

20   A    Yes.

21   Q    Thank you.  What did you mean about managing your other

22   investments?  What investment -- could you describe the

23   approach you took to managing your other investments?

24   A    I hired a financial advisor, who was at a small firm,

25   and he's managed my money since 1997.

Page 165

1    Q     Okay.  Have you ever discussed the RSUs with him?

2    A     At the time.

3    Q     We won't ask for his views, but what was your

4    understanding of a proper approach to investments in Lehman

5    at that time?

6              THE COURT:  I don't think I understand that

7    question.

8    Q     As a result of your conferring with your personal

9    financial advisor about the RSU program, did you reach any

10   conclusions yourself about the program and what should be

11   done with the Lehman shares that you received?

12   A     The Lehman shares that I ultimately received, it was

13   agreed that every year, on the first of December, they were

14   sold.

15   Q     Okay.  Thank you.  I want to read another sentence to

16   you, Ms. Krieger, and this is a statement from the Lehman

17   Brothers' brief in this hearing.  You have seen the briefs

18   that Lehman Brothers submitted to the Court, correct?

19   A     Yes.

20   Q     The sentence is, "RSUs gave employees a direct stake in

21   the company and motivated them to play a significant role in

22   the success or failure of Lehman Brothers."  This is the

23   Lehman -- the opening brief at page 17 for the record.

24        Do you recall reading that?  Do you think it's true?

25   You have to talk I'm afraid.

Page 166

1   A     Sorry, no, I did not.

2   Q     Okay.  Do you recall the source given in the brief for

3   that statement?

4   A     The first sentence in the paragraph you read, they

5   quoted me, and only took everything before the apostrophe,

6   and included, and said, while I most certainly thought and

7   acted like an owner during my 18 years at Lehman Brothers

8   every day, so they took the half of my sentence and said,

9   see, here's somebody who felt that way.

10  Q     What was your reaction when you read that?

11  A     I called furious, I called you and I said, how can they

12  do this.  It's not what I said.

13  Q     Okay.  Once again, just to be sure it's clear, you

14  refer in that sentence that you just read and that was

15  quoted, you thought and acted like an owner during your 18

16  years at Lehman, that thinking and feeling and acting like

17  an owner pre-dated the RSU owner, correct?

18  A     It has been with me since I started my career in 1978.

19  Q     So your use of the term owner in that letter had

20  nothing to do with the RSU program.

21  A     No, absolutely not.

22          THE COURT:  Ms. Krieger, you -- the RSU program

23  was a firm-wide program at Lehman Brothers, right?

24          THE WITNESS:  That's correct.

25          THE COURT:  And based on your description, you've

Page 167

1    made it very clear that you had a very particular and

2    exceptional work ethic and attitude toward any firm that you

3    worked at.

4                THE WITNESS:  That's correct.

5                THE COURT:  And certainly possible, and probable,

6    that there were many hundreds, if not thousands of employees

7    at Lehman Brothers who didn't approach their job the way you

8    did, right?

9                THE WITNESS:  That's correct.

10               THE COURT:  Right.  And it's possible that

11   notwithstanding the fact that the attorneys, as attorneys

12   will do sometimes unfortunately quote you out of context,

13   they quote me out of context too, that the program which

14   said in all of the glossy materials, we want to incentivize

15   you to act as an owner, that particularly among the younger

16   generation of employees, that they would respond to that

17   stock incentive because as we know, there was some boom,

18   boom years where that stock price was --

19               THE WITNESS:  Yes.

20               THE COURT:  -- climbing up.  Right?

21               THE WITNESS:  Yes.

22               THE COURT:  So that it's possible that, you know,

23   if Lehman could think, and corporations don't think except

24   through the people who run them, that Lehman thought that

25   they could get people to work 18 hours a day like you did

Page 168

1   naturally, and like I do naturally, that they could get some

2   of those people to work harder and produce, and produce, and

3   produce so that they could get those RSUs and ride that

4   price up and become rich, right?

5            THE WITNESS:  I would've left it on the table.

6            THE COURT:  I hear you.

7            THE WITNESS:  No interest.

8            THE COURT:  Okay.  All right.  Are we almost done

9   because I think Ms. Krieger's been up here a pretty long

10  time?

11           MR. SCHRAGER:  Okay.  Just a few -- I would say,

12  Your Honor, I've got another half an hour, but I'm not going

13  to need it.

14           THE COURT:  I'm not -- okay.

15           MR. SCHRAGER:  I would like a half an hour.

16           THE COURT:  You know, I just --

17           MR. SCHRAGER:  But I don't think it's --

18           THE COURT:  -- and I'm going to say this --

19           MR. SCHRAGER:  -- going to happen.

20           THE COURT:  -- and --

21           MR. SCHRAGER:  Yeah.

22           THE COURT:  -- I'm going to say this for --

23  largely for Ms. Krieger's benefit, okay --

24           MR. SCHRAGER:  Yes.

25           THE COURT:  -- there was a negotiated game plan

Page 169

1    and the game plan involved three hours total.  So it's very

2    important to me that everyone have a full opportunity to be

3    heard, but I do want continue to remind the claimants'

4    attorneys that -- and you took ownership of this

5    stipulation, you told me yesterday you negotiated it, and

6    now we have a situation where you're about to take up an

7    hour of what was supposed to have only been three hours.

8            So I'm just going to ask you to look at your

9    outline and try to figure out, you know, the -- what you

10   really need to cover, and what you might just not cover.

11           MR. SCHRAGER:  Yes, Your Honor, thank you for

12   the --

13           THE COURT:  All right.  And, Ms. Krieger, I will

14   say it over Mr. Miller's anticipated objection, if there's

15   something that you want to say, all right, not in response

16   to a specific question, you should just say it.  All right.

17   If when we get to the end, there hasn't been a full

18   opportunity for you to say what you want to say, you can say

19   it, but Mr. Miller does have the right to cross-examine you

20   on it.  All right?

21           THE WITNESS:  Thank you.

22           THE COURT:  All right.  Let's keep going.

23   BY MR. SCHRAGER:

24   Q   Just a few more questions, Ms. Krieger.  Let's pick

25   2007 as just the year before the bankruptcy.  At that point,

Page 170

1    you're a senior vice-president of Lehman, correct?

2    A    Yes.

3    Q    And how many people in a given year would you sit down

4    and discuss the RSU program with?

5    A    It ranged, depending upon --

6    Q    I'm sorry, let me withdraw --

7    A    -- the people at the time --

8    Q    -- that question and be more specific.

9         How many people reported to you, would you sit down and

10   discuss their bonus with, including the RSU group that was

11   part of the bonus?

12   A    At that time, it was probably somewhere between 12 and

13   15 at the end of 2007.

14   Q    Okay.  And just so we have it clear, and it's nothing

15   we're hiding from, but do you think, in your discussions

16   with those people, that the RSU program may them act and

17   feel like owners of the business?

18   A    I made them feel like owners of the business every day

19   in the way I managed my team.

20   Q    Okay.  When the program was first announced, the RSU

21   program and based on the first announcement and the meetings

22   that you sat in that you described earlier, do you know of

23   any benefit that the RSU program provided to Lehman?

24   A    It provided -- because it was really a retention of

25   cash, it provided working capital to an organization that

Page 171

1   was in its infancy when it started in 1994.  It needed

2   funding for all the capital changes that were required to

3   build an infrastructure to become separate from Shearson, to

4   become separate from American Express, to rebuild after

5   9/11, to invest in the things that needed to be invested in,

6   in order to become a mature organization.

7        We had dependencies on all of those other firms for

8   years, phone system, data center, networks, you name it, it

9   was all combined together.  And it required huge investments

10  of capital.

11       And so what this was provided working capital with the

12  hope that five years later, the firm would have the actual

13  revenue, increases, in order to then pay back its employees.

14  It also provided them an ability to retain employees, if

15  they did not pay these kinds of bases and bonuses, people

16  would've gone elsewhere.  So they were trying to retain

17  talent, they were trying to build the firm, and then

18  ultimately pay back the employees with the dollars converted

19  to equity at the time.

20  Q    Okay.  So in addition to the effect on the compensation

21  issue we discussed earlier, it enabled Lehman to declare a

22  bonus, and yet keep the cash that had been declared as a

23  bonus.

24  A    That's correct, and keep in line with the rating

25  agencies, and the fact that they were considered financially

Page 172

1    stable organization and give them the rating that they

2    required in order to borrow money at the competitive rates.

3    Q    If I can quote your letter, Ms. Krieger, you said it

4    was (indiscernible) shoot maneuver, I'm quoting here, a

5    (indiscernible) shoot maneuver required to impress the

6    credit agencies, the investment community, and the

7    regulators.  Those were your words.

8    A    Yes.

9    Q    And now what do you base your analysis there?

10   A    I was responsible for the technology budget of the

11   firm.  At the time that I worked for the CIO, I was managing

12   a budget of $350 million.  And so all of the firm, anybody

13   who had that responsibility, we had to go to budget meetings

14   from the finance organization, who would tell us the

15   parameters that we needed to operate in.

16       So that information was provided to us in terms of how

17   to build our budgets.

18   Q    Okay.  And, Ms. Krieger --

19            MR. SCHRAGER:  My final couple of questions, Your

20   Honor, would be this.

21   Q    -- that we've had some discussion over the last couple

22   of days on some awards of RSUs and some compensation figures

23   that have been taken into consideration and have been

24   discussed by the Court and by counsel.

25       Can you give us some idea of what your annual salary

Page 173

1   was at Lehman?

2   A    I started out at Lehman Brothers in 1990 as a VP, just

3   having come out of the Drexel bankruptcy, I was a VP and I

4   was making $65,000 a year.

5        In 2007, when I was promoted to SVP, my base salary was

6   $175,000, and my bonus was $270,000.  Of that $270,000,

7   $45,000 was taken out for RSUs.

8   Q    $45,000 taken out in 2007?

9   A    That's correct.

10  Q    Okay.  And your total claim for RSUs pending in this

11  proceeding now, do you recall that number?

12  A    $164,000.

13  Q    Okay.  Let me follow-up on the Court's invitation, Ms.

14  Krieger, is there anything else that you would like to add?

15  A    I would. There is one thing which is about the fine

16  print from Lehman.  In the years 1994 to 2001, we got

17  packages from the organization that talked about the

18  program.  Inside that there was a single sheet that was on

19  four sides and that provided a lot of the fine print.  What

20  I found is that when the firm made changes to the RSU

21  program throughout the years, they only talked about certain

22  things.  They talked about a separate distribution in 2001

23  right after 9/11.  They made one in September and one in

24  December.

25        In July of 2008 they issued a special RSU

Page 174

1    distribution which was the hope of -- I think they must have

2    realized they had some financial issues and they were trying

3    to pay some of the bonus money up front, but when it came

4    down to it, all of the fine print that changed year on year,

5    there was never any transparency provided.

6            So, in fact, the whole notion about bankruptcy in

7    these documents, year on year changed.  If you look in one

8    of the earlier years it talks about that a bankruptcy

9    occurs, Lehman is required to take the RSUs and distribute

10   them to us on the vesting date so that we can actually trade

11   them on the market.  We never saw anything in 2008, '09,

12   '10, '11, or '12, that they actually sent those converted

13   RSUs equivalent to shares back to us.  So, in fact, I feel

14   that they didn't really think they were equity because they

15   didn't distribute them.  They didn't give me the opportunity

16   to sell my RSUs that were converted to shares at sixteen

17   cents on the share if that's what they were trading at.

18           So I've been sitting all these years with my

19   ultimate claim which is $225,000 not being able to put it

20   down as a tax loss, not start anything waiting for this to

21   happen, but I honestly think there was no transparency

22   around the fine print and they changed the terms year on

23   year, but none of that was communicated to the employees of

24   the organization.  And unless you sat with document from

25   year one to document year two to document year three and try

Page 175

1    to compare the fine print, you never would have known.  And

2    it was only when I started to write this document because I

3    have all of the documents in a box at home from 1994 when

4    the program began and I looked and I said they changed the

5    fine print on these terms and no one ever knew about it.

6    There was no transparency.

7              THE COURT:  Okay, all right.

8              MR. SCHAGER:  Thank you, Your Honor.

9              I would note that Ms. Krieger, as other claimants

10   have, submitted a declaration and there is more ground

11   covered in her declaration and I don't think her testimony

12   today was duplicative of it.

13             THE COURT:  Okay, thank you.

14             MR. SCHAGER:  But thank you again, for your

15   patience.

16             Thank you, Ms. Krieger.

17             THE COURT:  Mr. Miller?

18             MR. MILLER:  Ralph Miller with LBHI.  We'll try to

19   be brief, Your Honor.

20             THE COURT:  Okay.

21             MR. MILLER:  And, Ms. Krieger, I'll try to be as

22   short as I can.

23   CROSS-EXAMINATION

24   BY MR. MILLER:

25   Q    I want to begin with the issue of the quotation from

Page 176

1   your letter, and I want to start by apologizing if you feel

2   that this was done out of context.

3          Do you have CLX-007 in front of you?

4   A   Yes, I do.

5   Q   I'd like to direct your attention to the paragraph that

6   is two above the one that was quoted that starts with

7   "Lehman Brothers' management made a decision"; do you see

8   that?

9   A   Yes.

10  Q   Okay.  I'm going to try to read that.  Would you follow

11  along and let me know if I read that correctly.

12  A   Yep.

13  Q   "Lehman Brothers' management made a decision in 1994

14  shortly after it became a publicly traded firm to establish

15  a stock award program that provides every member of Lehman

16  Brothers with an ownership interest in the firm and a

17  requirement that the stock be held for five years.  As noted

18  in their annual stock award distribution to its employees,

19  the program provides an incentive to think and act like an

20  owner every day and allows all participants to share in the

21  firm's financial success over time."

22          You did put that in your letter, right?

23  A   That's correct.  That was the marketing material they

24  provided to us.

25  Q   And then you later said, "You most certainly thought

Page 177

1    and acted like an owner during your 18 years at Lehman

2    Brothers every day" and then you said, "but you felt the

3    management decision to establish the program handcuffed your

4    ability to manage your RSU investments as you have managed

5    your other investments," correct?

6    A    That's right.

7    Q    If we flip over to the end of this, I would like to

8    direct your attention to the paragraph on page 6 that begins

9    with the word "Actually"; do you see that?

10            THE COURT:  Annually?

11            MR. MILLER:  I'm sorry.  I did misread it and I

12   did misspeak.  I apologize, Your Honor.

13            It's:  Annually.

14            THE WITNESS:  Yes.

15   BY MR. MILLER:

16   Q    All right.  And, again, I'd like to read just the first

17   two sentences and then ask you a question.

18            "Annually, Lehman Brothers went through a well-

19   coordinated set of sessions to manage compensation expense.

20   As a manager, I attended training sessions organized by the

21   human resource department to learn and practice the script

22   for that year in compensation conversation with my staff."

23            Did I read that correctly?

24   A    That's correct.

25   Q    So do I understand from that, that you were trained and

Page 178

1    then you, in turn, repeated this message that you were given

2    in your training to your staff; is that correct?

3    A    That's correct.  What they did was they told us what to

4    do.  They then had us sit in a room and we had an individual

5    who was going to act like the employee and we would act like

6    the employer and we needed to discuss how the firm did; how

7    the division did; how our department did; how the individual

8    did; and as a result, this was the compensation that you

9    were being awarded.  This was your base.  This was your

10   bonus, and that was the breakdown of your bonus and what was

11   actually going to be RSUs.

12   Q    All right.  And when you did those sessions, did you

13   try to present accurately, as you understood it, the

14   information to your staff?

15   A    I presented it the way they asked me to.

16   Q    Well, did you believe that some of the way that you

17   were asked to present was not an accurate statement of the

18   numbers or what was going to happen?

19   A    I was totally unhappy with that part of my employment

20   there, but I -- as a good corporate citizen, I did what I

21   was asked to do.

22   Q    All right.  If I could read the next sentence, it says

23   "The overall message associated to the RSU program was that

24   compensation was withheld in order to ensure that we felt

25   like owners and personally had skin in the game."

Page 179

1          Did I read that correctly?

2    A    Correct.

3    Q    And is that the way that you presented the message to

4    your staff?

5    A    Did I use "skin in the game" -- no; but I presented

6    that the firm wanted us to feel like we were managing this

7    like it were our own and it was our job to do whatever we

8    could to minimize expenses, as well as help the trading and

9    salespeople optimize their generation of revenue.

10   Q    All right.  What did you mean by the term "skin of the

11   game" when you used it in this filing?

12   A    Feel like you've got something to gain by doing this,

13   to feel like you put your heart and soul in something with

14   the hopes that, ultimately, the firm will be in a better

15   place.

16          I will tell you for years being involved in the

17   expense management situation of all of the technology

18   department, the firm not only had an expense issue, they had

19   a revenue problem.  And the fact was they knew that the only

20   way they could get their financials to be where they needed

21   to be was to work both sides, to work the revenue

22   generators, to do whatever they can to generate more

23   business and to keep driving expenses down.  We had

24   thermometers on our walls that showed everybody how much we

25   had done to reduce expenses.  It was a -- it was a mindset

Page 180

1    in that organization for years.

2    Q    All right.  Well, are you aware of the fact that

3    basically every investment banking firm had an equity

4    program by the year 2005 of something?

5    A    I was not aware.

6    Q    All right.

7    A    My head was down and unfortunately when the bankruptcy

8    occurred, as well as when I went on to Barclays, I never

9    spent any time thinking about going elsewhere.  I thought

10   about doing my job day in and day out.  So what other firms

11   had, I had no clue.

12   Q    All right.  I want to take just a minute and talk about

13   the compensation ratio.  Your letter has some tables on page

14   8 and page 9 about the compensation ratio, correct?

15   A    Uh-huh.

16   Q    Do I understand correctly that the point that you're

17   making is that the investment -- that the community you were

18   describing here, which you had called the "rating agencies

19   in the investment community"; do you see that reference?

20   A    On which page?

21   Q    This is on page 8.  This is the paragraph that begins

22   with "With the finesse with which Lehman Brothers handled

23   compensation expense"; do you see that?

24   A    Yes.

25   Q    And you say that -- looking just at the last sentence

Page 181

1    above the table "Lehman Brothers engineered the compensation

2    and benefits net ratio to stay within a 49 to 50 percent," I

3    guess that has the word "range," "to please the rating

4    agencies in the investment community"; do you see that

5    reference?

6    A    Yes.

7    Q    Did you understand that what the investment community

8    wanted was to see not higher than a 50 percent ratio?

9    A    That's correct.

10   Q    So when you did your substitution in your little

11   analysis of what happened if the RSUs had been paid in cash,

12   what you came up with, I think you estimated was 60 percent,

13   right?

14   A    I knew it was somewhere higher.  I mean I had done this

15   with a couple of other people and we were trying to figure

16   it out and we came out, each time we did it, close to 60; it

17   was just underneath.

18   Q    So if I understand the analysis that you did, what you

19   concluded was that Lehman couldn't really afford to pay in

20   cash the amounts that it was trying to deliver with the

21   combination of cash and the equity program if everything

22   worked out at the end of five years; is that right?

23   A    That's right.  Because they had to spend the money on

24   the capital improvements they needed to build the firm and

25   deliver the infrastructure that they required.

Page 182

1    Q   All right.  So from a standpoint of the employees, do

2    you know up through the, say 2003 when the equity awards

3    program obviously didn't get to play itself out, whether

4    generally speaking the equity awards program did deliver at

5    least as much compensation as would have been able to be

6    paid in cash earlier?

7    A   I'm not sure that I understand the question.

8    Q   Yes, let me try again.

9          Did your analysis consider -- let's take time up

10   through 2003.  Up through 2003, do you know if employees got

11   as much from their compensation that was a combination of

12   cash and equity awards, as they would have gotten if they --

13   at least as much -- as if they had been paid in cash at the

14   time that the equity awards were made, do you know the

15   answer?

16   A   I'm still struggling.  I'm not sure that I understand.

17   Q   All right.  Well, did the equity awards program, as you

18   understand it, in effect, allow Lehman to give a greater

19   total compensation package to its employees than it would

20   have been able to give if it had not used RSUs or something

21   like RSUs?

22          Did you --

23   A   I'm not -- I'm really not --

24          THE COURT:  Do you want me to try, Mr. Miller?

25          MR. MILLER:  Sure, please do, Your Honor.  I would

Page 183

1    love to have you try.

2                THE COURT:  Okay.  So what Mr. Miller is trying to

3    ask is if you know whether or not -- you just testified that

4    Lehman had to keep down expenses and one of the expenses it

5    has to keep down was compensation expenses.  And in order to

6    facilitate that -- which now looking back with the wisdom of

7    hindsight looks like a scheme, right -- in order to

8    facilitate that, they said, Ah ha, instead paying the

9    employees all in cash, let's save that cash money and let's

10   pay them with RSUs, right?

11               THE WITNESS:  Uh-huh.

12               THE COURT:  So the predicate of your analysis was

13   that if they couldn't afford to pay us all in cash, so in

14   order to facilitate the continuation of the business and the

15   build-up of the infrastructure, we're going to pay the

16   employees in RSUs, right?

17               THE WITNESS:  Right.  Right.

18               THE COURT:  Like Monopoly money, right?

19               THE WITNESS:  Right.

20               THE COURT:  And what Mr. Miller is asking you is

21   that if you accept that, which they -- so they began to pay

22   part in cash and part in these RSUs, but at the end of the

23   day, once you cashed in the RSUs, right, did it ultimately

24   cost the firm more or less than it would have, had they

25   actually paid it in cash than in the RSUs?

Page 184

1          Does that -- did I do any better?

2          THE WITNESS:  I think so, but I think they were

3     hoping that the five years since they generated this, they

4     would have been in financially better shape --

5          THE COURT:  Sure.

6          THE WITNESS:  -- to be able to afford to cover

7     that.

8          But I think that while they were covering the

9     five-year one that occurred, the next one was being issued.

10    So, in effect, if you ask me, and I don't know this, but I

11    would think that when they issued the next one, they were

12    using that money to pay us from five years before.

13         THE COURT:  So it felt -- it feels to you like a

14    Ponzi scheme?

15         THE WITNESS:  It felt like they were -- they were,

16    you know, borrowing to hopefully hit the right revenue

17    stream and reduce their expenses enough so that ultimately

18    they would be able to breathe a sigh of relief and be able

19    to actually land, you know, in the black and be able to pay

20    off their RSUs and be able to function.

21         MR. MILLER:  Can I do a follow-up on that?

22         THE WITNESS:  I'll try.

23    BY MR. MILLER:

24    Q    Sure.  Does "skin in the game" include a risk of losing

25    something if the game is lost?

Page 185

1  A    Sure.  I think that the goal is if you put enough in

2  it -- I mean my attitude in my life has always been:  I will

3  never fail, I will survive, come hell or high water.  But

4  there are clearly times when you do a project and it does

5  not work out as well.

6           So can you lose money -- absolutely; the

7  difference is I didn't want that risk.

8           THE COURT:  And that's why you sold those shares

9  the day you could?

10          THE WITNESS:  The day I could.

11          MR. MILLER:  May I approach, Your Honor?

12          THE COURT:  Sure.

13 BY MR. MILLER:

14 Q   I'm handing you what's been marked CLX-055 which is a

15 declaration that I believe you filed, Ms. Krieger, in this

16 case, right?

17 A    Yes.

18 Q   And I'm going to turn your attention to your claim form

19 that is attached, all right?

20 A    Yes.

21 Q   One of the things on the claim form is a stock

22 certificate; do you see that?

23 A    Yes.

24 Q   Was that stock certificate issued to you after the

25 Lehman bankruptcy or do you know when you got the stock

Page 186

1   certificate?

2   A    It was after the bankruptcy.

3   Q    All right.  So you said you did have some stock that

4   you did not sell before the bankruptcy; is that right?

5   A    So the stock that I did not sell was the $45,000.  That

6   was the money that came out of the December -- that was the

7   stock that became available on December of 2007.  So I chose

8   not to sell my conversion, and then I also had a little

9   piece that was in my IRA.

10  Q    Now, you said in response to one of the questions that

11  you felt that the fine print was being changed and changes

12  in the fine print were not fully disclosed, if I'm

13  summarizing your testimony -- I'm just talking about the

14  subject; do you recall that?

15  A    Yes.

16  Q    And one of the things that you talked about is you said

17  that if the -- if you had been given stock certificates upon

18  the bankruptcy, you would have gone in and tried to sell

19  them for fifteen cents a share or something?

20  A    I would have gone to talk to somebody and tried to

21  figure out what the best thing would have been, but I felt

22  like not having them, that Lehman Brothers was not actually

23  operating in line with the agreements -- in line with what

24  they told us the program was going to be.  And oddly enough,

25  if you look in the later documents, the bankruptcy

Page 187

1    discussion is totally removed.

2              So I'm going back to documents from 2000, 2001,

3    2002 where there were different terms year and year around

4    changing control and bankruptcy that talk about being

5    distributed on the actual vesting date, and then another one

6    said "or soon thereafter" so they would be available for us

7    to do something with them.

8    Q   All right.  Can I ask you to turn now in your claim

9    form to the page -- it's the second page in the claim form

10   and it's a document dated in the upper left-hand corner as

11   of August 31st, 2008 --

12   A    Yeah.

13   Q   -- and it's titled "restricted stock unit, award units

14   outstanding"; do you see that?

15   A    Yes.

16   Q   That is -- do you understand that to be a summary of

17   the RSU units that you held as of August 31st with the

18   bankruptcy being, of course, the next month?

19   A    That's correct; that's what came out of the Lehmanlive

20   site.

21   Q   And you don't -- and Lehmanlive, by the way, is a

22   computer web page, a portal that allows the Lehman employees

23   to --

24   A    It is the intranet site to where all of our personal

25   information could be accessed, and as well as how they

Page 188

1    communicated to us about goings on in the firm.

2    Q    And did it have a document section where these program

3    documents, that you refer to in your letter elsewhere, were

4    available?

5    A    There were some.  I don't know whether every year was

6    there.  I do know that for a person who keeps everything, my

7    physical documents ended in the early 2000, so I believe

8    there would have been someplace to actually access the later

9    program documents from 2002, 2003, to the end.

10   Q    All right.  In this sheet, if you look over, you'll

11   notice that there is a market value column next to the last

12   column; do you see that?

13   A    The last column?

14   Q    Yes.

15   A    Yeah.

16   Q    And that seems to be at five cents a share; do you see

17   that?

18   A    Yep.

19   Q    And that shows that your total market value, if you had

20   had all of those RSUs converted to stock as of that date,

21   was $205; is that right?

22   A    Yeah, that's correct.

23   Q    And that's what you say you think you should have

24   somehow had that stock made available to you so you could

25   get the $205?

Page 189

1    A    Well, I'm not sure that that ultimately would have been

2    the right choice.  What my point was:  The document said the

3    operational terms of the agreement would be that Lehman

4    would distribute the shares and in accordance with the rules

5    that they did, they did not follow their own procedures,

6    which were to distribute the shares at the time of the

7    bankruptcy.

8    Q    All right.  Well, do you know what the value was at the

9    time of the bankruptcy on September 15th; do you happen to

10   know that?

11   A    I do not.

12   Q    Do you know that it was even lower than five cents a

13   share by September 15th?

14   A    It might have been.  I have no idea.

15   Q    Do you understand that the result of this motion is

16   that you will have the same equity interest that you would

17   have if you held shares of common stock for this number of

18   shares of common stock?

19   A    I do understand that and that's why I'm fighting it

20   because I do not believe that those were equity shares until

21   they were actually equity delivered to us.  That it really

22   was a contract and it was a contract to, in five years from

23   now, deliver me equity shares.  But until then, they

24   borrowed my money; they withheld the cash.

25   Q    You do understand that there's nothing in the program

Page 190

1   documents that ever said that you had an option to get cash

2   instead of equity, setting aside a change of control or a

3   couple of other little details?

4   A    No, that's why my intention was that as soon as I got

5   it, I would sell it, so that I would have no tie to Lehman

6   from an investment perspective.

7   Q    All right.  But you did understand that, I mean that's

8   what your point is -- that's because you understood you

9   didn't have an option to get money, that's why as soon as

10  you got a share, that's why you tried to sell it?

11  A    That's right.

12          MR. MILLER:  No further questions, Your Honor.

13          THE COURT:  Okay.

14          MR. SCHAGER:  No redirect, Your Honor.

15          THE COURT:  Ms. Krieger, thank you very much.  I

16  really very much appreciate your patience in coming here for

17  both days.  You're welcome to stay or you're welcome to

18  leave if you have to get back to work.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right?

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23          All right.  We've been going for quite a while.

24  I'm fine to continue, but we can take a break if you'd like

25  to take a break and then we need to wrap up.

```
 1              Mr. Miller?

 2              MR. MILLER:  Your Honor, if we could have just a

 3    very short break --

 4              THE COURT:  Sure.

 5              MR. MILLER:  -- for the benefit of our group and

 6    everybody?

 7              THE COURT:  Yes.

 8              Okay.  Let's recommence at 3:45 and then we're

 9    going to be in the homestretch and then I also want to have

10    some clarity about what we're going to do tomorrow.

11              Mr. Miller, have you and Ms. Solomon resolved your

12    differences with respect to Mr. Kenny?

13              MR. MILLER:  I don't know yet, Your Honor.  I need

14    to talk to --

15              THE COURT:  Okay, all right.

16              Then let's come back at 3:45.

17         (Recess at 3:34 p.m.)

18              THE COURT:  Please have a seat.

19              All right.  What more do we have?

20              MR. KAPLAN:  Mr. Ramallo, Your Honor.

21              THE COURT:  All right.  And are we having -- well,

22    let's just get started.

23              Ms. Solomon seems to be missing.

24              Please come up, sir.

25              Would you raise your right hand, please.
```

Page 192

```
 1        (Witness sworn)

 2              THE WITNESS:  Yes, Your Honor.

 3              THE COURT:  Please have a seat, and thank you for

 4    your patience in waiting so long to give your testimony.

 5              THE WITNESS:  You're welcome, and thank you

 6    yesterday for letting me get my Blackberry, I forgot to

 7    thank you.

 8              THE COURT:  No problem.

 9    DIRECT EXAMINATION

10    BY MR. KAPLAN:

11    Q    Full name is Henry Ramallo?

12    A    Yes, my name is Henry Ramallo.

13    Q    You're an employee of Neuberger Berman?

14    A    Yes.

15    Q    When did you first join Neuberger Berman?

16    A    December of 1993.

17    Q    And in what capacity did you join Neuberger Berman?

18    A    I was the assistant tax manager.

19    Q    And did there come a time when you became an asset

20    manager or a portfolio manager?

21    A    Yes.

22    Q    And when was that?

23    A    It was a transition period between 1998 and 1999, and

24    the reason for that is Neuberger Berman tried to go public

25    two times; 1998 turned out to be not the right time, so I
```

Page 193

1    would get dragged back in to help with the documents and the

2    distribution of founder shares.

3          At the year end of '98, I worked with the

4    portfolio manager, Dick Weismann, who hired me.  Then it ran

5    into tax season and they asked me to stay on and do tax work

6    for the first part of '99.  After the tax return estimates

7    were done, I joined Dick Weismann, let's say, in April of

8    1999.

9    Q   Dick Weismann had a group of money managers working?

10   A   Neuberger Berman has today approximately 40, 41

11   different product teams, but there are 23 different

12   portfolio management teams, maybe 24; the Weismann Group, as

13   it was referred to, was one of those 23, 24 teams.

14   Q   And you joined --

15   A   I joined Dietrich -- his name was Dietrich Weismann.  I

16   joined Dietrich Weismann officially, as I said, probably in

17   April of 1999.

18   Q   And subsequent to joining Mr. Weismann, did you develop

19   a book of business?

20   A   No, the Weismann team worked differently than it

21   works -- than the group I'm currently with now.  When I

22   joined the Weismann team everything fell into his book of

23   business.  I was there.  How he worked it, you had a

24   response -- you had either a primary or secondary

25   responsibility for the stocks that were owned in the book.

Page 194

1   So I had primary responsibility on some and secondary

2   responsibility on others.

3           He viewed them --

4   Q   And --

5   A    Pardon me.  He viewed them as all of his clients,

6   although I did the majority of the communication with the

7   clients.  That was something that he did not like to do.

8   Q   And did there come a time when you left the Dick

9   Weismann Group and joined another group?

10  A    Yes.

11  Q   And when was that?

12  A    In 2003.

13  Q   And what group was that?

14  A    It's known as the Straus Group.

15  Q   And as a member of the Straus Group, did you develop a

16  book of business?

17  A    I was actually able to take -- Dick Weismann was asked

18  to basically retire.  His book of business was broken up.

19  Jim Baker, who was one of my colleagues at the time, took

20  the institutional business.  I was able to take the retail

21  business and move over to the Straus Group, and part of that

22  business, part of that business started off as my book of

23  business.

24  Q   And since then, you've developed other -- you've

25  enlarged that book of business?

Page 195

1    A    Yes, I have.

2    Q    Okay.  Now, in the period from 1999 when there was the

3    initial public offering of Neuberger to be acquisitioned by

4    Lehman in 2003, were you awarded any Neuberger Berman stock?

5    A    Yes, I was.

6    Q    And in connection with those stock awards, did you

7    enter into any restricted covenants?

8    A    Yes, I did.

9    Q    And at the time of -- in the months preceding the

10   acquisition of the merger with Lehman Brothers, were you

11   presented with a retention agreement?

12   A    Yes, I was.

13   Q    And in connection with that, did you have discussions

14   with someone named Heidi Steiger?

15   A    Yes, I did.  I happened to be on vacation and I

16   received a phone call from Heidi that she wanted to speak to

17   me.

18   Q    And just who was Heidi Steiger in the universe of

19   Neuberger Berman?

20   A    Heidi Steiger, as Ms. Krieger already stated, was her

21   predecessor in building the wealth management division of

22   the firm, but she became an executive committee member and

23   she was serving a role and facilitating Jeff Lane and Bob

24   Matza, Jeff Lane being the CEO of Neuberger Berman, and Bob

25   Matza being the President of Neuberger Berman, she was asked

Page 196

1   to play the role in getting everyone to sign these retention

2   agreements that were being given to us.

3   Q   And in connection with the retention agreement, you had

4   a number of interactions with Ms. Steiger?

5   A   No, there were only two interactions.  One was the

6   phone call when she called me while I was on vacation and

7   she wanted to either start faxing me or overnighting me a

8   package of documents that she wanted me to send back.  I

9   told her that I was at the tail end of my vacation and could

10  it wait until I returned.  I said "Can I ask just what kind

11  of retention I was getting" and she told me and I was

12  honestly a little bit disappointed.  And I said to her -- I

13  started having a conversation and she politely told me that

14  this wasn't a negotiation; this was the offer.

15              MR. MILLER:  And, Your Honor --

16              THE COURT:  And what was the date of this

17  conversation?

18              THE WITNESS:  In August of 2003, Your Honor.  I

19  can't give you the exact date.

20              THE COURT:  Okay.

21              Yes, Mr. Miller?

22              MR. MILLER:  Your Honor, we want to lodge an

23  objection.  At this point in time there was not an ownership

24  relationship between Lehman Brothers Holdings, Inc. and

25  Neuberger Berman, so this is not an admission by --

Page 197

1          THE COURT:  It's hearsay.

2          MR. KAPLAN:  It's hearsay being offered only to

3    show its impact on the actions thereafter taken by

4    Mr. Ramallo.

5          MR. MILLER:  If it's offered for state of mind of

6    the listener, we don't object, Your Honor.

7          THE COURT:  Right.

8          MR. MILLER:  If it's offered for the truth of the

9    matter stated, we do object.

10          THE COURT:  Right.  So -- well --

11          MR. KAPLAN:  And we are offering it only for its

12    impact on Mr. Ramallo and not the truth.

13          THE COURT:  Okay.  I'm not so sure that that's

14    actually how you've used it in the briefing up to this

15    point, but you can keep going.

16          And I agree with Mr. Miller's characterization of

17    the appropriate scope of the use of the testimony, all

18    right.

19    BY MR. KAPLAN:

20    Q   Well, you were saying that there was this telephone

21    conversation when you were on vacation -- have we finished

22    that conversation?

23    A    No.  The conversation basically was that she did agree

24    to wait until I got back to the office because it was just a

25    waste of time.  I didn't have a fax machine available.  I

Page 198

```
 1    wasn't going to start asking the hotel to have confidential

 2    documents sent to me, and, no, I simply did not want it to

 3    be overnighted at that moment because it was at the tail end

 4    of my vacation.  And I said "Can we deal with this when I

 5    get back on Monday" and she agreed.  And I'm not

 6    exaggerating; she was at my door on Monday, first thing in

 7    the morning.  As soon as she arrived she was at my door of

 8    my office --

 9    Q    And what happened?

10    A    -- with the documents in hand and she asked me to sign

11    these documents and I asked her "Don't I even have the

12    opportunity to review them?"

13          She said, "Of course" but at that time, she also

14    pointed out that if I wasn't going to agree to this, that

15    the transition that I was making, this would jeopardize that

16    transition and it would jeopardize my career at Neuberger

17    Berman.

18    Q    When you say "the transition you were making" you mean

19    from the Weismann Group to the Straus Group?

20    A    From the Weismann Group to the Straus Group, correct;

21    that's what I mean.

22    Q    Yeah.

23    A    That's what I'm referring to.

24    Q    And let me show you what's been marked as Neuberger

25    Berman Exhibit B and ask you if you recognize that document.
```

```
 1   A    Yes, I do.

 2           MR. KAPLAN:  Your Honor, do you want it?

 3           THE COURT:  I have it, thank you.

 4   BY MR. KAPLAN:

 5   Q    And is that the retention agreement that you ultimately

 6   signed?

 7   A    Yes, it is.

 8   Q    And why did you sign that agreement?

 9   A    I signed this agreement because I had no other choice.

10   It was simply stated that if I was -- if I can just give you

11   a little more color, Your Honor?

12           THE COURT:  Sure.

13           THE WITNESS:  My undergraduate degree is in

14   aerospace engineering.  Part-time I went and got an MBA with

15   majors in taxation and finance.  Many years earlier I wanted

16   to go to Wall Street and pursue this career, whether in

17   research or portfolio management.  It was a long, hard

18   struggle.  I finally got the opportunity ten years after

19   starting my MBA.

20           And what I've learned even in that short time

21   period, that you need to have your own track record.

22   Because under the way that Dick Weismann operated, I

23   wasn't -- had the opportunity to show I had my own

24   established track record, which I do today because Marvin

25   Schwartz and the Straus team operated differently.
```

Page 200

```
 1                  So for me to turn around and give up the dreams

 2       and what I pursued and to really grasp at this brass ring

 3       that I was given -- and I'm not referring to the amount of

 4       this retention, I'm saying what I viewed as the brass ring

 5       was the opportunity that very, very few people like myself

 6       had gotten at Neuberger Berman to make that type of career

 7       choice.  Today there are no job postings -- I don't know how

 8       many job postings there are at Neuberger Berman, but I'm

 9       willing to guarantee that there are no job postings for

10       portfolio manager.  So I was being given a very unique

11       opportunity at the firm, an opportunity that I don't think

12       that I would receive anyplace else.

13                  So it was either the firm knowing that if they

14       wanted my help in retaining the $600 million dollars at the

15       time that I was -- when I was leaving Dick Weismann's group,

16       if they were going to have any chance of retaining those

17       assets, I was going to play a role.  I wanted to continue

18       this.  When Marvin Schwartz actually interviewed me for the

19       position -- because it wasn't like he just hired me -- he

20       asked me at the end of my -- and you have been doing with

21       some of the witnesses -- is there any final statements that

22       you would like to make?

23                  And I said "Yes, this is the first firm that I've

24       been at for more than five years."  I had spent five years

25       at Grumman Aerospace, five years at (indiscernible -
```

Page 201

```
 1   2:34:56), five years at -- I'm drawing a blank right now --

 2   and I said "I would like to retire from this firm."

 3            Months later, Marvin told me that was one of the

 4   selling features.  So my heart and having this opportunity

 5   and to pursue this and the fact that two other times in my

 6   career, my wife had tolerated me making changes in careers,

 7   taking setbacks, both financially, pure economics, whether

 8   it be on a pure comp, 401(k), seniority, vacation time.  I

 9   wasn't about to start subjecting her to do this again.  It

10   was one thing I did in my twenties and it's another thing I

11   did in my thirties.  I didn't want to start to do this again

12   in my forties, because by that time I also had three

13   children, besides other family responsibilities.

14            So at the time, you know, I started at the firm

15   making $60,000 a year.  By this time I was graced with the

16   ability that I was making between $350,000 to $400,000 a

17   year and the firm is offering me a piece of paper that says

18   they're going to also give me $500,000.  To me, at that

19   moment, it was life-altering, so, yes, I decided to make the

20   decision to stay and not take this somewhere else because I

21   didn't think there would be anyone else who would look at my

22   background, as qualified as I felt I was, to match what I

23   was getting at Neuberger Berman.

24   BY MR. KAPLAN:

25   Q    Did the -- following the acquisition by Lehman
```

Page 202

1     Brothers, did the pay structure or the way you were paid

2     change between from what it was at Neuberger Berman, as a

3     standalone entity?

4     A     Absolutely.  When I started at Neuberger Berman I was

5     salaried and bonused.  Under Dick Weismann I went to what

6     was known as a comp -- I was an added expense to the firm.

7     I was an expense to Dick Weismann at some point in time.

8     The firm usually does ask groups to take on the

9     responsibility of compensating portfolio managers and

10    research assistants within the group, so I was Dick

11    Weismann's expense.  And at that point in time, I did not

12    have a partnership interest.  I wasn't a founding partner as

13    Stephanie was, but when I switched over to the Straus Group,

14    Marvin Schwartz put me on their direct comp guaranteeing me

15    $350,000 with a potential for bonus.  But, again, not a firm

16    bonus, a bonus that they would pay, the team would pay.

17           And then what ultimately happened, subsequent --

18    so this is 2003 moving forward -- sometime in 2004 -- at the

19    end of 2004 he discussed making me a part of the group.  In

20    2005, that's when it started, which meant now that I had my

21    book of business.  I was going to be paid out based on the

22    AUM, the assets under management.

23           And I would like to correct something that was

24    incorrectly stated earlier.  The firm gets paid, let's say

25    somewhere between one and one and a half percent, but we

Page 203

1    get, as Stephanie alluded, somewhere between -- well, it's

2    twenty-two percent business, if you got that line of

3    business, twenty-five percent business.  The only way it

4    gets to a forty percent business is if you've met certain

5    high-water marks, so not all our business is paid out at

6    forty percent.

7            So without any stretch of the imagination, I was

8    given a partnership percentage within the Straus Group and

9    then thereafter rolls around 2008, we are being told that

10   Lehman is taking us over -- excuse me, 2003 -- pardon me,

11   2003, Lehman is taking us over.  And so I was under the

12   structure that I was basically as they like to say, "eating

13   what I was cooking," but now going forward, eventually, as

14   we were told in 2004 that we were going to have to move in

15   line with Lehman's compensation structure, and the Lehman

16   compensation structure involved a withholding, a deferred

17   comp piece.

18           And just before -- if any records -- I'm going to

19   put this out on the table -- there was a mistake made

20   online.  Because I don't have all -- what I mean by mistake,

21   I was made a managing director at the end of 2003, but a

22   computer system that got transferred over to Lehman's

23   actually had me as a senior vice president, so they withheld

24   the wrong amount and they came back to me two years later

25   asking me to make it up and I told them that I thought they

Page 204

1    were crazy if I was going to write a check for their

2    mistake.  So I was underwithheld because I was withheld at

3    the SVP level, although I was a managing director.

4              I will say two other things --

5              THE COURT:  So you were underwithheld meaning

6    that -- when you say "withheld" you mean the portion of your

7    compensation that was paid in RSUs?

8              THE WITNESS:  No, the deferred comp.

9              It wasn't paid in RSUs.  I was under -- they

10   withdraw -- they would hold part of your compensation.

11   Throughout the year, as has been stated previously, in a

12   sense, we are lending the firm the money and at the end of

13   the year, they are going to buy you RSUs.

14             THE COURT:  They are going to buy you RSUs?

15             THE WITNESS:  RSUs, the restricts stock units,

16   okay.

17             So that's how it was deemed, so the firm -- so the

18   firm is holding money --

19             THE COURT:  Hold on a minute.  Hold on a minute.

20             So if -- your understanding of it is that you're

21   paid the compensation in, let's call it $30,000 a month, all

22   right, and that a portion of that $30,000 a month, $360,000

23   a year, is withheld?

24             THE WITNESS:  Correct, Your Honor.

25             THE COURT:  And that cash is put somewhere in an

Page 205

1    account?

2              THE WITNESS:  Correct, Your Honor.

3              THE COURT:  And you then pay taxes on that

4    $360,000?

5              THE WITNESS:  No, Your Honor.

6              THE COURT:  Okay.  So you only pay taxes on the

7    amount of cash that you actually got, right?

8              THE WITNESS:  Constructive receipt, yes, Your

9    Honor.

10             THE COURT:  And the deferred compensation was the

11   RSUs that you then got for the work that you performed that

12   year?

13             THE WITNESS:  Eventually, Your Honor.

14             THE COURT:  Eventually, okay.

15             So when you say that you were underwithheld, that

16   means that had they done it correctly, you would have gotten

17   more RSUs?

18             THE WITNESS:  No, in a sense, I would have had

19   more withheld and then ultimately I would have had more

20   RSUs.

21             THE COURT:  More RSUs.

22             THE WITNESS:  But they made that up, Your Honor.

23   As I said, they did make it up.  They caught the mistake --

24             THE COURT:  Okay.

25             THE WITNESS:  -- they just wanted me to write a

Page 206

1   check.

2           THE COURT:  But you didn't do that?

3           THE WITNESS:  No, but I -- because that's when you

4   started to ask your questions -- I was going to say --

5           THE COURT:  Yeah.

6           THE WITNESS:  -- what we agreed to do is that they

7   would take it out of my future comp.  So they made it up by

8   taking it out of my future comp.

9           THE COURT:  I see.

10          THE WITNESS:  So they made up the error, but a

11  later year.  So I was anticipating if the numbers looked

12  funny before they show me anything -- my case is so much

13  more back-end loaded because if I was supposed to have fifty

14  percent withheld, I can't remember if they were withholding

15  thirty-five or forty percent.

16          THE COURT:  Okay.  But in any event, none of these

17  RSUs could be converted because they were all within the

18  five years prior to the filing?

19          THE WITNESS:  Correct, Your Honor.

20          THE COURT:  Okay.

21          THE WITNESS:  So they started withholding in 2004

22  and they didn't -- you know, the five years had an

23  anniversary and so we got zero, except for what has already

24  been said, that final year of deferred comp that was

25  returned to us.

Page 207

```
1              THE COURT:  Okay.

2    BY MR. KAPLAN:

3    Q   The 2008 deferred comp --

4    A    2008 deferred comp.

5    Q   -- was paid to you in cash in 2009?

6    A    Correct.

7              MR. KAPLAN:  Nothing further, Your Honor.

8              THE COURT:  Okay.

9              Mr. Miller?

10             Well, let me ask you:  What was the amount that

11   you received in 2009, which is the time period -- the late

12   2008, early 2009 time period is the time period in which --

13   were you about to ask that question?

14             MR. MILLER:  Well, we do have this chart, Your

15   Honor.  I'm not sure if he's going to want to disclose that

16   amount publicly.  He can if he wants to, I just -- we're

17   going to do the same thing within a moment.

18             THE WITNESS:  If you don't mind, Your Honor, I

19   would like to have the opportunity to do what you did with

20   Ms. Krieger.

21             THE COURT:  Sure, absolutely.

22             MR. MILLER:  I was just offering that, Your Honor,

23   as an option for his privacy.

24             THE COURT:  All right.  And which exhibit?

25             MR. MILLER:  That would be my first.
```

Page 208

1              THE WITNESS:  Am I allowed to thank him?

2         Can I say thank you, Mr. Miller?

3              THE COURT:  I'm used to there being -- you know,

4    in contrast to some of the testimony we've heard over the

5    last two days, bankruptcy and court proceedings are supposed

6    to be public and transparent processes.  We do protect

7    personal financial information, but my baseline is that it's

8    supposed to be open.

9              So I'm not -- I wasn't seeking to put your

10   personal financial information out there.

11             THE WITNESS:  I didn't take it that way, Your

12   Honor.

13             THE COURT:  Okay.

14             THE WITNESS:  I mean, I'm just going to say that

15   for somebody who started at $60,000 a year and had happen

16   what has happened to me --

17             THE COURT:  I understand.

18             THE WITNESS:  -- I'm still somewhat -- I don't

19   believe it at times and I feel very grateful and sometimes

20   embarrassed.  I don't like to discuss it publicly.

21             THE COURT:  I understand.

22             MR. MILLER:  May I approach the witness, Your

23   Honor?

24             THE COURT:  Sure.

25             MR. MILLER:  All right.  I'm going to give you the

Page 209

1    Thoisseau (ph) declaration which you may have seen before.

2    This is Lehman Brothers Holdings, Inc. Exhibit 3.

3              I believe Your Honor has one, but I have two more

4    copies if you need one.

5              THE COURT:  I do.  Let me -- I think I have it

6    here.  I have it.

7              MR. MILLER:  I've got two more.

8              THE COURT:  I have it, thank you.

9              So perhaps, Mr. Kaplan and Mr. Miller --

10             MR. MILLER:  Yes?

11             THE COURT:  -- do you want to do the same thing --

12             MR. MILLER:  Do the same thing we did before, Your

13   Honor?

14             THE COURT:  -- you did previously?

15             MR. MILLER:  All right.

16   CROSS-EXAMINATION

17   BY MR. MILLER:

18   Q   And so were you here for Ms. Stiefel's testimony?

19   A   Yes, I was, sir.

20   Q   So, you saw we're going to --

21             THE COURT:  Stiefel.

22             THE WITNESS:  It's actually Stiefel, yes.

23             MR. MILLER:  I'm sorry -- Stiefel, Ms. Stiefel's

24   testimony.

25   BY MR. MILLER:

Page 210

1    Q    I believe there's ten lines and I'm going to show you

2    this and if you want to, you can point.  I believe I know

3    which one it is, and then we're going to write a number on

4    this piece of paper and see if you agree, and then we'll

5    show it to the Court.

6    A    Yes, sir.

7    Q    So we're in agreement on the line?

8    A    Yes, sir.

9    Q    Let me check my count here.  Let me show you this.

10   Just count from the top and make sure that you come up with

11   the same -- count lines down.

12   A    Oh, which line?  I apologize.

13   Q    Just the line there, all we're going to do is show them

14   the line.  So they got the chart, just like you.

15   A    Yes, sir.  I agree with you.

16   Q    All right.

17              MR. MILLER:  Your Honor?

18              THE COURT:  Okay.  Very good, thank you.

19   BY MR. MILLER:

20   Q    So we can use this to answer the Court's question which

21   was how much you received in 2000 -- early 2009 for your

22   deferred compensation in 2008; is that correct?

23   A    Yes, sir.

24   Q    And on that line that we just identified, that would be

25   the last number in the column, 2008 deferred compensation;

Page 211

1    is that right?

2    A    Yes, sir.

3    Q    And if we look -- let's go to some earlier lines.

4    A    Do you mean earlier years, sir?

5    Q    Yes, I did.  I misspoke.  Let me try that again.

6              Earlier columns, actually 2003, for example, as

7    with Ms. Stiefel, there was no deferred compensation for the

8    2003 year; is that correct?

9    A    That's correct, sir.

10   Q    And you received the same, approximately -- and it may

11   not be to the penny, but we're looking at gross income --

12   approximately the amount shown for 2005 in cash commissions;

13   is that correct?  On line 5, of 2005, I'm asking you.

14   A    It wasn't called -- well, yes, sir, that's what this

15   column says, but I never called it commissions.  I would

16   call it compensation, but, yes.

17   Q    All right.  It is compensation?

18   A    Yes.

19   Q    And then if we go over approximately amount shown for

20   past commission was the cash that you received in 2006,

21   correct?

22   A    Yes, sir.

23   Q    That was a significant increase, as many of these lines

24   are, between 2005 and 2006; is that correct?

25   A    I would be happy to explain it.

Page 212

1    Q    Well, I'm not asking you -- I'm just asking you, it is

2    an increase?

3    A    Yes, sir.

4    Q    And then there's a further increase to 2007; is that

5    correct?

6    A    Yes, sir.

7    Q    Now, you're saying that you did not receive the amount

8    shown for deferred compensation in 2007 because that was

9    part of the RSU program; is that correct?

10   A    Yes, sir.  That became part of the RSU program.

11   Q    But the combined amount that you received in 2008 was

12   substantially greater than the cash that you received in

13   2007, since you did, in fact, receive the deferred amount;

14   is that a true statement -- just asking you about it.

15   A    No, no, I'm just looking -- checking the numbers, sir.

16   On a combined basis, it would be more than I received in

17   2007 on a cash basis.

18   Q    All right.  So when Ms. Steiger came to you after your

19   vacation, did she threaten you with anything that you viewed

20   as illegal conduct?

21   A    Sir, to me illegal conduct is putting a gun to my head.

22   No, just verbally, she told me that there was no choice.

23   Q    Well, I want to be clear for the record.  She did not

24   threaten some harm, physical or financial, to you -- and by

25   financial, I mean she didn't say that your bank account will

Page 213

1    be drained by a hacker, for example, or that your house will

2    be burned down or any sort of clearly illegal conduct to get

3    you to sign; is that true?

4    A    She said that this wouldn't be -- the retention bonus

5    wouldn't be available to me, so that is financial.

6    Q    All right.  So that's what she said, she said the

7    retention bonus would not be available to you?

8    A    Correct, sir.

9    Q    All right.  So you felt like you had no choice, but to

10   take that retention bonus because you needed it, is that

11   what you're saying?

12   A    Yes, sir.

13   Q    And you made the decision to continue after that date

14   and work at Neuberger Berman -- you're still there now?

15   A    Sir, I'm still there now, and as I stated earlier,

16   there was no -- there were no options for me to get another

17   job that I currently have anywhere else, I'm convinced of

18   that.

19   Q    All right.  Nowhere to get a job at anything like these

20   compensation levels, is that what you're saying?

21   A    No, that's not what I'm saying.  I'm saying I would not

22   have a portfolio management position anyplace else at any

23   compensation level because I lacked the track record.

24   Q    All right.  You would not get a portfolio management

25   job, sir?

Page 214

```
1    A    Correct --

2    Q    But --

3    A    -- or a research job, anything that I wanted to do,

4    sir.

5    Q    And that was because you lacked a track record?

6    A    In my opinion of how Wall Street works, yes, sir.

7    Q    So it's not necessarily just because you signed these

8    covenants, it's because without the track record, you

9    just --

10   A    (Indiscernible - 2:51:46) in the covenants, sir.

11   Q    Well, let's look at the covenants for a moment.  If I

12   may call your attention to Neuberger Berman Exhibit B,

13   please, there's a schedule B on page -- the page numbers are

14   a little bit hard -- it's got NB-116 in the lower right

15   corner; do you see that?

16   A    00116?

17   Q    Yes, sir.

18   A    Yes, sir.

19   Q    That's the -- those are the restrictive covenants, I

20   believe, in this document -- you can look through them, but

21   I think that's where they are, right?

22   A    It appears to be, sir, yes.

23   Q    And these are for you for a period of 12 months from

24   the date of termination, not for a period of three years

25   that you heard about from Ms. Stiefel, correct?
```

1    A    Correct, sir.

2    Q    And was that because, as you understood it, you did not

3    have founder stock that you -- for 12 months?

4    A    That's correct, sir.

5    Q    And so you heard us go over this with Ms. Stiefel

6    before, right?

7    A    Yes, sir.

8    Q    But look at it from the bottom, this paragraph E was

9    that you would not solicit a person who worked at Neuberger

10   to go work at another firm, right?

11   A    That's correct; that's what it says.

12   Q    You could have gotten a job -- well, let's take Sanford

13   Bernstein, did they do what you did?

14   A    Sanford Bernstein is in the same line of business, sir.

15   Q    All right.  Let's take Sanford Bernstein as a for-

16   instance.  You could have gone to Sanford Bernstein and if

17   they had otherwise wanted you, you certainly didn't have to

18   bring employees with you; is that true?  You could have

19   still gone there and offered your services and tried to get

20   a job?

21   A    To be a chief cook and bottle washer in this industry

22   is very tough, but under your hypothetical scenario, maybe.

23   Q    All right.  Under my hypothetical scenario, number D

24   was that you would not employ any current or former employer

25   or consultant of the firm, other than clerical, secretarial,

Page 216

1    or other similar support or personnel.  So you could take an

2    assistant or a clerical support, but, again, if you went to

3    Sanford Bernstein, it would have been at least theoretically

4    possible for you to go and take your assistant.

5            It was allowed here, but not take anyone else,

6    right, theoretically?

7    A    Yes, theoretically, sir.

8    Q    All right.  And if we go up to C, it was not to solicit

9    or accept business found through or engage in any sales or

10   marketing activities based on your financial planner or

11   financial institution.  Now, there's a list here of people

12   with whom you had business contact during the one-year

13   period prior to your departure.  There were a lot of people

14   in that category that's listed in paragraph C that you had

15   personally had not had any business contact with.

16           They existed out there in the world, right?

17   A    They exist today, sir.

18   Q    All right.  B was that you would not solicit or accept

19   business from a prospective client of the firm who, within a

20   one-year period before, you had directly solicited or you

21   had supervised or participated in the firm's solicitation

22   activities; do you see that?

23   A    Yes, I do, sir.

24   Q    Now, you mentioned that there were various teams within

25   Neuberger Berman, right?

Page 217

1   A    That's correct, sir.

2   Q   And I assume that you did not supervise or participate

3   in the solicitation activities for those other teams; is

4   that true?

5   A    For the other teams -- no, sir.

6   Q   And so, for example, this would not keep you from --

7   this particular paragraph -- from soliciting someone that

8   another team to your -- perhaps without your knowledge --

9   had dealt with if you had not personally or directly

10  solicited or you had not supervised or participated in that

11  solicitation, would it?

12  A    I disagree, sir, and the reason I disagree is because

13  there are lawyers -- you know, we heard the term "good

14  leavers" joined this whole thing; there are also terms

15  called "bad leavers."  If the firm wanted to say that I was

16  leaving on bad terms, it could actually cost me more than

17  the retention bonus because now I would have to be hiring

18  lawyers to start defending actions of what is being

19  described here.  And what is being described here is,

20  obviously, written by lawyers and now I would have to start

21  explaining myself for what I did and did not do a year ago

22  and it would basically be impossible.

23          And so without the lack of a track record and

24  without the fact that I didn't have the direct clientele,

25  your perception is that I could have walked over to Sanford

Page 218

```
 1   Bernstein, and as Ms. Stiefel said "with basically nothing"

 2   and have them hire me.

 3   Q   My question, sir, is actually about the document.  The

 4   document --

 5   A   And I'm --

 6   Q   Literally, it does not restrict you from trying to

 7   solicit prospective clients that other teams at Neuberger

 8   Berman had solicited during the year before, it doesn't

 9   literally require that, right?

10   A   No, I don't agree with that, sir.  I believe it did.  I

11   believe that Neuberger Berman was all-encompassing.  If

12   Neuberger Berman saw themselves as a prospective client of

13   the firm that I was going to speak to them, that they would

14   see me as trying to poach the client.

15   Q   All right.  And let me ask you about the last one, this

16   is to solicit or accept business from any individual or

17   entity for whom the firm provides services in the year

18   before.  There are people who are potential clients of both

19   Neuberger Berman and Sanford Bernstein that neither one

20   provides services to, right?

21   A   Of course, sir.

22   Q   Did you -- did you protest, in writing, having to enter

23   into this agreement at any time before this case, sir?

24   A   The retention agreement you're referring to?

25   Q   Yes, the retention agreement.
```

Page 219

1    A    No, sir.

2    Q    And let's go back to the chart for a moment that you

3    had and let's -- what was the first year, regardless of what

4    the chart shows -- when you believe you became aware that

5    part of the compensation after LBHI acquired the stock of

6    Neuberger Berman would be paid in a deferred form under the

7    equity awards program, when did your first learn that?

8    A    When -- if I may make sure I understand your question:

9    When did I first learn that Lehman Brothers was going to

10   withhold some of my compensation and ultimately put into RSU

11   and then five years later would be converted into equities?

12   Q    Yes, sir.

13   A    Okay.  I learned about it in 2004, sir.

14   Q    You learned about it in 2004?

15   A    Yes.

16   Q    Early in 2004?

17   A    I will -- I am going to say in the first half of 2004,

18   sir.

19   Q    All right.  When, in 2004 when you -- well, first of

20   all, did you get a monthly statement of how much you were

21   going to be paid based on some kind of money production or

22   amount under management or something?

23   A    As I stated, by 2004 I had joined the Straus Group and

24   I was told that I would be getting $350,000.  So in a sense,

25   all you had to do was divide that and say this is what it

Page 220

1    was going to be.  That's what they guaranteed me.

2    Q    All right.

3    A    It turned out to be formulaically a little bit more,

4    based on what actually happened, sir.

5    Q    Okay.  Do you think you did or did not receive deferred

6    compensation in 2004 for that year, that fiscal year?

7    A    On a temporary -- on a timing basis, I did, but

8    eventually they made it up, sir.

9    Q    On a timed basis you did or didn't?

10   A    I received the money in 2004.  The firm realized the

11   mistakes and they caught it back later on.

12   Q    All right.  So this is -- that was when there was a

13   makeup where, although you didn't have deferred compensation

14   that year, they deferred more in some later years; is that

15   what you're saying?

16   A    Yes, sir.

17   Q    Okay.  But you became aware in 2004 that there would be

18   deferred compensation going forward?

19   A    Yes, sir.

20   Q    So, if you had chosen to leave during 2004, you didn't

21   have any deferred compensation that had been paid in 2003 or

22   2004 that you would lose; is that correct?

23   A    No, but I would lose the retention bonus, sir.

24   Q    All right.  You would lose the retention bonus, but you

25   didn't have any deferred compensation?

Page 221

1    A    I said no, but I would lose the retention.  I'm just

2    telling you where I was.

3    Q    Okay.  I understand.  I just wanted to make sure that I

4    had an answer.

5    A    No, you had it right.  It was at that moment in time,

6    the firm had not withheld anything for deferred comp.

7    Q    All right.  But at that moment in time, you said that

8    you would have lost the retention bonus and you also would

9    have been subject to these various restrictions?

10   A    Yes, sir.

11   Q    You made a decision at that point not to leave, right?

12   A    No, sir.

13   Q    You didn't make a decision not to leave?

14   A    Sir, there were no options for me, sir.  You don't want

15   to believe it, but there were no options.  I wasn't going to

16   go back to engineering.  I wasn't going to go back to

17   accounting.  The only place I feel that would continue to

18   give me the opportunity at that time to pursue a portfolio

19   management degree was Neuberger Berman.

20            THE COURT:  Mr. Ramallo, can I ask you, though --

21            THE WITNESS:  Yes?

22            THE COURT:  -- by looking at the numbers on this

23   line, the platform at Lehman -- and you can provide

24   alternate explanation -- but the platform between the years

25   2004 and 2008, at least was coincident with there being a

Page 222

1    ten-fold increase in the amount of your cash compensation,

2    if I'm reading this correctly.

3              THE WITNESS:  Yes, and I'm happy to explain that.

4              THE COURT:  And that was a period of time in

5    which -- I mean we now know in retrospect what happened

6    after 2008 -- but that was a period of time of tremendous

7    growth in the --

8              THE WITNESS:  In the stock market.

9              THE COURT:  -- the stock market.

10             THE WITNESS:  And something specific to me, again,

11   Your Honor.

12             THE COURT:  And what was that?

13             THE WITNESS:  When I joined the Straus Group, like

14   I said, I came over with about $600 million dollars.  I

15   didn't get to keep the $600 million dollars.  It was

16   dispersed throughout some of the other portfolio managers.

17   I got to keep approximately $150 million dollars under

18   management.

19             In 2004, Mr. Schwartz had an account, and out of

20   fairness and confidentiality I'm not going to disclose it,

21   but I will say it's a mutual fund that is sold throughout

22   Europe.  This European bank had hired Mr. Strauss --

23   Mr. Schwartz, excuse me, in 1992.  At the time when this

24   other bank took that account over, it was $126 million

25   dollars.

Page 223

1           Mr. Schwartz thought he was going to be fired from

2    the (indiscernible - 3:03:36).  He asked me to participate

3    in that meeting because he wanted to show a deeper

4    (indiscernible - 3:03:41).  The gentleman that came over on

5    that account not only did not want to fire us, he they

6    wanted to start adding assets and he liked the fact that

7    Mr. Schwartz had a much younger partner, because he

8    introduced me as his partner.

9           This account, because of what was going on in the

10   market and the fact that this firm had a tremendous

11   distribution arm, this account went from $126 million

12   dollars to about $4 billion dollars in the course of a

13   couple years.  The Europeans just flooded us with money and

14   I was participating in that rapid increase.

15           THE COURT:  I see.

16           THE WITNESS:  And Mr. Schwartz was also increasing

17   my participation specifically in that fund each and every

18   year, including this year where now I actually have -- it's

19   not worth $4 billion dollars anymore, it's about a billion-

20   dollar fund because the clients from that fund ran during

21   the Lehman event.

22           THE COURT:  So this is now back at Neuberger

23   Berman, now, right?

24           THE WITNESS:  It's never left Neuberger Berman.

25           THE COURT:  Okay.

Page 224

```
 1              THE WITNESS:  It never left Neuberger Berman, but

 2    my participation increased to where now I'm up to 75 percent

 3    ownership, but there's a lot less AUM, so my comp is lower.

 4    So it's just all mathematical.

 5              So this rise you see --

 6              THE COURT:  I see.

 7              THE WITNESS:  -- this temporary mediocre rise

 8    because of how dramatically things were changing for me.

 9    Plus, as you very eloquently stated, the market had five

10    terrific years prior to 2008.

11              THE COURT:  Right.  Right.

12              Can I just ask one more question:  So who do you

13    report to now at Neuberger Berman?

14              THE WITNESS:  You can say that, since I'm one of

15    the principals in the group, I always refer to him as my

16    senior partner, is Mr. Schwartz, but we have the president

17    and vice -- excuse me, the CEO, so you could say George

18    Walker and Joe Amato are my --

19              THE COURT:  So you and, Ms. Stiefel, I mean it's

20    clear how you feel about your careers and what you built up

21    and about the firm, even though, as Ms. Stiefel testified, I

22    think she used the words "lean and mean."

23              You said "eat what you cook"; she said it, I

24    think, more vividly, "eat what you kill."  It's a very tough

25    business.
```

Page 225

```
 1                THE WITNESS:  Yes, ma'am.

 2                THE COURT:  But there's nothing precluding you

 3      right now from going to the top folks at Neuberger Berman

 4      and saying, I lost a huge amount of money while we were at

 5      Lehman Brothers, make it up to me now.  You could do that,

 6      couldn't you?  You could ask them to make up to you what it

 7      is that Lehman Brothers wasn't able to pay you because of

 8      the catastrophe -- and it was a catastrophe, there's no two

 9      ways about it.  I mean I'll never forget how I felt looking

10      at my numbers, you know, go right down, but you could go --

11      you and your colleagues could go and make that ask, couldn't

12      you?  I mean it's math, right?

13                THE WITNESS:  That's assuming, Your Honor, if I

14      may?

15                THE COURT:  Yeah.

16                THE WITNESS:  Theoretically, of course, I can

17      theoretically, however, being a person of ethics, when I

18      turn around and I face the person across the table and I'm

19      facing you --

20                THE COURT:  Yes?

21                THE WITNESS:  -- realizing that you were in the

22      same position that I am, because they also lost money at

23      Lehman Brothers, and because they were employed by Lehman

24      Brothers much longer than I was, and because --

25                THE COURT:  Okay.
```

Page 226

1              THE WITNESS:  -- they were at a much higher level

2       than I was, I don't have it within my heart to actually sit

3       across the table from someone to say, you know what, I lost.

4       I realize you lost also.

5              How am I going to --

6              THE COURT:  Okay.

7              THE WITNESS:  So, no, I personally --

8              THE COURT:  Would not do that?

9              THE WITNESS:  -- within me -- no, I can't do.

10             In theory, you're right; I can do that.

11             THE COURT:  Okay.  And the only other thing is

12      that when the retention began, the retention program began,

13      that was prior to -- Lehman was not on the scene at that

14      point, right?  I mean when the firm went public, Lehman was

15      nowhere on the scene.

16             MR. KAPLAN:  The retention was at the time of the

17      acquisition, Your Honor.

18             THE COURT:  Excuse me.  The way it works is that

19      I'm talking to the witness.

20             MR. KAPLAN:  I'm sorry, Your Honor.

21             THE COURT:  If I wanted to ask you, I would ask

22      you, all right?  Thank you.

23             When the -- you were at Neuberger Berman at the

24      time that it went public, right?

25             THE WITNESS:  Yes, Your Honor.

Page 227

```
 1              THE COURT:  And then the retention bonus program

 2    was in August of 2003 and that was on the eve of the move to

 3    Lehman Brothers?

 4              THE WITNESS:  It was -- if I recall correctly,

 5    Your Honor, I think the deal was announced in July of

 6    2003 --

 7              THE COURT:  All right.

 8              THE WITNESS:  -- so I was one of the people

 9    receiving --

10              THE COURT:  And then prior to that when the firm

11    went public, the firm imposed a restrictive covenant on you,

12    prior to the firm --

13              THE WITNESS:  Because I had received some stock;

14    yes, Your Honor.

15              THE COURT:  All right, thank you.

16    BY MR. MILLER:

17    Q   In retrospect, it was certainly the right decision for

18    you to stay with Neuberger Berman, wasn't it?

19    A   Yes, sir.

20              MR. MILLER:  No further questions.

21              THE COURT:  Okay.

22              Mr. Kaplan, any redirect?

23    REDIRECT EXAMINATION

24    BY MR. KAPLAN:

25    Q   Mr. Ramallo, if the retention -- all things being
```

Page 228

1    equal -- if the retention bonus had been one dollar, would

2    you have signed the retention agreement and stayed with

3    Neuberger Berman?

4    A    Yes, sir;  I would have paid Neuberger Berman the

5    dollar to stay with Neuberger Berman at that moment because

6    I was being given, at that moment, what was a life-long

7    pursuit, okay.  So I would have signed the agreement, I just

8    didn't like the fact that I felt I deserved more because of

9    what I was actually doing helping save this line of business

10   from Dick Weismann.  I played a major role -- these clients

11   stayed -- yes, I'm not going to deny, I'm not -- I don't

12   have my head filled -- moving over to the Straus Group with

13   Marvin Schwartz I'm not saying is not a (indiscernible -

14   3:09:47) it does help, but Marvin did not know these people.

15   This is a people business, so the fact that I was their

16   continuity, the fact that I had been dealing with their

17   trials and tribulations for the five years prior and the

18   demise of the Weismann Group, the demise of the tech bubble,

19   okay, because the difference between the Straus Group and

20   the Weismann Group -- the Weismann Group had three years in

21   a row of decline during the tech bubble and the Straus Group

22   only had one year down in 2002.  So we had to boot some

23   disgruntled clients who had some off feelings toward Dick

24   Weismann, but liked me enough, so they were going to give it

25   a little bit more time, but I had to play.  So base that I

Page 229

```
 1    was working 18 to 20 hours a day to try to get this
 2    accomplished, at that moment, based on the economics of the
 3    firm and knowing what I knew about other people, I was a
 4    little dissatisfied with the half-million dollars.  That's
 5    human nature, sir, and that's all it is, but I would have
 6    signed for the one dollar.
 7              MR. KAPLAN:  Nothing further.
 8              THE COURT:  All right.  Thank you very much,
 9    Mr. Ramallo.  I appreciate your testimony and I appreciate
10    your patience in waiting until so late in the second day.
11              THE WITNESS:  Thank you, Your Honor.
12              And thanks to everyone for all their work.  Good
13    luck to everybody.
14              THE COURT:  Thank you, sir.
15              Okay.  What's next?  I would really like to finish
16    up since we are way in -- we are in quadruple overtime.
17              MR. MILLER:  Your Honor, by way of something
18    positive, Ms. Solomon and I are pleased to tell you that
19    we're not going to need to take any more time.
20              THE COURT:  Okay.  You're rewarding my faith in
21    the ability of lawyers to work things out at some level, so
22    that's great.
23              So are we done -- is the evidentiary record now
24    closed?
25              MR. KAPLAN:  As to the Neuberger claimants, yes,
```

Page 230

1    Your Honor.

2              THE COURT:  Okay, as to any of the other

3    claimants?

4              MR. SCHAGER:  Your Honor, I would like to

5    clarify --

6              MR. KAPLAN:  Other than putting into evidence the

7    various --

8              THE COURT:  Other than by your telling me which of

9    the documents are actually to be admitted into evidence,

10   then we're done with the testimony?

11             MR. KAPLAN:  Yes.

12             THE COURT:  Done with the offer of declarations?

13             Thank you, folks.  Thank you very much.

14             Okay.  Then do you want to, at the outset

15   tomorrow, give me your -- put on the record what the

16   documents are that you want to officially be part of the

17   record?

18             MR. KAPLAN:  Yes, Your Honor.

19             THE COURT:  Now, this has developed in a way that

20   was frankly a little not what I anticipated.  And I know

21   that the procedures didn't contemplate it, but we've had a

22   much more voluminous factual record than the stipulation

23   promised.

24             We went into this -- my expectation was we were

25   going to have three hours, so now we've had -- I've lost

Page 231

1    count -- but eight hours, or nine hours.  And what that

2    means is that in order for me to do what I have to do, I

3    have to make factual findings, so I'm going to need from

4    each of you post-trial submissions that have factual

5    findings that you believe are appropriate to make.  You have

6    to tell me what it is that you think that you have proved

7    that supports the relief that you've requested.

8              Had I known, going in, that this would turn into a

9    two-day evidentiary hearing, as opposed to a three-hour

10   evidentiary hearing -- less than three hours, because that

11   original three hours included the arguments of counsel.  So

12   this is not at all -- this was not as advertised.  In a case

13   where we're talking about things that were not as

14   advertised, this hearing was not as advertised.

15             So you might feel like I let you do this -- I did,

16   and the reason that I did it and because they're out of the

17   room now was because there was no way that I was not going

18   to let these people feel that they had an opportunity to be

19   heard.  But you folks completely, completely did not

20   appropriately handle your end of the stipulation, completely

21   inappropriately, and I am perturbed, because I don't want

22   things this way.  I run a tight ship and in order to afford

23   these people their due process rights, I was forced to

24   depart from my gold standard and I am really not happy about

25   it.

```
 1              And in order to give them their due and write a

 2     proper opinion in an appropriate period of time, because

 3     they obviously feel that they've been delayed for an

 4     inappropriate reason and I will tell you straight out that I

 5     have a significant backlog at that point and I'm not going

 6     to get to this.  If I get to this in June I'll be lucky and

 7     you can consult the docket and you can see for yourself what

 8     it is that I have, by way of a backlog.  I pride myself in

 9     four years on the bench, I have never had a backlog, but

10     right now I have just come off of five weeks of trial in

11     another matter.  Those people are waiting for work and these

12     people are just going to have to wait for work.

13              Now, I know and you know that there's not another

14     Lehman distribution for awhile, so that, in terms of

15     dollars, it doesn't matter.  In terms of their emotional

16     cost, it matters because they feel like they've waited a

17     long time.  So, therefore, even though it's outside the

18     stipulation, I'm going to ask that you prepare findings of

19     fact and post-trial conclusions of law because you need to

20     tell me what it is that you think that you've proved that

21     supports the relief that you've requested.  And you can,

22     among yourselves, decide what the timing is on that, and

23     having told you that I can't get to this any time soon, I'm

24     not looking to, you know, impose tight time frames.  I know

25     that Passover and Easter and the holidays and spring break
```

Page 233

1    and the like holidays are coming up.  So I put that on you

2    to think about it and to make a proposal tomorrow in terms

3    of the timing for those submissions and I would like to hear

4    what it is that we're going to do tomorrow and for how long

5    with precision so I can plan my day.

6            How long do you want tomorrow for closing?

7            MR. MILLER:  Your Honor, Ralph Miller again.

8            We've really been trying to follow the order, we

9    believe, Your Honor, and we were allowed an hour for our

10   closing.

11           THE COURT:  Okay.

12           MR. MILLER:  And you had indicated that you would

13   like to have it be a question and answer question.  We

14   certainly support that.

15           THE COURT:  Okay.

16           MR. MILLER:  We think that would be helpful.  We

17   don't know how long the question and answer might take --

18           THE COURT:  Right.

19           MR. MILLER:  -- but as far as my closing is

20   concerned, certainly an hour would be sufficient.

21           THE COURT:  Okay.

22           MR. MILLER:  And what we will try to do, Your

23   Honor, is we are going to try and go through the points --

24   we're not going to repeat the opening, but go through the

25   points that have come up and try to explain why.  Frankly,

Page 234

1   we still believe the stipulation has the answers to the

2   questions, but why we believe there are a lot of digressions

3   and other with issues and why we think they are digressions.

4           THE COURT:  That would be very helpful, okay.

5           All right.  And on this side of the room,

6   collectively, how much time?  Or do you not have any

7   understanding of how much time?

8           MR. SCHAGER:  Your Honor, I'm going to give a one-

9   sentence background and one-sentence request, and that is

10  that effectively you're hearing more than one case now

11  unfortunately and that's more clear than it was at the

12  outset because you've got Dover factors in front of you.

13          THE COURT:  But that was -- that's the part that's

14  baffling to me because the very premise of this entire

15  elaborate procedure was because Judge Peck said that each of

16  the types of claimants and claimants should have the

17  opportunity to take -- to demonstrate why they don't fit

18  within Enron.  So, from the get-go, it was clear that there

19  were different cases.

20          So I don't -- I viewed that as what the task was

21  coming in and I don't think that it's changed and I,

22  frankly, have not heard anything that very much

23  distinguishes any of the claimants.  You know, there's the

24  Neuberger Berman and there's the non-Neuberger Berman and

25  that I have not heard -- and you can tell me if you think

Page 235

1    that one group versus another -- there's a dispositive

2    factual difference that should, you know, push the ruling in

3    one way or the other.

4              And it's not -- you know, some of the witnesses, I

5    think -- or somebody alluded to the fact that there's a

6    conflict because one counsel is representing multiple

7    different types of claimants.  This is not a zero-sum gain.

8    If one group of claimants prevails and is not subordinated,

9    that doesn't mean that another group can't.  I mean the math

10   here is that if any of these claimants are not subordinated

11   and go up into the pool of general unsecured creditors, then

12   they get factored into that distribution, and given the

13   numbers here, it would affect the percentage distribution in

14   an infinitesimally small amount.

15             So, I mean you are free to argue however you want,

16   with respect to the claimants you represent, all right?

17             MR. SCHAGER:  I apologize, Your Honor, if I

18   misspoke.  Certainly there are two basic cases because

19   there's a variation in the Neuberger Berman claim.

20             THE COURT:  Right.  And then there's the RSU

21   versus the CSA.

22             MR. SCHAGER:  We all considered conflicts among

23   CSAs and RSUs and commission-based people.  We did not feel

24   that we had conflicts to address there.

25             Maybe it would be more accurate to say that you've

Page 236

```
1    got four different cases because you've got four different

2    groups of Plaintiffs and you've got four different lawyers,

3    which, of course, leads to five or six different theories in

4    the case or approaches to litigating the case.

5            You refer to our game plan, Your Honor, and I was

6    very sensitive to that because we do have a game plan -- we

7    did have a game plan, and part of our game plan -- this is

8    getting back to how much time we need tomorrow -- part of

9    our game plan was that I would not speak on opening which

10   was a huge disadvantage because I didn't have a chance to

11   introduce the Court to where the witnesses were going and I

12   was the one who wanted to call witnesses.

13           I think I will need an hour tomorrow to wrap

14   things up myself and I have three other law firms, all of

15   whom participated in the opening, who probably need another

16   half hour or more.  So I'm suggesting, Your Honor, that we

17   have an hour and a half tomorrow.

18           THE COURT:  Well, did these folks agree?

19           MR. SCHAGER:  Well, we're here, Your Honor.  We

20   haven't had a chance to discuss it.

21           MR. KAPLAN:  Judge, I --

22           MR. SCHAGER:  Let me qualify that --

23           THE COURT:  Mr. Kaplan, how long do you need?

24           MR. KAPLAN:  I said I needed, when we were

25   planning this, 15 minutes, subject to the questions that
```

Page 237

1    Your Honor might ask.

2              THE COURT:  Okay, 15 minutes --

3              MR. KAPLAN:  Fifteen minutes is fine.

4              THE COURT:  -- subject to my questions.

5              And, Ms. Solomon?

6              MS. SOLOMON:  I will need 15 minutes, subject to

7    the questions of Your Honor.

8              THE COURT:  Fine, all right.

9              So, then, Mr. Schager -- yes?

10             UNIDENTIFIED SPEAKER:  Your Honor, James Boyagen

11   (ph) would like to request ten minutes.

12             THE COURT:  Okay.  Ten minutes.

13             So why is that, Mr. Schager, you need an hour if

14   these folks all need 15 minutes?  Why do you need an hour?

15             MR. SCHAGER:  Because we're saying different

16   things, Your Honor.

17             THE COURT:  I understand that.  But they didn't

18   say --

19             MR. SCHAGER:  And for one thing, I think if

20   Mr. Miller is requesting an hour and I didn't say a word --

21             THE COURT:  Mr. Miller has to address everything

22   that each of your group says, so 15 minutes and 15 minutes

23   and 10 minutes and you can have half an hour.  That means an

24   hour and ten minutes on one side and an hour on the other

25   side -- a half an hour, subject to my questions, net of my

Page 238

1    questions.

2            MR. SCHAGER:  If that's the Court's order, Your

3    Honor, then --

4            THE COURT:  I think that it's more than adequate.

5    We have gone on for two whole days when the entire case of

6    the claimants, by agreement, a stipulation that you were the

7    architect of, called for three hours.

8            I will take the risk on appeal if the decision is

9    not in your favor that you will convince an appellate court

10   that you were denied your due process.  I think half an hour

11   is more than generous, net of my questions, all right?

12           So if you would please endeavor to curtail your

13   hour-long presentation to half an hour, I would appreciate

14   it, all right?

15           MR. SCHAGER:  I'll act in accordance with the

16   Court's order, Your Honor.

17           THE COURT:  Okay, thank you.

18           Mr. Miller?

19           MR. MILLER:  Yes, Your Honor.

20           I regret to bring up an unpleasant subject, but

21   Mr. Carriger (ph) yesterday reserved ten minutes for

22   himself.  He's not --

23           MR. KAPLAN:  He e-mailed this morning and

24   withdrew.

25           THE COURT:  And he withdrew.

Page 239

1              MR. MILLER:  Okay, great.

2              THE COURT:  So we're at ten minutes, fifteen

3     minutes, fifteen minutes, and a half an hour.

4              MR. MILLER:  All right.  Your Honor, my only

5     question is:  I wonder if there's any chance, since I have

6     no idea and I believe they have no idea what is going to be

7     said in all of this period of time, if I might take ten

8     minutes of my one hour and hold it in rebuttal?

9              THE COURT:  Yes.

10             MR. MILLER:  So I will take 50 minutes of closing

11    and then hold ten minutes of my one hour --

12             THE COURT:  Right.  And all net of any --

13             MR. MILLER:  -- and not having any net increase in

14    time, but be able to perhaps --

15             THE COURT:  Right.  But -- and all net of

16    questioning that I ask, which I will try to keep to a

17    minimum.

18             MR. MILLER:  Yes, sir.

19             THE COURT:  All right.

20             MR. KAPLAN:  So tomorrow is deal with the

21    exhibits --

22             THE COURT:  Yes.

23             MR. KAPLAN:  -- and then submissions?

24             THE COURT:  Right.

25             But deal with the exhibits in the since of that

Page 240

1    takes five minutes because you're just going to tell me what

2    it is that you are moving admission into the record of the

3    trial, okay?

4              MR. KAPLAN:  Yes.

5              THE COURT:  Okay?

6              MR. MILLER:  Yes.

7              THE COURT:  Thank you very much.  Get some rest.

8              Please, also, if you have a chance, work out the

9    schedule for post-trial submissions, all right.  There are

10   different options, you all know this.  They can be

11   simultaneous or they can be responsive.  One side can go

12   first and the other side can reply.

13             I will defer to however you folks want to proceed.

14   If you can't agree, we can talk about it tomorrow, okay?

15   Okay, thank you.

16   (Proceedings concluded at 5:00 PM)

17                           *  *  *  *  *

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                 W I T N E S S E S

4   WITNESS                 BY                  PAGE

5   ANDREA JAO              MS. JAO                7

6   PAUL SHOTTON            MR. SHOTTON           29

7                           MR. MILLER            55

8                           MR. SHOTTON           69

9   STEPHANIE STIEFEL       MR. KAPLAN            86

10                          MR. MILLER           104

11  KAREN SIMON KRIEGER     MR. SCHRAGER         141

12                          MR. MILLER           175

13  HENRY RAMOLLO           MR. KAPLAN           192

14                          MR. MILLER           209

15                          MR. KAPLAN           227

16

17

18

19

20

21

22

23

24

25

Page 242

```
 1              C E R T I F I C A T I O N S

 2    I, Dawn South, certify that the foregoing transcript is a

 3    true and accurate record of the proceedings.

 4
```

Dawn South  Digitally signed by Dawn South
DN: cn=Dawn South, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.07.24 17:00:33 -04'00'

```
 5

 6

 7    AAERT Certified Electronic Transcriber CET**D-408

 8     I, Sheila G. Orms, certify that the foregoing is a correct

 9    transcript from the official electronic sound recording of

10    the proceedings in the above-entitled matter.

11
```

Sheila  Digitally signed by Sheila Orms
Orms   DN: cn=Sheila Orms, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.07.24 17:01:08 -04'00'

```
12

13

      Signature of Approved Transcriber

14

      I, William Garling, certify that the foregoing transcript is

15

      a true and accurate record of the proceedings.

16
```

William  Digitally signed by William
Garling   Garling
DN: cn=William Garling, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.07.24 17:01:49 -04'00'

```
17

18

19

20    Veritext

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25
```