Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - x

4   In Re:                          CHAPTER 11

5   LEHMAN BROTHERS HOLDINGS, INC.,    CASE NO. 08-13555(SCC)

6   ET AL,                          (Jointly Administered)

7             Debtors.

8   - - - - - - - - - - - - - - - - x

9   In Re:

10   LEHMAN BROTHERS, INC.,          CASE NO.

11             Debtor.             08-08-1420(SCC)(SIPA)

12   - - - - - - - - - - - - - - - - x

13                     U.S. Bankruptcy Court

14                     One Bowling Green

15                     New York, New York

16

17                     June 19, 2014

18                     10:06 AM

19

20   B E F O R E :

21   HON. SHELLY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - MARIA R. and FRANCES FERGUSON

Page 2

1    HEARING Re Trustee's Motion for an Order pursuant to

2    Sections 105(a), 502(a), 502(c) and 726 of the Bankruptcy

3    Code and Bankruptcy Rule 3009 (I) Establishing a final

4    reserve for secured, administrative and priority claims,

5    (II) Allowing certain secured, administrative and priority

6    claims, (III) Authorizing the trustee to satisfy allowed

7    secured, administrative and priority claims, and related

8    relief (LBI ECF No. 8885)

9

10   HEARING Re Fifteenth Application of Hughes Hubbard & Reed

11   LLP for allowance of interim compensation for services

12   rendered and reimbursement of actual and necessary expenses

13   incurred from December 1, 2013 through March 31, 2014 (LBI

14   ECF No. 9004)

15

16   HEARING Re Joint notice of presentment of Seventh amended

17   order pursuant to Section 78eee(b)(5) of SIPA, Sections 105,

18   330 and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a)

19   and Local Bankruptcy Rule 2016-1 establishing procedures

20   governing interim monthly compensation of trustee and Hughes

21   Hubbard & Reed LLP (LBI ECF No. 9003)

22

23

24

25

Page 3

1    HEARING Re Trustee's Two Hundred Tenth Omnibus Objection to

2    general creditor claims (no liability claims) (LBI ECF No.

3    8284)

4

5    HEARING Re Motion for alternative dispute resolution

6    procedures order for indemnification claims of the debtors

7    against mortgage loan sellers (ECF No. 44450)

8

9    HEARING Re Two Hundred Fifth-Fourth Omnibus Objection to

10   Claims (ECF No. 25059)

11

12   HEARING Re Stonehill's Motion to re-file proofs of claim to

13   fix previously unliquidated claim amounts or alternatively

14   for leave to file amended claims (ECF No. 43988)

15

16   HEARING Re Plan administrator's objection to proof of claim

17   No. 33514 filed by Frank Tolin, Jr. (ECF No. 37839)

18

19   HEARING Re Lehman Brothers Special Financing, Inc. v Federal

20   Home Loan Bank of Cincinnati (Adversary proceeding No. 13-

21   01330), Pre-Trial conference

22

23

24

25   TRANSCRIPTIONISTS:  SHEILA ORMS AND SHERRI BREACH

1    A P P E A R A N C E S:

2

3    DECHERT LLP

4         Attorneys for (Unknown)

5         1095 Avenue of the Americas

6         New York, NY   10036

7

8    BY:  ALLAN S. BRILLIANT, ESQ.

9         SHMUEL VASER, ESQ.

10

11   LAW OFFICES OF

12        Attorneys for Heidi Steiger, Steiger Associates

13        51 East 42nd Street

14        11th Floor

15        New York, NY   10017

16

17   BY:  DONALD E. WATNICK, ESQ.

18

19   JONES & KELLER

20        Attorneys for LBHI

21        1999 Broadway

22        Suite 3150

23        Denver, CO   80202

24

25   BY:  MICHAEL A. ROLLIN, ESQ.

1    WEIL, GOTSHAL & MANGES, LLP

2         Attorneys for LBHI

3         767 Fifth Avenue

4         New York, NY  10153

5

6    BY:  GARRETT A. FAIL, ESQ.

7

8    WEIL, GOTSHAL & MANGES, LLP

9         Attorneys for LBHI

10         1300 Eye Street, N.W.

11         Suite 800

12         Washington, D.C.  20005

13

14    BY:  RALPH I. MILLER, ESQ.

15

16    PROSKAUER ROSE LLP

17         Attorneys for Federal Home Loan Bank of Cincinnati

18         Eleven Times Square

19         New York, NY  10036

20

21    BY:  MARTIN J. BIENENSTOCK, ESQ.

22         STEVE RATNER, ESQ.

23         PHIL ABELSON, ESQ.

24

25

Page 6

1   JONES DAY

2        Attorneys for Debtors

3        222 East 41st Street

4        New York, NY   10017

5

6   BY:  JAYANT W. TAMBE, ESQ.

7

8   SECURITIES INVESTOR PROTECTION CORPORATION

9        805 15th Str., N.W.

10       Suite 800

11       Washington, D.C.   20005

12

13  BY:  KENNETH J. CAPUTO, ESQ.

14

15  HUGHES HUBBARD

16       Attorneys for SIPA Trustee

17       One Battery Park Plaza

18       New York, NY   10004

19

20  BY:  JEFFREY S. MARGOLIN, ESQ.

21       CHRISTOPHER GARTMAN, ESQ.

22       JASON C. BENTON, ESQ.

23       JAMES B. KOBAK, JR., ESQ.

24

25

Page 7

 1   MILBANK, TWEED, HADLEY & MCCLOY, LLP

 2        Attorneys for (Unknown)

 3        One Chase Manhattan Plaza

 4        New York, NY  10005

 5

 6   BY:  GERARD UZZI, ESQ.

 7

 8   WEINER BRODSKY KIDER, P.C.

 9        Attorneys for (Unknown)

10

11   BY:  TESSA K. SOMERS, ESQ.

12

13   WOLLMUTH MAHER & DEUTSCH LLP

14        Attorneys for LBHI

15        500 Fifth Avenue

16        New York, NY  10110

17

18   BY:  PAUL R. DEFILIPPO, ESQ.

19

20   WOLLMUTH MAHER & DEUTSCH LLP

21        Special Counsel for LBHI

22        One Gateway Center

23        Newark, NY  07102

24

25   BY:  JAMES N. LAWLOR, ESQ.

Page 8

1   SHER TREMONTE, LLP

2        Attorneys for (Unknown)

3        80 Broad Street

4        Suite 1301

5        New York, NY  10004

6

7   BY:  JUSTIN M. SHER, ESQ.

8

9   SIMPSON THACHER & BARTLETT, LP

10        Attorneys for (Unknown)

11        425 Lexington Avenue

12        New York, NY  10017

13

14   BY:  ISAAC RETHY, ESQ.

15        DAVID J. WOLL, ESQ.

16

17   SPIZZ COHEN & SERCHUK, P.C.

18        Attorneys for Security National Mortgage Co.

19        425 Park Avenue

20        New York, NY  10022

21

22   BY:  ARTHUR GOLDSTEIN, ESQ.

23

24

25

Page 9

1  GIBBONS, P.C.

2        Attorneys for (Unknown)

3        One Pennsylvania Plaza

4        37th Floor

5        New York, NY  10119

6

7  BY:  DANIEL F. MARKHAM, ESQ.

8

9  ALSO PRESENT:

10

11  FRANK TOLIN, PRO SE

12

13  TELEPHONIC APPEARANCES:

14  GABRIEL GLAZER, PACHULSKI STANG ZIEHL & JONES

15  RAJ V. IYER, CANYON PARTNERS

16  HANNA MORIKAMI, NOMURA SECURITIES

17  AUSTIN SAYPOL, SILVERPOINT CAPITAL LP

18  HAROLD KIM, BLACKSTONE

19  JASON B. SANJANA, REORG RESEARCH

20  MATTHEW UNDERWOOD, HBK CAPITAL

21

22

23

24

25

Page 10

```
 1                    P R O C E E D I N G S

 2              THE COURT:  How is everyone today?

 3              MULTIPLE RESPONDERS:  Good.

 4              THE COURT:  Good.  All right.  Who would like to

 5      start?

 6              Good morning.

 7              MR. BENTON:  Good morning, Your Honor, Jason

 8      Benton from Hughes, Hubbard & Reed, Counsel for the LBI

 9      Trustee.  Mr. Ken Caputo from SIPC is also here today.

10              THE COURT:  Okay.

11              MR. BENTON:  Today, Your Honor, there are three

12      items on the agenda, which we plan to take in order if

13      that's okay with the Court.

14              THE COURT:  That would be the nice.

15              MR. BENTON:  The first item is the priority and

16      secured motion.

17              THE COURT:  Right.

18              MR. BENTON:  The second is the motion related to

19      certain fee matters.  And the third is the trustee's 210th

20      omnibus objection to the general creditor claims of the

21      Credencial parties.  Although, after the stipulation you

22      entered yesterday, that will actually just be to the -- to

23      Credencial.

24              THE COURT:  Hold on one second.  Okay.  I have the

25      fee application and also the interim comp motion.
```

Page 11

1                MR. BENTON:  That's correct.

2                THE COURT:  Right.  And then we have the

3    Credencial, right?

4                MR. BENTON:  Yes, Your Honor, I guess I kind --

5                THE COURT:  Four.

6                MR. BENTON:  -- of smushed (ph) the fee matters

7    together.

8                THE COURT:  Okay.  So we have four.

9                MR. BENTON:  Yes.

10               THE COURT:  Unsmushing.

11               MR. BENTON:  I will, to not do it again.

12               THE COURT:  Okay.  All right.

13               MR. BENTON:  Your Honor, I'll be addressing the

14   first item on the agenda.

15               THE COURT:  Okay.

16               MR. BENTON:  Which is the priority and secured

17   motion.

18               THE COURT:  All right.

19               MR. BENTON:  In that motion, we are asking this

20   Court to enter the trustee's motion for an order that sets

21   reserves and capped claim amounts for secured and priority

22   claimants, to allow a certain of those secured and priority

23   claims and to authorize the trustee to distribute, to allow

24   secured and priority claimants.

25               With Your Honor's indulgence, I would like to give

Page 12

1    a very short bit of historical context --

2            THE COURT:  Sure.

3            MR. BENTON:  -- on this motion.

4            Your Honor, with this Court's help over the years

5    and with the help and oversight of SIPC, the trustee has

6    been able to make significant historic achievements in this

7    case.

8            In the first months of the liquidation in 2008,

9    the trustee successfully transferred 110,000 accounts,

10   allowing former LBI customers access to over $92 billion in

11   assets.

12           Subsequently, we achieved major settlements with

13   some of the major affiliates, including specifically LBHI

14   and Lehman Brothers International Europe, and this enabled

15   us to ensure that we could pay the customer claimants in the

16   SIPA liquidation at a hundred percent.

17           And while that was going on, more than a year ago,

18   it became clear that customers would receive a hundred

19   percent on their claims, we begin to focus on reconciling

20   all the thousands and thousands of general creditor claims

21   that had also been asserted against the estate.

22           In that regard, there have been more than 13,400

23   general creditor claims, including reclassified customer

24   claims and administratively split claims.

25           To date, we've filed more than 240 omnibus

Page 13

1    objections to those claims, as well as numerous one-off

2    objections.  Overall the trustee has resolved more than

3    11,800 claims by orders, settlement, withdrawal or

4    otherwise, and as Your Honor is aware, just yesterday, there

5    were additional I think 200 claims resolved by court order.

6              And we're continuing to work all day and sometimes

7    every day to continue to get those claims resolved and

8    reconciled as quickly as possible.

9              Your Honor, there is still a thousand or more than

10   a thousand remaining claimants.  And some of those claims

11   are going to have to be litigated in front of this court, or

12   in the current process of being litigated, such as the

13   Credencial matter that we'll be addressing later today.

14             Resolving these claims is going to take time,

15   despite every effort by both the claimants and the trustee

16   and its professionals.  At the same time, the trustee has

17   also been able to achieve something extraordinary, and

18   frankly something that I don't think was anticipated at the

19   beginning of the case, a significant general estate.

20             Simply put, we have billions of dollars available

21   to get out, and we want to be able to do that.  But, of

22   course, we also have to protect the disputed and unresolved

23   claimants.  And I should mention, Your Honor, also that per

24   the order you also entered yesterday, there will be more

25   than a billion more dollars coming in, as part of the

Page 14

1   allocation of PFI.

2           So we believe it's time to start making

3   distributions.  First, to the priority and allowed claims,

4   and then as we mentioned in our papers on this priority and

5   secured motion, we plan --

6           THE COURT:  You mean priority and administrative.

7           MR. BENTON:  Priority, administrative and secured

8   motion.

9           THE COURT:  Okay.

10          MR. BENTON:  That we plan in the next days to file

11  a similar motion with respect to unsecured claims, and

12  subject to Your Honor's convenience and schedule, we hope to

13  have that heard on July 30th, so that we can actually start

14  making distributions on an interim basis to general

15  unsecured creditors.  Therefore, that's why we're presenting

16  the motion today.

17          Excuse me.  The security and priority and

18  administrative motion has two primary aims.  As I said, it's

19  to get money out --

20          THE COURT:  Right.

21          MR. BENTON:  -- to creditors, and also to protect

22  creditors.  It does that by first establishing reserves, and

23  also capping the amount of those reserves and allowing them

24  more amendments as of this date, after everyone's had a

25  chance to be heard, so that we can understand, okay, here's

Page 15

1    the entire universe of possible priority and administrative

2    claims up with respect to administrative claims up through

3    August 31st, the bar date date.

4              THE COURT:  Right.

5              MR. BENTON:  Understand how much we have to pay,

6    and then begin paying out.

7              THE COURT:  What's the mechanisms for making sure

8    that there will be sufficient funds for the administrative

9    claims that are not subject to the bar date?

10             MR. BENTON:  Well, Your Honor, as we set forth in

11   the motion, and I hope I have the exact number right, it is

12   a very big number, we have set aside 850 million --

13             THE COURT:  850 million.

14             MR. BENTON:  -- for those costs, the cost of the

15   trustee's professionals.

16             THE COURT:  That's the -- and that's as large as

17   it is, that's a conservative number?

18             MR. BENTON:  Yes, Your Honor, we do believe that

19   it is a conservative number, in the sense that it certainly

20   protects the ability of the estate to be able to pay all

21   ultimate and allowed and priority and secured, and will --

22   I'm not sure what the exact percentage was, it's subject to

23   so many contingencies --

24             THE COURT:  Right.

25             MR. BENTON:  -- but there will be money available

Page 16

1    to pay --

2              THE COURT:  All right.  And does that --

3              MR. BENTON:  -- unsecured creditors.

4              THE COURT:  -- number -- so that number covers the

5    Hughes Hubbard firm and other professionals as well,

6    correct?

7              MR. BENTON:  Yes, that's true, Your Honor, yes.

8              THE COURT:  So it actually is many years of

9    professional fees that it covers?

10             MR. BENTON:  Yes.  It's intended to cover the

11   possibility that there would be many years of litigation of

12   further professional fees --

13             THE COURT:  Right.

14             MR. BENTON:  -- incurred.  Certainly, Your Honor,

15   it could end up being less.  I mean, that's a possibility.

16             THE COURT:  Right.

17             MR. BENTON:  But what we're trying to do is set

18   aside and reserve that adequately protects us, and

19   ultimately adequately protects the creditors.

20             THE COURT:  Right.  Okay.  All right.

21             MR. BENTON:  And also, Your Honor, I should say

22   because it was a claim that was carved out of the secured

23   and priority motion, was the Barclay's administrative claim.

24             THE COURT:  Right.

25             MR. BENTON:  And I'm pleased to say that the

Page 17

1   parties filed a stipulation with regard to that claim

2   resolving it in a way that will allow us subject to the

3   objections that we have today.  And if the Court enters our

4   motion to proceed with our plan.

5            THE COURT:  Okay.  So I did read everything, and

6   why don't we turn to the IRS.

7            MR. BENTON:  Sure.

8            THE COURT:  Because based on the explanation that

9   I read in your papers, frankly I don't understand why or how

10  the IRS still believes its exposed, it has exposure.

11  Because based on what you've explained, it seems to me that

12  they are dollar-for-dollar covered.

13           MR. BENTON:  Yes, Your Honor, and that is exactly

14  what we are saying.

15           THE COURT:  So is the IRS here?

16           MR. BARNAY:  Yes, Your Honor.

17           THE COURT:  Come on up.

18           It wasn't clear to me -- good morning.

19           MR. BARNAY:  Good morning.  J.D. Barnay (ph) from

20  the U.S. Attorney's office on behalf of the IRS.

21           THE COURT:  How are you?  It wasn't clear to me

22  that your papers acknowledged the existence of the

23  stipulation between LBHI and LBI.

24           MR. BARNAY:  Your Honor, we are aware of those or

25  that stipulation, the IRS is not a beneficiary, a direct

Page 18

1    beneficiary of that agreement, but we understand that there

2    is an agreement, and that it provides that LBHI would

3    indemnify LBI as to any liability it has in a consolidated

4    claim.

5              However, the point of our objection is not that

6    we're -- that there aren't reserves available to protect the

7    IRS, it is that in the unlikely event that those reserves

8    somehow become unavailable, or you know, can't be used, LBI

9    remains jointly and severally liable for its portion of the

10   consolidated claim.

11             It may have indemnity rights against LBHI,

12   pursuant to that agreement.  It may have other abilities to

13   satisfy its obligation --

14             THE COURT:  Okay.

15             MR. BARNAY:  -- but what we're objecting to is the

16   principal here of in the guise of setting reserve amounts,

17   it's essentially trying to disallow and get out of, its

18   acknowledged, unobjected to joint and several liability for

19   the consolidated -- excuse me, for the consolidated portion

20   of the Lehman consolidated group plan.

21             THE COURT:  But is the flip side of what you're

22   saying that therefore we have to double reserve?

23             MR. BARNAY:  No, absolutely not.  And, Your Honor,

24   in --

25             THE COURT:  Okay.

1          MR. BARNAY:  -- the papers that LBI submitted,

2     they referenced an agreement that the IRS has already

3     entered into with all the other sort of Lehman group

4     members, where we agreed for a sole -- single reserve that

5     LBHI is maintaining and we have already agreed with -- and

6     we've told LBI this many times, that we would agree for them

7     to not set a reserve for the IRS' claim.

8          Our only point is, okay, they don't need to set a

9     reserve, they can start making distributions, but that does

10    not absolve them from unobjected to joint and several

11    liability on a consolidated claim.

12         The likelihood that the IRS would ever have to go

13    to them, given that the IRS already has cash on hand that it

14    may try to use as set-off rights, and that LBHI has a

15    reserve is very low, which is why we don't believe that they

16    need to make a reserve.

17         THE COURT:  So you have to help me out, because

18    are we in agreement or are we not in agreement?

19         MR. BARNAY:  Your Honor --

20         THE COURT:  I don't -- I mean, I hear the words,

21    but I don't understand given that why we don't -- why

22    there's a dispute still here.

23         MR. BARNAY:  Your Honor, we've told LBI this many

24    times, and we're agreeing to them to not set a reserve for

25    us and to make distributions.  They insist on having their

Page 20

1   joint and several liability expunged through this reserve

2   motion which we just belief is improper and has no legal

3   basis.

4           THE COURT:  Okay.  And with respect to LBI also

5   indicates that they will acknowledge the set-off.

6           MR. BARNAY:  Right.  There's two set-offs.

7   There's sort of like --

8           THE COURT:  Right.

9           MR. BARNAY:  -- a non-consolidated set-off --

10          THE COURT:  Right.

11          MR. BARNAY:  -- which their reply completely takes

12  care of.

13          THE COURT:  Right.

14          MR. BARNAY:  With respect to the consolidated set-

15  off, LBI has said that it would agree to the set-off, but

16  that still leaves the possibility that LBHI or any of the

17  other Lehman entities would object to that set-off, so

18  there's still a contingency there as to whether we're going

19  to be able to use that set-off at the end of the day.

20          THE COURT:  Okay.  So I still need help because I

21  still don't understand why we don't have an agreement here.

22          MR. BENTON:  Your Honor, I don't know if you can

23  hear me.

24          THE COURT:  I can.  Do you want release of the

25  joint and several liability?

1          MR. BENTON:  Well, no, Your Honor, that's what --

2    of course, we would love that --

3          THE COURT:  Yeah.

4          MR. BENTON:  -- but that's -- I mean that's not

5    what we -- in fact, in our papers we recognize it that under

6    the Code, we do have joint and several liability --

7          THE COURT:  Right.

8          MR. BENTON:  -- to consolidation a portion.

9          What we are saying is in response is two things.

10   The IRS, which they didn't say in their papers, but has said

11   just now that they would've allowed us to reserve --

12         THE COURT:  Once.

13         MR. BENTON:  -- right.  Well, they reserved once

14   already --

15         THE COURT:  Right.

16         MR. BENTON:  -- at LBHI.

17         THE COURT:  And they're happy with that.

18         MR. BENTON:  Exactly.

19         THE COURT:  And they're not asking for another

20   reserve.

21         MR. BENTON:  Right.  But they are, but they are --

22   their parade of horribles as to why they need to come after

23   us --

24         THE COURT:  Right.

25         MR. BENTON:  -- is they don't want to co-

1   committingly say or to cap the amount of liability that we

2   might have if LBHI doesn't pay them, if LBHI can't come

3   through with indemnity.

4            THE COURT:  Well, let's take an end of the world

5   scenario, right.  So we get to the end of the world, and the

6   reserve disappears, right, and then they say, look, we --

7   they hold up the piece of paper that says joint and several

8   liability and they turn to you, and you say, sorry, I gave

9   out all the money to everybody else.

10           MR. BENTON:  Well, Your Honor, they've been

11  holding $480 million, I mean, let's not forget, they're not

12  just reserves, they're not just reserved at LBHI for $390

13  million.  They're -- to be clear, they've not asserted a

14  priority claim against us.  They've asserted a secured claim

15  based on $479 million of refunds due to the consolidated

16  group --

17           THE COURT:  Right.

18           MR. BENTON:  -- and so if they turn in that parade

19  of horribles to us, we have not objected, we're not going to

20  object to their right to use that as a set-off.  They have

21  $480 million in the bank.

22           So if we -- if there's a parade of horribles that

23  leads to a potential, where we have to pay out, the

24  principle of the motion is that there is a parade of

25  horribles under any claim, IRS or otherwise, where we

Page 23

```
 1   ultimately might have to pay out dollar-for-dollar, right.

 2   We're going to reserve that amount for the claim.  And if

 3   such a parade of horribles had a basis, in fact, we wouldn't

 4   have to reserve whether or not the IRS agreed we couldn't

 5   reserve or not to zero, we would have to protect, or we

 6   would want to protect the other creditors and our ability to

 7   pay people by reserving $390 million.

 8              But they have a second reserve which is the $480

 9   million in refunds they owe to LBHI and to the consolidated

10   or to the consolidated group.

11              THE COURT:  I'm sorry, now I'm even more confused.

12   So now it is that you don't want to reserve anything at all?

13              MR. BENTON:  Well, we reserved -- we've agreed

14   upon our independent, LBI's independent liability, potential

15   liability with respect to the IRS.

16              THE COURT:  Yes.

17              MR. BENTON:  We will reserve at 2.5 which we put

18   in our papers.

19              THE COURT:  And everyone agrees on that?

20              UNIDENTIFIED:  Yes, that's completely resolved,

21   yes.

22              THE COURT:  So with respect to the 390?

23              MR. BENTON:  Yes.  With respect to the 390, the

24   IRS has two reserves essentially.  The IRS has 479, I might

25   have the number slightly off, but 479 million in refund
```

Page 24

1    money --

2         THE COURT:  Yes.

3         MR. BENTON:  -- they are holding.

4         THE COURT:  Okay.

5         MR. BENTON:  For -- to use as set-off --

6         THE COURT:  Right.

7         MR. BENTON:  -- vis a vis the consolidated group.

8    They also have a dedicated reserve of 390 million, right.

9         THE COURT:  Real money.

10        MR. BENTON:  Real money.

11        THE COURT:  Right.

12        MR. BENTON:  And so what we are asking is to

13   reserve and cap their claim at the 2.5 million, which is the

14   most that we would ever have to pay out to them.

15        THE COURT:  So you are, in effect, asking for

16   release from the joint and several liability, that's -- in

17   other words, you're not -- you are asking for that.  If I

18   don't impose the requirement that you double reserve, so in

19   my end of the world scenario, they could come to you and

20   assert their joint and several liability, and you could say,

21   sorry, we're out of money, and it would be too bad for them.

22        MR. BENTON:  Right.

23        THE COURT:  So that's the place that we should be

24   getting to, is that you maintain, you don't ask for release

25   from the joint and several liability, but you have no

Page 25

1    obligation to reserve another penny beyond the post set-off

2    amount for the unconsolidated liability, and then everybody

3    has what they want.

4              MR. BENTON:  Okay.  Your Honor --

5              THE COURT:  Yes?

6              MR. BENTON:  -- yes, we're willing to accept that.

7              MR. BARNAY:  Yes, Your Honor --

8              THE COURT:  Okay.

9              MR. BARNAY:  -- that's what we've asked for all

10   along.

11             THE COURT:  Okay.  Good.  All right.  So I can

12   leave it to -- leave you to your own devices to put that in

13   writing?

14             MR. BARNAY:  Yes, yes, Your Honor.

15             THE COURT:  Okay.

16             MR. BENTON:  Sure.

17             THE COURT:  Very good, thank you.

18             MR. BARNAY:  Thank you very much.

19             THE COURT:  So then I think we had one more

20   objector, and that was Mr. Peters.

21             MR. BENTON:  Yes, Mr. Peters.  I've spoken to Mr.

22   Peters.  I do believe that he does -- he did not want to

23   withdraw his objection.  I don't believe that he's here

24   today.

25             THE COURT:  Okay.  Let me ask.  Is Mr. Peters, are

Page 26

1    you on the telephone?

2        (No response)

3            THE COURT:  There's not to be.  I did review his

4    objection and for the reasons set forth in the trustee's

5    papers, the objection is overruled.

6            MR. BENTON:  Okay.  Thank you, Your Honor.

7            THE COURT:  All right.

8            MR. BENTON:  And there is one more clean-up item

9    that I'd like to address.  It's really a matter of -- for

10   the avoidance of doubt.  We have a -- one more paragraph

11   that we would like to add to the proposed order.

12           THE COURT:  Okay.

13           MR. BENTON:  Its purpose is just to make clear

14   that where there is a claim that is under priority or

15   secured or administrative schedules that is expunged by

16   final non-appealable order or withdrawn or settled with

17   similar effect, that we can remove it from the reserve

18   amount just to be clear.

19           THE COURT:  Sure.

20           MR. BENTON:  And I had a red line if you like, I

21   can bring up to Your Honor.

22           THE COURT:  That seems fine.

23           Okay.  Mr. Uzzi, did you wish to make a statement?

24   How are you?

25           MR. UZZI:  I'm well, Your Honor, and I don't want

Page 27

1    to take up your time, but I can't resist the opportunity to

2    stand before you.  It is my honor to be standing here.

3             Your Honor, for the record, Gerard Uzzi of Milbank

4    Tweed on behalf of the ad hoc group of LBI creditors.  And

5    in our papers, Your Honor, we hold collectively

6    approximately seven and a half billion dollars' worth of

7    claims against LBI.  We also hold collectively about $40

8    billion worth of claims against LBHI.

9             The significance of that is that one of the major

10   creditors of LBI is also LBHI.  And, Your Honor, we've --

11   let me just first say that we've said in our papers that

12   we've been working with the LBI estate fiduciaries, they've

13   been very cooperative with us and we greatly appreciate it.

14            And I believe it sets an example of how estate

15   fiduciaries should act with the ultimate economic

16   beneficiaries.  And I note that Weil Gotshal is here, and

17   other LBHI estate fiduciaries here too, and I'll say the

18   same thing for them, we greatly appreciate the cooperation.

19            We filed the pleading, Your Honor, I think that

20   the Hughes Hubbard folks in their pleadings, they covered

21   everything.  But the reason for us to file a pleading is

22   we're hopeful that it's helpful to the Court to know that

23   there are real economic beneficiaries out there who are

24   paying attention.  We -- with all the cooperation we have

25   with all the estate fiduciaries, that doesn't mean we always

Page 28

1   agree with them.  And if we didn't agree with them, we would

2   be up here telling you we don't agree with them.  So we

3   think it's important that when we do agree with them, to

4   also indicate to Your Honor that this -- we believe this is

5   important and meaningful relief.

6          We'll also say, just in closing, Your Honor, that

7   we're also very pleased to hear that the trustee is going to

8   be bringing what I'll call the most important motion in this

9   case, which is to make that general -- distributions to

10  general unsecured creditors.

11         We've been working with them, they've kept us

12  informed on that, and we appreciate again their cooperation.

13         THE COURT:  Well, I do appreciate your making the

14  affirmative statement, because I think that folks tend to

15  focus on the fact that it's 2014, and Lehman filed in 2008,

16  and why is this still going on, and why haven't we gotten

17  money.

18         And I think that these statements that have these

19  very large numbers, both in terms of dollars and the numbers

20  of claims that have been resolved, and the numbers of claims

21  that have yet to be resolved, it's very important that those

22  numbers are said out loud, so that the public and the

23  claimants understand just what an amazing process this is,

24  and how much work there is left to be done.  So I do

25  appreciate your filing the statement.

1              MR. UZZI:  Well, Your Honor, thank you for the

2    opportunity to be heard, and again, for the record, we

3    support the motion --

4              THE COURT:  Okay.

5              MR. UZZI:  -- and ask that Your Honor enter the

6    order.

7              THE COURT:  Very good.  So I will wait to get a

8    revised form of order that reflects, I'll say the three

9    things that we've talked about here today.  Okay.  Thank

10   you.

11             Okay.  So that takes us to number two, which is --

12             UNIDENTIFIED:  Your Honor, may I be excused?

13             THE COURT:  Yes, of course.

14             So just on the second item on the agenda is the

15   fee application of the Hughes Hubbard firm for four months.

16             MR. KOBAK:  That's correct, Your Honor.

17             THE COURT:  And just for my edification, SIPC

18   gives its recommendation pursuant to statute.

19             MR. KOBAK:  That's correct.

20             THE COURT:  And we do not hear from the United

21   States Trustee --

22             MR. KOBAK:  That's correct, Your Honor.

23             THE COURT:  -- is that correct?

24             And that will continue notwithstanding the good

25   fact that the customer claims have all been paid and we're

Page 30

1    into general estate.

2              MR. KOBAK:  That is correct.

3              THE COURT:  Okay.

4              MR. KOBAK:  And under the statute under Section

5    5(b), 5(c) of the SIPA statute, as I think Your Honor knows,

6    SIPA's -- SIPC's recommendation is entitled to considerable

7    reliance.  SIPC does support this fee application as it

8    supported the prior ones, and no other party has objected.

9              By the way, for the record, it's James Kobak,

10   Hughes Hubbard & Reed for the SIPC Trustee.

11             This application as Your Honor noted covered a

12   four month period beginning in December of last year through

13   March of this year.  It covers a total of 27,568.3 hours,

14   which include 243.10 hours of the trustee.

15             We also seek total expenses of $181,000 --

16   $181,713.53 and I'll note that in these cases, we do not ask

17   for reimbursement of expenses that we commonly charge to

18   other clients, such as taxi cabs and overnight meals and so

19   forth.

20             In the SIPC -- in this case, as in other SIPC

21   cases, we give a public service discount, so the amount that

22   we seek is really 90 percent of our standard fees.  There's

23   also a holdback of 10 percent, although that will be

24   affected by the second motion that --

25             THE COURT:  Right.

1          MR. KOBAK:  -- Mr. Benton smushed up with this

2     one, but that will unsmush.

3          In addition to the discount, we take a hard look

4     at our fees and expenses, and we wrote off almost $250,000

5     voluntarily.  SIPC which reviews counsel fees and other

6     administrative expenses very carefully then talked to us,

7     and we made further reductions of over $50,000.

8          I think that pages 9 to 23 of our application sets

9     forth the many activities that occurred during this period.

10    I know Your Honor was involved for half of it, and Judge

11    Peck was involved for half of it.  I think Mr. Benton, in

12    his remarks, also noted some of those activities.

13         THE COURT:  Well, also glancing at the summary,

14    Exhibit C is particularly helpful, the summary of project

15    categories.  And it reflects the reality which is that the

16    vast majority of the work is in the category of claims

17    resolution.

18         MR. KOBAK:  Yeah, that's correct.

19         THE COURT:  Which is a very labor --

20         MR. KOBAK:  That's correct.

21         THE COURT:  -- intensive exercise.

22         MR. KOBAK:  That's correct, Your Honor.

23         We also spent significant time reducing securities

24    to cash, which was a complicated process, and was one of the

25    reasons we are able -- have been able to achieve a sizeable

Page 32

1    general estate.

2           THE COURT:  Okay.  Let me ask if anyone wishes to

3    be heard with respect to the application of Hughes Hubbard

4    for approval of its fee application?

5        (No response)

6           THE COURT:  Okay.  So I'm happy to approve the

7    fifteenth application.  Just let me make one public service

8    announcement or a question.  Generally speaking, while a --

9    we love to see the involvement of summer associates, we also

10   do not love to see charges for their time on fee

11   applications.  So I'm just wondering since we're in summer

12   associate season and it's certainly a great opportunity for

13   law students to be involved in a historic case, I'm just

14   wondering if you faced that issue in the past, if Judge Peck

15   or SIPC had a view, just so I'm not surprised in a couple of

16   months.

17          MR. KOBAK:  I don't believe that we had an issue

18   with Judge Peck in that regard.  I think we have -- most of

19   the work is done by regular associates and partners, but

20   certainly some of it is done by summer associates.

21          THE COURT:  So the answer to my question is, yes,

22   you will be charging for the summer associates.

23          MR. KOBAK:  Well, we'll certainly take Your

24   Honor's remarks, maybe it'll be a learning experience for

25   them, Your Honor.

1              THE COURT:  All right.  Just take -- just keep an

2     eye on it.

3              MR. KOBAK:  Yes, I'll keep that in mind.  Thank

4     you.

5              THE COURT:  All right.  So let's move to the

6     interim comp motion.

7              MR. KOBAK:  The second motion is really on

8     presentment.  Again, it's supported by the Securities and

9     Investor Protection Corporation and there's no objection to

10    it.  And it's to revise the seventh or to enter a seventh

11    amended procedural order, which will have the effect of

12    allowing us to recover our holdback, which is a little under

13    a million and a half dollars.

14             THE COURT:  Okay.

15             MR. KOBAK:  There will be a remaining amount of a

16    million dollars.

17             THE COURT:  Okay.  Does anyone wish to be heard

18    with respect to the seventh amended interim compensation

19    order?

20        (No response)

21             THE COURT:  All right.  I'll approve that as well.

22             MR. KOBAK:  Thank you very much, Your Honor, and

23    I'll turn the podium back to Mr. Benton.

24             THE COURT:  Okay.  I guess my -- a question I have

25    for you is whether we should depart from the order of the

Page 34

1    agenda and take the ADR motion before the Credencial matter.

2              MR. BENTON:  I have no problem with that, Your

3    Honor.

4              THE COURT:  Is everyone here who has something to

5    say about the ADR motion?

6              MR. DEFILIPPO:  Debtor is ready, Your Honor.

7              THE COURT:  Why don't we do that.  All right.  If

8    you don't mind.

9              MR. BENTON:  No, of course not.

10             MR. DEFILIPPO:  Your Honor, may I approach?

11             THE COURT:  Yes, sure.

12        (Pause)

13             THE COURT:  How are you?  Sure.

14             MR. DEFILIPPO:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MR. DEFILIPPO:  Paul DeFilippo for LBHI as plan

17   administrator.

18             We are requesting the entry of an order

19   establishing a mandatory but non-binding ADR procedure with

20   respect to indemnification claims, we believe the estate,

21   the debtor holds against approximately 2,500 to 3,000

22   sellers with about 11,000 mortgage loans to the debtors or

23   their affiliates, which were subsequently resold to Fannie

24   Mae and Freddie Mac.

25             Over the last several days, we have attempted to

Page 35

1    resolve the eleven objections to this motion.  We received

2    -- we've entered into stipulations with two of the

3    objectors, PHH and Plaza Mortgage, adjourning their hearing

4    on their objections to a later date.

5              And so I won't be addressing their objections

6    directly.

7              THE COURT:  All right.

8              MR. DEFILIPPO:  Their rights are reserved till the

9    next hearing.

10             THE COURT:  Have there been similar discussions

11   with the other nine in terms of adjournments?

12             MR. DEFILIPPO:  Yes, Your Honor, there have, but

13   we've been unable to reach agreement with the other

14   objectors on adjourning their objections to a later date.

15             So with your permission, we would like to proceed

16   with the motion.

17             THE COURT:  Okay.

18             MR. DEFILIPPO:  As Your Honor knows, Lehman

19   Brothers, like other large financial institutions had a

20   substantial mortgage business.  It acquired individual

21   mortgage loans and resold those mortgages.  It used a

22   purchase agreement, which contained indemnification

23   provisions for losses suffered, as a result of breaches of

24   representations and warranties by the sellers.

25             Lehman monetized the mortgages it acquired

Page 36

```
 1    primarily in one of two ways, it either sold them to a GSE

 2    like Fannie Mae or Freddie Mac, or it sold the mortgages to

 3    RMBS Trust Solution Securities to finance the purchase price

 4    that was used to pay Lehman for the mortgages.

 5            As the mortgages defaulted, losses were suffered

 6    by both the GSEs and the trust.  This gave rise to claims

 7    against Lehman.

 8            Fannie and Freddie claims for about 20 billion,

 9    the trustees of the approximately 405 private label RMBS

10    trusts have filed claims in excess of 30 billion.  The

11    resolution of the GSE's claims occurred in January and

12    February of this year.

13            As a result, Lehman's indemnification claims

14    against the sellers have accrued and are now able to be

15    liquidated for the benefit of Lehman's creditors under the

16    plan.

17            The proposed ADR procedure is the first step which

18    Lehman proposes to use in liquidating those indemnity

19    claims.  That's parenthetically why we believe there are no

20    statute of limitations defenses to these claims as

21    indemnification accrues when payment is made on the

22    indemnified claim.

23            We recognize the sellers may feel differently, but

24    that issue is not before Your Honor today.  In fact, nothing

25    about the merits of the indemnification claims is before the
```

Page 37

1    Court today.

2              One important thing about the Fannie and Freddie

3    settlements, Your Honor, is that in order to achieve those

4    settlements, the GSEs did a deep dive into their loan files

5    and identified thousands of individual loans with breaches

6    and losses, which Lehman was able to review and talk to

7    Fannie and Freddie about if they disagreed.  But Lehman was,

8    in fact, able to satisfy itself that breaches did occur,

9    which gave rise to losses and so was comfortable agreeing to

10   allow Fannie a claim of $2.15 billion and to pay Freddie

11   $767 million for an assignment of all of its claims against

12   the estate.

13             The debtors are now in a position to pursue the

14   sellers of the mortgages to Fannie and Freddie through LBHI

15   for their losses.

16             The next step in the process of claims resolution

17   arising from the mortgage business will be tackling the

18   approximately 30 billion in claims and the trustees.  Those

19   claims involve 15 to 20,000 allegedly defective loans sold

20   to LBHI and resold to the trust.

21             In earlier proceedings in this case, Judge Peck

22   expressed the view that in order to prove their claims, the

23   trustees likely had to show losses on a loan-by-loan basis.

24   So if the trustees' claims are ever to get resolved, we

25   expect that it will be a monumental undertaking and very

Page 38

```
1    time-consuming to engage in that detailed loan-by-loan

2    analysis.

3            So we may be back before the Court at a proper

4    time asking Your Honor to either expand this ADR if you're

5    inclined to grant it, or to establish a new procedure to

6    resolve the amount of the trustees' losses and to add the

7    indemnification claims against the sellers that arise from

8    the payment on those losses to the ADR procedure that we're

9    asking you to establish today.

10            The purpose of giving Your Honor that background

11    is to give you a sense of the magnitude of the challenge

12    facing Lehman, as it attempts to manage the claims arising

13    out of its mortgage business, and the causes of action that

14    accrue in its favor when those claims are finally paid by

15    the estate.

16            It's not often that we encounter a set of claims

17    with thousands of potentially responsible parties on the

18    other side like the ones that arise out of this business.

19    And problems of that magnitude are not suitable for

20    resolution by standard litigation procedures by filing suit,

21    engaging discovery, and going to trial.  It's time

22    consuming, it's expensive.  It burdens the courts.

23            There are other instances where the --

24            THE COURT:  So it's not amenable to a defendant

25    class action?
```

1                    MR. DEFILIPPO:  No, Your Honor.  No, I wish it

2       were, but in other instances when the universe of potential

3       defendants was very large such in the derivatives area --

4                    THE COURT:  Right.

5                    MR. DEFILIPPO:  -- the Court has entered an order

6       establishing an ADR procedure, which included the

7       possibility of mandatory but non-binding arbitration.  And

8       Lehman's prior experience in using those procedures has been

9       very successful, as more than a 2 and a quarter billion has

10      been recovered through ADR procedures.

11                   So hoping to duplicate that success, we are

12      seeking a pre-litigation mandatory ADR program to deal with

13      the indemnification claims against the sellers of the

14      thousands of loans which it has reacquired from the GSEs and

15      which may be augmented by loans which it may reacquire from

16      the RMBS trustees.

17                   The proposed program will have a notice response

18      date, a negotiation period, and if there is no settlement,

19      then the option for a mediation phase, similar to the other

20      ADR programs.

21                   And contrary to some of the objectors'

22      contentions, those programs have been established even when

23      there has been no pending adversary proceeding.  Besides our

24      own derivatives procedure in this case, Judge Glenn ordered

25      mandatory mediation in the Residential Capital case on plan

Page 40

1    issues, Your Honor ordered it in Light Square without a

2    pending adversary proceeding.

3            And we want to assure both the Court and the

4    objectors that the debtors are not interested in wasting

5    time and money mediating claims that have been released.

6    But there are many claims that have not been released, and

7    the debtors have the obligation under the plan to liquidate

8    those claims for the benefit of their creditors.

9            I would note that the standing order allows the

10   Court to let someone out of mediation if Your Honor

11   concludes that the matter is not appropriate for mediation.

12   So individualized objections to mediation are still

13   available, are not being foreclosed by this process.  And if

14   someone doesn't thing they belong in mediation, they're free

15   to come before Your Honor.

16            THE COURT:  That's the part that I -- I mean,

17   there are a number of things that I don't understand about

18   the objections and that was one of them.  That given that

19   there's a mechanism, an escape ballot if you will, I didn't

20   understand why that doesn't suffice.  Secondly, the

21   indication of Stern versus Marshall and not Arkinson

22   continues to amaze.  It's got nothing whatsoever to do with

23   this.  Zero.

24            MR. DEFILIPPO:  Thank you, Your Honor, I can skip

25   much of this presentation.

Page 41

1                    THE COURT:  Please.

2                    MR. DEFILIPPO:  And one of the corollaries --

3                    THE COURT:  I mean, you folks can attempt to

4       convince me that it does if you like, but my view is that it

5       didn't -- when it was just Stern versus Marshall and it

6       super doesn't now that the Supreme Court has weighed in

7       again in Arkinson, so.

8                    MR. DEFILIPPO:  I think it just confuses the

9       Court's power to enter an order in the Chapter 11 case with

10      the Court's power to enter a final judgment in a non-core

11      adversary proceeding.  This is --

12                   THE COURT:  It's got nothing --

13                   MR. DEFILIPPO:  -- part of the administrative of

14      the case.

15                   THE COURT:  Right.

16                   MR. DEFILIPPO:  So this is a contested matter

17      under Rule 9014, and to the extent objectors have argued

18      that Your Honor can't reach them on this motion, Your Honor

19      has nationwide jurisdiction over anyone with minimum

20      contacts with the U.S. in a contested matter.  I don't need

21      to spend a lot of time on that.

22                   We are asking you to do what's been done before in

23      this case, which is we've cited to Your Honor cases that say

24      it's the law of the case.  We believe we've established that

25      the scope of the Court's post confirmation jurisdiction is

Page 42

1    broad enough to allow this order to be entered.

2          The DPH case, the Second Circuit expressly adopted

3    the close nexus test for post-confirmation jurisdiction and

4    found that it existed because resolution of the dispute in

5    that case would impact the implementation, execution, and

6    administration of the confirmed plan.

7          In Allegiance Telecom, Judge Drain exercised

8    jurisdiction over the post-confirmation effort by the plan

9    administrator to recover assets.  There's been a reservation

10   of jurisdiction, a very broad reservation in the plan.

11   8.1.4(b) of the plan in paragraph 79 of the confirmation

12   order reserved the debtors' right to prosecute

13   indemnification claims.

14         Section 6 of the plan -- Article 6 of the plan

15   says in 6.1(b)(3) and (b)(4) that the plan administrator is

16   to liquidate all assets including prosecuting liquidation

17   claims.  8.3, the plan says the plan administrator is to

18   make distributions of available cash semi-annually including

19   cash augmented by post-confirmation recoveries.

20         And Article 14 contains the broad reservation of

21   jurisdiction or for all matters arising under, arising out

22   of, or related to the Chapter 11 cases.

23         This is a liquidating plan and in Eastern Airlines

24   Judge Lifland opined that the scope of post-confirmation

25   jurisdiction and liquidating cases is broader than in a

Page 43

1    reorganized debtors' case, where the debtor operates,

2    expecting that the Court would be involved in post-

3    confirmation efforts to liquidate the assets.  None of the

4    objectors have even mentioned the Eastern case in their

5    objections.  And this motion is the first step in the plan

6    administrator's efforts to liquidate these recently accrued

7    causes of action.

8             The Chris case is helpful from the district court.

9    District Judge Lynch found that the close nexus test was

10   satisfied because the liquidating trust was given power to

11   prosecute the claims that were transferred to it under the

12   plan.  It's virtually indistinguishable from this case.

13            So, Your Honor, Park Avenue Radiologists, the case

14   that one of the objector cites is distinguishable, because

15   the post confirmation debtor was not proposing the share the

16   proceeds of the action with the creditors.  The sources of

17   the Court's power to grant this motion include the standing

18   order, which allows the Court to direct mediation of

19   adversary proceedings, contested matters or other disputes.

20            And in order to give all of the words of that

21   order their proper meaning, Your Honor, you must find that

22   other disputes includes matters that are not the subject of

23   either adversary proceedings or contested matters, like

24   these recently approved claims.

25            In addition, the order is entered in this case and

Page 44

1    other similar proceedings can be relied on by Your Honor,

2    and Section 105 which everyone seems to belittle, but the

3    Court in the Efedra (ph) case actually used to implement a

4    similar type of procedure.

5          Some of the sellers contend forcing them to

6    mediate violates due process, but they confuse arbitration

7    with mediation.  And if you look at the Woods case from the

8    Fifth Circuit, which we cited in our response, that and many

9    other cases like it hold that the power to mediate, that the

10   power to direct mediation does not infringe on due process

11   rights, while the power to arbitrate, the power to direct

12   arbitration may, but there's a meaningful distinction

13   between non-binding mediation and arbitration.

14         We agree, you can't force someone to arbitrate,

15   but you can force them to mediate.  Nothing that can happen

16   in the mediation to any of the sellers, that they did not

17   consent to happen, other than having to mediate can take

18   place.  And as you noted, they can get out.

19         They'll get all the information they need to allow

20   them to respond to our claims when we file the first notice.

21   And I'm baffled by the argument that we have to sue them

22   before you can direct them to mediate.  Nobody has cited a

23   case in support of that proposition, and they disregard the

24   three words, "or other disputes" in the standing order,

25   which I just mentioned.

Page 45

1                    So if Your Honor is --

2                    THE COURT:  Why don't I hear from some of the

3         objectors.

4                    MR. DEFILIPPO:  All right.

5                    THE COURT:  I think that your reply did a good job

6         of categorizing the different objections, so let me hear

7         from each of them if you wouldn't mind.

8                    MR. DEFILIPPO:  Thank you, Your Honor.

9                    THE COURT:  Good morning.

10                   MR. STEIN:  Good morning, Your Honor, Philip Stein

11        on behalf of seven of the objectors, Universal American

12        Mortgage Company LLC, Standard Pacific Mortgage, Inc., Shay

13        Mortgage, Inc., CTX Mortgage Company LLC, Prime Lending,

14        Allied Mortgage Group, Inc., and Direct Mortgage Corp.

15                   THE COURT:  Okay.

16                   MR. STEIN:  Your Honor, I will dispense with any

17        Stern versus Marshall argument, but what I would like to

18        tell you is that what you first heard -- one of the initial

19        comments by the debtors' counsel, and indeed something that

20        was stated at length in their moving papers, is that

21        essentially that they -- the debtors face a monumental task,

22        a Herculean task with perhaps 1,100 lenders and as many

23        3,000 loans or more at issue.

24                   I think what the -- what Your Honor needs to

25        recognize if you don't already is that they've faced exactly

Page 46

1    the same task, except red larger for the last five years and

2    have handled it quite differently.

3            At least 1,110 lenders or thereabouts, and far

4    more than 3,000 loans have been put forward by the debtors

5    in courts all across the country, federal and state courts.

6            THE COURT:  But I'm not -- this is not going to be

7    a, you know, Moroccan bizarre where you're going to try to

8    convince me that you've got a better idea.  They're the

9    fiduciary, they proposed a procedure that's worked

10   structurally so to speak with respect to other large groups

11   of claims in these cases.

12           So I want to hear about why what they've proposed

13   I can't order, because it has worked and it's worked well,

14   and now they've come back again promptly upon the accrual of

15   these indemnification claims subsequent to the settlement

16   with Fannie and Freddie.

17           So what is it about -- other than the fact that

18   you don't want to do it, you would rather put them to the

19   expense of filing the lawsuits than having to respond to the

20   mediation notice and engage in what frankly is the more

21   minimal activity involved with participating in the

22   mediation program.  And then if that doesn't work, if they

23   elect to proceed, they will sue you.

24           But we're talking about very narrowly

25   circumscribed, cost-efficient, nonburdensome procedures that

Page 47

1    are tailored for this situation.  And other than the fact

2    that you just would rather them have to sue you, well,

3    what's your objection?

4              MR. STEIN:  Your Honor, they're not more minimal

5    for the parties to which they're directed.  Many of those

6    parties are already facing claims, pending claims, current

7    claims by Lehman Brothers Holdings, Inc. in other courts

8    across the country.  We now are faced with the specter of

9    dealing with them on multiple fronts.  This one being a

10   particularly inconvenient one for my clients.

11             THE COURT:  But so they would have to sue you

12   again.  In other words, I don't -- I can't get past the

13   Lehman has a dispute with you, they make you aware of a

14   dispute.  Either they make you aware of the dispute because

15   they file a complaint against you that requires you to

16   answer or to move to dismiss it and/or engage in discovery,

17   or they put you in this mediation program, they send you a

18   notice, and you respond to the notice.  Either by saying, my

19   claim was settled, we think we shouldn't have to do this,

20   we're going to write a letter to the Judge, et cetera.

21             Action/reaction.  I just -- I'm sorry, and I don't

22   mean to be difficult, I just don't understand the difference

23   in those two worlds, other than the fact that you would

24   rather they have to spend more money and launch more

25   litigations because that's more burdensome on them, so

Page 48

1      burden on them is a disincentive for them to come after you.

2      But that's not the way it works.

3                  MR. STEIN:  Your Honor, we, the targets of the

4      motion would rather spend less money ourselves, we're not

5      focused on how many money Lehman is spending, we're focused

6      on how much money we're spending.

7                  THE COURT:  And I understand that.  And I just

8      outlined for you why in the scenario in which the ADR is

9      implemented, I'm not seeing the defendants, the punitive

10     defendants having to spend a lot of money.  I just -- I

11     don't see it.

12                 MR. STEIN:  Okay.  Well, let's talk about the

13     process itself, and what it is they're advocating.  While

14     it's correct, as was suggested to you earlier that we're not

15     here to discuss the substantive merits of the claim, I think

16     one thing Your Honor does need to factor in in evaluating

17     what's being requested here is kind of the track record of

18     where we stand today.

19                 These claims are almost certainly time barred,

20     notwithstanding the fact that they're being presented to you

21     as new indemnification claims that only accrued once they

22     reached the settlement with Fannie or Freddie Mac.

23                 When a particular variation of the statute of

24     limitations argument has been made in cases brought by

25     Lehman and adjudicated by federal and state courts thus far,

Page 49

1     every single time that that argument has been made and ruled

2     upon, the claims have been dismissed as time barred.

3                    To have to come forward in this case --

4                    THE COURT:  You have a case under New York law

5     that says that indemnification claims don't arise when --

6     don't accrue once the underlying claims are paid.

7                    MR. STEIN:  Your Honor, I'm aware of at least

8     eight that have been decided that way in recent months, yes.

9     We're happy to supplement the briefing on that point if Your

10    Honor deems it necessary.  But that's --

11                   THE COURT:  So that if that's your position, then

12    using the, what I'll call the escape hatch mechanism, you

13    would simply write a letter that cites that authority, and

14    ask me to let you out on that basis.

15                   MR. STEIN:  Well -- and if Your Honor is going to

16    be receptive to those types of entreaties, that may make

17    things very different, although we are reluctant, just as a

18    threshold matter to be pulled in a little bit deeper, and to

19    have --

20                   THE COURT:  So once again, you would rather they

21    sue you and then you have to file a motion to dismiss on the

22    basis that it's time barred, as opposed to taking me up on

23    my suggestion that you simply send me a letter that says

24    that.  In other ADR procedures that we have going certain

25    claimants have made the argument, or other litigation

Page 50

1    procedures rather, that folks don't want to be a part of it

2    because they're not subject to the personal jurisdiction of

3    the court because they're foreign.

4           Similarly, they were given an opportunity in an

5    efficient cost effective way to bring that to the Court's

6    attention.  So, Mr. DeFilippo, unless you're going to tell

7    me I'm making this up, then problem solved, right.

8           MR. DEFILIPPO:  Your Honor, I clearly see which

9    way the Court is leaning and I understand that.

10          THE COURT:  But you --

11          MR. DEFILIPPO:  Let me mention a couple of points.

12          THE COURT:  But we're not -- but this is not here

13   -- we're not here -- I mean, we are here because we enjoy

14   doing this, but you haven't explained to me why that doesn't

15   work.

16          MR. DEFILIPPO:  Let me try a couple of other

17   points.  The first, Your Honor, is that it's the supposition

18   of at least my clients, perhaps the clients and other

19   objectors -- of other objectors' counsel I should say, that

20   if not brought into this proceeding, if not brought into

21   this mandatory ADR mechanism, those suits that you're

22   positing will be filed won't be filed, at least as to

23   certain defendants.

24          In other words, this is their shot, trying to make

25   us come here, trying to build momentum for some sort of

Page 51

1    settlement through a process administered by this Court is

2    what they're going to do in lieu of filing additional claims

3    that they think might be futile again, at least as to

4    certain defendants.

5           So that's a bit of the problem here.  And that --

6    you know, maybe that supposition will prove to be correct,

7    maybe it will prove to be incorrect, but that is the working

8    supposition for -- at least for my clients.

9           The process itself also is something to which we

10   object, independent of whether we should come forward and be

11   brought into this process.  It's the particulars of the

12   process that give us pause.

13          THE COURT:  Such as?

14          MR. DEFILIPPO:  Such as the fact that they select

15   the mediator in a --

16          THE COURT:  There's a huge pool of mediators --

17          MR. DEFILIPPO:  There's a huge --

18          THE COURT:  -- comprised of practitioners, retired

19   practitioners, retired judges, it's a non-binding mediation.

20   I just -- there just seems to be this sense that permeates

21   the objections that the deck is stacked against the other

22   parties, that has not been the experience.

23          I just -- I don't understand that.

24          MR. DEFILIPPO:  Well, Your Honor, we certainly

25   hope our skepticism will prove to be unfounded and maybe it

Page 52

1    will.  But it's not the pool of mediators to which we

2    object, it's the fact that they get to select one from the

3    pool, and then we pay with them for the mediator they've

4    selected.

5            There are deadlines that are far more onerous on

6    us than they are on them, with respect to provision of

7    information.  There are concerns that we have just about the

8    way this is being laid out in the moving papers.

9            THE COURT:  So the selection of somebody from a

10   pool it's not a case where they're going to be -- someone's

11   going to call their brother-in-law, and say come and mediate

12   this dispute.  So that really doesn't move me very much.

13           With respect to deadlines, if there are -- in any

14   case, if there are particular impediments to satisfying a

15   deadline, once again you don't lose your voice, you have the

16   ability to have a conversation, and arrive at a reasonable

17   accommodation.

18           This is all about reasonableness and efficiency.

19   So if a particular set of time frames doesn't work for a

20   particular set of reasons, you can complain about that.

21           MR. DEFILIPPO:  Your Honor, I guess I will

22   conclude by saying that there's nothing that is stopping

23   these -- stopping Lehman Brothers Holdings, just as nothing

24   stopped them in the past five years from filing suits in

25   federal and state courts across the country from seeking

1    independent of this court and the process --

2           THE COURT:  They didn't --

3           MR. DEFILIPPO:  -- administered by this Court to

4    draw us into mediation, to select jointly with us a mediator

5    for any future claims.  They are trying to ensure that

6    things are done in their way.  And ADR is, as Your Honor's

7    aware, generally thought to be a consensual mutual process.

8    This is neither consensual nor mutual.  We are being told

9    rather than calling us up, people they've litigated against

10   over the past several years, and saying, would you like to

11   mediate with us in a forum convenient to both of us, would

12   you like to select a mediator with us, an inquiry to which

13   at least some of my clients I'm sure would respond

14   favorably, they're saying, here's a mandatory process in New

15   York administered by the bankruptcy court, we're going to

16   select the mediator --

17          THE COURT:  Right.

18          MR. DEFILIPPO:  -- you're going to pay for the

19   mediator along with us, come do it this way.

20          And, Your Honor, we certainly do not suggest that

21   you yourself are not fair-minded.  What we're suggesting is

22   that this process being requested of you from -- by LBHI,

23   which may have worked as to certain other types of claims is

24   unnecessary instance, since they've certainly shown a

25   proclivity for filing exactly these types of claims in

Page 54

1    forums all across the country other than this one.  Why is

2    it that they now want everybody to come here, participate in

3    a process that they've set up, a process to which we object.

4              And, Your Honor, that's the nature of our

5    objection, thank you.

6              THE COURT:  Thank you.

7              MR. WOLL:  Your Honor, David Woll from Simpson

8    Thatcher, may I be heard for just a couple of minutes?

9              THE COURT:  Yes, certainly.

10             MR. WOLL:  Thank you.  Your Honor, we represent

11   Mortgage It, one of the objectors.  I just wanted to address

12   two categories of issues.  One is our timing issues and the

13   second are some specific provisions of the order that

14   haven't been discussed yet.

15             With respect to timing, I think part of what has

16   gone on here is that my client along with 2 or 3,000 other I

17   guess sellers got this mailing and we're called to respond

18   to the motion --

19             THE COURT:  Right.

20             MR. WOLL:  -- in a case where we really haven't

21   been involved.  We're relative strangers to these

22   proceedings.

23             So I take with, you know, certainly at face value

24   and great interest with the comments about what's transpired

25   before, but we really didn't know anything about that.

Page 55

1                    THE COURT:  Okay.

2                    MR. WOLL:  And one of the proposals we had made to

3      LBHI was to adjourn the motion and give us more time to

4      discuss their proposal and to consider what's been

5      suggested.

6                    THE COURT:  But there is an agreement with two

7      other objectors to adjourn as to them, so that deal is on

8      the table for you.

9                    MR. WOLL:  Well, so here's the rock and the hard

10     place, which is why I'm here, and which is what I discussed

11     with my client, we weren't sure exactly how to proceed.

12                   We did talk about adjourning the motion and our

13     objection with respect to our objection.  And we were

14     willing to do that, but LBHI told us we want to get the

15     order entered with respect to the 2,500 other people.

16                   THE COURT:  Sure.

17                   MR. WOLL:  Yeah, okay, fine, I understand.  But we

18     were concerned that having -- the Court having entered the

19     order with respect to all these other people on an

20     uncontested basis that our ability to argue a month from now

21     that it shouldn't apply to us --

22                   THE COURT:  Well then what --

23                   MR. WOLL:  -- would somehow be compromised.

24                   THE COURT:  What would be the meaning of the

25     adjournment?  An adjournment is you've objected so, you

Page 56

1    know, we're going to get off the train and the train can

2    leave without us, and you're going to -- I mean, that's what

3    an adjournment does, right?

4            MR. WOLL:  Right, Your Honor.  We just -- I was

5    just concerned that something would happen here that would

6    preclude our arguments at the later adjournment date.

7            THE COURT:  Mr. DeFilippo, am I missing something?

8            MR. DEFILIPPO:  No, the stipulation reserves

9    everybody's rights who agreed to an adjournment.

10           THE COURT:  So do you want to --

11           MR. WOLL:  We'll stipulate to adjourn, Your Honor.

12           THE COURT:  -- stipulate to an adjournment?  Okay.

13   Very good.

14           MR. WOLL:  Thank you.

15           THE COURT:  By the way, I put the stipulation -- I

16   put the adjournment back on the table to any of you subject

17   to Mr. DeFilippo overruling me.

18           MR. DEFILIPPO:  We're fine, Your Honor.

19           THE COURT:  Yes?

20           MR. WRIGHT:  Good morning, Your Honor, Derrick

21   Wright (ph) and I'm here on behalf of 15 potential

22   defendants, and for the record --

23           THE COURT:  Okay.

24           MR. WRIGHT:  -- I'd like to state that First

25   California Mortgage Corporate, Mountain West Financial,

Page 57

1    Inc., Republic Mortgage Home Loans, Sun American Mortgage

2    Company, Sterling National Mortgage Company, Inc., W. R.

3    Starkey Mortgage LLP, Gateway Funding, Diversified Mortgage

4    Services, Arlington Capital Mortgage Corporation, Loan

5    Simple, Inc., New Fed Mortgage Corporation, Broadview

6    Mortgage Corporation, First Option Mortgage, AmeriFirst

7    Financial Corporation, Parole Mortgage (ph), Seminitch

8    Corporation (ph).

9              THE COURT:  Okay.

10             MR. WRIGHT:  Your Honor, to your last point, we

11   have also have had conversations with counsel for LBHI

12   regarding adjournment, and we are, in fact, amenable to

13   that, and believe that there would be great value in

14   continuing discussions.

15             We too had concerns with how this proceeding would

16   take place, and if the order was entered as to the 2,500

17   some other parties and in fact certain objections did go

18   forward, we thought there could be potential prejudice down

19   the road if Your Honor was interested in, for example, the

20   uniform set of arbitration procedures.

21             Because one thing we did discuss --

22             THE COURT:  We're not arbitrating, we're

23   mediating.

24             MR. WRIGHT:  Mediation procedures --

25             THE COURT:  Okay.

1           MR. WRIGHT:  -- I apologize, Your Honor.

2           THE COURT:  Okay.

3           MR. WRIGHT:  And one thing I would like to address

4    today is that we do have some specific concerns.  I think

5    some have been raised today but with the actual procedures.

6    And I know that's what's called for in the general order,

7    but for example, holding all the mediations in New York, I

8    think is a big concern for our clients.

9           Our clients, several of which, are involved in

10   pending litigations, mostly on the West -- out West, to come

11   to New York, rather than at a minimum, be allowed to

12   participate by telephone, which is something that we've

13   raised.

14          We think that at the end of the day, Your Honor,

15   our clients as we discussed earlier our concern with the

16   financial consequences.  And I think in cases where they are

17   already pending litigation, I think that some of the

18   plaintiff's arguments as to, you know, that this is a cost

19   saving mechanism, and that these are going to be costs that

20   are saved on both sides really doesn't apply in those cases,

21   where in fact, in one of the cases, there's been a final

22   order entered in our favor, and it's on appeal.

23          In other words, to now initiate a new process,

24   putting aside jurisdiction and some other issues that have

25   been raised, just from the straight cost perspective, and

Page 59

1    it's one thing that we've raised with counsel.  And again,

2    we can discuss separately and if we are in a -- you know, if

3    we adjourn as to us, and they discuss that, and they say, we

4    can carve out specific procedures potentially as to your

5    clients, but that was where our concern arose that if Your

6    Honor --

7              THE COURT:  Well again, I -- my intention was the

8    vast, vast, vast 90 what percent majority of the potential

9    defendants or participants, depending upon your

10   perspective --

11             MR. WRIGHT:  Uh-huh.

12             THE COURT:  -- didn't object.  So to the extent

13   that I can enter an order that takes care of most of them,

14   that's going to be great, and then you can continue your

15   discussions, and either you will resolve them or we'll come

16   back and do another round.

17             MR. WRIGHT:  Understood.  And as I discussed

18   previously, I think a lot of my clients are so situated that

19   we can resolve a lot of issues, or get clarity --

20             THE COURT:  Okay.

21             MR. WRIGHT:  -- and that's what we've wanted all

22   along.  But just, I wanted to be clear --

23             THE COURT:  So for today, so for any order that's

24   entered today, then the group of your clients will be carved

25   out and adjourned to another date.

Page 60

```
 1              MR. DEFILIPPO:  Yes, Your Honor.

 2              THE COURT:  All right.  Very good.

 3              MR. WRIGHT:  Thank you, Your Honor.

 4              THE COURT:  Thank you.  Anyone else?

 5              MR. GOLDSTEIN:  Good morning, Your Honor, Arthur

 6      Goldstein of --

 7              THE COURT:  Good morning.

 8              MR. GOLDSTEIN:  -- of Spizz Cohen & Serchuk

 9      representing Securities -- Security National Mortgage

10      Company.

11              I've heard everything that's been argued here

12      today and I note with interest the Court's comment with

13      respect to reservation of rights for another day.

14              I would like a few minutes, if the Court doesn't

15      mind to contact my client to confirm whether they would

16      agree to that --

17              THE COURT:  Certainly.

18              MR. GOLDSTEIN:  -- and if not --

19              THE COURT:  Okay.

20              MR. GOLDSTEIN:  -- I would like to reserve the

21      right to come back up here and make additional comments with

22      respect to the motion.

23              THE COURT:  Okay.  Go right ahead.

24              MR. GOLDSTEIN:  Thank you, Your Honor.

25              THE COURT:  Anyone else?
```

Page 61

1          MS. SOMERS:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. SOMERS:  My name is Tessa Somers, Weiner

4    Brodsky Kider P.C., and I'm here on behalf of defendant or

5    rather non-party Day Time Mortgage Corporation, objector.

6          Your Honor, I just wanted to address a couple of

7    things that were mentioned earlier.  First off, the idea

8    that this has worked in the past, I believe that to be true,

9    but I want to distinguish the Residential Funding case,

10   because I was cited as an example of where this worked.

11         In that case, it was actually creditors who were

12   working out a plan, so it wasn't quite the same, and in

13   fact, later in that same case, some of the objectors I know

14   are involved in adversary proceedings --

15         THE COURT:  Okay.

16         MS. SOMERS:  -- in the very same case, and it's

17   similar to indemnification claims, its repurchase, that sort

18   of thing.

19         So in that instance, they actually went the route

20   of pleading it out under Rule 8 and giving everyone notice.

21   And that's really where I want go with this is notice.

22         THE COURT:  But the procedures -- I read that part

23   of the objections, and I don't think anyone would suggest

24   that you have all the notice that you're going to get at

25   this point, but as the procedures get underway, there will

Page 62

1   be notice and before you're obligated to respond to

2   anything, expend resources, take action, the procedures made

3   clear to me, that there will be a notice that will

4   consistent with whatever due process rights you have at this

5   point, which I'm not sure is the final panoply of due

6   process rights, but we don't have to go there, that you will

7   get notice.  You're not going to be forced to respond to a

8   blanket statement that, you know, we have a claim against

9   you, please come and defend.

10          MS. SOMERS:  Right, that's true that they're going

11  to provide an ADR notice I think is what they term it, and

12  they say that will provide sufficient information for you to

13  know about what's going on.

14          And whether or not -- it doesn't lay out what

15  information will actually be provided, and whether there's a

16  way to object.  I mean, there's no pleading standard

17  necessarily then --

18          THE COURT:  Sure.

19          MS. SOMERS:  -- you know, the civil rules don't

20  apply so.

21          THE COURT:  Right.  But there's common sense and

22  there's the ability to complain here if for some reason that

23  notice isn't sufficient.  What I would imagine it would say

24  would be, at a minimum, to describe the paper, if you will,

25  that the claim involves.  I mean, they -- because they have

Page 63

1    to do this on a loan specific basis, they're going to have

2    to be loan specific I would think in the notices.  So that

3    is going to tell you a lot about what it is that they are --

4    want to talk about in the process.

5            MS. SOMERS:  I agree, Your Honor, and loan

6    specific would be a necessity for us to be able to defend or

7    to mediate on this issue.

8            THE COURT:  I'm getting a nod.  I'm getting a nod.

9            MR. DEFILIPPO:  I think that's the intent, Your

10   Honor.

11           THE COURT:  I think the intent is that the notices

12   are going to be loan specific.

13           MR. DEFILIPPO:  Yes, Your Honor, they are.

14           MS. SOMERS:  Well, that is very reassuring indeed.

15           THE COURT:  Okay.  Good.

16           MS. SOMERS:  On top of that, I do want to

17   highlight that in their response to our objections, they say

18   erroneously, that there's just basically no way that you can

19   have a technical default and have sanctions applied to you.

20   That's simply not true.

21           And 3,000 notices presumably were sent out about

22   this particular motion, and only 26 objectors appeared.  I

23   think that shows you that either people don't mind, and that

24   could be part of it, or that they didn't get the notice, or

25   they didn't understand that it was important to them.

1             But if you go then to this idea that they can send

2    an ADR notice later to all of these 3,000 people, and if you

3    don't respond timely, not even if you don't respond, but if

4    you don't respond timely, they can move for sanctions

5    including fees of the mediator, and other sanctions --

6             THE COURT:  Well, you're not here pleading the

7    case of those other 3,000, right.  You're just here for your

8    client, right?

9             MS. SOMERS:  I am just here for my client.  But I

10   would submit that our --

11            THE COURT:  So they're going to be --

12            MS. SOMERS:  -- arguments would apply.

13            THE COURT:  They're going to be looking out for

14   notice, right?

15            MS. SOMERS:  Well, I -- well, certainly, we will

16   and we're on notice too --

17            THE COURT:  Right.

18            MS. SOMERS:  -- and so hopefully we will get a

19   copy of that.

20            THE COURT:  But they don't get to automatically

21   impose sanctions, they just get to ask, which sometimes

22   asking --

23            MS. SOMERS:  That's true, they do have to seek --

24            THE COURT:  -- for sanctions has a way of

25   sharpening someone's focus in getting them to not throw

Page 65

1    notice in the -- you know, in the waste bin or what have

2    you.  So that --

3              MS. SOMERS:  Certainly.  As long as the sanctions

4    aren't applied because of a technical default.  You know,

5    this is somebody who got the notice but we didn't understand

6    it doesn't respond until a week after it's due, and

7    sanctions could be sought because technically that's a

8    default.

9              THE COURT:  But they might not be awarded, right?

10             MS. SOMERS:  They might not be awarded, that's

11   true, and I would hope they wouldn't be awarded, but I can't

12   say that's for sure the case.

13             And so with that in mind, we would object that the

14   notice either as it's sent or as it's pled, we aren't sure

15   that it's going to be sufficient to be able to defend

16   ourself.  And I understand, loan-by-loan, that's great, and

17   now I understand I can come to you and I can alert you if

18   it's not sufficient for our purposes.

19             THE COURT:  I mean, it's not -- you know, the

20   thing that I want to be clear, I mean, what I'm going to

21   authorize, and I am going to authorize this today, it's not

22   a game of gotcha.  This is not a game of gotcha.  It's not

23   inviting you to a -- you know, a rigged game, a non-level

24   playing field.  That's the way I view it.

25             And I think a lot of the objections have proceeded

Page 66

1    from a dark place, from a place that assumes that there's

2    going to be misbehavior.  And I don't view the world that

3    way.

4              So if a notice -- if someone's on vacation, and

5    the notice doesn't get, you know, opened on a timely

6    fashion, there's not going to be a negative consequence of

7    that.  And I'm sure steps will be undertaken, you know, we

8    all get those things in the mail that say time sensitive,

9    you know, open at once, that this is going to have some

10   indication that it's not something that ought to be thrown

11   away so.

12             MS. SOMERS:  Well, I think you're right, Your

13   Honor, that we might come from this from a little darker

14   place than you do, but it's partly informed by having gone

15   back and compared some of their prior -- because this has

16   happened, I take it, previously where they filed motions for

17   ADR orders, and they've been granted.  But those orders did

18   differ in material ways from the one that we have where --

19   and I highlight, I think, the last section of our objections

20   talks about, there's a section at the beginning of the order

21   that says, "I hereby --" you know, I found and affirm that

22   this is the case, and then it lays out a bunch of items that

23   we wouldn't necessarily want to have been found and affirmed

24   by the Court without having actually worked them out

25   including venue, you know, jurisdiction.

Page 67

1              But among other things, there's also -- I believe

2     there's one about, you know, this is a core matter, or this

3     is a close nexus to the events that have happened.

4              THE COURT:  Well, but the close nexus finding is

5     part of the predicate for my having the ability to order the

6     mediation.  But that doesn't prejudice any arguments.  For

7     example, I've not really invited a lot of discussion about

8     Stern versus Marshall, but to the extent that if and when

9     you ever got to the merits of a claim, if you felt you had a

10    Stern versus Marshall argument, it's totally this order will

11    totally not prejudice your ability to make that argument

12    then.

13             So that close nexus finding solely has to do with

14    the ADR, has no bearing, afforded no weight ultimately if

15    and when we would ever get to the merits of these suits, so

16    you're protected in that regard.

17             MS. SOMERS:  Okay.  Well -- and that's hopeful

18    too.

19             THE COURT:  Okay.

20             MS. SOMERS:  That's another section where it's

21    ordered and affirmed that this is the case.  And I believe

22    that LBHI has committed to amending some of the language to

23    explicitly preserve all rights, all defenses, all --

24             THE COURT:  Sure.

25             MS. SOMERS:  And so as long as we can get that in

Page 68

1     there, I think --

2               THE COURT:  Absolutely.

3               MS. SOMERS:  -- that will help us along the road

4     to agreeing to this.

5               THE COURT:  Never -- that was never a question in

6     my mind to the extent --

7               MS. SOMERS:  So that's one of the -- sorry.

8               THE COURT:  It was a lot of -- a couple of the

9     objections raised that, and that's not on the table, you're

10    not waiving any rights by participating in mediation.

11              MS. SOMERS:  Well, and that was something that had

12    been removed from prior motions of theirs.  So seeing sort

13    of this progression from motion-to-motion and then to ours

14    where they've removed some of these safeguards, they've

15    added in that we have to pay for the mediator.  You know, it

16    sort of -- it led us to a dark place --

17              THE COURT:  Okay.

18              MS. SOMERS:  -- where we questioned where this was

19    going.

20              So it's certainly good to get some reassurances

21    this morning from you.  We didn't want to wait a month and

22    then have found out subsequent --

23              THE COURT:  Sure.

24              MS. SOMERS:  -- that we should've known now.

25              THE COURT:  Okay.

Page 69

1           MS. SOMERS:  So --

2           THE COURT:  All right.  So why don't you go ahead

3    and confer with Mr. DeFilippo particularly with respect to

4    the reservation of rights, and any of these other fine

5    points that you think, you know, need to be clarified in a

6    word -- written word sense.

7           MS. SOMERS:  Very good.  Thank you, Your Honor.

8           THE COURT:  All right?  Thank you.

9           MS. SOMERS:  Thank you.

10          THE COURT:  Anyone else?

11          MR. SALTER:  Good morning, Judge.

12          THE COURT:  Good morning.

13          MR. SALTER:  Tim Salter (ph), Blank Rome for

14   Sterns Lending, Inc.  We had talked to opposing counsel

15   about an adjournment.  We had some of the same concerns the

16   other objectors did.  It's good to see where the Court is

17   leaning on this, and we're going to, I guess, agree to that

18   adjournment now, our objection --

19          THE COURT:  Okay.  Mr. DeFilippo, is that okay?

20          MR. DEFILIPPO:  Yes, Your Honor.  Anyone that

21   wants it, gets it.

22          THE COURT:  Okay.  All right.  I think we're

23   getting to the end.  Anyone else?

24          MS. SOMERS:  Your Honor, Tessa Somers again --

25          THE COURT:  Yeah.

1          MS. SOMERS:  -- on behalf of DHI, I'm sorry.  I'd

2     just like to clarify that I'd like to have permission to

3     adjourn, just so that we can actually go over a draft and

4     kind of work with LBHI on something that we can agree with,

5     rather than be covered by it, and just to carve out for us

6     today as well.

7          MR. DEFILIPPO:  Yes.

8          THE COURT:  Is that all right, Mr. DeFilippo?

9          MR. DEFILIPPO:  Yes, Your Honor, yes.

10         THE COURT:  Okay.  I hope someone is keeping score

11    on all this --

12         MS. SOMERS:  Thank you, Your Honor.

13         THE COURT:  -- because I'm not.

14         MR. DEFILIPPO:  We're assuming they're all going

15    to get the 30 days, right?

16         THE COURT:  Whatever you folks work out.  But I

17    think --

18         UNIDENTIFIED:  I would just like to adjourn for

19    like ten minutes, so I can just reach out to my client to

20    confirm I have the authority.

21         THE COURT:  Okay.  But I have to get the -- I have

22    to get the Credencial people up here and out.  So, Mr.

23    Stein, though, you don't want to adjourn?

24         MR. STEIN:  No, Your Honor, I would like to

25    adjourn if we're going to work on clarifying procedures and

Page 71

1    getting something that's more palatable to us so we don't

2    have to come back and bother you again with this, that's

3    fine.

4              THE COURT:  Okay.  So I'm hearing that that's

5    fine.  Okay.  So I'm going to give you your ten minutes, and

6    I'm going to be optimistic and assume that you're going to

7    get the authority to participate in this adjourned group.

8              UNIDENTIFIED:  Yes.

9              THE COURT:  And that you're all -- so, Mr.

10   DeFilippo, what is it that you're going to -- are you going

11   to give me an order today that reflects some of the things

12   that we've talked about?

13             MR. DEFILIPPO:  Yes, Your Honor.

14             THE COURT:  And then --

15             MR. DEFILIPPO:  Stipulate with the others.

16             THE COURT:  -- stipulate with the others, and then

17   perhaps give me an amended or a schedule or something that

18   brings in everyone who's being carved out of today.

19             MR. DEFILIPPO:  Correct, Your Honor.

20             THE COURT:  All right.  Does anyone else wish to

21   be heard with respect to the ADR motion regarding the

22   indemnification claims?

23        (No response)

24             THE COURT:  All right.  Thank you all very much.

25             UNIDENTIFIED:  Thank you, Your Honor.

Page 72

1        (Pause)

2                THE COURT:  All right.  Could I have the

3    Credencial group come on up.

4                MR. BENTON:  Good morning, Your Honor.

5                THE COURT:  Thank you for agreeing to be pushed to

6    the end.

7                MR. BENTON:  No problem.

8                THE COURT:  I was trying to figure out who might

9    take a shorter period of time.

10               We've been -- we've experienced an uptick in

11   activity in the Lehman case since my wonderful predecessor

12   departed.  So we're trying very hard to manage the calendar,

13   so that there's not a lot of time spent sitting around.  So,

14   Ms. Lutkus (ph) is going to be taking an active role in

15   working with all of your folks to keep an eye on the

16   calendar and just make sure that we get -- we move things

17   along.  We're not going to limit you to omnibus days.  We're

18   going to fill the omnibus days with a manageable amount of

19   matters, but I'm going to continue to give you extra days,

20   as much as everybody needs.

21               But we're very interested in efficiency, moving

22   you along, and not having, you know, 18 matters on one day

23   where I can't be fully focused and give you resolution.

24               MR. BENTON:  And that's very much appreciated,

25   Your Honor, and we -- I can say we --

```
 1              THE COURT:  Not that the way that Judge Peck did

 2     things wasn't absolutely perfect in every way.

 3              MR. BENTON:  No, and I very much appreciate how he

 4     did it.  But, of course, we also want to be efficient and if

 5     there are -- and I can say for certain, that if there are

 6     times when the schedule is filling up too much or if the --

 7              THE COURT:  Right, right.

 8              MR. BENTON:  -- that we want to work with the

 9     Court.

10              THE COURT:  Right.

11              MR. BENTON:  And with everyone to make sure it

12     gets done efficiently.

13              THE COURT:  Right.  And Ms. Lutkus has been

14     charged with being the time czar.  So she will be watching

15     it very closely.

16              MR. BENTON:  Will do.

17              THE COURT:  Okay.  All right.

18              MR. BENTON:  So good morning again, Your Honor.

19              THE COURT:  Good morning again.

20              MR. BENTON:  Jason Benton, Hughes Hubbard and

21     Reed, counsel for the LBI trustee.

22              The final item for this morning is the trustee's

23     210th omnibus objection to the claims of Credencial and

24     Minicreditos and Carlos Gorleri.  And this objection has now

25     been fully briefed by the parties.
```

Page 74

1          At the outset, Your Honor, I should say that the

2     parties are working cooperatively together, we were able to

3     come to a stipulation on the three claims, which Your Honor

4     so ordered yesterday, which consolidated or maybe I should

5     say smushed the three claims into one.  And with the

6     reservations outlined in the stipulation, and also thereby

7     have the effect of dropping the secured elements of the

8     claims.

9          Therefore, I don't plan to address the secured --

10         THE COURT:  Okay.

11         MR. BENTON:  -- elements.

12         THE COURT:  That was going to -- I was going to --

13    that was going to be my first question in the category of

14    low hanging fruit.

15         MR. BENTON:  Yeah, so I think that's -- you know,

16    that's off, Your Honor, and I do apologize if I --

17    definitely I'm going to mess up some plurals when I say

18    claim or claims.

19         THE COURT:  That's fine, got it.

20         MR. BENTON:  So the issue has been fully briefed.

21    In the interest of time, unless Your Honor wants to proceed

22    differently, I do not plan to repeat the arguments that have

23    been made.

24         THE COURT:  Let me -- just help me again since I'm

25    still relatively new at this case, this is a sufficiency

Page 75

1    hearing.

2            MR. BENTON:  Yes, Your Honor.

3            THE COURT:  Okay.  So say out loud for me what

4    that means.

5            MR. BENTON:  A sufficiency hearing under the ADR

6    procedures, and I apologize, I don't have the exact

7    provision in hand is if the -- if a --

8            THE COURT:  It's a 12(b)(6), right?

9            MR. BENTON:  Right, it's a 12(b)(6), it's a motion

10   to this standard.  It's modeled on the ADR procedures that

11   LBHI put in place.

12           THE COURT:  Right.

13           MR. BENTON:  There are difference between the --

14           THE COURT:  Right.

15           MR. BENTON:  -- two procedures.

16           THE COURT:  But it's basically the same thing.

17           MR. BENTON:  Yes, that's right.

18           THE COURT:  And it's a 12(b)(6) standard.

19           MR. BENTON:  Yes, that's right, and I've spoken to

20   my adversary, Mr. Sher, and we agree on that.

21           THE COURT:  So if -- just so to understand this,

22   so if I don't grant LBI's motion, then the next thing that

23   would happen would be it would be a case, it would --

24           MR. BENTON:  It would be a case, but it would be

25   subject still to the ADR procedures, Your Honor.  So if all

Page 76

1    or some portion of the claim survived the motion to dismiss,

2    or the sufficiency hearing, then the two -- it can go down

3    two paths.  The one path is, we can serve on Mr. Sher, and I

4    can assure you that we have a good relationship, I would

5    talk to him about it.

6             THE COURT:  Okay.

7             MR. BENTON:  I could serve the notice of ADR

8    procedures, which essentially puts the case into the

9    mediation.  Or we could set a claims hearing, a merits

10   hearing on it, and that's essentially it becomes a

11   litigation, we would devise a litigation schedule, submit it

12   to Your Honor, or if we couldn't agree, you would approve

13   one --

14            THE COURT:  Right.

15            MR. BENTON:  -- or come up with one, and then we

16   would proceed to a contested litigation.

17            THE COURT:  To a contested litigation that would

18   either be an evidentiary hearing or possible cross motions

19   for summary judgment.

20            MR. BENTON:  Exactly, Your Honor.  And that would

21   obviously be part -- where the summary judgment motions

22   might come in, would be part of the scheduling, but yes,

23   exactly right.

24            THE COURT:  Right, right.  Okay.  That's what I

25   thought, but it just -- I just wanted to make sure we're all

Page 77

1    on the same page.

2              MR. BENTON:  And that, by the way, Your Honor,

3    just in case, in general, I mean, that is how the procedures

4    will work.  I mean, we will have more matters coming before

5    Your Honor --

6              THE COURT:  Right.

7              MR. BENTON:  -- for hearings, and I've had, I know

8    you've had the Cornell recently.

9              THE COURT:  Right.

10             MR. BENTON:  And if it comes to that initial

11   hearing, that is a sufficiency hearing.

12             THE COURT:  Right.

13             MR. BENTON:  Unless, unless the parties before

14   that hearing had already designated it as a merits hearings,

15   and then it becomes a --

16             THE COURT:  Right.  Right.  I mean, based on our

17   own understanding, that's the conclusion we came to.  It

18   wasn't crystal clear form the papers, so I just wanted to

19   make sure we were all on the same page.

20             MR. BENTON:  Yes, no, no, no, that's not a -- and

21   I will take full blame, since I believe I've got my

22   signature at the bottom of those pages.

23             THE COURT:  It's okay.  All right.

24             MR. BENTON:  So as I said, I don't plan to repeat

25   all of the arguments.  I just want to emphasize what I think

Page 78

1    are a few key points.

2              THE COURT:  Okay.

3              MR. BENTON:  It's not disputed that the most

4    important factor in the federal analysis, and in fact, under

5    any analysis including in the New York State cases is the

6    language of the purported contract.

7              THE COURT:  Right.

8              MR. BENTON:  And a very specific part of the

9    language of the work plan, in two different ways shows that

10   the Credencial parties claims should be dismissed as a

11   matter of law on its face.  And it shouldn't be a surprise

12   given our papers that that's the termination provision

13   that's in the contract.

14             As an initial matter, the termination provision is

15   express recognition that the parties did not intend to bind

16   themselves necessarily to the ultimate transaction.  It

17   provides that if all of the definitive transactions that are

18   outlined in the work plan, are not entered into by a date

19   certain and we can get to it later.  I know there's a little

20   bit of a dispute about what that particular date certain is,

21   but if those were not all entered into by a date certain,

22   and no one disputes that those agreements were never entered

23   into, then the work plan would cease to apply.

24             Simply put, the work plan on its face recognize

25   the possibility that the parties' negotiations might fail.

Page 79

1    And that is simply completely inconsistent with the notion

2    that the work plan could be the binding agreement to the

3    ultimate transaction.  And the case law recognizes this.

4                 For example, the Second Circuit I believe in the

5    Arcadian case mentioned that where the agreement at issue

6    described the failure, the possibility of a failure to

7    negotiate, it can't be a binding type one.  In a way, the

8    work plan contains the seeds of its own destruction.

9                 So in that way, the termination provision shows as

10   a matter of law on its face, that it cannot be a binding

11   type one, and the other factors do too, but we've briefed

12   those.

13                The second thing the termination provision shows

14   is whether or not, whether or not it is a Type 1 or a Type 2

15   agreement.  There's no plausible allegation that there could

16   have been a breach.  And they've made no allegations that

17   there was a breach prior to the termination date.

18                In fact, all of the -- many of the allegations

19   they've made is, for example, in support of their promissory

20   estoppel and various other arguments is that we continued to

21   work with them.  We continued to negotiate drafts, we

22   continued to have conference calls with them.

23                Now, I think that that's a showing of good faith

24   frankly, but it's certainly not an allegation that there was

25   a breach prior to the termination date.

Page 80

1           Now, under the termination provision, the

2    termination date was linked to the exclusivity period, which

3    was a four month period that ended on March 2nd, 2008.  The

4    termination provision itself says that it could be extended,

5    but it only could be extended in writing.

6           The exclusivity period says that it could be

7    extended by mutual consent.  Our interpretation, and I think

8    the only plausible interpretation of the termination

9    provision is that it could only be extended in writing.  And

10   there is no writing extending the termination period.

11          So March 2nd by its terms, the work plan ceased to

12   exist.  But let's -- the -- excuse me.  The claimants have

13   made the argument that by continuing to negotiate the

14   drafts, providing these amendment to the loan on March 31st,

15   2008, that implicitly Lehman agreed to extend the

16   exclusivity period which dragged along the termination date

17   to a later period.

18          I don't dispute that there were negotiations, it

19   appears from the documents that went on after March 2nd.

20   There certainly wasn't an amendment after March 2nd.  I

21   don't think that means the termination date was extended.

22   But even if we accept the theory that it was, even under

23   plaintiff's theory, the exclusivity period could only be

24   extended by mutual consent of the parties.

25          Once that mutual consent was over, no party was

Page 81

1   under any obligation whatever the obligations that were

2   created the work plan were.

3          And what they say is Lehman's breach, both of the

4   Type 1 and of the Type 2, is Lehman's abandonment, which I

5   believe they say was communicated to them on April 16th,

6   2008.

7          Well, certainly at that point when Lehman picked

8   up the phone and frankly probably before, Lehman had not

9   continued to mutually consent to extension of the

10  exclusivity period, and therefore an extension of the

11  termination date.

12         And everyone agrees, I believe, that once the

13  termination date happened, the work plan expired.  So the

14  termination provision also shows as a matter of law that

15  whether it's a Type 1, whether it's a Type 2, there's no

16  plausible allegation of a breach.

17         And then, Your Honor, I should also mention that

18  the plaintiffs didn't address with respect to the Type 1

19  analysis, I should've said this earlier, they didn't address

20  the New York State case law when obviously a disagreement

21  was governed by New York State law.  And the New York State

22  cases say that where an agreement calls for the negotiation

23  and consummation of future agreements as a prerequisite to

24  performance, well, there is no agreement.  And that's

25  exactly what was called for here, and they haven't addressed

1   that in their papers.  So again, it's not a Type 1

2   agreement.

3          And then two more points, and then I'll sit down,

4   Your Honor.  The -- on the loss profits, okay, the lost

5   profits are subject to New York law, as is everything

6   because of the work plan, and under New York law, you have

7   to show that the damages were caused by the breach.  I won't

8   discuss it, because obviously we don't think there was a

9   breach.

10         Number two, you have to show that they're able to

11  be shown with reasonable certainty.  Your Honor, I submit

12  that with the allegations of the complaint, what's attached

13  to the complaint, it is simply implausible, and there are no

14  facts alleged that could possibly lead, not only to the

15  plausibility, but even the potential that a new potential

16  joint venture where Lehman was going to buy on a nominal

17  basis half of the company for $100,000 that somehow five

18  years later it -- that half share was going to be worth $88

19  million and five years of profit, which I believe was

20  calculated at $60 million.

21         It's also counter factual, because we're in kind

22  of a weird position, because a lot of these lost profit

23  cases you're trying to determine -- the Court is trying to

24  look a little bit in the -- where the history has happened,

25  and also out into the future.

Page 83

```
 1              Well, here we know exactly what happened.  Their

 2    business partner if this thing had gone through was us, I

 3    mean, not us literally but LBI, and they went into

 4    liquidation.  And it was also on the cusp of the greatest

 5    meltdown in financial global history.

 6              And so I think as a matter of common sense, and

 7    it's not plausible that these lost profits should be

 8    allowed.  And they're not, as a matter of law, by the way,

 9    should the Court determine that it was a Type 2 agreement,

10    they're not available as a matter of law for such an

11    agreement.

12              And the final factor in the Kenfurt (ph) New York

13    law analysis, is whether they were in the contemplation of

14    the parties.  There's nothing in the agreement that shows

15    that they were in the contemplation of the parties.

16              I know that the claimants have pointed to the

17    exclusivity provision that says there will be irreparable

18    harm, but I would submit it's an implausible reading to

19    think that that meant the parties thought if they breached

20    the exclusivity agreement, that they had to pay -- one or

21    the other had to pay upwards of $150 million.

22              THE COURT:  What about the removal of the header?

23              MR. BENTON:  Yes.  Well, Your Honor, certainly in

24    the Decold (ph) case, found that to be important.  But it

25    was not the only thing that was important.  It was only one
```

Page 84

1    of many factors that Decold looked at.  And I do think that

2    you can consider that.  But I think importantly in our case,

3    and unlike the Decold case, we have an express provision,

4    it's not just that we -- that it doesn't say that it's

5    binding, which is true against us, okay, it only says it's

6    binding against them on the exclusivity provision.

7          Regardless of whatever the header that came off in

8    the course of negotiations, it can't trump the express

9    language of the agreement.  And the express language of the

10   agreement says, it will not apply unless they enter into all

11   of the definitive agreements.  There is an express provision

12   that says it won't be binding.  It looked at -- the

13   agreement looked at itself in the mirror and said, this -- I

14   might never happen.

15         So I don't think Decold is relevant.  It's

16   relevant but --

17         THE COURT:  So and given the words of the

18   agreement then, it doesn't matter why Lehman didn't conclude

19   -- why the definitive documents weren't concluded.  In other

20   words, if Lehman just changed its mind.

21         MR. BENTON:  No, Your Honor, I don't -- I have

22   severed kind of levels I think to be answers to that.  It

23   also depends I think on which type of agreement we're going

24   to assume that the --

25         THE COURT:  Okay.

Page 85

1          MR. BENTON:  -- plan is.  But as an initial

2   matter, the agreement doesn't contain any bonding language

3   by imposing any particular standard of negotiations, whether

4   it's good faith, heightened good faith --

5          THE COURT:  But you -- but wait, good faith gets

6   implied.

7          MR. BENTON:  Well, good faith gets implied if

8   there's good faith and fair dealing gets implied into a

9   contract, but we're here.  We're here to decide --

10          THE COURT:  Right.  But if --

11          MR. BENTON:  -- what the nature of the contract

12   is.  And so, of course, if we decide that the contract is a

13   non-enforceable agreement to agree, we don't import a good

14   faith and fair dealing into it.

15          So it's an unusual, and it's kind of -- the state

16   of the law, and I'm sure Your Honor has looked at some or

17   all of the cases --

18          THE COURT:  Uh-huh.

19          MR. BENTON:  -- it can get a little wonky,

20   frankly, in terms of looking at these.  But in truth, the

21   question is whether there's a contract.  And if there's a

22   contract, what is the scope of that contract.  And then, of

23   course, if there is a contract, there is a duty of good

24   faith and fair dealing, but it depends on the scope of the

25   contract.

Page 86

1          And I would submit here, that the contract, the

2    work plan was a plan towards a potential strategic

3    transaction.  It bound the Credencial parties to deal

4    exclusively for a period with us, which I don't think is

5    surprising in a commercial agreement where it's a very small

6    party, such as Minicreditos is going to deal with a -- at

7    the time, very large and successful global investment

8    company.

9          So I don't think that there is -- I think Lehman

10   could have decided not to continue with the transaction if

11   they had decided -- if they wanted to.  And, in fact, the

12   approval rights, which are contained in the agreement, and

13   also by the way in the schedules to the work plan, the --

14   those provide that there's going to be board approval.  And

15   they don't (indiscernible) in the board approval.  And so

16   the board, you know, could disapprove.

17          Now, with that said, I don't disagree, and I'm

18   sure Mr. Sher is getting ready, that to the extent that a

19   contract is found to be a Type 2 agreement, that it is found

20   to be an agreement to negotiate in good faith towards a

21   goal, okay, the parties have to abide by the ability to --

22   the good faith obligation.

23          Now, that might or might not mean that there was

24   cabin (ph) on or some limits on the ability of the board

25   approval, although there are none contained in the

Page 87

1    agreement, but it certainly would mean that there would be

2    some obligation to, as set forth in Teachers, and it's whole

3    progeny that there would be a necessity to negotiate in good

4    faith towards the transaction.

5            Although I will mention again that that's why if

6    you breach that, which I can say that we don't --

7            THE COURT:  Right.

8            MR. BENTON:  -- it doesn't mean that you get lost

9    profits, because you could have the best faith, you could

10   negotiate forever and not get anywhere.

11           THE COURT:  So hypothetically, if it's a breach of

12   a Type 2, a breach of the obligations and negotiating in

13   good faith, what would the measure of damages be?

14           MR. BENTON:  The possible measure of damages would

15   be the reliance damages, okay.

16           THE COURT:  So out of pockets?

17           MR. BENTON:  Yes, out of pocket damages, and which

18   that they've said, I mean, they've alleged, and I don't know

19   the exact number, if you could help me out, I think it's

20   somewhere around the region of 2 million or 3 million.  I

21   don't know if they are including in that the value of the

22   shares that -- as part of the first, which they've got --

23           THE COURT:  Right.

24           MR. BENTON:  -- about 8 million I think now, I

25   would say that that's not part of the reliance damages or

Page 88

1   shouldn't be because those shares weren't pledged to us as

2   they freely admit.  And there's no allegation and no

3   evidence that they ever paid the loan back.  And I don't

4   necessarily agree that the amount that they put for the

5   reliance, I think they would be entitled to reliance

6   damages.

7            THE COURT:  All right.  Thank you.

8            MR. BENTON:  Sure.  Oh, and if I could mention one

9   more thing, Your Honor --

10            THE COURT:  Sure.

11            MR. BENTON:  -- just so I didn't forget,

12   apologies.

13            The parties -- we had objected to post-petition

14   interest, they didn't respond, so I just wanted to put that

15   out there as we're going forward, that's an independent

16   reason I think for that to be --

17            THE COURT:  But I kind of put the post-petition

18   interest in the same category as the secured claim.

19            MR. BENTON:  Okay.  Thank you, Your Honor.

20            THE COURT:  Okay.  Thank you.

21            MR. SHER:  Good morning, Your Honor.

22            THE COURT:  So you could start from where we just

23   left off with respect to the measure of damages.

24            MR. SHER:  Absolutely, Your Honor.

25            THE COURT:  Tell me your theory as to why, you

1   know, even if you're right, you should get so many millions

2   of dollars.

3          MR. SHER:  Absolutely.  If I may, for the record,

4   it's Justin Sher from the law firm of Sher Tremonte on

5   behalf of the claimants, Credencial, Minicreditos and Carlos

6   Gorleri, who's here with us today.  And I'm joined with my

7   associate, Mark Cooper at counsel table.

8          With respect to the damages, whether it's a Type 1

9   or Type 2 agreements, we are entitled to our direct

10   expectation damages.  And even if you don't describe them as

11   expectation damages, direct consequential damages, and I'm

12   concerned by the characterization of lost profits that the

13   trustee has used in their brief, and to the extent, we

14   adapted, we should not have, because that's not an accurate

15   description of what happened here.

16          Minicreditos was an existing company that was

17   doing very well.  It served the lower and middle income

18   communities, provided credit to those populations and as a

19   growing credit company, it required capital to continue to

20   grow.  And it had several options of potential institutions

21   from which to get that capital.  It ultimately chose Lehman

22   Brothers to do so.

23          The notion that it was not contemplated, that if

24   Lehman Brothers pulled out of their deal, and decided not to

25   support the 50 million Argentine pesos capital structure,

Page 90

1    that it would be a surprise to everyone that this credit

2    company could not continue to exist, that's just in my mind

3    untenable.

4          Clearly, if the capital is not there, a credit

5    company will be decimated, and that's exactly what happened.

6    So the notion that this is some speculative application for

7    lost profits, that's incorrect.

8          What happened as a result of LBI's breach, and we

9    submit it was a breach of a binding agreement, what happened

10   as a result of that breach is a company was decimated and

11   ceased operations.

12         And the way to value a company is you look at

13   projections.  And in this case, those projections were the

14   result of collaboration with LBI during a due diligence

15   period that preceded the work plan.

16         And to put this into context, Your Honor, there

17   was a non-binding agreement to negotiate, and that was the

18   letter of intent that was signed in August of 2007.  And in

19   that case, LBI and my clients agreed on a provision that

20   specifically said non-binding agreement.  And in the text of

21   that letter of intent, they described it as an

22   understanding, not as an agreement.

23         In contrast, the work plan, that paragraph,

24   paragraph 10 of the letter of intent is nowhere in there.

25   There's nothing that says this is a non-binding agreement.

Page 91

1    And in the merger clause that appears at the end, it says,

2    this agreement and understanding and the terms of this work

3    plan shall be in place, and shall apply unless and until the

4    transactional documents are executed.

5              And one of those transactions -- oh, go ahead.

6              THE COURT:  But then you have the termination

7    provisions that go into effect.

8              MR. SHER:  That's correct, and I'd be happy to

9    address that.

10             So as I understand the trustee's argument, they

11   claim that the reason it's not binding is because it had

12   this condition that these documents had to be executed by

13   this termination date.

14             And just to diverge for a second, they refer to

15   New York law, and suggest we haven't responded to it, what

16   -- as Mr. Benton correctly stated it, what New York law says

17   is, and I don't think that they've -- the New York Court of

18   Appeals actually clearly said, they still agree with the

19   reasoning of Teachers versus Tribune, which is the seminal

20   case, and hopefully I'll have a chance to explain later how

21   closely that case is in terms of facts to this one.

22             But what that New York Court of Appeals case says

23   is IDI, is that where the execution of final formal

24   documents is a precondition of performance, there may not be

25   a binding agreement.  And, in fact, in that case, they found

Page 92

1    that it wasn't a binding agreement in the IDI case in the

2    New York Court of Appeals.

3              Here, here there's no question that the execution

4    of those transaction documents was not a precondition of

5    performance.  How do we know that?  Because Credencial

6    performed under the work plan.  They did the Minicreditos --

7    they spent millions of dollars on the Minicreditos clean-up

8    at LBI's direction, they pledged 20 percent of their shares

9    to LBI, and they executed the Credencial loan documents.

10             So one of the transactional documents was, in

11   fact, executed, that's the Credencial loan.  And they --

12   yeah.

13             THE COURT:  But so they did those things --

14             MR. SHER:  Uh-huh.

15             THE COURT:  -- but they didn't do everything.

16             MR. SHER:  Credencial as far -- I don't think

17   there's -- believe there's any suggestion that my clients

18   didn't perform completely under the work plan.

19             THE COURT:  I'm sorry, I stated that incorrectly.

20   So certain things happened, but not everything happened --

21             MR. SHER:  Correct.

22             THE COURT:  -- that needed to happen before there

23   was no doubt that there was a binding agreement.  So certain

24   things didn't happen and then there was a termination,

25   right?

1          MR. SHER:  Well, I disagree slightly with the

2     characterization.  So there's no question that the one thing

3     that didn't happen certainly, although the draft agreements

4     were prepared, that they weren't executed.

5          THE COURT:  Right.

6          MR. SHER:  For whatever reason they weren't

7     executed.  That's for sure and Lehman Brothers, LBI didn't

8     provide financing that they said they would provide.

9          THE COURT:  Right.

10         MR. SHER:  And what the IDI case says is, and we

11     agree with it, is that we're not suggesting that in every

12     case where there's a preliminary agreement that contemplates

13     some further documentation down the road, that if it doesn't

14     go to fruition, there's a breach, and we're entitled to

15     damages.  That's not our position.

16         As the IDI case in the New York Court of Appeals

17     observed, if there's a good faith impasse over the

18     negotiation of those agreements, then there is no breach.

19     There's no breach of the duty of good faith and fair dealing

20     if that's what happens.  Here there is no suggestion that

21     there was a good faith impasse over those -- that

22     documentation.

23         All that happened, as the Court observed, is LBI

24     changed its mind, you know, whether it was because of the

25     financial situation or their lack -- their decision they

Page 94

1   were no longer interested in investing in the South American

2   consumer credit companies, whatever it was, they decided

3   after a period, you know what, we change our mind, we don't

4   want to do this deal.

5           As the Teachers case, Teachers versus Tribune

6   Company case says, you cannot do that.  And that case was

7   almost the exact same thing facts as this case.  It involved

8   a loan agreement.  The only difference was, the Court

9   enforced that agreement against the borrower.  The borrower

10  tried to get out of the preliminary loan agreement, because

11  what happened in the three months that they were supposed to

12  be negotiating their final agreements is interest rates

13  dropped.  And the bar said, you know what, I don't want this

14  deal anymore, I can get capital for less.  And the Court

15  said, no, you cannot do that.

16          And that's exactly what Lehman Brothers is trying

17  to do here.  And if an agreement like that is enforced

18  against the borrower, it has to also be enforced against the

19  lender.  So I want to make sure I answered the Court's

20  question.

21          THE COURT:  So you say it's -- you believe this is

22  Type 1.

23          MR. SHER:  Absolutely.  But even if it's Type 2,

24  we are entitled to all the damages we claim, a company was

25  decimated.  Just like in -- and again, the Teacher's case,

1    the Court found in favor of the plaintiff on its full

2    judgment.  It's exactly the same circumstances here.

3            The one other thing I wanted to point out is, what

4    LBI is suggesting is that the reason this work plan was not

5    a binding agreement, despite all the indications that the

6    parties intended to be bound by it, it's a 28-paged

7    document, signed by sophisticated parties, they took out all

8    this language that suggests it's not binding, but what LBI's

9    argument, as I understand it is, is that because there was a

10   condition in there that something, some final thing had to

11   happen before the parties proceeded to perform the

12   agreement, that is that the execution of the transactional

13   documents, and the approval of the board.

14           And again, on approval of the board, I go back to

15   the Teachers versus Tribune case, the borrower used the

16   exact same excuse as to why they didn't want -- why the

17   condition was not met under their preliminary agreement.

18   They said, our board never approved it, I'm sorry, it

19   expired as of the end of the year, we're off the hook.  The

20   Court said no, no, no, you can't do that.  That's a breach

21   of good faith and fair dealing.

22           But what LBI's position seems to be is that

23   whenever there is a condition in one of these agreement,

24   that it therefore is not binding.  And that's not true.

25   Because binding agreements all -- very often contain some

Page 96

1    sort of condition.  And for that principle referred to in a

2    Second Circuit case we cited in our papers, but we didn't

3    discuss at length, and that's Indian.com versus Delahl (ph)

4    and it's 412 F.3d 315.  And in that case, it was an

5    agreement to pay commission -- a company agreed to pay a

6    commission to a former employee who was asked to broker a

7    sale of one of its subsidiaries.  And if the deal closed,

8    only if the deal closed would the individual receive a

9    commission.

10           And what happened was, the individual did all the

11   work, brought the parties together, the sale was about to

12   happen, and for whatever reason, the company changed its

13   mind and said, I don't want to do this deal, I don't want to

14   pay your commission, deal doesn't close.

15           And in that case, the Second Circuit says, no, no,

16   you can't do that.  If there's a condition in the contract

17   that -- and you cause it --

18           THE COURT:  You caused the failure.

19           MR. SHER:  Exactly.  And that's exactly what

20   happened here, it's exactly what happened in Teachers versus

21   Tribune, and that's a breach of the good faith and fair

22   dealing -- implied covenant of good faith and fair dealing.

23           And interestingly, in India.com the Second Circuit

24   observed, that you don't even have to show bad faith in

25   those situations.  If you show that it was an arbitrary

1    decision, that that's a wrongful termination of the

2    agreement.  And in that situation, the broker got all of his

3    damages, the entire commission that he would've been

4    entitled to if the deal had closed.  And that's simply what

5    we're asking for.

6              THE COURT:  But now, and I'm going to skip topics

7    a little bit, but that type of damage calculation is very

8    different from the type of damage calculation that you've

9    put in.  So I thought counsel answered commendably and

10   honestly with respect to the -- you know, the reliance

11   damages, but there's a huge gap between that and, you know,

12   hey, the world would've been our oyster, and you owe us $100

13   million.  I mean, that's a big, big gap.

14             MR. SHER:  There's no question it's more

15   complicated than calculating a commission based on a sale

16   price, I completely agree, Your Honor.  But again, I don't

17   think it's fair to suggest that we are seeking extraordinary

18   speculative lost profits.  And I think by the way, it's

19   equally speculative to suggest that because of the recession

20   that Minicreditos could not have continued to make money in

21   South America serving the middle -- lower and middle

22   communities there.

23             And we're not pulling these numbers out of thin

24   air.  These are numbers that were a result of collaboration

25   with LBI in advance in the due diligence period --

1          THE COURT:  Right, but in a period of time before

2     the world fundamentally changed.

3          MR. SHER:  No question, no question.  But the

4     company, you know, this is again a credit company.  It's not

5     -- all the parties understood that if a credit company

6     doesn't have access to capital, it goes away.  So all we're

7     trying to do is, yes, out of pocket expenses, which as Mr.

8     Benton indicated it approached 10 million, but also the

9     decimation of a company that already existed.  This was not

10    a new company, it's not a new venture, it existed and it was

11    successful.  They needed capital to grow.  And that's all

12    we're seeking compensation for.

13         THE COURT:  Okay.  Thank you.

14         MR. SHER:  Thank you, Your Honor.

15         MR. BENTON:  Your Honor, just a few comments.  On

16    Teachers, I think there was some more smushing going on to a

17    certain degree, and I'll try not to do it, a fourth time

18    will not be the trick I think.

19         THE COURT:  Okay.

20         MR. BENTON:  You know, first of all, Teachers is a

21    type -- is a case where a Type 2 agreement was found in that

22    case, not a Type 1.  And I think in the brief, and also in

23    some of the comments, and it's also somewhat natural, I do

24    it when I talk about the cases, sometimes it's difficult to

25    keep the principles or the cases clear when we're talking

Page 99

1      about what actually the Court held.

2             But they -- to be clear, it was a Type 2, not a

3      Type 1.  And so Type 1, the Teachers case does not stand for

4      any proposition that -- for a Type 2 you can get lost

5      profits.

6             And I know that Mr. Sher repeatedly said that they

7      can get lost profits for a Type 2 agreement, but in fact,

8      the case law says you can't.  And we've cited it all, but

9      there are cases from Adjust Right (ph) in the Second Circuit

10     to the Gory Densky (ph) and Goodstein (ph) cases in New

11     York.  I mean, and also basically it's a matter of logic and

12     common sense.  Because otherwise, you'd just simply be

13     transforming an agreement to negotiate in good faith to the

14     agreement to consummate the ultimate transaction.  They

15     would again be smushed.  I'll go one more time.

16            And so that's not the law.  And also when Mr. Sher

17     says that we're on all fours, when we're on all fours with

18     Teachers that's also not the case.  There are fundamental

19     differences.  I mean, it is a deciminal case, in fact, it

20     came up with the whole Type 1, Type 2 evaluation.  Which I

21     don't disagree, there is a bit of confusion between the New

22     York State cases and the federal cases as to whether we're

23     going to use this nomenclature, as to whether we're not.

24            But at the end of the day, the reason we included

25     both is because I just don't think it matters.  I think the

Page 100

1   language matters and the intent matters.  And so I don't

2   disagree that we should be also citing the federal cases and

3   using them, because I think it's not always useful, but it

4   can be useful.

5           But Teachers --

6           THE COURT:  So in your view of the world though,

7   you know, you're getting down to the deadline, lawyers have

8   been working hard, you're in the closing room, agreements

9   are on the table --

10          MR. BENTON:  Uh-huh.

11          THE COURT:  -- and you just decide not to sign.

12  So in your formulation --

13          MR. BENTON:  Uh-huh.

14          THE COURT:  -- no consequence to that.

15          MR. BENTON:  Yes, unless it's -- I mean, if it's a

16  Type 2 -- if it is found to be a Type 2, then there could

17  well be a consequence to that.  If there is not a Type 2,

18  which is -- you know, the presumption for both Type 1 and

19  Type 2 under the law, as stated even in Teachers is against

20  finding binding obligations and agreements unless the

21  parties clearly intended to be bound.

22          So it's not that there are two types of

23  preliminary agreements, Your Honor, there are three types of

24  preliminary agreements.  One is called an unenforceable

25  agreement to agree, that's neither a Type 1 nor a Type 2.

Page 101

1              THE COURT:  Right.

2              MR. BENTON:  And with respect to Teachers,

3      fundamental differences apply even with our case and theirs.

4      It was Judge Gerber in Lyondell said, as many cases have

5      said, it's fundamentally important that Teachers actually

6      said that it was binding.  We don't have that here.

7              And not only that, Teachers did not have, to my

8      memory, they did not have anything like our termination

9      provision.  Also, with respect and I will try to be quick on

10     New York law.

11             I think it's the IDT case, but maybe I keep

12     looking at the T and it's in I's, so it's either IDT case or

13     IDI.  It's the case that said, as Mr. Sher stated, the New

14     York case that stated, you know, we don't necessarily agree

15     with the reasoning of the federal court cases, but we agree

16     with their logic, but where the negotiation of further

17     agreements is a prerequisite to a party's performance, you

18     know, there is no agreement.

19             It is absolutely true, as we pointed out in our

20     opening brief, that the IDT case itself is not kind of

21     directly relevant to our argument on the Type 1.  It's the

22     progender of later cases on the enforceability of

23     agreements, rather than the -- a condition to the

24     performance of an agreement.

25             The IDT case did involve a settlement agreement,

Page 102

1    but the Court said, this is a binding settlement agreement.

2    And then the parties had to go on and negotiate further per

3    their agreements.  And in that case, there was a

4    precondition to performance under an agreement the Court had

5    already determined.

6            But there's a difference as the Court itself in

7    IDT pointed out between conditions to performance of an

8    agreement that's an agreement, and looking to conditions

9    like we have here to determine is there an agreement at all.

10   And cases like Amcan and Lyondell have gone on and used the

11   IDT case to find no enforceable agreements.

12           With respect to the new entity, it -- as I believe

13   that Minicreditos was formed in 2006, there are cases such

14   as -- I believe Seanfeld (ph) and in any event, Logic, this

15   was a new company by very virtue of the fact that it was

16   going to be a joint venture that as their papers say, was

17   intended to compete with the -- they didn't say it this way,

18   but the big boys, with bigger -- with some of the bigger

19   competitors.  So I do think it was an unknown new joint

20   venture.

21           And I guess I think that's it.  I thought it was

22   interesting, Your Honor, though when Mr. Sher said that it

23   was equally speculative what would happen if -- maybe the

24   credits -- maybe the damages would've been more.  But I just

25   think that really points to why this is -- they are

Page 103

1    speculative.

2          Who knows, I don't know, and they don't know

3    either, and they haven't alleged why they know.

4          THE COURT:  Right.  But that's not something that

5    I can figure out at this -- whatever would be appropriate

6    for me to figure out at this stage.  I do make the

7    observation that it's a -- that's a tricky -- that would be

8    a tricky phase of the trial to, I think, to make that

9    determination of those damages.  As you said, you know,

10   you're looking in a crystal ball in a rearview mirror.

11         MR. BENTON:  I like that one.

12         THE COURT:  You like that one?

13         MR. BENTON:  I'm really upset I didn't put that

14   down.

15         THE COURT:  I just made that up.

16         MR. BENTON:  That was really good.  I appreciate

17   the -- but I do think there are cases --

18         THE COURT:  Look --

19         MR. BENTON:  -- on motion to dismiss on lost

20   profit damages, and in particular, it's not just the -- just

21   to be clear, it's not just whether they're speculative or

22   they could be proven to reasonable certainty.  It is also

23   whether they were in the contemplation of the parties.  And

24   I think that --

25         THE COURT:  Right.  No, the contemplation of the

Page 104

1   parties is definitely a big point.  Look, I find this very

2   fascinating and very difficult, and I -- frankly, I don't

3   feel comfortable sustaining the objection at this juncture.

4   That doesn't mean that victory is in hand, but I don't -- I

5   do not feel that there is a basis, despite the very

6   compelling arguments in your papers frankly to sustain the

7   objection at this 12(b)(6)-like phase.

8          So I think you ought to go into the next phase

9   consistent with the ADR procedures, you know, discovery,

10  briefing, what have you and let's keep going for a bit.

11         MR. BENTON:  Yeah, and that is not -- obviously

12  not a problem, Your Honor.

13         THE COURT:  Okay.

14         MR. BENTON:  Since -- but I would --

15         THE COURT:  I mean, to the extent that you're

16  reading, you know, the tea leaves that I'm pointing out, I

17  mean, I do -- I'm very troubled by the damage calculation,

18  but I'm also very interested and putting aside Type 1, Type

19  2 agreements, you know, however you want to bucket all of

20  this, there are aspects of the way this played out that I

21  think taken outside the realm of something that can be

22  purely decided on papers.

23         There was conduct, there was stuff going on that

24  informs this entire situation.  I just put out a rather

25  lengthy decision in another case that talks about, yes, you

Page 105

1   have to read the words, and the words can appear to be clear

2   and unambiguous, but you do also have to consider the

3   context.

4            So I'm feeling a little bit of a need, and you're

5   free to -- it's without prejudice to your rights to convince

6   me otherwise, if we would ever get to a summary judgment

7   phase to not look --

8            MR. BENTON:  Oh, I'm going to try certainly.

9            THE COURT:  So look at the context, but maybe

10  somewhere along the line in the ADR procedures, you'll find

11  another path to resolve this, but in any event.

12           MR. BENTON:  Well, I appreciate it, Your Honor.

13  And like I said, you know, in terms of ADR and the ADR

14  procedures don't prevent us from talking outside the ADR

15  procedures.

16           THE COURT:  Right.

17           MR. BENTON:  And we actually do.  Despite my

18  disagreement with their --

19           THE COURT:  With virtually everything he said.

20           MR. BENTON:  With virtually -- not virtually, it's

21  actually absolutely everything, no, but I mean, we do have a

22  good relationship --

23           THE COURT:  Okay.

24           MR. BENTON:  -- and so I'm sure that we can at

25  least have a good talk.

Page 106

1          THE COURT:  Okay.  So if you would be so kind as

2     to draft up an order and share it, and send me in order to

3     just disposing of what we had --

4          MR. BENTON:  Okay.

5          THE COURT:  -- today and indicating what's going

6     to happen in the future.

7          MR. BENTON:  Yes, that's not a problem, Your

8     Honor, thank you.

9          THE COURT:  All right.  Thank you very much.

10         MR. SHER:  Thank you, Your Honor.

11         THE COURT:  Have a good day.  I think that's it

12    for this morning.  So we will -- yes?

13         UNIDENTIFIED:  Can I address (indiscernible) in

14    our motion, Your Honor?  Not this motion but LBHI, we're

15    waiting on the (indiscernible).

16         THE COURT:  Right.  And?

17         UNIDENTIFIED:  We did get it.

18         THE COURT:  Okay.

19         UNIDENTIFIED:  So what we'll do, Your Honor, we'll

20    spin the order, you know, carve it out all the parties who

21    appeared and we'll (indiscernible) --

22         THE COURT:  Great, terrific.  All right.  Thank

23    you very much.  All right.  We're going to resume with the

24    rest of the calendar at 1:30 today.  Thank you, folks, very

25    much.

Page 107

1        (Recessed at 12:03 p.m.; reconvened at 1:41 p.m.)

2              THE COURT:  All right.  Who would like to start?

3              MR. MILLER:  Good afternoon, Your Honor.  May it

4    please the Court I'm Ralph Miller with the Weil firm here on

5    behalf of the plan administrator, Lehman Brothers Holdings,

6    Inc. or LBHI.

7              Your Honor, the first item on the afternoon agenda

8    will be two specific claims filed by Ms. Heidi Steiger and

9    by a limited partnership she controls, Steiger & Associates.

10   These claims Numbers 32379 and 32380 were objected to in the

11   two-hundred-fifty-fourth omnibus objection.  I think if I

12   might very briefly, Your Honor, I would like to explain why

13   the application of Section 510(b) to these claims is simple

14   and straightforward because the claims themselves contain

15   admissions that make the statute directly applicable to the

16   --

17             THE COURT:  So let me ask you a question, Mr.

18   Miller?  We spent a lot of quality time together during the

19   three-day trial we had relating to the RSUs and that

20   included some other claims by the Neuberger Berman folks.

21             So these securities if you will, these are not

22   RSUs.  This is stock.

23             MR. MILLER:  That's correct, Your Honor.  This was

24   Neuberger Berman stock originally that Ms. Steiger had --

25             THE COURT:  Right.

Page 108

1          MR. MILLER:  -- which were converted in 2004 at

2    the time of the merger.  Actually, it was an acquisition and

3    they were converted to Lehman Brothers Holdings Inc. common

4    stock.

5          THE COURT:  Okay.  So the -- at the first level,

6    stock is stock.

7          MR. MILLER:  That's correct, Your Honor.

8          THE COURT:  And the objection seems to want me to

9    say stock is not stock here.

10         MR. MILLER:  Well, I think that's right, Your

11   Honor.  Happily, the claim itself however makes it clear

12   that all the damages arise from the conversion of one stock

13   to another stock, and that's why we think this is something

14   that, really, on its face is in the core of Section 510(b).

15         THE COURT:  Okay.  Why don't I let you continue?

16         MR. MILLER:  Well, Your Honor, what I would like

17   to do just very briefly is I'll point out the three sort of

18   sentences in the statute that I think are the key, and then

19   I would like to pass out the claim and show how the

20   admissions in the claim make those --

21         THE COURT:  Okay.

22         MR. MILLER:  -- three sentences apply.

23         As the Court's well aware, the first operative

24   statutory definition is 11 U.S.C. Section 101.16 which

25   states the term equity security means "a share in a

Page 109

1    corporation whether or not transferrable or denominated

2    stock or a similar security."  That's important because they

3    make some emphasis on the fact that there were some transfer

4    restrictions.

5           The next two phrases are in 510(b) which requires

6    subordination for "a claim arising from rescission of a

7    purchase or sale of a security of the debtor or of an

8    affiliate of the debtor."  And also requires subordination

9    of a claim "for damages arising from the purchase or sale of

10   such security."

11          Now if I may approach, Your Honor --

12          THE COURT:  Sure.

13          MR. MILLER:  -- I have --

14       (Pause)

15          MR. MILLER:  Your Honor, what I did was to pass

16   out briefly the declaration of Mr. Donald A. Watnick and I

17   have -- we flagged really only two pages in each of the

18   claims themselves that have, we believe, key admissions.

19   The first highlight is on page one.  "Steiger" -- that's

20   referring to Heidi Steiger -- "a senior executive for

21   Neuberger Berman, Inc. at the time of its acquisition by

22   Lehman in or about October of 2003."

23          Then skipping a sentence, "as a part of her

24   compensation from Neuberger, Steiger received valuable

25   shares of stock in Neuberger."  Skipping another couple of

Page 110

1   sentences, and this is really the one that sort of ties this

2   up, "At the time of Lehman's acquisition of Neuberger,

3   Steiger agreed that her stock holdings in Neuberger would be

4   converted to shares of Lehman stock and would be subject to

5   certain restrictions, including (i) that she and any entity

6   she was affiliated with, such as Steiger & Associates, could

7   sell only ten percent of her Lehman shares per year and (ii)

8   that if she engaged in certain competitive activities with

9   Lehman she and affiliated entities would essentially forfeit

10  all shares of Lehman stock."

11         Then we skip over to the next page.  The first

12  paragraph there is talking about how the stock went down in

13  value and how she says she didn't pursue valuable

14  opportunities that could have made her $10 million a year.

15  There's no proof of any of that, Your Honor, but it's not

16  really relevant.

17         But the highlighted language on the second page

18  is:

19      "In view of the foregoing, Steiger is entitled to

20  recover damages equal to the value of the consideration that

21  Lehman agreed to provide to her in exchange for her

22  agreements to restrict her sales of Lehman stock and to not

23  engage in competitive activities for three years without

24  Lehman's prior consent and lost earnings.  These damages

25  should be award based on causes of action for breach of

Page 111

1    contract, rescission, unjust enrichment and as a matter of

2    equity, these damages are equal to between $16,800,000 (the

3    value of her Lehman stock holdings when her Lehman

4    employment terminated) less the value of any shares of

5    Lehman stock sold by claimant thereafter and $30 million,

6    her lost earnings for the three year non-compete period, and

7    will be proven in an appropriate hearing."

8            Now what is key to all of this is it makes it

9    clear that all this ties back to the stock.

10           The second tab is on the Steiger Associates proof

11   of claim and really the first sentence has everything that

12   is necessary to apply 510(b).  It says, "The basis for the

13   proof of claim of Steiger Associates, L.P., Steiger

14   Associates, a claimant, is stock it owned in Lehman Brother

15   Holding, Inc."  That says it all.

16           Now, Your Honor, we think that the statute just

17   clearly applies.  I do want to deal with a couple of sort of

18   loose ends and in response because they, of course, try to

19   make some distinction.

20           The argument in the response is that "stock

21   holdings in debtors did not arise from voluntary purchases

22   and did not arise out of compensation received from a non-

23   debtor Lehman entity."

24           Now the first part of that about voluntary

25   purchases is something that the Court has dealt with and, as

Page 112

1    you know, the Enron opinion at 341 B.R. 141 is one of a

2    number that have held that it's not involuntary because it's

3    part of a compensation arrangement and merger transaction

4    and other things.  There are groups of cases of that sort

5    cited in our reply.

6              This reference to compensation received from a

7    non-debtor Lehman entity really has nothing to do with

8    anything.  That's saying she worked at Neuberger.  She got

9    Neuberger stock.  It's the conversion that's the purchase,

10   Your Honor.

11             Now I don't think any case law is really needed,

12   but if you did need a case, the In re: Paragren (ph)

13   Systems, Inc. case, which is cited on page 3, is really

14   right on point.  There, the claimant had been a shareholder

15   in a company that was acquired prepetition by the debtor.

16   As a part of the merger the claimant exchanged his stock --

17   her stock of the debtor.  There were employment agreements

18   and non-competes, and the claimant filed a proof for damages

19   based on the non-competition agreement.  There, Judge

20   Fitzgerald found the "non-competition agreement was entered

21   into as part and parcel of the merger and for no other

22   purpose or consideration."

23             That's essentially what these -- what the claim

24   says.  It says, and it's notable by the way that the penalty

25   for the non-competition was forfeiture of the stock.  I

Page 113

1    mean, there's no other penalty alleged.  By the way, they

2    did not introduce in this record a copy of the agreement.

3         If Ms. Steiger wanted to argue that her conversion

4    was involuntary she -- or somehow coerced or anything else,

5    she filed a declaration.  There's nothing about that in the

6    declaration.  There's nothing in the record.  She's the sole

7    source of any argument for that.  They've had an

8    opportunity.  Nothing has been put in.

9         And, finally, with regard to these breach of

10   contract claims, Your Honor, there is -- first of all, there

11   is no identification that there was any alleged contract

12   that was breached, and there is no statement of the way in

13   which the breach occurred.  Although it says a reference to

14   unjust enrichment, there is no recitation elements or any

15   allegation of facts to go with the elements.  If this were a

16   motion to dismiss, this would be dismissed for failure to

17   state a claim.

18        As Judge Fitzgerald noted in the Paragren case,

19   "Subordination cannot be defeated merely by attempting to

20   classify a claim as a breach of contract rather than a

21   breach incident to a stock purchase or sale agreement."  And

22   that's essentially what we have here.

23        In short, Your Honor, all the claims asserted in

24   Claim Numbers 32379 and 32380 are arising from rescission of

25   the purchase of LBHI common stock because they do refer to

Page 114

1    rescission or damages arising from the purchase of such a

2    security, and that's the conversion.  The claimants have had

3    ample opportunity to offer any facts through their

4    declarations that would put in issue the causal connection

5    to the conversion.  They've not done so.  And there's not a

6    shred of evidence to support any of the allegations about

7    involuntary purchase or breach of contract that could avoid

8    the language in 510(b).

9            So the plan administrator requests that the

10   objections be granted.  The full value of the claims would

11   be converted to equity interest.  We're not quibbling over

12   the $33 million.  And that's the relief that we seek, Your

13   Honor.  I would be happy to take any questions.

14           THE COURT:  All right.  Thank you.

15           Good afternoon.

16           MR. WATNICK:  Good afternoon, Your Honor.  Donald

17   Watnick.  I represent the claimants, Heidi Steiger and

18   Steiger Associates.

19           THE COURT:  So, Mr. Watnick, let me ask you.  Ms.

20   Steiger left Lehman's employ in February of 2004?

21           MR. WATNICK:  I don't believe she ever was an

22   employee of Lehman.  She was an employee of Neuberger.  She

23   had been part of Neuberger at the time of the acquisition.

24           THE COURT:  Then -- but it says in your affidavit

25   that Steiger's employment with Lehman was voluntarily

Page 115

1    terminated.

2              MR. WATNICK:  Okay.  Yes.  I'm --

3              THE COURT:  Okay.  So Lehman was acquired by

4    Neuberger -- Neuberger was acquired by Lehman in October of

5    2003, right?  I mean, that was the deal.

6              MR. WATNICK:  Yes.

7              THE COURT:  All the Neuberger people got to go to

8    Lehman, although I understand they actually never left the

9    Neuberger building.

10             MR. WATNICK:  Correct.

11             THE COURT:  Right.  But they -- the Neuberger

12   people then became Lehman employees, right?

13             MR. WATNICK:  I -- Your Honor, I don't recall that

14   as I stand here.  I do have some recollection,

15   notwithstanding what I said in my affidavit, that I -- I'm

16   not sure if she ever became a Lehman person.  I -- I have

17   some recollection that she may always have been a Neuberger

18   person.  I certainly can check that, but I -- there's no

19   question that she was part of Neuberger and Neuberger was

20   acquired by Lehman, and that she left on the dates that you

21   mentioned.

22             THE COURT:  Okay.  I'm just -- Ms. Steiger was

23   part of a leadership team.  She was a senior executive with

24   Neuberger Berman.  She was one of the architects or lead

25   participants, if you will, on the Neuberger side of the

Page 116

1    Neuberger Lehman marriage, right?

2            MR. WATNICK:  She certainly was a partner at

3    Neuberger.  She certainly was a senior person at Neuberger.

4    I'm not sure if there's anything in the record that says she

5    was an architect of the acquisition.  She certainly did not

6    have the power to approve or disapprove it, and we submit

7    that there were others who made the decision.  I believe we

8    -- the record shows that there was an agreement that

9    prevented her from objecting to the merger, but in any

10   event, she didn't have enough shares to tip the scales as to

11   whether this was going to be approved or not.  And that's

12   really the basis of our position here, Your Honor; that this

13   was not a voluntary --

14           THE COURT:  Yeah.  But the problem is that it was

15   voluntary because she did not have to -- she -- if she

16   wanted to go out and do what she wanted to do for three

17   years, she could have done it.  That was a decision.  She

18   chose not to make that decision.  She chose to take this

19   stock which, if the world had turned a different way, would

20   have made her very wealthy or wealthier than she might have

21   already been at that point.  But that's not what happened.

22   So now she's unhappy.

23           And I -- I understand the RSU proceeding is

24   separate and not part of this record, but that's largely the

25   complaint of the Neuberger folks who got stock in RSUs.

Page 117

1   They were perfectly happy when -- you know, when the world

2   was going like this, but then were unhappy after that.

3            And, I mean, reading the words of your declaration

4   it fits, as Mr. Miller pointed out, it fits squarely within

5   the statute.  This is exactly what you're not allowed to do.

6   You're not allowed to take a claim that's based on stock --

7   this is clearly stock.  It's not even an RSU.  It's actual

8   stock -- and say, I don't like what it's worth now, so turn

9   it into something else.  And that -- you're not allowed to

10  do that.  That's what 510(b) prohibits you from doing.

11           Mr. Miller actually invited me down this path, and

12  I'll go down there, which is that even if I was inclined to

13  pursue the path that this was not covered by 510(b) -- and

14  I'll let you be heard -- I think that there's a good failure

15  to state a claim here full stop.  When I read these papers,

16  I don't even see the claim.  I don't see a claim.  She had

17  this stock, unclear she sold whatever she could sell or not,

18  and then the notion that Lehman somehow should pay her $30

19  million because she elected to abide by a non-compete, it's

20  just an extraordinary claim.  It's not -- but it's not -- as

21  Mr. Miller pointed out, it's not based on anything.  It -- I

22  mean, on a 12(b)(6) level there's no claim.

23           So you've got to -- I'm not getting there at all

24  based on what your papers have.  So if you have anything

25  else, I would be delighted to hear it.

Page 118

1          MR. WATNICK:  Your Honor, I hear your points.  I

2    hear Mr. Miller's points.  I know that the Court has covered

3    many of these points in the RSU matter which --

4          THE COURT:  No.  But to be clear, I'm basing the

5    disposition of this motion on this record.  But I -- of

6    course, I can't turn my brain off to what I heard in the RSU

7    --

8          MR. WATNICK:  I understand.

9          THE COURT:  -- trial.  So --

10         MR. WATNICK:  With respect to the point of claims,

11   I think the claims are pretty simple and straightforward,

12   and I think they are clear from the four corners of this

13   matter; that is, that there was an agreement that she wasn't

14   going to compete.  If she abided by that agreement, she was

15   entitled to certain considerations.  She didn't get.

16   Whether you look at it from a breach of contract standpoint

17   or an unjust enrichment standpoint --

18         THE COURT:  What -- she was entitled to what if

19   she didn't compete?

20         MR. WATNICK:  She was entitled to the value of

21   certain amounts.  She was entitled to be able to have the

22   value of the Neuberger stock that she had at the time of

23   this acquisition.  So that, we submit, is the basis --

24         THE COURT:  Well, let me give you a hypothetical.

25   Suppose -- and everybody, I think, of a certain age

Page 119

1   remembers what it was like the weekend leading into

2   September 15th, 2008.  I certainly remember.  And everybody

3   was thinking, is Lehman going to file; oh, my God, it's

4   never going to happen that Lehman's going to file.  What if,

5   at the eleventh hour, there had been a rescue and low and

6   behold Lehman didn't file, but the stock was worth a penny.

7   Is the argument then she gets the difference between what

8   she felt it should have been worth or what it was worth at

9   its peak and a penny?  Surely not.

10          The only reason that you're here making this

11  argument is because there was a bankruptcy and the stock was

12  rendered valueless.  And, by the way, bankruptcy doesn't

13  always render stock valueless.  You know, the folks who have

14  American Airlines stock are pretty happy these days.  And

15  Lehman's perfectly happy to have her have an allowed amount

16  of an equity interest with everybody else who has equity.

17          So just her articulation right now of how she's

18  been wronged doesn't help me.  It doesn't help me.  The fact

19  that she did what she was supposed to do and through no

20  fault of hers the stock became valueless, that's the risk

21  that you undertake when you take stock.

22          MR. WATNICK:  I understand the position there,

23  Your Honor.  Our position is that there is a claim and our

24  position is what's distinct here as we've said in our papers

25  and as others have said in papers filed with this Court is

Page 120

1   these weren't voluntarily -- voluntary purchases.  These

2   were purchases that my client did not voluntarily undertake,

3   whereas in the same way that the cases say where someone

4   actually went out and bought the stock -- even in the

5   Paragren case, that involved, I believe, the sole owner of a

6   company who was -- you know, there's no question was

7   actively and voluntarily participating in the stock

8   transfer.

9           We submit that is not this case.  We submit that

10  the authority -- the Paragren case and others all involve

11  voluntary purchases of stock whereas in this circumstance it

12  wasn't.  We submit that that's why this is distinct.

13          THE COURT:  And you say the damages are equal to

14  between $16,800, the value of her Lehman stock holdings when

15  her Lehman employment terminated.  So that was in February

16  of 2004.  What happened after that?  Did she sell her ten

17  percent a year?

18          MR. WATNICK:  She did sell stock in the interim.

19  I don't -- as I stand here, I'm not sure what percentage --

20          THE COURT:  Because it probably went up --

21          MR. WATNICK:  -- it was.

22          THE COURT:  It probably went up then.  But in any

23  event, what you're saying is that if she -- she elected to

24  -- made a decision that she has $16.8 million in stock.  She

25  knows she can earn $10 million a year for the three years in

Page 121

1    non-compete.  She made an economic decision to try to ride

2    up the stock instead of earning that $10 million.  Why

3    should that be something that the estate compensates her

4    for.  That's not an economically rational decision.  I

5    wouldn't make that decision.  If I had the ability to earn

6    $10 million a year versus some lower amount, although one

7    could argue that my taking this job was not an economically

8    rational decision, but that's a different story.

9           It just -- what I'm trying to say to you in the

10   nicest possible way is it just doesn't add up.  It just

11   doesn't add up to a claim for cash for which the Lehman

12   estate ought to be liable.  I think she should have a claim

13   that's at the level of equity and that's at the level of

14   other claims that are subject to 510(b).  And I think the

15   basis for that is, as has been articulated, by Lehman and

16   independently, frankly, as I said, I think that the claim

17   doesn't survive a 12(b)(6) type motion to dismiss.

18          But I heard Mr. Miller say that they're happy to

19   give her an allowed claim in the amount of the $30 odd

20   million at the level of equity and I think that's the

21   disposition.

22          MR. WATNICK:  Okay.

23          THE COURT:  But I thank you for coming in.

24          MR. WATNICK:  Thank you, Your Honor.  I appreciate

25   your hearing the claim.

Page 122

1           THE COURT:  Okay.  Thank you.

2           MR. WATNICK:  Okay.  Good day.

3           MR. MILLER:  Your Honor, we do have an order and a

4  disc which we will provide --

5           THE COURT:  Okay.

6           MR. MILLER:  -- to the Court.

7           THE COURT:  And would you share it with Mr.

8  Watnick before you --

9           MR. MILLER:  Yes.

10          THE COURT:  -- give it to us.

11          MR. MILLER:  Yes, Your Honor.  This is Ralph

12  Miller again.  The proposed order was attached to our --

13          THE COURT:  Okay.  With no changes.

14          MR. MILLER:  -- response, and it's not changed.

15          THE COURT:  Okay.

16          MR. MILLER:  And it does provide that it will be

17  at the level of LBHI common stock.

18          THE COURT:  Okay.  Very good.  Thank you.

19          MR. WATNICK:  I will -- I don't expect comments,

20  but I'll make -- I'll let you know.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Give me one moment.

24      (Pause)

25          THE COURT:   Okay.  I think next on the agenda is

Page 123

```
 1    --

 2            MR. FAIL:  Your Honor, Item Number 7, Stonehill's

 3    motion.

 4            THE COURT:  Stonehill.  Yes.  Mr. Brilliant.

 5         (Pause)

 6            THE COURT:  How are you today?

 7            MR. BRILLIANT:   Doing well, Your Honor.  I have a

 8    little bit of a -- I wouldn't say laryngitis, but a little

 9    bit of a cold.  So --

10            THE COURT:  All right.  Well, I'll try to --

11            MR. BRILLIANT:  -- if you have any trouble hearing

12    me --

13            THE COURT:  -- I'll try to go easy on you.  Most

14    of my family had that same thing and it takes a while to go

15    away.

16            MR. BRILLIANT:  It does, Your Honor.  Go as hard

17    as you want, but if you have any trouble hearing me, please

18    let me know.

19            THE COURT:  Okay.  So let's cut right to the

20    chase.

21            MR. BRILLIANT:  Sure, Your Honor.

22            THE COURT:  Okay.  So the main things that

23    interest -- interested me -- interest me here are the notion

24    that while you may not have known the amount of the

25    diminution of value, you knew all the securities by their
```

Page 124

1    names, so to speak.  And in the proof of claim it's not --

2    nothing's there.  Nothing's there.  The only thing -- and

3    you say it in your papers, and I'll try to find the

4    reference.  You say in your papers that in the proof of

5    claim you made it clear that this was including the

6    diminution of value.

7            And then when I looked at the proof of claim, at

8    least the one that I'm looking at, what I see is that -- all

9    I see is the sentence that says, this is in paragraph 4 of

10   attachment to proof of claim of Stonehill Offshore Harbors,

11   Ltd., I see the sentence, "The failure of LBI to return

12   claimant's cash and securities therefore constitute a breach

13   of the PB agreement by the debtor and the other Lehman

14   entities."  That's -- so those are -- that's like the

15   bookends.  I see that --

16           MR. BRILLIANT:  Okay.

17           THE COURT:  -- which clearly, as you say, refers

18   to the failure to return the securities.  But on the other

19   hand, Lehman has, I think, made an interesting point that,

20   you know, you could have -- there could have been a list.

21   You knew that all the securities were.  You could have had a

22   list and next to each one of those securities it could have

23   said, unliquidated or TBD or something like that.

24           So if you could focus --

25           MR. BRILLIANT:  Sure.

 1              THE COURT:  -- at least the beginning part of your

 2    comments on those two --

 3              MR. BRILLIANT:  Thank you, Your Honor.

 4              THE COURT:  -- things.

 5              MR. BRILLIANT:  Okay.  And, Your Honor, I'm going

 6    to do a really hard job to listen to you and let you talk as

 7    well as respond.  And if --

 8              THE COURT:  Okay.

 9              MR. BRILLIANT:  -- if I'm not doing that you

10    please --

11              THE COURT:  I will.

12              MR. BRILLIANT:  -- point that out.

13              THE COURT:  You know I will.

14              MR. BRILLIANT:  But I think, Your Honor, I think

15    you're right.  I think the place to start is with the proof

16    of claim.

17              THE COURT:  Okay.

18              MR. BRILLIANT:  And I think -- and I think it's

19    also important to start with the claim understanding what it

20    is that a proof of claim is as distinct from a complaint.

21              And so if we turn to the -- you know, the proof of

22    claim, Your Honor, and as Your Honor, you know, knows, the

23    amount that's claimed is not less than $23,460,716 in  the

24    one example.  There's two different proofs of claim, as Your

25    Honor knows, for the two different funds.

Page 126

1           THE COURT:  Right.

2           MR. BRILLIANT:  And a similar proof of claim was

3    filed against each of the debtors.

4           And then if Your -- Your Honor, you know, looks at

5    the claim itself, you know, in 9(2) it says, basis for the

6    claim and it says, see instructions number two on reverse

7    side.  And the reverse side of the claim is attached here.

8    And if you go to number two it says, "Basis for claim, state

9    the type of debt or how it was incurred.  Examples include,

10   good sold, money loaned, services performed, personal

11   injury, wrongful death, car loan, mortgage note, and credit

12   card."  So, you know, all the proof of claim asks for is a

13   general understanding s to where the claim arises.  And here

14   the basis for the claim says, "Prime brokerage agreement.

15   See attachment."

16          So that's kind of where we start out.  What were

17    you asked to do?  Give the basis of your claim:  "Prime

18   brokerage agreement.  See attachment."

19          So then we turn to the claim itself and at the end

20   of paragraph 3 -- I'm going to get right to the point that

21   Your Honor pointed out a minute ago.  But if you get to the

22   end of paragraph 3, the last sentence it says, "As a party

23   to the PB agreement, the debtor is fully liable for all

24   amounts owed to the claimant in connection with the PB

25   agreement."  Now, again, no specificity as to what that is,

Page 127

1    but just saying you're responsible for all damages related

2    to the PB agreement.

3             Four says, "as claimant sole prime broker and

4    pursuant to the PB agreement, LBI had custody of the

5    substantial portion of claimant's assets, including both

6    cash and securities."  So it's talking about what did they

7    have, a substantial portion of the assets and then it goes

8    on in saying that they're responsible for settling all

9    trades and they're responsible for turning over the

10   securities or doing with them what the client wants with the

11   securities as a matter of the contract, custom, you know,

12   and SEC regulations.

13            The last sentence in four says, "The failure of

14   LBI to return claimant's cash and securities, therefore

15   constituted a breach of the PB agreement by the debtor and

16   the other Lehman entities."  Now it says very clearly that

17   the failure to return claimant's cash and securities.  Now

18   you're right, Your Honor. It's not attached and listed as to

19   what they are.  And as the Washington -- as the Court in the

20   Washington case that we cited in our brief says, if there

21   was perfect analysis we wouldn't have hearings about -- on

22   these issues.

23            So we agree with Your Honor that it's general.

24   "The failure to return claimant's cash and securities

25   constituted a breach of the PB agreement by the debtor and

Page 128

1    the other Lehman entities."

2             THE COURT:  So -- but then keep going, right?

3             MR. BRILLIANT:  Okay.

4             THE COURT:  Okay.

5             MR. BRILLIANT:  So then, Your Honor, the next, you

6    know, paragraph in paragraph 6 really start to talk about

7    certain specific things.

8             THE COURT:  Right.  But you said --

9             MR. BRILLIANT:  Right.

10            THE COURT:  -- about paragraph 5, right --

11            MR. BRILLIANT:  Right.

12            THE COURT:  -- because there's that nice little

13   heading that says, "claims arising under PB agreement,"

14   right?  So we just told you that our claims arise under the

15   PB agreement.  And that little heading kind of announces --

16            MR. BRILLIANT:  Yeah.

17            THE COURT:  -- now I'm about to tell you what

18   those claims are.

19            MR. BRILLIANT:  Your Honor, as Your Honor knows,

20   when you see a contract usually there's a provision that

21   says, you know, the headings don't mean anything.

22            THE COURT:  Headings don't mean anything.  Right.

23            MR. BRILLIANT:  And I would say, Your Honor, that

24   in this context, especially where we're talking about, you

25   know, notice pleading, the headings don't mean anything.

Page 129

1    The sentence ahead of -- above that says, there's a breach

2    of the contract by not turning over the securities.

3              Now, you know, would it be easier for me if it

4    said, claims arising out of the PB agreement was right above

5    that?  Yeah.  It would be easier for me, but I don't think

6    it changes the legal analysis here one iota, the fact that

7    it comes right afterwards.

8              But you're right.  The next paragraph, you know,

9    talks about the goods, you know, the securities that were,

10   you know, being held by the entity.  And it says that, you

11   know, the majority of the assets had been returned by now

12   because, you know, about nine months had passed between the

13   -- well, a year before the bar date in connection with the

14   bankruptcy filing itself. But about nine months had occurred

15   since the SIPA proof of claim.

16             And so they -- we say in here that the majority of

17   the assets have been returned, and that's in paragraph 6 in

18   the second sentence:  "Between the commencement of the SIPA

19   proceeding and the date of this claim, the majority of

20   claimant's securities and a portion of claimant's cash have

21   been returned.  However, as of the date" -- and then we go

22   through and we list all the things that are still

23   outstanding.  And those, Your Honor, by and large are the

24   liquidated claims.

25             THE COURT:  Right.

1             MR. BRILLIANT:  And you -- if you have any doubt

2     about that, you know, you can see that in paragraph 7 where

3     it says, "The amounts described above in the aggregate equal

4     to approximately 23 million plus the additional unliquidated

5     amounts.  And if you add up all the stuff in 26 you get to

6     the 23,406.

7             THE COURT:  Right.

8             MR. BRILLIANT:  So, clearly, there's a

9     contemplation here that it's more than just these individual

10     securities that are being held.  And we're saying they held

11     all of our securities.  Their failure to turn them over to

12     us as we requested was a breach.  And, you know, and then we

13     say, and we're holding them responsible at the end, you

14     know, but -- and there's a lot of stuff in between which I

15     think is important that we talk about before --

16             THE COURT:  Okay.

17             MR. BRILLIANT:  -- we get there.  But at the end

18     we say, you know, and we're holding you responsible for all

19     direct and indirect damages relating to what's discussed

20     above, the breach.

21             So, Your Honor, then -- now if all we wanted was

22     the securities back and it's just the attachment -- you

23     know, look, I freely concede they're right.  The attachment

24     at the point in time -- at that point in time was just the

25     securities that were still being held, not the ones, you

Page 131

1    know, that we had gotten back.

2          But if that's all we wanted to say, then you don't

3    need to say, eight and nine and ten and eleven and twelve

4    and thirteen.  But what we did in eight to make it

5    absolutely clear that we're saying you're responsible for

6    all this stuff is we say, you know, the amounts owed are

7    recoverable as -- you know, by claimant as a result of

8    willful and material misrepresentations, and we go on and

9    talk about how they told us, you know, Lehman officials

10   called Mr. Metulsky (ph) and told Mr. Metulsky, don't worry.

11   You're okay.  Everything's going to be great.  Lehman's not

12   going to file.  Leave your securities with us.

13          And so there's no reason to say that if all we

14   wanted was our securities back on the basis of, you know,

15   the fact that we had.  But we're letting the party know --

16   again, general notice principals here -- that there's a

17   claim for mis -- in addition to the contractual claim for

18   not turning over the securities, there's a claim for

19   misrepresentation.  There's a claim, you know, for fraud.  I

20   mean, let's not kid ourselves, as to the fact that we were

21   told, leave them here.  It will be okay.

22          And so if you -- you read -- you know, eight

23   through twelve, and then thirteen, which reads at the

24   beginning, "Thus by virtue of the public misrepresentation

25   of Lehman Brothers and private representations by Mr.

Page 132

1    Wickham (ph), Lehman Brothers' agent directly to SEM which

2    misrepresentations were intended to convince Lehman

3    Brothers' customers and counterparties in general and SEM in

4    particular, the financial stability and health despite the

5    fact" -- blah, blah, blah.

6            You know, we're making it absolutely clear that

7    there's -- that the claim involves this whole range of

8    conduct, you know, inducing based on misrepresentations, you

9    know to Stonehill to keep their securities there and then

10   not turning them over after -- you know, timely after the

11   bankruptcy and leading to direct and indirect damages, you

12   know, to the Stonehill entities.

13           Now that, Your Honor, ends up at the end of

14   thirteen, you know, and then fourteen says, "Claimant is

15   entitled to and is asserting against Lehman entities,

16   including the debtor, the full amount of the claims arising

17   under the PB agreement, notwithstanding the SIPA claims."

18   So we're saying we're suing holding the Lehman entities

19   liable with respect to all these things as well as the SIPA

20   entities.

21           And then, Your Honor, you know, again, I wish the

22   headings weren't here, but they are.  I don't think they

23   mean anything here, especially when you look at -- so then

24   it says, "reservation of rights," fifteen then says, "No

25   payments have been made to claimant on account of the

Page 133

1    claims."  That's clearly not a reservation of rights type

2    provision.  It's in the wrong place.

3            And then "Claimant reserves all of its rights to

4    supplement the claim."  We're not relying on that, but it's

5    clearly -- you know, it's in there.  And then seventeen is a

6    reservation of rights issue, and then eighteen, which really

7    doesn't have anything to do with reservation of rights, but

8    really brings forward all of the language prior to that and,

9    you know, all the way through thirteen.  And it says, "To

10   the extent not set forth in this claim, claimant also makes

11   claim for all direct, indirect, nominal or consequential

12   damages, interests, costs, attorney's fees, and other

13   amounts owed or owing to it to the extent recoverable under

14   the applicable agreement or applicable law," and then it

15   just, you know, goes on.

16           And it's -- it says it's directly related to the

17   manners discussed in the claim.  It's not just a boiler

18   plate language that just says, in addition to -- we're

19   including interest and fees and other things.  It's the

20   things that are discussed and related to the claim.  All the

21   issues here that you made misrepresentations to us, that you

22   didn't turn over our securities when you were required to,

23   that that was a breach of the agreement and that we're

24   asserting all of our direct and indirect claims.

25           THE COURT:  Okay.  Thank you.

1              MR. BRILLIANT:  So, you know, Your Honor, I think

2     the issue as to, you know, it doesn't say anywhere in here

3     that the claims are just related to the ones that were still

4     being held. Clearly, those are delineated in the one

5     paragraph.

6              THE COURT:  But --

7              MR. BRILLIANT:  But --

8              THE COURT:  -- let's go one more round and --

9              MR. BRILLIANT:  Okay.

10             THE COURT:  -- tell me -- I'm reading this and

11    what is it in the attachment to the proof of claim that puts

12    me on notice that you're going to make a claim for the

13    diminution in value of the securities that warrant return.

14             MR. BRILLIANT:  I think what we're -- we say in

15    here specifically that we're -- you know, in paragraph four

16    that their failure to return them timely was a breach of the

17    agreement.  In paragraphs eight through thirteen we say that

18    we left them there because of the misrepresentations of the

19    Lehman entities, the representations of the Lehman entities.

20    And then in eighteen we say that we're holding them

21    responsible for all direct and indirect consequences that

22    are related to the breach which, you know, is, Your Honor,

23    diminution in the value.

24             I mean, there could be other claims related to

25    that that adversely affected the business, things of that

Page 135

1   sort.  But we're not raising those.  The ones we're raising

2   are the fact that there's a diminution in the value of the

3   claims.

4          Your Honor, like I said, this is notice pleading.

5   I mean, the -- what Lehman would like you to believe, and I

6   think it could be a really bad precedent here, is they're

7   basically saying, that portion of the claim which was

8   liquidated, you know, the 26 million and in connection with

9   the other one -- the other amounts, that's -- you know, when

10  you read their papers you really see this with their chart

11  and everything.  They say, that's the only claim you made.

12  You didn't make any other claim.  All you claimed was for

13  the amount that you specifically liquidated.

14         But I don't think you could read it that way here

15  where we talk specifically about a breach of contract,

16  unliquidated amounts, indirect -- direct and indirect claims

17  arising from the breach of contract.  But -- so I don't

18  think that it's appropriate to read it that way.  But even

19  if Your Honor got there and said, okay, you know what?  It

20  just doesn't put me on notice specifically of this specific

21  claim -- and I don't think we needed to use the word

22  diminution.  You know, again, I concede to you we wouldn't

23  be here if it had that.  Right.  But we don't have to use

24  the word diminution to put the party on notice of the fact

25  that we had this claim.  We say they breached the contract.

Page 136

1    They misrepresented why -- you know, what was happening to

2    keep them there and we're holding you responsible for the

3    damages.

4            But even if Your Honor got there and reached a

5    conclusion that, you know, it's just not specific enough,

6    you know, the amendment rules or that a claim should be

7    freely amended, you know, if there's enough in here, it

8    arises out of the same occurrence and transaction that's

9    described in the complaint.  And I don't see how anyone can

10   really say here, given that we describe the

11   misrepresentations, the breach of the agreement, you know,

12   that a diminution claim doesn't arise out of the same

13   transaction.

14           So if it arises out of the same transaction, you

15   know, an amendment should be freely allowed unless there

16   would be -- it would be inequitable to do so and we don't

17   believe on this record there's any likelihood that Your

18   Honor could find it's inequitable.  This was not filed.

19           This claim, unlike the Calpine (ph) case, which

20   they say which this language is under very different facts

21   which was filed on the eve of confirmation of the plan and

22   was -- you know, had the potential to interfere with the

23   confirmation.  Also, the bankruptcy judge in that case and

24   the District Court both found that the claim, as a matter of

25   law, was invalid, you know, also finding that it was --

Page 137

1    shouldn't be amended to be allowed which is not our

2    situation here where, you know, they're not arguing anything

3    about the merits at this point and it's subject to another

4    day.

5          So, you know, it just would seem that for -- you

6    know, that if Your Honor was to reach a conclusion that, you

7    know, it kind of says it, but it doesn't really specifically

8    say it, then you shouldn't allow us to amend to provide for

9    it because there's no prejudice to them other than the fact

10   that if our claim is allowed we will get a larger portion of

11   the claims pool than we -- you know, than we might otherwise

12   get.  But it's not going to -- it didn't change their --

13          THE COURT:  Right.  I think the prejudice --

14          MR. BRILLIANT:  -- conduct at all.

15          THE COURT:  I think the prejudice that they also

16   elude to is other similar amendments where -- in their view

17   of the world this is a new claim, and if I allow it others

18   are going to show up with new claims.  And I'm actually

19   curious to know other claimants who suffered the same things

20   that Stonehill did, the failure to have their securities

21   returned, what their proofs of claim look like for this

22   aspect.

23          MR. BRILLIANT:  Your Honor, I don't -- you know,

24   the debtors may know.

25          THE COURT:  They may know.

Page 138

1           MR. BRILLIANT:  I don't know whether anybody else

2    has asserted this type of -- you know, Stonehill --

3           THE COURT:  I'm guessing that you're not the only

4    ones who didn't get their securities back when they asked

5    for them.

6           MR. BRILLIANT:  Ultimately, they got them back.

7    It's just a question --

8           THE COURT:  Right.  They --

9           MR. BRILLIANT:  -- it's a question of time and --

10          THE COURT:  The diminution in value.  Right.

11          MR. BRILLIANT:  And Your Honor, you know,

12   understand that when you're a hedge fund and you have all

13   your securities at a prime broker and you don't have any

14   securities and you don't have any assets, you don't really

15   have a business.  Right.  So --

16          THE COURT:  Right.

17          MR. BRILLIANT:  So, you know, clearly Stonehill

18   was put in a very untenable position for a period of time

19   and was damaged.  And we made it clear in the complaint, I

20   believe, that we were going to hold Lehman liable for the

21   full amount --

22          THE COURT:  Right.  But that --

23          MR. BRILLIANT:  -- of direct and indirect damages.

24          THE COURT:  That damage and then --

25          MR. BRILLIANT:  Right.

Page 139

1            THE COURT:  -- there's also the diminution in

2    value of the securities.  In other words, if you had gotten

3    the securities back you could have liquidated those

4    positions, right?

5            MR. BRILLIANT:  Well, could have done that or

6    could have done a lot of things with them.  That's right.

7            THE COURT:  Could have done a lot of things.

8            MR. BRILLIANT:  But that's the --

9            THE COURT:  Right.

10           MR. BRILLIANT:  And in that point in time we were

11   not able to do it.  And, you know, clearly how that damage

12   would be calculated, you know, was not ascertainable at that

13   point.  I'm sure now maybe you can tell from their papers

14   they dispute the methodology we use.

15           And, you know, the Second Circuit and this Court

16   says, you know, an unliquidated claim is something that

17   can't be easily ascertainable.  What your damage was by not

18   getting your securities back for a number of months is not

19   something that is freely ascertainable by publicly available

20   sources.  So it clearly was an unliquidated claim.

21           But, Your Honor, you know, I think you have to

22   deal with our claim as our claim and, you know, there's no

23   evidence in the record of other people coming in, what they

24   might do and, quite frankly, I mean, it -- you know, I don't

25   know that it's necessarily -- if they filed proofs of claim

Page 140

1   which put the debtor on notice that they might have claims

2   for direct damages, for the breach of contract.  You know, I

3   suspect that other people may have raised claims, but I'm

4   not aware of any, Your Honor.  As far as I know, we're the

5   only one in this --

6             THE COURT:  And then --

7             MR. BRILLIANT:  -- situation.

8             THE COURT:  -- I guess there's a question also as

9   to why it took as long as it did to get to this point, which

10   is a fair question.

11             MR. BRILLIANT:  Yeah.  It is, Your Honor.  And,

12   you know, it's -- it just is what it is.  I mean, I think --

13   as Your Honor knows we're here in really a kind of a strange

14   procedural basis.  If not for their seeking to lower the

15   reserve we wouldn't even be here now.

16             THE COURT:  But that's exactly my point.  One

17   wonders what would have happened, right?  So they had sought

18   to lower the reserve, right?

19             MR. BRILLIANT:  Uh-huh.

20             THE COURT:  And it kind of teased this issue out.

21             MR. BRILLIANT:  Well, that --

22             THE COURT:  Did they --

23             MR. BRILLIANT:  As I said, I promised you I was

24   going to let --

25             THE COURT:  Go ahead.

1              MR. BRILLIANT:  -- you talk, but --

2              THE COURT:  Go ahead.

3              MR. BRILLIANT:  -- that's not right.

4              THE COURT:  Okay.

5              MR. BRILLIANT:  Okay.  So in November of 2012 they

6    sent us some discovery and we responded to their discovery,

7    and then we started to have some conversations with them,

8    you know, about the claim.

9              Now Your Honor had intimated in the reserves that

10   that -- we're trying to jump the line. It's not a question

11   of jumping the line.  I think all the creditors would like

12   to have their claims resolved.

13             THE COURT:  Sure.  So in the --

14             MR. BRILLIANT:  But --

15             THE COURT:  -- course of that discovery you --

16             MR. BRILLIANT:  We gave them the chart that's

17   attached --

18             THE COURT:  -- you gave them --

19             MR. BRILLIANT:  -- here.

20             THE COURT:  Okay.

21             MR. BRILLIANT:  And so they had that, you know, a

22   long time even before the reserve motion.  So they were

23   aware that we had this claim.

24             THE COURT:  Okay.

25             MR. BRILLIANT:  But I think, Your Honor, the thing

Page 142

1   is -- and Your Honor knows that the way the claims

2   adjudication process works in a typical case, and it's set

3   up for a Chapter 7 case and a Chapter 13 case and a mega

4   Chapter 11 case, the largest case ever --

5         THE COURT:  Well, don't talk about 13 because it's

6   totally different.

7         MR. BRILLIANT:  Yeah.  Yeah.  Okay.  Well, but

8   people file a proof of claim.

9         THE COURT:  Right.

10        MR. BRILLIANT:  Okay.  So you file a claim.  You

11  put the debtor on notice.  There's nothing in the statute or

12  the rules that require --

13        THE COURT:  It's kind of like an opening bid.

14        MR. BRILLIANT:  Right.  Well, we --

15        THE COURT:  Right?

16        MR. BRILLIANT:  And like I said, we showed you --

17  like the language.  It's just put them on notice of

18  generally --

19        THE COURT:  Right.

20        MR. BRILLIANT:  -- how much you owe them, how much

21  you think they owe you, and where it comes from.  Right.

22  And then until they object to the claim, you know, there --

23  or you -- and you start a claims adjudication process, not

24  really much happens with claims.  I don't think most people

25  who file claims sit around and say, oh, you know, I just

Page 143

1    sold something.  I've now quantified my loss.  I --

2              THE COURT:  Well, when it gets --

3              MR. BRILLIANT:  I need to go back and --

4              THE COURT:  If you've filed a large unliquidated

5    claim, then when it gets to be plan time there's a lot of

6    action because --

7              MR. BRILLIANT:  Potentially.  If -- because -- and

8    I say potentially because here there wasn't, right?

9              THE COURT:  Right.

10             MR. BRILLIANT:  If you want to vote your claim,

11   you have to come in and file the motion under 3018 and to

12   vote it.

13             THE COURT:  Right.

14             MR. BRILLIANT:  We didn't do that here.  We didn't

15   -- you know, we were given a valid presumably.  You know, I

16   don't know for sure, but presumably --

17             THE COURT:  Right.  So you just --

18             MR. BRILLIANT:  -- Stonehill voted --

19             THE COURT:  -- were willing to be one of the great

20   unwashed masses.

21             MR. BRILLIANT:  Right.  And then the other thing

22   about this plan is it says, whatever the face amount of your

23   claim is, that gets reserved forward.  And so we had 20

24   claims at $40 million.

25             THE COURT:  Right.

Page 144

1          MR. BRILLIANT:  We were getting a reserve for $875

2     million.  We -- you know, we didn't think we were owed the

3     entire amount of $875 million.

4          THE COURT:  Right.  So life was good.

5          MR. BRILLIANT:  We thought we were owed $200

6     million, so why do we need to come in and adjust that.

7     We're okay with that.

8          So the answer is, so why aren't we here sooner?

9     I'm not saying it's because they haven't objected to our

10    claim sooner, but I think that is a -- the reality of it.

11    It's because there was no reason to be here, you know,

12    sooner.  There's -- and I think that's kind of where we are.

13         THE COURT:  Okay.

14         MR. BRILLIANT:  You know, the only other thing I

15    would say, Your Honor, and then I'll sit down and -- unless

16    you have other questions and let Mr. Fail speak, which is,

17    you know, this whole issue of prejudice.  Leaving aside the

18    issue of opening the flood gates, which I don't think is

19    really the appropriate analysis when we look at individual

20    claims to take away someone's rights because it could have

21    been a little more specific and if I let you be more

22    specific other people may show up.  I don't think that's

23    really appropriate.

24         But, you know, in the Midland (ph) case, you know,

25    the Court was very clear that just the fact that there would

Page 145

1    be any diminution or a lower distribution to other claims

2    can't be the be all and end all of things because if that

3    were right then no one -- and that's in the context of a

4    late claim, not in connection with an amended.  But, you

5    know, the Second Circuit says that can't be right because if

6    that were the case than you could -- no -- excusable neglect

7    could never overcome that burden.

8              So I don't think that that's really an issue.  So

9    our sense, Your Honor, is that if this would have been a

10   smaller case and been dealt with in a different way.  They

11   would have filed an objection to our claim.  We would have

12   had a hearing in front of Your Honor.  We would have said,

13   we're owed $150 million for the diminution as well as 40

14   million of securities we haven't gotten back.  So we have a

15   $200 million claim, they might have at that point raised the

16   issue and said, oh, you know, that's a new claim and that's

17   barred.  And Your Honor at the hearing would have made a

18   decision as to whether or not you thought that it related

19   back or was improperly claimed.

20             Instead, because of the reserve issue, we ended up

21   in a slightly different posture.

22             THE COURT:  All right.  Thank you.

23             MR. FAIL:  Good afternoon, Your Honor.

24             THE COURT:  Good afternoon.

25             MR. FAIL:  Garrett Fail, Weil Gotshal for Lehman

Page 146

1    Brothers Holdings, Inc.

2             If I might, Your Honor, I was taking some notes as

3    Mr. Brilliant went through and explained what was clear to

4    him, but I see it clearly a different -- in a different way.

5             I don't mind starting out looking at the proofs of

6    claims themselves.  Mr. Brilliant skipped over a few words

7    that I think are --

8             THE COURT:  Okay.  Why don't we do --

9             MR. FAIL:  -- are critical.

10            THE COURT:  -- that first?

11            MR. FAIL:  So looking to the proofs of claim in

12   paragraph 6, this is where we -- you know, the debtor and

13   the plan administrator viewed the references to the

14   securities and that there were two of them as we said in our

15   proof of claim.  There was a statement between the

16   commencement of the SIPA proceeding and the date of this

17   claim.  The majority of claimant's securities and a portion

18   of claimant's cash have been returned.  So that basically is

19   consistent with the fact that we got a list of securities

20   and the majority -- everything else was returned.  Okay.

21            The subsequent sentence then says, Your Honor,

22   that the estimated value of the securities held by LBI is

23   $395,473.59 for Stonehill Offshore and $494,863.23 for

24   Stonehill Institutional, very specific amounts.  But -- and

25   not insignificant, but yet they total roughly $890,000.  So

Page 147

1    in the scheme of Lehman Brothers cases something that falls

2    on the smaller scale.

3            The claims that you pointed out did not include

4    any assertion that Stonehill securities had lost or may lose

5    value while in LBI's custody.  And you can see that when one

6    wants to do that in the new claims in paragraph nine through

7    eleven they were able to articulate that with the lead in

8    that says, additional leave.  They use the word additional

9    leave.  They add it in in the blackline that we show.  It's

10   apparent, a way to explain when one wants to claim

11   additional amounts.

12           The original claims did not identify any of the

13   $240 securities that are proposed to be amended or annexed,

14   which we think are new late claims which were returned to

15   Stonehill prior to the bar date.

16           So this is one of the things I don't think adds

17   up.

18           Mr. Brilliant articulated that it was difficult to

19   value certain securities.  But Stonehill was able to

20   articulate a value on a certain date for certain securities,

21   yet for 200 -- for the other ones that they had back in

22   their possession, as Mr. Brilliant just said for nine

23   months.  We don't know exactly when the securities were

24   returned because LBI returned them and not any of the

25   Chapter 11 estates.  But they've had those in their

Page 148

1    portfolio and it's a portfolio. It's an investment company.

2    It's a hedge fund.

3            So we -- one would rationally assume and

4    reasonably assume that Stonehill knew what its portfolio was

5    at different points in time and lost value, and if it

6    believed it lost value would have claimed that.  But that's

7    not in the claim.

8            So taken together the only reasonable conclusion

9    that could be drawn was that the original claims didn't

10   include diminution of claims.  Perhaps the securities went

11   up in value as did certain of Stonehill securities that are

12   shown on the list.

13           But paragraph six says more.  It claims a

14   particular dollar amount for particular securities and

15   doesn't include a reservation of rights with respect to

16   those securities.  Okay.  That's --

17           THE COURT:  Where are you now?

18           MR. FAIL:  In paragraph six of the original

19   claims.  The language that I just read was specific dollar

20   amounts referring to specific securities.  It does not

21   include a reservation of rights with respect to the

22   securities.  And I would like to just draw your attention in

23   contrast the same paragraph lists particular dollar amounts

24   for seven cash components of Stonehill's claims.  But it

25   includes the following reference with respect to such cash

Page 149

1    components.  In addition to the foregoing, interest may be

2    payable or claimable on the cash balance as described above.

3            THE COURT:  Right.

4            MR. FAIL:  And additional amounts -- and

5    additional misdirected wires and/or other amounts may have

6    been received by LBI.  So they knew how to add on things.

7            Paragraph seven --

8            THE COURT:  But --

9            MR. FAIL:  -- then says --

10           THE COURT:  Right.  But that's all -- this is all

11   -- this is all on these little buckets of cash claims.

12           MR. FAIL:  That's my point exactly, Your Honor.

13           THE COURT:  Okay.

14           MR. FAIL:  This is an exception saying I'm owed

15   specific dollars and cents in different foreign currencies

16   calculated very specifically and accurately --

17           THE COURT:  Right.

18           MR. FAIL:  -- and these all total to the front

19   page of the claim.

20           THE COURT:  Sure.

21           MR. FAIL:  So there -- for these there was no

22   notice that it might change a little bit.  LBI might have

23   received a little bit more cash post-petition.  Interest may

24   be payable on this cash that I may be entitled to.  So one

25   might say we were reasonably on notice of that.

Page 150

1                But then look further down on page -- on the

2      bottom of page 4, the last bullet, it says, in addition to

3      the foregoing -- and so that's what I was quoting.

4                THE COURT:  Right.

5                MR. FAIL:  Cash balances described above.

6      Paragraph seven says the amounts described above aggregate

7      approximately -- equal to approximately $23,460,716 plus the

8      unliquidated amounts referenced above.  So it's not any

9      unliquidated amounts.  It's not any things that we're

10     totaling.  It's the amounts described above, the specific

11     amount for the specific securities plus cash plus

12     unliquidated cash components.  There's no unliquidated

13     securities component.

14               Then let's move onto paragraph B.

15               THE COURT:  Wait.  Hold on.

16               MR. FAIL:  Uh-huh.

17               THE COURT:  Hold on.  So what you're saying is

18     that I should read paragraph six and there's all these

19     bullets, and then the last bullet in paragraph six says,

20     there may be additional stuff and I should --

21               MR. FAIL:  There may be additional cash stuff.

22               THE COURT:  Right.  And I should refer and then

23     when -- in seven when it makes the reference to plus the

24     additional unliquidated amounts referenced above --

25               MR. FAIL:  Mr. Brilliant didn't read those two

Page 151

1    words, referenced above, or I didn't hear him --

2              THE COURT:  Okay.

3              MR. FAIL:  -- read those.

4              THE COURT:  That I should only be looking back to

5    that bullet immediately preceding.

6              MR. FAIL:  You could look above to see that.  Yes,

7    because that's where the calculations total approximately --

8              THE COURT:  Okay.

9              MR. FAIL:  -- 23 million --

10             THE COURT:  So then to Mr. Brilliant's point, then

11   --

12             MR. FAIL:  In paragraph eight familiarly leads in

13   with a discussed above.  It's not just generally the amounts

14   owed under the prime brokerage agreements.  It's --

15             THE COURT:  But it's not --

16             MR. FAIL:  -- those that are discussed above.

17             THE COURT:  But it's not -- paragraph eight

18   doesn't say the cash amounts owed under the PB agreement.

19   It says, the amounts under the PB agreement discussed above

20   --

21             MR. FAIL:  I agree.

22             THE COURT:  -- are also recoverable by claimant

23   as, and then --

24             MR. FAIL:  That's a theory. Right.

25             THE COURT:  -- it -- right.  It goes on to --

Page 152

1          MR. FAIL:  I'm not saying they didn't assert that

2     890,000 is owed.  But it's not -- they didn't -- they don't

3     have an unliquidated amount.  That's a theory and they want

4     to add another theory to claim the 890.  What they don't

5     have a theory for is $153 million on top of the 890.

6          The difference is the amount, not that they --

7     that they ever claimed securities.  You found it.  Mr.

8     Brilliant explained it.  They asked for $890,000 in

9     securities.  They didn't ask for $153 million in securities.

10    They didn't put a place saver --

11         THE COURT:  But now -- but --

12         MR. FAIL:  -- for that.

13         THE COURT:  But the -- back in paragraph four they

14    say, the failure of LBI to return claimant's cash and

15    securities constitutes a breach and it's clear that the

16    story that's being told is designed to put some meat on the

17    bones of what the breach is.  And then it says, paragraph

18    fourteen says, claimant is entitled to assert and is

19    asserting against the Lehman entities, including the debtor,

20    the full amount of claims arising under the PB agreement,

21    notwithstanding the pending SIPA claim.

22         MR. FAIL:  We read it the way you read it, Your

23    Honor.  The reasonable way to read it; that the caption that

24    said the claims under the prime brokerage agreement were

25    setting forth their claims.  And had the debtor not objected

Page 153

1    to these claims, they would have been deemed prima facie --

2    the debtor hasn't.  So barring any objection, they would be

3    deemed prima facie valid.

4            They've already received over $86 million on

5    account of these claims which we've discovered through the

6    discovery.  Accordingly, based on the single recovery rule,

7    there would be no distributions under these claims.  So --

8            THE COURT:  All right.  Now you've lost me.  So

9    what does this have to do with --

10           MR. FAIL:  We were not on notice that there was

11   additional amounts that would be owed.  This claim

12   replicates a customer claim against LBI.  LBI has satisfied

13   customer claims in full with an exception of an $11 million

14   cash component, which is set aside because it's not being

15   amended.  The reasonable interpretation and the

16   interpretation of the debtors were under was that this claim

17   asked for $890 (sic) in securities for which they received

18   back at a value higher.  When they received it, they were

19   worth, according to the schedule on Stonehill's schedule $86

20   million.  It -- that's just according to the schedule.  You

21   calculate the --

22           THE COURT:  I'm sorry, Mr. Fail, but you have

23   completely lost me.  I don't understand what they've already

24   recovered has to do with whether or not I read this claim

25   now to give them a basis for asserting whatever their

Page 154

1    entitled to assert with respect to the diminution in value

2    of the securities as a result of the failure to have

3    returned their securities.  That has to do with, at the end

4    of the day, the amount of their distribution.  It doesn't

5    have to do with the amendment of the claim.  So I'm --

6    you've got to straighten me out because I'm just confused.

7              MR. FAIL:  Okay.  I think we could start from the

8    fact that they're trying to -- the face of the claim says

9    $40 million -- $44 million in aggregate, let's say, 20 on

10   one, 23 on the other.  And so the motion today is to take

11   the claim --

12             THE COURT:  It says not less than.

13             MR. FAIL:  Yes.

14             THE COURT:  Right?

15             MR. FAIL:  It says not less than.

16             THE COURT:  It says not less than.

17             MR. FAIL:  It says not less than.

18             THE COURT:  Okay.

19             MR. FAIL:  And then the components that total that

20   --

21             THE COURT:  Right.

22             MR. FAIL:  -- include cash plus additional amounts

23   for cash --

24             THE COURT:  Right.

25             MR. FAIL:  -- and securities in a fixed amount.

Page 155

1    And so the notice that was provided to the plan

2    administrator with respect to those claims were that they

3    wanted cash in fixed amounts and they wanted $890,000 for 54

4    securities.   Before the motion was filed today, that's what

5    the claim was -- would lead any reasonable person to

6    believe.

7            Stonehill now wants to re-file the claims, not

8    call it an amendment, but say they don't want 54 securities,

9    but there were 281 and it wasn't $890,000 that they were

10   asking for.   It was $153 million.   And they're saying that

11   that is a proper amendment if one were to look at it.   And

12   the standard for amendments is, was the debtor on reasonable

13   notice of it.   We don't believe that based on looking at the

14   claims there was reasonable notice.

15           Another factor in the amendment standard is is the

16   amount reasonably close, the amended amount reasonably close

17   to the amount asserted in the original claim.   There's no

18   case that cites -- that anyone could cite that says 173

19   times the original amount is reasonably close or similar.

20   Courts have disallowed amendments where there was a single

21   digit multiple and we've cited those.   We've cited cases

22   that stand for the proposition when a taxing authority

23   wanted to increase a claim from $2 million to -- from $2,000

24   to $2 million.   A $2,000 claim doesn't provide reasonable

25   notice for a $2 million claim.

Page 156

1           And so an amendment --

2           THE COURT:  But are you -- I'm still not

3    understanding.  Are you -- and maybe I'm conflating the

4    validity of the -- or the potential validity of the claim

5    with the amendment issue.  But there's no dispute that the

6    list of securities that they didn't get back is the list of

7    securities they didn't get back, right?

8           MR. FAIL:  We haven't analyzed whether -- we --

9    we're accepting for the sake of argument today that the list

10   of securities that they said they didn't get back when they

11   filed the claim is --

12          THE COURT:  And when the claims process was

13   engaged they didn't hide that fact from you.  They told you,

14   here's the securities we didn't get back.

15          MR. FAIL:  Correct.

16          THE COURT:  Right?  So whether or not they

17   ultimately recover what they say they ought to recover with

18   respect to those securities, the number might be extremely

19   large.  The number might be extremely small.  So that seems

20   to me to be a backwards way of deciding whether or not to

21   allow the amendment, to try to guess what that might

22   ultimately be.

23          And in the -- just -- I'm just not understanding

24   --

25          MR. FAIL:  The reason I brought it up, Your Honor,

Page 157

1    is only for the reasonable notice if Mr. Stone -- if Mr.

2    Brilliant -- if Stonehill would suggest that we were on

3    notice that the claims dropped in value, the only value that

4    we had to start was $890, and through discovery we learned

5    that they received $86 million for that.  So even when Mr.

6    -- when Stonehill produced discovery to --

7              THE COURT:  I'm sorry.  Could you say that

8    sentence one more time?

9              MR. FAIL:  There were 54 securities on the claim.

10             THE COURT:  Right.

11             MR. FAIL:  Stonehill said that they were $890,000.

12             THE COURT:  Right.

13             MR. FAIL:  In discovery and on the schedule

14   produced it -- we believe that that schedule says that for

15   those 54 securities the value when they were received back

16   was $86 million approximately.  And so if the debtors were

17   on notice of these claims and were to look at when the value

18   -- when the distribution was made back to the creditor, the

19   debtors would assume that they don't -- would have no

20   obligation to them, would have no further obligation to

21   Stonehill.  The securities that they received back were

22   satisfied.

23             But Your Honor was correct.  That isn't relevant

24   -- that isn't determinative here.  What needs to be focused

25   on is whether the amendment -- an amendment here is proper

Page 158

1    and whether there was notice.  And we don't believe that

2    based on the general reservations of rights I don't -- we

3    don't believe that a reference to the prime brokerage

4    agreement or the relationship is anything specific.  That is

5    as general a reservation of rights as one could get.

6              Stonehill says, I had a prime brokerage

7    relationship.  I want everything under that prime brokerage

8    relationship.  If that's the only contact and relationship

9    they have, then what is the difference between saying, I

10   reserve all rights to assert all different -- all other

11   claims.  There's no difference.  The only claims that you

12   could have are based on your relationship or contact.

13             And so referring back to a prime brokerage

14   agreement in a proof of claim was insufficient to convert a

15   general reservation into one that would put the creditor on

16   notice.

17             THE COURT:  But you've just did -- you just did a

18   slight of hand.  I mean, the general reservation would be a

19   proof of claim that says, this is a claim for every claim

20   that I have.

21             MR. FAIL:  Right.

22             THE COURT:  Right.  But that's not what they did.

23   They filed a claim that says that the failure of LBI to

24   return claimant's cash and securities -- generally, it

25   doesn't say as listed in Schedule 2 -- constituted a breach

Page 159

1    of the agreement.  And the -- you know, in lots of words,

2    right, so if you were really looking to cut corners, which

3    lawyers don't tend to want to do, you know, you would have

4    just filed the proof of claim without an attachment and I --

5    I don't know what the rules were as to whether or not you

6    had to attach the prime brokerage agreement or not, or you

7    could just refer to it.

8              And then here it is, paragraph fourteen, it's not

9    just reservation of rights because I've always wondered

10   about this, right?  Claimant reserves -- look at paragraph

11   sixteen, Claimant reserves all of its rights to supplement

12   or amend this claim in any and all respects.  Well, that's

13   clearly not true.  I mean, you could say that, right, but

14   that's not what the law -- you're not going to be allowed to

15   do that.  So I would --

16             MR. FAIL:  The case law says you can't do that.

17             THE COURT:  Right.  You can't do that.  So every

18   lawyer does it.  I was guilty of doing it.  But I don't

19   really think it means anything.

20             On the other hand, paragraph fourteen where it

21   says that claimant is asserting the full amount of claims

22   arising under the PB agreement.  I mean, that's a pretty

23   clear statement that, at least to me, that as of the time

24   that they filed this they weren't really putting it out

25   there in excruciating detail everything they had.  But they

Page 160

1    had stuff.

2            MR. FAIL:  And they calculated it to the penny

3    with specificity with respect to others.  And the only

4    question is, did they have -- that's one inquiry.  One

5    inquiry is whether they had notice.

6            THE COURT:  Right.  But I think that I -- you

7    know, I think I have a considerable amount of discretion

8    here and I think that there -- I don't think that there's

9    any indication, frankly, on either side that, you know,

10   there was inequitable conduct.  I don't think that this

11   really has the feel of, you know, a kind of five minutes to

12   midnight surprise claim that's upsetting the apple cart of

13   someone's plan.

14           I asked Mr. Brilliant the question, you know, why

15   didn't you do it earlier and I think his answer was rather

16   satisfactory; that in the way this particular claims process

17   played out, once issue was joined and things began to move

18   along they came up with the schedule and on they went.

19           So --

20           MR. FAIL:  Your Honor --

21           THE COURT:  -- look --

22           MR. FAIL:  -- to that point.

23           THE COURT:  Yeah.

24           MR. FAIL:  The Seventh Circuit had a quote in a

25   decision that we quoted, (indiscernible) that says:

Page 161

1           "If a creditor knows that after analyzing

2    information which is within -- wholly within its own

3    control, it may later seek to amend its claim dramatically.

4    It must not keep that knowledge secret.  If it does so, and

5    later surprises the debtor or other creditors, it should not

6    be -- it should not claim surprise if the Bankruptcy Court

7    elects to deny the amendment."

8           Here, there was discussion with Stonehill about

9    other claims that was irrelevant.  There was discovery

10   taken.  But that is also irrelevant because as Mr. Stone --

11   the pleading -- the Stonehill's pleadings made clear, the

12   2012 discovery did not produce the schedule of claims that

13   add up to 153 million.  That was only provided in November

14   of 2013 and in 2014 that was discussed.  And that's just --

15   that's accepting what's in Stonehill's pleadings.

16           And so that was --

17           THE COURT:  So what came out in discovery?

18           MR. FAIL:  Discovery was served in -- to try to

19   find a basis for -- to find a basis for liability against

20   the 23 different debtors under the prime brokerage

21   agreement.  But what wasn't produced was the full detail of

22   the securities that are listed here in the amounts and the

23   calculation of 153.

24           So it was a surprise.  And, Your Honor, this isn't

25   an evidentiary hearing.  But it was a surprise to the

Page 162

1    debtors and the plan administrator that after -- there were

2    -- there were previous attempts before we were here today

3    which included requests for Stonehill to withdraw the claims

4    because we -- the plan administrator believed they were

5    deemed satisfied in full, all but an $11 million piece which

6    is referenced and is the same in both the original and the

7    amended, but it hasn't been yet allowed by LBI.  It wasn't

8    allowed as a customer claim.  It's still to be determined if

9    it's a general unsecured claim.

10           So having been deemed satisfied, all other

11   creditors that had a prime brokerage relationship against --

12   with LBI yet asserted a claim against LBHI, I believe this

13   is the only claim or set of claims that's out there where

14   LBI was the only broker dealer in the Lehman family that was

15   involved with the creditor, and LBHI had claims in the other

16   28 states had claims filed against them that's still

17   outstanding.

18           LBHI took efforts to coordinate with Lehman

19   Brothers, Inc. to facilitate additional transfers of

20   securities in cash and believed that this -- these claims

21   would go away.  At that point Lehman Brothers Holdings, Inc.

22   was surprised to find out that there were 154 other

23   securities or that there were 240 other securities and that

24   with respect to all of them there was a tremendous

25   diminution in value.

Page 163

```
 1                 But --
 2                 THE COURT:  So what's the -- but -- so a couple of
 3        things.
 4                 One, then given the way you've described the --
 5        kind of the feel, then there's no floodgates issue, right?
 6        There's no --
 7                 MR. FAIL:  That's not correct, Your Honor.  I just
 8        -- I respectfully disagree with that.
 9                 THE COURT:  But you just said they're the only
10        ones.
11                 MR. FAIL:  With respect to --
12                 THE COURT:  So --
13                 MR. FAIL:  -- LBI only prime brokerage agreements,
14        yes.
15                 THE COURT:  Okay.
16                 MR. FAIL:  But there are 3,600 other claims that
17        are still outstanding, that are still -- that -- for which
18        -- I mean, the case law that we all cited for amendments of
19        claim don't deal with prime brokerage agreements and
20        diminution only.
21                 THE COURT:  Okay.  So your floodgates argument is
22        just if I generally allow this amendment of re-filing, it's
23        going to open the floodgates on every single claim.
24                 MR. FAIL:  It's twofold.  It's that and that's the
25        reasoning that the Court has previously disallowed 1,400
```

Page 164

1    claims already as being late filed, and those were all filed

2    or asserted or -- asserted prior to November 2013 when

3    Stonehill first informed the debtors of this information.

4    So that's -- yes.  It would apply equally --

5                THE COURT:  Okay.  But a late filed claim and an

6    amendment claim that relates back is two different things.

7                MR. FAIL:  It's the flip side.  If it doesn't

8    relate back, then it isn't an amendment and it is a late

9    claim.  So it's the same analysis.  You just reach a

10   different conclusion.

11               THE COURT:  Okay.  I don't see it that way, but we

12   don't have to agree on that.

13               MR. FAIL:  Okay.

14               THE COURT:  And what's your theory for why

15   Stonehill, you know, hung in the weeds?  I mean, I just

16   don't -- I'm trying --

17               MR. FAIL:  I don't understand it.  We don't

18   understand it either, Your Honor.  If it's true that 99.4

19   percent of the value of their portfolio was lost, we would

20   have thought it would have been claimed and specified in the

21   claim.  It wasn't.  So whether this is an attempt to

22   increase the claim amount under a new theory that they've --

23   that they've come up with, it's not for us to speculate.

24   The only reasonable conclusion that we could reached based

25   on looking at these claims is that it wasn't asserted.

Page 165

```
 1              THE COURT:  Okay.

 2              Mr. Brilliant.

 3              MR. BRILLIANT:  Yes, Your Honor.

 4              THE COURT:  So one more time, you gave me an

 5    answer before as to why you didn't make this clearer

 6    earlier.  You want to go another round with me on that one.

 7              MR. BRILLIANT:  Sure.  I think, Your Honor, the

 8    real answer is they never asked until we got into

 9    discussions -- let's just put this in the context of the

10    Lehman case here.

11              THE COURT:  okay.

12              MR. BRILLIANT:  I mean, you know, there are issues

13    going on with respect to LBI.  We were negotiating with LBI,

14    getting back securities.  We had certain claims allowed.

15    There were issues actually with respect to these debtors and

16    we reached agreements on certain things.  We got certain

17    claims allowed.

18              With respect to the issue of this proof of claim,

19    their focus, as Mr. Fail was very upfront about, was not on

20    the amount of the claim.  Their focus was whether or not in

21    an LBI only broker dealer whether or not on the terms --

22              THE COURT:  Yeah.

23              MR. BRILLIANT:  -- the face of the agreement where

24    it said they were all liable, you know, whether or not there

25    was joint and several liability and whether we had any
```

Page 166

1    claims.  That was their focus.

2          They never objected to our claim.  As much as --

3    and again, Judge, I'm not trying to -- this is not about

4    jumping the line here.  We wanted them to object to the

5    claims so that we could have a claims allowance process and

6    get our claim allowed.  They didn't do that.  A number of

7    other people came into court in front of Judge Peck and

8    asked for --

9          THE COURT:  Well, they would say --

10         MR. BRILLIANT:  -- that type of relief.

11         THE COURT:  -- They would say --

12         MR. BRILLIANT:  Didn't get it.

13         THE COURT:  They would say they didn't do that

14   because who knew that you were going to assert a claim for

15   $154 million.

16         MR. BRILLIANT:  Right.  But, again, we --

17         THE COURT:  Right.  So --

18         MR. BRILLIANT:  Right.

19         THE COURT:  Right.  So we're kind of at a --

20         MR. BRILLIANT:  Well --

21         THE COURT:  -- you know, we're staring each other

22   down here.

23         MR. BRILLIANT:  Look, you know, in the typical

24   case $150 million is a lot of money.  It's not in this case.

25   They were reserving for us, Your Honor, $865 million --

Page 167

```
 1              THE COURT:  Right.  But that --

 2              MR. BRILLIANT:  -- for --

 3              THE COURT:  -- but that argument -- I'll tell you

 4    right now.  That argument of yours I don't buy.

 5              MR. BRILLIANT:  Okay.

 6              THE COURT:  The look how much better off we are.

 7    It used to be 800 million and now it's only this amount.  So

 8    that's --

 9              MR. BRILLIANT:  Right.

10              THE COURT:  -- neither here nor there.

11              MR. BRILLIANT:  But I don't -- you know --

12              THE COURT:  That's not actual money they don't

13    have to give out.

14              MR. BRILLIANT:  Yeah.  Okay.  But the point is,

15    you know, you're saying like, well, you know, $150 million,

16    why didn't you come in and affirmatively --

17              THE COURT:  Yeah.

18              MR. BRILLIANT:  -- do this, because we're not

19    required to.  I mean, you know, people don't generally do

20    that.  You file you proof of claim.  If nothing comes up

21    under 3018, there's no issues with respect to reserve,

22    generally there's a deadline for the debtor to file an

23    objection in a reasonable period of time.  Here, it was a

24    lengthy one and it got extended.  And we are where we are.

25    They sought discovery from us.  Again, they just wanted to
```

Page 168

1     know how can you -- you know, our sense of that was they --

2     it really had less to do with us.  They just wanted to

3     understand what our theory was as to why there was joint and

4     several liability.  So that their -- you know, their

5     discovery was --

6                THE COURT:  So, in essence, they -- you know, that

7     -- in that round of discovery they asked the wrong question

8     and you didn't supply them with the right answer.

9                MR. BRILLIANT:  Right.  And then when they -- as

10    Mr. Fail said, when they asked us to -- when LBI distributed

11    securities to us and wrapped up --

12               THE COURT:  Right.

13               MR. BRILLIANT:  -- the vast majority of their case

14    and paid out the vast majority of their claims, they came to

15    us and said, we would like you to withdraw your claims.  And

16    we said, whoa, what are you talking about.  The unliquidated

17    portion of our claim is $153 million and we sent them the

18    chart.

19               Now one thing, it's a really small point and it's

20    kind of irrelevant in many respects, but I think it's

21    important that Your Honor understand, you know, Mr. Fail

22    says, well, you know, they give you just the amount they

23    lost.  They probably had some -- it increased in value

24    during that period of time.

25               If you look at the schedule, there are positives

Page 169

1    and negatives, and they're netted out.  We gave the debtors

2    the benefit of the doubt.  You know, I don't -- that goes to

3    the ultimate --

4            THE COURT:  Right.

5            MR. BRILLIANT:  -- amount of the claim.

6            THE COURT:  Right.

7            MR. BRILLIANT:  But we were not trying to be

8    unfair here and just say, well, if something you held

9    increased in value, you know, that's to our benefit.  But

10   anything you held and we lost value that, you know, you have

11   to pay us for that.  So we did net it out.

12           But the issue is, Your Honor, they had a lot of

13   opportunities here, you know, to figure this out and they

14   could have asked.   I mean, they could have asked in the

15   discovery, tell us what the unliquidated portion is.  But --

16   and this idea here that a debtor can read a proof of claim

17   and say there's liquidated and there's unliquidated

18   portions. In the face of the claim it says not less than.

19   So you -- you know, and it says unliquidated amounts.  How

20   one could understand --

21           THE COURT:  Well, but they get -- Mr. Fail gave a

22   view that was that that -- that the unliquidated really

23   referred to what you had put in with the other -- with the

24   bullet points related to the 23 million.

25           But, look --

1          MR. BRILLIANT:  Yeah.  But that's --

2          THE COURT:  -- I think that we could spend a

3     significant amount more time and everybody could think to

4     themselves or say out loud, you know, woulda, shoulda,

5     coulda, had I had everyone had an opportunity things would

6     have been done differently on both sides.

7          I don't think that there's a floodgate situation

8     here.  I don't think that I'm going to have a thousand

9     people showing up with late claims.  I don't think Judge

10    Peck allowed possibly even one claim amendment.  I think

11    this is a pretty unique set of facts and circumstances.

12         I think I have considerable discretion and I

13    think there -- while there are certainly equities on both

14    sides, given my reading of the proof of claim, I think the

15    tie goes to the runner here.  And that means that the claim

16    can be amended or re-filed.  I really am indifferent as to

17    --

18         MR. BRILLIANT:  Thank you, Your Honor.

19         THE COURT:  -- how you characterize that.  And

20    what I would ask, though, is that you work with Mr. Fail to

21    characterize it in a way that makes it very, very clear that

22    this is a very unique, generic set of circumstances to

23    address any concern that Lehman has that this is an open

24    invitation, open season to invite a lot more claims because

25    we have plenty of claims to deal with already.

Page 171

1           MR. FAIL:  Your Honor, may I just add one more

2    point before we conclude this matter?

3           To the extent that what Stonehill is now doing is

4    liquidating the unliquidated portion and that's --

5           THE COURT:  Well --

6           MR. FAIL:  -- what Your Honor --

7           THE COURT:  -- I don't think they're liquidating

8    it.  They're amending the claim to --

9           MR. FAIL:  To add an unliquidated -- what was

10   formally unliquidated.

11          THE COURT:  They're amending the claim to add

12   claims with respect to these securities.  This is -- I'm not

13   allowing -- to be clear, I'm not allowing the claim.

14          MR. FAIL:  Understood, Your Honor.  I was going to

15   clarify that for -- with respect to the 240 claims that were

16   returned, 101 -- roughly 101 million out of the $153 million

17   that they're claiming now was returned, according to Mr.

18   Brilliant, nine months before they filed this claim.  That

19   was a liquidated -- that could have been as liquidated as

20   the 890.  It's the other side of the -- it's the other

21   portion of the claims.

22          So to the extent that there's an addition of

23   claims, I would respectfully request that you limit it to

24   the portion that perhaps they couldn't have calculated.

25   They certainly could have told us the beginning date value,

Page 172

1  but not the full 153.  So do a carve-out to make it only

2  whatever the difference is with respect to the securities

3  that were listed on the claim.

4          THE COURT:  That seems kind of reasonable, Mr.

5  Brilliant.

6          MR. BRILLIANT:  Yeah.  Your Honor, it doesn't.  I

7  mean, what they're really asking Your Honor to do is decide

8  without any kind of record here that it wasn't -- it wasn't

9  -- it was easily ascertainable to have the amounts for all

10  the stuff that we've already received.

11          THE COURT:  Look, I mean, I think I -- they're

12  going to re-file the claim.  They're going to amend the

13  claim and if you want to make that argument at the allowance

14  phase, you can make it then.  I don't know -- I feel like

15  this is turning into a hearing on the allowance of the claim

16  and that's not what I'm doing.

17          MR. FAIL:  No, Your Honor.  I apologize if I

18  wasn't clear.  I was trying to limit what claims could be

19  asserted to only the securities that were listed.  So a

20  diminution for the 54 securities that were asserted on the

21  claim rather than the 240 other ones and the split, I

22  believe, would be 100 and 50.

23          THE COURT:  No.  He gets to file a claim for

24  diminution of all the securities that weren't returned.

25  That's my ruling.

Page 173

1               MR. FAIL:  Thank you.

2               THE COURT:  All right.

3               MR. BRILLIANT:  Thank you, Your Honor.

4               THE COURT:  Okay.

5               Okay.  Before we get to Mr. Tolin, if you wouldn't

6       just give me 30 seconds to deal with a scheduling matter in

7       another case.

8               MR. FAIL:  Your Honor, may we be excused?

9               THE COURT:  Yes.  Thank you very much.

10              MR. FAIL:  Thank you, Your Honor.

11              MR. BRILLIANT:  Thank you, Your Honor.

12          (Pause)

13              THE COURT:  How are you?

14              UNIDENTIFIED SPEAKER:  Well, Your Honor.  How are

15      you?

16              THE COURT:  I'm okay.

17              UNIDENTIFIED SPEAKER:  Good.

18              THE COURT:  It gets to be a long day.

19              UNIDENTIFIED SPEAKER:  Yeah.  No kidding.

20              THE COURT:  That's all right.

21              All right.  So this is objection to proof of claim

22      number 33514 filed by Frank Tolin, Jr.

23              MR. TOLIN:  Yes, ma'am.

24              THE COURT:  You're Mr. Tolin?

25              MR. TOLIN:  Yes, ma'am.

Page 174

```
 1              THE COURT:  How are you, sir?

 2              MR. TOLIN:  I'm doing fine.  How are you?

 3              THE COURT:  Welcome to our court.

 4              MR. TOLIN:  Thank you.

 5              UNIDENTIFIED SPEAKER:  How would you like to

 6     proceed, Your Honor?

 7              THE COURT:  Well, I've read everything and I'll be

 8     pretty honest.  I'll be totally honest, actually, Mr. Tolin.

 9     I'm not seeing a claim here.  There's no relationship

10     between, frankly, what happened to you for which I'm sorry

11     and any liability by any Lehman entity.  You signed on for a

12     mortgage.  You didn't get the rate that you said someone

13     told you you were going to get and then the person that you

14     dealt with, Ms. Washington, turned out to not do some nice

15     things.  And that has absolutely nothing to do with BNC.

16     There is no -- there's no nexus.  There's no possible nexus

17     at about five different levels.   The responsibility for any

18     damage that you suffered is not remotely near BNC.

19              You entered into this loan agreement knowing that

20     the interest rate was 9.6 instead of 5.5.  You then -- you

21     needed the cash.  I understand that.  And then these

22     unfortunate things happened with Ms. Washington and nothing

23     having to do with your dealings with Ms. Washington or the

24     Borden (ph) firm really can be tied back to BNC in any way.

25              So I just -- I tried very hard to see things from
```

Page 175

1   your perspective, but I think the fact is and the conclusion

2   has to be that, you know, you entered into the loan

3   agreement.  You were fully aware of what the terms were.

4   Ms. Washington was not BNC's agent and you really haven't

5   made any sort of a prima facie showing that she was.  And

6   BNC did not, you know, aid and abet or assist Ms. Washington

7   in making whatever representations she made to you with

8   respect to the rate, and certainly there's not even an

9   allegation that BNC had anything to do with the -- you know,

10  the subsequent events with the payment of her commission or

11  the additional loan or whatever.

12          So I'm sorry that that happened to you, but it's

13  really not something that BNC can be held responsible for.

14          I'm happy to hear you try to persuade me

15  otherwise.  But I fully prepare before I come out here, but

16  I do -- do not want to deprive you an opportunity to tell me

17  something I might have missed.

18          MR. TOLIN:  Thank you very much, ma'am.

19          Would you like me to approach?

20          THE COURT:  Sure.

21          MR. TOLIN:  Okay.  Thank you.

22          Well, as you know, I'm Frank Tolin, Jr. and I'm

23  representing myself pro se.

24          First, my position is that Patricia Washington did

25  act as the agent for BNC.  So typically the bank's agent

Page 176

1    disburses funds during a refinance.  Patricia Washington

2    disbursed those funds to me.  You know, so she go the funds

3    from the bank's agent -- from the bank's attorney.  Behind

4    closed doors, whatever they did they did.  She brought the

5    funds to me.  She did all the work.

6            Now the other thing is I found documents that

7    indicate that at some point she was to be paid a yield

8    spread premium by the bank.  So if she's going to be paid by

9    the bank and by me, then there's a conflict of interest from

10   the outset.  Okay.  Towards the very end, they didn't pay

11   her a yield spread premium, but that does not mean there was

12   a -- was not a conflict and that she was expecting to be

13   paid by BNC mere days before the closing.

14           So, yes.  My position is still that she was the

15   agent for BNC.  I do have some exhibits here that do

16   indicate that she was to be paid a yield spread premium.  I

17   did obtain documents from the New York State banking

18   authority filed by Gordon, Gordon & Gordon indicating that

19   typically they do get paid a yield spread premium.

20           THE COURT:  But I don't understand what that has

21   to do with the fact that you voluntarily entered into this

22   loan and there was a delta between what you thought you were

23   going to get and what the loan actually was.  I mean, you're

24   not -- your claim is not that you thought you were signing a

25   loan that had a 5.5 percent interest rate.  You knew you

Page 177

1    were --

2            MR. TOLIN:  No.  That's --

3            THE COURT:  -- taking out a loan for 9.6 percent,

4    right?

5            MR. TOLIN:  I knew when I showed up at the

6    closing.  But what --

7            THE COURT:  But you didn't have to sign, Mr.

8    Tolin.

9            MR. TOLIN:  Well, yes and no, ma'am.  And may I

10   give you an example?

11           THE COURT:  Sure.

12           MR. TOLIN:  Okay.  First, and I've told this to

13   Mr. Rollin before; that if someone say for instance knows

14   that you don't eat a certain type of food and then they

15   starve you and drag it out, and then offer you that piece of

16   food, then you go ahead and you eat it, but it's not

17   necessarily that you ate it of your own free will. They've

18   starved it and dragged it out.

19           And that's what occurred here.  So she dragged the

20   process out for three months.  In the meantime --

21           THE COURT:  She may well have done that, but you

22   --

23           MR. TOLIN:  Yes.

24           THE COURT:  -- you -- there are no allegations and

25   there's no proof, prima facie or otherwise --

Page 178

1             MR. TOLIN:  Yes, ma'am.

2             THE COURT:  -- that BNC was the driver behind

3     that.

4             The other thing that is inexplicable is that

5     you're asking for a million dollars.

6             MR. TOLIN:  Well, first it's recession of the

7     loan, reimbursement for all monies paid, legal fees.  I've

8     incurred over $30,000 in legal fees, and then whatever

9     damages --

10            THE COURT:  Well, I think you have to ask Ms.

11    Washington -- I think you have to try to recover those, if

12    anybody, from Ms. Washington.

13            MR. TOLIN:  She's in the wind.

14            THE COURT:  Well, that --

15            MR. TOLIN:  You know --

16            THE COURT:  But that speaks volumes as to why

17    there's a million dollar claim that's filed against Lehman

18    because Lehman is many things, but it's not in the wind.  I

19    mean, Lehman is here.  Lehman has money to give out.

20            But, you know, the plan administrator as a

21    fiduciary, I think, has done a very thorough job of

22    establishing that this was an unfortunate situation, but

23    that your own deposition testimony has supported the

24    conclusion that, you know, there was no fraud here.  You

25    knew what the loan terms were.  And that there were no --

Page 179

```
 1   there were no representations that could lead anybody to

 2   believe that BNC might be responsible for Ms. Washington's

 3   actions.  And, you know, it does bear pointing out some of

 4   the details surrounding what happened.

 5             I mean, you knew Ms. Washington for 12 years.

 6             MR. TOLIN:  Yes, I did, but I didn't know she was

 7   a con artist.  I had no idea.  And, you know, as a matter of

 8   fact, she's very good and someone else who was conned by her

 9   is here in court and he's worse off than I am, you know,

10   believe it or not.  I was able to track down several

11   individuals.  And, you know, it's -- she's very good.  You

12   would have no idea.  And the --

13             THE COURT:  Well, I don't have any reason to doubt

14   that nor do I have any basis on which to agree with it.

15             MR. TOLIN:  Okay.

16             THE COURT:  But in any event, there's nothing in

17   your claim that gives me a basis on which I can hold BNC

18   responsible for what Ms. Washington --

19             MR. TOLIN:  I understand.

20             THE COURT:  -- did to you or others which is most

21   unfortunate.

22             MR. TOLIN:  Heinous.  Yes, it is.

23             THE COURT:  And I would suggest to you that if, in

24   fact, she did what you say that she did, you might wish to

25   alert the local authorities --
```

Page 180

1           MR. TOLIN:  I've done that already.

2           THE COURT:  -- and try to get them interested in

3    this person.  They have a way of --

4           MR. TOLIN:  I've done that.

5           THE COURT:  -- of finding people.  But, Mr. Tolin

6    --

7           THE COURT:  I understand your position.

8           THE COURT:  -- unfortunately, I cannot allow your

9    --

10          MR. TOLIN:  I understand that, ma'am.  And you

11   know what?  I have contacted the FBI as well as the Queens

12   County District Attorney's Office and this is years ago

13   regarding this matter.  I believe he has contacted some

14   authorities also.

15          There's a couple of things that I just want to

16   point out.

17          THE COURT:  Sure.

18          MR. TOLIN:  There are some misinterpretations

19   regarding the deposition testimony.  At no point did I know

20   that she was unethical and I only found that out months

21   after the closing.

22          Second, and, you know, nothing against Mr. Mesedey

23   (ph) but some of the allegations he made was that there were

24   unclean hands on my part. There were no unclean hands.

25          THE COURT:  I really don't even -- I don't --

Page 181

1          MR. TOLIN:  I understand, ma'am.  But --

2          THE COURT:  I frankly don't even get to that --

3          MR. TOLIN:  But --

4          THE COURT:  -- issue.

5          MR. TOLIN:  But I'm just telling you now that it's

6     part of the record --

7          THE COURT:  Sure.

8          MR. TOLIN:  -- I mean, if someone does a search

9     then, you know, that's something I have to deal with.  But

10    out of principal, you know, I've been fighting since 2005

11    and that's the only reason I've hung in there and done it.

12    You know, when I did sell the property, which I really

13    didn't want to do, they found out that there really wasn't

14    any -- the mortgage hadn't been recorded.  So they went to

15    go pay me and I stopped the closing and said, wait a minute.

16    There's an outstanding mortgage.

17          So we stopped the closing, contacted the company,

18    and the company went ahead and, you know, sent us the payoff

19    letter.  I went ahead, had those funds disbursed to them.

20          Now after I did that, can I at least have the

21    money that I paid you guys for the recording, which was who

22    BNC hired.  They offered me $42 after I paid them over

23    5,000.

24          So even though you're saying that there's no

25    nexus, I have those checks here, proof of payment.  Can you

Page 182

1    at least get me --

2             THE COURT:  How much were -- so you -- you're

3    saying you were a good Samaritan with respect to the lack of

4    recordation of the mortgage?

5             MR. TOLIN:  That's right.  It was 158,000 and

6    change that --

7             THE COURT:  Right.

8             MR. TOLIN:  -- I had cut a check to them.

9             THE COURT:  And what were your costs that you

10   incurred in connection once you alerted them to that issue?

11            MR. TOLIN:  Well, once I alerted them to that

12   issue, I stayed here in New York, but prior to then I still

13   paid them for the refinance 5,000 and change, and then to

14   sell the property because their mortgage hadn't been

15   recorded, there was a lapse in the title.  So now I have to

16   track down the person who I bought the property from 20

17   years ago and then get him to go ahead and resign the

18   documents because any record that they could find that

19   notary signatures and it's all stale.

20            So, coincidentally, he happened to be in another

21   part of Texas, so I tracked him down, got the documents, got

22   him to sign them, notarize them, set them in and I was able

23   to sell the home.

24            But in terms of my out of pocket, I can't put a

25   calculation on the time and effort to track this person

1    down, but I do have those checks that were disbursed to pay

2    the company that they hired to go ahead and record the

3    title.  And --

4              THE COURT:  How much was the amount of those?

5              MR. TOLIN:  It's 5,000 and change.  I have a copy

6    for the Court.

7        (Pause)

8              MR. TOLIN:  Mr. Rollins, would you like a copy?

9              MR. ROLLIN:  Oh, sure.

10             MR. TOLIN:  And I had given a copy of that

11   already.

12             THE COURT:  Is there a --

13             MR. TOLIN:  Permission to approach, Your Honor.

14             THE COURT:  Sure.  Just trying to -- thinking of

15   --

16             MR. TOLIN:  Coincidentally, the attorney who

17   handled the sale of this property was also the same attorney

18   who handled the refinance back in 2005.

19             THE COURT:  I'm just trying to find your proof of

20   claim.

21             Mr. Rollin, is it in -- is it attached to one of

22   the pleadings?

23             MR. TOLIN:  The proof of claim for the check?

24             THE COURT:  No.  Your -- your claim generally?

25             MR. ROLLIN:  I'll look through it, Your Honor, and

Page 184

1    tell you right away.  I have a proof of claim here and I

2    probably have an extra copy if it will help, Your Honor.

3              MR. TOLIN:  I have a copy, but I don't have an

4    extra copy, Your Honor.

5              THE COURT:  Just it doesn't seem to be in the

6    materials that --

7              MR. TOLIN:  Well, it's -- it's not -- it may not

8    be in the materials because I only found out that the

9    mortgage was not recorded when I tried to sell the property.

10   However, I do have a document that says that BNC knew that

11   the mortgage was not recorded.

12             THE COURT:  Well, I'm asking a different -- all

13   I'm trying to find out is the claim is for a million

14   dollars.

15             MR. TOLIN:  Yes, ma'am.

16             THE COURT:  That's a round number.  All I'm trying

17   to figure out is if, in fact, you provided -- you went out

18   of pocket in this way that somehow provided something of

19   value directly to BNC.  I'm willing to find a way to

20   consider that as a claim.  That's all I'm talking about.

21             MR. TOLIN:  Okay.

22             THE COURT:  But I don't -- I'm not finding

23   anything in the packet that I have before me that helps me

24   figure out whether or not there's a place holder for these

25   amounts that you've handed me, which total about $5,200.

Page 185

1           So --

2           MR. TOLIN:  What about legal fees?

3           THE COURT:  I'm sorry.

4           MR. TOLIN:  What about legal fees?

5           THE COURT:  Don't push your luck, Mr. Tolin.

6           MR. TOLIN:  I was trying.

7       (Laughter)

8           THE COURT:  Would you -- could I impose on you to

9    take a look at this and see if there's a way or a basis for

10   considering those 5,200 of out of pockets because it seems

11   to me that if a value was provided directly to BNC, that

12   that's something that ought to be considered.

13           But I do stand by my earlier statement --

14           MR. TOLIN:  I understand, Your Honor.

15           THE COURT:  -- that with respect to the

16   overarching claim, I'm finding that there is no basis --

17           MR. TOLIN:  I understand.

18           THE COURT:  -- for that claim.

19           So why don't I ask you to talk to each other.  I'm

20   going to hand these pieces of paper back to you and you can

21   work together to submit an appropriate order to me and I'm

22   going to move onto the next --

23           MR. TOLIN:  That's your copy if you would like,

24   Your Honor.

25           THE COURT:  No.  I --

Page 186

1          MR. TOLIN:  Okay.

2          THE COURT:  I should only take things that are

3    filed on the docket.  You know that.  It was delightful to

4    talk to you today, Mr. Tolin.

5          MR. TOLIN:  My pleasure, ma'am.  Thank you very

6    much.

7          THE COURT:  All right.

8          MR. TOLIN:  You all have a --

9          THE COURT:  Thank you.

10         Okay.  The final matter is a pretrial conference

11   in LBSF versus FHLB.

12         Did you have an expectation that this would be on

13   or off the record?

14         MR. TAMBE:  We're happy either way, Your Honor.

15         THE COURT:  Okay.

16         MR. TAMBE:  It's really just scheduling matters

17   because we want to --

18         THE COURT:  Right.  Okay.

19         Hello, Mr. Bienenstock.  How are you?

20         MR. BIENENSTOCK:  Good afternoon, Your Honor.  How

21   are you?

22         THE COURT:  Good.

23         MR. TAMBE:  Since this is our first time here, I

24   have some materials for background so you have some context

25   of what the parties --

Page 187

1                THE COURT:  I'm sorry.

2                MR. TAMBE:  I have some materials for background.

3       This is our first time before Your Honor.

4                THE COURT:  Okay.

5                MR. TAMBE:  If I could just hand up --

6                MR. BIENENSTOCK:  We haven't seen this, Your

7       Honor.

8                MR. TAMBE:  It's nothing new.

9                May I approach, Your Honor?

10               THE COURT:  Yes.

11          (Pause)

12               MR. TAMBE:  It's an adversary proceeding, Your

13      Honor.

14               THE COURT:  Right.

15               MR. TAMBE:  LBSF against FHLB Cincinnati.  It has

16      to do with a termination of a ISDA master agreement.  The

17      basic facts are on slide 2.  The bankruptcy occurs at 1:45

18      a.m.  This ISDA master agreement, unlike the vast majority,

19      doesn't have optional early termination.  It has something

20      called automatic early termination.  And so there's a

21      provision written into the contract that says if you file a

22      petition for bankruptcy, the parties agree that the

23      agreement is terminated as of the time immediately

24      proceeding.  And that's an issue in dispute in this case.

25               On the 15th itself we get a letter from FHLB

Page 188

1    saying there has been early termination.  The next day they

2    enter into a replacement transaction or a series of

3    replacement transaction.  So what they had with Lehman right

4    before Lehman's bankruptcy were 90 plus different swaps all

5    under the same master agreement.

6              THE COURT:  Uh-huh.

7              MR. TAMBE:  On the 16th, according to their

8    statements, their public filings, they entered into

9    replacement transactions for all of those.  They replaced

10   the entire risk with the same terms, same economic

11   conditions.

12             And the result of those replacement transactions

13   were such that they received a gain.  They received a gain

14   of $70 plus million.  We have the calculations on page 10.

15   The parties had agreed if there's a gain on early

16   termination to something called second method.  Now what

17   second method means under the ISDA master agreement, unlike,

18   again, the vast majority of common law contracts, a

19   defaulting party gets the benefit of the bargain.

20             Now contracts 101 is if you're the breaching party

21   you lose your rights under the contract.  The second method

22   says, no, no, different rule for these kinds of derivatives.

23   If you're in the money, you get the money.  They didn't turn

24   over to us the gain they enjoyed from replacing the risk.

25             If you go back to the time line what really

Page 189

1    happens is they terminate us on the 15th.  They replace on

2    the 16th.  Nine days later they sent us a calculation

3    statement saying, we've replaced.  We owe you some money.

4    Here's what we owe you.  We find out from the public filings

5    later on that really what they had gained was far in excess

6    of what they paid to Lehman.  And so this dispute ensues.

7              We've been through mediation.  Mediation was

8    unsuccessful.  We filed the adversary proceeding.

9              So let's go to the contract language, page 5.

10   There are two aspects of the contract language that we

11   believe are amenable to summary adjudication and that's one

12   of the issues that I think we're going to end up talking

13   about is --

14              THE COURT:  But this --

15              MR. TAMBE:  Yeah --

16              THE COURT:  You know, not -- I don't want to cut

17   you short, but I am going to cut you short a little bit --

18              MR. TAMBE:  That's fine, Your Honor.

19              THE COURT:  -- because it just seems to me that we

20   ought to figure out a way that this all gets done at once.

21   I just want to do this once.  I don't want to do it twice

22   and the way it's set up now there's even a specter of my

23   doing it three times, let alone with whatever trips people

24   are going to want to take to the District Court.  And it

25   just seems to me that this summary judgment with respect to

Page 190

1    termination and motion to dismiss, that we should just do

2    this once and that it does not make sense really to spin out

3    -- it's one dispute.  It's a dispute over what these words

4    mean.

5            So why should we be spinning this out into

6    declaratory relief and motions to dismiss when, really, I

7    think, in essence, what you're saying to me maybe is it's

8    just cross-motions for summary judgment.  Why isn't it just

9    that?

10           MR. TAMBE:   The problem is it's not that because

11   there is -- there are two issues here.  There are what we

12   call the purely legal issues and there are factual issues.

13   The overarching factual issue which we are not seeking

14   summary judgment on is when you finally figure out when you

15   are supposed to value these --

16           THE COURT:  Right.

17           MR. TAMBE:  -- how do you do that valuation?

18           THE COURT:  Sure.

19           MR. TAMBE:  What do you do?  And that may well be

20   a battle of the experts.

21           But the threshold question is when should anyone

22   be permitted to value these contracts?  Should you be

23   permitted to value these contracts as of the date that

24   precedes the early termination date because that just

25   increases the scope of the possible factual issues that can

Page 191

1    be raised.  We can narrow that factual dispute significantly

2    if we say, as we're going to ask the Court to say, September

3    15th is the early --

4                THE COURT:  But that's -- but it -- but that's

5    piecemeal.  That's -- it's not different than any other case

6    in which you can identify those types of issues and say,

7    give us a declaration to that effect on this piece of it.

8    It is setting me up for a series of piecemeal

9    determinations.

10               MR. TAMBE:  Your Honor, I don't disagree that

11   we're asking for piecemeal, and I don't want to say

12   piecemeal is a bad word here.  And here's why.  We think it

13   actually will increase the efficiency because we'll then

14   know what the playground is, where the experts are going to

15   provide their opinions, what's the scope of what the

16   valuations could be.

17               One of the rulings we're asking for is a ruling

18   that predates the early termination date, a valuation that

19   predates the early termination date.  It's simply off the

20   tables.  You can't do that.  And that's the valuation that

21   they're relying on right now.  They're relying on a

22   valuation as of September 12th.  September 15th, in our

23   view, was the early termination date.  That valuation is

24   completely off the table.  That tells us what --

25               THE COURT:  But --

Page 192

1          MR. TAMBE:  -- we're going to be talking about.

2          THE COURT:  But you're getting to the merits and

3    I'm trying to stick with the procedure.  And what I see is

4    the specter of a -- in every case where I've got, you know,

5    a breach of contract action that I then am going to have,

6    you know, pregame show in which I'm going to give these

7    little mini-opinions on meanings of particular phrases.  And

8    that's not helpful to me.  It may be the way you want to do

9    it, but it sets me up for doing things multiple times and

10   creating inefficiencies when I think I -- we should find a

11   way to do this once, or at most twice.

12          MR. TAMBE:  Right.  And I think what we're

13   proposing would be, at most, twice because the way we see it

14   is you have these threshold issues right now, which is

15   what's the early termination date and can you value prior to

16   the early termination date.

17          THE COURT:  But you're -- again, I -- maybe it's

18   getting late in the day so I'm not being articulate.  But

19   you're plucking out phrases in a contract and saying, before

20   we get to the main event, give us a ruling on these

21   particular phrases.  And that's just not -- that's not

22   attractive to me as a way of proceeding.

23          MR. TAMBE:  Let me tell you why we thought it

24   might be attractive and --

25          THE COURT:  Okay.

Page 193

1          MR. TAMBE:  -- certainly it's attractive from our

2    perspective.

3          We could see that there could be a difference of

4    opinion, and we're going to have competing experts valuing

5    this on the 15th.

6          THE COURT:  Right.

7          MR. TAMBE:  They have their views as to what the

8    proper value should be on the 15th.  That, in our view, is a

9    much narrower range of disagreement than would exist if you

10   said it can go as far as back as the 12th and as far forward

11   as some other date.  It's a much broader range.

12         We hope, because we've been through mediation,

13   that if there's a ruling on that issue and if we're

14   successful -- we're not prejudging that.  Obviously that's a

15   decision Your Honor will make -- it might actually narrow

16   the dispute both factually, but also in terms of what's

17   possible in terms of resolution.  That's why we identified

18   those as declaratory relief counts in the complaint.  I

19   think we're pretty transparent about where we were headed

20   with the way the complaint was drafted.

21         And that's why we think summary judgment is

22   appropriate on those two discreet issues, which really are

23   plain language of the contract and nothing more than that.

24         THE COURT:  Okay.  Let -- when you say it that

25   way, it doesn't sound so problematic.  But let me hear from

Page 194

1    Mr. Bienenstock.

2              MR. TAMBE:  Sure.

3              MR. BIENENSTOCK:  Thank you.  Good afternoon, Your

4    Honor.  Martin Bienenstock of Proskauer Rose, LLP for

5    Federal Home Loan Bank of Cincinnati.

6              There is a way to do what you want, Your Honor,

7    and I will start with the solution and there are there just

8    a few things I would like to respond to.

9              THE COURT:  Okay.

10             MR. BIENENSTOCK:  By the way, did we decide that

11   this is on or off the record?

12             THE COURT:  It's on the record.

13             MR. BIENENSTOCK:  Okay.  So I do want to respond

14   to a few things, but I want to get to the solution and the

15   bottom line first.

16             The Federal Home Loan bank of Cincinnati has the

17   same goal of the Court, let's do it once, if at all

18   possible.  And Your Honor mentioned why do we need summary

19   judgment or motion to dismiss.  We can accommodate that

20   because we don't think Your Honor needs to address our

21   motion to dismiss or their summary judgment motion if Your

22   Honor simply tells us to agree on discovery.  Then, as Your

23   Honor contemplated, maybe the parties make cross-motions for

24   summary judgments, maybe we just have a trial.  We're

25   prepared to do that.  That's the simple -- that's the way it

Page 195

1    should be done.  I feel like saying, why don't we just agree

2    on that and go home.

3                The solution that --

4                THE COURT:  What about the point that I think has

5    some merit of that to the extent that there are -- I'm not

6    arguing against myself, but these threshold or --

7                MR. BIENENSTOCK:  That was my next point.

8                THE COURT:  -- isolated legal issues, why do we

9    need to roll into discovery in -- on this time frame when it

10   might be this time frame or this time frame?

11               MR. BIENENSTOCK:  Exactly.  And the answer is

12   because the two points for starters that LBSF is saying is

13   going to lead to that narrower scope of possible resolutions

14   are not the points we think will.  They could get both of

15   the rulings they're asking for.  We don't interpret the

16   contract or all the facts in the transaction to lead to the

17   conclusions that they do.

18               So if Your Honor wants to pick out, wants to

19   decide things to narrow the scope, they'll have their list.

20   We'll have our list.  If Your Honor wants to decide whose

21   list is right, well, then we're into the whole thing.

22   That's why the LBSF solution doesn't work, plain and simple.

23               Now what I wanted to respond to --

24               THE COURT:  But give me -- give me -- I mean,

25   there's going to have to be a game plan where we don't have

Page 196

1    a out of control amount of discovery, where we're not --

2              MR. BIENENSTOCK:  Right.

3              THE COURT:  -- looking at whatever the methodology

4    is here.  You know, tens of thousands of transactions in

5    order to determine, you know, what the right calculation was

6    and what the right bids were and all of those kinds of

7    events.

8              So it -- I don't want this -- in the name of

9    efficiency, I don't want this to then become more of a

10   monster than it is.

11             MR. BIENENSTOCK:  Well, we agree and, in fact, in

12   the mediation that was not successful my understanding is

13   LBSF already got a lot of stuff from us.  I don't think we

14   got anything from them.  But I don't know at this point that

15   I would expect either side to be unreasonable in the

16   discovery.  And --

17             THE COURT:  Well, let me -- so let's go there.  So

18   they got a lot of stuff from you already.

19             MR. BIENENSTOCK:  Yeah.  Yes.

20             THE COURT:  Okay.  And given the nature of the

21   dispute, what would it be that you would be asking from

22   them?

23             MR. BIENENSTOCK:  Well, I can't give Your Honor a

24   complete answer without consulting with my colleagues who

25   are here from Cincinnati --

 1          THE COURT:  Right.

 2          MR. BIENENSTOCK:  -- but we certainly want to see

 3     --

 4          THE COURT:  How they acted in similar situations.

 5          MR. BIENENSTOCK:  Exactly.  Exactly.

 6          THE COURT:  Well, this is an issue that is --

 7     that's coming up in a lot of different places and I'm not

 8     sure that -- I don't know about that.

 9          MR. BIENENSTOCK:  Well, okay.  I do want to alert

10     Your Honor to something -- maybe I'm not alerting Your

11     Honor.  Maybe Your Honor knows already.  But the way Lehman

12     has dealt with the overall case and the tactics, it has

13     everybody's information, all of its counter --

14          THE COURT:  I under --

15          MR. BIENENSTOCK:  -- the counterparties don't have

16     Lehman's information.

17          THE COURT:  I understand that.

18          MR. BIENENSTOCK:  The playing field is not level.

19     It's very unfair to the claimant.  And we don't want an

20     unfair playing field.  But -- and if we can't get things

21     directly from Lehman, that doesn't mean there aren't other

22     ways, but they're a lot more time consuming and expensive.

23          THE COURT:  Right.  No.  I appreciate the point

24     and it's certainly not fair for any party to, you know, take

25     the position that the way one party acted is not fair and

Page 198

1   reasonable when, in fact, in another context they might have

2   done that.  But, you know, litigation is litigation.  And

3   parties take positions in different contexts that may be at

4   odds and that doesn't necessarily mean that that should be a

5   driver of a result in a particular situation.

6           MR. BIENENSTOCK:  Well, okay.  But to help Your

7   Honor get to the right result on what we should be entitled

8   to, I think the safe thing to go by is the rules.  Things

9   calculated to lead to the --

10          THE COURT:  Agree.  Can't --

11          MR. BIENENSTOCK:  -- discovery of --

12          THE COURT:  -- disagree with that.

13          MR. BIENENSTOCK:  -- admissible evidence.

14          THE COURT:  Right.

15          MR. BIENENSTOCK:  And if we -- right now it sounds

16  to me like they may or may not have a plain meaning of the

17  contract that they think Your Honor should buy.  I'm not

18  sure because they're talking about a fact issue.

19          We do have a --

20          THE COURT:  No, but they are -- they're urging me

21  that that's what they want on the declaratory relief.  They

22  want me to --

23          MR. BIENENSTOCK:  Oh, just on a few parts.

24          THE COURT:  Right.

25          MR. BIENENSTOCK:  Right.  I don't know if --

1                THE COURT:  Right.

2                MR. BIENENSTOCK:  -- if they're saying there's no

3       part of the contract that's ambiguous or not and I don't

4       need to find out at the moment.  But I can say they may say

5       that all parts of their contract are -- of the contract are

6       -- have a plain meaning.  We may well say they have a plain

7       meaning, but different from the one they have in mind.  And

8       if Your Honor determines either based on listening to the

9       two of us or based on the Paragren case where a district

10      judge in this district recently said the very words we're

11      arguing over in the contract were ambiguous, there's going

12      to be evidence taken and the -- what we want in discovery is

13      what would clearly be admissible evidence of that, which is

14      how they've interpreted --

15               THE COURT:  Right.

16               MR. BIENENSTOCK:  -- that in the past.

17               THE COURT:  No.  I mean, I think that there's a --

18               MR. BIENENSTOCK:  We don't have to go overboard,

19      but --

20               THE COURT:  Right.

21               MR. BIENENSTOCK:  Okay.

22               THE COURT:  No.  I think that there's a reasonable

23      possibility of that and I think that we should go down the

24      path of doing this once.

25               MR. TAMBE:  If I could just respond briefly, Your

1   Honor.

2            MR. BIENENSTOCK:  Oh, may I finish first?

3            THE COURT:  Yeah.  Go ahead.

4            MR. BIENENSTOCK:  Two things, Your Honor.  The

5   letter that LBSF submitted yesterday is really a piece of

6   work and I don't want to go through it minutely, but I do

7   want to point out two things because I think it speaks

8   volumes about what the Court should be crediting and not.

9            We had made a point in our motion to dismiss that

10  the law in this district and generally is unanimous and firm

11  that when you have a cause of action you can't multiply it

12  into multiple causes of action by asking for declaratory

13  judgment on every fact within it.  And the LBSF letter cites

14  this Enzo-Biochem (ph) case as if this contradicts our

15  statement that in this district the authorities are

16  unanimous in our favor.

17           And they say that, look at this, a motion to

18  dismiss declaratory judgment claims claiming to be

19  duplicative of contract claims was denied.  That's what LBSF

20  gave Your Honor yesterday.  I -- it's hard for me to believe

21  that they didn't think that either Your Honor or myself or

22  both of us would pull out the Enzo-Biochem case and read --

23           THE COURT:  Well, I'll tell you right now I

24  haven't had time to pull it out.

25           MR. BIENENSTOCK:  Well --

Page 201

1                   THE COURT:  So --

2                   MR. BIENENSTOCK:  -- it's only one or two

3       sentences that are relevant and I'm going to read them.

4       "The Court disagrees" -- this is a quote -- "The Court

5       disagrees that plaintiff's declaratory judgment claims are

6       fully duplicative of the contract claims."

7                   The motion to dismiss the declaratory judgment

8       claims was denied because that Court found they were not

9       duplicative, and yet they submit this as contrary authority.

10                  I think that speaks volumes and that is consistent

11      with what I wanted to respond to in the opening by LBSF.

12      Your Honor got this PowerPoint and this description that

13      made it sound like the Federal Home Loan Bank made a 70

14      million some-odd gain and only gave them 13 and it was

15      supposed to give them 70 and, gosh, Judge, that poison --

16      that certainly must have poisoned the well in your mind.

17      But Your Honor understood that that goes to the merits and

18      that's not up today.

19                  Let me just say that what was told to you earlier

20      was as wrong and sly as citing Enzo-Biochem as if it

21      contradicted our authorities.  The -- we have a contact here

22      that -- this master agreement that has the language that

23      we're all fighting over that says how the innocent party is

24      supposed to calculate damages.  It says nothing about

25      turning over gains.  And they can't show you to the contrary

Page 202

1   because there's -- it's just -- the word gain or profit or

2   anything like that isn't in there.  And there's nothing

3   similar in there.

4          And there's a gross misstatement and a misleading

5   pail that they're trying to put over this case as if we made

6   a gain at their expense.  Whatever money the Federal Home

7   Loan Bank made or didn't make was earned because they

8   couldn't cover at 1:45 a.m. on September 8th -- or whatever

9   it was, September 15th, 2008, and when they covered they

10  might have had a big loss or they might have had a big gain,

11  and the loss or gain is attributable to the fact that they

12  were exposed for a period of time before they could line up

13  a transaction.

14         That has absolutely nothing to do with the dispute

15  before Your Honor and yet it's telling again that that's

16  what LBSF starts off with.  What this is about is did we

17  compute damages in accordance with the contractual

18  provisions that says how are we supposed to gather up the

19  quotations to --

20         THE COURT:  Right.

21         MR. BIENENSTOCK:  -- to compute damages.  That's

22  it.  And my letter to Your Honor cites the relevant language

23  and shows how we're supposed to do it as soon as possible

24  after the early termination date as of a date and time that

25  we select in good faith.  And we explain in the letter why

Page 203

```
1    we chose the last available market price not impacted by

2    their own default.

3            It's as simple as that.  But, anyway, Your Honor,

4    I think from the outset Your Honor certainly made clear

5    where the Court is going and, as I said, we can easily

6    accommodate it by agreeing with Jones Day on appropriate

7    discovery.  If we have a dispute, whatever Your Honor's

8    preference is --

9            THE COURT:  Well, let's --

10           MR. BIENENSTOCK:  -- we'll give you a call or

11   we'll ask for a conference.

12           THE COURT:  I -- that's exactly what I want you to

13   do.  So I don't want any motions now.  I want you to agree

14   on, you know, essentially a pretrial order on discovery.  If

15   you have discovery disputes you can come back, but I'm

16   confident you can work them out.  If you get to the point

17   where one or the other of you believes you have a

18   dispositive motion, request a conference.  We'll take it

19   from there.  And if we -- if I don't think that we're going

20   to get there that way, then we're going to set it down for

21   trial.

22           MR. TAMBE:  Your Honor --

23           THE COURT:  Yeah.

24           MR. TAMBE:  -- I see exactly where you're headed

25   and so --
```

Page 204

1              THE COURT:  Okay.

2              MR. TAMBE:  -- I need to make a point because I

3     think what -- one thing counsel said really illustrates

4     while the inefficiencies that's going to arise now.  They

5     want to know how, for example, we treated other parties.  On

6     the issue of the early termination date, it's a clear

7     contractual issue.  There's no reason to look into how

8     Lehman may have --

9              THE COURT:  Okay.

10             MR. TAMBE:  -- dealt with other parties.  There's

11    --

12             THE COURT:  Look, I already --

13             MR. TAMBE:  -- no reason for discovery of that.

14             THE COURT:  -- I already said to you that I have a

15    question about the appropriate scope of discovery by them

16    from you.  But we're not there right now.  So I'm going to

17    take Mr. Bienenstock at his word.  We're going to play by

18    the rules and we'll see.  And, you know, more likely than

19    not you're going to come back with this issue because I

20    think that this is going to be a live issue.  But, frankly,

21    I'll deal with that as and when you can't agree on it.

22             I see both sides on that particular issue, but I

23    frankly only see one side on my desire to do this once and

24    informed by recent experiences, both in this case and in

25    others, I've become more skeptical about the ability to

Page 205

1    dispose of these types of issues as being purely legal

2    issues because we have all these unique contexts that I

3    think come into play and may have some bearing.

4              So let's stay efficient.

5              MR. TAMBE:  Absolutely.

6              THE COURT:  Let's try to stay on track.  I

7    appreciate both sides and I'm not going to take Mr.

8    Bienenstock's spirited response to your last letter as an

9    indication that there are going to be hostilities going

10   forward.  I'm going to assume that you're going to get

11   along.

12             MR. TAMBE:  We'll hug it out, Your Honor.

13        (Laughter)

14             MR. BIENENSTOCK:  Thank you, Your Honor.

15             MR. TAMBE:  Thank you, Your Honor.

16             THE COURT:  All right.  Thank you.  Thank you for

17   coming in and I'm sorry that you had to wait as long as you

18   did.

19        (Whereupon, these proceedings concluded at 3:45 p.m.)

20                        * * * * *

21

22

23

24

25

Page 206

1                           I N D E X

2

3                         R U L I N G S

4    IDENTIFICATION                                    PAGE

5    Fifteenth Application of Hughes Hubbard &         32

6    Reed LLP for allowance of interim compensation

7    for services rendered and reimbursement of

8    actual and necessary expenses incurred from

9    December 1, 2013 through March 31, 2014

10   (LBI ECF No. 9004)

11

12   Joint notice of presentment of Seventh amended    33

13   order establishing procedures governing interim

14   monthly compensation of trustee and Hughes

15   Hubbard & Reed LLP (LBI ECF No. 9003)

16

17   HEARING Re Two Hundred Fifty-Fourth Omnibus

18   Objection to Claims (ECF No. 25059)               121

19

20   HEARING Re Stonehill's Motion to re-file proofs

21   of claim to fix previously unliquidated claim

22   amounts or alternatively for leave to file

23   amended claims (ECF No. 43988)                    170

24

25

Page 207

1

2                              I N D E X

3

4                            R U L I N G S

5    IDENTIFICATION                                          PAGE

6    HEARING Re Plan administrator's objection to

7    proof of claim No. 33514 filed by Frank Tolin,

8    Jr. (ECF No. 37839)                                     185

9

10   HEARING Re Lehman Brothers Special Financing,

11   Inc. v Federal Home Loan Bank of Cincinnati

12   (Adversary proceeding No. 13-01330), Pre-Trial

13   Conference                                              203

14

15

16

17

18

19

20

21

22

23

24

25

Page 208

1              C E R T I F I C A T I O N

2

3

    I, Sheila G. Orms and Sherri Breach certify that the
4    foregoing is a correct transcript from the official
5    electronic sound recording of the proceedings in the above-
6    entitled matter.

7

8    Dated:   June 23, 2014

9    Sheila Orms    Digitally signed by Sheila Orms
                    DN: cn=Sheila Orms, o, ou,
10                  email=digital1@veritext.com,
                    c=US
                    Date: 2014.11.11 16:31:50 -05'00'
11   Signature of Approved Transcriber

12

13   Sherri L    Digitally signed by Sherri L Breach
                 DN: cn=Sherri L Breach, o, ou,
                 email=digital1@veritext.com,
14   Breach      c=US
                 Date: 2014.11.11 16:32:30 -05'00'
     SHERRI L. BREACH

15

     AAERT Certified Electronic Reporter & Transcriber
16

     CERT*D-397
17

18

     Veritext
19

     330 Old Country Road
20

     Suite 300
21

     Mineola, New York 11501
22

23

     Date: June 23, 2014
24

25