**Motion and Cross-Motion Hearing Date:  December 10, 2014 at 10:00 a.m. (EST)**
**Objection Deadline on Cross-Motion:  November 14, 2014 by 4:00 p.m. (EST)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re:                                                  :    Chapter 11
                                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                :    Case No. 08-13555 (SCC)
                                                        :
                              Debtors.                  :    (Jointly Administered)
-------------------------------------------------------------------x

# The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review

Franklin H. Top III (admitted *pro hac vice*)
Scott A. Lewis (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone: (312) 845-3000

*Counsel for U.S. Bank National Association, solely in its capacity as Indenture Trustee for Certain Mortgage-Backed Securities Trusts*

M. William Munno
Daniel E. Guzmán
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York  10004
Telephone: (212) 574-1587

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as Separate Trustee for Certain Mortgage-Backed Securities Trusts*

John C. Weitnauer (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309
Telephone: (404) 881-7000

*Counsel for Wilmington Trust Company and Wilmington Trust, National Association, solely in their respective capacities as Trustee for Certain Mortgage-Backed Securities Trusts*

Richard C. Pedone (admitted *pro hac vice*)
Christopher Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, New York  10022
Telephone: (212) 940-3085

*Counsel for Deutsche Bank National Trust Company, solely in its capacity as Trustee for Certain Mortgage-Backed Securities Trusts*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................... 1

    A.    Estimation Of RMBS Claims By Statistical Sampling......................................... 1

    B.    Lehman's Cross-Motion To Re-underwrite Up To 209,000 Loans...................... 2

II.    FACTUAL BACKGROUND........................................................................ 4

    A.    Lehman's Repurchase Obligations ........................................................ 4

    B.    Lehman Agreed To Repurchase Covered Loans Upon Its Discovery Of
    Breaches And To Promptly Self-Report Them..................................... 5

    C.    The RMBS Trustees' Efforts To Consensually Resolve The RMBS Claims........ 7

    D.    The RMBS Trustees Diligently Worked To Obtain Detailed Proof Of The
    Damages Suffered By The RMBS Trusts ............................................. 9

III.    ARGUMENT ...................................................................................... 11

    A.    Statistical Sampling Has Been Approved By The Courts In RMBS Cases......... 11

    B.    Section 502(c) Of The Bankruptcy Code Expressly Allows Estimation Of
    The RMBS Claims .......................................................................... 13

    C.    Lehman's Cross-Motion Fails To Provide Any Basis To Require The
    Parties And This Court To Review Up To 209,000 Loan Files........................... 15

    IV.    THE RESERVE ORDER IS INTERLOCUTORY AND THE RESERVE
    AMOUNT CAN BE CHANGED TO PROTECT THE RMBS CLAIMS............... 21

    A.    Rule 54, Not Rule 60, Is Applicable To And Permits The Reserve To Be
    Increased ...................................................................................... 21

    B.    Even If The Reserve Order Were Deemed Final, Rule 60 Expressly
    Allows The Reserve To Be Increased.................................................. 23

CONCLUSION...................................................................................... 24

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Products, Inc.,*
5 F. Supp.3d 543 (S.D.N.Y. 2014) ........................................................................... 5

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,*
920 F. Supp. 2d 475 (S.D.N.Y. 2013) .................................................................... 12

*Bank of New York Mellon Trust Co., Nat'l Assoc. v. Morgan Stanley Mortg. Capital Inc.,*
2013 WL 3146824 (S.D.N.Y. June 19, 2013) .......................................................... 6

*Curtiss-Wright Corp. v. Gen. Elec. Co.,*
446 U.S. 1, 100 S. Ct. 1460, (1980) ....................................................................... 23

*Deutsche Bank Nat. Trust Co. v. WMC Mortg., LLC,*
2014 WL 1289234 (D. Conn. Mar. 31, 2014) ......................................................... 12

*Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC,*
2014 U.S. Dist. LEXIS 106327, 2014 WL 3824333 (D. Conn. Aug. 4, 2014) ....... 11

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,*
2012 U.S. Dist. LEXIS 173768, 2012 WL 600885 (S.D.N.Y. Dec. 3, 2012) ......... 12

*Ginett v. Computer Task Gr., Inc.,*
962 F.2d 1085 (2d Cir. 1992) .................................................................................. 23

*HBE Leasing Corp. v. Frank,*
48 F.3d 623 (2d Cir. 1995) ..................................................................................... 23

*In re American Home Mortgage Holdings, Inc.,*
No. 07-11047 (Bankr. D. Del. Feb. 18, 2009) ........................................................ 14

*In re Chemtura,*
448 B.R. 635 (Bankr. S.D.N.Y. 2011) .................................................................... 24

*In re First NLC Financial Services, LCC,*
No. 08-10632 (Bankr. Fla. S.D. Mar. 26, 2008) .................................................... 14

*In re Joint Eastern and Southern Districts Asbestos Litigation,*
237 F. Supp. 2d 297 (E.D.N.Y. 2002) .................................................................... 24

*In re New Century TRS Holdings,*
No. 07-10416 (Bankr. D. Del. Mar. 27, 2009) ....................................................... 14

## TABLE OF AUTHORITIES

*(continued)*

**Page**

*Horne v. Flores,*
  557 U.S. 433, 129 S.Ct. 2579 (2009) ........................................................................ 23

*MASTR Adjustable Rate Mortgage Trust 2006-OA2 v. UBS Real Estate Securities, Inc.,*
  Case No. 12-cv-07322 (S.D.N.Y. Apr. 1, 2013) ............................................... 11, 12

*Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.,*
  2002 WL 818082 (S.D.N.Y. Apr. 30, 2002) ............................................................. 6

*Retained Realty, Inc. v. McCabe,*
  376 Fed. Appx. 52 (2d Cir. 2010) ........................................................................... 22

*Richmond v. Nat'l Grid,*
  539 Fed. Appx. 15 (2d Cir. 2013) ........................................................................... 23

*Ryan v. U.S. Lines Co.,*
  303 F.2d 430 (2d Cir. 1962) ................................................................................... 24

*Taylor v. Bd. of Educ.,*
  288 F.2d 600 (2d Cir. 1961) ................................................................................... 22

### STATE CASES

*Ace Securities Corp. v. DB Structured Prods., Inc.,*
  40 Misc.3d 562 (Sup. Ct. N.Y. Cnty. 2013) ........................................................... 12

*Home Equity Mortgage Trust Series 2006-1 v. DLJ Mortgage Capital, Inc., Index* No.
  1560016-2012 (Sup. Ct. N.Y. Cnty. Nov. 19, 2013) .............................................. 12

### FEDERAL RULES AND REGULATIONS

11 U.S.C. 502 ................................................................................. 1, 3, 4, 13, 15

Fed. R. Civ. P. 54(b) .................................................................................... 22, 23

# I.    PRELIMINARY STATEMENT

## A.    *Estimation Of RMBS Claims By Statistical Sampling*

1.    The RMBS Trustees' Motion asked this Court to estimate the RMBS Claims related to Covered Loans owned by Covered Trusts using statistical sampling.[1]  We relied on two independent grounds: (i) the decisions of many courts approving statistical sampling to determine liability and damages in RMBS cases, and (ii) the explicit power given to this Court by section 502(c) of the Bankruptcy Code to estimate these claims – something that can be done with precision using statistical sampling.

2.    Lehman does not dispute that statistical sampling has been approved by many courts to determine liability and damages in RMBS cases.

3.    Nor does Lehman dispute that statistical sampling yields virtually the same precision as if each loan at issue was individually evaluated by the Court.

4.    Nor does Lehman dispute that the RMBS Trustees' expert discovery schedule in advance of an estimation hearing in mid-2015 will afford it sufficient time to conduct its own expert review of the 4,579 loan files that the RMBS Trustees had reviewed for representation and warranty ("**R&W**") breaches.

---

[1] "**Motion**" refers to *The RMBS Trustees' Motion To (i) Increase The Reserve To $12.143 Billion And (ii) Estimate And Allow Their Claims For Covered Loans At $12.143 Billion Pursuant To Section 502(c) Of The Bankruptcy Code*, ECF No. 46078.  "**RMBS Trustees**" refers to U.S. Bank National Association, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, solely in their respective capacities as trustee, separate trustee or indenture trustee for certain trusts that issued residential mortgage-backed securities (the "**RMBS Trusts**").  "**RMBS Claims**" refers to the proofs of claims timely filed by the RMBS Trustees in these cases.  The total RMBS Claims arise from approximately 405 RMBS Trusts and approximately 1 million mortgage loans.  "**Covered Loans**" are either "Lehman originated Loans," or "Bank originated Loans," *see* ECF No. 24254, ¶ 20, as to which Lehman acknowledges having made reps and warranties regarding their nature or quality.  Motion at ¶ 2.  The RMBS Claims related to Covered Loans are a subset of the total RMBS Claims.  The approximately 416,000 Covered Loans at issue in this Motion are included in 255 of the 405 RMBS Trusts (the "**Covered Trusts**").  Motion at ¶ 3.

The RMBS Trustees reserve, and do not waive, any of their rights in regard to their proofs of claims, including claims related to breaches of R&Ws concerning mortgage loans other than Covered Loans at issue in this Motion.

5.      Instead, Lehman asserts (without support, and incorrectly) that the RMBS Trustees have not complied with governing documents and have done nothing to prove these claims. In fact, the RMBS Trustees timely filed proofs of claims (in accordance with the governing documents), and tried for years to resolve the RMBS Claims consensually. After being repeatedly rebuffed or ignored by Lehman, the RMBS Trustees spent two years (i) having a statistically valid sample of loans identified, (ii) obtaining from third parties the loan files in that sample, (iii) having those loan files reviewed for material breaches of the applicable R&Ws (a process referred to as "re-underwriting"), and (iv) having the results analyzed and extrapolated. That work – explained and documented in the expert reports filed with the Motion – demonstrates that the claims of the Covered Trusts for these Covered Loans are not less than $12.143 billion.

### B.      Lehman's Cross-Motion To Re-underwrite Up To 209,000 Loans

6.      Nevertheless, in opposing the RMBS Trustees' Motion for an estimation hearing to determine liability and damages based on statistical sampling, Lehman asserts in its Cross-Motion[2] that the RMBS Trustees must conduct a loan-by-loan review of *every single one* of up to approximately 209,000 mortgage loan files for the relevant Covered Loans,[3] and prove for each loan a breach of a R&W that is material and adverse, in order to have these claims allowed (a "**R&W claim**").[4]

---

[2] "**Lehman Cross-Motion**" refers to *Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (i) Increase the Reserve to $12.143 Billion and (ii) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(C) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees*, ECF No. 46526. "**Lehman**" or the "**Debtors**" refers to Lehman Brothers Holdings Inc. ("**LBHI**" or the "**Plan Administrator**") and Structured Assets Securities Corporation ("**SASCO**") together, and collectively with their affiliated debtors in the above-captioned cases.

[3] Of the approximately 416,000 Covered Loans, 213,974 have not been paid in full as of June 2014. *See Declaration of Charles A. Parekh, Ph.D.* dated November 14, 2014, submitted herewith (the "**Parekh Supp. Decl.**") at ¶ 14. The RMBS Trustees already have re-underwritten 4,579 loans. Subtracting 4,579 from 213,974 equals 209,395 (*id.*), which we have rounded down and refer to above as "approximately 209,000 mortgage loan files."

[4] Lehman Cross-Motion at ¶¶ 3, 90 & n.24.

7.      According to Lehman, "individualized proof ... is expressly required by the Governing Agreements"[5] and a loan-by-loan review "is necessary so as to not jeopardize what may be billions of dollars of downstream claims that the Plan Administrator *may bring*."[6] Lehman then proposes that this loan-by-loan review should be conducted pursuant to a Protocol,[7] claiming – with no support – that the Protocol would be "efficient," "expeditious" and "economic."[8]   In fact, Lehman's Protocol would take up to 27 years and cost the RMBS Trusts and the Lehman Estate up to $219 million.[9]    Under the circumstances, this would be a nonsensical way to proceed.

8.      There is no contractual or legal reason that would require a loan-by-loan review. *First*, Lehman fails to cite any provision in the two examples of governing documents it attaches to its Cross-Motion that either require a loan-by-loan review or prohibit statistical sampling. There are no such provisions.    *Second*, numerous courts already have approved the use of statistical sampling to determine R&W claims.[10]    *Third*, bankruptcy courts are empowered to estimate claims by virtue of section 502(c) of the Bankruptcy Code.   Statistical sampling is particularly appropriate in an estimation proceeding.    While Lehman *now* contends the RMBS Claims are not subject to estimation under section 502(c) because, supposedly, they are not "unliquidated,"[11] Lehman took *the opposite position in this Court two years ago* stating that the

---

[5] Lehman Cross-Motion at ¶ 2.

[6] Lehman Cross-Motion at ¶ 13 (emphasis added).

[7] "**Protocol**" refers to Exhibit C to Lehman's Cross-Motion; ECF No. 46526-3.

[8] Lehman Cross-Motion at ¶¶ 100, 104.

[9] Parekh Supp. Decl. at ¶¶ 14-17.

[10] *See infra* at Part III.A.

[11] Lehman Cross-Motion at ¶¶ 66, 83-84.

RMBS Claims "*are actually ... unliquidated clams.*"[12]  Equally inconsistent with this newly-minted assertion, Lehman tells this Court that a convoluted, multi-step Protocol is needed *in order to liquidate* the RMBS Claims.

9.     Finally, Lehman also fails to cite any contractual provision in the governing documents to support its contention that the RMBS Trustees are obligated to perform a loan-by-loan review *for Lehman's benefit*, so that Lehma*n* "*may bring*"[13] claims that *Lehman may have* against *third parties*.  There are no such provisions.

10.    The RMBS Claims can be allowed by this Court based on a statistically valid sample.  This is so because (i) statistical sampling is a valid method to determine RMBS R&W claims, approved by many courts, and (ii) the explicit power to estimate claims is given to this Court by section 502(c) of the Bankruptcy Code.  Accordingly, the Court should set an expert discovery schedule, as the Motion requests,[14] and set a hearing date for the Spring of 2015.  If that schedule can be met, that portion of the Motion that seeks an increase in the Reserve can be deferred at this time.

## II.    FACTUAL BACKGROUND

### A.    *Lehman's Repurchase Obligations*

11.    Lehman's repurchase obligations arise under Mortgage Loan Purchase Agreements (or similar agreements) which were assigned to the RMBS Trustees.  *See* Lehman Cross-Motion, Ex. F, § 2.01.  These agreements typically set forth the repurchase remedy as follows:

---

[12] *Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and Sections 105(A), 502(C) and 1142(B) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage- Backed Securities for Purposes Of Establishing Reserves*," ECF No. 24254 (the "**Lehman Reserve Motion**") at p. 2 (emphasis added).

[13] Lehman Cross-Motion at ¶ 13.

[14] Motion at ¶¶ 45-47.

> It is understood and agreed that the representations and warranties [of LBHI] shall survive the Closing Date.  Upon discovery by either [LBHI] or [SASCO] of a breach of any of the foregoing representations and warranties …, that adversely and materially affects the value of the related Mortgage Loan that does not also constitute a breach of a representation or warranty of a Transferor in the related Transfer Agreement, the party discovering such breach shall give prompt notice to the other party; …. Within 60 days of the discovery of any such breach, [LBHI] shall either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof … at the applicable Purchase Price …, or (c) within the two-year period following the Closing Date substitute a Qualifying Substitute Mortgage Loan for the affected Mortgage Loan.

Lehman Cross-Motion, Ex. E, § 1.04(d).

12.     LBHI selected loans to convey to the Covered Trusts, prepared mortgage loan schedules (*id.* at § 1.01(b)), and made R&Ws regarding loans.  Thus, as the "sponsor" of these transactions, Lehman assumed the risks associated with defective loans.  This is a typical feature of RMBS.  *See, e.g., Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Products, Inc.,* 5 F. Supp.3d 543, 546 (S.D.N.Y.  2014).

B.     *Lehman Agreed To Repurchase Covered Loans Upon Its Discovery Of Breaches And To Promptly Self-Report Them*

13.     LBHI agreed to cure or repurchase Covered Loans upon its discovery of breaches and to promptly self-report them.  Lehman Cross-Motion, Ex. E, § 1.04(d).

14.     As the Examiner's report in this case[15] demonstrates, LBHI *was aware* that the Covered Loans (many of which were originated by Lehman's affiliates, including Aurora Bank, FSB ("**Aurora**"), BNC Mortgage Inc. ("**BNC**"), and Finance America) contained pervasive material breaches:

---

[15] Report of Anton R. Valukas, Examiner (Mar. 11, 2010) at p. 84 [ECF No. 7531] ("**Examiner's Report**").

(a)     By late 2006, "Lehman's mortgage business experienced other troubling trends, including sharp increases in repurchase requests, rises in delinquency rates and a spike in first-payment defaults.";[16]

(b)     Lehman had "a process for monitoring exposure to Representations and Warranties (R&W) fraud along with Early Payment Defaults (EDP)" and it "monitor[d] and actively manage[d] the risk of the origination business.";[17]

(c)     Lehman also had implemented in 2007 (or earlier) a "[m]onthly risk review process for … previously securitized loans.";[18]

(d)     Lehman noted in March, 2007 that "[t]he deterioration in BNC performance starting with late 2004 originations continues[,]" "[s]ubprime delinquency keeps climbing on all fronts[,]" and "Special Investigations completed the review of 240 LXS loans which resulted in 50% of the loans contained [sic] material misrepresentation[s.]";[19]

(e)     "I can see performance for Aurora originated loans to become [sic] even worse in 2007. Looking at the trends on originations and linking them to first payment defaults, the story is ugly[.] The last 4 months Aurora has originated the riskiest loans ever, with every month been [sic] riskier than the one before …";[20]

15.    Under New York law, LBHI "discover[s]" a breach "when it knows or *should know* that the breach has occurred."  *Bank of New York Mellon Trust Co., Nat'l Assoc. v. Morgan Stanley Mortg. Capital Inc.*, 2013 WL 3146824, at *19 (S.D.N.Y. June 19, 2013) (emphasis in original); *see also Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) (same).  Thus, the governing documents

---

[16] Examiner's Report at 84.

[17] Examiner's Report at 83 n. 264 [LBEX-DOCID 244792] (Madelyn Antoncic, Chief Risk Officer, Lehman 2007 Bondholder Meeting Presentation (Oct. 18, 2007), at p. 7).

[18] Examiner's Report at 83 n. 264 [LBEX-DOCID 244792].

[19] Examiner's Report at p. 84 n. 272 [LBEX-DOCID 188325] (Lehman Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 9,10).

[20] Examiner's Report,  at p. 83 n. 263 [LBEX-DOCID 380035]) (Email from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Jan. 30, 2007), Subject: Aurora origination trends and performance).    LBEX-DOCID documents can be obtained in full from the hyperlinks in the footnotes of the copy of the Examiner's Report posted at http://jenner.com/lehman (last visited on November 7, 2014).  Copies of the relevant pages of the Examiner's Report and cited Lehman documents are attached hereto collectively as Exhibit 1.

placed the burden on Lehman to cure or repurchase Covered Loans – something Lehman failed to do prepetition, thus damaging the Covered Trusts holding Covered Loans.

C.    *The RMBS Trustees' Efforts To Consensually Resolve The RMBS Claims*

16.    The RMBS Trustees tried for years to resolve the RMBS Claims consensually both before and after the entry of the Reserve Order.

17.    In 2009, after SASCO commenced its voluntary case under Chapter 11 and this Court established a bar date of September 22, 2009 for filing proofs of claims (ECF No. 4271), the RMBS Trustees timely filed unliquidated claims for breaches of R&Ws regarding 405 separate trusts holding over 1 million loans.

18.    Because the time and expense to retrieve and re-underwrite the loans would have been prohibitive, the RMBS Trustees wanted a commercially reasonable method to estimate and allow the RMBS Claims, particularly given the uncertain dividend the Estate might pay to creditors.

19.    In September 2010, Lehman contacted the RMBS Trustees (*see* Top Decl. ¶ 6), and expressed Lehman's view that breaches should be presented on a loan-by-loan basis.[21]

20.    In the Spring of 2011, Lehman objected to the RMBS Claims on the grounds of insufficient documentation.  *Id.* ¶ 7.

21.    In June 2011, the Court heard Lehman's objections, reserved judgment, and indicated that the parties should come up with a commercially practicable approach to resolving the RMBS Claims.  *See June 30, 2011 Hearing Tr.* at 70:19-20, 71:8-11 [ECF No. 18251]. Judge Peck stated that "the presentations by all parties highlight the complexity of the process of proving the existence and the amount of any claim for these representation and warranty

---

[21] "**Top Decl**." refers to *Declaration of Franklin H. Top III Regarding The RMBS Trustees' (1) Reply In Support of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition to Lehman's Cross-Motion For A Full Loan-By-Loan Review*, submitted herewith.

breaches in residential loans." *See id.* at 70:21-24.  The Court also stated that a loan-by-loan review "doesn't seem like a reasonable exercise" *(id.* at  34:24-25) and that "there seems to be little dispute that the exercise of going through a loan-by-loan review is both burdensome and commercially impracticable." *Id.* at  66:4-7.  Thereafter, the parties met and exchanged ideas as to how to resolve the RMBS Claims.

22.    In January 2012, Lehman filed its Reserve Motion, but noted that the parties were "continuing to negotiate the terms of a settlement protocol that would facilitate the final resolution and allowance of the Claims."  Lehman Reserve Motion at ¶ 11.

23.    The RMBS Trustees then engaged Cowen & Company, LLC ("**Cowen**") to assist in their efforts to resolve the RMBS Claims.  Top Decl. ¶ 11.

24.    In February 2012, the parties agreed to a $5 billion reserve and to mediate in an attempt to resolve the RMBS Claims.  *See February 22, 2012 Hearing Tr.* at 27:20-25, 28:1, ECF No. 25803.  The Court entered a conforming order which made clear that the reserve amount was without prejudice to the rights of the RMBS Trustees or Lehman to assert that a greater or lower amount should be allowed for the RMBS Claims.  ECF No. 25643.

25.    In June 2012, the RMBS Trustees proposed resolving the RMBS Claims by statistical sampling, but Lehman was not prepared to discuss the matter.  Top Decl. ¶¶ 14-15 & Exs. A & B thereto.

26.    After unsuccessful mediation, in October 2012, Lehman requested, and the RMBS Trustees proposed to Lehman, a framework to resolve the RMBS Claims, that was not based on statistical sampling.  Top Decl. ¶ 16.  The RMBS Trustees were advised by Lehman that the framework would be discussed with the Board of the Plan Supervisor. *Id.*  Lehman never responded. *Id.*

27.     Faced with Lehman's refusal to respond, and realizing that they might be required to try this contested matter, the RMBS Trustees undertook the task of proving these claims using statistical sampling.  Top Decl. ¶ 17.  Cowen created a random sample of 5,000 of the Covered Loans (the "**Sample**") to be re-underwritten to produce a statistically significant estimate of the overall breach rates.

28.     In September 2012, the RMBS Trustees retained Digital Risk, LLC ("**Digital Risk**") to re-underwrite the loans in the Sample.  The loan files then had to be obtained from loan servicers which proved to be time intensive, as many were out of business, in bankruptcy, or otherwise not very responsive.  Top Decl. ¶ 18.  Some loan files could not be obtained. Ultimately, it took the RMBS Trustees and Digital Risk some eighteen months to obtain the mortgage origination and servicing files for 4,579 of the 5,000 Covered Loans in the Sample.  *Id.*

29.     Both during and after this process, the RMBS Trustees tried to engage Lehman to discuss allowance of the RMBS Claims.  *See* Top Decl. ¶ 19.  Lehman responded at various times that (a) the RMBS Claims had been deferred to another meeting of the Board of the Plan Supervisor, (b) new General Counsel had to "get up to speed," and finally (c) in April 2014, Lehman was simply unwilling to discuss the RMBS Claims.  *See id.*

30.     Faced with Lehman's refusal to even discuss the RMBS Claims (*see id.*), the RMBS Trustees filed their Motion to set an expert discovery schedule and a date for an estimation hearing to allow the RMBS Claims.

   D.    *The RMBS Trustees Diligently Worked To Obtain Detailed Proof Of The Damages Suffered By The RMBS Trusts*

31.     As noted, beginning in June 2012, the RMBS Trustees engaged experts – Cowen, Digital Risk, and Duff & Phelps, LLC ("**Duff & Phelps**") to conduct a comprehensive loan-by-loan forensic review of the mortgage origination and servicing files (the "**Loan Files**") of the

loans in the Sample. Cowen constructed the Sample to produce a statistically sufficient estimate of the overall breach rates for all Covered Loans that suffered a loss or are projected to suffer a loss in the Covered Trusts. *Declaration of Charles A. Parekh, Ph.D.*, dated August 21, 2014, [ECF No. 46080] ("**Parekh Original Decl.**") at ¶¶ 15, 25. The Sample was chosen, using June 2012 remittance data, from a population of 149,568 Covered Loans with realized losses, that were delinquent, or that had been modified.[22] The Sample was selected to cover product type and loan vintage (twelve cohorts in all), in order to account for any potential variation in breach rates between different product types and vintages.[23]

32.    While Lehman asserts that the RMBS Trustees have had "unfettered" access to all of the relevant loan files (Lehman Cross-Motion at ¶ 68), the Loan Files are held by one or more "servicers" or custodians for each RMBS Trust. *See* Top Decl. ¶ 18. Accordingly, the RMBS Trustees had to request Loan Files from numerous servicers with respect to the 5,000 loans in the Sample.[24]

33.    The RMBS Trustees and Digital Risk ultimately obtained, and Digital Risk reviewed the 4,579 Loan Files against the applicable R&Ws in the underlying transaction documents to determine if a loan materially breached a R&W.[25] Digital Risk identified one or more material breaches in 2,612 of the 4,579 loans reviewed — a material breach rate of approximately 57%.[26]

---

[22] From a total population of 416,091 Covered Loans. Parekh Original Decl. ¶ 23.

[23] Parekh Original Decl. ¶¶ 16, 23.

[24] Top Decl. ¶ 18.

[25] *Id.*

[26] Parekh Original Decl. ¶ 9. The material breach rate found in the Sample is substantially similar to the breach rate of 50% that Lehman uncovered in a prior internal review. *See* Lehman Brothers, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 10, attached as Exhibit 1 to the Motion. Digital Risk discovered a total of 4,940 material and adverse breaches of Lehman's R&Ws with respect to 2,612 of the reviewed Covered Loans. The Sample also included loans found to have breaches that were deemed *not* material and adverse and were thus *excluded* from the calculation of the material breach rate for Covered Loans. *See* Aronoff Declaration ¶ 24.

34.    Duff & Phelps (i) reviewed the sampling and selection work performed by Cowen, (ii) reviewed and analyzed the findings made by Digital Risk, and (iii) opined that, based on a material breach rate of 57%, the liability for R&W breaches was not less than $12.143 billion.[27]

## III.    ARGUMENT

*A.    Statistical Sampling Has Been Approved By The Courts In RMBS Cases*

35.    Lehman does not dispute that courts in the Second Circuit (and other jurisdictions) have ruled in RMBS cases that statistical sampling and extrapolation methods can be used to prove liability and damages, and have rejected arguments that a loan-by-loan review of all loans is required.[28]

36.    In reiterating that statistical sampling is appropriate, United States District Judge Haight recently stated:

> Those passages [in earlier rulings by this court] can only be read as declarations on my part that statistical evidence is an accepted and useful way of proving liability (and by extension, damages) in an RMBS case. … I am satisfied that statistical sampling is, in principle, an acceptable way of proving liability and damages in an RMBS case such as this one.

*Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, 2014 U.S. Dist. LEXIS 106327, at * 30 2014 WL 3824333, at * 9 (D. Conn. Aug. 4, 2014).

37.    United States District Judge Baer approved the use of sampling to prove both liability and damages against a defendant-sponsor for repurchase claims without even holding a formal hearing in *MASTR Adjustable Rate Mortgage Trust 2006 OA2 v. UBS Real Estate*

---

[27] Parekh Original Decl. ¶16, 23.  While Lehman asserts, without any supporting basis, that the expert reports of Duff & Phelps are "flawed" (Cross-Motion ¶ 2) and that, supposedly, Duff & Phelps is merely a "purported" expert, *id.* ¶ 24, these assertions are meritless and will be refuted as part of the hearing process.

[28] *See* Motion at ¶¶ 38-43.

*Securities, Inc.*, Case No. 12-cv-07322 (S.D.N.Y. Apr. 1, 2013) (consolidated with Case No. 12-cv-01579), which demonstrates that sampling in RMBS R&W breach cases is not a controversial issue.[29]

38.    Statistical sampling also has been recognized in bankruptcy proceedings approving settlement of the claims arising from breaches of R&Ws. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020, 2013 Bankr. Lexis 2601, at *71, 2013 WL 3286198, at *21 (Bankr. S.D.N.Y. June 27, 2013, Glenn, J.) ("*ResCap*") (approving sampling of loans and noting that "[t]he methodology used by Duff & Phelps has been recognized and used in other cases asserting R&W claims, including, for example, in the recently tried case of [*Flagstar*].") Indeed, even Lehman's counsel has stated that statistical sampling is the established method of proving liability and calculating damages in RMBS cases.[30]

39.    Lehman completely ignores this case authority. Under these circumstances – where there are hundreds of RMBS Trusts and hundreds of thousands of loans – statistical sampling is not only an approved method, it is the only appropriate method.

---

[29] The plaintiff submitted a short letter seeking approval of the use of sampling to prove both liability and damages and the defendant submitted a two page letter in opposition. Judge Baer approved sampling pursuant to an endorsed letter, without holding a hearing. *See* Exhibit 2 attached hereto. Additional decisions endorsing statistical sampling to prove liability and/or damages in similar breach of R&W proceedings (not previously cited in the RMBS Trustees' Motion or Reply) include: *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 2012 U.S. Dist. LEXIS 173768, 2012 WL 600885 (S.D.N.Y. Dec. 3, 2012) (approving FHFA's use of an expert's methodology to sample and evaluate mortgage loans to support its RMBS claims); *Deutsche Bank Nat. Trust Co. v. WMC Mortg.*, LLC, 2014 WL 1289234, *12 (D. Conn. Mar. 31, 2014) ("Judge Rakoff's reasoned approval of sampling as a source of probative evidence in [*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013)] is instructive in liability aspects of the case at bar"); *Home Equity Mortgage Trust Series 2006-1 v. DLJ Mortgage Capital, Inc.*, Index No. 1560016-2012 (Sup. Ct. N.Y. Cnty. Nov. 19, 2013) (Interim Order) (approving plaintiffs' use of statistical sampling to "prove liability and damages" on all claims, including breaches of R&Ws) attached hereto as Exhibit 3; *Ace Securities Corp. v. DB Structured Prods., Inc.*, 40 Misc.3d 562, 570 (Sup. Ct. N.Y. Cnty. 2013) *rev.'d on other grounds*, 112 A.D.3d 525 (approving the use of sampling for damages).

[30] Lehman's counsel noted that "Judge Glenn approved the use of a loan file sampling" in *ResCap*. *See* Respondents' Joint Brief in Opposition to Approval of Proposed Settlement and Entry of Proposed Final Order and Judgment, at 40, n. 10, relevant pages attached hereto as Exhibit 4. *In re Bank of New York Mellon*, Index No. 651786 (Sup. Ct. N.Y. Cnty.) (Kapnick, J.). Lehman's counsel also has explained: "One way to short circuit the loan-by-loan fight is through statistical sampling. This allows forensic reunderwriting of a manageable number of loans and extrapolation of the results to entire trusts or shelves." Michael Rollin, *Use Statistical Sampling To Prove Trustee Liability, Damages*, (Nov. 29, 2011) (http://tranchewarfare.com/use-statistical-sampling-to-prove-trustee-liability-damages/) (last visited November 13, 2014).

B.    *Section 502(c) Of The Bankruptcy Code Expressly Allows Estimation Of The RMBS Claims*

40.    As the RMBS Trustees explained in their Motion,[31] a creditor may request estimation and allowance of its unliquidated claim pursuant to section 502(c) of the Bankruptcy Code.  Estimation ensures the timely and just resolution of a creditor's claim, and a court must estimate an unliquidated claim if the fixing or liquidation of such claim would unduly delay the administration of the case.[32]

41.    When Lehman filed its Reserve Motion in 2012, Lehman agreed that "Estimation *is proper* under section 502(c) of the Bankruptcy Code."  Lehman explained:

> Bankruptcy Courts may estimate claims in order "to avoid undue delay in the administration of bankruptcy proceedings."  As such, bankruptcy courts may estimate claims under section 502(c)(1) of the Bankruptcy Code in order: "1) [t]o avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions, and 2) . . . to promote a fair distribution to creditors through a realistic assessment of uncertain claims."  *In addition, estimation of a claim under section 502(c)(1) is appropriate if liquidation of a claim "will take too long and unduly delay the distribution of the estate's assets." Moreover, section 502(c) uses the word "shall," and, therefore, estimation is mandatory rather than permissive if the criteria of section 502(c) are met.*

Lehman Reserve Motion at ¶¶ 29-30 (emphasis added; citations omitted).

42.    Lehman now disavows its prior statements to this Court and asserts that the RMBS Claims are *not* unliquidated, and thus do not come within the scope of Section 502(c).  Lehman Cross-Motion at ¶ 83.  Yet, Lehman stated *exactly the opposite* in its Reserve Motion: "*the claims are actually ... unliquidated claims*."[33]

43.    The basis for Lehman's new and contradictory position is as follows:

> the RMBS Claims are not unliquidated because any actual, quantifiable losses incurred as a result of a breach of a representation or warranty that has a material

---

[31] Motion at ¶¶ 29-30.

[32] *See* Motion at ¶¶ 34-37.

[33] Lehman Reserve Motion at p. 2 (emphasis added).

and adverse effect on the value of the underlying mortgage loan are determinable by simple calculation.

Lehman Cross-Motion at ¶ 83 (internal quotation marks omitted).  But Lehman said *exactly the opposite* in its Reserve Motion, and explained why the RMBS Claims are *not* capable of being determined by a simple calculation:

> *[The two] factors supporting the estimation of claims pursuant to section 502(c)(1) are present here*: (a) *it would take a long time to commence and conclude litigation of the allowed amount of the Claims*; and (b) *waiting for the liquidation of the Claims will unduly delay the administration of the LBHI's and SASCO's estates. Litigation to determine the allowed amount of the Claim would be extraordinarily lengthy and complex.* Each Claim relates to thousands of mortgage loans. *The allowed amount of each Claim necessarily requires a review and determination for each loan underlying each Claim. Discovery regarding each individual loan, its historical performance and any reasons for losses sustained would be extraordinarily extensive and complex.* The Indenture Trustees asserted at the June 30 Hearing, that a review of each loan file to determine the breaches of representations and warranties would be extremely burdensome and commercially impractical. *Litigation to finally determine the allowed amount of the Claims would take years to complete.*[34]

44.    Not surprisingly, other bankruptcy courts have determined that R&W claims can be estimated for the purpose of allowance.  *See, e.g., In re New Century TRS Holdings*, No. 07-10416 (Bankr. D. Del. Mar. 27, 2009) (Order Granting the New Century Liquidating Trust's Motion Estimating and Allowing as Estimated for Distribution Purposes Certain EPD/Breach Claims) ECF No. 9355, 9479; *In re American Home Mortgage Holdings, Inc.,* No. 07-11047 (Bankr. D. Del. Feb. 18, 2009) (Article 7 of Amended Chapter 11 Plan) ECF No. 7029, 7042; *In re First NLC Financial Services, LCC*, No. 08-10632 (Bankr. S.D. Fla. Mar. 26, 2008) (Order Granting in Part and Denying in Part Debtors' Motion for an Order (i) Shortening Bar Dates, and (ii) Estimating Claims (allowing estimation of claims)) ECF No. 313, 2.[35]

---

[34] *Id.* at ¶ 31 (emphasis added).

[35]  In another bankruptcy case statistical sampling was used to determine the reasonableness of a proposed settlement:  *In re Residential Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y. Dec. 11, 2013) (Article IV of Second Amended Chapter 11 Plan (Incorporating RMBS Settlement)) ECF No. 4102, 6030-1, 6065.

45.     Estimation of the RMBS Claims under Section 502(c) is not only permitted, but *mandatory* given the delay attendant to a loan-by-loan review of every one of up to 209,000 loan files.

C.     *Lehman's Cross-Motion Fails To Provide Any Basis To Require The Parties And This Court To Review Up To 209,000 Loan Files*

46.     This Court can determine the RMBS Claims based on a statistical sample under either the decisions of non-bankruptcy courts in civil actions seeking damages for breaches of R&W claims in RMBS cases, or under Section 502(c).  There is no basis to require either party to examine any more loan files than is needed to have a statistically valid sample.  The results obtained by the loan-by-loan review of the Sample can be reliably extrapolated to the entire population of loans at issue to determine the allowed amount of the RMBS Claims.[36]  Examining more loan files would *not* meaningfully increase the accuracy of the Court's ultimate determination.[37]  Lehman's proposed loan-by-loan review of all the loan files would impose massive costs of up to $219 million, and up to 27 years of delay on the parties, the Lehman Estate and the Court.[38]

47.     While Lehman asserts – with no analysis or evidence offered in support – that its Protocol is "efficient," "expeditious" and "economic" (Lehman Cross-Motion ¶¶ 100, 104), it would impose crushing costs and delay on this Estate.  Lehman recognized the intolerable costs and delay of a loan-by-loan review when it asked this Court to approve its settlement with Fannie Mae (which resolved only 7,625 loans).[39]  Lehman stated:

---

[36] Parekh Original Decl. ¶ 12.

[37] Parekh Original Decl. at Part VII.

[38] Parekh Supp. Decl. at ¶ 15.

[39] *Motion of Lehman Brothers Holdings Inc. Pursuant to Bankruptcy Rule 9019 for Approval of Settlement Agreement Regarding Claim Of Federal National Mortgage Association*, ECF No. 42153 Exhibit A at 109 (p. 143 of 156 as numbered on ECF).

Litigating these issues [R&W claims] would require *the development of a massive factual record*, including the determination of whether LBHI breached its representations and warranties in connection with each of the thousands of Mortgage Loans that are the subject of the Fannie Mae Claim. *Such litigation would be very expensive and require the diversion of vast amounts of time and effort on the part of the Plan Administrator, the Plan Administrator's professionals, and the Court*—resources that could more profitably be spent on other aspects of the Chapter 11 Cases.[40]

48.    To put Lehman's statement made in connection with the Fannie Mae settlement in perspective, and assuming a conservative scenario where *only* 162,000 loans are to be reviewed,[41] Lehman's Protocol would require (among other steps):

(a)    collection from third parties of approximately 157,000 additional Loan Files;[42]

(b)    a re-underwriting of each of 157,000 files, which, based on breach rate of 57% established by the Sample, likely would result in an 92,226 Loan Files with material breaches to be submitted to Lehman;[43]

(c)    submission of a RMBS Claim File (discussed below) for each of those 92,226 loan files;

(d)    a review of each of those 92,226 loan files and submissions by Lehman, followed by the approval or rejection of those claims by Lehman;

(e)    for those claims *not* accepted by Lehman – assumed to be only one-half, but likely a high percentage, given Lehman's comments about the amount claimed by the RMBS Trustees[44] – a further review by "neutral claims facilitators" who will make non-binding recommendations to the parties, and

---

[40] *Id.* at ¶ 31 (emphasis added).

[41] Parekh Supp. Decl. ¶16-17 (Scenario 2). Scenario 2 presents the time and cost associated with a claim based on the subset of Covered Loans that have liquidated with a loss (as of June 2014) plus loans projected to liquidate with a loss in the future. *Id.* Scenario 1 represents the 416,091 Covered Loans in 255 Covered Trusts less any loan that paid-in-full as of June 2014. *Id.* at ¶ 14.

[42] Parekh Supp. Decl. at Attachment III, p. 3.

[43] As noted above, re-underwriting of the Sample revealed a material breach rate of 57%. 57% of 157,218 loans = 89,614 loans. By adding 89,614 to the 2,612 loans in the Sample with material breaches, it results in a total of 92,226 loans.

[44] Scenario 2 assumes that Lehman "agrees" with 50% of the loans submitted. Given Lehman's protestations that *all* of the RMBS Claims are no greater than "between $1.1 and $2.4 billion," Cross-Motion at ¶ 35, this assumption may result in a significant understatement of the likely costs of Lehman's proposed Protocol.

(f)    assuming that the "neutral claims facilitators" could resolve 75% of the loan files with disputes, court determination of the remaining disputed loan files – which would be more than 8,600 separate loan files.[45]

49.    The loan-by-loan file review that Lehman insists on here would require *Lehman* to review approximately 92,226 loan files – *a task more than 12 times as massive as the "massive" task Lehman described* in explaining why the Fannie Mae settlement should be approved.

50.    Moreover, Lehman's Protocol is a blatant attempt to *eliminate* the RMBS Claims virtually in their entirety as a punishment for the RMBS Trustees' supposed failure to do anything to establish their claims.  Lehman Cross-Motion at ¶¶ 102-06.  Thus, the very first step required by Lehman's Protocol – the submission of an "RMBS Claim File" for each loan – must occur within 60 days, or the claim is extinguished.  Complying with that step is not possible, as it would take many years just to obtain the loan files from servicers and then produce them to Lehman.[46]  Just to obtain 4,579 loans of the 5,000 loan Sample took 18 months.[47]

---

[45] *Id.*

[46] If the RMBS Trustees had to obtain all of the documents Lehman asks this Court to require for a "complete" RMBS Claim File, the time to complete just that production would take nearly 13 years. There are up to approximately 209,000 applicable Covered Loans in the Covered Trusts (Parekh Supp. Decl. at ¶ 14).  Assuming that each loan file would have 150 pages (a reasonable assumption given that LBHI asks for 43 distinct items and categories of items, see below), the RMBS Trustees would have to produce to Lehman approximately 31.4 million pages of documents.  If it only took 5 minutes to locate, review, document, copy and quality control each of the 43 items and categories of items, it would take 20 reviewers - working 8 hours a day, 365 days a year – almost 13 years simply to prepare these files for production. (209,000 loans x 43 items or categories of items = 8,987,000 items. 8,987,000 items x 5 minutes = 44,935,000 minutes.  44,935,000 minutes / 60 = 748,917 hours. 748,917 hours / 8 working hours = 93,615 work days. 93,615 work days / 20 reviewers = 4,681 work days per person.  4,681 work days / 365 days in a year = 12.82 years.)  The absurdity of just the very first step of Lehman's proposed protocol is self-evident.

In its settlement with Fannie Mae covering 7,625 Loans, the "Loan File" information consists of *only* 4 items or categories of items and the "Servicing File" information consists of *only* 10 items or categories of items.  Exhibits B and C, respectively, to the "Settlement Agreement" attached as Annex A to *Motion of Lehman Brothers Holdings Inc. Pursuant to Bankruptcy Rule 9019 for Approval of Settlement Agreement Regarding Claim of Federal National Mortgage Association*, ECF No. 42153.  Significantly, the effort and costs of obtaining Loan Files and Servicing Files is put on Lehman.  Under the terms of the Settlement Agreement, Fannie Mae is required to give the Plan Administrator:

such written authorization as is reasonably required *for the Plan Administrator to obtain the Loan File* (as such term is defined in Exhibit B hereto) *from any third party servicer*; provided, however, that Fannie Mae

51.     There is no basis in the governing documents for the requirements included in

Lehman's Protocol.  The Mortgage Loan Sale and Assignment Agreement attached to its Cross-

Motion only requires the following:

> Upon discovery by either [LBHI] or [SASCO] of a breach of any of the
> foregoing representations and warranties …, that adversely and materially
> affects the value of the related Mortgage Loan …, the party discovering
> such breach shall give prompt notice to the other party; ….  Within 60
> days of the discovery of any such breach, [LBHI] shall either (a) cure such
> breach in all material respects, (b) repurchase such Mortgage Loan or any
> property acquired in respect thereof … at the applicable Purchase Price …,
> or (c) within the two-year period following the Closing Date substitute a
> Qualifying Substitute Mortgage Loan for the affected Mortgage Loan.

Lehman Cross-Motion, Ex. E, § 1.04(d).

52.     In stark contrast to this contractual notice provision, Lehman's Protocol would

require the RMBS Trustees to prepare a "RMBS Claim File" that "*shall* include" the following:

1.  The Mortgage Loan File, including, *at a minimum*, the documentation
    identified in Exhibit C-1;

2.  A statement describing the specific alleged defect and the representation or
    warranty violated by the alleged defect, together with all supporting
    documentation thereof;

---

shall not be obligated to provide the Plan Administrator with any authorization related to a Rep and
Warranty Default Loan with respect to which Aurora or ALS was the primary servicer or subservicer on the
date such Rep and Warranty Default Loan was liquidated."

*Id.* at p. 5 (section 3.2(c)).   The same is true for Servicing Files.  For a period of nearly three years, Fannie Mae:

shall use commercially reasonable efforts *to assist the Plan Administrator in the Plan Administrator's*
*efforts to acquire the Servicing File* (as such term is defined in Exhibit C hereto) for each Rep and
Warranty Default Loan (with it being understood that Fannie Mae does not have any Servicing File under
its direct control). In connection therewith, Fannie Mae agrees to provide the Plan Administrator such
authorization as is reasonably required *for the Plan Administrator to obtain such Servicing Files from any*
*third party servicer or subservicer*, subject to applicable laws and the rights of such servicer or subservicer;
*provided, however, that Fannie Mae shall not be obligated to (i) require such servicer or subservicer to*
*produce all information requested or pay any associated expenses sought by such servicer or subservicer*;
or (ii) assist the Plan Administrator with any Servicing File related to a Rep and Warranty Default Loan
with respect to which Aurora or ALS was the primary servicer or subservicer on the date such Rep and
Warranty Default Loan was liquidated.

*Id.* at p. 6 (section 3.3).

[47] Top Decl. ¶ 20.

3. A statement of how the alleged defect materially and adversely affected the value of the mortgage loan, together with all supporting documentation;

4. A calculation of the Purchase Price (as defined in the governing agreement), together with all supporting documentation; and

5. A statement describing any notice of the alleged Material Breach (as defined below) provided to LBHI including (a) the approximate date on which the applicable RMBS Trustee became aware of such alleged Material Breach and the date and (b) the method of providing notice of such alleged Material Breach.

Lehman Cross-Motion, Ex. C at ¶ 1(a)(iv) (emphasis added; footnote omitted).

53.    Lehman's Protocol would further require each "Mortgage Loan File" to include

43 specific items or categories of items (whether or not they are relevant to the material breach):

**Credit File Documents:**

Original Endorsed Note
Certified Copy of Security Instrument/Riders
Any Assignment of Mortgage
Original or Certified True Copy of PMI Certificate
Original Title Policy or Title Commitment, marked for policy
Hazard Insurance Policy
Flood Insurance Policy
Sale Contract
Copy of 2nd Lien Note (if subordinate finance)
Verification of Mortgage
All co-op related documents
Any other program documents
1008 Transmittal Summary or contract underwriting summary/notice of approval
Payment History
Certified Copy of Final HUD-1
Original and Final Signed 1003
Flood Certificate
Verification of Employment/Income
Deposits/Assets as required by Documentation Type
Verification of Mortgage/Rental Appraisal with photos and all attachments including final inspection and/or Certificate of Occupancy, if applicable
Survey
Credit Reports and any necessary explanations
Verification of Deposit for down-payment

19

Final TIL
Notice of Right to Cancel
ARM Disclosure
Tax Information Sheet

**Servicing File Documents:**
Last Value Appraisal or BPO
REO HUD 1
Escrow Expenses
Corporate Expense Log
Hazard Claim EOB
MI EOB
Payment History Log
Loss Mitigation File
All servicing notes from loan default forward to include the below (Include all notes form all systems used)
Collection Notes
Bankruptcy Notes
Loss Mitigation Notes
Foreclosure Notes
Litigation Notes
Eviction Notes
REO Notes

Lehman Cross-Motion, Exhibit C-1.

54.    Lehman's proposed requirements for the "RMBS Claim File" and its convoluted, multi-step, insanely expensive process to determine damages from these pervasive material breaches bear no relationship to the notice requirements of the governing documents.

55.    Lehman concedes by silence that the RMBS Trustees' proposed discovery period in advance of an estimation hearing will afford it sufficient time to examine the statistical methods used and conclusions drawn by the RMBS Trustees' experts.  The RMBS Trustees already have made available, as Lehman requested, the 4,579 Loan Files re-underwritten by Digital Risk, along with its supporting documents, and seven categories of documents underlying the expert reports of Dr. Charles Parekh and James Aronoff, both of Duff & Phelps, submitted in support of the Motion.

20

56.     Lehman's only other argument is that the RMBS Trustees must perform a loan-by-loan review for Lehman's sole benefit, so that Lehman "may bring" claims it may have against third parties.  However, Lehman fails to cite any contractual provision in the governing documents obligating the RMBS Trustees to perform such review and deliver information to Lehman for Lehman's sole benefit – there is no such provision.

### IV.     THE RESERVE ORDER IS INTERLOCUTORY AND THE RESERVE AMOUNT CAN BE CHANGED TO PROTECT THE RMBS CLAIMS

57.     The RMBS Trustees believe that their claims can be determined or estimated using statistical sampling.  After giving Lehman additional time to review Duff & Phelps' expert reports, setting a date for submission of any expert reports by Lehman, allowing time for expert discovery and any pre-hearing motions, the RMBS Trustees believe that an estimation hearing could be held and an order issued resolving this matter, prior to Lehman's next claim distribution (scheduled for Spring 2015).  If that schedule can be put in place, so that an order allowing the claims for Covered Loans can be entered prior to Lehman's next claim distribution, then the RMBS Trustees are amenable to a deferral of that portion of their Motion that requested an increase in the Reserve.  However, if the allowance of these claims cannot be resolved by the Spring of 2015, or in the event the Court prefers to address at this time whether the Reserve may be increased, the RMBS Trustees reply below to Lehman's argument that the Reserve cannot be modified.

### A.     Rule 54, Not Rule 60, Is Applicable To And Permits The Reserve To Be Increased

58.     As the Reserve Order "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties" it "may be revised at any time."  Fed. R. Civ. P. 54(b).  Rule 54 is applicable here pursuant to Rule 7054 and 9014 of the Federal Rules of Bankruptcy Procedure.

59.     The Second Circuit, by way of example, has stated, "[a]n order adjudging liability but leaving the quantum of relief still to be determined has been a classic example of non-finality and non-appealability from the time of Chief Justice Marshall to our own." *Taylor v. Bd. of Educ.*, 288 F.2d 600, 602 (2d Cir. 1961); *accord Retained Realty, Inc. v. McCabe*, 376 Fed. Appx. 52, 56 (2d Cir. 2010). Here, the Reserve Order does not adjudicate the amount, validity or priority of the RMBS Trustees' Claim.[48]   With numerous issues still to be determined, the Reserve Order is "a classic example of non-finality," which means it can be revised.

60.     Under the express terms of Rule 54(b), the Reserve Order is interlocutory because it has not finally adjudicated the allowed amount, validity or priority of the RMBS Claims.

61.     Further, Lehman never intended the Reserve Order to be final and acknowledged as much in its Reserve Motion: "*The relief sought by the Debtors is temporary* until such time as the parties will hopefully reach a fully consensual resolution of the Claims."[49]   As an interlocutory order, the Reserve Order is "subject to revision at any time." Fed. R. Civ. P. 54(b).

62.     Further, Rule 54 also states "[w]hen an action presents more than one claim for relief – whether as a claim, counterclaim, crossclaim, or third-party claim – or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties *only if the court expressly determines that there is no just reason for delay*." (emphasis added). Here the Reserve Order makes no such express determination. "Once separate claims or claims against separate parties have been fully adjudicated, Rule 54(b) commits the decision to enter a judgment to the discretion of the District Court." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 631 (2d Cir. 1995) (citing *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8, 100 S. Ct. 1460, 1465 (1980); *Ginett v. Computer Task Gr., Inc.*, 962 F.2d 1085,

---

[48] Lehman Reserve Order at ¶ 3.

[49] Lehman Reserve Motion at ¶ 37 (emphasis added).

1092 (2d Cir. 1992). "But the exercise of this discretion must follow the procedures set out by the Rule, and the requirement of an express determination that there is no just reason for delay has not been taken lightly by this Circuit." *Id.* "We have found an abuse of discretion where entry of judgment has been accompanied by a mere repetition of the statutory language that 'there is no just reason for delay,' without any reasoned explanation for such determination." *Id.*

63. The Reserve Order does not determine that there is "no just reason for delay." Nor does it not contain "any reasoned explanation for such determination." Accordingly, the Reserve Order does not meet the requisite standard to be final under Rule 54(b). "The requirement of an express determination cannot be met if the [] Court does not make clear that such determination is for the purpose of certifying a final judgment (e.g., by labeling its order a 'Rule 54(b) Certification')." *HBE Leasing Corp.*, 48 F.3d at 631-32 (2d Cir. 1995) (finding "[b]ecause there was no Rule 54(b) certification, the District Court's order remains interlocutory"); *accord Richmond v. Nat'l Grid*, 539 Fed. Appx. 15, 16 (2d Cir. 2013).

B. *Even If The Reserve Order Were Deemed Final, Rule 60 Expressly Allows The Reserve To Be Increased*

64. "Federal Rule Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, applying the judgment or order prospectively is no longer equitable." *Horne v. Flores*, 557 U.S. 433, 447, 129 S. Ct. 2579, 2585 (2009) (brackets, quotation marks and citation omitted); *see also Lee v. Marvel Enters., Inc.*, 765 F. Supp. 2d 440, 451 (S.D.N.Y. 2011), *aff'd*, 471 Fed. Appx. 14 (2d Cir. Mar. 21, 2012) ("A party may move for relief pursuant to Rule 60(b)(5) if changed circumstances make it no longer equitable that the judgment should have prospective application."). Rule 60(b)(5) is "based on the historic equitable power of the court to modify its decree in light of changed circumstances," *In re Joint Eastern and Southern Districts Asbestos Litigation*, 237 F. Supp. 2d 297, 316 (E.D.N.Y. 2002),

and "properly applies only to judgments with prospective effect." *Ryan v. U.S. Lines Co.*, 303 F.2d 430, 434 (2d Cir. 1962).[50]

65.    If the RMBS Claims are determined to be greater than the current Reserve of $5 billion, there may be insufficient assets  left in the Estate for the RMBS Trusts to enjoy a *pro rata* distribution.  The whole purpose of the $5 billion Reserve was to protect against such an occurrence.  Rule 60(b)(5) allows for the Court to increase the Reserve to provide that protection.

## CONCLUSION

66.    The RMBS Trustees respectfully request that the Court enter an order (i) scheduling a hearing to estimate and allow the RMBS Claims based on a statistical sample, (ii) denying Lehman's Cross-Motion, and (iii) if this contested matter can be resolved by the Spring of 2015, deferring the RMBS Trustees' Motion to increase the Reserve from $5 billion of $12.143 billion.

---

[50] The *In re Chemtura Corp.* case, which Lehman described as "[p]articularly instructive here" because this Court denied "a claimant's request – akin to the Reserve Motion – that a previously ordered disputed claims reserve be increased by $20 million" actually supports the RMBS Trustee's position. What Lehman failed to disclose about that case is that the *Chemtura* court set the reserve in the full amount claimed, even though that claim included both already incurred legal fees, as well as the claimant's estimated future legal fees. What the *Chemtura* court denied was the request to increase the reserve to include the amounts of the claims the court *had disallowed*.

s/Franklin H. Top III
Franklin H. Top III (admitted *pro hac vice*)
Scott A. Lewis (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000

*Counsel for U.S. Bank National Association, solely in its capacity as Indenture Trustee for Certain Mortgage-Backed Securities Trusts*

s/John C. Weitnauer
John C. Weitnauer (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000

*Counsel for Wilmington Trust Company and Wilmington Trust, National Association, each solely in its capacity as Trustee for Certain Mortgage-Backed Securities Trusts*

s/M. William Munno
M. William Munno
Daniel E. Guzmán
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1587

*Counsel for Law Debenture Trust Company of New York, solely in its capacity as Separate Trustee for Certain Mortgage-Backed Securities Trusts*

s/Richard C. Pedone
Richard C. Pedone (admitted *pro hac vice*)
Christopher Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3085

*Counsel for Deutsche Bank National Trust Company, solely in its capacity as Trustee for Certain Mortgage-Backed Securities Trusts*

SK 16271 0159 6236075

25