UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: <br><br> **Lehman Brothers Holdings, Inc., et al.,** <br><br> Debtors. | **Case No. 1:08-bk-13555 (SCC)** <br><br> **Chapter 11** <br><br> **Jointly Administered** |

# DECLARATION OF CHARLES A. PAREKH, PH.D.

**November 14, 2014**

**Table of Contents**

I.   Scope of Work ........................................................................................................................ 1

II.  Experience and Qualifications .............................................................................................. 1

    A.   Summary of Conclusions ................................................................................................ 3

III. Time and Cost Associated with the Proposed Lehman Protocol ......................................... 3

    A.   Summary of the Proposed Lehman Protocol .................................................................. 3

    B.   Scenario 1 and Scenario 2 Time and Cost ...................................................................... 4

    C.   Scenario Inputs and Assumptions ................................................................................... 5

    D.   Total Time and Cost ...................................................................................................... 12

IV.  Reservation of Rights and Compensation Disclosure ........................................................ 13

## List of Attachments

Attachment I ................................................................. Resume of Charles A. Parekh, Ph.D.

Attachment II ............................................................................. List of Documents Considered

Attachment III .................................Time and Cost Associated with Proposed Lehman Protocol

ii

## I. Scope of Work

1. I, Charles A. Parekh, Ph.D., have been asked by Alston & Bird LLP, Seward & Kissel LLP, Chapman and Cutler LLP, and Nixon Peabody LLP ("**Law Firms**"), counsel to Wilmington Trust, National Association; Wilmington Trust Company; Law Debenture Trust Company of New York; U.S. Bank, National Association; and Deutsche Bank National Trust Company ("**Trustee Group**" or "**Trustees**") to provide an analysis of the Lehman Brothers Holdings, Inc. ("**Lehman**") Plan Administrator's proposed claims resolution protocol ("**Proposed Lehman Protocol**") as described in *Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees* (the "**Cross-Motion**"). The conclusions presented in this Declaration result from work performed by me and by my colleagues at Duff & Phelps, LLC ("**Duff & Phelps**").

## II. Experience and Qualifications

2. I am a Director at Duff & Phelps specializing in the application of economic and statistical analysis to damages, finance, and public policy issues. I have over fourteen years of experience working in dispute consulting and litigation support. My experience includes work in the securities, technology, and education industries.

3. Duff & Phelps is a premier global valuation and corporate finance advisor with expertise in complex valuation, dispute consulting, mergers and acquisitions, and restructuring. The firm's more than 1,000 employees serve a diverse range of clients from offices in North America, Europe and Asia. Duff & Phelps' experience includes numerous valuations of RMBS claims related to breaches of representations and warranties, including serving as the RMBS trustees' financial advisor in the Residential Capital ("**ResCap**") bankruptcy. Duff & Phelps' team includes professionals possessing a vast array of expertise in mortgage loan origination, bankruptcy and restructuring, financial forecasting, and statistical analysis.

1

4. I have led dozens of matters involving the use of statistical and economic modeling in order to calculate damages and losses. My RMBS experience includes leading the statistical and modeling teams in the use of sampling to estimate repurchase liabilities in multiple mortgage-backed securities litigations and bankruptcies, including the ResCap bankruptcy.

5. Additionally, I have extensive experience in applying statistical and economic analysis to litigation issues, including an assessment of the economic efficiency of electronic waste recycling, an analysis of damages from cigarette smoking, an examination of school efficiency and test score performance in New York City Public Schools, a study of school organization and educational outcomes, an evaluation of EPA clean air regulations, and an assessment of U.S. Postal Service pricing strategies. In the past, I provided expert testimony on the statistical evidence involved with randomly testing high school students for drug and alcohol use. In addition, I employed statistical analysis to investigate a whistle-blower complaint alleging the University of Illinois College of Law inflated admissions data, including LSAT scores and GPAs of incoming classes.

6. I hold a Ph.D. concentrating in Public Finance from New York University, as well as a M.P.P. in Public Policy Analysis from the University of Chicago, and a B.A. in Economics from Colgate University.

7. The conclusions set forth in this Declaration are my own and are based on work that I performed, or on work performed by my colleagues at Duff & Phelps under my supervision. In those instances where tasks were performed by my colleagues, I reviewed their work and determined that it was appropriate to rely upon that work.

8. My resume is attached to this Declaration as **Attachment I**.

9. The documents and other evidence considered in forming my conclusions are listed in **Attachment II**. I reserve the right to update this listing.

A. **Summary of Conclusions**

10. Based on study of the documents and other evidence considered, my experience with RMBS repurchase matters, the experience and knowledge of my colleagues at Duff & Phelps, and my experience, education, and training, I conclude the following:

    - Submitting claims employing the Proposed Lehman Protocol would require more than 20 years of professional and Court time and cost over $100 million dollars.[1]

11. A discussion of the bases for my conclusions is set forth in the balance of this Declaration.

## III. Time and Cost Associated with the Proposed Lehman Protocol

A. **Summary of the Proposed Lehman Protocol**

12. The Proposed Lehman Protocol involves the following steps.[2] This description of the Proposed Lehman Protocol steps is not meant to capture every requirement set forth in the *Cross-Motion*; rather, it depicts five general steps that would require significant time and expense to the Trustees and to Lehman. Requirements of the Proposed Lehman Protocol not presented in this Declaration could add significant time and cost to accomplish, beyond what is covered herein.

    - Claim Submission on a loan-by-loan rolling basis [I.a.i-iii];

    - The Plan Administrator's review and decision of each Claim Submission [I.b.i];

    - Negotiations of claims amounts for claims rejected by the Plan Administrator [I.e];

    - Review of rejected and unresolved claims by a Claims Facilitator [I.f-II.f];

    - Court review of remaining disputed claims [III.a-d].

---

[1] My conclusions do not extend to the question of the ability of the Trustees to satisfy the requirement in Part I.a.iii of the Proposed Lehman Protocol that sets a Claim Cut-Off Date of 60 days.
[2] The Proposed Lehman Protocol is set forth in Exhibit C to the *Cross-Motion*. For the listing of steps, above, I reference specific parts of the Proposed Lehman Protocol in brackets.

3

**B. Scenario 1 and Scenario 2 Time and Cost**

13. This Declaration presents two scenarios that estimate the time and cost associated with the Proposed Lehman Protocol. The scenarios employ the same inputs and assumptions (described below and in **Attachment III**); however, they differ in the number of loans modeled to participate in the Proposed Lehman Protocol.

14. Table 1 presents the time and cost associated with the Proposed Lehman Protocol based on claims arising from a universe of 213,974 loans ("**Scenario 1**"). Scenario 1 represents 416,091 Covered Loans in 255 Covered Trusts,[3] less any loan that paid-in-full as of June 2014. Paid-in-full loans are removed from the analysis, because no claim arises from these loans. Additionally, the 4,579 loans already reviewed by the Trustees are removed from the number of loans for review.

**Table 1: Scenario 1 — Covered Loans Less Loans Paid-in-Full**

| | | | |
|---|---|---|---|
| Number of Loans | | | 213,974 |
| Number of Loans for Review: | | | 209,395 |
| Cost to Trusts to Satisfy Protocol | $95,734,208 | - | $127,143,458 |
| Cost to Estate to Satisfy Protocol | $73,877,245 | - | $92,172,318 |
| Total Cost to Satisfy Protocol: | $169,611,453 | - | $219,315,775 |
| Total Labor-Years Needed to Satisfy Protocol: | | | 55.0 |
| *Years Needed to Satisfy Protocol (Running Basis):* | | | |
|   Protocol Process Completes Prior to Court Review | | | 35.7 |
|   Court Review Performed Seriatim | | | 27.6 |

15. In Scenario 1, the total cost to satisfy the Proposed Lehman Protocol ranges from $170 million to $219 million and would require nearly 28 years to complete, if the Court is able to rule on claims, seriatim.[4] If the Court chooses to wait until all claims are ready for its attention, then the required time increases to nearly 36 years. The time and cost estimate includes receiving 209,395 Covered Loans from the servicers, reviewing the loans for breaches, a review of the submitted loans by the Plan Administrator, negotiations over

---

[3] Covered Loans and Covered Trusts are defined in the *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), p. 1.
[4] The analysis presented in Scenarios 1 and 2 omits some potentially time-consuming aspects of the Proposed Lehman Protocol, such as the allowance of 30 days for the Claim Facilitator to render a decision on each loan, and the allowance of 20 business days before a party must submit a primer to the Claims Facilitator. Rather, the time estimates presented in Scenarios 1 and 2 assume that the throughput of loans proceeds on a continuous basis.

4

claims rejected by the Plan Administrator, a review of unresolved claims by the Claim Facilitator, and, finally, a Court review of any unresolved claims for final resolution.

16. Table 2 presents the time and cost associated with a claim based on the subset of Covered Loans that have liquidated with a loss (as of June 2014) plus loans expected to liquidate with a loss in the future ("**Scenario 2**"). While the universe of loans from which a claim may arise is 213,974 active Covered Loans, it is likely that some of these active loans will move from an active to a paid-in-full status. Therefore, even though any Covered Loan with a breach may be eligible for a claim, I have restricted the analysis presented in Scenario 2 to the 161,797 loans that have already suffered a loss or are expected to suffer a loss in the future.

**Table 2: Scenario 2 — Covered Loans with a Loss or Projected Loss**

| | | | |
|---|---|---|---|
| Number of Loans | | | 161,797 |
| Number of Loans for Review | | | 157,218 |
| Cost to Trusts to Satisfy Protocol | $72,110,698 | - | $95,693,398 |
| Cost to Estate to Satisfy Protocol | $55,862,763 | - | $69,696,702 |
| Total Cost to Satisfy Protocol: | $127,973,461 | - | $165,390,100 |
| Total Labor-Years Needed to Satisfy Protocol: | | | 42.3 |
| *Years Needed to Satisfy Protocol (Running Basis):* | | | |
|   Protocol Process Completes Prior to Court Review | | | 27.0 |
|   Court Review Performed Seriatim | | | 21.0 |

17. In Scenario 2, the total cost to satisfy the Proposed Lehman Protocol ranges from $128 million to $165 million and would require 21 years to complete if the Court reviews seriatim and 27 years if the Court waits for the claims process to complete. The time and cost estimate includes receiving 157,218 Covered Loans from the servicers, reviewing the loans for breaches, a review of the submitted loans by the Plan Administrator, negotiations over claims rejected by the Plan Administrator, a review of unresolved claims by the Claim Facilitator, and, finally, a Court review of any unresolved claims for final resolution.

C. **Scenario Inputs and Assumptions**

18. Both Scenarios 1 and 2 employ several inputs whose values are based, among other things, on my experience with this bankruptcy and other RMBS matters, the experience of my colleagues at Duff & Phelps in this bankruptcy and other RMBS matters, and discussions

5

with key personnel at the Trustees' loan review firm, Digital Risk, LLC ("**Digital Risk**"). In some cases, the Proposed Lehman Protocol requires steps for which the time and cost is relatively well understood. For example, Digital Risk has already obtained and reviewed a sample of over 4,500 loans, and I am able to base my estimates of loan review time and cost on this previous review.[5]

19. In other cases, estimating the time and cost requires assumptions of Lehman's staff size, costs, and efficiency, which are unknown to me. Additionally, at times, the Proposed Lehman Protocol is ambiguous or unclear to me in its requirements. In these cases, I have made reasonable assumptions based on my experience, and that of my colleagues at Duff & Phelps, in order to illustrate the time and cost associated with the Proposed Lehman Protocol. While I believe these illustrative assumptions are reasonable, I cannot attest to their precision. As such, whenever possible, I have made conservative assumptions or eliminated steps from my analysis altogether, resulting in estimates that are likely to understate the time and cost associated with the Proposed Lehman Protocol.

20. Each Scenario is divided into multiple steps, labeled Step 0 through Step 5. I will discuss each step, in turn.

   i.  **Step 0: Receive Loans from Servicers**

21. I make the assumption that the Trustees can request and receive all requested loan files from the applicable servicers within a period of three years. This assumption is based on conversations with Digital Risk, in which I was informed that they received 4,579 of 5,000 requested sample files in approximately 18-20 months.[6] The number of loans required for review by the Proposed Lehman Protocol is 30 to 40 times greater than the initial request of 5,000 loans, and Digital Risk informs me that such a large request would take substantially longer to fulfill than the initial request.[7] Because it is not necessary to wait until all the files are received, I make the assumption that after one month, the Trustees would receive a

---

[5] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), pp. 4-5.
[6] Interviews with Joe Phillips, Digital Risk.
[7] Interviews with Joe Phillips, Digital Risk. Mr. Phillips informed me, the time frame assumes the files would arrive, complete and correctly identified, as a single electronic file for each loan file, meaning the files would not require effort to electronically split apart or stich together. Additionally, it assumes the loan numbers and the servicer file numbers can be readily mapped to each other.

6

sufficient number of files to begin their review process, and, at no time, does the review queue ever diminish to the point of slowing the review process.

22. The estimated three-year time frame to request and receive files is based on Digital Risk's typical loan file request for the purposes of a review for breaches of representations and warranties. The total time required to receive loan files for the purposes of fulfilling the Proposed Lehman Protocol could be greater than a typical loan file request. The Proposed Lehman Protocol states that a complete RMBS Claim file includes, among other things, 43 separate items from the Mortgage Loan File, Credit File, and Servicing File.[8] In the Trustees initial request of 5,000 loan files they were unable to obtain all the documents required for a complete RMBS Claim File, as defined in the Proposed Lehman Protocol, for a number of loan files.[9] In addition, the Trustees were missing all, or substantially all, of 421 of the 5,000 files initially requested.[10] Given the missing documents and missing loan files in the initial request of 5,000 loans, obtaining all the loan files complete with all the documents necessary to comply with the Proposed Lehman Protocol could take significantly longer than three years, if it is possible at all.[11]

### ii. Step 1: Review Remaining Loans

23. As stated above, I assume that the Trustees are able to commence a loan review of either 209,395 loans (Scenario 1) or 157,218 loans (Scenario 2) one month after requesting the loans from the applicable servicers. Based on a conversation with Digital Risk, I use the assumptions that the loan review process would involve 40 reviewers reviewing three loans per day, each, for a total of 120 loans per day, and would work all 251 working days per

---

[8] *Cross-Motion*, Exhibit C-1.
[9] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), Attachment IV, and Interviews with Joe Phillips, Digital Risk.
[10] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), p. 5.
[11] If the documents required by the Proposed Lehman Protocol were not obtained by the originator in the first place, and those missing documents result in a breach determination, the Trustees would not be able to provide those documents in the RMBS Claim file, even though the missing documents constitute the reason for the breach determination.

7

year.[12] Based on this rate, it would require 7 years (Scenario 1) or 5 years (Scenario 2) to complete the loan review.

24. Digital Risk's current loan review costs are approximately $400 per loan; however, when the Trustees engaged Digital Risk, their cost per loan was as low as $250 per loan.[13] Based on the original cost and on the current cost per loan, I provide a range of costs for the loan review of $52 million to $84 million (Scenario 1) or $39 million to $63 million (Scenario 2).

### iii.    Step 2: Plan Administrator Reviews Repurchase Requests

25. Beginning one month into the multi-year loan review process, I assume that the Trustees will begin presenting claims to the Plan Administrator, and the Plan Administrator is able to review claims on a non-stop rolling basis until all the claims have been presented. The Trustees' review of 4,579 randomly-selected Covered Loans determined material breaches in 2,612 Covered Loans, a breach rate of 57%.[14] This breach rate implies that for the entire population of Covered Loans, the Trustees would present claims to the Plan Administrator on 121,967 loans (Scenario 1) or 92,226 loans (Scenario 2).

26. I assume the Plan Administrator would conduct its loan review employing 20 reviewers, reviewing three loans per day, for all 251 annual working days to review these loans, at a cost of $250 to $400 per loan. This implies that the Plan Administrator would require eight years and $30 million to $49 million (Scenario 1) or six years and $23 million to $37 million (Scenario 2) in order to complete its review.

27. Duff & Phelps has reviewed the breaches that determined the 57% material breach rate and has concluded that these breaches represent proper repurchase requests.[15] Based, however, on assertions made by Lehman, I assume the Plan Administrator would challenge some portion of these findings.[16] Consequently, I assume that, of the loans presented to the Plan

---

[12] Interview with Joe Phillips, Digital Risk. Mr. Phillips informed me that finding more than 20 reviewers would be difficult; however, with enough lead time and significant effort it may be possible to find as many as 40 qualified reviewers. I assume that 40 reviewers are employed throughout the entire review process.
[13] Interview with Joe Phillips, Digital Risk.
[14] *Declaration of James H. Aronoff*, August 21, 2014 (ECF 46085), p. 12.
[15] *Declaration of James H. Aronoff*, August 21, 2014 (ECF 46085), p. 5.
[16] *Cross-Motion*, p. 32.

8

Administrator, there would be an initial disagreement on 50% of those loans.[17] This implies that the Plan Administrator would deny claims on 60,984 loans (Scenario 1) or on 46,113 loans (Scenario 2).

    iv.    **Step 3: Trustees Negotiate Declined Repurchase Requests**

28. Beginning one month after the Plan Administrator receives and reviews claims, the Trustees and the Plan Administrator would enter into negotiations over the 46,113 to 60,984 denied claims. For these negotiations, I assume that each of the four Trustees can individually, simultaneously, and continually negotiate with Lehman at a rate of ten loans per day, each — or 40 loans per day in total. Based on 251 eight-hour days per year, the negotiations would require six years (Scenario 1) or five years (Scenario 2).

29. The cost of the negotiation is assumed to be $600 per hour, based on one negotiator on each side charging $300 per hour, apiece. This results in a total cost of $29 million (Scenario 1) and $22 million (Scenario 2). Unlike Steps 0-2, Step 3 involves both the Plan Administrator and the Trustees. Therefore, I allocated the total cost of Step 3 equally between the Trusts and the Estate.[18]

30. I assume that negotiations can resolve claims on 25% of the unresolved claims, resulting in 45,738 loans (Scenario 1) or 34,585 loans (Scenario 2) being passed on to the Claim Facilitator for review.

    v.    **Step 4: Claim Facilitator Reviews Unresolved Repurchase Claims**

31. For the 34,585 to 45,738 claims unresolved between the Trustees and the Plan Administrator, the Proposed Lehman Protocol requires review by a Claim Facilitator. I assume that one month after Step 3 commences, unresolved claims will begin flowing to the Claim Facilitator. If five facilitators can review ten loans per day, each, for 251 eight-hour

---

[17] Lehman's expert stated that 40% of loans with breaches would meet the material and adverse standard, implying a disagreement with the Trustees over 60% of the loans. *Declaration of Zachary Trumpp* (ECF 24255), January 12, 2012, pp. 7-8. Compared to Mr. Trumpp's statement that there would be disagreements at a 60% rate, the 50% assumption I use results in fewer loans passed on to Step 3, and thus results in lower time and cost estimates for Step 3.

[18] I have no insight into Lehman's cost structure, and a 50/50 split provides an illustrative allocation of the total cost of Step 3.

9

days per year, it would require four years (Scenario 1) or three years (Scenario 2) for the Claim Facilitator to review all the remaining claims.

32. The cost for the Claim Facilitation is an hourly rate, per facilitator, of $500, which is derived from the rate of an experienced arbitrator or attorney who might serve as a facilitator.[19] The total cost of facilitation, therefore, is $18 million (Scenario 1) or $14 million (Scenario 2). This cost is allocated evenly between the Trusts and the Estate.[20]

33. The Scenarios employ the assumption that 75% of the remaining disputed claims are resolved by the Claim Facilitator, and 25% of any remaining claims proceed to the Court for a final (and binding) resolution. This equates to 11,434 loans (Scenario 1) or 8,646 loans (Scenario 2) coming before the Court for a series of hearings to determine breaches and damages on a loan-by-loan basis.

   vi.    **Step 5: Court Reviews for Final Resolution**

34. To illustrate the time needed to resolve claims on 8,646 to 11,434 loans I assume that the Court can dedicate one full week each month (a week comprises five eight-hour days) to resolving the disputed claims at a rate of seven loans per day. Based on my experience, and based on discussions with my colleagues at Duff & Phelps, it is not realistic to expect that a Court would be able to review and determine breaches and damages on a loan-by-loan basis at a rate of seven loans per day, but I assume that such an overall brisk rate would be reached if the parties gain experience over the years of review. At this assumed rate, the Court would require 27 years (Scenario 1) or 21 years (Scenario 2) to resolve the remaining claims.

35. The cost of these hearings is based on one attorney and one expert for each side, all billing at a cost of $750 per hour, for a total of $3,000 per hour (split evenly between the Trusts and the Estate). The cost considers only time spent in Court and excludes Court costs and any

---

[19] For example, ADR Services, Inc. publishes hourly rates in the range of approximately $375-$600 per hours, plus expenses and fees (http://www.adrservices.org/rates.php).
[20] The Proposed Lehman Protocol states that the Non-Prevailing Party is responsible for the costs and fees of the Claim Facilitator and of the Prevailing Party, unless or until the court reverses the Claim Facilitator's decision. Because of the uncertainty of such outcomes, I illustrate the cost of Step 4 using an equal split between the parties.

other costs associated with trial. The total cost of trying the remaining claims on a loan-by-loan basis is $39 million (Scenario 1) and $30 million (Scenario 2).

36. In terms of when the Court would begin hearing the claims, I provide two assumptions: 1) that the Court hears loans seriatim, beginning Step 5 one month after Step 4 commences, and 2) that the Court waits until completion of Steps 0-4 before beginning the hearings. The assumption does not affect the cost or the total labor hours needed to satisfy the Proposed Lehman Protocol; however, it does shorten the overall time required if the Court proceeds alongside all the other steps.

37. Table 3 summarizes the inputs to Scenario 1 and Scenario 2.

**Table 3: Summary of Inputs to Scenario 1 and Scenario 2**

| | |
|---|---|
| **Step 0** | **Receive Loans From Servicers**<br>3 Years to Receive All Loans from Servicers |
| **Step 1** | **Review Remaining Loans**<br>40 Reviewers<br>3 Loans Reviewed per Day (Each)<br>251 Review Days per Year<br>Cost of $250 to $400 per Loan |
| **Step 2** | **Plan Administrator Reviews Repurchase Requests**<br>57% Material Breach Rate<br>20 Plan Administrator Loan Reviewers<br>3 Loans Reviewed per Day (Each)<br>251 Review Days per Year<br>Cost of $250 to $400 per Loan |
| **Step 3** | **Trustees and Plan Administrator Negotiate Declined Repurchase Requests**<br>4 Simultaneous Negotiations (1 Each per Trustee)<br>251 8 Hour Negotiation Days per Year<br>$600 Cost per Hour |
| **Step 4** | **Claim Facilitator Reviews Unresolved Repurchase Claims**<br>5 Facilitators Working Simultaneously<br>10 Loans per Day Reviewed (Each)<br>251 8 Hour Negotiation Days per Year<br>$500 Cost per Hour |

11

**Table 3: Summary of Inputs to Scenario 1 and Scenario 2**

| Step 5 | Court Reviews for Final Resolution |
|---|---|
| | 7 Loans Reviewed via Mini-Trial Each Day |
| | Court Devotes 1 Week per Month (60 8 Hour Days per Year) |
| | 1 Attorney and 1 Expert for Each Side at $750 per Hour Each ($3,000 per Hour) |

38. Table 4 summarizes the cost allocation for each Step.

**Table 4: Cost Allocation Between the Parties**

| | Trusts | Estate |
|---|---|---|
| Step 0: Receive Loans from Servicers | n/a | n/a |
| Step 1: Review Remaining Loans | 100% | 0% |
| Step 2: Plan Administrator Reviews Repurchase Requests | 0% | 100% |
| Step 3: Trustees Negotiate Declined Repurchase Requests | 50% | 50% |
| Step 4: Claim Facilitator Reviews Unresolved Repurchase Claims | 50% | 50% |
| Step 5: Court Reviews for Final Resolution | 50% | 50% |

**D. Total Time and Cost**

39. Based on the calculations detailed above, the Proposed Lehman Protocol will involve significant investments in terms of time and cost.[21] Scenario 1 is estimated to require 55 labor-years of effort and would take over 27 years, if every party were to dedicate substantial resources and work continuously on a rolling basis. Scenario 2, which reduces the number of loans on which the claim is based, is estimated to require 42 labor-years and 21 years to complete, on a rolling basis.

40. In addition to multiple decades of professional and Court time, the estimated monetary costs to both the Trusts and the Estate would be sizeable. Scenario 1 would cost the Trusts $96 million to $127 million and would cost the Estate $74 million to $92 million, totaling $170 million to $219 million. Likewise, Scenario 2 would cost the Trusts $72 million to $96 million and the Estate $56 million to $70 million, totaling $128 million to $165 million.

---

[21] The effort involved in the Proposed Lehman Protocol is especially high when compared to the time and cost of a claim estimation methodology involving statistical sampling. See *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), pp. 22-23.

## IV. Reservation of Rights and Compensation Disclosure

41. I reserve the right to revise or expand my conclusions to reflect any additional conclusions formulated upon newly acquired information, or arising from reflection and reconsideration of the conclusions based upon views expressed by expert witnesses, upon further study and information, including documentary and testimonial evidence introduced through deposition and trial.

42. Duff & Phelps charges an hourly rate, based on title and experience, for my services and the services of the team working on this analysis. Duff & Phelps' fees are not based, in part, or in whole, upon any conclusions presented in this Declaration, nor are they based, in part or in whole, upon the outcome of any hearings or trials employing this analysis. For this analysis, Duff & Phelps bills my time at an hourly rate of $810 per hour.

43. This Declaration is not to be reproduced, distributed, disclosed, or used for any purposes other than this Matter without prior written approval.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 14th day of November 2014, in Chicago, IL

_____

Charles A. Parekh