**<u>Exhibit D</u>**

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-01420-(JMP)(SIPA)

4

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6

7    In the Matter of:

8

9    LEHMAN BROTHERS INC.,

10                  Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17

18                  January 8, 2014

19                  10:02 AM

20

21    B E F O R E :

22    HON JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

1    Hearing re:  Trustee's Motion for an Order (1) Confirming

2    the Trustees Denial of SIPA Customer Status to Claren Road

3    Credit Master Fund Ltd. and (2) Subordinating the Claim [LBI

4    ECF No. 7539]

5

6    Hearing re:  Trustee's One Hundred Fourth Omnibus Objection

7    to General Creditor Claims (No Liability Claims)[LBI ECF No.

8    6768]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

```
 1   A P P E A R A N C E S :

 2   HUGHES HUBBARD

 3        Attorneys for the SIPA Trustee

 4        One Battery Park Plaza

 5        New York, NY 10004-1482

 6

 7   BY:  MICHAEL E. SALZMAN, ESQ.

 8        ROBERT B. FUNKHOUSER, ESQ.

 9

10   CLEARY GOTTLIEB STEEN & HAMILTON LLP

11        Attorney for the Junior Underwriter Claimants

12        One Liberty Plaza

13        New York, NY 10006-1470

14

15   BY:  LUKE A. BAREFOOT, ESQ.

16

17   GIBSON, DUNN & CRUTCHER LLP

18        Attorneys for Claren Road

19        200 Park Avenue

20        New York, NY 10166-0193

21

22   BY:  MARSHALL R. KING, ESQ.

23        JOSHUA WEISSER, ESQ.

24

25
```

Page 4

1    BINGHAM MCCUTCHEN LLP

2         Attorney for UBS Financial Systems, Inc.

3         399 Park Avenue

4         New York, NY 10022-4689

5

6    BY:  JOSHUA DORCHAK, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Be seated.  Good morning.

 3        (A chorus of good morning)

 4            THE COURT:  Please proceed.

 5            MR. SALZMAN:  Thank you, Your Honor.  Good

 6   morning, I'm Michael Salzman from Hughes Hubbard & Reed, the

 7   attorneys for the SIPA Trustee in the LBI case.

 8            This morning we have two motions on.  I -- with

 9   the Court's permission I intend to argue the Claren Road

10   motion, and my colleague, Mr. Funkhouser, will be arguing

11   the one hundred and fourth omnibus motion, the one

12   concerning the underwriters.  Both motions have in common a

13   legal issue but there are factual differences, and in our

14   view, subject to whatever Your Honor might think, we think

15   it'd be more orderly just to take the motions one at a time.

16            THE COURT:  That's fine.

17            MR. BAREFOOT:  Your Honor, if we may briefly be

18   heard on just the order of argument?

19            THE COURT:  Okay.  I did say that's fine, but

20   didn't mean to preclude somebody saying it's not fine.

21            MR. BAREFOOT:  Just as a background, the reason

22   we --

23            THE COURT:  You want to say who you are for the

24   record and who you represent?

25            MR. BAREFOOT:  My apologizes, Your Honor.  Luke
```

Page 6

1  Barefoot from Cleary Gottlieb for the junior underwriter

2  claimants.

3          And the reason that we had consolidated these two

4  proceedings was so that the common legal issue of 510(b)

5  could be argued together and decided together.

6          So our proposal was that, of course Mr. Salzman

7  could proceed with the argument of 510(b), and then we had

8  divided the labor among the -- the various claimants on the

9  510(b) issue.

10         There are certainly independent and different

11  arguments for the junior underwriters in terms of

12  subordination and no liability, but given that we've already

13  consolidated these so that they could be heard together, I'm

14  afraid it would be overly repetitious or moot to have Claren

15  Road entirely argued before reaching any portion of the

16  junior underwriters' arguments.

17         THE COURT:  Well, I'm not going to quibble with

18  you over the use of the term consolidated.  They're being

19  heard at the same time.  And when we had a telephone

20  conference regarding scheduling it was clear to me that

21  there were common legal issues that affected both of these

22  contested matters, but that did not necessarily mean that

23  they were one in the same.  Indeed Claren Road made a

24  strenuous argument that I summarily rejected by the way that

25  it should be heard separately.

```
 1              So I don't really care what the order of play
 2     turns out to be here, because the differences will need to
 3     be highlighted and the similarities will need to be
 4     highlighted, and the only issue efficiency of presentation.
 5              I'm mindful of your comment, but I think it is
 6     ultimately cleaner for these to be heard as independent
 7     matters that have certain common issues and certain
 8     distinguishing factors, and if it's repetitious that's my
 9     problem, not yours.
10              MR. BAREFOOT:  Very good, Your Honor.  Thank you.
11              MR. SALZMAN:  If I may proceed, Your Honor.
12              This is the trustee's motion for mandatory
13     subordination of a claim by bondholder of bonds issued by
14     LBI's parent, Lehman Brothers Holdings.
15              Claren Road filed a claim against LBI because LBI
16     failed to complete a purchase of LBHI bonds during Lehman
17     week.  It was the Friday before Lehman week that the
18     transaction was initiated, and it was supposed to settle on
19     Wednesday of Lehman week, and it didn't settle and
20     eventually Claren Road made a claim against LBI because the
21     bonds declined in price during -- during Lehman week.
22              Section 510(b) is the mandatory subordination
23     provision.  It says:
24              "That a claim for damages arising from the
25     purchase or sale of a security of the debtor or an affiliate
```

1    of the debtor, quote, 'shall be subordinated' to all claims

2    or interests that are senior to or equal the claim or

3    interest represented by such security."

4           We submit that's exactly what we have here.  We

5    have a claim for damages.  The claim arises from an aborted

6    sale and it's a sale of a security without any doubt, and

7    it's equally without any doubt security of an affiliate of

8    the debtor.

9           So on this motion we think there's no factual

10   dispute and the Court can rule based on the papers

11   submitted.

12          Claren held bonds issued by LBHI, two issues of

13   Euro denominated senior notes, Claren tried to sell them to

14   Lehman on the Friday before Lehman week, LBI failed to

15   complete the trade, and Claren's claim is stated as a

16   damages claim for the loss and value of the bonds between

17   the trade date, that Friday before Lehman week, and the SIPA

18   filing date, the following Friday.

19          Claren also made a claim for the full principal

20   amount of the bonds in the LBHI case, and those are claims

21   number 64113 and 64114 in the LBHI case.  And we've

22   submitted them in the Hoffer declaration in reply.

23          It's also a record fact that holders of those

24   bonds have recognized interest under the LBHI reorganization

25   plan.  Those ISIN numbers are specifically and expressly

Page 9

1    recognized in the LBHI case.

2              On these facts we submit, Your Honor, the words of

3    the statute are sufficient to provide the result.

4              THE COURT:  Let's -- I hear that, and this is an

5    interesting presentation of a 510(b) issue.  It is really

6    not plain vanilla, although I know you're presenting it as

7    plain vanilla.  And one of the things that I have been

8    thinking about, as I prepared for the hearing, is the

9    problem in 510(b) that is created by the reference to

10   securities of an affiliate of the debtor and the lack of

11   obvious symmetry between the words of the statute in

12   reference to, quote, "shall be subordinated to all claims or

13   interests that are senior to or equal the claim or interest"

14   -- and here are the words I'm emphasizing, "represented by

15   such security."  I think everybody is dancing around these

16   words.

17             The cases are uniform in agreeing with you.  The

18   problem that I'm having, as I think about this, is that the

19   happenstance that the trade involved an affiliate of the

20   debtor, LBHI, is what triggers the 510(b) subordination, but

21   the conduct in question, namely the execution of a trade, is

22   the ordinary course conduct of LBI as a functioning

23   broker/dealer.

24             So one of the questions that I have, and I'd like

25   you to address this, is why, other than the fact that the

1    statute says what it says, and I'm not disregarding that,

2    but why does it make sense for there to be a different

3    outcome in a failed trade with respect to LBHI bonds and any

4    other corporate bond that might have been the subject of a

5    failed trade during Lehman week?  That's the heart of my

6    concern.

7              MR. SALZMAN:  I'm happy to address that and I had

8    prepared to address that.

9              Our adversary did talk in its paper about how this

10   could, for example, have been Apple ink bonds rather than

11   Lehman bonds.

12             THE COURT:  And that was not chosen randomly, it

13   was because Judge Walrath --

14             MR. SALZMAN:  Right.

15             THE COURT:  -- happened to use that example in the

16   WAMU case.

17             MR. SALZMAN:  Right.  Understood.  And let me go

18   directly to that.

19             There may be some other case out there where it is

20   ordinary course of business and it may have been

21   happenstance that they were bonds of the affiliate.  This is

22   not that case.  And it's most clearly not that case if you

23   look as we stated in our reply paper at what LB -- sorry --

24   what Claren Road put in its original claim in the LBHI case.

25   They made a claim there with respect to the same damages,

1   the same loss and value during Lehman week, and in that

2   paper, which it filed months -- September -- months after

3   Lehman week -- September of 2009 and claiming against LBHI

4   it said, we have a claim for damages against LBHI or some

5   affiliate of LBHI upon information and belief it was

6   somebody in the Lehman family, is the effect of what they

7   were saying.

8           So from the point of view of Claren Road it was

9   not the bad luck.  It could have called Merrill to execute

10  the trade, it could have called Morgan Stanley to execute

11  the trade, and just its bad luck it called Lehman to execute

12  that trade.  That's not what happened, apparently.

13          What the record shows is that it called someone at

14  Lehman after the parent -- the day -- I guess the day before

15  that parent was going to -- the business day before that

16  entity was going to file for bankruptcy and said in

17  substance, please take back these bonds, and the person at

18  -- the way that worked Lehman would have been through the

19  broker, but it was really about Lehman and getting out of

20  Lehman and calling Lehman to get out of Lehman.

21          And so this case is not a case where it's ordinary

22  course of business.  The --

23          THE COURT:  Well you raise a question that I'm not

24  sure is directly part of what I was addressing, but let me

25  respond to it.

08-13555-mg Doc 45973-4 Filed 08/14/14 Entered 08/14/14 18:05:00 Exhibit D
Pg 12 of 50

Page 12

```
1          I recognize that there is in this rather clean

2    legal assessment of 510(b) context that is not clean, and

3    you are adverting to that both in your reply papers where

4    you make reference to not the unclean hands of the claimant,

5    but the claimant acting almost desperately to try to

6    extricate itself from its investment that is going down the

7    tube literally within days.

8          And it's also clear to me from the papers I have

9    looked at that Claren Road is a prime brokerage customer of

10   Lehman Brothers in its broadest and least specifically

11   tethered to legal entity term because of the relationship

12   with LBIE, the fact that it was making claims that

13   ultimately were disallowed as part of the settlement with

14   LBIE.

15         And I recognize that there is more going on here

16   in terms of background than the somewhat surgical analysis

17   that we're looking at today of some fairly opaque language

18   in 510(b), but my question to you was actually a much

19   simpler one.

20         Assume for the sake of discussion that the trade

21   in question is a trade that involves a bond issued by Morgan

22   Stanley, to use your Morgan Stanley example.  They're not

23   executing the trade, it just happens to be a bond of theirs.

24   Why should it make a difference to the trustee and the

25   trustee's constituent of unsecured creditors that the bond
```

1    in question is of an affiliate or of a non-affiliate?

2    Because the conduct in question is simply the failure to

3    close the trade.

4         MR. SALZMAN:  The classic case under 510(b), and

5    this goes back well before 510(b) itself existed, was the

6    concern that debt would turn into equity, that people had --

7    sorry -- equity would try to turn into debt, that people

8    near the bottom of the priority chain would try to move up.

9    That's -- and 510(b) -- the core of 510(b) is about

10   upholding the absolute priority rule.

11        THE COURT:  By the way, never before today did I

12   think that a 1973 law review article by Slane (ph) and

13   Kripke from the NYU law review would take on such

14   significance.  And I'm just going to let everybody know, I

15   don't think it's that significant.

16        So that the fact that we're going to be talking

17   about legislative history that may have been influenced by a

18   law review article is in my view absolutely meaningless to

19   my analysis here today.  This is a plain language decision.

20        I've read the Del Biaggio case, not to be confused

21   with Major Deblasio, and I know Judge Carlson (ph) and I

22   think it's a good opinion, and I highlighted for myself what

23   he wrote on page 5 of my copy of the opinion, which is a

24   Westlaw cite.  Quote, "This Court must apply the plain

25   language of section 510(b) even if that language goes beyond

1    the stated policy rationale for the statute."  And it cites

2    to RadLAX.

3              And just so everybody is clear on this, Homer

4    Kripke was a professor of mine at NYU Law School.  He's a --

5    he's a great guy -- or was.  He has nothing to do with

6    today's decision.  This decision is going to be made purely

7    on the basis of applying the words as written to the facts

8    presented.

9              MR. SALZMAN:  Let me explain.

10             First a footnote in the form of an apology, or an

11   apology in the form of a footnote, which is that last night

12   it came to my attention -- our attention, that the Del

13   Biaggio case was affirmed by the District Court in November,

14   and I apologize for not having put that in the brief.  We've

15   handed copies to our adversary, and I'm happy to hand one up

16   for the Court's convenience if you'd like me to do that.

17             THE COURT:  That's fine, it's not going to -- I

18   might want to have it to the extent I write something here,

19   but it's not going affect today's argument.

20             MR. SALZMAN:  And -- thank you, Your Honor.

21             Let me get directly to why application of the

22   plain words makes sense in this case.

23             This is not a case of equity trying to become

24   debt, but it is a case of debt in one case trying to become

25   debt in two cases.

Page 15

1           They have a good claim in the LBHI bankruptcy for

2     the value of the bonds as they turned out to be at the end

3     of -- by -- as of the -- as of the filing date of that case.

4     There's a plan, those bonds are going to be paid, whatever

5     is in the till for them from the reorganization plan and

6     those bonds have been recognized by this Court.  The

7     interest in those bonds have been recognized and a

8     distribution is being made accordingly.

9           Here these folks are also seeking to get onto a

10    second chain of priority, and the affiliate clause, one of

11    its affects, is to say, no, you can't get onto two different

12    chains of priority in a corporate family, it's -- and there

13    are good policy reasons for that.

14          The financial structure of LBI was intimately tied

15    in with the financial structure of LBHI, LBHI funded LBI

16    every day, when LBI had excess cash it went to LBHI, the

17    capital for LBI came from bonds that the parent would offer

18    to the public.

19          And so the congressional judgment, we submit,

20    makes sense certainly in this case, I'm not going to say in

21    every conceivable case, I don't have to do that, that a

22    bondholder of the parent has rights against the parent, but

23    it's not supposed to dilute the claims of ordinary creditors

24    of a subsidiary and get two bites at the apple.

25          The classic case, the debt turning into -- equity

08-13555-scc   Doc 8252-3   Filed 02/13/14   Entered 02/13/14 10:44:22   Main Document
Pg 16 of 50

1   turning into debt is an example of somebody attempting to

2   get a bigger bite at the apple.

3           This case, it's an instance of a creditor trying

4   to get two bites at the apple, and the affiliate clause says

5   you can't do that, at least not until the real creditors of

6   the subsidiary are paid in full.

7           THE COURT:  What are the claims or interests that

8   are represented by the LBHI bond?

9           MR. SALZMAN:  Well they are nul interest.  They

10  say I want money from you, the subsidiary, and the answer

11  is, you're on the wrong line, sorry, get over on that line.

12  And that's what the Del Biaggio case, the VF Brands case,

13  and the Learnoud (ph) case talk about, that they're separate

14  lines, and sorry, you're on the wrong line, and therefore

15  you go to the bottom or the back of the line.

16          THE COURT:  I understand -- I understand the cases

17  that have considered this conundrum, and what I'm struggling

18  with isn't the legislative history, but simply scanning the

19  text.  And so if you scan the text and you get into this

20  actionable section everybody I think will concede that there

21  is a triggering of potential 510(b) subordination by virtue

22  of the framing of the issue.  We have the failed trade of a

23  security of an affiliate of the debtor.  We're ready to

24  subordinate it.

25          Now how do you do that when it's being

```
 1    subordinated to all claims or interests that are senior to
 2    or equal the claim or interest, bolded language, represented
 3    by such security?  The security in question is the security
 4    of an affiliate of the debtor, its parent, and there are no
 5    claims or interests in the LBI case that are represented by
 6    that security, are there?
 7              MR. SALZMAN:  Well, I would say there are no valid
 8    interests.  It's like a zero interest, and it's saying -- in
 9    this case, which is an extreme case, you're at the end,
10    you're at the very end, you're below zero, you -- anyone
11    would be senior to you, and that's how the Del Biaggio case
12    and the other cases I mentioned deal with that, and they
13    don't -- they don't -- I understand the issue, but in this
14    case it's you get -- you go last because the security --
15    your security, these bonds, you -- it's subordinated to
16    zero.  Your interest in this estate is nothing and you get
17    subordinated to everyone.  Equal to.  It doesn't have to be
18    senior to, it can be equal to the claim.
19              THE COURT:  Well see here's what I think, and this
20    is why we're struggling with this, or I recognize I'm the
21    one who's forcing the question, but I think what happened
22    when they added the language to include or an affiliate of
23    the debtor is that those drafting the language didn't fully
24    think about how that really works when you're dealing with a
25    claim or interest represented by that security of the
```

1   affiliate.  Because the security of the affiliate really

2   isn't a claim in the debtor's case is it?

3           MR. SALZMAN:  It's not a good claim.

4           THE COURT:  What?

5           MR. SALZMAN:  It's not a good claim.

6           THE COURT:  Well is it -- why is it -- let's think

7   about that.

8           In what respect does the holder of LBHI bonds in a

9   case that is not substantively consolidated have any

10  standing at all in the LBI case?

11          And I reference some hearings that you did not

12  attend that occurred within the last month where counsel for

13  LBHI, in the context of a hearing to disallow the claims of

14  certain employees of LBI, argued that by virtue of a

15  settlement between LBI and LBHI, by virtue of the separate

16  confirmed plan for LBHI, and by virtue of the separate

17  administration of the SIPA case for LBI, LBI former

18  employees had no standing to assert alter ego type claims

19  against LBHI.  I entered orders consistent with that.

20          So we're not dealing with consolidated estates,

21  we're dealing with demonstrably separate estate

22  administrations.  And while substantive consolidation might

23  at one time have been an acted issue, it's now finally

24  settled by virtue of the confirmed plan and by virtue of the

25  settlements and by virtue of the law of the case.

 1          So in this setting, thinking about LBHI bonds,

 2    what claims are represented by that security in the LBI

 3    case?

 4          MR. SALZMAN:  I guess as a -- one answer at least

 5    is that as an economic matter if we had a situation where

 6    LBI was -- had -- it turned out could pay everybody then

 7    among the people it could pay would be its parent

 8    stockholder, and indirectly, as an economic matter, holders

 9    of bonds of LBHI would -- would benefit from that.

10          THE COURT:  That might --

11          MR. SALZMAN:  That's an economic matter, that's

12    not a legal matter, and I --

13          THE COURT:  But that could only occur on some

14    other planet in our galaxy, not here.

15          MR. SALZMAN:  Fair enough.  Well that's not the

16    Lehman case.  I understand that's not the Lehman case, but

17    obviously a statute is written for all purposes and for, you

18    know --

19          THE COURT:  Can you actually envision a situation

20    in which there is a debtor enterprise which is so solvent

21    that it pays off not only all of its creditors but all of

22    the creditors of its parent?  I mean it's hard to imagine

23    frankly, but I'll accept that it's a hypothetical that might

24    pass in a first year law school class.

25          MR. SALZMAN:  Fair enough.

1           The -- the legal -- the more direct legal answer

2    is that I submit that as found in those other cases that the

3    -- most courts were comfortable with Del Biaggio, in

4    particular, with the proposition that it's not a good --

5    it's not at a good claim, it's a zero claim, but that's what

6    makes sense to make sure that a bondholder of an affiliate

7    of an equity holder of an affiliate doesn't get two bites at

8    the apple.

9           THE COURT:  Would you acknowledge that the words

10   do not scan all that well?

11          MR. SALZMAN:  I acknowledge that you could have

12   written a statute that was three times longer that dealt

13   with affiliates in more detail, yes.

14          THE COURT:  All right.  Anyway, I've been

15   interrupting you, go ahead with your argument.

16          MR. SALZMAN:  No, that's fine.

17          I think we -- Your Honor's questions really got to

18   the heart of the matter, and I don't want to belabor it, but

19   I would go back to the proposition that there's no doubt

20   that the bond -- the bonds are securities, our opponent

21   attempts to make some argument that bonds shouldn't even be

22   part of the statute.  Clearly they are and there are plenty

23   of cases that enforce the statute as to bonds.

24          Likewise the affiliate clause is really in the

25   statute.  Claren Road makes some effort to say well maybe

1  that was just a mistake and it points to a different law

2  review article that speculates that a better statute

3  wouldn't have talked about affiliates at all, but that's not

4  the law.

5            And -- and on policy grounds I think you do get to

6  the right result if you don't allow Claren Road to get a

7  full claim like every other bondholder in the LBHI case and

8  also a claim for the fallen value of those bonds during --

9  during Lehman week.

10           In effect those bonds fell in value during that

11  week, precisely because the prospect that in the bankruptcy,

12  which had already begun, bondholders were not going to be

13  paid in full, and that's what that trading was all about.

14  And for Claren Road to get what bondholders in that case get

15  and also get the declining value during that week is a form

16  of double recovery.  It's not -- I'm not saying they're

17  getting more than 100 percent, but it is a form of double

18  recovery.

19           There's the value of the bonds, that's what they

20  get, and then there's also -- but we also get the decline in

21  value during that week is we submit double recovery, not

22  fair to the creditors of LBI, and so you do get to the right

23  result by subordinating.

24           THE COURT:  I hear your argument, but I'm going to

25  interpose maybe a different perspective, which goes back to

Page 22

1   the failed trade of Apple shares of that earlier

2   hypothetical.

3          Isn't the claim not a double recovery claim as

4   much as it is a claim for the failure to complete the trade,

5   which is of course what LBI as a broker/dealer undertook to

6   do?  So it's a breach claim.

7          MR. SALZMAN:  But the measure of the damage as it

8   turns out -- or not as it turns out -- necessarily so, the

9   measure of the damage they allege is precisely people

10  thinking through -- the market thinking through this is a

11  bankruptcy, this is a bad situation, you don't want to be in

12  these bonds, and so the price is going down to people's

13  guess as to what's going to happen in that bankruptcy.  The

14  bankruptcy had already occurred by the -- by the settlement

15  date, not by the trade date.

16         But so on the Friday before the rumors were there,

17  the news was there, people who knew understood that the

18  bankers were meeting to figure what to do about Lehman

19  Brothers, and if hypothetically all the holders of those

20  bonds had called LBI and said I want out, sell all my Lehman

21  bonds on that Friday, you could work through that situation,

22  and you would have aggregated the double recovery problem

23  that I talked about before.

24         THE COURT:  Okay.  So to sum up it's your position

25  that the issue having been framed, the language of 510(b),

1    when applied here, leads to an almost no-brainer that the

2    claims of Claren Road should be subordinated.

3            MR. SALZMAN:  Yes, and beyond the words, this

4    Court is not supposed to do anything in a robotic fashion,

5    it's supposed to apply the words as it can and not lead to

6    an absurd result, and we've explained I think why far from

7    an absurd result it's the correct economic result, it's the

8    correct result consistent with the purpose of the statute,

9    and for that reason we ask that Your Honor grant our motion.

10           THE COURT:  Okay.  Thank you.

11           MR. SALZMAN:  Thank you.

12           MR. KING:  Good morning, Your Honor, Marshall King

13   from Gibson, Dunn & Crutcher on behalf of Claren Road.

14           Your Honor has put your finger on most of the

15   reasons I think why this isn't a plain vanilla application

16   of the plain words of the statute.  Let me see if I can add

17   one or two that weren't discussed with counsel for the

18   trustee and put it in a legal framework and a context that

19   explains why because of the issues Your Honor has identified

20   and the difficulty in applying the plain words, why it means

21   we win here and that subordination is not appropriate.

22           You and counsel for the trustee went through

23   pretty extensively the ambiguities in trying to figure out

24   to what do we subordinate this claim?  And the cases -- and

25   by my count there are about three cases that find in favor

1    of the trustee's position in this type circumstance, but

2    they really all go back to Judge Walrath in VF Brands.

3           The Del Biaggio, for instance, both in the

4    District Court -- the Bankruptcy Court and the District

5    Court, which I saw, you know, for ten minutes before we

6    started this morning, relied on VF Brands --

7           THE COURT:  Uh-huh.

8           MR. KING:  -- the Judge Walrath case.  And you

9    know, truthful she just got it wrong in that case honestly.

10   I really think it is -- she misinterpreted the statute.  She

11   read it as saying the claim or interest represented by the

12   claim filed by the claimant as opposed to the claim

13   represented by the security.  She sort of -- and that

14   becomes somewhat circular in that context, because someone

15   has asserted a general unsecured creditor claim she then

16   treated the subordination as being subordinated to general

17   creditors.

18          But what Your Honor has rightly pointed out is you

19   have to look at what claim does the security represent?  And

20   in this context there's nothing.  There's nothing to

21   subordinate it to.  And the idea that -- and previously the

22   trustee took no position.  In its papers there was no

23   explanation of to what should this be subordinated, to what

24   level should it go?  They sort of just said, well, whatever

25   it is it's below general creditors and that's good enough

```
 1   for here.  But today Your Honor dragged it out of him, he
 2   thinks it's below nothing, below zero essentially.  And
 3   there's really no logic to subordinating this ordinary
 4   course contractual obligation that LBI undertook to zero --
 5   to less than zero.  I'm sorry, it's not even zero, it's less
 6   than zero, which is what he's advocating here.  There's no
 7   good reason to treat it that way.  And the -- the plain
 8   words of the statute don't require that.
 9           The plain words of the statute are ambiguous in
10   this circumstance, because you don't have a claim in the
11   priority structure of the debtor, who we're dealing with.
12           THE COURT:  Well couldn't you, just to be a
13   creative thinker here, couldn't you conclude that the only
14   way to make logical sense out of this is that there's a
15   virtual security, in effect if the security of the affiliate
16   were a security of the debtor then the claim represented by
17   such security would be an unsecured claim, and so you would
18   then subordinate to that hypothetical security.
19           How else could you make sense of this other than
20   by assuming that in the case of an affiliate, because you
21   have separate chains, that the claim represented by such
22   security in the bankruptcy case either assumes consolidation
23   or assumes that it would be somewhere in the capital stack
24   of the debtor as if it were a like type security?
25           MR. KING:  That's -- that's in substance what the
```

1   -- if I recall the Learnoud case concluded.  Although in

2   Learnoud I should point out the reason I said it all boils

3   down to VF Brands, in Learnoud the parties actually didn't

4   dispute that it needed to be subordinated to general

5   unsecured creditors, and so the issue wasn't really joined

6   on the issue that we have here today.  But could you do

7   that?  You could do that, but certainly the plain words of

8   the statute don't dictate that.

9           There are multiple interpretations of this

10  statute, and that's exactly what the Second Circuit has

11  held, means that this is ambiguous, and one then needs to

12  look at the legislative history and the policies underlying

13  this statute.

14          And perhaps there are circumstances, perhaps even

15  the Del Biaggio case as a decent example there's a policy

16  reason for saying yes subordination here where the parent --

17  or the parent -- the debtor parent essentially used the

18  subsidiary as part of the fraud and it was one -- one big

19  inextricable scheme in -- and it's not unusual for a party

20  to use a subsidiary in fraud -- and in such circumstances

21  you could say yes, the policies underlying the statute that

22  a -- that someone -- and someone deciding to invest getting

23  the expectations of a shareholder shouldn't be able to

24  elevate his or her claim to that of an ordinary creditor --

25  a debtor -- of a debtor.

1        But it's precisely when you look at the policies

2    underlying the statute that Claren Road's claim should not

3    be subordinated.

4        There is not a single argument to be made that

5    subordinating this claim for either of the two policy

6    objectives.

7        And I'm going to defend Slane and Kripke for a

8    moment if you allow me.  Not because Slane and Kripke aren't

9    smart guys and --

10        THE COURT:  But they are.

11        MR. KING:  -- but not because of that, because the

12    Second Circuit says those are the policies.  Regardless of

13    -- it's not because there was a great intellectual law

14    review article, it's because that law review article is what

15    led congress to enact the statute, and the Second Circuit

16    says in cases of ambiguity the only time we're going to

17    subordinate is if one of those two policy rationales is

18    furthered by that subordination.  And those two policy

19    rationales are taking on the risk and return expectations of

20    a shareholder rather than a creditor, and where the claimant

21    seeking to recover a contribution to the equity pool that's

22    presumably been relied on by other creditors of the debtor.

23        Trustee -- nobody argues that that's -- that those

24    policies are furthered by Claren Road.  Claren Road is

25    obviously not trying to elevate itself from a shareholder

1   and cloak itself in the garb of a creditor.  And there's no

2   argument to be made that any creditor of LBI relied on any

3   equity contribution that was somewhere buried in this chain

4   of events.

5            Before I even get to that I did want to point out

6   there's another reason why there's ambiguity here in this

7   statute, and it's something that both Your Honor and counsel

8   for the trustee mentioned.

9            The statute by its literal terms applies to

10  damages arising from the purchase or sale of a security.

11           Here, as the trustee's counsel put it, we have an

12  aborted sale, and Your Honor called it a failed sale.

13           The statute by its literal terms applies to an

14  actual purchase or sale.  Here we don't have that.  We have

15  the absence of one.

16           Now, I concede that the cases, such as Med

17  Diversified in the Second Circuit, once they find -- find

18  ambiguity in those circumstances and then opine the policy

19  rationale usually find that that -- the statute applies to

20  such cases, that it -- that even though it was a failed

21  consummation of a stock purchase, for instance, the claim

22  nevertheless arises from the purchase or sale of security.

23  So in other words, the statute can apply to a failed sale.

24  But again, only when those policies -- one of those two

25  policy rationales is furthered.  And this is not one of

1    those situations.  We have in fact the opposite, the flip

2    side if you will of Med Diversified.

3            Claren Road wasn't looking to invest in Lehman,

4    Lehman broadly speaking, Claren Road was looking to get out

5    of Lehman.  It was a -- it was a transaction separate from

6    the decision to invest and to become a bondholder of the

7    parent.  And therefore its expectations -- in Med

8    Diversified the Court said, well this employee who was

9    supposed to get stock, he had the expectations of a

10   stockholder, he had the expectations of unlimited upside,

11   and he should be bound to that, he shouldn't get the best of

12   both worlds.

13           We have the opposite.  We capped our recovery here

14   at the purchase price.  We had -- once -- once the contract

15   was entered into that was then breached we had an upside

16   capped in a fixed amount.  There's no -- that's not an

17   investment speculation that we were engaged in, we were

18   trying -- we'd fixed the price and we're not being treated

19   as an investor.  And so it's really the flip side of Med

20   Diversified where the policies definitely don't apply.

21           I want to address the dual recovery issue that was

22   -- that was mentioned and how Mr. Salzman tried to justify

23   subordination under the policies.  He sort of -- he said you

24   -- one of the policies, although it's not mentioned by the

25   Second Circuit in Med Diversified when it said the only --

```
 1    when it identified the only two policies -- was simply that

 2    -- was to not allow debt in one case to try to become debt

 3    in another case.  Respectfully, that doesn't distinguish our

 4    case from the Apple bond or the Morgan Stanley bond.

 5         We had two separate independent obligations by two

 6    separate independent obligors.  We made an investment in

 7    LBHI and had the bonds and thus became a creditor of LBHI,

 8    but separately -- a separate transaction we tried to -- we

 9    had a contract with LBI and tried to settle that, and they

10    breached that separate obligation.

11         The -- that's not dual -- the fact that we made a

12    claim -- by the way we have since sold the claim so it's not

13    like we're getting a dual recovery as a matter of fact, but

14    we aren't getting into the facts here too much --

15         THE COURT:  Then I will completely disregard the

16    fact that you sold your claim.

17         MR. KING:  Well, I'm not asking you to disregard

18    the fact that we sold the claim, but they're making an

19    argument that we're getting a dual recovery, and my point is

20    simply that isn't the fact.

21         THE COURT:  Well whether you sold the claim or not

22    it shouldn't affect the legal analysis today.

23         MR. KING:  It absolutely should not, and therefore

24    the issue of a dual recovery shouldn't affect the analysis

25    -- the potential dual recovery shouldn't affect the
```

1    analysis.

2             But --

3             THE COURT:  Are you suggesting that there is a

4    potential characterization of this as dual recovery?

5    Because even in my discussion with trustee's counsel I

6    distinguished the two.

7             MR. KING:  I distinguished the two as well, Your

8    Honor.  I --

9             THE COURT:  For the same reasons or for different

10   reasons?

11            MR. KING:  I think that's a total red herring.

12   The question is the claim against LBI arises out of an

13   independent obligation by LBI.

14            And the point I guess I was trying to lead to by a

15   roundabout route was had we bought a Morgan Stanley bond and

16   the same facts then occurred as occurred here we'd have a

17   right -- we'd still have the Morgan Stanley bond -- we'd

18   have a right to collect from Morgan Stanley, we'd also have

19   a right in damages against LBI for breeching its obligation

20   to purchase it at -- at a sum certain.

21            And while there may be issues down the road of

22   whether we could or could not acquire -- I'm sorry --

23   recover more than 100 cents on the dollar, that scenario is

24   not happening in our circumstance.

25            And so the idea that you can't have two parties

1    obligated for two separate independent obligations that

2    somehow relate to, you know, a similar body of facts, is

3    just wrong.  That -- that doesn't -- that is not the policy

4    underlying this statute.  And the affiliate issue doesn't --

5    doesn't change that.  There really is no justification in

6    this circumstance.

7              You could have circumstances where an affiliate --

8    the debtor had guaranteed an affiliate's bond obligations,

9    for instance, or other obligations, and in that circumstance

10   you could say perhaps that it makes sense to subordinate the

11   claim against the debtor.  That's a scenario where the

12   affiliate language might make some sense and could be

13   applied, but this isn't that scenario.  This is not

14   attempting to recover on the debt obligation, this is a

15   separate obligation that they had to purchase in the

16   ordinary course from us.

17             You know, I guess I would just conclude, Your

18   Honor, with -- with the observation that you had that you

19   would apply, following Del Biaggio, that even that it might

20   not make sense if the words compel it, that's Congress'

21   problem and not your problem and you're just applying the

22   words.  But not only do the words not compel it here but it

23   just doesn't make sense.

24             There's no problem that would be remediated by

25   subordinating Claren Road's claim.  Claren Road is not

1    attempting to bootstrap itself into a higher position in the

2    priority structure.  Claren Road is really no different than

3    any other creditor of LBI where LBI has breached an

4    obligation.  It's not altering the expectations of Claren

5    Road that it had when it entered into the contract with LBI,

6    it's not altering the expectations of any creditor of LBI,

7    it has nothing to do with the capital structure or

8    capitalization of LBI, and no one is being made worse off by

9    allowing Claren Road's claim to be treated on a par with

10   general creditors.

11            THE COURT:  It occurs to me that one of the things

12   that makes this any intriguing argument and not a plain

13   vanilla one is that we are dealing with the circumstance

14   that I would wager the drafters of Section 510(b) did not

15   contemplate.

16            We're not dealing with a corporate debtor issuer.

17   We're not dealing with a corporate debtor issuer's

18   affiliate.  We're dealing with a broker/dealer subject to

19   the SIPA regime that is engaged in the ordinary course in

20   the business of trading all kinds of securities, and it just

21   so happens that the securities in question today are

22   affiliate securities, bonds of LBHI.

23            And so the interesting question becomes, and I

24   recognize that there is some assumptions built into what

25   I've just said, is it sensible and consistent with the

```
 1    regime for liquidating a broker/dealer for there to be a

 2    different consequence to a Claren Road type claimant when

 3    the securities that are the subject of the failed trade

 4    happened to be affiliate securities as opposed to Apple

 5    stock?  That to me is the essential question.  And actually

 6    none of the papers truly focused on it in quite that way.

 7              MR. KING:  Guilty as charged I suppose, Your

 8    Honor, although we did bring the Apple --

 9              THE COURT:  I know.

10              MR. KING:  -- quote to you.

11              THE COURT:  I appreciate it and it's a great

12    analogy too.

13              MR. KING:  But -- well, I didn't -- I can't take

14    credit for it obviously.

15              THE COURT:  I know you can't.  You can take credit

16    for quoting --

17              MR. KING:  Yes.

18              THE COURT:  -- from a case you like from Judge

19    Walrath why critiquing another case you don't like from

20    Judge Walrath.

21              MR. KING:  I've done that to lots of judges --

22              THE COURT:  Okay.

23              MR. KING:  -- Your Honor.  But it's not Judge

24    Walrath who's -- who is at issue, it's the interpretation.

25              The -- there is no rational ground for treating it
```

08-01420-scc Doc 8252-3 Filed 02/18/11 Entered 02/18/11 10:44:20 Main Document
Pg 35 of 50
08-13555-mg Doc 46973-4 Filed 08/14/14 Entered 08/14/14 18:05:00 Exhibit D

1  differently, and that -- it's not -- it's not just an

2  interesting question frankly, it is the question that is

3  mandated by the Second Circuit in Med Diversified.  Does

4  subordinating this claim further one of those two policies

5  underlying the statute?  And it just doesn't.

6          I have not heard from the trustee or in the case

7  law frankly that exists any logic for applying the statute

8  in this circumstance, in the case of an ordinary course

9  trade by a broker/dealer that by happenstance happens to be

10  the bonds issued by an affiliate.

11          There is no reason in this circumstance, and I

12  think that's the answer to the question and why

13  subordination is not mandated here.

14          It could -- all -- there could be circumstances

15  where those policies might be furthered.  You could

16  hypothesize somebody trying to acquire LBHI's stock and

17  maybe there's a logic there where it's furthered.  This is

18  -- this is not that.  And the Second Circuit says because

19  the statute is ambiguous in many circumstances, because

20  applying the plain language isn't clear, you have to look at

21  those policies, and the policies dictate the answer, and

22  that here is no subordination.

23          THE COURT:  Okay.

24          MR. KING:  Thank you, Your Honor.

25          MR. SALZMAN:  Thank you, Your Honor.  Just

1    briefly.

2            I would start with the proposition that it's not

3    that it just so happens that Claren Road called Lehman

4    Brothers about getting out of Lehman Brothers' bonds.  If it

5    thought there was a receptive other place to go to sell the

6    Lehman bonds maybe it would have done that.

7            The affiliate provision of the statute brings

8    directly before the Court the proposition that including in

9    a SIPA transaction -- in a SIPA case that if you're trying

10   to sell the securities of an affiliate back to the corporate

11   family you should have your claim to the bonds but not your

12   claim to also have a damages claim or have a damages claim

13   instead.

14           And so I would resist the proposition that we have

15   to assume that this was an ordinary course transaction and

16   that it could just as easily been Apple stock.  Congress --

17           THE COURT:  But let's --

18           MR. SALZMAN:  -- did it the other way.

19           THE COURT:  -- let's -- let me stop you for a

20   second and ask you this.

21           How significant is it to your argument that the

22   transaction in question was an attempt by Claren Road to

23   exist its relationship with Lehman at a time of panic in the

24   markets?

25           And I ask you this question because I'm not sure

1    if I should be thinking about this clinically.  In other

2    words, a trade is placed, it doesn't close, the party to the

3    trade says to the broker/dealer, you breached your

4    obligation to me which was to complete this trade as agreed

5    during Lehman week, presumably there were any number of -- I

6    don't know the numbers -- but presumably there were any

7    number of customers that were in a similar circumstance

8    either with respect to Lehman securities or other

9    securities.

10          Can you help me in this respect?  I am trying to

11   understand whether what we are dealing with here is a

12   complete one off outlier situation in which a prime

13   brokerage customer of the Lehman enterprise is scurrying

14   about trying to protect its flanks at a time of market

15   turmoil and it calls for a trade which doesn't close and it

16   has a claim for that breach, which neither ranks as an

17   unsecured claim in the case or is a subordinated claim,

18   that's the binary choice.  It is a claim of some sort for

19   breach, you admit that.  Yes?  Absolutely.

20          MR. SALZMAN:  That was the -- that was why it was

21   asserted.

22          THE COURT:  So I don't know whether or not we're

23   talking about a class problem that affects any number of

24   potential customers and has a meaningful economic impact in

25   the liquidation of LBI or whether or not this is just an

```
 1    intellectually interesting hypothetical which happens to

 2    have real consequences only to Claren Road.

 3              MR. SALZMAN:  To my knowledge it has consequences

 4    to Claren Road.  I'm not aware of other claims in the

 5    pipeline that similarly are claims for breach of contract

 6    for LBI's failure to execute trades in Lehman securities.

 7    I'm not aware of any.

 8              THE COURT:  So this is really one off as far as

 9    you know.

10              MR. SALZMAN:  As far as I personally know.  I

11    don't pretend to know the whole story, but I do -- I'm not

12    aware.  This came to us as Claren Road asserting this claim

13    and we said it should be subordinated and they said, no, it

14    shouldn't.

15              But I would say that the nature of their claim --

16    I mentioned this before -- in the LBHI case where they said

17    we were dealing with Lehman, we don't know who -- please --

18    take my securities, please, that this was not a failure

19    where Lehman -- LBI was to go into the marketplace and find

20    a buyer, this was Lehman, at a determined price, agreeing

21    itself -- LBI itself apparently agreeing to take the bonds

22    at a stated price.  It's not as though they had found some

23    hypothetical buyer in the marketplace and that buyer walked

24    away and so the trade failed, this is LBI failing to step up

25    and buy the bonds.
```

08-01420-scc  Doc 8252   Filed 02/18/14   Entered 02/18/14 10:44:22   Main Document
Pg 40 of 61
08-13555-mg  Doc 46973-4   Filed 11/17/14   Entered 11/17/14 18:05:00   Exhibit D
Pg 40 of 50

1           THE COURT:  As principal.

2           MR. SALZMAN:  As principal.  That's my knowledge.

3    And so that presents in -- takes it out of a situation.

4           You might say in a SIPA case there could be a lot

5    of people whose trades failed, a lot of peoples trades did

6    fail during Lehman week.

7           This is a principal trade that LBI agreed to buy

8    the bonds at a price certain, apparently, that's the nature

9    of the claim being made.  And so for that reason I submit it

10   takes it out of the ordinary course or it just so happens to

11   be situation.  There could be other situations, but I submit

12   on the record we have that's not this case.

13          THE COURT:  Okay.  Thank you.

14          MR. SALZMAN:  Thank you.

15          MR. FUNKHOUSER:  Rob Funkhouser from Hughes

16   Hubbard & Reed on behalf of the SIPA Trustee, Your Honor.

17          In omnibus objection 104 the trustee objected to

18   contribution indemnity claims against LBI by underwriters of

19   LBHI securities.  The claims seek reimbursement of

20   settlements and defense costs that were incurred in

21   securities fraud suits brought by purchasers of LBHI

22   securities.

23          As set forth in the objection there were three

24   grounds for objection, including that the claims are subject

25   to mandatory subordination under 510(b).

1          There were two responses.  One filed by the junior

2     underwriters, who are 11 underwriters who collectively

3     participated in 25 offerings of different LBHI securities in

4     aggregate amounts in excess of $36 billion.  The other was

5     filed by UBS Financial Services who sold structured

6     securities issued by LBHI under a distribution agreement

7     with LBHI and LBI.

8          For purposes of the mandatory subordination

9     argument UBS has adopted the position of the junior

10    underwriters and so there's really the only -- the one

11    opposition to consider on those issues.  And from our review

12    the Court can fully resolve both sets of claims by directing

13    subordination under 510(b).

14          Based on the responses there's no disputed facts.

15    There's a narrow issue of law that Your Honor has

16    identified, and it applies to all claims and would obviate

17    the need to address the other grounds for objection or other

18    grounds that we may have reserved in the (indiscernible -

19    01:04:40) objection.

20          So like the Claren Road objection this objection

21    addresses 510(b) subordination claims arising from the

22    purchase or sale of LBHI securities as securities of an

23    affiliate of the debtor.

24          The objection asks the Court the provide the

25    provision of Section 510(b) that extends mandatory

1  subordination to reimbursement or contribution claims on

2  account of such claims.

3        Based on the objection and the responses there's

4  no dispute that the underwriters' claims are for

5  reimbursement and contribution.  There's no dispute that the

6  claims are an account of damages claims by purchasers of

7  LBHI securities.  And there's no dispute that LBHI is an

8  affiliate of LBI.

9        The narrow legal dispute for the Court is on the

10  meaning of 510(b), and from the text of the statute 510(b)

11  makes mandatory subordination where claims involve the

12  securities of the affiliate of the debtor to the same extent

13  as if the claims were securities of the debtor.

14        This Court has applied 510(b) to subordinate

15  underwriter indemnity claims in Jacom Computer Services, and

16  in doing so the Court identified that had 510(b) represents

17  a congressional judgment that the underwriters' litigation

18  costs, at least where it was involving debtor securities are

19  subordinated, should not dilute the recovers on general

20  creditor claims.

21        (Indiscernible - 01:06:18) relied on the Mid

22  Diversified -- Mid-American -- Mid-American Lease Systems

23  case from Delaware which went into more detail on the

24  legislative history and the policies behind 510(b) as

25  applies to reimbursement and contribution claims.

1          The rationale is essentially that in extending

2     subordination to others who are involved in the process of

3     issuing securities the risk of illegality in the issuance of

4     securities should be borne by those who are investing in or

5     participating in that process and not by the general

6     creditors.

7          The junior underwriters don't really contest that

8     Jacom Computer Services states the law in this district with

9     respect to claims that are brought involving debtor

10    securities, their narrow argument is that 510(b) does not

11    apply by its literal terms because there's no claim or

12    interest represented by the LBHI securities in this

13    proceeding.

14         As Your Honor pointed out that is contrary to the

15    uniform determination by other courts that have addressed

16    the issue in the context of fraud in the purchase or sale of

17    an affiliate securities.

18         We're not aware of another court having addressed

19    it in this context of reimbursement or contribution.  And

20    the Del Biaggio court in the affirmance by the District

21    Court of the Northern District of the California determined

22    that the interpreting the provision of 510(b) to not apply

23    when it was securities of the affiliate of the debtor

24    because there weren't an interest represented by the -- by

25    the affiliate securities would render the language

 1    meaningless and so should be rejected as a statutory

 2    construction matter.

 3          The argument by the junior underwriters also

 4    ignores that 510(b) requires subordination claims to claims

 5    that are senior to or equal the claim represented by the

 6    security.  So it isn't necessary that there be a claim for

 7    the security in the LBI proceeding if Your Honor can

 8    identify claims that are senior to the underwriter

 9    reimbursement claims or senior to claims that would be

10    represented by the LBHI securities.

11          And based on the legislative history of 510(b) and

12    the policy that is described in the Med Diversified decision

13    and in the courts that have applied the subordination

14    provisions of 510(b) to underwriter reimbursement claims to

15    DNO attempts to get reimbursement for securities liabilities

16    it makes sense that the subordination should be to all

17    general creditor claims.

18          Part of the rationale for passing 510(b) was that

19    securities claimants wouldn't improve their position by

20    bringing their claims as a fraud -- securities fraud claim.

21    It makes no more sense for underwriters to be able to

22    recover for those very same claims where they have been sued

23    directly by the purchasers and are -- and then seek

24    reimbursement for the same settlement from the debtor.

25          Under the absolute priority rule in the

08-01420-scc Doc 32523-4 Filed 02/18/14 Entered 02/18/14 10:44:20 Main Document
Pg 45 of 50
08-13555-mg Doc 46973-4 Filed 11/17/14 Entered 11/17/14 18:05:00 Exhibit D
Pg 44 of 50

Page 44

1    (indiscernible - 01:10:12) case and principals general

2    creditor claims are senior to securities claims regardless

3    of whether they're direct or indirect.

4          It may be that there are cases where it would

5    matter precisely where in the subordinated claims the

6    interests of an affiliates securities would fall.  It

7    doesn't matter here because it's already clear that the

8    general creditor claims will not be fully paid, there won't

9    be something to subordinate.

10          This application of 510(b) just determining that

11   the underwriters' claim should be subordinated to all

12   general creditor claims would be consistent with the Court's

13   orders on the employee equity claims that were presented in

14   omnibus objections 101 and 131 where the trustee had asked

15   and your order -- Your Honor directed that accrued equity

16   award claims by employees -- and these were four LBHI

17   securities -- should be subordinated and without determining

18   what specific priority or amount of the claims that they

19   would be.

20          If -- other Courts have taken this same course of

21   deciding only that because the claims must be subordinated

22   in the general creditor claims and that the general

23   creditors will not be fully paid, it is not necessary to

24   reach whether the claims need to be disallowed or in what

25   amount.

1      The Del Biaggio case ruled that way, the Mid

2   American Waste case from Delaware and in this district in

3   Enron the judge also determined not to reach the other

4   grounds for disallowance.

5      Your Honor, I'd be happy to answer any questions

6   on the other grounds for disallowance of the claims that

7   were presented in our objection and reply, but we'll rely on

8   the papers unless there are questions.

9      THE COURT:  But your essential argument is that

10  the only thing I need to consider is mandatory subordination

11  under 510(b), because for practical purposes that resolves

12  everything.  Is that right?

13      MR. FUNKHOUSER:  That's correct.

14      THE COURT:  Okay.

15      MR. BAREFOOT:  Good morning, Your Honor, Luke

16  Barefoot for the record from Cleary Gottlieb on behalf of

17  the junior underwriters.

18      Your Honor, the junior underwriters I want to make

19  clear at the outset are not making this claim in respect of

20  their capacity as underwriters of vis-à-vis the issuer,

21  LBHI.

22      Counsel for the trustee focused on many of the

23  cases, such as Jacom and other cases which focused on the

24  debtor's securities being underwritten.

25      The nature of our claim against LBI is in its

1  capacity as a co-underwriter of the claim.  Not as an

2  affiliate of LBHI, but in its capacity as a broker/dealer to

3  underwrite securities, that in this case happened to be the

4  securities of LBHI.  The -- LBI also was the vast --

5  underwrote the vast majority both by percentage and by

6  amount of the offerings that are at issue.

7          I want to focus, Your Honor, on 510(b) and on

8  separating out what I think are two different parts of the

9  statute, because I think in the presentations today from the

10  trustee there was a telling disconnect.

11          The trustee very quickly and correctly marched

12  through the first part of the statute, which is what types

13  of claims are potentially subject to 510(b)?

14          They're correct that there's no dispute that these

15  are claims for reimbursement of -- or contribution, that

16  they're on account of damages for the purchase of a

17  security, and that the security is an affiliate of the

18  debtor.  But that's not enough.  You have to go to the

19  second part of the statute which addresses to what extent

20  claims that otherwise fit within the first half of the

21  statute can be subordinated and to what level they can be

22  subordinated?

23          I think it's also telling, Your Honor, that the

24  trustee is not specifying to what level the claim should be

25  subordinated, and instead is focusing on a results-oriented

1  outcome that says you only need to subordinate them below

2  general creditor claims because that effectively lows to

3  disallowance.

4        THE COURT:  Why isn't that enough?

5        MR. BAREFOOT:  Because that's not what 510(b)

6  says.  510(b) does set up a very specific priority scheme

7  that is based on the nature and priority of the security

8  that gave rise to the claim.  Those securities are bonds and

9  preferred stock of LBHI.  Those securities, as the trustee

10  correctly conceded, and as they've gone to pains to point

11  out in many other context, have no place in this SIPA

12  proceeding.  So there's no way to apply the literal terms of

13  the statute that 510(b) would contemplate subordination to

14  or below the level of those securities.

15        The only textual hook that the trustee attempted

16  to offer for the first time today was that because those

17  claims don't exist you subordinate them to zero.  And the

18  reason that doesn't work is because subordination is an

19  inherently relative concept.

20        What the trustee would impose would amount to

21  disallowance.  This isn't about disallowance, this is about

22  subordination, and you can't subordinate something to a

23  claim that doesn't exist.

24        What the trustee in effect attempts to do is to

25  create an unspecified shadow class that sits below the

1    general creditor claims and is entirely disconnected from

2    the nature and the priority of the securities that the

3    junior underwriters sold and that gave rise to the claim.

4            THE COURT:  Let me -- let me ask you this, because

5    I'm slightly confused as to whether or not you are

6    responding to the argument that was made during the Claren

7    Road phase of today's hearing or whether or not you are

8    responding to the argument that was most recently made

9    before you stood up.

10           And because you were the one who sought to have

11   this all together as one proceeding I just want to be clear

12   that you haven't effectively adopted that position for

13   purposes of your own argument.  Because I view this as -- we

14   can hear whatever you want to say -- but I view this as

15   related arguments relating to comparable issues of

16   subordination but with different factual predicates, and I

17   just want to be clear I'm understanding what you're telling

18   me.

19           MR. BAREFOOT:  Your Honor, it is different factual

20   predicates, but those factual predicates have the exact same

21   result where the root of the problem that Your Honor

22   identified and that I don't want to dance around, I want to

23   focus on, is the subordination terms relative to the

24   security that gave rise to the claim.  And the security that

25   gave rise to the claim is a security of LBHI which doesn't

1 exist in this case.

2          THE COURT:  Well is that true in a setting in

3 which we're talking about a claim for reimbursement or

4 contribution?  And as I understand it your clients' claim is

5 a claim against LBI as co-underwriter for damages incurred

6 by virtue of having participated in that underwriting of

7 these LBHI securities, correct?

8          MR. BAREFOOT:  That's correct, Your Honor.

9          THE COURT:  And since that is a claim that arises

10 from the actual sale of securities and they are actually

11 securities of an affiliate of the debtor and they are

12 actually claims for reimbursement and contribution that in

13 fact tie down to the sale of the securities, why does it

14 matter for purposes of subordination?  Because a literal

15 reading of 510(b) would say you're at least below general

16 unsecured claims, and why do we have to otherwise rank them?

17          MR. BAREFOOT:  I disagree, Your Honor.  Because

18 the claims that we -- the securities that we underwrote that

19 gave rise to the claim are not LBI securities.

20          THE COURT:  I understand --

21          MR. BAREFOOT:  They're LBHI securities.

22          THE COURT:  -- they're in a different stack.

23          MR. BAREFOOT:  Exactly.  And if you -- if you read

24 510(b) it requires you to subordinate to or below the level

25 of such security.  That security, that LBHI bond has no

Page 50

1    place in this LBI capital structure.

2            THE COURT:  That's exactly what I was saying

3    during the Claren Road argument in an attempt to understand

4    how properly to scan the language of the statute, and I

5    suggested, without having a basis for the suggestion other

6    than I was being transparent in my thoughts, that when the

7    affiliate language was added to 510(b) there may not have

8    been full attention paid to how to address what occurs when

9    we're dealing not with debtor securities but affiliate

10   securities.

11           But it's nonetheless the case that the mandate of

12   510(b) applies to affiliate securities, and it's absolutely

13   clear based upon the position that the claims being made

14   here arise out of the sale of affiliate securities, and the

15   affiliate in question is the ultimate parent of LBI, and

16   presumably the proceeds realized from the sale of these LBHI

17   securities funded the operation of LBI.

18           So under these circumstances you're making what

19   amounts to what a certain Supreme Court justice might

20   describe as a hyper technical argument in respect of how the

21   statute should be interpreted that defies common sense,

22   because the purpose here is to subordinate your very

23   reimbursement claim, which is what the statute asks me to do

24   and which I could easily do with putting my hammer down if I

25   had one.

08-13555-mg Doc 46973-4 Filed 11/17/14 Entered 11/17/14 18:05:00 Exhibit D
Pg 52 of 60

1      MR. BAREFOOT:  Your Honor, but subordinate to

2   where?  Subordinate to the level or below the level of such

3   security.  That security isn't here.

4      THE COURT:  So does that mean -- and let's just

5   take this to its logical conclusion -- if we're dealing with

6   any case involving an affiliate security we are dealing with

7   a security that does not participate as a security of the

8   debtor.  So how do you make logical sense out of 510(b) if

9   you assume that there is this ambiguity in it unless you

10   apply it as it's written?

11      MR. BAREFOOT:  Well you can't apply it as it's

12   written because --

13      THE COURT:  Does that mean that the statute is a

14   nullity?

15      MR. BAREFOOT:  No, the trustee has suggested that

16   we're attempting to read the affiliate of the debtor

17   language out of the statute.

18      THE COURT:  Yes, that is what you're doing I

19   believe.

20      MR. BAREFOOT:  Well, Your Honor, I think that it's

21   just that there's a more narrow universe of claims, and I

22   think Your Honor hit it on the head of one example, which is

23   if there were substantive consolidation, then you could --

24   because then the securities of LBHI would have a place in

25   the capital structure, the cases would be together, and you

```
 1    could apply the text of 510(b) to subordinate to the level

 2    of that security or below it.  When those securities don't

 3    exist you can't do that.  And conversely the trustee

 4    suggests that we're trying to read that portion out of the

 5    statute, but the trustee is trying to read the entire

 6    priority scheme out of the statute and suggesting that you

 7    don't have to worry about where you subordinate it to even

 8    though the statute turns on the level of the security for

 9    subordination and instead you just subordinate it to zero or

10    to a level that's below any -- any creditor class that's in

11    the money.

12              I also want to briefly address, Your Honor, the

13    trustee suggested that the subordination is required because

14    of this Court's prior orders on other omnibus objections.

15    They cited to the one hundred and first and the one hundred

16    and thirty-first omnibus claims objections.  Nothing in

17    those orders speak at all to subordination.

18              The trustee's objection in that -- in both of

19    those instances moved in the alternative for the mutually

20    exclusive remedies of either subordination or expungement

21    and disallowance.  And each of those orders is very clear

22    that the objection is granted, to the extent set forth in

23    the order, and that the claims are disallowed and expunged.

24              So there's no basis for any suggestion that Your

25    Honor has already directed subordination of other similar
```

1    claims or that allowing these claims without subordination

2    would somehow result in some sort of unequal treatment or

3    inconsistency with any prior orders.

4        Your Honor, I also want to address -- Mr. King

5    already addressed the disconnect in VF Brands, which just as

6    with his claims it results in the same issue with our claims

7    in that the Court substituted the claims of money trust for

8    the claims of such security when money trust did not have

9    claims against -- have securities that were issued by the

10   debtor.

11        The only other textual point that I wanted to

12   address from VF Brands is the suggestion that because the

13   default at 510(b) is to common stock the Court could simply

14   subordinate to the level of common stock.  And that's simply

15   inapplicable to our claims where our clients did not

16   underwrite common stock but rather other senior classes of

17   securities of LBHI.

18        So if the Court or the trustee wants to engraph

19   the capital structure of LBHI onto LBI we may be subordinate

20   to senior notes of LBHI, but that doesn't make it

21   subordinate to general creditors of LBHI.

22        THE COURT:  Well let's look at the SIPA

23   distribution regime, which essentially -- and I may be

24   oversimplifying it -- is customers have priority and

25   everybody else participates as a general creditor, and

1   happily, for purposes of this administration, there appears

2   to be some prospect that general creditors will receive a

3   distribution, otherwise we wouldn't be having the argument

4   we're having today.

5           So this is a very successful, perhaps the most

6   successful in history liquidation of a major broker/dealer,

7   and we're dealing with a very nuanced question of what the

8   right answer should be when underwriters are seeking

9   reimbursement from a SIPA estate in respect of alleged co-

10  underwriter liability.  And it's pretty clear that if you're

11  going to follow the directives of 510(b) it is contemplated

12  that claims such as the one that you're making would be

13  subordinated to something.  And what you're saying is that

14  as a technical matter in reading this language of the

15  statute it doesn't neatly fit and as a result you shouldn't

16  be subordinated at all.

17          MR. BAREFOOT:  Not pursuant to 510(b), because

18  510(b) sets up a specific priority scheme that simply

19  doesn't fit the bill, and you can't -- and the other

20  alternative, Your Honor, is that if you do want to engraph

21  the capital structure and the priority scheme of LBHI into

22  this LBI case the claims -- many of the securities that were

23  underwritten were LBHI senior notes.  So if we want to be

24  junior to those that would put us into the general creditor

25  pool at the LBHI level, not at the subordinate to the

1    general creditor pool.

2              THE COURT:  But there's no authority for

3    engrafting the capital structure of an affiliate into the

4    debtor.

5              MR. BAREFOOT:  There's not, and for that precise

6    reason the fact that there is no security represented in

7    this case to which we can be subordinated means that we

8    cannot be subordinated if the hook for subordination is

9    510(b).

10             THE COURT:  That's kind of an extreme argument.

11   You're basically arguing impossibility that the statute as

12   written is so hard to apply that you should get the benefit

13   of no subordination whatsoever.

14             MR. BAREFOOT:  I don't believe that it's an

15   unbelievable argument, it's simply that the statute --

16             THE COURT:  I didn't say it was unbelievable.

17             MR. BAREFOOT:  I didn't mean to misquote --

18             THE COURT:  I believe it.  I believe you're making

19   that argument.

20             MR. BAREFOOT:  It's simply that the statute sets

21   up a specific circumstance and a specific set of claims to

22   which our claims should be subordinated.  If those claims do

23   not exist you simply can't apply the statute.  It's really

24   no different than Mr. King's argument.  There may be factual

25   differences, but the text of 510(b) applies with equal force

1    to both of our claims.

2              THE COURT:  Okay.  I mean I'm obviously sensitive

3    to the issue having raised it earlier myself.

4              MR. BAREFOOT:  Your Honor, I'll take direction,

5    but I am prepared to address the contingency and the

6    contractual basis for the claim.  I think that there were

7    some new arguments raised in reply on the trustee's part

8    that I'm happy to address, to the extent Your Honor has

9    questions or would like those addressed.

10             THE COURT:  I frankly think that we don't need to

11   dwell on those separate legal issues unless you feel

12   inclined to do so, because I view the key to the current

13   debate being rather concisely within 510(b).

14             MR. BAREFOOT:  Very good, Your Honor.

15             The only final point that I would make is that

16   there is a distinction between LBI as co-underwriter and

17   LBHI as issuer.

18             If we were in the LBHI case there's no question

19   that our claims would be subordinated and 510(b) makes very

20   clear where they would be subordinated.

21             Here even though we underwrote a very small

22   portion of the claims we suffered the lion's share of the

23   liability compared to the 70- or 90,000 that the trustee

24   suffered in getting the claims against it voluntarily

25   withdrawn.  And all that our claims are seeking to do is to

08-01420-scc Doc 8252 Filed 02/18/14 Entered 02/18/14 10:44:22 Main Document
Pg 58 of 61

1    rectify that in a qualify through the contribution mechanism

2    that's set forth in the master agreement among underwriters.

3              THE COURT:  Okay.  Thank you.

4              MR. DORCHAK:  Good morning, Your Honor, Joshua

5    Dorchak of Bingham McCutchen for UBS Financial Services,

6    Inc.

7              I feel like first -- first Mr. Funkhouser didn't

8    see fit to address the matters that I was specifically

9    prepared to address and now it sounds like Your Honor

10   doesn't need to hear them either, because really the main

11   point of my presentation was going to be to focus on those

12   issues that were specific to UBS, which has a different

13   contract than the junior underwriters do with LBI.  But I'm

14   also willing not to take up time on issues that others don't

15   want to take up time on.

16             The only thing I have to say in this case is that

17   I support the arguments made on this side of the room on the

18   510(b) issue to this point.  And the only thing I can add,

19   the only thing that occurred to me while I was sitting and

20   listening to what was a great debate was in this -- if we

21   can agree that there's an argument in the Claren Road case

22   that says it's just happenstance that these bonds that were

23   the subject of the failed trade were LBHI bonds.  I think

24   there's an equally strong argument to say that the

25   underwriters have a happenstance argument as well.  We have

08-01420-scc Doc 8252 Filed 02/19/14 Entered 02/19/14 10:44:22 Main Document
Pg 59 of 60
08-13555-mg Doc 46973-4 Filed 08/14/14 Entered 08/14/14 18:05:00 Exhibit D
Pg 59 of 60

1    a -- we're suing after all not because we all invested in

2    LBHI together, but because there's a -- the co-underwriters

3    have liability to each other for some harm that was felt by

4    others.  It happens to be with respect to the co-

5    underwriting of LBHI bonds, but I'm not sure that it makes

6    any difference.

7           And so if we have a happenstance argument then we

8    get to the same rational sort of step by step analysis that

9    Your Honor was doing in the first place.  Well maybe

10   affiliates doesn't work in the last portion of section

11   510(b) and maybe there's a reason while it doesn't work,

12   because maybe it shouldn't just always apply in a knee jerk

13   way.

14          So again, the argument was good and I don't want

15   to take up more of Your Honor's time unless you want to take

16   up mine, but I did want to add that one thought.

17          Anything further?

18          THE COURT:  No, that was fine.

19          MR. DORCHAK:  Thank you.

20          THE COURT:  Nice and brief.  Is there anything

21   more?

22          UNIDENTIFIED SPEAKER:  Nothing further.

23          THE COURT:  I'm going take this all under

24   advisement, and there's a very good chance that there'll be

25   a decision before January 31.  I think there has to be a

1    decision before January 31.  And we're adjourned, unless

2    there's anything more.

3          (A chorus of thank you)

4          (Whereupon, these proceedings concluded at 11:36 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6    Dawn South

    Digitally signed by Dawn South
    DN: cn=Dawn South, o=Veritext,
    ou, email=digital@veritext.com,
    c=US
    Date: 2014.01.09 11:40:04 -05'00'

7

8

9    AAERT Certified Electronic Transcriber CET**D-408

10

11   Veritext

12   330 Old Country Road

13   Suite 300

14   Mineola, NY  11501

15

16   Date:  January 9, 2014

17

18

19

20

21

22

23

24

25