## **Exhibit F**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Mitchell A. Lowenthal
Luke A. Barefoot

*Counsel for the Junior Underwriters*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                     :

In re                                  :

                                   :

LEHMAN BROTHERS INC.,           :   Case No. 08-01420 (JMP) SIPA

                                   :

             Debtor.            :

                                   :

-------------------------------------------------------------------- X

## RESPONSE OF UNDERWRITER CLAIMANTS TO THE TRUSTEE'S ONE HUNDRED FOURTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| BACKGROUND | 2 |
| ARGUMENT | 4 |
| A. The Junior Underwriters Have Enforceable Contractual and Statutory Claims for Contribution from LBI | 4 |
| B. The Claims Are Fixed and Non-Contingent | 12 |
| C. Section 510(b) of the Bankruptcy Code Does Not Apply to the Claims | 15 |
| CONCLUSION | 21 |
| APPENDIX A | A-1 |
| APPENDIX B | B-1 |
| APPENDIX C | C-1 |

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 77k(f) ................................................................................................ passim

11 U.S.C. § 502(e)(1)(B) .................................................................................... 10, 12

11 U.S.C. § 510(b) .............................................................................................. passim

**Cases**

Caminetti v. United States,
242 U.S. 470 (1917) ............................................................................................ 16

Employers Ins. of Wausau v. Musick, Peeler & Garrett,
954 F.2d 575 (9th Cir. 1992) .............................................................................. 8, 9, 20

Heizer Corp. v. Ross,
601 F.2d 330 (7th Cir. 1979) .............................................................................. 8

In re Apco Liquidating Trust,
370 B.R. 625 (Bankr. D. Del. 2007) .................................................................. 12

In re Betacom of Phoenix,
240 F.3d 823 (9th Cir. 2001) ............................................................................. 17-18

In re Del-Val Fin. Corp. Sec. Litig.,
868 F. Supp. 547 (S.D.N.Y. 1994) .................................................................... 9, 10

In re Drexel Burnham Lambert Group Inc. ("Drexel I"),
146 B.R. 98 (Bankr. S.D.N.Y. 1992) ................................................................. 13, 14

In re Drexel Burnham Lambert Group Inc. ("Drexel II"),
148 B.R. 982 (Bankr. S.D.N.Y. 1992) ............................................................... 14

In re Enron Corp.,
341 B.R. 141 (Bankr. S.D.N.Y. 2006) ............................................................... 15

In re G. Marine Diesel Corp.,
155 B.R. 851 (Bankr. E.D.N.Y. 1993) ............................................................... 11

In re Hemingway Transp., Inc.,
993 F.2d 915 (1st Cir. 1993) .............................................................................. 13

In re Jacom Computer Servs.,
280 B.R. 570 (Bankr. S.D.N.Y. 2002) ...................................................................... 20

In re Med Diversified, Inc.,
461 F.3d 251 (2d Cir. 2006)................................................................................ passim

In re Mid-Am. Waste Sys., Inc.,
228 B.R. 816 (Bankr. Del. 1999) ............................................................................ 20

In re RNI Wind Down Corp.,
369 B.R. 174 (Bankr. D. Del. 2007) ........................................................................ 13

In re Telegroup, Inc.,
281 F.3d 133 (3d Cir. 2002) .................................................................................... 19

In re VF Brands, Inc.,
275 B.R. 725 (Bankr. D. Del. 2002) .................................................................... 18, 19

Kirke La Shelle Co. v. Paul Armstrong Co.,
177 N.E. 163 (N.Y. 1933)......................................................................................... 7

Liggett & Myers, Inc. v. Bloomfield,
380 F.Supp. 1044 (S.D.N.Y. 1974) ............................................................................ 9

Market Street Assoc. Ltd. P'ship v. Frey,
941 F.2d 588 (7th Cir. 1991) ..................................................................................... 7

McCoy v. Goldberg,
778 F.Supp. 201 (S.D.N.Y. 1991) ............................................................................. 8

Musick, Peeler & Garrett v. Employers Ins. of Wausau,
508 U.S. 286 (1993).............................................................................................. 8, 9

Odette v. Shearson, Hammill & Co., Inc.,
394 F.Supp. 946 (S.D.N.Y. 1975) .......................................................................... 8-9

Smith v. Mulvaney,
827 F.2d 558 (9th Cir. 1987) ........................................................................... 8, 9, 10

Spanos v. Skouras Theatres Corp.,
364 F.2d 161, 169 (2d Cir. 1966) .............................................................................. 7

United States v. Ron Pair Enterprises, Inc.,
489 U.S. 235 (1989)................................................................................................ 16

**Other Authorities**

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ................................................. 13

Mark P. Kronfeld, Vincent Indelicato, & Chris Theodoridis, <u>The Murkiness of Corporate
Separateness in Chapter 11</u>, 32 Am. Bankr. Inst. J. 46 (2013) ......................................... 19

William O. Douglas & George E. Bates, <u>The Federal Securities Act of 1933,</u>
43 Yale L. J. 171 (1933) ...................................................................................... 8, 9

ANZ Securities, Inc., BMO Capital Markets Corp. (f/k/a Harris Nesbitt Corp.), BNY Mellon Capital Markets, LLC, Cabrera Capital Markets, LLC, DnB Nor Markets, Inc., BNP Paribas FS, LLC (as successor in interest to Fortis Securities, LLC, f/k/a Fortis Investment Services, LLC), nabSecurities, LLC (f/k/a nabCapital Securities, LLC), National Australia Bank Ltd., National Financial Services, LLC, SunTrust Robinson Humphrey, Inc., and The Williams Capital Group, L.P. (collectively, the "Junior Underwriters") hereby file their response (the "Response") in opposition to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) (the "Objection"), (D.I. 6768), to the extent that the Objection pertains to Claims No. 5678, 5133, 5682, 5683, 4360, 5686, 4944, 5127, 5738, 5673, 5841, and 5667 (collectively, the "Claims") filed by the Junior Underwriters against Lehman Brothers Inc. ("LBI"), the Debtor in the above-captioned SIPA proceeding.[1] In support of this Response, the Junior Underwriters respectfully state as follows:

## PRELIMINARY STATEMENT

1.    In a results-oriented effort to expunge or subordinate the Claims, the Objection ignores both the clear contractual and statutory bases on which the Claims are asserted and have become liquidated, as well as the basic inapplicability of Section 510(b). The Claims are based on the Junior Underwriters' enforceable right to contribution from LBI for losses incurred by the Junior Underwriters in defending and settling certain lawsuits related to the offering of securities of Lehman Brothers Holdings Inc. ("LBHI"), nearly ninety percent of which were underwritten by LBI. The Junior Underwriters' rights to contribution from LBI arise from: (1) binding contracts between LBI and the Junior Underwriters; and (2) Section 11(f) of the Securities Act of

---

[1]      The Response is joined in relevant part by UBS Financial Services Inc. ("UBS FS"), which also files its own response in opposition to the Objection to the extent that the Objection pertains to Claim No. 5275 filed by UBS FS against LBI.

1933, 15 U.S.C. § 77k(f). Moreover, the Claims are plainly not contingent, where the Junior

Underwriters have already incurred substantial out-of-pocket costs in connection with these

lawsuits, and LBI's liability to share in these losses is set by contract such that the Claims do not

depend on any future determination. Finally, the Claims arise from the purchase or sale of

securities issued by LBHI, rather than LBI, which do not represent any claims or interests in this

SIPA proceeding. As such, it is impossible to subordinate the Claims below the level of "such

securities," rendering both the plain text as well as the statutory purpose of Section 510(b) of the

Bankruptcy Code inapplicable.

## **BACKGROUND**

2.     Between 2006 and 2008, LBI was – by many orders of magnitude – the largest

underwriter of numerous offerings of registered securities issued by its corporate parent, LBHI.

See, e.g., Declaration of Peter Fox, Attached as Exhibit A ("Fox Decl."), Exs. 2-26.[2] LBI was

the lead underwriter in all of these offerings that underpin the Claims. See id.

3.     In order to participate in LBI-led offerings during this time period, each of the

Junior Underwriters was required by LBI to enter into the Lehman Brothers Inc. Master

Agreement Among Underwriters, dated December 1, 2005 ("MAAU"). See id., Ex. 1 (MAAU

Preamble); id. (MAAU § 12.8 ("Execution in Counterparts")). The MAAU governed the

relations between underwriters in all LBI-led offerings, see id., Ex. 1 (MAAU Preamble), and

contained provisions that remained in effect long after any particular offering had closed, see id.

(MAAU § 9.8 ("Survival of Agreements")). Among other things, the MAAU contained

provisions that required each underwriter to contribute, based on its agreed percentage

participation in an offering, towards any losses or liabilities incurred by another underwriter

---

[2]     For the convenience of the Court, a tabular summary of the relevant offerings of LBHI securities is
attached as Appendix A.

arising from allegations that the offering materials contained untrue statements or omissions. See id. (MAAU, § 9.5 ("Contribution. Notwithstanding any settlement on the termination of the applicable AAU, each Underwriter agrees to pay upon request of the Manager, as contribution, its Underwriting Percentage of any losses, claims, damages or liabilities, joint or several, paid or incurred by any Underwriter to any person other than an Underwriter, arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement...")). Notably, these contribution provisions survive termination, and do not require any final finding of fault or liability. Instead, an underwriter's obligation to contribute is triggered by losses arising from alleged untrue statements or omissions of material fact contained in offering materials. Id.

4.      Each of the Junior Underwriters accepted LBI's invitations to participate in various offerings of LBHI Securities, see id., Exs. 2-26, and, in so doing, agreed to the terms of the of MAAU, see id., Ex. 1 (MAAU § 12.8).

5.      After LBHI commenced its separate Chapter 11 proceedings in September 2008, a number of investors filed lawsuits, including class actions, against the Junior Underwriters. These actions alleged, inter alia, that LBHI's offering documents contained material misstatements and omissions, and that the Junior Underwriters – in their capacities as underwriters of LBHI-issued securities – were liable for damages under Section 11 of the Securities Act of 1933 ("Actions"). See App. B.[3] In response to the Actions, the Junior Underwriters retained counsel to investigate and defend the investors' claims against them.

6.      Litigation related to the Actions proved complex and protracted, and, to date, the Junior Underwriters have collectively incurred nearly $78 million of losses in the form of legal

---

[3]      For the convenience of the Court, a table of the Actions by caption and docket number is attached as Appendix B.

fees and settlement payments. <u>See</u> Declaration of Hayden McNamara, attached as Exhibit B; Declaration of Michael G. Zeiss, attached as Exhibit C; Declaration of Julie Lauck, attached as Exhibit D; Declaration of Jonathan R. Goldblatt, attached as Exhibit E; Declaration of Andrew Druch, attached as Exhibit F; Declaration of Mark Jensen, attached as Exhibit G; Declaration of Richard Rauchenberger, attached as Exhibit H; Declaration of Woodruff Polk, attached as Exhibit I; Declaration of Patrick Wo, attached as Exhibit J; and Declaration of William Nurthen, attached as Exhibit K (collectively, the "<u>Junior Underwriter Decls.</u>").[4] LBI, which was not named as a defendant in the Actions because of the automatic stay associated with this proceeding, has not shared in the Junior Underwriters' defense costs or contributed to their settlements. For its part, LBI has identified only the legal costs associated with obtaining withdrawal of claims asserted against LBI by certain plaintiffs in the Actions – approximately $93 thousand – which amounts to a tiny fraction of the Junior Underwriters' costs.[5]

## ARGUMENT

### A. The Junior Underwriters Have Enforceable Contractual and Statutory Claims for Contribution from LBI

7.      In asserting that LBI has no liability for the Claims, the Objection ignores both the contractual and federal statutory rights that the Junior Underwriters have to contribution from LBI. Their contractual right to contribution springs from the plain terms of the MAAU, and their statutory right to contribution is found in Section 11(f) of the Securities Act of 1933. These rights attach regardless of whether there was a final determination that LBHI's offering materials

---

[4]      For the convenience of the Court, a tabular summary of the losses, costs and expenses incurred by the Junior Underwriters, full details of which are provided in the Junior Underwriter Declarations, is attached as Appendix C.

[5]      In lieu of formal discovery, the LBI Trustee agreed to voluntarily provide this loss figure to the Junior Underwriters, which his counsel has confirmed represents the identified amount of losses, claims damages or liabilities suffered by LBI in connection with the Actions and related proofs of claim asserted in this proceeding. <u>See</u> Fox Decl., Ex. 27.

contained false statements or omissions, and they are not satisfied until LBI has paid its proportional share of the costs associated with Actions – something that has yet to happen. As of today, the Junior Underwriters have paid almost $78 million. By contrast, LBI, which underwrote the overwhelming majority of the LBHI securities at issue (and received the lion's share of related underwriting fees), has identified only $93 thousand in losses that it incurred. Moreover, because the SIPA claims filed by certain plaintiffs in the Actions have now been withdrawn, (see D.I. 6595 (Notice of Resolution of Trustee's Seventy-Ninth Omnibus Objection to General Creditor Claims (No Liability Claims))), there is no prospect that the LBI estate's losses in relation to the Actions will ever approach those of the Junior Underwriters.

Contractual Right to Contribution

8.      The MAAU requires LBI to pay, as contribution, its underwriting percentage of the Junior Underwriters' out-of-pocket expenses in the Actions. This obligation arises from the unambiguous language of Section 9.5 of the MAUU, which makes clear that, for each offering, each underwriter is responsible for its underwriting percentage of each other underwriters' losses related to alleged misstatements and omissions contained in the offering materials. The provision applies to every offering on which the Junior Underwriters were sued, and remains in effect to this day.

9.      Section 9.5 of the MAAU bears the heading, "Contribution," and states in relevant part:

> Notwithstanding any settlement on the termination of the applicable AAU, each Underwriter agrees to pay upon request of the Manager, as contribution, its Underwriting Percentage of any losses, claims, damages or liabilities, joint or several, paid or incurred by any Underwriter to any person other than an Underwriter, arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement [or other offering materials] or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading.

5

Fox Decl. Ex. 1 (MAAU § 9.5).

10.     There is no ambiguity about what Section 9.5 requires.  First, all underwriters must contribute toward "any losses, claims, damages or liabilities, joint or several, paid or incurred" by any other underwriter as a result of alleged misstatements or omissions in the offering materials.  Second, the amount of such contribution is fixed by the percentage of the offering underwritten by the contributing underwriter – that underwriter's "Underwriting Percentage." [6]  As such, when an underwriter is alleged to have violated Section 11 of the Securities Act – the language of which Section 9.5 tracks word-for-word – each other underwriter must contribute to that underwriter's losses arising from defense and resolution of the lawsuit.  The amount of contribution one underwriter owes to another underwriter is set at the contributing underwriter's agreed underwriting percentage – a figure that is already established on the face of the offering materials.  Thus, contrary to the Trustee's contentions, LBI's responsibility to make fixed contribution payments is established by the terms of the MAAU regardless of whether there has been a final judicial determination either as to whether the offering materials contained false statements or omissions or as to LBI's proportionate share of any damages arising therefrom.

11.     These MAAU terms were fully incorporated into each offering-specific agreement among underwriters, see id. (MAAU Preamble), and so they bound LBI and participating Junior Underwriters in every offering at issue in the Actions.  As Section 9.5 survived termination, it continues to apply to the Claims.  See id. (MAAU § 9.8 ("Survival of Agreements")).

---

[6]     "Underwriting Percentage" is defined in the MAAU to mean the ratio which the contributing underwriter's purchase obligation bears to the total amount of securities issued in a given offering.  See Fox Decl., Ex. 1 (MAAU § 1.1).

12. While Section 9.5 contemplates that the required contribution payments would be made "upon request of the Manager" (i.e., LBI, see id. (MAAU § 1.1 ("Certain Definitions"))), this language does nothing to absolve LBI of liability, nor does the Objection suggest as much. As an initial matter, it is incongruous to require LBI to "request" contribution of itself, and to do so would be a purely formalistic exercise.[7] Moreover, the "upon request of the Manager" device must be read in conjunction with other provisions in the MAAU that require that LBI, as manager, to investigate any relevant allegations concerning the offering materials, retain counsel on behalf of the underwriting syndicate and defend the syndicate in any such actions. See id. (MAAU §§ 9.3 ("Post Settlement Expenses") and 9.6 ("Procedure")). As a result of the commencement of these SIPA proceedings, LBI did not perform these functions nor request contribution from other underwriters for related costs and expenses. To permit LBI to evade its contribution obligations based on its own failure to perform under the MAAU would effectively permit LBI to benefit from its own breach. See Market Street Assoc. Ltd. P'ship v. Frey, 941 F.2d 588, 592 (7th Cir. 1991) (holding that "a contracting party cannot be allowed to use his own breach to gain an advantage by impairing the rights that the contract confers on the other party" (citing Spanos v. Skouras Theatres Corp., 364 F.2d 161, 169 (2d Cir. 1966))); see also Kirke La Shelle Co. v. Paul Armstrong Co., 177 N.E. 163, 167-68 (N.Y. 1933) (holding that a party that breached its obligations under a contract cannot rely on that breach to avoid its obligations under the contract). Finally, Sections 9.3 and 9.6 of the MAAU evince the parties' intent that LBI

---

[7] Moreover, it is not clear that LBI even remains the "Manager" for the purposes of the MAAU. Section 9.9 of that document provides for the replacement of the Manager in the event that LBI settles, but other underwriters do not settle, a lawsuit against the underwriting syndicate. See Fox Decl., Ex. 1 (MAAU § 9.9 ("Replacement of Manager")). As noted above, while LBI was not named as a defendant in the Actions, certain plaintiffs in those Actions did file proofs of claim against the LBI estate, which the LBI Trustee successfully had withdrawn, effectively "settling" the Actions in relation to it. To the extent that LBI is no longer the Manager, the new Managers among the Junior Underwriters, by and through the Claims, have requested that LBI contribute as required by Section 9.5.

ensure that the costs and benefits of mounting a defense to a Section 11 action be fairly

distributed throughout the underwriting syndicate. This responsibility includes enforcement of

the MAAU's contribution provision – even against itself.

Statutory Right to Contribution

13.     While the terms of the MAAU alone provide a clear basis for liability, the Junior

Underwriters also have an independent right to contribution from LBI under Section 11(f) of the

Securities Act of 1933. In relevant part, Section 11(f) provides that any person who makes "any

payment under this section may recover contribution as in cases of contract from any person

who, if sued separately, would have been liable to make the same payment. . .." 15 U.S.C.

§ 77k(f)(1).

14.     From the Securities Act's inception, it has been understood that Section 11(f)

allows for defendants sued under Section 11(a) to seek contribution in a separate action from

parties who have not been named directly in an action by the plaintiffs, but who would have been

jointly or severally liable if they had been named. See, e.g., William O. Douglas & George E.

Bates, The Federal Securities Act of 1933, 43 Yale L. J. 171, 180-81 (1933); Employers Ins. of

Wausau v. Musick, Peeler & Garrett, 954 F.2d 575, 580 (9th Cir. 1992). There is substantial

precedent for free-standing or third-party actions for contribution under other analogous

contribution provisions contained in, or implied from, the Securities and Exchange Acts. See,

e.g., Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 288 (1993) (free-

standing action for contribution under Rule 10b-5); Smith v. Mulvaney, 827 F.2d 558, 559 (9th

Cir. 1987) (same); Heizer Corp. v. Ross, 601 F.2d 330, 334 (7th Cir. 1979) (same); McCoy v.

Goldberg, 778 F.Supp. 201, 203 (S.D.N.Y. 1991) (third-party action for contribution under Rule

10b-5); Odette v. Shearson, Hammill & Co. Inc., 394 F.Supp. 946, 958 (S.D.N.Y. 1975) (third-

8

party action for contribution under Rule 10b-5, Sections 12(2) and 17(a) of the Securities Act and Section 15(c) of the Exchange Act); <u>Liggett & Myers, Inc. v. Bloomfield</u>, 380 F.Supp. 1044, 1045 (S.D.N.Y. 1974) (third-party action for contribution under Rule 10b-5).

15.     Moreover, just as the terms of the MAAU do not require a final determination of fault, the fact that a party has settled the underlying securities action with the plaintiffs does not prevent it from seeking contribution under Section 11(f) or analogous provisions of the federal securities laws. <u>See</u> <u>In re Del-Val Fin. Corp. Sec. Litig.</u>, 868 F. Supp. 547, 553-54 (S.D.N.Y. 1994) (citing <u>Musick</u>, 508 U.S. at 288).

16.     These actions for contribution under the federal securities laws are not enforcement proceedings, but rather require a judicial determination of the parties' relative culpability. <u>See</u> <u>Musick</u>, 954 F.2d at 580 (citing <u>Smith</u>, 827 F.2d at 561); <u>cf.</u> <u>Del-Val</u>, 547 F.Supp. at 563-64 (settling defendants may seek contribution from non-settling defendants to the extent that settlement amount exceeds their proportional share of fault as determined by the jury after the non-settling defendants' trial). Where liability for the underlying alleged violation of securities law is strict, the relative culpability of the parties to a claim for contribution should turn on their relative degree of participation in the offending transaction – in this case their underwriting percentages.[8]

17.     There is no question here that, pursuant to various settlement agreements, the Junior Underwriters have become "liable to make [a] payment" to the plaintiffs in the Actions under Section 11. If LBI had been sued under Section 11 for its role as lead managing

---

[8]     The MAAU also supports a decision that the amount of contribution LBI owes to the Junior Underwriters under Section 11(f) should be set by its underwriting percentage in the offerings at issue in Actions. Although it represents the basis for a distinct claim for contribution, the MAAU's formula for calculating contribution indicates that the parties agreed about how they would share responsibility for alleged Section 11 violations among themselves. <u>Cf.</u> Douglas & Bates, <u>supra</u> at 178-79 ("[I]t is probable, though not certain, that parties liable on the registration statement may by contract allocate <u>inter se</u> their liability.").

underwriter of the securities at issue in the Actions, it too would have been liable to the plaintiffs. Thus, LBI is liable under Section 11(f) to contribute to the Junior Underwriters' for their settlement payments to the plaintiffs. Under principles of comparative fault, the amount of LBI's contribution should be set at no less than its underwriting percentage in the offerings at issue in the Actions.[9]

Nothing in the Objection Serves to Defeat the Basis for the Claims

18.    The Trustee's argument that the Junior Underwriters are not entitled to contribution from LBI because, "the alleged false statements and omissions have not been established," Objection ¶ 15, has no basis in either the MAAU or Section 11(f). There is nothing in the MAAU that makes an underwriter's right to contribution depend on a finding that the offering materials at issue actually contained false statements or omissions. On the contrary, Section 9.5 expressly requires contribution for losses associated with any "<u>alleged</u> untrue statement of a material fact" or "<u>alleged</u> omission." The fact that the Junior Underwriters have been hailed into court to defend against accusations that they violated Section 11 is by itself sufficient to trigger the MAAU's contribution provision. Similarly, as discussed above, a defendant's settlement of Section 11 claims – and concomitant denial of wrongdoing – does not prevent it from seeking contribution under Section 11(f) for those settlement payments from other parties who could also be liable to the plaintiff. See Del-Val, 868 F. Supp. at 554.

---

[9]    Should the Court decline to decide the parties' relative culpability on the basis of their underwriting percentages but also consider the parties' other conduct, cf. Smith, 827 F.2d at 562 (in deciding a claim for contribution based on Rule 10b-5, trial court should consider "evidence which either compares or allows a comparison of the extent of the fault" of the parties), the Junior Underwriters reserve the right to submit additional evidence concerning, inter alia, LBI's comparative knowledge and ability to verify the statements in the offering materials, LBI's relative opportunities to conduct due diligence concerning LBHI, and any role LBI, as an affiliate of LBHI, may have had in making or negligently failing to detect the allegedly false statements in the offering materials. Any such proceedings, however, should follow only if the Court determines at the initial hearing on the Objection that the underwriters' underwriting percentages are not determinative. See Local Rule 9014-2 (providing that absent prior order, the first scheduled hearing on a contested matter will not be an evidentiary hearing).

19. The Trustee also appears to contend that LBI has already paid its proportional share of the losses from the Actions and so it is not liable to the Junior Underwriters for contribution. See Objection ¶ 16. The evidence – which the Objection ignores – is to the contrary.[10] Since the beginning of the Actions, the Junior Underwriters have paid more than $77 million dollars to defend and settle claims based mostly on LBI's malfeasance. See generally Junior Underwriter Decls. LBI, which under the MAAU is responsible for nearly 90 percent of these costs, claims to have paid approximately $93 thousand – the cost of filing a single objection in this proceeding. Not only has LBI not yet paid its proportional share of the losses related to the Actions, it is now clear that, outside of the Claims, it never will. The proofs of claim asserted by certain plaintiffs in the Actions against LBI were voluntarily withdrawn, (see D.I. 6595), such that LBI faces no further liability with respect to the Actions. As such, to expunge the Claims would not only deprive Claimants of their contractual and statutory rights, it would enable LBI to retain the benefits of the fees earned in underwriting LBHI's securities while evading its proportional share of losses resulting from the Actions arising from those underwritings.[11]

---

[10] The Trustee is not only mistaken about the facts, he also reverses the applicable burden of proof. The Trustee asserts that the Junior Underwriters "have not met [their] burden" to "establish that they have paid more than their proportionate share of liability." Objection ¶ 16. To the contrary, under Section 502 of the Bankruptcy Code, it is the Trustee, as the objecting party, who has the burden to produce evidence sufficient to rebut the claimant's prima facie case. See In re G. Marine Diesel Corp., 155 B.R. 851, 853 (Bankr. E.D.N.Y. 1993). The Trustee thus has the burden to introduce sufficient evidence to rebut the Junior Underwriters' allegation that LBI has not paid its fair share. The Objection provides no details on any alleged losses LBI has suffered related to the Actions, let alone evidence of losses sufficient to cover LBI's responsibility for nearly 90 percent of the cost of the Actions.

[11] It bears mentioning that LBI has also not paid its proportional share of losses suffered by other junior underwriters as a result of the Actions. Several of these other underwriters have filed claims that remain pending against LBI, though they are not the subject of the Objection.

11

**B.    The Claims Are Fixed and Non-Contingent**

20.    In contending that the Claims are subject to Section 502(e)(1)(B) of the

Bankruptcy Code, 11 U.S.C. § 502(e)(1)(B), the Objection misconstrues both the content of the

Claims and the language of the code, which requires that contingency be determined only as of

the time of disallowance. The Claims are now plainly fixed and non-contingent and depend on

nothing more than the application of the terms of the MAAU.

21.    First, the Claims themselves belie any contention that "[t]he No Liability

Claimants acknowledge their claims are contingent and unresolved." Objection ¶ 21.  Indeed,

the Trustee appears to ground his position solely on the unremarkable fact that in 2009, when the

Claims were filed, the Junior Underwriters recognized that some portion of the Claims remained

unliquidated. See Objection ¶ 21. The Objection fails to mention, however, that in filing the

Claims, the Junior Underwriters also made clear that they had already made significant payments

in connection with the Actions. See, e.g., Attachment to Claim No. 5841 at 3 ("STRH has

incurred defense costs. . ..").  In any event, the Junior Underwriters do not now "acknowledge"

that the Claims are contingent or unresolved. They have paid more than $77 million to dispose

of the Actions, and, under Section 502(e)(1)(B), the contingency of a claim is determined "as of

the time of allowance or disallowance" – namely, the date of the Court's ruling on the

Objection – not at the time of filing. See In re Apco Liquidating Trust, 370 B.R. 625, 636

(Bankr. D. Del. 2007) ("The determination of whether the claim is contingent is made at the time

of allowance or disallowance of the claim, which courts have established is the date of the

ruling."). Whether the Claims were contingent in 2009 is thus irrelevant.

22.    Nor is there any support for the Trustee's argument that the Claims are contingent

because a court has not determined the Junior Underwriters' liability in the Actions. See

12

Objection ¶ 22.[12]  As discussed above, neither basis for the Claims turns on a judicial finding of the Junior Underwriters' liability.  Under the MAAU, the Junior Underwriters became entitled to contribution from LBI the moment they were named as defendants in the Actions; under Section 11(f) the right attached upon their settlement with the plaintiffs in the Actions.  Similarly, the absence of any judicial determination of the amount of LBI's liability on the Junior Underwriter's contribution claims is irrelevant, where the amount of money LBI is obligated to contribute is set by contract.

23.    Moreover, the Trustee's attempt to disallow the Claims under Section 502(e) is at odds with its statutory purpose, where the withdrawal of plaintiff's claims leaves no risk of double liability.  "The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against insolvent estates."  In re Hemingway Transp., Inc., 993 F.2d 915, 923 (1st Cir. 1993) (emphasis added); see also H.R. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977) (advocating that § 502(e)(1)(B) be enacted "to prevent competition between a creditor and his guarantor for the limited proceeds for the estate").  There is no such risk of a double recovery here because the plaintiffs in the Actions have either failed to file or have withdrawn their proofs of claim against LBI.

24.    While the Objection relies on In re Drexel Burnham Lambert Group Inc. ("Drexel I"), 146 B.R. 98 (Bankr. S.D.N.Y. 1992), and In re Drexel Burnham Lambert Group Inc. ("Drexel II"), 148 B.R. 982 (Bankr. S.D.N.Y. 1992), neither case compels a different result.

---

[12]    The argument is also undermined by the Trustee's own recognition that the Junior Underwriters and LBI are co-liable to the plaintiffs in the Actions.  See Objection ¶ 20 ("the second element of section 502(e)(1)(B) [co-liability] is also satisfied").  Of course, LBI is not co-liable with the Junior Underwriters to the Junior Underwriters' attorneys for legal fees.  See In re RNI Wind Down Corp., 369 B.R. 174, 187-91 (Bankr. D. Del. 2007) (overruling the plan administrator's objection to an indemnification claim for legal expenses because, among other things, the debtor was not co-liable, for the purposes of Section 502(e)(1)(B), to the claimants' attorneys).  Thus, even if the Claims were contingent – which they are not – the relevant portions of the Claims that represent the Junior Underwriters' legal expenses must still be allowed because of the absence of co-liability, which alone renders 502(e)(1)(B) inapplicable.

13

Indeed, Drexel I expressly recognizes that, when a party's liability for contribution is set by

contract, there is no need for a judicial determination of such liability and the claim for

contribution is not contingent. See 146 B.R. at 101. Lest there be any doubt, the court in Drexel

II actually allowed contribution claims based on a contract among underwriters. See 148 B.R. at

990.[13] Nor do Drexel I or Drexel II stand for the proposition that a contribution claim is

contingent unless or until the claimant's underlying liability to a third party is determined by a

court. On the contrary, in Drexel I, the court expressly rejected the argument that the claimant

was not liable to the plaintiff in the underlying securities action because it had settled the matter.

See 147 B.R. at 102. What matters for the purposes of Section 502(e)(1)(B) is that the Junior

Underwriters have incurred out-of-pocket expenses that trigger liability, not that there has been a

final determination on the merits of the Actions. Compare Drexel II, 148 B.R. at 987

(contribution claims disallowed as contingent where "payment has not been made to the plaintiff

in the underlying action") with id. at 990 (contribution claims allowable where payment had

been made to defense counsel even in the absence of judgment or settlement of the underlying

action).

25.     Finally, the Trustee's argument that the Claims are contingent because it has not

been established that LBHI cannot pay indemnification, see Objection ¶ 24, is irrelevant. The

---

[13]     To the extent that Drexel I holds that a non-contractual claim for contribution remains contingent until
another court has determined the extent of the debtor's liability, see 98 B.R. at 102-03, the case is wrongly decided.
In Drexel I, the court disallowed a non-contractual claim for contribution by a settling defendant in a securities case
on the grounds that no court had determined the relative fault of debtor, Drexel, vis-à-vis the claimant. See id. at
105. However, determining the parties' relative culpability is the central function of the court presented with a
contribution claim under the federal securities laws. See Musick, 954 F.2d at 580; Smith, 827 F.2d at 561. Thus,
both here and in Drexel I, it is and was the Bankruptcy Court's job to decide the parties' relative culpability in ruling
on the proof of claim where contribution rights were asserted. Had the claimants impled Drexel into their securities
case, the task would have fallen to that court; had they launched a free-standing action against Drexel in some other
federal district court, the parties relative culpability would have been determined there. The holding in Drexel I
leads only to an absurd result: The court would not rule on the claim because it believed that the claim was
contingent, but the claim remained contingent only because the court would not rule on it. Such circular reasoning
is not the law.

Claims are not based on any agreement with LBHI, nor does Section 9.5 of the MAAU or

Section 11(f) of the Securities Act require an underwriter to seek indemnification from an issuer

before pursuing contribution claims against another underwriter.

## C.   Section 510(b) of the Bankruptcy Code Does Not Apply to the Claims

26.    The Claims relate to the purchase of LBHI's securities, which do not represent

any claims or interests in this SIPA proceeding for LBI, rendering the plain text of Section

510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b), inapplicable.  This alone prevents

mandatory subordination.  Nor do the Claims implicate the two policy justifications to which the

Second Circuit has held any interpretation of the statute must conform: (i) the Junior

Underwriters never took on the risk and return expectations of a shareholder; and (ii) the Claims

do not seek to recover a contribution to the equity pool.  See In re Med Diversified, Inc., 461

F.3d 251, 256 (2d Cir. 2006).  Failing to grasp the import of these distinctions, the Trustee urges

the court to subordinate the Claims in an arbitrary fashion that would ignore the statutory text

and frustrate the clear policy underpinning Section 510(b).

27.    As the Trustee correctly notes, Congress enacted Section 510(b) "to prevent

disappointed shareholders from recovering their investment loss by using fraud and other

securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy

proceeding."  Objection ¶ 13 (quoting In re Enron Corp., 341 B.R. 141, 158 (Bankr. S.D.N.Y.

2006)).  Accordingly, Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from
> rescission of a purchase or sale of a security of the debtor or of an affiliate
> of the debtor, for damages arising from the purchase or sale of such a
> security, or for reimbursement or contribution allowed under section 502
> on account of such a claim, shall be subordinated to all claims or interests
> that are senior to or equal the claim or interest represented by such
> security, except that if such security is common stock, such claim has the
> same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

28.     Thus, if an investor claimant re-characterizes his claim as one for rescission, damages, or contribution related to the purchase or sale of his security, the claim is subordinated to "all claims or interests that are senior to or equal the claim or interest represented by such security." The statute knocks down the would-be bootstrapper in priority to below where he would have been had he simply based his claim on his ownership of the security. For this system to work – and the statute to apply – the security whose "purchase or sale" gives rise to the potentially subordinated claim must currently represent claims or interests in the same bankruptcy proceeding. Not only does the statutory text compel this result, but the Objection cites no case to the contrary.

29.     Subordination is inherently a relative concept – a court can only subordinate a claim to another claim or interest to another interest. For this reason, Section 510(b) expressly designates the claims to which a securities-related claim is subordinated: namely, those claims "represented by such security." If there are no claims "represented by such security" in the debtor's capital structure, the court has nothing to which it can subordinate the rescission, damages, or contribution claims, and Section 510(b) cannot apply by its literal terms.[14] Cf. United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (where a "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'" (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))).

---

[14]     The Trustee implicitly recognized this disconnect in a subsequently filed objection, wherein he argued that Section 510(b) applied to claims arising from the purchase or sale of LBHI securities but was unable to specify the level to which such claims should be subordinated. (See D.I. 7158 (The Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims) ¶ 23 n.9 ("The Trustee takes no position as to the validity, value, or level of priority of subordinated and reclassified Accrued Equity Claim at this time and reserves the right to raise arguments as to these issues should the need arise.")).)

30.     Such is the case here. The Claims are for contribution "on account" of claims for damages made by the plaintiffs in the Actions, and these damages claims arose from the purchase or sale of LBHI securities. But, this being a proceeding for the liquidation solely of LBI, there are no claims or interests represented by any LBHI securities,[15] and therefore no claims or interests to which the Claims can be subordinated under Section 510(b). (Cf. D.I. 7158 (The Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims) ¶ 4 (explaining that alleged right to LBHI stock "represents an equity interest in LBHI, not LBI, the debtor in this separate and distinct proceeding)).) In attempting to transmogrify the structure of Section 510(b), the Trustee would have the Court, in effect, manufacture a new and artificial class of claims to which to subordinate the Claims.

31.     The Objection not only cites no authority that would permit this twisted application of Section 510(b), but the authorities it does cite compel a different result. As the Second Circuit has recognized, Congress had only two rationales for requiring subordination under Section 510(b), to which any interpretation of that statute must "conform." First, Section 510(b) aims to protect "the dissimilar risk and return expectations of shareholders and creditors;" and, second, to support "the reliance of creditors on the equity cushion provided by shareholder investment." Med Diversified, 461 F.3d at 256; see also id. ("Because there are only two rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted Section 510(b), we conform our interpretation of the statute to require subordination here only if [claimant] (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool"); In re Betacom of Phoenix, 240 F.3d 823, 827 (9th Cir. 2001) (noting that Congress passed Section 510(b) to protect general

---

[15]     Nor, for that matter, are there any remaining claims or interests represented by LBI securities. LBI was a wholly-owned subsidiary of LBHI, and all intercompany claims have now been settled. (See D.I. 6020.)

unsecured creditors from having their recoveries diluted when they expected to have rights

senior to equity shareholders). Clearly, the motivating force behind the statute's enactment was

Congress's concern about the fair treatment in bankruptcy proceedings of creditors vis-à-vis

investors. But, where there are no remaining investor claimants in a bankruptcy proceeding,

there is no investor-creditor fairness concern – all claimants are creditors – and, accordingly,

Congress did not provide for mandatory subordination.

32.     While some courts outside of this Circuit have failed to appreciate this distinction,

their holdings are both at odds with the Second Circuit's holding in Med Diversified and basic

canons of statutory interpretation. In re VF Brands, Inc., 275 B.R. 725 (Bankr. D. Del. 2002),

for example, shows how an erroneous interpretation of Section 510(b) can create the very

unequal treatment of similarly situated claims that Congress, in passing the statue, sought to

prevent. In VF Brands, the claimant, Money's Trust, filed a proof of claim sounding in contract

and tort for damages arising from the acquisition of one of the debtor's former subsidiaries,

Vlasic Farms, Inc. See id. at 726. Vlasic Farms, having been spun-off, was not a debtor in the

proceeding, and Money's Trust did not – and indeed could not – assert any claim based on its

ownership of Vlasic Farms' stock. See id. Nevertheless, the court subordinated the claim to the

level of the debtor's common stock. The reasoning behind this decision was opaque,[16] but its

deleterious effect was clear. Money's Trust, which never invested in the debtor and never shared

---

[16]     For one thing, the VF court never explained how, in the absence of any claims represented by "such security" – i.e., any claim represented by a Vlasic Farms security – the court was able to determine where to place Money's Trust's claim in the capital structure. Tellingly, the court misquoted Section 510(b) replacing "shall be subordinated to all claims or interests that are senior to or equal to the claim or interest represented by such security," with "senior or equal to the claims of Money's Trust." 275 B.R. at 727 (emphasis added). The two statements are obviously not the same. Intrinsically, Money's Trust's claim was present in the priority structure; claims represented by Vlasic Farms' securities were not. Additionally, to the extent that the VF court based subordination on the fact that Money's Trust's claim arose from the purchase or sale of common stock, see id., it ignored the basic difference between the common stock involved in the transaction related to Money's Trust's claim and the common stock representing claims and interests in the bankruptcy proceedings.

the expectations of the debtor's shareholders, was treated as if it had been a common stockholder, while the other general unsecured creditors – by virtue of the unjustified subordination of Money's Trust's claim – received a windfall. Cf. Med Diversified, 461 F.3d at 258 (courts must guard against "attempts by a bankruptcy debtor to clothe a general creditor in the garb of shareholder").

33.     Moreover, the policy justification that the VF court articulated for its ruling misconstrues Congressional intent, as articulated by the Second Circuit in Med Diversified. The VF court correctly noted that "Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy." Id. at 728 (quoting In re Telegroup, Inc., 281 F.3d 133, 142 (3d Cir. 2002)). However, it misapplied this rationale to Money's Trust's claims, stating that "to hold, as Money's Trust asserts, that it retains an unsubordinated general unsecured claim against [the debtor] for damages arising from its investment in Vlasic Farms would give it the best of both worlds – the right to share in profits if Vlasic Farms succeeded and the right to repayment (from the [debtor]) if it failed." VF Brands, 275 B.R. at 728. But whatever equity risk was associated with Money's Trust's investment in Vlasic Farms was totally unrelated to the right it sought to vindicate in the debtor's bankruptcy proceeding. Because Money's Trust never invested in the debtor, it had no "investment loss" to recoup through its general unsecured claim. The VF court thus conflated the parent debtor's identity with that of its former subsidiary. Cf. Mark P. Kronfeld, Vincent Indelicato, & Chris Theodoridis, The Murkiness of Corporate Separateness in Chapter 11, 32 Am. Bankr. Inst. J. 46, 89-90 (2013) (noting that the result in VF Brands is inconsistent with the principle of corporate separateness).

34.     To be sure, ownership of the debtor's security is not a requirement for subordination under Section 510(b). As the Trustee points out, indemnification claims of underwriters against bankrupt issuers have been properly subordinated under that section. See, e.g., In re Jacom Computer Servs., 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002); In re Mid-Am. Waste Sys., Inc., 228 B.R. 816, 824-26 (Bankr. Del. 1999). But – again – the securities at issue in the transactions related to the subordinated claims were those of the debtor, and thus represented claims or interests in the bankruptcy proceedings where the claims were filed. The facts of these cases fit with the text of Section 510(b) and subordination served the statute's policy. Just as Congress, in passing Section 510(b), focused on apportioning the risk of a debtor's failure between its creditors and its shareholders, see Med Diversified 461 F.3d at 256, the courts in these cases were concerned about the distribution of that risk as between the creditors and the debtor's underwriters, see Jacom Computer Servs., 570 B.R. at 572. The debtor's underwriters are better positioned to manage this risk than its creditors, and so their claims are subordinated. See id.

35.     Here, the Junior Underwriters are neither LBI shareholders nor LBI underwriters. The Junior Underwriters were involved in the issuance of LBHI's securities, not those of LBI. They did not expect or bargain to share in the rewards of LBI's success, and were mere contractual creditors of LBI, with whom they had a contractual relationship as co-underwriters. Subordination in this case would undermine the policy underpinning Section 510(b). Rather than fulfilling the relative expectations of LBI's creditors, investors, and underwriters, subordination of the Claims would arbitrarily discriminate against one class of general unsecured creditors in

favor another, permitting the LBI estate to retain the benefits of its underwriting fees while

evading claims that arose from those underwritings.[17]

## CONCLUSION

36.    For the foregoing reasons, the Court should (i) overrule the Objection in

all respects, (ii) allow the Claims based on LBI's underwriting percentage of the relevant

Junior Underwriters' losses, and (iii) grant such other and further relief as may be just

and proper.

Dated: September 9, 2013      CLEARY GOTTLIEB STEEN & HAMILTON LLP
      New York, New York

By: _____
      Mitchell A. Lowenthal
      Luke A. Barefoot

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel for the Junior Underwriters*

---

[17]    Even if the Court does subordinate the Claims, those claims that are on account of damages claims arising from the purchase of LBHI senior notes should only be subordinated to the level of general unsecured creditors. As discussed above, claims must only be subordinated to the level of claims represented by "such security." Some of the securities at issue in the Actions are senior notes issued by LBHI, see, e.g., Fox Decl., Exs. 17-A and 25, which pursuant to LBHI's confirmed plan, are senior to general creditor claims in the LBHI proceeding. See Notice of Filing of Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, Section 4.3, In re Lehman Brothers Holdings Inc., Case No. 08-13555, D.I. 22973 (Bankr. S.D.N.Y. Dec. 5, 2011). If the Court adopts the Trustee's approach to engraft LBHI's capital structure onto LBI's in order to shoehorn the Claims into Section 510(b), then by implication, those of the Claims related to the purchase or sale of LBHI senior notes should be subordinated only below the level of those senior notes (i.e., to the level of general creditor claims).

**APPENDIX A**

| Date | CUSIP | Offering Amount | Junior Underwriter(s) and Their Predecessors and Affiliates | LBI Underwriting Percentage |
|---|---|---|---|---|
| 10/18/2004 | 52517PXT3 | $500,000,000.00 | • ANZ Securities, Inc.<br>• Fortis Securities LLC<br>• Mellon Financial Markets, LLC<br>• Harris Nesbitt Corp.<br>• SunTrust Robinson Humphrey | 86% |
| 10/18/2004 | 52517PXU0 | $575,000,000.00 | • The Williams Capital Group, L.P. | 85% |
| 10/26/2004 | 52517PXU0 | $25,000,000.00 | • The Williams Capital Group, L.P. | 85% |
| 1/4/2005 | 52517PYN5 | $1,000,000,000.00 | • ANZ Securities, Inc.<br>• BNY Capital Markets, Inc.<br>• DnB Nor Markets, Inc.<br>• Harris Nesbitt Corp.<br>• National Australia Bank Ltd.<br>• SunTrust Robinson Humphrey | 86% |
| 1/27/2005 | 52517PYN5 | $100,000,000.00 | • ANZ Securities, Inc.<br>• BNY Capital Markets, Inc.<br>• DnB Nor Markets, Inc.<br>• Harris Nesbitt Corp.<br>• National Australia Bank Ltd.<br>• SunTrust Robinson Humphrey | 86% |
| 1/27/2005 (2/1/2005) | 52517PYN5 | $100,000,000.00 | • Harris Nesbitt Corp. | 98% |
| 7/6/2005 | 52517PA35 | $1,000,000,000.00 | • ANZ Securities, Inc.<br>• BNY Capital Markets, Inc.<br>• Harris Nesbitt Corp. | 85% |

A-1

| 12/14/2005 | 52517PD57 | $750,000,000.00 | <ul><li>ANZ Securities, Inc.</li><li>SunTrust Robinson Humphrey, Inc.</li><li>The Williams Capital Group, L.P.</li></ul> | 90% |
|---|---|---|---|---|
| 3/22/2006 | 52517PF63 | $1,000,000,000.00 | <ul><li>ANZ Securities, Inc.</li><li>Harris Nesbitt Corp.</li><li>National Australia Bank Ltd., London Branch</li><li>SunTrust Robinson Humphrey, Inc.</li></ul> | 89% |
| 4/18/2006 | 52517PG96 | $500,000,000.00 | <ul><li>Mellon Financial Markets, LLC</li><li>The Williams Capital Group, L.P. (on behalf of Northern Trust)</li></ul> | 95% |
| 8/24/2006 | 52517PK83 | $100,000,000.00 | <ul><li>Mellon Financial Markets, LLC</li></ul> | 98% |
| 10/24/2006 | 524908UB4 | $1,250,000,000.00 | <ul><li>Fortis Securities LLC</li><li>SunTrust Capital Markets, Inc.</li></ul> | 88% |
| 11/9/2006 | 52517PN98 | $1,350,000,000.00 | <ul><li>BNY Capital Markets, Inc.</li></ul> | 98% |
| 1/9/2007 | 52517PR60 | $1,500,000,000.00 | <ul><li>ANZ Securities, Inc.</li><li>BNY Capital Markets, Inc.</li><li>SunTrust Robinson Humphrey</li></ul> | 90% |
| 5/22/2007 | 52517P2K6 | $2,750,000,000.00 | <ul><li>Williams Capital Group, L.P.</li></ul> | 98% |
| 7/12/2007 | 52517P4C2 | $1,500,000,000.00 | <ul><li>Mellon Financial Markets, LLC</li><li>Williams Capital Group, L.P.</li></ul> | 90% |
| 7/12/2007 | 524908R36 | $2,000,000,000.00 | <ul><li>National Australia Bank</li></ul> | 91% |
| 7/12/2007 | 524908R44 | $1,500,000,000.00 | <ul><li>BNY Capital Markets, Inc.</li><li>SunTrust Capital Markets, Inc.</li></ul> | 94% |

A-2

| 9/19/2007 | 52517P5X5 | $2,250,000,000.00 | • ANZ Securities, Inc.<br>• Cabrera Capital Markets, LLC<br>• Harris Nesbitt<br>• Mellon Financial Markets, LLC<br>• SunTrust Robinson Humphrey | 86% |
|-----------|-----------|-------------------|---|-----|
| 9/19/2007 | 52517P5Y3 | $1,000,000,000.00 | • ANZ Securities, Inc.<br>• Cabrera Capital Markets, LLC<br>• Harris Nesbitt<br>• Mellon Financial Markets, LLC<br>• SunTrust Robinson Humphrey | 86% |
| 12/17/2007 | 5249087M6 | $1,500,000,000.00 | • ANZ Securities, Inc.<br>• BNY Capital Markets, Inc.<br>• SunTrust Robinson Humphrey | 85% |
| 1/15/2008 | 5252M0BZ9 | $4,000,000,000.00 | • Fortis Securities<br>• Mellon Financial Markets, LLC<br>• SunTrust Robinson Humphrey | 87% |
| 2/5/2008 | 52520W317 | $1,650,000,000.00 | • SunTrust Robinson Humphrey<br>• BNY Capital Markets, Inc.<br>• Fidelity Capital Markets Services | 12.3% |
| 4/24/2008 | 5252M0FD4 | $2,500,000,000.00 | • DnB NOR Bank ASA<br>• Mellon Financial Markets, LLC<br>• National Australia Bank<br>• SunTrust Robinson Humphrey<br>• Williams Capital Group, L.P. | 88% |

| 5/9/2008 | 5249087N4 | $2,000,000,000.00 | • Cabrera Capital Markets, LLC<br>• Williams Capital Group, L.P. | 97% |
|---|---|---|---|---|
| | | | | **LBI Average Underwriting Percentage** |
| | | | | 87% |

**APPENDIX B**

| No. | Docket Number | Case Name |
|-----|---------------|-----------|
| 1. | No. 08 Civ. 5523 (S.D.N.Y.) | Operative Plasterers & Cement Masons International Association Local 262 Annuity Fund v. Fuld, et al. |
| 2. | No. 08 Civ. 9793 (S.D.N.Y.) | Stark, et al. v. Callan, et al. |
| 3. | No. 08 Civ. 10206 (S.D.N.Y.) | Brooks Family Partnership, L.L.C., et al. v. Fuld, et al. |
| 4. | No. 09 Civ. 1230 (S.D.N.Y.) | Deathrow v. Fuld, et al. |
| 5. | No. 09 Civ. 1231 (S.D.N.Y.) | Mease & Caldwell v. Fuld, et al. |
| 6. | No. 09 Civ. 1235 (S.D.N.Y.) | Shipley v. Fuld, et al. |
| 7. | No. 09 Civ. 1236 (S.D.N.Y.) | Warden v. Fuld, et al. |
| 8. | No. 09 Civ. 1237 (S.D.N.Y.) | Napierala, et al. v. Fuld et al. |
| 9. | No. 09 Civ. 1238 (S.D.N.Y.) | Zenith Insurance Co. v. Fuld, et al. |
| 10. | No. 09 Civ. 1239 (S.D.N.Y.) | The San Mateo County Investment Pool v. Fuld, et al. |
| 11. | No. 09 Civ. 1944 (S.D.N.Y.) | Monterey County Treasurer, on Behalf of the Monterey County Investment Pool v. Fuld, et al. |
| 12. | No. 09 Civ. 1946 (S.D.N.Y.) | City of South San Francisco v. Citigroup |
| 13. | No. 09 Civ. 2363 (S.D.N.Y.) | American National Life Insurance Company v. Fuld |
| 14. | No. 09 Civ. 3475 (S.D.N.Y.) | City of Burbank v. Fuld et al. |
| 15. | No. 09 Civ. 3476 (S.D.N.Y.) | City of San Buenaventura v. Fuld et al. |
| 16. | No. 09 Civ. 3478 (S.D.N.Y.) | City of Freemont v. Citigroup |
| 17. | No. 09 Civ. 6040 (S.D.N.Y.) | Vallejo Sanitation and Flood Control District v. Fuld, et al. |
| 18. | No. 09 Civ. 6041 (S.D.N.Y.) | Washington State Investment Board v. Fuld, et al. |
| 19. | No. 09 Civ. 6652 (S.D.N.Y.) | Contra Costa Water District v. Fuld et al. |
| 20. | No. 09 Civ. 7878 (S.D.N.Y.) | City of Cerritos v. Citigroup |

| 21. | No. 11 Civ. 1281 (S.D.N.Y.) | The California Public Employees' Retirement System v. Fuld, et al. |
| 22. | No. 11 Civ. 3892 (S.D.N.Y.) | State Compensation Insurance Fund v. Fuld, et al. |

**APPENDIX C**

| Junior Underwriter(s) | Legal Fees | Settlement Payments | Total Out-of-Pocket Losses | LBI's Average Underwriting Percentage in Junior Underwriter's Offerings | Junior Underwriter's Claim Amount |
|---|---|---|---|---|---|
| ANZ Securities, Inc. | $305,804.20 | $6,803,642.00 | $7,109,446.20 | 86.9% | $6,178,108.70 |
| BMO Capital Markets Corp., f/k/a Harris Nesbitt Corp. | $195,562.13 | $4,159,266.00 | $4,354,828.13 | 87.8% | $3,823,539.00 |
| BNY Mellon Capital Markets, LLC | $544,508.52 | $22,049,943.00 | $22,594,451.52 | 84.5% | $19,092,311.53 |
| Cabrera Capital Markets, LLC | $375,867.00 | $124,133.00 | $500,000.00 | 89.7% | $448,500.00 |
| DnB Nor Markets, Inc. | $113,363.43 | $3,175,354.00 | $3,288,717.43 | 86.7% | $2,851,318.01 |
| BNP Paribas FS, LLC (as successor in interest to Fortis Securities, LLC f/k/a Fortis Investment Services) | $266,918.80 | $6,985,596.00 | $7,252,514.80 | 87% | $6,309,687.88 |
| nabSecurities, LLC, f/k/a nabCapital Securities, LLC and National Australia Bank, Ltd | $173,842.57 | $7,021,557.00 | $7,195,399.57 | 88% | $6,331,951.62 |

| | | | | |
|---|---|---|---|---|
| National Financial Services, LLC | $32,354.05 | $1,080,895.00 | $1,113,249.05 | 12.3% | $136,929.63 |
| SunTrust Robinson Humphrey, Inc. | $780,264.83 | $22,771,427.00 | $23,551,691.83 | 82.4% | $19,401,883.73 |
| Williams Capital Group, L.P. | $609,270.38 | $350,000.00 | $959,270.38 | 91% | $872,936.05 |

C-2