**Exhibit G**

08-13555-mg Doc 46973-7 Filed 09/17/14 Entered 09/17/14 18:05:00 Exhibit G
Pg 2 of 10

**Reply Deadline: TBD**
**Hearing Date: TBD**

Joshua Dorchak
Erin K. Mautner
**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, New York 10022
(212) 705-7000

*Attorneys for UBS Financial Services Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X
                                                                     :
In re                                                                :
                                                                     :
LEHMAN BROTHERS INC.,                                                : Case No. 08-01420 (JMP) (SIPA)
                                                                     :
            Debtor.                                                  :
                                                                     :
-------------------------------------------------------------------- X

### RESPONSE OF UBS FINANCIAL SERVICES INC. TO THE TRUSTEE'S ONE HUNDRED FOURTH OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)

UBS Financial Services Inc. ("UBSFS"), by its undersigned counsel, respectfully submits this response (the "Response"), with the accompanying Declaration of Kenneth G. Crowley, to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) [Docket No. 6768] (the "Objection") with respect to proof of claim No. 5275 (the "Claim") filed by UBSFS against Lehman Brothers Inc. ("LBI") in the above-captioned SIPA proceeding.

### PRELIMINARY STATEMENT

1.      The Objection misses the mark. Each of the alleged grounds for the Objection is refuted by the facts before the Court, as set forth in the Declaration of Kenneth G. Crowley filed in support of the Response (the "Crowley Declaration"), and the applicable law. The Claim is

08-13555-smb  Doc 46973-7  Filed 09/11/17  Entered 09/11/17 18:05:00  Exhibit G
Pg 3 of 10

based on UBSFS's right to contribution from LBI in connection with claims brought against UBSFS for alleged fraud in the sale of registered securities that were issued by Lehman Brothers Holdings Inc. ("LBHI"), underwritten by LBI, and purchased and sold to clients by UBSFS. These claims have caused UBSFS losses that are liquidated and non-contingent. UBSFS's right to contribution from LBI is based on LBI's role as underwriter of the securities in cooperation with LBHI. Under Section 11(f) of the Securities Act of 1933, LBI, in its capacity as underwriter, is strictly liable to UBSFS for such contribution, because LBI would have been liable to the same claimants if LBI had been sued alongside UBSFS. LBI was 100% owned by LBHI, the issuer of the securities that gave rise to the loss and, as the affiliated underwriter of those securities, was uniquely positioned to assess any alleged misrepresentations and/or omissions associated with those securities; but LBI was immune from suit, unlike UBSFS, due to the automatic stay. Notwithstanding its unique status, as of the date of this Response LBI has not paid any claims directly and has not paid UBSFS any portion of the damages suffered by UBSFS in connection with the LBHI securities. The Claim is valid and it is not contingent. Nor is the Claim subject to subordination, because (i) the Claim is related to securities issued by LBHI, not LBI, and thus there are no direct claims to which this Court could subordinate the Claim in LBI's SIPA case, and (ii) UBSFS is not an investor in LBI's securities attempting to upgrade an interest in those securities to a creditor claim. The Objection should be overruled.

## **BACKGROUND**

2. In 2007 and 2008, UBSFS purchased from LBI, in its capacity as underwriter, certain structured securities, including certain Medium Term Notes, Series I, U.S. Structured Notes issued by LBHI (the "Structured Securities"), expressly earmarked for sale to UBSFS's clients. *See id.* ¶ 4.

2

3. The relationship between LBHI, LBI and UBSFS in these transactions was governed by, among other things, that certain Purchase Agreement among LBHI, LBI and UBSFS dated March 9, 2007 and that certain U.S. Structured Notes Purchase Agreement Amendment 1, dated November 5, 2007 by and between UBSFS, LBHI and LBI, along with subsequent amendments thereto, including that certain sideletter, dated March 9, 2007 by and between LBI and UBSFS (collectively, the "Purchase Agreement"). *Id.* ¶ 5, Ex. A. The Purchase Agreement provides that LBI shall be the "Primary Agent," and that UBSFS shall have the same rights and obligations as LBI as Primary Agent, under a certain Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"). *Id.* ¶ 5, Ex. B. The Purchase Agreement further provides that UBSFS shall purchase the Structured Securities from LBI pursuant to a separate "Terms Agreement" relating to each subject issuance of such securities. *Id.* ¶ 5, Ex. A. There were approximately eighty-four issuances of Structures Securities purchased, at least in part, by UBSFS, pursuant to these agreements. *Id.* ¶ 5, Ex. C.

4. As expressly contemplated in the Purchase Agreement, UBSFS sold the Structured Securities to its clients. UBSFS did not purchase or hold any of the Structured Securities for its own account. *Id.* ¶ 6.

**The Proceedings Against UBSFS**

5. After the commencement of LBHI's chapter 11 case and LBI's SIPA case, a number of UBSFS's clients (the "Claimants") filed lawsuits (or joined class actions) or commenced arbitration proceedings before the Financial Industry Regulatory Authority ("FINRA") or other arbitral forums against UBSFS in connection with the Structured Securities (collectively, the "Proceedings"). *Id.* ¶ 7. In the Proceedings, the Claimants asserted (among other things) securities fraud and related claims against UBSFS, including claims under Section

3

11(a) of the Securities Act, and in support of those claims alleged that the offering materials concerning the Structured Securities that they had purchased contained material misstatements and omissions. *Id.*

6.      LBI is not a defendant in the Proceedings, apparently as a result of the automatic stay in LBI's SIPA case.[1]  *Id.* ¶ 8.

7.      The Proceedings include several putative class actions filed in the Fall of 2008 against UBSFS and others relating to the Structured Securities, which were consolidated with certain other actions relating to Lehman-issued securities in January 2009 before Judge Kaplan under the caption *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08 Civ. 5523 (LAK) (S.D.N.Y.) (the "Class Action").  *Id.* ¶ 9.  The Third Amended Complaint in the Class Action [Dkt. No. 212], filed on April 23, 2010, alleged that UBSFS, as an underwriter and seller of the Structured Securities, was liable under sections 11 and 12(a)(2) of the Securities Act for allegedly false and misleading statements and omissions in the offering materials for the Structured Securities relating to Lehman's financial condition and creditworthiness, as well as relating to the "principal protection" feature of some of the Structured Notes. *Id.*

8.      The Proceedings also include over 500 FINRA arbitrations filed from December 1, 2008 through the present. *Id.* ¶ 10, Ex. D.

9.      Since late 2008, UBSFS, with the assistance of outside counsel, has been engaged in investigating and defending the Claimants' allegations and claims in the Proceedings. *Id.* ¶ 11. The Proceedings have been numerous, complex, and in some cases protracted. *Id.*

---

[1] The automatic stay is intended to protect the debtor from litigation outside the bankruptcy court; it is not intended to protect the debtor from liability. *See In re Bock Laundry Machine Co.*, 37 B.R. 564 (Bankr. N.D.Ohio 1984) ("The automatic stay was never intended to preclude a determination of [ ] liability and the attendant damages. It was merely intended to prevent a prejudicial dissipation of the debtor's assets."); *In re Continental Air Lines, Inc.*, 61 B.R. 758, 779 (S.D. Tex. 1986) ("Courts have regarded the opportunity to litigate the issue of liability as a significant rights which cannot be easily set aside.").

08-13555-smb   Doc 46973-7   Filed 09/01/17   Entered 09/01/17 14:18:05:00   Exhibit G
Pg 6 of 10

**The Claim**

10.  On or about May 29, 2009, prior to the applicable bar date, UBSFS filed a proof of claim which was later assigned claim number 5275, asserting claims arising from losses suffered or defense costs incurred in connection with the Proceedings.  *Id.* ¶ 11, Ex. E.  UBSFS expressly stated in the Annex to the proof of claim that it reserved the right to amend the proof of claim.  *Id.* ¶ 12.

11.  On July 12, 2013, the Trustee filed its One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) [Dkt. No. 6768].  The Trustee alleged that:  (a) UBSFS failed to establish LBI's liability; (b) UBSFS failed to demonstrate that payments or potential payments by UBSFS exceed UBSFS's share of liability, and that the Claim is otherwise contingent; and (c) that the Claim should be subordinated pursuant to Bankruptcy Code section 510(b).

12.  At present, the Claim is liquidated and non-contingent, as settlements have been paid (or committed to be paid), and substantial legal fees have been incurred and paid.  For the purposes of an inquiry of whether a claim should be considered contingent and therefore disallowed, the date of allowance or disallowance, which hasn't arrived yet, is the relevant date.  *See In re Apco Liquidating Trust.*, 370 B.R. 625, 636 (Bankr. D. Del. 2007) ("The determination of whether the claim is contingent is made at the time of allowance or disallowance of the claim, which courts have established is the date of the ruling").  Certain of UBSFS's expenses for which LBI is liable pursuant to Section 11(f) of the Securities Act have become fixed, liquidated and supported with evidence, as demonstrated in detail in the Crowley Declaration.  Crowley Decl. ¶¶ 12-17.  Accordingly, the Objection should be overruled.

## **ARGUMENT**

13.     A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie proof of the validity of the claim.  *See In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr. S.D.N.Y. 2009); *In re Alper Holdings USA*, 2008 Bankr. LEXIS 86, at *90 (Bankr. S.D.N.Y. 2008); *In re MarketXT Holdings Corp.*, 2007 Bankr. LEXIS 740, at *17 n.8 (Bankr. S.D.N.Y. 2007).  If a party in interest files an objection to the proof of claim, "[t]he burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim."  *Alper Holdings*, 2008 Bankr. LEXIS 86, at *90. Specifically, "the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's sufficiency."  *Id.*; *DJK Residential*, 416 B.R. at 104. "When the burden [does] shift back to the claimant, the claimant must prove the validity of the claim by a preponderance of the evidence."  *MarketXT Holdings*, 2007 Bankr. LEXIS 740, at *17 n.8; *see DJK Residential*, 416 B.R. at 104-05 ("The claimant must then prove by a preponderance of the evidence that under applicable law the claim should be allowed.") (internal quotation marks omitted).  UBSFS provides such proof in this Response.

### A.     **LBI Is Liable to UBSFS.**

14.     The Objection should be overruled to the extent the Trustee argues that the Claim is disallowable because LBI has no potential liability to UBSFS, because UBSFS has an express statutory right to contribution from LBI under Section 11(f) of the Securities Act and LBI demonstrably has not honored that right of contribution.

15.     On this issue, UBSFS joins in and incorporates herein the points made by the "Junior Underwriters" in Argument Section A (¶¶ 13-19) of the Response of Underwriter Claimants to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims

(No Liability Claims) [Dkt. No. 7205] (the "<u>Junior Underwriter Response</u>"), insofar as it addresses Section 11(f), which apply equally to the Claim.

### B. The Claim is Not Contingent.

16.     The Objection should be overruled to the extent it is based on the argument that the Claim is disallowable as contingent under section 502(e)(1)(B), because UBSFS's claim is not contingent and is in fact fixed, within the meaning of that statute.

17.     Section 11(a)(5) of the Securities Act provides:

> In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue -- <u>every</u> underwriter with respect to such security.

15 U.S.C. § 77k(a)(5) (emphasis added).

18.     Section 11(f) of the Securities Act provides, in relevant part:

> … [A]ll or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment ….

15 U.S.C. § 77k(f) ("<u>Section 11(f)</u>").

19.     Pursuant to Section 11(f), UBSFS was entitled to such contribution the moment it paid fees or a settlement amount as a defendant in the Proceedings and filed the Proof of Claim indicating that it incurred liability in connection with the Structured Securities.[2]   The Claim is not contingent, as the Trustee alleges.

---

[2] The Trustee's argument that the Claim is contingent because it has not been established that LBHI cannot pay indemnification amounts, Objection ¶ 24, fails because the Claim is not based on any agreement with LBHI, and more importantly Section 11(f) of the Securities Act simply does not impose any requirement that a claimant seek indemnification from an issuer before seeking contribution from another underwriter.  *See* 15 U.S.C. § 77k(f).

20.     UBSFS has now shown actual losses incurred to date on the Claim.  As set forth in the accompanying Crowley Declaration, UBSFS has paid in excess of $80.1 million in arbitration settlements and awards and is obligated to pay another $120 million in settlement of the Class Action.  Crowley Decl. ¶¶ 14, 16.  Additionally, UBSFS and has paid attorneys' fees in excess of $56.4 million in connection with the Proceedings.  *Id.* ¶¶ 15, 17.  Thus, UBSFS's actual losses to date in connection with the Proceedings in excess of $256.5 million (the "Demonstrated Losses").  *Id.* ¶¶ 13-18.  The Claim is no longer contingent in that respect.  Nor is the Claim contingent in any other respect.

21.     For purposes of the Bankruptcy Code, a contingent claim is one whose validity, yes or no, remains to be determined, whereas an unliquidated claim is one that is valid but whose proper amount remains to be determined.  *See In re GCO Servs., LLC*, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005) (claims were unliquidated because the underlying claim amount had not yet been settled, and claims were contingent because contribution rights had not yet been determined); *In re RNI Wind Down Corp.*, 369 B.R. 174, 182-84 (Bankr. D.Del. 2007) ("A claim is contingent where it has not yet accrued and . . . is dependent upon some future event that may never happen. . . . An unliquidated claim is a claim in which the amount owed has not yet been determined.") (emphasis added).

22.     UBSFS incurred the Demonstrated Losses in defending claims that clearly could have been, and would have been, brought against LBI, if not for the automatic stay.  LBI was the primary underwriter of the Structured Securities and was intimately involved in their issuance by its parent, LBHI, pursuant to documentation that allegedly contained materially misleading statements and omissions, including those concerning "the fact that Lehman's reported net leverage was temporarily and artificially reduced as a result of the Repo 105 transactions" [Class

8

Action MTD Decision at p. 38 [Dkt. No. 439]]. There is no question that LBI would have been strictly liable to the Claimants, if it had been named as a defendant, under Section 11 of the Securities Act. Thus, LBI was clearly co-liable with UBSFS to the Claimants. Accordingly, under the burden-shifting analysis set forth above, LBI cannot meet its threshold burden of demonstrating the absence of liability and, even assuming *arguendo* that it can, UBSFS has plainly met its burden of establishing that LBI bears <u>some</u> liability to UBSFS for contribution under Section 11(f) of the Securities Act.

23. Put simply, the Claim is not contingent, but merely in part unliquidated. Section 502(e)(1)(B) does <u>not</u> provide for the disallowance of unliquidated claims. *See* 11 U.S.C. 502. Congress clearly understood that contingent and unliquidated are different concepts. *See In re GCO Servs*, 324 B.R. at 465; *In re RNI*, 369 B.R. 182-84; *see also* 11 U.S.C. § 502(c)(1) (treating unliquidated <u>or</u> contingent claims).

24. *In re Drexel Burnham Lambert Group Inc.*, 146 B.R. 98 (Bankr. S.D.N.Y. 1992) ("*Drexel I*") and *In re Drexel Burnham Lambert Group Inc.*, 148 B.R. 982 (Bankr. S.D.N.Y. 1992) ("*Drexel II*"), cited by the Trustee in the Objection, are inapposite. In those cases, the Court disallowed claims as contingent, where the claimant failed to meet its burden of demonstrating that the debtor had liability. Here, by contrast, the Trustee cannot reasonably argue that LBI has no liability to UBSFS under Section 11(f). As subsequent cases have made clear, the *Drexel* decisions cannot be read to support disallowance of a fixed but unliquidated liability, as is the case here. *See In re RNI*, 369 B.R. at 183 ("While the [*Drexel I*] court rather loosely stated that joint tortfeasor's claim remained contingent because the 'exact amount due is not fixed,' the court was speaking in terms of the extent of the debtor's liability (if any) to the third party rather than in terms of the amount of the claim."). Indeed, no court has taken the

9

position articulated by the Trustee here and followed the *Drexel* decisions to disallow unliquidated claims in the face of the debtor's liability. The Trustee has <u>no</u> support other than *Drexel I* and *II* for the argument that the Claim is contingent, and such reliance is misplaced.

25.     For all of these reasons, the Trustee's objection to the Claim based on section 502(e)(1)(B) should be overruled.

### C.  Section 510(b) of the Bankruptcy Code Does not Apply

26.     To the extent the Objection is based on section 510(b), it should be overruled, because (i) there are no direct claims to which this court <u>could</u> subordinate the Claim in LBI's SIPA case, and (ii) UBSFS is not an investor in securities attempting to improve its recovery by asserting a creditor claim in place of an interest in the securities themselves.

27.     On this issue, UBSFS joins in and incorporates herein the points made by the Junior Underwriters in Argument Section C (¶¶ 26-35) of the Junior Underwriter Response, which apply equally to the Claim.

### CONCLUSION

For the reasons set forth and incorporated herein, UBSFS respectfully requests that this Court overrule the Objection.

Dated:  September 9, 2013
New York, New York

**BINGHAM MCCUTCHEN LLP**

*/s/ Joshua Dorchak*
Joshua Dorchak
Erin K. Mautner
399 Park Avenue
New York, New York  10022
Telephone:  212.705.7000
Fax:  212.752.5378
joshua.dorchak@bingham.com
erin.mautner@bingham.com

*Attorneys for UBS Financial Services Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------- X
                                                                      :
In re                                                                 :
                                                                      :
LEHMAN BROTHERS INC.,                                                 :    Case No. 08-01420 (JMP) (SIPA)
                                                                      :
                                    Debtor.                           :
                                                                      :
----------------------------------------------------------------------- X

**DECLARATION OF KENNETH G. CROWLEY IN SUPPORT OF**
**RESPONSE OF UBS FINANCIAL SERVICES INC. TO THE TRUSTEE'S**
**ONE HUNDRED FOURTH OMNIBUS OBJECTION**
**TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)**

I, Kenneth G. Crowley, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am an Executive Director and a Deputy General Counsel of UBS Financial Services Inc. ("UBSFS").  I submit this affidavit in support of the response filed by UBSFS (the "Response") in opposition to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) [Docket No. 6768] (the "Objection") to the extent that the Objection pertains to Claim Number 5275 filed by UBSFS.

2.      Since late 2008, I have played a significant role in UBSFS's defense of claims brought by UBSFS's clients related to structured securities issued by Lehman Brothers Holdings Inc. ("LBHI") that were purchased by UBSFS from Lehman Brothers Inc. ("LBI") and sold to UBSFS's clients.  Except where indicated to the contrary herein, I am fully familiar with the facts and circumstances recited herein and the documents annexed as Exhibits hereto, on the basis of my personal knowledge, review of UBSFS books and records, consultations with my colleagues at UBSFS and with outside counsel engaged by UBSFS in connection with the Proceedings (as defined below).

**UBSFS's Purchase and Resale of LBHI Structured Securities with LBI**

3.      UBS Financial Services Inc. is an indirect wholly-owned subsidiary (through UBS Americas Inc.) of UBS AG, incorporated in Delaware with its principal place of business located in Weehawken, New Jersey.  It is registered with the Securities Exchange Commission as a broker-dealer and is a member of NASDAQ and the New York Stock Exchange.  Among other things, UBSFS provides wealth management and related services for clients residing and doing business in the United States.

4.      During 2007 and 2008, UBSFS purchased from LBI as underwriter certain structured securities, including certain Medium Term Notes, Series I, U.S. Structured Notes issued by LBHI (the "Structured Securities"), for sale to UBSFS's clients.

5.      The relationship between LBHI and LBI and UBSFS in these transactions was governed by, among other things, that certain Purchase Agreement among LBHI, LBI and UBSFS dated March 9, 2007, along with subsequent amendments thereto, including that certain U.S. Structured Notes Purchase Agreement Amendment 1, dated November 5, 2007 by and between UBSFS, LBHI and LBI, and that certain sideletter, dated March 9, 2007 by and between LBI and UBSFS (collectively, the "Purchase Agreement").   A true and correct copy of the fully executed Purchase Agreement is annexed hereto as Exhibit A.   The Purchase Agreement provides that LBI shall be the "Primary Agent" and that UBSFS shall have the same rights and obligations as LBI as Primary Agent under a certain Distribution Agreement dated May 30, 2006 (the "Distribution Agreement").   A copy of the form of Distribution Agreement is annexed hereto as Exhibit B.  The Purchase Agreement further provides that UBSFS shall purchase the Structured Securities from LBI pursuant to a separate "Terms Agreement" relating to each subject issuance of such securities.  A copy of the form of Terms Agreement is appended as

Exhibit A to the Purchase Agreement. There were approximately eighty-four issuances of Structured Securities purchased, at least in part, by UBSFS, pursuant to these agreements. A true and accurate list of the CUSIPS for such Structured Securities is annexed hereto as Exhibit C.

6. As expressly contemplated in the Purchase Agreement, UBSFS sold the Structured Securities to its clients. UBSFS did not purchase or hold any of the Structured Securities for its own account.

**The Proceedings Against UBSFS**

7. After the commencement of LBHI's chapter 11 case and LBI's SIPA case in September 2008, a number of UBSFS's clients (the "Claimants") filed lawsuits (or joined class actions) or commenced arbitration proceedings before the Financial Industry Regulatory Authority ("FINRA") against UBSFS in connection with the Structured Securities (collectively, the "Proceedings"). In the Proceedings, the Claimants asserted securities fraud and related claims against UBSFS, including claims under Section 11 of the Securities Act of 1933, and alleged in support of those claims that the offering materials concerning the Structured Securities that they had purchased from UBSFS contained material misstatements and omissions. The Claimants sought to hold UBSFS liable for the entire amount of their alleged losses.

8. LBI is not a defendant in the Proceedings or, on information and belief, in any legal action or FINRA arbitration, apparently as a result of the automatic stay in LBI's SIPA case.

9. The Proceedings include several putative class actions filed in the fall of 2008 against UBSFS and others relating to the Structured Securities, which were consolidated with certain other actions relating to Lehman-issued securities in January 2009 before Judge Kaplan under the caption *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08 Civ.

5523 (LAK) (S.D.N.Y.) (the "<u>Class Action</u>").  The Third Amended Complaint in the Class Action alleged that UBSFS, as an underwriter and seller of the Structured Securities, was liable under sections 11 and 12(a)(2) of the Securities Act of 1933 for allegedly false and misleading statements and omissions in the offering materials for the Structured Securities relating to Lehman's financial condition and creditworthiness, as well as relating to the "principal protection" feature of some of the Structured Notes.

10.     The Proceedings also include over 500 FINRA arbitrations filed from December 1, 2008 through the present.  A true and accurate list of identifying numbers and filing dates for such FINRA proceedings is annexed hereto as Exhibit D.   Because of privilege and confidentiality concerns, UBSFS has not provided here, but is prepared to provide to the Court and the Trustee directly, additional information regarding the FINRA proceedings.

11.     Since late 2008, UBSFS, with the assistance of outside counsel, has been engaged in investigating and defending the Claimants' allegations and claims in the Proceedings.  The Proceedings have been numerous, complex, and in some cases protracted.

12.     On or about May 29, 2009, prior to the applicable bar date, UBSFS filed a proof of claim which was later assigned claim number 5275, asserting as yet undetermined claims arising from losses suffered or defense costs incurred in connection with the Proceedings. UBSFS expressly stated in the Annex to the proof of claim that it reserved the right to amend the proof of claim.  An as-filed copy of the Claim is annexed hereto as Exhibit E.

**<u>UBSFS's Losses</u>**

13.     To date, UBSFS has incurred losses as a result of the Proceedings in at least the amounts set forth below.

14. *Class Action Settlement of $120 million*. In August 2013, UBSFS and plaintiffs in the Class Action reached an agreement, subject to the court's approval, settling the claims against UBSFS for $120 million. An as-filed copy of the motion to approve this settlement and proposed order is annexed hereto as Exhibit F. If Judge Kaplan preliminarily approves the settlement at or after a hearing to be held on September 9, 2013, UBSFS is required to transfer the $120 million settlement amount into an escrow account controlled by counsel to the Class Action plaintiffs. *See* Settlement Agreement ¶ 8 appended as Exhibit 1 to the settlement motion (Exhibit F hereto).

15. *Class Action Legal Expenses of $6.4 million*. To date, UBSFS has incurred and paid outside counsel attorneys' fees and expenses in the Class Action exceeding $6.4 million. A true and accurate summary of these fees and expenses is annexed hereto as Exhibit G. Because of privilege and confidentiality concerns, UBSFS has not provided here, but is prepared to provide to the Court and the Trustee directly, more detailed backup for these expenses.

16. *FINRA Arbitration Settlements and Awards of $80.1 million.* To date, UBSFS has paid no less than $106.6 million in settlements and awards to Claimants in FINRA arbitrations concerning the Structured Securities. Certain of the settlement payments have been mitigated by the Claimants' assignment to UBSFS of the subject Structured Securities, with an estimated aggregate value of $26.5 million. The chart annexed hereto as Exhibit H sets forth the settlement or award amount for each of the FINRA proceedings resolved to date, as well as the aggregate net payment amount after deducting the estimated value of the assigned securities. Because of client confidentiality concerns, UBSFS has not provided here, but is prepared to provide to the Court and the Trustee directly, more detail concerning these settlements and awards.

17.    *FINRA Arbitration Legal Expenses of $50 million.*  To date, UBSFS has incurred and paid outside counsel attorneys' fees and expenses in these FINRA arbitrations exceeding $50 million.  A true and accurate summary of these fees and expenses is annexed hereto as Exhibit I. Because of privilege and confidentiality concerns, UBSFS has not provided here, but is prepared to provide to the Court and the Trustee directly, more detailed backup for these expenses.

18.    The losses set forth above and in the Exhibits hereto are amounts that UBSFS has actually paid, with the sole exception of the Class Action settlement amount, to which UBSFS has committed, subject to Court approval, and which UBSFS expects to pay into escrow prior to the hearing on the Objection.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, New York on September 9, 2013.

Kenneth G. Crowley

# EXHIBIT A

Execution Copy

# LEHMAN BROTHERS HOLDINGS INC.

## Medium-Term Notes, Series I

## U.S. STRUCTURED NOTES PURCHASE AGREEMENT

March 9, 2007

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Primary Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I (the "Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended, between the Company and Citibank, N.A., as Trustee. The Distribution Agreement permits the Company to enter into an agreement with the Primary Agent and/or one or more additional persons to purchase Securities as principals.

The undersigned (the "Purchaser") agrees to purchase certain structured Securities (the "Designated Securities") from the Primary Agent, at the purchase price and terms as set forth in the applicable Terms Agreement (as defined herein).

Subject to the terms and conditions stated herein and subject to the reservation by the Company of the right to sell Securities (including Designated Securities) directly on its own behalf at any time, to any person, and the right to enter into agreements substantially identical hereto with other principals or agents, the Company hereby agrees that whenever the Primary Agent determines to sell Designated Securities pursuant to this Agreement, such Designated Securities shall be sold pursuant to a Terms Agreement (as defined herein) relating to such sale in accordance with the provisions of Section 1 herein between the Company, the Primary Agent and the Purchaser, pursuant to which the Purchaser shall purchase such Designated Securities as principal for resale to an Investor (as defined below) or for resale to one or more of the other agents or Sub-Distributors (as defined herein), each of whom will purchase as principal for resale to Investors or to other dealers, as further set forth in this Agreement. This Agreement shall only apply to sales of the Designated Securities and not to sales of any other securities or evidences of indebtedness of the Company and only on the specific terms set forth herein.

1

In accordance with Section 11(a) of the Distribution Agreement (as amended by this Agreement to allow for purchases of Designated Securities directly from the Primary Agent), the Purchaser hereby confirms that, except as set forth in this Agreement, with effect from the date hereof solely in respect of each issue of Designated Securities pursuant to a Terms Agreement (each an "Issue"), the Purchaser shall become a party to the Distribution Agreement, vested with all the authority, rights and powers, and subject to all representations, warranties, duties and obligations of the Primary Agent as if originally named as an Agent (as defined below) under the Distribution Agreement.

Such appointment is limited to each Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the term "Agent," as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to the Purchaser and (ii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Designated Securities and containing the name of the Purchaser. For purposes of Section 12 of the Distribution Agreement, the Purchaser confirms that its notice details are as set forth immediately beneath its name.

SECTION 1. Purchaser as Principal.

The Purchaser's obligation to purchase Designated Securities hereunder is subject to the accuracy, as of the Settlement Date, of the Company's representations and warranties contained in the Distribution Agreement and to the Company's performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein, including, without limitation, those pursuant to Sections 5, 6 and 7 thereof.

(i) Each sale of Designated Securities shall be made in accordance with the terms of this Agreement and a separate agreement to be entered into between the Company, the Primary Agent and the Purchaser which will provide for the sale of such Designated Securities to, and the purchase of and reoffering thereof by, the Purchaser as principal (a "Terms Agreement"). Each such Terms Agreement shall be substantially in the form attached hereto as Exhibit A or in such other form as the Primary Agent, the Company and the Purchaser may agree. Each Terms Agreement shall describe the Designated Securities to be purchased pursuant thereto by the Purchaser as principal, and shall specify, among other things, the principal amount of Designated Securities to be purchased, the interest rate and maturity date of such Designated Securities, the interest payment dates, the Offering Price, the Agent's Concession (as defined below), the Dealers' Concession (as defined below), the Reallowance (as defined below), if any, the net proceeds to the Company, the Applicable Time for such Designated Securities, the time of delivery of and payment for such Designated Securities (the "Settlement Date"), whether the Designated Securities are redeemable or repayable, and on what terms and conditions, whether there are any additional conditions precedent to the obligations of the Purchaser under such Terms Agreement and any other relevant terms.

2

(ii) Upon the closing of the sale of any Designated Securities sold by the Primary Agent to the Purchaser pursuant to a Terms Agreement as a result of a solicitation made by the Purchaser, the Purchaser agrees to purchase the Designated Securities at the purchase price (equal to the Offering Price less the Agent's concession (the "Agent's Concession") as set forth in the applicable Terms Agreement and pricing supplement setting forth the terms of each issuance of Designated Securities (the "Pricing Supplement").

(iii) The Purchaser shall purchase from the Primary Agent as principal for resale to Investors, or to Sub-Distributors as set forth in Section 2(ix) below, such aggregate principal amount of Designated Securities with respect to which it has communicated offers to purchase to the Primary Agent (the "Commitment Amount"). The Purchaser agrees to deliver to the Company or the Primary Agent, if specified by the Company, on the Settlement Date (or on such later date as may be specified by the Primary Agent) and at the place specified by the Primary Agent immediately available funds, payable to the order of the Company, for an amount equal to the Offering Price, less the Agent's Concession in respect of its Commitment Amount. The Company or the Primary Agent will deliver to the Purchaser the Designated Securities paid for by the Purchaser. If the Primary Agent has determined that transactions in the Designated Securities are to be settled through the facilities of DTC or another clearinghouse facility, payment for and delivery of Designated Securities purchased by the Purchaser shall be made through such facilities, if the Purchaser is a member, or, if the Purchaser is not a member, settlement shall be made through its ordinary correspondent who is a member.

SECTION 2. Purchaser's Representations, Warranties and Agreements.

The Purchaser hereby represents, warrants, agrees and undertakes to the Company that:

(i) this Agreement has been duly executed and delivered by it and constitutes or will constitute a legal, valid and binding obligation, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally, by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(ii) the execution of this Agreement and the performance of its obligations and any activities contemplated hereunder are within its corporate powers, and are lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different) and that any Purchase and holding of the Designated Securities will not contravene any law, rule (including the rules of any exchange), regulation or regulatory policy applicable to it;

(iii) it has taken all corporate action required to approve any such purchase of the Designated Securities by it and the proposed terms thereof;

(iv) the execution, delivery and performance by it of this Agreement will not conflict with or cause a breach under any other agreement to which it is party, except in each case where such breach would not, individually or in the aggregate, have a material adverse effect on its business or its ability to perform its obligations under this Agreement;

3

(v) it is solely responsible for deciding to purchase the Designated Securities, in making such decision it will rely solely on its own financial, legal, tax, accounting or other advisers and it has not relied upon the Company, any of the Company's affiliates or any of the Company's or its affiliates' officers, employees or representatives (collectively "Representatives") in making any such decision;

(vi) it will comply with all applicable selling, offering or distribution restrictions (howsoever described) in respect of the Designated Securities both (i) as described in the Pricing Disclosure Package and (ii) as required under the laws and regulations in force in any jurisdiction to which it and such sales are subject or in which it makes or is deemed to make such offers, purchases, sales, markets or arrangements and will obtain any consent, approval or permission that is required for the offer, purchase, sale, marketing or arrangement thereof by it or procure the same in relation to any affiliate through which it may sell the Designated Securities;

(vii)  it has implemented and currently maintains (and shall maintain for so long as it is a party to this Agreement) an anti-money laundering ("AML") program (including, without limitation, an effective customer identification program) that satisfies the requirements of (i) Section 326 of the USA PATRIOT Act (Pub. L. 107-56) and the regulations promulgated thereunder and (ii)  all applicable laws, rules and regulations of its own jurisdiction including, where applicable, the Bank Secrecy Act (as amended by the USA PATRIOT Act of 2001 (the "Act")).  The Purchaser further represents that it will adopt appropriate policies, procedures and internal controls to be fully compliant with any additional laws, rules or regulations, including the Bank Secrecy Act, to which it may become subject in any relevant jurisdiction;

(viii) it has taken or will take all necessary steps to ensure that (i) all purchases by it and (ii) all sales of the Designated Securities purchased from the Company comply with the rules, regulations and requirements of any relevant regulatory authority, relevant regulated trading market or relevant stock exchange, whether statutory or otherwise;

(ix) if offering, selling or marketing the Designated Securities in the United States, it is registered as a broker-dealer  under the Exchange Act;

(x) prior to the time an Investor commits to purchase any Security to be purchased from the Purchaser pursuant to this Agreement and re-sold by the Purchaser to such investor, it shall, in accordance with applicable law or regulation, provided that such material has been made available to the Purchaser in a timely manner by the Company, deliver to investors a copy of any relevant Pricing Disclosure Package materials relating to the Designated Securities to such investor.  (An "Investor" means, where the Purchaser re-sells or intends to re-sell Designated Securities, such persons to whom the Purchaser may sell or arrange for the sale of Designated Securities in accordance with the terms of this Agreement.);

(xi) in connection with the resale of the Designated Securities purchased, the Purchaser may engage the services of Sub-Distributors.  In any case where it shall sell the Designated Securities to any investor that is in turn re-selling to third parties (a "Sub-Distributor"), the Purchaser shall ensure that the Sub-Distributor is aware of, and complies with, the obligations of the Purchaser under this Agreement, as if applicable to such Sub-Distributor with respect to the offers and sales of Designated Securities by such Sub-Distributor;

4

(xii) it may sell Designated Securities to a Sub-Distributor at a price not less than the Offering Price less the applicable concession to dealers set forth in the applicable Pricing Supplement (the "Dealers' Concession");

(xiii) that any Sub-Distributor it may engage will agree that (i) such Sub-Distributor will offer the Designated Securities to Investors at the Offering Price and (ii) such Sub-Distributor will not reallow a discount on sales to other dealers in an amount in excess of the reallowance set forth in the applicable Pricing Supplement, if any (the "Reallowance").

(xiv) it shall comply with all applicable law and regulations (including, without limitation, (i) the U. S. and other countries' securities laws, (ii) NASD Rules 2730, 2740, 2750 and 2790 and in the case of a non-member broker-dealer in a foreign country, Rule 2420, as well as all other relevant NASD rules, and (iii) the rules of any relevant stock or other exchange or any like organization) and shall be solely responsible for the publication and contents of any marketing material published by it in relation to the Designated Securities and any and all other marketing activities in connection with its offering and selling activities;

(xv) in connection with re-sales of new issues of the Designated Securities purchased from the Company, it shall not provide any information or make any representations other than those contained in the Pricing Disclosure Package;

(xvi) neither it nor any of its affiliates, subsidiaries, their respective representatives, partners, officers, employees or agents shall use the name of "Lehman Brothers" or any other name registered by the Lehman Brothers group of companies or any part thereof in any statements (oral or written), marketing material or documentation in relation to its or their products without having first obtained the prior written consent of the Company;

(xvii) if at any time during the term of this Agreement, the Purchaser is informed or information comes to its attention that it is or may be in violation of any applicable law or regulations in connection with the purchase by it or on-sale of the Designated Securities, the Purchaser shall (i) immediately provide notice to Company or the Primary Agent of such information, (ii) immediately cease all offering, selling and marketing activities with respect to any Designated Securities, (iii) take all appropriate steps to remedy such violation and comply with such applicable law or regulations in all respects and (iv) upon the consent of Company or the Primary Agent, resume such offering, selling or marketing activities only after all such violations have been cured.  Further, the Purchaser shall establish and maintain all proper records (particularly, but without limitation, accounting records) required by any law, code of practice or corporate policy applicable to it from time to time; and

(xviii) if at any time during the term of this Agreement, the Purchaser is informed or information comes to its attention that any Sub-Distributor is or may be in violation of any applicable law or regulations in connection with the purchase or on-sale of the Designated Securities, the Purchaser shall (i) immediately provide notice to the Company or the Primary Agent of such information, (ii) immediately cease all offering, selling and marketing activities with such Sub-Distributor with respect to any Designated Securities and (iii) upon the consent of the Company or the Primary Agent, resume such offering, selling or marketing activities with such Sub-Distributor.

5

SECTION 3.  Suitability.

The Purchaser acknowledges and agrees to the following:

(i) it is a sophisticated institutional client and has such knowledge and experience in financial and business matters as to be capable of evaluating the risks and merits of an investment in the Designated Securities;

(ii) it is solely responsible for evaluating all information provided to it related to and in respect of the Designated Securities and it has not relied upon advice from the Company, any of its affiliates or any of their Representatives regarding the suitability of the Designated Securities as an investment for its investors and to the extent applicable, itself; and

(iii) it will determine whether any Designated Securities sold to an Investor are a suitable investment for such Investor, and that the Purchaser has not relied upon advice from the Company or any affiliate regarding such determination.

SECTION 4. Additional Indemnification by the Purchaser.

The Purchaser agrees to indemnify and hold harmless the Company and any entity within the Lehman Brothers group of companies, from and against all actual or alleged actions, claims, demands, proceedings, investigations, liabilities or judgments (collectively, "Claims") and any and all losses, damages, costs, charges and expenses (including all costs, expenses, and fees connected with investigating, preparing or defending any such Claims) of whatever nature and in whatever jurisdiction, and which arise directly or indirectly from (i) any breach by the Purchaser (or any of its Sub-Distributors) of any warranty, representation or agreement, or its failure to perform any of its respective obligations hereunder, (ii) the performance by the Purchaser (or any of its Sub-Distributors) of any activity in connection with the marketing, promotion, offer, sale, resale, distribution or transfer of the Designated Securities, (iii) the failure by the Purchaser (or any of its Sub-Distributors) to comply with any law or regulation applicable to the Purchaser (or any of its Sub-Distributors) in respect of such distribution activities; and (iv) the contents of any marketing material or statement produced, published, made or distributed or statements made by the Purchaser (or any of its Sub-Distributors) in connection with the marketing, promotion, offer, sale, resale, distribution or transfer of the Designated Securities (except, with respect to (i) – (iv), to the extent that the claim for which the Company seeks indemnification relates to information supplied by the Company).

SECTION 5. Miscellaneous.

Subparagraph A of the subsection entitled Settlement Procedures of the General Procedures Section of the Administrative Procedures attached as Exhibit A to the Distribution Agreement (the "Administrative Procedures") is hereby amended by permitting the Agent to advise the Company and the Trustee by telephone in addition to in writing, by telex or facsimile.

The subsection entitled Acceptance and Rejection of Offers of the Special Administrative Procedures for Book-Entry Notes Issuance Section of the Administrative Procedures is hereby amended by permitting the Agent, unless otherwise instructed by the Company, to advise the Company by e-mail as well as telephone.

6

Subparagraph A of the subsection entitled Settlement Procedures of the Special Administrative Procedures for Book-Entry Notes Issuance Section of the Administrative Procedures is hereby amended by permitting the Agent to advise the Company and the Trustee by telephone in addition to in writing, by telex or facsimile.

The undersigned agrees to perform its duties and obligations specifically provided to be performed by the Purchaser in accordance with the terms and provisions of the Distribution Agreement, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

053137-0169-10049-NY03.2491841.14

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____

Name: Eric Glicksman

Title: Managing Director

UBS FINANCIAL SERVICES INC.

By: _____

Name: Jorge Ramirez

Title: Executive Director


Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel


Accepted: March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.


By _____

Name:

Title:


LEHMAN BROTHERS INC.


By _____

Name:

Title:

053137-0169-10049-NY03.2491841.14

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____
　　Name:
　　Title:

UBS FINANCIAL SERVICES INC.

By: _____
　　Name:
　　Title:

Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel

Accepted: March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.

By _____
　　Name:  Andrew H.W. Yeung
　　Title:  Vice President

LEHMAN BROTHERS INC.

By _____
　　Name:
　　Title:

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel

Accepted: March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name:
    Title:

LEHMAN BROTHERS INC.

By _Christina D Sfakianis_
    Name: _Christina D Sfakianis_
    Title: _SVP_

053137-0169-10049-NY03.2491841.14

EXHIBIT A

# LEHMAN BROTHERS HOLDINGS INC.

## U.S. Structured Notes

FORM OF TERMS AGREEMENT

_____ ___, 20___

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York  10019
Attention: Treasurer

    Lehman Brothers Holdings Inc., a Delaware corporation (the "Company") and Lehman Brothers Inc., a Delaware corporation (the "Primary Agent"), have previously entered into a U.S. Structured Notes Purchase Agreement dated [__], 2007 (the "Purchase Agreement"), among the Company, the Primary Agent and UBS Financial Services Inc. (the "Purchaser"), with respect to the issue and sale by the Company of certain of its structured securities (the "Designated Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended between the Company and Citibank, N.A., as Trustee.  The Purchase Agreement provides that sales of Designated Securities shall be made pursuant to the Purchase Agreement and a separate agreement between the Company, the Primary Agent and the Purchaser as principal.

    The Purchaser agrees to purchase from the Primary Agent, at the purchase price (equal to the Offering Price less the Agent's Concession set forth in the Term Sheet), $_____ principal amount of Designated Securities.  The Designated Securities have the terms indicated in the Term Sheet attached as Schedule I hereto.

    The term "Applicable Time" means _____ [a.m.][p.m.] (New York City time) on the date of this Agreement.

    The Purchaser's obligation to purchase Designated Securities hereunder is subject to the accuracy, as of the Settlement Date, of the Company's representations and warranties contained in the Distribution Agreement and to the Company's performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein.

    Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement.

A-1

The undersigned agrees to perform its duties and obligations specifically provided to be performed by the Purchaser in accordance with the terms and provisions of the Purchase Agreement and the procedures, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws of New York.  This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

A-2

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:

UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:

Accepted: _____ ___, 20___

LEHMAN BROTHERS HOLDINGS INC.

By:_____
    Name:
    Title:

LEHMAN BROTHERS INC.

By:_____
    Name:
    Title:

053137-0169-10049-NY03.2491841.14

SCHEDULE I

[Term Sheet]

Execution Copy

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

U.S. STRUCTURED NOTES PURCHASE AGREEMENT
AMENDMENT 1

November 5, 2007

Lehman Brother Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Reference is made to the purchase agreement dated March 9, 2007 (the "Purchase Agreement") among Lehman Brothers Holdings Inc., Lehman Brothers Inc. and UBS Financial Services Inc.  Except as otherwise expressly provided herein, capitalized terms used but not defined herein shall have the same meanings ascribed to such terms in the Purchase Agreement or the Distribution Agreement (as defined in the Purchase Agreement), as applicable.

Section 2 of the Purchase Agreement is amended:

(1) By adding a new clause (xix) as follows:

"(xix) in connection with any offering by the Purchaser of any Designated Securities:

(a) it has not and will not use, authorize use of, refer to, or participate in the planning for the use of, any written communication relating to any offer of Designated Securities that would constitute a "free writing prospectus" (as defined in Rule 405 of the Rules and Regulations) without the prior written consent of the Company and the Primary Agent (which consent is deemed to have been given with respect to any Issuer Free Writing Prospectus provided to the Purchaser by the Company and the Primary Agent with respect to such Designated Securities), other than any free writing prospectus that (i) does not contain any "issuer information" (as defined in Rule 433(h)(2) of the Rules and Regulations)

that was not included in a previously filed Issuer Free Writing Prospectus
with respect to such Designated Securities or in the Prospectus (ii)
contains only information with respect to such Designated Securities
(including information as to the final terms of any Designated Securities)
included in an Issuer Free Writing Prospectus provided to the Purchaser
by the Company and the Primary Agent with respect to such Designated
Securities, and (iii) does not and will not require filing with the
Commission pursuant to Rule 433 of the Rules and Regulations; and

(b) it will comply with the requirements of Rule 433 of the Rules
and Regulations with respect to any free writing prospects prepared in
accordance with clause (a) above.

(2) By amending clause (xvi) to insert the following provision at the end thereof:

"; *provided*, however, that consent of the Company is deemed to have
been given with respect to any free writing prospectus prepared by the
Purchaser in compliance with clause (xix) hereof

The undersigned agrees to perform its duties and obligations specifically provided
to be performed by the Purchaser in accordance with the terms and provisions of the
Purchase Agreement and the procedures, as amended or supplemented hereby.  Except as
expressly amended or supplemented hereby, the provisions of the Purchase Agreement
shall remain in full force and effect and the Purchase Agreement shall be read and
construed as one document with this Amendment 1.

This Agreement shall be subject to the termination provisions of Section 10 of the
Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws
of New York.  This Agreement may be executed in one or more counterparts and the
executed counterparts taken together shall constitute one and the same agreement.

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By:_____
   Name:
   Title:


UBS FINANCIAL SERVICES INC.

By:_____
   Name:
   Title:


Accepted:  November 5, 2007


LEHMAN BROTHERS HOLDINGS INC.


By:_____
   Name:
   Title:

LEHMAN BROTHERS INC.


By:_____
   Name:
   Title:

# LEHMAN BROTHERS

March 9, 2007

UBS Financial Services Inc.
800 Harbor Boulevard, Third Floor
Weehawken, NJ 07086
Attention: Structured Products Group

Dear Sirs/Mesdames:

Pursuant to the Purchase Agreement, dated the date hereof, you are becoming an Agent under the Distribution Agreement, dated as of May 30, 2006, between our parent company, Lehman Brothers Holdings Inc. (the "Company"), and us Lehman Brothers Inc. (the "Primary Agent") with respect to the sale from time to time by the Primary Agent of the Company's Medium-Term Notes, Series I (the "Notes"). In order to induce you to act as an Agent under the Distribution Agreement, we agree to use our reasonable efforts (i) to create, participate in and maintain a secondary market for the Notes offered through you in order to provide a liquid market into which investors may dispose of such Notes so long as such Notes remain outstanding and (ii) to provide to you each trading day bid and asked prices for any outstanding Notes offered through you; provided, however, that (1) the foregoing shall not constitute a commitment to purchase or sell, or to offer to purchase or sell, Notes at any particular price or in unlimited quantities and (2) we may refrain from any such activities as and when necessary in our reasonable opinion to comply with applicable laws, regulations and requirements of self-regulatory organizations, including but not limited to Regulation M.

Very truly yours,

LEHMAN BROTHERS INC.

By: _Christine D. Sfakianos_

Name: _Christina D. Sfakianos_

Title: _SVP_

Acknowledged and agreed:

UBS FINANCIAL SERVICES INC.

By: _____

   Name:
   Title:

By: _____

   Name:
   Title:

# LEHMAN BROTHERS

March 9, 2007

UBS Financial Services Inc.
800 Harbor Boulevard, Third Floor
Weehawken, NJ 07086
Attention: Structured Products Group

Dear Sirs/Mesdames:

Pursuant to the Purchase Agreement, dated the date hereof, you are becoming an Agent under the Distribution Agreement, dated as of May 30, 2006, between our parent company, Lehman Brothers Holdings Inc. (the "Company"), and us Lehman Brothers Inc. (the "Primary Agent") with respect to the sale from time to time by the Primary Agent of the Company's Medium-Term Notes, Series I (the "Notes"). In order to induce you to act as an Agent under the Distribution Agreement, we agree to use our reasonable efforts (i) to create, participate in and maintain a secondary market for the Notes offered through you in order to provide a liquid market into which investors may dispose of such Notes so long as such Notes remain outstanding and (ii) to provide to you each trading day bid and asked prices for any outstanding Notes offered through you; provided, however, that (1) the foregoing shall not constitute a commitment to purchase or sell, or to offer to purchase or sell, Notes at any particular price or in unlimited quantities and (2) we may refrain from any such activities as and when necessary in our reasonable opinion to comply with applicable laws, regulations and requirements of self-regulatory organizations, including but not limited to Regulation M.

Very truly yours,

LEHMAN BROTHERS INC.

By: _____
    Name:
    Title:

Acknowledged and agreed:

UBS FINANCIAL SERVICES INC.

By: _____
    Name: Eric Glicksman
    Title: Managing Director

By: _____
    Name: Jorge Ramirez
    Title: Executive Director

08-13425-jmp    Doc 7207-27    Filed 09/09/13    Entered 09/09/13 18:49:50    Exhibit B
Pg 38 of 357

# EXHIBIT B

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

DISTRIBUTION AGREEMENT

May 30, 2006

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), confirms its agreement with you (the "Agent") with respect to the issue and sale by the Company of its Medium-Term Notes, Series I (the "Medium-Term Notes" or the "Securities"). The Securities are to be issued pursuant to an indenture, dated as of September 1, 1987, as amended and supplemented to date (as amended, the "Indenture"), between the Company and Citibank, N.A., as trustee (the "Trustee").

Subject to the terms and conditions stated herein and subject to the reservation by the Company of the right to sell Securities directly on its own behalf at any time, and to any person, the Company hereby appoints the Agent as the exclusive agent of the Company for the purpose of soliciting offers to purchase the Securities from the Company by others. This Agreement shall only apply to sales of the Securities and not to sales of any other securities or evidences of indebtedness of the Company and only on the specific terms set forth herein.

SECTION 1    Representations and Warranties. The Company represents and warrants to the Agent as of the date hereof, as of the Closing Date referred to in Section 2(e) hereof, and as of the times referred to in Section 6(a) hereof (the Closing Date and each such time being hereinafter sometimes referred to as a "Representation Date"), as follows:

(a)    An "automatic shelf effective registration statement" (as defined in Rule 405 ("Rule 405") under the Securities Act of 1933, as amended (the "Securities Act")) relating to the Securities (i) has been prepared by the Company in conformity with the requirements of the Securities Act and the rules and regulations (the "Rules and Regulations") of the Securities and Exchange Commission (the "Commission") thereunder; (ii) has been filed with the Commission under the Securities Act not earlier than the date that is three years prior to the date hereof; and (iii) is effective under the Securities Act. Copies of such registration statement and any amendment thereto have been delivered by the Company to you as the Agent. As used in this Agreement:

(i)    "Applicable Time" means the time and date set forth in the Purchase Agreement (as defined below) for an issue of Securities or, when not otherwise agreed to between the Company and the Agent, the time and date when

1

CONFIDENTIAL

UBSFS_SDNY1083332

the Agent first conveys to purchasers the pricing terms of an issue of Securities set forth in the applicable Term Sheet for such issue of Securities;

(ii) "<u>Base Prospectus</u>" the base prospectus filed as part of such registration statement, in the form in which it has most recently been filed with the Commission on or prior to the date of this Agreement;

(iii) "<u>Effective Date</u>" means any date as of which any part of such registration statement relating to the Securities became, or is deemed to have become, effective under the Securities Act in accordance with the Rules and Regulations (including pursuant to Rule 430B of the Rules and Regulations);

(iv) "<u>Issuer Free Writing Prospectus</u>" means each "issuer free writing prospectus" (as defined in Rule 433 of the Rules and Regulations ("<u>Rule 433</u>")) in connection with the offering of the Securities;

(v) "<u>Preliminary Prospectus</u>" means any preliminary prospectus relating to the Securities, including the Base Prospectus and any prospectus supplement thereto relating to the Securities, as filed with the Commission pursuant to Rule 424(b) of the Rules and Regulations ("<u>Rule 424(b)</u>");

(vi) "<u>Pricing Disclosure Package</u>" means, as of the Applicable Time for an issue of Securities, the most recent Preliminary Prospectus, together with each Issuer Free Writing Prospectus filed or used by the Company on or before the Applicable Time and any Term Sheet prepared and filed pursuant to Section 3(a) hereof;

(vii) "<u>Prospectus</u>" means the final prospectus relating to the Securities, including the Base Prospectus and any prospectus supplement thereto relating to the Securities, as filed with the Commission pursuant to Rule 424(b); and

(viii) "<u>Registration Statement</u>" means, collectively, the various parts of such registration statement, each as amended as of the Effective Date for such part, including any Preliminary Prospectus or Prospectus deemed to be a part thereof pursuant to Rule 430B of the Rules and Regulations, and all exhibits to such registration statement.

Any reference to the "<u>most recent Preliminary Prospectus</u>" shall be deemed to refer to the latest Preliminary Prospectus included in the Registration Statement or filed pursuant to Rule 424(b) on or prior to the date hereof. Any reference to any Preliminary Prospectus or the Prospectus shall be deemed to refer to and include any documents incorporated by reference therein pursuant to Form S-3 under the Securities Act as of the date of such prospectus. Any reference to any amendment or supplement to any Preliminary Prospectus or the Prospectus shall be deemed to refer to and include any post-effective amendment to the Registration Statement, any prospectus supplement relating to the Securities filed with the Commission pursuant to Rule 424(b) and any document filed under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), and incorporated by reference in such prospectus, in each case after the date of such prospectus; and any reference to any amendment to the Registration Statement shall be deemed to include any annual report of the Company on Form 10-K filed with the Commission

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083333

pursuant to Section 13(a) or 15(d) of the Exchange Act after the Effective Date that is incorporated by reference in the Registration Statement.

The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus, any Issuer Free Writing Prospectus or the Prospectus or suspending the effectiveness of the Registration Statement, and no proceeding or examination for such purpose has been instituted or, to the Company's knowledge, threatened by the Commission.  The Commission has not notified the Company of any objection to the use of the form of the Registration Statement pursuant to Rule 401(g)(2) of the Rules and Regulations.

(b)  The Company has been since the time of initial filing of the Registration Statement and continues to be a "well-known seasoned issuer" eligible to use Form S-3 for the offering of the Securities, including not having been an "ineligible issuer" (as such terms are defined in Rule 405) at any such time or date.

(c)  The Registration Statement conforms, and the Prospectus and any further amendments or supplements to the Registration Statement or the Prospectus will conform in all material respects to the requirements of the Securities Act and the Rules and Regulations; the Registration Statement and any post-effective amendments thereto do not and will not, as of the applicable effective date or dates, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and the Prospectus and any amendment or supplement thereto will not, as of its date, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided*, *however*, that this representation or warranty shall not apply to statements or omissions made in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein or to any statements in or omissions from the statement of eligibility and qualification on Form T-1 of the Trustee under the Trust Indenture Act ("Form T-1").  The documents incorporated by reference into any Preliminary Prospectus and the Prospectus, at the time they were or are filed with the Commission, conform, conform or will conform, as the case may be, in all material respects with the requirements of the Securities Act and the Rules and Regulations and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and did not or will not, as the case may be, include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d)  The Pricing Disclosure Package for any issue of Securities will not, as of the Applicable Time for such issue of Securities, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that no representation or warranty is made as to (i) information contained in or omitted from the Pricing Disclosure Package in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein, (ii) any statements in or omissions from the Form T-1, or (iii) any other information listed on Schedule III to the Purchase Agreement or otherwise agreed to between the Company and the Agent.

(e)  The Company has not made any written communication relating to the Securities that would constitute an Issuer Free Writing Prospectus (other than the Term Sheet

3

053137-0169-10049-NY03.2491841.14

prepared and filed pursuant to Section 3(a) hereof) without the prior consent of the Agent; the Company has complied and will comply with the requirements of Rule 433 with respect to any such Issuer Free Writing Prospectus; any such Issuer Free Writing Prospectus will not, as of its issue date and through the time the Securities are delivered pursuant to Section 3 hereof, include any information that conflicts with the information contained in the Registration Statement and the Prospectus; and any such Issuer Free Writing Prospectus, when taken together with the information contained in the Registration Statement and the Prospectus, did not, when issued or filed pursuant to Rule 433, and does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that this representation or warranty shall not apply to statements or omissions made in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein.

(f)    The nationally recognized independent registered public accounting firm whose report appears in the Company's most recent Annual Report on Form 10-K, which is incorporated by reference in the Prospectus, are independent registered public accountants as required by the Securities Act and the Rules and Regulations. In the event that a report of a nationally recognized independent registered public accounting firm regarding historical financial information with respect to any entity acquired by the Company is required to be incorporated by reference in the Prospectus, such independent registered public accountants were independent public accountants, as required by the Securities Act and the Rules and Regulations, during the period of their engagement to examine the financial statements being reported on and at the date of their report.

(g)    The audited consolidated financial statements of the Company included in the Prospectus and the Registration Statement present, and will present, as of the applicable Representation Date and during each period during which solicitations of offers to purchase Securities have not been suspended or during which, in the opinion of counsel to the Agent, a prospectus relating to the Securities is required to be delivered under the Securities Act (or required to be delivered but for Rule 172 of the Rules and Regulations) (each a "Marketing Period"), fairly on a consolidated basis the financial position, the results of operations, changes in common stock and stockholder's equity and cash flows of the Company and its subsidiaries as of the respective dates and for the respective periods indicated, all in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved. The unaudited consolidated financial statements of the Company, if any, included in the Prospectus and the Registration Statement and the related notes are, and will be, as of the applicable Representation Date and during each Marketing Period, true, complete and correct, subject to normally recurring changes resulting from year-end audit adjustments, and prepared in accordance with Regulation S-X of the Rules and Regulations.

(h)    Except as described in or contemplated by the Registration Statement and the Prospectus, there has not been any material adverse change in, or any adverse development which materially affects, the business, properties, financial condition or results of operations of the Company or the Company and its subsidiaries taken as a whole from the dates as of which information is given in the Registration Statement and the Prospectus.

(i)    The Securities conform to the description thereof contained in the Prospectus, are duly and validly authorized, and, when validly authenticated, issued and delivered in

4

accordance with the Indenture and sold as provided in this Agreement, will be validly issued and outstanding obligations of the Company entitled to the benefits of the Indenture.

(j)  The Indenture has been duly and validly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The Indenture (i) has been duly qualified under the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), (ii) complies as to form with the requirements of the Trust Indenture Act and (iii) conforms to the description thereof in the Prospectus.

(k)  This Agreement has been duly authorized, executed and delivered by the Company and constitutes the valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The execution, delivery and performance of this Agreement and the consummation of any related transactions described in the Registration Statement will not (i) conflict with, result in the creation or imposition of any lien, charge or encumbrance upon any of the assets of the Company or any of its Significant Subsidiaries pursuant to the terms of, or constitute a default under, any agreement, indenture or instrument, (ii) result in a violation of the organizational documents of the Company or any of its Significant Subsidiaries or (iii) result in the violation of any statute or any order, rule or regulation of any court or governmental agency having jurisdiction over the Company, any of its Significant Subsidiaries or their property, except in the case of clauses (i) and (iii) above for such conflict or violation that would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the business, condition or properties of the Company and its subsidiaries taken as a whole (a "Material Adverse Effect"). Except as set forth in the Prospectus or as required by the Securities Act, the Exchange Act, the Trust Indenture Act and applicable state securities laws, no consent, authorization or order of, or filing or registration with, any court or governmental agency is required for the execution, delivery and performance of this Agreement. "Significant Subsidiary" means any subsidiary of the Company with assets greater than or equal to 7.5% of the assets of the Company and its subsidiaries determined on a consolidated basis in accordance with GAAP (the "Consolidated Assets").  For the purposes of this definition, the Consolidated Assets at any time shall be determined on the basis of the financial statements in the Company's most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, as the case may be, filed with the Commission.

(l)  Each of the Company and the Significant Subsidiaries have been duly organized, are validly existing and in good standing under the laws of their respective jurisdictions of formation, are duly qualified to do business and in good standing as foreign corporations and are duly registered as a broker-dealer, broker, dealer or investment advisor, as the case may be, in each jurisdiction in which their respective ownership of property or the conduct of their respective businesses requires such qualification or registration, except for such jurisdictions in which the failure to qualify, to be in good standing or to register would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Each

5

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                                    UBSFS_SDNY1083336

of the Company and the Significant Subsidiaries holds all licenses, permits, and certificates from governmental authorities necessary for the conduct of its business and owns, or possesses adequate rights to use, all rights necessary for the conduct of such business and has not, to the Company's knowledge, received any notice of conflict with the asserted rights of others in respect thereof, except in each case where the failure to do so would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and each of the Company and the Significant Subsidiaries has the power and authority necessary to own or hold its properties and to conduct the businesses in which it is engaged. Neither the Company nor any of the Significant Subsidiaries is in violation of its organizational documents or in default under any agreement, indenture or instrument, the effect of which violation or default would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Except as may be disclosed in the Registration Statement and the Prospectus, all outstanding shares of capital stock of the Significant Subsidiaries have been duly authorized and are validly issued and outstanding, fully paid and non-assessable and, except for directors' qualifying shares, are owned by the Company, directly or indirectly through subsidiaries, free and clear of any lien, pledge and encumbrance or any claim of any third party.

(m)  Except as described in the Registration Statement and the Prospectus, there is no litigation or governmental proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its subsidiaries which might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or which is required to be disclosed in the Registration Statement and the Prospectus.

(n)  The Company is not, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Prospectus, an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "1940 Act").

(o)  The certificates delivered pursuant to paragraph (d) of Section 5 hereof and all other documents delivered by the Company or its representatives in connection with the issuance and sale of the Securities were on the dates on which they were delivered, or will be on the dates on which they are to be delivered, in all material respects true and complete.

(p)  Any certificate signed by any officer of the Company and delivered to one or more Purchasers (as hereinafter defined) or to counsel for the Purchasers in connection with an offering of the Securities to one or more Purchasers as principal or through the Agent or an Additional Agent as agent shall be deemed a representation and warranty by the Company to such Purchasers, Agent or Additional Agents (as the case may be) as to the matters covered thereby on the date of such certificate and, unless subsequently amended or supplemented, at each Representation Date subsequent thereto.

SECTION 2   Solicitations as Agent

. (a)      On the basis of the representations and warranties contained herein, but subject to the terms and conditions herein set forth, the Agent agrees, as exclusive agent of the Company, to use its reasonable best efforts to solicit offers to purchase the Securities upon the terms and conditions set forth in the Prospectus. The Agent shall not otherwise employ, pay or compensate any other person to solicit offers to purchase the Securities or to perform any of its functions as agent without the prior written consent of the Company. The Company reserves the

053137-0169-10049-NY03.2491841.14

6

right, in its sole discretion, to suspend solicitation of offers to purchase the Securities commencing at any time for any period of time or permanently. Upon receipt of at least one business day's prior notice from the Company, the Agent will forthwith suspend solicitation of offers to purchase Securities from the Company until such time as the Company has advised the Agent that such solicitation may be resumed. For the purpose of the foregoing sentence, "business day" shall mean any day which is not a Saturday or Sunday and which in New York City is not a day on which banking institutions are generally authorized or obligated by law to close. The Agent is authorized to solicit offers to purchase the Securities only in denominations of $1,000 or any amount in excess thereof which is an integral multiple of $1,000, at a purchase price equal to 100% of the principal amount thereof, or such other denominations or purchase price as shall be specified by the Company. The Agent shall communicate to the Company, orally or in writing, each reasonable offer to purchase Securities received by it as Agent. The Company shall have the sole right to accept offers to purchase the Securities and may reject any such offer in whole or in part. The Agent shall have the right, in its discretion reasonably exercised without advising the Company, to reject any offer to purchase the Securities received by it in whole or in part, and any such rejection shall not be deemed a breach of its agreement contained herein.

(b)  Promptly upon the closing of the sale of any Securities sold by the Company as a result of a solicitation made by the Agent, the Company agrees to pay the Agent a commission agreed to between the Company and the Agent.

(c)  The Agent represents and warrants to, and agrees with, the Company that it has not made, and will not make, any offer relating to the Securities that would constitute a "free writing prospectus" (as defined in Rule 405), without the prior written consent of the Company, other than one or more free writing prospectuses relating to the Securities containing customary information not inconsistent with the Term Sheet (as defined in Section 3(a) below) prepared and filed by the Company pursuant to Section 3(a) hereof.

(d)  Administrative procedures respecting the sale of each of the Securities shall be agreed upon from time to time by the Agent and the Company (the "Procedures"). The Procedures initially shall include those procedures set forth in Exhibit A hereto. The Agent and the Company agree to perform the respective duties and obligations specifically provided to be performed by each of them herein and in the Procedures.

(e)  The documents required to be delivered by Section 5 hereof shall be delivered at the offices of Lehman Brothers Inc., 745 Seventh Avenue, New York, New York 10019, no later than 10:00 A.M., New York City time, on the date of this Agreement or at such later time as may be mutually agreed by the Company and the Agent, which in no event shall be later than the time at which the Agent commences solicitation of purchasers of Securities hereunder, such time and date be herein called the "Closing Date."

SECTION 3   Covenants of the Company. The Company covenants and agrees with the Agent that it will furnish (to the extent it has not already done so) to each of the Agent and Simpson Thacher & Bartlett LLP, counsel to the Agent, a copy of the Registration Statement, including all exhibits, in the form it became effective and all of the amendments thereto and that:

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                                  UBSFS_SDNY1083338

(a)  Unless otherwise notified by the Agent, the Company will prepare a final term sheet (a "<u>Term Sheet</u>") relating to each offering of Securities, containing only information that describes the final terms of the Securities or the offering, in the form consented to by the Agent (which, in the case of any issue of Securities to be sold pursuant to a Purchase Agreement, will be in the form set forth in Schedule IV to such Purchase Agreement), and will file such Term Sheet pursuant to and in the time period required by Rule 433(d) of the Rules and Regulations ("<u>Rule 433(d)</u>").

(b)  The Company will prepare, with respect to any Securities to be sold through or to the Agent pursuant to this Agreement, a pricing supplement with respect to such Securities in the form agreed to by the Agent and will file such pricing supplement with the Commission prusuant to Rule 424(b) not later than the time specified by such rule.

(c)  The Company shall advise the Agent promptly (i) of any proposal to amend or supplement the Registration Statement or the Prospectus and will afford the Agent a reasonable opportunity to comment on any such proposed amendment or supplement and will advise the Agent of the filing of any such amendment or supplement; (ii) of any request or proposed request by the Commission for an amendment or supplement to the Registration Statement, the Prospectus, to any document incorporated by reference in any of the foregoing or for additional information; (iii) of the issuance by the Commission of any stop order preventing or suspending the use of the Prospectus, any Preliminary Prospectus or any Issuer Free Writing Prospectus, or the effectiveness of the Registration Statement or any part thereof or the initiation or threat of any stop order proceeding and will use its best efforts to prevent the issuance of any stop order and to obtain as soon as possible its lifting, if issued; (iv) of receipt by the Company of any notification by the Commission of any objection to the use of the form of the Registration Statement pursuant to Rule 401(g)(2) of the Rules and Regulations and (v) of the receipt by the Company of any order with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the initiation or threat of any proceeding for that purpose. The Company will use its best efforts to prevent the issuance of any order referred to in clause (iii) or (v) and, if issued, to obtain as soon as possible the withdrawal thereof.  In the event of its receipt of any notification referred to in clause (iv), the Company will promptly take such steps including, without limitation, amending the Registration Statement or filing a new registration statement, at its own expense, as may be necessary to permit offers and sales of the Securities by the Agent (and references herein to the "Registration Statement" shall include any such amendment or new registration statement).

(d)  If, during any Marketing Period, any event occurs as a result of which the Prospectus would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it is necessary at any time to amend the Prospectus to comply with the Securities Act, the Company will notify the Agent promptly to suspend solicitation of purchases of the Securities; and if the Company shall decide to amend or supplement the Registration Statement or the Prospectus, it will promptly advise the Agent by telephone (with confirmation in writing) and will promptly prepare and file with the Commission an amendment or supplement which will correct such statement or omission or an amendment which will effect such compliance and will use its reasonable best efforts to cause any amendment of the Registration Statement containing an amended Prospectus to be made effective as soon as possible.

053137-0169-10049-NY03.2491841.14

8

(e)  The Company will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus (other than the Term Sheet prepared and filed pursuant to Section 3(a) hereof) without the prior written consent of the Agent.

(f)  The Company will file promptly all material required to be filed by the Company with the Commission pursuant to Rule 433(d), will retain in accordance with Rule 433(g) of the Rules and Regulations all Issuer Free Writing Prospectuses not required to be filed pursuant to the Rules and Regulations; and if at any time after the date hereof any events shall have occurred as a result of which any Issuer Free Writing Prospectus, as then amended or supplemented, would conflict with the information in the Registration Statement or the Prospectus or would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or, if for any other reason it shall be necessary to amend or supplement any Issuer Free Writing Prospectus, to notify the Agent and, upon its request, to file such document and to prepare and furnish without charge to the Agent as many copies as the Agent may from time to time reasonably request of an amended or supplemented Issuer Free Writing Prospectus that will correct such conflict, statement or omission or effect such compliance.

(g)  As soon as practicable, but not later than 18 months, after the date of each acceptance by the Company of an offer to purchase Securities hereunder, the Company will make generally available to its security holders an earnings statement which will satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 of the Rules and Regulations under the Securities Act.

(h)  The Company will furnish to the Agent without charge written and electronic copies of the Registration Statement, including all exhibits, the Prospectus and all amendments and supplements to such documents, and any Issuer Free Writing Prospectus in each case as soon as available and in such quantities as are reasonably requested.

(i)  The Company will furnish such information, execute such instruments and take such actions as may be required to qualify the Securities for offering and sale under the laws of such jurisdictions as the Agent may designate and will maintain such qualifications in effect so long as required for the sale of the Securities; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action which would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

(j)  The Company will pay the required Commission filing fees relating to the Securities within the time period required by Rule 456(b)(1) of the Rules and Regulations without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r) of the Rules and Regulations.

(k)  If required by Rule 430B(h) of the Rules and Regulations, the Company will prepare a prospectus in a form approved by the Agent and to file such prospectus pursuant to Rule 424(b) not later than may be required by such Rule; and the Company will make no further amendment or supplement to such prospectus that will be disapproved by the Agent promptly after reasonable notice thereof.

9

053137-0169-10049-NY03.2491841.14

                                                                                          UBSFS_SDNY1083340

SECTION 4    Payment of Expenses

. The Company will pay (i) the costs incident to the authorization, issuance, sale and delivery of the Securities and any taxes payable in that connection, (ii) the costs incident to the preparation, printing and filing under the Securities Act of the Registration Statement and any amendments and exhibits thereto, (iii) the costs incident to the preparation, printing and filing of any document and any amendments and exhibits thereto required to be filed by the Company under the Exchange Act, (iv) the costs of distributing the Registration Statement, as originally filed, and each amendment and post-effective amendment thereof (including exhibits), any Preliminary Prospectus in any of the foregoing documents, the Prospectus, any Issuer Free Writing Prospectus and any amendments thereof or supplements thereto, (v) the fees and disbursements of the Trustee and its counsel, (vi) the cost of any filings with the National Association of Securities Dealers, Inc., (vii) the fees and disbursements of counsel to the Company and the Company's accountants, (viii) the fees paid to rating agencies in connection with the rating of the Securities, (ix) the fees and expenses of qualifying the Securities under the securities laws of the several jurisdictions as provided in Section 3(h) hereof and of preparing and printing a Blue Sky Survey and a memorandum concerning the legality of the Securities as an investment (including fees and expenses of the Agent's counsel in connection therewith) and (x) all other costs and expenses incident to the performance of the Company's obligations under this Agreement. In addition, the Company agrees to reimburse the Agent for the fees and disbursements of its legal counsel.

SECTION 5    Conditions of Obligations. The obligation of the Agent, as agent of the Company, under this Agreement to solicit offers to purchase the Securities is subject to the accuracy in all material respects, on each Representation Date, of the representations and warranties on the part of the Company contained herein, to the accuracy of any material statements of officers of the Company made in any certificates, opinions, affidavits, written statements or letters furnished to the Agent or counsel to the Agent pursuant to the provisions hereof, to the performance by the Company of its obligations hereunder, and to each of the following additional conditions precedent:

(a)  No order suspending the effectiveness of the Registration Statement or preventing or suspending the use of the Prospectus or any Issuer Free Writing Prospectus, or suspending the qualification of the Indenture shall be in effect and no proceedings for such purpose shall be pending before or threatened by the Commission; no notice of objection of the Commission to use the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations shall be have been received by the Company; and any requests for additional information on the part of the Commission (to be included in the Registration Statement or the Prospectus or otherwise) shall have been complied with to the reasonable satisfaction the Agent.

(b)  At the Closing Date, the Company shall have furnished to the Agent the opinion of the Chief Legal Officer, General Counsel or an Associate General Counsel of the Company, addressed to the Agent and dated the Closing Date, to the effect that:

(i)  The Company has been duly incorporated and is validly existing and in good standing as a corporation under the law of the jurisdiction of its incorporation and has full corporate power to conduct the businesses in which it is engaged as described in the Prospectus. Each of the Significant Subsidiaries that is incorporated under the laws of

053137-0169-10049-NY03.2491841.14

10

the United States or any State or territory thereof (a "Domestic Significant Subsidiary") is a duly incorporated and validly existing corporation in good standing under the law of its jurisdiction of incorporation, and has full corporate power and authority to conduct its business as described in the Prospectus. Each of the Company and the Domestic Significant Subsidiaries is duly qualified to do business as a foreign corporation, is in good standing in its jurisdiction of incorporation and is duly registered as a broker-dealer, broker, dealer or investment advisor, as the case may be, in each jurisdiction in which the nature of the business conducted by it or in which the ownership or holding by lease of the properties owned or held by it requires such qualification or registration, except for such jurisdictions where the failure to so qualify, to be in good standing or to register would not have a Material Adverse Effect.

(ii)   All the outstanding shares of capital stock of the Domestic Significant Subsidiaries have been duly authorized and are validly issued and outstanding and are fully paid and non-assessable and, except for directors' qualifying shares, are owned by the Company or a subsidiary of the Company free and clear of any claims, liens, encumbrances and security interests.

(iii)   The Securities and the Indenture conform in all material respects to the descriptions thereof contained in the Prospectus.

(iv)   The Indenture has been duly authorized, executed and delivered by the Company, has been duly qualified under the Trust Indenture Act and constitutes a valid and legally binding instrument enforceable against the Company in accordance with its terms; and the Securities have been duly authorized, executed and issued by the Company, and, when executed and authenticated as specified in the Indenture and delivered against payment therefor in accordance with this Agreement, will constitute valid and legally binding obligations of the Company entitled to the benefits of the Indenture, provided, however, that the foregoing is subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally from time to time in effect, to general equitable principles (whether considered in a proceeding at law or in equity) and to an implied covenant of good faith and fair dealing).

(v)   No consent, approval, authorization, order, registration or qualification of any court or governmental agency or body is required for the consummation of the transactions contemplated in this Agreement, except for (1) such consents, approvals, authorizations, orders registrations or qualifications as have been obtained under the Securities Act and such as may be required under the Exchange Act, under state securities laws and Blue Sky laws of any jurisdiction, and (2) the qualification of the Indenture under the Trust Indenture Act, which has been obtained.

(vi)   Such counsel does not know of any contracts or other documents that are required to be filed as exhibits to the Registration Statement by the Securities Act or by the Rules and Regulations which have not been filed as exhibits to the Registration Statement or incorporated therein by reference as permitted by the Rules and Regulations.

11

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083342

(vii)  Except as described in the Registration Statement and the Prospectus, such counsel does not know of any litigation or any governmental proceeding pending or threatened against the Company or any of its subsidiaries that might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or that is required to be disclosed in the Registration Statement and the Prospectus.

(viii)  To such counsel's knowledge, neither the Company nor any of the Domestic Significant Subsidiaries is in violation of its corporate charter or by-laws, nor in default under any agreement, indenture or instrument known to such counsel, which violation or default might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(ix)  This Agreement has been duly authorized, executed and delivered by the Company; the execution, delivery and performance of this Agreement by the Company will not conflict with, or result in the creation or imposition of any lien, charge or encumbrance upon any of the assets of the Company or the Domestic Significant Subsidiaries pursuant to the terms of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument known to such counsel and to which the Company or the Domestic Significant Subsidiaries is a party or bound, or result in a violation of the corporate charter or by-laws of the Company or the Domestic Significant Subsidiaries or any statute, rule, regulation or any order known to such counsel of any court or governmental agency having jurisdiction over the Company, the Domestic Significant Subsidiaries or any of their respective properties, the effect of which conflict, violation or default might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(x)  The Registration Statement has become effective under the Securities Act, and, to the best knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceeding for that purpose has been instituted or threatened by the Commission, and no notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations has been received by the Company.

(xi)  The Registration Statement and the Prospectus (except that no opinion need be expressed as to the financial statements and notes thereto or the schedules or other financial or statistical data or the Form T-1 included or incorporated by reference therein), comply as to form in all material respects with the requirements of the Securities Act and the Rules and Regulations.

Such counsel shall also have furnished a statement that although such counsel is not passing upon and does not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement and the Prospectus (except as to those matters stated in paragraph (iii) of this subsection (b)), such counsel has no reason to believe that (A) the Registration Statement, as of the latest Effective Date, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading or (B) the Prospectus as of its date and as of the Closing Date contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in light of the circumstances under which

12

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083343

they were made, not misleading, (except, with respect to (A) or (B) above, that no statement need be made as to the financial statements and notes thereto or the schedules or other financial or statistical data or the Form T-1 included or incorporated by reference therein). In rendering such opinion and statement, such counsel may rely upon opinions of local counsel satisfactory to the Agent for matters not governed by New York law and may rely as to matters of fact, to the extent he or she deems proper, upon certificates or affidavits of officers of the Company, the Trustee and public officials. Such counsel may rely on a certificate of the Trustee with respect to the execution of the Securities by the Company and the authentication thereof by the Trustee.

(c)   At the Closing Date, the Agent shall have received from counsel to the Agent such opinion or opinions, dated the Closing Date, with respect to the issuance and sale of the Securities, the Registration Statement and the Prospectus and other related matters as the Agent may reasonably require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(d)   The Company shall have furnished to the Agent on the Closing Date a certificate of its Chief Executive Officer, President, Chief Operating Officer, Chief Administrative Officer, any Executive Vice President, Senior Vice President or Vice President, and its Chief Financial Officer, its Treasurer, its Financial Controller or its Global Head of Asset Liability Management (or other officer performing substantially the same function), dated the day of the Closing Date, to the effect that the signers of such certificate have carefully examined the Registration Statement, the Prospectus and this Agreement, and that, to the best of their knowledge, after due inquiry:

(i)   The representations and warranties of the Company in this Agreement are true and correct in all material respects on and as of the Closing Date with the same effect as if made on the Closing Date, and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date.

(ii)   No stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or threatened; and no notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations has been received by the Company.

(iii)   (i) the Registration Statement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Prospectus does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and (iii) since the effective date of the Registration Statement there has not occurred any event required to be set forth in an amended or supplemented Prospectus which has not been so set forth.

(e)   At the Closing Date, a nationally recognized independent registered public accounting firm shall have furnished to the Agent a letter, dated the day of the Closing Date, confirming that they are independent auditors with respect to the Company within the meaning of the Securities Act and in form and substance satisfactory to the Agent, stating in effect that:

053137-0169-10049-NY03.2491841.14

13

                                                          UBSFS_SDNY1083344

(i)   In their opinion, the consolidated financial statements of the Company and its subsidiaries, and the supporting schedules, included in the Registration Statement and the Prospectus and audited by them comply as to form in all material respects with the applicable accounting requirements of the Securities Act and the Exchange Act and the related published rules and regulations thereunder.

(ii)   On the basis of a reading of the unaudited consolidated financial statements of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus and of the latest unaudited consolidated financial statements made available by the Company and Lehman Brothers Inc., carrying out certain specified procedures (but not an audit in accordance with generally accepted auditing standards), a reading of the minutes of the meetings of the directors of the Company and Lehman Brothers Inc., and inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company and its subsidiaries, as to transactions and events subsequent to the date of the most recent audited consolidated financial statements included in the Registration Statement and the Prospectus, nothing came to their attention that caused them to believe that:

(A)   any material modifications should be made to the unaudited consolidated financial statements of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus, for them to be in conformity with generally accepted accounting principles; and such financial statements do not comply as to form in all material respects with the applicable accounting requirements of the Securities Act and the published instructions, rules and regulations thereunder;

(B)   the unaudited capsule information of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus does not agree with the amounts set forth in the unaudited consolidated financial statements of the Company from which it was derived or was not determined on a basis substantially consistent with that of the corresponding financial information in the latest audited financial statements of the Company included in the Registration Statement and the Prospectus;

(C)   (I) as of the latest date as of which the Company and its subsidiaries have monthly financial statements, as compared to amounts shown in the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and the Prospectus, there was any change in the capital stock (other than issuances of common stock upon the exercise of options or employee awards and the repurchase of common stock in the ordinary course of business to provide for common stock to be issued pursuant to the exercise of options or employee awards), or increase in long-term indebtedness, or decrease in net assets or stockholders' equity of the Company and its subsidiaries and (II) from the date of the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and the Prospectus to the latest date as of which the Company and its subsidiaries have monthly financial statements, there was any consolidated loss from operations before taxes or consolidated net loss of the Company and its subsidiaries; or

14

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083345

(D)      as of a specified date no more than three business days prior to the date of the letter, as compared to the date of the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and Prospectus, there was any change in capital stock (other than issuances of common stock upon the exercise of options or employee awards and the repurchase of common stock in the ordinary course of business to provide for common stock to be issued pursuant to the exercise of options or employee awards), or increase in long-term indebtedness, or decrease in net assets or stockholders' equity of the Company and its subsidiaries;

except in all instances for changes, increases or decreases set forth in such letter, in which case the letter shall be accompanied by an explanation by the Company as to the significance thereof, unless said explanation is not deemed necessary by the Agent.

(iii)  If pro forma financial statements are included in the Registration Statement or the Prospectus, (x) they have read such pro forma financial statements, (y) they have made inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company as to the basis for their determination of the pro forma adjustments and whether such pro forma financial statements comply as to form in all material respects with the applicable accounting requirements of Rule 11-02 of Regulation S-X and (z) they have proved the arithmetic accuracy of the application of the pro forma adjustments to the historical amounts; and as a result thereof, nothing came to their attention that caused them to believe that such pro forma financial statements do not so comply with Rule 11-02 of Regulation S-X and that such pro forma adjustments have not been properly applied to the historical amounts in the compilation of those statements.

(iv)  They have performed certain other specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature (which is expressed in dollars, or percentages derived from dollar amounts, and has been obtained from the general accounting records of the Company) set forth in the Registration Statement, as amended, and the Prospectus, as amended or supplemented, and in Exhibit 12 to the Registration Statement, including specified information, if any, included or incorporated from the Company's Annual Report on Form 10-K incorporated therein or specified information, if any, included or incorporated from any of the Company's Quarterly Reports on Form 10-Q or its Current Reports on Form 8-K incorporated therein, agrees with the accounting records of the Company and its subsidiaries or computations made therefrom, excluding any questions of legal interpretation.

(f)  Subsequent to the execution and delivery of this Agreement (i) no downgrading shall have occurred in the rating accorded the Company's debt securities by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) of the Rules and Regulations and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Company's debt securities.

(g)  Since the date of the latest audited financial statements included in the Prospectus there shall not have been any change in the capital stock  or long-term debt of the

15

053137-0169-10049-NY03.2491841.14

Company or any of its subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Company and its subsidiaries, otherwise than as set forth or contemplated in the Prospectus, the effect of which is, in the judgment of the Agent, so material and adverse as to make it impracticable or inadvisable to proceed with the offering or the delivery of the Securities being delivered on such Delivery Date on the terms and in the manner contemplated in any Prospectus.

(h)  Prior to the Closing Date, the Company shall have furnished to the Agent such further information, certificates and documents as the Agent or counsel to the Agent may reasonably request.

If any of the conditions specified in this Section 5 shall not have been fulfilled when and as required by this Agreement, or if any of the certificates or opinions furnished to the Agent or to counsel to the Agent pursuant to this Section 5 shall not be in all material respects reasonably satisfactory in form and substance to the Agent and to counsel to the Agent, this Agreement and all obligations of the Agent hereunder may be cancelled by the Agent. Notice of such cancellation shall be given to the Company in writing, or by telegraph confirmed in writing.

SECTION 6    Additional Covenants of the Company. The Company covenants and agrees that:

(a)  Each acceptance by it of an offer for the purchase of Securities shall be deemed to be an affirmation that the representations and warranties of the Company contained in this Agreement are true and correct in all material respects at the time of such acceptance and an undertaking that such representations and warranties will be true and correct in all material respects at the time of delivery to the purchaser or his agent of the Securities relating to such acceptance as though made at and as of each such time (and it is understood that such representations and warranties shall relate to the Registration Statement and the Prospectus as amended or supplemented to each such time).

(b)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented or the Company shall file with the Commission any document incorporated by reference into the Prospectus (other than by filing with the Commission of an exhibit to the Registration Statement or Prospectus that does not relate to the Securities, a prospectus supplement not relating to the Securities or an amendment or supplement providing solely for a change in the interest rates, redemption provisions, amortization schedule or maturities of the Securities or a change in the principal amount of Securities remaining to be sold or other information contemplated by the Prospectus to be filed in a pricing supplement related to the Securities or similar changes, or any other change that the Agent reasonably deems immaterial), the Company shall, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding Marketing Period, furnish the Agent with a certificate of the Chairman of the Board, any Vice Chairman, the Chief Executive Officer, any Executive Vice President or any Vice President and the Treasurer, the Chief Financial Officer or the Senior Vice President and Director of Global Asset and Liability Management of the Company in form satisfactory to the Agent to the effect that the statements contained in the certificate referred to in Section 5(d) hereof which was last furnished to the Agent are true and correct at the time of such amendment

16

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083347

or supplement or filing, as the case may be, as though made at and as of such time (except that such statements shall be deemed to relate to the Registration Statement and the Prospectus as amended and supplemented to such time) or, in lieu of such certificate, a certificate of the same tenor as the certificate referred to in said Section 5(d), modified as necessary to relate to the Registration Statement and the Prospectus as amended and supplemented to the time of delivery of such certificate. If requested by the Lead Manager (which term shall have the meaning specified in the Purchase Agreement (as hereinafter defined), or, if there is only a single Purchaser, shall mean such Purchaser), in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date (as defined in the applicable Purchase Agreement) a certificate of the type described in the previous sentence.

(c)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented or the Company shall file with the Commission any document incorporated by reference into the Prospectus (other than by filing with the Commission of an exhibit to the Registration Statement or Prospectus that does not relate to the Securities, an amendment or supplement to or document incorporated by reference in the Registration Statement or Prospectus setting forth only financial statements or other financial information (including any press release announcing earnings), a prospectus supplement not relating to the Securities or an amendment or supplement providing solely for a change in the interest rates, redemption provisions, amortization schedule or maturities of the Securities or a change in the principal amount of Securities remaining to be sold or other information contemplated by the Prospectus to be filed in a pricing supplement related to the Securities or similar changes, or any other change that the Agent reasonably deems immaterial), the Company shall, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding Marketing Period, furnish the Agent with the written opinion of an Associate General Counsel to the Company, addressed to the Agent and dated the date of delivery of such opinion, in form satisfactory to the Agent, of the same tenor as the opinion referred to in Section 5(b) hereof, but modified, as necessary, to relate to the Registration Statement and the Prospectus as amended or supplemented to the time of delivery of such opinion; provided, however, that in lieu of such opinion, such counsel may furnish the Agent with a letter to the effect that the Agent may rely on a prior opinion delivered under Section 5(b) or this Section 6(c) to the same extent as if it were dated the date of such letter authorizing reliance (except that statements in such prior opinion shall be deemed to relate to the Registration Statement and the Prospectus as amended or supplemented to the time of delivery of such letter authorizing reliance). If requested by the Lead Manager, in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date an opinion of counsel of the type described in the previous sentence.

(d)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented to include additional financial information or the Company files with the Commission any document incorporated by reference into the Prospectus which contains additional financial information (other than information that the Agent reasonably deems immaterial), the Company shall cause the Company's auditors to

17

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083348

furnish the Agent, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding marketing Period, a letter, addressed to the Agent and dated the date of delivery of such letter, in form and substance satisfactory to the Agent, of the same tenor as the letter referred to in Section 5(e) hereof but modified to relate to the Registration Statement and Prospectus, as amended and supplemented to the date of such letter, with such changes as may be necessary to reflect changes in the financial statements and other information derived from the accounting records of the Company; provided, however, that if the Registration Statement or the Prospectus is amended or supplemented solely to include financial information as of and for a fiscal quarter, the Company's auditor may limit the scope of such letter to the unaudited financial statements included in such amendment or supplement unless there is contained therein any other accounting, financial or statistical information that, in the Agent's reasonable judgment, should be covered by such letter, in which event such letter shall also cover such other information. If requested by the Lead Manager, in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date a letter of the type described in the previous sentence.

SECTION 7    Indemnification and Contribution

. (a)  The Company shall indemnify and hold harmless the Agent, its officers and employees and each person, if any, who controls the Agent within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action or pending action in respect thereof (including, but not limited to, any loss, claim, damage, liability or action relating to purchases and sales of Securities), to which the Agent, officer, employee or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability, action or pending action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact contained in (A) the Registration Statement, as originally filed or in any amendment thereof, or in any Preliminary Prospectus, Prospectus or in any amendment or supplement thereto, (B) any Issuer Free Writing Prospectus or in any amendment or supplement thereto or (C) any "issuer information" filed or required to be filed pursuant to Rule 433(d) used or referred to in any "free writing prospectus" (as defined in Rule 405) with the consent of the Company and used or referred to by the Agent, or (ii) the omission or alleged omission to state therein any material fact required to be stated  therein or necessary to make the statements therein not misleading,  and shall reimburse the Agent and each such officer, employee or controlling person promptly upon demand for any legal or other expenses reasonably incurred by the Agent, officer, employee or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability, action or pending action as such expenses are incurred; provided, however, that the Company  shall not be liable in any such case to the extent that any such loss,  claim, damage, liability, action or pending action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with  written information concerning the Agent furnished to the Company by or on behalf of the Agent specifically for use in connection with the preparation thereof. The foregoing indemnity agreement is in addition to any liability that the Company may otherwise have to the Agent or to any officer, employee or controlling person of the Agent.

18

CONFIDENTIAL

UBSFS_SDNY1083349

(b)   The Agent shall indemnify and hold harmless the Company, its officers, employees, each of its  directors, and  each person, if any, who controls the Company within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action or pending action in respect thereof, to which the Company or any such director, officer or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability, action or pending action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact contained  in (A) the Registration Statement, as originally filed or in any amendment thereof, or in any Preliminary Prospectus, Prospectus or in any amendment or supplement thereto or (B) any Issuer Free Writing Prospectus or in any amendment or supplement thereto, or (ii) the omission  or alleged omission to state therein any  material fact required to be stated therein or necessary to make the statements therein not misleading, but in each case only to the extent that the untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information concerning the Agent furnished to the Company by or on behalf of the Agent specifically for inclusion therein, and shall reimburse the Company and any such director, officer or controlling person for any legal or other expenses reasonably incurred by the Company or any such director, officer or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability, action or pending action as such expenses are incurred.  The foregoing indemnity agreement is in addition to any liability that the Agent may otherwise have to the Company or any such director, officer, employee or controlling person.

(c)   Promptly after receipt by an indemnified party under this Section 7 of notice of any claim or the commencement of any action, the indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Section 7, notify the indemnifying party in writing of the claim or the commencement of that action; provided, however, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have under this Section 7 except to the extent it has been materially prejudiced by such failure and, provided further, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have to an indemnified party otherwise than under this Section  7.  If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel satisfactory to such indemnified party; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and either (i) the indemnifying party or parties and the indemnified party or parties mutually agree or (ii) representation of both the indemnifying party or parties and the indemnified party or parties by the same counsel is inappropriate under applicable standards of professional conduct due to actual or potential differing interests between them, the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties.  After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, the indemnifying party shall not be liable to the indemnified party under this Section 7 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed counsel in connection with the assumption of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel,

19

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083350

approved by the Agent in the case of subparagraph (a) representing the indemnified parties under subparagraph (a), as the case may be, who are parties to such action), (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party.  No indemnifying party shall (i) without the prior written consent of the indemnified parties (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding, or (ii) be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(d)  If the indemnification provided for in this Section 7 shall for any reason be unavailable to or insufficient to hold harmless an indemnified party under Section 7(a) or 7(b) in respect of any loss, claim, damage or liability, or any action or pending action in respect thereof, referred to therein, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability, action or pending action in respect thereof, (i) in such proportion as shall be appropriate to reflect the relative benefits received by the Company  on the one hand and the Agent on the other from the offering of the Securities or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company  on the one hand and the Agent on the other with respect to the statements or omissions that resulted in such loss, claim, damage or liability, action or pending action in respect thereof, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the Agent on the other with respect to such offering shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities purchased under this Agreement (before deducting expenses) received by the Company, on the one hand, and the total underwriting discounts and commissions received by the Agent with respect to the Securities purchased under this Agreement, on the other hand, bear to the total gross proceeds from the offering of the Securities under this Agreement, in each case as set forth in the table on the cover page of the Prospectus.  The relative fault shall be determined by reference to whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company or the Agent, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission.  The Company and the Agent agree that it would not be just and equitable if contributions pursuant to this Section were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein.  The amount paid or payable by an indemnified party as a result of the loss, claim, damage or liability, or action in respect thereof, referred to above in this Section shall be deemed to include, for purposes of this Section 7(d), any legal or other expenses reasonably incurred by such indemnified party in connection with

20

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083351

investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 7(d), no Agent shall be required to contribute any amount in excess of the amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Agent has otherwise paid or become liable to pay by reason of any untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(e)  The Company confirms and the Company acknowledges and agrees that, with respect to any issue of Securities, the names of the Agents on the cover of the Prospectus, the concession and reallowance figures in the Pricing Supplement for such Securities and the paragraphs relating to stabilization by the Agent appearing under the caption "Plan of Distribution" in the Base Prospectus are correct and constitute the only information concerning the Agent furnished in writing to the Company specifically for inclusion therein.

SECTION 8    Status of the Agent. In soliciting offers to purchase the Securities from the Company pursuant to this Agreement (other than offers to purchase pursuant to Section 11(a)), the Agent is acting solely as agent for the Company and not as principal. The Agent will make reasonable efforts to assist the Company in obtaining performance by each purchaser whose offer to purchase Securities from the Company has been solicited by the Agent and accepted by the Company but the Agent shall have no liability to the Company in the event any such purchase is not consummated for any reason. If the Company shall default in its obligations to deliver Securities to a purchaser whose offer it has accepted, the Company shall (i) hold the Agent harmless against any loss, claim or damage arising from or as a result of such default by the Company and (ii), in particular, pay to the Agent any commission to which it would be entitled in connection with such sale.

SECTION 9    Representations and Warranties to Survive Delivery. All representations and warranties of the Company contained in this Agreement, or contained in certificates of officers of the Company submitted pursuant hereto, shall remain operative and in full force and effect, regardless of the termination or cancellation of this Agreement or any investigation made by or on behalf of the Agent or any person controlling the Agent or by or on behalf of the Company, and shall survive each delivery of and payment for any of the Securities.

SECTION 10    Termination. (a)  This Agreement may be terminated for any reason, at any time, by either party hereto upon the giving of one day's written notice of such termination to the other party hereto. The provisions of Sections 3(h), 3(i), 4, 7, 8 and 9 hereof shall survive any termination of this Agreement.

(b)  The obligations of the Agent hereunder or under any Purchase Agreement may be terminated by the Agent by notice given to and received by the Company prior to delivery of and payment for any issue of Securities if, prior to that time, (i) trading in securities generally on the New York Stock Exchange or the American Stock Exchange or in the over-the-counter market, or trading in any securities of the Company on any exchange or in the over-the-counter market, shall have been suspended or the settlement of such trading generally shall have been materially disrupted or minimum prices shall have been established on any such exchange or such market by the Commission, by such exchange or by any other regulatory body or governmental authority having jurisdiction, (ii) a banking moratorium shall have been declared by Federal or state authorities, (iii) the United States shall have become engaged in hostilities,

21

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083352

there shall have been an escalation in hostilities involving the United States or there shall have been a declaration of a national emergency or war by the United States or (iv) there shall have occurred such a material adverse change in general economic, political or financial conditions, including without limitation as a result of terrorist activities after the date hereof, or the effect of international conditions on the financial markets in the United States shall be such as to make it, in the judgment of the Agent, impracticable or inadvisable to proceed with the public offering or delivery of the Securities being delivered on such date on the terms and in the manner contemplated in the Prospectus. The provisions of Sections 3(h), 3(i), 4, 7, 8 and 9 hereof shall survive any termination of a Purchase Agreement.

SECTION 11  (a)  Purchases as Principal. From time to time the Agent or one or more additional financial institutions experienced in the distribution of securities similar to the Securities (each a "Purchaser"), may agree with the Company to purchase Securities from the Company as principal. Such agreement (a "Purchase Agreement"), if with the Agent only, may be oral (in which case a written confirmation of terms shall be delivered by the Agent to the Company) or may be made in accordance with the terms of a separate written agreement to be entered into between the Agent and/or the other Purchasers and the Company, substantially in the form attached hereto as Exhibit B or in such other form as the company and the Agent and/or the other Purchasers may agree. Each Purchaser executing a written Purchase Agreement shall become a party to this Agreement, vested with all the authority, rights and powers and subject to all the duties and obligations of the Agent when purchasing Securities as a principal, as if originally named as an Agent hereunder, but solely in connection with and for the purposes of the issue of Securities identified in such Purchase Agreement. At the time of each purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Lead Manager, in its sole discretion, shall specify the requirements for the officers' certificate, opinion of counsel and comfort letter pursuant to Sections 5(b), 5(c), 5(d) and 5(e) hereof.

(b)  Additional Agents. Subject to Section 11(a) and notwithstanding Section 2(a) above, the Company may from time to time appoint one or more additional financial institutions experienced in the distribution of securities similar to the Securities (each such additional institution herein referred to as an "Additional Agent") as agent(s) hereunder on an issue by issue basis, pursuant to a letter (an "Agent Accession Letter") substantially in the form of Exhibit C to this Agreement, whereupon each such Additional Agent shall, subject to the terms and conditions of this Agreement and the Agent Accession Letter, become a party to this Agreement as an agent, vested with all the authority, rights and powers and subject to all the duties and obligations of an Agent as if originally named as an Agent hereunder, but solely in connection with and for the purposes of the issue of Securities identified in such Agent Accession Letter.

SECTION 12  Notices. Except as otherwise provided herein, all notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication. Notices to the Agent shall be directed to it as follows: Lehman Brothers Inc., 745 Seventh Avenue, New York, New York 10019, Attention: Fixed Income Syndicate; notices to the Company shall be directed to it as follows: Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, Attention: Treasurer.

SECTION 13  Research Analyst Independence.  The Company acknowledges that the Agent's research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal

22

053137-0169-10049-NY03.2491841.14

policies, and that such Agent's research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering that differ from the views of their respective investment banking divisions.  The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Agent with respect to any conflict of interest that may arise from the fact that the views expressed by their independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by such Agent's investment banking divisions.  The Company acknowledges that the Agent is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

SECTION 14  <u>No Fiduciary Duty</u>.  The Company acknowledges and agrees that in connection with this offering, sale of the Securities or any other services the Agent may be deemed to be providing hereunder, notwithstanding any preexisting relationship, advisory or otherwise, between the parties or any oral representations or assurances previously or subsequently made by the Agent:  (i) no fiduciary or agency relationship between the Company and any other person, on the one hand, and the Agent, on the other, exists; (ii) the Agent is not acting as advisor, expert or otherwise, to the Company, including, without limitation, with respect to the determination of the public offering price of the Securities, and such relationship between the Company, on the one hand, and the Agent, on the other, is entirely and solely commercial, based on arms-length negotiations; (iii) any duties and obligations that the Agent may have to the Company shall be limited to those duties and obligations specifically stated herein; and (iv) the Agent and its respective affiliates may have interests that differ from those of the Company.  The Company hereby waives any claims that the Company may have against the Agent with respect to any breach of fiduciary duty in connection with this offering.

SECTION 15  <u>Binding Effect; Benefits</u>. This Agreement shall be binding upon the Agent, the Company, and their respective successors. This Agreement and the terms and provisions hereof are for the sole benefit of only those persons, except that (a) the representations, warranties, indemnities and agreements of the Company contained in this Agreement shall also be deemed to be for the benefit of the person or persons, if any, who control the Agent within the meaning of Section 15 of the Securities Act, and (b) the indemnity agreement of the Agent contained in Section 7 hereof shall be deemed to be for the benefit of directors of the Company, officers of the Company who have signed the Registration Statement and any person controlling the Company. Nothing in this Agreement is intended or shall be construed to give any person, other than the person referred to in this Section, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

SECTION 16  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in counterparts and the executed counterparts shall together constitute a single instrument.

23

CONFIDENTIAL                                                                 UBSFS_SDNY1083354

If the foregoing correctly sets forth our agreement, please indicate your acceptance hereof in the space provided for that purpose below.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:  Barrett S. DiPaolo
    Title:  Vice President

CONFIRMED AND ACCEPTED,
as of the date first above written:

LEHMAN BROTHERS INC.

By: _____
    Name:  Martin Goldberg
    Title:  Senior Vice President

24

CONFIDENTIAL

UBSFS_SDNY1083355

EXHIBIT A

Lehman Brothers Holdings Inc.

Medium-Term Notes, Series I

ADMINISTRATIVE PROCEDURES

## I.  General Procedures

Medium-Term Notes, Series I (the "Notes") are to be offered on a continuing basis by Lehman Brothers Holdings Inc. (the "Company"). Lehman Brothers Inc., as agent (the "Agent"), has agreed to use its reasonable best efforts to solicit offers to purchase the Notes. The Notes are being sold pursuant to a Distribution Agreement between the Company and the Agent dated May 30, 2006 (the "Distribution Agreement") to which these administrative procedures are attached as an exhibit. Terms defined in the Distribution Agreement shall have the same meaning when used in this exhibit.

Administrative responsibilities, document control and record-keeping functions to be performed by the Company will be performed by its Treasury Department. Administrative procedures for the offering are explained below.

Each Note will be represented by a Global Security (as defined hereinafter) delivered to the Trustee, as agent for the Depository Trust Company ("DTC"), and recorded in the book-entry system maintained by DTC (a "Book-Entry Note"). An owner of a Book-Entry Note will not be entitled to receive a certificate representing such Note. In connection with the qualification of the Book-Entry Notes for eligibility in the book-entry system maintained by DTC, the Trustee will perform the custodial, document control and administrative functions described below, in accordance with its respective obligations under a Letter of Representation from the Company and the Trustee to DTC dated as of the date hereof and a Medium-Term Note Certificate Agreement between the Trustee and DTC dated October 31, 1988, and its obligations as a participant in DTC, including DTC's Same-Day Funds Settlement System ("SDFS"). Except as otherwise set forth in this Exhibit B, Book-Entry Notes will be issued in accordance with the administrative procedures set forth below.

**Price to Public**

Each Note will be issued at 100% of principal amount, unless otherwise determined by the Company.

**Date of Issuance**

Each Note will be dated and issued as of the date of its authentication by the Trustee.

B-1

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                       UBSFS_SDNY1083356

## Maturities

Each Note will mature on a Business Day (as defined below) selected by the purchaser and agreed upon by the Company, such date generally being more than three months from the date of issuance.

"Business Day" shall have the meaning as set forth in the prospectus supplement unless otherwise indicated in the pricing supplement.

## Denominations

The Notes will be issued in the denomination of $1,000 and any larger denomination which is an integral multiple of $1,000, unless otherwise indicated in the applicable Pricing Supplement.

## Registration

Notes will be issued only in fully registered form.

## Interest Payments

Each Note bearing interest at a fixed rate will bear interest from its issue date at the annual rate stated on the face thereof. Unless otherwise indicated in the applicable Pricing Supplement, interest will be payable on February 15 and August 15 of each year (the "Interest Payment Dates") and at maturity. Interest will be calculated and paid on the basis of a 360-day year of twelve 30-day months or, in the case of an incomplete month, the number of days elapsed. Interest will be payable to the person in whose name such Note is registered at the close of business on the February 1 or August 1, or such other dates as set forth in the applicable Pricing Supplement (the "Record Dates"), next preceding the respective Interest Payment Date; provided, however, that interest payable on a maturity date will be payable to the person to whom principal shall be payable. The first payment of interest on any Note originally issued between a Record Date and an Interest Payment Date will be made on the Interest Payment Date following the next succeeding Record Date. All interest payments (excluding interest payments made at maturity) will be made by wire transfer by the Trustee or by check mailed by the Trustee to the person entitled thereto as provided above.

On the fifth Business Day immediately preceding each Interest Payment Date, the Trustee will notify the Company as to the total amount of the interest payments to be made on such Interest Payment Date. The Trustee (or any duly selected paying agent) will provide monthly to the Company's Treasury Department a list of the principal and interest to be paid on Notes maturing in the next succeeding month. The Company will provide to the Trustee not later than the payment date sufficient moneys to pay in full all principal and interest payments due on such payment date. The Trustee will assume responsibility for withholding taxes on interest paid as required by law.

For special provisions relating to Floating Rate Notes, see Appendix A hereto.

B-2

CONFIDENTIAL                                                                    UBSFS_SDNY1083357

**Acceptance and Rejection of Offers**

The Company shall have the sole right to accept offers to purchase Notes and may reject any such offer in whole or in part. The Agent shall promptly communicate to the Company, orally or in writing, each reasonable offer to purchase Notes from the Company received by it other than those rejected by the Agent. The Agent shall have the right, in its discretion reasonably exercised, without notifying the Company, to reject any offers in whole or in part.

**Settlement**

The receipt of immediately available funds by the Company in payment for a Note (less the applicable commission) and the authentication and issuance of such Note shall, with respect to such Note, constitute "Settlement". All offers accepted by the Company will be settled from one to five Business Days from the date of acceptance by the Company pursuant to the timetable for Settlement set forth below unless the Company and the purchaser agree to Settlement on a later date; provided, however, that the Company will notify the Trustee of any such later date on or before the Business Day immediately prior to the Settlement date. Except as otherwise may be agreed to by the Company and the Agent, no Settlement of a Note will occur between a Record Date and an Interest Payment Date for that Note.

**Settlement Procedures**

In the event of a purchase of Notes by the Agent or another Purchaser or Purchasers, as principal, appropriate Settlement details will be set forth in the applicable Purchase Agreement to be entered into between the Agent and the Company pursuant to the Distribution Agreement.

Settlement procedures with regard to each Note sold through the Agent shall be as follows:

A.    The Agent will advise the Company and the Trustee by telephone or in writing, by telex or facsimile, of the following Settlement information:

1.    Exact name in which Note is to be registered ("Registered Owner").

2.    Exact address of the Registered Owner and address for payment of principal and interest, if any.

3.    Taxpayer identification number of the Registered Owner.

4.    Principal amount of the Note (and, if multiple Notes are to be issued, denominations thereof).

5.    Settlement date.

6.    Maturity date.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                                                    UBSFS_SDNY1083358

7. Interest rate:

    a.    Fixed Rate Notes:

        i.    interest rate

    b.    Floating Rate Notes:

        i.    base rate
        ii.    initial interest rate
        iii.    spread or spread multiplier, if any
        iv.    interest reset dates
        v.    interest payment dates
        vi.    index maturity
        vii.    maximum and minimum interest rates, if any

8. If applicable, the date on or after which the Notes are redeemable at the option of the Company and other terms of redemption.

9. If applicable, the date on or after which the Notes are terminable at the option of the holder.

10. Agent's Commission (to be paid in the form of a discount from the proceeds remitted to the Company upon Settlement).

B. The Company will confirm the above Settlement information to the Trustee by telephone (confirmed in writing), telex or facsimile, and the Trustee will assign a Note number to the transaction. If the Company rejects an offer, the Company will promptly notify the Agent and the Trustee by telephone.

C. The Agent will deliver to the purchaser a copy of the most recent Prospectus applicable to the Note with or prior to any written offer of Notes and the confirmation and payment by the purchaser for the Note.

**Settlement Procedures Timetable**

For offers accepted by the Company, Settlement procedures "A" through "C" set forth above shall be completed, as applicable, to the extent practicable on or before the respective times set forth below:

B-4

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083359

| Settlement Procedure | Time (New York City) |
| --- | --- |
| A | 2 PM on date of sale |
| B | 3 PM on date of sale |
| C | 3 PM on the Settlement date |

**Fails**

In the event that a purchaser of a Note shall either fail to accept delivery of or make payment for a Note on the date fixed by the Company for Settlement, the Agent will immediately notify the Trustee and the Company's Treasurer by telephone, confirmed in writing, of such failure and return the Note to the Trustee. Upon the Trustee's receipt of the Note from the Agent, the Company will promptly return to the Agent an amount of immediately available funds equal to any amount previously transferred to the Company in respect of the Note pursuant to advances made by the Agent. Such returns will be made on the Settlement date, if possible, and in any event not later than 12 noon (New York City time) on the Business Day following the Settlement date. The Company will reimburse the Agent on an equitable basis for its loss of the use of the funds during the period when the funds were credited to the account of the Company. Upon receipt of the Note in respect of which the default occurred, the Trustee will mark the Note "cancelled", make appropriate entries in its records and deliver the Note to the Company with an appropriate debit advice. The Agent will not be entitled to any commission with respect to any Note which the purchaser does not accept or make payment for.

**Maturity**

Upon presentation of each Note at maturity the Trustee (or any duly appointed Paying Agent) will pay the principal amount thereof, together with accrued interest due at maturity. Such payment shall be made in immediately available funds, provided that the Note is presented to the Trustee (or any such Paying Agent) in time for the Trustee (or such Paying Agent) to make payments in such funds in accordance with its normal procedures. The Company will provide the Trustee (and any such Paying Agent) with funds available for immediate use for such purpose. Notes presented at maturity will be cancelled by the Trustee as provided in the Indenture.

**Procedure for Rate Changes**

The Company will establish interest rates from time to time for the Notes then being offered and when a decision has been reached to change the interest rates of the Notes being sold by the Company, the Company will promptly advise the Agent, which will forthwith suspend solicitation of offers. The Agent will telephone the Company with recommendations as to the changed interest rates.

**Suspension of Solicitation; Amendment or Supplement**

If, at any time when a prospectus relating to the Securities is required to be delivered under the Act, any event occurs as a result of which the Prospectus would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not

B-5

053137-0169-10049-NY03.2491841.14

misleading, or if it is necessary at any time to amend the Prospectus to comply with the Act, the Company will notify the Agent promptly to suspend solicitation of purchases of the Securities and the Agent shall suspend its solicitations of purchases of securities; and if the Company shall decide to amend or supplement the Registration Statement or the Prospectus, it will promptly advise the Agent by telephone (with confirmation in writing) and will promptly prepare and file with the Commission an amendment or supplement which will correct such statement or omission or an amendment which will effect such compliance and will use its reasonable best efforts to cause any amendment of the Registration Statement containing an amended Prospectus to be made effective as soon as possible. Upon the Agent's receipt of such amendment or supplement and advice from the Company that solicitations may be resumed, the Agent will resume solicitations of purchases of the Securities.

In addition, subject to its representations, warranties and covenants contained in the Distribution Agreement, the Company may instruct the Agent to suspend solicitation of offers to purchase at any time for a period of time or permanently. Upon receipt of such instructions the Agent will forthwith (but in any event within one Business Day) suspend solicitation of offers to purchase from the Company until such time as the Company has advised it that solicitation of offers to purchase may be resumed. If the Company decides to amend or supplement the Registration Statement or the Prospectus relating to the Notes (other than to change interest rates), it will promptly advise the Agent and the Trustee and will furnish the Agent and the Trustee with copies of the proposed amendment or supplement.

In the event that at the time the Agent, at the direction of the Company, suspends solicitation of offers to purchase from the Company there shall be any orders outstanding which have not been settled, the Company will promptly advise the Agent and the Trustee whether such orders may be settled and whether copies of the Prospectus as theretofore amended or supplemented as in effect at the time of the suspension may be delivered in connection with the Settlement of such orders. The Company will have the sole responsibility for such decision and for any arrangements which may be made in the event that the Company determines that such orders may not be settled or that copies of such Prospectus may not be so delivered.

**Delivery of Prospectus**

The Agent will, to the extent required by applicable law, rule or regulation (including Rule 172 of the Rules and Regulations), provide a copy of the relevant Prospectus, appropriately amended or supplemented, which must accompany or precede each written offer of a Note, if any, by the Agent, each written confirmation of a sale sent to a purchaser or his agent by the Agent and each Note delivered to a purchaser or his agent.

**Authenticity of Signatures**

The Company will cause the Trustee to furnish the Agent from time to time with the specimen signatures of each of the Trustee's officers, employees and agents who have been authorized by the Trustee to authenticate Notes, but the Agent will have no obligation or liability to the Company or the Trustee in respect of the authenticity of the signature of any officer, employee or agent of the Company or the Trustee on any Note.

B-6

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083361

**Advertising Costs**

  The Company will determine with the Agent the amount and nature of advertising that may be appropriate in offering the Notes. Advertising expenses in connection with solicitation of offers to purchase Notes from the Company will be paid by the Company.

## II.  Special Administrative Procedures for Book-Entry Notes Issuance

  On any date of settlement (as defined under "Settlement" below) for one or more Fixed Rate Book-Entry Notes, the Company will issue a single global security in fully registered form without coupons (a "Global Security") representing up to each $500,000,000 principal amount of all of such Notes that have the same original issuance date, interest rate, optional redemption dates and Stated Maturity. Similarly, on any settlement date for one or more Floating Rate Book-Entry Notes, the Company will issue a single Global security representing up to each $500,000,000 principal amount of all of such Notes that have the same interest rate basis, original issuance date, Initial Interest Rate, Interest Payment Dates, Index Maturity, Spread, Spread Multiplier, minimum interest rate (if any), maximum interest rate (if any), optional redemption dates (if any), Stated Maturity and other terms. Each Global Security will be dated and issued as of the date of its authentication by the Trustee. No Global Security will represent both Fixed Rate and Floating Rate Book-Entry Notes.

**Identification Numbers**

  The Company will arrange, on or prior to commencement of a program for the offering of Book-Entry Notes, with the CUSIP Service Bureau of Standard & Poor's Credit Market Services (the "CUSIP Service Bureau") for the reservation of a series of CUSIP numbers (including tranche numbers), consisting of approximately 900 CUSIP numbers and relating to Global Securities representing the Book-Entry Notes. The Company has or will obtain from the CUSIP Service Bureau a written list of such series of reserved CUSIP numbers and will deliver to the Trustee and DTC such written list of 900 CUSIP numbers of such series. The Trustee will assign CUSIP numbers to Global Securities as described below under Settlement Procedure "B". The Company will notify the CUSIP Service Bureau periodically of the CUSIP numbers that the Trustee has assigned to Global Securities. The Trustee will notify the Company at any time when fewer than 100 of the reserved CUSIP numbers remain unassigned to Global Securities, and if it deems necessary, the Company will reserve additional CUSIP numbers for assignment to Global Securities representing Book-Entry Notes. Upon obtaining such additional CUSIP numbers the Company shall deliver such additional CUSIP numbers to the Trustee and DTC.

**Registration**

  Each Global Security will be registered in the name of Cede & Co., as nominee for DTC, on the Securities Register maintained under the Indenture. The

B-7

053137-0169-10049-NY03.2491841.14

  

beneficial owner of a Book-Entry Note (or one or more indirect participants in DTC designated by such owner) will designate one or more participants in DTC (with respect to such Note, the "Participants") to act as agent or agents for such owner in connection with the book-entry system maintained by DTC, and DTC will record in book-entry form, in accordance with instructions provided by such Participants, a credit balance with respect to such Note in the account of such Participants. The ownership interest of such beneficial owner in such Note will be recorded through the records of such Participants or through the separate records of such Participants and one or more indirect participants in DTC.

### Transfers

Transfers of a Book-Entry Note will be accomplished by book entries made by DTC and, in turn, by Participants (and in certain cases, one or more indirect participants in DTC) acting on behalf of beneficial transferors and transferees of such Note.

### Consolidation and Exchange

The Trustee may deliver to DTC and the CUSIP Service Bureau at any time a written notice of consolidation specifying (i) the CUSIP number of two or more Outstanding Global Securities that represent (A) Fixed Rate Book-Entry Notes having the same interest rate, optional redemption dates (if any) and Stated Maturity and with respect to which interest has been paid to the same date or (B) Floating Rate Book-Entry Notes having the same interest rate basis, optional redemption dates (if any), Initial Interest Rate, Interest Payment Dates, Index Maturity, Spread and/or Spread Multiplier, minimum interest rate (if any), maximum interest rate (if any) and with respect to which interest has been paid to the same date, (ii) a date, occurring at least 30 days after such written notice is delivered and at least 30 days before the next Interest Payment Date for such Book-Entry Notes, on which such Global Securities shall be exchanged for a single replacement Global Security and (iii) a new CUSIP number, obtained from the Trustee, to be assigned to such replacement Global Security. Upon receipt of such a notice, DTC will send to its participants (including the Trustee) a written reorganization notice to the effect that such exchange will occur on such date. Prior to the specified exchange date, the Trustee will deliver to the CUSIP Service Bureau a written notice setting forth such exchange date and the new CUSIP number and stating that, as of such exchange date, the CUSIP numbers of the Global Securities to be exchanged will no longer be valid. On the specified exchange date, the Trustee will exchange such Global Securities for a single Global Security bearing a new CUSIP number and dated the last Interest Payment Date to which interest has been paid or duly provided for on the exchanged Global Securities, and the CUSIP numbers of the exchanged Global Securities will, in accordance with CUSIP Service Bureau procedures, be cancelled and not immediately reassigned. Notwithstanding the foregoing, if the Global Securities to be exchanged exceed $500,000,000 in aggregate principal amount, one Global Security will be authenticated and issued to represent each $500,000,000 of

B-8

CONFIDENTIAL

UBSFS_SDNY1083363

principal amount of the exchanged Global Securities and an additional Global
Security will be authenticated and issued to represent any remaining principal
amount of such Global Securities (see "Denominations" below).

## Maturities

Each Book-Entry Note generally will mature on a date not less than three months
after the settlement date for such Note. A Floating Rate Book Entry Note will
mature only on an Interest Payment Date for such Note.

## Denominations

Book-Entry Notes will be issued in principal amounts of $1,000 or any amount in
excess thereof that is an integral multiple of $1,000. Global Securities will be
denominated in principal amounts not in excess of $500,000,000. If one or more
Book-Entry Notes having an aggregate principal amount in excess of
$500,000,000 would, but for the preceding sentence, be represented by a single
Global Security, then one Global security will be issued to represent each
$500,000,000 principal amount of such Book-Entry Note or Notes and an
additional Global Security will be issued to represent any remaining principal
amount of such Book-Entry Note or Notes. In such a case, each of the Global
Securities representing such Book-Entry Note or Notes shall be assigned the same
CUSIP number.

## Interest

*General*. Interest on each Book-Entry Note will accrue from and including the last
Interest Payment Date, except in the case of Floating Rate Notes which reset daily
or weekly. Each payment of interest on a Book-Entry Note will include interest
accrued through the day preceding, as the case may be, the Interest Payment Date
or Maturity, except in the case of Floating Rate Book-Entry Notes which reset
daily or weekly. In the case of Floating Rate Book-Entry Notes which reset daily
or weekly, interest payments will include accrued interest from and including the
original issuance date or from and including the last date in respect of which
interest has been paid, as the case may be, to, and including the Record Date
immediately preceding the applicable Interest Payment Date, provided that at
Maturity the interest payable will include interest accrued from and including the
original issuance date or from and including the last date in respect of which
interest has been paid through the day preceding Maturity. Interest payable at the
Maturity of a Book-Entry Note will be payable to the Person to whom the
principal of such Note is payable. Standard & Poor's Credit Market Services will
use the information received in the pending deposit message described under
Settlement Procedure "C" below in order to include the amount of any interest
payable and certain other information regarding the related Global Security in the
appropriate weekly bond report published by Standard & Poor's Credit Market
Services.

B-9

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083364

Promptly after each Interest Determination Date (as defined in Appendix A hereto) for Floating Rate Notes, the Calculation Agent will notify the Trustee after confirmation with the Company, and the Trustee in turn will notify Standard & Poor's Credit Market Services, of the interest rates determined on such Interest Determination Date.

**Payments of Principal and Interest**

*Payments of Interest Only.* Promptly after each Regular Record Date, the Trustee will deliver to the Company and DTC a written notice specifying by CUSIP number the amount of interest to be paid on each Global Security on the following Interest Payment Date (other than an Interest Payment Date coinciding with maturity) and the total of such amounts. DTC will confirm the amount payable on each Global Security on such Interest Payment Date by reference to the daily bond reports published by Standard & Poor's Credit Market Services. The Company will pay to the Trustee, as paying agent, the total amount of interest due on such Interest Payment Date (other than at Maturity), and the Trustee will pay such amount to DTC at the times and in the manner set forth below under "Manner of Payment".

*Payments at Maturity.* On or about the first Business Day of each month, the Trustee will deliver to the Company and DTC a written list of principal and interest to be paid on each Global Security maturing in the following month. The Company, the Trustee and DTC will confirm the amounts of such principal and interest payments with respect to each such Global Security on or about the fifth Business Day preceding the Maturity of such Global Security, except for Notes with a daily reset period in which case the Company, the Trustee and DTC will confirm the amount of the principal payable with respect to each such Global Security on or about the fifth Business Day preceding Maturity and the amount of interest payable with respect to such Global Security two Business Days preceding the maturity of such Global Security. The Company will pay to the Trustee, as the paying agent, the principal amount of such Global Security, together with interest due at such Maturity. The Trustee will pay such amount to DTC at the times and in the manner set forth below under "Manner of Payment".

Promptly after payment to DTC of the principal and interest due at the Maturity of such Global Security, the Trustee will cancel such Global Security and deliver it to the Company with an appropriate debit advice.

*Manner of Payment.* The total amount of any principal and interest due on Global Securities on any Interest Payment Date or at Maturity shall be paid by the Company to the Trustee in funds available for use by the Trustee as of 9:30 A.M. (New York City time) on such date. The Company will make such payment on such Global Securities by instructing the Trustee to withdraw funds from an account maintained by the Company at the Trustee. The Company will confirm such instructions in writing to the Trustee. For maturity, redemption or any other principal payments: prior to 10 A.M. (New York City time) on such date or as

B-10

CONFIDENTIAL

UBSFS_SDNY1083365

soon as possible thereafter, the Trustee will make such payments to DTC in same day funds in accordance with DTC's Same Day Funds Settlement Paying Agent Operating Procedures. For interest payments: the Trustee will make such payments to DTC in accordance with existing arrangements between DTC and the Trustee. DTC will allocate such payments to its participants in accordance with its existing operating procedures. Neither the Company nor the Trustee shall have any direct responsibility or liability for the payment by DTC to such Participants of the principal of and interest on the Book-Entry Notes.

*Withholding Taxes.* The amount of any taxes required under applicable law to be withheld from any interest payment on a Book-Entry Note will be determined and withheld by the Participant, indirect participant in DTC or other Person responsible for forwarding payments and materials directly to the beneficial owner of such Note.

### Acceptance and Rejection of Offers

Unless otherwise instructed by the Company, the Agent will advise the Company promptly by telephone or e-mail of all offers to purchase Book-Entry Notes received by the Agent, other than those rejected by it in whole or in part in the reasonable exercise of its discretion. Unless otherwise agreed by the Company and each of the Agent, the Company has the sole right to accept offers to purchase Book-Entry Notes and may reject any such offer in whole or in part.

### Settlement

The receipt by the Company of immediately available funds in payment for a Book-Entry Note and the authentication and issuance of the Global Security representing such Note shall constitute "settlement" with respect to such Note. All orders accepted by the Company will be settled from one to five Business Days from the date of acceptance by the Company pursuant to the timetable set forth below unless the Company and the purchaser agree to settlement on a later date.

### Settlement Procedures

Settlement Procedures with regard to each Book-Entry Note sold by the Company through the Agent, as agent, shall be as follows:

A.   The Agent will advise the Company and the Trustee by telephone or in writing, by telex or facsimile, the following Settlement information:

1.   Exact name in which Note is to be registered ("Registered Owner").

2.   Exact address of the Registered owner and address for payment of principal and interest, if any.

3.   Taxpayer identification number of the Registered Owner.

B-11

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083366

4.　　Principal amount of the Note (and, if multiple Notes are to be issued, denominations thereof)

5.　　Settlement date.

6.　　Maturity date.

7.　　Interest rate:

    a.　　Fixed Rate Notes

        i.　　interest rate

    b.　　Floating Rate Notes:

        i.　　base rate,

        ii.　　initial interest rate,

        iii.　　interest reset period or interest reset dates,

        iv.　　interest payment dates,

        v.　　index maturity,

        vi.　　maximum and minimum interest rates, if any,

        vii.　　spread or spread multiplier, if any,

        viii.　　if the note is a LIBOR note, any index currency, and

        ix.　　any other terms relating to the particular method of calculating the interest rate for the note and whether and how the spread or spread multiplier may be changed prior to stated maturity.

8.　　If applicable, the date on or after which the Notes are redeemable at the option of the Company and other terms of redemption.

9.　　If applicable, the date on or after which the Notes are terminable at the option of the holder.

10.　　Agent's Commission (to be paid in the form of a discount from the proceeds remitted to the Company upon Settlement).

B.　　The Company will confirm the above Settlement information to the Trustee by telephone (confirmed in writing), telex or facsimile, and the Trustee will assign a Note number to the transaction. If the Company rejects an offer, the Company will promptly notify the Agent and the Trustee by telephone.

B-12

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　UBSFS_SDNY1083367

C.   The Company shall communicate with the Trustee and Agent and each such communication by the Company shall constitute a representation and warranty by the Company to the Trustee and the Agent that (i) such Note is then, and at the time of issuance and sale thereof will be, duly authorized for issuance and sale by the Company and (ii) such Note, and the Global Security representing such Note, will conform with the terms of the Indenture pursuant to which such Note and Global Security are issued.

D.   The Trustee will assign a CUSIP number to the Global Security representing such Note and then advise the Company by telephone (confirmed in writing at any time on the same date) or electronic transmission of such CUSIP number.

E.   The Trustee will enter a pending deposit message through DTC's Participant Terminal System, providing the following settlement information to DTC, the Agent and Standard & Poor's Credit Market Services:

   1.   The information set forth in Settlement Procedure "A".

   2.   Identification as a Fixed Rate Book-Entry Note or a Floating Rate Book-Entry Note.

   3.   Initial Interest Payment Date for such Note, number of days by which such date succeeds the related "DTC Record Date" (which term means the Regular Record Date except in the case of Floating Rate Notes which reset daily and weekly in which case it means the date 5 calendar days immediately preceding the Interest Payment Date) and amount of interest per $1,000 principal amount payable on such Interest Payment Date.

   4.   Frequency of interest payments (monthly, semiannually, quarterly, etc.).

   5.   CUSIP number of the Global Security representing such Note.

   6.   Whether such Global Security will represent any other Book-Entry Note (to the extent known at such time).

F.   The Trustee will complete the preprinted Global Security representing such Note, the form of which was previously approved by the Company, the Agent and the Trustee.

G.   The Trustee will authenticate the Global Security representing such Note.

H.   DTC will credit such Note to the Trustee's participant account at DTC.

I.   The Trustee will enter an SDFS deliver order through DTC's Participant Terminal System instructing DTC to (i) debit such Note to the Trustee's participant account and credit such Note to the Agent's participant account and (ii) debit the Agent's settlement account and credit the Trustee's settlement account for an amount equal to the price of such Note less the Agent's commission. The entry of such a

B-13

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083368

deliver order shall constitute a representation and warranty by the Trustee to DTC that (i) the Global Security representing such Book-Entry Note has been issued and authenticated and (ii) the Trustee is holding such Global Security pursuant to the Medium-Term Note Certificate Agreement between the Trustee and DTC (the "Certificate Agreement").

J.     The Agent will enter an SDFS deliver order through DTC's Participant Terminal System instructing DTC (i) to debit such Note to the Agent's participant account and credit such Note to the participant accounts of the Participants with respect to such Note and (ii) to debit the settlement accounts of such Participants and credit the settlement account of the Agent for an amount equal to the price of such Note.

K.     Transfers of funds in accordance with SDFS deliver orders described in Settlement Procedures "I" and "J" will be settled in accordance with SDFS operating procedures in effect on the settlement date.

L.     The Trustee will credit to an account of the Company maintained at the Trustee funds available for immediate use in the amount transferred to the Trustee in accordance with Settlement Procedure "I".

M.     Monthly, the Trustee will send to the Company a statement setting forth the principal amount of Book-Entry Notes Outstanding as of that date under the Indenture and setting forth a brief description of any sales of which Company has advised the Trustee but which have not yet been settled.

N.     The Agent will, to the extent required by applicable law, rule or regulation (including Rule 172 of the Rules and Regulations), deliver to the purchaser a copy of the most recent Prospectus applicable to the Note with or prior to any written offer of Notes and the confirmation and payment by the purchaser of the Note.

O.     The Agent will confirm the purchase of such Note to the purchaser either by transmitting to the Participants with respect to such Note a confirmation order or orders through DTC's institutional delivery system or by mailing a written confirmation to such purchaser.

**Settlement Procedures Timetable**

For orders of Book-Entry Notes solicited by the Agent, as agent, and accepted by the Company for settlement on the first Business Day after the sale date, Settlement Procedures "A" through "N" set forth above shall be completed as soon as possible but not later than the respective times (New York City time) set forth below:

**Settlement Procedure Time**

| | |
|---|---|
| A-C | 11:00 A.M. on the sale date |
| D, E | 2:00 P.M. on the sale date |
| F | 9:00 A.M. on settlement date |

B-14

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083369

| G, H | 10:00 A.M. on settlement date |
| I,J | 2:00 P.M. on settlement date |
| K | 4:45 P.M. on settlement date |
| L,N | 5:00 P.M. on settlement date (or earlier to the extent required by applicable law, rule or regulation) |

If a sale is to be settled more than one Business Day after the sale date, Settlement Procedures "A" "B" "C" "D" and "E" shall be completed as soon as practicable but no later than the times specified above on the first Business Day after the sale date. If the initial interest rate for a Floating Rate Book-Entry Note has not been determined at the time that Settlement Procedure "A" is completed, Settlement Procedures "B" "C", "D" and "E" shall be completed as soon as such rate has been determined but no later than the times specified above on the second Business Day before the settlement date. Settlement Procedure "K" is subject to extension in accordance with any extension of Fedwire closing deadlines and in the other events specified in the SDFS operating procedures in effect on the settlement date.

If settlement of a Book-Entry Note is rescheduled or cancelled, the Trustee will deliver to DTC, through DTC's Participant Terminal System, a cancellation message to such effect by no later than 2:00 P.M. on the Business Day immediately preceding the scheduled settlement date.

**Failure to Settle**

If the Trustee has not entered an SDFS delivery order with respect to a Book-Entry Note pursuant to Settlement Procedure "I", the Trustee shall immediately notify the Company thereof. Thereafter, upon written request of the Company (which may be evidenced by facsimile transmission), the Trustee shall deliver to DTC, through DTC's Participant Terminal System, as soon as practicable a withdrawal message instructing DTC to debit such Note to the Trustee's participant account. DTC will process the withdrawal message, provided that the Trustee's participant account contains a principal amount of the Global Security representing such Note that is at least equal to the principal amount to be debited. If a withdrawal message is processed with respect to all the Book-Entry Notes represented by a Global Security, the Trustee will mark such Global Security "cancelled", make appropriate entries in the Trustee's records and send such cancelled Global Security to the Company. The CUSIP number assigned to such Global Security shall, in accordance with CUSIP Service Bureau procedures, be cancelled and not immediately reassigned. If a withdrawal message is processed with respect to one or more, but not all, of the Book-Entry Notes represented by a Global Security, the Trustee will exchange such Global Security for two Global Securities, one of which shall represent such Book-Entry Note or Notes and shall be cancelled immediately after issuance and the other of which shall represent the

B-15

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083370

other Book-Entry Notes previously represented by the surrendered Global
Security and shall bear the CUSIP number of the surrendered Global Security.

If the purchase price for any Book-Entry Note is not timely paid to any Participant
with respect to such Note by the beneficial purchaser thereof (or a Person,
including an indirect participant in DTC, acting on behalf of such purchaser), such
Participant may enter a deliver order through DTC's Participant Terminal System
debiting such Note to such Participant's participant account and crediting such
Note free to the participant account of the Trustee and shall notify the Trustee and
the Company thereof. Thereafter, the Trustee, (i) will immediately notify the
Company thereof, once the Trustee has confirmed that such Note has been
credited to its participant account, and the Company shall immediately transfer by
Fedwire (immediately available funds) to such Participant an amount equal to the
price of such Note which was previously credited to the account of the Company
maintained at the Trustee in accordance with Settlement Procedure "L" and (ii)
the Trustee will deliver the withdrawal message and take the related actions
described in the preceding paragraph.

Notwithstanding the foregoing, upon any failure to settle with respect to a Book-
Entry Note, DTC may take any actions in accordance with its SDFS operating
procedures then in effect. In the event of a failure to settle with respect to one or
more, but not all, of the Book-Entry Notes to have been represented by a Global
Security, the Trustee will provide, in accordance with Settlement Procedures "F"
and "G", for the authentication and issuance of a Global Security representing the
other Book-Entry Notes to have been represented by such Global Security and
will make appropriate entries in its records.

B-16

CONFIDENTIAL

UBSFS_SDNY1083371

**Special Provisions Relating to Floating Rate Notes**

**Interest Rate**

Interest on Floating Rate Notes will be determined by reference to an "Interest Rate Basis", which shall be the "CD Rate" ("CD Rate Notes"), the "Commercial Paper Rate" ("Commercial Paper Rate Notes"), the "Federal Funds (Effective) Rate" ("Federal Funds (Effective) Rate Notes"), the "Federal Funds (Open) Rate" ("Federal Funds Open Rate"), "LIBOR" ("LIBOR Notes"), "EURIBOR" ("EURIBOR Notes") the "Treasury Rate" ("Treasury Rate Notes"), the "Prime Rate" ("Prime Rate Notes"), the Eleventh District Cost of Funds Rate ("Eleventh District Cost of Funds Rate"), the CMS Rate ("CMS Rate") or such other interest rate formula as may be designated in a Pricing Supplement, based upon the Index Maturity and adjusted by a Spread and/or Spread Multiplier, if any, as specified in the applicable Pricing Supplement setting forth the terms of each issuance of Notes (the "Pricing Supplement"). The "Index Maturity" is the particular maturity of the type of instrument or obligation from which the Interest Rate Basis is calculated (e.g., in the case of commercial paper, 30-day rather than 90-day commercial paper). The "Spread" is the number of basis points (100 basis points equals one percent) above or below the Interest Rate Basis applicable to such Floating Rate Note, and the "Spread Multiplier" is the percentage of the Interest Rate Basis applicable to the interest rate for such Floating Rate Note. The Spread, Spread Multiplier, Index Maturity and other variable terms as described below are subject to change by the Company from time to time, but no such change will affect any Floating Rate Note theretofore issued or as to which an offer has been accepted by the Company.

A Floating Rate Note may also have either or both of the following: (i) a maximum limit, or ceiling ("Maximum Interest Rate"), on the rate of interest which may apply during any Interest Period (as defined below) and (ii) a minimum limit, or floor ("Minimum Interest Rate"), on the rate of interest which may apply during any Interest Period. In addition to any Maximum Interest Rate which may be applicable to any Floating Rate Note pursuant to the above provisions, the interest rate on the Floating Rate Notes will in no event be higher than the maximum rate permitted by New York law, as the same may be modified by United States law of general application.

The applicable Pricing Supplement will specify for each Floating Rate Note the following terms: Interest Rate Basis, optional redemption dates (if any), rate of interest for the initial Interest Period (the "Initial Interest Rate"), Issue Date, Interest Determination Dates (as defined below), Interest Reset Dates (as defined below), Interest Payment Dates (as defined below), Index Maturity, Maturity Date, Maximum Interest Rate and Minimum Interest Rate, if any, and the Spread and/or Spread Multiplier, if any.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083372

### Interest Payment Dates

Unless otherwise indicated in the applicable Pricing Supplement, interest on Floating Rate Notes will be payable as set forth in the Basic Prospectus, as supplemented by the prospectus supplement dated May 30, 2006 relating to the Medium-Term Notes (the "MTN Prospectus"). Each date on which interest is payable on a Floating Rate Note is referred to herein as an "Interest Payment Date."

### Interest Reset Date

Unless otherwise indicated in the applicable Pricing Supplement, the rate of interest on each Floating Rate Note will be reset as provided in the MTN Prospectus (each date an "Interest Reset Date").

### Interest Determination Date

Unless otherwise indicated in the applicable Pricing Supplement, the "Interest Determination Date" pertaining to an Interest Reset Date for a Floating Rate Note shall be as set forth in the MTN Prospectus.

### CD Rate Notes

A CD Rate Note will bear interest at the interest rate (calculated with reference to the CD Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the CD Rate Note and in the applicable Pricing Supplement.  Unless otherwise indicated in the applicable Pricing Supplement, the "CD Rate" shall be calculated as set forth in the MTN Prospectus.

### Commercial Paper Rate Notes

A Commercial Paper Rate Note will bear interest at the interest rate (calculated with reference to the Commercial Paper Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Commercial Paper Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Commercial Paper Rate" shall be calculated as set forth in the MTN Prospectus.

### Federal Funds (Effective) Rate Notes

A Federal Funds (Effective) Rate Note will bear interest at the interest rate (calculated with reference to the Federal Funds (Effective) Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Federal Funds (Effective) Rate Note and in the applicable Pricing Supplement.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083373

Unless otherwise indicated in the applicable Pricing Supplement, the "Federal Funds Effective Rate" shall be calculated as set forth in the MTN Prospectus.

**Federal Funds (Open) Rate Notes**

A Federal Funds Open Rate Note will bear interest at the interest rate (calculated with reference to the Federal Funds Open Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Federal Funds Open Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Federal Funds Open Rate" shall be calculated as set forth in the MTN Prospectus.

**LIBOR Notes**

A LIBOR Note will bear interest at the interest rate (calculated with reference to LIBOR and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the LIBOR Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, LIBOR shall be calculated as set forth in the MTN Prospectus.

**EURIBOR Notes**

A EURIBOR Note will bear interest at the interest rate (calculated with reference to EURIBOR and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the EURIBOR Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, EURIBOR shall be calculated as set forth in the MTN Prospectus.

**Treasury Rate Notes**

A Treasury Rate Note will bear interest at the interest rate (calculated with reference to the Treasury Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Treasury Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Treasury Rate" or "CMT Rate" shall be calculated as set forth in the MTN Prospectus.

**Prime Rate Notes**

A Prime Rate Note will bear interest at the interest rate (calculated with reference to the Prime Rate and the Spread and/or Spread Multiplier and will be subject to

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083374

the minimum interest rate or the maximum interest rate, if any) specified in the Prime Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Prime Rate" shall be calculated as set forth in the MTN Prospectus.

**Eleventh District Cost of Funds Rate Notes**

A Eleventh District Cost of Funds Rate Note will bear interest at the interest rate (calculated with reference to the Eleventh District Cost of Funds Rate and the Spread or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Eleventh District Cost of Funds Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Eleventh District Cost of Funds Rate" shall be calculated as set forth in the MTN Prospectus.

**CMS Rate Notes**

A CMS Rate Note will bear interest at the interest rate (calculated with reference to the CMS Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the CMS Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "CMS Rate" shall be calculated as set forth in the MTN Prospectus.

**Record Dates**

Unless otherwise indicated in the applicable Pricing Supplement, interest payments on Floating Rate Notes will be made on the Interest Payment Dates to the registered owners at the close of business on the date 15 calendar days prior to such Interest Payment Date (the "Regular Record Date"). Interest payable at maturity will be paid to the same person to whom principal is payable. Interest will begin to accrue (except in the case of Floating Rate Notes which reset daily or weekly) on the Issue Date of a Note for the first interest period and from and including the last Interest Payment Date. Each payment of interest (except in the case of Floating Rate Notes which reset daily or weekly) shall include interest accrued from and including the next preceding Interest Payment Date in respect of which interest has been paid (or, if none, from and including the Issue Date) to but excluding the next Interest Payment Date (an "Interest Period"). In the case of Floating Rate Notes that reset daily or weekly, interest payments will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, and including the Regular Record Date immediately preceding the applicable Interest Payment Date, providing that at maturity the interest payable will include interest accrued from and including the Issue Date or from and including the last date in

A-4

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083375

respect of which interest has been paid, as the case may be, to, but excluding, the date of maturity. The initial interest payment on Notes issued between a Regular Record Date and the Interest Payment Date immediately following such Regular Record Date will be made on the second Interest Payment Date following such issue (however, except as may otherwise be agreed to by the Company and the Agent, no Floating Rate Notes will be sold between a Regular Record Date and an Interest Payment Date).

**Accrued Interest**

Unless otherwise indicated in the applicable Pricing Supplement, accrued interest shall be calculated as set forth in the MTN Prospectus.

A-5

CONFIDENTIAL

UBSFS_SDNY1083376

08-13555-jmp   Doc 20737   Filed 09/09/11   Entered 09/09/11 18:49:50   Exhibit G
Pg 847 of 357

EXHIBIT B

## LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

PURCHASE AGREEMENT

[_____], 20__

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019

Attention: Treasurer

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I ("Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended, between the Company and Citibank, N.A., as Trustee. The Distribution Agreement permits the Company to enter into an agreement with the Agent and/or one or more additional persons to purchase Securities as principals.

[The undersigned] [Each of the purchasers identified on Schedule I attached hereto] ([the] [each a] "Purchaser") agrees[, severally and not jointly,] to purchase, at the purchase price (equal to the Issue Price less the Agents' Commission) set forth in the Pricing Supplement dated _____ __ , 20_, attached as Schedule II hereto (the "Pricing Supplement"), [$_____ principal amount] [the principal amount] of Securities described below [set forth next to such Purchaser's name on Schedule I attached hereto].

The Securities have the terms set forth in the Pricing Supplement.

The term "Applicable Time" means _____ [a.m.][p.m.] (New York City time) on the date of this Agreement.

Each Purchaser's obligation to purchase Securities hereunder is subject to the accuracy, as of the Settlement Date, of your representations and warranties contained in the Distribution Agreement and to your performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein, including, without limitation, those pursuant to Sections 5, 6 and 7 thereof. Each Purchaser's obligation to purchase Securities hereunder is subject to the further condition precedent that the Company shall have furnished to each Purchaser copies of the most recent documents (including any prior documents referred to therein) previously delivered to the Agent pursuant to Sections 5

C-1

CONFIDENTIAL

UBSFS_SDNY1083377

and 6 of the Distribution Agreement and such further information, certificates and documents as the Lead Manager, in its sole discretion, or counsel to Purchasers may reasonably request.

The "Lead Manager" for the Securities described in this Agreement is [insert lead manager's name]. [Pursuant to the last sentence of Section 11(a) of the Distribution Agreement, the Lead Manager hereby requests the delivery of, and it is hereby agreed that there shall be delivered, documents pursuant to Section[s] [5(b)][5(c)][5(d)][5(e)] of the Distribution Agreement.] [In addition to the opinion delivered pursuant to Section 5(b) of the Distribution Agreement, the Chief Legal Officer, General Counsel or an Associate General Counsel of the Company shall furnish a statement that such counsel has no reason to believe that the Preliminary Prospectus, together with the final term sheet in the form attached hereto as Schedule IV and/or any Issuer Free Writing Prospectus(es) set forth on a schedule to such opinion acceptable to counsel to the Agent, as of the Applicable Time, [except for the information listed on Schedule III], contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.]

In accordance with Section 11(a) of the Distribution Agreement, each Purchaser (other than Lehman Brothers Inc.) hereby confirms that, with effect from the date hereof solely in respect of the issue of the Securities described above (the "Issue"), each Purchaser shall become a party to, and an Agent under, the Distribution Agreement, vested with all the authority, rights and powers, and subject to all duties and obligations of an Agent as if originally named as such under the Distribution Agreement.

Such appointment is limited to the Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement, and such appointment will terminate upon issue of the Securities comprising the Issue, but without prejudice to any rights, duties or obligations which have arisen prior to such termination.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the term "Securities" shall mean only the Securities that are part of the Issue, (ii) the term "Agent," as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to the Purchasers (except for references in the Distribution Agreement to Agent where such Agent has discretion, in which case Agent shall mean the Lead Manager) and (ii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Securities and containing the name of the Purchasers. [For purposes of Section 12 of the Distribution Agreement, the Lead Manager confirms that its notice details are as set forth immediately beneath its name].

[IF THE OFFERING IS A GLOBAL OFFERING:

**European Economic Area**

In relation to each Member State of the European Economic Area which has

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083378

implemented the Prospectus Directive (each, a "Relevant Member State"), the Agent has represents and agrees, and each Agent agrees, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Securities to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of Securities to the public in that Relevant Member State:

    (a) in (or in Germany, where the offer starts within) the period beginning on the date of publication of a prospectus in relation to those Securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive and ending on the date which is 12 months after the date of such publication;

    (b) at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

    (c) at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

    (d) at any time in any other circumstances which do not require the publication by the Company of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Securities to the public" in relation to any Securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Securities to be offered so as to enable an investor to decide to purchase or subscribe the Securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

## United Kingdom

    The Agent has represents and agrees, and any Agent will be required to represent and agree, that:

    (a) in relation to any Securities which have a maturity of less than one year, (i) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (ii) it has not offered or sold and will not offer or sell any Securities other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or as agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the Securities would otherwise constitute a contravention of Section 19 of the FSMA by the Company;

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083379

(b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Company; and

(c) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Securities in, from or otherwise involving the United Kingdom.

The Agent will have agreed that it, to the best of its knowledge after due inquiry, will comply with all applicable laws and regulations in force in any jurisdiction in which it offers or sells the Securities or possesses or distributes the Prospectus, any Preliminary Prospectus or any Issuer Free Writing Prospectus or any other offering material and will obtain any consent, approval or permission required by it for the offer or sale by them of the Securities under the laws and regulations in force in any jurisdiction to which they are subject or in which they make such offers or sales.]

[The undersigned] [Each of the Purchasers] agrees to perform its duties and obligations specifically provided to be performed by [each of] the Purchasers in accordance with the terms and provisions of the Distribution Agreement and the Procedures, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

[If one or more of the Purchasers shall fail at the Settlement Date to purchase the Securities which it or they are obligated to purchase (the "Defaulted Securities"), then the non-defaulting Purchasers (the "non-defaulting Purchasers") shall have the right, within 24 hours thereafter, to make arrangements for one or more of them to purchase all, but not less than all, of the Defaulted Securities in such amounts as may be agreed upon and upon the terms herein set forth; provided, however, that if such arrangements shall not have been completed within such 24-hour period, then:

(A)   if the aggregate principal amount of Defaulted Securities does not exceed 9.09% of the aggregate principal amount of Securities to be so purchased hereunder on the Settlement Date, the non-defaulting Purchasers shall be obligated, severally and not jointly, to purchase the full amount thereof in the proportions that their respective initial underwriting obligations bear to the underwriting obligations of all non-defaulting Purchasers; or

(B)   if the aggregate principal amount of Defaulted Securities exceeds 9.09% of the aggregate principal amount of Securities to be so purchased hereunder on the Settlement Date, this agreement shall terminate without liability on the part of any non-defaulting Purchaser.

C-4

053137-0169-10049-NY03.2491841.14

No action taken pursuant to this paragraph shall relieve any defaulting Purchaser from liability in respect of its default. In the event of any such default which does not result in a termination of this agreement, either the non-defaulting Purchasers or the Company shall have the right to postpone the Settlement Date for a period not exceeding seven days in order to effect any required changes in the Registration Statement, the Prospectus Supplement, the Pricing Supplement or any other documents or arrangements.]

[Notwithstanding anything in the Distribution Agreement to the contrary, the obligations of the Purchasers under Section 7 of the Distribution Agreement are several and not joint, and in no case shall any Purchaser (except as may be provided in any agreement among them) be responsible under Section 7(d) to contribute any amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Purchaser has otherwise paid or become liable to pay with respect to the Securities purchased by such Purchaser hereunder.]

This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

C-5

CONFIDENTIAL

UBSFS_SDNY1083381

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

[NAME OF LEAD MANAGER]
[As Representative of the Purchasers named in Schedule I annexed hereto]

By: _____
    Name:
    Title:

Accepted: _____ ____, 20___

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name:
    Title:

C-6

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083382

08-13425-jmp    Doc 720-27    Filed 09/09/13    Entered 09/09/13 18:49:50    Exhibit G
Pg 93 of 357

SCHEDULE I

| Purchaser | Principal Amount of Securities |
|---|---|
|  | $ |
| Total | $ |

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083383

SCHEDULE II

[Pricing Supplement]

C-8

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083384

SCHEDULE III

[Exceptions to, if any, to Section 1(d) of the Distribution Agreement]

CONFIDENTIAL

UBSFS_SDNY1083385

SCHEDULE IV

**FORM OF FIXED RATE TERM SHEET**

[To be modified as appropriate and completed prior to execution of this Purchase Agreement]

| | |
|---|---|
| **Issuer:** | Lehman Brothers Holdings Inc. |
| **Ratings:** | |
| **Principal Amount:** | $ |
| | [Re-opening to become fungible with $___Notes due 20__] |
| **Security Type:** | Medium-Term Notes (Senior Notes) |
| **Settlement Date:** | _____, 20__ |
| **Maturity Date:** | _____, 20__ |
| **Issue Price:** | __% |
| **Coupon:** | __% |
| **Benchmark Treasury:** | __% due _____ __, 20__ |
| **Spread to Benchmark:** | __ basis points (__%) |
| **Treasury Strike:** | __% |
| **All-in Yield:** | __% |
| **Interest Payment Dates:** | Semi-annually on _____ and _____, commencing on _____, 20__ |
| **[Redemption Provisions:]** | |
|    [Call dates and price: | On____, 20__ [and each Interest Payment Date thereafter] at |
|    [Make-whole call: | [At any time] at a discount rate of Treasury plus __basis |
| **[Other Provisions:]** | |
| **Denominations:** | $ |
| **Underwriters:** | Lehman Brothers (__%) (bookrunner) |
| | [Others]          (__%) |

**The issuer has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (SEC) for this offering. Before you invest, you should read the prospectus for this offering in that registration statement, and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by searching the SEC online database (EDGAR®) at *www.sec.gov*. Alternatively, you may obtain a copy of the prospectus from Lehman Brothers Inc. by calling 1-888-603-5847.**

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083386

## FORM OF FLOATING RATE TERM SHEET

[To be modified as appropriate and completed prior to execution of this Purchase Agreement]

| | |
|---|---|
| **Issuer:** | Lehman Brothers Holdings Inc. |
| **Ratings:** | |
| **Principal Amount:** | $ |
| | [Re-opening to become fungible with ___Notes due 20_] |
| **Security Type:** | Medium-Term Notes (Senior Notes) |
| | |
| **Issue Price:** | __% of principal amount |
| **Settlement Date:** | _____, 20__ |
| **Maturity Date:** | _____, 20__ |
| **Coupon:** | [_____] |
| **Interest Payment Dates:** | [___, ___, ___, commencing on____, 200_] [_____] |
| **Interest Reset Dates:** | [_____] |
| **[Valuation Date]:** | [_____] |
| **Day Count Convention/** | Actual/360; Modified Following, Adjusted |
| **Business Day Convention:** | |
| **[Redemption Provisions:]** | |
|    **[Call Dates and Price:** | [On____, 20__ [and each Interest Payment Date thereafter] at [100]%]] |
| | [_____] |
| **Denominations:** | $ |
| **[Other Provisions:]** | |
| **Underwriters:** | Lehman Brothers (__%) (bookrunner) |
| | [Others]      (__%) |

**The issuer has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (SEC) for this offering. Before you invest, you should read the prospectus for this offering in that registration statement, and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by searching the SEC online database (EDGAR®) at *www.sec.gov*. Alternatively, you may obtain a copy of the prospectus from Lehman Brothers Inc. by calling 1-888-603-5847.**

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083387

EXHIBIT C

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

AGENT ACCESSION LETTER

[Name of Agent
Address of Agent]

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Existing Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I pursuant to an Indenture dated as of September 1, 1987, as amended between the Company and Citibank, N.A., as Trustee. The Distribution Agreement permits the Company to appoint one or more additional persons to act as agent with respect to the Securities, on terms substantially the same as those contained in the Distribution Agreement.  A copy of the Distribution Agreement, including the Procedures with respect to the issuance of the Securities attached thereto as Exhibit B, is attached hereto.

In accordance with Section 11(b) of the Distribution Agreement we hereby confirm that, with effect from the date hereof, solely in respect of the issue of _____ Notes due _____ (the "Issue"), you shall become a party to, and an Agent under, the Distribution Agreement, vested with all the authority, rights and powers, and subject to all duties and obligations of an Agent in relation to the Issue as if originally named as such under the Distribution Agreement. The undersigned agrees that it is acting as agent (not as principal) in connection with the Issue.

Such appointment is limited to the Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement, and such appointment will terminate upon issue of the Securities comprising the Issue but without prejudice to any rights, duties or obligations which have arisen prior to such termination.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the terms "Agent," "Agents" and "Additional Agents" as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to you, (ii) your obligation to act as Agent hereunder shall subject to you having received copies of the most recent documents (including any prior documents referred to therein) previously delivered to the Existing Agent pursuant to Sections 5 and 6 of the Distribution Agreement, and (iii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Securities and/or containing the name of the Agent and/or Additional Agents. By your signature below, you

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083388

2

confirm that such documents are to your satisfaction. For purposes of Section 11 of the Distribution Agreement, you confirm that your notice details are as set forth immediately beneath your signature.

Each of the parties to this letter agrees to perform its respective duties and obligations specifically provided to be performed by each of the parties to in accordance with the terms and provisions of the Distribution Agreement and the Procedures, as amended or supplemented hereby.

[Notwithstanding anything in the Distribution Agreement to the contrary, the obligations of the Agent and Additional Agents under Section 7 of the Distribution Agreement are several and not joint, and in no case shall any Agent or Additional Agent (except as may be provided in any agreement among them) be responsible under Section 7(d) to contribute any amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Purchaser has otherwise paid or become liable to pay from the offering of the Securities.]

This Agreement shall be governed by the laws of the State of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

D-2

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083389

3

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC.

By: _____
   Name:
   Title:


CONFIRMED AND ACCEPTED, as of
the date first above written

[Insert name of Additional Agent and information
pursuant to Section 12 of the Distribution Agreement]

By: _____
   Name:
   Title:

Notice information pursuant to Section 12 of the Distribution Agreement:

Name:
Address:
Contact Person:
Telephone:
Facsimile:

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083390

# EXHIBIT C

EXHIBIT A
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 01 | March 30, 2007 | 52520W564 524908VP2 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 02 | March 30, 2007 | 52520W556 524908VQ0 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 03 | April 30, 2007 | 52517PY21 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 04 | April 30, 2007 | 52517PX63 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 05 | April 30, 2007 | 52520W549 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 06 | April 30, 2007 | 52520W515 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 07 | May 31, 2007 | 52517PY62 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 08 | May 31, 2007 | 52517PY70 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate | $1,000.00 | $133.38 |

[1] Because reliable pricing data was not available for any of the Structured Products after Lehman's bankruptcy on September 15, 2008, the average closing prices for five other Lehman senior unsecured notes (CUSIP Nos. 52517P4C2, 52517P5X5, 52517P5Y3, 5252M0BZ9 and 5252M0FD4), for which reliable pricing data was available, was used to estimate value per note of the Structured Products as of October 31, 2008.  October 31, 2008 is the date on which the first lawsuit asserting claims on behalf of investors in the Structured Products was filed.

1

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 09 | May 31, 2007 | 52520W440 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 10 | June 22, 2007 | 52522L202 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 11 | June 29, 2007 | 52517P2P5 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 12 | June 29, 2007 | 52520W390 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 13 | July 31, 2007 | 52517P3H2 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 14 | July 31, 2007 | 52520W358 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 15 | August 31, 2007 | 52522L129 | Performance Securities with Contingent Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 16 | August 31, 2007 | 52522L137 | Performance Securities with Contingent Protection Linked to the Dow Jones EURO STOXX 50 Index | $10.00 | $1.33 |
| 17 | August 31, 2007 | 52522L145 | Performance Securities with Contingent Protection Linked to the Nikkei 225 Index | $10.00 | $1.33 |
| 18 | August 31, 2007 | 52522L186 | 100% Principal Protection Notes Linked to an International Index Basket | $10.00 | $1.33 |
| 19 | August 31, 2007 | 52522L889 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |

2

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 20 | September 18, 2007 | 52522L251 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 21 | September 28, 2007 | 52522L236 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 22 | September 28, 2007 | 52522L244 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 23 | September 28, 2007 | 52517P5K3 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 24 | October 31, 2007 | 52520W341 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 25 | October 31, 2007 | 52522L400 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index | $10.00 | $1.33 |
| 26 | October 31, 2007 | 52522L293 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 27 | October 31, 2007 | 52522L301 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 28 | October 31, 2007 | 52522L319 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 29 | October 31, 2007 | 52522L327 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 30 | October 31, 2007 | 52522L335 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |

3

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 31 | October 31, 2007 | 52522L384 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 32 | November 7, 2007 | 52522L418 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 33 | November 14, 2007 | 52522L426 | Performance Securities with Partial Protection Linked to an International Index Basket | $10.00 | $1.33 |
| 34 | November 26, 2007 | 52522L475 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 35 | November 30, 2007 | 52520W333 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 36 | November 30, 2007 | 52522L376 | 100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index | $10.00 | $1.33 |
| 37 | November 30, 2007 | 52522L392 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 38 | November 30, 2007 | 52522L459 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 39 | December 31, 2007 | 52522L483 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 40 | December 31, 2007 | 52522L491 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 41 | December 31, 2007 | 52522L533 | Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund | $10.00 | $1.33 |

4

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 42 | January 31, 2008 | 52517P4N8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 43 | January 31, 2008 | 52520W325 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 44 | January 31, 2008 | 52522L525 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 45 | February 8, 2008 | 52522L657 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 46 | February 13, 2008 | 52522L673 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 47 | February 13, 2008 | 52522L699 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 48 | February 13, 2008 | 52522L707 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 49 | February 13, 2008 | 52522L715 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 50 | February 13, 2008 | 52522L723 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 51 | February 29, 2008 | 5252M0CZ8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 52 | February 29, 2008 | 52522L632 | Performance Securities Linked to an Asian Currency Basket | $10.00 | $1.33 |

5

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 53 | February 29, 2008 | 52522L574 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 54 | February 29, 2008 | 52522L582 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 55 | February 29, 2008 | 52522L566 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 56 | February 29, 2008 | 52522L772 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR Fund vs. the Consumer Discretionary Select Sector SPDR Fund | $10.00 | $1.33 |
| 57 | February 29, 2008 | 52523J412 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 58 | March 7, 2008 | 52523J420 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 59 | March 19, 2008 | 52523J115 | 100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR S&P Homebuilders ETF | $10.00 | $1.33 |
| 60 | March 25, 2008 | 52523J149 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 61 | March 28, 2008 | 52523J131 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 62 | March 31, 2008 | 5252M0EK9 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |

6

## EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 63 | March 31, 2008 | 52523J438 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 64 | March 31, 2008 | 52522L806 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 65 | March 31, 2008 | 52522L814 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index | $10.00 | $1.33 |
| 66 | March 31, 2008 | 52522L871 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 67 | March 31, 2008 | 5252M0EV5 | 100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 68 | March 31, 2008 | 52522L798 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 69 | April 4, 2008 | 52522L848 | Return Optimization Securities Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 70 | April 4, 2008 | 52522L830 | 100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 71 | April 23, 2008 | 52523J172 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 72 | April 30, 2008 | 52523J156 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 73 | May 12, 2008 | 52523J503 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

7

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 74 | May 15, 2008 | 52523J206 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 75 | May 16, 2008 | 52523J222 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks | $10.00 | $1.33 |
| 76 | May 21, 2008 | 52523J214 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 77 | May 30, 2008 | 52523J230 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 78 | June 16, 2008 | 52520W283 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate | $10.00 | $1.33 |
| 79 | June 20, 2008 | 5252M0FU6 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 80 | June 30, 2008 | 5252M0CD7 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 81 | June 30, 2008 | 52523J263 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio | $10.00 | $1.33 |
| 82 | June 30, 2008 | 524935129 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

8

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 83 | June 30, 2008 | 52523J248 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |
| 84 | June 30, 2008 | 52523J255 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |

9

# EXHIBIT D

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 1 | 43341435-2011-46 | FINRA  Arb # 11-03370 | 9/13/2011 | 10/31/2011 |
| 2 | 43341435-2012-20 | FINRA Arb # 12-00487 | 2/21/2012 | 4/9/2012 |
| 3 | 43341435-2012-19 | FINRA Arb # 12-00443 | 2/21/2012 | 4/5/2012 |
| 4 | 43341435-2012-26 | FINRA Arb # 12-00865 | 3/15/2012 | 5/1/2012 |
| 5 | 43341435-2012-25 | FINRA Arb # 12-00813 | 3/15/2012 | 5/2/2012 |
| 6 | 43341435-2012-24 | FINRA Arb $ 12-00756 | 3/13/2012 | 4/30/2012 |
| 7 | 43341435-2012-29 | FINRA Arb # 12-00958 | 3/27/2012 | 5/14/2012 |
| 8 | 43341435-2012-32 | FINRA Arb # 12-01279 | | |
| 9 | 43341435-2012-33 | FINRA Arb # 12-1361 | 4/26/2012 | 6/11/2012 |
| 10 | 43341435-2012-34 | FINRA Arb # 12-01538 | 5/14/2012 | 6/27/2012 |
| 11 | 43341435-2012-38 | FINRA Arb # 12-01430 | 5/17/2012 | 7/3/2012 |
| 12 | 43341435-2012-41 | FINRA Arb # 12-01626 | 5/29/2012 | 7/12/2012 |
| 13 | 43341435-2012-44 | FINRA Arb #12-01917 | 6/1/2012 | 7/1/2012 |
| 14 | 43341435-2012-45 | FINRA Arb # 12-02072 | 6/12/2012 | 7/30/2012 |
| 15 | 43341435-2012-47 | FINRA Arb # 12-02238 | 8/10/2012 | 6/26/2012 |
| 16 | 43341435-2012-50 | FINRA Arb # 12-02337 | 7/3/2012 | 8/20/2012 |
| 17 | 43341435-2012-51 | FINRA Arb # 12-02425 | 7/9/2012 | 8/24/2012 |
| 18 | 43341435-2012-53 | FINRA Arb # 12-02436 | 7/9/2012 | 8/27/2012 |
| 19 | 43176861-2012-41 | FINRA Arb # 12-02522 | 7/19/2012 | 9/4/2012 |
| 20 | 43341435-2012-54 | FINRA Arb # 12-02018 | 7/20/2012 | 9/4/2012 |
| 21 | 43341435-2012-55 | FINRA Arb # 12-02543 | 7/23/2012 | 9/6/2012 |
| 22 | 43341435-2012-59 | FINRA Arb # 12-02401 | 8/13/2012 | 10/1/2012 |
| 23 | 43341435-2012-60 | FINRA Arb # 12-02869 | 8/20/2012 | 10/2/2012 |
| 24 | 43341435-2012-61 | FINRA Arb # 12-02787 | 8/24/2012 | 10/9/2012 |
| 25 | 43341435-2012-62 | FINRA Arb # 12-03076 | 9/4/2012 | 10/19/2012 |
| 26 | 43341435-2012-64 | FINRA Arb # 12-02945 | 9/21/2012 | 11/8/2012 |
| 27 | 43341435-2012-66 | FINRA Arb # 12-03311 | 9/27/2012 | 11/13/2012 |
| 28 | 43341435-2012-67 | Finra Arb # 12-03405 | 10/1/2012 | 11/16/2012 |
| 29 | 43341435-2012-68 | FINRA Arb # 12-03352 | 10/3/2012 | 11/19/2012 |
| 30 | 43341435-2012-70 | FINRA Arb # 12-03588 | 10/22/2012 | 12/6/2012 |
| 31 | 43341435-2012-72 | FINRA Arb # 12-03575 | 10/25/2012 | 12/12/2012 |
| 32 | 43341435-2013-1 | FINRA Arb # 12-04221 | 1/3/2013 | 2/12/2013 |
| 33 | 43341435-2013-2 | FINRA Arb # 12-04128 | 12/26/2012 | 2/6/2013 |
| 34 | 43341435-2013-3 | FINRA Arb # 12-04310 | 1/7/2013 | 2/22/2013 |
| 35 | 43341435-2013-4 | FINRA Arb # 13-00249 | 2/4/2013 | 3/25/2013 |
| 36 | 43115415-2013-7 | FINRA Arb # 13-00485 | 2/25/2013 | 4/12/2013 |
| 37 | 43341435-2013-8 | FINRA Arb # 13-00380 | 2/28/2013 | 4/6/2013 |
| 38 | 43341435-2013-9 | FINRA Arb # 13-00621 | 3/11/2013 | 4/26/2013 |
| 39 | 43341435-2013-10 | FINRA Arb # 13-00622 | 3/11/2013 | 4/25/2013 |
| 40 | 43341435-2013-11 | FINRA Arb # 13-00647 | 3/11/2013 | 4/25/2013 |
| 41 | 43341435-2013-12 | FINRA Arb # 13-00558 | 3/7/2013 | 4/22/2013 |
| 42 | 43341435-2013-13 | FINRA Arb # 13-00656 | 3/18/2013 | 5/1/2013 |
| 43 | 43341435-2013-14 | FINRA Arb #13-00659 | 3/18/2013 | 5/2/2013 |
| 44 | 43341435-2013-15 | FINRA Arb # 13-00725 | 3/20/2013 | 5/7/2013 |
| 45 | 43341435-2013-16 | FINRA Arb # 13-00706 | 3/21/2013 | 5/7/2013 |
| 46 | 43341435-2013-17 | FINRA Arb # 13-00755 | 3/27/2013 | 5/10/2013 |
| 47 | 43341435-2013-20 | FINRA Arb # 13-00713 | 4/9/2013 | 6/5/2013 |
| 48 | 43341435-2013-24 | FINRA Arb # 01194 | 5/6/2013 | 6/20/2013 |
| 49 | 43341435-2013-25 | FINRA Arb # 13-01227 | 5/13/2013 | 6/27/2013 |
| 50 | 43341435-2013-26 | FINRA Arb # 13-00789 | 5/13/2013 | 6/26/2013 |
| 51 | 43341435-2013-28 | FINRA Arb # 13-01537 | 6/6/2013 | 7/19/2013 |
| 52 | 43341435-2013-29 | FINRA Arb # 13-01210 | 6/7/2013 | 7/23/2013 |
| 53 | 43341435-2013-33 | FINRA Arb # 13-01773 | 6/24/2013 | 8/8/2013 |
| 54 | 43341435-2013-36 | FINRA Arb # 13-01772 | 6/28/2013 | 8/13/2013 |
| 55 | 43341435-2013-42 | FINRA Arb # 13-02167 | | |
| 56 | 43341435-2013-45 | FINRA ARB # 13-01817 | 8/20/2013 | 10/1/2013 |

|   | **Lexida ID** | **Forum** | **Service** | **Answer** |
|---|---|---|---|---|
|   |   |   |   |   |
|   |   |   |   |   |
|   | **CLOSED  CASES** |   |   |   |
|   |   |   |   |   |
| 1 | 43124983-2009-94 **- CLOSED -** | FINRA Arb # 09-03767 | 7/6/2009 | 8/18/2009 |
| 2 | 43129483-2009-63 **- CLOSED -** | FINRA Arb #09-02530 | 5/11/2009 | 6/29/2009 |
| 3 | 43129483-2009-58 **- CLOSED -** | FINRa Abr # 09-02320 | 5/4/2009 | 6/19/2009 |
| 4 | 4312948-2008-71 **- CLOSED** | FINRA - ARB #08-04179 | 1/5/2009 |   |
| 5 | 43129483-2009-117 **- CLOSED -** | FINRA Arb # 09-04461 | 8/10/2009 | 9/22/2009 |
| 6 | 43129483-2009-35 **- CLOSED -** | FINRA Arb # 09-01382 | 3/23/2009 | 5/7/2009 |
| 7 | 43177906-2009-1 **- CLOSED -** | FINRA Arb # 08-05022 | 1/6/2009 | 1/29/2009 |
| 8 | 43129483-2009-11  **- CLOSED** | FINRA Arb # 09-00237 | 1/12/2009 | 3/9/2009 |
| 9 | 43177906-2009-8 **- CLOSED** | FINRA Arb # 09-00025 | 1/27/2009 | 3/16/2009 |
| 10 | 43132588-2009-14    **- CLOSED -** | FINRA Arb # 09-00690 | 2/17/2009 | 4/6/2009 |
|   |   |   |   |   |
| 11 | 43160301-2008-39 **- CLOSED** | FINRA Arb #08-04356 | 11/25/2008 | 1/12/2008 |
| 12 | 43177906-2009-35 **- CLOSED -** | FINRA Arb # 09-02377 | 5/4/2009 | 6/19/2009 |
| 13 | 4312948-2008-70 - CLOSED - | FINRA   ARB #08-04152 | 1/2/2009 |   |
| 14 | 43206540-2009-6 **- CLOSED -** | FINRA Arb # 09-00147 | 1/21/2009 | 3/6/2009 |
| 15 | 43129483-2009-35 **- CLOSED -** | FINRa Arb #09-00582 | 2/13/2009 | 3/31/2009 |
| 16 | 43176861-2009-25 **- CLOSED -** | FINRA Arb # 09-02027 | 4/20/2009 | 6/8/2009 |
| 17 | 43132588-2009-82  **- CLOSED** | FINRA Arb #  09-04729 | 9/3/2009 | 10/19/2009 |
| 18 | 43176861-2009-9 **- CLOSED -** | FINRA Arb #09-00717 | 2/17/2009 | 4/3/2009 |
| 19 | 43132588-2008-66 **- CLOSED** | FINRA Arb # 08-04662 | 12/16/2008 | 1/30/2009 |
| 20 | 43206540-2008-16  **- CLOSED -** | FINRA Arb # 08-04630 | 12/17/2008 | 1/30/2008 |
| 21 | 43132588-2009-31 **- CLOSED -** | FINRA Arb # 09-01173 | 4/3/2009 | 5/19/2009 |
| 22 | 43176861-2009-1 **- CLOSED  -** | FINRA Arb # 08-05021 | 1/6/2009 | 2/19/2009 |
| 23 | 43160301-2009-22 **- CLOSED -** | FINRA Arb # 09-02335 | 5/4/2009 | 6/19/2009 |
| 24 | 43206540-2008-5 **- CLOSED -** | FINRA Arb # 08-04927 | 1/7/2009 | feb.-09 |
| 25 | 43129483-2009-6 **- CLOSED -** | FINRA Arb # 08-04935 | 1/7/2009 | 2/19/2009 |
| 26 | 43129483-2009-19 **- CLOSED** | FINRA Arb # 09-00429 | 2/3/2009 | 3/23/2009 |
| 27 | 43167837-2009-11  **- CLOSED -** | FINRA Arb # 09-00851 | 2/17/2009 | 4/6/2009 |
| 28 | 43157660-2009-21 **- CLOSED -** | FINRA Arb $09-02956 | 6/1/2009 | 7/17/2009 |
| 29 | 43132588-2009-21 **- CLOSED -** | FINRA Arb # 09-01014 | 3/9/2009 | 4/23/2009 |
| 30 | 43129483-2009-37 **- CLOSED -** | FINRA Arb #09-01456 | 3/26/2009 | 5/11/2009 |
| 31 | 43129483-2009-82 **- CLOSED -** | FINRA Arb # 09-03316 | 6/15/2009 | 7/29/2009 |
| 32 | 43160301-2008-31 **- CLOSED -** | AAA Arb #50-181-T-00391-08 | UBS filed 9/25/08 |   |
|   |   |   |   |   |
| 33 | 43129483-2008-79 **- CLOSED -** | FINRA Arb # 08-04695 | 12/22/2008 | 2/4/2009 |
| 34 | 43141447-2009-2 **- CLOSED -** | FINRA Arb  #09-00223 | 1/21/2009 | 3/9/2009 |
| 35 | 43206540-2009-3  **-  CLOSED -** | FINRA Arb #08-05003 | 1/6/2008 | 2/19/2009 |
| 36 | 43129483-2009-42 **- CLOSED -** | FINRA Arb # 09-01594 | 4/2/2009 | 5/18/2009 |
| 37 | 43167837-2009-13   **- CLOSED -** | FINRA Arb # 09-00851 | 2/23/2009 | 4/13/2009 |
| 38 | 43132588-2009-88 **- CLOSED -** | FINRA Arb. #09-04906 | 9/10/2009 | 10/23/2009 |
| 39 | 43176861-2009-15 **- CLOSED -** | FINRA Arb # 09-00897 | 3/17/2009 | 4/29/2009 |
| 40 | 43167837-2009-33 **- CLOSED -** | FINRA Arb # 09-02840 | 6/26/2009 | 8/12/2009 |
| 41 | 43167837-2009-29 **- CLOSED -** | FINRA Arb # 09-02628 | 5/18/2009 | 7/2/2009 |
| 42 | 43129483-2009-77 **- CLOSED -** | FINRA Arb # 09-03034 | 6/8/2009 | 7/22/2009 |
| 43 | 43176861-2008-28 **- CLOSED -** | FINRA -  Arb #08-03994 | 11/4/2008 | 12/22/2008 |
| 44 | 43115415-2009-10 **- CLOSED -** | Finra Arb # 09-00390 | 1/30/2009 | 3/18/2009 |
| 45 | 43115415-2008-19 **- CLOSED -** | FINRA- Arb #08-04212 | 1/5/2009 |   |
| 46 | 43115415-2008-22 **- CLOSED -** | FINRA Arb #08-04757 | 12/22/2008 | 2/5/2009 |
| 47 | 43206540-2008-14 **- CLOSED -** | FINRA Arb # 08-04463 | 12/8/2008 | 1/21/2009 |
| 48 | 43129483-2009-30 **- CLOSED -** | FINRA Arb # 09-01524 | 3/30/2009 | 5/13/2009 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 49 | 43206540-2009-4 **- CLOSED -** | FINRA Arb 08-04986 | 1/7/2009 | 2/23/2009 |
| 50 | 43141447-2009-7 **- CLOSED -** | FINRA Arb # 09-02876 | 6/1/2009 | 7/17/2009 |
| 51 | 43132588-2009-22 **- CLOSED -** | FINRA Arb # 09-01034 | 3/9/2009 | 4/23/2009 |
| 52 | 43176861-2009-26 **- CLOSED -** | FINRA Arb # 09-01776 | 4/24/2009 | 6/10/2009 |
| 53 | 43160301-2009-26 **- CLOSED -** | FINRA Arb # 09-03495 | 6/19/2006 | 8/5/2009 |
| 54 | 43129483-2009-113 **- CLOSED -** | FINRA Arb #09-04416 | 8/3/2009 | 9/18/2009 |
| 55 | 43132588-2009-17 **- CLOSED -** | FINRA Arb # 09-00971 | 3/2/2009 | 4/20/2009 |
| 56 | 43132588-2009-18 **- CLOSED -** | FINRA Arb # 09-00409 | 3/5/2009 | 4/22/2009 |
| 57 | 43129483-2009-196 **- CLOSED -** | FINRA Arb # 09-05660 | 12/18/2010 | 2/3/2010 |
| 58 | 43132588-2009-11 **- CLOSED -** | FINRA Arb #09-00490 | 2/9/2009 | 3/25/2009 |
| 59 | 43176861-2009-12 **- CLOSED -** | FINRA Arb. # 09-00641 | 2/23/2009 | 4/9/2009 |
| 60 | 43132588-2009-48 **- CLOSED -** | FINRA Arb # 09-01614 | 5/11/2009 | 6/25/2009 |
| 61 | 43129483-2009-3 **- CLOSED -** | FINRA Arb # 08-04809 | 1/6/2009 | 2/9/2009 |
| 62 | 43129483-2009-50 **- CLOSED -** | FINRA Arb # 09-01966 | 4/17/2009 | 6/4/2009 |
| 63 | 43129483-2009-53 **- CLOSED -** | FINRa Arb 09-02167 | 4/27/2009 | 6/12/2009 |
| 64 | 43141447-2009-8 **- CLOSED -** | FINRA Arb # 09-02775 | 6/22/2009 | 8/10/2009 |
| 65 | 43176861-2009-4 **- CLOSED -** | FINRA Arb # 08-04964 | 1/7/2009 | 2/18/2009 |
| 66 | 43176861-2009-17 **- CLOSED -** | FINRA Arb #09-01453 | 3/26/2009 | 5/12/2009 |
| 67 | 43132588-2009-26 **- CLOSED -** | FINRA Arb # 09-01267 | 3/17/2009 | 5/1/2009 |
| 68 | 43132588-2009-49 **- CLOSED -** | FINRA Arb # 09-02488 | 5/12/2009 | 6/26/2009 |
| 69 | 43160301-200915 **- CLOSED -** | FINRA Arb # 09-01571 | 3/30/2009 | 5/14/2009 |
| 70 | 43176861-2009-35 | FINRA Arb # 09-03018 | 6/8/2009 | 7/22/2009 |
| 71 | 43129483-2009-84 **- CLOSED -** | FINRA Arb # 09-03531 | 6/19/2009 | 8/5/2009 |
| 72 | 43129483-2009-66 **- CLOSED -** | FINRA #09-02252 | 5/18/2009 | 7/6/2009 |
| 73 | 43129483-2009-111 **- CLOSED -** | FINRA Arb #09-04360 | 7/31/2009 | 9/16/2009 |
| 74 | 43129483-2009-46 **- CLOSED -** | FINRA Arb # 09-01793 | 4/14/2009 | 5/27/2009 |
| 75 | 43160301-2009-9 **- CLOSED -** | FINRA Arb # 09-00773 | 2/23/2009 | 4/9/2009 |
| 76 | 43115415-2009-43 | FINRA Arb # 09-04151 | 7/17/2009 | 9/3/2009 |
| 77 | 43167837-2009-22 | FINRA Arb #09-02228 | 4/27/2009 | 6/12/2009 |
| 78 | 43176861-2009-42 | FINRA Arb # 09-03997 | 7/10/2009 | 8/27/2009 |
| 79 | 43115415-2009-33 | FINRa Arb #09-02750 | 5/26/2009 | 7/9/2009 |
| 80 | 43160301-2009-5 | FINRA Arb # 09-00075 | 1/27/2009 | 3/12/2009 |
| 81 | 43129483-2010-13 | FINRA Arb # 09-07001 | 2/2/2010 | 3/19/2010 |
| 82 | 43176861-2009-50 | FINRA Arb #09-04390 | 8/12/2009 | 9/29/2009 |
| 83 | 43129483-2009-99 | FINRA Arb # 09-03887 | 7/13/2009 | 8/25/2009 |
| 84 | 43129483-2009-137 | FINRA Arb #09-05221 | 9/21/2009 | 11/5/2009 |
| 85 | 43132588-2009-55 | FINRA Arb # 09-02941 | 6/1/2009 | 7/20/2009 |
| 86 | 43167837-2009-26 | FINRA Arb # 09-02312 | 5/1/2009 | 6/17/2009 |
| 87 | 43129483-2009-127 **- CLOSED -** | FINRA Arb #09-04877 | 8/28/2009 | 10/14/2009 |
| 88 | 43167837-2009-35 **- CLOSED -** | FINRA Arb # 09-04128 | 7/17/2009 | 9/28/2009 |
| 89 | 43129483-2009-130 | FINRA Arb #09-04974 | 9/9/2009 | 10/20/2009 |
| 90 | 43129483-2009-172 | FINRA Arb #09-06063 | 11/2/2009 | 12/16/2009 |
| 91 | 43167837-2009-19 **- CLOSED -** | FINRA Arb # 09-01675 | 4/6/2009 | 5/21/2009 |
| 92 | 43177906-2009-63 | FINRA Arb #09-05124 | 9/10/2009 | 10/26/2009 |
| 93 | 43129183-2009-144 | FINRA Arb #09-05499 | 10/1/2009 | 11/17/2009 |
| 94 | 43176861-2009-23 | FINRA Arb # 09-01989 | 4/20/2009 | 6/4/2009 |
| 95 | 43176861-2009-43 | FINRA Arb # 09-03235 | 7/20/2009 | 9/4/2009 |
| 96 | 43177906-2009-47 | FINRA Arb # 09-03226 | 6/29/2009 | 8/13/2009 |
| 97 | 43202704-2009-6 | FINRa Arb # 6460 | 11/23/2009 | 1/8/2010 |
| 98 | 43160301-2009-21 | FINRa Arb # 09-02285 | 5/4/2009 | 6/18/2009 |
| 99 | 43132588-2009-60 | FINRA Arb # 09-02679 | 6/8/2009 | 7/24/2009 |
| 100 | 43176861-2009-51 | FINRa Arb # 09-04720 | 8/17/2009 | 10/2/2009 |
| 101 | 43132588-2009-77 **- CLOSED -** | FINRA Arb #09-04076 | 7/31/2009 | 9/15/2009 |
| 102 | 43176861-2009-3 **- CLOSED** | FINRA Arb # 08-04923 | 1/6/2009 | 2/17/2009 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 103 | 43129483-2009-12 | FINRA Arb # 09-00231 | 1/21/2009 | 3/9/2009 |
| 104 | 43132588-2009-42 - **CLOSED -** | FINRA Arb # 09-02183 | 4/28/2009 | 6/15/2009 |
| 105 | 43129483-2009-83 - **CLOSED -** | FINRA Arb # 09-02788 | 6/22/2009 | 8/6/2009 |
| 106 | 43176861-2008-35 - **CLOSED -** | FINRA Arb # 08-04578 | 12/11/2008 | 1/26/2009 |
| 107 | 43129483-2009-148 | FINRA Arb # 09-05458 | 10/5/2009 | 11/16/2009 |
| 108 | 43167837-2009-21 - **CLOSED -** | FINRA Arb # 01507 | 4/20/2009 | 6/3/2009 |
| 109 | 43177906-2010-4 - **CLOSED -** | FINRA Arb # 09-07214 | 1/11/2010 | 2/23/2010 |
| 110 | 43132588-2009-57 - **CLOSED -** | FINRA Arb #09-02662 | 6/1/2009 | 7/20/2009 |
| 111 | 43129483-2009-110 - **CLOSED -** | FINRA Arb #09-04343 | 7/31/2009 | 9/15/2009 |
| 112 | 43132588-2009-64 - **CLOSED -** | FINRA Arb #09-03642 | 6/29/2009 | 8/13/2009 |
| 113 | 43176861-209-61 - **CLOSED -** | FINRA Arb #09-05371 | 10/5/2009 | 11/20/2009 |
| 114 | 43129483-2009-120 - **CLOSED _** | FINRA Arb # 09-04617 | 8/13/2009 | 9/29/2009 |
| 115 | 43129483-2009-136 - **CLOSED -** | FINRA #09-05189 | 9/21/2009 | 11/4/2009 |
| 116 | 43124983-2009-140 - **CLOSED -** | FINRA Arb #09-05346 | 9/24/2009 | 11/10/2009 |
| 117 | 43132588-2009-65 | FINRA Arb #09-02184 | 6/29/2009 | 8/12/2009 |
| 118 | 43167837-2009-20 - **CLOSED** | FINRA Arb #09-00923 | 4/13/2009 | 5/29/2009 |
| 119 | 43160301-2009-25 - **CLOSED -** | FINRA Arb #09-03085 | 6/15/2009 | 7/31/2009 |
| 120 | 43132588-2009-100 - **CLOSED -** | FINRA Arb #09-05770 | 10/26/2009 | 12/10/2009 |
| 121 | 43115415-2009-26 - CLOSED | FINRA Arb # 09-01944 | 5/4/2009 | 6/17/2009 |
| 122 | 43129483-2009-122 - CLOSED | FINRA Arb # 09-04701 | 8/17/2009 | 10/5/2009 |
| 123 | 43167837-2009-43 - CLOSED | FINRA Arb #09-03900 | 8/14/2009 | 9/30/2009 |
| 124 | 43167837-2009-44 - **CLOSED -** | FINRA Arb #09-04849 | 8/24/2009 | 10/12/2009 |
| 125 | 43129483-2010-15 - **CLOSED -** | FINRA Arb # 10-00225 | 2/16/2010 | 4/1/2010 |
| 126 | 43132588-2010-25 - CLOSED | FINRA Arb # 10-00754 | 3/8/2010 | 4/23/2010 |
| 127 | 43129483-2010-23 - CLOSED | FINRA Arb # 10-00747 | 3/2/2010 | 4/19/2010 |
| 128 | 43129483-2010-21 - CLOSED | FINRA Arb # 10-00748 | 3/1/2010 | 4/15/2010 |
| 129 | 43132588-2009-104 - CLOSED | FINRA Arb # 09-06012 | 10/29/2009 | 12/16/2009 |
| 130 | 43129483-2010-29 - CLOSED | FINRA Arb # 10-01131 | 3/23/2010 | 2/3/2009 |
| 131 | 43167837-2009-40 - CLOSED | FINRA Arb # 09-04605 | 8/10/2009 | 10/9/2009 |
| 132 | 43160301-2009-16 - CLOSED - | FINRA Arb # 09-01694 | 4/2/2009 | 5/19/2009 |
| 133 | 43129483-2010-3 - **CLOSED -** | FINRA Arb # 09-07022 | 12/30/2009 | 2/12/2010 |
| 134 | 43177906-2009-64 | FINRA Arb #09-05173 | 9/15/2009 | 10/30/2009 |
| 135 | 43160301-2009-20 | FINRA Arb # 09-02061 | 4/20/2009 | 6/8/2009 |
| 136 | 43160301-2009-28 | FINRA Arb #09-03658 | 6/29/2009 | 8/12/2009 |
| 137 | 43160301-2009-36 | FINRA Arb #09-04452 | 8/3/2009 | 9/21/2009 |
| 138 | 43176861-2009-59 | FINRA Arb #09-05182 | 9/15/2009 | 11/2/2009 |
| 139 | 43160301-2009-33 | FINRA Arb # 09-04177 | 7/20/2009 | 9/4/2009 |
| 140 | 43167783-2009-30 | FINRA Arb #09-02925 | 5/29/2009 | 7/15/2009 |
| 141 | 43115415-2009-15 | FINRA Arb # 09-00995 | 3/6/2009 | 4/21/2009 |
| 142 | 43115415-2008-21 | FINRA - ARB# 08-04357 | 12/1/2008 | 1/12/2009 |
| 143 | 43176861-2010-7 - CLOSED - | FINRA Arb # 10-00596 | 2/22/2010 | 4/7/2010 |
| 144 | 43115415-2010-67 | FINRA Arb # 10-03711 | 9/27/2010 | 11/11/2010 |
| 145 | 43115415-2010-43 | FINRA Arb # 10-03245 | 7/28/2010 | 9/14/2010 |
| 146 | 43115415-2010-35 | FINRA Arb # 10-03100 | | |
| 147 | 43115415-2009-27 | FINRA Arb # 09-02276 | 5/1/2009 | 6/17/2009 |
| 148 | 43167837-2009-47 | FINRA Arb #09-05167 | 9/15/2009 | 11/2/2009 |
| 149 | 43132588-2009-79 | FINRa Arb 09-04712 | 8/17/2009 | 10/2/2009 |
| 150 | 43132588-2010-2 | FINRA Arb # 09-06829 | 12/24/2009 | 2/9/2010 |
| 151 | 43115415-2010-63 | FINRA Arb # 10-03933 | 9/20/2010 | 11/2/2010 |
| 152 | 43132588-2009-81 | FINRa Arb #09-04469 | 8/20/2009 | 10/6/2009 |
| 153 | 43132588-2010-79 - **CLOSED -** | FINRa Arb # 10-01755 | 5/17/2010 | 7/6/2010 |
| 154 | 43129483-2009-51 | FINRA Arb $09-02087 | 4/20/2009 | 6/8/2009 |
| 155 | 43129483-2009-142 | FINRA Arb #09-05417 | 9/28/2009 | 11/13/2009 |
| 156 | 43177906-2010-5 | FINRA Arb # 10-00116 | 1/19/2010 | 3/4/2010 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 157 | 43129483-2009-186 | FINRA Arb # 09-06548 | 11/30/2009 | 1/12/2010 |
| 158 | 43167837-2009-27 | FINRA Arb # 09-02466 | 5/11/2009 | 6/25/2009 |
| 159 | 43141447-2009-1 | FINRA Arb # 09-00048 | 1/12/2009 | 2/26/2009 |
| 160 | 43129483-2009-167 | FINRA ARb # 09-05614 | 10/26/2009 | 12/9/2009 |
| 161 | 43115415-2010-30 | FINRA Arb # 10-02728 | 6/28/2010 | 8/12/2010 |
| 162 | 43177906-2009-70 | FINRA Arb #09-05319 | 10/13/2009 | 11/27/2009 |
| 163 | 43160301-2009-45 | FINRA Arb #09-05644 | 10/9/2009 | 11/25/2009 |
| 164 | 43129483-2009-185 | FINRA Arb # 09-06549 | 11/27/2009 | 1/12/2010 |
| 165 | 43160301-2010-4 | FINRA Arb # 10-00443 | 2/16/2010 | 3/30/2010 |
| 166 | 43129483-2010-17 | FINRA Arb # 10-00650 | 2/22/2010 | 4/8/2010 |
| 167 | 43129483-2010-1 | FINRA Arb # 09-07028 | 12/28/2009 | 2/11/2010 |
| 168 | 43132588-2010-11 | FINRA Arb # 09-06901 | 1/28/2010 | 3/16/2010 |
| 169 | 43129483-2010-44 | FINRA ARB # 10-01660 | 4/21/2010 | 6/7/2010 |
| 170 | 43115415-2010-34 | FINRA ARB # 10-02995 | 7/13/2010 | 8/30/2010 |
| 171 | 43115415-2010-108 | FINRa Arb # 10-03093 | 11/9/2010 | 12/27/2010 |
| 172 | 43115415-2011-4 | FINRA Arb # 10-05613 | 12/30/2010 | 2/14/2011 |
| 173 | 53115415-2010-51 | FINRA Arb # 10-03560 | 8/16/2010 | 9/30/2010 |
| 174 | 43176861-2009-46 | FINRA Arb #09-04451 | 8/3/2009 | 10/21/2009 |
| 175 | 43176861-2010-5 | FINRa Arb # 10-00298 | 2/1/2010 | 3/19/2010 |
| 176 | 43132588-2009-107 | FINRA Arb # 09-06010 | 10/30/2009 | 12/15/2009 |
| 177 | 43132588-2009-91 | FINRA Arb #09-04911 | 9/21/2009 | 11/6/2009 |
| 178 | 43202704-2010-3 | FINRA Arb # 10-00006 | 1/8/2010 | 2/25/2010 |
| 179 | 43129483-2010-48 | FINRA Arb #10-01789 | 5/4/2010 | 6/16/2010 |
| 180 | 43129483-2010-55 | FINRA Arb # 10-02269 | 5/25/2010 | 7/9/2010 |
| 181 | 43129483-2010-2 | FINRA Arb # 09-06983 | 12/28/2009 | 2/10/2010 |
| 182 | 43132588-2010-41 | FINRA Arb # 10-00800 | 3/26/2010 | 5/11/2010 |
| 183 | 43176861-2009-57 | FINRA Arb. #09-05066 | 9/14/2009 | 10/26/2009 |
| 184 | 43167837-2010-14 | FINRA Arb # 10-02254 | 6/1/2010 | 7/13/2010 |
| 185 | 43129483-2010-24 | FINRA ARb # 10-00522 | 3/5/2010 | 4/20/2010 |
| 186 | 43177906-2010-7 | FINRa Arb# 10-00306 | 2/4/2010 | 3/17/2010 |
| 187 | 43115415-2010-64 | FINRA Arb # 10-03984 | 9/22/2010 | 11/4/2010 |
| 188 | 43115415-2010-113 | FINRA ARB #10-04840 | 11/18/2010 | 1/5/2011 |
| 189 | 43115415-2011-22 | FINRA Arb # 00344 | 1/31/2011 | 3/21/2011 |
| 190 | 43115415-2010-71 | FINRA Arb # 10-04108 | 9/24/2010 | 11/9/2010 |
| 191 | 43129483-2010-46 | FINRA Arb # 10-01736 | 4/27/2010 | 6/10/2010 |
| 192 | 43129483-2010-57 | FINRA Arb # 10-02352 | 6/2/2010 | 7/15/2010 |
| 193 | 43115415-2010-110 | FINRA Arb # 10-04751 | 11/8/2010 | 12/22/2010 |
| 194 | 43202704-2010-10 | FINRA ARB # 10-00831 | 3/3/2010 | 4/20/2010 |
| 195 | 43115415-2010-54 | FINRA Arb # 10-03683 | 8/30/2010 | 10/13/2010 |
| 196 | 43132588-2010-30 | FINRA Arb # 10-00959 | 3/19/2010 | 5/4/2010 |
| 197 | 43132588-2010-54 | FIRNA Arb # 10-01594 | 4/15/2010 | 6/1/2010 |
| 198 | 43167837-2010-6 | FINRA Arb # 10-00387 | 2/22/2010 | 4/5/2010 |
| 199 | 43129483-2009-93 | FINRA Arb # 09-03832 | 7/6/2009 | 8/19/2009 |
| 200 | 43132588-2010-8 | FINRA Arb # 09-07233 | 1/13/2010 | 3/1/2010 |
| 201 | 43132588-2010-23 | FINRA Arb # 10-00713 | 3/1/2010 | 4/13/2010 |
| 202 | 43167837-2010-9 | FINRA Arb # 10-01103 | 3/15/2010 | 4/30/2010 |
| 203 | 43160301-2009-41 | FINRA Arb  #09-05171 | 9/15/2009 | 10/30/2009 |
| 204 | 43115451-2010-33 | FINRA Arb # 10-03015 | 7/8/2010 | 8/25/2010 |
| 205 | 43115415-2010-27 | FINRA Arb # 10-02634 | 6/14/2010 | 7/30/2010 |
| 206 | 43115415-2010-104 | FINRA Arb #10-04637 | 11/2/2010 | 12/15/2010 |
| 207 | 43115415-2010-79 | FINRA Arb # 10-04136 | 9/30/2010 | 11/17/2010 |
| 208 | 43115415-2010-78 | FINRA Arb # 10-04141 | 9/29/2010 | 11/16/2010 |
| 209 | 43176861-2009-31 | FINRA Arb # 09-02304 | 5/4/2009 | 6/19/2009 |
| 210 | 43132588-2010-19 | FINRA Arb # 10-00293 | 2/1/2010 | 3/18/2010 |
| 211 | 43202704-2010-2 | FINRA Arb # 09-07083 | 1/4/2010 | 2/16/2010 |
| 212 | 43115415-2010-55 | FINRA Arb # 10-03457 | 8/30/2010 | 10/14/2010 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 213 | 43129483-2010-12 | FINRA Arb # 10-00361 | 2/2/2010 | 3/22/2010 |
| 214 | 43132588-2010-22 | FINRA Arb # 10-00785 | 2/25/2010 | 4/14/2010 |
| 215 | 43115415-2011-72 | FINRA Arb # 11-01503 | 4/26/2011 | 6/9/2011 |
| 216 | 43129483-2010-34 | FINRA Arb # 10-01400 | 4/5/2010 | 5/20/2010 |
| 217 | 43115415-2010-87 | FINRA Arb # 10-04256 | 10/5/2010 | 11/19/2010 |
| 218 | 43115415-2010-52 | FINRA Arb # 10-03495 | 8/19/2010 | 10/4/2010 |
| 219 | 43115415-2010-70 | FINRA Arb # 10-04121 | 9/24/2010 | 11/9/2010 |
| 220 | 43115415-2010-109 | FINRA Arb # 10-04772 | 11/8/2010 | 12/22/2010 |
| 221 | 43115415-2011-25 | FINRA Arb # 11-00588 | 2/22/2011 | 2/23/2011 |
| 222 | 43115415-2010-112 | FINRA Arb 310-05006 | 11/15/2010 | 12/30/2010 |
| 223 | 43115415-2010-114 | FINRA Arb # 10-04736 | 11/22/2010 | 1/5/2011 |
| 224 | 43176861-2010-12 | FINRA Arb # 10-01551 | 4/12/2010 | 5/28/2010 |
| 225 | 43115415-2010-57 | FINRA Arb# 10-03803 | 9/3/2010 | 10/21/2010 |
| 226 | 43176861-2010-52 | FINRA Arb #10-03193 | 8/9/2010 | 9/24/2010 |
| 227 | 43115415-2010-98 | FINRA Arb # 10-04539 | 10/25/2010 | 12/7/2010 |
| 228 | 43132588-2010-61 | FINRA Arb # 10-01724 | 4/23/2010 | 6/9/2010 |
| 229 | 43115415-2010-41 | FINRA Arb # 10-02899 | 7/21/2010 | 9/7/2010 |
| 230 | 43115415-2010-99 | FINRa Arb # 10-04550 | 10/22/2010 | 12/6/2010 |
| 231 | 43115415-2010-56 | FINRA Arb # 10-03816 | 9/7/2010 | 10/20/2010 |
| 232 | 43341435-2011-23 | FINRA Arb # 11-02548 | 7/5/2011 | 8/19/2011 |
| 233 | 43341435-2011-9 | FINRA Arb # 11-02102 | 6/6/2011 | 7/25/2011 |
| 234 | 43115415-2011-69 | FINRA Arb # 11-01368 | 4/11/2011 | 5/27/2011 |
| 235 | 43115415-2010-42 | FINRA Arb # 10-03234 | 7/28/2010 | 9/10/2010 |
| 236 | 43115415-2010-94 | FINRA Arb # 10-04460 | 10/18/2010 | 12/2/2010 |
| 237 | 43129483-2010-28 | FINRA Arb # 10-00964 | 3/16/2010 | 4/28/2010 |
| 238 | 43115415-2010-124 | FINRA Arb # 10-05579 | 12/21/2010 | 2/7/2011 |
| 239 | 43115415-2010-119 | FINRA Arb # 10-5489 | 12/13/2010 | 1/31/2011 |
| 240 | 43176861-2010-116 | FINRA Arb # 10-04774 | 12/23/2010 | 11/9/2010 |
| 241 | 43160301-2009-44 | FINRA Arb # 09-05521 | 10/5/2009 | 11/19/2009 |
| 242 | 43115415-2010-85 | FINRA Arb # 10-04242 | 10/5/2010 | 11/18/2010 |
| 243 | 43129483-2009-171 | FINRA Arb # 09-06092 | 11/2/2009 | 12/18/2009 |
| 244 | 43132588-2009-101 | FINRA Arb # 09-05828 | 10/26/2009 | 12/11/2009 |
| 245 | 43132588-2010-7 | FINRA Arb # 09-07232 | 1/12/2010 | 2/26/2010 |
| 246 | 43132588-2010-32 | FINRA Arb # 10-00985 | 3/23/2010 | 5/6/2010 |
| 247 | 43115415-2010-25 | FINRA Arb # 10-02205 | 6/7/2010 | 7/26/2010 |
| 248 | 43115415-2010-88 | FINRA Arb # 10-04212 | 10/1/2010 | 11/16/2010 |
| 249 | 43115415-2011-77 | FINRA Arb # 11-01292 | 5/9/2011 | 6/23/2011 |
| 250 | 43115415-2009-52 | FINRA Arb - not served yet- | not served yet | |
| 251 | 43115415-2010-45 | FINRA Arb #10-03488 | 8/2/2010 | 9/29/2010 |
| 252 | 43177906-2010-10 | FINRa Arb #10-01864 | 4/30/2010 | 6/15/2010 |
| 253 | 43177451-2010-49 | FINRA Arb #10-03093 | 8/6/2010 | 9/22/2010 |
| 254 | 43176861-2010-71 | FINRA Arb # 10-03741 | 9/2/2010 | 10/19/2010 |
| 255 | 43115415-2010-105 | FINRA Arb # 10-04802 | 11/3/2010 | 12/21/2010 |
| 256 | 43115415-2010-97 | FINRA Arb # 10-04625 | 10/25/2010 | 12/9/2010 |
| 257 | 43115415-2010-115 | FINRA Arb # 10-04801 | 11/29/2010 | 1/11/2011 |
| 258 | 43115415-2010-117 | FINRA Arb # 10-05255 | 11/29/2010 | 1/13/2011 |
| 259 | 43115415-2010-29 | FINRA Arb # 10-02740 | 6/24/2010 | 8/10/2010 |
| 260 | 43202704-2010-1 | FINRA Arb # 09-07077 | 12/28/2009 | 2/12/2010 |
| 261 | 43115415-2010-73 | FINRA Arb # 10-04153 | 9/27/2010 | 11/11/2010 |
| 262 | 43115415-2011-2 | FINRA Arb # 10-05470 | 12/30/2010 | 2/10/2011 |
| 263 | 43115415-2011-9 | FINRA Arb # 10-05829 | 1/19/2011 | 3/2/2011 |
| 264 | 43167837-2010-1 | FINRA Arb # 10-00062 | 1/11/2010 | 2/26/2010 |
| 265 | 43115415-2010-31 | FINRA Arb # 10-02658 | 6/28/2010 | 8/13/2010 |
| 266 | 43115415-2010-83 | FINRA Arb # 10-04140 | 10/1/2010 | 11/17/2010 |
| 267 | 43115415-2010-89 | FINRA Arb # 10-04255 | 10/4/2010 | 11/18/2010 |
| 268 | 43115415-2010-72 | FINRA Arb # 10-04162 | 9/27/2010 | 11/11/2010 |

|  | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 269 | 43115415-2010-50 | FINRA Arb #10-03478 | 8/11/2010 | 9/28/2010 |
| 270 | 43176861-2010-15 | FINRA Arb # 10-01685 | 5/10/2010 | 6/24/2010 |
| 271 | 43115415-2010-61 | FINRA RAB # 10-03929 | 9/10/2010 | 10/28/2010 |
| 272 | 43176861-2010-82 | FINRA Arb :10-03957 | 9/20/2010 | 11/7/2010 |
| 273 | 43132588-2009-10 | FINRA Arb #09-00488 | 2/9/2009 | 3/26/2009 |
| 274 | 43115415-2011-8 | FINRA Arb # - served 2/22/11 - | not served yet | |
| 275 | 43115415-2011-57 | FINRA Arb # 11-01113 | 3/31/2011 | 5/17/2011 |
| 276 | 43115415-2010-101 | FINRA Arb # 10-04668 | 10/26/2010 | 12/13/2010 |
| 277 | 43115415-2011-17 | AAA Arb # n/a | 2/7/2011 | |
| 278 | 43115415-2010-60 | FINRA Arb # 10-03811 | 9/8/2010 | 10/25/2010 |
| 279 | 43341435-2011-58 | FINRA Arb # 11-03518 | 10/3/2011 | 11/17/2011 |
| 280 | 43341435-2011-65 | FINRA Arb # 11-03972 | 10/25/2011 | 12/12/2011 |
| 281 | 43115415-2011-37 | FINRA Arb # 11-00702 | 2/28/2011 | 4/15/2011 |
| 282 | 43115415-2011-3 | FINRA Arb # 10-05693 | 12/31/2010 | 2/16/2011 |
| 283 | 43115415-2011-35 | FINRA Arb # 11-00761 | 2/28/2011 | 4/18/2011 |
| 284 | 43115415-2010-46 | FINRA Arb # 10-03382 | 8/11/2010 | 9/27/2010 |
| 285 | 43115415-2010-69 | FINRA Arb # 10-04055 | 9/24/2010 | 11/9/2010 |
| 286 | 43115415-2010-26 | FINRA Arb # 10-02646 | 6/15/2010 | 7/19/2010 |
| 287 | 43176861-2010-85 | FINRA Arb # 10-04019 | 9/24/2010 | 11/8/2010 |
| 288 | 43176861-2010-82 | FINRA Arb # 10-03912 | 9/30/2010 | 11/17/2010 |
| 289 | 43115415-2011-6 | FINRA Arb # 11-00008 | 1/11/2011 | 2/28/2011 |
| 290 | 43115415-2011-59 | FINRA Arb # 11-01222 | 4/6/2011 | 5/24/2011 |
| 291 | 43115415-2010-96 | FINRA Arb # 10-04522 | 10/20/2010 | 12/3/2010 |
| 292 | 43115415-2010-116 | FINRa Arb # 10-05249 | 11/30/2010 | 1/13/2011 |
| 293 | 43115415-2010-123 | FINRA Arb # 10-05448 | 12/21/2010 | 2/7/2011 |
| 294 | 43115415-2011-13 | FINRA Arb # 11-00214 | 1/24/2011 | 3/14/2011 |
| 295 | 43115415-2010-75 | FINRA Arb # 10-04138 | 9/27/2010 | 11/15/2010 |
| 296 | 43115415-2010-111 | FINRA Arb # 10-04896 | 11/9/2010 | 12/27/2010 |
| 297 | 43176861-2009-41 | FINRA Arb # 09-03943 | 7/6/2009 | 8/21/2009 |
| 298 | 43115415-2010-74 | FINRA Arb # 10-04116 | 9/24/2010 | 11/9/2010 |
| 299 | 43115415-2010-81 | FINRA Arb # 10-04131 | 9/30/2010 | 11/17/2010 |
| 300 | 43115415-2011-42 | FINRA Arb # 11-00797 | 3/8/2011 | 4/25/2011 |
| 301 | 43202704-2009-7 | FINRA Arb # 09-06228 | 11/27/2009 | 1/13/2010 |
| 302 | 43115415-2010-95 | FINRA Arb # 10-04502 | 10/20/2010 | 12/2/2010 |
| 303 | 43115415-2011-5 | FINRA Arb # 10-0564 | 1/7/2011 | 2/22/2011 |
| 304 | 43115415-2011-78 | FINRA Arb # 11-01598 | 5/2/2011 | 6/15/2011 |
| 305 | 43341435-2011-64 | FINRA Arb # 11-03919 | 10/25/2011 | 12/9/2011 |
| 306 | 43115415-2010-65 | FINRA Arb # 10-04004 | 9/22/2010 | 11/8/2010 |
| 307 | 43115415-2010-76 | FINRA Arb # 10-04132 | 9/27/2010 | 11/12/2010 |
| 308 | 43115415-2011-45 | FINRA Arb # 11-00843 | 3/11/2011 | 4/27/2011 |
| 309 | 43115415-2011-66 | FINRA Arb # 11-01295 | 4/11/2011 | 5/25/2011 |
| 310 | 43115415-2011-83 | FINRA Arb # 11-01935 | 5/24/2011 | 7/8/2011 |
| 311 | 43115415-2010-28 | FINRA Arb # 10-02708 | 6/23/2010 | 8/9/2010 |
| 312 | 43115415-2010-44 | FINRa Arb # 10-02998 | 8/2/2010 | 9/15/2010 |
| 313 | 43115415-2011-26 | FINRA Arb # 11-00547 | 2/22/2011 | 4/8/2011 |
| 314 | 43115415-2010-62 | FINRA Arb # 10-03997 | 9/16/2010 | 11/2/2010 |
| 315 | 43115415-2011-36 | FINRA Arb # 11-00643 | 2/28/2011 | 4/14/2011 |
| 316 | 43115415-2011-53 | FINRA Arb # 11-01095 | 3/29/2011 | 5/13/2011 |
| 317 | 43115415-2011-67 | FINRA Arb # 11-01120 | 4/1/2011 | 5/17/2011 |
| 318 | 43341435-2011-3 | FINRA Arb #11-01983 | 5/31/2011 | 7/13/2011 |
| 319 | 43341435-2012-16 | FINRA Arb # 12-00021 | ProSe | 1/30/2012 |
| 320 | 43115415-2010-120 | FINRA Arb # 10-05383 | 12/10/2010 | 1/25/2011 |
| 321 | 43115415-2011-44 | FINRA Arb # 11-00794 | 3/14/2011 | 4/29/2011 |
| 322 | 43341435-2012-18 | FINRA Arb # 12-00318 | 2/13/2012 | 3/29/2012 |
| 323 | 43115415-2011-31 | FINRa Arb # 11-00689 | 2/28/2011 | 4/15/2011 |
| 324 | 43115415-2011-40 | FINRA Arb # 11-00355 | 3/7/2011 | 4/25/2011 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 325 | 43115415-2011-14 | FINRA Arb # 11-00209 | 1/31/2011 | 3/16/2011 |
| 326 | 43115415-2011-51 | FINRA Arb # 11-01096 | 3/25/2011 | 5/12/2011 |
| 327 | 43341435-2011-21 | FINRA Arb #11-02238 | 6/27/2011 | 8/10/2011 |
| 328 | 43341435-2012-22 | FINRA Arb # 12-00277 | 2/21/2012 | 4/9/2012 |
| 329 | 43115415-2011-46 | FINRA Arb # 11-00844 | 3/11/2011 | 4/27/2011 |
| 330 | 43115415-2010-93 | FINRA Arb # 10-04274 | 10/18/2010 | 12/1/2010 |
| 331 | 43115415-2011-23 | FINRA Arb # 11-00463 | 2/18/2011 | 4/4/2011 |
| 332 | 43115415-2011-49 | FINRA Arb # 11-01005 | 3/23/2011 | 5/9/2011 |
| 333 | 43115415-2011-47 | FINRA Arb #11-00976 | 3/17/2011 | 5/3/2011 |
| 334 | 43115415-2010-84 | FINRA Arb # 10-04139 | 9/29/2010 | 11/16/2010 |
| 335 | 43341435-2011-18 | FINRA Arb #11-02349 | 6/24/2011 | 8/9/2011 |
| 336 | 43115415-2010-22 | FINRA Arb # 10-02584 | 6/7/2010 | 7/26/2010 |
| 337 | 43341435-2011-28 | FINRA Arb # 11-02554 | 7/11/2011 | 8/26/2011 |
| 338 | 43341435-2011-36 | FINRA Arb #11-02823 | 8/16/2011 | 9/28/2011 |
| 339 | 43341435-2011-39 | FINRA Arb # 11-02994 | 8/16/2011 | 9/30/2011 |
| 340 | 43176861-2009-47 | FINRA Arb # 09-03454 | 8/3/2009 | 10/19/2009 |
| 341 | 43115415-2010-102 | FINRA Arb # 10-04638 | | |
| 342 | 43115415-2011-29 | FINRA Arb # 11-00569 | 2/24/2011 | 4/11/2005 |
| 343 | 43341435-2011-59 | FINRA Arb # 11-03365 | 10/11/2011 | 11/25/2011 |
| 344 | 43341435-2012-27 | FINRA Arb # 12-00863 | 3/16/2012 | 5/3/2012 |
| 345 | 43115415-2010-68 | FINRA Arb # 04137 | 9/29/2010 | |
| 346 | 43115415-2011-79 | FINRA Arb #11-01747 | 5/13/2011 | 6/28/2011 |
| 347 | 43341435-2011-12 | FINRA Arb# 11-02117 | 6/13/2011 | 7/26/2011 |
| 348 | 43116905-2011-1 | FINRA Arb # 11-02658 | 7/18/2011 | 9/2/2011 |
| 349 | 43202704-2010-14 | FINRA Arb # 10-01348 | 4/21/2010 | 6/7/2010 |
| 350 | 43115415-2010-77 | FINRA Arb # 10-04135 | 9/29/2010 | 11/16/2010 |
| 351 | 43115415-2010-100 | FINRA Arb # 10-04133 | 10/25/2010 | 12/8/2010 |
| 352 | 43115415-2011-54 | FINRA Arb # 11-01097 | 3/29/2011 | 5/13/2011 |
| 353 | 43115415-2011-64 | FINRA Arb # 11-01361 | 4/11/2011 | 5/31/2011 |
| 354 | 43115415-2011-76 | FINRA Arb # 11-00959 | 5/9/2011 | 6/21/2011 |
| 355 | 43341435-2011-2 | FINRA Arb # 11-02012 | 5/26/2011 | 7/12/2011 |
| 356 | 43341435-2011-66 | FINRA Arb # 11-03995 | 10/31/2011 | 12/15/2011 |
| 357 | 43115415-2011-24 | FINRA Arb # 11-00580 | 2/23/2001 | 4/7/2011 |
| 358 | 43115415-2011-52 | FINRa Arb # 11-01041 | 3/28/2011 | 5/6/2011 |
| 359 | 43341435-2011-80 | FINRA Arb # 11-04561 | 12/22/2011 | 2/6/2012 |
| 360 | 43115415-2010-80 | FINRA Arb # 10-04134 | 9/30/2010 | 11/17/2010 |
| 361 | 43115415-2010-103 | FINRa Arb# 10-04639 | 11/11/2010 | 12/15/2010 |
| 362 | 43115415-2011-50 | FINRA Arb # 11-01063 | 3/23/2011 | 5/9/2011 |
| 363 | 43341435-2011-52 | FINRA Arb #11-03537 | 9/26/2011 | 11/10/2011 |
| 364 | 43341435-2011-53 | FINRA Arb #11-03535 | 9/26/2011 | 11/9/2011 |
| 365 | 43341435-2011-72 | FINRA Arb # 11-04110 | 11/7/2011 | 12/21/2011 |
| 366 | 43115415-2011-65 | FINRa Arb # 11-01364 | 4/11/2011 | 5/27/2011 |
| 367 | 43115415-2011-70 | FINRa Arb # 11-00940 | 4/20/2011 | 5/31/2011 |
| 368 | 43115415-2011-80 | FINRA Arb # 11-01864 | 7/5/2011 | 5/19/2011 |
| 369 | 43341435-2012-1 | FINRA Arb # 11-04560 | 12/23/2011 | 2/3/2012 |
| 370 | 43341435-2012-6 | FINRA Arb # 11-04744 | 1/3/2012 | 2/17/2012 |
| 371 | 43115415-2010-32 | FINRA Arb #10-02941 | 7/6/2010 | 8/20/2010 |
| 372 | 43115415-2011-68 | FINRA Arb # 11-01132 | 4/1/2011 | 5/18/2011 |
| 373 | 43341435-2011-49 | FINRA Arb # 11-03390 | 9/16/2011 | 10/31/2011 |
| 374 | 43115415-2011-71 | FINRA Arb # 11-01539 | 4/25/2011 | 6/9/2011 |
| 375 | 43341435-2012-42 | FINRA Arb # 12-01910 | 5/31/2012 | 7/18/2012 |
| 376 | 43341435-2011-14 | FINRA Arb # 11-01999 | 6/13/2011 | 7/27/2011 |
| 377 | 43341435-2011-10 | FINRA Arb# 11-02153 | 6/10/2011 | 7/26/2011 |
| 378 | 43341435-2011-30 | FINRA Arn # 11-02566 | 7/19/2011 | 9/6/2011 |
| 379 | 43115415-2011-60 | FINRA Arb # 11-01182 | 4/5/2011 | 5/23/2011 |
| 380 | 43341435-2011-22 | FINRa Arb # 11-01998 | 6/27/2011 | 8/12/2011 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 381 | 43341435-2011-16 | FINRA Arb #11-02003 | 6/23/2011 | 8/9/2011 |
| 382 | 43115415-2011-56 | FINRA Arb # 11-00851 | 4/1/2011 | 5/19/2011 |
| 383 | 43341435-2011-29 | FINRA Arb # 11-02480 | 7/5/2011 | 8/18/2011 |
| 384 | 43341435-2011-38 | FINRA Arb # 11-02817 | 8/23/2011 | 10/10/2011 |
| 385 | 43341435-2011-60 | FINRA Arb # 11-03700 | 10/6/2011 | 11/22/2011 |
| 386 | 43341435-2011-74 | FINRA Arb # 11-04188 | 11/21/2011 | 1/4/2012 |
| 387 | 43341435-2012-5 | FINRA Arb # 11-04573 | 12/23/2011 | 2/7/2012 |
| 388 | 43341435-2011-20 | FINRA Arb # 11-02363 | 6/27/2011 | 8/10/2011 |
| 389 | 43115415-2011-75 | FINRA Arb # 11-01377 | 5/2/2011 | 6/15/2011 |
| 390 | 43341435-2011-24 | FINRA Arb # 11-02558 | 7/5/2011 | 8/19/2011 |
| 391 | 43341435-2011-35 | FINRA Arb #11- 02794 | 8/2/2011 | 9/19/2011 |
| 392 | 43341435-2011-73 | FINRA Arb # 11-04065 | 11/21/2011 | 1/9/2012 |
| 393 | 43115415-2011-82 | FINRA Arb # 11-01872 | 5/24/2011 | 7/8/2011 |
| 394 | 43341435-2011-27 | FINRA Arb # 11-02392 | 7/11/2011 | 8/24/2011 |
| 395 | 43341435-2011-34 | FINRA Arb #11-02795 | 8/1/2011 | 9/15/2011 |
| 396 | 43341435-2011-63 | FINRA Arb # 11-03741 | 10/21/2011 | 12/8/2011 |
| 397 | 43115415-2011-28 | FINRA Arb # 11-00648 | 4/11/2011 | 4/11/2011 |
| 398 | 43115415-2011-30 | FINRA Arb # 11-00701 | 2/28/2011 | 4/15/2011 |
| 399 | 43115415-2011-58 | FINRa Arb # 11-01265 | 4/11/2011 | 5/26/2011 |
| 400 | 43341435-2011-15 | FINRA Arb # 11-02205 | 6/20/2011 | 8/2/2011 |
| 401 | 43341435-2011-51 | FINRA Arb # 11-03526 | 9/20/2011 | 11/4/2011 |
| 402 | 43341435-2012-12 | FINRA Arb # 11-04218 | 1/17/2012 | 3/1/2012 |
| 403 | 43341435-2011-26 | FINRA Arb # 11-02276 | 7/5/2011 | 8/17/2011 |
| 404 | 43341435-2011-31 | FINRA Arb #11-02799 | 7/29/2011 | 9/14/2011 |
| 405 | 43115415-2011-55 | FINRA Arb # 11-01103 | 4/5/2011 | 5/20/2011 |
| 406 | 43115415-2011-27 | FINRA Arb # 11-00585 | 2/22/2011 | 4/7/2011 |
| 407 | 43341435-2012-9 | FINRA Arb # 12-00036 | 1/11/2012 | 2/28/2012 |
| 408 | 43341435-2012-40 | FINRA Arb # 12-01830 | 5/29/2012 | 7/16/2012 |
| 409 | 43341435-2011-25 | FINRA Arb # 11-02512 | 7/5/2011 | 8/19/2011 |
| 410 | 43341435-2011-32 | FINRA Arb #11-02821 | 8/1/2011 | 9/16/2011 |
| 411 | 43341435-2011-48 | FINRA Arb # 11-03436 | 9/15/2011 | 11/1/2011 |
| 412 | 43115415-2011-63 | FINRA Arb # 11-01255 | 4/8/2011 | 5/25/2011 |
| 413 | 43341435-2011-1 | FINRA Arb # 11-01976 | 5/31/2011 | 7/14/2011 |
| 414 | 43115415-2011-48 | FINRA Arb # 11-01066 | 3/23/2011 | 5/10/2011 |
| 415 | 43341435-2011-57 | FINRA Arb # 11-03511 | 10/3/2011 | 11/21/2011 |
| 416 | 43115415-2011-18 | FINRA Arb # 11-00395 | 2/7/2011 | 3/25/2011 |
| 417 | 43341435-2011-7 | FINRA ARB #11-02002 | 5/31/2011 | 7/15/2011 |
| 418 | 43341435-2011-11 | FINRA Arb #11-02209 | 6/13/2011 | 7/28/2011 |
| 419 | 43341435-2011-37 | FINRA Arb #11-03063 | 8/16/2011 | 9/29/2011 |
| 420 | 43341435-2011-45 | FINRA Arb # 11-03264 | 9/3/2011 | 10/19/2011 |
| 421 | 43341435-2012-35 | FINRA Arb # 12-01609 | 5/15/2012 | 7/2/2012 |
| 422 | 43341435-2011-75 | FINRA Arb # 11-04278 | 11/25/2011 | 1/10/2012 |
| 423 | 43341435-2012-39 | FINRA Arb $ 12-01761 | 5/22/2012 | 7/9/2012 |
| 424 | 43341435-2012-48 | FINRA Arb # 12-02301 | 8/13/2012 | 6/26/2012 |
| 425 | 43341435-2011-13 | FINRA Arb # 11-02149 | 6/13/2011 | 7/29/2011 |
| 426 | 43341435-2012-8 | FINRA Arb #11-04542 | 1/9/2012 | 2/24/2012 |
| 427 | 43341435-2011-62 | FINRA Arb # 11-03680 | 10/17/2011 | 12/2/2011 |
| 428 | 43115415-2011-62 | FINRA Arb # 11-00481 | 4/5/2011 | 5/19/2011 |
| 429 | 43341435-2012-21 | FINRA Arb # 12-00362 | 2/15/2012 | 4/3/2012 |
| 430 | 43341435-2011-43 | FINRA Arb # 11-03244 | 9/6/2011 | 10/19/2011 |
| 431 | 43115415-2011-61 | FINRA Arb # 11-01242 | 4/4/2011 | 5/23/2011 |
| 432 | 43341435-2011-47 | FINRA Arb # 11-03260 | 9/7/2011 | 10/20/2011 |
| 433 | 43341435-2011-61 | FINRA Arb # 11-03775 | 10/11/2011 | 11/28/2011 |
| 434 | 43341435-2012-36 | FINRA Arb # 12-01557 | 5/14/2012 | 6/28/2012 |
| 435 | 43341435-2011-4 | FINRA Arb #11-02000 | 5/31/2011 | 7/14/2011 |
| 436 | 43341435-2011-16 | FINRA Arb # 11-02351 | 6/22/2011 | 8/8/2011 |

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 437 | 43341435-2012-2 | FINRA Arb # 11-04792 | 1/3/2012 | 2/21/2012 |
| 438 | 43341435-2012-13 | FINRA Arb # 12-00079 | 1/20/2012 | 3/8/2012 |
| 439 | 43341435-2011-33 | FINRA Arb #11-02790 | 7/29/2011 | 9/13/2011 |
| 440 | 43341435-2011-44 | FINRA Arb #11-03271 | 9/6/2011 | 10/19/2011 |
| 441 | 43341435-2011-67 | FINRA Arb # 11-03531 | 10/31/2011 | 12/14/2011 |
| 442 | 43341435-2011-41 | FINRA Arb # 11-03256 | 8/29/2011 | 10/13/2011 |
| 443 | 43341435-2012-4 | FINRA Arb # 11-4768 | 1/3/2012 | 2/21/2012 |
| 444 | 43341435-2012-58 | FINRA Arb #12-02721  - SIMPLIFIED - | 8/13/2012 | 9/25/2012 |
| 445 | 43341435-2011-5 | FINRA Arb # 11-02059 | 5/31/2011 | 7/18/2011 |
| 446 | 43341435-2011-68 | FINRA Arb # 11-03552 | 10/31/2011 | 12/14/2011 |
| 447 | 43341435-2011-69 | FINRa Arb # 11-04004 | 11/1/2011 | 12/16/2011 |
| 448 | 43341435-2011-70 | FINRA Arb # 11-03464 | 10/31/2011 | 12/14/2011 |
| 449 | 43341435-2011-71 | FINRA Arb # 11-03917 | 11/7/2011 | 12/23/2011 |
| 450 | 43341435-2011-81 | FINRA Arb # 11-04624 | 12/22/2011 | 2/7/2012 |
| 451 | 43341435-2012-17 | FINRa Arb # 12-00316 | 2/10/2012 | 3/27/2012 |
| 452 | 43341435-2011-76 | FINRA Arb # 11-04378 | 11/30/2011 | 1/17/2012 |
| 453 | 43341435-2012-49 | FINRA Arb # 12-02260 | 8/14/2012 | 6/28/2012 |
| 454 | 43341435-2011-56 | FINRA Arb #11-03546 | 9/27/2011 | 11/10/2011 |
| 455 | 43341435-2012-35 | FINRA Arb # 12-01611 | 5/14/2012 | 6/28/2012 |
| 456 | 43341435-2011-79 | FINRA Arb # 11-04152 | 11/5/2011 | 1/23/2012 |
| 457 | 43341435-2012-46 | FINRA Arb # 12-01995 | 6/11/2012 | 7/30/2012 |
| 458 | 43341435-2012-10 | FINRA Arb # 11-04812 | 1/10/2012 | 2/24/2012 |
| 459 | 43341435-2012-28 | FINRA Arb # 12-00891 | 3/19/2012 | 5/3/2012 |
| 460 | 43341435-2011-42 | FINRA Arb # 11-02688 | 8/31/2011 | 10/17/2011 |
| 461 | 43341435-2012-14 | FINRA Arb # 12-00155 | 1/23/2012 | 3/9/2012 |
| 462 | 43341435-2011-8 | FINRA Arb # 11-01930 | 6/3/2011 | 7/20/2011 |
| 463 | 43341435-2012-23 | FINRA Arb # 12-00744 | 3/9/2012 | 4/26/2012 |
| 464 | 43341435-2011-40 | FINRA Arb # 11-03186 | 8/23/2011 | 10/10/2011 |
| 465 | 43341435-2012-15 | FINRA Arb # 12-00217 | 1/30/2012 | 3/19/2012 |
| 466 | 43341435-2012-30 | FINRA Arb # 12-00928 | 3/23/2012 | 5/9/2012 |
| 467 | 43341435-2011-54 | FINRA Arb #11-03530 | 9/26/2011 | 11/9/2011 |
| 468 | 43341435-2011-55 | FINRA Arb #11-03564 | 9/26/2011 | 11/8/2011 |
| 469 | 43341435-2012-43 | FINRA Arb # 12-01546 | 6/4/2012 | 7/20/2012 |
| 470 | 43341435-2012-11 | FINRA Arb #11-04577 | 1/17/2012 | 3/1/2012 |
| 471 | 43341435-2012-63 | FINRA Arb # 12-03112 | 9/14/2012 | 10/31/2012 |
| 472 | 43115415-2010-53 | FINRA Arb # 10-03534 | 8/30/2010 | 10/12/2010 |
| 473 | 43115415-2011-78 | FINRA Arb # 11-04327 | 11/5/2011 | 1/17/2012 |
| 474 | 43341435-2012-3 | FINRA Arb # 11-04665 | 12/27/2011 | 2/9/2012 |
| 475 | 43115415-2011-41 | FINRA Arb # 11-00472 | 2/22/2011 | 4/4/2011 |
| 476 | 43341435-2012-7 | FINRA Arb # 12-00002 | 1/9/2012 | 2/23/2012 |
| 477 | 43341435-2012-74 | FINRA Arb# 12-04142 | 12/17/2012 | 2/1/2013 |
| 478 | 43341435-2011-50 | FINRA Arb # 11-03140 | 9/20/2011 | 11/4/2011 |
| 479 | 43341435-2012-73 | FINRA Arb # | 11/15/2012 | 12/24/2012 |
| 480 | 43341435-2012-57 | FINRA Arb # 12-02715 | 8/6/2012 | 9/20/2012 |
| 481 | 43341435-2012-69 | FINRA Arb # 12-03377 | 10/4/2012 | 11/19/2001 |
| 482 | 43341435-2012-31 | FINRA Arb # 12-01276 | 4/16/2012 | 6/1/2012 |

08-01420-jmp   Doc 5202-5   Filed 09/09/13   Entered 09/09/13 18:45:50   Exhibit
g-1 of 57

# EXHIBIT E

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | Southern District of New York | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: **LEHMAN BROTHERS INC.** | Case Number: **08-01420 (SIPA) (jmp)** |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**UBS Financial Services Inc.** | ☐☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>**David L.Goldberg, Esq.**<br>**UBS Financial Services Inc.**<br>**1200 Harbor Boulevard**<br>**Weehawken, NJ 07086-6791**<br>**201.352.3334**    with copy to:<br><br>**Kenneth A. Kopelman, Esq.**<br>**Bingham McCutchen LLP**<br>**399 Park Avenue**<br>**New York, NY 10022**<br>**212.705.7278** | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br>**UBS Financial Services Inc. (see above)** | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** unknown: see attached Appendix.<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>x Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.<br><br>**2. Basis for Claim:** indemnity and contribution - see attached Appendix.<br>(See instruction #2 on reverse side.)<br><br>**3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>     **3a. Debtor may have scheduled account as:**_____<br>     (See instruction #3a on reverse side.)<br><br>**4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**    ☐ Real Estate    ☐ Motor Vehicle    x Other<br>**Describe:** Setoff against sums otherwise payable from claimant's affiliate to debtor under ISDA Master Agreement; see attached Appendix.<br><br>**Value of Property:$**_____ **Annual Interest Rate____%**<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>**if any: $**_____ **Basis for perfection:**_____<br><br>**Amount of Secured Claim: up to $75,818,358.91 Amount Unsecured: unknown - see attached Appendix.** | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).<br><br>☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$_____ |

| | |
|---|---|
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br>5/__/2009 | Signature: *[signature]*    Sr. Assoc. Gen. Counsel, Executive Direct, UBSFS *[signature]* Managing Director | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

A/73048891.1

**Appendix**

This Proof of Claim (the "Claim") is filed by UBS Financial Services Inc. ("Claimant") against Lehman Brothers Inc. ("LBI").

Claimant has claims against LBI for, among other things, indemnity, contribution, and intentional or negligent misrepresentation. The basis for such claims is as follows.

Claimant has been named as a defendant in a consolidated class action pending in the United States District Court for the Southern District of New York, captioned *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 08 Civ. 5523 (LAK), and as a respondent in a number of customer arbitration proceedings, in which the claimants allege that Claimant, as an underwriter or seller of securities of Lehman Brothers Holdings Inc. ("LBHI"), made misrepresentations in registration statements, prospectuses, and other offering materials. The information allegedly misrepresented by Claimant includes information that was provided to Claimant by representatives of LBI. Claimant reasonably relied on the truth of the information provided by LBI in approving the relevant registration statements, prospectuses, and offering materials, and in continuing to sell securities issued by LBHI. If, as the plaintiffs and claimants allege, the information was false and misleading, and if Claimant is found liable to the plaintiffs or claimants or otherwise suffers losses or incurs costs or expenses as a result, LBI is liable to Claimant for all or a portion of the losses. At present, the potential amount of this claim is unknown.

**Claim Secured by Right of Setoff**

LBI and Claimant's affiliate UBS AG ("UBS") are parties to a certain ISDA Master Agreement (the "ISDA"). UBS holds certain collateral posted by LBI under the ISDA, with a value of $75,818,358.91, net of LBI's payment obligations under the ISDA (the "Collateral"). UBS terminated the ISDA. The ISDA provides that upon such termination UBS may set off its obligation to return the Collateral to LBI against any fixed or contingent amounts due from LBI to UBS or any "Affiliate" of UBS (the "Setoff"). Because Claimant is such an "Affiliate," the Claim is subject to, and secured by, the Setoff to the extent of the value of the Collateral.

A true and correct copy of the ISDA and Claimant's May 22, 2009 letter to LBI describing the value of the Collateral and certain setoff rights under the ISDA are attached hereto collectively as Exhibit 1.

Upon information and belief, UBS will seek the Court's approval of the Setoff, to the extent Court approval is required, in the near future. Claimant reserves all of its rights in the event the Setoff is held to be invalid or is not effected for any reason.

**Reservation of Rights**

Claimant has a contractual right to reimbursement from Debtor for all reasonable collection and legal fees in connection with the claims underlying this Claim. Claimant reserves the right to claim all amounts due in respect of any such fees, as well as any applicable default interest, make-whole premium and postpetition interest to the extent allowed by law. The amounts of the foregoing cannot be determined at this time.

Claimant reserves its right to amend this Claim for the purposes and to the extent permitted by law.

This Claim is filed under the compulsion of the bar date established in this SIPA proceeding and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Filing of this Claim is not and shall not be deemed or construed as (a) a waiver or release of Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this

A/73048891.1

Court); (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (d) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; (g) an election of remedies; or (h) consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

08-01420-jmp   Doc 7202-5   Filed 09/09/13   Entered 09/09/13 18:45:50   Exhibit
Pg 123 of 357

# Exhibit 1

(Multicurrency—Cross Border)

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated as of
**July 13, 2004**

|   **UBS AG**   | and | **LEHMAN BROTHERS INC.** |
| **("Party A")** |  | **("Party B")** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.    Interpretation**

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

ISDA®1992
NYB 1082184

(ii)   *Liability.* If:—

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.*   Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.   Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

(i)   *Status.*   It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers.*   It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)   *No Violation or Conflict.*   Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.*   All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.*   Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

(b)   *Absence of Certain Events.*   No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.*   There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.*   All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)   *Payer Tax Representation.*   Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)   *Payee Tax Representations.*   Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.   Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information.*   It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)   any other documents specified in the Schedule or any Confirmation; and

(iii)   upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)   *Maintain Authorisations.*   It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)   *Comply with Laws.*   It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)   *Tax Agreement.*   It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)   *Payment of Stamp Tax.*   Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organized,

4

managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of

ISDA®1992
NYB 1082184

being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)  *Bankruptcy.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  *Merger Without Assumption.*  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)  *Illegality.*  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

6

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)  *Tax Event.*  Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)  *Tax Event Upon Merger.*  The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)  *Credit Event Upon Merger.*  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)  *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     *Event of Default and Illegality.*  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.     Early Termination

(a)     *Right to Terminate Following Event of Default.*  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event.*

ISDA®1992
NYB 1082184

(i)    **Notice.** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    **Transfer to Avoid Termination Event.** If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    **Two Affected Parties.** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    **Right to Terminate.** If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    **Calculations.**

(i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation

ISDA®1992
NYB 1082184

obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.*    An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*    If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*    If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*    If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.*    If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.*    If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.*    If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half

ISDA®1992
NYB 1082184

of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.*   In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

7.   **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)   a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)   a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.   **Contractual Currency**

(a)   *Payment in the Contractual Currency.*   Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)   *Judgments.*   To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to

ISDA®1992
NYB 1082184

the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

11

ISDA®1992
NYB 1082184

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organization of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.      Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.      Notices**

(a)      *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)      if in writing and delivered in person or by courier, on the date it is delivered;

(ii)      if sent by telex, on the date the recipient's answerback is received;

(iii)      if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)      if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)      if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.      Governing Law and Jurisdiction**

(a)      *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)      submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District

ISDA®1992
NYB 1082184

Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    is respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

ISDA®1992
NYB 1082184

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"Consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-

14

of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

ISDA®1992
NYB 1082184

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

16

ISDA®1992
NYB 1082184

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

17

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

UBS.A.G.

By: _____
Name:     Jeffrey Liffien
Title:    Director and Counsel
Date:     Legal Americas Region
          Fixed Income Section  9-2-04

By: _____
Name:     Catherine J. du Preez
Title:    Director
Date:     Region Americas Legal
          Fixed Income Section      9-2-04

LEHMAN BROTHERS INC.

By: _____
Name:     ALLYSON M CARINE
Title:
Date:     VICE PRESIDENT

18

ISDA®1992
NYB 1082184

EXECUTION COPY

**SCHEDULE**
to the Master Agreement
dated as of July 13, 2004

between

|  |  |  |
|---|---|---|
| **UBS AG**, a bank organized under the laws of Switzerland<br><br>("Party A") | And | **LEHMAN BROTHERS INC.,** a corporation organized under the laws of the State of Delaware<br>("Party B") |

**Part 1**
**Termination Provisions**

In this Agreement:

(a)     *"Specified Entity"* means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | UBS Securities LLC, UBS Financial Services Inc., or any of its successors. |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(iv), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Commercial Corporation ("LBCC"), Lehman Brothers Finance S.A. ("LBF") and Lehman Brothers Special Financing Inc. ("LBSF") |
| Section 5(a)(vi), | LBCC, LBSF and LBF |
| Section 5(a)(vii), | LBCC, LBSF and LBF |
| Section 5(b)(iv), | LBCC, LBSF and LBF |

(b)     *"Specified Transaction"* means (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party), which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, precious metals transactions,cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase or reverse repurchase transaction, securities lending agreements, forward contracts (including, for the avoidance of doubt, mortgage forward contracts) or other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction indentified as a Specified Transaction in this Agreement or the relevant Confirmation.

Section 5(a)(v) of this Agreement is amended by inserting the following at the end thereof:

"Notwithstanding the foregoing, in the case of any Specified Transaction that is a repurchase transaction or a reverse repurchase transaction, an Event of Default shall not occur under either (1) or (2) above if the default is a failure to perform an obligation to make a payment or delivery and, as demonstrated to the reasonable satisfaction of the other party: (a) such failure was caused by an error or omission of an administrative or operational nature and (b) such party has taken all steps necessary for it to take in order to cause such delivery or payment to be made and has the requisite funds or securities required to make such delivery or payment, on the scheduled delivery or payment date."

(c)    The *"Cross Default"* provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

**Specified Indebtedness**  "Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the repayment of borrowed money or for the payment of any obligation relating to any Derivative Transactions.

For purposes of determining whether the aggregate amount of Specified Indebtedness exceeds the applicable Threshold Amount: (1) with respect to any Derivative Transaction (other than any Repo Transaction), the relevant amount shall equal the aggregate of the net replacement value and any other unpaid amounts with respect to each Derivative Transaction  (other than any Repo Transaction) that are payable by the relevant party, and (2) with respect to any Repo Transaction, the relevant amount shall equal the Aggregate Deficit Amount of such Repo Transactions(s).

As used herein:

"Aggregate Deficit Amount" shall mean, at any time, the amount, after giving effect to any applicable netting provisions, by which (i) the aggregate amount of payment obligations for which the party in question is then liable under its Repo Transactions with one or more counterparties (other than subsidiaries of such party) exceeds (ii) the aggregate value of the collateral then securing all such payment obligations.

"Derivative Transaction" means (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party), which is not a Transaction under this Agreement which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, repurchase transaction, reverse repurchase transaction, precious metals transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction,

reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions); and (b) any combination of these transactions.

"Repo Transaction" means repurchase agreement, reverse repurchase agreement, sale buyback or buy sellback agreement or securities lending and borrowing agreement.

In addition, an Event of Default under Section 5(a)(vi) shall not have occurred if a party (the "Specified Party") refrains from performing any payment obligation relating to any Specified Indebtedness that is a Derivative Transaction due to a bona fide dispute with a third party (a "Bona Fide Dispute") and, as demonstrated to the reasonable satisfaction of the other party (a) such Bona Fide Dispute occurred because the Specified Party had a good faith basis for disputing (i) the amount of the relevant obligation, (ii) whether all conditions relevant to the performance of such obligation(s) have been satisfied or (iii) whether any other action (including any default) by the relevant third party has given the Specified Party the legal right to withhold performance with respect to the relevant obligation(s) and (b) the Specified Party is capable of performing each obligation with respect to the Bona Fide Dispute as and when such obligation(s) is due to be performed.

*"Threshold Amount"* means:

(i)     with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A or the relevant Specified Entity as shown on the most recent annual audited financial statements of Party A or the relevant Specified Entity and

(ii)    with respect to Party B, an amount equal to 2% of shareholders' equity (howsoever described) of Party B or the relevant Specified Entity as shown on the most recent annual audited financial statements of Party B or the relevant Specified Entity.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B, amended as follows:

"'Credit Event Upon Merger' shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support Provider or Specified Entity of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

(i)     X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)    any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

For purposes of **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party B fails to maintain a senior subordinate rating of at least Baa3 as determined by Moody's Investors Service, Inc.

(or any Specified Entity of the other party), and to execute, arrange for any required certification of, and deliver to the other party (or such Specified Entity) (or to such government or taxing authority as the other party (or such Specified Entity) reasonably directs), any form or document that may be required or reasonably requested in order to allow the other party (or such Specified Entity) to make a payment under this Agreement (or a Credit Support Document of the other party or a Specified Entity thereof) without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, promptly upon the earlier of (i) reasonable demand by the other party (or such Specified Entity) and (ii) learning that the form or document is required.

| Party required to deliver Document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Forms and or documents described in Section 4(a)(iii) of this Agreement | (i) Promptly upon reasonable demand by the other party. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A and Party B | Credit Support Document(s) described in Part 4(f). | On or before execution of this Agreement. | No |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party A and Party B | Annual audited financial statement it being understood that the delivery requirement relating to any such report may be satisfied by electronic filing of such document with the party's applicable regulatory authority (in English) on a publicly accessible site | Upon reasonable request by either Party A or Party B | Yes |

**Part 4**
**Miscellaneous**

(a)     *Addresses for Notices.* For the purposes of Section 12(a) of this Agreement:

(i) All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

| | |
|---|---|
| Address: | UBS AG, Stamford Branch |
| | 677 Washington Boulevard |
| | Stamford, CT 06912-0300 |
| Attention: | Legal Affairs |
| Facsimile: | (203) 719-0680 |
| Telephone: | (203) 719-3000 |

With a simultaneous copy to:

| | |
|---|---|
| Address: | UBS AG, Stamford Branch |
| | 677 Washington Boulevard |
| | Stamford, CT 06912-0300 |
| Attention: | Risk Control - Documentation |
| Facsimile: | (203) 719-5627 |
| Telephone: | (203) 719-3000 |

(ii) All notices or communications to Party B shall be sent to the address, or facsimile number reflected below:

| | |
|---|---|
| Address: | Lehman Brothers Inc. |
| | Transaction Management |
| | 745 Seventh Avenue, 28th Floor |
| | New York, New York 10019 |
| Attention: | Documentation Manager |
| Facsimile No.: | (212) 526-7672 |
| Telephone No.: | (212) 526-7187, For all purposes. |

(b)     *Process Agent.* For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: UBS Investment Bank, 299 Park Ave., New York, N.Y. 10171, Attention: Legal Affairs

Party B appoints as its Process Agent: Not Applicable

(c)     *Offices.* The provisions of Section 10(a) of this Agreement will apply to Party A and Party B.

(d)     *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:

(i) Party A is a Multibranch Party and may act through its branches in any of the following territories or countries: England and Wales, France, Hong Kong, United States of America, Singapore, Sweden and Switzerland.

(ii) <u>Party B</u> is not a Multibranch Party and may act only through its New York Office.

(e) **Calculation Agent.** The Calculation Agent is Party A, unless (i) otherwise specified in a Confirmation in relation to the relevant Transaction, or (ii) an Event of Default with respect to Party A has occurred and is continuing in which case Party B shall be the Calculation Agent.

(f) **Credit Support Document.** The Credit Support Annex is a Credit Support Document with respect to Party A and Party B for all purposes hereunder and is incorporated herein by this reference..

(g) **Credit Support Provider.** Credit Support Provider means with respect to Party B: Not Applicable.

(h) **Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York. (without reference to choice of law doctrine thereof other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York)**

(i) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will apply, except the following groups of Transactions: (1) foreign exchange transactions and currency options, in which case subparagraph (ii) of Section 2(c) of this Agreement will not apply.

(j) **"Affiliate"** will have the meaning specified in Section 14 of this Agreement.

**Part 5**
**Other Provisions**

(a) <u>**Set-off**</u>. Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set off, counterclaim, or otherwise withhold payment or any recourse to any Credit Support Document) under applicable law the Non-defaulting Party or Non-affected Party (in either case, "X") may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement, whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y and, for this purpose, may convert one currency into another at a market rate determined by X. If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set-off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

(b) <u>Representations</u>. Section 3(a) is amended by adding the following paragraphs:

(vi) **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(vii) **Eligible Contract Participant.** It is an "eligible contract participant" under, and as defined in, the Commodity Futures Modernization Act of 2000 and was not formed solely for the purposes of constituting an "eligible contract participant."

(viii)    *Non Public Information*.    Each party represents and warrants that, in effecting a Transaction referenced to a security, its trading personnel (including all persons executing such Transaction and approving or authorizing such Transaction) will not be aware of any material non-public information or non-public price sensitive information with respect to any security related to a Transaction that, under applicable securities laws, it would have to disclose in advance to a party effecting a purchase or sale with the offeree of such security.

(ix)    *Securities Act Representations*.    If any Transaction and/or the instrument underlying a Transaction is not otherwise exempt from the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act"), then each party makes the following representations, warranties and covenants with respect to such Transaction, and such representation, warranties and covenants shall remain in full force and effect whenever the offeree or buyer of the Transaction and/or the offeree or buyer of the instrument underlying the Transaction (the "Offeree") shall enter into a Transaction, or make any payment or delivery relating to a Transaction:

(A)    Each party is entering into the Transaction for its own account as principal, and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part;

(B)    Each party acknowledges its understanding that the offer and sale of any Transaction with the other party is intended to be exempt from registration under the Securities Act, by virtue of Section 4(2) of the Securities Act. In furtherance thereof, each party represents and warrants to the other party that (i) it has the financial ability to bear the economic risk of its investment, including a loss of its entire investment, and (ii) it is an "accredited investor" as that term is defined under Regulation D under the Securities Act, (iii) it has the knowledge and experience of investing in instruments similar to the Transaction and is capable of evaluating the risks and merits of the Transaction and has, or has had an opportunity to request, such information as it deemed necessary to make such evaluation; and

(C)    Each party understands that the Transaction has not been, and is not intended to be, registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless an exemption for such resale, pledge, assignment or disposition is available. Neither party is obliged to register the Transaction or to assist the Offeree in complying with any exemption from registration under the Securities Act or state securities laws.

(x)    *Physical Delivery*.    In respect of any physically settled Transactions, it will, at the time of delivery, be the legal and beneficial owner, free of liens and other encumbrances, of any securities or commodities it delivers to the other party.

(c)    *Relationship Between Parties*.    Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) *Non-Reliance*.    It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations

related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) *Status of Parties*. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(d)    *Waiver of Jury Trial*. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS AGREEMENT.

(e)    *Consent to Recording*. Each Party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(f)    *Scope of Agreement*. Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to specific Specified Transactions, all Specified Transactions then outstanding or any future Specified Transactions between Offices of the parties listed in Part 4(d) shall be subject to the terms hereof.

(g)    *ISDA Definitions*.    Unless otherwise specified in a Confirmation, this Agreement and each Transaction between the parties shall be subject to the 2000 ISDA Definitions (the "2000Definitions"), or the 1998 FX and Currency Option Definitions (the "FX Definitions") (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and the Foreign Exchange Committee) (the "1998 FX Definitions") are hereby incorporated in their entirety and shall (unless, in relation to a particular Transaction, as otherwise specified in the relevant Confirmation) apply to any FX Transaction or Currency Option entered into by the parties hereto. In relation to any such FX Transaction or Currency Option and in the event of any inconsistency between the provisions of the 1998 FX Definitions and the provisions of the 1992 ISDA FX and Currency Option Definitions as published by the International Swaps and Derivatives Association, Inc. (the "1992 FX Definitions"), the 1998 FX Definitions shall prevail (such 1992 FX Definitions and 1998 FX Definitions collectively referred to herein as the "FX Definitions").

(h)    *Prior Agreements*. This Agreement shall supersede all Agreements between the parties entered into prior to the date of execution of this Agreement governing the terms of any Specified Transactions between the parties including without limitation the ISDA Master Agreement dated as of September 5, 1997 and all confirmations relating to such Specified Transactions shall supplement, form part of, and be subject to this Agreement, such confirmations shall be Confirmations hereunder and such Specified Transactions shall be Transactions hereunder.

(i)    *Escrow Payments*. If by reason of the time difference between the cities in which payments are to

be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party with a minimum credit rating of at least A- giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00 p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(j)    *"Shareholders' Equity*" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(k)    *Accuracy of Specified Information*. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or", in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(l)    *Notices*. For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(m)    *Service of Process*. The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made.

(n)    *Transfer*. The parties agree that either party may transfer its rights and obligations under the Agreement, in whole but not in part, to any of its respective Affiliates; provided that, with respect to Party B, effective as of the date of transfer, Party B, as the transferring party, will provide Party A, the non-transferring party, with a guarantee issued by Lehman Brothers Holding Inc. in form and substance acceptable to the non-transferring party.

The right of either party to transfer its rights and obligations pursuant to this provision is subject to the conditions that (i) such transfer does not give rise to an Event of Default or Termination Event with respect to any party, any Credit Support Provider, or any Specified Entity, (ii) such transfer is not for the purpose of avoiding any obligations hereunder, (iii) such transfer will not result in the non-transferring party either (A) being required to pay to the transferee an additional amount in respect of an Indemnifiable Tax under section 2(d)(i)(4) of this Agreement greater than the amount which would have been required to have been paid in the absence of such transfer, or (B) receiving a payment from the transferee from which an amount has been deducted or withheld for or on account of any Tax (whether or not such Tax is an Indemnifiable Tax) which results in the amount of such payment being less than the amount that would have been received in the absence of such transfer, (iv) Party A, Party B, and the transferee shall execute an agreement

in writing in which the transferee, among other things, legally and effectively accepts all the interests and assumes all the obligations of the transferring party so transferred, (v) the transferee and the other party shall amend their respective Tax Representations and shall provide the necessary tax forms as may be appropriate to reflect the jurisdiction of incorporation of the transferee and/or the location of the Office through which the transferee shall act, (vi) such transfer will be to an entity legally incorporated in one of the G-7 countries.

"G-7 Countries" mean for purpose of the above provision, the following countries: United States, Japan, Germany, France, Britain, Italy and Canada.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**UBS AG**

("Party A")

By: _____

Name: Jeffrey Lillien

Title: Director and Counsel

Date: Legal Americas Region
Fixed Income Section  9-2-04

By: _____

Name: Catherine J. du Preez   9-2-04

Title: Director

Date: Region Americas Legal
Fixed Income Section

**LEHMAN BROTHERS INC.**

("Party B")

By: _____

Name: Allison M. Carine

Title:

Date: VICE PRESIDENT

(Bilateral Form)                          (ISDA Agreements Subject to New York Law Only)

# ISDA ®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

ISDA Master Agreement

dated as of  July 13, 2004

between

and

**UBS AG**
**("Party A")**

**LEHMAN BROTHERS INC.**
**("Party B")**

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

## Paragraph 1. Interpretation

(a) *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b) *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

## Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

## Paragraph 3. Credit Support Obligations
(a) *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

      (i)    the Credit Support Amount

   exceeds

      (ii)   the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b) *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

      (i)    the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

   exceeds

      (ii)   the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a) *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

      (i)    no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

      (ii)   (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b) *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c) *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

2

ISDA®1994

(d) *Substitutions.*

    (i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

    (ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

    (i)    In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

        (A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

        (B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

        (C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

    (ii)    In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a) *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b) *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c) *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either. For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d) *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the

4

ISDA®1994

Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)     that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party; (ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(ii)    that party fails to comply with or perform any agreement or obligation other than those specified, in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a) *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)     all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)   the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)    the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

5

ISDA®1994

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b) *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

      (i)      the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

      (ii)     the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

      (iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

      (iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

      (A)   Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

      (B)   to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c) *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d) *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

      (i)      it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

      (ii)     it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

      (iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

6

(iv)  the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

## Paragraph 10. Expenses

(a) *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b) *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c) *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a) *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b) *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c) *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d) *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e) *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f) *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

## Paragraph 12. Definitions

ISDA®1994

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

8

ISDA®1994

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

| | | |
|---|---|---|
| (i) | | in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient; |
| (ii) | | in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient; |
| (iii) | | in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, |

9

together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv)    in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i)    Eligible Collateral or Posted Collateral that is:

   (A) Cash, the amount thereof; and

   (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

[End of page]

ISDA®1994

EXECUTION COPY

ISDA

CREDIT SUPPORT ANNEX

to the Schedule

to the Master Agreement

dated as of July 13, 2004

between

UBS AG                          And                   LEHMAN BROTHERS INC.

**Paragraph 13. Elections and Variables**

(a)   *Security Interest for "Obligations."*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None
With respect to Party B:  None

(b)   *Credit Support Obligations.*

    (i)   *Delivery Amount, Return Amount and Credit Support Amount.*

        (A)   *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)   *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)   *"Credit Support Amount"* has the meaning specified in Paragraph 3.

    (ii)   *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | X | X | 100% |
| (B) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity at issuance of not more than one year | X | X | 99% |
| (C) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity at issuance of more than one year but not more than 10 years | X | X | 97% |

| | | |
|---|---|---|
| (D) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity of more than 10 years | X    X    95% |

(iii) **Other Eligible Support.** The following items will qualify as **"Other Eligible Support"** for the party specified:    None

(iv)    **Thresholds.**

(A)    **"Independent Amount"** means with respect to Party A:  $ 0
    **"Independent Amount"** means with respect to Party B:  $ 0

(B)    **"Threshold"** means, with respect to Party A and Party B, the amount set forth below opposite the lower of the ratings in effect on any Valuation Date for (i) the unsubordinated, unsecured, long-term indebtedness of Party A; and (ii) in the case of Party B, the senior subordinate indebtedness of Party B:

| Rating by Standard & Poor's Ratings Services | Rating by Moody's Investors Service, Inc. | Collateral Threshold |
|---|---|---|
| AAA | Aaa | USD 20,000,000 |
| AA+ | Aa1 | USD 20,000,000 |
| AA | Aa2 | USD 15,000,000 |
| AA- | Aa3 | USD 15,000,000 |
| A+ | A1 | USD 10,000,000 |
| A | A2 | USD 10,000,000 |
| A- | A3 | USD 5,000,000 |
| BBB+ | Baa1 | USD 1,000,000 |
| BBB | Baa2 | USD 1,000,000 |
| BBB- or below or not rated | Baa3 or below or not rated | 0 |

If either Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") or Moody's Investors Service, Inc. ("Moody's") ceases to be in the business of rating debt securities and such business is not continued by a successor or assign of such entity (the "Discontinued Agency"), the parties shall jointly select a nationally recognized credit rating agency in substitution thereof and agree on the rating level issued by such substitute agency that is equivalent to the ratings specified herein of the Discontinued Agency, whereupon such substitute agency and equivalent rating shall replace the Discontinued Agency and the rating level thereof for purposes of this Agreement.

(C)    **"Minimum Transfer Amount"** means with respect to Party A and Party B: $250,000, provided, that if (i) an Event of Default has occurred and is continuing, or (ii) the Threshold Amount of a Party is zero, then the Minimum Transfer Amount with respect to such party shall be zero.

(D)    **Rounding.** The Delivery Amount and the Return Amount will be up and down to the nearest integral multiple of $10,000 respectively.

(c)  **Valuation and Timing.**

    (i)    *"Valuation Agent"* means, for the purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for the purposes of Paragraphs 4(d) and 6(d), the Secured Party.

    (ii)    *"Valuation Date"* means each Local Business Day.

    (iii)    *"Valuation Time"* means the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same day.

    (iv)    *"Notification Time"* means 1:00 p.m. New York time on a Local Business Day.

(d)  **Conditions Precedent and Secured Party's Rights and Remedies.** The following Termination Event will be a *"Specified Condition"* for both parties: Illegality, Tax Event, Tax Event Upon Merger, Additional Termination Event and Credit Event Upon Merger.

(e)  **Substitution.**

    (i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

    (ii)    *Consent.* If specified here as applicable, then Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d):  N/A

(f)  **Dispute Resolution.**

    (i)    *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice of the dispute is given under Paragraph 5.

    (ii)    *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support of the type described in Paragraph 13(b)(ii)(B), (C) or (D) (referred to herein as "Government Obligations") will equal the Valuation Percentage multiplied by the sum of (A) either (1) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations, which market maker shall be selected by the Disputing Party in good faith and in a commercially reasonable manner, or (2) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day next preceding such date, on which such quotations were available, and (B) accrued interest on such Government Obligations (except to the extent included in the applicable price referred to in clause (A) above).

    (iii)    *Alternative.* The provision of Paragraph 5 will apply.

(g)  **Holding and Using Posted Collateral.**

    (i)    *Eligibility to Hold Posted Collateral; Custodians.* Either party and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

        (A)    Party A or Party B, as applicable:  Such party is not a Defaulting Party.

        (B)    Any Custodian appointed by a party must be a commercial bank or trust company organized under the laws of the United States or a political subdivision thereof or a

U.S. branch of a bank organized under the laws of Switzerland, having assets of at least $10 billion and a long term debt or deposit rating of at least "A3" from Moody's and "A-" from S&P.

(C)    Posted Collateral may only be held in one or more accounts in the United States and any account established by Party A or Party B, as applicable, or its Custodian to hold Posted Collateral shall be established and maintained for the sole purpose of receiving deliveries of and holding Posted Collateral.

(D)    If a party itself or a Custodian appointed by it at any time may not hold Posted Collateral consistent with this Paragraph 13(g) or elects not to do so, such party shall promptly give notice to the other party.

Initially, the *Custodian* for Party A is:  N/A.

Initially, the *Custodian* for Party B is:  N/A.

(ii)    *Use of Posted Collateral.*  The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    *Distributions and Interest Amount.*

(i)    *Interest Rate.*  The "*Interest Rate*" will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported In Federal Reserve Publication H.15-519.

(ii)    *Transfer of Interest Amount.*  The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month.

(iii)    *Alternative to Interest Amount.*  The provisions of Paragraph 6(d)(ii) will apply.

(i)    *Additional Representation(s).*  None.

(j)    *Other Eligible Support and Other Posted Support.*

(i)    "*Value*" shall have no meaning with respect to Other Eligible Support.
(ii)    "*Transfer*" shall have no meaning with respect to Other Eligible Support.

(k)    *Demands and Notices.*  Any demand, specification or notice under this Annex (each, a "Notice"), other than  a Notice pursuant to Paragraph 4(d), may be delivered orally, including by telephone.  If such Notice is delivered orally, such oral Notice shall be confirmed promptly in writing (a "Notice Confirmation") by tested telex, facsimile  or  actual  delivery.  Failure to provide that Notice Confirmation will not affect the validity of that oral Notice.  All Notices shall be delivered to the following addresses:

with respect to Party A:

UBS AG, Stamford Branch
Collateral Management
677 Washington Boulevard, Stamford, CT, 06901
Attention:  Margin Specialist
Telephone:  (203) 719-6116; Telecopier:  (203) 719-4955

with respect to Party B

Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attention:        Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672;  For all purposes.

(l)     ***Addresses for Transfers.***  Addresses for Transfers of Collateral for each party shall be supplied on or before the date of initial Transfer hereunder.

> With respect to Party A:
>
> (a)  for Collateral consisting of cash:  UBS AG, ABA #026007993, Acct. #101-WA-14007-000, UBS AG London Account, Attn:  Dan Cushing
>
> (b)  for Collateral consisting of securities:  JPMChase/UBSCUSTCOLLABA# 021000021
>
> With respect to Party B:
>
> (a)  Cash  USD,  credit  HSBC  USA  BANK,  ABA #  021-001-088,  A/C #  000-107794,  Lehman Brothers Inc., FFC (Counterparty Name), A/C # (Counterparty A/C #).
>
> (b)  Securities or obligations issued or guaranteed by the government of the United States of America or any of its agencies or instrumentalities, credit Chase NYC/CCNS, ABA # 021-000-021, Acct. LWQ, FFC (Counterparty Name), A/C # (Counterparty A/C #), Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019.

(m)     ***Other Provisions***.

**Paragraph 5.  Dispute Resolution.**  Paragraph 5 of the Credit Support Annex is hereby amended by deleting clause (2) in its entirety and inserting in lieu thereof the following:

> "(2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than (X) the time delivery otherwise would have been due if no dispute had existed in the case of (I) above, or (Y) the close of business on the Local Business Day following the date of Transfer in the case of (II) above,"

**Paragraph 12.  Definitions.**  Paragraph 12 of the Credit Support Annex is hereby amended as follows:

> The definition of **"Local Business Day"** is hereby amended by inserting the following in lieu thereof: **"Local Business Day** means a day on which commercial banks in New York City are open for business (including dealings in foreign exchange and foreign currency deposits)";

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below
with effect from the date specified on the first page of this document.

**UBS AG**
**(Party A)**

By: _____

Name:         Jeffrey Lillien
Title:         Director and Counsel
Date:         Legal Americas Region
              Fixed Income  Section  9-2-0⁴

By: _____

Name:                                     9-2-04
Title:
Date:         Catherine J. du Preez
              Director
              Region Americas Legal
              Fixed Income Section

**LEHMAN BROTHERS INC.**
**(Party B)**

By: _____

Name:  ALLYSON M. CARNS
Title:  VICE PRESIDENT
Date:



UBS Investment Bank

**UBS AG**
677 Washington Boulevard
Stamford, CT 06901
Tel. (203) 719-1000

www.ubs.com

May 22, 2009

**By Courier and by fax**
Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019
Attention: Documentation Manager
Telecopy: 212-526-7672

Ladies and Gentlemen:

We are writing to you with respect to the ISDA Master Agreement, dated as of July 13, 2004, between UBS AG ("UBS") and Lehman Brothers Inc. ("Counterparty"), as amended (the "Master Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings set out in the Master Agreement.

Further to our letter to you dated September 16, 2008, UBS has determined the amount payable in respect of the Early Termination Date pursuant to Section 6(e) of the Master Agreement. As required by Section 6(d)(i) of the Master Agreement, we hereby notify you that the amount payable under Section 6(e) of the Master Agreement is $94,101,862.41, such amount being the amount that UBS has reasonably determined in good faith to be its total losses and costs in connection with the Agreement, which is payable by Counterparty to UBS. This reflects a Loss calculated for the Agreement of $94,101,862.41 – the information in Annex A provides more detail on how the Loss has been calculated.

In addition to the amount described above, under Section 11 of the Master Agreement, Counterparty owes UBS for the reasonable out-of-pocket expenses incurred by UBS by reason of the early termination of the Transactions under the Master Agreement. As of the current date, UBS has incurred approximately $300,000 of such out-of-pocket expenses. This amount is in addition to the amounts otherwise owed by Counterparty under the Agreement. If further costs are incurred, UBS will advise you of such amounts.

As of the Early Termination Date, UBS was holding Posted Collateral under the Credit Support Annex to the Master Agreement in the amount of $170,220,221.32. Pursuant to Section 8(a)(iii) of the Credit Support Annex to the Master Agreement, we have exercised the contractual right to set off such amount against the Loss calculated above. We have also exercised the contractual right to set off against the Loss calculated above the amount of UBS's out-of-pocket expenses incurred to date, pursuant to Section 11 of the Master Agreement. The net amount remaining after our exercise of those rights is $75,818,358.91.

Section 5(a) of the Schedule to the Master Agreement provides that UBS may set off any amounts it owes to Counterparty under the Master Agreement against any amounts due from Counterparty to any Affiliate of UBS, "whether or not arising under [the Master Agreement] and … whether or not contingent …." Amounts are due from Counterparty to UBS and its Affiliates as follows (collectively, the "Section 5(a) Amounts"):

- An amount is due from Counterparty to UBS Securities LLC ("UBSS"), an Affiliate of UBS, under the Master Securities Loan Agreement, dated as of August 7, 2000, between Counterparty and UBSS. The amount due is $4,494,380.47.

- An aggregate amount of not less than $19,055,287.87 is due from Counterparty to UBSS in respect of commissions for exchange traded derivatives and listed options, syndicate fees and losses incurred by UBSS as a result of Counterparty failing to perform on securities transactions, and other similar

UBS Investment Bank is a business group of UBS AG

 Investment
Bank

                                                                        **Page 2**

items. Attached in Annex A is a list of the items that make up this amount (although such list is not exhaustive and we reserve the right to add additional items at a later date).

- An amount is due to UBS Financial Services, Inc. ("UBS-FS"), an Affiliate of UBS, and to UBSS relating to claims (the "Claims") against Counterparty arising from Counterparty's sale to UBS-FS and to UBSS of certain structured notes and other securities issued by Lehman Brothers Holdings Inc. UBS-FS and UBSS intend to pursue the Claims in Counterparty's pending liquidation proceedings under the Securities Investor Protection Act ("SIPA"). UBSS and UBS-FS in good faith estimate that the Claims have a value substantially in excess of $53,000,000.

Accordingly, pursuant to the Master Agreement and in accordance with section 553 of the Bankruptcy Code, made applicable by section 78fff(b) of SIPA, UBS has the right to set off the $77,647,451.65 that otherwise might be payable to Counterparty under the Master Agreement against the Section 5(a) Amounts (subject, in the case of the Claims, to UBS accounting to Counterparty when the Claims become fixed and liquidated). As a result, any payment that may be due from UBS to Counterparty under the Master Agreement at this time is subject to such setoff rights, which are hereby expressly reserved.

This letter is not a demand for payment or any action by you. This letter advises you of certain calculations that have been performed pursuant to the Master Agreement and applicable law.

Nothing contained herein will be deemed to be a waiver or modification by UBS of any of our rights under the Master Agreement or under applicable law.

If you have any questions regarding the foregoing please contact Bert Fuqua at 203-719-4038 or David Kelly at 203-719-5427.

Very truly yours,
UBS AG

By:_____          By:_____
Name: James B. Fuqua                Name:
Title: Managing Director and Counsel    Title:
        Region Americas Legal           Karen A. Wendell
                                        Managing Director and Counsel
                                        Region Americas Legal

�des UBS  Investment
           Bank

                                                                     Page 3

## ANNEX A

| Group of Transactions | Loss |
|---|---|
| FX (Cash) | $91,193,469.41 |
| Fixed Income | $2,908,393.00 |
| Loss under the ISDA Master Agreement | $94,101,862.41 |

Additional information in respect of the foregoing calculations is set out below.

## FOREIGN EXCHANGE PORTFOLIO

| Group of Transactions (by currency) | Loss |
|---|---|
| ARS | $2,214.12 |
| AUD | ($333,507,512.85) |
| CAD | $89,153,973.81 |
| CHF | ($557,161,459.07) |
| CNY | $171,098.63 |
| COP | $6,417.80 |
| CZK | ($4,506,073.50) |
| EUR | ($5,525,409,488.53) |
| GBP | ($696,252,097.58) |
| HKD | $104,880,877.16 |
| HUF | ($35,249,253.42) |
| IDR | $23,054.51 |
| ILS | $50,321,886.98 |
| INR | $112,359.97 |
| JPY | $694,998,340.06 |
| KRW | $71,727.47 |
| MXN | $81,815,181.81 |
| MYR | $30,938.04 |
| NOK | $111,110,045.77 |
| NZD | $264,446,955.99 |
| PHP | $27,748.79 |
| PLN | $223,410,853.12 |
| RON | ($13,826,944.41) |
| RUB | ($23,682,453.58) |
| SAR | $57,989.55 |
| SEK | ($28,421,056.35) |
| SGD | ($34,818,852.24) |
| SGX | ($119,722,279.14) |
| THB | $14,163,509.15 |
| TRY | ($245,243,296.58) |
| TWD | $73,105.77 |
| USD | $6,295,882,020.40 |
| ZAR | ($221,766,062.24) |
| | **$91,193,469.41** |

## FIXED INCOME PORTFOLIO

| Group of Transactions | Loss |
|---|---|
| Fixed Income (JPY/USD) | $2,908,393.00 |

## OPERATIONAL ITEMS FOR SETOFF

| Amount | Source |
|---|---|
| $48,180.00 | ETD commissions due to UBS Sec LLC |
| $41,379.00 | ETD commissions due to UBS Sec LLC |
| $41,607.00 | ETD commissions due to UBS Sec LLC |
| $1,440.00 | CMTA receivables (re: listed options) / April 2008 |
| $500.00 | CMTA receivables (re: listed options) / May 2008 |

## UBS Investment Bank

| | |
|---|---|
| $73,125.00 | CMTA receivables (re: listed options) / July 2008 |
| $183,248.00 | CMTA receivables (re: listed options) / August 2008 |
| $141,857.00 | CMTA receivables (re: listed options) / Sept 2008 |
| $1,613,149.93 | Payment made in error to customer acct at Lehman |
| $839,071.94 | Payment made in error to customer acct at Lehman |
| $1,160,000.00 | Loss on fail by LBI on purchase of $4mm Claires bonds |
| $82,449.00 | Loss on fail by LBI on purchase of $1.08mm of AIG bonds |
| $8,754,019.00 | ECMG receivable (Chesapeak Energy) |
| $4,378,444.00 | ECMG receivable (XTO Energy) |
| $350,024.00 | ECMG receivable (PetroHawk Energy) |
| $829,331.00 | ECMG receivable (Teppco Partners) |
| $3,720.00 | ECMG receivable (Energy Transfer) |
| $384,750.00 | DCMG receivable (XTO Energy) |
| $128,993.00 | DCMG receivable (Deutsche Telekom) |
| **$19,055,287.87** | |

08-13420-jmp    Doc 7207-6    Filed 09/09/13    Entered 09/09/13 18:49:50    Exhibit F
Pg 1 of 186

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION<br><br>This Document Applies To:<br><br>    In re Lehman Brothers Equity/Debt<br>    Securities Litigation, 08-CV-5523-LAK | Case No. 09-MD-2017 (LAK)<br><br><u>ECF CASE</u> |

## THE STRUCTURED PRODUCTS CLASS REPRESENTATIVES' NOTICE OF MOTION AND MOTION FOR ENTRY OF PRELIMINARY ORDER PURSUANT TO RULE 23

TO:    All Counsel of Record

    PLEASE TAKE NOTICE that upon the accompanying memorandum of law, and all the other papers and proceedings herein, the Structured Products Class Representatives hereby move this Court, under Federal Rule of Civil Procedure 23(e), for authorization to provide notice of a proposed settlement with defendant UBS Financial Services, Inc. and to schedule a hearing for consideration of approval of the proposed settlement.  Agreed upon proposed Orders are submitted with this motion.

Dated: August 8, 2013              Respectfully submitted,

                           **GIRARD GIBBS LLP**

                           By:    <u>/s/ Daniel C. Girard</u>
                                   Daniel C. Girard

                           Jonathan K. Levine
                           Amanda M. Steiner
                           John A. Kehoe
                           Dena C. Sharp

601 California Street, Floor 14
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dcg@girardgibbs.com
jkl@girardgibbs.com
as@girardgibbs.com
jak@girardgibbs.com
chc@girardgibbs.com

*Class Counsel and Counsel for Plaintiffs Mohan
Ananda, Richard Barrett, Neel Duncan, Nick
Fotinos, Stephen Gott, Karim Kano, Barbara
Moskowitz, Ronald Profili, Joe Rottman, Grace
Wang and Miriam Wolf*

**ZWERLING, SCHACHTER
    & ZWERLING, LLP**
Susan Salvetti
Justin M. Tarshis
41 Madison Avenue
New York, New York 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969
ssalvetti@zsz.com
jtarshis@zsz.com

*Counsel for Plaintiffs Ed Davis, Rick Fleischman,
Gastroenterology Associates, Ltd. Profit Sharing
Plan FBO Charles M. Brooks M.D., Arthur Simons
and Juan Tolosa*

**LAW OFFICES OF JAMES V. BASHIAN, P.C.**
James V. Bashian
500 Fifth Avenue, Suite 2700
New York, New York 10110
Telephone: (212) 921-4110
Facsimile: (212) 921-4229

*Counsel for Plaintiff David Kotz*

**BONNETT FAIRBOURN FRIEDMAN
    & BALINT, P.C.**
Andrew Friedman
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100

2

Facsimile: (602) 274 1199

**TIFFANY & BOSCO P.A.**
Richard G. Himelrick
2525 East Camelback Road
Phoenix, Arizona 85016
Telephone: (602) 255-6000
Facsimile: (602) 255-0103

*Counsel for Plaintiff Shea-Edwards Limited
Partnership*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

      In re Lehman Brothers Equity/Debt
      Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

## THE STRUCTURED PRODUCTS CLASS REPRESENTATIVES'
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR ENTRY OF PRELIMINARY ORDER PURSUANT TO RULE 23

# TABLE OF CONTENTS

I.      Preliminary Statement ............................................................................................1

II.     The Settlement Was Reached on a Well-Developed Record ................................1

III.    Certification of an Expanded Class for Settlement Purposes Is Appropriate .....................3

        A.     The Class Representatives Have Standing to Represent Investors in All 84
               Offerings ...................................................................................................4

        B.     The Rule 23(a) Prerequisites Are Satisfied ...............................................5

        C.     Common Issues Predominate Over Individual Issues ...............................7

        D.     The Settlement Class Is Superior to Individual Arbitrations ...................7

IV.     The Proposed Form and Manner of Notice ..........................................................8

V.      The Proposed Schedule .........................................................................................9

VI.     Conclusion ...........................................................................................................10

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Products v. Windsor*
    521 U.S. 591 117 S. Ct. 2231 (1997)................................................................. 7, 8

*Blum v. Yaretsky*
    457 U.S. 991 102 S. Ct. 2777 (1982).................................................................... 4

*Consolidated Rail Corp. v. Town of Hyde Park*
    47 F.3d 473 (2d Cir. 1995).................................................................................. 5

*Erhardt v. Prudential Group, Inc.*
    629 F.2d 843 (2d Cir. 1980)................................................................................ 9

*Gratz v. Bollinger*
    539 U.S. 244 S. Ct. 2411 (2003).......................................................................... 4

*In re Flag Telecom Holdings, Ltd. Securities Litig.*
    574 F.3d 29 (2d Cir. 2009).................................................................................. 6

*In re IndyMac Mortgage-Backed Securities Litig.*
    286 F.R.D. 226 (S.D.N.Y. 2012).......................................................................... 7

*In re Marsh & McLennan Cos., Inc. Securities Litig.*
    2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .................................................. 3, 7

*In re Monster Worldwide, Inc. Securities Litig.*
    251 F.R.D. 132 (S.D.N.Y. 2008) ......................................................................... 8

*In re Morgan Stanley Pass-Through Certificates Litig.*
    2013 WL 139556 (S.D.N.Y. Jan. 11, 2013) ........................................................ 5

*In re NYSE Specialists Securities Litig.*
    260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................................... 7

*In re Prudential Securities Inc. Ltd. Partnerships Litig.*
    163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................................... 3

*In re Salomon Analyst Metromedia Litig.*
    544 F.3d 474 (2d Cir. 2008)................................................................................ 7

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
    693 F.3d 145 (2d Cir. 2012)............................................................................. 2, 4

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*
    709 F.3d 109 (2d Cir. 2013) ................................................................... 5

*Public Employees' Retirement System of Miss. v. Merrill Lynch & Co., Inc.*
    277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................... 6

*Robidoux v. Celani*
    987 F.2d 931 (2d Cir. 1993)) .................................................................. 6

*Wal-Mart Stores, Inc. v. Dukes*
    131 S. Ct. 2541 (2011) ........................................................................... 6

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
    396 F.3d 96 (2d Cir. 2005) ...................................................................... 8

*Weinberger v. Kendrick*
    698 F.2d 61 (2d Cir. 1982) ...................................................................... 3

## Rules

Fed. R. Civ. Proc. 23 ..................................................................... passim

## Statutes

15 U.S.C. §78u-4 ............................................................................ 9

## Other Authorities

Manual for Complex Litigation, Fourth § 13.14 (2010) ............................... 3

## I.    Preliminary Statement

The Structured Products Class Representatives and UBS Financial Services, Inc.

("UBSFS") have agreed to a settlement in the amount of $120,000,000.  The settlement, which

was negotiated at a mature stage in the litigation with the assistance of a highly qualified

mediator, is conditioned on Court approval under Rule 23(e).  The Structured Products Class

Representatives ("Plaintiffs") submit this memorandum in support of their motion for entry of

the accompanying Preliminary Order, which authorizes the parties to provide notice of the

settlement to the class and sets a date for the settlement hearing.  The Preliminary Order also

modifies for settlement purposes only the Court's class certification order to include all 84

offerings of Lehman Structured Products sold by UBSFS.

## II.    The Settlement Was Reached on a Well-Developed Record

The settlement was reached after almost five years of litigation, following entry of this

Court's order certifying a class for liability purposes and the Second Circuit's denial of UBSFS's

petition for an immediate appeal under Rule 23(f).  The parties have exchanged thousands of

pages of documents and taken numerous depositions.  Plaintiffs' counsel have reviewed all of the

documents produced by UBSFS and relevant documents obtained from the Lehman estate's

records.  Plaintiffs have developed a thorough understanding of the strengths of the case and the

procedural and substantive obstacles they would face in prevailing at trial and on appeal.

The settlement negotiations leading to the proposed settlement are the product of many

meetings and phone calls and two mediation sessions conducted by the Hon. Daniel Weinstein

(Ret.), who served as mediator in connection with the earlier partial settlements approved by this

Court.  The parties' first mediation occurred in December 2012.  In January 2013, the Court

issued its order granting in large part the Structured Products Plaintiffs' motion for class

certification.  UBSFS petitioned the Second Circuit under Rule 23(f).

In March, the Supreme Court denied the petition for certiorari review of *NECA-IBEW*

*Health & Welfare Fund v. Goldman Sachs & Co*, 693 F.3d 145 (2d Cir. 2012).  And in April, the

Second Circuit denied UBSFS's Rule 23(f) petition for leave to appeal the class certification

order.  (Dkt. No. 1180)  Shortly thereafter, Plaintiffs renewed their motion seeking to reinstate a

number of offerings dismissed on standing grounds and to modify the class to include all of the

offerings sold by UBSFS.  (Dkt. No. 1183)  The Court had denied an earlier motion without

prejudice pending the Supreme Court's decision on the petition for certiorari.  (Dkt. No. 1054)

Concurrently, pursuant to the schedule entered by the Court following the January 2013

conference, the parties prepared for depositions and trial.

The parties scheduled a further mediation session for late May, also before Judge

Weinstein.  With the continued assistance of the mediator, in June the parties reached a tentative

agreement on a $120 million cash settlement.  The parties then negotiated the specific terms of

the settlement, as set forth in the Stipulation of Settlement attached as Exhibit 1.

In accordance with this Court's practice, Plaintiffs have not submitted evidence of the

sufficiency of the settlement in support of this motion, but will provide supporting evidence with

their motion for final approval of the settlement.  Plaintiffs' counsel estimate the $120 million

settlement represents a recovery of 13.4% of the total face value of the Structured Products (and

15.5% of the class's maximum recoverable statutory damages of $773 million), without taking

into account any of UBSFS's defenses and rights of offset, which could substantially reduce or

eliminate any recovery.  The settlement compares favorably with other recoveries in "credit

crisis" securities actions, and gives purchasers of Structured Products who suffered damages an

opportunity to share in the recovery.  The parties believe the settlement is fair, reasonable and adequate, and therefore are submitting it to the Court to authorize public notice and a hearing.  *See* Manual for Complex Litigation, Fourth § 13.14 (2010).

## III.    Certification of an Expanded Class for Settlement Purposes Is Appropriate

The parties have stipulated to certification of a settlement class which includes investors in all 84 of the offerings listed on Exhibit A to the Stipulation of Settlement.  The Court has already certified the claims of purchasers of 31 of these offerings.  In doing so, the Court found that the Rule 23(a) prerequisites were satisfied, that common issues predominated, and that class wide litigation was superior to a multitude of individual arbitrations.  *See* Dkt. No.1129.  The Court also appointed 18 plaintiffs as class representatives, and held that under *NECA-IBEW* the class representatives could adequately represent the investors in two notes they did not purchase because "Lehman issued them off of the same registration statement" and because of "the substantial similarity in alleged misrepresentations across the class period."  *Id.*

The same rationale applies to the claims of investors in the additional 53 offerings the parties have stipulated to include in the settlement.  As discussed below, the proposed settlement class satisfies the requirements of Rule 23.  And the Second Circuit has long recognized the propriety of certifying a class solely for the purposes of a class action settlement.  *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *In re Marsh & McLennan Cos., Inc. Securities Litig.*, No. 04 civ. 8144 (CM), 2009 WL 5178546, at *8 (S.D.N.Y. Dec. 23, 2009); *see also In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995) (certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants").

A.    **The Class Representatives Have Standing to Represent Investors in All 84 Offerings**

In *NECA-IBEW*, the Second Circuit held that "a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  693 F.3d at 162 (citing *Blum v. Yaretsky*, 457 U.S. 991, 999, 102 S. Ct. 2777, 2783 (1982); *Gratz v. Bollinger*, 539 U.S. 244, 267, 123 S. Ct. 2411, 2426 (2003)).  The court added that "in the context of claims alleging injury based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement."  *Id.*

As this Court has already recognized, the offering documents contain substantially similar (and mostly identical) misstatements and omissions about Lehman's financial condition and the principal protection feature of the notes.  (*See* Dkt. No. 1129 at 3 & n.6)  The misstatements and omissions about Lehman were made in twelve of Lehman's SEC filings, one or more of which were incorporated into the offering documents for each of the 84 offerings. Under *NECA-IBEW*, a plaintiff whose offering documents incorporated Lehman's 10-Q for the third quarter of 2007 has class standing to represent investors in other offerings with offering documents that incorporated the same 10-Q, because they were injured by identical misstatements and omissions.  693 F.3d at 163 ("Sections 11 and 12(a)(2) claims brought by a purchaser of debt from" one of "a series of corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation about the issuing company's impending insolvency … would raise a 'set of concerns' nearly identical to that of a purchaser

4

from another offering"). The statements about principal protection in the offering documents are similarly uniform.

The current class representatives therefore have standing to represent investors in the additional 53 offerings. *See, e.g., New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 128 (2d Cir. 2013) (noting that the relevant factual issue is "whether the relevant prospectuses contained 'similar if not identical'" misstatements and omissions); *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2013 WL 139556, at *2-3 (S.D.N.Y. Jan. 11, 2013) (reinstating fourteen dismissed offerings because the defendant's conduct implicated the same set of concerns for each offering).

In addition, investors in the two offerings that occurred on March 30, 2007 are properly included in the settlement class. The Court dismissed claims based on those offerings as barred by the statute of repose. When class representative Stephen Gott filed his initial complaint on November 6, 2008, however, the statute of repose had not run for those two offerings. Mr. Gott's complaint was filed on behalf of "a Class consisting of all persons or entities who, between May 30, 2006 and September 15, 2008 inclusive, purchased Lehman Principal Protection Notes, and who were damaged thereby." Since, under *NECA-IBEW*, Mr. Gott had class standing to pursue claims on behalf of investors of all of the principal protection offerings, including the two March 30, 2007 offerings, the statute of repose does not bar those claims.

## B.    The Rule 23(a) Prerequisites Are Satisfied

The settlement class satisfies all four of the Rule 23(a) prerequisites. The class is too numerous for joinder to be practicable. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (holding that numerosity is presumed when a class consists of 40 or more members). There is commonality because the claims based on all offerings "depend upon a common contention" that "is capable of class wide resolution—which means that determination

5

of its truth or falsity will resolve an issue that is central to the validity of each one of the claims

in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  One of the

common contentions is that the offering documents contained misstatements and omissions of

material fact, found specifically in the twelve Lehman SEC filings and the pricing supplements'

statements about principal protection.  *See Public Employees' Retirement System of Miss. v.

Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) ("[C]ourts in this circuit have

held that the Rule 23 commonality requirement is 'plainly satisfied [where] the alleged

misrepresentations in the prospectus relate to all the investors, [as the] existence and materiality

of such misrepresentations obviously present important common issues.'" (citation omitted)).

Another common contention is whether the misstatements and omissions were material to a

reasonable investor.  *Id.* at 114 ("Because materiality is determined by an objective rather than a

subjective standard, the question of materiality, 'rather than being an individual issue, is in fact a

common issue.'" (citation omitted)).

        The class representatives' claims are typical of all members of the expanded class

because "each class member's claim arises from the same course of events and each class

member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom

Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987

F.2d 931, 936 (2d Cir. 1993)). The Court has also found that the class representatives will

adequately represent the class, including class members who purchased the two offerings that

none of the class representatives purchased.  Because "the proposed class representatives possess

'the same interest and suffer the same injury as the class members,'" they are adequate

representatives of the class members who purchased the 53 additional offerings.  *In re NYSE*

*Specialists Securities Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 2251 (1997)).

### C.     Common Issues Predominate Over Individual Issues

The predominance requirement "tests whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008) (citation omitted).  In its class certification order, the Court noted "the substantial similarity in alleged misrepresentations across the class period."  Dkt. No. 1129 at 3, 7.  And this Court has previously recognized that "[c]ourts in this and other districts have found that such substantial similarity of the allegedly misleading statements in Offering Documents is sufficient for class certification, even where class members purchased different offerings at different times."  *In re IndyMac Mortgage-Backed Securities Litig.*, 286 F.R.D. 226, 241 (S.D.N.Y. 2012); *see also Amchem*, 521 U.S. at 594 (the predominance "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy … and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation").

### D.     The Settlement Class Is Superior to Individual Arbitrations

Certifying a class of purchasers of all 84 offerings for settlement purposes is the superior method for resolving this litigation.  In its class certification ruling, the Court held that class members are "entitled to the benefits of class treatment" and that individual FINRA arbitrations were not superior to a class action.  Dkt. No. 1129 at 7-8.  The Court recognized that "[t]his is not a case in which all of the investors have the means to maintain separate actions and invested large sums."  *Id.* at 7; *see also Marsh & McLennan*, 2009 WL 5178546, at *12 (recognizing that the "class action is uniquely suited to resolving securities claims" because "the prohibitive cost of instituting individual actions" gives class members "limited interest in individually controlling

the prosecution or defense of separate actions"); *In re Monster Worldwide, Inc. Securities Litig.*, 251 F.R.D. 132, 139 (S.D.N.Y. 2008) ("as a general rule, securities fraud cases 'easily satisfy the superiority requirement [as] [m]ost violations of the federal securities laws … inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible") (citation omitted). In addition, the manageability concerns of Rule 23(b)(3) are not an issue for a class certified for settlement purposes. *See Amchem*, 521 U.S. at 593, 117 S. Ct. at 2235.

## IV.  The Proposed Form and Manner of Notice

Plaintiffs propose to notify the class by sending a notice and claim form by first class mail to all class members who can be identified from the records maintained by the transfer agent Depository Trust Company and UBSFS's records and by publishing notice in *The Wall Street Journal* and *Investor's Business Daily*. The vast majority of class members will receive the full notice and a claim form, copies of which are attached as Exhibits B-2 and B-3 to the Stipulation of Settlement. The class also includes secondary purchasers, who will be notified by publication of the short form notice, a copy of which is attached as Exhibit B-4 to the Stipulation. This approach comports with Rule 23(c)(2), which requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

The summary and full notices "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). The full notice is modeled on the form provided by the Federal Judicial Center (available at www.fjc.gov), and the notices are written in plain English. *See id.* ("Notice is adequate if it may

be understood by the average class member."). The summary notice provides a brief description of the proposed settlement, and explains how to obtain a copy of the full notice and claim form.

The full notice provides all of the information required by due process, Rule 23(c)(2) and (e), and the PSLRA. It describes the background of the case; provides the class definition; describes the settlement and the proposed plan of allocation; explains how to opt out; says that class members may enter an appearance through their own counsel; and explains the binding effect of the settlement approval proceedings. It also provides the date, time and place of the settlement hearing, and the procedures for commenting on the settlement and appearing at the hearing. As required by the PSLRA, the notice states the amount of the settlement to be distributed to class members, in both the aggregate and an approximate amount per dollar invested, and the amount of attorneys' fees and expenses that Class Counsel will seek, in both the aggregate and an approximate amount per dollar invested. 15 U.S.C. §78u-4(a)(7). And the full and summary notices both provide a toll-free number, website address and physical address for the claims administrator and Class Counsel so that class members can obtain additional information.

In short, the notice "sets forth an impartial recital of the subject matter of the suit, informs [class] members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected." *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980). Plaintiffs therefore request that the Court authorize them to provide notice to the class of the proposed settlement in the form and manner proposed.

## V.    The Proposed Schedule

The parties propose the following schedule:

| Event | Proposed Due Date | Date/Deadline[1] |
|-------|-------------------|-------------------|
| Notice Date: deadline to mail notice and claim forms to class members[2] | 21 calendar days after entry of preliminary order | September 3, 2013 |
| Deadline to publish summary notice[3] | 10 business days after the Notice Date | September 17, 2013 |
| Deadline to file papers in support of settlement approval, plan of allocation, and application for attorneys' fees and expenses | 35 calendar days before the Settlement Hearing | October 11, 2013 |
| Deadline for class members to file requests for exclusion or objections | 21 calendar days before the Settlement Hearing | October 25, 2013 |
| Deadline to file reply papers in support of settlement, plan of allocation, and application for attorneys' fees and expenses | 7 calendar days before the Settlement Hearing | November 8, 2013 |
| Settlement Hearing | Subject to the Court's availability, the parties request a Settlement Hearing date in November 2013 | November 15, 2013 |
| Deadline for class members to submit claim forms | 120 calendar days after the Notice Date | January 1, 2014 |

## VI.    Conclusion

The Structured Products Class Representatives respectfully request that the Court

authorize notice to the settlement class of the proposed settlement in the form and manner

---

[1] Plaintiffs propose these specific dates based on the assumption the Court will enter the proposed Preliminary Order on August 13, 2013.  Plaintiffs' proposed Preliminary Order includes the same date intervals proposed above and, in the event the Court does not enter the proposed Order by August 13, Plaintiffs request that the Court adopts those intervals.

[2] See Exhibit B-2.

[3] See Exhibit B-4.

described in this motion, and set a settlement hearing on or about November 15, or a date

convenient for the Court.

Dated: August 8, 2013                              Respectfully submitted,

                                                  **GIRARD GIBBS LLP**

                                                  By:    */s/ Daniel C. Girard*
                                                          Daniel C. Girard

                                                  Jonathan K. Levine
                                                  Amanda M. Steiner
                                                  John A. Kehoe
                                                  Dena C. Sharp
                                                  601 California Street, Floor 14
                                                  San Francisco, CA 94108
                                                  Tel: (415) 981-4800
                                                  Fax: (415) 981-4846
                                                  dcg@girardgibbs.com
                                                  jkl@girardgibbs.com
                                                  as@girardgibbs.com
                                                  jak@girardgibbs.com
                                                  chc@girardgibbs.com

                                                  *Class Counsel and Counsel for Plaintiffs Mohan*
                                                  *Ananda, Richard Barrett, Neel Duncan, Nick*
                                                  *Fotinos, Stephen Gott, Karim Kano, Barbara*
                                                  *Moskowitz, Ronald Profili, Joe Rottman, Grace*
                                                  *Wang and Miriam Wolf*

                                                  **ZWERLING, SCHACHTER**
                                                  **  & ZWERLING, LLP**
                                                  Susan Salvetti
                                                  Justin M. Tarshis
                                                  41 Madison Avenue
                                                  New York, New York 10010
                                                  Telephone: (212) 223-3900
                                                  Facsimile: (212) 371-5969
                                                  ssalvetti@zsz.com
                                                  jtarshis@zsz.com

                                                  *Counsel for Plaintiffs Ed Davis, Rick Fleischman,*
                                                  *Gastroenterology Associates, Ltd. Profit Sharing*

11

*Plan FBO Charles M. Brooks M.D., Arthur Simons, and Juan Tolosa*

**LAW OFFICES OF JAMES V. BASHIAN, P.C.**
James V. Bashian
500 Fifth Avenue, Suite 2700
New York, New York 10110
Telephone: (212) 921-4110
Facsimile: (212) 921-4229

*Counsel for Plaintiff David Kotz*

**BONNETT FAIRBOURN FRIEDMAN
    & BALINT, P.C.**
Andrew Friedman
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274 1199

**TIFFANY & BOSCO P.A.**
Richard G. Himelrick
2525 East Camelback Road
Phoenix, Arizona 85016
Telephone: (602) 255-6000
Facsimile: (602) 255-0103

*Counsel for Plaintiff Shea-Edwards Limited
Partnership*

Case 1:14-cv-00217-RGA    Document 1 Filed 09/09/14    Page 21 of 156

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

    In re Lehman Brothers Equity/Debt
    Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

## <u>STIPULATION OF SETTLEMENT AND RELEASE</u>

This Stipulation of Settlement and Release (the "Stipulation" or "Settlement") is entered

into between and among Plaintiffs Mohan Ananda, Richard Barrett, Ed Davis, Neel Duncan,

Rick Fleischman, Nick Fotinos, Gastroenterology Associates, Ltd. Profit Sharing Plan and Trust

FBO Charles M. Brooks, MD, Stephen Gott, Karim Kano, David Kotz, Barbara Moskowitz,

Ronald Profili, Joseph Rottman, Shea-Edwards Limited Partnership, Juan Tolosa, Grace Wang

and Miriam Wolf (the "Structured Products Class Representatives")[1] on behalf of the Settlement

Class (defined below) and UBS Financial Services Inc. (the "Settling Defendant" or "UBSFS")

(together, the "Settling Parties") by and through their respective counsel in the above-captioned

consolidated class action (the "Action").  Subject to the approval of the District Court (defined

below) and certain limitations expressly provided herein, the settlement provided for in this

Stipulation (the "Settlement") is intended to settle and release all claims against Settling

Defendant. This Stipulation does not release any claims of the Structured Products Class

Representatives and any other Settlement Class Members (defined below) as against E&Y

---

[1]    All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them
in ¶1 herein.

(defined below).

WHEREAS, beginning on June 18, 2008, putative class actions were filed in the District Court, alleging violations of federal securities laws and captioned as follows: *Operative Plasterers & Cement Masons International Association Local 262 Annuity Fund, et al. v. Richard S. Fuld, Jr., et al.,* Case No. 08 Civ. 5523; *Fogel Capital Management, Inc. v. Richard S. Fuld, Jr., et al., Case No. 08 Civ. 8225; Jeffrey Stark, et al. v. Erin Callan, et al.,* Case No. 08 Civ. 9793*; Stanley Tolin v. Richard S. Fuld, Jr., et al.,* Case No. 08 Civ. 1 0008; and *Brooks Family Partnership, LLC, et al. v. Richard S. Fuld, Jr., et al.*, Case No. 08 Civ. 10206;

WHEREAS, beginning on October 31, 2008, other putative class actions were filed in the District Court alleging violations of federal securities laws on behalf of investors in certain structured products issued by Lehman Brothers Holdings Inc. ("Lehman"), some of which were sold and underwritten by UBSFS, and captioned as follows: *Anthony Peyser v. Richard S. Fuld, Jr., et al.*, Case No. 08 Civ. 9404; *Stephen P. Gott v. UBS Financial Services, Inc., et al.*, Case No. 08 Civ. 9578; and *Enrique Azpiazu v. UBS Financial Services, Inc., et al.*, Case No. 08 Civ. 10058 (the "Structured Products Actions"); [2]

WHEREAS, on January 9, 2009, the District Court entered an order (the "Consolidation Order") consolidating the Structured Products Actions with certain other actions brought on behalf of investors in other Lehman-issued securities under the caption *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08 Civ. 5523 (LAK) (the "Action");

WHEREAS, the Consolidation Order confirmed the previous appointment of Lead

---

[2] On September 15, 2008, Lehman and certain of its subsidiaries and affiliates filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code (the "Lehman Bankruptcy Proceedings"). For this reason, Lehman was not named as a defendant in the Structured Products Actions or the Action. Further, on September 19, 2008, a proceeding under the Securities Investor Protection Act (the "LBI SIPA Proceeding") was commenced against Lehman Brothers Inc. ("LBI"). For this reason, LBI was not named as a defendant in the Structured Products Actions or the Action.

2

Plaintiffs and Lead Counsel in the Action, and also established the appointment of a Plaintiffs'
Executive Committee consisting of lead counsel in: (i) the Action, (ii) *In re Lehman Brothers
Mortgage-Backed Securities Litigation*, and (iii) *In re Lehman Brothers ERISA Litigation*; and
(iv) Daniel C. Girard of the firm of Girard Gibbs LLP, one of the counsel in the Structured
Products Actions;

WHEREAS, on February 23, 2009, the Second Amended Consolidated Class Action
Complaint was filed on behalf of investors that purchased certain UBSFS-underwritten
structured products, as well as investors in other Lehman-issued securities;

WHEREAS, on April 27, 2009, UBSFS, in conjunction with the other Defendants,
moved to dismiss the Second Amended Consolidated Class Action Complaint;

WHEREAS, UBSFS moved to dismiss the Second Amended Consolidated Class Action
Complaint on the grounds that the Structured Products Class Representatives lacked standing to
bring claims with respect to structured products offerings in which no named plaintiff purchased
and that the Offering Materials contained no material misstatements or omissions;

WHEREAS, on January 26, 2010, the District Court held a hearing for oral argument on
the motions to dismiss;

WHEREAS, on March 17, 2010, pursuant to Pre-Trial Order No. 14, and the then-recent
filing of the Examiner's Report in the Lehman Bankruptcy Proceedings, the District Court
denied the pending motions to dismiss without prejudice and granted leave to further amend the
complaint on or before April 23, 2010;

WHEREAS, on April 23, 2010, the Third Amended Class Action Complaint (the
"Complaint") was filed in the Action on behalf of the Structured Products Class Representatives,
as well as investors in other Lehman-issued securities;

3

WHEREAS, the Complaint alleges that UBSFS, as underwriter and seller of the Structured Products, is liable under sections 11 and 12(a)(2) of the Securities Act of 1933 for materially false and misleading statements and omissions in the Offering Materials about Lehman's financial condition and creditworthiness, as well as the "principal protection" feature of some of the Structured Products (the "Structured Products Claims");

WHEREAS, on June 4, 2010, UBSFS, in conjunction with the other Defendants, moved, together with memoranda of law, declarations, and exhibits in support thereof, to dismiss the Complaint on the grounds that: (a) the Structured Products Class Representatives lacked standing to bring claims with respect to Structured Products offerings in which no named plaintiff purchased, (b) certain claims were time-barred, and (c) the Offering Materials contained no material misstatements or omissions;

WHEREAS, on June 30, 2010, all plaintiffs in the Action filed a consolidated memorandum of law, declarations, and exhibits in opposition to Defendants' motions to dismiss the Complaint, which included the arguments made by Structured Products Class Representatives in opposition to the UBSFS motion to dismiss the Structured Products Claims;

WHEREAS, on July 13, 2010, Defendants filed reply memoranda, declarations, and exhibits in support of their motions to dismiss the Complaint;

WHEREAS, on July 27, 2011, the District Court issued a Memorandum Opinion granting in part and denying in part Defendants' motions to dismiss;

WHEREAS, the District Court held that (i) the Structured Products Class Representatives lacked standing to pursue claims with respect to Structured Products offerings in which no named plaintiff purchased; (ii) claims with respect to offerings on or before March 30, 2007 were time-barred; (iii) claims asserted by certain newly added plaintiffs relating to offerings

4

subsequent to March 30, 2007 were timely; (iv) the Complaint stated claims under sections 11 and 12(a)(2) with respect to certain aspects of Lehman's financial condition and with respect to the principal protection feature of some of the Structured Products; and (v) the Complaint failed to state any claims by the Structured Products Class Representatives against E&Y;

WHEREAS, on September 8, 2011, the District Court entered Pretrial Order No. 20 revising the July 27, 2011 Memorandum Opinion;

WHEREAS, on September 8, 2011, the District Court entered Pretrial Order No. 19 (the "Motion to Dismiss Order"), which set forth the District Court rulings in the revised July 27, 2011 Memorandum Opinion;

WHEREAS, beginning in the fall of 2011, the Settling Parties engaged in discovery. The Structured Products Class Representatives and other Settlement Class Members produced more than 4,000 pages of documents in response to Settling Defendant's document requests and submitted to twenty-two depositions taken by Settling Defendant's Counsel. Structured Products Plaintiffs' Counsel served three sets of document requests, two sets of interrogatories and one set of requests for admission on Settling Defendant. Structured Products Plaintiffs' Counsel has reviewed the 1.8 million pages of documents produced by Settling Defendant, the nearly 2 million pages of documents produced by UBS AG (Settling Defendant's parent company) and its affiliates pursuant to a subpoena, and has also reviewed a substantial portion of the 4.4 million pages of documents produced from the Lehman estate, and documents produced by E&Y and non-parties. Structured Products Plaintiffs' Counsel has taken eleven depositions of UBSFS witnesses and experts, and has taken and attended 26 depositions of Lehman and E&Y witnesses to date;

WHEREAS, the discovery taken in the Action, and related motion practice filed by

5

Structured Products Plaintiffs' Counsel, has included inquiry into, among other topics, (i) the procedures by which UBSFS structured, marketed and sold structured products through its financial advisors, including the Lehman-issued Structured Products, (ii) the sales commissions payable to UBSFS and its financial advisors relating to the sale of structured products, (iii) the training and education of UBSFS financial advisors relating to the sale of structured products, (iv) communications between UBSFS financial advisors or consultants and purchasers of Structured Products, (v) whether class members had knowledge of facts related to the creditworthiness of Lehman, and (vi) the understanding of UBSFS financial advisors and customers of the principal protection features of Lehman-issued Structured Products;

WHEREAS, in October 2011, Structured Products Class Representatives, through their counsel, commenced settlement discussions and arm's-length negotiations with counsel for Settling Defendant, in an effort to reach a compromise and settlement of claims against Settling Defendant that will achieve the best relief possible consistent with the interests of the Settlement Class;

WHEREAS, on February 3, 2012, the Structured Products Class Representatives filed a motion for class certification and the appointment of class counsel together with a memorandum of law, declarations, and exhibits in support;

WHEREAS, on April 4, 2012, UBSFS filed a memorandum of law, declarations (including two expert declarations), and exhibits in opposition to the motion for class certification;

WHEREAS, on May 16, 2012, the Structured Products Class Representatives filed a reply memorandum of law, declarations, exhibits and an expert declaration in further support of their motion for class certification;

6

WHEREAS, on May 23, 2012, UBSFS filed a sur-reply memorandum of law, declarations (including an expert declaration), and exhibits in opposition to the motion for class certification;

WHEREAS, on September 21, 2012, on the basis of recent Second Circuit authority in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA-IBEW*"), the Structured Products Class Representatives moved for reconsideration (the "Motion for Reconsideration") of the Motion to Dismiss Order, which dismissed certain of the Structured Products Class Representatives' claims for lack of standing and for untimeliness;

WHEREAS, on October 9, 2012, UBSFS filed an opposition to the Motion for Reconsideration;

WHEREAS, on October 19, 2012, the Structured Products Class Representatives filed a reply memorandum of law in further support of the Motion for Reconsideration;

WHEREAS, on November 20, 2012, the District Court denied the Motion for Reconsideration without prejudice to renewal subject to Supreme Court action on a petition for a writ of certiorari in *NECA-IBEW*;

WHEREAS, on December 11, 2012, the Settling Parties engaged in the first of two separate mediation sessions before the Honorable Daniel Weinstein (Ret.) (the "Mediator"), and had numerous telephonic and face-to-face settlement conferences thereafter;

WHEREAS, on January 23, 2013, the District Court entered Pretrial Order No. 59 granting in part and denying in part the motion for class certification, appointed the Structured Products Class Representatives to represent the certified class, and appointed Girard Gibbs LLP as class counsel for the certified class (the "Class Certification Order");

WHEREAS, on February 6, 2013, UBSFS filed a petition with the Court of Appeals for

7

the Second Circuit, pursuant to Federal Rule of Civil Procedure 23(f), seeking permission to appeal the Class Certification Order (the "Rule 23(f) Petition");

WHEREAS, on February 22, 2013, the Structured Products Class Representatives filed a memorandum of law in opposition to the Rule 23(f) Petition;

WHEREAS, on March 4, 2013, UBSFS filed a reply memorandum of law in support of the Rule 23(f) Petition;

WHEREAS, on April 16, 2013, the Court of Appeals for the Second Circuit denied the Rule 23(f) Petition;

WHEREAS, on April 23, 2013, after the Supreme Court's denial of the petition for a writ of *certiorari* in *NECA-IBEW*, the Structured Products Class Representatives filed a renewed motion for reconsideration pursuant to Federal Rule of Civil Procedure 54(b), and for amendment of the Class Certification Order pursuant to Rule 23(c)(1)(C) (the "Renewed Motion for Reconsideration");

WHEREAS, on May 24, 2013, UBSFS filed its opposition to the Renewed Motion for Reconsideration;

WHEREAS, on May 28, 2013, the Settling Parties engaged in a second mediation session before the Mediator in an attempt to reach a resolution of the Structured Products Claims asserted in the Action;

WHEREAS, the Structured Products Class Representatives' reply in further support of the Renewed Motion for Reconsideration is due on August 14, 2013;

WHEREAS, Structured Products Plaintiffs' Counsel have conducted an investigation relating to the Structured Products Claims and the underlying events and transactions alleged in the Complaint, researched the applicable law with respect to the claims of Structured Products

Class Representatives and the other Settlement Class Members against Settling Defendant and the potential defenses thereto;

WHEREAS, based upon their investigation, the extensive discovery undertaken, and the considerable negotiation and mediation efforts expended, Structured Products Class Counsel has concluded that the terms and conditions of this Settlement and the documents incorporated herein by reference are fair, reasonable and adequate to Structured Products Class Representatives and the other Settlement Class Members and in their best interests, and has agreed to settle the Structured Products Claims asserted in the Action against Settling Defendant pursuant to the terms and provisions of this Stipulation, after considering: (1) the risks inherent in litigating the complex legal and factual issues of the Structured Products Claims; (2) the expense and delay of continued litigation; (3) the desirability of permitting the Settlement to be consummated as provided by the terms of this Stipulation; and (4) the benefits that Structured Products Class Representatives and other Settlement Class Members will receive from settlement of their claims against Settling Defendant;

WHEREAS, throughout the course of the Action, Settling Defendant has denied and continues to deny liability and maintains that it has meritorious defenses, including but not limited to its contentions that (i) the named plaintiffs lack standing to represent a class of investors in connection with Structured Products that they did not purchase; (ii) the class cannot be certified under Rule 23 due to the predominance of questions of knowledge of class members regarding the allegedly concealed information upon which the Structured Products Claims are based; (iii) a class action is not a superior method of adjudicating the Structured Products Claims; (iv) even if liability is found, any damages that are recoverable will be reduced to the extent that class members' losses were not foreseeable, or that such losses were not caused by

9

any alleged misrepresentations or omissions in the offering documents; (v) the offering documents did not contain any material misrepresentations or omissions; and (vi) any liability of Settling Defendant to the class is subject to reduction based on the proportionate liability of Defendants other than Settling Defendant.  Without waiving any of these defenses, Settling Defendant has determined that it is desirable that the Structured Products Claims asserted in the Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation;

WHEREAS, nothing in this Stipulation shall be construed or deemed to be evidence of an admission or concession on the part of Settling Defendant with respect to any claim or any fault or liability or wrongdoing or damages whatsoever, or any infirmity in the defenses that Settling Defendant has asserted or may assert.  Likewise, nothing in this Stipulation shall be construed or deemed to be evidence of an admission or concession on the part of any Structured Products Class Representative or any Settlement Class Member of any infirmity in the Structured Products Claims asserted in the Action against any Defendant, including Settling Defendant; and

WHEREAS, Settling Defendant and Structured Products Class Representatives agree that each has complied fully with the strictures of Rule 11 of the Federal Rules of Civil Procedure.

**NOW THEREFORE,** without any admission or concession on the part of the Structured Products Class Representatives or any other Settlement Class Member of any lack of  merit of the Structured Products Claims asserted in the Action, and without any admission or concession of any liability or wrongdoing or lack of merit in the defenses by Settling Defendant and other Released  Parties (as defined below), it is hereby **STIPULATED AND AGREED**, by and among the parties to this Stipulation, through their respective attorneys, subject to approval of the District Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, in

consideration of the benefits flowing to the parties hereto from the Settlement, that all Released

Claims (as defined below) as against the Released Parties shall be compromised, settled, released

and dismissed with prejudice, upon and subject to the following terms and conditions:

## **DEFINITIONS**

1.     As used in this Stipulation, the following terms shall have the following

meanings:

a.     "Action" shall mean *In re Lehman Brothers Equity/Debt Securities*

*Litigation*, Case No. 08 Civ. 5523 (LAK).

b.     "Authorized Claimant" shall mean a Settlement Class Member who

submits a timely and valid Proof of Claim Form (defined below) to the Claims Administrator

(described below), in accordance with the requirements established by the District Court, and

who is approved for payment from the Net Settlement Fund.

c.     "Claim" shall mean a claim for payment from the Net Settlement Fund

(defined below).

d.     "Claim Form" or "Proof of Claim Form" shall mean the form, to be

proposed to the District Court for approval (substantially in the form attached as Exhibit B-3

hereto), that a Claimant (defined below) must complete to be potentially eligible to share in a

distribution of the Net Settlement Fund.

e.     "Claimant" shall mean a person or entity that submits a Claim Form to the

Claims Administrator seeking to be potentially eligible to share in the proceeds of the Net

Settlement Fund.

f.     "Claims Administrator" shall mean the claims administrator selected by

Structured Products Class Counsel, subject to approval of the District Court, which shall provide

11

all notices approved by the District Court to potential Settlement Class Members and shall

administer the Settlement and distribute the Net Settlement Fund to Authorized Claimants.

       g.    "Class Distribution Order" shall mean the order to be entered by the

District Court authorizing and directing that the Net Settlement Fund be distributed, in whole or

in part, to the Authorized Claimants.

       h.    "Complaint" shall mean the Third Amended Class Action Complaint for

Violations of the Federal Securities Laws that was filed with the District Court on April 23,

2010, and any prior complaints filed in the Action asserting any claims against the Settling

Defendant relating to the purchase or sale of Structured Products.

       i.    "Defendants" shall collectively mean Settling Defendant, as well as the

other defendants named in the Complaint and against whom Structured Products Class

Representatives asserted claims, including those who are subject to the District Court-approved

settlements in the Action.

       j.    "District Court" or "Court" shall mean the United States District Court for

the Southern District of New York.

       k.    "Effective Date" shall have the meaning set forth in Paragraph 34 below.

       l.    "Escrow Account" shall mean an interest-bearing account designated and

controlled by Structured Products Class Counsel, acting as agent for Structured Products Class

Representatives and the Settlement Class, wherein the Settlement Amount shall be deposited and

held in escrow.

       m.    "Escrow Agent" shall mean Citibank, N.A, or such other financial

institution(s) as Structured Products Class Counsel shall select, which shall be responsible for

overseeing, safeguarding and distributing the Escrow Account, acting as agent for the Settlement

Class.

n.     "E&Y" shall mean Ernst & Young LLP.

o.     "Final" means, with respect to any order of any court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise. Without limitation, an order becomes "Final" when: (i) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (ii) an appeal has been filed and either (a) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (b) the order has been affirmed in all material respects and the prescribed time, if any, for commencing any further appeal has expired.  For purposes of this paragraph, an "appeal" includes appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of *certiorari* or mandamus, and any other proceedings of like kind.  Any appeal or other proceeding pertaining to an order adopting or approving a Plan of Allocation (defined below) or to any order issued with respect to any application for attorneys' fees and expenses pursuant to Paragraphs 17-19 below, shall not in any way delay or preclude the Judgment from becoming Final.

p.     "Judgment" shall mean the final judgment (substantially in the form attached as Exhibit C hereto), which includes, *inter alia*, a bar order and judgment reduction provision, to be entered by the District Court pursuant to Federal Rule of Civil Procedure 54(b) approving the Settlement.

q.     "Lehman" means Lehman Brothers Holdings Inc., and its current and former trustees, officers, directors, partners, principals, predecessors, successors, assigns, attorneys, parents, affiliates, employers, employees, agents, subsidiaries, and any of their heirs,

13

joint tenants, tenants in common, beneficiaries, executors, and administrators.

        r.      "Litigation Expenses" shall mean the costs and expenses incurred by Structured Products Plaintiffs' Counsel in connection with commencing and prosecuting the Action for which Structured Products Class Counsel intends to apply to the District Court for reimbursement from the Settlement Fund (defined below).

        s.      "Net Settlement Fund" shall mean the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the District Court; and (iv) any attorneys' fees awarded by the District Court.

        t.      "Notice" shall mean the Notice of Pendency of Class Action and Proposed Settlement with Settling Defendant, Settlement Fairness Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses, substantially in the form attached hereto as Exhibit B-2, which is to be sent to potential Settlement Class Members.

        u.      "Notice and Administration Costs" shall mean the costs, fees and expenses that are incurred by the Claims Administrator and Structured Products Class Counsel in connection with: (i) providing notice to the Settlement Class, including obtaining security holder lists; (ii) administering the Claims process; and (iii) the maintenance of the Escrow Account.

        v.      "Offering Materials" shall mean the Shelf Registration Statement filed by Lehman with the Securities and Exchange Commission on Form S-3 and dated May 30, 2006, together with any amendments thereto, materials incorporated by reference in the Shelf Registration Statement, and the prospectus supplements, product supplements, underlying supplements, and pricing supplements issued in connection with the offer and sale of the Structured Products, as well as any materials incorporated by reference therein.

        w.      "Plan of Allocation" shall mean the plan of allocation of the Net

14

Settlement Fund, substantially in the form attached as Exhibit B to the proposed Notice, which will be proposed to the District Court by Structured Products Class Counsel.

        x.     "Preliminary Order" shall mean the order, substantially in the form attached hereto as Exhibit B, to be proposed to the District Court for entry regarding preliminary evaluation of the Settlement and Notice.

        y.     "Publication Notice" or "Summary Notice" shall mean the Summary Notice of Pendency of Class Action and Proposed Settlement with Settling Defendant, Settlement Fairness Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses, to be published, substantially in the form attached hereto as Exhibit B-4, subject to the District Court's approval.

        z.     "Released Claims" shall have the meaning as set forth at Paragraph 4 below.

        aa.     "Released Parties" shall mean Settling Defendant and any and all of its current and former trustees, officers, directors, partners, principals, predecessors, successors, assigns, attorneys, parents, affiliates, employers, employees, agents, subsidiaries, and any of their heirs, joint tenants, tenants in common, beneficiaries, executors, and administrators, but specifically does not include any other Defendants.

        bb.     "Releasing Parties" shall mean the Structured Products Class Representatives and the Settlement Class Members.

        cc.     "Settlement" shall mean the settlement with Settling Defendant provided for in this Stipulation.

        dd.     "Settlement Amount" shall mean one hundred twenty million dollars ($120,000,000.00) in cash.

15

ee.     "Settlement Class" shall have the meaning set forth in Paragraph 2a below.

ff.     "Settlement Class Member" shall mean a person or entity that is a member of the Settlement Class and does not exclude himself, herself or itself by filing a timely request for exclusion in accordance with the requirements set forth in the Notice.

gg.     "Settlement Class Representatives" shall mean the Structured Products Class Representatives as defined below.

hh.     "Settlement Fund" shall mean the Settlement Amount plus any income or interest earned thereon.

ii.     "Settlement Hearing" shall mean the hearing to be set by the District Court under Rule 23(e) of the Federal Rules of Civil Procedure to consider final approval of the Settlement.

jj.     "Settling Defendant" shall mean UBSFS.

kk.     "Settling Defendant's Counsel" shall mean Gibson, Dunn & Crutcher LLP.

ll.     "Settling Parties" shall mean, collectively, the Structured Products Class Representatives, individually and on behalf of the Settlement Class, and Settling Defendant.

mm.     "Structured Products" shall mean the securities that are set forth in Exhibit A.

nn.     "Structured Products Claims" shall mean the claims asserted by the Structured Products Class Representatives in the Action, including without limitation claims for violations of sections 11 and 12(a)(2) of the Securities Act of 1933 based on alleged materially false and misleading statements and omissions in the Offering Materials about Lehman's

16

financial condition and the "principal protection" feature of some of the Structured Products.

oo.    "Structured Products Class Counsel" shall mean the law firm of Girard Gibbs LLP.

pp.    "Structured Products Class Representatives" shall mean Mohan Ananda, Richard Barrett, Ed Davis, Neel Duncan, Rick Fleischman, Nick Fotinos, Gastroenterology Associates, Ltd. Profit Sharing Plan and Trust FBO Charles M. Brooks, MD, Stephen Gott, Karim Kano, David Kotz, Barbara Moskowitz, Ronald Profili, Joseph Rottman, Shea-Edwards Limited Partnership, Juan Tolosa, Grace Wang and Miriam Wolf.

qq.    "Structured Products Plaintiffs' Counsel" shall mean Structured Products Class Counsel, Lead Counsel in the *In re Lehman Brothers Equity/Debt Securities Litigation,* 08-cv-5523, and the following law firms: Zwerling, Schachter & Zwerling, LLP; Law Offices of James V. Bashian; P.C., Bonnett Fairbourn Friedman & Balint, P.C.; and Tiffany & Bosco, P.A.

rr.    "Taxes" shall mean collectively: (i) any and all taxes, duties and similar charges (including any estimated taxes, withholdings, interest or penalties and interest thereon) arising in any jurisdiction with respect to the income or gains earned by, or in respect of, the Settlement Fund, including, without limitation, any taxes or tax detriments that may be imposed upon Settling Defendant or its counsel with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund may be finally determined to not qualify as a Qualified Settlement Fund (within the meaning contemplated in Paragraph 11 herein) for federal or state income tax purposes or any distribution of any portion of the Settlement Fund to Authorized Claimants and other persons and entities entitled thereto pursuant to this Stipulation and; (ii) the reasonable expenses and costs incurred in connection with the taxation of the Settlement Fund (including, without limitation, reasonable expenses of tax attorneys and

accountants).

ss.     "UBSFS" shall mean Settling Defendant UBS Financial Services Inc.

tt.     "Unknown Claims" shall mean any and all Released Claims which any
Structured Products Class Representative or any other Settlement Class Member does not know
or suspect to exist in his, her or its favor at the time of the release of such claims, and any
Released Parties' Claims (as defined in Paragraph 3 below) which any Released Party does not
know or suspect to exist in his, her or its favor at the time of the release of such claims, which if
known by him, her or it might have affected his, her or its decision(s) with respect to the
Settlement.  With respect to any and all Released Claims (defined in Paragraph 4 below), the
Settling Parties stipulate and agree that upon the Effective Date, Structured Products Class
Representatives and Settling Defendant shall expressly waive, and each other Settlement Class
Member shall be deemed to have waived and by operation of the Judgment shall have expressly
waived, any and all provisions, rights and benefits conferred by any law of any state or territory
of the United States, or principle of common law, which is similar, comparable, or equivalent to
Cal. Civ. Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know
> or suspect to exist in his or her favor at the time of executing the release,
> which if known by him or her must have materially affected his or her
> settlement with the debtor.

Structured Products Class Representatives and Settlement Class Members may hereafter
discover facts in addition to or different from those which he, she or it now knows or believes to
be true with respect to the subject matter of the Released Claims, but each Structured Products
Class Representative shall expressly – and each Settlement Class Member, upon the Effective

Date, shall be deemed to have, and by operation of the Judgment shall have – fully, finally and forever settled and released any and all Released Claims, known or Unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Structured Products Class Representatives and Settling Defendant acknowledge, and each other Settlement Class Member by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of Released Claims was separately bargained for and was a key element of the Settlement.

## CLASS CERTIFICATION

2.       Solely for the purpose of the Settlement, Settling Defendant stipulates and agrees to:

a.       certification of the Structured Products Claims asserted in the Action as a class action, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Settlement Class, which is defined as follows:

all persons and entities that bought or otherwise acquired any of the Structured

Products set forth in Exhibit A and who were damaged thereby.

Excluded from the Settlement Class are:

(i)       Defendants;

(ii)      current and former executive officers and directors of each

Defendant, and the members of their immediate families;

19

(iii)     the members of Defendants' immediate families;

(iv)     any entity in which a Defendant owns a majority interest,

**<u>provided, however</u>**, that the Settlement Class shall *include* any

investment company or pooled investment fund, including without

limitation mutual fund families, exchange-traded funds, fund of funds and

hedge funds, in which any Defendant has or may have a direct or indirect

interest, or as to which it or its affiliates may act as an investment advisor

but in which Defendant or any of its affiliates is not a majority owner or

does not hold a majority beneficial interest;

(v)     Lehman;

(v)     any person or entity who has

        a.     litigated claims in any forum against UBSFS arising out of

the purchase of Structured Products and received a judgment; or

        b.     settled and released claims against UBSFS arising out of

the purchase of Structured Products (as identified on a confidential

Exhibit, which shall be provided by UBSFS on a confidential basis to the

Claims Administrator, but shall not be provided to the Structured Products

Class Representatives or to Structured Products Plaintiffs' Counsel or to

any other person or entity); and

(vi)     the legal representatives, heirs, successors or assigns of any

excluded party.

Also excluded from the Settlement Class are any persons or entities who exclude

themselves by filing a timely request for exclusion in accordance with the requirements

set forth in Paragraph 31 below.

        b.      appointment of Structured Products Class Representatives as Settlement Class Representatives;

        c.      appointment of Structured Products Class Counsel as Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure; and

        d.      the entry of the Preliminary Order and the Judgment, which will certify the Structured Products Claims asserted in the Action to proceed as a class action as defined and set forth in subparagraph (a) above for settlement purposes only, and appoint Settlement Class Representatives and Class Counsel.

## RELEASE OF CLAIMS

3.      The obligations incurred pursuant to this Stipulation shall be in full and final disposition of the Released Claims (defined below) as against the Released Parties. The Settlement shall fully and finally release any and all Released Claims (defined below) as against all Released Parties. The Settlement also shall release any and all claims (whether known claims or Unknown Claims) by Settling Defendant as against the Structured Products Class Representatives and any of their spouses or representatives, Arthur Simons and his spouse, and Structured Products Plaintiffs' Counsel that arise out of or relate in any way to the institution, prosecution, or settlement of the Structured Products Claims, except for claims relating to the enforcement of this Settlement (the "Released Parties' Claims"). On the Effective Date, the Structured Products Claims asserted in the Action shall be dismissed as against only Settling Defendant with prejudice and without costs (except as to any award to Structured Products Plaintiffs' Counsel of Attorneys' Fees or Litigation Expenses ordered by the Court to be paid from the Settlement Amount).

4.    Pursuant to the Judgment and upon the Effective Date as defined in Paragraph 1(k) above, and in consideration of the terms and conditions herein, and except for the rights and obligations created by this Stipulation, Settlement Class Members shall be deemed by operation of law to have released the Released Parties from any and all claims, rights, demands, liabilities and causes of action of every nature and description, to the fullest extent that the law permits their release in this Action, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, whether class, derivative or individual in nature, that the Structured Products Class Representatives or any other member of the Settlement Class: (a) alleged in the Complaint or the Action, or (b) could have asserted in any forum that arise out of or are based upon or are related to the allegations, contentions, transactions, facts, matters or occurrences, representations  or omissions involved, set forth, or referred to in the Complaint or the Action, including without limitation any claims relating to (i) alleged misrepresentations or omissions in connection with the recommendation, sale or marketing of Structured Products to Settlement Class Members, and/or (ii) the purchase, acquisition or holding of the Structured Products (the "Released Claims").

5.    Pursuant to the Judgment, upon the Effective Date, each of the Structured Products Class Representatives and all other members of the Settlement Class, on behalf of themselves, their successors and assigns, and any other person or entity claiming (now or in the future) through or on behalf of them, shall release and be deemed by operation of law to have irrevocably, absolutely and unconditionally, fully, finally and forever released, waived, discharged and dismissed each and every Released Claim against each and all of the Released Parties with prejudice, and shall forever be enjoined from prosecuting any or all Released Claims against any Released Party.

22

6.       Notwithstanding Paragraphs 4 and 5 above, the Releasing Parties, through the release in this Settlement, will not release:

(a)       any claims against E&Y;

(b)       any claims or interests in the Lehman Bankruptcy Proceeding or the LBI SIPA Proceeding asserted by any Settlement Class Member based upon the ownership of any Lehman security which is entitled to a distribution under any confirmed plan of reorganization in the Lehman Bankruptcy Proceeding because of such ownership; or

(c)       claims relating to the enforcement of the Settlement.

7.       Pursuant to the Judgment, upon the Effective Date, Settling Defendant shall be deemed by operation of law to have irrevocably, absolutely and unconditionally, fully, finally and forever released, waived, discharged and dismissed the Released Parties' Claims against each and all of the Structured Products Class Representatives and any of their spouses or representatives, Arthur Simons and his spouse, and Structured Products Plaintiffs' Counsel, and shall forever be enjoined from prosecuting any or all of the Released Parties' Claims against any of the Structured Products Class Representatives and any of their spouses or representatives, Arthur Simons and his spouse, and Structured Products Plaintiffs' Counsel.

## THE SETTLEMENT CONSIDERATION

8.       In consideration of the Settlement of the Structured Products Claims asserted in this Action, and subject to the terms and conditions of this Stipulation, Settling Defendant shall cause the Settlement Amount to be deposited into the Escrow Account within 15 business days of the entry of the Preliminary Order.

## USE OF SETTLEMENT FUND

23

9.      The Settlement Fund shall be used to pay: (a) Taxes; (b) Notice and
Administration Costs; (c) any Litigation Expenses awarded by the District Court; and (d) any
attorneys' fees awarded to Structured Products Plaintiffs' Counsel by the District Court.  The
balance remaining in the Settlement Fund (the "Net Settlement Fund") shall be distributed to
Authorized Claimants as provided below.

10.      Except as provided herein or pursuant to orders of the District Court, the Net
Settlement Fund shall remain in the Escrow Account prior to the Effective Date.  All funds held
by the Escrow Agent shall be deemed to be in the custody of the District Court and shall remain
subject to the jurisdiction of the District Court until such time as the funds shall be distributed
pursuant to the terms of this Stipulation and/or further order of the District Court.  The Escrow
Agent shall invest the Settlement Fund exclusively in instruments backed by the full faith and
credit of the United States Government or fully insured by the United States Government or an
agency thereof, including a United States Treasury Money Market Fund or a bank account fully
insured by the United States Government Federal Deposit Insurance Corporation (FDIC) up to
the guaranteed FDIC limit.  All risks related to the investment of the Settlement Fund shall be
borne by the Settlement Fund.

11.      The parties hereto agree that the Settlement Fund is intended to be a separate
Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and that
Structured Products Class Counsel shall act as the administrator of the Qualified Settlement Fund
within the meaning of Treasury Regulation § 1.468B-2(k)(3), and shall be responsible for filing
or causing to be filed all informational and other tax returns for the Settlement Fund and paying
from the Settlement Fund any Taxes owed thereon.  Settling Defendant's Counsel will cause to
be provided promptly to Structured Products Class Counsel the statement described in Treasury

Regulation §1.468B-3(e).  Structured Products Class Counsel, as administrator of the Settlement

Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall timely make such

elections as are necessary or advisable to carry out this paragraph, including, as necessary,

making a "relation back election," as described in Treasury Regulation § 1.468-1(j)(ii), to cause

the  Qualified Settlement Fund to come into existence at the earliest allowable date, and shall

take or cause to be taken all actions as may be necessary or appropriate in connection therewith.

12.    All Taxes shall be paid out of the Settlement Fund, and shall be timely paid by the

Escrow Agent pursuant to the disbursement instructions to be set forth in the Escrow Agreement,

and without prior order of the District Court.  Any tax returns prepared for the Settlement Fund

(as well as the election set forth therein) shall be consistent with the previous paragraph and in

all events shall reflect that all Taxes (including any interest or penalties) on the income earned by

the Settlement Fund shall be paid out of the Settlement Fund as provided herein.  The Settlement

Fund shall indemnify and hold all Released Parties harmless for any Taxes and related expenses

of any kind whatsoever (including, without limitation, taxes payable by reason of any such

indemnification), if any, payable by Settling Defendant by reason of any income earned on the

Settlement Fund.  Settling Defendant's Counsel shall notify the Escrow Agent promptly if

Settling Defendant receives any notice of any claim for Taxes relating to the Settlement Fund.

13.    This is not a claims-made settlement.  Upon the occurrence of the Effective Date,

neither Settling Defendant nor any person or entity that paid any portion of the Settlement Fund

on its behalf shall have any right to the return of the Settlement Fund or any portion thereof

irrespective of the number of Claims filed, the collective amount of losses of Authorized

Claimants, the percentage of recovery of losses, or the amounts to be paid to Authorized

Claimants from the Net Settlement Fund.

14.     The Claims Administrator shall discharge its duties under Structured Products
Class Counsel's supervision and subject to the jurisdiction of the District Court.  Except as
otherwise provided herein, Settling Defendant shall have no responsibility for the administration
of the Settlement and shall have no liability to any person, including, but not limited to, the
Settlement Class Members, in connection with such administration.  Structured Products Class
Counsel shall cause the Claims Administrator to mail the Notice and Proof of Claim Form to
those members of the Settlement Class at the address of each such person as set forth in the
records of Lehman or UBSFS or their transfer agent(s), or who otherwise may be identified
through further reasonable effort.  Settling Defendant shall provide any information reasonably
available to it that, in its judgment, will assist in the identification of potential Settlement Class
Members for the purpose of sending notification of the Settlement within ten (10) business days
of the entry of the Preliminary Order.  Structured Products Class Counsel will cause to be
published the Publication Notice pursuant to the terms of the Preliminary Order or in whatever
other form or manner might be ordered by the District Court.

15.     Notwithstanding the fact that the Effective Date has not yet occurred, Structured
Products Class Counsel may pay from the Escrow Account, without further approval from
Settling Defendant, but subject to the prior approval of the District Court, all reasonable Notice
and Administration Costs actually incurred.  Such costs and expenses shall include, without
limitation, the actual costs of printing and mailing the Notice and Proof of Claim Form,
reimbursements to nominee owners for forwarding the Notice to their beneficial owners,
publication of the Summary Notice, the administrative expenses incurred and fees charged by the
Claims Administrator in connection with providing Notice and processing the submitted Claims,
and the fees, if any, of the Escrow Agent.  In the event that the Settlement is terminated pursuant

26

to the terms of this Stipulation, all Notice and Administration Costs reasonably paid or reasonably incurred, including any related fees, shall not be returned or repaid to Settling Defendant or any other person or entity that contributed any portion of the Settlement Amount.

16.     The Released Parties shall have no responsibility for, interest in, or liability whatsoever with respect to the maintenance, investment or distribution of the Settlement Fund, the establishment or maintenance of the Escrow Account, the establishment or administration of the Plan of Allocation, the determination, administration, or calculation of claims, the payment or withholding of Taxes, the distribution of the Net Settlement Fund, the administration of the Settlement, or any losses incurred in connection with such matters.  Settling Defendant takes no position with respect to the provisions of this Stipulation governing those issues.  The Released Parties shall have no further or other liability or obligations to Structured Products Class Representatives, Structured Products Class Counsel or any member of the Settlement Class with respect to the Released Claims, except as expressly stated in this Stipulation.

## ATTORNEYS' FEES AND LITIGATION EXPENSES

17.     Structured Products Class Counsel will apply to the District Court for a collective award of attorneys' fees on behalf of Structured Products Plaintiffs' Counsel from the Settlement Fund.  Structured Products Class Counsel will also apply to the District Court for reimbursement of Litigation Expenses, which may include a request for reimbursement of Structured Products Class Representatives' expenses in accordance  with 15 U.S.C. §77z-l(a)(4).  Settling Defendant shall have no obligation to pay any portion of Structured Products Plaintiffs' Counsel's attorneys' fees or Litigation Expenses, aside from payments due to the Settlement Fund, or take any position with respect to Structured Products Class Counsel's application for an award of attorneys' fees and/or Litigation Expenses.

27

18.     Any attorneys' fees and Litigation Expenses that are awarded by the District Court shall be paid to Structured Products Class Counsel from the Escrow Account immediately upon award, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof.  Structured Products Class Counsel agrees to make appropriate refunds or repayments to the Settlement Fund, plus interest, if any, actually accrued on such funds, if the Settlement is terminated pursuant to the terms of this Stipulation or if, as a result of any appeal or further proceedings on remand, or successful collateral attack, the award of attorneys' fees and/or Litigation Expenses is reduced or reversed.  Structured Products Class Counsel shall make the appropriate refund or repayment in full no later than fifteen (15) business days after receiving from Settling Defendant's Counsel or from a court of appropriate jurisdiction notice of any such reduction of the award of attorneys' fees and/or Litigation Expenses, or notice of the termination of the Settlement.  An award of attorneys' fees and/or Litigation Expenses is not a necessary term to this Stipulation or a condition of this Stipulation, the Settlement, or the releases provided herein.  Structured Products Class Representatives and Structured Products Class Counsel may not cancel or terminate the Stipulation or the Settlement based on the District Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.  Any appeal relating to an award of attorneys' fees or Litigation Expenses will not affect the finality of the Settlement, the Judgment or the releases provided herein.

19.     Structured Products Class Counsel shall have the sole authority to allocate the court-awarded attorneys' fees amongst Structured Products Plaintiffs' Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the prosecution and settlement of the Structured Products Claims asserted in the Action.  Any Structured Products

28

Plaintiffs' Counsel that receives an allocation or distribution of court-awarded attorneys' fees shall become obligated to make appropriate refund or repayments to the Settlement Fund pursuant to the provisions of Paragraph 18 above, in the same manner as Structured Products Class Counsel.  Settling Defendant shall have no responsibility for the allocation among Structured Products Plaintiffs' Counsel, and/or any other person or entity who may assert some claim thereto, of any award of attorneys' fees or Litigation Expenses that the Court may make, and Settling Defendant takes no position with respect to such matters.

## CLAIMS ADMINISTRATOR

20.     The Claims Administrator shall administer the process of receiving, reviewing and approving or denying Claims under Structured Products Class Counsel's supervision and subject to the jurisdiction of the District Court.  Settling Defendant shall have no responsibility whatsoever to any person, including, but not limited to, Structured Products Class Representatives, the Claims Administrator, Settlement Class Members or Structured Products Class Counsel in connection with such administration.

21.     The Claims Administrator shall receive Claims and determine first whether the Claim is a valid Claim, in whole or in part; and second each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's loss amount (as set forth in the Plan of Allocation to be submitted by Structured Products Class Counsel to the District Court for approval, or in such other plan of allocation as the District Court approves).

22.     The allocation of the Net Settlement Fund among Authorized Claimants is a matter separate and apart from the proposed Settlement between Settling Defendant and Structured Products Class Representatives, and any decision by the Court concerning the Plan of Allocation shall not affect the validity or finality of the proposed Settlement.

29

23.     The plan of allocation to be proposed by Structured Products Class Counsel is not a necessary term of this Stipulation, and it is not a condition of this Stipulation, the Settlement, or the releases provided herein that any particular plan of allocation be approved by the District Court.  Structured Products Class Representatives and Structured Products Class Counsel may not cancel or terminate the Stipulation or the Settlement based on the District Court's or any appellate court's ruling with respect to any particular plan of allocation.  Settling Defendant shall have no responsibility or liability whatsoever for allocation of the Net Settlement Fund.  Any appeal relating to the allocation of the Net Settlement Fund, the administration of the Settlement or the claims process will not affect the finality of the Settlement, the Judgment, or the releases provided herein.

24.     Any Settlement Class Member who does not submit a valid and timely Claim Form will not be entitled to receive any distribution from the Net Settlement Fund but will otherwise be bound by all of the terms of this Stipulation and Settlement, including the terms of the Judgment to be entered in the Action and the releases provided for herein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any and all Released Parties concerning any and all of the Released Claims.

25.     Structured Products Class Counsel shall be responsible for supervising the administration of the Settlement and disbursement of the Net Settlement Fund.  Settling Defendant shall have no liability, obligation or responsibility whatsoever for the administration of the Settlement or disbursement of the Net Settlement Fund.  Settling Defendant shall not be permitted to review, contest or object to any Claim Form or any decision of the Claims Administrator or Structured Products Class Counsel with respect to accepting or rejecting any Claim Form or Claim for payment by a Settlement Class Member.  Structured Products Class

30

Counsel shall have the right, but not the obligation, to waive what they deem to be formal or technical defects in any Claim Forms submitted in the interests of achieving substantial justice.

26. For purposes of determining the extent, if any, to which a Settlement Class Member shall be entitled to be treated as an Authorized Claimant, the following conditions shall apply:

a. Each Settlement Class Member shall be required to submit a Claim Form supported by such documents as are designated therein, including proof of the transactions and holdings claimed and the claimed incurred losses, or such other documents or proof as the Claims Administrator or Structured Products Class Counsel, in their discretion, may deem acceptable.

b. All Claim Forms must be submitted by the date that will be set by the District Court, unless such deadline is extended by order of the District Court. Any Settlement Class Member who fails to submit a Claim Form by such date shall be forever barred from receiving any distribution from the Net Settlement Fund or payment pursuant to this Stipulation (unless otherwise ordered by the District Court), but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment and the releases provided for herein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any and all Released Parties concerning any and all of the Released Claims. Provided that it is received before the motion for the Class Distribution Order is filed, a Claim Form shall be deemed to be submitted when posted, if received with a postmark on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon. In all other cases, the Claim Form shall be deemed to have been submitted when actually received by the Claims Administrator.

31

c.      Each Claim Form shall be submitted to and reviewed by the Claims

Administrator, who shall determine in accordance with this Stipulation and the Court-approved

plan of allocation and under the supervision of Structured Products Class Counsel, the extent, if

any, to which each Claim shall be allowed, subject to review by the District Court pursuant to

subparagraph (e) below.

d.      Claim Forms that do not meet the submission requirements may be

rejected.  Prior to rejecting a Claim in whole or in part, the Claims Administrator shall attempt

to communicate with the Claimant in writing, to give the Claimant the chance to remedy any

curable deficiencies in the Claim Form.  The Claims Administrator, under the supervision of

Structured Products Class Counsel, shall attempt to notify, in a timely fashion and in writing, all

Claimants whose Claims the Claims Administrator proposes to reject in whole or in part, setting

forth the reasons therefore, and shall indicate in the notice that any Claimant whose claim is to

be rejected has the right to a review by the District Court if the Claimant so desires and

complies with the requirements of subparagraph (e) below.

e.      If any Claimant whose claim has been rejected in whole or in part desires

to contest the rejection, the Claimant must, within twenty (20) days after the date of mailing of

the notice required in subparagraph (d) above, serve upon the Claims Administrator a notice and

statement of reasons indicating the Claimant's grounds for contesting the rejection, along with

any supporting documentation, and requesting a review by the District Court.  If a dispute

concerning a Claim cannot be otherwise resolved, Structured Products Class Counsel shall

present the request for review to the District Court.

f.      The administrative determinations of the Claims Administrator accepting

and rejecting Claims shall be presented to the District Court, on notice to Settling Defendant's

32

Counsel, for approval by the District Court in the Class Distribution Order.

27.    Each Claimant shall be deemed to have submitted to the jurisdiction of the District Court with respect to the Claimant's Claim, including, but not limited to, the releases provided for in the Judgment, and the Claim will be subject to investigation and discovery by Structured Products Class Counsel under the Federal Rules of Civil Procedure, provided that such investigation and discovery shall be limited  to that Claimant's status as a Settlement Class Member and the validity and amount of the Claimant's Claim.  No discovery in connection with the processing of Claim Forms shall be allowed on the merits of the Structured Products Claims asserted in this Action or this Settlement.

28.    Structured Products Class Counsel will apply to the District Court, on notice to Settling Defendant's Counsel, for a Class Distribution Order that, *inter alia*: (a) approves the Claims Administrator's administrative determinations concerning the acceptance and rejection of the Claims submitted; and (b) directs payment of the Net Settlement Fund to the Authorized Claimants from the Escrow Account.  Payment and/or distribution of any of the Settlement Amount to Settlement Class Members shall be made only after the Effective Date.

29.    Payment pursuant to the Class Distribution Order shall be final and conclusive against all Settlement Class Members.  All Settlement Class Members whose Claims are not approved by the District Court shall be barred from participating in distributions from the Net Settlement Fund, but otherwise shall be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment to be entered in the Action and the releases provided for therein and herein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any and all Released Parties concerning any and all of the Released Claims.

30.     All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including disputed questions of law and fact with respect to the validity of Claims, shall be subject to the jurisdiction of the District Court.

## REQUESTS FOR EXCLUSION

31.     Persons or entities that bought or acquired Structured Products but wish to request exclusion from the Settlement Class shall be required to provide the following information to the Claims Administrator, in addition to any other information specified in the Notice: (i) name; (ii) address; (iii) telephone number; (iv) amount and type of Structured Products purchased, acquired and sold, and (v) a statement that the person or entity wishes to be excluded from the Settlement Class.  Unless otherwise ordered by the District Court, any person who purchased Structured Products and does not submit a timely request for exclusion as provided by this section shall be bound by this Stipulation.  The deadline for submitting requests for exclusion shall be the date set forth in the Preliminary Order.

32.     The Claims Administrator shall scan and send electronically copies of all requests for exclusion to Settling Defendant's Counsel and to Structured Products Class Counsel expeditiously (and not more than three (3) business days) after the Claims Administrator receives the request.  As part of the reply papers in support of the Settlement, Structured Products Class Counsel will provide a list of all persons and entities that have requested exclusion from the Settlement Class, and will certify that all requests for exclusion received by the Claims Administrator have been copied and provided to Settling Defendant's Counsel.

## THE JUDGMENT

33.     If the Settlement contemplated by this Stipulation is approved by the District

34

Court, Structured Products Class Counsel and Settling Defendant's Counsel shall request that the District Court enter a Judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, substantially in the form of Exhibit C attached hereto.

## CONDITIONS TO THE SETTLEMENT

34.    The Effective Date of this Stipulation shall not occur unless and until each of the following events occurs and shall be the date upon which the last (in time) of the following events occurs:

a.    The Settling Parties have not exercised their respective rights to terminate the Settlement as provided in Paragraphs 35-37 below, and the time to exercise those rights has expired;

b.    The Court has entered the Preliminary Order proposed to the Court (as attached hereto as Exhibit B) by the Settling Parties or an order containing materially the same terms;

c.    The Court has preliminarily approved the Notice in the form proposed to the Court (as attached hereto as Exhibit B-2) by the Settling Parties or a notice containing materially the same terms;

d.    The Settlement Fund has been funded pursuant to timely authorization by Settling Defendant;

e.    The Settlement Fund is not revoked, rescinded or otherwise barred from disbursement to the Settlement Class Members due to any bankruptcy or other proceeding;

f.    The Court has approved the Settlement, following notice to the Settlement Class and the Settlement Hearing, and has entered the Judgment substantially in the form

35

and content proposed to the Court (as attached hereto as Exhibit C) by the Settling

Parties; and

    g.  The Judgment has become Final as defined in Paragraph 1o above.

## **TERMINATION**

  35.  Settling Defendant and Structured Products Class Representatives shall have the

right to terminate the Settlement and this Stipulation by providing written notice of their election

to do so to all other parties to this Stipulation within thirty (30) days of: (a) the District Court

declining to enter the Preliminary Order in any material respect without leave to amend and

resubmit; (b) the District Court's refusal to approve this Stipulation and Settlement or any

material part of it without leave to amend and resubmit; (c) the District Court declining to enter

the Judgment in any material respect without leave to amend and resubmit; or (d) the date upon

which the Judgment is modified or reversed in any material respect by the Court of Appeals or

the Supreme Court.  Structured Products Class Representatives shall have the right to terminate

the Settlement in the event that Settling Defendant does not cause the Settlement Amount to be

deposited into the Escrow Account as provided in Paragraph 8 above.  Settling Defendant shall

have the right to terminate the Settlement in accordance with the terms of the Supplemental

Agreement, described in Paragraph 36 below.  Any decision with respect to an application for

attorneys' fees or Litigation Expenses, or with respect to any Plan of Allocation, shall not be

considered material to this Stipulation and Settlement and shall not be grounds for termination.

  36.  Simultaneously herewith, Structured Products Class Counsel and Settling

Defendant's Counsel are executing a "Supplemental Agreement."  Unless otherwise directed by

the Court or unless and until a dispute as between Structured Products Class Representatives and

Settling Defendant concerning its interpretation or application arises, the Supplemental

36

Agreement will not be filed with the Court. Settling Defendant may, in accordance with the terms set forth in the Supplemental Agreement, and within the time set forth in the Supplemental Agreement, elect in writing to terminate the Settlement and this Stipulation if certain conditions are met (the "Opt-Out Threshold") and Structured Products Class Counsel and Settling Defendant's Counsel are unable to cure this condition in accordance with the terms of the Supplemental Agreement. If required by the Court, the Supplemental Agreement and/or any of its terms may be disclosed to the Court for purposes of approval of the Settlement, but such disclosure shall be carried out to the fullest extent possible in accordance with the practices of the Court so as to preserve the confidentiality of the Supplemental Agreement and in particular the Opt-Out Threshold. In the event of a termination of this Settlement pursuant to the Supplemental Agreement, this Stipulation and Settlement shall only be enforceable as to the provisions of Paragraphs 37 and 38.

37.     Except as otherwise provided herein, in the event the Settlement is terminated or fails to become effective for any reason, the Settlement termination shall be without prejudice, none of the terms shall be effective or enforceable, the facts of the Settlement shall not be admissible for any purpose, the parties to this Stipulation shall be deemed to have reverted *nunc pro tunc* to their respective status in the Action as of June 7, 2013, and, except as otherwise expressly provided, the Settling Parties shall proceed in all respects as if this Stipulation and any related orders had not been entered, and any portion of the Settlement Amount previously paid by or on behalf of Settling Defendant, including, but not limited to, any funds disbursed in payment of Litigation Expenses and attorneys' fees, together with any interest earned or appreciation thereon, less any Taxes paid or due with respect to such income, and less Notice and Administration Costs actually and reasonably incurred and paid or payable consistent with the

provisions of Paragraph 15 above, shall be returned to Settling Defendant within fifteen (15) business days after written notification of such event by Settling Defendant's Counsel and Structured Products Class Counsel to the Escrow Agent.

## <u>NO ADMISSION OF WRONGDOING</u>

38.    This Stipulation, whether or not consummated, and any proceedings taken pursuant to it, including exhibits, all negotiations, discussions, drafts and proceedings in connection with the Settlement, and any act performed or document signed in connection with the Settlement:

a.    shall not be offered or admitted against any of the Released Parties as evidence of, or construed as or deemed to be evidence of, any presumption, concession or admission by any of the Released Parties with respect to the truth of any fact alleged by Structured Products Class Representatives or the validity of any claim that was or could have been asserted against any of the Released Parties in this Action or in any litigation, or of any liability, negligence, fault or wrongdoing of any of the Released Parties;

b.    shall not be offered or admitted against any of the Released Parties as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any of the Released Parties or associated with any Structured Products sold or underwritten by the Released Parties, or against any of the Structured Products Class Representatives or any other Settlement Class Members as evidence of any infirmity in the claims of the Structured Products Class Representatives or the other Settlement Class Members;

c.    shall not be offered or admitted against any of the Released Parties as evidence of, or construed as or deemed to be evidence of, any presumption, concession or

38

admission by any of the Released Parties that any of the Court's prior decisions in the Action,

including without limitation the Motion to Dismiss Order and the Class Certification Order,

were correct or free of error, or as a waiver of any of the arguments or defenses set forth in the

Recitals;

        d.      shall not be offered or admitted against any of the Released Parties or

against any of the Structured Products Class Representatives or any other Settlement Class

Members as evidence of a presumption, concession or admission with respect to any liability,

negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of

the Released Parties, or against any of the Structured Products Class Representatives or any

other Settlement Class Members, in any other civil, criminal or administrative action, arbitration

or proceeding, other than such proceedings as may be necessary to effectuate the provisions of

this Stipulation; provided, however, that if this Stipulation is approved by the District Court,

Settling Defendant, any Released Party, Structured Products Class Representatives, and any

other Settlement Class Member may file this Stipulation and/or the Judgment in any action for

any purpose, including, but not limited to, in order to support a defense or counterclaim based

on principles of *res judicata*, collateral estoppel, release and discharge, good faith settlement,

judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar

defense or counterclaim;

        e.      shall not be construed against any Released Parties, any Structured

Products Class Representative or any other Settlement Class Member as an admission,

concession or presumption that the consideration to be given hereunder represents the amount

that could be or would have been recovered after trial; and

        f.      shall not be construed as or admitted in evidence as an admission,

concession or presumption against any Structured Products Class Representative or any other Settlement Class Member that any of their claims are without merit or that damages recoverable under the Complaint would not have exceeded the Settlement Amount.

## MISCELLANEOUS PROVISIONS

39.     The exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.

40.     This Settlement is not contingent on any of the Settling Parties settling with any other party in this or in any other ongoing litigation.

41.     Settling Defendant warrants that, as to the payments made by or on behalf of it, at the time of such payment that Settling Defendant made or caused to be made pursuant to Paragraph 8 above, Settling Defendant was not insolvent, nor will the payment required to be made by or on behalf of Settling Defendant render it insolvent, within the meaning of and/or for the purposes of the United States Bankruptcy Code, including sections 101 and 547 thereof. This representation is made by Settling Defendant and not by its counsel.  In the event one or more other entities are contributing to the Settlement Amount on behalf of Settling Defendant, the foregoing representations are made by such other entities.

42.     If a case is commenced with respect to Settling Defendant or any other person or entity contributing funds to the Settlement Fund on behalf of Settling Defendant under Title 11 of the United States Code (Bankruptcy), or a trustee, receiver, conservator, or other fiduciary is appointed under any similar law with respect to any of them, and in the event of the entry of a final order of a court of competent jurisdiction determining the transfer of money to the Settlement Fund or any portion thereof by or on behalf of Settling Defendant to be a preference, voidable transfer, fraudulent transfer or similar transaction and any portion thereof is required to

be returned, and such amount is not promptly deposited to the Settlement Fund by others, then, at the election of Structured Products Class Counsel on behalf of Structured Products Class Representatives, the Settling Parties shall jointly move the District Court to vacate and set aside the releases given and the Judgment entered pursuant to this Stipulation, which releases and Judgment shall be null and void, and the Settling Parties shall be restored to their respective positions in the litigation as of June 7, 2013, and any cash amounts in the Settlement Fund, as well as any attorneys' fees or Litigation Expenses paid to Structured Products Plaintiffs' Counsel, shall be returned as provided in Paragraph 37 above; however, the provisions in this paragraph requiring return of funds shall expire and terminate upon the Judgment becoming Final.

43.     The parties to this Stipulation intend the Settlement to be a final and complete resolution of all disputes that were asserted or could have been asserted by Structured Products Class Representatives or any other Settlement Class Member against the Released Parties with respect to all Released Claims.  Accordingly, Structured Products Class Representatives and Settling Defendant agree not to assert in any forum that the Structured Products Claims asserted in this Action were brought by Structured Products Class Representatives, or any other plaintiff in the actions consolidated in the Action, or were defended by Settling Defendant in bad faith or without a reasonable basis.  The parties hereto shall assert no claims of any violation of Rule 11 of the Federal Rules of Civil Procedure relating to the prosecution, defense and settlement of the Structured Products Claims asserted in this Action.  The parties to this Stipulation agree that the amount paid and the other terms of the Settlement were negotiated at arm's-length in good faith by the Settling Parties, including two separate mediations conducted under the auspices of a professional mediator, and reflect a settlement that was reached voluntarily after consultation

with experienced legal counsel.

44.     This Stipulation may not be modified or amended, nor may any of its provisions be waived, except in writing signed by all signatories hereto or their successors-in-interest.

45.     The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

46.     The administration and consummation of the Settlement as embodied in this Stipulation shall be under the authority of the District Court, and the District Court shall retain exclusive jurisdiction over the Action and this Settlement, including for the purpose of entering orders providing for awards of attorneys' fees and Litigation Expenses to Structured Products Plaintiffs' Counsel and enforcing the terms of this Stipulation.

47.     The waiver by a party of any breach of this Stipulation by the other party shall not be deemed a waiver of any other prior or subsequent breach of this Stipulation.

48.     This Stipulation and its exhibits, and the Supplemental Agreement, constitute the entire agreement among the parties hereto concerning this Settlement, and supersede all prior understandings, communications, and agreements with respect to the subject of the Settlement. No representations, warranties or inducements have been made by any party hereto concerning this Stipulation, its exhibits and the Supplemental Agreement other than those contained and memorialized in such documents.

49.     This Stipulation may be executed in one or more original, e-mail and/or faxed counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument.

50.     This Stipulation shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

51.     The construction, interpretation, operation, effect and validity of this Stipulation, and all documents necessary to effectuate it, shall be governed by the laws of the State of New York without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

52.     This Stipulation shall not be construed more strictly against one party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the parties, it being recognized that it is the result of arm's-length negotiations between the parties, and all parties have contributed substantially and materially to the preparation of this Stipulation.

53.     All counsel and any other persons executing this Stipulation and any of the exhibits hereto, or any related Settlement documents, warrant and represent that they have full authority to do so and that they have the authority to take appropriate action required or permitted to be taken pursuant to this Stipulation to effectuate its terms.  The Settling Parties represent and warrant that they have had the opportunity to consult with counsel before entering into this Stipulation.

54.      Structured Products Class Representatives represent and warrant that they have not assigned, transferred, or otherwise disposed of the claims that are the subject of this Stipulation.

55.     Except as provided in paragraphs 35 – 37 above and in the Supplemental Agreement, Structured Products Class Counsel and Settling Defendant's Counsel agree to cooperate fully with one another in seeking District Court approval of the Preliminary Order, this Stipulation and the Settlement, and to promptly agree upon and execute all such other documents as may be reasonably required to obtain final approval of the Settlement by the District Court.

43

56.    If any party is required to give notice to the other parties under this Stipulation, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, e-mail, or facsimile transmission with confirmation of receipt.  Notice shall be provided to counsel as indicated on the signature block below.

DATED:  August 8, 2013

**GIRARD GIBBS LLP**

By: _____
       Daniel C. Girard

Jonathan K. Levine
Amanda M. Steiner
John A. Kehoe
Dena C. Sharp
601 California Street, Suite 1400
San Francisco, CA  94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Structured Products Class Counsel*

**GIBSON, DUNN & CRUTCHER LLP**

By: _____
       Jonathan C. Dickey

Marshall R. King
Oliver M. Olanoff
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
*Attorneys for Defendant UBS Financial Services Inc.*

44

Case 420-jmp-0 Doc 7207-3   Filed 09/03/13   Entered 09/03/13 15:09:50   Exhibit 3
Pg 280 of 357

# EXHIBIT A

## EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 01 | March 30, 2007 | 52520W564 524908VP2 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 02 | March 30, 2007 | 52520W556 524908VQ0 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 03 | April 30, 2007 | 52517PY21 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 04 | April 30, 2007 | 52517PX63 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 05 | April 30, 2007 | 52520W549 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 06 | April 30, 2007 | 52520W515 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 07 | May 31, 2007 | 52517PY62 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 08 | May 31, 2007 | 52517PY70 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate | $1,000.00 | $133.38 |

[1] Because reliable pricing data was not available for any of the Structured Products after Lehman's bankruptcy on September 15, 2008, the average closing prices for five other Lehman senior unsecured notes (CUSIP Nos. 52517P4C2, 52517P5X5, 52517P5Y3, 5252M0BZ9 and 5252M0FD4), for which reliable pricing data was available, was used to estimate value per note of the Structured Products as of October 31, 2008. October 31, 2008 is the date on which the first lawsuit asserting claims on behalf of investors in the Structured Products was filed.

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 09 | May 31, 2007 | 52520W440 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 10 | June 22, 2007 | 52522L202 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 11 | June 29, 2007 | 52517P2P5 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 12 | June 29, 2007 | 52520W390 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 13 | July 31, 2007 | 52517P3H2 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 14 | July 31, 2007 | 52520W358 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 15 | August 31, 2007 | 52522L129 | Performance Securities with Contingent Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 16 | August 31, 2007 | 52522L137 | Performance Securities with Contingent Protection Linked to the Dow Jones EURO STOXX 50 Index | $10.00 | $1.33 |
| 17 | August 31, 2007 | 52522L145 | Performance Securities with Contingent Protection Linked to the Nikkei 225 Index | $10.00 | $1.33 |
| 18 | August 31, 2007 | 52522L186 | 100% Principal Protection Notes Linked to an International Index Basket | $10.00 | $1.33 |
| 19 | August 31, 2007 | 52522L889 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |

2

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 20 | September 18, 2007 | 52522L251 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 21 | September 28, 2007 | 52522L236 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 22 | September 28, 2007 | 52522L244 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 23 | September 28, 2007 | 52517P5K3 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 24 | October 31, 2007 | 52520W341 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 25 | October 31, 2007 | 52522L400 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index | $10.00 | $1.33 |
| 26 | October 31, 2007 | 52522L293 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 27 | October 31, 2007 | 52522L301 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 28 | October 31, 2007 | 52522L319 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 29 | October 31, 2007 | 52522L327 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 30 | October 31, 2007 | 52522L335 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 31 | October 31, 2007 | 52522L384 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 32 | November 7, 2007 | 52522L418 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 33 | November 14, 2007 | 52522L426 | Performance Securities with Partial Protection Linked to an International Index Basket | $10.00 | $1.33 |
| 34 | November 26, 2007 | 52522L475 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 35 | November 30, 2007 | 52520W333 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 36 | November 30, 2007 | 52522L376 | 100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index | $10.00 | $1.33 |
| 37 | November 30, 2007 | 52522L392 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 38 | November 30, 2007 | 52522L459 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 39 | December 31, 2007 | 52522L483 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 40 | December 31, 2007 | 52522L491 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 41 | December 31, 2007 | 52522L533 | Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund | $10.00 | $1.33 |

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 42 | January 31, 2008 | 52517P4N8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 43 | January 31, 2008 | 52520W325 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 44 | January 31, 2008 | 52522L525 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 45 | February 8, 2008 | 52522L657 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 46 | February 13, 2008 | 52522L673 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 47 | February 13, 2008 | 52522L699 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 48 | February 13, 2008 | 52522L707 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 49 | February 13, 2008 | 52522L715 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 50 | February 13, 2008 | 52522L723 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 51 | February 29, 2008 | 5252M0CZ8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 52 | February 29, 2008 | 52522L632 | Performance Securities Linked to an Asian Currency Basket | $10.00 | $1.33 |

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 53 | February 29, 2008 | 52522L574 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 54 | February 29, 2008 | 52522L582 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 55 | February 29, 2008 | 52522L566 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 56 | February 29, 2008 | 52522L772 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR Fund vs. the Consumer Discretionary Select Sector SPDR Fund | $10.00 | $1.33 |
| 57 | February 29, 2008 | 52523J412 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 58 | March 7, 2008 | 52523J420 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 59 | March 19, 2008 | 52523J115 | 100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR S&P Homebuilders ETF | $10.00 | $1.33 |
| 60 | March 25, 2008 | 52523J149 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 61 | March 28, 2008 | 52523J131 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 62 | March 31, 2008 | 5252M0EK9 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |

6

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 63 | March 31, 2008 | 52523J438 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 64 | March 31, 2008 | 52522L806 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 65 | March 31, 2008 | 52522L814 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index | $10.00 | $1.33 |
| 66 | March 31, 2008 | 52522L871 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 67 | March 31, 2008 | 5252M0EV5 | 100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 68 | March 31, 2008 | 52522L798 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 69 | April 4, 2008 | 52522L848 | Return Optimization Securities Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 70 | April 4, 2008 | 52522L830 | 100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 71 | April 23, 2008 | 52523J172 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 72 | April 30, 2008 | 52523J156 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 73 | May 12, 2008 | 52523J503 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

7

## EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 74 | May 15, 2008 | 52523J206 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 75 | May 16, 2008 | 52523J222 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks | $10.00 | $1.33 |
| 76 | May 21, 2008 | 52523J214 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 77 | May 30, 2008 | 52523J230 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 78 | June 16, 2008 | 52520W283 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate | $10.00 | $1.33 |
| 79 | June 20, 2008 | 5252M0FU6 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 80 | June 30, 2008 | 5252M0CD7 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 81 | June 30, 2008 | 52523J263 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio | $10.00 | $1.33 |
| 82 | June 30, 2008 | 524935129 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

8

**EXHIBIT A**

**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 83 | June 30, 2008 | 52523J248 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |
| 84 | June 30, 2008 | 52523J255 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |

9

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

      In re Lehman Brothers Equity/Debt
      Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

## [PROPOSED] ORDER CONCERNING PROPOSED SETTLEMENT
## <u>WITH UBS FINANCIAL SERVICES, INC.</u>

WHEREAS, the Structured Products Class Representatives and Defendant UBS Financial Services Inc. ("UBSFS") entered into a Stipulation of Settlement and Release on August 8, 2013 (the "Stipulation" or "Settlement"), setting forth the terms and conditions of their proposed settlement and the dismissal of the Action against UBSFS with prejudice upon the terms and conditions set forth in the Stipulation;

    WHEREAS, the Structured Products Class Representatives have moved the Court for entry of a preliminary order concerning the proposed Settlement pursuant to Federal Rule of Civil Procedure 23;

WHEREAS, UBSFS does not oppose this request;

WHEREAS, the Court is familiar with and has reviewed the record and has reviewed the Stipulation, including the exhibits attached to the Stipulation, and found good cause for entering the following Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      For purposes of this Order, the Court adopts all defined terms as set forth in the Stipulation.

## CLASS CERTIFICATION

2.      The Court finds, upon a preliminary evaluation and for purposes of the Settlement only, that the requirements of Federal Rules of Civil Procedure 23(a) and (b)(3) have been met. The Court preliminarily certifies the following class for purposes of the Settlement only:  all persons and entities that bought or otherwise acquired any of the Structured Products set forth in Exhibit B-1 and who were damaged thereby (the "Settlement Class").  Excluded from the Settlement Class are (i) Defendants; (ii) current and former executive officers and directors of each Defendant, and the members of their immediate families; (iii) the members of Defendants' immediate families; (iv) any entity in which a Defendant owns a majority interest, provided, however, that the Settlement Class shall include any investment company or pooled investment fund, including without limitation mutual fund families, exchange-traded funds, fund of funds and hedge funds, in which any Defendant has or may have a direct or indirect interest, or as to which it or its affiliates may act as an investment advisor but in which the Defendant or any of its affiliates is not a majority owner or does not hold a majority beneficial interest; (v) Lehman; (vi) any person or entity that has (a) litigated claims in any forum against UBSFS arising out of the purchase of Structured Products and received a judgment, or (b) settled and released claims against UBSFS arising out of the purchase of Structured Products (as identified on a confidential Exhibit which shall be produced by UBSFS on a confidential basis to the Claims Administrator, but shall not be provided to the Structured Products Class Representatives or to Structured Products Plaintiffs' Counsel or to any other person or entity); and (vii) the legal representatives,

2

heirs, successors or assigns of any excluded party. Also excluded from the Settlement Class are any persons or entities that exclude themselves by filing a timely request for exclusion in accordance with the requirements set forth in the Notice.

3. The Court preliminarily finds, for purposes of the Settlement only, that the prerequisites of Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied for the Settlement Class in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Structured Products Class Representatives are typical of the claims of the Settlement Class; (d) the Structured Products Class Representatives and Structured Products Class Counsel will fairly and adequately represent the interests of the Settlement Class; (e) the questions of law and fact common to the Settlement Class predominate over any questions affecting only individual members of the Settlement Class; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4. The Court preliminarily appoints the following Structured Products Class Representatives for the Settlement Class: Mohan Ananda, Richard Barrett, Ed Davis, Neel Duncan, Rick Fleischman, Nick Fotinos, Gastroenterology Associates, Ltd. Profit Sharing Plan and Trust FBO Charles M. Brooks, MD, Stephen Gott, Karim Kano, David Kotz, Barbara Moskowitz, Ronald Profili, Joseph Rottman, Shea-Edwards Limited Partnership, Juan Tolosa, Grace Wang and Miriam Wolf.

5. The Court also preliminarily appoints Structured Products Class Counsel as counsel for the Settlement Class pursuant to Federal Rule of Civil Procedure 23(g).

## MAILING AND PUBLICATION NOTICE

6.      The Court authorizes Structured Products Class Counsel to retain, and the Court hereby appoints, A.B. Data, Ltd. as the Claims Administrator to supervise and administer the notice procedures, as well as the processing of claims as more fully set forth below:

a.      No later than 21 calendar days after entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and Claim Form (attached as Exhibits B-2 and B-3, respectively) (collectively, the "Notice Packet") to be mailed by first-class mail, postage prepaid, to those members of the Settlement Class who may be identified through reasonable effort, including those identified in the records of Lehman or UBSFS, or their transfer agent(s), as provided to the Claims Administrator;

b.      A summary notice (the "Summary Notice"), attached as Exhibit B-4, shall be published once in the national edition of *The Wall Street Journal* and *Investor's Business Daily* no later than 10 business days after the Notice Date; and

c.      The Notice, the Summary Notice and the Claim Form shall also be placed on the Claims Administrator's website, or a website created for the settlements obtained in this Action, on or before the Notice Date.

7.      The Court approves the form of the Notice and Summary Notice (together, the "Notices") and the Claim Form, and finds that the procedures established for publication, mailing and distribution of the Notices substantially in the manner and form set forth in Paragraph 6 of this Order meet the requirements of Federal Rule of Civil Procedure 23, Section 27(a)(7) of the Securities Act of 1933, 15 U.S.C. § 77z-1(a)(7), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and the Constitution of the United States, and constitute the best notice practicable under the circumstances.

4

8.      Settling Defendant shall provide information reasonably available to it that will assist in the identification of potential Settlement Class Members for the purpose of sending notifications of the Settlement within ten (10) business days of the entry of this Order, at no expense to the Settlement Class, Structured Products Class Counsel, or the Settlement Fund.

9.      No later than 35 calendar days prior to the Settlement Hearing (as defined below), Structured Products Class Counsel shall cause to be filed with the Court affidavits or declarations showing that the mailing of the Notice Packet and publication of the Summary Notice have been made in accordance with this Order.

## NOMINEE PROCEDURES

10.      Nominees who purchased Structured Products for beneficial owners who are Settlement Class Members are directed to, within fourteen (14) calendar days of receipt of the Notice Packet:  (a) request additional copies of the Notice Packet from the Claims Administrator for such beneficial owners; or (b) send a list of the names and addresses of such beneficial owners to the Claims Administrator.  If a nominee elects to send the Notice Packet to beneficial owners, such nominee is directed to mail the Notice Packet within fourteen (14) calendar days of receipt from the Claims Administrator, and upon such mailing, the nominee shall send a statement to the Claims Administrator confirming that the mailing was made as directed, and the nominee shall retain the list of names and addresses for use in connection with any possible future notice to the Settlement Class.  Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought and reflecting compliance with these instructions, including timely mailing of the Notice Packet, if the nominee elected or elects to do so.  Such properly

5

documented expenses incurred by nominees in compliance with the terms of this Order shall be paid from the Settlement Fund.

<b><u>THE SETTLEMENT HEARING</u></b>

11.     The Court will hold a settlement hearing (the "Settlement Hearing") on _____, 2013, at _____ __.m., in the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, Courtroom 21B, for the following purpose:  (i) to finally determine whether the Settlement Class satisfies the applicable prerequisites for class action treatment under Rules 23(a) and 23(b)(3); (ii) to determine whether the Settlement should be approved as fair, reasonable, adequate and in the best interests of the Settlement Class; (iii) to determine whether a Judgment substantially in the form attached as Exhibit C to the Stipulation should be entered dismissing and releasing the Structured Products Claims with prejudice; (iv) to rule upon the Plan of Allocation; (v) to rule upon Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses; and (vi) to consider any other matters that may properly be brought before the Court in connection with the Settlement.

12.     The Court reserves the right to (a) adjourn or continue the Settlement Hearing without further notice to Settlement Class Members and (b) approve the Stipulation with modification and without further notice to Settlement Class Members.

13.     The Released Parties shall have no responsibility or liability with respect to the Plan of Allocation or Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses.  The Plan of Allocation and Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses will be considered separately from the fairness, reasonableness and adequacy of the

6

Settlement. At or after the Settlement Hearing, the Court will determine whether the proposed

Plan of Allocation should be approved, and the amount of attorneys' fees and Litigation

Expenses to be awarded to Structured Products Class Counsel. Any appeal from any orders

relating solely to the Plan of Allocation or solely to Structured Products Class Counsel's

application for an award of attorneys' fees and Litigation Expenses, or any reversal or

modification thereof, shall not operate to terminate or cancel the Settlement, or affect or delay

the finality of the Judgment approving the Stipulation and the Settlement.

14.    If the Settlement is approved, all Settlement Class Members will be bound by the

proposed Settlement provided for in the Stipulation, and by any judgment or determination of the

Court affecting Settlement Class Members, regardless of whether or not a Settlement Class

Member submits a Claim Form. All Settlement Class Members shall be bound by all

determinations and judgments in the Action concerning the Settlement, whether favorable or

unfavorable to the Settlement Class.

15.    Papers in support of the Settlement, the Plan of Allocation and Structured

Products Class Counsel's application for attorneys' fees and reimbursement of Litigation

Expenses shall be filed no later than 35 calendar days prior to the Settlement Hearing. Papers in

opposition shall be filed in accordance with paragraph 16 below. Reply papers shall be filed no

later than 7 calendar days prior to the Settlement Hearing.

## OBJECTIONS AND APPEARANCE AT THE SETTLEMENT HEARING

16.    Any member of the Settlement Class may appear at the Settlement Hearing and

show cause why the proposed Settlement should or should not be approved as fair, reasonable,

adequate and in the best interests of the Settlement Class, or why the Judgment should or should

not be entered, or to present opposition to the Plan of Allocation or to the application of

7

Structured Products Class Counsel for attorneys' fees and reimbursement of Litigation Expenses. No Settlement Class Member or any other person shall be heard or entitled to contest the approval of the terms and conditions of the Settlement, or, if approved, the Judgment to be entered approving the Settlement, or the terms of the Plan of Allocation or the application by Structured Products Class Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses, unless that Settlement Class Member or person (i) filed objections, papers and briefs with the Clerk of the United States District Court for the Southern District of New York no later than 21 calendar days prior to the Settlement Hearing; and (ii) has served written objections, by hand or first-class mail, including the basis for the objection(s), as well as copies of any papers and briefs in support of his, her or its position upon each of the following counsel for receipt no later than 21 calendar days prior to the Settlement Hearing: Daniel C. Girard, Girard Gibbs LLP, 601 California Street, Suite 1400, San Francisco, CA 94108 on behalf of the Structured Products Class Representatives; and Jonathan C. Dickey and Marshall R. King, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193 on behalf of the Settling Defendant.

17.     Any objection must include: (a) the full name (and the name of the purchasing entity if it is different), address, and telephone number of the objecting Settlement Class Member; (b) information concerning all of the Settlement Class Member's transactions involving Structured Products, including CUSIP numbers of the Structured Product(s), brokerage confirmation receipts or other competent documentary evidence of such transactions, the amount and date of each purchase, acquisition or sale, and the price paid and/or received; (c) a written statement of all grounds for the objection accompanied by any legal support for the objection; (d) copies of any papers, briefs or other documents upon which the objection is based; (e) a list of all

persons who will be called to testify in support of the objection; (f) a statement of whether the objector intends to appear at the Settlement Hearing; (g) a list of all other cases in which the objector or the objector's counsel has appeared either as a settlement objector or as counsel for objectors in the past five years; and (h) the objector's signature, even if represented by counsel. If the objector intends to appear at the Settlement Hearing through counsel, the objection must also state the identity of all attorneys who will appear on the objector's behalf at the Settlement Hearing.

18.     Any Settlement Class Member who does not make his, her or its objection in the manner provided for herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, reasonableness or adequacy of the Settlement, to the Plan of Allocation or to the application by Structured Products Class Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses.  By objecting, or otherwise requesting to be heard at the Settlement Hearing, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to the objection or request to be heard and the subject matter of the Settlement, including but not limited to enforcement of the terms of the Settlement.

19.     Any Settlement Class Member may enter an appearance in the Action, at his, her or its own expense, individually or through counsel of his, her or its own choice.  If a Settlement Class Member does not enter an appearance, he, she or it will be represented by Structured Products Class Counsel.

## CLAIMS PROCESS

20.     In order to be entitled to participate in the Settlement, a Settlement Class Member must complete and submit a Claim Form in accordance with the instructions contained therein.

9

To be valid and accepted, Claim Forms submitted in connection with the Settlement must be postmarked or submitted electronically no later than 120 calendar days after the Notice Date.

21.    Any Settlement Class Member who does not timely submit a valid Claim Form shall not be eligible to share in the Settlement Fund, unless otherwise ordered by the Court, but will otherwise be bound by all of the terms of the Stipulation, including the terms of the Judgment to be entered in the Action and the releases provided for therein.

## REQUEST FOR EXCLUSION FROM THE SETTLEMENT CLASS

22.    Any requests for exclusion must be postmarked no later than 21 calendar days prior to the Settlement Hearing.  Any person who would otherwise be a member of the Settlement Class who wishes to be excluded from the Settlement Class must provide his, her or its (i) name (and the name of the purchasing entity if it is different), (ii) address, (iii) telephone number and if applicable email address(es), (iv) the CUSIP numbers and amount of Structured Product(s) bought or acquired, and the date of each purchase or acquisition; (v) the CUSIP numbers and amount of Structured Product(s) sold, if any, and the date of each sale; and (vi) a statement that the person or entity wishes to be excluded from the Settlement Class.  Such statement must be signed by the person or entity requesting exclusion.  All persons or entities that submit valid and timely requests for exclusion in the manner set forth in this paragraph shall have no rights under the Stipulation, shall not share in the distribution of the Net Settlement Fund, and shall not be bound by the Stipulation or any orders of the Court, or any final judgment.

23.    Any person who would otherwise be a member of the Settlement Class who does not request exclusion from the Settlement Class in the manner stated in this Order shall be deemed to have waived his, her or its right to be excluded from the Settlement Class, and shall forever be barred from requesting exclusion from the Settlement Class in this or any other

10

proceeding, and shall be bound by the Settlement and the Judgment, including, but not limited to, the release of the Released Claims against the Released Parties provided for in the Stipulation and the Judgment, if the Court approves the Settlement.

## THE SETTLEMENT FUND, NOTICE AND ADMINISTRATION COSTS

24. Only Settlement Class Members and Structured Products Plaintiffs' Counsel shall have any right to any portion of, or any rights in the distribution of, the Settlement Fund, unless otherwise ordered by the Court or otherwise provided in the Stipulation.

25. The Settlement Fund shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed pursuant to the Stipulation and/or further order of the Court.

26. As set forth in the Stipulation, notwithstanding the fact that the Effective Date has not yet occurred, Structured Products Class Counsel may pay from the Settlement Fund, without further approval from the Settling Defendant, but subject to the prior approval of this Court, all reasonable Notice and Administration Costs actually incurred. In the event that the Settlement is terminated pursuant to the terms of the Stipulation, all Notice and Administration Costs reasonably paid or reasonably incurred shall not be returned or repaid to the Settling Defendant, any Released Parties or any person or entity who or that contributed any portion of the Settlement Amount.

## THE USE OF THIS ORDER

27. As set forth in the Stipulation, the fact and terms of this Order and the Settlement, all negotiations, discussions, drafts and proceedings in connection with this Order and the Settlement, and any act performed or document signed in connection with this Order and the Settlement, shall not, in this or any other Court, administrative agency, arbitration forum or other

11

tribunal, constitute an admission, or evidence, or be deemed to create any inference (i) of any

acts of wrongdoing or lack of wrongdoing, (ii) of any liability on the part of the Settling

Defendant to the Structured Products Class Representatives, the Settlement Class or anyone else,

(iii) of any deficiency of any claim or defense that has been or could have been asserted in this

Action, (iv) of any damages or lack of damages suffered by the Structured Products Class

Representatives, the Settlement Class or anyone else, or (v) that the Settlement Amount (or any

other amount) represents the amount that could or would have been recovered in this Action

against the Settling Defendant if it was not settled at this point in time.  The fact and terms of this

Order and the Settlement, all negotiations, discussions, drafts and proceedings in connection with

this Order and the Settlement, including, but not limited to, the Judgment and the release of the

Released Claims provided for in the Stipulation and the Judgment, shall not be offered or

received in evidence or used for any other purpose in this or any other proceeding in any court,

administrative agency, arbitration forum or other tribunal, except as necessary to enforce the

terms of this Order and/or the Settlement.

## **TERMINATION OF THE SETTLEMENT**

28.     In the event that the Settlement fails to become effective in accordance with its

terms, or if the Judgment is not entered or is reversed, vacated or materially modified on appeal

(and, in the event of material modification, if any party elects to terminate the Settlement), this

Order (except Paragraphs 26 and 27) shall be null and void, the Stipulation shall be deemed

terminated (excepts for any paragraphs that, pursuant to the terms of the Stipulation, survive

termination of the Stipulation), and the Settling Parties shall return to their positions without

prejudice in any way, as provided for in the Stipulation.

29.     The Court retains exclusive jurisdiction over the Action to consider all further
matters arising out of or connected with the Settlement.


Dated: _____, 2013

                        _____

                        The Honorable Lewis A. Kaplan
                        United States District Judge

08-13555-mg-0   Doc 7207-3   Filed 08/09/13   Entered 08/09/13 18:49:50   Page Exhibit 23
Pg 50 of 156

# EXHIBIT B-1

**EXHIBIT B-1**

**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 01 | March 30, 2007 | 52520W564 524908VP2 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 02 | March 30, 2007 | 52520W556 524908VQ0 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 03 | April 30, 2007 | 52517PY21 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 04 | April 30, 2007 | 52517PX63 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 05 | April 30, 2007 | 52520W549 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 06 | April 30, 2007 | 52520W515 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 07 | May 31, 2007 | 52517PY62 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 08 | May 31, 2007 | 52517PY70 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate | $1,000.00 | $133.38 |

[1] Because reliable pricing data was not available for any of the Structured Products after Lehman's bankruptcy on September 15, 2008, the average closing prices for five other Lehman senior unsecured notes (CUSIP Nos. 52517P4C2, 52517P5X5, 52517P5Y3, 5252M0BZ9 and 5252M0FD4), for which reliable pricing data was available, was used to estimate value per note of the Structured Products as of October 31, 2008.  October 31, 2008 is the date on which the first lawsuit asserting claims on behalf of investors in the Structured Products was filed.

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 09 | May 31, 2007 | 52520W440 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 10 | June 22, 2007 | 52522L202 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 11 | June 29, 2007 | 52517P2P5 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 12 | June 29, 2007 | 52520W390 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 13 | July 31, 2007 | 52517P3H2 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 14 | July 31, 2007 | 52520W358 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 15 | August 31, 2007 | 52522L129 | Performance Securities with Contingent Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 16 | August 31, 2007 | 52522L137 | Performance Securities with Contingent Protection Linked to the Dow Jones EURO STOXX 50 Index | $10.00 | $1.33 |
| 17 | August 31, 2007 | 52522L145 | Performance Securities with Contingent Protection Linked to the Nikkei 225 Index | $10.00 | $1.33 |
| 18 | August 31, 2007 | 52522L186 | 100% Principal Protection Notes Linked to an International Index Basket | $10.00 | $1.33 |
| 19 | August 31, 2007 | 52522L889 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |

2

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 20 | September 18, 2007 | 52522L251 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 21 | September 28, 2007 | 52522L236 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 22 | September 28, 2007 | 52522L244 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 23 | September 28, 2007 | 52517P5K3 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 24 | October 31, 2007 | 52520W341 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 25 | October 31, 2007 | 52522L400 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index | $10.00 | $1.33 |
| 26 | October 31, 2007 | 52522L293 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 27 | October 31, 2007 | 52522L301 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 28 | October 31, 2007 | 52522L319 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 29 | October 31, 2007 | 52522L327 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 30 | October 31, 2007 | 52522L335 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 31 | October 31, 2007 | 52522L384 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 32 | November 7, 2007 | 52522L418 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 33 | November 14, 2007 | 52522L426 | Performance Securities with Partial Protection Linked to an International Index Basket | $10.00 | $1.33 |
| 34 | November 26, 2007 | 52522L475 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 35 | November 30, 2007 | 52520W333 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 36 | November 30, 2007 | 52522L376 | 100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index | $10.00 | $1.33 |
| 37 | November 30, 2007 | 52522L392 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 38 | November 30, 2007 | 52522L459 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 39 | December 31, 2007 | 52522L483 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 40 | December 31, 2007 | 52522L491 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 41 | December 31, 2007 | 52522L533 | Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund | $10.00 | $1.33 |

4

EXHIBIT B-1

LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 42 | January 31, 2008 | 52517P4N8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 43 | January 31, 2008 | 52520W325 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 44 | January 31, 2008 | 52522L525 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 45 | February 8, 2008 | 52522L657 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 46 | February 13, 2008 | 52522L673 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 47 | February 13, 2008 | 52522L699 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 48 | February 13, 2008 | 52522L707 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 49 | February 13, 2008 | 52522L715 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 50 | February 13, 2008 | 52522L723 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 51 | February 29, 2008 | 5252M0CZ8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 52 | February 29, 2008 | 52522L632 | Performance Securities Linked to an Asian Currency Basket | $10.00 | $1.33 |

5

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 53 | February 29, 2008 | 52522L574 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 54 | February 29, 2008 | 52522L582 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 55 | February 29, 2008 | 52522L566 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 56 | February 29, 2008 | 52522L772 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR Fund vs. the Consumer Discretionary Select Sector SPDR Fund | $10.00 | $1.33 |
| 57 | February 29, 2008 | 52523J412 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 58 | March 7, 2008 | 52523J420 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 59 | March 19, 2008 | 52523J115 | 100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR S&P Homebuilders ETF | $10.00 | $1.33 |
| 60 | March 25, 2008 | 52523J149 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 61 | March 28, 2008 | 52523J131 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 62 | March 31, 2008 | 5252M0EK9 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |

6

**EXHIBIT B-1**

**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 63 | March 31, 2008 | 52523J438 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 64 | March 31, 2008 | 52522L806 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 65 | March 31, 2008 | 52522L814 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index | $10.00 | $1.33 |
| 66 | March 31, 2008 | 52522L871 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 67 | March 31, 2008 | 5252M0EV5 | 100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 68 | March 31, 2008 | 52522L798 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 69 | April 4, 2008 | 52522L848 | Return Optimization Securities Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 70 | April 4, 2008 | 52522L830 | 100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 71 | April 23, 2008 | 52523J172 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 72 | April 30, 2008 | 52523J156 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 73 | May 12, 2008 | 52523J503 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 74 | May 15, 2008 | 52523J206 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 75 | May 16, 2008 | 52523J222 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks | $10.00 | $1.33 |
| 76 | May 21, 2008 | 52523J214 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 77 | May 30, 2008 | 52523J230 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 78 | June 16, 2008 | 52520W283 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate | $10.00 | $1.33 |
| 79 | June 20, 2008 | 5252M0FU6 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 80 | June 30, 2008 | 5252M0CD7 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 81 | June 30, 2008 | 52523J263 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio | $10.00 | $1.33 |
| 82 | June 30, 2008 | 524935129 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

8

**EXHIBIT B-1**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 83 | June 30, 2008 | 52523J248 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |
| 84 | June 30, 2008 | 52523J255 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |

9

Case 420jmp-0Doc7127-o3WFiledCoBO9/13-12Enterodb09/13/13t89:50geEx0ibiHE3
Pg 273 of 357

EXHIBIT B-2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION<br><br>This Document Applies To:<br><br>    In re Lehman Brothers Equity/Debt Securities Litigation, 08-CV-5523-LAK | Case No. 09-MD-2017 (LAK)<br><br>ECF CASE<br><br>Notice of Pendency of Class Action and Proposed Settlement |

**IF YOU BOUGHT OR ACQUIRED THE LEHMAN-ISSUED STRUCTURED PRODUCTS DESCRIBED BELOW, YOU COULD RECEIVE A PAYMENT FROM A CLASS ACTION SETTLEMENT**

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- This class action Settlement involves securities known as structured products that were issued by Lehman Brothers Holdings Inc. and underwritten and sold by UBS Financial Services Inc. ("UBSFS") in 2007 and 2008. Structured products are a kind of security that consists of a fixed income security and a type of derivative, such as a basket of securities, options, commodities, or foreign currencies. Some of the structured products involved in the class action also offered "principal protection." A list of the structured products that are part of this Settlement is attached as Exhibit A to this notice. A full and complete copy of the parties' Stipulation of Settlement ("Stipulation"), along with the proposed Plan of Allocation for distribution of the Net Settlement Fund, can be found at website.com. Capitalized terms used but not defined in this Notice have the meanings defined in the Stipulation.

- A settlement fund of $120,000,000 (before deduction of attorneys' fees and expenses and administrative costs) will be distributed to certain investors who bought or acquired the securities identified on Exhibit A (which are referred to in this Notice as the "Structured Products") during the relevant time period, and who make a "Recognized Claim" under the proposed Plan of Allocation. Plaintiffs estimate that Class Members who purchased or acquired Structured Products with a total face value of approximately $892 million may have suffered damages during the relevant time period. Assuming all Class Members submit valid and timely claims, plaintiffs estimate that the average recovery per damaged Structured Product under the Settlement is $1.34 for Structured Products with a face value of $10.00 and $134.00 for Structured Products with a face value of $1,000.00, before deduction of Court-awarded attorneys' fees and expenses and administrative costs.

- Plaintiffs and UBSFS disagree on damages and do not agree on the average amount of damages per Structured Product that would be recoverable if plaintiffs were to have prevailed at trial. Plaintiffs estimate that if they prevailed at trial, the maximum statutory damages per Structured Product would be, on average, $8.67 for Structured Products with a face value of $10.00 and $867.00 for Structured Products with a face value of $1,000.00, based on the assumption that such damages would be equal to the difference between the par value of such Structured Products and the estimated value of such Structured Products on October 31, 2008, the date that the first lawsuit concerning the Structured Products was filed. These estimates do not take into account any of UBSFS's defenses or rights of offset, including loss causation defenses, which could substantially reduce or eliminate any such statutory damages. UBSFS denies that it is liable to plaintiffs or the class and specifically denies that plaintiffs and the class could recover damages in the range plaintiffs have described in this Notice. UBSFS contends that actual damages, if any, would be a fraction of such statutory damages as calculated by plaintiffs.

- The Settlement resolves a lawsuit in which investors allege that UBSFS sold the Structured Products by means of offering materials that were false and misleading. The litigation also involved inquiry into, among other topics, (i) the procedures by which UBSFS structured, marketed and sold structured products through its financial advisors, including the Lehman-issued Structured Products, (ii) the sales commissions payable to UBSFS and its financial advisors relating to the sale of structured products, (iii) the training and education of UBSFS financial advisors relating to the sale of structured products, (iv) communications between UBSFS financial advisors or consultants and purchasers of Structured Products, (v) whether Class Members had knowledge of facts related to the creditworthiness of Lehman, and (vi) the understanding of UBSFS financial advisors and customers of the principal protection features of Lehman-issued Structured Products. UBSFS denies that it did anything wrong, or that any of the investors' losses were caused by any alleged misrepresentations in the offering materials. The Settlement avoids the costs and risks to you of continuing the lawsuit; provides a recovery to investors who have a Recognized Claim; and releases UBSFS and other "Released Parties" (as defined in the Stipulation) from liability.

- Court-appointed attorneys for the Settlement Class will ask the Court for up to 22 percent of the Settlement Fund (or $26.3 million) as fees for representing the plaintiffs and recovering the Settlement and up to $1,000,000 to reimburse expenses they incurred in the litigation and the costs and expenses incurred by the Structured Products Class Representatives. If awarded, these fees and expenses would amount to an average per damaged Structured Product of approximately $0.30 for Structured Products with a face value of $10.00 and approximately $30.00 for Structured Products with a face value of $1,000.00. These attorneys have undertaken the representation of the class since 2008 on an entirely contingent basis.

- Plaintiffs and UBSFS disagree about whether plaintiffs would have enough evidence to proceed to trial and, if there was a trial, whether the plaintiffs would win. UBSFS believes it would have strong defenses to plaintiffs' claims, and that it would prevail at trial. Both sides recognize that there are risks and uncertainties in further litigating the case, however, and believe that a settlement is in the best interests of the parties.

- Your legal rights are affected whether you act or do not act. Read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way to receive a payment. |
| **EXCLUDE YOURSELF** | Get no payment. This is the only option that allows you to be part of any other timely legal proceeding against UBSFS about the legal claims in this case. |
| **OBJECT OR COMMENT** | Write to the Court about why you do or do not like the Settlement. |
| **GO TO A HEARING** | Ask to speak to the Court about the fairness of the Settlement. |
| **DO NOTHING** | Receive no payment and give up your rights. |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

- The Court has to decide whether to approve the settlement. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** ..................................................................................................................................**PAGE 3**
    1. Why did I receive this Notice?
    2. What is this lawsuit about?
    3. Why is the case a class action?
    4. Why is there a settlement?
    5. I've received notices about this case before. How is this one different?

**WHO IS IN THE SETTLEMENT**........................................................................................................................**PAGE 3**
    6. How do I know if I am part of the Settlement?
    7. Are there exceptions to being included?
    8. I'm still not sure if I am included.

**THE SETTLEMENT BENEFITS—WHAT YOU RECEIVE** ....................................................................**PAGE 4**
    9. What does the Settlement provide?
    10. How much will my payment be?

**HOW YOU RECEIVE A PAYMENT—SUBMITTING A CLAIM FORM** ............................................**PAGE 4**
    11. How can I receive a payment?
    12. When would I receive my payment?
    13. What am I giving up to receive a payment or stay in the class?

**YOU MAY EXCLUDE YOURSELF FROM THE SETTLEMENT**........................................................**PAGE 4**
    14. How do I exclude myself from the class and the Settlement?
    15. What are the consequences if I exclude myself?
    16. If I don't exclude myself, can I sue UBSFS for the same thing later?
    17. If I exclude myself, will I receive a payment from this Settlement?

**THE LAWYERS REPRESENTING YOU** ..........................................................................................**PAGE 5**
    18. Do I have a lawyer in this case?
    19. How will the lawyers be paid?

**COMMENTING ON THE SETTLEMENT** ........................................................................................**PAGE 5**
    20. How do I tell the Court what I think about the Settlement?
    21. What is the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING** ............................................................................................**PAGE 6**
    22. When and where will the Court decide whether to approve the Settlement?
    23. Do I have to come to the fairness hearing?
    24. May I speak at the fairness hearing?

**IF YOU DO NOTHING** ........................................................................................................................**PAGE 6**
    25. What happens if I do nothing?

**GETTING MORE INFORMATION** ..................................................................................................**PAGE 6**
    26. Are there more details about the Settlement?
    27. How do I get more information?

| 1. | Why did I receive this Notice? |
|---|---|

You or someone in your family may have purchased or acquired one or more of the Structured Products listed on Exhibit A.

You received this Notice because you have a right to know about a proposed settlement of a class action lawsuit and all of your options before the Court decides whether to approve the Settlement. If the Court approves the Settlement, and after objections and appeals, if any, are resolved, an administrator appointed by the Court will make the payments that the Settlement allows to qualified Class Members who submit a Proof of Claim and Release Form ("Claim Form") and who make a Recognized Claim.

This Notice explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Southern District of New York. The case is called *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-cv-5523 (S.D.N.Y.). The people who sued are called plaintiffs, and the company they sued, UBS Financial Services Inc. (or UBSFS), is called the defendant.

| 2. | What is this lawsuit about? |
|---|---|

The lawsuit alleges that UBSFS violated federal securities laws in underwriting and selling the Structured Products. The plaintiffs contend, among other things, that the offering materials for the Structured Products contained materially false and misleading statements and omitted material information about Lehman's financial condition and about the "principal protection" feature of some of the Structured Products. During the litigation the plaintiffs also inquired into the procedures by which UBSFS structured, marketed, and sold the Structured Products, the sales commissions earned, and communications between UBSFS financial advisors and customers. UBSFS denies that it did anything wrong, or that any purchasers of Structured Products incurred losses due to any alleged misrepresentations or omissions in the offering materials.

| 3. | Why is the case a class action? |
|---|---|

In a class action, one or more people called the representative plaintiffs sue on behalf of people who have similar claims. All these people with similar claims are a class or class members. One court resolves the issues for all class members. The representative plaintiffs in this class action are Mohan Ananda, Richard Barrett, Ed Davis, Neel Duncan, Rick Fleischman, Nick Fotinos, Gastroenterology Associates, Ltd. Profit Sharing Plan and Trust FBO Charles M. Brooks M.D., Stephen Gott, Karim Kano, David Kotz, Barbara Moskowitz, Ronald Profili, Joseph Rottman, Shea-Edwards Limited Partnership, Juan Tolosa, Grace Wang, and Miriam Wolf. U.S. District Judge Lewis A. Kaplan is in charge of the class action.

| 4. | Why is there a settlement? |
|---|---|

The Court did not decide in favor of the plaintiffs or the defendant. If the litigation continues, the Court will have to decide a number of critical legal and factual issues, including whether the plaintiffs have enough favorable evidence to proceed to trial, whether UBSFS committed any wrongs, and whether investors were damaged. If the case were to go to trial, the parties disagree about whether the plaintiffs would win. If plaintiffs won at trial, the parties disagree about the amount the plaintiffs could recover on behalf of themselves and the Class Members. It is possible that the plaintiffs could recover nothing at trial, or that UBSFS could substantially offset any damages by showing that those damages were due to the fault of others, including Lehman officers and directors who previously settled claims against them. It is also possible that any favorable verdict could be reversed on appeal, or that other Court rulings in the case could be reversed. The Settlement avoids the cost, risks and uncertainties of continuing with the litigation, and ensures that the investors who lost money on these investments will recover a portion of their losses. The representative plaintiffs and their attorneys believe the Settlement is fair and reasonable, and is in the best interests of all Class Members.

| 5. | I've received notices about this case before. How is this one different? |
|---|---|

You may have received prior class settlement notices in connection with the settlement of claims involving other Lehman securities than the Structured Products or in connection with the settlement of claims against other defendants involving the Structured Products. This Notice is different because it discusses a settlement of the claims brought against UBSFS on behalf of investors in the Structured Products. This Settlement is only with UBSFS, and does not involve any of the other defendants in the case. The prior settlements resolved claims against Lehman's directors and officers, as well as against various financial institutions acting as underwriters of other securities offerings. You may have filled out a claim form and received a payment from those settlements. **To participate in this Settlement, you need to submit a new Claim Form.**

## WHO IS IN THE SETTLEMENT

| 6. | How do I know if I am part of the settlement? |
|---|---|

Subject to the exceptions listed directly below, the Settlement includes everyone who bought or otherwise acquired any of the Structured Products listed on Exhibit A and suffered damages thereby.

| 7. | Are there exceptions to being included? |
|---|---|

Yes. You are **not** a Class Member if:

- You are one of the Defendants (as defined in the Stipulation) or a current or former executive officer or director of any Defendant or a member of any of their immediate families, or an immediate family member of any of the Defendants named in the Third

Amended Class Action Complaint filed on April 2, 2010 in re Lehman Brothers Securities and ERISA Litigation, Case No. 09-MD-2017 (S.D.N.Y.);[1] or

- You represent an entity in which a Defendant owns a majority interest, provided, however, that you are not excluded if you are an investment company or pooled investment fund, including without limitation mutual fund families, exchange-traded funds, fund of funds and hedge funds, in which any Defendant has or may have a direct or indirect interest, or as to which it or its affiliates may act as an investment advisor but in which Defendant or any of its affiliates is not a majority owner or does not hold a majority beneficial interest;

- You litigated claims against UBSFS relating to the Structured Products in any forum and received a judgment; or

- You settled and released claims against UBSFS arising out of the purchase of the Structured Products; or

- You are the legal representative, heir, successor or assign of an excluded party; or

- You exclude yourself by submitting a request for exclusion that complies with the requirements and deadline set forth in the response to question 14 below.

| 8. | I'm still not sure if I am included. |
|---|---|

If you are still not sure whether you are a Class Member, you can ask for free help. You can call 888-211-3565 or visit website.com for more information. You may also want to contact your broker to find out if you bought any of the Structured Products.

## THE SETTLEMENT BENEFITS—WHAT YOU RECEIVE

| 9. | What does the Settlement provide? |
|---|---|

UBSFS will pay $120 million into a settlement fund, and will have no further legal or financial obligation with respect to the Settlement fund. The distribution of the Settlement Fund is described in the response to question 10 below.

| 10. | How much will my payment be? |
|---|---|

When the Settlement is final, the Net Settlement Fund will be distributed to Class Members who submit a valid Claim Form and who make a Recognized Claim (as defined in the Plan of Allocation). After payment of any taxes and administrative costs and any attorneys' fees and expenses awarded by the Court, the Class Members will receive payments in accordance with the proposed Plan of Allocation, a copy of which is attached as Exhibit B to this Notice. Your share of the Net Settlement Fund will depend on whether you have a Recognized Claim (as defined in the Plan of Allocation) and for what amount, the number of valid Claim Forms that are submitted, and the total of all Class Members' Recognized Claims.

You can use the proposed Plan of Allocation to calculate your "Recognized Claim." It is unlikely that you will receive the full amount of your Recognized Claim, however, because your payment will depend on the number of valid Claim Forms that are received and the total of all Class Members' Recognized Claims.

## HOW YOU RECEIVE A PAYMENT—SUBMITTING A CLAIM FORM

| 11. | How can I receive a payment? |
|---|---|

You will receive a Claim Form to receive a payment from the Net Settlement Fund. A Claim Form is included with this Notice. You can also visit website.com to obtain a Claim Form, complete and file a Claim Form online or call 888-211-3565 to request that a Claim Form be mailed to you. Please retain all records of your ownership of Structured Products because they may be needed to document your claim. **Claim Forms must be postmarked by DATE or filed online by midnight on DATE**.

| 12. | When would I receive my payment? |
|---|---|

The Court will hold a hearing on **DATE, 2013**, to decide whether to approve the Settlement. If the Court approves the Settlement, the claims administrator will review all of the Claim Forms to determine how much each claimant will receive. The claims administrator expects to process all claims within six months of the deadline to file a claim.

| 13. | What am I giving up to receive a payment or stay in the class? |
|---|---|

You must stay in the Settlement class to receive a payment when the Settlement is final. By staying in the class, you will give up any right you may have to sue, continue to sue, or be part of any other lawsuit, arbitration or administrative action against UBSFS, as well as the Released Parties (as defined in the Stipulation). The full text of the release of UBSFS and the Released Parties is set forth in the Stipulation, which you may obtain at website.com or by calling 888-211-3565. You will also be bound by the Court's orders in this case, including the final judgment.

## YOU MAY EXCLUDE YOURSELF FROM THE SETTLEMENT

| 14. | How do I exclude myself from the class and the Settlement? |
|---|---|

Any request for exclusion from the class must be in writing, and must be delivered by hand, overnight delivery service, or First-Class Mail, postage paid to the following address:

---

[1] A copy of the complaint is available at website.com

(STRUCTURED PRODUCTS LITIGATION)
CLAIMS ADMINISTRATOR
EXCLUSIONS
c/o A.B. DATA, LTD.
3410 WEST HOPKINS STREET
MILWAUKEE, WI 53216

The request for exclusion must be received at this address no later than **DATE, 2013**. The request for exclusion must be signed by the person requesting exclusion and must include the following information: (a) your name and the name of the purchasing entity if it is different, address, telephone number and, if applicable, e-mail addresses; (b) the CUSIP numbers of the Structured Product(s) you purchased or acquired, the amount you purchased or acquired, and the date of each purchase or acquisition; (c) the CUSIP numbers of the Structured Product(s) you sold, if any, the amount you sold, and the date of each sale; and (d) a statement that you wish to be excluded from the Settlement class.

### 15.  What are the consequences if I exclude myself?

If you exclude yourself from the class—which is sometimes called "opting out" of the class—you will not be eligible to receive any cash payment under this Settlement. If you exclude yourself, you will not be legally bound by the Court's orders in the case, including the release of claims and the Court's final judgment, and you will not receive any payment from the Settlement. If you exclude yourself, you will not be barred from pursuing your separate claim, if any, for damages against UBSFS or the Released Parties.

### 16.  If I don't exclude myself, can I sue UBSFS for the same thing later?

No. If you remain a member of the class, you are giving up any right to sue UBSFS, or any of the other Released Parties for any of the Released Claims, as those terms are described in the Stipulation.

### 17.  If I exclude myself, will I receive a payment from this Settlement?

No. If you exclude yourself, you will not receive any payment from this Settlement.

### THE LAWYERS REPRESENTING YOU

### 18.  Do I have a lawyer in this case?

The Court has appointed the law firm of Girard Gibbs LLP to represent you and the other Class Members. This law firm is called Class Counsel. You can reach Class Counsel by calling 866-981-4800 and identifying yourself as a member of the Settlement class in this matter. You will not be charged directly for the services provided by these lawyers. Their fees will be paid from the Settlement Fund in an amount to be approved by the Court, as described in the response to question 19. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 19.  How will the lawyers be paid?

Class Counsel have prosecuted this matter on an entirely contingent basis since 2008. When they ask the Court to approve the Settlement, Class Counsel will also ask the Court to approve a payment of 22 percent of the Settlement Fund for attorneys' fees, or approximately $26.3 million. Class Counsel will also ask the Court to approve payment of up to $1,000,000 for the expenses they and the Structured Products Class Representatives have incurred. The Court will decide whether to approve these payments and may award less than these amounts. These amounts will be paid from the Settlement Fund and will reduce the total amount of the fund distributed to Class Members. In addition, Class Counsel will ask the Court to approve payment to the claims administrator of reasonable costs for administering the Settlement under the Court's supervision. Class Counsel anticipate that these administration costs will not exceed $500,000. The administration costs will also be paid from the Settlement Fund before any distribution to Class Members.

### COMMENTING ON THE SETTLEMENT

You may tell the Court that you agree or do not agree with the Settlement or any part of it.

### 20.  How do I tell the Court what I think about the Settlement?

If you are a member of the class, you can submit a comment in support of or objecting to the Settlement. You must give reasons why you think the Court should or should not approve it and include copies of any papers, briefs or other documents upon which any objection is based. The Court will consider your views. To submit a comment, you must send a letter that includes the name of the case—*In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-cv-5523 (S.D.N.Y.)—as well as your name, address and telephone number, the reasons you support or object to the Settlement, and your signature. To object, you must also provide (1) the CUSIP numbers of the Structured Products you purchased or acquired, the amount you purchased or acquired, and the date of each purchase or acquisition (and include brokerage confirmation receipts or other competent evidence of the transactions); (2) the CUSIP numbers of the Structured Products you sold, the amount you sold, and the date of each sale (and include brokerage confirmation receipts or other competent evidence of the transactions); (3) a list of all other cases in which you have appeared as a Settlement objector in the last five years; and (4) a list of all other cases in which your counsel has appeared as counsel for Settlement objectors in the last five years. Your objection must include your signature, even if you are represented by counsel.

If you do not present your views in writing in compliance with these procedures by the deadline, your views will not be considered, and you will waive any objections you have.

Mail your comment to each of these three different places so that it is received by each no later than **DATE, 2013**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>for the Southern District of New York<br>500 Pearl Street<br>New York, NY  10007-1312 | Daniel C. Girard<br>GIRARD GIBBS LLP<br>601 California Street, 14th Floor<br>San Francisco,  CA 94108 | Jonathan C. Dickey and Marshall R. King<br>GIBSON DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY  10166 |

**21.   What is the difference between objecting and excluding?**

Objecting is simply telling the Court that you are opposed to the Settlement.  You can object only if you stay in the class.  Excluding yourself is telling the Court that you do not want to be part of the class.  If you exclude yourself, you have no basis to object because the case no longer affects you.

### THE COURT'S FAIRNESS HEARING

The Court will have a hearing to decide whether to approve the Settlement.  You may attend and you may ask to speak, but you do not have to do so.

**22.   When and where will the Court decide whether to approve the Settlement?**

The Court will have a fairness hearing on **DATE, 2013**, at _____ _.m. in Courtroom 21B of the United States District Court for the Southern District of New York, 500 Pearl Street, New York, NY 10007.  At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court may also decide how much to pay in fees and expenses to the Court-appointed attorneys for the class.  The Court will listen to people who have asked to speak at the hearing or object to the fairness of the Settlement or the fee award, and who have complied with the Court's order concerning the submission of objections prior to the Settlement hearing.  At or after the hearing, the Court will decide whether to approve the Settlement.  The Court may change the time or date for the fairness hearing without further notice.  If you wish to attend the fairness hearing and would like to know if the date and time of the hearing have changed, you may contact Class Counsel.

**23.   Do I have to come to the fairness hearing?**

No.  Class Counsel will answer any questions the Court may have.  You may attend at your own expense or you can pay your lawyer to attend, but it is not necessary.  If you send a written comment or objection, you do not have to come to Court to talk about it.  As long as you mailed your written comment or objection on time and in compliance with the requirements described in response to question 20, the Court will consider it.  However, if you do not present your written views in compliance with these procedures by the deadline, your views will not be considered, and you will waive any objections you have.

**24.   May I speak at the fairness hearing?**

If you do not exclude yourself, you may ask the Court for permission to speak at the fairness hearing.  To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-cv-5523 (S.D.N.Y.)."  You must include your name, address, telephone number and signature, state the position you intend to present at the hearing, list any witnesses you may call to testify and exhibits you intend to introduce into evidence at the hearing and identify all attorneys representing you who will appear at the hearing.  Your Notice of Intention to Appear must be sent to the Clerk of the Court, Class Counsel and Defense Counsel at the three addresses provided in the response to question 20 above, and must be received no later than **Month 00, 2013**.

### IF YOU DO NOTHING

**25.   What happens if I do nothing?**

If you do nothing, you will not receive a payment from the Settlement.  In addition, you will not be able to start, continue with, benefit from, or be part of any other lawsuit, arbitration or administrative action against UBSFS or any of the other Released Parties for any of the Released Claims, as those terms are described in the Stipulation.

### GETTING MORE INFORMATION

**26.   Are there more details about the Settlement?**

This Notice provides only a summary of the proposed Settlement.  For more details, you may review the Stipulation and other documents from the case at website.com.  You may also contact Class Counsel by writing to Daniel C. Girard, Girard Gibbs LLP, 601 California Street, 14th Floor, San Francisco, CA 94108, or calling 866-981-4800.

**27.   How do I get more information?**

For more information about the Settlement, you can call 888-211-3565 toll free, visit website.com, or write to:  *In re Lehman Brothers Equity/Debt Securities Litigation* **(STRUCTURED PRODUCTS LITIGATION), CLAIMS ADMINISTRATOR, c/o A.B. DATA, LTD., PO BOX 170900, MILWAUKEE, WI 53217, info@website.com.**

Please do <u>not</u> contact the Court with questions about the Settlement.

DATE:  MONTH 00, 2013

BY ORDER OF THE COURT<br>UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT A TO NOTICE

EXHIBIT A
LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 01 | March 30, 2007 | 52520W564 524908VP2 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 02 | March 30, 2007 | 52520W556 524908VQ0 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 03 | April 30, 2007 | 52517PY21 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 04 | April 30, 2007 | 52517PX63 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 05 | April 30, 2007 | 52520W549 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 06 | April 30, 2007 | 52520W515 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 07 | May 31, 2007 | 52517PY62 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 08 | May 31, 2007 | 52517PY70 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate | $1,000.00 | $133.38 |

[1] Because reliable pricing data was not available for any of the Structured Products after Lehman's bankruptcy on September 15, 2008, the average closing prices for five other Lehman senior unsecured notes (CUSIP Nos. 52517P4C2, 52517P5X5, 52517P5Y3, 5252M0BZ9 and 5252M0FD4), for which reliable pricing data was available, was used to estimate value per note of the Structured Products as of October 31, 2008. October 31, 2008 is the date on which the first lawsuit asserting claims on behalf of investors in the Structured Products was filed.

1

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 09 | May 31, 2007 | 52520W440 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 10 | June 22, 2007 | 52522L202 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 11 | June 29, 2007 | 52517P2P5 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 12 | June 29, 2007 | 52520W390 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 13 | July 31, 2007 | 52517P3H2 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 14 | July 31, 2007 | 52520W358 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 15 | August 31, 2007 | 52522L129 | Performance Securities with Contingent Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 16 | August 31, 2007 | 52522L137 | Performance Securities with Contingent Protection Linked to the Dow Jones EURO STOXX 50 Index | $10.00 | $1.33 |
| 17 | August 31, 2007 | 52522L145 | Performance Securities with Contingent Protection Linked to the Nikkei 225 Index | $10.00 | $1.33 |
| 18 | August 31, 2007 | 52522L186 | 100% Principal Protection Notes Linked to an International Index Basket | $10.00 | $1.33 |
| 19 | August 31, 2007 | 52522L889 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |

2

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 20 | September 18, 2007 | 52522L251 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 21 | September 28, 2007 | 52522L236 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 22 | September 28, 2007 | 52522L244 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 23 | September 28, 2007 | 52517P5K3 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 24 | October 31, 2007 | 52520W341 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 25 | October 31, 2007 | 52522L400 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index | $10.00 | $1.33 |
| 26 | October 31, 2007 | 52522L293 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 27 | October 31, 2007 | 52522L301 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 28 | October 31, 2007 | 52522L319 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 29 | October 31, 2007 | 52522L327 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 30 | October 31, 2007 | 52522L335 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 31 | October 31, 2007 | 52522L384 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 32 | November 7, 2007 | 52522L418 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 33 | November 14, 2007 | 52522L426 | Performance Securities with Partial Protection Linked to an International Index Basket | $10.00 | $1.33 |
| 34 | November 26, 2007 | 52522L475 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 35 | November 30, 2007 | 52520W333 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 36 | November 30, 2007 | 52522L376 | 100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index | $10.00 | $1.33 |
| 37 | November 30, 2007 | 52522L392 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 38 | November 30, 2007 | 52522L459 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 39 | December 31, 2007 | 52522L483 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 40 | December 31, 2007 | 52522L491 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 41 | December 31, 2007 | 52522L533 | Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund | $10.00 | $1.33 |

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 42 | January 31, 2008 | 52517P4N8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 43 | January 31, 2008 | 52520W325 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 44 | January 31, 2008 | 52522L525 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 45 | February 8, 2008 | 52522L657 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 46 | February 13, 2008 | 52522L673 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 47 | February 13, 2008 | 52522L699 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 48 | February 13, 2008 | 52522L707 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 49 | February 13, 2008 | 52522L715 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 50 | February 13, 2008 | 52522L723 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 51 | February 29, 2008 | 5252M0CZ8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 52 | February 29, 2008 | 52522L632 | Performance Securities Linked to an Asian Currency Basket | $10.00 | $1.33 |

5

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 53 | February 29, 2008 | 52522L574 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 54 | February 29, 2008 | 52522L582 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 55 | February 29, 2008 | 52522L566 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 56 | February 29, 2008 | 52522L772 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR Fund vs. the Consumer Discretionary Select Sector SPDR Fund | $10.00 | $1.33 |
| 57 | February 29, 2008 | 52523J412 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 58 | March 7, 2008 | 52523J420 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 59 | March 19, 2008 | 52523J115 | 100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR S&P Homebuilders ETF | $10.00 | $1.33 |
| 60 | March 25, 2008 | 52523J149 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 61 | March 28, 2008 | 52523J131 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 62 | March 31, 2008 | 5252M0EK9 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |

6

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 63 | March 31, 2008 | 52523J438 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 64 | March 31, 2008 | 52522L806 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 65 | March 31, 2008 | 52522L814 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index | $10.00 | $1.33 |
| 66 | March 31, 2008 | 52522L871 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 67 | March 31, 2008 | 5252M0EV5 | 100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 68 | March 31, 2008 | 52522L798 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 69 | April 4, 2008 | 52522L848 | Return Optimization Securities Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 70 | April 4, 2008 | 52522L830 | 100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 71 | April 23, 2008 | 52523J172 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 72 | April 30, 2008 | 52523J156 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 73 | May 12, 2008 | 52523J503 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

EXHIBIT A

**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 74 | May 15, 2008 | 52523J206 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 75 | May 16, 2008 | 52523J222 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks | $10.00 | $1.33 |
| 76 | May 21, 2008 | 52523J214 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 77 | May 30, 2008 | 52523J230 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 78 | June 16, 2008 | 52520W283 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate | $10.00 | $1.33 |
| 79 | June 20, 2008 | 5252M0FU6 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 80 | June 30, 2008 | 5252M0CD7 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 81 | June 30, 2008 | 52523J263 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio | $10.00 | $1.33 |
| 82 | June 30, 2008 | 524935129 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

8

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 83 | June 30, 2008 | 52523J248 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |
| 84 | June 30, 2008 | 52523J255 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |

9

08-13555-mg   Doc 7207-3   Filed 02/25/11   Entered 02/25/11 18:49:59   Exhibit 3
Pg 291 of 356

# EXHIBIT B TO NOTICE

## PLAN OF ALLOCATION FOR THE NET SETTLEMENT FUND

### Purpose And Overview Of The Plan

Subject to the Court's approval, this Plan of Allocation ("Plan") specifies the method by which settlement money will be allocated among all class members entitled to such allocations. As discussed in more detail below, the allocation to each such class member is based on that person's "Recognized Claim," which will be calculated from the person's transactions in the Structured Products listed on Exhibit A to the notice.

**Even if you have already submitted a claim form in connection with an earlier settlement in any Lehman-related litigation, you must submit a new claim form to participate in this settlement.**

Under the Stipulation of Settlement and Release dated August 8, 2013 ("Stipulation"), $120,000,000 in cash will be provided for the benefit of the class. This money, plus any income or interest earned on it, will first be applied to pay taxes and Court-approved notice and administrative costs and attorneys' fees and expenses. The remaining balance is called the "Net Settlement Fund." The Net Settlement Fund will be allocated among all class members who (i) submit a timely and valid claim form and (ii) have a Recognized Claim. These class members are called "Authorized Claimants."

Assuming you are an Authorized Claimant, the amount of your allocation will be a *pro rata* share of the Net Settlement Fund, based on the amount of your Recognized Claim. What this means is that you will be allocated a percentage of the Net Settlement Fund equal to the percentage that your Recognized Claim represents in relation to the total of all Authorized Claimants' Recognized Claims. In other words, if your Recognized Claim is *X* percent of the total of all Recognized Claims, you will be allocated *X* percent of the Net Settlement Fund. Note that your Recognized Claim is not intended to be an estimate of the amount you will be paid under this settlement, or the amount you might have been able to recover after trial.

### Determining Your Recognized Claim

If you submit a timely and valid claim form, the Claims Administrator will proceed to determine whether you have a Recognized Claim and its amount according to the following steps.

A.    <u>Calculation of losses and gains for each Structured Product</u>. If you purchased or acquired a Structured Product, your losses and gains will be calculated as follows:

(1)    *If you purchased a Structured Product and sold it prior to September 15, 2008*, your loss for that note is zero and your gain for that note is zero.

(2)    *If you purchased a Structured Product prior to September 15, 2008 and sold it between September 15, 2008 and October 31, 2008 (inclusive)*, your loss or gain for that note is the lesser of (i) the price you paid for the note minus the sale price; or (ii) the issue price of the note (listed on Exhibit A) minus the sale price.

1

(3)  *If you purchased a Structured Product prior to September 15, 2008 and sold it after October 31, 2008*, your loss or gain for that note is the lesser of (i) the price you paid for the note minus either the sale price or the note's estimated value on October 31, 2008 (listed on Exhibit A), whichever is greater; or (ii) the issue price of the note (listed on Exhibit A) minus either the sale price or the note's estimated value on October 31, 2008 (listed on Exhibit A), whichever is greater.

(4)  *If you purchased a Structured Product prior to September 15, 2008 and still own it as of the date you submit your claim form*, your loss or gain for that note is the lesser of (i) the price you paid for the note minus the note's estimated value on October 31, 2008 (listed on Exhibit A); or (ii) the issue price of the note (listed on Exhibit A) minus the note's estimated value on October 31, 2008 (listed on Exhibit A).

(5)  *If you purchased a Structured Product after September 15, 2008*, your loss for that note is zero and your gain for that note is zero.

B.  <u>Multiple purchases and sales of the same Structured Product</u>.  If you bought a particular Structured Product more than once and sold that Structured Product more than once, your purchases and sales of that Structured Product will be matched on a first-in, first-out basis.  Sales will be matched against purchases of the same security in chronological order, beginning with the earliest purchase.  The losses and gains for such purchase-sale matches will then be calculated according to Part A above.  Purchases and sales shall be deemed to have occurred on the "contract" or "trade" date, not the "settlement" or "payment" date.

C.  <u>Treatment of Structured Products acquired by means of a gift, inheritance, or operation of law</u>. If you acquired any Structured Products by means of a gift, inheritance, or operation of law, the purchase date for that acquisition will be the original date of purchase and not the date of transfer, unless the transfer resulted in a taxable event or other change in the cost basis of those Structured Products.

D.  <u>Calculation of Recognized Claim</u>.  Your individual losses and gains will be calculated, as described above, for all purchases and acquisitions of Structured Products that you properly report on a valid claim form.  These losses and gains (if any) will then be summed.  If the result is a loss of $10.00 or more, and you did not receive restitution under the FINRA consent decree described in Part E below, then that loss is your Recognized Claim.  If the result is a loss of less than $10.00 or a gain, you do not have a Recognized Claim and are not entitled to a share of the settlement money.

E.  <u>FINRA restitution</u>.  In April 2011, UBS Financial Services Inc. entered into a consent decree with the Financial Industry Regulatory Authority (FINRA) under which UBS Financial Services Inc. provided restitution to certain class members.  If the summing of your individual losses and gains as described in Part D above results in a loss of $10.00 or more, and you received any restitution under the consent decree, then the loss will be offset by the restitution you received.  If the result is still a loss of $10.00 or more, then

that loss is your Recognized Claim.  If the result is a loss of less than $10.00 or a gain, you do not have a Recognized Claim and are not entitled to a share of the settlement money.

F.      Net Loss Under $10.00.  As stated above, if you have a net loss and it is less than $10.00, you do not have a Recognized Claim and will not be entitled to an allocation or distribution of settlement money.  As net losses of less than $10.00 are not Recognized Claims, they will be excluded from the calculation of the Recognized Claim total that is necessary for making *pro rata* allocations to Authorized Claimants.

**Distribution Of The Net Settlement Fund**

The Claims Administrator will distribute the Net Settlement Fund among all Authorized Claimants according to the Plan after the Court has given final approval of the Settlement and the Plan, the Judgment becomes Final, and all claims have been processed.  The Claims Administrator will make this distribution by mailing each Authorized Claimant a check in the amount of the person's *pro rata* allocation,  described above under the heading "Purpose And Overview Of The Plan."  If any distributable balance remains in the Net Settlement Fund by reason of uncashed checks or otherwise one year after the initial distribution, after the Claims Administrator has made reasonable and diligent efforts to have Authorized Claimants cash their distribution checks, then that balance shall be redistributed on a *pro rata* basis among those Authorized Claimants who have cashed their checks and who would receive at least $10.00 from the redistribution, after payment of any additional costs or fees incurred in administering the Net Settlement Fund for the redistribution.  If six months after the redistribution any balance still remains in the Net Settlement Fund, then that balance shall be contributed to one or more non-sectarian, not-for-profit, 501(c)(3) organizations designated by Class Counsel and approved by the Court.

The Court has reserved jurisdiction to allow, disallow or adjust on equitable grounds any claim.  The Court also reserves the right to modify this Plan without further notice to class members.  Payment pursuant to the Court-approved Plan shall be conclusive against all Authorized Claimants.  No person shall have any claim against any of the Released Parties, the Structured Products Class Representatives, Structured Products Plaintiffs' Counsel, the Claims Administrator, or any other agents designated by counsel based on distributions made substantially in accordance with the terms of the Stipulation, the Plan, or any further orders of the Court.

**REMEMBER:**  You must file a timely claim form to receive a payment from the Net Settlement Fund.  If you do not timely file a claim form in accordance with the terms of the Stipulation, you will not receive a payment from the Net Settlement Fund, but you will still be bound by the Settlement and the Final Judgment entered by the Court.

If you have any questions about the Plan or the calculation of your Recognized Claim, please contact the Claims Administrator at 1-888-211-3565 or info@website.com.

# EXHIBIT B-3

SOUTHERN DISTRICT OF NEW YORK

| In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION | Case No. 09-MD-2017 (LAK) |
|---|---|
| This Document Applies To: | ECF CASE |
| In re Lehman Brothers Equity/Debt Securities Litigation, 08-CV-5523-LAK | |

## PROOF OF CLAIM AND RELEASE

DEADLINE FOR SUBMISSION: _____, 2013.

***IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION***
**(STRUCTURED PRODUCTS LITIGATION)**
**CLAIMS ADMINISTRATOR**
**c/o A.B. DATA, LTD.**
**PO BOX 170900**
**MILWAUKEE, WI 53217**

**info@website.com**

IF YOU BOUGHT OR ACQUIRED ANY OF THE "STRUCTURED PRODUCTS" LISTED ON EXHIBIT A TO THE NOTICE OF PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT (THE "NOTICE"), YOU MAY BE A "CLASS MEMBER" AND YOU MAY BE ENTITLED TO SHARE IN THE SETTLEMENT PROCEEDS.

Please note that this Settlement relates to securities known as "Structured Products" that were issued by Lehman Brothers Holdings Inc. and underwritten and sold by UBS Financial Services Inc. in 2007 and 2008. Even if you have already submitted a claim form in connection with an earlier settlement in any Lehman-related litigation (as described in the Notice), you must submit a new claim form to participate in this Settlement.

IT IS IMPORTANT THAT YOU READ AND UNDERSTAND THE NOTICE AND THE PLAN OF ALLOCATION INCLUDED IN THE NOTICE. THE NOTICE AND PLAN OF ALLOCATION DESCRIBE THE PROPOSED SETTLEMENT, HOW CLASS MEMBERS WILL BE AFFECTED BY THE SETTLEMENT, AND THE MANNER IN WHICH THE NET SETTLEMENT FUND WILL BE DISTRIBUTED, IF THE COURT APPROVES THE SETTLEMENT AND THE PLAN OF ALLOCATION.

You are **not** a Class Member if:

- You are one of the Defendants (as defined in the Stipulation), or a current or former executive officer or director of any Defendant or a member of any of their immediate families, or an immediate family member of any of the Defendants named in the Third Amended Class Action Complaint filed on April 23, 2010 in *In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD-2017 (S.D.N.Y.);[1] or

- You represent an entity in which a Defendant owns a majority interest, provided, however, that you are not excluded if you are an investment company or pooled investment fund, including without limitation mutual fund families, exchange-traded funds, fund of funds and hedge funds, in which any Defendant has or may have a direct or indirect interest, or as to which it or its affiliates may act as an investment advisor but in which Defendant or any of its affiliates is not a majority owner or does not hold a majority beneficial interest; or

- You litigated claims against UBS Financial Services Inc. ("UBSFS") relating to the Structured Products in any forum and received a judgment; or

- You settled and released claims against UBSFS arising out of the purchase of the Structured Products; or

- You are the legal representative, heir, successor or assign of an excluded party; or

- You exclude yourself by submitting a request for exclusion that complies with the requirements and deadline set forth in the Notice.

---

[1] A copy of the complaint is available at website.com.

If you are not a Class Member, you are not eligible for any settlement benefits under the Settlement, and you should not submit this form.

If you are a Class Member, you must complete and submit this form to be eligible for any settlement benefits.

YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM (THE "CLAIM FORM") AND EITHER COMPLETE AND FILE IT ONLINE AT WEBSITE.COM NO LATER THAN MIDNIGHT ON [DATE] 2013 OR MAIL IT BY FIRST-CLASS MAIL TO THE FOLLOWING ADDRESS, TO BE POSTMARKED  NO LATER THAN _____, 2013:

***IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION***
**(STRUCTURED PRODUCTS LITIGATION)**
**CLAIMS ADMINISTRATOR**
**c/o A.B. DATA, LTD.**
**PO BOX 170900**
**MILWAUKEE, WI  53217**

IF YOUR ONLINE CLAIM IS NOT RECEIVED BY _____, 2013, OR YOUR CLAIM FORM IS NOT POSTMARKED BY _____, 2013, YOUR CLAIM MAY BE REJECTED AND YOU MAY NOT RECEIVE ANY MONEY IN CONNECTION WITH THE SETTLEMENT OF THIS LITIGATION.

You must submit your Claim Form only to the Claims Administrator.  A Claim Form shall be deemed to have been submitted when actually received by the Claims Administrator.  If you wish to be assured that your  Claim Form is actually received by the Claims Administrator, you should send it by Certified Mail, Return Receipt Requested.  No acknowledgment will be made as to the receipt of Claim Form.

Do not mail or deliver your Claim Form directly to the Court or to any of the parties or their counsel, as doing so does not constitute a valid submission of your claim.  Submission of this Claim Form does not guarantee that you will share in the proceeds of the Settlement.  Distribution of the Net Settlement Fund will be governed by the Plan of Allocation for the Settlement, if it is approved by the Court, or by such other plan of allocation as the Court approves.

**STATEMENT OF CLAIM AND RELEASE**

1.   I bought or acquired one or more of the Structured Products listed on Exhibit A to the Settlement Notice for my benefit or for the benefit of the person or entity that is a Class Member.[2]

2.   By submitting this Claim Form, I state that I believe in good faith that I am a Class Member, as defined above and in the Notice, or am acting for a person or entity that is a Class Member; that I am not excluded from the Settlement Class; that I have read and understand the Notice; that I believe that I am entitled to receive a share of the Net Settlement Fund; that I elect to participate in the proposed Settlement described in the Notice; that I have not obtained a judgment or settled or released my claims against UBSFS with respect to the Structured Products listed on Exhibit A; and that I have not filed a request for exclusion.

3.   I have included below all relevant information about each purchase or acquisition, and any sales, of the Structured Products listed on Exhibit A to the Notice.

4.   In support of my claim, I have enclosed or attached copies of transaction confirmations, UBS or other brokerage account statements, relevant portions of my tax returns or other documents evidencing each purchase, acquisition, or sale of the Structured Products listed below.[3]

5.   I understand that the information in this Claim Form is subject to verification by the Claims Administrator or the Court, and I agree to cooperate in any request for verification or additional information.[4]

6.   On the Effective Date (as defined in the Stipulation of Settlement), my signature will constitute confirmation of a full and complete release by me or by any person or entity on whose behalf I am submitting this Proof of Claim of the Released Claims (as defined in the Stipulation of Settlement).

7.   NOTICE REGARDING ELECTRONIC FILES: Class Members with large numbers of transactions (greater than 50) may request or may be asked to submit information regarding their transactions in electronic files.  All Class Members MUST submit a manually signed paper Proof of Claim Form listing all their Structured Product transactions whether or not they also submit electronic copies.  If you wish to file your claim electronically, you must contact the Claims Administrator by emailing efiling@abdata.com, calling 800-949-0194 or visiting the settlement website at website.com to obtain the required file layout.  No electronic files will be considered to have been properly submitted unless the Claims Administrator issues to such filer a written acknowledgment of receipt and acceptance of electronically submitted data.

---

[2] If you are acting in a representative capacity on behalf of a Class Member (*e.g.*, as an executor, administrator, trustee, or other representative), you must submit evidence of your current authority to act on behalf of that Class Member, such as letters testamentary, letters of administration, or a copy of relevant trust documents.

[3] If you do not have documentation of your purchases, acquisitions or sales of the Structured Products, please obtain documentation from your financial advisor or tax advisor, because these documents are necessary to prove and process your claim.

[4] The Claims Administrator may request additional information if it is necessary to efficiently and reliably calculate the Recognized Claim (as defined in the Plan of Allocation).  In some cases the Claims Administrator may condition acceptance of the claim on the production of additional information.

08-13555-jmp    Doc 420k    Filed 09/10/13    Entered 09/10/13 18:09    Main ocument
Pg 297 of 356

| For Official Use Only | | | MUST BE POSTMARKED NO LATER THAN [DATE] |
|---|---|---|---|
| *Lehman Brothers* | | SOUTHERN DISTRICT OF NEW YORK | |

*In re Lehman Brothers Equity/Debt Securities Litigation*
Case No. 08-CV-5523 (LAK)
<u>PROOF OF CLAIM AND RELEASE</u>
PLEASE TYPE OR PRINT

8.  <u>STATEMENT OF CLAIM</u>

Last Name (Claimant)

First Name (Claimant)

Last Name (Beneficial Owner If Different From Claimant)

First Name (Beneficial Owner)

Last Name (Co–Beneficial Owner)

First Name (Co–Beneficial Owner)

Company/Other Entity (If Claimant Is Not an Individual)

Contact Person (If Claimant Is Not an Individual)

Record Owner's Name (If Different From Beneficial Owner Listed Above, *e.g.*, Brokerage Firm, Bank, Nominee, Other, etc.)

Account Number (If Claimant Is Not an Individual)

Trust/Other Date (If Applicable)

Address Line 1

Address Line 2 (If Applicable)

City                                          State        Zip Code

Telephone Number (Day)                    Telephone Number (Night)
(        )          -                      (        )          -

Email Address [an email address is not required, but if you provide it, you authorize the Claims Administrator to use it in providing you with information relevant to this claim.]

○ **Check Here to Use Alternate Address for Distribution (Optional)**
Distribution Address Line 1

Distribution Address Line 2 (If Applicable)

City                                          State        Zip Code

IDENTITY OF CLAIMANT (check only one):   ○ Individual   ○ Corporation   ○ Joint Owners   ○ Estate   ○ Trust   ○ Partnership   ○ Private Pension Fund   ○ Legal Representative
○ IRA, Keogh, or Other Type of Individual Retirement Plan (indicate type of plan, mailing address, and name of current custodian on separate sheet)
○ Other (specify, describe on separate sheet) _____

QUESTIONS? CALL TOLL FREE 888-211-3565 OR VISIT <u>WEBSITE.COM</u>                                          PAGE 3 OF 6

Employer Identification Number (EIN for estates, trusts, corporations, etc.)    Social Security Number (SSN for individuals)

9. I MADE THE FOLLOWING PURCHASES OF STRUCTURED PRODUCTS LISTED ON EXHIBIT A (must be documented):

| Product Code (see Exhibit A) | Date(s) of Purchase (List Chronologically) (Month/Day/Year) | Number of Notes Purchased | Purchase Price Per Note in USD | Aggregate Cost in USD (net of commissions, taxes, and fees) | Proof of Purchase Enclosed |
|---|---|---|---|---|---|
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |

10. I MADE THE FOLLOWING SALES OF THE STRUCTURED PRODUCTS LISTED ON EXHIBIT A (must be documented):

| Product Code (see Exhibit A) | Date(s) of Sale (List Chronologically) (Month/Day/Year) | Number of Notes Sold | Sale Price Per Note in USD | Amount Received in USD (net of commissions, taxes, and fees) | Proof of Sale Enclosed |
|---|---|---|---|---|---|
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |
| | / / | | . | . | ○Y ○N |

IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS, PLEASE PHOTOCOPY THE RELEVANT PAGES AND LIST ANY ADDITIONAL INFORMATION.

11. I HELD THE FOLLOWING STRUCTURED PRODUCTS AS IDENTIFIED ON EXHIBIT A AS OF THE CLOSE OF BUSINESS ON THE DATE I SUBMITTED THIS CLAIM
FORM (must be documented):

| Product Code (see Exhibit A) | Number of Notes Held | Proof Enclosed |
|---|---|---|
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |
| | | ○ Y<br>○ N |

12. **I received the following amount of restitution pursuant to an April 2011 consent decree between the Financial Industry Regulatory Authority (FINRA) and UBSFS**

**pertaining to certain Structured Products listed on Exhibit A:**   $ _____ . \_\_

IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS, PLEASE PHOTOCOPY THE RELEVANT PAGES AND LIST ANY ADDITIONAL INFORMATION.

### SUBSTITUTE FORM W-9

Request for Taxpayer Identification Number:

Enter Taxpayer Identification Number below for the Beneficial Owner(s).  For most individuals, this is your Social Security number.  The Internal Revenue Service (IRS) requires your Taxpayer Identification Number.  If you do not provide this information, your claim may be rejected.

Social Security number (for individuals)           OR         Taxpayer Identification Number (for estates, trusts, corporations, etc.)

13. **CERTIFICATION**

UNDER THE PENALTY OF PERJURY, I/WE CERTIFY THAT ALL OF THE INFORMATION PROVIDED ON THIS CLAIM FORM IS TRUE, CORRECT AND COMPLETE.

I/We certify that I am/we are NOT subject to backup withholding under the provisions of Section 3406 (a)(1)(c) of the Internal Revenue Code because:  (a) I am/We are exempt from backup withholding, or (b) I/We have not been notified by the IRS that I am/we are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me/us that I am/we are no longer subject to backup withholding.

NOTE:  If you have been notified by the IRS that you are subject to backup withholding, please cross out the language above that says that you are not subject to backup withholding.

Executed this _____ day of _____ (month/year) in _____ (city/state).

_____        _____
Signature of Claimant                                                   Type or Print Your Name Here

_____        _____
Signature of Joint Claimant, if any                                  Type or Print Your Name Here

_____
Capacity of Person(s) Signing (*e.g.*, Beneficial Owner, Purchaser, Executor, Administrator, Trustee, etc.)

YOU MUST COMPLETE AND SIGN THIS CLAIM FORM AND EITHER FILE IT ONLINE AT WEBSITE.COM NO LATER THAN MIDNIGHT ON [DATE] 2013 OR MAIL IT BY FIRST-CLASS MAIL TO THE FOLLOWING ADDRESS, TO BE POSTMARKED NO LATER THAN _____, 2013:

*IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION*
**(STRUCTURED PRODUCTS LITIGATION)**
**CLAIMS ADMINISTRATOR**
**c/o A.B. DATA, LTD.**
**PO BOX 170900**
**MILWAUKEE, WI  53217**

You should be aware that it may take up to six months from the deadline for submission of Claim Forms for the Claims Administrator to process fully all of the Claim Forms and to administer the Settlement.  This work will be completed as promptly as possible, given the need to investigate and tabulate each Claim Form.  Please be patient, and please notify the Claims Administrator of any change of address by writing to:

*IN RE LEHMAN BROTHERS EQUITY/DEBT SECURITIES LITIGATION*
**(STRUCTURED PRODUCTS LITIGATION)**
**CLAIMS ADMINISTRATOR**
**c/o A.B. DATA, LTD.**
**PO BOX 170900**
**MILWAUKEE, WI  53217**

**info@website.com**

08-01425-jmp   Doc 4207-6   Filed 09/09/13   Entered 09/09/13 18:49:58   Exhibit 23
Pg 301 of 356

# EXHIBIT B-4

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

    In re Lehman Brothers Equity/Debt
    Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

ECF CASE

## SUMMARY NOTICE OF PENDENCY OF CLASS
## ACTION AND PROPOSED SETTLEMENT

**TO: ALL PERSONS WHO BOUGHT OR OTHERWISE ACQUIRED LEHMAN
BROTHERS-ISSUED STRUCTURED PRODUCTS IDENTIFIED ON EXHIBIT A
TO THE NOTICE OF PENDENCY OF CLASS ACTION**

YOU ARE HEREBY NOTIFIED that a proposed settlement has been reached in this action
between UBS Financial Services Inc. ("UBSFS") and a class of all persons and entities, subject
to certain exclusions, who bought or otherwise acquired certain structured products that were
issued by Lehman Brothers Holdings, Inc. and underwritten and sold by UBSFS in 2007 and
2008. A complete list of the structured products that are part of the settlement (the "Structured
Products") is attached as Exhibit A to the full printed notice, which is available as described
below. The proposed settlement, as set forth in a Stipulation of Settlement and Release, dated
August 8, 2013 (the "Settlement"), is in the amount of $120,000,000.

This notice provides only a summary of matters regarding the litigation and Settlement. The full
printed notice describing the litigation, the Settlement, and the rights of purchasers of the
Structured Products to participate in or exclude themselves from the Settlement has been mailed
to persons or entities known to be potential Settlement Class Members. If you have not yet
received the full printed notice and a claim form, you may obtain copies of these documents by
visiting www.website.com, calling 1-888-211-3565, or writing: Claims Administrator, c/o AB
Data, Ltd., PO Box 170900, Milwaukee, WI 53217.

A hearing will be held before the Honorable Lewis A. Kaplan in Courtroom 21B of the United
States District Court for the Southern District of New York, 500 Pearl Street, New York, NY
10007, at [time] on [date] to determine whether the proposed Settlement should be approved by
the District Court as fair, reasonable, and adequate, and to consider Class Counsel's motion for
attorneys' fees and reimbursement of litigation expenses.

**IF YOU ARE A POTENTIAL MEMBER OF THE CLASS DESCRIBED ABOVE, YOUR
RIGHTS WILL BE AFFECTED AND YOU MAY BE ENTITLED TO SHARE IN THE
SETTLEMENT FUND OR EXCLUDE YOURSELF FROM THE SETTLEMENT.**

To participate in the Settlement, you must submit a claim form no later than **Month, 00, 2013**.

To exclude yourself from the Settlement, you must submit a written request for exclusion.  You can find the requirements for excluding yourself in the full printed notice and on www.website.com.  Your exclusion must be received no later than **Month 00, 2013**.  If you do not exclude yourself, your rights will be affected even if you do not submit a claim form.

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE REGARDING THIS NOTICE.**

Inquiries may be made to Class Counsel by calling 415-981-4800, or writing to In re Lehman Equity/Debt Securities Litigation (Structured Products Litigation), Girard Gibbs LLP, 601 California Street, 14th Floor, San Francisco, CA 94108.

By Order of the Court

Case 1:14-cv-02709-JMF   Document 43-12   Filed 09/09/15   Entered 09/09/15 18:49   Page   Exhibit 23

EXHIBIT C

08-cv-5523-jmp-02bnc 420r3-6 W Filed 08/09/13 12 Entered 08/09/13 18:09 Page 1 of 23
Pg 305 of 356

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

      In re Lehman Brothers Equity/Debt
      Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

## JUDGMENT AND ORDER APPROVING SETTLEMENT BETWEEN STRUCTURED PRODUCT PLAINTIFFS AND UBS FINANCIAL SERVICES INC.

This matter came for hearing on _____, 2013 (the "Settlement Hearing") on the application of the Settling Parties to determine (1) whether the terms and conditions of the Stipulation of Settlement (the "Stipulation" or "Settlement") between the Structured Products Class Representatives and Defendant UBS Financial Services Inc. ("UBSFS" or "Settling Defendant") dated August 8, 2013 are fair, reasonable, and adequate, and should be approved; (2) whether a final judgment should be entered (a) dismissing the Third Amended Class Action Complaint for Violations of the Federal Securities Laws (along with any predecessor version, the "Complaint") on the merits and with prejudice in favor of Settling Defendant only, and as against Settlement Class Members; (b) releasing the Released Claims as against the Settling Defendant and all other Released Parties, and (c) entering the Bar Order and judgment reduction provisions set forth in paragraphs 13 and 14 herein. The Court, having considered all matters submitted to it at the Settlement Hearing and otherwise, and it appearing that a notice of the Settlement Hearing

1

substantially in the form approved by the Court was mailed to all persons and entities reasonably identifiable as members of the Settlement Class, and that a summary notice of the Settlement Hearing substantially in the form approved by the Court was published in the national edition of *The Wall Street Journal* and *Investor's Business Daily* pursuant to the specifications of the Court;

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      This Judgment hereby incorporates by reference the definitions in the Settlement, and all capitalized terms used herein shall have the same meaning as set forth in the Stipulation including:

a.      "Released Parties" shall mean Settling Defendant and any and all of its current and former trustees, officers, directors, partners, principals, predecessors, successors, assigns, attorneys, parents, affiliates, employers, employees, agents, subsidiaries, and any of their heirs, joint tenants, tenants in common, beneficiaries, executors, and administrators, but specifically does not include any other Defendants.

b.      "Released Claims" shall mean any and all claims, rights, demands, liabilities and causes of action of every nature and description, to the fullest extent that the law permits their release in this Action, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, whether class, derivative or individual in nature, that the Structured Products Class Representatives or any other member of the Settlement Class: (a) alleged in the Complaint or the Action, or (b) could have asserted in any forum that arise out of or are based upon or are related to the allegations, contentions, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint or the Action, including without limitation any claims relating to (i) alleged misrepresentations or omissions in connection with the recommendation, sale or marketing of Structured Products to Settlement Class Members, and/or (ii) the purchase, acquisition or holding of the Structured Products. Notwithstanding the foregoing, the Releasing Parties, through the release in the Settlement, will not release: (i) any claims against Ernst & Young LLP; (ii) any claims or interests in the Lehman Bankruptcy Proceeding or the LBI SIPA Proceeding asserted by any Settlement Class Member based upon the ownership of any Lehman security which is entitled to a distribution under any confirmed plan of reorganization in the Lehman Bankruptcy Proceeding because of such ownership; or (iii) claims relating to the enforcement of the Settlement.

2

2.     This Court has jurisdiction to enter this Judgment. The Court has jurisdiction over the subject matter of the Action and over all parties to the Action, including all Settlement Class Members.

3.     The Court hereby affirms its findings in its Order Concerning Proposed Settlement with UBS Financial Services Inc., dated _____, 2013 (the "Preliminary Order"), that for purposes of the Settlement only, the prerequisites for a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Structured Products Class Representatives are typical of the claims of the Settlement Class; (d) the Structured Products Class Representatives and Structured Products Class Counsel will fairly and adequately represent the interests of the Settlement Class; (e) the questions of law and fact common to the Settlement Class predominate over any questions affecting only individual members of the Settlement Class; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.     The Court further affirms its determinations in the Preliminary Order and finally certifies, for purposes of the Settlement only, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), that the Action shall proceed as a class action on behalf of all persons and entities that bought or otherwise acquired any of the Structured Products set forth in Exhibit A to the Preliminary Order and who were damaged thereby ("Settlement Class"). Excluded from the Settlement Class are (i) Defendants; (ii) current and former executive officers and directors of each Defendant, and the members of their immediate families; (iii) the members

3

of Defendants' immediate families; (iv) any entity in which a Defendant owns a majority

interest, provided, however, that the Settlement Class shall include any investment company or

pooled investment fund, including without limitation mutual fund families, exchange-traded

funds, fund of funds and hedge funds, in which any Defendant has or may have a direct or

indirect interest, or as to which it or its affiliates may act as an investment advisor but in which

the Defendant or any of its affiliates is not a majority owner or does not hold a majority

beneficial interest; (v) Lehman; (vi) any person or entity that has (a) litigated claims in any

forum against UBSFS arising out of the purchase of Structured Products and received a

judgment, or (b) settled and released claims against UBSFS arising out of the purchase of

Structured Products (as identified on a confidential Exhibit which has been produced by UBSFS

on a confidential basis to the Claims Administrator); and (vii) the legal representatives, heirs,

successors or assigns of any excluded  party.  Also excluded from the Settlement Class are the

persons and entities that timely and validly requested exclusion from the Settlement Class as

listed on the attached Exhibit 1.

     5.     Pursuant to Federal Rule of Civil Procedure 23, for purposes of the Settlement

only, this Court affirms its findings in the Preliminary Order that the Structured Products

Class Representatives are adequate class representatives and finally certifies Mohan Ananda,

Richard Barrett, Ed Davis, Neel Duncan, Rick Fleischman, Nick Fotinos, Gastroenterology

Associates, Ltd. Profit Sharing Plan and Trust FBO Charles M. Brooks, MD, Stephen Gott,

Karim Kano, David Kotz, Barbara Moskowitz, Ronald Profili, Joseph Rottman, Shea-Edwards

Limited Partnership, Juan Tolosa, Grace Wang and Miriam Wolf as Settlement Class

Representatives.

6.      Having considered the factors described in Federal Rule of Civil Procedure 23(g), the Court hereby appoints the law firm of Girard Gibbs LLP as Structured Products Class Counsel.

7.      Notice of the pendency of this Action as a class action and of the proposed Settlement was given to potential Settlement Class Members in accordance with the Court's Preliminary Order. The form and method of notifying potential Settlement Class Members of the pendency of the Action as a class action and of the terms and conditions of the proposed Settlement met the requirements of Federal Rule of Civil Procedure 23, Section 27(a)(7) of the Securities Act of 1933, 15 U.S.C. § 77z-1(a)(7), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and the Constitution of the United States, and constituted the best notice practicable under the circumstances.

8.      Pursuant to and in compliance with Federal Rule of Civil Procedure 23, the Court hereby finds that due and adequate notice of these proceedings was directed to all potential Settlement Class Members, advising them of the Settlement, of Structured Products Class Counsel's intent to apply for attorneys' fees and reimbursement of Litigation Expenses associated with the Action, and of their right to object thereto, and that a full and fair opportunity was accorded to all such potential Settlement Class Members to be heard with respect to the foregoing matters, or to exclude themselves from the Settlement Class and the Settlement. Thus, it is hereby determined that all members of the Settlement Class, who did not timely and validly elect to exclude themselves by written communication postmarked no later than the date set forth in the Notice and the Preliminary Order, are bound by this Judgment.

9.      Pursuant to Federal Rule of Civil Procedure 23, this Court hereby approves

the Settlement as set forth in the Stipulation, and finds that the Settlement is in all respects fair, reasonable and adequate, and in the best interests of Settlement Class Members. This Court further finds that the Settlement is the result of arm's-length negotiations between experienced counsel representing the interests of the Settling Parties. Accordingly, the Settlement embodied in the Stipulation is hereby approved in all respects and shall be consummated in accordance with the terms and provisions of the Stipulation.

10.    The Action, the Complaint, and the claims asserted therein by the Structured Products Class Representatives are hereby dismissed with prejudice against the Settling Defendant and without costs except for the payments expressly provided for in the Stipulation.

11.    Upon the Effective Date, each of the Structured Products Class Representatives and all other Settlement Class Members release and shall be deemed by operation of law to have irrevocably, absolutely and unconditionally, fully, finally and forever released, waived, discharged and dismissed each and every Released Claim against each and all of the Released Parties with prejudice, and shall forever be enjoined from prosecuting any or all Released Claims against any Released Party.

12.    Upon the Effective Date, the Settling Defendant releases and shall be deemed by operation of law to have irrevocably, absolutely and unconditionally, fully, finally and forever released, waived, discharged and dismissed the Released Parties' Claims against each and all of the Structured Products Class Representatives and any of their spouses or representatives, Arthur Simons and his spouse, and Structured Products Plaintiffs' Counsel, and shall forever be enjoined from prosecuting any or all of the Released Parties' Claims against any

6

of the Structured Products Class Representatives and any of their spouses or representatives,
Arthur Simons and his spouse, and Structured Products Plaintiffs' Counsel.

13.     Upon the Effective Date, any and all claims for contribution and indemnification
(or any other claim where the injury is the person's or entity's liability to one or more members
of the Settlement Class), arising from, relating to, or in connection with the Released Claims (i)
by any person or entity against any or all of the Released Parties, their insurers, subrogees or
assigns, or anyone acting on behalf of the Released Parties, their insurers, subrogees or assigns,
or (ii) by any or all of the Released Parties, their insurers, subrogees or assigns, or anyone acting
on behalf of the Released Parties, their insurers, subrogees or assigns against any Defendant
(other than the Settling Defendant), its insurers, subrogees or assigns, or anyone acting on behalf
of any Defendant (other than the Settling Defendant), its insurers, subrogees or assigns, other
than a person or entity whose liability to the Settlement Class has been extinguished pursuant to
this Settlement, are, to the fullest extent provided by law, permanently barred and fully
discharged, *provided that* the discharge of such claims shall not affect any Defendant's claims or
defenses arising under the Distribution Agreement, dated May 30, 2006, or filed against Lehman
in its bankruptcy proceeding or against LBI in the LBI SIPA Proceeding.

14.     Any final verdict or judgment that may be obtained by or on behalf of the
Settlement Class or any Settlement Class Member against any person or entity subject to the Bar
Order in paragraph 13 shall be reduced by the greater of: (i) an amount that corresponds to the
percentage of responsibility of the Settling Defendant for common damages; or (ii) the amount
paid by or on behalf of the Settling Defendant to the Settlement Class or the Settlement Class
Member, as applicable, for common damages.

15.     This Judgment and the Stipulation, whether or not the Judgment becomes
Final, and any proceedings taken pursuant to the Stipulation, including exhibits, all
negotiations, discussions, drafts and proceedings in connection with the Settlement, and any act
performed or document signed in connection with the Settlement:

a.      shall not be offered or admitted against any of the Released Parties as
evidence of, or construed as or deemed to be evidence of, any presumption, concession
or admission by any of the Released Parties with respect to the truth of any fact alleged
by Structured Products Class Representatives or the validity of any claim that was or
could have been asserted against any of the Released Parties in this Action or in any
litigation, or of any liability, negligence, fault or wrongdoing of any of the Released
Parties;

b.      shall not be offered or admitted against any of the Released Parties as
evidence of a presumption, concession or admission of any fault, misrepresentation or
omission with respect to any statement or written document approved or made by any of
the Released Parties or associated with any Structured Products sold or underwritten by
the Released Parties, or against any of the Structured Products Class Representatives or
any other Settlement Class Members as evidence of any infirmity in the claims of the
Structured Products Class Representatives or the other Settlement Class Members;

c.      shall not be offered or admitted against any of the Released Parties as
evidence of, or construed as or deemed to be evidence of, any presumption, concession
or admission by any of the Released Parties that any of the Court's prior decisions in the
Action, including without limitation the Motion to Dismiss Order and the Class

8

Certification Order, were correct or free of error, or as a waiver of any of the arguments or defenses set forth in the Recitals;

d.     shall not be offered or admitted against any of the Released Parties or against any of the Structured Products Class Representatives or any other Settlement Class Members as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the Released Parties, or against any of the Structured Products Class Representatives or any other Settlement Class Members, in any other civil, criminal or administrative action, arbitration or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; provided, however, that Settling Defendant, any Released Party, Structured Products Class Representatives, and any other Settlement Class Member may file the Stipulation and/or the Judgment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release and discharge, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

e.     shall not be construed against any Released Parties, any Structured Products Class Representative or any other Settlement Class Member as an admission, concession or presumption that the consideration to be given hereunder represents the amount that could be or would have been recovered after trial; and

f.     shall not be construed as or admitted in evidence as an admission, concession or presumption against any Structured Products Class Representative or any

9

other Settlement Class Member that any of their claims are without merit or that damages recoverable under the Complaint would not have exceeded the Settlement Amount.

16. The Court reserves jurisdiction over, without affecting in any way the finality of this Judgment, (a) implementation and enforcement of the Settlement; (b) approval of a plan of allocation; (c) the allowance, disallowance or adjustment of any Settlement Class Member's claim on equitable grounds and any award or distribution of the Settlement Fund; (d) disposition of the Settlement Fund; (e) hearing and determining Structured Products Class Counsel's application for attorneys' fees and reimbursement of Litigation Expenses; (f) the enforcement and administration of this Judgment; (g) the enforcement and administration of the Settlement, including any releases executed in connection with the Settlement; and (h) any other matter related or ancillary to the foregoing.

17. Separate orders shall be entered regarding the Structured Products Class Representatives' motion for approval of the proposed Plan of Allocation and Structured Products Class Counsel's application for attorneys' fees and reimbursement of Litigation Expenses. Those Orders shall not disturb or affect any of the terms of this Judgment.

18. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or in the event that the Settlement Fund, or any portion thereof, is returned to the Settling Defendant (or such persons or entities responsible for funding the Settlement Amount), and is not replaced by others, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation, and shall be vacated to the extent provided by the Stipulation and, in such event: (a) all Orders entered and releases delivered in connection herewith shall be null and void to the extent provided by

10

and in accordance with the Stipulation; (b) the fact of the Settlement shall not be admissible for any purpose and the Settling Parties shall be deemed to have reverted *nunc pro tunc* to their respective status in this Action as of June 7, 2013; and (c) the Settlement Amount plus accrued interest, less any Taxes paid or due with respect to such income, and less Notice and Administration Costs actually and reasonably incurred and paid or payable, shall be returned in full as provided in paragraph 37 of the Stipulation.

19.     Without further Order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

20.     There is no just reason for delay in the entry of this Judgment and immediate entry by the Clerk of the Court is expressly directed.

Dated: _____          _____

                                            The Honorable Lewis A. Kaplan
                                            United States District Judge

11

## EXHIBIT 1

**Persons and Entities Excluded from the Settlement Class**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re LEHMAN BROTHERS SECURITIES
AND ERISA LITIGATION

This Document Applies To:

     In re Lehman Brothers Equity/Debt
     Securities Litigation, 08-CV-5523-LAK

Case No. 09-MD-2017 (LAK)

<u>ECF CASE</u>

## [PROPOSED] ORDER CONCERNING PROPOSED SETTLEMENT
## <u>WITH UBS FINANCIAL SERVICES, INC.</u>

WHEREAS, the Structured Products Class Representatives and Defendant UBS Financial

Services Inc. ("UBSFS") entered into a Stipulation of Settlement and Release on August 8, 2013

(the "Stipulation" or "Settlement"), setting forth the terms and conditions of their proposed

settlement and the dismissal of the Action against UBSFS with prejudice upon the terms and

conditions set forth in the Stipulation;

    WHEREAS, the Structured Products Class Representatives have moved the Court for

entry of a preliminary order concerning the proposed Settlement pursuant to Federal Rule of

Civil Procedure 23;

WHEREAS, UBSFS does not oppose this request;

WHEREAS, the Court is familiar with and has reviewed the record and has reviewed the

Stipulation, including the exhibits attached to the Stipulation, and found good cause for entering

the following Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.　　　For purposes of this Order, the Court adopts all defined terms as set forth in the Stipulation.

## CLASS CERTIFICATION

2.　　　The Court finds, upon a preliminary evaluation and for purposes of the Settlement only, that the requirements of Federal Rules of Civil Procedure 23(a) and (b)(3) have been met. The Court preliminarily certifies the following class for purposes of the Settlement only:  all persons and entities that bought or otherwise acquired any of the Structured Products set forth in Exhibit B-1 and who were damaged thereby (the "Settlement Class").  Excluded from the Settlement Class are (i) Defendants; (ii) current and former executive officers and directors of each Defendant, and the members of their immediate families; (iii) the members of Defendants' immediate families; (iv) any entity in which a Defendant owns a majority interest, provided, however, that the Settlement Class shall include any investment company or pooled investment fund, including without limitation mutual fund families, exchange-traded funds, fund of funds and hedge funds, in which any Defendant has or may have a direct or indirect interest, or as to which it or its affiliates may act as an investment advisor but in which the Defendant or any of its affiliates is not a majority owner or does not hold a majority beneficial interest; (v) Lehman; (vi) any person or entity that has (a) litigated claims in any forum against UBSFS arising out of the purchase of Structured Products and received a judgment, or (b) settled and released claims against UBSFS arising out of the purchase of Structured Products (as identified on a confidential Exhibit which shall be produced by UBSFS on a confidential basis to the Claims Administrator, but shall not be provided to the Structured Products Class Representatives or to Structured Products Plaintiffs' Counsel or to any other person or entity); and (vii) the legal representatives,

2

heirs, successors or assigns of any excluded party.  Also excluded from the Settlement Class are

any persons or entities that exclude themselves by filing a timely request for exclusion in

accordance with the requirements set forth in the Notice.

3.      The Court preliminarily finds, for purposes of the Settlement only, that the

prerequisites of Federal Rules of Civil Procedure 23(a) and (b)(3) have been satisfied for the

Settlement Class in that:  (a) the number of Settlement Class Members is so numerous that

joinder of all members thereof is impracticable; (b) there are questions of law and fact common

to the Settlement Class; (c) the claims of the Structured Products Class Representatives are

typical of the claims of the Settlement Class; (d) the Structured Products Class Representatives

and Structured Products Class Counsel will fairly and adequately represent the interests of the

Settlement Class; (e) the questions of law and fact common to the Settlement Class predominate

over any questions affecting only individual members of the Settlement Class; and (f) a class

action is superior to other available methods for the fair and efficient adjudication of the

controversy.

4.      The Court preliminarily appoints the following Structured Products Class

Representatives for the Settlement Class:  Mohan Ananda, Richard Barrett, Ed Davis, Neel

Duncan, Rick Fleischman, Nick Fotinos, Gastroenterology Associates, Ltd. Profit Sharing Plan

and Trust FBO Charles M. Brooks, MD, Stephen Gott, Karim Kano, David Kotz, Barbara

Moskowitz, Ronald Profili, Joseph Rottman, Shea-Edwards Limited Partnership, Juan Tolosa,

Grace Wang and Miriam Wolf.

5.      The Court also preliminarily appoints Structured Products Class Counsel as

counsel for the Settlement Class pursuant to Federal Rule of Civil Procedure 23(g).

3

# **MAILING AND PUBLICATION NOTICE**

6.      The Court authorizes Structured Products Class Counsel to retain, and the Court hereby appoints, A.B. Data, Ltd. as the Claims Administrator to supervise and administer the notice procedures, as well as the processing of claims as more fully set forth below:

a.      No later than 21 calendar days after entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Notice and Claim Form (attached as Exhibits B-2 and B-3, respectively) (collectively, the "Notice Packet") to be mailed by first-class mail, postage prepaid, to those members of the Settlement Class who may be identified through reasonable effort, including those identified in the records of Lehman or UBSFS, or their transfer agent(s), as provided to the Claims Administrator;

b.      A summary notice (the "Summary Notice"), attached as Exhibit B-4, shall be published once in the national edition of *The Wall Street Journal* and *Investor's Business Daily* no later than 10 business days after the Notice Date; and

c.      The Notice, the Summary Notice and the Claim Form shall also be placed on the Claims Administrator's website, or a website created for the settlements obtained in this Action, on or before the Notice Date.

7.      The Court approves the form of the Notice and Summary Notice (together, the "Notices") and the Claim Form, and finds that the procedures established for publication, mailing and distribution of the Notices substantially in the manner and form set forth in Paragraph 6 of this Order meet the requirements of Federal Rule of Civil Procedure 23, Section 27(a)(7) of the Securities Act of 1933, 15 U.S.C. § 77z-1(a)(7), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and the Constitution of the United States, and constitute the best notice practicable under the circumstances.

4

8.      Settling Defendant shall provide information reasonably available to it that will assist in the identification of potential Settlement Class Members for the purpose of sending notifications of the Settlement within ten (10) business days of the entry of this Order, at no expense to the Settlement Class, Structured Products Class Counsel, or the Settlement Fund.

9.      No later than 35 calendar days prior to the Settlement Hearing (as defined below), Structured Products Class Counsel shall cause to be filed with the Court affidavits or declarations showing that the mailing of the Notice Packet and publication of the Summary Notice have been made in accordance with this Order.

## NOMINEE PROCEDURES

10.      Nominees who purchased Structured Products for beneficial owners who are Settlement Class Members are directed to, within fourteen (14) calendar days of receipt of the Notice Packet:  (a) request additional copies of the Notice Packet from the Claims Administrator for such beneficial owners; or (b) send a list of the names and addresses of such beneficial owners to the Claims Administrator.  If a nominee elects to send the Notice Packet to beneficial owners, such nominee is directed to mail the Notice Packet within fourteen (14) calendar days of receipt from the Claims Administrator, and upon such mailing, the nominee shall send a statement to the Claims Administrator confirming that the mailing was made as directed, and the nominee shall retain the list of names and addresses for use in connection with any possible future notice to the Settlement Class.  Upon full compliance with this Order, such nominees may seek reimbursement of their reasonable expenses actually incurred in complying with this Order by providing the Claims Administrator with proper documentation supporting the expenses for which reimbursement is sought and reflecting compliance with these instructions, including timely mailing of the Notice Packet, if the nominee elected or elects to do so.  Such properly

5

documented expenses incurred by nominees in compliance with the terms of this Order shall be paid from the Settlement Fund.

**THE SETTLEMENT HEARING**

11.     The Court will hold a settlement hearing (the "Settlement Hearing") on _____, 2013, at _____ __.m., in the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, Courtroom 21B, for the following purpose:  (i) to finally determine whether the Settlement Class satisfies the applicable prerequisites for class action treatment under Rules 23(a) and 23(b)(3); (ii) to determine whether the Settlement should be approved as fair, reasonable, adequate and in the best interests of the Settlement Class; (iii) to determine whether a Judgment substantially in the form attached as Exhibit C to the Stipulation should be entered dismissing and releasing the Structured Products Claims with prejudice; (iv) to rule upon the Plan of Allocation; (v) to rule upon Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses; and (vi) to consider any other matters that may properly be brought before the Court in connection with the Settlement.

12.     The Court reserves the right to (a) adjourn or continue the Settlement Hearing without further notice to Settlement Class Members and (b) approve the Stipulation with modification and without further notice to Settlement Class Members.

13.     The Released Parties shall have no responsibility or liability with respect to the Plan of Allocation or Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses.  The Plan of Allocation and Structured Products Class Counsel's application for an award of attorneys' fees and reimbursement of Litigation Expenses will be considered separately from the fairness, reasonableness and adequacy of the

6

Settlement.  At or after the Settlement Hearing, the Court will determine whether the proposed

Plan of Allocation should be approved, and the amount of attorneys' fees and Litigation

Expenses to be awarded to Structured Products Class Counsel.  Any appeal from any orders

relating solely to the Plan of Allocation or solely to Structured Products Class Counsel's

application for an award of attorneys' fees and Litigation Expenses, or any reversal or

modification thereof, shall not operate to terminate or cancel the Settlement, or affect or delay

the finality of the Judgment approving the Stipulation and the Settlement.

14.     If the Settlement is approved, all Settlement Class Members will be bound by the

proposed Settlement provided for in the Stipulation, and by any judgment or determination of the

Court affecting Settlement Class Members, regardless of whether or not a Settlement Class

Member submits a Claim Form.  All Settlement Class Members shall be bound by all

determinations and judgments in the Action concerning the Settlement, whether favorable or

unfavorable to the Settlement Class.

15.     Papers in support of the Settlement, the Plan of Allocation and Structured

Products Class Counsel's application for attorneys' fees and reimbursement of Litigation

Expenses shall be filed no later than 35 calendar days prior to the Settlement Hearing.  Papers in

opposition shall be filed in accordance with paragraph 16 below.  Reply papers shall be filed no

later than 7 calendar days prior to the Settlement Hearing.

**<u>OBJECTIONS AND APPEARANCE AT THE SETTLEMENT HEARING</u>**

16.     Any member of the Settlement Class may appear at the Settlement Hearing and

show cause why the proposed Settlement should or should not be approved as fair, reasonable,

adequate and in the best interests of the Settlement Class, or why the Judgment should or should

not be entered, or to present opposition to the Plan of Allocation or to the application of

Structured Products Class Counsel for attorneys' fees and reimbursement of Litigation Expenses.

No Settlement Class Member or any other person shall be heard or entitled to contest the

approval of the terms and conditions of the Settlement, or, if approved, the Judgment to be

entered approving the Settlement, or the terms of the Plan of Allocation or the application by

Structured Products Class Counsel for an award of attorneys' fees and reimbursement of

Litigation Expenses, unless that Settlement Class Member or person (i) filed objections, papers

and briefs with the Clerk of the United States District Court for the Southern District of New

York no later than 21 calendar days prior to the Settlement Hearing; and (ii) has served written

objections, by hand or first-class mail, including the basis for the objection(s), as well as copies

of any papers and briefs in support of his, her or its position upon each of the following counsel

for receipt no later than 21 calendar days prior to the Settlement Hearing:  Daniel C. Girard,

Girard Gibbs LLP, 601 California Street, Suite 1400, San Francisco, CA  94108 on behalf of the

Structured Products Class Representatives; and Jonathan C. Dickey and Marshall R. King,

Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193 on behalf of the

Settling Defendant.

      17.     Any objection must include:  (a) the full name (and the name of the purchasing

entity if it is different), address, and telephone number of the objecting Settlement Class

Member; (b) information concerning all of the Settlement Class Member's transactions involving

Structured Products, including CUSIP numbers of the Structured Product(s), brokerage

confirmation receipts or other competent documentary evidence of such transactions, the amount

and date of each purchase, acquisition or sale, and the price paid and/or received; (c) a written

statement of all grounds for the objection accompanied by any legal support for the objection; (d)

copies of any papers, briefs or other documents upon which the objection is based; (e) a list of all

8

persons who will be called to testify in support of the objection; (f) a statement of whether the objector intends to appear at the Settlement Hearing; (g) a list of all other cases in which the objector or the objector's counsel has appeared either as a settlement objector or as counsel for objectors in the past five years; and (h) the objector's signature, even if represented by counsel. If the objector intends to appear at the Settlement Hearing through counsel, the objection must also state the identity of all attorneys who will appear on the objector's behalf at the Settlement Hearing.

18.    Any Settlement Class Member who does not make his, her or its objection in the manner provided for herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, reasonableness or adequacy of the Settlement, to the Plan of Allocation or to the application by Structured Products Class Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses.  By objecting, or otherwise requesting to be heard at the Settlement Hearing, a person or entity shall be deemed to have submitted to the jurisdiction of the Court with respect to the objection or request to be heard and the subject matter of the Settlement, including but not limited to enforcement of the terms of the Settlement.

19.    Any Settlement Class Member may enter an appearance in the Action, at his, her or its own expense, individually or through counsel of his, her or its own choice.  If a Settlement Class Member does not enter an appearance, he, she or it will be represented by Structured Products Class Counsel.

## CLAIMS PROCESS

20.    In order to be entitled to participate in the Settlement, a Settlement Class Member must complete and submit a Claim Form in accordance with the instructions contained therein.

To be valid and accepted, Claim Forms submitted in connection with the Settlement must be postmarked or submitted electronically no later than 120 calendar days after the Notice Date.

21.     Any Settlement Class Member who does not timely submit a valid Claim Form shall not be eligible to share in the Settlement Fund, unless otherwise ordered by the Court, but will otherwise be bound by all of the terms of the Stipulation, including the terms of the Judgment to be entered in the Action and the releases provided for therein.

## <u>REQUEST FOR EXCLUSION FROM THE SETTLEMENT CLASS</u>

22.     Any requests for exclusion must be postmarked no later than 21 calendar days prior to the Settlement Hearing.  Any person who would otherwise be a member of the Settlement Class who wishes to be excluded from the Settlement Class must provide his, her or its (i) name (and the name of the purchasing entity if it is different), (ii) address, (iii) telephone number and if applicable email address(es), (iv) the CUSIP numbers and amount of Structured Product(s) bought or acquired, and the date of each purchase or acquisition; (v) the CUSIP numbers and amount of Structured Product(s) sold, if any, and the date of each sale; and (vi) a statement that the person or entity wishes to be excluded from the Settlement Class.  Such statement must be signed by the person or entity requesting exclusion.  All persons or entities that submit valid and timely requests for exclusion in the manner set forth in this paragraph shall have no rights under the Stipulation, shall not share in the distribution of the Net Settlement Fund, and shall not be bound by the Stipulation or any orders of the Court, or any final judgment.

23.     Any person who would otherwise be a member of the Settlement Class who does not request exclusion from the Settlement Class in the manner stated in this Order shall be deemed to have waived his, her or its right to be excluded from the Settlement Class, and shall forever be barred from requesting exclusion from the Settlement Class in this or any other

10

proceeding, and shall be bound by the Settlement and the Judgment, including, but not limited to, the release of the Released Claims against the Released Parties provided for in the Stipulation and the Judgment, if the Court approves the Settlement.

## THE SETTLEMENT FUND, NOTICE AND ADMINISTRATION COSTS

24.     Only Settlement Class Members and Structured Products Plaintiffs' Counsel shall have any right to any portion of, or any rights in the distribution of, the Settlement Fund, unless otherwise ordered by the Court or otherwise provided in the Stipulation.

25.     The Settlement Fund shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed pursuant to the Stipulation and/or further order of the Court.

26.     As set forth in the Stipulation, notwithstanding the fact that the Effective Date has not yet occurred, Structured Products Class Counsel may pay from the Settlement Fund, without further approval from the Settling Defendant, but subject to the prior approval of this Court, all reasonable Notice and Administration Costs actually incurred.  In the event that the Settlement is terminated pursuant to the terms of the Stipulation, all Notice and Administration Costs reasonably paid or reasonably incurred shall not be returned or repaid to the Settling Defendant, any Released Parties or any person or entity who or that contributed any portion of the Settlement Amount.

## THE USE OF THIS ORDER

27.     As set forth in the Stipulation, the fact and terms of this Order and the Settlement, all negotiations, discussions, drafts and proceedings in connection with this Order and the Settlement, and any act performed or document signed in connection with this Order and the Settlement, shall not, in this or any other Court, administrative agency, arbitration forum or other

11

tribunal, constitute an admission, or evidence, or be deemed to create any inference (i) of any

acts of wrongdoing or lack of wrongdoing, (ii) of any liability on the part of the Settling

Defendant to the Structured Products Class Representatives, the Settlement Class or anyone else,

(iii) of any deficiency of any claim or defense that has been or could have been asserted in this

Action, (iv) of any damages or lack of damages suffered by the Structured Products Class

Representatives, the Settlement Class or anyone else, or (v) that the Settlement Amount (or any

other amount) represents the amount that could or would have been recovered in this Action

against the Settling Defendant if it was not settled at this point in time.  The fact and terms of this

Order and the Settlement, all negotiations, discussions, drafts and proceedings in connection with

this Order and the Settlement, including, but not limited to, the Judgment and the release of the

Released Claims provided for in the Stipulation and the Judgment, shall not be offered or

received in evidence or used for any other purpose in this or any other proceeding in any court,

administrative agency, arbitration forum or other tribunal, except as necessary to enforce the

terms of this Order and/or the Settlement.

## <u>TERMINATION OF THE SETTLEMENT</u>

28.    In the event that the Settlement fails to become effective in accordance with its

terms, or if the Judgment is not entered or is reversed, vacated or materially modified on appeal

(and, in the event of material modification, if any party elects to terminate the Settlement), this

Order (except Paragraphs 26 and 27) shall be null and void, the Stipulation shall be deemed

terminated (excepts for any paragraphs that, pursuant to the terms of the Stipulation, survive

termination of the Stipulation), and the Settling Parties shall return to their positions without

prejudice in any way, as provided for in the Stipulation.

29.     The Court retains exclusive jurisdiction over the Action to consider all further

matters arising out of or connected with the Settlement.


Dated: _____, 2013      _____

                                 The Honorable Lewis A. Kaplan
                                 United States District Judge

# EXHIBIT G

# Gibson, Dunn & Crutcher LLP - UBSFS Class Action Invoice
## Summary

| Invoice | Paid | Invoice Date | Through Date |
|---|---|---|---|
| 2009022139 | 48,357.40 | 2/18/2009 | 1/31/2009 |
| 2009032096 | 46,612.24 | 3/12/2009 | 2/28/2009 |
| 2009042375 | 361,781.94 | 4/20/2009 | 3/31/2009 |
| 2009051633 | 151,660.71 | 5/12/2009 | 4/30/2009 |
| 2009060621 | 16,091.71 | 6/2/2009 | 5/31/2009 |
| 2009072476 | 8,209.84 | 7/24/2009 | 6/30/2009 |
| 2009082248 | 101,843.69 | 8/18/2009 | 7/31/2009 |
| 2009091327 | 3,026.25 | 9/8/2009 | 8/31/2009 |
| 2009101040 | 6,275.07 | 10/6/2009 | 9/30/2009 |
| 2009110694 | 28,875.07 | 11/5/2009 | 10/31/2009 |
| 2009120838 | 4,231.19 | 12/3/2009 | 11/30/2009 |
| 2010011427 | 2,003.63 | 1/13/2010 | 12/31/2009 |
| 2010020689 | 88,802.37 | 2/4/2010 | 1/31/2010 |
| 2010031557 | 16,684.99 | 3/10/2010 | 2/28/2010 |
| 2010041051 | 24,665.44 | 4/9/2010 | 3/31/2010 |
| 2010052251 | 25,571.67 | 5/21/2010 | 4/30/2010 |
| 2010062557 | 151,818.23 | 6/21/2010 | 5/31/2010 |
| 2010071663 | 46,809.80 | 7/14/2010 | 6/30/2010 |
| 2010082682 | 28,491.71 | 8/26/2010 | 7/31/2010 |
| 2010090489 | 3,650.85 | 9/3/2010 | 8/31/2010 |
| 2010101811 | 6,401.75 | 10/6/2010 | 9/30/2010 |
| 2010111329 | 17,105.22 | 11/5/2010 | 10/31/2010 |
| 2010120686 | 19,239.09 | 12/3/2010 | 11/30/2010 |
| 2011010842 | 14,261.62 | 1/7/2011 | 12/31/2010 |
| 2011031177 | 10,740.18 | 3/21/2011 | 2/28/2011 |
| 2011042942 | 2,504.53 | 5/5/2011 | 3/31/2011 |
| 2011060561 | 1,715.01 | 6/3/2011 | 4/30/2011 |
| 2011061684 | 751.40 | 6/10/2011 | 5/31/2011 |
| 2011073073 | 49,750.85 | 7/29/2011 | 6/30/2011 |
| 2011082138 | 47,134.23 | 8/16/2011 | 7/31/2011 |
| 2011090771 | 47,084.47 | 9/6/2011 | 8/31/2011 |
| 2011101901 | 128,554.73 | 10/8/2011 | 9/30/2011 |
| 2011111459 | 243,020.01 | 11/7/2011 | 10/31/2011 |
| 2011113320 | 318,344.58 | 11/30/2011 | 11/30/2011 |
| 2012012371 | 389,940.04 | 1/24/2012 | 12/31/2011 |
| 2012030722 | 494,239.18 | 2/21/2012 | 1/31/2012 |
| 2012033233 | 409,927.54 | 3/21/2012 | 2/29/2012 |
| 2012042726 | 309,293.76 | 4/3/2012 | 3/31/2012 |
| 2012052287 | 297,494.09 | 5/23/2012 | 4/30/2012 |
| 2012062329 | 294,722.19 | 6/19/2012 | 5/31/2012 |
| 2012072115 | 178,001.15 | 7/17/2012 | 6/30/2012 |
| 2012082154 | 107,632.45 | 8/15/2012 | 7/31/2012 |
| 2012092943 | 64,011.72 | 9/18/2012 | 8/31/2012 |
| 2012101038 | 125,174.56 | 10/2/2012 | 9/30/2012 |
| 2012111642 | 125,730.28 | 11/2/2012 | 10/31/2012 |
| 2012120465 | 151,256.19 | 12/1/2012 | 11/30/2012 |
| 2013011193 | 118,084.75 | 1/31/2013 | 12/31/2012 |
| 2013040892 | 133,765.27 | 2/4/2013 | 1/31/2013 |
| 2013040907 | 160,197.56 | 3/4/2013 | 2/28/2013 |
| 2013043099 | 110,238.36 | 4/2/2013 | 3/31/2013 |
| 2013053507 | 206,837.57 | 5/31/2013 | 4/30/2013 |
| 2013062105 | 509,623.01 | 6/14/2013 | 5/31/2013 |
| 2013073255 | 217,890.27 | 7/26/2013 | 6/30/2013 |
| **Grand Total** | **6,476,131.41** | | |

08-13425-jmp    Doc #2073-7    Filed 09/09/13    Entered 09/09/13 18:49:50    Exhibit H
Pg 1 of 11

# EXHIBIT H

| Year Opened | Year Closed | Closing Date | Matter ID | Settlement Amount USD |
|---|---|---|---|---|
| 2008 | 2009 | 02/27/2009 | 43129483-2008-78 | $0 |
| 2008 | 2009 | 03/26/2009 | 43160301-2008-40 | $0 |
| 2008 | 2009 | 03/26/2009 | 43160301-2008-38 | $0 |
| 2008 | 2009 | 03/26/2009 | 43160301-2008-33 | $0 |
| 2009 | 2009 | 04/09/2009 | 43206540-2009-3 | $0 |
| 2009 | 2009 | 07/23/2009 | 43129483-2009-27 | $0 |
| 2009 | 2009 | 07/28/2009 | 43129483-2009-58 | $0 |
| 2009 | 2009 | 06/02/2009 | 43132588-2009-14 | $235,000 |
| 2009 | 2009 | 09/24/2009 | 43176861-2009-25 | $25,000 |
| 2008 | 2009 | 10/09/2009 | 43129483-2008-71 | $1,000,000 |
| 2009 | 2009 | 10/26/2009 | 43160301-2009-22 | $7,500 |
| 2008 | 2009 | 10/28/2009 | 43160301-2008-31 | $0 |
| 2008 | 2009 | 12/03/2009 | 43206540-2008-16 | $475,000 |
| 2009 | 2009 | 12/08/2009 | 43129483-2009-19 | $120,000 |
| 2009 | 2009 | 12/16/2009 | 43132588-2009-82 | $90,000 |
| 2008 | 2009 | 12/16/2009 | 43132588-2008-66 | $35,000 |
| 2008 | 2009 | 12/16/2009 | 43160301-2008-39 | $225,000 |
| 2009 | 2010 | 01/11/2010 | 43157660-2009-21 | $16,213 |
| 2009 | 2010 | 01/19/2010 | 43129483-2009-25 | $175,000 |
| 2009 | 2010 | 01/20/2010 | 43177906-2009-35 | $225,000 |
| 2009 | 2010 | 01/20/2010 | 43176861-2009-1 | $20,000 |
| 2009 | 2010 | 01/24/2010 | 43206540-2009-5 | $26,000 |
| 2009 | 2010 | 02/02/2010 | 43167837-2009-11 | $105,000 |
| 2009 | 2010 | 02/04/2010 | 43176861-2009-9 | $16,000 |
| 2009 | 2010 | 02/09/2010 | 43129483-2009-6 | $60,000 |
| 2009 | 2010 | 02/17/2010 | 43129483-2009-82 | $30,000 |
| 2009 | 2010 | 02/17/2010 | 43132588-2009-31 | $500,000 |
| 2009 | 2010 | 02/17/2010 | 43141447-2009-2 | $37,500 |
| 2009 | 2010 | 02/27/2010 | 43129483-2009-117 | $23,000 |
| 2009 | 2010 | 02/27/2010 | 43129483-2009-94 | $37,500 |
| 2009 | 2010 | 03/04/2010 | 43206540-2009-6 | $62,500 |
| 2010 | 2010 | 03/11/2010 | 43132588-2010-9 | $0 |
| 2009 | 2010 | 03/11/2010 | 43132588-2009-88 | $8,000 |
| 2009 | 2010 | 03/18/2010 | 43129483-2009-63 | $300,000 |
| 2009 | 2010 | 03/25/2010 | 43176861-2009-15 | $50,000 |
| 2009 | 2010 | 03/29/2010 | 43129483-2009-77 | $160,000 |
| 2009 | 2010 | 03/29/2010 | 43132588-2009-21 | $450,000 |
| 2009 | 2010 | 04/01/2010 | 43129483-2009-42 | $65,000 |
| 2009 | 2010 | 04/01/2010 | 43129483-2009-37 | $220,000 |
| 2009 | 2010 | 04/12/2010 | 43167837-2009-33 | $12,500 |
| 2008 | 2010 | 04/16/2010 | 43115415-2008-19 | $490,612 |
| 2009 | 2010 | 04/19/2010 | 43115415-2009-10 | $145,000 |
| 2009 | 2010 | 04/20/2010 | 43167837-2009-29 | $32,000 |
| 2009 | 2010 | 04/20/2010 | 43132588-2009-22 | $333,333 |
| 2009 | 2010 | 04/20/2010 | 43177906-2009-1 | $38,000 |
| 2008 | 2010 | 04/20/2010 | 43206540-2008-14 | $218,000 |
| 2008 | 2010 | 04/20/2010 | 43176861-2008-28 | $65,000 |
| 2009 | 2010 | 04/21/2010 | 43129483-2009-39 | $445,000 |
| 2008 | 2010 | 04/21/2010 | 43129483-2008-79 | $15,000 |

| | | | | |
|---|---|---|---|---|
| 2009 | 2010 | 04/26/2010 | 43206540-2009-4 | $19,000 |
| 2009 | 2010 | 04/28/2010 | 43176861-2009-26 | $0 |
| *2010* | *2010* | *04/29/2010* | *43160301-2010-8* | *$0* |
| 2009 | 2010 | 04/29/2010 | 43160301-2009-26 | $165,000 |
| 2009 | 2010 | 04/29/2010 | 43129483-2009-35 | $123,004 |
| 2009 | 2010 | 05/05/2010 | 43141447-2009-7 | $155,000 |
| 2008 | 2010 | 05/05/2010 | 43115415-2008-22 | $300,000 |
| 2009 | 2010 | 05/12/2010 | 43132588-2009-17 | $22,500 |
| 2009 | 2010 | 05/17/2010 | 43129483-2009-50 | $75,000 |
| 2009 | 2010 | 05/19/2010 | 43129483-2009-196 | $10,000 |
| 2009 | 2010 | 05/19/2010 | 43129483-2009-53 | $70,000 |
| 2009 | 2010 | 05/24/2010 | 43132588-2009-48 | $370,000 |
| 2009 | 2010 | 05/24/2010 | 43132588-2009-18 | $55,000 |
| 2009 | 2010 | 06/03/2010 | 43141447-2009-8 | $385,000 |
| 2009 | 2010 | 06/07/2010 | 43132588-2009-11 | $325,000 |
| 2009 | 2010 | 06/10/2010 | 43129483-2009-3 | $150,000 |
| 2009 | 2010 | 06/17/2010 | 43176861-2009-17 | $130,000 |
| 2009 | 2010 | 06/17/2010 | 43176861-2009-12 | $85,000 |
| 2008 | 2010 | 06/18/2010 | 43129483-2008-70 | $250,462 |
| 2009 | 2010 | 06/24/2010 | 43129483-2009-84 | $200,000 |
| 2009 | 2010 | 06/28/2010 | 43167837-2009-13 | $75,000 |
| *2010* | *2010* | *07/06/2010* | *43167837-2010-8* | *$0* |
| 2009 | 2010 | 07/06/2010 | 43132588-2009-55 | $325,000 |
| *2008* | *2010* | *07/06/2010* | *43176861-2008-34* | *$0* |
| 2009 | 2010 | 07/15/2010 | 43176861-2009-4 | $130,000 |
| 2010 | 2010 | 07/22/2010 | 43129483-2010-13 | $47,895 |
| 2009 | 2010 | 07/22/2010 | 43129483-2009-111 | $100,000 |
| 2009 | 2010 | 07/22/2010 | 43167837-2009-22 | $500,000 |
| 2009 | 2010 | 07/22/2010 | 43160301-2009-9 | $102,500 |
| 2009 | 2010 | 07/26/2010 | 43176861-2009-35 | $950,000 |
| 2009 | 2010 | 07/29/2010 | 43176861-2009-50 | $180,000 |
| 2009 | 2010 | 07/29/2010 | 43160301-2009-5 | $1,000,000 |
| 2009 | 2010 | 08/02/2010 | 43129483-2009-113 | $130,000 |
| 2009 | 2010 | 08/02/2010 | 43177906-2009-8 | $50,000 |
| 2009 | 2010 | 08/02/2010 | 43129483-2009-11 | $150,000 |
| 2009 | 2010 | 08/09/2010 | 43129483-2009-66 | $75,000 |
| 2009 | 2010 | 08/10/2010 | 43115415-2009-43 | $462,000 |
| 2009 | 2010 | 08/12/2010 | 43129483-2009-137 | $75,000 |
| 2009 | 2010 | 08/12/2010 | 43176861-2009-42 | $31,000 |
| 2009 | 2010 | 08/12/2010 | 43115415-2009-33 | $100,000 |
| 2009 | 2010 | 08/12/2010 | 43167837-2009-26 | $76,000 |
| 2009 | 2010 | 08/12/2010 | 43129483-2009-46 | $1,500,000 |
| 2009 | 2010 | 08/24/2010 | 43129483-2009-99 | $900,000 |
| 2009 | 2010 | 08/31/2010 | 43129483-2009-144 | $250,000 |
| 2009 | 2010 | 08/31/2010 | 43177906-2009-63 | $72,500 |
| 2009 | 2010 | 08/31/2010 | 43167837-2009-19 | $550,000 |
| 2009 | 2010 | 09/01/2010 | 43132588-2009-26 | $200,000 |
| 2009 | 2010 | 09/07/2010 | 43160301-2009-15 | $350,000 |
| *2009* | *2010* | *09/07/2010* | *43176861-2008-37* | *$0* |
| 2009 | 2010 | 09/09/2010 | 43202704-2009-6 | $22,500 |
| 2009 | 2010 | 09/09/2010 | 43129483-2009-130 | $150,000 |
| 2009 | 2010 | 09/13/2010 | 43176861-2009-23 | $150,000 |

| 2009 | 2010 | 09/16/2010 | 43167837-2009-35 | $55,000 |
| 2009 | 2010 | 09/16/2010 | 43176861-2009-43 | $70,000 |
| 2009 | 2010 | 09/16/2010 | 43177906-2009-47 | $50,000 |
| 2009 | 2010 | 09/21/2010 | 43129483-2009-172 | $60,000 |
| 2009 | 2010 | 09/22/2010 | 43132588-2009-77 | $82,500 |
| 2009 | 2010 | 09/22/2010 | 43132588-2009-60 | $15,000 |
| 2009 | 2010 | 09/30/2010 | 43129483-2009-12 | $120,000 |
| 2009 | 2010 | 10/05/2010 | 43160301-2009-21 | $300,000 |
| 2009 | 2010 | 10/06/2010 | 43129483-2009-83 | $400,000 |
| 2009 | 2010 | 10/06/2010 | 43132588-2009-42 | $40,000 |
| 2009 | 2010 | 10/13/2010 | 43129483-2009-148 | $118,457 |
| 2009 | 2010 | 10/13/2010 | 43167837-2009-21 | $38,000 |
| 2008 | 2010 | 10/13/2010 | 43176861-2008-35 | $183,000 |
| 2010 | 2010 | 10/14/2010 | 43177906-2010-4 | $425,000 |
| 2009 | 2010 | 10/14/2010 | 43176861-2009-51 | $400,000 |
| *2010* | *2010* | *10/19/2010* | *43132588-2010-64* | *$0* |
| 2009 | 2010 | 10/19/2010 | 43176861-2009-61 | $80,000 |
| 2009 | 2010 | 10/19/2010 | 43129483-2009-140 | $72,500 |
| 2009 | 2010 | 10/19/2010 | 43129483-2009-136 | $25,000 |
| 2009 | 2010 | 10/19/2010 | 43129483-2009-120 | $47,500 |
| 2009 | 2010 | 10/19/2010 | 43129483-2009-110 | $1,990,000 |
| 2009 | 2010 | 10/19/2010 | 43132588-2009-64 | $175,000 |
| 2009 | 2010 | 10/19/2010 | 43132588-2009-57 | $1,050,000 |
| 2009 | 2010 | 10/21/2010 | 43132588-2009-49 | $875,000 |
| 2009 | 2010 | 10/25/2010 | 43129483-2009-127 | $34,100 |
| 2009 | 2010 | 10/25/2010 | 43176861-2009-3 | $258,000 |
| 2009 | 2010 | 11/11/2010 | 43132588-2009-65 | $737,000 |
| 2009 | 2010 | 11/11/2010 | 43167837-2009-20 | $170,000 |
| 2009 | 2010 | Nov, 2010 | 43160301-2009-25 | $92,750 |
| 2009 | 2010 | Nov, 2010 | 43132588-2009-100 | $80,000 |
| 2009 | 2010 | Nov, 2010 | 43115415-2009-26 | $220,000 |
| 2009 | 2010 | Nov, 2010 | 43129483-2009-122 | $455,000 |
| 2009 | 2010 | Nov, 2010 | 43167837-2009-43 | $115,000 |
| 2009 | 2010 | Nov, 2010 | 43167837-2009-44 | $187,500 |
| 2010 | 2010 | Nov, 2010 | 43129483-2010-15 | $35,000 |
| 2010 | 2010 | Nov, 2010 | 43132588-2010-25 | $34,000 |
| 2010 | 2010 | Nov, 2010 | 43129483-2010-23 | $500,000 |
| 2010 | 2010 | Nov, 2010 | 43129483-2010-21 | $32,500 |
| 2009 | 2010 | Nov, 2010 | 43132588-2009-104 | $475,000 |
| 2010 | 2010 | Nov, 2010 | 43129483-2010-29 | $425,000 |
| 2009 | 2010 | Nov, 2010 | 43167837-2009-40 | $150,000 |
| 2010 | 2010 | Nov, 2010 | 43129483-2010-3 | $100,000 |
| | 2010 | Dec, 2010 | | $50,532 |
| | 2010 | Dec, 2010 | | $18,000 |
| | 2010 | Dec, 2010 | | $25,000 |
| | 2010 | Dec, 2010 | | $27,500 |
| | 2010 | Dec, 2010 | | $55,000 |
| | 2010 | Dec, 2010 | | $55,000 |
| | 2010 | Dec, 2010 | | $62,500 |
| | 2010 | Dec, 2010 | | $75,000 |
| | 2010 | Dec, 2010 | | $79,800 |
| | 2010 | Dec, 2010 | | $180,000 |

| | 2010 | Dec, 2010 | | $240,000 |
|---|---|---|---|---|
| | 2010 | Dec, 2010 | | $375,000 |
| | 2010 | Dec, 2010 | | $390,000 |
| | 2010 | Dec, 2010 | | $673,614 |
| | 2010 | Dec, 2010 | | $950,000 |
| | 2010 | Dec, 2010 | | $1,411,053 |
| | 2010 | Dec, 2010 | | $529,688 |
| | 2011 | Jan, 2011 | | $19,000 |
| | *2011* | *Jan, 2011* | | *$20,000* |
| | 2011 | Jan, 2011 | | $25,000 |
| | 2011 | Jan, 2011 | | $45,000 |
| | 2011 | Jan, 2011 | | $100,000 |
| | 2011 | Jan, 2011 | | $100,000 |
| | 2011 | Jan, 2011 | | $200,000 |
| | 2011 | Jan, 2011 | | $300,000 |
| | 2011 | Jan, 2011 | | $475,000 |
| | 2011 | Jan, 2011 | | $550,000 |
| | 2011 | Jan, 2011 | | $2,563,000 |
| | 2011 | Feb, 2011 | 43115415-2010-34 | $8,500 |
| | 2011 | Feb, 2011 | 43177906-2009-70 | $30,000 |
| | 2011 | Feb, 2011 | 43129483-2010-1 | $32,000 |
| | 2011 | Feb, 2011 | 43115415-2010-108 | $37,500 |
| | 2011 | Feb, 2011 | 43160301-2010-4 | $90,000 |
| | 2011 | Feb, 2011 | 43129483-2010-17 | $120,000 |
| | 2011 | Feb, 2011 | 43129483-2010-44 | $161,500 |
| | 2011 | Feb, 2011 | 43115415-2010-30 | $250,000 |
| | 2011 | Feb, 2011 | 43160301-2009-45 | $1,050,000 |
| | 2011 | Feb, 2011 | 43132588-2010-11 | $1,050,000 |
| | 2011 | Feb, 2011 | 43129483-2009-185 | $4,775,000 |
| | 2011 | Mar, 2011 | 53115415-2010-51 | $20,000 |
| | 2011 | Mar, 2011 | 43176861-2009-46 | $200,000 |
| | 2011 | Mar, 2011 | 43176861-2010-5 | $290,000 |
| | 2011 | Mar, 2011 | 43132588-2009-107 | $460,000 |
| | 2011 | Mar, 2011 | 43132588-2009-91 | $822,500 |
| | 2011 | Mar, 2011 | | $967,000 |
| | *2011* | *Mar, 2011* | *93115415-2010-106* | *$1,331,500* |
| | 2011 | Apr, 2011 | 43115415-2010-113 | $25,000 |
| | 2011 | Apr, 2011 | 43167837-2010-14 | $37,500 |
| | 2011 | Apr, 2011 | 43129483-2010-55 | $75,000 |
| | 2011 | Apr, 2011 | 43202704-2010-3 | $75,000 |
| | 2011 | Apr, 2011 | 43177906-2010-7 | $77,500 |
| | 2011 | Apr, 2011 | 43129483-2010-2 | $80,000 |
| | 2011 | Apr, 2011 | 43132588-2010-41 | $100,000 |
| | 2011 | Apr, 2011 | 43176861-2009-57 | $147,500 |
| | 2011 | Apr, 2011 | 43115415-2010-64 | $207,000 |
| | 2011 | Apr, 2011 | 43132588-2009-101 | $386,546 |
| | 2011 | Apr, 2011 | 43129483-2010-24 | $375,000 |
| | 2011 | Apr, 2011 | 43129483-2010-48 | $450,000 |
| | 2011 | May, 2011 | 43115415-2011-22 | $15,000 |
| | 2011 | May, 2011 | 43115415-2010-110 | $25,000 |
| | 2011 | May, 2011 | 43115415-2010-71 | $60,000 |
| | 2011 | May, 2011 | 43129483-2010-46 | $62,500 |

| | 2011 | May, 2011 | 43129483-2010-57 | $80,000 |
|---|---|---|---|---|
| | 2011 | Jun, 2011 | 43115415-2010-54 | $10,000 |
| | 2011 | Jun, 2011 | 43167837-2010-9 | $18,000 |
| | 2011 | Jun, 2011 | 43167837-2010-6 | $20,000 |
| | 2011 | Jun, 2011 | 43115415-2010-33 | $24,900 |
| | 2011 | Jun, 2011 | 43115415-2010-104 | $25,000 |
| | 2011 | Jun, 2011 | 43115415-2010-79 | $53,424 |
| | 2011 | Jun, 2011 | 43132588-2010-54 | $58,500 |
| | 2011 | Jun, 2011 | 43202704-2010-10 | $75,000 |
| | 2011 | Jun, 2011 | 43132588-2010-23 | $75,000 |
| | 2011 | Jun, 2011 | 43132588-2010-30 | $100,000 |
| | 2011 | Jun, 2011 | 43132588-2010-19 | $100,000 |
| | 2011 | Jun, 2011 | 43202704-2010-2 | $119,000 |
| | 2011 | Jun, 2011 | 43115415-2010-27 | $131,500 |
| | 2011 | Jun, 2011 | 43115415-2010-78 | $156,626 |
| | 2011 | Jun, 2011 | 43160301-2009-41 | $160,000 |
| | 2011 | Jun, 2011 | 43129483-2009-93 | $300,000 |
| | 2011 | Jun, 2011 | 43132588-2010-8 | $315,000 |
| | 2011 | Jun, 2011 | 43176861-2009-31 | $2,921,300 |
| | 2011 | Jun, 2011 | 43132588-2010-22 | $260,000 |
| | 2011 | Jun, 2011 | 43129483-2010-12 | $1,765,989 |
| | 2011 | Jun, 2011 | 43115415-2010-55 | $908,500 |
| | 2011 | Jul, 2011 | 43115415-2011-72 | $10,000 |
| | 2011 | Jul, 2011 | 43129483-2010-34 | $48,000 |
| | 2011 | Jul, 2011 | 43115415-2010-87 | $68,250 |
| | | | | |
| | 2011 | Agust, 2011 | 43115415-2010-98 | $50,000 |
| | 2011 | Agust, 2011 | 43115415-2010-112 | $77,500 |
| | 2011 | Agust, 2011 | 43115415-2010-52 | $91,250 |
| | 2011 | Agust, 2011 | 43115415-2010-114 | $97,604 |
| | 2011 | Agust, 2011 | 43115415-2011-25 | $100,000 |
| | 2011 | Agust, 2011 | 43176861-2010-12 | $120,000 |
| | 2011 | Agust, 2011 | 43132588-2010-61 | $155,000 |
| | 2011 | Agust, 2011 | 43176861-2010-52 | $275,000 |
| | 2011 | Agust, 2011 | 43115415-2010-57 | $297,500 |
| | 2011 | Agust, 2011 | 43115415-2010-70 | $350,000 |
| | 2011 | Agust, 2011 | 43115415-2010-109 | $535,000 |
| | 2011 | Sept., 2011 | 43341435-2011-23 | $17,500 |
| | 2011 | Sept., 2011 | 43341435-2011-9 | $18,750 |
| | 2011 | Sept., 2011 | 43115415-2011-69 | $35,000 |
| | 2011 | Sept., 2011 | 43115415-2010-41 | $50,000 |
| | 2011 | Sept., 2011 | 43115415-2010-94 | $55,000 |
| | 2011 | Sept., 2011 | 43115415-2010-119 | $68,500 |
| | 2011 | Sept., 2011 | 43115415-2010-99 | $70,000 |
| | 2011 | Sept., 2011 | 43176861-2010-116 | $75,000 |
| | 2011 | Sept., 2011 | 43176861-2010-150 | $80,000 |
| | 2011 | Sept., 2011 | 43115415-2010-42 | $115,000 |
| | 2011 | Sept., 2011 | 43115415-2010-85 | $200,000 |
| | 2011 | Sept., 2011 | 43115415-2010-56 | $240,000 |
| | 2011 | Sept., 2011 | 43129483-2010-28 | $1,004,000 |
| | 2011 | Sept., 2011 | 43160301-2009-44 | $6,100,000 |

| | 2011 | Oct., 2011 | | $85,000 |
|---|---|---|---|---|
| | 2011 | Oct., 2011 | | $120,000 |
| | 2011 | Oct., 2011 | | $95,000 |
| | 2011 | Oct., 2011 | | $18,630 |
| | 2011 | Oct., 2011 | | $47,500 |
| | 2011 | Oct., 2011 | | $1,250,000 |
| | 2011 | Oct., 2011 | | $50,000 |
| | 2011 | Oct., 2011 | | $170,000 |
| | 2011 | Oct., 2011 | | $68,000 |
| | 2011 | Oct., 2011 | | $102,000 |
| | 2011 | Oct., 2011 | | $704,814 |
| | 2011 | Oct., 2011 | | $100,000 |
| | 2011 | Oct., 2011 | | $37,500 |
| | 2011 | Oct., 2011 | | $115,000 |
| | 2011 | Oct., 2011 | | $95,000 |
| | 2011 | Oct., 2011 | | $102,000 |
| | 2011 | Nov., 2011 | | $60,000 |
| | 2011 | Nov., 2011 | | $360,000 |
| | 2011 | Nov., 2011 | | $37,500 |
| | 2011 | Nov., 2011 | | $550,000 |
| | 2011 | Nov., 2011 | | $172,500 |
| | 2011 | Nov., 2011 | | $100,000 |
| | 2011 | Nov., 2011 | | $184,000 |
| | 2011 | Nov., 2011 | | $300,000 |
| | 2011 | Dec., 2011 | | $108,000 |
| | 2011 | Dec., 2011 | | $53,000 |
| | 2011 | Dec., 2011 | | $40,000 |
| | 2011 | Dec., 2011 | | $170,000 |
| | 2011 | Dec., 2011 | | $58,000 |
| | 2011 | Dec., 2011 | | $625,000 |
| | 2011 | Dec., 2011 | | $140,000 |
| | 2011 | Dec., 2011 | | $400,000 |
| | 2011 | Dec., 2011 | | $1,800,000 |
| | 2011 | Dec., 2011 | | $22,250 |
| | 2011 | Dec., 2011 | | $55,225 |
| | 2011 | Dec., 2011 | | $11,625 |
| | 2011 | Dec., 2011 | | $7,500 |
| | 2011 | Dec., 2011 | | $100,000 |
| | 2011 | Dec., 2011 | | $76,345 |
| | 2011 | Dec., 2011 | | $21,500 |
| | 2011 | Dec., 2011 | | $ 125,000.00 |
| | 2011 | Dec., 2011 | | $ 98,000.00 |
| | 2012 | Jan., 2012 | | $ 441,500.00 |
| | 2012 | Jan., 2012 | | $ 55,000.00 |
| | 2012 | Jan., 2012 | | $ 25,000.00 |
| | 2012 | Jan., 2012 | | $ 275,000.00 |
| | 2012 | Jan., 2012 | | $ 111,535.00 |
| | 2012 | Jan., 2012 | | $ 185,000.00 |
| | 2012 | Jan., 2012 | | $ 50,000.00 |
| | 2012 | Jan., 2012 | | $ 184,000.00 |
| | 2012 | Jan., 2012 | | $ 50,000.00 |
| | 2012 | Jan., 2012 | | $ 460,000.00 |

| | | 2012 | Jan., 2012 | | $ | - |
|---|---|---|---|---|---|---|
| | | 2012 | Feb., 2012 | | $ | 203,500.00 |
| | | 2012 | Feb., 2012 | | $ | 30,000.00 |
| | | 2012 | Feb., 2012 | | $ | 12,500.00 |
| | | 2012 | Feb., 2012 | | $ | 2,400,000.00 |
| | | 2012 | Feb., 2012 | | $ | 95,000.00 |
| | | 2012 | Feb., 2012 | | $ | 2,400,000.00 |
| | | 2012 | Feb., 2012 | | $ | 49,784.00 |
| | | 2012 | Feb., 2012 | | $ | 25,000.00 |
| | | 2012 | Feb., 2012 | | $ | 22,500.00 |
| | | 2012 | Feb., 2012 | | $ | 50,000.00 |
| | | 2012 | Mar., 2012 | | $ | 12,500.00 |
| | | 2012 | Mar., 2012 | | $ | 115,000.00 |
| | | 2012 | Mar., 2012 | | $ | 50,000.00 |
| | | 2012 | Mar., 2012 | | $ | 50,000.00 |
| | | 2012 | Mar., 2012 | | $ | 30,000.00 |
| | | 2012 | Mar., 2012 | | $ | 138,000.00 |
| | | 2012 | Mar., 2012 | | $ | 98,000.00 |
| | | 2012 | Mar., 2012 | | $ | 80,000.00 |
| | | 2012 | Mar., 2012 | | $ | 72,500.00 |
| | | 2012 | Mar., 2012 | | $ | 8,000.00 |
| | | 2012 | Mar., 2012 | | $ | 75,000.00 |
| | | 2012 | Mar., 2012 | | $ | 70,000.00 |
| | | 2012 | Mar., 2012 | | $ | 130,000.00 |
| | | 2012 | Mar., 2012 | | $ | 135,000.00 |
| | | 2012 | Mar., 2012 | | $ | 189,000.00 |
| | | 2012 | Apr., 2012 | | $ | 63,000.00 |
| | | 2012 | Apr., 2012 | | $ | 35,000.00 |
| | | 2012 | Apr., 2012 | | $ | 22,500.00 |
| | | 2012 | Apr., 2012 | | $ | 128,000.00 |
| | | 2012 | Apr., 2012 | | $ | 29,500.00 |
| | | 2012 | Apr., 2012 | | $ | 11,500.00 |
| | | 2012 | Apr., 2012 | | $ | 54,057.16 |
| | | 2012 | Apr., 2012 | | $ | 20,490.00 |
| | | 2012 | Apr., 2012 | | $ | 35,000.00 |
| | | 2012 | Apr., 2012 | | $ | - |
| | | 2012 | Mar., 2012 | | $ | 80,000.00 |
| | | 2012 | Mar., 2012 | | $ | 200,000.00 |
| | | 2012 | Mar., 2012 | | $ | 16,000.00 |
| | | 2012 | Mar., 2012 | | $ | 225,000.00 |
| | | 2012 | Mar., 2012 | | $ | 1,000,000.00 |
| | | 2012 | Mar., 2012 | | $ | 50,000.00 |
| | | 2012 | Mar., 2012 | | $ | 120,000.00 |
| | | 2012 | Mar., 2012 | | $ | 44,000.00 |
| | | 2012 | Mar., 2012 | | $ | 50,000.00 |
| | | 2012 | Mar., 2012 | | $ | 46,800.00 |
| | | 2012 | Mar., 2012 | | $ | 400,000.00 |
| | | 2012 | Mar., 2012 | | $ | - |
| | | 2012 | Mar., 2012 | | $ | 35,000.00 |
| | | 2012 | Mar., 2012 | | $ | 350,000.00 |
| | | 2012 | Mar., 2012 | | $ | - |
| | | 2012 | Jun., 2012 | | $ | 27,000.00 |

| | | | | |
|---|---|---|---|---|
| | 2012 | Jun., 2012 | | $ | 75,000.00 |
| | 2012 | Jun., 2012 | | $ | 260,000.00 |
| | 2012 | Jun., 2012 | | $ | 15,000.00 |
| | 2012 | Jun., 2012 | | $ | 30,000.00 |
| | 2012 | Jun., 2012 | | $ | 150,000.00 |
| | 2012 | Jun., 2012 | | $ | 40,000.00 |
| | 2012 | Jun., 2012 | | $ | 45,000.00 |
| | 2012 | Jun., 2012 | | $ | 30,000.00 |
| | 2012 | Jun., 2012 | | $ | 50,000.00 |
| | 2012 | Jun., 2012 | | $ | 120,000.00 |
| | 2012 | Jul., 2012 | | $ | 175,000.00 |
| | 2012 | Jul., 2012 | | $ | 23,000.00 |
| | 2012 | Jul., 2012 | | $ | - |
| | 2012 | Jul., 2012 | | $ | 45,000.00 |
| | 2012 | Jul., 2012 | | $ | 20,000.00 |
| | 2012 | Jul., 2012 | | $ | - |
| | 2012 | Jul., 2012 | | $ | 40,000.00 |
| | 2012 | Jul., 2012 | | $ | - |
| | 2012 | Jul., 2012 | | $ | 100,000.00 |
| | 2012 | Jul., 2012 | | $ | 50,000.00 |
| | 2012 | Jul., 2012 | | $ | - |
| | 2012 | Jul., 2012 | | $ | 30,000.00 |
| | 2012 | Jul., 2012 | | $ | 90,000.00 |
| | 2012 | Jul., 2012 | | $ | 75,000.00 |
| | 2012 | Aug., 2012 | | $ | 30,000.00 |
| | 2012 | Aug., 2012 | | $ | 25,000.00 |
| | 2012 | Aug., 2012 | | $ | 800,000.00 |
| | 2012 | Aug., 2012 | | $ | 28,000.00 |
| | 2012 | Aug., 2012 | | $ | 160,000.00 |
| | 2012 | Aug., 2012 | | $ | - |
| | 2012 | Sep., 2012 | | $ | 69,950.00 |
| | 2012 | Sep., 2012 | | $ | 84,000.00 |
| | 2012 | Sep., 2012 | | $ | 130,000.00 |
| | 2012 | Sep., 2012 | | $ | 582,000.00 |
| | 2012 | Sep., 2012 | | $ | 34,000.00 |
| | 2012 | Sep., 2012 | | $ | 19,500.00 |
| | 2012 | Sep., 2012 | | $ | 62,500.00 |
| | 2012 | Sep., 2012 | | $ | 50,000.00 |
| | 2012 | Sep., 2012 | | $ | 60,000.00 |
| | 2012 | Sep., 2012 | | $ | 24,500.00 |
| | 2012 | Sep., 2012 | | $ | 50,000.00 |
| | 2012 | Sep., 2012 | | $ | 38,000.00 |
| | 2012 | Oct., 2012 | | $ | 55,000.00 |
| | 2012 | Oct., 2012 | | $ | 135,000.00 |
| | 2012 | Oct., 2012 | | $ | 30,200.00 |
| | 2012 | Oct., 2012 | | $ | 67,968.00 |
| | 2012 | Oct., 2012 | | $ | 13,200.00 |
| | 2012 | Oct., 2012 | | $ | 150,000.00 |
| | 2012 | Oct., 2012 | | $ | 37,500.00 |
| | 2012 | Oct., 2012 | | $ | 65,000.00 |
| | 2012 | Oct., 2012 | | $ | 160,000.00 |
| | 2012 | Oct., 2012 | | $ | 22,500.00 |

| | | | | |
|---|---|---|---|---|
| 2012 | Oct., 2012 | | $ | 70,000.00 |
| 2012 | Oct., 2012 | | $ | 34,000.00 |
| 2012 | Oct., 2012 | | $ | 7,000.00 |
| 2012 | Oct., 2012 | | $ | 71,650.00 |
| 2012 | Nov., 2012 | | $ | 287,500.00 |
| 2012 | Nov., 2012 | | $ | 105,000.00 |
| 2012 | Nov., 2012 | | $ | 260,693.00 |
| 2012 | Nov., 2012 | | $ | 35,000.00 |
| 2012 | Nov., 2012 | | $ | 38,000.00 |
| 2012 | Nov., 2012 | | $ | 85,000.00 |
| 2012 | Nov., 2012 | | $ | 291,500.00 |
| 2012 | Nov., 2012 | | $ | 35,000.00 |
| 2012 | Nov., 2012 | | $ | 890,000.00 |
| 2012 | Nov., 2012 | | $ | 195,000.00 |
| 2012 | Nov., 2012 | | $ | - |
| 2012 | Dec., 2012 | | $ | 25,000.00 |
| 2012 | Dec., 2012 | | $ | 37,000.00 |
| 2012 | Dec., 2012 | | $ | 55,000.00 |
| 2012 | Dec., 2012 | | $ | 80,000.00 |
| 2012 | Dec., 2012 | | $ | 124,000.00 |
| 2012 | Dec., 2012 | | $ | 150,000.00 |
| 2012 | Dec., 2012 | | $ | 155,000.00 |
| 2012 | Dec., 2012 | | $ | 170,000.00 |
| 2012 | Dec., 2012 | | $ | 235,000.00 |
| 2012 | Dec., 2012 | | $ | 225,000.00 |
| 2012 | Dec., 2012 | | $ | 346,500.00 |
| 2012 | Dec., 2012 | | $ | 498,260.00 |
| 2012 | Dec., 2012 | | $ | 610,000.00 |
| 2013 | Jan., 2013 | | $ | 17,000.00 |
| 2013 | Jan., 2013 | | $ | 25,000.00 |
| 2013 | Jan., 2013 | | $ | 25,000.00 |
| | | | | |
| 2013 | Feb., 2013 | | $ | 14,687.50 |
| 2013 | Feb., 2013 | | $ | 24,999.00 |
| 2013 | Feb., 2013 | | $ | 31,000.00 |
| 2013 | Feb., 2013 | | $ | 59,500.00 |
| 2013 | Feb., 2013 | | $ | 73,437.50 |
| 2013 | Feb., 2013 | | $ | 75,000.00 |
| 2013 | Feb., 2013 | | $ | 75,000.00 |
| 2013 | Feb., 2013 | | $ | 146,875.00 |
| 2013 | Feb., 2013 | | $ | 160,000.00 |
| 2013 | Feb., 2013 | | $ | 198,000.00 |
| 2013 | Feb., 2013 | | $ | 350,000.00 |
| 2013 | Mar., 2013 | | $ | 103,766.69 |
| 2013 | Mar., 2013 | | $ | 17,000.00 |
| 2013 | Mar., 2013 | | $ | 20,000.00 |
| 2013 | Mar., 2013 | | $ | 23,500.00 |
| 2013 | Mar., 2013 | | $ | 30,000.00 |
| 2013 | Mar., 2013 | | $ | 54,000.00 |
| 2013 | Mar., 2013 | | $ | 57,000.00 |
| 2013 | Mar., 2013 | | $ | 76,250.00 |
| 2013 | Mar., 2013 | | $ | 100,000.00 |

| | | | | |
|---|---|---|---|---|
| | 2013 | Mar., 2013 | | $    160,000.00 |
| | 2013 | Apr., 2013 | | $10,000 |
| | 2013 | Apr., 2013 | | $23,500 |
| | 2013 | Apr., 2013 | | $25,000 |
| | 2013 | Apr., 2013 | | $48,000 |
| | 2013 | Apr., 2013 | | $105,000 |
| | 2013 | Apr., 2013 | | $135,000 |
| | 2013 | Apr., 2013 | | $1,350,000 |
| | 2013 | May, 2013 | 43341435-2012-23 | $35,000 |
| | 2013 | May, 2013 | 43341435-2012-10 | $54,834 |
| | 2013 | May, 2013 | 43341435-2012-28 | $60,000 |
| | 2013 | May, 2013 | 43341435-2011-42 | $100,000 |
| | 2013 | May, 2013 | 43341435-2012-14 | $124,500 |
| | 2013 | May, 2013 | 43341435-2011-40 | $160,000 |
| | 2013 | May, 2013 | 43341435-2011-8 | $275,000 |
| | 2013 | Jun., 2013 | 43341435-2012-15 | $50,000 |
| | 2013 | Jun., 2013 | 43341435-2012-63 | $55,000 |
| | 2013 | Jun., 2013 | 43341435-2012-30 | $63,000 |
| | 2013 | Jun., 2013 | 43341435-2011-55 | $67,000 |
| | 2013 | Jun., 2013 | 43341435-2012-11 | $105,000 |
| | 2013 | Jun., 2013 | 43341435-2012-43 | $127,500 |
| | 2013 | Jun., 2013 | 43341435-2011-54 | $230,000 |
| | 2013 | Jun., 2013 | 43115415-2010-53 | $25,500 |
| | 2013 | Jul., 2013 | | $49,000 |
| | 2013 | Jul., 2013 | | $89,000 |
| | 2013 | Jul., 2013 | | $125,000 |
| | 2013 | Jul., 2013 | | $140,000 |
| | 2013 | Jul., 2013 | | $725,000 |
| | TOTAL: | | | $106,624,977 |
| | | | | |
| | Estimated Value of Assigned Securities: | | | $26,500,000 |
| | **Net Total Payments:** | | | **$80,124,977** |

08-01420-jmp   Doc 720-9   Filed 09/05/13   Entered 09/05/13 18:40:50   Exhibit I
Pg 343 of 357

# EXHIBIT I

| MATTER List | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Grand Total |
|---|---|---|---|---|---|---|---|
| 1 | | $64,776.59 | $2,138.85 | | | | $66,915.44 |
| 2 | | | | | $10,472.61 | $21,520.61 | $31,993.22 |
| 3 | | | | $31,663.26 | $30,780.94 | $14,369.63 | $76,813.83 |
| 4 | | $4,594.54 | $37,059.73 | $12,957.58 | | | $54,611.85 |
| 5 | | $37,133.43 | $45,709.11 | $6,742.19 | | | $89,584.73 |
| 6 | | $160,023.44 | $25,322.42 | | | | $185,345.86 |
| 7 | | | | | $13,300.07 | $10,382.77 | $23,682.84 |
| 8 | | $27,371.48 | $13,238.04 | $34,924.18 | | | $75,533.70 |
| 9 | | $17,454.43 | $76,359.10 | | | | $93,813.53 |
| 10 | | | | | $22,429.70 | $14,258.05 | $36,687.75 |
| 11 | | | | $31,291.37 | | | $31,291.37 |
| 12 | | | | $15,953.86 | $41,985.43 | $43,719.58 | $101,658.87 |
| 13 | | | $34,335.15 | $12,476.07 | | | $46,811.22 |
| 14 | | | | $44,092.09 | $42,887.24 | $9,729.31 | $96,708.64 |
| 15 | | $7,369.40 | $19,567.67 | $377.23 | | | $27,314.30 |
| 16 | | | | $14,435.95 | $66,817.46 | | $81,253.41 |
| 17 | | | $19,843.62 | $123,703.62 | $14,212.15 | $4,000.00 | $161,759.39 |
| 18 | | | $110,350.56 | $9,879.72 | | | $120,230.28 |
| 19 | | | | $23,588.98 | $33,598.73 | $6,377.44 | $63,565.15 |
| 20 | | $36,208.95 | $48,273.99 | | | | $84,482.94 |
| 21 | | | $12,837.68 | $44,217.66 | | | $57,055.34 |
| 22 | | $22,996.53 | $75,606.23 | $12,434.15 | | | $111,036.91 |
| 23 | | $3,239.36 | $16,311.02 | $38,018.20 | $1,558.80 | | $59,127.38 |
| 24 | | | | $158,387.29 | $31,973.34 | | $190,360.63 |
| 25 | | | $64,357.11 | $22,216.60 | | | $86,573.71 |
| 26 | | | | $28,612.07 | $30,518.77 | | $59,130.84 |
| 27 | | | | $21,294.05 | $44,740.26 | $7,935.99 | $73,970.30 |
| 28 | | $1,664.44 | $57,092.61 | $52,630.82 | $8,576.25 | | $119,964.12 |
| 29 | | | | | | $57,467.13 | $57,467.13 |
| 30 | | | | $42,120.88 | $13,740.27 | | $55,861.15 |
| 31 | | | | | $83,657.34 | $22,092.95 | $105,750.29 |
| 32 | | | | $32,426.81 | | | $32,426.81 |
| 33 | | | | $67,647.85 | $25,022.91 | | $92,670.76 |
| 34 | | $19,485.00 | $65,134.48 | | | | $84,619.48 |
| 35 | | $88,156.41 | $27,742.30 | | | | $115,898.71 |
| 36 | | $18,354.16 | $6,343.63 | $535.90 | | | $25,233.69 |
| 37 | | | $22,229.06 | $8,222.35 | | | $30,451.41 |
| 38 | | | $20,747.81 | $15,128.09 | | | $35,875.90 |

| # | | | | | | | |
|---|---|---|---|---|---|---|---|
| 39 | | | | | $2,875.08 | $30.80 | $2,905.88 |
| 40 | | | | $5,976.11 | $24,518.70 | | $30,494.81 |
| 41 | | | | $10,535.80 | $45,113.83 | | $55,649.63 |
| 42 | | | $14,705.96 | $46,560.00 | $6,235.49 | | $67,501.45 |
| 43 | | | | | $28,056.77 | $10,075.88 | $38,132.65 |
| 44 | | $18,896.98 | $42,571.73 | $140.75 | | | $61,609.46 |
| 45 | | $7,686.53 | $87,544.21 | $1,272.00 | | | $96,502.74 |
| 46 | | | | $16,917.92 | $7,267.90 | | $24,185.82 |
| 47 | $5,199.61 | $186,731.07 | | | | | $191,930.68 |
| 48 | | | $54,947.96 | $1,779.65 | | $6,275.08 | $63,002.69 |
| 49 | | | | | $48,971.62 | | $48,971.62 |
| 50 | | $15,053.92 | $25,074.43 | $13,578.88 | | | $53,707.23 |
| 51 | | | | | | $3,326.69 | $3,326.69 |
| 52 | | $42,660.21 | $75,052.10 | $13,640.88 | | | $131,353.19 |
| 53 | | | | | $59,444.94 | $16,783.77 | $76,228.71 |
| 54 | | $82.33 | $63,946.89 | $5,499.05 | | | $69,528.27 |
| 55 | | | $5,240.94 | $57,977.13 | | | $63,218.07 |
| 56 | | | $12,967.43 | | | | $12,967.43 |
| 57 | | | | | | $12,789.46 | $12,789.46 |
| 58 | | | | $82,360.17 | $226,793.99 | $17,105.71 | $326,259.87 |
| 59 | | | | $56,002.67 | $143,703.66 | | $199,706.33 |
| 60 | | | | $23,877.16 | $5,478.48 | | $29,355.64 |
| 61 | | $2,472.48 | $59,345.78 | | | | $61,818.26 |
| 62 | | $199.78 | | | | | $199.78 |
| 63 | | | | | $20,498.52 | | $20,498.52 |
| 64 | | | | | $15,376.28 | $28,617.99 | $43,994.27 |
| 65 | | | | | $1,165.51 | | $1,165.51 |
| 66 | | $42,256.63 | $64,723.35 | $4,565.00 | | | $111,544.98 |
| 67 | | | | $57,190.77 | $6,423.27 | | $63,614.04 |
| 68 | | $1,493.40 | $103,490.88 | $14,268.05 | | | $119,252.33 |
| 69 | | | $58,289.27 | $1,403.81 | | | $59,693.08 |
| 70 | | $25,229.34 | $102,118.62 | | | | $127,347.96 |
| 71 | | | $11,732.43 | $76,308.06 | $1,744.00 | | $89,784.49 |
| 72 | | | $93,172.92 | $101,990.32 | $54,664.31 | | $249,827.55 |
| 73 | | | $26,971.77 | $5,000.00 | | | $31,971.77 |
| 74 | | | | | | $58,231.77 | $58,231.77 |
| 75 | | $30,448.49 | $66,972.12 | | | | $97,420.61 |
| 76 | | | | $41,944.02 | $32,193.33 | $5,764.40 | $79,901.75 |
| 77 | | | | $6,688.51 | $133,054.98 | $38,109.08 | $177,852.57 |
| 78 | | | | | $46,443.64 | $11,638.46 | $58,082.10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 79 | | $22,678.95 | $42,547.51 | $26,342.85 | | | $91,569.31 |
| 80 | | | | | | $26,335.36 | $26,335.36 |
| 81 | | | | $11,301.63 | $37,626.92 | $11,991.03 | $60,919.58 |
| 82 | | $1,966.36 | $85,510.84 | | | | $87,477.20 |
| 83 | | | | $52,900.40 | $7,014.91 | | $59,915.31 |
| 84 | | | | | $12,374.64 | $74,072.17 | $86,446.81 |
| 85 | | | | | $52,868.71 | $14,960.90 | $67,829.61 |
| 86 | | | $125,150.05 | $29,449.34 | | | $154,599.39 |
| 87 | | | | $184,011.78 | $4,663.19 | | $188,674.97 |
| 88 | | $14,246.24 | $16,313.95 | $178.40 | | | $30,738.59 |
| 89 | | | | | $18,065.11 | $19,024.09 | $37,089.20 |
| 90 | | | | | | $37,050.60 | $37,050.60 |
| 91 | | | | $19,763.38 | | $7,593.00 | $27,356.38 |
| 92 | | | $12,435.37 | $59,402.69 | $1,898.01 | | $73,736.07 |
| 93 | | | | $22,217.00 | $229,426.60 | $6,500.00 | $258,143.60 |
| 94 | | $38,912.76 | $26,484.38 | | | | $65,397.14 |
| 95 | | | | | $5,232.54 | $6,975.59 | $12,208.13 |
| 96 | | | $42,432.67 | $22,072.01 | | | $64,504.68 |
| 97 | | | | | $25,167.63 | $19,712.70 | $44,880.33 |
| 98 | | | $62,117.69 | $17,365.76 | $7,375.00 | | $86,858.45 |
| 99 | | $39,198.98 | $13,670.74 | | | | $52,869.72 |
| 100 | | | | $72,351.17 | $25,509.07 | | $97,860.24 |
| 101 | | $13,298.76 | $33,272.44 | | | | $46,571.20 |
| 102 | | | | $142,287.47 | $88,671.02 | | $230,958.49 |
| 103 | | $6,077.16 | $31,339.60 | $13,349.31 | | | $50,766.07 |
| 104 | | | $12,989.06 | $118,656.68 | | | $131,645.74 |
| 105 | | $4,999.35 | $54,629.69 | | | | $59,629.04 |
| 106 | | $251,276.70 | $115,560.34 | | | | $366,837.04 |
| 107 | | | $15,165.78 | $45,415.28 | | | $60,581.06 |
| 108 | | $191,318.63 | $2,508.47 | | | | $193,827.10 |
| 109 | | $9,468.29 | $52,947.08 | $95.18 | | | $62,510.55 |
| 110 | | | | $9,303.48 | $77,251.14 | $21,276.34 | $107,830.96 |
| 111 | | | | | $4,786.60 | $25,473.34 | $30,259.94 |
| 112 | | | $10,346.40 | $33,114.88 | $308.00 | | $43,769.28 |
| 113 | | $32,066.98 | $2,400.00 | | | | $34,466.98 |
| 114 | | | $51,160.35 | $52,128.75 | | | $103,289.10 |
| 115 | | $26,308.92 | $11,899.66 | | | | $38,208.58 |
| 116 | | $2,821.79 | $9,976.60 | $2,197.44 | | | $14,995.83 |
| 117 | | $13,370.89 | $28,939.47 | $49,358.63 | $123.52 | | $91,792.51 |
| 118 | | | | $2,175.35 | $22,896.79 | $57,818.66 | $82,890.80 |

| 119 | | | $15,007.85 | $57,172.90 | $3,947.52 | | $76,128.27 |
| 120 | | | | $27,473.76 | $32,057.61 | | $59,531.37 |
| 121 | | | $25,059.05 | $33,049.62 | | | $58,108.67 |
| 122 | | | $237.92 | $48,595.97 | $171.65 | | $49,005.54 |
| 123 | | | | $25,850.00 | $17,029.02 | | $42,879.02 |
| 124 | | $32,730.80 | $2,523.73 | | | | $35,254.53 |
| 125 | | $13,428.26 | $10,166.43 | | | | $23,594.69 |
| 126 | | | $26,515.96 | $20,151.61 | | | $46,667.57 |
| 127 | | | | | | $15,551.40 | $15,551.40 |
| 128 | | $46,873.01 | $42,051.31 | $2,851.91 | | | $91,776.23 |
| 129 | | | $3,308.48 | $24,535.07 | | | $27,843.55 |
| 130 | | | | | $3,629.08 | $32,665.36 | $36,294.44 |
| 131 | | $15,532.53 | | | | | $15,532.53 |
| 132 | | $750.00 | $95,372.93 | $47,234.80 | $899.00 | | $144,256.73 |
| 133 | | | $43,962.78 | $7,954.94 | | | $51,917.72 |
| 134 | | | $42,626.67 | $47,160.11 | $685.92 | | $90,472.70 |
| 135 | | | $25,207.84 | $74,655.04 | $28,274.99 | | $128,137.87 |
| 136 | | | | $11,443.73 | $47,195.71 | $21,418.49 | $80,057.93 |
| 137 | | | $5,939.00 | $33,409.10 | $17,074.45 | | $56,422.55 |
| 138 | | $12,589.92 | $63,979.06 | $6,631.87 | | | $83,200.85 |
| 139 | | | | | | $24,149.87 | $24,149.87 |
| 140 | | | $18,685.61 | $167,577.09 | $10,488.60 | | $196,751.30 |
| 141 | | | | | | $9,011.51 | $9,011.51 |
| 142 | | | | | $36,216.30 | $26,399.32 | $62,615.62 |
| 143 | | $6,493.39 | $8,573.33 | | | | $15,066.72 |
| 144 | | $21,387.18 | $34,659.46 | $19,939.31 | | | $75,985.95 |
| 145 | | | | | $53,222.90 | $21,951.30 | $75,174.20 |
| 146 | | $53,009.71 | $14,212.93 | $3,279.80 | | | $70,502.44 |
| 147 | | | | | $30,420.86 | $38,345.80 | $68,766.66 |
| 148 | | | | $19,990.86 | $95,584.45 | | $115,575.31 |
| 149 | | $10,964.62 | $7,354.08 | | | | $18,318.70 |
| 150 | | | | | | $22,193.75 | $22,193.75 |
| 151 | | | | | $69,344.24 | $21,245.67 | $90,589.91 |
| 152 | | | $1,644.63 | $58,647.65 | | | $60,292.28 |
| 153 | | $20,275.60 | $38,977.14 | $19,348.22 | | | $78,600.96 |
| 154 | | | | $8,284.62 | $13,698.99 | | $21,983.61 |
| 155 | | | | $4,946.19 | $47,772.83 | $32,688.95 | $85,407.97 |
| 156 | | | $5,073.06 | $16,174.24 | | | $21,247.30 |
| 157 | | | | $118,152.44 | $32,332.33 | | $150,484.77 |
| 158 | | $8,463.59 | $45,548.02 | $355.00 | $1,490.20 | | $55,856.81 |

| 159 | | $26,868.48 | $9,155.26 | | | | $36,023.74 |
| 160 | | | $3,134.78 | $49,133.16 | | | $52,267.94 |
| 161 | | | | $46,564.98 | $33,646.72 | $30,190.17 | $110,401.87 |
| 162 | | | | | | $8,807.83 | $8,807.83 |
| 163 | | | $18,592.17 | $5,935.02 | | | $24,527.19 |
| 164 | | $10,743.25 | $8,408.12 | $231.60 | $211,252.16 | | $230,635.13 |
| 165 | | | | | $394.25 | | $394.25 |
| 166 | | | $15,705.84 | $51,714.20 | | | $67,420.04 |
| 167 | $564.86 | $72,632.12 | $21,298.61 | | | | $94,495.59 |
| 168 | | | | | $8,572.90 | $26,626.04 | $35,198.94 |
| 169 | | | | $86,082.71 | | | $86,082.71 |
| 170 | | $2,317.16 | $26,161.16 | $2,219.68 | | | $30,698.00 |
| 171 | | $3,299.86 | $12,264.99 | $58.07 | | | $15,622.92 |
| 172 | | $32,365.23 | $60,140.11 | $19,529.90 | | | $112,035.24 |
| 173 | | | $5,617.79 | $19,597.49 | | | $25,215.28 |
| 174 | | | | $43,280.29 | $102,030.20 | $63.06 | $145,373.55 |
| 175 | | $60,752.77 | $18,297.60 | $91,727.54 | | | $170,777.91 |
| 176 | | $5,346.97 | $67,002.90 | $13,463.43 | | | $85,813.30 |
| 177 | | | | $8,029.78 | $13,327.42 | | $21,357.20 |
| 178 | | $30,072.64 | $102,229.69 | $1,700.00 | | | $134,002.33 |
| 179 | | | $52,408.37 | $1,521.60 | | | $53,929.97 |
| 180 | | | | $16,778.94 | $85,513.61 | $20,106.07 | $122,398.62 |
| 181 | | | | | | $9,049.36 | $9,049.36 |
| 182 | | $51,831.98 | $19,033.83 | $40,579.01 | $32,457.53 | $1,451.42 | $145,353.77 |
| 183 | | | $54,491.64 | $134,896.19 | $35,302.91 | | $224,690.74 |
| 184 | | $28,063.16 | $14,225.57 | | | | $42,288.73 |
| 185 | | $10,167.19 | $16,451.76 | | | | $26,618.95 |
| 186 | | | | $25,429.99 | $64,190.71 | $824.50 | $90,445.20 |
| 187 | | | $26,334.53 | $41,907.99 | $2,715.99 | | $70,958.51 |
| 188 | | $42,673.18 | $42,778.06 | | | | $85,451.24 |
| 189 | | | | | $25,396.25 | $1,122.33 | $26,518.58 |
| 190 | | | | $33,821.76 | $9,962.38 | | $43,784.14 |
| 191 | | $27,388.19 | $55,435.46 | | | | $82,823.65 |
| 192 | | | | | $7,712.97 | $8,266.65 | $15,979.62 |
| 193 | | | | | $40,275.52 | $25,241.60 | $65,517.12 |
| 194 | | | | | $8,277.15 | $41,820.58 | $50,097.73 |
| 195 | | | | | $84,898.45 | $19,871.17 | $104,769.62 |
| 196 | | | $32,512.06 | $22,171.45 | $8,493.96 | $227.69 | $63,405.16 |
| 197 | | | $13,671.04 | $37,727.35 | | | $51,398.39 |
| 198 | | | | $1,019.98 | $85,028.17 | | $86,048.15 |

| 199 | | | | $13,576.25 | $29,652.73 | $487.00 | $43,715.98 |
|---|---|---|---|---|---|---|---|
| 200 | | $67,761.64 | $146,428.53 | $8,253.00 | | | $222,443.17 |
| 201 | | | | | $120,281.09 | $26,362.12 | $146,643.21 |
| 202 | | | | $52,007.09 | $23,999.98 | | $76,007.07 |
| 203 | | | | | $46,704.38 | $15,552.05 | $62,256.43 |
| 204 | | $60,194.86 | $5,655.73 | | | | $65,850.59 |
| 205 | | $20,809.15 | $75,211.53 | | | | $96,020.68 |
| 206 | | | $17,882.36 | $12,610.94 | | | $30,493.30 |
| 207 | | | | $20,458.45 | $30,560.04 | $12,952.86 | $63,971.35 |
| 208 | | | $27,666.24 | $32,420.76 | | | $60,087.00 |
| 209 | | $2,548.73 | $11,710.00 | | | | $14,258.73 |
| 210 | | | | $13,670.14 | $4,500.33 | | $18,170.47 |
| 211 | | | | $19,194.90 | $1,817.93 | | $21,012.83 |
| 212 | | | | $23,919.69 | $43,426.29 | $48,296.72 | $115,642.70 |
| 213 | | | | $48,812.46 | $32,319.29 | $2,196.66 | $83,328.41 |
| 214 | | | | $8,780.36 | $30,693.24 | $35,910.72 | $75,384.32 |
| 215 | | $6,140.79 | $119,981.37 | $7,301.70 | | | $133,423.86 |
| 216 | | $3,267.58 | $103,659.12 | | | | $106,926.70 |
| 217 | | | $21,341.94 | $8,873.73 | | | $30,215.67 |
| 218 | | $46,419.17 | $144,381.82 | $40,563.91 | | | $231,364.90 |
| 219 | | $472.65 | $49,154.50 | $10,299.69 | | | $59,926.84 |
| 220 | | | | $42,327.83 | $125,183.58 | | $167,511.41 |
| 221 | | | $18,869.63 | $85,876.51 | $750.00 | | $105,496.14 |
| 222 | | | | | $104,935.57 | $78,340.89 | $183,276.46 |
| 223 | | | | $48,891.76 | $26,876.52 | | $75,768.28 |
| 224 | | | $7,300.00 | $71,695.72 | $325,180.74 | | $404,176.46 |
| 225 | | | | $1,100.00 | $20,796.69 | $63,373.84 | $85,270.53 |
| 226 | | | | $21,106.28 | | | $21,106.28 |
| 227 | | | $25.00 | $83,632.71 | | | $83,657.71 |
| 228 | | | | $33,209.65 | $166,834.00 | $12,633.52 | $212,677.17 |
| 229 | | $4,086.80 | $58,622.03 | $16,885.35 | | | $79,594.18 |
| 230 | | $28,072.74 | $135,465.55 | | | | $163,538.29 |
| 231 | | | $36,487.79 | $2,946.50 | | | $39,434.29 |
| 232 | | | | $21,806.77 | $4,896.03 | | $26,702.80 |
| 233 | | | $51,006.83 | $17,873.25 | | | $68,880.08 |
| 234 | | | $38,546.17 | $10,163.17 | | | $48,709.34 |
| 235 | | | $1,738.25 | $7,666.45 | $6,023.69 | | $15,428.39 |
| 236 | | | $76,287.24 | $13,379.76 | | | $89,667.00 |
| 237 | | | | | $51,459.97 | $33,395.19 | $84,855.16 |
| 238 | | $39,198.86 | $46,401.73 | | | | $85,600.59 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 239 | | | | | $81,025.06 | $16,815.26 | $97,840.32 |
| 240 | | | | | $146,745.35 | $15,101.80 | $161,847.15 |
| 241 | | | $12,901.04 | $26,670.79 | $57,941.25 | $21,768.06 | $119,281.14 |
| 242 | | | | $12,189.18 | $56,281.71 | $29,120.58 | $97,591.47 |
| 243 | | | | $13,572.48 | $47,143.77 | $13,855.54 | $74,571.79 |
| 244 | | | | $47,725.70 | $46,307.91 | $21,456.83 | $115,490.44 |
| 245 | | | | | | $18,026.43 | $18,026.43 |
| 246 | | | | $319.00 | $88,631.05 | $1,775.77 | $90,725.82 |
| 247 | | $50,612.46 | $87,464.02 | | | | $138,076.48 |
| 248 | | | $10,176.78 | $29,202.69 | $52,446.05 | | $91,825.52 |
| 249 | | | $57,336.86 | $30,001.12 | $114.12 | | $87,452.10 |
| 250 | | | | $10,314.26 | | | $10,314.26 |
| 251 | | | $3,392.40 | $16,512.05 | $18,324.60 | | $38,229.05 |
| 252 | | | | | $3,116.83 | | $3,116.83 |
| 253 | | | | | | $22,846.98 | $22,846.98 |
| 254 | | | $17,490.54 | | | | $17,490.54 |
| 255 | | | | $52,815.68 | $4,031.66 | | $56,847.34 |
| 256 | | | | $21,322.70 | $68,696.20 | | $90,018.90 |
| 257 | | | $1,830.50 | $66,909.12 | | | $68,739.62 |
| 258 | | $9,552.30 | $111,922.79 | | | | $121,475.09 |
| 259 | | $5,053.20 | | | | | $5,053.20 |
| 260 | | $6,340.46 | $274,591.06 | $178,921.05 | | | $459,852.57 |
| 261 | | $31,242.73 | $84,462.28 | $497.00 | | | $116,202.01 |
| 262 | | $24,715.85 | $48,791.31 | | | | $73,507.16 |
| 263 | | $11,430.71 | $110,014.26 | $47,409.42 | $22,086.78 | | $190,941.17 |
| 264 | | $21,871.85 | $173,541.64 | $33,758.86 | | | $229,172.35 |
| 265 | | | $14,488.47 | $44,313.66 | $16,364.77 | | $75,166.90 |
| 266 | | | $5,239.34 | $32,573.04 | $20,710.36 | | $58,522.74 |
| 267 | | | | $11,058.84 | $117,155.58 | $19,930.19 | $148,144.61 |
| 268 | | $1,462.64 | $13,900.53 | $14,670.97 | | | $30,034.14 |
| 269 | | | | $75,013.76 | $37,292.12 | | $112,305.88 |
| 270 | | | $4,368.11 | $25,136.99 | $3,487.50 | | $32,992.60 |
| 271 | | | | $17,480.70 | $74,827.29 | $15,651.51 | $107,959.50 |
| 272 | | | $20,563.94 | $91,956.25 | $41,105.77 | | $153,625.96 |
| 273 | | | | | $37,119.03 | $60,134.48 | $97,253.51 |
| 274 | | | $7,238.41 | $40,573.15 | $19,980.34 | | $67,791.90 |
| 275 | | | | | $171,849.76 | $51,074.70 | $222,924.46 |
| 276 | | | $169,180.95 | $65,640.24 | | | $234,821.19 |
| 277 | | | | | $28,259.49 | $14,954.45 | $43,213.94 |
| 278 | | | | $3,856.76 | $7,129.93 | | $10,986.69 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 279 | | | | | $72,040.19 | $32,793.85 | $104,834.04 |
| 280 | | | | $750.00 | | | $750.00 |
| 281 | | $6,256.71 | $349,889.37 | | | | $356,146.08 |
| 282 | | | | $867.47 | $38,337.71 | $32,768.33 | $71,973.51 |
| 283 | | $37,615.59 | $67,798.17 | $54,044.97 | | | $159,458.73 |
| 284 | | $25,513.68 | $83,381.02 | $5,500.00 | | | $114,394.70 |
| 285 | | | | $26,748.23 | $31,845.68 | $15,228.20 | $73,822.11 |
| 286 | | | $114,727.23 | $55,507.13 | | | $170,234.36 |
| 287 | | | | | $27,484.34 | $122,734.45 | $150,218.79 |
| 288 | | | $66,171.35 | $8,159.82 | | | $74,331.17 |
| 289 | | | | $160,343.64 | $7,822.45 | | $168,166.09 |
| 290 | | $5,522.75 | $93,854.04 | $121,029.02 | $68,688.47 | $40,122.36 | $329,216.64 |
| 291 | | $18,321.91 | $1,803.54 | | | | $20,125.45 |
| 292 | | $3,707.24 | $20,215.73 | | | | $23,922.97 |
| 293 | | | | | $19,867.81 | $94,226.90 | $114,094.71 |
| 294 | | | | $579.70 | $180,603.98 | $38,526.69 | $219,710.37 |
| 295 | | | $73,272.03 | $57,935.94 | | | $131,207.97 |
| 296 | | | $51,450.81 | $860.01 | | | $52,310.82 |
| 297 | | | $2,599.86 | $37,810.95 | | | $40,410.81 |
| 298 | | $5,072.05 | $10,401.47 | $17,393.14 | $6,440.19 | | $39,306.85 |
| 299 | | | | $24,445.10 | $44,967.98 | | $69,413.08 |
| 300 | | $25,801.04 | $32,842.83 | $7,347.55 | | | $65,991.42 |
| 301 | | | | | | $25,354.28 | $25,354.28 |
| 302 | | | | | | $14,161.27 | $14,161.27 |
| 303 | | | | $43,873.68 | $16,896.11 | $21,516.74 | $82,286.53 |
| 304 | | $37,554.40 | $53,935.55 | $2,130.76 | | | $93,620.71 |
| 305 | | $3,684.25 | $61,776.13 | | | | $65,460.38 |
| 306 | | $4,710.50 | $163,223.14 | $6,379.42 | | | $174,313.06 |
| 307 | | $53,226.99 | $103,910.71 | | | | $157,137.70 |
| 308 | | $38,123.14 | $45,286.03 | | | | $83,409.17 |
| 309 | | $4,390.71 | $112,758.84 | $24,968.80 | | | $142,118.35 |
| 310 | | | $6,486.54 | $31,999.18 | $1,700.00 | | $40,185.72 |
| 311 | | | | $17,369.94 | $7,430.35 | | $24,800.29 |
| 312 | | | | $21,329.70 | $15,453.32 | | $36,783.02 |
| 313 | | $82,683.73 | $8,926.14 | | | | $91,609.87 |
| 314 | | | | $39,945.81 | $12,192.29 | $15,988.10 | $68,126.20 |
| 315 | | $32,847.40 | $1,063.60 | | | | $33,911.00 |
| 316 | | | | $99,606.69 | $51,220.91 | | $150,827.60 |
| 317 | | | | $42,723.80 | $45,789.47 | | $88,513.27 |
| 318 | | | | | $214,374.94 | | $214,374.94 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 319 | | | $24,463.36 | $41,098.14 | | | $65,561.50 |
| 320 | | | | $72,322.40 | $15,495.52 | $9,605.28 | $97,423.20 |
| 321 | $3,779.36 | $40,562.81 | $21,449.02 | $539.00 | | | $66,330.19 |
| 322 | | $1,960.74 | -$18,517.68 | | | | -$16,556.94 |
| 323 | | | | | | $3,438.42 | $3,438.42 |
| 324 | | | $4,389.66 | $15,206.54 | | | $19,596.20 |
| 325 | | $70,532.13 | $71,368.98 | | | | $141,901.11 |
| 326 | | $42,684.39 | $36,027.88 | | | | $78,712.27 |
| 327 | | | | $166,013.34 | $19,982.59 | | $185,995.93 |
| 328 | | | $360.76 | $30,566.30 | $23,462.30 | | $54,389.36 |
| 329 | | $66,095.06 | $13,821.95 | | | | $79,917.01 |
| 330 | | $4,805.63 | $91,129.18 | $18,954.71 | | | $114,889.52 |
| 331 | | $11,756.02 | $211,382.39 | | | | $223,138.41 |
| 332 | | | | $27,989.84 | $66,686.94 | | $94,676.78 |
| 333 | | $46,987.45 | $4,499.14 | | | | $51,486.59 |
| 334 | | | | $7,303.85 | $24,168.30 | $219,416.76 | $250,888.91 |
| 335 | | | $24,074.22 | | | | $24,074.22 |
| 336 | | | | $26,708.29 | | | $26,708.29 |
| 337 | | | $9,898.03 | $14,870.53 | | | $24,768.56 |
| 338 | | $23,989.85 | $8,641.79 | | | | $32,631.64 |
| 339 | | $17,562.34 | $47,576.78 | | | | $65,139.12 |
| 340 | | | | $750.00 | | | $750.00 |
| 341 | | $29,463.91 | $750.00 | | | | $30,213.91 |
| 342 | | | | $37,147.46 | $15,528.80 | | $52,676.26 |
| 343 | | | | | $5,660.62 | $49,246.67 | $54,907.29 |
| 344 | | | $41,791.66 | $23,769.92 | | | $65,561.58 |
| 345 | | $46,038.23 | $22,905.93 | | | | $68,944.16 |
| 346 | | | $7,972.19 | $15,710.30 | | | $23,682.49 |
| 347 | | | $12,437.39 | $14,159.40 | | | $26,596.79 |
| 348 | | | | $894.91 | $50,208.22 | $11,423.00 | $62,526.13 |
| 349 | | | $26,450.73 | $17,507.47 | | $1,100.00 | $45,058.20 |
| 350 | | | | | $186,202.38 | $102,046.98 | $288,249.36 |
| 351 | | | $24,393.67 | $7,596.06 | | | $31,989.73 |
| 352 | | $37,440.45 | $25,326.96 | $889.40 | | | $63,656.81 |
| 353 | | | $36,869.34 | $55,614.36 | $17,909.20 | | $110,392.90 |
| 354 | | | | $36,237.21 | $27,253.54 | $19,651.56 | $83,142.31 |
| 355 | | | | | $52,087.70 | $20,355.39 | $72,443.09 |
| 356 | | $91,112.46 | $61,880.55 | $30,162.73 | | | $183,155.74 |
| 357 | | $12,070.32 | $20,811.84 | | | | $32,882.16 |
| 358 | | | | $37,584.10 | $18,713.03 | | $56,297.13 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 359 | | | | | $46,409.32 | $108,150.47 | $154,559.79 |
| 360 | | | $1,753.24 | $18,504.13 | $11,334.90 | -$107.50 | $31,484.77 |
| 361 | | | $15,651.05 | $4,367.33 | | | $20,018.38 |
| 362 | | | | | | $18,663.10 | $18,663.10 |
| 363 | | | | | $29,756.91 | | $29,756.91 |
| 364 | | | $3,394.01 | $46,211.53 | $6,160.62 | | $55,766.16 |
| 365 | | | $29,742.98 | $2,256.74 | | | $31,999.72 |
| 366 | | | | $25,910.29 | $22,546.96 | | $48,457.25 |
| 367 | | | | $54,480.97 | $122,315.97 | $1,659.85 | $178,456.79 |
| 368 | | | $13,484.97 | $473,468.30 | | | $486,953.27 |
| 369 | | | | $33,330.46 | $10,085.54 | $25,758.38 | $69,174.38 |
| 370 | | | | $756.83 | $691,589.26 | $42,589.65 | $734,935.74 |
| 371 | | | | $37,286.32 | $3,215.48 | | $40,501.80 |
| 372 | | | | $102,594.07 | $17,579.51 | | $120,173.58 |
| 373 | | | | $15,685.32 | $132,680.39 | $9,154.33 | $157,520.04 |
| 374 | | | | $48,462.61 | $22,744.34 | | $71,206.95 |
| 375 | | $9,980.95 | | | | | $9,980.95 |
| 376 | | | | | $35,418.26 | $2,819.07 | $38,237.33 |
| 377 | $30,338.78 | | $214.50 | | | | $30,553.28 |
| 378 | | | | | $31,470.95 | $116,166.73 | $147,637.68 |
| 379 | | | | | $12,460.39 | $46,089.11 | $58,549.50 |
| 380 | | | $19,092.86 | $9,857.95 | | | $28,950.81 |
| 381 | $31,508.29 | $61,358.86 | $510.45 | | | | $93,377.60 |
| 382 | | | | $72,524.25 | $14,710.22 | | $87,234.47 |
| 383 | | | | | $10,926.11 | $26,893.99 | $37,820.10 |
| 384 | | | | $47,291.77 | | | $47,291.77 |
| 385 | | | | | $24,707.15 | $65,488.11 | $90,195.26 |
| 386 | $23,993.07 | $83,094.39 | $5,498.54 | | | | $112,586.00 |
| 387 | | $5,241.86 | $26,947.96 | $21,684.29 | | | $53,874.11 |
| 388 | | $3,176.77 | $26,585.95 | $10,311.76 | | | $40,074.48 |
| 389 | | $36,889.28 | $84,094.78 | | | | $120,984.06 |
| 390 | | $40,110.43 | $55,158.15 | $2,750.00 | | | $98,018.58 |
| 391 | | | | $38,650.95 | $69,243.96 | | $107,894.91 |
| 392 | | $6,206.45 | $71,872.73 | | | | $78,079.18 |
| 393 | | | $8,110.52 | $320,446.27 | $77,325.12 | | $405,881.91 |
| 394 | | | | $20,777.98 | $65,556.88 | | $86,334.86 |
| 395 | $3,105.77 | $20,373.50 | $5,607.45 | | | | $29,086.72 |
| 396 | | | | $50,767.07 | $16,484.63 | | $67,251.70 |
| 397 | | | $14,598.19 | $37,899.91 | $116,528.41 | | $169,026.51 |
| 398 | | | $5,057.46 | $16,308.33 | | | $21,365.79 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 399 | | | | | | $26,040.39 | $26,040.39 |
| 400 | | | | | $65.80 | $239,277.58 | $239,343.38 |
| 401 | | $68,259.05 | $112,840.42 | | | | $181,099.47 |
| 402 | | | $1,205.30 | $91,981.29 | $6,769.96 | | $99,956.55 |
| 403 | | | | $17,407.32 | $78,258.13 | | $95,665.45 |
| 404 | | $9,130.90 | $35,178.88 | | | | $44,309.78 |
| 405 | | | | $75,904.81 | | | $75,904.81 |
| 406 | | $56,898.76 | $116,486.31 | $1,500.00 | | | $174,885.07 |
| 407 | | $92,993.70 | $18,676.09 | | | | $111,669.79 |
| 408 | | $189,305.85 | $16,268.28 | | | | $205,574.13 |
| 409 | | $112,533.71 | $6,492.47 | | | | $119,026.18 |
| 410 | | | $9,665.38 | $44,202.28 | $6,502.30 | | $60,369.96 |
| 411 | | $4,420.20 | $27,810.84 | $23,575.47 | | | $55,806.51 |
| 412 | | $10,734.65 | $57,378.46 | $462.22 | | | $68,575.33 |
| 413 | | | | | $58,099.73 | $28,898.77 | $86,998.50 |
| 414 | | | | | $89,817.87 | $13,747.34 | $103,565.21 |
| 415 | | | | $144,901.94 | $47,063.56 | $1,924.33 | $193,889.83 |
| 416 | | | | | $3,644.91 | $21,135.60 | $24,780.51 |
| 417 | | | | $6,939.10 | | | $6,939.10 |
| 418 | | -$113.81 | $62,544.55 | $15,067.94 | | | $77,498.68 |
| 419 | | | | | $126,670.98 | $12,564.59 | $139,235.57 |
| 420 | | $158,210.58 | $21,211.79 | $3,859.50 | $1,917.74 | | $185,199.61 |
| 421 | | | $5,689.56 | $33,902.36 | $8,072.21 | | $47,664.13 |
| 422 | | | $48,407.91 | $4,255.47 | | | $52,663.38 |
| 423 | | | | $38,702.85 | $31,990.12 | $7,908.76 | $78,601.73 |
| 424 | | $7,614.29 | $37,279.32 | $5,060.00 | | | $49,953.61 |
| 425 | | | $20,322.77 | $26,826.48 | $1,560.00 | | $48,709.25 |
| 426 | | | | | $32,751.94 | $12,545.77 | $45,297.71 |
| 427 | | | | $49,008.58 | $32,508.30 | | $81,516.88 |
| 428 | | | $48,396.62 | $17,232.15 | | | $65,628.77 |
| 429 | | | | | $23,023.30 | $9,374.95 | $32,398.25 |
| 430 | | | $31,365.69 | $58,885.12 | $10,393.80 | $30,055.06 | $130,699.67 |
| 431 | | | $44,034.36 | $3,946.98 | | | $47,981.34 |
| 432 | | | $65,863.03 | $57,611.71 | | | $123,474.74 |
| 433 | | | | $19,928.39 | $39,034.06 | $36,606.67 | $95,569.12 |
| 434 | | $10,852.10 | $40,211.93 | | | | $51,064.03 |
| 435 | | | | $260,956.52 | $2,361.20 | | $263,317.72 |
| 436 | | | | $181,362.01 | $203,900.91 | | $385,262.92 |
| 437 | | | $44,376.52 | $14,828.45 | | | $59,204.97 |
| 438 | | | $10,872.99 | $43,043.47 | $11,196.25 | | $65,112.71 |

| # | | | | | | |
|---|---|---|---|---|---|---|
| 439 | | | | $9,559.15 | | $9,559.15 |
| 440 | | $164,528.61 | $43,336.98 | | | $207,865.59 |
| 441 | | | | $144,742.20 | $19,585.31 | $164,327.51 |
| 442 | $79,062.02 | $25,697.92 | | | | $104,759.94 |
| 443 | | $141,730.26 | $157,422.95 | | | $299,153.21 |
| 444 | | | $10,101.85 | | | $10,101.85 |
| 445 | | $1,746.80 | $60,533.66 | $1,116.40 | | $63,396.86 |
| 446 | | $5,303.88 | $54,005.93 | $12,949.77 | | $72,259.58 |
| 447 | | | $325.00 | | | $325.00 |
| 448 | $46,713.53 | $8,395.82 | | | | $55,109.35 |
| 449 | | $31,695.86 | $222,642.10 | | | $254,337.96 |
| 450 | | | $321,404.62 | $11,375.07 | $1,261.39 | $334,041.08 |
| 451 | $45,496.56 | | | | | $45,496.56 |
| 452 | | $757.68 | $86,608.83 | $8,499.07 | | $95,865.58 |
| 453 | $31,302.39 | $30,694.48 | | | | $61,996.87 |
| 454 | | | | | $39.00 | $39.00 |
| 455 | | | $25,194.15 | $4,541.74 | | $29,735.89 |
| 456 | | $5,719.69 | $16,141.29 | $24,335.84 | $369,798.70 | $415,995.52 |
| 457 | | | $194,967.48 | $43,299.30 | | $238,266.78 |
| 458 | | | $839,375.50 | $34,472.87 | $1,967.03 | $875,815.40 |
| 459 | | | | $2,200.00 | $26,537.61 | $28,737.61 |
| 460 | | $80,761.17 | $48,021.42 | $52,573.39 | | $181,355.98 |
| 461 | | $58.50 | $92,028.16 | | | $92,086.66 |
| 462 | | | | $28,686.87 | $30,880.10 | $59,566.97 |
| 463 | | | $2,107.79 | | | $2,107.79 |
| 464 | | $33,990.92 | $5,092.22 | | | $39,083.14 |
| 465 | | | $8,985.67 | $37,103.73 | $64,162.68 | $110,252.08 |
| 466 | | | $114,074.72 | $40,623.72 | $39,466.94 | $194,165.38 |
| 467 | | | $72,757.69 | | | $72,757.69 |
| 468 | | $71,583.92 | $42,417.28 | $17,454.83 | | $131,456.03 |
| 469 | | | | $5,204.30 | $41,688.44 | $46,892.74 |
| 470 | | | $7,922.03 | $53,103.32 | -$7,581.51 | $53,443.84 |
| 471 | $22,538.15 | $18,559.62 | | | | $41,097.77 |
| 472 | | | $20,229.04 | $30,112.54 | | $50,341.58 |
| 473 | | | $376,533.66 | $33,721.92 | $33,315.17 | $443,570.75 |
| 474 | | $1,050.00 | $76,321.15 | $21,861.80 | | $99,232.95 |
| 475 | $16,572.06 | $29,604.60 | | | | $46,176.66 |
| 476 | $1,803.42 | $11,466.93 | $67,382.39 | | | $80,652.74 |
| 477 | $23,080.72 | $79,305.33 | $15,272.59 | | | $117,658.64 |
| 478 | | | $113,564.30 | $106,365.63 | | $219,929.93 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 479 | | | | $122,572.99 | $11,298.80 | | $133,871.79 |
| 480 | | $102,373.22 | $19,025.20 | | | | $121,398.42 |
| 481 | | $48,430.59 | $25,880.85 | $5,062.97 | | | $79,374.41 |
| 482 | | $8,258.25 | $14,145.63 | | | | $22,403.88 |
| 483 | | | $17,820.72 | $8,969.50 | | | $26,790.22 |
| 484 | | $73,103.15 | $54,401.27 | $8,274.97 | | | $135,779.39 |
| 485 | | $28,669.27 | $33,648.69 | | | | $62,317.96 |
| 486 | | $2,448.03 | $33,954.79 | $56,017.45 | $49,668.65 | | $142,088.92 |
| 487 | | | $70,038.39 | $67,150.94 | $104.52 | | $137,293.85 |
| 488 | | | $44,921.04 | $79,890.32 | | | $124,811.36 |
| 489 | | | $19,944.60 | $31,426.08 | $14,825.85 | | $66,196.53 |
| 490 | | | | $50,645.57 | $57,915.79 | $1,274.24 | $109,835.60 |
| 491 | | | $18,675.93 | $181,584.94 | | | $200,260.87 |
| 492 | | | $190,365.68 | $32,389.93 | $943.23 | | $223,698.84 |
| 493 | | $33,153.14 | $33,622.96 | $3,202.50 | | | $69,978.60 |
| 494 | | | | $23,380.37 | $52,454.00 | $12,678.39 | $88,512.76 |
| 495 | | | $9,309.48 | $15,074.44 | $750.00 | | $25,133.92 |
| 496 | | | | $18,987.09 | $21,195.37 | $14,700.13 | $54,882.59 |
| 497 | | $15,487.02 | $48,695.57 | $5,534.48 | | | $69,717.07 |
| 498 | | | $20,769.63 | $20,463.30 | $4,743.55 | | $45,976.48 |
| 499 | | | | $1,608.05 | $101,278.85 | $151,469.75 | $254,356.65 |
| 500 | | | | $14,013.95 | $79,056.04 | $14,841.46 | $107,911.45 |
| 501 | | $3,092.29 | $41,917.16 | $57,472.25 | | | $102,481.70 |
| 502 | | | | | | $39,163.71 | $39,163.71 |
| 503 | | | $51,646.52 | $45,648.01 | | | $97,294.53 |
| 504 | $1,100.00 | $66,494.62 | $858.64 | | | | $68,453.26 |
| 505 | | | $1,666.70 | $82,442.26 | $13,320.35 | | $97,429.31 |
| 506 | | | $63,323.21 | $16,384.56 | | | $79,707.77 |
| 507 | | | | $184,120.08 | $29,406.62 | | $213,526.70 |
| 508 | | $16,429.61 | $5,949.60 | | | | $22,379.21 |
| 509 | | | | | $23,934.85 | $214,850.16 | $238,785.01 |
| 510 | | | | $11,840.56 | $127,658.90 | $9,487.99 | $148,987.45 |
| 511 | | $16,261.31 | $27,085.49 | $29,080.46 | $27,531.80 | | $99,959.06 |
| 512 | | | | $237,664.69 | $23,850.88 | $14,932.72 | $276,448.29 |
| 513 | | $29,678.99 | $15,315.89 | | | | $44,994.88 |
| 514 | | | | $8,316.26 | $78,719.72 | $17,488.24 | $104,524.22 |
| 515 | | | $16,605.74 | $40,638.87 | | | $57,244.61 |
| 516 | | | | $52,910.17 | $382,570.74 | | $435,480.91 |
| 517 | | $17,136.75 | $37,252.70 | | | | $54,389.45 |
| 518 | | $35,373.53 | $2,602.49 | | | | $37,976.02 |

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| 519 |  |  |  | $34,093.61 | $5,342.89 |  | $39,436.50 |
| 520 |  |  |  |  |  | $2,281.40 | $2,281.40 |
| 521 |  |  |  | $154,023.51 | $45,818.61 | $2,750.00 | $202,592.12 |
| 522 |  |  |  | $20,348.80 | $35,884.73 |  | $56,233.53 |
| 523 |  |  | $3,950.00 | $102,724.64 | $2,447.67 |  | $109,122.31 |
| 524 |  | $15,289.37 | $46,488.26 |  |  |  | $61,777.63 |
| 525 |  |  |  |  | $35,180.33 | $21,631.14 | $56,811.47 |
| 526 |  |  | $6,681.69 | $29,721.15 | $1,195.20 |  | $37,598.04 |
| 527 |  |  |  | $31,462.18 | $33,192.30 | $1,305.00 | $65,959.48 |
| 528 |  |  |  |  | $52,994.87 | $24,302.79 | $77,297.66 |
| 529 |  | $1,822.80 | $48,233.27 |  |  |  | $50,056.07 |
| 530 |  |  |  | $9,984.90 | $42,852.41 |  | $52,837.31 |
| 531 |  |  | $9,584.75 | $36,933.44 | $43,046.36 |  | $89,564.55 |
| 532 |  |  | $8,012.47 | $30,861.09 |  |  | $38,873.56 |
| 533 |  |  |  | $15,290.44 | $38,297.81 |  | $53,588.25 |
| 534 |  |  |  | $118,368.60 | $50,111.51 |  | $168,480.11 |
| 535 |  | $25,800.92 | $5,834.58 |  |  |  | $31,635.50 |
| 536 |  |  |  |  |  | $3,667.40 | $3,667.40 |
| 537 |  |  |  | $24,318.22 | $11,679.65 |  | $35,997.87 |
| 538 |  |  |  | $9,103.95 | $122,964.32 | $49,662.40 | $181,730.67 |
| 539 |  | $11,876.26 |  |  |  |  | $11,876.26 |
| 540 |  |  | $34,514.86 | $27,364.90 |  |  | $61,879.76 |
| 541 |  |  | $728.34 | $90,267.79 |  |  | $90,996.13 |
| 542 |  |  | $102,776.19 | $4,287.38 |  |  | $107,063.57 |
| 543 |  | $3,690.12 | $27,528.86 |  |  |  | $31,218.98 |
| 544 |  |  |  |  | $19,831.10 | $12,010.90 | $31,842.00 |
| 545 |  |  |  |  |  | $15,789.35 | $15,789.35 |
| 546 |  |  | $43,530.20 | $28,402.31 |  |  | $71,932.51 |
| **Grand Total** | $10,643.83 | $5,207,624.85 | $11,909,336.26 | $15,580,579.00 | $12,231,098.88 | $5,244,347.73 | **$50,183,630.55** |