**<u>Exhibit H</u>**

WEIL:\95154813\3\58399.0011

08-13555-mg    Doc 46973-8    Filed 08/11/14    Entered 08/11/14 18:05:00    Exhibit H
                                         Pg 16 of 28

**Hearing Date and Time: January 8, 2014 at 10:00 a.m. (Prevailing Eastern Time)**

James B. Kobak, Jr.
Christopher K. Kiplok
Robert B. Funkhouser
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　　　　Debtor. | Case No.  08-01420 (JMP) SIPA |

**THE TRUSTEE'S OMNIBUS REPLY IN SUPPORT OF THE**
**ONE HUNDRED FOURTH OMNIBUS OBJECTION**
**TO GENERAL CREDITOR CLAIMS (NO LIABILITY CLAIMS)**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT .................................................................................................................................2

I.    AS A MATTER OF LAW, THE REIMBURSEMENT CLAIMS BY
      UNDERWRITERS ARISING FROM PURCHASES AND SALES OF LBHI
      SECURITIES SHOULD BE SUBORDINATED TO GENERAL CREDITOR
      CLAIMS. ................................................................................................................2

      A.    Section 510(b) Expressly Subordinates Reimbursement and Indemnity
            Claims Arising from Securities of LBI's Affiliate, LBHI. ......................................3

      B.    The Policy Underlying Section 510(b) Also Mandates Subordination of
            Underwriters' Claims. ............................................................................................6

      C.    Underwriters' Claims Should Be Treated Like Other Subordinated
            Claims. ..................................................................................................................10

II.   UNDERWRITERS' ARGUMENTS BASED ON STATUTORY
      CONTRIBUTION RIGHTS ARE FLAWED. ....................................................................12

      A.    Underwriters' Claims for Statutory Contribution Are Contingent On
            Relative Fault Determinations That Have Not Occurred and So Must Be
            Disallowed Under Section 502(e)(1)(B). ...............................................................13

      B.    Statutory Contribution Does Not Apply to Underwriters' Attorneys' Fees
            Claims. ..................................................................................................................14

      C.    Statutory Contribution Is Not Available to UBS. ..................................................15

III.  JUNIOR UNDERWRITERS' CONTRACTUAL CLAIMS FOR
      CONTRIBUTION AND INDEMNIFICATION ALSO MUST BE
      DISALLOWED BECAUSE THEY ARE CONTINGENT AND SUBJECT TO
      CONTRACTUAL PREDICATES THAT HAVE NOT BEEN MET .............................16

      A.    Junior Underwriters' Contractual Claims Are Contingent Within the
            Meaning of Section 502(e)(1)(B). .........................................................................17

      B.    Junior Underwriters Failed to Comply With Contractual Predicates for
            Their Claims. .........................................................................................................18

            1.    Indemnification Agreements Are Strictly Construed ................................19

            2.    Junior Underwriters Are Not Contractually Entitled to
                  Reimbursement of Counsel They Decided to Retain. ................................19

i

## <u>TABLE OF CONTENTS</u>
(Continued)

**Page**

3.     Junior Underwriters Failed to Comply With the Mandate That Their Settlement Agreements Release All Underwriters..............................20

4.     LBI Did Not Breach the MAAU and Is Not Seeking to Benefit From Any Such Breach............................................................................21

CONCLUSION.............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alper Holdings USA*, No. 07-12148 (BRL), 2008 WL 4186333 (Bankr. S.D.N.Y.
Sept. 10, 2008) ........................................................................................................................17

*Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200 (S.D.N.Y. 2005) ....................................19

*In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 92 (Bankr. S.D.N.Y. 1992) ........................17

*In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 98 (Bankr. S.D.N.Y. 1992) ..................13, 17

*In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982 (Bankr. S.D.N.Y. 1992) ...........13, 14, 17

*In re Fuel Barons, Inc.*, 488 B.R. 783 (Bankr. N.D. Ga. 2013)......................................................17

*In re GCO Servs., LLC*, 324 B.R. 459 (Bankr. S.D.N.Y. 2005)......................................................13

*In re Granite Partners LP*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) .................................................6

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .............................................................4

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487 (1989)..........................................19

*India. com, Inc. v. EasyLink Servs. Corp.*, 420 F. App'x 47 (2d Cir. 2011)..................................14

*In re Jacom Computer Servs., Inc.*, 280 B.R. 570 (Bankr. S.D.N.Y. 2002) .......................3, 7, 8, 9

*Jenkins v. Tomlinson (In re Basin Res. Corp.)*, 190 B.R. 824 (Bankr. N.D. Tex. 1996)...............10

*Jezarian v. Raichle (In the Matter of Stirling Homex Corp.)*, 579 F.2d 206 (2d Cir. 1978) ...........6

*Lernout & Hauspie Speech Prods., N.V. v. Baker (In re Lernout & Hauspie Speech
Prods., N.V.)*, 264 B.R. 336 (Bankr. D. Del. 2001) ............................................................6, 10

*Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del
Biaggio)*, No. 08-30991 (TEC), 2012 WL 5467754 (Bankr. N.D. Cal. Nov. 8, 2012) ... *passim*

*In re Lyondell Chem. Co.*, 442 B.R. 236 (Bankr. S.D.N.Y. 2011) ...........................................14, 18

*Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997)..........................................17

*In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816 (Bankr. D. Del. 1999) ..................................3, 7, 12

*Moskal v. United States*, 498 U.S. 103 (1990)................................................................................4

# TABLE OF AUTHORITIES

(Continued)

**Page(s)**

*Official Comm. of Creditors Holding Unsecured Claims v. PaineWebber Inc.* (*In re De Laurentiis Entm't. Grp., Inc.*), 124 B.R. 305 (C.D. Cal. 1991) ..............................................7, 9

*Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001)............................17

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012) ...............................4

*In re RNI Wind Down Corp.*, 369 B.R. 174 (Bankr. D. Del. 2007)..............................................14

*Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251 (2d Cir. 2006) ........................3, 9

*Tonking v. Port Auth.*, 3 N.Y.3d 486 (2004)....................................................................................19

*United States v. Atl. Research Corp.*, 551 U.S. 128 (2007)............................................................14

*United States v. Menasche*, 348 U.S. 528 (1955) .............................................................................4

*In re VF Brands, Inc.*, 275 B.R. 725 (Bankr. D. Del. 2002).........................................................5, 6

*In re Walnut Equip. Leasing Co.*, No. 97-19699DWS, 1999 WL 1271762 (Bankr. E.D. Pa. Dec. 28, 1999)..................................................................................................................7, 9

*In re Wedtech Corp.*, 85 B.R. 285 (Bankr. S.D.N.Y. 1988) .........................................................17

*Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437 (1996)...................................................................19

**STATUTES AND RULES**

11 U.S.C. § 502(e)(1)(B) ...........................................................................................13, 14, 16, 17

11 U.S.C. § 510(b) ................................................................................................................ *passim*

15 U.S.C. § 12.................................................................................................................................15

15 U.S.C. § 77k(f)...............................................................................................................12, 14, 15

**LEGISLATIVE AND ADMINISTRATIVE MATERIALS**

H.R. Doc. No. 93-137 (1973) ..........................................................................................................4

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................................4

**TREATISES AND PERIODICAL MATERIALS**

18 Am. Jur. 2d *Contribution* § 20 ..................................................................................................15

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and
    Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security
    Holders and Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 286-87, 298 (1973) ........................6

Mark P. Kronfeld et al., *The Murkiness of Corporate Separateness in Chapter 11*, 32 Am.
    Bankr. Inst. J. 46, 89-90 (2013) .................................................................................6

**OTHER AUTHORITIES**

*Black's Law Dictionary* 353 (8th ed. 2004).................................................................................14

v

## PRELIMINARY STATEMENT

1.     The responses by Junior Underwriters[1] and UBS Financial Services Inc.

("UBS")[2] (collectively "Underwriters") to the Trustee's One Hundred Fourth Omnibus Objection

demonstrate that the Trustee's subordination argument presents only a narrow issue of law and

involves no fact disputes.  Section 510(b) of the Bankruptcy Code mandates subordinating

reimbursement claims arising from the purchase or sale of the securities of the debtor or its

affiliates.  Based on the responses, this Court should rule that the Underwriters' claims are

subordinated.

2.     Underwriters concede that their reimbursement and contribution claims

against LBI arise from the purchase or sale of LBHI securities.  They do not contest that LBHI is

an "affiliate" of LBI as that term is used in Section 510(b).  Their narrow argument for evading

Section 510(b)'s mandatory subordination of their claims is that there are no claims or interests

represented by LBHI securities in LBI's proceeding and therefore nothing to which their claims

can be subordinated.

3.     This argument fails because Section 510(b) subordination does not require

such a securities interest.  Their argument is refuted by the plain text of Section 510(b), the

underlying policy, and each decision that has addressed this argument.  Accepting Underwriters'

interpretation would effectively read the phrase "of an affiliate of the debtor" out of the statute

and would also contradict the absolute priority rule that subordinates equity claims—whether of

---

1.   (Resp. of Underwriter Claimants to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor
     Claims (No Liability Claims), Sept. 9, 2013, ECF No. 7205 ("JU Resp.").)

2.   (Resp. of UBS Financial Services Inc. to the Trustee's One Hundred Fourth Omnibus Objection to General
     Creditor Claims (No Liability Claims), Sept. 9, 2013, ECF No. 7206 ("UBS Resp.").)  With respect to Section
     510(b), UBS relies entirely on Junior Underwriters' arguments.  (*Id.* at 10.)

shareholders or those, like underwriters, whose claims for reimbursement arise from their role in issuing equity—to general creditor claims. Like other general creditor claims to LBHI securities in this proceeding, which have been subordinated to general creditor claims, Underwriters' claims must be subordinated as well. Because there is no real prospect of a distribution on subordinated claims, this Court need not now (or likely ever) reach the question of whether some portion of Underwriters' claims are allowable as subordinated claims.

4. In the event this Court decides to address the merits of Underwriters' claims, it should find that they have not established those claims. Underwriters' statutory contribution claims depend on a fault determination not yet made, which is therefore contingent and disallowed under Section 502(e). Junior Underwriters (but not UBS) also have asserted contractual claims, but their indemnity agreements—construed narrowly under New York law—do not support their claims.

## ARGUMENT

## I. AS A MATTER OF LAW, THE REIMBURSEMENT CLAIMS BY UNDERWRITERS ARISING FROM PURCHASES AND SALES OF LBHI SECURITIES SHOULD BE SUBORDINATED TO GENERAL CREDITOR CLAIMS.

5. Although they acknowledge that, where the debtor issued the securities, underwriters' claims for indemnity or contribution are subject to mandatory subordination under Section 510(b) (JU Resp. at 20), Underwriters nonetheless assert that the provision does not apply here because the securities at issue are LBHI securities and because there are no claims or interests represented by LBHI securities in this proceeding to which their claims can be subordinated. (*Id.* at 16-17.) Underwriters' argument is contrary to both the plain text of Section 510(b)—which expressly applies to "a security . . . of an affiliate of the debtor"—and the decisions that have addressed this very issue. Moreover, there *are* claims for LBHI securities in

this proceeding.  Like other subordinated claims, such claims (as well as Underwriters' claims) must be subordinated to all unsecured general creditor claims.

**A.   Section 510(b) Expressly Subordinates Reimbursement and Indemnity Claims Arising from Securities of LBI's Affiliate, LBHI.**

6.    Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a *purchase or sale of a security* of the debtor or of *an affiliate of the debtor*, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, *shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security*, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (2012) (emphasis added).

7.    Underwriters do not dispute that:

- Section 510(b) applies to claims beyond just shareholders' claims for the purchase and sale of securities of debtor or its affiliates;

- Reimbursement and contribution claims by underwriters are subordinated under Section 510(b) where the underlying securities are issued by the debtor;

- Underwriters' claims are for reimbursement and arise from the purchase of LBHI securities;

- LBHI is an affiliate of LBI.

(*See* JU Resp. at 15-20.)  Indeed, the case law is clear on these points.  *See, e.g.*, *Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251, 256-58 (2d Cir. 2006); *In re Jacom Computer Servs., Inc.*, 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002); *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, 826 (Bankr. D. Del. 1999).

8.    Underwriters nonetheless argue that Section 510(b) should not apply here because the underlying securities were issued by LBHI, not LBI, and that Section 510(b) cannot

apply where there supposedly are no claims "represented by such security."  (*See* JU Resp. at 15-
20.)  But Section 510(b) explicitly applies to claims for "a security of the debtor *or of an affiliate
of the debtor*." 11 U.S.C. § 510(b) (emphasis added).) [3]  Under Underwriters' faulty reading of
Section 510(b), subordination would never apply to claims—whether for purchase or sale, or for
reimbursement or contribution—where the securities were issued by an affiliate of the debtor.
Underwriters' construction would "violate[] the established principle that a court should give
effect, if possible, to every clause and word of a statute." *Moskal v. United States*, 498 U.S. 103,
109 (1990) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)) (internal
punctuation omitted); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct.
2065, 2073 (2012) (stating that it is a court's "obligation to interpret the [Bankruptcy] Code
clearly and predictably using well established principles of statutory construction").
"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative
interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic
Contractors, Inc.*, 458 U.S. 564, 575 (1982).

        9.     Courts have applied Section 510(b) to subordinate claims for securities of
an affiliate of the debtor where there are no interests represented by the affiliate's securities in
the debtor's proceeding.  Further, no court has held to the contrary.  Indeed, the Bankruptcy
Court for the Northern District of California recently rejected arguments similar to those of
Underwriters.  *See Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman* (*In
re Del Biaggio*), No. 08-30991 (TEC), 2012 WL 5467754 (Bankr. N.D. Cal. Nov. 8, 2012).  In
*In re Del Biaggio*, an investor in an LLC asserted a claim against the bankruptcy estate of the

---

3.    The "affiliate" language is included in the legislative history, *see* H.R. Rep. No. 95-595, at 359 (1977),
*reprinted in* 1978 U.S.C.C.A.N. 5963, 6315; H.R. Doc. No. 93-137, at 115 (1973), and in both the original and
amended versions of the statute.

controlling shareholder for fraud and misrepresentation in connection with the investment. *Id.* at
*2. Creditors successfully moved for summary judgment, arguing that the claim should be
subordinated. *Id.* As here, the claimant argued that "an equity security in [LLC] is not within
the priority chain of claims against [the debtor]." *Id*. at *4. The court rejected these arguments
as contrary to Section 510(b) and its purpose. *Id*. at *5-7. Instead, the court concluded that all
creditors' claims in the controlling shareholder's proceeding were senior to the claim for the
LLC's securities. *Id.* at *5. Relying on both pre-Bankruptcy Code cases and cases applying
Section 510(b), the court held that the rationale for subordinating investor claims against the
debtor to general creditor claims also applied to investor claims against the affiliate. *Id*. at *2-4;
*see also id.* at *5 ("Courts have held expressly that a damage claim asserted against a *debtor*
concerning a security of an *affiliate* of the debtor must be subordinated to creditor's claims
against the *debtor*." (emphasis in original)). Because the estate had insufficient funds to pay all
unsecured general creditor claims, the court declined to determine whether the claims would be
allowable as subordinated claims. *Id.* at *1.

10. Similarly, in *In re VF Brands, Inc.,* 275 B.R. 725 (Bankr. D. Del. 2002),
the bankruptcy court rejected the claimant's argument that Section 510(b) did not apply because
(1) he was never a shareholder of the parent, and (2) subsidiary shareholders were not part of the
priority scheme of the parent. As the court explained, such claims would be general creditor
claims absent subordination, and Section 510(b) accordingly subordinated the claims to all
general creditor claims:

> In the absence of section 510(b), such a claim would have the same
> priority as any other general unsecured claim against the parent.
> Therefore, such a claim is one which is "equal to" the claims of the
> general unsecured creditors of the [parent]. Applying section 510(b)
> requires that the claim of [the claimant] (which is based on
> damages from the purchase of stock of an affiliate of the [debtor])
> must be subordinated to the claims of the general unsecured

> creditors of the [debtors] which in the absence of that section
> would be equal in priority to its claim.

*Id.* at 727.[4] *See also Lernout & Hauspie Speech Prods., N.V. v. Baker* (*In re Lernout & Hauspie Speech Prods., N.V.*), 264 B.R. 336, 341 (Bankr. D. Del. 2001) (claim against debtor-subsidiary arising out of the purchase of stock of its parent subordinated under Section 510(b) to claims of subsidiary's general unsecured creditors). As in *VF Brands* and *Lernout*, Underwriters' claims should be subordinated to all general creditor claims.

**B.    The Policy Underlying Section 510(b) Also Mandates Subordination of Underwriters' Claims.**

11.    As Underwriters acknowledge (JU Resp. at 15), the intent and policy behind Section 510(b) primarily derives from the longstanding absolute priority rule that provision may be made for stockholders only after all creditors have been paid. *See Jezarian v. Raichle* (*In the Matter of Stirling Homex Corp.*), 579 F.2d 206, 211 (2d Cir. 1978). *See also* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy— Allocating the Risk of Illegal Securities Issuance Between Security Holders and Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 286-87, 298 (1973) (advocating the enactment of a subordination statute based on "the absolute priority rule," which "mandates the complete subordination of equity claims against a bankrupt to the claims of general creditors"); *In re Granite Partners L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997) (citing Slain & Kripke, *supra*, at 286-87, 288) ("The allocation of the risk, as between the investor and the creditor, is reflected

---

4.    Underwriters criticize *In re VF Brands* as an "erroneous interpretation of 510(b)" but provide no supporting authority other than one article.  (JU Resp. at 18-19 (citing Mark P. Kronfeld et al., *The Murkiness of Corporate Separateness in Chapter 11*, 32 Am. Bankr. Inst. J. 46, 89-90 (2013)).)  But the cited pages state:  "[C]ourts may interpret 510(b) to allow subordinated claims against any debtor entity as long as the underlying security was issued by one of that debtor's affiliates. This broad interpretation of 510(b) seems to treat separate debtor entities as interchangeable, which some may argue is inconsistent with the principle of corporate separateness." Kronfeld, *supra*, at 90.  In context, the cited pages are referring to the court's allowing a claim for common stock of the affiliate at the same level of priority as the debtor's securities, not the decision to subordinate to general creditor claims.

in the absolute priority rule, and should not be reallocated…" and "…a shareholder's fraud claim cannot be treated equally with the claims of general creditors").  Underwriters mistakenly argue this policy does not apply to their reimbursement claim for LBHI securities because they are contractual creditors of LBI rather than shareholders and because no LBHI investor claims have been asserted.  Both arguments should be rejected.

12.     The 1984 amendment to Section 510(b), which added reimbursement claims, extended the policy of the original statute to "also subordinate claims of other parties (e.g., officers and directors and underwriters) who play a role in the purchase and sale transactions which give rise to the securities law claims."  *In re Mid-Am.*, 228 B.R. at 826.  *See also Official Comm. of Creditors Holding Unsecured Claims v. PaineWebber Inc.* (*In re De Laurentiis Entm't. Grp., Inc.*), 124 B.R. 305, 310 (C.D. Cal. 1991) (holding that the subordination rationale applies not only to direct claims asserted by shareholders, but also to claims asserted by those who evaluate risks associated with the securities).  The language of Section 510(b) "is sufficiently broad to include *any claim for indemnification* of defense costs incurred in connection with a lawsuit seeking damages arising from the purchase or sale of securities."  *In re Walnut Equip. Leasing Co.*, No. 97-19699DWS, 1999 WL 1271762, at *6 (Bankr. E.D. Pa. Dec. 28, 1999) (emphasis added).  "Moreover, the language of § 510(b) does not limit its application to any particular type of *claimant* . . . but, rather, focuses on the type of *claim* possessed (*e.g.*, claim for reimbursement or contribution)."  *Id.* (emphasis in original). Accordingly, underwriter claims for reimbursement must be subordinated to all other general unsecured creditor claims.  *See In re Jacom*, 280 B.R. at 572.  *Accord In re Mid-Am.*, 228 B.R. at 826 ("Congress made a legislative judgment that claims emanating from tainted securities law transactions should not have the same priority as the claims of general creditors of the estate."); *see also In re Walnut Equip.*, 1999 WL 1271762, at *11; *In re DeLaurentiis*, 124 B.R. at 310.

13.     Underwriters' argument, that because "there are no remaining investor claimants," then "there is no investor-creditor fairness concern" and thus no mandatory subordination (JU Resp. at 18), is wrong.  Congress amended Section 510(b) to include reimbursement and contribution claims, not just claims by securities purchasers and sellers. Even if there are no investor claimants, the "underwriter-creditor fairness concern" applies.  The same concern about the risk allocation between investors and creditors applies as between underwriters and creditors.  *See, e.g.*, *In re Jacom*, 280 B.R. at 572 ("it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs") (citations omitted).

14.     Underwriters acknowledge that they generally take on a greater distribution of risk than creditors and are in a better position to manage this risk than creditors with respect to the issuance of the securities.  (*See* JU Resp. at 20.)  The allegations in the underlying actions make clear that Underwriters' liability derived from their undertaking these risks with respect to LBHI's securities.[5]  Because Section 510(b) expressly extends the subordination of claims arising from the debtor's own securities to the securities of the debtor's affiliate, the subordination of underwriters' reimbursement and indemnity claims also applies to

---

5.   (*See* Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, at 74, *In re Lehman Brothers Equity/Debt Securities Litigation* ("*Lehman Securities Litig.*"), No. 1:08-cv-05523-LAK-GWG (S.D.N.Y. Feb. 23, 2009), Exhibit 5 to Declaration of Jason E. Zakai, Exhibit B to the Trustee's One Hundred Fourth Omnibus Objection ("Underwriter Defendants were sellers, offerors, and/or solicitors of sales of Lehman securities . . ." and "transferred title to Plaintiffs . . . and . . . solicited the purchase of Lehman securities . . . .").  *See also* Third Amended Class Action Complaint for Violations of the Federal Securities Laws, at 36-37, *Lehman Securities Litig.*, No. 1:08-cv-05523-LAK-GWG (S.D.N.Y. April 23, 2010), ECF No. 212 ("UBS implemented an initiative to increase sales of 'structured products' . . . " and "Lehman was a major issuer of UBS structured products.");  Consolidated First Amended Complaint, at 162, *Lehman Securities Litig.*, No. 1:09-cv-1238-LAK (S.D.N.Y. Nov. 29, 2011), ECF No. 85 ("Underwriter Defendants engaged in the business of effecting transactions in the Lehman Securities . . . ."); Consolidated First Amended Complaint for Damages, at 10, *Lehman Securities Litig.*, No. 1:09-cv-1946-LAK (S.D.N.Y. Nov. 28, 2011) ("Underwriter Defendants participated in the distribution and sale of the Lehman Notes.").)

claims concerning securities of debtor's affiliate. The "proper consideration of the risks and benefits anticipated by creditors and equity investors, the policy rationale of section 510(b), requires that claims arising from a security issued by an affiliate subsidiary must be subordinated to claims against the debtor." *In re Del Biaggio*, 2012 WL 5467754, at *6. This risk allocation policy rationale fully accords with the Second Circuit's broad interpretation of Section 510(b). *See In re Med Diversified*, 461 F.3d at 259.

15.     Underwriters are not "mere contractual creditors of LBI" (JU Resp. at 20), and their contractual relationship with LBI does not exempt them from Section 510(b). Courts repeatedly have rejected the same arguments made by other underwriters seeking indemnification, holding that an underwriting agreement or contractual relationship does not exempt such claims from mandatory subordination under Section 510(b). *See, e.g.*, *In re Jacom*, 280 B.R. at 572 (rejecting underwriter's argument that its claim should not be subordinated because it arose from an indemnity contract); *In re DeLaurentis*, 124 B.R. at 309 (holding that underwriter should be considered an equity holder, not a general creditor, in asserting its contractual indemnification claim); *In re Walnut Equip.*, 1999 WL 1271762, at **5-6 (holding that Section 510(b) applied to indemnification claim of qualified independent underwriter who was not involved in issuance of securities and did not take any equity interest, "regardless of whether the indemnification obligation is based on a statute, a contractual agreement or otherwise").

16.     Section 510(b) subordinates *all* damage claims that arise from the purchase of securities of the debtor's affiliate. Once subject to subordination, such damage claims cannot have priority greater than the security involved. More to the point, the priority will always be below that of general creditors. *See In re Del Biaggio*, 2012 WL 5467754, at *7

("To the extent 510(b) treats the claim arising from the Note as a claim against the assets of the [parent debtor], the claim would still be subordinated to other general unsecured claims against [the parent debtor].").  *See also In re Lernout*, 264 B.R. at 343 ("[O]nce the claimant was identified as one to whom § 510(b) applied, i.e., one who holds a claim arising from the sale or purchase of a security, the claim was subordinated to general unsecured creditors in the debtor's case.").

### C. Underwriters' Claims Should Be Treated Like Other Subordinated Claims.

17.    Underwriters mistakenly contend that their claims cannot be subordinated because there is no LBHI securities-claim level in this proceeding to which they may be subordinated.  But the law and policy discussed above demonstrate that Underwriters' claims must be subordinated to a level below unsecured general creditor claims, which is dispositive in this proceeding.[6]  *See, e.g.*, *Jenkins v. Tomlinson* (*In re Basin Res. Corp*.), 190 B.R. 824, 826 (Bankr. N.D. Tex. 1996).

18.    Section 510(b) does not require a separate class of pending subordinated claims representing the securities at issue, and Underwriters cite no authority that it does.  *See In re Del Biaggio*, 2012 WL 5467754, at *7 (rejecting argument by claimant that its claim cannot be subordinated because the plan did not provide a separate class for subordinated claims).

---

6.    As part of the approval of the LBHI settlement, the Trustee identified approximately $11.36 billion in claims subject to subordination.  (Notice of Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry of Order Approving Settlement Agreement Between the Trustee and the LBHI Entities at 18, Feb. 26, 2013, ECF No. 5784.)  Recognizing that the LBI general creditor estate had insufficient assets to pay unsecured general creditor claims in full (*see* Declaration of Christopher K. Kiplok in Support of Trustee's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Entry of Order Approving Settlement Agreement Between the Trustee and the LBHI Entities at 10, Feb. 26, 2013, ECF No. 5785), the LBHI settlement agreement simply provided that the allowed subordinated claims would receive distributions "if and only to the extent that there remain assets in the LBI General Estate after full satisfaction of all senior claims."  (Settlement Agreement at 22, § 2.02(c)(ii), Feb. 26, 2013, ECF No. 5784.)  Nothing more is required here.

Subordinating Underwriters' claims to all unsecured general creditor claims fully complies with the "relative concept" invoked by Underwriters. (*See* JU Resp. at 16.)

19. In any event, Underwriters' contentions overlook that other claims for LBHI securities have already been subordinated. Many investors in the same LBHI securities underwritten by Underwriters—the plaintiffs in the underlying litigations for which Underwriters seek indemnification—asserted general creditor claims in this SIPA proceeding against the LBI estate. While most of these claims have been withdrawn or expunged,[7] some claims are still pending. (*E.g.*, Proof of Claim No. 5888, June 1, 2009 (claim by purchaser of LBHI securities alleging securities fraud which has been subordinated in priority to all allowed unsecured general creditor claims against the LBI general estate)). Underwriters' assertion also is belied by the dozens of general creditor claims by former employees for LBHI equity interests that have been reclassified as equity interests and subordinated to general creditor claims. (*E.g.*, Order Granting the Trustee's One Hundred First Omnibus Objection to General Creditor Claims (Employee Equity Claims), Aug. 20, 2013, ECF No. 7055; Order Granting the Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims), Oct. 17, 2013, ECF No. 7464.)[8] Underwriters' claims should be subordinated in the same fashion.

---

7. (*See* The Trustee's Seventy-Ninth Omnibus Objection to General Creditor Claims (No Liability Claims), June 6, 2013, ECF No. 6340. *See also* Notice of Resolution of Trustee's Seventy-Ninth Omnibus Objection to General Creditor Claims (No Liability Claims), June 25, 2013, ECF No. 6595; Notice of Withdrawal of Proofs of Claim, June 21, 2013, ECF No. 6582.)

8. Junior Underwriters seize on the statement in the One-Hundred Thirty-First Omnibus Objection reserving the right to determine the validity, value, or level of priority of those subordinated claims "should the need arise" as somehow supporting their position. (*See* The Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims) at 11 n.9, Aug. 29, 2013, ECF No. 7158; *see also* JU Resp. at 16 n.14.) But this statement simply reflects that neither this Court nor the Trustee should expend time and resources to further address subordinated claims where there are insufficient LBI general estate assets to fully satisfy general creditor claims.

20.     Under Section 510(b), Underwriters' claims against LBI for reimbursement and contribution arising from LBHI securities are subject to mandatory subordination to all general creditor claims.  Because it is apparent that no distributions will be made on subordinated claims, this Court should simply rule that Underwriters' claims are subordinated and decline to determine whether Underwriters' claims are allowable or in what amount. *See In re Mid-Am.*, 228 B.R. at 818; *In re Del Biaggio*, 2012 WL 5467754, at *1.

## II.     UNDERWRITERS' ARGUMENTS BASED ON STATUTORY CONTRIBUTION RIGHTS ARE FLAWED.

21.     In their responses, UBS and Junior Underwriters rely heavily on Section 11(f) of the Securities Act of 1933, 15 U.S.C. § 77k(f), which establishes a limited right of contribution among joint tortfeasors.[9]  (*See* UBS Resp. at 6; JU Resp. at 8.)  This is a late surprise to the Trustee, as only one Underwriter asserted any claim for statutory contribution in its proof of claim.  (*See* Attachment A to Proof of Claim of SunTrust Robinson Humphrey, Inc. at 3, June 1, 2009, Proof of Claim No. 5841.)  In any event, Underwriters' belated reliance on Section 11(f) is misplaced—such claims for statutory contribution are contingent because no fault determination has been made.  Moreover, Section 11(f) contribution simply does not apply to attorneys' fees, costs, and the like, or to liabilities arising from claims other than Section 11 claims.

---

9.   Section 11(f) reads: "Except as provided in paragraph (2), all or any one or more of the persons specified in subsection (a) of this section shall be jointly and severally liable, and every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation."  15 U.S.C. § 77k(f)(1) (2012).

**A.     Underwriters' Claims for Statutory Contribution Are Contingent On
Relative Fault Determinations That Have Not Occurred and So Must Be
Disallowed Under Section 502(e)(1)(B).**

22.     Section 502(e)(1)(B) of the Bankruptcy Code mandates the disallowance

of "any claim for reimbursement or contribution of an entity that is liable with the debtor . . . to

the extent that . . . such claim for reimbursement or contribution is contingent as of the time of

allowance or disallowance."  11 U.S.C. § 502(e)(1)(B).  Mandatory disallowance under Section

502(e)(1)(B) applies when (1) the claim seeks "reimbursement or contribution," (2) the claimant

is "liable with the debtor" on the claims in the underlying action, and (3) the claim is "contingent

at the time of its allowance or disallowance."  *In re Drexel Burnham Lambert Grp. Inc.* ("*Drexel

III*"), 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992) (citing *In re Drexel Burnham Lambert Grp.,

Inc.* ("*Drexel II*"), 146 B.R. 98, 100-01 (Bankr. S.D.N.Y. 1992)); *accord In re GCO Servs., LLC*,

324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005).

23.     Underwriters expressly seek contribution and they assert that LBI is liable

with them on the underlying claims (*see* UBS Resp. at 21; JU Resp. at 9-10), thereby satisfying

the first and second prongs of the Section 502(e)(1)(B) test.

24.     Finally, the claims remain contingent because LBI's liability for

contribution, if any, can only be established by a future determination, thereby satisfying the

third prong.  Underwriters have now provided summary information regarding settlements  and

costs, but controlling Southern District precedent holds that their statutory claims for

contribution remain contingent until a relative fault hearing, a fairness hearing, or an actual trial

sets the amount of the debtor's liability.  *See Drexel II*, 146 B.R. at 105 ("Inasmuch as there has

been neither a hearing determining [debtor's] proportionate fault in the underlying action nor a

hearing on the fairness of the settlement to [debtor], the amount owed by [debtor] has not been

fixed and the claims are still contingent and are disallowed under Code § 502(e)(1)(B).").[10]

Moreover, Underwriters are not entitled to contribution to the extent that they were guilty of

fraudulent misrepresentation and LBI was not. 15 U.S.C. § 77k(f)(1). Until such a

determination is also made, the claims remain contingent. Underwriters' statutory contribution

claims therefore should be disallowed under Section 502(e)(1)(B).

**B.** **Statutory Contribution Does Not Apply to Underwriters' Attorneys' Fees Claims.**

25. Section 11(f)'s limited right of contribution does not cover the

Underwriters' claims for attorneys' fees, costs, or the like. "Contribution is defined as the

'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid

more than his or her proportionate share, the shares being determined as a percentage of fault.'"

*United States v. Atl. Research Corp.*, 551 U.S. 128, 138 (2007) (quoting *Black's Law Dictionary*

353 (8th ed. 2004)). Contribution does not encompass reimbursement for any fees or costs paid

by the claimant for its own defense. *See, e.g.*, *India.com, Inc. v. Dalal*, 420 F. App'x 47, 48 (2d

Cir. 2011) ("Furthermore, [the claimant's] argument for attorneys' fees based upon the

'contribution' portion of the indemnification clause fails because it misunderstands that

'contribution' is a legal term that, used in the indemnity context as it is here, plainly

contemplates only the 'right to demand that another who is jointly responsible *for a third party's*

*injury* supply part of what is required *to compensate the third party*.'" (quoting *Black's Law*

---

10. UBS suggests that the Court should ignore the *Drexel* line of cases, notwithstanding that *Drexel* is binding precedent in this district. (*See* UBS Resp. 9-10 (citing *In re RNI Wind Down Corp.*, 369 B.R. 174 (Bankr. D. Del. 2007)).) In *RNI*, however, the underlying agreement provided for advancement, not reimbursement, of defense costs. As Judge Gerber of this Court explained, "the right to payment that Judge Sontchi found to be 'unliquidated but not contingent' [in *RNI*] was the right to the *advancement of those costs of defense*, and not the right to *contribution or indemnity for amounts ultimately paid to a third party*—the circumstance that was relevant there and here." *In re Lyondell Chem. Co.*, 442 B.R. 236, 250 n.41 (Bankr. S.D.N.Y. 2011) (emphasis in original).

*Dictionary* at 352-53 (second emphasis added)); 18 Am. Jur. 2d *Contribution* § 20 ("Generally, the right of contribution does not extend to any part of the cost paid or the expense incurred by one of two or more parties subject to a joint liability in attempting to defend himself or herself against the claim, unless the costs or expenses were authorized by those who are jointly liable."). The claims should therefore be disallowed to the extent that Underwriters seek fees or costs under the guise of Section 11(f)'s limited right of contribution.

### C. Statutory Contribution Is Not Available to UBS.

26. Contribution under Section 11(f) only applies to payments on claims arising under Section 11 of the Securities Act. *See* 15 U.S.C. § 77k(f) (providing contribution right only to a party "who becomes liable to make any payment *under this section*") (emphasis added). UBS's central claim, for contribution of an as-yet-unpaid amount of $120 million to settle a class action in the Lehman MDL, arises out of claims under both Section 11 *and Section 12(a)(2)* of the Securities Act. (*See* UBS Resp. at 4; Declaration of Kenneth G. Crowley in Support of Response of UBS Financial Services Inc. to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) ("Crowley Decl.") at 5, Sept. 9, 2013, ECF No. 7206.) UBS is not entitled to contribution to the extent its liability arose from Section 12 rather than Section 11.

27. In any event, the Lehman MDL settlement documents establish that UBS settled to resolve its own conduct, not LBI's liability. (*See* Notice of Pendency of Class Action and Proposed Settlement at 1, included as Ex. B-2 to The Structured Products Class Representatives' Notice of Motion and Motion for Entry of Preliminary Order Pursuant to Rule 23, Ex. F to Crowley Decl. (describing litigation as including "(i) the procedures by which UBSFS structured, marketed and sold structured products through its financial advisors, including the Lehman-issued Structured Products, (ii) the sales commissions payable to UBSFS

15

and its financial advisors, relating to the sale of structured products, (iii) the training and

education of UBSFS financial advisors relating to the sale of structured products, (iv)

communications between UBSFS financial advisors or consultants and purchasers of Structured

Products.").)   UBS also denied that "any of the investors' losses were caused by any alleged

misrepresentations in the offering materials."  (*Id.*)   Moreover, far from resolving LBI's (or

LBHI's) joint liability, the UBS settlement expressly excluded from the release any class claims

against LBI or LBHI.  (*See* Stipulation of Settlement and Release ¶ 6(b), included as Ex. 1 to

Ex. F to Crowley Decl.)   UBS thus falls far short of establishing the grounds for statutory

contribution.

       28.     Similarly, UBS seeks contribution for a large number of FINRA

arbitration awards and settlements, but provides no basis for LBI having shared liability under

Section 11.[11]  Section 11(f)'s right of contribution does not apply to those awards and

settlements.

### III.  JUNIOR UNDERWRITERS' CONTRACTUAL CLAIMS FOR CONTRIBUTION AND INDEMNIFICATION ALSO MUST BE DISALLOWED BECAUSE THEY ARE CONTINGENT AND SUBJECT TO CONTRACTUAL PREDICATES THAT HAVE NOT BEEN MET.

       29.     Junior Underwriters assert claims for contribution and indemnification

arising out of certain agreements among Junior Underwriters and LBI.[12]  These claims fail for

two principal reasons:  first, Section 502(e)(1)(B) disallows such claims because they are

contingent on whether the liabilities will be satisfied by LBHI, which as issuer has the primary

obligation to indemnify underwriters.  Second, the agreements do not provide for reimbursement

---

11. UBS provided to Trustee's counsel a representative sample of FINRA arbitration claims.  Most of the claims do not even reference Section 11 and the few that do reference Section 11, do not reference LBI.

12. UBS does not assert a contractual basis for its reimbursement claims.

by LBI in these circumstances. Junior Underwriters retained counsel on their own account, and they settled their actions without discharging LBI's potential liability to the relevant plaintiffs.

**A. Junior Underwriters' Contractual Claims Are Contingent Within the Meaning of Section 502(e)(1)(B).**

30. In the Southern District, Section 502(e)(1)(B) is interpreted to accomplish dual purposes: safeguarding the estate from possible "double recoveries" *and* "according fair treatment to creditors by paying ascertainable claims as quickly as possible" without burdening the estate with "estimated claims contingent in nature." *In re Alper Holdings USA*, No. 07-12148 (BRL), 2008 WL 4186333, at *7 (Bankr. S.D.N.Y. Sept. 10, 2008) (quoting *Drexel III*, 148 B.R. at 988) (internal quotation marks omitted); *accord In re Drexel Burnham Lambert Grp., Inc.* ("*Drexel I*"), 146 B.R. 92, 97 (Bankr. S.D.N.Y. 1992) ("[*In re Wedtech Corp.*, 85 B.R. 285 (Bankr. S.D.N.Y. 1988),] and a number of other courts have viewed § 502(e)(1)(B) as having purposes that reach beyond the risk to the debtor of double liability and are directed at the difficulty of administering and distributing the debtor's estate while ongoing contingent claims of the type covered by § 502(e)(1)(B) still exist.").

31. "[T]the Second Circuit has held that a claim is contingent 'if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.'" *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y. 2001) (quoting *Mazzeo v. United States* (*In re Mazzeo*), 131 F.3d 295, 303 (2d Cir. 1997)). "It is clear that if [an] indemnification claim is contingent then a related claim for defense costs is also contingent." *In re Fuel Barons, Inc.*, 488 B.R. 783, 790 (Bankr. N.D. Ga. 2013); *accord Drexel II*, 146 B.R. at 97 ("[The claimant's] attempt to segregate these cost-related claims from the underlying indemnity claims on the basis of co-liability ignores the fact that they are simply different facets of the same unified whole.").

32. Here, the relevant underwriting agreements provide for mandatory indemnification by LBHI.[13] (Underwriting Agreement ¶ 8(a) (Exhibit 24A to Fox Decl., ECF No. 7204).) Under each offering-specific underwriting agreement, the potential obligations of underwriters arise if LBHI's indemnification is unavailable or insufficient. (*Id*. ¶ 8(d), sentence 1.) Many of the Junior Underwriters have submitted claims for indemnification to the LBHI estate, which remain pending. Until the LBHI estate resolves these underwriters' claims, the claims against LBI remain contingent.[14]

## B. Junior Underwriters Failed to Comply With Contractual Predicates for Their Claims.

33. Under the Master Agreement Among Underwriters ("MAAU"), only LBI as Manager can assert contribution or indemnity rights. Junior Underwriters are required to seek LBI's consent for any settlement. Moreover, no underwriter may agree to settle any action (nor may LBI consent to any settlement) that does not result in settlement of *all* claims by the plaintiffs against *all* underwriters, including LBI. And only LBI may retain syndicate counsel on behalf of all of the underwriters. After LBI filed for SIPA relief, Junior Underwriters retained counsel and entered settlements that failed to discharge the plaintiffs' claims against LBI without

---

13. Junior Underwriters assert that their "[c]laims are not based on any agreement with LBHI." (JU Resp. at 15.) But the Master Agreement Among Underwriters ("MAAU"), on which Junior Underwriters rely, explicitly incorporates the terms of these offering-specific agreements that relate to indemnification. (*See* MAAU ¶ 9.4 (Exhibit 1 to the Declaration of Peter Fox in Support of Response of Junior Underwriters to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) ("Fox Decl."), Sept. 9, 2013, ECF No. 7204) ("Each Underwriter agrees to indemnify and hold harmless each other Underwriter . . . in each case as set forth in the Underwriting Agreement.").)

14. Junior Underwriters appear to acknowledge that any liability or costs not paid on or before the hearing date are contingent and should be disallowed. "[U]ntil and unless amounts *are actually paid*, the claims for reimbursement or contribution with respect to those amounts remain contingent for 502(e)(1)(B) purposes." *In re Lyondell Chem. Co.*, 442 B.R. 236, 248 (Bankr. S.D.N.Y. 2011) (emphasis in original).

complying with these provisions.  Under the MAAU, such costs and settlements are not subject

to reimbursement by LBI.

### 1.     Indemnification Agreements Are Strictly Construed

34.     Under New York law, which governs the relevant agreements (MAAU ¶

12.4; Underwriting Agreement ¶ 17), a contract "is interpreted so as to effectuate the intention of

the parties as expressed in the unequivocal language used." *Weissman v. Sinorm Deli, Inc.*, 88

N.Y.2d 437, 446 (1996).  New York courts construe contractual indemnity clauses narrowly.

*Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005).  "When a party is

under no legal duty to indemnify, a contract assuming that obligation must be strictly construed

to avoid reading into it a duty which the parties did not intend to be assumed.  The promise

should not be found unless it can be clearly implied from the language and purpose of the entire

agreement and the surrounding facts and circumstances." *Hooper Assocs., Ltd. v. AGS*

*Computers, Inc.*, 74 N.Y.2d 487, 491-92 (1989) (internal citation omitted); *accord Tonking v.*

*Port Auth.*, 3 N.Y.3d 486, 490 (2004); *Weissman*, 88 N.Y.2d at 446.

### 2.     Junior Underwriters Are Not Contractually Entitled to Reimbursement of Counsel They Decided to Retain.

35.     Under the MAAU, LBI as Manager had discretion to retain syndicate

counsel, as well as separate counsel for any particular underwriter or group of underwriters.[15]

(*See* MAAU ¶ 9.6 ("If any Action is asserted or commenced to which the [indemnification or

contribution] provisions . . . may apply, *the Manager may* take such action in connection

---

15.  Under the MAAU, LBI was and is the Manager.  The only circumstance in which LBI could be removed from
     its position as Manager was if LBI settled an action against itself and excluded some of the other underwriters
     from the settlement.  (MAAU ¶ 9.9.)

therewith as it deems necessary or desirable, including retention of counsel for the Underwriters

. . . , and in its discretion separate counsel . . . .") (emphasis added).)

36.     The only provision for retention of counsel other than by the Manager

states, "[a]ny Underwriter may elect to retain *at its own expense* its own counsel," i.e., without

reimbursement or indemnification.  (*Id.* (emphasis added).)  Even where an underwriter retains

counsel at its own expense, the undewriter may not settle any action without LBI's consent.  (*Id.*)

37.     The MAAU does not provide for contribution towards liabilities or costs

except at LBI's request.  It provides that "each underwriter agrees to pay *upon request of the*

*Manager*, as contribution, its Underwriting Percentage of any losses, claims, damages or

liabilities . . . paid or incurred by any Underwriter . . . arising out of or based upon any . . .

alleged untrue statement of a material fact . . . or alleged omission to state . . . a material fact."

(*Id.* ¶ 9.5 (emphasis added).)  The MAAU likewise empowers LBI to allocate the cost of any

counsel that LBI retains.  (*See id.* ¶ 9.6 ("[T]he fees and disbursements of any counsel so retained

[by the Manager in its discretion] shall be allocated among the several Underwriters as

determined by the Manager.").)

38.     Taken together, these provisions authorize LBI to manage, supervise, and

approve all litigation activities for the underwriters' syndicate; to review and approve

settlements; and to allocate the associated costs.  No provision is made for other underwriters to

impose cost sharing.  Accordingly, Junior Underwriters' settlements and retention of counsel are

at their own expense.

### 3.     Junior Underwriters Failed to Comply With the Mandate That Their Settlement Agreements Release All Underwriters.

39.     Under the MAAU, underwriters may not settle any action unless the

settlement results in the settlement of *all* Actions (defined as *any* action, claim or proceeding (*id.*

¶ 9.3)) against *all* underwriters raised by the plaintiffs.  (*See id.* ¶ 9.7 ("Neither the Manager nor

any other Underwriter may settle or agree to settle . . . any Action unless such settlement

agreement (i) results in the settlement of all Actions against all Underwriters raised by the

plaintiffs party to such Action . . . .").)  This restriction expressly applies even to settlements by

counsel retained by underwriters at their own expense (as opposed to by the Manager).  (*See id.* ¶

9.6 ("Any Underwriter may elect to retain at its own expense its own counsel and, on advice of

such counsel but only with the consent of the Manager, may settle or consent to the settlement of

any such Action *but only in compliance with Section 9.7*.") (emphasis added).)

> 40.      Junior Underwriters' settlements fail to comply with MAAU paragraph

9.7 because they do not release any of the plaintiffs' claims against LBI.  In fact, the settlements

expressly *exclude* claims against LBI.  (*See* Judgment and Order Approving Settlement Between

Lead Plaintiffs and the Settling Underwriter Defendants at 4 ¶ 1(c), *Lehman Securities Litig.*, No.

09-MD-2017 (LAK) (S.D.N.Y. Apr. 25, 2012).)  Indeed, the lead plaintiffs and others asserted

claims against LBI in this proceeding, and the LBI estate incurred costs to resolve them.  As a

result, under the MAAU, Junior Underwriters' settlements are ineligible for contribution.

> **4.      LBI Did Not Breach the MAAU and Is Not Seeking to Benefit From
> Any Such Breach.**

> 41.      Junior Underwriters assert that LBI is seeking to benefit from its alleged

breach of MAAU paragraphs 9.3 and 9.6, which they characterize as requiring LBI "to

investigate any relevant allegations concerning the offering materials, retain counsel on behalf of

the underwriting syndicate and defend the syndicate in any such actions."  (JU Resp. at 7.)  But

the plain language of these MAAU paragraphs is permissive, not mandatory.  (*See* MAAU ¶ 9.6

("If any Action is . . . commenced . . . the Manager *may* take such action in connection therewith

as it deems necessary or desirable . . . ." (emphasis added)); *see also id.* ¶ 9.3 ("[Y]ou agree to

pay . . . your Underwriting Percentage of (i) all expenses *incurred by the Manager* in investigating, preparing to defend or defending against any action, claim or proceeding . . . ." (emphasis added)).)  Accordingly, there was no breach by LBI.

42.    In addition, the MAAU provides that the Manager "shall be under no liability to [the co-underwriters] for any act or omission except for obligations expressly assumed by the Manager in the applicable [offering-specific underwriting agreement]" (*id.* ¶ 12.2), and LBI never expressly assumed the obligation to investigate allegations or retain counsel.  Thus, LBI is not seeking to benefit from any breach, and the cases cited by Junior Underwriters are inapposite.

## CONCLUSION

43.    For the foregoing reasons and those in the Trustee's opening brief, the Court should hold that Underwriters' claims are subordinated to all unsecured general creditor claims.  Alternatively, the Court should disallow the claims.

Dated:  New York, New York
          December 18, 2013

HUGHES HUBBARD & REED LLP


By:  /s/ James B. Kobak, Jr.
James B. Kobak, Jr.
Christopher K. Kiplok
Robert B. Funkhouser
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 837-6000
Facsimile:  (212) 422-4726
Email:  kobak@hugheshubbard.com


*Attorneys for James W. Giddens,*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*