WEIL, GOTSHAL & MANGES LLP
CHRISTOPHER J. COX
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

WEIL, GOTSHAL & MANGES LLP
JACQUELINE MARCUS
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.,
in its capacity as Plan Administrator on behalf
of Lehman Brothers Special Financing Inc.,
and Lehman Brothers Financial Products Inc.

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>                Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc., and Lehman Brothers Financial Products Inc.,<br><br>                Plaintiffs,<br><br>   v.<br><br>Utah Housing Corporation (f/k/a Utah Housing Finance Agency), and Does 1-10,<br><br>                Defendants. | Adv. Proc. No. _____<br><br>**ADVERSARY PROCEEDING<br>COMPLAINT** |

1.      After terminating its agreements with Lehman Brothers Special Financing Inc.

("LBSF") and Lehman Brothers Financial Products Inc. ("LBFP"), Defendant Utah Housing

Corporation (f/k/a Utah Housing Finance Agency) ("Utah Housing"), with the help of its

financial advisor Swap Financial Group, LLC ("Swap Financial Group"), breached its contracts

with LBSF and LBFP, failed to calculate properly and in good faith the amounts LBSF and

LBFP were owed in a commercially reasonable manner, and severely undervalued the early

termination payments due to LBSF and LBFP.  As a result, Utah Housing did not pay millions of

dollars it owed LBSF and LBFP as of the Early Termination Dates.  Lehman Brothers Holdings

Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator" or

"Plaintiff") on behalf of LBSF and LBFP under the Modified Third Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") seeks to recover

that amount plus substantial interest which continues to accrue and alleges the following on

knowledge as to LBSF's, LBFP's, and LBHI's own acts and upon information and belief as to all

other matters against Utah Housing and Does 1-10 ("Does 1-10" and together, "Defendants"):

## PRELIMINARY STATEMENT

2.      LBSF and LBFP were parties to seventy-nine derivatives transactions[1] with Utah

Housing when LBHI filed for bankruptcy on September 15, 2008.  LBHI's bankruptcy triggered

an Event of Default under the Transaction Documents, entitling Utah Housing to terminate the

Transactions.

---

[1] Fifty of the transactions (the "LBSF Transactions") were governed by four separate 1992 form ISDA Master
Agreements, the schedules and annexes thereto, and confirmations corresponding to each transaction, originally
between Lehman Brothers Derivative Products Inc. ("LBDP") and Utah Housing, which were assigned to LBSF
(collectively, the "LBSF Agreements").  Specifically, the LBSF Transactions were governed by Agreements dated
May 5, 2000 (the "May 5, 2000 Agreement"), October 31, 2003 (the "October 31, 2003 Agreement"), February 6,
2004 (the "February 6, 2004 Agreement"), and April 22, 2004 (the "April 22, 2004 Agreement").  The remaining
twenty-nine transactions (the "LBFP Transactions," and together with the LBSF Transactions, the "Transactions")
were governed by twenty-two separate 1992 form ISDA Master Agreements, the schedules and annexes thereto, and
confirmations corresponding to each transaction, each between LBFP and Utah Housing (collectively, the "LBFP
Agreements," and together with the LBSF Agreements, the "Transaction Documents").

3.      Utah Housing terminated the Transactions on November 18, 19, and 20, 2008.  It hired Swap Financial Group as a financial advisor to implement the valuation process, which was flawed from the beginning and yielded a commercially unreasonable result.

4.      Upon early termination, the Transaction Documents require the Non-defaulting Party to value the Transactions using the standard ISDA Market Quotation measure.  Market Quotation requires the Non-defaulting Party to solicit replacement quotes from no more than four dealers, yet Utah Housing, through Swap Financial Group, sought market quotations from seven dealers.  Utah Housing's solicitation of seven dealers breached the Transaction Documents.

5.      At the time of the terminations, LBSF and LBFP were "in the money" by more than $75 million under the Transactions, meaning that the present value of the expected payments that Utah Housing would have made to LBSF and LBFP over the remaining terms of the Transactions exceeded by $75 million the payments that would have been owed by LBSF and LBFP.  The present value of the LBSF Transactions as of the Early Termination Dates was approximately $54.3 million, yet Utah Housing paid LBSF only $32,353,527.  The present value of the LBFP Transactions as of the Early Termination Dates was approximately $21.4 million, yet Utah Housing paid LBFP only $15,948,731.  Utah Housing improperly retained a gain of many millions of dollars in excess of the amounts it paid to LBSF and LBFP.  The Transaction Documents require that gain to be paid to LBSF and LBFP.  Indeed, the termination provisions of the Transaction Documents are intended to place the Non-defaulting Party in the same position as if the agreement had been fully performed, not to punish the Defaulting Party and provide a windfall to the Non-defaulting Party.  Utah Housing's retention of a multi-million dollar gain is inconsistent with the letter and spirit of the Transaction Documents.

2

6.    In addition, as part of its flawed Market Quotation process, Utah Housing notified the solicited dealers that it would be entering into replacement transactions for some or all of the Transactions and that Utah Housing would entertain replacement bids simultaneously with the Market Quotations it received from the dealers.  Thus, Utah Housing ran a simultaneous, parallel process, requesting one set of bids for determining the Settlement Amounts and another set of bids from the same, or virtually the same, group of dealers for potential replacement transactions, where the dealer would actually pay to step into LBSF or LBFP's shoes as the "in the money" counterparty on the Transactions and would actually execute documentation for the replacement transactions.

7.    Utah Housing then entered into trades to replace the terminated Transactions (based on the set of actual replacement bids) with the same dealers from which it received Market Quotation bids, for an upfront aggregate payment that was roughly $8.9 million greater than the Market Quotation valuation Utah Housing submitted to LBSF and LBFP as its termination payments.  Utah Housing simply pocketed the difference, recording it as a gain on its financial statements, instead of passing it on to LBSF and LBFP as it was required to do under the Transaction Documents.  Thus, based on the value of the replacement trades, Utah Housing's Market Quotation calculation is objectively commercially unreasonable – and it knew or should have known that when it prepared that calculation.

8.    Given that Utah Housing's Market Quotation process and its result were commercially unreasonable and violated the parties' agreements, Utah Housing should have reverted to the Loss measure, which requires that Utah Housing reasonably determine its total losses and costs, or, as here, its gain, and turn over that gain to LBSF and LBFP.

3

9.      Had Utah Housing properly calculated its Loss, as it was contractually obligated to do, it would have determined that it owed LBSF and LBFP millions of dollars more than what was paid.  Utah Housing thus must now pay what it still owes to LBSF and LBFP, plus the interest which will continue to accrue until payment is made in full.

## THE PARTIES

10.     LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estates of LBSF and LBFP.

11.     LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

12.     LBFP is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

13.     Utah Housing is a public corporation created by the State of Utah to raise funds to assist in the creating of housing opportunities for certain Utah residents.

14.     Does 1-10 are unknown individuals, entities, and/or groups of individuals or entities who may have received distributions from Utah Housing.

## JURISDICTION AND VENUE

15.     On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF and LBFP, commenced in this Court voluntary cases under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

4

16.     This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 541(c),

542(b), and 362 of the Bankruptcy Code, and New York law, which governs the majority of the

Transaction Documents pursuant to Part 4(g) of the Schedules.

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

18.     The Court has personal jurisdiction over Defendant Utah Housing.

19.     This adversary proceeding constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2).

20.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff

states that it consents to the entry of a final judgment by this Court if it is determined that this

Court, absent consent of the parties, cannot enter final orders or judgment consistent with

Article III of the United States Constitution.

21.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11

Cases are pending in this district.

## BACKGROUND FACTS

### A.     The Transaction Documents and the Transactions

22.     The Transactions between the parties were derivatives transactions based on the

movement of interest rates.  The Transaction Documents provide the basic terms for the

contractual relationships of the parties.

23.     The Transactions had scheduled termination dates ranging from July 1, 2010 to

January 1, 2038.

5

1.        **The LBSF Transactions**

24.        The fifty LBSF Transactions are governed by the four LBSF Agreements, which were originally entered into between LBDP and Utah Housing and assigned to LBSF on September 16, 2008.[2]

25.        The LBSF Transactions consisted of interest rate swaps and interest rate caps, the specific economic details of which were set forth in the Confirmations to the LBSF Transactions. On the interest rate swaps, Utah Housing paid LBDP a fixed interest rate and LBDP paid a floating interest rate, which would change each period based on changes in the underlying reference interest rates. This allowed Utah Housing to hedge its interest rate risk on related bond issuances. On the interest rate cap, Utah Housing was to receive an interest rate payment at the end of each period in which the interest rate exceeded a certain price, called the "strike price." In exchange, Utah Housing paid a periodic premium over the life of the trade. Like the interest rate swaps, the interest rate cap permitted Utah Housing to hedge its exposure to fluctuations of interest rates that exceeded the strike prices. Due to the relatively low interest rate environment, as of the Early Termination Dates, the termination values of the LBSF Transactions were "in the money" to LBSF,[3] meaning that Utah Housing owed substantial sums to LBSF in connection with the early termination of the LBSF Transactions.

26.        Following the commencement of LBHI's Chapter 11 Case on September 15, 2008, the parties chose not to terminate and settle all outstanding transactions between Utah Housing and LBDP. Instead, LBDP and Utah Housing entered into two Assignment and Amendment Agreements, both dated as of September 16, 2008, pursuant to which LBDP

---

[2] Even though the May 5, 2000 Agreement was entered into by LBFP and Utah Housing, the parties treated – and later characterized – the May 5, 2000 Agreement as being between **LBDP** and Utah Housing.

[3] As further described below, LBDP transferred its rights and obligations to the LBSF Transactions to LBSF.

WEIL:\95093263\16\58399.0011

transferred its rights and obligations under the fifty LBSF Transactions to LBSF, which, at that time, was not a Debtor.

27.     The relevant LBSF Agreements provide that the payment owed upon early termination will be calculated based upon "Second Method." *See* Schedules to the LBSF Agreements at Part 1(f).  Second Method means that the party that is "in the money" on the Early Termination Dates, whether or not it is the "Defaulting Party" – here LBSF – has a right to receive an early termination payment. *See* LBSF Agreements § 6(e)(i)(3).  In contrast, under "First Method," payment would be made only if it were owed to the Non-defaulting Party.  Thus, the LBSF Agreements are designed to provide the parties with the benefit of their bargain as of the Early Termination Dates regardless of which party defaulted.

28.     The Market Quotation process requires Utah Housing to solicit bids from Reference Market-makers (*i.e.*, "*four* leading dealers in the relevant market") (emphasis added) for replacement transactions "that would have the effect of preserving for [Utah Housing] the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."  LBSF Agreements § 12 (definition of "Market Quotation" and "Reference Market-makers").  In other words, under Market Quotation, Utah Housing was required, as the Non-defaulting Party, to seek quotations from *four* leading dealers in the relevant market for the amount those dealers would pay, or receive, to step into the Defaulting Party's position in the trade. *Id.*

29.     In cases where Market Quotation fails (*i.e.*, three or four quotes from four Reference Market-makers are not obtained) or does not yield a commercially reasonable result, the Non-defaulting Party must determine the Settlement Amount under the Loss measure – a reasonable and good faith determination of the Non-defaulting Party's total gains or losses as a

WEIL:\95093263\16\58399.0011

result of the termination.  LBSF Agreements § 12 (definition of "Settlement Amount" and "Loss").

### 2.    The LBFP Transactions

30.    The twenty-nine LBFP Transactions are governed by twenty-two LBFP Agreements, each between LBFP and Utah Housing.  The LBFP Transactions consisted of interest rate swaps.

31.    Similar to the interest rate swaps with LBSF referenced above, Utah Housing paid LBFP a fixed interest rate and LBFP paid a floating interest rate on the interest rates swaps, which allowed Utah Housing to hedge its interest rate risk on the related bond issuances.  As of the Early Termination Dates, the termination values of the LBFP Transactions were "in the money" to LBFP.

32.    Like the LBSF Agreements, Utah Housing and LBFP agreed that following an Early Termination Date, the amount payable would be calculated using Second Method under Section 6 of the LBFP Agreements.  *See* LBFP Agreements, Schedule Part 1(f); *id*. at § 6(e)(i)(3).

33.    Similarly, the LBFP Agreements also provide that, when the Market Quotation measure fails or if it would not produce a commercially reasonable result, the Non-defaulting Party must revert to the Loss measure – a reasonable and good faith determination of the Non-defaulting Party's total gains or losses as a result of the termination.  *See id*. at § 12 (definitions of "Settlement Amount," "Market Quotation," and "Loss").

### B.    Utah Housing Terminates the Transactions

34.    On September 15, 2008, LBHI commenced its Chapter 11 Case.  LBSF and LBFP commenced their Chapter 11 Cases on October 3, 2008 and October 5, 2008, respectively.

8

35.    Utah Housing designated November 18, 2008 as the Early Termination Date for the Transactions governed by the October 31, 2003 Agreement and the February 6, 2004 Agreement.  Utah Housing designated November 19, 2008 as the Early Termination Date for the Transactions governed by the April 22, 2004 Agreement.[4]  Utah Housing designated November 20, 2008 as the Early Termination Date for the Transactions governed by the May 5, 2000 Agreement.  Utah Housing designated November 18 or 20, 2008 as the Early Termination Dates for the LBFP Transactions.  Utah Housing expressly stated that its reason for terminating was the bankruptcy filing of LBSF with respect to the LBSF Transactions and the bankruptcy filing of LBFP with respect to the LBFP Transactions.

36.    By exercising its right to early termination, Utah Housing realized a net gain from being relieved of its future payment obligations under the Transactions and foregoing the benefits of future payment obligations owed to it by LBSF and LBFP.

### C.    Utah Housing Conducted a Flawed Market Quotation Process

37.    Utah Housing hired Swap Financial Group as financial advisor to advise it on the termination of the Transactions.

38.    Although the Transaction Documents dictate that quotations be sought from "four leading dealers," Utah Housing, through Swap Financial Group, ignored that provision and solicited Market Quotation bids from seven dealers.  This constituted a clear breach of the Transaction Documents, and it caused material harm to LBSF and LBFP because it tainted the process and reduced the reliability of the Market Quotation bids received as indicators of market

---

[4] Utah Housing purports to have previously terminated one of the Transactions under the April 22, 2004 Agreement on October 2, 2008, and later purported to set-off the $67,000 it claimed LBSF owed it with respect to that Transaction from the Settlement Amount Utah Housing calculated for the remaining Transactions governed by the April 22, 2004 Agreement.  Setting aside the issue of the propriety of its attempted termination of this Transaction via faxed letter, Utah Housing never provided LBSF with the methodology it used to determine this $67,000 amount as required by the April 22, 2004 Agreement.  See April 22, 2004 Agreement § 6(d)(i) (requiring counterparty to provide "reasonable detail" supporting its calculations of the Settlement Amount).

WEIL:\95093263\16\58399.0011

value.  By seeking Market Quotation bids from more than the requisite four dealers, Utah

Housing breached a provision of the Transaction Documents intended to insure the reliability of

the Market Quotation bids it received.

39.    In response to its solicitation of the seven dealers through its advisor, Swap

Financial Group, Utah Housing received Market Quotations from only three dealers (Barclays,

Deutsche Bank, and either Goldman Sachs or Wells Fargo), for the Transactions governed by the

May 5, 2000, October 31, 2003, and February 6, 2004 Agreements; Utah Housing dropped the

high and low quotations and used the middle quotation as the basis for calculating the

termination payments under those Agreements.  Utah Housing received only two quotations for

the Transactions governed by the April 22, 2004 Agreement (from Barclays and Deutsche Bank).

Utah Housing reverted to the Loss methodology to value the Transactions governed by the April

22, 2004 Agreement and used the higher of the two quotations that it received as the basis for

calculating the termination payments.

40.    On December 2, 2008, Utah Housing delivered four letters to LBSF setting forth

Utah Housing's calculation of the amounts owed to LBSF as a result of the terminations of the

LBSF Transactions.  Utah Housing asserted that it owed LBSF termination payments of

$32,353,527 for the LBSF Agreements, which Utah Housing paid to LBSF on December 2,

2008.  Utah Housing failed to calculate properly the termination payments.

41.    Utah Housing used the same flawed Market Quotation process for the LBFP

Transactions by seeking quotations from seven (instead of four) dealers; it received three

quotations for each of the LBFP Transactions and, after discarding the highest and lowest

quotations, Utah Housing used the middle quotation to determine the termination payments owed

to LBFP.

WEIL:\95093263\16\58399.0011

42.     On December 2, 2008, Utah Housing delivered twenty-two letters to LBFP setting forth Utah Housing's calculation of the amounts owed to LBFP as a result of the early termination of the LBFP Transactions.  Utah Housing calculated that it owed LBFP a total of $15,948,731 under the LBFP Agreements and paid that amount to LBFP on December 2, 2008. Utah Housing failed to calculate properly the termination payments.

43.     At the same time as it sought Market Quotation bids, Utah Housing ran a parallel replacement trade process, through Swap Financial Group, for actionable bids to enter into replacement transactions.  While soliciting bids for the Market Quotation valuation, Utah Housing invited the same, or substantially the same, dealers simultaneously to bid on actual replacement transactions.

44.     Beginning on or about November 17, 2008, Utah Housing replaced all but four of the terminated Transactions with new transactions entered into with Barclays Bank PLC and Deutsche Bank AG.  According to Utah Housing's own audited financial statements as of June 30, 2009, the new transactions were "in the same notional amount, with the same maturity dates and at the same fixed payer rates as the original swap agreements," and Utah Housing received "a net premium of $8,903,000" in connection with the new transactions (*i.e.*, Utah Housing received $8.9 million more by entering into the replacement transactions than it paid to LBSF and LBFP upon termination).  However, termination provisions of the Transaction Documents are intended to place the Non-defaulting Party in the same position as if the agreement had been fully performed, not to punish the Defaulting Party and provide a windfall to the Non-defaulting Party.  Utah Housing's $8,903,000 gain constituted a windfall to Utah Housing and should have been paid to LBSF and LBFP pursuant to the terms of the Transaction Documents.  LBSF and

11

LBFP seek to recover this amount; alternatively, LBSF and LBFP seek damages in an amount to be proven at trial.

> **D.    Because Its Flawed and Commercially Unreasonable Market Quotation Process Produced a Commercially Unreasonable Result, Utah Housing Was Required to Calculate the Settlement Amounts Using Loss**

45.    As alleged above, Market Quotation and Loss are specifically designed to leave the parties in the same economic position they would have been in had the trades not been terminated.  The definition of Market Quotation states that "[e]ach quotation will be for an amount . . . that would be paid to such party . . . that would have the effect of *preserving for such party the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date*."  Transaction Documents § 12 (emphasis added).  Likewise, Loss means, with respect to the terminated transactions, what "a party . . . *reasonably* determines in *good faith* to be its *total* losses and costs (*or gain . . .*) . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them)."  *Id.* (emphasis added).

46.    Utah Housing knew that the Settlement Amounts it calculated based on its flawed Market Quotation process produced a commercially unreasonable result because (i) the quotations it received on the terminated Transactions were substantially less than the market value of the terminated Transactions as of the Early Termination Dates and (ii) Utah Housing received payments for entering into the replacement transactions that were millions of dollars more than its calculated Settlement Amounts.  Specifically, to enter into the replacement transactions, Utah Housing's new counterparties paid Utah Housing an upfront payment (in the aggregate) approximately $8.9 million more than the Settlement Amounts Utah Housing used in

12

calculating the amount payable to LBSF and LBFP.  This more than $8.9 million gain on the part of Utah Housing was not transferred to LBSF or LBFP but rather was kept by Utah Housing as an unjustified windfall, which it recorded on its financial statements.

47.    Utah Housing's Market Quotation process violated the clear terms of the Transaction Documents, and its calculation of the termination payments based on the results of that flawed process was commercially unreasonable and invalid.  Because Utah Housing's Settlement Amount calculation under Market Quotation did not produce a commercially reasonable result, Utah Housing should have reverted to the Loss measure.

48.    Utah Housing realized a net gain from being relieved of its future payment obligations under the Transactions and foregoing the benefits of future payment obligations owed to it by LBSF and LBFP.  The derivative markets have developed standard and customary methods for determining the value of swaps and caps on a given day at a given point in time. The inputs necessary to perform such calculations are observable through a variety of market services.  The best measure of the termination values of the Transactions is the present value of the projected future payments of the terminated Transactions as of the Early Termination Dates using such market standard inputs.  The termination value of the terminated Transactions as of the Early Termination Dates was approximately $75.7 million "in the money" to LBSF and LBFP – and therefore the amount owed to LBSF and LBFP is many millions of dollars more than the amounts actually paid to LBSF and LBFP.

### E.    Utah Housing Owes Interest to LBSF and LBFP

49.    The Transaction Documents provide that any amount to be paid under Section 6(d) thereof – which covers termination payments – will be paid inclusive of interest at the Applicable Rate.  Transaction Documents § 6(d).  The Applicable Rate is defined as the Default Rate on any sums calculated pursuant to Section 6(e) from the date on which such sums become

WEIL:\95093263\16\58399.0011

payable under Section 6(d)(ii), which ordinarily is the date that a calculation statement is received. *See id.* § 12. Prior to receipt of the calculation statement, the Termination Rate applies to the amount owed. *Id.*

50.     Sections 6(d)(ii) and 12 of the Transaction Documents provide that the "Default Rate" shall equal "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amounts plus 1% per annum." Transaction Documents §§ 6(d)(ii), 12. LBSF and LBFP have certified that their cost of funds on each date from and after September 15, 2008, was greater than or equal to overnight LIBOR plus 12.50%, compounded daily.

51.     Accordingly, under the express terms of the Transaction Documents and controlling law, the Default Rate in this case is overnight LIBOR plus 13.50%.

52.     Utah Housing owes LBSF and LBFP interest on the proper termination payments at the Termination Rate for the period from the Early Termination Dates to but excluding the date of delivery of the Calculation Statements, plus interest on the difference between the proper termination payments and any partial payments at the Default Rate from and including the date of delivery of the Calculation Statements, through, but excluding, the date of full payment.

### F.    The Failed Mediation

53.     LBSF, LBFP, and Utah Housing engaged in settlement discussions without success. Part of those efforts included mediation between the parties pursuant to this Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207], which occurred on September 12, 2013. Mediation did not result in a settlement.

## COUNT I

### Breach of the Transaction Documents

*(Against Defendant Utah Housing)*

54.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-53 of this Complaint as though fully set forth in this cause of action.

55.     The Transaction Documents are enforceable contracts, and LBSF and LBFP have performed all of their obligations in connection with the respective Transaction Documents. Further, any conditions precedent have been performed, have occurred, or have been waived.

56.     The Transaction Documents require Utah Housing to reasonably determine in good faith its total losses and costs (or gain) in calculating the early termination payments.

57.     As more fully described above, Utah Housing conducted a flawed Market Quotation process, which violated the clear terms of the Transaction Documents and yielded a commercially unreasonable result.

58.     Utah Housing's calculation of the termination payments based on the results of that flawed process was therefore commercially unreasonable and invalid.  The Loss measure should have been used instead.

59.     Utah Housing breached the Transaction Documents by failing to properly calculate the termination payments under the Market Quotation measure, in a commercially reasonable manner with a commercially reasonable result, by failing to revert to the Loss measure, by failing to turn the full amounts of its gain over to LBSF and LBFP, and otherwise failing to follow reasonable, good faith, and commercially reasonable valuation practices.

60.     As a result of the foregoing breaches of contract, LBSF and LBFP have been damaged in an amount to be proven at trial plus interest which has accrued since the Early

Termination Dates and which will continue to accrue at the Default Rate until final payment is made to LBSF and LBFP.

## COUNT II

### Breach of the Transaction Documents Based on Utah Housing's Breach of the Implied Covenant of Good Faith and Fair Dealing

(*Against Defendant Utah Housing*)

61.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-60 of this Complaint as though fully set forth in this cause of action.

62.     The Transaction Documents require Utah Housing to reasonably determine in good faith its total losses and costs (or gain).

63.     By calculating the termination payments using Settlement Amounts that resulted from a Market Quotation bid process which was not commercially reasonable, failed to produce a commercially reasonable result, was not conducted in good faith, and that resulted in a windfall to Utah Housing to the detriment of LBSF, LBFP, and their creditors, and by failing to pay LBSF and LBFP properly calculated, commercially reasonable termination payments in accordance with the Loss measure, Utah Housing violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

64.     As a result of this breach, LBSF has been damaged in an amount to be proven at trial plus interest which has accrued since the Early Termination Dates and which will continue to accrue at the Default Rate until final payment is made to LBSF and LBFP.

WEIL:\95093263\16\58399.0011

## COUNT III

### Unjust Enrichment

*(Against Defendant Utah Housing and Does 1-10)*

65.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-64 of this Complaint as though fully set forth in this cause of action.

66.    As a result of Utah Housing's failure to pay LBSF and LBFP termination payments reflecting the amount LBSF was "in the money" under the Transactions, Utah Housing and Does 1-10 obtained an unjust windfall at the expense of LBSF and LBFP given the value of the payments to LBSF and LBFP that Utah Housing was able to avoid by terminating the Transactions and its receipt of more money as a result of entering into the replacement transactions than it paid to LBSF and LBFP.

67.    Utah Housing and Does 1-10 thus have been improperly and unjustly enriched at LBSF and LBFP's expense.  Equity and good conscience require that Utah Housing and Does 1-10 pay to LBSF and LBFP that to which LBSF and LBFP were entitled, plus prejudgment interest.

## COUNT IV

### Declaratory Judgment that Utah Housing Violated the Automatic Stay and an Order Requiring Turnover of the Properly Calculated Termination Payments

*(Against Defendant Utah Housing)*

68.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-67 of this Complaint as though fully set forth in this cause of action.

69.    Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under Chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the

17

estate" absent an order of the bankruptcy court granting relief from the stay.  11 U.S.C.
§ 362(a)(3).

70.     As fully alleged above, Utah Housing's termination payments were improperly
calculated, and Utah Housing owes a multi-million-dollar payable to LBSF and LBFP that
constitutes property of LBSF's and LBPF's estate.  Utah Housing's withholding of such payable
constitutes an "act to obtain possession of property of the estate or of property from the estate or
to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

71.     Under section 105(a) of the Bankruptcy Code, this Court may "issue any order,
process, or judgment that is necessary or appropriate to carry out the provisions of this title."
11 U.S.C. § 105(a).  This Court also may grant damages to punish violations of the automatic
stay.

72.     There is an actual controversy between the parties on this issue because Utah
Housing is actively withholding property of the estate from LBSF and LBFP and denies that it
conducted the Market Quotation bid process in a commercially unreasonable manner or that it
failed to pay LBSF and LBFP the full amount that was due and payable.

73.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF and
LBFP are entitled to (i) a declaration that Utah Housing has acted in violation of section 362 of
the Bankruptcy Code; and (ii) pursuant to section 105(a) of the Bankruptcy Code, an award of
monetary damages in an amount to be proven at trial and including (but not limited to) LBSF's
and LBFP's actual damages, costs, contractual interest, and attorneys' fees and expenses on
account of Utah Housing's knowing and willful violation of the automatic stay.

WEIL:\95093263\16\58399.0011

<u>COUNT V</u>

**Turnover of LBSF's and LBFP's Property Interest in the Properly Calculated Termination Payments Pursuant to Section 542(b) of the Bankruptcy Code**

(*Against Defendant Utah Housing*)

74.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-73 of this Complaint as though fully set forth in this cause of action.

75.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b). As fully alleged above, Utah Housing was obligated to pay LBSF and LBFP the properly calculated termination payments, plus interest; its failure to do so in the absence of a proper set-off made the amount due and owing a matured debt.

76.     The full amounts due to LBSF and LBFP from Utah Housing as of the Early Termination Dates are property of LBSF's and LBFP's estates under section 541(a) of the Bankruptcy Code.

77.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing Utah Housing to turn over the properly calculated termination payments, net any partial payments to LBSF and LBFP, as they constitute property of LBSF and LBFP's bankruptcy estate under section 541(a) of the Bankruptcy Code. Utah Housing seeks turnover of, at least, the $8.9 million gain that Utah Housing recognized on its financial statements.

WEIL:\95093263\16\58399.0011

## COUNT VI

### Interest

*(Against Defendant Utah Housing and Does 1-10)*

78.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-77 of this Complaint as though fully set forth in this cause of action.

79.     Utah Housing not only owes LBSF and LBFP a payment of an amount to be proven at trial, but also interest thereon.

80.     By failing to make the payment due to LBSF and LBFP under the terms of the Transaction Documents, Utah Housing must pay accrued interest on the amount it owes to LBSF and LBFP as set forth above, with interest continuing to accrue until payment to LBSF and LBFP is made in full.

81.     The Transaction Documents explicitly provide that the Applicable Rate of interest is the "Termination Rate" on sums calculated pursuant to section 6(e) of the Transaction Documents from the Early Termination Dates to the date the Calculation Statements are delivered and the Default Rate from the date the Calculation Statements are delivered to the date of payment.  Transaction Documents § 12.  The Default Rate is based on the receiving party's cost of funds "without proof or evidence of any actual cost" and "as certified by it" plus 1%.  *See id.*  The Termination Rate is the average cost of funds of the two parties.

82.     LBSF and LBFP have certified that their cost of funds on each date from and after September 15, 2008, was greater than or equal to overnight LIBOR plus 12.5%, compounded daily.  The Transaction Documents executed by Utah Housing precludes any challenge to the Default Rate because LBSF and LBFP have certified their cost of funds.

83.     Consequently, Utah Housing owes LBSF and LBFP interest on the proper termination payments at the Termination Rate for the period from the Early Termination Dates to

WEIL:\95093263\16\58399.0011

but excluding the date of delivery of the Calculation Statements, plus interest on the difference between the proper termination payments and any partial payments at the Default Rate from and including the date of delivery of the Calculation Statements, through, but excluding, the date of full payment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

(1)    <u>Against Defendant Utah Housing as follows</u>:

A.    As to Counts I and II, awarding LBSF and LBFP damages from Utah Housing in an amount to be determined at trial, plus interest which has accrued since the Early Termination Dates and which will continue to accrue at the Default Rate until final payment is made to LBSF and LBFP;

B.    As to Count IV, (1) a declaratory judgment that in withholding the properly calculated termination payments payable by Utah Housing to LBSF and LBHI, Utah Housing acted in express violation of section 362 of the Bankruptcy Code; and (2) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages, in an amount to be determined at trial and including (but not limited to) LBSF's and LBFP's actual damages, costs, and attorneys' fees and expenses, on account of Utah Housing's knowing and willful violation of the automatic stay; and

C.    Also as to Count IV, an award of the actual damages, contractual interest, costs, and attorneys' fees and expenses as set forth in the declaratory judgment entered pursuant to Count IV.

D.    As to Count V, a declaratory judgment that the properly calculated termination payments are property of the LBSF and LBFP bankruptcy estate under section 541 of the Bankruptcy Code and a judgment requiring Utah Housing to turn over, under section 542 of the

Bankruptcy Code, the principal amount of such receivable in an amount to be determined at trial,

but at least the $8.9 million gain that Utah Housing recognized on its financial statements;

      (2)    <u>Against Defendants Utah Housing and Does 1-10 as follows</u>:

      E.    As to Count III, awarding LBSF and LBFP damages from Utah Housing and

Does 1-10 in an amount to be determined at trial, but in all events, no less than that to which

LBSF and LBFP are entitled, plus prejudgment interest;

      F.    Pre-judgment and post-judgment interest; and

      G.    Such other and further relief, including interest, costs, and attorneys' fees, as the

Court deems just and proper.

Dated: November 17, 2014
      Redwood Shores, CA

      By:  <u>/s/ Christopher J. Cox</u>
      Christopher J. Cox

      WEIL, GOTSHAL & MANGES LLP
      201 Redwood Shores Parkway
      Redwood Shores, CA 94065
      Telephone: (650) 802-3000
      Facsimile: (650) 802-3100

      Jacqueline Marcus
      WEIL, GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, New York 10153
      Telephone: (212) 310-8000
      Facsimile: (212) 310-8007

      *Attorneys for Lehman Brothers Holdings Inc.,*
      *in its capacity as Plan Administrator on behalf*
      *of Lehman Brothers Special Financing Inc.,*
      *and Lehman Brothers Financial Products Inc.*

WEIL:\95093263\16\58399.0011