> **THE FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE SHOULD REVIEW THE OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OBJECTION AND/OR THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS THEIR CLAIM(S).**
>
> **IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, CINDI GIGLIO, AT 212-696-6936.**

**CURTIS, MALLET-PREVOST,**
 **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559
L. P. Harrison 3rd
Turner P. Smith
Cindi Eilbott Giglio

*Counsel for Lehman Brothers Holdings Inc.*
 *and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

----------------------------------------------------------------x

## NOTICE OF HEARING ON THE FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

**PLEASE TAKE NOTICE** that on December 1, 2014 Lehman Brothers Holdings

Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above-referenced chapter 11 cases, filed the four hundred eighty-eighth omnibus objection to claims (the "Four Hundred Eighty-Eighth Omnibus Objection to Claims"), and that a hearing (the "Hearing") to consider the Four Hundred Eighty-Eighth Omnibus Objection to Claims will be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on **January 15, 2015 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Four Hundred Eighty-Eighth Omnibus Objection to Claims must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399 upon (i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 623; (ii) attorneys for LBHI and certain of its affiliates, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Garrett Fail, Esq.); (iii) conflicts counsel for LBHI and certain of its affiliates, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178 (Attn: L. P. Harrison 3rd, Esq., Turner P. Smith, Esq., and Cindi Giglio, Esq.); and (iv) the Office of the United States

2

Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York,

New York 10014 (Attn: William K. Harrington, Esq., Susan Golden, Esq., and Andrea B.

Schwartz, Esq.); so as to be so filed and received by no later than **December 31, 2014 at 4:00**

**p.m. (Eastern Time)** (the "Response Deadline").

        **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Four Hundred Eighty-Eighth Omnibus Objection to Claims or any

claim set forth thereon, the Plan Administrator may, on or after the Response Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Four Hundred Eighty-Eighth Omnibus Objection to Claims, which order may be entered with no

further notice or opportunity to be heard offered to any party.

Dated: December 1, 2014
      New York, New York

                                       **CURTIS, MALLET-PREVOST,**
                                       **COLT & MOSLE LLP**

                              By:       */s/ L. P. Harrison 3rd*
                                     L. P. Harrison 3rd
                                     Turner P. Smith
                                     Cindi Eilbott Giglio
                        101 Park Avenue
                        New York, New York 10178-0061
                        Telephone: (212) 696-6000
                        Facsimile:  (212) 697-1559

                        *Counsel for Lehman Brothers Holdings Inc.*
                         *and Certain of Its Affiliates*

19611513

**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559
L. P. Harrison 3rd
Turner P. Smith
Cindi Eilbott Giglio

*Counsel for Lehman Brothers Holdings Inc.*
 *and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                              :    **Chapter 11 Case No.**
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :    **08-13555 (SCC)**
                                                   :
                     **Debtors.**                  :    **(Jointly Administered)**
-------------------------------------------------------------------x

**FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS**
<u>**OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**</u>

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OBJECTION AND/OR THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, CINDI GIGLIO, AT 212-696-6936.**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

   Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities in the above-referenced

chapter 11 cases (collectively, the "LBHI Estates"), respectfully represents as follows:

## **RELIEF REQUESTED**

   1.  Under the Prime Brokerage Agreement[1] governing the relationship

between the Claimants and the LBHI Estates, the Claimants expressly exculpated the LBHI

Estates from all liability asserted in the proofs of claim listed on Exhibit A attached hereto (each

a "Claim", and together, the "Claims").[2] Nevertheless, the Claimants continue to press their

Claims, seeking damages arising from an alleged breach of the Prime Brokerage Agreement—

the LBHI Estates' alleged failure to carry out the eleventh-hour securities transfer orders

submitted by the Claimants on the eve of LBHI's bankruptcy.

   2.  Moreover, even absent the clear exculpation provided in the Prime

Brokerage Agreement, the LBHI Estates have no liability for the Claims. The Claims

purportedly arise out of the LBHI Estates' failure to perform certain brokerage services under

those agreements. The LBHI Estates cannot be liable for a breach of obligations that they never

agreed to perform. Indeed, none of the LBHI Estates *could* have carried out the securities

transfer requests that underlie the Claims because not one of the LBHI Estates is a registered

---

[1] Capitalized terms used but not defined in this "Relief Requested" section shall have the meanings ascribed to them in the "Objection" section, below.

[2] The Claims were filed by Newport Global Opportunities Fund L.P., Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P., Providence TMT Special Situations Fund L.P., Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P. (each a "Claimant", and together, the "Claimants").

19611513

U.S. broker-dealer.  The Claimants therefore fail to state *prima facie* claims for breach of contract.

3.       Finally, to the extent that any Claims assert guarantor liability against LBHI based on LBHI's alleged general guarantees, such Claims fail because they are not supported by a specific guarantee and do not demonstrate that the applicable Claimant knew of and relied upon one of these alleged general guarantees before entering into the transactions that underlie the Claims.

4.       Accordingly, the Plan Administrator seeks an order disallowing and expunging the Claims pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and this Court's order approving procedures for the filing of objections to proofs of claim [ECF No. 6664] (the "Procedures Order").

## JURISDICTION

5.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

### I.       General Background

6.       Beginning on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Dates"), the LBHI Estates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

7.       Prior to LBHI's Commencement Date, Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers Inc. ("LBI") were broker-dealers.  LBIE and LBI are

3

not debtors in the Chapter 11 Cases.  On September 15, 2008, LBIE entered administration under

English insolvency law (the "UK Proceeding").  On September 19, 2008, the District Court for

the Southern District of New York appointed James W. Giddens as trustee to oversee LBI's

liquidation in a proceeding administered by the Court under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa *et seq.* (the "SIPA Proceeding").

8.      On January 14, 2010, the Court entered the Procedures Order, which

authorizes the LBHI Estates to file omnibus objections to claims on various grounds, including

those set forth in Bankruptcy Rule 3007(d) and those additional grounds set forth in the

Procedures Order.

9.      On December 6, 2011, the Court entered an order confirming the Plan

[ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, the Plan

Administrator is authorized to interpose and prosecute objections to claims filed in the Chapter

11 Cases.

## II.      The Claims

10.      Prior to the commencement of the Chapter 11 Cases, each Claimant

entered into a Customer Account Agreement Prime Brokerage (the "Prime Brokerage

Agreement")[3] with LBI.  Claims ¶ 1.  Various other Lehman entities, including LBIE and LBHI,

were listed as "parties to" the Prime Brokerage Agreement.  *See* Prime Brokerage Agreement

¶ 1(a).  LBI signed the Prime Brokerage Agreement "as signatory for itself and as agent for the

affiliates named herein."  *Id.* at 11.

---

[3] A substantially representative Prime Brokerage Agreement is attached hereto as Exhibit B.  There are minor
differences between the Prime Brokerage Agreement executed by NGOF (defined below) and the remaining
Claimants.  These minor differences are not relevant for the purposes of this objection.

11.     Each Claimant also executed a Margin Lending Agreement (the "MLA", and together with the Prime Brokerage Agreement, the "Agreements")[4] prior to the commencement of the Chapter 11 Cases.  Claims ¶ 2.  The parties to the MLA were the Claimants, LBI (as agent) and LBIE (as lender).  *See* MLA Preamble.

12.     Pursuant to the Prime Brokerage Agreement, the Claimants deposited certain assets, including securities, into brokerage accounts opened at LBI (the "Account Assets").  Claims ¶¶ 1-4.  According to the Claims, on September 10, 2008, the Claimants purportedly directed LBI to transfer the Account Assets from each applicable LBI account to certain accounts maintained by Credit Suisse.  *Id.* ¶¶ 3-4.  The Claimants state that on September 12, 2008 (the Friday leading into LBHI's bankruptcy filing) they provided either LBI or LBIE with the "Letters of Authorization" necessary to effectuate the transfer.  *See* Motion of Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P. and Providence TMT Special Situations Fund L.P. for Leave to Conduct Rule 2004 Discovery of Debtor Lehman Brothers Holdings Inc. and Other Entities ¶ 9 & Ex. B, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 29, 2008) [ECF No. 435] (hereinafter "2004 Motion").[5]  This transfer would have been settled on September 16, 2008— two business days after the Claimants provided LBI with the documentation necessary to effectuate the transfer.  *Id.* ¶ 9 & Ex. C.  The transfer of the Account Assets was never completed

---

[4] A substantially representative MLA is attached hereto as Exhibit C.  There are minor differences between the MLA executed by NGOF (defined below) and the remaining Claimants.  These minor differences are not relevant for the purposes of this objection.

[5] Although only four of the six Claimants made the factual statements contained within the 2004 Motion (Newport Global Credit Fund (Master) L.P., Newport Global Opportunities Fund, LP, Providence TMT Special Situations Fund LP, and PEP Credit Investor LP), LBHI has no reason to believe that these facts do not underlie the Claims of the remaining Providence fund Claimants (Providence Equity Partners VI LP and Providence Equity Partners VI-A, LP).

19611513

due to the intervening commencement of the Chapter 11 Cases, SIPA Proceeding and UK

Proceeding.  *See* Claims ¶¶ 4-5.

13.    The fact that the transfer was never completed is not surprising.  As the

Claimants implicitly acknowledge, their transfer request arrived in the midst of multiple

bankruptcy and administrative proceedings around the world affecting all operations of the

Lehman enterprise:  (i) on Wednesday, September 10, 2008, the Claimants purportedly requested

the Account Asset transfer to Credit Suisse,[6] (ii) on Friday, September 12, 2008, the Claimants

purportedly provided LBI with the letters of authorization necessary to perform the Account

Asset transfer,[7] and an LBI representative informed the Claimants that such transfer had been

"booked out" for settlement on Tuesday, September 16, 2008,[8] (iii) on Monday, September 15,

2008, the LBHI Estates began commencing the Chapter 11 Cases, LBIE commenced the UK

Proceeding, and an LBI representative informed the Claimants that LBIE's administrators would

update the Claimants on the progress of the Account Asset transfer because assets held in LBIE

accounts were "under lockdown" due to the UK Proceeding,[9] (iv) after the filing of the Chapter

11 Cases, the Account Asset transfer allegedly was never completed and the Claimants allege

that they have since been unable to exercise certain rights and / or receive certain distributions

related to the Account Assets.[10]

14.    Based on these facts, each Claim seeks to recover, from each LBHI Estate,

various damages allegedly arising from each estate's breach of its "obligations under the Prime

---

[6] Claims ¶¶ 4-5.

[7] *See* 2004 Motion ¶ 9 & Ex. B.

[8] *Id.* ¶ 9 & Ex. C.

[9] *Id.* ¶ 10.

[10] *See* Claims ¶¶ 4-9.

19611513

Brokerage Agreement."  Claims ¶¶ 3-6.  Each Claim also seeks to recover damages based on "Lehman's post-petition breaches of the Agreements."  *Id.* ¶¶ 7-9.  Further, the Claims (collectively, the "Newport Claims") asserted by Newport Global Opportunities Fund L.P. ("NGOF") and Newport Global Credit Fund (Master) L.P. (together, "Newport") seek to recover for (i) each LBHI Estate's "failure to properly capitalize CAPCO," the Customer Asset Protection Company surety bonds allegedly maintained by LBI and LBIE, and (ii) the applicable Claimant's "reliance on Lehman's CAPCO representations as inducement for entering into the Agreements" (collectively, the "CAPCO Claims").  Newport Claims ¶¶ 3, 10.

15.    Finally, in addition to the bases set forth above, each Claim asserted against LBHI also seeks recovery from LBHI as guarantor of the LBHI Estates' obligations under the Agreements (the "Guarantee Claims").  In the Guarantee Claims, the Claimants argue that LBHI is liable as guarantor based on the following documents: (i) a Resolution from the Board of Directors of LBHI, dated June 9, 2005, a copy of which is attached hereto as Exhibit D (the "Corporate Resolution"), and (ii) a Guarantee of Lehman Brothers Holdings Inc., dated January 4, 2008, addressed to Standard & Poor's Rating Services, a copy of which is attached hereto as Exhibit E (the "S&P Letter", and together with the Corporate Resolution, the "Alleged General Guarantees").

16.    This Court should disallow the Claims for several reasons.  As an initial matter, it should be emphasized that each Claimant has received a distribution from LBIE by participating in the UK Proceeding.  Earlier in the SIPA Proceeding, each Claimant held a claim (each, a "Customer Claim") against LBI defined as a "Duplicative Claim" in the settlement agreement between LBI and LBIE, dated February 21, 2013 (the "LBI-LBIE Settlement").  This Court approved the LBI-LBIE Settlement on April 16, 2013 and subsequently disallowed the

Duplicative Claims held by the Claimants.  *See* Order Approving Settlement Agreement Among

the Trustee, Lehman Brothers International (Europe) (In Administration) and the LBIE

Administrators, *SIPC v. Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16,

2013) [ECF No. 6021]; Order Confirming the Trustee's Determination of Duplicative Claims

¶ 4, *SIPC v. Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF

No. 6022].  As indicated in filings with this Court, the purpose of disallowing the Claimants'

Duplicative Claims was to channel them to the UK Proceeding and prevent the double recovery

Claimants now seek to accomplish.  *See* Declaration of Christopher K. Kiplok in Support of LBI-

LBIE Settlement Agreement ¶¶ 24-26, 34, 61-63, *SIPC v. Lehman Bros. Inc.*, SIPA Case No. 08-

01420 (Bankr. S.D.N.Y. Feb. 26, 2013) [ECF No. 5788] ("A fundamental premise of the

settlement was that the Duplicative Claimants should not recover twice for the same property.").

As a matter of equity, this Court should not now allow the double recovery that it previously

blocked.

        17.     There are three additional reasons why this Court should disallow the

Claims.  First, the Prime Brokerage Agreement's broad exculpatory provisions expressly bar the

causes of action asserted in the Claims.  Second, in any event, the Claimants have not stated

*prima facie* breach of contract claims—the Claimants have not identified obligations that the

LBHI Estates assumed under the Prime Brokerage Agreement and subsequently breached.

Third, the Guarantee Claims asserted against LBHI do not set forth facts sufficient to establish

guarantor liability—*i.e.*, that the applicable Claimant knew of and relied upon one of the Alleged

General Guarantees before entering into the transactions that underlie the Claims.  For these

three reasons, this Court should disallow and expunge the Claims in full.

19611513

## **OBJECTION**

18.     Bankruptcy Code section 502(b)(1) provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

19.     To be entitled to *prima facie* validity under Bankruptcy Rule 3001(f), a proof of claim must allege "facts sufficient to support legal liability to the claimant."  *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991).  As set forth below, the Claims are unenforceable against the LBHI Estates.  The Prime Brokerage Agreement expressly exculpates the LBHI Estates from all liability asserted in the Claims.  Thus, as a matter of law, the Claimants cannot plead facts sufficient to support the Claims.

20.     An objection refuting – on either a factual or a legal basis – one of a claim's essential allegations shifts to the claimant the burden of proof of demonstrating the validity of its claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  As set forth below, the Claims cannot withstand scrutiny.

21.     Accordingly, the Court should disallow and expunge the Claims in their entirety.

9

## I.    The Claims Are Barred by the Exculpatory
## Provisions in the Prime Brokerage Agreement

22.    The Claims fail because they are barred by the broad exculpatory

provisions contained within paragraphs 29 and 30 of the Prime Brokerage Agreement.[11]

Paragraph 29 releases the LBHI Estates from all liability arising from the occurrence of certain

events, including "any loss caused, directly or indirectly, by government restrictions . . .

suspension of trading . . . or other conditions beyond Lehman Brothers' control."  Prime

Brokerage Agreement ¶ 29.  Paragraph 30 further releases the LBHI Estates from all liability "in

connection with the execution, clearing, handling, purchasing or selling of securities,

commodities or other property, or other action."  *Id.* ¶ 30.  Although the exculpation in paragraph

30 of the Prime Brokerage Agreement contains an exception for "gross negligence or willful

misconduct on Lehman Brothers' part," the exculpation in paragraph 29 does not.  *Id.* ¶¶ 29-30.

23.    As explained below, both exculpatory provisions prevent the Claimants

from recovering on the Claims.  Therefore, the Claims should be disallowed.

A.    *The Claims Are Barred by Paragraph 29 of the Prime Brokerage Agreement*

24.    Paragraph 29 of the Prime Brokerage Agreement provides, in relevant

part, "Lehman Brothers will not be liable for any loss caused, directly or indirectly, by

government restrictions . . . suspension of trading . . . or other conditions beyond Lehman

Brothers' control."  Prime Brokerage Agreement ¶ 29.

25.    New York law is clear that a valid release "forecloses a party's ability to

litigate claims subject to that release."  *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 10

---

[11] In the Prime Brokerage Agreement executed by NGOF, these exculpatory provisions are contained within paragraphs 28 and 29, respectively.  Thus, with respect to NGOF: (i) references herein to paragraph 29 of the Prime Brokerage Agreement should be construed as references to paragraph 28 of the Prime Brokerage Agreement, and (ii) references herein to paragraph 30 of the Prime Brokerage Agreement should be construed as references to paragraph 29 of the Prime Brokerage Agreement.

10

Civ. 4933 (ALC) (GWG), 2013 WL 81263, at *3-6 (S.D.N.Y. Jan. 8, 2013) (dismissing

counterclaim based on valid release).

26.    Recently, in *In re MF Global Inc.*, this Court applied this explicit rule to

facts nearly identical to those underlying the Claims and recognized that a contractual provision

that exculpates a party from all liability arising from certain specifically identified events

operates as a bar to claims seeking to impose liability for such losses.  *In re MF Global Inc.*, 515

B.R. 434, 440-42 (Bankr. S.D.N.Y. 2014).

27.    In *MF Global*, as in the present case, customers of the failed broker-dealer

asserted claims for contractual damages, separate and apart from their customer claims, for

losses they incurred as a result of the inability to affect their accounts and exit certain trades

between the commencement of the broker-dealer's SIPA proceeding and the date on which their

accounts were liquidated or transferred by the SIPA trustee (the "Released Claims").  *Id.* at 440;

Trustee's Reply ¶ 6, *In re MF Global Inc.*, SIPA Case No. 11-2790 (Bankr. S.D.N.Y. Aug. 14,

2014) [ECF No. 8175].

28.    The Court in *MF Global* held that the customers were barred from

asserting the Released Claims as a result of an exculpatory provision in their customer

agreements that "clearly and unambiguously limit[ed] [the debtor's] liability to its customers and

[did] not create a cause of action based on the [losses] like those sought" by the customers.  *In re

MF Global Inc.*, 515 B.R. at 440-41.  Like the Prime Brokerage Agreement's exculpatory

provisions, MF Global's customer agreement provided that the customers have "no claim against

[the debtor] for any loss . . . caused directly or indirectly by, *inter alia*, (1) any Applicable Law,

or order of any court, (2) suspension or termination of trading, and (3) any other causes beyond

[the debtor's] control."  *Id.* (internal quotation marks omitted).  The Court reasoned that it was

11

the commencement of the SIPA proceeding that "led to the freezing of [the] customer accounts; an automatic result from the commencement of the case and a cause beyond [the debtor's] control." *Id.* at 441. Because the customer agreement expressly exculpated the debtor from liability for losses incurred as a result of such a "suspension of trading," the Court concluded that the customers were barred from recovering on the Released Claims. *Id.*

29.    The Court also rejected the customers' attempt to recover on the Released Claims based on theories of willful misconduct or gross negligence. Like the Prime Brokerage Agreement's exculpatory clauses, a separate exculpatory provision in MF Global's customer agreement contained a carve-out for gross negligence and willful misconduct. But the Court refused to read a carve-out for such liability from one section of the customer agreement into another that "explicitly exculpates [the debtor] from liability resulting from the required termination or suspension of trading upon the commencement of a SIPA proceeding. The plain language of the contract bars that result." *Id.* at 441-42. The Court disallowed and expunged the customers' Released Claims in their entirety.

30.    Like the brokerage creditors in *MF Global*, the Claimants are barred from asserting their Claims against the LBHI Estates by the express language of the Prime Brokerage Agreement. As described above, the Claimants' alleged damages arose from governmental restrictions and a suspension of trading caused by the UK Proceeding (commenced on September 15, 2008) and the SIPA Proceeding (commenced on September 19, 2008). The Claimants, sophisticated parties entering into arm's-length transactions, expressly agreed to exculpate the LBHI Estates from any liability arising from, as the Court put it in *MF Global*, restrictions that were "the result of the proper, statutory, mechanical operation of bankruptcy procedure . . . and SIPA." *Id.* at 442 n.9. The Claimants are barred as a matter of law from stating a plausible

claim for relief for the Claims.  The Court should disallow and expunge the Claims pursuant to

section 502(b)(1) of the Bankruptcy Code because the Claims are unenforceable against the

LBHI Estates.

> B.  *The Claims Are Barred by Paragraph 30 of the Prime Brokerage Agreement*

>> 31.     Paragraph 30 of the Prime Brokerage Agreement provides as follows:

> Lehman Brothers shall not be liable in connection with the execution, clearing,
> handling, purchasing or selling of securities, commodities or other property, or
> other action, *except for gross negligence or willful misconduct on Lehman
> Brothers' part*.  You understand that certain securities may be held outside the
> United States by unaffiliated, foreign agent banks and depositories.  Lehman
> Brothers will not be liable to you for any loss, liability or expense incurred by you
> in connection with these arrangements *except to the extent that any such loss,
> liability or expense results from Lehman Brothers' gross negligence or willful
> misconduct*.

Prime Brokerage Agreement ¶ 30 (emphasis added).  Each of the Claims seeks to recover

damages related to the "handling" of the Account Assets or for other alleged losses incurred "in

connection with [the] arrangements" under the Prime Brokerage Agreement,[12] thereby triggering

application of the Prime Brokerage Agreement's limitation of liability clause.  Accordingly,

because the Claimants have not shown that the LBHI Estates' purported breach was due to gross

negligence or willful misconduct, the Claims are barred by the limitation of liability clause.

>> 32.     "Gross negligence is 'conduct that evinces a reckless disregard for the

rights of others or smacks of intentional wrongdoing.'"  *Am. Telephone & Telegraph Co. v. City

of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot.*

---

[12] Each Claim attempts to use the Prime Brokerage Agreement as a basis to recover the following damages:  (i) the value of the Account Assets that were not returned to Claimants; (ii) damages arising from "Lehman's failure to comply" with each Claimant's September 10, 2008 instruction to transfer the Account Assets to Credit Suisse; (iii) damages arising from the LBHI Estates' alleged failure to remit to Claimants certain post-petition distributions (*e.g.*, dividends) earned on the Account Assets; (iv) damages arising from each Claimant's alleged inability to participate in post-petition rights offerings related to the Account Assets; and (v) damages arising from "Lehman's [alleged] failure to comply" with each Claimant's post-petition instructions to vote the securities included in the Account Assets.  *See* Claims ¶¶ 3-10.

*Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993)).  To constitute gross negligence, the act or

omission must be "of an aggravated character, as distinguished from the failure to exercise

ordinary care."  *Bayerische Hypo–Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A.

(In re Enron Corp.)*, 292 B.R. 752, 767 (Bankr. S.D.N.Y. 2003) (internal quotation marks

omitted).  A *prima facie* case in gross negligence must be proven "by a fair preponderance of the

credible evidence" that the defendant "not only acted carelessly in making a mistake, but that it

was so extremely careless that it was equivalent to recklessness."  *Travelers Indem. Co. of

Connecticut v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002).  "Under New York

law, a mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a

finding of gross negligence."  *Id.* at 644-45.

33.    A finding of willful misconduct similarly requires the defendant to possess

"tortious intent, such as fraud, malice, a dishonest purpose or bad faith."  *Global Crossing

Telecommunications, Inc. v. CCT Commc'ns, Inc. (In re CCT Commc'ns, Inc.)*, 464 B.R. 97, 106

(Bankr. S.D.N.Y. 2011).

34.    The Claimants do not allege any facts sufficient to demonstrate that the

LBHI Estates acted with gross negligence or willful misconduct.  As a result, the Claims fail.

*See Arjent Ltd. v EZE Castle Integration, Inc.*, 2008 N.Y. Misc. LEXIS 8331, at *8-10 (N.Y.

Sup. Ct. Feb. 27, 2008) (dismissing breach of contract claim pursuant to contract's limitation of

liability clause because plaintiff did not allege facts sufficient to support a finding of gross

negligence).

35.    As noted above, the Claimants' case appears to depend entirely on events

that were plainly outside the control of the LBHI Estates.  The Claimants concede that they did

not provide letters of authorization to perform the Account Asset transfer until Friday, September

14

12, 2008 (a request that was addressed to LBI and LBIE, not LBHI).[13]  An LBI representative

informed the Claimants that such transfer had been "booked out" for settlement on Tuesday,

September 16, 2008.[14]  But by then, LBIE (which held the Account Assets) had already

commenced the UK Proceeding, and the Claimants were told that the assets with LBIE were

"under lockdown" due to the UK Proceeding.[15]

36.    The LBHI Estates' pre-petition failure to transfer the Account Assets does

not rise to the level of gross negligence or willful misconduct.  The evidence indicates that, at

most, one business day elapsed between the Claimants' requested transfers and the beginning of

the commencement of the Chapter 11 Cases.  In other words, putting aside whether the LBHI

Estates had the obligation (or ability) to complete the Account Asset transfer request, they would

have had only *one day* in which to effectuate such request.  This one-day period does not

demonstrate a "reckless disregard for the rights of others" or "smack[] of intentional

wrongdoing," *Am. Telephone & Telegraph Co.*, 83 F.3d at 556, and it certainly does not show

that any LBHI Estate possessed "tortious intent, such as fraud, malice, a dishonest purpose or

bad faith."  *Global Crossing Telecomms.*, 464 B.R. at 106.

37.    Further, the LBHI Estates' inability post-petition to complete the specific

requests of the Claimants similarly does not evidence gross negligence or willful misconduct.  At

most, the evidence demonstrates that, in September of 2008, Lehman entities throughout the

world commenced various insolvency proceedings, affecting scores of operating entities and

hundreds of thousands of securities and securities transactions in progress.  This does not

---

[13] *See* 2004 Motion ¶¶ 8-9 & Ex. B.

[14] *Id.* ¶ 9 & Ex. C.

[15] *Id.* ¶¶ 8-10.

indicate reckless or malicious conduct.  It simply highlights the complexity of the Lehman

enterprise's multinational insolvency cases.

38.     Because the Claims fail to plead any facts demonstrating that the alleged

breach of the Prime Brokerage Agreement was caused by either gross negligence or willful

misconduct, the Claims fail.  *See Deutsche Lufthansa AG v. Boeing Co.*, 2007 U.S. Dist. LEXIS

9519, at *7, *11 (S.D.N.Y. Feb. 2, 2007) (dismissing breach of contract claim because "[t]he

conduct alleged by [plaintiff] falls well below the levels required by the New York courts to

invalidate a mutually agreed upon limitation of liability" (*i.e.*, gross negligence or willful

misconduct) (citing *Kalisch-Jarcho, Inc. v. New York*, 58 N.Y.2d 377, 384-85 (N.Y. 1983))).[16]

## II.     Assuming *Arguendo* that the Claims Can Survive Application of the Exculpatory Clauses, the Claims Still Fail Because the LBHI Estates Are Not Liable for the Alleged Breaches of the Prime Brokerage Agreement

39.     Even assuming *arguendo* that the Prime Brokerage Agreement's

exculpatory provisions do not bar the Claims, the LBHI Estates still have no liability on the

Claims for the reasons set forth below.

### A.     The LBHI Estates Did Not Assume the Prime Brokerage Agreement Obligations that Were Allegedly Breached

40.     It is a well-established principle of New York contract law that, "[w]here

the plain language of a contract signed by multiple parties indicates that only one party has

assumed an obligation, only that party will be held liable for a failure to perform." *Abundance

Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (refusing to hold a

defendant liable for its affiliate's obligation to repay a loan where the defendant was a party to

---

[16] To the extent that the Claimants attempt to assert their Claims under the MLA, the Claims fail under black letter law, as the LBHI Estates are not parties to the MLA.  *Krys v. Aaron (In re Refco Inc. Sec. Litig.)*, 826 F. Supp. 2d 478, 495 (S.D.N.Y. 2010) ("It is axiomatic that '[p]arent and subsidiary or affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of the other.'" (quoting *Sheridan Broad. Corp. v. Small*, 798 N.Y.S.2d 45, 46-47 (N.Y. App. Div. 2005))).

19611513

the agreement but had only undertaken the obligation to return certain collateral); *Kranze v.*
*Cinecolor Corp.*, 96 F. Supp. 728 (S.D.N.Y. 1951) (holding that because two of the parties to a
multi-party contract assumed separate obligations, each party was only liable for the obligation it
assumed, and a parent corporation that promised stock options was not liable for a subsidiary's
salary obligations under the same agreement).  In other words, joint and several liability is only
applicable where two or more parties to a contract have promised the same performance or
undertaken the same obligation.  *See Abundance*, 840 F. Supp. 2d at 767; *Kranze*, 96 F. Supp. at
728; *see also Tahoe DBS, LLC v. Loral Space & Commc'ns Ltd. (In re Loral Space & Commc'ns*
*Ltd.*), 412 B.R. 64, 67-71 (S.D.N.Y. 2009).  Thus, whether the LBHI Estates are liable on the
Claims depends on whether the LBHI Estates assumed the obligation to perform the prime
brokerage services that underlie the Claims.  They clearly did not, as the express provisions of
the Prime Brokerage Agreement confirm.

41.    Courts determine whether parties have promised the same performance or
separate performances by looking at the parties' intent.  *See NYKCool A.B. v. Pacific Fruit*
*Inc.,* No. 10-3867, 2011 WL 3666579, at *3 (S.D.N.Y. Aug. 9, 2011) ("Where two or more
parties to a contract make a promise or promises to the same promisee, the manifested intention
of the parties determines whether they promise that the same performance or separate
performances shall be given.") (citing Restatement (Second) of Contracts § 288).  The best
evidence of the parties' intent is the contract itself.  *See Eternity Global Master Fund Ltd. v.*
*Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 177 (2d Cir. 2004).  Therefore,
"[w]here the terms of an agreement are clear and unambiguous, courts do not look beyond the
four corners of the agreement, and parol evidence of the parties' intentions is inadmissible."

17

*Abundance Partners*, 840 F. Supp. 2d at 767. The interpretation of an unambiguous contract is a question of law for the Court, which should be decided without an evidentiary hearing. *See id.*

42.     Without any authority or explanation, the Claimants seemingly assert that the LBHI Estates are liable for the Claims simply because the LBHI Estates are "parties to" the Prime Brokerage Agreement. Claims ¶ 1. But the Prime Brokerage Agreement is unambiguous, and clearly sets forth the limited obligations undertaken by (and benefits bestowed upon) "Lehman Brothers" – a term defined to include LBI, the LBHI Estates, and any of their subsidiaries, parents, affiliates, divisions, as well as any of their officers, directors, agents and employees. Prime Brokerage Agreement ¶ 1. In direct contrast to the limited obligations undertaken by "Lehman Brothers," paragraph 21 of the Prime Brokerage Agreement sets forth broad *broker-dealer* obligations—obligations which "Lehman Brothers" did not and could not assume. *Id.* ¶ 21.

43.     The Claims seek to recover damages arising from the LBHI Estates' alleged failure to return Account Assets to Claimants and "Lehman's failure to comply" with each Claimant's September 10, 2008 instruction to transfer the Account Assets to Credit Suisse. Claims ¶¶ 3-5. In other words, the Claims assert that the LBHI Estates are liable for the non-performance of broker-dealer services, set forth in paragraph 21 of the Prime Brokerage Agreement. *See* Prime Brokerage Agreement ¶ 21.

44.     However, under the terms of the Prime Brokerage Agreement, "Lehman Brothers" did not agree to perform these prime brokerage services. In fact, none of the LBHI Estates *could* have performed these services, as none was a registered U.S. broker-dealer. The only promises made by "Lehman Brothers" in the Prime Brokerage Agreement were to perform certain ministerial tasks. *See, e.g.*, Prime Brokerage Agreement ¶ 11. The basis for the Claims is

18

the breach of the prime brokerage obligations, not a breach of any of these ministerial

responsibilities undertaken by the LBHI Estates.

45.     Accordingly, under controlling precedent, the LBHI Estates have no

liability for the Claims.  The fact that the LBHI Estates may be among the parties to the Prime

Brokerage Agreement could not, by itself, result in the LBHI Estates' joint and several liability

for the prime brokerage obligations assumed by other parties.  *See Abundance*, 840 F. Supp. 2d

at 767; *see also Kranze*, 96 F. Supp. at 728.  The LBHI Estates did not promise to perform the

prime brokerage services that give rise to the Claims, and, as a result, no such claims may be

asserted against the LBHI Estates.

B.     <u>The Claims Fail to State a Prima Facie Breach of Contract Claim</u>

46.     Under New York law, to establish a *prima facie* claim for breach of

contract, a plaintiff must plead: (i) the existence of a contract; (ii) breach by the other party; and

(iii) damages suffered as a result of the breach.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46

(2d Cir. 2000).  "In pleading these elements, a plaintiff must identify what provisions of the

contract were breached as a result of the acts at issue."  *Wolff v. Rare Medium, Inc.*, 171 F. Supp.

2d 354, 358 (S.D.N.Y. 2001).  In determining whether a party has identified contractual language

specifying the relevant obligation, "it is not for the court to 'supply a specific obligation the

parties themselves did not spell out.'"  *Manhattan Motorcars, Inc. v. Automobili Lamborghini,*

*S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007) (quoting *Tonking v. Port Auth. of New York & New*

*Jersey*, 821 N.E.2d 133 (N.Y. 2004)).  "[W]hen parties set down their agreement in a clear,

complete document, their writing should be enforced according to its terms."  *Vermont Teddy*

*Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (internal quotation marks

omitted).  "This is particularly appropriate if the contract 'was negotiated between sophisticated,

19611513

counseled business people negotiating at arm's length." *In re Allegiance Telecom, Inc.*, 356 B.R.

93, 98 (Bankr. S.D.N.Y. 2006) (quoting *Vermont Teddy Bear*, 807 N.E.2d at 879).

47.     Under these well-settled rules, the Claims fail because they do not identify

specific obligations created by the Prime Brokerage Agreement that each LBHI Estate assumed

and subsequently breached.[17]  Rather than specify clear obligations owed by the LBHI Estates,

the Claims vaguely allege that each applicable LBHI Estate is liable for breach of its "obligations

under the Prime Brokerage Agreement," or for "Lehman's post-petition breaches of the

Agreements."  Claims ¶¶ 4-10.  It is well-settled that, in order to state a breach of contract claim

against an entity, the claimant must identify breach and damages.  *See Wolff*, 171 F. Supp. 2d at

358 (dismissing breach of contract claim because plaintiffs failed to identify the contractual

provisions that defendant breached).  Because the Claimants have failed to demonstrate that the

LBHI Estates breached any provision of the Prime Brokerage Agreement, the Claimants' breach

of contract claims fail.  *Levy v. Bessemer Trust Co.*, No. 97 Civ. 1785 (JFK), 1997 WL 431079,

at *5 (S.D.N.Y. July 30, 1997) (dismissing breach of contract claim because plaintiff did not

identify "provisions of the agreement [that defendant] breached"); *Oppman v. IRMC Holdings,

Inc.*, 836 N.Y.S.2d 494 (N.Y. Sup. Ct. 2007) (dismissing breach of contract claim because

"plaintiffs['] allegations fail[ed] to establish that the Defendants breached any provision of a

contract with the [p]laintiffs").

48.     Further, the fact that LBI or LBIE may have held Claimants' Account

Assets pursuant to the Agreements does not create or modify any of the LBHI Estates'

obligations vis-à-vis the Prime Brokerage Agreement.  Pursuant to the Agreements, LBI and

---

[17] For example, the Newport Claims seek to recover damages from the LBHI Estates related to LBI and LBIE
CAPCO surety bonds.  *See* Newport Claims ¶¶ 3, 10.  However, the Newport Claims make no effort to explain (i)
when or how each LBHI Estate assumed an obligation to "capitalize CAPCO," and (ii) why each LBHI Estate
should be held liable for "*Lehman's* CAPCO representations."  *Id.* (emphasis added).

LBIE enjoyed rights and incurred obligations that are not applicable to the LBHI Estates. *See,*

*e.g.*, MLA ¶ 5(a), (e) ("[LBIE] may . . . demand that [Claimant] deliver for credit to a securities

account maintained by [LBIE] . . . collateral in the form of cash or securities[.] . . . [Claimant]

authorizes and requests [LBI], as agent for [LBIE], to transfer cash or securities from the

account(s) of [Claimant] opened and maintained pursuant to the [Prime Brokerage Agreement] to

[LBIE's] Account as Collateral under this Agreement."). Because the Claimants' relationship

with LBI and LBIE was fundamentally different from the Claimants' relationship with the LBHI

Estates, the actions taken by LBI and LBIE pursuant to the Agreements do not provide any

indication of the obligations assumed by the LBHI Estates.

49.      As this Court has explained, the mere fact that one Lehman entity has

incurred an obligation does not mean that all Lehman entities are liable for any purported breach

thereof. Here, the obligations assumed by LBI and LBIE under the Agreements are distinct from

those assumed by the LBHI Estates. As a result, it is inappropriate to saddle the LBHI Estates

with liability for the purported breach of the Prime Brokerage Agreement. To impose liability in

this context would impermissibly conflate the identities of LBI and LBIE with those of the LBHI

Estates.[18] *In re Lehman Bros. Holdings Inc.*, 515 B.R. 171, 176 (Bankr. S.D.N.Y. 2014)

---

[18] Even if this Court concludes that the Claimants have identified obligations in the Prime Brokerage Agreement that the LBHI Estates affirmatively assumed (*e.g.*, obligations to vote securities held in the Account Assets after receiving appropriate direction from the Claimants), the Claims still fail because the Claimants have not shown that the LBHI Estates actually breached any of these obligations. This is especially true, with respect to voting obligations, because, based on previous filings with this Court, Newport appears to have caused its own inability to vote the securities in the Account Assets. That is, Newport had the ability to vote its securities through LBIE, but refused to exercise that ability because Newport would not provide LBIE with requested indemnities. *See* Trustee's Opposition to Motion of Newport Global Opportunities Fund (Master) L.P. and Newport Global Opportunities Fund L.P. for Leave to Conduct Rule 2004 Discovery, Including All Joinders Thereto ¶¶ 22-23, *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Oct. 13, 2010) [ECF No. 3799] ("To support Rule 2004 discovery, Newport principally invokes its inability to exercise voting rights for securities[.] . . . [T]he [LBI SIPA] Trustee understands that Newport itself is responsible [for this inability] because it refuses to agree to indemnities requested by LBIE as a condition to issuing [voting] instructions."). Although these statements refer only to Newport explicitly, LBHI has no reason to believe that the other Claimants did not similarly prevent their own ability to vote their Account Assets.

19611513

("[E]ach [Lehman entity] exists as a separate legal entity and, when one specific legal entity enters into a contract, it is that entity alone that takes on the obligation and enjoys the rights under the contract.").[19]

### III.    The Guarantee Claims Fail Because the Claimants Have Not Demonstrated that They Knew of and Relied Upon One of the Alleged General Guarantees Before Entering into the Transactions that Underlie the Claims

50.    A guarantee is a contractual undertaking by one party, the guarantor, to satisfy the obligations of another party, the primary obligor, to a third party, the creditor, in the event of a default by the primary obligor. *See Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, No. 06 Civ. 52(JGK), 2006 WL 2337186, at *13 (S.D.N.Y. Aug. 11, 2006); Restatement (Third) of Suretyship & Guaranty § 1 cmts. f, g (1996); Black's Law Dictionary (9th ed. 2009); 38 Am. Jur. 2d *Guaranty* § 1 (2014). Like all contracts, acceptance is a crucial element in forming a valid guarantee contract. The United States Supreme Court in *Davis Sewing-Mach. Co. v. Richards*, 115 U.S. 524 (1885), explained:

---

[19] To the extent that this Court is willing to read Newport's CAPCO Claims as alleging tort causes of action for fraudulent or negligent misrepresentation, these CAPCO tort claims should be expunged as well. In full, Newport's CAPCO Claims seek to recover damages based on (i) each LBHI Estate's "failure to properly capitalize CAPCO," and (ii) the applicable Claimant's "reliance on Lehman's CAPCO representations as inducement for entering into the Agreements." Newport Claims ¶¶ 3, 10. These bare-bones allegations fail to support any cognizable tort claim, including claims for fraudulent or negligent misrepresentation. *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (under New York law, claim for fraudulent misrepresentation requires (i) a material misrepresentation of fact; (ii) that was known to be false by the defendant; (iii) that was made with the intent to deceive the plaintiff; (iv) on which the plaintiff reasonably relied; and (v) which resulted in injury to the plaintiff); *Manhattan Motorcars*, 244 F.R.D. at 213 (under New York law, claim for negligent misrepresentation requires showing that "(i) the defendant had a duty, as a result of a special relationship, to give correct information; (ii) the defendant made a false representation that it should have known was incorrect; (iii) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (iv) the plaintiff intended to rely and act upon it; and (v) the plaintiff reasonably relied on it to his or her detriment" (quoting *Tonking v. Port Auth. of New York and New Jersey*, 821 N.E.2d 133 (N.Y. 2004)). Further, a claim for fraudulent or negligent misrepresentation under New York law must also satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires all "averments of fraud" to be "stated with particularity." *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 949 F. Supp. 2d 486, 509 (S.D.N.Y. 2013). Newport has failed to meet any of these requirements with respect to the CAPCO Claims. As a result, the CAPCO Claims, if entertained as fraudulent or negligent misrepresentation claims, fail as a matter of law and should be disallowed.

> A contract of guaranty, like every other contract, can only be made
> by mutual assent of the parties. . . . [I]f the guaranty is signed by
> the guarantor without any previous request of the other party, and
> in his absence, for no consideration moving between them except
> future advances to be made to the principal debtor, the guaranty is
> in legal effect an offer or proposal on the part of the guarantor,
> *needing an acceptance by the other party to complete the contract.*

*Id.* at 525 (emphasis added). Furthermore, under the New York Statute of Frauds, a

guarantee contract must be in writing and signed by the guarantor. *See* N.Y. GEN. OBLIG.

LAW § 5-701(a)(2) (McKinney 2002); *see also DeRosis v. Kaufman*, 641 N.Y.S.2d 831,

832-34 (N.Y. App. Div. 1996).[20]

   51. General guarantees are offers that can be accepted by anyone to whom

they are presented, and do not necessarily specify the particular transactions that will be

guaranteed. *See Evansville Nat'l Bank v. Kaufman*, 93 N.Y. 273, 276 (N.Y. 1883); 38 Am. Jur.

2d *Guaranty* § 14; *see also Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876, 876 (N.Y. App. Div.

1939) (guarantor provided a letter of credit for buying materials). In contrast, specific guarantees

identify the benefiting creditor or, "with precision," the underlying agreements being guaranteed.

*See, e.g.*, *Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F. Supp. 2d 394, 400 (S.D.N.Y.

2000) (stating that a valid guarantee must describe "with precision the obligation to which the

person is bound").

   52. Acceptance of a general guarantee may be indicated by a party extending

credit in reliance on the guarantee—and the extension of credit also qualifies as consideration for

the guarantee. *See Evansville Nat'l Bank*, 93 N.Y. at 279; 63 N.Y. Jur. 2d *Guaranty and*

*Suretyship* § 78 (2014); *see also Union Carbide Corp. v. Katz*, 489 F.2d 1374, 1376 (7th Cir.

1973); *Farmers' State Bank of York v. Brock*, 234 N.W. 92, 94 (Neb. 1931) (holding that

---

[20] The Plan Administrator reserves all arguments including whether the Alleged General Guarantees are guarantee contracts of any kind, as well as whether the Alleged General Guarantees would satisfy the Statute of Frauds.

extending credit in reliance on the guarantee provided consideration for the guarantee).  Thus, in

order to benefit from a general guarantee, a creditor must have known of the existence of the

guarantee and acted in reliance upon its terms when entering into the transaction with the

primary obligor.  As the court in *Federal Deposit Insurance Corp. v. Schumacher*, 660 F. Supp.

6 (E.D.N.Y. 1984), explained:

> It is, of course, elementary that a creditor's right to enforce a
> contract of guaranty *must be based upon knowledge of the
> existence of the guaranty* and that the credit must be extended in
> reliance thereof[.]

*Id.* at 8 (emphasis added) (citations omitted).  Indeed, it is well-settled that:

> A "general" guaranty is addressed to persons generally and may be
> enforced by anyone to whom it is presented although it has been
> recognized that the person so acting *must have had definite
> knowledge of the existence of the guaranty and acted in reliance
> on it.*

38 Am. Jur. 2d *Guaranty* § 14 (emphasis added) (footnote omitted).

     53.     Courts consistently apply this test of knowledge and reliance.  *See, e.g.*,

*Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876 (N.Y. App. Div. 1939); *see also Joe Balestrieri &

Co. v. Comm'r of Internal Revenue*, 177 F.2d 867, 873 (9th Cir. 1949) (recognizing the validity

of guarantee claim where guarantee was made at the request of the prospective creditor and was

delivered by the primary obligor); *J. C. Wattenbarger & Sons v. Sanders*, 30 Cal. Rptr. 910, 915

(Cal. Ct. App. 1963) (rejecting guarantee claim where there was "no proof that credit was

extended with knowledge of it and reliance upon it"); *Calcot Ass'n v. Coast Cotton Mills*, 295

P.2d 1, 4 (Cal. Dist. Ct. App. 1956) (recognizing guarantee claim where court recognized that

product was delivered to the primary obligor "only because the guaranties had been made").

     54.     In *Philip Carey Co. v. Duffy*, 10 N.Y.S.2d 876 (N.Y. App. Div. 1939), for

example, the primary obligor presented potential creditors with a general letter of credit from its

24

guarantor that was intended by the guarantor (the defendant) to be used to secure debts for materials the primary obligor bought on credit. *Id.* at 876. The court, noting that the plaintiff acted "*in reliance upon that letter and promise of credit*" when the plaintiff sold materials to the primary obligor, held that the plaintiff was "entitled to recover from defendant the agreed price of the materials." *Id.* (emphasis added).

55.     Similarly, *Farmers' State Bank of York v. Brock*, 234 N.W. 92 (Neb. 1931), concerned a general guarantee signed by the primary obligor's stockholders so that the primary obligor could obtain further extensions of credit. *Id.* at 92-93. The court granted judgment only to those guarantee claim creditors "who had knowledge of it and extended credit to the association on the faith and credit of it." *Id.* at 94. As for the other creditors who provided insufficient evidence of knowledge and reliance, the court ruled that there was no consideration for the guarantee and denied judgment. *Id.*

56.     To the extent that the Alleged General Guarantees are deemed to be guarantees at all, they would be, at best, general guarantees. The Corporate Resolution broadly provides that LBHI "fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto." *See* Corporate Resolution, p. 2. Similarly, the S&P Letter broadly states that LBHI "guarantee[s] the payment by Lehman Brothers International (Europe) ('Affiliate') of all of Affiliate's liabilities, obligations and commitments . . . to any counterparty of Affiliate." *See* S&P Letter, p. 1. These Alleged General Guarantees do not identify any particular counterparties or transactions to which they might apply, much less "with precision." *See Cavendish Traders, Ltd.*, 117 F. Supp. 2d at 400. Accordingly, if the Alleged General Guarantees are deemed to be guarantees at all, they would be enforceable only

25

by those creditors that knew of and relied upon them when transacting business with the applicable LBHI subsidiary.

57.    The Guarantee Claims fail to allege or adduce any facts to support guarantor liability for LBHI: that the applicable Claimant knew of one of the Alleged General Guarantees and relied upon it as a guarantee when entering into the transactions underlying the Claims, as the law discussed at paragraphs 50 to 56, *supra*, clearly requires.  Consequently, the Guarantee Claims fail.

58.    If the Claims remain on the claims register, the potential exists for recoveries by parties who do not hold valid claims against the LBHI Estates.  Accordingly, the Plan Administrator respectfully requests that the Court disallow and expunge the Claims.

## RESERVATION OF RIGHTS

59.    The Plan Administrator reserves all rights to object on any other bases to any Claim as to which the Court does not grant the relief requested herein.  The Plan Administrator reserves the right to conduct further discovery as to the Claims and any matters raised by the Claimants and to supplement this and other filings as a result thereof.

## NOTICE

60.    No trustee has been appointed in these Chapter 11 Cases.  Notice of this omnibus objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) each claimant listed on Exhibit A; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

19611513

61.     No previous request for the relief sought herein has been made by the Plan

Administrator or the LBHI Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: December 1, 2014
         New York, New York

                                    **CURTIS, MALLET-PREVOST,
                                      COLT & MOSLE LLP**

                                    By:    _/s/ L. P. Harrison 3rd_
                                            L. P. Harrison 3rd
                                            Turner P. Smith
                                            Cindi Eilbott Giglio
                                    101 Park Avenue
                                    New York, New York 10178-0061
                                    Telephone: (212) 696-6000
                                    Facsimile:  (212) 697-1559

                                    _Counsel for Lehman Brothers Holdings Inc.
                                      and Certain of Its Affiliates_

19611513

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re                                                        :         **Chapter 11 Case No.**
                                                             :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :         **08-13555 (SCC)**
                                                             :
                         **Debtors.**                        :         **(Jointly Administered)**
------------------------------------------------------------------------x

### ORDER GRANTING THE FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

Upon the four hundred eighty-eighth omnibus objection to claims, dated

December 1, 2014 (the "Four Hundred Eighty-Eighth Omnibus Objection to Claims"),[1] of

Lehman Brothers Holdings Inc., as Plan Administrator under the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, seeking to

disallow and expunge the No Liability Claims pursuant to section 502(b) of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy

Procedure, and this Court's order approving procedures for the filing of omnibus objections to

proofs of claim [ECF No. 6664], all as more fully described in the Four Hundred Eighty-Eighth

Omnibus Objection to Claims; and due and proper notice of the Four Hundred Eighty-Eighth

Omnibus Objection to Claims having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Four Hundred Eighty-Eighth Omnibus Objection to Claims is in the best interests of the LBHI

Estates, their creditors, and all parties in interest, and that the legal and factual bases set forth in

the Four Hundred Eighty-Eighth Omnibus Objection to Claims establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Four Hundred Eighty-Eighth Omnibus Objection to Claims.

ORDERED that the relief requested in the Four Hundred Eighty-Eighth Omnibus

Objection to Claims is granted; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the Claims

listed on <u>Exhibit 1</u> annexed hereto are disallowed and expunged in their entirety with prejudice;

and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2015
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 1 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 26405 | Undetermined | Undetermined | No Liability |
| 2 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13901 (SCC) | Lehman Brothers Commercial Corporation | 09/22/2009 | 26406 | Undetermined | Undetermined | No Liability |
| 3 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 26407 | Undetermined | Undetermined | No Liability |
| 4 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 26408 | Undetermined | Undetermined | No Liability |
| 5 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 26409 | Undetermined | Undetermined | No Liability |
| 6 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 26410 | Undetermined | Undetermined | No Liability |
| 7 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 26501 | Undetermined | Undetermined | No Liability |
| 8 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 26556 | Undetermined | Undetermined | No Liability |
| 9 | NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 29229 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|------|-------------|-------------|------------|---------|------------------------------|--------------------------|----------------------------------|
| 10 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 29234 | Undetermined | Undetermined | No Liability |
| 11 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 29235 | Undetermined | Undetermined | No Liability |
| 12 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 29236 | Undetermined | Undetermined | No Liability |
| 13 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 29239 | Undetermined | Undetermined | No Liability |
| 14 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13908 (SCC) | East Dover Limited | 09/22/2009 | 29241 | Undetermined | Undetermined | No Liability |
| 15 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 09-10137 (SCC) | BNC Mortgage LLC | 09/22/2009 | 29245 | Undetermined | Undetermined | No Liability |
| 16 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 29246 | Undetermined | Undetermined | No Liability |
| 17 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29247 | Undetermined | Undetermined | No Liability |
| 18 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 29248 | Undetermined | Undetermined | No Liability |

**IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)**

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 19 NEWPORT GLOBAL CREDIT FUND (MASTER) L.P. | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 29250 | Undetermined | Undetermined | No Liability |
| 20 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 26348 | Undetermined | Undetermined | No Liability |
| 21 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13901 (SCC) | Lehman Brothers Commercial Corporation | 09/22/2009 | 26349 | Undetermined | Undetermined | No Liability |
| 22 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 26350 | Undetermined | Undetermined | No Liability |
| 23 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 26351 | Undetermined | Undetermined | No Liability |
| 24 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 26352 | Undetermined | Undetermined | No Liability |
| 25 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 26360 | Undetermined | Undetermined | No Liability |
| 26 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 26361 | Undetermined | Undetermined | No Liability |
| 27 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 26362 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 28 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 26363 | Undetermined | Undetermined | No Liability |
| 29 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 26364 | Undetermined | Undetermined | No Liability |
| 30 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 26372 | Undetermined | Undetermined | No Liability |
| 31 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 26374 | Undetermined | Undetermined | No Liability |
| 32 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 26375 | Undetermined | Undetermined | No Liability |
| 33 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 09-10137 (SCC) | BNC Mortgage LLC | 09/22/2009 | 26376 | Undetermined | Undetermined | No Liability |
| 34 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 26377 | Undetermined | Undetermined | No Liability |
| 35 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 26390 | Undetermined | Undetermined | No Liability |
| 36 NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 26557 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

**IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)**

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 37 | NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26558 | Undetermined | Undetermined | No Liability |
| 38 | NEWPORT GLOBAL OPPORTUNITIES FUND, LP | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 26559 | Undetermined | Undetermined | No Liability |
| 39 | PEP CREDIT INVESTOR LP | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 26379 | Undetermined | Undetermined | No Liability |
| 40 | PEP CREDIT INVESTOR LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 26380 | Undetermined | Undetermined | No Liability |
| 41 | PEP CREDIT INVESTOR LP | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 26381 | Undetermined | Undetermined | No Liability |
| 42 | PEP CREDIT INVESTOR LP | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 26382 | Undetermined | Undetermined | No Liability |
| 43 | PEP CREDIT INVESTOR LP | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 26383 | Undetermined | Undetermined | No Liability |
| 44 | PEP CREDIT INVESTOR LP | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 26384 | Undetermined | Undetermined | No Liability |
| 45 | PEP CREDIT INVESTOR LP | 08-13901 (SCC) | Lehman Brothers Commercial Corporation | 09/22/2009 | 26385 | Undetermined | Undetermined | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 46 PEP CREDIT INVESTOR LP | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 26386 | Undetermined | Undetermined | No Liability |
| 47 PEP CREDIT INVESTOR LP | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 26392 | Undetermined | Undetermined | No Liability |
| 48 PEP CREDIT INVESTOR LP | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 26397 | Undetermined | Undetermined | No Liability |
| 49 PEP CREDIT INVESTOR LP | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 26398 | Undetermined | Undetermined | No Liability |
| 50 PEP CREDIT INVESTOR LP | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 26399 | Undetermined | Undetermined | No Liability |
| 51 PEP CREDIT INVESTOR LP | 09-10137 (SCC) | BNC Mortgage LLC | 09/22/2009 | 27388 | Undetermined | Undetermined | No Liability |
| 52 PEP CREDIT INVESTOR LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 29264 | Undetermined | Undetermined | No Liability |
| 53 PEP CREDIT INVESTOR LP | 08-13908 (SCC) | East Dover Limited | 09/22/2009 | 29396 | Undetermined | Undetermined | No Liability |
| 54 PEP CREDIT INVESTOR LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 29397 | Undetermined | Undetermined | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 55 | PEP CREDIT INVESTOR LP | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 29398 | Undetermined | Undetermined | No Liability |
| 56 | PEP CREDIT INVESTOR LP | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 29399 | Undetermined | Undetermined | No Liability |
| 57 | PEP CREDIT INVESTOR LP | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 29400 | Undetermined | Undetermined | No Liability |
| 58 | PROVIDENCE EQUITY PARTNERS VI LP | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 26333 | Undetermined | Undetermined | No Liability |
| 59 | PROVIDENCE EQUITY PARTNERS VI LP | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 26334 | Undetermined | Undetermined | No Liability |
| 60 | PROVIDENCE EQUITY PARTNERS VI LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 26335 | Undetermined | Undetermined | No Liability |
| 61 | PROVIDENCE EQUITY PARTNERS VI LP | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 26336 | Undetermined | Undetermined | No Liability |
| 62 | PROVIDENCE EQUITY PARTNERS VI LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 26337 | Undetermined | Undetermined | No Liability |
| 63 | PROVIDENCE EQUITY PARTNERS VI LP | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 26420 | Undetermined | Undetermined | No Liability |

**IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)**

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 64 PROVIDENCE EQUITY PARTNERS VI LP | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 26421 | Undetermined | Undetermined | No Liability |
| 65 PROVIDENCE EQUITY PARTNERS VI LP | 08-13908 (SCC) | East Dover Limited | 09/22/2009 | 29228 | Undetermined | Undetermined | No Liability |
| 66 PROVIDENCE EQUITY PARTNERS VI LP | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 29230 | Undetermined | Undetermined | No Liability |
| 67 PROVIDENCE EQUITY PARTNERS VI LP | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 29243 | Undetermined | Undetermined | No Liability |
| 68 PROVIDENCE EQUITY PARTNERS VI LP | 08-13901 (SCC) | Lehman Brothers Commercial Corporation | 09/22/2009 | 29260 | Undetermined | Undetermined | No Liability |
| 69 PROVIDENCE EQUITY PARTNERS VI LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 29266 | Undetermined | Undetermined | No Liability |
| 70 PROVIDENCE EQUITY PARTNERS VI LP | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29267 | Undetermined | Undetermined | No Liability |
| 71 PROVIDENCE EQUITY PARTNERS VI LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 29268 | Undetermined | Undetermined | No Liability |
| 72 PROVIDENCE EQUITY PARTNERS VI LP | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 29269 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 73 PROVIDENCE EQUITY PARTNERS VI LP | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 29270 | Undetermined | Undetermined | No Liability |
| 74 PROVIDENCE EQUITY PARTNERS VI LP | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 29409 | Undetermined | Undetermined | No Liability |
| 75 PROVIDENCE EQUITY PARTNERS VI LP | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 29410 | Undetermined | Undetermined | No Liability |
| 76 PROVIDENCE EQUITY PARTNERS VI LP | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 29411 | Undetermined | Undetermined | No Liability |
| 77 PROVIDENCE EQUITY PARTNERS VI-A, LP | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 26327 | Undetermined | Undetermined | No Liability |
| 78 PROVIDENCE EQUITY PARTNERS VI-A, LP | 09-10137 (SCC) | BNC Mortgage LLC | 09/22/2009 | 26328 | Undetermined | Undetermined | No Liability |
| 79 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 26329 | Undetermined | Undetermined | No Liability |
| 80 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 26330 | Undetermined | Undetermined | No Liability |
| 81 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 26331 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

**IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)**

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 82 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 26332 | Undetermined | Undetermined | No Liability |
| 83 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 26422 | Undetermined | Undetermined | No Liability |
| 84 PROVIDENCE EQUITY PARTNERS VI-A, LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 26423 | Undetermined | Undetermined | No Liability |
| 85 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 26424 | Undetermined | Undetermined | No Liability |
| 86 PROVIDENCE EQUITY PARTNERS VI-A, LP | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 26425 | Undetermined | Undetermined | No Liability |
| 87 PROVIDENCE EQUITY PARTNERS VI-A, LP | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 29231 | Undetermined | Undetermined | No Liability |
| 88 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 29232 | Undetermined | Undetermined | No Liability |
| 89 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 29252 | Undetermined | Undetermined | No Liability |
| 90 PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 29253 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 91 | PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 29254 | Undetermined | Undetermined | No Liability |
| 92 | PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13908 (SCC) | East Dover Limited | 09/22/2009 | 29255 | Undetermined | Undetermined | No Liability |
| 93 | PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29256 | Undetermined | Undetermined | No Liability |
| 94 | PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 29261 | Undetermined | Undetermined | No Liability |
| 95 | PROVIDENCE EQUITY PARTNERS VI-A, LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 29262 | Undetermined | Undetermined | No Liability |
| 96 | PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13555 (SCC) | Lehman Brothers Holdings Inc. | 09/22/2009 | 29249 | Undetermined | Undetermined | No Liability |
| 97 | PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13907 (SCC) | CES Aviation IX LLC | 09/22/2009 | 29251 | Undetermined | Undetermined | No Liability |
| 98 | PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 09-12516 (SCC) | LB 2080 Kalakaua Owners LLC | 09/22/2009 | 29257 | Undetermined | Undetermined | No Liability |
| 99 | PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 09-10560 (SCC) | LB Rose Ranch LLC | 09/22/2009 | 29258 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)

OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|------|-------------|-------------|------------|---------|------------------------------|--------------------------|----------------------------------|
| 100 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13908 (SCC) | East Dover Limited | 09/22/2009 | 29259 | Undetermined | Undetermined | No Liability |
| 101 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 09-10558 (SCC) | Structured Asset Securities Corporation | 09/22/2009 | 29263 | Undetermined | Undetermined | No Liability |
| 102 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13888 (SCC) | Lehman Brothers Special Financing Inc. | 09/22/2009 | 29265 | Undetermined | Undetermined | No Liability |
| 103 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 09-10137 (SCC) | BNC Mortgage LLC | 09/22/2009 | 29391 | Undetermined | Undetermined | No Liability |
| 104 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 09-10108 (SCC) | Luxembourg Residential Properties Loan Finance S.a.r.l. | 09/22/2009 | 29392 | Undetermined | Undetermined | No Liability |
| 105 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13902 (SCC) | Lehman Brothers Financial Products Inc. | 09/22/2009 | 29393 | Undetermined | Undetermined | No Liability |
| 106 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13901 (SCC) | Lehman Brothers Commercial Corporation | 09/22/2009 | 29394 | Undetermined | Undetermined | No Liability |
| 107 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13900 (SCC) | Lehman Commercial Paper Inc. | 09/22/2009 | 29395 | Undetermined | Undetermined | No Liability |
| 108 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13905 (SCC) | CES Aviation LLC | 09/22/2009 | 29402 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

**IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (SCC)**

**OMNIBUS OBJECTION 488: EXHIBIT A - NO LIABILITY**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|------|-------------|-------------|------------|---------|------------------------------|--------------------------|----------------------------------|
| 109 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13899 (SCC) | Lehman Brothers Derivative Products Inc. | 09/22/2009 | 29403 | Undetermined | Undetermined | No Liability |
| 110 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13893 (SCC) | Lehman Brothers OTC Derivatives Inc. | 09/22/2009 | 29404 | Undetermined | Undetermined | No Liability |
| 111 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13885 (SCC) | Lehman Brothers Commodity Services Inc. | 09/22/2009 | 29405 | Undetermined | Undetermined | No Liability |
| 112 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13906 (SCC) | CES Aviation V LLC | 09/22/2009 | 29406 | Undetermined | Undetermined | No Liability |
| 113 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13600 (SCC) | LB 745 LLC | 09/22/2009 | 29407 | Undetermined | Undetermined | No Liability |
| 114 PROVIDENCE TMT SPECIAL SITUATIONS FUND LP | 08-13904 (SCC) | Lehman Scottish Finance L.P. | 09/22/2009 | 29408 | Undetermined | Undetermined | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

**<u>Exhibit B</u>**

# Customer Account Agreement Prime Brokerage

**LEHMAN BROTHERS INC.**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019

(212) 526-7000

| Title: Newport Global Credit Fund (Master) LP | Account (and Group) No.: |
|---|---|
| | |

## Please Read Carefully, Sign and Return

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** (a) A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as a Lehman Brothers Entity," or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby.

(b) You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Advisor (or Investment Manager or General Partner, as the case may be) appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a Investment Advisor Representation Letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding under any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as (i) all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities,

commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

**4. BREACH, BANKRUPTCY OR DEFAULT.** If you shall:

(i) breach, repudiate or default under this Agreement or any Contract with any Lehman Brothers Entity, whether heretofore or hereafter entered into;

(ii) make or repeat any misrepresentations in connection with this Agreement or any Contract with any Lehman Brothers Entity;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due or give Lehman Brothers other grounds for insecurity, as determined by Lehman Brothers in its sole and absolute discretion (including, without limitation, death; mental incompetence; dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity

2

or the attachment against your or such other party's account(s) with any Lehman Brothers Entity; or any indication of your refusal or inability to satisfy promptly any Margin Call (as defined below) or other obligation);

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement and any or all Contracts you may then have with any Lehman Brothers Entity, whether heretofore or hereafter entered into. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its sole discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default (however characterized) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** Subject to, and not as a limitation of, the rights of Lehman Brothers under this Agreement, if at any time Lehman Brothers has reasonable grounds for insecurity with respect to your performance of any of your obligations, Lehman Brothers may demand, and you shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lehman Brothers demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lehman Brothers may include, but shall not be limited to, the delivery by you of additional property as collateral.

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

3

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its sole and absolute discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under

4

this Agreement or any Contract. In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction.

**15. CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16. SHORT AND LONG SALES.** In placing any sell order for a short sale, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long order, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being long shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17. MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18. SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19. CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned,

pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

20. **OPTIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You understand that the official closing price may be determined some time after the close of trading for purposes of this section. You understand that listed equity options may be automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise listed options that are out-of-the-money by any amount, at-the-money, or in-the-money but are not subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You will notify Lehman Brothers of your intention not to exercise an option that is in-the-money, and subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You understand that listed options on an underlying index are automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise any option early or not to exercise an option on an underlying index which is in-the-money no later than 15 minutes prior to the close of trading for that option on that day. If notification is not given to Lehman Brothers within the times noted, Lehman Brothers is under no obligation to take action but will endeavor to comply with your instructions. Except as required by the OCC Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

21. **PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)     LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)     LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

6

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d)   In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e)   You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event : (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its sole discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f)   If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g)   If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h)   You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i)   Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman

7

Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)    The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22.    LEGALLY BINDING.** You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time. In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23.    AMENDMENT.** You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24.    GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25.    JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26.    WAIVER OF IMMUNITIES.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or

8

after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or

9

protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

**35. ERISA.** The investment manager or advisor for Customer represents that Customer is not benefit plan an ERISA Plan as defined in Section 3(3) of ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Customer is not a person acting on behalf of an ERISA Plan and that the Customer's assets do not constitute assets of an ERISA Plan.

10

PLEASE COMPLETE THIS INFORMATION *AND* SIGN THE APPROPRIATE SPACE BELOW:

THIS AGREEMENT IS DATED AS OF _____, 200_

Newport Global Credit Fund (Master) LP
*Name of Customer*

21 Weterway Ave, Suite 150    USA
*Address*    *Country*

The Woodlands, TX    77380
*City, State*    *Zip Code + 4*

BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:

YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.

CUSTOMER
NAME:    Newport Global Credit Fund (Master) LP
*Individual or Printed Name of Company*

SIGNATURE:    _____
*Signature of Authorized Person*

PRINT NAME:    Timothy T. Janszen, Authorized officer of Ultimate General Partner
*Printed Name and Title of Signatory or Name of General Partner if Signer is a Partnership*

BY:    _____
*Authorized Signatory and Title of General Partner if Above Signer is a Partnership Otherwise Blank*

ACKNOWLEDGED AND AGREED

BY: Newport Global Advisors LP solely for the purposes of the representation in Section 35

By: _____

Name: Timothy T. Janszen

Title: CEO

ACCEPTED AND AGREED TO:

_____

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates named herein

11

EXHIBIT A
AUTHORIZED PERSONS

<u>Name</u>                                    <u>Specimen Signature</u>

Roger A. May                           Roger A. May

Thomas Reeg

Ryan Langdon

12

**<u>Exhibit C</u>**

# Margin Lending Agreement

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE
United Kingdom

| Borrower: Newport Global Credit Fund (Master) LP | Reference No.: |
|---|---|

This Margin Lending Agreement (this "**Agreement**") by and among Lehman Brothers International (Europe) ("**Lender**") and the above-listed borrower ("**Borrower**") is arranged by Lehman Brothers Inc. ("**Agent**"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("**SEC**") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "**Loans**") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "**LBI Account Agreement**").

1. **AGENT AS AGENT OF LENDER AND BORROWER.**

   (a) Lender and Borrower (the "**Principals**") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

   (b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

   (c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

   (d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

2. **PURPOSE OF THE LOANS.** Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

3. **LOAN TERMS.**

   (a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "**GMSLA**"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

# LEHMAN BROTHERS

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

4.    **INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5.    **COLLATERAL.**

(a) Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion. Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

**LEHMAN BROTHERS**                                    2

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c)  Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would have been entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d)  Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e)  Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6.  EVENTS OF DEFAULT.  The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

LEHMAN BROTHERS                3

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

(viii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loansand/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

7.  **MISCELLANEOUS.**

(a) _Capacity to Contract._ Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) _ERISA._ (i) Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a Investment Advisor Representation Letter.

LEHMAN BROTHERS                    4

(ii) The investment manager or advisor for Borrower represents that Borrower is not an ERISA Plan as defined in Section 3(3) ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The Investment manager further represents and warrants that Borrower is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your

LEHMAN BROTHERS                    5

rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void.  Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower.  Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower.  Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) Securities Contract; Margin Payment; Settlement Payment.  Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) Legally Binding.  Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns.  Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation.  Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf.  Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) Amendment.  Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower.  By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification.  If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations.  Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) GOVERNING LAW.  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF, SAVE FOR CLAUSE (D) IN THIS SECTION 7 WHICH SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF ENGLAND.

(n) JURISDICTION; WAIVER OF JURY TRIAL.  The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy.  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.  ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) NO CONSEQUENTIAL DAMAGES.  IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

LEHMAN BROTHERS                    6

(p) <u>Waiver of Immunities</u>. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) <u>Headings</u>. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) <u>Cumulative Rights; Entire Agreement</u>. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

L EHMAN  B ROTHERS                     7

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the ____ day of ____

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
Name: David Swenson
Title: Managing Director

Borrower:

NEWPORT GLOBAL CREDIT FUND (MASTER) LP

By: _____
Name: Timothy T. Janszen
Title: Authorized Officer of Ultimate General Partner

Investment Advisor (for the sole purpose of agreeing to and acknowledging the representation contained in Section 7 (b) (ii))

By: _____
Name: Timothy T. Janszen
Title: CEO

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS                    8

## Exhibit D

# UNANIMOUS WRITTEN CONSENT OF THE

# EXECUTIVE COMMITTEE OF THE

# BOARD OF DIRECTORS OF

# LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

WHEREAS, the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

WHEREAS, certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

WHEREAS, due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

WHEREAS, the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

WHEREAS, Management wishes to establish additional Guaranteed Subsidiaries,

WHEREAS, Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

WHEREAS, Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

NOW THEREFORE BE IT,

06-09-05  11:31  JDM INVESTMENTS

ID=2023380294                                                    P.02

06.06.2005   29:11   L-N# - 312973802954                         NO.290   004
26/06/2005   16:41   LEHMAN + 3164575296                         NO.584   082

RESOLVED, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

RESOLVED, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

RESOLVED, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

RESOLVED, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

FURTHER RESOLVED, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 7, 2005

Richard S. Fuld, Jr.                        John D. Macomber

2

06-09-05   09:40        RECEIVED FROM:212 526 0339        P.04

06/08/2005    16:41    LEHMAN → 916467582653                    NO.504    003

**Schedule A**
**to LBHI Unanimous Written Consent**
**dated June 9 , 2005**

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

**<u>Exhibit E</u>**

FEB-17-2009 11:51 From:                                              To:Goldman Sachs    Co    P.1/2

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    **Standard & Poor's Rating Services**
       **55 Water Street**
       **New York, NY 10041**

We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns (collectively, the "Beneficiaries"), as the same shall respectively become due, together with accrued interest and charges, if any, and we agree to reimburse each Beneficiary for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration, irrespective of the validity, regularity or enforceability of any agreement or document setting forth a Guaranteed Obligation (each a "Borrower Agreement") against Affiliate (other than as a result of the unenforceability of the applicable Borrower Agreement against the Beneficiary), any waiver or consent by any Beneficiary with respect to any provisions thereof or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defenses of payment and statute of limitations, neither of which is waived); provided, however, that we shall be entitled to exercise any right that Affiliate could have exercised under the applicable Borrower Agreement to cure any default in respect of its obligations under the Borrower Agreement or to setoff, counterclaim or withhold payment in respect of any event of default or similar event in respect of a Beneficiary, but only to the extent such right is provided to Affiliate under the Borrower Agreement. We shall have no right of subrogation with respect to any payments we make under this Guarantee in connection with a Borrower Agreement until all Guaranteed Obligations of Affiliate under that Borrower Agreement are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and each Beneficiary may exercise its rights hereunder against us without first having to take any action against Affiliate, or any other guarantor. We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

We further agree that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation or interest thereon is rescinded or must otherwise be restored by or is recovered from a Beneficiary as a preference or fraudulent transfer under the federal Bankruptcy Code or any similar applicable state or foreign law.

hereunder to us shall be to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, New York, New York (Facsimile No. 646-758-3334).

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

**IN WITNESS WHEREOF,** I have hereunto set my hand on January 4, 2008.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:  James J. Killerlane III
Title:  Vice President

2