Hearing Date: December 10, 2014 at 10:00 a.m. (EST)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                             :

In re:                                  :        Chapter 11 Case No.
                                             :

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :        08-13555 (SCC)
                                           :

              Debtors.        :        (Jointly Administered)
                                           :
------------------------------------------------------------------x

# LEHMAN BROTHERS HOLDINGS INC.'S REPLY BRIEF (A) IN OPPOSITION TO RMBS TRUSTEES' MOTION TO (I) INCREASE THE RESERVE TO $12.143 BILLION AND (II) ESTIMATE AND ALLOW THEIR CLAIMS FOR COVERED LOANS AT $12.143 BILLION PURSUANT TO SECTION 502(C) OF THE BANKRUPTCY CODE, AND (B) IN FURTHER SUPPORT OF ITS CROSS-MOTION TO ESTABLISH A PROTOCOL TO RESOLVE CLAIMS FILED BY RMBS TRUSTEES

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-9000
Paul V. Shalhoub
Todd G. Cosenza

JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Telephone: (303) 573-1600
Facsimile: (303) 573-8133
Michael A. Rollin
Maritza Dominguez Braswell (*pro hac vice*)

*Attorneys for Debtors Lehman Brothers
Holdings Inc. and Certain of its Affiliates*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT .........................................................................................................................12

I.      THE PROTOCOL IS THE ONLY PROPOSED APPROACH TO CLAIM
        RESOLUTION THAT COMPORTS WITH THE GOVERNING
        AGREEMENTS..........................................................................................................12

        A.      The Governing Agreements Require Loan-Level Proof of Each Element of
                a Repurchase Claim, and the Contractual Remedy Can Only Be Applied
                On a Loan-by-Loan Basis. ....................................................................................13

        B.      The RMBS Trustees' Reliance On Sampling Finds No Support In the Case
                Law or the Bankruptcy Code. ................................................................................19

        C.      Lehman's Proposed Protocol Is Efficient, Requires Minimal Judicial
                Involvement, and Will Best Serve the Estate's Interest in Determining the
                Proper RMBS Allowed Claim Amount. ................................................................32

II.     THE RESERVE MOTION SHOULD BE DENIED.......................................................36

CONCLUSION......................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*ACE Secs. Corp. v. DB Structured Prods., Inc.*,
    40 Misc.3d 562 (N.Y. Sup. Ct. 2013), *rev'd on other grounds*,
    112 A.D.3d 522 (1st Dep't 2013) ..............................................25, 26

*In re Apex Oil Co.*,
    107 B.R. 189 (Bankr. E.D. Mo. 1989)...............................26

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
    892 F. Supp. 2d 596 (S.D.N.Y. 2012).................................22

*Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc.*,
    No. 12-cv-1579, 2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012)................. 22-23

*Backus Plywood Corp. v. Commercial Decal, Inc.*,
    317 F.2d 339 (2d Cir. 1963)..............................38

*Bear Stearns Mortg. Funding Trust 2007-ARS v. EMC Mortg. LLC*,
    C.A. No. 6861-CS (Del. Ch. Nov. 8, 2012).......................18

*In re Chemtura Corp.*,
    No. 09-11233, 2010 WL 4638898 (Bankr. S.D.N.Y. Nov. 8, 2010)...........37, 38

*Citigroup Mortg. Loan Trust 2007-AMC3 v. Citigroup Global Mkts. Realty Corp.*,
    No. 13 Civ. 2843, 2014 WL 1329165 (S.D.N.Y. Mar. 31, 2014) ..................16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................21

*Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*,
    No. 12-cv-00933, 2014 WL 1289234 (D. Conn. Mar. 31, 2014) ....................24

*Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*,
    No. 12-cv-00933, 2014 WL 3824333 (D. Conn. Aug. 4, 2014)......................24

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich. 1997)...............................26, 29

*ESPN, Inc. v. Office of Comm'r of Baseball*,
    76 F. Supp. 2d 416 (S.D.N.Y. 1999)......................... 17-18

*Federal Housing Finance Agency v. JP Morgan Chase & Co.*,
    No. 11 Civ. 6188, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012).....................20

*Giles v. Coughlin*,
    No. 95 Civ. 3033, 1997 WL 433437 (S.D.N.Y. Aug. 1, 1997) ................. 39-40

*Home Equity Mortg. Trust Series v. DLJ Mortg. Capital, Inc.*,
  No. 156016/2012 (N.Y. Sup. Ct. Nov. 19, 2013) ............................................................24

*Hunt Constr. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.*,
  607 F.3d 10 (2d Cir. 2010)...................................................................... 24-25

*LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*,
  No. 01 Civ. 4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) ........................................15

*In re LightSquared Inc.*,
  No. 12-12080, 2014 WL 5488413 (Bankr. S.D.N.Y. Oct. 30, 2014) ........................26, 27

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Secs., Inc.*,
  12-cv-07322 (S.D.N.Y. Apr. 1, 2013) ..............................................................22

*Mazzeo v. U.S. (In re Mazzeo)*,
  131 F.3d 295 (2d Cir. 1997)...........................................................................27

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  34 Misc.3d 895 (N.Y. Sup. Ct. 2012) ..............................................................22

*In re Prudence Co.*,
  98 F.2d 559 (2d Cir. 1938)............................................................................21

*In re Residential Capital, LLC*,
  No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ..............................21

*Residential Funding Co., LLC v. Americash*,
  No. 13-3460, 2014 WL 3577312 (D. Minn. July 21, 2014) ............................................16

*Residential Funding Co., LLC v. Embrace Home Loans, Inc.*,
  No. 13-3457, 2014 WL 2766114 (D. Minn. June 18, 2014)................................15, 16, 25

*Residential Funding Co., LLC v. The Mortgage Outlet, Inc.*,
  No. 13-cv-3447 (D. Minn. Nov. 26, 2014) ....................................................20

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992)....................................................................................39

*Silverman v. Miranda*,
  No. 06-CV-13222, 2014 WL 3728622 (S.D.N.Y. July 28, 2014) ....................................39

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
  874 F. Supp. 2d 328 (S.D.N.Y. 2012)...........................................................22

*In re Teigen*,
  228 B.R. 720 (Bankr. D.S.D. 1998).................................................................29

*Webster v. Fall*,
    266 U.S. 507 (1925)................................................................................................25

## STATUTES

11 U.S.C. § 502(c)(1)...................................................................................................26

Fed. R. Civ. P. 54(b) ...................................................................................................37

Fed. R. Civ. P. 60(b)(5)...............................................................................................38

N.Y. Ins. Law. § 3105(a) .............................................................................................22

N.Y. Ins. Law § 3106(b)..............................................................................................22

## OTHER AUTHORITIES

*2 Collier on Bankruptcy* ¶ 109.06(2)(c) (15th ed. rev. 1997) .......................................27

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator") and Structured

Assets Securities Corporation ("SASCO") (together, and collectively with their affiliated debtors

in the above-captioned cases, "Lehman" or the "Debtors"), respectfully submit this reply brief:

(A) in further opposition to certain RMBS Trustees' Motion to (I) Increase the Reserve to

$12.143 Billion (the "Reserve Motion") and (II) Estimate and Allow Their Claims for Covered

Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code (the "Estimation

Motion") filed August 22, 2014; and (B) in further support of Lehman's cross-motion to

implement a claims resolution Protocol to expeditiously reconcile and resolve the RMBS Claims

filed October 15, 2014 (the "Cross-Motion").  As demonstrated by the expert reports and the

arguments herein, the Protocol comports with the Governing Agreements and will provide for

the timely and efficient resolution of the RMBS Claims in approximately one year.  In support of

the relief sought herein, Lehman respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.     The RMBS Trustees' reply brief (the "Reply Br.," (Dkt. No. 46960)) offers a

feeble defense of their persistent failures — ***over the course of more than five years*** — to

provide the contractually required loan-level proof for their mortgage loan repurchase claims

against Lehman.  Upon entering into the Governing Agreements underlying the securitizations,

the RMBS Trustees knowingly assumed an obligation to identify and present to LBHI or

SASCO — on a loan-by-loan basis — those loans containing alleged material breaches of

---

[1]      Unless otherwise noted, capitalized terms shall have the same meaning ascribed to them in *LBHI's (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees* filed October 15, 2014 (Dkt. No. 46526) (the "Lehman Objection/Cross-Motion").

representations and warranties or document defects.  As the RMBS Trustees admit, the Plan

Administrator has for years (and at least as early as 2010) made its position clear that the

RMBS Trustees would be held to those contractually bargained for loan-level claim validation

requirements — the same procedures that were routinely followed pre-petition.

Notwithstanding, the RMBS Trustees still have done *nothing* to fulfill their obligations with

respect to the overwhelming majority of their RMBS Claims — stunning inaction given their

assertion that those claims are worth *over $12 billion*.  Put another way, the RMBS Trustees

fully embrace Lehman's repurchase obligations under the Governing Agreements, but disclaim

their own predicate obligations to prove their claims under those very same contracts.  The

RMBS Trustees' Estimation Motion and Lehman's Cross-Motion to establish a claim

resolution Protocol must be evaluated against this backdrop.

        2.      Remarkably, the RMBS Trustees concede that they waited three years after

filing their proofs of claim to begin collecting any of the individual loan files necessary to

substantiate their repurchase claims against Lehman.  Even then, they admit that they only

endeavored to collect files for the 5,000 loans in the sample chosen by their hired experts, just a

fraction (fewer than .04%) of the nearly 214,000 Covered Loans they contend had not been

paid in full as of June 2014.  (Reply Br. ¶¶ 6 n.3, 28.)  Their entire approach suggests a

calculated presumption on their part that if they dragged their feet slowly enough, they could

attempt to circumvent their obligations under the Governing Agreements altogether by using a

statistical sampling-based "shortcut" that would yield a wildly inflated claim against Lehman.

The Court should reject the RMBS Trustees' approach; which would not only turn the

Governing Agreements on their head, but also harm the Estate and unfairly treat other creditors.

        3.      The RMBS Trustees' excuses for their delay and inaction in these proceedings

ring hollow.  They insist they were "ignored" and "rebuffed" in their efforts to consensually

resolve their claims with Lehman.  (*Id.* ¶ 5.)  However, they offer no coherent explanation for

their failure to begin assembling loan-level proof for their claims before settlement talks began,

or in the event those settlement discussions proved unfruitful.  Simply put, the RMBS Trustees

could have submitted loan-level claims for validation at any time, but they failed to do so.

Their idle reliance on the prospect of a consensual resolution is particularly unreasonable given

that the parties have consistently been billions of dollars apart in their respective assessments of

Lehman's estimated loan repurchase liability.

4.       Nor should the RMBS Trustees' complaint that collecting the loan files has

proven tedious and time intensive relieve them of their obligations under the Governing

Agreements, particularly where the process of collecting loan-level claim documentation could

have been started years earlier.  It was these four RMBS Trustees who — weighing the costs

and benefits of doing so — agreed to serve as trustees for *as many as 405 RMBS Trusts* (the

claims of 255 of which are embraced by their Estimation Motion).  If each RMBS Trust had a

different trustee, there would be little question that the trustee could handle the required loan-

level review.  The RMBS Trustees should not be excused from their dereliction of duty merely

because they decided to profit across multiple deals by serving as the trustee for so many trusts.

In sum, Lehman should not be deprived of its contractual rights because the RMBS Trustees

only want to bear the fruits, but not the labors of the roles they contractually agreed to

undertake.

5.       The Plan Administrator believes the time has come to finally resolve the RMBS

Claims.  Consistent with the Governing Agreements, the RMBS Trustees should be required to

prove their claims on a loan-by-loan basis.  Lehman stands prepared to allow claims for its

repurchase obligations in connection with any properly proven RMBS Claims, but should only be required to do so if the RMBS Trustees abide by their predicate obligations under the Governing Agreements to provide the requisite loan-level proof.

6.      To achieve this end, Lehman's Cross-Motion charts what Lehman believes is the only appropriate path forward — an efficient claim resolution Protocol that is akin to the very loan-level claim resolution process the Plan Administrator has itself agreed to be bound by as it pursues claims against the sellers of loans that Lehman later sold to Fannie Mae and Freddie Mac.  Lehman's Protocol has several advantages over the purported sampling-based approach advocated by the RMBS Trustees.  Critically, the Protocol preserves the benefit of the parties' bargain under the Governing Agreements by reflecting the agreed upon loan-by-loan repurchase procedures set forth therein.  Moreover, the Protocol comports with mortgage industry practices, preserves Lehman's downstream indemnification rights against mortgage loan originators (which is of significant import and value to the Plan Administrator and the Estate), requires minimal Court involvement (as opposed to lengthy and complex expert discovery, briefing, and evidentiary hearings), provides a mechanism for resolution of all (rather than a subset) of the RMBS Claims, and will yield the most accurate calculation of Lehman's repurchase liability, thus serving the interests of the entire Estate.[2]  Indeed, the RMBS Trustees do not (and cannot) dispute that the Protocol will yield the most accurate valuation of the RMBS Claims.

7.      Lehman's proposed Protocol is premised on and effectuates the cure-or-repurchase remedy set forth in the Governing Agreements, which states, in relevant part:

---

[2]      For this and other reasons, Lehman's other creditors have voiced their opposition to the Estimation Motion, and their support for Lehman's Cross-Motion.  (*See Statement of the Litigation Subcommittee of the Official Committee of Unsecured Creditors in Support of Plan Administrator's (I) Objection to Motion of Certain RMBS Trustees to Increase Reserves and Estimate Claims for Allowance and (II) Cross-Motion to Establish Protocol to Resolve RMBS Claims*, filed November 14, 2014 (Dkt. No. 46963).)

> Upon discovery by either the Seller or the Depositor of a [(**1**)] breach of any of the foregoing representations and warranties . . . [(**2**)] *that adversely and materially affects the value of the **related Mortgage Loan*** . . . the party discovering such breach shall give [(**3**)] prompt written notice to the other party; . . . Within 60 days of the discovery of any such breach, the Seller shall either (a) cure such breach in all material respects, (b) repurchase **such Mortgage Loan** or any property acquired in respect thereof from the Depositor at the applicable Purchase Price or (c) within the two-year period following the Closing Date substitute a Qualifying Substitute Mortgage Loan for **the affected Mortgage Loan**.

(Lehman Objection/Cross-Motion Ex. E § 1.04(d) (emphasis added); *see also id.* Ex. F § 2.04.)

Thus, the Governing Agreements make clear that before Lehman is required to repurchase (or cure or substitute) a deficient loan, the RMBS Trustees must prove *each* of the following for *each mortgage loan***:** (1) a breach of a representation and warranty; (2) that the breach materially and adversely affected value of the mortgage loan; and (3) that prompt notice of the breach was provided to LBHI. These core elements of breach, causation, and notice can *only* be established on a loan-by-loan basis. They cannot be proven through purported "sampling" or other approaches that are directed at collective loan populations.

8.      The RMBS Trustees' argument that there are no provisions in the Governing Agreements that require "loan-by-loan review" ignores the plain language of the only provision providing for a remedy. (Reply Br. ¶¶ 8, 56.) As discussed above, a loan-by-loan requirement derives from (and indeed is the only logical reading of) the repurchase provisions in the Governing Agreements, which require the RMBS Trustees to establish the elements of breach, causation, and notice with respect to each loan at issue.

9.      Similarly unavailing is the RMBS Trustees' contention that the Protocol should not be adopted because loan-level review would only "benefit" Lehman. (*Id.* ¶¶ 9, 56.) As is more fully explained in Lehman's Objection/Cross-Motion, Lehman did not originate most of

the loans at issue, and instead acted as a mere middleman, passing along to loan purchasers virtually the same representations and warranties it received from the originators.  In fact, the Plan Administrator has determined that approximately 65% of the mortgage loans are Transferor Loans for which LBHI and SASCO have either no, or extremely limited, potential liability.  (*See* Lehman Objection/Cross-Motion ¶¶ 47-48.)  In view of this, Lehman bargained for a loan-by-loan claim resolution process, in part to preserve any downstream indemnification claims Lehman may pursue against loan originators.  If anything, protecting significant recoveries for the entire Estate (the "benefit" about which the RMBS Trustees complain) is an argument for, not against, adoption of a loan-by-loan review as required by the Governing Agreements.  Moreover, arriving at the most accurate valuation for the RMBS Claims does not constitute an improper "benefit" to Lehman.  It is a result that Lehman is obligated to obtain for the benefit of the entire Estate, including its creditors, and should be the principal aim of any claim resolution mechanism proposed by Lehman and adopted by this Court.

10.    Besides the fact that estimation through sampling is inconsistent with the Governing Agreements, the RMBS Trustees' arguments in favor of such an approach fail for at least three reasons.  First, while sampling has been used in a few other unrelated types of RMBS litigations, none of the cases cited by the RMBS Trustees compel the use of sampling here, particularly in view of the Governing Agreements, the unique requirements they impose, and the potential damage and prejudice to the Estate and other creditors that would result.  In fact, the RMBS Trustees' reliance upon federal securities cases, settlement approval decisions, and cases involving monoline insurer plaintiffs only supports Lehman's position — that sampling should not be applied to the particular claims at issue in this case.  Here, the RMBS Trustees are contractually obliged to prove breach, causation, and notice for each loan

- 6 -

repurchase claim, and Lehman continues to seek to enforce that bargained-for requirement.

Accordingly, irrespective of whether sampling has been used in other cases, the Court must

analyze whether it is appropriate here given the Governing Agreements, the concern for

Lehman's downstream indemnification rights, and the interest of Lehman creditors in ensuring

the allowed amount of the RMBS Claims accurately reflects Lehman's liability.

11.    Second, contrary to the RMBS Trustees' contentions, estimation is not required

or even permitted under section 502(c) of the Bankruptcy Code because the RMBS Claims are

neither contingent nor unliquidated.  Unable to muster any legal support to rebut this point, the

RMBS Trustees rely exclusively on statements in a January 2012 Lehman court filing (which

referred to the RMBS Claims as being unliquidated and subject to estimation).  It is important

to note that the resolution of the reserve for the RMBS Claims in 2012 allowed Lehman to plan

for and proceed with distributions under the Plan.  That Lehman sought estimation then for the

very narrowly defined purpose of establishing an RMBS Claims reserve is no reason to eschew

strict enforcement of the gating requirements of section 502(c) in connection with the RMBS

Trustees' instant request for estimation.  Here, strict and proper application of section 502(c)

precludes estimation of the RMBS Claims for allowance purposes because any related losses

can be determined through "simple calculation" — a point the RMBS Trustees do not and

cannot refute.  Moreover, loan-by-loan claim resolution by way of the Protocol will not delay

(unduly or otherwise) the administration of these cases, thus also making estimation pursuant to

section 502(c) inappropriate.

12.    Third, for reasons discussed more fully herein, the sampling analysis of the

RMBS Trustees' expert is fundamentally flawed, and provides no basis upon which to reliably

determine the allowed amount for the RMBS Claims, even if estimation is permitted.  Indeed,

the flaws in the RMBS Trustees' proffered analysis underscore why estimation is an inappropriate vehicle for resolution of the RMBS Claims. As Lehman's expert, Yale University Professor Dr. William N. Goetzmann — who has undertaken a preliminary evaluation of the sampling analysis put forward by the RMBS Trustees — observes the 5,000 loan sample analyzed by the RMBS Trustees' expert to extrapolate a breach rate across the more than 200,000 loans at issue was drawn exclusively from loans that were in default or had suffered a loss. The use of a sample comprised exclusively of loans that (based on their performance) were more likely to contain a breach, not only likely yielded an excessive breach rate, but also made it impossible to examine whether any of the alleged breaches had a material and adverse effect on the individual mortgage loans. Given these fundamental methodological flaws detailed below, as well as the myriad other unreasonable assumptions made by the RMBS Trustees' experts, it should come as no surprise that the RMBS Trustees engineered an artificially inflated $12.143 RMBS Claims estimate. The Estimation Motion should be denied.

13.    In lieu of the RMBS Trustees' Estimation Motion, the Court should grant Lehman's Cross-Motion to establish a claims resolution Protocol, which is consistent with industry practices and the Governing Agreements. As explained by Lehman's expert, Mr. William Alread — a 30-year veteran of the mortgage industry who has been involved in large-scale mortgage loan reviews — the Protocol comports with standard practices in the mortgage industry. (*See* Declaration of William Alread, dated December 3, 2014 ("Alread Decl.") at 4.) Based on information provided by Recovco Mortgage Management — a firm specializing in mortgage loan due diligence and quality control — Mr. Alread has opined that if adequate resources are devoted to the review of files, Steps 0-4 of the Protocol (which include the RMBS Trustees' submission of loan files to Lehman, Lehman's review of those files, negotiation

between the parties regarding any disputed claims, and the referral of disputed claims to the claim facilitator(s)) can be completed in approximately **one year** (*see id.* at 8), leaving only a small number of loan files requiring further resolution.  (*See also* Declaration of Craig Pino, dated December 3, 2014 ("Pino Decl.") at 1.)

14.     This one-year forecast assumes that the RMBS Trustees are required to submit claims to Lehman within **180 days** of the Court's entry of an order implementing the Protocol, or face disallowance of any claims that are not submitted by that deadline.  In its Cross-Motion, Lehman originally built a shorter, 60-day deadline into its proposed Protocol, premised on the assumption that the Estate should not be penalized for the RMBS Trustees' failure to collect loan-level information for the past several years.  Nevertheless, to give the RMBS Trustees more than adequate time, Lehman is willing to triple the amount of time the RMBS Trustees are given to present their claims to 180 days — a fair but finite extension Lehman believes is appropriate under the circumstances.

15.     Importantly, after Steps 0-4 of the Protocol are completed, Recovco believes that claims on just a small number of loans (approximately 50-70) will remain outstanding for further resolution.[3]  (*See* Pino Decl. at 1 n.1.)  Given this relatively small amount, particularly as compared to the collective scope of the RMBS Claims, Lehman expects that most, if not all, of those outstanding claims could be resolved consensually, as opposed to litigated, and that Step 5 would thus not require a significant outlay of Court time or resources.

16.     As for costs, Recovco and Mr. Alread believe that the Protocol will collectively

---

[3]     Lehman believes that its affiliate Aurora Loan Services can promptly produce approximately 50,000 imaged loan files, followed by an additional 10,000 hard copy loan files.  Another approximately 50,000 files are at Nation Star Mortgage, with the approximate 40,000 balance located in other primary servicers. Considering that Aurora Loan Services has been able to collect its 50,000 imaged loan files in less than a month (the collection began around November 10, 2014), the RMBS Trustees should be able to obtain the remaining files through diligent and good faith efforts.  (*See* Pino Decl. at 3 n.3.)

cost the parties a total of approximately $110 million.  (*See id.* at 1; Alread Decl. at 8.)

Although this cost may appear large, it is actually a relatively low cost figure given the 255

trusts at issue and the aggregate amount of the unpaid principal balance of the loans.  (*See*

Alread Decl. at 8.)  The cost is also well-justified given that as compared to benchmarks of

recent settlements reached by these same RMBS Trustees in other litigations (and controlling

for the unpaid principal balance of the loans at issue in those cases), the amount sought from

Lehman here far exceeds — by ***billions*** of dollars — the amount the RMBS Trustees agreed to

accept from other RMBS sponsors (including J.P. Morgan Chase Bank, N.A. and Citibank,

N.A.).  (*See* Lehman Objection/Cross Motion ¶ 58 n.16.)  Furthermore, any assessment of the

cost of the Protocol must account for the fact that the RMBS Trustees' preferred approach of

sampling would impose significant costs of its own, as the parties would be required to engage

in complex expert discovery, briefing, and extended proceedings before this Court.  Thus,

although the Protocol entails expense, it also avoids substantial legal and expert costs as well.

      17.     The RMBS Trustees' superficial criticisms of the Protocol are unsubstantiated.

The RMBS Trustees' expert opinion, by Dr. Parekh, that a complete loan-level review will take

27 years to complete (which, Lehman notes, is a significant downward adjustment from his

August prediction that such a review would take 41 years) is based on inadequate staffing

assumptions.  (*See* Alread Decl. at 9.)  As Mr. Alread opines, if adequately resourced, reviews

of the relevant mortgage loan files pursuant to the Protocol can be completed expeditiously.

(*See id.*)  The RMBS Trustees' 27-year prediction further disregards other efficiencies and

economies of scale that will accelerate the review process.  (*See id.* at 9-10.)  Far from

"convoluted" or "nonsensical," the Protocol is eminently workable and the only appropriate

means of timely and accurately valuing the RMBS Claims while adhering to the Governing

Agreements.

18.    Finally, for the reasons set forth in detail in Lehman's Objection/Cross-Motion,

the RMBS Trustees' Reserve Motion should be denied.[4]  The RMBS Trustees have repeatedly

shifted their position on the appropriate reserve for the RMBS Claims.  In January 2012, the

RMBS Trustees claimed the reserve should be at least $15 billion.  One month later, they

compromised with Lehman to set the reserve at $5 billion.  In August 2014, they filed the

Reserve Motion seeking to immediately increase the reserve to $12.143 billion, despite the fact

that their expert's estimate of the value of the RMBS Claims had actually decreased by nearly

$3 billion.  After Lehman filed its Objection/Cross-Motion, the RMBS Trustees informed

Lehman that based on information voluntarily provided by Lehman concerning the financial

condition of the Estate, they would defer the reserve issue until the summer of 2015.  Given

that understanding, Lehman collaborated in good faith with the RMBS Trustees on a proposed

schedule that culminated with an estimation hearing (if necessary) in July 2015.  It was

therefore surprising to Lehman when the RMBS Trustees asserted in their reply that they would

still seek a reserve increase if the allowed amount of their claims could not be determined prior

to Lehman's next planned distribution on or shortly after March 30, 2015.  When Lehman

raised the RMBS Trustees' change in position in a November 19, 2014 letter to the Court, the

RMBS Trustees *again* shifted position and stated they would agree to defer the Reserve

Motion, but only if Lehman could present proof that the Estate would have sufficient funds

after its next planned distribution to cover their estimated $12.143 billion in RMBS Claims.

The RMBS Trustees' constant shifts on the issue of the reserve is inappropriate, and should be

---

[4]    Based on the parties' telephone conference with the Court on December 1, 2014, Lehman understands that the Court will defer its consideration of the Reserve Motion until a future date.  Nonetheless, given the RMBS Trustees' reply arguments concerning the Reserve Motion, Lehman has included a response to those arguments herein.  Lehman reserves its rights to supplement its arguments in opposition to the Reserve Motion, particularly in response to any new arguments the RMBS Trustees may present in the future.

recognized for what it is — an attempt to gain leverage by holding hostage distributions to other creditors holding allowed claims.

19.     In any case, for the reasons thoroughly set forth in Lehman's Objection/Cross-Motion, the Reserve Motion remains improper and fails to meet the applicable standard for relief under any prong of Rule 60(b).  Nor does Rule 54(b) apply here because the stipulated Reserve Order did not "adjudicate[]" any "claims" or the "rights and liabilities" of any parties.  Accordingly, the Reserve Motion should be denied.

## ARGUMENT

### I.     THE PROTOCOL IS THE ONLY PROPOSED APPROACH TO CLAIM RESOLUTION THAT COMPORTS WITH THE GOVERNING AGREEMENTS.

20.     The RMBS Trustees' Estimation Motion and Lehman's Cross-Motion present the Court with a critical choice between two divergent approaches to resolving the RMBS Claims.  Of this pair of alternatives, the loan-level claim resolution Protocol advanced by Lehman's Cross-Motion is the only claim resolution mechanism that comports with the letter and spirit of the Governing Agreements and applicable law.  In contrast, the RMBS Trustees' preferred shortcut approach — estimation through sampling — would eviscerate the bargains struck in the Governing Agreements.  Their approach would also imperil the Estate's pursuit of downstream recoveries, run afoul of section 502(c) of the Bankruptcy Code, require complex expert discovery and court hearings, and almost certainly lead to unreliable results.  While preserving the benefit of the parties' bargain is reason alone to grant Lehman's Cross-Motion instead, the Protocol has other advantages in that it will provide a framework for resolution of *all* of the RMBS claims on a timely schedule, preserve Lehman's downstream indemnification rights against third-party loan originators, require minimal Court oversight, and ultimately yield the most accurate determination of the proper recovery amount.

**A.    The Governing Agreements Require Loan-Level Proof of Each Element of a Repurchase Claim, and the Contractual Remedy Can Only Be Applied On a Loan-by-Loan Basis.**

21.    The Governing Agreements set forth a specific and detailed mechanism through which the RMBS Trustees must pursue claims on defective loans.  For LBHI to compensate the trusts for their losses, the Governing Agreements specifically require the RMBS Trustees to prove *each* of the following for *each mortgage loan*:  (1) the breach of a representation and warranty; (2) that the breach materially and adversely affected the value of the mortgage loan; and (3) that prompt notice of the breach was provided to Lehman.  This is the *only* mechanism that the Governing Agreements — which were negotiated and agreed to by the RMBS Trustees — contemplate for recovery.  For example, the mortgage loan sale assignment agreements ("MLSAAs") — which included the various representations and warranties at issue — include the following unambiguous language:

> Upon discovery by either the Seller or the Depositor of a [(**1**)] breach of any of the foregoing representations and warranties . . . [(**2**)] *that adversely and materially affects the value of **the related Mortgage Loan*** . . . the party discovering such breach shall give [(**3**)] prompt written notice to the other party; . . . Within 60 days of the discovery of any such breach, the Seller shall either (a) cure such breach in all material respects, (b) repurchase **such Mortgage Loan** or any property acquired in respect thereof from the Depositor at the applicable Purchase Price or (c) within the two-year period following the Closing Date substitute a Qualifying Substitute Mortgage Loan for the **affected Mortgage Loan**.

(Lehman Objection/Cross-Motion Ex. E § 1.04(d) (emphasis added).)

22.    These critical requirements are also unambiguously repeated within the repurchase provisions of the trust agreements ("Trust Agreements") between SASCO, the RMBS Trustees and the respective servicers:

> Upon discovery by any of the Depositor, the Master Servicer or the Trustee of [(**1**)] a breach of any such representations and warranties [(**2**)] *that adversely and materially affects the value of*

- 13 -

*the **related Mortgage Loan***, the party discovering such breach
shall give [(**3**)] prompt written notice to the other parties…. Within
90 days of the discovery of a breach of any representation and
warranty given to the Trustee by the Depositor, any Transferor or
Lehman Holdings . . . the Depositor, such Transferor or Lehman
Holdings shall either (a) cure such breach in all material respects,
(b) repurchase **such Mortgage Loan** . . . at the Purchase Price, or
(c) . . . substitute a Qualifying Substitute Mortgage Loan for **the
affected Mortgage Loan**.

(*See* Lehman Objection/Cross-Motion Ex. F § 2.04(d) (emphasis added).)[5]  Importantly, in both

the MLSAAs and the Trust Agreements, the defined term Mortgage Loan, is singular, and the

repurchase remedy applies to "such Mortgage Loan" (*i.e.*, a specific mortgage loan).

23.    Despite the Trustees' contentions, sampling cannot prove these loan-level

elements because it merely allows one to "*infer* characteristics about the [loan] population."  (*See*

Declaration of Charles A. Parekh ("Parekh Decl.") (Dkt. No. 46080) at 6 (emphasis added)).

Because the Governing Agreements do not provide for a population-wide remedy, such

inferences about the loan population as a whole cannot be dispositive of Lehman's repurchase

liability.

24.    Most illustrative of the inapplicability of sampling to sale-agreement repurchase

cases is the causation requirement.  Even if one could infer the percentage of loans that breached

representations and warranties, determining whether those breaches materially and adversely

affected the loans (*i.e., caused* the particular loan at issue to lose value) is an entirely separate

---

[5]    The RMBS Trustees trumpet that the Governing Agreements contain no provisions expressly requiring a
loan-by-loan review.  (*See id.* ¶ 8.)  While it is true that the provisions do not use the specific phrase "loan-
by-loan review," by setting forth the required core elements of breach, causation, and notice (elements
which by their nature, can only be established on a loan-by-loan basis) as predicates to Lehman's
repurchase obligations, the Governing Agreements unmistakably oblige the RMBS Trustees to provide
Lehman with the requisite proof for ***each*** of the individual mortgage loans they contend that Lehman must
repurchase.  The RMBS Trustees correctly point out that these provisions contain no express prohibition on
statistical sampling.  (*See id.*)  In fact, the Governing Agreements nowhere mention or even contemplate
sampling at all, precisely because they clearly require loan-level proof.  Indeed, pre-petition, the RMBS
Trustees understood that they were required to present and prove their loan repurchase claims on a loan-by-
loan basis.

loan-specific inquiry. *See, e.g.*, *Residential Funding Co., LLC v. Embrace Home Loans, Inc.*,

No. 13-3457, 2014 WL 2766114, at *6 (D. Minn. June 18, 2014) (*"Embrace"*) (noting that the

existence of a loss on a loan does not prove that the loss was caused by a breach); *see also*

*LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389, 2002 WL 181703, at

*4–5 (S.D.N.Y. Feb. 5, 2002) (*"Citicorp"*) (determining a breach had a material and adverse

effect based on loan-level data regarding the borrower's actions and the effect of those actions).

As the *Embrace* court explained, the loss at issue could have resulted from an entirely different

event, and not necessarily a breach. *Embrace*, 2014 WL 2766114, at *4–5 ("it could be that the

borrower lost her job and defaulted on the loan"). If the loss was the result of some other event

or factor, Lehman would not be obligated to cure or repurchase. Thus, Lehman has the right to

require the loan-level detail necessary to determine whether the loss was actually the result of a

breach.[6]

      25.     The threshold question in every repurchase analysis is, "is there a breach?"

Whether a loan contains a breach requires a comparison between the loan's features and a

corresponding agreement to see whether they match. This is not only a loan-specific inquiry, but

also an agreement-specific inquiry. The loans comprising the 255 RMBS Trusts at issue vary in

a number of respects, including, for example, loan type, documentation type, vintage, geography,

and program and underwriting guidelines. Further, the Governing Agreements vary from trust to

trust. Thus, the threshold inquiry of "is there a breach?" must be, by its nature, loan-specific and

Trust-specific.

      26.     As explained in Lehman's Objection/Cross-Motion, Lehman bargained for a

---

[6]     Certain of the Governing Agreements deem certain of the breaches to materially and adversely affect the
value of the applicable mortgage loans. This factor only amplifies the need to identify specific breaches in
specific loans and then compare them to the specific agreements that govern the parties' rights and
obligations.

loan-by-loan claim validation process in the Governing Agreements in part for economic

reasons. Namely, Lehman bargained to have the right to mitigate its losses by pursuing

significant downstream indemnification claims against third-party loan originators. (Lehman

Objection/Cross-Motion ¶¶ 13, 19, 97.) For Lehman to obtain indemnification from

downstream originators, it must enforce its right to loan-by-loan proof from the RMBS

Trustees. *See Embrace*, 2014 WL 2766114, at *6 (dismissing claims for failure to plead claim

elements at the loan-level); *Residential Funding Co., LLC, v. Americash*, No. 13-3460, 2014

WL 3577312, at * 3 n.5 (D. Minn. July 21, 2014) (permitting claims to proceed on the basis of

sampling but "anticipat[ing] that [the plaintiff] will identify specific all [sic] allegedly-defective

loans in discovery").[7]

    27.    Moreover, Lehman would have "no obligation to cure or repurchase" unless it

either received notice of, or self-discovered, a breach that materially and adversely affected the

value of the mortgage loan. *See Citigroup Mortg. Loan Trust 2007-AMC3 v. Citigroup Global

Mkts. Realty Corp.*, No. 13 Civ. 2843, 2014 WL 1329165, at *6 (S.D.N.Y. Mar. 31, 2014)

("*2007-AMC3*"). Like causation, the notice inquiry must occur at the loan level. In *2007-

AMC3*, the court dismissed Trustee U.S. Bank's claims on all loans for which the Trustee did

not allege such notice or discovery at the loan level:

> Plaintiff has alleged no facts that identify a single Non-Noticed
> Loan, subsequently determined to be in breach. Plaintiff does not
> specify a date upon which Defendant allegedly discovered
> breaches pertaining to the Non-Noticed Loans, or suggest any
> person who discovered Non-Noticed Loan breaches. If there is no
> alleged discovery on the part of Defendant, then no alleged

---

[7]     The RMBS Trustees point out the rather unremarkable fact that the Governing Agreements do not state that loan-level review is required for Lehman to pursue such third-party claims (as if the Governing Agreements would even address potential third-party legal defenses to indemnification claims). In practice, however, it is not difficult to see — particularly given the example of *ResCap* — why eschewing the required loan-level claim reconciliation process could subject the Lehman estate to numerous, needless, and costly challenges to its contractual mitigation rights

> obligation to cure or repurchase any particular Non-Noticed Loan
> arose.

*Id.* Setting aside the ultimate question of whether the Trustees gave notice of any alleged breaches of representations and warranties as required by the Governing Agreements (which by definition did not occur with respect to the non-sampled loans comprising their alleged 57% breach rate), the individualized question of notice or discovery cannot be answered, or even inferred, through sampling.

28.    The Trustees' damages case fares no better.  Sampling cannot be used to calculate damages in the manner required by the Governing Agreements, because those agreements provide that the measure of damages will be calculated according to a formula defined as the "Purchase Price."  The Purchase Price formula can only be applied at the loan level because it requires loan-level inputs, such as unpaid principal balance, accrued interest, and unreimbursed servicing advances with respect to "such Mortgage Loan":

> With respect to the repurchase of *a Mortgage Loan* pursuant to this Agreement, an amount equal to the sum of (a) 100% of the unpaid principal balance of *such Mortgage Loan*, (b) accrued interest thereon at the Mortgage Rate, from the date as to which interest was last paid to (but not including) the Due Date immediately preceding the related Distribution Date, (c) any costs and damages incurred by the Trust Fund with respect to *such Mortgage Loan* in connection with any violation of any federal, state or local predatory or abusive lending laws or similar laws and (d) any unreimbursed Servicing Advances with respect to *such Mortgage Loan*.

(*See* Lehman Objection/Cross-Motion (Ex. F) § 1.01 (emphasis added).)

29.    In sum, the RMBS Trustees' proposed sampling methodology would result in an entirely speculative, and thus impermissible, measure of damages.  *See ESPN, Inc. v. Office of Comm'r of Baseball,* 76 F. Supp. 2d 416, 418 (S.D.N.Y. 1999) ("It is well-settled under New York law that a plaintiff seeking compensatory damages has the burden of proof and should

- 17 -

present to the court a proper basis for ascertaining the damages [it] seeks to recover.  They must

be susceptible of ascertainment in some manner other than by mere conjecture or guesswork.")

(internal quotation marks and citations omitted).  Indeed, the fundamental problem with the

RMBS Trustees' approach was aptly addressed by then-Chancellor Strine in *Bear Stearns Mortg.*

*Funding Trust 2007-AR2 v. EMC Mortg. LLC*, C.A. No. 6861-CS (Del. Ch. Nov. 8, 2012), in

which the court addressed a similar effort to prove repurchase liability through sampling.  In that

case, then-Chancellor Strine commented that, "**it's really nifty for a plaintiff to accuse**

**someone of breaching their obligations over a thousand loan contracts and not wish to try**

**all of them.  It's not going to happen here**."  (11/8/12 H'rg. Tr. at 3:13-17 (attached hereto as

Exhibit A) (emphasis added)).

     30.     In a transparent attempt to deflect from their own failures and unwillingness to

prove their claims as required by the Governing Agreements, the RMBS Trustees suggest it was

not their responsibility — but *Lehman's* — to affirmatively identify specific loan breaches and

repurchase loans without any showing from the RMBS Trustees at all.  The RMBS Trustees

misstate Lehman's obligations.  Pursuant to the Governing Agreements, Lehman's potential duty

to repurchase a particular mortgage loan only arose upon Lehman's discovery of a specific

breach of a representation or warranty or document defect that adversely and materially affected

the value of that loan.

     31.     ***None*** of the statements the RMBS Trustees quote from the Bankruptcy

Examiner — which Judge Peck ruled are inadmissible hearsay in any event[8] — suggest (let

alone establish) that Lehman was aware of any specific material breaches or defects in specific

loans or loan files.  At most, they suggest Lehman's awareness of troubling trends in the

---

[8]     *See* 10/18/10 Hr'g. Tr. (Dkt. No. 12253) at 22:17-19 ("THE COURT:  Okay.  I'm going to exclude all of
the excerpts from the examiner's report as evidence for all purposes.").

mortgage market generally, or the poor performance of certain loan populations. Awareness of

general market trends does not trigger Lehman's repurchase obligations under the Governing

Agreements. Loan-level proof of specific breaches, causation, and notice does, but the RMBS

Trustees remain unwilling to provide it. Indeed, it is incomprehensible that the RMBS Trustees

have idly watched hundreds of millions of dollars in alleged losses mount on hundreds of

thousands of loans over the course of at least eight years, and that they have not been reviewing

the files or overseeing loss recovery and mitigation throughout this time. Had they done so,

they would be in a position to substantiate their claims.

**B.      The RMBS Trustees' Reliance On Sampling Finds No Support In the Case
          Law or the Bankruptcy Code.**

32.      Advocating for the use of statistical sampling to estimate their claims, the RMBS

Trustees purport to rely on "two independent grounds":  (1) various court decisions approving

the use of statistical sampling to determine liability and damages in RMBS cases, and (2) section

502(c) of the Bankruptcy Code. Neither, however, supports the use of sampling in this case,

particularly given the requirements of the Governing Agreements, the prejudice to Lehman's

downstream indemnification rights, and applicable law. In fact, the inherent flaws in the

sampling analysis performed by the RMBS Trustees' experts only underscore why sampling is

an inappropriate and unreliable mechanism to resolve the RMBS Claims.

**1.      The RMBS Trustees' Sampling Case Analysis Ignores the Agreements That
          Govern *These* Transactions And Is In Any Event, Misleading.**

33.      The RMBS Trustees observe that courts "have ruled in RMBS cases that

statistical sampling and extrapolation methods can be used to prove liability and damages."

(Reply Br. ¶ 35.)  Although the RMBS Trustees suggest otherwise, requests by RMBS plaintiffs

to proceed via sampling are not uniformly or reflexively approved. Just last week in fact, the

district court overseeing ResCap's downstream claims against various mortgage loan originators

declined to consider ResCap's pre-discovery motions to use sampling to prove their claims,

noting that the defendants were entitled to "broad discovery from plaintiffs in order to assess and

perhaps challenge the reliability of the statistical sampling that plaintiffs propose to do at trial."

*Residential Funding Co., LLC v. The Mortgage Outlet, Inc.*, No. 13-cv-3447 (D. Minn. Nov. 26,

2014)  Thus, although the Court can and should reject the RMBS Trustees' request to estimate

the RMBS Claims through sampling, it certainly should not accept sampling prior to discovery.

34.    In any event, the sampling cases cited by the RMBS Trustees do not support the

application of sampling to the particular RMBS Claims at issue here.  To avoid the contractual

remedies by which they agreed to be bound, the RMBS Trustees conflate repurchase litigation

with other kinds of RMBS litigation in which sampling has been permitted.  However, federal

securities law, settlement approval, and monoline insurance cases are analytically different with

disparate elements of proof from sale-agreement repurchase cases — a critical distinction the

RMBS Trustees fail to identify in their submissions to the Court.

(a)    *Federal Securities Case Law Is Inapposite.*

35.    RMBS cases involving securitization-wide claims based on misrepresentations in

offering materials are inapposite.  In those cases — unlike here — the necessary analysis can

only be properly performed by analyzing the effect of alleged omissions and misstatements at the

offering level, not, as is required here, the loan level.  The RMBS Trustees thus wrongly rely on

*Federal Housing Finance Agency v. JP Morgan Chase & Co.*, No. 11 Civ. 6188,  2012 WL

6000885 (S.D.N.Y. Dec. 3, 2012) (*"FHFA"*), because the claims asserted by FHFA were not

dependent on loan-level proof of breach, causation, and notice.  Instead, the claims were

grounded in statutory law, and pertained to representations made in the offering materials

regarding the *entire securitization*.  Thus, the existence of misrepresentations, causation, and

damages had to be established on a securitization-wide basis.

36.     That the loan-level proof requirements applicable here are simply not relevant in securities cases is underscored by the fact that the defendants in such cases do not argue that sampling is inappropriate to prove the pool-wide misrepresentation claims.  Rather, the defendants only argue — and the decisions only address — the alleged flaws in the particular sampling methodology for purposes of determining admissibility under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993).  *See, e.g.*, *FHFA*, 2012 WL 6000885, at *7 ("[Defendants] identify numerous 'methodological errors' that they argue, taken together, render the Report unreliable and therefore make the samples and inferences to be drawn from the analysis of the samples inadmissible.").

*(b)     Settlement Approval Case Law Is Inapposite.*

37.     The RMBS Trustees also cite *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *21 (Bankr. S.D.N.Y. June 27, 2013), misstating that the Court approved sampling to establish liability and damages.  (*See* Reply Br. ¶ 12)  In *ResCap*, however, the Court did not approve sampling for purposes of proving liability or establishing damages. Instead, the Court merely found it persuasive that the debtor considered sampling data as part of its decision to settle claims.  (*Id.* ¶ 21.)

38.     Sampling may be appropriate in the settlement context because the purpose of settlement is to efficiently dispose of a case and permit the parties to avoid complex liability and damages determinations.  *See In re Prudence Co.*, 98 F.2d 559, 560 (2d Cir. 1938) ("The very purpose of a compromise is to avoid the determination of sharply contested and dubious issues . . . .").  To this end, a settling party may agree to extinguish claims, rights, and remedies in exchange for some benefit, monetary or otherwise.  But Lehman has not waived its rights.  It has

chosen to enforce its right to loan-by-loan proof, for the benefit of the Estate as a whole. Thus, that sampling has been utilized in the very different context of approving settlements is not grounds to be used to impose sampling on Lehman.[9]

> (c)     *Cases Involving Monoline Insurers Are Inapposite.*

39.     To suggest that sampling is permitted in all RMBS cases, the RMBS Trustees also rely on a series of decisions in cases brought by monoline insurers. In so doing, they ignore the critical differences between monoline litigation and sale-agreement repurchase cases like this.

40.     Sampling is permitted in monoline cases because, as insurers, the monolines are entitled to the benefit of state insurance law and their Insurance and Indemnity ("I&I") agreements with securitization sponsors. That body of law allows monolines to prove liability merely by showing that the breaches caused an increased risk of loss. Monoline insurers can use risk of loss to prove liability because New York insurance law "provides that an insurer has an interest in receiving complete and accurate information before deciding whether to issue a policy," and an "insurer may rescind a policy where an insurer has relied on a material misrepresentation." *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 334 (S.D.N.Y. 2012) (citing N.Y. Ins. Law §§ 3105(a), 3106(b)); *see also Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) (same); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 34 Misc.3d 895, 906 (N.Y. Sup. Ct. 2012) (same).[10] Because

---

[9]     The RMBS Trustees' citation to Lehman's statements in its motion to approve its settlement with Fannie Mae is misleading. (*See* Reply Br. ¶¶ 48-49.) In that case, Lehman did not bless sampling as an appropriate method of proof in *litigation* — but simply stated that settlement resolves the claim without the expense and time that would be "require[d]" in litigation for resolving the claims on a loan level. (*See Motion of [Lehman] Pursuant to Bankruptcy Rule 9019 for Approval of Settlement Agreement Regarding Claim of Federal National Mortgage Association* (Dkt. No. 42153) ¶ 31.)

[10]     The RMBS Trustees' reliance on *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Secs., Inc.*, 12-cv-07322 (S.D.N.Y. Apr. 1, 2013) is likewise misplaced. The Court's one-line order in that case was issued when Assured — a monoline insurer — was a plaintiff in the case. Assured pleaded a claim for pool-wide damages and was not bound by the loan-by-loan repurchase protocol. *See Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc.,* No. 12-cv-1579, 2012 WL 3525613, at *3 (S.D.N.Y.

the risk of loss analysis is not a loan-level inquiry, and because monolines are not confined to the

loan-by-loan repurchase remedies found in sale agreements, monolines can properly avail

themselves of sampling.[11]

41.    The RMBS Trustees' failure to identify the distinction between monoline cases

and loan-sale repurchase cases stands at odds with the position the Trustees have taken in

connection with their RMBS settlement with JPMorgan Chase and its affiliates.  There, the

RMBS Trustees' expert opined:

> I have been retained by the Trustees above[12] to provide an analysis
> of certain legal issues pertaining to a Proposed Settlement
> Agreement . . . .  The precise issue upon which I have been asked
> to opine here is to identify the legal differences, if any, between
> claims brought by "monoline insurers" on the one hand and claims
> for similar breaches brought by the Trustees . . . on the other . . . .
> Given that the investors in the Trusts and the monoline insurers
> were the beneficiaries of the same type of representations and
> warranties, ***the question that arises is whether the elements of
> proof are different in breach of warranty cases brought by the
> monoline insurers versus similar cases brought by the Trustees.
> The short answer is that yes, in New York, there are differences***. .
> . .  In contrast [to Trustee claims], monoline insurers have no
> requirement to prove [adverse effect on the value of the underlying
> mortgage loans].  That is because as insurers, they enjoy the
> benefits of N.Y. Insurance Law Sections 3105 and 3106. . . .  Thus,
> ***monoline insurers, unlike the Trustees, are relieved of the
> obligation of proving that the losses they suffered were directly
> caused by the breaches of representations and warranties***.

Expert Report of Hon. Anthony J. Carpinello (Ret.), dated May 27, 2014, *available at*

www.rmbstrusteesettlement.com (emphasis added).  Here, the RMBS Trustees attempt to

---

Aug. 15, 2012) (ruling that Assured was not bound by the loan-by-loan repurchase protocol).

[11]    There are instances in which even monolines may not be permitted to prove their claims by sampling.  That inquiry turns on the nature of the claims and the governing law.

[12]    The Bank of New York Mellon; The Bank of New York Mellon Trust Company, N.A.; Deutsche Bank National Trust Company; HSBC Bank USA National Association; Law Debenture Trust Company of New York; U.S. Bank National Association; Wells Fargo Bank, N.A.; and Wilmington Trust, National Association.

confuse the issues by omitting any discussion of the insurance-based rationale underlying the monoline decisions.[13]

> (d)    *Even the Non-Monoline Decisions Cited By the RMBS Trustees Do Not Support the Use of Sampling In This Case.*

42.    The RMBS Trustees also cite non-monoline cases involving repurchase claims to support their position that sampling may be used to prove liability and damages.  (*See* Reply Br. ¶¶ 11–12, n.29 (*citing Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, No. 12-cv-00933, 2014 WL 3824333, at *9 (D. Conn. Aug. 4, 2014) ("*Deutsche Bank II*"); *Deutsche Bank Nat'l Trust v. WMC Mortg., LLC, LLC*, No. 12-cv-00933, 2014 WL 1289234, at *12 (D. Conn. Mar. 31, 2014) ("*Deutsche Bank I*"); *Home Equity Mortg. Trust Series v. DLJ Mortg. Capital, Inc.*, No. 156016/2012, NYSCEF No. 236 at 1 (N.Y. Sup. Ct. Nov. 19, 2013)).  In those cases, however, the courts relied on *monoline* cases as authority, but failed to consider or analyze the important distinctions set forth above.

43.    Moreover, neither the *Deutsche Bank* nor the *Home Equity* court has made a final determination that sampling is *actually* admissible or sufficient to prove liability and damages at trial.  At most, the courts have ruled that, "in principle," sampling is acceptable.  *See, e.g.*, *Deutsche Bank II*, 2014 WL 3824333, at *9.  Thus, in those cases, the question of whether sampling is sufficient to prove a material and adverse effect at the loan level has not been considered, and the real and meaningful distinctions between monoline plaintiffs and sale-agreement plaintiffs have yet to be analyzed.  As such, those cases are not authoritative on whether precedent involving monoline insurers overrides express contractual language requiring loan-level proof of liability and damages.  *See Hunt Constr. Grp., Inc. v. Brennan Beer*

---

[13]    The RMBS Trustees' conflation of monoline and sale-agreement repurchase cases extends to their mischaracterization of statements by counsel drawing that very distinction.  (*See* Reply Br. ¶ 38 n.30 (failing to note that the source document stated:  "In cases against trustees, like the monoline cases, the suit . . . shouldn't be limited to the narrow repurchase remedy applicable only to the sales agreements.").)

*Gorman/Architects, P.C.*, 607 F.3d 10, 18 (2d Cir. 2010) ("[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

44.     *Deutsche Bank* and *Home Equity* stand in stark contrast to *Embrace* and *2007-AMC3,* discussed *supra,* which have actually considered and ruled on whether loan-level proof is required to establish a non-monoline plaintiff's claim for a breach of a representation and warranty.  *Embrace* dismissed the plaintiff's claims because it did not allege breach and causation at the loan-level, 2014 WL 2766114, at *5, and *2007-AMC3* dismissed the plaintiff's claim because it did not allege discovery or notice at the loan level, 2014 WL 1329165, at *6. Lehman respectfully submits that the Court should follow these cases (where the courts actually considered and ruled on whether loan-level proof was required for a non-monoline plaintiff's claim) rather than *Deutsche Bank* and *Home Equity* (where the loan-level proof requirements for non-monoline plaintiffs have yet to be considered or analyzed).

45.     In sum, in their reliance upon cases arising from distinguishable contexts, the RMBS Trustees also ignore and effectively seek to repudiate the Governing Agreements by which they agreed to be bound.  They may not disregard, however, their contractual obligations "merely out of frustration that being bound by the strict terms of the contract is laborious and inconvenient."  *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 40 Misc. 3d 562, 570 (N.Y. Sup. Ct. 2013), *rev'd on other grounds*, 112 A.D.3d 522 (1st Dep't 2013).  Indeed, "[t]he degree to which bargained for remedies are simple or convoluted is a matter for sophisticated commercial actors to address before the execution of a contract.  It is not something to complain about in

subsequent litigation." *Id.*[14]  Because sampling would contravene the express language of the

Governing Agreements and eviscerate rights the estate holds for the benefit of its creditors, it

should not be allowed here.

### 2.   Estimation Is Not Permitted Under Section 502(c) of the Bankruptcy Code.

46.   Section 502(c)(1) of the Bankruptcy Code provides that "[t]here shall be

estimated for purposes of allowance under this section — any contingent or unliquidated claim,

the fixing or liquidation of which, as the case may be, would unduly delay the administration of

the case . . . ." 11 U.S.C. § 502(c)(1).  "In order to seek estimation, however, a party must

demonstrate that the gating requirements for estimation are met — namely, that the claim to be

estimated is contingent or unliquidated and that the delay associated with the fixing or

liquidation of such claim would be 'undue.'"  *In re LightSquared Inc.*, No. 12-12080, 2014 WL

5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014) (citing *In re Dow Corning Corp.*, 211 B.R. 545,

562-63 (Bankr. E.D. Mich. 1997).  Although the RMBS Trustees baldly assert that "[e]stimation

of the RMBS Claims under [s]ection 502(c) is . . . *mandatory*" (Reply Br. ¶ 45 (original

emphasis)), as this Court recently observed, "it is within [the court's] sound discretion and *not

the obligation* of [the court] to estimate a claim."  *In re LightSquared Inc.*, 2014 WL 548813, at

*3 (emphasis added) (quoting *In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989)).[15]

47.   The RMBS Trustees do not dispute that their claims are not contingent.  Instead

they contend — relying not on any statutory or case law, but solely upon statements in a nearly

---

[14]   The RMBS Trustees cite *ACE* in support of their argument that sampling can be used to prove damages.
(*See* Reply Br. ¶ 37 n.29.)  However, the *Ace* court did not rule that sampling would, in fact, be acceptable
proof for damages.  Instead, the court stated "*if* sampling is to be used as a means to calculate damages, the
parties must come up with a sampling mechanism that meaningfully reflects the [governing agreement's]
damage calculation."  *ACE*, 40 Misc.3d at 570.  Thus, *ACE* supports Lehman's position that sampling can
only be used to the extent that it conforms to the agreements among the parties.

[15]   Particularly where estimation is sought for purposes of allowance (as opposed to for reserve or plan
feasibility purposes) such discretion should be exercised very sparingly.  This is especially true here, where
Lehman's right to procedural due process, as well as its rights under the Governing Agreements and
applicable law would be abrogated through sampling and/or estimation.

three-year old Lehman court filing — that the RMBS Claims are "unliquidated" and thus qualify

for estimation under section 502(c).  Their avoidance of the law on this point is telling given that

it establishes that the RMBS Claims are not unliquidated.

48.    Specifically, "[c]ourts have held that 'where the claim is determinable by

reference to an agreement or by simple computation' and where 'the value of a claim is easily

ascertainable,' the claim is generally viewed as liquidated." *In re LightSquared Inc.*, 2014 WL

5488413, at *5. (quoting *Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997)).  In

this case, the "simple computation" to be used in determining the value of the RMBS Claims is

the defined "Purchase Price" equation set forth in the Governing Agreements  (*see* Lehman

Objection/Cross Motion ¶¶ 83-84, Ex. E § 1.01.), an equation that effectively puts the parties

back in the positions they would have been had the loan not been sold in the first place, and

which can be applied to a loan at any point in its life-cycle by simply applying loan-level inputs.

The availability of this specific formula in the Governing Agreements means the RMBS Claims

are simply not unliquidated, and therefore do not qualify for estimation pursuant to section

502(c).[16]

49.    Eschewing any attempt to rebut the substance of Lehman's position, the RMBS

Trustees instead cite statements in Lehman's January 2012 motion to estimate the RMBS Claims

for reserve purposes (the "Lehman Estimation Motion"), wherein Lehman imprecisely referred

to the RMBS Claims as being unliquidated.  In 2012, the Lehman Estimation Motion sought

---

[16]    The RMBS Trustees claim there is an inconsistency between Lehman's position that the RMBS Claims are
liquidated on the one hand, and Lehman's support for the Protocol (which they assert is "needed in order to
liquidate the RMBS Claims") on the other.  (Reply Br. ¶ 8.)  There is not.  The Protocol is required so that
the Lehman has the necessary loan-level inputs to calculate the RMBS Claims' value using the "Purchase
Price" equation set forth in the Governing Agreements. That the Protocol is needed to determine those
inputs, does not mean the value of the RMBS Claims is not readily computable (thus making the claims
liquidated) once those inputs are available. *See In re Mazzeo*, 131 F.3d at 304 (quoting 2 L. King, *Collier
on Bankruptcy* ¶ 109.06(2)(c) (15th ed. rev. 1997) ("courts have generally held that a debt is 'liquidated'
. . . where the claim is determinable by reference to an agreement or by simple computation.")).

estimation for the narrow purpose of establishing a disputed claim reserve for the RMBS Claims, and so that Lehman could proceed with distributions to creditors pursuant to the Plan. The implications of the RMBS Trustees' Estimation Motion are far more significant as they seek estimation for allowance purposes. Accordingly, it is critical that the Court adhere to the strictures of section 502(c) and not permit estimation of the RMBS Claims, which are not unliquidated.

50.     Even were the Court to accept the RMBS Trustees' unsupported characterization of their claims as unliquidated, estimation of the RMBS Claims would still run afoul of another section 502(c) "gating requirement" — that the fixing or liquidation of such claims would "unduly delay" the administration of the Lehman bankruptcy cases. Undertaking the loan-level claim reconciliation process required by the Governing Agreements will not meaningfully delay these bankruptcy proceedings. The Lehman Estate has established a $5 billion reserve to cover the disputed RMBS Claims, and as individual claims are proven by way of the Protocol and subsequently allowed, that reserve can be drawn down as is appropriate, much akin to settlement trusts that have been established in the asbestos claim and other contexts. Indeed, the RMBS Trustees themselves advocated for precisely this kind of protocol in 2011 and 2012.[17] Such a process will in no respect impede the administration of Lehman's bankruptcy.

51.     Moreover, to the extent a loan-by-loan review process yields any delay, it would not be "undue." As one court has observed, "estimation does not become mandatory merely because liquidation may take longer . . . . Liquidation of a claim, in fact, will almost always be

---

[17]     *See Objection of U.S. Bank N.A., as Trustee, to the Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings, Inc. and its Affiliated Debtors and Sections 105(a), 502(c), and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage Backed Securities for Purposes of Establishing Reserves* (Dkt. No. 24491) at 2 (opposing a "fallible estimation process" and seeking additional time to negotiate claim resolution by means of a protocol).

more time consuming than estimation.  Nonetheless, bankruptcy law's general rule is to

liquidate, not to estimate."  *In re Dow Corning Corp.*, 211 B.R. at 562.  Under section 502(c),

any liquidation-related delay is only undue if it is "unjustifiable."  *See id*; *see also In re Teigen*,

228 B.R. 720, 723 (Bankr. D.S.D. 1998) ("Although liquidation of a claim may take longer, the

delay is only undue if it is unjustifiable.")  Here, cogent justifications exist for requiring the

RMBS Trustees to undertake the process of proving their claims on a loan-by-loan basis —

which, according to Recovco and Mr. Alread, will take approximately one year if Lehman's

proposed Protocol is adopted.  (*See* Pino Decl. at 1; Alread Decl. at 8.)  Most critically, the

Governing Agreements require it.  In addition, such a process will help preserve Lehman's rights

to pursue downstream indemnification claims against third-party loan originators.  In any event,

any delay associated with engaging in a loan-by-loan claim reconciliation process is entirely of

the RMBS Trustees' own making.  Having been able to begin such a process years ago, and

having chosen not to do so, the RMBS Trustees are hard-pressed to complain about delay at this

stage.[18]  For this reason too, estimation pursuant to section 502(c) is impermissible.

### 3.    The RMBS Trustees' $12.143 Billion Estimate of Their Claims Is Unreliable.

52.    The analysis put forward by the RMBS Trustees and their experts only

underscores why estimation through sampling should not be applied in this case.  The massive

$12.143 RMBS Claims estimate advanced by the RMBS Trustees is based on the sampling

analysis of their expert, Dr. Parekh, who relied upon a sample of 5,000 loans selected by Cowen

& Company ("Cowen") and re-underwritten by Digital Risk, LLC ("Digital Risk").  A

---

[18]    While Lehman has always been prepared to validate claims submitted in accordance with the Governing Agreements, the RMBS Trustees have failed to avail themselves of that opportunity.  *See, e.g.*, *Debtors' Ninety-Seventh Objection to Claims (Insufficient Documentation)* (Dkt. No. 14492) ¶ 21 ("The Debtors have, on more than one occasion contacted each of the claimants . . . and requested specific information that is necessary to begin to evaluate the validity of such claims.").

description of Digital Risk's processes is set forth in the declaration of the RMBS Trustees' other

expert, Mr. Aronoff.  Even a cursory evaluation of the work performed by the RMBS Trustees'

purported experts reveals it is grounded in unreasonable assumptions and replete with

methodological flaws, which likely led to a gross over-estimation of the actual value of the

RMBS Claims.  Thus, the RMBS Trustees' $12.143 estimate of their claims is fundamentally

unreliable, and itself demonstrates the risks associated with determining ultimate liability and

allowance through estimation.  Estimation should be rejected in favor of the indisputably more

accurate loan-by-loan claim reconciliation process mandated by the Governing Agreements.

53.    As set forth in detail in the Declaration of Dr. William N. Goetzmann, a Professor

of Finance and Management Studies and Director of the International Center for Finance at the

Yale School of Management, the analysis performed by the RMBS Trustees' experts is deficient

in a number of respects.  Based on his preliminary analysis, Dr. Goetzmann observes that Dr.

Parekh's sample only drew from loans that had suffered a loss or were in default.  (*See*

Declaration of William N. Goetzmann, dated December 3, 2014 ("Goetzmann Decl." ¶¶ 10-

11(d-e, g).)  Because Dr. Parekh selected such a sample, it was impossible for him to empirically

test whether the alleged breaches had — as they must for Lehman to bear any liability — a

material and adverse effect on the value of the loans in the pool.  That is because by construction,

all the alleged breaches identified in the sample would be associated with losses.  (*See id*.)

54.    In addition to the aforementioned sampling bias, Dr. Goetzmann has preliminarily

identified an array of other flaws in the RMBS Trustees' experts' analyses:

- *Lack of analysis to ensure the representativeness of the loans included in the sample* — Dr. Parekh performed no analysis to ensure the sample used was representative with respect to other loan and borrower characteristics (*e.g.*, the loan payments being "interest-only," or the proportion of borrowers with low FICO scores).  (*See id.* ¶¶ 11(d), 32-42.)

- *No explanation for the sample's missing loans* — Dr. Parekh offers no analysis for why 421 loans within his 5,000 loan sample were "unable to be delivered" and never examined. He does not consider whether these missing loans might have had significantly different breach rates than the rest of the sample. (*See id.* ¶¶ 11(f), 40-41.)

- *Unreasonable assumption that no cure was available for certain alleged breaches* — Mr. Aronoff and Digital Risk unreasonably assume that many alleged breaches cannot be "cured" by Lehman. (*See id.* ¶¶ 11(a), 12-17.)

- *Lack of analysis demonstrating that loan performance was materially and adversely affected by breaches* — The RMBS Trustees' experts perform no analysis to establish that the performance of the loans (and therefore their value) was adversely affected by the presence of breaches as opposed to other loan or borrower characteristics or market conditions. (*See id.* ¶¶ 11(c), 18-24.)

- *Failure to identify or account for key determinants of higher default probabilities* — Mr. Aronoff does not account for the various factors that have a causal relationship to higher probabilities of loan defaults. For example, he relies on the unverified and unsupported assertion that there is a greater probability of default if the borrower overstated his or her income in order to qualify for the loan at issue. In so relying, Mr. Aronoff fails to account for other key determinants of defaults during the housing crisis. (*Id.* ¶¶ 11(b), 25-31.)

- *Improper application of the proposed breach rate to all loans* — By only sampling loans that have losses or have defaulted, and applying the breach rate on such loans to loans that have no losses or that have not defaulted, Mr. Aronoff assumes the breach rate in both populations is identical. Indeed, it is unreasonable to assume that non-defaulted loans would have the same breach rate, particularly since they are still performing after the severe recession. (*Id.* ¶¶ 11(e, g), 33-35.)

- *Oversimplification of the projected future loss methodology* — By using a simplistic and "mechanical" methodology to project future losses, the RMBS Trustees' experts fail to account for known and well-studied factors affecting default rates and loss severity. (*Id.* ¶¶ 11(h), 45.)[19]

55. Given the above-mentioned deficiencies, the sampling-based analyses performed

by the RMBS Trustees' experts provides no basis for this Court to reliably estimate the RMBS

---

[19]    Should the Court determine that the allowed amount of the RMBS Claims should be determined through sampling and estimation, Lehman fully reserves its rights to more fully challenge the RMBS Trustees' experts' analyses at an estimation hearing following full expert discovery and any appropriate briefing.

Claims, and certainly not at the absurd amount of $12.143 billion. What the problems with these analyses also expose, however, is just how complex and ultimately unreliable any sampling-based approach to estimating the RMBS Claims in this context will be. Although the RMBS Trustees present sampling as the more expedient approach, sampling entails its own challenges, as raised *supra*, requiring complex expert discovery, lengthy briefing, hearings, and significant Court analysis. It also prejudices Lehman's bargained for contractual rights. Loan-by-loan review as required by the Governing Agreements would obviate the need for these Court-supervised steps and most importantly, lead to more a more accurate assessment of the Estate's liability. Accordingly, the Estimation Motion should be denied.

### C. Lehman's Proposed Protocol Is Efficient, Requires Minimal Judicial Involvement, and Will Best Serve the Estate's Interest in Determining the Proper RMBS Allowed Claim Amount.

56.    In contrast to the inappropriate sampling-based approach advanced by the RMBS Trustees' Estimation Motion — which contravenes the Governing Agreements, applicable law, and is inherently unreliable — the claim resolution Protocol proposed by Lehman's Cross-Motion avoids those problems. As Lehman's expert, William Alread — who has spent three decades working in the mortgage industry — opines, the Protocol is a "sound, efficient, workable, and cost-effective means of timely resolving each claim at the loan level through a clear and consistent process that follows mortgage industry standards and practices." (Alread Decl. at 4.) Specifically, Mr. Alread observes that he has seen approaches akin to the Protocol adopted in various areas of the mortgage industry, including for example, by mortgage insurance companies, that "approve or deny claims on a loan-by-loan basis by requesting and reviewing individual loan-level documents, and then participating in a back and forth dialogue with the owner and/or servicer of the loan." (*Id.* at 6.) Mr. Alread also observes that Fannie Mae and Freddie Mac, despite dealing with a large volume of loans, "maintain a loan-by-loan repurchase

process that includes an appeals process and alternative remedies."  (*Id.*)

57.      Both Recovco and Mr. Alread opine that the industry has the necessary capacity

for Lehman and the RMBS Trustees to timely complete Steps 0-4 of the Protocol in

approximately one year.  (*See* Pino Decl. at 1; Alread Decl. at 8.)  Lehman initially proposed that

the RMBS Trustees be given a 60-day deadline to present loan files, or face disallowance of any

claims that are not submitted before that deadline.  Given the RMBS Trustees' admissions that

they have only attempted to collect 5,000 loan files and that complying with such a deadline is

"not possible" (Reply Br. ¶ 50), Lehman proposes an extended ***180-day*** deadline to submit

claims.  Lehman believes the RMBS Trustees should be held to this fair and finite deadline,

particularly given their failures to begin collecting loan files years earlier.

58.      Once Steps 0-4 of the Protocol are completed, Recovco estimates that claims on

just 50-70 loans will remain in dispute and require further resolution (Step 5).  (*See* Pino Decl. at

1 n.1.)  Because the unpaid principal balance of this number of loans is likely to be relatively

small, particularly in light of the total amount of the RMBS Claims, such claims would more

likely than not be consensually resolved.  Accordingly, although Step 5 of the Protocol may

require some Court involvement, it is unlikely to require the significant expenditure of judicial

time or resources.  Moreover, even if Court involvement is necessary, it is likely to decide

categories of disputes, not individual disputed loans.

59.      As for costs, Recovco and Mr. Alread estimate that the complete loan-level

review using the Protocol would cost approximately $110 million in the aggrega*t*e.  (*See* Pino

Decl. at 1; Alread Decl. at 8.)  Although this cost may appear high, it is actually a relatively low

cost figure given the 255 trusts at issue, the unpaid principal balance of the loans, and the fact

that when compared to benchmarks of the RMBS Trustees' recent settlements in similar

litigations (and controlling for the unpaid principal balance of the loans at issue in those cases),

the $12.143 billion amount sought from Lehman exceeds the amount the RMBS Trustees agreed

to accept from other RMBS sponsors (including J.P. Morgan Chase Bank, N.A. and Citibank,

N.A.) by *billions* of dollars.  (*See* Lehman Objection/Cross Motion ¶ 58 n.16.)  The cost of the

Protocol should also be evaluated in light of the fact that it will not abrogate the parties' rights

under the applicable Governing Agreements and would save the parties the costs of sampling,

which would include complex expert discovery, briefing, and extended proceedings before this

Court.  As such, the cost of the Protocol is quite reasonable and well-justified given that it will

indisputably yield the most accurate calculation of Lehman's repurchase liability, thus preserving

the interests of the Estate, and its creditors.  Despite the RMBS Trustees' superficial

characterizations of the Protocol as "nonsensical," "convoluted," and "insanely expensive," they

do not (and cannot) dispute that the Protocol will most accurately determine Lehman's proper

repurchase liability.  Indeed, even these characterizations should be viewed with skepticism.  The

RMBS Trustees spent many months negotiating a "framework" (*i.e.*, protocol) they now say is

nonsense.[20]

> 60.     Beneath their bluster, the RMBS Trustees' criticisms of the Protocol boil down to

complaints regarding time, tedium, and cost.  To avoid having to do the work necessary to prove

their claims in accordance with the Governing Agreements, the RMBS Trustees assert that the

Protocol will take 27 years to complete and impose "massive" costs of up to $219 million.

(*Id.* ¶ 46)  Tellingly, the expert upon whom the RMBS Trustees rely for their 27-year prediction,

---

[20]     *See Declaration of Franklin H. Top III Regarding the RMBS Trustees' (1) Reply in Support of Their Motion to Estimate the RMBS Claims Using Statistical Sampling, and (2) Opposition to Lehman's Cross-Motion for a Full Loan-by-Loan Review* (Dkt. No. 46962) ¶ 16 (characterizing the loan-level protocol proposed by the RMBS Trustees, which is akin to the one proposed by Lehman in its Cross-Motion, as "a framework for resolving the RMBS Claims").

Dr. Parekh, is the same expert who just over two months ago opined that a full loan-level review

would take up to 41 years.

61.    In any case, Dr. Parekh's assumption that the Protocol would take 27 years to

complete (which is based on exceedingly lean staffing assumptions) is "grossly overstated and

misleading."[21]  (Alread Decl. at 9.)  As discussed above and set forth in detail in Mr. Alread's

Declaration, by increasing the number of loan file reviewers, negotiators and claim facilitators

involved, the timeframe required to complete the review can be shortened considerably.  (*See id.*

at 6-7.)  Moreover, Dr. Parekh's assessment of the Protocol also fails to consider the various cost

and time efficiencies that can be achieved through effective phasing of the Protocol, and likely

economies of scale as the process moves forward.  (*See id.* at 9-10.)  For example, loans with

similar characteristics can be assigned to the same review team so that reviewers develop

familiarity with the common structure and features of such files, and can complete them more

quickly.  As Mr. Alread opines, based on his experience with large-scale due diligence projects,

"as the parties and the review teams start to identify emerging patterns in the loan review

process, the review will become faster and more efficient."  (*Id.* at 10.)  In addition, as the

Governing Agreements only require Lehman to respond to specifically noted breaches, Lehman

will not be required to do a full re-underwriting of each aspect of every loan.  (*See id.* at 11.)

This factor too will enable the Protocol to move forward more expeditiously, and is overlooked

by Dr. Parekh's time estimate.

62.    The RMBS Trustees are hard-pressed to complain about the potential $110

---

[21]    The RMBS Trustees' contention that the Protocol would take 27 years to complete is nonsensical.  Given
the approximately 150,000 Covered Loans that the RMBS Trustees contend are not performing and have
not been paid in full, and the 255 Trusts at issue, a 27-year long process would require the RMBS Trustees
to review just 1.8 loan files on behalf of each Trust per month.  Clearly more can and should be expected of
the RMBS Trustees, who seek to recover $12 billion from the Estate and suffer from no dearth of
resources.

million cost of the Protocol (which is only about $272,000 per trust, and well-justified given the

magnitude of their total claims) when it was they who signed to serve as trustees for 405 separate

trusts (the claims of 255 of which are embraced by the Estimation Motion).  That the RMBS

Trustees have assumed contractual obligations that they are either unable or unwilling to perform

is no grounds to penalize Lehman or to deprive it of its right to a loan-by-loan claim resolution

process under the Governing Agreements.  Nor is it grounds to deprive the Estate and its

creditors of a loan-by-loan claim reconciliation process that will indisputably yield the most

accurate calculation of Lehman's repurchase liability.

63.      Should the RMBS Trustees have legitimate concerns with certain of the

Protocol's specific deadlines or documentation requirements, Lehman is of course open to

further adjusting the Protocol to address valid concerns.  Lehman's goal here is to reach the right

result.  It should not be responsible for an absurdly high, unjustified, and unproven claim

amount, but is not looking to penalize the RMBS Trustees either.  The Protocol framework

proposed in Lehman's Cross-Motion (adjusted for a six month claim submission deadline) is a

streamlined claim resolution process that comports with the Governing Agreements and

applicable law, and can be completed in a reasonable amount of time.  Accordingly, the Court

should grant Lehman's Cross-Motion.

## II.      THE RESERVE MOTION SHOULD BE DENIED.[22]

64.      The RMBS Trustees' continuing shifts and reversals on the matter of the timing

of the adjudication of the Reserve Motion  alone warrant skepticism.  The RMBS Trustees'

gamesmanship is, at a minimum, counterproductive, particularly in a bankruptcy proceeding

where a debtor, like Lehman, is working in good faith to plan for and execute orderly

distributions to creditors.

---

[22]      *See supra* note 4.

65.     The myriad reasons the Reserve Motion should be denied are set forth in

Lehman's Objection and Cross-Motion. (*See* Lehman Objection/Cross-Motion ¶¶ 54-79.)  As

Lehman explained, citing robust legal authority, the Reserve Motion should be denied, not only

because it is an improper attempt by the RMBS Trustees' to escape the terms of the parties'

Court-ordered compromise to set the reserve at $5 billion (*see id.* ¶¶ 55-59.), but also because it

is untimely and otherwise falls well short of the applicable legal standard under Rule 60(b).

(*See id.* ¶¶ 60-73)  The RMBS Trustees offer no credible response to Lehman's arguments,

including the numerous cases applying the Rule 60(b) requirements and legal standard to

motions to modify stipulated and other orders that resolved discrete disputes within the context

of broader bankruptcy proceedings.  Among these is *In re Chemtura Corp.*, in which Judge

Gerber applied Rule 60 (made applicable here by Federal Rule of Bankruptcy 9024) to a

motion to increase a previously ordered disputed claims reserve, a case the RMBS Trustees

half-heartedly try, but ultimately fail to materially distinguish.  *See In re Chemtura Corp.*, No.

09-11233, 2010 WL 4638898, at *3 (Bankr. S.D.N.Y. Nov. 8, 2010); Lehman Objection/Cross-

Motion ¶ 61).

66.     Attempting to save their Reserve Motion, the RMBS Trustees hang their hats on

Rule 54(b), which is plainly inapplicable.  Rule 54(b) speaks to multi-party, multi-claim

situations in which an order "adjudicates fewer than all the claims or the rights and liabilities of

fewer than all the parties" (Fed. R. Civ. P. 54(b)), the prototypical example being an order that

dismisses or enters summary judgment on certain causes of action but not others, or resolves

the rights and liabilities of certain parties while leaving others to continue litigating.  Under

Rule 54(b), these specific types of orders can be revised at any time prior to entry of judgment,

and cannot be immediately appealed without the court's certification.  The stipulated Reserve

Order of course was no such order.  It did not "adjudicate[]" any "claims" or the "rights and liabilities" of any parties.  Rather, it fixed the reserve for the RMBS Claims.  Accordingly, Rule 54(b) is inapposite.  *See Backus Plywood Corp. v. Commercial Decal, Inc.*, 317 F.2d 339, 341 (2d Cir. 1963) ("Rule 54(b) may be invoked only when there is more than one 'claim for relief' and at least one of those claims has been finally determined.")

67.    Because the Reserve Order disposed of a discrete dispute concerning the proper size of the reserve for the RMBS Claims (*see* Lehman Objection/Cross-Motion ¶¶ 60-61), the Reserve Motion is governed by a Rule 60(b) standard.  *See In re Chemtura Corp.*, 2010 WL 4638898, at *3.  The RMBS Trustees argue that Rule 60(b) should not apply because Lehman termed the relief afforded the Reserve Order "temporary until such time as the parties will hopefully reach a fully consensual resolution of the [RMBS Claims]."  (*See* Reply Br. ¶ 61) However, in no respect did the parties contemplate that the reserve issue would be reopened prior to any resolution (through settlement, allowance, or disallowance) of the RMBS Claims. The Reserve Order was only "temporary" in the sense that it conclusively established the reserve amount while the remaining issues (*i.e.*, ultimate allowance of the RMBS Claims) still needed to be resolved.

68.    Unable to respond to Lehman's arguments that the Reserve Motion is both untimely and otherwise deficient under Rule 60(b)(2) (the applicable subpart because the RMBS Trustees have relied on purported "newly discovered" expert evidence) (*see* Lehman Objection/Cross-Motion ¶¶ 62-73),[23] the RMBS Trustees grasp at Rule 60(b)(5), (*see* Reply Br. ¶¶ 64-65), but this argument does save the Reserve Motion.  Rule 60(b)(5) affords relief from an order if "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  As the

---

[23]    Lehman also noted that the Reserve Motion does not satisfy Rule 60(b)(1), (3), or (6).  (*See* Lehman Objection/Cross-Motion ¶¶ 64 n.19, 67-68)

Supreme Court has noted, "modification [pursuant to Rule 60(b)(5)] should not be granted

where a party relies upon events that actually were anticipated" at the time the order was

entered." *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992).  Under Rule

60(b)(5), a party must demonstrate "changed circumstances," *i.e.*, "either a significant change

in factual conditions or in law." *See Silverman v. Miranda*, No. 06-CV-13222, 2014 WL

3728622, at *4 (S.D.N.Y. July 28, 2014).

69.     The Reserve Motion obviously does not meet this standard.  The RMBS

Trustees make the very same argument in support of the Reserve Motion that they made when

they opposed the 2012 Lehman Estimation Motion — that failure to set an adequate reserve

would leave the Estate with insufficient assets to cover any allowed RMBS Claims in excess of

the reserve amount.  (*See* Lehman Objection/Cross Motion ¶ 71)  Fully cognizant of that risk,

the RMBS Trustees agreed to settle the Lehman Estimation and to the stipulated Reserve Order

setting the reserve at $5 billion.  The only purported "change of circumstances" the RMBS

Trustees can cite is their new expert report estimating the RMBS Claims at $12.143 billion

based on sampling.  This new estimate, however, is actually *lower* than the $15 billion estimate

the RMBS Trustees presented to the Court in 2012 and described as "conservative."  Thus, the

RMBS Trustees cannot credibly maintain that the reserve should be increased by $7.143

billion, when their estimate of the value of those claims has decreased by nearly $3 billion.

70.     Simply put, no inequity lies in holding the RMBS Trustees to the bargain they

previously struck on the $5 billion reserve amount.  In fact, to the extent any circumstances

have changed, they suggest the reserve should be *lowered*, not raised.  *See Giles v. Coughlin*,

No. 95 Civ. 3033, 1997 WL 433437, at *4 (S.D.N.Y. Aug. 1, 1997) (denying Rule 60(b)(5)

- 39 -

motion where "the alleged change in circumstances . . . was clearly anticipated at the time the

parties entered into the . . . decree.").  The Reserve Motion should be denied.

## CONCLUSION

WHEREFORE Lehman respectfully requests entry or an order:  (1) denying the RMBS

Trustees' Estimation Motion and Reserve Motion; (2) granting Lehman's Cross-Motion for

implementation of the Protocol; and (3) granting such further relief as the Court deems proper.

Dated:  December 3, 2014
      New York, New York

By:    /s/ Todd G. Cosenza
     Paul V. Shalhoub
     Todd G. Cosenza
     WILLKIE FARR & GALLAGHER LLP
     787 Seventh Avenue
     New York, New York 10019
     Telephone: (212) 728-8000
     Facsimile: (212) 728-9000

     -and-

     Michael A. Rollin
     Maritza Dominguez Braswell (*pro hac vice*)
     JONES & KELLER, P.C.
     1999 Broadway, Suite 3150
     Denver, Colorado 80202
     Telephone: (303) 573-1600
     Facsimile: (303) 573-8133

     *Attorneys for Debtors Lehman*
     *Brothers Holdings Inc. and certain of*
     *its affiliates*

# **Exhibit A**

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BEAR STEARNS MORTGAGE FUNDING     :
TRUST 2007-AR2,                   :
                                  :
              Plaintiff,          :
                                  :
        vs.                       :     Civil Action
                                  :     No. 6861-CS
EMC MORTGAGE LLC,                 :
                                  :
              Defendant.          :

                        _ _ _

                    Chancery Court Conference Room
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Thursday, November 8, 2012
                    2:00 p.m.


                        _ _ _

BEFORE:  HON. LEO E. STRINE, JR., Chancellor.

                        _ _ _




                    STATUS CONFERENCE




----------------------------------------------------------
                 CHANCERY COURT REPORTERS
                    34 The Circle
                 Georgetown, Delaware 19947
                    (302) 856-5645

2

1   APPEARANCES:

2           A. THOMPSON BAYLISS, ESQ.
            Abrams & Bayliss LLP
3             -and-
            HARVEY J. WOLKOFF, ESQ.
4           DANIEL V. WARD, ESQ.
            of the Massachusetts Bar
5           Ropes & Gray LLP
              for Plaintiff
6
            DANIEL B. RATH, ESQ.
7           Landis, Rath & Cobb LLP
              -and-
8           ROBERT A. SACKS, ESQ.
            Sullivan & Cromwell LLP
9           of the California Bar
              -and-
10          BRENT J. MCINTOSH, ESQ.
            of the District of Columbia Bar
11          Sullivan & Cromwell LLP
              for Defendant
12

13

14                      -  -  -

15

16

17

18

19

20

21

22

23

24

3

1            THE COURT:  Good afternoon, everyone.

2            ALL COUNSEL:  Good afternoon, Your

3    Honor.

4            THE COURT:  I'm glad you are all

5    getting along so well.  Just relax.

6            Here is -- I am not inclined to

7    embrace the notion that if someone can show that of 20

8    burglaries if they try three of them, somebody did two

9    that they should be -- there were 30 burglaries in the

10   neighborhood that they should be convicted of 20.  I

11   think I am mused to whether the parties might agree on

12   something like that, but an agreement on that is very

13   different than binding someone to it.  And it's really

14   nifty for a plaintiff to accuse someone of breaching

15   their obligations over a thousand loan contracts and

16   not wish to try all of them.  It's not going to happen

17   here.

18           Now, there is some merit to the idea

19   from both sides of doing the following, which would be

20   picking out a representative group of cases, using

21   them as a possible basis for -- you know, look.  The

22   plaintiffs are not in any equitable position here to

23   argue for shortcuts or something like that in terms

24   of, you know, that we have to do this tomorrow.  It's

4

1   just not that kind of case.

2                    I don't know enough about the

3   contractual issues at this point, and frankly, each

4   side is taking, you know -- understandably it takes a

5   self-interested view and is strained -- there are

6   strained arguments probably on both sides about other

7   courts' rulings.  I am not going to prejudge those.

8                    I could see how summary judgment

9   practice could be useful on both sides.  Honestly for

10  the same reason the plaintiff says it wouldn't be

11  useful because we win.  Well, prove it.  Then it might

12  be useful to you because, if you in fact win, it may

13  influence the defendants.  Maybe if you win, it won't.

14  Maybe you will each prove that not only are the

15  clients bricks and concrete that the lawyers are.  But

16  it could be, given the quality of lawyering on both

17  sides, that there is actually some supple thinkers.

18                   I am a little disappointed that you

19  all cut short your process, but I am not going to ask

20  you to do that.  I don't really understand.  It seems

21  like you were making some progress.  But you know, the

22  Bear Stearns Mortgage Funding Trust 2007-AR2 has its

23  priorities.  It has to move forward in a time frame of

24  its choosing.  So we are going to move forward.

5

1              But we are not going to have -- there

2     is all sorts of crazy things like you are going to get

3     the document discovery done by December.  You know, I

4     encourage a certain type of fishing before.  The

5     plaintiff has chosen a different type of fishing.  You

6     live with the type of fishing you pick.  And you are

7     not going to go that fast.

8              So what I would suggest to you all is

9     that you get a little more supple with each other,

10    stop walking out on things.  Even if -- I don't want

11    to go on the back and forth about who was at what

12    meeting or whatever.  It turns out the big mahatma on

13    each side missed one of the meetings.  I don't even

14    know why that is in the papers and why I have to read

15    about that.

16             If you believe -- frankly, I look to

17    Mr. Bayliss and Mr. Rath to have to get involved in

18    this process if they believe that people on somebody's

19    side is not doing what they should.  I expect them to

20    make sure that their own side is doing what they

21    should.  But you all cut off a voluntary process that

22    was resolving a fair number of things.  You did that.

23    Now, you can litigate.

24             I am certainly not going to try 1100

CHANCERY COURT REPORTERS

6

1    loans in three weeks.  I am not going do that.  It's

2    dumb.  But I am also not going to try a hundred loans

3    just because the polling data turned out to be good

4    upon election day this year that we should have just

5    enormous confidence always in statistical sampling.

6                    Again, I also think there are some

7    elements of the justice system that we haven't gotten

8    there yet, where probabilities are used to determine

9    things.  Because remember there is -- you are also

10   layering probabilities upon probabilities.

11                   What do I mean by that?  I am human.

12   At least, you know, you may think I am not human, but

13   I am human.  And I acknowledge, as a result of being

14   human, that what I do isn't perfect.  That is sort of

15   the tradition out of which I was taught that humans

16   are not perfect.  You do the best you can.  A human

17   being looking at a record through the prism of two

18   self-interested parties.  I mean, both sides may not

19   have very much direct evidence about some of these

20   things coming and telling me that I am going to peer

21   into that.  What you are going to do is say, "If you

22   try 50 mortgages, Strine found 37 of them were wrong,"

23   and then we are going to take that and we are going to

24   say that was a statistically significant sample I'm

1   going to pose on those.

2                  So you are taking a human being's

3   probabilistic determination, based on hindsight as to

4   certain files, and then you are going to say, "We will

5   just use that as a representative."  I am not sure

6   that anybody is going to endorse that.  I think,

7   frankly, even if it is sort of efficient, that is

8   something for the parties to decide.  And it seems to

9   me you might get more comfortable with it when you

10  have kind of some sort of trial run.

11                 I get the fact that there are courts

12  apparently otherwise, that are just going to say, you

13  know, frankly, "You can't reasonably expect us to try

14  these things."  So let's just say to the defendants,

15  you know, you can't really expect us to go to trial on

16  all these things.  So if the plaintiffs win on X of

17  this -- X of these ten cases, then you're liable on a

18  thousand.  Okay.

19                 When I get elected to something that

20  gives me that kind of authority, I will embrace it.  I

21  just don't get there.  You know, especially because I

22  haven't yet proven by contract -- that there is a

23  contract by contract thing contemplated.  And if,

24  frankly, the plaintiff -- if that's what they

8

1    bargained for, that's what they are stuck with.

2                    It's very easy to write a contract

3    that says if there is any breach of representation

4    warranty in any of these loans we can put back all of

5    them.  It's really easy.  So easy that you could take

6    the quote from this transcript that I just gave and

7    that could become a standard thing.  Or if it is

8    proven that there is a breach of representation

9    warranty in ten of the loans, then blank has the right

10   to put back all the rest.  Or if it is proven that

11   there is a breach of representation of warranty as to

12   20 of the loans... See, so I have created a new

13   boilerplate, not hard to draft.  Not immediately

14   apparent that's what is in the contract.  And so, I

15   mean, it's really nice to have --

16                   I loved the fact that your briefs were

17   focused.  But the idea that I would make one of the

18   world's most monumental judicial decisions, which is I

19   am now going to try a statistically significant

20   sampling, and then I am going to have to have a whole

21   inquiry as to what is a statistically significant

22   sample of a loan portfolio.  And we will have to

23   determine that issue, and then I am going to bind

24   somebody on the basis of that.  I am just not gutsy

9

1   enough to do it, and I am not going to do it.  So why

2   don't you use the room and report back to me in a

3   week.

4                   What I would suggest is that you put

5   together one -- if the plaintiff wants to move fast,

6   then the plaintiff ought to look over its documents

7   and other discovery requests and perhaps focus them.

8   If the plaintiff desires -- and I use the word in the

9   meaning in which it really has -- fulsome, which I

10  don't view as praise.  If it really wants fulsome

11  discovery, then it gets a more deliberative schedule

12  that goes with its fulsome discovery.

13                  I am not going to prepare to foreclose

14  summary judgment practice.  If I get summary judgment

15  motions that have four boxes of documents attached to

16  them, it will be very easy for me to decide that there

17  aren't four boxes of undisputed facts.  But if there

18  are interpreted issues that both parties, frankly --

19  as I said, the plaintiffs seem to think that their --

20  they have an Ochocinco touchdown dance to do on some

21  of these issues.  Well, maybe they do.  I don't know

22  why then to the plaintiffs --

23                  Do I really relish summary judgment

24  practice in this kind of case?  No.  But do I relish a

1    trial?  No.  There is nothing about this that is good

2    enough to put on top of a hot dog.  I mean, this is

3    what it is.  And so, you know, I could see the parties

4    agreeing.  Frankly, it would be more efficient.  I

5    mean, I am not usually a volunteer on these kinds of

6    things in the sense that I don't like typically

7    bifurcating, you know, issues or cases.  This is a

8    little different.

9                    What do I mean by that?  It's usually

10   not that good in a case to pick out -- if there is six

11   issues to pick out two.  The parties always promise

12   you if you resolve the two, the four will go away.

13   It's not my experience that somebody loses on two,

14   they're all hacked off and then they figure out a way

15   to fight on the four.

16                   What we are talking about here is if

17   you could identify a sample, if you all exchange views

18   of what are the kind of key contractual issues that

19   have come up thematically.  You know, what is the

20   characteristic?  What are their type -- types of

21   breaches that the plaintiff alleges against EMC,

22   right?  So I don't know what they are, right, but say

23   there are four or five characteristic type of loans

24   that they view as problematic -- and really, frankly,

1  that the plaintiff has to live a little bit with,

2  which is you are not going to raise more of the

3  typologies -- they have a huge type in typology.  So

4  we have professors.  You have to raise these X-anti,

5  not X-post discussion.  So X-anti you raise all your

6  typologies of loan breach.  You all -- and the

7  defendants surface their defenses, and everybody puts

8  them on the table and says what are -- out of this,

9  can we come up with a sample?  Let's try to come up

10  with an objected method to pick a reasonable number of

11  loans that we could try that together raise all of the

12  issues, legal issues, that are raised by all the loans

13  collectively.  Let's try them.  And let's get a ruling

14  on those.

15          It's a different kind of bifurcation

16  in the sense that actually it's a complete ruling

17  across the board on all the legal issues, which given,

18  you know, rules of preclusion somebody is going to be

19  bound by.  You could even then, obviously, get a Rule

20  54 certification, take them up, get -- it could be

21  that you all say look it could be -- let's be

22  optimistic in a way that none of your discussions to

23  date would make me, but I will be optimistic here for

24  a second, irrationally optimistic -- imagine you just

12

1   read the opinion.  You know that guy sure is the

2   subject of some pretty frightening looking cartoons,

3   but he writes a pretty darn good rep and warranty

4   decision in a mortgage case.  We are not perfectly

5   happy with we won some and we lost some on each side,

6   but it kind of gives us a template of let's apply them

7   to the rest of the loans.  We think we can knock this

8   out.  That's the optimistic ruling, probably not true,

9   probably not likely what would come out.

10                  The other route you take is -- both

11  sides take up what they agreed to my betters in Dover.

12  Then you get something definitive, unless you think

13  the Supreme Court is going to take cert on this.  It

14  might be good since it was a federal regulatory

15  problem for them to endure all these cases, but -- but

16  absent them taking cert, you get a definitive ruling

17  and then you can decide whether to go forward with the

18  trial or whether -- you know, look.  This has some

19  implications.  Let's see if we can settle it out.  So

20  I guess that's sort of the path I am talking about.

21                  I don't have any fixed views on the

22  utility of summary judgment versus a trial.  I think

23  if you get -- if you talk around the concept that I am

24  mentioning, you know, it may be that you come together

13

1    on that if the plaintiff can -- you know, if everybody

2    can agree on the shape of discovery.  Because then you

3    wouldn't do summary judgment briefs, you would

4    obviously come and tell the story at a focused trial.

5    Then we are talking about a much more focused trial if

6    we are talking about a smaller number of loans and you

7    write one kind of set of legal briefs.

8                    I am not prepared to dictate that at

9    this point because there is a lot of things that I

10   also don't know, which is -- you know, what are the

11   types of breaches you alleged?  What type of

12   underwriting personnel are going to have to come in?

13   How easy it is to find those people after the fact,

14   and all that kind of good stuff.  I am assuming these

15   things were written -- you know, underwritten in a

16   variety of places, right?  It's not a geographically

17   focused portfolio.

18                    MR. SACKS:  No, a lot of underflow

19   loans, underwritten and purchased by Bear Stearns at

20   the time.  So they could be underwritten by all sorts

21   of people.

22                    THE COURT:  In fact, I think there was

23   a kind of -- because of the S&L crises there was a

24   sort of idea of not trying to have a geographic

14

1    concentration, right?

2                    MR. SACKS:  Unfortunately a lot of

3    these pools are fairly concentrated --

4                    THE COURT:  Florida?

5                    MR. SACKS:  -- in California.

6                    THE COURT:  California.  Where in

7    California?

8                    MR. SACKS:  Each -- I don't know where

9    this one is, but most of them have 50 plus percent

10   concentration in California and Nevada and all the

11   states that --

12                   THE COURT:  Florida?

13                   MR. SACKS:  -- Florida would usually

14   be a second or third in most of these pools.  I don't

15   know the percentage for this pool precisely.

16                   THE COURT:  So what I am saying for

17   today is, you know, I don't know how to enter a case

18   management plan on this point.  What I am saying is if

19   you can't agree on some sort of representative sample,

20   I am not going to go to trial for three weeks on 1100

21   loans.  I just don't get that.  But nor am I going to

22   let you all do the equivalent, which is I think what

23   you are trying to do, which is to go to trial on 1100

24   loans in a short period of time by essentially going

15

1    to trial on some group of loans that gets selected and

2    then deeming that to be the trial on 1100 loans.

3              I mean, in some ways the parties are

4    in the identical position, just a different way.  And

5    you know, I will say to Bear Stearns and to EMC,

6    "Yeah, I don't think it will ever be the case that

7    Strine or any of his colleagues tries 1100 loans."

8    You will likely have a special master.  You will

9    likely pay for it.  If you then want to have de novo

10   review of those things, you will have it on some sort

11   of piecemeal basis.  But the idea that we are going to

12   stop the world for this case, no.  And what that

13   should lead if there are -- you know, I don't know who

14   the client, the Law Debenture Trust Company -- whose

15   behind the Law Debenture Trust Company?

16              MR. WOLKOFF:  Well --

17              THE COURT:  What I mean is who in

18   George W. Bush -- President George W. Bush was trying

19   to lead us to this signer?

20              MR. WOLKOFF:  Who the directing

21   certificate holder is, Your Honor?

22              THE COURT:  Not really what I was

23   thinking of.  Because when you mention that word, you

24   mention to me that that would be someone who holds an

16

```
 1   office who dearly desired never to have to actively do
 2   anything but is thrust in by unusual circumstances
 3   into a different, a very highly, unusual role.  So
 4   what I am sort of saying, "Yeah, if that's the
 5   name" -- what I am talking about who is really
 6   providing input on the plaintiff's side about how this
 7   case gets resolved.
 8                   MR. WOLKOFF:  We put into our papers
 9   who that is, Your Honor.  It's Baupost.
10                   THE COURT:  It's who?
11                   MR. WOLKOFF:  It's Baupost, B-A-U --
12                   MR. McINTOSH:  It's a hedge fund.
13                   THE COURT:  It's a hedge fund.
14                   MR. SACKS:  They own a quarter of the
15   certificates, and they are directing this process.
16                   MR. WOLKOFF:  We have described them,
17   Your Honor, in our papers in a recent filing I think a
18   couple months ago.  So they are the directing
19   certificate holder in this particular case.  Now,
20   obviously, there are many other certificate holders
21   not just Baupost.  And with respect to what Baupost --
22   what its intent with regard to suggesting the
23   statistical sampling, Your Honor, was we recognized
24   that having Your Honor review 1141 loans just probably
```

17

1   can't be done.  So we were searching for some way that

2   we could come up with a method for getting a fair --

3                THE COURT:  Let me just also surface

4   reality.  You know, the Court does its job.  Baupost

5   it doesn't want to prepare 1134 cases.

6                MR. WOLKOFF:  Well, Your Honor, that's

7   -- you know, I would --

8                THE COURT:  No.  No.  I think it

9   really doesn't, unless its not rational and probably

10  not an adequate representative of others' interests.

11  I get why it doesn't want to.  Because when you

12  actually get down to looking at each file -- and the

13  same thing would be for the defendants -- as painful

14  as it would be for me -- and I am not saying it

15  wouldn't be painful.  You know, I would rather watch

16  dressage than do this.  But to some extent, I come at

17  the end of that process.  And so I get why --

18                But what I am saying about it is

19  sometimes in life -- I worked for a very good,

20  excellent federal judge.  He said -- we talked about

21  this.  He said the words you always have to keep in

22  your mind when you say "you are going to cut through

23  this," you always view those as a hazard, like a

24  signal to himself.  And sometimes we have to kind of

18

1  do that.

2              That's why I said about voluntarily.

3  You all could both cut to it.  It's not really my

4  role, and what I am saying about it is, you know, it's

5  nice to say that the Court doesn't want to try 1134

6  cases.  I don't think either side really wants to, and

7  I would say the plaintiff doesn't.  And actually by

8  the plaintiff having to think about preparing for

9  1134, the defendant having to defend 1134, then the

10 men and woman of financial science, which is an

11 oxymoron, right?  The people who brought us price

12 discovery on both sides and who thought about these

13 risk reduction methods, which have just made the world

14 far more stable than when someone held a mortgage and

15 really cared about who it was giving it to because the

16 source of repayment was the person they were giving it

17 to rather than, you know.  But we have people, again

18 men and woman on both sides of the science of

19 financial price discovery, and therefore, one of the

20 things that's an element to litigation price discovery

21 would be facing the costs of litigating your claims.

22 And all I will say to the plaintiff is there is a

23 burden of persuasion.  And it has to be met.

24              And so, you know, I think I am

1   disinclined to engage in the basis of very admirably

2   terse papers in one of the more significant rulings I

3   have been asked to make in the last two years.  I am

4   not going to.  So you can all talk in the room.  I am

5   not going to rule on either side's proposals, because

6   I am not hep to either side's proposal.  So to the

7   extent you are all asking me to enter either cross

8   motions, your things are each denied because I don't

9   find that either side's proposal to be acceptable.  I

10  am probably more with the defendants, except that I do

11  think that the idea of a representative sample of

12  cases being the subject of either immediately a trial

13  or a sequence of summary judgment in a trial probably

14  has a lot of common sense to it.

15              Okay.  So use the room.  If you can

16  bang out 15 loans now that each of the big guns are

17  here, right?  You guys are in the same room.  I feel

18  honored by this, right.

19              MR. SACKS:  We don't make any

20  decisions.

21              THE COURT:  Was there like a feeling

22  around each meeting where each of you was gone that it

23  just didn't count?

24              MR. WOLKOFF:  No.  Your Honor, there

20

1   was --

2                   THE COURT:  I am just kidding.

3                   MR. WOLKOFF:  There was a lot of time

4   spent at each meeting.  It just wasn't what we felt,

5   on behalf of the plaintiffs, was sufficient progress.

6                   MR. SACKS:  We obviously felt we were

7   making progress.

8                   MR. WOLKOFF:  You know, withdrawing

9   five loans after three meetings didn't seem to us to

10  be sufficient progress.  That being said, Your Honor,

11  we are going --

12                  THE COURT:  Was it only five?

13                  MR. SACKS:  No.  We went through 50

14  loans.  Between them withdrawing and us agreeing to

15  repurchase, we got rid of 20 percent of them.

16                  MR. WOLKOFF:  They withdrew --

17                  MR. SACKS:  We bought five or six, and

18  they withdrew.  We got rid of ten of 50.  I thought

19  that was actually productive.

20                  THE COURT:  Was it just not the right

21  proportion?

22                  MR. WOLKOFF:  We withdrew, we dropped

23  seven, Your Honor.  We wanted to get the ball rolling

24  in a good faith determination on the other side.  They

CHANCERY COURT REPORTERS

21

1    agreed to purchase five loans, Your Honor, and we

2    couldn't make heads or tails of the reasons why they

3    were repurchasing these five as opposed to another

4    five or another seven.  We couldn't -- there were

5    situations where you had a waitress who said she was

6    making $150,000 a year and was getting a mortgage for

7    $700,000 and had a debt chock of 1800 percent.

8                    THE COURT:  She worked at Per Se.

9                    MR. SACKS:  15 percent on their prices

10   would make a pretty good living.

11                   MR. WOLKOFF:  The only point we are

12   trying to make, Your Honor, was that --

13                   THE COURT:  Or maybe waitress was a

14   more polite phrase for --

15                   MR. WOLKOFF:  And then we have a

16   similar person at an IHOP and they wouldn't repurchase

17   it.  So without being able to go through the loans and

18   get a rhyme or reason, we felt like --

19                   THE COURT:  So you guys have an

20   anti-pancake --

21                   MR. WOLKOFF:  No, I like pancakes,

22   Your Honor, but three days for five loans.

23                   THE COURT:  I understand.

24                   MR. SACKS:  You can't force people to

22

1    talk, if they don't want to talk.  So I actually think

2    one of the things -- maybe we should have this

3    conversation you suggested.  One of the things we had

4    suggested was trying to identify issues that cross a

5    large number of loans and either trying to reach

6    agreement on some of those, approaching them for

7    discussion along those lines, or your approach is very

8    much -- it sort of is consistent with how we

9    approached it.  But your suggestion rather than solely

10   legal issues, we deal with a section of loans to deal

11   with the legal issues.

12                   THE COURT:  Because there must be --

13   the reality is the legal issues will arise in a

14   context that's relevant.

15                   MR. WOLKOFF:  I think that is

16   important, Your Honor.

17                   THE COURT:  What I also need to know

18   from you all, and I am getting -- as I said, I don't

19   have an optimistic feeling as to how well counsel is

20   getting along.

21                   MR. WOLKOFF:  Counsel are getting

22   along fine, Your Honor.  We are cooperating with each

23   other.

24                   THE COURT:  Well in terms of

CHANCERY COURT REPORTERS

1    identifying these representative issues.

2                    MR. WOLKOFF:  I think Your Honor's

3    suggestion about picking out 50 loans that cross a

4    spectrum of the different issues -- of course, each

5    loan has individual issues, but we should be able to

6    sit in a room, not necessarily today, but at least

7    agree on the structure of it where we could agree to

8    have 50 or 75 loans that we select out that --

9                    THE COURT:  And let me -- I am going

10   to be blunt in way that I hope that none of -- you

11   know, we are honored to have counsel of your quality

12   coming from communities that -- you know, I have a

13   great deal of fondness for Massachusetts.  I spent --

14   I vacation there.  DC is a wonderful town.  LA is

15   really cool.  I hunger for the Buffalo pigs trotters

16   from LA.

17                   But what I worry about -- just telling

18   you -- I worry about when defining these issues if I

19   am going to leave it to Boston, LA, and DC, are you

20   all going to come around sensibly, or do I, to be

21   honest, need to say to two people I respect a lot,

22   Mr. Rath and Mr. Bayliss, I expect you to be present

23   on these discussions.  Just being blunt.  Because I

24   wonder whether, you know --

24

1              MR. WOLKOFF:  Honestly --

2              THE COURT:  The only thing is when I

3    read things that get to the level of adolescence --

4    and I say adolescence is saying that at the last meet

5    and confer the senior lawyer on the other side wasn't

6    present -- I forget which side -- you don't even have

7    to tell me which side.  Somebody said that about the

8    process, and then it turns out that that was also true

9    of the senior lawyer on the other side as to a

10   previous meeting.  When it gets to that level, that

11   might be funny when you are in seventh grade.  It's

12   expensive.  And, you know, people have clients who are

13   highly motivated.  Obviously, the defendants have a

14   client that's under siege.  The Bear Stearns Mortgage

15   Funding Trust 2007-AR2 has a controller who is -- has

16   bought a bunch of stuff and is trying to maximize the

17   value of it, which means that the inputs, probably the

18   accounts you are getting from both sides are fairly

19   intense from their clients.

20              And you know, the other thing about

21   cases like this is that, frankly, the outside counsel,

22   outside Delaware counsel you don't have to necessarily

23   deal with each other in every case all the time,

24   whereas Mr. Rath and Mr. Bayliss will come across each

1    other quite a bit.  So I have distinguished counsel,

2    distinguished law firms.  I am not in the room.  As I

3    said, I am a reader.  Judges read these things.  When

4    we get to the level of who was at the meeting and

5    that's the reason to get rid of the process because

6    one person is not taking it seriously.

7                     MR. SACKS:  I don't think that's the

8    issue, Your Honor.

9                     THE COURT:  Okay.

10                    MR. SACKS:  It's not a personality

11   issue.  It's an issue of I think that -- call it the

12   clients, if you will, that I think you've hit it

13   perfectly.  We have a client who is under siege.  They

14   have a client who is in a very different position.

15   Each case has collateral implications for other cases.

16   There is a big disconnect between the way the

17   plaintiffs want these cases to go and the way the

18   defendants want them to go.  And it's not just a one

19   off that you can easily say, "Okay.  Let's just deal

20   with the six issues" --

21                    THE COURT:  I get it.

22                    MR. SACKS:  -- "and be done with it."

23   I think that is more the issue.

24                    THE COURT:  Again, I am not being -- I

26

1    am not blaming anyone.  I'm trying to get an

2    understanding of the dynamic to make sure -- what I

3    want to make sure is that we don't leave the room and

4    then not get what we need to figure out how to move

5    forward.

6                    MR. WOLKOFF:  Your Honor, I think it's

7    a good idea to have Mr. Bayliss and Mr. Rath present

8    at discussions.  I think Your Honor's suggestion of

9    our picking out whatever number of representative

10   loans we can pick out to present to you and have a

11   trial, to put the legal issues in the context of those

12   loans, those are all not only excellent ideas, but

13   they are acceptable ideas to the plaintiff.  And we

14   would like to sit here, and we would like to discuss

15   it with our opposing counsel, who we have been

16   cooperating with, with regard to discovery and other

17   issues.

18                    As the offending senior lawyer who was

19   not present at the meeting because I did have an

20   emergency court hearing on something else, I was not

21   there, but we did send other lawyers to deal with the

22   issues, and I was available.  I could not be there,

23   but I was available by phone.  We are taking these

24   matters very seriously, Your Honor.  So we would like

1   some time to discuss coming up with a representative

2   sample.

3                    THE COURT:  What I am asking you all

4   to -- because I know that you -- I think what you will

5   find with close listening skills, as I have no doubt

6   your friends on the other side noticed, how you left

7   out any openness to summary judgment in that.  But

8   what I'm saying is I think it should surface on both

9   sides, which is the defendant should be open to the

10  possibility that it would be more efficient to go to

11  trial and to obviate summary judgment practice if you

12  can do the trial in an appropriate way, and the

13  plaintiffs should be open to the opposite, which is if

14  there are some legal issues that both sides agree will

15  drive a lot of things.  You can disagree about the

16  outcome, which is you can say to each other we think

17  your position is clearly ludicrous and unless Strine

18  can't spell cat, then he is going to rule our way.

19  Well, you could each agree on that.

20                   It doesn't really matter because if

21  you agree on the five issues that are that way, then

22  it might be efficient from the plaintiff's perspective

23  to bang them out, or it might not be, or it might be

24  when you think about how you present them to me -- and

 1    I think this is an important thing -- how you present

 2    them to me, whether they're best presented sort of

 3    decontextualized from loan files or whether they're

 4    most understandably presented to someone in the

 5    context of some discrete -- a discrete sample so that

 6    when you are arguing about them, it's not just sort of

 7    an abstraction.

 8                MR. SACKS:  Let me give you one

 9    example of one that I do think we will talk about.  It

10    has to be a summary judgment issue because it will

11    define what we deem at trial, the requirement that a

12    breach have a material and adverse affect.  We have a

13    fundamentally different -- because that is the one

14    they say we are ridiculous.  We have lost it, and they

15    should win.  We have a different view on that.  Their

16    view is it's measured at the time of the

17    securitization.  Our view is, no, it has to actually

18    happen.

19                The whole presentation of the context

20    of the loans to Your Honor on the breaches will be

21    fundamentally different depending on which of those

22    interpretations is the proper interpretation of the

23    contract.  We won't be addressing issues as to whether

24    loans breached and what happened and whether -- what

29

1   caused the breach after the fact, if it's measured as

2   of the time of the securitization whereas we will be

3   dealing with issues as to what did or did not

4   materially increase a risk at that time.  It's a

5   totally different focus on both sides I would think,

6   so unless we are not going to have --

7              THE COURT:  Again, when I try to think

8   about that abstractly, right?

9              MR. SACKS:  Right.  I will give you an

10  example, Your Honor, Loan A.  Loan A went ahead.  They

11  allege a breach of -- stated income breach let's say,

12  and we go ahead, and the loan paid for four years and

13  then the person lost their job four years later, and

14  it defaulted a month later.  That is an example.  If

15  their interpretation of the contract is correct, the

16  fact that it paid for four years, the fact that the

17  person lost their job, and that it defaulted only

18  after the person lost their job, four years after the

19  fact may not be material, may not be the focus of

20  this.  It will only be the breach and what the

21  situation was at the time of securitization.

22             THE COURT:  So what you are saying

23  is -- well, I think what --

24             MR. SACKS:  I am only raising that

CHANCERY COURT REPORTERS

1    because that, to me, is an issue that I believe is

2    acceptable to summary judgment and will affect our --

3                    THE COURT:  And what is contrary --

4    the plaintiff's argument would be if the breach -- if

5    at the time that the representation warranty was made,

6    the breach is material in the sense that the

7    difference between what was represented about the

8    borrower and what was, in fact, true about the

9    borrower would be a materially different credit risk

10   for the lender.

11                   MR. WOLKOFF:  Yes, Your Honor.

12                   THE COURT:  Then, the lender has a

13   remedy.  You don't look down.

14                   MR. SACKS:  Correct.  That is a

15   difference of opinion we have on the contract.

16                   MR. WOLKOFF:  We don't use hindsight.

17   And to take that example, Your Honor --

18                   MR. RATH:  I am simply -- I am not

19   trying to argue our perspective positions --

20                   THE COURT:  No.  No, I get it.  What I

21   am saying is I think I can see --

22                   MR. SACKS:  That's the type of thing

23   we see as being one you would decide before you get

24   into the specifics of individual loans.

1              THE COURT:  That's when I said to the

2     plaintiffs, which is I understand your position to be

3     that their position is wrong and that it's actually

4     going to be decided adversely.

5              MR. WOLKOFF:  It's also incorrect,

6     Your Honor.  That is the decisions in New York were

7     correct.  This is a New York contract.

8              THE COURT:  I know.  I know.  Right.

9     So what I am saying, without getting into who is right

10    or wrong, I know that you profoundly disagree with

11    their position and you believe actually, you know,

12    that might even be binding on them or something like

13    that.  But what I'm getting at is, it may be though,

14    right?  That it's advantageous for you to get that

15    decided because, however erroneous their opinion is,

16    right, if you would prevail or you at least convince

17    me -- I might not even change their mind, right?  They

18    can still believe that a fact that a judge takes a

19    position doesn't mean that the party holding the

20    different position was wrong.

21              Ask any trial judge about whether they

22    think when they get affirmed they were always sure

23    they were right, and when they get reversed that they

24    now understand the wrong, I mean, that's just human.

32

1    I am saying that's the kind of things where I think if

2    you focus on what you all think is most important,

3    there might be actually some utility, even for the

4    plaintiffs of getting an answer to that, and you know,

5    where you don't actually disagree, yeah, okay, that's

6    in contest.  You fight like heck about the merits of

7    that but getting a ruling might actually make some

8    sense.

9            MR. WOLKOFF:  That's the one issue,

10   Your Honor, where we would say that getting a ruling

11   would make some sense.

12           If you go down the list that we just

13   got in their reply brief on Page 4 of their reply

14   brief in support of the cross motion for entry of

15   order, you go through the list.  You know, the other

16   five legal issues that would, according to the

17   defendants, benefit from summary judgment are not

18   going to either eliminate any of the 1141 claims at

19   all, or if they did, the number would be very, very

20   small.  And you know, the other points on Page 4, Your

21   Honor, of their cross motion -- the first one is the

22   one that Mr. Sacks just mentioned materially and

23   adversely affect, and there we agree.  We think we

24   could probably benefit from having a ruling.  But the

CHANCERY COURT REPORTERS

1    second one they list is the meaning of the sole remedy

2    provision of Section 2.03(b).  They also list as the

3    last one, the indemnification --

4                        MR. SACKS:  We won't need the sole

5    remedy if we are not sampling.

6                        MR. WOLKOFF:  So when you go through

7    their list, the points of law -- actually, the points

8    of what a contract means when it says you have to

9    verify assets, and does that mean that you can check a

10   bank account and say, yep, he has $50,000?  Or does it

11   mean you have to go a step further and see whether or

12   not that $50,000 was a second loan, a second mortgage

13   on the same property.  Those types of things are best

14   taken up, Your Honor, we would submit in the context

15   of the trial of the 50 or 75 representative loans

16   that --

17                       THE COURT:  But what I'm saying is --

18                       MR. SACKS:  I don't necessarily

19   disagree with that.

20                       MR. WOLKOFF:  So that's something --

21                       THE COURT:  I think that's where

22   you'll each have to talk about it.  Because what you

23   should also think about is how would I argue about

24   this.

34

1          MR. WOLKOFF:  Yes.

2          THE COURT:  And unlike the one about

3    the materiality and when its determined, which I

4    think, you know, you can almost come up with a

5    strawman case about, some of these other things might

6    be more difficult to deal with without a loan.  And

7    again, you mentioned again things would be easier with

8    75 to a hundred loans.  I don't know if it's 75 to a

9    hundred loans.  I don't know what the right sample is.

10   You guys would know.

11          MR. SACKS:  I don't think it's

12   going --

13          MR. WOLKOFF:  Whatever we can agree

14   on.  I wasn't trying to prejudge a number.

15          THE COURT:  I think one of the issues

16   in all these cases -- look, I guess I am relatively

17   blessed compared to some other judges around the

18   country about this, but you all are much closer to

19   this.  I don't remember -- putting together the

20   witnesses for each loan thing is not going to be easy

21   to recreate, right?  Probably a lot of these loan

22   officers lost their jobs.

23          MR. SACKS:  We are not finding

24   individual loan officers for these loans.  That's not

CHANCERY COURT REPORTERS

1     what any of these cases are about.  You can't find the

2     individual underwriter who wrote loan number 2654.

3                     THE COURT:  No, no, no.  What you are

4     then going to do is somehow try to recreate how the

5     file was, in fact, made.

6                     MR. SACKS:  We have the files based on

7     practice, and the arguments about what the practice is

8     and what the standards are.

9                     MR. WOLKOFF:  Industry standards, Your

10    Honor.

11                    MR. SACKS:  And what the guidelines

12    were, which are in writing.  As to what should and

13    what is material to deviate, what's immaterial, and

14    those sorts of arguments.

15                    I don't disagree with Mr. Wolkoff as

16    to some of what he was saying.  I think there is more

17    than just the one I stated that is acceptable for

18    summary judgment.  I think there are a few more we

19    would benefit by that are not loan specific, but we

20    can talk about them further.  I am happy to talk about

21    them in full, and as I say, I think your suggestion is

22    a variant of where we were headed.  I have no

23    objection to the concept of it and let's try to work

24    something out.

36

1                    THE COURT:  We have some other

2  argument coming up, right?

3                    MR. SACKS:  We have moved to strike

4  some of the allegations of their complaint that is

5  in -- do we have a date for the argument?

6                    MR. WOLKOFF:  The reply brief is due

7  on the 12th, and we need a date.

8                    MR. SACKS:  Maybe we could come back

9  for that argument and also come back and deal with the

10  scheduling order at that time.

11                    THE COURT:  Does it make sense to

12  maybe require you, excepting the Friday after

13  Thanksgiving, to report back each Friday until we get

14  a schedule?

15                    MR. WOLKOFF:  Yes, Your Honor.  Yes.

16                    THE COURT:  And we will start with

17  next Friday.

18                    MR. SACKS:  That's fine.

19                    THE COURT:  Good.  Thank you.  You can

20  use the room.  Thank you.

21                    MR. WOLKOFF:  Thank you, Your Honor.

22                    MR. SACKS:  Thank you, Your Honor.

23              (Conference concluded at 2:45 p.m.)

24                         -  -  -

CHANCERY COURT REPORTERS

37

# CERTIFICATE

I, CHRISTINE L. QUINN, Official Court Reporter for the Court of Chancery of the State of Delaware, do hereby certify that the foregoing pages numbered 3 through 36 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF I have hereunto set my hand this 13th day of November, 2012.


```
                        /s/ Christine L. Quinn
                        ------------------------
                        Official Court Reporter
                         of the Chancery Court
                           State of Delaware
```

Certificate Number:  123-PS
Expiration:  Permanent