# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re: | Case No. 1:08-bk-13555 (SCC) |
|---|---|
| Lehman Brothers Holdings Inc., et al., | |
| Debtors. | |

### Declaration of William Alread

### December 3, 2014

## I.    <u>QUALIFICATIONS</u>

I have worked in the mortgage industry for 30 years, and have either performed or directly supervised the due diligence and/or underwriting of residential mortgage loans throughout that time.  I spent my early career at First Mortgage Strategies Group, Inc., where I focused on mortgage loan due diligence and transaction management in connection with the Resolution Trust Corporation ("RTC") liquidation.  I then spent seven years at First Tennessee Capital Assets Corp., where I was the senior executive in charge of contract finance and underwriting on various fixed-income investments, including residential mortgage loans.  Before founding Steel Mountain Loan Trading, LLC ("SMLT")[1], my current employer, I spent eight years as a Senior Vice President at a private loan acquisition firm and a large national bank in Denver, Colorado.  At both companies, I was responsible for overseeing the purchases of residential mortgage loans, as well as due diligence related to such loans.

I am currently the Chief Operations Officer and head of the Contract Finance Department for SMLT, a mortgage trading, risk management, and servicing oversight company established in 2014 that purchases mortgage loans, develops and implements exit strategies for purchased assets, and provides a diverse array of services to banks, credit unions, and various companies in the mortgage business.  My primary responsibilities at SMLT, and throughout my career, have included the preparation and negotiation of all contracts, agreements, and closing documents for the purchase and sale of mortgage loans, and the settlement of contract breaches as well as repurchases.  I also supervise all of the firm's due diligence and underwriting of mortgage loans.  Because my firm's business primarily involves the purchase and sale of mortgage loans, a core

---

[1]    I am co-owner and President of Steel Mountain Capital Management, LLC which was formed in 2005.  I am also Chief Operations Officer of Steel Mountain Loan Trading, LLC which was formed in 2014.  I will refer collectively to these companies as SMLT in this report.

part of that business is due diligence to assess the risk factors associated with those loans,

including, among others, those related to borrower credit, regulatory compliance, and property

value.  Since 2005, I have been involved in over 340 separate mortgage loan transactions with a

combined outstanding balance of over $1 billion.  A copy of my complete resume, which sets

forth my qualifications, work experience, and education, is attached hereto as Exhibit A.  Exhibit

A also lists the cases in which I have served as an expert witness.

## II.    RETENTION IN THIS CASE AND ASSIGNMENT

SMLT and I have been retained to provide professional services with respect to claims

made by certain RMBS Trustees against Lehman Brothers Holdings Inc. ("Lehman").

Specifically, I was asked to review the claim resolution protocol advanced by Lehman

("Protocol") to determine whether it conforms with industry standards and practices.  It is my

opinion that the Protocol provides a reasonable framework for the implementation of the cure or

repurchase and Purchase Price[2] calculation provisions of the Governing Agreements,[3] and as a

result the Protocol is consistent with industry standards and practices.  I was also asked to

describe the repurchase claims resolution process typically applied in the industry.  It is my

opinion that the repurchase claims resolution process—from an industry custom and practice

perspective—can only occur on a loan-by-loan basis in order to accurately capture the scope of

liability attributable to a sponsor.

My opinions are based on my 30 years of industry experience, including my involvement

with due diligence and the assessment of various risk factors associated with the purchase and

sale of loans, and my first-hand knowledge of agreements and the repurchase claims process.  I

---

[2]     Although the Purchase Price calculation provision varies among the Governing Agreements (and the variance itself underscores the importance of a loan-by-loan review), the fundamental elements of those provisions require that the calculation be performed at the loan level.

[3]     The Governing Agreements include the underlying Trust Agreements and Mortgage Loan Sale and Assignment Agreements.

am being paid a fee of $800 per hour for my work in connection with the preparation of this

declaration, my continued consulting analysis, and any deposition or trial testimony I may

provide.  Further, SMLT is being reimbursed for all of its actual, necessary, out-of-pocket

expenses incurred in connection with my work.  My fee is not contingent on the outcome of this

case or on the substance of my opinions.  Exhibit B lists the materials I have reviewed in forming

the opinions expressed herein, which are my own.

I reserve the right to amend my opinions, as stated herein, based on my receipt or

examination of any new or additional information.

## III.   <u>SUMMARY OF OPINIONS</u>

<u>Opinion 1</u>:  The Protocol is a sound, efficient, workable, and cost-effective means of

timely resolving each claim at the loan level through a clear and consistent process that follows

mortgage industry standards and practices. The mortgage industry standard and practice is that

cure and repurchase claims are resolved on a loan-by-loan basis.  Conversely, it is not industry

standard or practice to use sampling in connection with cure or repurchase claims because

sampling does not provide the loan-level information needed to effectuate the cure or repurchase

remedy.

<u>Opinion 2</u>:  In my business experience, not applying a loan-level inquiry for claim

reconciliation would ignore the allocation of responsibilities among the securitization parties and

run contrary to mortgage industry standards and practices, as reflected in the Governing

Agreements, requiring notice to Lehman of specific alleged breaches, loan-level evidence to

substantiate those claims, and loan-level remedies.

## IV.     THE PROPOSED RMBS PROTOCOL

A.    *Overview of the Protocol Process*

Lehman's proposed Protocol provides a reasonable framework for a claim resolution process that conforms with mortgage industry standards and practices, as reflected in the Governing Agreements, and preserves the parties' relative rights and responsibilities.  Without a loan-level inquiry process, Lehman would be unable to exercise the following rights:

(1)    to rebut claims when inaccurate;

(2)    to cure claims when possible;

(3)    to determine the properly calculated Purchase Price on RMBS claims that are valid; and

(4)    to obtain the information necessary to effectuate downstream indemnification rights against Lehman counterparties.

In my professional opinion, and given the number and principal amount of the loans at issue, the Protocol is an efficient and cost-effective means of complying with industry standards and practices and meeting the requirements of the Governing Agreements through a clear and consistent process that will timely facilitate the resolution of each claim at the loan level.

In addition, the Protocol provides a potential economic benefit to both parties.  The RMBS Trustees will come away with verified loan-level data and potentially many cured loans, which would be to the benefit of the certificateholders and may aid their defense of claims I have been told they are facing from certificateholders.  For its part, and as discussed above, Lehman will allow claims based on actual liability (not estimates and projections), and retain the ability to process downstream claims on behalf of the Estate.  The Protocol also provides for streamlined and cost-effective resolution of disputed claims without resorting to full-blown litigation, and thus provides a further benefit to both parties.

5

The individual steps of the Protocol are, in my experience, consistent with standard industry practices, and both the RMBS Trustees and Lehman should be able to complete them in a timely manner.  I have seen similar approaches implemented in other aspects of the mortgage industry.  For example, Fannie Mae and Freddie Mac, although dealing with a large volume of loans, maintain a loan-by-loan repurchase process that includes an appeals process and alternative remedies.  Moreover, the mortgage insurance companies approve or deny claims on a loan-by-loan basis by requesting and reviewing individual loan-level documents, and then participating in a back-and-forth dialogue with the owner and/or servicer of the loan.

B.    *Overview of the Protocol's Scalability*

At my direction, Recovco (a large mortgage loan due diligence and quality control company that provides solutions, valuations, quality control, due diligence, underwriting, fulfillment, and auditing services) has prepared a chart (below) that provides information concerning staffing and timing for underwriting processes.[4]  The chart was prepared to assist me in drawing conclusions about the time required to complete Lehman's proposed Protocol.

The chart contains two sections.  The first section shows the staffing required for a forensic review team to complete 2,000 forensic reviews per month.  An individual underwriter can perform approximately three forensic reviews per day, while a senior reviewer (who reviews the accuracy and logic of the work and positions taken by the underwriters) can review approximately nine forensic evaluations per day.  In addition to the 57 staff members necessary to complete 2,000 files per month, a forensic review team needs approximately four managers, six researchers and data handlers, and three support staff.

---

[4]    This chart is provided merely to represent scalability and is not meant to be an example as to what should be done in this case.

The first section of the chart also shows how capacity can be increased by adding additional teams to a review project. This scalability is achievable by the large re-underwriting firms in the market, including by combining with peer firms to achieve maximum review capacity.   Specifically, the chart shows that an underwriting firm like Recovco (which is not unique in the mortgage industry in terms of size or capacity) can assign up to three additional teams to the Lehman project (bringing the total number of teams working on the Lehman project to four).  With four assigned teams, Recovco can produce approximately 8,000 forensic reviews per month for the Lehman project.  Finally, the chart shows that, through resource sharing agreements with other forensic research firms, Recovco can engage seven teams on the Lehman project, which would produce approximately 14,000 forensic reviews per month.  Per Recovco, additional teams could be assigned to further increase capacity and shorten the timeframe required to complete the Protocol; such projections are not unique to Recovco, but rather should be common to all large re-underwriting firms in the market.

**Number and Composition of Teams Needed to Perform Forensic Reviews on 2000, 4000, 6000, 8000, 10,000, 12,000 and 14,000 Loan Files Per Month**

| | Recovco Exisiting Lehman Team | Reassignment of Second Recovco Team to Lehman Project | Reassignment of Third Recovco Team to Lehman Project | Development of Fourth Recovco Team for Lehman Project | Access to a Fifth Team Through Recovco's Capacity Sharing Agreements | Access to a Sixth Team Through Recovco's Capacity Sharing Agreements | Access to a Seventh Team Through Recovco's Capacity Sharing Agreements |
|---|---|---|---|---|---|---|---|
| Capacity in Loans per Month | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Managers | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Underwriters | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Senior Reviewers | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Forensic Researchers (data) | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Additional Support Staff | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Personnel for 2000 Loans/Month | 57 | 57 | 57 | 57 | 57 | 57 | 57 |

**Number of Months Needed to Perform Forensic Reviews on 150,000 Loan Files Showing Number of Teams and Required Personnel by Type of Staff Member**

| Forensic File Reviews Completed Each Month | # of Months Needed to Review 150,000 Files | # of Years Needed to Review 150,000 Files | Number of Teams Working on Files | Total Number of Personnel Working on Forensic Reviews | Number of Managers | Number of Underwriters | Number of Senior Reviewers | Number of Forensic Researchers (Data Handling) | Number of Additional Support Staff |
|---|---|---|---|---|---|---|---|---|---|
| 2,000 | 75.0 | 6.3 | 1 | 57 | 4 | 33 | 11 | 6 | 3 |
| 4,000 | 37.5 | 3.1 | 2 | 114 | 8 | 66 | 22 | 12 | 6 |
| 6,000 | 25.0 | 2.1 | 3 | 171 | 12 | 99 | 33 | 18 | 9 |
| 8,000 | 18.8 | 1.6 | 4 | 228 | 16 | 132 | 44 | 24 | 12 |
| 10,000 | 15.0 | 1.3 | 5 | 285 | 20 | 165 | 55 | 30 | 15 |
| 12,000 | 12.5 | 1.0 | 6 | 342 | 24 | 198 | 66 | 36 | 18 |
| 14,000 | 10.7 | 0.9 | 7 | 399 | 28 | 231 | 77 | 42 | 21 |

C.  *Timing and Cost of the Protocol*

Based on further analysis provided by Recovco, which aligns with my mortgage industry experience, Step 0 through Step 4 of the Protocol proposed by Lehman should take approximately one year to complete and cost approximately $110 million.[5]  While this cost may appear large, it is actually a relatively small cost figure when (i) divided by the 255 trusts containing the loans giving rise to the claims in this matter; and/or (ii) compared to the total unpaid principal balance of the loans.

This time and cost analysis reflects the fact that for a large-scale project such as this, our industry is more than able to provide the necessary number of reviewers, negotiators and facilitators to complete the Protocol in a timely and efficient manner.  Indeed, in the mortgage industry there are numerous vendors who provide due diligence and quality control services,

_____

[5]    Exhibit A to Declaration of Craig Pino.

such as NewOak Capital, FTI Consulting and Fortace, that could be hired for a project of this nature and scale.  Additionally, the time and cost analysis recognizes that efficiencies, such as those discussed below, would develop as the Protocol proceeds, and that such efficiencies would accelerate the review process.

      D.    *General Observations Concerning the Protocol and Dr. Parekh's Analysis of the Protocol*

          i.    *Dr. Parekh Disregards the Industry's Capacity for Large, Efficient Review Teams.*

Based on my mortgage industry experience, and Recovco's analysis, my opinion is that the 27-year timeframe proposed by the RMBS Trustees is grossly overstated and misleading. The number of reviewers, negotiators, and facilitators is scalable, and there is no reason to adopt Dr. Parekh's inadequate staffing assumptions.  For example, in his Declaration dated November 14, 2014, Dr. Parekh suggests that 40 reviewers be used in Step 1 for purposes of reviewing three loans per day.  In my opinion, this proposal reveals a lack of practical experience with large-scale mortgage loan review projects.  As mentioned previously, our industry has the capacity to devote far more robust resources to this project than Dr. Parekh assumes.  Specifically, as the Recovco analysis illustrates, a loan-level Protocol could be completed much more quickly by utilizing the efforts of a far greater number of industry professionals.[6]

          ii.    *Dr. Parekh Ignores Efficiencies Gained from Lessons Learned as the Protocol Proceeds.*

Further, as both sides move forward with the objection and negotiation processes in the Protocol, they will inevitably be able to apply lessons learned from other similar loans and streamline the process.  Practically speaking, this means that as the parties and the review teams

---

[6]    *Id.*

start to identify emerging patterns in the loan review process, the review will become faster and more efficient.

For example, in Dr. Parekh's November 14, 2014 Declaration, he suggests 34,585 to 45,738 of the loans will require review by a Claim Facilitator. Even if those numbers are accurate at the beginning of the project, based on information provided by Recovco,[7] the percentage of loans requiring review by a Claim Facilitator will likely decrease over time, which in turn will decrease the required timeframe to complete the Protocol. As Lehman has the opportunity to identify and relay the relevant facts for a loan, over time patterns will likely develop for similar loans and factual disputes will oftentimes be resolved concurrently for those similar loans.

As discussed in my footnote nine below, there are various ways the number of loans requiring a Claim Facilitator review can be decreased. These areas include, but are not limited to, the handling of missing documentation breaches where the document exists, undisclosed debt breaches where the additional debts are not those of the subject borrower, and undisclosed debts where the borrower still qualified for the subject loan per guidelines. These are three examples of types of breaches that can be resolved to both parties' satisfaction without involving a Claim Facilitator.

Dr. Parekh also suggests that 8,646 to 11,434 loans will require the Court's review. By utilizing the common sense approaches stated above, I believe the number of loans requiring judicial review will be much lower. As the parties go through the Protocol, disputes will center around categories of loans instead of on specific loans. For example, my opinion is that a compliance issue (such as where a loan file is missing either a HUD-1or a Final Truth-In-Lending statement) can be categorically addressed. This means that if there are 1,000 loans for

---

[7]        *Id.* at Step 4.

which this type of alleged compliance issue is present, resolving the overall dispute will provide

a resolution for the group of 1,000 loans.  Accounting for these types of efficiencies, it should be

the case that very few loans or dispute categories, if any, become the subject of the Court's

determination.    Dr. Parekh's findings, however, are based on the assumption that each separate

alleged breach will fully proceed to the Court review phase. In making this assumption, he does

not account for efficiencies in claim resolution that are very much a part of a loan-by-loan

review, leading to what I view as an error in his analysis.

> iii.    *Dr. Parekh Disregards the Fact that Lehman Must Only Respond to Specific Alleged Breaches.*

Since the Trustees will identify specific breaches, Lehman must only respond to those

specific breaches, and is not required to do a full re-underwriting review of every aspect of every

loan.  For example, if there are no alleged breaches related to the appraisal on a given loan, the

reviewer for Lehman would not need to spend any time analyzing that particular appraisal.  This

focused type of review takes less time than a full file review, and is yet another reason why the

Protocol steps can proceed expeditiously.  Dr. Parekh fails to recognize this practical aspect of

the Protocol.

## V.    THE MORTGAGE INDUSTRY RESOLVES CURE OR REPURCHASE CLAIMS ON A LOAN-BY-LOAN BASIS

A.    *Loan-by-Loan Claim Resolution*

As is the case in every mortgage loan sale agreement I have encountered, the entire

claims process is predicated on loan-by-loan discovery and notice.  For example, one Mortgage

Loan Sale and Assignment Agreement[8] reads in part, "Upon discovery by either the Seller or the

Depositor of a breach of any of the foregoing representations and warranties…that adversely and

---

[8]    MLSAA for LXS 2007-6 at page 15, Section 1.04 (d).

materially affects the value *of the related Mortgage Loan*…" (emphasis added).  In my experience, this contractual language reflects an industry-wide practice that the cure or repurchase remedy is to be applied on a loan-by-loan basis, as it refers to "the related Mortgage Loan," not the entire pool.

Generally, upon the presentation of an alleged breach of a representation and warranty, a number of things may result.  First, the seller may disagree with and rebut the claim.  A written rebuttal is typically made within 30-90 days, and in my experience, is always done at the loan level.  Many rebuttals successfully convince the claimant its claim was made in error and the matter is then dropped.  For example, a seller may rebut a purchaser's weak claim using information the purchaser failed to consider in making the claim.[9]

For undisputed breaches, there are three specified remedies in these Governing Agreements:[10]

(1)    The seller can cure the breach, which would be done by correcting documentation errors, locating missing documents, etc.

(2)    The seller can repurchase the loan in accordance with the Purchase Price calculations laid out in the Governing Agreements.

(3)    The seller may substitute the affected loan with a different loan, but only in the first two years after securitization.

---

[9]    For example, it appears that over 2,000 of the RMBS Trustees' breaches pertain to missing documentation. Based on my experience, it is likely that a large percentage of those breaches will be cured so long as the documents exist and are available for review.  Also, there are many undisclosed debt breaches and oftentimes the additional debts are not those of the subject borrower, or, even if they were, the borrower would have qualified per guidelines with the debts included.  This means that such alleged breaches are not actually breaches under the Governing Agreements.

[10]    These remedies are set out, for example, in the Trust Agreement and Mortgage Loan Sale and Assignment Agreement for SASCO 2005-1 and LXS 2007-6.

Based on my experience, the inquiry process takes place on a loan-by-loan basis, precisely because of the above list of remedies.

Practicalities also support the fact that the cure or repurchase remedy is applied on a loan-by-loan basis. The obligation to cure must necessarily be performed on a given loan, not a group of loans. Further, in the event of repurchase, the required remedy is the defined term "Purchase Price," which is an equation usually consisting of loan-level inputs including unpaid principal balance, accrued interest, and certain servicing advances.[11] Because this equation requires loan-level inputs, it can only be applied at the loan level, and not in an aggregate or through estimation (as the RMBS Trustees propose).

To be clear, I do believe that sampling can be used in secondary market transactions. Parties to mortgage loan transactions are generally free to decide both how many loans to review and the degree to which such loans should be reviewed in connection with their trades. For example, SMLT performs 100% due diligence because we think it better protects our interests in the loans, but I am aware that some mortgage loan transactions may include review of fewer than 100% of the loans. My opinion is not that sampling is *never* useful or appropriate[12], but that it is not industry standard or practice in connection with cure or repurchase claims because it does not provide the loan-level information needed to accurately effectuate the cure or repurchase remedy.

B.    *Loan-Level Detail Is Required to Substantiate a Claim*

In my opinion there are a clear set of steps that should be undertaken in the event of the discovery of a breach. Those steps are industry standard and practice and reflect the Governing Agreements themselves. First, "the party discovering such breach shall give prompt written

---

[11]    *Supra* n.2.

[12]    It is my experience that sampling is common in pre-purchase due diligence.

13

notice to the other party."[13]  In my experience, that written notice would be in the form of a

repurchase demand letter, which would either reference a single loan or include a schedule of

loans with a detailed description of the type of breach alleged on each loan.  The repurchase

demand letter would also identify which specific representation in the mortgage loan sale

agreement was breached and provide loan-level facts supporting the claim.  I do not recall ever

having seen a repurchase demand that did not include such loan-level detail.  Attached as Exhibit

C is a sample repurchase demand letter I issued when a loan represented to have mortgage

insurance in fact did not.

        Each alleged breach would also have to have a material and adverse effect on the value of

the loan.  This element must be established at the loan level because factors other than a breach

of a representation and warranty may be the underlying reason for a diminished value on a loan.

        Many macroeconomic factors can be the root cause of diminished values including:

        (1)      significant changes in housing prices;

        (2)      increasing unemployment rates

        (3)      collapse of liquidity in the capital markets; and/or

        (4)      unexpected default rates in the mortgage market.

If it was not the alleged breach, but rather one of these types of factors (which are only

examples) that caused the loan to lose value, then there is no claim to be made against the seller.

        Additionally, in my experience, defaults that occur years after origination are unlikely to

have been caused by breaches of representations and warranties by the seller.  Instead, they are

often caused by microeconomic life events, including loss of income due to illness, job loss,

reduction in working hours, bonus reduction, divorce, or death of one's spouse.  Mortgage loan

servicers, as a matter of course, attempt to ascertain a reason for default (also known as the

---

[13]        MLSAA for LSX 2007-6 at page 6, Section 1.04 (d).

"RFD") and record that RFD in the servicing notes for each individual delinquent loan. They do this because the RFD can be an important element in the potential recovery of losses. This is yet another reason why the cure or repurchase analysis must be performed at the loan level.

C.    *The Governing Agreements Reflect Lehman's Bargained For Ability to Protect Its Downstream Indemnification Rights.*

In my experience and from a business perspective, not applying a loan-level inquiry for claim reconciliation would ignore the allocation of responsibilities among the securitization parties and run contrary to mortgage industry standards and practices, as reflected in the Governing Agreements, requiring notice to Lehman of specific alleged breaches, loan-level evidence to substantiate those claims, and loan-level remedies.

Based on Lehman's submissions to the Court, I understand that Lehman seeks to preserve its indemnification rights against the originators who sold loans containing alleged breaches of representations and warranties to Lehman. In my experience, downstream indemnification is enforced on a loan-level basis because the representations are made at the loan level, and the remedies are to be performed and calculated on each loan individually.

Specifically, a detailed loan-level repurchase demand from the RMBS Trustees is required for Lehman to work through the next level of the claims process with the originators who sold the loan to Lehman. Lehman must be able to show the basis for the breach and the amount of Lehman's liability on a per loan basis in order to recover from the correct corresponding counterparty for that specific loan. From a business perspective, the failure of the RMBS Trustees to provide loan-by-loan proof to Lehman may, in turn, impede Lehman's ability to seek indemnity from originators. My understanding is that the downstream claim process is already underway for loan-level claims Lehman settled with the Government Sponsored Enterprises.

The claims process in the mortgage industry is fairly standard and in my 30 years of experience with these types of agreements, I have not seen much variation. Specifically, it is a contractual agreement that is heavily negotiated and relied upon, and if either party believed at the onset of the transaction that its provisions were not enforceable or performable, it is questionable whether the loan sale would have taken place.

In the regular course of my business at SMLT, I have been presented with repurchase demands from companies buying loans from my company. Since SMLT does not originate mortgage loans, we take these claims back to the party who sold the loans to SMLT. In some cases, we have been able to obtain a simple cure by correction, and in others, we have found a creative solution to cure the breach. For example, in one case we had the originator pay down the principal balance to a level that made the breach of not having mortgage insurance irrelevant. There have also been times when no cure was available, and a loan had to be first repurchased by SMLT, and then repurchased from us by the original seller. These are just a few illustrative examples from my own experience that demonstrate the reliance that parties in my industry place on the downstream indemnification process when that process has been bargained for in the applicable underlying agreements.

Executed this 3rd day of December, 2014.

_William Alread_
William Alread

16

# Exhibit A

**William Alread Resume**

William Alread has over thirty years of experience in the secondary mortgage market. Mr. Alread is the co-founder and co-owner of Steel Mountain Loan Trading, which recently merged with Phoenix Collateral Advisors. He is currently the head of the Operations/Contract Finance Department and is engaged in all aspects of the operations of the company. He is responsible for all contract matters, consulting engagements, and the administration of warehouse lines and sub-servicing relationships. Mr. Alread supervises the due-diligence, servicing management and accounting departments. Mr. Alread manages the preparation and negotiation of all contracts and closing documents for purchases and sales. He advises the trading area on bid parameters and bid stipulations and implements portfolio level risk mitigation. Mr. Alread assesses risk factors including borrower credit, regulatory compliance and property values of loan pools prior to final pricing and purchase. He conducts the identification, management and settlement of alleged contract breaches and repurchase demands. Mr. Alread is solely responsible for relationship management and oversight of all third party servicing vendors. He is responsible for all portfolio oversight, management and loss mitigation strategies and execution.

In Mr. Alread's early career, he was focused on due diligence and transaction management within a broad range of asset classes during the Resolution Trust Corporation (RTC) liquidation. He spent seven years with the First Tennessee bond division where he was the senior executive of the due diligence and contract finance areas. At First Tennessee, Mr. Alread managed the relationships with both Fannie Mae and Freddie Mac. During the prior eight years before founding Steel Mountain Loan Trading, Mr. Alread served as Senior Vice President at a private loan acquisition firm and a large national bank in Denver, Colorado.

**PRIOR MORTGAGE INDUSTRY EXPERIENCE**

· Security National Servicing Corporation (2000-2005) Senior Vice President, Operations
· Matrix Capital Bank (1998-2000) Senior Vice President, Operations
· First Tennessee Capital Assets Corp, a Division of First Tennessee Bank  (1991-1998) Vice President, Operations
· First Mortgage Strategies Group, Inc. (1985-1991) Assistant Vice President, Project Manager

**EDUCATION**

Bachelor of Science Degree – Business Administration
University of Arkansas, Fayetteville, Arkansas
Major:  Finance and Banking - Minor:  Economics

CURRENT/PRIOR LITIGATION SUPPORT CASES

Mr. Alread has opined in rebuttal to topics including underwriting of residential mortgage loans and their conformity to the requirements of the relevant agreements between the parties. He has also opined on market standards applicable at the time of origination of the loans, the effect of underwriting, seasoning and market conditions on loan values, as well as industry practices relating to the purchase and sale of residential loans.

**SMLT was retained by Goodwin Procter LLP on behalf of Nomura Asset Acceptance Corp.**

· PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, vs. NOMURA ASSET ACCEPTANCE CORPORATION, et al., Civil Action No. 08-10446-RGS In the United States District Court for the District of Massachusetts

**SMLT was retained by Fulbright & Jaworski LLP on behalf of Lehman Brothers Holding.**

· LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation v. SECURITYNATIONAL MORTGAGE COMPANY, 11 a Utah corporation, Civil Action No. 2:11-cv-00519-TS, In The United States District Court, District of Utah, Central Division

**SMLT was retained by Featherstone Petrie DeSisto LLP on behalf of CitiMortgage Inc.**

· CITIMORTGAGE, INC., a New York corporation, v. AMERICAN TITLE SERVICES COMPANY, a Colorado corporation, Civil Action No. 11-cv-02040-CMA-BNB, In The United States District Court For the District of Colorado

**SMLT was retained by Featherstone Petrie DeSisto LLP on behalf of CitiMortgage, Inc.**

· CITIMORTGAGE, INC., a New York corporation v. AMERICAN MORTGAGE NETWORK, INC., n/k/a Wells Fargo Home Mortgage, a division of Wells Fargo Bank, National Association, Civil Action No. 1:09-CV-02064-JLK-CBS in the United States District Court for the District of Colorado

**SMLT was retained by Reilly Pozner LLP on behalf of Lehman Brothers Holding.**

· LEHMAN BROTHERS HOLDINGS, INC. v. PRIMELENDING, A PLAINSCAPITAL COMPANY, Civil Action No. 09-CV-00212 PAB-KLM in the United States District Court for the District of Colorado

**SMLT was retained by FTI Consulting and Gunster, Yoakley & Stewart, P.A. on behalf of Countrywide.**

· GREAT FLORIDA BANK v. COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE SECURITIES CORP., AND BAC HOME LOANS SERVICING, LP, Civil Action No. 10-CV-22124 in the United States District Court Southern District of Florida

**<u>Exhibit B</u>**

## Information Reviewed In This Case

1. Mortgage Loan Sale and Assignment Agreement – dated January 1, 2005; Structured Asset Securities Corporation, Series 2005-1

2. Trust Agreement – dated January 1, 2005; Structured Asset Securities Corporation, Series 2005-1

3. Mortgage Loan Sale and Assignment Agreement – dated April 1, 2007; Lehman XS Trust, Series 2007-6

4. Trust Agreement – dated June 1, 2007; Structured Asset Securities Corporation, Series 2007-3

5. Exhibit C from Objection To Increase – Proposed RMBS Protocol

6. Declaration of Charles A. Parekh, PH.D. – dated November 14, 2014

7. Declaration of Charles A. Parekh, PH.D. – dated August 21, 2014

8. RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code (dated August 22, 2014)

9. Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code, and (B) Cross-motion to establish a protocol to resolve claims filed by RMBS Trustees (dated October 15, 2014)

10. The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review (dated October 15, 2014)

11. Trust Agreement – dated April 1, 2007; Lehman XS Trust, Series 2007-6

12. Declaration of James H. Aronoff – dated August 21, 2014

13. Recovco Report dated December 3, 2014 with accompanying exhibits

14. Recovco and Digital Risk websites

# **Exhibit C**

# STEEL MOUNTAIN CAPITAL MANAGEMENT LLC

**VIA OVERNIGHT DELIVERY**

July 11, 20█

Mr. ████████
████████████

RE:    ████ Loan # 210███████
Breach: Invalid Private Mortgage Insurance

Notification of Breach of Representations, Warranties and Covenants pursuant to the terms of the Agreement for the Purchase and Sale of Mortgage Loans dated ███████ ████ (the "Agreement") by and between Steel Mountain Capital II, LLC ("Purchaser") and ████████ Mortgage LLC ("Seller").

Dear Mr. ████,

This letter will serve as notification that a breach of Section 3.02 (i) under the Agreement has been discovered by Purchaser with regard to the loan referenced above.

This loan was disclosed as having Private Mortgage Insurance ("PMI"). The Mortgage Loan Schedule identifies this loan as having PMI. Please see the attached letter from Radian rescinding the PMI.

Purchaser hereby demands repurchase of the above referenced loan under the terms of the Agreement.

Please contact me concerning the repurchase date, the repurchase amount, returning the collateral file and the servicing transfer.  I can be reached at ████████.

Sincerely,


William Alread
Managing Partner


3190 S. Wadsworth Blvd Suite 150, Lakewood, CO. 80227