**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Lehman Brothers Holdings Inc., et al.,<br><br>Debtors. | Case No. 1:08-bk-13555 (SCC) |

**Declaration of Craig Pino**

**December 3, 2014**

**I.      QUALIFICATIONS**

I am the President of Recovco Mortgage Management and am responsible for the management of the operations of mortgage underwriting, forensic loan file review, quality control, and appraisal review. I have over twenty-three years of experience in management of mortgage companies including operational and financial management. My experience includes building and managing teams of forensic underwriters in support of forensic mortgage reviews. My resume is attached as Appendix A.

**II.     ASSIGNMENT**

I have been asked by Willkie Farr & Gallagher LLP, counsel for Lehman Brothers Holdings, Inc. ("LBHI" or the "Plan Administrator"), to express my opinions regarding the timing and cost of the protocol proposed by LBHI in its October 15, 2014 cross-motion ("Protocol").

In preparing this declaration I have reviewed information from a number of sources as detailed in Appendix B. In addition, I have applied my knowledge and expertise gained through my twenty-three years in the mortgage industry. In this time, I have overseen 10 forensic mortgage reviews with an aggregate outstanding principal balance of at least $1 billion; 5 of those 10 reviews have had an aggregate outstanding principal balance of at least $5 billion. My work in this matter is ongoing, and I reserve the right to supplement this declaration as new information becomes available or if asked by counsel to consider additional issues.

For my work in this matter, I am being compensated at my standard consulting rate of $300 per hour. My compensation is in no way contingent or based upon the content of my opinions or the outcome of this matter.

**III.    SUMMARY OF OPINIONS**

Steps 0 through 4 of the Protocol (described below) should take approximately one year in the aggregate and cost approximately $110 million in the aggregate,[1] which is inclusive of $70 million in costs to the RMBS Trustees and $40 million in costs to LBHI. These cost projections include the cost of both the RMBS Trustees and LBHI's review and reconciliation of the claims, from the beginning of the claim file review process in Step 0 through completion of the reconciliation process before a group of Claim Facilitators in Step 4. These costs do not include attorneys fees incurred in supervising the aforementioned review, if needed, or any costs that may be incurred in Step 5 of the Protocol, which requires resolution of a small number of remaining loan files following the conclusion of Step 4. These time and cost figures are consistent with the resources available in our industry for loan review and claim reconciliation, and would not overburden, tax or require diversion of unreasonable human capital from our industry. These figures are both reasonable for the size of the project and consistent with the size, timing and costs I have observed in prior forensic mortgage reviews.

---

[1] I have not projected the time and cost of Step 5, which is the resolution of remaining loan files and may require determination by the Court. However, based on my projections for each of Steps 0 through 4, it is my opinion, as detailed in Part IV(G) below, that a total of 50 to 70 loan files would remain after Step 4.

**IV.     SUMMARY OF THE PROPOSED PROTOCOL**

The Protocol consists of a series of steps that provide for the review and reconciliation of claims related to the mortgage loans underlying the dispute between LBHI and the RMBS Trustees.[2]  Exhibit A to this declaration is a quantitative analysis of each step, which this declaration describes in detail.  The numbers projected in Exhibit A have been chosen based on one reasonable set of assumptions with respect to the number of reviewers that both the RMBS Trustees and the Plan Administrator could employ to carry out their respective reviews.  Considering the volume of review firms in our industry, and as demonstrated in Exhibit B to this declaration, more reviewers could be employed, with the effect of reducing the time that Steps 1 and 2 take to complete.  As Exhibit B reveals, the number of reviewers is directly determinative of how long the Protocol would take to implement.

In summary, the steps comprise the following process:

Step 0:  Sets out a rolling time frame pursuant to which the RMBS Trustees gather loan files before turning them over for claim reconciliation to the Plan Administrator.

Step 1:  Sets out the number of RMBS Trustees reviewers and the time that these reviewers would take to review and turn over to the Plan Administrator the loan files for which they contend that LBHI has liability.

Step 2:  Sets out the number of Plan Administrator reviewers and the time that these reviewers would take to review the loan files with potential claims which the RMBS Trustees turned over in Steps 0 and 1.

Step 3:  Estimates the percentage of claim files over which disputes are expected, sets out the number of Claim Negotiators needed to review disputed files and sets out the amount of time that such negotiations between the RMBS Trustees and the Plan Administrator would take.

Step 4:  Sets out a claims facilitation process for the claim files that remain in dispute between the RMBS Trustees and the Plan Administrator following the conclusion of Step 3.

Step 5:  Will require the resolution of a small number of remaining claims following the conclusion of Step 4.

**V.     STEP-BY-STEP ANALYSIS OF THE PROTOCOL**

A.   Step 0:

Step 0 of the Protocol involves the receipt of loan files by the RMBS Trustees from the primary servicers.  It presumes that the RMBS Trustees will have approximately 50,000

---

[2]  I have adopted the same step numbers used by Dr. Charles Parekh (in the RMBS Trustees' November 14, 2014 submission) for each phase of the Protocol.

-2-

files to review on day one of the Protocol, and that the RMBS Trustees will receive rolling deliveries of the remaining loan files within 5 months of the Protocol's implementation.[3]

B. Step 1:

This step, which occurs concurrently with Step 0, projects the number of RMBS Trustee reviewers that could review the remaining loan files at issue and the time it would take these reviewers to complete their review. Assuming the RMBS Trustees used 465 underwriters,[4] of which 90%, or 419 are working each business day, and that each underwriter is able to complete 3 loan reviews each day worked, it would take about six months for the RMBS Trustees to complete the review of the remaining 157,218 loans.[5] It is assumed the RMBS Trustees will present claims on 57% of the reviewed loans.[6]

C. Step 2:

This step projects the number of Plan Administrator reviewers that could review the files that the RMBS Trustees submit to the Plan Administrator with alleged claims and the time it would take these reviewers to complete their review. Assuming that the RMBS Trustees will present claims on 57% of the loans reviewed, a total of 92,226 loans will be presented. Assuming the Plan Administrator employs 272 underwriters, of which approximately 90%, or 245 are working each business day,[7] and that each underwriter is able to complete 3 loan reviews

---

[3] I understand from LBHI that LBHI's affiliate Aurora Loan Services has approximately 50,000 loan files of the 157,218 outstanding loans available for the RMBS Trustees' immediate review. I also understand that Aurora's collection of these 50,000 files began around November 10, 2014. On this time frame, it is reasonable to assume that the other primary servicers could gather and turn over their respective loan files within 5 months from implementation of the Protocol.

[4] I have projected this number of reviewers (also assumed in Exhibit A, Step 0) based on my experience, the number of reviewers that would be needed for a project of this size and information provided on Digital Risk's website, such as Digital Risk's statement that in 2013 (the latest information available) Digital Risk employed 1,956 persons and has completed over $1.7 trillion of due diligence quality control reviews (assuming an average loan size of $200,000). Additionally, Digital Risk could enter into arrangements with other forensic review firms to expand its capacity, if necessary. There are thousands of underwriters who have experience performing forensic reviews and who work for more than a dozen vendors in the mortgage industry that are engaged in the business of performing forensic reviews. These firms include, in addition to Digital Risk and Recovco, Opus Capital Markets, Quatrro, Barrent Group, Clayton, Core Logic and JCIII; each of these firms has significant experience performing forensic reviews. The review encompassed by the Protocol will not burden the mortgage industry.

[5] I assume that because Digital Risk has already reviewed the RMBS Trustees' sample loan population of 4,579 loans, these would not have to be re-reviewed in Step 1 of the Protocol.

[6] I have conservatively applied the RMBS Trustees' suggested breach rate in making our calculations. For the avoidance of doubt, I have not been asked to opine on the accuracy of the RMBS Trustees' breach rate or to offer an alternative breach rate.

[7] Because the Plan Administrator has fewer loans to review than the RMBS Trustees (the Plan Administrator would only review 57% of the set of loans, in accordance with the RMBS Trustees' projected breach rate), I have assumed a smaller number of reviewers for the Plan Administrator's review in Step 2, which remains consistent with being able to review the claim files at issue in an efficient, expeditious manner.

-3-

for each day worked, it would take about six months for the Plan Administrator to complete the review of the 92,226 presented claims. These reviews would be performed on a rolling basis so that as the RMBS Trustees' underwriters complete and present claims, the Plan Administrator can immediately review such claims to determine if they should be accepted or denied.

With these figures in mind, the approximate amount of time needed for the large majority of loans (97.5%)[8] to be worked from Step 0 through Step 2 (from receipt and review of the loan files by the RMBS Trustees through receipt and review of the loan files by the Plan Administrator) should be seven months. This time frame allows time for files to be forwarded from servicers to the RMBS Trustees, and then from the RMBS Trustees to the Plan Administrator, all on a rolling basis as work is concurrently performed. Only a small number of loans – those that servicers did not deliver timely to the RMBS Trustees (approximately 2.5% based on our prior projects) – would not be have been worked through Steps 0, 1 and 2 after seven months.

Assuming the Plan Administrator agrees with 50% of the claims presented by the RMBS Trustees, the Plan Administrator would deny 46,113 claims.[9] Of the 46,113 claims denied by the Plan Administrator, an estimated 50% of the denials or 23,057 claims denials would be for incontestable reasons, and consequently not subject to further adjudication.[10] For example, for document defect claims (where loan file documents such as a HUD 1 Settlement Statement are allegedly missing or where an appraisal is allegedly missing), it is my view based on prior experience, that the Plan Administrator will be able to locate many of the documents asserted missing. Location of such missing documents by the Plan Administrator would resolve such missing document claims in an incontestable manner, thereby making further adjudication unnecessary.

While locating allegedly missing documents should be a significant source of incontestable Plan Administrator denials, there are other examples of incontestable denials. For instance, I expect that some claims of allegedly undisclosed liabilities will be found by the Plan Administrator as a result of name confusion. An example of this would be where a mortgage asserted by the RMBS Trustees to have an undisclosed debt of a borrower is discovered to instead be the longstanding loan on the home of the borrower's father, which would not give rise to a claim on the loan.

It is an improper inflating of the effort needed to resolve the RMBS Trustees' claims to not consider that a large number of claims will be denied by the Plan Administrator for an incontestable reason, and consequently will no longer be at controversy. Based on prior experience and review of Attachment V to Dr. Charles Parekh's August 21, 2014 declaration, it

---

[8] Based on my experience, all loan files will not be provided to the RMBS Trustees for their review by the primary servicers; as a result, I project that in this case, this production turnover failure will represent approximately 2.5% of the outstanding loan population.

[9] I have conservatively applied the RMBS Trustees' 50% dispute rate in this calculation.

[10] A 50% denial rate for incontestable reasons is both consistent with my prior experience and reasonable based upon my review of the types of breaches presented in Digital Risk's review of the 2,600 loan sample.

-4-

is estimated that 50% of the claims denied by the Plan Administrator will be denied for an incontestable reason (such as required loan documentation asserted to be missing, in actuality being located). These claims, for the reasons stated above, will not require further adjudication. Given 50% of claims denied by the Plan Administrator will be for incontestable reasons,[11] the number of claims needing further adjudication will be 23,057 (not the 46,112 estimated by Dr. Parekh).

    D.    <u>Step 3</u>:

This step of the Protocol involves negotiations between the RMBS Trustees and the Plan Administrator with regard to disputed claim files. In light of the projection that an estimated 50% of the claims denied by the Plan Administrator will be denied for incontestable reasons, negotiations through a Claim Negotiator would apply to 23,056 loan files. I believe that negotiation on the 23,05 loans will not, in a high number of cases, require negotiations on the loan-level. The reason for this is that the RMBS Trustees' claims on many these loans will be decided based on a standard handling method.

For example, where the RMBS Trustees are making claims based on insufficient title insurance, these claims are the same in every instance where there is not also a title defect. As a result, because the claims are very similar or even the same across every loan, a recovery decision can be made for the category as a whole and then applied consistently to all claims that contain insufficient title insurance. While there may be some exceptions and outliers, I believe that consistent rules and applications can be developed for the review.

This means that resolution of these claims can occur without determination by a Claims Facilitator or the Court. Assuming that the RMBS Trustees employ 8 Claim Negotiators, each negotiating 25 loans per day, it would take an estimated five to six months to complete negotiations of denied claims. It is assumed, based on prior experience, that negotiations will resolve 25% of the unresolved claims, requiring further adjudication by a Claim Facilitator on 17,292 loans.

    E.    <u>Step 4</u>:

Step 4 of the Protocol involves the submission of remaining unresolved claims between the RMBS Trustees and the Plan Administrator to a Claim Facilitator. With respect to adjudication of the remaining 17,292 disputed loans, this set, too, will not, in a high number of cases, require dedicated hearings or "mini trials." The reason is that the RMBS Trustees' claims regarding many claim decisions in this step will also be decided, as in Step 3 above, based on a standard handling method.

For example, many of the RMBS Trustees' claims repeat from loan to loan. Based on my experience with claim reconciliation between adverse parties, it is estimated that 60% of the claims that either (i) are not accepted by the Plan Administrator, or (ii) are denied by

---

[11] Based on prior experience, an estimated 25% of claims are factually wrong or cured through procurement of necessary documentation.

-5-

the Plan Administrator for an incontestable reason will be controlled by the Claims Facilitator's previous determinations.

Altogether, it is estimated that the 17,292 disputed loans in Step 4 will proceed as follows: (i) 40% of the loans, or 6,917 will be adjudicated by the Claims Facilitator, while (ii) the outcome of the remaining 60% or 10,375 loans will be resolved through the standard handling method. Assuming the Claims Facilitator has ten facilitators assigned to the case, and assuming each facilitator can adjudicate four loans per day, the Claims Facilitator will resolve the 6,917 loans in an approximate range of eight to nine months.[12]

Additionally, the Claims Facilitator would assign 10 assistant facilitators to ensure that the standard handling method was correctly applied to all loans where the RMBS Trustees made the same claim on multiple loans. Assuming these assistant facilitators could each resolve 15 loans per day, it is estimated that the 10 assistant facilitators will resolve the 10,375 loans in an approximate range of three to four months, which would run concurrently with the Claims Facilitator's eight to ninth month review period stated above.

F.  Timing Summary for Steps 0 – 4:

In total, Steps 0-2 will take an aggregate of approximately seven months, and Steps 3-4 will take an aggregate of approximately nine to ten months. Accounting for the overlap of these steps, Steps 0-4 will take approximately one year to complete.[13]

G.  Step 5:

Step 5 requires resolution of the remaining disputed claim files. The great majority of loan claims asserted by the RMBS Trustees will be determined by:

(i)  the Plan Administrator accepting the RMBS Trustees' position;
(ii)  the Plan Administrator finding an incontestable reason why the Trustees' claims should be denied;
(iii)  the Claim Facilitator consistently applying the law of the case; or
(iv)  the Claim Facilitator using sufficient resources to timely resolve the balance of loans requiring adjudication.

As a result, only a small number of loans – approximately 50 to 70 – will not be resolved by the conclusion of the Protocol and proceed to Step 5.

---

[12]  As discussed above, these projections of the number of Claim Facilitators working and the number of days worked (which are the same as projected in Steps 1 and 2) are based on my experience and my related projections of what would be a reasonable number of facilitators for a project of this size.

[13]  For this quantitative analysis, see the section entitled "Total Labor Years to Satisfy Protocol Steps 0-4" of Exhibit A.

VI.     **CONCLUSION**

        Steps 0 through 4 of the Protocol should take approximately 1 year in the aggregate and cost approximately $110 million. These figures are consistent with the resources available in our industry, on a step by step basis. In my experience, these figures are both reasonable for the size of the project and consistent with the size, timing and costs of prior forensic mortgage reviews that I have overseen.

Executed this  3  day of December, 2014.

_____
Craig Pino

# **Appendix A**

**Craig S. Pino**
2313 Ranch House Drive
Southlake, TX 76092
(631) 697-2977

---

| Mortgage Finance | Capital Markets | Treasury Operations |

---

Highly skilled Executive with over 23 years of experience in the mortgage finance industry. **Significant experience organizing and managing forensic underwriting review projects, assisting clients with RMBS litigation including assisting in developing scope and assembling teams, and managing loan review process.** Results –oriented leader with proven success in fast-paced fluid environments and a **track record of producing direct positive impact on bottom-line profitability**.

---

**Professional Experience**

*Recovco Mortgage Management, LLC*
*President*                                                                                          *2010-Present*

*Key Achievements*
- Built operational platform including three scalable operations centers
- Manage large-scale underwriting and loan file review engagements for major clients
- Assisting clients in developing loan review strategies around repurchase and litigation
- Develop and execute business strategy for underwriting and quality control reviews
- Use existing and new business contacts to enhance company performance and expand operations

*American Home Mortgage Servicing, Inc.*                                      *2008 – 2010*
*Executive Vice President and Treasurer*

*Key Achievements:*
- Established Treasury/Finance department staffing, systems, policies, and reporting
- Developed liquidity and capital allocation budgets
- Managed Cashiering and Investor Accounting functions
- Increased Banking/Investment Banking relationships to the company
- Increasing financing facilities by over $2 billion dollars

- Lead company's efforts to lobby federal government to include servicing advances in TALF program, leading to significantly more liquidity at lower cost
- Lowered bank fees and increased float earnings to account for over $2 million pre-tax earnings per annum

*American Home Mortgage Investment Corp.*                                                    *2004 – 2008*
*Executive Vice President and Treasurer*

Served as Executive Vice President and Treasurer of $20 billion NYSE-traded mortgage REIT with $60+ billion of mortgage originations and $50 billion of mortgage servicing rights. Responsible for financing $12 billion mortgage loan warehouse and $600 million mortgage servicing rights investment, investing $1.2 billion of custodial deposits, Accessed sub-debt, trust preferred, residual, and working capital financing markets. Managed banking and investment banking relationships, and oversaw a staff of approximately 45 employees.

*Key Achievements:*
- Increasing financing facilities by over $12 billion dollars in three years
- Lowered borrowing spreads by over 60 basis points through innovative funding products
- Established ALCO committee and liquidity committee
- Worked with Bank Regulators on acquisition of bank
- Reducing bank fees by over 45% per year
- Improving Treasury funding process to allow for 3 times more funding cycles per day

*Countrywide Home Loans, Inc*                                                                 *1996 – 2004*
*Executive Vice President and Assistant Treasurer*

Responsible for Treasury Funding, Cash Management, and Projects for the largest independent mortgage company and a recognized industry leader in the mortgage finance business with over $100 billion in assets. Managed the funding of $15 billion of secured and unsecured commercial paper, $10+ billion of US and Euro Medium Term Notes, $5 billion of conduit financing, $5+ billion of short-term investments, bank relationship, daily cash management, and special projects.

*Key Achievements*:
- Developed liquidity and capital planning group
- Structured over $10 billion of secured financing facilities
- Responsible for implementation of FAS 133 for liability hedging
- Executed roughly $10 billion of medium term notes and related derivatives hedges
- Developed FAS133 tracking system for liability hedges

*North American Mortgage Company*                                                              *1995 –1996*
*Treasury Manager*

- 3 -

| | |
|---|---|
| *Arbor National Mortgage*<br>*Treasury Director* | *1994 – 1995* |
| *Margaretten and Company, Inc*<br>*Cash Manager* | *1991 –1994* |
| *Home Life Insurance Company*<br>*Senior Cash Management Analyst* | *1987 – 1991* |

## Education

| | |
|---|---|
| *Rutgers University*<br>*Major: Economics* | *1984 – 1987* |
| *California State at Channel Islands*<br>*Major: Accounting/Business Administration* | *2001- 2003* |

## Military Training

| | |
|---|---|
| *US Army Infantry Officer Basic Course* | *1990* |

# **Appendix B**

**Items Reviewed in Preparation of Report**

1. RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code (including the expert declarations and exhibits)

2. Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code, and (B) Cross-motion to establish a protocol to resolve claims filed by RMBS Trustees (including Exhibit C – the proposed Protocol).

3. The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review (including the expert report and exhibits)

4. Digital Risk's website.

# **Exhibit A**

**Loan Files Within 255 Trusts at Issue**

| | |
|---|---:|
| Number of Covered Loans | 416,091 |
| Number of Covered Loans with Loss/Expected Loss | 161,797 |

**Trustees Review to Date and Remaining Loans for Review**

| | |
|---|---:|
| Loans Requested-to-Date | 5,000 |
| Loans Received and Reviewed | 4,579 |
| Number of Loans for Review | 157,218 |

**Step 0: Receive Loans from Servicers**

| | |
|---|---:|
| Years to Receive Loans from Servicer | 0.5 |

50,000 loans available on Day one of Review, Balance received on Rolling Basis Between 60 and 180 days

**Step 1: RMBS Trustees Review of Remaining Loans**

| | |
|---|---:|
| Years to Review Remaining Loans | 0.50 |
| Cost to Review Remaining Loans | $ 62,887,200 |

- 419 Reviewers
- 3 Loans per Day (Each)
- 251 Days per Year
- $400 Cost per Loan (Based on Range Estimate of $375-$425 per Loan)

**Step 2: Plan Administrator Review of Repurchase Requests**

| | |
|---|---:|
| Number of Requests from Initial Sample | 2,612 |
| Number of Additional Requests Submitted | 89,614 |
| Total Number of Loans Requested for Repurchase | 92,226 |
| Years for Plan Administrator to Review Requests | 0.50 |
| Cost to Review Requests | $ 32,279,100 |
| Plan Administrator Agrees to Repurchase | 46,113 |
| Plan Administrator Declines to Repurchase | 46,113 |
| Claims Denied for Incontestable Reasons | 23,057 |
| Claims Requiring Negotiation | 23,057 |

- Reflectes 57% of Parekh Assumed Breach Rate
- 245 Reviewers (Because Lehman's Review Populations Smaller than Trustees, Fewer number of Reviewers Required to Complete Review in Timeframe Similar to Trustee)
- 3 Loans per Day (Each)
- 251 Days per Year
- $350 Cost per Loan (Based on Range Estimate of $325 - $375 for Industry Pricing of Rebuttal Review)
- 50% Agreed to Repurchase
- 50% Disagreed to Repurchase
- 50% Claims Denied for Incontestable Reasons
- 50% Claims Requiring Negotiation

**Step 3: Parties Negotiate Declined Repurchase Requests**

| | |
|---|---:|
| Years to Negotiate Declined Repurchase Requests | 0.46 |
| Negotiation Results in Resolution | 5,764 |
| Cost to Negotiate Repurchase Requests | $ 4,426,848 |

- 8 Negotiators (2 per Trustee)
- 25 Loans Negotiated per Day
- 251 Days per Year
- 25% Percentage Resolved
- $600 Hourly Rate of Negotiation (We have Assumed the Estimated Rate used by Parekh)

**Step 4: Claims Facilitator Reviews Unresolved Repurchase Claims**

| | |
|---|---:|
| Loans Sent to Claims Facilitators | 17,292 |
| Loans Reviewed by Claims Facilitators | 6,917 |
| Loans Reviewed by Assistants Claims Facilitators | 10,375 |
| Years for Claims Facilitators to Review Requests | 0.69 |
| Years for Assistant Claims Facilitators to Review Requests | 0.28 |
| Claims Resolved by Claims Facilitators | 17,222 |
| Cost for Claims Facilitator to Review Requestss | $ 6,916,950 |
| Cost for Assistant Claims Facilitator to Review Requests | $ 2,766,780 |

- 75% Percentage Unresolved after Negotiations
- 40% Percentage of Unresolved Loans Requiring Claims Facilitators
- 60% Percentage of Unresolved Loans Requiring Assistant Claims Facilitators
- 10 Claims Facilitators
- 4 Loans per Day
- 251 Days per Year
- $500 Hourly rate of Facilitators (We have Assumed the Estimated Rate used by Parekh for Facilitators)
- 10 Assistant Claims Facilitators
- 15 Loans per Day
- 251 Days per Year
- $500 Hourly rate of Assistant Facilitators (We have Assumed the Estimated Rate used by Parekh for Facilitators)
- 99.60% Claims Resolved by Claims Facilitators

**Step 5: Court Reviews for Final Resolution**

| | |
|---|---:|
| Loans Sent to Court for Final Resolution | 70 |

**Total Labor Years Needed to Satisfy Protocol Steps 0 - 4**

| Step | Process | Duration | Start (Years) | End (Years) | |
|---|---|---|---|---|---|
| 0 | Receive Loan Files from Servicers | 0.50 | 0 | 0.50 | |
| 1 | Review Remaining Loans | 0.50 | 0 | 0.50 | |
| 2 | Plan Administrator Reviews Repurchase | 0.50 | 0.08 | 0.58 | Due to concurrent review, Step 2 would start 30 days after Step 1 |
| 3 | Trustee Negotiate Declined Request | 0.46 | 0.17 | 0.75 | Due to concurrent review, Step 3 would start 30 days after Step 2 |
| 4 | Assitant Claims Facilitator/Claims Failicit | 0.69 | 0.25 | 1.00 | Due to concurrent review, Step 4 would start 30 days after Step 3 |

**Cost Needed to Satisfy Protocol Steps 0 - 4**

| Step | Process | Cost | Cost Attributable to the Trustees | Costs Attributable to the Estate | |
|---|---|---|---|---|---|
| 1 | Review Remaining Loans | $ 62,887,200 | 62,887,200 | | 100% Cost Attributable to the Trustees |
| 2 | Plan Administrator Reviews Repurchase | $ 32,279,100 | | $ 32,279,100 | 100% Cost Attributable to the Estate |
| 3 | Trustee Negotiate Declined Request | $ 4,426,848 | 2,213,424 | $ 2,213,424 | Cost Attributable to the Trustees and 50% the Estate |
| 4 a) | Claims Facilitator Reviews Unresolved Cl | $ 6,916,950 | 3,458,475 | $ 3,458,475 | Cost Attributable to the Trustees and 50% the Estate |
| 4 b) | Assitant Claims Facilitator Reviews Unre | $ 2,766,780 | 1,383,390 | $ 1,383,390 | Cost Attributable to the Trustees and 50% the Estate |
| | Total Estimated Cost | $ 109,276,878 | 69,942,48 | $ 39,334,389 | Cost Attributable to the Trustees and 50% the Estate |

**Exhibit B**

**Number and Composition of Teams Needed to Perform Forensic Reviews on 2000, 4000, 6000, 8000, 10,000, 12,000 and 14,000 Loan Files Per Month**

|  | Recovco's Exisiting Lehman Team | Reassignment of a Second Recovco Team to Lehman Project | Reassignment of a Third Recovco Team to Lehman Project | Development of a Fourth Recovco Team for Lehman Project | Access to a Fifth Team Through Recovco's Capacity Sharing Agreements | Access to a Sixth Team Through Recovco's Capacity Sharing Agreements | Access to a Seventh Team Through Recovco's Capacity Sharing Agreements |
|---|---|---|---|---|---|---|---|
| Capacity in Loans per Month | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Managers | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Underwriters | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Senior Reviewers | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Forensic Researchers (data handling) | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Additional Support Staff | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Total Personnel for 2000 Loans / Month | 57 | 57 | 57 | 57 | 57 | 57 | 57 |

**Number of Months Needed to Perform Forensic Reviews on 150,000 Loan Files Showing Number of Teams and Required Personnel by Type of Staff Member**

| Forensic File Reviews Completed Each Month | Number of Months Needed to Review 150,000 Files | Number of Years Needed to Review 150,000 Files | Number of Teams Working on Files | Total Number of Personnel Working on Forensic Reviews | Number of Managers | Number of Underwriters | Number of Senior Reviewers | Number of Forensic Researchers (Data Handling) | Number of Additional Support Staff |
|---|---|---|---|---|---|---|---|---|---|
| 2,000 | **75.0** | **6.3** | 1 | 57 | 4 | 33 | 11 | 6 | 3 |
| 4,000 | **37.5** | **3.1** | 2 | 114 | 8 | 66 | 22 | 12 | 6 |
| 6,000 | **25.0** | **2.1** | 3 | 171 | 12 | 99 | 33 | 18 | 9 |
| 8,000 | **18.8** | **1.6** | 4 | 228 | 16 | 132 | 44 | 24 | 12 |
| 10,000 | **15.0** | **1.3** | 5 | 285 | 20 | 165 | 55 | 30 | 15 |
| 12,000 | **12.5** | **1.0** | 6 | 342 | 24 | 198 | 66 | 36 | 18 |
| 14,000 | **10.7** | **0.9** | 7 | 399 | 28 | 231 | 77 | 42 | 21 |