STAMELL & SCHAGER, LLP
555 Fifth Avenue, 14th Floor
New York, NY  10017-9257
Richard J. Schager, Jr., Esq. (RS5875)
Andrew R. Goldenberg, Esq. (AG8213)


*Counsel for Appealing Parties Identified Below*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                                        Debtors.

-----------------------------------------------------------------x

Chapter 11

Case No.08-13555 (SCC)

Jointly Administered

## DESIGNATION OF ITEMS TO BE INCLUDED
## IN THE RECORD ON APPEAL AND STATEMENT OF ISSUES ON APPEAL

Pursuant to Rules 8006 of the Federal Rules of Bankruptcy Procedure, the Claimants[1]

hereby submit their statement of issues to be presented and their designation of the items to be

included in the record on appeal of the Bankruptcy Court's *Order Sustaining Omnibus*

*Objections and Reclassifying Claims for Restricted Stock Units and Contingent Stock Awards*

[Dkt. # 46853] entered November 7, 2014 in the above-captioned case, including all judgments,

decrees, decisions, rulings and/or opinions that merged into or became a part of the Order on

which the Order was based.

---

[1] The Claimants are: Jennifer Adler, Ian Anderson, Jennifer Becker, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Guillemette Callies, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal, Adrian Graves, Sandra Hahn-Colbert, Gregg Hawes, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Fabio Liotti, Patricia Luken, Lawrence McCarthy, Michael McCully, Hugh McGee, Michael Mullen (Estate of), Ian Neville, Thomas O'Sullivan, Helmut Olivier, Martin Patterson, Michael Petrucelli, Sandy Fleischman Richman, Barry Porter, Jack Rivkin, Alvaro Santodomingo, Christiane Schuster, Steven Schwab, Brian Seward, Ross Shapiro, Paul Shotton, Norman Siegel, Margaret Smith, Stephen Snelling, Gregg Somma, Andrea Sullivan, Milan Veleba, Pierluigi Volini, Jeffrey Wecker, Peter Ward, Colin S.A. Welch, Timothy Wilkinson and Judith Winchester.

## Statement of Issues to be Presented on Appeal

1.      Did the Bankruptcy Court err in sustaining Lehman Brothers Holdings Inc.'s

("LBHI" or "Lehman") fourteen Omnibus Objections (collectively, the "Omnibus Objections")[2]

and subordinating under § 510(b) of the Bankruptcy Code the proofs of claim filed by Claimants

based on RSUs and CSAs granted to them as a form of compensation?

2.      Did the Bankruptcy Court err in holding that the RSUs and CSAs fall within the

definitions of "equity security" and "security" under §§ 101(16) and 101(49) of the Bankruptcy

Code, respectively?

3.      Did the Bankruptcy Court err in determining that Claimants did not identify "a

single characteristic" that distinguished the RSUs and CSAs from the stock options in *In re*

*Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) where Claimants provided testimony,

declarations, documentary evidence and legal authority establishing that, unlike the stock options

in *Enron*, Claimants made no investment decision relating to the RSUs and CSAs?

4.      Did the Bankruptcy Court err in declining to consider why the RSUs and CSAs

were not investment contracts or commonly known as a security within the definition of

"security" under § 101(49)(A) of the Bankruptcy Code?

---

[2] The Omnibus Objections are: Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]; Debtors' Two Hundred Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]; Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28433]; Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435]; Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28777]; and the Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30357].

5.      Did the Bankruptcy Court err in refusing to consider recent federal Court of Appeals authority concluding that RSUs were not equity awards and are not commonly known as securities?

6.      Did the Bankruptcy Court err in declining to consider whether the RSUs and CSAs were excluded from the definition of "security" by § 101(49)(B) of the Bankruptcy Code?

7.      Did the Bankruptcy Court err in declining to consider the legislative history of § 510(b) of the Bankruptcy Code by stating Claimants "shouldn't be using the legislative history [of § 510(b)] at all" where Claimants submitted evidence that claims for unpaid compensation arising from grants of unconverted RSUs and CSAs were beyond the scope of § 510(b) and the legislative history supported that reading of the statute?

8.      Did the Bankruptcy Court err in holding participation by Claimants in the RSU/CSA compensation program that was subject to the terms of the Lehman Brothers Equity Award Program (the "Program") was voluntary where Claimants submitted uncontroverted testimony, declarations and documentary evidence showing (i) Claimants were required to participate in the Program by virtue of their employment with Lehman; (ii) Claimants could not elect to receive cash instead of RSU or CSA awards; (iii) the terms of the Program could not be changed or varied without approval of Lehman's Compensation Committee; (iv) the Program was imposed upon employees firm-wide by Lehman acting unilaterally; (v) Claimants had no decisions to make under the Program; (vi) there was no election or enrollment forms for Claimants to complete; (vii) Claimants could not choose or elect to participate and had no say in the percentage of their compensation they would receive in RSUs or CSAs; and (viii) Claimants could not negotiate or vary the terms of the Program.

9.      Did the Bankruptcy Court err in overlooking uncontroverted testimony, declarations and documentary evidence established that (i) Claimants did not view the RSUs and CSAs as constituting equity before LBHI shares were issued; (ii) LBHI did not consider Claimants stockholders until they became record holders of LBHI stock and that Claimants' rights as grantees of RSUs and CSAs were no better than those of a general creditor; (iii) both pre-petition through LBHI's RSU Trust and post-petition through LBHI's pre-populated proofs of claim given to Claimants, LBHI considered RSU and CSA claims as unsecured contract claims, not equity; and (iv) there was no voting of stock by holders of RSUs and CSAs and no documentary evidence showing solicitation of proxies or any procedure for permitting the exercise of voting rights by Claimants.

10.      Did the Bankruptcy Court err in concluding the purported purpose of the Program was to provide Claimants with a "sense of ownership" and Claimants were motivated to "secure the firm's success" where the Bankruptcy Court's conclusion disregarded Claimants' testimony and declarations and was based only on Lehman's own Program documents, with no supporting testimony other than arguments made by Lehman's attorneys who were not competent to offer such testimony?

11.      Did the Bankruptcy Court err in declining to consider tax implications associated with the grant, delivery and conversion of the RSUs and CSAs, including that (i) the income reported to tax authorities by Claimants was only after the RSUs and CSAs converted to LBHI stock; (ii) the tax withheld was calculated at ordinary income rates, not capital gains; (iii) an I.R.C. § 83(b) election was not available for RSUs and CSAs; (iv) upon conversion of the RSUs and CSAs to LBHI stock, LBHI claimed an income tax deduction as compensation expense; and

(v) the dividend equivalent amounts that were reinvested as additional RSUs and CSAs were also treated as tax-deductible compensation.

## Designation of Items for Record on Appeal

| Docket No. | Description |
|---|---|
| 13295 | Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 15666 | Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 16115 | Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 16116 | Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 16530 | Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 16532 | Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 16808 | Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 19392 | Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 19714 | Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) |
| 20012 | Debtors' Two Hundred Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 23470 | Debtors' Omnibus Reply to Responses to Debtors' One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventh-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claims as Equity Interests) |
| 23741 | Transcript regarding hearing held on 12/21/2011 |
| 28433 | Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of |

| | Claim as Equity Interests) |
|---|---|
| 28434 | Transcript regarding hearing held on 05/31/2012 |
| 28435 | Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) |
| 28777 | Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 30357 | Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 40263 | Order Approving Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs |
| 40263-1 | Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, With Respect to Debtors' Omnibus Objections to Proofs of Claim |
| 42176 | Stipulation & Order Establishing Procedures for an Evidentiary Hearing in Connection with Omnibus Objections to Reclassify Proofs of Claim as Equity Interests |
| 42348 | Memorandum in Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation Claims as Equity, or Alternatively, to Subordinate Claims Pursuant to Section 510(b) of the Bankruptcy Code |
| 42386 | Declaration of Stephanie Stiefel |
| 42387 | Declaration of Judith Ann Kenney |
| 42388 | Declaration of Henry Ramallo |
| 42404 | Memorandum of Law in Support of Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| | Declaration of Ralph I. Miller in Support of Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests)[3] |

---

[3] Claimants are unable to locate the docket number for the January 28, 2014 Declaration of Ralph I Miller in Support of Debtors' Omnibus Objections to Claims.  The Declaration should be in the docket adjoined to the Memorandum

| | |
|---|---|
| 43418 | Memorandum of Law in Opposition to Claimants' Opening Memoranda Regarding Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 43420 | Declaration of John Tuosto |
| 43421 | Supplemental Declaration of Ralph I. Miller |
| 43432 | Declaration of Roger Saks |
| 43433 | Affidavit of Riccardo Banchetti |
| 43434 | Affidavit of Madelyn Antoncic, Ph.D. |
| 43435 | Affidavit of Michele Bareggi |
| 43436 | Affidavit of Timothy A. Burke |
| 43437 | Affidavit of Nachiketa Das |
| 43438 | Affidavit of Philippe Dufournier |
| 43439 | Affidavit of Peter Hornick |
| 43440 | Affidavit of Michael Lawsky |
| 43441 | Affidavit of Richard Noble |
| 43442 | Affidavit of Anke Parr |
| 43443 | Affidavit of Vincent Primiano |
| 43444 | Affidavit of Jonathan Sebiri |
| 43445 | Affidavit of Charles Spero |
| 43446 | Affidavit of Gordon Sweely |
| 43447 | Memorandum in Further Opposition to Debtors' Fourteen Omnibus Objections |

of Law in Support of Debtors' Omnibus Objections to Claims [Dkt. No. 42404]. A copy of the Mr. Miller's Declaration is attached hereto as Exhibit A to be made part of the designated items for appeal.

|  | Seeking to Reclassify Compensation Claims as Equity, or Alternatively, to Subordinate Claims Pursuant to § 510(b) of the Bankruptcy Code |
|---|---|
| 43448 | Affidavit of Giancarlo Saronne |
| 43457 | Declaration of Darian J. Cohen |
| 43460 | Declaration of Lars P. Jacobson |
| 43450 | Declaration of Paola Biraschi |
| 43451 | Declaration of Nestor DeJesus |
| 43452 | Declaration of Donald Boughram |
| 43453 | Declaration of Joseph D'Amadeo |
| 43454 | Declaration of Steven Engel |
| 43455 | Declaration of Julian Iragorri |
| 43456 | Declaration of Michael Gran |
| 43458 | Declaration of Harriet Chan King |
| 43459 | Declaration of Virgilio Casuple |
| 43461 | Declaration of Mary E. Langevin |
| 43463 | Declaration of Karen M. Simon Krieger |
| 43464 | Declaration of Amit K. Sarkar |
| 43465 | Declaration of Lawrence H. Morgan |
| 43466 | Declaration of Lawrence Nicole |
| 43467 | Declaration of Brian Monahan |
| 43468 | Declaration of Michael McCully |
| 43469 | Declaration of Helmut Olivier |
| 43470 | Declaration of Michael Petrucelli |
| 43471 | Declaration of Barry Porter |

| | |
|---|---|
| 43472 | Declaration of Sandy Fleischman Richman |
| 43473 | Declaration of Ross Shapiro |
| 43474 | Declaration of Gregg Somma |
| 43475 | Declaration of Wendy M. Uvino |
| 43476 | Declaration of Andrew Wideman |
| 43477 | Declaration of Christian Stevens |
| 43763 | Joint Stipulation Regarding Authenticity and Admissibility of Documents and Designated Deposition Testimony in Connection with Debtors' Omnibus Objections to Proofs of Claim |
| 43763-3 | Exhibit List for Represented Compensation Claimants (Excluding Neuberger Berman Claimants) |
| 43763-4 | LBHI's Proposed Exhibit List Pursuant to ¶ 13 of the Evidentiary Hearing Procedures |
| 43875 | Declaration of Nicholas P. Howard |
| 43969 | Transcript regarding hearing on 04/01/2014 |
| | Transcript regarding hearing on 04/02/2014[4] |
| 43970 | Transcript regarding hearing held on 04/03/2014 |
| 46797 | Memorandum Decision Sustaining Omnibus Objections to Claims |
| 43970 | Transcript regarding hearing held on 04/03/2014 |
| 46797 | Memorandum Decision Sustaining Omnibus Objections to Claims |
| 46853 | Order Sustaining Omnibus Objections and Reclassifying Claims for Restricted Stock Units and Contingent Stock Awards |
| 47003 | Claimants' Notice of Appeal |

---

[4] Claimants are unable to locate the docket number regarding the hearing held before the Court on 04/02/2014, however, excerpts from the 04/02/2014 hearing are cited throughout the Court's *Order Sustaining Omnibus Objections and Reclassifying Claims for Restricted Stock Units and Contingent Stock Awards* [Dkt. # 46853]. A copy of the 04/02/2014 transcript is attached hereto as Exhibit B to be made part of the designated items for appeal.

| Claim No. | Description |
|-----------|-------------|
| 23900 | Proof of Claim for Michael Gran |

Dated: New York, New York
        December 5, 2014

STAMELL & SCHAGER, LLP

By: /s/ Richard J. Schager, Jr.
Richard J. Schager, Jr.
Andrew R. Goldenberg
555 Fifth Avenue, 14th Floor
New York, NY 10017
Tel.: (212) 566-4047
Fax: (212) 566-4061

*Counsel to Claimants: Jennifer Adler, Ian Anderson, Jennifer Becker, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Guillemette Callies, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal, Adrian Graves, Sandra Hahn-Colbert, Gregg Hawes, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Fabio Liotti, Patricia Luken, Lawrence McCarthy, Michael McCully, Hugh McGee, Michael Mullen (Estate of), Ian Neville, Thomas O'Sullivan, Helmut Olivier, Martin Patterson, Michael Petrucelli, Sandy Fleischman Richman, Barry Porter, Jack Rivkin, Alvaro Santodomingo, Christiane Schuster, Steven Schwab, Brian Seward, Ross Shapiro, Paul Shotton, Norman Siegel, Margaret Smith, Stephen Snelling, Gregg Somma, Andrea Sullivan, Milan Veleba, Pierluigi Volini, Jeffrey Wecker, Peter Ward, Colin S.A. Welch, Timothy Wilkinson and Judith Winchester*

11

# EXHIBIT A

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DECLARATION OF RALPH I. MILLER IN SUPPORT OF**
**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS'**
**SEVENTY-THIRD, ONE HUNDRED EIGHTEENTH,**
**ONE HUNDRED THIRTIETH, ONE HUNDRED THIRTY-FIRST,**
**ONE HUNDRED THIRTY-THIRD, ONE HUNDRED THIRTY-FOURTH,**
**ONE HUNDRED THIRTY-FIFTH, ONE HUNDRED SEVENTY-SIXTH AND**
**TWO HUNDRED SEVENTH OMNIBUS OBJECTIONS TO CLAIMS**
**(TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)**

I, Ralph I. Miller, under penalty of perjury, declare that the foregoing is true and correct

to the best of my knowledge, information, and belief:

1.    I am an attorney admitted to practice before this Court and a partner of  Weil,

Gotshal & Manges LLP, attorneys for Lehman Brothers Holdings Inc. ("LBHI"), as Plan

Administrator for LBHI and certain of its affiliates under the *Modified Third Amended Joint*

*Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan").[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.      I submit this declaration in support of the Memorandum of Law in Support of

Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-

First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One

Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (To

Reclassify Proofs of Claim as Equity Interests) dated January 28, 2014 (the "Motion") and to

provide the Court with true and correct copies of certain documents filed with the Court in

support of the Motion.

3.      Attached hereto are true and correct copies of the following documents:

Exhibit A:    Order Approving Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, dated October 2, 2013 (with attached exhibits), [ECF No. 40263];

Exhibit B:    Hearing Transcript, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555-jmp (Bankr. S.D.N.Y. Dec. 21, 2011) [ECF No. 23741];

Exhibit C:    A brochure entitled, "Lehman Brothers 2005 Equity Award Program For Bonus-Eligible and Production-Based Employees," bearing Bates numbers LEH-RSU 0022573 – 0022584;

Exhibit D:    Excerpts from LBHI's 2005 Form 10-K for Fiscal Year ended November 30, 2005, dated February 13, 2006 and bearing beginning Bates number LEH-RSU 0005994;

Exhibit E:    A document entitled, "Lehman Brothers Holdings Inc. Employee Incentive Plan as amended through November 8, 2007," bearing Bates numbers LEH-RSU 0000254-0000262; and

Exhibit F:    Letter from Karen M. Simon Kreiger to Honorable James M. Peck, Robert J. Lemons, Esq., and Mark Bernstein, Esq., dated March 29, 2013 re: Participation in RSU Claims Discovery in Connection with Omnibus Objections to Reclassify Proofs of Claim as Equity Interest: Karen M. Simon Krieger – Claim Number: 18087 in the amount of $164.319.52, sent in response to LBHI's Discovery Requests (without production enclosures).

2

4.    I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  January 28, 2014


Ralph I. Miller

3

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

### ORDER APPROVING STIPULATION OF FACTS REGARDING RSUs AND CSAs, INCLUDING THE TAX AND ACCOUNTING TREATMENT OF RSUs AND CSAs

Upon the Notice of Presentment of the Stipulation of Facts Regarding RSUs and

CSAs, including the Tax and Accounting Treatment of RSUs and CSAs, dated September 13, 2013

(the "Stipulation"),[1] a copy of which is attached hereto as Exhibit 1, seeking approval of the

Stipulation which was negotiated by counsel for numerous Participants as that term is defined in

paragraph 3(b) of the Court's Second Amended Order Establishing Discovery Procedures, dated

February 13, 2013 [ECF No. 34583], on the one hand, and counsel for Lehman Brothers Holdings

Inc. ("LBHI"), in its capacity as Plan Administrator under the *Modified Third Amended Joint*

*Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* for certain entities in

the above-referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), on the other hand; and

the Stipulation having been executed by LBHI and the various Participants identified in the

Stipulation (together with LBHI, the "Parties"); and due and proper notice of the Stipulation having

been provided to all Claimants subject to the Omnibus Objections; and the Court having found and

determined that approval of the Stipulation is in the best interests of the Chapter 11 Estates, their

creditors; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Stipulation is APPROVED; and it is further

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in
the Stipulation.

ORDERED that the facts described in the Stipulation shall be binding in all respects as to all Claimants who have received due and proper notice of the Stipulation provided, however, that any individual Claimant that is able to demonstrate prejudice by virtue of the approval of this Stipulation will be permitted to argue that the Stipulation does not apply to such Claimant; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
       October 2, 2013



/s/ James M. Peck

_____
Honorable James M. Peck
United States Bankruptcy Judge

## **STIPULATION OF FACTS**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | **08-13555 (JMP)** |
| Debtors. | **Jointly Administered** |

----------------------------------------------------------------x

### STIPULATION OF FACTS REGARDING RSUs AND CSAs,
### INCLUDING THE TAX AND ACCOUNTING TREATMENT OF RSUs AND CSAs,
### WITH RESPECT TO DEBTORS' OMNIBUS OBJECTIONS TO PROOFS OF CLAIM

### RECITALS

A.     Between December 7, 2010 and August 24, 2012, Lehman Brothers Holdings Inc.

("LBHI") and certain affiliated Debtors, as debtors and debtors in possession herein

(collectively, the "Debtors"), and LBHI as Plan Administrator (the "Plan Administrator"), under

the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its*

*Affiliated Debtors* (the "Plan") for certain entities in the above-referenced chapter 11 cases, filed

fourteen Omnibus Objections to Proofs of Claims for bonus or commission compensation during

the years 2003 and 2008 as to which many claimants were granted Restricted Stock Units and

Contingent Stock Awards (collectively, the "Omnibus Objections").[1]  The Omnibus Objections

---

[1]   The Omnibus Objections are: Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]; Debtors' Two Hundred

seek to reclassify these claims as equity interests and/or subordinate them to the claims of

general unsecured creditors.  The claimants who oppose the Omnibus Objections and still have

claims pending on the Omnibus Objections are referred to herein as the "<u>Claimants</u>" and their

claims, to the extent subject to the Omnibus Objections, are referred to herein as the "<u>Claims</u>."

      B.      On August 27, 2012, the Court entered an Order Establishing Discovery

Procedures (ECF No. 30421), amendments to which were entered on November 28, 2012 (ECF

No. 32386) and February 13, 2013 (ECF No. 34583) (collectively, the "<u>Discovery Procedures</u>

<u>Order</u>").  The Claimants who are party to this stipulation are "<u>Participants</u>" as defined in

paragraph 3(b) of the Discovery Procedures Order.

      C.      Section 11 of the Discovery Procedures Order provides for a Rule 30(b)(6)

deposition by Participants of LBHI.[2]  A notice for the Rule 30(b)(6) deposition was served on

April 22, 2013 (the "<u>Rule 30(b)(6) Notice</u>").  LBHI served a response to the Rule 30(b)(6)

Notice on August 16, 2013.  The matters set out under the Rule 30(b)(6) Notice on which

testimony is sought primarily relate to the tax and accounting treatment of the RSU/CSA Awards

(defined below).

      D.      The parties hereto have agreed to stipulate to the facts set forth herein in lieu of

examination on these subjects at the Rule 30(b)(6) deposition (the "<u>Stipulation</u>").  The parties

agree that upon the execution of the Stipulation, the sole topics that will be covered at the Rule

---

Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]; Three
Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No.
28433]; Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435]; Three
Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No.
28777]; and the Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as
Equity Interests) [ECF No. 30357].

[2]   Federal Rule of Civil Procedure 30(b)(6) allows a party to notice the deposition of a public or private corporation,
a partnership, an association, a governmental agency, or other entity, and the entity is then to designate an agent or
other person to testify about information known or reasonably available to the organization.

-2-

30(b)(6) deposition or addressed in a separate stipulation will be the treatment of RSUs and

CSAs by Lehman for balance sheet purposes and/or in Lehman's financial statements (Subject

for Examination No. 1(v) and No. 3), and the RSU and CSA claims that were included in the

settlement of inter-company claims between LBHI and LBI on or around February 21, 2013

(Subject for Examination No. 6).  The Stipulation and the facts set forth herein are without

prejudice to, and shall not preclude any party from presenting, any other factual points or any

legal arguments under applicable state or federal law in briefing or other papers in support of or

opposition to the Claims.

       E.      While the Stipulation identifies facts that are uncontested by the parties and the

parties have agreed that the Court may consider as evidence the facts set forth in this Stipulation

and all documents attached to this Stipulation in connection with the Omnibus Objections, the

Stipulation does not constitute an admission that these facts or documents are material or

relevant to the resolution of the Omnibus Objections.  Thus, LBHI and the Participants do not

waive, and expressly reserve, any objection to the relevance or weight of the facts cited herein.

## **STIPULATED FACTS**

       1.      The Claims for compensation as to which Restricted Stock Units

("RSUs") and/or Conditional Stock Awards ("CSAs") were granted pertain to the years 2003-

2008.  The Claims for compensation as to which no Restricted Stock Units or Conditional Stock

Awards were granted pertain to the 2008 fiscal year (All Restricted Stock Units and Conditional

Stock Awards concerning the Claims are referred to herein collectively as the "RSUs /CSAs"

and the RSUs/CSAs that are the subject to the Claims are referred to herein as the "Claimants'

RSUs/CSAs").  For years 2003-2008, bonus eligible (salaried) and production-based

(commissioned) Lehman employees in the United States were granted the RSUs, and for

-3-

overseas employees the CSAs, as a portion of the total compensation for services they performed as employees (the "RSU/CSA Award").

       2.     The 2008 "Guide to Working at Lehman Brothers" ("the U.S. Employee Handbook") stated:

> At the Firm's option, a portion of [an employee's] total compensation (combined base salary, bonus and other compensation) may be payable in the form of conditional equity awards (restricted stock units ("RSUs"), stock options, or other equity awards) pursuant to the Firm's Equity Award Program.

LEH-RSU 0000300.[3]  The Employee Handbook for UK Employees similarly stated:

> At the Firm's discretion a portion of your total compensation under any discretionary bonus award may be made in the form of Contingent Stock Awards (CSAs) under the appropriate Lehman Brothers' Stock Award Program.

LEH-RSU 0001552.  Moreover, in cases where Lehman had an employment contract with a Claimant, those contracts provide that at Lehman's discretion, a portion of the employee's compensation may be or will be paid in RSUs or CSAs.  For example, one contract states:

> At the Firm's option, a portion of your total compensation (combined base salary, bonus, and other compensation) may be payable in the form of restricted stock units pursuant to the Firm's employee Stock Award Program.

Exhibit 1 (LS CLMT-RSU 5-6) (sample contract with a Claimant with identifying information redacted).  Another contract states:

> At the Firm's discretion, a portion of your total 2007, 2008 and future years' total compensation (combined base salary, bonus and other compensation) will be payable in conditional equity awards (restricted stock units and/or other equity awards) pursuant to the Firm's employee equity award program as then in effect.

---

[3] Documents that are not referenced by Exhibit number have not been attached to the Stipulation.  However, copies will be provided to the Court upon request.

US_ACTIVE:\44282210\18\58399.0011

Exhibit 2 (S&S CLMT-RSU 000296-97) (sample contract with a Claimant with identifying

information redacted).

        3.      LBHI's Consolidated Financial Statement for FY 2003, contained in its

2003 Annual Report on SEC Form 10-K, stated that"[e]ligible employees receive RSUs as a

portion of their total compensation in lieu of cash," that "[t]here is no further cost to employees

associated with the RSU awards," and that the awards "generally convert to unrestricted freely

transferable Common Stock five years from the grant date."[4]   LBHI's Financial Statements for

FY 2004 through FY 2007 similarly stated that "[e]ligible employees receive RSUs, in lieu of

cash, as a portion of their total compensation," that "[t]here is no further cost to employees

associated with RSU awards," and that the awards "convert to unrestricted freely-transferable

common stock five years from the grant date."[5]

        4.      Attached as Exhibit 3 (LEH-RSU 0015888-15902) is a true and correct

copy of a brochure entitled "2003 Equity Award Program [for] Senior Vice President," which

describes the Program for 2003, including the issuance of and the tax treatment of RSUs and

Stock Options (the "2003 U.S. SVP Brochure").  The descriptions in this Brochure summarized

below were not materially changed during the years 2003 through 2008.

        5.      A grant of an RSU or CSA "represent[ed] a conditional right" for an

employee "to receive one share of Lehman Brothers common stock five years after the RSU [or

CSA] is granted, assuming continued employment with the Firm," subject to the terms of the

---

[4] LEH-RSU 0005539-0005634, 0006434-0006487 (LBHI 2003 Annual Report) at LEH-RSU 0005603 (Consl. Fin. Stmts., Note 15 at p. 95).

[5] LEH-RSU 0005635-0005671, 0006279-0006432 (LBHI 2004 Annual Report) at LEH-RSU 0006396 (Consl. Fin. Stmts., Note 16 at p. 116); LEH-RSU 0005672-0005697, 0005994-0006133 (LBHI 2005 Annual Report) at LEH-RSU 0006097 (Consl. Fin. Stmts., Note 14 at p. 102); LEH-RSU 0005698-0005719, 6135-6277 (LBHI 2006 Annual Report) at LEH-RSU 0006244 (Consl. Fin. Stmts., Note 15 at p. 109); LEH-RSU 0005832-0005992 (LBHI 2007 Annual Report) at LEH-RSU 0005958 (Consl. Fin. Stmts., Note 12 at p. 125).

Lehman Brothers Equity Award Program (the "Program").  *See* Exhibit 3 (2003 U.S. SVP

Brochure) at 1.  The date that an RSU or CSA is granted is referred to herein as the "Grant

Date."  The date that an RSU or CSA converts to LBHI Common Stock is referred to herein as

the "Conversion/Issuance Date."  The Conversion/Issuance Date was a fixed date that Lehman

employees could neither accelerate nor defer.  None of the Participants' RSUs or CSAs (other

than RSUs issued as Neuberger Berman retention bonuses) had reached their

Conversion/Issuance Date at the date this proceeding was commenced.

      6.     The 2003 U.S. SVP Brochure states:

> Each RSU represents the conditional right to receive one share of
> Lehman Brothers common stock five years after the RSU is
> granted, assuming continued employment with the Firm.  On
> November 30, 2008, the restriction period will end, and you will be
> entitled to receive one share of Lehman Brothers common stock
> for each vested RSU you hold at that time.  Once your RSUs
> convert to common stock, they become freely tradable.  The RSUs
> cannot be sold, traded, pledged, or assigned before conversion.

*Id.* at 1.

      7.     The conversion of RSUs and CSAs and receipt of LBHI common stock

(other than RSUs issued as Neuberger Berman retention bonuses) was subject to the RSU/CSA

grantee's fulfillment of certain employment-related conditions during this five-year period.

Lehman employees were advised that if these conditions were not fulfilled, the RSUs or CSAs

would be forfeited and canceled.  Attached as Exhibit 4 (LEH-RSU 0015051-54), Exhibit 5

(LEH-RSU 0014329-32), Exhibit 6 (LEH-RSU 0000108-111), Exhibit 7 (LEH-RSU 0017757-

61), Exhibit 8 (LEH-RSU 0000278-82), Exhibit 9 (LEH-RSU 0007228-31), Exhibit 10 (LEH-

RSU 0001054-57), Exhibit 11 (LEH-RSU 0001082-85), Exhibit 12 (LEH-RSU 0019153-58) and

Exhibit 13 (LEH-RSU 0000263-68) are true and correct copies of sample grant agreements from

2003 through 2007, identifying the employment-related conditions applicable to those grants.

-6-

8.      LBHI has conducted a review of its records and has not found evidence

that the RSUs or CSAs granted to the Participants during the years 2003-2008 have been

forfeited, as reflected on the Compensation Summaries that LBHI produced to the Participants in

its Initial Disclosures pursuant to paragraph 4(b) of the Discovery Procedures Order.

9.      The U.S. SVP Brochure also noted that "[u]pon conversion to common

stock, the fair market value of the shares [would] be taxed as employment income based on the

closing price of Lehman Brothers common stock on the conversion date." *Id.* at 11.  The U.S.

SVP Brochure also states that "[w]hen [stock] options are exercised, the difference between the

Fair Market Value on the exercise date and the option exercise price will be taxed as

employment income." (*id.* at 11).

10.     The terms of the Program were approved by the Compensation and

Benefits Committee (the "Compensation Committee") of LBHI's Board of Directors (the "Board

of Directors"), including any percentage or amount of the employees' compensation that would

be paid in RSUs or CSAs (which varied from year to year) and the Grant Date for the related

awards.  Employees could not elect to receive cash instead of the awards, and the terms of the

Program could not be changed or varied without approval of the Compensation Committee.

Various grant agreements from 2003 through 2007 with respect to RSUs state, "[t]he validity,

construction, interpretation, administration, and effect of the Plan, and of its rules and

regulations, and rights relating to the Plan and to this Agreement, shall be governed by the

substantive laws, but not the choice of law rules, of the State of Delaware."  *See. e.g.,* Exhibit 4

at LEH-RSU 0015053; Exhibit 5 at LEH-RSU 0014331; Exhibit 6 at LEH-RSU 0000110;

Exhibit 7 at LEH-RSU 0017660; Exhibit 8 at LEH-RSU 0000281.  Various award letters from

2003 through 2007 with respect to CSAs state, "[t]he validity, construction, interpretation,

-7-

administration, and effect of the Plan and of its rules and regulations and rights relating to the

Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but

not the choice of law rules, of the State of Delaware, United States of America." *See, e.g.,*

Exhibit 9 at LEH-RSU 0007230; Exhibit 10 at LEH-RSU 0001056; Exhibit 11 at LEH-RSU

0001084; Exhibit 12 at LEH-RSU 0019156; Exhibit 13 at LEH-RSU 0000266.

        11.     In a description of 2007 amendments to outstanding equity awards, dated

November 15, 2007, Lehman explained to employees:

> New tax rules under Internal Revenue Code Section 409A
> governing deferred compensation have recently come into effect
> which impact awards granted under the Firm's Equity Award
> Program.  In order to comply with these new tax rules, the Firm
> has made changes to equity awards including Restricted Stock
> Units ("RSUs"), Contingent Stock Awards ("CSAs"), Conditional
> Equity Awards ("CEAs") granted from 2003 through the present
> and stock options granted from 2000 through the present.
>
> These changes, which primarily impact the timing of delivery of
> shares under certain circumstances . . .have been made with a view
> to assuring compliance with these new tax rules while preserving
> the original terms of the awards to the fullest extent possible.  If
> outstanding awards were not amended to comply with these rules,
> severe tax consequences – including excise taxes, penalties, and
> interest – could result to employees.

*See* LEH-RSU 0008108.  Further down on the page, Lehman explained the RSU/CSA/CEA

Amendments will "Clarify those types of bankruptcies which may result in 'Bankruptcy

Acceleration Events,' generally resulting in the acceleration of delivery of shares." *Id.*

        12.     Near the end of the years 2003 through 2008, LBHI announced to its

bonus eligible (salaried) and production-based (commissioned) employees what portion, if any,

of their compensation would be paid in RSUs/CSAs.  From 2003 through 2007 the Grant Date

occurred in late November or early December.  In an email dated July 2, 2008, Lehman stated

that changes to the Equity Award Program included "[g]ranting an equity award on July 1"

-8-

which was "meant to be an 'advance' against any full-year equity award [the employee] may receive as part of [his/her] 2008 total compensation."  *See* LEH-RSU 0014376-77.

13.    During the years 2003 through 2008, any amount of compensation that was to be paid in RSUs and CSAs was communicated to employees via face-to-face communications, and the general terms for grants of such RSU/CSA Awards were communicated to employees firm-wide via face-to-face communications, conference calls, the online bonus system "LehmanLive" (the Firm's internal computer network), and/or electronic mail.  During each of these years, preprinted packets of information containing a "Dear Colleague" letter, a summary of the material terms, and a brochure were distributed to employees.  Lehman employees were required to participate in the Program by virtue of their employment with Lehman and the implementation of Equity Award Programs by the Board.  Thus, there were no election or enrollment forms for participation in the Program.

14.    Near the end of each fiscal year 2003 through 2008, bonus-eligible (salaried) and production-based (commissioned) employees typically received a brochure with a schedule attached identifying any percentage and/or amount of an employee's bonus or commissions that would be paid in RSUs and CSAs for those years, which was based on the level of compensation and corporate title held by the employee (the "Grid").  Attached as Exhibit 14 (LEH-RSU 0000927-942) is a true and correct copy of a brochure entitled, "Questions and Answers for Bonus-Eligible and Production-Based Employees," dated July 1, 2008, which was distributed to employees in the United States (the "2008 RSU Q&A").  Exhibits B and C of the 2008 RSU Q&A (at LEH-RSU 000938-39) are examples of the Grid used for bonus-eligible and production-based employees, respectively.  Overseas employees granted CSAs typically received a similar brochure, also attaching a Grid for salaried and production-based employees.  Attached

-9-

as Exhibit 15 (LEH-RSU 0000911-926) is a true and correct copy of a brochure entitled,

"Questions and Answers for Bonus-Eligible and Production-Based Employees," dated July 1,

2008, which was distributed to employees overseas (the "2008 CSA Q&A").  Exhibits B and C

of the 2008 CSA Q&A (LEH-RSU 000922-23) are examples for bonus-eligible and production-

based employees.

      15.    The U.S. Employee Handbook states that employees were paid on a "total

compensation" basis.  *See* LEH-RSU 0000300.  The U.S. Employee Handbook also states that,

"Total compensation may include base salary, cash commissions, overtime, bonus payments,

conditional equity awards (in accordance with the Lehman Brothers Equity Award Program),

and other compensation."  *Id.*  Typically, a salaried employee based in the United States was

given at or near year-end a standard form document prepared by LBHI entitled "200_ Total

Compensation Statement."  These statements set forth the employee's total compensation for that

year, which was stated to include a salary and bonus.  The statements also identified any portion

of the bonus to be paid in RSUs or CSAs.  The following is an example of the information

contained in a Total Compensation Statement issued for an employee in the United States during

the years 2003 through 2008.  The line items listed under "Compensation Type" were:

| | |
|---|---|
| Annualized Salary | $200,000 |
| Bonus | $900,000 |
| TOTAL COMPENSATION | $1,100,000 |

Lower on the page, the employees were provided with a "Payment Schedule" showing the

amount of the bonus to be paid in RSUs.  Continuing the example, the line items were:

| | |
|---|---|
| Bonus | $900,000 |
| Less RSUs | ($235,000) |
| Total Cash Payment (Before Taxes) | $665,000 |

-10-

Attached as Exhibit 16 (S&S CLMT-RSU 000124) is a true and correct copy of a sample of a

Total Compensation Statement (with identifying information redacted).

16.     Salaried employees stationed overseas during the years 2003 through 2008

were provided the similar information in a "Total Compensation Statement," but in a slightly

different format.  Those compensation statements contained a "Total Compensation Summary"

with the following information:

|  | GBP |
|---|---|
| Paid Salary | 100,000 |
| Total Bonus | 134,600 |
| Total Compensation | 234,600 |
| Total Bonus | 134,600 |
| Total Equity Award | 31,953 |
| Net Bonus Award | 102,647 |

For a sample of the Total Compensation Statement (with identifying information redacted) used

for overseas employees, *see* Exhibit 17 (S&S CLMT-RSU 000046).

17.     For the years 2003 through 2008, a production-based employee had a

portion of his/her monthly Total Sales Compensation (*i.e.,* the employee's gross commissions)

allocated to a future grant of RSUs.  Typically, each production-based employee could access

his/her compensation statement on an internal Lehman website called "LehmanLive."  The

compensation statement identified, among other things, the employee's total "Gross Production"

per month, his/her "Total Sales Compensation," the portion of  that compensation to be paid in

cash referred to as "Cash Commissions," and the portion to be paid in RSUs granted near the end

of the year, referred to as "Equity Accrual Calculated."   As illustrated by the attached Exhibits

18 and 19, the term Total Sales Compensation (fifth line from the bottom) was used to describe

-11-

the total of Cash Commissions plus Equity Accrual Calculated.  *See* Exhibits 18 and 19 (sample compensation statements with identifying information redacted).

18.     Near the end of each fiscal year through and including 2007 (but excluding fiscal year 2008), the total amount of the Equity Accrual Calculated for each of the pay periods in that fiscal year was typically awarded to the employee in the form of RSUs, with the number of RSUs based on the total Equity Accrual Calculated divided by the price of the RSUs on the Grant Date.  *See* Exhibit 3(2003 U.S. SVP Brochure) at 7.

19.     In fiscal year 2008, for all monthly pay periods prior to September 2008, a portion of the compensation for production-based employees accrued as part of the Equity Accrual Calculated line item on the compensation statement.  The compensation statements for production-based employees (other than Managing Directors of Neuberger Berman) for the fiscal year December 1, 2007 to November 30, 2008 do not reflect any "Equity Accrual Calculated" for September through November 2008.  *See* Exhibits 18 and 19 (sample compensation statements with identifying information redacted).

## Taxation of RSUs and CSAs

20.     A brochure for the FY 2003 Program Lehman Brothers distributed to U.S. employees receiving RSUs advised them as follows:

Tax Treatment of Restricted Stock Units

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock.  As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period . . . .

Provided below is a summary of the U.S. taxes that are ultimately due under current tax law:

- At the time the RSUs are awarded, there is no taxable event.

-12-

- After the restriction period for 2003 RSUs ends, on November 30, 2008, your RSUs, including any additional RSUs that you receive through dividend reinvestment, convert to common stock. Ordinary income equal to the November 30, 2008 market value of your shares will be reported to the IRS, and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rates apply, rather than the special provisions dealing with capital gains.

- On November 30, 2008, when your 2003 RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares than it was when the RSUs converted, you will have a capital loss to declare.

*See* LEH-RSU 0015954.

     21.    A similar brochure for the FY 2003 Program Lehman Brothers distributed to overseas employees receiving CSAs advised them as follows:

<u>Tax Treatment of Contingent Stock Awards</u>

Under current tax regulations, you will not be taxed on the value of your CSAs until they convert to common stock. As a result, your CSAs appreciate on a pre-tax basis for the five-year restriction period.

Provided below is a summary of the taxes that are ultimately due under current tax law:

- At the time the CSAs are awarded, there is no taxable event.

- After the restriction period for 2003 CSAs ends, on November 30, 2008, your CSAs, including any additional CSAs that you receive through dividend reinvestment, convert to common stock. The market value of the stock to which you are entitled on that date will be treated as employment income, on which tax will be payable at the prevailing income tax rates. For United States taxpayers, this income will be reported to the IRS and subject to applicable tax withholding.

- On November 30, 2008, when your 2003 CSAs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares than it was when the CSAs converted, you will have a capital loss to declare.

*See* LEH-RSU 0007289.

-13-

22.     The 2003 U.S. SVP Brochure distributed to Senior Vice-Presidents

(discussed at ¶¶ 4-9 above) receiving RSUs or CSAs, and the FY 2005 Program brochures

distributed to employees receiving RSUs or CSAs advised them as follows:

Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your [RSUs / CSAs]
until they convert to common stock.  As a result, your [RSUs / CSAs] appreciate on a
pre-tax basis for the five-year restriction period . . . .

Provided below is a summary of the taxes related to RSUs . . . .

- No taxation on the award date.

- Upon conversion to common stock, the fair market value of the shares will be
  taxed as employment income based on the closing price of Lehman Brothers
  common stock on the conversion date.

- This income will be subject to [applicable tax withholding, or tax / social security
  withholding in the case of CSAs in FY 2005].

- Special provisions dealing with capital gains will not apply upon conversion to
  common stock.

- If you retain your shares after [RSUs / CSAs] convert to common stock, the basis
  for capital gains is the closing price on the conversion date.

Exhibit 3 at LEH-RSU 15900; *see* LEH-RSU 0007248 (2003 brochure for CSAs awarded to

SVPs); 0007273 (2003 brochure for CSAs awarded to Managing Directors), 0015680 (2003

brochure for RSUs awarded to Managing Directors), 0022619 (2005 brochure for RSUs for

bonus -eligible and production-based employees, including SVPs and Managing Directors),

0022668 (2005 brochure for CSAs for bonus-eligible and production-based employees, including

SVPs and Managing Directors).

23.     The FY 2006 and FY 2007 Program brochures distributed to employees

receiving RSUs or CSAs advised them as follows:

-14-

Under current [U.S. Federal tax law], you will not be taxed on the value of your [RSUs / CSAs] until shares of common stock are delivered. As a result, your [RSUs / CSAs] (including dividend reinvestment [RSUs / CSAs] . . .) appreciate on a pre-tax basis until they convert to shares of common stock. Provided below is a summary of the taxes related to RSUs . . . .

- No taxation on the award date.

- Upon delivery of common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers Holdings Inc. common stock on the conversion date.

- This income will be subject to applicable tax withholding.

- Special provisions dealing with capital gains will not apply upon delivery of common stock.

- If you retain your shares after delivery, the basis for capital gains is the closing price on the conversion date.

LEH-RSU 0014264 (2006 brochure for RSUs for bonus-eligible and production-based employees including SVPs and Managing Directors); *see* 0000290-91 (2007 brochure for RSUs for bonus-eligible and production-based employees), 0000195 (2006 brochure for CSAs for bonus-eligible and production-based employees), 0023032 (2007 brochure for CSAs for bonus-eligible and production-based employees).

24. Thus, once an RSU or CSA converted to common stock, LBHI was entitled to, and did in fact claim, a U.S. federal income tax deduction as compensation expense (subject to any other limitations as may have been required under federal, state and local income tax laws) for the then prevailing amount/value of the award in the year of payment to such employee. The amount of such income tax deduction would be based on the market price of LBHI common stock, as quoted on the New York Stock Exchange, as of the delivery/release date and deducted in the same taxable year.

-15-

25.     In addition, once an RSU or CSA converted to common stock, LBHI

commonly reduced the amount of the RSU/CSA Award by the amount of any income and

employment taxes due to any federal, state, local or other taxing authority.  The only exceptions

were where, when by permitted by local law, the recipient decided to pay the tax directly by

remitting sufficient cash to LBHI (or the local Lehman affiliate employing the grantee).

26.     Since the Claimants' RSUs/CSAs were granted to the Claimants between

2003 and 2008, the RSUs/CSAs had not converted to common stock and no stock or shares had

issued as of September 15, 2008, the date LBHI and its affiliated debtors began filing voluntary

cases under chapter 11 of the Bankruptcy Code (the "Petition Date").  Therefore, as of the

Petition Date, LBHI was not entitled to report the grants of the RSUs/CSAs to the Internal

Revenue Service or any other tax authority as compensation income to any employee.

27.     As of the Petition Date, no Claimant-employee was required to report the

grants of the Claimants' RSUs/CSAs between 2003 and 2008 to the Internal Revenue Service or

any other tax authority as compensation income to such employee for income tax purposes,

because the RSUs/CSAs had not converted and no common stock had issued.  An "Employee

Q&A" issued by Lehman after the Petition Date stated as follows: "Q: What happens to my

restricted stock units (RSUs)? A: This transaction [i.e., sale to Barclays] does not trigger an

acceleration of vesting or delivery of your Lehman Brothers RSUs. They remain outstanding and

subject to their original terms and conditions."  LEH-RSU 00014383.

28.     Since no shares of stock were ever issued to employees pursuant to the

grants of the Claimants' RSUs/CSAs between 2003 and 2008 (other than RSUs issued as

Neuberger Berman retention bonuses), LBHI did not take a federal income tax deduction for

-16-

these grants of the Claimants' RSUs/CSAs and they were never reported by the employees as compensation income to the Internal Revenue Service or any other tax authority.

29.      Dividend equivalents arising from the Claimants' RSUs/CSAs granted between 2003 and 2008 were reflected in additional RSUs/CSAs consistent with dividends of Lehman common stock and were subject to the same Program provisions as the underlying RSUs/CSAs to which they related.

30.      LBHI never reported the dividend equivalents arising from the Claimants' RSUs/CSAs granted between 2003 and 2008 as compensation income to the Internal Revenue Service or any other tax authority.

31.      No amount of the RSU/CSA Award for the years 2003-2008, and no shares of stock to be issued pursuant to the terms thereof, were ever held by LBHI in any reserve, escrow or other similar account for the benefit of a particular grantee.

32.      LBHI never purchased or reserved LBHI common stock the ownership of which was specifically attributable to a particular grantee of RSUs or CSAs.

33.      LBHI's Earnings Release Q&A for the fourth quarter of 2003 states as follows: "RSUs and options generate a significant tax benefit once the shares are issued.  The tax benefit is derived at the price on the date the shares are issued.  Therefore, the proceeds will also be used to fund the repurchase of shares."  *See* LEH-RSU 0023181.  Similarly, LBHI's Earnings Release Q&A for the fourth quarter of 2006 states: "RSUs and options generate a significant tax benefit once the shares are issued.  The tax benefit is derived at the price on the date the shares are issued.  Therefore, the proceeds will also be used to fund the repurchase of shares."  *See* LEH-RSU 0013577.

-17-

**Accounting Treatment of RSUs and CSAs**

34.     RSUs and CSAs issued to Lehman employees under the Program were generally amortized for financial accounting purposes over various periods of time ranging from the grant year (for FY 2003 through FY 2005) or the year after the grant year (for FY 2006 and FY 2007) through the year of Conversion/Issuance five years after the Grant Date in accordance with the terms of the Program. *See* ¶¶ 4-6 above.  The amount amortized was based on the prevailing market price of LBHI common stock at the Grant Date, as quoted on the New York Stock Exchange, as of the Grant Date.

35.     The compensation expense for the RSU/CSA Award granted for the years 2003 through 2008 was recognized in the financial statements of LBHI for financial accounting purposes (but not tax purposes) over this period for the fulfillment of certain employment-related conditions.  *Id.*  LBHI's financial statements referred to this period as the "related service period" or for 2003, the "relevant service period."  LEH-RSU 0005585 (2003 Consl. Fin. Stmts., Note 1 at 77), LEH-RSU 0006370 (2004 Consl. Fin. Stmts., Note 1 at 90), LEH-RSU 0006077 (2005 Consl. Fin. Stmts., Note 1 at 82), LEH-RSU 0006221-22 (2006 Consl. Fin. Stmts., Note 1 at 86-87), LEH-RSU 0005927 (Consl. Fin. Stmts., Note 1 at 94-95).

36.     Thus, in FY 2003 the compensation expense for the RSUs and CSAs granted in that year was recognized for financial accounting purposes (but not tax purposes), over, for the most part, 2003 through 2008.  LBHI measured the compensation expense to be amortized based on the market value of LBHI common stock at the Grant Date, without a discount for resale restrictions.  *See* LEH-RSU 0005510-0005634, 0006433-0006487 (LBHI 2003 Annual Report) at LEH-RSU 0005585 (Note 1 at p. 77) and LEH-RSU 0005603 (Note 15

-18-

at p. 95); LEH-RSU 0005698-0005719, 0006134-0006277 (LBHI 2006 Annual Report) at LEH-RSU 0006244 (Note 15 at p. 109).

       37.     In FY 2004 and FY 2005, a portion of the compensation expense was allocated to the year of the grant and the balance was recognized over, for the most part, the five-year period through the Conversion/Issuance Date for financial accounting purposes (but not tax purposes).  LBHI measured the compensation expense to be amortized based on the market price of LBHI's common stock at the Grant Date, less a discount of between three to eight percent per year for resale restrictions in place until the Conversion/Issuance Date.  *See* LEH-RSU 0005635-0005671, 0006278-0006432 (LBHI 2004 Annual Report) at LEH-RSU 0006370 (Note 1 at p. 90) and LEH-RSU 0006396 (Note 16 at p. 116); LEH-RSU 0005672-0005697, 0005993-0006133 (LBHI 2005 Annual Report) at LEH-RSU 0006077 (Note 1 at p. 82) and LEH-RSU 0006097 (Note 14 at p. 102).

       38.     In FY 2006 and FY 2007, the compensation expense was recognized over, for the most part, a five-year period beginning the year after the year of the grant of RSUs or CSAs through the Conversion/Issuance Date for financial accounting purposes (but not tax purposes).  LBHI measured the compensation expense based on the market price of LBHI's common stock at the Grant Date, less a discount of between three to eight percent per year for resale restrictions in place until the Conversion/Issuance Date.  *See* LEH-RSU 0005698-0005719, 6134-6277 (LBHI 2006 Annual Report) at LEH-RSU 0006221-0006222 (Note 1 at pp. 86-87) and LEH-RSU 0006244 (Note 15 at p. 109); LEH-RSU 0005720-0005992 (LBHI 2007 Annual Report) at LEH-RSU 0005927-0005928 (Note 1 at pp. 94-95) and LEH-RSU 0005958 (Note 12 at p. 125).

-19-

08-13555-scc   Doc 46263   Filed 09/02/15   Entered 09/02/15 09:35:51   Exhibits
Pg 21 of 48

39.     Attached as Exhibit 20 (LEH-RSU 0014995) is a true and correct copy of
any email from Mark Gross to James Emmert, dated April 14, 2004, attaching a presentation
entitled "Equity Awards Overview."  The text of the email states that it is a "'final' version."
Attached as Exhibit 21 (LEH-RSU 0015001) is a true and correct copy of page 6 of the
presentation attached to Mark Gross' email, which contains a chart demonstrating the
amortization process from 2000 and 2003.  The chart follows the statement:  "The amortization
of awards over time lowers our comp and benefits ratio.  If we were to fully expense all awards
in the year of grant (including options), our comp ratio would be over 57% over the period."

US_ACTIVE:\44282210\18\58399.0011

/s/ Ralph Miller
Ralph I. Miller
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

-21-

STAMELL & SCHAGER LLP

By: /s/ Richard J. Schager
       Richard J. Schager, Jr.
       Andrew R. Goldenberg
One Liberty Plaza - 23/F
New York, NY 10006-1404
Tel.: (212) 566-4047
Fax" (212) 566-4061

*Counsel to: Jennifer Adler, Craig Benson,*
*Paola Biraschi, Karen Brewer,*
*William Broadbent, David Brooks,*
*Patrick Cremin, Michael Collier,*
*Joseph D'Amadeo, John Dmuchowski,*
*Nestor De Jesus, Steven Engel,*
*Louise Goldberg, Michael Gran,*
*Anshuman Goyal, Adrian Graves,*
*Sandra Hahn-Colbert, Nicholas Howard,*
*Julian Iragorri, Harriet Chan King,*
*Tal Lev Ari, Yeruchim Levilev, Sarah Lewis,*
*Patricia Luken, Lawrence McCarthy,*
*Michael McCully, Hugh McGee,*
*Michael Mullen, Ian Neville, Thomas*
*O'Sullivan, Helmut Olivier, Martin Patterson,*
*Michael Petrucelli, Sandy Richman Fleischman,*
*Barry Porter, Jack Rivkin, Alvaro Santodomingo,*
*Brian Seward, Ross Shapiro, Margaret Smith,*
*Andrea Sullivan, Stephen Snelling, Milan Veleba,*
*Pierluigi Volini, Jeffrey Wecker, Peter Ward,*
*Timothy Wilkinson, Judith Winchester*


VINSON & ELKINS LLP
Steven M. Abramowitz
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Tel.: (212) 237-0137
Fax: (917) 849-5381

*Counsel to: Lisa Marcus*

LAW OFFICES OF LISA M. SOLOMON

By: /s/ Lisa M. Solomon
       Lisa M. Solomon
One Grand Central Place
305 Madison Avenue, Suite 4700
New York, NY 10165
Tel.: (212) 471-0067
Fax: (212) 980-6965

*Counsel to: Madelyn Antoncic, Vincent*
*Primiano, Gordon Sweely, Charles Spero,*
*Timothy Burke, Jonathan Sebiri, Riccardo*
*Banchetti, Philippe Dufournier, Anke Parr,*
*Giancarlo Saronne, Harsh Shah and*
*Peter Hornick*


KAPLAN LANDAU LLP
Eugene Neal Kaplan
1065 Avenue of the Americas - 27/F
New York, NY 10018
Tel.: (212) 593-1700
Fax: (212) 593-1707

JULIEN & SCHLESINGER, P.C.
Michael S. Schlesinger
One Whitehall Street - 17th Floor
New York, NY 10004
Tel.: (212) 962-8020

*Counsel to: Judith Ann Kenney, Richard*
*Nackenson, Seth Finkel, Richard S. Levine,*
*Henry Ramallo, Christian F. Reynolds,*
*Marvin C. Schwartz, Stephanie Stiefel,*
*David I Weiner and Richard Glasebrook*

08-13555-smb   Doc 47281   Filed 12/05/14   Entered 12/05/14 18:18:28   Exhibits
Pg 42 of 598

RICH, MICHAELSON MAGALIFF
  MOSER LLP
Howard P. Magaliff
Robert N. Michaelson
340 Madison Avenue - 19th Floor
New York, NY  10173
Tel.:  (212) 220-9402
Fax:  (212) 913-9644
*Counsel to:  Roger Saks, Donald Boughrum,*
*Brian Monahan, Nicole Lawrence,*
*H. Morgan Lawrence, III*

LAW OFFICES OF A. JAMES BOYAJIAN
355 S. Grand Avenue, Suite 2450
Los Angeles, CA  90071
Tel.:  (424) 258-0777
Fax:  (424) 298-4377

*Counsel to:  Jeffrey Wardell*

PADUANO & WEINTRAUB LLP
Willard Knox
1251 Avenue of the Americas - 9th Floor
New York, NY  10020
Tel.:  (212) 785-9100

*Counsel to:  W. Phillip Walsh*

-23-

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 25 of 148

**E
X
H
I
B
I
T

1**

**EXHIBIT 1**

# LEHMAN BROTHERS

ANTHONY J. COLLERTON
SENIOR VICE PRESIDENT
HUMAN RESOURCES



June 3, 1999

REDACTED

REDACTED

Dear

We are delighted to confirm our offer of full-time employment as the    REDACTED
REDACTED     at Lehman Brothers (the "Firm"). Your title of Managing Director will be
officially confirmed by the Firm's Board of Directors shortly after your start date.

Your total compensation at Lehman Brothers will consist of salary and bonus, and will be
determined at the end of each year based on your performance and contributions to the Firm
and on the Firm's overall performance. For the performance years ending November 30,
1999, and November 30, 2000, we will guarantee you a minimum total compensation of
$850,000, with your 1999 compensation prorated for the period you are employed by the
Firm. Specifically, your compensation will be paid as follows:

- Salary at the annualized rate of $200,000, payable in biweekly installments in
accordance with our customary payroll practices.

- A 1999 annualized bonus of $650,000, with the actual bonus received calculated based
on the actual number of days worked during performance year 1999. The bonus portion
of your compensation will be paid to you at such time as the Firm pays its annual bonus
distribution (on or about January 31, 2000).

- A 2000 bonus of $650,000, to be paid to you at the time the Firm pays its annual bonus
distribution (on or about January 31, 2001).

- At the Firm's option, a portion of your total compensation (combined base salary, bonus
and other compensation) may be payable in the form of restricted stock units pursuant to
the Firm's employee Stock Award Program. Please understand that the grant of
restricted stock units is subject to the standard terms and provisions of the Program.

You will also be eligible to participate in the standard employee benefits program, which will
be explained to you during your orientation session.

000005

REDACTED

June 3, 1999
Page 2



The salary and bonus amounts set forth above will be paid at the time and in the amount stated except that they will not be payable if, before the date of scheduled payment, you have voluntarily terminated your Firm employment, have died or become disabled, or have been terminated from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations material to your employment, or failure to perform employment duties or obligations satisfactorily. These amounts may be reduced in the event any authorized leave of absence during 1999 or 2000. Your compensation for 2001 and subsequent years will be determined at the Firm's discretion, based on your performance and contributions to the Firm and on the Firm's overall performance.

Please understand that the terms and conditions of your employment by our Firm are governed by standard Firm policies. Among other things, this means that this offer of employment is conditional upon the successful completion of a background investigation, including reference, credit, criminal and other checks, as well as on your satisfactorily meeting all pre-employment requirements, including passing a pre-employment drug screen and producing documentation to verify your identity and eligibility to work in the United States.

While the foregoing compensation commitments will be honored, this letter is not a contract of continuing employment. Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time and for any reason.

This agreement shall be binding upon the Firm and its successors and assigns.

If you agree with the terms outlined in this letter, please acknowledge the same by signing the enclosed copy and returning it to me. Please contact me at (212) 526-3144 with any additional questions or concerns.

Sincerely,

Anthony J. Collerton

Accepted on this 4ᵗʰ day of June, 1999

REDACTED

cc:     M. Miskovic

09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 28 of 148

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**2**

**EXHIBIT 2**

DONNA ASARO
VICE PRESIDENT
HUMAN RESOURCES

May 4, 2007

REDACTED

Dear    REDACTED

We are pleased to confirm the terms we have agreed to with respect to your continued employment with the Mortgage Capital Division of Lehman Brothers Inc. (the "Firm").

For performance year 2007 (ending November 30, 2007), your compensation will be as follows:

- Bi-weekly base salary of $6,346.15, which is equivalent to $165,000 per year.

- A minimum bonus in the amount of $685,000, less applicable deductions, payable at the time the Firm pays its annual bonus distribution (on or about January 31, 2008).

For the performance year 2008 (December 1, 2007 through November 30, 2008), your compensation will be as follows:

- Bi-weekly base salary of $7,692.30, which is equivalent to $200,000 per year.

- A minimum bonus in the amount of $650,000, less applicable deductions, payable at the time the Firm pays its annual bonus distribution (on or about January 31, 2009).

The foregoing salary will be paid for all periods of your active employment with the Firm in performance years 2007 and 2008. The bonuses set forth above will be paid at the times and in the amounts stated except that such bonuses will not be payable if you have failed to obtain and/or maintain in good standing all applicable licenses and registrations or if, before the date of scheduled payment, you have resigned, or have been terminated from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations, or substantial and continuing failure to perform employment duties or obligations satisfactorily (collectively or individually, "Cause"). The above stated bonus amounts may be reduced in the event of an approved leave of absence during the applicable performance year.

At the Firm's discretion, a portion of your total 2007, 2008 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units and/or other equity awards) pursuant to the Firm's employee equity

CONFIDENTIAL                    S&S CLMT-RSU 000296

award program as then in effect. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

All payments described in this letter will be subject to applicable payroll and income tax withholding and other applicable deductions. Your compensation with respect to all periods after performance year 2008 will be determined at the Firm's discretion.

Please understand that the terms and conditions of your employment by our Firm will continue to be governed by standard Firm policies.

Please understand that this letter is not a contract of continuing employment. Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time for any reason subject to any applicable notice requirement. Currently, the Firm's notice policy requires officers of the Firm to provide 30 days' advance written notice of resignation, and provides for 30 days' advance notice by the Firm to its officers in the event of an involuntary termination under certain circumstances.

REDACTED , we are enthusiastic and pleased that you are going to continue to be a part of our organization. If you agree with the terms outlined in this letter, please acknowledge same by signing this letter and returning it to me. An additional copy of this letter is enclosed for your files.

Sincerely,

Donna Asaro
Vice President
Human Resources

Accepted and agreed to:

REDACTED

by:

_____5/23/07_____
Date

LEHMAN BROTHERS
745 7TH AVENUE, 26TH FLOOR NEW YORK NY 10019 TELEPHONE 212-526-1080

CONFIDENTIAL                                   S&S CLMT-RSU 000297

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**3**

**EXHIBIT 3**



2003

# EQUITY AWARD PROGRAM

*Senior Vice President*

# LEHMAN BROTHERS

CONFIDENTIAL

LEH-RSU 0015888

# 2003 EQUITY AWARD PROGRAM

*Senior Vice President*

## Contents

2003 Equity Award Program at a Glance . . . . . . . .1

How the Equity Award Program Works . . . . . . . . .2

Components of the 2003 Equity Award . . . . . . . .3

Equity Award Vesting
When will my RSUs vest? . . . . . . . . . . . . . . . . .3
When will my stock options
become exercisable? . . . . . . . . . . . . . . . . . . . . .3

Salaried Members of the Firm:
2003 Equity Award Schedule . . . . . . . . . . . . . .4
Award Calculation Example . . . . . . . . . . . . . . .4

Investment Representatives (IRs):
2003 Equity Award Schedule . . . . . . . . . . . . . .5
Calculating Your 2003 Monthly Accrual . . . . . . .6
Award Calculation Example . . . . . . . . . . . . . . .7

Termination Provisions for RSUs
and Stock Options . . . . . . . . . . . . . . . . . . . . . . .8

Tax Considerations . . . . . . . . . . . . . . . . . . . . . .11

Change in Control ("CIC") Provisions . . . . . . . . .12
Payment of RSUs Upon a Friendly CIC . . . . . . .12

Dividend Equivalents . . . . . . . . . . . . . . . . . . . . .13

Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Other Information . . . . . . . . . . . . . . . . . . . . . . .13

This brochure describes significant features of the
Lehman Brothers Equity Award Program for 2003.
It is not intended to replace the award agreement
or other official plan documents. This brochure
should be read in conjunction with the other
award documents.

LEH-RSU 0015889

# 2003 EQUITY AWARD PROGRAM AT A GLANCE

- All eligible Senior Vice Presidents (SVPs) receive a portion of their total compensation in conditional equity awards. The amount of compensation payable in equity increases as the amount of your compensation rises.

- The equity component of total compensation is in a combination of restricted stock units (RSUs) and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

- Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment with the Firm. On November 30, 2008, the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold at that time. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, traded, pledged, or assigned before conversion.

- Your 2003 RSUs were calculated based on the price of $53.54 per RSU (reflecting a December 10, 2003 market price of $71.39, less a 25 percent discount).

- Your 2003 stock options have an exercise price of $71.39 and will expire on November 29, 2013. The number of options you received was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option, less a 25 percent discount ($20.84).

**Senior Vice President**

*Your Award Summary details your 2003 award.*



CONFIDENTIAL

LEH-RSU 0015890

# HOW THE EQUITY AWARD PROGRAM WORKS

EQUITY AWARD PROGRAM

2

The Equity Award Program for Senior Vice Presidents (SVPs) was developed to recognize the important role you, as an SVP, play in the success of the Firm. Together with your colleagues, you drive revenue generation, provide quality service and technical expertise to our clients and customers, manage expenses, and provide the infrastructure support to ensure efficient and effective processes. Given the key role you play in Lehman Brothers' success, it is important for you to have a significant stake in the Firm. With this in mind, the Equity Award Program for SVPs was designed to deliver a significant portion of your compensation in conditional equity awards (restricted stock units (RSUs) and stock options), which you acquire at a substantial discount. The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time.

Your 2003 equity award was awarded to you as a portion of your 2003 compensation. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2008. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time provided you meet certain terms and conditions. The RSUs cannot be sold, traded, pledged, or assigned for that five-year period.

The stock options awarded to you in 2003 will expire on November 29, 2013. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

## The Size of Your Award

The Award Summary shows your 2003 equity award. The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation. Under this schedule, the amount of compensation in the form of conditional equity awards (RSUs and stock options) increases as total compensation rises.

**Salaried Members of the Firm:** Your award was based on your 2003 total compensation, which includes salary earned in fiscal year 2003 plus any additional compensation with respect to the fiscal year in 2003, even if some of these payments are deferred or paid in 2004. Such compensation includes 2003 bonus, commissions, and other compensation.

**Investment Representatives (IRs):** Similar to salaried employees, you received a year-end conditional equity award as a portion of your 2003 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2002 through October 2003 (paid from January through November 2003) after all adjustments. For 2003, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2003 Equity Award Schedule appears on page 5.) The 2003 payout may have included regular grid production payout, certain special payments, and other production payout. During any period an IR is paid a draw, equity (in the form of RSUs and/or stock options) is awarded with respect to the amount of the draw. If the draw ends and the IR has earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued).

*Note that for purposes of this brochure, all references to payout or compensation assume compensation payments that are equity eligible only.*

## The Firm-Provided Discount

The number of RSUs you received for 2003 was based on the closing price of Lehman Brothers common stock ($71.39 per share), less a 25 percent discount. With a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value. A 25 percent discount really means that the Firm "grosses up" your contribution 33 percent at the outset.

The number of options you received for 2003 was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option on December 10, 2003, less a 25 percent discount ($20.84). These options have an exercise price of $71.39. Your 2003 options will expire approximately 10 years after the grant date, on November 29, 2013.



*The amount of compensation paid in equity increases as the amount of total compensation rises.*

CONFIDENTIAL



# COMPONENTS OF 2003 EQUITY AWARD

### Equity Award in RSUs and Stock Options

All SVPs receive a portion of their total compensation in the form of conditional equity awards. The equity component of total compensation is in a combination of both RSUs and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

| Description | RSUs | Stock Options |
|---|---|---|
| Grant Date: | December 10, 2003 | December 10, 2003 |
| Market Price: | $71.39 | N/A |
| Exercise Price: | N/A | $71.39 |
| Black-Scholes Value: | N/A | $27.79 |
| Discount: | 25% | 25% |
| Cost to SVP: | $53.54 | $20.84 |
| Restriction Period: | 5 years, until 11/30/08 | N/A |
| Option Period: | N/A | 10 years, until 11/29/13 |



# EQUITY AWARD VESTING

## When will my RSUs vest?

The vesting provisions of your 2003 RSUs are consistent with last year's SVP RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2003 compensation before the discount (75 percent of the award). The discount portion represents 25 percent of your RSU award.

Your RSUs will vest in two stages:

2 Years (November 30, 2005): Principal portion

5 Years (November 30, 2008): Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2008, all of your RSUs will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

## When will my stock options become exercisable?

Your stock options will become exercisable consistent with the vesting schedule of your 2003 RSUs. Your stock options will become exercisable in two stages:

2 Years (November 30, 2005): Principal portion

5 Years (November 30, 2008): Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2013, all of your stock options will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions for RSUs and Stock Options* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.

*Senior Vice President*



LEH-RSU 0015892

EQUITY AWARD PROGRAM

4

# **S**ALARIED MEMBERS OF THE FIRM

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation. An example of the calculations follows.

| Total Compensation Range | Portion of 2003 Compensation Paid Through Equity Award Program |
| --- | --- |
| $0 - $99,999 | 2% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $30,000 plus 16.25% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $62,500 plus 20% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $112,500 plus 35% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $200,000 plus 35% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $375,000 plus 45% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $600,000 plus 55% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 35% of 2003 total compensation |

## Award Calculation Example

Using the equity award schedule above, your 2003 equity award was determined at year-end based on your 2003 total compensation.

EXAMPLE: As an example, we'll go through the calculation for an SVP whose 2003 total compensation was $400,000.

| | |
| --- | --- |
| 2003 Total Compensation: | $400,000.00 |
| Equity Award Based on 2003 Grid: | $46,250.00 |
| RSU Component: | $34,687.50 (75% of Total Equity) |
| Stock Option Component: | $11,562.50 (25% of Total Equity) |

Based on a stock price of $71.39 and a Black-Scholes option value of $27.79, the components of the 2003 equity award are as follows:

| RSU Component | | Market Price | Discount Price | Number of Shares |
| --- | --- | --- | --- | --- |
| RSU Award (75%): | $34,687.50 | $71.39 | $53.54 | 648 |
| **Option Component** | | | | |
| Option Award (25%): | $11,562.50 | $27.79 (a) | $20.84 | 555 |
| Total 2003 Equity Award: | $46,250.00 | | | |

(a) Black-Scholes value

**Note to Investment Representatives (IRs):** Your 2003 equity award was accrued as a portion of your monthly payout. Please refer to the section *IRs: Calculating Your 2003 Monthly Accrual* on page 6 for an illustration of how your monthly equity award accrual was determined.



CONFIDENTIAL



# INVESTMENT REPRESENTATIVES (IRs)

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation.[*] An example of the calculations follows.

## 2003 Equity Award Schedule

| Total Compensation Range[*] | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2.50% of 2003 total compensation |
| $100,000 - $199,999 | $2,500 plus 7.50% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $10,000 plus 12.50% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $37,500 plus 20.31% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $78,125 plus 25.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $140,625 plus 43.75% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $250,000 plus 43.75% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $468,750 plus 56.25% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $750,000 plus 68.75% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 43.75% of 2003 total compensation |

[*]For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

*Senior Vice President*



LEH-RSU 0015894



**EQUITY AWARD PROGRAM**

**6**

## Calculating Your 2003 Monthly Accrual

As an example, we'll go through the monthly calculation for an SVP IR whose 2003 total compensation earned from December 2002 through October 2003 (paid from January through November 2003) was $360,000.

| Step | Instructions | Sample Calculation | Sample Result |
|---|---|---|---|
| Step 1 | Take YTD Total Payout for first month and annualize (multiply by 12 and divide by production month number). | $30,000 x 12 ÷ 1 | $360,000 |
| Step 2 | Calculate equity accrual from 2003 award schedule on page 5. | $360,000 | $49,686 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($49,686 x 8.33%) - $0 | $4,141 |
| Step 4 | Take YTD Total Payout for second month and annualize (multiply by 12 and divide by production month number). | $65,000 x 12 ÷ 2 | $390,000 |
| Step 5 | Calculate equity accrual from 2003 award schedule on page 5. | $390,000 | $55,779 |
| Step 6 | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($55,779 x 16.67%) - $4,141 | $5,156 |
| Step 7 | Repeat for next month. | | |

### Example

| # | Pay Month | Monthly Total Payout($) | YTD Total Payout ($) | Annualized Total Payout ($) | Annualized Equity Award ($) | Allocation % | YTD Equity Accrual ($) | Monthly Equity Accrual ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | January | 30,000 | 30,000 | 360,000 | 49,686 | 8.33% | 4,141 | 4,141 |
| 2 | February | 35,000 | 65,000 | 390,000 | 55,779 | 16.67% | 9,297 | 5,156 |
| 3 | March | 40,000 | 105,000 | 420,000 | 61,872 | 25.00% | 15,468 | 6,171 |
| 4 | April | 25,000 | 130,000 | 390,000 | 55,779 | 33.33% | 18,593 | 3,125 |
| 5 | May | 28,000 | 158,000 | 379,200 | 53,586 | 41.67% | 22,327 | 3,734 |
| 6 | June | 32,000 | 190,000 | 380,000 | 53,748 | 50.00% | 26,874 | 4,547 |
| 7 | July | 38,000 | 228,000 | 390,857 | 55,953 | 58.33% | 32,639 | 5,765 |
| 8 | August | 40,000 | 268,000 | 402,000 | 58,216 | 66.67% | 38,811 | 6,172 |
| 9 | September | 32,000 | 300,000 | 400,000 | 57,810 | 75.00% | 43,358 | 4,547 |
| 10 | October | 27,000 | 327,000 | 392,400 | 56,266 | 83.33% | 46,889 | 3,531 |
| 11 | November | 33,000 | 360,000 | 392,727 | 56,333 | 91.67% | 51,639 | 4,750 |
| 12 | December [1] | — | 360,000 | 360,000 | 49,686 | 100.00% | 49,686 | (1,953) |
| **Total** | | | | | | | | **49,686** |

[1] Note that for purposes of calculating your 2003 equity award, your December payout was assumed to be zero.

CONFIDENTIAL

## Award Calculation Example

As an example, we'll go through the calculation for an SVP IR with payout of $360,000 for 2003. For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Your 2003 award was determined at year-end based on your total compensation from January through November. | Not applicable | $360,000 |
| **Step 2** | According to the schedule on page 5, the SVP in our example, with 2003 total compensation between $300,000 and $500,000 received $37,500 plus 20.31 percent of his 2003 total compensation over $300,000 in RSUs and stock options. | $37,500 + (20.31% x $60,000) | $49,686 |
| **Step 3** | The next step is to figure out how many options were awarded in 2003. The 2003 equity award was based on total payout, after all adjustments, for production months December 2002 through October 2003 (paid from January through November 2003) and the 2003 IR Equity Award Schedule on page 5. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, multiplied by 25 percent, gives us the stock option award. | [$37,500 + (20.31% x $60,000)] x 25% | $12,421.50 |
| **Step 4** | To calculate the number of options received, divide the value from step 3 by $20.84 (which represents the $27.79 Black-Scholes value of a 10-year Lehman Brothers option, less the Firm-provided 25 percent discount). | $12,421.50 ÷ $20.84 | 596 options |
| **Step 5** | The next step is to figure out how many RSUs were awarded in 2003. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, less the result in step 3 (which represents the value of the 2003 stock options), gives us the 2003 RSU award. | [($37,500 + (20.31% x $60,000)) - ($12,421.50)] | $37,264.50 |
| **Step 6** | To calculate the number of RSUs received, divided the value in step 5 by $53.54 (which represents the $71.39 price of Lehman Brothers stock on December 10, 2003, less the Firm-provided 25 percent discount). | $37,264.50 ÷ $53.54 | 696 RSUs |

*Senior Vice President*



# **T**ERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS

EQUITY AWARD PROGRAM

8

| Reason | RSUs | Stock Options |
|---|---|---|
| **General Rules** | | |
| **Salaried Members of the Firm** | ∎ If termination occurs prior to January 30, 2004, all RSUs will be forfeited. | ∎ If termination occurs prior to January 30, 2004, all options will be forfeited. |
| | ∎ If termination occurs after January 30, 2004, the disposition of the RSUs will be subject to the provisions outlined below. | ∎ If termination occurs after January 30, 2004, the disposition of the options will be subject to the provisions outlined below. |
| **Investment Representatives** | ∎ If termination occurs prior to November 30, 2003, the 2003 RSUs will be based on the amount of production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 75 percent. The disposition of the RSUs will be subject to the provisions outlined below. | ∎ If termination occurs prior to November 30, 2003, options will be based on the amount of your production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 25 percent. The disposition of the options will be subject to the provisions outlined below. |
| **Voluntary Not to a Competitor** | ∎ Entitled to the entire principal portion provided no Competitive Activity or Detrimental Activity through the Share Payment Date as defined below. | ∎ Entitled to the entire principal portion and discount portion of the option award. |
| | ∎ Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Competitive Activity or Detrimental Activity through the Share Payment Date. | ∎ Options become exercisable six months after termination (or on the scheduled date if sooner than six months), provided no Competitive Activity or Detrimental Activity. |
| | ∎ If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Competitive Activity or Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. | ∎ Options remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after the termination date. |
| | | ∎ If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date), provided you do not engage in Competitive Activity or Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. |
| | ∎ Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following the termination date. | ∎ In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |



# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
| --- | --- | --- |
| **Voluntary to a Competitor** | n Forfeit entire principal portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>n Entitled to the entire principal portion if termination occurs after November 30, 2005 (two years after the award date) provided no Detrimental Activity.<br><br>n Forfeit entire discount portion.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Forfeit entire principal portion and discount portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>n Forfeit options that are not exercised prior to termination date if termination occurs after November 30, 2005 (two years after the award date). |
| **Involuntary with Cause** | n Entire principal and discount portion will be forfeited immediately upon termination. | n Entire principal and discount portion will be forfeited immediately upon termination. |
| **Involuntary without Cause** | n Entitled to the entire principal portion provided no Detrimental Activity through the Share Payment Date.<br><br>n Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Detrimental Activity through the Share Payment Date.<br><br>n If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Entitled to the entire principal portion and discount portion of the option award.<br><br>n Options become immediately exercisable and remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after termination date, provided no Detrimental Activity.<br><br>n If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date) provided you do not engage in Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |

*Senior Vice President*



CONFIDENTIAL

LEH-RSU 0015898

EQUITY AWARD PROGRAM

**10**

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|--------|------|---------------|
| **Death, Disability, Retirement** | n Entire principal portion and discount portion will vest immediately.<br><br>n Shares of Lehman Brothers common stock will be issued immediately.<br><br>n Retirement means a termination of employment which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. | n Entire principal portion and discount portion will immediately become exercisable and remain exercisable until the expiration date (November 29, 2013).<br><br>n Retirement means a termination of employment, which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. |

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2003 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

### COMPETITIVE ACTIVITY

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, all of the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### DETRIMENTAL ACTIVITY

Detrimental Activity means at any time (i) using information received during a person's employment with Lehman Brothers Holdings Inc. or any subsidiary, their affiliates or clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with Holdings or any subsidiary or to breach any of the terms of his or her employment with Holdings or any subsidiary; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).



LEH-RSU 0015899



# TAX CONSIDERATIONS

## Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period.

You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding.

Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

| RSUs | Options |
|---|---|
| ▫ No taxation on the award date. | ▫ No taxation on the award date. |
| ▫ Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date. | ▫ When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale prices (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options. |
| ▫ This income will be subject to applicable withholding tax. | |
| ▫ Special provisions dealing with capital gains will not apply upon conversion to common stock. | |
| ▫ If you retain your shares after RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date. | ▫ This income will be subject to applicable withholding tax. |
| | ▫ Special provisions dealing with capital gains will not apply when options are exercised. |
| | ▫ If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise. |

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.

<em>Senior Vice President</em> 11



EQUITY AWARD PROGRAM

12

# **C**HANGE IN CONTROL ("CIC") PROVISIONS

| Reason | RSUs | Stock Options |
|---|---|---|
| **Hostile** | n All RSUs vest immediately. | n All options become immediately exercisable. |
| | n Shares of Lehman Brothers common stock will be issued immediately. | |
| **Friendly** | n Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity. | n Half of the non-exercisable options will become immediately exercisable. |
| | n The additional value of the RSUs in excess of the undiscounted RSU award price will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2008 (five years after the award date). | n The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates (75 percent on November 30, 2005 and 25 percent on November 30, 2008). |
| | n The RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | |

## Payment of RSUs Upon a Friendly CIC

EXAMPLE: Let's use as an example an SVP whose 2003 compensation was $400,000. The amount of compensation paid in RSUs was $34,688 (for 648 RSUs at a market value of $46,261). Assume there is a Change in Control and the market price for Lehman Brothers stock at that time is $100 per share.

### UNDISCOUNTED PURCHASE PRICE:

n Upon a Friendly Change in Control, this SVP receives a payment of shares (or cash) equivalent in value to the original award, $46,261. Assuming a market price of $100, this SVP would receive 463 shares.

### PREMIUM OVER UNDISCOUNTED PRICE:

n The additional value of the RSUs, in excess of the original award value, $16,539 ((648 RSUs x $100) - $46,261), will be held on the SVP's behalf in either cash or equity of the successor entity.

n The payment (in either cash or equity of the successor entity) will be subject to the same vesting and issuance restrictions as the RSU award.

n Assume the SVP leaves within two years of the Change in Control:

  – The SVP will be entitled to 75 percent of the additional value of the RSUs, in excess of the original award value ($16,539 x 75% = $13,904), provided no Competitive Activity or Detrimental Activity for a period of one year after termination date (or the second anniversary of the Change in Control, if sooner).

  – The SVP will also be entitled to a pro-rata portion of the remaining 25 percent of the additional value of the RSUs (in excess of the original award value) based on the number of full years completed after the RSU award date (e.g., if termination occurs during 2006 (but before November 30, 2006), 2/5th of the remaining amount or $1,854).

  – In total, the SVP will receive $15,758 ($1,854 plus $13,904) or 158 shares. In this example, the SVP receives 85 percent of the additional value of the RSUs in excess of the original award value.

n Please note that this value may be converted to shares of the successor entity. In this instance, the above percentages will be applied to the converted shares.



LEH-RSU 0015901



# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs. Dividends will not be paid on stock option awards.

# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit award agreement, the Stock Option award agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award statement or your award agreement, call the Compensation Department at 212-526-8346 (5-8346), or for IRs, your PCS Human Resources contact at 212-526-2921 (5-2921).

*Senior Vice President* 13



09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 47 of 148

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**4**

# EXHIBIT 4

# 2003 MANAGING DIRECTOR EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



## LEHMAN BROTHERS

1. **GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

2. **ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. **VESTING.** Units awarded to you hereunder shall become vested in accordance with the following vesting schedule:

□ Half of the Principal Units (35% of the total award) shall become vested on November 30, 2006.

□ The remaining half of the Principal Units and all of the Discount Units (65% of the total award) shall become vested on November 30, 2008.

Notwithstanding the above, in the event your employment is terminated with Cause or if you engage in Detrimental Activity prior to November 30, 2008, all of your vested and unvested Units will be forfeited and canceled.

4. **ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2008 (the "Maturity Date"). In the event of your Termination (as defined below) for any reason or notification of employment prior to January 30, 2004 or you engage in Detrimental Activity at any time prior to the Maturity Date, all Units held by you shall be forfeited and canceled. Delivery of Common Stock hereunder shall be made on, or as soon as practicable after, the Maturity Date except as specified in Paragraphs 4(b), (c), (d), (e), (f) and (g) below. For purposes of the Equity Award Program, "Termination" means the end of employment with Holdings or a subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

(b) **Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2006, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2006, you shall be entitled to half of the Principal Units (35% of the total award). Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity through the Share Payment Date.

(c) **Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination (as defined in

Annex A), you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(b) shall apply. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(c) shall be forfeited and canceled.

(d) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

(e) **Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity prior to the Share Payment Date. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(e) shall be forfeited and canceled.

(f) **Retirement.** Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of your Retirement on or after January 30, 2004 and provided you do not engage in Competitive Activity or Detrimental Activity, all Principal Units and Discount Units shall become immediately payable. You will receive freely transferable shares of common stock for each payable Unit as soon as practicable after your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(b) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(b). If you engage in Detrimental Activity, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

(g) **Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of the occurrence on or after January 30, 2004 of (i) a Bankruptcy Distribution Event, (ii) your death or Disability, (iii) your death or Disability following a Termination of employment described in Paragraphs 4(c) or (e) hereof, all outstanding Units held by you shall become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

(h) **Affidavit.** In the event of your Termination on or after January 30, 2004, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit within 60 days may cause you to forfeit all Units held by you at that time.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 30, 2004, you shall be paid cash and/or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

**7. NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

**8. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Maturity Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

**9. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Hostile Change in Control, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, you shall receive in the same form of consideration as that received by shareholders generally, the undiscounted market value (at the time of grant) for your Units, and the excess of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of two years from the date of the Friendly Change in Control or the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

**10. TREATMENT IN BANKRUPTCY.** (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you, or to a subsidiary for delivery by such subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

**11. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**12. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**13. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

**14. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**15. WITHHOLDING/DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and/or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

**ANNEX A: DEFINITIONS**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or

LEH-RSU 0015053

any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 30% discount upon issuance of the award.

**"Friendly Change in Control"** shall mean any Change in Control, which is not a Hostile Change in Control.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Hostile Change in Control"** shall mean the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (70% of the total number of units awarded).

**"Retirement"** means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Share Payment Date"** means as soon as practicable after the earlier of (a) November 30, 2008 or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

©2003 Lehman Brothers. All Rights Reserved. LB10464_C1_US_RSUAgmt/MD_RSU_Agmt

LEH-RSU 0015054

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 52 of 148

E
X
H
I
B
I
T

5

**EXHIBIT 5**

08-13555-smp Doc 47281 Filed 12/05/14 Entered 12/05/14 18:18:28 Main Document
Pg 53 of 598

2004 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS

Investment Representatives



# LEHMAN BROTHERS

CONFIDENTIAL

1. GRANT OF UNITS. Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 9, 2004 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

In the event of your Termination prior to November 30, 2004, the number of Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2004 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

2. ADDITIONAL DOCUMENTS; DEFINITIONS. You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. VESTING. Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

■ The Principal Units (75% of the total award) shall become vested on November 30, 2006.

■ The Discount Units (25% of the total award) shall become vested on November 30, 2009.

4. ENTITLEMENT TO RECEIVE COMMON STOCK.

(a) General Rule. Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2009 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date.

(b) Effect of Detrimental Activity. Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

(c) Occurrence of Death, Disability. In the event of the occurrence of your death or Disability, all outstanding Units held by you shall become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

(d) Voluntary Termination with Competitive Activity. In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2006, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2006, you shall be entitled to receive freely transferable shares of Common Stock for the Principal Units.

(e) Voluntary Termination without Competitive Activity. In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment

with Holdings or a Subsidiary after November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d) shall apply.

(f) Involuntary Termination with Cause. In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

(g) Involuntary Termination without Cause. In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

(h) Retirement. Notwithstanding the foregoing provisions of Paragraphs 4(d), (e), (f) and (g), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units as soon as practicable following your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(d) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d). If you engage in Detrimental Activity prior to the Share Payment Date, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

(i) Occurrence of Death or Disability following Termination. Notwithstanding the foregoing provisions of Paragraph 4(d), (e), (f) and (g), in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(e) or (g) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4 (other than Paragraph 4(h) or (i)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of the Paragraph 4(d)-(i) shall be canceled by Holdings.

(j) Affidavit. In the event of your Termination, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time.

LEH-RSU 0014330

5. DIVIDEND EQUIVALENTS. With respect to each dividend or distribution paid or made on Common Stock to holders of record, you shall be paid cash and / or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

6. LIMITATION ON OBLIGATIONS. Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

7. NON-ASSIGNMENT. Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. EQUITABLE ADJUSTMENT. In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Share Payment Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. CHANGE IN CONTROL. Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. TREATMENT IN BANKRUPTCY. (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a Subsidiary, Holdings agrees to deliver to (or at the direction of) such Subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a Subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you,

or to a Subsidiary for delivery to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

11. AMENDMENT. The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

12. BINDING ACTIONS. Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

13. NO RIGHT TO CONTINUED EMPLOYMENT. The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

14. APPLICABLE LAW. The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

15. WITHHOLDING / DEDUCTIONS. Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and / or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

16. SECTION 409(A)(1) TAX TREATMENT. Notwithstanding any other provisions of this Agreement, if any payment otherwise due hereunder would have the effect of subjecting you to tax under the provisions of Code Section 409A(a)(1), such payment shall be postponed until the earliest date upon which the payment could be made without subjecting you to tax under the provisions of Code Section 409A(a)(1).

ANNEX A: DEFINITIONS

"Appropriate Officer" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"Cause" means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to, the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"Change in Capitalization" means the occurrence of a circumstance described in Section 14 of the Plan.

"Committee" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"Competitive Activity" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"Detrimental Activity" means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"Disability" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"Discount Units" shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

"Full Career Termination" means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

"Principal Units" shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

"Retirement" means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"Share Payment Date" means as soon as practicable after the earlier of (a) the Maturity Date or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

"Termination" means the end of employment with Holdings or a Subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

©2004 Lehman Brothers. All Rights Reserved.

 LEH-RSU 0014332

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**6**

**EXHIBIT 6**

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

LEH-RSU 0000108

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings, Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of November 30, 2005 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

- Half of the Principal Units (35% of the total award) shall become vested on November 30, 2008.

- The remaining half of the Principal Units and all of the Discount Units (65% of the total award) shall become vested on November 30, 2010.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2010 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date, but no later than December 31, 2010.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of your death or Disability, on or after January 31, 2006, all outstanding Units held by you shall become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2006, all Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2008, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2008, you shall be entitled to receive freely transferable shares of Common Stock for half of the Principal Units (35% of the total award).

**(ii)Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a Subsidiary after November 30,

2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(iv) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

**(v) Retirement.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i), (ii), and (iv), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units on the 30th day following your Retirement. In the event of a voluntary Termination, if you engage in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply as of the date of your Retirement, and you shall forfeit Units in accordance with such provision or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d)(i). In any case, if you engage in Detrimental Activity prior to the Share Payment Date, you shall forfeit all Units held by you or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(vi) Occurrence of Death or Disability following Termination.** Notwithstanding the foregoing provisions of Paragraph 4(d)(i), (ii), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(d)(ii) or (iv) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of Paragraph 4(d) shall be canceled by Holdings.

**(e) Affidavit.** In the event of your Termination on or after January 31, 2006, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time or, in the event of Retirement, to repay to Holdings the full gross amounts or shares you received under this Agreement.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 31, 2006, you shall be credited with a number of additional Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares with respect to Units are to be issued or delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the Units, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. **AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

11. **BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

12. **NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

13. **APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

14. **WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

15. **CODE SECTION 409A.** It is intended that none of the Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

### ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment

LEH-RSU 0000110

contract between the person and Holdings or any Subsidiary, by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 30% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (70% of the total number of units awarded).

**"Retirement"** means a Termination when the person's age plus years of service with Holdings or any Subsidiary equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service.

**"Share Payment Date"** means the earlier of (a) the Maturity Date or (b) the 30th day after the completion of the fiscal quarter following the one-year anniversary of termination of employment.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2005 Lehman Brothers. All Rights Reserved.

LEH-RSU 0000111

E

X

H

I

B

I

T


7

**EXHIBIT 7**

## 2006 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 8, 2006 (the "Date of Grant"), the number of Restricted Stock Units ("2006 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2006 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2006 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2006 fiscal year ended November 30, 2006 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2006, the number of 2006 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2006 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, 2006 Units awarded to you hereunder shall become vested in accordance with the vesting schedule applicable to you as described under the term "Vesting Schedule" in the glossary attached hereto.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2006 Unit that has become vested which you hold on November 30, 2011 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(b) **Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2006 Units is called for hereunder, all 2006 Units held by you, whether or not vested, shall be terminated, forfeited, cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(c) **Occurrence of Death, Disability While You Are Employed** Without limiting Paragraphs 4(b), 4(d)(ii), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate shares of Common Stock underlying all of your then outstanding 2006 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production-Based

Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

(d) **Effect of Termination.** Except if you are a Production-Based Employee, and subject to Paragraph 9 hereof, in the event of your Termination for any reason or notification of Termination prior to January 31, 2007, all 2006 Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence (including, without limitation, if you are a Production-Based Employee), the following rules shall apply:

(i) **Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2006 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2006 Units not so terminated.

(ii) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2006 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iii) **Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) and 4(d)(v), and 9, and subject to Paragraphs 4(b), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2006 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2011, provided however, that your entitlement to receive freely transferable shares of Common Stock with respect to such unvested outstanding 2006 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect, but all then outstanding unvested 2006 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iv) **Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2006 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011. An express condition of your 2006 Units becoming vested and shares of Common Stock underlying such 2006 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii),

2

4(d)(v), 7, 9, 14 and 15, in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2006 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(c), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2006 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production Based Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2006 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2006 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2006 Units, with respect to each then outstanding 2006 Unit you then hold, you shall be credited with a number of additional 2006 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2006 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2006 Units to which they correspond; provided however, in the event you are not classified as a Production Based Employee, no such additional 2006 Units shall be granted to you in respect of any such dividend or distribution paid or made on Common Stock to holders of record on any date prior to January 31, 2007.

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the 2006 Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2006 Units are to be delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to 2006 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** 2006 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2006 Units, the number and kind of shares of Common Stock which may be delivered with respect to 2006 Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your 2006 Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be delivered. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the "undiscounted market value" (at the time of grant) of the shares of Common Stock underlying your outstanding 2006 Units (i.e., the fair market value of your 2006 Units determined on the date of grant) or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such "undiscounted market value" shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your 2006 Units shall remain otherwise subject to all delivery restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any 2006 Units, in which case you would only be delivered shares of Common Stock or receive the "undiscounted market value" in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such 2006 Units upon successful completion of a Change in Control.

10. **AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as

3

LEH-RSU 0017759

amended from time to time, (whether or not your rights are adversely affected).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of 2006 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the delivery of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**15. CODE SECTION 409A.** It is intended that none of the 2006 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the

Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

### ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any

4

CONFIDENTIAL

LEH-RSU 0017760

activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"**Discount Units**" shall mean the number of 2006 Units (and any dividend equivalents related thereto that are not Principal Units. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, thirty percent (30%) of your 2006 Units as of the date of grant will be Discount Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, twenty-five percent (25%) of your 2006 Units as of the date of grant will be Discount Units.

"**Full Career Termination**" means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) a person meets all of the following criteria: (a) the person is at least 50 years old, and (b) the person has at least 5 years of service.

"**Principal Units**" shall mean the number of 2006 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy percent (70%) of your 2006 Units as of the date of grant will be Principal Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy-five percent (75%) of your 2006 Units as of the date of grant will be Principal Units.

"**Share Payment Date**" means November 30, 2011.

"**Termination**" means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

"**Vesting Schedule**" means the schedule below that is applicable to you, pursuant to which your 2006 Units are scheduled to vest subject to the terms and conditions of Paragraph 3 and the other terms and conditions of the Agreement:

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 50% on November 30, 2009; 50% on November 30, 2011 |
| Discount Units: | 100% on November 30, 2011. |

(b) If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 100% on November 30, 2008 |
| Discount Units: | 100% on November 30, 2011. |

©2006 Lehman Brothers. All Rights Reserved.

5

CONFIDENTIAL

LEH-RSU 0017761

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 88 of 148

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**8**

# EXHIBIT 8

# 2007 EQUITY AWARD PROGRAM
## LIFE @ LEHMAN
### YOUR BENEFITS AND LIFE BALANCE

Agreement Evidencing A Grant of
Restricted Stock Units

## LEHMAN BROTHERS

LEH-RSU 0000278

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 7, 2007 (the "Date of Grant"), the number of Restricted Stock Units ("2007 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2007 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2007 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2007 fiscal year ended November 30, 2007 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2007, the number of 2007 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2007 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, 2007 Units awarded to you hereunder shall become vested in accordance with the following vesting schedule

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

| Principal Units: | 50% on November 30, 2010; |
| | 50% on November 30, 2012 |
| Discount Units: | 100% on November 30, 2012. |

(b) If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

| Principal Units: | 100% on November 30, 2009 |
| Discount Units: | 100% on November 30, 2012. |

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2007 Unit that has become vested which you hold on November 30, 2012 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2007 Units is called for hereunder, all 2007 Units held by you, whether or not vested, shall be terminated, forfeited, and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(c) Occurrence of Death, Disability While You Are Employed.** Without limiting Paragraphs 4(b), 4(d)(ii), 4(e), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate, shares of Common Stock underlying all of your then outstanding 2007 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** Notwithstanding Paragraph 3 hereof, in the event of any Termination the following rules shall apply:

**(i) Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2007 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2007 Units not so terminated.

**(ii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2007 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(iii) Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) 4(d)(v), and 9, and subject to Paragraphs 4(b), 4(e), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2007 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2012, provided however, that your entitlement to receive freely transferable shares of Common Stock with respect to such unvested outstanding 2007 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect. All then outstanding unvested 2007 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2007 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012. An express condition of your 2007 Units becoming vested and shares of Common Stock underlying such 2007 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and

2

including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2007 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(b), 4(e), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii), and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2007 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v)) shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2007 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2007 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2007 Units, with respect to each then outstanding 2007 Unit you then hold, you shall be credited with a number of additional 2007 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2007 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2007 Units to which they correspond

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the 2007 Units granted

hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2007 Units are to be delivered to you falls on a non-business or non-trading day such shares shall be delivered on the immediately succeeding trading day (i.e., when shares trade regular way on the New York Stock Exchange). Whenever shares with respect to 2007 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** 2007 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2007 Units, the number and kind of shares of Common Stock which may be delivered with respect to the 2007 Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.**

(a) **Vesting of Units Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to earlier vesting pursuant to Paragraphs 3 and 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination, all of your then outstanding 2007 Units shall vest upon the later of (x) 18 months following such Change in Control or (y) a date determined by the Committee that is within 15 days of November 30 of the Fiscal Year following the Fiscal Year in which the Change in Control occurs (such later date, the "Change in Control Vesting Date"). Additionally, all of your 2007 Units (including Principal and Discount Units) shall become immediately vested in the event of your involuntary Termination without Cause following the Change in Control but prior to the Change in Control Vesting Date.

(b) **Delivery of Common Stock Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to receive earlier delivery of shares of Common Stock pursuant to Paragraph 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination or by reason of Paragraphs 7 or 14, you shall receive shares of Common Stock in respect of your then outstanding 2007 Units on the Change in Control Vesting Date; provided, however, that in the event of your Termination for any reason other than due to death or Disability following the Change in Control but prior to the Change in Control Vesting Date, you shall receive shares of Common Stock in respect of your then vested 2007 Units upon the earlier of (x) the last day

3

LEH-RSU 0000280

of the fiscal quarter that ends after the first anniversary of the date of your Termination or (y) the Change in Control Vesting Date.

For purposes of this Paragraph 9, the term "Fiscal Year" shall refer to the fiscal year of Holdings.

**10. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not your rights are adversely affected).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of 2007 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment which it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you arising as a result of the grant, vesting or payment hereunder. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold or satisfy any taxes required by law which are incurred by reason of or are otherwise due as a result of the grant, vesting or the delivery of such shares of Common Stock, and (b) that where determined necessary or appropriate by the Firm in its sole discretion, you direct the sale of any shares of Common Stock delivered in respect of any 2007 Units to satisfy any such amounts in Paragraph 14(a) hereof, and (c) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the

grant or vesting of the 2007 Units or delivery of shares of Common Stock hereunder. If the amount requested for the purpose of satisfying the withholding or other tax obligation is not paid, you hereby direct Holdings to withhold shares of Common Stock and / or related dividend equivalents and to otherwise sell shares of Common Stock delivered hereunder in order to fulfill any such obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary; provided, however, that no such right to deduct or offset shall arise or otherwise be deemed to arise until the date upon which shares of Common Stock are deliverable hereunder.

**15. CODE SECTION 409A.** It is intended that none of the 2007 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code. If you are a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares of Common Stock that are linked to the date of your separation from service shall not be made prior to the date which is six (6) months after the date of your separation from service Holdings and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.

**ANNEX A: DEFINITIONS**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's

4

violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto) that are not Principal Units. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, thirty percent (30%) of your 2007 Units as of the date of grant will be Discount Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, twenty-five percent (25%) of your 2007 Units as of the date of grant will be Discount Units.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) the person is at least 50 years old, and the person has at least 5 years of service.

**"Principal Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, seventy percent (70%) of your 2007 Units as of the date of grant will be Principal Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30,

2007, seventy-five percent (75%) of your 2007 Units as of the date of grant will be Principal Units.

**"Share Payment Date"** means November 30, 2012.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2007 Lehman Brothers. All Rights Reserved.

LEH-RSU 0000282

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 74 of 148

E
X
H
I
B
I
T

9

**EXHIBIT 9**

08-13555-mp Doc 46263 Filed 10/02/12 Entered 10/02/12 23:09:51 Main Exhibits
Pg 95 of 598

## 2003 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 10, 2003 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")—which may be adjusted under section 7 of this Letter—subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

1. GRANT. The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on November 30, 2008 (the "Maturity Date"), subject to fulfillment of the conditions set out in this Letter.

2. ENTITLEMENT TO RECEIVE COMMON STOCK.

(a) **General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date, but in the event of Termination of the Participant's employment with the Group for any reason or notification of termination prior to January 30, 2004, or in the event that the Participant engages in any Detrimental Activity at any time prior to the Maturity Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

(b) **Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination, and if the Participant engages in Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2005, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2005, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date.

(c) **Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination on or after January 30, 2004:

(i) Provided that the Participant does not engage in Competitive Activity or Detrimental Activity from the date of his Termination to the Share Payment Date, the Participant shall, on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) If such Termination occurs prior to November 30, 2005 and the Participant engages in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall not become entitled to any Principal Award Shares; and

(iii) If such Termination occurs on or subsequent to November 30, 2005, and the Participant engages in Competitive Activity prior to the Share Payment Date, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares, provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date; and

(iv) Provided that the Participant does not engage in Competitive Activity or Detrimental Activity before the Share Payment Date, the Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2003 and before Termination; and

# LEHMAN BROTHERS

(v) However, if such Termination is a Full Career Termination (as defined in the Appendix), and the Participant does not engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(vi) If the Participant engages in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall not become entitled to any Discount Award Shares.

(d) **Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

(e) **Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause on or after January 30, 2004:

(i) Provided that the Participant does not engage in Detrimental Activity from the date of his Termination to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) Provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2003 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, and the Participant does not engage in Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

(f) **Retirement.** Notwithstanding sections 2(a) – (e) of this Letter, in the event of the Participant's Retirement on or after January 30, 2004 and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, as soon as practicable after his Retirement. If the Participant engages in Competitive Activity, the provisions specified in section 2(b) of this Letter shall apply as of the date of his Retirement, and the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(b). If the Participant engages in Detrimental Activity, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

(g) **Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding sections 2(a) – (e) of this Letter, in the event on or after January 30, 2004:

(i) A Bankruptcy Distribution Event, the Participant shall immediately become entitled to receive all the Principal Award Shares and the Discount Award Shares; and

(ii) The Participant's death or Disability or the Participant's death or Disability following (aa) the Participant's voluntary Termination without Competitive Activity; or (bb) the Participant's involuntary Termination without Cause, the Participant shall immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

3. **AFFIDAVIT.** In the event of the Termination of the Participant on or after January 30, 2004, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign, and return the affidavit within 60 days may prevent the Participant from becoming entitled to any of the Award Shares.

4. **INTERIM PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 30, 2004, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant, pay to the Participant cash amounts, or award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto. The Participant shall become entitled to any such additional Award Shares and/or cash amounts at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares and/or cash amounts relate.

5. **TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter.

6. **NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

7. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

8. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Hostile Change in Control, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, the Participant shall receive, in the same form of consideration as that received by shareholders generally, the undiscounted U.S. Dollar market value (at the time of grant) for his Award Shares, and the excess of the price paid by an acquiror over such undiscounted U.S. Dollar market value shall become receivable after the earlier of two years from the date of that Friendly Change in Control or the first to occur of the dates set out under section 2 of this Letter (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are

LEH-RSU 0007229

satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

9. TREATMENT IN BANKRUPTCY. (a) If the Participant is an employee of Holdings, Holdings agrees to deliver, and (b) if the Participant is an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, Shares on the date on which such Shares become due to be delivered under this Letter. If the Participant is an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of the Participant and the Participant shall have the full right to enforce Holdings' obligation to deliver Shares as if such obligation was made directly in favour of the Participant. All of the Participant's claims arising from, or in connection with, or in any way relating to, any failure of any Group Company to deliver to the Participant Shares on the date on which Shares become and are due to be delivered to the Participant under this Letter shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Shares, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, a holding of Shares.

10. AMENDMENT. The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

11. BINDING ACTIONS. Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation, or effect of this Letter or the Plan shall be within its sole and absolute discretion, as the case may be, and shall be final, conclusive, and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

12. NO RIGHT TO CONTINUED EMPLOYMENT. Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

13. APPLICABLE LAW. The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

14. SUBMISSION TO JURISDICTION. The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

15. STOCKHOLDER RIGHTS. The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

16. TAXES/DEDUCTIONS. It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may refuse to issue or transfer the relevant Shares and/or related interim payments or take any other action they deem necessary to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

17. COMPLIANCE WITH LAW. Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

18. ENTIRE AGREEMENT. The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

APPENDIX

1. In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distributions to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

LEH-RSU 0007230

"**Beneficial Ownership**" has the same meaning as in Rule 13d-3 promulgated under the Exchange Act.

"**Board**" means the board of directors of Holdings.

"**Cause**" means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"**Committee**" means the Compensation and Benefits Committee of the Incumbent Board (see definition of change in control in the plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant, or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

"**Discount Award Shares**" means Shares equal in number to 25% of the Award Shares.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

"**Friendly Change in Control**" means any Change in Control, which is not a Hostile Change in Control.

"**Full Career Termination**" means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any subsidiary.

"**Group**" means Holdings and all its Subsidiaries and Affiliates, and

"**Group Company**" shall mean any entity within the Group.

"**Hostile Change in Control**" means the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

"**Person**" has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

"**Plan**" means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

"**Principal Award Shares**" means Shares equal in number to 75% of the Award Shares.

"**Retirement**" means a Termination of employment with all Group Companies which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"**Share**" means a vested share of Common Stock of Holdings, par value of $0.10 per share.

"**Share Payment Date**" means as soon as practicable after the earlier of (i) November 30, 2008 or (ii) the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

"**Subsidiary**" means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

"**Termination**" means the end of employment with Holdings or any Group Company. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

"**Voting Securities**" means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

2. In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2004 Lehman Brothers. All Rights Reserved. LB10484_C1_Non_US_Agmt&Letters/CSA_Award_letter

E
X
H
I
B
I
T

10

**EXHIBIT 10**

## 2004 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 9, 2004 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")—which may be adjusted under section 7 of this Letter–subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on November 30, 2009 (the "Maturity Date"), subject to fulfillment of the conditions set out in this Letter.

## 2. ENTITLEMENT TO RECEIVE COMMON STOCK.

**(a) General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of the Participant's death or Disability, all outstanding Award Shares

held by the Participant shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of Termination of the Participant's employment with the Group for any reason or notification of Termination prior to January 31, 2005, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination with Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2006, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2006, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares.

**(ii) Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination without Competitive Activity:

(i) The Participant shall, on the Share Payment Date, become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2004 and before Termination; and

# LEHMAN BROTHERS

LEH-RSU 0001054

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(iv) If the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 2(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

**(iv) Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause:

(i) The Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2004 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

**(v) Retirement.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the Participant's Retirement and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, as soon as practicable after his Retirement. If the Participant engages in Competitive Activity, the provisions specified in section 2(d)(i) of this Letter shall apply as of the date of his Retirement, and the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(d)(i). If the Participant engages in Detrimental Activity prior to the Share Payment Date, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

**(vi) Occurrence of Death or Disability following a Termination.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(iii) or (iv) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares that become payable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 2(b). Any remaining Award Shares that are not payable pursuant to the provisions of the Paragraph 2(d) shall be canceled by Holdings.

**3. AFFIDAVIT.** In the event of the Termination of the Participant on or after January 31, 2005, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares.

**4. DIVIDEND PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 31, 2005, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant, pay to the Participant cash amounts, or award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto. The Participant shall become entitled to any such additional Award Shares and/or cash amounts at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares and/or cash amounts relate.

**5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter.

**6. NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

**8. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, and sales restrictions will lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying his outstanding Award Shares or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the

LEH-RSU 0001055

excess price) in respect of such Shares upon successful completion of a Change in Control.

**9. TREATMENT IN BANKRUPTCY.** (a) If the Participant is an employee of Holdings, Holdings agrees to deliver, and (b) if the Participant is an employee of a Group Company, Holdings agrees to deliver to (or at the direction of) such Group Company, Shares on the date on which such Shares become due to be delivered under this Letter. If the Participant is an employee of a Group Company, Holdings' obligation in clause (b) in the preceding sentence is created expressly for the benefit of the Participant and the Participant shall have the full right to enforce Holdings' obligation to deliver Shares as if such obligation was made directly in favour of the Participant. All of the Participant's claims arising from, or in connection with, or in any way relating to, any failure of any Group Company to deliver to the Participant Shares on the date on which Shares become and are due to be delivered to the Participant under this Letter shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Shares, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, a holding of Shares.

**10. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**14. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**15. STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**16. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may refuse to issue or transfer the relevant Shares and/or related interim payments or take any other action they deem necessary to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

1. In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution

LEH-RSU 0001056

for a felony or such a misdemeanor, habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means Shares equal in number to 25% of the Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Normal Termination"** means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any subsidiary.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

**"Principal Award Shares"** means Shares equal in number to 75% of the Award Shares.

**"Retirement"** means a Termination of employment with all Group Companies which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Share"** means a vested share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means as soon as practicable after the earlier of (i) the Maturity Date or (ii) the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of employment with Holdings or any Group Company. The date of Termination and the reason of Termination are as determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2004 Lehman Brothers. All Rights Reserved.

LEH-RSU 0001057

09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 84 of 148

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**11**

# EXHIBIT 11

08-13555-jmp Doc 46263 Filed 12/02/15 Entered 12/02/13 09:35:51 Main Exhibits
Pg 103 of 528

2005 **EQUITY AWARD** PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of November 30, 2005 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")—which may be adjusted under section 7 of this Letter–subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on the Maturity Date, subject to fulfillment of the conditions set out in this Letter.

## 2. ENTITLEMENT TO RECEIVE COMMON STOCK.

**(a) General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of the Participant's death or Disability on or after January 31, 2006, all outstanding Award Shares held by the Participant shall

become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of Termination of the Participant's employment with the Group for any reason or notification of Termination prior to January 31, 2006, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination with Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2007, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2007, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares.

**(ii) Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination without Competitive Activity:

(i) The Participant shall, on the Share Payment Date, become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2005 and before Termination; and

# LEHMAN BROTHERS

LEH-RSU 0001082

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(iv) If the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 2(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

**(iv) Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause:

(i) The Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2005 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

**(v) Retirement.** Notwithstanding sections 2(d)(i), (ii), and (iv) of this Letter, in the event of the Participant's Retirement and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, on the 30th day after his Retirement. In the event of a voluntary Termination, if the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in section 2(d)(i) of this Letter shall apply as of the date of his Retirement, and the Participant shall be entitled only to such Award Shares as provided therein or, if the Participant has already received Award Shares, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(d)(i). In any case, if the Participant engages in Detrimental Activity prior to the Share Payment Date, the Participant shall not be entitled to any Award Shares or, if the Participant has already received Award Shares, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

**(vi) Occurrence of Death or Disability following a Termination.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(iii) or (iv) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares that become payable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v) or (vii)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 2(b). Any remaining Award Shares that are not payable pursuant to the provisions of the Paragraph 2(d) shall be canceled by Holdings.

**3. AFFIDAVIT.** In the event of the Termination of the Participant on or after January 31, 2006, the Participant may be requested, from time to time, after that Termination, to complete and sign an

affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares or in the event of Retirement, may cause the Participant to repay to Holdings the full gross amounts or Shares received under this Letter.

**4. INTERIM PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 31, 2006, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate.

**5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**6. NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to receive Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

**8. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as

LEH-RSU 0001083

that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying his outstanding Award Shares or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

**9. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

**10. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**11. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**13. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**14. STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**15. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the

Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may withhold the relevant Shares and/or related interim payments to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

**16. CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in

the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means Shares equal in number to 25% of the Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any Group Company.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and **"Group Company"** shall mean any entity within the Group.

**"Maturity Date"** means as soon as practicable after November 30, 2010 but no later than December 31, 2010.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

**"Principal Award Shares"** means Shares equal in number to 75% of the Award Shares.

**"Retirement"** means a Termination when the Participant's age plus years of service with any Group Company equals at least 65, provided that (i) the Participant is at least 65 years old and has at least 5 years of service or (ii) the Participant is at least 55 years old and has at least 10 years of service.

**"Share"** means a vested share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means the earlier of (i) the Maturity Date or (ii) the 30th day after the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2005 Lehman Brothers. All Rights Reserved.

LEH-RSU 0001085

09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 89 of 148

**E**
**X**
**H**
**I**
**B**
**I**
**T**

**12**

# EXHIBIT 12

2006 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER



## LEHMAN BROTHERS

CONFIDENTIAL LEH-RSU 0019153

Pursuant to the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan (the "Plan")Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 8, 2006 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "2006 Award Shares")--which may be adjusted under section 7 of this Letter--subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter"). A portion of the Participant's 2006 Award Shares are classified either as "Principal Award Shares" or "Discount Award Shares" as defined in the glossary attached hereto.

If the Participant is classified by Holdings or any applicable Group Company as a "production based employee" for the Company's 2006 fiscal year ended November 30, 2006 ("Production-Based Employee"), in the event of the Participant's Termination prior to November 30, 2006, the number of 2006 Award Shares the Participant was awarded was based on the appropriate portion of such Participant's production-based compensation accrued for such Participant's 2006 equity award through the date of the Participant's Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at the Participant's level.

This Letter will entitle the Participant to receive the 2006 Award Shares, under and on fulfillment of the conditions and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

1. GRANT. The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the 2006 Award Shares and the Participant shall become entitled to receive the 2006 Award Shares and Shares related thereto on the Share Payment Date, subject to fulfillment of the conditions set out in this Letter. Some of the conditions set out in this Letter, such as those provided in paragraph 2(b) apply through the Share Payment Date or such other date on which the vesting of unconditional 2006 Award Shares and delivery of Shares in respect thereof is otherwise called for hereunder. In contrast to such "full conditions," other "limited" conditions, such as Paragraph 2(d) apply only over the time periods and under the circumstances provided as described in those conditions.

2. ENTITLEMENT TO RECEIVE COMMON STOCK.

(a) General Rule. Subject to other provisions of this section 2, 6, 8, 15 and 16, the Participant shall become entitled to receive vested 2006 Award Shares on the Share Payment Date. Unless otherwise set forth herein, the Participant shall receive one share of Common Stock for each 2006 Award Share which the Participant holds on November 30, 2011 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, the Participant shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(b) Effect of Detrimental Activity. Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the 2006 Award Shares and all rights hereunder shall terminate.

(c) Occurrence of Death, Disability While Participant is Employed. In the event of the occurrence of the Participant's death or Disability all outstanding 2006 Award Shares held by the Participant shall become vested and Shares relating thereto shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable shares of Common Stock provided, however, if Participant is not classified as a Production Based Employee, the foregoing shall only apply if the Participant's death or Disability occurs on or after January 31, 2007.

(d) Effect of Termination. Except if the Participant is a Production-Based Employee and except as prescribed in paragraph 8 hereof, in the event of Termination of the Participant's employment with Holdings or any Group Company for any reason or notification of Termination prior to January 31, 2007, the Participant will not become entitled to any of the 2006 Award Shares and all rights hereunder shall terminate. Except as otherwise provided in this Paragraph 2(d) and Paragraph 8, the rights granted to a Participant hereunder to receive unconditional 2006 Award Shares is conditioned not only on "full conditions" such as Paragraphs 2(b), 9 and 15, without limitation, but also on the Participant remaining actively employed through the date (or dates) applicable to such Participant as described under "Service Requirements" in the glossary. In the event of any Termination not described in the first sentence of this Paragraph 2(d) (including without limitation, if the Participant is a Production Based Employee), the following rules shall apply:

(i) Voluntary Termination. Except as otherwise provided for in Paragraph 2(d)(iv) and 2(d)(v) hereof, and subject to Paragraph 8 hereof, in the event of a Participant's voluntary Termination all then outstanding 2006 Award Shares as to which the applicable Services Requirements as described in the glossary had not been met as of the date of such Termination shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2006 Award Shares not so terminated.

(ii) Involuntary Termination with Cause. In the event of the Participant's involuntary Termination with Cause at any time prior to the Share Payment Date, the 2006 Award Shares shall be terminated, forfeited and cancelled and the Participant shall not on that date become entitled to any 2006 Award Shares or any shares of Common Stock relating thereto.

(iii)Involuntary Termination without Cause. Except as provided in Paragraphs 2(c), 2(d)(iv) 2(d)(v), and, 8, and subject to the "full conditions" of Paragraphs 2(b), 6, 15 and 16, in the event of a Participant's involuntary Termination without Cause, the Participant shall be entitled to receive 2006 Principal Award

2

LEH-RSU 0019154

Shares and freely transferable shares of Common Stock with respect thereto as soon as practicable after the Share Payment Date, but no later than December 31, 2011, provided, however, that your entitlement to any freely transferable shares of Common Stock underlying such outstanding 2006 Principal Award Shares as to which the applicable Service Requirements have not been met is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Group Company and in accordance with Holdings' (or any Group Company's) policies and procedures then in effect, but all then outstanding 2006 Discount Award Shares shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any shares of Common Stock relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of the "full conditions" of Paragraphs 2(b), 2(d)(ii), 6, 8, 15 and 16, in the event of a Participant's voluntary Termination which occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirements shall need to be satisfied by the Participant in respect of all of such Participant's then outstanding 2006 Award Shares and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to satisfaction of such other "full conditions". An express condition of no longer requiring that the Participant satisfy the Service Requirements with respect to such 2006 Award Shares and an express condition to the shares of Common Stock underlying such 2006 Award Shares becoming deliverable pursuant to the immediately preceding sentence is that the Participant not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of Paragraphs 2(b), 2(d)(ii), 4(d)(v), 6, 8, 15 and 16, in the event the Participant's involuntary Termination without Cause occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirement shall be required of the Participant with respect to all then outstanding 2006 Award Shares and, subject to the "full conditions" described herein, such 2006 Award Shares shall vest and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

**(v) Occurrence of Death or Disability following a Termination.** Without limiting the applicability of Paragraphs 2(b), 6, 8, 15 and 16 hereof and notwithstanding sections 2(d)(i), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(i) or (iii) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v)) shall be delivered to the Participant as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to the application of

Paragraphs 2(b), 8, 15 and 16. Any remaining 2006 Award Shares that are not deliverable pursuant to the provisions of Paragraph 2 or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and the Participant shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not the Participant's Termination is voluntary, involuntary, or with or without Cause, whether or not the Participant has engaged in Detrimental Activity, or whether or not the Participant meets the definition of Disability or Full Career Termination.

## 4. INTERIM PAYMENTS AND FURTHER AWARDS.
Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after the Date of Grant, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate, provided however, in the event the Participant is not classified as a Production Based Employee, no such additional 2006 Award Shares shall be granted to the Participant in respect of any such dividend or distribution paid or made on Common Stock to holders of record on any date prior to January 31, 2007.

## 5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.
Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

## 6. NON-ASSIGNMENT.
No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

3

CONFIDENTIAL

LEH-RSU 0019155

7. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

8. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be delivered. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the "undiscounted market value" (at the time of grant) of the shares of Common Stock underlying his outstanding 2006 Award Shares (i.e. the fair market value of the Participant's 2006 Award Shares determined on the Date of Grant) or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be delivered Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

9. **AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not the Participant's rights are adversely affected).

10. **BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

11. **NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other

Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

12. **APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

13. **SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

14. **STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

15. **TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may withhold the relevant Shares and/or related interim payments to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

16. **CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon the Participant of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to the Participant with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing the Participant to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in the Participant's incurring any tax liability under

4

LEH-RSU 0019156

Section 409A of the Code.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

## APPENDIX

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group

Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means the number of 2006 Award Shares (and any dividend equivalents related thereto). If Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, thirty percent (30%) of Participant's 2006 Award Shares as of the date of grant will be Discount Award Shares. If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, twenty-five percent (25%) of Participant's 2006 Award Shares as of the date of grant will be Discount Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) a person meets all of the following criteria: (a) the person is at least 50 years old, and (b) the person has at least 5 years of service.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group. Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not an entity is or is not a "Group Company" for purposes of any provision of this Agreement.

**"Person"** has the same meaning as in section 13(d) or 14(f) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

**"Service Requirements"** means the schedule below that is applicable to the Participant, pursuant to which the Participant is required to be actively employed with the Company and/or any Group Company as described in Paragraph 2, and which, except as provided in Paragraphs 2(c), 2(d)(i), (iii), (iv) and (v) and 8, shall be a necessary

5

condition for the Participant to become entitled to receive both vested 2006 Award Shares and shares of Common Stock underlying such 2006 Award Shares provided the Participant otherwise satisfies the other terms and conditions hereunder:

(a) If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified below in order to be eligible to receive that portion of such 2006 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 50%: November 30, 2009; |
| | 50%: November 30, 2011. |
| Discount Award Shares: | 100%: November 30, 2011. |

(b) If Participant was an employee of Holdings or any Group Company other than a Managing Director for the fiscal year ended November 30, 2006 such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified in order to be eligible to receive that portion of such 2006 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 100%: November 30, 2008 |
| Discount Award Shares: | 100%: November 30, 2011. |

"**Principal Award Shares**" shall mean the number of 2006 Award Shares (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, seventy percent (70%) of such Participant's 2006 Award Shares as of the Date of Grant will be Principal Award Shares. If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, seventy-five percent (75%) of such Participant's 2006 Award Shares as of the Date of Grant will be Principal Award Shares.

"**Share**" means a share of Common Stock of Holdings, par value of $0.10 per share.

"**Share Payment Date**" means November 30, 2011.

"**Subsidiary**" means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

"**Termination**" means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

"**Voting Securities**" means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2006 Lehman Brothers. All Rights Reserved.

6

CONFIDENTIAL                                                          LEH-RSU 0019158

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 96 of 148

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**13**

**EXHIBIT 13**

# 2007 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

Contingent Stock Award Letter

# LEHMAN BROTHERS

LEH-RSU 0000263

Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), Holdings hereby grants to you (the "Participant"), as of December 7, 2007 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "2007 Award Shares")--which may be adjusted under section 7 of this Letter--subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter"). A portion of the Participant's 2007 Award Shares are classified either as "Principal Award Shares" or "Discount Award Shares" as defined in the glossary attached hereto.

If the Participant is classified by Holdings or any applicable Group Company as a "production-based employee" for the Company's 2007 fiscal year ended November 30, 2007 ("Production-Based Employee"), in the event of the Participant's Termination prior to November 30, 2007, the number of 2007 Award Shares the Participant was awarded was based on the appropriate portion of such Participant's production-based compensation accrued for such Participant's 2007 equity award through the date of the Participant's Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at the Participant's level.

This Letter will entitle the Participant to receive the 2007 Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the 2007 Award Shares and the Participant shall become entitled to receive the 2007 Award Shares and Shares related thereto on the Share Payment Date, subject to fulfillment of the conditions set out in this Letter. Some of the conditions set out in this Letter, such as those provided in paragraph 2(b) apply through the Share Payment Date or such other date on which the 2007 Award Shares become unconditional and delivery of Shares in respect thereof is otherwise called for hereunder. In contrast to such "limited conditions," other "full" conditions, such as Paragraph 2(d) apply only over the time periods and under the circumstances provided as described in those conditions.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Subject to other provisions of this section 2, 6, 8, 15 and 16, the Participant shall become entitled to receive 2007 Award Shares on the Share Payment Date. Unless otherwise set forth herein, the Participant shall receive one Share for each 2007 Award Share which the Participant holds on November 30, 2012 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, the Participant shall be entitled to receive freely transferable Shares as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the 2007 Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability While Participant is Employed.** In the event of the occurrence of the Participant's death or Disability all outstanding 2007 Award Shares held by the Participant shall become unconditional and Shares relating thereto shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable Shares.

**(d) Effect of Termination.** Except as otherwise provided in this Paragraph 2(d) and Paragraph 8, the rights granted to a Participant hereunder to receive 2007 Award Shares is conditioned not only on "limited conditions" such as Paragraphs 2(b), 9 and 15, without limitation, but also on the Participant remaining actively employed through the date (or dates) applicable to such Participant as described under "Service Requirements" in the glossary. In the event of any Termination the following rules shall apply:

**(i) Voluntary Termination.** Except as otherwise provided for in Paragraph 2(d)(iv) and 2(d)(v) hereof, and subject to Paragraph 8 hereof, in the event of a Participant's voluntary Termination all then outstanding 2007 Award Shares as to which the applicable Services Requirements as described in the glossary had not been met as of the date of such Termination shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any Shares relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2007 Award Shares not so terminated.

**(ii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Share Payment Date, the 2007 Award Shares shall be terminated, forfeited and cancelled and the Participant shall not on that date become entitled to any 2007 Award Shares or any Shares relating thereto.

**(iii) Involuntary Termination without Cause.** Except as provided in Paragraphs 2(c), 2(d)(iv) 2(d)(v), and 8, and subject to the "limited conditions" of Paragraphs 2(b), 3, 6, 15 and 16, in the event of a Participant's involuntary Termination without Cause, the Participant shall be entitled to receive 2007 Principal Award Shares and freely transferable Shares with respect thereto as soon as practicable after the Share Payment Date, but no later than December 31, 2012, provided, however, that the Participant's entitlement to any freely transferable Shares underlying such outstanding 2007 Principal Award Shares as to which the applicable Service Requirements have been met is expressly conditioned on the Participant's timely execution of a release in such form as may be required by Holdings or any Group Company and in accordance with Holdings' (or any Group Company's) policies and procedures then in effect. All then outstanding 2007 Discount Award Shares shall be terminated,

2

forfeited and be cancelled, and the Participant shall have no further right to any Shares relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of the "limited conditions" of Paragraphs 2(b), 2(d)(ii), 3, 6, 8, 15 and 16, in the event of a Participant's voluntary Termination which occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirements will need to be satisfied by the Participant in respect of all of such Participant's then outstanding 2007 Award Shares and Shares relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to satisfaction of such other "limited conditions". An express condition of no longer requiring that the Participant satisfy the Service Requirements with respect to such 2007 Award Shares and an express condition to the Shares underlying such 2007 Award Shares becoming deliverable pursuant to the immediately preceding sentence is that the Participant not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of Paragraphs 2(b), 2(d)(ii), 3, 4(d)(v), 6, 8, 15 and 16, in the event the Participant's involuntary Termination without Cause occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirement shall be required of the Participant with respect to all then outstanding 2007 Award Shares and, subject to the "limited conditions" described herein, Shares relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(v) Occurrence of Death or Disability following a Termination.** Without limiting the applicability of Paragraphs 2(b), 3, 6, 8, 15 and 16 hereof and notwithstanding sections 2(d)(i), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(i) or (iii) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any Shares that become deliverable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v)) shall be delivered to the Participant as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to the application of Paragraphs 2(b), 3, 8, 15 and 16. Any remaining 2007 Award Shares that are not deliverable pursuant to the provisions of Paragraph 2 or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and the Participant shall have no further right to any Shares relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not the Participant's Termination is voluntary, involuntary, or with or without Cause, whether or not the Participant has engaged in Detrimental Activity, or whether or not the Participant meets the definition of Disability or Full Career Termination.

**3. AFFIDAVIT.** In the event of the Termination of the Participant, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares or may cause the Participant to repay to Holdings the full gross amounts or Shares received under this Letter.

**4. INTERIM PAYMENTS AND FURTHER AWARDS.**
Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after the Date of Grant, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate.

**5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day (i.e., when shares trade regular way on the New York Stock Exchange). Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**6. NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

3

## 8. CHANGE IN CONTROL.

**(a)** **Expiration of Service Requirements Following a Change in Control**. Following a Change in Control, except to the extent that (i) the Participant is entitled to the earlier expiration of the Service Requirements pursuant to Paragraphs 2 or (ii) the Participant's 2007 Award Shares are forfeited pursuant to Paragraph 2 due to the Participant's engaging in Detrimental Activity, Termination with Cause or voluntary Termination, all of the Participant's then outstanding 2007 Award Shares shall cease to be subject to the Service Requirements upon the later of (x) 18 months following such Change in Control or (y) a date determined by the Committee that is within 15 days of November 30 of the Fiscal Year following the Fiscal Year in which the Change in Control occurs (such later date, the "Change in Control Service Requirement Expiration Date"). Additionally, all of the Participant's 2007 Award Shares (including Principal and Discount) shall immediately cease to be subject to the Service Requirements in the event of the Participant's involuntary Termination without Cause following the Change in Control but prior to the Change in Control Service Requirement Expiration Date.

**(b)** **Delivery of Common Stock Following a Change in Control**. Following a Change in Control, except to the extent that (i) the Participant is entitled to receive earlier delivery of Shares pursuant to Paragraph 2 or (ii) the Participant's 2007 Award Shares are forfeited pursuant to Paragraph 2 due to engaging in Detrimental Activity, Termination with Cause or voluntary Termination or by reason of Paragraphs 6 or 15, the Participant shall receive Shares in respect of the Participant's 2007 Award Shares on the Change in Control Service Requirement Expiration Date; provided, however, that in the event of the Participant's Termination for any reason other than due to death or Disability following the Change in Control but prior to the Change in Control Service Requirement Expiration Date, the Participant shall receive Shares in respect of the Participant's then Award Shares as to which the Service Requirement no longer applies upon the earlier of (x) the last day of the fiscal quarter that ends after the first anniversary of the date of the Participant's Termination or (y) the Change in Control Service Requirement Expiration Date.

For purposes of this Paragraph 9, the term "Fiscal Year" shall refer to the fiscal year of Holdings.

**9. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not the Participant's rights are adversely affected).

**10. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**11. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**13. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**14. STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**15. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay (or cause to be paid) to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable Shares, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the grant, vesting or delivery hereunder or any interim payments under section 4 of this Letter to which the Participant becomes entitled; (b) where determined necessary or appropriate by the Firm in its sole discretion, the Participant directs the sale of any Shares delivered in respect of any 2007 Award Shares to satisfy any such amounts in Paragraph 15(a) hereof, and  (c) that the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Participant hereby directs Holdings to withhold the relevant Shares and/or related interim payments and to otherwise sell Shares delivered hereunder to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other

4

liability or obligation of any kind which the Participant may at that time have with respect to any Group Company provided, however, that no such right to deduct or offset shall arise or otherwise be deemed to arise until the date upon which Shares are deliverable hereunder.

**16. CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon the Participant of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to the Participant with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing the Participant to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in the Participant's incurring any tax liability under Section 409A of the Code. In the case of a Participant who is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of Shares hereunder that are linked to the date of the Participant's separation from service shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from Holdings and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in

the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means the number of 2007 Award Shares (and any dividend equivalents related thereto). If Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, thirty percent (30%) of Participant's 2007 Award Shares as of the date of grant will be Discount Award Shares. If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, twenty-five percent (25%) of Participant's 2007 Award Shares as of the date of grant will be Discount Award Shares.

5

LEH-RSU 0000267

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) the person is at least 50 years old, and the person has at least 5 years of service.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group. Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not an entity is or is not a "Group Company" for purposes of any provision of this Agreement.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

**"Service Requirements"** means the schedule below that is applicable to the Participant, pursuant to which the Participant is required to be actively employed with the Company and/or any Group Company as described in Paragraph 2, and which, except as provided in Paragraphs 2(c), 2(d)(i), (iii), (iv) and (v) and 8, shall be a necessary condition for the Participant to become entitled to receive both 2007 Award Shares and Shares underlying such 2007 Award Shares provided the Participant otherwise satisfies the other terms and conditions hereunder:

(a) If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified below in order to be eligible to receive that portion of such 2007 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 50%: November 30, 2010; |
| | 50%: November 30, 2012 |
| Discount Award Shares: | 100%: November 30, 2012. |

(b) If Participant was an employee of Holdings or any Group Company other than a Managing Director for the fiscal year ended November 30, 2007 such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified in order to be eligible to receive that portion of such 2007 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 100%: November 30, 2009 |
| Discount Award Shares: | 100%: November 30, 2012. |

**"Principal Award Shares"** shall mean the number of 2007 Award Shares (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, seventy percent (70%) of such Participant's 2007 Award Shares as of the Date of Grant will be Principal Award Shares. If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, seventy-five percent (75%) of such

Participant's 2007 Award Shares as of the Date of Grant will be Principal Award Shares.

**"Share"** means a share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means November 30, 2012.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2007 Lehman Brothers. All Rights Reserved.

6

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**14**

# EXHIBIT 14



# 2008 EQUITY AWARD PROGRAM
## L I F E @ L E H M A N
### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

# LEHMAN BROTHERS

LEH-RSU 0000927

# TABLE OF CONTENTS

### OVERVIEW OF 2008 CHANGES

Q1   How will the 2008 equity award differ from last year's award? ......................................4

Q2   When will I be granted my 2008 equity award? .................................................. ..5

Q3   How will 2008 equity award levels compare to last year? .................................................5

### JULY AWARD

Q4   Who is eligible for a July equity award?................................................................. ...................6

Q5   How was the value of my July equity award calculated?................................................... 6

  Bonus-eligible Employees ................................................... ............................6

  Production-based Employees.................................................... ...............................6

Q6   How many July RSUs have I been granted? ................................................. .......7

Q7   Why is the July equity award only 20% of last year's award?...........................................7

Q8   How were the grant date and grant price for the July award determined?..........................7

Q9   What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

### YEAR-END AWARD

Q10  Who is eligible for a 2008 Year-end equity award? ..........................................................8

Q11  How will my 2008 Year-end equity award be calculated? .................................................8

  Bonus-eligible Employees ................................................... ............................8

  Production-based Employees.................................................... ..................................9

### 2008 VESTING AND TERMINATION PROVISIONS

Q12  When will my 2008 RSUs vest? ............................................... ..........................9

Q13  When will my 2008 RSUs convert to shares of common stock?.....................................9

Q14  What will happen to my 2008 RSUs if I resign from the Firm? ........................................9

Q15  What will happen to my 2008 RSUs if my employment is terminated?...........................10

Q&A RSU 7.01.08

LEH-RSU 0000928

## GENERAL INFORMATION

Q16 Where can I find details regarding my July award and other equity awards?...................10

Q17 Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18 Whom do I contact if I have further questions regarding the Equity Award Program?.....10

## EXHIBITS

Exhibit A: 2007 Equity Award Schedule........................................................ ..........................11

Exhibit B: 2008 Equity Award Schedule for Bonus-eligible Employees ..................................12

Exhibit C: 2008 Equity Award Schedule for Production-based Employees............................13

Exhibit D: 2008 Equity Award Calculation for Production-based Employees........................14

Exhibit E: Termination Provisions ......................................................... ..........................15

Exhibit F: Glossary of Select Terms .......................................................... ..........................16

Q&A RSU 7.01.08

LEH-RSU 0000929

# OVERVIEW OF 2008 CHANGES

## Q1  HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1  The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008. These changes are designed to achieve a number of objectives, including:

- **Simplifying the program** : the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**: the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

  - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**: as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Restricted Stock Units ("RSUs"). The 3 primary changes to the 2008 program are:

1. **Equity Discount** : Beginning with the 2008 equity award, employees will **no longer be granted RSUs at a discount** from their fair market value at the time of grant. However, RSUs will be subject to a much shorter holding period. See "Holding Period" below.

2. **Vesting Schedule** : Under the 2008 Equity Award Program, the vesting schedule for all employees will be the same, irrespective of corporate title:  **33% per year over 3 years** (1/3 vesting on November 30, 2009, 1/3 vesting on November 30, 2010, and 1/3 vesting on November 30, 2011, respectively).

3. **Holding Period** : In 2008, the holding period will be reduced from 5 years to **3 years**. This means that vested 2008 RSUs will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

Q&A RSU 7.01.08

LEH-RSU 0000930

## Q2  WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?

A2  Eligible employees' 2008 equity award will comprise two separate grants on **two dates**: a) a grant on July 1, 2008 (the "July RSUs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award"). You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive. The July RSUs and any Year-end Award will vest and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price. Further information on the July award is provided in the "July Award" section below.

## Q3  HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?

A3  For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[1] regardless of corporate title and based on total compensation levels. In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[2] and certain other employees, the schedule will be as previously communicated. See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[1] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 2 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy. Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[2] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award. "Production-based" employees typically do not receive any year-end bonus. Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion. If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

Q&A RSU 7.01.08

LEH-RSU 0000931

# July Award

## Q4  WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?

A4  Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence . Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries.  In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

## Q5  HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?

A5  **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July RSUs was calculated as 20% of the principal portion[3] of the 2007 equity award. In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July RSUs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July RSUs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July RSUs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July RSUs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008). See Exhibit D for examples of how the July equity award was determined.

---

[3] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A RSU 7.01.08

LEH-RSU 0000932

**Q6  HOW MANY JULY RSUs HAVE I BEEN GRANTED?**

A6  To determine the number of July RSUs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July RSUs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July RSUs, then no July RSUs will be granted.**

**Q7  WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7  As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses. Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time. To maintain sufficient flexibility in the determination of pay for 2008-and to minimize the risk that employee cash bonuses are not adversely impacted-the Firm decided that the July award would be based on 20% of the prior year award for most employees. Please bear in mind that a July RSU award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8  HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8  All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors. The July 1 grant date was set by the Committee. The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July RSUs granted to you.

**Q9  WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9  **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July RSUs. If you leave the Firm on or after November 30, 2008, your entitlement to any July RSUs, the same as any Year-end Award, will depend on when you leave, the

Q&A RSU 7.01.08

LEH-RSU 0000933

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

### Q10 WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?

A10 Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions : employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries. Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award. In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

### Q11 HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?

A11 **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award. In no event, however, will your full-year award be less than your July Award. Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee. In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A RSU 7.01.08

LEH-RSU 0000934

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award. In no event, however, will your full-year award be less than your July Award. Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 VESTING AND TERMINATION PROVISIONS

### Q12  WHEN WILL MY 2008 RSUs VEST?

A12  The 2008 equity award (including any July RSUs) will vest in 1/3 increments on November 30, 2009, 2010 and 2011.

### Q13  WHEN WILL MY 2008 RSUs CONVERT TO SHARES OF COMMON STOCK?

A13  Vested 2008 RSUs (including any July RSUs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

### Q14  WHAT WILL HAPPEN TO MY 2008 RSUs IF I RESIGN FROM THE FIRM?

A14  If you resign, you will forfeit all RSUs that are unvested at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

|  | % of Total Equity Award Retained | | |
|---|---|---|---|
|  | *If you resign from the Firm after November 30 of:* | | |
|  | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 RSUs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of: (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.** See Exhibit E for termination provisions.

Q&A RSU 7.01.08

LEH-RSU 0000935

**Q15 WHAT WILL HAPPEN TO MY 2008 RSUs IF MY EMPLOYMENT IS TERMINATED?**

A15 As in prior years, if your employment with the Firm is terminated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) unvested 2008 RSUs, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity. Your 2008 RSUs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011. (If you do not sign a release agreement, you will be eligible to receive only the vested portion of your award.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason before November 30, 2008 forfeit any July RSUs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding RSUs. See Exhibit E for termination provisions.

# GENERAL INFORMATION

## Q16 WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?

A16 Details of your equity awards can be found on the Personal Award Summary of the Equity Award Program section of LehmanLive, which you can access by using keyword equityaward. The number of July RSUs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

## Q17 DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?

A17 No. The changes outlined here apply only to awards granted in 2008. These changes will not be retroactive to awards granted in prior years.

## Q18 WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?

A18 If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com.

Q&A RSU 7.01.08

LEH-RSU 0000936

# EXHIBIT A:  2007 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

Q&A RSU 7.01.08

LEH-RSU 0000937

# EXHIBIT B: 2008 EQUITY AWARD SCHEDULE FOR BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below. Any Year-end Award will be determined by subtracting any July RSUs from your full-year award, but in no event will your full-year award be less than your July RSUs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[4] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | 1% of 2008 TC | | 1% |
| $75,000 - $99,999 | 2% of 2008 TC | | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[4] Subject to a 5-share minimum.

Q&A RSU 7.01.08

LEH-RSU 0000938

## EXHIBIT C: 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated. Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July RSUs.

### 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million up to a max of 50% of 2008 TC |

---

[5] Subject to a 5-share minimum.

Q&A RSU 7.01.08

LEH-RSU 0000939

# EXHIBIT D:  2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July RSUs, if any. The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

Q&A RSU 7.01.08

LEH-RSU 0000940

## EXHIBIT E:   TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination** <br> *(but not Full Career)* | Participants will forfeit all unvested July RSUs and Year-end RSUs (together, "2008 RSUs"). Any vested 2008 RSUs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** <br> *(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs, including the unvested portion (provided the employee signs a Firm-standard release agreement). Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date. <br><br> **Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Full Career Termination** | **Voluntary Termination:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011. <br><br> **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011. <br><br> **Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Termination due to Death or Disability** | All 2008 RSUs will immediately vest, and shares will be delivered 30 days following the termination date. |

**NOTE:** Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July RSUs. In such cases, "Full Career" treatment does not apply.

Q&A RSU 7.01.08

LEH-RSU 0000941

# EXHIBIT F: GLOSSARY OF SELECT TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Competitive Activity"** means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

**"Disability"** means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

**"Full Career Termination"** means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

**"Restricted Stock Units (RSUs)"** An RSU represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011. Generally, RSUs cannot be sold, traded, pledged or transferred during that three-year period.

**"Termination"** means the end of employment with Holdings or a subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A RSU 7.01.08

LEH-RSU 0000942

09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 120 of 148

E
X
H
I
B
I
T

15

**EXHIBIT 15**

# 2008 EQUITY AWARD PROGRAM
## L I F E @ L E H M A N
### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.

# LEHMAN BROTHERS

# TABLE OF CONTENTS

OVERVIEW OF 2008 CHANGES

Q1  How will the 2008 equity award differ from last year's award?........................................4

Q2  When will I be granted my 2008 equity award? ................................................. ..5

Q3  How will 2008 equity award levels compare to last year? .................................................5

JULY AWARD

Q4  Who is eligible for a July equity award?................................................................... ...................6

Q5  How was the value of my July equity award calculated?.................................................. 6

    Bonus-eligible Employees ................................................................... ...........................6

    Production-based Employees..................................................... ..................................6

Q6  How many July CSAs have I been granted? ............................................................... .......7

Q7  Why is the July equity award only 20% of last year's award?.............................................7

Q8  How were the grant date and grant price for the July award determined?..........................7

Q9  What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

YEAR-END AWARD

Q10  Who is eligible for a 2008 Year-end equity award? ............................................................8

Q11  How will my 2008 Year-end equity award be calculated? .................................................8

    Bonus-eligible Employees ................................................................... ...........................8

    Production-based Employees..................................................... ..................................9

2008 CONDITIONS AND TERMINATION PROVISIONS

Q12  When will my 2008 CSAs become subject to Limited Conditions? ..................................9

Q13  When will my 2008 CSAs convert to shares of common stock?........................................9

Q14  What will happen to my 2008 CSAs if I resign from the Firm? ........................................9

Q15  What will happen to my 2008 CSAs if my employment is terminated?............................10

Q&A CSA 7.01.08

LEH-RSU 0000912

08-13555-jmp Doc 46263 Filed 09/04/15 Entered 09/04/15 09:35:51 Exhibits
Pg 143 of 578

**GENERAL INFORMATION**

Q16  Where can I find details regarding my July award and other equity awards?...................10

Q17  Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18  Whom do I contact if I have further questions regarding the Equity Award Program?.....10

**EXHIBITS**

Exhibit A:  2007 Equity Award Schedule........................................................ ...........................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees ..................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees.............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees.........................14

Exhibit E:  Termination Provisions ........................................................ ...........................15

Exhibit F:  Glossary of Select Terms ............................................................ ..........................16

Q&A CSA 7.01.08

LEH-RSU 0000913

# OVERVIEW OF 2008 CHANGES

## Q1  HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1  The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program** : the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**: the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

  - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**: as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Contingent Stock Awards ("CSAs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount** : Beginning with the 2008 equity award, employees will **no longer be granted CSAs at a discount** from their fair market value at the time of grant.  However, CSAs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Conditions**[1]: Under the 2008 Equity Award Program, CSAs for all employees will be become subject to both Full and Limited Conditions for the same period, irrespective of corporate title:  **33% of CSAs will become subject to Limited Conditions each year over 3 years** (1/3 on November 30, 2009, 1/3 on November 30, 2010, and 1/3 on November 30, 2011, respectively).

3. **Holding Period**: In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that 2008 CSAs which become subject to Limited Conditions will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

---

[1] See Glossary of Select Terms for the definition of both "Full Conditions" and "Limited Conditions".

Q&A CSA 7.01.08

LEH-RSU 0000914

## Q2 WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?

A2 Eligible employees' 2008 equity award will comprise two separate grants on **two dates**: a) a grant on July 1, 2008 (the "July CSAs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award"). You can consider the July award, which is genera lly 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive. The July CSAs and any Year-end Award will become subject to Limited Conditions and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potenti al in our stock price. Further information on the July award is provided in the "July Award" section below.

## Q3 HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?

A3 For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[2] regardless of corporate title and based on total compensation levels. In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[3] and certain other employees, the schedule will be as previously communicated. See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[2] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 3 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy. Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[3] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award. "Production-based" employees typically do not receive any year-end bonus. Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion. If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

5          Q&A CSA 7.01.08

LEH-RSU 0000915

# JULY AWARD

### Q4 WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?

A4  Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence. Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries. In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

### Q5 HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?

A5  **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July CSAs was calculated as 20% of the principal portion[4] of the 2007 equity award. In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July CSAs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July CSAs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July CSAs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July CSAs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008). See Exhibit D for examples of how the July equity award was determined.

---

[4] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A CSA 7.01.08

LEH-RSU 0000916

**Q6 HOW MANY JULY CSAs HAVE I BEEN GRANTED?**

A6 To determine the number of July CSAs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July CSAs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July CSAs, then no July CSAs will be granted.**

**Q7 WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7 As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses. Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time. To maintain sufficient flexibility in the determination of pay for 2008-and to minimize the risk that employee cash bonuses are not adversely impacted-the Firm decided that the July award would be based on 20% of the prior year award for most employees. Please bear in mind that a July CSA award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8 HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8 All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors. The July 1 grant date was set by the Committee. The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July CSAs granted to you.

**Q9 WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9 **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July CSAs. If you leave the Firm on or after November 30, 2008, your entitlement to any July CSAs, the same as any Year-end Award, will depend on when you leave, the

Q&A CSA 7.01.08

LEH-RSU 0000917

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

#### Q10 WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?

A10 Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions: employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries. Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award. In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

#### Q11 HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?

A11 **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award. In no event, however, will your full-year award be less than your July Award. Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee. In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A CSA 7.01.08

LEH-RSU 0000918

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award. In no event, however, will your full-year award be less than your July Award. Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 CONDITIONS AND TERMINATION PROVISIONS

### Q12 WHEN WILL MY 2008 CSAs BECOME SUBJECT TO LIMITED CONDITIONS?

A12 The 2008 equity award (including any July CSAs) will become subject to Limited Conditions in 1/3 increments on November 30, 2009, 2010 and 2011.

### Q13 WHEN WILL MY 2008 CSAs SUBJECT TO LIMITED CONDITIONS CONVERT TO SHARES OF COMMON STOCK?

A13 2008 CSAs subject to Limited Conditions (including any July CSAs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

### Q14 WHAT WILL HAPPEN TO MY 2008 CSAs IF I RESIGN FROM THE FIRM?

A14 If you resign, you will forfeit all CSAs that are subject to Full Conditions at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

|  | **% of Total Equity Award Retained** | | |
|---|---|---|---|
|  | ***If you resign from the Firm after November 30 of:*** | | |
|  | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 CSAs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of: (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.** See Exhibit E for termination provisions.

LEH-RSU 0000919

**Q15 WHAT WILL HAPPEN TO MY 2008 CSAs IF MY EMPLOYMENT IS TERMINATED?**

A15 As in prior years, if your employment with the Firm is termi nated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfei ted) 2008 CSAs still subject to Full Conditions, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity. Your 2008 CSAs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011. (If you do not sign a release agreement, you will be eligible to rece ive only the portion of your award subject to Limited Conditions.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason b efore November 30, 2008 forfeit any July CSAs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding CSAs. See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16 WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16 Details of your equity awards can be found on Personal Award Summar y of the Equity Award Program section of LehmanLive, which you can access by using keyword equityaward . The number of July CSAs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

**Q17 DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17 No. The changes outlined here apply only to awards granted in 2008. Thes e changes will not be retroactive to awards granted in prior years.

**Q18 WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18 If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com .

Q&A CSA 7.01.08

LEH-RSU 0000920

# EXHIBIT A:  2007 EQUITY AWARD SCHEDULE

| | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| Total Compensation Range | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

Q&A CSA 7.01.08

LEH-RSU 0000921

# EXHIBIT B: 2008 EQUITY AWARD SCHEDULE FOR BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below. Any Year-end Award will be determined by subtracting any July CSAs from your full-year award, but in no event will your full-year award be less than your July CSAs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | 1% of 2008 TC | | 1% |
| $75,000 - $99,999 | 2% of 2008 TC | | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[5] Subject to a 5-share minimum.

Q&A CSA 7.01.08

LEH-RSU 0000922

# EXHIBIT C: 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated. Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July CSAs.

### 2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[6] | | |
|---|---|---|---|
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

---

[6] Subject to a 5-share minimum.

Q&A CSA 7.01.08

LEH-RSU 0000923

# EXHIBIT D:   2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July CSAs, if any. The examples below assume an individual with production compensation for the full year 2008.

|  |  |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

14                                         Q&A CSA 7.01.08

LEH-RSU 0000924

## EXHIBIT E: TERMINATION PROVISIONS

|  | All Employees |
|---|---|
| **Voluntary Termination** *(but not Full Career)* | Participants will forfeit July CSAs and Year-end CSAs still subject to Full Conditions (together, "2008 CSAs"). Any 2008 CSAs subject to Limited Conditions will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** *(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 CSAs, including the portion subject to Full Conditions (provided the employee signs a Firm-standard release agreement). Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date.<br><br>**Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 CSAs. |
| **Full Career Termination** | **Voluntary Termination:** Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011.<br><br>**Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011.<br><br>**Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 CSAs. |
| **Termination due to Death or Disability** | All Conditions on 2008 CSAs will lapse, and shares will be delivered 30 days following the termination date. |

**NOTE:** Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July CSAs. In such cases, "Full Career" treatment does not apply.

Q&A CSA 7.01.08

LEH-RSU 0000925

# EXHIBIT F: GLOSSARY OF SELECT TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Competitive Activity"** means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Contingent Stock Awards (CSAs)"** A CSA represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011. Generally, CSAs cannot be sold, traded, pledged or transferred for that three-year period.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

**"Disability"** means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

**"Full Career Termination"** means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

CSAs which are subject to **"Full Conditions"** are forfeited if the award recipient's employment with the Firm terminates or if the award recipient engages in Detrimental Activity.

CSAs which are subject to **"Limited Conditions"** are forfeited if the award recipient engages in Detrimental Activity.

**"Termination"** means the end of employment with Holdings or a subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A CSA 7.01.08

LEH-RSU 0000926

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**16**

**EXHIBIT 16**

**Lehman Brothers**

**2005 Total Compensation Statement**

<u>CONFIDENTIAL</u>

REDACTED

Employee :

Division  : Mortgage Capital Division(LBB)        Stock Program :   SVP

Hire Date : September 6, 1988        Employee Id :   REDACTED

<u>COMPENSATION</u>

| Compensation Type | Current - 2005 |
|---|---|
| Paid Salary | $200,000 |
| Bonus | $900,000 |
| **TOTAL COMPENSATION** | **$1,100,000** |

<u>EQUITY SUMMARY in USD</u>

| | Equity Component | Market Price | Discount Price | Shares |
|---|---|---|---|---|
| RSUs | $235,000.02 | $126.00 | $94.50 | 2,486.77 |

Your equity award was calculated based on total compensation of $1,100,000, where "total compensation" includes salary, bonus, and other forms of eligible compensation.

All terms and conditions of equity awards, including those relating to vesting and forfeiture, are subject to controlling plan documents, including the FY 2005 equity award agreements (expected to be finalized in early 2006), the Employee Incentive Plan and related Prospectus.

<u>PAYMENT SCHEDULE</u>

| | | |
|---|---|---|
| Bonus | $900,000 | |
| Less RSUs | ($235,000) | |
| Total Cash Payment (Before Taxes) | $665,000 | Payable on or about January 31, 2006 |

<u>ANNUAL SALARY</u>

Effective Fiscal Year 2006, your annual base salary will be as follows:

| Current Annual Salary | $200,000 |
|---|---|

Note: All bonus awards and equity awards are contingent on your being employed on the scheduled bonus award date (on or about January 31, 2006) and not having given or received notice of employment termination before that date.

If you are not employed on January 31, 2006, or you have received notice of employment termination before that date, you will not be eligible to receive a bonus award (including any special awards) or any equity award for fiscal year 2005.

If you have any additional questions regarding your compensation or personal data, please contact your divisional HR representative. If you have any questions regarding your equity award, please contact the Compensation Department at (212)526-8346.

12-Dec-05

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 159 of 148

**E
X
H
I
B
I
T

17**

**EXHIBIT 17**

**PRIVATE AND CONFIDENTIAL**

**2006 TOTAL COMPENSATION STATEMENT**

TO: REDACTED                                                                        REDACTED

DEPT:     CORP : 49143 - Real Estate-Europe/56

FROM:     P Hohnsbeen

OATE:     December 13 2006

Please find below the details of your 2006 Total Compensation and any year-end awards:

### Total Compensation Summary

|                    | GBP     |
|--------------------|---------|
| Paid Salary        | 100,000 |
| Total Bonus        | 134,600 |
| **Total Compensation** | **234,600** |
| Total Bonus        | 134,600 |
| Total Equity Award | 31,953  |
| Net Bonus Award    | 102,647 |

### Equity Award Detail

| Equity Type        | UBD Award Value | USD Mkt Price | USD Grant Price | No. of Units |
|--------------------|-----------------|---------------|-----------------|--------------|
| CSAs               | 57,960          | 77.03         | 57.77           | 1,003.28     |
| **Total Equity Award** | **57,960**  |               |                 |              |

Your total CSA Award is based on a Total Compensation of USD 425,540 (for the purposes of calculating the CSA Award ONLY).

When awarding the CSA award the Firm has applied a discount of 25% to the market price of $ 77.03. CSAs are subject to restrictions until 30 November 2011; they cannot be sold, traded or pledged before then.

A full summary of all your outstanding CSA Awards (including your 2006 Award) will be available on LehmanLive, keyword "equityaward", during the first quarter of 2007. All terms and conditions of the CSA Awards are subject to the controlling plan documents.

**Base Salary**

Your base salary has increased to GBP 110,000 with effect from 1 December 2006.

**Additional Information**

All terms and conditions of your employment remain unchanged.

Entitlement to your 2006 Awards are contingent on you being employed by Lehman Brothers at, and not under notice either given or received prior to, 31 January 2007.

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**18**

# EXHIBIT 18

GetSum

## Compensation Statement

Find: GSID 10142380   [get]  [Get in Excel]
Fiscal year: 2008   ☐ Show as of before EOM

Sales Org: REDACTED

Name: REDACTED
From: 12/1/2007 To: 12/31/2008
Future payout trades



| | Year Total | 12/2008 | 11/2008 | 10/2008 | 9/2008 | 8/2008 | 7/2008 | 6/2008 | 5/2008 | 4/2008 | 3/2008 | 2/2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Production | REDACTED | | | | | | | | | | | |
| Net Production | 403,316.44 | 0.00 | -29.07 | 7,961.49 | 9,365.10 | 28,522.00 | 55,760.48 | 32,336.47 | 64,695.18 | 61,118.23 | 35,434.40 | 35,218.97 |
| Reno Net Production | 9,313.69 | | | | | | | | | | | |
| Average Rate (%) | 34.27 | 0.00 | 1.12 | 32.24 | 35.69 | 34.45 | 35.86 | 34.53 | 34.32 | 35.66 | 33.58 | 31.88 |
| Prior Months' Debit/Overage | | | | | | | | | | | | |
| Adj to Net Production | -40,292.67 | -1,383.00 | 0.00 | -6,496.29 | -599.47 | -1,639.91 | -4,193.37 | -2,085.02 | -4,391.24 | -4,921.41 | -2,299.26 | -2,313.38 |
| Monthly Payout Balance | | | | | | | | | | | | |
| Draw Amount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Sales Compensation | 395,587.82 | | | | | | | | | | | |
| Cash Commissions | 306,880.05 | 0.00 | 0.00 | 0.00 | 0.00 | 23,492.76 | 43,727.52 | 26,395.11 | 53,526.27 | 47,898.63 | 28,739.93 | 28,553.27 |
| Points Accrual Calculated | 50,638.86 | | | | | | | | | | | |
| Recorded Total Sales Compensation | 357,518.85 | 0.00 | 0.00 | 0.00 | 0.00 | 26,682.09 | 51,567.12 | 30,251.45 | 63,617.77 | 56,696.82 | 33,135.14 | 32,905.59 |
| Debit/Overage | | | | | | | | | | | | |

09-13555-jmp    Doc 46263-1    Filed 10/02/13    Entered 10/02/13 09:35:51    Exhibits
Pg 143 of 198

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**19**

# EXHIBIT 19

Compensation Statement

REDACTED

Name:
From: 12/1/2007 To: 11/30/2008

| | Year Total | Sep-08 | Aug-08 | Jul-08 | Jun-08 | May-08 | Apr-08 | Mar-08 | Feb-08 | Jan-08 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Production | 4,763,621.17 | 265,665.39 | 693,382.12 | 632,710.87 | 561,868.48 | 575,650.57 | 404,012.31 | 266,370.96 | 302,838.22 | 510,652.33 | 320,491.34 |
| Net Production | 1,245,558.09 | 55,967.96 | 166,118.57 | 208,850.83 | 159,087.45 | 181,772.60 | 119,110.70 | 80,179.27 | 80,842.98 | 122,130.20 | 90,477.55 |
| Retro Net Production | 81.06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Average Rate (%) | 26.17 | 21.07 | 24.24 | 25.08 | 26.88 | 31.58 | 29.48 | 22.59 | 26.71 | 30.13 | 26.23 |
| Prior Months -Deficit/Overage | -55,582.50 | -55,582.50 | 0 | 0 | 0.01 | 0.01 | -0.01 | -0.01 | 0 | 23.92 | 28.23 |
| Adj to Net Production | -210,969.30 | 0 | -47,875.87 | -58,707.63 | -39,759.62 | -21,332.78 | -10,497.73 | -7,504.83 | -8,717.96 | -10,139.80 | -8,463.99 |
| Monthly Payout Balance | 0 | 405.46 | 120,242.80 | 150,143.00 | 150,143.00 | 160,439.82 | 108,683.90 | 52,874.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| Draw Amount | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minimum Compensation | 1,566.21 | 1,566.21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Sales Compensation | 961,622.37 | 1,971.67 | 120,242.80 | 150,143.00 | 119,327.84 | 160,439.82 | 108,683.90 | 52,874.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| Cash Commissions | 703,197.40 | 0 | 84,740.71 | 102,082.94 | 84,210.18 | 108,055.09 | 74,910.41 | 48,863.64 | 57,992.51 | 79,161.78 | 63,378.11 |
| Equity Accrual Calculated | 276,483.29 | 0 | 35,501.89 | 48,090.05 | 35,117.69 | 82,384.72 | 33,763.49 | 4,004.59 | 16,132.50 | 32,858.95 | 18,635.46 |
| Recorded Total Sales Compensation | 1,035,233.19 | 0 | 176,525.10 | 150,143.00 | 119,327.81 | 160,439.81 | 108,683.90 | 52,874.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| -Deficit/Overage | -1,566.21 | -1,566.21 | 0 | 0 | 0 | 0.01 | 0 | 0 | -0.01 | 0 | -0.01 |

09-13555-jmp   Doc 46263-1   Filed 10/02/13   Entered 10/02/13 09:35:51   Exhibits
Pg 145 of 148

**E**
**X**
**H**
**I**
**B**
**I**
**T**

**20**

# EXHIBIT 20

| From: | Gross, Mark D <mgross@lehman.com> |
|---|---|
| Sent: | Wednesday, April 14, 2004 9:07 AM |
| To: | Emmert, James R <jemmert@lehman.com> |
| Subject: | FW: Based on your most excellent feedback, Ian has made some changes to the document |
| Attach: | Stock Awards Overview 0413a.ppt |

"final" version

> -----Original Message-----
> From:     Gross, Mark D
> Sent: Tuesday, April 13, 2004 2:15 PM
> To:   Collerton, Anthony J; Tuininga, Chris; Arreglado, Elizabeth R;
> Wegrzyn, Boguslaw
> Subject:    FW: Based on your most excellent feedback, Ian has made
> some changes to the document
>
>
>
> -----Original Message-----
> From:     James, Mimi
> Sent: Tuesday, April 13, 2004 12:28 PM
> To:  Binkley, Tracy A
> Cc:  Gross, Mark D
> Subject:    Based on your most excellent feedback, Ian has made some
> changes to the document
>
> <<Stock Awards Overview 0413a.ppt>>
> New Page 3 ( can you make sure we are saying this right?)
> Page 7 - Options Overhang (last sentence - again could you check that
> this is correct?)
> Page 15 & 16- Potential levers - added # 6 & 7 to lever list and to
> impact list
> Next Steps page - we added "even for the EC" to no option grants
>

LEH-RSU 0014995

E
X
H
I
B
I
T

21

**EXHIBIT 21**

# Equity Award Value To Employees

The amortization of awards over time lowers our comp and benefits ratio. If we were to fully expense all awards in the year of grant (including options), our comp ratio would be over 57% over the period.

| | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Revenues | $7,707 | $6,737 | $6,155 | $8,647 |
| *Comp Accrual/revenues* | *51.0%* | *51.0%* | *51.0%* | *49.9%* |
| | | | | |
| Comp & Benefits Accrual - Reported comp | $3,931 | $3,436 | $3,139 | $4,318 |
| RSU amortization | (478) | (477) | (522) | (560) |
| PSU amortization | (43.9) | (27.3) | (19.0) | (28.0) |
| C&B expense bef amortization of equity awards | 3,409 | 2,931 | 2,598 | 3,731 |
| | | | | |
| RSU grant value (principal + discount) | 886 | 601 | 390 | 790 |
| Options Black Scholes value | 249 | 291 | 500 | 333 |
| PSU grant value | 48.7 | 53.1 | 23.1 | 54.4 |
| Comp value to employees | 4,592 | 3,877 | 3,511 | 4,908 |
| *Comp ratio* | *59.6%* | *57.5%* | *57.0%* | *56.8%* |

6

**LEHMAN BROTHERS**

CONFIDENTIAL

LEH-RSU 0015001

# Exhibit B

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555-jmp

5     - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matters of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              December 21, 2011

19              10:04 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

```
 1

 2    Hearing re:  1. Debtors' Objection to the Claim of Wilmington

 3    Trust Company as Indenture Trustee (Claim No. 10082) [ECF No.

 4    20510]

 5

 6    Hearing re:  2. Debtors' One Hundred Thirty-Sixth Omnibus

 7    Objection to Claims (Misclassified Claims) [ECF No. 16867]

 8

 9    Hearing re:  3. Debtors' Motion for Authorization to Implement

10    the Defense Costs Fund [ECF No. 22647]

11

12    Hearing re:  4. Application of the Debtors for Authorization to

13    Employ and Retain Gleacher & Company Securities, Inc. as

14    Financial Advisor Effective as of February 17, 2011 [ECF No.

15    22520]

16

17    Hearing re:  5. Archstone LB Syndication Partner LLC, et al. v.

18    Banc of America Strategic Ventures, Inc. et al. [Adversary Case

19    No. 11-02928] (Hearing on separate transcript)

20

21    Hearing re:  6. Motion for Sanctions [ECF No. 22817]

22

23    Hearing re:  7. Debtors' Seventy-Third Omnibus Objection to

24    Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF

25    No. 13295]
```

Page 3

1

2    Hearing re:  8. Debtors' One Hundred Eighteenth Omnibus

3    Objection to Claims (To Reclassify Proofs of Claim as Equity

4    Interests) [ECF No. 15666]

5

6    Hearing re:  9. Debtors' One Hundred Thirtieth Omnibus

7    Objection to Claims (To Reclassify Proofs of Claim as an Equity

8    Interest) [ECF No. 16115]

9

10   Hearing re:  10. Debtors' One Hundred Thirty-First Omnibus

11   Objection to Claims (To Reclassify Proofs of Claim as an Equity

12   Interest) [ECF No. 16116]

13

14   Hearing re:  11. Debtors' One Hundred Thirty-Third Omnibus

15   Objection to Claims (To Reclassify Proofs of Claim as an Equity

16   Interest) [ECF No. 16530]

17

18   Hearing re:  12. Debtors' One Hundred Thirty-Fourth Omnibus

19   Objection to Claims (To Reclassify Proofs of Claim as an Equity

20   Interest) [ECF No. 16532]

21

22   Hearing re:  13. Debtors' One Hundred Thirty-Fifth Omnibus

23   Objection to Claims (To Reclassify Proofs of Claim as an Equity

24   Interest) [ECF No. 16808]

25

Page 4

1

2    Hearing re:  14. Debtors' One Hundred Seventy-Sixth Omnibus

3    Objection to Claims (To Reclassify Proofs of Claim as Equity

4    Interests) [ECF No. 19392]

5

6    Hearing re:  15. Debtors' Two Hundred Seventh Omnibus Objection

7    to Claims (To Reclassify Proofs of Claim as Equity Interests)

8    [ECF No. 21083]

9

10   Hearing re:  16. Debtors' Twenty-Eighth Omnibus Objection to

11   Claims (Valued Derivative Claims) [ECF No. 9983]

12

13   Hearing re:  17. Debtors' Thirty-Fifth Omnibus Objection to

14   Claims (Valued Derivative Claims) [ECF No. 11260]

15

16   Hearing re:  18. Debtors' Fortieth Omnibus Objection to Claims

17   (Late-Filed Claims) [ECF No. 11305]

18

19   Hearing re:  19. Debtors' Forty-First Omnibus Objection to

20   Claims (Late-Filed Claims) [ECF No. 11306]

21

22   Hearing re:  20. Debtors' Forty-Second Omnibus Objection to

23   Claims (Late-Filed Lehman Programs Securities Claims) [ECF No.

24   11307]

25

Page 5

1

2    Hearing re:  21. Debtors' Forty-Third Omnibus Objection to

3    Claims (Late-Filed Lehman Programs Securities Claims) [ECF No.

4    11308]

5

6    Hearing re:  22. Debtors' Sixty-Third Omnibus Objection to

7    Claims (Valued Derivative Claims) [ECF No. 11978]

8

9    Hearing re:  23. Debtors' Sixty-Seventh Omnibus Objection to

10   Claims (Valued Derivative Claims) [ECF No. 12533]

11

12   Hearing re:  24. Debtors' Seventy-First Omnibus Objection to

13   Claims (Valued Derivative Claims) [ECF No. 13230]

14

15   Hearing re:  25. Debtors' Eighty-Fourth Omnibus Objection to

16   Claims (Valued Derivative Claims) [ECF No. 13955]

17

18   Hearing re:  26. Debtors' Eighty-Sixth Omnibus Objection to

19   Claims (No Liability Claims) [ECF No. 14440]

20

21   Hearing re:  27. Debtors' Eighty-Seventh Omnibus Objection to

22   Claims (No Liability Claims) [ECF No. 14442]

23

24   Hearing re:  28. Debtors' Eighty-Eighth Omnibus Objection to

25   Claims (No Liability Claims) [ECF No. 14450]

Page 6

1

2    Hearing re:  29. Debtors' Eighty-Ninth Omnibus Objection to

3    Claims (No Liability Claims) [ECF No. 14452]

4

5    Hearing re:  30. Debtors' Ninetieth Omnibus Objection to Claims

6    (No Liability Claims) [ECF No. 14453]

7

8    Hearing re:  31. Debtors' Ninety-Second Omnibus Objection to

9    Claims (No Blocking Number LPS Claims) [ECF No. 14472]

10

11   Hearing re:  32. Debtors' Ninety-Fifth Omnibus Objection to

12   Claims (Valued Derivative Claims) [ECF No. 14490]

13

14   Hearing re:  33. Debtors' Ninety-Sixth Omnibus Objection to

15   Claims (Duplicative LPS Claims) [ECF No. 14491]

16

17   Hearing re:  34. Debtors' One Hundred Third Omnibus Objection

18   to Claims (Valued Derivative Claims) [ECF No. 15003]

19

20   Hearing re:  35. Debtors' One Hundred Tenth Omnibus Objection

21   to Claims (Pension Claims) [ECF No. 15010]

22

23   Hearing re:  36. Debtors' One Hundred Eleventh Omnibus

24   Objection to Claims (No Liability Claims) [ECF No. 15012]

25

Page 7

1

2    Hearing re:  37. Debtors' One Hundred Twelfth Omnibus Objection

3    to Claims (Invalid Blocking Number LPS Claims) [ECF No. 15014]

4

5    Hearing re:  38. Debtors' One Hundred Seventeenth Omnibus

6    Objection to Claims (No Liability Non-Debtor Employee Claims)

7    [ECF No. 15363]

8

9    Hearing re:  39. Debtors' One Hundred Twentieth Omnibus

10   Objection to Claims (No Blocking Number LPS Claims) [ECF No.

11   16074]

12

13   Hearing re:  40. Debtors' One Hundred Twenty-First Omnibus

14   Objection to Claims (To Reclassify Proofs of Claim as an Equity

15   Interest) [ECF No. 16075]

16

17   Hearing re:  41. Debtors' One Hundred Twenty-Second Omnibus

18   Objection to Claims (No Liability Claims) [ECF No. 16046]

19

20   Hearing re:  42. Debtors' One Hundred Twenty-Ninth Omnibus

21   Objection to Claims (No Liability Derivatives Claims) [ECF No.

22   16114]

23

24   Hearing re:  43. Debtors' One Hundred Thirty-Seventh Omnibus

25   Objection to Claims (Valued Derivative Claims) [ECF No. 16860]

1

2    Hearing re:  44. Debtors' One Hundred Thirty-Eighth Omnibus

3    Objection to Claims (No Liability Derivatives Claims) [ECF No.

4    16865]

5

6    Hearing re:  45. Debtors' One Hundred Fortieth Omnibus

7    Objection to Claims (Duplicative of Indenture Trustee Claims)

8    [ECF No. 16853]

9

10   Hearing re:  46. Debtors' One Hundred Forty-Third Omnibus

11   Objection to Claims (Late-Filed Claims) [ECF No. 16856]

12

13   Hearing re:  47. Debtors' One Hundred Fifty-First Omnibus

14   Objection to Claims (No Liability Claims) [ECF No. 17478]

15

16   Hearing re:  48. Debtors' One Hundred Fifty-Fifth Omnibus

17   Objection to Claims (Valued Derivative Claims) [ECF No. 17468]

18

19   Hearing re:  49. Debtors' One Hundred Fifty-Sixth Omnibus

20   Objection to Claims (No Liability Derivatives Claims) [ECF No.

21   17469]

22

23   Hearing re:  50. Debtors' One Hundred Fifty-Eighth Omnibus

24   Objection to Claims (Late-Filed Claims) [ECF No. 18399]

25

1

2     Hearing re:  51. Debtors' One Hundred Fifty-Ninth Omnibus

3     Objection to Claims (Invalid Blocking Number LPS Claims) [ECF

4     No. 18407]

5

6     Hearing re:  52. Debtors' One Hundred Sixtieth Omnibus

7     Objection to Claims (Settled Derivatives Claims) [ECF No.

8     18444]

9

10    Hearing re:  53. Debtors' One Hundred Sixty-Second Omnibus

11    Objection to Claims (Valued Derivative Claims) [ECF No. 18405]

12

13    Hearing re:  54. Debtors' One Hundred Seventy-Third Omnibus

14    Objection to Claims (No Liability Employee Claims) [ECF No.

15    19399]

16

17    Hearing re:  55. Debtors' One Hundred Seventy-Fourth Omnibus

18    Objection to Claims (To Reclassify Proofs of Claim as Equity

19    Interests) [ECF No. 19390]

20

21    Hearing re:  56. Debtors' One Hundred Seventy-Fifth Omnibus

22    Objection to Claims (No Liability Pension Claims) [ECF No.

23    19391]

24

25

Page 10

1

2    Hearing re:  57. Debtors' One Hundred Seventy-Seventh Omnibus

3    Objection to Claims (No Liability Non-Debtor Employee Claims)

4    [ECF No. 19393]

5

6    Hearing re:  58. Debtors' One Hundred Seventy-Eighth Omnibus

7    Objection to Claims (Misclassified Claims) [ECF No. 19377]

8

9    Hearing re:  59. Debtors' One Hundred Seventy-Ninth Omnibus

10   Objection to Claims (No Liability Derivatives Claims) [ECF No.

11   19378]

12

13   Hearing re:  60. Debtors' One Hundred Eightieth Omnibus

14   Objection to Claims (Invalid Blocking Number LPS Claims) [ECF

15   No. 19396]

16

17   Hearing re:  61. Debtors' One Hundred Eighty-Second Omnibus

18   Objection to Claims (Valued Derivative Claims) [ECF No. 19398]

19

20   Hearing re:  62. Debtors' One Hundred Eighty-Fifth Omnibus

21   Objection to Claims (Compound Claims) [ECF No. 19714]

22

23   Hearing re:  63. Debtors' One Hundred Eighty-Sixth Omnibus

24   Objection to Claims (Misclassified Claims) [ECF No. 19816]

25

Page 11

 1

 2    Hearing re:  64. Debtors' One Hundred Eighty-Seventh Omnibus

 3    Objection to Claims (Misclassified Claims) [ECF No. 19817]

 4

 5    Hearing re:  65. Debtors' One Hundred Eighty-Eighth Omnibus

 6    Objection to Claims (Duplicative LPS Claims) [ECF No. 19871]

 7

 8    Hearing re:  66. Debtors' One Hundred Eighty-Ninth Omnibus

 9    Objection to Claims (No Liability Repo Claims) [ECF No. 19870]

10

11    Hearing re:  67. Debtors' One Hundred Ninetieth Omnibus

12    Objection to Claims (No Liability Security Claims) [ECF No.

13    19873]

14

15    Hearing re:  68. Debtors' One Hundred Ninety-First Omnibus

16    Objection to Claims (Valued Derivative Claims) [ECF No. 19888]

17

18    Hearing re:  69. Debtors' One Hundred Ninety-Second Omnibus

19    Objection to Claims (Partially Settled Guarantee Claims) [ECF

20    No. 19875]

21

22    Hearing re:  70. Debtors' One Hundred Ninety-Eighth Omnibus

23    Objection to Claims (Late-Filed Claims) [ECF No. 19902]

24

25

Page 12

1

2   Hearing re:  71. Debtors' One Hundred Ninety-Ninth Omnibus

3   Objection to Claims (No Liability Claims) [ECF No. 19903]

4

5   Hearing re:  72. Debtors' Two Hundredth Omnibus Objection to

6   Claims (No Liability Claims) [ECF No. 19921]

7

8   Hearing re:  73. Debtors' Two Hundred Fifth Omnibus Objection

9   to Claims (Insufficient Documentation Claims) [ECF No. 19936]

10

11  Hearing re:  74. Debtors' Two Hundred Ninth Omnibus Objection

12  to Portions of Claim Nos. 29883 and 29879 Filed by Citibank,

13  N.A. and Citigroup Global Markets, Inc. [ECF No. 20030]

14

15  Hearing re:  75. Debtors' Two Hundred Nineteenth Omnibus

16  Objection to Claims (Valued Derivative Claims) [ECF No. 20787]

17

18  Hearing re:  76. Debtors' Two Hundred Twenty-First Omnibus

19  Objection to Claims (Duplicative of Indenture Trustee Claims)

20  [ECF No. 20860]

21

22  Hearing re:  77. Debtors' Two Hundred Twenty-Fourth Omnibus

23  Objection to Claims (Late-Filed Claims) [ECF No. 20864]

24

25

Page 13

1

2     Hearing re:  78. Debtors' Two Hundred Twenty-Eighth Omnibus

3     Objection to Claims (No Liability Derivatives Claims) [ECF No.

4     20886]

5

6     Hearing re:  79. Debtors' Two Hundred Thirty-Second Omnibus

7     Objection to Claims (Valued Derivative Claims) [ECF No. 21727]

8

9     Hearing re:  80. Debtors' Objection to Proof of Claim No. 66099

10    Filed by Syncora Guarantee, Inc. [ECF No. 20087]

11

12    Hearing re:  81. Debtors' Objection to Proof of Claim Number

13    29702 [ECF No. 20100]

14

15    Hearing re:  82. Cathay United Bank's Response in Opposition to

16    Debtors' Fortieth Omnibus Objection to Claims (Late-Filed

17    Claims) as to Claim No. 35181 and Motion to Have Claim No.

18    35181 Deemed Timely Filed [ECF No. 12037]

19

20    Hearing re:  83. Motion of Pearl Assurance Limited to Deem

21    Proofs of Claim to Be Timely Filed [ECF No. 12072]

22

23    Hearing re:  84. Motion of Pictet & Cie and Bank Julius Baer &

24    Co. Ltd. to Enlarge the Time Period for the Filing of Claim

25    Number 64249 By One Day [ECF No. 21979]

Page 14

```
 1

 2    Hearing re:  85. Motion of Robert Franz Pursuant to Fed. R.

 3    Bankr. P. 9024 Incorporating By Reference Fed. R. Civ. P.

 4    60(b), and Section 105(a) of the Bankruptcy Code for

 5    Reconsideration and Reinstatement of Proof of Claim [ECF No.

 6    22665]

 7

 8    Hearing re:  86. Motion of Caisse Des Dépôts Et Consignations

 9    to Permit a Late-Filed Claim Against Lehman Brothers Special

10    Financing Inc. [ECF No. 18039]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Hana Copperman
```

Page 15

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtor

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:    MARK BERNSTEIN, ESQ.

9          RICHARD P. KRASNOW, ESQ.

10         RICHARD LEVINE, ESQ.

11         CHRISTINA M. MANTHEI, ESQ.

12         JACQUELINE MARCUS, ESQ.

13

14

15   O'MELVENY & MYERS LLP

16         Attorneys for Olivant Investments Switzerland SA

17         Times Square Tower

18         7 Times Square

19         New York, NY 10036

20

21   BY:    DANIEL S. SHAMAH, ESQ.

22

23

24

25

Page 16

```
 1   OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP

 2         Attorneys for Christiane Schuster

 3         Park Avenue Tower

 4         65 East 55th Street

 5         New York, NY 10022

 6

 7   BY:   JORDANNA L. NADRITCH, ESQ.

 8

 9

10   QUINN EMANUEL URQUHART & SULLIVAN, LLP

11         Special Counsel to Creditors' Committee

12         51 Madison Ave

13         22nd Floor

14         New York, NY 10010

15

16   BY:   JAMES C. TECCE, ESQ.

17

18

19   DECHERT LLP

20         Attorneys for LBHI Outside Directors

21         1095 Avenue of the Americas

22         New York, NY 10036

23

24   BY:   ADAM J. WASSERMAN, ESQ.

25
```

Page 17

 1

 2    ORRICK, HERRINGTON & SUTCLIFFE LLP

 3          Attorneys for Barclays

 4          51 West 52nd Street

 5          New York, NY 10019-6142

 6

 7    BY:   JOSEPH J. FRANK, ESQ.

 8

 9    GOODWIN PROCTER LLP

10          Attorneys for Gleacher & Company Securities, Inc.

11          The New York Times Building

12          620 Eighth Avenue

13          New York, NY 10018

14

15    BY:   EMANUEL C. GRILLO, ESQ.

16          BRIAN W. HARVEY, ESQ.

17

18

19    COVINGTON & BURLING LLP

20          Attorneys for Wilmington Trust Company

21          The New York Times Building

22          620 Eighth Avenue

23          New York, NY 10018-1405

24

25    BY:   SUSAN POWER JOHNSTON, ESQ.

Page 18

```
 1

 2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 3        Attorneys for Bank of America

 4        2000 Pennsylvania Avenue, NW

 5        Washington, DC 20006

 6

 7   BY:   LAWRENCE B. FRIEDMAN, ESQ.

 8         DAVID H. HERRINGTON, ESQ.

 9         BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

10

11   THE MICHAELSON LAW FIRM

12        Attorneys for W. Brian Monahan

13        11 Broadway

14        Suite 615

15        New York, NY 10004

16

17   BY:   ROBERT N. MICHAELSON, ESQ.

18

19   DICONZA TRAURIG & MAGALIFF LLP

20        Attorneys for Roger Saks

21        630 Third Avenue

22        7th Floor

23        New York, NY 10017

24

25   BY:   HOWARD P. MAGALIFF, ESQ.
```

Page 19

 1

 2    MILBANK, TWEED, HADLEY & MCCLOY LLP

 3          Attorneys for Official Committee of Unsecured Creditors

 4          One Chase Manhattan Plaza

 5          New York, NY 10005

 6

 7    BY:   DENNIS C. O'DONNELL, ESQ.

 8          BRAD FRIEDMAN, ESQ.

 9

10

11    SEWARD & KISSEL LLP

12          Attorneys for the Counterparty

13          One Battery Park Plaza

14          New York, NY 10004

15

16    BY:   JACK YOSKOWITZ, ESQ.

17

18

19    WOLLMUTH MAHER & DEUTSCH LLP

20          Special Counsel to the Debtors

21          500 Fifth Avenue

22          New York, NY 10110-0002

23

24    BY: PAUL R. DEFILIPPO, ESQ.

25

Page 20

1

2    TOFEL AND PARTNERS, LLP

3          Attorneys for Charles Diccianni

4          800 Third Avenue

5          New York, NY 10022

6

7    BY:    LAWRENCE TOFEL, ESQ.

8

9

10    LAW OFFICES OF LISA M. SOLOMON

11          Attorneys for Gordon Sweely, Vincent Primiano,

12          Riccardo Banchetti, Giancarlo Sarrone, Harsh Shah,

13          Philippe Dufournie, Charles Spero and Tim Burke

14          305 Madison Avenue

15          Suite 4700

16          New York, NY 10165

17

18    BY:    LISA M. SOLOMON, ESQ.

19

20

21

22

23

24

25

1

2      UNITED STATES DEPARTMENT OF JUSTICE

3            Office of the United States Trustee

4            33 Whitehall Street

5            Suite 2100

6            New York, NY 10004

7

8      BY:   SUSAN D. GOLDEN, ESQ.

9

10

11     KAPLAN LANDAU LLP

12           Attorneys for Nine Managing Directors of Neuberger Berman

13           1065 Avenue of the Americas

14           27th Floor

15           New York, NY 10018

16     BY:   EUGENE NEAL KAPLAN, ESQ.

17

18

19     NEUBERGER BERMAN LLC

20           605 Third Avenue

21           36th Floor

22           New York, NY 10158

23

24     BY:   NIKKI A. MARSHALL

25

Page 22

```
 1

 2   VINSON & ELKINS LLP

 3        Attorneys for Lisa Marcus

 4        666 Fifth Avenue

 5        26th Floor

 6        New York, NY 10103

 7

 8   BY:   STEVEN M. ABRAMOWITZ, ESQ.

 9

10

11   STAMELL & SCHAGER LLP

12        Attorneys for Michael K. McCully

13        One Liberty Plaza

14        35th Floor

15        New York, NY 10006

16

17   BY:   RICHARD J. SCHAGER, ESQ.

18

19   WILMINGTON TRUST COMPANY

20        Trustee, for the Senior Noteholders

21        50 South Sixth Street

22        Suite 1290

23        Minneapolis, MN 55402-1544

24

25   BY:   JULIE BECKER (TELEPHONICALLY)
```

Page 23

1

2    LAW OFFICE OF A. JAMES BOYAJIAN

3          Attorneys for Creditor Jeffery K. Wardell

4          355 S. Grand Avenue

5          Suite 2450

6          Los Angeles, CA 90071

7

8    BY:   A. JAMES BOYAJIAN, ESQ. (TELEPHONICALLY)

9

10

11   FARALLON CAPITAL MANAGEMENT, L.L.C.

12          One Maritime Plaza

13          Suite 2100

14          San Francisco, CA 94111

15

16   BY:   ANATOLY BUSHLER, ESQ. (TELEPHONICALLY)

17

18

19   DAY PITNEY, LLP

20          Attorneys for Creditor Fabio Liotti

21          One International Place

22          Boston, MA 02110

23

24   BY:   DANIEL CARRAGHER, ESQ. (TELEPHONICALLY)

25

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for The Baupost Group, Perry Capital and

4         Elliott Management

5         1901 Avenue of the Stars

6         12th Floor

7         Los Angeles, CA 90067

8

9    BY:   GABRIEL GLAZER, ESQ. (TELEPHONICALLY)

10         MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

11

12   MCCARTHY, JOHNSON & MILLER

13         Attorneys for California Winery Workers Trust Fund

14         595 Market Street

15         Suite 2200

16         San Francisco, CA 94105

17

18   BY:   ANA HALLMON, ESQ. (TELEPHONICALLY)

19

20   REED SMITH LLP

21         Attorneys for Bank of New York

22         225 Fifth Avenue

23         Pittsburgh, PA 15222

24

25   BY:   ERIC A. SCHAFFER, ESQ. (TELEPHONICALLY)

1

2    KING STREET CAPITAL MANAGEMENT

3    BY:    MITCHELL SOCKETT, ESQ. (TELEPHONICALLY)

4

5    MONARD - D'HULST HASSELT

6           Attorneys for Roger VanDebroek

7           Gouverneur Roppesingel 131

8           3500 Hasselt

9           The Netherlands

10

11   BY:    THOMAS VANDERSMISSEN, ESQ. (TELEPHONICALLY)

12

13

14   ALSO APPEARING:

15          PAUL NIGEL SHOTTON, PARTY PRO SE

16          DARIAN COHEN, PARTY PRO SE (TELEPHONICALLY)

17          CYNTHIA FLACKMAN, PARTY PRO SE

18          MICHAEL GRAN, PARTY PRO SE

19          RANDALL HUTON, PARTY PRO SE

20          LARS P. JACOBSON, PARTY PRO SE (TELEPHONICALLY)

21          TAL LEV ARI, PARTY PRO SE (TELEPHONICALLY)

22          ARTHUR KENNEY, PARTY PRO SE

23          RODNEY PLASKETT, PARTY PRO SE

24

25

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 193 of 598

Page 26

```
 1                      P R O C E E D I N G S

 2          THE COURT:  Be seated.  Good morning.

 3          MR. BERNSTEIN:  Good morning, Your Honor.  Mark

 4    Bernstein from Weil, Gotshal & Manges on behalf of Lehman

 5    Brothers Holdings Inc. and its affiliated Chapter 11 debtors.

 6    We're here today for what was initially scheduled as a claims

 7    hearing, but, as you can tell from the crowd, there's a few

 8    other matters on.  It turned into a little bit more than just

 9    that.

10          However, the first two items on the agenda are

11    uncontested claims matters which I'll be handling and then turn

12    the podium over to some of my colleagues.  The first item on

13    the agenda is the debtors' objection to reduce and allow the

14    claim of Wilmington Trust Company, which was initially heard at

15    the November 30th claims hearing.  The order was granted with

16    respect to the nonstructured securities claims, and Your Honor

17    had asked for additional information and a declaration be filed

18    related to the structured securities claims and the notice that

19    had been provided to the holders regarding the injunction that

20    Wilmington had requested be included in the order.

21          Wilmington did file a declaration including that

22    notice, which specifically notified the holders of that

23    requested protection.  Wilmington's counsel is here today if

24    Your Honor has any further questions on that matter.  If not we

25    respectfully request that be granted on an uncontested basis.
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 194 of 598
Pg 2 of 30

Page 27

 1          THE COURT:  It will be granted on an uncontested

 2    basis.  I've reviewed the declaration of Julie Becker and it

 3    satisfies all of my questions from November 30.

 4          MR. BERNSTEIN:  Thank you, Your Honor.  The second

 5    item on the agenda is a carryover item from a prior hearing as

 6    well.  This is to the debtors' one hundred thirty-sixth omnibus

 7    objection, which seeks to reclassify certain claims that were

 8    filed as secured as unsecured.  These claims generally were

 9    filed as secured in order for the parties to reserve their

10    rights of setoff that they might have in the future.  We're

11    going forward today with respect to two claims, one the claim

12    of Xanadu Holdings, for which we had extended the objection

13    deadline.  That party has not filed their response.  Their

14    deadline has expired.  And the claim of Olivant Investments

15    Switzerland, who did file a response to the objection.

16    However, their response merely reserves their right to assert

17    that any property is not property of the estate.  They're not

18    objecting to the reclassification of their claim as unsecured,

19    and, as a result, we're seeking to go forward on an uncontested

20    basis and have those two claims reclassified as unsecured and

21    respectfully request Your Honor grant that.

22          THE COURT:  I think counsel wishes to comment.

23          MR. SHAMAH:  Your Honor, Daniel Shamah on behalf of

24    Olivant Investments Switzerland SA.  I just wanted to note my

25    appearance.  We did file a reservation of rights.  It's not on

Page 28

 1    the agenda, but counsel's description of that reservation is

 2    accurate and we do not have any opposition to the relief

 3    requested.

 4          THE COURT:  Fine.  That is granted on an uncontested

 5    basis.

 6          MR. BERNSTEIN:  Thank you, Your Honor.  At this point

 7    I will cede the podium to Mr. Krasnow to handle the next item.

 8          MR. KRASNOW:  Good morning, Your Honor.  Richard

 9    Krasnow, Weil, Gotshal & Manges, on behalf of the debtors.

10    Your Honor, the next item on the agenda is item number 3, which

11    is the debtors' motion for authorization to implement the

12    Defense Costs Fund that appears on docket number 22647.  Your

13    Honor, pursuant to this motion the debtors seek authority to

14    use up to, but no more than, two million dollars to provide

15    funding to current directors and one current employee of LAMCO

16    with respect to defense costs that they might incur in

17    connection with pending actions that relate to pre-petition

18    acts as to which, while the debtors are not named in those

19    proceedings, claims have been asserted against the debtors in

20    proofs of claim, either by the plaintiffs or by the defendants

21    in indemnity claims in amounts which -- asserted amounts which

22    are in the hundreds of millions of dollars.

23          Your Honor, the debtors have set forth, both in the

24    motion and in a reply to an objection, the only objection that

25    was filed to the motion, an objection filed by the creditors'

Page 29

1    committee as to the business reasons why they believe the

2    establishment of this fund, and it's not a fund, per se, we're

3    just making two million dollars available, is warranted.  In

4    respect of that objection, Your Honor, subsequent to the filing

5    of the objection we engaged in discussions with the creditors'

6    committee and facilitated a resolution of the committee's

7    objections, facilitated based on discussions we had with the

8    respective counsel for the current directors and the current

9    employee of LAMCO.  That resolution, Your Honor, is set forth

10   in a revised order that we filed with the Court yesterday in

11   both clean and blackline formats, and, if I may, Your Honor,

12   just set forth what that resolution is.

13           It's really twofold, Your Honor.  The order makes it

14   clear, or proposed order makes it clear that this two million

15   dollar fund, if you will, will not be replenished, so once

16   exhausted there will be no further funding from the debtors.

17   Secondly, the individuals who would benefit from the

18   establishment of this fund have agreed that to the extent that

19   any of their indemnification claims are allowed their

20   distribution entitlements in respect of those claims would be

21   reduced on a dollar for dollar basis based upon that portion of

22   the two million dollars, if any, which is actually advanced to

23   them or their counsel.  It's our understanding that based upon

24   those resolutions the committee is prepared to withdraw its

25   objection, and assuming that counsel confirms that we would

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 30 of 30

Page 30

 1    respectfully request that for the reasons set forth in the

 2    motion and in our reply that the relief be granted.

 3         Your Honor, unless the Court has any questions perhaps

 4    it would make sense to simply turn the podium over to committee

 5    counsel.

 6         THE COURT:  That's fine.  I'll hear from the

 7    committee.

 8         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

 9    Tweed, Hadley & McCloy, on behalf of the official committee.

10    Your Honor, Mr. Krasnow's recital of where we are is correct.

11    We did file an objection to the relief requested in the motion,

12    because we do have a long history with this issue in terms of

13    insurance coverage, tail coverage in two instances where the

14    directors and then the approval of the legal defense cost

15    motion back in June.  We thought the circumstances were

16    different there.  We thought the debtors' business judgment was

17    different there.  Here we continued to believe that there was

18    no legal right as originally presented to this type of

19    entitlement for the directors and question the debtors'

20    business judgment.

21         The discussions that Mr. Krasnow alluded to resulted

22    in modifications to the relief being granted, which we think

23    largely address our concerns in terms of the dollar for dollar

24    reduction of any claims that the directors may have on

25    indemnification claims, which would bring the distributions to

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 198 of 598

Page 31

1  them closer to those that are being made to all other unsecured

2  creditors and the commitment that there will be no

3  replenishment of this fund.

4        So with those changes we are prepared to withdraw our

5  objection.

6        THE COURT:  And you are, in fact, withdrawing the

7  objection.

8        MR. O'DONNELL:  We are, in fact, withdrawing our

9  objection, yes.

10       THE COURT:  Great.  This is approved now as an

11  uncontested matter.  I've reviewed the modified order, which

12  reflects the adjustments just described, and I am pleased that

13  this has been resolved, because this really represented one of

14  the very few times in my recollection that the creditors'

15  committee and the debtor were at odds.

16       MR. KRASNOW:  Yes, Your Honor.  We appreciate the fact

17  that the committee worked with us in resolving this in the

18  manner described.

19       THE COURT:  Okay.  Fine.  It's approved.

20       MR. KRASNOW:  Your Honor, if we may jump on the

21  agenda, because it's my understanding that there is something

22  listed, item number 6 is a contested matter, which is now an

23  uncontested matter, and if I may turn over the podium to my

24  partner, Mr. Levine.

25       THE COURT:  Okay.

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 199 of 598

Page 32

1          MR. LEVINE:  Good morning, Your Honor.  Richard Levine

2     from Weil, Gotshal for debtors LBFP.  This was a motion for

3     sanctions against an ADR counterparty which was not disclosed

4     in the public record.

5          THE COURT:  Right.

6          MR. LEVINE:  Their counsel is here, and I am pleased

7     to say that based on discussions that --

8          THE COURT:  Will he be wearing a bag over his head?

9          MR. LEVINE:  No, it's the mask.  And, obviously, it

10    was disclosed to the Court and the committee and the U.S.

11    Trustee and so forth.  I'm pleased to say that based on

12    discussions that began yesterday afternoon and were resolved

13    with the signing of a stipulation in this courtroom this

14    morning there is an agreement in it by stipulation where the

15    counterparty will be serving an ADR response which responds to

16    these three specific issues raised in the ADR notice, the

17    enforceability of the flip clause in light of the prohibition

18    on ipso facto clauses, the amounts that the debtors claim are

19    due on termination from the two issuers involved, and whether

20    that payment must be made.  The counterparty has agreed that it

21    has full authority to negotiate a settlement on its behalf, and

22    the parties have agreed, notwithstanding the fact that the

23    counterparties, as it has participated previously in good

24    faith, and the debtors have argued that they did not, that the

25    counterparty will participate in the ADR process and mediation

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 200 of 598

Page 33

1    in good faith going forward.  And the stip also specifically

2    recognizes that any settlement may include a mechanism which

3    can protect the issuer from claims of noteholders subject,

4    obviously, to notice the noteholders and approval of the Court.

5        So the debtors and the committee, I think, are happy

6    with this resolution.  We expect the ADR to go forward smoothly

7    and hopefully will result in a settlement, or, if not, we will

8    litigate, but we thought it was important that the issues that

9    were raised were resolved either by a Court ruling or by a

10   resolution such as this.

11       THE COURT:  I think I should hear from counsel for the

12   undisclosed counterparty confirming that the arrangements just

13   described are, in fact, acceptable.

14       MR. YOSKOWITZ:  Thank you, Your Honor.  It's Jackie

15   Yoskowitz from Seward & Kissel for the counterparty.  Mr.

16   Levine's description is correct.  When I saw Mr. Levine's reply

17   to our objection to his motion for sanctions I realized parties

18   were, sort of, saying the same things.  Our issue had always

19   been we thought we could negotiate for ourselves, but with

20   respect to the noteholders we had concerns about overpromising

21   at a mediation.  With my discussions with Mr. Levine yesterday

22   and the stipulation that we worked out I think we're of the

23   same mind and we understand that there's a mechanism that we

24   can agree on, hopefully, in the future to get everybody on

25   board with a potential settlement.  So we're comfortable with

08-13555-mg    Doc 42721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 201 of 598

Page 34

```
 1    the stipulation.

 2            THE COURT:  Good.

 3            MR. YOSKOWITZ:  Thank you, Your Honor.

 4            THE COURT:  Let's proceed with a successful ADR then.

 5            MR. YOSKOWITZ:  Hopefully we will.  Thank you, Your

 6    Honor.

 7            THE COURT:  Okay.

 8            MR. LEVINE:  Thank you, Your Honor.

 9            THE COURT:  Okay.  So that stipulation will be

10    submitted in writing for approval.

11            MR. LEVINE:  Your Honor, we had not prepared it for

12    Court approval.  It was just between the parties, but if the

13    Court wants a copy I'm happy to hand it up.

14            THE COURT:  There's no need for that.  It wasn't clear

15    to me procedurally what you had in mind.  If all that's

16    happening is that the motion for sanctions is being withdrawn

17    without prejudice on the assumption that the parties perform in

18    accordance with their separate stipulation that's fine.

19            MR. LEVINE:  That is, in fact, what was going on.  We

20    are going to file the redacted stipulation on the record so

21    that --

22            THE COURT:  But you're not looking for Court approval.

23            MR. LEVINE:  But we're not looking for Court approval.

24            THE COURT:  Fine.

25            MR. LEVINE:  Thank you, Your Honor.
```

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 202 of 598

Page 35

1          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

2    Marcus, Weil, Gotshal & Manges, on behalf of Lehman Brothers

3    Holdings Inc. and its affiliated debtors.  Flipping back, Your

4    Honor, to number 4 on the agenda, this is the first contested

5    matter.  It's the application of the debtors for authorization

6    to employ and retain Gleacher & Company Securities, Inc. as

7    financial advisor, effective as of February 17, 2011.

8          As reflected on the docket, Your Honor, objections to

9    the application have been filed by the Office of the U.S.

10   Trustee and the creditors' committee.  The debtors filed an

11   omnibus reply in response to the objections as well as the

12   supplemental affidavit of Stephen Hentschel of Gleacher.  Our

13   understanding is that the supplemental affidavit resolves the

14   U.S. Trustee's objection with respect to the disclosure

15   matters.

16         In addition, Your Honor, as described in the debtors'

17   reply, there have been some adjustments made to the engagement

18   agreement which resolved the objections of the U.S. Trustee and

19   the creditors' committee to the nunc pro tunc nature of the

20   engagement.  Specifically, the monthly retainer has been

21   eliminated, and the schedule that sets forth the applicable

22   transaction fee has been revised to increase the transaction

23   fee payable in certain circumstances, subject to the same

24   fifteen million dollar cap.  We filed a revised proposed order

25   last night to reflect those changes, and the revised order has

Page 36

1    been reviewed by the U.S. Trustee and counsel to the creditors'

2    committee.  As a result, although the engagement will still be

3    nunc pro tunc to February 17, 2011, the effect of that is

4    limited to the indemnification provided to Gleacher and to

5    Gleacher's right to reimbursement of expenses.

6         I believe that the U.S. Trustee is prepared to forego

7    any further objections at this point, based upon the language

8    in the proposed order regarding the U.S. Trustee's ability to

9    object to the fees payable to Gleacher based on the

10   reasonableness standard set forth in Section 330 of the

11   Bankruptcy Code.

12        We're left, therefore, Your Honor, with the objection

13   of the creditors' committee.  The creditors' committee's

14   remaining concerns relate to the possibility of duplication of

15   services and duplication of transaction fees.  As indicated in

16   the debtors' reply and as can be confirmed by Bryan Marsal, who

17   is here in court today, there's no risk regarding duplication

18   of services, because Lazard has not rendered any services to

19   the debtors regarding Archstone.  Moreover, as set forth,

20   again, in the application and the reply, the debtors believe

21   that Gleacher is uniquely qualified to advise them regarding

22   Archstone matters, and, therefore, have not requested Lazard to

23   render services relating to Archstone.

24        The debtors want their financial advisor for Archstone

25   matters to be a firm that's familiar with the property,

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 204 of 598

Page 37

1    familiar with the management and familiar with the multifamily

2    unit community, and Gleacher satisfies all of those

3    prerequisites.

4        The creditors' committee, which has been actively

5    involved in the debtors' deliberations with regard to

6    Archstone, knows that Lazard hasn't been involved in any of the

7    Archstone discussion and also knows the extent to which

8    Gleacher has been involved in advising the debtors with respect

9    to Archstone.

10       As far as the risk of duplicate transaction fees is

11   concerned, while the committee is correct that the debtors and

12   Lazard have not agreed to exclude Archstone from the services

13   rendered by Lazard, given that in accordance with the order

14   dated March 22, 2011 granting the debtors' supplemental

15   application with respect to Lazard the Court can review

16   Lazard's compensation under the standards set forth in Section

17   330 of the Code the debtors believe that there is little risk

18   that Lazard will be able to demonstrate that it is entitled to

19   a transaction fee with respect to Archstone.

20       In any event, in light of the extensive services

21   rendered by Gleacher to date and the importance of resolving

22   Gleacher's engagement at this time, in light of all the recent

23   activity pertaining to Archstone, the debtors do not believe it

24   is appropriate to make Gleacher take the risk with respect to

25   approval of its fees.  Rather, Lazard's entitlement to the fee

08-13555-mg    Doc 47321    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 205 of 598

Page 38

1    will be taken up by the Court at a later date if Lazard files

2    an application seeking compensation regarding Archstone.

3            For all of the foregoing reasons, Your Honor, the

4    debtors believe that the engagement of Gleacher on the terms

5    outlined in the application as revised is necessary,

6    appropriate and reasonable, and we request that the Court

7    approve the application.

8            THE COURT:  I have a couple of questions, and I am

9    pleased to see that progress has been made in resolving the

10   objections to this application.  But first is really one that's

11   based on pure curiosity on my part.  Given the sophistication

12   of the parties, how is it possible for Gleacher to have been

13   involved on a consulting basis since February 17 of 2011 and

14   for no application to have been made for approval of that

15   retention?  That just shocks me.

16           MS. MARCUS:  It's very complicated, Your Honor, but we

17   have -- and that's an understatement.

18           THE COURT:  Things in this case usually are

19   complicated.

20           MS. MARCUS:  That's an understatement.  There have

21   been many iterations of the Gleacher engagement.  At certain

22   points in time it was expected that Gleacher would be engaged

23   by the Archstone entity, as opposed to by the debtors.  There

24   were a lot of different alternatives considered, and there have

25   been discussions with Lazard for some period of time in an

Page 39

1    effort to resolve this.  To be perfectly frank, the application

2    was drafted many months ago, and we've just been trying to work

3    through it.

4         THE COURT:  You anticipate my second question, which

5    is whether or not Lazard will agree to carve out from any claim

6    it might otherwise make in this case those services that are

7    being performed by Gleacher, thereby eliminating any risk that

8    we have to be involved at some future date in an argument over

9    a claim by Lazard for a right to a transaction fee.

10        MS. MARCUS:  To date they have not been prepared to do

11   that.

12        THE COURT:  Is Lazard represented in court today?

13        MS. MARCUS:  They said they might have somebody here,

14   but apparently not.

15        THE COURT:  That was a wise move on their part, I

16   think, because I would have called whoever that was up to make

17   public inquiry.

18        All right.  Those are my questions.  I'll hear from

19   those who have objected to see whether or not the order as

20   modified satisfies those objection.

21        MS. GOLDEN:  Your Honor, I'll be brief.  Susan Golden

22   for the U.S. Trustee.  Ms. Marcus accurately described the

23   nature of the resolution of the U.S. Trustee's issues.

24   Certainly the Lazard fee is of great concern to the U.S.

25   Trustee, but the U.S. Trustee does have 330 rights from

08-13555-mg   Doc 47221   Filed 12/05/14   Entered 12/05/14 13:12:38   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 940 of 930

Page 40

```
 1    Lazard's initial engagement, and with that the U.S. Trustee was

 2    satisfied that, if need be, the U.S. Trustee would deal with

 3    the Lazard claim for the 17 million dollar transaction fee at

 4    the time that Lazard put it an application for it.

 5          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

 6    Tweed, Hadley & McCloy, again, on behalf of the committee.

 7    Your Honor, we are pleased, as well, that there's been some

 8    progress towards resolving this.  We've certainly been trying

 9    for a long time to resolve the issues relating to this

10    application.  As Ms. Marcus indicated, there has been a long

11    discussion of whether Gleacher should be retained here and how

12    we should deal with Lazard as a result that probably go back to

13    February of this year, so the nunc pro tunc, I think, is easily

14    explainable by that dialogue back and forth.

15          However, we would not be here -- as you observed

16    earlier we -- the committee has rarely objected to the debtors'

17    applications at this stage, when they've actually been before

18    the Court.  We've obviously acted behind the scenes in many

19    instances, but here we just got to a point where we knew we

20    could not see eye to eye on the issue, and the single issue,

21    really, that is the one that's been of most interest to us and

22    why we're here today is the possibility of a duplicate fee with

23    respect to Lazard.

24          I don't think we debate that Lazard has not been

25    involved.  We haven't seen Lazard involved in this situation.
```

08-13555-mg   Doc 47721   Filed 12/05/14   Entered 12/05/14 13:12:38   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 208 of 598

Page 41

1    We know Gleacher has been.  However, Lazard does have an

2    engagement letter that provides that it gets a fee for this

3    type of transaction.  That letter also provides that that fee

4    can be waived or they can carve it out.  That has not happened.

5    And it says that Lazard cannot unreasonably withhold its

6    consent, and, notwithstanding that, nothing has happened.

7           There has been a lot of back and forth on the issue,

8    but we're still here today with an application where the

9    debtors are seeking to retain and, ultimately, pay Gleacher for

10   something that Lazard has said, has argued it would be entitled

11   to a fee for as well.  And we believe under those circumstances

12   it would be difficult for the Court to grant 328(a) approval

13   here.

14          In terms of the Court needing to make a determination

15   that the fee structure is reasonable, if there is a clear and

16   foreseeable possibility that another professional will assert a

17   claim to this -- assert fees with respect to the same

18   transaction and possibly the debtors would wind up paying twice

19   for the same fees.  Under those circumstances making the 328

20   reasonableness determination is difficult.

21          It also would raise an issue for us in terms of

22   challenging it down the road, because if the Court approves

23   this application pursuant to 328(a) it could only be undone if

24   it was shown to be improvident based on events that could not

25   have been foreseen at the time.  Clearly we, everyone in the

Page 42

1    courtroom can foresee at this point that Lazard may, maybe not,

2    but may assert a competing claim here to a fee for the same

3    transaction, and under those circumstances we would not be able

4    to meet the 328(a) standard and could arguably not object to

5    any reduction of the Gleacher fee at that time to take into

6    account a Lazard fee.

7         So our primary issue, remaining issue, is with the

8    need for -- the possibility of a 328(a) approval today.  In

9    terms of whether there has to be an approval today at all, I'm

10   not sure why there has to be.  There's been eleven months of

11   the back and forth.  I think our suggestion is that we go back

12   to the table again and try to get Lazard at the table and try

13   to get this issue resolved and then approve it.  With the

14   monthly fees off the table Gleacher isn't go to see any

15   compensation here until they consummate a transaction, so

16   there's no pressing need, from our perspective, to actually

17   approve this today.  With this issue on the table we need to

18   have Lazard at the table and we need to try to figure out

19   whether we can definitively resolve this issue to avoid a fight

20   down the road.

21        THE COURT:  So that last point surprised me, because

22   my expectation was that I was hearing from the two objectors

23   saying as a result of the revised order we're prepared to

24   accept the engagement.  What I'm hearing you say is that you

25   would prefer that this be deferred to another omnibus hearing

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 210 of 598

Page 43

1   date, perhaps January 11, and that between now and then some

2   effort be made to clarify Lazard's position.  Is that what

3   you're saying?

4          MR. O'DONNELL:  I think if that's said that's,

5   perhaps, a fallback more than -- and I think our initial

6   position here is that to the extent that the Court is going to

7   approve it today it needs to approve it with some clear

8   reservation of rights or clear contingency as to the existence

9   of a Lazard fee.  It can't be a clear-cut 328(a) approval.

10  That would preclude us from challenging Gleacher's fee down the

11  road to reduce it to take into account a Lazard fee.

12         Should the Court not want to go there the other option

13  here, since we all know that the issue is trying to get Lazard

14  to the table, that we adjourn it and try once again to get

15  Lazard to the table and get it done.

16         THE COURT:  Well, I don't think there's going to be a

17  problem getting Lazard to the table, because I am going to

18  direct that to occur, and we're going to have a chambers

19  conference on this sometime before I enter an order.  It may

20  not be required that we have a further hearing on it, but I do

21  want to hear from authorized representatives of Lazard as to

22  what their actual position is with respect to any claims to be

23  made with regard to Archstone.

24         I would expect them to exclude Archstone from any

25  claim they might otherwise make.  If they refuse to do that we

08-13555-mg    Doc 43721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 44 of 990

Page 44

1    have a problem, and we might as well find out that we have that

2    problem now.

3          I'm available for a conference tomorrow or Friday.  Or

4    anytime next week.  I am actually here throughout the holidays

5    and do not want this to in any way drag.  If it needs to

6    because of holiday plans of parties who need to be at the

7    meeting I am proposing this may end up being put off until

8    January 11, but I view that as a less favorable alternative.

9          So what I am prepared to do is to approve the

10   arrangement subject to there being an acceptable understanding,

11   properly documented, with Lazard concerning Lazard's ongoing

12   claims, if any, with respect to the Archstone transaction, and

13   I am prepared to have a meeting on that tomorrow or Friday.

14         MS. MARCUS:  Your Honor, can I take one more shot?  I,

15   obviously, will do what you've suggested, but in the

16   alternative, I understand your concern about Lazard's position.

17   I guess I would say from Gleacher's perspective they want to

18   get this resolved as soon as possible, and we think that's

19   appropriate.  In fact, they were served, I believe, with --

20         THE COURT:  Tomorrow is not soon enough?

21         MS. MARCUS:  If it can be arranged I'm certainly

22   available.  Everybody from Lehman's side will be available for

23   a conference.  My only point was going to be since any

24   compensation requested by Lazard is ultimately up to Your Honor

25   anyway could we get the Gleacher engagement approved now

08-13555-mg    Doc 43721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 212 of 598

Page 45

1    without the reservation that Mr. O'Donnell requested, and then

2    you'll make sure that there is not a duplication of fees at the

3    appropriate time.

4            THE COURT:  I can always make sure that there is not a

5    duplication, but I have had personal experience with 328(a) and

6    with the Second Circuit's decision in Smart World, and I want

7    this resolved prior to any formal engagement.  I want to see

8    Lazard tomorrow in my chambers, and if that can't be done we'll

9    find another day when it can be done.  The approval of this

10   engagement, and I mean no disrespect to the work that has been

11   done by Gleacher and that will be done by Gleacher, but we

12   can't have clashing titans each claiming that they're entitled

13   to significant fees from this estate and have me be the arbiter

14   only to have an argument that I actually don't have the

15   authority, based upon the form of the order, to tell certain

16   people that they need to go away.

17           MS. MARCUS:  Okay.

18           THE COURT:  So I'm not going to create the problem.

19   I'm going to avoid it.

20           MS. MARCUS:  That's fine, Your Honor.  We'll contact

21   your chambers to schedule a time.

22           THE COURT:  And hopefully that can happen tomorrow.

23           MS. MARCUS:  Okay.

24       (Adversary proceeding heard from 10:33 a.m. to 1:49 p.m.)

25           THE COURT:  Be seated, please.

Page 46

1          MR. BERNSTEIN:  Good morning, again, Your Honor.  It's

2     Mark Bernstein of Weil, Gotshal & Manges on behalf of the

3     Lehman Chapter 11 debtors.  The remaining nine items on the

4     agenda are all omnibus objections that were filed by the

5     debtors to claims asserted by former Lehman employees based on

6     restricted stock units or RSUs.  Since the objections are all

7     identical, I think it makes sense if Your Honor agrees to take

8     them all at one time.

9          THE COURT:  I agree.

10         MR. BERNSTEIN:  Okay.  The objections seek to

11    reclassify each of the claims as equity interests in LBHI.

12    Prior to the commencement of these Chapter 11 cases, LBHI

13    granted RSUs to employees as part of their compensation, in

14    order to enable the employees to participate in any increase in

15    value of the Lehman enterprise.

16         The RSUs bear the hallmarks of traditional equity

17    interests.  The holder benefit from the increased value of the

18    corporation, receive dividends and bear the risk if the

19    corporation should fail.  The RSUs has rights to acquire common

20    stock in LBHI, which is all they entitle their holders to

21    receive, followed in the definition of equity security in

22    Section 101-16 of the Bankruptcy Code.

23         A particular telling fact about the nature of the

24    RSUs, Your Honor, is had LBHI delivered to all the holders of

25    the RSUs on the day before bankruptcy the common stock that

08-13555-mg   Doc 47721   Filed 12/05/14   Entered 12/05/14 13:12:38   Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 214 of 598

Page 47

1    they were entitled to receive in exchange for their RSUs, we

2    wouldn't be here today, because all the holders would merely be

3    common stock holders, and which would very clearly be equity

4    interests in the debtors.

5         The terms of the programs under which the RSUs were

6    issued also evidence that the claims should be reclassified as

7    equity interests.  Under the program documents under which the

8    RSUs were issued, at no time did any of the claimants have any

9    right to demand or receive cash in exchange for their RSUs.

10   The program documents all included language to the effect that

11   "Holdings and any of its subsidiaries' obligations with respect

12   to the" -- this one I'm readying from is 2007 -- "the 2007

13   units granted hereunder, is limited solely to the delivery to

14   you of shares of common stock on the date on which such shares

15   are due to be delivered hereunder.  In no way shall Holdings or

16   any subsidiary become obligated to pay cash in respect of such

17   obligations."

18        One of the main contentions that the creditors make in

19   response to these objections is that the RSUs were issued as

20   part of their compensation.  The debtors don't dispute that.

21   As part of either their bonus or if they were commission-based

22   employees, part of their compensation was, in fact, issued in

23   RSUs.  However, compensation and equity interests are not

24   mutually exclusive.  The fact that the equity was issued as

25   part of compensation has no bearing on the classification of

1    these claims or the priority in which they're entitled to

2    recover from LBHI.

3          Two of the program documents, the 2003 and 2004,

4    expressly provided that the claims are to be treated as

5    equivalent with common stock of LBHI.  And pursuant to Section

6    510(a) of the Bankruptcy Code, those subordination provisions

7    in the documents should be held enforceable in these cases.

8          Alternatively, Your Honor, should the RSUs be

9    considered claims against the debtors and not equity interests

10   in the debtors, they must be subordinated as equity interests

11   under Section 510(b) of the Bankruptcy Code, as these claims

12   all arise from the purchase of securities.

13         Section 510(b) has been interpreted very broadly by

14   the courts in this circuit and applied in similar contexts as

15   the facts in this case.  The bankruptcy courts in the Enron and

16   WorldCom case and the Section Circuit in In re Med Diversified,

17   among other courts, have embraced the broad interpretation of

18   "arising from" in the statute and have subordinated claims if

19   there's any nexus or causal relationship between the purchase

20   of the securities and the damages that are being claimed.

21         In this case, the claimants purchased the RSUs with

22   their labor.  It's not -- they didn't actually buy the shares,

23   they didn't exchange cash, but by working for Lehman, they

24   exchanged their labor for these RSUs.  Bankruptcy courts in

25   Enron, WorldCom and U.S. Wireless, have all held that employees

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHM/23/BROTHERS HOLDINGS INC., ET AL.
Pg 216 of 598

Page 49

1    who receive RSUs as part of their compensation or similar

2    instruments, purchased those securities with their labor, for

3    the purchase of 510(b) -- the purchase requirements.  This is

4    settled law in this jurisdiction.

5            Despite their contentions that they had no choice and

6    did not elect to receive the RSUs, by accepting employment for

7    Lehman and going to work every day, they continuously accepted

8    that condition to their employment, which was, part of your

9    compensation will be paid in RSUs.

10           Creditors have asserted a variety of theories and

11   liability against LBHI relating to the RSUs, ranging from the

12   diminution in value of the RSUs, fraudulent statements that

13   were made by LBHI in their financial statements prior to or in

14   connection with the issuance of the RSUs, that led them to hold

15   onto their common stock or these RSUs or induce them not to

16   sell.

17           Other creditors have asserted that the debtors

18   breached their employment agreements by actually issuing these

19   RSUs as opposed to paying them in cash, although no creditor

20   has produced an employment agreement that said your

21   compensation will be paid in cash.  And several of the

22   employment agreements that were attached to the responses or

23   the claims specifically provide that Lehman was entitled to pay

24   part of the compensation in equity awards.

25           Courts have held that claims based on all these types

08-13555-jmp    Doc 23741    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
Pg 50 of 230

Page 50

1    of theories of damages have been -- can be subordinated,

2    pursuant to 510(b) of the Bankruptcy Code.

3              Certain employees who were commission-based employees

4    have attempted to distinguish the RSUs that they would have

5    received for the year of 2008 from the other RSUs that were

6    actually issued.  When the employees who were commission-

7    based -- each month they received a statement based on their

8    performance about how much equity they had accrued for that

9    month.  But those employees actually did not receive the RSUs

10   until -- typically until the end of the year, November or

11   December, I think is typically how it worked.

12             So these employees have argued that they did not

13   receive their RSUs, and therefore those portions of their

14   claims that were based on their 2008 compensation, should for

15   some reason, be treated differently from the portions of their

16   claim for which they actually do have RSUs.  Because their

17   argument is they haven't received anything in exchange for

18   their labor.

19             However, there's nothing that says they're entitled to

20   cash in any document that they've provided.  And in fact, the

21   way the debtors are proposing to treat those claims is that we

22   will subordinate the entire amount of their claim as equity,

23   not just the portion for which they have issued RSUs.  So had

24   they been issued RSUs on a monthly basis, they would have just

25   had RSUs in the amount of that withheld compensation or that

1    portion of their compensation which was equity accrual, and

2    they would be treated the exact same way as the debtors are

3    intending to treat them under these objections, which is that

4    portion -- they would have those RSUs, and those should be

5    subordinated.

6        LBHI has put forth facts and law that dispute the

7    claims asserted by these claimants.  And as a result, the

8    burden has shifted back to these claimants to prove by a

9    preponderance of evidence that their claims are valid, based on

10   the law in this jurisdiction.

11       Your Honor, in sum, these employees received exactly

12   what they bargained for when they signed up to work at Lehman.

13   They received the right to acquire common stock in LBHI as part

14   of their compensation.  As part of that, the employees also

15   bargained for the risk that Lehman might potentially fail, and

16   then that common stock would not have any value.

17       These equity awards are just that.  They were equity.

18   And claimants who hold them should not now be able to bootstrap

19   themselves up to general unsecured creditors by asserting

20   different theories of liability.

21       The creditors' committee has filed a statement in

22   support of the subordination pursuant to 510(b), and the

23   debtors respectfully request that each of the claims be

24   classified as subordinated -- as equity interests in LBHI.  And

25   I'm happy to answer any questions Your Honor may have, or it

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 219 of 598

Page 52

1    may be proper to hear from some of the respondents, first.

2            THE COURT:  Well, let me share with you the challenge

3    that I had in trying to deal with these various objections to

4    claim disallowance.

5            The debtor filed an omnibus reply.  The omnibus reply

6    deals with all the legal arguments and also includes, as an

7    attachment, a schedule that references the objections of

8    various claimants without identifying them by name.  One of the

9    problems that we had in chambers in attempting to understand

10    the position being advanced was to correlate the position of

11    the debtors with respect to the particulars of each claimant.

12    And that was time consuming and frankly, somewhat burdensome.

13            One of the questions that we still have, however, and

14    I'd like to just understand how we're approaching this, is

15    whether we are dealing today on a claim-by-claim basis, or

16    whether or not we are dealing with all of the claims as if they

17    are part of a class.

18            Judge Gonzalez, in his Enron decision, dealt with

19    somewhat comparable claims that arose in Enron, but that were

20    predicated largely on claims of fraud, but dealt with those

21    claims as one class without going to the specifics of each

22    claimant's assertions.

23            I don't know, as I sit here, how you intend to

24    approach today's hearing.  And there are different arguments

25    that have been made by different former employees arising under

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 220 of 598

Page 53

1    different annual programs.  And I don't know whether or not you

2    intend to approach this as a class-wide issue, which

3    effectively is the creditors' committee's approach, saying you

4    don't have to worry about the specifics; regardless of the

5    particulars, under 510(b) all claims should be treated as

6    equity.

7         So my first question to you is, how am I supposed to

8    get through this thicket?  We have a fairly packed courtroom

9    still and we have people on the telephone.  Are we doing this

10   on a claimant-by-claimant basis?  Are we doing this on a class

11   basis?  Whichever way we do it, I want it to be fair and I want

12   everybody to have an opportunity to be heard.  And in part

13   because of the added omnibus-type matters that we heard this

14   morning that wouldn't ordinarily be heard at the time of a

15   claims hearing, it's now almost lunch time.

16        MR. BERNSTEIN:  Sure.  Let me respond to that.  We

17   believe that the legal issues that relate to each of these

18   claims are identical.  Now, certain creditors, as you stated,

19   raised different type arguments.  But the programs under which

20   these RSUs were issued, they may have slight differences from

21   year to year, but in substance, and the relevant provisions of

22   those program documents, for the purposes of the arguments that

23   we make here today, the programs are identical.

24        And we scheduled all of these omnibus objections which

25   were filed at different times throughout the year, all for one

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 225 of 590

Page 54

1    hearing, in the interest of fairness.  Because some of these

2    parties are pro se, some of them do have counsel.  The claims

3    vary in amount.  But we thought it made sense to have all of

4    the issues and all the arguments on the table and to deal with

5    them as a class.  Either the claims -- the claims are, from our

6    view, the same claims.  Reserving the right to -- if certain

7    parties have facts that they assert that are different than

8    others, we can talk about those separately.  But generally, we

9    believe the claims and the nature of these claims are the same,

10   and the legal issues are the same, and are prepared to deal

11   with it as a class, unless there do arise, one-off issues,

12   which we can talk about, I guess, as those arise.

13        THE COURT:  Well, I guess the first thing I'd like to

14   find out is if there is any affected claimant that objects to

15   treating it as a class-wide matter and wishes to be heard

16   separately -- apparently hands are going up everywhere.  So

17   this is going to be not -- according to their wishes, it's not

18   going to be on a class-wide basis.  At some point it may become

19   that.

20        There are basically two ways that this can be

21   approached -- maybe more than two, but two that occur to me.

22   One is for every argument made by every claimant to apply to

23   every claimant in the same class, notwithstanding the fact that

24   we are, by a show of hands, preferring to do this on an

25   individual claimant basis.  I had thought, as I was preparing

08-13555-mg    Doc 23741    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 55 of 330

Page 55

```
 1    for this morning's hearing, that the debtors' response was

 2    effectively putting all claims in the same basket, and by doing

 3    so, was treating every argument as if it applied to every

 4    claimant, and then attempting to defeat each one of those

 5    arguments.

 6        In some respects, it is fairer to the claimants

 7    individually for them to have the benefit of, in effect, every

 8    other argument that every other similarly situated claimant has

 9    made, whether or not they made that argument, thereby allowing

10    for the possibility that if one argument is a successful

11    argument that applies across the board, that everybody gets the

12    benefit of it, but that if there's an argument that's

13    particular to a particular program or to a particular claimant,

14    obviously that would be personal.

15        I have some concerns just from a case management

16    perspective as to how we deal with all these individuals on

17    this one day.  And it wasn't certainly my choice that employee

18    claims would all be heard at one time in this manner, it was

19    the debtors' choice.  So I'm going to take suggestions as to

20    the most efficient way to deal with this in a manner that also

21    protects the interests of each individual.

22        MR. BERNSTEIN:  Sure.  I mean, I think that we will

23    see when the various claimants do get up to state their

24    arguments, that the issues involved are the same.  They may

25    want to have -- phrase them differently or characterize them
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 223 of 598

Page 56

1    differently.  But these claims all arise from identical

2    instruments.  And the facts surrounding their issuance was

3    identical.  They got them as part of their compensation.

4         So I'm not exactly sure what the different creditors

5    are going to say that would result in there being different

6    rulings or there could be different decisions made on a claim-

7    by-claim basis.  And we had thought, as Your Honor, that it was

8    the most fair to allow all of the argu -- any argument made by

9    any claimants to be used for the benefit or by the benefit of

10   any other claimant.  Because these issues really, as we viewed

11   them, these claims are the same.

12        Whether someone raised an argument in their response

13   or not, they have the same rights as any other holder of these

14   RSUs.  And we think they really should be treated the same way,

15   whatever way that ultimately is.  So I think that maybe if we

16   start to hear from the claimants, we will -- it's our belief

17   that we will see that the issues really are the same.  I could

18   be wrong.  But that's where I think this ends up.

19        THE COURT:  Does the creditors' committee have

20   anything to say?

21        MR. O'DONNELL:  Your Honor, on that last point I think

22   we agree as well, that that would be the most efficient way to

23   proceed.  We think the arguments are -- overlap significantly.

24   And if we grant the benefit of each argument to each of the

25   claimants, I think that's a fair way to proceed.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 224 of 598

Page 57

1        Beyond that, I'm just noting that our objection took

2    the position that the 510(b) arguments are the cleanest and

3    most efficient way to decide this.  We wish the circumstances

4    were different.  We realize that these -- you know, the former

5    employees were valuable assets of the Lehman enterprise, pre-

6    petition.  But the bottom line is that they had two types of

7    claims.  They had claims for cash and claims for equity

8    compensation.  And equity compensation brings 510(b) into play.

9    And we don't see how any other result other than that advocated

10   by the debtors and the committee is possible here.

11        THE COURT:  Okay.  I'm going to make a general comment

12   and then I'm going to just take the claimants in turn, and

13   we'll see whether or not these positions begin to clump

14   together.  If they do, fine.  If they don't, we'll deal with

15   it.

16        In anticipation of today's hearing, I reviewed the

17   papers submitted, including the papers submitted by the debtors

18   in omnibus reply.  And it became clear to me that one case in

19   particular was particularly relevant, and that was the case I

20   just referred to earlier, Judge Gonzalez's decision in the

21   Enron matter.

22        It's a very long decision and one that does not, in

23   all respects, apply here.  But it's that decision that, in

24   effect, led to counsel's quotation of the exchange of labor for

25   the consideration of RSUs, because Judge Gonzalez used that

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 225 of 598

Page 58

1    terminology in his decision in 2006, I believe or 2003.  I'm

2    not sure of the exact year.  But I did -- if somebody has the

3    year we can correct the record.

4            UNIDENTIFIED SPEAKER:  2006.

5            MR. BERNSTEIN:  2006.

6            THE COURT:  2006?  I was right the first time.

7            The decision treated all of the employee claims with

8    sympathy as part of the same class of claimants and focused on

9    Section 510(b) of the Bankruptcy Code, its legislative history,

10   the role of a Law Review article that was published in 1972 in

11   the New York University Law Review, in which Homer Kripke was

12   one of the authors -- I only remember that because he was a

13   professor of law that I had when I was in law school -- and

14   that shows you how old I am.

15           The rather thoughtful decision pointed out that

16   there's a fundamental policy that is at stake in Section

17   510(b), and it's as fundamental as where stakeholders should

18   rank in the distribution of assets out of a Chapter 11 estate.

19   And without recharacterizing what the Court said in Enron, in

20   effect, Judge Gonzalez concluded that regardless of how these

21   rights to receive stock may be characterized, that they are

22   really governed by Section 510(b), which leads to subordination

23   of the contract right to receive stock to the same level as an

24   equity holder.

25           And I want everybody who's about to speak to know that

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 226 of 598

Page 59

1    unless you can demonstrate that the instrument governing your

2    right is distinguishable from what was at issue in Enron -- and

3    there's a footnote to the opinion, I think it's footnote 3,

4    where Judge Gonzalez notes it's possible that there may be some

5    way to structure a right to receive restricted stock in a

6    manner that would take it outside the ambit of the 510(b)

7    subordination -- and now I'm paraphrasing -- but I doubt it.

8         In effect, what the footnote says is I'm not ruling

9    for all time, for all purposes, in every example that may come

10   before a bankruptcy court that these stock options are

11   necessarily to be subordinated, but I kind of doubt that it's

12   going to be possible to do that.

13        So I say this so that those who are speaking recognize

14   that what I'm really looking for, if you can tell me, is what

15   it is about your claim that takes it outside of the reasoning

16   that I've reviewed and that I intend to follow.  And those who

17   are represented by counsel may want to have the lawyers speak

18   first, only because this is a fundamentally legal issue, and it

19   may be that you'll be helped by what they have to say.  And if

20   the lawyers don't get up, that's a bad sign.

21        I'll take anybody who wants to come forward.  Now, we

22   have a whole bunch coming forward.  Feel free to come forward

23   and sit in front of the bar of the court, and you can get up in

24   turn and make your arguments.

25        MR. ABRAMOWITZ:  Thank you.  May it please the Court,

Page 60

1    Steven Abramowitz.  I represent Lisa Marcus.  Lisa Marcus is a

2    commission salesperson.  I do want to distinguish, our claim is

3    very distinguishable from what has been described which is

4    respect of RSUs that have been granted regarding RSU

5    instruments.  What this claim relates to is the following

6    methodology that Lehman employed.

7         Lehman had both commission salespeople and bonus

8    employees.  With respect to bonus employees, they received

9    their money at the end of the year, and it was a simple matter

10   that when Lehman typically issued RSUs at the conclusion of the

11   year, which for this year would have been 2008 -- November 30,

12   2008, they would have simply deducted that from the bonus, and

13   that would have paid for the RSUs.  At the time the RSUs would

14   have been issued, the value of that RSU would have been

15   determined, the number of shares, what the strike price would

16   have been, et cetera.

17        For commission salespeople, like my client, because

18   the draw and their commissions goes up and down in the year,

19   they simply withhold that money from their compensation during

20   the year.  And in the claim we attached a compensation

21   statement produced by Lehman that showed what that deduction

22   was.

23        Lehman, in July 2008, because of all the turmoil that

24   was facing the company, they did decide to issue some of the

25   anticipated November '08 RSUs early.  And some -- so people did

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 61 of 230

Page 61

1    get the benefit of RSUs.  And then my client would have had the

2    benefit of the increase and decrease for that small portion.

3    That portion is not included in the claim that I'm debating.

4    And this claim does not involve any RSUs that were issued.

5         What happened is, compensation was deducted every

6    month from Lisa's commission and draw, and then the bankruptcy

7    intervened.  Because the bankruptcy intervened, a couple of

8    things happened.  Number one, the RSUs were never issued,

9    because a critical event had to have happened.  Lehman's board

10   would have had to have met.  They would have had to approve the

11   RSUs.  They would have had to, importantly, determine what the

12   number each employee would get, and that would have been based

13   on the price.

14        At that point, had the RSUs been issued, Lisa would

15   have been a beneficiary and had the detriment of the increase

16   or decrease in the stock.  But Lehman went into bankruptcy

17   before that could happen.  So I contend that this is simply a

18   case of compensation that was not paid, that is due under the

19   labor law.  It's a right to payment.

20        If anything, the most that Lehman had is, had Lehman

21   not gone into bankruptcy, they would have had the right to have

22   issued RSUs in exchange for that money.  But that right, at

23   most, would have been right that under 365 is not enforceable.

24   This is simply, again -- we're not talking about RSUs that were

25   issued.  We're not talking about the provisions of the various

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 229 of 598

Page 62

1    instruments that say once RSUs are issued they vest under the

2    following circumstances; they're forfeited under the following

3    circumstances; you're not entitled to stock instead of your

4    RSUs.  This strictly relates to deductions from pay for a

5    commissions salesperson that were not received because of the

6    intervening bankruptcy.  And it's not in respect to any RSUs

7    that were issued.

8            So for this amount, there was none of the

9    characteristics that Judge Gonzalez in Enron and that the

10   court, particularly in Med Diversified, where they talk about

11   someone who bears the risk and rewards of shareholding, should

12   bear that risk and be subordinated.  Lisa never got that

13   opportunity, because the stock was never issued.  So she had

14   effect as being treated differently than non-commission

15   salespeople who, you know, they never got that -- they never

16   got the bonus; the bonus was never used for the issuance of

17   RSUs.  This was simply pay that was deducted as security by

18   Lehman for the possible issuance, which issuance never

19   occurred.

20           THE COURT:  Let me ask you how this program worked in

21   one detail that occurs to me that could be of relevance.  Did

22   Lisa or others like her have the option to not buy stock?  In

23   other words, could they right to payment be a right for payment

24   in cash, or was it simply money set aside that could only be

25   used to acquire the RSUs?

Page 63

1          MR. ABRAMOWITZ:  I believe that had the board actually

2     acted to issue the RSUs, they could have only been used for

3     RSUs.

4          THE COURT:  So if the money could only be used for

5     RSUs and the RSUs were never issued, how can there be a claim

6     for money?  Because at most, there would have been a claim --

7     assuming they'd been issued -- for the equity which would be

8     subordinated.  I recognize that there's an inequitable aspect

9     to this and that money is reserved and then never paid.  But

10    the money that's reserved and never paid could never be

11    received anyway.

12         MR. ABRAMOWITZ:  I think it's -- well, I mean, it's

13    clear from the statements -- I mean, this is -- these are based

14    on commissions and draw that was earned by the employee.

15    Correct, Lehman had -- it was a part of their compensation

16    scheme to issue RSUs in November.  The plan documents are clear

17    that the amount of that is to be determined at a future time.

18          I think it is decisive, Your Honor, that the

19    bankruptcy intervened.  I believe that had Lehman -- forget

20    about a bankruptcy -- had Lehman done a merger, you know, in

21    the interim; had they terminated the employee; there'd be a --

22    had I represented a client in that context, I would have said

23    this is the money, you never gave me the RSUs, so this is not a

24    question about whether it vests because of a voluntary

25    termination or not.  This is simply pay.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 64 of 230

Page 64

```
 1              Normally, in the normal course, the employee is happy;
 2       the company works; and it's understood, we'll get those RSUs.
 3       If the stock price happens to be down, we'll get a lot of RSUs
 4       when they're issued; if the stock price is up, we'll get less.
 5       But we will, at that point, become someone who benefits from or
 6       risks that of being an equity holder.  I don't know if I
 7       answered your question.  I see your perplexed --
 8              THE COURT:  Well, I am perplexed --
 9              MR. ABRAMOWITZ:  -- expression.
10              THE COURT:  -- only because I'm not sure I know how
11       this works --
12              MR. ABRAMOWITZ:  Okay.
13              THE COURT:  -- in practice.  Is there a scheduled
14       deduction that occurs with each commission payment that's
15       otherwise due that is set aside for purposes of purchasing the
16       RSU?  Is that how this works?
17              MR. ABRAMOWITZ:  I don't believe that money is
18       literally put in escrow.  And we're not making a constructive
19       trust fund.  There is, though, a deduction from the
20       compensation amount that is reflected.  In other words, the net
21       cash paycheck that someone gets is net of what the deduction is
22       for, what I'll call, anticipated RSUs.  But the key is that
23       it's anticipated.  And in the normal course, people know that
24       at the end of the year they're going to get -- you know, if the
25       board acts and nothing happens in the meantime, they will get
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 232 of 598

Page 65

1    those RSUs with the rights and vesting and risks attendant to

2    that.

3            THE COURT:  But that to which there is an entitlement

4    is something which is, if received, is subordinated?

5            MR. ABRAMOWITZ:  If the RSUs were received -- and I'll

6    give deference -- I'm sure other counsel will argue what the

7    rights of an RSU holder are -- but if those RSUs had been

8    issued, we'd be having a different discussion.  I would not --

9    then I either would be arguing or not whether those RSUs

10   themselves are claims.  And I think the argument that counsel

11   for the debtors would made is well, when you got those RSUs, if

12   the stock went up the next day, you benefited; if it went down

13   the next day you didn't benefit.  But I'm not making that

14   argument because they were never issued.

15           THE COURT:  So your distinguishing argument is these

16   are claims based upon RSUs that were never issued, and so they

17   should be treated as claims?

18           MR. ABRAMOWITZ:  Essentially.  But the key point is,

19   it is compensation that Lehman withheld basically as a security

20   device to make sure the money would be there.  So it's really

21   compensation.  But the key distinguishing is, I'm not like the

22   other RSUs, because I never got them.  So I want to make it

23   clear that this is a compensation-related claim.

24           The reason Lehman did the withholding is that they

25   had -- because unlike bonus employees, where they just take it

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 233 of 598

Page 66

1    out of the bonus, for commission employees, they can't do that.

2    They have to do it as the commissions are earned.

3            THE COURT:  Okay.  Thank you.

4            MR. ABRAMOWITZ:  Thank you.

5            UNIDENTIFIED SPEAKER:  I don't mean to be redundant,

6    but Steven Abramowitz and Lisa Marcus are part of this as well.

7    I'm part of their group.  And it is the exact same issue of

8    funds deducted and no RSUs ever granted.  So, I won't take up

9    more of your time.

10           THE COURT:  And do you know what happens to the funds

11   that are deducted?

12           UNIDENTIFIED SPEAKER:  They're withheld.  They were

13   withheld from our paychecks, but they were never remitted to us

14   in any way.  And we were sort of lumped -- according to Weil --

15   as a group that owned RSUs.  We did not ever get RSUs.  The

16   bankruptcy occurred two months before.

17           If you send somebody for a container of milk, and they

18   don't get it, does that mean that you don't get your money

19   back?  You know, nothing was ever purchased.  We were never

20   reimbursed or returned the money that was withheld from us.

21   And -- understood, if you owned the stock, that's an

22   unfortunate thing, and most of us lost everything.  But if you

23   didn't buy the stock, why are you entitled to hold onto that

24   money?

25           THE COURT:  Okay.  I understand the argument.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 234 of 598

Page 67

1          MR. TOFEL:  Lawrence Tofel of Tofel and Partners for

2     Charles Diccianni.  We had filed papers.  Mr. Diccianni's

3     affidavit -- let me actually -- Mr. Bernstein started, I think

4     with a false premise, and that is, I think the motion starts on

5     the premise of we issued these RSUs and everything then falls

6     from there.  As you've heard from counsel, and my client's in

7     the exact same position, there are no contract documents; there

8     are no contracts signed by Mr. Diccianni at all.  He was never

9     given a choice as to what to do.  They simply take money out of

10    his commissions.

11          They allocate them to something, which they never

12    issue.  And in a court of equity, the debtors' counsel now

13    comes in and says well, if we'd issued the RSUs we wouldn't be

14    standing here.  Okay.  But you didn't.  You took my client's

15    money, you didn't give him anything.  He had no choice, no

16    rights.  And now he's simply relegated to the ranks of a holder

17    of a security that they didn't issue under equitable

18    subordination?

19          I'm not entirely sure that the debtor would be

20    entitled -- or the creditor's committee -- now, I understand

21    their agendas -- would be entitled to invoke any equity when

22    they didn't act equitably.  This is money taken from commission

23    employees, long-term employees who are still there working for

24    Neuberger Berman; monies taken out.  They're told what they're

25    going to get; they don't get it.  It still is simply sitting

Page 68

1    there.  I don't know where the money went.  There's no

2    agreement.  There's no understanding between the parties.  It's

3    simply self help when Lehman comes in and takes over Neuberger.

4         So the money is pulled out of his compensation.  And

5    he's left to be told that he is actually an equity holder of a

6    company that he never was offered or actually had equity in?

7    Again, that's the basis of our argument.  So I don't think --

8    to answer Your Honor's direct question -- I don't think Judge

9    Gonzalez's opinion and the progeny of it applies.

10        That is, the debtor is trying to invoke these

11   principles of equitable subordination with respect to

12   securities that they never issued.  There is nothing in this

13   record that Mr. Diccianni ever signed, recognized or anything

14   submitted by the debtor that Mr. Diccianni acknowledge that he

15   was getting stock or agreed to have get stock.  He wouldn't

16   have and he didn't.  That's our argument.

17        THE COURT:  Okay.

18        MR. KAPLAN:  Your Honor, my name is Eugene Kaplan and

19   I'm from the firm of Kaplan Landau.  I represent, in three

20   separate objections, nine managing directors of Neuberger

21   Berman.

22        And their claim here is very different and has not

23   been addressed either by the debtor or by the creditors'

24   committee, because the debtor, in their response says --

25   quoting essentially Judge Gonzalez, "In willingly engaging in

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 236 of 598

Page 69

1    the exchange of labor for equity awards, the respondents

2    bargained not for cash but to become shareholders."  And as we

3    observed in our papers, our clients were all managing directors

4    of Neuberger Berman at the time Neuberger Berman was merged

5    into Lehman Brothers.

6         Some of them, at that time, because they were partners

7    in Neuberger Berman prior to it becoming a public corporation,

8    were subject to nonsolicitation and noncompete agreements to

9    begin with.  Others, at the time of the merger, became subject

10   to nonsolicitation and noncompete agreements, and in fact, as

11   substantial shareholders, senior managing directors and the

12   like of Neuberger Berman, as a matter of law, could not have

13   solicited or competed with the Neuberger Berman entity that

14   became part of Lehman Brothers.

15        So my clients found themselves in the position of

16   having developed these tremendous books of business as

17   Neuberger Berman employees, and as Neuberger Berman employees,

18   not being subject to taking half their pay in restricted stock

19   units or the like, and then because of the merger and by no act

20   on their part, being subjected to the Lehman pay structure.

21   And they had no choice but to accept the Lehman pay structure,

22   because had they walked away, they would have forfeited their

23   tremendous books of business and their ability to earn a

24   livelihood, because they had developed -- I mean, as you will

25   see in your papers, some of these people were managing

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 237 of 598

Page 70

1    directors who were in control of six billion dollars worth of

2    business, and by the time Lehman went bankrupt had control of

3    seventeen billion dollars worth of business.

4           And so they never willingly exchanged their labors for

5    Lehman's pay structure, they had no choice in the matter.  They

6    didn't bargain for stock as did the plaintiff or the party --

7    creditor in Med Diversified.  They clearly fall outside of

8    Judge Gonzalez's opinion in Enron and the progeny of Enron.

9    These people never purchased anything.  They never were willing

10   purchasers.

11          They were essentially, because of the merger, put into

12   a pay system that they did not accept, but had no choice --

13   that they had no choice but to accept in order to continue to

14   engage in the business that they had engaged in collectively

15   for the hundred years previously, and which they continue now,

16   now that Neuberger Berman has been spun out of the debtor and

17   is now back as a freestanding entity.  And they continue to do

18   what they do without being subject to a pay structure.

19          It's for the five years or four years that they were

20   merged into Lehman Brothers, that they were compelled to be a

21   part of the pay structure where half of their compensation was

22   withheld and paid in these restricted stock units.  And they

23   have a claim for their compensation.  Whether it's a claim for

24   unjust enrichment or a claim for breach of contract, their

25   claim is that they never voluntarily participated in this pay

Page 71

1   structure; that this was something thrust upon them.  And that

2   distinguishes them quite clearly from the creditor in Med

3   Diversified, the creditors in Enron, and in all the other cases

4   that have been cited by the debtor.  And I think that is a

5   significant difference.

6        THE COURT:  It's a definition of involuntary servitude

7   I've never heard before.

8        MR. KAPLAN:  It's not involu -- well, it is

9   involuntary servitude in a way.  I mean, if you say to someone,

10  you either can work for us --

11       THE COURT:  But isn't this --

12       MR. KAPLAN:  -- or you can start over.  You can give

13  up your life's --

14       THE COURT:  -- isn't this true of --

15       MR. KAPLAN:  -- work and start over --

16       THE COURT:  -- but isn't this true of every -- pretty

17  much every large corporate employer?  Because if you are an

18  employee in a large organization, you necessarily lack

19  individualized bargaining rights.  You get the benefit of the

20  structure that you voluntarily entered as an employee, but with

21  mergers and acquisitions and the evolution of business in the

22  twenty-first century, where you started isn't necessarily where

23  you end up.  And isn't it a voluntary act to stay?

24       MR. KAPLAN:  I would submit it is not, in this

25  instance, where you are -- where your choice is, as a matter of

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 239 of 598

Page 72

```
 1    law and as a matter of contract, you cannot compete and you

 2    cannot solicit and you cannot go out and do anything except

 3    start as though you had just gotten out of graduate school, and

 4    give up the twenty years or thirty years or whatever you had

 5    put in at Neuberger Berman.  I would submit that it is not.

 6    You don't have that choice.

 7            THE COURT:  You suggest this is driven by the

 8    noncompete provisions of the employment arrangements?

 9            MR. KAPLAN:  In part, yes.  In part -- in the

10    noncompete provisions of the employment arrangements that

11    either occurred at the time of the merger, or in the instance

12    of a number of the claimants, at the time that Neuberger Berman

13    went public, which was long before the merger with Lehman, when

14    they became -- they couldn't compete with Neuberger, so they

15    couldn't compete once Neuberger merged.  And they did not

16    volunteer to become part of this pay structure.  They just

17    became part of the pay structure, because they had no choice in

18    the matter.

19            They could basically retire and give up their life's

20    work or they could accept the pay structure that Lehman thrust

21    upon them.  But they didn't have a choice.

22            THE COURT:  Okay.  I understand your argument.

23            MR. KAPLAN:  Thank you.

24            THE COURT:  Thank you.

25            MS. NADRITCH:  Good afternoon, Your Honor.  I'm
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 240 of 598

Page 73

1    here -- my name is Jordanna Nadritch.  I'm from Olshan

2    Grundman, on behalf of claimant, Christiane Schuster.  She has

3    filed a claim in this matter -- to help Your Honor facilitate

4    the reconciliation, her claim number is 11369.

5           Your Honor, my client was an employee in London in

6    Lehman Brothers in Europe for nine years.  As part of Ms.

7    Schuster's compensation consideration she received three

8    components.  She received cash -- a salary, she received RSUs,

9    and she received stock options.

10          Your Honor, Ms. Schuster's claim does not address the

11   stock options.  Ms. Schuster acknowledges that stock options,

12   as Judge Gonzalez's opinion has explained, are equity and can

13   be reclassified under 510(b) or subordinated under 510(b).  The

14   distinction, Your Honor, is an RSU is not a stock option and

15   the debtors' various plans that they filed with the Court as

16   well the ones that actually govern my client, which were not

17   filed with the Court, distinguished between the RSUs and stock

18   options.

19          They are different vehicles.  An RSU is not equity,

20   Your Honor.  And I could walk you through that and explain to

21   you, you know, why we believe an RSU is not equity and why

22   Judge Gonzalez's opinion in Enron is applicable to stock

23   options, and not to RSUs, necessarily.

24          An RSU, Your Honor -- let me just step back one second

25   to make clear, the debtors reply they filed, I think it was a

Page 74

1    few days ago, attaches various agreements.  Those agreements,

2    Your Honor, don't tie to my client's claim.  They have not

3    established how they tie to anybody's claim specifically.

4    There are various agreements, and they've put them forth in the

5    record, but I do have with me today two agreements from my

6    client that I have spoken with last night in Europe that do

7    apply to her claim.  And they are somewhat different, Your

8    Honor, than the agreements filed by the debtors.

9            THE COURT:  Let me just clarify.  Was your client

10   employed by LBIE?

11           MS. NADRITCH:  Yes.  Well, it's Lehman -- it was

12   Lehman Europe, Your Honor.

13           THE COURT:  Lehman Brothers International Europe?

14           MS. NADRITCH:  Yes.  And the way it worked is her RSUs

15   were granted through LBHI.  That's how all the RSUs were

16   granted, as far as I understand.  So her claim resides at LBHI,

17   but her employment was through Lehman Europe.

18           With respect --

19           THE COURT:  So does she have a claim in the SIPA case

20   or does she have a claim in this case?

21           MS. NADRITCH:  In this case, Your Honor.  And, Your

22   Honor --

23           THE COURT:  You'll have to explain this to me.

24           MS. NADRITCH:  Oh.

25           THE COURT:  You have too many affiliates already.

Page 75

```
 1              MS. NADRITCH:  I'm sorry?

 2              THE COURT:  You have too many affiliates already.  I'm

 3      not sure how you have a claim --

 4              MS. NADRITCH:  Well, pursuant to --

 5              THE COURT:  -- in the LBHI case.

 6              MS. NADRITCH:  -- well, pursuant to Ms. Schuster's

 7      employment -- and I don't have the terms of her employment

 8      exactly with me, but I do have her equity bonus award

 9      compensation package with me -- let's say two years, 2005/2006.

10      The equity awards do resemble the -- in similar function,

11      programs filed by the debtors, but they are different.

12              But it's no -- it should be of no issue whether her

13      employment was in Europe or in America.  The way the RSUs were

14      granted, were granted through Lehman Brothers Holding, Inc.

15      They were granted through the U.S. entity.  Her statements came

16      from the U.S. entity.  Her employer happened to have been in

17      London, but her statements came in her -- her RSUs were through

18      the U.S. entity.

19              With respect to the RSUs, Your Honor, I mean, what I

20      was alluding to earlier was that an RSU is different than a

21      stock option.  An RSU is not a grant on the first day.  A stock

22      option is a grant on the first day.  An RSU is a conditional or

23      a contingent grant that vests in five years' time.  And it

24      can't be sold, it can't be pledged, it can't be transferred.

25      The agreements all state that.
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 243 of 598

Page 76

1           And the agreements all distinguish between an RSU and

2      a stock option.  I think the debtors, in their -- even in their

3      reply, tried to carve out -- in their attempt to explain why an

4      RSU was equity, they explained how the exception to equity is a

5      right to convert.  And in explaining how -- the exception to

6      the right to convert, they note that, for instance, a

7      convertible note is the exception, as a convertible note is

8      convertible into equity, it's a right to convert.  And that's

9      an exception to 101-16.

10          Well, I think, Your Honor, an RSU is exactly that.

11     It's exactly a convertible note.  It's the exception to 101-16.

12     It's a right to convert.  Whereas a stock option, actually,

13     Your Honor, is listed in 101-16(c), I believe, where it says

14     it's a right to purchase.  That's not what an RSU is, Your

15     Honor.  It's not what my client held.  They held a right to

16     convert.  And that's why I think, in the first instance, it's

17     completely distinguishable from a stock option and Judge

18     Gonzalez's opinion in Enron.

19          You know, as a second matter, Your Honor, there was

20     opportunity, actually, for the RSUs to be paid in cash.

21     Specifically, upon a friendly change in control, the RSUs could

22     be exchanged for stock or cash.  And I'm not here to argue

23     whether the bankruptcy and the sale of assets to Barclays or

24     whoever else was a change in control -- a friendly change of

25     control -- but there was that ability.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 244 of 598

Page 77

1          So despite the debtors' contention that it could never

2     be paid in stock, in fact, my client's agreements do provide

3     upon a change of control -- a friendly change in control, there

4     could be the option to receive the RSUs in cash.

5          You know, separately, Your Honor, my client's

6     agreements don't contain any subordination provisions, unlike

7     some of the other agreements filed by the debtor.  But to

8     really hone in on Your Honor questions, do -- even assuming,

9     arguendo, that 510(b) even -- you were to look at 510(b) in

10    relation to RSUs, assuming you could argue it's a security,

11    which, Your Honor, I don't believe it is a security, because

12    it's excepted under 101-16(c) and 101-49 -- what my client is

13    seeking is not damages.  It's seeking simply compensation.

14         It's not on account of fraud.  In Enron, those

15    particular employees were seeking damages on account of the

16    fraud perpetrated by the company, by Enron, and were seeking

17    damages on account of those stock options.  My client's not

18    alleging fraud; she's not alleging breach of contract claims or

19    tort claims.  She's simply seeking to receive the compensation

20    that she believes she is owed, on account of her employ.  And I

21    think that's a very large distinction between the Enron

22    decision and where we are today.

23         THE COURT:  Okay.  Thank you.

24         MS. NADRITCH:  Thank you, Your Honor.

25         THE COURT:  Before we proceed further -- and I'm not

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 245 of 598

Page 78

1     cutting anybody off -- I'm recognizing that it's 1 o'clock, and

2     there's still a number of people who wish to be heard.  I think

3     we're going to need, at some point, to take a break or to talk

4     about a rescheduled hearing.

5          I think it makes sense before talking about a

6     rescheduled hearing, to take a break and then my suggestion is

7     that we break until 2 o'clock.  As you heard if you were

8     listening this morning, I have a 3 o'clock chambers conference

9     that I've scheduled.  I'm going to take a break at 3 o'clock.

10    Whether I come back at 4 o'clock or we come back another day, I

11    don't know.

12         But this has turned out to be a much longer and, I

13    think, difficult to manage a process than certainly I had

14    contemplated.  I'm going to suggest that debtors' counsel give

15    some thought during the lunch break as to how best to manage

16    what I think has the potential of being an unmanageable day.

17         We'll take a break till 2.

18    (Recess from 1:02 p.m. until 2:06 p.m.)

19         THE COURT:  Be seated, please.

20    MR. BERNSTEIN:  Good afternoon, Your Honor.  Mark

21    Bernstein from Weil Gotshal on behalf of the Lehman debtors.

22    As you suggested, after the morning session, we discussed with

23    the creditors' committee and considered how best to proceed.

24    And we still believe that since there are, we think, mainly

25    common issues, we think we would like, if the Court is willing

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:39    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 246 of 598

Page 79

1    to try to get through them before 3:00.  We believe --

2        THE COURT:  Well, here's --

3        MR. BERNSTEIN:  -- at some point, the issues are going

4    to start to be repetitive and --

5        THE COURT:  We're here and I think we should do it.

6    I've given some thought to the presentation thus far.  And I

7    have a thought I'd like to share before we start.

8        It occurs to me that while it's true that the burden

9    has shifted to the claimants as a result of the showings made

10   by the debtors, there's at least in my mind, and I don't know

11   if it's in the mind of others, some confusion as to how the

12   omnibus response applies to each particular claim.  And I think

13   it would be useful, certainly to the Court, if the debtor were

14   to provide an annotated supplement or some further briefing in

15   which the position that is broadly expressed is applied with

16   particularity to individual claimants.

17       I also think that it would be useful for the claimants

18   themselves to have an opportunity to respond.  So what I am

19   suggesting is what amounts to another round of relatively

20   concise supplemental papers on the subject so that arguments

21   such as those that have been made thus far today can be more

22   grounded in the particulars.

23       MR. BERNSTEIN:  Sure.  Happy to work and provide that

24   to the Court.

25       THE COURT:  Okay.  And it seems to me that some

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 80 of 230

Page 80

1    schedule might be worked out where the claimants themselves

2    that would have a common date for not only your supplemental

3    pleading but thereafter for those claimants who wish to respond

4    in writing to have a date when that will occur.  Otherwise,

5    that opportunity is waived.

6         MR. BERNSTEIN:  Okay.  We can work into the pleading

7    and establish a response deadline, a reasonable response

8    deadline as well.

9         THE COURT:  Okay.  And I think that some kind of

10   notice should probably go on the claims docket so that for

11   those parties who may be appearing by telephone or may have had

12   to leave because this turned out to be a fairly prolonged day,

13   they'll have a chance to know what you know --

14        MR. BERNSTEIN:  Absolutely.

15        THE COURT:  -- about what I've just said.

16        MR. BERNSTEIN:  Certainly.  We will get that done.

17   One point I wish to just correct for the record and then I'm

18   happy to let -- we can continue with the responses from the

19   various claimants.  The last attorney who spoke, she was the

20   attorney for Christiane Schuster.  She had provided us with

21   additional documents, program documents, which Lehman did not

22   previously have.  We've taken a look at these throughout --

23   during the lunch break.  And just to clarify one thing she

24   said, she implied that there was language in these documents

25   that said that claimants were entitled to get cash or could get

Page 81

1    cash in exchange for their RSUs.  The only place this refers to

2    receiving cash is if there's a friendly change of control.  And

3    in that circumstance, it is Lehman's decision whether to pay

4    cash or equity in exchange for those RSUs.  There is no right

5    or entitlement to cash.

6            So, other than that, I'm happy to hold my responses

7    till all the other arguments that have been made until we go

8    through all of them.

9            THE COURT:  Okay.

10            UNIDENTIFIED SPEAKER:  I just want to request that

11    we -- I'm not here as an attorney and you've heard from

12    attorneys.  Could you hear from someone who is a claimant and

13    directly offended?

14            THE COURT:  Oh.  We're going to hear from everybody

15    who wishes to say something assuming we have time.  And if we

16    don't have time and there are people who still wish to be

17    heard, we'll have another hearing date.

18            UNIDENTIFIED SPEAKER (TELEPHONICALLY):  Well, what is

19    the cue for telephonic appearances today?

20            THE COURT:  I'm sorry.  What was that about

21    telephonic --

22            UNIDENTIFIED SPEAKER:  Forgive me, Your Honor.  What

23    is the cue or the order in which you will hear telephonic

24    appearances since we're not there to see the line

25            THE COURT:  Well --

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 249 of 590

Page 82

1          UNIDENTIFIED SPEAKER:  -- of the creditors' attorneys?

2          THE COURT:  -- I think that in order to deal with the

3     people I see before I deal with the people who are unseen,

4     everybody who is in the courtroom will come ahead of everybody

5     who's on the telephone.  And then once we get to those who are

6     appearing by telephone, you're going to have to first identify

7     yourselves in advance.  I'll take down notes as to who's on the

8     phone and we'll determine some appropriate order.

9          UNIDENTIFIED SPEAKER:  Thank you.

10         MR. MICHAELSON:  Good afternoon, Your Honor.  Robert

11    Michaelson.  I represent three claimants:  Morgan Lawrence,

12    Nicole Lawrence and Brian Monahan.  And I have three comments

13    to make and I'll be as brief as possible.  The first one is

14    really procedural.  I represent another claimant who has RSU

15    claims under the 185th omnibus objection which is not being

16    heard today.  His claim is more -- is broader than just the

17    RSUs.  Now I spoke to Mr. Lemons at Weil and he explained that

18    it was only RSU claims today.  If a claim -- if I heard him

19    correctly, the reason other claims are not being heard is

20    because they involved other issues.  However, to the extent

21    that there others besides my client who has RSU claims, it

22    would seem that it's necessary to tie everyone in since they're

23    going to have their say in this as well.  And so, I'm posing

24    that as an issue.  I don't mean to overcomplicate this, but if

25    we're going to be talking about the RSUs, they should be all of

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 250 of 598

Page 83

1    the RSUs not just those people who were noticed for hearing

2    today.

3            THE COURT:  Well, I'm not sure I know what you're

4    requesting.  Are you proposing that there be another hearing at

5    which time everybody that has an RSU claim will have an

6    opportunity to be heard and it will be, in effect, a

7    continuation of today's hearing or are you proposing that to

8    the extent that there is a determination that applies to the

9    class of holders of RSU claims, it will apply to everyone?

10           MR. MICHAELSON:  Well, I would prefer if it didn't

11   apply to everyone, I can only speak for my client.  I would

12   think that someone would want their day in court.  To the

13   extent that a determination is made, it's going to become the

14   law of the case and they'll be effectively precluded from being

15   able to argue their position.  Now with respect to my client,

16   I'm going to be arguing -- making the same arguments for all of

17   them.  So he's not affected by this.  If debtors' counsel tells

18   me he's the only one other than -- who's affected by this,

19   that's one situation.  But if there are others, I would think

20   that we run the risk of having a ruling that people didn't have

21   an opportunity to participate in.

22           THE COURT:  Well, I'm not sure that that's true but I

23   hear what you're saying.  We have a hearing that was noticed

24   with respect to a certain sequence of claims objections that

25   all relate to the RSU claims.  The debtor has filed a single

Page 84

1    response applicable to all of the claimants who are in court

2    today or had notice at least that this was happening today.

3    The position of the debtor is that -- and they can certainly

4    speak for themselves but I'm going to repeat my understanding

5    of their position.  Their arguments with respect to entitlement

6    apply to an entire class in much the same way that Judge

7    Gonzales' decision in Enron, by its own terms, applied to an

8    entire class of claimants.  For that reason, there will be

9    issue preclusion and there will be a result that is binding

10   assuming either to determine that there is a proper class-wide

11   disallowance of all of these claims or a subordination of these

12   claims to equity.  So that issue is out there.

13        Whether or not an individual claimant has the ability

14   to distinguish its claim and, in effect, obtain separate

15   treatment, that's what we're doing today.  If someone else that

16   didn't have notice of today's hearing or is subject to a

17   different omnibus claims hearing schedule, presumably that

18   opportunity will exist to present separate and independent

19   argument at that time.  But those arguments may be trumped to

20   the extent that I were to determine in the context of today's

21   proceeding that there is class-wide preclusion.

22        Have I responded?

23        MR. MICHAELSON:  You have, Your Honor.  I'd still be

24   concerned that perhaps there is an attorney representing some

25   claimant out there who has a take on this that the rest of us

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 95 of 190

Page 85

1    don't have that might be persuasive to the Court and that would

2    affect the ultimate outcome.  I think that what's represented

3    here today is probably in all likelihood pretty much the

4    universe of arguments that would be raised.  But I don't

5    pretend to know everything.  And I don't think most of the

6    people here do.  And so, I lay that out as a possibility.

7    Whether it's real or not, I don't know.  But I just mention it

8    because I was aware of that situation with my particular client

9    and I thought it should at least be brought to the attention of

10   the Court.

11        THE COURT:  Thanks for bringing it to my attention but

12   I think what we're going to deal with is what's before us --

13        MR. MICHAELSON:  Okay.

14        THE COURT:  -- instead of what might be out there.

15        MR. MICHAELSON:  I appreciate that, Your Honor.  I

16   will be brief.  Two substantive points.  The first one has to

17   do with the Enron case.  As Judge Gonzales said, that case was

18   limited to the facts presented to the Court.  And one of the

19   facts presented to the Court involved an agreement that was a

20   precursor to employment.  There was also a fraud element but it

21   was a precursor to employment.  In this particular instance, it

22   was not a precursor to employment.  There was no bargain in the

23   sense that that term is used as an equivalent of a sale.  These

24   were well compensated employees who were given what amounted to

25   a take-it-or-leave-it choice.  There was no bargaining whether

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 980 of 990

Page 86

1    in the legal sense or in the generic sense.  They were told

2    that if they wanted to maintain their employment, they had to

3    do this.  Now to the extent that Judge Gonzales has said that

4    his case was limited to its facts, that is a material

5    distinction that I think must be noted.  And in the other

6    cases, most of the other cases, cited by the debtor, there was

7    a prior vesting that would distinguish it.  There was no

8    vesting in this particular case.  These employees were told

9    take it or leave it.

10        Now Your Honor made a very good point which is you can

11   walk.  You can vote with your feet.  You don't have to stay

12   there.  But I would say that that is a very weak bargaining

13   position if it's a bargaining position at all.  And I think

14   this sounds more like a classic contract of adhesion in the

15   sense that everything was set up.  There was no choice.  It

16   was, as I said before, take it or leave it.  Employees were

17   highly compensated.  They did not want to lose the valuable

18   position they had.  And so they were, in essence, tied to this

19   company through this agreement until such time as the vesting

20   occurred and they could realize the gains from the commissions

21   they had that were deferred.

22        So I think that Enron is not controlling in this

23   particular case.

24        THE COURT:  Well, your particular clients, what were

25   there positions with Lehman?

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 254 of 598

Page 87

```
 1              MR. MICHAELSON:  They were commission salespeople.

 2              THE COURT:  Not Neuberger Berman people?

 3              MR. MICHAELSON:  They were not Neuberger Berman

 4     people.

 5              THE COURT:  So they're more like the people described

 6     right at the outset of the hearing this morning when we were

 7     talking about a commission claim and stock that was not issued

 8     because of the intervention of the bankruptcy?  Is that what

 9     we're talking about?

10              MR. MICHAELSON:  That is correct.  Essentially, the

11     company came to a crashing halt.  And whatever hope they had of

12     ever realizing on that vanished.  The stock was simply not

13     going to be issued.  Now there are really two components of

14     that.  There was that which was taken prior to 2008.  And then

15     you've heard the arguments before that there was money that was

16     paid over from 2008 and not invested in any particular fashion.

17     And in speaking to my client during the break, he mentioned to

18     me that there were terms and conditions under which money that

19     was withheld during that period before it was invested would be

20     returned to the employee in the form of cash if the employee

21     left the employment before that took place.

22              So that's a distinction as well.  So you have to

23     divide these into two components.  2008, where there was an

24     opportunity and, according to my client, a history of cash

25     being returned to employees under certain circumstances.  And
```

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 255 of 598

Page 88

1    you have the prior period where you -- money was taken,

2    presumably never actually invested in the stock but merely just

3    taken and held in a form that we've never been clear about.

4        So --

5        THE COURT:  It's very difficult for me to deal with

6    what you just said for purposes of today's hearing.  You're

7    making a hearsay statement as counsel.  I don't know how to

8    deal with it.  It's not evidence of anything yet.  I don't know

9    whether or not you're proposing a declaration of your client to

10   supplement the record with respect to this issue with some

11   specificity as to how it ties to the claim.

12       MR. MICHAELSON:  Yes, I am, Your Honor.  I gave

13   thought to that issue because I realized that my statement or

14   my client's statement is not evidence that this Court can rely

15   on to make a ruling.  But there are two options here.  One is a

16   declaration from my client.  And the second is, in the context

17   of this contested matter, applying the adversary rules and

18   allowing depositions to be taken to determine what money was

19   spent -- how -- where the money was put, under what terms and

20   conditions money may have been released that may have indicated

21   that it was something other than what it might have been

22   labeled or appeared to be.

23       So I think there are legitimate questions about the

24   interaction between the parties.  I think, expanding on that,

25   there's a legitimate question as to this whole issue of whether

08-13555-mg    Doc 47321    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 89 of 598

Page 89

1      a bargain was struck.  We've heard a lot of talk about their

2      having been -- this being bargained for.  And you've heard me

3      say and my client has said and others have said that there was

4      no bargain.  This was a unilateral imposition of a new policy

5      in which they had no say.  The debtor has a slightly different

6      view of that.  Well, that's a factual question that, from the

7      presentations today, I would find it very difficult for the

8      Court to opine on.

9              But this may be fundamental to the very issue that

10     we're talking about in the spirit of what Judge Gonzales said

11     in Enron, that there are -- he said he couldn't imagine that

12     there were circumstances.  But he didn't preclude them.  And he

13     also said that his ruling was limited to those specific facts.

14     I think that we may be in that very narrow range where we have

15     an opportunity here to reach a different conclusion.  But I

16     think that the facts have not been fully investigated and

17     expanded upon and certainly not sufficient to inform the Court,

18     in my view, of what really went on in this case.

19             THE COURT:  Okay.

20             MR. BERNSTEIN:  Thank you.

21             MS. SOLOMON:  Good afternoon, Your Honor.  Lisa

22     Solomon.  I represent eight claimants:  Mr. Gordon Sweely,

23     Vincent Primiano, Riccardo Banchetti, Giancarlo Sarrone, Harsh

24     Shah, Philippe Dufournier, Charlie Spero and Tim Burke.  The

25     individuals that I represent in this case, Your Honor, some of

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:13:33    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 290 of 530

Page 90

1    them worked in the United States and some of them worked

2    outside of the United States.  So the individuals who worked in

3    the United States have asserted claims under RSUs.  And the

4    individuals who worked outside the United States have asserted

5    similar claims under the contingent stock arrangements.

6            Your Honor, the claims that have been asserted here,

7    and the debtors haven't contested this, are claims for unpaid

8    wages.  They were issued under a stock incentive plan for all

9    of the claimants.  And the claim for unpaid wages arises under

10   Delaware law as well as the Bankruptcy Code.  The stock

11   incentive plan which hasn't been referred to in any of the

12   debtors' documents is a pivotal document here, not necessarily

13   the grant agreements which were issued after the stock

14   incentive plan.  And the stock incentive plan in paragraph 8

15   specifically provides that nothing herein shall give any

16   participant any rights that are greater than those of a general

17   creditor of the company.

18           Your Honor, it's submitted that -- it's acknowledged

19   here that they did have the rights of a general creditor of the

20   company and that they did not -- and that the claimants did not

21   have rights as shareholders.  In fact, that paragraph 8 goes on

22   to provide further that the participants shall not have any

23   rights of a shareholder of the company with respect to shares

24   subject to an award until the delivery of such shares.

25           The claimants have claims for unpaid wages.  And in

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 258 of 598

Page 91

1    fact, Your Honor, it's our position that certain parts of the

2    claim are entitled to priority wage treatment under the

3    Bankruptcy Code and that their wages under Delaware law as

4    well.  Your Honor, it's been submitted that this is very

5    significant here because, as far as I know, there isn't any

6    prior case law that has construed Section 510(b) and, in

7    particular, the Enron case did not address this issue where a

8    claimant was entitled to priority wage treatment and at the

9    same time, it was found that that claimant's claim could be

10   subject to subordination under the Bankruptcy Code under

11   510(b).

12          THE COURT:  What's the basis for asserting that any of

13   your clients are entitled to priority wage treatment?

14          MS. SOLOMON:  Because the RSUs and the CSAs that were

15   issued were on account of services rendered within 180 days of

16   the bankruptcy filing.  That's the basis, Your Honor.  And it's

17   submitted with respect to other case law that has been cited in

18   the debtors' filings dealt with terminated employees not

19   current employees who are continuing to render services.  And

20   that Congress found it appropriate to grant priority status to

21   claimants for their services rendered is significant here.

22          THE COURT:  Well, how do you deal with the distinction

23   between the payment of cash and the payment of the right to

24   receive equity?

25          MS. SOLOMON:  Well, first, I would note also that

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 259 of 598

Page 92

1    while the debtors were not under an obligation, the debtors

2    reserved the right to pay in equity or cash under the stock

3    incentive plan.  And so, the claimants were not guaranteed just

4    that they would receive equity upon the satisfaction of the

5    conditions.  But it was possible that they would never receive

6    any equity.  And whether or not the debtor was obligated or it

7    was in the discretion of the debtor, I don't consider it to be

8    that significant.  The point is that these claimants did not

9    know at any time that they would be an equity security holder

10   of the company.

11        What we're talking about here, Your Honor, is

12   basically a categorical reordering of a priority claim that was

13   granted by Congress under the Bankruptcy Code.  And I say

14   categorical reordering because it's the same set of facts that

15   give the claimants a priority claim that makes their claim

16   according to the debtors subject to subordination under Section

17   510(b).  And it's submitted that there's no basis for a

18   categorical reordering of their priority claims.

19        The fact that their claim is tied to the price of the

20   stock doesn't change the underlying nature of the claim.  And

21   that is, it's a wage claim for unpaid services, for services

22   that were rendered but that they didn't receive payment on.

23        Your Honor, I would point out also that the factual

24   background with regard to various of the claims is different.

25   And some of my claimants started employment with Lehman --

Page 93

1   Lehman Holdings more than twenty years ago.  And at that time,

2   Your Honor, there was no equity package whatsoever.  They were

3   privately owned.  They were owned by American Express.  And

4   over the years, that changed and slowly equity compensation was

5   worked into the formula.  And the portion of their equity

6   compensation was increased over time.  But this isn't a

7   situation, as has been described by the debtors, where, from

8   day one, there was a contract in place and my clients agreed to

9   certain terms.  That's just not what happened here.

10  Eventually, at the end of the day, their compensation was based

11  in part -- was up to the equity comp -- a portion was up to

12  practically forty percent.  But that was very, very different

13  from what it started out at the beginning of time.  And if they

14  were to leave at any point in time, they would therefore have

15  forfeited the prior equity compensation that had been

16  previously earned.  And while, Your Honor, I don't consider

17  that necessarily to be involuntary servitude, I don't, at the

18  same time, consider that to be a fully bargained for agreement.

19       I'd like to point out further, Your Honor, that the

20  terms of the RSUs and the CSAs were universal within Lehman.

21  And this was not a situation where there was a single private

22  agreement reached with one particular claimant.  But this was

23  the universal employment policies of the company.  And I

24  believe that that makes this case very different from any of

25  the prior cases that have been cited dealing with terminated

08-13555-mg    Doc 43721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHM/N BROTHERS HOLDINGS INC., ET AL.
Pg 29 of 330

Page 94

1    employees and severance packages that they may have reached

2    with the debtor in those particular cases.  And I would also

3    point out that the claims that have been asserted here are not

4    based on diminution of value of stock.  They're not damage

5    claims for diminution of value of stock.  They're wage claims

6    for the wages that my clients had earned but were not paid

7    because the debtor deferred it and then said I'll pay it in the

8    equity portion down the road.

9            So to the extent that which Cong -- 510(b) is very

10   clear, the debtors have to show that we have a damage claim

11   arising from purchase of a stock.  We don't have that here.

12   It's not based on diminution of value of stock but rather based

13   upon the compensation that my clients earned prior to the

14   bankruptcy filing.

15           I would also point out that, Your Honor, in certain

16   cases there was guaranteed compensation that was put off in

17   terms the equity compensation.  It was described as

18   guaranteed compensation -- and this is in our papers, Your

19   Honor.  It was described as guaranteed compensation and

20   referred to as guaranteed compensation.  In one or more

21   contracts between my clients and the debtor.  And not only is

22   that compensation now not being paid to them, but they're told

23   that they can't even make a claim and get the same rights as

24   general creditors in the company for that guaranteed

25   compensation.  That's it, Your Honor.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 262 of 598

Page 95

1          THE COURT:  Okay.

2          MS. FLACKMAN:  Good afternoon, Your Honor, and members

3     of the court.  My name is Cynthia Flackman.  I'm representing

4     myself, I'm not a lawyer, in the matter of claim 4709.  And I

5     submitted a response to the 131st objection to my claim.  And I

6     believe I made a number of meritorious statements and stated

7     facts related to certain legal precedent in that filing and the

8     filing of my response.  But I do not want to reiterate that

9     filing because of my respect for your time, Your Honor.

10         I would simply like to state that notwithstanding the

11    fact that the debtors' objection has aptly described the nature

12    of equity securities and related instruments that may be

13    broadly categorized as equity securities, the debtors' 131st

14    omnibus objection to claims is without merit with regard to my

15    claim because it is entirely based on the intended form of

16    payment and does not address the substance of the liability to

17    me as creditor for unpaid wages.

18         Whereas, as creditor, I adjusted the amount of the

19    RSUs that were published in the LehmanLive RSU summary, and I

20    specifically removed the 2008 grant that was not incorporated

21    in any of my compensation statements, the RSU values that I am

22    categorizing as my compensation were stated as my compensation

23    for the year, salary plus bonus.  There's a footnote about RSUs

24    in the statement and any amount of the bonus that's paid in

25    cash is stated and separated from the equity.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 263 of 598

Page 96

1          But whereas the compensation total was presented in

2     this way, regardless of the categorization of equity and the

3     kinds of -- the types of precedents that deal with these types

4     of securities, I don't think it really addresses the other side

5     of the balance sheet, my claim.  The consideration that would

6     be offered to settle my claim and whatever that consideration

7     is, it has a variety of financial characteristics but I don't

8     think it settles my claim.  And because I made this adjustment,

9     I feel I have distinguished my compensation claim from the

10    generalities of RSUs.

11         I would also like to state that it was somewhat

12    painful to see references to Enron and WorldCom.  Excuse me,

13    Your Honor.  I find Lehman as an entity that I always felt

14    tried to do the right thing.  And legal precedents can be set

15    that are either good or bad.  And sometimes we can rely on bad

16    precedent and come out with bad laws or bad decisions.  But

17    there always was a remedy starting with Magna Carta and the

18    foundation of our laws was a remedy, equitable remedy.  And I

19    would like to respectfully petition the Court to grant an

20    equitable remedy to me in full settlement of my claim.

21         My claim was part of reasonable compensation.  It's

22    not millions of dollars.  If you were to look at the

23    compensation that a person would be paid for the job and the

24    hours that I worked, I feel my claim was very reasonable.  And

25    I would like to ask for an equitable remedy.  And I have

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 264 of 598

Page 97

1    brought paperwork which I'd like to approach the bench with to

2    submit my request for an equitable remedy which I think

3    distinguishes me from the other claimants.

4          THE COURT:  Before you hand that to me, I just want to

5    make sure that the debtor knows what it is that you're handing

6    me.

7          MS. FLACKMAN:  Oh, yes. I have it for them also.  And

8    I have it for the --

9          THE COURT:  Okay.  I'll take a look at it.

10         MS. FLACKMAN:  Sorry.

11         THE COURT:  Okay.  Thank you.

12         MR. KENNEY:  Your Honor, my name is Arthur Kenney.  I

13   am not a lawyer.  I was a twenty-five year salesman at Lehman

14   Brothers and a commissioned salesman at that.  Similar to the

15   first couple of colleagues who -- or representatives who spoke,

16   again, I was a commissioned salesperson.  And like my

17   colleagues, a portion of that commission was accrued to

18   purchase RSUs at the end of the year when the price would be

19   set.  That was similar to what I think of it as a convertible

20   debt obligation with the conversion price to be determined at

21   the end of the year.  On the first of July, 2008, twenty

22   percent of the accrual was used to purchase, in my case,

23   1416.06 RSUs at a price of 20.96.

24         My claim, as my colleague who just preceded me,

25   consists of the accrued commissions minus the amount of the

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 265 of 598

Page 98

1    commissions that were granted in RSUs for that July 1st

2    purpose.  So my claim is the net outstanding accrued earned

3    commissions that I argue should not be reclassified as equity.

4    I assert that these owed commissions are -- remain as debt as

5    convertible debt which cannot be converted.  So that's the

6    claim that I am making.

7              THE COURT:  Okay.  Thank you.

8              MR. KENNEY:  Thank you for your time.

9              MR. PLASKETT:  Good afternoon, Your Honor.  I'm Rodney

10   Plaskett.  I'm one of the claimants.  I actually did practice

11   law for twenty years -- for ten years.  For the last nineteen,

12   I've been an institutional equity research salesperson.

13             I was going to ask for your indulgence if you might

14   read back the first couple of sentences of your statement that

15   you had earlier today.

16             MR. BERNSTEIN:  I'm not exactly sure what you're --

17             MR. PLASKETT:  Just the first couple of --

18             THE COURT:  What is it you're asking for?

19             MR. BERNSTEIN:  What are you trying to --

20             MR. PLASKETT:  I'm trying to recall your first couple

21   of statements which I did not feel were at all true.

22             MR. BERNSTEIN:  "The objection seeks to reclassify the

23   claims as equity interests.  Part of the commencement, LBHI

24   granted RSUs to employees as part of their compensation in

25   order to enable employees to participate in the increased value

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:13:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 266 of 598

Page 99

1    of Lehman by enabling them to receive common stock.  The RSUs

2    bear the hallmarks of equities.  The holders' benefit an

3    increased value of the corporation, receive dividends and bear

4    the risk of failure of the corporation.

5            MR. PLASKETT:  Thank you.  The compensation I'm

6    seeking today is a defined amount.  It's about 60,000 dollars.

7    And that was not compensation to me.  That was -- that Lehman

8    gave to me.  That was commissions that I earned.  I was not a

9    salaried employee receiving a bonus.  Okay, Rodney, you did a

10   great job this year.  On top of your salary, we're going to

11   give you X dollars.  No.  Every day I come in, it's zero.  And

12   then I earn X; I'm paid Y.  And out of that Y is taken a

13   portion.  It's called a holdback.  That holdback can be used

14   for whatever the employer deems fit.  If I have a bad trade

15   that goes against me, they can take some of that money.  If I

16   misstate how a trade should be executed, they can take that

17   money.  If I do a deal and there's a penalty bid -- a penalty

18   bid is when one of my clients decides to flip a hot stock.

19   They can take that money.

20           So Lehman goes bankrupt and I get my monthly

21   statement.  And I see I have made X.  And there's another line

22   that's got 60,000 dollars in it.  And that 60,000 dollars is

23   definable as cash and as a holdback.  It's my compensation.

24   Every single commissioned salesperson on that desk can point to

25   a number that was still cash.

Page 100

1           Lehman goes under.  We get an e-mail from Barclays:

2     accept or decline employment.  We accept employment.  We go to

3     our management.  Okay, guys.  We realize the RSUs may be zero

4     but where's our defined commissioned money we saw on our last

5     statements?  I don't know.  Don't ask us about it.  So, I mean,

6     why?  None of the management changed.  They just changed from

7     being Lehman management to Barclays management.  Where was that

8     sum of money?  It's definable; it's in writing.  I submitted it

9     with my petition and I would really love to get it because I

10    could have lost it for trading errors, for penalty bids, for

11    whatever Lehman -- if Lehman wanted to give me Hess trucks for

12    Christmas, they could have said, well, that's what we bought

13    with that money.  But that money was definable compensation,

14    definable commission revenue.

15          RSUs were not part of the bargain of my working at

16    Lehman.  As a commissioned salesperson, once again, you started

17    at zero and you earned your commissions every day, every month.

18    If I had been let go without cause, I'm willing to state that,

19    Rodney, we're going to scale back this month.  So here's the

20    money we were holding back from you because it's not time to

21    deliver RSUs.  Thank you very much, Lehman management.  That's

22    fair.  I earned it.  You see it.  It's right there.  It's not

23    time for RSUs so it must be in cash.

24          THE COURT:  Can I ask you a question about --

25          MR. PLASKETT:  Yes, sir.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC.; ET AL.
Pg 268 of 380

Page 101

1          THE COURT:  -- at least how your situation with Lehman

2     was documented?  Was there a set of procedures or terms and

3     conditions of your employment as a commissioned salesman that

4     laid out what Lehman could do with funds that were held back

5     from your salary?

6          MR. PLASKETT:  No.  It was the opportunity that maybe

7     we'll give you RSUs.  But other than that, no.  So any monies

8     that I earned, they could have used in any manner they desired.

9     That's the power of that man -- of any management, often.  But,

10    no.  There was no contract other than you may have a -- you'll

11    have a holdback, could go with the RSUs, could be used if you

12    screw up, if you blow a trade.  And those things did happen.

13         THE COURT:  Okay.  So do I understand that, at least

14    in your experience, and perhaps this is similar to the

15    experience of other commissioned sales personnel, that there

16    was a separate accounting sheet that was created on a monthly

17    or quarterly basis that laid out what you had earned in

18    commissions and that set aside a certain amount which was

19    disclosable on the form that showed what was being held back.

20    Is that correct?

21         MR. PLASKETT:  Yes, sir.

22         THE COURT:  And was it ever the practice of Lehman, to

23    the best of your knowledge, for the funds being held back to be

24    paid to the commissioned salesperson in cash at the end of a

25    year?  Was it ever a fund that you could tap into?

Page 102

```
 1           MR. PLASKETT:  I could not tap into it.

 2           THE COURT:  You did not?

 3           MR. PLASKETT:  I could not --

 4           THE COURT:  You could not.

 5           MR. PLASKETT:  I could not tap into it.

 6           THE COURT:  And is it true that no one could?

 7           MR. PLASKETT:  No.  Management could tap into it.

 8           THE COURT:  No.  But none of the commissioned

 9   salespeople had a right to tap into the fund?

10           MR. PLASKETT:  Correct --

11           THE COURT:  Okay.

12           MR. PLASKETT:  -- to the best of my knowledge.

13           THE COURT:  All right.  Thank you.

14           MR. PLASKETT:  So I stand here once again, reiterating

15   my claim for a definable amount of cash that was earned

16   commission, that was income that I feel has been, first of all,

17   channeled to import -- to incentivize the management that was

18   retained by Barclays as commissioned salespersons, none of us

19   received retention bonuses.  There were two sales forces at

20   Lehman.  One which I was in was Little Markets; and another

21   which was called Portfolio Sales.  They were supposed to cover

22   the top 200 accounts in the country.  And they were on salary

23   plus bonus.  Many of those individuals received retention

24   bonuses.  None of us in commission sales received a dime.

25           So, in other words, I do feel as though I've been
```

1    defrauded because the amount of money is quite clear has been

2    with my file.  I don't have the financial wherewithal at this

3    time to retain counsel.  I have to act as my own.  But I do

4    hope that as you review the many commission salespersons'

5    complaints that you will look at them from the standpoint of

6    those who did hire counsel to extract favorable case law.  And

7    at least for those of us who decided to take the time to put in

8    a claim, to give it the benefit of some of those common

9    filings.

10           I believe that really does sum up what I had to say

11   here today and I really thank you for your time.

12           THE COURT:  Okay.  Thank you very much.  Before I hear

13   from the next individual, based upon what I've heard to this

14   point, I'm concerned about the lack of a formal evidentiary

15   record here.  And I don't think we're going to solve the

16   problem this afternoon.  It seems to me that this is taking on

17   a character that's somewhat similar to a matter that I recently

18   decided in a totally different context in the LBI SIPA case

19   that involved -- and it's a reported decision, claims with

20   respect to so-called TBA contracts.  And I'm thinking of it

21   because, in that setting, I at least had a record because the

22   parties stipulated that certain declarations and attachments to

23   the declarations could be accepted as reliable and authentic

24   evidence that I could refer to for purposes of decision making.

25   And what I am finding as a result of this hearing up to this

1    point, and we're not done, is that there are issues of fact

2    that are being referenced in a very credible way by individuals

3    who are not under oath, who are not subject to cross-

4    examination and who are in a position to influence the Court.

5        So I'm troubled by where we are right now in this

6    proceeding just as a pure matter of case management and

7    administration.  I haven't opened up this envelope which was

8    handed to me but I will.  But I'm not sure what I'm supposed to

9    do with it once I read it.

10        I think, as a result, that we need to do a better job

11    managing this process so that I can make some judgments about

12    particular claimants within what previously has been

13    characterized as a class.  And it seems to me that I have

14    already heard enough to know that there are subclasses within

15    the class and that one subclass would be commissioned

16    salespeople who had funds held back and accounted for but, as

17    just stated, did not have the ability to access those funds but

18    nonetheless those funds represented what they could, with a

19    straight face, characterize as earned commissions.

20        I also have heard just before the lunch break from an

21    attorney who represents individuals who had been working at

22    Neuberger Berman before the acquisition and presumably are

23    still with Neuberger Berman and who explained their terms and

24    conditions of employment were changed as a result of the

25    acquisition by Lehman but that by virtue of the economic

08-13555-mg    Doc 43721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 380

Page 105

1   reality of their practices, were held captive by economic

2   coercion.  It wasn't anything that willful; it was just

3   circumstantial.

4          I think that both of these examples, and I'm not

5   limiting the field to these examples, raise some questions as

6   to what the facts actually are.  And it further raises a

7   question in my mind as to whether we can deal with this in so

8   undifferentiated a way as we have started to deal with it this

9   afternoon.  So that's my mid-course reaction to what I've heard

10  so far in terms of whether or not we're in a position to make

11  some decisions.  And I don't mean to cut anybody off.  I think

12  that we've reached just about five minutes to 3.  And I'm going

13  to have to take a break for the chambers conference which will

14  be starting at about 3:00.  Is there someone --

15          UNIDENTIFIED SPEAKER:  Yes.  Your --

16          THE COURT:  I see someone standing --

17          UNIDENTIFIED SPEAKER:  Right.

18          THE COURT:  -- in reference to --

19          UNIDENTIFIED SPEAKER:  Your Honor, that chambers

20  conference -- the parties are talking and then respectively

21  talking to their business principals --

22          THE COURT:  Could you come forward --

23          UNIDENTIFIED SPEAKER:  Sure.

24          THE COURT:  -- only because I can barely hear you.

25          UNIDENTIFIED SPEAKER:  Your Honor, the parties are

1    talking among themselves.  We started talking about twenty

2    minutes ago.  And now they're respectively reaching out to

3    their business principals to see if we can get some kind of

4    framework to present to Your Honor at 3.  And given that

5    ongoing discussion, we wondered if we could postpone it ten or

6    fifteen minutes if that works for Your Honor.

7              THE COURT:  You can postpone it for a half hour.

8              UNIDENTIFIED SPEAKER:  Okay.

9              THE COURT:  You can postpone it for forty-five

10   minutes.  I don't really care.

11             UNIDENTIFIED SPEAKER:  I don't think we need more

12   than, say, twenty minutes.  So if you want to say a half hour

13   to be safe.

14             THE COURT:  Let's call it 3:30.

15             UNIDENTIFIED SPEAKER:  Okay.

16             THE COURT:  And are you gathering in the conference

17   room across from my chambers?

18             UNIDENTIFIED SPEAKER:  We can do that.  We are in the

19   hall right now.

20             THE COURT:  Why don't you ask my courtroom deputy to

21   open up the conference room which is across the hall.  You can

22   gather in there and I'll join you there at about 3:30.

23             UNIDENTIFIED SPEAKER:  Okay.  Great.  And where can I

24   find your courtroom deputy?

25             THE COURT:  Just walk into the door that says

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 107 of 380

Page 107

1    "Chambers Entrance".

2         UNIDENTIFIED SPEAKER:  Okay.  Thank you, Your Honor.

3         (Pause)

4         THE COURT:  Okay.  We've just been given a half hour.

5    I think we should continue to hear from those individuals who

6    are gathered here now and who wish to be heard.

7         MR. KENNEY:  If I could just put an addendum to my

8    colleague, Mr. Rodney?  You asked if there was a statement

9    that's an example of a statement that -- and may I show it to

10   you?  And you see there are --

11        THE COURT:  I appreciate that there is such a

12   statement and that only serves to further emphasize in my mind

13   the procedural concern that I have which is that we don't have

14   an established evidentiary record to deal with some of the

15   ancillary materials that are being present.  And we're going to

16   need to do that before I can do anything with the information

17   that's being developed.

18        MR. SCHAGER:  Good afternoon, Your Honor.  Richard

19   Schager for claimant, Michael McCully.  And I'm just going to

20   make a very quick point 'cause I'm quite happy with the

21   procedure Your Honor outlined about subsequent sequential

22   papers to be filed before the next hearing.

23        I thought the fatal flaw in omnibus motion 130 was the

24   way it glossed together and glossed over differences among

25   different plans including stock option plans, the contingent

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 18:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 980

Page 108

 1    stock awards and the restricted stock units all of which are

 2    significantly different.  I think virtually everything that has

 3    been said today has dealt with RSUs.  I thought I heard one

 4    reference to a stock option plan but it wasn't clear to me.  So

 5    I was going to ask the Court to -- I was going to ask the Court

 6    respectfully to clarify whether to the Court's knowledge the

 7    130th omnibus motion still deals with stock option plans and

 8    contingent stock awards as well as RSUs or has the relief been

 9    granted for everything except the restricted stock units, the

10    RSUs?

11         THE COURT:  We'll have to ask debtors' counsel for

12    that --

13         MR. SCHAGER:  And if they can't be addressed today

14    then I think it has -- I would just flag that I think it's

15    something that has to be addressed in the papers.

16         THE COURT:  We'll have to ask debtors' counsel to

17    clarify that.

18         MR. BERNSTEIN:  Your Honor, the -- it was not entirely

19    clear to us from the proofs of claim if parties were claiming

20    for stock options, contingent stock awards or RSUs.  They

21    generally attached -- generally, statements were attached that

22    said how many RSU units they held whether they acquired those

23    through the equity awards program, the contingent stock award

24    program.  I think the end result is the same.  They end up with

25    RSUs.  So the objection addressed everything that was included

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 109 of 980

Page 109

1    on the proof of claim attached to those -- included in those

2    proofs of claim.  So if there were stock options included on

3    those and the party had ended up with RSUs, those obviously

4    were included.  And if they had something different, that was

5    also included in the objection.  So no relief yet has been

6    granted here today but those -- all of those items on those

7    proofs of claim were intended to be subject to the objection.

8             MR. SCHAGER:  Okay.  While I'm -- subject to making

9    one brief point, Your Honor, I'd say I'd wait until the next

10   round of briefing.  But I think there are -- the Court is going

11   to find that there are, in fact, significant differences

12   between stock options that are granted which represents a real

13   physical act and a restricted stock unit that just, by way of

14   one example, a stock option has a tax consequence.  And it

15   might not be taxable at the time of the grant but that's

16   subject to provisions of the Internal Revenue Code.  Restricted

17   stock units were never taxed.  And it's not clear that there

18   was anything that transpired that would constitute taxable

19   compensation.  I think that's going to be the type of

20   difference in these types of plans that has to be addressed.

21   Having said that, though, I'm happy to wait until the next

22   round of briefing.

23            THE COURT:  Okay.

24            MR. SCHAGER:  Thank you.

25            MR. SHOTTON:  Thank you very much, Your Honor.  My

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 110 of 380

Page 110

 1    name's Paul Shotton.  I'm here representing myself as a former

 2    Lehman Brothers employee.  The offer letter of employment which

 3    constitutes the only employment contract I've had with the firm

 4    guaranteed a total compensation amount as a dollar figure for

 5    the first year of employment.  The letter went on to explain

 6    that in subsequent years the figure would be variable but

 7    referencing the figure for that first year to establish a run

 8    rate.  And it said that solely at the firm's discretion, part

 9    of the compensation made be paid in the form off conditional

10    equity awards.  It went on to describe those as being RSUs or

11    stock  options or of a conditional equity award pursuant to the

12    employee equity award program then in effect.

13         Now the terms of the program including the proportion

14    of conditional equity changed from year to year solely at the

15    firm's discretion.  I was never consulted nor asked to approve

16    that.  And bonus amounts and amounts of equity which were

17    determined at the end of each fiscal year were fixed in dollar

18    amounts not as a particular fixed number of shares and,

19    likewise, when stock actually vested, tax which was due to the

20    Internal Revenue -- to the Treasury -- taxes withheld at source

21    automatically by the firm.

22         So it's quite clear from the contract letter that the

23    firm viewed the conditional equity awards, cash salary and cash

24    bonuses as being completely fungible quantities.  And the

25    deferred equity portion was used solely or principally as an

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 79 of 380

Page 111

1     employer retention device.

2          The equity awards programs make clear that the RSUs as

3     counsel admits they are immediately convertible into cash

4     albeit at the behest of the firm in the event of a change of

5     control.  So I believe that the argument that RSUs are only

6     classifiable as equity is fundamentally incorrect.

7          And in summary, I'm pursuing a wage claim seeking just

8     compensation for services rendered to the firm in good faith.

9          THE COURT:  Okay.  Thank you.

10          MR. HUTTON:  Good afternoon.  My name is Randall

11    Hutton.  I'm not an attorney.  My claim number is 14023 which I

12    initially filed in September 2009.

13          I filed a response on May 16th of this year to the

14    debtors' 118th omnibus objection to reclassify my proof of

15    claim to equity interest.  In doing so, I reduced the amount of

16    the initial claim that I had to only reflect deferred

17    compensation under an employment contract that I had with the

18    debtor.  Per my amended claim, I disagree with the debtors'

19    assertion and their objection that the conditional equity

20    awards I earned in 2006 an 2007 under the employment contract

21    is security under Section 510(b) Bankruptcy Code.

22          I further disagree with the debtors' omnibus reply

23    filed on December 15th to the general omnibus responses as it

24    failed to address my specific claim and my response.  As a way

25    of background, I had signed an employment contract on December

1    10th, 2004 with the debtor which I had included in Exhibit A of

2    my response.  The contract specifies a consideration and

3    compensation for my services throughout its term which was

4    calculated annually through a defined formula.  Per the

5    contract, Lehman had the discretion to pay a portion of

6    compensation in the form of conditional equity awards which is

7    the amount of my amended claim.  The debtor had filed for

8    bankruptcy before any of these were paid to me.

9          The employment contract called for an exchange of my

10   services for a calculated dollar amount of compensation in 2006

11   and 2007.  Given this was a contractual obligation for a

12   calculated dollar amount and only a calculated dollar amount,

13   the conditional equity portion I received was in form of

14   compensation only, not necessarily ultimate value.  My contract

15   states in Section 3 that a portion of my compensation could be

16   paid in the form -- and underline "form" -- of conditional

17   equity awards.  This could be interpreted to referring to the

18   deferral investing aspects related to conditional equity but

19   not necessarily its ultimate value.  In other words, Lehman was

20   not contractually obligated to hold a certain number of shares

21   to me but rather, needed to provide the amount of stock when

22   vested to contractually fulfill the calculated dollar amount

23   owed under the contract.

24         To illustrate this point, assume that Lehman did not

25   file for bankruptcy but instead its stock increased in value

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 319 of 980

Page 113

1    substantially.  When the conditional equity was due to be

2    delivered to me pursuant to the terms of the contract, Lehman

3    could limit the amount of shares delivered to me to the

4    contracted amount of compensation in my claim.  Even though the

5    market value that those shares -- may be much higher, Lehman

6    could argue that under contract and general contract

7    principles, it is only responsible for a contracted amount and

8    not the higher equity market value amount.  Thus, I did not

9    necessarily have the upside of an equity investor.  Given that

10   the conditional equity I received under the contract was capped

11   under a contract amount and under general contract law

12   principles, it does not meet the Bankruptcy Code definition of

13   "security" as defined in Section 501(b) as the debtor alleges.

14        The case law is, I think, the similar Enron court

15   opinion regarding employee claims filed on May 2nd, 2006 where

16   Judge Gonzales describes the absolute priority rule in saying

17   that "In return for the right to share in the profits of the

18   corporation, securities holders must also accept the risk of

19   insolvency and therefore precluded from sharing in the

20   distribution of the estate until all general creditors have

21   been satisfied.  Security holders thus accept greater risk in

22   return for the opportunity of a greater reward whereas general

23   creditors' bear less risk commensurate with the fixed nature of

24   their award.

25        Given the conditional equity that I had under my

Page 114

```
 1   contract was contractually capped at a calculated amount, it

 2   compromised any right to share in profits in Lehman.  Per these

 3   reasons, the conditional equity amount should not be considered

 4   a security per Section 510(b) as the debtor alleges but should

 5   be a general unsecured claim against the debtor.  Thus, I

 6   respectfully petition the Court to deny the debtors' request to

 7   reclassify the claim as an equity interest.

 8            THE COURT:  Thank you.

 9            MR. HUTTON:  Thank you.

10            THE COURT:  Is there anyone else in the courtroom who

11   wishes to be heard?  All right.  That means that those of us

12   who are still on the telephone will have a chance to express

13   themselves.  But the first thing that I'm going to ask is that

14   you at least identify yourself by name if you wish to be heard

15   at this time.

16            MR. BOYAJIAN (TELEPHONICALLY):  Yes.  Hello?

17            THE COURT:  Listening.

18            MR. BOYAJIAN:  Yes.  This is James Boyajian, law

19   office of A. James Boyajian in Los Angeles on behalf of Jeffrey

20   Wardell, claim number 24545.

21            THE COURT:  All right.  You're on the list.  Anybody

22   else?

23            MR. CARRAGHER (TELEPHONICALLY):  Yes.  This is Dan

24   Carragher for claimant, Fabio Liotti, L-I-O-T-T-I.  And I would

25   like to be heard.  It's claim number 25895.
```

1          THE COURT:  I have -- that's two.  Is there anybody

2     else on the line who wishes to be heard?

3          MR. COHEN (TELEPHONICALLY):  Darian Cohen from Los

4     Angeles representing myself.  The claim number is 16153.

5          THE COURT:  Could I have your name again, please?

6          MR. COHEN:  Sure.  It's Darian, D-A-R-I-A-N, Cohen,

7     C-O-H-E-N.

8          THE COURT:  Anybody else?

9          MR. JACOBSON:  Lars Jacobson, L-A-R-S,

10    J-A-C-O-B-S-O-N, claim number 24335.

11         THE COURT:  So far I have four.  Anybody else?  Okay.

12         MR. GRAN (TELEPHONICALLY):  This is Michael Gran.

13         THE COURT:  Michael -- what's your last name?

14         MR. GRAN:  G-R-A-N --

15         THE COURT:  I couldn't hear your last name.

16         MR. GRAN:  G-R-A-N, as in November.

17         THE COURT:  And are you a lawyer or speaking for

18    yourself?

19         MR. GRAN:  For myself.  Claim number 23900.

20         THE COURT:  Okay.  Do we have a complete list of five?

21    Apparently so.  We'll go in the order in which people spoke up.

22    The first is the attorney who represents Mr. Wardell.

23         MR. BOYAJIAN:  Thank you, Your Honor.  The Code aims

24    to protect employees as priority creditors.  Jeffrey Wardell

25    was a broker in LBHI's San Francisco office who has a 507(a)

08-13555-mg    Doc 47321    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 339 of 980

Page 116

1    priority claim for $50,638.80 for the extent admissible under

2    the 507 priority status and for the rest of it by general

3    unsecured claim.  These amounts are for unpaid wages, benefits

4    and compensation.  The money was taken out of his paycheck by

5    debtor LBHI in anticipation of issuing restricted stock units

6    at the end of November of 2008 under the 2008 equity award

7    agreement.  The RSUs ultimately could not be issued and do not

8    exist.  He got no cash and no RSUs.

9            We ask the Court to deny debtors' objection because

10   this claim is valid for the following two reasons.  Despite

11   Your Honor's mention of the shifting of burden earlier, we

12   believe that debtors' objection does not refute the essential

13   allegations about this claim and therefore does not shift the

14   burden to prove validity of the claim.

15           And secondly, even if the burden has shifted to us,

16   this claim is valid based on the preponderance of evidence

17   because it arises out of unpaid compensation and requires

18   restitution.

19           First, the debtors failed to shift the burden because

20   they cite no relevant authority to refute this claim.  The case

21   turns, as Your Honor mentioned earlier, on whether not granted

22   RSUs are equity securities.  None of the cases cited in the

23   objection or the reply briefs are relative to this issue.  In

24   re Enron deals with stock options and phantom stock.  To posit

25   three other examples, in the matter of Baldwin-United Corp.

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 284 of 598

Page 117

1    deals with stock option claimants; Curreri v. Jopps (ph.) deals

2    with preferred stock warrants; and Einstein Noah Bagel Corp.

3    deals with puts.

4            None of these cases as cited by debtors deal with

5    RSUs.  RSUs are a completely different animal, Your Honor.

6    They're not equity securities as defined in Section 101,

7    paragraph 16.  Even had they issued and invested because RSUs

8    are different from stocks, puts, warrants, phantom stocks and

9    stock options, all of these equity interests give a present

10   right to the risks and benefits of equity ownership.  RSUs give

11   only a conditional right to convert to an equity interest at a

12   later point in time and not a present equity interest.

13           Also, unlike these other equity securities, RSU

14   holders do not enjoy the hallmarks of equity ownership

15   including benefiting increases in entity value, building rights

16   or transferability.

17           To quote directly from the 2008 LBHI equity award

18   program, RSUs are defined on page 16 as "the conditional rights

19   received one share of Lehman Brothers common stock three years

20   after the grant date on November 30, 2011.  Generally, RSUs

21   cannot be sold, traded, pledged or transferred during that

22   three year period."

23           Unlike most securities, RSUs are easily forfeitable

24   and unvested rights to buy stock many years later only if

25   several contingencies on the -- and as we have heard earlier

Page 118

1   this morning, Lehman reserved the right to pay out cash instead

2   of issuing those RSUs.  So it's not even certain whether they -

3   - whether the employees will be getting the benefit of RSUs or

4   future common stock if converted.  Therefore, Section 510(b)

5   does not mandate that this claim have the same priority as

6   common equity in LBHI.

7        Not to get to your question, Your Honor, and to the

8   heart of the matter, the Enron case and all of the other cases

9   cited in support of mandatory 510(b) subordination should be

10  distinguished from this claim because they involved stocks and

11  options that had vested.  As to footnote 3 in Enron, it is

12  clear that this opinion applies only to stock options.  And I

13  quote from that footnote:  "To the extent that stock options

14  necessarily implicate the purchase or sale of a security, it is

15  doubtful that any stock options can be so denied."

16       As you can see, RSUs are not stock options and Enron

17  has nothing to do with RSUs.  Even a phantom stock, which is

18  also at issue in Enron, that was not delivered was a present

19  equity interest with expectation of sharing in profits and

20  losses albeit with a deferred date of receipt for tax purposes.

21  In contrast, since respondent never received RSUs and knew of

22  the high risk of forfeiture, he did not expect to participate

23  in the firm's profits and losses.

24       Your Honor, the only two cases that are on point as to

25  the issue of whether RSUs are equity or whether they are debt

Page 119

1    are FleetBoston out of the district of Massachusetts and Diab

2    v. Textron out of the eastern district of Michigan both of

3    which are cited in my response brief.  These cases effectively

4    state that RSUs are not equity like common stock shares or

5    stock options.  A conditional promise to grant a possible

6    equity stake in the future is not a present equity interest.

7          Moreover, debtors do not cite any contract provisions

8    which require subordination under 510(a).  On pages 8 and 9 of

9    their reply brief, the debtors mistakenly suggest that the 2008

10   equity agreement contains a subordination agreement to treat

11   the RSUs as "arising from the purchase or sale of a security

12   like common shares in LBHI in the case of a bankruptcy".  This

13   term appears only in the 2003 and 2004 equity agreements.  It

14   does not appear in the 2008 equity award agreement which

15   governs the amount disputed in this claim.  Nothing in the 2003

16   and 2004 agreements is incorporated by reference into the 2008

17   agreement.  The 2008 agreement that debtors attached in Exhibit

18   B of their reply brief does not even mention the word

19   "bankruptcy".  The fact that this language was removed

20   altogether from the 2008 agreement goes to indicate that the

21   parties agreed they would no longer subordinate RSUs as equity

22   in the case of a bankruptcy.

23          This brings me to my final point, Your Honor.  And

24   I'll keep it a quick one.  As to my second point, this

25   arises -- this claim itself arises out of unpaid compensation

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 120 of 180

Page 120

1    and not for fraud or breach of contract damages arising out of

2    a purchase or sale of the security that was at issue in Enron.

3    There will be no other recourse to seek these unpaid

4    compensations other than by allowing these claims to proceed.

5    The evidence is clear, Your Honor, Jeffrey Wardell's sworn

6    affidavit and his compensation earnings statement show that

7    this money was withdrawn monthly and held in accrual.  He had

8    no cash and no RSUs which begs the question, where is the

9    money.  Can LBHI simply take cash out of an employee's paycheck

10   and keep it in return for worthless common stock that was never

11   bargained for and may have never been received through

12   conversion of the RSUs?  If LBHI could not possibly issue the

13   RSUs, they owe to their employees to pay them cash back that

14   they withheld under the state labor laws of Delaware as well as

15   New York as well as under the equitable doctrine of

16   restitution.

17          My client was -- my client's money was withheld as

18   the -- it was money that was consideration for the waiver that

19   he rendered as a broker for the San Francisco office of LBHI.

20   He therefore has a legal and equitable right to payment under

21   Section 101, paragraph 5.  As such, it is a valid claim.  Your

22   Honor, in summary, we respect ask this Court to use its Section

23   105 equitable powers to cancel and set aside the 2008 equity

24   award agreement due to impossibility because it could not be

25   performed during the voluntary bankruptcy.  The Bankruptcy Code

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 288 of 580

Page 121

 1    strongly prefers that employee claims such as Mr. Wardell's

 2    remain a 507(a) priority claim.  Thank you, Your Honor.

 3            THE COURT:  Thank you.  The next is the attorney

 4    representing Fabio Liotti.

 5            MR. CARRAGHER:  Thank you, Your Honor.  This is Dan

 6    Carragher from Day Pitney in Boston.  I'll keep my remarks

 7    brief and will avoid pretty much in the way of factual

 8    recitation because I think, in light of Your Honor's comments

 9    about keeping the record clear, that's probably better provided

10    in the form of a declaration to be considered at a future

11    hearing.

12            But by brief introduction, Mr. Liotti was employed in

13    London.  He holds claims under RSUs that were issued in 2004,

14    5, 6 and 7 in consideration of over three million dollars of

15    compensation.  And he also has asserted a claim which I'd like

16    to speak to today for 2008 compensation that wasn't paid and

17    was withheld and for which he did not receive -- in his case it

18    was CSAs because he was overseas and not in the United States.

19    And that accounts for approximately 950,000 dollars.

20            What I'd like to focus on is the debtors' argument in

21    their response, point 10 of their Appendix A, the statement

22    that the employees bargained for and willingly accepted a

23    compensation package that included the risks and benefits

24    attended to equity awards in exchange for their labor.  And

25    it's true that the employees accepted certain risks, apart from

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 289 of 980

Page 122

1    some of the arguments made, but there were risks of future

2    decline in value, there were risks of forfeiture of the units

3    if there was a cessation of employment and there were risks

4    because the CSAs were not registered securities with the

5    benefits that would entail.  They could not be sold, assigned

6    or traded.

7         But there were other risks that the employees did not

8    accept.  They did not accept a risk that when the time came for

9    the issuance of the CSAs in November of 2008 that Lehman would

10   arbitrarily change the bargain under which they had earned

11   their commission income to, for example, issue CSAs of what's

12   half of what they intended or some percent or zero.  They did

13   not accept a risk that they would completely forego and waive

14   any right to compensation for the percent of their commissions

15   that was withheld which, in my client's case, was capped at

16   thirty-six percent of the annual income.

17        Getting right to the point here, they did not accept a

18   risk that in the event it became impossible for LBHI to honor

19   its part of the bargain by issuing equity awards that the

20   employees would be held to theirs.  And echoing Mr. Boyajian's

21   comments, I think it's appropriate under the doctrines of

22   impossibility and frustration that the Court should fashion a

23   remedy to protect those employees.  We know the remedy will be

24   an imperfect one because LBHI's in bankruptcy and creditors

25   aren't being paid in full.  But the fair resolution here should

Page 123

1   be to allow a claim for the portion of the commissions earned

2   but which no compensation was ever provided in any form

3   including the issuance of CSAs.  For that kind of claim,

4   there's no statutory or equitable basis to subordinate it and

5   we believe it should be allowed in full.  Thank you, Your

6   Honor.

7           THE COURT:  Thank you.  Mr. Cohen?

8           MR. COHEN:  Thank you, Your Honor.  I'll be brief and

9   try not to go over any of the ground that has already been

10  covered.  I think, based on what the first speaker said, it's

11  hard to deny that the money was held in 2008 was never invested

12  in anything that could appreciate or depreciate in value, that

13  that didn't happen until November 30th, 2008.  And, of course,

14  that never existed because of the bankruptcy.

15          THE COURT:  I'm going to break in just to ask you to

16  speak up because I think your voice is fading and it may not be

17  picked up on the record.

18          MR. COHEN:  Oh, I'm sorry.  Is that better?

19          THE COURT:  Just speak up the entire time and we'll

20  see what happens.

21          MR. COHEN:  Okay.  So the 2008 money that was withheld

22  clearly was never invested or theoretically invested in

23  anything that could appreciate or depreciate.  So that should,

24  as the first speaker said, be treated as a priority claim.

25  However, with regard to the monies that were withheld in the

08-13555-mg    Doc 47221    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 291 of 598

Page 124

1    prior years, it says in the plan documents that the plan is to

2    remain unfunded -- and I'm not going to read the whole

3    paragraph, but it says it constitutes an unfunded plan for

4    long-term incentive compensation.  And with respect to any

5    payments not yet made to a participant by the company, nothing

6    herein made shall give the participant any right that are

7    greater than those of a general creditor.  It has no right --

8    we have no right as a shareholder.

9         But the point is, those plans are rather common.  In

10   fact, the company I work at now has a similar plan but you can

11   invest in whatever you want.  And in this case, for instance,

12   the company I work in now, if I participated in the plan, if

13   whatever I invested went up a lot -- I work for Deutsche Bank

14   now -- if Deutsche Bank were to go bankrupt, the debtors would

15   not be giving me any value of what my nonqualified plan

16   appreciated to.  I would be an unsecured creditor of Deutsche

17   Bank and getting the twenty or thirty cents on the dollar that

18   everyone else gets because the money is never really invested

19   in anything.  If it was, it would be like a pension plan and it

20   wouldn't be tax deferred.  Part of the reason that they're tax

21   deferred is you are an unsecured creditor of the company that

22   you work for.

23        So nothing is ever purchased.  It's just money that's

24   set aside in an escrow account and that's how it fits as a

25   nonqualified plan.  I mean, if I had invested -- if they gave

Page 125

1  us a choice of what to invest in and I invested in Apple

2  computer and it went up ten to one, would the debtors then --

3  I'm sure would then claim, hey, you don't get the value of

4  Apple, you just get -- you're just an unsecured creditor for

5  the value of the money that was taken out.

6          So it does need to be consistent in that regard.  But

7  I see -- that's really the only point I'd make that there are

8  two separate things, the money in '08 and the money prior.

9  However, none of it was ever set aside in any kind of separate

10 account.  It was just a general fund of Lehman.  And come

11 November 30th of every year, they would issue stock based on a

12 formula of where the stock was then.  Thank you.

13         THE COURT:  Thank you.  Mr. Jacobson?

14         MR. JACOBSON:  Thank you, Your Honor.  Claim 24335.  I

15 think Mr. Cohen covered everything I was going to say so I

16 won't repeat anything.  So thank you very much for your time.

17         THE COURT:  Okay.  Mr. Bran (sic), you're the last

18 one.

19         MR. GRAN:  Well, seeing that I was only last, I -- and

20 also that I think that I concur with many of the other comments

21 being made is something I would say is that I definitely agree

22 with statements that have been made in theory talking about

23 RSUs --

24         THE COURT:  Mr. Bran -- Mr. Bran, I don't mean to

25 break in.  I'm having a very hard time following what you're

Page 126

1  saying.  Something is being lost in transmission.  And I don't

2  know where you're calling from or what your telephone service

3  is but you're not coming through loud and clear.

4      MR. GRAN:  Sorry.  I'm actually calling from Jordan,

5  using the land lines here.  So I am sorry I'm not on the best

6  of lines but hopefully this is better now that I don't have you

7  on speaker.

8      THE COURT:  That's a lot better and I suggest that you

9  speak up.

10     MR. GRAN:  Okay.  I was only saying that I definitely

11  concur with those comments made earlier specifically those that

12  are related to the idea that the RSU is not a purchase of a

13  security.  The economic value and the way we look at an RSU

14  economically is completely different from an equity security,

15  is a contingent payment of wages that are earned which over

16  time eventually you would be getting essentially a vested

17  interest in your -- in stocks which will eventually be paid to

18  you as stock most likely and then many people would sell those

19  stocks and then your compensation on an annual basis would

20  match what people would say -- what the company would say is

21  your annual compensation for a given year.

22      So it's a great way for companies to manage cash

23  flows, to reduce tax and to work on employee retention, but it

24  has nothing to do with giving an economic interest in the

25  company over the period invested in those RSUs.  It was a way

08-13555-mg    Doc 47721    Filed 12/05/14    Entered 12/05/14 13:12:38    Main Document
LEHMAN BROTHERS HOLDINGS INC., ET AL.
Pg 294 of 598

Page 127

1    of deferring compensation which had an economic benefit to the

2    actual shareholders not to mention the debt holders of the

3    company.

4              THE COURT:  Okay.

5              MR. GRAN:  And I'll save any other comments for

6    whenever we get to the next stage.

7              THE COURT:  Okay.  Thank you very much.  Is there

8    anyone I've left out who wishes to be heard?  Good.  I think

9    that this has been an extremely useful process of shared

10   education.  I've learned some things and I suspect that the

11   debtor learned some things as well.

12             I think it would be useful for us to follow the plan

13   that I laid out at the beginning of this afternoon's hearing.

14   But by no means am I suggesting that that's the only way for us

15   to proceed.  And if upon further reflection, the parties are

16   able to develop a more efficient or productive means to get to

17   the same end, I'm certainly open to suggestions.  But I'm going

18   to at least reiterate, first, that there be an annotation or

19   restatement of the debtors' omnibus reply.  I'm not suggesting

20   that there be a reply to today's hearing.  In other words, I'm

21   not suggesting that you have an opportunity for rebuttal.  I

22   presume that at some point you will have that opportunity.  I

23   think that the claimants who wish to comment with respect to

24   the statements that are currently on the record by the debtor

25   should have that opportunity once they recognize each and every

Page 128

1    part of the omnibus statement of the debtor that applies to

2    their claims.

3         I then think it would be useful for the debtor to

4    engage in a dialogue particularly with but not exclusively

5    limited to those claimants who are represented by counsel for

6    purposes of developing a set of procedures so that we can have

7    a record here.  I am not in a position to decide the matters

8    before the Court without competent evidence.  And at the

9    moment, while I have suggestions as to what the facts may be, I

10   do not have admissible evidence at this point.  The evidence

11   can be admissible by virtue of stipulations, declarations,

12   depositions or perhaps a formal evidentiary hearing to be

13   scheduled on notice.

14        To the extent that the parties wish an opportunity to

15   further brief the issues in anticipation of that evidentiary

16   hearing or that evidentiary submission, I'm going to request

17   that the debtor take the lead in proposing a schedule for that.

18   There'll be no need to repeat everything that has already been

19   said.  But I think there will be a need to deal with the

20   specifics of what I heard today which, frankly, differs from

21   some of what I've read in preparation for today.

22        With that, I'm going to adjourn today's hearing and go

23   into my chambers conference.  And I wish you all a good

24   holiday.

25        (Whereupon these proceedings were concluded at 3:35 p.m.)

Page 129

1

2                        I N D E X

3

4                         RULINGS

5                                                Page      Line

6    Granting of Debtors' Objection to the Claim    27        2

7    of Wilmington Trust Company as Indenture

8    Trustee (Claim No. 10082)

9

10   Granting of Debtors' One Hundred Thirty-Sixth  28        4

11   Omnibus Objection to Claims

12

13   Granting of Debtors' Motion for Authorization  31        10

14   to Implement the Defense Costs Fund

15

16   Granting of Application of the Debtors for      44        9

17   Authorization to Employ and Retain Gleacher &

18   Company Securities, Inc. as Financial Advisor

19   Effective as of February 17, 2011 Subject to

20   Understanding with Lazard

21

22

23

24

25

Page 130

CERTIFICATION

I, Hana Copperman, certify that the foregoing transcript is a
true and accurate record of the proceedings.

Hana
Copperman

Digitally signed by Hana Copperman
DN: cn=Hana Copperman, o, ou,
email=digital1@veritext.com, c=US
Date: 2011.12.27 11:00:05 -05'00'

_____

HANA COPPERMAN

AAERT Certified Electronic Transcriber CET**D 487

Also Transcribed by:

LISA BAR-LEIB
   AAERT Certified Electronic Transcriber CET**D-486

PENINA WOLICKI
   AAERT Certified Electronic Transcriber CET**D-569

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  December 25, 2011

# Exhibit C

# LEHMAN BROTHERS



## 2005 EQUITY AWARD PROGRAM
## FOR BONUS-ELIGIBLE AND
## PRODUCTION-BASED EMPLOYEES

CONFIDENTIAL

# LEHMAN BROTHERS

## Eligibility

Active employees (both bonus-eligible and production-based ) hired on or before November 30, 2005, including employees on an approved leave of absence, are eligible to receive an equity award for 2005. Any bonus-eligible employee whose employment terminates (or who gives notice or is notified of termination) prior to the time when bonuses are paid in January 2006 is not entitled to a 2005 equity award.

If a production-based employee terminates employment prior to November 30, 2005, the 2005 equity award is based on the amount of production-based compensation accrued for the 2005 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.

Note that eligibility to receive an equity award is subject to a 3-share minimum.

## How the Equity Award Program Works

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm, and requires us to hold that stake for at least five years. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. Your 2005 equity award was awarded to you as a portion of your 2005 compensation.

For MDs and SVPs, if you elected to receive stock options in 2005, seventy-five percent of the value of your 2005 equity award was in restricted stock units ("RSUs") and 25 percent was in stock options; for all other employees (as well as MDs and SVPs who did not elect to receive stock options), one hundred percent of the value of your 2005 equity award was in RSUs. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2010. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time, provided you meet certain terms and conditions. The RSUs cannot be sold, traded, or pledged for that five-year period. Any stock options awarded to you as part of the 2005 Equity Award Program will expire on or before November 29, 2015. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

### The Size of Your Award

The details of your 2005 equity award are available on the Personal Award Summary section of the Equity Award Program site on LehmanLive (keyword: EquityAward). The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title. Under this schedule, the amount of compensation paid in the form of conditional equity awards (RSUs and stock options, as applicable) increases as total compensation rises.

**Bonus-Eligible Employees:** Your award was based on your 2005 total compensation, which includes salary earned in fiscal year 2005 plus any additional compensation with respect to fiscal year 2005, even if some of these payments are deferred or paid in 2006. Such compensation includes 2005 bonus, commissions, and other compensation.

2

2005 RSU

CONFIDENTIAL

LEH-RSU 0022574

# LEHMAN BROTHERS

**Production-Based Employees:** Similar to bonus-eligible employees, you received a year-end conditional equity award as a portion of your 2005 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2004 through November 2005 (paid from January through December 2005) after all adjustments. For 2005, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2005 Equity Award Schedule appears on page 5.) The 2005 payout may have included regular production payout, certain special payments, and other production payout. During any period you are paid a draw, equity (in the form of RSUs and/or stock options) may be awarded with respect to the amount of the draw. If the draw ends and the you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued). Note that for purposes of this communication, all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of RSUs you received for 2005 was based on the closing price of Lehman Brothers common stock on November 30, 2005 ($126.00 per share), less a discount: 30 % for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of compensation in RSUs gives you $143 in value; for other employees, with a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value. The discount really means that the Firm "grosses up" your contribution at the outset.

If you elected stock options for 2005 (MDs and SVPs only), the number of options you received was based on the Black-Scholes value ($46.96) of a 10-year Lehman Brothers option on November 30, 2005, less the applicable discount (30% for MDs and 25% for SVPs). These options have an exercise price of $126.00 and will expire on or before November 29, 2015.

## Components of the Equity Award

Employees receive a portion of their total compensation in the form of conditional equity awards. The equity component of total compensation is in a combination of 75% RSUs and 25% stock options (for MDs and SVPs who elected to receive stock options) or 100% in RSUs (for all other employees):

|                      | **RSUs**                          | **Options**                       |
| -------------------- | --------------------------------- | --------------------------------- |
| Grant Date:          | November 30, 2005                 | November 30, 2005                 |
| Market Price:        | $126.00                           | N/A                               |
| Exercise Price:      | N/A                               | $126.00                           |
| Black-Scholes Value: | N/A                               | $46.96                            |
| Discount:            | 30% MDs<br>25% Others             | 30% MDs<br>25% SVPs               |
| Cost to Employee:    | $88.20 (MDs)<br>$94.50 (Others)   | $32.87 (MDs)<br>$35.22 (SVPs)     |
| Restriction Period:  | 5 years                           | N/A                               |
| Option Period:       | N/A                               | 10 years                          |

2005 RSU

CONFIDENTIAL                                                                            LEH-RSU 0022575

# LEHMAN BROTHERS

## When Will My RSUs Vest?

The vesting provisions of your 2005 RSUs are consistent with last year's RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2005 total compensation before the discount. The discount portion represents the balance of your RSU award, provided by the Firm. Your RSUs will vest in accordance with the schedule below:

|  | Principal | Discount |
|---|---|---|
| **MDs** | 35% on November 30, 2008<br>35% on November 30, 2010 | 30% on November 30, 2010 |
| **Others** | 75% on November 30, 2007 | 25% on November 30, 2010 |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2010, all of your RSUs will be forfeited. Please refer to page 9 for the definition of Detrimental Activity.

## When Will My Stock Options Become Exercisable (MDs and SVPs, as applicable)?

You should consider your stock option award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of stock options awarded as part of your 2005 compensation before the discount. The discount portion represents the balance of your stock option award, provided by the Firm.

Your stock options (if elected) will become exercisable in accordance with the schedule below:

|  | Principal | Discount |
|---|---|---|
| **MDs** | 35% on November 30, 2008<br>35% on November 30, 2010 | 30% on November 30, 2010 |
| **SVPs** | 75% on November 30, 2007 | 25% on November 30, 2010 |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2015, all of your stock options will be forfeited. Please refer to page 9 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.

4                                                                 2005 RSU

CONFIDENTIAL                                                       LEH-RSU 0022576

# LEHMAN BROTHERS

## 2005 Equity Award Schedule

The participation schedule for 2005 is listed below. This schedule reflects the equity portion of 2005 total compensation ("TC"). An example of the calculations follows.

### 2005 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| | **Employees Through Vice President Level** | **Senior Vice Presidents** | **Managing Directors** |
| $0 - $74,999 | 1% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $75,000 - $99,999 | 2% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $100,000 - $199,999 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30% of 2005 TC over $1.0 million | $200,000 plus 35% of 2005 TC over $1.0 million | $200,000 plus 44% of 2005 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $310,500 plus 35% of 2005 TC over $1.5 million | $375,000 plus 45% of 2005 TC over $1.5 million | $420,000 plus 56% of 2005 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $485,500 plus 40% of 2005 TC over $2.0 million | $600,000 plus 55% of 2005 TC over $2.0 million | $700,000 plus 60% of 2005 TC over $2.0 million |
| $2,500,000 and up | $685,500 plus 45% of 2005 TC over $2.5 million up to a max of 30% of 2005 TC | 35% of 2005 TC | 40% of 2005 TC |

2005 RSU

CONFIDENTIAL

LEH-RSU 0022577

# LEHMAN BROTHERS

## Award Calculation Example

Using the Equity Award Schedule above, your 2005 equity award was determined at year-end based on your 2005 total compensation. Sample illustrations are shown below.

|  | Employees thru VP Level | SVPs[1] | MDs[1] |
|---|---|---|---|
| 2005 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| Amount of Compensation in Equity | $2,000 | $62,500 | $200,000 |
| *Amount of Compensation in RSUs:* | *$2,000* | *$46,875* | *$150,000* |
| FMV on grant date: | $126.00 | $126.00 | $126.00 |
| Discount: | 25% | 25% | 30% |
| Discounted grant price: | $94.50 | $94.50 | $88.20 |
| Total # of RSUs: | 21 | 496 | 1,701 |
| *Principal Portion:* | *16* | *372* | *1,191* |
| *Discount Portion:* | *5* | *124* | *510* |
| *Amount of Compensation in Options:* |  | *$15,625* | *$50,000* |
| Exercise price on grant date: |  | $126.00 | $126.00 |
| Black-Scholes (B-S) value: | N/A | $46.96 | $46.96 |
| Discount: |  | 25% | 30% |
| Discounted B-S value: |  | $35.22 | $32.87 |
| Total # of Options: |  | 444 | 1,521 |
| *Principal Portion:* |  | *333* | *1,065* |
| *Discount Portion:* |  | *111* | *456* |

Note: The number of RSUs has been rounded to the nearest whole number for illustrative purposes only.

---

[1] Assumes SVP/MD elected to receive 25% of the 2005 equity award in stock options.

2005 RSU

CONFIDENTIAL  LEH-RSU 0022578

# LEHMAN BROTHERS

## 2005 Monthly Equity Accrual for Production-Based Employees

Below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2004 to November 2005 (paid January to December 2005) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|---|---|---|---|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| Step 2 | Calculate projected award from 2005 Award schedule. | $1,680 | $1,680 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,680 x 8.33%) - $0 | $140 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| Step 5 | Calculate projected award from 2005 Award schedule | $1,800 | $1,800 |
| Step 6 | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,800 x 16.67%) - $140 | $160 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|---|---|---|---|---|---|---|---|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,680 | 8.33% | $140 | $140 |
| 2 | February | 8,000 | 15,000 | 90,000 | 1,800 | 16.67% | 300 | 160 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,000 | 25.00% | 500 | 200 |
| 4 | April | 7,500 | 32,500 | 97,500 | 1,950 | 33.33% | 650 | 150 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,048 | 41.67% | 853 | 203 |
| 6 | June | 7,000 | 49,000 | 98,000 | 1,960 | 50.00% | 980 | 127 |
| 7 | July | 7,500 | 56,500 | 96,857 | 1,937 | 58.33% | 1,130 | 150 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,030 | 66.67% | 1,353 | 223 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,000 | 75.00% | 1,500 | 147 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,012 | 83.33% | 1,677 | 177 |
| 11 | November | 6,500 | 90,000 | 98,182 | 1,964 | 91.67% | 1,800 | 123 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,000 | 100.00% | 2,000 | 200 |
| | Total | | | | | | | $2,000 |

In the example above, $2,000 is the amount of total compensation delivered to the production-based employee in equity. For calculation of the number of RSUs and/or stock options (including principal and discount portion), see example on page 6. *Note that if a production-based employee terminates employment prior to November 30, 2005, the 2005 equity award is based on the amount of production-based compensation accrued for the 2005 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.*

7                                                                    2005 RSU

CONFIDENTIAL                                                    LEH-RSU 0022579

# LEHMAN BROTHERS

## Termination Provisions

| | All Employees |
|---|---|
| **Voluntary Termination to Non-Competitor** | **RSUs:** Participants remain entitled to the principal portion of their RSU award plus a pro-rata portion of their discount (20% for each full year of employment after November 30, 2005). Shares will be issued on the Share Payment Date (defined as the earlier of the end of the fiscal quarter one year after termination or November 30, 2010), provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| | **Stock Options:** Stock options become exercisable six months after termination and remain exercisable until the later of 5 years from grant, or 6 months after termination (but no later than the expiration date), provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| **Involuntary Termination** | **RSUs:** Participants remain entitled to the principal portion of their award plus a pro-rata portion of the discount (20% for each full year of employment after November 30, 2005). Shares will be issued on the Share Payment Date, provided the participant does not engage in Detrimental Activity. |
| | **Stock Options:** Stock options become exercisable immediately upon termination and remain exercisable until the later of 5 years from grant, or 6 months after termination (but no later than the expiration date), provided the participant does not engage in Detrimental Activity. |
| | **However, in the event of an involuntary termination with Cause, both the principal and discount portions of both RSUs and stock options will be forfeited.** |
| **Voluntary Termination to Competitor** | **RSUs:** Participants forfeit all unvested RSUs. Any remaining shares will be issued on the Share Payment Date, provided the participant does not engage in Detrimental Activity. |
| | **Stock Options:** Any stock options that have not been exercised prior to termination will be forfeited. |
| **Full Career Termination** | **RSUs:** Participants who leave the Firm or are involuntarily terminated without Cause but who qualify under "Full Career" provisions will receive 100% of the RSU discount (in addition to the principal portion) on the Share Payment Date, subject to applicable Competitive Activity and Detrimental Activity provisions. A termination is "Full Career" if:<br><br>• The participant has at least 20 years of service, OR<br>• The participant has at least 10 years of service, is at least 45 years old and the sum of the participant's age plus service is 65 or more |
| | **Stock Options:** All stock options become exercisable under the applicable provisions described above and remain exercisable until the expiration date (November 29, 2015), subject to applicable Competitive Activity and Detrimental Activity provisions. |
| **Death, Disability, Retirement [1]** | **RSUs:** Entire principal and discount vest immediately, and shares of Lehman Brothers common stock will be issued immediately. |
| | **Options:** Entire principal and discount immediately become exercisable and remain exercisable until the expiration date (November 29, 2015). |

---

[1] Retirement means a termination of employment when the person's age plus years of service equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service. Entitlement is subject to applicable Competitive Activity and Detrimental Activity provisions.

CONFIDENTIAL                                                                                          LEH-RSU 0022580

# LEHMAN BROTHERS

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2005 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

### Competitive Activity

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, investment banks, commercial banks, small boutique-type firms, asset management companies, mortgage-related companies, private equity firms, and hedge funds, are considered competitors of the Firm for purposes of the Equity Award Program.

While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### Detrimental Activity

Detrimental Activity means at any time (i) using information received during a person's employment with Holdings or any of its subsidiaries relating to the business affairs of Holdings or any of its subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

CONFIDENTIAL

LEH-RSU 0022581

# LEHMAN BROTHERS

## Tax Considerations

### Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding. Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

**Note**: Pursuant to current tax law, if you work in more than one tax jurisdiction during the 5-year restriction period (from the date of grant through the conversion date for RSUs) or during the 10-year option period (from the date of grant through the date of exercise), you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction. The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.

| RSUs | Options |
|---|---|
| • No taxation on the award date. | • No taxation on the award date. |
| • Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date. | • When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale price(s) (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options. |
| • This income will be subject to applicable tax withholding. | |
| • Special provisions dealing with capital gains will not apply upon conversion to common stock. | |
| • If you retain your shares after your RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date. | • This income will be subject to applicable tax withholding. |
| | • Special provisions dealing with capital gains will not apply when options are exercised. |
| | • If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise. |

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.

CONFIDENTIAL                                                    LEH-RSU 0022582

# LEHMAN BROTHERS

## Change in Control ("CIC") Provisions

| Reason | RSUs | Options |
|---|---|---|
| Hostile | • All RSUs vest immediately.<br>• Shares of Lehman Brothers common stock will be issued immediately. | • All options become immediately exercisable. |
| Friendly | • Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity.<br>• The additional value of the RSUs in excess of the undiscounted RSU award price ("Premium") will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2010 (five years after the award date).<br>• The premium RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | • Half of the non-exercisable options will become immediately exercisable.<br>• The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates:<br>ƒ MDs: 35 percent on 11/30/08<br>        65 percent on 11/30/10<br>ƒ SVPs: 75 percent on 11/30/07<br>        25 percent on 11/30/10 |

## Example: Payment of RSUs Upon a Friendly CIC

| | Employees thru VP Level | SVP[1] | MD[1] |
|---|---|---|---|
| FMV of LEH at Grant | $126.00 | $126.00 | $126.00 |
| Discounted Grant Price | $94.50 | $94.50 | $88.20 |
| Amount of Compensation in RSUs | $2,000 | $62,500 | $200,000 |
| Principal RSUs | 16 | 496 | 1,587 |
| Discount RSUs | 5 | 165 | 680 |
| Total Grant Value with Discount | $2,667 | $83,333 | $285,714 |
| **Upon Change in Control** | | | |
| CIC Offer Price | $200.00 | $200.00 | $200.00 |
| Total Value of RSUs at CIC Price | $4,233 | $132,275 | $453,515 |
| Value of RSUs to be Issued | $2,667 | $83,333 | $285,714 |
| # Shares of LEH Issued Upon CIC | 13 | 417 | 1,429 |
| **Premium over Grant Value**<br>*(paid on earlier of 2 years from CIC or November 30, 2010)* | | | |
| Value of Premium | $1,566 | $48,942 | $167,800 |
| Additional Premium RSUs | 8 | 245 | 839 |
| "Principal Premium RSUs" | 6 | 184 | 587 |
| "Discount Premium RSUs" | 2 | 73 | 252 |

---

[1] Assumes SVP/MD elected to receive 100% of the 2005 equity award in RSUs.

11                                                                              2005 RSU

CONFIDENTIAL                                                                  LEH-RSU 0022583

# LEHMAN BROTHERS

## Dividend Equivalents

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs. Dividends will not be paid on stock option awards.

## Voting Rights

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

## Other Information

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit Award Agreement, the Stock Option Award Agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive (keyword: EquityAward) or contact the Compensation Department at 212-526-8346 (5-8346) or by e-mail at compensation@lehman.com .

2005 RSU

CONFIDENTIAL

LEH-RSU 0022584

# Exhibit D

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

☒    **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended November 30, 2005**
OR

☐    **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from _____ to _____**

### Commission File Number 1-9466

# Lehman Brothers Holdings Inc.
#### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **13-3216325** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **745 Seventh Avenue**<br>**New York, New York** | **10019** |
| (Address of principal executive offices) | (Zip Code) |

#### Registrant's telephone number, including area code: (212) 526-7000

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.10 par value | New York Stock Exchange<br>Pacific Exchange |
| Depositary Shares representing 5.94% Cumulative Preferred Stock, Series C | New York Stock Exchange |
| Depositary Shares representing 5.67% Cumulative Preferred Stock, Series D | New York Stock Exchange |
| Depositary Shares representing 6.50% Cumulative Preferred Stock, Series F | New York Stock Exchange |
| Depositary Shares representing Floating Rate Cumulative Preferred Stock, Series G | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series K, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.375% Trust Preferred Securities, Series L, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.00% Trust Preferred Securities, Series M, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| 6.24% Trust Preferred Securities, Series N, of Subsidiary Trust (and Registrant's guarantee thereof) | New York Stock Exchange |
| Guarantee by Registrant of 7⅞% Notes due 2006 of Lehman Brothers Inc. | New York Stock Exchange |
| 6¼% Exchangeable Notes Due October 15, 2007 (subject to exchange into shares of common stock of General Mills, Inc.) | New York Stock Exchange |
| Absolute Buffer Notes Due July 29, 2008, Linked to the Dow Jones EURO STOXX50 SM Index (SX5E) | American Stock Exchange |
| Absolute Buffer Notes Due July 7, 2008, Linked to the Dow Jones EURO STOXX 50 SM Index (SX5E) | American Stock Exchange |
| Dow Jones Industrial Average 112.5% Minimum Redemption PrincipalPlus Stock Upside Note Securities® Due August 5, 2007 | American Stock Exchange |
| Dow Jones Industrial Average Stock Upside Note Securities® Due April 29, 2010 | American Stock Exchange |
| Index-Plus Notes Due December 23, 2009, Performance Linked to the Russell 2000® INDEX (RTY) | American Stock Exchange |
| Index-Plus Notes Due March 3, 2010, Linked to the S&P 500® Index (SPX) | American Stock Exchange |
| Index-Plus Notes Due November 15, 2009, Linked to the Dow Jones STOXX 50 SM Index (SX5P) | American Stock Exchange |
| Index-Plus Notes Due September 28, 2009, Performance Linked to S&P 500® Index (SPX) | American Stock Exchange |
| Nasdaq-100® Index Rebound Risk AdjustiNG Equity Range Securities SM Notes Due May 20, 2007 | American Stock Exchange |
| Nasdaq-100® Index Rebound Risk AdjustiNG Equity Range Securities SM Notes Due June 7, 2008 | American Stock Exchange |
| Nikkei 225SM Index Call Warrants Expiring May 8, 2007 | American Stock Exchange |
| Nikkei 225SM Index Stock Upside Note Securities® Due June 10, 2010 | American Stock Exchange |
| Prudential Research Universe Diversified Equity Notes Due July 2, 2006, Linked to a Basket of Healthcare Stocks | American Stock Exchange |
| Return Accelerated Portfolio Debt Securities Due September 3, 2006, Linked to the S&P 500 Index (SPX) | American Stock Exchange |
| S&P 500® Index Callable Stock Upside Note Securities® Due November 6, 2009 | American Stock Exchange |
| S&P 500® Index Stock Upside Note Securities® Due August 5, 2008 | American Stock Exchange |
| S&P 500® Index Stock Upside Note Securities® Due December 26, 2006 | American Stock Exchange |
| S&P 500® Index Stock Upside Note Securities® Due February 5, 2007 | American Stock Exchange |
| S&P 500® Index Stock Upside Note Securities® Due September 27, 2007 | American Stock Exchange |
| The Dow Jones Global Titans SM 50 Index Stock Upside Note Securities Due February 9, 2010 | American Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one): Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

The aggregate market value of the voting and nonvoting common equity held by non-affiliates of the Registrant at May 31, 2005 (the last business day of the Registrant's most recently completed second fiscal quarter) was approximately $24,370,000,000. As of that date, 264,317,470 shares of the Registrant's common stock, $0.10 par value per share, were held by non-affiliates. For purposes of this information, the outstanding shares of common stock that were and that may be deemed to have been beneficially owned by directors and executive

LEH-RSU 0005994

## LEHMAN BROTHERS HOLDINGS INC.

### Report of Independent Registered Public Accounting Firm

**The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.**

We have audited management's assessment, included in the accompanying *Management's Assessment of Internal Control over Financial Reporting*, that Lehman Brothers Holdings Inc. (the "Company") maintained effective internal control over financial reporting as of November 30, 2005, based on criteria established in *Internal Control-Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Lehman Brothers Holdings Inc. maintained effective internal control over financial reporting as of November 30, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, Lehman Brothers Holdings Inc. maintained, in all material respects, effective internal control over financial reporting as of November 30, 2005, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of Lehman Brothers Holdings Inc. as of November 30, 2005 and 2004 and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the three years in the period ended November 30, 2005 of Lehman Brothers Holdings Inc. and our report dated February 13, 2006 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
New York, New York
February 13, 2006

-68-

## LEHMAN BROTHERS HOLDINGS INC.

### Management's Assessment of Internal Control over Financial Reporting

The management of Lehman Brothers Holdings Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control system is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of November 30, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control-Integrated Framework*. Based on our assessment we believe that, as of November 30, 2005, the Company's internal control over financial reporting is effective based on those criteria.

The Company's independent registered public accounting firm that audited the accompanying Consolidated Financial Statements has issued an attestation report on our assessment of the Company's internal control over financial reporting. Their report appears on the preceding page.

-69-

LEH-RSU 0006064

## LEHMAN BROTHERS HOLDINGS INC.

### Report of Independent Registered Public Accounting Firm

**The Board of Directors and Stockholders of Lehman Brothers Holdings Inc.**

We have audited the accompanying consolidated statement of financial condition of Lehman Brothers Holdings Inc. (the "Company") as of November 30, 2005 and 2004, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended November 30, 2005. Our audits also included the financial statement schedule listed in the Index at Item 15. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2005 and 2004, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2005, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2006 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP
New York, New York
February 13, 2006

-70-

## LEHMAN BROTHERS HOLDINGS INC.
## CONSOLIDATED STATEMENT OF INCOME

**In millions, except per share data**
**Year ended November 30**

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Revenues** | | | |
| Principal transactions | $ 7,811 | $ 5,699 | $ 4,272 |
| Investment banking | 2,894 | 2,188 | 1,722 |
| Commissions | 1,728 | 1,537 | 1,210 |
| Interest and dividends | 19,043 | 11,032 | 9,942 |
| Asset management and other | 944 | 794 | 141 |
| Total revenues | 32,420 | 21,250 | 17,287 |
| Interest expense | 17,790 | 9,674 | 8,640 |
| Net revenues | 14,630 | 11,576 | 8,647 |
| **Non-Interest Expenses** | | | |
| Compensation and benefits | 7,213 | 5,730 | 4,318 |
| Technology and communications | 834 | 764 | 598 |
| Brokerage and clearance fees | 503 | 453 | 367 |
| Occupancy | 490 | 421 | 319 |
| Professional fees | 282 | 252 | 158 |
| Business development | 234 | 211 | 149 |
| Other | 245 | 208 | 125 |
| Real estate reconfiguration charge | – | 19 | 77 |
| Total non-personnel expenses | 2,588 | 2,328 | 1,793 |
| Total non-interest expenses | 9,801 | 8,058 | 6,111 |
| Income before taxes and dividends on trust preferred securities | 4,829 | 3,518 | 2,536 |
| Provision for income taxes | 1,569 | 1,125 | 765 |
| Dividends on trust preferred securities | – | 24 | 72 |
| Net income | $ 3,260 | $ 2,369 | $ 1,699 |
| Net income applicable to common stock | $ 3,191 | $ 2,297 | $ 1,649 |
| **Earnings per share** | | | |
| Basic | $ 11.47 | $ 8.36 | $ 6.71 |
| Diluted | $ 10.87 | $ 7.90 | $ 6.35 |

See Notes to Consolidated Financial Statements.

-71-

LEH-RSU 0006066

**LEHMAN BROTHERS HOLDINGS INC.**
**CONSOLIDATED STATEMENT OF FINANCIAL CONDITION**

In millions
November 30

| | | 2005 | | 2004 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ | 4,900 | $ | 5,440 |
| Cash and securities segregated and on deposit for regulatory and other purposes | | 5,744 | | 4,085 |
| Financial instruments and other inventory positions owned: | | | | |
| (includes $36,369 in 2005 and $27,418 in 2004 pledged as collateral) | | 177,438 | | 144,468 |
| Securities received as collateral | | 4,975 | | 4,749 |
| Collateralized agreements: | | | | |
| Securities purchased under agreements to resell | | 106,209 | | 95,535 |
| Securities borrowed | | 78,455 | | 74,294 |
| Receivables: | | | | |
| Brokers, dealers and clearing organizations | | 7,454 | | 3,400 |
| Customers | | 12,887 | | 13,241 |
| Others | | 1,302 | | 2,122 |
| Property, equipment and leasehold improvements (net of accumulated depreciation and amortization of $1,448 in 2005 and $1,187 in 2004) | | 2,885 | | 2,988 |
| Other assets | | 4,558 | | 3,562 |
| Identifiable intangible assets and goodwill (net of accumulated amortization of $257 in 2005 and $212 in 2004) | | 3,256 | | 3,284 |
| Total assets | $ | 410,063 | $ | 357,168 |

See Notes to Consolidated Financial Statements.

-72-

LEH-RSU 0006067

**LEHMAN BROTHERS HOLDINGS INC.**
**CONSOLIDATED STATEMENT OF FINANCIAL CONDITION (Continued)**

In millions, except per share data
November 30

| | 2005 | 2004 |
|---|---|---|
| **Liabilities and Stockholders' Equity** | | |
| Short-term borrowings | $ 2,941 | $ 2,857 |
| Financial instruments and other inventory positions sold but not yet purchased | 110,577 | 96,281 |
| Obligation to return securities received as collateral | 4,975 | 4,749 |
| Collateralized financings: | | |
| Securities sold under agreements to repurchase | 116,155 | 105,956 |
| Securities loaned | 13,154 | 14,158 |
| Other secured borrowings | 23,116 | 11,621 |
| Payables: | | |
| Brokers, dealers and clearing organizations | 1,870 | 1,705 |
| Customers | 47,210 | 37,824 |
| Accrued liabilities and other payables | 10,962 | 10,611 |
| Long-term borrowings | 62,309 | 56,486 |
| Total liabilities | 393,269 | 342,248 |
| Commitments and contingencies | | |
| **Stockholders' Equity** | | |
| Preferred stock | 1,095 | 1,345 |
| Common stock, $0.10 par value; | | |
| Shares authorized: 600,000,000 in 2005 and 2004; | | |
| Shares issued: 302,668,973 in 2005 and 297,796,197 in 2004; | | |
| Shares outstanding: 271,437,103 in 2005 and 274,159,411 in 2004 | 30 | 30 |
| Additional paid-in capital | 6,314 | 5,865 |
| Accumulated other comprehensive income (net of tax) | (16) | (19) |
| Retained earnings | 12,198 | 9,240 |
| Other stockholders' equity, net | 765 | 741 |
| Common stock in treasury, at cost: 31,231,870 shares in 2005 and 23,636,786 shares in 2004 | (3,592) | (2,282) |
| Total common stockholders' equity | 15,699 | 13,575 |
| Total stockholders' equity | 16,794 | 14,920 |
| Total liabilities and stockholders' equity | $ 410,063 | $ 357,168 |

See Notes to Consolidated Financial Statements.

-73-

LEH-RSU 0006068

## LEHMAN BROTHERS HOLDINGS INC.
## CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

**In millions**
**Year ended November 30**

| | 2005 | 2004 | 2003 |
|---|---:|---:|---:|
| **Preferred Stock** | | | |
| 5.94% Cumulative, Series C: | | | |
| Beginning and ending balance | $ 250 | $ 250 | $ 250 |
| | | | |
| 5.67% Cumulative, Series D: | | | |
| Beginning and ending balance | 200 | 200 | 200 |
| | | | |
| 7.115% Fixed/Adjustable Rate Cumulative, Series E: | | | |
| Beginning balance | 250 | 250 | 250 |
| Redemptions | (250) | – | – |
| Ending balance | | 250 | 250 |
| | | | |
| 6.50% Cumulative, Series F: | | | |
| Beginning balance | 345 | 345 | – |
| Issuances | – | – | 345 |
| Ending balance | 345 | 345 | 345 |
| | | | |
| Floating Rate (3% Minimum) Cumulative, Series G: | | | |
| Beginning balance | 300 | – | – |
| Issuances | – | 300 | – |
| Ending balance | 300 | 300 | – |
| | | | |
| Total preferred stock, ending balance | 1,095 | 1,345 | 1,045 |
| | | | |
| **Common Stock, Par Value $0.10 Per Share** | | | |
| Beginning balance | 30 | 29 | 25 |
| Issuances in connection with Neuberger acquisition | – | – | 3 |
| Other Issuances | – | 1 | 1 |
| Ending balance | 30 | 30 | 29 |
| | | | |
| **Additional Paid-In Capital** | | | |
| Beginning balance | 5,865 | 6,164 | 3,628 |
| RSUs exchanged for Common Stock | 184 | 135 | (36) |
| Employee stock-based awards | (760) | (585) | (352) |
| Tax benefit from the issuance of stock-based awards | 1,005 | 468 | 543 |
| Share issuances in connection with Neuberger acquisition | – | – | 2,371 |
| Neuberger final purchase price adjustment | – | (307) | – |
| Other, net | 20 | (10) | 10 |
| Ending balance | 6,314 | 5,865 | 6,164 |
| | | | |
| **Accumulated Other Comprehensive Income** [1] | | | |
| Beginning balance | (19) | (16) | (13) |
| Translation adjustment, net | 3 | (3) | (3) |
| Ending balance | $ (16) | $ (19) | $ (16) |

[1]     Net of income taxes of $1 in 2005, $(2) in 2004 and $(1) in 2003.

See Notes to Consolidated Financial Statements.

-74-

LEH-RSU 0006069

**LEHMAN BROTHERS HOLDINGS INC.**
**CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY–(Continued)**

In millions
Year ended November 30

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Retained Earnings** | | | |
| Beginning balance | $ 9,240 | $ 7,129 | $ 5,608 |
| Net income | 3,260 | 2,369 | 1,699 |
| Dividends declared: | | | |
| 5.94% Cumulative, Series C Preferred Stock | (15) | (15) | (15) |
| 5.67% Cumulative, Series D Preferred Stock | (11) | (11) | (11) |
| 7.115% Fixed/Adjustable Rate Cumulative, Series E Preferred Stock | (9) | (18) | (18) |
| 6.50% Cumulative, Series F Preferred Stock | (22) | (23) | (6) |
| Floating Rate (3% Minimum) Cumulative, Series G Preferred Stock | (12) | (5) | — |
| Redeemable Voting Preferred Stock | — | — | — |
| Common Stock | (233) | (186) | (128) |
| Ending balance | 12,198 | 9,240 | 7,129 |
| **Common Stock Issuable** | | | |
| Beginning balance | 3,874 | 3,353 | 2,822 |
| RSUs exchanged for Common Stock | (832) | (585) | (425) |
| Deferred stock awards granted | 1,574 | 1,182 | 957 |
| Other, net | (68) | (76) | (1) |
| Ending balance | 4,548 | 3,874 | 3,353 |
| **Common Stock Held in RSU Trust** | | | |
| Beginning balance | (1,353) | (852) | (754) |
| Employee stock-based awards | (676) | (876) | (518) |
| RSUs exchanged for Common Stock | 549 | 401 | 444 |
| Other, net | (30) | (26) | (24) |
| Ending balance | (1,510) | (1,353) | (852) |
| **Deferred Stock Compensation** | | | |
| Beginning balance | (1,780) | (1,470) | (1,119) |
| Deferred stock awards granted | (1,574) | (1,182) | (999) |
| Amortization of deferred compensation, net | 988 | 773 | 625 |
| Other, net | 93 | 99 | 23 |
| Ending balance | (2,273) | (1,780) | (1,470) |
| **Common Stock In Treasury, at Cost** | | | |
| Beginning balance | (2,282) | (2,208) | (1,955) |
| Repurchases of Common Stock | (2,994) | (1,693) | (967) |
| Shares reacquired from employee transactions | (1,163) | (574) | (541) |
| RSUs exchanged for Common Stock | 99 | 49 | 18 |
| Employee stock-based awards | 2,748 | 2,144 | 1,237 |
| Ending balance | (3,592) | (2,282) | (2,208) |
| Total stockholders' equity | $ 16,794 | $ 14,920 | $ 13,174 |

See Notes to Consolidated Financial Statements.

LEH-RSU 0006070

**LEHMAN BROTHERS HOLDINGS INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

In millions
Year ended November 30

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Cash Flows From Operating Activities** | | | |
| Net income | $ 3,260 | $ 2,369 | $ 1,699 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 426 | 428 | 315 |
| Deferred tax benefit | (502) | (74) | (166) |
| Tax benefit from the issuance of stock-based awards | 1,005 | 468 | 543 |
| Amortization of deferred stock compensation | 1,055 | 800 | 625 |
| Real estate reconfiguration charge | — | 19 | 77 |
| Other adjustments | 173 | 85 | (26) |
| Net change in: | | | |
| Cash and securities segregated and on deposit for regulatory and other purposes | (1,659) | (985) | (297) |
| Financial instruments and other inventory positions owned | (36,652) | (8,936) | (14,736) |
| Resale agreements, net of repurchase agreements | (475) | (9,467) | 19,504 |
| Securities borrowed, net of securities loaned | (5,165) | (22,728) | (25,048) |
| Other secured borrowings | 11,495 | (2,923) | 2,700 |
| Receivables from brokers, dealers and clearing organizations | (4,054) | 1,475 | (1,100) |
| Receivables from customers | 354 | (4,432) | (530) |
| Financial instruments and other inventory positions sold but not yet purchased | 14,156 | 23,471 | 5,326 |
| Payables to brokers, dealers and clearing organizations | 165 | (1,362) | 1,280 |
| Payables to customers | 9,386 | 10,158 | 10,189 |
| Accrued liabilities and other payables | (801) | 520 | 1,195 |
| Other operating assets and liabilities, net | 345 | (370) | 346 |
| Net cash provided by (used in) operating activities | (7,488) | (11,484) | 1,896 |
| **Cash Flows From Financing Activities** | | | |
| Derivative contracts with a financing element | 140 | 334 | 110 |
| Issuance (payments) of short-term borrowings, net | 84 | 526 | (38) |
| Issuance of long-term borrowings | 23,705 | 20,485 | 13,383 |
| Principal payments of long-term borrowings | (14,233) | (10,820) | (10,137) |
| Issuance of preferred securities subject to mandatory redemption | — | — | 600 |
| Issuance of common stock | 230 | 108 | 57 |
| Issuance (retirement) of preferred stock | (250) | 300 | 345 |
| Issuance of treasury stock | 1,015 | 551 | 260 |
| Purchase of treasury stock | (2,994) | (1,693) | (967) |
| Dividends paid | (302) | (258) | (178) |
| Net cash provided by financing activities | 7,395 | 9,533 | 3,435 |
| **Cash Flows From Investing Activities** | | | |
| Purchase of property, equipment and leasehold improvements, net | (409) | (401) | (451) |
| Business acquisitions, net of cash acquired | (38) | (130) | (657) |
| Net cash used in investing activities | (447) | (531) | (1,108) |
| Net change in cash and cash equivalents | (540) | (2,482) | 4,223 |
| Cash and cash equivalents, beginning of period | 5,440 | 7,922 | 3,699 |
| Cash and cash equivalents, end of period | $ 4,900 | $ 5,440 | $ 7,922 |

**Supplemental Disclosure of Cash Flow Information (in millions):**
Interest paid totaled $17,893, $9,534 and $8,654 in 2005, 2004 and 2003, respectively.
Income taxes paid totaled $789, $638 and $717 in 2005, 2004 and 2003, respectively.

See Notes to Consolidated Financial Statements.

-76-

LEH-RSU 0006071

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

## Note 1 Summary of Significant Accounting Policies

### Description of Business

Lehman Brothers Holdings Inc. ("Holdings") and subsidiaries (collectively, the "Company," "Lehman Brothers," "we," "us" or "our") is one of the leading global investment banks serving institutional, corporate, government and high-net-worth individual clients. Our worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. We are engaged primarily in providing financial services. The principal U.S., European, and Asian subsidiaries of Holdings are Lehman Brothers Inc. ("LBI"), a U.S. registered broker-dealer, Lehman Brothers International (Europe) ("LBIE"), an authorized investment firm in the United Kingdom and Lehman Brothers Japan, a registered securities company in Japan, respectively.

### Basis of Presentation

The Consolidated Financial Statements are prepared in conformity with generally accepted accounting principles, and include the accounts of Holdings, our subsidiaries, and all other entities in which we have a controlling financial interest or are considered to be the primary beneficiary. All material intercompany accounts and transactions have been eliminated in consolidation. Certain prior-period amounts reflect reclassifications to conform to the current year's presentation.

### Use of Estimates

Generally accepted accounting principles require management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Management estimates are required in determining the valuation of inventory positions, particularly over-the-counter ("OTC") derivatives, certain commercial mortgage loans and investments in real estate, certain high-yield positions, private equity and other principal investments, and non-investment-grade retained interests. Additionally, significant management estimates are required in assessing the realizability of deferred tax assets, the fair value of assets and liabilities acquired in a business acquisition, the accounting treatment of QSPEs and VIEs, the outcome of litigation, the fair value of equity-based compensation awards and determining the allocation of the cost of acquired businesses to identifiable intangible assets and goodwill and determining the amount of the real estate reconfiguration charges. Management believes the estimates used in preparing the financial statements are reasonable and prudent. Actual results could differ from these estimates.

### Consolidation Accounting Policies

**Operating companies.**    Financial Accounting Standards Board ("FASB") Interpretation No. 46(R), *"Consolidation of Variable Interest Entities (revised December 2003)–an interpretation of ARB No. 51"*, ("FIN 46(R)"), defines the criteria necessary to be considered an operating company (i.e., a voting-interest entity) for which the consolidation accounting guidance of Statement of Financial Accounting Standards ("SFAS") No. 94, *"Consolidation of All Majority-Owned Subsidiaries"*, ("SFAS 94") should be applied. As required by SFAS 94, we consolidate operating companies in which we have a controlling financial interest. The usual condition for a controlling financial interest is ownership of a majority of the voting interest. FIN 46(R) defines operating companies as businesses that have sufficient legal equity to absorb the entities' expected losses (presumed to require minimum 10% equity) and, in each case, for which the equity holders have substantive voting rights and participate substantively in the gains and losses of such entities. Operating companies in which we exercise significant influence but do not control are accounted for under the equity method. Significant influence generally is deemed to exist when we own 20% to 50% of the voting equity of a corporation, or when we hold at least 3% of a limited partnership interest.

**Special purpose entities.**    Special purpose entities ("SPEs") are corporations, trusts or partnerships that are established for a limited purpose. SPEs by their nature generally do not provide equity owners with significant voting powers because the SPE documents govern all material decisions. There are two types of SPEs: qualifying special purpose entities ("QSPEs") and variable interest entities ("VIEs").

A QSPE generally can be described as an entity whose permitted activities are limited to passively holding financial assets and distributing cash flows to investors based on pre-set terms. Our primary involvement with SPEs relates to securitization transactions in which transferred assets, including mortgages, loans, receivables and other assets, are sold to an SPE that qualifies as a QSPE under SFAS No. 140, *"Accounting for Transfers and Servicing of Financial Assets*

-78-

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

*and Extinguishments of Liabilities"*. ("SFAS 140"). In accordance with SFAS 140 we do not consolidate QSPEs. Rather, we recognize only our retained interests in the QSPEs, if any. We account for such retained interests at fair value.

Certain SPEs do not meet the QSPE criteria because their permitted activities are not sufficiently limited or because the assets are not deemed qualifying financial instruments (e.g., real estate). Such SPEs are referred to as VIEs and we typically use them to create securities with a unique risk profile desired by investors, as a means of intermediating financial risk or to make an investment in real estate. In the normal course of business we may establish VIEs, sell assets to VIEs, underwrite, distribute, and make a market in securities issued by VIEs, transact derivatives with VIEs, own securities or residual interests in VIEs, and provide liquidity or other guarantees to VIEs. Under FIN 46(R), we are required to consolidate a VIE if we are deemed to be the primary beneficiary of such entity. The primary beneficiary is the party that has either a majority of the expected losses or a majority of the expected residual returns of such entity, as defined. In 2004 we adopted FIN 46(R) for all VIEs in which we hold a variable interest. The effect of adopting FIN 46(R) in fiscal 2004 was not material to our financial condition or results of operations.

For a further discussion of our securitization activities and our involvement with VIEs see Note 3 to the Consolidated Financial Statements.

**Revenue Recognition Policies**

*Principal transactions.*    Financial instruments classified as Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased (both of which are recorded on a trade-date basis) are valued at market or fair value, as appropriate, with unrealized gains and losses reflected in Principal transactions in the Consolidated Statement of Income.

*Investment banking.*    Underwriting revenues, net of related underwriting expenses, and revenues for merger and acquisition advisory and other investment-banking-related services are recognized when services for the transactions are completed. Direct costs associated with advisory services are recorded as non-personnel expenses, net of client reimbursements.

*Commissions.*    Commissions primarily include fees from executing and clearing client transactions on stocks, options and futures markets worldwide. These fees are recognized on a trade-date basis.

*Interest and dividends revenue and interest expense.*    We recognize contractual interest on Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased on an accrual basis as a component of Interest and dividends revenue and Interest expense, respectively. Interest flows on derivative transactions are included as part of the mark-to-market valuation of these contracts in Principal transactions in the Consolidated Statement of Income and are not recognized as a component of interest revenue or expense. We account for our secured financing activities and short-and long-term borrowings on an accrual basis with related interest recorded as interest revenue or interest expense, as applicable.

*Asset management and other.*    Investment advisory fees are recorded as earned. Generally, high-net-worth and institutional clients are charged or billed quarterly based on the account's net asset value at the end of a quarter. Investment advisory and administrative fees earned from our mutual fund business (the "Funds") are charged monthly to the Funds based on average daily net assets under management. In certain circumstances, we receive asset management incentive fees when the return on assets under management exceeds specified benchmarks. Such incentive fees generally are based on investment performance over a twelve-month period and are not subject to adjustment after the measurement period ends. Accordingly, such incentive fees are recognized when the measurement period ends. We receive private equity incentive fees when the return on certain private equity funds' investments exceeds specified threshold returns. Such incentive fees typically are based on investment periods in excess of one year, and future investment underperformance could require amounts previously distributed to us to be returned to the funds. Accordingly, these incentive fees are recognized when all material contingencies have been substantially resolved.

**Financial Instruments and Other Inventory Positions**

Financial instruments classified as Financial instruments and other inventory positions owned, including loans, and Financial instruments and other inventory positions sold but not yet purchased are recognized on a trade-date basis and are carried at market or fair value, or amounts which approximate fair value, with unrealized gains and losses reflected in Principal transactions in the Consolidated Statement of Income. Lending commitments also are recorded at fair value, with unrealized gains or losses recognized in Principal transactions in the Consolidated Statement of Income.

LEH-RSU 0006074

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

We follow the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, *"Brokers and Dealers in Securities"*, (the "Guide") when determining market or fair value for financial instruments. Market value generally is determined based on listed prices or broker quotes. In certain instances, such price quotations may be deemed unreliable when the instruments are thinly traded or when we hold a substantial block of a particular security and the listed price is not deemed to be readily realizable. In accordance with the Guide, in these instances we determine fair value based on management's best estimate, giving appropriate consideration to reported prices and the extent of public trading in similar securities, the discount from the listed price associated with the cost at the date of acquisition, and the size of the position held in relation to the liquidity in the market, among other factors. When listed prices or broker quotes are not available, we determine fair value based on pricing models or other valuation techniques, including the use of implied pricing from similar instruments. We typically use pricing models to derive fair value based on the net present value of estimated future cash flows including adjustments, when appropriate, for liquidity, credit and/or other factors. We account for real estate positions held for sale at the lower of cost or fair value with gains or losses recognized in Principal transactions in the Consolidated Statement of Income.

All firm-owned securities pledged to counterparties that have the right, by contract or custom, to sell or repledge the securities are classified as Financial instruments and other inventory positions owned, and are disclosed as pledged as collateral, as required by SFAS 140.

*Derivative financial instruments.*    Derivatives are financial instruments whose value is based on an underlying asset (e.g., Treasury bond), index (e.g., S&P 500) or reference rate (e.g., LIBOR), and include futures, forwards, swaps, option contracts, or other financial instruments with similar characteristics. A derivative contract generally represents a future commitment to exchange interest payment streams or currencies based on the contract or notional amount or to purchase or sell other financial instruments at specified terms on a specified date. OTC derivative products are privately-negotiated contractual agreements that can be tailored to meet individual client needs and include forwards, swaps and certain options including caps, collars and floors. Exchange-traded derivative products are standardized contracts transacted through regulated exchanges and include futures and certain option contracts listed on an exchange.

Derivatives are recorded at market or fair value in the Consolidated Statement of Financial Condition on a net-by-counterparty basis when a legal right of offset exists and are netted across products when such provisions are stated in the master netting agreement. Cash collateral received is netted on a counterparty basis, provided legal right of offset exists. Derivatives often are referred to as off-balance-sheet instruments because neither their notional amounts nor the underlying instruments are reflected as assets or liabilities of the Company. Instead, the market or fair values related to the derivative transactions are reported in the Consolidated Statement of Financial Condition as assets or liabilities, in Derivatives and other contractual agreements, as applicable. Margin on futures contracts is included in receivables and payables from/to brokers, dealers and clearing organizations, as applicable. Changes in fair values of derivatives are recorded in Principal transactions in the Consolidated Statement of Income. Market or fair value generally is determined either by quoted market prices (for exchange-traded futures and options) or pricing models (for swaps, forwards and options). Pricing models use a series of market inputs to determine the present value of future cash flows with adjustments, as required, for credit risk and liquidity risk. Credit-related valuation adjustments incorporate historical experience and estimates of expected losses. Additional valuation adjustments may be recorded, as deemed appropriate, for new or complex products or for positions with significant concentrations. These adjustments are integral components of the mark-to-market process.

We follow Emerging Issues Task Force ("EITF") Issue No. 02-3, *"Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities"*, ("EITF 02-3") when marking to market our derivative contracts. Under EITF 02-3, recognition of a trading profit at inception of a derivative transaction is prohibited unless the fair value of that derivative is obtained from a quoted market price, supported by comparison to other observable market transactions or based on a valuation technique incorporating observable market data. Subsequent to the transaction date, we recognize trading profits deferred at inception of the derivative transaction in the period in which the valuation of such instrument becomes observable.

As an end user, we primarily use derivatives to modify the interest rate characteristics of our long-term debt and secured financing activities. We also use equity derivatives to hedge our exposure to equity price risk embedded in certain of our debt obligations and foreign exchange forwards to manage the currency exposure related to our net investment in non-U.S.-dollar functional currency operations (collectively, "End-User Derivative Activities"). In many hedging relationships both the derivative and the hedged item are marked to market through earnings ("fair value hedge"). In these instances, the

-80-

LEH-RSU 0006075

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

hedge relationship is highly effective and the mark to market on the derivative and the hedged item virtually offset. Certain derivatives embedded in long-term debt are bifurcated from the debt and marked to market through earnings.

We use fair value hedges primarily to convert a substantial portion of our fixed-rate debt and certain long-term secured financing activities to floating interest rates. Any hedge ineffectiveness in these relationships is recorded in Interest expense in the Consolidated Statement of Income. Gains or losses from revaluing foreign exchange contracts associated with hedging our net investments in non-U.S.-dollar functional currency operations are reported within Accumulated other comprehensive income in Stockholders' equity. Unrealized receivables/payables resulting from the mark to market of end-user derivatives are included in Financial instruments and other inventory positions owned or Financial instruments and other inventory positions sold but not yet purchased.

***Private equity investments.***    We carry our private equity investments, including our partnership interests, at fair value. Certain of our private equity positions are less liquid and often contain trading restrictions. Fair value is determined based upon our assessment of the underlying investments incorporating valuations that consider expected cash flows, earnings multiples and/or comparisons to similar market transactions. Valuation adjustments reflecting consideration of credit quality, concentration risk, sales restrictions and other liquidity factors are an integral part of pricing these instruments.

***Securitization Activities.***    In accordance with SFAS 140, we recognize transfers of financial assets as sales provided control has been relinquished. Control is deemed to be relinquished only when all of the following conditions have been met: (i) the assets have been isolated from the transferor, even in bankruptcy or other receivership (true-sale opinions are required); (ii) the transferee has the right to pledge or exchange the assets received and (iii) the transferor has not maintained effective control over the transferred assets (e.g., a unilateral ability to repurchase a unique or specific asset).

**Securities Received as Collateral and Obligation to Return Securities Received as Collateral**

When we act as the lender in a securities-lending agreement and we receive securities that can be pledged or sold as collateral, we recognize in the Consolidated Statement of Financial Condition an asset, representing the securities received (Securities received as collateral) and a liability, representing the obligation to return those securities (Obligation to return securities received as collateral).

**Secured Financing Activities**

***Repurchase and resale agreements.***    Securities purchased under agreements to resell and Securities sold under agreements to repurchase, which are treated as financing transactions for financial reporting purposes, are collateralized primarily by government and government agency securities and are carried net by counterparty, when permitted, at the amounts at which the securities subsequently will be resold or repurchased plus accrued interest. It is our policy to take possession of securities purchased under agreements to resell. We monitor the market value of the underlying positions on a daily basis compared with the related receivable or payable balances, including accrued interest. We require counterparties to deposit additional collateral or return collateral pledged, as necessary, to ensure the market value of the underlying collateral remains sufficient. Financial instruments and other inventory positions owned that are financed under repurchase agreements are carried at market value, with unrealized gains and losses reflected in Principal transactions in the Consolidated Statement of Income.

We use interest rate swaps as an end-user to modify the interest rate exposure associated with certain fixed-rate resale and repurchase agreements. We adjust the carrying value of these secured financing transactions that have been designated as the hedged item.

***Securities borrowed and loaned.***    Securities borrowed and securities loaned are carried at the amount of cash collateral advanced or received plus accrued interest. It is our policy to value the securities borrowed and loaned on a daily basis and to obtain additional cash as necessary to ensure such transactions are adequately collateralized.

***Other secured borrowings.***    Other secured borrowings principally reflects non-recourse financing, and is recorded at contractual amounts plus accrued interest.

**Long-Lived Assets**

Property, equipment and leasehold improvements are recorded at historical cost, net of accumulated depreciation and amortization. Depreciation is recognized using the straight-line method over the estimated useful lives of the assets. Buildings are depreciated up to a maximum of 40 years. Leasehold improvements are amortized over the lesser of their

-81-

LEH-RSU 0006076

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

useful lives or the terms of the underlying leases, ranging up to 30 years. Equipment, furniture and fixtures are depreciated over periods of up to 15 years. Internal-use software that qualifies for capitalization under AICPA Statement of Position 98-1, *"Accounting for the Costs of Computer Software Developed or Obtained for Internal Use"*, is capitalized and subsequently amortized over the estimated useful life of the software, generally three years, with a maximum of seven years. We review long-lived assets for impairment periodically and whenever events or changes in circumstances indicate the carrying amounts of the assets may be impaired. If the expected future undiscounted cash flows are less than the carrying amount of the asset, an impairment loss would be recognized to the extent the carrying value of such asset exceeded its fair value.

**Identifiable Intangible Assets and Goodwill**

Identifiable intangible assets with finite lives are amortized over their expected useful lives. Identifiable intangible assets with indefinite lives and goodwill are not amortized. Instead, these assets are evaluated at least annually for impairment. Goodwill is reduced upon the recognition of certain acquired net operating loss carryforward benefits.

**Equity-Based Compensation**

SFAS No. 123, *"Accounting for Stock-Based Compensation"*, ("SFAS 123") established financial accounting and reporting standards for equity-based employee and non-employee compensation. SFAS 123 permits companies to account for equity-based employee compensation using the intrinsic-value method prescribed by Accounting Principles Board ("APB") Opinion No. 25, *"Accounting for Stock Issued to Employees"*, ("APB 25"), or using the fair-value method prescribed by SFAS 123. Through November 30, 2003, we followed APB 25 and its related interpretations to account for equity-based employee compensation. Accordingly, no compensation expense was recognized for stock option awards because the exercise price equaled or exceeded the market value of our common stock on the grant date.

In 2004, we adopted the fair value recognition provisions of SFAS 123 as amended by SFAS No. 148, *"Accounting for Stock-Based Compensation-Transition and Disclosure, an amendment of FASB Statement No. 123"*, using the prospective adoption method. Under this method of adoption, compensation expense is recognized based on the fair value of stock options and RSUs granted for 2004 and future years over the related service periods. Stock options granted for the years ended November 30, 2003 and before continue to be accounted for under APB 25. Adoption of SFAS 123 also required us to change the fair value measurement method for RSUs. Under SFAS 123, the fair value measurement of an RSU must include a discount from the market value of an unrestricted share of common stock on the RSU grant date for selling restrictions subsequent to the vesting date. RSUs granted prior to 2004 continue to be measured in accordance with APB 25 and, accordingly, a discount from the market value of an unrestricted share of common stock on the RSU grant date is not recognized for selling restrictions subsequent to the vesting date. Under both APB 25 and SFAS 123, compensation expense for RSUs with future service requirements is recognized over the relevant stated vesting periods of the awards. See Accounting Developments below for a discussion of SFAS No. 123(R), *"Share-Based Payment"* ("SFAS 123(R)"), which we are required to adopt on December 1, 2005.

Our equity-based employee award plans provide for the accrual of non-cash dividend equivalents on outstanding RSUs. These dividend equivalents on RSUs are charged to retained earnings as declared.

-82-

LEH-RSU 0006077

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

The following table illustrates the effect on net income and earnings per share for the years ended November 30, 2005, 2004, and 2003 if the fair-value-based retroactive method prescribed by SFAS 123 had been applied to all awards granted prior to fiscal year 2004:

**Equity Based Compensation–Pro Forma Net Income and Earnings per Share**

| In millions, except per share data Year ended November 30 | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income, as reported | $ 3,260 | $ 2,369 | $ 1,699 |
| Add: stock-based employee compensation expense included in reported net income, net of related tax effect | 611 | 464 | 362 |
| Deduct: stock-based employee compensation expense determined under the fair-value-based method for all awards, net of related tax effect | (694) | (623) | (534) |
| Pro forma net income | $ 3,177 | $ 2,210 | $ 1,527 |
| Earnings per share: | | | |
| Basic, as reported | $ 11.47 | $ 8.36 | $ 6.71 |
| Basic, pro forma | $ 11.17 | $ 7.78 | $ 6.01 |
| Diluted, as reported | $ 10.87 | $ 7.90 | $ 6.35 |
| Diluted, pro forma | $ 10.64 | $ 7.42 | $ 5.77 |

We used the Black-Scholes option-pricing model to measure the fair value of the stock options granted during 2005 and 2004, as well as for the measurement of fair value utilized to quantify the pro forma effects on net income and earnings per share of the fair value of stock options outstanding during 2005, 2004 and 2003. Based on the results of the model, the weighted-average fair values of the stock options granted were $26.48, $19.26, and $22.02 for 2005, 2004 and 2003, respectively. The weighted-average assumptions used for 2005, 2004 and 2003 were as follows:

**Weighted Average Black-Scholes Assumptions**

| Year ended November 30 | 2005 | 2004 | 2003 |
|---|---|---|---|
| Risk-free interest rate | 3.97% | 3.04% | 3.10% |
| Expected volatility | 23.73% | 28.09% | 35.00% |
| Dividends per share | $0.80 | $0.64 | $0.48 |
| Expected life | 3.9 years | 3.7 years | 4.6 years |

The increase in the weighted-average fair value price of stock options granted in 2005 compared with 2004 resulted primarily from the higher price of the Company's stock on the grant dates. The expected volatility declined due to lower volatility in our stock over the historical and future periods the Company uses to determine volatility.

**Earnings per Share**

We compute earnings per share ("EPS") in accordance with SFAS No. 128, *"Earnings per Share"*. Basic EPS is computed by dividing net income applicable to common stock by the weighted-average number of common shares outstanding, which includes restricted stock units for which service has been provided. Diluted EPS includes the components of basic EPS and also includes the dilutive effects of restricted stock units for which service has not yet been provided and employee stock options. See Notes 13 and 14 to the Consolidated Financial Statements for additional information about EPS.

**Income Taxes**

We account for income taxes in accordance with SFAS No. 109, *"Accounting for Income Taxes"*, ("SFAS 109"). We recognize the current and deferred tax consequences of all transactions that have been recognized in the financial statements using the provisions of the enacted tax laws. Deferred tax assets are recognized for temporary differences that will result in deductible amounts in future years and for tax loss carry-forwards. We record a valuation allowance to reduce deferred tax assets to an amount that more likely than not will be realized. Deferred tax liabilities are recognized for temporary differences that will result in taxable income in future years. Contingent liabilities related to income taxes are recorded when probable and reasonably estimable in accordance with SFAS No. 5, *"Accounting for Contingencies"*.

-83-

LEH-RSU 0006078

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

**Cash Equivalents**

Cash equivalents include highly liquid investments not held for resale with maturities of three months or less when we acquire them.

**Foreign Currency Translation**

Assets and liabilities of foreign subsidiaries having non-U.S.-dollar functional currencies are translated at exchange rates at the Consolidated Statement of Financial Condition date. Revenues and expenses are translated at average exchange rates during the period. The gains or losses resulting from translating foreign currency financial statements into U.S. dollars, net of hedging gains or losses and taxes, are included in Accumulated other comprehensive income, a component of Stockholders' equity. Gains or losses resulting from foreign currency transactions are included in the Consolidated Statement of Income.

**Accounting Developments**

*FSP FAS 109-2.*    In December 2004, the FASB issued FSP FAS 109-2    *"Accounting and Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004".* ("FSP FAS 109-2") which provides guidance on the accounting implications of the American Jobs Creation Act of 2004 (the "Act") related to the one-time tax benefit for the repatriation of foreign earnings. The Act creates a temporary incentive for U.S. corporations to repatriate accumulated income earned outside the U.S. by providing an 85 percent dividends received deduction for certain dividends from controlled foreign corporations. We have reviewed the Act to determine the implications of repatriating all or a portion of our accumulated non-U.S. retained earnings pool and determined that we would not generate any material tax benefits associated with the Act, as any amounts able to be repatriated under the Act would not be material.

*SFAS 123(R).*    In December 2004, the FASB issued SFAS No. 123(R), *"Share-Based Payment",* ("SFAS 123(R)"), which we will adopt on December 1, 2005. SFAS 123(R) requires public companies to recognize expense in the income statement for the grant-date fair value of awards of equity instruments granted to employees. Expense is to be recognized over the period during which employees are required to provide service.

SFAS 123(R) also clarifies and expands the guidance in SFAS 123 in several areas, including measuring fair value and attributing compensation cost to reporting periods. Under the modified prospective transition method applied in the adoption of SFAS 123(R), compensation cost will be recognized for the unamortized portion of outstanding awards granted prior to the adoption of SFAS 123. Upon adoption of SFAS 123(R) on December 1, 2005, we will recognize an after-tax gain of approximately $47 million as the cumulative effect of a change in accounting principle, primarily attributable to the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. We do not expect adoption of SFAS 123(R) otherwise will have a material effect on our consolidated financial statements.

SFAS 123(R) generally requires equity-based awards granted to retirement-eligible employees, and those employees with non-substantive non-compete agreements to be expensed immediately. For stock-based awards granted prior to our adoption of SFAS123(R), compensation cost for retirement eligible employees and employees subject to non-compete agreements, is recognized over the service period specified in the award. We accelerate the recognition of compensation cost if and when a retirement-eligible employee or an employee subject to a non-compete agreement, leaves the Company.

-84-

LEH-RSU 0006079

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

The following table sets forth the pro forma net income that would have been reported for the years ended November 30, 2005, 2004 and 2003 if equity-based awards granted to retirement-eligible employees, and those with non-substantive non-compete agreements had been expensed immediately as required by SFAS 123(R):

**Pro Forma Net Income**

| In millions<br>Year ended November 30 | 2005 | 2004 | 2003 |
|---|---|---|---|
| Net income, as reported | $ 3,260 | $ 2,369 | $ 1,699 |
| Add: stock-based employee compensation expense included in reported<br>net income, net of related tax effect | 611 | 464 | 362 |
| Deduct: stock-based employee compensation expense, net of<br>related tax effect, determined under SFAS 123 (R) | (867) | (643) | (447) |
| Pro forma net income | $ 3,004 | $ 2,190 | $ 1,614 |

***EITF Issue No. 04-5.*** In June 2005, the FASB ratified the consensus reached in EITF Issue No. 04-5, *"Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights"*, ("EITF 04-5") which requires general partners (or managing members in the case of limited liability companies) to consolidate their partnerships or to provide limited partners with rights to remove the general partner or to terminate the partnership. As the general partner of numerous private equity, merchant banking and asset management partnerships, we adopted EITF 04-5 immediately for partnerships formed or modified after June 29, 2005. For partnerships formed on or before June 29, 2005 that have not been modified, we are required to adopt EITF 04-5 on December 1, 2006 in a manner similar to a cumulative-effect-type adjustment or by retrospective application. We do not expect adoption of EITF 04-5 for partnerships formed on or before June 29, 2005 that have not been modified will have a material effect on our consolidated financial statements.

**Note 2 Financial Instruments**

**Financial Instruments and Other Inventory Positions**

Financial instruments and other inventory positions owned and Financial instruments and other inventory positions sold but not yet purchased were comprised of the following:

| In millions<br>November 30 | Owned | | Sold But Not<br>Yet Purchased | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Mortgages, mortgage-backed and real estate inventory positions | $ 62,216 | $ 43,831 | $ 63 | $ 246 |
| Corporate equities | 33,426 | 26,772 | 21,018 | 23,019 |
| Corporate debt and other | 30,182 | 24,948 | 8,997 | 10,988 |
| Government and agencies | 30,079 | 29,829 | 64,743 | 46,697 |
| Derivatives and other contractual agreements | 18,045 | 17,459 | 15,560 | 15,242 |
| Certificates of deposit and other money market instruments | 3,490 | 1,629 | 196 | 89 |
| | $ 177,438 | $ 144,468 | $ 110,577 | $ 96,281 |

**Mortgages, Mortgage-backed and Real Estate Inventory Positions**

Mortgages and mortgage-backed positions include mortgage loans (both residential and commercial), non-agency mortgage-backed securities and real estate investments held for sale. We originate residential and commercial mortgage loans as part of our mortgage trading and securitization activities and are a market leader in mortgage-backed securities trading. We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market. We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively. In addition, we originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndication activities. See Note 3 to the Consolidated Financial Statements for additional information about our securitization activities. We record mortgage loans at fair

-85-

LEH-RSU 0006080

**LEHMAN BROTHERS HOLDINGS INC.**
**Notes to Consolidated Financial Statements**

As of December 1, 2005, Holdings became regulated by the SEC as a consolidated supervised entity ("CSE"). As such, Holdings is subject to group-wide supervision and examination by the SEC and, accordingly, we are subject to minimum capital requirements on a consolidated basis. LBI is also authorized to calculate its net capital under provisions as specified by the SEC applicable rules.

**Note 13 Earnings per Share**

Earnings per share was calculated as follows:

**Earnings per Share**

| In millions, except per share data<br>Year ended November 30 | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| **Numerator:** | | | | | | |
| Net income | $ | 3,260 | $ | 2,369 | $ | 1,699 |
| Preferred stock dividends | | 69 | | 72 | | 50 |
| Numerator for basic earnings per share-net income applicable to common stock | $ | 3,191 | $ | 2,297 | $ | 1,649 |
| **Denominator:** | | | | | | |
| Denominator for basic earnings per share-weighted-average common shares | | 278.2 | | 274.7 | | 245.7 |
| Effect of dilutive securities: | | | | | | |
| Employee stock options | | 12.7 | | 13.8 | | 12.2 |
| Restricted stock units | | 2.7 | | 2.2 | | 2.0 |
| Dilutive potential common shares | | 15.4 | | 16.0 | | 14.2 |
| Denominator for diluted earnings per share-weighted-average common and dilutive potential common shares[1] | | 293.6 | | 290.7 | | 259.9 |
| Basic earnings per share | $ | 11.47 | $ | 8.36 | $ | 6.71 |
| Diluted earnings per share | $ | 10.87 | $ | 7.90 | $ | 6.35 |

(1) Anti-dilutive options and restricted stock units excluded from the calculations of diluted earnings per share — 4.3 — 2.0 — 8.0

**Note 14 Employee Incentive Plans**

In 2004 the Company adopted the fair value recognition provisions of SFAS 123 using the prospective adoption method. The Company's adoption of SFAS 123 on a prospective basis in 2004 resulted in a change in measurement for employee stock awards. See Note 1 for a further discussion.

**Employee Stock Purchase Plan**

On June 30, 2004, the Employee Stock Purchase Plan (the "ESPP") expired following the completion of its 10-year term as approved by shareholders. The ESPP allowed employees to purchase Common Stock at a 15% discount from market value, with a maximum of $25,000 in annual aggregate purchases by any one individual. At November 30, 2005 6.3 million shares of Common Stock had cumulatively been purchased by eligible employees through the ESPP.

**1994 Management Ownership Plan**

On May 31, 2004 the Lehman Brothers Holdings Inc. Management Ownership Plan (the "1994 Plan") expired following the completion of its 10-year term. The 1994 Plan provided for the issuance of RSUs, performance stock units ("PSUs"), stock options and other equity awards for a period of up to ten years to eligible employees. At November 30, 2005, RSU, PSU and stock option awards with respect to 33.1 million shares of Common Stock have been made under the 1994 Plan, of which 3.1 million are outstanding and 30.0 million have been converted to freely transferable Common Stock.

-101-

LEH-RSU 0006096

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

**1996 Management Ownership Plan**

The 1996 Management Ownership Plan (the "1996 Plan"), under which awards similar to those of the 1994 Plan may be granted, provides for up to 42.0 million shares of Common Stock to be subject to awards. At November 30, 2005, RSU, PSU and stock option awards with respect to 39.5 million shares of Common Stock have been made under the 1996 Plan of which 9.5 million are outstanding and 30.0 million have been converted to freely transferable Common Stock.

**Employee Incentive Plan**

The Employee Incentive Plan ("EIP") has provisions similar to the 1994 Plan and the 1996 Plan, and authorization from the Board of Directors to issue up to 246.0 million shares of Common Stock that may be subject to awards. At November 30, 2005 awards with respect to 231.9 million shares of Common Stock have been made under the EIP of which 93.0 million are outstanding and 138.9 million have been converted to freely transferable Common Stock.

**Stock Incentive Plan**

The Stock Incentive Plan ("SIP") has provisions similar to the 1994 Plan, the 1996 Plan and the EIP, and authorization from the Board of Directors to issue up to 10.0 million shares of Common Stock that may be subject to awards. At November 30, 2005 awards with respect to 2.3 million shares of Common Stock have been made under the SIP of which 2.3 million are outstanding.

**1999 Long Term Incentive Plan**

The 1999 Neuberger Berman Inc. Long-Term Incentive Plan (the "LTIP") provided for the grant of restricted stock, restricted units, incentive stock, incentive units, deferred shares, supplemental units and stock options. The total number of shares of Common Stock that may be issued under the LTIP may not exceed 7.7 million. At November 30, 2005, awards with respect to approximately 6.7 million shares of Common Stock have been made under the LTIP, of which approximately 3.7 million restricted shares, RSUs and stock options are outstanding and 3.0 million have been converted to freely transferable Common Stock.

**1999 Directors Stock Incentive Plan**

The 1999 Neuberger Berman Inc. Directors Stock Incentive Plan (the "DSIP") provided for the grant of stock options or restricted stock to non-employee members of Neuberger's board of directors. Non-employee directors could elect to exchange a portion of their annual cash retainer paid by Neuberger for services rendered as a director for restricted stock. At November 30, 2004, awards with respect to approximately 62,000 shares have been made under the DSIP of which all shares have been converted to freely transferable Common Stock. We do not intend to grant additional awards from the DSIP.

**Restricted Stock Units**

Eligible employees receive RSUs, in lieu of cash, as a portion of their total compensation. There is no further cost to employees associated with the RSU awards. For awards granted prior to 2004, we measure compensation cost for RSUs based on the market value of our Common Stock at the grant date in accordance with APB 25. For awards granted beginning in 2004 we measure compensation cost based on the market value of our Common Stock at the grant date less a discount for sale restrictions subsequent to the vesting date in accordance with our adoption of SFAS 123 on a prospective basis. RSUs granted in each of the years presented contain selling restrictions subsequent to the vesting date. We amortize the RSU awards over the applicable service periods. RSU awards made to employees have various vesting provisions and generally convert to unrestricted freely transferable Common Stock five years from the grant date. We accrue a dividend equivalent on each RSU outstanding (in the form of additional RSUs), based on dividends declared on our Common Stock.

-102-

LEH-RSU 0006097

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

The following table summarizes RSUs outstanding under stock-based incentive plans:

**Restricted Stock Units**

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Balance, beginning of year | 64,242,393 | 64,343,313 | 69,338,068 |
| Granted | 13,965,142 | 14,899,012 | 14,796,772[1] |
| Canceled | (1,512,954) | (1,276,002) | (1,447,319) |
| Exchanged for stock without restrictions | (16,485,744) | (13,723,930) | (18,344,208) |
| Balance, end of year | 60,208,837 | 64,242,393 | 64,343,313 |
| Shares held in RSU Trust | (34,558,884) | (38,861,068) | (33,408,893) |
| RSUs outstanding, net of shares held in RSU trust | 25,649,953 | 25,381,325 | 30,934,420 |

[1] Includes approximately 1.7 million RSUs granted in 2003 related to our acquisition of Neuberger. See Note 5 to the Consolidated Financial Statements for additional information about the Neuberger acquisition.

Of the RSUs outstanding at November 30, 2005, approximately 36 million were amortized and included in basic and diluted earnings per share, approximately 10 million will be amortized during 2006, and the remainder will be amortized subsequent to November 30, 2006. See Note 11 to the Consolidated Financial Statements for additional information.

Included in the previous table are PSUs awarded to certain senior officers prior to 2004. The number of PSUs that may be earned is dependent on achieving certain performance levels within predetermined performance periods. During the performance period, these PSUs are accounted for as variable awards. At the end of a performance period, any PSUs earned will convert one-for-one to RSUs that then vest in three or more years. At November 30, 2005, approximately 11.2 million PSUs had been awarded, of which 6.0 million remained outstanding, subject to vesting and transfer restrictions. The compensation cost for the RSUs payable in satisfaction of PSUs is accrued over the combined performance and vesting periods.

**Stock Options**

The following table summarizes stock option activity for the years ended November 30, 2005, 2004 and 2003:

**Stock Option Activity**

|  | Options | | Weighted-Average Exercise Price | Expiration Dates |
|---|---|---|---|---|
| Balance, November 30, 2002 | 83,540,492 | $ | 44.21 | 11/03–11/12 |
| Granted | 15,536,462 | $ | 66.98 | |
| Exercised[1] | (10,595,469) | $ | 28.08 | |
| Canceled[1] | (1,734,835) | $ | 46.63 | |
| Balance, November 30, 2003 | 86,746,650 | $ | 50.21 | 12/03–11/13 |
| Granted | 5,423,596 | $ | 80.74 | |
| Exercised | (17,167,352) | $ | 36.36 | |
| Canceled | (1,459,299) | $ | 56.48 | |
| Balance, November 30, 2004 | 73,543,595 | $ | 55.57 | 12/04–11/14 |
| Granted | 3,524,013 | $ | 111.53 | |
| Exercised | (25,537,742) | $ | 48.76 | |
| Canceled | (654,703) | $ | 66.76 | |
| Balance, November 30, 2005 | 50,875,163 | $ | 62.72 | 12/05–11/15 |

[1] Includes approximately 4.3 million stock options granted, 0.3 million stock options exercised, and 0.1 million stock options canceled in 2003 related to our acquisition of Neuberger. See Note 5 to the Consolidated Financial Statements for additional information about the Neuberger acquisition.

-103-

LEH-RSU 0006098

**LEHMAN BROTHERS HOLDINGS INC.**
Notes to Consolidated Financial Statements

The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant. The table below provides further details related to stock options outstanding at November 30, 2005.

**Stock Options**

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| | Number Outstanding | Weighted-Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Number Exercisable | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
| $20.00-$29.99 | 1,797,889 | $ 20.69 | 3.01 | 1,797,889 | $ 20.69 | 3.01 |
| $30.00-$39.99 | 1,377,796 | $ 37.16 | 4.03 | 1,377,796 | $ 37.16 | 4.03 |
| $40.00-$49.99 | 8,295,915 | $ 47.78 | 5.05 | 5,162,629 | $ 48.47 | 4.50 |
| $50.00-$59.99 | 14,324,484 | $ 54.03 | 6.13 | 8,629,809 | $ 54.43 | 5.64 |
| $60.00-$69.99 | 6,539,260 | $ 63.49 | 4.58 | 3,285,498 | $ 63.58 | 3.19 |
| $70.00-$79.99 | 11,545,366 | $ 71.57 | 5.98 | 5,840,136 | $ 71.70 | 4.47 |
| $80.00-$89.99 | 4,777,248 | $ 85.73 | 5.02 | 225,460 | $ 85.50 | 5.33 |
| $90.00-$99.99 | 22,500 | $ 93.30 | 9.34 | 0 | n/a | n/a |
| $100.00-$149.99 | 2,194,705 | $ 127.20 | 6.37 | 0 | n/a | n/a |
| | 50,875,163 | $ 62.72 | 5.46 | 26,319,217 | $ 55.29 | 4.58 |

**Restricted Stock**

In connection with the 2003 Neuberger acquisition, we issued approximately 806,000 shares of restricted Common Stock to replace outstanding shares of Neuberger restricted Common Stock. During 2005, we awarded approximately 7,767 shares of our restricted Common Stock under the LTIP.

The following table summarizes restricted stock activity for the years ended November 30, 2005 and 2004:

**Restricted Stock**

| | 2005 | 2004 |
|---|---|---|
| Balance, beginning of year | 770,846 | 805,587 |
| Granted | 7,767 | 223,889 |
| Canceled | (18,723) | (27,325) |
| Exchanged for stock without restrictions | (238,702) | (231,305) |
| Balance, end of year | 521,188 | 770,846 |

Total compensation cost for stock-based awards recognized during 2005, 2004 and 2003 was approximately $1,055 million, $800 million and $625 million, respectively.

-104-

LEH-RSU 0006099

# Exhibit E

**LEHMAN BROTHERS HOLDINGS INC.**
**EMPLOYEE INCENTIVE PLAN**
**As amended through November 8, 2007**

## SECTION 1 — PURPOSE

The purpose of the Lehman Brothers Holdings Inc. Employee Incentive Plan (the "Plan") is to strengthen Lehman Brothers Holdings Inc. (the "Company") by providing selected employees of the Company with the opportunity to acquire a proprietary and vested interest in the growth and performance of the Company, thus generating an increased incentive to contribute to the Company's future success and prosperity, enhancing the value of the Company for the benefit of stockholders, and enhancing the Company's ability to attract and retain individuals of exceptional talent.

The purposes of the Plan are to be achieved through the grant of various types of stock-based awards.

## SECTION 2 — DEFINITIONS

For purposes of the Plan, the capitalized terms shall have the meanings ascribed to them in Exhibit A hereof.

## SECTION 3 — SHARES SUBJECT TO THE PLAN

(a)    Shares of Common Stock which may be issued under the Plan may be either authorized and unissued shares of Common Stock or authorized and issued shares of Common Stock held in the Company's treasury, or any combination thereof. Subject to adjustment as provided in Section 14, the number of shares of Common Stock with respect to which Awards (whether distributable in shares of Common Stock or in cash) may be granted under the Plan shall be 246 million shares. The maximum number of shares of Common Stock available for stock options, stock appreciation rights or Other Stock-based Awards that may be granted to a Participant during a calendar year shall not exceed two million.

(b)    Notwithstanding the last sentence of Section 3(a), to the extent that the number of shares of Common Stock with respect to which Awards may be granted under the Plan to an individual in any calendar year exceeds the number of shares of Common Stock with respect to which Awards were granted under the Plan during that calendar year, such excess shall be available for grant under the Plan in succeeding calendar years.

(c)    In the event that any other Award subject to repurchase or forfeiture rights is reacquired by the Company or if any Award is canceled, terminates or expires unexercised (except with respect to a stock option which terminates on the exercise of a stock appreciation right) for any reason under the Plan, any Common Stock allocated in connection with such Award shall thereafter again be available for grant pursuant to the Plan.

## SECTION 4 — ELIGIBILITY

Selected employees, officers, directors and consultants to the Company and its Affiliates are eligible to be Participants in the Plan.

## SECTION 5 — ADMINISTRATION

The Plan shall be administered by the Committee, which shall have the power to select those Participants who shall receive Awards and to determine the terms of such Awards. As to the selection of, and the terms of Awards granted the Committee may delegate any or all of its responsibilities to officers or employees of the Company.

LEH-RSU 0000254

The Committee's authority hereunder shall include, without limitation, the establishment of vesting schedules or exercisability in installments with respect to Awards. The Committee may, in its sole discretion, accelerate or waive vesting or exercise periods or the lapse of restrictions on all or any portion of any Award, or extend the exercisability (including to extend or provide for post-termination exercisability) of stock options or stock appreciation rights; provided that such exercisability shall not extend past ten years from the date of grant of any incentive stock options.

Subject to the provisions of the Plan, the Committee shall be authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware and applicable Federal law.

## SECTION 6 — STOCK OPTIONS

(a)    Any stock options granted under the Plan shall be in such form as the Committee may from time to time approve and shall be subject to the terms and conditions provided herein and such additional terms and conditions not inconsistent with the terms of the Plan as the Committee shall deem desirable.

(b)    Stock options may be granted to any Participant. Each grant of stock options shall specify whether the underlying options are intended to be incentive stock options or non-incentive stock options. In the case of incentive stock options, the terms and conditions of such grants shall be subject to and comply with such requirements as may be prescribed by Section 422(b) of the Code, as from time to time amended, and any implementing regulations, including, but not limited to, the requirement that such stock options are exercisable during the Participant's lifetime only by such Participant. The Committee shall establish the option price at the time each stock option is granted, which price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant.

(c)    No stock options may be exercisable later than ten years after their date of grant. The option price of each share of Common Stock as to which a stock option is exercised shall be paid in full at the time of such exercise or as otherwise permitted by the Committee. Such payment may be made at the sole discretion of the Committee, pursuant to and in accordance with criteria and guidelines established by the Committee (which criteria and guidelines may be different for executive officers and for other Participants), as the same may be modified from time to time, (i) in cash (in any form of currency acceptable to the Committee), (ii) by tender of shares of Common Stock already owned by the Participant, valued at Fair Market Value as of the date of exercise, (iii) if authorized by the Committee, by withholding pursuant to the election of the Participant, which election is subject to the disapproval of the Committee, from those shares that would otherwise be obtained upon exercise of the option a number of shares having a Fair Market Value equal to the option price, (iv) if authorized by the Committee, and in combination with services rendered by the exercising Participant, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by the Company to, (a) sell shares of Common Stock subject to the option and to deliver promptly to the Company a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to the Company the loan proceeds, at the time of exercise to pay the option price, (v) by any combination of (i), (ii), (iii) or (iv) above or (vi) by other means that the Committee deems appropriate.

(d)    A stock option holder may, in the discretion of the Committee, have the right to surrender a stock option or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of

2

unexercised shares of Common Stock under the option which are being surrendered multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90-day period preceding such Change in Control, over (ii) the purchase price of the option as set forth in the underlying option agreement (the foregoing, a "Limited SAR").

## SECTION 7 — STOCK APPRECIATION RIGHTS

(a)    Stock appreciation rights may be granted independent of any stock option or in conjunction with all or any part of any stock option granted under the Plan, either at the same time as the stock option is granted or at any later time during the term of the option. Stock appreciation rights shall be subject to such terms and conditions as determined by the Committee, not inconsistent with the provisions of the Plan.

(b)    Upon exercise, a stock appreciation right shall entitle the Participant to receive from the Company an amount equal to the excess of the Fair Market Value of a share of Common Stock on the date of exercise of the stock appreciation right over the per share grant or option price, as applicable (or such lesser amount as the Committee may determine at the time of grant), multiplied by the number of shares of Common Stock with respect to which the stock appreciation right is exercised. Upon the exercise of a stock appreciation right granted in connection with a stock option, the stock option shall be canceled to the extent of the number of shares as to which the stock appreciation right is exercised, and upon the exercise of a stock option granted in connection with a stock appreciation right or the surrender of such stock option, the stock appreciation right shall be canceled to the extent of the number of shares as to which the stock option is exercised or surrendered. The Committee shall determine whether the stock appreciation right shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(c)    A holder of a stock appreciation right may, in the discretion of the Committee, have the right to surrender the stock appreciation right or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of shares of Common Stock under the stock appreciation right which are being exercised, multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90 day period preceding such Change in Control, over (ii) the per share grant price of the stock appreciation right as set forth in the underlying agreement.

## SECTION 8 — OTHER STOCK-BASED AWARDS

(a)    Other Awards of Common Stock and Awards that are valued in whole or in part by reference to, or otherwise based on, the Fair Market Value of Common Stock (all such Awards being referred to herein as "Other Stock-based Awards"), may be granted under the Plan in the discretion of the Committee. Other Stock-based Awards shall be in such form as the Committee shall determine, including without limitation, (i) the right to purchase shares of Common Stock, (ii) shares of Common Stock subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, and (iii) shares of Common Stock issuable upon the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee. Other Stock-based Awards may be granted alone or in addition to any other Awards made under the Plan. All references in the preceding sentence to "specified period of service," in the case of Other Stock-based Awards which (i) are not in lieu of cash compensation to employees generally, (ii) are not paid to recruit a new employee in an amount of less than 5% of the total awards available for grant under the Plan or (iii) are not subject to the attainment of performance objectives, shall provide that vesting, restrictions on transfer or some other comparable restriction which incents continued performance of the recipient, will be for a period of not less than three years (although vesting or lapsing may occur in tranches over the three years), unless there is a Change in Control or the recipient retires, becomes disabled or dies. Subject to the provisions of the Plan, the Committee shall have sole and absolute discretion to determine to whom and when such Other Stock-based Awards will be made, the number of shares of Common Stock to be awarded under (or otherwise related to) such Other Stock-based Awards and all other terms and conditions of such Awards. The Committee

3

LEH-RSU 0000256

shall determine whether Other Stock-based Awards shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(b)    With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary may pay to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

## SECTION 9 — DIVIDENDS, EQUIVALENTS AND VOTING RIGHTS

Awards other than stock options and stock appreciation rights may, at the discretion of the Committee, provide the Participant with dividends or dividend equivalents and voting rights prior to either vesting or earnout.

## SECTION 10 — AWARD AGREEMENTS

Each Award under the Plan shall be evidenced by an agreement setting forth the terms and conditions, not inconsistent with the provisions of the Plan, as determined by the Committee, which shall apply to such Award.

## SECTION 11 — WITHHOLDING

The Company shall have the right to deduct from all amounts paid to any Participant in cash (whether under this Plan or otherwise) any taxes required by law to be withheld therefrom. In the case of payments of Awards in the form of Common Stock, at the Committee's discretion, the Participant may be required to pay to the Company the amount of any taxes required to be withheld with respect to such Common Stock, or, in lieu thereof, the Company shall have the right to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld. Without limiting the foregoing, the Committee may, in its discretion and subject to such conditions as it shall impose, permit share withholding to be done at the Participant's election.

## SECTION 12 — NON-TRANSFERABILITY

No Award shall be assignable or transferable, and no right or interest of any Participant in any Award shall be subject to any lien, obligation or liability of the Participant, except by will, the laws of descent and distribution, or as otherwise set forth in the Award agreement.

## SECTION 13 — NO RIGHT TO EMPLOYMENT OR CONTINUED PARTICIPATION IN PLAN/NO RIGHTS AS STOCKHOLDERS

(a)    No person shall have any claim or right to the grant of an Award, and the grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or to be eligible for any subsequent Awards. Further, the Company expressly reserves the right at any time to dismiss a Participant free from any liability or any claim under the Plan, except as provided herein or in any agreement entered into hereunder.

(b)    The grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder.

4

LEH-RSU 0000257

## SECTION 14 — ADJUSTMENT OF AND CHANGES IN COMMON STOCK

In the event of any change in the outstanding shares of Common Stock by reason of any Common Stock dividend or split, recapitalization, merger, consolidation, spin-off, combination or exchange of shares or other corporate exchange, or any distribution to stockholders of Common Stock other than regular cash dividends, the Committee shall make a substitution or adjustment to the number or kind of shares of Common Stock or other securities issued or reserved for issuance pursuant to the Plan, and to outstanding Awards, as well as the option price or other affected terms of such Awards as in its judgment shall be necessary to preserve the Participant's rights substantially proportionate to the rights existing prior to such event.

Unless otherwise provided in an award agreement, after a merger of one or more corporations into the Company or after a consolidation of the Company and one or more corporations (a "Merger Event") in which the Company shall be the surviving or resulting corporation, an Award holder shall, where applicable, at the same cost, be entitled upon the exercise of an Award, to receive (subject to any action required by stockholders) such securities of the surviving or resulting corporation as shall be equivalent to the shares underlying such Award as nearly as practicable to the nearest whole number and class of shares of stock or other securities.

Unless otherwise provided in an award agreement, if the Company enters into any agreement with respect to any transaction which would, if consummated, result in a Merger Event in which the Company will not be the surviving corporation, the Committee in its sole discretion and without liability to any person shall determine what actions shall be taken with respect to outstanding Awards, if any, including, without limitation, the payment of a cash amount in exchange for the cancellation of an Award or the requiring of the issuance of substitute Awards that will substantially preserve the value, rights and benefits of any affected Awards previously granted hereunder as of the date of the consummation of the Merger Event.

## SECTION 15 — AMENDMENT

The Committee or the Board may amend, suspend or terminate the Plan or any portion hereof at any time.

## SECTION 16 — UNFUNDED STATUS OF PLAN

The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any payments not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or payments in lieu thereof or with respect to options, stock appreciation rights and other Awards under the Plan; provided, however, that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan.

## SECTION 17 — EFFECTIVE DATE

This Plan shall be effective on April 5, 1995. No Awards may be granted under the Plan on or after April 30, 2006.

## SECTION 18 — SECTION 409A

Notwithstanding other provisions of the Plan or any Award agreements thereunder, no Award shall be granted, deferred, accelerated, extended, paid out or modified under this Plan in a manner that would result in the imposition of an additional tax under Section 409A of the Code upon a Participant. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments or deliveries of shares in respect of any Award under the Plan may not be made at the time contemplated by the terms of the Plan or the relevant Award agreement, as the case may be, without causing the Participant

5

holding such Award to be subject to taxation under Section 409A of the Code, the Company will make such payment or delivery of shares on the first day that would not result in the Participant incurring any tax liability under Section 409A of the Code. In the case of a Participant who is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares in respect of any Award subject to Section 409A of the Code that are linked to the date of the Participant's separation from service shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from the Company and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder. The Company shall use commercially reasonable efforts to implement the provisions of this Section 18 in good faith; provided that neither the Company, the Committee nor any of the Company's employees, directors or representatives shall have any liability to Participants with respect to this Section 18.

6

LEH-RSU 0000259

## EXHIBIT A

(a) "Affiliate" shall mean any entity designated by the Committee in which the Company pr an Affiliate has an interest.

(b) "Award" shall mean any type of stock-based award granted pursuant to the Plan.

(c) "Board" shall mean the Board of Directors of the Company; provided, however, that any action taken by a duly authorized committee of the Board within the scope of authority delegated to such committee by the Board shall be considered an action of the Board for purposes of this Plan.

(d) "Change in Control" shall mean the occurrence during the term of the Plan of:

a) The commencement (within the meaning of Rule 14d-2 under the Securities Exchange Act of 1934 (the "Exchange Act")) of a tender offer for more than 20% of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors (the "Voting Securities");

b) An acquisition (other than directly from the Company) of any voting securities of the Company by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the Exchange Act) immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary"), (ii) the Company or its Subsidiaries, or (iii) any Person who files in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (b);

c) The individuals who, as of the effective date of the 1994 initial public trading in Company shares, are members of the Board (the "Incumbent Board"), ceasing for any reason to constitute at least a majority of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest;

d) Approval by stockholders of the Company of:

(i) A merger, consolidation or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in (A), (B) and (C) below:

(A) the stockholders of the Company, immediately before such merger, consolidation or reorganization, own, directly or indirectly, immediately following such merger, consolidation or reorganization, at least the Applicable Minimum Percentage (as defined below) of the combined

7

LEH-RSU 0000260

voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

(B)   the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least the Applicable Minimum Proportion (as defined below) of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation or reorganization; and

(C)   no Person other than the Company, any Subsidiary, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary, or any Person who, immediately prior to such merger, consolidation or reorganization had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation or reorganization;

(ii)   A complete liquidation or dissolution of the Company; or

(iii)   An agreement for the sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary); or

e)   An event that would constitute a "Change in Control" within the meaning of Section 2(g) in the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

With respect to paragraph (d)(i) above, "Applicable Minimum Percentage" means (1) eighty percent (80%) with respect to Awards made prior to November 14, 2000, and (2) fifty percent (50%) with respect to Awards made on or after November 14, 2000; and "Applicable Minimum Proportion" means (1) two-thirds with respect to Awards made prior to November 14, 2000, and (2) a majority with respect to Awards made on or after November 14, 2000.

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

(e)   "Code" shall mean the Internal Revenue Code of 1986, as from time to time amended.

(f)   "Committee" shall mean the Compensation and Benefits Committee of the Company.

(g)   "Common Stock" shall mean the common stock of the Company, $.10 par value.

(h)   "Company" shall mean Lehman Brothers Holdings Inc. and, except as otherwise specified in this Plan in a particular context, any successor thereto, whether by merger, consolidation, purchase of substantially all its assets or otherwise.

(i)   "Fair Market Value" on any date means the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading (or, if such

8

exchange is not open on such date, the immediately preceding date on which such exchange is open), the arithmetic mean of the per share closing bid price and per share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System, or such other market in which such prices are regularly quoted, or, if there have been no published bid or asked quotations with respect to such shares on such date, the Fair Market Value shall be the value established by the Committee in good faith and, in the case of an incentive stock option, in accordance with Section 422 of the Code.

    (j)   "Other Stock-based Award" shall mean any of those Awards described in Section 8 hereof.

    (k)   "Participant" shall mean an employee, officer, director or consultant of the Company.

    (l)   "Subsidiary" shall mean any corporation which at the time qualifies as a subsidiary of the Company under the definition of "subsidiary corporation" in Section 424(f) of the Code, as amended from time to time.

LEH-RSU 0000262

# Exhibit F

19 Marshall Court
Great Neck, New York 11021
March 29, 2013

Honorable James M. Peck
One Bowling Green
New York, New York 10004
Courtroom 601

Mr. Robert J. Lemons, Esq.
Mr. Mark Bernstein, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Re: Participation in RSU Claims Discovery in Connection with Omnibus Objections to Reclassify Proofs of Claim as
Equity Interest:  Karen M. Simon Krieger – Claim Number:  18087 in the amount of $164,319.52

Dear Sirs:

As a United States employee of Lehman Brothers from November, 1990 through September, 2008, I filed Claim
18087 in response to the 2008 bankruptcy.  Upon receiving a copy of the Objection to Claims submitted by Weil,
Gotshal & Manges LLP which references my claim in its Appendix, I formally objected to its merits to convert my
entire claim to an Equity Interest.  I requested that the motion be denied in its entirety.

In response to the Discovery process as requested by Weil, Gotshal & Manges, enclosed are my supporting
documents and response upholding why the Restricted Stock Units (RSU) claims must be considered
compensation and are, in fact, liabilities of Lehman Brothers that are owed to me for services rendered.

My claim consists of $164,319.52 in Lehman Brothers RSUs, $45,320.36 in Lehman Brothers Common Stock and
$15,756.67 in 401K investment in Lehman Brothers Common Stock.

- The portion of the claim held in RSUs ($164, 319.52) was a mandatory annual deduction from compensation
that was required to be held by Lehman Brothers for a period of five years before vesting.  Upon the five year
vesting, this would have been converted to common stock at the current market rate.  This portion never
vested nor did it convert to Lehman Brothers Common Stock as it was still less than the five year period at the
time of the Lehman Brothers bankruptcy.  As this was not a discretionary deduction and was part of my
income, the $164,319.52 should be considered as lost compensation.

- The portion of the claim held in Lehman Brothers Common Stock ($45,320.36) was the portion of the Lehman
Brothers RSUs that had vested and was converted to Common Stock at the end of 2007.

- The portion of the claim held in Lehman Brothers Common Stock ($15,756.67) was the portion of my 401K
that I chose to invest in Lehman Brothers Common Stock.

The evidence is overwhelming; the deferred and ultimately unpaid compensation which was converted to
unvested RSUs is a Lehman Brothers liability that is owed to me and must be paid to me to settle the claim.  On
every dimension, employee-employer, enterprise – investing public-at-large, and the enterprise – regulators,
Lehman Brothers, in its own documents, recorded and communicated its obligation to pay for services rendered.

1

With regard to the RSUs, there is overwhelming evidence that Lehman Brothers consistently communicated to its employees via

- Lehman Brothers Stock Award Program Material,
- Lehman Brothers Offer Letters,
- Lehman Brothers Intranet Site (Equity Award Program Equity Award issuance),
- Lehman Brothers Compensation Statements,
- Lehman Brothers Memorandums on the Stock Award Program,
- Lehman Brothers Annual Reports,
- Lehman Brothers Form 10K Reports, and
- Lehman Brothers RSU Bonus Pay Stubs

that the RSUs were a component of an employee's compensation with appropriate ordinary income tax treatment. Additionally, RSUs were not treated in accordance with the terms laid out in the program's supporting documentation when an involuntary termination without cause or a hostile change in control occurs.

From the point of entry into the Firm to its declaration of bankruptcy, Lehman Brothers communicated to not only me, but to every employee, its investors, the rating agencies and even the federal government that the stock award program (RSU program) was compensation and implemented via compensation deductions.

Lehman Brothers' management made a decision in 1994, shortly after it became a publicly traded Firm, to establish a stock award program that provides every member of Lehman Brothers with an ownership interest in the Firm and a requirement that the stock be held for five years. As noted in their annual stock award distribution to its employees, the program provides and incentive to think and act like an owner every day, and allows all participants to share in the Firm's financial success over time.

It has been repeatedly communicated to the employees that the RSUs were funded through a mandatory deduction of a portion of our annual compensation and therefore should be treated as if it is lost compensation and a priority, secured claim. Further supporting this is the notion that I was neither in any position to make a choice regarding my desire to become a participant nor could I make any investment decisions during the restricted period. Choices to hold or sell the RSUs were only available after the completion of the vesting period.

Going through my third, very public employer bankruptcy is just unconscionable. Every effort was made by me to learn from the lessons of the first and second bankruptcies at Drexel Burnham Lambert and Sentinel Government Securities respectively and minimize my investment in an organization where I had a dependency on for my annual earnings stream. In light of my previous employers' history and my personal circumstances, I needed to sell most of my RSUs each year upon their vesting in order to pay for the raising of my children through their college education and graduation.

While I most certainly thought and acted like an owner during my eighteen years at Lehman Brother every day, the management decision to establish this program handcuffed my ability to manage my RSU investments as I have managed my other investments. I was dependent upon decisions outside of my control.

My objection is associated to the RSUs where I had no ability to make prudent investment decisions. I have excluded those shares that I have kept beyond the restricted period where I had the discretionary ability to make personal investment decisions.

In summary, I am asking the court to rule that the portion of my claim associated to the unvested RSUs ($164,319.52) be treated as if it is lost compensation and a priority, secured claim.

2

<u>Discovery Documentation Upholding RSUs as Compensation</u>

Lehman Brothers communicated to each employee at time of offer to join as an employee that the RSU program was a component of compensation.  **Exhibit KK-03,** a Lehman Brothers Offer Letter, as noted below, provides the verbiage that clearly classifies the RSUs as a portion of an employee's current and future compensation pursuant to the Firm's employee stock award program.

... At the Firm's option, a portion of your 2000 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in RSUs pursuant to the Firm's employee stock award program as then in effect.

It is important to note that this compensation would be withheld for a period of five years.  It was not an issuance of stock but retention of cash, to facilitate a balance sheet maneuver required to impress the rating agencies, the investment community, and the regulators.  Whether the holding vehicle for the withheld compensation is held in cash, certificates of deposit, treasury bonds, an index basket of investments, or a Firm-managed vehicle it should be viewed as irrelevant as underlying this maneuver is the employee's deferred compensation.

In the years immediately following Lehman Brothers going public, (1994 – 2001), Lehman Brothers issued detailed hard copy documents explaining the Employee Stock Award Program.  Subsequently, in the more recent years, these documents were made available on Lehman Live, the Firm's Intranet portal. In accordance with **Exhibit KK-01 and KK-02,** as noted below, the Lehman Brothers Employee Stock Award Program provides the underlying details associated to how the overall program works, that the shares are awarded as a portion of compensation, how the shares are converted to common stock after the five year vesting period, the appropriate ordinary income tax treatment at vesting and thereafter and how unvested shares should be handled in the event of an involuntary termination without cause.  To date, the unvested shares have not been handled in accordance with the terms of involuntary termination without cause as stated in how the program is supposed to work.   It is important to note that the tax treatment appears to have been implicitly approved by the IRS. Additionally, the federal government must have considered and approved the five year withholding period of compensation through RSU vesting and conversion from deferred compensation to Lehman Brothers stock as a non-capital gains event from investment activities.  For reference, in accordance with **Exhibit KK-01** Lehman Brothers Stock Award Program, on page 2 it states,

All bonus eligible members of the Firm receive a portion of their compensation in restricted stock units (RSUs). Each RSU represents the right to receive one share of Lehman Brothers common stock five years after the RSU is granted.  The RSUs have been awarded to you as part of your 1994 bonus payable for the year's performance. The portion of compensation paid in RSUs increases as the amount of your total compensation rises.

For reference and in accordance with **Exhibit KK-01,** Page 9 summarizes the tax treatment and what will be required and ultimately due under current tax law:

- At the time the RSUs are awarded, there is no taxable event.

3

- When your RSUs vest, you will owe FICA tax on their value. The value of the RSUs subject to the FICA tax will be the number of units vesting multiplied by the price of Lehman Brothers common stock on the date the units vest.
- After the restriction period for 1994 RSUs ends, on July 1, 1999, your RSUs convert to common stock. Ordinary income equal to the July 1, 1999 market value of your shares will be reported to the IRS and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rates apply, rather than the special provisions dealing with capital gains.
- On July 1, 1999, when your RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell than it was when the RSUs converted, you will have a capital loss to declare.

Annually, the communications from Lehman Brothers continued to uphold how the program would work and its ongoing compliance with the IRS tax regulations. For reference and in accordance with **Exhibit KK-02**, the 2001 Lehman Brother Stock Award Program, Page 2 of the 2001 Stock Award Program at a Glance states:

- All eligible members of the Firm receive a portion of their compensation in restricted stock units (RSUs). Each RSU represents the right to receive one share of Lehman Brothers common stock five years after the RSU is granted.
- RSUs have been awarded to you as part of your 2001 compensation payable for the year's performance. The amount of compensation paid in RSUs increases as the amount of your total compensation rises.
- In 2001, a portion of your stock award was priced in September and the balance of your award was priced in December. Generally, the Firm's stock award is made only at one time in the year, at year end.
- A portion of your RSU award was priced at $34.98, based on the closing price of Lehman Brothers common stock on September 20, 2001 ($46.64), less a 25 percent discount. The balance of your 2001 RSUs was priced at $47.55 based on the closing price of Lehman Brothers common stock on December 3, 2001 ($63.40), discounted by 25 percent.
- On November 30, 2006 the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, transferred or pledged before conversion.

Additionally, Page 12 provides transparency into the Tax Treatment of RSUs and states:

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. (For members of the Firm whose employment status changes, special provisions apply. Please see the following section.)

Provided below is a summary of the U.S. taxes that are ultimately due under current tax law:
- At the time the RSUs are awarded, there is no taxable event.
- After the restriction period for 2001 RSUs ends, on November 30, 2006, your RSUs, including any additional RSUs that you receive through dividend reinvestment, convert to common stock. Ordinary income equal to the November 30, 2006 market value of your shares will be reported to the IRS, and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rate apply, rather than the special provisions dealing with capital gains.

4

- On November 30, 2006, when your 2001 RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares that it was when the RSUs converted, you will have a capital loss to declare.

Furthermore Page 14 of **Exhibit KK-02** as noted below provides the steps to be taken by Lehman Brothers in the case of an Involuntary Termination without Cause. At bankruptcy, our employment with Lehman Brothers was terminated and we either became employed by Barclays Capital, Nomura Securities or lost our jobs. In accordance with these below mentioned steps, Lehman Brothers did not follow the procedures subsequent to the bankruptcy which would have required them to issue the common stock and enable us to make investment decisions at the then prevailing market price.

- If you are terminated involuntarily but without cause, you will be entitled to receive the entire principal portion (75 percent) of your 2001 RSUs and a pro-rata portion of the discount (25 percent of the award). The portion of the discount you receive will be prorated in 20 percent increments for every full year of service with the Firm after November 30, 2001. So, if your termination occurs prior to November 30, 2002, you will not be entitled to receive any of the RSUs related to the discount portion. However, if termination occurs after a "Full Career" with the Firm, you will be entitled to receive the entire discount portion of your RSU award. "Full Career" termination means you have at least 20 years of service or your age and length of service equals at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. Shares of Lehman Brothers common stock will be issued to you, without restrictions, at the earlier of a) November 30, 2006 (five years after the award date) or b) the end of the fiscal quarter one year following your termination date, provided you do not engage in Detrimental Activity through that date.

Furthermore, according to the terms of the 2001 Lehman Brothers Stock Award Plan **Exhibit KK-02**, on page 15, Section: Change in Control ("CIC") Provisions:

Hostile:

- All RSU's vest immediately
- Shares of Lehman Brothers common stock will be issued immediately so you may tender your shares with other shareholders

Clearly, the acquisition of Lehman Brothers by Barclays Capital and Nomura Securities meets the condition of that clause. Lehman Brothers chose not to distribute my vested RSU's to my Firm-approved account at A.R. Schmeidler, as prescribed by its own documents. I was unable to sell [at a loss] into the marketplace in 2008, 2009, 2010, 2011, or 2012. Now, after years of legal maneuvering, Lehman Brothers' shares are no longer trading.

As evidenced in **Exhibit KK- 04,** Lehman ensured that there was program and personal award transparency on Lehman Live, the Firm's Intranet Site Page on the Equity Award Program and how the conditional equity awards are a portion of total compensation and how shares associated to involuntary terminations should be handled as noted below. To date, the unvested shares have not been handled in accordance with the terms of involuntary termination without cause as stated in how the program is supposed to work.

5

In support of Lehman Brothers program transparency, **Exhibit KK – 04** Equity Award Program – Lehman Live states:

Equity Award Components - Employees receive a portion of their total compensation in the form of conditional equity awards.  The form of equity award depends on the work location, as follows:

| Location | Equity Award Type |
|---|---|
| United States | Restricted Stock Units ("RSUs") |

RSU Termination Provisions: 2006 – 2007 Equity Award Program - 2006 – 2007 RSU Termination Provisions for All Employees - Involuntary Termination: Participants will become entitled to 100% of both the RSU Principal and Discount on the Share Payment Date, provided they do not engage in Detrimental Activity through that date. RSUs will convert to shares of common stock and be issued on the Share Payment Date.

As further evidenced **in Exhibit KK-04**, Lehman Brothers provided personal award transparency on Lehman Live, the Firm's intranet portal.  The amounts withheld from compensation are identified as Grant Value.  The holding vehicle is defined as Units and not Lehman Brothers common stock.   The total sum of monies withheld is identified as $159,244. Additionally the statement shows additional dividend equivalents accrued to each of my units granted.  The dividend equivalents are then multiplied by the initial grant price and added to the withheld dollars to total $164, 319.52 which is owed to me for services performed during my tenure at Lehman Brothers. Attached is a print out of my personal statement with data as of August 31, 2008.

Annually, Lehman Brothers went through a well-coordinated, structured set of sessions to manage compensation expense.  As a manager I attended training sessions organized by the Human Resourced department to learn and practice the script for that year end compensation conversation with my staff.  The overall message associated to the RSU program was that compensation was withheld in order to ensure we felt like owners and personally had skin in the game.  In additions to these sessions, we were given talking points for every scenario possible, in order to diffuse a potential employee dispute to their year-end compensation distribution. **Exhibit KK-23** provides a sample of the Manager Communications Sheets which are labeled 2007 Total Compensation Statement.  The payment schedule itemizes the bonus plus any awards less the bonus amount that will be withheld for the RSU plan and ultimately the net total cash payment before taxes.

With the investment community, the message to the public was construed in order to generate a favorable impression of solid relations with its employees.  In those meetings, it was often touted how supportive employees were of the Lehman Brothers' mission.  It was reputed that ~33% of The Lehman Brothers was owned by employees, one of the highest for financial firms.  The strategy was quite sophisticated with both internal and external perception well managed by communications experts sprinkled in the Human Relations department {for internal employee issues}, the Marketing Department {for the public}, and the Finance Department {for the investment community.}  With the latter, financial engineering was implemented throughout all levels of Lehman Brothers, in order to meet the quarterly analyst estimates.

My compensation statements that were provided to me by my manager provided me with the transparency as an employee.  **Exhibits KK-05, KK-06, KK-07**, as noted below on the Lehman Brothers Total Compensation Statements, provide the employee with an understanding of the components of their compensation which include paid salary and bonus which is made up of RSUs and Net Bonus After RSUs.

6

**Exhibit KK – 05** Lehman Brothers 2003 Total Compensation Statement, **Exhibit KK – 06** Lehman Brothers 2004 Total Compensation Statement and **Exhibit KK – 07** Lehman Brothers 2005 Total Compensation Statement each were distributed each year and provided the breakdown of the Total Compensation as Paid Salary and Bonus which sums to each employee's Total Compensation. Further detail shows the Bonus as a Gross Bonus minus the Compensation associated to the RSUs and then the Net Bonus after RSUs and Before Taxes.

Additionally, my Lehman Brothers Pay Stubs for Bonuses paid from 2003 – 2007, **Exhibits KK-18, through KK-22**, reflect full year compensation as comprised of earnings, annual bonus and bonus associated to the RSU component. **Exhibit KK – 18** 2003 RSU Bonus Pay Stub- Pay stub for 2003 Bonus reflects Bonus 2003, 2003 RSU Bonus and Regular Salary as Earnings. **Exhibit KK – 19** 2004 RSU Bonus Pay Stub -Pay stub for 2004 Bonus reflects Bonus 2004, 2004 RSU Bonus and Regular Salary as Earnings. **Exhibit KK – 20** 2005 RSU Bonus Pay Stub- Pay stub for 2005 Bonus reflects Bonus 2005, 2005 RSU Bonus and Regular Salary as Earnings. **Exhibit KK – 21** 2006 RSU Bonus Pay Stub- Pay stub for 2006 Bonus reflects Bonus 2006, 2006 RSU Bonus and Regular Salary as Earnings. **Exhibit KK – 22** 2007 RSU Bonus Pay Stub- Pay stub for 2007 Bonus reflects Bonus 2007, 2007 RSU Bonus and Regular Salary as Earnings.

A firm wide memorandum was distributed to all participants of the stock award program as referenced in **Exhibit KK-08** that provide the employee with an understanding of the how the taxes associated to the vested shares will be handled, reiterating that they are in line with ordinary income and included on our W2 in line with IRS tax regulations.

**Exhibit KK- 08** Memorandum – Participants of the 2002 Stock Award Program
On November 30, 2007, the RSUs you received under the Lehman Brothers Stock Award Program converted to shares of Lehman Brothers common stock. At that time, the market value of your shares was recognized as income subject to tax withholding. This income was based on the closing price of Lehman Brothers stock ($62.63) on November 30, 2007.

You elected to tender shares to cover the tax withholding obligation related to the issuance of your 2002 RSUs. Please note that the income related to the issuance of your shares and your tax withholding obligation will be included in your 2007 Form W2. Additionally, the payment of your tax withholding obligation has been remitted to the IRS on your behalf.

Further detailing the tax treatment is **Exhibit KK-09**, as noted below, from Lehman Live, the Firm's Intranet Site Page on the November 2007 Equity Award Issuance represents the treatment of the RSU shares that were granted under the 2002 Lehman Brothers Equity Award Program and provides the employee with an understanding of the how the taxes associated to the vested shares will be handled, in line with ordinary income tax treatment.

Cost Basis - The market value of the issued shares will be reported as employment income as of November30, 2007. This price represents your cost basis. Any subsequent increase in value of you shares may be treated as capital gains when the stock is sold. If your sale price is lower than the closing price on November 30, 2007, you may have a capital loss declare, if applicable. Your holding period for capital gains/losses begins November 30, 2007.

Ordinary Income (Shares x Cost Basis) - Shares issued multiplied by the closing price of LEH at time of issuance.

7

Required Tax Withholding Obligation - The tax withholding obligation represents the minimum amount Lehman Brothers is required to withhold as follows:

Federal Tax Liability, State Tax Liability, Local Tax Liability, Social Security, Medicare, SDI/SUI, Non –US Tax Liability = Tax Withholding Obligation

Total Taxes Paid - Represents the closing pricing of LEH multiplied by the number of shares withheld to cover taxes....

Shares Withheld to Cover Taxes - The number of shares withheld to cover your tax obligation was based on the closing price of Lehman Brothers common stock on November 30, 2007. Lehman Brothers withheld taxes based on the minimum required withholding rates. You may have further tax reporting and/or payment obligation with respect to this income. {For participants subject to U.S. taxes, you will receive a Form 1099B for the 2007 tax year which reflects the value of the shares tendered to Lehman brothers to cover your taxes.} Your tax basis for these shares is based on the closing price of Lehman Brothers common stock on November 30, 2007 ($62.63). There is no gain or loss on the shares tendered to Lehman Brothers for taxes.

November 2007 Equity Award issuance - Taxes Due - At this time the RSUs/CSAs were awarded, there was no taxable event. After the restriction period ends on November 30, 2007, your RSUs/CSAs will convert to freely tradable shares of Lehman Brothers common stock. The market value of your shares on November 30, 2007, will be recognized as employment income, on which tax will be payable at the prevailing income tax rates.

The finesse with which Lehman Brothers handled compensation expense is further evidenced in the financial statements, audited by Ernst & Young LLP, the Independent Registered Public Accounting Firm, from 2000 – 2007. Excerpts from each year's financial statements are submitted as **Exhibits KK-10** through **KK-16** and the Lehman Brothers 10K-as **Exhibit KK-17.** As part of its marketing pitch as a "Best Operator," Lehman Brothers engineered the Compensation and Benefits/Net Revenues ratio to stay within a 49% - 50%, to please the rating agencies and investment community.

Table 1. 0 Compensation Ratio

| (Data Extracts in Millions) INCOME STATEMENT | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | $19,894 | $18,989 | $26,447 | $22,392 | $16,781 | $17,287 | $21,250 | $32,420 | $46,709 | $59,003 |
| Net Revenues | $4,113 | $5,340 | $7,707 | $6,736 | $6,155 | $8,647 | $11,576 | $14,630 | $17,583 | $19,257 |
| Compensation & Benefits/Net Revenues | 51% | 51% | 51% | 51% | 51% | 50% | 49% | 49% | 48% | 49% |

Source: Lehman Brothers Annual Reports, 2000-2006 and 2007 10-K

The details are outlined in Notes, along with the Statements themselves. From 2000 to 2005, in the Consolidated Statement of Cash Flows, the amortization of deferred stock compensation appears in the Cash Flows from Operating Activities. This, explicitly, states by the auditors that it is not from a financing or investing activity. Further in the Notes section for Employee Incentive Plans, the language reads, "Eligible employees receive RSU's as a portion of their total compensation in lieu of cash."

8

These documents were not confidential nor were they employee eyes-only documents. They were prepared by financial professionals for external consumption by the investing public, regulators, and the rating agencies. It is explicit, conceptually, operationally, and financially, that the employees are owed monies for their services and the payment of that liability will be smoothed out over a five year timeframe, the vesting period. This is not some complicated option pricing mechanism. It is very clear that Lehman Brothers acknowledged that it owed employees those monies and the holding period could be used to incent people internally, while meeting the external results required by investors, suppliers and regulators, during volatile financial market cycles.

From my analysis, if Lehman Brothers were to pay a 100% cash bonus, it would never have been able to achieve a praised, though architected, Compensation and Benefits/Net Revenues ratio.

Table 2.0 Compensation Ration (Revised)

| (Data Extracts In $Millions) INCOME STATEMENT | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|
| Compensation and Benefits | $2,086 | $2,707 | $3,931 | $3,437 | $3,139 | $4,318 | $5,730 | $7,213 | $8,669 |
| Amortization of Deferred Stock Compensation (CBD) | -$225 | -$383 | -$520 | -$594 | -$970 | -$626 | -$800 | -$1,055 | -$1,706 |
| Deferred Stock Awards Granted | $417 | $593 | $1,003 | $624 | $407 | $999 | $1,182 | $1,574 | $881 |
| Total Compensation Expense (TCE) | $2,282 | $2,877 | $2,282 | $2,879 | $4,414 | $3,517 | $3,976 | $4,692 | $9,112 |
| TCE/Net Revenues | 55% | 54% | 30% | 43% | 72% | 41% | 26% | 32% | 35% |

Source: Lehman Brothers Annual Reports, 2000-2006 and 2007 10-K

Why is this accounting detail even necessary information? The Statement of Consolidated Cash Flows clearly outlined that the monies used to pay dividends to shareholders and for investing activities, such as the purchase of property, equipment and leasehold improvements (Assets) were funded from two sources: (1) monies withheld from employees and (2) the IRS-approved tax benefit for doing so. Essentially, Lehman Brothers acted as an escrow agent, permitted to use the withheld funds for its own purposes for a period of 5 years, which included the ability to book assets (short-termed and long-lived) on the balance sheet.

In 2006, there was concern in the financial community that firms, not just Lehman Brothers, were not properly accounting for employee services, when compensation was deferred. The Financial Accounting Standards Board (FASB) completed a revision of FASB Statement No. 123 to address "transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. "

This Statement focused "primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions." This was to address "concerns by requiring an entity to recognize the cost of employee services received in share-based payment transactions, thereby reflecting the economic consequences of those transactions in the financial statements." Conceptually, the cost of employee service "will be recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period). ..."A public entity will initially measure the cost of employee services received in exchange for an award of liability instruments based on its current fair value; the fair value of that award will be remeasured subsequently at each reporting date through the settlement date. Changes in fair value during the requisite service period will be recognized as compensation cost over that period."

9

In non-accounting speak, this was an acknowledgment that management of many firms, including Lehman Brothers, had been smoothing Income Statement results, in order to reduce variability and convey "good news," also known as better than the analysts' estimates. Although somewhat old, the Ball and Brown Study, "An Empirical Evaluation of Accounting Income Numbers," in the Journal of Accounting Research (Autumn 1968) demonstrated "clear (empirical) association between earnings and stock market reaction....firms whose earnings conveyed good news enjoyed abnormally better stock returns." (White, Sondhi, Fried, The Analysis and Use of Financial Statements, 1994, p. 297).

Since financial statements are an important part of functioning financial markets, FASB's revision, and Lehman Brothers' adoption in 2006, was to make very clear "Employee services received in exchange for awards of share-based compensation qualify as assets, though only momentarily—as the entity receives and uses them—although their use may create or add value to other assets of the entity. This Statement will improve the accounting for an entity's assets resulting from receipt of employee services in exchange for an equity award by requiring that the cost of such assets either be charged to expense when consumed or capitalized as part of another asset of the entity (as permitted by U.S. GAAP)."

As any finance professional knows, FASB is the "designated organization in the private sector for establishing standards of financial accounting that govern the preparation of financial reports by nongovernmental entities. Its standards are officially recognized as authoritative by the Securities and Exchange Commission (SEC) (Financial Reporting Release No. 1, Section 101, and reaffirmed in its April 2003 Policy Statement) and the American Institute of Certified Public Accountants (Rule 203, Rules of Professional Conduct, as amended May 1973 and May 1979)." (http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495)

FASB was well aware of the research efforts in academia, along with the actual practice of buying employee services now and pay later. It was very clear that FASB understood, also, the ramifications of non-transparent financial statements. As Sondhi, White and Fried explain, "a monitoring device is needed to ensure that the agreements or contracts between managers – shareholders-creditors are adhered to. ...a firm [is not] an independent entity but rather a 'nexus of contracts' (explicit or implicit) between parties, each motivated by their own self-interest. The role of accounting in this scenario is to provide the monitoring device enabling the contracting process to function." (SWF, p. 314).

If the industry accounting standards board, Lehman Brothers' accountants, and Lehman Brothers 10-K **(Exhibit KK – 17)** filing to the SEC, a U.S. government governing entity, acknowledge that my provision of labor is a compensation expense, then it seems pretty clear that there is an unpaid obligation that need to be settled. Even Lehman Brothers' own paperwork demonstrates that fact. It seems curious as to why Lehman Brothers no longer wants to reimburse me, for services rendered from 2003 through 2008. If there is a question about the quality of my labor, as an effort to dismiss my claim, it seems a bit late. As a high performer I always represented Lehman Brothers' interests to the best of my ability, both internally and externally.

While I expect Lehman Brothers to contest the existence of any contract, I submit the following:

- Offer and acceptance (I received an offer letter from Lehman Brothers and accepted employment – Lehman Brothers left me; I never left Lehman Brothers.)
- Competent persons (I was rated highly throughout my term of employment. Lehman Brothers was experienced with over 150 years in business.)

10

- Consideration (The bargain was an exchange:  I deliver top quality advice, expertise, and management capabilities for the Technology Division and Lehman Brothers pays me Compensation.)
- Sufficiency (Up until its bankruptcy, Lehman Brothers paid me and I delivered an excellent work product.)

In my opinion, it is ironic that key to Lehman Brothers' success was its moral fiber to do the right thing and to work honorably.  As this case and claims process has dragged on, often for Lehman Brothers' and its attorneys' financial benefit, it seems that the once-proud firm has lost its anchor.  Lehman Brothers and its leaders made an exorbitant amount of money, yet the employees  who built the technology, negotiated its deals, ran the operations  and day-in, day-out delivered excellence, often to the neglect of their own personal lives, are being forced to take financial losses, because it is no longer convenient for Lehman Brothers to honor its obligations to the suppliers of the intellectual capital that built it and its assets which continue to generate revenue for the estate and pay the associated legal fees.

As I see it, Lehman Brothers chose to not only ignore the years of documentation, but also to use its portfolio of resources, built by the sweat of a very loyal workforce, against the very same people, whose intellectual capital created it.  The delay tactics, the legal methodology forced on weary employees, already traumatized, along with re-employment of senior executives, as hired guns to continue to build the case and not testify against Lehman Brothers demonstrates the capacity and willingness to ignore its legal commitment to its former employees.

I submit that that every piece of evidence contributes to the fact that a contract existed between Lehman Brothers and me and with it comes an outstanding balance that is owed to me. Based on the documents provided, it is quite clear that as an employee, there is a contract for payment.  Since it is now almost 10 years since the initial delivery of work product, Lehman Brothers should pay me the outstanding balance and what is rightfully owed to me. Every document submission has demonstrated that my compensation has been withheld.  It is time for Lehman Brothers and its attorneys to read its own documents and to do the right thing.

I ask the court to order payment of my claim in full, in the amount of $164, 319.52.

Thank you,

Karen M. Simon Krieger

Karen M. Simon Krieger
kmskrieger@gmail.com
cell - 917-545-7481

[All FASB quotes are from it Summary of Statement No. 123 (revised 2004) located at:
http://www.fasb.org/summary/stsum123r.shtml]

11

# EXHIBIT B

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    CASE NO. 08-13555-scc

4    - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8    ET AL,

9

10                   Debtors.

11   - - - - - - - - - - - - - - - - - x

12

13                        U.S. Bankruptcy Court

14                        One Bowling Green

15                        New York, New York

16

17                        April 2, 2014

18                        10:04 AM

19

20   B E F O R E :

21   HON. SHELLY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - F. FERGUSON

1    **HEARING Re Evidentiary Hearing on RSU Claims**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    **Transcribed by:  Dawn South, Sheila Orms, and William**

25    **Garling**

Page 3

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for LBHI

4         767 Fifth Avenue

5         New York, NY 10153-0119

6

7    BY:  TERESA C. BRADY, ESQ.

8         DENISE ALVAREZ, ESQ.

9

10   WEIL, GOTSHAL & MANGES LLP

11        Attorneys for LBHI

12        1300 Eye Street, N.W.

13        Suite 900

14        Washington, D.C.  20005

15

16   BY:  RALPH I. MILLER, ESQ.

17

18   LAW OFFICES OF

19        Attorneys for Compensation Claimants

20        305 Madison Avenue

21        Suite 4700

22        New York, NY 10165

23

24   BY:  LISA M. SOLOMON, ESQ.

25

Page 4

1   STAMELL & SCHAGER, LLP

2        Attorneys for Claimants

3        One Liberty Plaza

4        35th Floor

5        New York, NY  10006

6

7   BY:  ANDREW R. GOLDENBERG, ESQ.

8        RICHARD J. SCHAGER, JR.

9

10  KAPLAN LANDAU LLP

11       Attorneys for Neuberger Berman Claimants

12       1065 Avenue of the Americas

13       27th Floor

14       New York, NY  10018

15

16  BY:  EUGENE NEAL KAPLAN, ESQ.

17

18  LAW OFFICE OF

19       Attorneys for Represented Claimants

20       355 S. Grand Avenue

21       Suite 2450

22       Los Angeles, CA  90071

23

24  BY:  A. JAMES BOYAJIAN, ESQ.

25

**Page 5**

```
 1   JULIEN & SCHLESINGER, ESQ.

 2        Attorneys for Neuberger Berman Claimants

 3        207 E. 94th St.

 4        Suite 303

 5        New York, NY 10128

 6

 7   BY:  MICHAEL SCHLESINGER, ESQ.

 8

 9   DAY PITNEY LLP

10        Attorneys for Fabio Liotti

11        One Jefferson Road

12        Parsippany, NJ  07054

13

14   BY:  MARGARITA Y. GINZBURG, ESQ.

15

16   RICH MICHAELSON MAGALIFF MOSER, LLP

17        Attorneys for Claimants

18        340 Madison Avenue

19        19th Floor

20        New York, NY  10173

21

22   BY:  HOWARD P. MAGALIFF, ESQ.

23        ROBERT N. MICHAELSON, ESQ.

24

25
```

Page 6

1                  P R O C E E D I N G S

2     (DISCLAIMER:  Poor audio; attorneys away from microphones;

3     attorneys and witness on same microphone; shuffling of

4     papers, etc. noted as "indiscernible")

5               THE COURT:  All right.  So we are back in session,

6     and as we had discussed yesterday, pursuant to the agreement

7     of the parties and the stipulation and order establishing

8     procedures for this hearing, today is the day that we have

9     set aside to hear from pro se parties.

10              So I think the first thing that I'd like to do is

11    to determine who's here and who would like to be heard.

12              Please come up.  Good morning.

13              MR. SHOTTON:  Good morning.

14              MS. JAO:  Good morning, Your Honor.

15              THE COURT:  All right, so there are only two here

16    as far as we can tell, two of you?  Do you have an

17    understanding if anybody else is going to be coming later

18    today?

19              MR. SHOTTON:  I'm not aware of anybody else, no.

20              THE COURT:  Okay.  Well then why don't -- yes,

21    Ms. Solomon?

22              MS. SOLOMON:  Your Honor, I just wanted to remind

23    the Court that I would be speaking on behalf of a pro se

24    upon their completion.

25              THE COURT:  Okay, that's fine.  All right.

Page 7

1            Okay, so then why don't we -- why don't we start

2    with you, ma'am, and then sir, you'll have your chance next.

3            All right, what is your name, please.

4            MS. JAO:  Good morning, Your Honor, my name is

5    Andrea Jao.

6            THE COURT:  Okay.

7            MS. JAO:  I'm a pro se claimant who started as a

8    junior analyst with equity research in 2000, and had

9    opportunity to take a more responsibility and stayed through

10   the bankruptcy in 2008.

11           THE COURT:  Okay.  Ms. Jao, before -- before you

12   keep going I just want to clarify procedurally that I view

13   your statement as -- I mean I'm anticipating that it will be

14   some combination of an argument and also some factual

15   matters.  Fair summary or fair guess?

16           MS. JAO:  Yeah.

17           THE COURT:  Okay.  So to the extent that you are

18   testifying and telling me things that you want me to find as

19   a fact then I'm going to treat what you're saying as

20   testimony and I'm going to treat it as having been made

21   under oath.

22           MS. JAO:  Yes, Your Honor.

23           THE COURT:  Although I won't formally administer

24   the oath.  Okay?

25           MS. JAO:  Yes, Your Honor.

Page 8

```
 1                THE COURT:  All right, go ahead.

 2                MS. JAO:  Thank you.  Well first of all thank you

 3     for the chance to --

 4                THE COURT:  Absolutely.

 5                MS. JAO:  -- to speak.  I will apologize ahead of

 6     time as I will not be able to use the same language with

 7     precision and as articulate --

 8                THE COURT:  Okay.  I will look -- I will look

 9     forward --

10                MS. JAO:  -- as counsel.

11                THE COURT:  -- to hearing whatever you have to say

12     however you say it.

13                MS. JAO:  Okay.

14                So in 2009 I received proof of claim forms from

15     Lehman Brothers Holdings Inc. which I filed and which I

16     submitted as instructed, because I thought it only fair that

17     I should recover unpaid compensation.

18                I would like to respectfully petition the Court to

19     recognize the RSU claims as unpaid compensation and that

20     claimants should receive -- such as myself should receive

21     these payments from Lehman Brothers Holdings.

22                I will not repeat, you know, the arguments said

23     yesterday, but I do have four points that I'd like to go

24     through briefly --

25                THE COURT:  Okay.
```

Page 9

1              MS. JAO:  -- which I think actually address or

2    touch on some of the questions Your Honor has raised

3    repeatedly yesterday.  So hopefully that's helpful.

4              THE COURT:  Okay.

5              MS. JAO:  So RSUs as a compensation scheme

6    entailed a lot of complications as well -- entailed a lot of

7    complications, and one of the points brought up yesterday

8    was that RSUs make employees act as owners or shareholders,

9    and as you yourself has mentioned, you take advantage of

10   appreciation and depreciation of the stock price.

11             I think though that we should think more deeply as

12   to what this means.  It really begs the question, did

13   holders of RSUs really have the ability to act as owners and

14   shareholders?  And for the four following reasons I would

15   argue that holders of RSUs, vested or unvested, did not have

16   the full ability to act as owners and shareholders.

17             Point number one.  One of the hallmarks of

18   ownership in a company is the ability to have an impact on

19   its policies such as what types of business to engage in,

20   how much risk to take, how much leverage to put on the

21   balance sheet, how much dividends to pay, to raise or not to

22   raise capital, or to draw down a cash reserve or to lengthen

23   debt maturities.

24             Why did I enumerate these things?  Because these

25   were the important decisions management was making and had

Page 10

1    implemented in the months leading up to the bankruptcy.

2            And, you know, the former senior management of

3    Lehman Brothers had ongoing conversations and conference

4    calls with institutional shareholders during which

5    institutional investors could express their opinions

6    regarding these policies.

7            In addition, institutional investors could signal

8    their favor or disfavor to senior management through

9    financial markets such as through the stock price or through

10   credit default swap spreads.

11           Holders of RSUs, such as myself, would typically

12   hear about these strategies or implementation of strategies

13   the same time it came out in the public domain, the same

14   time it hit the news wires.  Holders of RSUs, such as

15   myself, did not participate in any of these -- of the

16   markets that, you know, full institutional shareholders

17   participated in.  Senior management and the board of

18   directors were the ones who crafted and made decisions for

19   Lehman brothers, not you know, rank and file employees.

20           Point number two.  Another hallmark of ownership

21   in a publicly traded company is the ability to use liquid

22   markets to express an opinion.  Typically both institutional

23   and retail equity investors make a specific choice to buy

24   shares of stock and can easily do so given liquid cash

25   equity markets.  Once they own the stock their choices are

Page 11

1    to hold or to sell, which again they can do easily.

2            The typical equity shareholder thus faces three

3    choices; buy, hold, or sell.  If equity investors carry

4    residual risk and can be wiped out it is important that they

5    have the ability to exercise all three choices first along

6    as their investors.

7            Holders of RSUs did not have these choices.  RSUs

8    have neither buy or sell choices.  All an employee can do is

9    hold.  And this goes to an important point -- or question

10   you raised yesterday about participate -- RSU holders

11   participating in appreciation and depreciation of the stock

12   price.

13           Again, your typical equity shareholder

14   institutional investor at any point in time can realize

15   gains or losses.  At any time.  And therefore making

16   participation in -- in appreciation or depreciation of stock

17   price real.

18           THE COURT:  Can I ask you a question?

19           MS. JAO:  Yes, ma'am.

20           THE COURT:  Do you think that it was illegal for

21   Lehman to have paid employees with restricted stock units?

22   Was it against the law?

23           MS. JAO:  That's a -- depends on what else is in

24   that question, how much did you know about?

25           THE COURT:  No, I'm not really asking the question

Page 12

1    about --

2              MS. JAO:  Okay.  So --

3              THE COURT:  -- how'd your know about it, I mean --

4              MS. JAO:  -- in general?  No.

5              THE COURT:  -- Lehman -- so they -- I mean it's a

6    -- it's an instrument --

7              MS. JAO:  Uh-huh.

8              THE COURT:  -- they determine what characteristics

9    --

10             MS. JAO:  Uh-huh.

11             THE COURT:  -- it would have.  They told you that

12   you were getting this as part --

13             MS. JAO:  Uh-huh.

14             THE COURT:  -- of your compensation, right?

15             MS. JAO:  Yeah.

16             THE COURT:  They gave you documents that described

17   it, and all day yesterday the only thing that I heard about

18   what you weren't told --

19             MS. JAO:  Uh-huh.

20             THE COURT:  -- was that there at one point was

21   something that said in the event of a bankruptcy you're

22   subordinated and that was taken out.

23             So the only thing that I've heard about a non-

24   disclosure --

25             MS. JAO:  Uh-huh.

```
 1              THE COURT:  -- was that.

 2              MS. JAO:  I have points three and four --

 3              THE COURT:  Okay.

 4              MS. JAO:  -- regarding that.

 5              THE COURT:  Okay, go ahead.

 6              MS. JAO:  If I may.

 7              THE COURT:  Go ahead.

 8              MS. JAO:  Okay.  So -- so definitely I'll come

 9     back to that.

10              THE COURT:  Okay.

11              MS. JAO:  But in the meantime regarding point two.

12     So RSU shareholders while hypothetically saw the values of

13     RSUs rise and fall with the stock price, unlike true

14     shareholders there's no way to realize the benefit or loss,

15     and I think that's a big difference, because it's also

16     related to -- for an RSU holder to vote with their feet, so

17     they already don't have the ability to realize the gain or

18     loss so long as it's an RSU, you know, before it converts.

19     But to vote with our feet is very costly because they would

20     be walking away from unpaid wages, and that's how I view,

21     you know, RSUs, unpaid wages for which labor is already

22     rendered.

23              RSUs are often described as a retention device by

24     employers and holders of RSUs do not have the full capacity

25     to vote with their feet.  Yes, there is a choice
```

Page 14

```
 1    hypothetically, but I don't know if the right term is

 2    punitive, it's a very -- it's very --

 3              THE COURT:  It's a hard choice, right?

 4              MS. JAO:  It's a very -- it's an extreme choice,

 5    and --

 6              THE COURT:  But it is a choice.

 7              MS. JAO:  Yes.

 8              THE COURT:  It just has a cost, right?

 9              MS. JAO:  A very high cost.

10              So it's my humble opinion that -- and I'm no

11    expert in labor law -- but it's in my humble opinion that

12    labor law should protect employees from having to walk away

13    from compensation for which they already rendered labor.  I

14    mean, you know, it's -- but that's just my opinion.

15              THE COURT:  No, I understand that, and what I'm --

16    what I'm struggling with is that when you have a situation

17    and going in to the situation each year, the first year that

18    you start, before it becomes costly --

19              MS. JAO:  Uh-huh.

20              THE COURT:  -- in other words before you have the

21    sunk cost --

22              MS. JAO:  Right.

23              THE COURT:  -- of I've gotten this and now in

24    order to realize the value of it I have to wait.  At that

25    threshold moment there's a choice.  There's a choice of
```

Page 15

1    whether to accept this employment in which you're being told

2    that you're going to get a salary --

3              MS. JAO:  Uh-huh.

4              THE COURT:  -- and a bonus, and that part of it

5    will be paid in this other form of currency, this non-cash

6    currency.

7              MS. JAO:  Right.

8              THE COURT:  And at that moment you have a choice.

9    You -- this is not indentured servitude --

10             MS. JAO:  Uh-huh.

11             THE COURT:  -- it's not slavery, you can say no

12   thank you, Lehman Brothers, I don't want to work for you --

13             MS. JAO:  Uh-huh.

14             THE COURT:  -- I'm going go work for Credit Suisse

15   or Goldman Sachs or Citibank where they pay all in cash.

16   You have -- you have that choice.

17             MS. JAO:  Understood, Your Honor, but let's go

18   into a bit more detail about that decision.

19             Let's say I'm standing here January 1 making the

20   decision whether to continue working or not given the

21   current compensation structure.  So that (indiscernible -

22   00:12:17) by point three.

23             Shareholders and institutional investors know up

24   front before they make an investment, before they make a

25   decision how much their investment would be.  Lehman

Page 16

1    employees were only told that a portion of their

2    compensation would be RSUs at the end of the year.  At the

3    start of the year we were not told -- we were not told, you

4    know, 50 percent or 10 percent.

5                THE COURT:  Right, and you --

6                MS. JAO:  We weren't told.

7                THE COURT:  You weren't told, but you -- you then

8    at that moment in time had a choice that you understood that

9    there was going to be a number, and the assortment of forms

10   of compensation was in their determination, and at that

11   point in time early on you could say I can't live with that

12   uncertainty --

13               MS. JAO:  But how do you --

14               THE COURT:  -- I'm not going to work here.  Go

15   ahead.

16               MS. JAO:  I understand what you're saying, Your

17   Honor, but how could you make a good enough decision at the

18   start of the year whether the cash flow you'll get would

19   be --

20               THE COURT:  Well you knew the cash flow that you

21   were going to get -- I mean the ones that I saw yesterday

22   there was a -- the number I kept seeing was 200,000 --

23               MS. JAO:  Uh-huh.

24               THE COURT:  -- that was the example.

25               MS. JAO:  Yeah.

Page 17

1          THE COURT:  So if you're getting $200,000 a year

2     that means roughly speaking you're taking home, you know,

3     based on what -- how my taxes work -- you're taking home

4     about $10,000 a month.

5          MS. JAO:  Uh-huh.

6          THE COURT:  And then the rest of it is to be

7     determined.  And you -- on some of the compensation

8     statements that I saw at the end of the year you got a lump

9     sum of additional cash and you got some stock.

10         MS. JAO:  Right.

11         THE COURT:  And that's what -- that -- that's

12    exactly what they told you -- Lehman told you up front was

13    going to happen.  What -- what it sounded like from some of

14    the papers was that people were saying after the fact Lehman

15    took away some of that 200,000.  So --

16         MS. JAO:  No, you weren't given the exact

17    proportion until after you render labor.

18         THE COURT:  That's right, but you were told up

19    front at the firm's option we're going to pay some of this

20    compensation in -- we may pay some of this compensation in

21    this other form.

22         So going into at the first moment in time you had

23    the choice of saying, I don't like that, I want to know

24    exactly what I'm going to be paid and in what form and I'm

25    not going to work here.

Page 18

```
 1                You -- when you go to work at any

 2      -- at any firm like this before you agree to walk through

 3      the door and sit down at a desk and give your labor, that's

 4      the bargain, right?

 5                MS. JAO:  Right.

 6                THE COURT:  That's the bargain.  You could say,

 7      this is not for me, this is not for me, I'm going to -- so

 8      I'm going to go to bank across the street because at bank

 9      across the street they pay all in cash.

10                I suspect, although I don't know, that there was

11      an opportunity to earn a bigger number, a higher number of

12      more compensation at Lehman partially because some of it was

13      payable in stock.  So there's a choice, right?  I could go

14      to bank across the street where they're promising to pay me

15      $400,000 in cash --

16                MS. JAO:  Uh-huh.

17                THE COURT:  -- or I can work at Lehman and get

18      $200,000 in cash and have a chance to get this black box of

19      compensation more.  That's my only point.

20                MS. JAO:  No, I see your point, Your Honor, and

21      how you could take the -- that as a take away from

22      yesterday's discussions.  My experience has been a little

23      different.

24                THE COURT:  Okay.

25                MS. JAO:  It's not in my prepared statement, but
```

Page 19

```
 1    you know, I joined Lehman as a junior --

 2               THE COURT:  Okay.

 3               MS. JAO:  -- as part of a bigger team which was

 4    taken out -- which was lifted out actually from Citigroup.

 5               THE COURT:  Okay.  What year was that?

 6               MS. JAO:  2000.

 7               THE COURT:  Okay.

 8               MS. JAO:  July of 2000.  So, you know,

 9    negotiations were hurried, you weren't actually -- so you

10    were -- so in the contract you were told part of your

11    compensation is going to be in RSUs, what the hell are

12    those?  Well don't worry, the senior guys are getting them,

13    you know, it's the same thing.

14               So I see what you're saying --

15               THE COURT:  Uh-huh.

16               MS. JAO:  -- my experience has just been a little

17    different.  I wish I was better informed, I wish I was less

18    naive then, but --

19               THE COURT:  Well, you know, one thing that's --

20    you know, that is striking, I mean I think you make a good

21    point that the senior guys were getting them, right?

22               MS. JAO:  Right.

23               THE COURT:  So probably a lot of the senior guys

24    had very, very, very substantial numbers of RSUs --

25               MS. JAO:  Yes.
```

Page 20

```
 1              THE COURT:  -- that --

 2              MS. JAO:  Certainly my -- my RSUs made claims are

 3    I -- I'm pretty sure are but a fraction of what you were

 4    hearing yesterday, so why would --

 5              THE COURT:  I don't know about that, but I will

 6    say, so if you began at Lehman in 2000 --

 7              MS. JAO:  Uh-huh.

 8              THE COURT:  -- then you were able to convert the

 9    RSUs that you had between -- that you earned between 2000

10    and 2000 and --

11              MS. JAO:  Three?

12              THE COURT:  -- three, right?

13              MS. JAO:  Yeah, very -- it was a very small

14    amount.  You know, it was a token amount.

15              THE COURT:  Okay.  And then it rose as you became

16    more senior?

17              MS. JAO:  No, the stock converted --

18              THE COURT:  Uh-huh.

19              MS. JAO:  -- so the stock itself was a very token

20    amount, and the RSUs, eventually you know, increased

21    incrementally --

22              THE COURT:  Right.

23              MS. JAO:  -- I was still not -- you know, I never

24    made managing director so it wasn't --

25              THE COURT:  Uh-huh.
```

Page 21

1            MS. JAO:  But I'm still here because for me it's a

2    matter of principal.

3            THE COURT:  I absolutely --

4            MS. JAO:  Right?

5            THE COURT:  -- I absolutely understand and I --

6    you're being extremely articulate and I appreciate it.

7            So I've interrupted you, so why don't I let you

8    keep going.

9            MS. JAO:  Yeah.

10           THE COURT:  You said you had --

11           MS. JAO:  Yeah.

12           THE COURT:  -- some additional points.

13           MS. JAO:  Yeah.  Yes.

14           While the RSUs -- while the use of RSUs with

15   described as compensation mechanism their use by Lehman

16   Brothers allowed the company to defer expenses, which

17   complicated employer/employee relationship.

18           At Lehman we were given our compensation

19   statements at the end of the year based on how well we did

20   in the preceding 12 months.  We received cash compensation

21   soon after.

22           With Lehman recognizing this expense during the

23   course of the year, the cash compensation Lehman recognized

24   over the 12 months; however, Lehman recognized the expenses

25   associated to RSUs only over the next three or five years

Page 22

1    and benefited from the failure of expenses even if services

2    were rendered in the preceding 12 month, and they received

3    full benefit of my services in the preceding 12 months.

4            This accounting practice gave Lehman the incentive

5    to use compensation mechanisms that was not necessarily

6    transparent, fair, or in the best interest of their rank and

7    file employees working for the company whose emphasis was,

8    you know, to make a livelihood.

9            So to wrap up, and as I mentioned earlier, part to

10   the reason, you know, I'm making an effort to participate in

11   this process, is really a matter of fairness.

12           You know, so an outsider looking in it's very easy

13   to view the proceedings as it's procedural, you know, it's

14   very structured, but I've also come to understand that the

15   law does not exist in a vacuum and so I'd like to wrap up by

16   mentioning fairness.

17           Like other claimants who were rank and file

18   employees of Lehman Brothers my relationship with the

19   company is a way to earn a livelihood.  While I'm not a

20   lawyer and not as well informed I do understand that workers

21   are afforded certain protections under the law; however,

22   through the bankruptcy process we've been relegated to the

23   end of the line.

24           Institutional investors, as well as their legal

25   counsel, have already received significant amounts on an

Page 23

1    ongoing basis.  On the other hand employees are still

2    struggling to get through the proceedings with far less

3    resources and no how to do so.

4           The best way I can describe the experience is that

5    it's been a matter of attrition.  I think others have

6    dropped their claims not because they agree that the RSUs

7    are equity interest, but because the requirements have

8    become too demanding, too confusing, and they've been

9    discouraged because of that.

10          Last but not least, and this related to fairness.

11   Yesterday you mentioned a passage from the RSU agreement

12   that states RSUs does not -- you know, RSU holders do not

13   have the rights of shareholders, and if I understood the

14   discussions correctly --

15          THE COURT:  Uh-huh.

16          MS. JAO:  -- that was described as a boilerplate

17   statement and should be disregarded.

18          While I'd like to think that, you know, I have

19   some ability to comprehend the documents, but there was no

20   way I could have made the distinction that this part of the

21   documents should be disregarded and this part should not be.

22   I mean how would --

23          THE COURT:  Yeah, I think that -- I think that

24   there was a little confusion around that part.  That

25   particular legend said that you don't have the rights of a

Page 24

1     shareholder until it converts to common stock.

2          MS. JAO:  Yes.

3          THE COURT:  And that was meant to convey exactly

4     your point that your started the day with, which was that

5     you couldn't vote, right?  You yourself as the holder of an

6     RSU were not going to get a proxy statement as you would,

7     but there were -- there were -- there were voting rights

8     that were attached to the RSUs --

9          MS. JAO:  Yeah.

10         THE COURT:  -- because of those interests being

11    put into a trust and having that trustee vote.

12         What I was arguing I believe with Ms. Solomon

13    about on that point was that -- the point was being made

14    that because it says you don't have the rights of a

15    shareholder that means that you must have been being told

16    you had the rights of a general creditor.

17         So in the -- let me explain a little -- let me

18    explain bankruptcy world, right?  So when you have a

19    bankruptcy estate the law is that the assets get distributed

20    in a --

21         MS. JAO:  Right.

22         THE COURT:  -- in an order --

23         MS. JAO:  Yes.

24         THE COURT:  -- you know, in a -- and there's a

25    very elaborate priority scheme.

Page 25

1          MS. JAO:  Yes.

2          THE COURT:  Right?  So that for that purpose we

3     have to -- a debtor -- a reorganized debtor or a trust has

4     to divide the world into each of those interests, and I

5     think what was being argued yesterday was you see, the

6     holders of the RSUs were told that they don't have the

7     rights of a shareholder and therefore that means that in

8     this bankruptcy they have the rights of creditors and be --

9     get to be ahead of the line.  And what I was saying was,

10    that's not a fair reading of that statement, because as you

11    said, context is everything.

12          So the context of that statement was clarifying

13    exactly your point was that you don't get to vote, you don't

14    get to demand -- make a demand on the board to bring a

15    particular action which would give rise to the right to

16    bring a shareholder suit.

17          So you're absolutely right, you -- the RSUs were

18    not equivalent in terms of all of the rights that they have

19    to a share of stock.  You are right, I agree with you.

20          MS. JAO:  When -- thank you, Your Honor.

21          THE COURT:  Okay.

22          MS. JAO:  When I started at Lehman --

23          THE COURT:  Uh-huh.

24          MS. JAO:  -- as a junior I worked 80 hundred (sic)

25    hour weeks and weekends, so even if these documents were

Page 26

1    available, you know, your priorities were a little different

2    or else you're -- you know, you're out there, but even if I

3    did read the documents I swear I would have never understood

4    them in this way.  But that -- you know, that's okay --

5              THE COURT:  No --

6              MS. JAO:  -- that's water under the bridge.

7              THE COURT:  -- I understand.

8              But I also want to respond to what you said about

9    kind of the war of attrition that you feel --

10             MS. JAO:  Uh-huh.

11             THE COURT:  -- has taken place here, because the

12   case -- we're now -- it's now 2014 and of course I took over

13   from Judge Peck in January, and I think this matter first

14   came up before him a couple of years ago and then there's

15   this elaborate procedure.

16             When the estate gets administered -- and I know

17   it's hard to accept this -- but it's the duty of those who

18   administer it to follow the law and make sure that every

19   claim falls in the right bucket and that folks who under the

20   law are supposed to be at the back of the line and in this

21   case not receive anything, don't jump up.  Because if you

22   imagine a very large RSU claim that gets turned into a cash

23   claim that then reduces the recovery of the people -- of the

24   creditors who are above that class.

25             MS. JAO:  Uh-huh.

1            THE COURT:  So it's a very important exercise

2     mandated by law to do this, and I know that it doesn't seem

3     fair, and I'm, you know, greatly sympathetic, I was an

4     associate at a law firm for many, many years and when you

5     get hired, you know, you get told you have a salary and a

6     bonus, and I remember thinking, well, what does that mean a

7     bonus?  Is that real, do I really get that, do I not get

8     that?

9            So -- and as you said, you know, I wouldn't have

10    really kind of like knocked on the managing partner's door

11    and said what does that really mean because you're -- you

12    know, you're starting out and you want to succeed and you go

13    along.

14            So I understand where you're coming from is the

15    easiest way for me to say it, and I just want to convey to

16    you that I'm -- will do everything -- I am obligated to

17    follow the law and do everything that I can to come to the

18    right result.

19            MS. JAO:  Your Honor, I do appreciate the value of

20    the procedure and the bankruptcy laws in this country,

21    because during the last financial crisis you could see

22    recovery encompassed here --

23            THE COURT:  Right.

24            MS. JAO:  -- more quickly with less destruction of

25    value because we do have the benefit of the bankruptcy laws

Page 28

1    and Bankruptcy Court.  I do appreciate that.

2           My only question is, and maybe this isn't the

3    right venue for it, but where do labor protections fall?

4           THE COURT:  Well, I think -- I mean, you know, we

5    could spend a day --

6           MS. JAO:  Right.

7           THE COURT:  -- we could spend a day talking about

8    it.  I think that, you know, it's the classic bind that

9    labor is in because of the nature of the relationship.

10          If all of the analysts in 2002 had said to Lehman,

11   you know, we're -- we don't know what this really means, we

12   don't like this deal, we're going walk with our feet maybe

13   Lehman would have changed it or maybe Lehman would have said

14   walk with your feet.

15          But, you know, at a certain point, you know, you

16   -- in the absence of circumstances, which frankly so far I

17   don't believe are present here, I don't think there's really

18   a remedy under -- under the labor law.

19          I mean I think that bankruptcy is a -- is a

20   shocking event for people.  No one could have foreseen -- no

21   one could have foreseen the fall of Lehman Brothers.  No one

22   could have foreseen it.  Hopefully it'll never happen again,

23   and a lot of innocent folks lost a lot of -- lost a lot of

24   money, but any way.

25          MS. JAO:  Thank you, Your Honor.

```
 1              THE COURT:  Thank you very much, I very much
 2     appreciate your taking the time to come down.
 3              MS. JAO:  Thank you.
 4              THE COURT:  Thank you, Ms. Jao.
 5              Sir?  Did I hear someone ring in on the line?
 6              I'm sorry, Mr. Miller, did you want to ask Ms. Jao
 7     some questions?
 8              MR. MILLER:  Ralph Miller for LBHI.
 9              No, Your Honor.  I just wanted to state that we
10     have no questions --
11              THE COURT:  Okay, thank you.
12              MR. MILLER:  -- or cross-examination for the
13     record.
14              THE COURT:  Thank you.
15              Is there somebody who dialed in on the telephone
16     line?
17              Okay, yes, sir.  What is your name, please.
18              MR. SHOTTON:  My name is Paul Shotton.
19              THE COURT:  How do you spell your last name?
20              MR. SHOTTON:  S-H-O-T-T-O-N.
21              THE COURT:  Okay, thank you, Mr. Shotton.
22              The same rules apply with respect to you.  I
23     assume that largely what you're going to say is in the
24     nature of argument, but to the extent that you are
25     indicating facts relating to your personal circumstances and
```

Page 30

1    situation with Lehman I will view that as sworn testimony --

2              MR. SHOTTON:   Indeed.

3              THE COURT:   -- that you're giving under oath.

4              Okay, go ahead.

5              MR. SHOTTON:   So my name is Paul Shotton.   I was

6    hired by Lehmans brothers on May the 24th of 2004 by the

7    chief risk officer of the firm, Madelyn Antoncic, who I knew

8    slightly from relationships at earlier firms that we'd both

9    worked at, and I was hired as a managing director to be the

10   global head of marketing risk management.

11             Now when I was hired it was clear that that job

12   was always going to be in New York where all of the senior

13   management, certainly in the corporation functions or the

14   risk management functions were all based in New York.   But I

15   was born in the United Kingdom and I was working in the

16   United Kingdom up until the time when I was hired.

17             So knowing that it would take some time to get a

18   visa for the U.S. immigration authorities to give me a visa

19   to move to the states I began working in London on May the

20   24th, and my visa finally -- or came through in August of

21   2004, I moved by family to the United States in August 2004,

22   I've been here every since.

23             So I continued with Lehman until the bankruptcy,

24   and then initially I was transferred to Barclays Capital,

25   but on October the 20th of 2008, I, along with most of the

Page 31

```
 1    other senior members of risk management, that were laid out

 2    of my Barclays Capital.

 3              Shortly afterwards in 2009 I received at my home

 4    address in Connecticut, through one of the mail delivery

 5    services, I received a proof of claim form which was already

 6    largely populated, it was populated with my name and

 7    address, it was populated with the name of the creditor

 8    Lehman Brothers Holdings Inc., and the notice of scheduled

 9    claims said that it was a Schedule G, executory contract or

10    unexpired lease, the description being restricted stock unit

11    agreements.  So I completed that form and sent it in.

12              I later had cause to need to change some of the

13    figures on my form, and the form that I subsequently sent in

14    I actually had to make two amendments, and they were blank

15    forms, so I filled those in myself, but I simply copied all

16    of the information in terms of the -- in terms of the

17    creditors being LBHI.

18              I put into the court record my hiring letter that

19    I had from Lehman Brothers.  I've actually put it into the

20    record twice.  The first time on February the 13th of 2012

21    in response to an earlier attempt by Lehman to have my claim

22    reclassified as equity, and I put it into the record again

23    on March the 4th of this year because I couldn't be sure --

24    having put it in so long ago originally I couldn't be sure

25    that it would be -- it would be fresh in mind.  So that's an
```

Page 32

1    employment letter, gives me a guarantee for the performance

2    year 2004.

3              So fiscal -- Lehman's fiscal performance year is

4    identical to their fiscal year, ends on November the 30th of

5    each year.

6              THE COURT:  Okay.  Let me ask you to pause for a

7    minute.  Is Mr. Shotton's letter in the -- in the record

8    somewhere?

9              MR. SHOTTON:  I have some copies I can --

10             THE COURT:  Do you have an extra copy?

11   Ms. Alvarez, do you have a copy?

12             MS. ALVAREZ:  No.

13             THE COURT:  And, sir, you believe you filed this

14   on the docket?

15             MR. SHOTTON:  I'm sorry?

16             THE COURT:  You filed this on the docket of this

17   court you think?

18             MR. SHOTTON:  I -- yes, I actually addressed one

19   to your good self on March the 4th of this year --

20             THE COURT:  Okay.

21             MR. SHOTTON:  -- and I had already sent one to

22   Judge Peck and to other parties in --

23             THE COURT:  Ms. Solomon?

24             MS. SOLOMON:  Yes, Your Honor, it's Claimant 69 in

25   the attached joint appendix.

1           (Pause)

2                THE COURT:  So at the joint appendix CL0069 is

3    Mr. Shotton's declaration, and attached to that is a proof

4    of claim, and attached to that is -- is the hiring letter.

5                MR. SHOTTON:  Indeed.

6                THE COURT:  Okay.  Very good.  Thank you.

7                MR. SHOTTON:  So you'll see in the second

8    paragraph -- as I was explaining the performance here is

9    equal to the fiscal year, which ended on November the 30th

10   each year.

11               So you'll see for the performance year 2004 my --

12   the year which I was hired -- I was going to be paid a

13   salary at annualized rate of $200,000, and that was I think

14   the maximum salary with any MD in the firm was paid --

15   managing director of the firm was paid.  And a guaranteed

16   minimum bonus of $1.55 million payable on or about January

17   the 31st in the following year.

18               And at the bottom of the letter, the one, two --

19   the fourth paragraph says:

20               "At the firm's discretion a portion of this 2004

21   and future years compensation will be payable in conditional

22   equity awards pursuant to the firm's stock award program

23   then in effect."

24               And then the next paragraph begins:

25               "Your compensation for all periods after

Page 34

```
 1    performance of year 2004 will be determined at the firm's

 2    discretion; however, referencing a run rate compensation

 3    level for that of 2004 of one and three quarter million

 4    dollars."

 5              So my point here is that this guarantee for the

 6    first year and the run rate which was referenced for future

 7    years compensation was guaranteed in U.S. dollars, the legal

 8    tender of this country.  That wasn't guaranteed in terms of

 9    a number of hours used, the number of Lehman shares, the

10    number of share options or CSAs or anything else, it was

11    U.S. dollars.  And so I understood that to being that they

12    were -- that was the -- my -- my guarantee.

13              And I understood RSUs -- I mean many Wall Street

14    firms, most firms have similar compensation deferral

15    programs and part of that deferred compensation is paid in

16    the form of equity.

17              There were two things that were unusual about a

18    Lehman scheme in relation to other firms.  One was the

19    amount of compensation, which was paid in the form of

20    deferred equity.  So as other firms typically might have

21    been 15 to 25 percent of total compensation was deferred at

22    Lehman between -- well for the first year 33 percent of my

23    bonus was deferred in the form of RSUs, later it became 40

24    percent of the bonus, which were very high figures.

25              The other unusual future was the long length of
```

Page 35

1     the deferral period.  So other firms, the lady spoke

2     yesterday about Barclays, my own experience at JPMorgan

3     before was that deferrals were in -- of three years -- three

4     equal transfers, paid a third, a third, a third after the

5     end of the subsequent three years, and as soon as equity

6     vested it was immediately yours free to dispose of as you

7     wished.

8             So this cliff vesting after five years was an

9     unusual feature of Lehman's terms.  And ostensibly as sort

10    of compensation for that that was why the stock was offered

11    at a discount.  That was another rare -- by that point

12    unusual feature.  Most firms had -- no longer granted their

13    equity at a discount, Lehman was one of the few that did,

14    and they finally got rid of that clause in 2008.

15            So Lehman might say, well, okay, you -- you

16    accepted this letter, perhaps initially you (indiscernible -

17    00:38:20) you didn't do enough due diligence to really

18    understand exactly what the terms of the deferral were, I

19    had assumed it was going to be similar to those other

20    typical Wall Street firms like JPMorgan, but after the first

21    year once you had experienced the first years compensation

22    that should have been clear to you, why did you continue to

23    stay?  And de facto by continuing to stay for another three

24    and a half years after the first year you had accepted the

25    terms and conditions.  If you didn't like them then you

Page 36

1    could have --

2              THE COURT:  Well, can I --

3              MR. SHOTTON:  -- you could have walked.

4              THE COURT:  -- can I just -- can I just stop you,

5    because it's a striking letter, and I'm quite glad that

6    you're here, because the situation that you describe, which

7    is making an enormous decision to move your family to the

8    United States.

9              MR. SHOTTON:  Exactly.

10             THE COURT:  An enormous decision, okay?  And you

11   get a letter -- and I'm trying to read this through your

12   eyes, right?  You get a letter that says, "At the firm's

13   discretion ..." no question what those words mean.  "At the

14   firm's discretion ..."

15             MR. SHOTTON:  Absolutely.

16             THE COURT:  "A portion of your total 2004 and

17   future years total compensation ...," and then there's a

18   parenthetical that draws down on that, "combined base

19   salary, bonus, and other compensation will be payable in

20   conditional equity awards."

21             So through my eyes if I'm reading this I say,

22   whoa, not only are they telling me that they can pay part of

23   my bonus in equity, but they're telling me that they might

24   actually be able to pay my base salary in equity.

25             I mean that to me just plain English reading would

 1    set off enormous bells and -- alarm bells because it would

 2    signal to me that I have no -- there's no backstop here,

 3    there's nothing here -- there's no firm guarantee -- cash

 4    number that's guaranteed.

 5            So -- so -- and your case is also extremely

 6    interesting because obviously the title, the position, you

 7    weren't being hired as somebody, you know, to work in some

 8    low level department, I mean you fantastically sophisticated

 9    individual.

10            So I'm just trying to harmonize what you're

11    telling me with, you know, your having gotten this letter --

12            MR. SHOTTON:  Uh-huh.

13            THE COURT:  -- and made a decision to come over

14    here.

15            MR. SHOTTON:  A literal interpretation of their

16    words may well indicate that even the salary was potentially

17    -- could potentially being withheld in the form of RSUs.

18            THE COURT:  Be in play, right?

19            MR. SHOTTON:  But that was not the practice at

20    all.  Remember that it was common practice on Wall Street to

21    withhold some portion of compensation and to be deferred

22    either deferred cash or deferred equity, so that wasn't

23    unusual to me.

24            Also remember that my hiring manager, Madelyn

25    Antoncic, I knew -- I didn't know her extremely well, but I

Page 38

```
 1    knew her somewhat --

 2              THE COURT:  Uh-huh.

 3              MR. SHOTTON:  -- we both worked as Golden Sachs in

 4    the past, we both shared a short period -- short experience

 5    at BSW, myself in London always and she in New York, so I

 6    didn't know her well --

 7              THE COURT:  Uh-huh.

 8              MR. SHOTTON:  -- but I knew her reasonably well

 9    and I knew standard Wall Street practices, and so to me it

10    wasn't unusual.

11              THE COURT:  Uh-huh.

12              MR. SHOTTON:  I took a certain amount on trust of

13    course, and I have to say that the first year, 2004, only 33

14    percent of the bonus was withheld in the form of RSUs, and

15    my understanding is that that had been the typical -- the

16    typical kind of percentage --

17              THE COURT:  Uh-huh.

18              MR. SHOTTON:  -- withholding for up until that

19    period.  It was only after that that it was increased to 40

20    percent.

21              THE COURT:  So that means in the first year then

22    and it's pro rata it's not a full year, but so 33 percent --

23    I'm sorry -- was the -- does that one million five represent

24    the pro rata?

25              MR. SHOTTON:  1. -- no, 1.55 was the guaranteed
```

1    bonus for the -- for the whole year, whatever I worked of

2    it.

3              THE COURT:  For calendar -- for calendar of 2004.

4              MR. SHOTTON:  For -- well, for fiscal year, for

5    performance year 2004.

6              THE COURT:  Performance year.  So --

7              MR. SHOTTON:  1.55 million.

8              THE COURT:  So eventually --

9              MS. JAO:  The thing that was pro rata was the

10   salary, because I joined May the 24th --

11             THE COURT:  Yeah, yeah.

12             MR. SHOTTON:  -- I worked for just over six months

13   so I got just over $100,000 of salary --

14             THE COURT:  Okay.  And then how much --

15             MR. SHOTTON:  -- but the 1.55 was guaranteed.

16             THE COURT:  -- how much -- how much cash did you

17   get on January 31, 2005?  So it would have been a third

18   of --

19             MR. SHOTTON:  The --

20             THE COURT:  -- of a half of a million five?

21             MR. SHOTTON:  Of the 1.55 million bonus RSUs

22   amounted to 509,952 and the cash payment before taxes was

23   $1,040,048.

24             THE COURT:  So even though you only worked a half

25   a year that number is the -- is the actual number that is

Page 40

1    your bonus for the year 2004?

2            MR. SHOTTON:  That's correct.  That's correct.

3    Because --

4            THE COURT:  Was part of that like a signing bonus?

5            MR. SHOTTON:  Effectively because in leaving

6    JPMorgan, my previous employer, I was leaving behind a bonus

7    on the table there.

8            THE COURT:  Okay.

9            MR. SHOTTON:  So this was again standard Wall

10   Street practice at the time.

11           THE COURT:  Okay.  So all in the cash that you

12   received on account of the work that you did in 2004 was

13   approximately a million one.

14           MR. SHOTTON:  Yes.

15           THE COURT:  Okay.  Okay, go ahead, I interrupted

16   you.

17           MR. SHOTTON:  Okay.  So -- so Lehman might say,

18   well, after the first year at least by then your eyes were

19   opened, you were well aware of how much and to what extent

20   Lehman could defer compensation in the form of these RSUs,

21   so why didn't you just walk?  You had the option to go

22   somewhere else.

23           Now from a -- in principal that's correct, but I

24   had -- if you think about it any major Wall Street firm, any

25   major trading firm, capital markets firm needs only one

Page 41

1    global head of market risk management, so how many firms are

2    there?  Well we're talking about five Wall Street firms.

3    Golden Sachs, Merrill Lynch, Morgan Stanley, Lehman

4    Brothers, and (indiscernible - 00:44:23).  Then there are --

5    there were the two large (indiscernible - 00:44:26) banks,

6    JPMorgan and Citibank, that was it.  Bank of America once it

7    acquired Merrill wasn't a major capital markets player, so

8    seven names in the United States, one of which I was already

9    at Lehman.

10           In Europe you had two large Swiss banks, UBS and

11   Credit Suisse, and Deutsche Bank in Germany, and that was

12   pretty much it.  Barclays wasn't a major player, it wasn't a

13   first league player until after they brought Lehman's out of

14   bankruptcy -- North American business out of bankruptcy in

15   2008.  So there were about nine firms that I could have gone

16   to.

17           So my skill set is highly technical, highly

18   quantitative, quite rare, and therefore compensated, it's

19   also the case there's a fairly limited demand for somebody

20   with my skill set.  I had already waited -- I had been at

21   JPMorgan for seven years before moving to Lehman, I'd waited

22   for a considerable part of that period to make the next step

23   in my career progression, which at JPMorgan I was the

24   European -- Europe, Africa, Middle East head of marketing

25   risk.  So the next step in the progression was global head

Page 42

1   of market risk, and then I saw, you know, chief

2   (indiscernible - 00:45:28) after that.  So I really had to

3   wait a long time to find the Lehman opportunity.

4          And out of leaving that behind, leaving --

5   obviously over the -- over the course of the four and a half

6   years my compensation at Lehmans accumulated to, you know,

7   four and a half million dollars or so of RSU -- RSUs left on

8   the table, I would have to walk away from that.

9          The chances of finding another equivalent job as

10  head of market risk somewhere else pretty small.

11         The chances that I could persuade another firm to

12  pay out the compensation that I was leaving on the table at

13  Lehman was -- you know, was slim to none.

14         So whilst theoretically it's correct to say I had

15  the option to walk, as a practical matter I didn't really

16  have an option to walk, and that's why I stayed at the firm.

17         And as far as my understanding of RSUs, Lehman in

18  its documentation they like to conflate the idea of RSUs

19  with equity in order to encourage employees to act like

20  shareholders, and they would used terms like equity awards

21  in relation to RSUs and CSAs and so on.  But let's not let

22  that confuse us.  RSUs are RSUs.  They are not equity at

23  all.

24         The very basic -- if you think back for the

25  foundation of joint stock corporations they started because

Page 43

```
 1    wealthy investors wanted to invest in businesses and

 2    ventures, but then at some point those circumstances

 3    changed, they needed liquidity or they wanted to invest at a

 4    better opportunity somewhere else and so they -- they needed

 5    some means of getting out of their -- of their investment,

 6    and so, you know, as history tells it they gathered under a

 7    buttonwood tree not too far from here and developed the idea

 8    of exchanging stocks, and that was the origin of the joint

 9    stock corporation and that's the origin of equity.

10            A fundamental element of equity is that it is

11    transferable.  RSUs are not sellable.  I couldn't sell them,

12    I couldn't hedge them, I couldn't do anything with them.

13            As far as I was concerned there was simply nothing

14    more than a promise that in five years time they would

15    convert into equity, and until that time all I had was a

16    promise from Lehman and nothing more, and that's why I

17    regard them not as equity, not as equivalent of equity at

18    all, they're simply promises -- unfulfilled promises and

19    that's why I regard them as being equivalent to debt claims

20    not as -- not as equity claims.

21            THE COURT:  Okay.

22            MR. SHOTTON:  There is, if you allow me --

23            THE COURT:  Yes, go ahead.

24            MR. SHOTTON:  -- there's one more matter that I'd

25    like to bring to the Court's attention.
```

Page 44

1          So on December the 21st, 2011 your distinguished

2    predecessor Judge James Peck invited a number of employee

3    claimants to make statements about their --

4          THE COURT:  Right.

5          MR. SHOTTON:  -- their situation, those

6    circumstances were in front of the Court.  I was there on

7    that day, I was privileged to be allowed to address the

8    Court.  And whereas Lehman had been saying, oh, these --

9    these employee claims they're all the same, they're all just

10   equity, they should all be reclassified as equity.

11         Judge Peck, having heard the people speak said,

12   no, that's not right.  He heard people talk about -- so

13   salaried employees, not myself -- speak of RSUs.  He heard

14   people in the UK and elsewhere speak of CSAs, which are

15   economically similar but legally distinct.  He heard talk of

16   equity options, which are very different from RSUs and CSAs,

17   both economically and legally.  He heard about commissioned

18   sales people part of whose sales commissions were being

19   withheld.  And he heard about the Neuberger Berman partners

20   whose partnership stakes were swapped for RSUs.

21         THE COURT:  Right.

22         MR. SHOTTON: and he said this -- there's a lot of

23   different cases here, different classes, they're not all the

24   same, and he asked the employees claimants be categorized

25   into these classes.

1          THE COURT:  Right.

2          MR. SHOTTON:  Now realizing full well that it

3    would be almost impossible for the employees to organize

4    themselves into these classes, because after all we didn't

5    really know one another, and it also at that point it wasn't

6    clear just how many different classes there were, he charged

7    Lehman with the responsibility of defining the classes and

8    grouping the employee claimants into these classes in order

9    to ease the process for the Court to make it more efficient

10   and at the same time that would make it more efficient for

11   the employees as well.  So that each class of employees

12   could have one law firm representing them, that would avoid

13   potential conflicts of interest between different classes of

14   employees being -- their interests being represented by the

15   same law firm, and that would most importantly ease the --

16   the situation for the Court, make it more efficient.  And so

17   he charged Lehman with the responsibility to do that.

18          After he did that Lehman did absolutely nothing.

19   They completely ignored that instruction, and that's why

20   today you would see that there are half a dozen law firms

21   representing the represented claimants, but it's not nicely

22   lined up in the way that Judge Peck intended with one law

23   firm representing RSU holders and one law firm -- salaried

24   employees, one for CSAs, one for commission sales people,

25   one for (indiscernible - 00:50:32).  It's not like that at

1   all.  These law firms covering the covered employees cover

2   several different categories.

3              THE COURT:  Right.

4              MR. SHOTTON:  It's quite a -- quite a mixture.

5              THE COURT:  It is a mixture and I'm just -- I'm

6   very interested in what you're saying, because my reading of

7   what Judge Peck observed was that his inclination at the

8   initial hearing was to rule as a matter of law that RSUs and

9   CSAs across the board had to be subordinated, but as the day

10  went on and as he listened to more and more of the

11  individuals state their concerns he felt that as a matter of

12  procedural fairness, due process --

13             MR. SHOTTON:  Yes.

14             THE COURT:  -- and also to insure the ability to

15  make -- for him to make the right decision, and at that

16  moment in time of course he had no inkling that he would be

17  retiring, he then said to the debtors, we're going to have

18  to figure out a way to have an evidentiary hearing to give

19  the individual employees an opportunity to get themselves --

20  distinguish them -- their cases from the cases that led to

21  the ruling in Enron.  And that's a great simplification --

22             MR. SHOTTON:  Uh-huh.

23             THE COURT:  -- of the issues.

24             But the -- I don't think that he had -- was

25  directing, and I don't think that Weil, Gotshal would have

Page 47

```
 1    the ability to organize the claimant pool.  The claimant

 2    pool then had to unfortunately organize itself.

 3              And what happens in a lot of cases, and I also --

 4    I've -- among the many cases that I have heard I preside

 5    over the Ambac case.  I'm sure you're familiar with --

 6              MR. SHOTTON:  Uh-huh.

 7              THE COURT:  -- what Ambac is.  Ambac is the second

 8    largest municipal bond insurer in the United States and it

 9    ended up in this court of course because of the defaults in

10    the -- the CDOs and the --

11              MR. SHOTTON:  The monoclines, yeah.

12              THE COURT:  -- CDOs squared, and the monoclines,

13    exactly.  And in that case we had claimants come in who

14    similarly were represented, not every single one of them,

15    but lawyers came in representing groups of them.  It kind of

16    became the symbol for the whole -- the whole class.

17              So -- so I don't know if you're telling me that

18    you find it troubling that each of the law firms that is

19    appearing here seems to be representing one from -- one from

20    each of the different buckets.  I don't --

21              MR. SHOTTON:  Well my -- your interpretation of

22    Judge Peck's comments is perhaps different than mine was.

23    My interpretation of what he said was that he wanted the

24    Court to be able to consider the employee claimants in their

25    distinct classes, and he -- my understanding was that he
```

1    charged Lehman with the responsibility of organizing those

2    classes, and then as a side comment this would also be far

3    more efficient for the employees because then each class can

4    only -- can have one law firm representing.  You have to

5    share the cost amongst that class, that's obviously cheaper

6    and more efficient than having half a dozen law firms all

7    covering the same things.

8              THE COURT:  Right.

9              MR. SHOTTON:  I --

10             THE COURT:  Well if -- and I'll ask Mr. Miller,

11   I'm happy to go back and look at the transcript of that day,

12   but my impression of it is that he was looking for there to

13   be a process --

14             MR. SHOTTON:  Uh-huh.

15             THE COURT:  -- which there was and was heavily

16   negotiated that would serve as an opportunity for anyone and

17   everyone who wanted to be heard to be able to be heard.

18             MR. SHOTTON:  Uh-huh.

19             THE COURT:  And you and Ms. Jao before you

20   obviously rose to the occasion to appear here and then we

21   have groups of others represented by the lawyers.  And

22   beyond that it's difficult for the Court to kind of go out

23   and on an individual claimant basis, you know, ask for

24   them --

25             MR. SHOTTON:  Uh-huh.

Page 49

1              THE COURT:  -- to participate.  We -- you know,

2        the concept is notice and an opportunity to be heard, and

3        today is that day.

4              So, Mr. Miller, do you have the transcript and is

5        there something that I'm missing in terms of what Weil,

6        Gotshal was tasked or what Lehman was tasked with in order

7        to get us to today?

8              MR. MILLER:  Your Honor, Ralph Miller.

9              We don't believe there is anything that the Court

10       is missing.  We did understand and we did undertake to serve

11       operative documents on all the pro se participants so they

12       had a flow of information.

13             THE COURT:  Uh-huh.

14             MR. MILLER:  We made suggestions during that

15       hearing that all the people on the phone expressed their

16       views about whether they wanted to be heard, and some people

17       said they would like to be heard, and there was a discussion

18       in that transcript about whether it should be bifurcated

19       into two hearings.  The one hearing --

20             THE COURT:  The represented and the non-

21       represented?

22             MR. MILLER:  Yes.  And we thought that was

23       inefficient and I think Judge Peck believed that was

24       inefficient, and some of the people who did not have an

25       order said they'd like to get to speak at the same time and

Page 50

```
 1   they'd like to be integrated, so --

 2              THE COURT:  Okay.

 3              MR. MILLER:  -- Judge Peck decided that it would

 4   be an integrated proceeding.

 5              He also decided to give the pro se claimants the

 6   opportunity to come watch the represented claimants and the

 7   opening statement if they wished to do so so that they could

 8   gain the background information --

 9              THE COURT:  Right.

10              MR. MILLER:  -- in the first day --

11              THE COURT:  Right.

12              MR. MILLER:  -- and then in a later day if they

13   wished to speak or not speak they could do so.

14              I don't know where Mr. Shotton was here yesterday

15   or not.

16              MR. SHOTTON:  I was here yesterday.

17              THE COURT:  Okay.

18              MR. MILLER:  So he has had the benefit of that

19   process.

20              THE COURT:  Okay.

21              MR. MILLER:  And we have received inquiries from

22   people and we have consistently indicated what the options

23   were I believe to come -- you know, participate in the

24   pretrial which we also made available by telephone and let

25   people know in the notice --
```

Page 51

1            THE COURT:  Well, we did -- we did -- our chambers

2    did receive a number of phone calls, and you know, the usual

3    rules of the court here are that if you're in Manhattan you

4    have to come, and in this case my chambers was instructed

5    that anyone who calls and wants to participate

6    telephonically in this hearing was to be given permission to

7    do so, no questions asked.

8            So I don't know -- you know, there are rules about

9    the Court communicating with the parties, so my chamber

10   staff deals with this and I was advised that anyone who

11   called was given the opportunity to call in.

12           MR. SHOTTON:  Uh-huh.

13           THE COURT:  So -- so again, Mr. Shotton, I don't

14   know where to go with your observation.  I will go back and

15   look at that transcript to see if there's some defect, but

16   you yourself are here --

17           MR. SHOTTON:  Well --

18           THE COURT:  -- and are doing --

19           MR. SHOTTON:  -- it's possible that I over

20   interpreted what he meant and I -- it's possible that I was

21   thinking that he wanted to make the process very efficient,

22   which would have been the case had each of the classes been

23   distinct classes and each class been represented by one law

24   firm, you wouldn't have had some of the kind of confusion

25   that you -- you know, you heard yesterday when a single -- a

Page 52

1    representative of a single law firm is talking about

2    multiple different claimants and different types of claims

3    that they had.  That could have been simplified a lot.

4           I mean I've -- I've appeared pro se because I

5    can't afford paying for representation, but I have taken

6    part in a large number of conference calls over the last two

7    years and so, and I have to say that they've been -- they've

8    been pretty chaotic.  And I think that that is perhaps

9    emblematic of the war of attrition that happened between

10   Lehman and the claimants, they were -- they were quite fine

11   that the process being efficient and be dragged out because

12   that would then motivate claimants -- how so many other

13   previous employee claimants had abandoned their claims

14   because they could no longer afford to continue

15   representation and they became frustrated with the process

16   so they abandoned their claims.

17          So as far as I can see it was actually part of a

18   deliberate strategy.  It wasn't just incompetence or

19   misunderstanding.  But that's -- perhaps I was over

20   interpreting Judge Peck's intentions that the process be

21   efficient.

22          THE COURT:  Well, I think it's important to react

23   somewhat to the statement that it's a deliberate strategy,

24   because certainly, you know, the suggestion that the Court

25   is somehow encouraging or tolerating something that's

Page 53

1    improper is not -- is not something that I cannot -- not

2    react to.

3              My view of what Judge Peck did, as reflected in

4    the stipulation, and the folks -- and I think it bears

5    saying that -- and I actually -- I wrote a decision in the

6    Ambac case in which I did not allow the claims of the

7    shareholders, and in that decision I said -- I indicated

8    that, you know, the anger and the disappointment of the

9    shareholders --

10             MR. SHOTTON:  Uh-huh.

11             THE COURT:  -- in that case was completely

12   understandable, but that when you're obligated to apply the

13   law, right, I --

14             MR. SHOTTON:  I understand.

15             THE COURT:  -- you know, I'm not -- you wouldn't

16   want judges to be anarchists, right, and not apply the law,

17   and there's a great debate over the extent to which we

18   should do what's fair as opposed to what the law requires.

19             MR. SHOTTON:  I realize that, you know, the law

20   and justice are not one in the same thing.  I appreciate

21   that.

22             THE COURT:  And they're not -- you know, and I'm a

23   great --

24             MR. SHOTTON:  But I would like to believe that the

25   two at least have a noting acquaintance.

1          THE COURT:  Well then if you'd like to do some

2     reading then I wrote a decision in a case called Patriot

3     Coal in which I said the question was what is justice?  So

4     I've thought about this a lot.

5          MR. SHOTTON:  Uh-huh.

6          THE COURT:  And I do believe that I have to apply

7     the law and that I also do have to do justice, but I do have

8     to apply the law.

9          And what this has to do with the Lehman estate is

10    that there is this bankruptcy structure, and the folks who

11    represent Lehman are obligated to implement it, and they

12    don't have a dog in the fight in the sense of wanting to

13    allow one claimants' claim versus another.  They don't get

14    paid more or less, they just have to sort the claims so

15    that --

16          MR. SHOTTON:  Well, I can construe a possible

17    motive though, Your Honor.

18          THE COURT:  What motive would that be?

19          MR. SHOTTON:  Well the -- there are various firms

20    available in administering Lehman's estate right now, and

21    you might think as you just implied, that they are

22    dispassionate, disinterested third parties, but I believe

23    they do have a vested interest, because they -- these firms

24    confidently expect to get future business to have as future

25    clients the corporate claimants to Lehman's estate, whereas

1   they have no reason to expect to get any future business at

2   all from the employee claimants, and that creates a motive

3   for them to unfairly discriminate against the employees in

4   order to benefit the corporate claimants and to line their

5   own pockets in the process, Your Honor.

6          THE COURT:  Okay.  Well, I understand that that's

7   your view, and I don't -- I have to decide this matter and

8   every matter --

9          MR. SHOTTON:  Of course.

10         THE COURT:  -- as a question of law and listening

11  to the facts, and I'm quite happy that you came in today,

12  and I appreciate your presentation, it added a lot --

13         MR. SHOTTON:  Thank you for your indulgence, Your

14  Honor.

15         THE COURT:  -- to what I heard yesterday.

16         And let me just ask Mr. Miller if he wanted to ask

17  you any questions in the nature of cross-examination?

18         MR. MILLER:  I do briefly, Your Honor.

19         THE COURT:  All right.  It's always a little

20  unusual when we have a pro se claimant, but if I could ask

21  you to take the witness stand that would be great.

22         MR. MILLER:  And he is --

23         THE COURT:  I will now administer the oath.

24    (Witness Sworn)

25         THE COURT:  Okay.  Please have a seat,

Page 56

1    Mr. Shotton.

2    CROSS-EXAMINATION

3    BY MR. MILLER:

4    Q    Mr. Shotton, my name is Ralph Miller, I don't think you

5    and I have spoken before, but you have made a number of

6    calls I understand --

7             MR. MILLER:  Excuse me, I'm sorry, Your Honor,

8    apparently --

9             THE COURT:  Oh, try it again.

10            MR. MILLER:  Yes.

11   BY MR. MILLER:

12   Q    Mr. Shotton, my name is Ralph Miller, I don't believe

13   you and I have spoken; is that correct?

14   A    We have not.

15   Q    You have however called my colleague, Ms. Alvarez, on a

16   number of occasions and sought information as I understand?

17   A    Yes.

18   Q    Now you made reference to a series of conference calls

19   you were in.

20   A    Yes.

21   Q    Were those conference calls with other claimants and

22   counsel that you were referring to?  I don't want you to get

23   into any contents?  Yes.

24   A    Yes, they were.

25   Q    Weil, Gotshal was not in those conference calls,

1    correct?

2    A    I think some of the conference calls Weil, Gotshal was

3    at, some they were not.

4    Q    All right.  You did file a declaration in this case; is

5    that right?

6    A    Yes.

7    Q    And this declaration appears to be based on some sort

8    of form you received; is that correct?

9    A    Yes.

10   Q    Yes.  Who did you receive that form from?

11   A    Well, I actually saw a lot of forms from the -- what's

12   the -- there's some court service which distributes all of

13   the papers from all of the claimants across -- to all of the

14   interested parties.  So I received a large number of emails

15   to my work and home email address with attached subject --

16   attached forms to them.

17          So having seen that -- those started to come

18   through I think on March the -- around March the 2nd, March

19   the 3rd.  Having seen those I decided I should put in a

20   statement of my own.

21          So I had earlier received from one of the -- one

22   of the attorneys a draft copy of an earlier version of such

23   a thing, which I, in combination of that that's where I had

24   seen other claimants make, created my own version of that

25   and submitted that to the court I think on like I said March

Page 58

1    the 3rd or March the 4th.

2    Q    So you were in contact with other claimants and their

3    counsel?  Again, I'm not asking you for the content of

4    that --

5    A    Yes.

6    Q    -- but you were able.

7         And was there any effort made to try to organize

8    into coherent groups in that conversation -- those

9    conversations you had?

10   A    Not that I'm aware of, no.

11   Q    All right.  Did -- are you aware of the fact that LBHI

12   did not want to have this evidentiary hearing?

13   A    I wasn't aware of that I don't think.

14   Q    All right.  Do you know whether or not LBHI suggested

15   that it didn't want to have discovery in this case?

16   A    I can't recall, no.

17   Q    All right.  So you don't know with regard to this war

18   of attrition that you've talked about whether LBHI sought

19   the discovery and this hearing or someone else did --

20   A    No.

21   Q    -- as a matter of fact.

22        You did understand that you had the right to

23   select your own counsel if you wished to and you understand

24   that that's not up to LBHI to find counsel for you?

25   A    (Indiscernible - 01:06:19).

Page 59

1   Q    All right.  I want to talk just a little bit about your

2   testimony.  You are classified as a managing director?

3   A    That's correct.

4           MR. MILLER:  Your Honor, may I approach?

5           THE COURT:  Yes.

6       (Pause)

7           THE COURT:  Thank you.

8   BY MR. MILLER:

9   Q    I have handed you --

10          THE COURT:  Mr. Miller, I just -- I just want to

11  interrupt you for a second because of this -- because we've

12  gone back in time with respect to Judge Peck's tenor, and I

13  just want to illuminate a little bit about -- and I know

14  it's odd in the middle of the cross-examination, but you

15  know, when a judge retires the judge's docket of cases gets

16  distributed to colleagues.  That's what happens.  And

17  there's a process that we go through.

18          There was a determination made that I would

19  receive the Lehman body of cases and no others, because the

20  Lehman group of cases is so substantial.

21          And there's a transition period that happens in

22  which the departing judge talks to the judge who's assuming

23  the cases so that in order to insure that the parties are

24  not prejudiced by the transition.

25          That being said though it's my case now and I have

Page 60

1    attempted to respect and accommodate what Judge Peck did for

2    those five years, but I get to do my own thing, so to speak.

3            And in this case Judge Peck had indicated at the

4    previous hearing on this matter that he intended to follow

5    the Enron decision and that the further proceedings that

6    were to take place were to give folks the opportunity to

7    demonstrate why Enron should not be followed with respect to

8    them.  That's all shorthand for the ruling that he was

9    poised to make on that date.

10           So that I just wanted you to understand that I

11   understand the background, and whether or not Judge Peck

12   would ultimately have ruled one way or other and that ruling

13   is the same that I will eventually hand down here, we don't

14   know, but I don't want -- I hope people don't feel that

15   they've been prejudiced by the fact that -- prejudiced or

16   advantaged by the fact that we've gone from one to the

17   other.  I think the judges in this building pride themselves

18   on -- you know, trying to take a fairly consistent approach

19   in the application of the law.

20           So I just wanted to let you know that I am doing

21   my level best in terms of making it as non-chaotic as

22   possible, and I don't know that I'm succeeding, but I just

23   wanted to give you that little bit of background.

24           I apologize, Mr. Miller.

25           MR. MILLER:  Thank you, Your Honor.  I was going

Page 61

1    to change topics --

2              THE COURT:  Go ahead.

3              MR. MILLER:  -- unless there were any other issues

4    that you want me to --

5              THE COURT:  No.

6              MR. MILLER:  -- explore on this issue of the right

7    to choose counsel and --

8              THE COURT:  Yeah, go ahead.

9              MR. MILLER:  -- who can organize them.

10             And I have just passed out a document which is --

11   if you'll remind me what exhibit this stipulation is this?

12             UNIDENTIFIED SPEAKER:  Seven.

13             MR. MILLER:  Seven?  All right, I believe, Your

14   Honor, this is Exhibit 7 to the stipulation already, which

15   is CL001.  So it doesn't need to be remarked, but this is a

16   convenience copy.

17             THE COURT:  Okay.

18             MR. MILLER:  And I believe --

19   BY MR. MILLER:

20   Q    Would you look at this and see if you recognize this as

21   a -- a document dealing with the grant of RSUs?

22   A    It is, yes.  I don't recall this document in

23   particular, but there are many similar kinds of documents

24   that I did receive while I was at Lehman and I've seen them

25   in the evidentiary (indiscernible - 01:10:55) since.  So

1    yes, I recognize that's what it is.

2    Q    Well, did you understand that one of the stated

3    purposes of the restricted stock unit program was to give

4    you a feeling of ownership in the firm?

5    A    I viewed the principal reason why it was held as an

6    employee retention device.  It secondarily had the role of

7    (indiscernible - 01:11:35) employees to behave like bonus.

8    Q    Did you understand that you would receive the benefit

9    of stock appreciation at the end of the five years if you

10   met the conditions and remained with Lehman for five years?

11   A    I understood that this promise to convert the RSUs into

12   equities after five -- five years after the grant date would

13   happen and that had those conversions taken place that the

14   equity when delivered would be worth whatever it is now

15   worth with a higher or lower or whatever.

16   Q    Now I understand that your position was the head of

17   global risk management; is that correct?

18   A    Global market risk management.

19   Q    Global market risk management.  Okay.  What is global

20   market risk management?  What --

21   A    Market risk is the risk that a firm experiences as a

22   result of changes in interest rates, in credit spreads, in

23   equity prices, foreign exchange prices, volatility levels.

24   It's the risk that a firm has to value its -- of its

25   exposures as a function of changes in market levels as

Page 63

1    opposed to credit risk, for example, credit risk being the

2    exposure that a firm has because of the failure to pay via a

3    counterparty.

4           So market risk is specifically to do with changes

5    in market prices and levels of volatility risks.

6    Q    Did this include such things as the derivatives

7    programs --

8    A    Yes.

9    Q    -- that were involved?

10   A    Yes.

11   Q    And this included such thing as changes in the value,

12   for example, of special purpose vehicles, so-called SPVs,

13   that held residential mortgages?

14   A    The underlying -- the changes in the value of the

15   underlying collateral is driven by market risk, but the risk

16   that the firm has then is actually counterparty credit risk,

17   so that's a more complicated case which actually covers both

18   elements of market and credit risk, but certainly there are

19   elements of market risk.

20   Q    All right.  Did you feel that as the head of a global

21   market risk management you did have some opportunity to

22   contribute to the financial success of the Lehman

23   enterprise?

24   A    Yes.

25   Q    Now did you feel that you also had some responsibility

Page 64

1    to protect it as best you could --

2    A    Yes.

3    Q    -- from misfortune?

4    A    Yes.

5    Q    In fact it did suffer misfortune?

6    A    It did indeed.

7    Q    And much of that misfortune was as a result of market

8    risk; is that not true?

9    A    Correct.

10   Q    Were you aware at all that you had a personal

11   involvement in your management of market risk when you were

12   doing it?

13   A    A personal involvement in the sense that --

14   Q    Well, I'm -- let me say a personal financial stake both

15   in the fact that your job depended on it and the fact that

16   your RSUs depended on it?

17   A    Indeed.

18   Q    Okay.  Obviously as a head of market risk management

19   you were aware of the fact that stock can go up and stock

20   can go down?

21   A    Yes.

22   Q    And you did understand, whether you liked it or not,

23   that the way the RSU program was structured the stock of

24   Lehman could go down and your RSU value at the end of five

25   years, assuming it was still in operation and you met the

Page 65

1    conditions, could go down?

2    A    Of course, but the value of the equity could go up or

3    down, but RSUs are not equity.  None of my RSUs converted.

4    My first RSUs were granted in 2004 -- November 2004, five

5    years after grant date, November 2009 is over a year after

6    the firm went bankrupt.  So none of my RSUs ever converted.

7            I am not making a claim for diminution of value of

8    equity, either granted or given to me by the firm or paid

9    for.  That's not the case.  My RSUs never converted.  RSUs

10   are not equity.  My claim is for the RSUs, not for

11   diminution of value of the equity.

12   Q    Well you say your claim is for the RSUs.

13   A    Yes.

14   Q    You have the RSUs, what do you want to do with the

15   RSUs?

16   A    I can do nothing with them.  They're simply a promise

17   by Lehman to convert them into equity five years after the

18   grant date, a promise which they failed to carry through.

19   Q    Well how do you want to measure your claim then?  What

20   is your position on how the money should be measured that

21   had you want to put in your claim?

22   A    The best estimate that I have was the value that the

23   RSUs were ascribed at the time they were granted to me, plus

24   the compensation for the fact that I was effectively being

25   asked to -- or told to lend the firm money for five years.

1   If you loan money to somebody for five years you expect to

2   get an interest payment.

3          So there's the value of the equities when they

4   were granted, plus the interest payment on the values of

5   that debt claim, and Lehman had -- and it structured the

6   RSUs, had set that interest rate equal to the dividend

7   payable on the actual equity at the time.

8   Q    So in essence you want the money back that went into

9   the RSU program as you see it?

10  A    Yes.

11  Q    And is that because you think there was something

12  unfair about the way the agreement was reached so that it

13  should be set aside?

14  A    It was what it was.  Whether it was unfair or not I

15  couldn't say.

16         I -- had I been given option to be paid in cash I

17  could have used that cash to go out and buy Lehman equity

18  how I wanted.  It traded freely on the stock exchange every

19  business day.

20         I didn't uproot my family from England and travel

21  3,000 miles in order to become a Lehman stockholder, I came

22  for employment reasons, and the fact was that part of my

23  compensation or employment was withheld via this promise to

24  convert it to equity.  That promise Lehman failed to deliver

25  on that promise because the firm went bankrupt.

Page 67

1    Q    All right.  My question, sir, though, first let me be

2    clear.  Are you trained as a lawyer, sir?

3    A    No, I have no training as a lawyer.  My background is

4    in particle physics.

5    Q    What I'm trying to understand is as you understand your

6    claim why should though the deal that you understood you

7    made, even though you didn't like it, be set aside and you

8    should get your money back?  What is your basis for saying

9    that?

10   A    Because all that I had at the time the firm went

11   bankrupt, all that I had was the RSUs.  I had no equity,

12   none of those RSUs are converted to equity, which had it

13   done so the equity would have been worthless (indiscernible

14   - 01:18:28) if I hadn't already sold it, but that's not the

15   case.  I had the claim in case of my first year at the firm

16   the guarantee of $1.55 million in compensation, only about

17   one million of which had been paid, and so that -- the

18   additional for that year accumulated over the course of

19   several years several million dollars worth of unpaid

20   compensation.  That was what I felt that I was -- I was

21   still owed because the firm was no longer in a position to

22   carry through its promise to convert -- to convert these

23   RSUs into equity.

24   Q    So because the firm you say was no longer in a position

25   to carry through its promise to convert do you understand

Page 68

1    what the affect of this proceeding would be if your -- if

2    your claim was converted to equity?

3              MR. KAPLAN:  Objection, Your Honor, that's a legal

4    -- he's asking for a legal conclusion.

5              THE COURT:  What --

6              MR. MILLER:  I'm asking what he understands, Your

7    Honor.

8              THE COURT:  First of all, it's entirely clear to

9    me on what basis you're objecting.

10             MR. KAPLAN:  Well somebody has -- somebody has to.

11             THE COURT:  No, no, no, nobody actually has to.

12             First of all I want to make an observation that

13   once again, notwithstanding the highly negotiated procedure

14   that was agreed to by all the parties, that we are taking

15   what appears to be an unlimited amount of time to insure

16   that Mr. Shotton is heard.

17             There was an allocated 20 minutes, we've now been

18   here for almost an hour and a half over two witnesses.  But

19   again, in the spirit of trying to give everybody, you know,

20   an opportunity to say everything that they want to say we're

21   doing that.  I'm not going to get into a situation where the

22   group of lawyers is going to inject themselves.

23             So, Mr. Miller, I'm going let you finish with

24   Mr. Shotton and then we're going to move on.

25             MR. MILLER:  All right.  Your Honor, I think in

Page 69

1    the interest of time I'll withdraw my question and I will

2    conclude with Mr. Shotton.

3                    THE COURT:  All right.  Thank you very much,

4    Mr. Miller.

5                    Okay, Mr. Shotton, is there anything that you --

6    else -- anything more you wanted to say subsequent to the

7    cross-examination by Mr. Miller?  Typically a witness -- if

8    a lawyer were representing you now the lawyer would ask you

9    some additional questions so that you could clarify --

10                   THE WITNESS:  I don't think there's anything which

11   is actually germane to the --

12                   THE COURT:  -- earlier statements that you made.

13                   THE WITNESS:  -- situation here, but Mr. Miller

14   did ask me questions about my role and my personal

15   responsibility for market risk management at Lehman Brothers

16   and Lehman's failure.  I would simply point you to the

17   examination which (indiscernible - 01:21:06) conducted into

18   Lehman's failure, and if you read that you will see many,

19   many citations from me where I'm quoted as warning senior

20   management about the level of risk that it was taking and

21   about board presentations that I put today which was later

22   amended by other people to remove elements of warning that I

23   put there.

24                   So my reputation as far as I'm concerned is

25   completely sound.

1          THE COURT:  All right.  I very much appreciate

2     that.  All right, thank you very much.

3          THE WITNESS:  Thank you.

4          THE COURT:  Okay.  We have 35 minutes left before

5     noon where I have a hard stop because I scheduled something

6     at noon in reliance on the schedule here.

7          So do any of the represented claimants want to

8     make use of this 35 minutes?

9          MS. SOLOMON:  Your Honor --

10         THE COURT:  I have a couple of volunteers.

11         MS. SOLOMON:  -- I would like to make a

12    presentation on behalf of Art Kenny who is a pro se

13    claimant.

14         THE COURT:  Yeah, see this is the part of it,

15    Ms. Solomon, that I don't understand.  We now have -- we had

16    an understanding with respect to pro ses, and now a pro se

17    has morphed into a represented claimant and is going to be

18    using time.

19         MS. SOLOMON:  Your Honor --

20         THE COURT:  So --

21         MS. SOLOMON:  -- I thought we went through this

22    yesterday --

23         THE COURT:  Well, we did go through it yesterday,

24    but --

25         MS. SOLOMON:  -- and we did have an understanding

1    --

2              THE COURT:  -- when I had time to reflect on --

3    you know, procedural fairness is very important to me, and I

4    just want the folks -- the claimant folks to understand that

5    -- that the Lehman side -- and I know you necessarily feel

6    this way -- but the Lehman side is putting up with a

7    complete abrogation of the negotiated process by this side

8    of the room, and frankly --

9              MS. SOLOMON:  I disagree with that, Your Honor.

10             THE COURT:  -- and frankly by me.

11             MS. SOLOMON:  I disagree wholly with that, Your

12   Honor.  I have fully followed the procedure and I have done

13   everything I can to follow the procedure.

14             THE COURT:  I --

15             MS. SOLOMON:  And I don't think it's correct, Your

16   Honor, to just lock everybody on this side of the table --

17             THE COURT:  The claimants were given three hours.

18   We are now going -- we are now about to enter into the

19   beginning of the sixth hour, and --

20             MS. SOLOMON:  And I've fully abided within that

21   three-hour limit, Your Honor.

22             THE COURT:  Okay.  I'm not meaning to make it

23   personal.  I'm making the observation that it would be

24   wholly within the rights of the Lehman party to say this is

25   beyond what was negotiated, the claimants are done.  And I

1    have to tell you, I think if Judge Peck were sitting here he

2    would look at the stipulation and say you bargained for

3    three hours, your three hours is up, we're done.

4              So I just want to be perfectly clear that I am

5    doing this notwithstanding the fact that I read the

6    stipulation, because I do not want anyone to argue that they

7    haven't had a full and fair opportunity to be heard.

8              MS. SOLOMON:  I --

9              THE COURT:  Period, full stop.

10             MS. SOLOMON:  Your Honor, I understand perfectly

11   where you're coming from.  I'd just like to give you a

12   little more background in terms of this one particular

13   claimant and why I am intending to speak on his behalf.

14             He filed -- he appeared --

15             THE COURT:  Mr. Miller, hold on, let her finish

16   and then I'll hear from you, okay?

17             MS. SOLOMON:  He appeared -- his name is Arthur

18   Kenney, Your Honor, and he has appeared in these proceedings

19   from the start as a pro se claimant.

20             THE COURT:  Right.

21             MS. SOLOMON:  And with regard to the briefing

22   schedule Mr. Kenny also appeared as a pro se claimant and he

23   filed a brief in --

24             THE COURT:  Right.

25             MS. SOLOMON:  -- support of his position.

 1              After he filed his brief I think he became a

 2     little unnerved and he was very concerned about speaking at

 3     the hearing on his own behalf.  And he approached me at that

 4     point.  I didn't reach out to him.  He approached me and he

 5     asked me if I could represent him at the hearing.  And I

 6     agreed to do so and I promised that I would represent him at

 7     the hearing.  And his particular claim is different from all

 8     of the claims that are encompassed within the represented

 9     participants brief.

10              He has a unique issue, Your Honor, although there

11     are I understand some other claimants that have this issue

12     as well, he's a claimant that was never granted RSUs and

13     there was compensation withheld and he's a sales commission

14     person, Your Honor.

15              THE COURT:  The part that I don't understand,

16     Ms. Solomon, is that going into yesterday's hearing I would

17     have thought that all the claimants would have sat down and

18     said, okay, we have three hours, who gets what?  And that

19     your portion of that three hours at that point yesterday

20     would have then included Mr. Kenny, but apparently it

21     didn't, because now you're saying that you want to be deemed

22     to be a pro se, and apparently the three hours was never

23     divvied up among you folks, and there's just -- the three

24     hours was just completely ignored.

25              If that was the case then we shouldn't have wasted

Page 74

1    all the time and the estate resources negotiating the

2    procedure.  It just was a waste.  It was -- there was coming

3    into yesterday's hearing you guys didn't have a game plan,

4    and now basically I'm giving you a free pass and allowing

5    you to be heard, and I just think it's important for you to

6    understand that I'm doing that, because it's -- we're

7    ignoring the stipulation entirely.

8                MS. SOLOMON:  Your Honor, we each represent our

9    own clients, and I think --

10               THE COURT:  Then you should have never agreed as a

11   group to three hours, because --

12               MS. SOLOMON:  Perhaps, Your Honor, but we were

13   also asked by the Court and we made a very, very sincere

14   effort to try to streamline the procedures, Your Honor, we

15   all take that with a grain of salt of course because this

16   has not turned out to be the most streamlined, but --

17               THE COURT:  Okay.  We're now -- no, it has not

18   been streamlined at all.

19               MS. SOLOMON:  -- but the effort -- but appearing

20   as represented participants was made in response to the

21   Court that we tried to coordinate, and it was our sincere

22   effort to have the procedures streamlined as possible.

23               THE COURT:  Well, all right, let me just say that

24   I see some folks sitting in the gallery who were here

25   yesterday, and I -- if there are other folks here who want

Page 75

1    to be heard and need to be heard before noon today I want to

2    know about that, because Ms. Solomon, you're going to be

3    here.

4              MS. SOLOMON:  I know, Your Honor.

5              THE COURT:  All right.  So please have a seat.

6              MS. SOLOMON:  At your convenience.

7              THE COURT:  And let me hear if there's anybody

8    who's here who needs to be heard between now and noon?

9              MR. KAPLAN:  Your Honor, Mr. Ramallo is here,

10   Mr. Reynolds is here, and Mr. Schrager has a witness --

11             THE COURT:  Okay, I --

12             MR. KAPLAN:  -- who is here, who was here

13   yesterday.

14             THE COURT:  I'm -- I don't -- I am not going pick.

15   I am asking --

16             MR. KAPLAN:  Right.  Mr. -- I will defer to

17   Mr. Schrager's witness who was -- who wanted to testify

18   yesterday in the worst way, so if he wants to go forward he

19   should.

20             THE COURT:  Mr. Miller, you had wanted to say

21   something before.

22             MR. MILLER:  Yes, Your Honor, at the appropriate

23   time I want to object to Ms. Solomon, who for the first time

24   we learned today represents Mr. Kenny, but I will do that at

25   the appropriate time --

```
 1                THE COURT:  All right.

 2                MR. MILLER:  -- you're going to take that up

 3      later.

 4                THE COURT:  Thank you.

 5                All right.  Do we have a witness who wants to

 6      testify now?  And we're going to -- there's a hard stop at

 7      noon.

 8                MR. SCHRAGER:  Yes we do, Your Honor.

 9                THE COURT:  Okay.  Let's get -- let's do it.

10                MR. MILLER:  Your Honor, just to clarify --

11                THE COURT:  Is there anyone else in the courtroom

12      -- is there anyone else in the courtroom who is a pro se

13      claimant who wishes to be heard?  Yes, sir?

14                MR. MAIA:  I'm a pro se, I filed a claim.

15                THE COURT:  Come up.

16                MR. MAIA:  Yes, thank you.  Good morning, Your

17      Honor.

18                THE COURT:  Good morning.  Could you just --

19                MR. MAIA:  Yes.

20                THE COURT:  -- hold on for one second, okay?

21                So this morning was the time that was set aside

22      for pro se claimants to be heard, and yesterday I said that

23      I would hear all the pro se claimants who wanted to be heard

24      this morning.  So if there's a witness who's appearing who

25      is represented -- who is one of the represented parties then
```

Page 77

1   according to the stipulation and what we said yesterday I'm

2   not going to hear that person now.

3           I'm trying very hard to not have people get

4   aggravated and annoyed at the timing issues, but I'm

5   struggling with what to do, because every time I try to get

6   things to be orderly something else happens.

7           So I think that by the rules we all agreed on

8   yesterday I need to hear from this gentleman because ten to

9   12:00 was the time set aside for pro se claims.

10          So I apologize for anyone who was told by counsel

11  to come this morning, because yesterday I believe I made it

12  very clear that the morning was set aside for pro ses and

13  that the afternoon beginning at 1 o'clock would be when we

14  would conclude the represented claimants' portion of the

15  case, notwithstanding the fact that we are completely over

16  the allotted time limit.  Okay?

17          So go ahead, sir.  Give me your name, please.

18          MR. MAIA:  Thank you, good morning.  My Alexandre

19  Catalao Maia.

20          THE COURT:  Okay.

21          MR. MAIA:  I filed --

22          THE COURT:  How do you spell your last name,

23  please.

24          MR. MAIA:  M-A-I-A.  Middle name is C-A-T-A-L-A-O.

25  I have claim number 17760.

Page 78

1           THE COURT:  Okay.  Go ahead.

2           MR. MAIA:  Well, I -- in the interest of time --

3    well good morning for everyone.

4           THE COURT:  You're titled to 20 minutes and you

5    can use your full 20 minutes, all right?

6           MR. MAIA:  Thank you.

7           I had prepared some remarks, I do believe that

8    they will not add any new facts to what has been discussed

9    already here before.

10          If I'm required to make a statement in order to

11   keep my claim alive then I would like to do so.  If it is

12   not a requirement then I will not make the statements in the

13   interest of time for all of you --

14          THE COURT:  Okay.

15          MR. MAIA:  -- as I understand time is short.

16          THE COURT:  You're not required, you're certainly

17   -- can make any statement that you like.  You're not

18   required to.  This was an opportunity for any individual

19   claimant --

20          MR. MAIA:  Uh-huh.

21          THE COURT:  -- to advise the Court of what it is

22   about his or her individual claim that distinguishes it from

23   the type of claim that Judge Peck had identified as a claim

24   that would be subordinated.

25          So if there's anything in particular about your

1      particular circumstances that you want to bring to the

2      Court's attention this is -- this is your opportunity and

3      I'm happy to listen.

4              MR. MAIA:  Thank you, Your Honor.

5              There isn't anything which is different for --

6      about my claim relative to all the claims that have been

7      discussed --

8              THE COURT:  Okay.

9              MR. MAIA:  -- both by counsel as well as by

10     individual witnesses.

11             If I need to make the same points to represent my

12     claim then I would like to do it.  If it's not a requirement

13     and the arguments which have been made already in court

14     would benefit me in the case of a ruling -- a favorable

15     ruling then I will just open this time for other people who

16     would like to be heard.

17             THE COURT:  Okay.  All right.  That's fine.

18     You -- you're not required to say anything in order to have

19     your claim considered as part of this -- as part of this

20     proceeding.

21             MR. MAIA:  Okay.  Thank you very much.

22             THE COURT:  Okay.  Thank you very much.

23             MR. MAIA:  Thank you.

24             THE COURT:  All right.  I'll ask one more time,

25     are there any pro se claimants who are in the courtroom, who

Page 80

1    are on the phone -- or who are on the phone who would like

2    to speak on their own behalf?  Okay.  It's 11:36, let the

3    record reflect there have been no further responses.

4              Okay, would you like to call a witness now?

5              MR. SCHRAGER:  I would --

6              THE COURT:  Mr. Miller?

7              MR. MILLER:  Your Honor, I just want to clarify

8    particularly if he's going to call a witness I think he's

9    going to call -- I don't see that we're going to be able to

10   complete her testimony and cross between now and noon.  So

11   if we can break and make sure -- who are you gowning to

12   call, Mr. -- what's your witness?

13             THE COURT:  What witness are you --

14             MR. SCHRAGER:  Ms. Karen Krieger.

15             MR. MILLER:  Yes.

16             THE COURT:  All right.

17             MR. MILLER:  Ms. Krieger has a good deal of

18   material already, Your Honor, so I just want to note we're

19   happy to start her, but she's going to need to come back.

20             THE COURT:  All right.  What's your preference?

21   I'd prefer -- I'd prefer not to have a break in the middle

22   of direct examination.  If you don't believe you can

23   complete the direct before 11:59 then I'd prefer to come

24   back at 1 o'clock and do it then.  It's not a -- it's not a

25   procedure I follow with a witness unless I absolutely have

Page 81

1    to to have a break in the middle of the testimony.

2              MR. SCHRAGER:  May I have a moment, Your Honor?

3              THE COURT:  Sure.

4         (Pause)

5              THE COURT:  My recollection is that between 1:00

6    and 2:00 we had earmarked that time as at least one of the

7    Neuberger witnesses; is that correct?

8              MR. KAPLAN:  Ms. Stiefel is coming down at 1:00

9    because I --

10             THE COURT:  And how long do you believe her

11   examination will take?

12             MR. KAPLAN:  The direct I don't think will take 15

13   or 20 minutes --

14             THE COURT:  All right.

15             MR. KAPLAN:  -- I would think.  I mean -- or as I

16   said we can use her declaration and let Mr. Miller cross

17   from that if that will abbreviate -- you know, abbreviate --

18             THE COURT:  All right.  Well, Mr. Miller can think

19   about -- can think about that option, but then we would be

20   able to begin with this witness then at a quarter to 2:00?

21             MR. SCHRAGER:  Your Honor, the witness is

22   committed to making a contribution here and she will make

23   herself available --

24             THE COURT:  Okay.

25             MR. SCHRAGER:  -- this afternoon.

Page 82

1            THE COURT:  All right.  Well, I apologize, I'm --

2            MR. SCHRAGER:  I think the --

3            THE COURT:  -- I seem to be unable to impose an

4     order on this situation, and I am very frustrated about it,

5     and I -- at the end of the day I want everybody who wants to

6     be heard to be heard.  So that's what we're going to do.

7            MR. KAPLAN:  Your Honor, if you like Mr. Ramallo

8     is in the courtroom, I know I can get his direct done before

9     12 o'clock --

10           THE COURT:  But then -- then we're going to come

11    back and we have a witness who's going appear at 1 o'clock

12    and I don't want to have a delay between a direct and a

13    cross.  So --

14           MR. KAPLAN:  Okay.

15           THE COURT:  -- it's just not going to work.

16           So why don't I let you go now, I want you to work

17    out as best as you have every single thing about how things

18    are going to happen starting at 1 o'clock this afternoon and

19    then we'll just come back and we'll start then at 1 o'clock

20    with Mr. Ramallo and then your witness can take the stand

21    after that.

22           MR. SCHRAGER:  Well we have Ms. Stiefel at --

23    Ms. Stiefel at 1 o'clock --

24           THE COURT:  Ms. Stiefel.

25           MR. SCHRAGER:  And Mr. Ramallo --

Page 83

```
1            THE COURT:  So we have three witnesses this
2    afternoon, right?
3            MR. KAPLAN:  We have three witnesses.
4            THE COURT:  Stiefel --
5            MR. KAPLAN:  Unless Your Honor lets me put
6    Mr. Reynolds on.
7            THE COURT:  -- Ramallo, and Ms. Krieger, is
8    that --
9            MR. SCHRAGER:  That's correct, Your Honor.
10           MR. KAPLAN:  And Mr. Reynolds if Your Honor will
11   allow it.  But we have the objection from Mr. Miller.
12           THE COURT:  I thought I said yesterday that I was
13   not allowing Mr. Reynolds.  Am I making that up?
14           MR. KAPLAN:  No, I thought you said we'd have to
15   wait and see if there was proper --
16           THE COURT:  If there was time.
17           MR. KAPLAN:  -- if there was proper rebuttal.
18           THE COURT:  Right.
19           MR. KAPLAN:  Based on the cross-examination.
20           THE COURT:  Exactly, right.
21           MR. KAPLAN:  So that we can't decide that now.
22           THE COURT:  Right.
23           MS. SOLOMON:  And then the presentation from
24   Mr. Kenny, Your Honor.
25           THE COURT:  All right.  Well, I'm going to hear
```

Page 84

1    from Mr. Miller about the propriety of that later.

2              MS. SOLOMON:  Okay.  And just for purposes of

3    reminding the Court I very clearly stated on the record

4    yesterday that was my intention and there was no objection

5    related to that.

6              THE COURT:  Okay.

7              MR. MILLER:  I just want to clarify, Your Honor,

8    Ms. Solomon did not tell us who she represented yesterday,

9    and Mr. Kenny is in a unique position and has submitted a

10   lot of material, and for him not to be here, I don't believe

11   he's here, and for her to speak on his behalf really is a

12   surprise to us.  He should have filed a brief, we should

13   have known something about what's going on.  If he's here

14   personally that's a different issue and I'm going to

15   encourage her to bring him in personally.

16             MS. SOLOMON:  He filed a brief and certainly they

17   had an ability to --

18             THE COURT:  He filed a brief as a pro se claimant.

19   Yesterday you said I'm going to be appearing on behalf of a

20   pro se claimant.  You did not identify who it is.  I reacted

21   yesterday to the news that somehow a pro se claimant was now

22   going to be become a represented claimant and that there was

23   going to be extra time afforded to that person.  That's

24   completely contrary to the procedure.

25             So you folks seem intent on ignoring the

1    stipulation because you want to say what you're going to

2    say.  And again, not for you, but for the sake of the

3    claimants I'm going go along with it potentially over the

4    objection of LBHI.

5            We're going to take a break now, we're going to

6    come back at 1 o'clock, and we're going to finish this

7    afternoon.  And I encourage you to work out every logistical

8    detail you can over the next hour and 15 minutes, all right?

9            Thank you.

10           MS. SOLOMON:  Thank you.

11           THE COURT:  Thanks Francis, 1 o'clock, okay?

12       (Recessed at 11:43 a.m. and reconvened at 1:11 p.m.)

13           THE COURT:  Please have a seat.  All right.  Are

14   we ready?

15           MR. KAPLAN:  We are, Your Honor.

16           THE COURT:  Okay.  I see a bag, but I don't see

17   Ms. Solomon.

18           MR. KAPLAN:  Ms. Solomon --

19           THE COURT:  Is she all right?

20           MR. KAPLAN:  -- went out -- yes, she's fine.  She

21   waived her appearance.  She's out speaking with a client,

22   and she said we could proceed in her absence.

23           THE COURT:  Okay.  All right.  So what are we

24   starting with now?

25           MR. KAPLAN:  Stephanie Stiefel on behalf of the

1    Neuberger claimants.

2              THE COURT:  Okay.  Very good.  Hold on, Mr.

3    Miller, did you have a comment first?

4              MR. MILLER:  No, assuming they're going to call

5    her live, we don't have a comment.

6              THE COURT:  Okay.

7              MR. MILLER:  That's fine.  Are you going to call

8    her as a witness live?

9              MR. KAPLAN:  Yeah.

10             THE COURT:  Okay.  All right.

11             MR. KAPLAN:  Right?  I mean, unless you want me to

12   proceed with the declaration, and you want to proceed with

13   cross.

14             THE COURT:  All right.  Ms. Stiefel, would you

15   come up, please?

16             All right.  Would you raise your right hand,

17   please?

18                  STEPHANIE STIEFEL, WITNESS, SWORN

19             THE COURT:  Please have a seat.

20                      DIRECT EXAMINATION

21   BY MR. KAPLAN:

22   Q    Ms. Stiefel, how are you employed currently?

23   A    I work for Neuberger Berman and have been since 1990.

24             THE COURT:  Ms. Stiefel, I'm going to ask you to

25   move a little bit forward, and that horizontal black

1    microphone, just move it towards you a bit and please keep

2    your voice up.  Thanks.

3    Q    Can you tell us your educational background?

4    A    Yes.  I went to college, I'm a graduate of Queens

5    College, and I'm a Certified Public Accountant.

6    Q    And you joined --

7    A    Or used to be.

8    Q    Used to be.

9    A    I haven't practiced in a long time.

10   Q    And you joined Neuberger Berman in 1990?

11   A    I joined in 1990 as they were building out their high

12   network business.  And I was hired to help them grow, and

13   establish new relationships for high net worth individuals.

14   Q    And what was -- when you initially joined Neuberger

15   Berman, what was your compensation?

16   A    So at my last year at Arthur Andersen I was there ten

17   years.  I finally made $100,000, and when I started at

18   Neuberger Berman, I got exactly the same thing, which was a

19   draw against the production of business that I would bring

20   in, and that was for two years, to keep my cash flow stable,

21   as I was starting to build a business.

22   Q    And after that two year period, how would you

23   compensated at Neuberger Berman?

24   A    Purely on production.  So if I hadn't brought in enough

25   business, my income would go down.

Page 88

1   Q    Can you explain to Her Honor how production based

2   compensation worked at Neuberger Berman?

3   A    Sure.  So you come into Neuberger Berman, you are given

4   no pre-existing clients.  As a CPA, I started networking

5   with accountants and lawyers, and the hope was that they

6   would refer clients to me, and I would meet with those

7   clients.  I would discuss asset allocation.  I would discuss

8   the portfolio management resources of Neuberger Berman.  And

9   if I -- if we win the client, if they become a client of

10  Neuberger Berman, they start paying a fee.

11       Everybody who is working with clients at Neuberger,

12  whether you be the money manager or the wealth advisor,

13  receives a portion of that fee.

14       So, for example, if in the first year if I would have,

15  and this is near impossible, but if I would have brought in

16  $100 million of Ms. Smith, Mr. Jones, and all the varieties

17  thereto --

18            THE COURT:  $100 million of assets under

19  management?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.

22            THE WITNESS:  And depending on what the asset

23  allocation is because the fee for equity is more than the

24  fee for bonds, but just to make the math easy for us, if the

25  average fee is 1 percent, which is an annual fee, which is

1    calculated quarterly, the fee to Neuberger Berman would be

2    $1 million on a $100 million of new business.

3            For the first year, as the wealth advisor, you get

4    a higher profit participation in that, because you won the

5    business.  And then in subsequent years, as you service it,

6    it goes down very significantly.

7            So the percentage is 30 percent, so of the $1

8    million, I would have made $300,000.  And if I would have

9    brought in $100 million in my first year, I would have made

10   more than my draw, and I would be making the 300,000.

11           In the subsequent year, that $100 million that's

12   generating 1 percent of revenue goes down to $100,000, so

13   it's 10 percent versus when you win, 30 percent.  However,

14   you are always earning money as long as that client remains

15   a client and is paying a fee, you are always earning money

16   against that revenue.

17           The portfolio manager also participates and shares

18   in that revenue generation.  And the portfolio manager

19   makes, there's different rates, but in general, from 25

20   percent to 40 percent for managing the money.

21           So I'm interfacing with the client, I'm bringing

22   the client to Neuberger Berman, I'm having a discussion

23   about their goals and objectives.  I am proposing the proper

24   portfolio management solution, and if we win that mandate,

25   as soon as they are fee paying, I'm entitled to a percentage

Page 90

1    of that.

2    BY MR. KAPLAN:

3    Q    And is that -- was that compensation structure

4    consistent at Neuberger Berman from the time you started

5    through the time -- through today?

6    A    No, it's evolved.

7    Q    Okay.

8    A    And it's evolved in a number of different ways.  So for

9    those that have built a very significant book of business,

10   their trailer, and there was a point that I was also

11   managing the sales force, so -- let me step back.

12        I was a sales -- I'll call it a sales person.  I was a

13   wealth advisor from 1990 to 1998.  I brought in a lot of

14   business and I was very successful, and I was the first

15   sales person to be rewarded with a partnership interest.

16        So in 1998, I became a partner.  In 1999, my boss, who

17   hired me, went on the executive committee, and then I

18   started running the sales force, the whole biz, you take

19   your best sales person and that they will teach and mentor

20   other wealth advisors.

21        We were also opening offices across the country, and it

22   was my job, in addition to still managing my business, part

23   of my business, it was also my job to help open other

24   offices.

25        When I was managing, I put in a change in the

Page 91

1    compensation scheme to incentivize people to bring in more

2    money, and I would reward them if they did better than what

3    we expected.  We'd have an agreement at the beginning of the

4    year, you should bring in X, and that's how we managed the

5    business.  And if they brought in X plus, they were able to

6    increase their trailer from 10 to as much as 12 or 15

7    percent (indiscernible) on 20, depending on the degree of

8    out performance of the accounts that they won.

9         So it was a very entrepreneurial culture.  It is

10   described as eat what you kill, and there were incentives to

11   motivate people to really outperform.

12        Today, that is pretty much the construct for manage --

13   for what your participation in your revenue is.  And the

14   only difference with me is that for a period I was

15   management, and then I went back to production.  And that

16   was part of when we were acquired by Lehman.

17   Q    During the time -- jumping ahead for a moment, what was

18   the compensation structure during the time that Neuberger

19   Berman was part of Lehman?

20   A    So we had my system, which is 30 percent in the first

21   year, 10, 12, 15 and 20, depending on how you out perform.

22        There was a lot of difficulty and confusion when we

23   were merged with Lehman Brothers, because the compensation

24   scheme for brokers was different than the compensation

25   scheme for asset management professionals.

Page 92

1        So to kind of explain the difference.  So you have a 1

2    percent fee base, you have wealth advisors that have their

3    percentage, you have money managers that have their

4    percentage, and the two together manage the money, interact

5    with the client, win new business, service, roughly equals

6    55 percent, and the house keeps the rest, right, for rent,

7    and et cetera.

8        At Lehman Brothers, they were trying to transform their

9    brokerage sales force from a transactional one to more of an

10   asset management base, that was one of the reasons they

11   acquired Neuberger Berman.

12       And the payout for brokers, since they are wearing the

13   hat of managing the money, and servicing and winning is a

14   higher pay out.  It's 40 percent throughout.

15       So if you can imagine how difficult it was to manage a

16   sales force that was more successful in bringing in more

17   assets to the firm but making less money.  And the rallying

18   cry of equal work for equal pay surfaced very quickly.  So

19   that was part of the challenge in managing the small, I'll

20   call it the David sales force, to the Goliath sales force of

21   Lehman Brothers.  There was a -- two different pay schemes.

22   Q    But did the formulaic nature of your compensation

23   scheme at -- as a Neuberger employee within the Lehman

24   structure change, or did it remain a formulated structure?

25   A    So for me, for my entire 24 years at Neuberger

1    Berman --

2    Q    Yeah.

3    A    -- there was a period when I also had management

4    responsibilities, and then it changed somewhat then.  But I

5    will tell you that -- and maybe this is what I learned from

6    Arthur Andersen, your clients are your strength, and your

7    clients are your power.  And so even when I was in

8    management, I still kept a book of business because without

9    it, you have no security.

10   Q    Now, you testified a few moments ago that in 1998, you

11   became a partner of Neuberger Berman.

12   A    Yes.

13   Q    In 1999, Neuberger Berman went -- became a public

14   corporation; is that right?

15   A    That's right, that's correct.

16   Q    And at that time, did you enter into a stockholder

17   agreement?

18   A    I did.

19   Q    And did you receive founder shares?

20   A    I did.

21   Q    Let me show you what has been marked as Neuberger

22   Berman Exhibit C and ask you if you recognize it.

23        MR. KAPLAN:  Judge, I have a standalone copy if

24   you'd like.

25        THE COURT:  Hold on, I think I -- it's in your

```
 1    book.

 2              MR. MILLER:  I may have a copy.

 3              THE COURT:  C?  All right.  I have it.

 4              MR. MILLER:  Thank you, we have a copy.

 5         (Counsel confer)

 6              MR. MILLER:  Your Honor, we're going to object to

 7    this --

 8              THE COURT:  I just -- well -- I'm sorry.  Go

 9    ahead, Mr. Miller.

10              MR. MILLER:  This is Ralph Miller for Lehman.  I

11    do have an objection to admissibility of this document, but

12    I can reserve that till later, if you --

13              THE COURT:  Okay.  I just -- you know, we've had a

14    lot of conversation for almost two days now about the

15    schedule and the agreement.  I appreciate that it's

16    necessary to lay some foundation and have some background,

17    but we're nowhere near the relevant time period yet in the

18    testimony of this witness, which I -- you know --

19              MR. KAPLAN:  I --

20              THE COURT:  So we just -- we need to stay focused

21    on the issue that's actually before the Court, all right?

22              THE WITNESS:  I recognize this agreement.

23    BY MR. KAPLAN:

24    Q    Is that the agreement that you entered in 1999?

25    A    Yes.
```

Page 95

1    Q    And did that agreement contain restrictive covenants in

2    it?

3    A    It did.

4    Q    And what were the -- as best as you can recall, what

5    were the restrictive covenants of that agreement?

6    A    That I could not solicit clients.  I believe it also

7    was I could not accept clients.  I could not take any

8    confidential information with me.  I could not interact with

9    any of the referral sources that I had cultivated over the

10   years, and I was essentially not able to do my job for a

11   period of three years.

12   Q    After leaving Neuberger?

13   A    If I would have elected to leave, I would not have been

14   able to -- you keep describing it as sitting on a beach, I

15   would have to sit on a beach for three years.

16   Q    Okay.  Now, following the initial public offering, were

17   employees of Neuberger Berman also given Neuberger Newman

18   stock?

19   A    They were.  I can speak to the group that I, you know,

20   were working with, they were.

21   Q    And were they required to enter into restrictive

22   covenants in connection with that?

23   A    They were.

24   Q    Now, moving forward to --

25              THE COURT:  So can I just clarify?  So what you

Page 96

1   just described was in connection with Neuberger Berman

2   becoming a public company?

3            THE WITNESS:  That's correct.

4            THE COURT:  And did you or anyone else file any

5   sort of an action or a lawsuit complaining of the imposition

6   of the restricted covenant that you just described at that

7   time?

8            THE WITNESS:  No, that's not my nature, but no, I

9   did not, and actually I can -- I can't answer that question,

10  Your Honor, for others.

11           THE COURT:  I'm only interested in what you did

12  and your personal knowledge.

13           THE WITNESS:  And I answered that.

14           THE COURT:  Okay.  Go ahead.

15  BY MR. KAPLAN:

16  Q    In 2003, there came a time when there was a merger

17  between Lehman Brothers and Neuberger Berman.

18  A    Yes.

19  Q    And did you enter into any -- did you enter into an

20  amended stockholder's agreement at that time?

21  A    Yes.

22  Q    And let me show you what's been marked as Neuberger

23  Berman Exhibit D, and ask you if you recognize that.

24  A    I do.

25  Q    And is that the amended stockholder agreement that was

1    entered into the Lehman/Neuberger Berman merger?

2    A    Yes.

3    Q    And did that document contain similarly restrictive

4    covenants to the other document --

5    A    Yes.

6    Q    -- that we spoke about?

7    A    Yes.

8    Q    And did you also enter at the time of the merger a

9    retention agreement?

10   A    I did.

11   Q    Let me show you what's been marked as Neuberger Berman

12   H and ask you if you recognize this.

13   A    I do.

14   Q    And did that retention agreement also contain a

15   restrictive covenant?

16   A    It did.

17   Q    And was there a reason that you continued your

18   employment at Neuberger Berman, and in the face of the

19   restrictive covenants that you were presented with at the

20   time of the merger?

21   A    This was my life's work.  This was working with

22   individuals, giving them financial security, helping them

23   buy homes.  It had been accumulated and worked along over a

24   long period of time.  It very much fulfills me, it's a very

25   important part of who I am, and I love what I do, and at age

1   47 to stop doing it was absolutely not a possibility.

2   Q    Well, could you have gone to work someplace else, for

3   example?

4   A    If I would have gone to work at a competitor, there

5   would have been a big financial cost to that.

6            THE COURT:  If I could interrupt, please.  Do you

7   have any understanding of how the merger with Lehman came

8   about?  I mean on -- Neuberger Berman was a very successful

9   firm, and it got on the radar screen of Lehman obviously, so

10  then what happened?  How did the merger come about, what was

11  the management situation like at Neuberger that led to the

12  merger and by implication of what you're saying, put you

13  into the position that you found yourself in?

14           THE WITNESS:  I can't speak to what the management

15  considerations were, because I wasn't part of the executive

16  committee, and I wasn't privy to what was going on.  So I

17  learned about it when everybody learned about it.  Although

18  I do recall that there were rumors or quite a number of

19  rumors, but I learned about when the press release was

20  released and we got a copy on our desks.

21           THE COURT:  So what was the management of

22  Neuberger at that point in time, it was run by an executive

23  committee?

24           THE WITNESS:  So it was run by an executive

25  committee, and we had a CEO and a President.

Page 99

```
 1              THE COURT:  And there was no board of directors,

 2     the executive committee performed the function of a board of

 3     directors?

 4              THE WITNESS:  So again, I wasn't part of that

 5     process of managing the firm.

 6              THE COURT:  Uh-huh.

 7              THE WITNESS:  But I imagine since we were a public

 8     company that there was a board of directors, of course.

 9              THE COURT:  I would imagine so, right, okay.  All

10     right.  Thank you.

11     BY MR. KAPLAN:

12     Q    Now, were you aware that other employees of Neuberger

13     Berman also signed retention agreements?

14     A    Yes, I am aware of that.  I was aware of that.

15     Q    You were aware of that?

16     A    Yes, sorry.

17     Q    And were you aware of that in part because of your

18     being the head of the sales force at that time?

19     A    That's correct.

20     Q    Now, after the merger did the way that you were paid

21     change from how you were paid at Neuberger?

22     A    Yes, it did.

23     Q    Can you tell us how it changed?

24     A    Sure, sure, as best as I can recall.

25              Since the merger was announced on October 31st, 2003,
```

Page 100

1    and it was the end of the year, nothing was really done, in

2    terms of changing our compensation structure.

3        In 2004, we were weaned into the different comp

4    arrangements that they had.  And I believe that it was half

5    of what Lehman was doing.  And then from 2004 forward, we

6    were fully the same as Lehman employees, differentiated, as

7    you've heard described here by your -- the level that you

8    were, and the amount of compensation that you made.

9        So I think at some point, it was from 50 percent to

10   even more.  I think that for some levels, it was as much as

11   65 percent.

12   Q    Of the total compensation?

13   A    That's correct.

14   Q    Was deferred?

15   A    That's correct.

16   Q    And this was different from the compensation at

17   Neuberger?

18   A    Very much so.

19   Q    Because?

20   A    Because they had these -- I'll call them opportunities,

21   because they were done with the spirit of, you know,

22   employee retention but also safety of the business, but they

23   were significant amounts that were taken from your cash

24   flow, and put aside for future vesting.

25       And in the case of Neuberger Berman since it was five

Page 101

1    year vesting, we never got any of the monies that were

2    deferred, we never saw any of it.  I think we were short by

3    a month for the first possible vesting.

4    Q    Because the merger applied in October of 2003, and the

5    bankruptcy occurred in September 2008.

6    A    And we started in the program in 2004, so we were never

7    -- we never received a penny.  So all of that, all of those

8    years of deferred compensation just completely evaporated.

9    Q    Now, what happened with respect to the compensation

10   that was deferred in the year 2008?  Do you have any

11   recollection concerning that?

12   A    I absolutely do.  We got paid dollar-for-dollar of the

13   2008 compensation in 2009.

14   Q    And did you receive memoranda from Neuberger management

15   in that regard?

16   A    Yes, we did.

17   Q    And I show you what has been marked as Neuberger Berman

18   N and O, and ask you if you recognize these documents.

19              THE COURT:  Do I have them, Mr. Kaplan?

20              MR. KAPLAN:  Those are the highly redacted

21   documents.  We looked at them yesterday, but I will give you

22   a copy now.

23              THE COURT:  Thank you.

24   BY MR. KAPLAN:

25   Q    Do you remember seeing those, of course, not in

Page 102

1   redacted form --

2   A    In Q and A form, yes.

3   Q    And that that was Neuberger's management informing you

4   that you would be paid dollar-for-dollar for your deferred

5   comp in 2008?

6   A    Yes.

7   Q    And at that time --

8            THE COURT:  I'm sorry, can you be more specific

9   about where -- which statement are you referring to, Ms.

10  Stiefel?

11           THE WITNESS:  This was a document that was given

12  to us that was in Q and A format, and I don't remember

13  exactly the date that we got it when it was put on our

14  desks, but it essentially was trying to help us understand

15  what was going to be the treatment of monies that were taken

16  out of our compensation for 2008, and which ultimately were

17  going to be paid to us in 2009.

18           THE COURT:  What was the context of this document?

19  Was this in connection with -- what precipitated this

20  November 17th communication?  At this point, you were --

21  Neuberger Berman is owned by Lehman?

22           THE WITNESS:  At this point, we are -- we are not

23  -- well Lehman is bankrupt.

24           THE COURT:  Lehman -- right, so the filing was in

25  September --

Page 103

```
 1              THE WITNESS:  Neuberger --

 2              THE COURT:  -- of 2008, right.

 3              THE WITNESS:  Right.  Neuberger was -- is not part

 4    of the bankruptcy, we are still in our offices, we are most

 5    importantly, still managing client's portfolios, and there

 6    was tremendous confusion, and I think this was an attempt by

 7    management to give us some clarity about us as an

 8    independent -- independent in quotes, not necessarily

 9    ownership, entity.

10    BY MR. KAPLAN:

11    Q    Did this have anything to do with the subsequent offers

12    of various firms to buy Neuberger from the bankrupt estate?

13    A    So I wasn't familiar with those goings on whatsoever,

14    other than what we might be reading in the newspaper.  And

15    I'm not sure of the timing of November 2008.  Before the

16    bankruptcy, there was an intention to sell Neuberger Berman

17    to Hellman & Freeman & Bayne, and I recall that then became

18    the jurisdiction, if you will, of the bankruptcy process.

19    And the -- in the bankruptcy -- and I'm not a lawyer, but in

20    the bankruptcy process, I think that they were getting in

21    bids from other private equity firms and so we knew, for

22    example, this was known to us, that Carlisle who was going

23    to bring back Jeff Lane as the CEO, he was the former CFO in

24    New Republic, that they were putting in a bid.

25          We were aware of Hellman & Freeman & Bayne because they
```

1    were spending time in our offices, and I am unfamiliar with

2    what other offers might have been presented to the

3    bankruptcy.

4    Q    Going back for a moment, at the time of the merger, did

5    you feel you had a choice as to whether to work -- continue

6    working at Neuberger/Lehman or not?

7    A    For me --

8    Q    Yes.

9    A    -- I did not feel that I had a choice.  I had too much

10   to lose.  I had worked too long and too hard and had

11   established wonderful relationships, and had a great

12   business.  And as I said, it was very fulfilling to me.  I

13   was still very young, I loved what I do, and I wanted to

14   continue doing it.  It gives me great gratification and

15   satisfaction, and for my clients as well, who really rely on

16   me.

17            MR. KAPLAN:  No further questions, Your Honor.

18            THE COURT:  All right.  Thank you.  Mr. Miller.

19                     CROSS-EXAMINATION

20   BY MR. MILLER:

21   Q    Ms. Stiefel, my name is Ralph Miller, I represent LBHI.

22   We've never met or spoken before; is that right?

23   A    That's correct.

24   Q    I want to continue with the subject you were just

25   talking about and then maybe we'll work backwards a little

Page 105

1    bit through this.

2        What ultimately happened with regard to the ownership

3    of Neuberger?

4    A    To my surprise and delight, the bankruptcy court

5    approached the management of Neuberger Berman and said that

6    they needed to submit a bid as well.

7    Q    And that ultimately led to a so-called management buy-

8    out; is that correct?

9    A    We were awarded within the bankruptcy court process, we

10   were awarded that right to buy back the firm from the

11   bankruptcy court -- from the estate, sorry.

12   Q    Now, earlier you were asked about Neuberger Berman

13   Exhibits N and O which are this question and answer document

14   that refers to a payment that was promised for 2008 amounts

15   of production that had been earmarked for RSUs.  Do you

16   recall that?

17   A    I do.

18   Q    And you said that the -- you thought that was, if I

19   heard you correctly, an attempt by management to give you

20   some clarity, was that what you said, or certainty?

21   A    That's what I remember.

22   Q    All right.  And was that, do you think in part, to make

23   sure that the stability of the business, and the commitment

24   to clients continued during that period of uncertainty?

25   A    That's certainly one reason.

Page 106

1  Q    And that's the same management that ended up doing the

2  buy-out and owning 51 percent of the stock --

3  A    That's correct.

4  Q    -- correct?

5       And they were making the decisions at that point as you

6  understood it, and not the former management of Lehman that

7  had set up the RSUs program; is that true?

8  A    That's correct.

9  Q    All right.  There was some discussion about your

10  compensation, and I think to help with the Court, if I

11  might.

12          MR. MILLER:  May I approach the witness, Your

13  Honor?

14          THE COURT:  Yes.  So, Ms. Stiefel, how much -- did

15  you receive a payment in January 2009 as this Q and A

16  indicates you would?

17          THE WITNESS:  I did.  I did.

18          THE COURT:  You did.  And how much was that

19  payment?

20          THE WITNESS:  Upwards of probably pre-tax

21  $800,000, and after tax about -- I think 450 or something

22  like that.

23          THE COURT:  All right.  Thank you.

24          MR. MILLER:  Your Honor, I've passed out what's

25  been marked Lehman Brothers Exhibit 3, it's the amended

1    Twotso declaration.  And this is a -- has attached to the

2    back a page that showed where the ten Neuberger Berman

3    claimants or at least has ten lines for Neuberger Berman

4    claimants without identifying their names, their

5    compensation in various years.

6    BY MR. MILLER:

7    Q    And if you look at that, Ms. Stiefel, can you identify

8    without saying which one it is, which line appears to be

9    yours?

10   A    I think I can guess.

11   Q    All right.  Well, I don't think you have to guess, I

12   can confirm.  Now, there are two ways we can do this, Ms.

13   Stiefel, and this is up to you and to the Court, by the way,

14   I want to make sure I pronounce it right, is it Stiefel or

15   Stiefel, how do you --

16   A    It's Stiefel.

17   Q    Stiefel, Ms. Stiefel.  One way is we can just talk

18   about the numbers in open court if you don't object to that.

19   The other way to do it is, and this is a little unusual, but

20   I've done it before, you can write the line number, we can

21   put it on a piece of -- a legal pad here, and show it to the

22   Court and the court reporter, and then we'll all talk about

23   it, but then the people -- if any other people have a copy

24   of this, which is publicly filed, they can't tell which line

25   we're talking about.

Page 108

1          THE COURT:  It's not that unusual, Mr. Miller.  I

2     just conducted a three-week trial in which there was

3     substantial testimony about someone that we referred to as

4     third party A.

5          MR. MILLER:  All right.  So --

6          THE COURT:  So, in fact, what you can do is that

7     you can and Mr. Kaplan, you can join Mr. Miller, you can

8     actually approach the witness, point to the line, and you

9     can just refer to that and the record will so reflect.

10         MR. MILLER:  All right.  Well, I want the Court to

11    be able to know which line it is.

12         THE COURT:  Yes.  And you can let me in on the

13    connection.

14    BY MR. MILLER:

15    Q    Would you prefer to do it that way, Ms. Stiefel?

16    A    That seems very dramatic.

17         THE COURT:  It's not dramatic, it's just designed

18    to protect your -- the confidentiality of your information,

19    which I already have actually elicited from you, so.  But --

20        (Counsel and witness confer quietly)

21         MR. MILLER:  If I may, the magic number --

22         THE COURT:  Very good.  Thank you very much.

23    Q    It is dramatic and it's kind of fun, so (indiscernible

24    - away from microphone).

25         THE COURT:  This is only fun to lawyers who do

Page 109

```
 1    this for a living, it's not --

 2              MR. MILLER:  It's probably --

 3              THE COURT:  It's not at all --

 4              MR. MILLER:  -- a strange --

 5              THE COURT:  -- fun for the witness.  I was a

 6    witness once many years ago, and it's --

 7              MR. MILLER:  We understand that.

 8              THE COURT:  -- a very hard situation.

 9              MR. MILLER:  It is a way to protect, however --

10              THE COURT:  Confidential information.

11              MR. MILLER:  -- the confidentiality, and we so we

12    certainly want to do that for you.

13    BY MR. MILLER:

14    Q    If you looked at your line, and I'm going to try not to

15    ask questions that allow people to derive too much, you'll

16    see that there is what is shown as cash compensation.  It's

17    true that none of the lines show any equity deferral for

18    2003, correct?

19    A    That's correct.

20    Q    If we look at the 2004 line for you, it shows an amount

21    of cash commission, and while it may not be precise to the

22    last two digits, does that seem approximately the cash

23    commission that you received in 2004 before tax?

24    A    So it does, but I don't recall that there was no

25    deferral.  I thought --
```

Page 110

1    Q    All right.

2    A    -- there was a deferral in 2004.

3    Q    Well okay.

4    A    So I don't know where this John Twotso document is

5    coming from, but --

6    Q    Well --

7    A    -- my memory was that we were weaned in, and that it

8    was half of what was the customary in 2004.

9    Q    Well -- okay.

10   A    And I guess another way to cross-reference it, forgive

11   me because I'm an accountant by background, is if you look

12   on my claim and see if there was a 2004 amount, and that

13   will tell you the validity of this statement.

14   Q    All right.  Well, I'm really not going to concentrate

15   on that as much, because the purpose is not to establish

16   your claim, but I want to focus on the other parts.

17   A    Okay.

18   Q    For 2005, there is a number shown for cash commissions,

19   and you think you received that; is that the --

20   A    That's the gross number, yes.

21   Q    Gross number.  And then there is an equity deferral

22   amount, does that appear to be approximately the right

23   relationship and amount?

24   A    That's not my memory.  I don't remember that number.

25   Q    Okay.  The cash commission for 2006 looks approximately

Page 111

1    right?

2    A    On the gross basis, yes.

3    Q    Do you recall whether the equity deferral looks

4    approximately right or not?

5    A    I don't honestly.

6    Q    You don't or --

7    A    I don't, I do not remember.

8    Q    Okay.  The cash commission for 2007, does that seem to

9    be approximately what you recall?

10   A    No, that looks low.

11   Q    All right.

12   A    It definitely was lower, but that looks very low.

13   Q    All right.  And then the cash commission for 2008 and

14   the equity deferral, I think you've testified that you ended

15   up receiving both of those in cash, in fact.

16   A    In 2008 I got my deferral back for 2008's deferred

17   comp.

18   Q    In 2009 you actually received it.

19   A    In 2009.

20   Q    Does that --

21   A    And that's about close to what I thought it was,

22   it's --

23   Q    The combined total appears to be about correct.

24   A    Yes, sir.  Yes, sir.

25   Q    It does appear and I don't want to describe this in a

1    way that is unique, but it does appear that there was a

2    significant increase at least in some of the years while you

3    were working after the Lehman merger in the cash portions

4    that you received; is that correct?

5    A    Say that again.

6    Q    Yes.

7    A    Does it appear --

8    Q    If we look at your 2004, 2005 and 2006 numbers, they

9    are significantly larger than the year 2003 cash commission;

10   is that true?

11   A    Yes.

12   Q    And actually if we look across the line, for example,

13   your 2005 is higher than 2004 also, correct, cash

14   commission?

15   A    Correct.

16   Q    So it was a success for you to go -- did you consider

17   it successful on balance that you did stay with Neuberger

18   Berman after it merged with Lehman as opposed to trying to

19   break away at the time of the merger and go somewhere else?

20   A    May I answer you as follows?  The initial idea, as I

21   understand it, of acquiring Neuberger Berman by Lehman

22   Brothers' perspective was they didn't have an asset

23   management, call it manufacturer, and yet, they had an

24   enormous, enormous network, and an enormous power in the

25   marketplace.  And the spirit of it was that they would have

Page 113

1    more opportunities to direct asset management mandates to

2    the wholly owned division of Neuberger Berman, and the

3    numbers bear out that that original spirit was effective and

4    working.

5    Q    Okay.  I think my question was --

6    A    The growth of assets occurred in the initial years when

7    Lehman acquired us.  It occurred on the portfolio management

8    side and it occurred throughout the organization.  And I

9    think at the time that we were acquired by Lehman Brothers,

10   we maybe had 50 billion -- don't hold me to this, this is

11   just an approximation, $50 billion.  And then when we were

12   part of Lehman Brothers that continued to grow every year in

13   terms of the assets under management.

14   Q    All right.  Well, I'm not sure my question was clear, I

15   think you did answer it, but let me just focus it.

16   A    Sure.

17   Q    I was not asking about whether it was a success from

18   the perspective of Neuberger Berman or Lehman, I was asking

19   from your personal perspective.  You had a choice to make

20   when the merger with Lehman occurred, and you chose to stay

21   with the merged entity, or actually merger is not exactly a

22   correct term, it was actually a subsidiary I believe all the

23   time, wasn't it, or was it merged into the unity, if you

24   know?

25   A    It was -- I think you're right, I think it was a

Page 114

1  subsidiary.

2  Q     All right.  So the subsidiary was acquired by Lehman

3  Brothers Holdings, Inc.

4  A     A public company was wholly acquired by Lehman

5  Brothers, that's correct.

6  Q     All right.  So you had to decide whether you wanted to

7  stay after the company was acquired, Neuberger Berman, or

8  whether you wanted to leave --

9  A     That's right.

10 Q     -- right?

11       Looking back over these first few years, and looking at

12 what you knew then, not what you know now, would you

13 consider it was a personal success for you to stay with

14 Neuberger Berman as opposed to, particularly with your

15 restrictive covenants at that time, going out and trying to

16 find other employment?

17 A     I was 44 years old, I loved what I did, and I love my

18 clients, and I was very excited to continue what I do.

19 Q     All right.  And you understood at that time that one of

20 the changes was that because you were going to go to work

21 for -- what was generally investment bank, was that there

22 would be a deferred component to your compensation

23 potentially at some time.  Did you understand that at some

24 point?

25 A     Well, we learned it eventually, but I didn't know that

Page 115

1    on the way in when the announcement was made.  I had no idea

2    about that.

3    Q    Well, you came to know that when, because it's not

4    clear to me whether you had deferred compensation in 2004 or

5    2005?

6    A    So the first year that we were on the program is when I

7    came to know that.

8    Q    So was that part of 2003 or was that part of 2004?

9    A    I think it was 2004.

10   Q    All right.  And you said that you made a change around

11   that same time to go back to production.

12   A    No, I made a change to go back to pure production in

13   2007, but I was always what we call a player/coach.  I was

14   production and also managing.  I was doing both.

15   Q    Okay.

16   A    So I had client responsibilities, and I also had the

17   responsibility of managing the sales force and growing the

18   sales force.

19   Q    All right.  Now, managing the sales force, that

20   component of your work is not -- doesn't involve direct

21   client contact.  It involves making sure that the managers

22   know how to make client contact, the people you're managing,

23   know how to make client contact, and coaching them to go out

24   and actually do the client contact.  Is that the way it

25   works primarily?

Page 116

1   A    No, actually no.  It -- I was meeting clients all over

2   the country because sometimes they would ask for my, you

3   know, help in a pitch, in a large pitch, so I would go all

4   over the country sometimes.

5   Q    All right.

6   A    We wore a lot of hats at Neuberger.  It was a very lean

7   and mean place.

8   Q    All right.  Thank you.  When did you become aware that

9   some of the compensation that you were -- was shown in your

10  compensation statements was going to be deferred and would

11  go into the equity awards program?

12  A    When it was -- when it came into effect, which I

13  believe was in 2004, and we were given materials to that

14  effect.

15  Q    All right.  And you chose to continue to work there as

16  opposed to go somewhere else at that time; is that true?

17  A    I did.

18          THE COURT:  Can I interrupt, Mr. Miller.  In

19  connection with the acquisition of Neuberger by Lehman, did

20  the Neuberger shareholders receive compensation?

21          (No response)

22          THE COURT:  The company was bought, right?

23          THE WITNESS:  The answer is no.

24          THE COURT:  Neuberger was bought by Lehman.

25          THE WITNESS:  That's right.

Page 117

1            THE COURT:  Right?  So Neuberger -- but so Lehman

2    paid to acquire Neuberger?

3            THE WITNESS:  Right.  So it was just --

4            THE COURT:  So where did that money go?

5            THE WITNESS:  -- an exchange -- the -- if you were

6    a shareholder of Neuberger Berman --

7            THE COURT:  Yes.

8            THE WITNESS:  -- you got some whatever the

9    translated or calculated amount of Lehman shares were, and I

10   think it was 80 percent in that stock conversion, and I

11   believe, but don't hold me to it, that it was 20 percent in

12   cash.  So I have a vague memory of that.

13           THE COURT:  So the consideration Lehman paid to

14   acquire Neuberger Berman and the owners of Neuberger Berman,

15   the shareholders, for each of their shares of Neuberger

16   Berman got some combination of cash and stock?

17           THE WITNESS:  Primarily stock.

18           THE COURT:  Primarily stock of Lehman Brothers.

19           THE WITNESS:  That's correct.

20           THE COURT:  Okay.  And do you recall what you

21   received on a kind of -- you held shares in Neuberger

22   Berman?

23           THE WITNESS:  I did, because I was a partner.

24           THE COURT:  And do you recall what you received as

25   consideration for the merger?

Page 118

1                THE WITNESS:  I don't, but I could get that.

2                THE COURT:  So it was some amount of shares in

3     stock.

4                THE WITNESS:  Right.

5                THE COURT:  And did you then -- do you recall, did

6     you immediately cash out the Lehman shares, or did you hold

7     them for a period of time?

8                THE WITNESS:  We couldn't immediately cash out --

9                THE COURT:  Okay.

10               THE WITNESS:  -- because there was a restriction,

11    and you could only sell 10 percent per year.

12               THE COURT:  I see.  Beginning immediately?  So it

13    was like a run-off?

14               THE WITNESS:  Beginning immediately I think.

15               THE COURT:  Okay.  Thank you very much.  Go ahead,

16    Mr. Miller.

17               THE WITNESS:  And by the time -- if this is

18    helpful, by the time that Lehman went bankrupt, we all got

19    stuck with 30 percent.  So I think that over that -- that

20    would suggest there were seven opportunities to sell the

21    stock.  But none of the claims that are -- we're discussing,

22    Your Honor, has anything to do with that.  That's all been

23    lost, and that's not the basis of this --

24               THE COURT:  No, I understand.

25               THE WITNESS:  Okay.

Page 119

1          THE COURT:  I'm just trying to understand because

2     the claim is being made, the legal theory around the claim

3     that you're asserting, has to do with the circumstances --

4          THE WITNESS:  Right.

5          THE COURT:  -- among other things, the

6     circumstances of Lehman's acquisition of Neuberger Berman.

7     So I'm just trying to understand since I don't -- I only

8     know what, you know, what gets told to me in this context.

9     So I'm just trying to understand how the transaction took

10    place.  I'm sorry, Mr. Miller, go ahead.

11    BY MR. MILLER:

12    Q    To follow up on that, did you sell the maximum amount

13    of the Lehman stock that you received, every opportunity

14    that you had to sell it?

15    A    Unfortunately I did not.

16    Q    So how much without telling us the dollar value or the

17    number of shares, what percentage of the Lehman stock that

18    you received as a part of the merger were you left holding

19    when the music stopped, so to speak, in mid-September 2008?

20    A    (Indiscernible) a pretty significant percentage.  I

21    don't know what it was, but was probably north of 80

22    percent.

23    Q    Okay.

24    A    And unfortunately my tax background was part of that

25    decision, which in retrospect was quite foolish, which was

Page 120

1    -- had a very low cost basis, so whenever I would sell stock

2    it would cost a lot of money in taxes.

3    Q    Okay.  But it would've been capital gain taxes; is that

4    true?

5    A    That's correct.

6    Q    I have one more topic.  I wanted to talk a little bit

7    about the discussion you had earlier with Mr. Kaplan about

8    going to sit on a beach.  And for that, do you still have in

9    front of you Neuberger Berman Exhibit D, which is the

10   amended and restated stockholder's agreement?

11   A    I do.

12   Q    And this is the document that you had to agree to in

13   order to cash in your Neuberger Berman shares, is that one

14   of the things you got out of this?

15   A    I wouldn't describe it as cashing in my Neuberger

16   shares.  I would describe it as being awarded my Neuberger

17   shares.

18   Q    All right.  I'm sorry, that's perhaps a better term.

19   In order to participate in the exchange, and to continue to

20   be a Neuberger Berman -- well, in order to turn in your

21   shares, you had to sign this agreement; is that correct?

22   A    That's correct.

23   Q    Do you know if you had said I don't want to turn in my

24   shares, but I want to keep on working there, if you could've

25   gotten a different agreement at Neuberger Berman?

Page 121

1   A    I don't believe so.

2   Q    Did anyone -- do you know if there was an option for

3   you to say I just forfeit my Neuberger Berman shares, but I

4   want to keep working there, I want to get different terms,

5   you don't know one way or another if that's --

6   A    I do not.

7   Q    All right.  This --

8             THE COURT:  Do you know -- one more, one more.

9   And do you know at that moment, and I understand what you

10  said about the clientele that you had built up, so at this

11  moment in time, things are happening, things are moving

12  quickly, there's not a hundred percent nearly transparency

13  in what's going on, right.

14            At this moment in time, do you know if you had

15  done as Mr. Miller suggested, or just said, I don't want to

16  be part of Lehman Brothers, I'm voting with my feet, I'm

17  leaving.  Do you know if the restrictive covenants that you

18  were operating under as a Neuberger Berman employee, and

19  that you then had to take with you to Lehman, would they

20  have fallen away because -- and this is kind of fancy lawyer

21  talk because of the change in control?

22            In other words, you had signed up, you were

23  Neuberger Berman, you weren't Lehman Brothers.  So --

24            THE WITNESS:  Your Honor --

25            THE COURT:  -- do you know if --

Page 122

1           THE WITNESS:  -- I'm not a lawyer.

2           THE COURT:  And I understand that.

3           THE WITNESS:  Right, and I was under the

4    impression that these restrictive covenants still applied.

5           THE COURT:  If you had at the moment the --

6           THE WITNESS:  If I had voted with my feet.

7           THE COURT:  -- mid -- your -- 11:59 a.m. before

8    the merger takes place, you left, and went to another wealth

9    management firm and you wanted to take your book with you,

10   you --

11          THE WITNESS:  I couldn't do that.

12          THE COURT:  -- believe --

13          THE WITNESS:  I couldn't do that.

14          THE COURT:  -- you couldn't do that.

15          THE WITNESS:  I absolutely positively believe that

16   I couldn't do that.

17          THE COURT:  And I don't know the answer, but --

18   and you believe that that the change in control that

19   Neuberger was about to be acquired by Lehman did not have --

20          THE WITNESS:  Did not liberate me.

21          THE COURT:  -- did not liberate you?

22          THE WITNESS:  That's correct.

23          THE COURT:  That's what you believed?

24          THE WITNESS:  Absolutely a hundred percent.

25          THE COURT:  Okay.  Thank you.

Page 123

BY MR. MILLER:

1

2    Q    All right.  So moving forward a little bit in time, you

3    did sign this agreement, and this was the agreement that was

4    in effect when you became aware of the -- you said in 2004,

5    that some of the compensation was deferred; is that right?

6    A    This was the agreement that was in effect, that's

7    correct.

8    Q    Yes, the Neuberger Berman D.

9         Now, I do want to ask, did you ever complain about the

10   restrictions that were in the -- this Exhibit D at the time

11   you were asked to sign it, to register written complaints

12   or?

13   A    (No audible response)

14   Q    No?

15   A    No.

16   Q    So you didn't file a lawsuit and say you thought that

17   this was something that shouldn't be forced on you?

18   A    That's not in my nature.

19   Q    All right.

20   A    I'm not litigious.

21   Q    When you learned that some of your compensation under

22   the Lehman system was going to be deferred, were you aware

23   of the fact that this was consistent with the way Lehman did

24   pay the people who were generally higher levels in the

25   organization, that there was some deferred compensation?

1    A    I learned it at that time.

2    Q    All right.  Did you complain about that and say you

3    didn't know you were getting into this, and you think you

4    were being -- that this was inappropriate or unfair to you?

5    A    I wasn't happy about it, but no, I'm not someone -- I

6    keep my noise clean, I work with my clients, and I'm not

7    someone that's very vocal or a nuisance to management.

8    Q    All right.  Did you go back and look at Exhibit D and

9    try to figure out what are my options at that point, or did

10   you just decide it just wasn't really something that you

11   needed to consider seriously to leave, because there was

12   going to be some deferred compensation?

13   A    I didn't consider leaving because there was a cost to

14   leaving that was too great with all due respect from a girl

15   from Que Gardens (ph) and I loved what I did, and I wanted

16   to continue doing it.

17   Q    All right.  Well, let's talk about that point in time

18   though.  In 2004, and this is true of all Neuberger Berman

19   group, at least it was certainly true of you, there was no

20   2003 deferral that you would give up if you'd left in 2004;

21   is that true?

22   A    I think that's correct, but I had founder shares.

23   Q    All right.  So what would you give up if you left other

24   -- in the way of deferred compensation as opposed to the

25   restrictive covenants?

1   A    If I would've gone to a competitor, I could've lost my

2   stock.

3   Q    All right.  If you'd gone to a competitor --

4   A    If I would sit on a beach, I would be able to sell 10

5   percent a year.

6   Q    Well, let's ask whether you understand that literally

7   means if you'd gone to a competitor, or do you understand

8   that it means if you went to a competitor and did certain

9   things?  Do you have that distinction in mind?

10  A    So it was my understanding again, I'm not a lawyer,

11  that there was virtually nothing I could do in the industry.

12  Q    Let's look at that if we could.  Would you turn with me

13  in Exhibit D to the definition of harmful activity, I

14  believe that's what I'm looking for.

15  A    What page?  Oh, page 4.

16  Q    The definition is on page 9 --

17  A    Oh, okay.

18  Q    -- of harmful activity.  Let's start with page 4, as

19  you say.  Page 4, I think, is where it says you won't engage

20  in harmful activity.

21  A    Okay.

22  Q    It -- Article 3 says that there is not going to be any

23  harmful activity, right?

24  A    (No audible response)

25  Q    And it talks about liquidated damages.  Paragraph B at

Page 126

1    the top of page 5 has a statement, see if you can -- I can

2    read this correctly, "It is expressly understood and agreed

3    that although each principal and the company consider the

4    restrictions contained in the Section 3.1 to be reasonable

5    if a final judicial determination is made by a court of

6    competent jurisdiction, that the time or territory, or any

7    other restriction contained in this agreement is an

8    unenforceable restriction against such principal, the

9    provisions of this agreement shall not be rendered void, but

10   shall be deemed amended to apply as to such maximum time and

11   territory, and to such maximum extent as such court may

12   judicially determine to indicate to be reasonable."

13   A    But does that mean you have to go to court?  Yes.

14   Q    Well, I'm asking you the question, first of all, if I

15   read that correctly.

16   A    That's how I read it the same.

17   Q    All right.  Do you know if anybody at Neuberger Berman

18   ever went to court to try to get a determination of whether

19   these restrictions were reasonable in terms of time or

20   territory or otherwise?

21   A    I sincerely don't know if anyone did, it's possible,

22   it's absolutely possible.

23   Q    Do you think it's likely from this small organization

24   that someone had gone to court over this issue, and you

25   would not have heard that?

1   A    With all due respect it is possible because when

2   somebody leaves, you aren't necessarily in the flow of

3   information about them.  So I would not necessarily be aware

4   of litigation against the firm.  That isn't something that's

5   widely discussed, so I would not have been in the flow of

6   information about that.

7        And maybe to my detriment, I have a book of business, I

8   have clients, I'm responsive to them 24/7, and that's what I

9   spend my day doing.  So if -- it's possible, but it is not

10  outlandish to assume that I wouldn't know about it.

11  Q    But certainly you didn't, as you've said earlier.

12  A    I didn't.

13  Q    So let's -- there are various consequences of harmful

14  activity here, and I -- the Court can read those.  Let's go

15  over to the definition of harmful activity which begins on

16  page 9, please.

17       And the subparagraph A talks about soliciting or

18  accepting business from, and then it has a list of

19  categories we're going to talk about in a moment.  Do you

20  see that paragraph?

21  A    I do.

22  Q    And it has to do -- the first little I is "any person

23  who is a client of the company group during the one year

24  period prior to such principal's employment termination

25  date."  And it also includes the during the one year period

Page 128

1   immediately prior to the action.

2       So that clearly applies to the clients of Neuberger

3   Berman; is that true?

4   A    Yes.

5   Q    Little two I refers to "any prospective client of the

6   company group, who within the one year period prior to such

7   employment termination date had been directly solicited by

8   such principal."  Let's just stop there.

9       Do you see the term "directly solicited"?

10  A    (No audible response)

11  Q    Now, you did directly solicit some perspective clients,

12  right?

13  A    I did.

14  Q    Some of them became clients, some of them didn't.

15  A    That's correct.

16  Q    Do you -- would you understand "directly solicited"

17  means you had contacts with them, they weren't somebody that

18  somebody two offices down called on the phone?

19  A    That's correct.

20  Q    All right.  Then or it goes on "where directly,

21  indirectly, in whole or in part, such principal supervised

22  or participated in the company group solicitation activities

23  related to such perspective client."

24      Now, you did supervise or participate in some

25  solicitation activities.

Page 129

```
 1    A    I did.

 2    Q    Right.  Then -- so this is talking about clients of the

 3    group and prospective clients of the group so far, right?

 4    A    Yes.

 5    Q    The Neuberger Berman group didn't have all the people

 6    who needed to have money invested as either clients or

 7    perspective clients, did it?

 8    A    I don't understand what you mean, what's

 9    (indiscernible).

10    Q    Well, I mean, there's a lot of people in the world --

11    A    Sure.

12    Q    -- who need to have an investment manager.

13    A    Sure.

14    Q    So there were a lot of people left over in the big

15    circle --

16    A    Okay.

17    Q    -- that Neuberger Berman didn't manage to either get as

18    a client or solicit during the one year period, right?

19    A    Unfortunately.

20    Q    Right.  And there would've been some that had been

21    solicited two years ago or three years ago, and they're not

22    in this group, right?

23    A    I guess definitionally.

24    Q    This is for the one year before you decide to leave.

25    Okay.  Then subparagraph B is to solicitor except business
```

1    engaged in sales or marketing with a financial intermediary

2    --

3    A    Yes.

4    Q    -- and this talks about who they are, or any person

5    employed with them, with whom the principal had business

6    contact during the one year period prior to such principal's

7    employment termination date.

8        And this is --

9    A    This could be an accountant, a lawyer, all of your

10   referral sources.

11   Q    All right.  So again, this means the people that you

12   had business contact with during a one year period, but this

13   is again, your business contact, not all the business

14   contact of all the people in the office, right?  It's the

15   principal?

16   A    That's correct.

17   Q    Then it gets easier, because C has to do with hiring

18   people, it says you can't go in and employ people.  And D

19   has to do with using your record to market, promote, or

20   otherwise trade on your success while you were working at

21   Neuberger Berman, right?

22   A    It didn't apply to me, because I wasn't managing money.

23   I was -- right, I was soliciting clients and servicing

24   clients.

25   Q    All right.  And then C and D are -- I'm sorry, E and F

Page 131

1   are even easier.  E has to do with disclosing confidential

2   information, that's derived here, right?  And F has to do

3   with making disparaging or derogatory remarks about the

4   company or the people who work there, right?

5   A    (No audible response)

6   Q    So the real restriction here, first of all, you could

7   go to a competitor and let's work up from the bottom, you

8   could avoid making disparaging or derogatory comments,

9   right?

10  A    Absolutely.

11  Q    And you could avoid disclosing confidential

12  information, right?

13  A    Well -- but isn't confidential information phone

14  numbers and things of that nature, addresses?

15  Q    It may be.

16  A    Right.

17  Q    But I'm going to come back to that --

18  A    Okay.

19  Q    -- but you -- once you figure it out what it is, you

20  could avoid disclosing confidential information, right?

21  A    (No audible response)

22  Q    And then it may not be convenient, but let's say that

23  you went -- who was a big competitor?

24  A    Sanford Bernstein.

25  Q    Okay.  Sanford Bernstein, okay.  So let's say that you

1    went to Sanford Bernstein, and you are now a manager, is

2    that what you call yourself, what would you call -- a wealth

3    manager?

4    A    A wealth advisor.

5    Q    Okay.  A wealth advisor.  So you're a wealth advisor at

6    Sanford Bernstein, you could, if you went to work there,

7    this paragraph D does not keep you from talking about the

8    success of Sanford Bernstein in managing money, it just

9    means you can't say while I was at Neuberger Berman, here's

10   what we did, right?

11   A    That part is correct.

12   Q    All right.  Now, C you couldn't hire an employee or a

13   consultant, that's okay, you could go to work for Sanford

14   Bernstein and not have to bring anybody with you, right?

15   A    So no assistant, no nothing.

16   Q    Well, that would be the -- that would be right.  It

17   would be just you.

18   A    Just me.

19   Q    Now it gets a little more complicated.  B says that you

20   couldn't solicit business from through or engage in sales

21   activity with the people you had business contact with

22   during the one year period, right?

23   A    (No audible response)

24   Q    So you'd have to go through your rolodex and figure out

25   who you had contact with over the last year.  Everybody that

Page 133

1    you had contact with 13 months ago or earlier, they'd be

2    fair game, but the people from last year, you couldn't make

3    contact through them for three years, right?

4    A    Correct.

5    Q    All right.  And now let's go back to A.  You couldn't

6    solicit or accept business from an existing client from

7    Neuberger Berman, right, or a prospective client that either

8    you directly solicited or you supervised the solicitation

9    of, right?

10   A    That's correct.

11   Q    That still left a lot of people that were on Sanford

12   Bernstein's list of prospective clients that you'd never

13   heard of before probably?

14   A    What list are you referring to, Sanford Bernstein's

15   list?

16   Q    You don't think that any competitor is going to have a

17   list of prospective clients that you've never heard of?

18   A    Absolutely not, I don't think that.

19   Q    That has that --

20   A    That's what they're hiring a wealth advisor is to

21   generate that list.

22   Q    All right.  And your belief is that all the prospective

23   clients in the world were already on your list?

24   A    That's a gross exaggeration, of course, because you

25   can't get to all of the prospective clients in the world,

Page 134

```
 1    but what -- where you build a business is on the basis of

 2    your rolodex and your network.  And for me, being in public

 3    accounting, I was networking with my former Arthur Andersen

 4    colleagues.  I was networking with matrimonial lawyers.  I

 5    was networking with trust and estate lawyers, and I was

 6    networking with ERISA lawyers, and they are the lifeblood of

 7    what we do.  Nobody gives you a list, nobody gives you

 8    clients, you generate all of them on your own, and they're

 9    based on your own contacts.

10        And the reason I was successful is because I had

11    initially believe it or not, even though it doesn't exist

12    anymore, I had the base of Arthur Andersen as a reference to

13    refer clients to me.  And I built a business from that, and

14    you know, other related --

15    Q    All right.

16    A    -- referral sources.

17            THE COURT:  Mr. Miller, are we getting towards the

18    end here?

19            MR. MILLER:  Yes, we are.  Let me just ask a

20    follow-up, a final I guess question on this, Your Honor, I

21    think.

22    BY MR. MILLER:

23    Q    Did you make any effort to sit down and consider what

24    practicality you would have in going to a competitor and

25    saying, I can come to work here, but here are the things
```

1    that I can't do based on what we've been through, but I can

2    go back more than a year, and I can work with all the

3    information that I had more than a year ago, that I built up

4    from Arthur Andersen and people I haven't had business

5    contacts with, and define what you could do?  Did you ever

6    go through that exercise in your own mind?

7    A     First of all, how do you track it, right?  You'd have

8    to go back and research your calendar and, you know, et

9    cetera, et cetera.  But in my mind, I was out of business,

10   because I could not solicit and accept clients, I could not

11   network with the intermediaries that I had cultivated, and

12   what typically happens, the way that you continue to build

13   your business is that you are trying to touch them with, you

14   know, different materials so that they think of you, if

15   there is a situation, a life cycle situation where there's

16   an asset management opportunity.

17        So the facts -- I know you believe that if you just

18   eliminated the time period that you would've been, you know,

19   open for business, and you could just continue what you do,

20   but the reality is, you're hoping to continually touch them.

21   You build a database of these referral sources, and you send

22   them a recent article, or you send them something about the

23   markets.

24        So you essentially are out of business because if

25   you're doing your job properly, and how I was successful in

Page 136

1     building my business is that I'm reaching out and touching

2     them.  It's not perfect.  The database always has to be, you

3     know, updated and adjusted and sometimes you get busy with

4     client demands, so your best intentions don't necessary get

5     executed in that way.

6          But effectively I believed that I would be out of

7     business because my base of generating a business, I would

8     go from a book of let's say in 2003, it was 700 million to

9     zero.  And when you have zero, you are valueless to your

10    competitor, because you can't bring your clients, they're

11    not going to generate revenue.  And if you go to a

12    competitor, someone has to pay you.  And if they pay you,

13    it's coming from somewhere.  And if you're not generating

14    revenue, then you are a lost leader.

15         And maybe you're a nice person and maybe you have a

16    great personality, but effectively it can take five to seven

17    years to build a business.  And if you are closed with

18    respect to all the clients that you did this wonderful work

19    for, help them buy houses, help them send their kids to

20    college, and all these wonderful things that you've been

21    responsible for, and if you eliminate that, then you are out

22    of business.

23    Q    Your --

24    A    You are worthless in the marketplace.

25    Q    You're out of business in wealth management, right?

1    A    That's correct.

2    Q    You said you had a CPA at one time.

3    A    Oh, my goodness, that would be a scary thought, because

4    I haven't practiced, at the time, in 14 years, and so the

5    laws change all the time.  I would probably be -- what is

6    it, I would be disbarred if you're a lawyer, I would -- that

7    would be a scary thought frankly, Mr. Miller, because --

8    Q    Well, I didn't finish my question.

9    A    Sorry, I'm sorry.

10    Q    My question was, you know that there are a number of

11    large accounting firms that have consulting practices of

12    various kinds.

13    A    That's correct.

14    Q    Did you consider whether these restrictions would allow

15    you to go to work for an accounting firm, not as an

16    accountant, but to use, for example, your training

17    capabilities, your management capabilities to organize

18    groups and perhaps get them to try to provide say,

19    accounting services to somebody?

20    A    And that's worth a million dollars a year?

21    Q    That was my follow-up question, thank you.  If you'd

22    gone to any large accounting firms, do you think you

23    could've made anything like the kind of income that we see,

24    for example, on the line we've identified before 2005 in

25    cash?

Page 138

```
 1   A    I can't answer that question because I don't what the

 2   compensation scheme is for accounting firms.  I will tell

 3   you that I was a tax person for ten years, I loved doing

 4   that, I love giving advice, I loved that people came to me

 5   to seek an answer.  I loved saving them tax money.  But at

 6   the end of the day what I loved more was making them money.

 7        And the idea of going to be something completely

 8   different after I had built a successful business, and had

 9   been acknowledged as such by being awarded the partnership,

10   was not something that I felt was viable.  I felt what I was

11   excellent at was working with clients and helping them with

12   their financial affairs.  And I continue to do that today,

13   and I love what I do.

14             THE COURT:  So picking up on that, where do you

15   work now?

16             THE WITNESS:  Neuberger Berman.

17             THE COURT:  Thank you.

18             MR. MILLER:  No further questions, Your honor.

19             THE COURT:  All right.  Thank you.  Mr. Kaplan,

20   any redirect?

21             MR. KAPLAN:  No, Your Honor.

22             THE COURT:  Okay.  Ms. Stiefel, thank you very

23   much.  I really appreciate your testimony today.

24             All right.  What's next?

25             MR. KAPLAN:  Henry Ramallo, Your Honor.
```

```
 1                THE COURT:  All right.  Well, what about Ms.
 2      Krieger who has been patiently waiting?
 3                MR. KAPLAN:  Whatever your -- they've been both
 4      here.  Mr. Ramallo I think will be quick, but if --
 5                THE COURT:  I really don't want to get in the
 6      middle of the management of your witnesses.  I can just -- I
 7      do have eyes, and I can see that folks have been -- I don't
 8      know who have got other priorities elsewhere, so I don't
 9      want --
10                MR. KAPLAN:  I will --
11                THE COURT:  I'm just asking the question.
12                MR. KAPLAN:  I will yield to Mr. Schrager and Ms.
13      Krieger, and we will take Mr. Ramallo last.
14                THE COURT:  Well, let me ask, if Mr. Ramallo is
15      also a Neuberger Berman employee --
16                MR. KAPLAN:  Yes.
17                THE COURT:  -- so Mr. Miller and Ms. Krieger, I'll
18      -- we can hear from Ms. Krieger directly in terms of her
19      timing situation, but for that, there would be logic to
20      hearing from the Neuberger Berman employee now because we
21      have that story being evolved.  But if Ms. Krieger has to be
22      somewhere else, then I'll -- you know, it's a cost benefit
23      here.
24                MS. KRIEGER:  (indiscernible) Your Honor.
25                MR. KAPLAN:  She does have to go back to work.
```

1          THE COURT:  Mr. Miller, would you -- can we get

2   Ms. Krieger back to work, would you mind?

3          MR. MILLER:  Your Honor, it's the Court's

4   pleasure, we can work with it either way.  I think we'll all

5   be able to remember what was just happening --

6          THE COURT:  Okay.  All right.

7          MR. MILLER:  -- in (indiscernible - away from

8   microphone).

9          THE COURT:  Then let's have Ms. Krieger come up so

10  that she can go back to work.

11         MR. SCHRAGER:  We've done it, Your Honor, but for

12  the record, I'll say I'd like to call Karen Krieger to the

13  stand.

14         THE COURT:  All right.  Ms. Krieger, would you

15  raise your right hand please?

16              KAREN KRIEGER, WITNESS, SWORN

17         THE COURT:  Please have a seat.

18         MR. SCHRAGER:  Your Honor, before I start

19  questioning Ms. Krieger, I would like to thank the Court

20  again for its graciousness and --

21         THE COURT:  It's my job, no problem.

22         MR. SCHRAGER:  -- flexibility with the time

23  period.  So one factor that I thought may not be coming out

24  in some of the understandings is that the cross-examination

25  time doesn't count against the presenter of the witness, it

Page 141

1    counts against the cross-examiner's time, so I think we're

2    both tuned we're well --

3              THE COURT:  We are way beyond any --

4              MR. SCHRAGER:  -- over three hours at this point.

5    Right.

6              THE COURT:  -- time periods whatsoever, so I don't

7    think we need to talk about them anymore, but I would like

8    to be done before 5 o'clock today.

9              MR. SCHRAGER:  Great, thank you, Your Honor.

10                        DIRECT EXAMINATION

11   BY MR. SCHRAGER:

12   Q    Ms. Krieger, can you state your name for the record,

13   please?

14   A    Karen Simon Krieger.

15   Q    And can you tell me where you were employed at the time

16   of the Lehman bankruptcy, please?

17   A    At Lehman Brothers.

18   Q    And when did you start work at Lehman Brothers?

19   A    November 19th, 1990.

20   Q    1990, okay.  What was your position at the time of the

21   bankruptcy?

22   A    I ran the business process alignment group within the

23   IT organization, so I was responsible for business analysis

24   around tools, process, and resources, and how they were used

25   in the technology department for enterprise-wide projects.

Page 142

```
 1        So things like incident problem, change, asset

 2   management --

 3             THE COURT:  I'm sorry, what was that, incident?

 4             THE WITNESS:  Incident, problem, change.

 5             THE COURT:  Could you explain what that means?

 6             THE WITNESS:  So in a technology department, you

 7   have many systems that are in production, and you also have

 8   systems that are in development.  Systems that go into

 9   production have problems, and they could go down.  So if

10   they go down, we have tools that manage, help incidents in

11   tools are -- that provide transparency to the organization,

12   so that the right people get involved to fix it.  So if a

13   training floor application goes down --

14             THE COURT:  I see, okay.

15             THE WITNESS:  -- the right people need to be

16   notified.

17             THE COURT:  Okay.  All right.  Thank you, thank

18   you.

19   BY MR. SCHRAGER:

20   Q    Just for shorthand reference, Ms. Krieger, do you have

21   a title that we can refer to during that -- at the time of -

22   - prior to bankruptcy?

23   A    So I was the (indiscernible - attorney speaking over)

24   head of business process alignment and my corporate title, I

25   was promoted at the end of 2007 to SVP, which is senior
```

Page 143

1    vice-president.

2    Q    Okay.  Did you have a number of people reporting to you

3    at that time?

4    A    At that time I had a staff of approximately 20 people

5    throughout my years at Lehman, I had varying amounts of

6    people that ranged between a dozen to 50 people at different

7    points.

8    Q    Now, you said you started work at Lehman in 1980, you

9    were working at Lehman then when it was spun-off by American

10   Express and became an independent company?

11   A    Yes.  I was responsible in 1992, 1993 for the

12   technology separation from Shearson, and then the subsequent

13   separation from American Express.  And at that point, I

14   built a business office, and that business office was

15   associated to separation of contracts, separation of

16   billing.  It was putting in the abilities in Lehman to

17   become an independent organization.

18        So I put in place a process for how we request goods

19   and services, how we receive goods and services into the

20   organization, and how they are deployed.  So when PCs came

21   in, when phones came in, any equipment, software that came

22   in, it was my responsibility or my team to actually bring

23   those goods in, inform the people whose job it was to deploy

24   them, so that they would pick them up, and that they then

25   would build the machines, they would deploy them to the

Page 144

1   user's desks, so that people could be in operational.

2   Q    And just for background, Ms. Krieger, how many people

3   did you have reporting to you at that time?

4   A    At the time, approximately 35.

5   Q    Okay.  Now, at that time, you were working out of the

6   Lehman headquarters at the World Financial Center?

7   A    I was in the World Financial Center from 1990 until

8   1995, and then I was sent over to 101 Hudson in New Jersey,

9   and then I came back to New York, and again, was in the

10  World Financial Center until the beginning of 2001.  And in

11  2001, I was then moved to the World Trade Center, where I

12  was on the fortieth floor.

13  Q    Okay.  Can you -- this is by way of introduction of

14  your background and skills, Ms. Krieger, and your role in

15  the company.  What happened with respect to your

16  responsibilities after the attack on 9/11?

17  A    My responsibility was to work on the firm's technology

18  insurance claim.  So my job was to try and understand what

19  the value of the assets were that we lost, both in the World

20  Financial Center and the World Trade Center, as well as I

21  was responsible for the capital projects to rebuild the

22  firm, and rebuild the facilities that needed to get set up

23  at 101 Hudson, 70 Hudson, 745 7th Avenue in order to -- so

24  there was a short term, steps that needed to be taken, so

25  that it would be up and operational very quickly after the

Page 145

1    terrorist attacks.  And then it was around building the

2    capital projects to actually facilitate moving into 745 7th

3    Avenue, so that we would have a headquarter building once

4    again.

5    Q    That's very helpful, thank you.  Ms. Krieger, you've

6    appeared in this court before in this proceeding; is that

7    correct?

8    A    Yes.  I appeared before Judge Peck in September of 2012

9    when I -- I was a per se claimant, and I was called by

10   someone from Weil Gotshal, his name was Angel, and I don't

11   recall his last name, who asked that I drop my objection to

12   a motion, and I said that I would not.

13        And at that time, he said that if I did not drop my

14   objection, that Judge Peck may ask that I come before the

15   Court.  So I came --

16            THE COURT:  I just want to -- you know, I want to

17   clarify because -- and I don't want to interfere with your

18   attorney/client relationship, but -- and Mr. Miller hasn't

19   objected to something which is technically what we call a

20   hearsay.  You're relating to me what someone said to you,

21   right.  And I'm not disbelieving --

22            THE WITNESS:  Okay.

23            THE COURT:  -- you, but what I'm saying is that

24   without having the speaker of those words here, there's no

25   way for me independently to ask the speaker is that what you

Page 146

1    said.  Okay.  And the words that you're using have an

2    implication that there was something improper or there was a

3    threat -- and if you would just let me finish, and I just

4    want to make the observation that it's standard operating

5    procedure and the duty of the attorneys for a party when

6    there's an objection to something ahead of time, the Court

7    wants to know, have you tried to work this out.

8                And so the explanation for what you've just

9    relayed is that prior to a hearing on your objection,

10   counsel has to reach out to the objector and say, if -- you

11   know, are you going to stand on your objection, are you

12   going to come and appear.  And generally speaking, Courts,

13   Judge Peck, I can't speak for specifically what he would've

14   done, but if somebody files an objection and they don't

15   appear, it could be that the Court then says, you have to be

16   here, or your objection is going to be overruled.

17               So I just wanted to tell you that I hear what

18   you're saying, and in no way do I not believe what you're

19   saying, but there was implicit in that a characterization,

20   and there's also an element of your relating something that

21   occurred out of my hearing.  Okay?

22               THE WITNESS:  So I did appear.

23               THE COURT:  Okay.

24               THE WITNESS:  I came to court and I explained what

25   my claim was about, and that I was going to stand --

Page 147

1    continue to keep my claim live.

2              THE COURT:  Okay.  This claim that's here today?

3              THE WITNESS:  It was against the -- either the

4    385th or the 329th omnibus objection at the time.  And this

5    covered this claim.

6              THE COURT:  This claim here?  Okay.

7              THE WITNESS:  As well as the remainder of the

8    claim that I do have, and Judge Peck said to Mark Bernstein,

9    who was the lawyer from Weil Gotshal because I was

10   representing myself --

11             THE COURT:  Yes.

12             THE WITNESS:  -- that Weil Gotshal had an

13   obligation to continue to help me through the process.

14             THE COURT:  Uh-huh.

15             THE WITNESS:  I explained to him that in my 33-

16   year career in financial services, that the Lehman

17   bankruptcy was my third bankruptcy, and that as a result of

18   my ignorance and my inability to handle the legal matters

19   associated to it, clearly I needed some help because I

20   wanted to make sure that I would be able to see my claim

21   through from beginning to end.  And that when it was

22   ultimately either approved or denied, I would be still with

23   my claim until a decision was ultimately made.

24             So Mark Bernstein then gave me the number of

25   Denise Alvarez who helped me with some of the conactivity

1    (ph) that --

2    BY MR. SCHRAGER:

3    Q    I'm sorry, by conactivity you mean?

4    A    Meaning a lot of the documents were being placed in a

5    repository, and I had issues with its access to be able to

6    get through to them.  Unfortunately, because of where Weil

7    Gotshal was in the case, Denise very clearly advised me that

8    her ability to advise me from a legal perspective did not

9    exist, so that I was in effect, in a lot of this on my own,

10   and it was only recently that I engaged Richard as my

11   attorney because I felt clearly overwhelmed by the legal

12   documents and whether I was continuing to be on the right

13   track or not.  So I was pro se until about three months ago.

14   Q    Okay.

15             MR. SCHRAGER:  Your Honor, may I approach the

16   witness?

17             THE COURT:  Yes.

18             MR. SCHRAGER:  I'm going to offer and hand to her

19   CLX007, which has been introduced.  It was an attachment to

20   an affidavit --

21             THE COURT:  All right.  Do you have an extra copy

22   there?

23             MR. SCHRAGER:  -- by Mr. (indiscernible - away

24   from microphone).

25             THE COURT:  Thank you.

Page 149

1    BY MR. SCHRAGER:

2    Q    Ms. Krieger, under the cover page --

3            THE COURT:  Hold on a moment, Mr. Miller is

4    standing.

5            MR. SCHRAGER:  I'm sorry.

6            MR. MILLER:  We have no objection, Your Honor, to

7    this being discussed and there are some parts of it that we

8    might object to later, but for now, it's -- we have no

9    objection to the usage.

10           THE COURT:  Okay.  All right.

11   BY MR. SCHRAGER:

12   Q    Okay.  Ms. Krieger, if you could take a look at your

13   cover page which is -- the first page of your letter which

14   is under the cover page.  That is a letter from you

15   addressed to James M. Peck and Robert J. Lemons of Weil

16   Gotshal dated March 29, 2013.

17   A    That's correct.

18   Q    And this letter was drafted by you?

19   A    That's correct.

20   Q    Okay.  So -- and that is your signature on page 11?

21   A    That is correct.

22   Q    Okay.  And that was before you retained my firm --

23   A    That's correct.

24   Q    -- as your counsel.  Okay.

25           And there were some exhibits with that letter that are

Page 150

1   not attached here; is that correct?

2   A    Yes.  They are referenced in this document, and in

3   fact, the entire package was sent to Judge Peck, as well as

4   Robert Lemons and Mark Bernstein with all of the attachment,

5   there were 23 exhibits.

6   Q    Could you give a rough idea of the total number of

7   pages in the compilation?

8   A    Probably 150.

9   Q    Okay.  When you were still pro se, Ms. Krieger, you

10  knew about this hearing?  You knew that an evidentiary

11  hearing was planned, correct?

12  A    As far as I could tell from the documents, I think that

13  there was some back and forth as to whether or not one would

14  happen.  And --

15  Q    Would it have been your intention to testify when it

16  had happened?

17  A    Absolutely.

18  Q    You would've testified --

19  A    Absolutely.

20  Q    -- on a pro se basis?

21  A    Absolutely.

22  Q    Is that correct?

23  A    Yes.

24  Q    Thank you.  I'm going to pose some questions, Ms.

25  Krieger, about the structure of the RSU program.  Do you

Page 151

1   recall when you first got RSUs?

2   A    1994.

3   Q    1994.  And was that the beginning of the program?

4   A    Yes, it was.

5   Q    Did you elect to take RSUs?

6   A    Absolutely not.  I very consciously felt that it was a

7   bad decision based upon the two bankruptcies that I had gone

8   through previously, that I ever have my income and my

9   investment stream in the same place, so I very deliberately

10  ensured that whatever I could have elsewhere, I would.

11  Q    Okay.  Now, in the context that we discussed earlier

12  with your responsibilities at that time, did you have people

13  reporting to you when the RSU program was initiated?

14  A    Yes.

15  Q    Was it your responsibility to communicate with any of

16  them about the RSU program?

17  A    At the very beginning of the program, it was our

18  responsibility to provide an overview of what the program

19  would be.  We were given training sessions by HR, as to --

20  Q    HR is?

21  A    I'm sorry, human resources, as to how to explain what

22  that program meant, and then subsequently each year, as

23  compensation was ready to be announced, we had training

24  sessions again with the HR department that required us to

25  ensure we understand the script that we needed to deliver to

Page 152

1    our employees so that they would understand their

2    compensation.

3    Q    Okay.  When you were first awarded RSUs, did you have

4    any choice about the number, the percentage of your bonus

5    that would be allocated RSUs or the vesting period or any of

6    the other features of the RSU award?

7    A    No.

8    Q    When you communicated to your -- report -- the persons

9    reporting to you, did any of them question whether any of

10   these options were available?

11   A    You know, initially there were questions about how it

12   would work, and what it would mean to them, but the firm

13   very clearly marketed it as this was a new program that was

14   being implemented, and it was not up for discussion in terms

15   of people's options.

16   Q    Okay.  In here, in your experience at Lehman at the

17   time of the commencement of the program, did you have an

18   understanding of what the purpose of the RSU program was?

19   A    So I think it was two-fold.  When they started in 1994,

20   we had just completed the separation from Shearson and from

21   American Express.

22       Lehman Brothers had a huge hurdle in front of them in

23   terms of building an infrastructure that would require them

24   to be independent.  So it was very clearly explained to us

25   that in order to remain a viable organization, they needed

1    to present comp ratios that said that the compensation ratio

2    must remain within the 49 to 51 percent, and these were

3    thing that came from the top down when --

4    Q    If I can interrupt you there a moment, Ms. Krieger.

5    Let's be sure we understand that.  We've referred to a

6    compensation ratio.  That is the ratio of the compensation

7    and benefits to employees over some other number.  What

8    would that -- what would the ratio be between what two

9    figures?

10   A    Total -- it was a ratio of compensation as a

11   relationship to the rest of the expenses of the firm.

12   Q    Okay.  And -- thank you.

13        Where was the source of your understanding -- sorry.

14   What was the compensation ratio that you understood the firm

15   to have as its goal?

16   A    So in 1994, I was chartered with managing the

17   technology expense which included telecom, networking,

18   hardware, software, and professional services.

19        So as a result of being part of these committees that

20   were to gain the transparency around the spend of the firm,

21   they talked to us about how to drive spend out of the

22   organization.  And --

23   Q    I'm sorry, how to drive --

24   A    Spend --

25   Q    How to reduce expenses.

Page 154

1    A    How to reduce expenses by looking for --

2    Q    Thank you.

3    A    -- demand reduction, renegotiation of contracts,

4    whatever was potentially plausible to help reduce the

5    expenses of the firm.

6         So with that, there was a financial component, and the

7    message from our finance organization which gave us goals as

8    to what we needed to hit, told us what was important in

9    terms of the transparency to the rating agencies that the

10   compensation ratio needed to remain between 49 and 51

11   percent.

12   Q    49 and 51 percent, okay.

13   A    Yes.

14   Q    Thank you.  Do you have any understanding of what the

15   compensation ratio would've been if the RSUs had been

16   included in the compensation?

17   A    Considerably higher.

18   Q    Uh-huh.

19              MR. MILLER:  Excuse me, Your Honor, I just want to

20   object to lack of foundation, that the answer is probably

21   vague and so I don't know if (indiscernible - away from

22   microphone).

23              THE COURT:  Okay.

24              THE WITNESS:  I will say also that Dick Fold (ph)

25   and Dave Goldfarb (ph) and Joe Gregory also, in our

Page 155

1    quarterly reviews of the firm's earnings, they would have

2    quarterly conference calls where the entire firm would

3    listen to them providing an update.  And then there were

4    also additional meetings that they called where some of the

5    more senior people would go into an auditorium, and they

6    would provide us that.

7              And as part of the statement around earnings, and

8    how the firm was doing, they also would provide us around

9    transparency around the compensation ratio and where they

10   were in terms of it, and the importance of keeping that

11   aligned to the 49 to 51 percent ratio.

12   BY MR. SCHRAGER:

13   Q    Okay.  Let me ask you this, you said you were promoted

14   to SVP, senior vice-president in 2007, correct?

15   A    Correct.

16   Q    In your capacity as SVP, did you go to any of those

17   meetings that you just discussed?

18   A    I went to some of those meetings then, and I did

19   previously as well, because my role when I had

20   responsibility was the CAO, who worked for the CIO of the

21   organization.

22        So I had responsibilities --

23   Q    So that's the chief administrative officer for the

24   chief information officer --

25   A    Chief information -- chief administrative officer to

1    the chief information officer.  So I --

2    Q    CAO for the CIO, thank you.

3    A    That's right.  I was responsible for the day-to-day

4    operations of the IT organization.

5    Q    Right.  And then --

6              MR. SCHRAGER:  Well, Your Honor, I think that

7    addresses the foundation objection that Mr. Miller was going

8    to make.

9              THE COURT:  All right.  Well --

10             MR. SCHRAGER:  And I would --

11             THE COURT:  -- let's keep going.  I'm --

12   BY MR. SCHRAGER:

13   Q    I'm going to pose the question again, Ms. Krieger, do

14   you have any idea what the comp ratio would've been, this

15   goal of 49 to 51 percent, what the (indiscernible) would

16   have been had the RSUs been included in the comp ratio?

17   A    Significantly higher.  I mean, you know, I had done a

18   calculation based on my looking at the balance sheet, and it

19   appeared to me that it would've approached the 60 percent

20   mark.

21   Q    Was the RSU program something --

22             MR. MILLER:  Again, Your Honor, I do object to

23   that as without foundation and move to strike.

24             THE COURT:  Okay.  Let's keep going.  All right.

25             MR. SCHRAGER:  Okay.

1    BY MR. SCHRAGER:

2    Q    Ms. Krieger, was the RSU program when announced, was it

3    something that was attractive to you as an employee?

4    A    It was not.

5    Q    Can you explain to us why?

6    A    I felt that as an employee of the firm that I operated

7    day-in/day-out like an owner.  I treated the firm's money

8    like it was my own bank book.  I was prudent about any

9    decisions that I had to make with regard to how the firm

10   invested.

11        I unfortunately felt that when they instituted this

12   program, that I was going to be handcuffed, handcuffed in

13   the prospective that I did not want anybody managing my

14   money.  I want -- I will tell you that in 1996,

15   unfortunately, my husband passed away, and Lehman Brothers

16   hired on my behalf somebody to help me figure out how to get

17   my financial life in order.

18        They worked with me to ensure that financially I was in

19   an okay position, in terms of raising my children who were

20   very young at the time.  They helped me get a financial

21   advisor.  They gave me an exception to the process that I

22   had, because the firm mandated that all purchases of stock

23   needed to go through them as an organization.  I raised an

24   objection and said to them, if you tell me I have to go to

25   somebody at Lehman Brothers to make my investment decisions,

Page 158

1     I will not be focused on my job.  I will be focused on,

2     because the people at Lehman Brothers were order takers at

3     the time.  It was a retail organization.  And you would pick

4     up the phone and say, please buy me 50 shares of AT&T.  I

5     had a job to do during the day.  I certainly couldn't figure

6     out the best way to invest my money if I wasn't going to

7     focus on the stock market and to figure out when I needed to

8     buy bonds.

9         Lehman Brothers came back to me and said, we've hired

10    somebody to help you figure out your personal set of

11    circumstances, like when I needed to -- how I needed to

12    assess the value of my home, how I needed to do things to

13    get me in place as a young widow, and then they also said

14    they would give me exception.  And they said to me, you can

15    hire an external financial advisor as long as you have every

16    confirmation, for every trade you do, sent to your manager,

17    as well as the compliance department, which I immediately

18    complied with.

19    Q    Okay.  I'm going to ask two quick questions here.  A

20    few moments ago, Ms. Krieger, you used the term owner, that

21    you felt like an owner of the business.  Was that before or

22    after the RSU program was put into place?

23    A    I am a child of immigrants.  My parents raised me that

24    the most important thing in the world was to be able to take

25    care of yourself.  So I treated my home life and my work

1    life exact same way.

2        If the firm gave me a responsibility for a budget,

3    whatever it is, my job was to oversee it, to make sure it

4    was spent prudently, to make sure any time Lehman Brothers

5    in the technology department had an audit issue that needed

6    to get resolved, they came to me to oversee it, because they

7    knew I treated the firm like it was my own.  I was

8    financially and fiscally responsible to the enth degree.

9    Q    So as a financial and fiscally responsible employee, it

10   was not the RSU program that made you feel like an owner?

11            MR. MILLER:  Objection, leading.

12            THE COURT:  Sustained.

13   BY MR. SCHRAGER:

14   Q    Was it the RSU program, Ms. Krieger, that made you feel

15   like an owner?

16   A    No, because it handcuffed my ability, because the

17   decisions around my money were going to be managed by

18   somebody where I had no control of.

19   Q    Okay.

20   A    And having lost the money at Drexel Berman and having

21   lost it at federal government securities, I vowed I would

22   never go through this again.

23   Q    Now, let me ask a little more about the --

24            THE COURT:  So can I interrupt --

25            MR. SCHRAGER:  Sorry.

Page 160

1          THE COURT:  -- so could I ask you a question?

2          THE WITNESS:  Uh-huh.

3          THE COURT:  So when the RSU program began, and you

4    wisely didn't want to be part of it, but you stayed at

5    Lehman, right?  And I can imagine why you decided to stay.

6          But was it difficult for you to -- and you

7    remained a loyal employee, and you went through these

8    terrible things, terrible things, was it difficult for you

9    to feeling the way that you did towards the firm, the firm

10   was part of your family, right, and yet they were imposing

11   this condition of employment on you, that you recognized as

12   entailing risk, and putting yourself at risk.  So how -- I'm

13   just trying to understand how you felt about that, since you

14   -- when you went to work in the morning, and I feel the same

15   way about my job, that you know, it's that important, it's

16   not just something that you do from 9 to 5.

17         So how did you process that dissonance in your

18   mind of that condition of your employment, and yet you felt

19   that it was putting your financial security at risk because

20   part of your wealth was now tied up with the RSUs?

21         THE WITNESS:  Frankly, I was petrified.  But I

22   also was in survival mode.  I -- you know, between what

23   transpired in my personal life, what transpired on 9/11, and

24   being in the building, and the potential of leaving my kids

25   as orphans, the fact that several other people in my -- my

Page 161

1    whole network of people around me, I lost my dad, my in-laws

2    all at the same time, I had nobody to turn to.

3           The only people in my life at the time were my

4    kids and my friends at work.  I drowned myself in the

5    office, in order to survive.  However, every year that those

6    RSUs became viable to sell on day one, I sold them.  The

7    only year I did not sell them was December -- was the 2007,

8    and the reason I did not sell them is, at the time, I had

9    one daughter who was on the verge of graduating from

10   college, and a second daughter who was starting, and I was

11   slightly financially ahead of myself, and I said, I'm going

12   to sell those in September of '08 when my younger daughter

13   starts college.  Because I -- and what happened

14   unfortunately is because I lost those RSUs, Barclays brought

15   me over and kept me there employed, and I stayed there until

16   2011.

17          I had to live on one paycheck a month in order to

18   get my second daughter through college because I did not

19   have the funds to pay for her, and I swore that when both of

20   my kids were going to get out of college without a loan, so

21   I lived on one check until -- and those RSUs would've made

22   the difference in my life while she -- but now they're both

23   out of school, and I'm in a different situation, and have

24   left the industry.

25          But for me, it was a nightmare.  My financial

Page 162

1    advisor agreed with me, but my hands were tied, and I

2    couldn't -- the thought of leaving the firm, I would've been

3    emotionally destroyed.

4    BY MR. SCHRAGER:

5    Q    I'd like to come back to that personal financial

6    advisor.  You said that that was something unusual for

7    Lehman to do, that was not the normal policy; is that

8    correct?

9    A    No.

10   Q    And why do you think that exception was made in your

11   case?

12   A    They understood my ethic, they under --

13   Q    They meaning --

14   A    They meaning --

15   Q    -- (indiscernible).

16   A    -- (indiscernible - talking over each other)

17   compliance, I had to talk to the head of the IT department,

18   and I said to them, you can have whatever transparency you

19   want, I need somebody who is going to step aside, look at my

20   stuff in terms of how to take care of me, and how to take

21   care of my kids, and whatever they decide, I will feel I can

22   focus on my job, I can focus on raising of my children, and

23   the rest of it is their problem, and you can see what you

24   need to see.

25   Q    And you refer to compliance and your own IT department,

Page 163

1   so you were discussing this situation with people outside

2   your normal chain of command at Lehman Brothers?

3   A    That's correct.

4   Q    What was your personal feeling about the help you got?

5   Did it inspire you?

6   A    I was forever indebted to the fact that I needed to

7   take clear -- I mean, my children were 5 and 10.  I needed

8   to take time after work to get them through the grieving

9   process.  Lehman was incredibly supportive of my situation.

10  I mean, they knew it was coming, my husband was sick for

11  several years.  But they went out, above and beyond to help

12  me get my life back where I needed to be in order to

13  continue working and raise my children.

14  Q    Okay.  I'd like you to concur, Ms. Krieger, your fear

15  about Lehman that you've just described, with your feeling

16  about the RSU program.  Obviously they're not consistent,

17  can you explain to the Court how you reconcile them?

18  A    The choice was leave Lehman and leave the comfort of

19  what, in fact, was my family, and I realized that I was in

20  no position to go to another firm and try to establish my

21  credibility and to try and work and build a new future.

22  Because at that point, I cared about day-to-day living with

23  my kids, and making sure they had the right caregiver when I

24  went to work.  And it was very tough because working at

25  Lehman, I worked on average 15 to 18 hours a day.  My kids

Page 164

1    did not see me night after night, I had somebody living in

2    the house with me because -- and sadly, it was -- a lot of

3    it was to deal with my grief because I was comfortable

4    there, but the thought of going anywhere was beyond

5    frightening to me.

6         You know, to say that I was going to leave because of

7    the RSU program, I couldn't bear to leave people who were

8    being so supportive.

9    Q    Thank you.  Now, Ms. Krieger, I'd like to read a

10   sentence into the record from page 2 of your letter.  This

11   is on page 2, the third paragraph from the bottom.

12        "Why I most certainly thought and acted like an owner

13   during my 18 years at Lehman every day, the management

14   decision to establish the program, the RSU program

15   handcuffed my ability to manage my RSU investments, as I

16   have managed my other investments."

17        Are those your words?

18   A    Yes, they are.

19   Q    That's in your letter?

20   A    Yes.

21   Q    Thank you.  What did you mean about managing your other

22   investments?  What investment -- could you describe the

23   approach you took to managing your other investments?

24   A    I hired a financial advisor, who was at a small firm,

25   and he's managed my money since 1997.

Page 165

1    Q    Okay.  Have you ever discussed the RSUs with him?

2    A    At the time.

3    Q    We won't ask for his views, but what was your

4    understanding of a proper approach to investments in Lehman

5    at that time?

6              THE COURT:  I don't think I understand that

7    question.

8    Q    As a result of your conferring with your personal

9    financial advisor about the RSU program, did you reach any

10   conclusions yourself about the program and what should be

11   done with the Lehman shares that you received?

12   A    The Lehman shares that I ultimately received, it was

13   agreed that every year, on the first of December, they were

14   sold.

15   Q    Okay.  Thank you.  I want to read another sentence to

16   you, Ms. Krieger, and this is a statement from the Lehman

17   Brothers' brief in this hearing.  You have seen the briefs

18   that Lehman Brothers submitted to the Court, correct?

19   A    Yes.

20   Q    The sentence is, "RSUs gave employees a direct stake in

21   the company and motivated them to play a significant role in

22   the success or failure of Lehman Brothers."  This is the

23   Lehman -- the opening brief at page 17 for the record.

24        Do you recall reading that?  Do you think it's true?

25   You have to talk I'm afraid.

1    A    Sorry, no, I did not.

2    Q    Okay.  Do you recall the source given in the brief for

3    that statement?

4    A    The first sentence in the paragraph you read, they

5    quoted me, and only took everything before the apostrophe,

6    and included, and said, while I most certainly thought and

7    acted like an owner during my 18 years at Lehman Brothers

8    every day, so they took the half of my sentence and said,

9    see, here's somebody who felt that way.

10   Q    What was your reaction when you read that?

11   A    I called furious, I called you and I said, how can they

12   do this.  It's not what I said.

13   Q    Okay.  Once again, just to be sure it's clear, you

14   refer in that sentence that you just read and that was

15   quoted, you thought and acted like an owner during your 18

16   years at Lehman, that thinking and feeling and acting like

17   an owner pre-dated the RSU owner, correct?

18   A    It has been with me since I started my career in 1978.

19   Q    So your use of the term owner in that letter had

20   nothing to do with the RSU program.

21   A    No, absolutely not.

22           THE COURT:  Ms. Krieger, you -- the RSU program

23   was a firm-wide program at Lehman Brothers, right?

24           THE WITNESS:  That's correct.

25           THE COURT:  And based on your description, you've

1    made it very clear that you had a very particular and

2    exceptional work ethic and attitude toward any firm that you

3    worked at.

4           THE WITNESS:  That's correct.

5           THE COURT:  And certainly possible, and probable,

6    that there were many hundreds, if not thousands of employees

7    at Lehman Brothers who didn't approach their job the way you

8    did, right?

9           THE WITNESS:  That's correct.

10          THE COURT:  Right.  And it's possible that

11   notwithstanding the fact that the attorneys, as attorneys

12   will do sometimes unfortunately quote you out of context,

13   they quote me out of context too, that the program which

14   said in all of the glossy materials, we want to incentivize

15   you to act as an owner, that particularly among the younger

16   generation of employees, that they would respond to that

17   stock incentive because as we know, there was some boom,

18   boom years where that stock price was --

19          THE WITNESS:  Yes.

20          THE COURT:  -- climbing up.  Right?

21          THE WITNESS:  Yes.

22          THE COURT:  So that it's possible that, you know,

23   if Lehman could think, and corporations don't think except

24   through the people who run them, that Lehman thought that

25   they could get people to work 18 hours a day like you did

Page 168

1   naturally, and like I do naturally, that they could get some

2   of those people to work harder and produce, and produce, and

3   produce so that they could get those RSUs and ride that

4   price up and become rich, right?

5            THE WITNESS:  I would've left it on the table.

6            THE COURT:  I hear you.

7            THE WITNESS:  No interest.

8            THE COURT:  Okay.  All right.  Are we almost done

9   because I think Ms. Krieger's been up here a pretty long

10  time?

11           MR. SCHRAGER:  Okay.  Just a few -- I would say,

12  Your Honor, I've got another half an hour, but I'm not going

13  to need it.

14           THE COURT:  I'm not -- okay.

15           MR. SCHRAGER:  I would like a half an hour.

16           THE COURT:  You know, I just --

17           MR. SCHRAGER:  But I don't think it's --

18           THE COURT:  -- and I'm going to say this --

19           MR. SCHRAGER:  -- going to happen.

20           THE COURT:  -- and --

21           MR. SCHRAGER:  Yeah.

22           THE COURT:  -- I'm going to say this for --

23  largely for Ms. Krieger's benefit, okay --

24           MR. SCHRAGER:  Yes.

25           THE COURT:  -- there was a negotiated game plan

1    and the game plan involved three hours total.  So it's very

2    important to me that everyone have a full opportunity to be

3    heard, but I do want continue to remind the claimants'

4    attorneys that -- and you took ownership of this

5    stipulation, you told me yesterday you negotiated it, and

6    now we have a situation where you're about to take up an

7    hour of what was supposed to have only been three hours.

8              So I'm just going to ask you to look at your

9    outline and try to figure out, you know, the -- what you

10   really need to cover, and what you might just not cover.

11             MR. SCHRAGER:  Yes, Your Honor, thank you for

12   the --

13             THE COURT:  All right.  And, Ms. Krieger, I will

14   say it over Mr. Miller's anticipated objection, if there's

15   something that you want to say, all right, not in response

16   to a specific question, you should just say it.  All right.

17   If when we get to the end, there hasn't been a full

18   opportunity for you to say what you want to say, you can say

19   it, but Mr. Miller does have the right to cross-examine you

20   on it.  All right?

21             THE WITNESS:  Thank you.

22             THE COURT:  All right.  Let's keep going.

23   BY MR. SCHRAGER:

24   Q    Just a few more questions, Ms. Krieger.  Let's pick

25   2007 as just the year before the bankruptcy.  At that point,

1    you're a senior vice-president of Lehman, correct?

2    A    Yes.

3    Q    And how many people in a given year would you sit down

4    and discuss the RSU program with?

5    A    It ranged, depending upon --

6    Q    I'm sorry, let me withdraw --

7    A    -- the people at the time --

8    Q    -- that question and be more specific.

9         How many people reported to you, would you sit down and

10   discuss their bonus with, including the RSU group that was

11   part of the bonus?

12   A    At that time, it was probably somewhere between 12 and

13   15 at the end of 2007.

14   Q    Okay.  And just so we have it clear, and it's nothing

15   we're hiding from, but do you think, in your discussions

16   with those people, that the RSU program may them act and

17   feel like owners of the business?

18   A    I made them feel like owners of the business every day

19   in the way I managed my team.

20   Q    Okay.  When the program was first announced, the RSU

21   program and based on the first announcement and the meetings

22   that you sat in that you described earlier, do you know of

23   any benefit that the RSU program provided to Lehman?

24   A    It provided -- because it was really a retention of

25   cash, it provided working capital to an organization that

Page 171

1    was in its infancy when it started in 1994.  It needed

2    funding for all the capital changes that were required to

3    build an infrastructure to become separate from Shearson, to

4    become separate from American Express, to rebuild after

5    9/11, to invest in the things that needed to be invested in,

6    in order to become a mature organization.

7         We had dependencies on all of those other firms for

8    years, phone system, data center, networks, you name it, it

9    was all combined together.  And it required huge investments

10   of capital.

11        And so what this was provided working capital with the

12   hope that five years later, the firm would have the actual

13   revenue, increases, in order to then pay back its employees.

14   It also provided them an ability to retain employees, if

15   they did not pay these kinds of bases and bonuses, people

16   would've gone elsewhere.  So they were trying to retain

17   talent, they were trying to build the firm, and then

18   ultimately pay back the employees with the dollars converted

19   to equity at the time.

20   Q    Okay.  So in addition to the effect on the compensation

21   issue we discussed earlier, it enabled Lehman to declare a

22   bonus, and yet keep the cash that had been declared as a

23   bonus.

24   A    That's correct, and keep in line with the rating

25   agencies, and the fact that they were considered financially

Page 172

1    stable organization and give them the rating that they

2    required in order to borrow money at the competitive rates.

3    Q    If I can quote your letter, Ms. Krieger, you said it

4    was (indiscernible) shoot maneuver, I'm quoting here, a

5    (indiscernible) shoot maneuver required to impress the

6    credit agencies, the investment community, and the

7    regulators.  Those were your words.

8    A    Yes.

9    Q    And now what do you base your analysis there?

10   A    I was responsible for the technology budget of the

11   firm.  At the time that I worked for the CIO, I was managing

12   a budget of $350 million.  And so all of the firm, anybody

13   who had that responsibility, we had to go to budget meetings

14   from the finance organization, who would tell us the

15   parameters that we needed to operate in.

16        So that information was provided to us in terms of how

17   to build our budgets.

18   Q    Okay.  And, Ms. Krieger --

19             MR. SCHRAGER:  My final couple of questions, Your

20   Honor, would be this.

21   Q    -- that we've had some discussion over the last couple

22   of days on some awards of RSUs and some compensation figures

23   that have been taken into consideration and have been

24   discussed by the Court and by counsel.

25        Can you give us some idea of what your annual salary

Page 173

1    was at Lehman?

2    A    I started out at Lehman Brothers in 1990 as a VP, just

3    having come out of the Drexel bankruptcy, I was a VP and I

4    was making $65,000 a year.

5         In 2007, when I was promoted to SVP, my base salary was

6    $175,000, and my bonus was $270,000.  Of that $270,000,

7    $45,000 was taken out for RSUs.

8    Q    $45,000 taken out in 2007?

9    A    That's correct.

10   Q    Okay.  And your total claim for RSUs pending in this

11   proceeding now, do you recall that number?

12   A    $164,000.

13   Q    Okay.  Let me follow-up on the Court's invitation, Ms.

14   Krieger, is there anything else that you would like to add?

15   A    I would. There is one thing which is about the fine

16   print from Lehman.  In the years 1994 to 2001, we got

17   packages from the organization that talked about the

18   program.  Inside that there was a single sheet that was on

19   four sides and that provided a lot of the fine print.  What

20   I found is that when the firm made changes to the RSU

21   program throughout the years, they only talked about certain

22   things.  They talked about a separate distribution in 2001

23   right after 9/11.  They made one in September and one in

24   December.

25        In July of 2008 they issued a special RSU

Page 174

1    distribution which was the hope of -- I think they must have

2    realized they had some financial issues and they were trying

3    to pay some of the bonus money up front, but when it came

4    down to it, all of the fine print that changed year on year,

5    there was never any transparency provided.

6           So, in fact, the whole notion about bankruptcy in

7    these documents, year on year changed.  If you look in one

8    of the earlier years it talks about that a bankruptcy

9    occurs, Lehman is required to take the RSUs and distribute

10   them to us on the vesting date so that we can actually trade

11   them on the market.  We never saw anything in 2008, '09,

12   '10, '11, or '12, that they actually sent those converted

13   RSUs equivalent to shares back to us.  So, in fact, I feel

14   that they didn't really think they were equity because they

15   didn't distribute them.  They didn't give me the opportunity

16   to sell my RSUs that were converted to shares at sixteen

17   cents on the share if that's what they were trading at.

18          So I've been sitting all these years with my

19   ultimate claim which is $225,000 not being able to put it

20   down as a tax loss, not start anything waiting for this to

21   happen, but I honestly think there was no transparency

22   around the fine print and they changed the terms year on

23   year, but none of that was communicated to the employees of

24   the organization.  And unless you sat with document from

25   year one to document year two to document year three and try

Page 175

1    to compare the fine print, you never would have known.  And

2    it was only when I started to write this document because I

3    have all of the documents in a box at home from 1994 when

4    the program began and I looked and I said they changed the

5    fine print on these terms and no one ever knew about it.

6    There was no transparency.

7                THE COURT:  Okay, all right.

8                MR. SCHAGER:  Thank you, Your Honor.

9                I would note that Ms. Krieger, as other claimants

10   have, submitted a declaration and there is more ground

11   covered in her declaration and I don't think her testimony

12   today was duplicative of it.

13               THE COURT:  Okay, thank you.

14               MR. SCHAGER:  But thank you again, for your

15   patience.

16               Thank you, Ms. Krieger.

17               THE COURT:  Mr. Miller?

18               MR. MILLER:  Ralph Miller with LBHI.  We'll try to

19   be brief, Your Honor.

20               THE COURT:  Okay.

21               MR. MILLER:  And, Ms. Krieger, I'll try to be as

22   short as I can.

23   CROSS-EXAMINATION

24   BY MR. MILLER:

25   Q   I want to begin with the issue of the quotation from

1    your letter, and I want to start by apologizing if you feel

2    that this was done out of context.

3              Do you have CLX-007 in front of you?

4    A    Yes, I do.

5    Q    I'd like to direct your attention to the paragraph that

6    is two above the one that was quoted that starts with

7    "Lehman Brothers' management made a decision"; do you see

8    that?

9    A    Yes.

10   Q    Okay.  I'm going to try to read that.  Would you follow

11   along and let me know if I read that correctly.

12   A    Yep.

13   Q    "Lehman Brothers' management made a decision in 1994

14   shortly after it became a publicly traded firm to establish

15   a stock award program that provides every member of Lehman

16   Brothers with an ownership interest in the firm and a

17   requirement that the stock be held for five years.  As noted

18   in their annual stock award distribution to its employees,

19   the program provides an incentive to think and act like an

20   owner every day and allows all participants to share in the

21   firm's financial success over time."

22             You did put that in your letter, right?

23   A    That's correct.  That was the marketing material they

24   provided to us.

25   Q    And then you later said, "You most certainly thought

Page 177

1   and acted like an owner during your 18 years at Lehman

2   Brothers every day" and then you said, "but you felt the

3   management decision to establish the program handcuffed your

4   ability to manage your RSU investments as you have managed

5   your other investments," correct?

6   A     That's right.

7   Q     If we flip over to the end of this, I would like to

8   direct your attention to the paragraph on page 6 that begins

9   with the word "Actually"; do you see that?

10              THE COURT:  Annually?

11              MR. MILLER:  I'm sorry.  I did misread it and I

12   did misspeak.  I apologize, Your Honor.

13              It's:  Annually.

14              THE WITNESS:  Yes.

15   BY MR. MILLER:

16   Q     All right.  And, again, I'd like to read just the first

17   two sentences and then ask you a question.

18              "Annually, Lehman Brothers went through a well-

19   coordinated set of sessions to manage compensation expense.

20   As a manager, I attended training sessions organized by the

21   human resource department to learn and practice the script

22   for that year in compensation conversation with my staff."

23              Did I read that correctly?

24   A     That's correct.

25   Q     So do I understand from that, that you were trained and

Page 178

```
 1    then you, in turn, repeated this message that you were given

 2    in your training to your staff; is that correct?

 3    A    That's correct.  What they did was they told us what to

 4    do.  They then had us sit in a room and we had an individual

 5    who was going to act like the employee and we would act like

 6    the employer and we needed to discuss how the firm did; how

 7    the division did; how our department did; how the individual

 8    did; and as a result, this was the compensation that you

 9    were being awarded.  This was your base.  This was your

10    bonus, and that was the breakdown of your bonus and what was

11    actually going to be RSUs.

12    Q    All right.  And when you did those sessions, did you

13    try to present accurately, as you understood it, the

14    information to your staff?

15    A    I presented it the way they asked me to.

16    Q    Well, did you believe that some of the way that you

17    were asked to present was not an accurate statement of the

18    numbers or what was going to happen?

19    A    I was totally unhappy with that part of my employment

20    there, but I -- as a good corporate citizen, I did what I

21    was asked to do.

22    Q    All right.  If I could read the next sentence, it says

23    "The overall message associated to the RSU program was that

24    compensation was withheld in order to ensure that we felt

25    like owners and personally had skin in the game."
```

Page 179

1           Did I read that correctly?

2    A    Correct.

3    Q    And is that the way that you presented the message to

4    your staff?

5    A    Did I use "skin in the game" -- no; but I presented

6    that the firm wanted us to feel like we were managing this

7    like it were our own and it was our job to do whatever we

8    could to minimize expenses, as well as help the trading and

9    salespeople optimize their generation of revenue.

10   Q    All right.  What did you mean by the term "skin of the

11   game" when you used it in this filing?

12   A    Feel like you've got something to gain by doing this,

13   to feel like you put your heart and soul in something with

14   the hopes that, ultimately, the firm will be in a better

15   place.

16           I will tell you for years being involved in the

17   expense management situation of all of the technology

18   department, the firm not only had an expense issue, they had

19   a revenue problem.  And the fact was they knew that the only

20   way they could get their financials to be where they needed

21   to be was to work both sides, to work the revenue

22   generators, to do whatever they can to generate more

23   business and to keep driving expenses down.  We had

24   thermometers on our walls that showed everybody how much we

25   had done to reduce expenses.  It was a -- it was a mindset

Page 180

1  in that organization for years.

2  Q   All right.  Well, are you aware of the fact that

3  basically every investment banking firm had an equity

4  program by the year 2005 of something?

5  A   I was not aware.

6  Q   All right.

7  A   My head was down and unfortunately when the bankruptcy

8  occurred, as well as when I went on to Barclays, I never

9  spent any time thinking about going elsewhere.  I thought

10  about doing my job day in and day out.  So what other firms

11  had, I had no clue.

12  Q   All right.  I want to take just a minute and talk about

13  the compensation ratio.  Your letter has some tables on page

14  8 and page 9 about the compensation ratio, correct?

15  A   Uh-huh.

16  Q   Do I understand correctly that the point that you're

17  making is that the investment -- that the community you were

18  describing here, which you had called the "rating agencies

19  in the investment community"; do you see that reference?

20  A   On which page?

21  Q   This is on page 8.  This is the paragraph that begins

22  with "With the finesse with which Lehman Brothers handled

23  compensation expense"; do you see that?

24  A   Yes.

25  Q   And you say that -- looking just at the last sentence

Page 181

1    above the table "Lehman Brothers engineered the compensation

2    and benefits net ratio to stay within a 49 to 50 percent," I

3    guess that has the word "range," "to please the rating

4    agencies in the investment community"; do you see that

5    reference?

6    A    Yes.

7    Q    Did you understand that what the investment community

8    wanted was to see not higher than a 50 percent ratio?

9    A    That's correct.

10   Q    So when you did your substitution in your little

11   analysis of what happened if the RSUs had been paid in cash,

12   what you came up with, I think you estimated was 60 percent,

13   right?

14   A    I knew it was somewhere higher.  I mean I had done this

15   with a couple of other people and we were trying to figure

16   it out and we came out, each time we did it, close to 60; it

17   was just underneath.

18   Q    So if I understand the analysis that you did, what you

19   concluded was that Lehman couldn't really afford to pay in

20   cash the amounts that it was trying to deliver with the

21   combination of cash and the equity program if everything

22   worked out at the end of five years; is that right?

23   A    That's right.  Because they had to spend the money on

24   the capital improvements they needed to build the firm and

25   deliver the infrastructure that they required.

Page 182

```
1    Q    All right.  So from a standpoint of the employees, do

2    you know up through the, say 2003 when the equity awards

3    program obviously didn't get to play itself out, whether

4    generally speaking the equity awards program did deliver at

5    least as much compensation as would have been able to be

6    paid in cash earlier?

7    A    I'm not sure that I understand the question.

8    Q    Yes, let me try again.

9         Did your analysis consider -- let's take time up

10   through 2003.  Up through 2003, do you know if employees got

11   as much from their compensation that was a combination of

12   cash and equity awards, as they would have gotten if they --

13   at least as much -- as if they had been paid in cash at the

14   time that the equity awards were made, do you know the

15   answer?

16   A    I'm still struggling.  I'm not sure that I understand.

17   Q    All right.  Well, did the equity awards program, as you

18   understand it, in effect, allow Lehman to give a greater

19   total compensation package to its employees than it would

20   have been able to give if it had not used RSUs or something

21   like RSUs?

22        Did you --

23   A    I'm not -- I'm really not --

24        THE COURT:  Do you want me to try, Mr. Miller?

25        MR. MILLER:  Sure, please do, Your Honor.  I would
```

Page 183

1    love to have you try.

2            THE COURT:  Okay.  So what Mr. Miller is trying to

3    ask is if you know whether or not -- you just testified that

4    Lehman had to keep down expenses and one of the expenses it

5    has to keep down was compensation expenses.  And in order to

6    facilitate that -- which now looking back with the wisdom of

7    hindsight looks like a scheme, right -- in order to

8    facilitate that, they said, Ah ha, instead paying the

9    employees all in cash, let's save that cash money and let's

10   pay them with RSUs, right?

11           THE WITNESS:  Uh-huh.

12           THE COURT:  So the predicate of your analysis was

13   that if they couldn't afford to pay us all in cash, so in

14   order to facilitate the continuation of the business and the

15   build-up of the infrastructure, we're going to pay the

16   employees in RSUs, right?

17           THE WITNESS:  Right.  Right.

18           THE COURT:  Like Monopoly money, right?

19           THE WITNESS:  Right.

20           THE COURT:  And what Mr. Miller is asking you is

21   that if you accept that, which they -- so they began to pay

22   part in cash and part in these RSUs, but at the end of the

23   day, once you cashed in the RSUs, right, did it ultimately

24   cost the firm more or less than it would have, had they

25   actually paid it in cash than in the RSUs?

Page 184

1          Does that -- did I do any better?

2          THE WITNESS:  I think so, but I think they were

3   hoping that the five years since they generated this, they

4   would have been in financially better shape --

5          THE COURT:  Sure.

6          THE WITNESS:  -- to be able to afford to cover

7   that.

8          But I think that while they were covering the

9   five-year one that occurred, the next one was being issued.

10  So, in effect, if you ask me, and I don't know this, but I

11  would think that when they issued the next one, they were

12  using that money to pay us from five years before.

13         THE COURT:  So it felt -- it feels to you like a

14  Ponzi scheme?

15         THE WITNESS:  It felt like they were -- they were,

16  you know, borrowing to hopefully hit the right revenue

17  stream and reduce their expenses enough so that ultimately

18  they would be able to breathe a sigh of relief and be able

19  to actually land, you know, in the black and be able to pay

20  off their RSUs and be able to function.

21         MR. MILLER:  Can I do a follow-up on that?

22         THE WITNESS:  I'll try.

23  BY MR. MILLER:

24  Q   Sure.  Does "skin in the game" include a risk of losing

25  something if the game is lost?

1    A    Sure.  I think that the goal is if you put enough in

2    it -- I mean my attitude in my life has always been:  I will

3    never fail, I will survive, come hell or high water.  But

4    there are clearly times when you do a project and it does

5    not work out as well.

6            So can you lose money -- absolutely; the

7    difference is I didn't want that risk.

8            THE COURT:  And that's why you sold those shares

9    the day you could?

10           THE WITNESS:  The day I could.

11           MR. MILLER:  May I approach, Your Honor?

12           THE COURT:  Sure.

13   BY MR. MILLER:

14   Q   I'm handing you what's been marked CLX-055 which is a

15   declaration that I believe you filed, Ms. Krieger, in this

16   case, right?

17   A    Yes.

18   Q   And I'm going to turn your attention to your claim form

19   that is attached, all right?

20   A    Yes.

21   Q   One of the things on the claim form is a stock

22   certificate; do you see that?

23   A    Yes.

24   Q   Was that stock certificate issued to you after the

25   Lehman bankruptcy or do you know when you got the stock

1    certificate?

2    A    It was after the bankruptcy.

3    Q    All right.  So you said you did have some stock that

4    you did not sell before the bankruptcy; is that right?

5    A    So the stock that I did not sell was the $45,000.  That

6    was the money that came out of the December -- that was the

7    stock that became available on December of 2007.  So I chose

8    not to sell my conversion, and then I also had a little

9    piece that was in my IRA.

10   Q    Now, you said in response to one of the questions that

11   you felt that the fine print was being changed and changes

12   in the fine print were not fully disclosed, if I'm

13   summarizing your testimony -- I'm just talking about the

14   subject; do you recall that?

15   A    Yes.

16   Q    And one of the things that you talked about is you said

17   that if the -- if you had been given stock certificates upon

18   the bankruptcy, you would have gone in and tried to sell

19   them for fifteen cents a share or something?

20   A    I would have gone to talk to somebody and tried to

21   figure out what the best thing would have been, but I felt

22   like not having them, that Lehman Brothers was not actually

23   operating in line with the agreements -- in line with what

24   they told us the program was going to be.  And oddly enough,

25   if you look in the later documents, the bankruptcy

1    discussion is totally removed.

2           So I'm going back to documents from 2000, 2001,

3    2002 where there were different terms year and year around

4    changing control and bankruptcy that talk about being

5    distributed on the actual vesting date, and then another one

6    said "or soon thereafter" so they would be available for us

7    to do something with them.

8    Q    All right.  Can I ask you to turn now in your claim

9    form to the page -- it's the second page in the claim form

10   and it's a document dated in the upper left-hand corner as

11   of August 31st, 2008 --

12   A    Yeah.

13   Q    -- and it's titled "restricted stock unit, award units

14   outstanding"; do you see that?

15   A    Yes.

16   Q    That is -- do you understand that to be a summary of

17   the RSU units that you held as of August 31st with the

18   bankruptcy being, of course, the next month?

19   A    That's correct; that's what came out of the Lehmanlive

20   site.

21   Q    And you don't -- and Lehmanlive, by the way, is a

22   computer web page, a portal that allows the Lehman employees

23   to --

24   A    It is the intranet site to where all of our personal

25   information could be accessed, and as well as how they

Page 188

1    communicated to us about goings on in the firm.

2    Q    And did it have a document section where these program

3    documents, that you refer to in your letter elsewhere, were

4    available?

5    A    There were some.  I don't know whether every year was

6    there.  I do know that for a person who keeps everything, my

7    physical documents ended in the early 2000, so I believe

8    there would have been someplace to actually access the later

9    program documents from 2002, 2003, to the end.

10   Q    All right.  In this sheet, if you look over, you'll

11   notice that there is a market value column next to the last

12   column; do you see that?

13   A    The last column?

14   Q    Yes.

15   A    Yeah.

16   Q    And that seems to be at five cents a share; do you see

17   that?

18   A    Yep.

19   Q    And that shows that your total market value, if you had

20   had all of those RSUs converted to stock as of that date,

21   was $205; is that right?

22   A    Yeah, that's correct.

23   Q    And that's what you say you think you should have

24   somehow had that stock made available to you so you could

25   get the $205?

Page 189

1    A    Well, I'm not sure that that ultimately would have been

2    the right choice.  What my point was:  The document said the

3    operational terms of the agreement would be that Lehman

4    would distribute the shares and in accordance with the rules

5    that they did, they did not follow their own procedures,

6    which were to distribute the shares at the time of the

7    bankruptcy.

8    Q    All right.  Well, do you know what the value was at the

9    time of the bankruptcy on September 15th; do you happen to

10   know that?

11   A    I do not.

12   Q    Do you know that it was even lower than five cents a

13   share by September 15th?

14   A    It might have been.  I have no idea.

15   Q    Do you understand that the result of this motion is

16   that you will have the same equity interest that you would

17   have if you held shares of common stock for this number of

18   shares of common stock?

19   A    I do understand that and that's why I'm fighting it

20   because I do not believe that those were equity shares until

21   they were actually equity delivered to us.  That it really

22   was a contract and it was a contract to, in five years from

23   now, deliver me equity shares.  But until then, they

24   borrowed my money; they withheld the cash.

25   Q    You do understand that there's nothing in the program

Page 190

1    documents that ever said that you had an option to get cash

2    instead of equity, setting aside a change of control or a

3    couple of other little details?

4    A    No, that's why my intention was that as soon as I got

5    it, I would sell it, so that I would have no tie to Lehman

6    from an investment perspective.

7    Q    All right.  But you did understand that, I mean that's

8    what your point is -- that's because you understood you

9    didn't have an option to get money, that's why as soon as

10   you got a share, that's why you tried to sell it?

11   A    That's right.

12          MR. MILLER:  No further questions, Your Honor.

13          THE COURT:  Okay.

14          MR. SCHAGER:  No redirect, Your Honor.

15          THE COURT:  Ms. Krieger, thank you very much.  I

16   really very much appreciate your patience in coming here for

17   both days.  You're welcome to stay or you're welcome to

18   leave if you have to get back to work.

19          THE WITNESS:  Thank you.

20          THE COURT:  All right?

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23          All right.  We've been going for quite a while.

24   I'm fine to continue, but we can take a break if you'd like

25   to take a break and then we need to wrap up.

Page 191

```
 1                Mr. Miller?

 2                MR. MILLER:  Your Honor, if we could have just a

 3     very short break --

 4                THE COURT:  Sure.

 5                MR. MILLER:  -- for the benefit of our group and

 6     everybody?

 7                THE COURT:  Yes.

 8                Okay.  Let's recommence at 3:45 and then we're

 9     going to be in the homestretch and then I also want to have

10     some clarity about what we're going to do tomorrow.

11                Mr. Miller, have you and Ms. Solomon resolved your

12     differences with respect to Mr. Kenny?

13                MR. MILLER:  I don't know yet, Your Honor.  I need

14     to talk to --

15                THE COURT:  Okay, all right.

16                Then let's come back at 3:45.

17          (Recess at 3:34 p.m.)

18                THE COURT:  Please have a seat.

19                All right.  What more do we have?

20                MR. KAPLAN:  Mr. Ramallo, Your Honor.

21                THE COURT:  All right.  And are we having -- well,

22     let's just get started.

23                Ms. Solomon seems to be missing.

24                Please come up, sir.

25                Would you raise your right hand, please.
```

Page 192

```
 1        (Witness sworn)

 2             THE WITNESS:  Yes, Your Honor.

 3             THE COURT:  Please have a seat, and thank you for

 4   your patience in waiting so long to give your testimony.

 5             THE WITNESS:  You're welcome, and thank you

 6   yesterday for letting me get my Blackberry, I forgot to

 7   thank you.

 8             THE COURT:  No problem.

 9   DIRECT EXAMINATION

10   BY MR. KAPLAN:

11   Q    Full name is Henry Ramallo?

12   A    Yes, my name is Henry Ramallo.

13   Q    You're an employee of Neuberger Berman?

14   A    Yes.

15   Q    When did you first join Neuberger Berman?

16   A    December of 1993.

17   Q    And in what capacity did you join Neuberger Berman?

18   A    I was the assistant tax manager.

19   Q    And did there come a time when you became an asset

20   manager or a portfolio manager?

21   A    Yes.

22   Q    And when was that?

23   A    It was a transition period between 1998 and 1999, and

24   the reason for that is Neuberger Berman tried to go public

25   two times; 1998 turned out to be not the right time, so I
```

Page 193

1     would get dragged back in to help with the documents and the

2     distribution of founder shares.

3              At the year end of '98, I worked with the

4     portfolio manager, Dick Weismann, who hired me.  Then it ran

5     into tax season and they asked me to stay on and do tax work

6     for the first part of '99.  After the tax return estimates

7     were done, I joined Dick Weismann, let's say, in April of

8     1999.

9     Q   Dick Weismann had a group of money managers working?

10    A   Neuberger Berman has today approximately 40, 41

11    different product teams, but there are 23 different

12    portfolio management teams, maybe 24; the Weismann Group, as

13    it was referred to, was one of those 23, 24 teams.

14    Q   And you joined --

15    A   I joined Dietrich -- his name was Dietrich Weismann.  I

16    joined Dietrich Weismann officially, as I said, probably in

17    April of 1999.

18    Q   And subsequent to joining Mr. Weismann, did you develop

19    a book of business?

20    A   No, the Weismann team worked differently than it

21    works -- than the group I'm currently with now.  When I

22    joined the Weismann team everything fell into his book of

23    business.  I was there.  How he worked it, you had a

24    response -- you had either a primary or secondary

25    responsibility for the stocks that were owned in the book.

1   So I had primary responsibility on some and secondary

2   responsibility on others.

3            He viewed them --

4   Q   And --

5   A   Pardon me.  He viewed them as all of his clients,

6   although I did the majority of the communication with the

7   clients.  That was something that he did not like to do.

8   Q   And did there come a time when you left the Dick

9   Weismann Group and joined another group?

10  A   Yes.

11  Q   And when was that?

12  A   In 2003.

13  Q   And what group was that?

14  A   It's known as the Straus Group.

15  Q   And as a member of the Straus Group, did you develop a

16  book of business?

17  A   I was actually able to take -- Dick Weismann was asked

18  to basically retire.  His book of business was broken up.

19  Jim Baker, who was one of my colleagues at the time, took

20  the institutional business.  I was able to take the retail

21  business and move over to the Straus Group, and part of that

22  business, part of that business started off as my book of

23  business.

24  Q   And since then, you've developed other -- you've

25  enlarged that book of business?

1   A    Yes, I have.

2   Q    Okay.  Now, in the period from 1999 when there was the

3   initial public offering of Neuberger to be acquisitioned by

4   Lehman in 2003, were you awarded any Neuberger Berman stock?

5   A    Yes, I was.

6   Q    And in connection with those stock awards, did you

7   enter into any restricted covenants?

8   A    Yes, I did.

9   Q    And at the time of -- in the months preceding the

10  acquisition of the merger with Lehman Brothers, were you

11  presented with a retention agreement?

12  A    Yes, I was.

13  Q    And in connection with that, did you have discussions

14  with someone named Heidi Steiger?

15  A    Yes, I did.  I happened to be on vacation and I

16  received a phone call from Heidi that she wanted to speak to

17  me.

18  Q    And just who was Heidi Steiger in the universe of

19  Neuberger Berman?

20  A    Heidi Steiger, as Ms. Krieger already stated, was her

21  predecessor in building the wealth management division of

22  the firm, but she became an executive committee member and

23  she was serving a role and facilitating Jeff Lane and Bob

24  Matza, Jeff Lane being the CEO of Neuberger Berman, and Bob

25  Matza being the President of Neuberger Berman, she was asked

Page 196

1    to play the role in getting everyone to sign these retention

2    agreements that were being given to us.

3    Q    And in connection with the retention agreement, you had

4    a number of interactions with Ms. Steiger?

5    A    No, there were only two interactions.  One was the

6    phone call when she called me while I was on vacation and

7    she wanted to either start faxing me or overnighting me a

8    package of documents that she wanted me to send back.  I

9    told her that I was at the tail end of my vacation and could

10   it wait until I returned.  I said "Can I ask just what kind

11   of retention I was getting" and she told me and I was

12   honestly a little bit disappointed.  And I said to her -- I

13   started having a conversation and she politely told me that

14   this wasn't a negotiation; this was the offer.

15                  MR. MILLER:  And, Your Honor --

16                  THE COURT:  And what was the date of this

17   conversation?

18                  THE WITNESS:  In August of 2003, Your Honor.  I

19   can't give you the exact date.

20                  THE COURT:  Okay.

21                  Yes, Mr. Miller?

22                  MR. MILLER:  Your Honor, we want to lodge an

23   objection.  At this point in time there was not an ownership

24   relationship between Lehman Brothers Holdings, Inc. and

25   Neuberger Berman, so this is not an admission by --

1           THE COURT:  It's hearsay.

2           MR. KAPLAN:  It's hearsay being offered only to

3      show its impact on the actions thereafter taken by

4      Mr. Ramallo.

5           MR. MILLER:  If it's offered for state of mind of

6      the listener, we don't object, Your Honor.

7           THE COURT:  Right.

8           MR. MILLER:  If it's offered for the truth of the

9      matter stated, we do object.

10          THE COURT:  Right.  So -- well --

11          MR. KAPLAN:  And we are offering it only for its

12     impact on Mr. Ramallo and not the truth.

13          THE COURT:  Okay.  I'm not so sure that that's

14     actually how you've used it in the briefing up to this

15     point, but you can keep going.

16          And I agree with Mr. Miller's characterization of

17     the appropriate scope of the use of the testimony, all

18     right.

19     BY MR. KAPLAN:

20     Q   Well, you were saying that there was this telephone

21     conversation when you were on vacation -- have we finished

22     that conversation?

23     A    No.  The conversation basically was that she did agree

24     to wait until I got back to the office because it was just a

25     waste of time.  I didn't have a fax machine available.  I

Page 198

1    wasn't going to start asking the hotel to have confidential

2    documents sent to me, and, no, I simply did not want it to

3    be overnighted at that moment because it was at the tail end

4    of my vacation.  And I said "Can we deal with this when I

5    get back on Monday" and she agreed.  And I'm not

6    exaggerating; she was at my door on Monday, first thing in

7    the morning.  As soon as she arrived she was at my door of

8    my office --

9    Q    And what happened?

10   A    -- with the documents in hand and she asked me to sign

11   these documents and I asked her "Don't I even have the

12   opportunity to review them?"

13            She said, "Of course" but at that time, she also

14   pointed out that if I wasn't going to agree to this, that

15   the transition that I was making, this would jeopardize that

16   transition and it would jeopardize my career at Neuberger

17   Berman.

18   Q    When you say "the transition you were making" you mean

19   from the Weismann Group to the Straus Group?

20   A    From the Weismann Group to the Straus Group, correct;

21   that's what I mean.

22   Q    Yeah.

23   A    That's what I'm referring to.

24   Q    And let me show you what's been marked as Neuberger

25   Berman Exhibit B and ask you if you recognize that document.

1    A    Yes, I do.

2              MR. KAPLAN:  Your Honor, do you want it?

3              THE COURT:  I have it, thank you.

4    BY MR. KAPLAN:

5    Q    And is that the retention agreement that you ultimately

6    signed?

7    A    Yes, it is.

8    Q    And why did you sign that agreement?

9    A    I signed this agreement because I had no other choice.

10   It was simply stated that if I was -- if I can just give you

11   a little more color, Your Honor?

12             THE COURT:  Sure.

13             THE WITNESS:  My undergraduate degree is in

14   aerospace engineering.  Part-time I went and got an MBA with

15   majors in taxation and finance.  Many years earlier I wanted

16   to go to Wall Street and pursue this career, whether in

17   research or portfolio management.  It was a long, hard

18   struggle.  I finally got the opportunity ten years after

19   starting my MBA.

20             And what I've learned even in that short time

21   period, that you need to have your own track record.

22   Because under the way that Dick Weismann operated, I

23   wasn't -- had the opportunity to show I had my own

24   established track record, which I do today because Marvin

25   Schwartz and the Straus team operated differently.

Page 200

```
 1            So for me to turn around and give up the dreams
 2    and what I pursued and to really grasp at this brass ring
 3    that I was given -- and I'm not referring to the amount of
 4    this retention, I'm saying what I viewed as the brass ring
 5    was the opportunity that very, very few people like myself
 6    had gotten at Neuberger Berman to make that type of career
 7    choice.  Today there are no job postings -- I don't know how
 8    many job postings there are at Neuberger Berman, but I'm
 9    willing to guarantee that there are no job postings for
10    portfolio manager.  So I was being given a very unique
11    opportunity at the firm, an opportunity that I don't think
12    that I would receive anyplace else.
13            So it was either the firm knowing that if they
14    wanted my help in retaining the $600 million dollars at the
15    time that I was -- when I was leaving Dick Weismann's group,
16    if they were going to have any chance of retaining those
17    assets, I was going to play a role.  I wanted to continue
18    this.  When Marvin Schwartz actually interviewed me for the
19    position -- because it wasn't like he just hired me -- he
20    asked me at the end of my -- and you have been doing with
21    some of the witnesses -- is there any final statements that
22    you would like to make?
23            And I said "Yes, this is the first firm that I've
24    been at for more than five years."  I had spent five years
25    at Grumman Aerospace, five years at (indiscernible -
```

Page 201

```
 1    2:34:56), five years at -- I'm drawing a blank right now --
 2    and I said "I would like to retire from this firm."
 3              Months later, Marvin told me that was one of the
 4    selling features.  So my heart and having this opportunity
 5    and to pursue this and the fact that two other times in my
 6    career, my wife had tolerated me making changes in careers,
 7    taking setbacks, both financially, pure economics, whether
 8    it be on a pure comp, 401(k), seniority, vacation time.  I
 9    wasn't about to start subjecting her to do this again.  It
10    was one thing I did in my twenties and it's another thing I
11    did in my thirties.  I didn't want to start to do this again
12    in my forties, because by that time I also had three
13    children, besides other family responsibilities.
14              So at the time, you know, I started at the firm
15    making $60,000 a year.  By this time I was graced with the
16    ability that I was making between $350,000 to $400,000 a
17    year and the firm is offering me a piece of paper that says
18    they're going to also give me $500,000.  To me, at that
19    moment, it was life-altering, so, yes, I decided to make the
20    decision to stay and not take this somewhere else because I
21    didn't think there would be anyone else who would look at my
22    background, as qualified as I felt I was, to match what I
23    was getting at Neuberger Berman.
24    BY MR. KAPLAN:
25    Q   Did the -- following the acquisition by Lehman
```

1    Brothers, did the pay structure or the way you were paid

2    change between from what it was at Neuberger Berman, as a

3    standalone entity?

4    A      Absolutely.  When I started at Neuberger Berman I was

5    salaried and bonused.  Under Dick Weismann I went to what

6    was known as a comp -- I was an added expense to the firm.

7    I was an expense to Dick Weismann at some point in time.

8    The firm usually does ask groups to take on the

9    responsibility of compensating portfolio managers and

10   research assistants within the group, so I was Dick

11   Weismann's expense.  And at that point in time, I did not

12   have a partnership interest.  I wasn't a founding partner as

13   Stephanie was, but when I switched over to the Straus Group,

14   Marvin Schwartz put me on their direct comp guaranteeing me

15   $350,000 with a potential for bonus.  But, again, not a firm

16   bonus, a bonus that they would pay, the team would pay.

17         And then what ultimately happened, subsequent --

18   so this is 2003 moving forward -- sometime in 2004 -- at the

19   end of 2004 he discussed making me a part of the group.  In

20   2005, that's when it started, which meant now that I had my

21   book of business.  I was going to be paid out based on the

22   AUM, the assets under management.

23         And I would like to correct something that was

24   incorrectly stated earlier.  The firm gets paid, let's say

25   somewhere between one and one and a half percent, but we

Page 203

1    get, as Stephanie alluded, somewhere between -- well, it's

2    twenty-two percent business, if you got that line of

3    business, twenty-five percent business.  The only way it

4    gets to a forty percent business is if you've met certain

5    high-water marks, so not all our business is paid out at

6    forty percent.

7            So without any stretch of the imagination, I was

8    given a partnership percentage within the Straus Group and

9    then thereafter rolls around 2008, we are being told that

10   Lehman is taking us over -- excuse me, 2003 -- pardon me,

11   2003, Lehman is taking us over.  And so I was under the

12   structure that I was basically as they like to say, "eating

13   what I was cooking," but now going forward, eventually, as

14   we were told in 2004 that we were going to have to move in

15   line with Lehman's compensation structure, and the Lehman

16   compensation structure involved a withholding, a deferred

17   comp piece.

18           And just before -- if any records -- I'm going to

19   put this out on the table -- there was a mistake made

20   online.  Because I don't have all -- what I mean by mistake,

21   I was made a managing director at the end of 2003, but a

22   computer system that got transferred over to Lehman's

23   actually had me as a senior vice president, so they withheld

24   the wrong amount and they came back to me two years later

25   asking me to make it up and I told them that I thought they

Page 204

1    were crazy if I was going to write a check for their

2    mistake.  So I was underwithheld because I was withheld at

3    the SVP level, although I was a managing director.

4              I will say two other things --

5              THE COURT:  So you were underwithheld meaning

6    that -- when you say "withheld" you mean the portion of your

7    compensation that was paid in RSUs?

8              THE WITNESS:  No, the deferred comp.

9              It wasn't paid in RSUs.  I was under -- they

10   withdraw -- they would hold part of your compensation.

11   Throughout the year, as has been stated previously, in a

12   sense, we are lending the firm the money and at the end of

13   the year, they are going to buy you RSUs.

14             THE COURT:  They are going to buy you RSUs?

15             THE WITNESS:  RSUs, the restricts stock units,

16   okay.

17             So that's how it was deemed, so the firm -- so the

18   firm is holding money --

19             THE COURT:  Hold on a minute.  Hold on a minute.

20             So if -- your understanding of it is that you're

21   paid the compensation in, let's call it $30,000 a month, all

22   right, and that a portion of that $30,000 a month, $360,000

23   a year, is withheld?

24             THE WITNESS:  Correct, Your Honor.

25             THE COURT:  And that cash is put somewhere in an

Page 205

```
 1   account?

 2           THE WITNESS:  Correct, Your Honor.

 3           THE COURT:  And you then pay taxes on that

 4   $360,000?

 5           THE WITNESS:  No, Your Honor.

 6           THE COURT:  Okay.  So you only pay taxes on the

 7   amount of cash that you actually got, right?

 8           THE WITNESS:  Constructive receipt, yes, Your

 9   Honor.

10           THE COURT:  And the deferred compensation was the

11   RSUs that you then got for the work that you performed that

12   year?

13           THE WITNESS:  Eventually, Your Honor.

14           THE COURT:  Eventually, okay.

15           So when you say that you were underwithheld, that

16   means that had they done it correctly, you would have gotten

17   more RSUs?

18           THE WITNESS:  No, in a sense, I would have had

19   more withheld and then ultimately I would have had more

20   RSUs.

21           THE COURT:  More RSUs.

22           THE WITNESS:  But they made that up, Your Honor.

23   As I said, they did make it up.  They caught the mistake --

24           THE COURT:  Okay.

25           THE WITNESS:  -- they just wanted me to write a
```

1    check.

2              THE COURT:  But you didn't do that?

3              THE WITNESS:  No, but I -- because that's when you

4    started to ask your questions -- I was going to say --

5              THE COURT:  Yeah.

6              THE WITNESS:  -- what we agreed to do is that they

7    would take it out of my future comp.  So they made it up by

8    taking it out of my future comp.

9              THE COURT:  I see.

10             THE WITNESS:  So they made up the error, but a

11   later year.  So I was anticipating if the numbers looked

12   funny before they show me anything -- my case is so much

13   more back-end loaded because if I was supposed to have fifty

14   percent withheld, I can't remember if they were withholding

15   thirty-five or forty percent.

16             THE COURT:  Okay.  But in any event, none of these

17   RSUs could be converted because they were all within the

18   five years prior to the filing?

19             THE WITNESS:  Correct, Your Honor.

20             THE COURT:  Okay.

21             THE WITNESS:  So they started withholding in 2004

22   and they didn't -- you know, the five years had an

23   anniversary and so we got zero, except for what has already

24   been said, that final year of deferred comp that was

25   returned to us.

Page 207

```
 1              THE COURT:  Okay.

 2   BY MR. KAPLAN:

 3   Q   The 2008 deferred comp --

 4   A    2008 deferred comp.

 5   Q   -- was paid to you in cash in 2009?

 6   A    Correct.

 7              MR. KAPLAN:  Nothing further, Your Honor.

 8              THE COURT:  Okay.

 9              Mr. Miller?

10              Well, let me ask you:  What was the amount that

11   you received in 2009, which is the time period -- the late

12   2008, early 2009 time period is the time period in which --

13   were you about to ask that question?

14              MR. MILLER:  Well, we do have this chart, Your

15   Honor.  I'm not sure if he's going to want to disclose that

16   amount publicly.  He can if he wants to, I just -- we're

17   going to do the same thing within a moment.

18              THE WITNESS:  If you don't mind, Your Honor, I

19   would like to have the opportunity to do what you did with

20   Ms. Krieger.

21              THE COURT:  Sure, absolutely.

22              MR. MILLER:  I was just offering that, Your Honor,

23   as an option for his privacy.

24              THE COURT:  All right.  And which exhibit?

25              MR. MILLER:  That would be my first.
```

Page 208

1                    THE WITNESS:  Am I allowed to thank him?

2              Can I say thank you, Mr. Miller?

3                    THE COURT:  I'm used to there being -- you know,

4        in contrast to some of the testimony we've heard over the

5        last two days, bankruptcy and court proceedings are supposed

6        to be public and transparent processes.  We do protect

7        personal financial information, but my baseline is that it's

8        supposed to be open.

9                    So I'm not -- I wasn't seeking to put your

10       personal financial information out there.

11                   THE WITNESS:  I didn't take it that way, Your

12       Honor.

13                   THE COURT:  Okay.

14                   THE WITNESS:  I mean, I'm just going to say that

15       for somebody who started at $60,000 a year and had happen

16       what has happened to me --

17                   THE COURT:  I understand.

18                   THE WITNESS:  -- I'm still somewhat -- I don't

19       believe it at times and I feel very grateful and sometimes

20       embarrassed.  I don't like to discuss it publicly.

21                   THE COURT:  I understand.

22                   MR. MILLER:  May I approach the witness, Your

23       Honor?

24                   THE COURT:  Sure.

25                   MR. MILLER:  All right.  I'm going to give you the

Page 209

1   Thoisseau (ph) declaration which you may have seen before.

2   This is Lehman Brothers Holdings, Inc. Exhibit 3.

3          I believe Your Honor has one, but I have two more

4   copies if you need one.

5          THE COURT:  I do.  Let me -- I think I have it

6   here.  I have it.

7          MR. MILLER:  I've got two more.

8          THE COURT:  I have it, thank you.

9          So perhaps, Mr. Kaplan and Mr. Miller --

10          MR. MILLER:  Yes?

11          THE COURT:  -- do you want to do the same thing --

12          MR. MILLER:  Do the same thing we did before, Your

13   Honor?

14          THE COURT:  -- you did previously?

15          MR. MILLER:  All right.

16   CROSS-EXAMINATION

17   BY MR. MILLER:

18   Q   And so were you here for Ms. Stiefel's testimony?

19   A    Yes, I was, sir.

20   Q   So, you saw we're going to --

21          THE COURT:  Stiefel.

22          THE WITNESS:  It's actually Stiefel, yes.

23          MR. MILLER:  I'm sorry -- Stiefel, Ms. Stiefel's

24   testimony.

25   BY MR. MILLER:

1    Q   I believe there's ten lines and I'm going to show you

2    this and if you want to, you can point.  I believe I know

3    which one it is, and then you're going to write a number on

4    this piece of paper and see if you agree, and then we'll

5    show it to the Court.

6    A    Yes, sir.

7    Q   So we're in agreement on the line?

8    A    Yes, sir.

9    Q   Let me check my count here.  Let me show you this.

10   Just count from the top and make sure that you come up with

11   the same -- count lines down.

12   A    Oh, which line?  I apologize.

13   Q   Just the line there, all we're going to do is show them

14   the line.  So they got the chart, just like you.

15   A    Yes, sir.  I agree with you.

16   Q    All right.

17            MR. MILLER:  Your Honor?

18            THE COURT:  Okay.  Very good, thank you.

19   BY MR. MILLER:

20   Q   So we can use this to answer the Court's question which

21   was how much you received in 2000 -- early 2009 for your

22   deferred compensation in 2008; is that correct?

23   A    Yes, sir.

24   Q   And on that line that we just identified, that would be

25   the last number in the column, 2008 deferred compensation;

Page 211

1    is that right?

2    A    Yes, sir.

3    Q    And if we look -- let's go to some earlier lines.

4    A    Do you mean earlier years, sir?

5    Q    Yes, I did.  I misspoke.  Let me try that again.

6             Earlier columns, actually 2003, for example, as

7    with Ms. Stiefel, there was no deferred compensation for the

8    2003 year; is that correct?

9    A    That's correct, sir.

10   Q    And you received the same, approximately -- and it may

11   not be to the penny, but we're looking at gross income --

12   approximately the amount shown for 2005 in cash commissions;

13   is that correct?  On line 5, of 2005, I'm asking you.

14   A    It wasn't called -- well, yes, sir, that's what this

15   column says, but I never called it commissions.  I would

16   call it compensation, but, yes.

17   Q    All right.  It is compensation?

18   A    Yes.

19   Q    And then if we go over approximately amount shown for

20   past commission was the cash that you received in 2006,

21   correct?

22   A    Yes, sir.

23   Q    That was a significant increase, as many of these lines

24   are, between 2005 and 2006; is that correct?

25   A    I would be happy to explain it.

Page 212

1    Q    Well, I'm not asking you -- I'm just asking you, it is

2    an increase?

3    A    Yes, sir.

4    Q    And then there's a further increase to 2007; is that

5    correct?

6    A    Yes, sir.

7    Q    Now, you're saying that you did not receive the amount

8    shown for deferred compensation in 2007 because that was

9    part of the RSU program; is that correct?

10   A    Yes, sir.  That became part of the RSU program.

11   Q    But the combined amount that you received in 2008 was

12   substantially greater than the cash that you received in

13   2007, since you did, in fact, receive the deferred amount;

14   is that a true statement -- just asking you about it.

15   A    No, no, I'm just looking -- checking the numbers, sir.

16   On a combined basis, it would be more than I received in

17   2007 on a cash basis.

18   Q    All right.  So when Ms. Steiger came to you after your

19   vacation, did she threaten you with anything that you viewed

20   as illegal conduct?

21   A    Sir, to me illegal conduct is putting a gun to my head.

22   No, just verbally, she told me that there was no choice.

23   Q    Well, I want to be clear for the record.  She did not

24   threaten some harm, physical or financial, to you -- and by

25   financial, I mean she didn't say that your bank account will

Page 213

1  be drained by a hacker, for example, or that your house will

2  be burned down or any sort of clearly illegal conduct to get

3  you to sign; is that true?

4  A    She said that this wouldn't be -- the retention bonus

5  wouldn't be available to me, so that is financial.

6  Q    All right.  So that's what she said, she said the

7  retention bonus would not be available to you?

8  A    Correct, sir.

9  Q    All right.  So you felt like you had no choice, but to

10  take that retention bonus because you needed it, is that

11  what you're saying?

12  A    Yes, sir.

13  Q    And you made the decision to continue after that date

14  and work at Neuberger Berman -- you're still there now?

15  A    Sir, I'm still there now, and as I stated earlier,

16  there was no -- there were no options for me to get another

17  job that I currently have anywhere else, I'm convinced of

18  that.

19  Q    All right.  Nowhere to get a job at anything like these

20  compensation levels, is that what you're saying?

21  A    No, that's not what I'm saying.  I'm saying I would not

22  have a portfolio management position anyplace else at any

23  compensation level because I lacked the track record.

24  Q    All right.  You would not get a portfolio management

25  job, sir?

Page 214

1   A    Correct --

2   Q   But --

3   A    -- or a research job, anything that I wanted to do,

4   sir.

5   Q   And that was because you lacked a track record?

6   A    In my opinion of how Wall Street works, yes, sir.

7   Q   So it's not necessarily just because you signed these

8   covenants, it's because without the track record, you

9   just --

10  A    (Indiscernible - 2:51:46) in the covenants, sir.

11  Q   Well, let's look at the covenants for a moment.  If I

12  may call your attention to Neuberger Berman Exhibit B,

13  please, there's a schedule B on page -- the page numbers are

14  a little bit hard -- it's got NB-116 in the lower right

15  corner; do you see that?

16  A    00116?

17  Q   Yes, sir.

18  A    Yes, sir.

19  Q   That's the -- those are the restrictive covenants, I

20  believe, in this document -- you can look through them, but

21  I think that's where they are, right?

22  A    It appears to be, sir, yes.

23  Q   And these are for you for a period of 12 months from

24  the date of termination, not for a period of three years

25  that you heard about from Ms. Stiefel, correct?

Page 215

1    A    Correct, sir.

2    Q    And was that because, as you understood it, you did not

3    have founder stock that you -- for 12 months?

4    A    That's correct, sir.

5    Q    And so you heard us go over this with Ms. Stiefel

6    before, right?

7    A    Yes, sir.

8    Q    But look at it from the bottom, this paragraph E was

9    that you would not solicit a person who worked at Neuberger

10   to go work at another firm, right?

11   A    That's correct; that's what it says.

12   Q    You could have gotten a job -- well, let's take Sanford

13   Bernstein, did they do what you did?

14   A    Sanford Bernstein is in the same line of business, sir.

15   Q    All right.  Let's take Sanford Bernstein as a for-

16   instance.  You could have gone to Sanford Bernstein and if

17   they had otherwise wanted you, you certainly didn't have to

18   bring employees with you; is that true?  You could have

19   still gone there and offered your services and tried to get

20   a job?

21   A    To be a chief cook and bottle washer in this industry

22   is very tough, but under your hypothetical scenario, maybe.

23   Q    All right.  Under my hypothetical scenario, number D

24   was that you would not employ any current or former employer

25   or consultant of the firm, other than clerical, secretarial,

Page 216

1    or other similar support or personnel.  So you could take an

2    assistant or a clerical support, but, again, if you went to

3    Sanford Bernstein, it would have been at least theoretically

4    possible for you to go and take your assistant.

5            It was allowed here, but not take anyone else,

6    right, theoretically?

7    A    Yes, theoretically, sir.

8    Q    All right.  And if we go up to C, it was not to solicit

9    or accept business found through or engage in any sales or

10   marketing activities based on your financial planner or

11   financial institution.  Now, there's a list here of people

12   with whom you had business contact during the one-year

13   period prior to your departure.  There were a lot of people

14   in that category that's listed in paragraph C that you had

15   personally had not had any business contact with.

16           They existed out there in the world, right?

17   A    They exist today, sir.

18   Q    All right.  B was that you would not solicit or accept

19   business from a prospective client of the firm who, within a

20   one-year period before, you had directly solicited or you

21   had supervised or participated in the firm's solicitation

22   activities; do you see that?

23   A    Yes, I do, sir.

24   Q    Now, you mentioned that there were various teams within

25   Neuberger Berman, right?

1    A    That's correct, sir.

2    Q    And I assume that you did not supervise or participate

3    in the solicitation activities for those other teams; is

4    that true?

5    A    For the other teams -- no, sir.

6    Q    And so, for example, this would not keep you from --

7    this particular paragraph -- from soliciting someone that

8    another team to your -- perhaps without your knowledge --

9    had dealt with if you had not personally or directly

10   solicited or you had not supervised or participated in that

11   solicitation, would it?

12   A    I disagree, sir, and the reason I disagree is because

13   there are lawyers -- you know, we heard the term "good

14   leavers" joined this whole thing; there are also terms

15   called "bad leavers."  If the firm wanted to say that I was

16   leaving on bad terms, it could actually cost me more than

17   the retention bonus because now I would have to be hiring

18   lawyers to start defending actions of what is being

19   described here.  And what is being described here is,

20   obviously, written by lawyers and now I would have to start

21   explaining myself for what I did and did not do a year ago

22   and it would basically be impossible.

23            And so without the lack of a track record and

24   without the fact that I didn't have the direct clientele,

25   your perception is that I could have walked over to Sanford

Page 218

```
 1   Bernstein, and as Ms. Stiefel said "with basically nothing"

 2   and have them hire me.

 3   Q   My question, sir, is actually about the document.  The

 4   document --

 5   A   And I'm --

 6   Q   Literally, it does not restrict you from trying to

 7   solicit prospective clients that other teams at Neuberger

 8   Berman had solicited during the year before, it doesn't

 9   literally require that, right?

10   A   No, I don't agree with that, sir.  I believe it did.  I

11   believe that Neuberger Berman was all-encompassing.  If

12   Neuberger Berman saw themselves as a prospective client of

13   the firm that I was going to speak to them, that they would

14   see me as trying to poach the client.

15   Q   All right.  And let me ask you about the last one, this

16   is to solicit or accept business from any individual or

17   entity for whom the firm provides services in the year

18   before.  There are people who are potential clients of both

19   Neuberger Berman and Sanford Bernstein that neither one

20   provides services to, right?

21   A   Of course, sir.

22   Q   Did you -- did you protest, in writing, having to enter

23   into this agreement at any time before this case, sir?

24   A   The retention agreement you're referring to?

25   Q   Yes, the retention agreement.
```

1    A    No, sir.

2    Q    And let's go back to the chart for a moment that you

3    had and let's -- what was the first year, regardless of what

4    the chart shows -- when you believe you became aware that

5    part of the compensation after LBHI acquired the stock of

6    Neuberger Berman would be paid in a deferred form under the

7    equity awards program, when did your first learn that?

8    A    When -- if I may make sure I understand your question:

9    When did I first learn that Lehman Brothers was going to

10   withhold some of my compensation and ultimately put into RSU

11   and then five years later would be converted into equities?

12   Q    Yes, sir.

13   A    Okay.  I learned about it in 2004, sir.

14   Q    You learned about it in 2004?

15   A    Yes.

16   Q    Early in 2004?

17   A    I will -- I am going to say in the first half of 2004,

18   sir.

19   Q    All right.  When, in 2004 when you -- well, first of

20   all, did you get a monthly statement of how much you were

21   going to be paid based on some kind of money production or

22   amount under management or something?

23   A    As I stated, by 2004 I had joined the Straus Group and

24   I was told that I would be getting $350,000.  So in a sense,

25   all you had to do was divide that and say this is what it

Page 220

1    was going to be.  That's what they guaranteed me.

2    Q    All right.

3    A    It turned out to be formulaically a little bit more,

4    based on what actually happened, sir.

5    Q    Okay.  Do you think you did or did not receive deferred

6    compensation in 2004 for that year, that fiscal year?

7    A    On a temporary -- on a timing basis, I did, but

8    eventually they made it up, sir.

9    Q    On a timed basis you did or didn't?

10   A    I received the money in 2004.  The firm realized the

11   mistakes and they caught it back later on.

12   Q    All right.  So this is -- that was when there was a

13   makeup where, although you didn't have deferred compensation

14   that year, they deferred more in some later years; is that

15   what you're saying?

16   A    Yes, sir.

17   Q    Okay.  But you became aware in 2004 that there would be

18   deferred compensation going forward?

19   A    Yes, sir.

20   Q    So, if you had chosen to leave during 2004, you didn't

21   have any deferred compensation that had been paid in 2003 or

22   2004 that you would lose; is that correct?

23   A    No, but I would lose the retention bonus, sir.

24   Q    All right.  You would lose the retention bonus, but you

25   didn't have any deferred compensation?

Page 221

1    A    I said no, but I would lose the retention.  I'm just

2    telling you where I was.

3    Q    Okay.  I understand.  I just wanted to make sure that I

4    had an answer.

5    A    No, you had it right.  It was at that moment in time,

6    the firm had not withheld anything for deferred comp.

7    Q    All right.  But at that moment in time, you said that

8    you would have lost the retention bonus and you also would

9    have been subject to these various restrictions?

10   A    Yes, sir.

11   Q    You made a decision at that point not to leave, right?

12   A    No, sir.

13   Q    You didn't make a decision not to leave?

14   A    Sir, there were no options for me, sir.  You don't want

15   to believe it, but there were no options.  I wasn't going to

16   go back to engineering.  I wasn't going to go back to

17   accounting.  The only place I feel that would continue to

18   give me the opportunity at that time to pursue a portfolio

19   management degree was Neuberger Berman.

20            THE COURT:  Mr. Ramallo, can I ask you, though --

21            THE WITNESS:  Yes?

22            THE COURT:  -- by looking at the numbers on this

23   line, the platform at Lehman -- and you can provide

24   alternate explanation -- but the platform between the years

25   2004 and 2008, at least was coincident with there being a

Page 222

1    ten-fold increase in the amount of your cash compensation,

2    if I'm reading this correctly.

3             THE WITNESS:  Yes, and I'm happy to explain that.

4             THE COURT:  And that was a period of time in

5    which -- I mean we now know in retrospect what happened

6    after 2008 -- but that was a period of time of tremendous

7    growth in the --

8             THE WITNESS:  In the stock market.

9             THE COURT:  -- the stock market.

10            THE WITNESS:  And something specific to me, again,

11   Your Honor.

12            THE COURT:  And what was that?

13            THE WITNESS:  When I joined the Straus Group, like

14   I said, I came over with about $600 million dollars.  I

15   didn't get to keep the $600 million dollars.  It was

16   dispersed throughout some of the other portfolio managers.

17   I got to keep approximately $150 million dollars under

18   management.

19            In 2004, Mr. Schwartz had an account, and out of

20   fairness and confidentiality I'm not going to disclose it,

21   but I will say it's a mutual fund that is sold throughout

22   Europe.  This European bank had hired Mr. Strauss --

23   Mr. Schwartz, excuse me, in 1992.  At the time when this

24   other bank took that account over, it was $126 million

25   dollars.

Page 223

1          Mr. Schwartz thought he was going to be fired from

2    the (indiscernible - 3:03:36).  He asked me to participate

3    in that meeting because he wanted to show a deeper

4    (indiscernible - 3:03:41).  The gentleman that came over on

5    that account not only did not want to fire us, he they

6    wanted to start adding assets and he liked the fact that

7    Mr. Schwartz had a much younger partner, because he

8    introduced me as his partner.

9          This account, because of what was going on in the

10   market and the fact that this firm had a tremendous

11   distribution arm, this account went from $126 million

12   dollars to about $4 billion dollars in the course of a

13   couple years.  The Europeans just flooded us with money and

14   I was participating in that rapid increase.

15          THE COURT:  I see.

16          THE WITNESS:  And Mr. Schwartz was also increasing

17   my participation specifically in that fund each and every

18   year, including this year where now I actually have -- it's

19   not worth $4 billion dollars anymore, it's about a billion-

20   dollar fund because the clients from that fund ran during

21   the Lehman event.

22          THE COURT:  So this is now back at Neuberger

23   Berman, now, right?

24          THE WITNESS:  It's never left Neuberger Berman.

25          THE COURT:  Okay.

Page 224

1            THE WITNESS:  It never left Neuberger Berman, but

2      my participation increased to where now I'm up to 75 percent

3      ownership, but there's a lot less AUM, so my comp is lower.

4      So it's just all mathematical.

5            So this rise you see --

6            THE COURT:  I see.

7            THE WITNESS:  -- this temporary mediocre rise

8      because of how dramatically things were changing for me.

9      Plus, as you very eloquently stated, the market had five

10     terrific years prior to 2008.

11           THE COURT:  Right.  Right.

12           Can I just ask one more question:  So who do you

13     report to now at Neuberger Berman?

14           THE WITNESS:  You can say that, since I'm one of

15     the principals in the group, I always refer to him as my

16     senior partner, is Mr. Schwartz, but we have the president

17     and vice -- excuse me, the CEO, so you could say George

18     Walker and Joe Amato are my --

19           THE COURT:  So you and, Ms. Stiefel, I mean it's

20     clear how you feel about your careers and what you built up

21     and about the firm, even though, as Ms. Stiefel testified, I

22     think she used the words "lean and mean."

23           You said "eat what you cook"; she said it, I

24     think, more vividly, "eat what you kill."  It's a very tough

25     business.

Page 225

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  But there's nothing precluding you

3    right now from going to the top folks at Neuberger Berman

4    and saying, I lost a huge amount of money while we were at

5    Lehman Brothers, make it up to me now.  You could do that,

6    couldn't you?  You could ask them to make up to you what it

7    is that Lehman Brothers wasn't able to pay you because of

8    the catastrophe -- and it was a catastrophe, there's no two

9    ways about it.  I mean I'll never forget how I felt looking

10   at my numbers, you know, go right down, but you could go --

11   you and your colleagues could go and make that ask, couldn't

12   you?  I mean it's math, right?

13         THE WITNESS:  That's assuming, Your Honor, if I

14   may?

15         THE COURT:  Yeah.

16         THE WITNESS:  Theoretically, of course, I can

17   theoretically, however, being a person of ethics, when I

18   turn around and I face the person across the table and I'm

19   facing you --

20         THE COURT:  Yes?

21         THE WITNESS:  -- realizing that you were in the

22   same position that I am, because they also lost money at

23   Lehman Brothers, and because they were employed by Lehman

24   Brothers much longer than I was, and because --

25         THE COURT:  Okay.

Page 226

1                THE WITNESS:  -- they were at a much higher level

2      than I was, I don't have it within my heart to actually sit

3      across the table from someone to say, you know what, I lost.

4      I realize you lost also.

5                How am I going to --

6                THE COURT:  Okay.

7                THE WITNESS:  So, no, I personally --

8                THE COURT:  Would not do that?

9                THE WITNESS:  -- within me -- no, I can't do.

10               In theory, you're right; I can do that.

11               THE COURT:  Okay.  And the only other thing is

12     that when the retention began, the retention program began,

13     that was prior to -- Lehman was not on the scene at that

14     point, right?  I mean when the firm went public, Lehman was

15     nowhere on the scene.

16               MR. KAPLAN:  The retention was at the time of the

17     acquisition, Your Honor.

18               THE COURT:  Excuse me.  The way it works is that

19     I'm talking to the witness.

20               MR. KAPLAN:  I'm sorry, Your Honor.

21               THE COURT:  If I wanted to ask you, I would ask

22     you, all right?  Thank you.

23               When the -- you were at Neuberger Berman at the

24     time that it went public, right?

25               THE WITNESS:  Yes, Your Honor.

Page 227

1            THE COURT:  And then the retention bonus program

2     was in August of 2003 and that was on the eve of the move to

3     Lehman Brothers?

4            THE WITNESS:  It was -- if I recall correctly,

5     Your Honor, I think the deal was announced in July of

6     2003 --

7            THE COURT:  All right.

8            THE WITNESS:  -- so I was one of the people

9     receiving --

10            THE COURT:  And then prior to that when the firm

11     went public, the firm imposed a restrictive covenant on you,

12     prior to the firm --

13            THE WITNESS:  Because I had received some stock;

14     yes, Your Honor.

15            THE COURT:  All right, thank you.

16     BY MR. MILLER:

17     Q   In retrospect, it was certainly the right decision for

18     you to stay with Neuberger Berman, wasn't it?

19     A    Yes, sir.

20            MR. MILLER:  No further questions.

21            THE COURT:  Okay.

22            Mr. Kaplan, any redirect?

23     REDIRECT EXAMINATION

24     BY MR. KAPLAN:

25     Q   Mr. Ramallo, if the retention -- all things being

Page 228

1   equal -- if the retention bonus had been one dollar, would

2   you have signed the retention agreement and stayed with

3   Neuberger Berman?

4   A    Yes, sir;  I would have paid Neuberger Berman the

5   dollar to stay with Neuberger Berman at that moment because

6   I was being given, at that moment, what was a life-long

7   pursuit, okay.  So I would have signed the agreement, I just

8   didn't like the fact that I felt I deserved more because of

9   what I was actually doing helping save this line of business

10  from Dick Weismann.  I played a major role -- these clients

11  stayed -- yes, I'm not going to deny, I'm not -- I don't

12  have my head filled -- moving over to the Straus Group with

13  Marvin Schwartz I'm not saying is not a (indiscernible -

14  3:09:47) it does help, but Marvin did not know these people.

15  This is a people business, so the fact that I was their

16  continuity, the fact that I had been dealing with their

17  trials and tribulations for the five years prior and the

18  demise of the Weismann Group, the demise of the tech bubble,

19  okay, because the difference between the Straus Group and

20  the Weismann Group -- the Weismann Group had three years in

21  a row of decline during the tech bubble and the Straus Group

22  only had one year down in 2002.  So we had to boot some

23  disgruntled clients who had some off feelings toward Dick

24  Weismann, but liked me enough, so they were going to give it

25  a little bit more time, but I had to play.  So base that I

```
 1    was working 18 to 20 hours a day to try to get this

 2    accomplished, at that moment, based on the economics of the

 3    firm and knowing what I knew about other people, I was a

 4    little dissatisfied with the half-million dollars.  That's

 5    human nature, sir, and that's all it is, but I would have

 6    signed for the one dollar.

 7              MR. KAPLAN:  Nothing further.

 8              THE COURT:  All right.  Thank you very much,

 9    Mr. Ramallo.  I appreciate your testimony and I appreciate

10    your patience in waiting until so late in the second day.

11              THE WITNESS:  Thank you, Your Honor.

12              And thanks to everyone for all their work.  Good

13    luck to everybody.

14              THE COURT:  Thank you, sir.

15              Okay.  What's next?  I would really like to finish

16    up since we are way in -- we are in quadruple overtime.

17              MR. MILLER:  Your Honor, by way of something

18    positive, Ms. Solomon and I are pleased to tell you that

19    we're not going to need to take any more time.

20              THE COURT:  Okay.  You're rewarding my faith in

21    the ability of lawyers to work things out at some level, so

22    that's great.

23              So are we done -- is the evidentiary record now

24    closed?

25              MR. KAPLAN:  As to the Neuberger claimants, yes,
```

```
 1    Your Honor.

 2              THE COURT:  Okay, as to any of the other

 3    claimants?

 4              MR. SCHAGER:  Your Honor, I would like to

 5    clarify --

 6              MR. KAPLAN:  Other than putting into evidence the

 7    various --

 8              THE COURT:  Other than by your telling me which of

 9    the documents are actually to be admitted into evidence,

10    then we're done with the testimony?

11              MR. KAPLAN:  Yes.

12              THE COURT:  Done with the offer of declarations?

13              Thank you, folks.  Thank you very much.

14              Okay.  Then do you want to, at the outset

15    tomorrow, give me your -- put on the record what the

16    documents are that you want to officially be part of the

17    record?

18              MR. KAPLAN:  Yes, Your Honor.

19              THE COURT:  Now, this has developed in a way that

20    was frankly a little not what I anticipated.  And I know

21    that the procedures didn't contemplate it, but we've had a

22    much more voluminous factual record than the stipulation

23    promised.

24              We went into this -- my expectation was we were

25    going to have three hours, so now we've had -- I've lost
```

Page 231

1    count -- but eight hours, or nine hours.  And what that

2    means is that in order for me to do what I have to do, I

3    have to make factual findings, so I'm going to need from

4    each of you post-trial submissions that have factual

5    findings that you believe are appropriate to make.  You have

6    to tell me what it is that you think that you have proved

7    that supports the relief that you've requested.

8            Had I known, going in, that this would turn into a

9    two-day evidentiary hearing, as opposed to a three-hour

10   evidentiary hearing -- less than three hours, because that

11   original three hours included the arguments of counsel.  So

12   this is not at all -- this was not as advertised.  In a case

13   where we're talking about things that were not as

14   advertised, this hearing was not as advertised.

15           So you might feel like I let you do this -- I did,

16   and the reason that I did it and because they're out of the

17   room now was because there was no way that I was not going

18   to let these people feel that they had an opportunity to be

19   heard.  But you folks completely, completely did not

20   appropriately handle your end of the stipulation, completely

21   inappropriately, and I am perturbed, because I don't want

22   things this way.  I run a tight ship and in order to afford

23   these people their due process rights, I was forced to

24   depart from my gold standard and I am really not happy about

25   it.

Page 232

1             And in order to give them their due and write a

2     proper opinion in an appropriate period of time, because

3     they obviously feel that they've been delayed for an

4     inappropriate reason and I will tell you straight out that I

5     have a significant backlog at that point and I'm not going

6     to get to this.  If I get to this in June I'll be lucky and

7     you can consult the docket and you can see for yourself what

8     it is that I have, by way of a backlog.  I pride myself in

9     four years on the bench, I have never had a backlog, but

10    right now I have just come off of five weeks of trial in

11    another matter.  Those people are waiting for work and these

12    people are just going to have to wait for work.

13             Now, I know and you know that there's not another

14    Lehman distribution for awhile, so that, in terms of

15    dollars, it doesn't matter.  In terms of their emotional

16    cost, it matters because they feel like they've waited a

17    long time.  So, therefore, even though it's outside the

18    stipulation, I'm going to ask that you prepare findings of

19    fact and post-trial conclusions of law because you need to

20    tell me what it is that you think that you've proved that

21    supports the relief that you've requested.  And you can,

22    among yourselves, decide what the timing is on that, and

23    having told you that I can't get to this any time soon, I'm

24    not looking to, you know, impose tight time frames.  I know

25    that Passover and Easter and the holidays and spring break

Page 233

1     and the like holidays are coming up.  So I put that on you

2     to think about it and to make a proposal tomorrow in terms

3     of the timing for those submissions and I would like to hear

4     what it is that we're going to do tomorrow and for how long

5     with precision so I can plan my day.

6              How long do you want tomorrow for closing?

7              MR. MILLER:  Your Honor, Ralph Miller again.

8              We've really been trying to follow the order, we

9     believe, Your Honor, and we were allowed an hour for our

10    closing.

11             THE COURT:  Okay.

12             MR. MILLER:  And you had indicated that you would

13    like to have it be a question and answer question.  We

14    certainly support that.

15             THE COURT:  Okay.

16             MR. MILLER:  We think that would be helpful.  We

17    don't know how long the question and answer might take --

18             THE COURT:  Right.

19             MR. MILLER:  -- but as far as my closing is

20    concerned, certainly an hour would be sufficient.

21             THE COURT:  Okay.

22             MR. MILLER:  And what we will try to do, Your

23    Honor, is we are going to try and go through the points --

24    we're not going to repeat the opening, but go through the

25    points that have come up and try to explain why.  Frankly,

Page 234

1    we still believe the stipulation has the answers to the

2    questions, but why we believe there are a lot of digressions

3    and other with issues and why we think they are digressions.

4              THE COURT:  That would be very helpful, okay.

5              All right.  And on this side of the room,

6    collectively, how much time?  Or do you not have any

7    understanding of how much time?

8              MR. SCHAGER:  Your Honor, I'm going to give a one-

9    sentence background and one-sentence request, and that is

10   that effectively you're hearing more than one case now

11   unfortunately and that's more clear than it was at the

12   outset because you've got Dover factors in front of you.

13             THE COURT:  But that was -- that's the part that's

14   baffling to me because the very premise of this entire

15   elaborate procedure was because Judge Peck said that each of

16   the types of claimants and claimants should have the

17   opportunity to take -- to demonstrate why they don't fit

18   within Enron.  So, from the get-go, it was clear that there

19   were different cases.

20             So I don't -- I viewed that as what the task was

21   coming in and I don't think that it's changed and I,

22   frankly, have not heard anything that very much

23   distinguishes any of the claimants.  You know, there's the

24   Neuberger Berman and there's the non-Neuberger Berman and

25   that I have not heard -- and you can tell me if you think

Page 235

1    that one group versus another -- there's a dispositive

2    factual difference that should, you know, push the ruling in

3    one way or the other.

4            And it's not -- you know, some of the witnesses, I

5    think -- or somebody alluded to the fact that there's a

6    conflict because one counsel is representing multiple

7    different types of claimants.  This is not a zero-sum gain.

8    If one group of claimants prevails and is not subordinated,

9    that doesn't mean that another group can't.  I mean the math

10   here is that if any of these claimants are not subordinated

11   and go up into the pool of general unsecured creditors, then

12   they get factored into that distribution, and given the

13   numbers here, it would affect the percentage distribution in

14   an infinitesimally small amount.

15           So, I mean you are free to argue however you want,

16   with respect to the claimants you represent, all right?

17           MR. SCHAGER:  I apologize, Your Honor, if I

18   misspoke.  Certainly there are two basic cases because

19   there's a variation in the Neuberger Berman claim.

20           THE COURT:  Right.  And then there's the RSU

21   versus the CSA.

22           MR. SCHAGER:  We all considered conflicts among

23   CSAs and RSUs and commission-based people.  We did not feel

24   that we had conflicts to address there.

25           Maybe it would be more accurate to say that you've

Page 236

1    got four different cases because you've got four different

2    groups of Plaintiffs and you've got four different lawyers,

3    which, of course, leads to five or six different theories in

4    the case or approaches to litigating the case.

5            You refer to our game plan, Your Honor, and I was

6    very sensitive to that because we do have a game plan -- we

7    did have a game plan, and part of our game plan -- this is

8    getting back to how much time we need tomorrow -- part of

9    our game plan was that I would not speak on opening which

10   was a huge disadvantage because I didn't have a chance to

11   introduce the Court to where the witnesses were going and I

12   was the one who wanted to call witnesses.

13           I think I will need an hour tomorrow to wrap

14   things up myself and I have three other law firms, all of

15   whom participated in the opening, who probably need another

16   half hour or more.  So I'm suggesting, Your Honor, that we

17   have an hour and a half tomorrow.

18           THE COURT:  Well, did these folks agree?

19           MR. SCHAGER:  Well, we're here, Your Honor.  We

20   haven't had a chance to discuss it.

21           MR. KAPLAN:  Judge, I --

22           MR. SCHAGER:  Let me qualify that --

23           THE COURT:  Mr. Kaplan, how long do you need?

24           MR. KAPLAN:  I said I needed, when we were

25   planning this, 15 minutes, subject to the questions that

Page 237

1    Your Honor might ask.

2                THE COURT:  Okay, 15 minutes --

3                MR. KAPLAN:  Fifteen minutes is fine.

4                THE COURT:  -- subject to my questions.

5                And, Ms. Solomon?

6                MS. SOLOMON:  I will need 15 minutes, subject to

7    the questions of Your Honor.

8                THE COURT:  Fine, all right.

9                So, then, Mr. Schager -- yes?

10               UNIDENTIFIED SPEAKER:  Your Honor, James Boyagen

11   (ph) would like to request ten minutes.

12               THE COURT:  Okay.  Ten minutes.

13               So why is that, Mr. Schager, you need an hour if

14   these folks all need 15 minutes?  Why do you need an hour?

15               MR. SCHAGER:  Because we're saying different

16   things, Your Honor.

17               THE COURT:  I understand that.  But they didn't

18   say --

19               MR. SCHAGER:  And for one thing, I think if

20   Mr. Miller is requesting an hour and I didn't say a word --

21               THE COURT:  Mr. Miller has to address everything

22   that each of your group says, so 15 minutes and 15 minutes

23   and 10 minutes and you can have half an hour.  That means an

24   hour and ten minutes on one side and an hour on the other

25   side -- a half an hour, subject to my questions, net of my

Page 238

```
 1    questions.

 2              MR. SCHAGER:  If that's the Court's order, Your

 3    Honor, then --

 4              THE COURT:  I think that it's more than adequate.

 5    We have gone on for two whole days when the entire case of

 6    the claimants, by agreement, a stipulation that you were the

 7    architect of, called for three hours.

 8              I will take the risk on appeal if the decision is

 9    not in your favor that you will convince an appellate court

10    that you were denied your due process.  I think half an hour

11    is more than generous, net of my questions, all right?

12              So if you would please endeavor to curtail your

13    hour-long presentation to half an hour, I would appreciate

14    it, all right?

15              MR. SCHAGER:  I'll act in accordance with the

16    Court's order, Your Honor.

17              THE COURT:  Okay, thank you.

18              Mr. Miller?

19              MR. MILLER:  Yes, Your Honor.

20              I regret to bring up an unpleasant subject, but

21    Mr. Carriger (ph) yesterday reserved ten minutes for

22    himself.  He's not --

23              MR. KAPLAN:  He e-mailed this morning and

24    withdrew.

25              THE COURT:  And he withdrew.
```

Page 239

1                    MR. MILLER:  Okay, great.

2                    THE COURT:  So we're at ten minutes, fifteen

3       minutes, fifteen minutes, and a half an hour.

4                    MR. MILLER:  All right.  Your Honor, my only

5       question is:  I wonder if there's any chance, since I have

6       no idea and I believe they have no idea what is going to be

7       said in all of this period of time, if I might take ten

8       minutes of my one hour and hold it in rebuttal?

9                    THE COURT:  Yes.

10                   MR. MILLER:  So I will take 50 minutes of closing

11      and then hold ten minutes of my one hour --

12                   THE COURT:  Right.  And all net of any --

13                   MR. MILLER:  -- and not having any net increase in

14      time, but be able to perhaps --

15                   THE COURT:  Right.  But -- and all net of

16      questioning that I ask, which I will try to keep to a

17      minimum.

18                   MR. MILLER:  Yes, sir.

19                   THE COURT:  All right.

20                   MR. KAPLAN:  So tomorrow is deal with the

21      exhibits --

22                   THE COURT:  Yes.

23                   MR. KAPLAN:  -- and then submissions?

24                   THE COURT:  Right.

25                   But deal with the exhibits in the since of that

Page 240

1    takes five minutes because you're just going to tell me what

2    it is that you are moving admission into the record of the

3    trial, okay?

4              MR. KAPLAN:  Yes.

5              THE COURT:  Okay?

6              MR. MILLER:  Yes.

7              THE COURT:  Thank you very much.  Get some rest.

8              Please, also, if you have a chance, work out the

9    schedule for post-trial submissions, all right.  There are

10   different options, you all know this.  They can be

11   simultaneous or they can be responsive.  One side can go

12   first and the other side can reply.

13             I will defer to however you folks want to proceed.

14   If you can't agree, we can talk about it tomorrow, okay?

15   Okay, thank you.

16   (Proceedings concluded at 5:00 PM)

17                        * * * * *

18

19

20

21

22

23

24

25

Page 241

1                    I N D E X

2

3              W I T N E S S E S

4    WITNESS              BY                    PAGE

5    ANDREA JAO           MS. JAO                  7

6    PAUL SHOTTON         MR. SHOTTON             29

7                         MR. MILLER              55

8                         MR. SHOTTON             69

9    STEPHANIE STIEFEL    MR. KAPLAN              86

10                        MR. MILLER             104

11   KAREN SIMON KRIEGER  MR. SCHRAGER           141

12                        MR. MILLER             175

13   HENRY RAMOLLO        MR. KAPLAN             192

14                        MR. MILLER             209

15                        MR. KAPLAN             227

16

17

18

19

20

21

22

23

24

25

Page 242

1                C E R T I F I C A T I O N S

2    I, Dawn South, certify that the foregoing transcript is a

3    true and accurate record of the proceedings.

4

5

6

7    AAERT Certified Electronic Transcriber CET**D-408

8     I, Sheila G. Orms, certify that the foregoing is a correct

9    transcript from the official electronic sound recording of

10   the proceedings in the above-entitled matter.

11

12

13

      Signature of Approved Transcriber

14

     I, William Garling, certify that the foregoing transcript is

15

     a true and accurate record of the proceedings.

16

17

18

19

20   Veritext

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25