# Exhibit A

**Motion and Cross-Motion Hearing Date:  December 10, 2014 at 10:00 a.m. (EST)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re:                                  :   Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :   Case No. 08-13555 (SCC)
                                        :
                      Debtors.          :   (Jointly Administered)
------------------------------------------------------------x
```

DECLARATION OF SCOTT A. LEWIS IN SUPPORT OF SUPPLEMENT TO MOTION OF
RMBS TRUSTEES TO ESTIMATE THE RMBS CLAIMS USING STATISTICAL
SAMPLING

Franklin H. Top III (admitted *pro hac vice*)
Scott A. Lewis (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000

*Counsel for U.S. Bank National Association,
solely in its capacity as Indenture Trustee for
Certain Mortgage-Backed Securities Trusts*

M. William Munno
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1587

*Counsel for Law Debenture Trust Company of
New York, solely in its capacity as Separate
Trustee for Certain Mortgage-Backed
Securities Trusts*

John C. Weitnauer (admitted *pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000

*Counsel for Wilmington Trust Company and
Wilmington Trust, National Association, solely
in their respective capacities as Trustee for
Certain Mortgage-Backed Securities Trusts*

Richard C. Pedone (admitted *pro hac vice*)
Christopher Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3085

*Counsel for Deutsche Bank National Trust
Company, solely in its capacity as Trustee for
Certain Mortgage-Backed Securities Trusts*

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to 28 U.S.C. § 1746, I, Scott A. Lewis , declare as follows:

1.      I am Senior Counsel at the law firm of Chapman and Cutler LLP, 111 West
Monroe Street, Chicago, Illinois, 60603.  If called upon to testify in this case, I could
competently testify to the following facts on personal knowledge.

2.      I submit this declaration in support of the Supplement to Motion of RMBS
Trustees to Estimate the RMBS Claims Using Statistical Sampling.

3.      Attached hereto as Exhibit 1 is a true and correct copy of Docket Number 229 in
the case of *Home Equity Mortgage Trust Series 2006-1, et al. v. DLJ Mortgage Capital, Inc., et
al.,* Case No. 156016/2012 (N.Y. Sup. Ct.) (*"Home Equity"*).

4.      Exhibit 1 contains a letter from the Plaintiffs' Attorney in *Home Equity,* in which
the Plaintiffs' attorney argues for statistical sampling in that case and includes as Exhibit A
thereto the endorsed letter and documents considered by Judge Baer in *MASTR Adjustable Rate
Mortgages Trust 2006-OA2, et al. v. UBS Real Estate Securities, Inc.,* Case No. 12-cv-07322
(S.D.N.Y. 2013).

5.      Attached hereto as Exhibit 2 is a true and correct copy of Docket Numbers 232,
233 and 234 in the *Home Equity* case, in which the Defendants' attorney argues against statistical
sampling in that case.[1]

---

[1]      Docket No. 229, 232, 233 and 234 may be obtained from the case's electronic docket, which is available at
https://iapps.courts.state.ny.us/webcivil/FCASSearch?param=I (visited last Dec. 6, 2014).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 8, 2014

_____ /s Scott Lewis___
Scott A. Lewis

# Exhibit 1

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7080**

WRITER'S INTERNET ADDRESS
ericataggart@quinnemanuel.com

November 11, 2013

**BY HAND AND ELECTRONIC FILING**

The Honorable Melvin Schweitzer
New York Supreme Court
26 Broadway, 10th Floor
New York, NY 10004

Re:   *Home Equity Mortgage Trust Series 2006-1, et al. v. DLJ Mortgage Capital, Inc., et al.,*
      Case No. 156016/2012

Dear Justice Schweitzer:

        We write on behalf of Plaintiffs in the above-captioned matter to seek the Court's approval for the use of statistical sampling to prove liability and damages on all of Plaintiffs' claims. Specifically, Plaintiffs wish to use a statistically significant sample of loans drawn from each of the three Trusts at issue and to extrapolate those results to prove their claims. It is neither practicable nor necessary to perform a manual review of the origination and servicing files for each of the 28,646 loans at issue (each of which contains 400 to 1,200 pages). Such a review would take years to complete and would cost each party many millions of dollars. Use of a statistically significant sample will achieve the same result, but at a fraction of the cost in terms of both time and expenses for both the parties and the Court. We have therefore asked Defendants to consent to the use of sampling, but they have declined even to meet and confer on the subject.

        Because of the efficiencies achieved by sampling, numerous New York courts have approved it to prove both liability and damages in residential mortgage-backed securities ("RMBS") cases, including claims seeking to enforce contractual loan repurchase obligations just like this one. For example, in *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010), an action against the defendant sponsor of 15 RMBS trusts backed by approximately 380,000 loans, Justice Bransten approved the use of sampling to prove plaintiff's repurchase claims, among other things. The Court held that "the use of sampling is widespread as a valid method to prove cases with large amounts of underlying data," and that it may "sav[e] the parties and the court

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS

from significant litigation time and may significantly streamline the action without compromising either party from proving its case." *Id.* at *6.

Similarly, in *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 11-cv-2375(JSR), 2013 WL 440114 (S.D.N.Y. Feb. 15, 2013), the plaintiff brought repurchase claims against the sponsor of three RMBS trusts backed by 15,610 mortgage loans. Judge Rakoff held that sampling was appropriate to determine both liability and damages, and more generally for "cases relating to RMBS and involving repurchase claims." *Id.* at *40-41. Judge Rakoff recognized that a "loan-by-loan presentation of evidence in this case would be virtually impossible, and without question delay the trial date, dramatically extend the length of trial, and impose a substantial and unwarranted burden on the time and resources of this Court." *Id.* He concluded that "[t]he presentation of proof based on a statistically valid random sample" would "conserve the resources of the parties and the Court, streamline the trial, and promote judicial economy and efficiency." *Id.*

Likewise, in *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09-cv-3106, 2011 WL 1135007 (S.D.N.Y. 2011), an action against the sponsor of two RMBS trusts backed by 9,871 mortgage loans, Judge Crotty held that the plaintiff "could seek a pool-wide remedy based on sampling and extrapolation" for its repurchase claims. *Id.* He further noted: "The repurchase protocol is a low-powered sanction for bad mortgages that slip through the cracks. It is a narrow remedy ('onesies and twosies') that is appropriate for individualized breaches and designed to facilitate an ongoing information exchange among the parties. That is not what is alleged here. ... EMC cannot reasonably expect the Court to examine each of the 9,871 transactions to determine whether there has been a breach, with the sole remedy of putting them back one by one." *Id.*

Most recently, in *MASTR Adjustable Rate Mortgages Trust 2006-OA2, et. al., v. UBS Real Estate Securities, Inc.*, Case No. 12-cv-07322 (S.D.N.Y. 2013), Judge Baer approved the use of sampling to prove both liability and damages on repurchase claims against the defendant sponsor of three RMBS trusts backed by approximately 16,000 mortgage loans. *See* Ex. A. Indeed, reflecting the non-controversial nature of the use of sampling in such cases, Judge Baer issued his decision without even requiring a formal motion. The plaintiffs submitted a short letter seeking approval of the use of sampling to prove both liability and damages; defendants submitted a two page letter in opposition; and Judge Baer approved the application by way of an endorsed letter. *See id.*[1]

As these precedents make clear, the presentation of evidence based on a statistically significant, random sample of Loans would conserve the resources of the parties and the Court, streamline the trial, and promote judicial economy and efficiency, without compromising the quality or reliability of the evidence adduced to prove Plaintiffs' claims. The Trusts at issue are backed by 28,646 loans—considerably more than the loans at issue in *Flagstar, Syncora,* or *MASTR*. Thus,

---

[1] *See also Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 11 Civ. 6188 (DLC), 2012 WL 6000885, at *10-11 (S.D.N.Y. Dec. 3, 2012) (allowing sampling to prove liability and damages on RMBS fraud claims); *Prudential Ins. Co. of America v. Morgan Stanley*, Docket No. ESX-L-3080-12, Discovery Master's Report and Recommendations, at 15 (N.J. Super. Oct. 8, 2012) ("*Prudential I*") ((allowing sampling to prove fraud claims, and holding that "[i]t is inconceivable to think that some form of sampling will not be used by both sides in this matter. ... The issue then is what should be the size of the sample."); *Prudential Ins. Co. of America v. J.P. Morgan Securities LLC*, Docket No. ESX-L-3085-12, Discovery Master's Report and Recommendations, at 15 (N.J. Super. Oct. 28, 2012) (same).

sampling is necessary and appropriate to avoid the wholly impracticable alternative of presenting evidence to the fact-finder on a loan-by-loan basis as to every one of these 28,646 loans.[2]

As these decisions also make clear, approval of sampling is necessary at this early stage of the litigation to ensure that the full benefits of sampling are achieved. *See, e.g., FHFA*, 2012 WL 6000885, at *3 ("Early vetting of the parties' sampling protocols is particularly important in this case, as the plaintiff and defendants should not be required to begin the costly and time-consuming process of re-underwriting without some assurance that the samples will be deemed admissible.").[3]

Plaintiffs are prepared to present evidence from a qualified expert in statistical sampling to prove the statistical significance of the specific sample they wish to use. If the Court wishes, Plaintiffs will file a formal motion setting forth this evidence in detail, and will make their expert available for examination. However, Plaintiffs respectfully submit that it would be more efficient for the Court to approve the use of sampling in principle, as Judge Baer did in *MARM Trusts*, and to order the parties to meet and confer to resolve any disputes as to the specific sample to be used.

Plaintiffs therefore respectfully seek either (1) an order approving Plaintiffs' use of a statistically significant sample to prove both liability and damages on all their claims, and requiring the parties to meet and confer as to the sample to be used, or (2) permission to file a motion for a case management order authorizing Plaintiffs to use a specific sample to prove their claims.

We thank the Court for its consideration of this submission.

> Sincerely,
>
> /s/ Erica P. Taggart
>
> Erica P. Taggart

---

[2]  We note that in *MARM Trusts*, Judge Baer specifically approved sampling over defendants' objection that, because plaintiff was subject to a "sole remedy" clause, loan by loan proof of breaches was required. *See id.; see also Flagstar*, 2013 WL 440114 at *40-41 (awarding damages after a bench trial based on sampling proof of breaches of representations and warranties, notwithstanding a "sole remedy" clause); *Syncora*, 2011 WL 1135007 at 6 n. 4 (adopting Judge Rakoff's reasoning to approve sampling despite a "sole remedy" clause, and noting the futility of applying an individualized remedy to allegedly widespread misrepresentations).

[3]  *See also Countrywide*, 2010 WL 5186702, at *1-2, *5 (allowing plaintiff to move *in limine* to use a statistical sample more than one year before trial, and holding that "the governing rules of this court do not mandate an outside time limit for a movant to initiate a motion *in limine*"); *MARM Trusts*, Ex. A (approving use of sampling in early stages of discovery, before reunderwriting had commenced); *In re Massachusetts Life Insurance Co. Litig.*, No. 11-cv-30039, Order at 5 (D. Mass. Mar. 5, 2013) ("early vetting of plaintiff's sampling protocol can limit" the costs of expensive re-underwriting); *Prudential I*, Discovery Master's Report and Recommendations, at 15 ("If the Court assumes that sampling is inevitable in this case, early identification and admissibility of the protocol will benefit both sides.").

# Exhibit A

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com



DIRECT DIAL
(212) 735-2628
DIRECT FAX
(617) 777-2628
EMAIL ADDRESS
SCOTT.MUSOFF@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

April 1, 2013

**BY FAX**

Hon. Harold Baer, Jr.
United States District Judge
500 Pearl Street, Chambers 2230
New York, New York 10007

RE:   *Assured Guaranty Municipal Corp. v. UBS Real Estate*
      *Securities Inc., 12-cv-1579 (HB)(JCF) (the "Assured Action")*

Dear Judge Baer:

      We represent UBS Real Estate Securities Inc. ("UBS RESI") in the
above-referenced consolidated action. At the March 22 conference, Your Honor
ordered Plaintiff to submit its proposed amended complaint by March 26 and for
UBS RESI to respond with its position by March 29 (Tr. at 24:20 – 25:15), which the
parties have done. Contrary to the Court's direction, Plaintiff submitted today an
additional letter responding to UBS RESI's March 29 submission. While this new
letter purports to "correct several errors" in UBS RESI's March 29 letter, Plaintiff's
submission merely constitutes additional legal argument not authorized by this
Court. UBS RESI disagrees with the arguments contained in Plaintiff's additional
submission and is prepared to address them. As requested in UBS RESI's March 29
letter, we respectfully request an opportunity to fully brief these issues, including
Plaintiff's failure to state a claim for relief in connection with this novel claim
asserted for the first time last week.

Respectfully submitted,

*As to the March 22 [illegible]*
*① I will allow something now C [illegible]*
*② I will Not allow at*
*this time [illegible] see opn 4/11/13*

Scott D. Musoff

③

cc:  Adam M. Abensohn, Esq. (by email)

SO ORDERED
Harold Baer, Jr., U.S.D.J.

Date: 4/1/13

Endorsement:

As to the March 22 letter:

1.    I will allow sampling.

2.    I will not allow a new cause of action at this time.

3.    I will see you on April 11, 2013.

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7229**

WRITER'S INTERNET ADDRESS
adamabensohn@quinnemanuel.com

March 26, 2013

**BY FAX AND BY HAND**

Hon. Harold Baer, Jr.
United States District Judge
500 Pearl Street, Chambers 2230
New York, New York 10007

Re:    *Assured Guaranty Municipal Corp., et al. v. UBS Real Estate Securities Inc.*, 12-cv-1579 (HB)(JCF); *MASTR Adjustable Rate Mortgages Trust 2006-OA2, et al. v. UBS Real Estate Sec. Inc.*, 12-cv-7322 (HB)(JCF)

Your Honor:

On behalf of all plaintiffs, we write to seek the Court's approval for the use of statistical sampling to prove liability and damages in all claims in the above-captioned consolidated matter. Specifically, plaintiffs seek to use a statistically significant sample of loans drawn from each of the three Trusts at issue and to extrapolate those results to prove their claims. The use of sampling will substantially promote efficiencies both for the parties and for the Court without any meaningful loss in accuracy. It is also an approach approved by numerous courts for the very claims at issue in this litigation.

It is neither practicable nor necessary to re-underwrite each of the 9,000 loans underlying the Trusts (a process that entails manual review of every loan file), and to present the results of that re-underwriting at trial on a loan-by-loan basis. For this reason, courts have widely accepted the use of sampling in residential mortgage-backed securities ("RMBS") cases, in the Southern District of New York and elsewhere. Judge Rakoff approved sampling in *Assured Guaranty Municipal Corp. v Flagstar Bank, N.A.*, -- F. Supp. 2d --, 2013 WL 440114, *36 (S.D.N.Y. Feb. 5, 2013) ("Sampling is a widely-accepted method of proof in cases brought under New York law, including in cases relating to RMBS and involving repurchase claims. ... [T]he Court accepts sampling as an appropriate method of proof in this case"); Judge Crotty approved sampling in *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09-cv-3106, 2011 WL 1135007, *4, 7 (S.D.N.Y. Mar. 25, 2011) (granting Syncora's motion for partial summary judgment that it "could seek a pool-wide remedy based on sampling and extrapolation" for its repurchase claims); Judge Cote approved sampling—over the objections of defendant UBS Real Estate Securities,

Inc. ("UBS")—in *Federal Housing Finance Agency v. JPMorgan Chase*, 2012 WL 6000885, at
*3, *11 (S.D.N.Y. Dec. 13, 2012); and Justice Bransten of New York Supreme Court approved
sampling in *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, Slip op. at 13
(Sup. Ct. N.Y. Cnty. Dec. 22, 2010) ("the use of sampling is widespread as a valid method to
prove cases with large amounts of underlying data").

As *Flagstar* and *Syncora* held, sampling is an appropriate method for proving liability
and damages for repurchase claims, such as those brought by the Trusts, involving alleged
misrepresentations across a large number of loans. As explained in *Syncora*: "The repurchase
protocol is a low-powered sanction for bad mortgages that slip through the cracks. It is a narrow
remedy ('onesies and twosies') that is appropriate for individualized breaches and designed to
facilitate an ongoing information exchange among the parties. This is not what is alleged here.
Here, Syncora alleges massive misleading and disruption of any meaningful change by distorting
the truth. ... EMC cannot reasonably expect the Court to examine each of the 9,871 transactions
to determine whether there has been a breach, with the sole remedy of putting them back one by
one." *Syncora*, 2011 WL 1135007, at 6 n.4.

Moreover, *Flagstar* makes clear that the presence of "sole remedy" provisions limiting
the Trusts to the repurchase remedy for breaches of representation and warranty does not prevent
the Trusts from relying on sampling to prove their claims and recover money damages. In
*Flagstar*, Judge Rakoff awarded the plaintiff damages (in essentially the entire amount of its
claim) based on sampling, despite his holding that the plaintiff—like the Trusts here—was
subject to a "sole remedy" provision. *Flagstar*, 2013 WL 440114 at *40-41.

The only case cited by UBS to plaintiffs, by contrast, is *Central Mortgage Co. v. Morgan
Stanley Capital Hldgs. LLC*, Civ. No. 5140-CS, 2012 WL 3201139 (Del. Ch. Aug. 22, 2012).
Not only did that case not address the use of sampling, but its holding requiring loan-by-loan
proof related to a repurchase claim where only 47 loans out of a pool of more than 12,000 loans
were alleged to have breached representations and warranties—precisely the type of "onesies and
twosies" claim for which the repurchase remedy may be practicably invoked. By contrast,
plaintiffs here allege pervasive and material breaches, as in *Flagstar* and *Syncora*. *See* Assured
Complaint ¶¶ 4-5, 7, 52, 54, 60-61, 64; Trusts Complaint ¶¶ 5, 37-38.

Both Assured and the Trusts seek to use the same criteria that Judge Rakoff approved in
*Flagstar*. *See Flagstar*, 2013 WL 440114 at *10. This approach will preserve the resources of
the parties and this Court while ensuring an accurate result.

Respectfully submitted,

*Adam M. Abensohn/r*

Adam M. Abensohn

cc: Counsel for Defendant

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
(212) 735-2628
DIRECT FAX
(917) 777-2628
EMAIL ADDRESS
JAY.KASNER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 29, 2013

**BY FAX AND HAND**

Hon. Harold Baer, Jr.
United States District Judge
500 Pearl Street, Chambers 2230
New York, New York 10007

RE:    *Assured Guaranty Municipal Corp. v. UBS Real Estate Securities Inc.*, 12-
cv-1579 (HB)(JCF) (the "Assured Action"); *MARM 2006-OA2 Trust, et al. v.
UBS Real Estate Securities Inc.*, 12-cv-7322 (HB) (JCF) (the "Trust Action")

Dear Judge Baer:

On behalf of UBS Real Estate Securities Inc. ("UBS RESI") in the above-captioned actions, we write in response to Plaintiffs' March 26 letter on statistical sampling. As an initial matter, UBS RESI submits that determination of this issue is premature at this stage of the litigation and is more appropriately addressed once certain threshold matters have been decided. Plaintiffs gloss over the fact that there are two distinct claims involving different claims and different legal issues. For example, the Court has not definitively decided whether Assured is bound by the "Sole Remedy Provision" in the PSAs, which provides that if a particular loan is found to have breached one or more representations or warranties, the "sole remedy" available for breaches of R&Ws shall be enforcement of UBS RESI's obligation to cure or repurchase the breaching loan *on a specific, loan-by-loan basis.* (*See* UBS Trust MTD Br. at 8, 12-13.) If it is determined that Assured is so bound, sampling would be inappropriate "to prove liability and damages in all claims," as Plaintiffs request. Thus, it is premature to decide whether sampling is appropriate in the Assured Action.[1]

Regardless of what remedies may be available in the Assured Action, Plaintiffs in the Trust Action are unambiguously bound by the Sole Remedy Provision (UBS Trust MTD Br. at 12-13), and thus are clearly barred from relying upon sampling in the Trust

---

[1] Despite Plaintiffs' claim that sampling has been "widely accepted" in RMBS cases, such acceptance has not been uniform. *See* Ex. A, Transcript, *Bearn Stearns Mortgage Funding Trust 2007-AR2 v. EMC Mortg. LLC*, C.A. No. 6861-CS, at 3 (Del. Ch. Nov. 8, 2012) ("it's really nifty for a plaintiff to accuse someone of breaching their obligations over a thousand loan contracts and not wish to try them all. *It's not going to happen here.*"); *id.* at 8 ("It's very easy to write a contract that says if there is any breach of representation [and] warranty in any of these loans, we can put back all of them. . . . Or if it is proven that there is a breach of representation [and] warranty in ten of the loans, then blank has the right to put back all the rest"); *accord Central Mortgage Co. v. Morgan Stanley Capital Holdgs, LLC*, 2012 WL 3201139 (Del. Ch. Aug. 22, 2012) (New York law) ("[E]ach alleged breach of contract due to a breach of representation . . . as to each individual loan constitutes a *separate transaction or occurrence*, regardless of the fact that the loans might have been part of the same loan pool."). The very same reasoning applies here.

Hon. Harold Baer, Jr.
March 29, 2013
Page 2

Action. Indeed, this limitation on liability was agreed to by the parties – all sophisticated entities – to the PSAs. Plaintiffs' attempt to impose liability through sampling for loans that were not even put back to UBS RESI not only contradicts the plain terms of the Sole Remedy Provision but it seeks to circumvent UBS RESI's bargained-for right to know *which* loans are allegedly defective and to cure them or repurchase the specific performing asset underlying them in order to mitigate damages. (*See* UBS Trust Reply Br. at 8.) In short, allowing sampling would destroy the Sole Remedy Provision and render that part of the PSAs virtually meaningless.

Plaintiffs' cited cases are not to the contrary, as the courts there allowed plaintiffs to pursue remedies beyond the repurchase remedy – an issue yet to be determined here. In *Syncora Guarantee, Inc. v. EMC Mortgage Corp.*, 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011), the court held that the plaintiff could pursue broader remedies under a separate indemnification and insurance agreement ("I&I"). *Id.* at *7; *see also Assured Guaranty Municipal Corp. v Flagstar Bank, N.A.*, 2011 WL 5335566, at *5 (S.D.N.Y. 2011) (plaintiff could pursue damages under separate I&I which permitted it to "'take *whatever action* at law or in equity that may appear necessary to . . . enforce [Flagstar's] obligation'"). In stark contrast, here, there are no equivalent I&Is between the parties and the PSAs provide no exceptions to the Sole Remedy Provision of loan-specific cure or repurchase.[2]

Plaintiffs' argument that the Sole Remedy Provision only applies to "onesies or twosies" ignores its plain language, which contains no such carve-out or exception to the loan-by-loan remedy based on the scale of the alleged breaches. By arguing that the Sole Remedy Provision should not apply as written, Plaintiffs really mean that they now want to demand broader remedies than were bargained for at the time of the transaction. This is not a principled reason for the Court to ignore the PSAs.[3]

Accordingly, Plaintiffs should not be permitted to attempt to establish UBS RESI's liability for allegedly breaching loans through sampling. Even if the Court were to permit sampling as a general manner at this stage (and it should not), UBS RESI reserves the right to challenge the adequacy of Plaintiffs' specific methodology if and when such methodology is disclosed.

In light of the above, UBS RESI respectfully requests full briefing on this issue.

---

[2] Neither *MBIA Ins. Corp. v. Countrywide* nor *FHFA v. JPMorgan Chase*, cited by Plaintiffs, addressed the issue of a party's express waiver of the ability to rely on sampling by agreeing to be bound by a loan-specific sole remedy.

[3] If the parties had wanted to set a materiality threshold beyond which the Sole Remedy Provision was no longer exclusive, they easily could have done so. For example, in a similar RMBS deal involving the same trustee, the agreement provided a loan-by-loan remedy but contained no "sole remedy" clause and also provided for "repurchase by [the seller] of the entire loan pool" in certain circumstances. *U.S. Bank, N.A. v. Greenpoint Mortgage Funding, Inc.*, 26 Misc. 3d 1234(A), 2010 N.Y. Slip Op. 50371(u),a t *7 (Sup. Ct. N.Y. County 2010).

Hon. Harold Baer, Jr.
March 29, 2013
Page 3

Respectfully submitted,

Jay B. Kasner

cc:    Adam M. Abensohn, Esq. (by email)

# Exhibit 2



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019-6142

tel +1-212-506-5000
fax +1-212-506-5151

WWW.ORRICK.COM

November 15, 2013

Richard A. Jacobsen
(212) 506-3743
Rjacobsen@orrick.com

By Electronic Filing and By Hand

The Honorable Melvin L. Schweitzer
New York State Supreme Court
26 Broadway, 10th Floor
New York, New York 10004

Re:    Home Equity Mortgage Trust Series 2006-1, et al. v. DLJ Mortgage Capital, Inc., et al.,
       Index No. 156016/2012

Dear Justice Schweitzer,

        Defendants DLJ Mortgage Capital, Inc. ("DLJ") and Select Portfolio Servicing, Inc.
("SPS") respectfully respond to Plaintiffs' letter of November 11, 2013, in which Plaintiffs
request that the Court approve their use of statistical sampling to prove "all of Plaintiffs' claims."
The request is premature and overbroad. First, Plaintiffs' breach of contract claims are subject to
a pending motion to dismiss because they are, inter alia, (1) barred by the statute of limitations
and (2) barred by the contractual "sole remedy" of repurchase. (Motion Sequence No. 2.) If the
Court grants DLJ's motion, it will not be necessary to consider whether sampling is appropriate
here. In the event sampling ultimately needs to be addressed in this case, the gravity of the issue
and fundamental fairness require that it be done on full briefing and motion. Below, we respond
briefly, but not completely, to Plaintiffs' points.

        In none of Plaintiffs' cited decisions did the court approve sampling before deciding
initial motions to dismiss. Indeed, this court has denied a letter motion to permit sampling as
premature because "no foundation [had been] laid for the admissibility of the evidence" and
expert discovery had not even begun. Assured v. Deutsche Bank Structured Prods., Index No.
650705/2010-E (Sup. Ct. N.Y. Cnty. Sept. 12, 2011) (Kornreich, J.) (annexed hereto as Exhibit
A). The Court should do so here as well.

        Plaintiffs rely on decisions from much more advanced stages of litigation. In MBIA Ins.
Corp. v. Countrywide Home Loans, Inc., No. 602825/08, 2010 WL 5186702 (Sup. Ct. N.Y.
Cnty. Dec. 22, 2010), the court permitted sampling only after a fully-briefed motion in limine,
complete with expert support and an evidentiary hearing. See id. at *1.[1] It decided the sampling

---

[1]    DLJ also respectfully disagrees with the substance of the decision, which relied on authority that does not
show widespread acceptance of statistical sampling to prove claims under in commercial litigation. E.g., In re
Sunset Taxi Co. v. Blum, 73 A.D.2d 691, 692 (2d Dep't 1979) ("adherence to technical rules of evidence" was not



ORRICK

Hon. Melvin L. Schweitzer
November 15, 2013
Page 2

motion a year and a half after its decision on the defendant's motion to dismiss the initial complaint. See MBIA v. Countrywide, No. 602825/08, 2009 N.Y. Misc. LEXIS 6042 (Sup. Ct. N.Y. Cnty. July 13, 2009) (decision on motion to dismiss).[2]

Nor is the substance of Plaintiffs' request supported by the caselaw. Here, the relevant Pooling and Servicing Agreements (PSAs) contain a sole remedy -- the repurchase protocol -- which is incompatible with proving liability or damages through sampling. See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC, No. 5140-CS, 2012 WL 3201139, at *19 (Del. Ch. Aug. 7, 2012) ("The breaches alleged here are loan-specific . . . . [T]he Master Agreement contemplates a loan-specific cure . . . ."). As Chancellor Strine has explained in denying a similar request from a plaintiff-trust in RMBS repurchase litigation: "it's really nifty for a plaintiff to accuse someone of breaching their obligations over a thousand loan contracts and not wish to try them all. It's not going to happen here." Bear Stearns Mortg. Funding Trust 2007-AR2 v. EMC Mortg. LLC, No. 6861-CS, Transcript of Hearing (annexed hereto as Exhibit B), at 3, 8.

Unlike the deal terms here, Plaintiffs rely on decisions addressing sampling in connection with agreements where the plaintiffs were not limited to the "sole remedy" of repurchase. MBIA v. Countrywide, 2009 N.Y. Misc. LEXIS 6042, at *6 (Insurance Agreement between the parties permitted monoline insurer to "exercise remedies for any breach"); Syncora Guarantee Inc. v. EMC Mortg. Corp., No. 09-cv-3106, 2011 WL 1135007, at *5-7 (S.D.N.Y. Mar. 25, 2011) (holding monoline insurer had additional rights beyond "sole remedy" based on separate Insurance Agreement); Assured v. UBS, 2012 WL 3525613, at *3 (holding monoline insurer may have additional rights beyond "sole remedy" because it was not named in "sole remedy" provision, unlike the Trustee here). In Assured v. Flagstar, although the court held that the plaintiff was bound by the sole remedy clause, it applied Sections 3105 and 3106 of the Insurance Law and awarded Assured, a monoline insurer, damages reflecting claims paid under the insurance contracts. Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, No. 11-cv-2375,

---

necessary in that administrative proceeding); In re Henry Hosp. of Watertown v. N.Y. Dep't of Soc. Servs., 79 N.Y.2d 197, 205 (1992) (statistical sampling required by the applicable government regulation in Medicaid case). Defendants' preliminary research did not reveal frequent use of statistical sampling in the New York courts in commercial breach of contract actions.

[2]    Judge Baer's general indication that sampling would be appropriate in Assured Guaranty Mun. Corp. v. UBS Real Estate Secs., 12-cv-1579 (HB)(JCF) (S.D.N.Y. April 1, 2013) (attached to Plaintiffs' letter as Exhibit A) came more than seven months into discovery, after the court decided the defendant's motion to dismiss and thereby determined which claims, issues, and remedies would be at issue in the case. Id.; Assured v. UBS, No. 12 Civ. 1579 (HB), 2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012).



ORRICK

Hon. Melvin L. Schweitzer
November 15, 2013
Page 3

2013 U.S. Dist. LEXIS 16682, at *119 (S.D.N.Y. Feb. 6, 2013).  Such damages are not available here, where Plaintiffs have made no claims payments and the Insurance Law cannot apply.  Other decisions, as Plaintiffs represent, relate to fraud claims, which Plaintiffs have not and cannot bring here.  Plaintiffs' claims here for breach of the PSAs, and they remain limited by the "sole remedy" of repurchase contained in those agreements.

Plaintiffs' request is also overbroad insofar as they request to use sampling of loan files to prove "all" of their claims.  Plaintiffs' claims for indemnification against DLJ (fourth cause of action) and alleging denial of access to loan files against SPS (eighth and ninth causes of action) do not depend upon loan-by-loan review, so loan file sampling could not possibly relate to "all" claims.

Respectfully Submitted,

Richard A. Jacobsen

FILED: NEW YORK COUNTY CLERK 11/15/2013
NYSCEF DOC. NO. 233

INDEX NO. 156016/2012
RECEIVED NYSCEF: 11/15/2013

# Exhibit A

FILED: NEW YORK COUNTY CLERK 09/12/2011

NYSCEF DOC. NO. 103

INDEX NO. 650705/2010

RECEIVED NYSCEF: 09/12/2011

p. 1 of 2

## SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

ASSURED GUARANTY

Plaintiff(s),

-against-

DB Structured Products

Defendant(s).

INDEX NO. 650705/2010-E

IAS PART 54

~~COMPLIANCE CONFERENCE~~

**ORDER**

On _____, 20___, a conference was held in this case. The parties appeared as follows: by letters

Plaintiff(s)    π    by    Eric Haas, Esq

Defendant(s)    Greenpoint    by    James K. Goldfarb
DB Structured Prods & Ace    Noreen A. Kelly-Najah
Securities

The Court has determined that the Court's Case Management Order of _____, 20___
has not been complied with in that _____

Based on letters dated 8/9/11 (π); 8/23/11 (DB&Ace) & 8/23/11 Greenpoint

Accordingly, it is ORDERED that 1) π must respond to discovery demands asking
for identification of the loans that allegedly breached contractual
representations & warranties that are the basis of π's
contractual claims; 2) π's request for the court to
receive briefs on statistical sampling for proving ~~the~~

Enter:

JUSTICE SHIRLEY WERNER KORNREICH
J.S.C.

Dated:    9/7/11

TS-13c (rev 2/1/93)

ASSURED GUARANTY v DB STRUCTURED PRODS
650705/10                                                                p. 2 of e

## PRELIMINARY CONFERENCE ORDER

**X. ADDITIONAL DIRECTIVES:** its case at trial is denied as premature. π has not yet obtained an expert review of the loans (GreenPoint Letter, Exh A, 7/6/11 Letter from π's Counsel). Thus, π's request is based on a hypothetical method of statistical sampling. In the absence of an expert report explaining the method used to select the "representative" sample with certain "characteristics", there is no foundation laid for the admissibility of the evidence. Parker v. Mobil Oil Corp., 7 NY3d 434 (2006).

**X.   ADDITIONAL DIRECTIVES**

SC-8F (REV 2/86)

FILED: NEW YORK COUNTY CLERK 11/15/2013

NYSCEF DOC. NO. 234

INDEX NO. 156016/2012

RECEIVED NYSCEF: 11/15/2013

# Exhibit B

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BEAR STEARNS MORTGAGE FUNDING    :
TRUST 2007-AR2,                  :
                                 :
          Plaintiff,             :
                                 :
     vs.                         :.  Civil Action
                                 :   No. 6861-CS
EMC MORTGAGE LLC,                :
                                 :
          Defendant.             :

                    —  —  —

                    Chancery Court Conference Room
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Thursday, November 8, 2012
                    2:00 p.m.


                    —  —  —

BEFORE:  HON. LEO E. STRINE, JR., Chancellor.

                    —  —  —




                STATUS CONFERENCE






------------------------------------------------------------
                CHANCERY COURT REPORTERS
                    34 The Circle
               Georgetown, Delaware 19947
                    (302) 856-5645

2

1    APPEARANCES:

2            A. THOMPSON BAYLISS, ESQ.
            Abrams & Bayliss LLP
3              -and-
            HARVEY J. WOLKOFF, ESQ.
4            DANIEL V. WARD, ESQ.
            of the Massachusetts Bar
5            Ropes & Gray LLP
               for Plaintiff
6
            DANIEL B. RATH, ESQ.
7            Landis, Rath & Cobb LLP
               -and-
8            ROBERT A. SACKS, ESQ.
            Sullivan & Cromwell LLP
9            of the California Bar
               -and-
10            BRENT J. MCINTOSH, ESQ.
            of the District of Columbia Bar
11            Sullivan & Cromwell LLP
               for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

3

1           THE COURT:  Good afternoon, everyone.

2           ALL COUNSEL:  Good afternoon, Your

3    Honor.

4           THE COURT:  I'm glad you are all

5    getting along so well.  Just relax.

6           Here is -- I am not inclined to

7    embrace the notion that if someone can show that of 20

8    burglaries if they try three of them, somebody did two

9    that they should be -- there were 30 burglaries in the

10   neighborhood that they should be convicted of 20.  I

11   think I am mused to whether the parties might agree on

12   something like that, but an agreement on that is very

13   different than binding someone to it.  And it's really

14   nifty for a plaintiff to accuse someone of breaching

15   their obligations over a thousand loan contracts and

16   not wish to try all of them.  It's not going to happen

17   here.

18           Now, there is some merit to the idea

19   from both sides of doing the following, which would be

20   picking out a representative group of cases, using

21   them as a possible basis for -- you know, look.  The

22   plaintiffs are not in any equitable position here to

23   argue for shortcuts or something like that in terms

24   of, you know, that we have to do this tomorrow.  It's

CHANCERY COURT REPORTERS

4

1   just not that kind of case.

2                I don't know enough about the

3   contractual issues at this point, and frankly, each

4   side is taking, you know -- understandably it takes a

5   self-interested view and is strained -- there are

6   strained arguments probably on both sides about other

7   courts' rulings.  I am not going to prejudge those.

8                I could see how summary judgment

9   practice could be useful on both sides.  Honestly for

10  the same reason the plaintiff says it wouldn't be

11  useful because we win.  Well, prove it.  Then it might

12  be useful to you because, if you in fact win, it may

13  influence the defendants.  Maybe if you win, it won't.

14  Maybe you will each prove that not only are the

15  clients bricks and concrete that the lawyers are.  But

16  it could be, given the quality of lawyering on both

17  sides, that there is actually some supple thinkers.

18                I am a little disappointed that you

19  all cut short your process, but I am not going to ask

20  you to do that.  I don't really understand.  It seems

21  like you were making some progress.  But you know, the

22  Bear Stearns Mortgage Funding Trust 2007-AR2 has its

23  priorities.  It has to move forward in a time frame of

24  its choosing.  So we are going to move forward.

CHANCERY COURT REPORTERS

5

1          But we are not going to have -- there

2    is all sorts of crazy things like you are going to get

3    the document discovery done by December.  You know, I

4    encourage a certain type of fishing before.  The

5    plaintiff has chosen a different type of fishing.  You

6    live with the type of fishing you pick.  And you are

7    not going to go that fast.

8          So what I would suggest to you all is

9    that you get a little more supple with each other,

10   stop walking out on things.  Even if -- I don't want

11   to go on the back and forth about who was at what

12   meeting or whatever.  It turns out the big mahatma on

13   each side missed one of the meetings.  I don't even

14   know why that is in the papers and why I have to read

15   about that.

16          If you believe -- frankly, I look to

17   Mr. Bayliss and Mr. Rath to have to get involved in

18   this process if they believe that people on somebody's

19   side is not doing what they should.  I expect them to

20   make sure that their own side is doing what they

21   should.  But you all cut off a voluntary process that

22   was resolving a fair number of things.  You did that.

23   Now, you can litigate.

24          I am certainly not going to try 1100

CHANCERY COURT REPORTERS

6

1  loans in three weeks.  I am not going do that.  It's

2  dumb.  But I am also not going to try a hundred loans

3  just because the polling data turned out to be good

4  upon election day this year that we should have just

5  enormous confidence always in statistical sampling.

6          Again, I also think there are some

7  elements of the justice system that we haven't gotten

8  there yet, where probabilities are used to determine

9  things.  Because remember there is -- you are also

10  layering probabilities upon probabilities.

11          What do I mean by that?  I am human.

12  At least, you know, you may think I am not human, but

13  I am human.  And I acknowledge, as a result of being

14  human, that what I do isn't perfect.  That is sort of

15  the tradition out of which I was taught that humans

16  are not perfect.  You do the best you can.  A human

17  being looking at a record through the prism of two

18  self-interested parties.  I mean, both sides may not

19  have very much direct evidence about some of these

20  things coming and telling me that I am going to peer

21  into that.  What you are going to do is say, "If you

22  try 50 mortgages, Strine found 37 of them were wrong,"

23  and then we are going to take that and we are going to

24  say that was a statistically significant sample I'm

CHANCERY COURT REPORTERS

7

1   going to pose on those.

2            So you are taking a human being's

3   probabilistic determination, based on hindsight as to

4   certain files, and then you are going to say, "We will

5   just use that as a representative." I am not sure

6   that anybody is going to endorse that. I think,

7   frankly, even if it is sort of efficient, that is

8   something for the parties to decide. And it seems to

9   me you might get more comfortable with it when you

10  have kind of some sort of trial run.

11           I get the fact that there are courts

12  apparently otherwise, that are just going to say, you

13  know, frankly, "You can't reasonably expect us to try

14  these things." So let's just say to the defendants,

15  you know, you can't really expect us to go to trial on

16  all these things. So if the plaintiffs win on X of

17  this -- X of these ten cases, then you're liable on a

18  thousand. Okay.

19           When I get elected to something that

20  gives me that kind of authority, I will embrace it. I

21  just don't get there. You know, especially because I

22  haven't yet proven by contract -- that there is a

23  contract by contract thing contemplated. And if,

24  frankly, the plaintiff -- if that's what they

8

1   bargained for, that's what they are stuck with.

2              It's very easy to write a contract

3   that says if there is any breach of representation

4   warranty in any of these loans we can put back all of

5   them.  It's really easy.  So easy that you could take

6   the quote from this transcript that I just gave and

7   that could become a standard thing.  Or if it is

8   proven that there is a breach of representation

9   warranty in ten of the loans, then blank has the right

10  to put back all the rest.  Or if it is proven that

11  there is a breach of representation of warranty as to

12  20 of the loans...  See, so I have created a new

13  boilerplate, not hard to draft.  Not immediately

14  apparent that's what is in the contract.  And so, I

15  mean, it's really nice to have --

16              I loved the fact that your briefs were

17  focused.  But the idea that I would make one of the

18  world's most monumental judicial decisions, which is I

19  am now going to try a statistically significant

20  sampling, and then I am going to have to have a whole

21  inquiry as to what is a statistically significant

22  sample of a loan portfolio.  And we will have to

23  determine that issue, and then I am going to bind

24  somebody on the basis of that.  I am just not gutsy

9

1   enough to do it, and I am not going to do it.  So why

2   don't you use the room and report back to me in a

3   week.

4              What I would suggest is that you put

5   together one -- if the plaintiff wants to move fast,

6   then the plaintiff ought to look over its documents

7   and other discovery requests and perhaps focus them.

8   If the plaintiff desires -- and I use the word in the

9   meaning in which it really has -- fulsome, which I

10  don't view as praise.  If it really wants fulsome

11  discovery, then it gets a more deliberative schedule

12  that goes with its fulsome discovery.

13              I am not going to prepare to foreclose

14  summary judgment practice.  If I get summary judgment

15  motions that have four boxes of documents attached to

16  them, it will be very easy for me to decide that there

17  aren't four boxes of undisputed facts.  But if there

18  are interpreted issues that both parties, frankly --

19  as I said, the plaintiffs seem to think that their --

20  they have an Ochocinco touchdown dance to do on some

21  of these issues.  Well, maybe they do.  I don't know

22  why then to the plaintiffs --

23              Do I really relish summary judgment

24  practice in this kind of case?  No.  But do I relish a

10

1  trial?  No.  There is nothing about this that is good

2  enough to put on top of a hot dog.  I mean, this is

3  what it is.  And so, you know, I could see the parties

4  agreeing.  Frankly, it would be more efficient.  I

5  mean, I am not usually a volunteer on these kinds of

6  things in the sense that I don't like typically

7  bifurcating, you know, issues or cases.  This is a

8  little different.

9              What do I mean by that?  It's usually

10  not that good in a case to pick out -- if there is six

11  issues to pick out two.  The parties always promise

12  you if you resolve the two, the four will go away.

13  It's not my experience that somebody loses on two,

14  they're all hacked off and then they figure out a way

15  to fight on the four.

16              What we are talking about here is if

17  you could identify a sample, if you all exchange views

18  of what are the kind of key contractual issues that

19  have come up thematically.  You know, what is the

20  characteristic?  What are their type -- types of

21  breaches that the plaintiff alleges against EMC,

22  right?  So I don't know what they are, right, but say

23  there are four or five characteristic type of loans

24  that they view as problematic -- and really, frankly,

CHANCERY COURT REPORTERS

11

1    that the plaintiff has to live a little bit with,

2    which is you are not going to raise more of the

3    typologies -- they have a huge type in typology.  So

4    we have professors.  You have to raise these X-anti,

5    not X-post discussion.  So X-anti you raise all your

6    typologies of loan breach.  You all -- and the

7    defendants surface their defenses, and everybody puts

8    them on the table and says what are -- out of this,

9    can we come up with a sample?  Let's try to come up

10    with an objected method to pick a reasonable number of

11    loans that we could try that together raise all of the

12    issues, legal issues, that are raised by all the loans

13    collectively.  Let's try them.  And let's get a ruling

14    on those.

15                It's a different kind of bifurcation

16    in the sense that actually it's a complete ruling

17    across the board on all the legal issues, which given,

18    you know, rules of preclusion somebody is going to be

19    bound by.  You could even then, obviously, get a Rule

20    54 certification, take them up, get -- it could be

21    that you all say look it could be -- let's be

22    optimistic in a way that none of your discussions to

23    date would make me, but I will be optimistic here for

24    a second, irrationally optimistic -- imagine you just

CHANCERY COURT REPORTERS

12

1    read the opinion.  You know that guy sure is the

2    subject of some pretty frightening looking cartoons,

3    but he writes a pretty darn good rep and warranty

4    decision in a mortgage case.  We are not perfectly

5    happy with we won some and we lost some on each side,

6    but it kind of gives us a template of let's apply them

7    to the rest of the loans.  We think we can knock this

8    out.  That's the optimistic ruling, probably not true,

9    probably not likely what would come out.

10                   The other route you take is -- both

11   sides take up what they agreed to my betters in Dover.

12   Then you get something definitive, unless you think

13   the Supreme Court is going to take cert on this.  It

14   might be good since it was a federal regulatory

15   problem for them to endure all these cases, but -- but

16   absent them taking cert, you get a definitive ruling

17   and then you can decide whether to go forward with the

18   trial or whether -- you know, look.  This has some

19   implications.  Let's see if we can settle it out.  So

20   I guess that's sort of the path I am talking about.

21                   I don't have any fixed views on the

22   utility of summary judgment versus a trial.  I think

23   if you get -- if you talk around the concept that I am

24   mentioning, you know, it may be that you come together

13

1   on that if the plaintiff can -- you know, if everybody

2   can agree on the shape of discovery.  Because then you

3   wouldn't do summary judgment briefs, you would

4   obviously come and tell the story at a focused trial.

5   Then we are talking about a much more focused trial if

6   we are talking about a smaller number of loans and you

7   write one kind of set of legal briefs.

8              I am not prepared to dictate that at

9   this point because there is a lot of things that I

10  also don't know, which is -- you know, what are the

11  types of breaches you alleged?  What type of

12  underwriting personnel are going to have to come in?

13  How easy it is to find those people after the fact,

14  and all that kind of good stuff.  I am assuming these

15  things were written -- you know, underwritten in a

16  variety of places, right?  It's not a geographically

17  focused portfolio.

18             MR. SACKS:  No, a lot of underflow

19  loans, underwritten and purchased by Bear Stearns at

20  the time.  So they could be underwritten by all sorts

21  of people.

22             THE COURT:  In fact, I think there was

23  a kind of -- because of the S&L crises there was a

24  sort of idea of not trying to have a geographic

CHANCERY COURT REPORTERS

14

1    concentration, right?

2                MR. SACKS:   Unfortunately a lot of

3    these pools are fairly concentrated --

4                THE COURT:   Florida?

5                MR. SACKS:   -- in California.

6                THE COURT:   California.  Where in

7    California?

8                MR. SACKS:   Each -- I don't know where

9    this one is, but most of them have 50 plus percent

10   concentration in California and Nevada and all the

11   states that --

12               THE COURT:   Florida?

13               MR. SACKS:   -- Florida would usually

14   be a second or third in most of these pools.  I don't

15   know the percentage for this pool precisely.

16               THE COURT:   So what I am saying for

17   today is, you know, I don't know how to enter a case

18   management plan on this point.  What I am saying is if

19   you can't agree on some sort of representative sample,

20   I am not going to go to trial for three weeks on 1100

21   loans.  I just don't get that.  But nor am I going to

22   let you all do the equivalent, which is I think what

23   you are trying to do, which is to go to trial on 1100

24   loans in a short period of time by essentially going

15

1   to trial on some group of loans that gets selected and

2   then deeming that to be the trial on 1100 loans.

3                    I mean, in some ways the parties are

4   in the identical position, just a different way.  And

5   you know, I will say to Bear Stearns and to EMC,

6   "Yeah, I don't think it will ever be the case that

7   Strine or any of his colleagues tries 1100 loans."

8   You will likely have a special master.  You will

9   likely pay for it.  If you then want to have de novo

10  review of those things, you will have it on some sort

11  of piecemeal basis.  But the idea that we are going to

12  stop the world for this case, no.  And what that

13  should lead if there are -- you know, I don't know who

14  the client, the Law Debenture Trust Company -- whose

15  behind the Law Debenture Trust Company?

16                    MR. WOLKOFF:  Well --

17                    THE COURT:  What I mean is who in

18  George W. Bush -- President George W. Bush was trying

19  to lead us to this signer?

20                    MR. WOLKOFF:  Who the directing

21  certificate holder is, Your Honor?

22                    THE COURT:  Not really what I was

23  thinking of.  Because when you mention that word, you

24  mention to me that that would be someone who holds an

CHANCERY COURT REPORTERS

16

1   office who dearly desired never to have to actively do

2   anything but is thrust in by unusual circumstances

3   into a different, a very highly, unusual role.  So

4   what I am sort of saying, "Yeah, if that's the

5   name" -- what I am talking about who is really

6   providing input on the plaintiff's side about how this

7   case gets resolved.

8                  MR. WOLKOFF:  We put into our papers

9   who that is, Your Honor.  It's Baupost.

10                  THE COURT:  It's who?

11                  MR. WOLKOFF:  It's Baupost, B-A-U --

12                  MR. McINTOSH:  It's a hedge fund.

13                  THE COURT:  It's a hedge fund.

14                  MR. SACKS:  They own a quarter of the

15  certificates, and they are directing this process.

16                  MR. WOLKOFF:  We have described them,

17  Your Honor, in our papers in a recent filing I think a

18  couple months ago.  So they are the directing

19  certificate holder in this particular case.  Now,

20  obviously, there are many other certificate holders

21  not just Baupost.  And with respect to what Baupost --

22  what its intent with regard to suggesting the

23  statistical sampling, Your Honor, was we recognized

24  that having Your Honor review 1141 loans just probably

17

1   can't be done.  So we were searching for some way that

2   we could come up with a method for getting a fair --

3                   THE COURT:  Let me just also surface

4   reality.  You know, the Court does its job.  Baupost

5   it doesn't want to prepare 1134 cases.

6                   MR. WOLKOFF:  Well, Your Honor, that's

7   -- you know, I would --

8                   THE COURT:  No.  No.  I think it

9   really doesn't, unless its not rational and probably

10  not an adequate representative of others' interests.

11  I get why it doesn't want to.  Because when you

12  actually get down to looking at each file -- and the

13  same thing would be for the defendants -- as painful

14  as it would be for me -- and I am not saying it

15  wouldn't be painful.  You know, I would rather watch

16  dressage than do this.  But to some extent, I come at

17  the end of that process.  And so I get why --

18                   But what I am saying about it is

19  sometimes in life -- I worked for a very good,

20  excellent federal judge.  He said -- we talked about

21  this.  He said the words you always have to keep in

22  your mind when you say "you are going to cut through

23  this," you always view those as a hazard, like a

24  signal to himself.  And sometimes we have to kind of

18

1    do that.

2              That's why I said about voluntarily.

3    You all could both cut to it.  It's not really my

4    role, and what I am saying about it is, you know, it's

5    nice to say that the Court doesn't want to try 1134

6    cases.  I don't think either side really wants to, and

7    I would say the plaintiff doesn't.  And actually by

8    the plaintiff having to think about preparing for

9    1134, the defendant having to defend 1134, then the

10   men and woman of financial science, which is an

11   oxymoron, right?  The people who brought us price

12   discovery on both sides and who thought about these

13   risk reduction methods, which have just made the world

14   far more stable than when someone held a mortgage and

15   really cared about who it was giving it to because the

16   source of repayment was the person they were giving it

17   to rather than, you know.  But we have people, again

18   men and woman on both sides of the science of

19   financial price discovery, and therefore, one of the

20   things that's an element to litigation price discovery

21   would be facing the costs of litigating your claims.

22   And all I will say to the plaintiff is there is a

23   burden of persuasion.  And it has to be met.

24              And so, you know, I think I am

CHANCERY COURT REPORTERS

19

1    disinclined to engage in the basis of very admirably

2    terse papers in one of the more significant rulings I

3    have been asked to make in the last two years.  I am

4    not going to.  So you can all talk in the room.  I am

5    not going to rule on either side's proposals, because

6    I am not hep to either side's proposal.  So to the

7    extent you are all asking me to enter either cross

8    motions, your things are each denied because I don't

9    find that either side's proposal to be acceptable.  I

10   am probably more with the defendants, except that I do

11   think that the idea of a representative sample of

12   cases being the subject of either immediately a trial

13   or a sequence of summary judgment in a trial probably

14   has a lot of common sense to it.

15                Okay.  So use the room.  If you can

16   bang out 15 loans now that each of the big guns are

17   here, right?  You guys are in the same room.  I feel

18   honored by this, right.

19                MR. SACKS:  We don't make any

20   decisions.

21                THE COURT:  Was there like a feeling

22   around each meeting where each of you was gone that it

23   just didn't count?

24                MR. WOLKOFF:  No.  Your Honor, there

CHANCERY COURT REPORTERS

20

1   was --

2                    THE COURT:  I am just kidding.

3                    MR. WOLKOFF:  There was a lot of time

4   spent at each meeting.  It just wasn't what we felt,

5   on behalf of the plaintiffs, was sufficient progress.

6                    MR. SACKS:  We obviously felt we were

7   making progress.

8                    MR. WOLKOFF:  You know, withdrawing

9   five loans after three meetings didn't seem to us to

10  be sufficient progress.  That being said, Your Honor,

11  we are going --

12                   THE COURT:  Was it only five?

13                   MR. SACKS:  No.  We went through 50

14  loans.  Between them withdrawing and us agreeing to

15  repurchase, we got rid of 20 percent of them.

16                   MR. WOLKOFF:  They withdrew --

17                   MR. SACKS:  We bought five or six, and

18  they withdrew.  We got rid of ten of 50.  I thought

19  that was actually productive.

20                   THE COURT:  Was it just not the right

21  proportion?

22                   MR. WOLKOFF:  We withdrew, we dropped

23  seven, Your Honor.  We wanted to get the ball rolling

24  in a good faith determination on the other side.  They

21

1    agreed to purchase five loans, Your Honor, and we

2    couldn't make heads or tails of the reasons why they

3    were repurchasing these five as opposed to another

4    five or another seven.  We couldn't -- there were

5    situations where you had a waitress who said she was

6    making $150,000 a year and was getting a mortgage for

7    $700,000 and had a debt chock of 1800 percent.

8              THE COURT:  She worked at Per Se.

9              MR. SACKS:  15 percent on their prices

10   would make a pretty good living.

11             MR. WOLKOFF:  The only point we are

12   trying to make, Your Honor, was that --

13             THE COURT:  Or maybe waitress was a

14   more polite phrase for --

15             MR. WOLKOFF:  And then we have a

16   similar person at an IHOP and they wouldn't repurchase

17   it.  So without being able to go through the loans and

18   get a rhyme or reason, we felt like --

19             THE COURT:  So you guys have an

20   anti-pancake --

21             MR. WOLKOFF:  No, I like pancakes,

22   Your Honor, but three days for five loans.

23             THE COURT:  I understand.

24             MR. SACKS:  You can't force people to

CHANCERY COURT REPORTERS

22

1    talk, if they don't want to talk.  So I actually think

2    one of the things -- maybe we should have this

3    conversation you suggested.  One of the things we had

4    suggested was trying to identify issues that cross a

5    large number of loans and either trying to reach

6    agreement on some of those, approaching them for

7    discussion along those lines, or your approach is very

8    much -- it sort of is consistent with how we

9    approached it.  But your suggestion rather than solely

10   legal issues, we deal with a section of loans to deal

11   with the legal issues.

12                  THE COURT:  Because there must be --

13   the reality is the legal issues will arise in a

14   context that's relevant.

15                  MR. WOLKOFF:  I think that is

16   important, Your Honor.

17                  THE COURT:  What I also need to know

18   from you all, and I am getting -- as I said, I don't

19   have an optimistic feeling as to how well counsel is

20   getting along.

21                  MR. WOLKOFF:  Counsel are getting

22   along fine, Your Honor.  We are cooperating with each

23   other.

24                  THE COURT:  Well in terms of

23

1    identifying these representative issues.

2              MR. WOLKOFF:  I think Your Honor's

3    suggestion about picking out 50 loans that cross a

4    spectrum of the different issues -- of course, each

5    loan has individual issues, but we should be able to

6    sit in a room, not necessarily today, but at least

7    agree on the structure of it where we could agree to

8    have 50 or 75 loans that we select out that --

9              THE COURT:  And let me -- I am going

10   to be blunt in way that I hope that none of -- you

11   know, we are honored to have counsel of your quality

12   coming from communities that -- you know, I have a

13   great deal of fondness for Massachusetts.  I spent --

14   I vacation there.  DC is a wonderful town.  LA is

15   really cool.  I hunger for the Buffalo pigs trotters

16   from LA.

17             But what I worry about -- just telling

18   you -- I worry about when defining these issues if I

19   am going to leave it to Boston, LA, and DC, are you

20   all going to come around sensibly, or do I, to be

21   honest, need to say to two people I respect a lot,

22   Mr. Rath and Mr. Bayliss, I expect you to be present

23   on these discussions.  Just being blunt.  Because I

24   wonder whether, you know --

24

1          MR. WOLKOFF:  Honestly --

2          THE COURT:  The only thing is when I

3    read things that get to the level of adolescence --

4    and I say adolescence is saying that at the last meet

5    and confer the senior lawyer on the other side wasn't

6    present -- I forget which side -- you don't even have

7    to tell me which side.  Somebody said that about the

8    process, and then it turns out that that was also true

9    of the senior lawyer on the other side as to a

10   previous meeting.  When it gets to that level, that

11   might be funny when you are in seventh grade.  It's

12   expensive.  And, you know, people have clients who are

13   highly motivated.  Obviously, the defendants have a

14   client that's under siege.  The Bear Stearns Mortgage

15   Funding Trust 2007-AR2 has a controller who is -- has

16   bought a bunch of stuff and is trying to maximize the

17   value of it, which means that the inputs, probably the

18   accounts you are getting from both sides are fairly

19   intense from their clients.

20          And you know, the other thing about

21   cases like this is that, frankly, the outside counsel,

22   outside Delaware counsel you don't have to necessarily

23   deal with each other in every case all the time,

24   whereas Mr. Rath and Mr. Bayliss will come across each

25

1   other quite a bit.  So I have distinguished counsel,

2   distinguished law firms.  I am not in the room.  As I

3   said, I am a reader.  Judges read these things.  When

4   we get to the level of who was at the meeting and

5   that's the reason to get rid of the process because

6   one person is not taking it seriously.

7                THE COURT:  MR. SACKS:  I don't think that's the

8   issue, Your Honor.

9                THE COURT:  Okay.

10               MR. SACKS:  It's not a personality

11  issue.  It's an issue of I think that -- call it the

12  clients, if you will, that I think you've hit it

13  perfectly.  We have a client who is under siege.  They

14  have a client who is in a very different position.

15  Each case has collateral implications for other cases.

16  There is a big disconnect between the way the

17  plaintiffs want these cases to go and the way the

18  defendants want them to go.  And it's not just a one

19  off that you can easily say, "Okay.  Let's just deal

20  with the six issues" --

21               THE COURT:  I get it.

22               MR. SACKS:  -- "and be done with it."

23  I think that is more the issue.

24               THE COURT:  Again, I am not being -- I

CHANCERY COURT REPORTERS

26

1  am not blaming anyone.  I'm trying to get an

2  understanding of the dynamic to make sure -- what I

3  want to make sure is that we don't leave the room and

4  then not get what we need to figure out how to move

5  forward.

6            MR. WOLKOFF:  Your Honor, I think it's

7  a good idea to have Mr. Bayliss and Mr. Rath present

8  at discussions.  I think Your Honor's suggestion of

9  our picking out whatever number of representative

10 loans we can pick out to present to you and have a

11 trial, to put the legal issues in the context of those

12 loans, those are all not only excellent ideas, but

13 they are acceptable ideas to the plaintiff.  And we

14 would like to sit here, and we would like to discuss

15 it with our opposing counsel, who we have been

16 cooperating with, with regard to discovery and other

17 issues.

18            As the offending senior lawyer who was

19 not present at the meeting because I did have an

20 emergency court hearing on something else, I was not

21 there, but we did send other lawyers to deal with the

22 issues, and I was available.  I could not be there,

23 but I was available by phone.  We are taking these

24 matters very seriously, Your Honor.  So we would like

27

1    some time to discuss coming up with a representative

2    sample.

3              THE COURT:  What I am asking you all

4    to -- because I know that you -- I think what you will

5    find with close listening skills, as I have no doubt

6    your friends on the other side noticed, how you left

7    out any openness to summary judgment in that.  But

8    what I'm saying is I think it should surface on both

9    sides, which is the defendant should be open to the

10   possibility that it would be more efficient to go to

11   trial and to obviate summary judgment practice if you

12   can do the trial in an appropriate way, and the

13   plaintiffs should be open to the opposite, which is if

14   there are some legal issues that both sides agree will

15   drive a lot of things.  You can disagree about the

16   outcome, which is you can say to each other we think

17   your position is clearly ludicrous and unless Strine

18   can't spell cat, then he is going to rule our way.

19   Well, you could each agree on that.

20              It doesn't really matter because if

21   you agree on the five issues that are that way, then

22   it might be efficient from the plaintiff's perspective

23   to bang them out, or it might not be, or it might be

24   when you think about how you present them to me -- and

CHANCERY COURT REPORTERS

28

1    I think this is an important thing -- how you present

2    them to me, whether they're best presented sort of

3    decontextualized from loan files or whether they're

4    most understandably presented to someone in the

5    context of some discrete -- a discrete sample so that

6    when you are arguing about them, it's not just sort of

7    an abstraction.

8            MR. SACKS:  Let me give you one

9    example of one that I do think we will talk about.  It

10   has to be a summary judgment issue because it will

11   define what we deem at trial, the requirement that a

12   breach have a material and adverse affect.  We have a

13   fundamentally different -- because that is the one

14   they say we are ridiculous.  We have lost it, and they

15   should win.  We have a different view on that.  Their

16   view is it's measured at the time of the

17   securitization.  Our view is, no, it has to actually

18   happen.

19            The whole presentation of the context

20   of the loans to Your Honor on the breaches will be

21   fundamentally different depending on which of those

22   interpretations is the proper interpretation of the

23   contract.  We won't be addressing issues as to whether

24   loans breached and what happened and whether -- what

29

1  caused the breach after the fact, if it's measured as

2  of the time of the securitization whereas we will be

3  dealing with issues as to what did or did not

4  materially increase a risk at that time.  It's a

5  totally different focus on both sides I would think,

6  so unless we are not going to have --

7                    THE COURT:  Again, when I try to think

8  about that abstractly, right?

9                    MR. SACKS:  Right.  I will give you an

10  example, Your Honor, Loan A.  Loan A went ahead.  They

11  allege a breach of -- stated income breach let's say,

12  and we go ahead, and the loan paid for four years and

13  then the person lost their job four years later, and

14  it defaulted a month later.  That is an example.  If

15  their interpretation of the contract is correct, the

16  fact that it paid for four years, the fact that the

17  person lost their job, and that it defaulted only

18  after the person lost their job, four years after the

19  fact may not be material, may not be the focus of

20  this.  It will only be the breach and what the

21  situation was at the time of securitization.

22                    THE COURT:  So what you are saying

23  is -- well, I think what --

24                    MR. SACKS:  I am only raising that

CHANCERY COURT REPORTERS

30

1    because that, to me, is an issue that I believe is

2    acceptable to summary judgment and will affect our --

3              THE COURT:  And what is contrary --

4    the plaintiff's argument would be if the breach -- if

5    at the time that the representation warranty was made,

6    the breach is material in the sense that the

7    difference between what was represented about the

8    borrower and what was, in fact, true about the

9    borrower would be a materially different credit risk

10   for the lender.

11             MR. WOLKOFF:  Yes, Your Honor.

12             THE COURT:  Then, the lender has a

13   remedy.  You don't look down.

14             MR. SACKS:  Correct.  That is a

15   difference of opinion we have on the contract.

16             MR. WOLKOFF:  We don't use hindsight.

17   And to take that example, Your Honor --

18             MR. RATH:  I am simply -- I am not

19   trying to argue our perspective positions --

20             THE COURT:  No.  No, I get it.  What I

21   am saying is I think I can see --

22             MR. SACKS:  That's the type of thing

23   we see as being one you would decide before you get

24   into the specifics of individual loans.

CHANCERY COURT REPORTERS

31

1          THE COURT:  That's when I said to the

2    plaintiffs, which is I understand your position to be

3    that their position is wrong and that it's actually

4    going to be decided adversely.

5          MR. WOLKOFF:  It's also incorrect,

6    Your Honor.  That is the decisions in New York were

7    correct.  This is a New York contract.

8          THE COURT:  I know.  I know.  Right.

9    So what I am saying, without getting into who is right

10   or wrong, I know that you profoundly disagree with

11   their position and you believe actually, you know,

12   that might even be binding on them or something like

13   that.  But what I'm getting at is, it may be though,

14   right?  That it's advantageous for you to get that

15   decided because, however erroneous their opinion is,

16   right, if you would prevail or you at least convince

17   me -- I might not even change their mind, right?  They

18   can still believe that a fact that a judge takes a

19   position doesn't mean that the party holding the

20   different position was wrong.

21          Ask any trial judge about whether they

22   think when they get affirmed they were always sure

23   they were right, and when they get reversed that they

24   now understand the wrong, I mean, that's just human.

CHANCERY COURT REPORTERS

32

1    I am saying that's the kind of things where I think if

2    you focus on what you all think is most important,

3    there might be actually some utility, even for the

4    plaintiffs of getting an answer to that, and you know,

5    where you don't actually disagree, yeah, okay, that's

6    in contest.  You fight like heck about the merits of

7    that but getting a ruling might actually make some

8    sense.

9                 MR. WOLKOFF:  That's the one issue,

10   Your Honor, where we would say that getting a ruling

11   would make some sense.

12                If you go down the list that we just

13   got in their reply brief on Page 4 of their reply

14   brief in support of the cross motion for entry of

15   order, you go through the list.  You know, the other

16   five legal issues that would, according to the

17   defendants, benefit from summary judgment are not

18   going to either eliminate any of the 1141 claims at

19   all, or if they did, the number would be very, very

20   small.  And you know, the other points on Page 4, Your

21   Honor, of their cross motion -- the first one is the

22   one that Mr. Sacks just mentioned materially and

23   adversely affect, and there we agree.  We think we

24   could probably benefit from having a ruling.  But the

33

1    second one they list is the meaning of the sole remedy

2    provision of Section 2.03(b).  They also list as the

3    last one, the indemnification --

4                    MR. SACKS:  We won't need the sole

5    remedy if we are not sampling.

6                    MR. WOLKOFF:  So when you go through

7    their list, the points of law -- actually, the points

8    of what a contract means when it says you have to

9    verify assets, and does that mean that you can check a

10   bank account and say, yep, he has $50,000?  Or does it

11   mean you have to go a step further and see whether or

12   not that $50,000 was a second loan, a second mortgage

13   on the same property.  Those types of things are best

14   taken up, Your Honor, we would submit in the context

15   of the trial of the 50 or 75 representative loans

16   that --

17                    THE COURT:  But what I'm saying is --

18                    MR. SACKS:  I don't necessarily

19   disagree with that.

20                    MR. WOLKOFF:  So that's something --

21                    THE COURT:  I think that's where

22   you'll each have to talk about it.  Because what you

23   should also think about is how would I argue about

24   this.

34

1          MR. WOLKOFF: Yes.

2          THE COURT: And unlike the one about

3 the materiality and when its determined, which I

4 think, you know, you can almost come up with a

5 strawman case about, some of these other things might

6 be more difficult to deal with without a loan. And

7 again, you mentioned again things would be easier with

8 75 to a hundred loans. I don't know if it's 75 to a

9 hundred loans. I don't know what the right sample is.

10 You guys would know.

11          MR. SACKS: I don't think it's

12 going --

13          MR. WOLKOFF: Whatever we can agree

14 on. I wasn't trying to prejudge a number.

15          THE COURT: I think one of the issues

16 in all these cases -- look, I guess I am relatively

17 blessed compared to some other judges around the

18 country about this, but you all are much closer to

19 this. I don't remember -- putting together the

20 witnesses for each loan thing is not going to be easy

21 to recreate, right? Probably a lot of these loan

22 officers lost their jobs.

23          MR. SACKS: We are not finding

24 individual loan officers for these loans. That's not

35

1    what any of these cases are about.  You can't find the

2    individual underwriter who wrote loan number 2654.

3                    THE COURT:  No, no, no.  What you are

4    then going to do is somehow try to recreate how the

5    file was, in fact, made.

6                    MR. SACKS:  We have the files based on

7    practice, and the arguments about what the practice is

8    and what the standards are.

9                    MR. WOLKOFF:  Industry standards, Your

10   Honor.

11                   MR. SACKS:  And what the guidelines

12   were, which are in writing.  As to what should and

13   what is material to deviate, what's immaterial, and

14   those sorts of arguments.

15                   I don't disagree with Mr. Wolkoff as

16   to some of what he was saying.  I think there is more

17   than just the one I stated that is acceptable for

18   summary judgment.  I think there are a few more we

19   would benefit by that are not loan specific, but we

20   can talk about them further.  I am happy to talk about

21   them in full, and as I say, I think your suggestion is

22   a variant of where we were headed.  I have no

23   objection to the concept of it and let's try to work

24   something out.

36

1              THE COURT:  We have some other

2    argument coming up, right?

3              MR. SACKS:  We have moved to strike

4    some of the allegations of their complaint that is

5    in -- do we have a date for the argument?

6              MR. WOLKOFF:  The reply brief is due

7    on the 12th, and we need a date.

8              MR. SACKS:  Maybe we could come back

9    for that argument and also come back and deal with the

10   scheduling order at that time.

11             THE COURT:  Does it make sense to

12   maybe require you, excepting the Friday after

13   Thanksgiving, to report back each Friday until we get

14   a schedule?

15             MR. WOLKOFF:  Yes, Your Honor.  Yes.

16             THE COURT:  And we will start with

17   next Friday.

18             MR. SACKS:  That's fine.

19             THE COURT:  Good.  Thank you.  You can

20   use the room.  Thank you.

21             MR. WOLKOFF:  Thank you, Your Honor.

22             MR. SACKS:  Thank you, Your Honor.

23        (Conference concluded at 2:45 p.m.)

24                  -  -  -

CHANCERY COURT REPORTERS

37

## CERTIFICATE

I, CHRISTINE L. QUINN, Official Court Reporter for the Court of Chancery of the State of Delaware, do hereby certify that the foregoing pages numbered 3 through 36 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF I have hereunto set my hand this 13th day of November, 2012.

/s/ Christine L. Quinn
----------------------------------
Official Court Reporter
of the Chancery Court
State of Delaware

Certificate Number:  123-PS
Expiration:  Permanent