Hearing Date: December 10, 2014 at 10:00 a.m. (EST)
Objection Deadline: December 10, 2014 at 10:00 a.m. (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                        :
In re:                                                  :        Chapter 11 Case No.
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*             :        08-13555 (SCC)
                                                        :
                      Debtors.                          :        **(Jointly Administered)**
                                                        :
-------------------------------------------------------------------x

## NOTICE OF MOTION AND HEARING REGARDING LEHMAN BROTHERS HOLDINGS INC.'S MOTION *IN LIMINE* TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF DR. CHARLES PAREKH

**PLEASE TAKE NOTICE** that by motion *in limine* dated December 9, 2014 (the "Motion"), Lehman Brothers Holdings Inc. ("LBHI") moved to exclude the reports and testimony of Dr. Charles Parekh.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take place on December 10, 2014 at 10:00am (EST), or as soon thereafter as the matter may be heard, before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623 of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004 (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Motion must be made at or prior to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that if no responses or objections are made at or prior to the Hearing, the relief may be granted as requested in the Motion without further notice or a hearing.

**PLEASE TAKE FURTHER NOTICE** that you need not appear at the Hearing if you do not object to the relief requested in the Motion.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

Dated: December 9, 2014
     New York, NY

/s/ Todd G. Cosenza
Todd G. Cosenza (tcosenza@willkie.com)
Paul V. Shalhoub (pshalhoub@willkie.com)
Roger Netzer (rnetzer@willkie.com)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019
Telephone:  (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Debtors and Debtors in Possession*

Hearing Date: December 10, 2014 at 10:00 a.m. (EST)
Objection Deadline: December 10, 2014 at 10:00 a.m. (EST)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*             :        08-13555 (SCC)
                                                    :
                    Debtors.                        :        (Jointly Administered)
                                                    :
-------------------------------------------------------------------x

### LEHMAN BROTHERS HOLDINGS INC.'S MOTION *IN LIMINE* TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF DR. CHARLES PAREKH

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator") and

Structured Assets Securities Corporation ("SASCO") (together, and collectively with their

affiliated debtors in the above-captioned cases, "Lehman" or the "Debtors") hereby move to

exclude the reports and testimony of Dr. Charles Parekh.  Dr. Parekh has been proffered by the

RMBS Trustees to opine that "employment of the Proposed Lehman Protocol would require

more than 20 years of professional and Court time."  Parekh Declaration, dated November 14,

2014 ("Parekh Decl.") (Ex. A), at 3. In support of the relief sought herein, Lehman respectfully

states as follows:

### PRELIMINARY STATEMENT

1.      Dr. Parekh is not qualified to render the opinion in his Declaration because: (1) he

lacks the requisite expertise in the subject of mortgage review; (2) he has not conducted an

independent analysis leading to his conclusion; and (3) the actual substantive expertise he

purports to rely on belongs (at best) to others with whom he claims to have spoken orally, but who have not submitted expert reports.  The evidence Parekh plans to offer therefore fails to satisfy the requirements of Federal Rule of Evidence 702.  Because it does not rest on a reliable foundation of expertise and experience, the Parekh Declaration fails to meet the minimum standard of  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) for the admission of expert testimony.  Finally, because the Parekh Declaration relays the opinions of third parties who have not submitted expert reports, such opinions constitute inadmissible hearsay not permitted under Federal Rule of Evidence 703 and barred by Rule 26(a)(2) of the Federal Rules of Civil Procedure.

### PAREKH LACKS THE REQUISITE EXPERTISE AND EXPERIENCE TO RENDER THE OPINION IN HIS DECLARATION

**A.**     **Parekh Lacks Expertise and Experience in Both Mortgage Loan Review and Mortgage Loan Repurchase Demands.**

2.     Dr. Parekh holds himself out as an expert on "statistical and economic modeling," in which he has 20 years of experience. Parekh Decl. at 2.  Lehman need not dispute those credentials at present because the closest Dr. Parekh gets to statistical modeling in his Declaration is simple arithmetic, more specifically, the multiplication of hours by number of workers. Transcript of the Deposition of Charles Parekh, dated December 5, 2014 ("Parekh Tr.") (Ex. B), at 99:8 – 100:17 ("I did the multiplication … multiplication, I guess, is some level of expertise.  But, no, it's just multiplication.").

3.     Looking past the arithmetic, the actual subjects of expertise that the Parekh Declaration addresses are (a) the process of mortgage loan review in connection with mortgage loan repurchase demands, (b) underwriter capacity in the mortgage loan review industry across

the United States, and (c) the rate at which mortgage loan reviews can be completed in the course of the large-scale mortgage loan review project contemplated by the Protocol.

4.      There can be no doubt that these are genuine subjects where proper expert testimony might aid a trier of fact.  But Dr. Parekh does not possess that expertise.  Dr. Parekh had no experience whatsoever in the mortgage loan sector prior to 2012, and the little experience he does have comes in the litigation context, rather than in the actual buying and selling of loans.  Parekh Tr. 164:9, 165:10.  Within that business sector, more than ten large companies are engaged in the business of mortgage loan review nationally, plus smaller regional enterprises.  Parekh's employer, Duff &  Phelps (which he joined in 2011) is not in either group.  Parekh Tr. 164:9, 165:10; *see also* 190:18.

5.      During his tenure there, Duff & Phelps took on a single, one-off assignment that entailed mortgage loan reviews.  Since Duff & Phelps lacked loan review expertise, it sub-contracted the work to CrossCheck Compliance.  Id. 47:10, 188:21-190:20.  Parekh received on-the-job training from CrossCheck's' loan review professionals.  Id. 111:9-113:3.

6.      Since that single engagement, Duff & Phelps has stayed out of the loan review business.  Id. 165:10-66:13, 190:18.  Given the changes in industry standards since that time, Duff & Phelps (including Dr. Parekh) does not possesses "top-flight" forensic loan review expertise, and would need to seek that expertise from outside the firm were an engagement to require it.  Id. 190:8-191:3 ("it's one of the reasons Duff & Phelps doesn't necessarily want to be in the loan review business").

7.      There is no shortage of genuine experts in the field.  By contrast with Parekh's lack of experience overseeing loan reviews, Lehman's experts have overseen more than 1500 loan review projects.

8.      As to mortgage loan repurchase demands, Dr. Parekh has no experience whatsoever.  Id. 185  ("my only experience is that I know people at the firm do this type of work [repurchase demands]… I have not been specifically involved that I can recall, at least right now.").

**B.      Parekh Lacks the Expertise to Opine As He Does That No More Than 40 Loan Reviewers Can Be Deployed to Work On the Protocol.**

9.      The sole basis for Parekh's opinion that the loan review will take five to seven years to complete is his assumption that no more than 40 reviewers can work on the RMBS Trustees Step 1 review at any given time.  Parekh Decl. at 7.  By contrast, Lehman's experts opine that at least ten times that many can be deployed at once.  Pino Declaration, dated December 3, 2014 ("Pino Decl.") (Ex. C), at 3.

10.      This is the pivotal dispute between Lehman and the Trustees, so it is illuminating to consider what Parekh did to reach his conclusion.

11.      To compensate for his own lack of pertinent experience, Parekh asked Joe Phillips, an employee of Digital Risk – the Trustees' loan review firm – one question: could Digital Risk deploy more than 20 loan reviewers to the Lehman project.  Parekh Tr. 65:15.  Mr. Philips answered that he could get 40.  Id.  Asked at his deposition whether this included outside contractors or merely Digital Risk on-site employees, Dr. Parekh did not know because he had not asked Mr.  Phillips the question.  Id. 66:17.  Asked whether Mr. Phillips had actually stated

- 4 -

that Digital Risk could not deploy more than 40 reviewers, Dr. Parekh admitted that he had not

asked.  Id. 64:17.  Asked *why* Digital Risk could not boost the number to 60, Dr. Parekh did not

know because he had not asked Mr. Phillips the question.  Id. 65:5.  Asked whether Digital Risk

would be willing to collaborate with another loan review company to increase its capacity

beyond 40 reviewers, Dr. Parekh did not know, again because he had not asked.  Id. 67:23-

69:16.

12.    Despite his lack of first-hand knowledge that was the entire breadth and depth of

the survey of loan review service providers throughout the United States that Dr. Parekh

undertook before rendering his opinion that no loan review project could involve more than 40

reviewers.  Id. 67:10.

13.    After rendering his opinion regarding the Protocol on November 14th, Parekh did

one more thing: he asked two colleagues at Duff & Phelps how many people in the United States

possess the ability to conduct loan reviews.  Id. 90:11.  The three Duff & Phelps directors (Dr.

Parekh, Mr. Aronoff, and Mr. Sauerwein) all agreed that the number does not exceed 700.  Id.

92:8-21.

14.    Mr. Aronoff, according to Dr. Parekh, had an explanation as to why Lehman's

experts might have reached a different conclusion.  It turns out the "same people"  keep getting

hired at the different mortgage loan review companies, creating the illusion that there are more

than 700 of them.  Id. 92:6.  Parekh was asked how Aronoff could know this, and he testified as

follows: "He has experience on – with loan review firms that have brought in outside reviewers

and he knows – you know, he knows who they are, and he's met with them and he's worked with

them at other companies.  So, the same people at different times, not at the same time."  Id.

94:13-19.

      **C.**        **Parekh Lacks the Experience to Opine, As He Does, That It Would Take
Approximately Three Years to Gather All Loan Mortgage Files From the
Loan Servicers.**

    15.      Parekh estimated that it will take three years to obtain the loan files from the

applicable servicers, based on conversations that he conducted with Joe Phillips at Digital Risk.

*See* Parekh Decl. at 6; *see also* Parekh Tr. 215:15-18, 218:19-23.  This is because it took, he

says, 18 to 20 months for Digital Risk to obtain the fewer than 5,000 loans analyzed in the

sample.

    16.      Dr. Parekh's analysis on the issue involves crude multiplication of the time it took

to obtain the loan files of the sample by the "30 to 40 times the number of loans than the initial

request."  Id. 221:3-5.  His sole explanation is that "you have multiples and multiples of those

same problems, and so you're going to just take more time."  Id. 221:11-13.  This opinion is

based solely on his reliance on the experience of those at Digitial Risk, coupled with

multiplication, and Dr. Parekh's ultimate conclusion in no way flows from the data cited.

      **D.**        **Parekh Lacks the Experience to Opine, As He Does, That Efficiencies Will
Not Develop During the Course of the Loan Review and Negotiation
Processes Contemplated in the Protocol.**

    17.      When asked if any efficiencies would arise during the course of the claims

negotiation process contemplated in the Protocol, Dr. Parekh stated that he does not believe that

any experience is gained from previous negotiations that could be applied moving forward,

ultimately creating such efficiencies, because "the evidence that would need to come out of the

negotiation process as the loan proceeds through the Protocol would need to be individualized for that loan." Parekh Tr. 136:2-6.

18.     Dr. Parekh specified that, "my reading of the Protocol requires that evidence be treated on an individual basis. But even generally, if you were trying to estimate claims on a loan-by-loan basis, you would have to look at the totality of each loan to determine whether or not it has a claim." Id. 135:12-18.  He further opined that a problem with extrapolating from one Lehman loan to the next is that "by generalizing from one loan to the next, you would be potentially ignoring the totality of what might – what might create a breach. And so, two loans that might have the same breach may not both result in the same kind of claim." Id. 137:9-14.

19.     Dr. Parekh has failed to articulate any reason why efficiencies would not develop over the course of a loan-by-loan review, if implemented.  It fully comports with the carrying out of such a review that loans would be categorized in a manner during the course of the review and negotiation processes, that a decision as to one loan becomes a decision as to all in any given category.

20.     As such, experience gained throughout the implementation of the Protocol will aid both sides, allowing them to apply lessons learned from similar loans and resolve claims on a group – rather than individual – basis in order to streamline the process. *See* Declaration of William Alread, dated December 3, 2014 ("Alread Decl.") (Ex. D), at 9-11.  Loan-by-loan review will create efficiencies.  Indeed, it is *solely* through the loan-by-loan analysis in the Protocol that similarities among loans – such as, identical breaches – will be discovered, thereby allowing the parties to negotiate loans in a more efficient manner. *See* Pino Decl. at 5; Alread Decl. at 10.

- 7 -

21.    Furthermore, Dr. Parekh's rejection of the idea that any efficiencies will develop, coupled with his insistence that an "individualized" analysis is necessary for each and every loan, is an admission that sampling cannot work precisely – because it requires generalization from one loan to the next without the foundation of knowledge provided by a loan-by-loan review.

### E.    Parekh Did Not Arrive at His General Opinion Regarding the Protocol Independent of His Client's View That a Loan-By-Loan Review Takes Too Long and Costs Too Much.

22.    Dr. Parekh did not give any consideration on his own as to whether a loan-by-loan review of the RMBS claims is a viable alternative to a sampling methodology.  When asked if he engaged in any discussions with the Trustees prior to July or August 2014 regarding the potential of performing a loan-by-loan analysis, Dr. Parekh stated, "I don't recall being involved in any personally."  Parekh Tr. 33:16-25.  He further clarified that "the *clients* expressed what I would characterize as disbelief in an ability to do a loan-by-loan review practically."  Id. 34:9-13 (emphasis added).

### ARGUMENT

### A.    Dr. Parekh's Qualifications As an Expert Do Not Comport With the Federal Rules of Evidence or the Standard Articulated in *Daubert*.

23.    Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b)  the testimony is based on sufficient facts or data;

    c)  the testimony is the product of reliable principles and methods; and

    d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

24.    Under Rule 702, district courts must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" before admitting or considering expert testimony for any purpose. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-51 (1999). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helfpul." *Daubert*, 509 U.S. at 591 (citation omitted). In assessing reliability, courts "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

25.    "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Second Circuit has consistently excluded expert testimony that does not do so. *See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-68 (2d Cir. 1997) (expert testimony properly excluded where "report was probative of no material fact"); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-23 (2d Cir. 1996) (expert testimony inadmissible under Rule 702 where "not accompanied by a sufficient factual foundation"). On this basis, bankruptcy courts in this district have granted motions *in limine* to exclude the testimony of experts who fail to meet the standards enumerated in *Daubert*. *See, e.g.*, *In re*

*Eastman Kodak Co.*, No. 12-10202, 2013 WL 4413300, at *5 (Bankr. S.D.N.Y. Aug. 15, 2013);

*In re Worldcom, Inc.*, 371 B.R. 33, 42 (Bankr. S.D.N.Y. 2007).

26.    For the reasons set forth below, the anticipated testimony of Dr. Parekh has no

basis in his own experience or expertise and merely relays the opinions of other experts, and it is

therefore irrelevant to the issues to be resolved in these proceedings, rendering it inadmissible

under Rule 702.

**B.    Dr. Parekh Merely Relies on the Experience and Expertise of Others, Without Providing Any of His Own Expertise, Thereby Violating Federal <u>Rule of Evidence 703.</u>**

27.    Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

28.    Rule 703 does not allow mere recitation of another expert's hearsay conclusions.

"Under Rule 703, an expert can testify to opinions based on inadmissible evidence in forming

their opinions. . . . The expert may not, however, simply transmit that hearsay to the jury.

Instead, *the expert must form his own opinions by applying his extensive experience and a*

*reliable methodology to the inadmissible materials.*   Otherwise, the expert is simply repeating

hearsay evidence without applying any expertise whatsoever, a practice that allows [the party

offering the expert's testimony] to circumvent the rules prohibiting hearsay."   *Unites States v.*

*Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations and quotation marks omitted) (emphasis

- 10 -

added); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("Although

the Rules permit experts some leeway with respect to hearsay evidence, . . . a party cannot call an

expert simply as a conduit for introducing hearsay under the guise that the testifying expert used

the hearsay as the basis for his testimony.") (citations and internal quotation marks omitted).

29.     Courts in the Second Circuit follow *Mejia* by drawing a distinction between

merely *repeating* source materials (not acceptable) and *synthesizing* information from these

source materials in order to form an independent expert opinion (acceptable).  *See*, *e.g.*,

*Broadspring, Inc. v. Congoo, LLC*, 2014 U.S. Dist. LEXIS 116070, *45-46 (S.D.N.Y. 2014)

("Here, in some portions of his report, [the expert witness] has relied on his specialized

knowledge in the field of information security *to synthesize information from his diverse sources*

*and to form an opinion* as to whether FavoriteMan or Netpals were, indeed, spyware. . . . In those

respects, his testimony is proper and Plaintiff's motion [to exclude the expert testimony] is

without merit.  At other points, however, [the expert witness]'s report crosses the line into

*improper regurgitation of hearsay*.").

30.     Dr. Parekh's testimony is grounded solely in his two and a half years of

experience in the mortgage loan industry, and his experience in reviewing approximately 200

loans without the supervision of an experienced mortgage loan reviewer.  Parekh Tr. 46:7-12,

112:6-11.  Aside from this limited contact with the industry, Dr. Parekh's opinions are culled

together through conversations with actual experts in mortgage loan review from Digital Risk

and from his conversations with his more experienced colleagues, Mr. Aronoff and Mr.

Sauerwein.  Thus, any opinions that Dr. Parekh might offer on the alleged feasibility or potential

timing of the proposed Lehman Protocol are irrelevant here and inadmissible under Rules 702

and 703.  Accordingly, this purported evidence, whether embodied in Dr. Parekh's reports or in

trial testimony, should be excluded *in limine*. *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 178 (S.D.N.Y. 2012) (testimony of finance professor and former chief economist of SEC inadmissible where "expert testimony would not be helpful" to resolving the issue in dispute); *United States v. Brooks*, No. 08 Cr. 35, 2008 WL 2332371, at *2 (S.D.N.Y. June 4, 2008) (testimony of financial expert inadmissible where proposed subjects of testimony were irrelevant to the issues in dispute); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 555 (S.D.N.Y. 2004) (testimony of pharmaceutical experts inadmissible where proposed testimony "would not assist the trier to determine a fact in issue").

## CONCLUSION

For the foregoing reasons, Lehman respectfully requests entry of an order *in limine*

precluding the Trustees from offering the expert reports from, or testimony of, Dr. Charles

Parekh, at trial to the extent that he (1) lacks expertise in any area that would aid the trier of fact,

and (2) impermissibly relays the hearsay opinions of other experts, and awarding Lehman such

other and further relief as the Court deems just and proper.


Dated: December 9, 2014
      New York, NY

             /s/ Todd G. Cosenza
Todd G. Cosenza (tcosenza@willkie.com)
Paul V. Shalhoub (pshalhoub@willkie.com)
Roger Netzer (rnetzer@willkie.com)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019
Telephone:  (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 1:08-bk-13555 (SCC)** |
| **Lehman Brothers Holdings, Inc., et al.,** | **Chapter 11** |
| **Debtors.** | **Jointly Administered** |

**DECLARATION OF CHARLES A. PAREKH, PH.D.**

**November 14, 2014**

## Table of Contents

I.   Scope of Work.................................................................................................................1

II.  Experience and Qualifications....................................................................................1

   A.   Summary of Conclusions .......................................................................................3

III. Time and Cost Associated with the Proposed Lehman Protocol.........................3

   A.   Summary of the Proposed Lehman Protocol.......................................................3

   B.   Scenario 1 and Scenario 2 Time and Cost...........................................................4

   C.   Scenario Inputs and Assumptions.........................................................................5

   D.   Total Time and Cost.............................................................................................12

IV.  Reservation of Rights and Compensation Disclosure ...................................13

## List of Attachments

Attachment I ......................................................................... Resume of Charles A. Parekh, Ph.D.

Attachment II ................................................................................List of Documents Considered

Attachment III...................................Time and Cost Associated with Proposed Lehman Protocol

## I.    Scope of Work

1.    I, Charles A. Parekh, Ph.D., have been asked by Alston & Bird LLP, Seward & Kissel LLP, Chapman and Cutler LLP, and Nixon Peabody LLP ("**Law Firms**"), counsel to Wilmington Trust, National Association; Wilmington Trust Company; Law Debenture Trust Company of New York; U.S. Bank, National Association; and Deutsche Bank National Trust Company ("**Trustee Group**" or "**Trustees**") to provide an analysis of the Lehman Brothers Holdings, Inc. ("**Lehman**") Plan Administrator's proposed claims resolution protocol ("**Proposed Lehman Protocol**") as described in *Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees* (the "**Cross-Motion**"). The conclusions presented in this Declaration result from work performed by me and by my colleagues at Duff & Phelps, LLC ("**Duff & Phelps**").

## II.    Experience and Qualifications

2.    I am a Director at Duff & Phelps specializing in the application of economic and statistical analysis to damages, finance, and public policy issues. I have over fourteen years of experience working in dispute consulting and litigation support. My experience includes work in the securities, technology, and education industries.

3.    Duff & Phelps is a premier global valuation and corporate finance advisor with expertise in complex valuation, dispute consulting, mergers and acquisitions, and restructuring. The firm's more than 1,000 employees serve a diverse range of clients from offices in North America, Europe and Asia. Duff & Phelps' experience includes numerous valuations of RMBS claims related to breaches of representations and warranties, including serving as the RMBS trustees' financial advisor in the Residential Capital ("**ResCap**") bankruptcy. Duff & Phelps' team includes professionals possessing a vast array of expertise in mortgage loan origination, bankruptcy and restructuring, financial forecasting, and statistical analysis.

4.  I have led dozens of matters involving the use of statistical and economic modeling in order to calculate damages and losses. My RMBS experience includes leading the statistical and modeling teams in the use of sampling to estimate repurchase liabilities in multiple mortgage-backed securities litigations and bankruptcies, including the ResCap bankruptcy.

5.  Additionally, I have extensive experience in applying statistical and economic analysis to litigation issues, including an assessment of the economic efficiency of electronic waste recycling, an analysis of damages from cigarette smoking, an examination of school efficiency and test score performance in New York City Public Schools, a study of school organization and educational outcomes, an evaluation of EPA clean air regulations, and an assessment of U.S. Postal Service pricing strategies. In the past, I provided expert testimony on the statistical evidence involved with randomly testing high school students for drug and alcohol use. In addition, I employed statistical analysis to investigate a whistle-blower complaint alleging the University of Illinois College of Law inflated admissions data, including LSAT scores and GPAs of incoming classes.

6.  I hold a Ph.D. concentrating in Public Finance from New York University, as well as a M.P.P. in Public Policy Analysis from the University of Chicago, and a B.A. in Economics from Colgate University.

7.  The conclusions set forth in this Declaration are my own and are based on work that I performed, or on work performed by my colleagues at Duff & Phelps under my supervision. In those instances where tasks were performed by my colleagues, I reviewed their work and determined that it was appropriate to rely upon that work.

8.  My resume is attached to this Declaration as **Attachment I**.

9.  The documents and other evidence considered in forming my conclusions are listed in **Attachment II**. I reserve the right to update this listing.

## A.  Summary of Conclusions

10.  Based on study of the documents and other evidence considered, my experience with RMBS repurchase matters, the experience and knowledge of my colleagues at Duff & Phelps, and my experience, education, and training, I conclude the following:

- Submitting claims employing the Proposed Lehman Protocol would require more than 20 years of professional and Court time and cost over $100 million dollars.[1]

11.  A discussion of the bases for my conclusions is set forth in the balance of this Declaration.

## III. Time and Cost Associated with the Proposed Lehman Protocol

## A.  Summary of the Proposed Lehman Protocol

12.  The Proposed Lehman Protocol involves the following steps.[2] This description of the Proposed Lehman Protocol steps is not meant to capture every requirement set forth in the *Cross-Motion*; rather, it depicts five general steps that would require significant time and expense to the Trustees and to Lehman. Requirements of the Proposed Lehman Protocol not presented in this Declaration could add significant time and cost to accomplish, beyond what is covered herein.

- Claim Submission on a loan-by-loan rolling basis [I.a.i-iii];

- The Plan Administrator's review and decision of each Claim Submission [I.b.i];

- Negotiations of claims amounts for claims rejected by the Plan Administrator [I.e];

- Review of rejected and unresolved claims by a Claims Facilitator [I.f-II.f];

- Court review of remaining disputed claims [III.a-d].

---

[1] My conclusions do not extend to the question of the ability of the Trustees to satisfy the requirement in Part I.a.iii of the Proposed Lehman Protocol that sets a Claim Cut-Off Date of 60 days.
[2] The Proposed Lehman Protocol is set forth in Exhibit C to the *Cross-Motion*. For the listing of steps, above, I reference specific parts of the Proposed Lehman Protocol in brackets.

## B.    Scenario 1 and Scenario 2 Time and Cost

13.    This Declaration presents two scenarios that estimate the time and cost associated with the
Proposed Lehman Protocol. The scenarios employ the same inputs and assumptions
(described below and in **Attachment III**); however, they differ in the number of loans
modeled to participate in the Proposed Lehman Protocol.

14.    Table 1 presents the time and cost associated with the Proposed Lehman Protocol based on
claims arising from a universe of 213,974 loans ("**Scenario 1**"). Scenario 1 represents
416,091 Covered Loans in 255 Covered Trusts,[3] less any loan that paid-in-full as of June
2014. Paid-in-full loans are removed from the analysis, because no claim arises from these
loans. Additionally, the 4,579 loans already reviewed by the Trustees are removed from the
number of loans for review.

**Table 1: Scenario 1 — Covered Loans Less Loans Paid-in-Full**

| | | | |
|---|---|---|---|
| Number of Loans | | | 213,974 |
| Number of Loans for Review: | | | 209,395 |
| Cost to Trusts to Satisfy Protocol | $95,734,208 | - | $127,143,458 |
| Cost to Estate to Satisfy Protocol | $73,877,245 | - | $92,172,318 |
| Total Cost to Satisfy Protocol: | $169,611,453 | - | $219,315,775 |
| Total Labor-Years Needed to Satisfy Protocol: | | | 55.0 |
| *Years Needed to Satisfy Protocol (Running Basis):* | | | |
|     Protocol Process Completes Prior to Court Review | | | 35.7 |
|     Court Review Performed Seriatim | | | 27.6 |

15.    In Scenario 1, the total cost to satisfy the Proposed Lehman Protocol ranges from $170
million to $219 million and would require nearly 28 years to complete, if the Court is able to
rule on claims, seriatim.[4] If the Court chooses to wait until all claims are ready for its
attention, then the required time increases to nearly 36 years. The time and cost estimate
includes receiving 209,395 Covered Loans from the servicers, reviewing the loans for
breaches, a review of the submitted loans by the Plan Administrator, negotiations over

---

[3] Covered Loans and Covered Trusts are defined in the *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014
(ECF 46080), p. 1.
[4] The analysis presented in Scenarios 1 and 2 omits some potentially time-consuming aspects of the Proposed
Lehman Protocol, such as the allowance of 30 days for the Claim Facilitator to render a decision on each loan, and
the allowance of 20 business days before a party must submit a primer to the Claims Facilitator. Rather, the time
estimates presented in Scenarios 1 and 2 assume that the throughput of loans proceeds on a continuous basis.

claims rejected by the Plan Administrator, a review of unresolved claims by the Claim Facilitator, and, finally, a Court review of any unresolved claims for final resolution.

16. Table 2 presents the time and cost associated with a claim based on the subset of Covered Loans that have liquidated with a loss (as of June 2014) plus loans expected to liquidate with a loss in the future ("**Scenario 2**"). While the universe of loans from which a claim may arise is 213,974 active Covered Loans, it is likely that some of these active loans will move from an active to a paid-in-full status. Therefore, even though any Covered Loan with a breach may be eligible for a claim, I have restricted the analysis presented in Scenario 2 to the 161,797 loans that have already suffered a loss or are expected to suffer a loss in the future.

**Table 2: Scenario 2 — Covered Loans with a Loss or Projected Loss**

| | | | |
|---|---|---|---|
| Number of Loans | | | 161,797 |
| Number of Loans for Review | | | 157,218 |
| Cost to Trusts to Satisfy Protocol | $72,110,698 | - | $95,693,398 |
| Cost to Estate to Satisfy Protocol | $55,862,763 | - | $69,696,702 |
| Total Cost to Satisfy Protocol: | $127,973,461 | - | $165,390,100 |
| Total Labor-Years Needed to Satisfy Protocol: | | | 42.3 |
| *Years Needed to Satisfy Protocol (Running Basis):* | | | |
| Protocol Process Completes Prior to Court Review | | | 27.0 |
| Court Review Performed Seriatim | | | 21.0 |

17. In Scenario 2, the total cost to satisfy the Proposed Lehman Protocol ranges from $128 million to $165 million and would require 21 years to complete if the Court reviews seriatim and 27 years if the Court waits for the claims process to complete. The time and cost estimate includes receiving 157,218 Covered Loans from the servicers, reviewing the loans for breaches, a review of the submitted loans by the Plan Administrator, negotiations over claims rejected by the Plan Administrator, a review of unresolved claims by the Claim Facilitator, and, finally, a Court review of any unresolved claims for final resolution.

## C.  Scenario Inputs and Assumptions

18. Both Scenarios 1 and 2 employ several inputs whose values are based, among other things, on my experience with this bankruptcy and other RMBS matters, the experience of my colleagues at Duff & Phelps in this bankruptcy and other RMBS matters, and discussions

with key personnel at the Trustees' loan review firm, Digital Risk, LLC ("**Digital Risk**"). In some cases, the Proposed Lehman Protocol requires steps for which the time and cost is relatively well understood. For example, Digital Risk has already obtained and reviewed a sample of over 4,500 loans, and I am able to base my estimates of loan review time and cost on this previous review.[5]

19.  In other cases, estimating the time and cost requires assumptions of Lehman's staff size, costs, and efficiency, which are unknown to me. Additionally, at times, the Proposed Lehman Protocol is ambiguous or unclear to me in its requirements. In these cases, I have made reasonable assumptions based on my experience, and that of my colleagues at Duff & Phelps, in order to illustrate the time and cost associated with the Proposed Lehman Protocol. While I believe these illustrative assumptions are reasonable, I cannot attest to their precision. As such, whenever possible, I have made conservative assumptions or eliminated steps from my analysis altogether, resulting in estimates that are likely to understate the time and cost associated with the Proposed Lehman Protocol.

20.  Each Scenario is divided into multiple steps, labeled Step 0 through Step 5. I will discuss each step, in turn.

i.      **Step 0: Receive Loans from Servicers**

21.  I make the assumption that the Trustees can request and receive all requested loan files from the applicable servicers within a period of three years. This assumption is based on conversations with Digital Risk, in which I was informed that they received 4,579 of 5,000 requested sample files in approximately 18-20 months.[6] The number of loans required for review by the Proposed Lehman Protocol is 30 to 40 times greater than the initial request of 5,000 loans, and Digital Risk informs me that such a large request would take substantially longer to fulfill than the initial request.[7] Because it is not necessary to wait until all the files are received, I make the assumption that after one month, the Trustees would receive a

---

[5] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), pp. 4-5.
[6] Interviews with Joe Phillips, Digital Risk.
[7] Interviews with Joe Phillips, Digital Risk. Mr. Phillips informed me, the time frame assumes the files would arrive, complete and correctly identified, as a single electronic file for each loan file, meaning the files would not require effort to electronically split apart or stich together. Additionally, it assumes the loan numbers and the servicer file numbers can be readily mapped to each other.

sufficient number of files to begin their review process, and, at no time, does the review queue ever diminish to the point of slowing the review process.

22. The estimated three-year time frame to request and receive files is based on Digital Risk's typical loan file request for the purposes of a review for breaches of representations and warranties. The total time required to receive loan files for the purposes of fulfilling the Proposed Lehman Protocol could be greater than a typical loan file request. The Proposed Lehman Protocol states that a complete RMBS Claim file includes, among other things, 43 separate items from the Mortgage Loan File, Credit File, and Servicing File.[8] In the Trustees initial request of 5,000 loan files they were unable to obtain all the documents required for a complete RMBS Claim File, as defined in the Proposed Lehman Protocol, for a number of loan files.[9] In addition, the Trustees were missing all, or substantially all, of 421 of the 5,000 files initially requested.[10] Given the missing documents and missing loan files in the initial request of 5,000 loans, obtaining all the loan files complete with all the documents necessary to comply with the Proposed Lehman Protocol could take significantly longer than three years, if it is possible at all.[11]

### ii.    Step 1: Review Remaining Loans

23. As stated above, I assume that the Trustees are able to commence a loan review of either 209,395 loans (Scenario 1) or 157,218 loans (Scenario 2) one month after requesting the loans from the applicable servicers. Based on a conversation with Digital Risk, I use the assumptions that the loan review process would involve 40 reviewers reviewing three loans per day, each, for a total of 120 loans per day, and would work all 251 working days per

---

[8] *Cross-Motion*, Exhibit C-1.
[9] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), Attachment IV, and Interviews with Joe Phillips, Digital Risk.
[10] *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), p. 5.
[11] If the documents required by the Proposed Lehman Protocol were not obtained by the originator in the first place, and those missing documents result in a breach determination, the Trustees would not be able to provide those documents in the RMBS Claim file, even though the missing documents constitute the reason for the breach determination.

year.[12] Based on this rate, it would require 7 years (Scenario 1) or 5 years (Scenario 2) to complete the loan review.

24.  Digital Risk's current loan review costs are approximately $400 per loan; however, when the Trustees engaged Digital Risk, their cost per loan was as low as $250 per loan.[13] Based on the original cost and on the current cost per loan, I provide a range of costs for the loan review of $52 million to $84 million (Scenario 1) or $39 million to $63 million (Scenario 2).

### iii.    Step 2: Plan Administrator Reviews Repurchase Requests

25.  Beginning one month into the multi-year loan review process, I assume that the Trustees will begin presenting claims to the Plan Administrator, and the Plan Administrator is able to review claims on a non-stop rolling basis until all the claims have been presented. The Trustees' review of 4,579 randomly-selected Covered Loans determined material breaches in 2,612 Covered Loans, a breach rate of 57%.[14] This breach rate implies that for the entire population of Covered Loans, the Trustees would present claims to the Plan Administrator on 121,967 loans (Scenario 1) or 92,226 loans (Scenario 2).

26.  I assume the Plan Administrator would conduct its loan review employing 20 reviewers, reviewing three loans per day, for all 251 annual working days to review these loans, at a cost of $250 to $400 per loan. This implies that the Plan Administrator would require eight years and $30 million to $49 million (Scenario 1) or six years and $23 million to $37 million (Scenario 2) in order to complete its review.

27.  Duff & Phelps has reviewed the breaches that determined the 57% material breach rate and has concluded that these breaches represent proper repurchase requests.[15] Based, however, on assertions made by Lehman, I assume the Plan Administrator would challenge some portion of these findings.[16] Consequently, I assume that, of the loans presented to the Plan

---

[12] Interview with Joe Phillips, Digital Risk. Mr. Phillips informed me that finding more than 20 reviewers would be difficult; however, with enough lead time and significant effort it may be possible to find as many as 40 qualified reviewers. I assume that 40 reviewers are employed throughout the entire review process.
[13] Interview with Joe Phillips, Digital Risk.
[14] *Declaration of James H. Aronoff*, August 21, 2014 (ECF 46085), p. 12.
[15] *Declaration of James H. Aronoff*, August 21, 2014 (ECF 46085), p. 5.
[16] *Cross-Motion*, p. 32.

Administrator, there would be an initial disagreement on 50% of those loans.[17] This implies that the Plan Administrator would deny claims on 60,984 loans (Scenario 1) or on 46,113 loans (Scenario 2).

### iv.    Step 3: Trustees Negotiate Declined Repurchase Requests

28.    Beginning one month after the Plan Administrator receives and reviews claims, the Trustees and the Plan Administrator would enter into negotiations over the 46,113 to 60,984 denied claims. For these negotiations, I assume that each of the four Trustees can individually, simultaneously, and continually negotiate with Lehman at a rate of ten loans per day, each — or 40 loans per day in total. Based on 251 eight-hour days per year, the negotiations would require six years (Scenario 1) or five years (Scenario 2).

29.    The cost of the negotiation is assumed to be $600 per hour, based on one negotiator on each side charging $300 per hour, apiece. This results in a total cost of $29 million (Scenario 1) and $22 million (Scenario 2). Unlike Steps 0-2, Step 3 involves both the Plan Administrator and the Trustees. Therefore, I allocated the total cost of Step 3 equally between the Trusts and the Estate.[18]

30.    I assume that negotiations can resolve claims on 25% of the unresolved claims, resulting in 45,738 loans (Scenario 1) or 34,585 loans (Scenario 2) being passed on to the Claim Facilitator for review.

### v.    Step 4: Claim Facilitator Reviews Unresolved Repurchase Claims

31.    For the 34,585 to 45,738 claims unresolved between the Trustees and the Plan Administrator, the Proposed Lehman Protocol requires review by a Claim Facilitator. I assume that one month after Step 3 commences, unresolved claims will begin flowing to the Claim Facilitator. If five facilitators can review ten loans per day, each, for 251 eight-hour

---

[17] Lehman's expert stated that 40% of loans with breaches would meet the material and adverse standard, implying a disagreement with the Trustees over 60% of the loans. *Declaration of Zachary Trumpp* (ECF 24255), January 12, 2012, pp. 7-8. Compared to Mr. Trumpp's statement that there would be disagreements at a 60% rate, the 50% assumption I use results in fewer loans passed on to Step 3, and thus results in lower time and cost estimates for Step 3.

[18] I have no insight into Lehman's cost structure, and a 50/50 split provides an illustrative allocation of the total cost of Step 3.

days per year, it would require four years (Scenario 1) or three years (Scenario 2) for the Claim Facilitator to review all the remaining claims.

32. The cost for the Claim Facilitation is an hourly rate, per facilitator, of $500, which is derived from the rate of an experienced arbitrator or attorney who might serve as a facilitator.[19] The total cost of facilitation, therefore, is $18 million (Scenario 1) or $14 million (Scenario 2). This cost is allocated evenly between the Trusts and the Estate.[20]

33. The Scenarios employ the assumption that 75% of the remaining disputed claims are resolved by the Claim Facilitator, and 25% of any remaining claims proceed to the Court for a final (and binding) resolution. This equates to 11,434 loans (Scenario 1) or 8,646 loans (Scenario 2) coming before the Court for a series of hearings to determine breaches and damages on a loan-by-loan basis.

**vi.    Step 5: Court Reviews for Final Resolution**

34. To illustrate the time needed to resolve claims on 8,646 to 11,434 loans I assume that the Court can dedicate one full week each month (a week comprises five eight-hour days) to resolving the disputed claims at a rate of seven loans per day. Based on my experience, and based on discussions with my colleagues at Duff & Phelps, it is not realistic to expect that a Court would be able to review and determine breaches and damages on a loan-by-loan basis at a rate of seven loans per day, but I assume that such an overall brisk rate would be reached if the parties gain experience over the years of review. At this assumed rate, the Court would require 27 years (Scenario 1) or 21 years (Scenario 2) to resolve the remaining claims.

35. The cost of these hearings is based on one attorney and one expert for each side, all billing at a cost of $750 per hour, for a total of $3,000 per hour (split evenly between the Trusts and the Estate). The cost considers only time spent in Court and excludes Court costs and any

---

[19] For example, ADR Services, Inc. publishes hourly rates in the range of approximately $375-$600 per hours, plus expenses and fees (http://www.adrservices.org/rates.php).
[20] The Proposed Lehman Protocol states that the Non-Prevailing Party is responsible for the costs and fees of the Claim Facilitator and of the Prevailing Party, unless or until the court reverses the Claim Facilitator's decision. Because of the uncertainty of such outcomes, I illustrate the cost of Step 4 using an equal split between the parties.

other costs associated with trial. The total cost of trying the remaining claims on a loan-by-loan basis is $39 million (Scenario 1) and $30 million (Scenario 2).

36. In terms of when the Court would begin hearing the claims, I provide two assumptions: 1) that the Court hears loans seriatim, beginning Step 5 one month after Step 4 commences, and 2) that the Court waits until completion of Steps 0-4 before beginning the hearings. The assumption does not affect the cost or the total labor hours needed to satisfy the Proposed Lehman Protocol; however, it does shorten the overall time required if the Court proceeds alongside all the other steps.

37. Table 3 summarizes the inputs to Scenario 1 and Scenario 2.

**Table 3: Summary of Inputs to Scenario 1 and Scenario 2**

| | |
|---|---|
| **Step 0** | **Receive Loans From Servicers** |
| | 3 Years to Receive All Loans from Servicers |
| | |
| **Step 1** | **Review Remaining Loans** |
| | 40 Reviewers |
| | 3 Loans Reviewed per Day (Each) |
| | 251 Review Days per Year |
| | Cost of $250 to $400 per Loan |
| | |
| **Step 2** | **Plan Administrator Reviews Repurchase Requests** |
| | 57% Material Breach Rate |
| | 20 Plan Administrator Loan Reviewers |
| | 3 Loans Reviewed per Day (Each) |
| | 251 Review Days per Year |
| | Cost of $250 to $400 per Loan |
| | |
| **Step 3** | **Trustees and Plan Administrator Negotiate Declined Repurchase Requests** |
| | 4 Simultaneous Negotiations (1 Each per Trustee) |
| | 251 8 Hour Negotiation Days per Year |
| | $600 Cost per Hour |
| | |
| **Step 4** | **Claim Facilitator Reviews Unresolved Repurchase Claims** |
| | 5 Facilitators Working Simultaneously |
| | 10 Loans per Day Reviewed (Each) |
| | 251 8 Hour Negotiation Days per Year |
| | $500 Cost per Hour |

11

| Table 3: Summary of Inputs to Scenario 1 and Scenario 2 | |
| --- | --- |
| **Step 5** | **Court Reviews for Final Resolution**<br>7 Loans Reviewed via Mini-Trial Each Day<br>Court Devotes 1 Week per Month (60 8 Hour Days per Year)<br>1 Attorney and 1 Expert for Each Side at $750 per Hour Each ($3,000 per Hour) |

38. Table 4 summarizes the cost allocation for each Step.

**Table 4: Cost Allocation Between the Parties**

| | **Trusts** | **Estate** |
| --- | --- | --- |
| Step 0: Receive Loans from Servicers | n/a | n/a |
| Step 1: Review Remaining Loans | 100% | 0% |
| Step 2: Plan Administrator Reviews Repurchase Requests | 0% | 100% |
| Step 3: Trustees Negotiate Declined Repurchase Requests | 50% | 50% |
| Step 4: Claim Facilitator Reviews Unresolved Repurchase Claims | 50% | 50% |
| Step 5: Court Reviews for Final Resolution | 50% | 50% |

## D.   Total Time and Cost

39.   Based on the calculations detailed above, the Proposed Lehman Protocol will involve significant investments in terms of time and cost.[21] Scenario 1 is estimated to require 55 labor-years of effort and would take over 27 years, if every party were to dedicate substantial resources and work continuously on a rolling basis. Scenario 2, which reduces the number of loans on which the claim is based, is estimated to require 42 labor-years and 21 years to complete, on a rolling basis.

40.   In addition to multiple decades of professional and Court time, the estimated monetary costs to both the Trusts and the Estate would be sizeable. Scenario 1 would cost the Trusts $96 million to $127 million and would cost the Estate $74 million to $92 million, totaling $170 million to $219 million. Likewise, Scenario 2 would cost the Trusts $72 million to $96 million and the Estate $56 million to $70 million, totaling $128 million to $165 million.

---

[21] The effort involved in the Proposed Lehman Protocol is especially high when compared to the time and cost of a claim estimation methodology involving statistical sampling. See *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014 (ECF 46080), pp. 22-23.

## IV. Reservation of Rights and Compensation Disclosure

41. I reserve the right to revise or expand my conclusions to reflect any additional conclusions formulated upon newly acquired information, or arising from reflection and reconsideration of the conclusions based upon views expressed by expert witnesses, upon further study and information, including documentary and testimonial evidence introduced through deposition and trial.

42. Duff & Phelps charges an hourly rate, based on title and experience, for my services and the services of the team working on this analysis. Duff & Phelps' fees are not based, in part, or in whole, upon any conclusions presented in this Declaration, nor are they based, in part or in whole, upon the outcome of any hearings or trials employing this analysis. For this analysis, Duff & Phelps bills my time at an hourly rate of $810 per hour.

43. This Declaration is not to be reproduced, distributed, disclosed, or used for any purposes other than this Matter without prior written approval.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 14th day of November 2014, in Chicago, IL

_____

Charles A. Parekh

# ATTACHMENT I



*Charles Parekh, Ph.D.*
*Director*
*Duff & Phelps*

# PROFESSIONAL CREDENTIALS

*Charles Parekh is a Director at Duff & Phelps specializing in the application of economic and statistical analysis to damages, finance, and public finance issues. He has over fourteen years of experience working in dispute consulting and litigation support. His experience includes work in the securities, technology, and educational industries.*

*Professional Experience*

- Dr. Parekh has led dozens of matters involving the use of statistical and economic modeling in order to calculate damages and losses. He led the statistical modeling teams in multiple engagements employing sampling to estimate repurchase liabilities in multiple mortgage-backed securities litigations and bankruptcies. In addition, his statistical experience includes the sampling of transactions to detect price fixing, the use of regression techniques in internal investigations, and the use of surveys and regressions in order to value intellectual property.

- He has an extensive background in economic and policy analysis including an assessment of the economic efficiency of electronic waste recycling, an analysis of damages from cigarette smoking, an examination of school efficiency and test score performance in New York City Public Schools, a study of school organization and educational outcomes, an evaluation of EPA clean air regulations, and an assessment of U.S. Postal Service pricing strategies.

- Dr. Parekh served as an expert to the Trustees in the Lehman Brothers bankruptcy and provided expert testimony on the statistical need to randomly test students for drugs and alcohol. He also served on the team that investigated a whistle-blower complaint alleging the University of Illinois College of Law inflated admissions data, including LSATs and GPAs of incoming classes. He has also led multiple consulting engagements assisting law schools in reporting their graduate employment statistics.

### SELECTED CONSULTING EXPERIENCE:

**RMBS Financial Advisory**
Project leader of team that performed financial analysis and advisory for the Trustee of a pool of RMBS trusts. Work included sampling and statistical analysis of the mortgage pools, as well as a the determination of breaches of representations and warranties of the trust governing agreements.

**Lehman Brothers RMBS Bankruptcy**
Project leader of team that advised the Trustees of a pool of RMBS trusts throughout the bankruptcy process. Work involved evaluating a sample of loans from several hundred trusts that was selected by the third-party firm and determining the value of the sample for the Trustees' needs. In addition, provided an estimation of claims arising from breaches of representations and warranties.

**Residential Capital RMBS Bankruptcy**
Led the statistical and economic analysis team tasked with advising the Trustees of a multi-billion dollar pool of RMBS trusts. Work involved statistical sampling of millions of mortgages from nearly hundreds of trusts in order to determine the number and value of repurchase requests due to breaches of trust representations and warranties. Additionally, primarily responsible for managing, preparing, and drafting expert testimony on the statistical analysis performed.

*Professional*
*Experience*
*(continued)*

**Need for Random Drug Testing, Loyalsock, PA, School District**

Testified in court and submitted a written expert report covering the statistical need to drug test middle and high school students. Analyses included a statistical review of the school district's drug and alcohol incident data and an analysis of the surveys and methodologies used by the school district to justify random testing.

**Statistical Fraud Detection**

Served as expert consultant for a large options exchange to assist them in the development of a protocol for reviewing and analyzing the Exchange's trading and regulatory data. This protocol assists the exchange in regulatory and enforcement actions and covered methods to monitor, detect, and prosecute violations of Regulation SHO, which aims to prevent unethical traders from engaging in illegal naked short selling practices.

**Healthcare False Claims Act**

Served as statistical and calculation expert for a healthcare provider accused of submitting false claims for public and private insurance reimbursements. Work included the sampling of hundreds of thousands of invoices for service to determine the level of overpayment and damages associated with overpayments. In addition, the analysis calculated overpayments using multiple forecasting methods.

**University of Illinois College of Law Investigation**

Served as co-investigator of a whistle-blower complaint alleging the College of Law inflated admissions statistics, including LSATs and GPAs of incoming classes. Also provided recommendations to the College of Law to assist in improving its internal controls and the accuracy of its reporting. Retained in subsequent year to provide a review of the accuracy of externally-reported statistics to the ABA and *US News & World Report*.

**Alzheimer Drug Intellectual Property Litigation, Large Pharmaceutical Manufacturer**

Calculated damages due to an unjust enrichment claim against client. Disputed economic logic of plaintiff's complaint, and calculated revised past and future earnings from a major Alzheimer drug. Work involved a theoretical and statistical analysis of relevant markets, as well as statistical forecasting of future earnings.

**Electronic Waste Recycling Analysis, Consumer Technology Industry Association**

Performed an economic analysis of consumer electronic waste recycling legislation in New York City. Work included an economic assessment of the legislation, including both a technical and a theoretical analysis of its economic efficiency, as well as an analysis of related proposals and counter proposals in order to advise client of the best course of action regarding the legislation.

**Tobacco Damage Calculation, Several Large Tobacco Manufacturers**

Provided economic and strategic consulting to several tobacco manufacturers regarding alleged damages incurred by a group of private and public hospital systems. Assisted clients in disputing the economic logic of claims and provided econometric analysis to support the results.

*Professional*
*Experience*
*(continued)*

**Mail Sorting Technology, US Postal Service**

Analyzed and prepared written report on the effects of advances in mail sorting technology on mail volume and revenue to determine if technological improvements in scanning and sorting technology resulted in new financial incentives for small mailers.

**Postal Pricing Strategies, US Postal Service**

Analyzed and prepared written report on several alternative pricing strategies for the Postal Service. These strategies centered on price caps and rate-of-return regulation and were used to justify increases in postal rates.

**Electronic Bill Payment and Processing, US Postal Service**

Analyzed and prepared written report on the effects of electronic bill payment and presentment (EBPP) on First Class mail volumes. Generated long-term forecasts of the adoption rates of EBPP and its effect on mail volumes, confirming that the shift from paper bill payment to electronic bill payment has had a profound impact on the Postal Service. These forecasts were used to justify increases in postal rates.

**Calculation of Damages and Value of Life, USG Corporation**

Used demographic and income data to estimate costs of morbidity and mortality related to asbestos exposure. Estimated damages for several thousand individual litigants claiming damages due to exposure. Created value of life models that matched each plaintiff on a case-by-case basis. Analysis was used in expert testimony to support the structuring of a class action settlement.

**Economic Analysis of Contract Dispute, Comcast Cable Corporation**

Provided economic analysis for Comcast Cable's disputed contract with a large billing vendor. Devised litigation strategy and assisted in writing expert testimony to provide an economic basis for nullification of the contract.

**Economic Analysis of Market Concentration, Dean Foods and Suiza Foods**

Analyzed local market competitiveness for the merger of Dean Foods and Suiza Foods. Used plant location, plant capacities, and shipping routes to demonstrate that Dean and Suiza did not compete for school milk contracts in specific local markets. Devised alternative measures for market concentration where data was incomplete. Analysis was used in expert testimony to support the case for merging under federal antitrust statutes.

**Economic Analysis of Market Substitutes, eBay and PayPal**

Conducted economic research regarding market substitutes for PayPal's payment system. Projected ability of market substitutes to compete with PayPal post-acquisition, ultimately demonstrating that the current level of competition would remain virtually unchanged. Analysis was used in expert testimony to support the case for merging under Federal anti-trust and banking laws.

**Oil and Gas Intellectual Property Litigation, Large Oil and Gas Well Services Provider**

Calculated damages for a large drilling services provider in a dispute and counter suit concerning tools used in the extraction of oil and gas from a well. Analyses included calculation of damages from lost sales, price erosion, and accelerated market entry. Additionally, provided an analysis of reasonable royalties. Provided client with both a Plaintiff and Defendant report.

*Professional*
*Experience*
*(continued)*

**Vitamin Price Fixing Litigation, Ralston Purina Corporation**

Analyzed price data to demonstrate that several large companies were guilty of price collusion. Also used economic and econometric methods to estimate damages owed due to price collusion. Analysis was used in expert testimony to support the structuring of a class action settlement.

**IPO and Underwriter Litigation, Several Large Investment Banks**

Performed event study to ascertain if lead underwriters and large brokers were illegally promoting initial public offerings (IPOs). Responsible for determining data sources, assembling data, and conducting analysis of several types of IPO rating schemes used by different underwriters. Analysis was used in expert testimony to support client defense in federal court.

**Analysis of the Cost Impacts of Clean Air Regulation, Houston Chamber of Commerce**

Analyzed the costs and benefits of Clean Air Act compliance for the greater Houston area and assisted in writing the white paper Cleaning Up Houston's Act: An Economic Evaluation of Alternative Strategies. This white paper was used by the Houston Chamber of Commerce to estimate the total economic costs of compliance and to assist them in applying for an extension of the 2007 deadline.

**Antitrust and Competition Analysis of CVS Caremark Merger, Texas Independent Pharmacies**

Consulted for several independent pharmacies in Texas to provide a detailed antitrust and competition analysis of the merger between CVS Pharmacy and Caremark, a large pharmaceutical benefits manager. Advised clients on the likelihood of victory in a potential antitrust litigation against CVS Caremark.

**Gender Discrimination Litigation, Smith-Barney Corporation**

Analyzed hiring, account allocation, and bonus practices of a large brokerage house to evaluate the possibility of gender discrimination. Used econometric analysis to demonstrate that the magnitude of the accusation was not warranted. To respond to the individual cases covered by the legal action, developed different types of analysis for time periods during which certain types of data were not available. Analysis was used in expert testimony to support the structuring of settlement agreements.

## PUBLICATIONS, WORKING PAPERS, AND PRESENTATIONS

Presenter, "The Use of Statistical Analysis in Valuation" Illinois CPA Society, Business Valuation Conference, Chicago, IL, May 22, 2013

"Price Erosion Damages: The Use of Regression to Estimate Elasticity of Demand." Working Paper, 2013.

Presenter, How Do Boys and Girls Do? New Evidence on the Gender Gap in New York City Public Schools, American Education Finance & Policy Association 36th Annual Conference, Seattle, WA, March 25, 2011.

"Does School Configuration Matter? Sixth Grade Test Score Performance in New York City" (with Leanna Stiefel and Amy Ellen Schwartz). New York University Working Paper, 2011.

*Charles Parekh, Ph.D.*
*Director*
*Page 5*

| | |
|---|---|
| ***Professional Experience*** (continued) | "How Do Boys and Girls Do? New Evidence on the Gender Gap in New York City Public Schools" New York University Working Paper, 2011. |

*Three Essays on Grade Configuration, Academic Achievement, and the Gender Gap*, Ph.D. Dissertation, New York University, May 12, 2010.

Presenter, School Configuration and Test Score Performance of Sixth Grade Students in New York City Public Schools, American Education Finance Association 33rd Annual Conference, Denver, CO, April 10, 2008.

Presenter, How Should We Organize Primary Schooling? Grade Span, School Size, and Student Academic Performance: Evidence From New York City, Institute of Education Sciences Research Conference, Washington, DC, June 7, 2007.

Presenter, Gender Differences and Test Score Performance in New York City Public Schools, New York University Wagner Graduate School Research Colloquium, New York, NY, March 18, 2007.

"Is a Higher Salary High Enough?: ATI's COLA Tells All" ModRN Nurse Careers: Career Guide 2007, Spring 2007, p. 84-104.

Discussant Panel, Neighborhood Economic Development Policy, Association of Public Policy and Management Fall Research Conference, Madison, WI, November 2, 2006.

"Is a Higher Salary High Enough?" ModRN Nurse Careers: Career Guide 2006, Spring 2006, p. 48-67.

### TESTIMONY EXPERIENCE:

- ***In re: Lehman Brothers Holdings, Inc., et al., Debtors***
  United States Bankruptcy Court
  Southern District of New York
  Case Number 08-13555 (SCC)
  August 21, 2014

  Provided expert report related to the sampling of mortgage loans in RMBS trusts.

- ***Brian Fagnano v. Loyalsock Township School District***
  Court of Common Pleas of Lycoming County, Pennsylvania
  Docket Number 11-00908
  March 27, 2012

  Testified in Court as to the statistical evidence supporting the random drug testing of high school students in Pennsylvania.

- ***Brian Fagnano v. Loyalsock Township School District***
  Court of Common Pleas of Lycoming County, Pennsylvania
  Docket Number 11-00908
  April 11, 2013

  Testified in Court as to the statistical evidence supporting the random drug testing of high school students in Pennsylvania.

*Charles Parekh, Ph.D.*
*Director*
*Page 6*

| | |
|---|---|
| *Education* | Ph.D., (Public Finance), New York University, 2010 |
| | M. Phil., (Public Finance), New York University, 2006 |
| | M.P.P., (Public Policy Analysis), University of Chicago, 2000 |
| | B.A., (Economics), Colgate University, 1997 |
| *Professional Affiliations* | Member, American Economic Association |
| | Member, Association of Public Policy Analysis and Management |
| | Member, Association for Education Finance and Policy |

# ATTACHMENT II

# Documents Considered

**Legal Filings**

1. *Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code, and (B) Cross-Motion to Establish a Protocol to Resolve Claims Filed by RMBS Trustees* and Exhibits, October 15, 2014 (ECF 46526).

2. *Joint Motion to Allow/The RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code* and Exhibits, August 22, 2014 (ECF 46078).

**Declarations**

3. *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014, and Attachments (ECF 46080).

4. *Declaration of James H. Aronoff*, August 21, 2014 (ECF 46085).

5. *Declaration of Zachary Trumpp in Support of Debtors Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities or Purposes of Establishing Reserves*, January 12, 2012 (ECF 24255).

**Interviews**

6. Interviews with Joe Phillips, Digital Risk, June 10, 2014, and November 12, 2014.

**Other**

7. All documents listed in Attachment II to the *Declaration of Charles A. Parekh, Ph.D.*, August 21, 2014, (ECF 46080).

# ATTACHMENT III

**Scenario 1: Covered Loans Less Loans Paid-in-Full**

| Processes | | | Assumptions | |
|---|---|---|---|---|
| Number of Covered Loans | | 416,091 | | |
| Number of Covered Loans Less Loans Paid-in-Full | | 213,974 | | Any Loan that has not Paid Off is Reviewed |
| | | | | (as of June 2014) |
| Loans Requested-to-Date | | 5,000 | | |
| Loans Received and Reviewed | | 4,579 | | |
| Number of Loans for Review | | 209,395 | | |

**Step 0: Receive Loans from Servicers**

| | | | | |
|---|---|---|---|---|
| Years to Receive Loans from Servicers | | 3.0 | 3 | Years to Receive Loans from Servicers |

**Step 1: [Proposed Lehman Protocol Iai-ii]: Review Remaining Loans**

| | | | | |
|---|---|---|---|---|
| | | | 40 | Reviewers |
| | | | 3 | Loans per Day (Each) |
| Years to Review Remaining Loans | | 7.0 | 251 | Days per Year |
| | | | $250 - $400 | Cost per Loan (Range) |
| Cost to Trusts to Review Remaining Loans | $52,348,750 | - $83,758,000 | 100% | Cost Attributable to Trusts |
| Cost to Estate to Review Remaining Loans | $0 | - $0 | 0% | Cost Attributable to Estate |

**Step 2: [Proposed Lehman Protocol Ibi]: Plan Administrator Reviews Repurchase Requests**

| | | | | |
|---|---|---|---|---|
| Number of Requests from Initial Sample | | 2,612 | 57% | Breach Rate from Digital Risk Review Applied to 4,579 Loans |
| Number of Additional Requests Submitted | | 119,355 | 57% | Breach Rate Applied to 209,395 Loans |
| Total Number of Loans Requested for Repurchase | | 121,967 | | |
| | | | 20 | Reviewers |
| | | | 3 | Loans per Day (Each) |
| Years for Plan Administrator to Review Requests | | 8.1 | 251 | Days per Year |
| | | | $250 - $400 | Cost per Loan (Range) |
| Cost to Trusts to Review Requests | $0 | - $0 | 0% | Cost Attributable to Trusts |
| Cost to Estate to Review Requests | $30,491,788 | - $48,786,860 | 100% | Cost Attributable to Estate |
| Plan Administrator Agrees to Repurchase | | 60,984 | 50% | Agreed to Repurchase |
| Plan Administrator Declines to Repurchase | | 60,984 | 50% | Disagreed to Repurchase |

**Step 3: [Proposed Lehman Protocol 1e-f]: Trustees Negotiate Declined Repurchase Requests**

| | | | | |
|---|---|---|---|---|
| | | | 4 | Trustees |
| | | | 10 | Loans per Day (Each) |
| Years to Negotiate Declined Repurchase Requests | | 6.1 | 251 | 8 Hour Days per Year |
| Negotiation Results in Resolution | | 15,246 | 25% | Percentage Resolved |
| | | | $600 | Hourly Rate of Negotiation |
| Cost to Trusts of Negotiation | | $14,636,058 | 50% | Cost Attributable to Trusts |
| Cost to Estate of Negotiation | | $14,636,058 | 50% | Cost Attributable to Estate |

**Step 4: [Proposed Lehman Protocol IIa-f]: Claim Facilitator Reviews Unresolved Repurchase Claims**

| | | | | |
|---|---|---|---|---|
| Loans Sent to Claim Facilitator | | 45,738 | 75% | Percentage Unresolved after Negotiation |
| | | | 5 | Facilitators |
| | | | 10 | Loans per Day (Each) |
| Years for Claim Facilitator to Review Requests | | 3.6 | 251 | 8 Hour Days per Year |
| Claim Facilitator Review Results in Resolution | | 34,303.26 | 75% | Percentage of Requests Settled by CF and PA |
| | | | $500 | Hourly Rate |
| Cost to Trusts of Claim Facilitator Review | | $9,147,536 | 50% | Cost Attributable to Trusts |
| Cost to Estate of Claim Facilitator Review | | $9,147,536 | 50% | Cost Attributable to Estate |

**Step 5: [Proposed Lehman Protocol IIIa-d]: Court Reviews for Final Resolution**

| | | | | |
|---|---|---|---|---|
| Loans Sent to Court for Final Resolution | | 11,434 | 25% | Percentage of Requests not Settled by CF and PA |
| | | | 1 | Judge |
| | | | 7 | Loans per Day |
| Years for Court to Review Remaining Requests | | 27.2 | 60 | 8 Hour Days per Year (1 Weeks per Month) |
| | | | $3,000 | Hourly Rate (Lawyers/Experts) |
| Cost to Trusts of Court Review | | $19,601,863 | 50% | Cost Attributable to Trusts |
| Cost to Estate of Court Review | | $19,601,863 | 50% | Cost Attributable to Estate |

| | | | | |
|---|---|---|---|---|
| **Cost to Trusts to Satisfy Protocol** | $95,734,208 | - $127,143,458 | | |
| **Cost to Estate to Satisfy Protocol** | $73,877,245 | - $92,172,318 | | |
| **TOTAL COST TO SATISFY PROTOCAL** | $169,611,453 | - $219,315,775 | | |

| | |
|---|---|
| **TOTAL LABOR-YEARS NEEDED TO SATISFY PROTOCOL** | 55.0 |

**Protocol Process Complete Prior to Court Review**

| | |
|---|---|
| **YEARS NEEDED TO SATISFY PROTOCOL (RUNNING BASIS)** | 35.7 |

**Court Review Performed Seriatim**

| | |
|---|---|
| **YEARS NEEDED TO SATISFY PROTOCOL (RUNNING BASIS)** | 27.6 |

**Notes:**
Projected durations assume continuous throughput without scheduling delays or wait times.

**Scenario 1: Covered Loans Less Loans Paid-in-Full**

**Protocol Process Complete Prior to Court Review**

| Step | Process | Rate per Month (Capacity) | Progress Rate per Month | Effective Rate per Month | Effective Rate per Year | Process Duration (Years) | Start (Years)* | End (Years) |
|------|---------|---------------------------|-------------------------|--------------------------|-------------------------|--------------------------|----------------|-------------|
| 0 | Receive Loans from Servicers | 5,817 | n/a | 5,817 | 69,798 | 3.0 | 0.0 | 3.0 |
| 1 | Review Remaining Loans | 2,510 | 5,817 | 2,510 | 30,120 | 7.0 | 0.1 | 7.0 |
| 2 | Plan Administrator Reviews Repurchase Requests | 1,255 | 1,431 | 1,255 | 15,060 | 8.1 | 0.2 | 8.3 |
| 3 | Trustees Negotiate Declined Repurchase Requests | 837 | 628 | 628 | 7,530 | 8.1 | 0.3 | 8.3 |
| 4 | Claim Facilitator Reviews Unresolved Repurchase Claims | 1,046 | 471 | 471 | 5,648 | 8.1 | 0.3 | 8.4 |
| 5 | Court Reviews for Final Resolution | 35 | 118 | 35 | 420 | 27.2 | 8.4 | 35.7 |
| | | | | | | | **Projected Duration:** | **35.7** |

\* One month (.08 Year) elapses before each new stage begins.



**Court Review Performed Seriatim**

| Step | Process | Rate per Month (Capacity) | Progress Rate per Month | Effective Rate per Month | Effective Rate per Year | Process Duration (Years) | Start (Years)* | End (Years) |
|------|---------|---------------------------|-------------------------|--------------------------|-------------------------|--------------------------|----------------|-------------|
| 0 | Receive Loans from Servicers | 5,817 | n/a | 5,817 | 69,798 | 3.0 | 0.0 | 3.0 |
| 1 | Review Remaining Loans | 2,510 | 5,817 | 2,510 | 30,120 | 7.0 | 0.1 | 7.0 |
| 2 | Plan Administrator Reviews Repurchase Requests | 1,255 | 1,431 | 1,255 | 15,060 | 8.1 | 0.2 | 8.3 |
| 3 | Trustees Negotiate Declined Repurchase Requests | 837 | 628 | 628 | 7,530 | 8.1 | 0.3 | 8.3 |
| 4 | Claim Facilitator Reviews Unresolved Repurchase Claims | 1,046 | 471 | 471 | 5,648 | 8.1 | 0.3 | 8.4 |
| 5 | Court Reviews for Final Resolution | 35 | 118 | 35 | 420 | 27.2 | 0.4 | 27.6 |
| | | | | | | | **Projected Duration:** | **27.6** |

\* One month (.08 Year) elapses before each new stage begins.



**Scenario 2: Covered Loans with a Loss or Projected Loss**

| Processes | | | | Assumptions | |
|---|---|---|---|---|---|
| Number of Covered Loans | | 416,091 | | | |
| Number of Covered Loans with Loss/Expected Loss | | 161,797 | | Any Loan that has not Paid Off is Reviewed | |
| | | | | (as of June 2014) | |
| Loans Requested-to-Date | | 5,000 | | | |
| Loans Received and Reviewed | | 4,579 | | | |
| Number of Loans for Review | | 157,218 | | | |
| **Step 0: Receive Loans from Servicers** | | | | | |
| Years to Receive Loans from Servicers | | 3.0 | | 3 | Years to Receive Loans from Servicers |
| **Step 1: [Proposed Lehman Protocol Iai-ii]: Review Remaining Loans** | | | | | |
| | | | | 40 | Reviewers |
| | | | | 3 | Loans per Day (Each) |
| Years to Review Remaining Loans | | 5.2 | | 251 | Days per Year |
| | | | | $250 - $400 | Cost per Loan (Range) |
| Cost to Trusts to Review Remaining Loans | $39,304,500 | - | $62,887,200 | 100% | Cost Attributable to Trusts |
| Cost to Estate to Review Remaining Loans | $0 | - | $0 | 0% | Cost Attributable to Estate |
| **Step 2: [Proposed Lehman Protocol Ibi]: Plan Administrator Reviews Repurchase Requests** | | | | | |
| Number of Requests from Initial Sample | | 2,612 | | 57% | Breach Rate from Digital Risk Review Applied to 4,579 Loans |
| Number of Additional Requests Submitted | | 89,614 | | 57% | Breach Rate Applied to 157,218 Loans |
| Total Number of Loans Requested for Repurchase | | 92,226 | | | |
| | | | | 20 | Reviewers |
| | | | | 3 | Loans per Day (Each) |
| Years for Plan Administrator to Review Requests | | 6.1 | | 251 | Days per Year |
| | | | | $250 - $400 | Cost per Loan (Range) |
| Cost to Trusts to Review Requests | $0 | - | $0 | 0% | Cost Attributable to Trusts |
| Cost to Estate to Review Requests | $23,056,565 | - | $36,890,504 | 100% | Cost Attributable to Estate |
| Plan Administrator Agrees to Repurchase | | 46,113 | | 50% | Agreed to Repurchase |
| Plan Administrator Declines to Repurchase | | 46,113 | | 50% | Disagreed to Repurchase |
| **Step 3: [Proposed Lehman Protocol 1e-f]: Trustees Negotiate Declined Repurchase Requests** | | | | | |
| | | | | 4 | Trustees |
| | | | | 10 | Loans per Day (Each) |
| Years to Negotiate Declined Repurchase Requests | | 4.6 | | 251 | 8 Hour Days per Year |
| Negotiation Results in Resolution | | 11,528 | | 25% | Percentage Resolved |
| | | | | $600 | Hourly Rate of Negotiation |
| Cost to Trusts of Negotiation | | $11,067,151 | | 50% | Cost Attributable to Trusts |
| Cost to Estate of Negotiation | | $11,067,151 | | 50% | Cost Attributable to Estate |
| **Step 4: [Proposed Lehman Protocol IIa-f]: Claim Facilitator Reviews Unresolved Repurchase Claims** | | | | | |
| Loans Sent to Claim Facilitator | | 34,585 | | 75% | Percentage Unresolved after Negotiation |
| | | | | 5 | Facilitators |
| | | | | 10 | Loans per Day (Each) |
| Years for Claim Facilitator to Review Requests | | 2.8 | | 251 | 8 Hour Days per Year |
| Claim Facilitator Review Results in Resolution | | 25,938.64 | | 75% | Percentage of Requests Settled by CF and PA |
| | | | | $500 | Hourly Rate |
| Cost to Trusts of Claim Facilitator Review | | $6,916,970 | | 50% | Cost Attributable to Trusts |
| Cost to Estate of Claim Facilitator Review | | $6,916,970 | | 50% | Cost Attributable to Estate |
| **Step 5: [Proposed Lehman Protocol IIIa-d]: Court Reviews for Final Resolution** | | | | | |
| Loans Sent to Court for Final Resolution | | 8,646 | | 25% | Percentage of Requests not Settled by CF and PA |
| | | | | 1 | Judge |
| | | | | 7 | Loans per Day |
| Years for Court to Review Remaining Requests | | 20.6 | | 60 | 8 Hour Days per Year (1 Weeks per Month) |
| | | | | $3,000 | Hourly Rate (Lawyers/Experts) |
| Cost to Trusts of Court Review | | $14,822,078 | | 50% | Cost Attributable to Trusts |
| Cost to Estate of Court Review | | $14,822,078 | | 50% | Cost Attributable to Estate |
| **Cost to Trusts to Satisfy Protocol** | **$72,110,698** | **-** | **$95,693,398** | | |
| **Cost to Estate to Satisfy Protocol** | **$55,862,763** | **-** | **$69,696,702** | | |
| **TOTAL COST TO SATISFY PROTOCAL** | **$127,973,461** | **-** | **$165,390,100** | | |
| **TOTAL LABOR-YEARS NEEDED TO SATISFY PROTOCOL** | | **42.3** | | | |
| **Protocol Process Complete Prior to Court Review** | | | | | |
| **YEARS NEEDED TO SATISFY PROTOCOL (RUNNING BASIS)** | | **27.0** | | | |
| **Court Review Performed Seriatim** | | | | | |
| **YEARS NEEDED TO SATISFY PROTOCOL (RUNNING BASIS)** | | **21.0** | | | |

**Notes:**
Projected durations assume continuous throughput without scheduling delays or wait times.

**Scenario 2: Covered Loans with a Loss or Projected Loss**

**Protocol Process Complete Prior to Court Review**

| Step | Process | Rate per Month (Capacity) | Progress Rate per Month | Effective Rate per Month | Effective Rate per Year | Process Duration (Years) | Start (Years)* | End (Years) |
|---|---|---|---|---|---|---|---|---|
| 0 | Receive Loans from Servicers | 4,367 | n/a | 4,367 | 52,406 | 3.0 | 0.0 | 3.0 |
| 1 | Review Remaining Loans | 2,510 | 4,367 | 2,510 | 30,120 | 5.2 | 0.1 | 5.3 |
| 2 | Plan Administrator Reviews Repurchase Requests | 1,255 | 1,431 | 1,255 | 15,060 | 6.1 | 0.2 | 6.3 |
| 3 | Trustees Negotiate Declined Repurchase Requests | 837 | 628 | 628 | 7,530 | 6.1 | 0.3 | 6.4 |
| 4 | Claim Facilitator Reviews Unresolved Repurchase Claims | 1,046 | 471 | 471 | 5,648 | 6.1 | 0.3 | 6.5 |
| 5 | Court Reviews for Final Resolution | 35 | 118 | 35 | 420 | 20.6 | 6.5 | 27.0 |
| | | | | | | | *Projected Duration:* | **27.0** |

* One month (.08 Year) elapses before each new stage begins.



**Court Review Performed Seriatim**

| Step | Process | Rate per Month (Capacity) | Progress Rate per Month | Effective Rate per Month | Effective Rate per Year | Process Duration (Years) | Start (Years)* | End (Years) |
|---|---|---|---|---|---|---|---|---|
| 0 | Receive Loans from Servicers | 4,367 | n/a | 4,367 | 52,406 | 3.0 | 0.0 | 3.0 |
| 1 | Review Remaining Loans | 2,510 | 4,367 | 2,510 | 30,120 | 5.2 | 0.1 | 5.3 |
| 2 | Plan Administrator Reviews Repurchase Requests | 1,255 | 1,431 | 1,255 | 15,060 | 6.1 | 0.2 | 6.3 |
| 3 | Trustees Negotiate Declined Repurchase Requests | 837 | 628 | 628 | 7,530 | 6.1 | 0.3 | 6.4 |
| 4 | Claim Facilitator Reviews Unresolved Repurchase Claims | 1,046 | 471 | 471 | 5,648 | 6.1 | 0.3 | 6.5 |
| 5 | Court Reviews for Final Resolution | 35 | 118 | 35 | 420 | 20.6 | 0.4 | 21.0 |
| | | | | | | | *Projected Duration:* | **21.0** |

* One month (.08 Year) elapses before each new stage begins.



**<u>Exhibit B</u>**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


In re:                          )
                                )Chapter 11
LEHMAN BROTHERS HOLDINGS         )
INC., et al,                    )Case No.
                                )08-13555
            Debtors.            )(SCC)
                                )
                                )
------------------------------)




DEPOSITION OF CHARLES A. PAREKH, Ph.D.

New York, New York

Friday, December 5, 2014




Reported by:
TAMI H. TAKAHASHI, RPR, CSR
JOB NO. 36918

2

```
 1
 2
 3                      December 5, 2014
 4                      10:05 a.m.
 5
 6           Deposition of CHARLES A. PAREKH,
 7    Ph.D., held at the offices of Seward & Kissel
 8    LLP, One Battery Park Plaza, New York, New
 9    York, pursuant to Notice, before TAMI H.
10    TAKAHASHI, a Registered Professional Reporter
11    and Notary Public of the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1

2      A P P E A R A N C E S :

3

4          Attorneys for Debtors Lehman Brothers

5          Holdings Inc. and Certain of its

6          Affiliates

7                  WILLKIE FARR & GALLAGHER LLP

8                  787 Seventh Avenue

9                  New York, New York  10019-6099

10     BY:    ROGER NETZER, ESQ.

11                 rnetzer@willkie.com

12                 CRISTINA I. HAGGLUND, ESQ.

13                 chagglund@willkie.com

14                 GAIL HYMAN, ESQ.

15                 ghyman@willkie.com

16

17         Attorneys for Debtors

18                 JONES & KELLER, P.C.

19                 1999 Broadway, Suite 3150

20                 Denver, Colorado  80202

21     BY:    MICHAEL A. ROLLIN, ESQ.

22                 mrollin@joneskeller.com

23

24

25

4

1

2    A P P E A R A N C E S (continued):

3

4         Attorneys for The Witness

5              SEWARD & KISSEL LLP

6              One Battery Park Plaza

7              New York, New York  10004

8    BY:   M. WILLIAM MUNNO, ESQ.

9              munno@sewkis.com

10

11        Attorneys for Deutsche Bank, as Trustee

12             NIXON PEABODY LLP

13             100 Summer Street

14             Boston, Massachusetts  02110-2131

15   BY:   RICHARD C. PEDONE, ESQ.

16             rpedone@nixonpeabody.com

17

18        Attorneys for Wilmington Trust Company,

19        as Trustee

20             ALSTON & BIRD LLP

21             One Atlantic Center

22             1201 West Peachtree Street

23             Atlanta, Georgia  30309-3424

24   BY:   KIT WEITNAUER, ESQ.

25             kit.weitnauer@alston.com

5

1

2    A P P E A R A N C E S (continued):

3

4        CHAPMAN AND CUTLER LLP

5        Attorneys for U.S. Bank National

6        Association, as Indenture Trustee

7            111 West Monroe Street

8            Chicago, Illinois  60603-4080

9    BY:   SCOTT A. LEWIS, ESQ.

10           slewis@chapman.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1

2          IT IS HEREBY STIPULATED AND AGREED

3     by and between the attorneys for the

4     respective parties herein, that filing

5     and sealing be and the same are hereby

6     waived.

7          IT IS FURTHER STIPULATED AND AGREED

8     that all objections, except as to the

9     form of the question, shall be reserved

10    to the time of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be signed

13    and sworn to before any officer

14    authorized to administer an oath, with

15    the same force  and effect as if signed

16    and sworn to before the Court.

17

18

19

20                    -O-

21

22

23

24

25

7

```
1
2              (Whereupon, the witness was
3        administered the oath.)
4              (Debtors' Exhibit 1, Declaration of
5        Charles A. Parekh, Ph.D., November 14,
6        2014, marked for identification as of
7        this date.)
8              (Debtors' Exhibit 2, Declaration of
9        William Alread, December 3, 2014, marked
10       for identification as of this date.)
11             (Debtors' Exhibit 3, Declaration of
12       Craig Pino, December 3, 2014, marked for
13       identification as of this date.)
14   C H A R L E S  A.  P A R E K H,  called as
15       a witness, having been duly sworn by a
16       Notary Public, was examined and
17       testified as follows:
18                     EXAMINATION
19   BY MR. NETZER:
20       Q.   Mr. Parekh, I'm going to put in
21   front of you a copy of your report for you to
22   refer to.
23       A.   Thank you.
24       Q.   Why don't I also --
25            That will be Exhibit 1.  I also
```

8

Parekh

1
2        have, although I won't have -- refer to them
3        right away, copies of the declarations of
4        Mr. Alread and of Mr. Pino.  And I'll put
5        those there, too, but I'll refer to them in
6        due course.  But thank you.
7                MR. NETZER:  And we have extra
8            copies for anyone who needs them.
9                MR. MUNNO:  Could I trouble you,
10           Roger, for his report.
11               MS. HAGGLUND:  I'll do it.  I got
12           it.
13               MR. NETZER:  Thank you.
14       BY MR. NETZER:
15           Q.   First of all, Mr. Parekh --
16           A.   Yes.
17           Q.   -- when were you first engaged by
18       the trustees in connection with Lehman?
19           A.   I'm not exactly sure of -- I don't
20       recall the exact date, but it was about two
21       years ago, maybe a little bit more.  But
22       about two years ago.
23           Q.   And at the time of that engagement,
24       what was your understanding of the dispute,
25       if any, as to how the trustees and Lehman

9

                              Parekh

1
2      would resolve issues relating to the

3      mortgages?

4              It can be quite summary.  I'm not

5      asking for your --

6          A.   Sure.

7              I mean, I'm not sure if I

8      understand there was a dispute.  Our -- you

9      know, my understanding was that I and the

10     team of Duff & Phelps would work to estimate

11     a claim, is the way that I would characterize

12     it.

13         Q.   And so, at the time you were

14     engaged, that was, generally speaking, the

15     scope of your engagement, to help estimate

16     the claims?

17         A.   That was -- that was part of it.

18     And provide other financial advisory to the

19     trustees as needed related to the RMBS

20     claims.

21         Q.   And at that time, what

22     consideration had been given by the trustees

23     to the use of a Protocol of some kind in

24     connection with the claims?

25         A.   Can you help me understand what you

10

                              Parekh

1

2    mean by "Protocol"?

3            I'm sorry.  I mean, I just want to

4    make sure I'm answering your question.  I

5    apologize.

6        Q.   You're familiar with the Protocol

7    that you discuss in your expert report?

8        A.   Oh, of course, yes.

9        Q.   Okay.  And is this the first time

10   you've ever seen a Protocol for the analysis

11   of claims like this?

12       A.   It's the first time that I've seen

13   a Protocol similar to this, yes.

14       Q.   Okay.  Is it the first time you've

15   seen a Protocol for sequencing and organizing

16   multiple claims related to mortgages?

17       A.   Yes.  I think it's -- yeah, it's

18   the first time I've seen a Protocol like that

19   or seen a Protocol for sequencing, as you

20   asked it, and --

21       Q.   What -- and so, you've never seen a

22   Protocol before --

23            Before you saw this, the one

24   proposed by Lehman here, you had never seen a

25   Protocol for organizing and sequencing the

11

1                          Parekh

2    analysis of claims related to mortgages; is

3    that fair?

4              MR. MUNNO:  Just to be clear, I'm

5         not sure I quite understand the

6         question.  Referring to sequencing in

7         the manner that the Lehman proposed

8         Protocol be sequenced?

9              MR. NETZER:  I'll let the question

10        stand.

11             MR. MUNNO:  You may answer.

12        A.   Well, sure, I've seen -- I've seen

13   we'll call them "Protocols" in which you

14   might organize how you're going to review and

15   understand how a claim might arise out of a

16   group of loans.  But I've never been familiar

17   with a Protocol that would contemplate

18   estimating a claim out of -- out of such a

19   large number of loans that arises from

20   reviewing every, every loan.

21   BY MR. NETZER:

22        Q.   Okay.  So -- but there were two

23   things you said.  Out of one this size

24   reviewing.  Have you -- are you familiar with

25   Protocols for the review of every loan of a

12

                              Parekh

1

2    smaller size?

3         A.    I've heard that some investors may

4    review every loan in a trust that they --

5    that they may be an investor in, but I'm not

6    familiar for what purpose they review that.

7    It may not be for making a claim.

8         Q.    Okay.  So, but -- so, it's fair to

9    say that you're not familiar with the use of

10   a loan Protocol, of a Protocol for the

11   purposes for organizing and sequencing

12   loans -- sequencing claims related to loans

13   before you saw the Lehman Protocol?

14        A.    I think that's fair to say, yes.

15        Q.    And that would have been --

16             And when did you first see the

17   loan -- the Lehman Protocol?

18        A.    I can't recall exactly, but in the

19   last couple of months when it -- when it was

20   put out by Lehman.

21        Q.    Good enough.  I'm not asking you to

22   pinpoint the day.  Thank you.

23             And so, by that time you had

24   been -- your engagement was, you know, what,

25   20 months, you'd already been working

13

Parekh

1    20 months or so?

2        A.   That's correct.

3        Q.   What consideration had you and your

4    clients given to what kind of Protocol might

5    be used in this case to advance the claims

6    prior to the time you saw?

7        A.   Prior to the time that I saw

8    Lehman's Protocol, the only ways that I

9    had -- and Duff & Phelps had contemplated

10   estimating the claims is through the use of

11   sampling.

12          Now, in another report submitted to

13   the -- to the Court, I estimated the cost of

14   a loan-by-loan -- time and cost of a

15   loan-by-loan review.  But I would not

16   characterize that as a Protocol in the sense

17   that Lehman has a Protocol.  It was a -- it

18   was an estimate of a -- of a Court review.

19       Q.   And that was -- what was that --

20   what -- which report was that?

21       A.   That was in -- I can -- if I can

22   just refer to it, because I cited it.

23       Q.   That's fine.

24       A.   It was my declaration dated

14

                              Parekh

1   August --

2          Q.    Okay.

3          A.    -- 21st, 2014.

4          Q.    Okay.  And prior -- and when --

5                Obviously, the day you submitted

6   it, you had given some thought to it.  When

7   had you begun considering the process of

8   estimating a Court review, or however you

9   want to put it, that was the subject of your

10  report in August; how far in advance of it?

11         A.    How far in advance?  No more than a

12  month prior to filing that.

13         Q.    And what precipitated that?  I

14  mean --

15         A.    What precipitated that?

16         Q.    In other words, at some point

17  you or your clients, either you pitched

18  your -- proposed your clients or your clients

19  raised with you whatever the issues were that

20  led to that.  I'm asking, what was the

21  precipitating -- what precipitated it?

22         A.    I understood from some of the

23  filings in the matter, as well as counsel

24  recounting some of the discussions with

15

Parekh

1   Lehman, that Lehman was proposing or could

2   have been proposing some sort of loan-by-loan

3   estimation of the claim.  And so, I -- at

4   that point, I began to think about what that

5   might have involve.

6       Q.   Okay.  So, is it fair to say that

7   prior to that time, Duff & Phelps had not

8   given any consideration to a loan-by-loan

9   consideration of the claims?

10       A.   Prior to that time and over the

11   course of, you know, the last couple of

12   years, I think we have thought about

13   loan-by-loan.

14           Certainly in the ResCap matter in

15   which I was involved, there was at least some

16   discussion about how long it might take to

17   review claims.  You know, it was probably --

18   characterized as informal -- I would

19   characterize as informal discussion of how

20   long it might take to estimate a claim from

21   looking at all the loans, but we very quickly

22   dropped any discussion of that as

23   impractical.

24       Q.   Why was it impractical?

16

                              Parekh

1

2       A.   Too long and too costly.

3       Q.   How long did you consider it?

4       A.   I don't understand -- how long did

5   I consider --

6       Q.   Well, this process.

7       A.   How long did I consider -- how long

8   did I spend thinking about a loan-by-loan

9   review or how long did I think it would take?

10      Q.   The former.  Thank you very much.

11      A.   The former.

12      Q.   How long -- your thinking about it.

13      A.   My thinking about it was probably

14  no more than a -- two or three hours total.

15      Q.   And who did you discuss it with,

16  either among your colleagues or with your

17  clients?

18      A.   I discussed it with counsel at the

19  time, so --

20      Q.   Who in particular?

21          MR. MUNNO:  Just to be clear, we're

22      talking about ResCap now?

23          THE WITNESS:  Yeah, ResCap.

24  BY MR. NETZER:

25      Q.   Oh, this was not -- you didn't

17

Parekh

1   discussed it at all -- I'm sorry.  I thought

2   you were discussing it since you had done the

3   work on --

4        A.   Oh, I apologize.

5        Q.   So, the discussions that you're

6   describing were not discussions with the

7   trustees here?

8        A.   That is correct, not discussions

9   with the trustees in Lehman.

10       Q.   Okay.  Now, let's go -- my -- let's

11  go back to an earlier question, then, because

12  I perhaps wasn't clear or perhaps I

13  misunderstood, or both.

14            Prior to the month or so before

15  your August declaration, what consideration

16  had you given to a loan-by-loan analysis of

17  the claims or analysis or prosecution of the

18  claims in this case?

19       A.   So, in connection with the -- with

20  the August -- and -- declaration and

21  preparation for submitting that, I gave

22  thought to how long it would take to -- for

23  the -- to -- for the trustees and then the

24  Court to review a group of loans referred to

18

Parekh

1
2    in my report as the sampling population.

3           And I spent some hours, and I can't

4    give you an exact number of hours, prior to

5    that declaration in thinking about that in

6    order to write the declaration.

7        Q.   Okay.  And --

8           MR. MUNNO:  Can I just get a point

9        of clarification?  You mentioned the

10        trustees and the Court.  Did your

11        analysis include anybody else?

12           MR. NETZER:  Can I -- I'm sorry.

13        I'd really appreciate -- hold that

14        thought, okay?  I'd like to finish my

15        examination.

16           MR. MUNNO:  Sure.

17    BY MR. NETZER:

18        Q.   The -- when did you first conclude

19    that a loan-by-loan analysis was not

20    practical in this case?

21        A.   I don't believe I've -- I don't

22    believe I concluded that, that a loan-by-loan

23    review --

24           Actually, let me -- let me strike

25    that.

19

1                          Parekh

2              Did you say when?

3        Q.    Um-hum.

4        A.    I don't -- when I submitted my

5   declarations, I would say that are -- those

6   are my conclusions.

7        Q.    And you hadn't reached that

8   conclusion prior to that?

9        A.    Not in this matter, because I

10  hadn't considered it prior to that.

11       Q.    Okay.  So, would it be fair to say

12  then that prior to --

13             When you say your report, you mean

14  the November report or the August report?

15       A.    Well, my November report covers the

16  Protocol, so that is a form of loan-by-loan

17  review.  And it's -- and in that report I've

18  concluded that the Protocol is not practical.

19             In the August report, what I

20  concluded was that a loan-by-loan review of

21  the sampling population was not practical.

22       Q.    And why did you -- why were you

23  asked to opine on whether or not a

24  loan-by-loan review of the sampling

25  population was not practical?

20

Parekh

1

2          MR. MUNNO:  Objection.

3          You may answer.

4     A.   I was -- I was asked to analyze

5   those because I think the trustees wanted to

6   understand the time and cost that it would

7   take to engage in such an activity.

8   BY MR. NETZER:

9     Q.   But prior to the month or so before

10  August of 2014, you had never discussed with

11  your clients any of the difficulties or

12  impracticalities of conducting a loan-by-loan

13  review, either of the sampling population or

14  of all the loans, correct?

15     A.   Well, we've -- we had discussed a

16  loan-by-loan review of a sample of the loans,

17  but I don't recall any discussion of a

18  loan-by-loan -- you know, estimating a claim

19  with a loan-by-loan review of every loan.

20     Q.   I'm asking now, I thought your

21  discussion with your clients of the

22  loan-by-loan review of the sampling

23  population was a discussion that commenced a

24  month or so before your August report.  Am I

25  wrong about that?

21

1                          Parekh

2              MR. MUNNO:  That's not the

3         witness's testimony.

4              MR. NETZER:  Right.  That's why I'm

5         asking if I'm wrong about it.

6    BY MR. NETZER:

7         Q.   When was it that you discussed that

8    first?

9         A.   The loan-by-loan review of the

10   sampling population?

11        Q.   Yeah.

12             MR. MUNNO:  I still have an

13        objection because it presupposes there

14        was a discussion about it --

15             MR. NETZER:  He's answering, so

16        you're -- don't -- save your objection.

17        Not while the witness is answering.

18             MR. MUNNO:  No, I'm not --

19             MR. NETZER:  You can't interrupt

20        the witness.  You and I should agree

21        neither of us will do that.

22   BY MR. NETZER:

23        Q.   Go ahead, sir.

24             MR. MUNNO:  We're not going to

25        agree to that.

22

                    Parekh

1

2          MR. NETZER:  Good.  Okay.  That's

3      your way of doing things.  I'm not going

4      to interrupt the witness.

5  BY MR. NETZER:

6      Q.   Please answer the question.

7      A.   Can you please ask your question

8  again.

9          MR. NETZER:  That's the problem

10     with getting interrupted, exactly that.

11         MR. MUNNO:  We can have it read

12     back.

13  BY MR. NETZER:

14     Q.   When was it -- let me just pose a

15  different question.

16         Prior to the discussions that led

17  to your August declaration, discussions which

18  I understood happened in the month before

19  your declaration, what considerations had you

20  given, sir, to a loan-by-loan review of the

21  mortgages here?

22     A.   All of the consideration of

23  loan-by-loan reviews would have been in

24  reference to the sampling, a loan-by-loan

25  review of the sampling.

23

1                      Parekh

2          Q.    When did you first give

3      consideration to a loan-by-loan review of

4      loans in the sampling?

5          A.    Of the loans in the sample?  That

6      would have dated back to Duff & Phelps'

7      engagement about two years ago.

8          Q.    Okay.  And tell me about the

9      consideration you then gave to the

10     possibility of doing a loan-by-loan review of

11     the sample.

12         A.    Can you repeat that.  I'm not sure

13     I understood it.

14         Q.    Sure.

15             At the time --

16         A.    I apologize.

17         Q.    No, no.

18             At the time of your engagement was

19     when you first gave consideration or had

20     discussions about conducting a loan-by-loan

21     review of the sample, correct?

22         A.    Correct.

23         Q.    So, the sample had already been

24     selected by then?

25         A.    Yes, the sample had already been

24

                              Parekh

1

2  selected by then.

3      Q.   Now, in connection with that

4  consideration of the loan-by-loan review of

5  the sample, what were your conclusions at

6  that time?

7              MR. MUNNO:  Objection.

8              You may answer.

9      A.   Well, I don't -- I didn't have any

10  conclusions at the time that those

11  discussions commenced.  I had to spend two

12  years studying, you know, roughly the sample

13  and the review and the process that was done,

14  and then I gave those conclusions in my

15  August declaration.

16  BY MR. NETZER:

17      Q.   Okay.  So, at the time that you

18  began considering the issues that you opine

19  about in your August declaration, you were

20  considering conducting a loan-by-loan review,

21  correct, considering it?

22              MR. MUNNO:  Objection.

23      A.   No, no, I would not say --

24              I'm not sure what you mean by

25  "loan-by-loan review."

25

Parekh

1

2          If for some reason someone wants to

3   review three loans and they look at one loan,

4   then they look at the next loan, look at the

5   third loan, that -- that's a loan-by-loan

6   review of three loans.

7          What I would say that the sample

8   involved was a loan-by-loan review of the

9   5,000 loans in the sample.  That's different

10  than estimating a claim on a loan-by-loan

11  basis which is what the Protocol, in my

12  understanding, contemplates.

13     Q.   So, did you ever consider doing

14  a --

15          What consideration did you give to

16  engaging in a loan-by-loan -- by estimating a

17  claim on a loan-by-loan basis?

18          MR. MUNNO:  Objection.

19          You may answer.

20     A.   That -- what consideration did I

21  give?

22  BY MR. NETZER:

23     Q.   Yes.

24     A.   I would have considered how many

25  loans there are, how long it takes, how long

26

Parekh

1    it -- you know, how much it cost.  These

2    are the types of considerations I gave in my

3    November declaration.

4         Q.   Okay.  And when did you first

5    consider those?

6         A.    Well, when we were first engaged, I

7    would have looked at the total number of

8    loans and at least to myself considered that

9    that's a large number of loans, and let me

10   start thinking about a sample that could --

11   that could estimate a claim.

12        And then I would have considered

13   for my August declaration what it would take

14   to review the 149,000 or so loans in the --

15   in the sampling population.  And then in

16   drafting my November declaration, I would

17   have considered that in relation to the

18   Protocol.

19        Q.   Okay.  So, taking you -- and

20   that --

21        So, the consideration you gave in

22   connection with your August declaration would

23   have been in the month or so before the

24   August declaration, correct?

27

1                         Parekh

2        A.    Correct.

3        Q.    All right.  I just want to --

4              So, the only consideration, then,

5    is it fair to say that you gave to a

6    loan-by-loan review of all the loans was what

7    you just testified to in your answer about --

8              I want to use your words.  You

9    said, "When we were first engaged, I would

10   have looked at the total number of loans and

11   at least to myself considered that that's a

12   large number of loans, and let me start

13   thinking about a sample that could -- that

14   could estimate a claim."  I'm just reading

15   from your previous answer.

16             Was there any other -- is that the

17   full extent of your thinking on the subject

18   before August or July of 2014?  Anything you

19   want to add?

20       A.    That's what I recall at this time.

21   But let me be clear.  "Considered" is a -- is

22   a -- is a broad word, and I don't want to

23   overstate, you know, or understate.  These

24   are thoughts that went through my head that I

25   recall, but there may be others.  So --

28

Parekh

1

2      Q.    Yeah.   And to the extent there are

3      others that you can recall, tell me now.

4      A.    I can't recall any other times now.

5      Q.    Did you have any discussions with

6      anyone in which you expressed the thought

7      that you've just expressed here?

8      A.    Well, in preparation for my August

9      declaration and in preparation for my

10     November declaration, there would have been

11     discussions amongst my colleagues at Duff &

12     Phelps and as well as with counsel.

13     Q.    Okay.   So, but at the time, no

14     discussions?   That is at the time you were

15     engaged.

16     A.    At the time I was engaged, I can't

17     recall having any discussions with anyone

18     that would have related to a loan-by-loan

19     review to estimate the claims.

20     Q.    And that would be true also from

21     the time of your engagement till July or so

22     when you began the preparation for the August

23     declaration?

24     A.    That's correct.

25     Q.    And during that same period, from

29

Parekh

1
2    your engagement to the time you began

3    preparing the August declaration, what

4    consideration did you give for -- with

5    respect to a Protocol for analyzing the loans

6    and prosecuting any claims based on them?

7                MR. MUNNO:  Objection.

8                You may answer.

9        A.    Well, I want to make sure that

10   we agree on what a "Protocol" is.  If a

11   Protocol is a set of instructions that

12   somebody needs to follow, the trustees' team,

13   including Duff & Phelps, would have had a

14   Protocol to estimate a claim through the use

15   of a sample.

16   BY MR. NETZER:

17       Q.    Putting aside the use of a sample,

18   then --

19       A.    Okay.

20       Q.    -- did you consider any other

21   Protocol?

22       A.    Not prior to July or so of 2014.

23   No other Protocol that would have involved a

24   loan-by-loan estimation of using all of the

25   loans or, you know, all of the applicable,

30

                            Parekh

1

2   you know, covered loans.

3        Q.   And why didn't you discuss that

4   with your clients?

5             MR. MUNNO:  Objection.

6             You may answer.

7        A.   I didn't discuss it because I

8   didn't ever consider it being a practical way

9   of estimating a claim.  And it's not one that

10  I am familiar with and -- and -- well, it's

11  not one that I'm familiar with having been

12  done before.

13  BY MR. NETZER:

14       Q.   Has it never been done before?

15       A.   I don't know.

16       Q.   So, even now you're not familiar

17  with any -- withdrawn.

18             And what led to your view -- why

19  didn't you consider it practical?

20       A.   It would take too long and cost too

21  much.

22       Q.   How long would it take, how much

23  would it cost?

24       A.   How long --

25       Q.   This is back -- I'm not asking you

31

```
 1                        Parekh
 2    now about your November declaration.  I'm --
 3    this is in connection with the reason why you
 4    didn't consider it prior to July or August --
 5         A.   I can't tell you --
 6         Q.   -- of 2014.
 7         A.   Okay.  I'm sorry.
 8         Q.   No, no.
 9         A.   I didn't mean to interrupt.
10         Q.   You knew where I was going and so
11    you were interrupting, but we do have to
12    be -- she can't take us both down at the same
13    time.  But you have the right idea.
14         A.   That being said, I did interrupt
15    and I missed the dates that you asked.  Do
16    you mind --
17         Q.   Prior to preparing -- and I'm using
18    July of 2014 because you said it was roughly
19    a month, so I'm not trying to pin you down on
20    that exactly.
21              Prior to July of 2014, what made
22    you think that it was not practical?
23         A.   And I think I said it would take
24    too long and cost too much.
25         Q.   I thought I asked another question
```

32

Parekh

1    after that.

2           MR. MUNNO:  You did.  You asked him

3        how much and how long.

4           MR. NETZER:  Thank you very much.

5        I'm not seeing it in the Live Note.

6        A.   I didn't consider any specific

7    amount but, given the number of loans, my

8    immediate thought would have been it would

9    have taken years and much, much more time and

10   cost than sampling would.

11   BY MR. NETZER:

12       Q.   Okay.  And apart from what -- and

13   can you elaborate on -- is there anything

14   else you did other than having that thought

15   to reach the conclusion that it would be

16   impractical?

17       A.   I had the thought -- and I don't

18   know if you would consider that something I

19   did, but I had the thought that given a

20   choice between a sampling methodology and

21   something that involved reviewing every

22   single loan, it's impractical because the

23   sampling methodology allows you to arrive at

24   claim with far less cost and effort.  So --

33

```
 1                      Parekh
 2          Q.    Fair enough.
 3          A.    -- that would have been --
 4          Q.    That would have been the thought?
 5          A.    That would have been the thought.
 6          Q.    That counts and -- within my
 7     question, I mean.
 8                And the choice you mentioned, did
 9     you present that choice as options or
10     alternatives for your client?
11          A.    I don't -- I don't recall any
12     discussions.
13          Q.    Did your clients ask you to
14     consider those two options?
15          A.    I don't recall that they did.
16          Q.    Prior to July or August of 2014,
17     what, if any, discussions did you have with
18     the trustees about doing a loan-by-loan
19     analysis and prosecution of claims?
20          A.    I don't recall any.
21          Q.    To the best of your recollection,
22     was there any such discussion?
23          A.    There may have been such
24     discussions, but I wasn't -- I don't recall
25     being involved in any personally.
```

34

Parekh

1

2    Q.    Okay.  What has -- what did your

3    clients tell you about their own assessment

4    of the use of a Protocol to analyze and

5    prosecute -- to analyze the loans and

6    prosecute claims with respect to them?

7                MR. MUNNO:  Objection.

8                You may answer.

9    A.    Generally, the clients expressed

10   what I would characterize as disbelief in an

11   ability to do a loan-by-loan review

12   practically.

13   BY MR. NETZER:

14   Q.    Okay.  And what was their basis for

15   their disbelief?

16   A.    I don't think I can answer what was

17   in their head, but some of the things that

18   were expressed to me is there are a lot of

19   loans and it would take a long, long time to

20   go through this and it would cost a lot of

21   time.  And potentially, you know, have all

22   sorts of logistical problems that may even

23   prevent them from even being able to do it in

24   the first place.

25   Q.    Okay.  And they had experience with

35

1                           Parekh

2       using a sample method?  Your clients, I mean,

3       the trustees.

4            A.   At least some of the trustees had

5       an experience because we worked -- "we" being

6       Duff & Phelps and I -- worked with them in

7       ResCap.  And we used a sample there.  I don't

8       know if all of the clients have, but I know

9       that certainly many of the -- many of the

10      clients and the ones I would call active and

11      core attorneys were also involved in ResCap.

12           Q.   And what consideration -- and did

13      you discuss the ResCap process with your

14      clients in this case?  I mean, did you

15      discuss -- in connection with this case, did

16      you discuss with the trustees their

17      experience and your experience in ResCap?

18           A.   Certainly, in general terms.  And

19      the reason I hesitate is much of my

20      involvement with ResCap is subject to

21      mediation privilege.  And I'll -- I'd have to

22      get some guidance on whether -- you know, how

23      much detail I can speak about this

24      deposition.

25           But certainly --

36

1                         Parekh

2          Q.   I'm only asking about your

3     discussions --

4          A.   With?

5          Q.   -- with the trustees in this case.

6          A.   In that case?

7          Q.   About ResCap.

8          A.   About ResCap.  We discussed our

9     experiences in ResCap.

10         Q.   I'm sorry.  I said I wouldn't

11    interrupt and I did.

12         A.   I'll forgive you.

13              So, what was your question, though?

14    I didn't actually hear it.

15         Q.   When were those discussions?

16         A.   At various points over the last two

17    years.  I can't recall any specific time that

18    they would have happened, but it would have

19    been a topic of discussion over the last two

20    years.

21         Q.   And was one of the topics of

22    discussion whether or not to use a sample

23    versus a loan-by-loan approach?

24         A.   That did come up, but after July.

25         Q.   Fair enough.  Thank you for --

37

                    Parekh

1
2       you're right, that was what I was focusing

3       on.   Thank you.

4               Footnote -- on page 3 of your

5       report, which is Exhibit 1 --

6       A.    Um-hum.

7       Q.    -- you referenced the fact that

8       your conclusion -- footnote referenced the

9       fact that your conclusions did not extend to

10      the question of "the ability of the Trustees

11      to satisfy the requirement in Part 1.a.iii of

12      the Proposed Lehman Protocol that sets a

13      claim Cut-Off Date of 60 days."

14              Do you see that?

15      A.    I do.

16      Q.    Have you not given consideration to

17      that?

18      A.    I've given consideration to it.   I

19      didn't include it in the analysis in my

20      declaration.

21      Q.    What was your conclusion, or

22      what --

23      A.    What was my consideration?

24      Q.    Thank you.   If you reached a

25      conclusion, tell me what it was.

38

Parekh

1

2      A.    Sure.

3            So, the 60-day claim cutoff, which

4     I find it highly impractical that the

5     trustees could make all their claims within

6     60 days based on a couple of things.

7            One, I think it would take more

8     than 60 days just to get all the loans from

9     the servicers, and then to review them and

10    put together the claim packet that's required

11    by the Protocol with the 43 document groups,

12    all of that, just I didn't think it was

13    practical -- you know, I don't think it's

14    practical that could be done all within 60

15    days.

16      Q.    Okay.  Why didn't you -- why did

17    you omit it from your report?

18      A.    I omitted it from my report because

19    I was trying to estimate the time and cost of

20    the report and not --

21      Q.    The Protocol?

22      A.    I'm sorry.  Of the Protocol.

23            And this was a step that did not

24    have a time limit -- at least did not have a

25    cost associated with it, and it was -- it was

39

1                           Parekh

2      really part of step zero of the -- of my --

3      of my analysis, which is, you know, prior to

4      the -- to the Protocol.

5           Q.    Okay.   So, you didn't do a

6      full-blown analysis, although you have a view

7      as to whether it would be practical or not?

8           A.    I have a view as to whether it

9      would be practical.

10          Q.    But you, in fact, did not do an

11     expert analysis of that for purposes of

12     this -- of this report?

13          A.    Of this report, no.

14          Q.    Okay.

15          A.    As I think I wrote there.

16          Q.    You did.   Indeed, you did.

17     Sometimes I repeat things --

18          A.    That's fine.

19          Q.    -- pedantically, but just trying to

20     nail a few things down.

21               Can you go to page 5 of your report

22     to the Scenario Inputs and Assumptions

23     section, paragraph 18, which carries over

24     onto page 6.   I have a question about that.

25          A.    Okay, I'm there.

40

1                        Parekh

2        Q.   Okay.

3             You reference the Trustees' loan

4   firm, Digital Risk.

5        A.   Yes.

6        Q.   And have you worked with Digital

7   Risk in the past prior to working with them

8   in connection with this case?

9        A.   I have not.  Others at Duff &

10  Phelps have.

11       Q.   Okay.  And what is a --

12            You call them a "loan review firm."

13  Can you for the record state what a loan

14  review firm is and does?

15       A.   A loan review firm is a firm that

16  specializes in the reunderwriting of loans

17  for the purposes of reviewing for breaches of

18  reps and warranties.  They may do other

19  things, but that's how I see a loan review

20  firm in this matter.

21       Q.   Okay.  And when did loan review

22  firms begin doing this kind of work?

23            MR. MUNNO:  Objection.

24            You may answer.

25       A.   I don't know when they began doing

41

                            Parekh

1

2     this kind of work.

3     BY MR. NETZER:

4          Q.   Is this a new industry or has it

5     been around for a while?

6          A.   I couldn't answer when -- if it's

7     been around a while or not.  I mean, I have

8     to imagine that in -- you know, there have

9     been mortgage loans for quite some time.  And

10    so, in some form or another, there may have

11    been someone reviewing loans.  But my

12    familiarity dates back, you know, to about

13    two and a half years ago with --

14         Q.   What happens --

15              MR. MUNNO:  Let him finish.

16         A.   -- with loan review firms.

17    BY MR. NETZER:

18         Q.   Oh, I'm sorry.

19         A.   With loan review firms.

20              But given that I have colleagues

21    with, you know, many, many years of expertise

22    with the mortgage industry, you know, I would

23    have to assume that in some form or another

24    there may have been loan reviewers.  But I

25    don't know how far back it goes that there

42

1                         Parekh

2    are firms that specialize in reviewing

3    mortgages for reps and warranties breaches.

4         Q.    Who are the other loan review firms

5    besides Digital Risk?

6         A.    That I'm familiar with?  I can't

7    tell you all of them.  I'm familiar with

8    Barrant Group, Edge Mac, Recovco, Cross Check

9    Compliance.  There are others, I imagine

10   there are firms.  And I'm not familiar with,

11   you know, their sizes or anything like that,

12   but those are the names of some that I can

13   recall right now that I'm familiar with.

14        Q.    What work did you -- what work have

15   you done with those, the ones you just

16   testified about, not including Digital Risk?

17        A.    With some of those firms, I have

18   participated in forensic loan reviews.  The

19   only one that I -- that is disclosed is

20   Cross Check Compliance was the loan review

21   firm hired by the trustees in ResCap.

22        Q.    And what was your -- what

23   experience have you had with the others?

24        A.    With some of those, Edge Mac,

25   Barrant, Recovco, I or others at my firm have

43

1                          Parekh

2       participated in loan reviews with those

3       firms.

4            Q.   For the moment, I'd like to focus

5       just on you.

6            A.   Um-hum.

7            Q.   What experience have you had with

8       the firms other than Digital and -- apart

9       from Digital and was it Cross Check?

10           A.   It was Cross Check.  And it was the

11      one I mentioned in ResCap.

12           Q.   Okay.  Apart from those two, I'm

13      now asking you, sir, what experience have you

14      had with these -- with other loan review

15      firms?

16           A.   So, those are -- those are loan

17      review firms who have been hired in trustee

18      matters in which I've worked to do the

19      forensic reviews.  And my experience has

20      to -- has been to sit alongside with them,

21      review some portion of the loans personally

22      so I could have a better understanding of

23      what's going on, look at their results and

24      employ their results in estimating sometimes

25      bankruptcy claims, damages claims, all

44

                    Parekh

1

2   related to RMBS, you know, securities that

3   have loans with breaches.

4        Q.   And which are the firms that you've

5   worked with besides Digital and Cross Check?

6        A.   I've worked with Edge Mac, I've

7   worked Barrent Group.  Those are the other

8   two that I have personally worked with.

9        Q.   And who are the people you worked

10  with at Edge Mac?  Who in particular?  Who,

11  the individuals, I mean.

12       A.   Yeah, the individuals, I can't

13  recall the name now.

14       Q.   How about at Barrent Group?

15       A.   Again, I can't recall the name of

16  the person at Barrant Group.

17       Q.   Or could you give me any references

18  who would be familiar with you at either of

19  those firms?

20       A.   Well, the head of Edge Mac would be

21  familiar with me.  Barrent Group, I can't

22  recall speaking to anyone there.  I would

23  have reviewed their results and reviewed

24  loans that they had reviewed and -- but they

25  likely would have just communicated with the

45

1                         Parekh

2    trustee or with counsel.

3         Q.    Okay.  And -- but you say the head

4    of Edge Mac?

5         A.    Yes, I've spoken to her.

6         Q.    About what?

7         A.    About the loan reviews and the

8    results and --

9              Oh, there's one more also that I

10   recall now.  It's called Investors

11   Consulting.  And I've worked with them as

12   well, a man named Dave Pilowsky.

13        Q.    Okay.  What is the name of the

14   woman at Edge Mac?

15        A.    I can't -- that's the name I can't

16   recall.

17        Q.    Oh, you can't.

18        A.    I have to go look it up.  But I've

19   had multiple conversations with her and, you

20   know, counsel in this matter.

21        Q.    Counsel in this matter?

22        A.    No, no, not this matter.  That

23   matter.  Sorry.

24        Q.    That's okay.

25        A.    That was a misuse of "this" and

46

Parekh

1      "that."

2      Q.    Don't worry.

3      Okay.  And what -- when did you

4      first become involved in the mortgage

5      industry?

6      A.    I first became involved in RMBS

7      matters about two and a half years ago.

8      Q.    I was asking now in the mortgage

9      industry in general.

10     A.    That would be the same answer,

11     about two and a half years ago.

12     Q.    And how did that come about?

13     A.    With my retention and my firm's

14     retention in ResCap.

15     Q.    And what experience do you have,

16     you individually have, with doing a

17     loan-by-loan analysis of mortgages in a

18     portfolio?

19     A.    Well, I've reviewed mortgage loans

20     files for breaches of reps and warranties.

21     Q.    Okay.  And how many?  You know, you

22     can estimate.

23     A.    In total, several hundred, less

24     than a thousand.

47

Parekh

1     Q.   And when was the first time you did

2  that?

4     A.   In connection with the ResCap

5  matter, about two and a half years ago.

6     Q.   Okay.  And your role was to review

7  specific loans, or were you overseeing a team

8  of people working on loans or how did -- what

9  was your role?

10    A.   Both.  I was overseeing a team and,

11 as part of that oversight, I reviewed loans

12 and I was -- I was trained by those at

13 Cross Check Compliance and the ResCap on how

14 they review loans.  And I participated in the

15 process for a few hundred loans --

16    Q.   Go ahead.

17    A.   -- in order to better have an

18 understanding of timing and cost so that we

19 could, you know, make sure to do our job

20 expeditiously and efficiently.  And

21 accurately.  Sorry.

22    Q.   When you say "our job," what is

23 "our job"?

24    A.   Our job is ResCap was to assist the

25 trustees in estimating their claim in that

48

                              Parekh

1

2    bankruptcy.  And part of that would have been

3    estimating the number of breaches and reps

4    and warranties.

5         Q.   Okay.  And when you say you

6    participated, can you elaborate or tell me

7    what your participation consisted of?

8         A.   Yeah.  I sat --

9              Well, in terms of the overall

10   bankruptcy or the -- or specifically the loan

11   review?

12        Q.   Well, I was referring to what you

13   said earlier about "I participated in the

14   process for a few hundred loans."  That.

15        A.   Okay.

16             So, for the loan review, I sat in

17   front of a computer screen with loan files,

18   and I went through loan files page by page

19   with a -- you know, an experienced reviewer

20   sitting next to me.  And he or she, depending

21   on who it was, would show me what they do and

22   what they look for and how they get the

23   results.

24             And then eventually I started

25   reviewing, you know, some loans on my own to

49

Parekh

1   make sure that I got the same results that

2   the Cross Check reviewers were getting.

3       Q.   Okay.  And how many did you do on

4   your own?

5       A.   Probably about 200 on my own

6   without any supervision.

7       Q.   Okay.  And what became -- those

8   loans, were they made the subject of a claim?

9       A.   They were -- they were part of the

10  sample that estimated the claim.

11      Q.   And what happened with respect to

12  those particular loans that you reviewed in

13  connection --

14      A.   I don't know what you mean by "what

15  happened to them."

16      Q.   Well, after you finished your

17  review --

18      A.   Um-hum.

19      Q.   -- they became part of a sample

20  that was part of an estimation process,

21  correct?

22      A.   Well, they were already part of a

23  sample.  That's why I reviewed them.

24      Q.   And what happened to the ones that

50

Parekh

1    you reviewed after your review?  I mean, what

2    happened in the process?

3        A.    What happened in the process was

4    the results from those loans would get

5    tallied into the overall results from the

6    sample and then that -- those results, along

7    with the results of all the other loans in

8    the sample, were used to estimate the claim.

9        Q.    Okay.  Do you remember in

10   particular what use was made of the loans you

11   had reviewed in connection with the

12   estimation of the claims?

13       A.    They contributed to the -- those

14   particular loans contributed to the -- to the

15   overall results.

16       Q.    And how?  How did those particular

17   loans contribute?

18       A.    Well, if there was a breach -- and

19   I can't recall of those loans how many had a

20   breach.  But if there was a breach, then that

21   loan was tallied as having a breach.

22       Q.    And you were involved in the

23   prosecution of the claim in connection with

24   the sample, correct?

51

1                   Parekh

2          MR. MUNNO:  Objection.

3          You may answer.

4     A.   I was involved in the estimation of

5  the claim.  And I guess the prosecution of

6  the claim was done by the counsel, and I was

7  retained by counsel and assisting counsel.

8  BY MR. NETZER:

9     Q.   Okay.  Let's go back to paragraph

10  18 now.

11     A.   Um-hum.

12     Q.   You spoke with key personnel at the

13  trustees' loan review firm --

14     A.   Um-hum.

15     Q.   -- concerning the subjects that you

16  opine about.  Who in particular at Digital

17  Risk did you talk to?

18     A.   In particular, it would have been

19  Joe Phillips, who has a --

20          Well, in particular, it would have

21  been Joe Phillips, but I also went to Digital

22  Risk and spent, I think, a couple of days

23  there and to better understand their process.

24  And in that time I spoke to other people --

25  you know, met and spoke to other people.  The

52

Parekh

1   only one I can specifically remember was a

2   loan fulfillment manager whose name was

3   Hector.  And I can't recall his last name.

4   But Joe Phillips would have been the

5   primary --

6        Q.   Okay.  And when --

7        A.   -- contact.

8        Q.   When was it that you spoke to

9   Mr. Phillips and visited Digital for a couple

10  of days?

11       A.   Oh, I would say it must have been

12  in the -- in a spring or summer because it

13  was warm there in Orlando when we met with

14  them.

15            So, it's always warm.  It would

16  have been closer to -- well, when we visited

17  would have been closer to our initial

18  engagement.  So, maybe a year and a half ago,

19  maybe even up to, you know, closer to two

20  years ago.

21            And then I spoke with Joe Phillips

22  prior to filing both my August report and my

23  November -- August declaration and my

24  November declaration, as well as I spoke to

53

1                           Parekh

2      him on the phone.

3           Q.   Okay.  And why did you speak to him

4      as opposed to anyone else?  That is, I'm

5      talking about in connection with your

6      reports.

7           A.   Yeah, I spoke to him because he is

8      our -- he was -- served as our primary point

9      of contact and -- with Digital Risk.  And so,

10     he was the person that we would call if we

11     needed to speak with Digital Risk.

12          Q.   Okay.  And what is his role?

13          A.   His role is managerial, you know,

14     both process and business.  I can't recall

15     his exact title, but --

16          Q.   What does he do?

17          A.   He -- for us, he oversaw the

18     Digital Risk loan review forensic

19     reunderwriting process.

20          Q.   Who was it who came up with the

21     sample?

22          A.   A firm called Cowen & Company.

23          Q.   And you spoke to them, too?

24          A.   I have spoken with them, as well.

25          Q.   Now, when you spoke to Digital Risk

54

Parekh

1    about estimating --

2           You spoke to Digital Risk, did you

3    not, about estimating the time and cost

4    required for a loan review, correct?

5         A.   That is correct.

6         Q.   Okay.  Did you speak to any other

7    loan companies about that?

8         A.   Not in connection with this matter.

9         Q.   I'm talking about the -- thank you.

10   I'm now talking specifically about the trust,

11   on behalf of the trustees.

12        A.   In the Lehman bankruptcy.

13        Q.   Well, have you talked with -- yes.

14        A.   The -- okay.

15        Q.   Did you talk with any other loan

16   companies?

17             MR. MUNNO:  In connection with the

18        Lehman matter that we're talking about

19        or other matters?

20             MR. NETZER:  In the Lehman

21        bankruptcy, yes.

22   BY MR. NETZER:

23        Q.   In connection with the Lehman

24   bankruptcy, did you discuss estimating loan

55

Parekh

1    review time and cost with anyone other than

2    Digital?

3        A.    No one other than Digital Risk in

4    connection with the Lehman bankruptcy.

5        Q.    Why not?

6        A.    Because Digital Risk is the firm

7    that the trustees selected to do their loan

8    review.  It's the only firm that, in

9    connection with these loans and this

10   bankruptcy, we had diligenced their process.

11   And so their estimates seemed the most --

12   would be the most relevant because, in my

13   estimation, they would be the ones that could

14   perform this review.

15       Q.    Do you have any reason to believe

16   that other loan companies could not do the

17   review more cheaply or more quickly?

18       A.    I don't believe it would be

19   reasonable for other loan companies to do the

20   review more cheaply or more quickly based on,

21   you know, my experience with other loan

22   review firms as well as, you know, the

23   experience of loan reviews and loan review

24   firms of those -- you know, colleagues at

56

```
 1                    Parekh
 2   Duff & Phelps who have decades of experience
 3   in the mortgage industry and have also
 4   considerable experience working with loan
 5   review firms.
 6        Q.   But I'm now asking about the basis
 7   you're testifying to the Court about.
 8        A.   Um-hum.
 9        Q.   What -- apart from -- I mean, you
10   didn't even think of calling up another firm
11   to see if they could do it more cheaply or
12   more quickly?
13            MR. MUNNO:  I think the witness has
14        asked and answered.
15            You can answer again.
16        A.   I can't recall whether I thought of
17   it, but my conclusion is that Digital Risk's
18   estimates would be the germane estimates to
19   this matter.  They had already looked at
20   loans similar to these that -- not similar.
21   They had already looked at a sample of loans
22   from the -- from the covered loans, and so
23   their estimate of how they could do this and
24   what it would take was the relevant estimate.
25   BY MR. NETZER:
```

57

1                           Parekh

2        Q.    And did you discuss with Digital

3    reducing the cost and increasing the

4    efficiency and how that could be done?

5        A.    Yes, I did.

6        Q.    Tell us what those discussions

7    were, what you said and what they said.

8        A.    Well, I asked when I --

9             As I said in my report, when I

10   initially asked, they gave me a number of

11   reviewers.  And I pressed them and said, you

12   know, "Could you get more reviewers?" and

13   they said "with considerable effort of

14   finding other reviewers."

15            And, you know, it might take some

16   lead time to find those reviewers because

17   firms are at capacity, their firm was at

18   capacity, but they could find -- they could

19   double it.

20            Then I inquired as to whether they

21   would be quality reviewers or would we have

22   quality control problems?  And they assured

23   us that, no, they could -- they could find

24   the 40 quality reviewers to do this.

25       Q.    And did you discuss with them --

58

Parekh

1                    But those would be people -- am I

2     correct that they would have to hire those

3     people?

4          A.   I didn't -- I don't know how they

5     would obtain those.  They would be

6     responsible for them, so I don't know whether

7     they would hire them as 1099 employees or if

8     they were already on-staff.  That I don't

9     know the answer to.  But when I asked, I was

10    told instead of 20, they could get 40.

11         Q.   Just a minute.

12                    Footnote 12 on page 8 you say,

13    "Interview with Joe Phillips, Digital Risk.

14    Mr. Phillips informed me that finding more

15    than 20 reviewers would be difficult;

16    however, with enough lead time and

17    significant effort it may be possible to find

18    as many as 40 qualified reviewers."

19                    MR. MUNNO:   Footnote 12, for the

20         record.

21    BY MR. NETZER:

22         Q.   What did he mean by finding?

23         A.   I interpreted the word "find" to

24    mean employing, use -- and not employing in

59

                                    Parekh

1    the sense -- just use.

2            I did assume he meant locate either

3    within his firm or without his firm, but

4    present for use to the trustees, is how I --

5    I meant the word "find" -- interpreted the

6    word "find."

7        Q.    Okay.  But you didn't discuss with

8    him whether they would be people from outside

9    his firm?

10        A.    I didn't.  I asked him if they

11   would be of high quality.  He said "yes."

12   And, at that point, that seemed to be enough.

13   That's what he said they -- they could get

14   for our use.

15        Q.    When you said "would they be of

16   high quality," what did you mean?

17        A.    So, when we went to -- when we at

18   Duff & Phelps went down to Digital Risk, one

19   of the things that we ascertained was the --

20   was their quality control procedure of making

21   sure that their -- that their findings are

22   accurate.

23            And as part of that, their

24   reviewers need to be experienced enough to do

60

Parekh

1    the job.  And I wanted to make sure that when

2    he was presenting us with 40 reviewers, those

3    would be reviewers who were good enough in

4    the dimensions that reviewers need to be good

5    at to do their job.

6        Q.   And when you did your initial visit

7    where you learned about -- concerning quality

8    control, was it your understanding that the

9    reviewers were employees of Digital?

10       A.   I don't have an understanding.  My

11   understanding is that Digital Risk was

12   responsible for the -- their results,

13   their -- you know, was responsible for paying

14   them.  I don't know if that makes them an

15   employee or not.

16       Q.   Well, what --

17            Can you please elaborate on the due

18   diligence that Duff & Phelps did --

19       A.   Um-hum.

20       Q.   -- in connection with ensuring the

21   quality control of the initial 20 reviewers.

22       A.   Well, that would be, you know, done

23   in more detail in Jim -- in the report, you

24   know, Jim Aronoff's declaration.  But what we

61

Parekh

1   did was we reviewed their credentials and we

2   met with them and we talked to some of them,

3   but not all of them, about their experience.

4          And we looked at their process of

5   how they take loans in from the beginning and

6   all the way through their process of checking

7   and double-checking the results, and then how

8   they present them to us.

9      Q.   And they were all -- your

10  understanding was that they would be

11  employees -- this is the 20, now -- would be

12  employees of Digital Risk or not necessarily?

13     A.   Well, again, I'm struggling with

14  what you mean by "employees."  They're not

15  volunteers.  They're being paid to do this

16  job.  I -- how they're being paid in terms of

17  their actual tax structure, I don't know.

18     Q.   Fair enough.

19          My question is, were they -- would

20  they be people who were brought in for a

21  specific project or who had worked with

22  Digital Risk before?

23     A.   I don't know the answer to that.

24     Q.   So far as you're aware, correct,

62

                        Parekh

1

2    the loan reviewers can be brought in from the

3    outside?

4         A.   I'm aware that is possible.

5         Q.   Do you have --

6         A.   As far as I'm aware, that is

7    possible.

8         Q.   You don't know one way or the

9    other, do you, whether they're brought in

10   from the outside or they're preexisting

11   people who have worked with Digital Risk

12   before, correct?

13        A.   I -- at this time, I can't recall

14   one way or the other.

15        Q.   Did you ever know?

16        A.   I don't know if I ever knew.

17        Q.   Okay.  And, similarly, you don't

18   know whether the additional 20 would be knew

19   (sic) to Digital Risk, correct?

20        A.   I don't know whether -- how Digital

21   Risk would go about finding those people and

22   employing them, but -- so, no, I don't know

23   one way or the other.

24        Q.   Okay.  And did you discuss with --

25             So, so far as you're aware,

63

                        Parekh

1

2      therefore, the additional loan reviewers

3      could -- might be or might not be people that

4      were brought in from the outside and had not

5      worked with Digital Risk before, fair?

6               MR. MUNNO:   Objection;

7          hypothetical.

8               You may answer.

9          A.   Yeah, I don't know -- I don't know

10     how Digital Risk would do that.  No, I don't

11     know one way or the other.

12     BY MR. NETZER:

13         Q.   So, really it is just a matter of

14     hypothesis for you; your lawyer is quite

15     right, you have no knowledge of it?

16              MR. MUNNO:   "It" being what?

17              MR. NETZER:   The subject of my

18          question.

19         A.   I'll answer -- I have no knowledge

20     as to how Digital Risk selects and hires its

21     employees.

22     BY MR. NETZER:

23         Q.   Okay.  And why couldn't Digital

24     Risk get 60 as opposed to 40?

25              MR. MUNNO:   Objection;

64

```
1                         Parekh

2         hypothetical.

3               You may answer.

4         A.   I don't know why they couldn't get

5    60.

6    BY MR. NETZER:

7         Q.   Again, your lawyer is right, it's

8    complete speculation on your part, right, you

9    don't know?

10              MR. MUNNO:  Objection.

11              You may answer.

12        A.   There -- what's complete

13   speculation?  I'm sorry.

14   BY MR. NETZER:

15        Q.   On whether they could get 60 or

16   not.

17        A.   Well, I don't think they can get 60

18   because I asked the question and I was told

19   they could get 40.

20        Q.   That's right.  But apart from that,

21   you don't know?

22        A.   Well, I don't think they could get

23   60 because it -- if they could get 60, I --

24   Mr. Phillips would have told me they could

25   get 60.
```

65

                    Parekh

1

2        Q.   What did Mr. Phillips say when you

3    asked him "Why can't you get 60?"

4             MR. MUNNO:  Objection.

5        A.   I didn't ask him why he can't get

6    60.

7    BY MR. NETZER:

8        Q.   That's right.  You didn't, did you?

9        A.   I asked him if he could get more --

10       Q.   What about 40?

11            MR. MUNNO:  He didn't finish

12       answering his question.

13            MR. NETZER:  I'm sorry.  I thought

14       he was done.

15       A.   I asked if he could get more than

16   20, and he replied that he could get 40, up

17   to 40.

18   BY MR. NETZER:

19       Q.   Up to 40.  Up to 40 more?

20       A.   No, no.  Up to 40 total.

21       Q.   Okay.  And why couldn't he get

22   more?

23            MR. MUNNO:  Objection.

24       A.   The only thing he told me about the

25   limits was that there weren't qualified

66

1                         Parekh

2       reviewers available.  And he would have to

3       work, but he could reallocate some resources

4       and get 40.

5       BY MR. NETZER:

6            Q.    Reallocate resources?

7            A.    (Witness nodded head.)

8            Q.    What did that mean?

9            A.    I think that meant that his

10      reviewers would be doing other things, but

11      with some effort and consolidation he could

12      put 40 reviewers on this -- on this project.

13           Q.    Okay.  And these would be new

14      hires?

15           A.    I don't know.

16           Q.    Did you ask him?

17           A.    No.

18           Q.    And did you ask him why he couldn't

19      get more than 20 -- 20 more, that is, total

20      40?

21                 MR. MUNNO:  Asked and answered.

22                 You may answer it one more time

23            only.

24           A.    No, I asked him if he could get

25      more than 20.  That's what I asked him.

```
 1                      Parekh
 2   BY MR. NETZER:
 3        Q.    And did you ask any other loan
 4   review companies if they could supply more
 5   personnel to the project than just 40 loan
 6   reviewers?
 7        A.    Did I ask any loan reviewers in
 8   connection with this matter?
 9        Q.    Yes.
10        A.    If -- no, I thought I had testified
11   earlier that I had not spoken to other loan
12   review firms in connection with this matter.
13        Q.    And what did you and Mr. Phillips
14   discuss with respect to working with other
15   loan review companies to --
16             MR. MUNNO:  Objection.
17   BY MR. NETZER:
18        Q.    -- augment --
19             MR. NETZER:  Pardon?
20             MR. MUNNO:  I'm sorry.  I thought
21        you finished.
22   BY MR. NETZER:
23        Q.    What did you and Mr. Phillips
24   discuss with respect to Digital working with
25   other loan review companies to complete the
```

68

Parekh

1    loan review?

2             MR. MUNNO:  Objection.

3             You may answer.

4             MR. NETZER:  Basis?

5             MR. MUNNO:  No foundation for the

6        question.

7    BY MR. NETZER:

8        Q.   Oh.  So, you -- I'm sorry.  You

9    never did discuss this.  I get what your

10   lawyer is saying.

11       A.   I never discussed that with --

12       Q.   Why not?

13            MR. MUNNO:  You may answer the

14       question.

15       A.   I thought I had.  I never discussed

16   that.

17   BY MR. NETZER:

18       Q.   Why not?

19       A.   Oh, I'm sorry.  I didn't hear you.

20   I apologize.

21       Q.   No.  I probably mumbled.

22            Why not?

23       A.   I -- it -- Digital Risk was the

24   firm that was doing the loan reviews.  And

69

1                           Parekh

2    we, you know -- we had diligenced Digital

3    Risk and were satisfied with the quality that

4    they were giving us.

5              If other firms were to be brought

6    in, that would be a different process.  That

7    would -- that would create potential other

8    problems.  And in doing this analysis, I

9    wasn't prepared to analyze, you know, what

10   the cost and time associated with those

11   problems would be, because Digital Risk was

12   the firm that the trustees and Duff & Phelps

13   were comfortable with.

14        Q.   Okay.  And they were not

15   comfortable with any others?

16        A.   Not at the time.  Not at this time.

17        Q.   Well, was there -- tell me --

18        A.   In connection with this matter.

19        Q.   Um-hum.  Do you have any reason to

20   think that other firms could not do what

21   Digital Risk is going to do or would be

22   doing?

23        A.   I think there are other firms that

24   can do that, do the work that Digital Risk

25   would.  So, I don't want to say there are any

70

Parekh

1    other firms, but I do believe there are other

2    firms that could also review loans to the

3    quality that Digital Risk does.

4         Q.   Which firms?

5         A.   The ones I had mentioned in the

6    past, Cross Check, Edge Mac, Barrent.  But

7    these are not firms that we were working with

8    in connection with this matter.

9         Q.   And what is the reason that the

10   trustees couldn't work with these firms in

11   this matter?

12             MR. MUNNO:   Objection.

13        A.   I didn't -- I don't believe I --

14   their -- I gave a reason that they couldn't.

15   I said they aren't working with.

16   BY MR. NETZER:

17        Q.   Is there any reason why they

18   couldn't?

19        A.   They could work with other firms.

20   It would require some potential -- you know,

21   potential but certainly some up-front effort,

22   time and cost.

23        Q.   How much?

24        A.   I don't know the answer to that.

71

1                           Parekh

2         Q.   Do you have any idea?

3         A.   Well, it would certainly take, you

4    know, a few days for each firm to -- two or

5    three days for each firm to go diligence

6    these firms and meet with them.

7              But what I really don't have any

8    sense of is when you have multiple firms

9    working together, there's going to have to be

10   some sort of oversight and management

11   structure over the top of all this, and

12   there's also going to have to be integration

13   of computer systems so that the quality

14   control can go back and forth so that the

15   results coming out are all standardized.

16             And I don't -- I've never been

17   involved with doing that.  I'm not saying it

18   can't be done, but I just don't know what

19   that would involve.

20        Q.   I'm sorry.  Why did they have to be

21   standardized?

22        A.   Because -- why?  Sorry.

23        Q.   There are different trusts here,

24   correct?

25        A.   There are different trusts,

72

                          Parekh

1

2     absolutely.

3          Q.    There are different trustees,

4     correct?

5          A.    There are different trustees.

6          Q.    Why does the loan review have to be

7     standardized?

8          A.    I'm not saying the loan review

9     needs to be standardized.  The results need

10    to be standardized and coordinated.

11         Q.    Because?

12         A.    Because when you get a massive

13    number of results, 200 -- you know, 200,000

14    odd reviews, if the results of the loan

15    review are differently calibrated, different

16    standards for material and adverse, for

17    example, it would be -- potentially lead to

18    inaccuracies or a high variability -- low

19    level of precision in figuring out the

20    claim -- in figuring out what loans the

21    trustees would want to submit into the

22    Protocol.

23              MR. MUNNO:  Would this be a good

24         time for a break?

25              MR. NETZER:  Sure, absolutely.

73

1                          Parekh

2               THE WITNESS:  Thank you.

3               (Recess taken.)

4     BY MR. NETZER:

5          Q.   Sir, are you offering yourself to

6     the Court as an expert on loan review?

7          A.   I'm --

8               MR. MUNNO:  I'm going to object

9          because the lawyers are going to be

10         offering experts and the subjects.  And

11         he's not going to be offered as an

12         expert on loan review.  He's being

13         offered as someone who has analyzed the

14         Protocol.

15              MR. NETZER:  Right.  I'm trying to

16         understand the basis for the expertise

17         that enables him to analyze the

18         Protocol.

19    BY MR. NETZER:

20         Q.   Are you an expert on loan review?

21         A.   I have participated in loan reviews

22    extensively over the last two and a half

23    years, and the basis of the opinions in my

24    report also include discussions with those at

25    Duff & Phelps who are experts on loan review

74

Parekh

1    specifically and have decades of experience

2    in the mortgage securitization and mortgage

3    industry.

4         Q.   For the -- I'm asking, and I'm

5    offering your answer to the Court:  Are you

6    an expert on loan review or not?

7         A.   I'm not an expert in the

8    interpretation of results of loan reviews.  I

9    have -- like I said, I have two and a half

10   years of experience working with loan reviews

11   quite extensively.

12        Q.   Are you an expert on conducting a

13   loan review?

14             MR. PEDONE:  Can I take a break and

15        speak to Mr. Munno for a second?

16             MR. NETZER:  Could we wait until I

17        get an answer to my question?

18             MR. PEDONE:  Of course.

19             THE WITNESS:  And your question was

20        again --

21             I'm sorry.  Can it just be read

22        back?

23   BY MR. NETZER:

24        Q.   Are you an expert on conducting a

75

Parekh

1  loan review?

2          MR. MUNNO:  I'm going to object.

3      It's a legal conclusion.

4          But you may answer.

5      A.   I have, like I said, two and a half

6  years of experience in working with firms

7  that engage in loan reviews.  I know how to

8  get a loan review done.  If someone came to

9  me and said, "We need to get a loan review

10  done," I can get that loan review done.

11          I don't know if that's conducting a

12  loan review, but I know exactly how to get

13  that loan review done based on my experience,

14  as well as the fact that those that I work

15  with at Duff & Phelps have conducted, as I --

16  many, many loan reviews.

17  BY MR. NETZER:

18      Q.   Well, let's take your -- I'm going

19  to use your style.

20          If someone came to you and said,

21  "We're looking for an expert on loan

22  reviews," would you say, "I'm your man"?

23      A.   I would ask, "What part of a loan

24  review do you need expertise on?"

76

1                         Parekh

2         Q.   And then depending on the answer,

3    you could say, "Yes I can do that" or, "No, I

4    can't do that"?

5         A.   Depending on the answer, I would

6    say "I can do it" or I would direct them to

7    the person at Duff & Phelps that could do

8    that piece.

9              MR. NETZER:  Are you okay here?

10        You need a break?

11             MR. PEDONE:  I would love to speak

12        with Mr. Munno.

13             MR. NETZER:  Okay.  Can the witness

14        stay here at least?

15             MR. PEDONE:  Sure.

16             MR. MUNNO:  Don't ask him any

17        questions.

18             MR. NETZER:  I just want to save

19        time.

20             (Recess taken.)

21   BY MR. NETZER:

22        Q.   When you spoke to Mr. Phillips and

23   he gave you the estimate that is referenced

24   in your report in, let's see, paragraph 23,

25   did you -- which of your colleagues at Duff &

77

1                        Parekh

2    Phelps did you ask to verify that this was

3    correct, what he had told you, what

4    Mr. Phillips had told you?

5              MR. MUNNO:   Objection.

6              You may answer.

7         A.   I spoke with Jim Aronoff and

8    Richard Sauerwein.

9    BY MR. NETZER:

10        Q.   And what did they say and what did

11   you say?

12        A.   They told me that they were

13   skeptical that 40 reviewers are possible.

14   They had experience conducting loan reviews

15   and finding even 20 reviewers has been -- has

16   been difficult for them.

17             And I said to them that

18   Mr. Phillips said he could get 40 reviewers.

19   And they said they were skeptical, again.

20             And I said, "Well, but if he thinks

21   he can get 40 reviewers, then that's the best

22   information in this matter that I have to go

23   on."

24        Q.   Did you talk to them about using

25   reviewers who weren't at Digital?

78

```
 1                        Parekh
 2        A.   Yes.  And none of -- none of us
 3   have ever heard of a loan review that
 4   involves multiple firms.  We had never heard
 5   of it.  We had never -- none -- neither
 6   Mr. Aronoff nor Mr. Sauerwein had any
 7   experience in doing that, and they were
 8   skeptical that that could ever work.
 9        Q.   So, in fact, you may --
10             So, you did discuss it?  I thought
11   you testified earlier that you hadn't
12   discussed that with anyone.
13             MR. MUNNO:  No, that wasn't the
14        question.  You asked him about
15        Mr. Phillips.
16             MR. NETZER:  I'm asking the witness
17        a question now.  You can wait.
18             MR. MUNNO:  Well, I'm objecting to
19        the question.
20             MR. NETZER:  Your objection is
21        noted.
22   BY MR. NETZER:
23        Q.   Go ahead, sir.
24        A.   Can you ask your question again.
25        Q.   Sure.
```

79

Parekh

2          So, in fact, you did discuss with

your colleague at Duff & Phelps whether or

not it was feasible to work -- to have

different firms doing the loan review,

correct?

          A.   I have discussed that subsequent to

the filing of my report.

          Q.   When?

          A.   Over the last several days.

          Q.   When exactly?

          A.   In the last two weeks.

          Q.   When exactly?

          A.   That's the best that I can

remember.

          Q.   It wasn't today?

          A.   It was not today, no.

          Q.   And what prompted you to do that?

          A.   The reports by Mr. Pino and Mr. --

is it Alread -- would have been one reason.

          We certainly would have discussed

it in connection with those reports.  I don't

recall what may have prompted discussing it

before then, if there were discussions before

then.  What I -- what I do recall is that

80

Parekh

1    Mr. Aronoff and Mr. Sauerwein were skeptical

2    about the 40 reviewers.

3        Q.   No, I'm talking about something

4    else.

5        A.   Okay.

6        Q.   I'm talking about your statement of

7    your -- of Duff & Phelps, your colleagues at

8    Duff & Phelps saying that they have no

9    familiarity with different loan companies

10   conducting loan reviews.

11       A.   That would have been in conjunction

12   with discussing Mr. Parekh and Mr. Alread's

13   report.  So, that would have had to been in

14   the last -- not today, but the day before or

15   the last day before that, the last couple of

16   days.

17       Q.   And tell me -- and they said --

18   they said none of them has ever heard of a

19   loan review that involves multiple firms; is

20   that what your discussion was with them in

21   the last couple of days?

22       A.   Yes.  I told them I have no

23   experience with that type of review and asked

24   them if they had any experience with that

81

Parekh

1    type of review, because they have significant

2    industry experience.  And they have no --

3    they also replied, you know, that they have

4    never seen any review like that and have no

5    experience with a -- with a loan review

6    involving multiple firms.

7        Q.   And how much experience do they

8    have with a loan review of this size?

9        A.   Of the size contemplated in the --

10   by this Protocol of 200,000-something loans?

11       Q.   Yes.

12       A.   They recounted to me they never

13   experienced a loan review of that size.

14       Q.   And why is the loan review -- why

15   have the trustees decided that all of their

16   mortgages would be the subject of the same

17   loan review?

18           MR. MUNNO:  Objection; no

19       foundation.

20           You may answer.

21           MR. NETZER:  Let me -- what I

22       mean -- fair question.

23   BY MR. NETZER:

24       Q.   Why is it -- I mean, is there any

82

Parekh

1

2   legal requirement that these trustees get

3   together and have one company review the

4   mortgages that they own?  They're owned by

5   different trustees, correct?

6           MR. MUNNO:  Objection.

7       A.   I can't speak to legal

8   requirements.  I wouldn't know.  I'm not a

9   lawyer.  I'm sorry.

10  BY MR. NETZER:

11      Q.   That's fair, but is there any

12  requirement?

13      A.   I don't know if there's a

14  requirement that this has.  The problem is

15  that, you know, we have -- we as a firm have

16  no experience in how to do that or that it

17  can be done.  I mean, nobody that I've spoken

18  to has any confidence that that could be done

19  with quality, successfully and quickly.

20      Q.   And why is it that the trustees

21  here have decided to hire one firm, Duff &

22  Phelps, to advise them about this process?

23  Couldn't they have each used a different

24  firm?

25          MR. MUNNO:  Objection.

83

1                          Parekh
2              You may answer, if you can.
3         A.    My -- I can only speculate as to
4    why they only hired -- why -- only why
5    they've hired us.
6              I mean, I would like to think we're
7    good and we can offer good advice to the
8    trustees and they all want to work with us,
9    but --
10   BY MR. NETZER:
11        Q.    And I -- don't be modest.  I think
12   that's a fair statement.  My question is,
13   though, all I'm driving at is they --
14             The trusts here contain different
15   mortgages, correct?
16        A.    Yes.
17        Q.    And each trust could prosecute its
18   own claims, correct?
19             MR. MUNNO:  Objection.
20             You may answer.
21        A.    Yeah, that's a legal question.  I
22   don't think I can, I think, speak to how the
23   trust, because -- and then this is getting
24   into legal requirements, but the trusts need
25   to direct the trustees.  And what the

84

Parekh

1    requirements are for that, I haven't studied

2    at all, so --

3    BY MR. NETZER:

4        Q.   Let me ask you a different

5    question.  Why is it that the trustees are

6    working in this consolidated way?

7            Do you know what I mean by

8    "consolidated way"?  As opposed to working

9    separately.

10           MR. MUNNO:  Objection.

11           You may answer.

12       A.   My sense is that there are gains

13   from, you know, using common advice and not

14   paying different firms to do the same work.

15           There may be other trustees who

16   have chosen to do things differently.  I

17   don't know.

18   BY MR. NETZER:

19       Q.   Any other reason you can think of?

20           MR. MUNNO:  Any other reason as to

21           why it is that the trustees are doing

22           what they're doing?

23           MR. NETZER:  Well, I didn't ask

24           what they're doing -- what they're

85

Parekh

1    doing.  More specific.

2    BY MR. NETZER:

3        Q.   Any other reasons that you can

4    think?

5        A.   Any other reason that they --

6             Are you asking me are there any

7    other reasons I can think of that they've

8    decided to work with Duff & Phelps?

9        Q.   No.

10       A.   No?

11       Q.   They've also decided to work with

12   only one loan review company, correct?

13       A.   They have decided to work with only

14   one loan review company, Digital Risk.

15       Q.   And as you say, I think the reason

16   they've chosen to work with Duff & Phelps is

17   because of the --

18            You'd like to think it's the

19   quality, and I appreciate that.  And I'm not

20   disputing any of that.  It's just I'm trying

21   to understand.  Nothing prevents them from

22   proceeding discreetly --

23            I mean, the size of this project is

24   because the trustees have decided to work in

                         Parekh

1

2     a consolidated manner, correct?

3              MR. MUNNO:  Objection.

4              You may answer.

5         A.   The size of the project is because

6     there are a lot of loans.  And even if the

7     trustees worked in separate manners, there

8     would be a lot of loans.

9     BY MR. NETZER:

10        Q.   Exactly.  But there wouldn't be --

11    the loan --

12             They can have multiple loan

13    companies working on this, couldn't they?

14        A.   They would then suffer from the

15    problems I had spoken to earlier of not -- of

16    not being able to put forth a claim on the

17    same basis, you know.

18        Q.   True, they would be separate

19    parties putting forth a claim -- separate

20    claims.  They wouldn't have it -- they

21    wouldn't speak with one voice, that's true.

22    Anything else?

23             MR. MUNNO:  He already indicated

24         other things.

25             But you may answer again.

87

Parekh

2      MR. NETZER:  Well, I think these

3   are important reasons.  I want to make

4   sure I give the witness to chance to

5   elaborate on them.

6      A.   I mean, I can't speculate as to --

7   there may be a myriad of legal reasons that

8   the trustees would want to work together.

9      But time and cost of using one

10  firm, you know, the cost is -- specifically

11  is a concern.  And by using the one firm,

12  they can -- they could benefit from a single

13  oversight process with a single quality

14  control mechanism.  And that has been always

15  our basis for working with Digital Risk, is

16  that they produce high-quality results.

17  BY MR. NETZER:

18      Q.   Okay.

19      A.   And a big concern in our

20  discussions over the last couple of days has

21  been that if you try to do this with multiple

22  firms, we don't know of anyone that has any

23  experience in how to do it and whether it

24  could even be done properly.  Or would we, at

25  the end of it, run the risk of having to

88

Parekh

1   scrap the results and, you know, potentially

2   redoing major portions of this, because the

3   quality wasn't the same?

4            You start to add more and more and

5   more reviewers, you may get lower-quality

6   reviewers as you add them on.  You start to

7   have things going across different firms and

8   you're going to have differences in the

9   results.

10            These are all problems that we've

11  never seen before, never -- have no

12  experience in how do deal with.

13       Q.   And you had not considered these

14  problems before you prepared your expert

15  report, correct?

16       A.   It never occurred to us that it

17  could be a good idea to use multiple firms,

18  so we never considered it.

19       Q.   And now it has -- excuse me.

20       A.   We've considered it now only

21  because your expert has considered it, and we

22  still don't believe it's a good idea.

23       Q.   And have you done an expert

24  analysis that it's not a good idea?

89

Parekh

1

2      A.    No, I've not done an expert

3   analysis that it's -- that it's not a good

4   idea.  What I've done is an analysis that

5   shows that Digital Risk would be able to do

6   this -- to do this review.

7      Q.    Right.  My question is:  Have the

8   trustees conducted an expert analysis on

9   whether or not multiple loan companies could

10  do it?

11     A.    Not beyond the discussions that

12  I've had with those at Duff & Phelps, who

13  have significant and deep expertise in the

14  mortgage -- you know, the mortgage industry

15  and the loan review process.

16     Q.    And those were two colleagues or

17  more than two?

18     A.    Specifically the two, Aronoff and

19  Sauerwein.  But I also had some discussions

20  with other colleagues who have mortgage

21  industry experience, Edmond Esses and Allen

22  Pfeiffer.

23     Q.    And what did you say to them, what

24  did they say to you?

25     A.    Well, both of them have worked with

90

Parekh

1    me extensively over the last two and a half

2    years.

3

4              Allen Pfeiffer was -- Mr. Pfeiffer

5    was extremely involved in the ResCap matter

6    and the ResCap loan review process.

7    Mr. Esses has several years of mortgage

8    industry experience.  And I asked them if

9    they had ever heard of anything like this

10   or -- and they had said "no" either.

11             But the main basis of my reliance

12   would have been on Aronoff and Sauerwein.

13        Q.   When you say "anything like this,"

14   what is "this"?

15        A.   The Protocol.  I was speaking

16   specifically about the Protocol.  And then

17   also about Mr. Pino's report where he

18   suggested that.  And I can't -- and I can't

19   recall whether I had spoken to Pfeiffer and

20   Esses about multiple loan review firms or

21   whether just the total number of reviewers.

22        Q.   And they've seen the Protocol?

23        A.   They have seen the Protocol, yes.

24        Q.   And they saw the expert reports?

25        A.   They have seen the expert reports.

91

1                        Parekh

2     I can't testify as to how closely they've

3     read the expert reports.

4          Q.    Have they read the expert reports?

5          A.    I don't know if they've read them,

6     but I believe that all four of the gentlemen

7     I mentioned have read them.  I just don't

8     know for certainty.

9          Q.    Back to Mr. Aronoff and

10    Mr. Sauerwein.

11         A.    Um-hum.

12         Q.    Apart from them saying "I" --

13    they're not familiar with this, did you --

14              That's one thing, they've never

15    seen it before.  And did you also discuss

16    with them those concerns -- and I don't mean

17    to put words in your mouth, I'm using my own

18    understanding -- about consistency and

19    quality control and oversight?

20         A.    Yes, we discussed that.

21         Q.    And what did they say about that

22    and what did you say about that?

23         A.    They expressed significant concern

24    that the number of reviewers are available.

25    They didn't think the industry has the

92

Parekh

1    capacity.

2          One thing that Mr. Aronoff pointed

3    out was that many of these additional

4    reviewers that each firm claims that they can

5    bring on are actually the same people that

6    might get hired in a contract basis, and he

7    just didn't believe that Mr. Pino's version

8    of the Protocol that requires 700 and

9    something reviewers total actually exists in

10   the industry, not at a high quality.  He --

11       Q.   In the total industry, there aren't

12   700 quality reviewers?

13       A.   He didn't -- he did not think that

14   there were 700 total quality reviewers

15   available to do this, this Protocol, in the

16   entire industry.

17       Q.   And what do you think?

18       A.   I agree with Mr. Aronoff, and

19   Mr. Sauerwein also expressed the same

20   concern.  And I agree with them.

21       Q.   And what is the basis for your

22   agreement with them?

23       A.   That I -- one, that I trust them

24   and their industry experience.  And two, I've

93

Parekh

1  never -- I've never heard of or experienced

2  any loan review with that many reviewers.

3  And when we have asked for more reviewers in

4  previous engagements, we have had difficulty

5  getting them.

6  

7      Q.   Asked for more reviewers from one

8  company or asked for reviewers from multiple

9  companies?

10     A.   Within one company.

11     Q.   Right.

12     A.   We never tried to work or thought

13  it was a good idea to work with multiple

14  companies.

15     Q.   And the basis for their statement

16  that they're all the same -- that there's

17  overlap among these reviewers is what?

18     A.   Mr. Aronoff's experience with the

19  industry and -- Mr. Aronoff's experience with

20  the industry.

21     Q.   Exactly what is that experience

22  that he explained to you that led him to that

23  conclusion?

24     A.   He has been involved with loan

25  reunderwriting and forensic reviews for many

94

Parekh

1    years with many firms and has hired and used

2    many firms to perform loan underwriting, and

3    he has exhibited -- or he has expressed in

4    the past that he's had trouble getting more

5    reviewers when he needs them.

6        Q.   From one company?

7        A.   From one company.

8        Q.   My question now is the basis for

9    his conclusion that the different companies

10   used the same reviewers.  What is the basis

11   for that conclusion?

12       A.   He has experience on -- with loan

13   review firms that have brought in outside

14   reviewers and he knows -- you know, he knows

15   who they are, and he's met with them and he's

16   worked with them at other companies.  So, the

17   same people at different times, not at the

18   same time.

19       Q.   What are -- what do you mean by

20   "outside reviewers"?

21       A.   He referred to them as "1099

22   employees."

23       Q.   And how many -- what's the size of

24   that population?

95

Parekh

1        A.    I don't know.

2        Q.    Did you ask him?

3        A.    No, I did not.

4        Q.    But in any event, his comment about

5   these people, the number of people who are

6   not standard employees of the loan companies,

7   correct, they're 1099 reviewers -- 1099

8   employees?

9        A.    I didn't understand what the

10   question was.

11        Q.    What does he mean by "1099

12   employees"?

13        A.    I assume that means contractors who

14   are not, I guess, full-time employees.  But

15   that's just how I understand 1099 to be.

16        Q.    So, when he said there aren't 700

17   in the industry, you doubted there were 700

18   in the industry; do you remember that?

19        A.    He doubted there were 700 available

20   in the industry.

21        Q.    700 what?

22        A.    Review -- reviewers that could be

23   used at the same time.

24        Q.    And does that mean reviewers at

96

                        Parekh

1
2    loan companies or does that mean the 1099

3    employees?

4         A.   He said total, so that would --

5    that would include both.

6         Q.   So, of the 700, how many of them

7    are 1099s?

8         A.   I don't know the answer to that.

9         Q.   100?

10            MR. MUNNO:  He said he doesn't know

11        the answer.  Come on.

12        A.   I don't know the answer.

13   BY MR. NETZER:

14        Q.   500?

15        A.   I don't know the answer to that.

16        Q.   How many individual loans were

17   reviewed in the sample?

18        A.   4,579, I believe.  Let me just

19   recollect that from my report.  But I believe

20   that is the number.

21            4,579 have already been reviewed.

22        Q.   And that was by Digital Risk?

23        A.   That was by Digital Risk, yes.

24        Q.   But that -- you were not involved

25   in that review; that was before your

97

Parekh

1      engagement?

2          A.   The review --

3          Q.   I'm sorry.  That was a compound

4      question.

5          A.   Yeah, the review was completed

6      before the engagement.  I was involved in

7      diligencing the review and quality checking

8      the results and understanding the results.

9          Q.   And how many reviewers were there?

10         A.   We -- I understand there to be

11     about 20 reviewers who were working at any

12     one time on --

13         Q.   So, at any one time, there were 20

14     reviewers working on the sample?

15         A.   Yes.

16         Q.   And how was the sample selected?

17         A.   The sample was selected by Cowen &

18     Company as a stratified random sample.

19         Q.   And how do you select a stratified

20     random sample?

21         A.   As I wrote in my first report, you

22     group overall sampling population into a

23     strata and then you randomly sample from

24     within each of the strata.  So, in essence,

98

                        Parekh

1

2   each strata is an individual random sample.

3        Q.   Okay.  And you have --

4             Have you, yourself, designed and

5   executed a sample of mortgages?

6        A.   Yes.

7        Q.   And when did you do that?

8        A.   I've done that in ResCap, and I've

9   done that in at least four other matters that

10  I can recall in which our retention isn't

11  disclosed.  But those were all specifically

12  for mortgages.  And throughout my career,

13  I've designed many samples.

14       Q.   Of mortgages?

15       A.   Not of mortgages.

16       Q.   Just --

17       A.   So, the mortgages I said was

18  ResCap.  And then the other, at least four,

19  are RMBS matters.

20       Q.   Could you turn to paragraph 23

21  again -- or turn to paragraph 23 of your

22  report.  Maybe it isn't again.

23       A.   Okay.

24       Q.   Looking at your conclusion, "Based

25  on this rate, it requires 7 years or 5 years

99

Parekh

1   to complete the loan review" --

2          Do you see that at the end of

3   paragraph 23?

4          A.   I do.

5          Q.   What was it that you did to make

6   that determination?

7          A.   I spoke to Digital Risk about how

8   many reviewers they could put on the task of

9   reviewing.  I spoke to Digital Risk,

10  Mr. Sauerwein and Mr. Aronoff about the rate

11  with which each reviewer could review a loan,

12  and I looked at a calendar to count how many

13  working days there are in a year.  And then I

14  did the multiplication.

15         Q.   Was there -- did you -- what

16  expertise did you use in reaching this

17  conclusion?

18         A.   I used -- well, I'm not sure what

19  you mean by "expertise."

20              MR. MUNNO:  I'm going to object to

21         the question.

22              You may answer.

23         A.   I mean, it's multiplication, so --

24  BY MR. NETZER:

100

Parekh

1      Q.   That's what I'm saying.  So, there

2   was no particular expertise you used,

3   correct?

4           MR. MUNNO:  Objection.

5           You may answer.

6      A.   The expertise comes in

7   Digital Risk's, mine, Mr. Aronoff's and

8   Mr. Sauerwein's expertise on how many

9   reviewers are available and how fast each

10  reviewer can reasonably go.  That's the

11  expertise.  The rest of the -- the rest of it

12  is -- you know, 251 days in a year is --

13  workdays in a year is fact.  And

14  multiplication, I guess, is some level of

15  expertise.  But, no, it's just

16  multiplication.

17  BY MR. NETZER:

18     Q.   Well, the expertise --

19          The 40 figure came from

20  Mr. Phillips, correct?

21     A.   Correct.

22     Q.   And you checked it with your

23  colleagues, correct?

24     A.   I checked it with my colleagues.

101

1                        Parekh

2        Q.    And the three days come from?

3        A.    The three day comes from

4    Mr. Phillips, Mr. Sauerwein, Mr. Aronoff and

5    myself, in our experience, based on our

6    experiences with how fast reasonable loan

7    reviews can occur.

8        Q.    And did you have experience or

9    expertise that enabled you to evaluate what

10   Mr. Phillips said about the 40 reviewers?

11       A.    Yes, we have experience.

12       Q.    You, sir, please.  You, as the

13   witness.

14            MR. MUNNO:  You can answer.

15       A.    Yes.

16   BY MR. NETZER:

17       Q.    What is that expertise?

18       A.    That expertise is my experience in

19   conducting loan reviews and the discussions

20   that I had with Mr. Aronoff and Mr. Sauerwein

21   and their experiences.

22       Q.    And what was it, in your experience

23   of loan reviews, that supported the notion

24   that you could have no more than 40 loan

25   reviewers?

Parekh

1

2       A.   In all the loan reviews that I've

3   been involved in, as well as the loan reviews

4   that I discussed Mr. Aronoff and

5   Mr. Sauerwein having been involved in, they

6   have not been able to get 40 reviewers all at

7   the same time to review loans.

8       Q.   "In all the loan reviews that I've

9   been involved in" --

10          I'm going to ask -- I want to read

11   this back:  "In all the loan reviews that

12   I've been involved in, as well as the loan

13   reviews that I discussed with Mr. Aronoff and

14   Mr. Sauerwein, they have been involved in,

15   they have not been able to get 40 reviewers

16   all at the same time to review loans."

17          Here's my question:  Putting aside

18   what Mr. Aronoff and Mr. Sauerwein said, in

19   all of the loan reviews that you've been

20   involved with, they have not been able to get

21   40 reviewers all at the same time; is that

22   correct?

23       A.   I have never been involved with a

24   loan review that had 40 reviewers at the same

25   time.

103

Parekh

1    Q.   And my question is:  You just

2  testified that you have not been able to get

3  40 reviewers, in all of your experience,

4  correct?

5    A.   I did say that and maybe I -- I'm

6  being misunderstood in what I meant to say.

7  What I meant to say is that I don't have

8  experience where 40 loan reviewers have

9  worked on loan reviews in which I've been

10  involved.  And at times, we have asked for

11  more loan reviewers and been unable to get

12  more loan reviewers.

13    Q.   Tell me about those times.

14    A.   There have been times when, either

15  because of client or Court or settlement

16  pressures, we have needed to increase the

17  rate and we have asked the firms for more

18  reviewers.  And they have not --

19      They've been able to get us more

20  reviewers, but it was a small number, and

21  never did the number come up to 40.

22    Q.   Okay.  Tell me about those times

23  when you, sir, tried to get these increased

24  numbers.  And tell us -- or tell the Court,

104

1                          Parekh

2     rather, why it doesn't get up to 40.

3              Your experience, not

4     Mr. Sauerwein's, not Mr. Aronoff's.  Yours.

5          A.   It's because there weren't that

6     many reviewers available.

7          Q.   No, not why.  Tell us your

8     experience.

9              Who was it that you were trying to

10    get the additional reviewers for?  You, sir.

11         A.   Right.  I'm --

12         Q.   Not your firm.

13         A.   Who was it that I was trying to get

14    them for or --

15             MR. MUNNO:  From.

16         A.   -- from?

17    BY MR. NETZER:

18         Q.   In connection with what.

19         A.   It was -- I don't know if I'm

20    allowed to disclose which firm it is because

21    I've signed protective orders, but it was a

22    well-known loan review firm.  We asked for

23    more loan reviewers and --

24         Q.   "We."  You.  I'm focusing now on

25    your experience as opposed to Duff & Phelps.

105

                    Parekh

1

2       A.   Well, so we as a firm, but I was

3   involved.

4       Q.   That's right.

5       A.   I was involved with the review.

6       Q.   Fair enough.

7       A.   And "we" means Duff & Phelps as a

8   firm.

9       Q.   Okay.

10      A.   I don't know if I made the call or

11  someone else, but --

12      Q.   Fair enough.

13      A.   But I was involved.

14      Q.   Okay.

15      A.   And we were unable to get more

16  reviewers.

17      Q.   Okay.  And how many reviewers did

18  you need and how many could you get?

19           You don't have to tell me the name

20  of the company.

21      A.   Sure.

22           We needed as many as possible, and

23  typically -- well, not typically.  So, in the

24  experience that I can think of, we had ten

25  reviewers, if I recall correctly, and they

106

Parekh

1    gave us an additional three or four

2    reviewers.

3        Q.    And how many did you need?

4        A.    Well, we needed --

5        Q.    How many did you want?

6        A.    We wanted as many as they could

7    give us.  And I don't think --

8        Q.    40, 50, 60?

9        A.    I don't know if I ever considered a

10   number that high because I didn't consider a

11   number.  I specifically asked for "as many

12   reviewers as you can give me."

13       Q.    And you got how many?

14       A.    Additional three.

15       Q.    Okay.

16       A.    And I was told the reason for that

17   was everybody's booked up, that's what they

18   have available.

19       Q.    Booked up till when?

20       A.    Past the point that I needed them,

21   which would have been in the next month or

22   so.

23       Q.    Okay.  So, you have an experience

24   where you could not get more than 13

107

Parekh

1    reviewers for a month, correct?  You have

2    that experience?

3        A.    Yes.

4        Q.    Okay.  What other experiences do

5    you have for the proposition that you cannot

6    get more than 40?  You, sir.  Putting aside

7    what Digital told you, putting aside what

8    Mr. Aronoff and Mr. Sauerwein told you.

9        A.    That's my experience.

10       Q.    So, does that experience -- doesn't

11   that experience teach you that you can't get

12   more than 13?  What does that experience tell

13   you about the issue?  That's what I'm trying

14   to understand.

15       A.    Well, I'm not sure that --

16       Q.    I'm trying to help the judge

17   understand.

18       A.    Yeah.  That experience teaches me

19   it's difficult to get loan reviewers, a large

20   number of loan reviewers.

21       Q.    In a month?

22       A.    In that instance, it was a month.

23   And remember, that is -- that experience is

24   not the sole basis for my numbers in the

108

Parekh

1    input in this report, right?  That one

2    experience is one of several experiences that

3    contributed.  You know, my experience as well

4    as Mr. Aronoff's and Mr. Sauerwein's and what

5    Digital Risk represented to us.

6    

7        Q.    That's right.  But the only part

8    that you have direct experience of yourself

9    is the one you've mentioned, correct?

10       A.    That's correct.

11       Q.    Okay.  And the ones that

12   Mr. Aronoff and Mr. Sauerwein had, which ones

13   were those, which companies were those?

14       A.    Those are ongoing litigation so I'm

15   not sure I can discuss specific companies,

16   but they're well-known loan review companies.

17       Q.    Okay.  And what were the numbers

18   that were sought?

19       A.    Less than -- the numbers that were

20   sought --

21            The numbers that were achieved were

22   less than 40.  I don't know what was sought.

23       Q.    What were the numbers that were

24   achieved?

25       A.    They told me typically in the 10 to

1                        Parekh

2    20 range of the number of reviewers.

3        Q.   Additional reviewers or just

4    reviewers?

5        A.   Total reviewers.

6        Q.   So, they couldn't get -- so, the

7    experience is that Mr. Aronoff -- is this the

8    same experience for both gentlemen or is it

9    two different experiences or only one?

10       A.   No, no, they have different

11   experiences.  They may have common

12   experiences, but they have different

13   experiences, so --

14       Q.   And what was the window, the time

15   window?

16       A.   I don't know.  I -- what I asked

17   them was, does it seem reasonable to get more

18   than -- you know, that 40 reviewers is

19   reasonable.  And then when the Pino report

20   came out, I asked them if this was reasonable

21   to get 465 reviewers.  So, I did not --

22            MR. NETZER:  Want to go off the

23       record?

24            (Discussion off the record.)

25   BY MR. NETZER:

110

Parekh

1    Q.   Back to --

2         One question about your -- I say

3    one.  Never believe one.

4         -- the experience you had with the

5    trying to up from the 10 reviewers and you

6    got three additional.  When was that?

7    A.   I can't recall exactly, but about a

8    year ago.

9    Q.   Okay.  And I apologize.  You had --

10   you had described how you worked with people

11   and sat next to people and learned how to do

12   loan reviews.  I don't think -- it wasn't in

13   connection with this case, it was in

14   connection with ResCap?

15   A.   ResCap.

16   Q.   Okay.  And I want to come back to

17   that.

18        Prior to ResCap, had you worked in

19   the mortgage industry before?

20   A.   No.

21   Q.   Okay.  And prior to sitting down

22   and watching the people at --

23   A.   Cross Check Compliance.

24   Q.   -- Cross Check, had you done a

111

                              Parekh

1

2    loan -- when did you before -- before you got

3    that kind of on-the-job training that you

4    mentioned, if you will?

5         A.   No, I had not.

6         Q.   Okay.  And you worked with several

7    different loan reviewers or you sat with one

8    for a period of time?

9         A.   It was three or four.  And I

10   apologize, I can't really recall.

11        Q.   Three or four different people?

12        A.   Three or four different people.

13        Q.   And you worked --

14             Before you took off the training

15   wheels, how many -- pardon my

16   colloquialism -- how many loans did you

17   review with the --

18        A.   With the supervision of the other

19   reviewers, about 75 I would -- I would

20   estimate.  But that's -- you know, I only

21   have a general recollection of it.

22        Q.   And that was doing about three a

23   day?

24        A.   Not at first.  So --

25        Q.   It was less than three initially?

112

1                        Parekh

2           I'm sorry.

3      A.   Yes.

4      Q.   You tell me.  I apologize.

5      A.   That is -- that is correct.

6           Or it was 75 different loans and we

7  could look at pieces of loans at the

8  beginning, so we wouldn't do the whole loan.

9  We might do a piece of a loan, so I'm not

10  sure that three-a-day rate applies for a lot

11  of that training.

12     Q.   Fine.  But eventually, you were up

13  to three a day?

14     A.   I never --

15     Q.   Got that?

16     A.   Never really achieved a rate of

17  three a day where I was accurate.  But my --

18  but my understanding is that experienced loan

19  reviewers should be able to reach that rate,

20  and a quality reviewer should.

21     Q.   And so, you -- this was --

22          So, you spent as many -- 25 days

23  doing that before you did it on your own?

24     A.    In total, I would have reviewed

25  loans over the course of close to a year, you

113

                        Parekh

1

2    know, sometimes spending many hours,

3    sometimes spending less.

4        Q.   Did you have a look at Mr. Alread's

5    expert report?

6        A.   Could I have a look at it?

7        Q.   Yeah.  It's at --

8            MR. NETZER:  Which one is that?

9            MS. HAGGLUND:  It's Exhibit 2.

10           MR. MUNNO:  May I trouble you for a

11   copy of Exhibit 2?

12           MR. NETZER:  Yes.

13           Anyone else?

14           MR. MUNNO:  Thank you very much.

15           MS. HAGGLUND:  Sure.

16   BY MR. NETZER:

17       Q.   Let me ask -- let me start with a

18   more general question.

19           You've had a chance in the last

20   couple of days to review this and discuss it

21   with your colleagues at Duff & Phelps,

22   correct?  You have -- excuse me.  Let me pose

23   the question a different way.

24           You have reviewed this and you

25   discussed it with your colleague at Duff &

114

                              Parekh

1

2    Phelps, correct?

3        A.   I have read Mr. Alread's report.  I

4    haven't had a chance to study it in detail,

5    but I've read it.  I only had it for a little

6    over 24 hours.  And we -- we, at Duff &

7    Phelps, have had some discussions.

8        Q.   Okay.  Based on those discussions,

9    are there -- that you've had and what reading

10   and review of it you've done, are there any

11   parts of it that you disagree with?

12       A.   Yes, that's the --

13       Q.   Can you elaborate on those?

14       A.   Of course.

15            So, I disagree, you know, with his

16   conclusion that the Protocol is sound,

17   efficient, you know, workable and

18   cost-efficient.

19            I disagree with his statement where

20   he says that -- you know, on page 8 of his

21   report he says the Protocol will take -- you

22   know, cost approximately 110 million.  And

23   while this -- and while this cost may appear

24   large, it's a relatively small cost figure.

25   I really had a question as to relative to

115

1                        Parekh

2   what?  I -- you know, relative to a sampling

3   procedure, I would say it's quite large.  And

4   so, I disagreed with that.

5                And then I -- you know, this may

6   not be all of them, because obviously I

7   haven't studied it yet, but he also makes the

8   statement that in -- on page 11 that Lehman

9   must only respond to, you know, specifically

10   alleged breaches and so Lehman's review time

11   would take less time.

12                And I disagree with that because

13   the way that the Protocol was set up, as I

14   analyzed it and as I believe Mr. Pino

15   analyzed it, it works in serial.  And so,

16   Lehman's loan review can only go as fast as

17   the trustees' loan review.

18                And so, if the trustees can review

19   it at three a day, which is the number

20   that -- per reviewer, then the number going

21   to Lehman would be governed by that, by that

22   rate.  So, if Lehman moves faster per

23   reviewer, then the reviewer would be sitting

24   and waiting for the next loan to come from

25   step 1.

116

1                              Parekh

2              So, those were -- those were some

3       initial thoughts that I -- that I had in

4       disagreement with Mr. Alread.

5          Q.   Okay.   Thank you.

6          A.   There may be others, though.

7          Q.   I'm -- I appreciate that.

8              Can you look at page 7, or which

9       is -- actually, if you want to --

10             I'm looking at the section B,

11      "Overview of the Protocol's Scalability."  Do

12      you see that, sir?

13             MR. MUNNO:   What page, please?

14             MR. NETZER:   That's on page 6, but

15         I want to --

16             My question is going to be about

17         something on page 7, but I just want to

18         show the context.

19         A.   Okay.   I'm there.

20             MR. MUNNO:   Have you read it?   Let

21         him read it.

22         A.   May I -- may I --

23      BY MR. NETZER:

24         Q.   Why don't I ask the question and

25      then --

1                        Parekh

2        A.   Okay.

3        Q.   -- the question can be there.  But

4   you feel free to read as much as you want.

5             But my question is going to be or

6   is, and you can take your time to read it, he

7   states on page 6 in the second paragraph

8   under B that "An individual underwriter can

9   perform approximately three forensic reviews

10  per day, while a senior reviewer (who reviews

11  the accuracy and logic of the work and

12  positions taken by the underwriters) can

13  review approximately nine forensic

14  evaluations per day."

15            Is that -- do you have any

16  disagreement with that?

17        A.   Just give me a moment.

18        Q.   Absolutely.

19        A.   Well, I'm unclear as to whether the

20  senior reviewer is reviewing loans that have

21  already been reviewed by the -- by the

22  underwriter.  I haven't done any work to

23  ascertain, you know, what a senior

24  underwriter -- a senior reviewer would do.

25            To me that sounds like it's a

118

Parekh

 1    quality control position over the top of the

 2    underwriter who is doing the three loans per

 3    day.  I agree with the three loans per day

 4    that the underwriter can do.

 5         Q.   And assuming -- taking your

 6    assumption that the senior reviewer is the

 7    quality control over you, do you disagree

 8    with nine reviews a day?

 9         A.   I don't agree or disagree with

10    that.  I haven't done anything to ascertain

11    that, but...

12         Q.   Okay.  Now, he describes the

13    information he received from Recovco.

14         A.   I believe that's how it's

15    pronounced, yes.

16         Q.   Do you know that firm?

17         A.   I know of it.

18         Q.   Have you worked with them?

19         A.   I have not personally worked with

20    Recovco.  I know Duff & Phelps has worked

21    with Recovco.

22         Q.   And they're a reputable firm, so

23    far as you know?  Would you have any reason

24    to think they're not?

119

                         Parekh

1

2      A.    I'm just trying to --

3            I have a question as to whether I

4      can discuss experiences with Recovco.  Am I

5      allowed to ask counsel as to whether I can --

6      Q.    If you have a concern about

7      violating confidentiality, I don't mind your

8      discussing that with counsel.  But maybe I

9      can ask the question in a way that gets

10     around it, if you want to.

11           So, why don't you hold off, but I

12     don't object to your discussing that with

13     counsel.  But maybe I can render it

14     unnecessary.

15     A.    Okay.

16     Q.    Do you -- will you be taking the

17     position in this matter that Recovco is not a

18     reputable firm?

19           Maybe it's premature.  I'm just

20     looking for a way around the issue.

21           MR. MUNNO:  I'm going to just lodge

22        an objection and make a statement.

23           MR. NETZER:  Go ahead.

24           MR. MUNNO:  We've only gotten these

25        reports of Mr. Alread and Mr. Pino and

120

1                         Parekh

2          Mr. Goetzmann, which is not going to be

3          the subject, I believe, of our hearing,

4          on Wednesday, the 10th, and we don't

5          have a position yet about these things

6          because we're literally in the process

7          of reviewing them.

8               And we had scheduled time for

9          Mr. Parekh's deposition in relation to

10         his declaration concerning the proposed

11         Protocol and not in connection with

12         trying to critique either the

13         declaration of Mr. Alread or the

14         declaration of Mr. Pino.

15              MR. NETZER:  I understand.

16              MR. MUNNO:  So, we're just not

17         there.  This is a very compressed

18         period.

19              MR. NETZER:  I understand.

20              MR. MUNNO:  And I'll add further,

21         I'm not -- we haven't had an opportunity

22         even to figure out whether there are

23         confidentiality constraints and the like

24         that he's subject to.

25              MR. NETZER:  Okay.  Let's see if --

121

                            Parekh

1
2              Go ahead.

3        A.    Let me just answer and say at this

4   time I don't believe I'm prepared to answer

5   the question, you know, as to whether I

6   believe Recovco is a reputable firm or not.

7   BY MR. NETZER:

8        Q.    No, I'm not -- I mean, you're not

9   prepared because -- what does -- I'm not sure

10  I understand that.

11       A.    Well, because I'm not sure that

12  I -- if I answered it, I would be violating a

13  confidentiality agreement.

14       Q.    Okay.  So, anything else apart from

15  that?

16       A.    No, not apart from that.

17       Q.    Okay.  It states here that an

18  underwriting --

19              That is the expert report --

20  rather, the declaration of Mr. Alread says,

21  "The chart shows an underwriting firm like

22  Recovco (which is not unique in the mortgage

23  industry in terms of size or capacity) can

24  assign up to three additional teams to the

25  Lehman project (bringing the total number of

122

Parekh

1    teams working on the Lehman project to four).

2    With four assigned teams, Recovco can produce

3    approximately 8,000 forensic reviews per

4    month for the Lehman project."

5           Is that true or false, in your

6    opinion?

7           A.   That he's written that?

8           Q.   No, no.  The statement itself.

9    Obviously, he's written it.  The question is:

10   Is it correct or not?  Let me put it that

11   way.  True or false?

12          A.   Nothing in my experience or the

13   discussions I've had with Mr. Sauerwein or

14   Mr. Aronoff lead me to believe that's a

15   correct statement, no.

16          Q.   Okay.  Does your experience lead

17   you to believe that it's an incorrect

18   statement?

19          A.   Yes, we at Duff & Phelps do not

20   believe that's a correct statement.

21          Q.   And the basis for that is what

22   you've already testified to?  Or is there

23   something specific about Recovco that leads

24   you to that conclusion?

123

                              Parekh

1

2      A.   No.  It's what we've -- what I've

3   already testified to.

4      Q.   Okay.  So -- and just --

5      A.   Well, let me -- let me stop you

6   there.  There may be more that -- to say

7   anything more might be violating a

8   confidentiality agreement.  But what I've --

9   what I've testified to previously, again, we

10  don't believe that's a correct answer.

11     Q.   But, were you free and not

12  constrained by a confidentiality concern, you

13  would have additional information to provide

14  in response to that question?

15     A.   I've had --

16     Q.   It's a "yes" or "no" question.  I'm

17  not asking you to discuss it.

18     A.   Yes, there's -- there is additional

19  information.

20     Q.   Well, I'm going to -- just for the

21  record, I'll ask the question.  What is that

22  information?

23          MR. NETZER:  You can object or

24      instruct or consult.  I don't mind your

25      consulting if you want to about the

124

1                    Parekh

2        confidentiality.  I don't have any --

3               MR. MUNNO:  Are you able to answer

4        this question without potentially

5        violating the confidentiality

6        undertaking with respect to the matter

7        to which you are referring?

8               THE WITNESS:  No, I don't believe I

9        can.

10              MR. MUNNO:  Okay.  Then the witness

11       is unable to answer that question at

12       this time.

13   BY MR. NETZER:

14       Q.   Do you agree that --

15              The statement that Mr. Alread makes

16   on the bottom of page 6, it says, "The chart

17   contains two sections."

18              And then there's the sentence,

19   which I won't go over again, about what an

20   individual underwriter and a -- and a senior

21   underwriter can do and it says, "In addition

22   to the 57 staff members necessary to complete

23   2,000 files per month, a forensic review team

24   needs approximately four managers, six

25   researchers and data handlers, and three

125

                              Parekh

1

2    support staff."

3             Putting aside about what you said

4    about getting the number of reviewers, I

5    understand that, but do you otherwise

6    disagree with the -- with that -- anything in

7    that sentence?

8         A.   I don't agree or disagree with

9    anything in that sentence.  I don't have

10   any --

11            Yeah, I don't agree or disagree

12   with that.

13        Q.   Well --

14        A.   I don't agree -- yeah, I don't

15   agree or disagree.

16        Q.   Well, if there were 57 staff

17   members and enough loan reviewers, could they

18   review 2,000 files per month?  That's all my

19   question is.

20            MR. MUNNO:  There may have been a

21       misapprehension of the question before.

22   BY MR. NETZER:

23        Q.   It may have.  I'm really --

24        A.   I mean, 50 -- 57 staff members that

25   review -- you know, are able to complete

126

1                        Parekh

2      2,000 files per month, so 50 --

3              I would have to do the math to make

4      sure I agree.  But roughly in my head that's,

5      you know, 180 loans per day, and 30 days

6      seems reasonable.

7          Q.   I'm just trying -- what I'm just

8      trying to do, and I appreciate your help, is

9      just to focus on the areas of disagreement

10     which I take it -- I understand loud and

11     clear about there aren't enough quality loan

12     reviewers.  Now I'm trying to see if there --

13     putting that -- without conceding that could

14     be done, that there are that many, whether

15     there are other disagreements here with --

16     yes, basically with the math.

17             Then he says -- on the next page he

18     says that there in fact can be four assigned

19     teams, that Recovco can create four assigned

20     teams.  And I take it, you don't agree they

21     can produce even one assigned team --

22     withdrawn.  That was not well-posed question.

23             Could they put together one team to

24     achieve the 2,000 files per month?

25             MR. MUNNO:  Which presupposes 57

127

1                          Parekh

2          members?

3               MR. NETZER:  Yeah.  Although I

4          don't think they're all --

5               Yes, that's correct.

6          A.   57 is close to 40.  And so, to the

7     extent that I --

8               MR. MUNNO:  You may answer.  He's

9          consulting with his colleague.

10               THE WITNESS:  Okay.

11          A.   So, I don't know what Recovco can

12     do.  You know, I don't agree or disagree with

13     that statement.  I probably would disagree

14     because 57, you know, is approximately, you

15     know, 50 percent more than 40.

16     BY MR. NETZER:

17          Q.   Okay.

18          A.   And based on the information we got

19     from Digital Risk plus our experience, you

20     know, even 40 is a difficult number to reach.

21          Q.   Okay.

22          A.   So --

23          Q.   Sorry.

24          A.   No, no.

25          Q.   And I take it, it follows that

128

Parekh

1   they're not -- that since even one would be

2   at best a stretch, in your opinion, putting

3   together four would be impossible.  Is that

4   fair?

5       A.   Yeah, I don't have any belief that

6   they could put together four teams of --

7       Q.   Okay.

8           And then he says, "Finally, the

9   chart shows that, through resource sharing

10  agreements with other forensic research

11  firms, Recovco can engage seven teams on the

12  Lehman project, which would produce

13  approximately 14,000 forensic reviews per

14  month."

15          Do you have an opinion -- you have

16  testified already about issues of consistency

17  and quality control with respect to putting

18  teams together that are not within the

19  specific and single mortgage company.  But

20  apart from that, do you disagree that Recovco

21  could engage seven teams on the Lehman

22  project?

23          I understand your reservations

24  about quality and consistency.  But is it

129

Parekh

1   impossible to put together the seven teams

2   through -- when I --

3            I'm sorry.  Let me -- I didn't mean

4   to be partial there.

5        A.    Sure.

6        Q.    Do you agree or disagree with the

7   statement that through resource sharing

8   agreements with other forensic research

9   terms, Recovco can engage seven teams on the

10  Lehman project?

11       A.    I don't believe that's possible,

12  no.

13       Q.    And when you say you don't believe

14  it's possible, is that because of the quality

15  and consistency concerns?  Or is it more than

16  that, that there just aren't that number of

17  reviewers available?

18           Those two things may be related.

19  I'm not saying they're not.  But I'm trying

20  to understand better your opinion.

21       A.    Based on the discussions that I've

22  had with the Duff & Phelps team and our

23  experience, about our experiences, we don't

24  believe that the -- that the number of


130

1                          Parekh

2    reviewers would be available.

3              And there also could be a serious

4    quality drop-off as you -- as you start to

5    bring in other firms, which is what I

6    interpret a sharing agreement to be.  We've

7    just never experienced anything like that,

8    seen it, heard of it.

9         Q.   Okay.  The --

10             If you want to go to page 8, I want

11   to focus on the -- what Mr. Alread says in

12   the carry-over paragraph, and in particular

13   the carry-over sentence from 8 to 9:

14   "Indeed, in the mortgage industry, there are

15   numerous vendors who provide due diligence

16   and quality control services, such as NewOak

17   Capital, FTI Consulting and Fortace, that

18   could be hired for a project of this nature

19   and scale."

20             Do you have an agreement or

21   disagreement with that statement?

22        A.   I agree that there are numerous

23   vendors.  I'm not particularly familiar with

24   NewOak or Fortace.  I know FTI Consulting,

25   but I did not know that -- or I'm not

131

Parekh

1  familiar with their loan review due

2  diligence.  But I agree there are numerous

3  vendors.

4     Q.   Is it your opinion that NewOak

5  Capital, FTI Consulting and/or Fortace could

6  not be hired for a project of this nature and

7  scale?

8     A.   I don't understand the answer to

9  that.

10    Q.   You don't disagree with it; you

11 don't have an opinion one way or the other?

12    A.   I don't have an opinion one way or

13 the other.

14         MR. MUNNO:  Are there any proposed

15    agreements with them attached to this

16    report?

17         I take it the answer is "no."

18 BY MR. NETZER:

19    Q.   Is there anything --

20         MR. NETZER:  I'm not -- you're

21    asking me?

22         MR. MUNNO:  Yes.

23         MR. NETZER:  That's my deposition.

24    That's tomorrow.

132

1                          Parekh

2              MR. MUNNO:   Okay.

3    BY MR. NETZER:

4         Q.   Let's go to the next subsection of

5    his report, his statement, declaration --

6         A.   Um-hum.

7         Q.   -- which suggests that you've

8    ignored efficiencies gained from lessons

9    learned as the Protocol proceeds.

10             Is he wrong in stating that "as

11   both sides move forward with the objection

12   and negotiation processes in the Protocol,

13   they will inevitably be able to apply lessons

14   learned from other similar loans and

15   streamline the process"?

16             I'm going to read the second

17   sentence.  "Practically speaking, this means

18   that as parties and the review teams start to

19   identify emerging patterns in the loan review

20   process, the review will become faster and

21   more efficient."

22             Do you agree or disagree?

23        A.   I disagree in terms of the

24   Protocol.

25             (Discussion off the record.)

133

1                           Parekh

2                MR. MUNNO:  Is there a question?

3                MR. NETZER:  No.

4    BY MR. NETZER:

5        Q.   Have you read any notes in the

6    course of your deposition that your lawyer

7    has given you?

8        A.   No.

9        Q.   You haven't read any notes as

10   you're sitting at the table, anything he's

11   written?

12       A.   I may have looked at his pad when I

13   saw the pen moving out of just --

14       Q.   Did you see anything?

15       A.   No, I don't recall any words.  I've

16   seen writing.

17       Q.   Okay.  So, your witness -- your

18   lawyer did not tap you and draw your

19   attention to something that he had written

20   that he wanted you to read, correct?

21       A.   Not tap me and draw my attention to

22   something, no.

23       Q.   Did he show you something he wanted

24   you to read?

25       A.   No, not that I know of.

134

1                    Parekh

2        Q.   You're sure?

3             MR. MUNNO:  He's answered the

4        question.

5             You can answer it again.

6        A.   No, I -- and there's nothing I

7    read.  I may have looked around.  I've been

8    looking around the room.

9    BY MR. NETZER:

10       Q.   That's fair, you're allowed to look

11   around.  I just wanted to make sure that, you

12   know, your lawyer hasn't passed you a note or

13   shown you something.

14       A.   No, I don't think there's anything

15   here.

16       Q.   And why do you disagree in terms of

17   the Protocol with what I just read?

18       A.    Well, my reading of the Protocol is

19   that -- and I'd have to get the -- you know,

20   read the Protocol to refresh my, you know,

21   memory for the exact language, but was that

22   evidence from one loan can't be used in terms

23   of denial or acceptance of a claim from

24   another, from another loan.  And so, I

25   understood that each loan needs to be judged

135

1                          Parekh

2      on its individual ability.

3                In addition, I would have concerns

4      with loans that have multiple breaches,

5      that to their totality add up to a claim, a

6      loan with a claim.

7                And so, loans can't easily or

8      accurately be grouped for a claim.  They need

9      to be treated on an individual basis.

10         Q.   Under the Protocol?

11         A.   Certainly under the Protocol,

12     because my reading of the Protocol requires

13     that the evidence be treated on an individual

14     basis.  But even generally, if you were

15     trying to estimate claims on a loan-by-loan

16     basis, you would have to look at the totality

17     of each loan to determine whether or not it

18     has a claim.

19         Q.   Okay.  So, but I think he's talking

20     about -- putting aside evidence, he's talking

21     about the actual -- the negotiation process.

22               You couldn't generalize in the

23     negotiation process as it moves forward based

24     on extrapolation from previously negotiated

25     resolutions?

136

1                         Parekh

2        A.    I don't believe so, because the

3    evidence that would need to come out of the

4    negotiation process as the loan proceeds to

5    through the Protocol would need to be

6    individualized for that loan.

7        Q.    So, there are no general -- putting

8    aside the Protocol, you're not of the view,

9    are you, that you couldn't extrapolate from

10   one loan in order --

11       A.    Well --

12       Q.    -- in order to -- in order to

13   demonstrate the result that should be

14   achieved for another, are you?

15       A.    Well, what I analyzed in my report

16   was the Protocol, so I'm not sure that I've

17   done any analysis on the negotiations outside

18   the Protocol, because I have no experience

19   with these types of, you know, negotiations

20   as they're sort of contemplated in the

21   Protocol.

22            So, my analysis was in specific

23   reference to the negotiations that would take

24   place in the Protocol.

25       Q.    Okay.  Putting aside specific

137

1                              Parekh

2      negotiations under the Protocol, speaking

3      more hypothetically, is there any problem

4      with extrapolating from one Lehman loan, one

5      of the loans in this case, in order to draw a

6      conclusion about any others?

7          A.   I'd be worried that -- yes, I think

8      there would be.  I would be worried that

9      by -- you know, by generalizing from one loan

10     to the next, you would be potentially

11     ignoring the totality of what might -- what

12     might create a breach.  And so, two loans

13     that have the same breach may not both result

14     in the same kind of claim.

15         Q.   So, how under those circumstances

16     would you be able to demonstrate the damages

17     flowing from the two breaches with respect to

18     those two loans?

19         A.   I don't understand what you're --

20         Q.   I'm sorry.  I thought you had said

21     that two loans with a similar breach with the

22     same breach, I thought you --

23         A.   Well --

24         Q.   Let me finish.

25         A.   I'm sorry.  Go ahead.

138

1                           Parekh

2        Q.   No, no.  You probably knew what I

3    was going to say, but let me try to get it

4    clear.

5             I believe you said -- and so, two

6    loans that have the same breach may not

7    result in the same kind of claim.  What do

8    you mean?

9        A.   Well, I'll speak in generalities

10   here because I don't have anything specific

11   in mind in terms of a --

12            But breaches don't equal put-backs.

13   A breach does not equal a put-back.  In some

14   cases it does.  But it could be that the

15   degree of the breach is what leads to a

16   put-back, or the degree of a breach along

17   with other breaches in the -- found in the

18   loan review for that loan.

19            And so, making blanket assumptions

20   that everything with a particular breach is

21   or is not a claim could potentially ignore

22   the other breaches or the other degrees or

23   the totality of what each loan review found.

24   And so, I would be very concerned that

25   grouping loans in the negotiation would lead

139

                    Parekh

1

2    to imprecise claims.

3         Q.   What about grouping loans in the

4    claims process; you could do that, couldn't

5    you?

6         A.   In the claims process?

7         Q.   In other words, actually

8    determining the amount of a put-back, you

9    could make generalizations about similar

10   breaches among different loans, couldn't you?

11        A.   Right.  But a breach doesn't equal

12   a claim.  Each loan has -- you know, in this

13   process has -- on a loan-by-loan process, and

14   especially in this Protocol, has an

15   individual claim.

16        Q.   Putting aside this Protocol,

17   though, is there any other problem with

18   generalizing from among different loans,

19   drawing the same conclusion based on similar

20   breaches that the same put-backs --

21        A.   Yeah.  I think I've said there is a

22   problem, yes.

23        Q.   What is it?  I thought you were

24   answering only with respect to this Protocol.

25        A.   No, no.  I was saying --

140

1                              Parekh

2              So, with respect to the Protocol --

3         Q.   No, I'm asking you --

4         A.   Right.  So, not with respect to the

5    Protocol.  In general, the problem is that

6    it -- a claim is made from a combination of

7    breaches and the degree to which those

8    breaches deviate from the reps and

9    warranties, and grouping loans would

10   presuppose that those combinations and those

11   deviations are the same.

12        Q.   What's wrong with that?

13        A.   Well, they may not be.

14        Q.   How do you determine whether they

15   are or they weren't, then?

16        A.   You have to review each loan and

17   then put each loan through negotiation.  And

18   then both sides would have to agree that each

19   loan is the same.  And then once both sides

20   agree that each loan is the same, perhaps you

21   could -- you could group them.  But that, by

22   definition, requires the negotiation and the

23   claims process to proceed on an individual

24   basis.

25        Q.   How do you think the claims process

141

Parekh

1    should be resolved in this case, then?

2          MR. MUNNO:  Objection.  There's no

3       foundation.  The witness has testified

4       to the contrary about the claims

5       process.

6             You may answer.

7    A.    My report analyzes the Protocol and

8    how long it takes.  I don't think I've done

9    any work at this time or I'm prepared to talk

10   at this time as to how the claims process

11   should be done.

12   BY MR. NETZER:

13   Q.    Well, in your view, how long will

14   it take to complete the claims process in the

15   absence of a Protocol?

16   A.    I haven't analyzed that question.

17   Q.    Now, in this next paragraph he

18   states, "In Mr. Parekh's November 14, 2014

19   Declaration, he suggests 34,585 to 45,758 of

20   the loans will require review by a Claim

21   Facilitator.  Even if those numbers are

22   accurate at the beginning of the project,

23   based on information provided by Recovco, the

24   percentage of loans requiring review by a

142

Parekh

1   Claim Facilitator will likely decrease over

2   time, which in turn will decrease the

3   required timeframe to complete the Protocol.

4   As Lehman has opportunity to identify and

5   relay the relevant facts for a loan, over

6   time patterns will likely develop for similar

7   loans and factual disputes will oftentimes be

8   resolved concurrently for those similar

9   loans."

10         This may relate to what you just

11  said, but do you disagree or agree with that?

12         A.   I disagree.

13         Q.   For the same reasons or --

14         A.   For the same reasons.

15         Q.   Okay.  I won't bother to read it

16  into the record because I don't want to waste

17  the time, but the next paragraph which

18  incorporates or references footnote 9 on

19  page 12, can you tell me if you agree or

20  disagree with that?

21         If you can't, I'll break it down

22  individually.

23         MR. MUNNO:  We're looking at

24  footnote 9 on page 12?

143

                              Parekh

1

2          MR. NETZER:  Yes, and the second

3       full paragraph on page 10 because it

4       begins with the sentence, "As discussed

5       in my footnote nine below."  So, I

6       thought it made sense to --

7          THE WITNESS:  Okay.

8          MR. NETZER:  Take your time.

9          THE WITNESS:  Let me read that,

10      please.

11         So, we're reading the paragraph

12      that starts with "Generally"?

13         MR. NETZER:  No.

14         MR. MUNNO:  No.  "As discussed in

15      my footnote nine below" on page 10,

16      please.

17         MR. NETZER:  Thank you.

18         THE WITNESS:  Oh, I see it.

19         (Witness reviewing document.)

20         THE WITNESS:  Okay.  I've read the

21      paragraph in footnote 9.

22   BY MR. NETZER:

23      Q.   Okay.  And do you agree or

24   disagree?

25      A.   With everything in that -- I

144

Parekh

1    mean --

2        Q.   That is my question.  But if it's

3    impossible to answer that way, I understand

4    and I'll break it down and be more specific

5    if you prefer.  It's --

6            MR. MUNNO:  I certainly would

7        prefer that.

8            MR. NETZER:  That's fine.

9        A.   Yeah, let's just do it that way to

10   make sure you get your questions answered.

11   BY MR. NETZER:

12       Q.   That's very reasonable.

13           He -- let's start with the second

14   sentence on -- in paragraph 10 -- I'm sorry,

15   paragraph -- on page 10.

16           Are there types of breaches that

17   can be resolved to both parties' satisfaction

18   without involving a claim facilitator?

19   That's what he states -- he's stating.  Is

20   that wrong or right?

21           MR. MUNNO:  Objection.

22           You may answer.

23       A.   Well, in my analysis, I -- you

24   know, I interpret the claims facilitator as

145

Parekh

```
 1          step 4.  And there are certainly breaches

 2          that get resolved prior to step 4.  So, I'd

 3          have to refresh my memory for the exact

 4          numbers, but I certainly contemplate breaches

 5          that get resolved prior to step 4, either

 6          through the Plan Administrator or through

 7          negotiation in step 3.

 8              Q.   Okay.  Let's switch, then, to

 9          footnote 9.

10              A.   Um-hum.

11              Q.   Let's turn to that.

12                   "It appears over 2,000 of the RMBS

13          Trustees' breaches pertain to missing

14          documentation.  Based on my experience, it is

15          likely that a large percentage of those

16          breaches will be cured so long as the

17          documents exist and are available for

18          review."  Do you agree or disagree?

19              A.   I have not done anything that I at

20          least specifically recall whether the 2,000

21          breaches is the right number, but I would say

22          that with this -- you know, based on

23          discussions with Mr. Aronoff, that he has

24          serious doubt that the documents still exist.
```

146

1                        Parekh

2              That being said, my understanding

3       is if the documents were able to be produced,

4       then those would go back to Digital Risk to

5       be rereviewed in the time that it might take

6       to make sure that the cure has occurred.  So,

7       that's -- that is my thought on that, on your

8       question.

9              Q.    Thank you.

10             MR. MUNNO:  I just want to be clear

11        that there had been documents that the

12        RMBS trustees have provided underlying

13        the review of the sample that are for

14        settlement purposes only, and it would

15        appear to me from this footnote that

16        this information comes from that.

17             MR. NETZER:  I'm sorry.  I guess

18        I'm not sure.  And therefore?

19             MR. MUNNO:  Therefore, it's

20        inconsistent with our agreement that

21        that documentation would not be used in

22        connection with anybody's reports or

23        testimony.

24             MR. NETZER:  Let's take that

25        up --

147

1                    Parekh

2          MR. MUNNO:  I'm not going to make

3     an issue about it.  I just want it to be

4     on the record.

5          MR. NETZER:  Lunch?

6          MR. MUNNO:  Yes, now.  And it's

7     next door, ready to go.

8          MR. NETZER:  Is that okay with you?

9          THE WITNESS:  That's fine with me.

10         (Time noted:  1:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

148

1                          Parekh

2            A F T E R N O O N    S E S S I O N.

3                 (Time noted:  1:36 p.m.)

4    C H A R L E S  A.   P A R E K H, having been

5        previously duly sworn, was examined and

6        testified further as follows:

7                    FURTHER EXAMINATION

8    BY MR. NETZER:

9        Q.    Back to your report, Mr. Parekh.

10       A.    My report.

11       Q.    Yes.

12       A.    Okay.

13       Q.    The November one.  Would you please

14   turn to page 4, which is where --

15       A.    I'm on page 4.

16       Q.    Yeah, to the table.  And can you

17   please explain why you've broken out 169

18   separately from the 219?  I'm abbreviating

19   here.  169,611,453 versus 219,315,775.

20       A.    So, that represents a range of

21   costs from --

22             Well, let me start over.  Was there

23   a question or --

24       Q.    I'm sorry.  Withdrawn.

25       A.    Okay.

<pre>
 1                        Parekh
 2         Q.   I'd rather -- what I mean to do is
 3    call your attention to the distinctions in
 4    the two scenarios, number of loans for review
 5    157,218 in scenario 2, number of loans for
 6    review 209,395 in scenario 1.  Scenario 1
 7    being on page, scenario 2 being on page 5.
 8         A.   Okay.
 9         Q.   And the difference in the two --
10    the reason for the different amounts is, sir?
11         A.   So, let me -- let me just step
12    back, and I think it'll be more illustrative
13    to first just explain the difference
14    between -- stick with table 1 -- the 209,395
15    and the 213,974.  And then I can just explain
16    what those -- what the numbers represent.
17              But you asked specifically --
18         Q.   That's fine.
19         A.   -- about the 209,395.  That number
20    is a number of loans minus the ones that have
21    already been reviewed by the trustees, the
22    4,579.  So, if you add the 4,579 to the
23    209,395, you see the number 213,974.
24         Q.   Thank you.
25         A.   And I'll explain what that is.
</pre>

150

Parekh

1

2          And then similarly on scenario 2.

3     So, what that 213,974 represents is the

4     covered loans in the covered trusts, which is

5     416,091 -- 416,091 covered loans in the

6     covered trusts, less the loans that have paid

7     in full as of the date that I got that number

8     which is June 2014.

9          Q.   Okay.  And --

10         A.   And so, I'm sorry.

11         Q.   No, no, that's fine.

12         A.   Keep going.

13         Q.   Scenario 2, okay.

14         A.   Yeah, scenario 2, table 2, which is

15    on page 5, what that 161,797 represents --

16    and, again, that's the number you asked me

17    about plus the loans that have already been

18    reviewed.

19         What that 161,797 represents is the

20    loans that have already suffered loss as of

21    June 2014, as well as the loans that are

22    projected or expected to suffer a loss in the

23    future.

24         Q.   That is the 157,000?

25         A.   Yes.

151

1                      Parekh

2        Q.   Okay.  So, then the loans already

3   suffered a loss and are projected to suffer a

4   loss in the future?

5        A.   Correct.

6        Q.   Okay.  And what is the additional

7   balance that brings you to 209,000 in

8   scenario 1?  What loans are those?

9        A.   So, the 209,000 loans are loans

10  that have suffered a loss and all the

11  remaining active loans.

12       Q.   Okay.

13       A.   So, that's a larger number.

14       Q.   It is a larger number.  So, what we

15  have -- so, the 157,000 includes the loans

16  that have suffered a loss?

17       A.   Um-hum.

18       Q.   Plus the loans that are projected

19  to suffer a loss?

20       A.   Um-hum.

21       Q.   And then the 209 includes an

22  additional group of loans, correct?

23       A.   Correct.

24       Q.   That have neither suffered a loss

25  nor been projected to suffer a loss?

152

1                         Parekh

2        A.    That is correct, yes.

3        Q.    And, in your experience, is there

4    any difference in the likelihood that those

5    roughly 50,000 loans will suffer a loss than

6    the loans that are projected to suffer a loss

7    or suffer losses?

8        A.    I'm not quite sure what you mean by

9    "difference in likelihood."

10       Q.    Well --

11       A.    I don't understand your question.

12       Q.    What is the likelihood that those

13   loans will suffer a loss, the 50,000?

14       A.    That number --

15             I guess it's easier to work

16   backwards.

17       Q.    However you'd like, that's okay.

18       A.    Yeah, and I'm not -- you know, only

19   trying to answer your question this way.

20             If we were to start the Protocol,

21   the 416 loans would be too big a number to

22   put through the Protocol.  I mean, it would

23   be -- because that involves loans that are --

24   that are paid in full.  And even if we were

25   to put them through the Protocol, no claim

153

                          Parekh

1

2    would arise from those loans.

3              So, we get rid of those loans and

4    what you're left -- and then let's just get

5    rid of the loans that have already been

6    reviewed because for -- because that's the

7    number you were asking me about right now.

8    That results in 209,395 that would need to go

9    through the Protocol.

10             But in order to give the Protocol

11   the biggest benefit of the doubt, I

12   understand that some number of loans, as you

13   go through the Protocol, might pay off and

14   might move into the paid in full category.  I

15   don't know which loans those are, but based

16   on the -- on the projections of the -- of all

17   the trusts as a whole, we can estimate the

18   number of loans.

19             And so, it is an attempt to give

20   the Protocol the benefit of the doubt by

21   saying, if we were to go through this and

22   because this process takes time, some loans

23   may move to the paid in full.

24             And that number, though it's

25   actually likely to be -- the number of loans

154

Parekh

1    that would need to be realized would likely

2    be higher than the 157,218, that's giving the

3    Protocol the biggest benefit of the doubt

4    saying, "You know what?  Loans will pay off

5    and, you know, at the end of this, we do

6    expect this number at some point in the

7    future, maybe far into the future, to pay

8    off."

9           But if we were to do this without

10   including any of the expected payoff loans,

11   we would end up with, you know, 161,000

12   roughly loans.

13       Q.   Okay.  And have you done any

14   analysis of the like -- that given the fact

15   these loans have performed thus far, is that

16   a fair statement?  Again, the roughly 50,000,

17   is there a lesser likelihood that they will

18   become non-performing loans as a result of

19   that?

20           In other words, is there any --

21   over time, does the likelihood diminish -- if

22   a loan has been performing now for six years,

23   is the likelihood that it will keep

24   performing higher than in connection in the

155

Parekh

1   loans projected already to produce a loss, in

3   your experience?

4       A.   I think it depends as to what --

5   when in time you make that assessment.

6           These trusts are relatively

7   seasoned, they're older trusts.  And I think

8   at this point the likelihood of default

9   remains relatively constant, faulting with

10  the loss relatively constant going forward.

11  So, I don't think the likelihood changed.

12          Earlier in the life of a trust you

13  might have more variables around that, but

14  our projections, you know, at Duff & Phelps

15  would take into --

16          Well, let me just -- let me stop

17  there.  I think --

18      Q.   I understand you think the

19  remainder will remain constant because

20  they're seasoned.

21      A.   Um-hum.

22      Q.   Okay.  But what is the likelihood

23  that will remain constant?

24      A.   I can't tell you that because

25  it's different for every trust.

156

                        Parekh

1

2          I mean, this is an aggregate

3    number, but we -- but we projected this

4    differently for every trust.

5          Q.    Okay.   What is it for the different

6    trusts?

7          A.    Well, I don't have that information

8    in front of me.   That would require me to go

9    back and look at data.

10         Q.    There's not -- but you have --

11               Pardon me.   Sorry.   Go ahead.

12         A.    It would require me to look at data

13   on 255 trusts, but that analysis did go into

14   this -- into those projections.

15         Q.    What analysis?

16         A.    The analysis of looking at data on

17   255 trusts.   I just don't have that in front

18   me.

19         Q.    Well, can -- we'd like to see it.

20   Can we see it?   If it's part of the analysis,

21   we'd like to see it.   What form does it take?

22         A.    It's computer projections.

23         Q.    Okay.

24   RQ          MR. NETZER:   I'd call for the

25         production of that.

157

1                            Parekh

2    BY MR. NETZER:

3         Q.   I mean, you're not -- I mean, is it

4    20 percent, 100 percent?  Is there

5    100 percent likelihood that those loans will

6    perform?

7         A.   That's not a question I can answer

8    because we didn't do the analysis on a

9    loan-by-loan basis.

10             We did it on a trust-by-trust basis

11   and we projected a default rate and other

12   things on a trust basis, on an aggregate

13   trust basis.

14        Q.   And I assume none of them were --

15             And did any of the trusts, were

16   they -- were they 100 percent likelihood that

17   the loans in it would remain performing?

18        A.   No, I don't believe so, but I can't

19   recall at this time.

20        Q.   What was the range, generally?

21   Just --

22        A.   I can't recall that at this time.

23        Q.   The lowest -- can you give the

24   lowest and highest?

25        A.   No, not at this point.

158

                            Parekh

1

2    RQ        MR. NETZER:  We would call for the

3         production of that.  Thank you.

4    BY MR. NETZER:

5         Q.    Duff & Phelps does loan reviews

6    itself?

7         A.    It does.

8         Q.    What's the largest it's ever done?

9         A.    Along with Cross Check, we

10   participated as a firm in the -- in the

11   forensic underwriter reviewing in ResCap

12   which would have been about 7,000 loans.

13        Q.    And how were the loans allocated as

14   between Cross Check and Duff & Phelps?

15        A.    Loans were randomly allocated to

16   either Cross Check or Duff & Phelps, and then

17   we reviewed at a -- at a quality check level

18   by Cross Check.

19        Q.    How did you overcome the issue of,

20   you know, sharing computers?

21        A.    I don't know that there was an

22   issue of sharing computers.

23        Q.    Well, how did you overcome the --

24   how were you able to use consistent standards

25   in the review between the two firms?

1                      Parekh

2        A.   We established standards

3   beforehand.  And then at the beginning of the

4   review, you know, for the first -- I don't

5   know the period but I would think about, you

6   know, the first month or two, we reviewed and

7   rereviewed loans.

8             We used multiple reviewers on the

9   same loan to make sure that RMBS reviewers

10  were arriving at the same -- at the same

11  conclusions until we had ironed out those

12  problems.

13       Q.   But what was it that went so

14  seriously wrong in that process?

15       A.   Did I say something went seriously

16  wrong?  I don't think anything went seriously

17  wrong.

18       Q.   It did not?  Okay.  So, everything

19  went fine, no problems?

20       A.   Well, that's also -- I don't think

21  I said there were no problems either.

22       Q.   Well, let me put it this way.

23            Based on Duff & Phelps's

24  collaboration with another firm, Cross Check,

25  in doing a loan review, what were the

160

                        Parekh

1

2    issues -- why wasn't it possible to establish

3    consistent standards?

4         A.   Cross Check was acting as a -- as a

5    contractor with Duff & Phelps.  As part of

6    Duff & Phelps, we had everybody in the same

7    room, or actually it was two rooms.  And

8    consistent standards were established because

9    we were operating under one single working

10   agreement as Duff & Phelps.

11        Q.   Oh.  Why was Cross Check willing to

12   do that?

13             MR. MUNNO:  Objection.

14        A.   I'm not sure --

15             MR. MUNNO:  You can answer.

16        A.   -- what you mean, why was

17   Cross Check willing to do --

18   BY MR. NETZER:

19        Q.   Why was it willing to submit to the

20   same --

21             There was no problem; is that your

22   testimony --

23             MR. MUNNO:  Objection.

24   BY MR. NETZER:

25        Q.   -- during that --

161

1                       Parekh

2           MR. MUNNO:  He's already said there

3      were problems.

4    BY MR. NETZER:

5      Q.    What were the problems?

6      A.    Well, let me -- let me just answer

7    your question, why was --

8           Cross Check was willing to work

9    under Duff & Phelps because Duff & Phelps was

10   hired to do the loan review and we wanted

11   Cross-Check's expertise to be part of the

12   that loan review.

13     Q.    Why wouldn't Cross Check work for

14   Digital?

15          MR. MUNNO:  Objection.

16          You may answer.

17          MR. NETZER:  Pardon me?

18          MR. MUNNO:  I said, "Objection; you

19      may answer."

20          MR. NETZER:  Sorry.  I didn't hear.

21     A.    Cross Check and Digital are

22   different firms.  They have different

23   management, they have different rules and

24   different standards.  I don't -- I don't have

25   an answer as to whether they would be willing

162

                                  Parekh

1

2       to or not.  I haven't asked Cross Check.

3           Q.   Can you think of any reason why

4       they wouldn't be willing?

5           A.   Yes, I can think of -- I can think

6       of reasons.  They may not be willing to use

7       the same pricing, they may not be willing to

8       use the same quality control.  They may not

9       be willing to come to an agreement as to what

10      the output should look like.  There --

11          Q.   We --

12               MR. MUNNO:  Let him finish.

13               Keep going.

14          A.   You know.  So, those are all --

15      those are some reasons I can think of now.

16      There may be others, but I don't work for

17      Cross Check or Digital Risk, so --

18      BY MR. NETZER:

19          Q.   And why -- how was Duff & Phelps

20      able to persuade Cross Check to collaborate?

21          A.   We hired Cross Check as

22      subcontractors to be Duff & Phelps, to work

23      as Duff & Phelps.  So, we hired them as

24      employees for their expertise.  They were

25      subject to all of our rules and standards.

163

                        Parekh

1

2    And they agreed to it in that -- in that time

3    period, you know, of two -- you know, over

4    two years ago to do that.  I don't know what

5    they would agree to now.

6         Q.   My question is:  What makes you

7    think that Digital can't achieve with

8    Cross Check what Duff & Phelps achieved with

9    Cross Check?

10             MR. MUNNO:  Asked and answered.

11             You may answer it again.

12        A.   I think that Digital and

13   Cross Check are competitors, and they have

14   standards and a role and a place in the

15   marketplace and, you know, their own pricing

16   and their own -- and their own standards.

17   And I think those two firms could have

18   differences in collaborating.  Digital -- I

19   mean Cross Check and Duff & Phelps are not

20   competitors.

21   BY MR. NETZER:

22        Q.   And they have the same standards?

23        A.   Duff & Phelps was able to set the

24   standards for the ResCap review and

25   Cross Check was able to agree to them.

1                       Parekh

2         Q.   And what is the basis for your

3    conclusion that Cross Check and Duff & Phelps

4    are not competitors and Digital and

5    Cross Check are competitors?

6         A.   Digital and Cross Check work do

7    forensic underwriting reviews.  Duff & Phelps

8    will do forensic underwriting reviews, but

9    that is not something that we typically sell

10   or try to engage in unless somebody has a

11   specific reason for us to do it.

12        Q.   What was the specific reason for

13   you to do it in that case?

14        A.   Make sure that I can discuss this,

15   but my understanding of the specific reason

16   is that this was early on in -- you know,

17   earlier on.  You know, it was two and a

18   half -- maybe the decision was made closer to

19   three years ago, but two and a half years

20   ago.  And the standards of how to review

21   things may not have been established,

22   especially in a bankruptcy as large as

23   ResCap.

24             The clients weren't sure exactly

25   what they needed at the time and they needed

165

Parekh

1          a firm that had possibly more flexibility in

2          terms of financial advisory than a -- than a

3          forensic underwriting firm would provide

4          only.

5               Q.   And why did Duff & Phelps stop

6          doing forensic underwriting after that?

7                    MR. MUNNO:  Objection.

8                    You may answer.

9               A.   Well, one, I don't think we've

10         stopped.  We just generally don't sell it.

11         But we're very expensive.  Most of these

12         firms are able to do forensic underwriting at

13         a cost that's considerably less than Duff &

14         Phelps can provide.

15         BY MR. NETZER:

16              Q.   I'm still trying to understand why

17         you're not competitors, though.  If you

18         sell -- you do sell the service, people --

19              A.   No.

20              Q.   You don't sell it?

21              A.   We don't --

22              Q.   People just come to you and force

23         themselves upon you?

24                   MR. MUNNO:  Let's not argue with

166

                        Parekh

1

2       the witness.  He answered "no."  If you

3       want him to elaborate, he will.

4           A.    We don't advertise ourselves as

5       service.   People do come to us because they

6       know our personnel have expertise in this.

7       They know that at least the ResCap, we've

8       done it in the past.   And if someone asked us

9       to do it, we would do it.

10              But since, ResCap Duff & Phelps has

11      not engaged, to my knowledge, in a -- in a

12      forensic underwriting without working with

13      another firm.

14      BY MR. NETZER:

15          Q.    Okay.  So, why can't Duff & Phelps

16      hire Cross Check here?

17          A.    I don't understand.   "Here" means

18      what?

19          Q.    Well, you're saying that you don't

20      think Cross Check and Digital would enter

21      into the kind of arrangement that Duff &

22      Phelps had with Cross Check because of the

23      different kind of relationship that Digital

24      and Cross Check has versus the kind of

25      relationship Duff & Phelps and Cross Check

1                    Parekh

2    has.

3            For example, Digital and

4    Cross Check you say are competitors and

5    Duff & Phelps and Cross Check are not

6    competitors; true so far?

7        A.   Yes.

8        Q.   Okay.  What stops Cross Check --

9    excuse me -- Duff & Phelps from engaging

10   Cross Check on behalf of the trustees to

11   expand the loan review team?

12       A.   Well, I don't think that there's a

13   business reason for Duff & Phelps to do that.

14   The marketplace has changed.  The cost

15   structures have changed.  And typically what

16   we see now is trustees hire their own loan

17   review firms.

18           I'm sure from a business

19   perspective we would love to do it that way,

20   but I'm not sure the clients see that as an

21   efficient or practical way to do it.

22       Q.   Okay.  But nothing stops --

23           Does anything stop the trustees

24   from hiring Cross Check in addition to --

25   sorry -- Digital?

168

Parekh

1   A.   I think I've testified to the

2   reasons why the trustees would not want to

3   hire multiple loan review firms.

4       Q.   Well, why can't Duff & Phelps

5   establish standards like they did when they

6   worked with Cross Check and both Cross Check

7   and Digital could be subject?  Why wouldn't

8   that work?  Why is that business model no

9   good?

10          MR. MUNNO:  Objection.

11          You may answer.

12      A.   I think at this point forensic loan

13  review has developed into an industry where

14  these firms are differentiating -- trying to

15  differentiate themselves on their quality and

16  speed and whatnot.  And I just don't believe

17  that they would be willing to subject to --

18  subject themselves to rules and standards.

19          We just haven't had experience.

20  And let me be very clear.  Even in ResCap

21  where we subcontracted with another firm,

22  there weren't multiple loan review firms.  We

23  were only able to do one firm.  Or we only

24  did one firm under -- you know, under the

1                         Parekh

2      Duff & Phelps umbrella.

3      BY MR. NETZER:

4          Q.    And Duff & Phelps didn't do any

5      loan reviews in that case?

6          A.    That's not true.  I testified that

7      we --

8          Q.    So, Duff & Phelps did loan reviews

9      and Cross Check did loan reviews under the

10     Duff & Phelps umbrella?

11         A.    Cross Check provided the

12     higher-level reviewers, I think Mr. Alread

13     referred to them as the "senior reviewers,"

14     as well as the training and the software

15     systems and things like that.  And Duff &

16     Phelps provided the junior-level reviewers.

17              Cross Check also provided some

18     junior-level reviewers at the beginning,

19     while Duff & Phelps -- while Duff & Phelps

20     employees were training to become loan

21     reviewers.

22         Q.    But that's the only instance where

23     loan reviewers worked side-by-side from

24     different companies, worked side-by-side on

25     the same loan review?

170

1                       Parekh

2          A.   Yes, I believe that's true.

3          Q.   It's never happened --

4          A.   Well, I mean, in my experience.   I

5     mean, I know you don't mean -- but I just

6     wanted to be clear.

7          Q.   No.  I'm asking -- it's your

8     testimony, is it not, that it's never

9     happened except that one time?

10         A.   Wait, wait.  Never happened where?

11              MR. MUNNO:  With Duff & Phelps

12         or --

13              MR. NETZER:  With anyone.

14              MR. MUNNO:  -- in the industry?

15         A.   Oh, I can't testify to that.  I

16    have no idea whether it's happened or never

17    happened or --

18    BY MR. NETZER:

19         Q.   Well, how -- then what is the basis

20    for your saying it couldn't happen here?  Let

21    me put it that way.

22              MR. MUNNO:  Objection.  I don't

23         think he testified that it couldn't

24         happen.

25              But go ahead.

Parekh

1

2          A.    Yeah, I haven't testified that it

3    couldn't happen.  I've testified that I have

4    no experience with it happening.  And I --

5    and I don't know that, you know, my --

6               Yeah, I have no experience with

7    that happening.

8    BY MR. NETZER:

9          Q.    So, what is your basis for

10   believing it couldn't happen?

11              MR. MUNNO:  Asked and answered.

12              You may answer it again.

13   BY MR. NETZER:

14         Q.    You have no experience; it's not

15   based on experience.  So, why doesn't it

16   happen?

17              MR. MUNNO:  Asked and answered.

18              You may answer it again.

19         A.    Why it doesn't -- why doesn't it

20   happen?

21   BY MR. NETZER:

22         Q.    Yeah.  Why can't -- why can't

23   different loan companies work on the same

24   project --

25              MR. MUNNO:  Asked and answered.

172

Parekh

1   BY MR. NETZER:

2       Q.   -- if it's a large enough project?

3   That's what I'm trying to understand.

4       A.   I think there are quality control

5   problems.  I think there are different

6   pricing schemes, different management

7   structures, different locations.  All of

8   these things may cause logistical problems

9   in doing -- in being able to do this.

10      Q.   You can't think of a way to fix the

11  location?  The location of what?

12      A.   Of where the reviewers are.  If you

13  need to have quality control, that's done

14  face-to-face.  And you have managers.  Those

15  managers might have to move around the

16  country.

17          It's not impossible to fix.  It

18  would just add to the cost, the location

19  issue.

20      Q.   Okay.  You were able to overcome

21  the review standard issue in your case,

22  correct?  That is the Duff &

23  Phelps/Cross Check case.

24      A.   Yes.  And we had to send people to

1                        Parekh

2      different locations.  And we had two, we had

3      two locations.

4           Q.   How did you do that?

5           A.   Airplane.

6           Q.   Oh, this -- and pricing.  It can't

7      be done, you mentioned, because of pricing.

8      That was another obstacle.

9           A.   I said it may have problems with

10     pricing.

11                Loan review firms charge

12     different -- they have different packages

13     available, and those packages may cost

14     different amounts, and they may not be

15     willing to standardize pricing across firms

16     because they may have different strengths and

17     weaknesses.  They may have different

18     relationships with outside vendors that

19     they -- they may have different contracts

20     negotiated with data sources.

21                All of these things seem to make it

22     very difficult to -- such that we've had no

23     experience with working with -- you know, in

24     loan reviews that involve multiple firms.

25     These are all things that I can think of that

1                           Parekh

2      would cause issues.

3           Q.   Well, you did it in the case of

4      Cross Check.  Did you try and do it and fail

5      to do it in other instances?

6           A.   Not that I recall.

7           Q.   Okay.  So, you don't have personal

8      experience with these obstacles actually

9      preventing it from happening, correct?

10          A.   I don't have personal experience

11     other than the discussions I've had with

12     Mr. Aronoff and Mr. Sauerwein, who also do

13     not believe it would be possible.

14          Q.   Well, just to say -- you're not

15     saying that they have personal experience

16     with trying to make it happen and failing

17     you, are you?

18          A.   I don't know the answer to that.  I

19     know that my personal experience is when

20     asking the question to them, based on all of

21     their experience, they don't think it's

22     possible.

23          Q.   But you didn't ask, "Have you ever

24     tried to do it other than the time we did it

25     successfully with Cross Check?"

175

Parekh

1    A.   I don't recall exactly what I've

asked them, but the -- but the -- what I

believe I asked them was "Could it be done?"

Not -- you know, "could it be done?"  I asked

them if it could be done, and they said they

did not believe so.

8    Q.   And when they said they did not

believe so, did you say, like, "Well, why

were we able to do it with Cross Check?"  Did

you push back on it at all?

12   A.   No.

13        One, they weren't involved with the

ResCap loan review, so it wouldn't have been

a reasonable question to ask them.

16   Q.   You were, though?

17   A.   I was involved.

18   Q.   And your experience was that it

worked out just fine, what you did in that

case?

21   A.   Right, because Cross Check provided

the higher-level reviewers and the training

and they were working with Duff & Phelps

employees, Duff & Phelps e-mail addresses,

Duff & Phelps phone numbers and all of that.

176

1                       Parekh

2      So, it was -- it was a different

3      relationship.  And --

4           Q.   Different relationship than what?

5           A.   Than one in which two separate but

6      equal firms might work -- try and work

7      together.

8                (Discussion off the record.)

9      BY MR. NETZER:

10          Q.   In paragraph 29 of your report,

11     checking on the --

12          A.   Yes.

13          Q.   -- paragraph 29, where does the

14     $300 an hour number come from?

15          A.   That's based on what I think is a

16     reasonable assumption for what a negotiator

17     might charge, maybe a junior non-partner

18     lawyer, something like that, what -- someone

19     from the trustees' office.

20               It's just a reasonable assumption

21     for an hourly cost that someone with that

22     type of training might have.

23          Q.   What type of training?

24          A.   The type of training to understand

25     breaches of reps and warranties sufficient to

177

Parekh

1    negotiate these.

2        Q.    So, you're assuming a lawyer?

3        A.    A lawyer or someone very familiar

4    with loan review -- loan reviews.

5        Q.    And where -- can you elaborate on

6    how the $300 an hour number you determined

7    was reasonable.  What did you -- what went

8    into that determination that it was

9    reasonable?

10       A.    I thought about what a lawyer might

11   charge, what someone as a senior executive

12   might charge who is from a loan review firm,

13   and that type of person.  But it's -- you

14   know, it is -- it's an estimate.  It could be

15   more.  You know, you may be -- I don't think

16   it would be less, but it certainly could be

17   more.

18          But that was what I thought was a

19   reasonable estimate for what that -- what a

20   person might charge as an hourly rate.

21       Q.    Do you know people who engage in

22   this thing, negotiation of loans?

23       A.    Not in the context of Protocol

24   because I've never --

178

1                              Parekh

2          Q.    Outside the Protocol, just

3      negotiating loans.

4          A.    I mean, yes, and all of those

5      people are senior attorneys, and they charge

6      much more than 300 an hour.  But I assumed --

7      I want to give the Protocol the benefit of

8      the doubt and assume that you don't need a

9      partner at a -- at an AMLaw 100 law firm to

10     be doing this.

11         Q.    Turning to what Mr. Alread has --

12     his declaration --

13         A.    Okay.

14         Q.    -- he states --

15             MR. MUNNO:  What page, please?

16             MR. NETZER:  On page 15, sorry.

17     BY MR. NETZER:

18         Q.    Second full paragraph under

19     section C.

20         A.    Um-hum.

21         Q.    "Based on Lehman's submissions to

22     the Court, I understand that Lehman seeks to

23     preserve its indemnification rights against

24     the originators who sold loans containing

25     alleged breaches of representations and

1                        Parekh

2    warranties to Lehman."  Do you see that, sir?

3        A.   I see that.

4        Q.   Okay.  Is that your

5    understanding --

6             Is your understanding the same as

7    Mr. Alread's?

8             MR. MUNNO:  Objection; no

9        foundation.

10             Go ahead, you may answer.

11        A.   I have no idea.  I haven't thought

12    about that issue at all.

13    BY MR. NETZER:

14        Q.   How -- under -- does the Protocol

15    provide a means for preserving those

16    indemnification rights?

17             MR. MUNNO:  Objection.

18             You may answer.

19        A.   I'm not sure I understand what

20    the --

21             I haven't thought about the

22    indemnification rights.  I'm not sure that I

23    understand what they are.  And there -- I

24    think that sounds legal to me, and I'm not at

25    all a lawyer.  And so, I haven't thought

180

Parekh

1   about it.  I don't think I could answer that

2   question.

3   BY MR. NETZER:

4       Q.   Well, are you saying --

5           I understand you're not lawyer.

6   Are you saying you don't know what

7   indemnification rights are under a loan

8   agreement?

9           MR. MUNNO:  Objection.  I'm not

10          sure that I've seen indemnification

11          rights under the loan agreement.

12          MR. NETZER:  That's interesting,

13          but can I get an answer to my question?

14          MR. MUNNO:  If you can do so.

15      A.   I mean, I --

16          MR. MUNNO:  Do you have any in this

17          record?

18          MR. NETZER:  Can I take my

19          deposition here and then we can move on.

20  BY MR. NETZER:

21      Q.   Go ahead, sir.

22          MR. MUNNO:  Well, I don't want the

23          witness to speculate about --

24          MR. NETZER:  Then why don't you

1                       Parekh

2          object and we'll proceed.

3                  MR. MUNNO:  Objection.

4                  MR. NETZER:  You have objected.

5          Please let the witness answer now and

6          spare us the speaking objections.  Thank

7          you.

8          A.   So, I'm -- I mean, I generally

9     understand what, you know, indemnification

10    rights are, but I don't -- I don't understand

11    legalese specifically, what they would

12    involve.

13              And so, I'm not sure if the

14    Protocol provides for that.  I mean, I just

15    haven't studied what --

16    BY MR. NETZER:

17         Q.   Do you have any understanding of --

18    as to why Lehman has indemnification rights

19    against the originators who sold loans

20    containing alleged breaches of

21    representations and warranties?

22         A.   I mean, I'd have to now -- I just

23    don't -- that's not an issue I'm familiar

24    with.

25                  MR. MUNNO:  I just want to be clear

182

1                        Parekh

2          on the objection because there's

3          nothing --

4               MR. NETZER:  There's no question

5          pending.

6               MR. MUNNO:  I'm making an

7          objection.

8               MR. NETZER:  To what?  There's no

9          question pending.

10              MR. MUNNO:  There's no foundation.

11         You have nothing in this record.

12              Go ahead.

13              MR. NETZER:  Well, we're building a

14         record, you see?  So, sometimes I don't

15         know what the witness is going to say

16         until I ask the question.

17              MR. MUNNO:  Okay.

18    BY MR. NETZER:

19         Q.   So, do you disagree with anything

20    in section C of Mr. Alread's declaration?

21         A.   Well, let me -- may I have a moment

22    to read it?

23         Q.   Absolutely.

24         A.   Thank you.

25         Q.   Take as long as you'd like.

1                              Parekh

2              (Witness reviewing document.)

3         A.    There's nothing that strikes me

4    here that I disagree with, but that's very

5    largely based on the fact that much of what's

6    written here I have no knowledge of, or a

7    deep legal understanding of.

8              So, if there's something specific

9    I'd be happy to answer, but as a -- you know,

10   as a general --

11        Q.    Okay.

12        A.    -- statement.

13        Q.    Sure.

14              Page 16 --

15        A.    Um-hum.

16        Q.    -- Mr. Alread says, "In the regular

17   course of my business at SMLT, I've been

18   presented with repurchase demands from

19   companies buying loans from my company.

20   Since SMLT does not originate mortgage loans,

21   we take these claims back to the party who

22   sold the loans to SMLT."

23              What is your experience about being

24   presented with repurchase demands from

25   companies buying loans from my company --

184

                        Parekh

1

2     from your company?

3               MR. MUNNO:  Objection.

4               You may answer.

5          A.   I -- my -- I have no experience

6     because my company doesn't buy or sell loans.

7     So, no one has come to my company.

8               Was that your question?  I'm not

9     trying to be glib at all.  I'm trying --

10    BY MR. NETZER:

11         Q.   That's definitely responsive, but

12    I'll follow up and let me ask the question a

13    little differently.

14               What's the experience of Duff &

15    Phelps in rendering advice to companies that

16    have been presented with repurchase demands

17    from companies buying loans from your client

18    that you're advising?

19               MR. MUNNO:  Objection.

20               You may answer.

21         A.   Can you repeat that.  I'm sorry.

22    BY MR. NETZER:

23         Q.   Sure.

24               Does Duff & Phelps -- I understand

25    Duff & Phelps doesn't buy or sell mortgages.

185

                        Parekh

1

2          A.    Yes.

3          Q.    Does it ever render advice to

4     companies that buy or sell mortgages?

5          A.    Yes.

6          Q.    Okay.  And what is your experience

7     in -- with respect to repurchase demands from

8     companies that bought loans from your client?

9          A.    Um-hum.

10              MR. MUNNO:  Objection.

11              You may answer.

12         A.    So, my only experience is that I

13    know people at the firm do this type of work

14    and -- but my experience has been --

15              Well, I know -- I know people at

16    the firm do give this kind of advice to

17    clients who have had repurchase demands made

18    against them.  I have not been specifically

19    involved that I can recall, at least right

20    now, in any of these matters in --

21    BY MR. NETZER:

22         Q.    Well, has -- so, has Duff & Phelps

23    given any advice to the trustees here about

24    how Lehman would deal with going back to the

25    parties who sold loans to Lehman?

186

1                      Parekh

2        A.    Not --

3              MR. MUNNO:  Objection.

4              You may answer.

5        A.    Not that I know of.  There may have

6    been discussions that I haven't been party

7    to, but not that I know of.

8    BY MR. NETZER:

9        Q.    But in the absence of Protocol, how

10   will Lehman preserve its rights under against

11   those companies?

12             MR. MUNNO:  Objection; no

13        foundation.

14             You may answer.

15       A.    I haven't done that analysis.  I

16   don't know the answer to that.

17   BY MR. NETZER:

18       Q.    What -- how much -- in the absence

19   of a Protocol, what will the cost be to

20   Lehman of not being able to preserve those

21   claims?

22             MR. MUNNO:  Objection; no

23        foundation.

24             You may answer.

25       A.    I don't know the answer to that.

187

```
1                          Parekh
2      BY MR. NETZER:
3          Q.   And no one at Duff & Phelps has
4      given that any thought?
5          A.   I don't know the answer to that
6      question either.
7          Q.   To your knowledge, no one has?
8          A.   To my knowledge.
9          Q.   Not that you're aware of?
10         A.   Not that I'm aware of.  I can't
11     answer that they have or have not.
12         Q.   Before I forget, ResCap -- I'm
13     sorry.  Cross Check --
14              MS. HAGGLUND:  Cross Check.
15     BY MR. NETZER:
16         Q.   When Duff & Phelps worked on ResCap
17     with Cross Check, what was the size of -- how
18     many loan reviewers at any one time were
19     working on it?
20         A.   To the best of my recollection, at
21     any one time it was approximately 20 junior,
22     you know, loan underwriter reviewers.
23         Q.   That includes both at Cross Check
24     and Duff & Phelps?
25         A.   Yes.
```

1                          Parekh

2         Q.    And --

3         A.    You know, that was probably --

4               Maybe every now and then there was

5    a couple more, but that would be sort of the

6    average size of the review.

7         Q.    When you say it was approximately

8    20 junior loan underwriter reviewers, is

9    there -- were there other kind of loans

10   underwriter reviewers --

11        A.    Well, there were senior --

12        Q.    -- that were working on it?

13        A.    There were senior people who would

14   rereview, but they wouldn't -- you know, they

15   wouldn't sort of increase the pace, only slow

16   it down.  They would rereview for quality.

17   These are, you know -- you know, I think

18   Alread referred to as the "senior reviewers."

19        Q.    And the 20, were they 20 Duff &

20   Phelps or 20 Cross Check?

21        A.    By the end, there were 20 Duff &

22   Phelps.  But, you know, before that, you

23   know, especially during the training process

24   and earlier on, Cross Check may have either

25   sat by Duff & Phelps employees or reviewed a

189

Parekh

1

loan first and then given it to a Duff &

2

Phelps employee to review --

3

Q.   Okay.

4

A.   -- again.

5

Q.   And the Duff & Phelps employees who

6

were doing the review, before they did the

7

review, what was their job at Duff & Phelps?

8

A.   They were typically analyst-level

9

staff or maybe a little more senior than

10

that.  So, these are people who are trained

11

in finance and accounting, audit, those types

12

of things.

13

Q.   And how long was the ResCap review

14

process?

15

A.   Boy, I believe -- to the best of my

16

recollection, it took over a year.

17

Q.   Okay.  And of the 20 people who

18

were reviewing toward the end from Duff &

19

Phelps, prior to that year how many loan

20

review processes had they worked on?

21

A.   Zero.

22

Q.   So, all of them learned how to do

23

it that year?

24

A.   Yes.

25

190

                          Parekh

1

2       Q.   All 20?

3            And how long did it take them to

4  learn how to do it before they were doing it

5  on their own?

6       A.   Several -- you know, a month --

7  probably a couple of months.

8            But let me just caution you that

9  that review at that time served a very

10  different purpose.  It didn't -- well, not a

11  very different purpose but the output was

12  very different.  It didn't produce the same

13  type of output that we see in a standard now

14  from the firms.  It really served to estimate

15  a claim in a settlement, as opposed to

16  producing the evidence that a top-flight firm

17  like Digital Risk produces now.

18            Honestly, it's one of the reasons

19  Duff & Phelps doesn't necessarily want to be

20  in the loan review business.

21       Q.   So, would it be fair to say that

22  the industry, the loan review industry, if

23  that's the right word, has changed

24  substantially in the last two years?

25            MR. MUNNO:  Objection.

                        Parekh

1
2              You may answer.

3       A.    I would say it's fair to "change."

4              I don't want to put the word

5       "substantial" on it because I don't know what

6       "substantially" means.  But, yes, it has

7       changed.

8       BY MR. NETZER:

9       Q.    Let me be -- try and be more

10      specific, then.  Would it take more than a

11      month or two to learn how to do a loan review

12      today as opposed to two years ago?

13              MR. MUNNO:  For what purpose?

14      BY MR. NETZER:

15      Q.    Go ahead, sir.

16      A.    I think --

17              MR. MUNNO:  Objection.

18              You may answer.

19      A.    I think for --

20              MR. NETZER:  He may answer whether

21      or not you give him permission.  He's

22      required to.

23              Go ahead.

24      A.    Well, I'm going to answer.  So --

25      BY MR. NETZER:

192

Parekh

1        Q.    I know.

2        A.    For the purposes of doing some --

3   an analysis like we had to do for ResCap,

4   which didn't require as much of the

5   documentation and the mapping of the reps and

6   warranties, the matching of loan numbers to

7   servicer numbers and things like that, which

8   we did, you know, a lot of -- which had to go

9   on at Lehman, and for the purpose of

10  estimating the claim for a settlement offer

11  which was on the table, I think you could

12  train people in one to two months.

13           For the purpose of doing a forensic

14  loan review like we did in Lehman, I don't

15  have an answer to that because the trustees

16  decided to hire a top-flight firm where the

17  people are already trained.

18       Q.    When you say "we" did, you mean

19  Digital Risk?

20           I'm sorry.  When you say "like we

21  did in Lehman," Duff & Phelps did at Lehman?

22       A.    I meant the trustees' team is the

23  "we."

24       Q.    Cowen and Digital Risk?

1                         Parekh

2          A.   Cowen, Digital Risk, whatever input

3     the trustees and their counsel had on that,

4     if they did have any.

5          Q.   But Cowen did the loan review on

6     the sample?

7          A.   No.  Digital Risk did the review.

8          Q.   By itself without any help from

9     Cowen?

10         A.   I can't tell you if Cowen helped or

11    not.  I don't -- I don't know.  That was not

12    something I know about.

13         Q.   Well, who did the -- who did the

14    loan analysis on the sample?

15         A.   Digital Risk.  Digital Risk did the

16    loan review.  The forensic loan under --

17    reunderwriting.

18         Q.   And Cowen did not?

19         A.   Cowen did not do that.

20              I think your question was:  Did

21    they have any input, or something along those

22    lines.  You know, they may have -- they're

23    experienced mortgage people, so they may or

24    may not.

25              I don't know.  I wasn't part it, so

194

Parekh

1        I can't speak to it.  I just didn't want to

2        give the impression that I had some knowledge

3        that I don't.

4            Q.   Fair enough.

5                 Back to paragraphs 28 through 30 of

6        your report.

7            A.   Okay.

8            Q.   Yeah.  You say, "I assume that each

9        of the four Trustees" -- this is in paragraph

10       28 -- "can individually, simultaneously, and

11       continually negotiate with Lehman at a rate

12       of ten loans per day, each -- or 40 loans per

13       day in total," and so forth.

14                Do you see that, sir?

15           A.   I do.

16           Q.   What's the basis for your

17       assumption?

18           A.   Based on discussions with

19       Mr. Aronoff and Mr. Sauerwein as well as, you

20       know, my reading of -- or my -- you know,

21       my experience in how complicated these loans

22       are, I thought that a good estimate was, you

23       know, a little less than an hour to negotiate

24       for each loan, because it's complicated, so

195

1                        Parekh

2      it takes some time.

3              But these are things that people

4      want to be motivated to push through because

5      there are so many loans.  And so, 10 loans a

6      day in an eight-hour day is -- you know, I'd

7      have to do the math again, but it seems like

8      it's 40 minutes, 45 minutes per loan.  So --

9          Q.   And what did Mr. Sauerwein and

10     Mr. Aronoff tell you when you consulted among

11     them?

12         A.   Well, again, none of us have any

13     experience in the types of negotiations that

14     are -- that are occurring in this Protocol,

15     but they have been involved in the course of

16     their career and in negotiating repurchase

17     demands and they say -- you know, they inform

18     me it's a -- it's a complicated process that

19     takes a long time.

20              I haven't studied it.  But even in

21     the brief that went around the last day or

22     two from Lehman, there's a transcript there

23     where people are negotiating over loans and

24     it seems like that just -- you know, a small

25     number of loans is taking a lot of time and

Parekh

1

2    effort.

3          So, it is a process that I tried to

4    represent here that takes a lot of time and

5    effort, but I wanted to give the benefit of

6    the doubt of the Protocol.  And so, I assume

7    that people would be able to move through

8    these expeditiously, you know, about 40 or 45

9    minutes per loan on average.

10         Q.   You personally have no experience

11    that's how long it takes, correct?

12         A.   I've never negotiated a repurchase

13    demand.  I have only spoken with those who

14    have been involved with it.

15         Q.   Those being the two gentlemen, your

16    two colleagues?

17         A.   Well, I mean, I've spoken with

18    other clients on other matters, mostly

19    attorneys who have -- who have been involved

20    with negotiating repurchase demands, as well.

21         So, that's my personal experience,

22    is that -- is that in other matters, there

23    have been repurchase demands made and there

24    have been settlement negotiations on these

25    demands.  But I personally have not

1                    Parekh

2     negotiated a repurchase demand myself.

3          Q.   Well, what expertise are you

4     bringing to bear to your opinion here?  Let

5     me put it that way.

6          A.   I'm bringing to bear the expertise

7     of Duff & Phelps on what we believe a

8     repurchase demand would take at a minimum to

9     negotiate.

10         Q.   I'm asking you what expertise -- I

11    understand.  My question now is:  What

12    expertise do you, as opposed to your

13    colleagues at Duff & Phelps, bring to bear on

14    the opinion you're rendering for the Court

15    here?

16         A.   I bring the results of my

17    discussions with them.

18              MR. MUNNO:  As long as you're

19         pausing, can I have a bathroom break,

20         please?

21              MR. NETZER:  Absolutely.

22              (Recess taken.)

23    BY MR. NETZER:

24         Q.   Paragraph 34 of your report, sir.

25         A.   Okay, I'm there.

1                           Parekh

2          Q.   This concerns the Court reviews for

3    Final Resolution.

4               "Based on my experience, and based

5    on my discussions with colleagues at Duff &

6    Phelps, it is not unrealistic (sic) to expect

7    that a Court would be able to review and

8    determine breaches and damages on a

9    loan-by-loan basis at rate of seven loans per

10   day, but I assume that such an overall risk

11   rate would be reached if the parties gained

12   experience over the over the years of

13   review."

14             MR. MUNNO:  One moment, please.

15        You said "unrealistic."

16             MR. NETZER:  Did I?

17             MR. MUNNO:  I think you misread it.

18        "It is not realistic."  I think you may

19        have misread it.

20             MR. NETZER:  What it says is "it is

21        not" -- oh, I'm sorry, you're

22        absolutely -- I did say "it is not

23        unrealistic."  I remember it, because I

24        remember thinking that's lithotine to

25        myself.

199

Parekh

```
 1
 2    BY MR. NETZER:
 3         Q.   "It is not realistic."  So --
 4              "Based on my experience, and based
 5    on discussions with my colleagues at Duff &
 6    Phelps, it is not realistic to expect that a
 7    Court would be able to review and determine
 8    breaches and damages on a loan-by-loan basis
 9    at a rate of seven loans per day."  And then
10    you continue.  That is the end of the
11    sentence, but I just -- that's enough for
12    purposes of asking the question.
13              Well, what experience of yours are
14    you referring to?
15         A.   My experience with this is based on
16    how complicated the breach claims are.
17              So, when we review breach reports
18    from loan review firms like Digital Risk,
19    looking at the -- looking at the loan and
20    understanding and discussing how long that
21    would take with -- you know, with others at
22    Duff & Phelps, it's a very slow process.
23              And then also it's based on my
24    discussions with Mr. Aronoff and
25    Mr. Sauerwein and their experiences in
```

200

Parekh

1        working in put-back matters where Courts have

2        potentially have to rule or have ruled.

3               So, their input to me was that

4        seven loans per day is brisk, and they know

5        of -- and know of matters -- that those types

6        of Court reviews have taken much, much longer

7        per loan.

8            Q.    What are those matters?

9            A.    I don't know.  That is their

10       statement to me, that seven loans a day is

11       brisk.  And I agree with that, you know,

12       based on my experience on how complicated

13       these matters are.

14           Q.    But their -- what they told you

15       about were certain court proceedings,

16       correct?

17           A.    They told me that, in their

18       experience, Courts could not easily review

19       seven loans per day.

20           Q.    And the experience they were

21       referring to was experience of Courts

22       deciding these issues, correct?

23           A.    I don't know -- I don't know the

24       answer to that.  They told me that based on

201

1                              Parekh

2      their experience.  I can't speak specifically

3      to what their experience is, but they have

4      been in the industry for a long time.  So,

5      they have familiarity with Court review

6      times.

7          Q.   Has Mr. Alread been in the industry

8      a long time?

9          A.   I actually don't know that, so --

10         Q.   What I'm driving at --

11         A.   -- I'm guessing.

12         Q.   Is that enough for you to accept

13     the information that the person giving you

14     the information is experienced?

15         A.   It's part of it.  But it's also

16     that I believe that seven loans per day is a

17     reasonable estimate, because that's looking

18     at, you know, about a loan an hour, which

19     seems like a reasonable number to me.

20              You know, could it be faster?  I

21     suppose.  But I don't have any reason to

22     think it would -- it would go much faster.

23     And, you know, I -- it could be slower as

24     well.  But this is -- this is the reasonable

25     estimate, I believe is the time it would

202

                         Parekh

1

2     take.  It doesn't --

3               It seems to me, you know, a

4     reasonable estimate to say that, you know,

5     about an hour to review a claim that has gone

6     through an entire Protocol.  So, it's the

7     Plan Administrator has seen it, it's gone

8     through negotiation.  The claims facilitator

9     has made a ruling.  All of this has happened,

10    and it's still not settled.  And, therefore,

11    these are likely to be the most contentious,

12    most complicated rulings.

13              And just the logistics of it,

14    right?  If you're talking about a lawyer

15    making an argument for each side, as well as

16    an expert on each loan stating the case,

17    there's just logistics that are going to take

18    some time.

19         Q.   What did the lawyers tell you about

20    that?

21              MR. MUNNO:  The lawyers?

22         A.   What lawyers?

23    BY MR. NETZER:

24         Q.   The lawyers you consulted about

25    this.

203

                    Parekh

1

2          MR. MUNNO:  Objection.

3     A.    I'm not -- I haven't consulted any

4    lawyers.

5    BY MR. NETZER:

6     Q.    No.  It says here you're talking

7    about how long the proceedings in court would

8    take, right?

9     A.    Um-hum.

10     Q.    Who were the lawyers who you asked

11    that?  What did you discuss --

12          You didn't discuss this with a

13    lawyer?

14     A.    Not in forming my opinion.  I mean,

15    lawyers have read my report.

16     Q.    And what did they say and what did

17    you say about this?

18          You consulted them before you wrote

19    your report, didn't you?

20          MR. MUNNO:  Objection.

21          You may answer.

22     A.    I -- I'm not sure what you mean by

23    "consulted" them, but I formed the opinion

24    based on what I think it would take and, you

25    know, those of the colleagues of mine at

204

Parekh

1   Duff & Phelps.  A lawyer never -- I just want

2   to be very clear.  The lawyer never came to

3   me and said, "This is what it should take to

4   do this."

5

6           I've been in court.  I know that

7   things take a long time in court.  So, I was

8   trying to give a reasonable estimate of each

9   loan based on the idea that each loan -- each

10  side would present an expert who would make

11  the case for or against, that being a

12  put-back, the judge would listen to the -- to

13  the advice of each expert and then render

14  their ruling.

15      Q.   And it would be experts, though,

16  that would do it?

17      A.   Yes.  I mean, somebody would have

18  to serve as a -- as an expert for why this

19  is -- this is a loan that has a claim or not.

20      Q.   Okay.  So, each side would present

21  their expert, right?

22           I'm just going through your

23  opinion.

24      A.   Yes, yes.

25      Q.   And then there would be what, an

205

1                          Parekh
2     opening, a closing?
3          A.    Well, I don't know how the judge
4     would choose to do that, actually.  I
5     can't -- I haven't done that -- I haven't
6     done that analysis.  I've given what I think
7     is a reasonable estimate for a -- to do the
8     whole loan on a loan-by-loan basis.
9          Q.    My question is more --
10              I understand --
11         A.    Um-hum.
12         Q.    -- that things take time and so
13    forth.
14         A.    Things take time.
15         Q.    Things take time.
16              Now, I'm asking, apart -- what's
17    your expertise that you're offering to the
18    judge here about how long it would take?
19    That's what I'm trying to understand.  What
20    is it that you're telling Judge Chapman that
21    she couldn't figure out on her own without an
22    expert witness to this?
23         A.    Well, I'm not -- okay.  Let me be
24    very clear, I'm not telling Judge Chapman
25    anything here in terms of --

Parekh

2        Are you talking about in my report

3   or are you talking about in these hearings

4   that are contemplated in step 5?

5        Q.   I'm talking about what you say in

6   your report about the hearings contemplated

7   in step 5.

8        A.   Okay.  So, what I'm -- what I'm

9   saying in my report is that the way that I've

10  estimated this time is that each side would

11  need to provide information to the judge,

12  maybe with an expert, usually with an expert

13  but -- maybe not always with an expert.  But

14  on average, they would be able to do about

15  seven loans per day.

16       Q.   No, I understand.  I'm trying to

17  understand the expert -- what is the

18  expertise that you offer to the judge to

19  persuade her that this is so?

20            MR. MUNNO:  He's answered that

21       question.

22  BY MR. NETZER:

23       Q.   Apart from things take time?

24            MR. MUNNO:  You may answer it

25       again.

1                          Parekh

2              THE WITNESS:  Okay.

3         A.   So, I have been to court many times

4    and I've seen how long things can or cannot

5    take.  I have spoken to Mr. Aronoff and

6    Mr. Sauerwein as to their experiences with

7    how long it may take to -- for a Court to do

8    these types of, you know, reviews.

9              And I have also reviewed breach

10   reports from firms like Digital Risk and know

11   how long it takes me to read through these

12   types of reports to understand, you know,

13   what it would take.  And, you know, I -- and

14   that leaves me to believe what I -- you know,

15   I think is a reasonable estimate.

16   BY MR. NETZER:

17        Q.   In the absence of using the

18   Protocol, how long will it take for the Court

19   to reach final resolution on these disputes?

20             MR. MUNNO:  Objection.  I'm not

21        sure I understand the question.

22             But you may answer it.

23        A.   Well, do you mean on total or on a

24   per-loan basis?

25   BY MR. NETZER:

208

Parekh

1      Q.    Either, whatever you feel more

2   comfortable with.

3      A.    Well, on a per-loan basis, I don't

4   think the Protocol affects, you know, the

5   time.  I mean, I think that roughly seven

6   loans per day is reasonable, is a reasonable

7   amount of time.  I don't think that's --

8      Q.    In the Protocol or outside the

9   Protocol?

10      A.    Outside the Protocol or in the

11   Protocol.

12      Q.    And how many -- were more than --

13   how many special masters would be involved in

14   this?

15          MR. MUNNO:  Objection.  Presupposes

16      special masters can even be appointed by

17      a bankruptcy judge.

18          But you may answer.

19      A.    I don't know.  I contemplated the

20   rate of, you know, one judge --

21          Let me just read what I wrote on my

22   report.  It's, you know, one Court dedicating

23   one full week a month.

24   BY MR. NETZER:

209

Parekh

Q.   What was your basis for excluding
the use of multiple special masters?

MR. MUNNO:   Objection; foundation.

You may answer.

A.   I -- well, honestly, necessarily --
well, let me just start over.

I don't think I have a basis for
excluding special masters.  What I estimated
was that this judge in this court would be
doing this work.

BY MR. NETZER:

Q.   One judge?

A.   And I wouldn't presume, you know,
to make any speculation really on telling a
judge how to run their courtroom, but this is
the estimate that I made because I thought it
was reasonable.

Q.   Paragraph 23, you state your
assumption that the trustees being able to
commence a loan review one month after
requesting the loans from the applicable
servicers.  Do you see that?

A.   I do.

Q.   Is there -- what is the reason that

210

Parekh

1    the trustees have not already commenced loan

2    reviews?

3

4              MR. MUNNO:  Objection.

5        A.    Well, they've commenced the loan

6    review on the -- on the 5,000 sample.

7    BY MR. NETZER:

8        Q.    Fair enough.  Why haven't they

9    commenced loan reviews with respect to more,

10   with respect to others?

11             MR. MUNNO:  Objection.

12             You may answer.

13       A.    I don't believe the trustees

14   believe it's necessary to do a loan review on

15   the other loans.  They -- they've estimated

16   their claim already, and to do additional

17   loan reviews would take time and money that

18   they don't need to use to estimate their

19   claim.

20   BY MR. NETZER:

21       Q.    What was the basis --

22             Did they get -- obtain a court

23   determination that it was unnecessary to

24   commence the loan reviews?

25             MR. MUNNO:  Objection.

211

Parekh

1          A.   I don't -- I don't know the answer

2     to that.

3     BY MR. NETZER:

4          Q.   Did they -- did they do it with the

5     consent of Lehman?

6               MR. MUNNO:   Do what with the

7          consent of Lehman?

8     BY MR. NETZER:

9          Q.   Not to commence the loan review

10    except with respect to the loans in the

11    settlement.

12         A.   Are you asking me did they not do

13    something with the consent of Lehman?

14         Q.   In other words, when they --

15              You're saying they didn't do it,

16    correct?

17         A.   I'm saying they have not done a

18    loan review beyond the loan review of the

19    5,000 loans sample that they've already done.

20         Q.   And I believe you said that the

21    reason they didn't is they don't believe it's

22    necessary, correct?

23              MR. MUNNO:   Objection.  His answer

24         stands as it was.

212

1                    Parekh

2    BY MR. NETZER:

3        Q.   And I just want to --

4             Fair enough.

5        A.   That's my belief.  There may be

6    other reasons that I'm not privy to or part

7    of.

8        Q.   Exactly.  And but for that, but for

9    that belief that it wasn't necessary, did

10   anything stop them from beginning the loan

11   reviews -- when could they have started?

12             MR. MUNNO:  Objection.

13       A.   I suppose as soon as they justified

14   spending the trust money with whoever they

15   have to justify that to.

16   BY MR. NETZER:

17       Q.   Okay.  But apart from that, was

18   there anything else -- apart from their

19   decision that they shouldn't do it, was there

20   any logistical prohibition on their doing it,

21   say, starting in 2008?

22             MR. MUNNO:  2008?  Objection.

23             You may answer, if you know.

24       A.   I have no -- I have no idea.  I

25   wasn't even involved in this matter in 2008.

213

                         Parekh

1

2    BY MR. NETZER:

3        Q.    What about 2009?

4        A.    I wasn't involved in 2009.  I

5    don't --

6        Q.    Could it have been started in 2013

7    if they wanted to, if they determined it

8    was -- the cost justified it?

9        A.    Well, sure.  I mean, an additional

10   loan review could start.  There would be

11   significant time and effort and cost involved

12   in getting that going.  But if you're saying

13   "can" versus "should," they can start it.

14       Q.    Okay.  When could they have first

15   started it?

16             And yes, could, not should.  I

17   understand that they didn't think they should

18   and you didn't think they should.  I'm

19   asking -- now we're in the "can" realm.  I'm

20   just trying to understand.

21             MR. MUNNO:  Objection.

22       A.    I mean, I would have to speculate

23   to that because I don't know what the status

24   of these loans were and where they were and

25   which master servicers had them and all these

214

1                           Parekh

2      sort of logistical issues, who had -- you

3      know, did Digital Risk have the capacity?

4      Were there loan review firms available?  All

5      that sort of thing.

6                I mean, I don't know the answer to

7      that.  I mean, there are lots of variables

8      about when they could have started.

9      BY MR. NETZER:

10          Q.   When did they first make their

11     claims, the trustees --

12               MR. MUNNO:  Objection.

13     BY MR. NETZER:

14          Q.   -- in the bankruptcy court?

15               MR. MUNNO:  If you know, you may

16          answer.

17          A.   I don't know the answer to that,

18     actually.

19     BY MR. NETZER:

20          Q.   When did the Lehman bankruptcy

21     commence?

22          A.   From my reading in the media, about

23     2008.

24          Q.   When did the loan review commence

25     for the sample?

215

Parekh

1
2      A.   I can't recall exactly because, you

3  know, that was prior to Duff & Phelps'

4  retention.  Sometime, you know, prior to

5  2012, I believe, is my best recollection.

6      Q.   In paragraph 21, you state that you

7  make the assumption that the trustees can

8  request and receive all requested loan files

9  from the applicable services within a period

10  of three years.  Do you see that, sir?

11      A.   I do.

12      Q.   You state that the assumption is

13  based on conversations with Digital Risk.

14  Based on anything else?

15      A.   It's largely based on the

16  conversations with Digital Risk and their

17  experience with requesting the 5,000 loans

18  and how difficult that was.

19           I do know from my other loan review

20  experience of that, requesting loans,

21  getting -- and getting the loans and getting

22  them ready for review, which means splitting

23  out the files, making sure that, you know,

24  loan A is in fact loan A.  When you find out

25  loan B is going back to the servicer and

216

Parekh

1   getting loan A when they accidentally gave

2   you loan B, dealing with the missing files,

3   dealing with missing documents within the

4   file, dealing with nonresponsive servicers --

5   and there's multiple servicers here -- all of

6   this can take a significant amount of time.

7          Now, when I did the analysis in the

8   Protocol, I did give full credit to the fact

9   that many loans may come in very quickly and

10  they can get queued up and processed and

11  ready to go, and the review would start

12  within one month.  But I didn't want the --

13  you know, to undervalue the effort that's

14  really involved in getting these loans.

15      Q.   Part of that effort, I take it, is

16  the --

17          And who at the trustees would be

18  making that effort?

19      A.   All of the trustees, you know,

20  would have to be involved with that effort,

21  as well as Digital Risk and all of the

22  master -- the applicable servicers and master

23  servicers that have those loan files.  All of

24  those parties would be involved.

217

Parekh

1    Q.   Okay.  And how many people at

2  Digital Risk would be involved?

3    A.   There is a team that they call a

4  "loan fulfillment team."  I don't know the

5  number of people that are on that team.  It

6  was managed by this gentleman whose name is

7  Hector, but -- I believe his name is Hector.

8  But there are multiple people involved in

9  this process.

10    Q.   And what is the relationship

11  between the amount of time it will take to

12  request and receive the loan files from the

13  applicable servicers and the number of people

14  assigned at either -- at Digital Risk or

15  others to assist the trustees in that

16  process?

17    A.   I don't think it's contingent on

18  the number of people as long as you have --

19        It's really about, you know, making

20  phone calls, getting the servicers to

21  respond, processing the .pdf.  You could --

22  you know, there's some labor involved in

23  that.  You have to diligence what comes in

24  and do -- you know, match servicer numbers

218

1                        Parekh

2    with loan numbers and all the significant

3    efforts.

4              So, there are some places where you

5    can speed up the process slightly, but really

6    it's just a back-and-forth between those who

7    have the loan files and those who need the

8    loan files.  It's -- you know, in my

9    experience, it has never been a smooth

10   process.

11             But I will, you know, stress to you

12   again that in my timing -- you know, in my

13   analysis of the timing, this effectively

14   takes one month, right?  There is effort in

15   getting this.  That's why I want to show the

16   three years there.  But in my calculations of

17   the timing, the review starts after one month

18   and the loans are able to trickle in or come

19   in.  I won't say trickle in.  Come in fast

20   enough.  There's always loans to review.

21             I also, you know, note that in that

22   5,000 sample, there were almost 500 loans

23   that they never got.  And I think that's also

24   going to be a significant problem in this --

25   in this Protocol, is how do you -- how does

219

1                          Parekh

2       that Protocol deal with the -- with the loans

3       that just are never going to come in?  Or,

4       you know, missing documents that -- you know,

5       loans with -- sorry -- with a significant

6       number of missing documents as well that

7       render them unreviewable and having to go

8       back and forth with the servicer and master

9       servicer there to get those.

10           Q.   How long did it take the Digital to

11      get the 4,579?

12           A.   About 18 to 20 months, I believe.

13           Q.   And that was based -- and how many

14      people at Digital were working on that?

15           A.   I don't know the answer to that.

16           Q.   And -- well, ballpark, 20?

17           A.   I don't know the answer to that.  I

18      don't think I could ballpark it because I --

19      I worked with, you know, Mr. Phillips and the

20      loan -- and the head of the loan fulfillment

21      team and all of that, you know, and I spoke

22      to them.  But all of that effort occurred

23      before Duff & Phelps's involvement.

24           Q.   Right.  So, what did Mr. Phillips

25      tell you about how many people were involved?

220

Parekh

1       A.   I never asked him that question.

2       Q.   What is your basis for believing --

3   I believe you believe, maybe you don't

4   believe it.  But what is your basis for the

5   opinion that having more people involved

6   couldn't accelerate the pace?

7       A.   No, no, I don't believe I said

8   that.  I think I said the opposite.

9           I think there are points where you

10  could speed up the process.  The loan

11  matching -- the looking at .pdfs and things

12  like that, you could speed up the pace of

13  getting them ready to review.

14          But there is also just a component

15  of going back and forth to other

16  organizations, these master servicers.  And

17  no matter how many people you have sitting at

18  Digital Risk, once you've asked the master

19  servicer for a new request, you're just

20  waiting for them to turn that request around.

21      Q.   Well, what's the basis of your

22  determination that it would take more than

23  18 -- than the 18 or so months or 18 months

24  to two years if that was --

221

                        Parekh

1
2          18 to 20 months, maybe you said.

3      A.    Well, because it's 30 to 40 times

4   the number of loans than the initial request

5   of 5,000.

6      Q.    Anything else?

7      A.    No.  It's the volume, it's the huge

8   volume of loans that --

9          So, every problem that takes some

10  time, that -- you know, that took -- that

11  took time in the 5,000, you have multiples

12  and multiples of those same problems, and so

13  you're going to just take more time.

14     Q.    Tell me more about the problems

15  that they encountered.  And did Mr. Phillips

16  elaborate on what were the most serious

17  problems, what was really taking up the time?

18  Did he tell you?

19     A.    It -- so, what Mr. Phillips told me

20  is that there were times that files would

21  arrive misidentified.  There were times when

22  files would arrive split into multiple pieces

23  that had to be stitched back together.

24         There were times when a single file

25  was in -- sorry -- multiple loan files were

222

Parekh

1   in a single electronic file.  There were

2   times when an electronic file had no loan in

3   it, it was just blank.

4        There were illegible pages that had

5   to, perhaps, go back to the master servicer

6   and get those pages rescanned, if possible.

7   Loan numbers --

8        So, you have to match the request,

9   right?  One of the -- one of the issues is

10  you have to match the request and catalog

11  everything, and loan numbers are not

12  necessarily consistent across different

13  parties.  And so, loans had to be identified

14  and mapped and reidentified.

15       And so, all of these types of

16  things.  And this is consistent with my

17  experience in other loan requests as well.

18       Q.   Oh, tell me about those

19  experiences.

20       A.   So, we had similar problems that I

21  just testified to in ResCap.  And then in

22  these other matters, we have issues.  And

23  I -- you know, I don't want to really call

24  them problems.  They're just -- there are

223

Parekh

1    things that you have to do to get the loans

2    ready to review.  It's -- you know, it's just

3    not possible that on -- you know, on day 1 of

4    your request, that everything comes in ready

5    to go.

6            It's just these things have been

7    sitting around, they're old files.  They've

8    been scanned, they've been scanned at a

9    high-speed, in some cases without a lot of

10   due diligence.  Things get lost, things get

11   misplaced.  Parts of the documents are in one

12   place and the other parts are in another

13   place.  All of these things just take time.

14       Q.   And what is your basis --

15           Now, it was 18 to 20 months for the

16   sample, correct?

17       A.   That's correct.

18       Q.   Why would it take -- maybe I'm

19   misreading this.  The estimated three-year

20   time frame to request and receive files,

21   based on Digital Risk's typical loan request,

22   for the purposes of a review for breaches of

23   representations and warranties, so the 18 to

24   20 month project was not their typical?

224

                        Parekh

1

2      A.    No, no, it was, it was.

3            What I meant by "typical" was that

4      unfortunately this Protocol requires

5      potentially something far more difficult.

6      So, the Protocol requires 43 groups of

7      documents to be in a -- in a claim -- I

8      forget exactly what it's called, but a claim

9      packet, I'll just call it.

10           And so, in a Digital Risk typical

11     loan file request, they will request and say,

12     "You give me what you have, and as long as it

13     has the minimum number of documents that a

14     loan file should have, I'll review -- I'll

15     review it and make a determination based on

16     what you present to me."

17           But because in the Protocol a claim

18     requires 43 categories of documents from the

19     mortgage files, the credit file and the

20     servicing file, that loan -- that loan

21     request could be far more onerous because

22     they can't just review what they get sent.

23     They may have to go back and forth and --

24     with the servicer and old servicers, you

25     know, where servicing has been transferred to

225

Parekh

1   get all of these 43 categories of documents

2   that are required in the Protocol.

3            So, that's why I said the word

4   "typical" there.

5       Q.   Okay.  Just to be clear, maybe I

6   misunderstood.  But I think you clarified.

7            So, when you say the estimated

8   three-year time frame to request and receive

9   files is based Digital Risk's typical loan

10  file request, you mean that it's based on

11  typical Risk's -- Digital Risk's typical 18

12  to 20 months, but then you layer on the items

13  you mentioned in the sentences that follow to

14  get to the three years?

15      A.   Let me -- let me restate that

16  because I don't think you quite said it the

17  way that I would.

18      Q.   Maybe not.

19      A.   So, a typical loan file request

20  that Digital Risk engages in for the 5,000

21  took 18 to 20 months.

22           My estimate is that if Digital Risk

23  were to do a typical loan file request of the

24  same types of materials that they would need

226

1                          Parekh

2      for that 5,000 but to try to do it for the

3      full 200,000 -- 167,000 or 200,000 loans,

4      that would take them about three years.

5      That's what I'm saying.

6                  But it could take longer if in fact

7      to satisfy the Protocol they have to go back

8      and forth and get all of these 43 categories

9      of documents that are required by the

10     Protocol.  So, Digital's -- Digital Risk's

11     typical loan file request does not entail

12     that extra effort.  And I didn't include it

13     in my calculations, but I did want to point

14     it out.

15          Q.   I think I understand.

16          A.   Okay?

17          Q.   So, but what Digital Risk did in

18     connection with the sample was its typical

19     loan request process, correct?

20          A.   Yes.

21          Q.   Okay.  And how does that work?

22                  They ask for -- the trustee asks

23     a -- makes a global request to each servicer.

24     How many servicers are there?  Can you

25     elaborate on that?

227

1                        Parekh

2              You've talked a little bit about

3      the difficulties and identified some of them.

4          A.   Um-hum.

5          Q.   How many servicers are there?

6          A.   I don't know as I sit here today.

7      There are multiple ones.

8          Q.   You probably know better than me.

9      We -- are we talking 500, 5,000?

10         A.   I don't know how many they have --

11     they have to request from.  I don't think

12     it's 500 or 5,000.  I think it's a smaller

13     number than that.

14         Q.   Okay.

15         A.   But --

16         Q.   You do know more than me, way more.

17     So, I'm wondering if there could --

18              I understand you're saying that the

19     typical pace or rate or whatever would

20     increase because of the number.  I'm trying

21     to understand if there could be economies of

22     scale.  Wouldn't that impact the pace, could

23     it diminish?

24         A.   Well, actually I agree with that.

25     I mean, if there weren't economies of scale,

228

Parekh

1   then if the 5,000 took 18 to 20 months, then

2   30 to 40 times would take 30 to 40 times

3   that.  I certainly don't think that.

4         The three years reflects the fact

5   that, you know, going to these servicers and

6   they're sending you their files to send 30 to

7   40 times as many files doesn't take 30 to 40

8   times as long.

9       Q.   So, did -- I -- in -- was it

10  Digital that made the request?

11      A.   Digital Risk made -- well, I mean,

12  actually don't know the answer to that,

13  whether the trustees formally make the

14  request or Digital Risk makes the request.

15  But it was -- it was the group of Cowen,

16  Digital Risk and the trustees at that time

17  who made the request.

18      Q.   And, again, you're not a lawyer,

19  but -- and why is it that the servicers

20  respond at all?

21      A.   My understanding is they're

22  contractually obligated to.

23      Q.   Okay.  And --

24      A.   But to the extent of how much

229

Parekh

1    effort and how much time they need to put

2    into it, whether they can charge for those --

3    for those requests, I don't know, and I don't

4    know if it's standardized or varies.  But --

5         Q.   Well, I'm just -- I'm a lawyer and

6    I don't know the answer to this, but what --

7              My question is:  What pressure can

8    the trustees bring to bear on the servicers

9    to accelerate?

10             MR. MUNNO:  Objection.

11             You may answer.

12        A.   I don't know if there is pressure

13   that the trustees can bear other than

14   potentially threats of court intervention and

15   things like that.  You know, maybe business

16   relationships.  I don't know what --

17             And then I would also say that if

18   the documents aren't there or the documents

19   are difficult to be found or if they're

20   stitched together or split up, you know, no

21   amount of pressure can make someone do the

22   impossible.  It's just going to take as long

23   as it takes even if somebody is working very

24   hard at it.

230

Parekh

1          MR. NETZER:  Let's take a little

2     break.  I'm getting near the end.

3          MR. MUNNO:  Okay.

4          (Recess taken.)

5   BY MR. NETZER:

6        Q.   You mentioned the -- some of the

7   changes in the practices and standards of

8   loan companies in the past two years the

9   subject came up.  And could you please tell

10  us what is the reason for those changes.

11       A.   Well, what I've -- what I mentioned

12  was that loan review firms have -- you know,

13  in what I've experienced, have become better

14  at the -- you know, the output that they give

15  you.  And I think the reason for that is

16  marketplace demand.

17            When I first got involved with

18  these types of RMBS matters, you were -- the

19  rules and standards for what qualified as a

20  repurchase claim weren't necessarily settled.

21  And I think in many cases the market and

22  possibly the legal area has settled on what

23  qualifies a claim.  But I know certainly the

24  market has started to demand certain things

231

Parekh

1   and I think the firms have adapted to that.

2   They've --

3       Q.   And when you say "since I started,"

4   is that like two and a half years ago?

5       A.   Two and a half years ago.

6       Q.   Thank you.

7           And you say the changes are based

8   on demand for those changes?

9       A.   Yes.

10      Q.   And why is it that the demand --

11  there was a demand for those changes?

12      A.   So, when I was first involved, I

13  think there were still uncertainties.  Or

14  maybe not still.  There were -- there were

15  many uncertainties as to what qualified as a

16  claim, what qualified as a -- you know, a

17  repurchase claim.  And at least in the

18  marketplace, that's -- some of that has

19  become resolved.

20          And also the ability to map to --

21  directly to reps and warranties and what the

22  output on that looks like and matching and

23  the ability to electronically review the reps

24  and warranties has gotten better, the

232

1                           Parekh

2       technology.  And so, the standards for the

3       marketplace have changed because it can be

4       done now and, therefore, for that price it

5       should be done.

6           Q.   When you say "for that price" --

7           A.   Well, for a price.  I mean, if it

8       can be done and I'm paying you to do it, you

9       know, I'm going to expect a good product.

10      And I don't mean "I" particularly, I mean I

11      as a marketplace.

12          Q.   And just -- has the increased or

13      the changed -- it's -- well, stay --

14              What I mean, the increased demand,

15      is it just an increase in the quality, if you

16      will, as I heard you just said, or is there

17      just more -- is the industry growing in size?

18          A.   I don't know the latter part.  What

19      I'm talking about is specifically about

20      quality.  And you said increased demand

21      and --

22          Q.   No, I thought that's what you

23      meant.

24          A.   Yeah, I don't mean quantity of

25      demand.  I just mean the services and quality

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

1                        Parekh

2    of services demanded.

3         Q.    And I take it -- you mentioned two

4    principal things.  One was that some of the

5    uncertainties as to what qualified as a claim

6    have been resolved.  And the second thing is

7    just the technology, if you will, fairly

8    generally to map reps and warranties has

9    gotten better.  Anything else?

10             First of all, I don't mean to -- if

11   I'm misrepresented what you said, I don't

12   mean to.

13        A.    No, you're getting it right.

14   There's nothing specific I recall right now.

15        Q.    Do you know what it was that caused

16   the -- maybe it is a legal question.

17             Well, actually, let me just ask

18   you:  What are you referring to?  What are

19   the uncertainties as to what qualified as a

20   claim -- a repurchase claim -- that have

21   become resolved?

22        A.    Well, those are legal questions

23   when you say "resolved," but I -- but I can

24   say from a market standpoint what we -- what

25   we're really looking at is -- now is, you

234

Parekh

1  know, what did the loan look like at

2  know, what did the loan look like at

3  origination?

4      The trusts -- the trusts are buying

5  loans and there's many -- you know, there are

6  potentially places to look for breaches, but

7  what's become very standardized now is:  What

8  does this loan look like at origination?  And

9  that -- that's what Digital Risk provided to

10  us in its assessment.

11      And I don't know that when we did

12  the ResCap review, for example, that's always

13  what we were looking for in our review.

14      Q.   So, again, your words, not mine --

15  can you -- can -- when you say what the loans

16  looked like at origination, can you elaborate

17  on that?

18      In other words, or what's the

19  difference between what's being done now,

20  i.e., the loan -- looking at the loans as

21  they looked at origination, versus what you

22  were doing two and a half years ago when

23  there might have been other things?

24      A.   Well, we may -- two and a half

25  years ago, we may have been looking at items

235

<div style="text-align:center">Parekh</div>

1

2  in the servicing file to see, you know, if

3  there was a -- if there were other

4  circumstances that may have resulted in a

5  default.

6            I don't want to get too far because

7  I do think these are legal questions.  But I

8  think we were looking at all sorts of things.

9  And I think, you know, the way Digital Risk

10  does it now and my experience now, the other

11  firms that I've worked with, they have a

12  relatively standard set of items that they

13  look at.

14            Now, in the Protocol, as I said,

15  you know, maybe they have to look at more

16  things because the claim packet requires it.

17  But at least in Digital Risk's typical

18  review, it seems to be on par with my

19  experience with other loan review firms in

20  how they reviewed and what they -- you know,

21  what they look for, not how.

22            Sorry.  Go ahead.

23      Q.   No, you're --

24            So, what are -- apart from the --

25  can you tell me the difference between

236

1                          Parekh

2     looking at items in the servicing file and

3     how that's different from how the loans

4     looked like at origination?

5          A.   Well, the -- origination is a point

6     frozen in time.

7          Q.   And the servicing file would

8     include --

9          A.   Is ongoing.

10         Q.   Good answer.  You did understand.

11              I take it that -- is it fair to say

12    looking for things in the servicing file has

13    become less important or less --

14         A.   Well --

15         Q.   Less focus of it?  What is the

16    difference?

17         A.   Not less important overall, but

18    less --

19              I would say it's not the focus of

20    a -- breaches of reps and warranties at

21    origination.  There are many servicing

22    reviews and servicing litigation going on.

23    But that wasn't the focus of the review in

24    this matter.

25         Q.   And so, what is it --

237

1                         Parekh

2              All right, then let's go back to

3       what they are focusing on now, what Digital

4       Risk is in this matter.  Can you elaborate

5       on --

6              Your phrase, I think it was how the

7       loan booked it at origination.  What does

8       that mean for --

9         A.    Well, my understanding is that the

10      breach -- the breach of reps and warranties

11      is frozen in time as to what that loan -- you

12      know, what information was in that file and

13      what effect did that -- you know, that file

14      when it was sold to the trust.

15             Because the trust purchased a loan

16      and paid a price for a loan that had certain

17      qualities.  And what Digital Risk would look

18      for is, you know, were the qualities of that

19      loan as represented actually what happened?

20      That's what I mean.

21             I don't know that I have a lot more

22      to say than that.  But that's, I think, a --

23        Q.    And so, in looking at the loans, in

24      analyzing the loans, as they look at

25      origination, what does Digital do with the

238

```
 1                         Parekh
 2    items in the servicing file in that analysis?
 3              MR. MUNNO:  Objection.
 4              You may answer.
 5         A.   I don't know what they do with
 6    them.  I believe that in terms of the
 7    Protocol -- so, if you're talking about the
 8    Protocol, I believe they would at least have
 9    to verify their existence and completeness.
10    Because the Protocol calls for all the
11    document categories -- for many document
12    categories in the servicing file.
13              But in terms of estimating the
14    claim through the sample, I don't believe
15    Digital Risk had to consider the servicing
16    file.
17    BY MR. NETZER:
18         Q.   What did they do -- what
19    consideration did they give the servicing
20    file?
21         A.   I don't -- I don't know the answer
22    to that.
23         Q.   Did -- well, what, if any --
24              Did they consider it at all?
25              MR. MUNNO:  Asked and answered.
```

239

```
 1                      Parekh

 2             You may answer again.

 3        A.   I don't know the answer to that.

 4   BY MR. NETZER:

 5        Q.   Well, you've looked at the sample

 6   and you've looked at their work, haven't you?

 7        A.   I've looked at the sample and I've

 8   looked at the results of their work.

 9        Q.   And what's in there about the

10   servicing file?

11        A.   They don't look at breaches based

12   on the servicing file.  Breaches of

13   origination.

14        Q.   Well, what do they look at the

15   servicing file for?

16             MR. MUNNO:  Objection.

17        A.   I don't know what they would look

18   for -- look -- what they look at the

19   servicing file for.

20   BY MR. NETZER:

21        Q.   Well, what have they -- what has

22   Digital told you about their review of the

23   servicing files?

24             MR. MUNNO:  Objection; no

25        foundation.
```

240

                        Parekh

1

2          You may answer.

3      A.    Nothing.

4  BY MR. NETZER:

5      Q.    What has Digital done in connection

6  with its review of the servicing files?

7          MR. MUNNO:    Objection; no

8      foundation.

9          You may answer.

10     A.    I don't know the answer to that.

11  BY MR. NETZER:

12     Q.    Has Digital reviewed the servicing

13  file?

14     A.    I don't know the answer to that.

15  In fact, I don't know even of the

16  completeness of the servicing files.

17          You know, one of the difficulties

18  is that, you know, many of these servicers --

19  and there are multiple servicers that were in

20  bankruptcy, and getting files from them, you

21  know, servicing files from them, just may

22  have been problematic.  When servicing gets

23  transferred from a bankrupt entity, those

24  servicing files may not have gone over.  So,

25  all the difficulties that --

241

                    Parekh

1

2          And this also applies as

3    origination files, would also be there with

4    the servicing files.  I mean --

5          Q.   I understand.  But --

6          A.   Drawing blood from a stone, so to

7    speak.

8          Q.   But notwithstanding that, you're

9    saying that Digital did obtain and review the

10   servicing files where possible?

11              MR. MUNNO:   Objection.

12         A.   I did not.  I don't believe I said

13   that.  I don't know what they did with the

14   servicing files.

15   BY MR. NETZER:

16         Q.   But you've seen -- have you -- but

17   you've seen their sample and what they did,

18   correct?

19         A.   I have seen their sample, meaning I

20   know what loans were drawn into the sample.

21   I have reviewed their process on finding

22   origination breaches.  But I don't know what

23   they did with the servicing file.

24         Q.   Well, what have you done to

25   determine the impact of servicing breaches on

242

1                    Parekh

2    the sample?

3              MR. MUNNO:  Objection.

4        A.   I haven't done anything --

5              MR. MUNNO:  Relevance.

6        A.   -- on the impact of servicing

7    breaches on the sample.

8    BY MR. NETZER:

9        Q.   Well, who --

10             What have the trustees themselves

11   done, then?

12             MR. MUNNO:  Objection; relevance.

13        A.   I don't know what you mean by the

14   "impact of servicing breaches on the sample."

15   We're not -- as far as I understand, we're

16   not looking for servicing breaches.

17             (Continued on next page to include

18        jurat.)

19

20

21

22

23

24

25

243

1                          Parekh

2              MR. NETZER:  I think I have no

3        further questions at this time.

4        A.    But that's -- okay.

5              MR. MUNNO:  This deposition is

6        concluded.

7              (Time noted:  3:45 p.m.)

8

9

10                    _____

11                    CHARLES A. PAREKH

12

13       Subscribed and sworn to before me

14       this_____ day of _____, 2014.

15

16       _____

17

18

19

20

21

22

23

24

25

244

1

2               C E R T I F I C A T E

3    STATE OF NEW YORK       )

4                            : ss.

5    COUNTY OF NEW YORK      )

6

7           I, TAMI H. TAKAHASHI, a Notary

8       Public within and for the State of New

9       York, do hereby certify:

10          That CHARLES A. PAREKH, the witness

11      whose deposition is hereinbefore set

12      forth, was duly sworn by me and that

13      such deposition is a true record of the

14      testimony given by the witness.

15          I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I

18      am in no way interested in the outcome

19      of this matter.

20          IN WITNESS WHEREOF, I have hereunto

21      set my hand this 6th day of December

22      2014.

23

24      _____

25              TAMI H. TAKAHASHI

245

1

2      ----------------- I N D E X ----------------

3      WITNESS                  EXAMINATION BY        PAGE

4      CHARLES A. PAREKH    MR. NETZER                 7

5

6      ------------ INFORMATION REQUESTS -----------

7      DIRECTIONS:  (None)

8      RULINGS:  (None)

9      TO BE FURNISHED:  (None)

10     REQUESTS:  156, 158

11     MOTIONS:  (None)

12     ------------------- EXHIBITS ----------------

13     DEBTORS'                        FOR ID.

14     Debtors' Exhibit 1, Declaration of

15     Charles A. Parekh, Ph.D., November 14,

16     2014                                 7

17     Debtors' Exhibit 2, Declaration of

18     William Alread, December 3, 2014         7

19     Debtors' Exhibit 3, Declaration of

20     Craig Pino, December 3, 2014             7

21

22

23

24

25

246

INSTRUCTIONS TO WITNESS

1

2

3      Please read your deposition over carefully

4  and make any necessary corrections. You should state

5  the reason in the appropriate space on the errata

6  sheet for any corrections that are made.

7      After doing so, please sign the errata sheet

8  and date it.

9      You are signing same subject to the changes

10  you have noted on the errata sheet, which will be

11  attached to your deposition.

12      It is imperative that you return the original

13  errata sheet to the deposing attorney within thirty

14  (30) days of receipt of the deposition transcript by

15  you. If you fail to do so, the deposition transcript

16  may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25

247

```
 1                        E R R A T A

 2

 3

 4

 5          I wish to make the following changes,

 6       for the following reasons:

 7

 8       PAGE LINE

 9       ____  ____ CHANGE:_____

10       REASON:_____

11       ____  ____ CHANGE:_____

12       REASON:_____

13       ____  ____ CHANGE:_____

14       REASON:_____

15       ____  ____ CHANGE: _____

16       REASON:_____

17       ____  ____ CHANGE: _____

18       REASON:_____

19       ____  ____ CHANGE: _____

20       REASON:_____

21

22       _____    _____

23          WITNESS' SIGNATURE                DATE

24

25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**A**

**abbreviating**
148:18
**ability** 34:11
37:10 135:2
231:21,24
**able** 34:23
86:16 89:5
102:6,15,20
103:3,20
112:19
124:3
125:25
132:13
137:16
146:3
158:24
162:20
163:23,25
165:13
168:24
172:10,21
175:10
186:20
196:7 198:7
199:7
206:14
209:20
218:18
**absence**
141:16
186:9,18
207:17
**absolutely**
72:2,25
117:18
182:23
197:21
198:22
**accelerate**
220:7
229:10
**accept** 201:12
**acceptance**
134:23
**accidentally**
216:2

**accounting**
189:12
**accuracy**
117:11
**accurate**
59:23
112:17
141:23
246:16
**accurately**
47:21 135:8
**achieve**
126:24
163:7
**achieved**
108:21,24
112:16
136:14
163:8
**acting** 160:4
**action** 244:17
**active** 35:10
151:11
**activity** 20:7
**actual** 61:18
135:21
**adapted**
231:2
**add** 27:19
88:5,7
120:20
135:5
149:22
172:19
**addition**
124:21
135:3
167:24
**additional**
62:18 63:2
92:4 104:10
106:2,15
109:3 110:7
121:24
123:13,18
151:6,22
210:16

213:9
**addresses**
175:24
**administer**
6:14
**administered**
7:3
**Administra...**
145:7 202:7
**advance** 13:6
14:11,12
**adverse** 72:16
**advertise**
166:4
**advice** 83:7
84:14
184:15
185:3,16,23
204:13
**advise** 82:22
**advising**
184:18
**advisory** 9:18
165:3
**Affiliates** 3:6
**aggregate**
156:2
157:12
**ago** 8:21,22
23:7 41:13
46:8,12
47:5 52:19
52:21 110:9
163:4
164:19,20
191:12
231:5,6
234:22,25
**agree** 21:20
21:25 29:10
92:19,21
118:4,10
124:14
125:8,11,14
125:15
126:4,20
127:12

129:7
130:22
131:3
132:22
140:18,20
142:12,20
143:23
145:19
163:5,25
200:12
227:24
**agreed** 6:2,7
6:11 163:2
**agreement**
92:23
121:13
123:8 130:6
130:20
146:20
160:10
162:9 180:9
180:12
**agreements**
128:11
129:9
131:16
**ahead** 21:23
47:16 78:23
119:23
121:2
137:25
156:11
170:25
179:10
180:22
182:12
191:15,23
235:22
**Airplane**
173:5
**al** 1:6
**alleged**
115:10
178:25
181:20
**Allen** 89:21
90:4

**allocated**
158:13,15
**allowed**
104:20
119:5
134:10
**allows** 32:24
**alongside**
43:20
**Alread** 7:9
8:4 79:20
116:4
119:25
120:13
121:20
124:15
130:11
169:12
178:11
183:16
188:18
201:7
245:18
**Alread's**
80:13 113:4
114:3 179:7
182:20
**ALSTON**
4:20
**alternatives**
33:10
**AMLaw**
178:9
**amount** 32:8
139:8 208:8
216:7
217:12
229:22
**amounts**
149:10
173:14
**analysis**
10:10 11:2
17:17,18
18:11,19
33:19 37:19
39:3,6,11

46:18 69:8
88:25 89:3
89:4,8
136:17,22
144:24
154:15
156:13,15
156:16,20
157:8
186:15
192:4
193:14
205:6 216:8
218:13
238:2
**analyst-level**
189:9
**analyze** 20:4
34:4,5 69:9
73:17
**analyzed**
73:13
115:14,15
136:15
141:17
**analyzes**
141:8
**analyzing**
29:5 237:24
**and/or** 131:6
**answer** 11:11
20:3 22:6
24:8 25:19
27:7,15
29:8 30:6
34:8,16
40:24 41:6
46:11 51:3
56:15 58:10
61:24 63:8
63:19 64:3
64:11 66:22
68:4,14
70:25 74:6
74:18 75:5
76:2,5 77:6
81:21 83:2

83:20 84:12
86:4,25
96:8,11,12
96:15 99:23
100:6
101:14
121:3,4
123:10
124:3,11
127:8 131:9
131:18
134:5 141:7
144:4,23
152:19
157:7
160:15
161:6,16,19
161:25
163:11
165:9
168:12
171:12,18
174:18
179:10,18
180:2,14
181:5 183:9
184:4,20
185:11
186:4,14,16
186:24,25
187:5,11
191:2,18,20
191:24
192:16
200:25
203:21
206:24
207:22
208:19
209:5
210:12
211:2,24
212:23
214:6,16,17
219:15,17
228:13
229:7,12

236:10
238:4,21
239:2,3
240:2,9,10
240:14
**answered**
56:14 66:21
121:12
134:3
144:11
163:10
166:2
171:11,17
171:25
206:20
238:25
**answering**
10:4 21:15
21:17 65:12
139:24
**anybody**
18:11
**anybody's**
146:22
**apart** 32:13
43:8,12
56:9 64:20
91:12
121:14,16
128:21
205:16
206:23
212:17,18
235:24
**apologize**
10:5 17:5
23:16 68:21
110:10
111:10
112:4
**appear**
114:23
146:15
**appears**
145:13
**applicable**
29:25

209:22
215:9
216:23
217:14
**applies**
112:10
241:2
**apply** 132:13
**appointed**
208:17
**appreciate**
18:13 85:20
116:7 126:8
**approach**
36:23
**appropriate**
246:5
**approxima...**
114:22
117:9,13
122:4
124:24
127:14
128:14
187:21
188:7
**area** 230:23
**areas** 126:9
**argue** 165:25
**argument**
202:15
**arises** 11:19
**Aronoff** 77:7
78:6 80:2
89:18 90:12
91:9 92:3
92:19 99:11
101:4,20
102:4,13,18
107:9
108:12
109:7
122:15
145:24
174:12
194:20
195:10

199:24
207:5
**Aronoff's**
60:25 93:18
93:19 100:8
104:4 108:5
**arrangement**
166:21
**arrive** 32:24
221:21,22
**arriving**
159:10
**ascertain**
117:23
118:11
**ascertained**
59:20
**aside** 29:17
102:17
107:7,8
125:3
135:20
136:8,25
139:16
**asked** 10:20
19:23 20:4
31:15,25
32:3 56:14
57:8,10
58:10 59:11
64:18 65:3
65:9,15
66:21,24,25
78:14 80:24
90:8 93:4,7
93:8 103:11
103:18
104:22
106:12
109:16,20
149:17
150:16
162:2
163:10
166:8
171:11,17
171:25

175:3,4,5
203:10
220:2,19
238:25
**asking** 9:5
12:21 14:21
20:20 21:5
30:25 36:2
43:13 46:9
56:6 74:5
78:16 85:7
123:17
131:22
140:3 153:7
170:7
174:20
197:10
199:12
205:16
211:13
213:19
**asks** 226:22
**assessment**
34:3 155:5
234:10
**assign** 121:24
**assigned**
122:3
126:18,19
126:21
217:15
**assist** 47:24
217:16
**assisting** 51:7
**associated**
38:25 69:10
**Association**
5:6
**assume** 41:23
59:3 95:14
157:14
178:8 194:9
196:6
198:10
**assumed**
178:6
**assuming**

118:6 177:3
**assumption**
118:7
176:16,20
194:18
209:20
215:7,12
**assumptions**
39:22
138:19
**assured** 57:22
**Atlanta** 4:23
**Atlantic** 4:21
**attached**
131:16
246:11
**attempt**
153:19
**attention**
133:19,21
149:3
**attorney**
246:13
**attorneys** 3:4
3:17 4:4,11
4:18 5:5 6:3
35:11 178:5
196:19
**audit** 189:12
**augment**
67:18
**August** 14:2
14:11 17:16
17:21 19:14
19:19 20:10
20:24 22:17
24:15,19
26:14,23,25
27:18 28:8
28:22 29:3
31:4 33:16
52:23,24
**authorized**
6:14
**available**
66:2 91:24
92:16 95:20

100:10
104:6
106:19
129:18
130:2
145:18
173:13
214:4
**Avenue** 3:8
**average**
188:6 196:9
206:14
**aware** 61:25
62:4,6,25
187:9,10
**a.m** 2:4

**B**

**B** 116:10
117:8
215:25
216:3
**back** 17:12
22:12 23:6
30:25 41:12
41:25 51:9
71:14 74:23
91:9 102:11
110:2,17
146:4 148:9
149:12
156:9
175:11
183:21
185:24
194:6
215:25
219:8
220:16
221:23
222:6
224:23
226:7 237:2
**backwards**
152:16
**back-and-f...**
218:6
**balance** 151:7

**ballpark**
219:16,18
**Bank** 4:11
5:5
**bankrupt**
240:23
**bankruptcy**
1:2 43:25
48:2,10
54:13,22,25
55:5,11
164:22
208:18
214:14,20
240:20
**Barrant** 42:8
42:25 44:16
**Barrent** 44:7
44:14,21
70:7
**based** 29:6
38:6 55:21
75:14 98:24
101:5 114:8
127:18
129:22
135:23
139:19
141:24
145:15,23
153:15
159:23
171:15
174:20
176:15
178:21
183:5
194:19
198:4,4
199:4,4,15
199:23
200:13,25
203:24
204:9
215:13,14
215:15
219:13

223:22
224:15
225:10,11
231:8
239:11
**basically**
126:16
**basis** 25:11
25:17 34:14
56:6 68:5
73:16,23
86:17 87:15
90:11 92:7
92:22 93:15
94:9,11
107:25
122:22
135:9,14,16
140:24
157:9,10,12
157:13
164:2
170:19
171:9
194:17
198:9 199:8
205:8
207:24
208:4 209:2
209:8
210:21
220:3,5,22
223:15
**bathroom**
197:19
**Battery** 2:8
4:6
**bear** 197:4,6
197:13
229:9,14
**began** 15:5
24:18 28:22
29:2 40:25
**beginning**
61:6 112:8
141:23
159:3

169:18
212:10
**begins** 143:4
**begun** 14:8
**behalf** 54:12
167:10
**belief** 128:6
212:5,9
**believe** 18:21
18:22 55:16
55:19 70:2
70:14 88:23
91:6 92:8
96:18,19
110:4
115:14
118:15
120:3 121:4
121:6
122:15,18
122:21
123:10
124:8
129:12,14
129:25
136:2 138:5
157:18
168:17
170:2
174:13
175:4,7,9
189:16
197:7
201:16,25
207:14
210:13,14
211:21,22
215:5 217:8
219:12
220:4,4,5,8
238:6,8,14
241:12
**believing**
171:10
220:3
**benefit** 87:12
153:11,20

154:4 178:7
196:5
**best** 33:21
77:21 79:14
128:3
187:20
189:16
215:5
**better** 43:22
47:17 51:23
129:21
227:8
230:14
231:25
233:9
**beyond** 89:11
211:19
**big** 87:19
152:21
**biggest**
153:11
154:4
**BIRD** 4:20
**bit** 8:21 227:2
**blank** 222:4
**blanket**
138:19
**blood** 241:6
244:17
**booked**
106:18,20
237:7
**Boston** 4:14
**bother**
142:16
**bottom**
124:16
**bought** 185:8
**Boy** 189:16
**breach** 50:19
50:21,21,22
137:12,13
137:21,22
138:6,13,15
138:16,20
139:11
199:16,17

207:9
237:10,10
**breaches**
40:17 42:3
44:3 46:21
48:3 115:10
135:4
137:17
138:12,17
138:22
139:10,20
140:7,8
144:17
145:2,5,14
145:17,22
176:25
178:25
181:20
198:8 199:8
223:23
234:6
236:20
239:11,12
241:22,25
242:7,14,16
**break** 72:24
74:15 76:10
142:22
144:5
197:19
230:3
**brief** 195:21
**bring** 92:6
130:5
197:13,16
229:9
**bringing**
121:25
197:4,6
**brings** 151:7
**brisk** 200:5
200:12
**broad** 27:22
**Broadway**
3:19
**broken**
148:17

**Brothers** 1:6
  3:4
**brought**
  61:21 62:2
  62:9 63:4
  69:5 94:14
**building**
  182:13
**business**
  53:14
  167:13,18
  168:9
  183:17
  190:20
  229:16
**buy** 184:6,25
  185:4
**buying**
  183:19,25
  184:17
  234:4

**C**
**C** 3:2 4:2,15
  5:2 7:14
  148:4
  178:19
  182:20
  244:2,2
**calculations**
  218:16
  226:13
**calendar**
  99:13
**calibrated**
  72:15
**call** 11:13
  35:10 40:12
  53:10
  105:10
  149:3
  156:24
  158:2 217:4
  222:24
  224:9
**called** 7:14
  45:10 53:22
  224:8

**calling** 56:10
**calls** 217:21
  238:10
**capacity**
  57:17,18
  92:2 121:23
  214:3
**Capital**
  130:17
  131:6
**career** 98:12
  195:16
**carefully**
  246:3
**carries** 39:23
**carry-over**
  130:12,13
**case** 1:6 13:6
  17:19 18:20
  35:14,15
  36:5,6 40:8
  110:14
  137:5 141:2
  164:13
  169:5
  172:22,24
  174:3
  175:20
  202:16
  204:11
**cases** 138:14
  223:10
  230:22
**catalog**
  222:11
**categories**
  224:18
  225:2 226:8
  238:11,12
**category**
  153:14
**cause** 172:9
  174:2
**caused**
  233:15
**caution** 190:8
**Center** 4:21

**certain** 3:5
  200:16
  230:25
  237:16
**certainly**
  15:15 35:9
  35:18,25
  70:22 71:3
  79:21
  135:11
  144:7 145:2
  145:5
  177:17
  228:4
  230:24
**certainty**
  91:8
**certify** 244:9
  244:15
**chagglund...**
  3:13
**chance** 87:4
  113:19
  114:4
**change** 191:3
  247:9,11,13
  247:15,17
  247:19
**changed**
  155:11
  167:14,15
  190:23
  191:7 232:3
  232:13
**changes**
  230:8,11
  231:8,9,12
  246:9 247:5
**Chapman** 5:4
  205:20,24
**Chapter** 1:5
**characterize**
  9:11 13:17
  15:20 34:10
**characteriz...**
  15:19
**charge**

173:11
  176:17
  177:12,13
  177:21
  178:5 229:3
**Charles** 1:12
  2:6 7:5
  243:11
  244:10
  245:4,15
**chart** 121:21
  124:16
  128:10
**cheaply** 55:18
  55:21 56:11
**check** 42:8,20
  43:9,10
  44:5 47:13
  49:3 70:7
  110:24,25
  158:9,14,16
  158:17,18
  159:24
  160:4,11,17
  161:8,13,21
  162:2,17,20
  162:21
  163:8,9,13
  163:19,25
  164:3,5,6
  166:16,20
  166:22,24
  166:25
  167:4,5,8
  167:10,24
  168:7,7
  169:9,11,17
  172:24
  174:4,25
  175:10,21
  187:13,14
  187:17,23
  188:20,24
**checked**
  100:23,25
**checking** 61:7
  97:8 176:11

**Chicago** 5:8
**choice** 32:21
  33:8,9
**choose** 205:4
**chosen** 84:17
  85:17
**circumstan...**
  137:15
  235:4
**cited** 13:23
**claim** 9:11
  11:15,18
  12:7 15:4
  15:21 20:18
  25:10,17
  26:12 27:14
  29:14 30:9
  32:25 37:13
  38:3,10
  47:25 49:9
  49:11 50:9
  50:24 51:5
  51:6 72:20
  86:16,19
  134:23
  135:5,6,8
  135:18
  137:14
  138:7,21
  139:12,15
  140:6
  141:21
  142:2
  144:19
  152:25
  190:15
  192:11
  202:5
  204:19
  210:16,19
  224:7,8,17
  230:21,24
  231:17,18
  233:5,20,20
  235:16
  238:14
**claims** 9:16

9:20,24
  10:11,16
  11:2 12:12
  13:6,11
  15:10,18
  17:18,19
  28:19 29:6
  33:19 34:6
  38:5 43:25
  43:25 50:13
  83:18 86:20
  92:5 135:15
  139:2,4,6
  140:23,25
  141:5,11,15
  144:25
  183:21
  186:21
  199:16
  202:8
  214:11
**clarification**
  18:9
**clarified**
  225:7
**clear** 11:4
  16:21 17:13
  27:21
  126:11
  138:4
  146:10
  168:21
  170:6
  181:25
  204:3
  205:24
  225:6
**client** 33:10
  103:16
  184:17
  185:8
**clients** 13:5
  14:18,19,19
  16:17 20:11
  20:21 30:4
  33:13 34:3
  34:9 35:2,8

35:10,14
164:24
167:20
185:17
196:18
**close** 112:25
127:6
**closely** 91:2
**closer** 52:17
52:18,20
164:18
**closing** 205:2
**collaborate**
162:20
**collaborating**
163:18
**collaboration**
159:24
**colleague**
79:3 113:25
127:9
**colleagues**
16:16 28:11
41:20 55:25
76:25 80:8
89:16,20
100:24,25
113:21
196:16
197:13
198:5 199:5
203:25
**colloquialism**
111:16
**Colorado**
3:20
**combination**
140:6
**combinations**
140:10
**come** 36:24
46:13 96:11
101:2
103:22
110:17
115:24
136:3 162:9

165:23
166:5
176:14
184:7
216:10
218:18,19
219:3
**comes** 100:7
101:3
146:16
217:24
223:5
**comfortable**
69:13,15
208:3
**coming** 71:15
**commence**
209:21
210:24
211:10
214:21,24
**commenced**
20:23 24:11
210:2,5,9
**comment**
95:5
**common**
84:14
109:11
**communica...**
44:25
**companies**
54:8,17
55:17,20
67:4,15,25
80:10 86:13
89:9 93:9
93:14 94:10
94:17 95:7
96:2 108:13
108:15,16
169:24
171:23
183:19,25
184:15,17
185:4,8
186:11

230:9
**company**
4:18 53:22
82:3 85:13
85:15 93:8
93:10 94:7
94:8 97:19
105:20
128:20
183:19,25
184:2,6,7
**competitors**
163:13,20
164:4,5
165:18
167:4,6
**complete**
64:8,12
67:25 99:2
124:22
125:25
141:15
142:4
**completed**
97:6
**completeness**
238:9
240:16
**Compliance**
42:9,20
47:13
110:24
**complicated**
194:22,25
195:18
199:16
200:13
202:12
**component**
220:15
**compound**
97:4
**compressed**
120:17
**computer**
48:17 71:13
156:22

**computers**
158:20,22
**conceding**
126:13
**concern**
87:11,19
91:23 92:21
119:6
123:12
**concerned**
138:24
**concerning**
51:15 60:8
120:10
**concerns**
91:16
129:16
**conclude**
18:18
**concluded**
18:22 19:18
19:20 243:6
**conclusion**
19:8 32:16
37:8,21,25
56:17 75:4
93:23 94:10
94:12 98:24
99:18
114:16
122:25
137:6
139:19
164:3
**conclusions**
19:6 24:5
24:10,14
37:9 159:11
**concurrently**
142:9
**conducted**
75:16 89:8
**conducting**
20:12 23:20
24:20 74:13
74:25 75:12

77:14 80:11
101:19
**confidence**
82:18
**confidentia...**
119:7
120:23
121:13
123:8,12
124:2,5
**conjunction**
80:12
**connection**
8:18 9:24
17:20 24:3
26:23 31:3
35:15 40:8
47:4 49:14
50:12,24
53:5 54:9
54:18,24
55:5,10
60:21 67:8
67:12 69:18
70:9 79:22
104:18
110:14,15
120:11
146:22
154:25
226:18
240:5
**consent** 211:6
211:8,14
**consider** 16:3
16:5,7
25:13 26:6
29:20 30:8
30:19 31:4
32:7,19
33:14
106:11
238:15,24
**considerable**
56:4 57:13
**considerably**
165:14

**considerati...**
9:22 13:4
15:9,10
17:16 22:22
23:3,9,19
24:4 25:15
25:20 26:22
27:4 29:4
35:12 37:16
37:18,23
238:19
**considerati...**
22:19 26:3
**considered**
19:10 25:24
26:9,13,18
27:11,21
88:14,19,21
88:22
106:10
**considering**
14:8 24:18
24:20,21
**consisted**
48:7
**consistency**
91:18
128:17,25
129:16
**consistent**
158:24
160:3,8
222:13,17
**consolidated**
84:7,9 86:2
**consolidation**
66:11
**constant**
155:9,10,19
155:23
**constrained**
123:12
**constraints**
120:23
**consult**
123:24
**consulted**

195:10
202:24
203:3,18,23
**consulting**
45:11
123:25
127:9
130:17,24
131:6
**contact** 52:8
53:9
**contain** 83:14
**containing**
178:24
181:20
**contains**
124:17
**contemplate**
11:17 145:5
**contemplat...**
13:10 81:10
136:20
206:4,6
208:20
**contemplates**
25:12
**contentious**
202:11
**context**
116:18
177:24
**contingent**
217:18
**continually**
194:12
**continue**
199:10
**continued** 4:2
5:2 242:17
**contract** 92:7
**contractor**
160:5
**contractors**
95:14
**contracts**
173:19
**contractually**

228:23
**contrary**
141:5
**contribute**
50:18
**contributed**
50:14,15
108:4
**control** 57:22
59:21 60:9
60:22 71:14
87:14 91:19
118:2,8
128:18
130:16
162:8 172:5
172:14
**conversatio...**
45:19
215:13,16
**coordinated**
72:10
**copies** 8:3,8
**copy** 7:21
113:11
**core** 35:11
**correct** 13:3
17:9 20:14
23:21,22
24:21 26:25
27:2 28:24
49:22 50:25
54:5,6 58:3
61:25 62:12
62:19 71:24
72:4 77:3
79:6 82:5
83:15,18
85:13 86:2
88:16 95:8
100:4,21,22
100:24
102:22
103:5 107:2
108:9,10
112:5
113:22

114:2
122:11,16
122:21
123:10
127:5
133:20
151:5,22,23
152:2
172:23
174:9
196:11
200:17,23
211:17,23
223:17,18
226:19
241:18
**corrections**
246:4,6
**correctly**
105:25
**cost** 13:14,15
20:6 26:2
30:20,23
31:24 32:11
32:25 34:20
38:19,25
47:18 54:4
55:2 57:3
69:10 70:23
87:9,10
114:22,23
114:24
165:14
167:14
172:19
173:13
176:21
186:19
213:8,11
**costly** 16:2
**costs** 148:21
**cost-efficient**
114:18
**counsel** 14:24
16:18 28:12
45:2,20,21
51:6,7,7

119:5,8,13
193:3
**count** 99:13
**country**
172:17
**counts** 33:6
**COUNTY**
244:5
**couple** 12:19
15:12 38:6
51:22 52:10
80:16,22
87:20
113:20
188:5 190:7
**course** 8:6
10:8 15:12
74:19
112:25
114:14
133:6
183:17
195:15
**court** 1:2
6:16 13:14
13:19 14:9
17:25 18:10
56:7 73:6
74:6 103:16
103:25
178:22
197:14
198:2,7
199:7 200:7
200:16
201:5 203:7
204:6,7
207:3,7,18
208:23
209:10
210:22
214:14
229:15
246:16
**courtroom**
209:16
**Courts** 200:2

200:19,22
**covered** 30:2
56:22 150:4
150:4,5,6
**covers** 19:15
**Cowen** 53:22
97:18
192:25
193:2,5,9
193:10,18
193:19
228:16
**Craig** 7:12
245:20
**create** 69:7
126:19
137:12
**credentials**
61:2
**credit** 216:9
224:19
**CRISTINA**
3:12
**critique**
120:12
**Cross** 42:8,20
43:9,10
44:5 47:13
49:3 70:7
110:24,25
158:9,14,16
158:18
159:24
160:4,11,17
161:8,13,21
162:2,17,20
162:21
163:8,9,13
163:19,25
164:3,5,6
166:16,20
166:22,24
166:25
167:4,5,8
167:10,24
168:7,7
169:9,11,17

174:4,25
175:10,21
187:13,14
187:17,23
188:20,24
**Cross-Chec...**
161:11
**CSR** 1:19
**cure** 146:6
**cured** 145:17
**CUTLER** 5:4
**cutoff** 38:3
**Cut-Off**
37:13

---
**D**
---
**D** 245:2
**damages**
43:25
137:16
198:8 199:8
**data** 124:25
156:9,12,16
173:20
**date** 7:7,10
7:13 8:20
37:13 150:7
246:8
247:23
**dated** 13:25
23:6
**dates** 31:15
41:12
**Dave** 45:12
**day** 12:22
14:6 80:15
80:16 101:3
111:23
112:13,17
115:19
117:10,14
118:4,4,9
126:5
194:13,14
195:6,6,21
198:10
199:9 200:5
200:11,20

206:15
208:7 223:4
243:14
244:21
**days** 37:13
38:6,8,15
51:22 52:11
71:4,5
79:10 80:17
80:22 87:20
99:14
100:13
101:2
112:22
113:20
126:5
246:14
**deal** 88:13
185:24
219:2
**dealing** 216:3
216:4,5
**Debtors** 1:7
3:4,17 7:4,8
7:11 245:13
245:14,17
245:19
**decades** 56:2
74:2
**December**
1:14 2:3 7:9
7:12 244:21
245:18,20
**decided**
81:16 82:21
85:9,12,14
85:25
192:17
**deciding**
200:23
**decision**
164:18
212:19
**declaration**
7:4,8,11
13:25 17:16
17:21 18:5

18:6 22:17
22:19 24:15
24:19 26:4
26:14,17,23
26:25 28:9
28:10,23
29:3 31:2
37:20 52:24
52:25 60:25
120:10,13
120:14
121:20
132:5
141:20
178:12
182:20
245:14,17
245:19
**declarations**
8:3 19:5
**decrease**
142:2,3
**dedicating**
208:23
**deemed**
246:16
**deep** 89:13
183:7
**default** 155:8
157:11
235:5
**definitely**
184:11
**definition**
140:22
**degree**
138:15,16
140:7
**degrees**
138:22
**demand**
196:13
197:2,8
230:17,25
231:9,11,12
232:14,20
232:25

**demanded**
233:2
**demands**
183:18,24
184:16
185:7,17
195:17
196:20,23
196:25
**demonstrate**
136:13
137:16
**denial** 134:23
**Denver** 3:20
**depending**
48:20 76:2
76:5
**depends**
155:4
**deposing**
246:13
**deposition**
1:12 2:6
6:12 35:24
120:9
131:24
133:6
180:20
243:5
244:11,13
246:3,11,14
246:15
**described**
110:11
**describes**
118:13
**describing**
17:7
**designed** 98:4
98:13
**detail** 35:23
60:24 114:4
**determinat...**
99:7 177:9
210:23
220:23
224:15

**determine**
135:17
140:14
198:8 199:7
241:25
**determined**
177:7 213:7
**determining**
139:8
222:13
236:3
**Deutsche**
4:11
**develop** 142:7
**developed**
168:14
**deviate** 140:8
**deviations**
140:11
**difference**
149:9,13
152:4,9
234:19
235:25
236:16
**differences**
88:9 163:18
**different**
22:15 25:9
69:6 71:23
71:25 72:3
72:5,15
79:5 80:10
82:5,23
83:14 84:5
84:15 88:8
94:10,18
109:9,10,12
111:7,11,12
112:6
113:23
139:10,18
149:10
155:25
156:5
161:22,22
161:23,24
166:23
169:24

171:23
172:6,7,8
173:2,12,12
173:14,16
173:17,19
176:2,4
190:10,11
190:12
222:13
236:3
**differentiate**
168:16
**differentiat...**
168:15
**differently**
72:15 84:17
156:4
184:13
**difficult**
58:16 77:16
107:20
127:20
173:22
215:18
224:5
229:20
**difficulties**
20:11 227:3
240:17,25
**difficulty**
93:5
**Digital** 40:4,6
42:5,16
43:8,9 44:5
51:16,21
52:10 53:9
53:11,18,25
54:3 55:3,4
55:7 56:17
57:2 58:14
59:19 60:10
60:12 61:13
61:23 62:11
62:19,20
63:5,10,20
63:23 67:24
68:24 69:2

69:11,21,24
70:4 77:25
85:15 87:15
89:5 96:22
96:23 99:8
99:10 100:8
107:8 108:6
127:19
146:4
161:14,21
162:17
163:7,12,18
164:4,6
166:20,23
167:3,25
168:8
190:17
192:20,25
193:2,7,15
193:15
199:18
207:10
214:3
215:13,16
216:22
217:3,15
219:10,14
220:19
223:22
224:10
225:10,12
225:21,23
226:10,17
228:11,12
228:15,17
234:9 235:9
235:17
237:3,17,25
238:15
239:22
240:5,12
241:9
**Digital's**
226:10
**diligence**
60:19 71:5
130:15

131:3
217:24
223:11
**diligenced**
55:11 69:2
**diligencing**
97:8
**dimensions**
60:5
**diminish**
154:22
227:23
**direct** 76:6
83:25 108:8
**DIRECTI...**
245:7
**directly**
231:22
**disagree**
114:11,15
114:19
115:12
118:8,10
125:6,8,11
125:15
127:12,13
128:21
129:7
131:11
132:22,23
134:16
142:12,13
142:21
143:24
145:19
182:19
183:4
**disagreed**
115:4
**disagreement**
116:4
117:16
126:9
130:21
**disagreeme...**
126:15
**disbelief**

34:10,15
**disclose**
104:20
**disclosed**
42:19 98:11
**discreetly**
85:23
**discuss** 10:7
16:15 30:3
30:7 35:13
35:15,16
54:25 57:2
57:25 59:8
62:24 67:14
67:24 68:10
78:10 79:2
91:15
108:15
113:20
119:4
123:17
164:14
203:11,12
**discussed**
16:18 17:2
20:10,15
21:7 36:8
68:12,16
78:12 79:7
79:21 91:20
102:4,13
113:25
143:4,14
**discussing**
17:3 79:23
80:13 119:8
119:12
199:20
**discussion**
15:17,20,23
20:17,21,23
21:14 33:22
36:19,22
80:21
109:24
132:25
176:8

**discussions**
14:25 17:6
17:7,9
22:16,17
23:20 24:11
28:5,11,14
28:17 33:12
33:17,24
36:3,15
57:6 73:24
79:24 87:20
89:11,19
101:19
114:7,8
122:14
129:22
145:24
174:11
186:6
194:19
197:17
198:5 199:5
199:24
**dispute** 8:24
9:8
**disputes**
142:8
207:19
**disputing**
85:21
**distinctions**
149:3
**DISTRICT**
1:3
**document**
38:11
143:19
183:2
238:11,11
**documenta...**
145:15
146:21
192:6
**documents**
145:18,25
146:3,11
216:4 219:4

219:6
223:12
224:7,13,18
225:2 226:9
229:19,19
**doing** 22:3
23:10 25:13
33:18 40:22
40:25 46:17
66:10 68:25
69:8,22
71:17 78:7
79:5 84:22
84:23,25
85:2 111:22
112:23
118:3
159:25
165:7
172:10
178:10
189:7 190:4
192:3,14
209:11
212:20
234:22
246:7
**door** 147:7
**double** 57:19
**double-che...**
61:8
**doubt** 145:25
153:11,20
154:4 178:8
196:6
**doubted**
95:18,20
**drafting**
26:17
**draw** 133:18
133:21
137:5
**drawing**
139:19
241:6
**drawn** 241:20
**driving** 83:13

201:10
**dropped**
15:23
**drop-off**
130:4
**due** 8:6 60:18
130:15
131:2
223:11
**Duff** 9:10
13:10 15:8
23:6 28:11
29:13 35:6
40:9 56:2
59:19 60:19
69:12 73:25
75:16 76:7
76:25 79:3
80:8,9
82:21 85:9
85:17 89:12
104:25
105:7
113:21,25
114:6
118:21
122:20
129:23
155:14
158:5,14,16
159:23
160:5,6,10
161:9,9
162:19,22
162:23
163:8,19,23
164:3,7
165:6,14
166:10,15
166:21,25
167:5,9,13
168:5 169:2
169:4,8,10
169:15,19
169:19
170:11
172:23

175:23,24
175:25
184:14,24
184:25
185:22
187:3,16,24
188:19,21
188:25
189:2,6,8
189:19
190:19
192:22
197:7,13
198:5 199:5
199:22
204:2 215:3
219:23
**duly** 7:15
148:5
244:12

———

**E**

**E** 3:2,2 4:2,2
5:2,2 7:14
7:14 148:2
148:2,4,4
244:2,2
245:2 247:1
**earlier** 17:12
48:13 67:11
78:11 86:15
155:12
164:17
188:24
**early** 164:16
**easier** 152:15
**easily** 135:7
200:19
**economies**
227:21,25
**Edge** 42:8,24
44:6,10,20
45:4,14
70:7
**Edmond**
89:21
**effect** 6:15
237:13

effectively
  218:13
efficiencies
  132:8
efficiency
  57:4
efficient
  114:17
  132:21
  167:21
efficiently
  47:20
effort 32:25
  57:13 58:18
  66:11 70:22
  196:2,5
  213:11
  216:14,16
  216:19,21
  218:14
  219:22
  226:12
  229:2
efforts 218:3
eight-hour
  195:6
either 14:18
  16:16 20:13
  44:18 59:3
  90:10
  103:15
  120:12
  145:6
  158:16
  159:21
  187:6
  188:24
  208:2
  217:15
elaborate
  32:14 48:6
  60:18 87:5
  114:13
  166:3 177:6
  221:16
  226:25
  234:16

237:4
electronic
  222:2,3
electronically
  231:24
emerging
  132:19
employ 43:24
employee
  60:16 189:3
employees
  58:8 60:10
  61:12,13,15
  63:21 94:23
  95:7,9,13
  95:15 96:3
  162:24
  169:20
  175:24
  188:25
  189:6
employing
  58:25,25
  62:22
enabled
  101:9
enables 73:17
encountered
  221:15
engage 20:7
  75:8 128:12
  128:22
  129:10
  164:10
  177:22
engaged 8:17
  9:14 26:7
  27:9 28:15
  28:16
  166:11
engagement
  8:23 9:15
  12:24 23:7
  23:18 28:21
  29:2 52:19
  97:2,7
engagements

93:5
engages
  225:21
engaging
  25:16 167:9
ensuring
  60:21
entail 226:11
enter 166:20
entire 92:17
  202:6
entity 240:23
equal 138:12
  138:13
  139:11
  176:6
errata 246:5
  246:7,10,13
especially
  139:14
  164:22
  188:23
ESQ 3:10,12
  3:14,21 4:8
  4:15,24 5:9
  191:11
  238:13
essence 97:25
Esses 89:21
  90:7,20
establish
  160:2 168:6
established
  159:2 160:8
  164:21
estimate 9:10
  9:15 13:19
  15:21 26:12
  27:14 28:19
  29:14 38:19
  46:23 50:9
  56:23,24
  76:23
  111:20
  135:15
  153:17
  177:15,20
  190:14
  194:23

201:17,25
  202:4 204:8
  205:7
  207:15
  209:17
  210:18
  225:23
estimated
  13:14 49:11
  206:10
  209:9
  210:15
  223:20
  225:8
estimates
  55:12 56:18
  56:18
estimating
  11:18 13:11
  14:9 20:18
  25:10,16
  30:9 43:24
  47:25 48:3
  54:2,4,25
  192:11
  238:13
estimation
  15:4 29:24
  49:21 50:13
  51:4 55:14
et 1:6
evaluate
  101:9
evaluations
  117:14
event 95:5
eventually
  48:24
  112:12
everybody
  160:6
everybody's
  106:18
evidence
  134:22
  135:13,20
  136:3

190:16
exact 8:20
  18:4 53:15
  134:21
  145:4
exactly 8:19
  12:18 22:10
  31:20 75:13
  79:11,13
  86:10 93:21
  110:8
  164:24
  175:2 212:8
  215:2 224:8
examination
  7:18 18:15
  148:7 245:3
examined
  7:16 148:5
example
  72:17 167:3
  234:12
excluding
  209:2,9
excuse 88:20
  113:22
  167:9
executed 98:5
executive
  177:12
Exhibit 7:4,8
  7:11,25
  37:5 113:9
  113:11
  245:14,17
  245:19
exhibited
  94:4
EXHIBITS
  245:12
exist 145:18
  145:25
existence
  238:9
exists 92:10
expand
  167:11

expect 154:7
  198:6 199:6
  232:9
expected
  150:22
  154:11
expeditiously
  47:20 196:8
expensive
  165:12
experience
  34:25 35:5
  35:17,17
  42:23 43:7
  43:13,19
  46:16 55:22
  55:24 56:2
  56:4 61:4
  74:2,11
  75:7,14
  77:14 78:7
  80:24,25
  81:3,6,8
  82:16 87:23
  88:13 89:21
  90:8 92:25
  93:18,19,21
  94:13 101:5
  101:8,11,18
  101:22
  103:4,9
  104:3,8,25
  105:24
  106:24
  107:3,10,11
  107:12,13
  107:19,24
  108:3,4,8
  109:7,8
  110:5
  122:13,17
  127:19
  129:24
  136:18
  145:15
  152:3 155:3
  168:20

170:4 171:4
171:6,14,15
173:23
174:8,10,15
174:19,21
175:18
183:23
184:5,14
185:6,12,14
194:22
195:13
196:10,21
198:4,12
199:4,13,15
200:13,19
200:21,22
201:2,3
215:17,20
218:9
222:18
235:10,19
**experienced**
48:19 59:25
81:14 93:2
112:18
130:7
193:23
201:14
230:14
**experiences**
36:9 101:6
101:21
107:5 108:3
109:9,11,12
109:13
119:4
129:24
199:25
207:6
222:20
**expert** 10:7
39:11 73:6
73:12,20
74:7,8,13
74:25 75:22
88:15,22,24
89:2,8

90:24,25
91:3,4
113:5
121:19
202:16
204:10,13
204:18,21
205:22
206:12,12
206:13,17
**expertise**
41:21 73:16
75:25 89:13
99:17,20
100:3,7,9
100:12,16
100:19
101:9,17,18
161:11
162:24
166:6 197:3
197:6,10,12
205:17
206:18
**experts** 73:10
73:25
204:15
**explain**
148:17
149:13,15
149:25
**explained**
93:22
**expressed**
28:6,7 34:9
34:18 91:23
92:20 94:4
**extend** 37:9
**extensively**
73:22 74:12
90:2
**extent** 27:17
28:2 127:7
228:25
**extra** 8:7
226:12
**extrapolate**

136:9
**extrapolating**
137:4
**extrapolation**
135:24
**extremely**
90:5
**e-mail** 175:24

**F**

**F** 148:2 244:2
**face-to-face**
172:15
**facilitator**
141:22
142:2
144:19,25
202:8
**fact** 37:7,9
39:10 75:15
78:9 79:2
100:14
126:18
154:15
183:5
215:24
216:9 226:6
228:5
240:15
**facts** 142:6
**factual** 142:8
**fail** 174:4
246:15
**failing** 174:16
**fair** 11:3 12:8
12:14 15:7
19:11 27:5
33:2 36:25
61:19 63:5
81:23 82:11
83:12 105:6
105:12
128:5
134:10
154:17
190:21
191:3 194:5
210:8 212:4

236:11
**fairly** 233:7
**false** 122:6,12
**familiar** 10:6
11:16,24
12:6,9
30:10,11,16
42:6,7,10
42:13 44:18
44:21 91:13
130:23
131:2 177:4
181:23
**familiarity**
41:12 80:10
201:5
**far** 14:11,12
32:25 41:25
61:25 62:6
62:25
118:24
154:8,16
167:6 224:5
224:21
235:6
242:15
**FARR** 3:7
**fast** 100:10
101:6
115:16
218:19
**faster** 115:22
132:20
201:20,22
**faulting**
155:9
**feasible** 79:4
**feel** 117:4
208:2
**figure** 100:20
114:24
120:22
205:21
**figuring**
72:19,20
**file** 216:5
221:24

222:2,3
224:11,14
224:19,20
225:11,20
225:24
226:11
235:2 236:2
236:7,12
237:12,13
238:2,12,16
238:20
239:10,12
239:15,19
240:13
241:23
**files** 46:21
48:17,18
124:23
125:18
126:2,24
215:8,23
216:3,24
217:13
218:7,8
221:20,22
221:25
223:8,21
224:19
225:10
228:7,8
239:23
240:6,16,20
240:21,24
241:3,4,10
241:14
**filing** 6:4
14:13 52:23
79:8
**filings** 14:24
**final** 198:3
207:19
**Finally** 128:9
**finance**
189:12
**financial** 9:18
165:3
**find** 38:4

57:16,18,23
58:18,24
59:6,7
215:24
**finding** 57:14
58:15,23
62:21 77:15
241:21
**findings**
59:22
**fine** 13:24
39:18
112:12
144:9 147:9
149:18
150:11
159:19
175:19
**finish** 18:14
41:15 65:11
137:24
162:12
**finished**
49:17 67:21
**firm** 40:4,12
40:14,15,15
40:20 42:21
42:25 51:13
53:22 55:7
55:9 56:10
57:17 59:4
59:4,10
68:25 69:12
71:4,5
82:15,21,24
87:10,11
92:5 104:12
104:20,22
105:2,8
118:17,23
119:18
121:6,21
158:10
159:24
165:2,4
166:13
168:22,24

| | | | | | |
|---|---|---|---|---|---|
| 168:25 | 10:18 12:16 | 42:18 43:19 | 229:20 | **further** 6:7 | 93:6 94:5 |
| 177:13 | 18:18 21:8 | 53:18 93:25 | **foundation** | 6:11 120:20 | 125:4 |
| 178:9 | 23:2,19 | 117:9,13 | 68:6 81:20 | 148:6,7 | 213:12 |
| 185:13,16 | 26:5,7 27:9 | 122:4 | 141:4 179:9 | 243:3 | 215:21,21 |
| 190:16 | 34:24 46:5 | 124:23 | 182:10 | 244:15 | 215:21 |
| 192:17 | 46:7 47:2 | 128:11,14 | 186:13,23 | **future** 150:23 | 216:2,15 |
| **firms** 40:22 | 97:22 | 129:9 | 209:4 | 151:4 154:8 | 217:21 |
| 41:16,19 | 111:24 | 158:11 | 239:25 | 154:8 | 218:15 |
| 42:2,4,10 | 149:13 | 164:7,8 | 240:8 | | 220:14 |
| 42:17 43:3 | 159:4,6 | 165:4,7,13 | **four** 91:6 | **G** | 230:3 |
| 43:8,15,17 | 189:2 | 166:12 | 98:9,18 | **GAIL** 3:14 | 233:13 |
| 44:4,19 | 213:14 | 168:13 | 106:2 111:9 | **gained** 132:8 | 240:20 |
| 55:23,25 | 214:10 | 192:14 | 111:11,12 | 198:11 | **ghyman@...** |
| 56:5 57:17 | 230:18 | 193:16 | 122:2,3 | **gains** 84:13 | 3:15 |
| 67:12 69:5 | 231:13 | **forget** 187:12 | 124:24 | **GALLAG...** | **give** 18:4 23:2 |
| 69:20,23 | 233:10 | 224:8 | 126:18,19 | 3:7 | 25:15,21 |
| 70:2,3,5,8 | **fix** 172:11,18 | **forgive** 36:12 | 128:4,7 | **general** 35:18 | 29:4 44:17 |
| 70:11,20 | **flexibility** | **form** 6:9 | 194:10 | 46:10 | 87:4 106:8 |
| 71:6,8 75:7 | 165:2 | 19:16 41:10 | **frame** 223:21 | 111:21 | 106:13 |
| 78:4 79:5 | **flowing** | 41:23 | 225:9 | 113:18 | 117:17 |
| 80:20 81:7 | 137:17 | 156:21 | **free** 117:4 | 136:7 140:5 | 153:10,19 |
| 84:15 87:22 | **focus** 43:4 | **formally** | 123:11 | 183:10 | 157:23 |
| 88:8,18 | 126:9 | 228:14 | **Friday** 1:14 | **generalities** | 178:7 |
| 90:20 94:2 | 130:11 | **formed** | **front** 7:21 | 138:9 | 185:16 |
| 94:3,14 | 236:15,19 | 203:23 | 48:17 156:8 | **generalizati...** | 191:21 |
| 103:18 | 236:23 | **former** 16:10 | 156:17 | 139:9 | 194:3 196:5 |
| 128:12 | **focusing** 37:2 | 16:11 | **frozen** 236:6 | **generalize** | 204:8 216:9 |
| 130:5 | 104:24 | **forming** | 237:11 | 135:22 | 224:12 |
| 158:25 | 237:3 | 203:14 | **FTI** 130:17 | **generalizing** | 230:15 |
| 161:22 | **follow** 29:12 | **Fortace** | 130:24 | 137:9 | 238:19 |
| 163:17 | 184:12 | 130:17,24 | 131:6 | 139:18 | **given** 9:22 |
| 165:13 | 225:14 | 131:6 | **fulfillment** | **generally** | 13:5 14:7 |
| 167:17 | **following** | **forth** 71:14 | 52:3 217:5 | 9:14 34:9 | 15:9 17:17 |
| 168:4,15,23 | 247:5,6 | 86:16,19 | 219:20 | 135:14 | 22:20 32:8 |
| 173:11,15 | **follows** 7:17 | 194:14 | **full** 27:17 | 143:12 | 32:20 37:16 |
| 173:24 | 127:25 | 205:13 | 143:3 150:7 | 157:20 | 37:18 41:20 |
| 176:6 | 148:6 | 219:8 | 152:24 | 165:11 | 133:7 |
| 190:14 | **footnote** 37:4 | 220:16 | 153:14,23 | 181:8 233:8 | 154:15 |
| 199:18 | 37:8 58:13 | 224:23 | 178:18 | **gentleman** | 185:23 |
| 207:10 | 58:20 | 226:8 | 208:24 | 217:7 | 187:4 189:2 |
| 214:4 | 142:19,25 | 244:12 | 216:9 226:3 | **gentlemen** | 205:6 |
| 230:13 | 143:5,15,21 | **forward** | **full-blown** | 91:6 109:8 | 244:14 |
| 231:2 | 145:10 | 132:11 | 39:6 | 196:15 | **giving** 69:4 |
| 235:11,19 | 146:15 | 135:23 | **full-time** | **Georgia** 4:23 | 154:3 |
| **firm's** 46:14 | **force** 6:15 | 155:10 | 95:15 | **germane** | 201:13 |
| **first** 8:15,17 | 165:23 | **found** 138:17 | **FURNISH...** | 56:18 | **glib** 184:9 |
| 10:9,12,14 | **forensic** | 138:23 | 245:9 | **getting** 22:10 | **global** 226:23 |
| | | | | 49:3 83:23 | |

go 17:11,12
21:23 34:20
39:21 45:18
47:16 51:9
62:21 71:5
71:14 77:22
78:23
100:11
109:22
115:16
119:23
121:2
124:19
130:10
132:4
137:25
146:4 147:7
153:8,13,21
156:8,11,13
170:25
179:10
180:22
182:12
191:15,23
192:9
201:22
216:12
219:7 222:6
223:6
224:23
226:7
235:22
237:2
goes 41:25
Goetzmann
120:2
going 7:20
11:14 21:24
22:3 31:10
43:23 69:21
71:9,12
73:8,9,11
75:3,19
88:8,9
99:21
102:10
115:20

116:16
117:5
119:21
120:2
123:20
132:16
138:3 147:2
150:12
155:10
162:13
182:15
185:24
191:24
202:17
204:22
213:12
215:25
218:24
219:3
220:16
221:13
228:6
229:23
232:9
236:22
good 12:21
22:2 60:4,5
72:23 83:7
83:7 88:18
88:23,25
89:3 93:13
168:10
194:23
232:9
236:10
gotten 119:24
231:25
233:9
governed
115:21
group 11:16
17:25 42:8
44:7,14,16
44:21 97:23
140:21
151:22
228:16

grouped
135:8
grouping
138:25
139:3 140:9
groups 38:11
224:6
growing
232:17
guess 51:5
95:15
100:15
146:17
152:15
guessing
201:11
guidance
35:22

___ H ___

H 1:19 2:9
7:14,14
148:4,4
244:7,25
HAGGLU...
3:12 8:11
113:9,15
187:14
half 41:13
46:8,12
47:5 52:19
73:22 74:10
75:6 90:2
164:18,19
231:5,6
234:22,24
hand 244:21
handlers
124:25
happen
170:20,24
171:3,10,16
171:20
174:16
happened
22:18 36:18
49:12,16,25
50:3,4

170:3,9,10
170:16,17
202:9
237:19
happening
171:4,7
174:9
happens
41:14
happy 183:9
hard 229:25
head 27:24
34:1 44:20
45:3 66:7
126:4
219:20
hear 36:14
68:20
161:20
heard 12:3
78:3,4
80:19 90:9
93:2 130:8
232:16
hearing 120:3
hearings
206:3,6
Hector 52:4
217:8,8
held 2:7
help 9:15,25
107:17
126:8 193:8
helped
193:10
hereinbefore
244:11
hereunto
244:20
hesitate
35:19
high 59:12,17
72:18 92:11
106:11
higher 154:3
154:25
higher-level

169:12
175:22
highest
157:24
highly 38:4
high-quality
87:16
high-speed
223:10
hire 58:3,8
82:21
166:16
167:16
168:4
192:17
hired 42:21
43:17 83:4
83:5 92:7
94:2 130:18
131:7
161:10
162:21,23
hires 63:20
66:14
hiring 167:24
hold 18:13
119:11
Holdings 1:6
3:5
honestly
190:18
209:6
hour 176:14
177:7 178:6
194:24
201:18
202:5
hourly
176:21
177:21
hours 16:14
18:3,4
113:2 114:6
huge 221:7
hundred
46:24 47:15
48:14

HYMAN
3:14
hypothesis
63:14
hypothetical
63:7 64:2
hypothetic...
137:3

___ I ___

ID 245:13
idea 31:13
71:2 88:18
88:23,25
89:4 93:13
170:16
179:11
204:9
212:24
identification
7:6,10,13
identified
222:14
227:3
identify
132:19
142:5
ignore 138:21
ignored 132:8
ignoring
137:11
illegible
222:5
Illinois 5:8
illustrative
149:12
imagine 41:8
42:9
immediate
32:9
impact
227:22
241:25
242:6,14
imperative
246:12
important
87:3 236:13

236:17
**impossible**
128:4 129:2
144:4
172:18
229:23
**impractical**
15:24,25
32:17,23
38:4
**impractical...**
20:12
**imprecise**
139:2
**impression**
194:3
**inaccuracies**
72:18
**include** 18:11
37:19 73:24
96:5 226:12
236:8
242:17
**includes**
151:15,21
187:23
**including**
29:13 42:16
154:11
**inconsistent**
146:20
**incorporates**
142:19
**incorrect**
122:18
**increase**
103:17
188:15
227:20
232:15
**increased**
103:24
232:12,14
232:20
**increasing**
57:3
**indemnific...**

178:23
179:16,22
180:8,11
181:9,18
**Indenture** 5:6
**indicated**
86:23
**individual**
96:16 98:2
117:8
124:20
135:2,9,13
139:15
140:23
**individuali...**
136:6
**individually**
46:17
142:23
194:11
**individuals**
44:11,12
**industry** 41:4
41:22 46:6
46:10 56:3
74:4 81:3
89:14,21
90:8 91:25
92:11,12,17
92:25 93:19
93:20 95:18
95:19,21
110:20
121:23
130:14
168:14
170:14
190:22,22
201:4,7
232:17
**inevitably**
132:13
**inform**
195:17
**informal**
15:19,20
**information**

77:22
118:14
123:13,19
123:22
127:18
141:24
146:16
156:7
201:13,14
206:11
237:12
245:6
**informed**
58:15
**initial** 52:18
60:7,22
116:3 221:4
**initially** 57:10
111:25
**input** 108:2
193:2,21
200:4
**Inputs** 39:22
**inquired**
57:20
**instance**
107:23
169:22
**instances**
174:5
**instruct**
123:24
**instructions**
29:11 246:1
**integration**
71:12
**interested**
244:18
**interesting**
180:13
**interpret**
130:6
144:25
**interpretati...**
74:9
**interpreted**
58:24 59:6

**interrupt**
21:19 22:4
31:9,14
36:11
**interrupted**
22:10
152:23
**interrupting**
31:11
**intervention**
229:15
**Interview**
58:14
**investor** 12:5
**investors**
12:3 45:10
**involve** 15:6
71:19
173:24
181:12
**involved**
15:16 25:8
29:23 32:22
33:25 35:11
46:5,7
50:23 51:4
71:17 90:5
93:24 96:24
97:7 102:3
102:5,9,12
102:14,20
102:23
103:11
105:3,5,13
175:13,17
185:19
195:15
196:14,19
208:14
212:25
213:4,11
216:15,21
216:25
217:3,9,23
219:25
220:6
230:18
231:13

**involvement**
35:20
219:23
**involves** 78:4
80:20
152:23
**involving**
81:7 144:19
**ironed** 159:11
**issue** 107:14
119:20
147:3
158:19,22
172:20,22
179:12
181:23
**issues** 9:2
14:20 24:18
128:17
160:2 174:2
200:23
214:2
222:10,23
**items** 225:13
234:25
235:12
236:2 238:2
**it'll** 149:12
**i.e** 234:20

**J**
**Jim** 60:24,25
77:7
**job** 1:20
47:19,22,23
47:24 60:2
60:6 61:17
189:8
**Joe** 51:19,21
52:5,22
58:14
**JONES** 3:18
**judge** 107:17
204:12
205:3,18,20
205:24
206:11,18
208:18,21

209:10,13
209:16
**judged**
134:25
**July** 27:18
28:21 29:22
31:4,18,21
33:16 36:24
**June** 150:8
150:21
**junior** 176:17
187:21
188:8
**junior-level**
169:16,18
**jurat** 242:18
**justified**
212:13
213:8
**justify** 212:15

**K**
**K** 7:14 148:4
**keep** 150:12
154:24
162:13
**KELLER**
3:18
**key** 51:12
**kind** 9:23
13:5 40:22
41:2 111:3
137:14
138:7
166:21,23
166:24
185:16
188:9
**Kissel** 2:7 4:5
**KIT** 4:24
**kit.weitnau...**
4:25
**knew** 31:10
62:16,18
138:2
**know** 9:9
12:24 15:12
15:18 20:18

24:12 26:2
27:23 29:25
30:2,15
32:19 34:21
35:8,8,22
38:13 39:3
40:25 41:8
41:12,21,22
41:25 42:11
44:2 45:20
46:22 47:19
48:19,25
49:15 51:25
52:20 53:13
55:22,23,25
57:12,15
58:5,7,10
60:14,15,23
60:25 61:18
61:24 62:8
62:15,16,18
62:20,22
63:9,9,11
64:4,9,21
66:15 69:2
69:9 70:21
70:25 71:4
71:18 72:13
75:8,12,13
81:4 82:8
82:13,15
84:8,14,18
86:17 87:10
87:22 88:2
89:14 91:5
91:8 94:15
95:2 96:8
96:10,12,15
100:13
104:19
105:10
106:10
108:4,22
109:16,18
111:20
113:2
114:15,17

114:20,22
115:2,5,9
117:23
118:17,18
118:21,24
121:5
125:25
126:5
127:11,12
127:14,15
127:20
130:24,25
133:25
134:12,19
134:20
136:19
137:9
139:12
144:25
145:23
152:18
153:15
154:5,6,12
155:14
158:20,21
159:4,5,6
162:14
163:3,3,4
163:15
164:16,17
166:6,7
168:25
170:5 171:5
171:5
173:23
174:18,19
175:5
177:15,16
177:22
180:7 181:9
182:15
183:9
185:13,15
185:15
186:5,7,16
186:25
187:5,22

188:3,14,17
188:17,22
188:23
190:6 191:5
192:2,9
193:11,12
193:22,25
194:21,21
194:24
195:6,17,24
196:8
199:21
200:5,6,10
200:12,24
200:24
201:9,18,20
201:23
202:3,4
203:25
204:6 205:3
207:8,10,12
207:13,14
208:5,20,21
208:23
209:14
211:2
212:23
213:23
214:3,6,15
214:17
215:3,4,19
215:23
216:14,20
217:5,20,23
217:25
218:8,11,12
218:21
219:4,4,15
219:17,19
219:21
221:10
222:24
223:3,4
224:25
227:6,8,10
227:16
228:6,13

229:4,5,7
229:13,16
229:17,21
230:13,15
230:24
231:17
232:9,18
233:15
234:2,5,11
235:2,9,15
235:20
237:12,13
237:18,21
238:5,21
239:3,17
240:10,14
240:15,17
240:18,21
241:13,20
241:22
242:13
**knowledge**
63:15,19
166:11
183:6 187:7
187:8 194:3
**knows** 94:15
94:15
———
**L**
**L** 7:14 148:4
**labor** 217:23
**language**
134:21
**large** 11:19
26:10 27:12
107:20
114:24
115:3
145:16
164:22
172:3
**largely** 183:5
215:15
**larger** 151:13
151:14
**largest** 158:8
**law** 178:9

**lawyer** 63:14
64:7 68:11
82:9 133:6
133:18
134:12
176:18
177:3,4,11
179:25
180:6
202:14
203:13
204:2,3
228:19
229:6
**lawyers** 73:9
202:19,21
202:22,24
203:4,10,15
**layer** 225:13
**lead** 57:16
58:17 72:17
122:15,17
138:25
**leads** 122:24
138:15
**learn** 190:4
191:11
**learned** 60:8
110:12
132:9,14
189:23
**leaves** 207:14
**led** 14:21
22:16 30:18
93:22
**left** 153:4
**legal** 75:4
82:2,7
83:21,24
87:7 179:24
183:7
230:23
233:16,22
235:7
**legalese**
181:11
**Lehman** 1:6

3:4 8:18,25
10:24 11:7
12:13,17,20
13:18 15:2
15:2 17:10
37:12 54:13
54:19,21,24
55:5 115:8
115:21,25
121:25
122:2,5
128:13,22
129:11
137:4 142:5
178:22
179:2
181:18
185:24,25
186:10,20
192:10,15
192:22,22
194:12
195:22
211:6,8,14
214:20
**Lehman's**
13:9 115:10
115:16
178:21
**lesser** 154:18
**lessons** 132:8
132:13
**let's** 17:11,11
51:9 75:19
76:24
120:25
132:4
144:10,14
145:9,12
146:24
153:4
165:25
230:2 237:2
**level** 72:19
100:15
158:17
**LEWIS** 5:9

**life** 155:12
**likelihood**
  152:4,9,12
  154:18,22
  154:24
  155:8,11,22
  157:5,16
**limit** 38:24
**limits** 65:25
**LINE** 247:8
**lines** 193:22
**listen** 204:12
**literally** 120:6
**lithotine**
  198:24
**litigation**
  108:14
  236:22
**little** 8:21
  114:5
  184:13
  189:10
  194:24
  227:2 230:2
**Live** 32:6
**LLP** 2:8 3:7
  4:5,12,20
  5:4
**loan** 11:20,25
  12:4,10,17
  20:19 25:3
  25:4,5
  32:23 40:3
  40:12,13,15
  40:19,21
  41:16,19,24
  42:4,18,20
  43:2,14,16
  45:7 48:10
  48:16,17,18
  50:22 51:13
  52:3 53:18
  54:5,8,16
  54:25 55:8
  55:17,20,22
  55:24,24
  56:4 62:2

63:2 67:3,5
67:7,11,15
67:25 68:2
68:25 72:6
72:8,14
73:6,12,20
73:21,25
74:7,9,11
74:14 75:2
75:8,9,10
75:11,13,14
75:17,22,24
77:14 78:3
79:5 80:10
80:11,20
81:6,9,14
81:15,18
85:13,15
86:11,12
89:9,15
90:6,20
93:3,24
94:3,13
95:7 96:2
99:2,12
101:6,19,23
101:24
102:2,3,8
102:11,12
102:19,24
103:9,10,12
103:13
104:22,23
107:20,21
108:16
110:13
111:2,7
112:8,9,18
115:16,17
115:24
125:17
126:11
131:2
132:19
134:22,24
134:25
135:6,17

136:4,6,10
137:4,9
138:18,18
138:23
139:12
140:16,17
140:19,20
142:6
154:23
158:5 159:9
159:25
161:10,12
167:11,16
168:4,13,23
169:5,8,9
169:20,23
169:25
171:23
173:11,24
175:14
177:5,5,13
180:8,12
187:18,22
188:8 189:2
189:20
190:20,22
191:11
192:7,15
193:5,14,16
193:16
194:25
195:8 196:9
199:18,19
200:8
201:18
202:16
204:9,9,19
205:8
209:21
210:2,5,9
210:14,17
210:24
211:10,19
211:19
212:10
213:10
214:4,24

215:8,19,24
215:24,25
216:2,3,24
217:5,13
218:2,7,8
219:20,20
220:11
221:25
222:3,8,12
222:18
223:22
224:11,14
224:20,20
225:10,20
225:24
226:11,19
230:9,13
234:2,8,20
235:19
237:7,11,15
237:16,19
**loans** 11:16
  11:19 12:12
  12:12 15:22
  17:25 20:14
  20:16 23:4
  23:5 25:3,6
  25:9,25
  26:9,10,15
  27:6,10,12
  29:5,25
  30:2 32:8
  34:5,19
  38:8 40:16
  41:9,11
  43:21 44:3
  44:24 46:20
  47:7,8,11
  47:14,15
  48:14,25
  49:9,13
  50:5,8,11
  50:15,18,20
  55:10 56:20
  56:21,22
  61:6 70:3
  72:20 81:11

86:6,8
96:16 102:7
102:16
111:16
112:6,7,25
117:20
118:3,4
126:5
132:14
135:4,7
137:5,12,18
137:21
138:6,25
139:3,10,18
140:9
141:21,25
142:8,10
149:4,5,20
150:4,5,6
150:17,20
150:21
151:2,8,9,9
151:11,15
151:18,22
152:5,6,13
152:21,23
153:2,3,5
153:12,15
153:18,22
153:25
154:5,11,13
154:16,19
155:2 157:5
157:17
158:12,13
158:15
159:7
177:23
178:3,24
181:19
183:19,20
183:22,25
184:6,17
185:8,25
188:9
194:13,13
194:22

195:5,5,23
195:25
198:9 199:9
200:5,11,20
201:16
206:15
208:7
209:22
210:15
211:11,20
213:24
215:17,20
215:21
216:10,15
218:18,20
218:22
219:2,5
221:4,8
222:14
223:2 226:3
234:5,15,20
236:3
237:23,24
241:20
**loan-by-loan**
  13:15,16
  15:3,9,14
  16:8 17:17
  18:19,22
  19:16,20,24
  20:12,16,18
  20:19,22
  21:9 22:20
  22:23,24
  23:3,10,20
  24:4,20,25
  25:5,8,10
  25:16,17
  27:6 28:18
  29:24 33:18
  34:11 36:23
  46:18
  135:15
  139:13
  157:9 198:9
  199:8 205:8
**locate** 59:3

| | | | | | |
|---|---|---|---|---|---|
| **location** | 116:8 | **lost** 223:11 | 124:24 | **math** 126:3 | 125:24 |
| 172:12,12 | 134:10 | **lot** 34:18,20 | 172:15,16 | 126:16 | 129:4 138:8 |
| 172:19 | 135:16 | 86:6,8 | **manner** 11:7 | 195:7 | 144:2 149:2 |
| **locations** | 156:9,12 | 112:10 | 86:2 | **matter** 14:24 | 152:8,22 |
| 172:8 173:2 | 162:10 | 192:9 | **manners** 86:7 | 15:15 19:9 | 156:2 157:3 |
| 173:3 | 234:2,6,8 | 195:25 | **map** 231:21 | 40:20 45:20 | 157:3 |
| **lodge** 119:21 | 235:13,15 | 196:4 | 233:8 | 45:21,22,23 | 160:16 |
| **logic** 117:11 | 235:21 | 223:10 | **mapped** | 47:5 54:9 | 163:19 |
| **logistical** | 237:17,24 | 237:21 | 222:15 | 54:19 56:19 | 170:4,5,5 |
| 34:22 172:9 | 239:11,14 | **lots** 214:7 | **mapping** | 63:13 67:8 | 178:4 |
| 212:20 | 239:17,18 | **loud** 126:10 | 192:6 | 67:12 69:18 | 180:16 |
| 214:2 | 239:18 | **love** 76:11 | **marked** 7:6,9 | 70:9,12 | 181:8,14,22 |
| **logistics** | **looked** 26:8 | 167:19 | 7:12 | 77:22 90:5 | 192:19 |
| 202:13,17 | 27:10 56:19 | **low** 72:18 | **market** | 119:17 | 196:17 |
| **long** 15:17,21 | 56:21 61:5 | **lower-quality** | 230:22,25 | 124:6 | 203:14,22 |
| 16:2,3,4,7,7 | 99:13 | 88:6 | 233:24 | 212:25 | 204:17 |
| 16:9,12 | 133:12 | **lowest** 157:23 | **marketplace** | 220:18 | 207:23 |
| 17:23 25:25 | 134:7 | 157:24 | 163:15 | 236:24 | 208:6 213:9 |
| 25:25 30:20 | 234:16,21 | **Lunch** 147:5 | 167:14 | 237:4 | 213:22 |
| 30:22,24 | 236:4 239:5 | | 230:17 | 244:19 | 214:6,7 |
| 31:24 32:4 | 239:6,7,8 | **M** | 231:19 | **matters** 43:18 | 225:11 |
| 34:19,19 | **looking** 15:22 | **M** 4:8 | 232:3,11 | 46:8 54:20 | 227:25 |
| 141:9,14 | 75:22 98:24 | **Mac** 42:8,24 | **marriage** | 98:9,19 | 228:12 |
| 145:17 | 116:10 | 44:6,10,20 | 244:17 | 185:20 | 232:7,10,10 |
| 182:25 | 119:20 | 45:4,14 | **Massachus...** | 196:18,22 | 232:14,24 |
| 189:14 | 134:8 | 70:7 | 4:14 | 200:2,6,9 | 232:25 |
| 190:3 | 142:24 | **main** 90:11 | **massive** | 200:14 | 233:10,12 |
| 195:19 | 156:16 | **major** 88:3 | 72:12 | 222:23 | 237:8,20 |
| 196:11 | 199:19,19 | **making** 12:7 | **master** | 230:19 | 241:4 |
| 197:18 | 201:17 | 59:21 | 213:25 | **mean** 9:7 | 242:13 |
| 199:20 | 220:12 | 138:19 | 216:23,23 | 10:2,3 | **meaning** |
| 201:4,8 | 233:25 | 182:6 | 219:8 | 14:15 19:13 | 241:19 |
| 203:7 204:7 | 234:13,20 | 202:15 | 220:17,19 | 24:24 31:9 | **means** 95:14 |
| 205:18 | 234:25 | 215:23 | 222:6 | 33:7 35:2 | 105:7 |
| 207:4,7,11 | 235:8 236:2 | 216:19 | **masters** | 35:14 41:7 | 132:17 |
| 207:18 | 236:12 | 217:20 | 208:14,17 | 44:11 49:15 | 166:17 |
| 217:19 | 237:23 | **man** 45:12 | 209:3,9 | 50:2 56:9 | 179:15 |
| 219:10 | 242:16 | 75:23 | **match** 217:25 | 58:23,25 | 191:6 |
| 224:12 | **looks** 231:23 | **managed** | 222:9,11 | 59:17 61:15 | 215:22 |
| 228:9 | **loss** 150:20 | 217:7 | **matching** | 66:8 81:23 | **meant** 59:3,6 |
| 229:23 | 150:22 | **management** | 192:7 | 81:25 82:17 | 66:9 103:7 |
| **longer** 200:7 | 151:3,4,10 | 71:10 | 220:12 | 83:6 84:8 | 103:8 |
| 226:6 | 151:16,19 | 161:23 | 231:23 | 85:24 87:6 | 192:23 |
| **look** 25:3,4,4 | 151:24,25 | 172:7 | **material** | 91:16 94:20 | 224:3 |
| 43:23 45:18 | 152:5,6,13 | **manager** 52:3 | 72:16 | 95:12,25 | 232:23 |
| 48:22 112:7 | 155:2,10 | **managerial** | **materials** | 96:2 99:20 | **mechanism** |
| 113:4,6 | **losses** 152:7 | 53:13 | 225:25 | 99:24 121:8 | 87:14 |
| | | **managers** | | | |

media 214:22
mediation
  35:21
meet 71:6
members
  124:22
  125:17,24
  127:2
memory
  134:21
  145:4
mentioned
  18:9 33:8
  43:11 70:6
  91:7 108:9
  111:4 173:7
  225:14
  230:7,12
  233:3
met 51:25
  52:14 61:3
  94:16
method 35:2
methodology
  32:21,24
MICHAEL
  3:21
million
  114:22
mind 31:16
  119:7
  123:24
  138:11
mine 100:8
  203:25
  234:14
minimum
  197:8
  224:13
minus 149:20
minute 58:12
minutes
  195:8,8
  196:9
misappreh...
  125:21
misidentified

221:21
misplaced
  223:12
misread
  198:17,19
misreading
  223:20
misreprese...
  233:11
missed 31:15
missing
  145:14
  216:3,4
  219:4,6
misunderst...
  17:14 103:7
  225:7
misuse 45:25
model 168:9
modest 83:11
moment 43:4
  117:17
  182:21
  198:14
money
  210:17
  212:14
Monroe 5:7
month 14:13
  17:15 20:9
  20:24 22:18
  26:24 31:19
  106:22
  107:2,22,23
  122:5
  124:23
  125:18
  126:2,24
  128:15
  159:6 190:6
  191:11
  208:24
  209:21
  216:13
  218:14,17
  223:25
months 12:19

12:25 13:2
  190:7
  192:13
  219:12
  220:24,24
  221:2
  223:16
  225:13,22
  228:2
mortgage
  41:9,22
  46:5,9,20
  56:3 74:3,3
  89:14,14,20
  90:7 110:20
  121:22
  128:20
  130:14
  183:20
  193:23
  224:19
mortgages
  9:3 10:16
  11:2 22:21
  42:3 46:18
  81:17 82:4
  83:15 98:5
  98:12,14,15
  98:17
  184:25
  185:4
MOTIONS
  245:11
motivated
  195:4
mouth 91:17
move 132:11
  153:14,23
  172:16
  180:20
  196:7
moves 115:22
  135:23
moving
  133:13
mrollin@jo...
  3:22

multiple
  10:16 45:19
  71:8 78:4
  80:20 81:7
  86:12 87:21
  88:18 89:9
  90:20 93:8
  93:13 135:4
  159:8 168:4
  168:23
  173:24
  209:3 216:6
  217:9
  221:22,25
  227:7
  240:19
multiples
  221:11,12
multiplicati...
  99:15,24
  100:15,17
mumbled
  68:22
Munno 4:8
  8:9 11:4,11
  16:21 18:8
  18:16 20:2
  21:2,12,18
  21:24 22:11
  24:7,22
  25:18 29:7
  30:5 32:3
  34:7 40:23
  41:15 51:2
  54:18 56:13
  58:20 63:6
  63:16,25
  64:10 65:4
  65:11,23
  66:21 67:16
  67:20 68:3
  68:6,14
  70:13 72:23
  73:8 74:16
  75:3 76:12
  76:16 77:5
  78:13,18

81:19 82:6
  82:25 83:19
  84:11,21
  86:3,23
  96:10 99:21
  100:5
  101:14
  104:15
  113:10,14
  116:13,20
  119:21,24
  120:16,20
  124:3,10
  125:20
  126:25
  127:8
  131:15,23
  132:2 133:2
  134:3 141:3
  142:24
  143:14
  144:7,22
  146:10,19
  147:2,6
  160:13,15
  160:23
  161:2,15,18
  162:12
  163:10
  165:8,25
  168:11
  170:11,14
  170:22
  171:11,17
  171:25
  178:15
  179:8,17
  180:10,15
  180:17,23
  181:3,25
  182:6,10,17
  184:3,19
  185:10
  186:3,12,22
  190:25
  191:13,17
  197:18

198:14,17
  202:21
  203:2,20
  206:20,24
  207:20
  208:16
  209:4 210:4
  210:11,25
  211:7,24
  212:12,22
  213:21
  214:12,15
  229:11
  230:4 238:3
  238:25
  239:16,24
  240:7
  241:11
  242:3,5,12
  243:5
munno@se...
  4:9
myriad 87:7

N

N 3:2 4:2 5:2
  148:2,2,2
  245:2
nail 39:20
name 44:13
  44:15 45:13
  45:15 52:3
  52:4 105:19
  217:7,8
named 45:12
names 42:12
National 5:5
nature
  130:18
  131:7
near 230:3
necessarily
  61:13
  190:19
  209:6
  222:13
  230:21
necessary

| | | | | | |
|---|---|---|---|---|---|
| 124:22 | 140:17,22 | 87:2,17 | 184:10,22 | 219:3 220:2 | 27:10,12 |
| 210:14 | 145:8 | 96:13 99:25 | 185:21 | new 1:3,13,13 | 32:8 48:3 |
| 211:23 | 177:23 | 100:18 | 186:8,17 | 2:8,8,11 3:9 | 57:10 72:13 |
| 212:9 246:4 | 202:8 | 101:16 | 187:2,15 | 3:9 4:7,7 | 90:21 91:24 |
| need 59:25 | negotiations | 104:17 | 191:8,14,20 | 41:4 66:13 | 95:6 96:20 |
| 60:5 72:9 | 136:17,19 | 109:22,25 | 191:25 | 220:20 | 103:21,22 |
| 75:10,25 | 136:23 | 113:8,12,16 | 197:21,23 | 244:3,5,8 | 106:11,12 |
| 76:10 83:24 | 137:2 | 116:14,23 | 198:16,20 | NewOak | 107:21 |
| 105:18 | 195:13 | 119:23 | 199:2 | 130:16,24 | 109:2 |
| 106:4 135:8 | 196:24 | 120:15,19 | 202:23 | 131:5 | 115:19,20 |
| 136:3,5 | negotiator | 120:25 | 203:5 | nine 117:13 | 121:25 |
| 153:8 154:2 | 176:16 | 121:7 | 206:22 | 118:9 143:5 | 125:4 |
| 172:14 | neither 21:21 | 123:23 | 207:16,25 | 143:15 | 127:20 |
| 178:8 | 78:5 151:24 | 124:13 | 208:25 | NIXON 4:12 | 129:17,25 |
| 206:11 | NETZER | 125:22 | 209:12 | nodded 66:7 | 145:22 |
| 210:18 | 3:10 7:19 | 127:3,16 | 210:7,20 | nonrespons... | 149:4,5,19 |
| 218:7 | 8:7,13,14 | 131:19,21 | 211:4,9 | 216:5 | 149:20,23 |
| 225:25 | 11:9,21 | 131:24 | 212:2,16 | non-partner | 150:7,16 |
| 229:2 | 16:24 18:12 | 132:3 133:3 | 213:2 214:9 | 176:17 | 151:13,14 |
| needed 9:19 | 18:17 20:8 | 133:4 134:9 | 214:13,19 | non-perfor... | 152:14,21 |
| 53:11 | 21:4,6,15 | 141:13 | 230:2,6 | 154:19 | 153:7,12,18 |
| 103:17 | 21:19,22 | 143:2,8,13 | 238:17 | Notary 2:11 | 153:24,25 |
| 105:22 | 22:2,5,9,13 | 143:17,22 | 239:4,20 | 7:16 244:7 | 154:7 156:3 |
| 106:5,21 | 24:16 25:22 | 144:9,12 | 240:4,11 | note 32:6 | 176:14 |
| 164:25,25 | 29:16 30:13 | 146:17,24 | 241:15 | 134:12 | 177:7 |
| needs 8:8 | 32:5,12 | 147:5,8 | 242:8 243:2 | 218:21 | 195:25 |
| 29:12 72:9 | 34:13 41:3 | 148:8 | 245:4 | noted 78:21 | 201:19 |
| 94:6 124:24 | 41:17 51:8 | 156:24 | never 10:21 | 147:10 | 217:6,14,19 |
| 134:25 | 54:21,23 | 157:2 158:2 | 10:24 11:16 | 148:3 243:7 | 219:6 221:4 |
| negotiate | 56:25 58:22 | 158:4 | 20:10 30:14 | 246:10 | 224:13 |
| 177:2 | 63:12,17,22 | 160:18,24 | 68:10,12,16 | notes 133:5,9 | 227:13,20 |
| 194:12,24 | 64:6,14 | 161:4,17,20 | 71:16 78:4 | Notice 2:9 | numbers |
| 197:9 | 65:7,13,18 | 162:18 | 78:5 81:5 | notion 101:23 | 103:25 |
| negotiated | 66:5 67:2 | 163:21 | 81:13 88:12 | notwithsta... | 107:25 |
| 135:24 | 67:17,19,22 | 165:16 | 88:12,17,19 | 241:8 | 108:17,19 |
| 173:20 | 68:5,8,18 | 166:14 | 91:14 93:2 | November | 108:21,23 |
| 196:12 | 70:17 72:25 | 169:3 | 93:2,12 | 7:5 19:14 | 141:22 |
| 197:2 | 73:4,15,19 | 170:13,18 | 102:23 | 19:15 26:4 | 145:5 |
| negotiating | 74:17,24 | 171:8,13,21 | 103:22 | 26:17 28:10 | 149:16 |
| 178:3 | 75:18 76:9 | 172:2 176:9 | 110:4 | 31:2 52:24 | 175:25 |
| 195:16,23 | 76:13,18,21 | 178:16,17 | 112:14,16 | 52:25 | 192:7,8 |
| 196:20 | 77:9 78:16 | 179:13 | 130:7 170:3 | 141:19 | 217:25 |
| negotiation | 78:20,22 | 180:4,13,19 | 170:8,10,16 | 148:13 | 218:2 222:8 |
| 132:12 | 81:22,24 | 180:21,25 | 177:25 | 245:15 | 222:12 |
| 135:21,23 | 82:10 83:10 | 181:4,16 | 196:12 | number | numerous |
| 136:4 | 84:4,19,24 | 182:4,8,13 | 204:2,3 | 11:19 18:4 | 130:15,22 |
| 138:25 | 85:3 86:9 | 182:18 | 218:9,23 | 26:8,10 | 131:3 |

**O**

**O** 6:20 148:2
148:2,2
**oath** 6:14 7:3
**object** 73:8
75:3 99:21
119:12
123:23
181:2
**objected**
181:4
**objecting**
78:18
**objection**
20:2 21:13
21:16 24:7
24:22 25:18
29:7 30:5
34:7 40:23
51:2 63:6
63:25 64:10
65:4,23
67:16 68:3
70:13 77:5
78:20 81:19
82:6,25
83:19 84:11
86:3 100:5
119:22
132:11
141:3
144:22
160:13,23
161:15,18
165:8
168:11
170:22
179:8,17
180:10
181:3 182:2
182:7 184:3
184:19
185:10
186:3,12,22
190:25
191:17
203:2,20

207:20
208:16
209:4 210:4
210:11,25
211:24
212:12,22
213:21
214:12
229:11
238:3
239:16,24
240:7
241:11
242:3,12
**objections**
6:8 181:6
**obligated**
228:23
**obstacle**
173:8
**obstacles**
174:8
**obtain** 58:6
210:22
241:9
**obviously**
14:6 115:6
122:10
**occur** 101:7
**occurred**
88:17 146:6
219:22
**occurring**
195:14
**odd** 72:14
**offer** 83:7
192:11
206:18
**offered** 73:11
73:13
**offering** 73:5
73:10 74:6
205:17
**office** 176:19
**officer** 6:13
**offices** 2:7
**oftentimes**

142:8
**oh** 10:8 16:25
17:5 41:18
45:9,17
52:12 68:9
68:20
143:18
160:11
170:15
173:6
198:21
222:19
**okay** 10:9,14
11:22 12:8
14:3,5 15:7
17:11 18:7
18:14 19:11
22:2 23:8
24:17 26:5
26:20 28:13
29:19 31:7
32:13 34:2
34:14,25
38:16 39:5
39:14,25
40:2,11,21
43:12 45:3
45:13,24
46:4,22
47:6 48:5
48:15 49:4
49:8 50:10
51:9 52:7
53:3,12
54:7,15
59:8 62:17
62:24 63:23
65:21 66:13
69:14 76:9
76:13 80:6
87:18 98:3
98:23
103:23
105:9,14,17
106:16,24
107:5
108:11,17

110:10,17
110:22
111:6 114:8
116:5,19
117:2
118:13
119:15
120:25
121:14,17
122:17
123:4
124:10
127:10,17
127:21
128:8 130:9
132:2
133:17
135:19
136:25
142:16
143:7,20,23
145:9 147:8
148:12,25
149:8 150:9
150:13
151:2,6,12
152:17
154:14
155:22
156:5,23
159:18
166:15
167:8,22
172:21
174:7
178:13
179:4
182:17
183:11
185:6 189:4
189:18
194:8
197:25
204:20
205:23
206:8 207:2
212:17

213:14
217:2 225:6
226:16,21
227:14
228:24
230:4 243:4
**old** 223:8
224:24
**older** 155:7
**omit** 38:17
**omitted**
38:18
**once** 140:19
220:19
**onerous**
224:21
**ones** 35:10
42:15 49:25
55:14 70:6
108:11,12
149:20
227:7
**ongoing**
108:14
236:9
**on-staff** 58:9
**on-the-job**
111:3
**opening**
205:2
**operating**
160:9
**opine** 19:23
24:18 51:16
**opinion** 122:7
128:3,16
129:21
131:5,12,13
197:4,14
203:14,23
204:23
220:6
**opinions**
73:23
**opportunity**
120:21
142:5

**opposed** 53:4
63:24 84:9
104:25
190:15
191:12
197:12
**opposite**
220:9
**options** 33:9
33:14
**order** 18:6
47:17
136:10,12
136:12
137:5
153:10
**orders** 104:21
**organizatio...**
220:17
**organize**
11:14
**organizing**
10:15,25
12:11
**original**
246:12
**originate**
183:20
**origination**
234:3,8,16
234:21
236:4,5,21
237:7,25
239:13
241:3,22
**originators**
178:24
181:19
**Orlando**
52:14
**outcome**
244:18
**output**
162:10
190:11,13
230:15
231:23

outside 59:9
62:3,10
63:4 94:14
94:21
136:17
173:18
178:2 208:9
208:11
overall 48:9
50:6,16
97:23
198:10
236:17
overcome
158:19,23
172:21
overlap 93:17
oversaw
53:17
overseeing
47:7,10
oversight
47:11 71:10
87:13 91:19
overstate
27:23
Overview
116:11
owned 82:4

_____

**P**
P 3:2,2 4:2,2
5:2,2 7:14
148:4
pace 188:15
220:7,13
227:19,22
packages
173:12,13
packet 38:10
224:9
235:16
pad 133:12
page 37:4
39:21,24
48:18,18
58:13
114:20

115:8 116:8
116:13,14
116:17
117:7
124:16
126:17
130:10
142:20,25
143:3,15
144:16
148:14,15
149:7,7
150:15
178:15,16
183:14
242:17
245:3 247:8
pages 222:5,7
paid 61:16,17
150:6
152:24
153:14,23
237:16
par 235:18
paragraph
39:23 51:9
76:24 98:20
98:21 99:4
117:7
130:12
141:18
142:18
143:3,11,21
144:15,16
176:10,13
178:18
194:10
197:24
209:19
215:6
paragraphs
194:6
pardon 67:19
111:15
156:11
161:17
Parekh 1:12

2:6 7:5,20
8:1,15 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1,13
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1

99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
148:9 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1

192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
243:11
244:10
245:4,15
**Parekh's**
120:9
141:19
**Park** 2:8 4:6
**part** 9:17
37:11 39:2
47:11 48:2
49:10,20,21
49:23 59:24
64:8 75:24
108:7
156:20
160:5
161:11
193:25
201:15
212:6
216:16

232:18
**partial** 129:5
**participated**
42:18 43:2
47:14 48:6
48:13 73:21
158:10
**participation**
48:7
**particular**
16:20 44:10
49:13 50:11
50:15,17
51:16,18,20
100:3
130:12
138:20
**particularly**
130:23
232:10
**parties** 6:4
86:19
132:18
144:18
185:25
198:11
216:25
222:14
244:16
**partner** 178:9
**parts** 114:11
223:12,13
**party** 183:21
186:6
**passed**
134:12
**patterns**
132:19
142:7
**pausing**
197:19
**pay** 153:13
154:5,8
**paying** 60:14
84:15 232:8
**payoff** 154:11
**pdf** 217:22

**pdfs** 220:12
**PEABODY**
4:12
**Peachtree**
4:22
**pedantically**
39:19
**PEDONE**
4:15 74:15
74:19 76:11
76:15
**pen** 133:13
**pending**
182:5,9
**people** 44:9
47:8 51:24
51:25 58:2
58:4 59:9
61:21 62:11
62:21 63:3
92:6 94:18
95:6,6
110:11,12
110:23
111:11,12
165:19,23
166:5
172:25
177:22
178:5
185:13,15
188:13
189:11,18
192:13,18
193:23
195:3,23
196:7 217:2
217:6,9,14
217:19
219:14,25
220:6,18
**percent**
127:15
157:4,4,5
157:16
**percentage**
141:25

145:16
**perform**
55:15 94:3
117:9 157:6
**performed**
154:16
**performing**
154:23,25
157:17
**period** 28:25
111:8
120:18
159:5 163:3
215:9
**permission**
191:21
**person** 44:16
53:10 76:7
177:14,21
201:13
**personal**
174:7,10,15
174:19
196:21
**personally**
33:25 43:21
44:8 118:20
196:10,25
**personnel**
51:12 67:5
166:6
**perspective**
167:19
**persuade**
162:20
206:19
**pertain**
145:14
**per-loan**
207:24
208:4
**Pfeiffer** 89:22
90:4,4,19
**Phelps** 9:10
13:10 15:8
23:6 28:12
29:13 35:6

40:10 56:2
59:19 60:19
69:12 73:25
75:16 76:7
77:2 79:3
80:8,9
82:22 85:9
85:17 89:12
104:25
105:7
113:21
114:2,7
118:21
122:20
129:23
155:14
158:5,14,16
160:5,6,10
161:9,9
162:19,22
162:23
163:8,19,23
164:3,7
165:6,15
166:10,15
166:22,25
167:5,9,13
168:5 169:2
169:4,8,10
169:16,19
169:19
170:11
175:23,24
175:25
184:15,24
184:25
185:22
187:3,16,24
188:20,22
188:25
189:3,6,8
189:20
190:19
192:22
197:7,13
198:6 199:6
199:22

204:2 215:3
**Phelps's**
159:23
219:23
**Phelps/Cross**
172:24
**Phillips** 51:19
51:21 52:5
52:10,22
58:14,15
64:24 65:2
67:13,23
76:22 77:4
77:18 78:15
100:21
101:4,10
219:19,24
221:15,19
**phone** 53:2
175:25
217:21
**phrase** 237:6
**Ph.D** 1:12 2:7
7:5 245:15
**piece** 76:8
112:9
**pieces** 112:7
221:22
**Pilowsky**
45:12
**pin** 31:19
**Pino** 7:12 8:4
79:19
109:19
115:14
119:25
120:14
245:20
**Pino's** 90:17
92:8
**pinpoint**
12:22
**pitched** 14:18
**place** 34:24
136:24
163:14
223:13,14

**places** 218:4
234:6
**Plan** 145:7
202:7
**Plaza** 2:8 4:6
**please** 22:6,7
60:18
101:12
116:13
143:10,16
148:13,17
178:15
181:5
197:20
198:14
230:10
246:3,7
**plus** 127:19
150:17
151:18
**point** 14:17
15:5 18:8
53:8 59:13
106:21
154:7 155:8
157:25
168:13
226:13
236:5
**pointed** 92:3
**points** 36:16
220:10
**population**
18:2 19:21
19:25 20:13
20:23 21:10
26:16 94:25
97:23
**portfolio**
46:19
**portion** 43:21
**portions** 88:3
**pose** 22:14
113:22
**position**
118:2
119:17

120:5
**positions**
117:12
**possibility**
23:10
**possible**
58:18 62:4
62:7 77:13
105:22
129:12,15
160:2
174:13,22
222:7 223:4
241:10
**possibly**
165:2
230:23
**potential**
69:7 70:21
70:22
**potentially**
34:21 72:17
88:2 124:4
137:10
138:21
200:3 224:5
229:15
234:6
**practical**
18:20 19:18
19:21,25
30:8,19
31:22 38:13
38:14 39:7
39:9 167:21
**practically**
34:12
132:17
**practices**
230:8
**precipitated**
14:14,16,22
**precipitating**
14:22
**precision**
72:19
**preexisting**

| | | | | | |
|---|---|---|---|---|---|
| 62:10 | 27:15 93:5 | 240:22 | 195:18 | 172:3 | 29:5,10,11 |
| **prefer** 144:6 | **previously** | **problems** | 196:3 | 223:25 | 29:14,21,23 |
| 144:8 | 123:9 | 34:22 57:22 | 199:22 | **projected** | 34:4 37:12 |
| **premature** | 135:24 | 69:8,11 | 217:10,17 | 150:22 | 38:11,21,22 |
| 119:19 | 148:5 | 86:15 88:11 | 218:5,10 | 151:3,18,25 | 39:4 72:22 |
| **preparation** | **price** 232:4,6 | 88:15 | 220:11 | 152:6 155:2 | 73:14,18 |
| 17:22 28:8 | 232:7 | 159:12,19 | 226:19 | 156:3 | 81:11 90:15 |
| 28:9,22 | 237:16 | 159:21 | 241:21 | 157:11 | 90:16,22,23 |
| **prepared** | **pricing** 162:7 | 161:3,5 | **processed** | **projections** | 92:9,16 |
| 69:9 88:15 | 163:15 | 172:6,9 | 216:11 | 153:16 | 114:16,21 |
| 121:4,9 | 172:7 173:6 | 173:9 | **processes** | 155:14 | 115:13 |
| 141:10 | 173:7,10,15 | 221:12,14 | 132:12 | 156:14,22 | 120:11 |
| **preparing** | **primary** 52:6 | 221:17 | 189:21 | **prompted** | 132:9,12,24 |
| 29:3 31:17 | 53:8 | 222:21,25 | **processing** | 79:18,23 | 134:17,18 |
| **present** 33:9 | **principal** | **procedure** | 217:22 | **pronounced** | 134:20 |
| 59:5 61:9 | 233:4 | 59:21 115:3 | **produce** | 118:16 | 135:10,11 |
| 204:10,20 | **prior** 13:7,8 | **proceed** | 87:16 122:3 | **properly** | 135:12 |
| 224:16 | 14:5,13 | 140:23 | 126:21 | 87:24 | 136:5,8,16 |
| **presented** | 15:8,11 | 181:2 | 128:13 | **proposed** | 136:18,21 |
| 183:18,24 | 17:15 18:4 | **proceeding** | 155:2 | 10:24 11:7 | 136:24 |
| 184:16 | 19:8,10,12 | 85:23 | 190:12 | 14:19 37:12 | 137:2 |
| **presenting** | 20:9 22:16 | **proceedings** | **produced** | 120:10 | 139:14,16 |
| 60:3 | 29:22 31:4 | 200:16 | 146:3 | 131:15 | 139:24 |
| **preserve** | 31:17,21 | 203:7 | **produces** | **proposing** | 140:2,5 |
| 178:23 | 33:16 39:3 | **proceeds** | 190:17 | 15:2,3 | 141:8,16 |
| 186:10,20 | 40:7 52:23 | 132:9 136:4 | **producing** | **proposition** | 142:4 |
| **preserving** | 110:19,22 | **process** 14:8 | 190:16 | 107:6 | 152:20,22 |
| 179:15 | 145:3,6 | 16:6 24:13 | **product** | **prosecute** | 152:25 |
| **pressed** 57:11 | 189:20 | 35:13 47:15 | 232:9 | 34:5,6 | 153:9,10,13 |
| **pressure** | 215:3,4 | 48:14 49:21 | **production** | 83:17 | 153:20 |
| 229:8,13,22 | **privilege** | 50:3,4 | 156:25 | **prosecuting** | 154:4 |
| **pressures** | 35:21 | 51:23 53:14 | 158:3 | 29:6 | 177:24 |
| 103:17 | **privy** 212:6 | 53:19 55:11 | **Professional** | **prosecution** | 178:2,7 |
| **presume** | **probably** | 61:5,7 69:6 | 2:10 | 17:18 33:19 | 179:14 |
| 209:14 | 15:18 16:13 | 82:22 87:13 | **prohibition** | 50:24 51:5 | 181:14 |
| **presuppose** | 49:6 68:22 | 89:15 90:6 | 212:20 | **protective** | 186:9,19 |
| 140:10 | 127:13 | 120:6 | **project** 61:22 | 104:21 | 195:14 |
| **presupposes** | 138:2 188:3 | 132:15,20 | 66:12 67:5 | **Protocol** 9:23 | 196:6 202:6 |
| 21:13 | 190:7 227:8 | 135:21,23 | 85:24 86:5 | 10:2,6,10 | 207:18 |
| 126:25 | **problem** 22:9 | 136:4 139:4 | 121:25 | 10:13,15,18 | 208:5,9,10 |
| 208:16 | 82:14 137:3 | 139:6,13,13 | 122:2,5 | 10:19,22,25 | 208:11,12 |
| **prevent** 34:23 | 139:17,22 | 140:23,25 | 128:13,23 | 11:8,17 | 216:9 |
| **preventing** | 140:5 | 141:6,11,15 | 129:11 | 12:10,10,13 | 218:25 |
| 174:9 | 160:21 | 153:22 | 130:18 | 12:17 13:5 | 219:2 224:4 |
| **prevents** | 218:24 | 159:14 | 131:7 | 13:9,17,18 | 224:6,17 |
| 85:22 | 221:9 | 188:23 | 141:23 | 19:16,18 | 225:3 226:7 |
| **previous** | **problematic** | 189:15 | 171:24 | 25:11 26:19 | 226:10 |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

238:7,8,10
**Protocols**
11:13,25
**Protocol's**
116:11
**provide** 9:18
123:13
130:15
165:4,15
179:15
206:11
**provided**
141:24
146:12
169:11,16
169:17
175:21
234:9
**provides**
181:14
**Public** 2:11
7:16 244:8
**purchased**
237:15
**purpose** 12:6
190:10,11
191:13
192:10,14
**purposes**
12:11 39:11
40:17
146:14
192:3
199:12
223:23
**pursuant** 2:9
**push** 175:11
195:4
**put** 7:20 8:4
12:20 14:10
38:10 66:12
86:16 91:17
99:9 122:11
126:23
128:7 129:2
140:17
152:22,25

159:22
170:21
191:4 197:5
229:2
**putting** 29:17
86:19
102:17
107:7,8
125:3
126:13
128:3,18
135:20
136:7,25
139:16
**put-back**
138:13,16
139:8 200:2
204:12
**put-backs**
138:12
139:20
**P.C** 3:18
**p.m** 147:10
148:3 243:7
——————
**Q**
**qualified**
58:19 65:25
230:20
231:16,17
233:5,19
**qualifies**
230:24
**qualities**
237:17,18
**quality** 57:21
57:22,24
59:12,17,21
60:8,22
69:3 70:4
71:13 82:19
85:20 87:13
88:4 91:19
92:11,13,15
97:8 112:20
118:2,8
126:11
128:18,25

129:15
130:4,16
158:17
162:8
168:16
172:5,14
188:16
232:15,20
232:25
**quantity**
232:24
**question** 6:9
10:4 11:6,9
17:12 22:6
22:7,15
31:25 33:7
36:13 37:10
39:24 61:20
63:18 64:18
65:12 68:7
68:15 74:18
74:20 78:14
78:17,19,24
81:23 83:12
83:21 84:6
89:7 94:9
95:11 97:5
99:22
102:17
103:2 110:3
113:18,23
114:25
116:16,24
117:3,5
119:3,9
121:5
122:10
123:14,16
123:21
124:4,11
125:19,21
126:22
133:2 134:4
141:17
144:3 146:8
148:23
152:11,19

157:7 161:7
163:6
174:20
175:15
180:3,14
182:4,9,16
184:8,12
187:6
193:20
197:11
199:12
205:9
206:21
207:21
220:2 229:8
233:16
**questions**
76:17
144:11
233:22
235:7 243:3
**queued**
216:11
**quickly** 15:22
55:18,21
56:12 82:19
216:10
**quite** 9:4 11:5
41:9 63:14
74:12 115:3
152:8
225:17
——————
**R**
**R** 3:2 4:2 5:2
7:14,14
148:2,4,4
244:2 247:1
247:1
**raised** 14:20
**random**
97:19,21
98:2
**randomly**
97:24
158:15
**range** 109:2
148:20

157:20
**rate** 98:25
99:11
103:18
112:10,16
112:19
115:22
157:11
177:21
194:12
198:9,11
199:9
208:21
227:19
**reach** 32:16
112:19
127:20
207:19
**reached** 19:7
37:24
198:11
**reaching**
99:17
**read** 22:11
74:22 91:3
91:4,5,7
102:10
114:3,5
116:20,21
117:4,6
132:16
133:5,9,20
133:24
134:7,17,20
142:16
143:9,20
182:22
203:15
207:11
208:22
246:3
**reading** 27:14
114:9
134:18
135:12
143:11
194:21

214:22
**ready** 147:7
215:22
216:12
220:14
223:3,5
**realistic**
198:18
199:3,6
**realized**
154:2
**reallocate**
66:3,6
**really** 18:13
39:2 63:13
71:7 111:10
112:16
114:25
125:23
190:14
209:15
216:15
217:20
218:5
221:17
222:24
233:25
**realm** 213:19
**reason** 25:2
31:3 35:19
55:16 69:19
70:10,15,18
79:20 84:20
84:21 85:6
85:16
106:17
118:24
149:10
162:3
164:11,12
164:15
167:13
201:21
209:25
211:22
230:11,16
246:5

247:10,12
247:14,16
247:18,20
**reasonable**
55:20 101:6
109:17,19
109:20
126:6
144:13
175:15
176:16,20
177:8,10,20
201:17,19
201:24
202:4 204:8
205:7
207:15
208:7,7
209:18
**reasonably**
100:11
**reasons** 85:4
85:8 87:3,7
142:14,15
162:6,15
168:3
190:18
212:6 247:6
**recall** 8:20
12:18 20:17
27:20,25
28:3,4,17
33:11,15,20
33:24 36:17
42:13 44:13
44:15,22
45:10,16
50:20 52:4
53:14 56:16
62:13 79:23
79:25 90:19
98:10
105:25
110:8
111:10
133:15
145:21

157:19,22
174:6 175:2
185:19
215:2
233:14
**receipt**
246:14
**receive** 215:8
217:13
223:21
225:9
**received**
118:14
**Recess** 73:3
76:20
197:22
230:5
**recollect**
96:19
**recollection**
33:21
111:21
187:20
189:17
215:5
**record** 40:13
58:21
109:23,24
123:21
132:25
142:17
147:4 176:8
180:18
182:11,14
244:13
**recounted**
81:13
**recounting**
14:25
**Recovco** 42:8
42:25
118:14,21
118:22
119:4,17
121:6,22
122:3,24
126:19

127:11
128:12,21
129:10
141:24
**redoing** 88:3
**reducing** 57:3
**refer** 7:22 8:2
8:5 13:23
**reference**
22:24 40:3
136:23
**referenced**
37:7,8
76:23
**references**
44:17
142:19
**referred**
17:25 94:22
169:13
188:18
**referring**
11:6 48:12
124:7
199:14
200:22
233:18
**reflects** 228:5
**refresh**
134:20
145:4
**Registered**
2:10
**regular**
183:16
**reidentified**
222:15
**relate** 142:11
**related** 9:19
10:16 11:2
12:12 28:18
44:2 129:19
244:16
**relating** 9:2
**relation**
26:18 120:9
**relationship**

166:23,25
176:3,4
217:11
**relationships**
173:18
229:17
**relative**
114:25
115:2
**relatively**
114:24
155:6,9,10
235:12
**relay** 142:6
**relevance**
242:5,12
**relevant**
55:13 56:24
142:6
**reliance**
90:11
**remain**
155:19,23
157:17
**remainder**
155:19
**remaining**
151:11
**remains**
155:9
**remember**
50:10 52:2
79:15 95:19
107:24
198:23,24
**render**
119:13
185:3
204:13
219:7
**rendering**
184:15
197:14
**repeat** 23:12
39:17
184:21
**replied** 65:16

81:4
**report** 7:21
8:10 10:7
13:13,21
14:11 18:2
19:13,14,14
19:15,17,19
20:24 37:5
38:17,18,20
39:12,13,21
52:23 57:9
60:24 73:24
76:24 79:8
80:14 88:16
90:17 96:19
97:22 98:22
108:2
109:19
113:5 114:3
114:21
121:19
131:17
132:5
136:15
141:8 148:9
148:10
176:10
194:7
197:24
203:15,19
206:2,6,9
208:23
**Reported**
1:19
**Reporter**
2:10
**reports** 53:6
79:19,22
90:24,25
91:3,4
119:25
146:22
199:17
207:10,12
**represent**
149:16
196:4

**representat...**
178:25
181:21
223:24
**represented**
108:6
237:19
**represents**
148:20
150:3,15,19
**reps** 40:18
42:3 46:21
48:3 140:8
176:25
192:6
231:22,24
233:8
236:20
237:10
**repurchase**
183:18,24
184:16
185:7,17
195:16
196:12,20
196:23
197:2,8
230:21
231:18
233:20
**reputable**
118:23
119:18
121:6
**request** 215:8
217:13
220:20,21
221:4 222:9
222:11
223:5,21,22
224:11,11
224:21
225:9,11,20
225:24
226:11,19
226:23
227:11

228:11,15
228:15,18
**requested**
215:8
**requesting**
209:22
215:17,20
**requests**
222:18
229:4 245:6
245:10
**require** 70:21
141:21
156:8,12
192:5
**required**
38:10 54:5
142:4
191:22
225:3 226:9
**requirement**
37:11 82:2
82:12,14
**requirements**
82:8 83:24
84:2
**requires** 92:9
98:25
135:12
140:22
224:4,6,18
235:16
**requiring**
141:25
**rereview**
188:14,16
**rereviewed**
146:5 159:7
**rescanned**
222:7
**ResCap**
15:15 16:22
16:23 35:7
35:11,13,17
35:20 36:7
36:8,9
42:21 43:11

46:15 47:4
47:13,24
90:5,6 98:8
98:18
110:15,16
110:19
158:11
163:24
164:23
166:7,10
168:21
175:14
187:12,16
189:14
192:4
222:22
234:12
**research**
128:11
129:9
**researchers**
124:25
**reservations**
128:24
**reserved** 6:9
**resolution**
198:3
207:19
**resolutions**
135:25
**resolve** 9:2
**resolved**
141:2 142:9
144:18
145:3,6
231:20
233:6,21,23
**resource**
128:10
129:8
**resources**
66:3,6
**respect** 29:5
34:6 49:12
67:14,24
124:6
128:18

137:17
139:24
140:2,4
185:7 210:9
210:10
211:11
**respective** 6:4
**respond**
115:9
217:22
228:21
**response**
123:14
**responsible**
58:7 60:13
60:14
**responsive**
184:11
**rest** 100:12
100:12
**restate**
225:16
**result** 136:13
137:13
138:7
154:19
**resulted**
235:4
**results** 43:23
43:24 44:23
45:8 48:23
49:2 50:5,6
50:7,8,16
60:13 61:8
71:15 72:9
72:13,14
74:9 87:16
88:2,10
97:9,9
153:8
197:16
239:8
**retained** 51:7
**retention**
46:14,15
98:10 215:4
**return** 246:12

**reunderwri...**
40:16 53:19
93:25
193:17
**review** 11:14
11:25 12:4
12:6 13:16
13:19 14:9
15:18 16:9
17:25 18:23
19:17,20,24
20:13,16,19
20:22 21:9
22:20,25
23:3,10,21
24:4,13,20
24:25 25:3
25:6,8
26:15 27:6
28:19 34:11
38:9 40:12
40:14,15,19
40:21 41:16
41:19 42:4
42:20 43:14
43:17,21
47:6,14
48:11,16
49:18 50:2
51:13 53:18
54:5 55:2,9
55:15,18,21
55:23,24
56:5 67:4
67:12,15,25
68:2 70:3
72:6,8,15
73:6,12,20
73:25 74:7
74:14 75:2
75:9,10,11
75:13,14,25
78:3 79:5
80:20,24
81:2,5,6,9
81:14,15,18
82:3 85:13

85:15 89:6
89:15 90:6
90:20 93:3
94:14 95:23
96:25 97:3
97:6,8 99:2
99:12 102:7
102:16,24
104:22
105:5
108:16
111:17
113:20
114:10
115:10,16
115:17,18
117:13
124:23
125:18,25
131:2
132:18,19
132:20
138:18,23
140:16
141:21,25
145:19
146:13
149:4,6
158:25
159:4,25
161:10,12
163:24
164:20
167:11,17
168:4,14,23
169:25
172:22
173:11
175:14
177:5,13
188:6 189:3
189:7,8,14
189:21
190:9,20,22
191:11
192:15
193:5,7,16

198:7,13
199:7,17,18
200:19
201:5 202:5
209:21
210:6,14
211:10,19
211:19
213:10
214:4,24
215:19,22
216:12
218:17,20
220:14
223:3,23
224:14,15
224:22
230:13
231:24
234:12,13
235:18,19
236:23
239:22
240:6 241:9
**reviewed**
44:23,23,24
46:20 47:11
49:13,24
50:2,12
61:2 96:17
96:21
112:24
113:24
117:21
149:21
150:18
153:6
158:17
159:6
188:25
207:9
235:20
240:12
241:21
**reviewer**
48:19 99:12
100:11

112:20
115:20,23
115:23
117:10,20
117:24
118:7
**reviewers**
41:24 49:3
57:11,12,14
57:16,21,24
58:16,19
59:25 60:3
60:4,5,10
60:22 62:2
63:2 66:2
66:10,12
67:6,7
77:13,15,18
77:21,25
80:3 88:6,7
90:21 91:24
92:5,10,13
92:15 93:3
93:4,7,8,17
94:6,11,15
94:21 95:8
95:23,25
97:10,12,15
99:9 100:10
101:10,25
102:6,15,21
102:24
103:4,9,12
103:13,19
103:21
104:6,10,23
105:16,17
105:25
106:3,13
107:2,20,21
109:2,3,4,5
109:18,21
110:6 111:7
111:19
112:19
125:4,17
126:12

129:18
130:2 159:8
159:9
169:12,13
169:16,18
169:21,23
172:13
175:22
187:18,22
188:8,10,18
**reviewing**
11:20,24
32:22 40:17
41:11 42:2
48:25 99:10
117:20
120:7
143:19
158:11
183:2
189:19
**reviews** 22:23
42:18 43:2
43:19 45:7
55:24 68:25
72:14 73:21
74:9,11
75:8,17,23
77:14 80:11
93:25 101:7
101:19,23
102:2,3,8
102:11,13
102:19
103:10
110:13
117:9,10
118:9 122:4
128:14
158:5 164:7
164:8 169:5
169:8,9
173:24
177:5 198:2
200:7 207:8
210:3,9,17
210:24

212:11
236:22
**Richard** 4:15
77:8
**rid** 153:3,5
**right** 8:3 21:4
27:3 31:13
37:2 42:13
63:15 64:7
64:8,20
65:8 73:15
89:7 93:11
104:11
105:4 108:2
108:7
139:11
140:4
144:21
145:22
153:7
175:21
185:19
190:23
202:14
203:8
204:21
218:14
219:24
222:10
233:13,14
237:2
**rights** 178:23
179:16,22
180:8,12
181:10,18
186:10
**risk** 40:4,7
42:5,16
51:17,22
53:9,11,18
53:25 54:3
55:4,7
58:14 59:19
60:12 61:13
61:23 62:11
62:19,21
63:5,10,20

63:24 68:24
69:3,11,21
69:24 70:4
85:15 87:15
87:25 89:5
96:22,23
99:8,10
108:6
127:19
146:4
162:17
190:17
192:20,25
193:2,7,15
193:15
198:10
199:18
207:10
214:3
215:13,16
216:22
217:3,15
220:19
224:10
225:21,23
226:17
228:12,15
228:17
234:9 235:9
237:4,17
238:15
**Risk's** 56:17
100:8
223:22
225:10,12
225:12
226:10
235:17
**RMBS** 9:19
44:2 46:7
98:19
145:13
146:12
159:9
230:19
**rnetzer@w...**
3:11

**Roger** 3:10
8:10
**role** 47:6,9
53:12,13
163:14
**ROLLIN**
3:21
**room** 134:8
160:7
**rooms** 160:7
**roughly**
24:12 31:18
126:4 152:5
154:13,17
208:6
**rpedone@...**
4:16
**RPR** 1:19
**RQ** 156:24
158:2
**rule** 200:3
**ruled** 200:3
**rules** 161:23
162:25
168:19
230:20
**ruling** 202:9
204:14
**rulings**
202:12
245:8
**run** 87:25
209:16

———————
**S**

**S** 3:2 4:2 5:2
7:14 148:2
148:2,2,4
**sample** 20:16
23:5,11,21
23:23,25
24:5,12
25:7,9
26:11 27:13
29:15,17
35:2,7
36:22 49:11
49:20,24

50:7,9,25
53:21 56:21
96:17 97:15
97:17,18,19
97:21,24
98:2,5
146:13
193:6,14
210:6
211:20
214:25
218:22
223:17
226:18
238:14
239:5,7
241:17,19
241:20
242:2,7,14
**samples**
98:13
**sampling**
13:12 18:2
19:21,24
20:13,22
21:10 22:24
22:25 23:4
26:16 32:11
32:21,24
97:23 115:2
**sat** 48:8,16
110:12
111:7
188:25
**satisfaction**
144:18
**satisfied** 69:3
**satisfy** 37:11
226:7
**Sauerwein**
77:8 78:6
80:2 89:19
90:12 91:10
92:20 99:11
101:4,20
102:5,14,18
107:9

108:12
122:14
174:12
194:20
195:9
199:25
207:6
**Sauerwein's**
100:9 104:4
108:5
**save** 21:16
76:18
**saw** 10:23
12:13 13:7
13:8 90:24
133:13
**saying** 68:11
71:17 72:8
80:9 91:12
100:2
129:20
139:25
153:21
154:5
166:19
170:20
174:15
180:5,7
206:9
211:16,18
213:12
226:5
227:18
241:9
**says** 114:20
114:21
121:20
124:16,21
126:17,18
128:9
130:11
183:16
198:20
203:6
**Scalability**
116:11
**scale** 130:19

131:8
227:22,25
**scanned**
223:9,9
**SCC** 1:7
**scenario**
39:22 149:5
149:6,6,7
150:2,13,14
151:8
**scenarios**
149:4
**scheduled**
120:8
**schemes**
172:7
**scope** 9:15
**SCOTT** 5:9
**scrap** 88:2
**screen** 48:17
117:7
132:16
143:2
144:14
178:18
233:6
**section** 39:23
116:10
178:19
182:20
**sections**
124:17
**securities**
44:2
**securitizati...**
74:3
**see** 12:16
37:14 40:19
56:11 76:24
99:3 116:12
120:25
126:12
133:14

143:18
149:23
156:19,20
156:21
167:16,20
179:2,3
182:14
190:13
194:15
209:23
215:10
235:2
**seeing** 32:6
**seeks** 178:22
**seen** 10:10,12
10:15,18,19
10:21,24
11:12,12
81:5 88:12
90:22,23,25
91:15 130:8
133:16
180:11
202:7 207:4
241:16,17
241:19
**select** 97:20
**selected**
23:24 24:2
55:8 97:17
97:18
**selects** 63:20
**sell** 164:9
165:11,19
165:19,21
184:6,25
185:4
**send** 172:25
228:7
**sending**
228:7
**senior** 117:10
117:20,23
117:24
118:7
124:20
169:13

177:12
178:5
188:11,13
188:18
189:10
**sense** 13:17
59:2 71:8
84:13 143:6
**sent** 224:22
**sentence**
124:18
125:7,9
130:13
132:17
143:4
144:15
199:11
**sentences**
225:14
**separate** 86:7
86:18,19
176:5
**separately**
84:10
148:18
**sequenced**
11:8
**sequencing**
10:15,19,25
11:6 12:11
12:12
**serial** 115:15
**serious** 130:3
145:25
221:16
**seriously**
159:14,15
159:16
**serve** 204:18
**served** 53:8
190:9,14
**service**
165:19
166:5
**servicer**
192:8
215:25

217:25
219:8,9
220:20
222:6
224:24
226:23
**servicers** 38:9
209:23
213:25
216:5,6,23
216:24
217:14,21
220:17
224:24
226:24
227:5 228:6
228:20
229:9
240:18,19
**services**
130:16
215:9
232:25
233:2
**servicing**
224:20,25
235:2 236:2
236:7,12,21
236:22
238:2,12,15
238:19
239:10,12
239:15,19
239:23
240:6,12,16
240:21,22
240:24
241:4,10,14
241:23,25
242:6,14,16
**set** 29:11
115:13
163:23
235:12
244:11,21
**sets** 37:12
**settled** 202:10

230:21,23
**settlement**
103:16
146:14
190:15
192:11
196:24
211:12
**seven** 128:12
128:22
129:2,10
198:9 199:9
200:5,11,20
201:16
206:15
208:6
**Seventh** 3:8
**Seward** 2:7
4:5
**sharing**
128:10
129:8 130:6
158:20,22
**sheet** 246:6,7
246:10,13
**show** 48:21
116:18
133:23
218:15
**shown** 134:13
**shows** 89:5
121:21
128:10
**sic** 62:19
198:6
**side** 202:15
204:10,20
206:10
**sides** 132:11
140:18,19
**side-by-side**
169:23,24
**sign** 246:7
**SIGNATU...**
247:23
**signed** 6:12
6:15 104:21

| | | | | | |
|---|---|---|---|---|---|
| **significant** | 223:8 | 31:7 36:10 | **speak** 35:23 | 180:24 | 71:15,21 |
| 58:18 81:2 | **six** 124:24 | 38:22 41:18 | 53:3,11 | 213:22 | 72:7,9,10 |
| 89:13 91:23 | 154:23 | 45:23 47:21 | 54:7 74:16 | **speculation** | 229:5 234:7 |
| 213:11 | **size** 11:23 | 64:13 65:13 | 76:11 82:7 | 64:8,13 | **standards** |
| 216:7 218:2 | 12:2 81:9 | 67:20 68:9 | 83:22 86:21 | 209:15 | 72:16 |
| 218:24 | 81:10,14 | 68:20 71:20 | 138:9 194:2 | **speed** 168:17 | 158:24 |
| 219:5 | 85:24 86:5 | 71:22 74:22 | 201:2 241:7 | 218:5 | 159:2 160:3 |
| **signing** 246:9 | 94:24 | 82:9 97:4 | **speaking** 9:14 | 220:11,13 | 160:8 |
| **similar** 10:13 | 121:23 | 112:2 | 44:22 90:15 | **spend** 16:8 | 161:24 |
| 56:20,20 | 187:17 | 127:23 | 132:17 | 24:11 | 162:25 |
| 132:14 | 188:6 | 129:4 | 137:2 181:6 | **spending** | 163:14,16 |
| 137:21 | 232:17 | 137:20,25 | **special** | 113:2,3 | 163:22,24 |
| 139:9,19 | **sizes** 42:11 | 144:15 | 208:14,17 | 212:14 | 164:20 |
| 142:7,9 | **skeptical** | 146:17 | 209:3,9 | **spent** 18:3 | 168:6,19 |
| 222:21 | 77:13,19 | 148:24 | **specialize** | 51:22 | 230:8,20 |
| **similarly** | 78:8 80:2 | 150:10 | 42:2 | 112:22 | 232:2 |
| 62:17 150:2 | **slewis@cha...** | 156:11 | **specializes** | **split** 221:22 | **standpoint** |
| **simultaneo...** | 5:10 | 161:20 | 40:16 | 229:21 | 233:24 |
| 194:11 | **slightly** 218:5 | 167:25 | **specific** 32:7 | **splitting** | **stands** 211:25 |
| **single** 32:23 | **slow** 188:15 | 178:16 | 36:17 47:7 | 215:22 | **start** 26:11 |
| 87:12,13 | 199:22 | 184:21 | 61:22 85:2 | **spoke** 51:12 | 27:12 88:5 |
| 128:20 | **slower** 201:23 | 187:13 | 108:15 | 51:24,25 | 88:7 113:17 |
| 160:9 | **small** 103:21 | 192:21 | 122:24 | 52:9,22,25 | 130:4 |
| 221:24 | 114:24 | 198:21 | 128:20 | 53:7,23,25 | 132:18 |
| 222:2 | 195:24 | 219:5 | 136:22,25 | 54:3 76:22 | 144:14 |
| **sir** 21:23 | **smaller** 12:2 | 221:25 | 138:10 | 77:7 99:8 | 148:22 |
| 22:20 43:13 | 227:12 | 235:22 | 144:5 | 99:10 | 152:20 |
| 73:5 78:23 | **SMLT** | **sort** 15:3 | 164:11,12 | 219:21 | 209:7 |
| 101:12 | 183:17,20 | 71:10 | 164:15 | **spoken** 45:5 | 213:10,13 |
| 103:24 | 183:22 | 136:20 | 183:8 | 53:24 67:11 | 216:12 |
| 104:10 | **smooth** 218:9 | 188:5,15 | 191:10 | 82:17 86:15 | **started** 48:24 |
| 107:7 | **software** | 214:2,5 | 233:14 | 90:19 | 212:11 |
| 116:12 | 169:14 | **sorts** 34:22 | **specifically** | 196:13,17 | 213:6,15 |
| 149:10 | **sold** 178:24 | 235:8 | 48:10 52:2 | 207:5 | 214:8 |
| 179:2 | 181:19 | **sought** | 54:11 74:2 | **spring** 52:13 | 230:25 |
| 180:22 | 183:22 | 108:18,20 | 87:10 89:18 | **ss** 244:4 | 231:4 |
| 191:15 | 185:25 | 108:22 | 90:16 98:11 | **staff** 124:22 | **starting** |
| 194:15 | 237:14 | **sound** 114:16 | 106:12 | 125:2,16,24 | 212:21 |
| 197:24 | **sole** 107:25 | **sounds** | 115:9 | 189:10 | **starts** 143:12 |
| 215:10 | **somebody** | 117:25 | 145:21 | **stand** 11:10 | 218:17 |
| **sit** 43:20 | 29:12 | 179:24 | 149:17 | **standard** | **state** 2:11 |
| 227:6 | 164:10 | **sources** | 181:11 | 95:7 172:22 | 40:13 |
| **sitting** 48:20 | 204:17 | 173:20 | 185:18 | 190:13 | 209:19 |
| 110:22 | 229:24 | **SOUTHERN** | 201:2 | 235:12 | 215:6,12 |
| 115:23 | **soon** 212:13 | 1:3 | 232:19 | **standardize** | 244:3,8 |
| 133:10 | **sorry** 10:3 | **space** 246:5 | **speculate** | 173:15 | 246:4 |
| 220:18 | 17:2 18:12 | **spare** 181:6 | 83:3 87:6 | **standardized** | **statement** |

80:7 83:12
93:15
114:19
115:8
119:22
122:9,16,19
122:21
124:15
127:13
129:8
130:21
132:5
154:17
183:12
200:11
**states** 1:2
117:7
121:17
141:19
144:20
178:14
**stating**
132:10
144:20
202:16
**status** 213:23
**stay** 76:14
232:13
**step** 38:23
39:2 115:25
145:2,3,6,8
149:11
206:4,7
**stick** 149:14
**STIPULA...**
6:2,7,11
**stitched**
221:23
229:21
**stone** 241:6
**stop** 123:5
155:16
165:6
167:23
212:10
**stopped**
165:11

**stops** 167:8
167:22
**strata** 97:24
97:25 98:2
**stratified**
97:19,20
**streamline**
132:15
**Street** 4:13
4:22 5:7
**strengths**
173:16
**stress** 218:11
**stretch** 128:3
**strike** 18:24
**strikes** 183:3
**structure**
61:18 71:11
**structures**
167:15
172:8
**struggling**
61:14
**studied** 84:2
115:7
181:15
195:20
**study** 114:4
**studying**
24:12
**style** 75:20
**subcontrac...**
168:22
**subcontrac...**
162:22
**subject** 14:10
27:17 35:20
49:9 63:17
81:17 120:3
120:24
162:25
168:8,18,19
230:10
246:9
**subjects**
51:15 73:10
**submissions**

178:21
**submit** 72:21
160:19
**submitted**
13:13 14:6
19:4
**submitting**
17:22
**Subscribed**
243:13
**subsection**
132:4
**subsequent**
79:7
**substantial**
191:5
**substantially**
190:24
191:6
**successfully**
82:19
174:25
**suffer** 86:14
150:22
151:3,19,25
152:5,6,7
152:13
**suffered**
150:20
151:3,10,16
151:24
**sufficient**
176:25
**suggested**
90:18
**suggests**
132:7
141:20
**Suite** 3:19
**summary** 9:4
**summer** 4:13
52:13
**supervision**
49:7 111:18
**supply** 67:4
**support**
125:2

**supported**
101:23
**suppose**
201:21
212:13
**sure** 8:19 9:6
9:7 10:4
11:5,12
18:16 23:12
23:14 24:24
29:9 38:2
47:19 49:2
59:22 60:2
72:25 76:15
78:25 87:4
99:19
105:21
107:16
108:15
112:10
113:15
121:9,11
126:4 129:6
134:2,11
136:16
144:11
146:6,18
152:8 159:9
160:14
164:14,24
167:18,20
179:19,22
180:11
181:13
183:13
184:23
203:22
207:21
213:9
215:23
**switch** 145:9
**sworn** 6:13
6:16 7:15
148:5
243:13
244:12
**systems** 71:13

169:15
———————
**T**
**T** 148:2 244:2
244:2 247:1
**table** 133:10
148:16
149:14
150:14
192:12
**TAKAHA...**
1:19 2:10
244:7,25
**take** 15:17,21
16:9 17:23
20:7 26:14
30:20,22
31:12,23
34:19 38:7
56:24 57:15
61:6 71:3
74:15 75:19
114:21
115:11
117:6
126:10,20
127:25
131:18
136:23
141:15
143:8 146:5
146:24
155:15
156:21
180:19
182:25
183:21
190:3
191:10
197:8
199:21
202:2,17
203:8,24
204:4,7
205:12,14
205:15,18
206:23
207:5,7,13

207:18
210:17
216:7,16
217:12
219:10
220:23
221:13
223:14,19
226:4,6
228:3,8
229:23
230:2 233:3
236:11
**taken** 32:10
73:3 76:20
117:12
197:22
200:7 230:5
**takes** 25:25
141:9
153:22
195:2,19
196:4,11
207:11
218:14
221:9
229:24
**talk** 51:17
54:16 77:24
141:10
**talked** 54:14
61:3 227:2
**talking** 16:22
53:5 54:10
54:11,19
80:4,7
135:19,20
202:14
203:6 206:2
206:3,5
227:9
232:19
238:7
**tallied** 50:6
50:22
**TAMI** 1:19
2:9 244:7

**tap** 133:18,21
**task** 99:9
**tax** 61:18
**teach** 107:12
**teaches**
　107:19
**team** 9:10
　29:12 47:7
　47:10
　124:23
　126:21,23
　129:23
　167:11
　192:23
　217:4,5,6
　219:21
**teams** 121:24
　122:2,3
　126:19,20
　128:7,12,19
　128:22
　129:2,10
　132:18
**technology**
　232:2 233:7
**tell** 23:8 28:3
　31:5 34:3
　37:25 42:7
　48:6 57:6
　69:17 80:18
　103:14,23
　103:25,25
　104:7
　105:19
　107:13
　112:4
　142:20
　155:24
　193:10
　195:10
　202:19
　219:25
　221:14,18
　222:19
　230:10
　235:25
**telling** 205:20

205:24
209:15
**ten** 105:24
194:13
**terms** 35:18
48:9 61:17
121:23
129:10
132:23
134:16,22
138:11
165:3
205:25
238:6,13
**testified** 7:17
27:7 42:16
67:10 78:11
103:3
122:23
123:3,9
128:17
141:4 148:6
168:2 169:6
170:23
171:2,3
222:22
**testify** 91:2
170:15
**testifying**
56:7
**testimony**
21:3 146:23
160:22
170:8
244:14
**thank** 7:23
8:6,13
12:22 16:10
32:5 36:25
37:3,24
54:10 73:2
113:14
116:5
143:17
146:9
149:24
158:3 181:6

182:24
231:7
**thing** 65:24
91:14 92:3
177:23
214:5 233:6
**things** 11:23
22:3 34:17
38:6 39:17
39:20 40:19
59:20 66:10
84:17 86:24
88:8 120:5
129:19
157:12
164:21
169:15
172:9
173:21,25
189:13
192:8 195:3
204:7
205:12,14
206:23
207:4
220:12
222:17
223:2,7,11
223:11,14
229:16
230:25
233:4
234:23
235:8,16
236:12
**think** 10:17
12:14 15:5
15:13 16:9
20:5 31:22
31:23 34:16
38:7,12,13
39:15 51:22
56:10,13
64:17,22
66:9 69:20
69:23 83:6

83:11,22,22
84:20 85:5
85:8,16,19
87:2 91:25
92:14,18
105:24
106:8
110:13
118:25
127:4
134:14
135:19
137:7
139:21
140:25
141:9
149:12
155:4,7,11
155:17,18
159:5,16,20
162:3,5,5
162:15
163:7,12,17
165:10
166:20
167:12
168:2,13
169:12
170:23
172:5,6,11
173:25
174:21
176:15
177:16
179:24
180:2
188:17
191:16,19
192:12
193:20
198:17,18
201:22
203:24
205:6
207:15
208:5,6,8
209:8

213:17,18
217:18
218:23
219:18
220:9,10
225:7,17
226:15
227:11,12
228:4
230:16,22
231:2,14
235:7,8,9
237:6,22
243:2
**thinking** 16:8
16:12,13
18:5 26:11
27:13,17
198:24
**thinks** 77:20
**third** 25:5
**thirty** 246:13
**thought** 14:7
15:13 17:2
17:23 18:14
20:20 28:6
31:25 32:9
32:15,18,20
33:4,5
56:16 65:13
67:10,20
68:16 78:10
93:12
137:20,22
139:23
143:6 146:7
177:11,19
179:11,21
179:25
187:4
194:23
209:17
232:22
**thoughts**
27:24 116:3
**thousand**
46:25

**threats**
229:15
**three** 16:14
25:3,6 71:5
101:2,3
106:2,15
110:7 111:9
111:11,12
111:22,25
112:13,17
115:19
117:9 118:3
118:4
121:24
124:25
164:19
215:10
218:16
225:15
226:4 228:5
**three-a-day**
112:10
**three-year**
223:20
225:9
**till** 28:21
106:20
**time** 6:10
8:23 9:13
9:21 10:9
10:12,14,18
12:23 13:7
13:8,15
15:8,11
16:19 20:6
23:15,18
24:6,10,17
27:20 28:13
28:14,16,21
29:2 31:13
32:10 34:19
34:21 36:17
38:19,24
41:9 47:2
51:24 54:4
55:2 57:16
58:17 62:13

66:22 69:10
69:16,16
70:23 72:24
76:19 87:9
94:19 95:24
97:13,14
102:7,16,21
102:25
109:14
111:8
115:10,11
117:6 120:8
121:4
124:12
141:10,11
142:3,7,18
143:8 146:5
147:10
148:3
153:22
154:22
155:5
157:19,22
163:2
164:25
170:9
174:24
187:18,21
190:9 195:2
195:19,25
196:4 201:4
201:8,25
202:18
204:7
205:12,14
205:15
206:10,23
208:6,8
210:17
213:11
216:7
217:12
221:10,11
221:13,17
223:14,21
225:9
228:17

229:2 236:6
237:11
243:3,7
**timeframe**
142:4
**times** 28:4
94:18
103:11,14
103:15,23
201:6 207:3
221:3,20,21
221:24
222:3 228:3
228:3,8,9
**timing** 47:18
218:12,13
218:17
**title** 53:15
**today** 79:16
79:17 80:15
191:12
227:6
**told** 58:11
64:18,24
65:24 77:3
77:4,12
80:23
106:17
107:8,9
108:25
200:15,18
200:25
221:19
239:22
**tomorrow**
131:25
**top** 71:11
118:2
**topic** 36:19
**topics** 36:21
**top-flight**
190:16
192:17
**total** 16:14
26:8 27:10
46:24 65:20
66:19 90:21

92:10,12,15
96:4 109:5
112:24
121:25
194:14
207:23
**totality** 135:5
135:16
137:11
138:23
**train** 192:13
**trained** 47:12
189:11
192:18
**training**
111:3,14
112:11
169:14,20
175:22
176:22,23
176:24
188:23
**transcript**
195:22
246:14,15
**transferred**
224:25
240:23
**treated** 135:9
135:13
**trial** 6:10
**trickle** 218:18
218:19
**tried** 93:12
103:24
174:24
196:3
**trouble** 8:9
94:5 113:10
**true** 28:20
86:18,21
122:6,12
167:6 169:6
170:2
244:13
**trust** 4:18
12:4 54:11

83:17,23
92:24
155:12,25
156:4
157:12,13
212:14
237:14,15
**trustee** 4:11
4:19 5:6
43:17 45:2
226:22
**trustees** 8:18
8:25 9:19
9:22 17:8
17:10,24
18:10 20:5
29:12 33:18
35:3,4,16
36:5 37:10
38:5 40:3
42:21 47:25
51:13 54:12
55:8 59:5
69:12 70:11
72:3,5,21
81:16 82:2
82:5,20
83:8,25
84:6,16,22
85:25 86:7
87:8 89:8
115:17,18
145:14
146:12
149:21
167:10,16
167:23
168:3
176:19
185:23
192:16,23
193:3
194:10
209:20
210:2,13
214:11
215:7

216:18,20
217:16
228:14,17
229:9,14
242:10
**trusts** 71:23
71:25 83:14
83:24 150:4
150:6
153:17
155:6,7
156:6,13,17
157:15
234:4,4
**trust-by-tr...**
157:10
**try** 87:21
138:3
164:10
174:4 176:6
191:9 226:2
**trying** 31:19
38:19 39:19
73:15 85:21
104:9,13
107:14,17
110:6 119:2
120:12
126:7,8,12
129:20
135:15
152:19
165:17
168:15
172:4
174:16
184:9,9
204:8
205:19
206:16
213:20
227:20
**turn** 98:20,21
142:3
145:12
148:14
220:21

**Turning**
178:11
**two** 8:20,22
11:22 16:14
23:7 24:11
33:14 36:16
36:19 41:13
43:12 44:8
46:8,12
47:5 52:20
71:4 73:22
74:10 75:6
79:12 89:16
89:17,18
90:2 92:25
109:9
124:17
129:19
137:12,17
137:18,21
138:5 149:4
149:9
158:25
159:6 160:7
163:3,4,17
164:17,19
173:2,3
176:5
190:24
191:11,12
192:13
195:22
196:15,16
220:25
230:9 231:5
231:6 233:3
234:22,24
**type** 80:24
81:2 176:22
176:23,24
177:14
185:13
190:13
**types** 26:3
136:19
144:17
189:12

195:13
200:6 207:8
207:12
222:16
225:25
230:19
**typical**
223:22,25
224:3,10
225:5,10,12
225:12,20
225:24
226:11,18
227:19
235:17
**typically**
105:23,23
108:25
164:9
167:15
189:9

**U**

**umbrella**
169:2,10
**Um-hum**
19:3 37:6
43:6 49:19
51:11,14
56:8 60:20
69:19 91:11
132:6
145:11
151:17,20
155:21
178:20
183:15
185:9 203:9
205:11
227:4
**unable**
103:12
105:15
124:11
**uncertainties**
231:14,16
233:5,19
**unclear**

117:19
**underlying**
146:12
**understand**
9:8,25 11:5
11:15 16:4
20:6 51:23
73:16 85:22
95:10,16
97:11
107:15,18
120:15,19
121:10
125:5
126:10
128:24
129:21
131:9
137:19
144:4
152:11
153:12
155:18
165:17
166:17
172:4
176:24
178:22
179:19,23
180:6 181:9
181:10
184:24
197:11
205:10,19
206:16,17
207:12,21
213:17,20
226:15
227:18,21
236:10
241:5
242:15
**understand...**
8:24 9:9
25:12 43:22
47:18 60:9
60:11,12

61:11 91:18
97:9 112:18
146:2
164:15
179:5,6
181:17
183:7
199:20
228:22
237:9
**understate**
27:23
**understood**
14:23 22:18
23:13
134:25
**undertaking**
124:6
**undervalue**
216:14
**underwriter**
117:8,22,24
118:3,5
124:20,21
158:11
187:22
188:8,10
**underwriters**
117:12
**underwriting**
94:3 121:18
121:21
164:7,8
165:4,7,13
166:12
**unfortunat...**
224:4
**unique**
121:22
**UNITED** 1:2
**unnecessary**
119:14
210:23
**unrealistic**
198:6,15,23
**unreviewable**
219:7

**up-front**
70:22
**use** 9:23 12:9
13:11 27:8
29:14,17
34:4 36:22
50:11 58:25
59:2,5,15
75:20 88:18
99:17
158:24
162:6,8
209:3
210:18
**usually**
206:12
**U.S** 5:5

**V**

**variability**
72:18
**variables**
155:13
214:7
**varies** 229:5
**various** 36:16
**vendors**
130:15,23
131:4
173:18
**verify** 77:2
238:9
**version** 92:8
**versus** 36:23
148:19
166:24
213:13
234:21
**view** 30:18
39:6,8
136:8
141:14
**violating**
119:7
121:12
123:7 124:5
**visit** 60:7
**visited** 52:10

52:17
**voice** 86:21
**volume** 221:7
221:8
**volunteers**
61:16

**W**

**wait** 74:17
78:17
170:10,10
**waiting**
115:24
220:21
**waived** 6:6
**want** 10:3
14:10 27:3
27:8,19,22
29:9 69:25
72:21 76:18
83:8 87:3,8
102:10
106:6
109:22
110:17
116:9,15,17
117:4
119:10
123:25
130:10,10
142:17
146:10
147:3 166:3
168:3 178:7
180:23
181:25
190:19
191:4 194:2
195:4 204:2
212:3
216:13
218:15
222:24
226:13
235:6
**wanted** 20:5
60:2 106:7
133:20,23

134:11
161:10
170:6 196:5
213:7
**wants** 25:2
**warm** 52:14
52:16
**warranties**
40:18 42:3
46:21 48:4
140:9
176:25
179:2
181:21
192:7
223:24
231:22,25
233:8
236:20
237:10
**wasn't** 17:13
33:24 69:9
78:13 79:16
88:4 110:13
160:2
193:25
212:9,25
213:4
236:23
**waste** 142:17
**watching**
110:23
**way** 9:11 22:3
30:8 61:7
62:8,14,23
63:11 84:7
84:9 113:23
115:13
119:9,20
122:12
131:12,13
144:4,10
152:19
159:22
167:19,21
170:21
172:11

| | | | | | |
|---|---|---|---|---|---|
| 197:5 206:9 | 242:15,15 | 143:20 | 185:13 | **works** 115:15 | 150:14 |
| 225:18 | **we've** 20:15 | 147:9 166:2 | 209:11 | **worried** | 152:18 |
| 227:16 | 88:11,21 | 180:24 | 226:21 | 137:7,8 | 171:2,6,22 |
| 235:9 | 119:24 | 181:5 | 239:6,8 | **worry** 46:3 | 194:9 |
| 244:18 | 123:2 130:6 | 182:15 | **workable** | **wouldn't** | 232:24 |
| **ways** 13:9 | 165:10 | 183:2 | 114:17 | 36:10 82:8 | **year** 52:19 |
| **weaknesses** | 166:7 | 205:22 | **workdays** | 86:10,20,21 | 99:14 |
| 173:17 | 173:22 | 207:2 | 100:14 | 112:8 | 100:13,14 |
| **Wednesday** | **whatnot** | 244:10,14 | **worked** 35:5 | 161:13 | 110:9 |
| 120:4 | 168:17 | 244:20 | 35:6 40:6 | 162:4 168:8 | 112:25 |
| **week** 208:24 | **wheels** | 245:3 246:1 | 43:18 44:5 | 175:14 | 189:17,20 |
| **weeks** 79:12 | 111:15 | 247:23 | 44:6,7,8,9 | 188:14,15 | 189:24 |
| **WEITNAU...** | **WHEREOF** | **witness's** 21:3 | 45:11 61:22 | 209:14 | **years** 8:21,22 |
| 4:24 | 244:20 | **woman** 45:14 | 62:11 63:5 | 227:22 | 15:13 23:7 |
| **well-known** | **William** 4:8 | **wondering** | 86:7 89:25 | **write** 18:6 | 24:12 32:10 |
| 104:22 | 7:9 245:18 | 227:17 | 94:17 | **writing** | 36:17,20 |
| 108:16 | **willing** | **word** 27:22 | 103:10 | 133:16 | 41:13,21 |
| **well-posed** | 160:11,17 | 58:24 59:6 | 110:11,19 | **written** 122:8 | 46:8,12 |
| 126:22 | 160:19 | 59:7 190:23 | 111:6,13 | 122:10 | 47:5 52:21 |
| **went** 27:24 | 161:8,25 | 191:4 225:4 | 118:19,20 | 133:11,19 | 73:23 74:11 |
| 48:18 51:21 | 162:4,6,7,9 | **words** 14:17 | 118:21 | 183:6 | 75:7 90:3,7 |
| 59:18,19 | 168:18 | 27:8 91:17 | 168:7 | **wrong** 20:25 | 94:2 98:25 |
| 159:13,15 | 173:15 | 133:15 | 169:23,24 | 21:5 132:10 | 98:25 |
| 159:16,19 | **WILLKIE** | 139:7 | 175:19 | 140:12 | 154:23 |
| 177:8 | 3:7 | 154:21 | 187:16 | 144:21 | 163:4 |
| 195:21 | **Wilmington** | 211:15 | 189:21 | 159:14,16 | 164:19,19 |
| **weren't** 65:25 | 4:18 | 234:14,18 | 219:19 | 159:17 | 190:24 |
| 77:25 104:5 | **window** | **work** 9:10 | 235:11 | **wrote** 39:15 | 191:12 |
| 140:15 | 109:14,15 | 17:4 40:22 | **working** | 97:22 | 198:12 |
| 164:24 | **wish** 247:5 | 41:2 42:14 | 12:25 40:7 | 203:18 | 215:10 |
| 168:23 | **withdrawn** | 42:14 66:3 | 47:8 56:4 | 208:22 | 218:16 |
| 175:13 | 30:17 | 69:24 70:11 | 67:14,24 | | 220:25 |
| 227:25 | 126:22 | 70:20 75:15 | 70:8,16 | **——— X ———** | 225:15 |
| 230:21 | 148:24 | 78:8 79:4 | 71:9 74:11 | **X** 245:2 | 226:4 228:5 |
| **West** 4:22 5:7 | **witness** 4:4 | 83:8 84:15 | 75:7 84:7,9 | | 230:9 231:5 |
| **we'll** 11:13 | 7:2,15 | 85:9,12,14 | 86:13 87:15 | **——— Y ———** | 231:6 |
| 181:2 | 16:23 21:17 | 85:17,25 | 97:12,15 | **yeah** 10:17 | 234:22,25 |
| **we're** 16:21 | 21:20 22:4 | 87:8 93:12 | 99:14 122:2 | 16:23 21:11 | **York** 1:3,13 |
| 21:24 54:19 | 56:13 66:7 | 93:13 | 160:9 | 28:2 44:12 | 1:13 2:8,9 |
| 75:22 83:6 | 73:2 74:20 | 117:11,22 | 166:12 | 48:8 53:7 | 2:11 3:9,9 |
| 120:6,16 | 76:13 78:16 | 141:10 | 173:23 | 63:9 83:21 | 4:7,7 244:3 |
| 142:24 | 87:4 101:13 | 152:15 | 175:23 | 97:6 107:19 | 244:5,9 |
| 143:11 | 124:8,10 | 161:8,13 | 187:19 | 113:7 | |
| 165:12 | 127:10 | 162:16,22 | 188:12 | 125:11,14 | **——— Z ———** |
| 182:13 | 133:17 | 164:6 168:9 | 200:2 | 127:3 128:6 | **zero** 39:2 |
| 213:19 | 141:4 143:7 | 171:23 | 219:14 | 139:21 | 189:22 |
| 233:25 | 143:9,18,19 | 176:6,6 | 229:24 | 144:10 | |
| | | | | 148:16 | **——— $ ———** |

**$300** 176:14
177:7

**0**

**02110-2131**
4:14
**08-13555** 1:7

**1**

**1** 7:4,25 37:5
115:25
149:6,6,14
151:8 223:4
245:14
**1.a.iii** 37:11
**1:05** 147:10
**1:36** 148:3
**10** 108:25
110:6 143:3
143:15
144:15,16
195:5
**10th** 120:4
**10:05** 2:4
**100** 4:13 96:9
157:4,5,16
178:9
**10004** 4:7
**10019-6099**
3:9
**1099** 58:8
94:22 95:8
95:8,12,16
96:2
**1099s** 96:7
**11** 1:5 115:8
**110** 114:22
**111** 5:7
**12** 58:13,20
142:20,25
**1201** 4:22
**13** 106:25
107:13
**14** 7:5 141:19
245:15
**14,000** 128:14
**149,000** 26:15
**15** 178:16

**156** 245:10
**157,000**
150:24
151:15
**157,218** 149:5
154:3
**158** 245:10
**16** 183:14
**161,000**
154:12
**161,797**
150:15,19
**167,000** 226:3
**169** 148:17
**169,611,453**
148:19
**18** 39:23
51:10
219:12
220:24,24
220:24
221:2
223:16,24
225:12,22
228:2
**180** 126:5
**1999** 3:19

**2**

**2** 7:8 113:9
113:11
149:5,7
150:2,13,14
150:14
245:17
**2,000** 124:23
125:18
126:2,24
145:13,21
**20** 12:25 13:2
58:11,16
60:22 61:12
62:18 65:16
66:19,19,25
77:15 97:12
97:14 109:2
157:4
187:21

188:8,19,19
188:20,21
189:18
190:2
219:12,16
221:2
223:16,25
225:13,22
228:2
**200** 49:6
72:13
**200,000** 72:13
226:3,3
**200,000-so...**
81:11
**2008** 212:21
212:22,25
214:23
**2009** 213:3,4
**2012** 215:5
**2013** 213:6
**2014** 1:14 2:3
7:6,9,12
14:4 20:10
27:18 29:22
31:6,18,21
33:16
141:19
150:8,21
243:14
244:22
245:16,18
245:20
**209** 151:21
**209,000** 151:7
151:9
**209,395** 149:6
149:14,19
149:23
153:8
**21** 215:6
**21st** 14:4
**213,974**
149:15,23
150:3
**219** 148:18
**219,315,775**

148:19
**23** 76:24
98:20,21
99:4 209:19
**24** 114:6
**25** 112:22
**251** 100:13
**255** 156:13,17
**28** 194:6,11
**29** 176:10,13

**3**

**3** 7:9,11,12
37:4 145:8
245:18,19
245:20
**3:45** 243:7
**30** 126:5
194:6 221:3
228:3,3,7,8
246:14
**300** 178:6
**30309-3424**
4:23
**3150** 3:19
**34** 197:24
**34,585** 141:20
**36918** 1:20

**4**

**4** 145:2,3,6
148:14,15
**4,579** 96:18
96:21
149:22,22
219:11
**40** 57:24
58:11,19
60:3 63:24
64:19 65:10
65:16,17,19
65:19,20
66:4,12,20
67:5 77:13
77:18,21
80:3 100:20
101:10,24
102:6,15,21

102:24
103:4,9,22
104:2 106:9
107:7
108:22
109:18
127:6,15,20
194:13
195:8 196:8
221:3 228:3
228:3,8,8
**416** 152:21
**416,091** 150:5
150:5
**43** 38:11
224:6,18
225:2 226:8
**45** 195:8
196:8
**45,758** 141:20
**465** 109:21

**5**

**5** 1:14 2:3
39:21 98:25
149:7
150:15
206:4,7
**5,000** 25:9
210:6
211:20
215:17
218:22
221:5,11
225:21
226:2 227:9
227:12
228:2
**50** 106:9
125:24
126:2
127:15
**50,000** 152:5
152:13
154:17
**500** 96:14
218:22
227:9,12

**57** 124:22
125:16,24
126:25
127:6,14

**6**

**6** 39:24
116:14
117:7
124:16
**6th** 244:21
**60** 37:13 38:6
38:8,14
63:24 64:5
64:15,17,23
64:23,25
65:3,6
106:9
**60-day** 38:3
**60603-4080**
5:8

**7**

**7** 98:25 116:8
116:17
245:4,16,18
245:20
**7,000** 158:12
**700** 92:9,13
92:15 95:17
95:18,20,22
96:6
**75** 111:19
112:6
**787** 3:8

**8**

**8** 58:13
114:20
130:10,13
**8,000** 122:4
**80202** 3:20

**9**

**9** 130:13
142:19,25
143:21
145:10

**<u>Exhibit C</u>**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Lehman Brothers Holdings Inc., et al.,<br><br>Debtors. | Case No. 1:08-bk-13555 (SCC) |

## Declaration of Craig Pino

## December 3, 2014

## I.    QUALIFICATIONS

I am the President of Recovco Mortgage Management and am responsible for the management of the operations of mortgage underwriting, forensic loan file review, quality control, and appraisal review. I have over twenty-three years of experience in management of mortgage companies including operational and financial management. My experience includes building and managing teams of forensic underwriters in support of forensic mortgage reviews. My resume is attached as Appendix A.

## II.    ASSIGNMENT

I have been asked by Willkie Farr & Gallagher LLP, counsel for Lehman Brothers Holdings, Inc. ("LBHI" or the "Plan Administrator"), to express my opinions regarding the timing and cost of the protocol proposed by LBHI in its October 15, 2014 cross-motion ("Protocol").

In preparing this declaration I have reviewed information from a number of sources as detailed in Appendix B. In addition, I have applied my knowledge and expertise gained through my twenty-three years in the mortgage industry. In this time, I have overseen 10 forensic mortgage reviews with an aggregate outstanding principal balance of at least $1 billion; 5 of those 10 reviews have had an aggregate outstanding principal balance of at least $5 billion. My work in this matter is ongoing, and I reserve the right to supplement this declaration as new information becomes available or if asked by counsel to consider additional issues.

For my work in this matter, I am being compensated at my standard consulting rate of $300 per hour. My compensation is in no way contingent or based upon the content of my opinions or the outcome of this matter.

## III.    SUMMARY OF OPINIONS

Steps 0 through 4 of the Protocol (described below) should take approximately one year in the aggregate and cost approximately $110 million in the aggregate,[1] which is inclusive of $70 million in costs to the RMBS Trustees and $40 million in costs to LBHI. These cost projections include the cost of both the RMBS Trustees and LBHI's review and reconciliation of the claims, from the beginning of the claim file review process in Step 0 through completion of the reconciliation process before a group of Claim Facilitators in Step 4. These costs do not include attorneys fees incurred in supervising the aforementioned review, if needed, or any costs that may be incurred in Step 5 of the Protocol, which requires resolution of a small number of remaining loan files following the conclusion of Step 4. These time and cost figures are consistent with the resources available in our industry for loan review and claim reconciliation, and would not overburden, tax or require diversion of unreasonable human capital from our industry. These figures are both reasonable for the size of the project and consistent with the size, timing and costs I have observed in prior forensic mortgage reviews.

---

[1]    I have not projected the time and cost of Step 5, which is the resolution of remaining loan files and may require determination by the Court. However, based on my projections for each of Steps 0 through 4, it is my opinion, as detailed in Part IV(G) below, that a total of 50 to 70 loan files would remain after Step 4.

## IV.      SUMMARY OF THE PROPOSED PROTOCOL

The Protocol consists of a series of steps that provide for the review and reconciliation of claims related to the mortgage loans underlying the dispute between LBHI and the RMBS Trustees.[2]  Exhibit A to this declaration is a quantitative analysis of each step, which this declaration describes in detail.  The numbers projected in Exhibit A have been chosen based on one reasonable set of assumptions with respect to the number of reviewers that both the RMBS Trustees and the Plan Administrator could employ to carry out their respective reviews.  Considering the volume of review firms in our industry, and as demonstrated in Exhibit B to this declaration, more reviewers could be employed, with the effect of reducing the time that Steps 1 and 2 take to complete.  As Exhibit B reveals, the number of reviewers is directly determinative of how long the Protocol would take to implement.

In summary, the steps comprise the following process:

Step 0:  Sets out a rolling time frame pursuant to which the RMBS Trustees gather loan files before turning them over for claim reconciliation to the Plan Administrator.

Step 1:  Sets out the number of RMBS Trustees reviewers and the time that these reviewers would take to review and turn over to the Plan Administrator the loan files for which they contend that LBHI has liability.

Step 2:  Sets out the number of Plan Administrator reviewers and the time that these reviewers would take to review the loan files with potential claims which the RMBS Trustees turned over in Steps 0 and 1.

Step 3:  Estimates the percentage of claim files over which disputes are expected, sets out the number of Claim Negotiators needed to review disputed files and sets out the amount of time that such negotiations between the RMBS Trustees and the Plan Administrator would take.

Step 4:  Sets out a claims facilitation process for the claim files that remain in dispute between the RMBS Trustees and the Plan Administrator following the conclusion of Step 3.

Step 5:  Will require the resolution of a small number of remaining claims following the conclusion of Step 4.

## V.      STEP-BY-STEP ANALYSIS OF THE PROTOCOL

A.    Step 0:

Step 0 of the Protocol involves the receipt of loan files by the RMBS Trustees from the primary servicers.  It presumes that the RMBS Trustees will have approximately 50,000

---

[2]      I have adopted the same step numbers used by Dr. Charles Parekh (in the RMBS Trustees' November 14, 2014 submission) for each phase of the Protocol.

files to review on day one of the Protocol, and that the RMBS Trustees will receive rolling deliveries of the remaining loan files within 5 months of the Protocol's implementation.[3]

B.    Step 1:

This step, which occurs concurrently with Step 0, projects the number of RMBS Trustee reviewers that could review the remaining loan files at issue and the time it would take these reviewers to complete their review.  Assuming the RMBS Trustees used 465 underwriters,[4] of which 90%, or 419 are working each business day, and that each underwriter is able to complete 3 loan reviews each day worked, it would take about six months for the RMBS Trustees to complete the review of the remaining 157,218 loans.[5]  It is assumed the RMBS Trustees will present claims on 57% of the reviewed loans.[6]

C.    Step 2:

This step projects the number of Plan Administrator reviewers that could review the files that the RMBS Trustees submit to the Plan Administrator with alleged claims and the time it would take these reviewers to complete their review.  Assuming that the RMBS Trustees will present claims on 57% of the loans reviewed, a total of 92,226 loans will be presented. Assuming the Plan Administrator employs 272 underwriters, of which approximately 90%, or 245 are working each business day,[7] and that each underwriter is able to complete 3 loan reviews

---

[3]      I understand from LBHI that LBHI's affiliate Aurora Loan Services has approximately 50,000 loan files of the 157,218 outstanding loans available for the RMBS Trustees' immediate review.  I also understand that Aurora's collection of these 50,000 files began around November 10, 2014.  On this time frame, it is reasonable to assume that the other primary servicers could gather and turn over their respective loan files within 5 months from implementation of the Protocol.

[4]      I have projected this number of reviewers (also assumed in Exhibit A, Step 0) based on my experience, the number of reviewers that would be needed for a project of this size and information provided on Digital Risk's website, such as Digital Risk's statement that in 2013 (the latest information available) Digital Risk employed 1,956 persons and has completed over $1.7 trillion of due diligence quality control reviews (assuming an average loan size of $200,000).  Additionally, Digital Risk could enter into arrangements with other forensic review firms to expand its capacity, if necessary.  There are thousands of underwriters who have experience performing forensic reviews and who work for more than a dozen vendors in the mortgage industry that are engaged in the business of performing forensic reviews.  These firms include, in addition to Digital Risk and Recovco, Opus Capital Markets, Quatrro, Barrent Group, Clayton, Core Logic and JCIII; each of these firms has significant experience performing forensic reviews.  The review encompassed by the Protocol will not burden the mortgage industry.

[5]      I assume that because Digital Risk has already reviewed the RMBS Trustees' sample loan population of 4,579 loans, these would not have to be re-reviewed in Step 1 of the Protocol.

[6]      I have conservatively applied the RMBS Trustees' suggested breach rate in making our calculations.  For the avoidance of doubt, I have not been asked to opine on the accuracy of the RMBS Trustees' breach rate or to offer an alternative breach rate.

[7]      Because the Plan Administrator has fewer loans to review than the RMBS Trustees (the Plan Administrator would only review 57% of the set of loans, in accordance with the RMBS Trustees' projected breach rate), I have assumed a smaller number of reviewers for the Plan Administrator's review in Step 2, which remains consistent with being able to review the claim files at issue in an efficient, expeditious manner.

for each day worked, it would take about six months for the Plan Administrator to complete the review of the 92,226 presented claims. These reviews would be performed on a rolling basis so that as the RMBS Trustees' underwriters complete and present claims, the Plan Administrator can immediately review such claims to determine if they should be accepted or denied.

With these figures in mind, the approximate amount of time needed for the large majority of loans (97.5%)[8] to be worked from Step 0 through Step 2 (from receipt and review of the loan files by the RMBS Trustees through receipt and review of the loan files by the Plan Administrator) should be seven months. This time frame allows time for files to be forwarded from servicers to the RMBS Trustees, and then from the RMBS Trustees to the Plan Administrator, all on a rolling basis as work is concurrently performed. Only a small number of loans – those that servicers did not deliver timely to the RMBS Trustees (approximately 2.5% based on our prior projects) – would not be have been worked through Steps 0, 1 and 2 after seven months.

Assuming the Plan Administrator agrees with 50% of the claims presented by the RMBS Trustees, the Plan Administrator would deny 46,113 claims.[9] Of the 46,113 claims denied by the Plan Administrator, an estimated 50% of the denials or 23,057 claims denials would be for incontestable reasons, and consequently not subject to further adjudication.[10] For example, for document defect claims (where loan file documents such as a HUD 1 Settlement Statement are allegedly missing or where an appraisal is allegedly missing), it is my view based on prior experience, that the Plan Administrator will be able to locate many of the documents asserted missing. Location of such missing documents by the Plan Administrator would resolve such missing document claims in an incontestable manner, thereby making further adjudication unnecessary.

While locating allegedly missing documents should be a significant source of incontestable Plan Administrator denials, there are other examples of incontestable denials. For instance, I expect that some claims of allegedly undisclosed liabilities will be found by the Plan Administrator as a result of name confusion. An example of this would be where a mortgage asserted by the RMBS Trustees to have an undisclosed debt of a borrower is discovered to instead be the longstanding loan on the home of the borrower's father, which would not give rise to a claim on the loan.

It is an improper inflating of the effort needed to resolve the RMBS Trustees' claims to not consider that a large number of claims will be denied by the Plan Administrator for an incontestable reason, and consequently will no longer be at controversy. Based on prior experience and review of Attachment V to Dr. Charles Parekh's August 21, 2014 declaration, it

---

[8]    Based on my experience, all loan files will not be provided to the RMBS Trustees for their review by the primary servicers; as a result, I project that in this case, this production turnover failure will represent approximately 2.5% of the outstanding loan population.

[9]    I have conservatively applied the RMBS Trustees' 50% dispute rate in this calculation.

[10]    A 50% denial rate for incontestable reasons is both consistent with my prior experience and reasonable based upon my review of the types of breaches presented in Digital Risk's review of the 2,600 loan sample.

is estimated that 50% of the claims denied by the Plan Administrator will be denied for an incontestable reason (such as required loan documentation asserted to be missing, in actuality being located). These claims, for the reasons stated above, will not require further adjudication. Given 50% of claims denied by the Plan Administrator will be for incontestable reasons,[11] the number of claims needing further adjudication will be 23,057 (not the 46,112 estimated by Dr. Parekh).

D.    Step 3:

This step of the Protocol involves negotiations between the RMBS Trustees and the Plan Administrator with regard to disputed claim files. In light of the projection that an estimated 50% of the claims denied by the Plan Administrator will be denied for incontestable reasons, negotiations through a Claim Negotiator would apply to 23,056 loan files. I believe that negotiation on the 23,05 loans will not, in a high number of cases, require negotiations on the loan-level. The reason for this is that the RMBS Trustees' claims on many these loans will be decided based on a standard handling method.

For example, where the RMBS Trustees are making claims based on insufficient title insurance, these claims are the same in every instance where there is not also a title defect. As a result, because the claims are very similar or even the same across every loan, a recovery decision can be made for the category as a whole and then applied consistently to all claims that contain insufficient title insurance. While there may be some exceptions and outliers, I believe that consistent rules and applications can be developed for the review.

This means that resolution of these claims can occur without determination by a Claims Facilitator or the Court. Assuming that the RMBS Trustees employ 8 Claim Negotiators, each negotiating 25 loans per day, it would take an estimated five to six months to complete negotiations of denied claims. It is assumed, based on prior experience, that negotiations will resolve 25% of the unresolved claims, requiring further adjudication by a Claim Facilitator on 17,292 loans.

E.    Step 4:

Step 4 of the Protocol involves the submission of remaining unresolved claims between the RMBS Trustees and the Plan Administrator to a Claim Facilitator. With respect to adjudication of the remaining 17,292 disputed loans, this set, too, will not, in a high number of cases, require dedicated hearings or "mini trials." The reason is that the RMBS Trustees' claims regarding many claim decisions in this step will also be decided, as in Step 3 above, based on a standard handling method.

For example, many of the RMBS Trustees' claims repeat from loan to loan. Based on my experience with claim reconciliation between adverse parties, it is estimated that 60% of the claims that either (i) are not accepted by the Plan Administrator, or (ii) are denied by

---

[11]    Based on prior experience, an estimated 25% of claims are factually wrong or cured through procurement of necessary documentation.

the Plan Administrator for an incontestable reason will be controlled by the Claims Facilitator's previous determinations.

Altogether, it is estimated that the 17,292 disputed loans in Step 4 will proceed as follows: (i) 40% of the loans, or 6,917 will be adjudicated by the Claims Facilitator, while (ii) the outcome of the remaining 60% or 10,375 loans will be resolved through the standard handling method. Assuming the Claims Facilitator has ten facilitators assigned to the case, and assuming each facilitator can adjudicate four loans per day, the Claims Facilitator will resolve the 6,917 loans in an approximate range of eight to nine months.[12]

Additionally, the Claims Facilitator would assign 10 assistant facilitators to ensure that the standard handling method was correctly applied to all loans where the RMBS Trustees made the same claim on multiple loans. Assuming these assistant facilitators could each resolve 15 loans per day, it is estimated that the 10 assistant facilitators will resolve the 10,375 loans in an approximate range of three to four months, which would run concurrently with the Claims Facilitator's eight to ninth month review period stated above.

F.    <u>Timing Summary for Steps 0 – 4</u>:

In total, Steps 0-2 will take an aggregate of approximately seven months, and Steps 3-4 will take an aggregate of approximately nine to ten months. Accounting for the overlap of these steps, Steps 0-4 will take approximately one year to complete.[13]

G.    <u>Step 5</u>:

Step 5 requires resolution of the remaining disputed claim files. The great majority of loan claims asserted by the RMBS Trustees will be determined by:

(i)    the Plan Administrator accepting the RMBS Trustees' position;
(ii)   the Plan Administrator finding an incontestable reason why the Trustees' claims should be denied;
(iii)  the Claim Facilitator consistently applying the law of the case; or
(iv)   the Claim Facilitator using sufficient resources to timely resolve the balance of loans requiring adjudication.

As a result, only a small number of loans – approximately 50 to 70 – will not be resolved by the conclusion of the Protocol and proceed to Step 5.

---

[12]    As discussed above, these projections of the number of Claim Facilitators working and the number of days worked (which are the same as projected in Steps 1 and 2) are based on my experience and my related projections of what would be a reasonable number of facilitators for a project of this size.

[13]    For this quantitative analysis, see the section entitled "Total Labor Years to Satisfy Protocol Steps 0-4" of Exhibit A.

-6-

## VI.    <u>CONCLUSION</u>

Steps 0 through 4 of the Protocol should take approximately 1 year in the aggregate and cost approximately $110 million. These figures are consistent with the resources available in our industry, on a step by step basis. In my experience, these figures are both reasonable for the size of the project and consistent with the size, timing and costs of prior forensic mortgage reviews that I have overseen.

Executed this ___3___ day of December, 2014.

_____
Craig Pino

**Appendix A**

**Craig S. Pino**
**2313 Ranch House Drive**
**Southlake, TX 76092**
**(631) 697-2977**

| **Mortgage Finance** | **Capital Markets** | **Treasury Operations** |
| --- | --- | --- |

Highly skilled Executive with over 23 years of experience in the mortgage finance industry. **Significant experience organizing and managing forensic underwriting review projects, assisting clients with RMBS litigation including assisting in developing scope and assembling teams, and managing loan review process.** Results –oriented leader with proven success in fast-paced fluid environments and a **track record of producing direct positive impact on bottom-line profitability**.

## Professional Experience

*Recovco Mortgage Management, LLC*
*President*                                                                  2010-Present

*Key Achievements*
- Built operational platform including three scalable operations centers
- Manage large-scale underwriting and loan file review engagements for major clients
- Assisting clients in developing loan review strategies around repurchase and litigation
- Develop and execute business strategy for underwriting and quality control reviews
- Use existing and new business contacts to enhance company performance and expand operations

*American Home Mortgage Servicing, Inc.*                  2008 – 2010
*Executive Vice President and Treasurer*

*Key Achievements:*
- Established Treasury/Finance department staffing, systems, policies, and reporting
- Developed liquidity and capital allocation budgets
- Managed Cashiering and Investor Accounting functions
- Increased Banking/Investment Banking relationships to the company
- Increasing financing facilities by over $2 billion dollars

- Lead company's efforts to lobby federal government to include servicing advances in TALF program, leading to significantly more liquidity at lower cost
- Lowered bank fees and increased float earnings to account for over $2 million pre-tax earnings per annum

*American Home Mortgage Investment Corp.*                              *2004 – 2008*
*Executive Vice President and Treasurer*

Served as Executive Vice President and Treasurer of $20 billion NYSE-traded mortgage REIT with $60+ billion of mortgage originations and $50 billion of mortgage servicing rights.   Responsible for financing $12 billion mortgage loan warehouse and $600 million mortgage servicing rights investment, investing $1.2 billion of custodial deposits, Accessed sub-debt, trust preferred, residual, and working capital financing markets. Managed banking and investment banking relationships, and oversaw a staff of approximately 45 employees.

*Key Achievements:*
- Increasing financing facilities by over $12 billion dollars in three years
- Lowered borrowing spreads by over 60 basis points through innovative funding products
- Established ALCO committee and liquidity committee
- Worked with Bank Regulators on acquisition of bank
- Reducing bank fees by over 45% per year
- Improving Treasury funding process to allow for 3 times more funding cycles per day

*Countrywide Home Loans, Inc*                                          *1996 – 2004*
*Executive Vice President and Assistant Treasurer*

Responsible for Treasury Funding, Cash Management, and Projects for the largest independent mortgage company and a recognized industry leader in the mortgage finance business with over $100 billion in assets.  Managed the funding of $15 billion of secured and unsecured commercial paper, $10+ billion of US and Euro Medium Term Notes, $5 billion of conduit financing, $5+ billion of short-term investments, bank relationship, daily cash management, and special projects.

*Key Achievements*:
- Developed liquidity and capital planning group
- Structured over $10 billion of secured financing facilities
- Responsible for implementation of FAS 133 for liability hedging
- Executed roughly $10 billion of medium term notes and related derivatives hedges
- Developed FAS133 tracking system for liability hedges

*North American Mortgage Company*                                      *1995 –1996*
*Treasury Manager*

- 3 -

*Arbor National Mortgage*                                           *1994 – 1995*
*Treasury Director*

*Margaretten and Company, Inc*                                     *1991 –1994*
*Cash Manager*

*Home Life Insurance Company*                                      *1987 – 1991*
*Senior Cash Management Analyst*

## Education

*Rutgers University*                                               *1984 – 1987*
*Major: Economics*

*California State at Channel Islands*                              *2001- 2003*
*Major: Accounting/Business Administration*

### Military Training

*US Army Infantry Officer Basic Course*                                *1990*

**Appendix B**

**Items Reviewed in Preparation of Report**

1. RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code (including the expert declarations and exhibits)

2. Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code, and (B) Cross-motion to establish a protocol to resolve claims filed by RMBS Trustees (including Exhibit C – the proposed Protocol).

3. The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review (including the expert report and exhibits)

4. Digital Risk's website.

# Exhibit A

**Exhibit A: Proof of Loss/Damages Analysis**

| Loan Files Within 255 Trusts at Issue | |
|---|---|
| Number of Covered Loans | 416,091 |
| Number of Covered Loans with Loss/Expected Loss | 161,797 |

| Trustees Review to Date and Remaining Loans for Review | |
|---|---|
| Loans Requested-to-Date | 5,000 |
| Loans Received and Reviewed | 4,579 |
| Number of Loans for Review | 157,218 |

| Step 0:  Receive Loans from Servicers | | |
|---|---|---|
| Years to Receive Loans from Servicer | 0.5 | 50,000 loans available on Day one of Review, Balance received on Rolling Basis Between 60 and 180 days |

| Step 1: RMBS Trustees Review of Remaining Loans | | | |
|---|---|---|---|
| | | 419 | Reviewers |
| | | 3 | Loans per Day (Each) |
| Years to Review Remaining Loans | 0.50 | 251 | Days per Year |
| Cost to Review Remaining Loans | $ 62,887,200 | 400 | Cost per Loan (Based on Range Estimate of $375-$425 per Loan) |

| Step 2: Plan Administrator Review of Repurchase Requests | | | |
|---|---|---|---|
| Number of Requests from Initial Sample | 2,612 | | |
| Number of Additional Requests Submitted | 89,614 | | Reflectes 57% of Parekh Assumed Breach Rate |
| Total Number of Loans Requested for Repurchase | 92,226 | | |
| | | 245 | Reviewers (Because Lehman's Review Populations Smaller than Trustees, Fewer number of Reviewers Required to Complete Review in Timeframe Similar to Trustee |
| Years for Plan Administrator to Review Requests | 0.50 | 3 | Loans per Day (Each) |
| | | 251 | Days per Year |
| Cost to Review Requests | $ 32,279,100 | 350 | Cost per Loan (Based on Range Estimate of $325 - $375 for Industry Pricing of Rebuttal Review) |
| Plan Administrator Agrees to Repurchase | 46,113 | 50% | Agreed to Repurchase |
| Plan Administrator Declines to Repurchase | 46,113 | 50% | Disagreed to Repurchase |
| Claims Denied for Incontestable Reasons | 23,057 | 50% | Claims Denied for Incontestable Reasons |
| Claims Requiring Negotiation | 23,057 | 50% | Claims Requiring Negotiation |

| Step 3: Parties Negotiate Declined Repurchase Requests | | | |
|---|---|---|---|
| | | 8 | Negotiators (2 per Trustee) |
| | | 25 | Loans Negotiated per Day |
| Years to Negotiate Declined Repurchase Requests | 0.46 | 251 | Days per Year |
| Negotiation Results in Resolution | 5,764 | 25% | Percentage Resolved |
| Cost to Negotiate Repurchase Requests | $ 4,426,848 | 600 | Hourly Rate of Negotiation (We have Assumed the Estimated Rate used by Parekh) |

| Step 4: Claims Facilitator Reviews Unresolved Repurchase Claims | | | |
|---|---|---|---|
| Loans Sent to Claims Facilitators | 17,292 | 75% | Percentage Unresolved after Negotiations |
| Loans Reviewed by Claims Facilitators | 6,917 | 40% | Percentage of Unresolved Loans Requiring Claims Facilitators |
| Loans Reviewed by Assistants Claims Facilitators | 10,375 | 60% | Percentage of Unresolved Loans Requiring Assistant Claims Facilitators |
| | | 10 | Claims Facilitators |
| | | 4 | Loans per Day |
| Years for Claims Facilitators to Review Requests | 0.69 | 251 | Days per Year |
| | $ | 500 | Hourly rate of Facilitators (We have Assumed the Estimated Rate used by Parekh for Facilitators) |
| | | 10 | Assistant Claims Facilitators |
| | | 15 | Loans per Day |
| Years for Assistant Claims Facilitators to Review Requests | 0.28 | 251 | Days per Year |
| | $ | 500 | Hourly rate of Assistant Facilitators (We have Assumed the Estimated Rate used by Parekh for Facilitators) |
| Claims Resolved by Claims Facilitators | 17,222 | 99.60% | Claims Resolved by Claims Facilitators |
| Cost for Claims Facilitator to Review Requestss | $ 6,916,950 | | |
| Cost for Assistant Claims Facilitator to Review Requests | $ 2,766,780 | | |

| Step 5: Court Reviews for Final Resolution | |
|---|---|
| Loans Sent to Court for Final Resolution | 70 |

**Total Labor Years Needed to Satisfy Protocol Steps 0 - 4**

| Step | Process | Duration | Start (Years) | End (Years) | |
|------|---------|----------|---------------|-------------|---|
| 0 | Receive Loan Files from Servicers | 0.50 | 0 | 0.50 | |
| 1 | Review Remaining Loans | 0.50 | 0 | 0.50 | |
| 2 | Plan Administrator Reviews Repurchase | 0.50 | 0.08 | 0.58 | Due to concurrent review, Step 2 would start 30 days after Step 1 |
| 3 | Trustee Negotiate Declined Request | 0.46 | 0.17 | 0.75 | Due to concurrent review, Step 3 would start 30 days after Step 2 |
| 4 | Assitant Claims Facilitator/Claims Failicit | 0.69 | 0.25 | 1.00 | Due to concurrent review, Step 4 would start 30 days after Step 3 |

**Cost Needed to Satisfy Protocol Steps 0 - 4**

| Step | Process | Cost | Cost Attributable to the Trustees | Costs Attributable to the Estate | |
|------|---------|------|-----------------------------------|----------------------------------|---|
| 1 | Review Remaining Loans | $ 62,887,200 | 62,887,20 | | 100% Cost Attributable to the Trustees |
| 2 | Plan Administrator Reviews Repurchase | $ 32,279,100 | | $ 32,279,100 | 100% Cost Attributable to the Estate |
| 3 | Trustee Negotiate Declined Request | $ 4,426,848 | 2,213,424 | $ 2,213,424 | 50% Cost Attributable to the Trustees and 50% the Estate |
| 4 a) | Claims Facilitator Reviews Unresolved Cl | 6,916,950 | 3,458,475 | $ 3,458,475 | Cost Attributable to the Trustees and 50% the Estate |
| 4 b) | Assistant Claims Facilitator Reviews Unre | 2,766,780 | 1,383,390 | $ 1,383,390 | 50% the Trustees and 50% the Estate |
| | Total Estimated Cost | $ 109,276,878 | 69,942,48 | $ 39,334,389 | Cost Attributable to the Trustees and 50% the Estate |

# Exhibit B

**Number and Composition of Teams Needed to Perform Forensic Reviews on 2000, 4000, 6000, 8000, 10,000, 12,000 and 14,000 Loan Files Per Month**

| | Recovco's Exisiting Lehman Team | Reassignment of a Second Recovco Team to Lehman Project | Reassignment of a Third Recovco Team to Lehman Project | Development of a Fourth Recovco Team for Lehman Project | Access to a Fifth Team Through Recovco's Capacity Sharing Agreements | Access to a Sixth Team Through Recovco's Capacity Sharing Agreements | Access to a Seventh Team Through Recovco's Capacity Sharing Agreements |
|---|---|---|---|---|---|---|---|
| Capacity in Loans per Month | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Managers | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Underwriters | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Senior Reviewers | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Forensic Researchers (data handling) | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Additional Support Staff | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Total Personnel for 2000 Loans / Month | 57 | 57 | 57 | 57 | 57 | 57 | 57 |

**Number of Months Needed to Perform Forensic Reviews on 150,000 Loan Files Showing Number of Teams and Required Personnel by Type of Staff Member**

| Forensic File Reviews Completed Each Month | Number of Months Needed to Review 150,000 Files | Number of Years Needed to Review 150,000 Files | Number of Teams Working on Files | Total Number of Personnel Working on Forensic Reviews | Number of Managers | Number of Underwriters | Number of Senior Reviewers | Number of Forensic Researchers (Data Handling) | Number of Additional Support Staff |
|---|---|---|---|---|---|---|---|---|---|
| 2,000 | 75.0 | 6.3 | 1 | 57 | 4 | 33 | 11 | 6 | 3 |
| 4,000 | 37.5 | 3.1 | 2 | 114 | 8 | 66 | 22 | 12 | 6 |
| 6,000 | 25.0 | 2.1 | 3 | 171 | 12 | 99 | 33 | 18 | 9 |
| 8,000 | 18.8 | 1.6 | 4 | 228 | 16 | 132 | 44 | 24 | 12 |
| 10,000 | 15.0 | 1.3 | 5 | 285 | 20 | 165 | 55 | 30 | 15 |
| 12,000 | 12.5 | 1.0 | 6 | 342 | 24 | 198 | 66 | 36 | 18 |
| 14,000 | 10.7 | 0.9 | 7 | 399 | 28 | 231 | 77 | 42 | 21 |

**Exhibit D**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re: | Case No. 1:08-bk-13555 (SCC) |
|---|---|
| Lehman Brothers Holdings Inc., et al., | |
| Debtors. | |

## Declaration of William Alread

## December 3, 2014

## I.    <u>QUALIFICATIONS</u>

I have worked in the mortgage industry for 30 years, and have either performed or directly supervised the due diligence and/or underwriting of residential mortgage loans throughout that time.  I spent my early career at First Mortgage Strategies Group, Inc., where I focused on mortgage loan due diligence and transaction management in connection with the Resolution Trust Corporation ("RTC") liquidation.  I then spent seven years at First Tennessee Capital Assets Corp., where I was the senior executive in charge of contract finance and underwriting on various fixed-income investments, including residential mortgage loans.  Before founding Steel Mountain Loan Trading, LLC ("SMLT")[1], my current employer, I spent eight years as a Senior Vice President at a private loan acquisition firm and a large national bank in Denver, Colorado.  At both companies, I was responsible for overseeing the purchases of residential mortgage loans, as well as due diligence related to such loans.

I am currently the Chief Operations Officer and head of the Contract Finance Department for SMLT, a mortgage trading, risk management, and servicing oversight company established in 2014 that purchases mortgage loans, develops and implements exit strategies for purchased assets, and provides a diverse array of services to banks, credit unions, and various companies in the mortgage business.  My primary responsibilities at SMLT, and throughout my career, have included the preparation and negotiation of all contracts, agreements, and closing documents for the purchase and sale of mortgage loans, and the settlement of contract breaches as well as repurchases.  I also supervise all of the firm's due diligence and underwriting of mortgage loans.  Because my firm's business primarily involves the purchase and sale of mortgage loans, a core

---

[1]     I am co-owner and President of Steel Mountain Capital Management, LLC which was formed in 2005.  I am also Chief Operations Officer of Steel Mountain Loan Trading, LLC which was formed in 2014.  I will refer collectively to these companies as SMLT in this report.

2

part of that business is due diligence to assess the risk factors associated with those loans, including, among others, those related to borrower credit, regulatory compliance, and property value. Since 2005, I have been involved in over 340 separate mortgage loan transactions with a combined outstanding balance of over $1 billion. A copy of my complete resume, which sets forth my qualifications, work experience, and education, is attached hereto as Exhibit A. Exhibit A also lists the cases in which I have served as an expert witness.

## II. RETENTION IN THIS CASE AND ASSIGNMENT

SMLT and I have been retained to provide professional services with respect to claims made by certain RMBS Trustees against Lehman Brothers Holdings Inc. ("Lehman"). Specifically, I was asked to review the claim resolution protocol advanced by Lehman ("Protocol") to determine whether it conforms with industry standards and practices. It is my opinion that the Protocol provides a reasonable framework for the implementation of the cure or repurchase and Purchase Price[2] calculation provisions of the Governing Agreements,[3] and as a result the Protocol is consistent with industry standards and practices. I was also asked to describe the repurchase claims resolution process typically applied in the industry. It is my opinion that the repurchase claims resolution process—from an industry custom and practice perspective—can only occur on a loan-by-loan basis in order to accurately capture the scope of liability attributable to a sponsor.

My opinions are based on my 30 years of industry experience, including my involvement with due diligence and the assessment of various risk factors associated with the purchase and sale of loans, and my first-hand knowledge of agreements and the repurchase claims process. I

---

[2]      Although the Purchase Price calculation provision varies among the Governing Agreements (and the variance itself underscores the importance of a loan-by-loan review), the fundamental elements of those provisions require that the calculation be performed at the loan level.

[3]      The Governing Agreements include the underlying Trust Agreements and Mortgage Loan Sale and Assignment Agreements.

am being paid a fee of $800 per hour for my work in connection with the preparation of this

declaration, my continued consulting analysis, and any deposition or trial testimony I may

provide.  Further, SMLT is being reimbursed for all of its actual, necessary, out-of-pocket

expenses incurred in connection with my work.  My fee is not contingent on the outcome of this

case or on the substance of my opinions.  Exhibit B lists the materials I have reviewed in forming

the opinions expressed herein, which are my own.

I reserve the right to amend my opinions, as stated herein, based on my receipt or

examination of any new or additional information.

## III.    <u>SUMMARY OF OPINIONS</u>

<u>Opinion 1</u>:  The Protocol is a sound, efficient, workable, and cost-effective means of

timely resolving each claim at the loan level through a clear and consistent process that follows

mortgage industry standards and practices. The mortgage industry standard and practice is that

cure and repurchase claims are resolved on a loan-by-loan basis.  Conversely, it is not industry

standard or practice to use sampling in connection with cure or repurchase claims because

sampling does not provide the loan-level information needed to effectuate the cure or repurchase

remedy.

<u>Opinion 2</u>:  In my business experience, not applying a loan-level inquiry for claim

reconciliation would ignore the allocation of responsibilities among the securitization parties and

run contrary to mortgage industry standards and practices, as reflected in the Governing

Agreements, requiring notice to Lehman of specific alleged breaches, loan-level evidence to

substantiate those claims, and loan-level remedies.

## IV.    **THE PROPOSED RMBS PROTOCOL**

A.    *Overview of the Protocol Process*

Lehman's proposed Protocol provides a reasonable framework for a claim resolution

process that conforms with mortgage industry standards and practices, as reflected in the

Governing Agreements, and preserves the parties' relative rights and responsibilities.  Without a

loan-level inquiry process, Lehman would be unable to exercise the following rights:

(1)    to rebut claims when inaccurate;

(2)    to cure claims when possible;

(3)    to determine the properly calculated Purchase Price on RMBS claims that
are valid; and

(4)    to obtain the information necessary to effectuate downstream
indemnification rights against Lehman counterparties.

In my professional opinion, and given the number and principal amount of the loans at issue, the

Protocol is an efficient and cost-effective means of complying with industry standards and

practices and meeting the requirements of the Governing Agreements through a clear and

consistent process that will timely facilitate the resolution of each claim at the loan level.

In addition, the Protocol provides a potential economic benefit to both parties.  The

RMBS Trustees will come away with verified loan-level data and potentially many cured loans,

which would be to the benefit of the certificateholders and may aid their defense of claims I have

been told they are facing from certificateholders.  For its part, and as discussed above, Lehman

will allow claims based on actual liability (not estimates and projections), and retain the ability to

process downstream claims on behalf of the Estate.  The Protocol also provides for streamlined

and cost-effective resolution of disputed claims without resorting to full-blown litigation, and

thus provides a further benefit to both parties.

The individual steps of the Protocol are, in my experience, consistent with standard industry practices, and both the RMBS Trustees and Lehman should be able to complete them in a timely manner.  I have seen similar approaches implemented in other aspects of the mortgage industry.  For example, Fannie Mae and Freddie Mac, although dealing with a large volume of loans, maintain a loan-by-loan repurchase process that includes an appeals process and alternative remedies.  Moreover, the mortgage insurance companies approve or deny claims on a loan-by-loan basis by requesting and reviewing individual loan-level documents, and then participating in a back-and-forth dialogue with the owner and/or servicer of the loan.

B.    *Overview of the Protocol's Scalability*

At my direction, Recovco (a large mortgage loan due diligence and quality control company that provides solutions, valuations, quality control, due diligence, underwriting, fulfillment, and auditing services) has prepared a chart (below) that provides information concerning staffing and timing for underwriting processes.[4]  The chart was prepared to assist me in drawing conclusions about the time required to complete Lehman's proposed Protocol.

The chart contains two sections.  The first section shows the staffing required for a forensic review team to complete 2,000 forensic reviews per month.  An individual underwriter can perform approximately three forensic reviews per day, while a senior reviewer (who reviews the accuracy and logic of the work and positions taken by the underwriters) can review approximately nine forensic evaluations per day.  In addition to the 57 staff members necessary to complete 2,000 files per month, a forensic review team needs approximately four managers, six researchers and data handlers, and three support staff.

---

[4]    This chart is provided merely to represent scalability and is not meant to be an example as to what should be done in this case.

The first section of the chart also shows how capacity can be increased by adding additional teams to a review project. This scalability is achievable by the large re-underwriting firms in the market, including by combining with peer firms to achieve maximum review capacity. Specifically, the chart shows that an underwriting firm like Recovco (which is not unique in the mortgage industry in terms of size or capacity) can assign up to three additional teams to the Lehman project (bringing the total number of teams working on the Lehman project to four). With four assigned teams, Recovco can produce approximately 8,000 forensic reviews per month for the Lehman project. Finally, the chart shows that, through resource sharing agreements with other forensic research firms, Recovco can engage seven teams on the Lehman project, which would produce approximately 14,000 forensic reviews per month. Per Recovco, additional teams could be assigned to further increase capacity and shorten the timeframe required to complete the Protocol; such projections are not unique to Recovco, but rather should be common to all large re-underwriting firms in the market.

| Number and Composition of Teams Needed to Perform Forensic Reviews on 2000, 4000, 6000, 8000, 10,000, 12,000 and 14,000 Loan Files Per Month | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Recovco Exisiting Lehman Team | Reassignment of Second Recovco Team to Lehman Project | Reassignment of Third Recovco Team to Lehman Project | Development of Fourth Recovco Team for Lehman Project | Access to a Fifth Team Through Recovco's Capacity Sharing Agreements | Access to a Sixth Team Through Recovco's Capacity Sharing Agreements | Access to a Seventh Team Through Recovco's Capacity Sharing Agreements |
| Capacity in Loans per Month | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Managers | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Underwriters | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Senior Reviewers | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Forensic Researchers (data) | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Additional Support Staff | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Personnel for 2000 Loans/Month | 57 | 57 | 57 | 57 | 57 | 57 | 57 |

| Number of Months Needed to Perform Forensic Reviews on 150,000 Loan Files Showing Number of Teams and Required Personnel by Type of Staff Member | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Forensic File Reviews Completed Each Month | # of Months Needed to Review 150,000 Files | # of Years Needed to Review 150,000 Files | Number of Teams Working on Files | Total Number of Personnel Working on Forensic Reviews | Number of Managers | Number of Underwriters | Number of Senior Reviewers | Number of Forensic Researchers (Data Handling) | Number of Additional Support Staff |
| 2,000 | 75.0 | 6.3 | 1 | 57 | 4 | 33 | 11 | 6 | 3 |
| 4,000 | 37.5 | 3.1 | 2 | 114 | 8 | 66 | 22 | 12 | 6 |
| 6,000 | 25.0 | 2.1 | 3 | 171 | 12 | 99 | 33 | 18 | 9 |
| 8,000 | 18.8 | 1.6 | 4 | 228 | 16 | 132 | 44 | 24 | 12 |
| 10,000 | 15.0 | 1.3 | 5 | 285 | 20 | 165 | 55 | 30 | 15 |
| 12,000 | 12.5 | 1.0 | 6 | 342 | 24 | 198 | 66 | 36 | 18 |
| 14,000 | 10.7 | 0.9 | 7 | 399 | 28 | 231 | 77 | 42 | 21 |

## C.    *Timing and Cost of the Protocol*

Based on further analysis provided by Recovco, which aligns with my mortgage industry experience, Step 0 through Step 4 of the Protocol proposed by Lehman should take approximately one year to complete and cost approximately $110 million.[5]  While this cost may appear large, it is actually a relatively small cost figure when (i) divided by the 255 trusts containing the loans giving rise to the claims in this matter; and/or (ii) compared to the total unpaid principal balance of the loans.

This time and cost analysis reflects the fact that for a large-scale project such as this, our industry is more than able to provide the necessary number of reviewers, negotiators and facilitators to complete the Protocol in a timely and efficient manner.  Indeed, in the mortgage industry there are numerous vendors who provide due diligence and quality control services,

---

[5]        Exhibit A to Declaration of Craig Pino.

8

such as NewOak Capital, FTI Consulting and Fortace, that could be hired for a project of this

nature and scale.  Additionally, the time and cost analysis recognizes that efficiencies, such as

those discussed below, would develop as the Protocol proceeds, and that such efficiencies would

accelerate the review process.

       D.     *General Observations Concerning the Protocol and Dr. Parekh's Analysis of the*
             *Protocol*

          i.     *Dr. Parekh Disregards the Industry's Capacity for Large, Efficient Review*
               *Teams.*

Based on my mortgage industry experience, and Recovco's analysis, my opinion is that

the 27-year timeframe proposed by the RMBS Trustees is grossly overstated and misleading.

The number of reviewers, negotiators, and facilitators is scalable, and there is no reason to adopt

Dr. Parekh's inadequate staffing assumptions.  For example, in his Declaration dated November

14, 2014, Dr. Parekh suggests that 40 reviewers be used in Step 1 for purposes of reviewing three

loans per day.  In my opinion, this proposal reveals a lack of practical experience with large-

scale mortgage loan review projects.  As mentioned previously, our industry has the capacity to

devote far more robust resources to this project than Dr. Parekh assumes.  Specifically, as the

Recovco analysis illustrates, a loan-level Protocol could be completed much more quickly by

utilizing the efforts of a far greater number of industry professionals.[6]

          ii.     *Dr. Parekh Ignores Efficiencies Gained from Lessons Learned as the*
               *Protocol Proceeds.*

Further, as both sides move forward with the objection and negotiation processes in the

Protocol, they will inevitably be able to apply lessons learned from other similar loans and

streamline the process.  Practically speaking, this means that as the parties and the review teams

---

[6]     *Id.*

start to identify emerging patterns in the loan review process, the review will become faster and more efficient.

For example, in Dr. Parekh's November 14, 2014 Declaration, he suggests 34,585 to 45,738 of the loans will require review by a Claim Facilitator. Even if those numbers are accurate at the beginning of the project, based on information provided by Recovco,[7] the percentage of loans requiring review by a Claim Facilitator will likely decrease over time, which in turn will decrease the required timeframe to complete the Protocol. As Lehman has the opportunity to identify and relay the relevant facts for a loan, over time patterns will likely develop for similar loans and factual disputes will oftentimes be resolved concurrently for those similar loans.

As discussed in my footnote nine below, there are various ways the number of loans requiring a Claim Facilitator review can be decreased. These areas include, but are not limited to, the handling of missing documentation breaches where the document exists, undisclosed debt breaches where the additional debts are not those of the subject borrower, and undisclosed debts where the borrower still qualified for the subject loan per guidelines. These are three examples of types of breaches that can be resolved to both parties' satisfaction without involving a Claim Facilitator.

Dr. Parekh also suggests that 8,646 to 11,434 loans will require the Court's review. By utilizing the common sense approaches stated above, I believe the number of loans requiring judicial review will be much lower. As the parties go through the Protocol, disputes will center around categories of loans instead of on specific loans. For example, my opinion is that a compliance issue (such as where a loan file is missing either a HUD-1 or a Final Truth-In-Lending statement) can be categorically addressed. This means that if there are 1,000 loans for

---

[7]    *Id.* at Step 4.

10

which this type of alleged compliance issue is present, resolving the overall dispute will provide

a resolution for the group of 1,000 loans.  Accounting for these types of efficiencies, it should be

the case that very few loans or dispute categories, if any, become the subject of the Court's

determination.   Dr. Parekh's findings, however, are based on the assumption that each separate

alleged breach will fully proceed to the Court review phase. In making this assumption, he does

not account for efficiencies in claim resolution that are very much a part of a loan-by-loan

review, leading to what I view as an error in his analysis.

   iii. *Dr. Parekh Disregards the Fact that Lehman Must Only Respond to Specific Alleged Breaches.*

   Since the Trustees will identify specific breaches, Lehman must only respond to those

specific breaches, and is not required to do a full re-underwriting review of every aspect of every

loan.  For example, if there are no alleged breaches related to the appraisal on a given loan, the

reviewer for Lehman would not need to spend any time analyzing that particular appraisal.  This

focused type of review takes less time than a full file review, and is yet another reason why the

Protocol steps can proceed expeditiously.  Dr. Parekh fails to recognize this practical aspect of

the Protocol.

## V. THE MORTGAGE INDUSTRY RESOLVES CURE OR REPURCHASE CLAIMS ON A LOAN-BY-LOAN BASIS

   A. *Loan-by-Loan Claim Resolution*

   As is the case in every mortgage loan sale agreement I have encountered, the entire

claims process is predicated on loan-by-loan discovery and notice.  For example, one Mortgage

Loan Sale and Assignment Agreement[8] reads in part, "Upon discovery by either the Seller or the

Depositor of a breach of any of the foregoing representations and warranties…that adversely and

---

[8] MLSAA for LXS 2007-6 at page 15, Section 1.04 (d).

materially affects the value *of the related Mortgage Loan*…" (emphasis added).  In my experience, this contractual language reflects an industry-wide practice that the cure or repurchase remedy is to be applied on a loan-by-loan basis, as it refers to "the related Mortgage Loan," not the entire pool.

Generally, upon the presentation of an alleged breach of a representation and warranty, a number of things may result.  First, the seller may disagree with and rebut the claim.  A written rebuttal is typically made within 30-90 days, and in my experience, is always done at the loan level.  Many rebuttals successfully convince the claimant its claim was made in error and the matter is then dropped.  For example, a seller may rebut a purchaser's weak claim using information the purchaser failed to consider in making the claim.[9]

For undisputed breaches, there are three specified remedies in these Governing Agreements:[10]

(1)     The seller can cure the breach, which would be done by correcting documentation errors, locating missing documents, etc.

(2)     The seller can repurchase the loan in accordance with the Purchase Price calculations laid out in the Governing Agreements.

(3)     The seller may substitute the affected loan with a different loan, but only in the first two years after securitization.

---

[9]     For example, it appears that over 2,000 of the RMBS Trustees' breaches pertain to missing documentation.  Based on my experience, it is likely that a large percentage of those breaches will be cured so long as the documents exist and are available for review.  Also, there are many undisclosed debt breaches and oftentimes the additional debts are not those of the subject borrower or, even if they were, the borrower would have qualified per guidelines with the debts included.  This means that such alleged breaches are not actually breaches under the Governing Agreements.

[10]    These remedies are set out, for example, in the Trust Agreement and Mortgage Loan Sale and Assignment Agreement for SASCO 2005-1 and LXS 2007-6.

12

Based on my experience, the inquiry process takes place on a loan-by-loan basis, precisely because of the above list of remedies.

Practicalities also support the fact that the cure or repurchase remedy is applied on a loan-by-loan basis.  The obligation to cure must necessarily be performed on a given loan, not a group of loans.  Further, in the event of repurchase, the required remedy is the defined term "Purchase Price," which is an equation usually consisting of loan-level inputs including unpaid principal balance, accrued interest, and certain servicing advances.[11]  Because this equation requires loan-level inputs, it can only be applied at the loan level, and not in an aggregate or through estimation (as the RMBS Trustees propose).

To be clear, I do believe that sampling can be used in secondary market transactions. Parties to mortgage loan transactions are generally free to decide both how many loans to review and the degree to which such loans should be reviewed in connection with their trades.  For example, SMLT performs 100% due diligence because we think it better protects our interests in the loans, but I am aware that some mortgage loan transactions may include review of fewer than 100% of the loans.  My opinion is not that sampling is *never* useful or appropriate[12], but that it is not industry standard or practice in connection with cure or repurchase claims because it does not provide the loan-level information needed to accurately effectuate the cure or repurchase remedy.

B.    *Loan-Level Detail Is Required to Substantiate a Claim*

In my opinion there are a clear set of steps that should be undertaken in the event of the discovery of a breach. Those steps are industry standard and practice and reflect the Governing Agreements themselves.  First, "the party discovering such breach shall give prompt written

---

[11]    *Supra* n.2.

[12]    It is my experience that sampling is common in pre-purchase due diligence.

13

notice to the other party."[13]  In my experience, that written notice would be in the form of a

repurchase demand letter, which would either reference a single loan or include a schedule of

loans with a detailed description of the type of breach alleged on each loan.  The repurchase

demand letter would also identify which specific representation in the mortgage loan sale

agreement was breached and provide loan-level facts supporting the claim.  I do not recall ever

having seen a repurchase demand that did not include such loan-level detail.  Attached as Exhibit

C is a sample repurchase demand letter I issued when a loan represented to have mortgage

insurance in fact did not.

Each alleged breach would also have to have a material and adverse effect on the value of

the loan.  This element must be established at the loan level because factors other than a breach

of a representation and warranty may be the underlying reason for a diminished value on a loan.

Many macroeconomic factors can be the root cause of diminished values including:

    (1)    significant changes in housing prices;

    (2)    increasing unemployment rates

    (3)    collapse of liquidity in the capital markets; and/or

    (4)    unexpected default rates in the mortgage market.

If it was not the alleged breach, but rather one of these types of factors (which are only

examples) that caused the loan to lose value, then there is no claim to be made against the seller.

Additionally, in my experience, defaults that occur years after origination are unlikely to

have been caused by breaches of representations and warranties by the seller.  Instead, they are

often caused by microeconomic life events, including loss of income due to illness, job loss,

reduction in working hours, bonus reduction, divorce, or death of one's spouse.  Mortgage loan

servicers, as a matter of course, attempt to ascertain a reason for default (also known as the

---

[13]    MLSAA for LSX 2007-6 at page 6, Section 1.04 (d).

14

"RFD") and record that RFD in the servicing notes for each individual delinquent loan. They do

this because the RFD can be an important element in the potential recovery of losses. This is yet

another reason why the cure or repurchase analysis must be performed at the loan level.

      C.      *The Governing Agreements Reflect Lehman's Bargained For Ability to Protect Its Downstream Indemnification Rights.*

In my experience and from a business perspective, not applying a loan-level inquiry for

claim reconciliation would ignore the allocation of responsibilities among the securitization

parties and run contrary to mortgage industry standards and practices, as reflected in the

Governing Agreements, requiring notice to Lehman of specific alleged breaches, loan-level

evidence to substantiate those claims, and loan-level remedies.

Based on Lehman's submissions to the Court, I understand that Lehman seeks to preserve

its indemnification rights against the originators who sold loans containing alleged breaches of

representations and warranties to Lehman. In my experience, downstream indemnification is

enforced on a loan-level basis because the representations are made at the loan level, and the

remedies are to be performed and calculated on each loan individually.

Specifically, a detailed loan-level repurchase demand from the RMBS Trustees is

required for Lehman to work through the next level of the claims process with the originators

who sold the loan to Lehman. Lehman must be able to show the basis for the breach and the

amount of Lehman's liability on a per loan basis in order to recover from the correct

corresponding counterparty for that specific loan. From a business perspective, the failure of the

RMBS Trustees to provide loan-by-loan proof to Lehman may, in turn, impede Lehman's ability

to seek indemnity from originators. My understanding is that the downstream claim process is

already underway for loan-level claims Lehman settled with the Government Sponsored

Enterprises.

The claims process in the mortgage industry is fairly standard and in my 30 years of experience with these types of agreements, I have not seen much variation.  Specifically, it is a contractual agreement that is heavily negotiated and relied upon, and if either party believed at the onset of the transaction that its provisions were not enforceable or performable, it is questionable whether the loan sale would have taken place.

In the regular course of my business at SMLT, I have been presented with repurchase demands from companies buying loans from my company.  Since SMLT does not originate mortgage loans, we take these claims back to the party who sold the loans to SMLT.  In some cases, we have been able to obtain a simple cure by correction, and in others, we have found a creative solution to cure the breach.  For example, in one case we had the originator pay down the principal balance to a level that made the breach of not having mortgage insurance irrelevant.  There have also been times when no cure was available, and a loan had to be first repurchased by SMLT, and then repurchased from us by the original seller.  These are just a few illustrative examples from my own experience that demonstrate the reliance that parties in my industry place on the downstream indemnification process when that process has been bargained for in the applicable underlying agreements.

Executed this _3rd_ day of December, 2014.

_William Alread_
William Alread

16

# Exhibit A

## William Alread Resume

William Alread has over thirty years of experience in the secondary mortgage market. Mr. Alread is the co-founder and co-owner of Steel Mountain Loan Trading, which recently merged with Phoenix Collateral Advisors. He is currently the head of the Operations/Contract Finance Department and is engaged in all aspects of the operations of the company. He is responsible for all contract matters, consulting engagements, and the administration of warehouse lines and sub-servicing relationships. Mr. Alread supervises the due-diligence, servicing management and accounting departments. Mr. Alread manages the preparation and negotiation of all contracts and closing documents for purchases and sales. He advises the trading area on bid parameters and bid stipulations and implements portfolio level risk mitigation. Mr. Alread assesses risk factors including borrower credit, regulatory compliance and property values of loan pools prior to final pricing and purchase. He conducts the identification, management and settlement of alleged contract breaches and repurchase demands. Mr. Alread is solely responsible for relationship management and oversight of all third party servicing vendors. He is responsible for all portfolio oversight, management and loss mitigation strategies and execution.

In Mr. Alread's early career, he was focused on due diligence and transaction management within a broad range of asset classes during the Resolution Trust Corporation (RTC) liquidation. He spent seven years with the First Tennessee bond division where he was the senior executive of the due diligence and contract finance areas. At First Tennessee, Mr. Alread managed the relationships with both Fannie Mae and Freddie Mac. During the prior eight years before founding Steel Mountain Loan Trading, Mr. Alread served as Senior Vice President at a private loan acquisition firm and a large national bank in Denver, Colorado.

### PRIOR MORTGAGE INDUSTRY EXPERIENCE

· Security National Servicing Corporation (2000-2005) Senior Vice President, Operations
· Matrix Capital Bank (1998-2000) Senior Vice President, Operations
· First Tennessee Capital Assets Corp, a Division of First Tennessee Bank  (1991-1998) Vice
     President, Operations
· First Mortgage Strategies Group, Inc. (1985-1991) Assistant Vice President, Project Manager

### EDUCATION

    Bachelor of Science Degree – Business Administration
    University of Arkansas, Fayetteville, Arkansas
    Major:  Finance and Banking - Minor:  Economics

CURRENT/PRIOR LITIGATION SUPPORT CASES

Mr. Alread has opined in rebuttal to topics including underwriting of residential mortgage loans and their conformity to the requirements of the relevant agreements between the parties. He has also opined on market standards applicable at the time of origination of the loans, the effect of underwriting, seasoning and market conditions on loan values, as well as industry practices relating to the purchase and sale of residential loans.

**SMLT was retained by Goodwin Procter LLP on behalf of Nomura Asset Acceptance Corp.**

· PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, vs. NOMURA ASSET ACCEPTANCE CORPORATION, et al., Civil Action No. 08-10446-RGS In the United States District Court for the District of Massachusetts

**SMLT was retained by Fulbright & Jaworski LLP on behalf of Lehman Brothers Holding.**

· LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation v. SECURITYNATIONAL MORTGAGE COMPANY, 11 a Utah corporation, Civil Action No. 2:11-cv-00519-TS, In The United States District Court, District of Utah, Central Division

**SMLT was retained by Featherstone Petrie DeSisto LLP on behalf of CitiMortgage Inc.**

· CITIMORTGAGE, INC., a New York corporation, v. AMERICAN TITLE SERVICES COMPANY, a Colorado corporation, Civil Action No. 11-cv-02040-CMA-BNB, In The United States District Court For the District of Colorado

**SMLT was retained by Featherstone Petrie DeSisto LLP on behalf of CitiMortgage, Inc.**

· CITIMORTGAGE, INC., a New York corporation v. AMERICAN MORTGAGE NETWORK, INC., n/k/a Wells Fargo Home Mortgage, a division of Wells Fargo Bank, National Association, Civil Action No. 1:09-CV-02064-JLK-CBS in the United States District Court for the District of Colorado

**SMLT was retained by Reilly Pozner LLP on behalf of Lehman Brothers Holding.**

· LEHMAN BROTHERS HOLDINGS, INC. v. PRIMELENDING, A PLAINSCAPITAL COMPANY, Civil Action No. 09-CV-00212 PAB-KLM in the United States District Court for the District of Colorado

**SMLT was retained by FTI Consulting and Gunster, Yoakley & Stewart, P.A. on behalf of Countrywide.**

· GREAT FLORIDA BANK v. COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE SECURITIES CORP., AND BAC HOME LOANS SERVICING, LP, Civil Action No. 10-CV-22124 in the United States District Court Southern District of Florida

**Exhibit B**

## Information Reviewed In This Case

1. Mortgage Loan Sale and Assignment Agreement – dated January 1, 2005; Structured Asset Securities Corporation, Series 2005-1

2. Trust Agreement – dated January 1, 2005; Structured Asset Securities Corporation, Series 2005-1

3. Mortgage Loan Sale and Assignment Agreement – dated April 1, 2007; Lehman XS Trust, Series 2007-6

4. Trust Agreement – dated June 1, 2007; Structured Asset Securities Corporation, Series 2007-3

5. Exhibit C from Objection To Increase – Proposed RMBS Protocol

6. Declaration of Charles A. Parekh, PH.D. – dated November 14, 2014

7. Declaration of Charles A. Parekh, PH.D. – dated August 21, 2014

8. RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code (dated August 22, 2014)

9. Lehman Brothers Holdings Inc.'s (A) Objection to RMBS Trustees' Motion to (I) Increase the reserve to $12.143 billion and (II) Estimate and allow their claims for covered loans at $12.143 billion pursuant to section 502(c) of the Bankruptcy Code, and (B) Cross-motion to establish a protocol to resolve claims filed by RMBS Trustees (dated October 15, 2014)

10. The RMBS Trustees' (1) Reply In Support Of Their Motion To Estimate The RMBS Claims Using Statistical Sampling, And (2) Opposition To Lehman's Cross-Motion For A Full Loan-By-Loan Review (dated October 15, 2014)

11. Trust Agreement – dated April 1, 2007; Lehman XS Trust, Series 2007-6

12. Declaration of James H. Aronoff – dated August 21, 2014

13. Recovco Report dated December 3, 2014 with accompanying exhibits

14. Recovco and Digital Risk websites

**Exhibit C**

# STEEL MOUNTAIN CAPITAL MANAGEMENT LLC

**VIA OVERNIGHT DELIVERY**

July 11, 20█

Mr. █████████
████████████

RE:     ████ Loan # 210████████
        Breach: Invalid Private Mortgage Insurance

        Notification of Breach of Representations, Warranties and Covenants pursuant to the
        terms of the Agreement for the Purchase and Sale of Mortgage Loans dated ███████
        █████ (the "Agreement") by and between Steel Mountain Capital II, LLC ("Purchaser")
        and █████████ Mortgage LLC ("Seller").

Dear Mr. █████,

This letter will serve as notification that a breach of Section 3.02 (i) under the Agreement has
been discovered by Purchaser with regard to the loan referenced above.

This loan was disclosed as having Private Mortgage Insurance ("PMI"). The Mortgage Loan
Schedule identifies this loan as having PMI. Please see the attached letter from Radian rescinding
the PMI.

Purchaser hereby demands repurchase of the above referenced loan under the terms of the
Agreement.

Please contact me concerning the repurchase date, the repurchase amount, returning the collateral
file and the servicing transfer.  I can be reached at ████████████.

Sincerely,

William Alread
Managing Partner

3190 S. Wadsworth Blvd Suite 150, Lakewood, CO. 80227
████████████