Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555(SCC)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  November 7, 2014

18                  10:06 AM

19

20

21

22

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1  Doc # 46364 Motion for Approval of Settlement Agreement

2  Among Putnam Structured Product Funding 2003-1, Ltd., Putnam

3  Structured Product Funding 2003-1 LLC, U.S. Bank National

4  Association, as Successor Trustee, Lehman Brothers Special

5  Financing, Inc., and Lehman Brothers Holdings, Inc.

6

7  Doc. #15363 Debtors' One Hundred Seventeenth Omnibus

8  Objection to Claims (No Liability Non-Debtor Employee

9  Claims)

10

11  Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

12  Doc. #9013 Two Hundred Thirty-Seventh Omnibus Objection to

13  General Creditor Claims (Employee Claims)

14

15  Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

16  Doc #9478 Two Hundred Fifty-First Omnibus Objection to

17  General Creditor Claims (Employee Claims)

18

19  Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

20  Doc #10097 Trustee's Two Hundred Sixty-Seventh Omnibus

21  Objection to General Creditor Claims (Employee Claims)

22

23  Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

24  Doc #10194 Trustee's Objection to the General Creditor Proof

25  of Claim of Robert J. Chambers (Claim No. 6107)

1   Adversary Proceeding: 08-01420-scc Lehman Brothers, Inc.

2   Doc #9601 Two Hundred Fifty-Ninth Omnibus Objection to

3   General Creditor Claims

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach and Sheila Orms

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for LBHI & Affiliates

4         767 Fifth Avenue

5         New York, NY  10153

6

7    BY:  CANDACE M. ARTHUR, ESQ.

8         GARRETT A. FAIL, ESQ.

9

10   HUGHES HUBBARD & REED, LLP

11        Attorneys for SIPA Trustee

12        One Battery Park Plaza

13        New York, NY  10004

14

15   BY:  JORDAN E. PACE, ESQ.

16        JEFFREY S. MARGOLIN, ESQ.

17        KAREN M. CHAU, ESQ.

18        MEAGHAN C. GRAGG, ESQ.

19        SAVVAS A. FOUKAS, ESQ.

20

21

22

23

24

25

Page 5

1   WHITE & CASE, LLP

2         Attorneys for 1EE, LLC

3         1155 Avenue of the Americas

4         New York, New York 10036

5

6   BY:  DOUGLAS P. BAUMSTEIN, ESQ.

7

8   CHAPMAN & CUTLER, LLP

9         Attorneys for U.S. Bank, National Association, as

10        Trustee

11        111 West Monroe Street

12        Chicago, Illinois 60603

13

14  BY:  FRANKLIN H. TOP, III, ESQ.

15

16  KLESTADT & WINTERS, LLP

17        Attorneys for Atif Khan

18        570 Seventh Avenue, 17th Floor

19        New York, New York 10018

20

21  BY:  MAEGHAN J. MCLOUGHLIN, ESQ.

22

23

24

25

Page 6

1  CARTER, LEDYARD & MILBURN, LLP

2      Attorneys for Julia Kaufman

3      2 Wall Street

4      New York, New York 10005

5

6  BY:  AARON R. CAHN, ESQ.

7

8  MAYER BROWN, LLP

9      Attorneys for Julie Shapiro

10     1675 Broadway

11     New York, New York 10019

12

13 BY:  CHRISTINE WALSH, ESQ.

14

15 KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP

16     Attorneys for former employees

17     1633 Broadway

18     New York, New York 10019

19

20 BY:  DAVID J. MARK, ESQ.

21

22 ALSO APPEARING:

23 VITO SANTORO (Telephonic)

24 ALEXANDER LESIN (no card)

25 ROB FRYLICK (no card)

```
 1                    P R O C E E D I N G S

 2             THE COURT:  Good morning.  You can have a seat.

 3             How's everyone today?

 4             MS. ARTHUR:  Good.

 5             THE COURT:  All right.  Let's see.  We have a

 6    number of folks on the phone, but I don't think I need to

 7    identify them until we get to Mr. Santoro who is appearing

 8    pro se with respect to one of the matters.

 9             Okay.

10             MS. ARTHUR:  Good morning, Your Honor.  For the

11    record, Candace Arthur of Weil, Gotshal & Manges on behalf

12    of Lehman Brothers Holdings, Inc. as plan administrator.

13             As Your Honor will note the agenda is fairly short

14    today for the plan administrator, and if it's acceptable to

15    the Court I'll go in the order of the agenda letter --

16             THE COURT:  Certainly.

17             MS. ARTHUR:  -- that was filed.

18             THE COURT:  Thank you.

19             MS. ARTHUR:  The first motion before the Court is

20    an uncontest -- the uncontested motion of the plan

21    administrator filed pursuant to Bankruptcy Rule 9019 and

22    Section 105(a) seeking approval of a settlement agreement

23    amongst Lehman Brothers Holdings, Inc., Lehman Brothers

24    Special Financing, Inc., Putnam Structured Product Fundings

25    2003-1, Ltd., Putnam Structured Product Funding 2003-1, LLC,
```

Page 8

1    and U.S. Bank National Association in its capacity as

2    successor trustee.

3           Your Honor, we filed a motion on September 24th

4    and delivered a copy of the confidential settlement

5    agreement on October 21st to the parties, the chambers, the

6    U.S. Trustee as well as Milbank.

7           I would also like to note for the Court that we

8    filed a declaration of Lawrence Brandman of Lehman Brothers

9    Holdings, Inc. in support of the motion and the trustee has

10   also filed an affidavit in connection with the settlement

11   agreement.  Counsel for the trustee is present in the

12   courtroom today.

13          Your Honor, the settlement agreement resolves

14   another one of the SPD flip clause disputes.  It resolves

15   all disputes amongst the parties and upon full receipt of

16   the settlement amount to LBSF we will, in fact, proceed to

17   dismiss the issuer, the co-issuer, collateral manager and

18   U.S. Bank from the adversary proceeding.  No objections have

19   been made to the motion and the plan administrator does

20   submit that the settlement agreement is in the best interest

21   of LBSF's estate and its creditors.

22          Accordingly, unless Your Honor has any questions,

23   the plan administrator does respectfully request for the

24   motion to be granted and the settlement agreement approved.

25          THE COURT:  All right.  Does anyone wish to be

Page 9

1     heard with respect to the motion to approve pursuant to Rule

2     9019, the Putnam settlement?

3              All right.  Very good.  The settlement clearly

4     falls above the lowest level of the range of reasonableness

5     and I'll enter the order approving it.

6              MS. ARTHUR:  Thank you, Your Honor.

7              I will now turn the podium over to my colleague,

8     Garrett Fail, for the next matter on the agenda.

9              THE COURT:  All right.  Thank you very much.

10             MR. FAIL:  Good morning, Your Honor.  Garrett --

11             THE COURT:  Good morning.

12             MR. FAIL:  -- Fail, Weil, Gotshal & Manges for

13    Lehman Brothers Holdings, Inc. as the plan administrator.

14             The next item on the agenda is a hearing to

15    consider the Debtors' one hundred seventeenth omnibus

16    objection to claim 32308 filed by Mr. Vito Santoro.

17             THE COURT:  All right.

18             MR. FAIL:  Your Honor, the claim seeks $657,100 --

19             THE COURT:  Hold on -- hold on one moment.

20             MR. FAIL:  Of course.

21             THE COURT:  Just let me confirm that Mr. Santoro

22    is there and can hear us.

23             Mr. Santoro, sir, are you there?

24             MR. SANTORO:  Yes, I am, Your Honor.

25             THE COURT:  All right.  Good morning.

Page 10

1          MR. SANTORO:  Good morning.

2          MR. FAIL:  Your Honor, the claim seeks $657,115

3    for "employee claims."  The debtors filed their objection

4    because Mr. Santoro was not an employee of and failed to

5    state a claim against any of the Chapter 11 debtors.  Mr.

6    Santoro wrote on his proof of claim, "Duplicate to LBI claim

7    of 5/27/09" and attached to the claim is an offer letter to

8    Mr. Santoro from "Lehman Brothers, Inc."

9          Mr. Santoro responded to the objection, but his

10   response does not assert a basis for liability against

11   Lehman Brothers Holdings, Inc. or any one of the Chapter 11

12   estates.

13         Your Honor, more recently in connection with his

14   claim against LBI in the SIPA proceeding, Mr. Santoro filed

15   a response which stated, "My original contract executed and

16   dated 15 January 2008 listed my employer as Lehman Brothers,

17   Inc. (LBI)."  It goes on to discuss Mr. Santoro's employment

18   BY LBI from the start of his employment to the start of the

19   bankruptcy cases.

20         Your Honor, that response is part of the SIPA

21   docket at Docket 9714 and I can submit -- hand up a copy to

22   Your Honor and --

23         THE COURT:  All right.  Yes.  Thank you.

24         MR. FAIL:  Your Honor, based on the proof of claim

25   and the response, the debtors scheduled this hearing to move

Page 11

1   forward to disallow and expunge this claim as it doesn't

2   state a prima facie claim against Lehman Brothers Holdings

3   Inc. or anyone of the Chapter 11 estates.

4            THE COURT:  All right.  Thank you.

5            Mr. Santoro --

6            MR. SANTORO:  Yes, Your Honor.

7            THE COURT:  -- would you like to respond to the

8   trustee's argument?

9            MR. SANTORO:  I think there was some confusion on

10  my part, Your Honor, because I see two case numbers before

11  you today, 01420 in the name of Lehman Brothers, Inc. as

12  well as 13555 in the name of Lehman Brothers Holding, Inc.

13           THE COURT:  Right.

14           MR. SANTORO:  I -- listening to the attorney this

15  morning, I did claim in my notes that my employer was LBI,

16  and while I do believe that, you know, a holding company has

17  some responsibility for its holdings, I think in this case

18  my real pursuit is with LBI.

19           THE COURT:  Okay.  All right.  So just to confirm

20  and clarify any lingering confusion that you have, the

21  Lehman Brothers Holdings, Inc. case is separate from the

22  Lehman Brothers, Inc. case and they are separate from all of

23  the other filed cases.

24           To the extent that you were employed by LBI, you

25  can properly assert a claim that will be considered by the

Page 12

1    trustee in the LBI case.  Many employees also filed claims

2    against LBHI either out of confusion or because they

3    believed that all the estates would just be considered

4    together simply generically as Lehman.  But Judge Peck, who

5    presided over these cases before I took over this earlier

6    this year, made findings that there is no basis to

7    substantively consolidate the cases or to treat one

8    interchangeably than the other.

9            So your claim against LBHI will, in fact, be

10   expunged as the trustee requests and your claim asserted

11   against LBI will be dealt with in the LBI estate.

12           Does that --

13           MR. SANTORO:  Thank you, Your Honor.

14           THE COURT:  Does that help?  All right.  Thank

15   you, Mr. Santoro.

16           MR. FAIL:  Thank you, Your Honor.  And at this

17   point I'll turn the agenda over --

18           THE COURT:  All right.

19           MR. FAIL:  -- and the calendar over to --

20           THE COURT:  Mr. -- Mr. Santoro --

21           MR. FAIL:  -- LBI.

22           THE COURT:  -- your LBI claim is part of the

23   claims that are being addressed in the status conference

24   that we're going to have later this morning, so if you would

25   like you -- you should stay on the line for that.

1          MR. SANTORO:  Yes.  I would like to do that, Your

2     Honor, if that's okay.

3          THE COURT:  Okay.  Thank you.

4          MR. FAIL:  Thank you, Your Honor.

5          MR. SANTORO:  Okay.

6          THE COURT:  Good morning.

7          MR. FOUKAS:  Good morning, Your Honor.  Savvas

8     Foukas, F-O-U-K-A-S of Hughes, Hubbard & Reed for the SIPA

9     trustee.  And I'm here with my colleagues, Jeff Margolin,

10    Meaghan Gragg, Karen Chau and Jordan Pace will be handling

11    the next matter on the --

12         THE COURT:  Okay.

13         MR. FOUKAS:  -- agenda.

14         So we're here for the status conference on the

15    objections to the claims filed by former Lehman employees

16    who were transferred to Barclays as a result of the asset

17    purchase agreement in 2008.  The claims are principally for

18    2008 bonuses that the employees were allegedly guaranteed in

19    their employment contracts with Lehman.  There are some

20    claims that have some other compensation elements in them,

21    but --

22         THE COURT:  Right.

23         MR. FOUKAS:  -- principally these are 2008 bonus

24    claims.  Under the asset purchase agreement, Barclays

25    assumed the obligation to pay 2008 bonuses to transferred

1     employees.  These claims seek payment from LBI.

2             At this point we have objected to all of the

3     claims.  We've received responses.  I think the last

4     response is due to come in in the next few days at which

5     point we'll have all the contested objections in a position

6     to move forward in a coordinated fashion.

7             THE COURT:  Okay.

8             MR. FOUKAS:  Over the past several months we have

9     been in communication with the claimants and received some

10    information relating to the claims from the claimants.

11    We've also received some information from Barclays.  But at

12    this point the trustee does require further factual

13    information to determine the appropriate procedural path for

14    the claims.  In particular, we need to know whether each

15    claimant was paid by Barclays, if they were paid how much

16    they were paid, and if they were not paid what they were

17    owed and why not.

18            So we've requested that information and some other

19    information from the claimants and we've also reached out to

20    Barclays.  And the trustee --

21            THE COURT:  Is there residual liability at Lehman

22    if Barclays failed to pay?

23            MR. FOUKAS:  I think at this point we can't say.

24    I think it depends, Your Honor, on what we find out.  Why

25    weren't they paid; did Barclays have a reason.  So at this

1    point I -- you know, we really do need the information to

2    determine the best way forward.

3              THE COURT:  Okay.

4              MR. FOUKAS:  So the way --

5              THE COURT:  So you -- have you had conversations

6    with Mr. Baumstein?

7              MR. FOUKAS:  We have had conversations with Mr.

8    Baumstein and I know he has provided the information for his

9    client and I think there is some additional information that

10   we're looking for.  And I'm confident we'll get it and I

11   know we have reached out as well to each of the other

12   claimants --

13             THE COURT:  Okay.

14             MR. FOUKAS:  -- seeking similar information.

15             And so I guess what we see as the appropriate way

16   forward here is over the next few weeks to receive this

17   information from the claimants and from Barclays, and at

18   that point we'll be able to figure out which claims involve

19   claims for people who have actually been paid, which don't

20   and why not, and at that point be able to move each category

21   forward in the appropriate fashion after discussion with the

22   claimants.

23             THE COURT:  So you will -- you'll bucket them into

24   those that can go down the path of a sufficiency hearing and

25   those that have to have something a little more complex?

Page 16

1          MR. FOUKAS:  I think that's right.  I think it may

2    be merits hearings for all the buckets or some kind of

3    mediation process for others.

4          THE COURT:  Okay.

5          MR. FOUKAS:  But, yeah, I think it really will

6    depend on the information we get because, you know, at this

7    point I think it's hard for us to say --

8          THE COURT:  Okay.

9          MR. FOUKAS:  -- now --

10          THE COURT:  The most recent back and forth I have

11    on this are the letters that were exchanged between Hughes,

12    Hubbard and White & Case early in October.  So is there

13    anything more that any of the claimants would like to say

14    this morning?

15          MR. FOUKAS:  I think there probably is.  Yes.

16          THE COURT:  Okay.  Thank you.

17          MR. MARK:  Your Honor, David Mark --

18          THE COURT:  Good morning.

19          MR. MARK:  -- Kasowitz, Benson, Torres & Friedman

20    representing a number of the former employees.

21          The only objection made against the claims of my

22    clients is that Barclays assumed their obligation and that

23    somehow discharged LBI from its contract.  It's a purely

24    legal issue.  There are no fact issues relating to that.  I

25    think the Court can decide that issue purely on the papers

Page 17

```
1    that have been submitted.  That includes the Barclays

2    contract and whatever else the trustee has submitted that

3    supports that as well as our objections.

4            We believe there's absolutely no merit whatsoever

5    to this argument, but it does present a purely legal issue.

6    There is no reason to have an extensive proceeding.  There's

7    no reason for discovery to address --

8            THE COURT:  So you need to --

9            MR. MARK:  -- this issue.

10           THE COURT:  -- be armed with that in order to get

11   Barclays to pay?

12           MR. MARK:  Yeah.

13           THE COURT:  Is that the bottom line?

14           MR. MARK:  The bottom line is whether or not

15   somehow the debtor has been -- was discharged as a result of

16   the asset purchase agreement with Barclays.  The debtor did

17   not assume the agreements, did not assign them under Section

18   365.  We simply don't see that there's any plausible basis

19   for this argument, but it is a legal argument.  And if the

20   Court rejects that argument, our -- my clients' claims

21   should be allowed because there's -- that's the only

22   objection that the trustee has filed.

23           So we don't see any reason why there should be any

24   extensive delay --

25           THE COURT:  So you -- none of your clients has
```

Page 18

1    been paid by Barclays?

2             MR. MARK:  Some of my clients have entered into --

3    what happened, basically, is that Barclays assumed --

4    Barclays hired these people and in three of the cases

5    Barclays immediately terminated them.  They didn't -- in

6    other words, they didn't keep them.  They didn't enter into

7    a separate employment agreement with them.  They made --

8    they paid some termination -- severance payments to them,

9    but did not hire them.

10            But they did not -- certainly, Barclays did not

11   assume their agreement with Lehman in none of these cases.

12   And there is -- and the trustee has submitted no evidence

13   whatsoever that there was any such assumption and it's

14   simply is not the fact.  And if the trustee wants -- you

15   know, we can certainly provide the trustee with the support

16   that Barclays did not assume any of these people's

17   agreement.

18            I presume the trustee has obtained this

19   information from Barclays as well.  We don't -- obviously,

20   we do not know what the -- Barclays has told the trustee

21   because the trustee has not given us that information.  But

22   there is nothing in the record that would suggest that

23   Barclays assumed the agreements that my clients had with

24   Lehman.

25            THE COURT:  Okay.  All right.  Let me hear from

Page 19

1     some of the other counsel.

2            Good morning.

3            MR. BAUMSTEIN:  Good morning, Your Honor.  Doug

4     Baumstein from White & Case on behalf of 1EE, LLC.

5            THE COURT:  Are you in a similar -- are your

6     clients in a similar situation?

7            MR. BAUMSTEIN:  No.  They're -- well, they're --

8     yes and no.  I think with respect to the 237th omnibus

9     objection that is a purely legal argument.  We think that

10    legal argument has no merit.  It can be resolved.  There are

11    some factual issues around it -- around whether he's even a

12    transferred employee, as that term is defined.  There's also

13    perhaps some issues, I don't know, about calculation.

14           As Hughes Hubbard has already recognized in

15    conversations we've had, they have all the information they

16    need from us to evaluate the claim.  And my concern here is

17    we're talking now about, well, we're trying to find a

18    procedural path forward.

19           From our point of view, in August we said we're

20    ready to sit down and talk to you either through a mediator

21    or directly.  They said, no.  We need you to respond.  Now

22    we're in a position where they're saying, well, we would

23    like to take some time to evaluate, but they haven't said

24    what information will cause them to either want to talk

25    about settlement, to proceed with a sufficiency hearing or

Page 20

1   otherwise.

2           So my concern here is that we're essentially

3   caught in a position where we're at their mercy on a timing

4   issue.  And I just want to make sure that we have various

5   either -- either status conferences or, more accurately --

6           THE COURT:  Well, we need to -- we need to set

7   some dates and deadlines because enough time has passed.

8           MR. BAUMSTEIN:  I -- Your Honor, that's exactly my

9   point.  We --

10          THE COURT:  You know, and the trustee's letter

11  states, among other things, the trustee agrees with the

12  claimants that the omnibus objections should be heard by the

13  Court in a prompt matter.

14          So we have to set dates.  So you're all here.

15  There may be some other counsel who are here.  So let's just

16  set some dates.  I mean, it just can't continue to roll

17  forward until the trustee collects every last bit of

18  information.

19          I mean, the risk is that in some aspects a ruling

20  on the legal issue might be something of an advisory opinion

21  to the extent that somebody got terminated or doesn't

22  properly belong in the group.  But I think to hold

23  everything up for that possibility would be the tail wagging

24  the dog.

25          So is the trustee prepared to give us an out --

Page 21

```
 1    give us an outside date for a plan being rolled out, either

 2    -- either if we're going to skip a sufficiency hearing and

 3    just go to a merits hearing; either we're going to have a --

 4    whether -- I don't care whether you call it a sufficiency

 5    hearing or a merits hearing on the purely legal issue,

 6    putting to one side other factual issues that may impact the

 7    applicability of any ruling that comes out of that to

 8    individual employees.  But we should set a date.

 9              MR. FOUKAS:  I guess I just want to say, I mean,

10    the purely legal issue, it really is intertwined with the

11    question of did these people get paid by Barclays.  The

12    assumption here was the obligation to pay bonuses.  If

13    Barclays paid those bonuses, then there's really nothing

14    that the trustee has any liability for.

15              Now I've heard for the first time, I guess, that

16    Mr. Mark's clients got some kind of payments.  We just need

17    to know what those are and if --

18              THE COURT:  Okay.  But what's holding up getting

19    that information?

20              MR. FOUKAS:  I'm not sure, Your Honor.  At this

21    point I -- we've asked for it.  It shouldn't be --

22              THE COURT:  I have --

23              MR. FOUKAS:  -- that hard.

24              THE COURT:  I have too many of you standing.  So

25    two of you --
```

Page 22

1            MR. MARK:  The answer is we only requested that --

2   they only requested information from us two days ago.  I've

3   been talking to --

4            MR. FOUKAS:  Well --

5            THE COURT:  Okay.

6            MR. MARK:  -- the SIPA trustee --

7            THE COURT:  Okay.

8            MR. MARK:  -- for a year and a half about my

9   claims.

10           THE COURT:  All right.

11           MR. MARK:  It took them until two days ago to

12  actually ask for that information.

13           THE COURT:  Okay.  So he asked the question and so

14  we're going to have a deadline for finding that out.

15           MR. FOUKAS:  I think if we can get the information

16  -- we've asked for the information to come in in the next

17  couple of weeks.  It shouldn't really take that long to find

18  out how much someone was paid.  When we get that

19  information, I think we should be in a position to talk to

20  the claimants as to which way we go forward, whether it is

21  to a merits hearing with respect to certain of them or

22  whether it is to a resolution or mediation process with

23  others.

24           But I don't think talking about this is a pure

25  legal issue really we can do that without the facts of were

Page 23

1    these people fully paid because that's a really different

2    legal issue than if they were not.  And so I -- you

3    mentioned an advisory opinion.  I really think it would be

4    in the absence of just the real basic information of --

5              THE COURT:  Well, there's two ways that -- there's

6    two reasons why Barclays would have paid them:  (a) because,

7    as the trustee suggests, there was some kind of an

8    obligation to pay them or (b) Barclays independently hired

9    them and decided to pay them, right?

10             So it gets more complicated and more interesting

11   because if they did get paid something by Barclays, it

12   doesn't necessarily -- and I haven't dug a deeply into this.

13   It doesn't necessarily preclude the argument that Lehman

14   might still be responsible for additional monies.  I don't

15   know.

16             MR. FOUKAS:  I --

17             THE COURT:  I don't know.

18             MR. FOUKAS:  -- think it's probably, in these

19   circumstances, probably would given the transaction and the

20   claimants we're talking about.  But I understand others may

21   feel differently about that.

22             But, again, that's a very different issue than

23   someone who received nothing from Barclays.

24             THE COURT:  Well, then, let's set a date and we're

25   getting into the holiday season.  I appreciate that.  And I

Page 24

```
1    have a lot of calendar issues, but let's set a date for, you

2    know, a fish or cut bait date that at that point you have to

3    indicate which way you want to go with respect to every

4    claimant.  Any information that you've asked for presumably

5    would be provided by then.  It's not complicated.  And then

6    we'll either set a -- we'll set a hearing on the legal issue

7    if the parties haven't otherwise agreed to go down the

8    mediation path or otherwise.

9            So these guys would like to do this on Monday.

10   I'm not going to do that.  But you want to look at some kind

11   of a date in December?

12           MR. FOUKAS:  Yeah.  Well, I guess it would be best

13   for the information if we can get it, you know, either

14   December or January for a status conference, I think, would

15   make sense, Your Honor.

16           THE COURT:  Okay.  Hold on.  One more person needs

17   to be heard, so why don't you folks have a seat for a moment

18   and let me hear from this gentleman?

19           Good morning.

20           MR. FRYLICK:  Good morning.  Thank you, Your

21   Honor.  My name is Rob Frylick of Ruttenberg and Rich (ph).

22   We represent claimant Okshai Murthay (ph) who is in a

23   similar situation, I think, to a lot of the other employees

24   that are here.

25           My only concern is that when we're setting a date,
```

Page 25

1    people like Mr. Murthy who are single employees don't

2    necessarily have the same records that perhaps Barclays

3    would.  We listed in our claim what Mr. Murthy received from

4    Barclays when he transferred over.  He was very shortly

5    after being transferred terminated and was not paid his

6    payment bonus under his employment agreement.

7             And so having listed it in the claim, we then

8    received from the trustee requests for further information.

9    I'm not sure what more we can really provide other than a

10   statement of what we were paid.  We don't have other records

11   and I think the trustee is looking for, I'm not sure exactly

12   what to prove what we received.  This was, I would say six

13   years ago now.  So people like Mr. Murthy aren't going to

14   necessarily have beyond just their statements in their

15   claims what they received.

16            THE COURT:  Right.  So they -- they have a tax

17   return or a 1099 or a W-2 or something along those lines.

18            MR. FRYLICK:  Okay.  But as the trustee indicated,

19   though, there's significant other information they might be

20   looking for and they may be looking to Barclays to get it.

21   And I don't know how responsive Barclays is going to be --

22            THE COURT:  Well --

23            MR. FRYLICK:  -- within the December deadline to

24   provide that information.

25            THE COURT:  Well, in your situation, though,

1    you're saying that you -- you have provided the information

2    about what Barclays paid.  And I would be surprised if

3    Barclays doesn't have the information.  But if there's

4    nothing more that they get, then we're done with that and

5    we're going to move forward based on the information that

6    you provided.

7              MR. FRYLICK:  Okay.

8              THE COURT:  So, I mean, you can't produce

9    something that you don't have.

10             MR. FRYLICK:  Correct, Your Honor.

11             THE COURT:  Right.  So --

12             MR. FRYLICK:  Thank you.

13             Okay.  Thank you, Your Honor.

14             THE COURT:  Okay.  Thank you.

15             MR. MARK:  David Mark.  And I just want to --

16             THE COURT:  Yeah.

17             MR. MARK:  -- emphasize the point that there's a

18   -- the objection raises only one legal argument which is

19   that the debtor has been fully discharged because Barclays

20   assumed the agreement.  That's an issue of law.  There are

21   no facts that (indiscernible) into that decision.

22             Whether -- now whether or not any payments that my

23   clients received from Barclays based on some other agreement

24   they had with Barclays would in any way act as a set-off

25   against their rights under the Lehman contract is, again,

Page 27

1    also an issue of law.

2            THE COURT:  But if your clients were issued a

3    check with a cover letter that says, dear employee, enclosed

4    is your bonus payment pursuant to our obligation to pay

5    bonuses that were due and payable to Lehman employees which

6    we assumed under X contract, that would be pretty

7    dispositive.

8            MR. MARK:  I think that would be -- that would

9    certainly be relevant to the issue.

10           THE COURT:  Right.  So there are -- there are

11   hypothetical fact issues that could be involved.  But --

12           MR. MARK:  I --

13           THE COURT:  -- I'm trying to give you what you

14   want.

15           MR. MARK:  It's purely hypothetical, I agree.  And

16   that's all I'm saying.  I think whatever factual issues

17   there are can be resolved rather quickly.  And all I'm

18   saying is that we should get a fairly prompt hearing on the

19   legal issues.

20           THE COURT:  And that's what I'm trying -- that's

21   what I'm trying to give you.

22           So subject to, you know, folks' holiday plans, I

23   can give you a hearing date the first week of January.

24           MR. FOUKAS:  That's fine with us, Your Honor.

25   That's fine, Your Honor.

Page 28

1          (Pause)

2                THE COURT:  I'm being overruled.

3          (Laughter)

4                THE COURT:  There's a Lehman omnibus day on

5     January 15th and because of the volume of matters that are

6     coming on on the 15th, apparently we're doing an extra day

7     on the 16th.  So one of two -- those two days would be

8     preferable.

9                But let me clarify a little bit what I'm thinking

10    about.  I'm thinking that on that date I'm going to have a

11    hearing on the merits of something, not just another status

12    conference.

13                MR. FOUKAS:  I guess I would suggest that we do it

14    as a status conference, Your Honor, and the reason I do

15    that, Your Honor, is because as Your Honor has identified

16    and I think as we've talked through, there are really

17    relevant factual issues to this --

18                THE COURT:  Then I'm --

19                MR. FOUKAS:  -- legal question.

20                THE COURT:  Then I'll have back you for a status

21    conference in December.  I'm not -- I'm not going to go out

22    two months for another status conference that's going to

23    lead to a request to go out another two months on mediations

24    and motions.  That's just an inordinate amount of time.

25                So then today is November 7th.  I have a Lehman

1   day on December 10th.  So why don't you come back on the

2   December 10th calendar for a further status conference and

3   to agree on a definitive plan to get to dispositive motions

4   as -- as applicable.

5           MR. FOUKAS:  That's fine.  Thank you.

6           THE COURT:  All right.  December 10th at 10:00.

7           MR. MARK:  All right.  Thank you, Your Honor.

8           MR. FOUKAS:  Thank you.

9           THE COURT:  Okay.  Thank you very much.

10          If in the meantime you arrive at a game plan, let

11  us know and we can do something else.  All right.

12          MR. FOUKAS:  Thank you.

13          THE COURT:  Thank you.

14      (Pause)

15          THE COURT:  Good morning.

16          MR. PACE:  Good morning, Your Honor.  Jordan Pace

17  of Hughes, Hubbard & Reed for the SIPA trustee.

18          The last item on the agenda is one contested

19  matter.  It's a single claim on the trustee's two hundred

20  and fifty-ninth omnibus objection.

21          THE COURT:  Hold on.

22          Folks, if you don't mind.  Thank you.

23          MR. PACE:  We're here for a sufficiency hearing on

24  the claim filed by Atif Khan through his broker, GLG

25  Partners.  That's Claim Number 3036 and it seeks three and a

Page 30

1     half million dollars.

2             The amount claimed is the alleged decrease in the

3     value of Mr. Khan's securities in his LBI account from the

4     end of August 2008, so about three weeks before our filing

5     date, through November 30th of 2008, so more than two months

6     after the filing date.

7             Conceptually we can think of this claim in two

8     parts:  What happened before the filing date and what

9     happened after the filing date.  And what happened before

10    the filing date, from LBI's perspective, is nothing.  There

11    are no allegations that anyone, Mr. Khan or his brokers at

12    GLG ever contacted anyone at LBI prior to the filing date.

13            The claim shows that the first contact was on

14    September 20th, the day after the filing date.  And it's

15    also clear from the allegations that there was no trade

16    ticket.  There is no sale order that was communicated to LBI

17    prior to the filing date.  That's what distinguishes Mr.

18    Khan's claim from all of the cases that he cites where there

19    was some breach of contract liability based on an accepted

20    or standing sale order that the broker dealer was actually

21    aware of.

22            So the second part is what happened after the

23    filing date.  And in the larger context, what happened after

24    the filing date to Mr. Khan and over 100,000 other customers

25    of LBI is that they had a temporary inability to trade in

Page 31

1    their accounts while the trustee, pursuant to SIPA and his

2    duties under SIPA completed the bulk transfer of accounts to

3    Barclays and to Neuberger Vermin.

4           As I mentioned, this affected over 100,000 account

5    holders and it was a transfer of, I believe it's over $92

6    billion in customer assets.  This was the largest and most

7    successful use of SIPA's transfer provision in the four

8    decades of SIPA and it was approved by Judge Peck.

9           And once those assets are transferred to Barclays

10   they're out of the estate.  They're out of the trustee's

11   hands.  And what the law says is that claimants like Mr.

12   Khan cannot recover for post-filing date market losses

13   either as a customer or as a general creditor claim.

14          So we are requesting that Your Honor disallow and

15   expunge the claim.

16          THE COURT:  Okay.

17          MR. PACE:  I'm happy to answer any questions.

18          THE COURT:  Thank you.

19     (Pause)

20          THE COURT:  Good morning.

21          MS. MCLOUGHLIN:  Good morning, Your Honor.

22   Meaghan McLoughlin, counsel to Mr. Khan.

23          Contrary to the trustee's position we believe that

24   Mr. Khan did try to attempt trades before the filing date.

25   In his proof of claim that he submitted there are two trade

Page 32

```
 1   forms, one dated September 17th, one dated September 19th

 2   which he tried to trade for 100,000 shares and 50,000

 3   shares, and he was told for both that he was unable to

 4   conduct any trades.

 5            THE COURT:  Okay.  Why don't we look at those?

 6            MS. MCLOUGHLIN:  Sure.

 7       (Pause)

 8            MS. MCLOUGHLIN:  In the trustee's numbered version

 9   it's page 22 and --

10            THE COURT:  Are you talking about these --

11            MS. MCLOUGHLIN:  -- 23.

12            THE COURT:  -- two from Compliance London GLG

13   Partners?

14            MS. MCLOUGHLIN:  Yes.  Mr. Khan worked for GLG,

15   but GLG also managed his account --

16            THE COURT:  Okay.

17            MS. MCLOUGHLIN:  -- at LBI and he -- he was 00 he

18   conducted -- the way it was handled in the ordinary course

19   is that he would direct his trades at GLG who would then

20   contact Lehman, but he could --

21            THE COURT:  Okay.

22            MS. MCLOUGHLIN:  -- also trade himself.

23            THE COURT:  Okay.

24            MS. MCLOUGHLIN:  And I believe for these --

25            THE COURT:  The law -- the law requires that in
```

Page 33

```
 1   order for there to be a recovery of an unsecured claim there

 2   needs to be a trade that was placed that was not executed.

 3   And it's unclear to me what these documents are, but there's

 4   nothing on the face of them that evidences a communication

 5   to LBI, let alone a generation of a trade by LBI.

 6            The cases that you cite all involve unexecuted

 7   trades that were actually placed.  And that's where we have

 8   a disagreement.

 9            MS. MCLOUGHLIN:  I -- I understand what you are

10   saying.  What we believe is that he did try to place these

11   trades and there are several emails from the 17th of

12   September stating that he tried to place trades, but was

13   unable to do so because there's nowhere to book it.

14            THE COURT:  But you -- and where are the emails?

15            MS. MCLOUGHLIN:  Let me get the page.

16       (Pause)

17            MS. MCLOUGHLIN:  It should be --

18            THE COURT:  There are --

19            MS. MCLOUGHLIN:  -- page 6 of the trustee's --

20   page 6 at the bottom.

21            THE COURT:  Page 6 of?

22            MS. MCLOUGHLIN:  The proof of claim that the

23   trustee submitted has numbered pages at the bottom.  It's

24   page 6 of that.

25            THE COURT:  Okay.  And you're talking about from
```

Page 34

1    Atif Khan to Christian Roy, "Tried to do a trade today and

2    was told I can't because there's nowhere to book it.  What's

3    the status of it?"  That's the basis of it?

4              MS. MCLOUGHLIN:  Yes.

5              THE COURT:  Okay.  So you still have to take me

6    back to the law which is that it's -- you don't get a claim

7    if you tried to book a trade.  You get a claim if you booked

8    a trade that was not executed.  There's --

9              MS. MCLOUGHLIN:  Well --

10             THE COURT:  There's no support in the law for a

11   claim based on a trade that somebody tried to book.

12             MS. MCLOUGHLIN:  We believe -- I under -- we

13   understand the law and I understand the trustee's position.

14   What Mr. Khan believes is that he is entitled to this claim,

15   but at the least he would like some discovery as to where

16   these communications went, if there were any records to LBI

17   within those three days and what happened with these trade

18   forms that were rejected.

19             THE COURT:  But if -- under the law that's

20   irrelevant if the only basis for allowing a claim is that

21   there have been a actual trade that was booked that was not

22   executed, then I think it's irrelevant as a matter of law

23   that an attempt was made to book a trade.  And this -- who

24   is Mr. Roy?

25             MS. MCLOUGHLIN:  He is an employee at GLG.  He is

Page 35

1    one of the employees that Mr. Khan would book trades

2    through.

3                THE COURT:  Do you want to show me -- point to any

4    of the cases that you cited that would support the position

5    that there's a claim even though -- even in the absence of a

6    trade having been booked?

7                MS. MCLOUGHLIN:  I think in the -- I'm looking at

8    the trustee's reply on page 4 towards the bottom.

9                THE COURT:  Yes.

10               MS. MCLOUGHLIN:  In the AR Barron case, there the

11   debtor failed to execute the trade as instructed.

12        (Pause)

13               THE COURT:  But, again, that speaks to their

14   having actually been the placement of a trade.  I instruct

15   you to sell a hundred shares of General Motors, and there's

16   no evidence that's been presented that there was any such

17   instruction.

18               The other cases are -- for example, Artford versus

19   Miller denying customer status and holding the claimant had

20   a general unsecured claim where the broker failed to execute

21   a sale order.  So you have not tendered a sale order.  If

22   there were a sale order, there would be a claim.  Without a

23   sale order, with respect to the prepetition, there's no

24   claim.

25               MS. MCLOUGHLIN:  I understand your position and we

Page 36

1    believe -- we would like discovery on this, if possible.

2              THE COURT:  Okay.  Let me hear from the trustee

3    with respect to that last point, and then we need to talk

4    about the post-petition period.  All right.

5              MS. MCLOUGHLIN:  Sure.

6              THE COURT:  So should there be discovery?

7              MR. PACE:  Your Honor, just to address a related

8    point that feeds into that.

9              In paragraph 5 of Mr. Khan's declaration attached

10   to their response he says specifically, "I attempted to

11   execute and settle the trades at LBI through my liaison, GLG

12   Partners."  So there's some I would say suggestion that

13   maybe possibly he might have gone outside of GLG.  That's

14   contradicted by the allegations and all of the evidence.

15             And that feeds into the discovery point because

16   it's particularly within Mr. Khan's power as an employee or

17   partner -- I'm not really sure which -- but affiliated with

18   GLG Partners that if GLG had taken his request or his GLG

19   tickets, which is what Ms. McLoughlin pointed to, and sent

20   that over to LBI, that's in the possession of GLG.  All of

21   this stuff is in the possession of GLG.

22             But as Your Honor mentioned, this is all

23   irrelevant because the cases say without that ticket,

24   without some clear instruction there is no claim whatsoever.

25             THE COURT:  Okay.  All right.  Let's talk about

Page 37

1   the post-petition.  I think the trustee has correctly

2   summarized the law with respect to what happens once SIPA

3   steps in.  Is there anything you wanted to say with respect

4   to that?

5            MS. MCLOUGHLIN:  With respect to that we -- Mr.

6   Khan feels that he -- he has no idea what happened to his

7   account from the filing date through at least -- for the

8   next three months he was unable to access his account, which

9   I know the trustee's counsel has said happened to many, many

10  other --

11           THE COURT:  Sure.

12           MS. MCLOUGHLIN:  -- other claimants and we

13  understand that.  But what we're really focusing on today is

14  his prepetition activities because I understand the law on

15  the transfer.

16           THE COURT:  On the transfer, on the --

17           MS. MCLOUGHLIN:  Yes.

18           THE COURT:  -- post-petition.  So there is no

19  claim for the decline in value of the securities after SIPA

20  --

21           MS. MCLOUGHLIN:  We --

22           THE COURT:  -- took over?

23           MS. MCLOUGHLIN:  He still believes he has a claim

24  for the period of time that he has no idea what happened to

25  his money, but I understand the law is --

Page 38

```
 1              THE COURT:  Okay.  But in the absence of some sort

 2    of an argument of malfeasance, which I don't read him to be

 3    making, he's simply complaining that the securities declined

 4    in value.  There was a delay, et cetera.

 5              But he has been fully paid the whatever was in his

 6    account, I assume, as of --

 7              MS. MCLOUGHLIN:  That I'm not sure of.

 8              THE COURT:  -- whatever.

 9              MR. PACE:  Your Honor --

10              THE COURT:  Did he have a balance in his account?

11              MR. PACE:  Well, there's no claim that Mr. Khan

12    did not receive his full filing date equity.

13              THE COURT:  Say that again.

14              MR. PACE:  There's no claim that Mr. Khan didn't

15    receive his full --

16              THE COURT:  Right.

17              MR. PACE:  -- filing date --

18              THE COURT:  So you're saying that in the negative,

19    but I'm saying it in the positive.  Everything to which he

20    was entitled on his customer claim he received.

21              MS. MCLOUGHLIN:  That I'm not sure of, but he --

22    it's not something that is at issue today.  We're not

23    disputing that.

24              THE COURT:  Okay.  Well, it was -- it was put at

25    issue in the papers and that's why we're talking about it.
```

Page 39

1    So let's be clear that there is no claim -- there is no

2    additional claim with respect to whatever was in his account

3    after SIPA took over.

4          MS. MCLOUGHLIN:  I don't -- I don't think we're

5    saying that exactly.

6          THE COURT:  Okay.  Well, I need to understand what

7    you are saying exactly because it seems to be a little bit

8    contradictory.  The trustee's position with which I agree is

9    that there is no basis for a claim under SIPA or the

10   Bankruptcy Code; that all of the assets and the securities

11   in the accounts valued as of September 29th, 2008 have been

12   received and, therefore, the trustee has satisfied the

13   claims under SIPA Section 78(fff)(2)(f).  So there is no

14   additional claim either for decline in value or for any lack

15   of information or access that might have been associated

16   with that period of time.

17         MS. MCLOUGHLIN:  No.  He's seeking a claim as a

18   general unsecured for his --

19         THE COURT:  Okay.  Well, that's going to be

20   overruled and denied.

21         MS. MCLOUGHLIN:  Thank you, Your Honor.

22         THE COURT:  Okay.  And with respect to the

23   prepetition account, I think the trustee has made a

24   convincing case that the claimant himself who transacted

25   business through GLG did not contact anyone prior to LBI and

Page 40

1    indeed his own sworn statement bears that out.  The account

2    was transferred to Barclays as part of the bulk transfer,

3    and in the absence of any evidence where there does -- which

4    there does not appear to be that there was an actual order

5    that was placed with LBI prior to the filing date, there is

6    no basis in the law to afford him a contract claim or an

7    unsecured claim.

8            I thank you for your arguments.  Thank you for

9    coming down.  And I would ask that the trustee prepare an

10   order and share it with counsel and submit it to chambers.

11           MR. PACE:  Sure.

12           THE COURT:  All right.

13           MS. MCLOUGHLIN:  Thank you, Your Honor.

14           THE COURT:  Thank you very much.

15           I think that that concludes the agenda --

16           MR. PACE:  It does, Your Honor.

17           THE COURT:  -- for today.

18           MR. PACE:  Yes.

19           THE COURT:  All right.  Thank you very much.  Have

20   a lovely weekend.

21           MR. PACE:  You, too.

22       (Whereupon, these proceedings concluded at 10:49 a.m.)

23

24

25

Page 41

1                    I N D E X

2

3                     RULINGS

4    DESCRIPTION                              PAGE      LINE

5    Doc # 46364 Motion for Approval of

6    Settlement Agreement Among Putnam Structured

7    Product Funding 2003-1, Ltd., Putnam

8    Structured Product Funding 2003-1 LLC, U.S.

9    Bank National Association, as Successor

10   Trustee, Lehman Brothers Special Financing,

11   Inc., and Lehman Brothers Holdings, Inc.     9         3

12

13   Doc. #15363 Debtors' One Hundred Seventeenth

14   Omnibus Objection to Claims (No Liability

15   Non-Debtor Employee Claims)                 12         9

16

17   Adversary Proceeding: 08-01420-scc Lehman

18   Brothers, Inc. Doc #9601 Two Hundred

19   Fifty-Ninth Omnibus Objection to General

20   Creditor Claims                            39        19

21

22

23

24

25

```
1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, certify that the foregoing transcript

4    is a true and accurate record of the proceedings.

5

6

7    _____

8    Sherri L. Breach

9    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11   Veritext

12   330 Old Country Road

13   Suite 300

14   Mineola, New York 11501

15

16

      Date: November 10, 2014

17

18

19

20

21

22

23

24

25
```

Sherri L Breach

Digitally signed by Sherri L Breach
DN: cn=Sherri L Breach, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.11.10 18:09:37 -05'00'