**Hearing Date and Time: January 15, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: January 5, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999
Thomas J. Moloney
Sean A. O'Neal
Humayun Khalid

*Attorneys for Claimant SPCP Group, L.L.C.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING ON CLAIMANT SPCP GROUP, L.L.C.'S MOTION UNDER BANKRUPTCY CODE SECTION 1142(b) TO COMPEL LOTC TO PAY POST-PETITION INTEREST AS REQUIRED BY ITS CONFIRMED PLAN OF REORGANIZATION**

PLEASE TAKE NOTICE that on December 19, 2014, SPCP Group, L.L.C. (as agent for Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd., "Silver Point"), filed its motion under Bankruptcy Code section 1142(b) to compel LOTC to pay post-petition interest as required by its confirmed plan of reorganization (the "Motion"), and that a hearing (the "Hearing") to consider the Motion will be held before the Honorable Shelly C. Chapman, United States Bankruptcy Judge, in Courtroom 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004,

on **January 15, 2015 at 10:00 a.m. (Prevailing Eastern Time)**, or as soon thereafter as counsel

may be heard.

       **PLEASE TAKE FURHTER NOTICE** that any responses to the Motion must be

in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of

the Bankruptcy Court, shall be filed with the Bankruptcy Court (a) electronically in accordance

with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users

of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or

3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

shall be served in accordance with General Order M-399 upon (i) the chambers of the Honorable

Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 621; (ii)

attorneys for Silver Point, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New

York, New York 10006 (Attn: Thomas Moloney, Esq., Sean A. O'Neal, Esq., and Humayun

Khalid, Esq.) (iii) attorneys for LBHI and certain of its affiliates, Weil, Gotshal & Manges LLP,

767 Fifth Avenue, New York, New York 10153 (Attn: Garret A. Fail, Esq., Harvey R. Miller,

Esq., Lori R. Fife, Esq.); (iv) the Office of the United States Trustee, U.S. Federal Office

Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: William K.

Harrington, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); and (v) attorneys for the

official committee of unsecured creditors in these cases, Milbank, Tweed, Hadley & McCloy

LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq.,

Dennis O'Donnell, Esq., and Evan R. Fleck, Esq.); so as to be filed and received by no later than

**January 5, 2015 at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Motion or any claim set forth thereon, Silver Point may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated: December 19, 2014
       New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:      /s Sean A. O'Neal
         Thomas J. Moloney
         Sean A. O'Neal
         Humayun Khalid
         One Liberty Plaza
         New York, New York 10006
         Telephone: (212) 225-2000
         Fax: (212) 225-3999

         *Attorneys for Claimant SPCP Group, L.L.C.*

**Hearing Date and Time: January 15, 2015 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: January 5, 2015 at 4:00 p.m. (Prevailing Eastern Time)**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999
Thomas J. Moloney
Sean A. O'Neal
Humayun Khalid

*Attorneys for Claimant SPCP Group, L.L.C.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**CLAIMANT SPCP GROUP, L.L.C.'S MOTION UNDER BANKRUPTCY CODE SECTION 1142(b) TO COMPEL LOTC TO PAY POST-PETITION INTEREST AS REQUIRED BY ITS CONFIRMED PLAN OF REORGANIZATION**

Claimant SPCP Group, L.L.C., as agent for Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd., ("Silver Point" or the "Claimant") submits this Motion under Bankruptcy Code section 1142(b) (the "Motion") for an order compelling Lehman Brothers OTC Derivatives Inc. ("LOTC") and Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as plan administrator in the above captioned cases (the "Plan Administrator"), to perform their obligations to pay post-petition interest under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (D.I. 23023) (as amended or supplemented, the "Plan") and to provide an accounting and timetable for such payments ahead

of the next distribution date under the Plan.  In support of the Motion, Claimant submits the declaration of Austin Saypol (the "Saypol Decl.") and respectfully states as follows:[1]

## PRELIMINARY STATEMENT

1.      The Plan Administrator and LOTC have unjustifiably refused to make distributions of post-petition interest to Silver Point and other similarly situated holders of Allowed Claims against LOTC despite such payments being required to be made under the Plan. They have also improperly refused to inform creditors about their progress in meeting their obligation to make such payments.  The Plan requires LOTC to make Distributions of post-petition interest at the contract rate to its creditors from Available Cash after all Allowed Claims against it have been satisfied in full.  Plan § 8.13(c).  For more than a year, allowed general unsecured claims and affiliate claims against LOTC have been satisfied in full, yet LOTC has not made any further Distributions to its creditors as required by Plan section 8.13(c).  All the while, LOTC has held Available Cash with which to make such Distributions—as demonstrated by their recent loan of $560 million to another Chapter 11 entity.

2.      On October 7, 2014, Silver Point submitted its interest certification to LOTC, in accordance with the swap agreement on which its claims are based, and asked LOTC to disclose its plans for making post-petition interest Distributions in accordance with the Plan.  Despite repeated requests, LOTC has not made any such Distributions and has also failed to provide any information regarding its intentions and timing for making such Distributions.

3.      LOTC is in violation of the confirmed Plan by failing to make any post-petition interest payments and apparently also by failing even to undertake the preliminary steps that are necessary for such payments to be made.  LOTC has also violated its obligation to LOTC

---

[1]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

creditors by stonewalling their requests for information, including information regarding when Distributions may be expected, any specific barriers to Distribution, or any estimate for how much interest may be owed.  Without even attempting to work through these issues, the Plan Administrator has instead loaned $560 million to another Chapter 11 estate for distribution to LBHI creditors.  The decision to use money owed to LOTC creditors to pay creditors of another estate raises serious issues of conflicts of interest, requiring even more transparency and disclosure to LOTC creditors and to this Court.

4.      Given LOTC's refusal to make post-petition interest Distributions—and to inform LOTC creditors of the obstacles, if any, to such payments or its plans for resolving them—Silver Point respectfully requests that this Court enforce LOTC's obligation to make an initial Distribution of post-petition interest to LOTC creditors at the next Distribution Date, and, ahead of such Distribution Date, require the Plan Administrator and LOTC to provide an accounting and reasonable timetable for resolving all issues required to permit the full and final payment of such interest.

## JURISDICTION

5.      The Bankruptcy Court retained exclusive jurisdiction "over all matters arising under or related to, the Chapter 11 Cases, including, without limitation, the matters set forth in Article XIV of the Plan."  Confirmation Order ¶ 77.  The Court has the power to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan.  Plan § 14.1(h).

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      The statutory predicate for the relief requested herein is section 1142(b) of the Bankruptcy Code.

3

## BACKGROUND

I.    **The Bankruptcy Cases And The Confirmed Plan**

8.    On September 15, 2008, LBHI and certain of its subsidiaries commenced

voluntary cases under chapter 11 of the Bankruptcy Code, and LOTC commenced the same on

October 3, 2008.

9.    On December 6, 2011, the Court approved and entered an order confirming the

Plan (D.I. 23023) (the "Confirmation Order").  The Plan became effective on March 6, 2012 (the

"Effective Date").

10.    On July 18, 2012, this Court entered the Order Modifying Certain Existing Claims

Orders (D.I. 29505) (the "Claims Order"), which allowed the Plan Administrator to settle claims

asserted against the Debtors without prior court approval or any other party in interest where the

allowed amount of the settled claim is less than or equal to $200 million.

11.    Pursuant to the Claims Order, on December 14, 2012, the Plan Administrator and

Silver Point settled claims under a terminated swap agreement (the "Swap Agreement")

documented under the 1992 ISDA Master Agreement (the "Swap Agreement Claims"), which, as

a result of the settlement, were "allowed as general unsecured claims against LOTC and LBHI

respectively, each in the amount of $15,000,000.00."  See Saypol Decl. Ex. 2 (the "Settlement

Agreement").[2]  The Court approved the modified and allowed Swap Agreement Claims.  See

Fifth Supplemental Order Granting Debtors' One Hundred Third Omnibus Objection to Claims

(Valued Derivative Claims) (D.I. 33260) (the "SPCP Derivative Claims Order"); SPCP

Derivative Claims Order Ex. 1.

---

[2]    A fuller explanation of the Swap Agreement Claims is provided in the declaration of Austin Saypol
submitted herewith.

12.     Since the Effective Date in March 2012,  the Plan Administrator has made

Distributions to creditors twice a year—on or about March 30 and September 30.  See Plan § 8.3.

Holders of general unsecured claims and affiliate claims against LOTC have received 100% of

their allowed Distributions since at least October 3, 2013.  See Notice Regarding Fourth

Distribution Pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Creditors (D.I. 40225) (the "Fourth Distribution Notice").

LOTC reported no Distributions to LOTC creditors on the fifth or sixth distribution dates.  See

Notice Regarding Fifth Distribution Pursuant to the Modified Third Amended Joint Chapter 11

Plan of Lehman Brothers Holdings Inc. and Its Affiliated Creditors (D.I. 43745) (the "Fifth

Distribution Notice"); Notice Regarding Sixth Distribution Pursuant to the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Creditors

(D.I. 46365) (the "Sixth Distribution Notice").

13.     Under the Plan, when a debtor has Available Cash after all Allowed Claims

against that Debtor have been satisfied in full, each holder of such Allowed Claims "shall receive

its Pro Rata Share of further Distributions."  Plan § 8.13(c).  Such Distributions are to be paid "to

the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest

on the Allowed amount of such Claims at the rate applicable in the contract or contracts on

which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate)."  Id.

## II.     LOTC'S Failure to Pay Post-Petition Interest

14.     On its most recent balance sheet, LOTC possessed cash and short term

investments of $495 million as of June 30, 2014.  See Balance Sheets as of June 30, 2014

Management's Discussion and Analysis and Accompanying Schedules at 18 (D.I. 46422) (the

"Q2 2014 Financial Statements").

15.     In April 2014, Silver Point asked LOTC about its plan regarding post-petition interest Distributions.  <u>See</u> Saypol Decl. ¶ 8.  LOTC stated that a plan for making post-petition interest Distributions had not yet been developed, but it was working on one.  <u>Id.</u>

16.     Given the foregoing conversation, Silver Point was surprised to discover that on October 1, 2014, LOTC had agreed to loan LBHI $560 million for payment of LBHI's creditors.  <u>See</u> Q2 2014 Financial Statements at 26.  In the Sixth Distribution Notice, dated September 25, 2014, LOTC reported no distributions to any of its creditors.  <u>See</u> Sixth Distribution Notice Ex. A.

17.     Despite having ample Available Cash and having paid its creditors, LOTC concedes that it has "not recorded an estimate for post-petition interest in LOTC as of June 30, 2014."  <u>See</u> Q2 2014 Financial Statements at 16.

18.     On October 7, 2014, Silver Point submitted the interest certification for its post-petition interest claim, pursuant to the Swap Agreement, and asked LOTC to disclose its plans for making post-petition interest Distributions.  <u>See</u> Saypol Decl. Ex. 3 (the "<u>Interest Certification</u>").  The post-petition interest owed was calculated using the market yield implied by trading prices of the publicly issued senior secured debt of the original swap counterparty plus 1% per annum.[3]  <u>Id.</u>  Interest continues to accrue and compound daily until payment is made in full.  <u>Id.</u>[4]

---

[3]     Importantly, the two primary issues on which LBHI has apparently challenged another LOTC creditor's entitlement to post-petition interest are not present here.  In contrast to the situation arising in <u>Bania Brothers, L.L.C. v. Lehman Bros. OTC Derivatives Inc.</u>, Adversary No. 14-02095 (SCC) (Bankr. S.D.N.Y. 2014), Silver Point's Settlement Agreement does not release Silver Point's entitlement to post-petition interest and Silver Point's interest certification is based on the cost of funding of the original swap counterparty, not that of Silver Point as the assignee.

[4]     Under the Swap Agreement, a defaulting party was required to pay interest "for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate."  1992 ISDA Master Agreement (the "<u>ISDA Master</u>") § 2(e).  "Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed."  <u>Id.</u>  Defaulting parties must pay interest at a "rate per annum

19.      LOTC replied on October 14, 2014, with vague references to remaining
outstanding claims against LOTC being an obstacle to further distributions under the Plan.  See
Saypol Decl. Ex. 4 (the "October 14 Letter").  LOTC failed to provide any information regarding
any plan in place to address these obstacles or to provide a timeline for when further
Distributions might occur.  Id.

20.      On November 10, 2014, Silver Point wrote again to LOTC, requesting
information regarding the significance of the problems that LOTC had identified and its plans
and timetable for dealing with the post-petition interest issue.  Silver Point suggested that such
information should be made generally available to LOTC creditors.  See Saypol Decl. Ex. 5 (the
"November 10 Letter").

21.      To date, the Plan Administrator has not responded to Silver Point's November 10
Letter or otherwise provided a framework or timeline for payment of post-petition interest owed
to LOTC creditors.[5]  The Plan Administrator's erroneous view that it has discretion to use money
now due to LOTC creditors to satisfy the obligations of other Lehman estates gives an even
greater urgency to the request here.

---

equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to
fund or of funding the relevant amount plus 1% per annum."  Id. § 14.  A copy of the form 1992 ISDA Master
Agreement is attached hereto as Exhibit B.

[5]      In anticipation of this Motion, counsel to the Plan Administrator informed the Court at a hearing on
December 10, 2014, involving matters unrelated to this Motion, that the Plan Administrator would submit a
"procedure" to resolve post-petition interest issues for "solvent LBHI subsidiaries."  Hearing Transcript at 30-31,
In re Lehman Bros. Holdings Inc., et al., Case No. 08-13555 (SCC) (Bankr. S.D.N.Y. Dec. 10, 2014).  No such
proposal or procedure, however, has been filed with the Court or shared with Silver Point.

## **ARGUMENT**

I.    **THE COURT SHOULD COMPEL LOTC TO COMPLY WITH THE PLAN, INCLUDING BY PAYING POST-PETITION INTEREST TO SILVER POINT AND SIMILARLY SITUATED CREDITORS**

22.    The Court has authority to require LOTC to comply with the Plan and to perform any act necessary for the consummation of the Plan.  Section 1141 of the Bankruptcy Code provides that "the provisions of a confirmed plan bind the debtor."  11 U.S.C. § 1141(a).  Pursuant to section 1142 of the Bankruptcy Code, the Court has broad authority to enforce the terms of the Plan.  See 11 U.S.C. § 1142(b) ("The court may direct the debtor . . . to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . necessary for the consummation of the plan."); In re Chateaugay Corp., 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996) (stating that the "clear intent" of 1142(b) is to "assure that the terms and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the final decree is entered closing the case"); In re WorldCom, Inc., No. 02-13533 (AJG), 2009 WL 2959457, at *7 (Bankr. S.D.N.Y. May 19, 2009) (stating that 1142(b) "'empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan'" (quoting United States Brass Corp. v. Travelers Ins. Corp., Inc. (In re United States Brass Corp.), 301 F.3d 296, 306 (5th Cir. 2002))).  Use of this power is especially appropriate where the bankruptcy court, as here, has expressly retained jurisdiction under the plan.  Chateaugay Corp., 201 B.R. at 66; cf. Confirmation Order ¶ 77; Plan § 14.1(h).

23.    The Plan Administrator's obligations under the Plan are straightforward:  When all Allowed Claims against a particular Debtor are satisfied in full, and that Debtor holds Available Cash,  the Plan Administrator is required to make further Distributions to satisfy post-

petition interest on Allowed Claims of such Debtor.  Failure to do so is a violation of the clear

mandates of the Plan.  Nonetheless, the Plan Administrator has not made a single payment of

post-petition interest to Silver Point—or any other holders of Allowed Claims against LOTC—

despite the fact that LOTC held apparently ample Available Cash as of June 30, 2014.[6]  Silver

Point requests that the Court compel LOTC,  in compliance with the Plan, to pay post-petition

interest to Silver Point at the next Distribution Date.

**A.**    **Silver Point, as a Holder of an Allowed Claim, Is Entitled to Post-Petition Interest, Compounded Daily, at the Rate Specified in the Swap Agreement**

24.    Pursuant to the Settlement Agreement, Silver Point's Swap Agreement Claims are

"allowed as prepetition general unsecured claims."  See Settlement Agreement; SPCP Derivative

Claims Order.  Under the Plan, holders of Allowed Claims shall receive post-petition interest

payments "at the rate applicable in the contract or contracts on which such Allowed Claim is

based."  Plan § 8.13(c).

25.    The contract on which the Silver Point Swap Agreement Claims are based is the

Swap Agreement.  See Interest Certification.  Silver Point purchased all "rights, title, and interest

in," including the rights to payments and distributions from, the Swap Agreement Claims from

the original swap counterparty.  See Interest Certification.  As stated in the original

counterparty's proof of claim and as LOTC acknowledged in the Settlement Agreement, the

Swap Agreement Claims are governed by the Swap Agreement.  See Saypol Decl. Ex. 1 (the

"Proof of Claim"); Settlement Agreement.

26.    Pursuant to the Swap Agreement, when a party has defaulted, the non-defaulting

party is entitled to interest "for the period from (and including) the original due date for payment

---

[6]    Since at least the Fourth Distribution Notice—over one year ago—all LOTC general unsecured creditors have been paid in full.  See Fourth Distribution Notice.  And despite LOTC's assertion in the October 14 Letter that there are remaining outstanding claims, LOTC has not paid any Distributions to any LOTC creditors in any of the past two distribution periods.  See Fourth Distribution Notice; Fifth Distribution Notice; Sixth Distribution Notice.

to (but excluding) the date of actual payment, at the Default Rate."  ISDA Master § 2(e).  The

"Default Rate" is the "rate per annum equal to the cost (without proof or evidence of any actual

cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount

plus 1% per annum."  ISDA Master § 14.  Such interest is to be compounded daily until the date

of payment.  Id. § 2(e).

27.     As a matter of bankruptcy law, when a debtor is solvent, there is a presumption

that default interest paid to unsecured creditors should be paid at the default rate as specified in

the contract.  See, e.g., In re Dow Corning Corp., 456 F.3d 668, 679 (6th Cir. 2006) ("[I]n

solvent debtor cases . . . courts have generally confined themselves to determining and enforcing

whatever pre-petition rights a given creditor has against the debtor.");  In re Manville Forest

Prods. Corp., 60 B.R. 403, 404 (S.D.N.Y. 1986) (holding that unsecured creditors of a solvent

debtor are entitled to compound post-petition interest where the plan called for reinstatement of

the creditors' debt); see also 11 U.S.C. § 1129(b)(2)(B) (unsecured creditors must receive the

allowed amount of their claims for a plan to be fair and equitable).

28.     Here, Silver Point's Swap Agreement Claims provide for compound interest at the

default rate set out in the Swap Agreement—and, therefore, that is the rate at which the post-

petition interest Distributions must be made.  See Plan § 8.13(c).  On October 7, 2014, Silver

Point submitted the Interest Certification to LOTC, in accordance with the terms in the Swap

Agreement.  See Interest Calculation.  In calculating the interest owed, Silver Point used the cost

of funding as applied to the original counterparty and hence the relevant payee.  Id.  Silver

Point's Interest Certification is sufficient on its own, and, pursuant to the Swap Agreement, no

other evidence of the interest owed is needed.  ISDA Master § 14 (the Swap Agreement provides

that interest will be calculated at a rate equal to the cost "without proof or evidence of any actual

cost" to the relevant payee, "as certified by it"); see also Fin. One Pub. Co. v. Lehman Bros. Special Fin. Inc., No. 00 Civ. 6739(CBM), 2003 WL 21638214, at *2 (S.D.N.Y. July 11, 2003) (noting the latitude granted to the relevant payee under an ISDA Master Agreement to certify its cost of funding without proof or evidence of any actual cost and holding that plaintiff need show no other proof of cost).

29.    Compound interest is explicitly provided for in the Swap Agreement, and LOTC is a solvent debtor. See Q2 2014 Financial Statements at 18 (showing LOTC with cash and short-term investments of $495 million); ISDA Master § 2(e) (stating that interest will be compounded); In re Foamex Int'l Inc., 382 B.R. 867, 870 (Bankr. D. Del. 2008) (stating that under New York law, compound interest is recoverable where the contract expressly provides for it); see also Manville Forest, 60 B.R. at 404 (holding that unsecured creditors of a solvent debtor are entitled to compound post-petition interest where the plan called for reinstatement of the creditors' debt); In re P.G. Realty, 220 B.R. 773, 783 (Bankr. E.D.N.Y. 1998) (allowing compound interest against a solvent debtor).

30.    The Plan directs the Plan Administrator to look to the Swap Agreement to determine the proper interest rate. See Plan § 8.13(c) (stating that interest should be paid at the rate applicable in the contract on which the Allowed Claim is based). When and if interest compounds is an integral part of what the interest rate means, as the interest owed can vary greatly if calculated as simple interest or compounded, e.g., monthly, quarterly, or yearly. To hold that daily compounding is not part of the rate, despite the requirement of the Swap Agreement and the Plan, would create a windfall for LOTC. Instead, LOTC, as a solvent debtor, should grant Silver Point the "pre-petition rights [it] ha[d] against the debtor." Dow Corning, 456 F.3d at 679.

II. **IN ADVANCE OF THE NEXT DISTRIBUTION DATE, THE PLAN ADMINISTRATOR SHOULD ALSO BE REQUIRED TO PROVIDE AN ACCOUNTING AND REASONABLE TIMETABLE FOR PAYMENT OF POST-PETITION INTEREST OF LOTC CLAIMS, IN COMPLIANCE WITH THE PLAN'S PROVISIONS**

31.     Given the delay in making post-petition interest Distributions, the failure of the Plan Administrator to provide Silver Point with any relevant or responsive information regarding such Distributions, and the Plan Administrator's decision to loan LBHI $560 million of LOTC's assets, LOTC should also be required to provide a reasonable timetable to LOTC creditors for resolving all issues required to permit the full and final Distributions of post-petition interest.

32.     LOTC and the Plan Administrator, as administrator of the LOTC estate under which LBHI is required to wind-down assets for the benefit of creditors, owe a fiduciary duty to LOTC creditors, including a duty to keep them informed of their progress in fulfilling their obligations under the Plan.  See In re Consolidated Pioneer Mortgage Entities, 264 F.3d 803, 808 (9th Cir. 2001) (finding that, pursuant to a chapter 11 plan of liquidation, the "bankruptcy court correctly determined that [the post-emergence debtor] had a fiduciary duty to account to the investors, the absence of the word 'trust' from the plan language notwithstanding"); see also In re Oldco M Corp., 466 B.R. 234, 236 (Bankr. S.D.N.Y. 2012 (noting that trustees in a bankruptcy case act as fiduciaries, and finding that a liquidating trustee should not be granted an order to seal the details of a claims settlement); In re Blue Stone Real Estate, 487 B.R. 573, 575, 577 (Bankr. M.D. Fla. 2013) (noting that the post-confirmation distribution agent under a joint liquidating plan had to fulfill fiduciary duties to creditors).

33.     The Plan itself makes clear the duty of the Plan Administrator to pay post-petition interest Distributions.  The Plan does not make Distributions of post-petition interest discretionary; rather, the Plan states that the payments "shall" be made.  See Plan § 8.13(c); see also Plan §§ 6.1(b)(ii) (Plan Administrator given authority to implement the provisions of the

Plan to make Distributions to holders of Allowed Claims in accordance with the Plan); 6.1(b)(iii)

(Plan Administrator given authority to implement the provisions of the Plan to "maximize

Distributions to holders of Allowed Claims").

34.     LBHI publicly reaffirmed its obligation to pay post-petition interest on October 1,

2014.  See Q2 2014 Financial Statements at 16.  However, in that very same statement, LBHI

acknowledged that it had failed to record any estimate for the amount or timing of post-petition

interest Distributions to LOTC creditors.  Id.  Additionally, LBHI has refused to engage with

LOTC creditors for resolution of post-petition interest amounts owed by LOTC, instead stating

that disclosure of the Plan Administrator's plans for making post-petition interest Distributions

"is not something that can, as a practical matter, be accommodated."  See October 14 Letter.

35.     This refusal to engage with LOTC creditors regarding post-petition interest is

inconsistent with LBHI's fiduciary responsibilities and stands in stark contrast to the LBIE plan

administrator, which in consultation with its creditor constituencies and the court has established

a framework for briefing and resolving post-petition interest disputes in LBIE's UK insolvency

proceeding.  See generally Waterfall II Application, In the Matter of Lehman Brothers

International (Europe) (In Administration) and In the Matter of the Insolvency Act 1986 [2014]

EWHC.[7]

**NOTICE**

36.     Notice of this Motion has been provided in accordance with the procedures set

forth in the order entered on June 17, 2010, governing case management and administration

procedures for these cases (D.I. 9635) on (i) counsel for the Lehman Estates; (ii) counsel to the

---

[7]     See also Lehman Brothers International (Europe) (in administration) Announce an Application to Seek a
Determination on Various Issues Concerning Entitlements to Surplus in the LBIE Estate, PWC.co.uk, June 13, 2014,
http://www.pwc.co.uk/business-recovery/administrations/lehman/lehman-brothers-international-europe-in-
administration-announce-an-application-to-seek-a-determination-on-various-issues-concerning-entitlements-to-the-
surplus-in-the-lbie-estate-13062014.jhtml.

Official Committee of Unsecured Creditors; (iii) the Office for the United States Trustee for

Region 2; and (iv) all parties who have requested notice.  Claimant submits that no other or

further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, for the reasons stated, Claimant respectfully requests that the Court enter an order, substantially in the form attached as Exhibit A, compelling LOTC to perform its obligation to make an initial Distribution of post-petition interest under the confirmed plan of reorganization at the next Distribution Date and, ahead of such Distribution Date, to provide an accounting and reasonable timetable for resolving all issues required to permit the full and final Distribution of post-petition interest.

Dated: December 19, 2014
       New York, New York

                         CLEARY GOTTLIEB STEEN & HAMILTON LLP

                         By:    __/s Sean A. O'Neal_____
                                Thomas J. Moloney
                                Sean A. O'Neal
                                Humayun Khalid
                                One Liberty Plaza
                                New York, New York 10006
                                Telephone: (212) 225-2000
                                Fax: (212) 225-3999

                                *Attorneys for Claimant SPCP Group, L.L.C.*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re*:* | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |
| | **D.I.** __ |

**ORDER GRANTING MOTION TO COMPEL LOTC, UNDER BANKRUPTCY CODE
SECTION 1142(b), TO PERFORM ITS OBLIGATION TO PAY POST-PETITION
INTEREST UNDER THE CONFIRMED PLAN OF REORGANIZATION**

Upon consideration of the Motion, dated December 19, 2014, of Claimant SPCP Group,

L.L.C., for entry of an order, pursuant to section 1142(b) of title 11 of the United States Code

(the "Bankruptcy Code"), compelling LOTC (i) to perform its obligation to pay post-petition

interest under the confirmed plan of reorganization and (ii) to provide an accounting and

reasonable timetable for payment of said interest ahead of the next Distribution Date, all as more

fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein; and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this matter constituting a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and due notice of

the Motion having been provided; and it appearing that no other or further notice need be

provided; and having determined that the legal and factual bases set forth in the Motion establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor; it is hereby:[8]

1.      ORDERED that the Motion is GRANTED; and it is further

---

[8]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them to the
Motion.

2.      ORDERED that the Plan Administrator make an initial Distribution of post-petition interest to LOTC creditors that hold Allowed Claims, including without limitation Silver Point, at the next Distribution Date, on or about March 30, 2015; and it is further

3.      ORDERED that prior to the next Distribution Date, the Plan Administrator must provide LOTC creditors, including without limitation Silver Point, with a detailed accounting and reasonable timetable for resolving all issues required to permit the full and final Distribution of post-petition interest; and it is further

4.      ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2015
            New York, New York


_____
Honorable Shelly C. Chapman
United States Bankruptcy Judge

# EXHIBIT B

(Multicurrency — Cross Border)



## ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................

......…………….….…………..……..…..……. and …………..……………….....………………….........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)  *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest*; *Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at a law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)      any other documents specified in the Schedule or any Confirmation; and

(iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)     *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)     *Credit Support Default*.

(1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)     *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)   *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

**6.**    **Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate*. If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   **Statement**. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   **Events of Default**. If the Early Termination Date results from an Event of Default: —

(1)   *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  ***Termination Events***.  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  ***Adjustment for Bankruptcy***. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  ***Pre-Estimate***. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For tbe purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

                                                                                    **ISDA® 1992**

**9.    Miscellaneous**

(a)    ***Entire Agreement***. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    ***Amendments***. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    ***Survival of Obligations***. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    ***Remedies Cumulative***. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    ***Counterparts and Confirmations***.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    ***No Waiver of Rights***. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    ***Headings***. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.    Notices

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meanings specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

.............................................................          ....................................................................

(Name of Party)                                                (Name of Party)


By: ....................................................................          By: ................................................................
   Name:                                                       Name:
   Title:                                                      Title:
   Date:                                                       Date:

**ISDA® 1992**

**(Multicurrency — Cross Border)**

# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
### to the
### Master Agreement

dated as of  ........................................................................

between ..................................................................  and   ................................................................................
              ("Party A")                                                              ("Party B")

Part 1.  **Termination Provisions.**

(a)      *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),   ...............................................................................................................................................

Section 5(a)(vi),   .............................................................................................................................................

Section 5(a)(vii),   ...........................................................................................................................................

Section 5(b)(iv),   ............................................................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v),   ...............................................................................................................................................

Section 5(a)(vi),   .............................................................................................................................................

Section 5(a)(vii),   ...........................................................................................................................................

Section 5(b)(iv),   ............................................................................................................................................

(b)      *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here   ..............................................................................................................

...............................................................................................................................................................................

...............................................................................................................................................................................

(c)      The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A
                                                                                 will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here ...............................................................................................................

...............................................................................................................................................................................

*"Threshold Amount"* means ....................................................................................................

....................................................................................................................................................

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A

will/will not * apply to Party B

(e)    The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A

will/will not * apply to Party B

(f)    *Payments on Early Termination*. For the purpose of Section 6(e) of this Agreement: —

    (i)  Market Quotation/Loss * will apply.

    (ii)  The First Method/The Second Method * will apply.

(g)    *"Termination Currency"* means ........................................................ , if such currency is specified and freely available, and otherwise  United States Dollars.

(h)    *Additional Termination Event* will/will not apply*. The following shall constitute an  Additional Termination Event: — ....................................................................................................................

…………… ..............................................................................................................................

....................................................................................................................................................

....................................................................................................................................................

....................................................................................................................................................

....................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected  Parties shall be: —  ...

....................................................................................................................................................

Part 2. **Tax Representations**.

(a)    *Payer Representations*. For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    *Payee Representations*. For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

    (i)    The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the Specified Treaty with respect to any  payment described in such provisions and received or to be received

---

\*  Delete as applicable.

**ISDA® 1992**

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

*"**Specified Treaty**"* means with respect to Party A    ......................................................................

*"**Specified Jurisdiction**"* means with respect to Party A    ..............................................................

*"**Specified Treaty**"* means with respect to Party B    ......................................................................

*"**Specified Jurisdiction**"* means with respect to Party B    ..............................................................

(ii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

*"**Specified Jurisdiction**"* means with respect to Party A    ..............................................................

*"**Specified Jurisdiction**"* means with respect to Party B    ..............................................................

(iii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A)  It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)    Other Payee Representations: —    ...........................................................................................

..........................................................................................................................................

..........................................................................................................................................

..........................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

\* Delete as applicable.

**ISDA® 1992**

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| .................................... | .................................... | .................................... |
| .................................... | .................................... | .................................... |
| .................................... | .................................... | .................................... |
| .................................... | .................................... | .................................... |
| .................................... | .................................... | .................................... |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| .................................... | .................................... | .................................... | Yes/No* |
| .................................... | .................................... | .................................... | Yes/No* |
| .................................... | .................................... | .................................... | Yes/No* |
| .................................... | .................................... | .................................... | Yes/No* |
| .................................... | .................................... | .................................... | Yes/No* |

Part 4. **Miscellaneous**.

(a)     *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address: ...........................................................................................................

Attention: ...........................................................................................................

Telex No.: ................................................................  Answerback: ...........................................

Facsimile No.: ................................................................  Telephone No: ...........................................

Electronic Messaging System Details: ...........................................................

Address for notices or communications to Party B: —

Address: ...........................................................................................................

Attention: ...........................................................................................................

Telex No.: ................................................................  Answerback: ...........................................

---

\*  Delete as applicable.

**ISDA® 1992**

Facsimile No.: ................................................................    Telephone No.: .................................................

Electronic Messaging System Details: ...............................................................................................

(b)  ***Process Agent.*** For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent ...............................................................................................

Party B appoints as its Process Agent ...............................................................................................

(c)  ***Offices.*** The provisions of Section 10(a) will/will not* apply to this Agreement.

(d)  ***Multibranch Party***. For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

    …………………………    …………………………    …………………………..

    …………………………    …………………………    …………………………..

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

    …………………………    …………………………    …………………………..

    …………………………    …………………………    …………………………..

(e)  ***Calculation Agent***. The Calculation Agent is …………………………………………., unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)  ***Credit Support Document***. Details of any Credit Support Document: — …………………………..

…………………………………………………………………………………………………………...

…………………………………………………………………………………………………………...

…………………………………………………………………………………………………………...

(g)  ***Credit Support Provider***. Credit Support Provider means in relation to Party A, …………………..

…………………………………………………………………………………………………………...

…………………………………………………………………………………………………………...

Credit Support Provider means in relation to Party B, ………………………………………………

…………………………………………………………………………………………………………...

…………………………………………………………………………………………………………...

(h)  ***Governing Law***. This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference to choice of law doctrine) *.

_____

\*  Delete as applicable.

**ISDA® 1992**

(i)    *Netting of Payments*. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from  ………………………………… *) ……………………………….……….

…………………………………………………………………………………………………………….

…………………………………………………………………………………………………………….

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here

…………………………………………………………………………………………………………….

…………………………………………………………………………………………………………….

Part 5. **Other Provisions**.

---

* Delete as applicable.

**ISDA® 1992**