WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
David J. Schwartz

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>     Plaintiff,<br><br>v.<br><br>Saint Louis University,<br><br>     Defendant. | Adv. Proc. No. 14-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator

(in this capacity, "Plaintiff") under the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), on behalf of itself and

Lehman Brothers Special Financing Inc. ("LBSF"), alleges the following, on knowledge as to

LBSF's and LBHI's own acts and upon information and belief as to all other matters, against

defendant Saint Louis University ("SLU"):

## PRELIMINARY STATEMENT

1.       Plaintiff brings this action seeking to recover the many millions of dollars in

principal – plus millions of dollars more in interest – that SLU owes to LBSF as a result of

SLU's early termination of five interest-rate swap transactions (the "Swaps").  At the time that it

terminated the Swaps, SLU knew or should have known that LBSF was substantially "in the

money" on the transactions – that the present value of the expected payments that SLU would

have owed to LBSF over the remaining life of the Swaps (had they not been terminated) was

over $42 million greater than the present value of the expected payments that LBSF would have

owed to SLU under the Swaps.

2.       The agreement between the parties required SLU, as a consequence of its decision

to terminate the Swaps, to make a termination payment to LBSF based on that difference in

value.  Specifically, the contract obligated SLU to determine the amount it owed to LBSF as a

result of SLU's early termination of the Swaps through a commercially reasonable bidding

process under which SLU would request from four leading dealers the amount each dealer would

pay to step into LBSF's shoes in the terminated Swaps (the "Market Quotation" process).  The

Market Quotation process performed by SLU, however, was commercially unreasonable,

breached the parties' agreement, and resulted in a commercially unreasonable and artificially low

termination payment by SLU to LBSF.  SLU, in fact, requested that nine dealers provide

"indicative" bids – *i.e.*, what they *theoretically* might pay to step into LBSF's shoes as the in-the-money counterparty on the Swaps, although SLU made it clear to the dealers that it had no intention of actually entering into replacement transactions at the quoted prices. Moreover, on the same day that it sought these merely "indicative" quotations from nine dealers for purposes of Market Quotation, SLU ran a parallel process, requesting "actionable" bids from the same, or virtually the same, group of dealers on transactions that would effectively replace the Swaps but on different terms. On information and belief, this strategy on the part of SLU had the effect of signaling to the solicited dealers that their Market Quotation bids should be low ones because they would be used solely to calculate what SLU had to pay to LBSF.

3.        Given that the Market Quotation process conducted by SLU violated the parties' agreement, was conducted in a commercially unreasonable manner, and yielded a valuation far below the present value of the net payments SLU would have been expected to make had the Swaps not been terminated, SLU was contractually obligated to defer to the alternative "Loss" methodology to calculate what it owed LBSF, which methodology required it to determine reasonably and in good faith its total "gain" resulting from the termination of the Swaps and pay that gain over to LBSF. SLU failed to do so.

4.        Indeed, on the very same day that SLU received the Market Quotation bids, it entered into new swaps with four of the dealers from which it also requested Market Quotation bids. SLU profited by millions of dollars by terminating the LBSF Swaps and entering into the new swaps because the fixed rates SLU was obligated to pay under the new swaps (which were different in several respects from the terminated Swaps) were far lower than the fixed rates it had been paying under the terminated Swaps, but it did not pass along this gain to LBSF.

5.      LBSF has properly determined SLU's total gain resulting from its termination of the Swaps by calculating the Swaps' mid-market value, a market standard and objective measurement of the financial obligations avoided and financial benefits lost as a consequence of the termination of the Swaps.  Had SLU so calculated its Loss, it would have determined that it owed LBSF approximately $42.4 million, roughly $17.9 million more than what it paid.  SLU thus must now pay that difference to LBSF, plus interest, with interest continuing to accrue until payment is made in full.

<u>JURISDICTION AND VENUE</u>

6.      Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of title 11 of the United State Code (the "<u>Bankruptcy Code</u>").

7.      This adversary proceeding is brought pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), as well as pursuant to sections 105(a), 362(a)(3), 541(a), and 542(b) of the Bankruptcy Code and New York law.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

9.      This Court has personal jurisdiction over SLU.

10.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

11.      Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

WEIL:\44542507\21\58399.0011

12.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the chapter 11 cases of LBHI and LBSF were filed in this District and because the parties irrevocably waived any venue objection in the Master Agreement.

**THE PARTIES**

13.     LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

14.     LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

15.     Upon information and belief, SLU is a private, not-for-profit university incorporated under the laws of the State of Missouri.  SLU's principal place of business is located in Missouri.

**BACKGROUND FACTS**

**A.     The Governing Documents**

16.     On April 20, 2005, LBSF and SLU entered into the Swaps pursuant to a 1992 form (Local Currency-Single Jurisdiction) ISDA Master Agreement (with the associated schedule (the "Schedule") and Credit Support Annex, the "Master Agreement").

17.     The Master Agreement provides the basic terms of the parties' contractual relationship and contemplates supplementation by "confirmations" that provide the economic terms of the specific transactions entered into under the Master Agreement.

4

18.    Each of the terminated Swaps was documented by such a confirmation (collectively, the "Confirmations").

19.    By entering into the Swaps, SLU procured protection from fluctuations in variable interest rates.  This was because, under the Swaps, SLU was obligated to pay LBSF fixed rates of interest in exchange for LBSF's agreement to pay SLU floating rates of interest (based on an index).

20.    The transaction documents are all governed by New York law.

**B.    SLU's Termination Of The Swaps**

21.    On September 15, 2008, LBHI, LBSF's ultimate corporate parent and its "Credit Support Provider" under the Master Agreement, filed a petition for relief under chapter 11 of the Bankruptcy Code.  LBSF filed its own chapter 11 petition on October 3, 2008.

22.    Pursuant to the terms of the Master Agreement, the bankruptcy filings of each of LBHI and LBSF constituted an Event of Default that permitted SLU to terminate the Swaps.  *See* Master Agreement at §§ 5(a)(vii), 6(a).  The Master Agreement further provides the "Non-defaulting Party" – here, SLU – with the discretion to designate an "Early Termination Date" of its choosing following the occurrence of an Event of Default and requires it to determine the amount owed by or to it as a result of the early termination (the "Early Termination Payment"). *See id.* at § 6(a).

23.    On December 23, 2008, LBSF received a letter from SLU dated December 19, 2008, terminating all outstanding Swaps under the Master Agreement as of the "Early Termination Date" based on LBSF's chapter 11 filing and designating January 7, 2009 as the Early Termination Date (the "Termination Notice").

WEIL:\44542507\21\58399.0011

**C.    The Master Agreement Required SLU To Use "Second Method" And Market Quotation To Determine The Early Termination Payment It Owed To LBSF**

24.    Section 6(e) of the Master Agreement governs the calculation of the Early Termination Payment.  *See* Master Agreement at § 6(e).  It allows the parties to elect in the Schedule to the Master Agreement the payment measure and method that will apply should an early termination occur.  *Id.*  The parties have the option of selecting "Market Quotation" or "Loss" and "First Method" or "Second Method" to determine the "Settlement Amount" that is owed – the main driver of the Early Termination Payment.  *Id.*  The "Settlement Amount" is the value of the terminated Swaps, determined on the basis of Loss or Market Quotation, and any pre-termination amounts that have become due and payable but have not yet been paid.  Second Method means that the party that is "in the money" on the Early Termination Date, whether or not it is the "Defaulting Party," has a right to receive an Early Termination Payment.  *See* Master Agreement at § 6(e)(i).  (In contrast, under "First Method," an Early Termination Payment would be made only if it were owed to the Non-defaulting Party.)  Moreover, even if Market Quotation is selected, if it fails to generate a sufficient number of bids or renders a commercially unreasonable result, as it did here, the Settlement Amount must be determined on the basis of the alternative "Loss" measure.  *See id.* at §12.

25.    Here, the Schedule provides that the payment owed upon early termination will be calculated based upon "Market Quotation" and "Second Method."  *See* Schedule to the Master Agreement at Part 1(f).  Thus, the termination payment provisions these parties agreed to are designed to ensure each of the parties receives their gains or losses under the Swaps as of the Early Termination Date regardless of which party defaulted.

26.    "Market Quotation" is defined in the Master Agreement as follows:

***"Market Quotation"*** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of

6

quotations from Reference Market-makers.  Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. . . .  If more than three quotations are provided the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values.  If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations.  For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded.  If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

Master Agreement at § 12.   Thus, each quotation is intended to reflect "an amount . . . that would have the effect of preserving for [the non-defaulting] party the economic equivalent of any payment . . . by the parties . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."  *Id.*

27.    "Reference Market-makers," in turn, is defined in the Master Agreement as follows:

> ***"Reference Market-makers"*** means ***four*** leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

Master Agreement at § 12 (emphasis supplied).

28.    Section 12 of the Master Agreement further provides that if Market Quotation fails or the Market Quotation process does not "produce a commercially reasonable result" (as occurred in this case), the Non-defaulting Party must instead utilize Loss.  *See* Master Agreement at § 12 (defining "Settlement Amount").

7

29.     Thus, the Market Quotation measure the parties selected when they entered into the Master Agreement requires that, upon early termination of a transaction, the Non-defaulting Party (here, SLU) solicit quotations from Reference Market-makers – exactly four leading swap dealers – for the amount that each would pay, or demand as payment, to step into the shoes of the Defaulting Party (here, LBSF); the valuation is determined by taking the mean of the middle two quotations if four quotations are received or the middle quotation if only three quotations are received.  *See* Master Agreement at § 12.  If the Market Quotation process fails because less than three of the four Reference Market-makers solicited (75 percent) provide a quotation or the result is not commercially reasonable, then the Non-defaulting Party must use the Loss measure instead of Market Quotation.  *Id.* (defining "Settlement Amount").

**D.    SLU Conducted A Flawed And Commercially Unreasonable Market Quotation Process That Failed To Produce A Commercially Reasonable Result**

30.     SLU hired counsel as well as Kensington Capital Advisors ("Kensington"), as financial advisor, to advise it on the termination of the Swaps.

31.     Although the Master Agreement dictates that quotations be sought from exactly "four leading dealers," on January 7, 2009, SLU, through Kensington, breached this provision by soliciting Market Quotation bids from at least *nine* swaps dealers.  SLU also expressly informed the nine dealers that the Market Quotation bids were needed for the sole "purpose of calculating Settlement Amounts necessary to close out the swap contracts" with LBSF, thus making clear that SLU was not seeking to execute trades based on the bids but was only seeking them for the purpose of determining how much it owed LBSF.  SLU, therefore, removed the normal economic incentives that ensure Reference Market Makers will deliver competitive market bids because the dealers knew the bids would not lead to an actual transaction.  SLU effectively asked the dealers to do the work necessary to generate the bids without any potential remuneration.

Moreover, each dealer would have understood that it could potentially help its client, SLU, by providing a low-ball bid, because such a bid could minimize the amount SLU would have to pay LBSF.

32.    Thus, not surprisingly, in response to its Market Quotation solicitation of the nine dealers, SLU received "bids" from only four (44 percent, not the contractual minimum of 75 percent): Barclays Bank PLC ("Barclays"), Deutsche Bank AG, New York Branch ("Deutsche Bank"), JP Morgan Chase Bank, N.A. ("JP Morgan Chase"), and Royal Bank of Canada ("RBC"), and those bids were largely uncompetitive.

33.    On the same day it sought Market Quotation bids, SLU ran a parallel process, also through its financial advisor Kensington, inviting the same, or substantially the same, dealers to bid on new swaps with lower fixed interest rates than the terminated Swaps.  This further underscored to the dealers that the Market Quotation process was only being used to determine what SLU owed to LBSF, not to replace the Swaps, and clearly indicated that SLU wanted the Market Quotation bids to be understated.

34.    On the same day that it received its Market Quotation bids, as a result of its parallel solicitation of new swaps, SLU entered into new swaps that effectively replaced the Swaps but on more favorable terms for SLU with three of the same dealers who provided market quotation bids, Barclays, Deutsche Bank, and JPMorgan Chase, along with a fourth dealer, Wells Fargo Bank, which passed on bidding in the Market Quotation process, but was willing to submit bids for the new swaps.

35.    Over one month later, on February 9, 2009, LBSF received a letter from SLU, dated February 6, 2009, setting forth SLU's calculation of the Early Termination Payment it purportedly owed to LBSF as a result of its early termination of the Swaps (the "Calculation

9

Statement"). In the Calculation Statement, SLU asserted that SLU owed LBSF a payment of only about $24.5 million based on SLU's calculation of the Settlement Amount using the Market Quotation measure, from which SLU deducted $120,000 and $200,000, respectively, for legal and advisory fees. These fees clearly are excessive for a relatively modest engagement to execute a Market Quotation closeout process for five swaps, especially given the process was not done correctly.

36. On March 2, 2009, SLU sent a payment to LBSF and a supplemental letter documenting how SLU calculated the payment. The payment SLU made to LBSF was in the amount of approximately $24.5 million (the "Partial Payment"), which included SLU's calculation of the alleged interest owed to LBSF of $4,238. The letter also attached trade confirmations for the new transactions SLU executed on the Early Termination Date. Such confirmations showed that SLU would be paying far lower interest rates on the new transactions than it would have paid under the terminated Swaps, representing a savings of millions of dollars for SLU.

37. SLU's Market Quotation calculation did not reflect the true economic value of the terminated Swaps, was not calculated in a commercially reasonable manner, and was not commercially reasonable. Nevertheless, SLU used its approximately $24.8 million Market Quotation figure (before deducting fees) in calculating the Early Termination Payment, resulting in a payment to LBSF (and thus its unsecured creditors) of approximately $17.9 million less than the mid-market value of the terminated Swaps.

38. SLU's Calculation Statement also failed to calculate the interest it owed to LBSF in accordance with Section 6(e) of the Master Agreement.

**E.     Because It Conducted A Flawed And Commercially Unreasonable Market
Quotation Process Which Produced A Commercially Unreasonable Result,
SLU Was Required To Calculate The Settlement Amount Using Loss**

39.     Under the Master Agreement, even if the parties have selected the Market

Quotation measure, if less than three of the four dealers solicited (75 percent) submit bids, if the

Market Quotation process is not properly conducted, or if Market Quotation renders a

commercially unreasonable result, the Settlement Amount must be determined using the "Loss"

measure.  *See* Master Agreement at § 12 (definition of "Settlement Amount").

40.     "Loss" is defined in the Master Agreement, in relevant part, as follows:

> ***"Loss"*** means, with respect to this Agreement or one or more Terminated
> Transactions, as the case may be, and a party, an amount that party **reasonably
> determines in good faith** to be its **total** losses and costs (or **gain**, in which case
> expressed as a negative number) in connection with this Agreement or that
> Terminated Transaction or group of Terminated Transactions, as the case may be,
> including any loss of bargain, cost of funding or, at the election of such party but
> without duplication, loss or cost incurred as a result of its terminating, liquidating,
> obtaining or reestablishing any hedge or related trading position (**or any gain
> resulting from any of them**). . . .

Master Agreement at § 12 (emphasis supplied).  Loss thus attempts to put the parties in the same

economic position that they would have been in but for the termination of the transactions and

any gain to the non-defaulting party resulting from termination must be paid to the other party.

Like the Market Quotation measure, Loss must be determined "reasonably" and "in good faith."

*Id.*

41.     Because SLU's Market Quotation process was not in compliance with the letter

and spirit of the Market Quotation provisions of the Master Agreement in that (i) SLU failed to

include the contractually designated number of dealers, (ii) it received bids from only 44 percent

of the dealers solicited, (iii) it expressly communicated to the dealers that the bids were solely for

calculating the amount payable to LBSF and not for entering into replacement trades and (iv) the

solicitation was conducted simultaneously with a new trade solicitation, each of which caused

the Market Quotation process to be inherently unreliable and commercially unreasonable (and allowed SLU to pocket a windfall at the expense of LBSF), a reasonable Settlement Amount had to be determined based on Loss.

42.    Further, because SLU's Settlement Amount calculation under Market Quotation did not produce a commercially reasonable result, it is a nullity, and a reasonable Settlement Amount must be determined based on Loss.  The Settlement Amount SLU calculated based on its flawed Market Quotation process produced a commercially unreasonable result in that (i) it deviated substantially from the true economic value of the terminated Swaps as of the Early Termination Date and (ii) SLU was able to enter into new transactions on the same day which provided significant additional value to SLU, because it would be paying lower fixed interest rates than under the terminated Swaps, which gain was not reflected in its Settlement Amount.

43.    Here, Loss should be determined based on the mid-market value of the terminated Swaps on the Early Termination Date.  "Mid-market" represents the net present value of a party's expected future payment obligations and receipts over the life of a transaction.  It is an objective method of determining the Early Termination Payment because it is an accurate measurement of the financial rights and obligations that were lost and/or avoided due to the termination of a transaction using standard market inputs (and is therefore not easily subject to manipulation).

44.    The end-of-day, mid-market value of the terminated Swaps on the Early Termination Date was approximately $42.4 million using a market standard methodology and market standard inputs, which inputs are available to any market professional with expertise in derivatives.

WEIL:\44542507\21\58399.0011

F.    **SLU Purported To Charge LBSF Unreasonable Legal And Financial Advisory Fees**

45.    In determining the net Early Termination Payment, Section 9 of the Master Agreement allows the Non-Defaulting Party to deduct from (or add to) the Settlement Amount "*reasonable*" out-of-pocket expenses incurred in connection with the "*enforcement and protection of its rights* under th[e] [Master] Agreement." Master Agreement at § 9 (emphasis added).

46.    SLU, however, deducted $120,000 in legal fees and $200,000 in financial advisory fees from its calculated Settlement Amount in determining its Early Settlement Payment.

47.    These levels of legal and financial advisory fees are not reasonable and they grossly exceed the customary levels of fees associated with closing out a small portfolio of swaps.

48.    Moreover, on information and belief, a large portion of these fees were incurred in connection with work that went beyond the allowed scope of enforcing and protecting SLU's rights under the Master Agreement and, in fact, most of these fees were incurred in connection with SLU's attempt to avoid its obligation to pay LBSF the full amount owing under the Master Agreement.

49.    Such fees thus are not "reasonable" nor were they incurred in connection with the "enforcement and protection of [SLU's] rights" and therefore they cannot be deducted from what is owed to LBSF.  *See* Master Agreement at § 9.

50.    As a result, what SLU owes LBSF is: the mark-to-market value of the terminated Swaps as of January 7, 2009, approximately $42,400,000; *minus* (i) reasonable legal fees and financial advisory fees which are a fraction of the grossly excessive fees charged (no more than

13

$50,000 in total), and *minus* (ii) the payment LBSF received from SLU of approximately $24.5 million, for a principal amount due and owing of almost $18.0 million; *plus* (iii) interest on the balance due.

## G.    SLU Must Pay Termination Rate And Default Rate Interest

51.    Section 6 of the Master Agreement governs payments upon early termination and provides that any amount payable thereunder will be paid inclusive of interest at the "Applicable Rate." *See* Master Agreement at §§ 6(d)(ii) and 6(e).  Applicable Rate is defined as the "Termination Rate" between the Early Termination Date and service of the Calculation Statement and the "Default Rate" following the date upon which sums become payable under Section 6(d)(ii), which is the date that the Calculation Statement is received.  *Id.* at § 12.

52.    Section 12 of the Master Agreement defines "Termination Rate" as "a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts."  That same section defines "Default Rate" as "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amounts plus 1% per annum."  *Id.*

53.    Although SLU designated January 7, 2009, as the Early Termination Date and recognized its obligation to make a payment to LBSF as early as February 9, 2009, SLU did not make a payment until March 2, 2009.  SLU, therefore, owes LBSF interest on the proper Settlement Amount (minus reasonable fees) of approximately $42.4 million at the Termination Rate for the period from January 7, 2009 (the Early Termination Date) to but excluding February 9, 2009 (the date of delivery of the Calculation Statement), and at the Default Rate from and including February 9, 2009, to, but excluding, March 2, 2009, the date SLU's payment was

14

received by LBSF.  SLU owes LBSF interest accrued on the balance due of nearly $18.0 million

at the Default Rate from and including March 2, 2009, to but excluding the date SLU makes full

payment to LBSF.

**H.      The Parties' Attempt To Resolve Their Dispute Consensually Failed**

54.      LBHI, LBSF, and SLU attempted to resolve their dispute without success,

including through mediation pursuant to this Court's Alternative Dispute Resolution Procedures

Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP)

(Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207], in March 2013.

## COUNT I

### (Breach of the Master Agreement)

55.      Plaintiff repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1-54 of this Complaint as though fully set forth in this cause of action.

56.      The Swaps were entered into pursuant to a valid and enforceable contract with

adequate consideration.  LBSF fully performed its obligations thereunder.

57.      On the Early Termination Date, LBSF was the "in-the-money" party and thus

entitled to receive an Early Termination Payment from SLU pursuant to the terms of the Master

Agreement.

58.      The Master Agreement required SLU to determine the Settlement Amount

component of the Early Termination Payment it owed using a Market Quotation process that

complied with the Master Agreement and was conducted in a commercially reasonable manner

and which produced a commercially reasonable result.

59.      As more fully set forth above, SLU breached the Master Agreement because the

Market Quotation process conducted by SLU did not comply with the terms of the Master

Agreement and was not run in a commercially reasonable manner.  Moreover, SLU also

15

breached the Master Agreement because its Market Quotation calculation did not reflect the true economic value of the terminated Swaps and, thus, was commercially unreasonable.

60.     Given the foregoing, SLU was required under the Master Agreement to revert to the Loss measure to calculate the Settlement Amount it owed to LBSF. SLU's failure to revert to the Loss measure to calculate the Settlement Amount further breached the Master Agreement.

61.     SLU was allowed under the Master Agreement to deduct only reasonable out-of-pocket expenses related solely to enforcing and protecting its rights under the Master Agreement from the amount owed to LBSF. SLU, however, deducted legal and financial advisory fees which were grossly excessive and/or unrelated to enforcing and protecting its rights in yet a further breach of the Master Agreement.

62.     As a result of such breaches, LBSF has been damaged in an amount to be proven at trial including Termination Rate and Default Rate interest.

## COUNT II

**(Breach of the Master Agreement Based on SLU's Breach of the Implied Covenant of Good Faith and Fair Dealing)**

63.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-62 of this Complaint as though fully set forth in this cause of action.

64.     To the extent not a breach of an express term of the Master Agreement, by calculating an Early Termination Payment using a Settlement Amount that resulted from a Market Quotation bid process which was commercially unreasonable and that resulted in a windfall to SLU to the detriment of LBSF and its unsecured creditors, and by failing to pay LBSF a properly calculated, commercially reasonable Early Termination Payment, SLU violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

16

65.     As a result of this breach, LBSF has been damaged in an amount to be proven at trial including Termination Rate and Default Rate interest.

## COUNT III

**(Declaratory Judgment That SLU Is Willfully Violating The Automatic Stay)**

66.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-65 of this Complaint as though fully set forth in this cause of action.

67.     Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11 U.S.C. § 362(a)(3).

68.     As fully alleged above, SLU's Early Termination Payment was improperly calculated and was commercially unreasonable and SLU owes a multi-million payable to LBSF that constitutes property of LBSF's estate.  SLU's withholding of such payable constitutes an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

69.     Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  This Court also may grant damages to punish violations of the automatic stay.

70.     There is an actual controversy between the parties on this issue because Plaintiff asserts that SLU is actively withholding property of the estate from LBSF as more fully alleged above while SLU denies that it failed to pay LBSF the full amount it owed.

71.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF is entitled to (i) a declaration that SLU has acted in violation of section 362 of the Bankruptcy Code; and (ii) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages in an amount to be proven at trial and including (but not limited to) LBSF's actual damages, costs, contractual interest, and attorneys' fees and expenses on account of SLU's knowing and willful violation of the automatic stay.

## COUNT IV

### (Turnover of the Properly-Calculated Settlement Amount Pursuant to Section 542(b) of the Bankruptcy Code)

72.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-71 of this Complaint as though fully set forth in this cause of action.

73.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

74.     The amount due and owing to LBSF from SLU as of the Early Termination Date is property of LBSF's estate under section 541(a) of the Bankruptcy Code and SLU had no right of set-off under Section 553.

75.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing SLU to turn over the properly-calculated Early Termination Payment net of the payment made by SLU to LBSF as it constitutes property of LBSF's bankruptcy estate under section 541(a) of the Bankruptcy Code.

18

## COUNT V

### (Unjust Enrichment)

76.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-75 of this Complaint as though fully set forth in this cause of action.

77.    As a result of SLU's failure to pay LBSF an Early Termination Payment reflecting the amount LBSF was "in the money" under the Swaps as of the Early Termination Date, SLU obtained an unjust windfall at LBSF and its unsecured creditors' expense given that the value of the net payment streams that SLU avoided having to pay to LBSF on the terminated Swaps was many millions of dollars greater than what it paid to LBSF.

78.    SLU thereby has been improperly and unjustly enriched at LBSF and its unsecured creditors' expense.  Equity and good conscience require that SLU pay to LBSF that to which LBSF was entitled, plus prejudgment interest.

## COUNT VI

### (Termination Rate And Default Rate Interest)

79.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-78 of this Complaint as though fully set forth in this cause of action.

80.    SLU owes LBSF an outstanding principal balance in an amount to be proven at trial.

81.    Because SLU failed to make the full payment due to LBSF under the terms of the Master Agreement when due, SLU must pay interest to LBSF as set forth above, with interest continuing to accrue until payment to LBSF is made in full.

82.    The Master Agreement explicitly provides that the Applicable Rate of interest is the "Termination Rate" on sums calculated pursuant to section 6(e) of the Master Agreement

from the Early Termination Date to the date the Calculation Statement is delivered and the Default Rate from the date the Calculation Statement is delivered to the date of payment. Master Agreement § 12. The Default Rate is based on the receiving party's cost of funds "without proof or evidence of any actual cost" and "as certified by it" plus 1%. *See id.* The Termination Rate is the average cost of funds of the two parties.

83.    Consequently, SLU owes LBSF interest on the proper Settlement Amount of approximately $42.4 million at the Termination Rate for the period from January 7, 2009 (the Early Termination Date) to but excluding February 9, 2009 (the date of delivery of the Calculation Statement), and at the Default Rate from and including February 9, 2009, to, but excluding, March 2, 2009, the date the partial payment was received. SLU also owes LBSF additional interest on the balance owed at the Default Rate from and including March 2, 2009 until SLU makes full payment to LBSF.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

A.    As to Counts I and II, awarding LBSF damages in an amount to be determined at trial plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until full payment is made to LBSF;

B.    As to Count III, a declaratory judgment that, in withholding a properly calculated Early Termination Payment payable by SLU to LBSF under the Master Agreement plus interest, SLU has acted in violation of section 362 of the Bankruptcy Code and that, pursuant to section 105(a) of the Bankruptcy Code, LBSF is entitled to an award of damages in an amount to be determined at trial and including (but not limited to) LBSF's actual damages, contractual interest, costs, and attorneys' fees and expenses incurred on account of SLU's knowing and willful violation of the automatic stay;

WEIL:\44542507\21\58399.0011

C.      Also as to Count III, an award of the actual damages, contractual interest, costs, and attorneys' fees and expenses as set forth in the declaratory judgment entered pursuant to Count III;

D.      As to Count IV, a declaratory judgment that the properly-calculated Early Termination Payment is property of the LBSF bankruptcy estate under section 541 of the Bankruptcy Code and a judgment requiring SLU to turn over, under section 542 of the Bankruptcy Code, the principal amount of such receivable in an amount to be determined at trial plus interest;

E.      As to Count V, awarding LBSF damages in an amount to be determined at trial, but in all events no less than that to which LBSF is entitled, plus prejudgment interest;

F.      Pre-judgment and post-judgment interest; and

G.      For such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: New York, New York
      December 23, 2014

By: /s/  Richard L. Levine
     Richard L. Levine
     David J. Schwartz

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

WEIL:\44542507\21\58399.0011