Objection Deadline: February 12, 2015 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: February 19, 2015 at 10:00 a.m. (Prevailing Eastern Time)

**HOGAN LOVELLS US LLP**
Christopher R. Donoho, III, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: chris.donoho@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| | **Case No. 08-13555 (SCC)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **(Jointly Administered)** |
| Debtors. | |

**NOTICE OF HEARING ON MOTION OF DR. THOMAS MARSONER**
**TO DEEM PROOFS OF CLAIM TO BE TIMELY FILED**
**BY THE CLAIMS BAR DATE**

PLEASE TAKE NOTICE that the hearing on the annexed motion ("Motion") of Dr.
Thomas Marsoner ("Dr. Marsoner") for entry of an order deeming claims with respect to Dr.
Marsoner's advisory services to Lehman Brothers Europe Limited that benefited Lehman
Commercial Paper Inc. to be timely filed by the Claims Bar Date, as more fully described in
the Motion, will be held before the Honorable Shelley C. Chapman, United States Bankruptcy
Judge, in Courtroom 623 of the United States Bankruptcy Court for the Southern District of
New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York
10004 (the "Bankruptcy Court"), on **February 19, 2015 at 10:00 a.m. (Prevailing Eastern
Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, must
be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and Local Rules of
the Bankruptcy Court and shall be filed with the Bankruptcy Court electronically by
registered users of the Bankruptcy Court's case filing system (the User's Manual for the

Electronic Case FilingSystem can be found at http://www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format, in either case, with two hard copies delivered directly to the Chambers of the Honorable Shelley C. Chapman, U.S.B.J., United States Bankruptcy Court, One Bowling Green, New York, New York 10004, Courtroom 623; and shall be served upon: (i) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (ii) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and William K. Harrington, Esq.; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan R. Fleck, Esq., attorneys for the Creditors' Committee; (iv) Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022, Attn: Christopher R. Donoho, III, Esq. and M. Shane Johnson, Esq., attorneys for Dr. Thomas Marsoner so as to be received no later than **February 12, 2015 at 4:00 p.m.  (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections that have been filed and served by the Objection Deadline in accordance with the procedures herein may be considered by the Bankruptcy Court at the Hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

PLEASE TAKE FURTHER NOTICE that the Bankruptcy Court may grant the relief requested in the Motion without a hearing if no objections to the Motion are timely filed and served.

Dated: December 30, 2014
New York, New York

**HOGAN LOVELLS US LLP**

By:  /s/  Christopher R. Donoho III
Christopher R. Donoho, III, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: chris.donoho@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

Objection Deadline: February 12, 2015 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: February 19, 2015 at 10:00 a.m. (Prevailing Eastern Time)

**HOGAN LOVELLS US LLP**
Christopher R. Donoho, III, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: chris.donoho@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| | **Case No. 08-13555 (SCC)** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **(Jointly Administered)** |
| **Debtors.** | |

**MOTION OF DR. THOMAS MARSONER**
**TO DEEM PROOFS OF CLAIM TO BE TIMELY FILED**
**BY THE CLAIMS BAR DATE**

Dr. Thomas Marsoner ("Dr. Marsoner" or the "Movant") hereby moves this Court (the "Motion") for the entry of an order, in substantially the form attached hereto as Exhibit A, pursuant to section 105(a) of title 11 of the United States Code and Rule 9024 of the Federal Rules of Bankruptcy Procedure, deeming as timely filed Proofs of Claim against Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers Holdings Inc. ("LBHI", and collectively with its debtor affiliates, the "Debtors").  In support of the Motion, the Movant respectfully states as follows:

## PRELIMINARY STATEMENT

1. This Motion stems from Dr. Marsoner's investment banking advisory services with respect to the FIA Formula One World Championship ("F1")[1] that he provided to Lehman Brothers Europe Limited and the Lehman group ("LBEL", and collectively with the Debtors, "Lehman"), which inured to the benefit of LCPI. Dr. Marsoner also has a claim directly against LBHI because LBHI directly benefited from and paid Dr. Marsoner under the terms of all of his advisory agreements.

2. Dr. Marsoner recognizes the extraordinary relief he has requested in this Motion and the high hurdle he must clear to have his claims deemed timely filed five years after the September 22, 2009 deadline to file claims against the Debtors (the "Claims Bar Date"). Dr. Marsoner will demonstrate, however, that he can clear this hurdle because he both meets the legal test for the allowance of a late filed claim and because his advisory services created extraordinary value for the Debtors' estate, yet he never received any compensation for his services from either LCPI or LBHI, which has led to a fundamentally unfair result to Dr. Marsoner and a windfall to the estates.

3. In 2005, Dr. Marsoner sagely and presciently advised Lehman to retain its investment in F1 immediately after the first announcement of CVC Capital Partners' intention to buy a controlling interest in F1, which ultimately led to approximately **$1.5 billion** in revenues commencing in 2012 for LCPI, the Lehman vehicle used to reinvest. As a result of his very wise (and profitable) advice to Lehman, and in accordance with the mutually accepted terms of a technically expired 2004 agreement with LBEL, Dr. Marsoner is entitled to 10% of LCPI's F1 revenues. Without Dr. Marsoner's advice, which was contrary to conventional wisdom at the time, Lehman would have followed JP Morgan's lead and sold at least most of its stake in F1 for a small

---

[1] F1 is the highest class of single-seat auto racing sanctioned by the Fédération Internationale de l'Automobile, with cars racing at speeds of up to 220 mph. F1 consists of a series of races that take place around the world, with an overall champion determined based on a points system.

loss. Dr. Marsoner and Dr. Marsoner alone saved Lehman from a colossal financial missed opportunity when he provided Lehman with unique information and early advice, yet the Debtors never compensated him for these services. Dr. Marsoner has been prejudiced to a much greater extent than the Debtors or even other unsecured creditors could argue they would be prejudiced if Dr. Marsoner recovered under his proofs of claim because they would not have received any substantial return from Lehman's F1 investment without his services. Dr. Marsoner therefore has cognizable contractual and/or quantum meruit claims against LBHI and LCPI for the valuable advisory services he provided that resulted in approximately $1.5 billion for the Debtors' estate.

4.    As a known creditor Dr. Marsoner was entitled to receive actual notice of the Claims Bar Date, yet he never received actual notice at any address, much less actual notice at his last known address, even though the Debtors undoubtedly were aware of this address. Because of the lack of notice, Dr. Marsoner was unaware that LBHI and LCPI had reasons to believe he was a potential creditor for the services provided. Moreover, it was not until he pursued his claim against LBEL in its U.K. insolvency proceeding that the Lehman beneficiaries became clear and he realized that he had claims against both LBHI and LCPI, in addition to LBEL. Dr. Marsoner's situation—where LBHI and LCPI knew he was a potential creditor but he did not know he was a potential creditor—is a classic example of why the notice requirement exists. Consequently, the Debtors cannot discharge Dr. Marsoner's claims.

5.    Dr. Marsoner recognizes the two-step process to determine the validity of his claims. First, by this Motion, the Movant requests the Court to deem the Proofs of Claim to be timely filed because Dr. Marsoner, a known creditor, did not receive actual notice of the Claims Bar Date at his last known address. Second, once the Court deems his claims timely filed, Dr. Marsoner would request that the Court set another hearing to decide the merits of his claims, which as the Motion establishes are worthy of consideration.

**JURISDICTION**

6.  The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A) and (B).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The Motion is made pursuant § 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

**Senior Advisor Qualifications**

7.  Dr. Marsoner's education and experience qualified him to advise Lehman on its F1 investment, and their reliance on his advice created an enormous gain to the estate. Dr. Marsoner graduated from Vienna University in 1982 with a Juris Doctorate, and from Columbia Business School in 1985 with a Masters of Business Administration. See Declaration of Dr. Thomas Marsoner ("Marsoner Decl.") ¶ 2, attached hereto as Exhibit B. Directly after he graduated from Columbia Business School, Dr. Marsoner worked for Salomon Brothers from 1985 to 1995. See id.

8.  Dr. Marsoner left Salomon Brothers for Lehman, where he served as a Managing Director, Head of the Financial Institutions Group, and Head of Industry Groups in European Investment Banking from July 1995 to February 28, 2001. See id. During this time, Dr. Marsoner was a key member of the team that introduced Lehman to F1. See Marsoner Decl. ¶ 7.

9.  After Dr. Marsoner ended his full-time employment with LBEL to spend more time in Austria and with his young family, he entered into advisory services agreements with LBEL in 2001, 2002, 2004, 2006 and 2007 to serve as an investment banking consultant and Senior Advisor, because Lehman wanted to retain access to his depth of knowledge and substantial

expertise (collectively the "Agreements"). See Marsoner Decl. ¶ 3; see also Executive Advisory Services Agreements, attached hereto as Exhibit C.

10.    Under the Agreements, in addition to quarterly fixed fees,[2] Dr. Marsoner is entitled to a "success fee" (i) equal to 10% of Total Revenues;[3] or (ii) 20% of Net Investment Banking Revenues.[4] See Executive Advisory Services Agreements. Although the calculation of Dr. Marsoner's claims is not currently before the Court, under either formula he is entitled to approximately 10% of the F1 Reinvestment's (defined herein) gross revenues.[5]

11.    It was the standard practice for LBHI to pay Dr. Marsoner his fees even though the latter Agreements were with LBEL, and in fact Dr. Marsoner received all payments related to his consulting services for LBEL from LBHI. See Dr. Marsoner's Bank Statements ("Bank Statements"), attached hereto as Exhibit D; see also Marsoner Decl. ¶ 5. Given the overlapping nature of the businesses, and because both were "Lehman", there was no reason for Dr. Marsoner to question the source of the payment or the exact beneficiary of the services.

---

[2] These fees were received timely by Dr. Marsoner from LBHI.

[3] The 2004 Agreement defines Total Revenues as "(i) for financing products, (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fee and/or (B) the amount of any market gains made by Lehman Brothers for its own account, less the amount of any market losses incurred by Lehrman Brothers for its own account and less the amount of any unre-imbursed out of pocket and other expenses; and (ii) for advisory transactions retainer and success fees, less the amount of any unre-imbursed out pocket or other expenses."

[4] The 2004 Agreement defines Net Investment Banking Revenues as "(i) for financing products, the share that the Lehman Brothers' Investment Banking Division receives (this is currently 50% for most transactions) of (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fee and/or (B) the amount of any market gains made by Lehman Brothers for its own account, less the amount of any market losses incurred by Lehman Brothers for its own account and less the amount of any unre-imbursed out of pocket and other expenses; and (ii) for advisory transactions, the share that the Lehman Brothers' Investment Banking Division receives (this is currently 100%) of any retainer and success fees, less the amount of any unreimbursed out of pocket or other expenses."

[5] If the Court employs the first formula, Total Revenues—calculated as "(A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fee and/or (B) the amount of any market gains made by Lehman Brothers"—are approximately $1.51 billion, and 10% of Total Revenues is $151 million. If the Court employs the second formula, Net Investment Banking Revenues—calculated as "the share that the Lehman Brothers' Investment Banking Division receives (this is currently 50% for most transactions) of (A) the sum of Lehman Brothers' management fees, sales credits, net underwriting fees and/or (B) the amount of any market gains made by Lehman Brothers"—are approximately $755 million, and 20% of Net Investment Banking Revenues is $151 million. Dr Marsoner feels strongly that the $4 million (£2.5 million) he received from LBEL should be deducted from this sum, leaving a net claim of $147million.

12.    During his time as advisor, Dr. Marsoner advised Lehman on several potential investment opportunities, with a focus on transactions in Germany, Switzerland and Austria. <u>See</u> Marsoner Decl. ¶ 4. As LBEL acknowledged in the 2002 Agreement, Dr. Marsoner "is experienced in financial markets in European countries and particularly Germany, Switzerland and Austria, and Lehman Brothers wishes to avail itself of the experience" of Dr. Marsoner. <u>See</u> Executive Advisory Services Agreements. Clearly Lehman valued Dr. Marsoner's knowledge and insight, and was prepared to pay him large sums of money to continue to advise Lehman. <u>See id.</u>

13.    Dr. Marsoner's unprecedented knowledge and connections to F1 are based in large part on his extensive personal experience with F1 and his high-level and long-standing family connections, which date all the way back to when he was a 10-year-old boy watching his uncle's best friend, Jochen Rindt, who won the 1970 F1 world championship tragically after Rindt died in a car wreck that same year. <u>See</u> Marsoner Decl. ¶ 6. Among other anecdotes, both his uncle and his father were later involved in buying from, and selling to, three-time F1 world champion Niki Lauda's[6] (race) cars, and Dr Marsoner was allowed to assist in both transactions. <u>See id.</u> In other words, F1 has been in his blood from the time he was a young boy, an interest that he actively pursued until he took Ruggero Magnoni, Vice Chairman of the Board of Lehman Brothers Inc. to the 1998 Monte Carlo Grand Prix, where Lehman's first talks with Bernie Ecclestone, F1's CEO and formerly a close friend of Jochen Rindt, took place. <u>See id.</u> In combination with his investment banking background, Dr. Marsoner made for a formidable resource when analyzing F1 investments.

---

[6] Niki Lauda is a former F1 driver from Austria who won the F1 world championship in 1975, 1977 and 1984. His rivalry with fellow F1 racer James Hunt was immortalized in the 2013 film *Rush*, directed by Ron Howard.

### Lehman's Investment in F1

14.     Lehman and JP Morgan ("JPM") initially became F1 shareholders in 2002 when they took over a stake held by German media company Kirch after it defaulted on a loan from Bayerische Landesbank, Lehman and JPM. See Marsoner Decl. ¶ 7.

15.     From 2002, at the request of Vittorio Pignatti, the former head of European M&A and Vice Chairman of LBEL and Dr. Marsoner's contact person under the 2004 Agreement with LBEL, Dr. Marsoner advised Lehman on its stake in F1. See id. This involved years of work, particularly around the existential threat to the F1 Investment posed by the threatened split of several key teams to form their own Grand Prix World Championship series. See id. This culminated in his advice to Tom Bernard, the Lehman Brothers Inc. Head of Global Credit Businesses, personally in charge of the F1 loan work-out, not to dispose of its F1 Investment when CVC Capital Partners announced its intention to buy a controlling interest in F1. See F1 E-mails, attached hereto as Exhibit E 25. November 2005 21:14 email ("my senior advice is (strongly) against selling out now" and "Staying put where Lehman is still beats a sale now"); see also Marsoner Decl. ¶ 8. In addition to the emails he sent to Lehman executives, whose responses show both their appreciation of the advice received and the substantial knowledge gap between them and Dr. Marsoner, he also had numerous telephone conversations where he provided additional information and reiterated his advice not to sell its interest in F1. See Marsoner Decl. ¶ 8.

16.     It is in fact undisputed that Dr. Marsoner provided invaluable advisory services related to F1 that Lehman could not have obtained from another source, and that based primarily on this advice, Lehman reinvested in F1 in 2006 (the "F1 Reinvestment"). See F1 E-mails, 26. November 2005 16:22 email from Thomas Bernard ("We are inclined to take your advice and stay in"). In contrast, JPM, whom Dr. Marsoner did not advise (they passed on the offer by LBEL jointly to appoint him in 2002, (not incorrectly) deeming him "too close to Lehman"),

lost money on its F1 investment when it disposed of the vast majority of its equity holding in F1 in 2005. See Marsoner Decl. ¶ 9. Without Dr. Marsoner's advice, Lehman undoubtedly would have sold its F1 Investment at the same time as JPM for a small loss. See id.

17.    Furthermore, Dr. Marsoner clearly intended his advice to be in return "for a very modest percentage participation in LB's gain upon eventual sale" in accordance with prior agreements and transactions. See F1 E-mails, 25. November 2005 21:14 email; see also Marsoner Decl. ¶ 8. It was also the understanding of Vittorio Pignatti, who signed Dr. Marsoner's 2004 Agreement on behalf of LBEL, that LBEL intended to pay Dr. Marsoner a "success fee" for his advisory services similar to those included in the 2004 Agreement. Because Dr. Marsoner discussed the F1 Reinvestment with executives from LBEL, his contractual counterparty as well as Lehman Brothers Inc., he was unsure which Lehman entity ultimately benefited from the reinvestment in F1. See Marsoner Decl. ¶ 18.

18.    From 2001 to September 2008, it was LBEL's and Dr. Marsoner's established practice and mutual intent to continue working under the terms of the Agreements, even when the prior agreement had technically lapsed or an Agreement did not expressly cover a certain transaction. See Marsoner Decl. ¶ 5. Dr. Marsoner thus provided the F1 advice based on the terms of the parties' (technically expired) 2004 Agreement and the parties' well-established course of dealing best exemplified by the BAWAG acquisition by Cerberus. See Marsoner Decl. ¶ 10.

**BAWAG Acquisition**

19.    It was not uncommon for Lehman and Dr. Marsoner to continue their working relationship notwithstanding the lapse in term of the Agreements between them. As evidence of the parties' course of dealing when an Agreement did not expressly cover a transaction, Dr. Marsoner advised Lehman on Cerberus' acquisition of BAWAG, an Austrian Bank, for approximately $3.6 billion from April 2006 to December 2006. See id. In June 2007, after Dr.

Marsoner provided Lehman with valuable advisory services related to the BAWAG acquisition, LBHI paid Dr. Marsoner 20% of the investment banking revenues from the BAWAG acquisition. See BAWAG E-mail, attached hereto as Exhibit F; see also Marsoner Decl. ¶ 10; Bank Statements. LBHI paid Dr. Marsoner for the BAWAG acquisition after the 2007 Agreement's effective date on February 1, 2007, although the BAWAG acquisition had never been formally cited in any of the advisory agreements. See Executive Advisory Services Agreements; see also Bank Statements.

### Actual Notice of the Claims Bar Date was Required but Never Received

20.    Dr. Marsoner's address when he was a full-time employee with LBEL was 1 Airlie Gardens, London W8 6LP. See Marsoner Decl. ¶ 11. After he became a Senior Advisor to LBEL in 2001, he moved to Austria full time in late March 2001. See id. He then purchased a home at 20 Earls Terrace, London W8 6LP in April 2002. See id. Dr. Marsoner's last known and still current office address is Andreas Hofer Strasse 43, 6020 Innsbruck, Austria, which Dr. Marsoner listed as his address on his final Agreement with LBEL in 2007. See Marsoner Decl. ¶ 12; see also Executive Advisory Services Agreements.

21.    Notwithstanding Lehman's knowledge of these addresses, the Notice of Deadlines for Filing Proofs of Claim (the "Bar Date Notice") was apparently served on "Thomas Marsoner" at Casa Andreas, 16 Trig Sant' Andrrija Lija BLZ10 Morocco and Casa Andreas 16 Triq Sant' Andrija Lija BLZ10 Morocco (collectively the "Moroccan Addresses"), at Casa Pelicanos Costa Careyes Montenegro, Republic of (the "Montenegrin Address"), and at Casa Carpione Parco San Giacomo Gargnano 25084 Italy (the "Italian Address"); and apparently served on "Marsoner, Thomas S" at One Broadgate 5th Floor London EC2M 7HA United Kingdom (the "London Address"). See Affidavit of Service [Docket No. 4349]. **The Moroccan Addresses and the Montenegrin Address were incorrectly addressed because the Moroccan Addresses are in the Republic of Malta and the Montenegrin Address is in Mexico. See** Marsoner Decl. ¶¶ 13-

14. Each of these addresses is also a temporary address that Dr. Marsoner has not lived at since 2006. <u>See id.</u>

22.     **The Italian Address was the address of Dr. Marsoner's father's vacation home, which does not have a mail box for deliveries.** <u>See</u> Marsoner Decl. ¶ 15. **The London Address was LBEL's address until it moved in 2002 to 25 Bank Street in London.** <u>See</u> Marsoner Decl. ¶ 16.

23.     **All of the addresses listed in the Affidavit of Service were incorrectly addressed and/or were not a valid address for Dr. Marsoner, and thus, as discussed further below, Dr. Marsoner has sufficiently rebutted the presumption of receipt because he could not have received the Bar Date Notice at any of these addresses.** <u>See</u> Marsoner Decl. ¶ 17.

24.     Dr. Marsoner was also unaware that he had claims against LBHI and LCPI until after the claims process with LBEL had concluded, because he did not receive the Bar Date Notice and had only worked with LBEL executives. <u>See</u> Marsoner Decl. ¶ 18. Up until this time, Dr. Marsoner believed that his sole claim was against LBEL. <u>See id.</u>

25.     In the LBEL insolvency proceeding, Dr. Marsoner submitted a proof of debt against LBEL on August 13, 2012 asserting both contractual and quantum meruit claims, which he later amended on September 11, 2013 and November 12, 2013. LBEL's Administrators, acting in their self-interest as the representatives of LBEL's estate, initially rejected Dr. Marsoner's claims. As discussed further below, Dr. Marsoner strongly disagrees with the Administrators' initial denial of his claims, and it has no effect on the validity of his claims against LBHI or LCPI. The Administrators and Dr. Marsoner later entered into a settlement agreement approved by the U.K. court that provided Dr. Marsoner with a general unsecured claim in the amount of £2.5 million ($4 million), which recognizes that he provided value to LBEL. <u>See</u> Consent Order, attached hereto as <u>Exhibit G</u>. Most of the value, however, only accrued to LBHI and LCPI. The Consent order

expressly provides that "Any person who is not a party to this Agreement shall have no right . . . to enforce or enjoy the benefit of any term of this Agreement." See id. As non-parties to the settlement agreement, LCPI and LBHI were not released by the court's consent order, and cannot rely on that order in this proceeding.

**LCPI Sale of F1 Interests to LBI Group Inc.**

26.     Unbeknownst at the time to Dr. Marsoner, on July 17, 2009, the Court entered an order approving the sale of LCPI's interest in Delta Topco Limited and Delta Prefco Limited (collectively "Delta"), the holding companies of Alpha Topco Limited and Beta Topco 1 Limited, which hold the rights to F1, to LBI Group Inc., a wholly owned indirect subsidiary of LBHI. See Order Approving Sale of Delta Shares [Docket No. 4435]. Under the terms of the Purchase Agreement, in exchange for transferring all of its right, title and interest in Delta, LCPI will receive the net proceeds from LBI Group Inc. with respect to its F1 holdings. See Motion to Sell Delta Shares, Exhibit A [Docket No. 4162]. After June 30, 2014, LCPI also has the right under the Purchase Agreement to demand that LBI Group Inc. pay the fair value of its interest in F1 to LCPI. Id.

**F1 Reinvestment Revenues**

27.     In October 2012 Lehman received a dividend recapitalization from the F1 Reinvestment, and in November 2012 it sold a portion of its interests in F1 for a substantial profit. See Considerations on Formula 1 ("Considerations"), attached hereto as Exhibit H. As of early 2014, Lehman's Total Revenues/Net Investment Banking Revenues from the F1 Reinvestment, which LBI Group Inc. must pass on to LCPI under the terms of the order entered by the Court, are estimated to be approximately $1.51 billion, of which around half has now been realized in cash. The remainder is expected to be realized in the IPO of F1, currently expected for 2015. See Considerations.

11

**RELIEF REQUESTED**

1. By this Motion, the Movant seeks entry of an order consistent with Due Process and pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9024 deeming the Proofs of Claim to be timely filed by the Claims Bar Date because Dr. Marsoner did not receive actual notice of the Claims Bar Date.  Although not specifically before the Court at this time, Dr. Marsoner has also included the legal basis for his claims.

**BASIS FOR RELIEF**

**Dr. Marsoner was a Known Creditor Entitled to Actual Notice of the Claims Bar Date.**

2. "The bar date is strictly enforced except when a known creditor is not listed on the schedules and fails to receive notice of the bar date." In re AMR Corp., 492 B.R. 660, 663 (Bankr. S.D.N.Y. 2013). In addition to lack of notice being an exception to application of the bar date, due process requires that known creditors must receive actual notice of the bar date in order to discharge their claims. Levin v. Maya Constr. (In re Maya Constr. Co.), 78 F.3d 1395, 1399 (9th Cir. 1996) ("Generally, if a known contingent creditor is not given formal notice, he is not bound by an order discharging the bankruptcy's obligations."); Shu Lun Wu v. May Kwan Si, Inc., 508 B.R. 606, 614 (S.D.N.Y. 2014) ("If plaintiffs did not have notice of the Bar Date, their claims were not discharged under the plan."); In re Chateaugay Corp. Reomar, Inc., No. 86 B 11270 BRL, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009); In re U.S.H. Corp. of N.Y., 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998). The first issue is therefore whether Dr. Marsoner is a "known creditor" entitled to actual notice, or whether he is an "unknown creditor" entitled only to publication notice. See In re BGI, Inc., 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012) subsequently aff'd, No. 13-2226-BK, 2014 WL 5462477 (2d Cir. Oct. 29, 2014).

3. A "known" creditor includes "both a claimant whose identity is actually known to the debtor or a claimant whose identity is 'reasonably ascertainable' by the debtor." Id. (quoting

Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995)). "[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.'" In re XO Commc'ns, Inc., 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) aff'd, No. 04 CIV. 01489LAK, 2004 WL 2414815 (S.D.N.Y. June 14, 2004). "The requisite search . . . focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are 'reasonably ascertainable' and hence 'known' creditors." Chemetron, 72 F.3d at 347.

4. Because LBHI regularly paid Dr. Marsoner fixed and contingent fees prior to its bankruptcy filing, which could have been discovered by examining the Debtors' books and records, Dr. Marsoner was a "known creditor" entitled to receive notice of the Claims Bar Date. The Debtors' attempt to serve Dr. Marsoner demonstrates that the Debtors "actually knew" of Dr. Marsoner and believed he was a "known creditor" entitled to service of the Claims Bar Date.

**Dr. Marsoner did not Receive Actual Notice of the Claims Bar Date.**

5. Even though Dr. Marsoner participated in LBEL's U.K. insolvency and was generally aware of the U.S. proceedings, as a "known creditor" Dr. Marsoner was entitled to actual notice of the Claims Bar Date. Maya Constr., 78 F.3d at 1399 ("The fact that a creditor has actual knowledge that a Chapter 11 bankruptcy proceeding is going forward involving a debtor does not obviate the need for notice."); In re Brunswick Hosp. Ctr., Inc., No. 892-80487-20, 1997 WL 836684, at *5 (Bankr. E.D.N.Y. Sept. 12, 1997) (internal citations omitted) ("[T]he burden is on the Chapter 11 debtor to cause formal notice to be given to creditors. A creditor who is not given notice, even if it has actual knowledge of the reorganization, does not have a duty to investigate or inject itself into the proceedings."). The Debtors did not meet their burden because Dr. Marsoner

did not receive actual notice of the Claims Bar Date, which prevented him from realizing that he

had claims against LBHI and LCPI. <u>See</u> Marsoner Decl. ¶ 17-18.[7]

A. <u>Incorrect Addresses</u>

6. "Mail properly addressed, stamped and deposited in the mail system is presumed

to have been received by the party to whom it has been addressed." <u>In re R.H. Macy & Co., Inc.</u>,

161 B.R. 355, 359 (Bankr. S.D.N.Y. 1993). However, "[w]here an incorrect address is used the

presumption of receipt does not arise." <u>Randbere Corp. v. Ladney (In re Randbre Corp.)</u>, 66 B.R.

482, 485 (Bankr. S.D.N.Y. 1986) (holding that a notice addressed to "660 E. 15 Mile Rd." instead

of "6600 E. 15 Mile Rd." was not an inconsequential difference); <u>In re La Rouche Indus., Inc.</u>, 307

B.R. 774, 779 (D. Del. 2004) (holding that street address listed as "Drive Hicks Boulevard" rather

than "Dr. Hicks Boulevard" was sufficient to rebut presumption of receipt). Accordingly, because

the Moroccan Addresses and the Montenegrin Address were incorrectly addressed, the presumption

of receipt does not apply to these mailings.

B. <u>Last Known Address</u>

7. Although courts have held that notice sent to the "last known address of a

creditor satisfies due process because it is 'reasonably calculated' to inform the creditor of the bar

date for filing Proofs of Claim", <u>Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.)</u>, 62

F.3d 730, 736 (5th Cir. 1995), neither the Italian Address nor the London Address was Dr.

Marsoner's last known address. <u>See</u> Marsoner Decl. ¶ 12. Furthermore, Dr. Marsoner could not

have received the Bar Date Notice at an address that does not accept mail delivery or at an office

address that LBEL no longer occupied.

---

[7] Dr. Marsoner was listed on the Schedules of Lehman Brothers Commercial Corporation (08-13901) with the incorrect
London Address as the holder of a derivative contract that is entirely unrelated to the claims asserted in this Motion, but
not on the Schedules of LBHI or LCPI.

### Contractual or Quantum Meruit Claims

8. Dr. Marsoner's claims against LCPI and LBHI are either contractual or quantum meruit claims for investment advice related to Lehman's F1 Reinvestment. As discussed above in ¶¶ 14-18 and in the attached Declaration, Dr. Marsoner's advice to Lehman in 2005 to continue its investment in F1 ultimately led to approximately $1.51 billion in revenues for LCPI. See Considerations. As part of the parties' consistent and well-established course of dealing, as demonstrated by the payments to Dr. Marsoner for his advisory services on the BAWAG acquisition by Cerberus, Dr. Marsoner is entitled to 10% of the F1 revenues.

A. Statute of Limitations

9. LBHI and LCPI are Delaware corporations with their principal places of business in New York. See Voluntary Petition Case No. 08-13555, [Docket No. 1]; see also Voluntary Petition Case No. 08-13900, [Docket No. 1]. Dr. Marsoner is an individual domiciled at Andreas Hofer Strasse 43, 6020 Innsbruck, Austria. See Marsoner Decl. ¶ 12. New York has personal jurisdiction over LBHI and LCPI because they have their principal places of business in New York and both transacted business within New York. See N.Y. C.P.L.R. 302(a)(1).

10. The Second Circuit has applied the New York statute of limitations to actions brought in bankruptcy court based on state law. In re Gaston & Snow, 243 F.3d 599, 608 (2d Cir. 2001). In New York, a quantum meruit claim must be brought within six years. N.Y. C.P.L.R. 213(2); Eisen v. Feder, 307 A.D.2d 817, 818 (1st Dept. 2003). However, the limitations period only begins to run from the time the cause of action accrued. N.Y. C.P.L.R. 203(a). Courts applying New York law have held that when a contract or quasi-contract claim is based on the defendant's enrichment or future payment, the claim does not accrue until the defendant has been enriched or the plaintiff demands payment. Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc., 559 F. Supp. 503, 506-07 (S.D.N.Y. 1983) aff'd sub nom. Salen AB v. Pierot & Sons, Inc., 738 F.2d 419

(2d Cir. 1984) (holding that the services provided by the plaintiff did not enrich the defendant until the defendant received its commission, and therefore "the quantum meruit claim in this case could not have been maintained and therefore did not accrue until [the defendant] received its commission."); Bombardier Transp. (Holdings) USA, Inc. v Telephonics Corp., 14 A.D.3d 358, 359 (1st Dept. 2005) (holding that the right to payment did not accrue until the work was invoiced). Here, Dr. Marsoner's quantum meruit claims did not accrue until LCPI first realized a profit from the F1 Reinvestment on or about October 2012—less than three years ago—because before that time Lehman did not owe Dr. Marsoner a "success fee."

11.    Furthermore, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. 2007) (citing Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606, 610 (1979)). The Agreements contemplated a continuing contract whereby Dr. Marsoner would continue to serve as a Senior Advisor under the most recent Agreement until the parties entered into a new agreement, and Lehman would continue to pay Dr. Marsoner 10% of the net revenues based on Dr. Marsoner's investment advice.

B.    Choice of Law

12.    As for the substantive law that will apply to Dr. Marsoner's claims, the Second Circuit has held "that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state." Gaston & Snow, 243 F.3d at 601-02. In another Second Circuit case, the Court applied New York's choice-of-law analysis for contract claims to a quantum meruit claim. See Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001). Under New York's "center of gravity" or "grouping of contacts" choice-of-law analysis approach for contracts, courts must decide "which State has 'the most significant relationship to the transaction and the parties.'" Zurich Ins. Co. v. Shearson Lehman

Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (citing Restatement [Second] of Conflict of Laws
§ 188[1]). In making this determination, "[t]he Second Restatement, in addition to the traditionally
determinative choice of law factor of the place of contracting, offers four other factors to be
considered in establishing this 'most significant relationship': the places of negotiation and
performance; the location of the subject matter; and the domicile or place of business of the
contracting parties."

13.     The State with the most significant relationship to the transaction and parties
is either New York or England. Dr. Marsoner rendered the services to representatives of LBEL, an
English corporation, under a technically expired Agreement that provides English law governs, but
was paid by LBHI and the transaction benefited LCPI, which both had their principal places of
business in New York. Dr. Marsoner has cognizable quantum meruit claims under either English or
New York law.

14.     Under English law, to the extent that the terms on which Dr. Marsoner's
advice may not have been spelled out orally or in writing, there is an implied obligation to pay a
reasonable sum or quantum meruit for the completed work. See Sharab v Royal Highness Prince
Al-Saud [2013] EWHC 2324 (Ch); see also Benedetti v Sawiris [2013] UKSC 50. In Benedetti, the
Court held that the starting point for valuing the services was the objective market value of the
services provided. This should be determined by considering what a reasonable person in the
position of the defendant would have agreed to pay for them. In our case, the objective market
value of Dr. Marsoner's advisory services had been established by the Agreements to be 10% of
gross revenues from the transaction, and thus that is the amount he is entitled to receive for his
advisory services on the F1 Reinvestment.

15.     "To recover in quantum meruit under New York law, a party must establish
'(1) the performance of the services in good faith, (2) the acceptance of the services by the person

to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.' LeBoeuf, Lamb, Greene & MacRae, L.L.P. v Worsham, 185 F.3d 61, 66 (2d Cir. 1999) (quoting Martin H. Bauman Assoc., Inc. v H & M Intern. Transp., Inc., 171 A.D.2d 479, 484 (1st Dept. 1991). Similarly, "[a]s a general rule, the performance and acceptance of services can give rise to the inference of an implied contract to pay for the reasonable value of such services." Berlinger v. Lisi, 288 A.D.2d 523, 524-25 (3d Dept. 2001).

16.     Dr. Marsoner satisfies these elements because (1) he performed the consulting services in good faith; (2) Lehman accepted and acted upon the advice by reinvesting in F1; (3) Dr. Marsoner expected compensation as evidenced by the e-mails he sent to LBEL executives and it was the understanding of LBEL executives that Lehman would pay Dr. Marsoner; and (4) it was established from the parties' course of dealing that he was entitled to a percentage of the net revenues from the F1 Reinvestment, and his services were valuable because without them Lehman would have sold off most of its stake in F1 for a small loss just as JPM did in 2005. Moreover, Dr. Marsoner did not provide his advisory services gratuitously as indicated by the F1 E-mails and Declaration attached hereto, and because Lehman accepted his services and profited handsomely, Dr. Marsoner is entitled to the reasonable value of his services.

17.     In light of the circumstances described above, the Movant humbly and respectfully requests that the Court grant the Motion to deem the Proofs of Claim to be timely filed because otherwise the Debtor may not constitutionally discharge Dr. Marsoner's claims.

## NOTICE

18.     The Movant has provided notice of the Motion pursuant to the Second Amended Order Implementing Certain Notice and Case Management Procedures entered in this proceeding [Docket No. 9635].  The Movant submits that no other or further notice need be given.

## NO PRIOR REQUEST

19.     No prior motion for the relief requested herein has been made to this Court or any other U.S. court.

WHEREFORE, the Movant respectfully move this Court to enter an order in the form annexed hereto as Exhibit A, (i) permitting the Movant to file Proofs of Claim against LBHI and LCPI based on the Debtors failure to properly serve Dr. Marsoner with the Bar Date Notice within five (5) business days of the entry of the order, and (ii) granting such other and further relief as this Court deems just and equitable.

Dated: December 30, 2014
New York, New York

                              **HOGAN LOVELLS US LLP**

                              By:  /s/   Christopher R. Donoho III
                              **HOGAN LOVELLS US LLP**
                              Christopher R. Donoho, III, Esq.
                              M. Shane Johnson, Esq.
                              875 Third Avenue
                              New York, NY 10022
                              Telephone:  (212) 918-3000
                              Facsimile:  (212) 918-3100
                              Email: chris.donoho@hoganlovells.com
                              Email: shane.johnson@hoganlovells.com

                              *Attorneys for Dr. Thomas Marsoner*