Response Deadline:  January 2, 2015 at 5:00 p.m. (Prevailing Eastern Time)[1]
Hearing Date and Time:  January 15, 2015 at 10:00 a.m. (Prevailing Eastern Time)

David J. Molton
Andrew Dash
Howard S. Steel
Jacob T. Beiswenger
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone:  212-209-4800
Facsimile:  212-209-4801

*Counsel for Newport Global Opportunities Fund LP
and Newport Global Credit Fund (Master) LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **Case No. 08-13555 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------------ x

**RESPONSE OF NEWPORT GLOBAL OPPORTUNITIES FUND LP
AND NEWPORT GLOBAL CREDIT FUND (MASTER) LP TO THE
FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS**

---

[1]    The Response Deadline was extended by agreement with the Plan Administrator.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 6

RESPONSE TO OBJECTION ............................................................................................ 20

I.      THE CLAIMS SHOULD BE ALLOWED OR,
        AT A MINIMUM, REQUIRE DISCOVERY AND A MERITS HEARING. ................. 20

    A.      The Objection Is Insufficient To Overcome
        The *Prima Facie* Validity Of The Claims. .......................................................... 20

    B.      At The Very Least, The Claims Require
        Discovery And A Merits Hearing. ....................................................................... 23

II.     THE PRIME BROKERAGE AGREEMENT DOES NOT RELEASE
        THE DEBTORS FROM LIABILITY FOR THE NEWPORT FUNDS' CLAIMS. ........ 24

    A.      The Claims Are Not Barred By Section 29
        Of The Prime Brokerage Agreement. .................................................................. 25

    B.      The Claims Are Not Barred By Section 30
        Of The Prime Brokerage Agreement. .................................................................. 29

III.    THE CLAIMS STATE VALID BREACH OF CONTRACT CLAIMS
        FOR WHICH THE DEBTORS ARE JOINTLY AND SEVERALLY LIABLE. ........... 35

    A.      The Claims State *Prima Facie* Valid Claims For Breach of Contract. ................. 35

    B.      The Debtors Are Jointly And Severally Liable
        For The Claims Under The Prime Brokerage Agreement. ................................... 40

IV.     THE CLAIMS SHOULD BE ALLOWED IN FULL
        SUBJECT TO THESINGLE-SATISFACTION RULE. ................................................ 43

CONCLUSION.................................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abundance Partners LP v. Quamtel, Inc.,
   840 F. Supp. 2d 758 (S.D.N.Y. 2012)........................................................................................42

Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.),
   94 F.3d 772 (2d Cir. 1996)........................................................................................................21

Arjent Ltd. v. EZE Castle Integration, Inc.,
   No. 0603543/2007, 2008 N.Y. Misc. LEXIS 8331
   (N.Y. Sup. Ct., N.Y. Cnty. Feb. 27, 2008)................................................................................34

Ash v. New York Univ. Dental Ctr.,
   564 N.Y.S.2d 308 (1st Dep't 1990) ...........................................................................................25

Banc of Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C.,
   847 N.Y.S.2d 49 (1st Dep't 2007) .............................................................................................25

Battery Assocs., Inc. v. J & B Battery Supply, Inc.,
   944 F. Supp. 171 (E.D.N.Y. 1996) ......................................................................................40, 41

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)...................................................................................................................23

Deutsche Lufthansa AG v. Boeing Co.,
   2007 U.S. Dist. LEXIS 9519 (S.D.N.Y. Feb. 2, 2007).............................................................34

Edgewater Growth Capital Partners, L.P. v. Greenstar N. Am. Holdings, Inc.,
   Case No. 108641/08, 2013 WL 9057379 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 2, 2013) ...............40

Fed. Deposit Ins. Corp. v. Shea & Gould,
   No. 95 Civ. 5491, 1997 WL 401822 (S.D.N.Y. July 17, 1997) ...............................................24

Fein ex rel. Estate of Fein v. Chi. Ins. Co.,
   No. 01 Civ. 11386, 2003 WL 21688239 (S.D.N.Y. July 16, 2003) .........................................30

Gens v. Resolution Trust Corp.,
   112 F.3d 569 (1st Cir. 1997), cert. denied, 522 U.S. 931 (1997) ......................................20, 21

In re Allegheny Int'l, Inc.,
   954 F.2d 167 (3d Cir. 1992).................................................................................................21, 22

In re BI-LO, LLC,
   No. 7:11-cv-00177, 2011 WL 4549150 (D.S.C. Sept. 30, 2011) .............................................21

In re Del Biaggio,
      496 B.R. 600 (Bankr. N.D. Cal. 2012) ...................................................................44

In re John B. Rose Co.,
      275 F. 409 (2d Cir. 1921).......................................................................................43

In re King,
      305 B.R. 152 (Bankr. S.D.N.Y. 2004) ..................................................................22

In re LightSquared, Inc.,
      No. 12-12080-SCC, 2014 WL 5488413 (Bankr. S.D.N.Y. Oct. 30, 2014) ............43

In re MF Global, Inc.,
      515 B.R. 434 (Bankr. S.D.N.Y. 2014).......................................................5, 27, 28

In re Motors Liquidation Co.,
      447 B.R. 142 (Bankr. S.D.N.Y. 2011) ..................................................................30

In re O'Malley,
      252 B.R. 451 (Bankr. N.D. Ill. 1999) ...................................................................21

In re Nat'l Energy & Gas Trans., Inc.,
      492 F.3d 297 (4th Cir. 2007), cert. denied, 552 U.S. 1231 (2008)..................43, 44

In re Residential Capital, LLC,
      No. 12-12020, 2014 WL 1058921 (Bankr. S.D.N.Y. Mar. 17, 2014) ....................22

In re WorldCom, Inc.,
      No. 02-13533, 2005 WL 3832065 (Bankr. S.D.N.Y. Dec. 29, 2005) ..............21, 22

Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr,
      295 U.S. 243 (1935)...............................................................................................43

JPMorgan Chase Bank N.A. v. Baupost Grp., LLC
      (In re Enron Creditors Recovery Corp.),
      380 B.R. 307 (S.D.N.Y. 2008)..........................................................................30, 32

Kel Kim Corp. v. Cent. Mkts., Inc.,
      519 N.E.2d 295 (N.Y. 1987)...................................................................................26

Kranze v. Cinecolor Corp.,
      96 F. Supp. 728 (S.D.N.Y. 1951) ..........................................................................42

Liona Corp. v. PCH Assocs. (In re PCH Assocs.),
      949 F.2d 585 (2d Cir. 1991)...................................................................................21

Litwin v. Blackstone Grp., L.P.,
      634 F.3d 706 (2d Cir. 2011), cert. denied, 132 S. Ct. 242 (2011) ..........................23

Norton v. S. Utah Wilderness Alliance,
    542 U.S. 55 (2004)..................................................................................................32

Packer & Klein v. I. Frank & Sons,
    196 N.Y.S. 289 (1st Dep't 1922) ......................................................................41, 42

Phillips P.R. Core, Inc. v. Tradax Petrol., Ltd.,
    782 F.2d 314 (2d Cir. 1985)...................................................................................26

Robin Bay Assocs., LLC v. Merrill Lynch & Co.,
    No. 07 Civ. 376, 2008 WL 2275902 (S.D.N.Y. June 3, 2008)..............................33

Rochester Gas & Elec. Corp. v. Delta Star, Inc.,
    No. 06-CV-6155, 2009 WL 368508 (W.D.N.Y. Feb. 13, 2009) ...........................26

S. Rafael Jewels Corp. v. Nezaj,
    Case No. 107336/11, 2014 WL 2106250 (N.Y. Sup. Ct. N.Y. Cnty. May, 15 2014) .............36

Sommer v. Fed. Signal Corp.,
    593 N.E.2d 1365 (N.Y. 1992)................................................................................28

Soroof Trading Dev. Co., Ltd. v. GE Fuel Cells Sys. LLC,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012).............................................................28, 29

Starr v. Sony BMG Music Entm't,
    592 F.3d 314 (2d Cir. 2010)...................................................................................23

Terwillinger v. Terwillinger,
    206 F.3d 240 (2d Cir. 2000)...................................................................................35

Topever Corp. v. ENE Grp. LLC,
    No. 12-cv-869, 2013 WL 822378 (S.D.N.Y. Mar. 6, 2013)..................................24

Travelers Indem. Co. of Conn. v. The Losco Grp.,
    136 F. Supp. 2d 253 (S.D.N.Y. 2001)....................................................................33

Travelers Indem. Co. of Conn. v. The Losco Grp., Inc.,
    204 F. Supp. 2d 639 (S.D.N.Y. 2002)....................................................................33

Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.,
    802 N.Y.S.2d 411 (1st Dep't 2005), leave to appeal denied, 7 N.Y.3d 703 (2006)................40

**STATUTES**

11 U.S.C. § 502(a) .......................................................................................................21

Fed. R. Bankr. P. 3001 .................................................................................................21

Fed. R. Bankr. P. 3001(a) ............................................................................................21

Fed. R. Bankr. P. 3001(f) .................................................................................................21

Fed. R. Bankr. P. 7012(b) ...............................................................................................22

Fed. R. Bankr. P. 9019 ....................................................................................................17

Fed. R. Civ. P. 8 ..............................................................................................................22

Fed. R. Civ. P. 12(b)(6) ...............................................................................................3, 22

N.Y. U.C.C. Law § 8-511(a) ............................................................................................36

**REGULATIONS**

12 C.F.R. Part 220 ...............................................................................................7, 13, 35

17 C.F.R. § 220.15c3-3 ...............................................................................7, 12, 13, 35

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Newport Global Opportunities Fund LP ("**NGOF**") and Newport Global Credit Fund (Master) LP ("**NGCF**" and, together with NGOF, the "**Newport Funds**"), by and through their undersigned attorneys, hereby file this response (the "**Response**") to the *Four Hundred Eighty-Eighth Omnibus Objection to Claims (No Liability Claims)* (the "**Objection**"), dated December 1, 2014 [Docket No. 47101], filed by Lehman Brothers Holdings Inc. ("**LBHI**" and, together with its affiliated Chapter 11 debtors, the "**Debtors**"), as Plan Administrator (the "**Plan Administrator**"), objecting to the Newport Funds' proofs of claim listed on Exhibit A of the Objection (the "**Claims**").[2]  In support of this Response, the Newport Funds respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Newport Funds are investment funds with hundreds of millions of dollars of assets under management and a significant number of public pension investors.  They were also, unfortunately, prime brokerage customers of Lehman Brothers.[3]

---

[2]      On December 29, 2014, the Plan Administrator filed its *Notice of Withdrawal of Four Hundred Eighty-Eighth Omnibus Objection To Claims (No Liability Claims) Solely As To Certain Claims*, withdrawing the Objection to, *inter alia*, the Newport Funds' guarantee claims against LBHI (Claim Nos. 29235 and 26372).  See Docket No. 47564.  The Notice, which is denominated as being "without prejudice," does not specify a basis for or cause of the withdrawal.  The Plan Administrator should not be permitted to continue a strategic delay instead of simply allowing otherwise allowable claims.  The Newport Funds should not face the continued prejudice of additional delay (after waiting over six years to date), and the Court should schedule a prompt merits hearing on the Newport Funds' guarantee claims, to the extent those claims continue to be disputed by the Plan Administrator.  For purposes of this Response, references to "Claims" shall not include the guarantee claims that are no longer subject to the Objection.

[3]      Throughout this Response, the Newport Funds use "Lehman Brothers" as referred to in the Prime Brokerage Agreement (defined below) and where Lehman Brothers was held out to the Newport Funds as a joint enterprise incapable of being separated into specific Lehman Brothers entities by the Newport Funds.  See Declaration of Roger May, Senior Managing Director, CFO, and COO of Newport Global Advisors, ¶ 12, attached hereto as **Exhibit A** (the "**May Declaration**").

2.     The Newport Funds hold direct claims against the Debtors, as parties to the Prime Brokerage Agreement, and guarantee claims against LBHI, as guarantor of the debts of Lehman Brothers International (Europe) ("**LBIE**") (as a party to the Prime Brokerage Agreement).

3.     The Claims arise from Lehman Brothers' reckless failure to follow the Newport Funds' instructions pre-bankruptcy and transfer the Newport Funds' securities to a third-party broker dealer in breach of the Prime Brokerage Agreement.

4.     Lehman Brothers' failure amounts to gross negligence and willful misconduct because Lehman Brothers confirmed that they would complete the transfer at least a day prior to the LBHI bankruptcy filing and LBIE's administration order, and Lehman Brothers had the ability to timely perform the transfer, but did not do so in total derogation of the Newport Funds' rights.

5.     As a result of the Newport Funds' unique circumstances, the Newport Funds have been active participants in these Chapter 11 proceedings from day one.  However, in what can only be described as an unjust war of attrition, the Newport Funds have been barred for over six years from obtaining any significant discovery and a day in Court on the substantive merits of their Claims (with further unreasonable delay now with respect to their guarantee claims).

6.     The Objection seeks disallowance of the Claims.  The crux of the Objection is that, (i) despite the Newport Funds' instructions to Lehman Brothers prior to the bankruptcy filing to transfer the Newport Funds' securities to Credit Suisse Securities (USA) LLC ("**Credit Suisse**") as required under the Prime Brokerage Agreement, (ii) despite Lehman Brothers' confirmation that it would transfer the securities in advance of what was to become the LBHI bankruptcy filing date, and (iii) despite Lehman Brothers' clear ability to do so, the Newport Funds somehow fail to state allowable claims against the Debtors for breach of contract for not

complying with the Newport Funds' pre-bankruptcy instruction to transfer their securities to a financially secure custodian.

7.       To make matters worse, in a striking example of overreach and procedural gamesmanship, the Plan Administrator seeks to dictate that the Claims be heard as part of a "Sufficiency Hearing" akin to the dismissal standard of Rule 12(b)(6) of the Federal Rules of Civil Procedure.

8.       The Claims, however, state entirely plausible claims for breach of contract and the Objection should be overruled and the Claims allowed.  At minimum, the Claims more than clear the hurdle under a "sufficiency"/motion to dismiss review, as the Objection at most raises triable issues of fact for which the record must be further developed.

9.       As will be demonstrated, the Plan Administrator's reliance on the purported exculpatory provisions in the Prime Brokerage Agreement is unavailing.

10.      The Plan Administrator's reliance on Section 29 of the Prime Brokerage Agreement (a "force majeure" clause) does not relieve the Debtors of liability.   Indeed that provision is simply irrelevant here.  The Claims are not based on actions or events beyond Lehman Brothers' control.

11.      More specifically, there is no evidence of any government restrictions, suspensions of trading or other conditions beyond Lehman Brothers' control as of September 14, 2008—the date the transfer of the Newport Funds' securities should have been made.  In fact, on information and belief, Lehman Brothers was able to transfer customer accounts and settle

trades, both in a significant number, on the eve of LBHI's bankruptcy filing and the LBIE administration order and shortly thereafter.[4]

12.     Even if Section 29 were applicable, it cannot exculpate the Debtors for gross negligence or willful misconduct as exculpations for gross negligence or willful misconduct are invalid as a matter of governing New York law.

13.     Similarly, the Plan Administrator cannot rely on Section 30 of the Prime Brokerage Agreement to avoid liability for the Claims.  The Claims arise from Lehman Brothers' failure to comply with the Newport Funds' instructions to transfer the Newport Funds' securities, not "the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action."  Prime Brokerage Agreement § 30.  The Claims do not fit within the limited list of protected acts enumerated in Section 30 of the Prime Brokerage Agreement.

14.     Section 30 of the Prime Brokerage Agreement also contains an explicit carve-out for gross negligence and willful misconduct.  Lehman Brothers' failure to effectuate the transfer of the Newport Funds' securities was an act of gross negligence and willful misconduct.  At a minimum, it was extremely careless with a reckless disregard for the Newport Funds' rights; at worst, it was part of a bad faith and illegal scheme to cover up LBIE's wrongful conversion of customer securities.  At the very least, whether the Debtors' course of conduct constitutes gross negligence or willful misconduct is an issue of fact that is not properly subject to resolution on a "sufficiency" challenge.

---

[4]     See *The Trustee's Position Statement Regarding the Omnibus Customer Claim of Lehman Brothers International (Europe)*, ¶ 3, In re Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA (Bankr. S.D.N.Y. Jan. 13, 2012) [Docket No. 4865] ("During the five-day period of September 15-19, 2008 . . . approximately 190,000 trades by the LBIE Clients were due to settle.  LBI settled or partially settled approximately 95% of these trades with third parties while the remaining trades failed."); see also *Trustee's First Interim Report For The Period September 19, 2008 Through May 29, 2009*, ¶ 10, In re Lehman Brothers Inc., Case No. 08-01420 (JMP) SIPA, (Bankr. S.D.N.Y. May 29, 2009) [Docket No. 1151] (acknowledging that LBI transferred over 110,000 customer accounts under 15 U.S.C. § 78fff-2(f)).

15.    Unquestionably, the facts here are far more murky than those presented in In re MF Global, Inc., 515 B.R. 434 (Bankr. S.D.N.Y. 2014), which the Plan Administrator over-hypes as nearly identical to the Claims.  Unlike the customers in MF Global, the Newport Funds' securities should have been transferred prior to LBHI's Chapter 11 filing, the LBIE administration order and the commencement of the LBI SIPA proceeding.  For that factual distinction and other reasons set forth below, MF Global should have no bearing on the resolution of the Claims.

16.    Perhaps cognizant that the contractual exculpation provisions are not available to the Debtors (and they are not), the Plan Administrator tries to cast all blame and liability for the Claims on LBI as prime broker under Section 21 of the Prime Brokerage Agreement.  The Plan Administrator does so despite the fact that the Debtors are directly obligated with respect to the breaches of the Prime Brokerage Agreement by the terms of the Prime Brokerage Agreement as set forth in the Claims.  Furthermore, the Debtors are, as a matter of contract, jointly and severally liable among themselves, LBI and LBIE for the breaches of the Prime Brokerage Agreement as set forth in the Claims.

17.    In this regard, the Objection fails to rebut the presumption that obligations under multi-party contracts are joint unless the contract contains adequate severing language, which the Prime Brokerage Agreement does not.  The Debtors were named parties to the Prime Brokerage Agreement and enjoyed the benefits of the Prime Brokerage Agreement and were and are bound to share in its burdens.

18.    At the very least, to the extent the Court does not find the Debtors jointly and severally liable to the Newport Funds under the Prime Brokerage Agreement as a matter of law,

the resulting ambiguity raises triable issues of fact regarding whether the Debtors were intended to be jointly and severally liable under the Prime Brokerage Agreement.

19.    Finally, while LBIE has made distributions to the Newport Funds, the Claims do not seek double recovery.  Specifically, distributions to date from LBIE have not satisfied the Claims in full in accordance with Sections 8.13(a) and 8.13(d) of the Plan.  As set forth in this Response, the current shortfall is over $13 million dollars.

20.    Accordingly, each of the Claims should be allowed at 100 percent of the underlying liability (NGOF - $163,334,098.49 (USD); NGCF - $38,327,041.04 (USD)), plus currently unliquidated amounts to be determined, provided that the Newport Funds cannot collect from the Debtors' estates more than the amount of the total liability.

21.    In sum, the Objection should be overruled.  At most, it raises disputed issues of fact that cannot properly be resolved on a sufficiency/motion to dismiss review.

## BACKGROUND

A.    **General Overview.**

22.    Lehman Brothers aggressively represented to the Newport Funds that they would "deliver the firm" to the Newport Funds if they became prime brokerage customers of Lehman Brothers.[5]  In marketing materials and discussions with representatives held out as employees of Lehman Brothers, the constant refrain was that the Newport Funds could rely on the Lehman Brothers enterprise as a whole in connection with Lehman Brothers' prime broker services.  At a minimum, there was never any question that the Newport Funds, as prime brokerage customers, would have the full benefit of an LBHI guarantee.  It was the "deliver the firm"/guarantee package that the Newport Funds relied on when executing their Prime Brokerage Agreements

---

[5]    See May Decl. ¶ 13.

and entrusting over one hundred million dollars of securities to Lehman Brothers to their detriment.

23.    Unbeknownst to the Newport Funds at the time, "delivering the firm" in the eyes of Lehman Brothers meant a license for Lehman Brothers to use the Newport Funds' securities as it wished.  And it appears that is what Lehman Brothers recklessly did.  In particular, LBIE rehypothecated the Newport Funds' securities at an alarming rate and in apparent contravention of the Prime Brokerage Agreement, Federal Reserve Board Regulation T, 12 C.F.R. Part 220, and SEC Rule 15c3-3, 17 C.F.R. § 220.15c3-3—the "Customer Protection Rule."

24.    As evidence mounted concerning Lehman Brothers' financial instability, the Newport Funds determined their securities were at risk.  Accordingly, five days prior to the LBHI bankruptcy filing and LBIE administration order and over a week prior to the commencement of LBI's SIPA proceeding, the Newport Funds instructed Lehman Brothers to transfer their securities to Credit Suisse.

25.    Under the Prime Brokerage Agreement, and Lehman Brothers' confirmation of the Newport Funds' instruction (not to mention industry custom and practice), the transfer should have been completed no later than the day before the LBHI Chapter 11 filing and LBIE administration order.  Instead, there was a blatant—and epic—fail by Lehman Brothers.

26.    Lehman Brothers scrambled to call back the Newport Funds' securities that— unbelievably—could not be fully accounted for by the Newport Funds' prime broker.  Then, Lehman Brothers failed to, or refused to, "push the button" and transfer the Newport Funds' securities, despite evidence that Lehman Brothers had the ability to do so.  Six years later, the Newport Funds are still seeking to be made whole for Lehman Brothers' gross negligence and reckless conduct.

B.     **The Newport Funds' Relationship With Lehman Brothers.**

27.     The Newport Funds are and at all relevant times were investment funds managing hundreds of millions of dollars of assets, primarily focused on distressed investment opportunities.  See May Decl. ¶ 6.

28.     At all relevant times, Newport Global Advisors LP ("**NGA**") managed the Newport Funds.  See id. ¶ 3.

29.     The key employees of NGA have extensive credit management backgrounds and at all relevant times were particularly concerned about the credit protection of the prime broker for the Newport Funds.  See id. ¶ 7.

30.     Prior to entering into the Prime Brokerage Agreement, the Newport Funds had extensive discussions with Lehman Brothers' representatives about Lehman Brothers' prime broker services and creditworthiness.  See id. ¶ 8.

31.     As was the case throughout the Newport Funds' relationship with Lehman Brothers, its representatives often identified themselves to the Newport Funds as employees of Lehman Brothers as a whole, not specific Lehman Brothers entities.  See id. ¶ 9.

32.     For example, Lehman Brothers' marketing materials provided to the Newport Funds prior to entering into the Prime Brokerage Agreement listed the Lehman Brothers' representatives who were to provide prime broker customer support for the Newport Funds. Each such representative was identified as an employee of "Lehman Brothers," not as an employee of a specific Lehman Brothers entity.  See id. ¶ 10.

33.     Additionally, the Lehman Brothers' representatives who interacted with the Newport Funds on a day-to-day basis held themselves out as representatives of "Lehman

Brothers" and never distinguished themselves as employees of specific Lehman Brothers entities. See id. ¶ 11.

34.     In communications and marketing documentation sent to the Newport Funds prior to the Newport Funds entering into the Prime Brokerage Agreement, Lehman Brothers stressed to the Newport Funds that, by partnering with Lehman Brothers as prime brokerage customers, Lehman Brothers would "deliver the firm" and that the Newport Funds could rely on "direct access to all resources and levels of" the Lehman Brothers enterprise. See id. ¶ 13.

35.     Lehman Brothers' commitment to "deliver the firm" and to provide "direct access to all resources and levels of" the Lehman Brothers enterprise was part of the overall creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker and upon which the Newport Funds relied to transact with Lehman Brothers. See id. ¶ 15.

36.     Subsequently, all of the Newport Funds' requests to purchase or sell securities were placed with, and confirmed by, representatives who held themselves out as Lehman Brothers' representatives. See id. ¶ 14.   Indeed, the Newport Funds never spoke with a representative of LBIE until after the Lehman Brothers' insolvency filings. See id.

### i.      *The 2005 LBHI Guarantee.*

37.     On June 9, 2005, the Executive Committee of the Board of Directors of LBHI executed the Unanimous Written Consent of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc. (the "**2005 LBHI Guarantee**"). See id. ¶ 16-17.

38.     The 2005 LBHI Guarantee provides that "[Lehman Brothers Holdings Inc.] hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for

purposes of the [LBHI Code of Authorities]." 2005 LBHI Guarantee at 2 (attached as Exhibit D to the May Decl.).

39.    Schedule A of the 2005 LBHI Guarantee includes LBIE among the list of Guaranteed Subsidiaries.  See id. at 3.

40.    Roger May, as manager of the Newport Funds, had knowledge of, and reviewed, the 2005 LBHI Guarantee prior to the Newport Funds entering into the Prime Brokerage Agreement and such knowledge is imputed, by law, to the Newport Funds.  See May Decl. ¶ 20.

41.    To the Newport Funds, the 2005 LBHI Guarantee was a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, those obligations of LBIE, which the Newport Funds understood to be a party to the Prime Brokerage Agreement.  See id. ¶ 21.

42.    The 2005 LBHI Guarantee was part of the overall creditworthiness that induced the Newport Funds to choose Lehman Brothers as their prime broker and upon which the Newport Funds relied when executing the Prime Brokerage Agreement and entering into transactions with Lehman Brothers, including entrusting the Newport Funds' securities to Lehman Brothers.  See id. ¶ 22-23.

**ii.       *The Prime Brokerage Agreement.***

43.    In 2006, with knowledge of and in reliance on, *inter alia*, the 2005 LBHI Guarantee, NGOF and NGCF each entered into a Prime Brokerage Customer Account Agreement (each a "**Prime Brokerage Agreement**"), with LBI and other Lehman Brothers Entities (as defined in the Prime Brokerage Agreement).  See May Decl. ¶ 24-25; Proof of Claim ¶ 1.

10

44.     The Prime Brokerage Agreement is governed by New York law.   <u>See</u> Prime Brokerage Agreement § 24 (attached as Exhibit E to the May Decl.).

45.     The Prime Brokerage Agreement expressly provides that the parties to the Agreement:

> shall consist of [the Fund] and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns . . . (each such entity or person being referred to hereinafter as "Lehman Brothers" or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers").

<u>Id.</u> § 1(a).

46.     LBI counter-signed the Prime Brokerage Agreement as "signatory for itself and as agent for the affiliates named herein."   <u>Id.</u> at 11.

47.     The Prime Brokerage Agreement provides that:   "This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers . . . will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer."   <u>Id.</u> at Preamble.

48.     Pursuant to the Prime Brokerage Agreement, a prime brokerage account was to be opened at LBI for each of NGOF and NGCF.   <u>See id.</u> § 1(a) ("A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc.").

49.     All transactions under the Prime Brokerage Agreement are "subject to the applicable laws, rules and regulations of all U.S. . . . federal, state and self-regulatory authorities." Id. § 2.[6]

50.     Moreover, Section 21(*l*) of the Prime Brokerage Agreement, which does not distinguish between LBI and other Lehman Brothers entities, requires that the prime brokerage services be "provided in a manner consistent with the SEC Letter." Id. § 21(*l*).

51.     The "SEC Letter," in turn, refers to SEC Rule 15c3-3—the Customer Protection Rule—which sets out a broker-dealer's duty to return securities to customers on demand. See 17 C.F.R. § 220.15c3-3.

### iii.    *The Margin Lending Agreement.*

52.     In connection with entering into the Prime Brokerage Agreement, Lehman Brothers induced each of NGOF and NGCF to enter into a Margin Lending Agreement (each an "**MLA**") with LBI and LBIE, pursuant to which LBIE agreed to make loans to the Newport Funds in connection with transactions under the Prime Brokerage Agreement. See May Decl. ¶ 27-28; Proof of Claim ¶ 2.

---

[6]     Section 2 of the Prime Brokerage Agreement states as follows:

> 2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY. All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

Prime Brokerage Agreement § 2.

53.    Upon information and belief, Lehman Brothers chose to use LBIE for potential financing for its prime brokerage customers to increase its own borrowing base and to seek to avoid requirements under Federal Reserve Board Regulation T, 12 C.F.R. Part 220.

54.    Under the MLA, the Newport Funds authorized LBIE—within the limits of applicable laws, rules, and regulations (*i.e.*, U.S. securities laws and New York law)—to lend either to itself or to others "any or all Collateral," which could then be "pledged, repledged, hypothecated or rehypothecated . . . for any amounts due to [LBIE] thereon or for a greater sum." MLA § 5(c) (attached as Exhibit F to the May Decl.).

55.    As of September 15, 2008, the date LBIE was placed into administration proceedings under English law and the date on which the first of the instant Debtors sought protection under Chapter 11, the Newport Funds did not have any indebtedness to LBIE under the MLAs. See id. ¶ 32.

56.    However, on information and belief, Lehman Brothers improperly transferred to LBIE or permitted LBIE to retain or assert rights in and/or to the Newport Funds' securities, prior to the LBIE administration, without the Newport Funds' consent, and in breach of the Prime Brokerage Agreement, Margin Lending Agreement, Federal Reserve Regulation T, 12 C.F.R. Part 220, and the Customer Protection Rule (SEC Rule 15c3-3), 17 C.F.R. § 220.15c3-3.

*iv.*    ***Lehman Brothers' Assurances To The Newport Funds Regarding Its Creditworthiness.***

57.    In late 2007-2008, the capital markets experienced significant distress, including the failure of Bear Stearns.

58.    As a result, the Newport Funds sought additional assurances from Lehman Brothers with respect to Lehman Brothers' creditworthiness and the safety of the Newport Funds' securities entrusted to Lehman Brothers. See id. ¶ 33.

13

59.    In March 2008, as part of a series of ongoing communications between the Newport Funds and Lehman Brothers about Lehman Brothers' financial well-being, Roger May, as manager of the Newport Funds, spoke with Donald DeGraff and John Gatsos of Lehman Brothers, who verbally assured him that the Newport Funds benefitted from an LBHI parent guarantee.  See id. ¶ 34.

60.    In further support of its verbal statements, Lehman Brothers assured the Newport Funds of its creditworthiness by, *inter alia*, pointing to and providing the Newport Funds with a Customer Asset Protection Overview from November 2007 (the "**2007 Credit Protection Overview**").  See id. ¶ 35-36.

61.    The 2007 Credit Protection Overview provides an overview of Lehman Brothers' creditworthiness, including, *inter alia*, stating that "LBIE has the benefit of a full parent guarantee from LBHI."  2007 Credit Protection Overview at 7 (attached as Exhibit G to the May Decl.).

62.    The Newport Funds, through Roger May, as manager of the Newport Funds, understood the "full parent guarantee from LBHI" to include the 2005 LBHI Guarantee.  See May Decl. ¶ 38.

63.    On account of Lehman Brothers' representations of financial stability, including, without limitation, the 2007 Credit Protection Overview and its reference to the full parent guarantee from LBHI, the Newport Funds continued to transact with Lehman Brothers and entrust their securities to Lehman Brothers.  See id. ¶ 39.

*v.*     ***The 2008 LBHI Guarantee.***

64.     On January 4, 2008, LBHI executed the Guarantee of Lehman Brothers Holdings Inc. (the "**2008 LBHI Guarantee**" and, together with the 2005 LBHI Guarantee, the "**LBHI Guarantees**").  See id. ¶ 40-41.

65.     The 2008 LBHI Guarantee states:   "We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers International (Europe) ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns . . . ."   2008 LBHI Guarantee at 1 (attached as Exhibit H to the May Decl.).

66.     Roger May, as manager for the Newport Funds, had knowledge of and reviewed the 2008 LBHI Guarantee at or around the time of its publication.  See May Decl. ¶ 43.

67.     The Newport Funds understood the 2008 LBHI Guarantee to be a guarantee by LBHI of Lehman Brothers' prime broker services under the Prime Brokerage Agreement—including, without limitation, the obligations of LBIE, which the Newport Funds understood to be a party to the Prime Brokerage Agreement—and part of Lehman Brothers' commitment to "deliver the firm" to the Newport Funds as a prime brokerage customer of Lehman Brothers. See id. ¶ 44.

68.     Accordingly, the LBHI Guarantees were relied on by the Newport Funds as a core element of Lehman Brothers' overall creditworthiness and as a basis to continue transacting with Lehman Brothers under the Prime Brokerage Agreement during tumultuous economic times. See id. ¶ 45.

**C.    The Newport Funds' Instructions To**
**Transfer Their Securities From Lehman Brothers.**

69.    As is standard in the securities industry, and as required under the Prime Brokerage Agreement, Lehman Brothers was obligated to comply with the instructions of the Newport Funds regarding their securities entrusted to Lehman Brothers.  See id. ¶ 46; Prime Brokerage Agreement §§ 2, 21.

70.    Despite Lehman Brothers' assurances of their creditworthiness, by September 2008, the Newport Funds made the decision to transfer their securities out of Lehman Brothers.

71.    On September 10, 2008, the Newport Funds instructed Lehman Brothers to transfer all of the Newport Funds' securities to Credit Suisse, which was to assume the duties as the Newport Funds' prime broker.  See May Decl. ¶ 47.

72.    The transfer request was acknowledged by Lehman Brothers on September 11, 2008.  See id. ¶ 48.

73.    On September 12, 2008, at Lehman Brothers' request, the Newport Funds forwarded Letters of Authorization to Lehman Brothers to facilitate the transfer of their securities.  See id. ¶ 49.

74.    Upon receipt of the Letters of Authorization, the transfer of the Newport Funds' securities was booked by Lehman Brothers on September 12, 2008, and Lehman Brothers informed the Newport Funds that "[a]ny transfers initiated [on September 12, 2008] will need to be T+2 settlement."  See id. ¶ 50-51.

75.    As such, the transfer of the Newport Funds' securities should have been completed no later than September 14, 2008, *one day prior* to the commencement of LBHI's Chapter 11 proceeding and LBIE's administration order, and *five days prior* to commencement of LBI's SIPA proceeding.  See id. ¶ 52.

76.     On September 15, 2008, the Newport Funds were advised by Lehman Brothers that it had "lost access" to the Newport Funds' securities.  See May Decl. ¶ 53.

77.     To this date, the Newport Funds' securities have never been transferred by Lehman Brothers per the Newport Funds' instructions to Credit Suisse or any other replacement prime broker.  See id. ¶ 54.

**D.     Lehman Brothers' Insolvency Proceedings.**

78.     Commencing on September 15, 2008, and periodically thereafter, the Debtors filed with the Court voluntary petitions for relief under Chapter 11 of title 11 of the United States Code.

79.     On September 15, 2008, LBIE was placed into administration under English law.

80.     On September 19, 2008, LBI's SIPA proceeding was commenced.

**E.     The Newport Funds' Claims Against LBI And LBIE.**

81.     The Newport Funds timely filed claims against LBI and LBIE asserting damages for, *inter alia*, breaches of the Prime Brokerage Agreement.

82.     In both the LBI SIPA proceeding and the LBIE administration, the Newport Funds actively sought the return of their securities and discovery related to their Claims.

83.     The Newport Funds achieved mixed results—with efforts to compel the prompt return of their securities denied, discovery limited, and the Newport Funds' customer claims against LBI disallowed as part of a global settlement between LBI and LBIE approved under Bankruptcy Rule 9019.

84.     Under the global settlement between LBI and LBIE, LBIE's omnibus customer claim against LBI on behalf of purported LBIE customers was allowed, and an omnibus trust

17

was ultimately formed that included customer securities and dividends to be distributed by LBIE to holders of allowed trust asset claims.

85.    Subsequently the Newport Funds were granted allowed trust asset claims against LBIE in the following amounts:  (i) NGOF - $58,282,872.38 (USD); (ii) NGCF - $38,327,041.04 (USD).

86.    Additionally, NGOF was granted an allowed general unsecured claim against LBIE in the amount of £58,566,776.00 at an exchange rate of 1.79370 U.S. Dollars to British Pound Sterling, fixing the liquidated value of this claim at $105,051,226.11 (USD).

87.    To date, LBIE has made distributions on the Newport Funds' allowed trust asset claims and unsecured claim, but as set forth below, the Claims have not yet been fully satisfied under the Plan.

## F.    The Newport Funds' Claims Against the Debtors.

88.    On September 22, 2009, the Newport Funds timely filed the Claims.

89.    The Claims seek to recover against the Debtors for breaches of the Prime Brokerage Agreement seeking damages for, *inter alia*:

- the value of the Newport Funds' securities held by Lehman Brothers pursuant to the Prime Brokerage Agreement that have not been otherwise returned to the Newport Funds, see Proof of Claim ¶ 4; Prime Brokerage Agreement §§ 2, 3;

- all damages and losses resulting from Lehman Brothers' failure to comply with the Newport Funds' instruction on September 10, 2008 to transfer the Newport Funds' securities to Credit Suisse, see Proof of Claim ¶ 5; Prime Brokerage Agreement § 2;

- the value of all post-commencement date dividends and interest in respect of the Newport Funds' securities held by Lehman Brothers, see Proof of Claim ¶ 6; Prime Brokerage Agreement § 19(b);

- all damages in an amount presently unknown for the loss of the Newport Funds' ability to participate in certain corporate events as a direct result of

18

Lehman Brothers' breach of the Prime Brokerage Agreement, <u>see</u> Proof of Claim ¶ 8; Prime Brokerage Agreement §§ 10, 11; and

- damages to the Newport Funds on account of Lehman Brothers' misrepresentations and failure to properly capitalize the Customer Asset Protection Company ("**CAPCO**"), <u>see</u> Proof of Claim ¶¶ 3, 10; Prime Brokerage Agreement § 2.

90.     The Claims assert liquidated damages in the aggregate amount of no less than $163,334,098.49 (USD) for NGOF and $38,327,041.04 (USD) for NGCF against each of the Debtors for direct breaches of the Prime Brokerage Agreement and against LBHI under the LBHI Guarantees.

91.     The Newport Funds also assert unliquidated claims against the Debtors and LBHI for, *inter alia*, damages relating to their inability to participate in corporate events connected to their securities while under Lehman Brothers' control in breach of Sections 10 and 11 of the Prime Brokerage Agreement and damages relating to the loss of investment opportunities given Lehman Brothers' failure to promptly return the Newport Funds' securities in breach of, *inter alia*, Section 2 of the Prime Brokerage Agreement.

**G.     The Debtors' Chapter 11 Plan.**

92.     On December 6, 2011 (the "**Confirmation Date**"), the Court entered its *Order Confirming Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors* [Docket No. 23023] (the "**Confirmation Order**").  A copy of the *Modified Third Amended Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors* (the "**Plan**") is attached as Exhibit A to the Confirmation Order.

93.     The Plan became effective on March 6, 2012.  <u>See</u> Docket No. 26039.

94.     The Plan provides that, "[f]or purposes of determining whether an Allowed Claim has been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be

converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date." Plan § 8.13(d).[7]

95.    The then existing exchange rate from British Pound Sterling to U.S. Dollars on the Confirmation Date was approximately 1.5643.[8]

96.    Accordingly, as of today's date, NGOF has received distributions from LBIE of approximately $91,616,007.70 based upon the exchange rate as of the Confirmation Date.  See Plan § 8.13(d).

97.    Therefore, under Section 8.13(d) of the Plan, at least $13,435,218.41, plus unliquidated amounts are owed by each of the Debtors to NGOF, subject to the single-satisfaction rule.  Likewise, to date, NGCF's Claims have not been fully satisfied under the Plan.

## RESPONSE TO OBJECTION

**I.    The Claims Should Be Allowed Or, At A
Minimum, Require Discovery And A Merits Hearing.**

**A.    The Objection Is Insufficient To
Overcome The *Prima Facie* Validity Of The Claims.**

98.    Proofs of claim are notice pleadings and are not required to satisfy the pleading requirements under the Federal Rules of Civil Procedure.  See Gens v. Resolution Trust Corp., 112 F.3d 569, 575 (1st Cir. 1997), cert. denied, 522 U.S. 931 (1997) ("[A] [proof of claim] need

---

[7]    The full text of Section 8.13(d) of the Plan reads as follows:

    For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date.  Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

    Plan § 8.13(d).

[8]    See Currency Converter, Yahoo! Finance, http://finance.yahoo.com/currency-converter/#from=GBP; to=USD;amt=1 (last visited Dec. 29, 2014) (utilized given precise historical data from Reuters could not be obtained).

only provide adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable.").

99.    As notice pleadings, proofs of claim need only "ensure that all those involved in the proceedings will be made aware of the claims against the debtor's estate and will have an opportunity to contest those claims." Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 605 (2d Cir. 1991).

100.    The pleading requirements for proofs of claim are governed by Bankruptcy Rule 3001 and Official Form 10. See, e.g., Fed. Bankr. R. 3001(a) ("A proof of claim is a written statement setting forth a creditor's claim [and] . . . shall conform substantially to the appropriate Official Form."); In re BI-LO, LLC, No. 7:11-cv-00177, 2011 WL 4549150, at *7 (D.S.C. Sept. 30, 2011) (Official Form 10 "only requires the creditor to include basic facts as to the identity of the claimant, and the amount, nature, and basis of the claim").

101.    Neither Bankruptcy Rule 3001 nor Official Form 10 incorporates the pleading standard under Rule 8 of the Federal Rules of Civil Procedure. See Fed. R. Bankr. P. 3001; In re O'Malley, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999) ("A claim in bankruptcy need not meet the foregoing tests of litigation pleading [under Rules 8(a) and 9(b)] of the Federal Rules of Civil Procedure."); see also Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 777 (2d Cir. 1996) (holding that a proof of claim need only be "sufficiently specific" on its face to give "notice" of the claim); In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992) ("a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward").

102.    Accordingly, a properly filed proof of claim is *prima facie* evidence of the validity of that claim. See 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); In re WorldCom, Inc.,

No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) ("A proof of claim is deemed *prima facie* valid.").

103.    To overcome the presumptive validity of a duly filed proof of claim, "'the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.'"  In re King, 305 B.R. 152, 164 (Bankr. S.D.N.Y. 2004) (quoting In re Allegheny Int'l, Inc., 954 F.2d at 173-74).

104.    The burden shifts back to the claimant only when the objector refutes the validity of the claimant's proof of claim.  See In re Residential Capital, LLC, No. 12-12020, 2014 WL 1058921, at *4 (Bankr. S.D.N.Y. Mar. 17, 2014) (overruling debtor's claim objection where it "did not present evidence specifically addressing the [claimant's] contentions—contained in the proof of claim—that they were unable to deposit funds into the frozen account").

105.    The Plan Administrator concedes that it bears the burden to rebut the presumptive validity of the Claims.  See Objection ¶ 19.  As set forth in this Response, the Plan Administrator has failed to meet its burden to rebut the *prima facie* validity of the Claims and the Claims should be allowed.

106.    The same result should be reached if the Court undertakes a Rule 12(b)(6) analysis and applies the pleading standards under the Federal Rules of Civil Procedure to the Claims as the Claims satisfy Federal Rule of Civil Procedure 8.

107.    The Claims clearly contain "a short plain statement of the claim showing that the [Newport Funds are] entitled to relief; and [make] a demand for the relief sought" against the Debtors.  See Fed. R. Civ. P. 8(a)(2)-(3).

108.    Under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), this Court must accept the factual allegations contained in the Claims, this Response and the May Declaration as

true and draw all favorable inferences in the Newport Funds' favor.  See Litwin v. Blackstone

Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011), cert. denied, 132 S. Ct. 242 (2011).  The Newport

Funds are required to allege "only enough facts to state a claim to relief that is plausible on its

face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

109.    The plausibility requirement does not impose a "probability requirement [on the

Claims] at the pleading stage; it simply calls for enough facts to raise a reasonable expectation

that discovery will reveal evidence of the conduct alleged."  Starr v. Sony BMG Music Entm't,

592 F.3d 314, 322 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 556).

110.    Accepting all factual allegations set forth in the Claims as true, the Newport

Funds have established plausible claims for breaches of the Prime Brokerage Agreement, gross

negligence and willful misconduct by the Debtors, and the joint and several liability of the

Debtors under the Prime Brokerage Agreement.    Accordingly, the Objection should be

overruled.

### B.    At The Very Least, The Claims Require Discovery And A Merits Hearing.

111.    On April 19, 2010, the Court entered its *Order Pursuant to Section 105 of the*

*Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to*

*Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for*

*Claims Against the Debtors* (the "**Claims Procedures Order**") [Docket No. 8474].

112.    Under the Claims Procedures Order, all hearings "to address the legal sufficiency

of [a] particular Contested Claim and whether [a] Contested Claim states a claim against the

asserted Debtor under Bankruptcy Rule 7012" are considered "Sufficiency Hearings" when the

Plan Administrator fails to serve the "holder of a Contested Claim (each, a 'Claimant') with a . . .

Notice of Merits Hearing."  Claims Procedures Order, Exhibit A ¶ 4(a).

113.    The Plan Administrator has not served the Newport Funds with a Notice of Merits Hearing.  Accordingly, the Objection triggers only a Sufficiency Hearing.

114.    Under the Claims Procedures Order, Sufficiency Hearings do not include the right to discovery, unless otherwise ordered by the Court.  Id. at 2-3.

115.    At the very least, the Court should overrule the Objection and permit the Newport Funds limited discovery as the Objection raises material issues of fact.  See Topever Corp. v. ENE Grp. LLC, No. 12-cv-869, 2013 WL 822378, at *4 (S.D.N.Y. Mar. 6, 2013) (denying motion to dismiss breach of contract claim and finding that plaintiff alleged sufficient facts even though complaint was missing information); Fed. Deposit Ins. Corp. v. Shea & Gould, No. 95 Civ. 5491, 1997 WL 401822, at *8, *15 (S.D.N.Y. July 17, 1997) (denying motion to dismiss breach of contract claim and ordering parties to complete discovery).

116.    For example, the Court cannot find that the Claims are barred under Paragraph 29 or 30 of the Prime Brokerage Agreement on the current record based on the Plan Administrator's conclusory pronouncement that the Debtors' actions or inactions with respect to the Newport Funds' securities did not constitute gross negligence or willful misconduct.

117.    Moreover, it would be improper to credit—without any discovery—the Plan Administrator's selective disclaimer of the Debtors' liability under the Prime Brokerage Agreement.  At the very least, the Court should permit discovery to determine the scope of LBI's agency and the benefits and burdens undertaken by the Debtors as parties to the Prime Brokerage Agreement.

## II.    The Prime Brokerage Agreement Does Not Release The Debtors From Liability For The Newport Funds' Claims.

118.    As a preliminary matter, New York courts interpret exculpatory provisions narrowly against parties attempting to insulate themselves from liability based upon "the long-

settled general proposition that the law frowns upon an agreement intended to exculpate a party

from the consequences of its own [conduct]." Ash v. New York Univ. Dental Ctr., 564 N.Y.S.2d

308, 310 (1st Dep't 1990) ("Because exculpation provisions are not favored by the law, they are

strictly construed against the party relying on them and must be unambiguously expressed in

unmistakable language that is clear and explicit in communicating the intention to absolve from

negligence the party seeking to be insulated from liability.") (citation omitted).

119.    Indeed, under New York law, exculpatory clauses are generally "'disfavored by

the law . . . closely scrutinized by the courts,'" and are only recognized when they do not offend

public policy. Banc of Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C., 847 N.Y.S.2d 49, 53 (1st

Dep't 2007) (citation omitted).

### A.    The Claims Are Not Barred By Section 29 Of The Prime Brokerage Agreement.

120.    Section 29 of the Prime Brokerage Agreement states:

> You agree that Lehman Brothers will not be liable for any loss
> caused, directly or indirectly, by government restrictions, exchange
> or market rulings, suspension of trading, war (whether declared or
> undeclared), terrorist acts, insurrection, riots, fires, flooding,
> strikes, failure of utility services, accidents, adverse weather or
> other events of nature, including but not limited to earthquakes,
> hurricanes and tornadoes, or other conditions beyond Lehman
> Brothers' control. In the event that any communications network,
> data processing system, or computer system Lehman Brothers uses
> is rendered inoperable, Lehman Brothers will not be liable to you
> for any loss, liability, claim, damage or expense resulting, either
> directly or indirectly, therefrom.

Prime Brokerage Agreement § 29.[9]

121.    By its terms, Section 29 is a force majeure exculpation clause that is not

applicable to the Claims. This provision relieves the Debtors of liability only from the

---

[9]    In the Prime Brokerage Agreement executed by NGOF, Sections 29 and 30 are contained within Sections 28
and 29, respectively.

consequences of events over which they had no control—not unilateral decisions by Lehman Brothers not to comply with contractual obligations to follow prime brokerage customers' instructions.

122.    New York courts, moreover, interpret force majeure provisions narrowly and excuse performance "only if the force majeure clause specifically includes the event that actually prevents a party's performance." See Kel Kim Corp. v. Cent. Mkts., Inc., 519 N.E.2d 295, 296-96 (N.Y. 1987) (clause limiting liability for events "beyond the control" of a party did not excuse performance under the contract where "the events listed in the force majeure clause . . . [were] different in kind and nature" from the alleged inability to honor the contract's terms); see also Rochester Gas & Elec. Corp. v. Delta Star, Inc., No. 06-CV-6155, 2009 WL 368508, at *8 (W.D.N.Y. Feb. 13, 2009) (holding that performance could not be excused under force majeure clause where it did "not specifically mention" the alleged impossibility).

123.    The burden of demonstrating whether a force majeure occurred is "on the party seeking to have its performance excused" and a "non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure." Phillips P.R. Core, Inc. v. Tradax Petrol., Ltd., 782 F.2d 314, 319-20 (2d Cir. 1985) (breaching party was not excused from performance under force majeure clause where purported force majeure did not prevent the party from carrying out its obligations under the contract).  The Plan Administrator has not come near to sustaining this burden.

124.    The Plan Administrator has offered no evidence of any event applicable here that could release the Debtors from liability under Section 29—which plainly addresses the acts of third parties and does not include failure to follow instructions from customers or insolvency as events that release the Debtors from liability.

26

125. The Plan Administrator's conclusory assertions that the initiation of the Debtors' Chapter 11 proceedings, the LBIE administration order, and the commencement of LBI's SIPA proceeding relieved the Debtors of liability under the Prime Brokerage Agreement is unsupported by any facts, pleadings or orders to that effect. See Objection ¶¶ 12, 36.

126. Indeed, Lehman Brothers had more than sufficient time to transfer the Newport Funds' securities prior to LBHI's Chapter 11 bankruptcy filing, the LBIE administration order and the commencement of LBI's SIPA proceeding, as the Newport Funds directed Lehman Brothers to transfer their securities to Credit Suisse five days prior to the LBHI Chapter 11 filing and LBIE administration order, and nine days prior to the commencement of LBI's SIPA proceeding. The Plan Administrator fails to offer any evidence that the transfer of the Newport Funds' securities could not have been completed in accordance with the Prime Brokerage Agreement and the Newport Funds' instruction.

127. Moreover, contrary to the Plan Administrator's assertion, the facts in In re MF Global, Inc., 515 B.R. 434 (Bankr. S.D.N.Y. 2014) are not nearly identical to the facts presented here. Accordingly, MF Global does not support the contention that the Claims are barred by Section 29 of the Prime Brokerage Agreement.

128. The exculpatory provision in the MF Global customer agreement covered the precise harm for which the plaintiffs sought to recover: contract losses "caused directly or indirectly by,' *inter alia*, (1) '***any Applicable Law, or any order of any court***;' (2) '***suspension or termination of trading***,' and (3) 'any other causes beyond [MFGI's] control.'" Id. (emphasis added). In holding that the claims were barred because the customer agreement expressly exculpated the debtor from liability for losses caused by and after "a suspension of trading," the Court reasoned that the commencement of the SIPA proceeding "led to the freezing of [the]

customer accounts; an automatic result from the commencement of the case (the liquidation order specifically ordered all accounts to be "frozen") and a cause beyond [the debtor's] control." Id. at 441.

129.    The issues presented to this Court by the Claims are fundamentally different than those presented in MF Global.  Unlike the case in MF Global, Lehman Brothers received the Newport Funds' instruction to transfer the securities to Credit Suisse five days before LBHI's Chapter 11 filing and the LBIE administration order, and nine days before commencement of LBI's SIPA proceeding.  Thus, Lehman Brothers was contractually obligated to transfer the Newport Funds' securities prior to the commencement of each respective insolvency proceeding and, on information and belief, no court order prevented Lehman Brothers from doing so.

130.    Moreover, Section 29 of the Prime Brokerage Agreement does not include insolvency proceedings or court orders as events that could relieve the Debtors of liability.  Here, the Claims arise directly from Lehman Brothers' failure to transfer the Newport Funds' securities as duly instructed before any insolvency proceedings were initiated, not from the initiation of bankruptcy proceedings or other court order.

131.    Further, the absence of a carve-out for acts of gross negligence or willful misconduct in Section 29 does not insulate the Debtors from liability for their failure to transfer the Newport Funds' securities, which amounts to gross negligence or willful misconduct.

132.    Exemptions from liability for willful or grossly negligent acts have long been viewed as wholly void under governing New York law.  See Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1370 (N.Y. 1992) ("It is the public policy of [New York] . . . that a party may not insulate itself from damages caused by grossly negligent conduct."); Soroof Trading Dev. Co., Ltd. v. GE Fuel Cells Sys. LLC, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[A]n exculpatory

agreement, no matter how flat and unqualified in terms, will not exonerate a party from liability under all circumstances.").

133.    Accordingly, the Court should not bar the Claims under Section 29 because they allege acts of gross negligence or willful misconduct by the Debtors.    At the very least, the Objection raises issues of fact for which the Court should permit discovery.

**B.    The Claims Are Not Barred By
Section 30 Of The Prime Brokerage Agreement.**

134.    Section 30 of the Prime Brokerage Agreement states:

> Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part.  You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct.  In no event will either party be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

Prime Brokerage Agreement § 30.

135.    Section 30 does not bar the Claims for two reasons:  _first_, the Claims fall outside the scope of the transactions covered by this provision; _second_, the Claims assert gross negligence or willful misconduct by Lehman Brothers, which are expressly carved out of Section 30, and, at the very least, by their nature raise material issues of fact that require discovery.

_**i.      The Claims Are Not Barred By Section 30
Because They Are Outside The Scope Of Its Terms.**_

136.    The Claims are not covered by Section 30 of the Prime Brokerage Agreement because the language of Section 30 is limited in scope to specific enumerated transactions (none of which are applicable here).  By its terms, Section 30 does not extend to Lehman Brothers'

failure to follow the Newport Funds' instruction to transfer their securities to another prime broker. Section 30 does not refer to "transferring," "returning," or "following instructions." If the intent was to release Lehman Brothers for such a failure, such language would be included in the Prime Brokerage Agreement. But no such language was included in the Prime Brokerage Agreement. Accordingly, the Objection must fail.

137.    That the Plan Administrator cannot stretch Section 30 to cover the Claims is also confirmed by the canon of construction *noscitur a sociis*, which requires that "the meaning of a word in a series of words be determined 'by the company it keeps.'" <u>JPMorgan Chase Bank N.A. v. Baupost Grp., LLC (In re Enron Creditors Recovery Corp.)</u>, 380 B.R. 307, 322 (S.D.N.Y. 2008) ("Terms in a provision are construed in accordance with the meaning of the words that are associated with them."); <u>In re Motors Liquidation Co.</u>, 447 B.R. 142, 148 (Bankr. S.D.N.Y. 2011) (two words in a series, "accidents" and "incidents," "should be given related meaning" under *noscitur a sociis*).

138.    Applying this canon of construction, Section 30 does not extend to the Claims because the exculpated transactions, by their plain terms, relate to the process of purchasing or selling securities—not the failure to follow the Newport Funds' instruction regarding the transfer of their securities to Credit Suisse.

139.    At the very least, any ambiguity in the scope of Section 30 must be interpreted against the Debtors, given that the Prime Brokerage Agreement was drafted by Lehman Brothers. <u>See Fein ex rel. Estate of Fein v. Chi. Ins. Co.</u>, No. 01 Civ. 11386, 2003 WL 21688239, at *6 (S.D.N.Y. July 16, 2003) (ambiguous contracts should be "'construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.'" (quoting <u>Jacobson v. Sassower</u>, 499 N.Y.S.2d 381, 382 (1985))).

140.     The Court should also reject the Plan Administrator's proposed interpretation of Section 30, which attempts to force the Claims into its purview by alleging that "the Claims seek to recover damages [i] related to the 'handling' of the Account assets or [ii] for other alleged losses incurred 'in connection with [the] arrangements' under the Prime Brokerage Agreement." Objection ¶ 31.  The Plan Administrator offers no supporting explanation or details as to why or how the Claims should fall within Section 30 of the Prime Brokerage Agreement.

141.     First, the term "handling" must be interpreted in association with the terms surrounding it in Section 30—none of which relate to the transfer or return of the securities to the Newport Funds, or Lehman Brothers' compliance with its customers' instructions.

142.     Further, given the lack of insight as to:  (i) where the Newport Funds' securities were located when the Newport Funds requested their transfer; (ii) where the securities were located at the time of the Chapter 11 bankruptcy filing; and (iii) the Debtors' "handling" of the Newport Funds' securities at any time, the Plan Administrator's reliance on Section 30's reference to "handling" should fail.

143.     Second, this Court should reject the Plan Administrator's assertion that Section 30 of the Prime Brokerage Agreement bars the Claims because they "allege[] losses incurred 'in connection with [the] arrangements' under the Prime Brokerage Agreement."  Objection ¶ 31.

144.     The Plan Administrator takes the term "arrangements" in the last sentence of Section 30 out of context in an apparent effort to expand its application to all arrangements relating to the Newport Funds' securities under the Prime Brokerage Agreement.  Id.  But, in fact, the "arrangements" referenced in Section 30 relate only to potential losses caused by the Debtors' arrangements with third-party banks and depositories.  See Prime Brokerage Agreement § 30.

145.     Indeed, Section 30 expressly states that "Lehman Brothers will not be liable . . .
for any loss, liability or expense . . . in connection with *these arrangements*" in reference to the
very arrangements described in the preceding sentence (which are not applicable here).  See id.
(emphasis added).   Thus, the scope of this sentence cannot be expanded to apply to all
"arrangements" under the Prime Brokerage Agreement as the Plan Administrator contends.

146.     The Plan Administrator also cannot avoid liability for the Claims by reference to
the "other action" language in Section 30.  The canon of construction *ejusdem generis* attributes
to the last item in a sequence of items "the same characteristic of discreteness shared by all the
preceding items."  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 62-63 (2004) (limiting
the interpretation of the last word in a list based upon the characteristics of those items preceding
it); see also In re Enron Creditors Recovery Corp., 380 B.R. at 323 ("The canon of *ejusdem
generis* is employed to limit 'broad catch-all terms' in a manner consistent with the other listed
terms that are more specific.").

147.     Accordingly, the phrase "other action" must be interpreted to cover items and
actions similar to those listed before it, which do not include the failure to comply with the
Newport Funds' instructions to transfer their securities to Credit Suisse.

148.     Thus, the terms of Section 30 do not bar the Claims and the Objection should be
overruled on this point.

> ***ii.***        ***At The Very Least, Reliance On Section 30***
> ***To Object To The Claims Raises Issues Of***
> ***Fact That Cannot Be Resolved Without Discovery.***

149.     Section 30 of the Prime Brokerage Agreement contains an express carve-out for
gross negligence and willful misconduct.  See Prime Brokerage Agreement § 30 ("Lehman

Brothers shall not be liable . . . except for gross negligence or willful misconduct on Lehman Brothers' part.").

150.    Under New York law, to state a claim for gross negligence, a party must allege that the breaching party:  (i) breached a duty owed to the non-breaching party; (ii) which proximately caused; (iii) the non-breaching party's damages; and (iv) "the act or omission [is] of an aggravated character."  Travelers Indem. Co. of Conn. v. The Losco Grp., Inc., 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998)).

151.    Further, under New York law, the determination as to whether acts or omissions constitute gross negligence is reserved for the trier of fact and should not be determined prior to discovery.  See Travelers Indem. Co. of Conn. v. The Losco Grp., 136 F. Supp. 2d 253, 256-57 (S.D.N.Y. 2001) (denying motion to dismiss claims for gross negligence because they could not "be fully established until discovery is completed"); see also Robin Bay Assocs., LLC v. Merrill Lynch & Co., No. 07 Civ. 376, 2008 WL 2275902, at *6 (S.D.N.Y. June 3, 2008) (denying motion to dismiss on grounds that plaintiff had stated a cause of action for breach of contract and because the court was "reluctant to terminate the proceedings . . . without allowing the parties to conduct formal discovery" given "the subtle distinctions that differentiate gross negligence from negligence").

152.    Here, the Newport Funds have sufficiently stated claims for gross negligence and willful misconduct as Lehman Brothers' failure to abide by the terms of the Prime Brokerage Agreement, applicable laws, rules and regulations, and standard practices in the industry, all while having the capacity to do so, is a failure of aggravated character.

153.    Lehman Brothers simply could have "pressed the button" and transferred the Newport Funds' securities no later than a day prior to the LBHI bankruptcy filing or LBIE

administration order (or within the next week prior to the commencement of LBI's SIPA proceeding).    Lehman Brothers' failure to do so constituted gross negligence and willful misconduct.

154.    The two cases cited by the Plan Administrator in support of expunging the Claims at the motion to dismiss stage are inapposite here.    In Arjent Ltd. v. EZE Castle Integration, Inc., No. 0603543/2007, 2008 N.Y. Misc. LEXIS 8331, at *8-10 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 27, 2008), the court held that two short telephone service outages suffered by the plaintiff were insufficient to qualify as gross negligence.    There, the defendant service provider had sent a technician to repair the outage shortly after it occurred.    Id.    Even though the issue was not immediately resolved, the court found that the curative steps taken by the service provider precluded a finding of gross negligence.

155.    The Plan Administrator's reliance on Deutsche Lufthansa AG v. Boeing Co., 2007 U.S. Dist. LEXIS 9519 (S.D.N.Y. Feb. 2, 2007) is also off-base.    In Deutsche Lufthansa AG, the court found that the defendant's conduct did not amount to gross negligence largely on account of plaintiffs' counsel's concession that he was unaware of any facts that constituted a reckless disregard for the plaintiff's contractual rights.    Id. at *7, *11.

156.    Here the Newport Funds have alleged that Lehman Brothers received its instruction to transfer the securities, acknowledged the instruction, and still failed to complete the transfer after the transfer was booked, despite having the means to do so.    See May Decl. ¶ 46-52.

157.    Lehman Brothers' failure to transfer the Newport Funds' securities in the days prior to the LBHI bankruptcy, LBIE administration order, and LBI SIPA proceeding, despite having the means to do so, was gross negligence and willful misconduct.

158.    This is particularly so given that, upon information and belief, the Newport

Funds' securities were rehypothecated by LBIE in violation of the Prime Brokerage Agreement,

Margin Lending Agreement, Federal Reserve Board Regulation T, 12 C.F.R. Part 220, and

Customer Protection Rule, 17 C.F.R. § 220.15c3-3, and were not under appropriate control by

Lehman Brothers as required of a prime broker at the time of the Newport Funds' transfer

request.

159.    Accordingly, to the extent the Court does not allow the Claims at this time, the

factual record should be developed further with respect to the Debtors' gross negligence or

willful misconduct.

### III.  The Claims State Valid Breach of Contract Claims For Which The Debtors Are Jointly and Severally Liable.

### A.  The Claims State *Prima Facie* Valid Claims For Breach of Contract.

160.    The Plan Administrator asserts that the Debtors have no liability for the Claims

because they never "agreed to perform" the prime brokerage services under the Prime Brokerage

Agreement.    Objection ¶ 44.    As such, the Plan Administrator asserts that "the Claims fail

because they do not identify specific obligations created by the Prime Brokerage Agreement that

each LBHI Estate assumed and subsequently breached."    Objection ¶ 47.

161.    There are three elements that must be established as part of a breach of contract

claim under New York law:  (i) existence of a contract; (ii) breach by the other party; and (iii)

damages suffered as a result of the breach.  See Terwillinger v. Terwillinger, 206 F.3d 240, 245-

46 (2d Cir. 2000).

162.    The Claims identify several breaches of the Prime Brokerage Agreement for

which each of the Debtors is liable.

35

163.    Specifically, the Debtors are liable for "the value of [the Newport Funds'] assets held pursuant to the Agreements in the Account[s] that have not been otherwise returned to [the Newport Funds]."  Proof of Claim ¶ 4.

164.    Under Section 3 of the Prime Brokerage Agreement, the Newport Funds' securities were "held by or through any Lehman Brothers Entity . . . as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities . . . ."  Prime Brokerage Agreement § 3.

165.    It is well established under New York law that a bailee must return bailed property on demand.  See S. Rafael Jewels Corp. v. Nezaj, Case No. 107336/11, 2014 WL 2106250, at *2 (N.Y. Sup. Ct. N.Y. Cnty. May, 15 2014) ("It is well-established law in [New York] that the failure on the part of a bailee to return bailed property on demand raises a presumption of negligence in the case of a mutual bailment or bailment for hire.").

166.    Additionally, the failure of the Debtors to return the Newport Funds' securities on demand was a breach of the Debtors' obligations under Article 8 of the Uniform Commercial Code, which protects a security owner—whose securities are held with a securities intermediary—from the securities intermediary's other creditors.  See, e.g., N.Y. U.C.C. Law § 8-511(a) (with respect to competing interests in securities held by a securities intermediary "the claims of entitlement holders, other than the creditor, have priority over the claim of the creditor").

167.    Under Section 3 of the Prime Brokerage Agreement "[the Newport Funds] and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the 'UCC') and that any account maintained by [the Newport Funds] with any Lehman

Brothers Entity shall be a securities account under Article 8 of the UCC." Prime Brokerage Agreement § 3.

168. In contravention of the protections afforded to the Newport Funds under Article 8 of New York's Uniform Commercial Code, Lehman Brothers' failure to return the Newport Funds' securities favored other creditors over the Newport Funds' to the Newport Funds' detriment.

169. Accordingly, the Debtors are liable for breach of the Prime Brokerage Agreement for the failure to return the Newport Funds' securities in accordance with New York law.

170. Relatedly, the Debtors are liable to the Newport Funds "for all damages and losses resulting from Lehman's failure to comply with [the Newport Funds'] instruction on September 10, 2008 to transfer securities held under the Agreements to Credit Suisse." Proof of Claim ¶ 5.

171. Under Section 2 of the Prime Brokerage Agreement, Lehman Brothers agreed that "[a]ll transactions under this Agreement shall be subject to applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities." Prime Brokerage Agreement § 2.

172. Accordingly, because Lehman Brothers agreed to comply with all applicable laws, rules and regulations, the Debtors are liable for breach of the Prime Brokerage Agreement for their failure to transfer the Newport Funds' securities to Credit Suisse in contravention of applicable U.S. law, including, without limitation, applicable New York law, the SEC Letter, SEC Rule 15c3-3, and Regulation T.

173. The Debtors are further liable to the Newport Funds for "the value of all Distributions received postpetition, and any such future dividend and interest distributions

37

received (including payment-in-kind distributions) on account of [the Newport Funds'] assets held pursuant to the Agreements in the Account." Proof of Claim ¶ 6.

174.    Specifically, Section 19(b) of the Prime Brokerage Agreement provides that "[u]nless otherwise agreed by Lehman Brothers and [the Newport Funds], [the Newport Funds] will be entitled to receive all distributions . . . made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent . . . ." Prime Brokerage Agreement § 19(b); see also Proof of Claim ¶ 6.

175.    Given that the Newport Funds' securities were never returned to the Newport Funds by Lehman Brothers, numerous post-petition distributions wrongfully flowed to and were retained by Lehman Brothers for which the Debtors are jointly and severally liable as asserted in the Claims.

176.    Furthermore, the Debtors are liable for "the loss of [the Newport Funds'] ability to participate in certain rights offering(s) [and other corporate events], as a direct result of Lehman's post-petition breaches of the Agreements." Proof of Claim ¶ 8.

177.    Section 10 of the Prime Brokerage Agreement provides that, "if Lehman Brothers receives notice from you that you wish to act on any [rights issue, among other things] . . . Lehman Brothers will act in accordance with your wishes." Prime Brokerage Agreement § 10.

178.    Additionally, Section 11 of the Prime Brokerage Agreement provides that "[i]f any right to vote arises with respect to securities in [the Newport Funds'] account, [the Newport Funds] may inform Lehman Brothers that [they] wish to exercise such right as [they] specify . . . [and Lehman Brothers] will act in accordance with [the Newport Funds'] wishes." Id. § 11.

179.    Accordingly, the Debtors are jointly and severally liable for this obligation because Lehman Brothers failed to transfer the Newport Funds' securities and as a direct result

the Newport Funds lost the ability to participate in various post-petition corporate events connected to the Newport Funds' securities. The Debtors cannot avoid liability by claiming that the Newport Funds failed to provide LBIE with an indemnity that has no basis under the Prime Brokerage Agreement and was not commercially reasonable.

180.    Finally, the Debtors are liable for their failure to properly capitalize CAPCO and for all losses and damages to the Newport Funds on account of their reliance on Lehman Brothers' fraudulent or negligent misrepresentations about CAPCO. See Proof of Claim ¶ 10.

181.    For example, in the 2007 Credit Protection Overview, Lehman Brothers represented to the Newport Funds that "LBI maintains a surety bond issued by the Customer Asset Protection Company ('CAPCO') . . . [and that the] same persons that would be considered 'customers' under SIPA are eligible for protection under CAPCO's bond which, with certain limitations, covers the full amount of the unsatisfied portion of the customer's net equity claim." 2007 Credit Protection Overview, May Decl. Exhibit G, at 5.

182.    Lehman Brothers also represented that "LBIE also maintains a surety bond issued by CAPCO . . . [which] covers the unsatisfied portion of a customer's net equity claim not otherwise provided by LBIE's assets or the LBHI guarantee." Id. at 7.

183.    The Newport Funds relied on Lehman Brothers' fraudulent or negligent misrepresentations in the 2007 Credit Protection Overview that the Newport Funds could rely on CAPCO surety bonds in transacting with Lehman Brothers and entrusting their securities to Lehman Brothers, and the Newport Funds were damaged by Lehman Brothers' fraudulent or negligent misrepresentations to that effect.

184.    Accordingly, the Claims state *prima facie* breach of contract claims and other claims for which the Debtors are liable. At the very least, the Claims are plausible, and the

Newport Funds are entitled to discovery and a Merits Hearing (as defined in the Claims Procedure Order) on the Claims.

**B.     The Debtors Are Jointly And Severally Liable
For The Claims Under The Prime Brokerage Agreement.**

185.    The Plan Administrator asserts that "joint and several liability is only applicable where two or more parties to a contract have promised the same performance or undertaken the same obligation" and that here, the Debtors did not specifically assume the obligation to perform the prime brokerage services because only LBI is mentioned under Section 21 of the Prime Brokerage Agreement. <u>See</u> Objection ¶ 40

186.    This effort to evade liability fails because, as shown above, the Claims identify several breaches of the Prime Brokerage Agreement for which the Debtors are directly liable under the Prime Brokerage Agreement, and, as shown below, the Debtors are jointly and severally liable for all obligations to the Newport Funds under the Prime Brokerage Agreement.

187.    In a multi-party contract under New York law, "contractual rights and responsibilities are presumed to be joint unless the contract includes severing language." <u>Edgewater Growth Capital Partners, L.P. v. Greenstar N. Am. Holdings, Inc.</u>, Case No. 108641/08, 2013 WL 9057379, at *9-10 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 2, 2013) (parties to stock purchase agreement were jointly and severally liable where the agreement did not contain language limiting liability); <u>see also</u> <u>Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.</u>, 802 N.Y.S.2d 411, 414 (1st Dep't 2005) (contract contained no limiting language that could overcome the presumption of joint liability), <u>leave to appeal denied</u>, 7 N.Y.3d 703 (2006).

188.    Moreover, under New York law, "the requisite intent to be jointly and severally bound may be found where the [contract] is worded in the singular." <u>Battery Assocs., Inc. v. J & B Battery Supply, Inc.</u>, 944 F. Supp. 171, 178 (E.D.N.Y. 1996) (finding that the contract

imposed joint and several liability on the co-signatory defendants when the contract was worded in the singular by using terms such as "the undersigned," "himself," and "his").

189.    The Prime Brokerage Agreement states that it "sets forth the terms and conditions under which Lehman Brothers . . . will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer."  Prime Brokerage Agreement at Preamble.

190.    Two Debtors are specifically named parties to the Prime Brokerage Agreement (LBHI and Lehman Brothers Special Financing Inc.), and the other Debtors are parties to the Prime Brokerage Agreement as "subsidiaries" or "affiliates" of the named parties.

191.    LBI acted as agent for, and signed on behalf of, the other Lehman Brothers entities in that capacity, reflecting the intent that all Lehman Brothers entities would be jointly and severally liable under the multi-party Prime Brokerage Agreement.

192.    LBI and each of the Debtors are defined as and referred to throughout the Prime Brokerage Agreement collectively and interchangeably as the "Lehman Entities" and "Lehman Brothers."

193.    The Prime Brokerage Agreement does not contain any clear, express severing language at all.  To the contrary, the use of "Lehman Brothers," "it," and "its" throughout the Prime Brokerage Agreement indicates that the obligations under the Prime Brokerage Agreement were intended to be obligations of all the Lehman Brothers entities that were parties to the Agreement, including the Debtors.  See, e.g., Prime Brokerage Agreement §§ 11, 17.

194.    Further, the Debtors are joint and severally liable under the principle that a party may not accept the benefits of the bargain and avoid the obligations thereunder.  See Packer & Klein v. I. Frank & Sons, 196 N.Y.S. 289, 290 (1st Dep't 1922) (holding that a corporation

which had "knowingly accepted the benefit of a contract . . . could not accept the benefits of the arrangement and repudiate the incident obligation").

195.    It is undisputed that the Prime Brokerage Agreement provides Lehman Brothers with numerous benefits.  See, e.g., Prime Brokerage Agreement § 19 (permitting "Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of [the Newport Fund's] accounts."); id. § 21(j) (providing for an indemnity in favor of Lehman Brothers).

196.    Accordingly, it is clear that the Debtors reaped the benefits of the Prime Brokerage Agreement and therefore remain bound by the obligations and liabilities thereunder.

197.    Further, the two cases relied upon by the Plan Administrator in this regard are distinguishable and should not be given weight by the Court on this issue.  First, in Abundance Partners LP v. Quamtel, Inc., 840 F. Supp. 2d 758, 769 (S.D.N.Y. 2012), the payment obligation was created in a prior agreement that was not expressly assumed by the new party in the amended agreement under which the plaintiff sought to enforce a claim.  Conversely, here, all of the obligations were created under the same instrument with Lehman Brothers as a whole (including the Debtors) as parties to, and benefitting from, the Prime Brokerage Agreement.

198.    Second, in Kranze v. Cinecolor Corp., 96 F. Supp. 728, 730 (S.D.N.Y. 1951), the parties were named as separate entities throughout the agreement and none of the separate benefits or obligations overlapped with any other party.  Conversely, here, the Prime Brokerage Agreement refers to Lehman Brothers throughout, and all of the Lehman Brothers entities enjoyed the benefits of the Prime Brokerage Agreement.

199.    In sum, the Objection fails to rebut the presumption that obligations under multi-party contracts are joint and several unless the contract contains adequate severing language, which is not present in the Prime Brokerage Agreement.

200.    At the very least, the issue of whether the parties intended the Prime Brokerage Agreement to sever the Debtors' liability for the Claims is a question of fact that requires discovery and is outside the scope of a Sufficiency Hearing.  See In re John B. Rose Co., 275 F. 409, 414-15 (2d Cir. 1921) (intention to bifurcate liability must be "determined by the language used and by intention of the parties as gathered from all the circumstances of the case.").

IV.    **The Claims Should Be Allowed In Full Subject To The Single-Satisfaction Rule.**

201.    The Court should allow the Claims in the liquidated amounts set forth above and permit discovery as to the value of the unliquidated amounts of the Claims.

202.    It is well established that a creditor is permitted to assert the full value of its claim against a debtor co-obligor, subject only to the "single-satisfaction rule" that the creditor cannot retain value beyond payment in full.  See Ivanhoe Building & Loan Ass'n of Newark, N.J. v. Orr, 295 U.S. 243, 245-46 (1935) (holding that a creditor may recover from non-debtor parties without reducing the value of its claim against a bankruptcy estate); see also In re LightSquared, Inc., No. 12-12080-SCC, 2014 WL 5488413, at *6-7 (Bankr. S.D.N.Y. Oct. 30, 2014) ("[E]ach [claimant] continues to hold a claim against every [debtor co-obligor] . . . for any amount that is unpaid when due, and each of the . . . claims continues to exist until the [obligation] is paid, in full.").

203.    This principle does not change where a creditor has received distributions from other sources—the creditor is still permitted an allowed claim for the full asserted amount.  See In re Nat'l Energy & Gas Trans., Inc., 492 F.3d 297, 301 (4th Cir. 2007) (allowing full value of

creditor's claim despite creditor having already received $140 million in payments on the claim), cert. denied, 552 U.S. 1231 (2008); In re Del Biaggio, 496 B.R. 600 (Bankr. N.D. Cal. 2012) (holding that a proof of claim need not be reduced by amounts already recovered from a third party unless the creditor would otherwise reap a double recovery).

204.    Accordingly, under applicable law, the Newport Funds retain the right to assert the full value of their Claims and the Claims should be allowed in the full value asserted subject to the single-satisfaction rule.

205.    As the Newport Funds are not seeking a double recovery, the Objection should be overruled on this issue.

## **CONCLUSION**

206.    The Debtors have delayed and deferred confronting the Newport Funds' Claims for years, apparently hoping that their war of attrition would exhaust the Newport Funds from pursuing full relief for their Claims.  The Newport Funds should not have to bear more costs and risk at this stage of the proceedings when the Claims should have been allowed long ago.  The Objection should be seen for what it is—another unreasonable procedural hurdle by the Debtors to delay the rightful allowance of the Claims.  The Objection should be overruled.

WHEREFORE, for all the reasons set forth in this Response, the Newport Funds respectfully request that the Court:  (i) overrule the Objection; (ii) allow the Claims in the aggregate amounts of:   (a) $163,334,098.49 (USD) for NGOF, plus currently unliquidated amounts to be determined; and (b) $38,327,041.04 (USD) for NGCF, plus currently unliquidated amounts to be determined; (iii) permit the Newport Funds limited discovery with respect to the unliquidated amounts of the Claims and schedule a Merits Hearing related thereto; and (iv) grant such other and further relief as is just and proper.

Dated: January 2, 2015
      New York, New York

                             **BROWN RUDNICK LLP**

                             */s/ Howard S. Steel*
                             David J. Molton
                             Andrew Dash
                             Howard S. Steel
                             Jacob T. Beiswenger
                             Seven Times Square
                             New York, New York 10036
                             Telephone: 212-209-4800
                             Facsimile:  212-209-4801

                             *Counsel for Newport Global Opportunities Fund LP and Newport Global Credit Fund (Master) LP*