WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |

**OBJECTION OF THE PLAN ADMINISTRATOR TO
CLAIMANT SPCP GROUP, L.L.C.'S MOTION UNDER BANKRUPTCY
CODE SECTION 1142(b) TO COMPEL LOTC TO PAY POST-PETITION INTEREST**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"),[1] submits this objection to *Claimant SPCP Group, L.L.C.'s Motion Under Bankruptcy Code Section 1142(b) to Compel LOTC to Pay Post-Petition Interest As Required by Its Confirmed Plan of Reorganization* (ECF No. 47474) (the "Motion") and respectfully represents as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. "Silver Point" shall mean SPCP Group, L.L.C. as agent for Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd.

1. The Motion must be denied, as it is based on improper assumptions on which the Plan Administrator and the Court cannot rely.

   a. First, the Motion assumes that the Plan requires Cash to be paid *currently* on account of postpetition interest to holders of Allowed Claims. It does not.

   b. Second, the Motion assumes that the amount of excess Cash that will be available for Distributions on account of postpetition interest is known. It is not. There are 19 Disputed Claims outstanding against LOTC, including 8 wholly unliquidated claims.

   c. Third, the Motion assumes that Silver Point is entitled to the amount of postpetition interest that it has recently demanded. Compelling a Distribution at this time would improperly undermine the Plan Administrator's review of, and objection to, Silver Point's demand. *Indeed, review and objection may well be particularly warranted here, as Silver Point is now demanding a different and much higher rate than the one submitted in the Derivative Questionnaire* underlying Silver Point's claim against LOTC.[2]

   d. Finally, the Plan provides for each holder of an Allowed Claim that is entitled to postpetition interest to receive only its Pro Rata Share of further Distributions. The Motion assumes that the Plan Administrator will be able, sufficiently in advance of the next Distribution Date, to determine the total amount of postpetition interest that may be demanded from LOTC and ultimately owed to LOTC creditors. But, thus far, there has been no demand for postpetition interest for the majority in number of Allowed Claims against LOTC. Accordingly, the Plan Administrator has sought to impose a bar date for such demands, but the Plan Administrator's motion remains pending consideration by the Court, and it is premature and speculative to anticipate the time required to implement the proposed process and resolve any issues arising therefrom.[3]

2. The Plan Administrator has been delegated sole authority and broad discretion to implement the Plan and to make Distributions. Silver Point's Claims represent less than 3% of the more than $1 billion of Claims Allowed against LOTC, and Silver Point's parochial interests are not entitled to priority over those of any other creditor of LOTC. The Plan Administrator has requested the Court's approval of one next step (the bar date for demands for postpetition interest) in a process to efficiently obtain information required to promote a fair and

---

[2] The Plan Administrator reserves any and all rights it may have to review and object to any demands of Silver Point or any other entity.

[3] *See Motion of the Plan Administrator in Aid of Execution of the Plan to Establish a Bar Date for Demands for Postpetition Interest Against Lehman Brothers OTC Derivatives Inc. and Lehman Brothers Commercial Corporation* (ECF No. 47487) (the "Postpetition Interest Bar Date Motion").

2

accurate resolution of *all* postpetition interest demands.  Only after the universe of demands is identified can the Plan Administrator determine the most efficient path to identify and resolve any disputes.  And only after that can it attempt to estimate the timing of Distributions on account of postpetition interest and Equity Interests.

3. Substantial progress in the administration of LOTC's estate since the fourth Distribution Date belies Silver Point's bald assertion that the Plan Administrator is "failing even to undertake the preliminary steps that are necessary for [postpetition interest] payments to be made." (Mot. ¶3.)  At the fourth Distribution Date, LOTC had satisfied approximately $715 million in Claims in accordance with the Plan, but reported more than $524 million in Disputed Claims remaining.  Since the fourth Distribution Date, LOTC:

a. resolved more than half in number of the Claims that were Disputed (28 of 47);

b. collected more than $300 million of Cash from derivative counterparties and successful monetization of other assets, including affiliate claims, and pursued affirmative litigation seeking to recover additional Cash for subsequent Distributions;

c. issued subpoenas to many of LOTC's original counterparties for information related to postpetition interest;

d. engaged in litigation with creditors holding a significant amount of the Allowed Claims against LOTC over their entitlement to postpetition interest (*Bania Brothers, L.L.C. v. LOTC*, Adv. Pro. No.14-02095 (SCC) (Bankr. S.D.N.Y.));

e. invested its Cash in a secure manner that will increase the amount of Cash available to make subsequent Distributions – whether on account of postpetition interest or an Equity Interest; and

f. filed the Postpetition Interest Bar Date Motion.

**I. The Plan Does Not Require Postpetition Interest to be Paid Currently at the Expense of Disputed Claims**

4. Silver Point asserts that the Plan Administrator was required to begin making Distributions in satisfaction of postpetition interest at the fourth Distribution Date. (Mot. ¶¶ 14-14, 23, 33.)  Silver Point interprets Section 8.13(c) of the Plan to require payment of

3

postpetition interest on an Allowed Claim, regardless of the number of unliquidated and other Disputed Claims outstanding. Carried to its logical conclusion, Silver Point's interpretation would require the Plan Administrator to make distributions of postpetition interest as soon as there was one "Allowed" Claim satisfied in full, even if all remaining Claims were Disputed.

5.  By the fourth Distribution Date, LOTC reported Distributions of approximately $715 million to holders of Allowed Claims. LOTC had disallowed and expunged 139 Disputed Claims, but there were many Disputed Claims remaining. (LOTC reported that it continued to dispute more than $524 million of liquidated Claims and additional wholly unliquidated claims.[4])

6.  The Plan Administrator has made major progress resolving Disputed Claims against LOTC since the fourth Distribution Date. As highlighted above, the Plan Administrator has resolved more than half of the number of Claims that were Disputed as of the fourth Distribution Date. Significantly, this included approximately half of the wholly unliquidated Claims.

7.  Currently, 19 Claims remain Disputed, including 8 wholly-unliquidated Claims. This is still more than 15% of the number of all Claims remaining against LOTC (Allowed and Disputed). The remaining Claims are currently in various stages of resolution.[5] The magnitude of uncertainty as to what Claims and amounts ultimately may be Allowed is compounded by the total uncertainty as to what amounts of postpetition interest may be demanded by holders of ultimately Allowed Claims.[6]

---

[4] *See* Notice Re Fourth Distribution [ECF No. 40225]. This excludes additional Disputed Claims of the Internal Revenue Service for which separate reserves were established.

[5] Thirteen of the remaining Disputed Claims are subject to pending objections.

[6] On August 5, 2014, for example, the Court entered an order permitting two claimants to increase the amount asserted in their claims against LOTC by an aggregate of more than $120 million.

WEIL:\95199395\6\58399.0011

8.  Section 8.13(c) of the Plan, requiring payments only "to the fullest extent permissible under the Bankruptcy Code," "after all Allowed Claims against that Debtor have been satisfied in full," must be read together with the mandatory waterfall provisions of the Bankruptcy Code, requiring payment of principal before interest or equity. All Claims have not been Allowed or disallowed. Prematurely making Distributions on account of postpetition interest could lead to Distributions of amounts required to satisfy in full all Disputed Claims against LOTC.[7]

## II. Pro Rata Shares of Further Distributions Are Not Known Yet

9.  The Plan provides for each holder of an Allowed Claim that is entitled to postpetition interest to receive only its Pro Rata Share of further Distributions. Plan §8.13(c). As explained in the Plan Administrator's prompt response to Silver Point October 7, 2014 initial demand:

> Even if all outstanding claims were resolved, however, postpetition interest distributions, if any, payable to creditors of LOTC must be made in a manner that does not satisfy one such creditor's right to such interest at the expense of another such creditor's rightful entitlement. Therefore, the relative distributions to LOTC creditors on account of postpetition interest can only be evaluated after the aggregate amount of LOTC's postpetition interest is determined or adequately capped.

(Saypol Decl. Ex. 4 (October 14, 2014 letter from Plan Administrator to Silver Point).)

10.  On December 10, 2014, the Plan Administrator disclosed publicly to the Court that "the plan administrator is planning to submit a procedure that will organize these [post-petition interest disputes] and allow them to be presented to the Court in a way that should avoid, or at least hopefully greatly reduce, any one[-off] resolution." (Dec. 10, 2014 Hr'g Tr. at 31:2-6, *In re Lehman Brothers Holdings Inc.*, 08-13555(SCC) (Bankr. S.D.N.Y.) On December

---

[7] Likewise, the Plan Administrator must protect the rights of the holder of Equity Interests in LOTC to ensure that creditors of LOTC do not receive more than is permitted to under the Bankruptcy Code.

19, 2014, before Silver Point filed its Motion, counsel for the Plan Administrator informed counsel for and representatives of Silver Point that the "procedure" referred to in Court was a motion to establish a bar date for demands for postpetition interest against LOTC. Indeed, on December 22, 2014, the Plan Administrator filed the Postpetition Interest Bar Date Motion. (ECF No. 47487.)

11. The Motion assumes that the Plan Administrator will be able, sufficiently in advance of the next Distribution Date, to determine the total amount of postpetition interest that may be demanded from LOTC. As previously disclosed, thus far, there has been no demand for postpetition interest for the majority of Allowed Claims against LOTC. (ECF No. 47847 ¶2.) Accordingly, the Plan Administrator has sought to impose a bar date for such demands, but the Plan Administrator's Postpetition Interest Bar Date Motion remains pending consideration by the Court, and it is premature to anticipate the time required to implement the proposed process and to resolve any issues arising therefrom.

12. Further, the Motion must be denied to the extent it seeks to compel the Plan Administrator to make partial distributions pending resolution of the amount of postpetition interest due to any entity in particular (e.g., Distributions of a minimum amount which is not Disputed by the Plan Administrator). There is no support in the Plan for such request. Making Distributions only upon final resolution of disputes with respect to Claims has promoted administrative efficiencies and the resolution of and Distributions to thousands of Claims in these chapter 11 cases.[8]

---

[8] The Plan provides for "No Distribution Pending Allowance" for portions of Claims that are Disputed:

<u>No Distributions Pending Allowance</u>. Notwithstanding any other provision hereof and unless otherwise agreed, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

6

### III. The Motion Cannot Be Used to Obtain Declaratory or Injunctive Relief

13. Silver Point devotes a substantial portion of its Motion to its interpretation and calculation of its "Entitle[ment] to Post-Petition Interest, Compounded Daily, at the Rate Specified in the Swap Agreement" entered into prepetition between LOTC and Central European Media Enterprises Ltd. ("CEME," LOTC's original counterparty and the party from which Silver Point acquired its claim) (Mot. ¶¶ 18, 24-30). The proposed order would require the Plan Administrator to make Distributions of LOTC's assets to Silver Point on account of postpetition interest, as calculated by Silver Point. The Motion must be denied to the extent it seeks to determine the extent of Silver Point's Pro Rata interest in LOTC's future Distributions or to obtain a declaration or injunction or some other equitable relief regarding Silver Point's demand for postpetition interest or the Plan Administrator's right to review or object to same.[9]

14. The Plan Administrator has the sole authority and broad discretion to implement the Plan and to make Distributions (Plan §6.1), and various orders of the Court enable the Plan Administrator to "maximize the efficiency of the claims process and promote the fair resolution of the tens of thousands of filed claims." *In re Lehman Bros. Holdings Inc.,* 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010). The orders authorize the Plan Administrator to take discovery pursuant to Bankruptcy Rule 2004 prior to filing objections, to determine the order in which objections are filed and heard, to seek to resolve claims on a motion-to-dismiss or summary judgment basis at a "sufficiency hearing" before proceeding to a "merits hearing," and to seek

---

Plan §9.2. This Plan provision was accepted by creditors, including those like Silver Point that signed Plan Support Agreements. (*See* Plan Schedule 4.)

[9] Bankruptcy Rule 7001 requires the commencement of an adversary proceeding for and affords the Plan Administrator protections in connection with "a proceeding to determine the validity, priority, or extent of [an] interest in property," "a proceeding to obtain an injunction or other equitable relief," or "a proceeding to obtain a declaratory judgment relating to any of the foregoing." *See* FED. R. BANKR. P. 7001.

7

resolution through alternative dispute resolution mechanisms before judicial intervention or determination. *See id.* at 120 n.16.

15. In the Postpetition Interest Bar Date Motion, the Plan Administrator has proposed a process designed to meet the same ends for postpetition interest demands: a process through which parties assert demands and the Plan Administrator efficiently obtains information required to promote a fair and accurate resolution. It properly places the burden on the party seeking additional Distributions from the chapter 11 estates to come forth with its demand and to provide certain basic information. It will enable logical, targeted, and efficient use of judicial resources.

16. Silver Point admittedly waited until after the last Distribution Date to submit its "certification" and demand for postpetition interest and should not expect that the Plan Administrator would accept it without review in an exercise of its duty to creditors and Equity Interests. Moreover, in each "certification," Silver Point "reserves the right to amend or supplement [its] certification." Virtually no other creditor of LOTC has submitted any demand for postpetition interest.

17. The process proposed by the Plan Administrator would establish a bar date and require Silver Point and others to provide, in a format not protected by settlement privilege, the calculation of its demand; such basic information was not included in Silver Point's Motion or provided to the Plan Administrator. For example, without such information, neither the Plan Administrator nor the Court can:

a. reconcile the apparent inconsistency between the rate claimed in Silver Point's Derivative Questionnaire (7.594%) and the significantly higher rate described in its Motion and demanded through its October 7, 2014 letter[10]; or

---

[10] The foregoing assumes, *arguendo*, that Silver Point may certify a historical Default Rate for CEME and that certification from CEME is not required; the Plan Administrator has not conceded this point.

8

b.  determine whether Silver Point's calculation improperly included interest for a period prior to LOTC's petition date that is already subsumed in its Allowed Claim.

The Plan Administrator is not compelled in the context of responding to the Motion to prematurely assert any or all objections to Silver Point's demands, and the Plan Administrator reserves any and all rights it has with respect thereto.[11]

**IV. Additional Disclosure is neither Practicable nor Required by the Plan**

18.  Silver Point seeks to compel – within three months – a "detailed accounting and reasonable timetable for resolving all issues required to permit the full and final Distribution of post-petition interest." (Mot. ¶15.) Silver Point ignores the inconsistency between its (a) perception of a delay in receiving an "estimate [from LOTC] for how much interest may be owed" to all creditors (*id.*) and (b) recent submission of its own demand for interest. (LOTC's fourth Distribution Date was on or about October 3, 2013; Silver Point submitted its demand for postpetition interest more than a year later, on October 7, 2014, five days after the sixth Distribution Date. (Mot. ¶¶ 2, 18, 28).)

19.  The Plan governs the Plan Administrator's "Post-Effective Date Reporting" requirements. (*See* Plan §15.6.) Yet, tellingly, Silver Point cites no support for its assertions that the Plan Administrator or LOTC "improperly refused to inform creditors about their progress" (Mot. ¶1), or "violated its obligations to LOTC creditors by stonewalling their requests for information" (*id.* ¶2).

---

[11] The *Fin. One* decision cited by Silver Point was not a bankruptcy case and did not involve enforcement of unilateral certification against a chapter 11 debtor. *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin. Inc.*, No. 00 Civ. 6739 (CBM), 2003 WL 21638214, at *2 (S.D.N.Y. July 11, 2003). Moreover, the court in *Fin. One* did not consider a certification provided by an entity other than the one whose cost of funding was in question. Further, the court in *Fin. One* wrote that a counterparty could be required to provide evidence to support its default rate in cases of "bad faith, fraud, gross negligence or contravention of public policy." *Id. Cf. Lehman Bros. Fin. S.A. v. Sal. Oppenheim Jr. & Cie. KGAA*, [2014] EHWC (QB) 2627 [¶¶ 49-52] (holding of the High Court of Justice in England that a court may "go behind a certificate … if there is no evidence to support [it]").

9

20. As explained above, additional disclosure regarding the timing and amount of Distributions from LOTC on account of postpetition interest is not practicable at this time. The Plan Administrator has made public disclosures of information, including (a) descriptions of LOTC's assets and liabilities, (b) its request and proposed timing for a bar date for postpetition interest demands [ECF No. 47847], (c) the briefing and hearing schedule with respect to current litigation related to postpetition interest demands against LOTC (Adv. Pro. No. 14-02095(SCC), ECF Nos. 16, 20),[12] and (d) the investment by LOTC of its Cash in a secured loan maturing prior to the upcoming seventh Distribution Date.[13]

21. Thus, LOTC's case is easily distinguished from the cases cited by Silver Point. *See Pioneer Liq. Corp. v. U.S. Trustee (In re Consol. Pioneer Mort. Entities)*, 264 F.3d 803 (9th Cir. 2001) (involving a seven-year-long refusal by a liquidating trustee to provide any form of accounting to its creditors); *In re Blue Stone Real Estate*, 487 B.R. 573, 577 (Bankr. M.D. Fla. 2013) (stating, in *dicta*, in the context of granting a post-confirmation distribution agent's request for compensation, that the atmosphere in which the agent "had to operate to fulfill his fiduciary duties to creditors and to ensure the integrity of the bankruptcy system was highly charged with suspicion of the [d]ebtors' principal."); *In re Oldco M Corp.*, 466 B.R. 234, 236–37 (Bankr. S.D.N.Y. 2012) (denying motion pursuant to section 107(a) of the Bankruptcy

---

[12] Silver Point mistakenly asserts that issues in the current litigation "are not present" in connection with Silver Point's Claim because "Silver Point's certification is based on the cost of funding of the original swap counterparty, not that of Silver Point as the assignee." (Mot. ¶18 n.3.) Silver Point presumes that the Plan Administrator and LOTC will ultimately prevail on the merits. More relevant, though, is that a presumed agreement between the Plan Administrator and Silver Point would not resolve a conflict with other creditors or prevent a contrary ruling from the Court.

[13] There is no question that LOTC is authorized by the Plan to invest Cash of LOTC in the exercise of its business judgment without the need for Court or creditor approval. *See* Plan §6.1(b)(viii). Further, the majority of LOTC's secured loan to LBHI has already been repaid as of the date hereof.

10

Code to seal the terms of a settlement agreement where statutory requirements were not met and failure to seal would not prejudice the effectiveness of the settlement).

22. Additionally, the Plan Administrator responded promptly and privately to Silver Point – in a substantive letter on October 14, 2014, in response to Silver Point's October 7, 2014 letter (*See* Saypol Decl. Ex. 4), and in settlement discussions with Silver Point subsequent to Silver Point's November 10, 2014 letter, including telephonic conference calls with attorneys and principals on November 21, December 5, and December 19, 2014 (prior to Silver Point's filing of the Motion). For the reasons set forth herein, the Plan Administrator was and remains unable to meet Silver Point's demands.

**Reservation of Rights**

23. The Plan Administrator reserves all of its rights, including to (i) request that the Court hold an evidentiary hearing pursuant to Federal Rule of Bankruptcy Procedure 9014 and Local Rule 9014-2, including relating to whether Silver Point has acted in good faith in submitting a demand for postpetition interest; and (ii) object to all or any part of any demand by Silver Point for postpetition interest.

11

**WHEREFORE** the Plan Administrator respectfully requests the Court deny the Motion and grant such other and further relief as is just and proper.

Dated: January 5, 2015
New York, New York

/s/ Garrett A. Fail
Ralph I. Miller
Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

WEIL:\95199395\6\58399.0011