## **EXHIBIT B**

Amended Complaint filed in
<u>Lehman Bros. Holdings Inc. v. LCOR Alexandria L.L.C.</u>,
Adv. No. 13-01689 (Bankr. S.D.N.Y. Dec. 5, 2014)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Andrew J. Rossman
Leah McCallister Ray
Lindsay M. Weber

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Itself and Lehman Brothers Special Financing Inc.,<br><br>     Plaintiff,<br><br>  v.<br><br>LCOR Alexandria L.L.C., PTO Holdings LLC, Does 1-10, Barclays Bank PLC, and Barclays Capital, Inc.,<br><br>     Defendants. | Adv. Pro. No. 13-01689 (SCC)<br><br>**FIRST AMENDED**<br>**COMPLAINT** |

1.      Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator

(in this capacity, the "Plan Administrator" or "Plaintiff") on its own behalf and on behalf of

Lehman Brothers Special Financing Inc. ("LBSF, and together with LBHI, "Lehman") under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan"), alleges the following on knowledge as to Lehman's own acts and

upon information and belief as to all other matters against Defendants LCOR Alexandria L.L.C.

("LCOR"), PTO Holdings LLC ("PTO Holdings"), Does 1-10 ("Does 1-10"), Barclays Bank

PLC ("Barclays Bank") and Barclays Capital Inc. ("Barclays Capital," and together with

Barclays Bank, "Barclays"):

## PRELIMINARY STATEMENT

2.      LCOR, upon early termination of LBSF's swap, owed Plaintiff a $42 million

termination payment.  Instead of making that payment, LCOR, with the aid and active

participation of Barclays, avoided any payment and split the $42 million profit with Barclays,

keeping $15 million for itself.  It did so by entering into a swap with Barclays that was

economically identical to the swap it entered into with Plaintiff, diverting those funds to a newly-

created affiliate, PTO Holdings, and improperly manipulating its calculations related to the swap

termination. Through its role in assisting LCOR in these actions, Barclays secured for itself

certain financial gains that rightfully should have been passed to Lehman.

3.      Plaintiff thus brings this action to recover more than $42 million due in 2008

when LCOR terminated an interest rate swap transaction with LBSF (the "Swap"), plus

contractual interest, for damages in an amount to be determined at trial.  When LCOR valued the

Swap termination payment, it ignored both the provisions of the governing ISDA Master

Agreement[1] and section 562 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>"), each of which required LCOR to value the Swap on the Early Termination Date.

LCOR's valuation process and results were also commercially unreasonable for numerous other

reasons.

4.        Both the Master Agreement and the Bankruptcy Code require LCOR to determine

Market Quotation or measure its Loss *as of* the Early Termination Date and prohibit use of an

earlier date.  The Master Agreement also requires that both the procedures and results of

valuation calculations must be commercially reasonable.  LCOR[2] violated these clear

requirements, thus purporting to convert a multi-million dollar liability into an amount due from

LBSF.  LCOR also redirected the proceeds of a virtually identical new swap with Barclays,

which should have been remitted promptly to LBSF, to a newly created entity, defendant PTO

Holdings.  Specifically, LCOR:

- violated the plain terms and spirit of the transaction documents and section 562 of
  the Bankruptcy Code by (i) conducting an ineffective Market Quotation
  solicitation four days *after* it entered into a new swap with Barclays and (ii) then
  performing an improper Loss computation four days *prior* to the Early
  Termination Date;

- failed to take into account the substantial gain it realized based on the present
  value of the net discounted cash flows to maturity from the terminated Swap;

- further distorted its Loss valuation calculation by including over $5 million in
  charges related to a phantom interest rate cap that never existed between LCOR
  and LBSF;

- entered into a swap on December 8, 2008 with Barclays (the "<u>Barclays Swap</u>")
  for which it obtained $15.64 million (the "<u>Barclays Swap Proceeds</u>"), but failed to

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 form (Local
Currency-Single Jurisdiction) ISDA Master Agreement, dated as of December 13, 2001 (together with all schedules,
annexes, and exhibits thereto, the "<u>Master Agreement</u>").

[2] LCOR is a special purpose entity whose managers were familiar with the valuation requirements of the Master
Agreement and the Bankruptcy Code.

account for this gain when calculating the early termination payment due to LBSF
for the Swap, even though the Barclays swap had virtually identical economic
terms as the LBSF Swap, the effective date for the Barclays swap was the same as
the Early Termination Date for the Swap with LBSF and, on information and
belief, the Barclays Swap was intended to replace the LBSF Swap;

- directed Barclays to make the payment of $15.64 million to PTO Holdings,
  apparently in an effort to make it more difficult for LBSF to recover those funds;
  and, finally,

- claimed over a half million dollars in excessive expenses relating to its alleged
  fees – an amount that greatly exceeds reasonable expenses incurred in terminating
  and closing out transactions of this type.

5.      LCOR directed Barclays to transfer all of the Barclays Swap Proceeds to PTO

Holdings, making PTO Holdings complicit in LCOR's improper actions.  PTO Holdings knew,

or should have known, that the Barclays Swap Proceeds were wrongly transferred to it.

Nevertheless, PTO Holdings has retained ownership and control over the Barclays Swap

Proceeds, or has further distributed them to Does 1–10, thus depriving LBSF's estate of its right

to these funds for over five years.  PTO Holdings, or its transferees, designated as Does 1-10,

owe LBSF the Barclays Swap Proceeds and are required to turn over those funds, plus interest, to

LBSF's estate.

6.      Further, although Barclays well understood the value of the transaction to

Lehman, it entered into the Barclays Swap with LCOR at a deep discount (over fifty percent) to

market price.  As a result, Barclays realized the value of the discount, which had belonged to

Lehman, keeping most of the windfall and paying the rest to LCOR in the form of the Barclays

Swap Proceeds.  Certain Barclays employees who had transitioned to Barclays in connection

with the sale of LBHI's North American broker-dealer business in September 2008 were

intimately familiar with the value of the Swap.  On information and belief, these employees took

advantage of knowledge that they had obtained while employed at Lehman to step into LBSF's

shoes.  They did so, even though the asset purchase agreement dated as of September 16, 2008

(the "Asset Purchase Agreement") explicitly required Barclays to preserve the confidential

nature of information obtained by it in connection with the sale process.  Barclays breached the

Asset Purchase Agreement when it used Lehman's confidential and proprietary information for

its own financial gain.

## JURISDICTION AND VENUE

7.      On September 15, 2008, and periodically thereafter, LBHI and certain of its

subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the

Bankruptcy Code (the "Chapter 11 Cases").

8.      This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 362, 562,

541(c), 542(a) and 542(b) of the Bankruptcy Code, and New York law, which governs the

Master Agreement pursuant to Part 4(h) of the Schedule and the Asset Purchase Agreement

pursuant to paragraph 13.6.

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

10.     The Court has personal jurisdiction over Defendants LCOR, PTO Holdings, and

Barclays pursuant to Rule 7004 of the Bankruptcy Rules.  In addition, Barclays consented to the

jurisdiction of this Court in the Asset Purchase Agreement.

11.     This adversary proceeding constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2).

12.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff

states that it consents to the entry of a final judgment by this Court if it is determined that this

Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article

III of the United States Constitution.

13.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

**THE PARTIES**

14.     LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of itself and the estate of LBSF.

15.     LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

16.     LCOR Alexandria L.L.C. is a limited liability company organized in Delaware, with its principal place of business located at 6701 Democracy Boulevard, Suite 711, Bethesda, Maryland 20817.

17.     PTO Holdings is a limited liability company organized in Delaware, with its principal place of business located at c/o The Related Companies, 60 Columbus Circle, New York, New York 10023, and its registered agent for service of process located at 2711 Centerville Road Suite 400, Wilmington, Delaware 19808.

18.     Does 1-10 are unknown individuals, entities, and/or groups of individuals or entities who may have received distributions of the Barclays Swap Proceeds from PTO Holdings.

19.     Barclays Bank is a public limited company incorporated and domiciled in England and Wales, with offices at 1 Churchill Place, Canary Wharf, London E14 5HP.  Barclays Bank also has an office located at 200 Park Avenue, New York, New York through which it regularly transacts business in New York.

5

20.     Barclays Capital, a wholly-owned subsidiary of Barclays Bank, is a Connecticut corporation with its principal offices at 745 Seventh Avenue, New York, New York, through which it regularly transacts business.

## BACKGROUND FACTS

A.     **Lehman Files for Bankruptcy and Enters the Asset Purchase Agreement**

21.     On September 15, 2008, LBHI filed its chapter 11 petition.   LBSF filed its chapter 11 petition on October 3, 2008.  Shortly after LBHI's bankruptcy filing, Barclays and LBHI signed the Asset Purchase Agreement dated September 16, 2008.  The Asset Purchase Agreement incorporated the terms of a confidentiality agreement dated as of September 11, 2008 (the "Confidentiality Agreement").  Under the Confidentiality Agreement, Barclays agreed that confidential information provided to it by LBHI and its affiliates would be used solely in connection with evaluating or effecting the sale of Lehman's North American broker-dealer business.  Barclays specifically agreed not to use such information for any other purpose.

22.     Paragraph 8.6 of the Asset Purchase Agreement, expressly incorporates and preserves the terms of the Confidentiality Agreement.  It states that "Confidential Information provided to [Barclays] by Seller or its representatives concerning Seller and its Subsidiaries shall, other than the Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement [dated September 11, 2008] after the Closing Date."  The term Confidential Information is defined as, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information and proprietary matters.  The Swap with LCOR was not among the assets sold to Barclays in connection with the sale.

### B.    The Master Agreement and the Swap

23.    The Master Agreement provides the basic terms for the parties' contractual relationship. The Fourth Amended and Restated Confirmation, dated as of March 30, 2005, [3] sets forth the specific economic details of the parties' insured interest rate Swap, in which LCOR paid a fixed rate of 6.8005%, and LBSF paid a floating rate based on three-month LIBOR.

24.    The Swap had a maturity date of September 15, 2032 and an initial notional amount of $60,200,000, presumably tied to LCOR's floating interest-rate exposure on its Series 2001 E Floating Rate Bonds backed by the lease of the United States Patent and Trademark Office (the "USPTO") of a five building office complex in Alexandria, Virginia.  LCOR was created as a vehicle to facilitate the design, development, construction and leasing of the USPTO.

25.    Several years after LBSF and LCOR entered into the Swap, The Related Companies, a sophisticated, global real estate development company, facilitated the purchase of equity interests in LCOR by a group of investors and began to exercise influence over its operations.

26.    About two months after LBSF's bankruptcy filing, on December 9, 2008, LCOR hand-delivered to LBSF a termination notice (the "Early Termination Notice") citing LBSF's bankruptcy filing and LBHI's credit downgrading as Events of Default, designating December 16, 2008 as the "Early Termination Date" under the Master Agreement, and effectively terminating the Swap.  The Master Agreement provides the Non-defaulting Party with the discretion to designate an "Early Termination Date" of its choosing following the occurrence of an Event of Default.  *See* Master Agreement §§ 5, 6.

---

[3] The original confirmation dated December 13, 2001 was amended and restated on July 14, 2004, October 14, 2004, November 19, 2004, and finally on March 30, 2005.

27.     The Schedule to the Master Agreement provides that the payment owed upon
early termination will be calculated based upon the "Second Method" and the "Market
Quotation" measure.  *See* Master Agreement at Schedule at Part 1(c)(i)).  The "Second Method"
provides for the Non-defaulting Party (here LCOR) to pay "the absolute value" of its net gain or
loss under the Transaction to the Defaulting Party.  *See* Master Agreement section 6(e)(i).  In
other words, the party that is "in the money" on the Early Termination Date – here LBSF – has a
right to an early termination payment even if it is the Defaulting Party.  Thus, these termination
payment provisions selected in the Master Agreement are not designed to punish the Defaulting
Party or deprive it of the benefits accrued under the Transactions.

28.     The Master Agreement also provides that "'Market Quotation' means . . . an
amount determined on the basis of quotations from Reference Market-makers" and defines
Reference Market-makers as "four leading dealers in the relevant market."  *Id.* § 12.   The Master
Agreement further provides that "[t]he party making the determination (or its agent) will request
each Reference Market-maker to provide its quotation to the extent reasonably practicable as of
the same day and time (without regard to different time zones) *on or as soon as reasonably
practicable after* the relevant Early Termination Date."  *Id.* (defining "Market Quotation")
(emphasis added).

29.     When Market Quotation cannot be determined or would not (in the reasonable
belief of the party making the determination) produce a commercially reasonable result, the
Master Agreement requires reversion to the Loss measure to value the terminated Swap.  *See id.*
§12 (definition of "Settlement Amount").   "Loss" means a reasonable and good faith
determination of LCOR's total loss or gain as a result of the early termination; in other words, it
includes the gain or loss to LCOR based on the present value of the net discounted cash flows to

maturity from the terminated Swap.  If the amount of Loss is a positive number, it would be

payable *to* the Non-defaulting Party, but where it is a negative number, the absolute value of

such number would be payable *to* the Defaulting Party *by* the Non-defaulting Party.  Of critical

importance to this dispute, the Master Agreement also provides that in calculating Loss, a "party

will determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably

practicable, as of the earliest date *thereafter* as is reasonably practicable."  *Id.* § 12 (emphasis

added).

30.     Here, because LBSF was "in the money" on the terminated Swap according to

standard industry valuation methods – meaning that the present value of LCOR's expected future

payments from and after the Early Termination Date under the Swap were much greater than the

present value of LBSF's expected future payments – LBSF was entitled to an early termination

payment from LCOR consisting of (i) "Unpaid Amounts"[4] *plus* (ii) a "Settlement Amount,"

representing the value of the terminated Swap as determined on the basis of Market Quotation

(or Loss, if Market Quotation failed or did not produce a commercially reasonable result).  *See*

*id.* §§ 6(e)(i), 12 (definition of "Settlement Amount").

## C.     LCOR Enters into the Barclays Swap

31.     In late September 2008, the employees who managed the Swap at Lehman,

including, among others, Brandon Wolanski, transitioned to Barclays following LBHI's

bankruptcy filing.  These employees were intimately familiar with the value of the Swap with

LCOR.  At that time, the fixed rate of 6.8005% on the LBSF Swap was higher than the

prevailing fixed rate for an otherwise identical swap—in other words, the fixed rate payment

---

[4] "Unpaid Amounts" are the net periodic payments that had already become payable at the end of the typical
payment cycle (monthly or quarterly) before the Early Termination Date and which remained unpaid as of the Early
Termination Date under the Transaction.

represented the opportunity to earn money on the spread between the swap's fixed rate and the current market fixed rate.  With this information in hand, on information and belief, Barclays actively sought to gain LBSF's standing in the Swap.

32.     On December 8, 2008, the day before delivering the Early Termination Notice to LBSF (when the Swap was still a "live trade"), and *eight days prior to* the Early Termination Date that LCOR later designated, LCOR entered into the Barclays Swap.  Barclays paid LCOR $15,640,000 up front for the Barclays Swap in exchange for the opportunity effectively to step into LBSF's shoes in the terminated Swap by agreeing to the same terms that would have applied had the Swap not been terminated.  By stepping into LBSF's shoes at such a discounted rate, Barclays realized an immediate windfall economic benefit of approximately $25 million (the value of the swap less the upfront payment to LCOR).

33.     The terms of the Barclays Swap plainly state that LCOR elected to negotiate the terms of the swap with Barclays rather than "solicit competitive bids for the execution" of a new swap transaction.  *See* LCOR/Barclays Muni Swap Insured Confirmation dated December 8, 2008, § 7(iv).   As this provision reveals, the Barclays Swap was not a competitive transaction and, therefore, not indicative of the most favorable terms that LCOR could have obtained for a swap on that day.  *See id.* §7.  Consequently, even if the Barclays Swap Proceeds had been remitted to LBSF – as they should have been – LCOR would still have failed to fully satisfy its obligations to LBSF.  Moreover, Barclays knew that its entry into the LBSF Swap was not the result of a competitive transaction process, not indicative of the most favorable terms that LCOR could have obtained for the Swap, and that it was acting to the detriment of LBSF and to its own financial benefit.

10

34.     In fact, the mid-market value of the Swap at the close of business on December 8, 2008 was $39,561,804.  Therefore, the amount of the Barclays Swap Proceeds is not a commercially reasonable indicator of the value of the terminated Swap between LCOR and LBSF.  Nevertheless, at a minimum, the magnitude of the Barclays Swap Proceeds demonstrates that the terminated Swap was valuable and significantly "in the money" to LBSF.

35.     Three days prior to executing the Barclays Swap, on December 5, 2008, LCOR (or its agents) organized a new limited liability company in the State of Delaware called PTO Holdings.  The Barclays Swap provides that the $15.64 million Barclays Swap Proceeds would be paid on behalf of LCOR to a Bank of America account held in the name of PTO Holdings. Presumably LCOR inserted this provision to ensure the Barclays Swap Proceeds would be diverted to PTO Holdings in an effort to frustrate and delay LBSF's collection efforts.

36.     A few weeks later on December 22, 2008, Richard O'Toole, a vice president at The Related Companies, filed a W-9 form Request for Taxpayer Identification Number and Certification with the United States Department of the Treasury Internal Revenue Service listing "PTO Holdings LLC" as the name of the entity, "LCOR Alexandria LLC" as the "Business name," and listing The Related Companies' address at 60 Columbus Circle, New York, New York 10023.

37.     The facts and circumstances of PTO Holdings' organization indicate that it was created for the express purpose of receiving the Barclays Swap Proceeds.  PTO Holdings knew or should have known that:

- The $15.64 million it received represented the Barclays Swap Proceeds;

- This payment evidenced the significant gain to LCOR in connection with the termination of the Swap with LBSF;

- LCOR would owe LBSF an early termination payment for the Swap; and

- PTO Holdings' receipt and continued possession of the Barclays Swap Proceeds interfered with, and deprived LBSF of, its rightful property interest in funds that could have been used to make part of the early termination payment due to LBSF.

## D.   LCOR's Flawed Valuation Process and Calculation of the Early Termination Payment

38.   LCOR retained a financial advisor, Chatham Financial ("Chatham"), to assist it in conducting a Market Quotation process, which Chatham purported to undertake four days *after* LCOR entered into the Barclays Swap, on December 12, 2008.  According to LCOR, Chatham did not receive any quotations from the four Reference Market-makers it solicited, and thus, LCOR reverted to the Loss measure to calculate the early termination payment.

39.   About ten days after delivering the Early Termination Notice, LCOR provided LBSF with a letter dated December 19, 2008 containing a calculation statement (the "Calculation Statement"), purportedly prepared under section 6(d)(i) of the Master Agreement.  The Calculation Statement asserted that, based on Loss, LBSF owed LCOR a payment of $6,712,965.06 as a result of LCOR's early termination of the Swap, including payment for legal fees and expenses totaling $549,030 and alleged Unpaid Amounts owed to LCOR by LBSF of $463,935.06.  Additionally, the Calculation Statement included approximately $5.7 million in hypothetical charges LCOR allegedly would have incurred if it had entered into an interest rate cap.  Notably, LCOR never filed a proof of claim against LBHI or LBSF for its alleged loss.  Presumably, if LCOR truly believed that it had suffered a loss of well over $6 million, it would have pursued recovery in the Chapter 11 Cases.

40.   On information and belief, Barclays assisted LCOR in executing its closeout of the Swap, presumably to retain the value of the discount it had received on the Barclays Swap, which amount was rightfully due to LBSF.  Because of the enormous financial windfall it

secured by assuming LBSF's place in the Swap, Barclays had the incentive to aid LCOR in these
actions and to act to the detriment of Lehman.

41.     LCOR's solicitation of Market Quotations prior to the Early Termination Date
and subsequent calculation of the early termination payment under Loss were commercially
unreasonable, failed to comply with Master Agreement or governing New York law, and
violated section 562 of the Bankruptcy Code.

42.     LCOR's solicitation (through Chatham) of Market Quotations four days prior to
the Early Termination Date was entirely improper under the Master Agreement, which provides
that "[t]he party making the [Market Quotation] determination (or its agent) will request each
Reference Market-maker to provide its quotation to the extent reasonably practicable *as of the
same day and time . . . on or as soon as reasonably practicable after* the Early Termination
Date."  Master Agreement § 12 (emphasis added).  Soliciting quotes from dealers for a
replacement transaction to value the LBSF Swap was a pointless exercise by LCOR (other than
to disguise the actual gain LCOR realized) given that it had already entered into the Barclays
Swap, and may have contributed to LCOR's failure to receive any bids during its Market
Quotation process.

43.     The Master Agreement also provides in the definition of Loss that a "party will
determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably
practicable, as of the earliest date thereafter as is reasonably practicable."  *Id.*  The primary
motivation for this time constraint requiring the non-defaulting party to determine Market
Quotation or Loss *as of* the Early Termination Date or as soon as reasonably practicable
thereafter is to prevent an inaccurate valuation.  *See* GOOCH & KLEIN, DOCUMENTATION FOR
DERIVATIVES 253 (4th ed. 2002).

44.     These strict date requirements in the Master Agreement under both "Market Quotation" and "Loss" accord with section 562 of the Bankruptcy Code, which also requires that a terminated swap be valued as of the termination date.  Section 562 is even more protective of a chapter 11 debtor in that it expressly places the burden on the non-debtor swap participant (here, LCOR) to show that commercially reasonable determinants of value were not available on the Early Termination Date before it will be permitted to use a later date.  Specifically, section 562 provides as follows:

> (a)  If the trustee rejects a swap agreement . . . or if a . . . swap participant liquidates, terminates, or accelerates such . . . agreement, *damages shall be measured as of the earlier of—*
>
> (1)  the date of such rejection; or
>
> (2)  *the date or dates of such liquidation, termination, or acceleration*.

11 U.S.C. § 562(a) (emphases added).  Under no circumstances is the non-defaulting party permitted to use a date prior to the Early Termination Date.  LCOR should have solicited Market Quotations on the Early Termination Date, as the Master Agreement and section 562 require, and should have measured its Loss as of that date.  By failing to do so, LCOR harmed LBSF and breached the Master Agreement.

45.     The timeline below evidences the key dates relating to LCOR's termination and valuation of the Swap, and PTO Holdings' role in depriving LBSF of the Barclays Swap Proceeds:

- **September 15, 2008**:  LBHI commences its Chapter 11 Case.

- **October 3, 2008**:  LBSF commences its Chapter 11 Case.

- **December 5, 2008**:  PTO Holdings is formed in Delaware.

- **December 8, 2008**:  LCOR enters into the Barclays Swap, which has an effective date of December 16, 2008.

14

- **December 9, 2008**:  LCOR delivers to LBSF the Early Termination Notice designating December 16, 2008 as the Early Termination Date.

- **December 10, 2008**:  Barclays pays the Barclays Swap Proceeds to PTO Holdings.

- **December 12, 2008**:  LCOR commences its Market Quotation Process.

- **December 12-16, 2008**:  The market moves further in LBSF's favor as interest rates fall, increasing the value of the Swap to LBSF by over $2 million.

- **December 16, 2008**:  The Swap is terminated pursuant to the Early Termination Notice.  LBSF's calculation of the value of the Swap on Early Termination Date, chosen at LCOR's sole discretion, is $41,720,650 in LBSF's favor.

- **December 19, 2008**:  LCOR provides LBSF with its Calculation Statement, alleging that LBSF owes LCOR $6,712,965.06 under the Loss measure.

- **December 22, 2008**:  Richard O'Toole of The Related Companies submits the W-9 Request for Taxpayer Identification Number and Certification for PTO Holdings listing LCOR as the "Business name."

- **September 22, 2009**:  The bar date for filing claims occurs and LCOR fails to file a proof of claim.

46.      LCOR not only initiated its market quotation process prematurely, it also utilized a flawed methodology in performing its Loss valuation.  LCOR's calculation of the early termination payment under Loss was not commercially reasonable because LCOR failed to take into account the substantial gain it realized based on the present value of the net discounted cash flows to maturity from the terminated Swap.  The gain to LCOR from its termination of the Swap as measured on the proper date is $41,720,650, plus Unpaid Amounts of $559,541, plus accrued interest to the Early Termination Date on the Unpaid Amounts of $212, for a total (rounded to the nearest dollar) of $42,280,402.

47.      LCOR contrived its Loss calculation to result in a receivable by claiming approximately $5.7 million in hypothetical charges LCOR allegedly would have incurred if it had entered into an interest rate cap.  LCOR never purchased such an interest rate cap and hence

never incurred these charges.  It is improper under the express terms of the Master Agreement,

governing New York contract law, and the Bankruptcy Code to include charges that were never

incurred in a Loss calculation.  Imposing such charges on LBSF here is particularly egregious

considering LCOR received over $15 million by entering into a virtually identical swap with

Barclays just *prior to* the Early Termination Date.

48.     LCOR's Calculation Statement also included improper expenses totaling over a

half million dollars relating to its purported legal and advisory fees.  This is not commercially

reasonable and far exceeds reasonable termination expenses for similar transactions.  Any

advisory expenses LCOR incurred as a result of its improper attempt to avoid paying LBSF the

appropriate termination payment are clearly not subject to reimbursement.

49.     Upon early termination, section 6(e) of the Master Agreement required LCOR to

value the termination payment on the Early Termination Date that it designated.  LCOR has

defaulted on its obligations under section 6(e) of the Master Agreement.  As a result, it owes

interest to LBSF at the Default Rate as provided in the Master Agreement.  *See* Master

Agreement § 6 (providing that "an amount calculated as being due in respect of any Early

Termination Date under section 6(e) will be payable on the day that notice of the amount payable

is effective . . . . Such amount will be paid together with . . . interest thereon . . . from (and

including) the relevant Early Termination Date to (but excluding) the date such amount is paid,

at the Applicable Rate § 6(d)(ii).").  Section 12 of the Master Agreement provides that the

"Applicable Rate" is the "Termination Rate" for the period of time between the Early

Termination Date and provision of the Calculation Statement.  *Id.* §12.  Thereafter, the

"Applicable Rate" is the "Default Rate" for the period of time from the date of receipt of the

Calculation Statement until the date when payment is made.  *Id.* § 12.  Here, this means that

Default Rate interest began accruing on December 19, 2008 and continues to accrue until LCOR pays LBSF in full.

50.     While LCOR kept over $15 million of the amount owed to Lehman for itself, Barclays also realized a substantial windfall gain as realized by entering into a valuable swap transaction at a deeply discounted price to the detriment of Lehman.

**E.      The Parties Attempt Mediation**

51.     Since November 2009, LBSF has been engaged in settlement discussions with LCOR without success.  Part of those efforts included a mediation between those parties pursuant to this Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207], which occurred on March 12, 2012 and which failed to produce a settlement.

**COUNT I**

**Breach of the Master Agreement**

*(Against Defendant LCOR)*

52.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as though fully set forth in this cause of action.

53.     On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from LCOR.

54.     The Master Agreement provides that valuation of the early termination payment should occur on the Early Termination Date or on the earliest date thereafter, regardless of whether the Market Quotation or the Loss measure was chosen.  Therefore, LCOR should have valued the early termination payment on December 16, 2008.

55.     By valuing the Swap prior to the designated Early Termination Date and
otherwise failing to use reasonable valuation practices, LCOR breached the Master Agreement.
As a result, LBSF has been damaged in an amount to be proven at trial, but no less than
approximately $42 million, representing the value of the Swap on the Early Termination Date
(plus the Unpaid Amounts), together with contractual interest.

## COUNT II

### Breach of the Master Agreement Based on LCOR's Breach of the Implied Covenant of Good Faith and Fair Dealing

*(Against Defendant LCOR)*

56.     Plaintiff repeats, realleges, and incorporates by reference each and every
allegation set forth above as though fully set forth in this cause of action.

57.     On the Early Termination Date, LBSF was the party "in-the-money" and thus
entitled to receive a substantial termination payment from LCOR.

58.     LCOR manipulated its computations to achieve a windfall when it improperly
calculated the early termination payment under Loss.  Specifically, as described above, by failing
to account for its gain that exceeded $41 million due to the early termination of the Swap, and by
imposing hypothetical and excessive charges on LBSF, LCOR breached the agreement.

59.     By refusing to pay LBSF a properly calculated, commercially reasonable
termination payment in accordance with the Loss measure in the Master Agreement, LCOR
violated the covenant of good faith and fair dealing implicit in all contracts governed by New
York law.

60.     As a result of this breach, LBSF has been damaged in an amount to be proven at
trial, but no less than approximately $42 million, representing the value of the Swap on the Early
Termination Date (plus the Unpaid Amounts), together with contractual interest.

## COUNT III

### Violation of Section 562 of the Bankruptcy Code

*(Against Defendant LCOR)*

61.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as though fully set forth in this cause of action.

62.     Section 562 of the Bankruptcy Code requires that a terminated swap be valued as of the Early Termination Date unless no commercially reasonable determinants of value are available on that date, and places a burden on the Non-defaulting Party – here, LCOR –to show that commercially reasonable determinants of value were not available on that date.

63.     LCOR, however, solicited Market Quotations and measured its Loss at least four days prior to the Early Termination Date in express contravention of section 562.  Therefore, LCOR violated the express terms of section 562.

64.     LBSF has been damaged by LCOR's violation in an amount to be proven at trial, but no less than approximately $42 million, representing the value of the Swap on the Early Termination Date (plus the Unpaid Amounts), together with contractual interest.

## COUNT IV

### Turnover of LBSF's Property Interest in the Properly Calculated Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code

*(Against Defendant LCOR)*

65.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as though fully set forth in this cause of action.

66.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt

may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C.

§ 542(b).

67.    As fully alleged above, LCOR was obligated to pay LBSF a properly calculated

early termination payment under the Master Agreement, plus interest.  The amount due to LBSF

from LCOR as of December 16, 2008, the Early Termination Date, is property of LBSF's estate

under section 541(a) of the Bankruptcy Code.

68.    The termination value of the Swap on the Early Termination Date (plus Unpaid

Amounts) under the Loss measure was approximately $42 million, which represents the payment

LCOR owed to LBSF as of that date.

69.    LCOR has failed to pay LBSF that amount and continues to do so, making the

early termination payment a matured debt.

70.    Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff

requests an order compelling and directing LCOR to turn over to LBSF an amount to be

determined at trial but no less than approximately $42 million, together with contractual interest.

## COUNT V

**Alternatively, Turnover of the Barclays Swap Proceeds
Pursuant to Section 542(b) of the Bankruptcy Code**

*(Against Defendant LCOR)*

71.    Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

72.    Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that

owes a debt that is property of the estate and that is matured, payable on demand, or payable on

order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt

may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C.

§ 542(b).

73.     LCOR entered into the Barclays Swap on December 8, 2008, for which Barclays

paid LCOR $15,640,000 in exchange for Barclays' opportunity effectively to step into LBSF's

shoes in the soon-to-be-terminated Swap.

74.     The Barclays Swap Proceeds represent a portion of its "gain" on early termination

of the Swap that LCOR is required to pay to LBSF under the Master Agreement.  Therefore,

upon LCOR's constructive receipt of the Barclays Swap Proceeds, LCOR had a matured debt to

LBSF in the amount of $15.64 million.

75.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff

requests an order compelling and directing LCOR to turn over $15.64 million to LBSF, plus

contractual interest.

## COUNT VI

### Turnover of the Barclays Swap Proceeds
### Pursuant to Section 542(a) of the Bankruptcy Code

*(Against Defendants Barclays, PTO Holdings, and Does 1-10)*

76.     Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

77.     Section 542(a) of the Bankruptcy Code expressly provides that ". . . an entity,

other than a custodian, in possession, custody, or control, during the case, of property that the

trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under

section 522 of this title, shall deliver to the trustee, and account for, such property or the value of

such property, unless such property is of inconsequential value or benefit to the estate."  11

U.S.C. § 542(a).

78.     The Barclays Swap Proceeds constitute property of LBSF's estate under section 541(a) of the Bankruptcy Code.  By accepting receipt and retaining and exercising wrongful control over the Barclays Swap Proceeds, PTO Holdings obtained custody and exercised control over property of LBSF's estate that LBSF could use, sell or lease under section 363 of the Bankruptcy Code.  To the extent that PTO Holdings distributed this property to Does 1–10, Plaintiff is entitled to turnover of those funds.

79.     In addition, the value of the replacement transaction on the early termination date is property in which LBSF had a legal and/or equitable interest, pursuant to the Master Agreement between LBSF and LCOR.  The value of the replacement transaction is property of LBSF's estate under 541(a)(1) of the Bankruptcy Code.  Barclays is in "possession, custody, or control" of this property, which is of substantial value and benefit to LBSF's estate and which is property belonging to LBSF.  Barclays does not have a right to this property, by contract or otherwise, and Section 542 of the Bankruptcy Code requires that Barclays turn over that property.

80.     Accordingly, pursuant to section 542(a) of the Bankruptcy Code, Plaintiff requests an order (a) compelling and directing PTO Holdings and Does 1–10 to turn over the $15.64 million to LBSF, plus prejudgment interest; and (b) compelling and directing Barclays to turn over the value of the replacement transaction on the early termination date (plus any applicable interest) immediately for the benefit of LBSF's unsecured creditors pursuant to section 542 of the Bankruptcy Code.

08-13555-mg   Doc 47709-2   Filed 01/07/15   Entered 01/07/15 14:04:20   Exhibit B
Pg 24 of 32

## COUNT VII

### Conversion

*(Against Defendants PTO Holdings and Does 1-10)*

81.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as though fully set forth in this cause of action.

82.     Instead of paying LBSF a properly calculated, commercially reasonable termination payment in accordance with the Loss measure as required by the Master Agreement, LCOR directed that Barclays pay the Barclays Swap Proceeds to PTO Holdings.

83.     PTO Holdings knew or should have known the facts described above in paragraph 29.

84.     PTO Holdings' possession of the Barclays Swap Proceeds directly interfered with LBSF's ability to possess them.  Alternatively, possession of the Barclays Swap Proceeds by Does 1 – 10 also directly interfered with LBSF's ability to possess them.  Thus, PTO Holdings and Does 1 – 10 wrongfully deprived LBSF of the use of, and its property interest in, the Barclays Swap Proceeds.

85.     As a result of PTO Holdings' retention of the Barclays Swap Proceeds, or the retention of those proceeds by Does 1–10, LBSF has been damaged in an amount to be proven at trial, but no less than $15.64 million, an amount representing the full value of the Barclays Swap Proceeds, which must be paid over to LBSF, plus prejudgment interest.

## COUNT VIII

### Unjust Enrichment

*(Against Defendants Barclays, PTO Holdings, and Does 1-10)*

86.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as though fully set forth in this cause of action.

87.    By entering into a replacement transaction with LCOR on December 8, 2008, in advance of LCOR's termination of the Swap, at an off market rate and with a deeply discounted upfront payment, Barclays received a valuable benefit equal to the value of the discount Barclays received when it stepped into the Swap.  Both parties fully knew and appreciated that Barclays was being enriched and benefitted at Lehman's expense.

88.    LCOR's transfer of this benefit was the result of Barclays' unfair efforts to take advantage of an opportunity to profit from Lehman's bankruptcy.  Although Barclays, as a sophisticated dealer who faced its own close-out transactions with Lehman would have been well aware of LCOR's obligations under the ISDA Master, on information and belief, it collaborated with LCOR to enable LCOR to submit an unreasonable and bad faith calculation statement to Lehman in violation of the terms of the ISDA Master.  Moreover, on information and belief, Barclays relied on ex-Lehman employees who had prior knowledge of the Swap and used that knowledge to its advantage and gain, and assisted LCOR in executing its closeout of the Swap in order to retain the value of the discount it had received.

89.    Based on its relationship with Lehman through the Asset Purchase Agreement as well as its knowledge gained from acquiring former Lehman employees, Barclays was aware of the value of the LBSF Swap to Lehman and the damage that its actions would cause Lehman.

90.    Thus, as a result of Barclays' efforts and inside knowledge, Barclays was unjustly enriched, at Lehman's direct expense, in an amount to be proven at trial, plus any applicable interest.  Equity and good conscience require restitution of these funds to Lehman.

91.    Further, as a result of LCOR's breach of its obligations to LBSF under the Master Agreement and transfer of the Barclays Swap Proceeds to PTO Holdings, PTO Holdings and Does 1 – 10 obtained an unjust windfall at the expense of LBSF.

92.     PTO Holdings and Does 1–10 have been improperly and unjustly enriched at
LBSF's expense as a result of LCOR's actions.  LBSF's entire interest in the Barclays Swap
Proceeds was wrongly transferred to PTO Holdings and Does 1–10.  LBSF received nothing in
return.  Equity and good conscience require that PTO Holdings and Does 1–10 return to LBSF
$15.64 million, plus prejudgment interest.

## COUNT IX

### Unfair Competition by Misappropriation

(*Against Defendants Barclays*)

93.     Plaintiff repeats, realleges, and incorporates by reference each and every
allegation set forth above as though fully set forth in this cause of action.

94.     Barclays improperly used and/or disclosed Lehman's confidential information to
gain an unfair competitive advantage over LBSF.  Barclays' use and exploitation of Lehman's
confidential and proprietary information constitutes unfair competition by misappropriation.

95.     As a result of this unfair competition by misappropriation, Lehman was damaged
in an amount to be proven at trial, plus any applicable interest.

## COUNT X

### Breach of Contract

(*Against Defendants Barclays*)

96.     Plaintiff repeats, realleges, and incorporates by reference each and every
allegation set forth above as though fully set forth in this cause of action.

97.     The Asset Purchase Agreement and Confidentiality Agreement are valid,
enforceable contracts that remain in full force and effect.  Lehman duly performed all of its
contractual obligations under the Asset Purchase Agreement and Confidentiality Agreement and
all valid and properly approved modifications thereof.

98.     Upon information and belief, Barclays misused confidential and proprietary

information it had learned about Lehman's business for its own financial benefit, in breach of the

Asset Purchase Agreement and Confidentiality Agreement.

99.     As a result of this breach, Lehman was damaged in an amount to be proven at

trial, plus any applicable interest.  Lehman is also entitled to recover from Barclays all incidental

and consequential damages arising out of duties of care, good faith and fair dealing.

## COUNT XI

## Aiding and Abetting Breach of Fiduciary Duty

### (*Against Defendants Barclays*)

100.    Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

101.    Former Lehman employees, working at Barclays, had access to confidential and

proprietary information regarding the LBSF Swap.  These former employees continued to owe a

fiduciary duty to Lehman with respect to such confidential information following termination of

their employment.  These former employees, on behalf of Barclays, intentionally and willfully

breached their fiduciary duty to LBSF by exploiting and/or disclosing Lehman's confidential and

proprietary information for Barclays' benefit.

102.    Barclays knowingly induced or participated in these breaches of duty.  Among

other things, Barclays knew that certain former Lehman employees had access to insider

information.  Barclays also knew that the valuation assigned to the LBSF Swap was

unreasonable and unfavorable from Lehman's perspective.

103.    Absent this misconduct, the LBSF Swap would have been accurately valued at a

more favorable price to LBSF.  As a result of this breach, Lehman was damaged in an amount to

be proven at trial, plus any applicable interest.

19-01895-scc   Doc 18-7   Filed 12/05/14   Entered 12/05/14 19:56:27   Main Document
Pg 29 of 33

## COUNT XII

## Money Had And Received

### (*Against Defendants Barclays*)

104.    Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

105.    By entering into a replacement transaction with LCOR on December 8, 2008,

following the termination of the Swap, at an off market rate and with a deeply discounted upfront

payment, Barclays received a valuable benefit equal to the value of the discount Barclays

received when it stepped into the Swap, and was enriched and benefitted thereby.

106.    Lehman was entitled to these funds.  The terms of Lehman's agreement with

LCOR entitled Lehman to be paid any gain realized by LCOR upon termination of the Swap.

Instead, LCOR transferred part of this gain to Barclays, and Barclays accepted it.  Both Barclays

and LCOR fully knew and appreciated that Barclays was being enriched and benefitted at

Lehman's expense.

107.    LCOR's transfer of this benefit was the result of Barclays' unfair efforts to take

advantage of an opportunity to profit from Lehman's bankruptcy.  Although Barclays, as a

sophisticated dealer who faced its own close-out transactions with Lehman would have been well

aware of LCOR's obligations under the ISDA Master, upon information and belief, it assisting

LCOR in executing its closeout of the Swap.  Moreover, on information and belief, Barclays

relied on ex-Lehman employees who had prior knowledge of the LBSF Swap and used that

knowledge to its advantage and gain.

108.    Thus, as a result of Barclays' efforts and inside knowledge, Barclays was unjustly

enriched, at Lehman's direct expense, in an amount to be proven at trial, plus any applicable

interest.  Equity and good conscience require restitution of these funds to Lehman.

## COUNT XIII

## Conspiracy To Induce Breach Of Contract

### (*Against Defendants Barclays*)

109.    Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

110.    Barclays knew, including because its employees were previous Lehman

employees, that LCOR and Lehman were parties to a valid contract, the ISDA Master, the terms

of which governed termination and replacement of the LBSF Swap.

111.    Although Barclays understood LCOR's obligations under the ISDA Master, by

seeking to replace Lehman as counterparty and, upon information and belief, assisting LCOR in

executing its closeout of the Swap, it induced and aided LCOR in violating the ISDA Master by

failing to properly calculate the payment owed to Lehman upon early termination.  To the benefit

of Barclays, LCOR submitted a calculation statement to Lehman that was unreasonable, in bad

faith, and converted its gains under the Loss measure to receivables.

112.    As a result of this breach, Lehman was damaged in an amount to be proven at

trial, plus any applicable interest.  Barclays is jointly and severally liable for this breach.

## COUNT XIV

## Default Interest

### (*Against Defendant LCOR*)

113.    Plaintiff repeats, realleges, and incorporates by reference each and every

allegation set forth above as though fully set forth in this cause of action.

114.    LCOR not only owes LBSF a termination payment of approximately $42 million,

but also interest thereon.

115.    By failing to value the Swap properly on the termination date and make the

28

payment due to LBSF, LCOR breached the Master Agreement and, therefore must pay accrued interest at the Default Rate on the amount it owes to LBSF, which interest continues to accrue until payment to LBSF in full.

116.   The Master Agreement explicitly provides that the proper default rate is the receiving party's cost of funds "without proof or evidence of any actual cost" and "as certified by it."  Master Agreement § 12.  The Master Agreement executed by LCOR precludes any challenge to the Default Rate because LBSF has certified its cost of funds.

117.   Consequently, the interest owed on the early termination payment to which LBSF is entitled began to accrue (i) at the Termination Rate from and including December 16, 2008, to but excluding December 19, 2008, and (ii) at the Default Rate from and including December 19, 2008, with interest continuing to accrue at the Default Rate until payment to LBSF in full.

## CONDITIONS PRECEDENT

All conditions precedent have occurred, been performed, or been waived or excused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

(1)   Against Defendant LCOR as follows:

A.   As to Counts I, II, and III, awarding LBSF damages from LCOR in an amount to be determined at trial, but in all events, no less than approximately $42 million, representing the value of the Swap on the Early Termination Date (plus Unpaid Amounts), together with contractual interest;

B.   As to Count IV, an order compelling and directing LCOR to turn over the properly-calculated Settlement Amount to LBSF, which LBSF has calculated to be approximately $42 million, together with contractual interest;

C.   As to Count V, an order compelling and directing LCOR to turn over the Barclays

19-01055-scc    Doc 18    Filed 12/05/14    Entered 12/05/14 19:56:27    Main Document
Pg 32 of 33

Swap Proceeds to LBSF, together with contractual interest;

(2)    <u>Against Defendant PTO Holdings and Does 1 – 10 as follows:</u>

D.    As to Count VI, an order compelling and directing PTO Holdings and Does 1 – 10 to turn over the Barclays Swap Proceeds to LBSF, plus prejudgment interest;

E.    As to Count VII and VIII, awarding LBSF damages from PTO Holdings and Does 1 – 10 in an amount to be determined at trial, but in all events, no less than $15.64 million, an amount representing the full value of the Barclays Swap Proceeds, plus prejudgment interest;

(3)    <u>Against Defendants Barclays Bank and Barclays Capital</u>

F.    As to Count VI, an order compelling and directing Barclays to turn over the value of the replacement transaction, plus prejudgment interest;

G.    As to Count VIII, ordering restitution of funds belonging to Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc. in an amount to be determined at trial;

H.    As to Counts IX, X, XI, XII, and XIII awarding LBHI and LBSF damages in an amount to be determined at trial;

(4)    <u>Against Defendants LCOR, PTO Holdings, Does 1 – 10, Barclays Bank, and Barclays Capital as follows:</u>

I.    Pre-judgment and post-judgment interest; and

J.    Such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: December 5, 2014
      New York, New York

By:  /s/ Ralph I. Miller              
      Ralph I. Miller
      Jacqueline Marcus

      WEIL, GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, New York 10153
      Telephone: (212) 310-8000
      Facsimile: (212) 310-8007
      ralph.miller@weil.com
      jacqueline.marcus@weil.com

      *Attorneys for Lehman Brothers Holdings Inc.*
      *and Lehman Brothers Special Financing Inc.*
      *as to the claims asserted against LCOR*
      *Alexandria L.L.C., PTO Holdings LLC, and*
      *Does 1 – 10.*


By:  /s/ Andrew J. Rossman          
      Andrew J. Rossman
      Leah McCallister Ray
      Lindsay M. Weber

      QUINN EMANUEL URQUHART
      & SULLIVAN, LLP
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      Telephone: (212) 849-7000
      Facsimile: (212) 849-7100
      andrewrossman@quinnemanuel.com
      calliray@quinnemanuel.com
      lindsayweber@quinnemanuel.com

      *Attorneys for Lehman Brothers Holdings Inc.*
      *and Lehman Brothers Special Financing Inc.*
      *as to the claims asserted against Barclays*
      *Bank PLC and Barclays Capital Inc.*