HEARING DATE AND TIME: March 11, 2015 at 10:00 a.m. (Eastern Time)
RESPONSE DEADLINE: February 9, 2015 at 4:00 p.m. (Eastern Time)

**QUINN EMANUEL
URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for Debtors Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (SCC) |

**NOTICE OF HEARING ON OBJECTION TO PORTIONS OF PROOF OF CLAIM NO. 66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND PROOF OF CLAIM NO. 66455 AGAINST LEHMAN BROTHERS SPECIAL FINANCING INC. OF JPMORGAN CHASE BANK, N.A. REGARDING DERIVATIVES LOSSES**

**PLEASE TAKE NOTICE** that a hearing on the annexed objection, dated January 7, 2015, 2014 (the "Objection") filed by Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., and their affiliated debtors in the above-referenced chapter 11 case, as debtors and debtors in possession (collectively, the "Debtors"), to portions of Proof of Claim No. 66462 against Lehman Brothers Holdings Inc. and Proof of Claim No. 66455 against Lehman Brothers Special Financing Inc. shall be held before the Honorable Shelley C. Chapman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Custom House, Courtroom 621, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **March 11, 2015 at 10:00 a.m. (Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the responding party, the basis for the response and the specific grounds thereof, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance with General Order M-399, and on (i) the Chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Lori Fife, Esq.); (iii) conflicts counsel for the Debtors, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Andrew J. Rossman, Esq. and Tyler G. Whitmer, Esq.); (iv) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Elisabeth Gasparini, Esq. and Andrea Schwartz, Esq.); and (v) attorneys for the Official Committee of Unsecured Creditors appointed in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq.) so as to be filed and received by no later than **February 9, 2015 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection or any claim set forth thereon, the Debtors may, on or after the Response Deadline, submit to the Bankruptcy Court an order, which order may be entered with no further notice or opportunity to be heard offered to any party.

**PLEASE TAKE FURTHER NOTICE** that responding parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  January 7, 2015
         New York, New York

                                                    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                                                    By:  /s/ Andrew J. Rossman
                                                    Susheel Kirpalani
                                                    Andrew J. Rossman
                                                    Tyler G. Whitmer
                                                    51 Madison Avenue, 22nd Floor
                                                    New York, New York 10010-1601
                                                    (212) 849-7000
                                                    *Counsel for Debtors Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
*Counsel for Debtors Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (SCC) |

**OBJECTION TO PORTIONS OF PROOF OF CLAIM NO. 66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND PROOF OF CLAIM NO. 66455 AGAINST LEHMAN BROTHERS SPECIAL FINANCING INC. OF JPMORGAN CHASE BANK, N.A. REGARDING DERIVATIVES LOSSES**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and, collectively with its affiliates, "Lehman"), Lehman Brothers Special Financing Inc. ("LBSF"), and their affiliated debtors, in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent as follows:

**Preliminary Statement**

1.  This Objection seeks a ruling that the claims of JPMorgan Chase Bank, N.A. ("JPMCB" and, together with its affiliates, "JPMorgan") against LBSF and LBHI (as guarantor)

relating to certain derivatives transactions between Washington Mutual Bank, FA ("WaMu") and LBSF are overstated because WaMu did not comply with the Bankruptcy Code or the terms of the parties' agreement when it calculated the amount due upon termination of the transactions. The claims related to these transactions should be reduced as described below.

**Relief Requested**

2.      This Objection seeks to reduce the portions of Proof of Claim No. 66462 against LBHI and Proof of Claim No. 66455 against LBSF described therein as arising from amounts purportedly due upon the termination of derivatives trades between WaMu and LBSF (the "WaMu Derivatives Claim") pursuant to section 502(b) of the Bankruptcy Code, Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) for Approval of Claim Objections Procedure (the "Procedures Order") [Docket No. 6664].

3.      Debtors have examined the WaMu Derivatives Claim and have determined that it should be reduced for the reasons described below. Debtors therefore request entry of an order reducing the WaMu Derivatives Claim as set forth below.

**Jurisdiction**

4.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

**Procedural Background**

5.      Beginning on September 15, 2008 (the "Commencement Date") and periodically thereafter, Lehman filed with this Court voluntary cases under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). Lehman's confirmed chapter 11 plans went effective in March 2012.

2

6. On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271]. A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

7. Claimants received notice of the Bar Date Order by mail. (*See* Notice of Deadlines for Filing Proofs of Claim (the "Bar Date Notice")). The Bar Date Notice also was posted on the docket, and the Bar Date Order was published in The New York Times (International Edition), The Wall Street Journal (International Edition), and The Financial Times. A list of the Debtors in these chapter 11 cases and their respective case numbers was included as part of the Bar Date Notice as well as on the instructions to the proof of claim form. (Bar Date Notice at Schedule A). In accordance with the Bar Date Order's requirement that claims be filed against the proper Debtor, the Bar Date notice stated, in bold-face type and in capital letters, that "YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS." (*Id.* at 3).

8. On January 14, 2010, this Court entered the Procedures Order, which authorizes the Debtors, among other things, to file omnibus objections to no more than 500 claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and those additional grounds set forth in the Procedures Order.

**Factual Background**

9. Prior to LBHI's bankruptcy filing on September 15, 2008, WaMu and LBSF were counterparties to a number of derivatives transactions, which were governed by an International Swaps and Derivatives Association ("ISDA") Master Agreement dated May 28, 1998 (the "Master Agreement").

3

10. LBHI is a guarantor of the obligations of LBSF under the Master Agreement and, therefore, is a "Credit Support Provider" under the Agreement.

11. Under the terms of the Master Agreement, the commencement of LBHI's chapter 11 case on September 15, 2008 constituted an "Event of Default" and gave WaMu the right to terminate the transactions under the Master Agreement. On that same date, WaMu notified LBSF that it was terminating the transactions under the Master Agreement and designating September 15, 2008 as the "Early Termination Date."

12. On September 25, 2008, the director of the Office of Thrift Supervision placed WaMu into receivership and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. That day, the FDIC sold substantially all of the assets of WaMu to JPMCB. As part of its acquisition, JPMCB was assigned WaMu's rights under certain derivatives and swap agreements, including the Master Agreement.

13. On October 17, 2008, JPMorgan submitted a calculation statement (the "Calculation Statement") to LBSF as its basis for the calculation of claims under the Master Agreement.

14. Under the Master Agreement, the parties had selected the "Market Quotation" method to measure the Settlement Amount due upon early termination. Market Quotation is defined as:

> ***"Market Quotation"*** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early

4

>Termination Date, have been required after that date. . . . If more than three quotations are provided the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

1992 ISDA Master Agreement § 14.

15. The determining party thus is required to seek Market Quotations from "Reference Market-makers," which is defined in the Master Agreement as follows:

>"*Reference Market-makers*" means *four* leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*Id.* at § 12 (emphasis supplied). In order for the results of the Market Quotation method to be valid, it must "produce a commercially reasonable result." *See id.* (definition of "Settlement Amount").

16. The Master Agreement also contained requirements governing when the determining party must obtain the Market Quotations. The definition of Market Quotation states: "The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date." 1992 ISDA Master Agreement § 14. Thus, to the extent reasonably practicable, the determining party was required to obtain quotations that were as of the same time on the Early Termination Date.

5

17.     The Bankruptcy Code similarly limits the ability of a determining party to calculate the Market Quotation amount as of any date after the Early Termination Date. Section 562(a) of the Bankruptcy Code establishes the general rule that when a participant to a swap terminates the swap agreement, it must measure its damages as of the date of termination. 11 U.S.C. § 562(a). Section 562(b) allows an exception only "if there are not any commercially reasonable determinants of value" as of the Early Termination Date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value." 11 U.S.C. § 562(b).

18.     Under the Master Agreement, even if the parties have selected the Market Quotation measure, if Market Quotation renders a commercially unreasonable result or if less than three of the four dealers submit bids, the settlement amount owed must be determined instead using the "Loss" measure. *See* 1992 ISDA Master Agreement at § 12 (definition of "Settlement Amount"). "Loss" is defined in the Master Agreement, in relevant part, as follows:

> **"Loss"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party **reasonably determines in good faith** to be its **total** losses and costs (or **gain**, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (**or any gain resulting from any of them**). . . .

*Id.* at § 12 (emphasis supplied).

19.     Loss thus attempts to put the parties in the same economic position that they would have been in but for the termination of the transactions. Like the Market Quotation measure, Loss must be determined "reasonably" and "in good faith." *Id.*

6

**Objection**

20.  In their review of the claims filed on the claims register in these chapter 11 cases and maintained by the Court-appointed claims agent, the Debtors have identified the WaMu Derivatives Claim as a claim that should be reduced.

21.  On April 1, 2010, JPMorgan filed its amended Proofs of Claim against LBHI and LBSF, including the WaMu Derivatives Claim. The WaMu Derivatives Claim totals $80,313,435. This claim consists of aggregate Market Quotation amounts of $222,326,721 and unpaid amounts of $1,208,594[1] in JPMCB's favor, which is offset by the return of collateral held by JPMCB to LBSF (which JPMCB claims totals $143,221,880).[2]

22.  The Market Quotation process used by WaMu did not achieve a commercially reasonable result, but instead inflated the WaMu Derivatives Claim by more than $16 million. The Debtors used readily available market data and industry standard third-party pricing services to determine that the value of the terminated trades under the Master Agreement, as of the Early Termination Date, was $207,329,237. When this amount is offset by the $143,189,422 in collateral held by JPMCB it results in a claim of $64,139,815, rather than the $80,313,435 submitted as the WaMu Derivatives Claim. Thus the Market Quotation process utilized by WaMu inflated the claim by more than 25%.

23.  The reason for the overstatement of WaMu's Market Quotation amounts is not entirely apparent, as JPMCB has not provided Debtors with sufficient information to evaluate the process used by WaMu to obtain quotations. The only information provided to support the

---

[1] "Unpaid amounts" are amounts that became payable on or prior to the termination date but remained unpaid. Debtors calculate that no unpaid amounts are due under the Master Agreement.

[2] Debtors calculate the amount of collateral held by JPMCB as $143,189,422.

7

WaMu Derivatives Claim is a single-page spreadsheet attached to the Calculation Statement that lists, for each terminated trade under the Master Agreement, price quotations from a number of dealers and corresponding columns labeled "Date," "Time," and "bps." JPMCB has not provided any of the underlying documentation showing the request for or receipt of these quotations.

24. Without more clarity into the process, Debtors cannot know with certainty how WaMu obtained the quotations it used to calculate its inflated claim. However, it appears based on the limited information provided in its Calculation Statement that WaMu may have conducted the Market Quotation process in two ways that violated both the Bankruptcy Code and the Master Agreement. Specifically, it appears WaMu may have: (1) improperly obtained quotations as of September 16 and 17, instead of September 15 as it was required to do under both the Bankruptcy Code and the Master Agreement; and (2) failed to request and obtain the proper number of quotations in order to determine its claim using the Market Quotation method.

25. WaMu designated September 15, 2008 as the Early Termination Date when it provided notice to LBSF that it was terminating the trades under the Master Agreement. Under section 562 of the Bankruptcy Code, WaMu was therefore required to measure its damages as of that date unless there were "not any commercially reasonable determinants of value" available. 11 U.S.C. § 562. Similarly, the Master Agreement required WaMu to obtain quotations "on or as soon as reasonably practicable after" September 15, 2008. 1992 ISDA Master Agreement § 14.[3]

---

[3] There is no evidence that it was "commercially unreasonable" or not "reasonably practicable" for WaMu to obtain quotations as of September 15, 2008. On the contrary, the swap markets were open and trading at high volumes on that date, making commercially reasonable determinants of value widely available.

8

26. It appears, based on the information provided, that WaMu may have calculated the Market Quotation amounts in its claim using prices quoted as of September 16 and 17, 2008, instead of September 15, 2008. All of the quotations received by WaMu are listed in the Calculation Statement with a "Date" of "9/16/2008" or "9/17/2008." If the information in the "Date" column reflects the date as of which the quotations were made, then WaMu violated the Bankruptcy Code and the Master Agreement by not obtaining quotations made as of September 15, 2008.

27. In addition, it appears WaMu may have violated the Master Agreement by not obtaining the proper number of quotations. Although the Master Agreement dictates that quotations be sought from exactly "*four* leading dealers," WaMu solicited Market Quotation bids from at least *six* dealers: Goldman Sachs; Bank of America; Barclays Bank; Morgan Stanley; Credit Suisse; and JPMCB. The Calculation Statement shows that, in response to its solicitation of the six dealers on September 16 and 17, 2008, WaMu received quotes from three or four dealers for every position solicited. It appears according to the Calculation Statement, but cannot be ascertained with certainty without an examination the underlying documentation, that for every position on which a quote was solicited, two to three dealers declined to provide a price.

28. The Master Agreement's express terms require the solicitation of bids from four dealers to ensure the market is a reliable indicator of value. The Agreement further provides that the Market Quotation measure may be used only if the soliciting party receives three or four quotations from the four Reference Market-makers solicited. Anything less than three out of four is deemed by the Master Agreement to be insufficiently reliable to serve as the basis for a determination of the Settlement Amount. If WaMu did in fact seek Market Quotations on each position from more than the requisite four dealers, as it appears from the Calculation Statement,

9

then it received quotes from less than 75% of the dealers it solicited, and use of these quotes to formulate its claim violated the terms of the Master Agreement.

29. The WaMu Derivatives Claim is overstated by more than $16 million. It appears this may be the result of WaMu utilizing quotes made as of impermissible dates and/or quotes that were insufficiently reliable according to the Master Agreement. As a result, the WaMu Derivatives Claim should be reduced to $64,139,815.

## Conclusion

30. Accordingly, the Debtors respectfully request that the Court enter an order reducing the WaMu Derivatives Claim to $64,139,815.

## Notice

31. No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Objection on (i) the U.S. Trustee; (ii) the attorney for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) JPMorgan Chase Bank, N.A.; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the *Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* entered on June 17, 2010 [Docket No. 9635]. The Debtors submit that no other or further notice need be provided.

32. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

10

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order (a) granting the relief requested herein and (b) granting the Debtors such other relief as is just.

Dated: January 7, 2015
New York, New York

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ Andrew J. Rossman
Susheel Kirpalani
Andrew J. Rossman
Tyler G. Whitmer
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for Debtors Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*