Paul J. Lawrence
Kymberly K. Evanson
PACIFICA LAW GROUP
1191 2nd Avenue, Suite 2000
Seattle, Washington 98101-3404
Tel: (206) 245-1700
Fax: (206) 245-1750

Robert N. Michaelson
Eric T. Moser
RICH MICHAELSON MAGALIFF MOSER, LLP
340 Madison Avenue, 19th Floor
New York, New York 11073
Tel: (212) 220-9404
Fax: (212) 913-9642

*Attorneys for Washington State Tobacco Settlement Authority*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

## WASHINGTON STATE TOBACCO SETTLEMENT AUTHORITY'S POST-TRIAL BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION AND BACKGROUND ....................................................................... 1

II.   SUMMARY OF KEY FACTS ....................................................................................... 3

III.  VALUATION THEORIES PRESENTED AT TRIAL ..................................................... 7

    A.    Hypothetical Replacement. ................................................................................... 8

        1.    A Hypothetical Replacement RFA Should Reflect Delivery of
             Commercial Paper. .................................................................................. 9

        2.    A Credit Charge of 3.00% Would Reasonably Reflect Market
             Conditions in 2009. ............................................................................... 11

    B.    TSA's Loss of Bargain Can Also Be Calculated With A Projected Return
       Methodology. ..................................................................................................... 15

    C.    Lehman's Mid-Market Valuation Does Not Reflect TSA's Total
       Losses and Costs. .............................................................................................. 18

    D.    TSA's Section 7.7(b) Losses are $553,080. ....................................................... 21

IV.   LEGAL POINTS AND AUTHORITIES ....................................................................... 21

    A.    Standard of Review ........................................................................................... 22

    B.    TSA's Reasonable and Good Faith Determination of the Termination
       Amount is Binding. ............................................................................................ 23

    C.    TSA's Inability to Obtain Market Quotations Does Not Void Lehman's
       Obligation to Pay the Termination Amount ........................................................ 25

    D.    TSA Is Not Required to Calculate the Termination Amount "As If It Were
       Lehman". ........................................................................................................... 27

    E.    Given the Unique Market Conditions and the Inability of TSA to Enter
       Into Long Term Transactions, Looking at Market Data and TSA's
       Actual Losses After March 25, 2009 is Appropriate. .......................................... 29

    F.    TSA is Entitled to Its Attorneys' Fees and Costs as the Burdened Party. ............ 31

V.    CONCLUSION ........................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Atl. Term. Urban Renewal Area Coal. v. N.Y. City Dep't of Envtl. Prot.*,
740 F. Supp. 989 (S.D.N.Y. 1994) ........................................... 24

*Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
910 F. Supp. 2d 629 (S.D.N.Y. 2012) ................................. 23, 24

*Boyce v. Soundview Tech. Group, Inc.*,
464 F.3d 376 (2d Cir. 2006) ...................................................... 29

*Cary Oil Co., Inc. v. MG Ref. and Mktg., Inc.*,
90 F. Supp. 2d 401 (S.D.N.Y. 2000) .......................................... 26

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................ 23

*Green Harbour Homeowners' Assn., Inc. v. G.H. Dev. & Constr., Inc.*,
14 A.D.3d 963, 789 N.Y.S.2d 319 (N.Y. App. Div. 2005) .................... 28

*Harris v. Provident Life and Acc. Ins. Co.*,
310 F.3d 73 (2d Cir. 2002) ........................................................ 24

*In re Am. Home Mortg. Holdings, Inc.*,
637 F.3d 246 (3d Cir. 2011) ...................................................... 29

*In re Arcapita Bank B.S.C.(c)*,
508 B.R. 814 (S.D.N.Y. 2014) ................................................... 22

*In re Bradlees Stores, Inc.*,
313 B.R. 565 (S.D.N.Y. 2004) ................................................... 23

*In re Loews Cineplex Ent'm't Corp.*,
No. 04 Civ. 612(HB), 2004 WL 875819 (S.D.N.Y. Apr. 23, 2004) ............ 29

*Jordan v. Can You Imagine, Inc.*,
485 F. Supp. 2d 493 (S.D.N.Y. 2007) ........................................ 27

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
442 F.3d 101 (2d Cir. 2006) ...................................................... 27

*People ex rel. Four Park Ave. Corp. v. Lilly*,
37 N.Y.S.2d 733 (N.Y. App. Div. 1942) ...................................... 29

*Rattigan v. Commodore Int'l Ltd.*,
739 F. Supp. 167 (S.D.N.Y. 1990) ............................................. 23

*Richland v. Crandall*,
262 F. Supp. 538 (S.D.N.Y. 1967) ............................................. 29

*Sharma v. Skaarup Ship Mgmt. Corp.*,
916 F.2d 820 (2d Cir. 1990) ...................................................... 30

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
   289 U.S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933) ................................................................ 30

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
   487 F.3d 89 (2d Cir. 2007) .............................................................................................. 22, 23

*Travelers Cas. and Sur. Co. of Am. v. Pac. Gas and Elec. Co.*,
   549 U.S. 443, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007) ........................................................ 22

## Statutes and Regulations

11 U.S.C. § 502 ............................................................................................................................ 22

11 U.S.C. § 562 ............................................................................................................................ 29

Fed. R. Bankr. Pro. 3001 .............................................................................................................. 22

Wash. Rev. Code § 43.340.005 ...................................................................................................... 3

Wash. Rev. Code § 43.340.080 ...................................................................................................... 3

Wash. Rev. Code § 43.340.110 ...................................................................................................... 4

## Other Authorities

23 Williston on Contracts § 63:3 (4th ed. 2006) ......................................................................... 27

BLACK'S LAW DICTIONARY (9th ed. 2009) .......................................................................... 24

10000 00001 ea14fv175v

## I.    INTRODUCTION AND BACKGROUND

The Washington State Tobacco Settlement Authority ("TSA"), a public instrumentality of the State of Washington, entered into a Reserve Fund Agreement ("RFA") with Lehman in 2002.  The purpose of that agreement was to provide TSA with a guaranteed rate of return of 4.484% on its $45.53 million Reserve Fund, which TSA was required by its Bond Indenture to maintain, until the earlier of 2032 or when TSA's Bonds were completely paid off.   The benefits of this bargain for TSA were threefold.  First, TSA received a significant fixed rate of interest reflecting October 2002 market data on long-term rates for its repeated short-term investment of the Reserve Fund with Lehman through 2032.  TSA took no risk that rates would fall compared to market expectations in 2002; Lehman took that risk and entered into long-term hedges to protect itself.  Second, TSA was guaranteed access to the Reserve Fund without penalty in the event that the funds were needed either to cover a shortfall in tobacco settlement payments, or to retire the Bonds early.  Such access would not have been available if TSA made long-term investments to capture higher long-term rates without the RFA.  Third, in the event of a Lehman default, TSA had contracted for payment of a Termination Amount to reflect either (a) the cost of a replacement RFA or (b) its gains or losses.  Further, TSA had contracted for the ability to determine the Termination Amount which would be subject to a deferential standard of review.

Each of these benefits was heightened by the overall security of contracting with a highly rated counterparty and investing in only the highest rated Eligible Securities.  In exchange for its $45.53 million, TSA's bargain with Lehman gave TSA access to a market offering long-term rates it could not otherwise enter, protected TSA and the public funds it invested from the uncertainties of interest rate fluctuations, and generated income to support public health programs in Washington.

POST TRIAL BRIEF - 1

Lehman's 2008 default on the RFA, and the collapse of the financial markets that followed, have caused TSA substantial (and mounting) losses. Interest rates in 2009 were (and remain) substantially below the guaranteed 4.484% Lehman had agreed to pay. TSA cannot replace its bargain with Lehman in the market at any cost. A replacement RFA was not available. And there is no evidence that the TSA had the opportunity in March 2009 to invest its Reserve Fund consistently with the investment limitations in the RFA for anything near the guaranteed rate.

It is undisputed, moreover, that TSA is the Burdened Party under the RFA and is therefore owed a Termination Amount reflecting its losses. This Court is thus charged with the difficult task of attempting to quantify this irreplaceable bargain in a dysfunctional market in the absence of comparable values.

TSA has appropriately determined that its losses are the difference in value between what TSA would have earned under the RFA until its original final maturity date of 2032 and what TSA reasonably should be able to earn by investing the Reserve Fund amount in investments similar to those permitted under the RFA. TSA quantifies this loss using two alternative methods. First, TSA proposes using a hypothetical replacement RFA to compare the rates that should have been available if there were a functional market in March 2009 with the guaranteed rate. Lehman's expert agrees that the method proposed by the TSA is appropriate although there is disagreement on certain components. Second, TSA proposes comparing the projected returns to the TSA from its own investment of the Reserve Fund with the guaranteed rate. Both of these methods are reasonable attempts to estimate TSA's losses despite the dysfunctionality of the market in 2009 and the inherent difficulty of predicting future rates of return.

Lehman, however, has responded with vitriolic *ad hominen* attacks and a lawyer-directed mid-market method that even Lehman's own expert admits (a) is not contained in the RFA, (b)

POST-TRIAL BRIEF - 2

does not reflect TSA's losses and (c) results in a lower valuation than if the parties had been able

to use the preferred market quotation method. Lehman's arguments rest on the false premises

that TSA should be treated as a dealer and should be able to transact based on the forward curve

to lock in the market's March 25, 2009 expectations of rates out to 2032.

Finally, Lehman has offered nothing that undermines one of the foundational benefits

that TSA purchased in its contract with Lehman: namely, the right to determine its losses

reasonably and in good faith, and for this determination to be binding on the parties, absent

manifest error.

The Court should adhere to the language of the RFA and set a Termination Amount that

reflects TSA's true loss of bargain. As fully set forth below, the evidence adduced at trial

supports valuing TSA's claim at $28,509,490 plus TSA's reasonable costs and attorneys' fees.

## II.    SUMMARY OF KEY FACTS[1]

TSA is an instrumentality of the State of Washington created by the state legislature in

2002 in order to monetize future annual payments from tobacco manufacturers to Washington

State as part of the national tobacco litigation settlement. *See* Wash. Rev. Code § 43.340.005.

Washington assigned 29.2% of its ongoing tobacco revenue stream to TSA, which in turn issued

bonds secured by that revenue stream. *See id.*; Docket No. 46543 ("Uncontested Facts") at ¶¶ 2-

4. TSA has been paying back bondholders since that time and will continue to receive 29.2% of

Washington's tobacco revenue stream so long as bonds remain outstanding. *See* Wash. Rev.

Code § 43.340.080(2). Once TSA's bonds are paid off, TSA's portion of the tobacco revenue

---

[1] Given that the Court is aware of the facts of this case and the complete relevant facts are set
forth in TSA's proposed Findings of Fact, only key facts are summarized here.

POST-TRIAL BRIEF - 3

stream will revert to the State of Washington for further use in promoting public purposes in

Washington.  *See* Wash. Rev. Code § 43.340.110; *see* Trans. 104:2-18; 108:3-109:6.

A provision of the Bond Indenture required TSA to maintain a $45.53 million Reserve

Fund to insure the semi-annual payment obligations under the Bonds.  *See* Joint Ex. 3, at 7, 20-

21.  To meet this requirement, TSA sought bids from dealers offering a fixed rate of return on

investment of the Reserve Fund.  *See* Joint Ex. 4.  Lehman was selected as the RFA provider

among six other dealers because it offered the highest guaranteed fixed rate on the Reserve Fund,

met TSA's high ratings requirements, and accepted the terms of TSA's request for bids without

conditions or changes.  Trans. 120:17-23; Joint Ex. 5.  Included in the request for bids was the

requirement that in the event of default, the Termination Amount would be determined by the

Burdened Party.  Joint Ex. 4 at 4.  During negotiations, Lehman expressly agreed to this term.

*See* TSA Exs. H at 2, I at 5-6.  TSA and Lehman entered into the RFA on November 5, 2002.

Uncontested Facts at ¶ 12.

Lehman determined the interest rate it would offer in response to the request for bids by

taking into account both a valuation of the delivery of eligible securities and charges including a

credit charge, profit and other costs of the transaction.  Specifically, Lehman calculated its return

from investing commercial paper, then imposed a charge of $4,522,000 "to mitigate the credit

risk involved in the Tobacco deals as well as the mandatory cleanup call", and took "$2,089,000"

in profit and to cover other costs of the transaction to determine its offer rate of 4.484% to TSA.

*See* TSA Ex. B and C.  When the bid was accepted, Lehman immediately entered into three long

term hedge transactions to mitigate its interest rate risk. TSA Ex. B and D.

Under the RFA, a trustee would deliver $45.53 million to Lehman every six months in

exchange for a qualified investment (short term high grade commercial paper, treasuries, or

government agencies).  *Id.* at ¶ 14-17.  Lehman would then deliver back the $45.53 million plus

POST-TRIAL BRIEF - 4

the guaranteed interest (4.484% on an annual basis) at the end of six months. *Id.* The RFA

lasted until 2032 absent an event of default or mandatory call on the bond reserve. *See* Joint Exs.

1, 2.

On December 1, 2008, Lehman failed to deliver any Eligible Securities under the RFA.

Uncontested Facts at ¶ 24. TSA sent a letter to Lehman on December 18, 2008 formally

notifying Lehman of its default. Joint Ex. 6. The Court authorized Lehman's rejection and

termination of the RFA on March 25, 2009 (the "Rejection Date"). Uncontested Facts at ¶ 28.

Lehman's failure to deliver and rejection of the RFA constitute a default and termination

entitling TSA as the Burdened Party to determine the Termination Amount that must be paid.

Joint Ex. 1 at 5.

TSA filed a claim for approximately $38 million[2] in Lehman's bankruptcy proceeding in

September of 2009. Claim No. 37355 and 37356. Lehman originally sought to have the TSA's

claim reduced to approximately $4 million. Dkt. 19888. Lehman now seeks to have the TSA's

claim disallowed in its entirety.

This Court held an evidentiary hearing on November 4-6, 2014. At the hearing, TSA and

Lehman presented expert testimony on the valuation of the RFA. The Court also heard

testimony from TSA and Lehman employees. In addition, the parties have submitted deposition

testimony for the Court's consideration, including Lehman's 30(b)(6) deponent, James Vergara

of Swap Financial and Christopher Harris of PFM.

The Termination Amount is defined in the RFA as "an amount, as determined *by the*

*Burdened Party* reasonably and in good faith on the basis of the arithmetic mean of quotations

---

[2] TSA's initial claim was for approximately $47 million because it was inadvertently calculated
based on a final bond maturity date of 2042 instead of 2032. TSA notified Lehman in May of
2012 when the error was discovered, and formally stipulated to the amended claim prior to the
evidentiary hearing on TSA's claim.

POST-TRIAL BRIEF - 5

from at least three Dealers of the amount . . . such Dealer would require . . . or would pay . . . [for] an agreement . . . preserving for the Burdened Party the economic equivalent of its rights under this Agreement . . . ." Joint Ex. 1 at 5 (emphasis added). The RFA further provides that "if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs . . . or gains . . . including any loss of bargain . . . ." *Id.*

Regardless of whether the "market quotations" method or the "total losses" method is used to determine the Termination Amount, the final calculation shall also include the Burdened Party's losses from nonperformance prior to termination ("Section 7.7(b) losses") and reasonable attorneys' fees and costs. *Id.* at 5-6.

As a result of Lehman's default, it is undisputed that TSA is the Burdened Party under the RFA. *See id.* at 1. As such, TSA is entitled to determine the Termination Amount. TSA presented evidence at trial that it was unable to obtain the requisite market quotations. Trans. 587:6-589:17. Though Lehman disputes this evidence, Lehman was likewise unable to obtain three market quotations[3], and all experts agree that at the time the RFA was terminated, there was no active market for replacement RFAs. As such, the Termination Amount should be TSA's "total losses and costs", including its loss of bargain, plus Section 7.7(b) losses and fees.

TSA presented evidence of its actual losses to date at trial. TSA's Senior Finance Director Bob Cook testified at trial that as of September 30, 2013, TSA had lost approximately $9.4 million in interest payments alone. Trans. 229:14-231:15. As of 12/31/2014, that number has grown to approximately $12.1 million. This figure does not include the financial impact of delaying the ultimate retirement of the bonds. *See id.* Under the RFA, TSA was able to apply

---

[3] The RFA requires quotations from "at least three dealers". Joint Ex. 1 at 5. Without three market quotes, then the loss method applies.

POST-TRIAL BRIEF - 6

approximately $2 million in interest income to the outstanding bonds every year. *Id.* But without

that income stream, TSA also incurs "the lost opportunity cost of paying high-rate bonds off that

were yielding between 6 and 7 percent." *Id.* at 231:13-15.

## III.    VALUATION THEORIES PRESENTED AT TRIAL

TSA's true loss of bargain is best reflected by the difference between what TSA was

entitled to receive under the RFA with Lehman and what TSA reasonably could be expected to

receive from hypothetical investment of the Reserve Fund as of March 25, 2009.  That is a

difficult determination because it involves predicting returns from 2009 to 2032 in a very

turbulent and uncertain market offering historically low rates of return.  Valuation is difficult

also because market expectations of returns in March 2009, as reflected in then long-term rates,

were not predictive and indeed have greatly exceeded actual short-term returns from March 2009

to date.  Because TSA is limited to short-term investment[4] of the Reserve Fund, it could not

purchase the long-term securities or place the hedge transactions necessary to capture March 25,

2009 market expectations.  Put differently, TSA was simply not able to take advantage of March

25, 2009 market expectations of interest rates to 2032 in the same way a dealer could.

At trial, TSA presented two different methodologies by which the Court can quantify

TSA's loss of bargain: "hypothetical replacement" and "projected return".  Both methods

accomplish the difficult task of measuring TSA's losses as of the Rejection Date in the absence

of a functioning market for Tobacco RFAs and in light of the limitations on TSA's ability to

invest.

---

[4] The Reserve Fund must be liquid and available every six months to pay bondholders in the
event there is a shortfall in tobacco settlement revenues.

POST-TRIAL BRIEF - 7

### A.    Hypothetical Replacement.

The first methodology is "hypothetical replacement" of the RFA.  Under this method, the RFA can be valued by calculating the fixed interest rate a hypothetical willing dealer would have offered TSA for an RFA on the same economic terms as TSA's original RFA with Lehman.  The replacement contract is hypothetical because, as noted, no dealer was willing to offer TSA a replacement contract.  *See* Trans. 995:9-18.  The RFA is one of the few types of contracts TSA could hypothetically enter into to obtain the benefit of higher long-term rates while limiting its investment to short-term high grade instruments and maintaining access to the Reserve Fund on a six-month basis.  TSA's loss is then determined by comparing the total return generated under the hypothetical new agreement with the total return generated by the original RFA with Lehman (i.e. the new rate v. 4.484%) discounted to present value.  This method tries to capture the hypothetical result of the preferred market quotation method.

There are two essential steps in pricing a hypothetical replacement RFA.  These steps are the same that Lehman took when it originally priced the RFA in 2002.  The first step involves selection of the deliverable security and calculation of the long-term rates of return a dealer would receive for delivery of the selected security under the RFA.  Trans. 592:4-583:23.  Next, adjustments must be made to account for relevant variables, and to reflect the special nature of an RFA transaction.  Trans. 596:4-22, 600:22-601:10.  These adjustments include principally a credit charge related to the risks associated with the RFA being a tobacco related risk and other unique aspects of the RFA; and the hypothetical dealer's profit and costs.  *Id.*  Lehman's expert, Samuel Gruer, agreed that any dealer actually pricing an RFA would include these charges.  Trans. 993:2-17.  Likewise, Chris Harris, from TSA's financial advisor, PFM, testified that if he

POST-TRIAL BRIEF - 8

had been engaged formally to calculate a Termination Amount in this case, he would have also included charges for credit, profit and costs. Harris Dep. 68:15-69:8; 70:18-72:15.[5]

While TSA and Lehman agree in principal on the elements of the hypothetical replacement methodology, the parties dispute the appropriate deliverable security and the credit spread. Trans. 1015:13-1016:5. As set forth below, the deliverable security should be commercial paper, and the credit spread should conservatively be 3.00%.

### 1. A Hypothetical Replacement RFA Should Reflect Delivery of Commercial Paper.

TSA's experts testified that a hypothetical dealer would have used the market for commercial paper to price a replacement RFA, largely because, unlike U.S. Government Agency Securities ("agencies"), there was a market for related transactions that would have allowed the hypothetical dealer to hedge the risk of interest rate fluctuations over the term of the deal. Trans. 513:12-515:21, 611:16-613:25. This inability to hedge agencies is admitted by Lehman in an internal memorandum. *See* TSA Ex. P at 9. Other evidence also supports commercial paper as the appropriate deliverable. Lehman used commercial paper both to price the RFA initially and to evaluate the RFA as a position on its books on an ongoing basis. *See* Trans. 334:5-10; 335:3-14. Moreover, Lehman delivered only commercial paper throughout the history of performance of the RFA and never once delivered agencies. Uncontested Facts at ¶18. Based on market data

---

[5] A consistent theme of Lehman's at trial was that TSA had abandoned its "trusted financial advisor, PFM" in order to hire Swap Financial and inflate its claim. *See e.g.*, Trans. 59:2-7; 94:18-19. But there is nothing in the record to support this unfounded accusation. As Kim Herman testified, PFM remains TSA's financial advisor today. *Id.* at 117:21-118:2. And TSA sought help from Swap Financial both because of the complexity of the valuation and because they believed that PFM's involvement in the initial bidding and negotiation of the RFA could constitute a conflict of interest. *Id.* at 145:9-146:15. Finally, as noted above, TSA's advisor at PFM testified in support of the method employed by Swap.

POST-TRIAL BRIEF - 9

available on March 25, 2009, Mr. Shapiro calculated a commercial paper spread of LIBOR+ 66.6 basis points ("bps").[6]

In contrast, Mr. Gruer opined that the deliverable security should have been agencies rather than commercial paper. By using a forward curve for agencies, Mr. Gruer was able to opine that Lehman would have been "in the money" on the RFA by 2032. Mr. Gruer's agency-based forward curve, however, is problematic for multiple reasons. First, Lehman would not have priced an RFA based on delivery of agencies because they cannot be hedged in the same manner as commercial paper. Trans. 514:8-515:17. Second, Lehman never delivered agencies under the RFA; Lehman only delivered CP. Lehman had in fact contracted with SunAmerica to deliver Briarwood CP for the life of the contract. Uncontested Facts at ¶ 18; TSA Ex. N at 1. Finally, the agency forward curve constructed by Mr. Gruer is based upon long-term transactions for agency securities, while the RFA required delivery of short-term securities every six months. Trans. 1000:5-22, 1009:16-1010:8, 1010:23-1013:9. As Mr. Gruer admitted at trial, actual interest rates on agency securities are always at or below LIBOR, rather than in excess of LIBOR as depicted in his forward curve supporting his loss valuation. *See id.* Mr. Gruer also conceded that since the Rejection Date, actual agency interest rates have never come close to the levels identified in his forward curve calculations. Trans. 1012:4-1013:9; 1004:25-1006:19.

In sum, a replacement RFA would be priced using commercial paper, just as Lehman did when originally pricing the RFA with TSA. Commercial paper is the appropriate deliverable security here.

Perhaps recognizing that an agency-based forward curve is unsupportable, Mr. Gruer also conducted a second valuation using commercial paper as the deliverable security. Trans. 1016:9-

---

[6] Mr. Shapiro also opined that this spread was likely generous to Lehman and that a more accurate spread would be LIBOR+ 3.1 bps. Trans. 607:6-609:13.

POST-TRIAL BRIEF - 10

12.  For purposes of this calculation, Mr. Gruer accepted Mr. Shapiro's rate of LIBOR+ 66.6 bps and profit charge of 25 bps.  Trans. 1016:13-24.  As discussed more fully below, Mr. Gruer then employed an artificially low credit charge to substantially reduce the Termination Amount owed to TSA.

## 2.    A Credit Charge of 3.00% Would Reasonably Reflect Market Conditions in 2009.

The biggest item of contention between the parties is the appropriate credit charge. While Lehman may continue to press for a mid-market valuation with no credit charge at all, Lehman's expert and corporate representative have both tacitly conceded that some sort of credit charge is appropriate.  Trans. 993:2-994:22, 1015:13-20, 1026:19-1028:24.  The question is one of magnitude.[7]

Mr. Shapiro opined that a credit spread of 429 bps would appropriately reflect the risk of tobacco credit as well as the poor condition of the credit markets as of the Rejection Date.  Trans. 599:11-600:21.  This number was selected because on March 25, 2009, TSA's bonds were trading at 10.000%, a spread of 4.29% over the Bloomberg 30-year General Purpose Revenue Bond Index (A-rated).  *Id.*  Lehman does not dispute the calculation of that spread.  That 4.29% difference represented the heightened risk as perceived by the market of the risk of default of the TSA's bonds.  *See, e.g.*, Trans. 596:6-599:22.

Mr. Shapiro testified to numerous factors that supported a significant credit charge.  First, the appropriate credit charge must begin with the credit charge assessed by Lehman in 2002 when entering into the RFA with TSA, which would have reflected Lehman's assessment of

---

[7] As previously noted, Chris Harris of PFM testified that if PFM had been asked to conduct a loss valuation, it too would have included a credit charge and not relied solely on a mid-market method.  Harris Dep. 68:15-69:8; 70:18-72:25. Mr. Harris testified to the factors that inform the "art" versus "science" of assigning a credit charge, including looking at where the issuer's bonds are trading, just as Mr. Shapiro did.  *Id.*

POST-TRIAL BRIEF - 11

general tobacco risk and the RFA's unique features. *See* Trans. 615:7- 616:12.[8] Second,

assessing the credit market conditions in March of 2009 is equally important, as all credit spreads

had widened dramatically since 2002 as a result of the financial crisis. *See* Trans. 596:6-597:21;

616:13-619:21. The changing conditions would have impacted greatly any hypothetical dealer's

willingness to offer a replacement RFA, even absent the special considerations with respect to

tobacco credit.[9] *Id.* Third, any charge must reflect the unique risks of tobacco credit for a dealer,

namely that a Reserve Fund provider is deeply subordinated to the credit position of the

bondholder. Trans. 517:13-520:6, 1022:22-1023:15; TSA Ex. Y, ¶ 20. In the event of a credit

problem, the Reserve Fund is tapped first, such that the dealer may experience a total loss where

a bondholder experiences none. *Id.*; Trans. 1020:21-1021:17. Moreover, the RFA's

replenishment provision heightens the credit risk to a dealer and must be considered in pricing.

Specifically, if TSA had needed to draw on the Reserve Fund for any reason, it retained the

option to replenish the Reserve Fund for a full year, at which time the dealer would have been

required to reinstate the agreement at the guaranteed rate, after presumably having unwound its

---

[8] As the Lehman trader explained at the time of booking, the $4.5 million credit mitigation option was meant "[t]o mitigate the credit risk involved in the [tobacco] deals as well as the mandatory cleanup [call]" provision in the RFA. TSA Ex. B; Trans. 322:17-24. Lehman's 30(b)(6) representative testified that such a credit charge is a pricing component that would fall within the discretion and experience of each trader. Konheim Dep. at 37:3-10.

[9] By way of example, from the Nov. 5, 2002 inception date of the RFA to the Mar. 25, 2009 Rejection Date, the credit default swap on the nation's largest bank, J.P. Morgan Chase, increased from 74.5 bps to 174.4 bps, an increase of 134%. Likewise, the credit default swap on Procter & Gamble increased from 31.0 bps to 118.3 bps, an increase of 282%. Harvard University, which is AAA-rated with "stellar" credit, issued 35-year debt in July 2002 at a spread of negative 16.9 bps under the 30-year US Treasury. In mid-December 2008, Harvard issued 28-year debt, also tax-exempt, at a spread of 271.4 over the 30-year Treasury, a net increase in credit spread of 288.3 bps. *See* Trans. 617:10-619:21. Meanwhile, while tobacco credit was generally considered risky to begin with, after Lehman's default "tobacco credit spreads blew out to levels which were unheard of." Trans. 598:20-21; *see also id.* at 597:15-599:4; 586:8-587:5.

POST-TRIAL BRIEF - 12

hedges and potentially facing very unfavorable interest rate conditions. Trans. 213:17-214:4.

Given the deterioration in the perception of tobacco risk as a result of the financial crisis, these

risks would have increased substantially from 2002 to 2009. TSA Ex. Y at 6.

Mr. Gruer, by contrast, argued for a 16 bps credit charge. The evidence does not support

that credit charge. First, 16 bps is significantly less than the actual credit charge imposed by

Lehman at the time of pricing the RFA in 2002, which took place in a healthy functioning

market. Trans. 615:5-24. The credit charge originally imposed by Lehman was 67 bps (or $4.5

million), four times larger than that proposed by Gruer. Trans. 1018:7-1019:2. Mr. Gruer

admitted that credit was more stressed in 2009 than 2002 and that generally you would expect

credit charges in 2009 to be larger for similar situations than in 2002. Trans. 1018:23-1019:14.

Second, Mr. Gruer admitted he made no effort to determine at what levels Tobacco RFAs were

trading prior to March 2009. Trans. 1019:20-25. Third, Mr. Gruer relied on a Bloomberg

program that (1) did not take into account any Tobacco specific risk, (2) understated the credit

risk by assuming a 40% recovery in case of default instead of a 0% recovery which would have

been appropriate, and (3) did not take into account the mandatory clean-up call provision of the

RFA. Trans. 1020:2-1022:21. Finally, Mr Gruer did not take into account that bondholders

would have priority over the RFA dealer in case of default, which would be a credit issue to a

dealer. Trans. 1022:22-1023:15.

Lehman has criticized the extent of Mr. Shapiro's credit charge arguing that it was

inflated for strategic purposes. The evidence as a whole does not support that charge.

Regardless, there is evidence in the record of another view of an appropriate credit charge. In an

early draft of the Loss Calculation Memorandum prepared by Swap Financial, Mr. Shapiro's

colleague, James Vergara, proposed a 300 bps credit charge. Trans. 798:25-799:6; *see also*

Trans. 674:12-675:11; 676:18-677:13; 680:15-23. He reached this number by using the same

POST-TRIAL BRIEF - 13

spread between TSA's bonds and the municipal index that Mr. Shapiro had used, but he applied a 3% ceiling to the charge to be conservative.  *Id.*  Though Mr. Shapiro later questioned whether this charge sufficiently accounted for tobacco risk, TSA maintains that 300 bps is an appropriate conservative figure and a reasonable representation of market conditions as of March 25, 2009. Using a 300 bps credit charge, Mr. Vergara determined TSA's loss to be $34,418, 045 assuming an erroneous 2042 termination date.  As Mr. Shapiro testified at trial, that figure can be recalculated to a 2032 termination date evidencing a loss of $27,956,410.  *See* Trans. 681:15-682:15. TSA's Exhibit BB is the actual Principia spreadsheet that shows total returns and confirms that figure.[10]

In sum, a hypothetical replacement methodology is an appropriate way to value the RFA. The parties agree on the elements considered in pricing a replacement RFA.  Breaking the RFA into its components of deliverable security, profit charge, and credit spread mirrors the process that Lehman undertook at pricing, and enables the parties to assign a value to an otherwise illiquid instrument.  This approach also most closely mirrors the "market quotations" methodology under the RFA, as Mr. Gruer testified that any dealer providing quotations would include these components.  Trans. 1028:3-18.  Using commercial paper is consistent with industry practice in general and Lehman's actual practice in pricing and valuing the RFA. Assigning a reasonable credit charge reflective of both the charge Lehman originally took in a normal market in 2002 and the significant disruptions in the credit market in March 2009 is

---

[10] Lehman contorts Mr. Shapiro's replacement methodology to argue it results in negative interest rates at various six-month periods.  But as Lehman is well aware, the purpose of pricing a replacement hypothetical RFA is not to calculate or predict six month cash flows, but rather to capture the totality of the value of the deal.   Pricing the RFA looks at the life of the agreement so that the dealer can determine what fixed rate it can offer.  *See* Konheim 30(b)(6) Dep. 24:9-25:7 (describing Lehman's pricing model that generated the bid rate).

POST-TRIAL BRIEF - 14

likewise consistent with industry methods and Lehman's actual approach to mitigating tobacco risk.

**B.    TSA's Loss of Bargain Can Also Be Calculated With A Projected Return Methodology.**

At trial, TSA presented a second method of quantifying its total losses and costs, including its loss of bargain, caused by Lehman's default.  Under this method, TSA's experts Messrs. Curry and Hasterok compared TSA's projected future earnings on the Reserve Fund with the guaranteed rate of 4.484% promised by Lehman under the RFA.  This approach reflects the real options available to TSA in 2009 for making short term investments of the Reserve Fund until 2032, since options such as an RFA were not available in the market.  To calculate the projected returns on the Reserve Fund, Curry and Hasterok analyzed market data for investment options from the date of default through the Rejection Date (December 1, 2008 through March 25, 2009).  Notwithstanding the difficulty of predicting TSA's likely return on future investments, Curry and Hasterok testified that TSA's losses should not be determined from the perspective of a hypothetical dealer given that, in fact, there was no market for a replacement RFA and therefore inadequate reliable market information.  Trans. 378:24-380:13.

In order to project TSA's likely future returns on reinvestment of the Reserve Fund, Curry and Hasterok first acknowledged the legal and practical limits on TSA's ability to reinvest. TSA cannot make investments that are inconsistent with the Indenture, state law, or with TSA's own investment policies.  *See, e.g.*, Trans. 368:2-22.  For example, the Reserve Fund has to be liquid and accessible every six months.  *See* Joint Ex. 3 at 26-27.  Accordingly, TSA can make only short-term investments and is not able to take advantage of higher long-term investment returns.  Trans. 372:14-22.  Further, TSA can make only low-risk investments permitted under the Indenture and consistent with prudent practices for handling public money.  Trans. 368:2-22.

POST-TRIAL BRIEF - 15

For purposes of the loss calculation, TSA's investment options should conform to the risk profiles of the investments permitted under the RFA.

Curry and Hasterok evaluated the various types of potential investments that TSA could make on a semiannual basis into the future, including securities such as commercial paper and certificates of deposit. *See, e.g.*, Trans. 396:21-398:20. As Curry and Hasterok acknowledged, there are numerous limitations on each one. For one, available data on rates of return tend to group investments permitted under the Indenture with lower-rated or otherwise ineligible investments, with no way to isolate the permitted investments. Trans. 521:8-23. Further, data on average returns often reflect a wide range of circumstances with wide-ranging yields, further limiting the usefulness of such data. *See id.* Most importantly, TSA must consider various risks, such as counterparty risk and market risk, when deciding how to invest its Reserve Fund, in addition to the restrictions found in the Indenture, making it difficult to predict which investments will be acceptable to TSA on an ongoing basis. Finally, as Bob Cook testified, TSA does not have the administrative capabilities to continually monitor and change its investments. Trans. 225:21-226:18.

Curry and Hasterok then created a matrix showing available rates of return on the various investment options for the period of TSA's actual reinvestment leading up to the Rejection Date. TSA Ex. X at 19. The most difficult task is projecting rates of return into the future. Curry and Hasterok noted that for each investment the actual rate of return from the Rejection Date to the date of their report (March 25, 2009 to December 1, 2013) was substantially lower than the

POST-TRIAL BRIEF - 16

average rate of return from the date of default to the Rejection Date.[11]  In other words, rates continued to fall dramatically after the Rejection Date and remain today at historic lows. Because TSA's actual investment data was the least speculative data source available, Curry and Hasterok determined that assuming the higher average rate for the default to Rejection Date was appropriate.  They reasoned that because future rates of return are unknown, and any such rates could be greater or less than the status quo, and because TSA is unable to transact in long term investments such as swaps that are used as the basis of short term interest rate prediction models, a "no change" assumption from the Rejection Date, projecting the data from TSA's actual investment of the Reserve Fund into the future, was appropriate.  Trans. 393:17-396:6.  The matrix showed a range of loss from $30 million to $44.5 million. TSA Ex. X at 19.

Curry and Hasterok ultimately determined that TSA's actual reinvestment in permitted money market accounts provided the most useful and least speculative data on which to base its projected returns.  Trans. 393:17-394:24.  From the time of Lehman's default on December 1, 2008 to the date of rejection on March 25, 2009, TSA earned a .65% rate of return on its investment of the Reserve Fund.  Trans. 400:7-18.  Curry and Hasterok thus project a .65% average rate of return through 2032, indicating total losses of approximately $37.5 million plus TSA's Section 7.7(b) losses and fees.  Curry and Hasterok also provided a similar evaluation for the other investment options available to TSA for the period from the default to rejection.  The investment option with the highest rate of return for that period was certificates of deposit with a yield of 1.25%.  Assuming that TSA had reinvested with certificates of deposit, its total losses are approximately $30 million plus TSA's Section 7.7(b) losses and fees.

---

[11] For example, TSA averaged a .65% return on its money market investments from December 1, 2008 to March 25, 2009, but only a .18% return from March 26, 2009 to December 1, 2013. TSA Ex. X at 19.

POST-TRIAL BRIEF - 17

At trial, Lehman repeatedly mischaracterized Curry and Hasterok's methodology, claiming that their opinion predicted interest rates to remain flat at .65% until 2032. *See e.g.*, Trans. 84:13-19.  However, as Mr. Hasterok testified, their opinion is not that rates on money markets will remain flat, but rather that TSA is likely to average .65% on its money market investments between 2009 and 2032.  Trans. 400:24 - 402:11.  As such, Curry and Hasterok acknowledge that rates will certainly go up and down over time, but based on market data as of March 25, 2009, TSA's earnings would likely **average** .65%.  Given that interest rates on money markets have been well below .65% since the Rejection Date, rates would necessarily have to rise significantly in the future for Curry and Hasterok's predicted returns to materialize.  For certificates of deposit, similarly, although rates between 2009 and 2013 were substantially below the matrix yield of 1.25%, rates would have to average above the yield rate going forward to reach the matrix yield.

While the hypothetical replacement methodology assumes TSA can replace the RFA, but at a much lower fixed rate (or greater cost), the projected return methodology recognizes TSA's reality in the market place, namely, that TSA could not replace the RFA at any cost.  This method likewise recognizes that TSA is not a dealer, cannot enter into long-term hedges or swap transactions or even the purchase of long-term instruments such as agencies that would capture the rates in the forward curve on March 25, 2009.  As such, comparing TSA's actual reinvestment options and returns with what Lehman had guaranteed is an equally appropriate way of quantifying TSA's total losses and costs.

## C.    Lehman's Mid-Market Valuation Does Not Reflect TSA's Total Losses and Costs.

Lehman's expert, Mr. Gruer testified as to the value of the RFA based on a mid-market valuation that consists only of calculating the cash flows from the deliverable security, based on

10000 00001 ea14fv175v

the forward curve for that security on a given day. Trans. 910:12-25. Using the forward curve for agencies, and totaling up those cash flows and comparing them to the guaranteed rate, Lehman determined that TSA would owe Lehman $1.3 million in 2032.

Mr. Gruer's use of a mid-market valuation is not appropriate. First, the valuation approach was one suggested by the Jones Day legal team, not an independent approach developed by Lehman's expert as the best means to measure TSA's losses or gains. Mr. Gruer admitted at trial that he conducted the analysis "Jones Day told [him] to do." Trans. 990:7-18. Second, the mid-market analysis was not an effort to determine TSA's losses or gains as required by the RFA. Mr. Gruer specifically admitted that he did not seek to determine TSA's losses or gains under the RFA; he only performed the mid-market analysis "as asked by Jones Day". Trans 994:2 – 22. Third, a mid-market analysis does not take into account the charges a dealer typically would take into account in pricing a replacement RFA. Trans 993:2 – 17. Fourth, Mr. Gruer did not take into account how Lehman actually priced the TSA RFA, or performed under the TSA RFA. Trans 1001:9 – 1002:2. Finally, as described below, use of a mid-market valuation is not appropriate because it incorrectly presumes that the TSA can transact based on the forward curve.

The forward curve is a one-day snapshot of what the market expects rates will be for a given security on a given day in the future. Trans. 910:12-25. Both Gruer and Lehman's other expert, David Babbel, acknowledged that forward curves are *not* predictive tools and are not used by dealers or other market participants for to predict future rates. Trans. 909:15-910:11; 1005:11-24. Indeed, empirical research has shown that forward curves do not provide accurate indications of actual future rates of return, and Mr. Gruer concedes that the rates shown in his forward curve do not come close to reality. TSA Ex. X at 14-15; Ex. Z at 15-17; Trans. 1004:25-1007:19. By way of example, Gruer's March 25, 2009 forward curve shows that rates on six-

POST-TRIAL BRIEF - 19

month agencies would have been 3.194% on 12/1/2011. Debtors. Ex. 139, Appendix 3.   But

TSA introduced unrebutted evidence that actual rates on agencies maturing on 12/1/2011 were

.08 %.  *See* Debtors Ex. 108 at 2.

The rates represented in Gruer's forward curve are only "real" if one could actually

transact on March 25, 2009 to lock in those rates.  As such, a dealer transacting on March 25,

2009 could have locked in that future expected 3.194% rate predicted for 12/1/2011 via a swap

or hedge transaction or actual purchase of an agency maturing on that date.  TSA, by contrast,

must invest in short-term instruments only, and thus could not engage in a hedge swap or buy an

agency maturing on 12/1/2011 until June of 2011.  TSA, thus, could only achieve the "real" rate

of .08%.

Mr. Babbel agreed that without executing swaps and hedges (which are unavailable to

TSA), to capture the forward rates, TSA would have had to buy agencies on the Rejection Date

that come due each of the six months between March 25, 2009 all the way out to 2032.  Trans.

911:11-912:14.  TSA's experts testified that actually purchasing $45 million worth of agencies

maturing at every bond payment date between 2009 and 2032 would cost TSA approximately $2

billion.  Trans. 514:14-515:21.  As Mr. Tambe was fond of saying at trial, "that is just the math."

Here, "the math" shows that using the forward curve to value TSA's lost bargain when TSA

cannot access the rates contained in the forward curve is not a reasonable method of measuring

TSA's "total losses and costs."

Finally, use of the forward curve where TSA cannot transact based on the forward curve

completely shifts the risk of inherent error in the forward curve from Lehman (which bore that

risk in the RFA) to TSA.  Indeed, the whole point of the RFA is for an entity like TSA to obtain

a fixed predictable rate of return rather than being subject to the six-month vicissitudes of the

market.  That shift is contrary to the benefit of the bargain that must be reflected in the

POST-TRIAL BRIEF - 20

Termination Amount. Lehman's insistence on a mid-market valuation is thus both disingenuous and impractical.

### D.    TSA's Section 7.7(b) Losses are $553,080.

Under the RFA, the Termination Amount payable to TSA includes any losses resulting from Lehman's failure to deliver Eligible Securities from December 1, 2008 until March 25, 2009. *See* Joint Ex. 1 at 5. At Lehman's guaranteed rate, TSA's Reserve Fund should have earned $646,553.95 during this time period. However, after Lehman failed to deliver, the Reserve Fund was invested in short-term Eligible Securities and earned only $93,473.93. As such, TSA is entitled to $553,080 under Section 7.7(b).

Mr. Gruer departs from the plain language of the RFA and calculates the Section 7.7(b) losses by comparing the RFA's guaranteed rate with what he projects TSA could have earned by investing in asset-backed commercial paper, which he states was the "highest yielding" of Eligible Securities. Trans. 1029:7-18. But nothing in the RFA required TSA to purchase the "highest yielding" Eligible Security. Rather, the RFA provides that upon Lehman's failure to deliver, the Reserve Fund should be invested "to the extent directed by [TSA] pursuant to the Indenture," and that TSA's losses are the difference between the guaranteed rate of 4.484% and the rate "*actually* earned" on the substitute investments. Joint Ex. 1 at 7, 20-21 (emphasis added). Accordingly, incorporating TSA's actual losses of $553,080 as part of the Termination Amount is both reasonable and required under the RFA.

## IV.    LEGAL POINTS AND AUTHORITIES

While the disputes between the parties are largely factual, Lehman has consistently sought to downplay the legal framework in which this case arises. Specifically, the plain language of the RFA empowers TSA, as the Burdened Party, to determine the Termination Amount and then applies a deferential standard of review to that determination. TSA

POST-TRIAL BRIEF - 21

specifically negotiated, and paid for, this standard of review and Court must employ it. Moreover, the Bankruptcy Code and New York law puts the burden of any uncertainty in determining damages squarely on Lehman, the defaulting party.  This is likewise consistent with the bargain TSA struck.

Despite Lehman's rhetorical attacks, TSA acted reasonably in exercising its rights under the RFA, establishing a Rejection Date (to which Lehman agreed) and attempting to fairly calculate its substantial (and mounting) losses in a dysfunctional market.  Likewise, TSA reasonably relied on assurances from its expert, Peter Shapiro, that he had appropriately sought market quotations for the RFA and none were available.  Lehman's expert likewise agreed that the market for RFAs was inactive on the Rejection Date.  Finally, TSA introduced evidence supporting the plain reading of the RFA, demonstrating that the Burdened Party is to determine the Termination Amount.  As Lehman's own witnesses testified, they did not consider the "as if it were Lehman" phrase in conducting their valuations.  Nor should this Court.

In sum, TSA has reasonably determined its total losses and costs and its claim should be allowed.

### A.  Standard of Review

A properly filed proof of claim is "prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. Pro. 3001(f).  An objecting party "bears the initial burden of production and must provide evidence showing the claim is legally insufficient." *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014).  If the objecting party meets this initial burden, the claimant then "must prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.* (internal quotations omitted). The "basic federal rule in bankruptcy is that state law governs the substance of claims" and will determine whether a claim should be allowed. *Travelers Cas. and Sur. Co. of Am. v. Pac. Gas and Elec. Co.*, 549 U.S. 443, 450, 127

POST-TRIAL BRIEF - 22

S. Ct. 1199, 167 L. Ed. 2d 178 (2007).  And a claim should be allowed "in such amount" as is

warranted under applicable law. 11 U.S.C. § 502(b).

Under New York law, "when it is certain that damages have been caused by a breach of

contract," but there is "uncertainty [] as to their amount," the "burden of uncertainty as to the

amount of damage" falls on the breaching party.  *Tractebel Energy Marketing, Inc. v. AEP*

*Power Marketing, Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotations omitted) (citing

cases). Thus, the non-breaching party "need only show a stable foundation for a reasonable

estimate", which "necessarily requires some improvisation, and the party who has caused the

loss may not insist on theoretical perfection." *Id.* at 110-11 (internal quotations omitted); *see also*

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361-62 (S.D.N.Y.

2007) (noting that even as to investments "traded between investors and dealers rather than on

exchanges," valuation "is not a precise science" and "may be considerably more a statement of

opinion than a report of an objectively determinable fact"); *See, e.g.*, *Bank of N.Y. Mellon Trust*

*Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 645 (S.D.N.Y. 2012) (noting

"the dearth of legal authority regarding the calculation of termination payments"). This case law

is particularly applicable here where the court is tasked with the difficult task of determining the

reasonableness of expert opinion on future interest rates over a 23 year period in the midst of a

dysfunctional market.

> **B.      TSA's Reasonable and Good Faith Determination of the Termination Amount is Binding.**

State contract law "governs the nature and amount" of TSA's claim.  *In re Bradlees Stores, Inc.*,

313 B.R. 565, 570 (S.D.N.Y. 2004).  Specifically, New York law governs. Joint Ex. 1 at 25.

Under New York law, the parties to a contract may agree on a method of calculating uncertain

damages so long as public policy is not violated and the method chosen provides a reasonable

POST-TRIAL BRIEF - 23

estimation of actual damages.  *See, e.g.*, *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169

(S.D.N.Y. 1990) (citing cases).  In particular, the parties to a complex financial instrument can

decide that in case of breach, the non-defaulting party may determine its own damages

reasonably and in good faith.  *Bank of N.Y. Mellon*, 910 F. Supp. 2d at 635, 653, 655 (enforcing,

under New York law, provision of financial contract authorizing non-defaulting party to

determine damages reasonably and in good faith).

Here, the parties negotiated that in the case of a default, the Termination Amount is "as

reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total

losses and costs . . . or gains . . . including any loss of bargain . . . ." *Id.*  The parties further

agreed that such determination "shall be conclusive and binding on the parties [] absent manifest

error." Joint Ex. 1 at 6.

A "manifest error" is one that is "plain and indisputable, and that amounts to a complete

disregard of the controlling law or [available] evidence . . . ." BLACK'S LAW DICTIONARY

(9th ed. 2009).  Under the RFA's deferential standard, the burden falls on Lehman to

demonstrate that TSA has calculated its losses with indisputable dishonesty (so as to be

manifestly in bad faith), or in complete disregard of the law or facts (so as to be manifestly

unreasonable).

Lehman cannot show that TSA's methods of calculating the Termination Amount

constitute manifest error.  Rather, TSA offered two methodologies by which the Court could

evaluate TSA's total losses and costs, and its expert opinions reflect the "careful efforts of skilled

professionals to grapple with complex technical issues." *Atl. Term. Urban Renewal Area Coal. v.

N.Y. City Dep't of Envtl. Prot.*, 740 F. Supp. 989, 995 (S.D.N.Y. 1994).  Lehman's experts may

criticize TSA's experts, but mere disagreement among experts does not demonstrate

unreasonableness, let alone manifest error, and is to be expected in the context of a difficult and

POST-TRIAL BRIEF - 24

complicated damages valuation. *See, e.g., Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 83 (2d Cir. 2002) ("[T]he existence of a significant disagreement between [experts] does not render . . . [an] expert's opinion unreasonable."); *Atl. Term.*, 740 F. Supp. at 994 (noting that when reviewing for reasonableness, expert disagreements "demonstrate the existence of a [] dispute" but the court's role is not "to resolve that dispute").  This is especially true with respect to the hypothetical replacement RFA methodology, where Lehman's expert disputes two components of the method, but otherwise concedes that the method itself is reasonable.

By contrast, Lehman's mid-market valuation is not reasonable.  As described above, a mid-market valuation methodology is not adopted in the RFA.  Although Lehman persists in repeating that "everyone uses the forward curve", a valuation method based on the forward curve was not adopted by the parties.   Though Lehman repeatedly argued at trial that a mid-market methodology is the "industry standard", Mr. Gruer conceded that if TSA had been able to obtain market quotations, they would not have been at mid-market.  Trans. 1028:3-18. Rather, those quotations would have contained charges for credit, profit and dealer costs, as in Mr. Shapiro's hypothetical replacement model.  *Id.*  The definition of Termination Amount provides two methods for its calculation: market quotations and total losses.  Mr. Gruer concedes his methodology reflects neither.  Accordingly, a mid-market value is unsupported.  The Court should accept TSA's reasonable determination of its losses and costs as binding per the RFA.

C.     **TSA's Inability to Obtain Market Quotations Does Not Void Lehman's Obligation to Pay the Termination Amount.**

Lehman suggested at trial that TSA did not seek market quotations and therefore its claim should be disallowed altogether or at the very least, Lehman should determine the Termination Amount.  Trans. 819:18-820:2.  This argument fails.  First, the evidence at trial demonstrated that the market for reserve fund agreements had disappeared completely.  Mr. Shapiro testified

that he sought market quotations and was universally turned down. Trans. 587:6-589:17. Mr. Gruer agreed that the market for reserve fund agreements was "inactive" in March of 2009, and has been so ever since. Trans. 995:2-18. Moreover, Lehman was also unable to procure three market quotations, despite its efforts, and instead produced only a single, non-actionable "indicative value" that was "null and void" upon delivery.[12] *See* Debtors Ex. 44; *see also* TSA Ex. R (response from Deutsche Bank refusing to provide even an "indicative" quotation). If market quotations were so easily obtainable, surely Lehman could have procured the requisite three, or at least one actual actionable quote reflecting a real offer from a dealer to replicate the RFA.

Second, accepting Lehman's argument would require the Court to nullify all the remedial provisions of the RFA for the alleged breach of an immaterial provision. This is contrary to New York law. While the RFA denotes a preference for the market quotation process in calculating the Termination Amount, nothing in the RFA conditions receipt of a Termination Payment upon engaging in a quote process. To the contrary, the RFA recognizes that market quotations may not be readily available, and further acknowledges that market quotations will not even be useful unless there are three or more of them. Joint Ex. 1 at 5. In that event, the RFA rejects the use of quotations in favor of the Burdened Party's own calculation of its "total losses and costs." *Id.*

Accordingly, even if the Court were to discredit Mr. Shapiro's testimony with respect to the market quotation process, any alleged breach of TSA's obligations under the quote provision in the RFA would be immaterial and Lehman's obligations under the RFA would remain enforceable. Under New York law, an immaterial breach does not relieve the other party of its

---

[12] Lehman did not apparently use the Wachovia value in calculating its proposed Termination Amount. After TSA filed its claim, Lehman filed an objection seeking to value the claim at $4.3 million, not the $6.25 million indicated from Wachovia.

POST-TRIAL BRIEF - 26

obligations under a contract. *Cary Oil Co., Inc. v. MG Ref. and Mktg., Inc.*, 90 F. Supp. 2d 401, 409 (S.D.N.Y. 2000) (if breach is not material, contract remains in force). For a breach to be material, it must "'go to the root of the agreement between the parties.'" *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 498 (S.D.N.Y. 2007) (quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101 (2d Cir. 2006)). The RFA's preference for market quotations does not meet this standard, as the provision does not "touch upon the fundamental purpose of the contract" nor does TSA's inability to procure quotes "defeat the object of the parties in entering into the contract" in the first place. *Id.* (quoting 23 Williston on Contracts § 63:3 (4th ed. 2006)). To the contrary, the RFA explicitly envisions that a party may be unable to procure three market quotations and consequently provides an alternative loss calculation methodology. As such, TSA's failure to obtain market quotations does not relieve Lehman of its obligation under the RFA to pay the Termination Amount, nor does it alter the definition of the Termination Amount as the Burdened Party's determination of its total losses and costs.

### D. TSA Is Not Required to Calculate the Termination Amount "As If It Were Lehman".

TSA is likewise not required to calculate the Termination Amount from a dealer's perspective. At trial, Lehman argued that TSA is required to calculate the Termination Amount "as if it were Lehman", rather than as defined in the RFA.[13] *See e.g.*, Trans. 55:19-56:11. In support of this claim, Lehman cites to an RFA provision providing that in case of a Lehman

---

[13] As noted above, Lehman's expert conceded that a dealer pricing an RFA or offering a market quotation would not provide a "mid-market" valuation. Trans. 1028:3-18. Accordingly, even if the RFA were to be valued from Lehman's perspective as a dealer, a mid-market valuation is still inappropriate. Lehman's expert also conceded that a mid-market evaluation is not a measure of TSA's "losses or costs."

POST-TRIAL BRIEF - 27

default and resulting termination, "Lehman shall determine the Termination Amount" and "pay

such amount," and "if Lehman fails to determine the Termination Amount within three Business

Days . . . then [TSA] shall make such determination as if it were Lehman . . . ." Joint Ex. 1 at 19-

20.  This provision does not alter the definition of "Termination Amount" in the RFA.

Moreover, despite Lehman's arguments, Lehman's own experts and corporate representative

testified that they did not rely on this provision in calculating the Termination Amount.  Trans.

1025:24-1026:18; Melchior 30(b)(6) Dep. 48:14-49:2.

     Furthermore, as Kim Herman testified at trial, the drafting history of the RFA confirms

that both parties intended that the Burdened Party would determine the Termination Amount.

*See* Trans. 119:8-22; 129:2-15.  The "as if it were Lehman" provision was held over from

Lehman's preliminary draft only as an oversight.  Moreover, the parties specifically negotiated

the definition of the "Termination Amount," which empowers TSA, rather than Lehman, to

determine the Termination Amount.  *See* TSA Exs. F, G, H, I.  As such, because Lehman is not

authorized to make that determination in the first place, the "as if it were Lehman" provision—

which applies only "*if* Lehman fails to determine the Termination Amount within three Business

Days"—is moot.  Joint Ex. 1 at 20 (emphasis added).

     The RFA should be read so as to harmonize all its provisions.  *See Green Harbour*

*Homeowners' Assn., Inc. v. G.H. Dev. & Constr., Inc.*, 14 A.D.3d 963, 965, 789 N.Y.S.2d 319,

321 (N.Y. App. Div. 2005) ("A contract should be interpreted in a way which reconciles all its

provisions, if possible[.]").  When read in context, the "as if it were Lehman" clause simply

indicates that TSA will determine the Termination Amount instead of Lehman, if Lehman fails

to do so within three days of its default.  The clause does not purport to change the RFA's

definition of "Termination Amount"—which is the only operative language instructing the

parties how to make the calculation—nor does the clause require TSA to calculate its losses and

POST-TRIAL BRIEF - 28

costs in a particular way. This is the only reading that preserves the definition of Termination Amount and its included methods of calculation. Lehman cannot rely on the "as if it were Lehman" provision to select a Termination Amount in conflict with the remainder of the RFA.

> **E.    Given the Unique Market Conditions and the Inability of TSA to Enter Into Long Term Transactions, Looking at Market Data and TSA's Actual Losses After March 25, 2009 is Appropriate.**

While the Bankruptcy Code directs that TSA's claim is to be measured as of the Rejection Date, using "commercially reasonable determinants of value . . . ." 11 U.S.C. § 562(a), (b), a fixed date for valuation "does not bar proof of occurrences after the [valuation] date which may shed light upon the actual value as of the [valuation] date." *People ex rel. Four Park Ave. Corp. v. Lilly*, 37 N.Y.S.2d 733 (N.Y. App. Div. 1942); *see also Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 386 (2d Cir. 2006) (noting that general disfavor of valuation by hindsight is not a "bright line" or "mechanical" rule and depends upon circumstances, evidence at issue, and its intended purpose). A commercially reasonable determinant of value is "the market price . . . when the market is functioning properly," but must include "other determinants of value" when "the market is dysfunctional . . . ." *In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 257 (3d Cir. 2011). Here, the market in March 2009 was dysfunctional. *See e.g.*, Trans. 585:10-587:5; 791:25-792:16.

Post-breach market data for returns on short-term eligible investments and TSA's actual losses can properly inform the determination of the Termination Amount in two ways. First, post-breach market data and TSA's actual losses to date confirm the reasonableness of its experts' assumptions and valuations. TSA's rate of return in the five years since the Rejection Date has been lower than the average rates that Curry and Hasterok calculated for the pre-breach period used to develop their loss matrix. Actual subsequent events may be used to confirm the reasonableness of such projections. *See In re Loews Cineplex Ent'm't Corp.*, No. 04 Civ.

POST-TRIAL BRIEF - 29

612(HB), 2004 WL 875819, at *4 (S.D.N.Y. Apr. 23, 2004) (upholding bankruptcy claim

valuation that included use of "subsequent events" to "corroborate an independently formed

conclusion" as to value); *Richland v. Crandall*, 262 F. Supp. 538, 548 n.8 (S.D.N.Y. 1967)

("Evidence of events subsequent to the sale was [] admitted . . . as confirmation of judgments

made at the time of sale about anticipated losses . . . ."). And the post-breach market data shows

that the forward curve was completely and significantly off as a predictor of future short-term

rates. Using a forward curve based on long-term rates recalculated to predict short-term rates

significantly understates TSA's losses.

Second, TSA's actual losses to date also serve as direct evidence of the extent of TSA's

total losses as of the Rejection Date. In *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289

U.S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933), the United States Supreme Court explained why

subsequent actual losses may reveal and fix contractual damages that were uncertain on the date

on which a contract is to be valued:

> The law will make the best appraisal that it can, summoning to its service whatever aids it
> can command. At times the only evidence available may be that supplied by testimony of
> experts . . . . This will generally be the case if the trial follows quickly . . . . But a
> different situation is presented if years have gone by before the evidence is offered.
> Experience is then available to correct uncertain prophecy. Here is a book of wisdom
> that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and
> forbids us to look within.
>
> . . . To correct uncertain prophecies [when measuring the damages for a breach of
> contract or a tort] is not to charge the offender with elements of value nonexistent at the
> time of his offense. It is to bring out and expose of light the elements of value that were
> there from the beginning.

289 U.S. at 697-98 (citations omitted). In other words, TSA's actual losses up to the date of the

POST-TRIAL BRIEF - 30

hearing reflect a true portion of TSA's total losses as of the Rejection Date.[14]  That TSA's total

losses to date so greatly outstrip those predicted by Lehman's experts based on the forward curve

emphasizes the inappropriateness of applying the forward curve to an entity that cannot transact

based on the forward curve.  The Court can thus consider these losses as a "reality check" on the

reasonableness of TSA's methodology, as independent evidence of TSA's substantial losses

themselves, or evidence of the inappropriateness of relying on an always-inaccurate forward

curve.

**F.      TSA is Entitled to Its Attorneys' Fees and Costs as the Burdened Party.**

Under the RFA, the Burdened Party has an unqualified right to recover its reasonable

attorneys' fees and costs.  The parties do not dispute that TSA is the Burdened Party as a result

of Lehman's bankruptcy and default.  Pursuant to the RFA and regardless of the method of

calculation, the Termination Amount "shall also include . . . any incidental costs and expenses

incurred by the Burdened Party … including costs of collection and reasonable attorneys' fees."

TSA is continuing to incur attorneys' fees and other costs of collection.  TSA will submit

evidence of its fees and costs at the conclusion of this matter.

**V.      CONCLUSION**

Lehman's breach of the RFA has caused significant damage to TSA and the state of

Washington.  Though TSA recognizes that it will never recover the full extent of its losses, as the

---

[14] New York courts generally disfavor hindsight valuation in contract cases, but that is because a contracting party usually can hedge against the risk that a given asset will gain or lose value over time.  *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990) ("[U]ncertainties . . . may cause an asset to be under- or over-valued at any particular time.  At that time, however, either party has an opportunity to hedge according to his or her judgment about the future stream of income.").  As already been explained, there was no market for the RFA on the Rejection Date and TSA is not a dealer with the ability to hedge risk associated with the ongoing investment of its Reserve Fund.  Thus, considering TSA's actual losses as direct evidence of damages remains reasonable and appropriate here.

Burdened Party, the Court should credit TSA's reasonable and good faith determination of the Termination Amount.  Whether under the hypothetical replacement method or the projected returns analysis, TSA has presented more than sufficient evidence of its total losses and costs to meet its burden.  The Court should allow TSA's claim against Lehman in the amount of $28,509,490, plus its reasonable costs and attorneys' fees.

       DATED this 14th day of January, 2015.


PACIFICA LAW GROUP, LLP


By  /s/  *Paul J. Lawrence*
    Paul J. Lawrence, WSBA # 13557
Admitted Pro Hac Vice
    Kymberly K. Evanson, WSBA # 39973
Admitted Pro Hac Vice
Attorneys for Washington State Tobacco
Settlement Authority


POST-TRIAL BRIEF - 32

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2015, I caused the document to which

this Certificate is attached to be served upon the following:

| | |
|---|---|
| Jayant W. Tambe | ☐ via facsimile |
| Laura W. Sawyer | ☐ via overnight courier |
| Jennifer L. Del Medico | ☐ via first-class U.S. mail |
| Benjamin Rosenblum | ☒ via email |
| Jones Day | ☒ via electronic court filing |
| 222 East 41st Street | ☐ via hand delivery |
| New York, New York 10017 | |

Email:  jtambe@jonesday.com
Email:  lwsawyer@jonesday.com
Email:  jdelmedico@jonesday.com
Email:  brosenblum@jonesday.com
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for the Debtors and Debtors in
Possession

Signed at Seattle, Washington this 14th day of January, 2015.

/s/  Kymberly K. Evanson
Kymberly K. Evanson
Attorney for Washington State Tobacco
Settlement Authority

POST-TRIAL BRIEF - 33