JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Laura W. Sawyer

*Attorneys for Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

In re:                                                    :          Chapter 11

LEHMAN BROTHERS HOLDINGS INC., et al.    :          Case No. 08-13555 (SCC)

Debtors.                          :          (Jointly Administered)

                                                              :

----------------------------------------------------------------- x

## DEBTORS' POST-TRIAL MEMORANDUM, PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CLAIMS NUMBER 37355 AND NUMBER 37356

# TABLE OF CONTENTS

**Page**

POST-TRIAL MEMORANDUM ................................................................. 1

I.    PRELIMINARY STATEMENT ........................................................ 1

II.   FACTUAL BACKGROUND ............................................................ 6

    A.    Washington TSA and the Bonds ................................................. 6

    B.    The Reserve Fund Agreement ................................................... 8

    C.    Washington TSA's Response to Lehman's Bankruptcy ........................ 12

        1.    Washington TSA's Wait-and-See Strategy ................................ 12

        2.    Washington TSA Hired Swap Financial to Maximize Its Claim ................................................................................ 15

        3.    Washington TSA Compels Lehman to Reject the RFA ............. 15

        4.    Washington TSA Chooses Not to Pursue Increased Returns on the Reserve Fund ............................................................ 16

    D.    Washington TSA's Claim ....................................................... 18

    E.    Lehman's Determination of the Termination Amount ........................ 19

    F.    Washington TSA's Determination of The Termination Amount ............ 21

        1.    Shapiro Inflated The Termination Amount With Hypothetical and Commercially Unreasonable Assumptions ............................................................... 21

        2.    Curry and Hasterok Reject the Standard Methodology for Valuing RFAs ................................................................ 24

III.  ARGUMENT ............................................................................ 25

    A.    Washington TSA Cannot Satisfy Its Burden of Proof ......................... 26

    B.    Section 562 of the Bankruptcy Code ........................................... 26

    C.    Lehman's Valuation Is Reasonable and Based on Industry Standard Methodology ........................................................... 28

    D.    Washington TSA's Determination of the Termination Amount Fails to Meet the Requirements of the RFA ................................... 29

        1.    Washington TSA Deliberately Failed to Seek Market Quotations ..................................................................... 30

        2.    Washington TSA Failed To Determine the Termination Amount Reasonably and in Good Faith ................................... 37

            a.    Washington TSA Rejected PFM's Valuations and Engaged Swap Financial to "Maximize" the Claim Against Lehman ............................................... 39

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | b. | Swap Financial's Determination of the Termination Amount Was Not Reasonable or Done In Good Faith | 43 |
| | c. | Shapiro's Expert Opinions are Inadmissible | 54 |
| | d. | Curry's and Hasterok's Opinions Should Not Be Admitted | 58 |
| E. | | Washington TSA's Valuation Constitutes Manifest Error | 60 |
| F. | | Washington TSA Failed To Mitigate Its Loss | 62 |
| G. | | Washington TSA Should Be Barred From Recovering Attorneys' Fees And Costs | 64 |

CONCLUSION ........................................................................................... 66

PROPOSED FINDINGS OF FACT ........................................................... 67

| I. | | BACKGROUND AND THE RESERVE FUND AGREEMENT | 67 |
|---|---|---|---|
| | a. | Establishment of Washington TSA and Issuance of the Bonds | 67 |
| | b. | The Reserve Fund Agreement | 68 |
| II. | | WASHINGTON TSA ADOPTS A "WAIT-AND-SEE" STRATEGY AFTER LEHMAN'S BANKRUPTCY INSTEAD OF PAYING A TERMINATION AMOUNT TO LEHMAN | 73 |
| III. | | WASHINGTON TSA ENGAGES SWAP FINANCIAL TO MAXIMIZE ITS CLAIM IN ORDER TO BE MADE WHOLE BY LEHMAN | 74 |
| IV. | | SWAP FINANCIAL DID NOT VALUE THE RFA ACCURATELY | 79 |
| | a. | Swap Financial Lacked Expertise Relating to RFAs | 79 |
| | b. | Swap Financial Failed to Produce Any Evidence of its Market Quotation Process | 81 |
| | c. | Swap Financial Has Not Justified Its Valuation | 83 |
| V. | | CURRY AND HASTEROK'S EXPERT REPORTS ARE UNRELIABLE | 91 |
| | a. | The Selection of the Replacement Yield Is Arbitrary | 92 |
| | b. | Authorities Relied on by Curry and Hasterok Do Not Support Their Opinion that the Forward Curve Should be Rejected | 94 |
| | c. | Curry and Hasterok Ignored the RFA's Provisions | 95 |
| VI. | | LEHMAN'S EXPERT VALUATIONS | 95 |
| VII. | | WASHINGTON TSA CHOSE NOT TO PURSUE ALTERNATIVE INVESTMENT OPTIONS | 97 |
| VIII. | | THE BONDS WERE REFUNDED IN 2013 | 100 |

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| PROPOSED CONCLUSIONS OF LAW | | 101 |
| I. | BURDEN OF PROOF | 101 |
| II. | SECTION 562 OF THE BANKRUPTCY CODE | 101 |
| III. | CALCULATION OF TERMINATION AMOUNT UNDER THE RFA | 102 |
| IV. | WASHINGTON TSA FAILED TO FOLLOW THE RFA AND DID NOT SOLICIT MARKET QUOTATIONS | 103 |
| V. | WASHINGTON TSA DID NOT CALCULATE THE TERMINATION AMOUNT REASONABLY AND IN GOOD FAITH | 104 |
| | A. Swap Financial's Calculation of Termination Amount is Not Reasonable | 104 |
| | B. Curry and Hasterok's Opinions Should Not Be Considered | 106 |
| VI. | WASHINGTON TSA'S TERMINATION AMOUNT CALCULATION AMOUNTS TO MANIFEST ERROR | 109 |
| VII. | LEHMAN'S DETERMINATION OF TERMINATION AMOUNT IS REASONABLE | 109 |
| VIII. | LEHMAN SHOULD NOT BE RESPONSIBLE FOR WASHINGTON TSA'S FAILURE TO MITIGATE ITS LOSSES | 109 |

# TABLE OF AUTHORITIES

**Page**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..............................................................................107

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012)................................................................107

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ..............................................................101, 107, 109

*Chevron Corp. v. Donziger*,
   296 F.R.D. 168 (S.D.N.Y. 2013) ........................................................................34

*Drummond v. Morgan Stanley & Co.*,
   No. 95 Civ. 2011, 1996 U.S. Dist. LEXIS 16137 (S.D.N.Y. October 30, 1996) ............60, 101

*ESPN, Inc. v Off. of the Comm'r of Baseball*,
   76 F. Supp. 2d 383 (S.D.N.Y. 1999)...........................................................36, 37, 96

*GE v. Joiner*,
   522 U.S. 136, 118 S. Ct. 512 (1997)...........................................................55, 98, 108

*Grand St. Realty, LLC v. McCord*,
   No. 04-cv-4738 (CBA), 2005 U.S. Dist. LEXIS 45314 (E.D.N.Y. Sept. 30,
   2005) ..............................................................................................................63, 65

*In re A. Terricone, Inc.*,
   83 B.R. 253 (Bankr. S.D.N.Y. 1988)...................................................................65

*In re Am. Home Mortg. Holdings, Inc.*,
   411 B.R. 181 (Bankr. D. Del. 2009) ..............................................................26, 27

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216.......................................55, 100, 107

*In re Oneida Ltd.*,
   400 B.R. 384 (Bankr. S.D.N.Y. 2009)..................................................................93

*In re Rockefeller Ctr. Props.*,
   272 B.R. 524 (Bankr. S.D.N.Y. 2000)..................................................................93

# TABLE OF AUTHORITIES

(continued)

**Page**

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137, 152 (1999) ........................................................................................55, 56, 107

*Liquidation Trust v. Daimler AG (In re Old Car Co LLC),*
    No. 11 Civ. 5039, 2011 U.S. Dist. LEXIS 134539 (S.D.N.Y. Nov. 22, 2011) ......................33

*Maroney v. Hawkins,*
    50 A.D.3d 862 (2nd Dep't 2008) ................................................................................35, 37, 96

*Matter of Hermance v. Bd. of Supervisors of Ulster County,*
    71 N.Y. 481 (1877) ......................................................................................................58, 101

*Muzak Corp. v. Hotel Taft Corp.,*
    1 N.Y.2d 42 (1956) ......................................................................................................36, 37, 96

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005) ...............................................................................................55, 107

*NML Capital v. Republic of Argentina,*
    17 N.Y.3d 250 (2011) ..................................................................................................35, 37, 95

*Pavarini McGovern, LLC v. Tag-Court Square, LLC,*
    62 A.D.3d 680 (2d Dep't 2009) ..................................................................................35, 37, 96

*Primavera Familienstiftung v. Askin,*
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...................................................................................55

*PSG Poker, LLC v. DeRosa-Grund,*
    No. 06 Civ. 1104, 2008 WL 190055 (S.D.N.Y. Jan. 22, 2008) ..............................................35

*Raskin v. Wyatt Co.,*
    125 F.3d 55 (2d Cir. 1997) ..................................................................................................107

*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
    306 F.3d 99 (2d Cir. 2002) ....................................................................................................34

*Sherman v. Novak (In re Reilly),*
    245 B.R. 768 (B.A.P. 2d Cir. 2000) .................................................................................26, 93

*Short v. Manhattan Apartments, Inc.,*
    286 F.R.D. 248 (S.D.N.Y. 2012) ..........................................................................................34

# TABLE OF AUTHORITIES

(continued)

**Page**

*Szczepanek v. Dabek,*
   No. 10-cv-2459 (SJF), 2011 WL 846193 (E.D.N.Y. Mar. 7, 2011), *aff'd,*
   *Szczepanek v. Dabek*, 465 Fed. Appx. 74 (2d Cir. 2012) ........................................................58

**STATUTES**

11 U.S.C.S. § 105(a) ..............................................................................................................63, 65

11 U.S.C. § 365(d)(2) ..................................................................................................................16

11 U.S.C. § 502(a) ........................................................................................................................93

11 U.S.C. § 562 ..........................................................................................................24, 26, 93, 94

RCW 43.340.005, *et seq.* .........................................................................................................6, 64

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ....................................................................................52, 53, 55, 98, 100, 108

Fed. R. Civ. P. 26(a)(2).........................................................................................................22, 82

Restatement (Second) of Contracts, § 203 (1981) ...........................................................36, 38, 96

As requested by the Court at the conclusion of the evidentiary hearing that took place on

November 4 through November 6, 2014 (the "Hearing"), Lehman Brothers Holdings Inc.

("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF" and collectively with LBHI,

"Lehman" or the "Debtors") respectfully submit this Post-Trial Memorandum, Proposed

Findings of Fact and Conclusions of Law in support of its objections with respect to Claims

Numbers 37355 and 37356 (the "Claim") filed by the Washington State Tobacco Settlement

Authority ("Washington TSA").  This submission is divided into three parts.  The first section is

a post-trial memorandum containing argument based upon the evidence presented to the Court.

The second and third sections contain proposed findings of fact and conclusions of law.

## POST-TRIAL MEMORANDUM

### I.    PRELIMINARY STATEMENT

This dispute between Lehman and Washington TSA arises over the proper valuation of

the Termination Amount for the Reserve Fund Agreement (the "RFA") between Lehman and

Washington TSA.  At the Hearing, Washington TSA failed to carry its burden of proof regarding

its Claim.  Accordingly Washington TSA's Claim must be denied.

The evidence presented at the Hearing confirmed that Washington TSA failed to

calculate the Termination Amount reasonably and in good faith "as if it were Lehman" as

required by the RFA.  Instead of calculating an appropriate Termination Amount in accordance

with the RFA, Washington TSA admitted that it sought to be "made whole" by Lehman.

Washington TSA soon realized that the only way to achieve this improper goal in Lehman's

bankruptcy was to file an inflated claim, i.e., a "grossed-up" claim, against the Lehman Estate, to

the detriment of other creditors.  Only such a "grossed-up" claim would allow Washington TSA

to recover enough in bankruptcy dollars to be "made whole" by Lehman.  As discussed below,

the testimony adduced at the Hearing revealed the utter lack of any credible support for

Washington TSA's inflated Claim.

In contrast to Washington TSA's exaggerated Claim, Lehman's valuation expert, Samuel

Gruer, calculated a commercially reasonable Termination Amount in accordance with industry-

standard methodology that is routinely used to value forward purchasing agreements like the

RFA.  Gruer adhered to the terms of the RFA and calculated a Termination Amount of

$1,132,772.61 owed ***to Lehman*** by Washington TSA.  The RFA explicitly warned, and

Washington TSA is aware, that "a Termination Amount may be due Lehman" and that under

"certain market conditions the amount of any Termination Amount owed to Lehman. . . could be

substantial."  Joint Ex. 1, RFA at § 5.5.

Washington TSA's course of action since LBHI's bankruptcy filing on September 15,

2008 has consistently demonstrated Washington TSA's lack of good faith with respect to its

Claim.  In its quest to be made whole, Washington TSA abandoned its longtime financial advisor

Public Financial Management, Inc. ("PFM") (who had previously determined the RFA was in

the money ***to Lehman***) and hired Swap Financial Group ("Swap Financial").[1]  Swap Financial

was willing to ignore the terms of the RFA and drastically inflate the Termination Amount

through the application of unreasonable charges to produce an absurd result that bears no relation

to the economic value of the RFA.  As shown at the Hearing, after being approached by

Washington TSA, Swap Financial immediately embarked upon a path to "maximize"

Washington TSA's claim.  As the evidence demonstrated, what Swap Financial did was to

---

[1]       Immediately after LBHI's bankruptcy, Washington TSA was informed by its long-time financial
advisor, PFM, that it would owe Lehman approximately $1.2 million if the RFA were terminated at that time.
Unwilling to make any payment to Lehman, Washington TSA adopted a "wait-and-see" strategy until the market
moved in its favor.  Tr. 172:19-173:14.  By November 2008, the market did move in Washington TSA's favor, and
PFM advised that Lehman would owe Washington TSA a Termination Amount of $1.2 million if the RFA were
terminated at that time.  Knowing that it would need a much higher claim to be "made whole," Washington TSA
chose to engage Swap Financial.

concoct a Claim that bears no relation to the value of the RFA, not merely maximize a legally permissible claim.

Swap Financial realized as soon as it was engaged that it would be better off to avoid the market quotation process mandated by the RFA, in order to ensure that Lehman would owe Washington TSA "a boat load of money."  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.[2]  The avoidance of the market quotation process allowed Swap Financial to subjectively calculate Washington TSA's "losses . . . or gains."  Joint Ex. 1, RFA at § 1.

In order to calculate the Termination Amount, Washington TSA's primary valuation witness, Peter Shapiro, used the same methodology as Gruer ***except*** he manipulated it beyond all recognition and reasonableness with the obvious intent to inflate Washington TSA's claim.  First, Shapiro ignored Lehman's right to choose the "cheapest to deliver" security and then manufactured a fantastic credit charge – which alone represents nearly 85% of Washington TSA's Claim – designed to inflate the Termination Amount in Washington TSA's favor.  As an initial matter, Lehman does not believe such hypothetical dealer charges are properly recoverable by Washington TSA when they were not incurred.  However, even if such charges were appropriate, those imposed by Mr. Shapiro must be rejected as inconsistent with market practice.  And as confirmed by Swap Financial's own employee who performed the calculation, this credit charge is far beyond anything ever seen in the marketplace.

When Swap Financial applied this inflated "credit charge" to the forward curve used to value the RFA, it generated an absurd result.  The forward curve was shifted downward so

---

[2]    "[Deponent] Dep. XXX:XX" refers to the designated portions of the identified depositions.  "Tr. XXX:XX" refers to the trial transcript.  "Debtors' Ex. XX" refers to exhibits submitted by Lehman.  "TSA Ex. XX" refers to exhibits submitted by Washington TSA.  "Joint Ex. XX" refers to exhibits jointly submitted by Lehman and Washington TSA.

dramatically that, as evidenced by Swap Financial's own documents, most of the forward curve

was plunged into negative interest rate territory, meaning that a lender would have to pay a

borrower a return on the borrowed money.  *See* Debtors' Ex. 63, Swap Financial Principia

Screenshot v16 (showing application of minus 3.874% to 3-month LIBOR rates); TSA Ex. AA,

Principia Discount Rate and Cash Flows Screenshot, SFG_002543-44;[3] Debtors' Ex. 159,

Charges for Municipal Tobacco Credit and Profit Component Graph No. 1; *see also* Debtors'

Ex. 43, Excel Spreadsheet created by Curry and Hasterok (showing 3-month LIBOR rates as of the

Rejection Date).

Ultimately, Swap Financial declared that Lehman owed Washington TSA a Termination

Amount of more than $38 million.  The absurdity of Swap Financial's calculation is confirmed

by the fact that Swap Financial claims that Washington TSA is entitled to receive more than the

present value of the guaranteed payments that Washington TSA would have received if the RFA

had not been terminated *plus* all of the investment returns the Reserve Funds would earn for the

next 24 years (*i.e.*, what it had sold to LBSF).  TSA Ex. AA, Principia Discount Rate and Cash

Flows Screenshot, SFG_002543-44.

Washington TSA's other two experts – Daniel Curry and Jeffrey Hasterok – admitted at

the Hearing that they had always used Gruer's methodology for valuing RFAs in their combined

40 years on Wall Street, ***except*** for in this case.  Curry and Hasterok turned their backs on their

professional experience, rejected the industry-standard methodology entirely and adopted an *ad

hoc,* unprecedented and unverifiable approach crafted only for this litigation.  Neither Swap

Financial or Curry and Hasterok have demonstrated the intellectual rigor and reliability that

---

[3]    TSA Ex. AA was produced on December 19, 2014, and Lehman has not had an opportunity to
question Mr. Shapiro about this document.  Lehman and Washington TSA are currently negotiating a stipulation to
admit this document, and will provide the Court with the stipulation once agreed upon.

courts demand from expert witnesses such that their opinions can be admitted and considered by the Court.

Putting aside Washington TSA's fantastical Claim and its impermissible quest to be made whole by the Lehman estate, the reality is that Washington TSA has had control of its Reserve Fund, containing over $45 million dollars, since December 2008.[4]  The termination of the RFA did not prevent Washington TSA from taking steps to maximize its return on its Reserve Fund. Instead of doing so, Washington TSA disregarded the many admittedly viable alternative and permissible investment proposals it received for the Reserve Fund in favor of simply leaving the Reserve Fund in a low yielding money market account.  *See, e.g.*, Tr. 237:8-12; Debtors' Ex. 22, Memorandum from PFM, Nov. 11, 2008; Debtors' Ex. 20, Email chain between Kim Herman and Bob Cook et al., Nov. 7, 2008; Debtors' Ex. 105, Email from John McCarthy to Bob Cook, attaching Debt Service Reserve Fund Rate Indications, Mar. 4, 2011; Debtors' Ex. 109, Memorandum from Barclays Capital to Washington TSA, Nov. 4, 2011; Debtors' Ex. 111, Memorandum from Swap Financial to Washington TSA concerning Reinvestment of TSA's Reserve Fund, Nov. 16, 2011, at 3.  This failure to properly reinvest the Reserve Fund reveals Washington TSA's true investment strategy – to wait for interest rates to rise while maximizing its recovery by pursuing an inflated claim against Lehman.  The evidence proffered at the Hearing further demonstrates that Washington TSA's strategy was to avoid locking up the Reserve Fund in permissible investments that were available to Washington TSA in anticipation

---

[4]        The Reserve Fund was eliminated in 2013 when Washington TSA refunded the Bonds and realized $58 million in present value savings in connection with the refunding.  Debtors' Ex. 134, Washington TSA Press Release, Oct. 17, 2013.

that interest rates would rise.[5]  As a result, Washington TSA earned little on its Reserve Fund. However that is no reason to permit Washington TSA to recover an inflated Claim at the expense of other creditors.

For the reasons stated herein, the testimony received and the evidence admitted, the Court should deny Washington TSA's Claim.

## II.    Factual Background

### A.    Washington TSA and the Bonds

On November 23, 1998, Attorneys General of 46 states and the four largest tobacco manufacturers settled claims that the states had brought relating to the use of, or exposure to, tobacco products.  As part of that settlement, the tobacco manufacturers agreed to pay the states an estimated $206 billion through 2025.  The State of Washington was entitled to approximately 2.05% of the initial and annual settlement payments and approximately 5.76% of the payments made to states for their contributions to the tobacco litigations.

In order to deal with a $450 million budget shortfall in 2002, the State of Washington established Washington TSA in 2002 to issue bonds secured by the tobacco manufacturers' obligation to make future settlement payments.  Uncontested Facts at ¶ 5.[6]  Washington TSA is an independent public instrumentality of the State of Washington, established pursuant to Chapter 365 of Laws of 2002 of the State of Washington, codified as RCW 43.340.005, *et seq.*[7] *Id.* at ¶ 2.  After establishing Washington TSA, the State of Washington sold 29.2% of its

---

[5]    On June 3, 2009, after being provided with available investment options by the trustee, Bob Cook emailed Washington TSA staff and stated that "[w]ith rates so low, I'm hesitant to 'chase' rates. . . ."  Joint Ex. 7, Email from Bob Cook, June 3, 2009, TSA_008827.  *See also* Tr. Tr. 237:8-239:13; 247:22-248:4; 251:18-252:9.

[6]    "Uncontested Facts" refers to the Joint Statement of Uncontested Facts jointly submitted by Washington TSA and Lehman filed on October 21, 2014 [Docket No. 46543].

[7]    Washington TSA is governed by a board of directors (the "<u>TSA Board</u>"), which is a regulatory body under Washington law and sets the policy and makes the decisions to be carried out by the staff of Washington TSA.  Tr. 105:14-23.

tobacco settlement revenues to Washington TSA, which issued $517,905,000 of Tobacco

Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "Bonds")

pursuant to an Indenture dated as of October 1, 2002, between Washington TSA and U.S. Bank

N.A., as Indenture Trustee (the "Indenture").  Uncontested Facts at ¶¶ 3-4.

      The Bonds were scheduled to mature in 2032, and the Indenture gave Washington TSA

the right, upon the satisfaction of certain conditions, to partially or fully redeem the Bonds prior

to their scheduled maturity.[8]  Joint Ex. 3, Indenture at § 404(a).  When the Bonds were issued,

their "projected final turbo redemption date" was June 1, 2019.  Uncontested Facts at ¶ 7.

However, all of TSA's experts agreed that the prospect of a turbo redemption was non-existent

as of March 2009.  Tr. 370:3-371:6, 404:17-405:10, 408:10-15 (Hasterok); 498:9-501:19 (Curry);

651:20-652:11, 653:6-654:10 (Shapiro).

      On October 17, 2013, Washington TSA refinanced the Bonds by issuing $334.7 million

in tax-exempt refunding revenue bonds, which resulted in all of the Bonds being refunded.

Debtors' Ex. 134, Washington TSA Press Release, Oct. 17, 2013.  Washington TSA's interest

savings relating to the refunding amounted to "just under $90 million, or $58 million in today's

dollars when adjusted for inflation."  *Id.*

### B.    The Reserve Fund Agreement

      The Indenture related to the 2002 Bonds established a Liquidity Reserve Account in the

amount of $45,534,106.25 to provide additional credit support in the event of a temporary

revenue shortfall (the "Reserve Fund").  Uncontested Facts at ¶ 8.  While the Reserve Fund was

---

[8]      The RFA also provided that Washington TSA may terminate the RFA in the event of a
"Mandatory Cleanup Call" with 30 days written notice to LBSF, in which case no Termination Amount shall be due.
A "Mandatory Cleanup Call" was defined in the RFA to mean: "a mandatory redemption of the Bonds in whole
equal to 100 percent of the principal amount being redeemed at any time that the available amounts on deposit in the
Accounts (as defined in the Indenture) (other than the Rebate Account, the Operating Account, the Operating
Contingency Account and the Costs of Issuance Account) exceed the aggregate principal amount of, and accrued
interest on, the Bonds."  Joint Ex. 1, RFA, §§ 1, 2.8; Uncontested Facts at ¶ 21.

established to ensure that debt service payments could be made even if there was a revenue

shortfall, Washington TSA sought to maximize its return on the Reserve Fund itself.  Based upon

the advice of its long-time financial advisor, PFM, Washington TSA decided to enter into a form

of an investment agreement referred to as a reserve fund agreement.  Tr. 116:15-117:20.  In

general terms, a reserve fund agreement is a type of forward delivery agreement that provides the

holder of a reserve fund with an opportunity to earn a guaranteed return on the reserve fund

while still maintaining the liquidity necessary to cover debt service payments if necessary.

On Washington TSA's behalf, PFM solicited bids from various financial institutions on

October 22, 2002.  Uncontested Facts at ¶ 11.  A number of bidders responded to PFM's

solicitation.  Washington TSA ultimately accepted Lehman's bid, which was the highest bid.

Joint Ex. 5, Email from Torretti to Slater *et al.* attaching results of Washington TSA RFA bid; Tr.

120:2-23.

Subsequently, Washington TSA, Lehman, and U.S. Bank, as the Indenture Trustee,

entered into the RFA on November 5, 2002.  Joint Ex. 1, RFA; Uncontested Facts at ¶ 12.  Under

the RFA, LBSF provided a Guaranteed Rate of 4.484% on a Scheduled Reserve Amount of

$45,534,106.25, (the "Scheduled Reserve Amount") which equaled the entirety of the Reserve

Fund.  Uncontested Facts at ¶ 14.

Because debt service payments are payable to the bondholders periodically, any

investments made with the Reserve Fund had to mature on or before the periodic payment dates

so that there would be cash in the Reserve Fund on those dates in case Washington TSA needed

such cash to make the requisite debt service payments.  Accordingly, the RFA provided that

every six months Washington TSA would deliver $45,534,106.25 to Lehman.  Joint Ex. 1, RFA

at Exhibit A.  In exchange for the delivery of the Scheduled Reserve Amount, Lehman was

required to deliver short-term "Eligible Securities" that would mature on or before the next Bond

Payment Date.  *Id.* at § 2.1, Exhibit A.

The RFA defined "Eligible Securities" as follows:

> [N]on-callable and non-prepayable (a) direct obligations of the
> United States of America including only notes, bonds, bills or
> certificates of indebtedness, (b) senior debt and/or guaranteed
> mortgage pass-through obligations of the Federal National
> Mortgage Association, Federal Home Loan Mortgage Corporation,
> Government National Mortgage Association, any Federal Home
> Loan Bank, and the Federal Farm Credit System, or (c)
> commercial paper rated "P-1" by Moody's and "A-1+" by
> Standard & Poor's; provided that, at the time of delivery, any such
> commercial paper is not on negative credit watch and the issuer
> thereof is subject to U.S. law; additionally, if the maturity date of
> the commercial paper tendered is 100 days or more, the issuer
> thereof must have long-term debt ratings of at least "A1" by
> Moody's, "A+" by Standard & Poor's and "A" by Fitch.

Uncontested Facts at ¶ 16; Joint Ex. 1, RFA, § 1.  In other words, Eligible Securities included

treasury securities, agency securities, and commercial paper.

Under the RFA, Lehman had the right to select which Eligible Securities to deliver on

each delivery date, so long as the Eligible Securities were also Qualified Securities under the

terms of the RFA.  Uncontested Facts at ¶ 17.  The RFA defined "Qualified Securities" to

include Eligible Securities that mature on or before the next debt service payment date and have

an aggregate purchase price as close as possible to but does not exceed the Scheduled Payment

Amount.  Joint Ex. 1, RFA at § 1; Uncontested Facts at ¶ 15.  Lehman's ability to select the

Qualified Securities to be delivered to Washington TSA was crucial to Lehman, as it afforded

Lehman the opportunity to maximize its profit or minimize its loss from such deliveries.[9]

Tr. 528:14-530:15; 948:4-949:4.  To the extent Lehman could acquire Qualified Securities for

---

[9]    Although Lehman delivered commercial paper acquired through a commercial paper program
during the course of the RFA, Washington TSA's expert agrees that nothing prevented Lehman from delivering
agencies despite the existence of the commercial paper program.  Tr. 530:10-16.

delivery at a price lower than the purchase price required to be paid by Washington TSA, Lehman would earn a profit equal to such difference. *See id*. Conversely, if Lehman could only acquire Qualified Securities at a price that exceeded the purchase price to be paid by Washington TSA, Lehman would suffer a loss equal to such excess amount.[10]

Due to a drafting error, the RFA initially stated that it would terminate on May 30, 2042, ten years after the scheduled maturity date of the Bonds. Uncontested Facts at ¶ 19. To correct this error, the RFA was amended on March 26, 2003 to change the termination date to May 28, 2032. Uncontested Facts at ¶ 20; Joint Ex. 2, Amendment Agreement among Washington TSA, LBSF, and US Bank; Tr. 195:16-23.

The RFA could be terminated upon the occurrence of certain defined events of default. Joint Ex. 1, RFA at §§ 7.1-7.3. Depending on the type of default, the RFA specified the available remedies, which include, *inter alia*, the payment of a "Termination Amount." *Id.* at §§ 7.4-7.6. In the event of a "Lehman Event of Default" (which occurred here), the RFA provided that "Lehman shall determine the Termination Amount," but:

> if Lehman fails to determine the Termination Amount within three Business Days of written notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default ***then the Issuer shall make such determination as if it were Lehman*** and the amount as so determined by the Issuer shall for purposes of this Section 7.6 be deemed the Termination Amount.

*Id.*, § 7.6(c) (emphasis added).

The RFA defined Termination Amount as:

---

[10]    In the RFA, Washington TSA acknowledged that it had "minimized the risks resulting from fluctuations in interest rates during the term [of the RFA] on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations." Joint Ex. 1, RFA, § 5.4.

[A]n amount, as determined by the Burdened Party reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay the Dealer . . . in consideration of such Dealer entering into an agreement with the Burdened Party . . . which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under [the RFA] . . . . if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement . . . . Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

*Id.*, § 1.  The definition of Termination Amount set out a hierarchy to determine the Termination Amount.  First, the Termination Amount should be based on market quotations.  If and ***only if*** no quotations satisfying the requirements of the RFA can be obtained, then the Termination Amount may be calculated on the basis of Washington TSA's total losses or gains.  *Id.*

The RFA explicitly warned that "a Termination Amount may be due Lehman" and that under "certain market conditions the amount of any Termination Amount owed to Lehman. . . could be substantial."  *Id.*, RFA, § 5.5.  Washington TSA was well aware of the possibility that, in certain circumstances, it could owe a termination payment to Lehman.[11]  *See* Tr. 167:18-168:7; Cook 30(b)(6) Dep. 24:8-15; 33:21-24; Herman Dep. 37:20-23.

### C.    Washington TSA's Response to Lehman's Bankruptcy

On September 15, 2008, LBHI filed a voluntary petition for relief under Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District

---

[11]    The RFA also provided "that the "Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communications and prior writings with respect thereto."  Joint Ex. 1, RFA at § 9.8.

of New York.  Uncontested Facts at ¶ 22.  In response to LBHI's bankruptcy, Washington TSA's

staff and advisors participated in a conference call on September 19, 2008 to "assess

[Washington TSA's] options" (the "September 19 Call").[12] Debtors' Ex. 18, Memorandum from

Jay A. Reich to Kim Herman, *et al.*, Sept. 25, 2009 (the "September 25 Memo"), at 2.  On

September 25, 2008, Jay Reich of K&L Gates LLP prepared a memorandum summarizing the

discussion and decisions made on the September 19 Call.  *Id*. at 1.

### 1.    Washington TSA's Wait-and-See Strategy

On the September 19 Call, PFM advised Washington TSA that "a Termination Amount

calculated as of [September 19, 2008] would obligate [Washington TSA] to pay Lehman

approximately $1,200,000."[13] *Id*.; Herman Dep. 167:24-168:7; Tr. 169:19-170:2.  According to

PFM, "[$1,200,000] reflects what Lehman would need to receive to preserve the economic

equivalent of the [RFA] for its term."  Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim

Herman, *et al.*, Sept. 25, 2009 at 1.  In light of PFM's determination that Washington TSA would

owe a substantial payment to Lehman,[14] the participants on the September 19 Call decided that

Washington TSA "should not terminate the [RFA] and trigger the payment of the Termination

Amount."  *Id.* at 3.  Washington TSA decided to "not terminate the Agreement unless and until

the legal or factual context changes, e.g. the Termination Amount would be no less than $0."  *Id.*

---

[12]    Washington TSA staff members Kim Herman, Bob Cook and Carol Johnson, representatives from PFM, U.S. Bank, Hawkins Delafield & Wood LLP and K&L Gates LLP participated on the September 19 Call. Debtors' Ex. 18.  No members of the Washington TSA Board were on the September 19 Call.

[13]    During the first few days after LBHI's bankruptcy filing, Washington TSA asked PFM to provide a "quick estimate" of the Termination Amount. Tr. 138:25-139:11.

[14]    Notwithstanding PFM's determination that Washington TSA owed Lehman a Termination Amount, Washington TSA was confident that PFM could calculate the Termination Amount and believed that PFM calculated the Termination Amount in accordance with the RFA. Tr. 170:9-23.  In fact, Herman specifically asked whether John Bonow of PFM was comfortable with the conclusions reached on the September 19 Call because he trusted Bonow's opinion. Tr. 175:7-176:4; Debtors' Ex. 17, Kim Herman's handwritten notes, Sept. 19, 2008.

In fact, Washington TSA's top executive testified that although he was aware that Washington TSA could owe Lehman a Termination Amount in the aftermath of Lehman's bankruptcy, he had no intention of paying any termination payment to Lehman.  Tr. 173:11-14.  Herman reiterated this position when he noted in an email that "it will be a cold day in hell [before] we pay Lehman anything!"  Debtors' Ex. 99, Email chain between Peter Shapiro and Kim Herman, Jul. 14, 2010.

By November 10, 2008, PFM informed Washington TSA that the Termination Amount had moved in Washington TSA's favor, and that if the RFA was terminated at that time Lehman would owe $1,237,902.06 to Washington TSA.  Debtors' Ex. 25, Email chain between Bob Cook and Debra Stephenson, Nov. 17, 2008.  Notwithstanding the fact that the market moved in favor of Washington TSA, Washington TSA still took no action with respect to the RFA.  Tr. 142:16-143:12.  The Washington TSA Board held a Special Board Meeting on November 12, 2008.  At this meeting, Washington TSA staff informed the Board that had it terminated the RFA in September, it would have owed Lehman a Termination Amount, but

> the market has reversed itself and at this point in time, Lehman would owe money to the Authority.  There is no expectation that we could collect the money from Lehman and unless the value to us of the termination payment was large, it would not even have a significant discounted value on the secondary market for such obligations.

Debtors' Ex. 24, Minutes of November 12, 2008 Washington TSA Board Meeting, at 4.  The Washington TSA staff recommended leaving the RFA in place until the Qualified Securities currently held by the Trustee matured on December 1, 2008, and "[t]he decision of whether or not to leave the investment agreement in place will be based on the market value of the termination payment at that time."  *Id.*

- 13 -

On November 21, 2008, Washington TSA, through its attorneys, and without

consultation with the Board, sent a letter to Lehman's attorneys and demanded that Lehman

stipulate to the rejection of the RFA.  Debtors' Ex. 27, Letter from K&L Gates to Weil Gotshal,

Nov. 21, 2008;[15] Herman Dep. 214:17-23.  In response, Lehman's attorneys proposed a

termination of the RFA with a mutual waiver of claims.  Debtors' Ex. 28, Email from Weil

Gotshal to K&L Gates, Nov. 28, 2008.  This proposal was never discussed with the Washington

TSA Board.  Tr. 183:24-184:15.

On December 1, 2008, the previously-delivered Qualified Securities matured under the

RFA.  Lehman did not deliver any Qualified Securities to Washington TSA on December 1,

2008, nor did Washington TSA tender the Scheduled Reserve Amount to Lehman.[16]  Tr. 144:13-

15, 237:3-7.  Subsequently, Washington TSA has maintained control of the full amount of the

Reserve Fund from December 1, 2008 until the refunding of the Bonds in October 2013.

Tr. 236:22-237:12; Cook 30(b)(6) Dep. 18:13-16; 98:16-18.  Simply put, Washington TSA has

not lost a dollar of the Reserve Fund.

### 2.    Washington TSA Hired Swap Financial to Maximize Its Claim

Dissatisfied with the valuations that its trusted financial advisor PFM provided,

Washington TSA engaged Peter Shapiro of Swap Financial on an "emergency basis" in

December 2008 to "maximize" Washington TSA's Claim against Lehman.  Debtors' Ex. 34,

Memorandum from Swap Financial to Washington TSA, Dec. 12, 2008 at 1; Herman Dep.

44:19-45:7.  Swap Financial proceeded to declare PFM's Termination Amount calculation

---

[15]    This letter confirmed that Washington TSA understood that upon termination the RFA was to be valued as a derivative contract, with a determination being made as to whether Lehman or Washington TSA was "in the money" and by how much.  Debtors' Ex. 27, Letter from K&L Gates to Weil Gotshal, Nov. 21, 2008.

[16]    Neither Washington TSA nor the Trustee delivered the "Scheduled Reserve Amount" to Lehman on December 1, 2008, as required by the RFA.

"horribly wrong," without any serious consideration of the calculation, and instead embarked upon a path to recover "a boat load" of money for Washington TSA from Lehman. Shapiro 30(b)(6) Dep. 65:2-66:8; Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008. In order to accomplish that goal, Swap Financial knew it needed to avoid the market quotation process mandated by the RFA in order to inflate the Termination Amount. *Id.* Internal Swap Financial emails confirm that they believed "we may be better off" not getting market quotations for Washington TSA, *id.* at SFG_001916, even though the RFA explicitly required that a market quotation process be undertaken to determine the Termination Amount. Joint Ex. 1, RFA at § 1.

### 3.    Washington TSA Compels Lehman to Reject the RFA

On December 18, 2008, Washington TSA notified Lehman in writing that as a result of the bankruptcy filings and LBSF's failure to deliver Qualified Securities, Lehman Events of Default had occurred under the RFA. Joint Ex. 6, Notice of Event of Default from Washington TSA, Dec. 12, 2008. In its letter, Washington TSA did not exercise its rights to terminate the RFA, but reserved all of its rights and remedies under applicable law and the RFA. *Id.* The Washington TSA Board did not specifically authorize this Notice. Herman Dep. 220:6-16.

On January 15, 2009, Washington TSA filed a motion to compel Lehman to assume or reject the RFA pursuant to 11 U.S.C. § 365(d)(2) or, alternatively, to modify the automatic stay to allow Washington TSA to terminate the RFA (the "Motion to Compel"). Debtors' Ex. 41, Washington TSA's motion to compel Lehman to assume or reject the RFA; Uncontested Facts at ¶ 26. Attached to the Motion to Compel was a declaration submitted by Swap Financial's Peter Shapiro that stated that the Termination Amount due Washington TSA as of January 12, 2009

was $27.5 million,[17] a stark change from the $1.2 million PFM calculated just two months earlier.

Debtors' Ex. 40, Declaration of Peter Shapiro in support of Washington TSA's motion to compel

Lehman to assume or reject the RFA.  Lehman and Washington TSA attempted to agree upon a

mutual termination of the RFA, but were unsuccessful.  *See* Debtors' Ex. 39, Email chain

between Washington TSA and U.S. Bank, Mar. 2, 2009.  On March 25, 2009, the Court entered

an order deeming the RFA rejected.  Uncontested Facts at ¶ 28.  The parties agree that the

Termination Amount should be determined as of March 25, 2009 (the Termination Date).  *See*

Uncontested Facts at ¶¶ 28, 32.

### 4.    Washington TSA Chooses Not to Pursue Increased Returns on the Reserve Fund

As noted above, Washington TSA has had possession of the entire Reserve Fund since

December 1, 2008.  Tr. 237:3-7.  However, Washington TSA made no effort to pursue increased

returns on the Reserve Fund.  Instead, Washington TSA deliberately kept the Reserve Fund in

low-yielding money market accounts, even though it has been presented with many investment

alternatives that would provide substantially higher returns while still meeting the requirements

of the Indenture.[18]  Tr. 237:8-12; Cook 30(b)(6) Dep. 98:19-24; Herman Dep. 306:25- 307:14.

For example:

- In November 2008, PFM gave Washington TSA a detailed memorandum on reinvestment options.  *See* Debtors' Ex. 22, Memorandum from PFM, Nov. 11, 2008. PFM advised that Washington TSA had the opportunity to enter into a long-term, fixed rate investment at a rate of 3.73%, and that a 3-year Agency security was available at a rate of 3.38%.  *Id.*

---

[17]    Neither Swap Financial nor Washington TSA has produced any work papers showing how this valuation was done.

[18]    The Indenture permitted Washington TSA to invest the Reserve Fund in a number of Eligible Investments, including, *inter alia*, agency securities, treasuries, commercial paper, investment agreements and guaranteed investment contracts. Joint Ex. 3, Indenture, §§ 405(a), 102.

- In November 2008, Kim Herman was offered a guaranteed investment contract ("GIC") from an insurance company. *See* Debtors' Ex. 20, Email chain between Kim Herman and Bob Cook et al., Nov. 7, 2008.

- In March 2011, the Grant Street Group solicited and received GIC proposals on Washington TSA's behalf. *See* Debtors' Ex. 105, Email from John McCarthy to Bob Cook, attaching Debt Service Reserve Fund Rate Indications, Mar. 4, 2011. The proposals received by Grant Street Group provided rates of return ranging from 1.40% to 4.00% depending on collateralization and maturity. *Id.*

- In November 2011, Barclays Capital, one of Washington TSA's underwriters, provided a GIC proposal that would provide Washington TSA 2.75% of return for 5 years. Debtors' Ex. 109, Memorandum from Barclays Capital to Washington TSA, Nov. 4, 2011.

- Swap Financial analyzed Washington TSA's investment options in November 2011 and outlined an investment strategy that would provide an anticipated average yield of 2.60%. Debtors' Ex. 111, Memorandum from Swap Financial to Washington TSA concerning Reinvestment of TSA's Reserve Fund, Nov. 16, 2011 at 3.

Despite acknowledging that Washington TSA was permitted to make these investments,[19] Washington TSA did not take advantage of any of these investment opportunities. For example, Washington TSA's Cook confirmed that the GIC proposal from Barclays (Debtors' Ex. 109) complied with the Indenture, but was never discussed with the Washington TSA Board. Tr. 255:2-7. Instead of evaluating all investment options rigorously, Washington TSA declined investment options simply because it was "uncomfortable with the terms," it was reluctant to make its staff "take their time to look at various investments over time," or because it was reluctant to commit itself to a rate for a long term while it expected interest rates to rise. Tr. 251:18-252:9, 226:2-10, 239:5-18.

---

[19] None of these alternative investments were discussed with the Washington TSA board. Tr. 181:23-182:7.

### D.    Washington TSA's Claim

On October 12, 2009, Washington TSA filed amended Proofs of Claim Nos. 37355 and 37356 against LBSF and LBHI, respectively, claiming $47,063,714.01 (the "Proofs of Claim").[20] Uncontested Facts at ¶ 30; Joint Ex. 8, Proof of Claim no. 37355 against LBSF; Joint Ex. 9, Proof of Claim no. 37356 against LBHI.  In the Proofs of Claim, Washington TSA sought a Termination Amount payment of $46,437,610 as of March 25, 2009, lost earnings of $553,080.02 associated with the failure to deliver Qualified Securities from December 1, 2008 until March 25, 2009 and $73,023.99 in costs and expenses.  Uncontested Facts at ¶ 32.  Lehman objected to the Proofs of Claim on September 12, 2012, taking the position that Washington TSA's Claim should be reduced to $4.3 million.  Uncontested Facts at ¶ 33.

The Proofs of Claim, though, did not account for the Amendment of the RFA and wrongly calculated the Termination Amount based on a final maturity date of 2042 instead of 2032.  *See* Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at *1; Vergara Dep. 158:13-22.  Consequently, on November 3, 2014, the parties stipulated that Washington TSA's Proofs of Claims shall be deemed to assert claims in the amount of $38,560,427 and Lehman's objection shall be deemed to be $0.  Docket No. 46798, Stipulation Entered Nov. 3, 2014, ¶¶ 2, 3.

### E.    Lehman's Determination of the Termination Amount

Faced with a Claim far in excess of any reasonable calculation of the Termination Amount, Lehman set out to determine a reasonable value for the RFA.  Lehman's expert Samuel

---

[20]    Washington TSA originally filed Proofs of Claim No. 15016 and 14871 against LBSF and LBHI, respectively, on September 17, 2009, Uncontested Facts at ¶ 29, which were then amended by Proofs of Claim Nos. 37355 and 37356 to include additional professional fees.  *See* Joint Ex. 8, Proof of Claim no.  37355; Joint Ex. 9, Proof of Claim no. 37356.  On September 22, 2009, the Trustee, U.S. Bank, N.A., also filed proofs of claim in the Lehman and LBHI bankruptcies (Claim nos. 31016 and 31026, respectively).

Gruer, who has more than 20 years of experience pricing agreements similar to the RFA,

employed the industry-standard approach to value forward delivery agreements like the RFA.

Tr. 944:15-17; 949:6-12.  To determine the value, Gruer employed the industry-standard method

to value reserve fund agreements.  *See* Debtors' Ex. 139, Gruer Report at ¶ 34.  Gruer (and all

market participants) used this methodology each time a reserve fund or similar agreement was

valued regardless of whether it was to execute a new transaction, place a value on an existing

transaction, or to terminate a transaction, and regardless of whether the valuation was on behalf

of a dealer or an issuer.  *Id*.  This method is well known to anyone faced with the task of valuing

a reserve fund agreement.  *See generally* Tr. 948:15-949:19.

Gruer began his analysis by determining that U.S. Agency Securities were the highest

yielding or "cheapest to deliver" Eligible Securities as of March 25, 2009.  Tr. 950:5-951:13.  To

determine the "cheapest to deliver" securities, Gruer analyzed the yield curves for each type of

Eligible Securities, as of March 25, 2009, using information published by Bloomberg.

Tr. 952:24-953:21; Debtors' Ex. 139, Gruer Report at ¶ 42.  Since the RFA provided Lehman

with the right to deliver securities that would have produced the best economic result for Lehman

(the "cheapest to deliver" securities), Joint Ex. 1, RFA at § 1, the forward curve for those

securities should be used to construct the floating leg.  Tr. 948:15-949:12.  Consequently, Gruer

constructed a forward curve for  U.S. Agency Securities, using Bloomberg data.[21]  Debtors' Ex.

139, Gruer Report at ¶¶ 42, 45, 46; Tr. 950:14-951:9.

Gruer then proceeded to value the RFA by calculating the future cash flows of the two

legs of the transaction and discounting the difference between such cash flows to present value

---

[21]    While Washington TSA claims that agency forward curves cannot be constructed or used to value the
RFA, Professor Babbel was clear that agency curves can be constructed, Tr. 920:9-15, and are used "all the time" in
the financial services industry, Tr. 927:20-928:14, 930:20-23.

using the applicable LIBOR rate.  Tr. 949:13-19.  The "fixed leg" is determined by using the

Guaranteed Rate of the RFA (4.484%) and the "floating leg" is determined using the forward

curve for U.S. Agency Securities.  *See* Tr. 948:8-949:19.  Using this methodology, Gruer

determined that the mid-market value of the RFA was $1,359,394.59 payable by Washington

TSA to Lehman.  Debtors' Ex. 139, Gruer Report at ¶ 49.

In calculating the Termination Amount, Gruer also considered section 7.7(b) of the RFA,

which required Lehman to compensate Washington TSA for its lost earnings ("Lost Earnings")

in connection with the failure to deliver Qualified Securities.  *Id.* at ¶ 50.  The RFA required that,

after Lehman's failure to deliver Qualified Securities, Washington TSA should invest the

Reserve Fund in the longest maturity date but maturing no later than the next Bond Payment

Date of June 1, 2009.  Joint Ex. 1, RFA at § 2.4(a).  Had Washington TSA complied with the

RFA,[22] its Lost Earnings would have been $226,622 payable to Washington TSA from Lehman.

Debtors' Ex. 139, Gruer Report at ¶¶ 56, 57.  Gruer then added the section 7.7(b) loss to the mid-

market valuation of the RFA ($1,359,395 payable by Washington TSA to Lehman) and

concluded that the Termination Amount of the RFA should be $1,132,773 due from Washington

TSA to Lehman.  *Id.* at ¶ 58; Tr. 945:24-946:16.

F.    **Washington TSA's Determination of The Termination Amount**

In support of its Claim, Washington TSA presented two expert opinions:  one opinion

from Peter Shapiro of Swap Financial and the other from Daniel Curry and Jeffrey Hasterok,

jointly.  These experts employed fundamentally different and contradictory methodologies for

---

[22]      Washington TSA did not invest in the highest-yielding securities or those with the longest possible
maturity date.  Instead, Washington TSA left the Reserve Fund in a money market account, which paid a low yield
in exchange for daily liquidity.  This decision is illustrative of Washington TSA's approach to the termination of the
RFA, expecting Lehman to compensate it for its own investment decisions.

valuing the Termination Amount, yet all conveniently concluded that Washington TSA's Claim should be approximately $38 million.

Both Lehman's experts and Washington TSA's experts agree that there is an industry-standard methodology to value reserve fund agreements.  *See* Tr. 465:20-466:8, 470:2-12 (Hasterok); Tr. 545:17-546:13, 547:23-548:5 (Curry); Tr. 639:4-14 (Shapiro); Tr. 844:14-845:2 (Babbel); Tr. 949:6-19, 961:18-962:10 (Gruer).  In general, the industry values a reserve fund agreement by comparing the Guaranteed Rate of the reserve fund agreement (called the fixed leg) with the forward curve of the "cheapest to deliver" of the Eligible Securities provided for in the reserve fund agreement (called the floating leg) for the remaining life of the reserve fund agreement.  *See* Tr. 877:13-17; 948:8-949:19; Vergara Dep. 45:25-46:21.

Despite their recognition of the industry-standard methodology, Washington TSA's experts have materially deviated from the generally accepted approach, or rejected it all together, in determining their respective Termination Amounts.

### 1.    Shapiro Inflated The Termination Amount With Hypothetical and Commercially Unreasonable Assumptions

As described in Swap Financial's memorandum presented in support of Washington TSA's Claim prepared by Peter Shapiro and James Vergara, Swap Financial employed the basic framework of the industry-standard methodology before distorting it to inflate Washington TSA's Claim.[23]  *See* Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009.  Swap Financial approached the valuation of the reserve fund agreement as a fixed-for-floating interest rate swap, comparing the cash flows from two "legs" –

---

[23]    On December 16, 2013, Peter Shapiro submitted an Expert Report pursuant to Federal Rule of Civil Procedure 26(a)(2) in which he opined that the "Termination Amount owed to Washington TSA is $38,007,347, plus Section 7.7(b) losses in the amount of $553,080, plus reasonable attorney and advisor fees," assuming that the RFA's maturity date is 2032. TSA Ex. W, Shapiro Expert Witness Disclosure. Other than this addendum, Shapiro's expert report is identical to Swap Financial's September 2009 Calculation of Loss Memo. *Compare id. with* Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009.

a fixed leg of 4.484%, and a floating rate of LIBOR plus adjustments. *Id.* However, in constructing the "floating" rate, which Shapiro acknowledged is of critical importance, Swap Financial made assumptions that are markedly inconsistent with market practice and substantially inflate its valuation of the RFA in Washington TSA's favor. *See id.*; Tr. 600:2-21, 639:4-13, 745:2-746:15. Swap Financial started with the 3-month LIBOR forward curve, moved the curve up by 66.6 basis points to represent the delivery of commercial paper,[24] and then moved the forward curve down by 429 basis points to represent a credit charge that a dealer might impose,[25] and then moved the forward curve down by an additional 25 basis points to represent a profit charge.[26]  Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009; Debtors' Ex. 63, Swap Financial Principia Screenshot v16; Debtors' Ex. 156, Swap Financial's Adjustments to LIBOR Chart.  Altogether, Swap Financial subtracted 3.874% from the three-month LIBOR rate.  Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009; Debtors' Ex. 63, Swap Financial Principia Screenshot v16.

However, when negative 3.874% is applied to the three-month LIBOR forward curve, the floating leg produced negative interest rates for most of the remaining 23 years on the RFA other than the period between May 2018 and November 2023.  *See* Debtors' Ex. 156, Swap Financial's Adjustments to LIBOR Chart.  Recognizing that the magnitude of the hypothetical dealer

---

[24]    In using commercial paper, Swap Financial did not use the highest yielding or "cheapest to deliver" securities in calculating the Termination Amount, despite recognizing that the industry-standard approach requires the use of the "cheapest to deliver" securities in valuing the RFA. Vergara Dep. 45:25-46:21, 169:15-24; Shapiro 30(b)(6) Dep. 129:13-24.

[25]    The "credit charge" alone represents nearly 85% of Washington TSA's claim and has no basis in market practice or reality.

[26]    To further undermine the reliability of Swap Financial's opinions, neither Washington TSA nor Swap Financial has produced any work papers explaining or showing the analysis that was done in connection with either the credit charge or the evaluation of the "cheapest to deliver" securities.

charges imposed would result in negative interest rates – meaning a lender pays a borrower to borrow money – Shapiro gave testimony at the Hearing that was inconsistent with the actual analysis that was performed by Swap Financial and revealed Shapiro's complete lack of understanding of the Principia model used by Swap Financial to calculate the Termination Amount. *See, e.g.,* Tr. 744:10-749:22. Shapiro unabashedly testified that "I don't know how to run this model." Tr. 628:12-629:22. Notwithstanding the fact that Swap Financial's memorandum and the Principia screenshots clearly show the subtraction of 3.874% from the LIBOR curve, Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009; Debtors' Ex. 63, Swap Financial Principia Screenshot v16, at the Hearing, Shapiro tried to explain that 3.874% should be subtracted from the Guaranteed Rate to value the RFA.[27] Tr. 754:20-25.

### 2. Curry and Hasterok Reject the Standard Methodology for Valuing RFAs

Curry and Hasterok,[28] despite recognizing the industry standard methodology, Tr. 545:17-546:13, 547:23-548:5 (Curry); 470:2-12 (Hasterok), created an *ad hoc* approach crafted only for this litigation. *See* Tr. 410:4-20, 465:20-466:8, 523:2-20. Curry and Hasterok are financial industry professionals whose purported expertise derives solely from their

---

[27]    Shapiro's explanation conflicts with the clear testimony of Vergara who, unlike Shapiro, knew how to run the Principia model. Vergara testified that Principa would "look at the two streams of payments. So we have our fixed rate, guaranteed rate payment, and then we have our floating rate payment which is based on the different assumptions that we input into the model in terms of the spread to an index and then the forward value of that index, which is just determined by the market. And so you would look at those two cash flows and discount each period. . . . and then you would sum those up and take the present value of them to come up with the net value, the net mark-to-market value." Vergara Dep. 116:3-117:3. Not surprisingly, Vergara's testimony is consistent with the recently produced screenshot from the Principia model revealing two streams of cash flows: one for the Guaranteed Rate and the other for LIBOR-3.874%. TSA Ex. AA, Principia Discount Rate and Cash Flows Screenshot, SFG_002543-44.

[28]    Shapiro referred Curry and Hasterok to Washington TSA's attorneys. Tr. 544:18-25.

experience, yet they have turned their backs on that experience and discarded the industry-standard methodology.

As part of their admittedly novel approach, Curry and Hasterok rejected the use of forward yield curves for valuing a long-dated financial instrument and opined – with no justifiable or rational basis – that Washington TSA will only earn 0.65% on its Reserve Fund for the next 23 years. Tr. 433:12-435:15; Debtors' Ex. 43, Excel Spreadsheet created by Curry and Hasterok. To determine the Termination Amount, Curry and Hasterok merely deducted 0.65% from the Guaranteed Rate of 4.484% and discounted the result to present value (also using 65 basis points as the discount rate). *See id*. Curry and Hasterok attempted to justify their novel approach by claiming it would not be "fair" for Washington TSA to have to value the RFA consistent with the industry standard. Tr. 380:7-13. However, the RFA requires that any valuation done by Washington TSA must be done "as if it were Lehman." Joint Ex. 1, RFA at § 7.6(c). Indeed, it would be manifestly "unfair" to all other claimants in the Lehman bankruptcy for Washington TSA to be permitted to cast aside the industry standard in favor of its own manufactured methodology to inflate the Termination Amount.

## III.    Argument

Washington TSA's Claim must be rejected because it was calculated in violation of both the Bankruptcy Code and the explicit terms of the RFA governing the procedure for determining the Termination Amount.

First, Washington TSA's valuation violates the plain language of § 562 of the Bankruptcy Code. Since commercially reasonable determinants of value were available as of March 25, 2009, the date on which the parties agree that the RFA should be valued, Washington TSA should have used these commercially reasonable determinants of value, but did not. Instead, Shapiro employed commercially unreasonable assumptions, most notably, in connection with his

- 24 -

egregious credit charge, to inflate the Termination Amount in favor of Washington TSA. *See* Tr. 946:4-11 (Gruer testifying that "Swap Financial's credit charge substantially exceeds any commercially reasonable credit charge that I have seen or calculated in my career"). Washington TSA's own expert Hasterok even acknowledged that he would be hesitant to use a credit charge of the magnitude of Shapiro's credit charge. Tr. 428:2-13. Likewise, Curry and Hasterok, unambiguously disregarded market indicators and the industry standard methodology in calculating their inflated Termination Amount. *See* Tr. 427:17-25, 461:23-462:3. Neither course of action is permissible.

Second, Washington TSA's Claim should be rejected for violating the plain language of the RFA. The RFA is clear that upon the occurrence of a Lehman Event of Default, Lehman is to determine the Termination Amount. Joint Ex. 1, RFA at § 7.6. To the extent that Lehman does not determine the Termination Amount, the RFA allows Washington TSA to determine it, so long as it makes the determination "as if it were Lehman." *Id*. Moreover, the definition of the Termination Amount outlined a specific procedure that must be followed to determine the Termination Amount and further required that the Termination Amount be determined reasonably and in good faith. *Id*. at § 1. Washington TSA failed to comply with any of these requirements contained in the RFA. Instead, Washington TSA hired experts to inflate its Claim at the expense of the other creditors of the Lehman Estate. Washington TSA's inflated Claim must be rejected.

## A. Washington TSA Cannot Satisfy Its Burden of Proof

Washington TSA bears the burden of proof in connection with its Claim. Fed. Bank. R. P. 3001(f) adv. Comm. Notes; s*ee also Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773-74 (B.A.P. 2d Cir. 2000). In order to meet this burden, Washington TSA must demonstrate that it

determined its Claim in accordance with the Bankruptcy Code and the language of the RFA. Washington TSA has failed to do so.

## B.    Section 562 of the Bankruptcy Code

Section 562 of the Bankruptcy Code provides that the RFA should be valued using "commercially reasonable determinants of value" on the rejection date, and if "commercially reasonable determinants of value" are not available on that date, then the valuation must be done "as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562.  The parties agree that, pursuant to Section 562, the valuation date for the RFA is March 25, 2009, the date on which the RFA was rejected. Uncontested Facts at ¶ 28.  Section 562 requires the Court to determine the value of the RFA independent of anything that may have happened subsequent to March 25, 2009.

The Delaware Bankruptcy Court in *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181 (Bankr. D. Del. 2009), warned of the "moral hazard" that would be created if Section 562 were disregarded:

> If damages were measured at some future date, the [counterparty] could hold the asset at little or no risk.  If the price of the asset were to rise, the [counterparty] participant would capture that increase up to the full amount owed under the agreement.  If the price were to fall, however, the [counterparty's] losses would be covered because its deficiency claim would rise accordingly.  Even if such a claim were not to be paid at 100%, there would certainly be instances where the discounted claim is sufficiently large to motivate the [counterparty] to shift the risk to the debtor.  In effect, this would make the debtor an insurer of the [counterparty's] investment even though the debtor has no control over the management of the asset—thus, the moral hazard.

*Id.* at 191.

There is no dispute that "commercially reasonably determinants of value" existed on March 25, 2009 by which the value of the RFA can be determined.  All of the experts proffered

by both Washington TSA and Lehman, as well as Washington TSA's long-time financial

advisor, PFM, agree that it is standard practice in the market to determine the value of a reserve

fund agreement based upon the forward curves in effect on the date of the valuation.[29]

Tr. 465:20-466:8 (Hasterok); 470:2-12 (Hasterok); 545:17-546:13 (Curry); 547:23-548:5 (Curry);

639:4-14 (Shapiro); 844:14-845:2 (Babbel); 949:6-19 (Gruer); 961:18-962:10 (Gruer); Harris

(PFM) Dep. 19:4-20.

    Likewise, there is no dispute that market data from which forward curves could be

constructed was available on March 25, 2009. *See* Debtors' Ex. 43, Excel Spreadsheet created

by Curry and Hasterok (recording market data available as of March 25, 2009, including implied

three-month LIBOR rates); Tr. 849:14-850:16, 951:5-9, 953:13-954:2. Indeed, both Lehman's

expert, Gruer, and Washington TSA's expert, Shapiro, relied upon forward curves, as of March

25, 2009, in determining their respective views as to the value of the RFA. *See, e.g.,* Tr. 949:5-

19; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10,

2009. Given that "commercially reasonable determinants of value" existed on March 25, 2009,

those must be used to determine the value of the RFA as of that date. Nothing in the Bankruptcy

Code permits a party to reject available "commercially reasonable determinants of value" based

upon that party's subjective criticism of the market approach.

### C.    Lehman's Valuation Is Reasonable and Based on Industry Standard Methodology

    Lehman's valuation is based on the methodology that is used by market participants to

value forward delivery agreements like the RFA every day, regardless of whether the valuation

---

[29]    While two of Washington TSA's experts, Curry and Hasterok, argue that the industry-standard approach should be discarded because it is not "fair" to Washington TSA, they concede, as they must, that the market would value the RFA with the use of forward curves in effect on the date of the valuation. *See* Tr. 465:21-466:8 (Hasterok); 536:21-537:7 (Curry).

at issue is related to executing a new transaction, placing a value on an existing transaction, or terminating a transaction, and regardless of whether the valuation was on behalf of a dealer or an issuer.[30]  Debtors' Ex. 139, Gruer Report at ¶ 34.  In addition to being generally accepted, Lehman's methodology is consistent with the RFA that provided Lehman with the right to deliver the "cheapest to deliver" Eligible Securities.  Joint Ex. 1, RFA at § 2.1.  Gruer reviewed the yield curves on the valuation date for each type of Eligible Securities using information published by Bloomberg and determined that U.S. Agency Securities were the highest yielding or cheapest to deliver Eligible Securities on such date.  Debtors' Ex. 139, Gruer Report at ¶ 42.  Next, Gruer developed a forward curve for U.S. Agency Securities.  Tr. 949:6-19.  Again, it is standard market practice to use forward rates of interest to value forward commitments like the RFA.  Debtors' Ex. 138, Report of Professor David F. Babbel at 10.  Gruer completed his mid-market valuation by calculating the future cash flows of the two legs of the transaction and discounting the difference between such cash flows to present value.  Debtors' Ex. 139, Gruer Report at  ¶¶ 40, 47, 48.  Ultimately, Gruer determined that the mid-market value of the cash flows was $1,359,394.59 payable by Washington TSA to Lehman.  *Id.* at ¶ 49.

Because Washington TSA has not replaced the RFA, the appropriate valuation is a "mid-market" valuation (*i.e.*, a valuation without the imposition of dealer charges).  Indeed, Washington TSA's long-time financial advisor, PFM, testified that the "mid-market" value is where PFM has "historically seen these sorts of agreements terminate."  Harris Dep. 43:10-14.

---

[30]     Washington TSA's argument that the standard methodology for valuing RFAs should be rejected because the market for new reserve fund agreements was "dead" in March 2009 has no basis. *See* Tr. 995:2-22. Even if there was not a single tobacco reserve fund agreement entered into during that time, market participants still had to  mark their books and value their positions in tobacco reserve fund agreements on a daily basis using the standard methodology for valuation.  Tr. 523:16-524:24, 536:21-537:7. Washington TSA's experts do not claim – because they cannot – that market participants stopped valuing the reserve fund agreements on their books at any point in time.  Instead, the market data is based on the cheapest to deliver of the Eligible Securities and is readily available in the market.

Gruer's mid-market calculation, based on the industry-standard methodology and the agency forward curve is $1,359,395 (payable by Washington TSA).[31]

### D.    Washington TSA's Determination of the Termination Amount Fails to Meet the Requirements of the RFA

The definition of the Termination Amount in the RFA outlined a specific procedure that must be followed to determine the Termination Amount.  Initially, the RFA dictated that the Termination Amount should be determined:

> on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay the Dealer . . . in consideration of such Dealer entering into an agreement with the Burdened Party . . . which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under [the RFA] . . . .

Joint Ex. 1, RFA at § 1.  Only in the event that three market quotations cannot be obtained, can the Termination Amount then be based upon a calculation of the Washington TSA's "total losses or … gains." *Id.*  Any determination of the Termination Amount – whether it is based upon market quotations or a loss calculation – must be done "reasonably and in good faith."  *Id.*  If Washington TSA determined the Termination Amount in accordance with the requirements of the RFA, then its determination is binding "absent manifest error."  *Id.*

### 1.    Washington TSA Deliberately Failed to Seek Market Quotations

Without a shred of documentary evidence in support, Washington TSA claimed that it solicited market quotations, but that it was unable to obtain market quotations.  Then, based upon

---

[31]    Shapiro's mid-market value can be determined by looking at LIBOR + 66 bps (representing the delivery of commercial paper) and is $3,685,692 (payable by Lehman). Tr. 1041:11-19; Debtors' Ex. 139, Gruer Report at ¶ 68. Washington TSA's long-time financial advisor, PFM, used an assumption of LIBOR + 10 bps to determine the mid-market value of reserve fund agreements. Harris Dep. 43:10-14. Using LIBOR + 10 bps as of March 25, 2009, the mid-market value of the RFA is $7,463,121 (payable by Lehman).  Not surprisingly, the mid-market values determined using the assumptions employed by Shapiro and PFM are much more in line with Lehman's valuation than Washington TSA's egregious Claim.  These mid-market values are also consistent with the market quotation, which Lehman obtained from Wachovia, as of March 25, 2009, that placed a value on the RFA of $6.225 million (payable by Lehman).  Debtor's Ex. 44, Email chain between Casey Rogers and Sergey Arefiev, Mar. 26, 2009.

the alleged failure of the market quotation process, Washington TSA proceeded to the subjective

alternate calculation of its "losses . . . or gains."  Joint Ex. 1, RFA at § 1.  However, the evidence

revealed that Washington TSA deliberately avoided the market quotation process in order to

avail itself of the more subjective "losses . . . or gains" analysis.  Moreover, in light of the

absence of any supporting evidence that Washington TSA conducted a market quotation process,

Lehman is entitled to an adverse inference that Washington TSA avoided the market quotation

process because it knew the results would not support its inflated Claim against Lehman.

Shapiro testified that Swap Financial solicited market quotations from "every conceivable

dealer," but did not receive any quotes – either indicative or actionable – in response.[32]  *See* Tr.

718:2-25.  According to Shapiro, "We called every conceivable provider in this business, and

people just said I'm not doing tobacco FDAs.  Forget about it, I don't even want to see the

papers."  Tr. 587:6-24.  Shapiro emphasized that Swap Financial conducted the market quotation

process "several times in this case.  We had to do it right around the time of the rejection date,

that is the termination date. . . . we also had done it earlier in the process, because we were

seeking to evaluate it on a different day as well."  Tr. 720:12-20.  According to Shapiro, these

quotations were solicited by himself and James Vergara.  Shapiro 30(b)(6) Dep. 104:21-105:7;

Tr. 718:2-18.  Notwithstanding the claim that quotations were solicited several times, not a

single document corroborated Shapiro's story.  Tr. 719:23-720:11.

Not only is there no documentary evidence reflecting any market quotation process

conducted on behalf of Washington TSA, the testimony in this case undermined Shapiro.  James

Vergara, the individual with primary responsibility at Swap Financial for determining the

---

[32]     Notwithstanding Shapiro's lack of specificity regarding the alleged process, counsel for
Washington TSA has claimed that 14 dealers were solicited.  *See* Letter from Paul Lawrence to the Hon. Shelley C.
Chapman, Apr. 14, 2014, at 2 ("TSA pursued market quotations, as required by the RFA, from 14 sources, none of
whom provided a quote").

Termination Amount, testified that he did not recall conducting any market quotation process for Washington TSA. Vergara Dep. 126:2-14, 133:18-134:6, 205:2-206:15. However, Kim Herman and Bob Cook had a different recollection. They both testified at the Hearing that Shapiro had received indicative quotes, but neither could recall the range of the indicative quotes. Tr. 190:6-21 (Herman); Tr. 235:24-236:12 (Cook). Shapiro discredited Herman's and Cook's testimony on this point, stating that he could not recall receiving "any type of quote, however indicative, and providing that information to Mr. Cook and Mr. Herman." Tr. 743:7-744:3.

Likewise, the documents that have been produced contradict Shapiro's testimony. On Friday, March 27, 2009, Washington TSA's attorney informed Washington TSA that the RFA should be valued as of March 25, 2009, the Rejection Date. Debtors' Ex. 45, Email chain between Swap Financial and Washington TSA, Mar. 30, 2009. Later, on that same day, Cook forwarded the attorney's email to Swap Financial and asked Shapiro to "proceed with calculations." *Id*. Shapiro responded in the early morning of the following Monday and Vergara furnished his calculations to Washington TSA that same day. *Id*. As Shapiro confirmed at the Hearing, no quotation process was conducted over the weekend before the Termination Amount calculation was done by Vergara. Tr. 721:18-722:11. Shapiro did not specify when the alleged market quotation process would have been done, if it was not done prior to calculating the Termination Amount.

Additionally, Swap Financial knows that a quotation solicitation process for purposes of placing a value on a derivative contract, such as is found in the RFA, is common in the industry, must be run fairly, must give the dealers a clear description of the agreement for which

quotations are being solicited and records must be kept of the process.[33]  *See* Vergara Dep. 125:19-25; Tr. 587:25-588:25.  For example, when it assisted the Tobacco Settlement Financing Corporation of State of New York with its claim against Lehman arising from two terminated reserve fund agreements, Swap Financial detailed the process by which it solicited quotations in a memorandum submitted with the proof of claim of the Tobacco Settlement Financing Corporation of the State of New York.  Debtors' Ex. 71, Proof of Claim No. 18990 by the New York Tobacco Settlement Financing Corporation against LBSF.  However, there is no memorandum here that contains the details of the alleged quotation process that was conducted for Washington TSA.  Indeed, Vergara explained that if Swap Financial had conducted a market quotation process for Washington TSA, it would most likely have recorded the results in a memorandum.  Vergara Dep. 205:11-206:18.  Yet, not a single document has been produced reflecting that any such process occurred.  In the absence of such records, it is impossible to assess whether the process was conducted in a reasonable and good faith manner.

In an attempt to excuse the absence of any documentary evidence of a quote process, Washington TSA argued that any market quotation process would have been futile because the market for reserve fund agreements was dead.  *See* Tr. 587:11-24, 588:12-589:4, 600:2-18, 722:16-723:24.  Yet this bald assertion is belied by the evidence.  In connection with Washington TSA's RFA, Lehman was able to obtain a market quotation from Wachovia for the RFA in March 2009 for $6,225,000.[34]  Debtors' Ex. 44, Email chain between Casey Rogers and Sergey Arefiev, Mar. 26, 2009.  Moreover, Curry and Hasterok, who were actual providers in the reserve fund market in 2009, acknowledged that indicative quotations were available at that time

---

[33]    Shapiro also testified that Swap Financial did not send out any bid packages to potential dealers that would have informed them regarding the terms of the deal in connection with the alleged quotation solicitation. Tr. 723:13-20.

[34]    This would be an amount payable to Washington TSA by Lehman.

for tobacco RFAs.  Tr. 469:20-25.  Their employer, Morgan Stanley, was providing indicative quotes to tobacco reserve fund agreement counterparties of Lehman in 2009.  Tr. 470:2-7. Consistent with the testimony of Curry and Hasterok, other tobacco reserve fund agreement counterparties have filed claims against Lehman purportedly based upon quotations that they received in the market around the same time Washington TSA claims it would have been futile to solicit quotations.  *See, e.g.*, Proof of Claim No. 17406 for  the Commonwealth of Virginia Tobacco Settlement Financing Corporation; Proof of Claim No. 17407 for the Commonwealth of Virginia Tobacco Settlement Financing Corporation; Proof of Claim No. 21488 for the Tobacco Settlement Financing Corporation (New Jersey).[35]  Indeed, PFM, a financial advisor who has represented a number of claimants in the Lehman bankruptcy with terminated reserve fund agreements, testified that in ***every*** instance, the claims asserted against Lehman were based on market quotations.  Harris Dep. 74:4-10.

Instead of confirming a good faith quote solicitation process, the documentary evidence revealed a deliberate intention to avoid the market quotation process to inflate Washington TSA's Claim.  Shortly after Washington TSA first contacted Swap Financial, internal emails among Swap Financial staff explained that Washington TSA "may be better off" not getting market quotations for Washington TSA.  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.  Instead, Swap Financial concluded that a "loss" calculation using certain assumptions would create a claim where "Lehman will owe [Washington TSA] a boat load of money."  *Id.*

---

[35]      While Proofs of Claim nos. 17406, 17407, and 21488 are not a part of the record, since they are filings in this bankruptcy case, the Court may take judicial notice of them.  *See Liquidation Trust v. Daimler AG (In re Old Car Co LLC)*, No. 11 Civ. 5039, 2011 U.S. Dist. LEXIS 134539, at *32-33 (S.D.N.Y. Nov. 22, 2011) ("it is appropriate to take judicial notice of filings in bankruptcy proceedings").

In the absence of any documentary evidence, the conflicting evidence regarding the alleged quote solicitation process and the evidence revealing an intention to avoid the market quotation process warrants an adverse inference that Washington TSA avoided the market quotation process because it knew the results would not support its inflated Claim against Lehman.

An adverse inference is appropriate where:

> (1) [] the party having control over the evidence had an obligation to timely produce it; (2) [] the party that failed to timely produce the evidence had "a culpable state of mind;" and (3) [] the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).  *See also Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222-24 (S.D.N.Y. 2013) (granting an adverse inference motion for the defendants' failure to produce crucial evidence); *Short v. Manhattan Apartments, Inc.*, 286 F.R.D. 248, 255 (S.D.N.Y. 2012) (holding that a party's repeated refusal to turn over relevant documents . . . is enough to establish culpability and that the documents not produced are relevant based on the party's bad faith and circumstantial evidence sufficient to show that the withheld documents were damaging to the withholding party); *PSG Poker, LLC v. DeRosa-Grund*, No. 06 Civ. 1104, 2008 WL 190055, at *12 (S.D.N.Y. Jan. 22, 2008) ("[party's] repeated failure to either produce relevant documents or a credible story regarding their whereabouts-despite the admonitions of this Court and repeated requests from the [other party]- can only be interpreted as an intentional and willful act").

All of the elements for an adverse inference are met here.  Evidence regarding the alleged market quotation process would have been in the possession of Washington TSA and/or its financial advisor, Swap Financial.  Washington TSA failed to produce any such evidence, which

would be directly relevant to the Claim asserted by Washington TSA.  Finally, there is evidence

that Washington TSA acted in bad faith in avoiding the market quotation process in order to have

the latitude to inflate its Claim against Lehman.  *See* Debtors' Ex. 31, Email chain between

Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.

Washington TSA simply hopes that the Court will disregard the RFA's requirement that

it solicit market quotations and instead let it calculate its "losses . . . or gains."  But the language

of the RFA is unambiguous that Washington TSA can only resort to a determination of "losses

… or gains" in the event that it is "unable" to secure at least three market quotations.  Joint Ex. 1,

RFA at § 1.  Washington TSA cannot disregard certain provisions of a contract and selectively

decide which provisions of the contract it wishes to follow.  *See NML Capital v. Republic of

Argentina*, 17 N.Y.3d 250, 259 (2011) ("when parties set down their agreement in a clear,

complete document, their writing should be enforced according to its terms"); *Pavarini

McGovern, LLC v. Tag-Court Square, LLC*, 62 A.D.3d 680, 680 (2d Dep't 2009) ("[w]hen

interpreting a [] contract negotiated by and entered into at arm's length between sophisticated

business people, represented by an attorney, a court [would be obligated to] enforce the

agreement according to its terms"); *Maroney v. Hawkins*, 50 A.D.3d 862, 863 (2nd Dep't 2008)

(refusing to enforce a valuation agreed to by the parties, which was not consistent with the

valuation mechanism of the contract); *ESPN, Inc. v Off. of the Comm'r of Baseball*, 76 F. Supp.

2d 383, 400 (S.D.N.Y. 1999) (impermissible to selectively enforce some clauses of a contract

and not others).  Contracts must be interpreted in such a manner so as to give "reasonable, lawful

and effective meaning to all the terms."  Restatement (Second) of Contracts, § 203 (1981); *see

also Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of

contracts require us to adopt an interpretation which gives meaning to every provision of a

contract or, in the negative, no provision of a contract should be left without force and effect.").
Washington TSA's cavalier disregard of this requirement so that it can resort to its subjective
inflated valuations that are inconsistent with market practice cannot be permitted.

**2.    Washington TSA Failed To Determine the Termination Amount
Reasonably and in Good Faith**

The RFA expressly required that any Termination Amount determination must be done
"reasonably" and "in good faith."  Joint Ex. 1, RFA at § 1.  Yet Washington TSA's Termination
Amount was not determined reasonably or in good faith.  Instead, Washington TSA first adopted
a "wait-and-see" strategy with the goal of finding an advisor to calculate an inflated, or "grossed-
up," claim against Lehman in order to be made whole in bankruptcy dollars.  *See, e.g.*, Tr. 141:3-
22, 233:12-234:12.  Then Washington TSA cast aside its trusted long time (and current) financial
advisor and engaged Swap Financial's Peter Shapiro, who lacked any expertise with reserve fund
agreements.  Notwithstanding its lack of expertise, Swap Financial accomplished the task it had
been assigned – to "maximize" Washington TSA's Claim against Lehman – by avoiding the
market quotation process and calculating an inflated Termination Amount that bears no relation
to the RFA's market value.  Then, in an attempt to bolster the outlandish Termination Amount
presented by Swap Financial, Washington TSA engaged two additional "experts," Curry and
Hasterok, who concocted a novel valuation methodology for the RFA – one they admit they have
never seen or used in their combined 40+ years of experience in the market, Tr. 410:4-20, 523:2-
20 – that conveniently results in a Termination Amount nearly identical to that determined by
Swap Financial.  If Washington TSA had calculated the Termination Amount in good faith, it
would have used the industry-standard methodology and market-accepted assumptions, which
would result in Washington TSA owing money to Lehman.  Washington TSA's failure to act

- 36 -

reasonably and in good faith has rendered its Termination Amount determination meaningless, and Washington TSA's Claim should be denied.

Further, Washington TSA's disregard for Section 7.6(c) of the RFA evidenced its lack of good faith. Section 7.6(c) of the RFA provided that in the event that the Burdened Party were to calculate the Termination Amount, it must do so "as if it were Lehman." Prior to the Hearing, Washington TSA claimed that it was going to show that this provision should be disregarded as a mistake. *See* Washington TSA's Opposition to Motion to Exclude Curry and Hasterok at 9 ("Moreover, as TSA will show at the evidentiary hearing, the negotiations surrounding the RFA demonstrate that this provision was held over from Lehman's preliminary draft only as an oversight…"). In other words, Washington TSA intended to produce parol evidence to vary the terms of an integrated contract. But, in the absence of demonstrating any ambiguity, such evidence is not permitted. *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ( "If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received. . . ."). Instead, the Court is required to enforce all provisions of the RFA as written. *See ESPN, Inc.*, 76 F. Supp. 2d at 400; *NML Capital*, 17 N.Y.3d at 259; *Muzak Corp.*, 1 N.Y.2d at 46; *Pavarini McGovern, LLC*, 62 A.D.3d at 680; *Maroney*, 50 A.D.3d at 863 (S.D.N.Y. 1999); Restatement (Second) of Contracts, Section 203 (1981). Moreover, even if the Court did consider parol evidence, none of the evidence presented by Washington TSA demonstrated that Section 7.6(c) was mistakenly included in the RFA. To the contrary, the evidence confirmed that when the parties discovered a mistake in the RFA, they promptly amended it. Joint Ex. 2, Amendment Agreement; Tr. 134:16-135:8 ("when we discovered the [maturity date] error, we corrected it").

### a. Washington TSA Rejected PFM's Valuations and Engaged Swap Financial to "Maximize" the Claim Against Lehman

Within days of LBHI's bankruptcy, Washington TSA learned from its long-time financial advisor, PFM, that if it terminated the RFA, it "would have to pay Lehman approximately $1,200,000." *See* Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim Herman, et al., Sept. 25, 2009 at 1; Herman Dep. 167:24-168:7; Tr. 169:19-170:2. Not interested in making such a payment to Lehman, Washington TSA decided to "wait and see" whether the market would move such that it would not owe a Termination Amount to Lehman. Tr. 140:17-141:15.

In the fall of 2008, Washington TSA asked PFM, its financial advisor since the Bonds' issuance in 2002, to calculate the Termination Amount at various points in time so that it could assess whether it was "in the money" under the RFA. *See* Debtors' Ex. 21, Email from Bob Cook to John Bonow *et al.*, Nov. 10, 2008. As requested by Washington TSA, PFM did these calculations consistently, using a "spread to LIBOR" analysis and assuming a spread to LIBOR of + 10 bps.[36] Harris Dep. 42:15-43:14; Debtors' Ex. 25, Email chain between Bob Cook and Debra Stephenson, Nov. 17, 2008. In other words, PFM used the forward LIBOR curve and moved it up 10 basis points (as opposed to Swap Financial moving the forward LIBOR curve down 387.4 basis points). PFM's employee (Christopher Harris) who did these valuations for Washington TSA explained that LIBOR + 10 bps "is reflective of where [PFM has] historically seen these sorts of agreements terminate" and "effectively reflective of . . . the mid-market level

---

[36]        Using that consistent methodology, PFM determined that Washington TSA would have owed Lehman approximately $1.2 million if the RFA had been terminated in September 2008 and then, in November 2008, Lehman would have owed Washington TSA approximately $1.2 million if the RFA had been terminated at that time. Tr. 140:23-142:22, 169:19-170:2; Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim Herman, et al., Sept. 25, 2009 at 1; Debtors' Ex. 25, Email chain between Bob Cook and Debra Stephenson, Nov. 17, 2008; Herman Dep. 167:24-168:7.

for the [reserve fund] agreement."[37]  Harris Dep. 43:10-14.  Indeed, Washington TSA's

Executive Director Kim Herman admitted that he believed that PFM had made the calculations

in accordance with the definition of Termination Amount in the RFA.  Tr. 170:8-171:2.

By November 2008, the market did move slightly in Washington TSA's favor, and PFM

advised that Lehman would owe Washington TSA a Termination Amount of $1.2 million if the

RFA were terminated at that time.  Tr. 142:2-22.  But Washington TSA's strategy had now

evolved.  No longer was Washington TSA simply trying to avoid making a payment to Lehman:

now Washington TSA wanted to maximize, i.e. "gross-up," its claim against Lehman in order to

be "made whole."  Tr. 233:12-234:9; Debtors' Ex. 99, Email chain between Peter Shapiro and

Kim Herman, Jul. 14, 2010 ("it will be a cold day in hell that we pay Lehman anything!").

In order to meet its opportunistic goal, Washington TSA cast its long-time trusted

financial advisor PFM[38] aside and hired a new financial advisor, Swap Financial. [39]  Washington

TSA engaged Swap Financial, on an "emergency" basis so that it could avoid the statutory

---

[37]      Washington TSA issued a Request for Proposals for Quantitative Consultant Services on March
15, 2010 (the "Quantitative Consultant RFP").  Debtors' Ex. 87, Email from Peter Shapiro to James Vergara and
Lillian Chern, attaching Response to the TSA to provide Quantitative Consultant Services, Mar. 15, 2010.  PFM and
Swap Financial both responded to the Quantitative Consultant RFP.  Debtors' Ex. 89, Swap Financial "Presentation
to Provide Quantitative Consultant Services" to Washington TSA, Apr. 28, 2010; Debtors' Ex. 90, PFM
Presentation to Washington TSA Apr. 28, 2010.  PFM continued to use LIBOR plus 10 basis points to value the
RFA in its presentation in response to the Quantitative Consultant RFP.  Debtors' Ex. 90, PFM Presentation to
Washington TSA Apr. 28, 2010 at 9.  Swap Financial was retained as Washington TSA's Quantitative Consultant on
May 3, 2010.  Debtors' Ex. 94, Memorandum from Bob Cook to Washington TSA Board, Jun. 28, 2010, at 2.

[38]      When Kim Herman was deposed as a 30(b)(6) witness for Washington TSA, he affirmed that "we
obviously had confidence in PFM. . . . We felt confident they could do such a valuation, yes."  Herman Dep. 43:11-
15.  This confidence was likely grounded in Washington TSA's personal experience with PFM and PFM's rich
experience in this area.  Since September 2008, PFM has advised on 41 swap terminations or transfers related to the
Lehman bankruptcy.  See Debtors' Ex. 90, , PFM Presentation to Washington TSA Apr. 28, 2010 at 7.  PFM also
has particular experience in the tobacco RFA market, having assisted in the structuring of eight tobacco reserve
funds accounts.  Id at 3.  PFM's employees have over 30 years combined Wall Street experience and have arranged
a transaction with a notional principal exceeding multiple billions of dollars since 1997.  Id. at 2; Harris Dep. 59:3-6;
59:9-61:20.

[39]      Washington TSA staff was familiar with Shapiro because he had advised them on swap
agreements for another Washington State agency for which they were also staff.  Herman Dep. 39:9-19; 86:13-21;
Cook Dep. 62:17-63:4; Tr. 145:9-146:15.

requirements for engaging a contractor and avoid obtaining Board approval.[40]  Tr. 146:16-147:10; Herman Dep. 44:19-45:5; 225:15-18; Cook Dep. 73:8-20; 78:11-18.  Swap Financial proceeded to declare PFM's Termination Amount calculation "horribly wrong," without any serious consideration of the calculation, and instead embarked upon a path to recover "a boat load" of money for Washington TSA from Lehman.  Shapiro 30(b)(6) Dep. 65:2-66:8; Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.

Shortly after Washington TSA first contacted Swap Financial, internal emails among Swap Financial staff illustrate that Swap Financial's goal was to inflate Washington TSA's claim even at the cost of ignoring the terms of the RFA.  For example, one email explained that while "[Swap Financial] could try to get MQs [market quotations]," Washington TSA "may be better off" simply calculating Washington TSA's "loss."  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.  Avoiding the market quotation process would allow Swap Financial to manipulate the "spread to LIBOR" to manufacture whatever Termination Amount it desired.  Id.  It was suggested that "L-XXX" (meaning a spread to LIBOR of at least a negative 100 basis points) would ensure that Lehman would owe Washington TSA "a boat load of money."  Id.

Washington TSA freely admitted that Swap Financial was engaged to "maximize" its claim against Lehman.  Tr. 233:12-234:12.  Indeed, Swap Financial's engagement letter provided that "[i]n consultation with counsel, we will assist in development of a strategy for making whatever claim against Lehman is warranted, with a goal to maximizing the Authority's potential financial benefit."  Debtors' Ex. 34, Memorandum from Swap Financial to Washington TSA,

---

[40]     Swap Financial's engagement by Washington TSA in December 2008 was not specifically approved or authorized by the Washington TSA Board.  Herman Dep. 234:5-8.

Dec. 12, 2008 at 1.  Washington TSA's Senior Director of Finance, Bob Cook, explained that Washington TSA wanted "to make sure that [it was] made whole by Lehman…"  Cook Dep. 76:19-22; Tr. 234:4-12.  In the words of Washington TSA's Executive Director, Kim Herman, maximizing the claim against Lehman was just "business."  Herman Dep. 226:20.

Washington TSA's switch from PFM to Swap Financial had a drastic effect on Washington TSA's Claim.  Whereas PFM calculated a $1.2 million payable to Washington TSA in November 2008, Swap Financial calculated the Termination Amount to be $27.5 million as of January 12, 2009.  Debtors' Ex. 40, Declaration of Peter Shapiro in support of Washington TSA's motion to compel Lehman to assume or reject the RFA at 3.  While neither Washington TSA nor Swap Financial has produced any documentation related to the calculation of this $27.5 million Termination Amount, it equates to approximately LIBOR minus 170 bps, or a swing of 180 basis points from PFM's "mid-market" calculations.  Given that PFM's valuation was less than 5% of that determined by Swap Financial, it is no surprise that Washington TSA has continued to rely upon Swap Financial for its valuation of the RFA.  Washington TSA successfully found a financial advisor that would concoct a claim that would make Washington TSA "whole" in bankruptcy dollars – and then some.

The following chart summarizes the various Termination Amount valuations from Washington TSA's perspective.[41]  Shapiro's credit charge, which accounts for 85% of the Claim,

---

[41]        With the exception of "Washington TSA's Claim, these amounts do not include "fails" (unpaid amounts from December 1, 2008 – March 25, 2009).  Washington TSA has calculated fails of $553,080.  Per Gruer's unrebutted opinion, Washington TSA's calculation was contrary to the RFA and instead should be reduced to $226,622.  Debtors' Ex. 139, Gruer Report, at ¶¶ 56, 57.

is shown in red.



### b.    Swap Financial's Determination of the Termination Amount Was Not Reasonable or Done In Good Faith

From the outset, Swap Financial did not approach the Termination Amount determination in good faith.  Instead, Swap Financial set on a course to avoid the market quotation process, knowing it would "be better off" to do so.  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.  This deliberate avoidance of the market quotation process not only ignored (and violated) the terms of the RFA, but it also demonstrated Swap Financial's fundamental lack of good faith in doing whatever it could to artificially inflate the Termination Amount calculation.  Once freed from the shackles of the market quotation process, Swap Financial proceeded to calculate Washington TSA's "losses or gains" in connection with the Termination Amount.

Although Swap Financial employed the framework of the industry-standard methodology to value the RFA, Swap Financial inflated the resulting Termination Amount through the imposition of egregious dealer charges that do not reflect market reality. Swap Financial approached the valuation of the RFA by using a "LIBOR plus spread analysis with an interest rate swap." Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2. According to Swap Financial, "the appropriate method" to value RFA "is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 4.484% and the other payer (TSA) would pay a floating rate." *Id.* The discounted difference between these two cash flows is the Termination Amount. The comparison of the two cash flows – one for the floating leg and one for the fixed leg – is exactly the same basic approach used by Lehman's expert, Sam Gruer, and the generally accepted market methodology to value a reserve fund agreement. Tr. 545:17-546:13 (Curry); 639:4-14 (Shapiro); 844:14-20 (Babbel); 949:6-19 (Gruer).

Swap Financial and Lehman's expert, Gruer, agreed that the Guaranteed Rate of the RFA should be used in calculating the fixed payment leg. Tr. 629:20-630:8 (Shapiro); 956:18-24, 1004:5-8 (Gruer). They also agreed that the floating leg "should represent the value of the securities which are going to be delivered – short term obligations (treasuries, agencies or commercial paper)" (*i.e.*, the Eligible Securities). Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2; Tr. 948:15-949:12, 950:16-951:4. There was also agreement that the floating leg should be determined using the "cheapest to deliver" of the Eligible Securities. Vergara Dep. 45:25-46:21, 169:15-24; Shapiro 30(b)(6) Dep. 129:13-24; Tr. 948:15-949:12. Notwithstanding this methodological agreement, Swap Financial did not use the "cheapest to deliver" of the Eligible Securities in constructing the floating leg, but

instead used commercial paper.  Tr. 594:9-17, 714:2-10.  However, as demonstrated by Gruer,

U.S. Agency Securities were the cheapest to deliver of the Eligible Securities over the life of the

RFA as of March 25, 2009 (that is, such securities would have produced the best economic result

for Lehman).  Debtors' Ex. 139, Gruer Report at ¶ 42; Tr. 952:24-955:23.

The selection of which Eligible Security to use in calculating the floating leg makes a

material difference in the valuation of the RFA.[42]  Gruer constructed a forward curve for U.S.

Agency Securities and using that curve, determined that the mid-market value of the RFA was

$1,359,394.59 payable to Lehman by Washington TSA.[43]  Debtors' Ex. 139, Gruer Report at ¶¶

58, 68.  Under Shapiro's instructions, Vergara looked at the historical trading relationship

between commercial paper and LIBOR and determined that it was 66.6 basis points.[44]  Tr.

675:12-18; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial,

Sept. 10, 2009 at 2.  Based upon that information, Swap Financial began its calculation of the

floating leg by adding 66.6 basis points to the forward LIBOR curve, which resulted in a mid-

market value for the RFA at $3,685,691.56 payable to Washington TSA by Lehman.  *See* Tr.

---

[42]     Under the RFA, Washington TSA was required to accept any Eligible Securities that Lehman may have delivered and accepted the risk of default of those securities.  Since the termination of the RFA, Washington TSA has had the ability to select less risky investments, thereby improving upon the bargain they had made with Lehman.  Lehman is not obligated to compensate Washington TSA for its investment decisions since the termination of the RFA, only for the losses or gains that Washington TSA incurred as a result of the termination of the RFA.

[43]     There is no merit in Washington TSA's argument that it would be inappropriate to choose agencies as the Eligible Security to use in calculating the Termination Amount because agencies cannot be hedged.  At the Hearing, both of Lehman's experts testified that agencies can be hedged.  Lehman's expert David Babbel testified that "[t]here is definitely a hedge market for agencies" and that he was aware of an agency swap market.  Tr. 924:14-20, 925:3-7 , 928:10-14.  Gruer testified that as a market participant he had personally used agencies to price forward purchase agreements, and that he had entered into transactions involving the delivery of agency securities.  Tr. 980:25- 981:8, 981:14-16.

[44]     At the Hearing, Shapiro claimed that his "staff" had overstated this spread by nearly twenty times.  Tr. 608:19-609:13.  Shapiro testified that it was a mistake to use a spread to LIBOR of +66 basis points to represent the delivery of commercial paper and instead, the correct spread to LIBOR should be  3.1 basis points.  *Id.*  Yet when Shapiro was deposed regarding this very same spread, he vehemently defended the use of LIBOR + 66 basis points, stating that he was "try[ing] to do things accurately, fairly, correctly, defensively."  Tr. 701:9-702:11; Shapiro 30(b)(6) Dep. 141:10-24.  Moreover, Shapiro testified at his deposition that he was responsible for selecting commercial paper and determining the spread, not his "staff."  Shapiro 30(b)(6) Dep. 131:22-133:22; Tr. 715:19-24.

967:6-11; 1041:10-16; Debtors' Ex. 139, Gruer Report at ¶ 68. By not using the "cheapest to deliver" of the Eligible Securities, Swap Financial inflated the Termination Amount by approximately $5 million.

Then, to further inflate the Termination Amount, Swap Financial imposed two hypothetical "dealer charges" to purportedly represent what a dealer would require to replace the RFA: (1) a credit charge of 429 basis points and (2) a profit charge of 25 basis points. Tr. 599:11-601:10; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2-3. Such theoretical dealer charges that were never incurred by Washington TSA (or even quoted by a dealer) are not properly recoverable by Washington TSA. The definition of the Termination Amount is expressly limited to losses or costs actually incurred. *See* Joint Ex. 1, RFA at § 1. Because Washington TSA did not replace its RFA, it should not be entitled to recover these "dealer charges" that it did not, in fact, incur and would never incur.

Even assuming *arguendo* that dealer charges are appropriately included in the Termination Amount when the RFA has not been replaced, the magnitude of these charges reveals a fundamental lack of understanding of the nature of the "dealer charges" seen in the industry and bear absolutely no relationship to the RFA.[45] Swap Financial's credit charge is $32,431,696.44, which alone comprises nearly 85% of Washington TSA's Claim. *See* Debtors' Ex. 139, Gruer Report at ¶¶ 68, 71.

Swap Financial based its 429 basis point credit charge on the purported spread between the trading yields of Washington TSA's Bonds and an A-rated municipal-bond index as of

---

[45]     To the extent that dealer charges are included, Gruer calculated commercially reasonable dealer charges, using Swap Financial's assumptions in terms of the delivery of commercial paper and a mid-market value of $3,685,692. Debtors' Ex. 139, Gruer Report at ¶ 68. Using the industry-standard approach to determine credit charges by taking into account potential exposure and possibility of default, Gruer determined that a market standard credit charge would be approximately 17 basis points – a dramatic departure from the 429 basis points claimed by Washington TSA. *Id.* Even assuming that 25 basis points is an appropriate profit charge, total dealer charges would be approximately 42 basis points.

March 25, 2009.  Tr. 599:11-22; Joint Ex. 11, Memorandum Regarding Calculation of Loss from

Swap Financial, Sept. 10, 2009 at 2.  Swap Financial simply took this 429 basis point credit

spread and inappropriately applied it directly to the LIBOR curve as a "credit charge."  Joint Ex.

11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2; Tr.

599:22-600:21.  By doing so, Swap Financial departed from market practice and moved the

floating leg down so dramatically that it applies negative interest rates for much of the forward

curve – essentially meaning that a lender would have to pay a borrower a return on the borrowed

money.  *See* Debtors' Ex. 159, Charges for Municipal Tobacco Credit and Profit Component

Graph No. 1; *see also*, chart, *infra* at § III(E). This resulted in the absurdity of assuming that the

dealer would have to buy securities in the market at negative yields.  Even Hasterok rejected

Swap Financial's use of the entire credit spread as a credit charge.  *See* Tr. 428:2-13.

In performing this fundamentally flawed analysis Swap Financial conflated the concepts

of a "credit spread" and a "credit charge."  *See* Tr. 599:5-600:21; 958:15-959:20.  The "credit

spread" that measures the difference between the yield on the Bonds and a benchmark bond

index does not measure the credit risk a dealer would face assuming the obligations of the RFA

or what that dealer would charge to assume such risk.  Tr. 958:15-959:20.  The credit risk

associated with entering into a reserve fund agreement is very different from the risks associated

with owning actual bonds.  *See* Tr. 1036:18-1039:14; Debtors' Ex. 139, Gruer Report at ¶¶ 64-65.

A bondholder is exposed both to the risk that interest payments will not be made and the

potential loss of the principal of the Bonds.  The bondholder is compensated for these risks by

means of the credit spread that it receives (*i.e.*, the "spread" above the interest rate that

equivalent "risk-free" bonds would yield).  A replacement RFA dealer would not have ***any***

exposure to a principal loss on the Bonds issued by Washington TSA.  In contrast to the

bondholder, a dealer entering into a reserve fund agreement includes a credit charge to protect itself against the risk that its counterparty will not be able to perform under the terms of the governing instrument.  Tr. 963:2-18.

In other words, a "credit charge" relates to the counterparty and its ability to pay in a Termination Amount in the event of a default, not to the underlying Bonds.  Debtors' Ex. 139, Gruer Report at ¶ 64.  In Gruer's experience, a dealer will consider two factors to determine the credit charge to impose:  (a) the creditworthiness of the issuer, and (b) the dealer's risk of potential exposure to the issuer.  *See* Tr. 1037:6-19, 1038:24-1039:9; Debtors' Ex. 139, Gruer Report at ¶¶ 64-65.  As explained by Gruer, a dealer's credit charge for a reserve fund agreement would ***not*** be equivalent to the "credit spread" Swap Financial calculated.  Instead, there is an industry-standard approach to calculating a credit charge, which involves first, calculating potential exposures, *i.e.* the spread at which an issuer's bonds are trading to some index, and second, intersecting that with the probability of default by the dealer's counterparty, *i.e.* how often (and by how much) the dealer expects to be "in the money" under the reserve fund agreement.  *Id.* at ¶ 64-67; Tr. 962:11-964:16, 1036:18-1039:9.  In assessing the first step, as of the Termination Date, the potential exposure had reduced as compared to when the RFA was first entered into.  That is, interest rates were lower as of the Termination Date and the substantial passage of time reduced the extent of moves in exposure.  Next, the probability of default by the dealer's counterparty should be assessed.  These probabilities may be inferred from the "credit spread" embedded in a bond yield.  Debtors' Ex. 139, Gruer Report at ¶ 65.  However, this is only the starting point to the second step, as a dealer would then apply default probabilities (derived from the credit spread) to each of the possible exposures in order to determine the credit charge.  Tr. 1038:24-1039:14; Debtors' Ex. 139, Gruer Report at ¶ 65.  In

other words, the "credit spread" is just one of the inputs that a dealer would use to determine a credit charge to impose.[46]  Tr. 959:2-20, 962:11-22.

Swap Financial's credit charge does not represent the real credit risk associated with entering into a reserve fund agreement, but instead significantly overstates such risk.  Shapiro admitted that he did not consider possible credit exposures and probability of default, in determining the credit charge he imposed as part of his Termination Amount calculation.  Tr. 650:2-25 (Shapiro stated "[A dealer] is not going to experience a loss without a default [by the issuer]").

Swap Financial's departure from market practice can be attributed, in part, to Swap Financial's lack of experience with valuing reserve fund agreements.  Peter Shapiro had no experience at all with reserve fund agreements, Shapiro 30(b)(6) Dep. 57:17-58:9, so he turned to his junior employee, James Vergara, to determine the Termination Amount.  Tr. 594:18-596:3, 716:18-717.  Indeed, when first asked by Washington TSA to value the RFA, Shapiro immediately asked his junior colleague, Vergara to "figure out how to put a value on it."  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial; *see also* Tr. 594:18-596:3 (Shapiro testifying that Vergara "knew these agreements very well.  And I asked him to take charge of taking the first cut at this."); Shapiro 30(b)(6) Dep. 76:3-77:6.  In fact, much, if not all, of the actual valuation work performed for

---

[46]     Using Swap Financial's calculated credit spread of 429 basis points and the industry-standard approach to determine a credit charge, Gruer determined a commercially reasonable credit charge of 16.9 basis points – a small fraction of the credit charge imposed by Swap Financial.  Tr. 959:21-960:12.  Replacing only Shapiro's egregious credit charge in Shapiro's calculation (i.e., leaving the Shapiro mid-market based on commercial paper and Shapiro profit charge in place), the Termination Amount calculation is reduced to $7,403,657.03, payable to Washington TSA by Lehman.  Tr. 960:19-961:9; Debtors' Ex. 139, Gruer Report, ¶ 68.  To be clear, this is not Gruer's view of what a hypothetical dealer would charge to replace the RFA, but a calculation done merely to illustrate how much Shapiro's valuation is inflated as a result of a commercially unreasonable credit charge.

Washington TSA was done by James Vergara.  *See* Shapiro 30(b)(6) Dep. 198:14-199:12; Tr. 622:17-23, 627:3-17, 629:14-19.

Vergara, though, had almost no experience with reserve fund agreements himself. Vergara's experience consisted of sitting next to traders at Lehman who were involved in pricing and valuing reserve fund agreements.  Vergara Dep. 40:5-41:17.  Vergara testified that he had only bid on fewer than five reserve fund agreements when his colleague was on vacation, but in each instance, Vergara relied upon the expertise of others to determine the critical assumptions – such as profit and credit charges – to be used in determining the bid price for reserve fund agreements.  *Id.* at 44:16-18, 48:25-49:13.  Moreover, while working at Lehman, Vergara had no experience in valuing reserve fund agreements, including in the event of a termination.  *Id.* at 61:15-62:19.

But discovery has revealed that Swap Financial's exaggerated credit charge was not merely a result of their lack of experience in the market, but instead was a deliberate tactic designed to inflate Washington TSA's Claim.  In connection with Vergara's calculation of the Termination Amount, Shapiro asked him to prepare a memorandum detailing how the calculation was done.  *See* Tr. 622:17-23.  The drafts of this memorandum revealed the steady and progressive inflation of the credit charge.  *See* Debtors' Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund Agreement with LBSF, Mar. 30, 2009; Debtors' Ex. 48, Email chain between Peter Shapiro and James Vergara, Apr. 20, 2009; Debtors' Ex. 49, Email from J. Vergara to P. Shapiro attaching draft memorandum, Apr. 21, 2009; Debtors' Ex. 65, Swap Financial Memorandum re Calculation of Loss for TSA's Reserve Fund Agreement with LBSF, Apr. 21, 2009; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009.

- 49 -

Based upon Vergara's limited exposure to reserve fund agreements, he was generally aware that profit and credit charges usually were in the "tens of basis points" not "hundreds of basis points."  Vergara Dep. 49:8-19.  Notwithstanding his understanding as to the magnitude of dealer charges, when Vergara first calculated the Termination Amount he used a total of 150 basis points to represent all dealer charges (*i.e.*, both profit and credit),[47] which resulted in a Termination Amount of $23.7 million.[48]  Debtors' Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund Agreement with LBSF, Mar. 30, 2009.  However, this charge was not enough for Shapiro, particularly when it resulted in a lower Termination Amount than the $27.5 million Termination Amount that Shapiro had calculated in support of Washington TSA's Motion to Compel in January 2009.  Debtors' Ex. 40, Declaration of Peter Shapiro in support of Washington TSA's motion to compel Lehman to assume or reject the RFA.  After consulting with Mr. Shapiro, Mr. Vergara's next attempt at valuing the RFA contained a credit spread of 300 bps that yielded a Termination Amount of $34.4 million.[49]  Debtors' Ex. 49, Email from J. Vergara to P. Shapiro attaching draft memorandum, Apr. 21, 2009 at 2.  But even this credit charge and Termination Amount was not enough to make Washington TSA "whole."[50]  In the next draft of the memo, the credit charge was increased to 429 basis points – equivalent to

---

[47]    Vergara likely selected 150 basis points based upon the strategy that if the calculation was done using "L-XXX," the resulting Termination Amount would yield Washington TSA a "boat load of money."  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial.

[48]    The Termination Amount calculation of $23,664,383 in this draft memorandum wrongly assumed a maturity of the RFA of 2042 (not 2032).  Debtors' Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund Agreement with LBSF, Mar. 30, 2009.

[49]    This Termination Amount calculation was also based on the erroneous 2042 maturity date.  Debtors' Ex. 49, Email from J. Vergara to P. Shapiro attaching draft memorandum, Apr. 21, 2009 at 2.

[50]    Bob Cook even undertook to prepare a spreadsheet purporting to calculate Washington TSA's "actual losses."  *See* Tr. 249:22-250:5.  According to this document, TSA Exhibit V, Washington TSA's losses as of August 31st 2012 were $9,467,680.84, while losses over the remaining life of the agreement were projected to be $33,394,977.54. TSA Ex. V, Spreadsheet of Actual Losses, at *17; *see also* Tr. 230:22-231.  Thus, nothing less than the total of these two numbers—$42,862,658.38 —would be sufficient to make Washington TSA "whole."  It is no surprise that Washington TSA's initial claim of $46,437,610 exceeded that amount.

the entire credit spread of the Bonds.  Debtors' Ex. 65, Swap Financial Memorandum re:

Calculation of Loss for TSA's Reserve Fund Agreement with LBSF, Apr. 21, 2009; Joint Ex. 11,

Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009.  While

Washington TSA may attempt to rely on one of Vergara's draft calculations, no evidence –

expert or otherwise – has been presented to demonstrate that they are commercially reasonable,

nor have any work papers or other analysis of the increasing credit charges been presented.

Instead, Vergara's own testimony – that a credit charge would normally be "tens of basis points,"

not hundreds of basis points – highlights that none of his calculations are credible with respect to

credit charge.  Vergara Dep. 49:8-19.

Any attempt to use the "credit charge" that Lehman incorporated into its pricing of the

RFA at its inception in 2002 to defend Shapiro's inflated credit charge must be rejected.  As an

initial matter, despite Washington TSA's protestations to the contrary, there is no evidence of

what credit charge Lehman used in 2002 with respect to the RFA.  While Washington TSA

points to an email showing a "credit mitigation option," of (4,522,000), TSA Exhibit C, Email

from Chris Armada, Oct. 24, 2002, that "credit mitigation option" is not the credit charge

Lehman imposed.  Instead, the "credit mitigation option" was put on internally at Lehman to

address two risks:  (1) the credit risk of the RFA and (2) the risk of "the mandatory clean up call."

TSA Exhibit B, Email from Anatoly Zelikoff, Oct. 24, 2002.  There is no evidence showing how

the credit mitigation option was allocated between these two risks, but as Washington TSA's

own expert confirmed, at the time the RFA was entered into, the risk of the mandatory clean up

call was "major."[51]  Tr. 370:6-15, 404:4-25, 405:11-17.

---

[51]    All of Washington TSA's experts agree that as of the Termination Date in March 2009, the risk of early redemption and, therefore, a mandatory clean-up call, was non-existent.  Tr. 370:3-371:6, 404:17-405:10, 408:10-15 (Hasterok); 498:9-501:19 (Curry); 651:20-652:11, 653:6-654:10 (Shapiro).

In fact, even if it were appropriate to impose a hypothetical credit charge when no credit charge was incurred at termination and no replacement agreement was entered into, which it is not, such a credit charge would unquestionably be lower than a credit charge used in 2002. First, at inception there is a greater exposure to the counterparty based on the mere fact that there are more years left until maturity. Second, it is not disputed that interest rates were significantly lower in March 2009 than at inception. The market data available as of March 25, 2009, as shown by the LIBOR rates supplied by Curry and Hasterok, suggest a low rate environment in which a dealer is unlikely to be "in the money." When the LIBOR rates supplied by Curry and Hasterok are adjusted upwards 66.6 basis points to reflect Swap Financial's commercial paper spread, the resulting floating leg's rates would only minimally exceed the Guaranteed Rate approximately six out of the 23 remaining years on the RFA. Debtors' Ex. 156, Swap Financial's Adjustments to LIBOR Chart; Debtors' Ex. 160, Charges for Municipal Tobacco Credit and Profit Component Graph No. 2. Thus, based on the data provided by Washington TSA's experts, for most of the remainder of the RFA the transaction would likely be "in the money" to Washington TSA, and even when the dealer would be "in the money," the amount is minimal. While Shapiro's credit charge assumes that the dealer would have a 100% chance of being substantially "in the money," his data shows that the dealer would never be in the money. Therefore, Swap Financial's credit charge is unsupported by market data and Swap Financial failed to reasonably determine the Termination Amount.

c.    **Shapiro's Expert Opinions are Inadmissible**

Shapiro's testimony at the evidentiary Hearing illustrated that his opinions failed to meet the requirements for admissibility pursuant to Federal Rule 702 and should be excluded. As an initial matter, Shapiro lacked the requisite expertise to opine on the calculation of the Termination Amount and, in fact, Shapiro freely conceded that he deferred the valuation work to

one of his junior staff members because Shapiro did not even know how to use the valuation

software that calculated Washington TSA's Claim.  Not surprisingly, given his lack of expertise,

Shapiro's opinions are inconsistent with market practice, which is yet another reason that

Shapiro's opinions should be excluded.  Ultimately, Shapiro's opinions are nothing more than

*ipse dixit* and cannot be admitted.

   As discussed above, prior to this engagement by Washington TSA, Shapiro had no

experience with reserve fund agreements.  Shapiro 30(b)(6) Dep. 57:17-58:9; Tr. 679:3-10.

Given his lack of experience with these types of agreements, when Washington TSA contacted

him to value the RFA, he turned to his junior colleague, Vergara, to "figure out how to put a

value on it."  Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James

Vergara of Swap Financial; *see also* Tr. 594:18-596:3, 716:18-717; Shapiro 30(b)(6) Dep. 76:3-

77:6.  Shapiro freely admitted that Vergara did the actual valuation work performed for

Washington TSA.[52]  *See* Shapiro 30(b)(6) Dep. 198:14-199:12; Tr. 622:17-23; 627:3-17; 629:14-

19.  A witness without "specialized knowledge" cannot be qualified as an expert.  Fed. R. Evid.

702(a); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Nimely v. City of New York*,

414 F.3d 381, 396 (2d Cir. 2005).  Instead, Shapiro's opinions are nothing more than

inadmissible lay opinions.

   To the extent that Shapiro is qualified to be an expert, his expertise arises solely from his

general experience in the finance arena.  However, his opinions are inconsistent with market

practice in two critical respects and are therefore inadmissible.  As discussed above, Shapiro

---

[52]       Although Vergara has not been tendered as an expert witness, as discussed above, he also had
limited experience with reserve fund agreements.  Vergara's experience consisted of sitting next to traders at
Lehman who were involved in pricing and valuing reserve fund agreements.  Vergara Dep. 40:5-41:17, 61:15-62:19.
Vergara was only involved in bidding on less than five reserve fund agreements and, in connection with the bids,
Vergara relied on others to provide the critical profit and credit charges to incorporate.  Vergara Dep. 44:16-18,
48:25-49:13.

failed to use the "cheapest to deliver" securities and imposed an astronomical credit charge of

429 basis points in constructing the floating leg.  Both of these deviations from market practice

materially distort the value of the Termination Amount in favor of Washington TSA and render

Shapiro's opinions nothing more than inadmissible lay opinions.

Both Shapiro and Vergara confirmed that it is industry practice for a dealer to deliver

those eligible securities that are the "cheapest to deliver."  Tr. 592:25-594:17; Shapiro 30(b)(6)

Dep. 129:13-19; Vergara Dep. 169:15-20.  Notwithstanding their understanding of industry

practice, Vergara, who actually performed the calculation, could not recall if he examined each

of the eligible securities to determine which was "cheapest to deliver."[53]  Vergara Dep. 169:18-

170:7.  Had Shapiro and Vergara diligently confirmed which of the Eligible Securities were the

cheapest to deliver, they would have found that U.S. Agencies were in fact the cheapest to

deliver as of March 25, 2009.

Additionally, both Shapiro's approach to determining the 429 basis point credit charge

and the magnitude of the credit charge are inconsistent with market practice.  As confirmed by

Vergara, the Swap Financial employee who valued the RFA, a credit charge would normally be

"tens of basis points," not hundreds of basis points.  Vergara Dep. 49:8-19.  Swap Financial's

credit charge was not determined by considering the hypothetical dealer's possible exposure and

possibility of default, as dealers would typically do in the market, Tr. 1039:15-1041:23, but

instead was a direct (and inappropriate) application of the entire credit spread of the Bonds to the

---

[53]        Additionally, Shapiro also appears to disregard the express language of the RFA, which requires
any determination of the Termination Amount to be made from Lehman's perspective.  Joint Ex. 1, RFA at § 7.6(c).
Lehman certainly would have selected the "cheapest to deliver" securities, which would have produced the best
economic result for Lehman.

forward curve.[54]  Tr. 617:10-619:21.  Shapiro admitted that he did not undertake any analysis to determine when the dealer might be "in the money" to assess probability of default.  Shapiro 30(b)(6) Dep. 154:23-155:6; 161:11-16.

Shapiro's disregard of market practice results in opinions that do not adhere to the standards of rigor exhibited by professionals in the field and are not admissible.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137,152 (1999) (holding that the touchstone for reliability is the "level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216, at *15 (S.D.N.Y. Jun. 5, 2008) (finding expert opinion inadmissible where it "fail[s] to use the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").  Consequently, Shapiro's grossly inflated Termination Amount cannot be considered.

Additionally, Shapiro has produced almost no work papers or detailed analysis of his valuation.  Instead, he simply asserted that the Court must accept his opinion based upon his experience and trust the Principia model that was used.  However, since Shapiro's purported expertise derived from his experience in the financial industry, he "must do more than aver conclusorily that his experience led to his opinion."  *Primavera Familienstiftung v. Askin,* 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001).  Rather, an expert who is relying "solely . . . on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid 702 advisory committee's note (2000 Amendments).  In other words, an

---

[54]      The inappropriate nature of Shapiro's credit charge is confirmed by the evidence showing how it was consistently inflated over time – nearly tripling from less than 150 basis points to 429 basis points.  *See* Tr. 634:22-635:8, 684:4-685:7, 673:6-685:21, 685:16-25; *compare* Debtors' Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund Agreement with LBSF, Mar. 30, 2009 *with* Debtors' Ex. 65, Swap Financial Memorandum re: Calculation of Loss for TSA's Reserve Fund Agreement with LBSF, Apr. 21, 2009.   Shapiro provided no explanation – based in market practice or otherwise – as to why the credit charge increased over time. Tr. 684:4-685:25.

expert must show his work.  As "nothing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence which is connected to existing data only by the

*ipse dixit* of the expert," Shapiro's opinions should be excluded.  *See GE v. Joiner*, 522 U.S. 136,

146, 118 S. Ct. 512, 519 (1997).

Even more concerning than Shapiro's conclusory assertion that the Court should trust his

opinions and results from the Principia model is the misleading description Shapiro gave of the

analysis done by the model.  Before the Hearing, Swap Financial produced "screenshots" from

the Principia software that confirmed that the analysis done by the model was to generate future

cash flows by subtracting 3.874% from LIBOR curve.  *See, e.g.,* Debtors' Ex. 52, Swap

Financial Principia Screenshot v3; *see also* Tr. 628:4-630:19.  However, as illustrated in Debtors'

Exhibits 156 and 159 (*see also*, chart, *infra* at § III (E)), when negative 3.874% is applied to the

three-month LIBOR forward curve, ***the floating leg produced negative interest rates for most of***

***the remaining 23 years on the RFA***.  Confronted with the absurdity of negative interest rates,

Shapiro dissembled and in so doing revealed his utter lack of understanding of the model used by

Vergara to calculate the Termination Amount.  *See, e.g.,* 744:10-749:22.  Shapiro admitted: "I

don't know how to run this model."  Tr. 628:12-629:22.  Trying to spin his way out of this

predicament, Shapiro stated that the model was subtracting 3.874% from the guaranteed rate to

value the RFA.  Tr. 754:20-25, 811:2-812:7.  In other words, Shapiro claimed that the future

cash flows were simply determined by subtracting 3.874% from the Guaranteed Rate of 4.484%,

or 0.61%.  Tr. 754:20-25.  But that was not true.  Lehman demanded immediate production of

spreadsheets and model data that supported this fantastic testimony.  After the Hearing, Swap

Financial produced a screenshot of the cash flows that showed negative interest rates for most of

the time period, just as Lehman had contended all along.  *See* TSA Ex. AA, Principia Discount

Rate and Cash Flows Screenshot, SFG_002543-44.

### d.    Curry's and Hasterok's Opinions Should Not Be Admitted

For the reasons set forth in Lehman's Motion for an Order Excluding the Testimony of

Daniel Curry and Jeffrey Hasterok, dated September 26, 2014, Docket No. 46382 (the "Daubert

Motion"), the opinions of Curry and Hasterok are inadmissible and should be disregarded.  For

the sake of brevity, Lehman will not repeat its arguments and the law included in the Daubert

Motion, but incorporates them by reference here.  However, the evidence adduced at the Hearing

provided even more support to exclude the opinions of Curry and Hasterok.

Following Lehman's experts' attacks on the Curry and Hasterok approach, Hasterok

admitted that he was simply "looking for quotes" on the internet which were incorporated in the

Curry and Hasterok rebuttal report.[55]  Tr. 458:18-22.  Indeed, the Hearing testimony revealed

that Curry and Hasterok cherry-picked sound bites from these articles and either failed to

review—or failed to mention—the parts of the articles that directly contradict their opinions.  At

the Hearing, though, both Curry and Hasterok were forced to admit that the very articles that

they relied upon in their rebuttal report actually cut against their arguments.  For example:

- Curry and Hasterok cited "Funding Value Adjustments and Fair Value," to support their argument that "funding costs" should be included in their fair value analysis of the Termination Amount.  However, the article concluded, "[s]hould two entities with different funding costs have different fair value estimates for the same asset? The answer is no."  Tr. 559:8-11.

---

[55]    As explained more fully in the Daubert Motion, the "sum total of the research" cited by Curry and Hasterok in the initial report—a single blog post—was the fruit of a Google search designed to find words to support the ad hoc approach they had just created. Tr. 444:20-445:25. The blog post, written by Peter Orr, was cited for the proposition that "[f]orward rates as implied by market rates and basis curves are not generally accurate[] representatives of the actual path the rates will actually follow over time." Tr. 447:6-13. Curry and Hasterok omitted, however, Mr. Orr's admonition that those who "are looking to perform a fair price analysis of an interest rate derivative using an interest rate model," "better use forward rates." Tr. 447:14-448:4.

- Curry and Hasterok cited "Anticipation of Monetary Policy in Financial Markets" for the proposition that "[t]he very short end of the yield curve displays some ability to predict changes in short-term interest rates, but this predictive power fades fairly quickly as the horizon lengthens." Tr. 452:24-453:9. Yet, they failed to mention that the purpose of this article was to review that statement (the product of literature from the early 1990s) to see if it held true in 2001 when the article was published. Tr. 452:18-453:18. What the authors found – and what Curry and Hasterok did not incorporate into their opinion – was that recent developments had resulted in a "remarkably strong" increase in the "ability of the financial markets to predict future changes in policy." Tr. 455:2-20.

- While Hasterok testified on direct that forward rates were "too good for Lehman" because they over-predicted future rates, the article, "Interest Rate Forecasts: A Pathology," found that "when interest rates are on an upward (downward) cyclical path, the forecast underestimates (overestimates) the actual subsequent path of the rates." Tr. 461:10-16. According to the authors, when an "econometrician applies his or her tests to the complete time series, she will find no aggregate sign of [upward or downward] bias," meaning that forward curves do not over- or under-predict when longer time series are used. Tr. 462:8-463:2.

The misuse of these articles demonstrate what Hasterok freely admitted—that he and Curry were simply "looking for quotes" to plug into their rebuttal report. Tr. 458:18. Though the articles do not stand for the propositions for which they were cited, what they do support is the exclusion of Curry and Hasterok's expert opinions.

### E.    Washington TSA's Valuation Constitutes Manifest Error

Washington TSA's valuation of the RFA amounts to manifest error. *See Matter of Hermance v. Bd. of Supervisors of Ulster County*, 71 N.Y. 481, 486 (1877) ("manifest error" is "evident, visible, plain, obvious to the understanding from an examination of the roll or document; or, at the most, only requiring a mathematical calculation to demonstrate it."); *see also Szczepanek v. Dabek*, No. 10-cv-2459, 2011 WL 846193 at *4-9 (E.D.N.Y. Mar. 7, 2011) (finding "manifest error" in calculation of attorney's fees due to lack of "documentary backup" and excessive amount of fees), *aff'd, Szczepanek v. Dabek*, 465 Fed. Appx. 74, 75 (2d Cir. 2012).

Washington TSA's determination of the Termination Amount – whether by Shapiro or Curry/Hasterok – was not done in good faith, is not commercially reasonable and constitutes manifest error.  As demonstrated at the Hearing, Shapiro's excessive charges, once applied to the market data provided by Curry and Hasterok produced the absurd result of a forward curve with mostly negative interest rates, essentially meaning that a lender would have to pay a borrower a return on the borrowed money.  *See, e.g.,* Tr. 431:2-24; Debtors' Ex. 156, Swap Financial's Adjustments to LIBOR Chart.  The graph below, submitted with Debtors' Ex. 156, illustrates the effect Swap Financial's excessive charges had on the forward curve:



While Shapiro vehemently attempted to defend his spread by claiming that the excessive spread should be applied to the Guaranteed Rate, that is contradicted by the documentary evidence Swap Financial has produced that shows the spread is deducted from the LIBOR forward curve and resultant negative cash flows.  Tr. 629:23-630:24; Tr. 754:20-755:19; Debtors' Ex. 63, Swap Financial Principia Screenshot v16; Debtors' Ex. 156, Swap Financial's

Adjustments to LIBOR Chart; TSA Ex. AA, Principia Discount Rate and Cash Flows Screenshot, SFG_002543-44.

Curry and Hasterok's Termination Amount determination fares no better. It is nothing more than a concocted methodology, created for the sole purpose of this litigation, designed to bolster the absurd valuation put forward by Shapiro. Recognizing that Shapiro departed from the industry-standard to generate Washington TSA's inflated Claim, Curry and Hasterok did the same.

### F.    Washington TSA Failed To Mitigate Its Loss

It appears that Washington TSA wants Lehman to compensate it for its failure to minimize its losses since the RFA was terminated. But Lehman should not be charged with Washington TSA's own refusal to invest the Reserve Fund and minimize its losses. *See, e.g., Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011, 1996 U.S. Dist. LEXIS 16137, at *5 (S.D.N.Y. Oct. 30, 1996) (holding that six months is an unreasonable amount of time to wait before attempting to mitigate). Washington TSA has maintained possession and control of the Reserve Fund, containing $45.5 million, since December 1, 2008 until the refunding of the Bonds in October 2013. Cook 30(b)(6) Dep. 18:13-16, 98:16-18; Tr. 192:2-194:4; 237:3-238:9. Washington TSA could direct the Trustee to invest in other securities as long as the securities met the requirements of an investment under the Indenture. Tr. 162:11-20. Since Lehman's bankruptcy, Washington TSA received multiple investment proposals but chose to do nothing other than leave the Reserve Fund in a money market account in the hope that interest rates would rise. Tr. 237:8-238:15; *see also* Cook 30(b)(6) Dep. 92:6-14. As a result, Washington TSA has earned little on the Reserve Fund. However, Washington TSA's decision to forego permissible investment opportunities with higher yields is no reason to allow its inflated Claim against Lehman.

Shortly after Lehman's bankruptcy, PFM advised Washington TSA that agency securities were available for purchase by Washington TSA at 2.58% to 3.38% as of November 11, 2008. Debtors' Ex. 22, Memorandum from PFM, Nov. 11, 2008 at 4.  Furthermore, on November 6, 2008, Barclays advised Washington TSA that it had "been approached by a AA insurer who was willing to take tobacco risk on an uncollateralized GIC."  Debtors' Ex. 20, Email chain between Kim Herman and Bob Cook et al., Nov. 7, 2008.  Washington TSA chose to ignore these opportunities.

Washington TSA continued to disregard similar opportunities.  In March 2011, Washington TSA received a list of investment agreement rate indications from Grant Street Group.  Debtors' Ex. 105, Email from John McCarthy to Bob Cook, attaching Debt Service Reserve Fund Rate Indications, Mar. 4, 2011.  According to Grant Street Group, rates of return on uncollateralized investment agreements ranged from 1.90% to 4.00%, based on maturities ranging from 5 to 12 years.  *Id.*  The rates of return for collateralized investment agreements ranged from 1.40% to 3.13%.  *Id.*  All of these proposals provided significantly higher returns than what Washington TSA was earning with its Reserve Fund in money market funds.  Tr. 242:4-15.  On November 4, 2011, Barclays Capital advised Washington TSA that it was willing to enter into an uncollateralized guaranteed investment contract for a term of 5 years for an amount of $45,530,000 with a variable rate of 1.50% spread over 3-month LIBOR and a fixed rate of 2.75%.  Debtors' Ex. 109, Memorandum from Barclays Capital to Washington TSA, Nov. 4, 2011.  Under such a contract, Washington TSA would receive $1,252,075 in annual earnings. *Id.*  According to Washington TSA's Senior Director of Finance, Barclays Capital's investment proposal was compliant with the definition of eligible security under the RFA.  Tr. 255:2-7. However, Washington TSA ignored both of these offers.

Even Swap Financial provided Washington TSA with suggestions on how to minimize its losses. On November 16, 2011, Swap Financial provided a memorandum regarding reinvestment strategy and suggested a mixed-investment strategy that could provide an anticipated average yield of approximately 2.60%. Debtors' Ex. 111, Memorandum from Swap Financial to Washington TSA concerning Reinvestment of TSA's Reserve Fund, Nov. 16, 2011 at 3.

Instead of exploring any of these investment strategies or investment agreements, however, Washington TSA decided to invest the Reserve Fund exclusively in money market accounts. Tr. 158:9-15, 224:15-21. Despite offering to consult with any member of the TSA Board about investment alternatives for the Reserve Fund, Washington TSA staff did not in fact have any discussions with any board member regarding alternative investments for the Reserve Fund since the RFA was terminated. In fact, the TSA Board was not involved in the evaluation of any alternative investment options. Tr. 181:22-182:7, 191:22-25. Washington TSA partly refused to re-invest the Reserve Fund because it expected interest rates to rise and did not want to lock itself into an artificially low rate, such as the 2.60% under the Swap Financial proposal. Cook 30(b)(6) Dep. 92:6-14; Tr. 247:22-248:4. Moreover, instead of evaluating the alternative investment proposals based on whether they were consistent with the terms of the Indenture, Cook testified that Washington TSA was simply "not comfortable" with the conditions of these proposals. Tr. 251:4-252:9. Furthermore, Cook testified that "[he does not] want to be looking at investments or having [his] people take their time to look at various investments over time" after the termination of the RFA. Tr. 225:21-226:10. Washington TSA's own unwillingness to make investment decisions contributed significantly to the extent of its losses, and Lehman should not now have to bear the cost of Washington TSA's own inactions.

### G.    Washington TSA Should Be Barred From Recovering Attorneys' Fees And Costs

Washington TSA's attempt to recover attorneys' fees and costs incurred as a result of its pursuit of its inflated Claim must be denied.  Washington TSA has only itself to blame for the attorneys' fees and costs it has incurred.  Lehman has been able to resolve disputes amicably with other tobacco counterparties—and thousands of other claimants—through informal negotiations and mediations.  *See, e.g.,* Claim Nos. 67684, 67685, 67686, 67687 (Golden State Tobacco Securitization Corporation); 66852, 66853 (Tobacco Settlement Financing Corporation New York); 17406, 17407, 17417, 17418 (Commonwealth of Virginia Tobacco Settlement Financing Corporation); 42907, 42908 (Tobacco Settlement Financing Corporation of Louisiana).  The record in this case and evidence presented at the Hearing revealed that Washington TSA, led by Shapiro, embarked on a ruinous path.  As discussed above, there is simply no basis for Washington TSA's inflated Claim.

In addition, Washington TSA's pattern of obfuscation in discovery also resulted in increased fees – for both parties.  For example, Washington TSA forced Lehman to engage in a months-long exchange of correspondence, which cumulated in motion practice and a hearing before the Court, just to force Washington TSA to produce documents related to Swap Financial ***that should have been produced in the first place***.  In addition, if Shapiro were prepared for his initial deposition and all relevant documents had been produced timely, Lehman would not have been forced to depose him two additional times – again, at additional cost to both parties.[56]  Courts will deny a party's request for attorneys' fees arising out of the party's vexatious or duplicitous behavior.  *See* 11 U.S.C.S. § 105(a); *In re A. Terricone, Inc.*, 83 B.R. 253, 255

---

[56]    The RFA explicitly requires attorneys' fees to be "reasonable."  Based on Washington TSA's course of action in this litigation, the fees it seeks to recover cannot be reasonable.

(Bankr. S.D.N.Y. 1988) (holding that while a creditor is entitled to seek attorneys' fees under the contracts at issue, "such fees must be reasonable under both the terms of [the contracts] and the Bankruptcy Code.  The bankruptcy court retains discretion to determine if the attorney fees are reasonable.").  The Court here should do the same and reject Washington TSA's request for attorneys' fees and costs based on its behavior in litigating the Claim.

## **CONCLUSION**

For the foregoing reasons, Lehman respectfully requests the Court to deny Washington TSA's Proof of Claim Numbers 37355 and 37356.

## PROPOSED FINDINGS OF FACT

I.    **Background and the Reserve Fund Agreement**

a.    **Establishment of Washington TSA and Issuance of the Bonds**

1.    On November 23, 1998, Attorneys General of 46 states and the four largest tobacco manufacturers settled claims that the states had brought relating to the use of, or exposure to, tobacco products.  As part of that settlement, the tobacco manufacturers agreed to pay the states an estimated $206 billion through 2025.  The State of Washington was entitled to approximately 2.05% of the initial and annual payments, and approximately 5.76% of the payments made to states for their contributions to the tobacco litigations.

2.    Washington TSA was established in order to deal with a $450 million budget shortfall in 2002. The State of Washington established Washington TSA to issue bonds secured by the tobacco manufacturers' obligation to make future settlement payments.  Herman Dep. 76:16-77:11; Tr. 104:2-16; Uncontested Facts at ¶¶ 3, 5.

3.    Washington TSA is an independent public instrumentality of the State of Washington, established pursuant to Chapter 365 of Laws of 2002 of the State of Washington, codified as RCW 43.340.005, *et seq*.  Joint Ex. 1, RFA at *1; Uncontested Facts at ¶ 2.

4.    Washington TSA is governed by a board of directors (the "<u>TSA Board</u>"), which is a regulatory body under Washington law and sets the policy and makes decisions to be carried out by the staff of Washington TSA.  Tr. 105:14-23.

5.    In 2002, Washington TSA issued $517,905,000 of Tobacco Settlement Authority Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "<u>Bonds</u>") pursuant to an Indenture, dated as of October 1, 2002, between Washington TSA and U.S. Bank N.A., as Indenture Trustee (the "<u>Indenture</u>").  Joint Ex. 3, Indenture at § 1.01; Uncontested Facts at ¶ 3.

6.      After establishing Washington TSA, the State of Washington sold 29.2% of its tobacco settlement revenues to Washington TSA. Herman Dep. 77:4-11; Tr. 107:22-108:16; Uncontested Facts at ¶ 4.

7.      The Bonds were scheduled to mature in 2032.  Uncontested Facts at ¶ 6.

8.      When the Bonds were issued, their "projected final turbo redemption date" was June 1, 2019.  Uncontested Facts at ¶ 7.

9.      The Indenture related to the 2002 Bonds established a Liquidity Reserve Account in the amount of $45,534,106.25.  Joint Ex. 3, Indenture at § 102; Uncontested Facts at ¶ 8.

10.      The Indenture gave Washington TSA the right, upon the satisfaction of certain conditions, to partially or fully redeem the Bonds prior to the scheduled maturity of the Bonds. Joint Ex. 3, Indenture at § 404(a); Uncontested Facts at ¶ 9.

### b.      The Reserve Fund Agreement

11.      Based upon the advice of its long-time financial advisor, Public Financial Management ("PFM"), Washington TSA decided to enter into a form of an investment agreement referred to as a reserve fund agreement.  Tr. 116:15-117:20; Herman Dep. 43:8-15.

12.      On Washington TSA's behalf, PFM solicited bids for the RFA from various financial institutions on October 22, 2002.  Cook 30(b)(6) Tr. 41:16-18; Joint Ex. 4, Request for Bids from PFM dated Oct. 22, 2002; Uncontested Facts at ¶ 11.

13.      A number of bidders responded to PFM's solicitation.  Washington TSA ultimately accepted Lehman's bid, which was the highest bid.  Joint Ex. 5, Email from Torretti to Slater *et al.* attaching results of Washington TSA RFA bid; Tr. 120:2-23.

14.      On November 5, 2002, LBSF,  Washington TSA as Issuer, and U.S. Bank, N.A. as Trustee, entered into a Reserve Fund Agreement (the "RFA").  Joint Ex. 1, RFA at *1; Uncontested Facts at ¶ 12.

- 66 -

15.    The RFA provided a Guaranteed Rate of 4.484% on a Scheduled Reserve Amount of $45,534,106.25.  Joint Ex. 1, RFA at § 1; Uncontested Facts at ¶ 13, 14.

16.    Because debt service payments are payable to the bondholders periodically, any investments made with the Reserve Fund had to be liquid on or before the periodic payment dates so that the Reserve Fund could be accessed those dates in case Washington TSA needed such cash to make the requisite debt service payments.  Accordingly, the RFA provided that every six months Washington TSA would deliver $45,534,106.25 to Lehman (the "Scheduled Reserve Amount").  In exchange for the delivery of the Scheduled Reserve Amount, Lehman was required to deliver short-term "Eligible Securities" that would mature on or before the next Bond Payment Date.  Joint Ex. 1, RFA at § 2.1, Exhibit A.

17.    The RFA defined "Qualified Securities" to include Eligible Securities that mature on or before the next debt service payment date and have an aggregate purchase price as close as possible to but does not exceed the Scheduled Payment Amount.  Joint Ex. 1, RFA at § 1; Uncontested Facts at ¶ 15.

18.    The RFA defined Eligible Securities as:

> [N]on-callable and non-prepayable (a) direct obligations of the United States of America including only notes, bonds, bills or certificates of indebtedness, (b) senior debt and/or guaranteed mortgage pass-through obligations of the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Government National Mortgage Association, any Federal Home Loan Bank, and the Federal Farm Credit System, or (c) commercial paper rated "P-1" by Moody's and "A-1+" by Standard & Poor's; provided that, at the time of delivery, any such commercial paper is not on negative credit watch and the issuer thereof is subject to U.S. law; additionally, if the maturity date of the commercial paper tendered is 100 days or more, the issuer thereof must have long-term debt ratings of at least "A1" by Moody's, "A+" by Standard & Poor's and "A" by Fitch.

Joint Ex. 1, RFA at § 2.01(a); Uncontested Facts at ¶ 16.

19.     Under the RFA, Lehman had the right to select the Eligible Securities to deliver with respect to every delivery date, so long as the Eligible Securities were also Qualified Securities under the terms of the RFA.  Joint Ex. 1, RFA at § 2.1; Uncontested Facts at ¶ 17.

20.     Lehman's ability to select the Qualified Securities to be delivered to Washington TSA was crucial to Lehman, as it afforded Lehman the opportunity to maximize its profit or minimize its loss from such deliveries.  Tr. 528:14-530:15, 948:4-949:4.  To the extent Lehman could acquire Qualified Securities for delivery at a price lower than the purchase price required to be paid by Washington TSA, Lehman would earn a profit equal to such difference.  *Id.* Conversely, if Lehman could only acquire Qualified Securities at a price that exceeded the purchase price to be paid by Washington TSA, Lehman would suffer a loss equal to such excess amount.

21.     The RFA defined Termination Amount as:

> [A]n amount, as determined by the Burdened Party reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay the Dealer . . . in consideration of such Dealer entering into an agreement with the Burdened Party . . . which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under [the RFA] . . . . if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as *reasonably determined in good faith* by the Burdened Party, to be the Burdened Party's *total losses and costs* (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), *or gains* (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement . . . . Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

Joint Ex. 1, RFA at § 1 (emphasis added).

22.    In other words, to determine the Termination Amount under the RFA, a calculation should first be sought on the basis of market quotations.  If and only if no quotations satisfying the requirements of the RFA can be obtained, may the Burdened Party calculate the Termination Amount on the basis of its total losses or gains.  *Id.*

23.    Under Section 7.6(c) of the RFA, upon the occurrence of a Lehman Event of Default, Lehman had the right to calculate the Termination Amount.  *Id.* at § 7.6(c).

24.    Section 7.6(c) of the RFA further provides:

> if Lehman fails to determine the Termination Amount within three Business Days of written notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer shall make such determination as if it were Lehman and the amount as so determined by the Issuer shall for purposes of this Section 7.6 be deemed the Termination Amount.

*Id.* at § 7.6(c).

25.    Under the RFA, Washington TSA acknowledged that it had "minimized the risks resulting from fluctuations in interest rates during the term [of the RFA] on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations."  *Id.* at § 5.4.

26.    The RFA explicitly warned that "a Termination Amount may be due Lehman" and that under "certain market conditions the amount of any Termination Amount owed to Lehman. . . could be substantial."  *Id.* at § 5.5.

27.    Washington TSA was well aware of the possibility that, in certain circumstances, it could owe a termination payment to Lehman.  *See* Tr. 167:18-168:7; Cook 30(b)(6) Dep. 24:8-15; 33:21-24; Herman Dep. 37:20-23.

28.     The RFA provided that the "Agreement constitutes the entire agreement and

understanding of the parties with respect to its subject matter and supersedes all oral

communications and prior writings with respect thereto."  Joint Ex. 1, RFA at §  9.8.

29.     Due to a drafting error, the RFA initially stated that the termination date was May

30, 2042.  Joint Ex. 1, RFA at § 9.7, Exhibit A; Uncontested Facts at ¶ 19.

30.     The RFA was amended on March 26, 2003 to change its termination date to May

28, 2032.  Joint Ex. 2, Amendment Agreement; Tr. 195:16-23; Uncontested Facts at ¶ 20.

31.     The RFA also provided that Washington TSA may terminate the RFA in the event

of a "Mandatory Cleanup Call" with 30 days written notice to LBSF, in which case no

Termination Amount shall be due.  A "Mandatory Cleanup Call" was defined in the RFA to

mean:

> a mandatory redemption of the Bonds in whole equal to 100
> percent of the principal amount being redeemed at any time that
> the available amounts on deposit in the Accounts (as defined in the
> Indenture) (other than the Rebate Account, the Operating Account,
> the Operating Contingency Account and the Costs of Issuance
> Account) exceed the aggregate principal amount of, and accrued
> interest on, the Bonds.

Joint Ex. 1, RFA at §§ 1, 2.8; Uncontested Facts at ¶ 21.

32.     Although Lehman delivered commercial paper acquired through a commercial

paper program during the course of the RFA, Washington TSA's expert agrees that nothing

prevented Lehman from delivering agencies despite the existence of the commercial paper

program.  Tr. 530:10-15.

## II.    Washington TSA Adopts a "Wait-and-See" Strategy after Lehman's Bankruptcy Instead of Paying a Termination Amount to Lehman

33.    On September 15, 2008, LBHI filed a voluntary petition for relief under Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Uncontested Facts at ¶ 22.

34.    During the first few days after LBHI's bankruptcy filing, Washington TSA asked PFM to calculate a "quick estimate" of the Termination Amount.  Tr. 138:25-139:11.

35.    On September 19, 2008, a conference call was held among Kim Herman, Paul Edwards, Bob Cook, Debra Stephenson and Carol Johnson of Washington TSA, Deborah Kuykendall and Bruce Colwell of U.S. Bank, N.A., John Bonow, Monique Spike, Duncan Brown and Roan Blacker of PFM, Roger Bagley and Richard VanDusen of Hawkins Delafield & Wood LLP,  and Jay Reich of K&L Gates LLP regarding the status of the RFA following the LBHI bankruptcy filing (the "September 19 Call").  Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim Herman, *et al.*, Sept. 25, 2009.

36.    On September 25, 2008, Jay Reich of K&L Gates LLP prepared a memorandum summarizing the conference call that occurred on September 19, 2008 (the "September 25 Memo").  *Id.*

37.    On the September 19 Call, PFM advised Washington TSA that "a Termination Amount calculated as of [September 19, 2008] would obligate [Washington TSA] to pay Lehman approximately $1,200,000."  *Id.* at 1; Herman Dep. 167:24-168:7, Tr. 169:19-170:2.

38.    Washington TSA was confident that PFM knew how to calculate the Termination Amount and believed that PFM had calculated the $1.2 million amount payable to Lehman in accordance with the definition of Termination Amount in the RFA.  Tr. 170:9-171:2.

39.    According to the September 25 Memo, "[$1,200,000] reflects what Lehman would need to receive to preserve the economic equivalent of the [RFA] for its term."  Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim Herman, *et al.*, Sept. 25, 2009 at 1.

40.    PFM used LIBOR + 10 bps to calculate that the Termination Amount was approximately $1,200,000 owed to Lehman in September 2008.  Harris Dep. 28:9-18, 28:20-29:2, 61:1-17.

41.    The purpose of the September 19, 2008 conference call was to "assess [Washington TSA's] options" in light of PFM's determination that Washington TSA would owe a substantial payment to Lehman. Debtors' Ex. 18, Memorandum from Jay A. Reich to Kim Herman, *et al.*, Sept. 25, 2009 at 2.

42.    The September 25 Memo recommended that Washington TSA "not terminate the Agreement unless and until the legal or factual context changes, e.g. the Termination Amount would be no less than $0."  *Id.*

43.    The consensus of the participants on the September 19, 2008 conference call was that Washington TSA "should not terminate the [RFA] and trigger the payment of the Termination Amount."  *Id.*

44.    At that point in time, Washington TSA had no intention of paying any termination payment to Lehman at any time.  Tr. 173:11-14; Debtors' Ex. 99, Email chain between Peter Shapiro and Kim Herman, Jul. 14, 2010.

III.    **Washington TSA Engages Swap Financial to Maximize Its Claim In Order to Be Made Whole by Lehman**

45.    In November 2008, as requested by Washington TSA, PFM did a calculation of the Termination Amount for the RFA using a "spread to LIBOR" analysis and assuming a spread

to LIBOR of + 10 bps.  Harris Dep. 42:15-43:14; Debtors' Ex. 25, Email chain between Bob

Cook and Debra Stephenson, Nov. 17, 2008.

46.    PFM's employee who did these valuations for Washington TSA explained that

LIBOR + 10 bps "is reflective of where [PFM has] historically seen these sorts of agreements

terminate" and "effectively reflective of . . . the mid-market level for the [reserve fund]

agreement."  Harris Dep. 43:10-14.

47.    On November 11, 2008, PFM informed Washington TSA that the Termination

Amount had moved in Washington TSA's favor, and that if the RFA was terminated at that time

Lehman would owe $1,237,902.06 to Washington TSA.  Debtors' Ex. 25, Email chain between

Bob Cook and Debra Stephenson, Nov. 17, 2008

48.    When Kim Herman was deposed as a 30(b)(6) witness for Washington TSA, he

affirmed that "we obviously had confidence in PFM. . . . We felt confident they could do such a

valuation, yes."  Herman Dep. 43:11-15.

49.    The TSA Board held a Special Board Meeting on November 12, 2008.  At this

meeting, Washington TSA staff informed the Board that had it terminated the RFA in

September, it would have owed Lehman a Termination Amount.  Debtors' Ex. 24, Minutes of

November 12, 2008 Washington TSA Board Meeting.

50.    At the November 12, 2008 Washington TSA Board meeting, the Washington

TSA staff recommended that there was "no expectation that we could collect the money from

Lehman and unless the value to us of the termination payment was large, it would not even have

a significant discounted value on the secondary market for such obligations."  Debtors' Ex. 24,

Minutes of November 12, 2008 Washington TSA Board Meeting.

51.     Washington TSA staff further advised the board at the November 12, 2008 meeting that it recommended "leaving the RFA in place until the Qualified Securities currently held by the Trustee matured on December 1, 2008, and "[t]he decision of whether or not to leave the investment agreement in place will be based on the market value of the termination payment at that time." *Id*.

52.     On November 21, 2008, Washington TSA's counsel sent a letter to Lehman's attorneys and demanded that Lehman stipulate to the rejection of the RFA (the "November 21 Letter").  Debtors' Ex. 27, Letter from K&L Gates to Weil Gotshal, Nov. 21, 2008.

53.     The November 21 Letter was not discussed with the TSA Board before it was sent to Lehman.  Herman Dep. 212:13-213:3, 214:7-23.

54.     On November 28, 2008, Lehman's attorneys proposed terminating the RFA with a mutual waiver of claims.  Debtors' Ex. 28, Email from Weil Gotshal to K&L Gates, Nov. 28, 2008.

55.     Lehman's proposal on November 28, 2008 to terminate the RFA with a mutual waiver of claims was not discussed with the Washington TSA Board.  Tr. 183:24-184:15; Herman Dep. 217:11-14.

56.     On December 1, 2008, the previously-delivered Qualified Securities being held by U.S Bank matured and Washington TSA received the Scheduled Reserve Amount plus the Guaranteed Rate for the period from June 1, 2008 to December 1, 2008.  *See* Joint Ex. 1, RFA at § 1.  Uncontested Facts at ¶ 24.

57.     On December 1, 2008, LBSF did not deliver any Qualified Securities to Washington TSA, nor did Washington TSA tender the Scheduled Reserve Amount to Lehman.  Tr. 144:13-15; 237:3-7; Joint Ex. 8, Proof of Claim no. 37355 against LBSF at ¶ 8.

- 74 -

58.    On December 8, 2008, Washington TSA, through its senior director of finance, Robert Cook, contacted Peter Shapiro of Swap Financial Group, LLC ("Swap Financial") regarding the RFA.  Debtors' Ex. 29, Email from Robert Cook to Peter Shapiro, December 8, 2008, SFG_001917; Cook Dep. 58:22-59:2.

59.    On December 18, 2008, Washington TSA notified Lehman in writing that as a result of the bankruptcy filings and LBSF's failure to deliver Qualified Securities, Lehman Events of Default had occurred under the RFA.  Joint Ex. 6, Notice of Event of Default from Washington TSA, Dec. 12, 2008; Uncontested Facts at ¶ 25.

60.    The December 18, 2008 Notice to Lehman was not specifically authorized by the Washington TSA Board.  Herman Dep. 220:6-16.

61.    Swap Financial's engagement letter provides that "[i]n consultation with counsel, we will assist in development of a strategy for making whatever claim against Lehman is warranted, with a goal to maximizing the Authority's potential financial benefit . . . ."  Debtors' Ex. 34, Memorandum from Swap Financial to Washington TSA, Dec. 22, 2008 at 1.

62.    According to Washington TSA's Senior Director of Finance, Bob Cook, Washington TSA wanted "to make sure that [it was] made whole by Lehman…"  Cook Dep. 76:19-22; Tr. 234:4-12.

63.    According to Kim Herman, Swap Financial's job of "maximizing the authority's potential financial benefit" was just "business."  Herman Dep. 226:3-20.

64.    In December 2008, Washington TSA engaged Swap Financial on an emergency basis.  Herman Dep. 44:19-45:7.

65.    Washington TSA engaged Swap Financial on an "emergency" basis so that it could avoid the statutory requirements for engaging a contractor and avoid obtaining Board

approval.  Tr. 146:16-147:10; Herman Dep. 44:19-45:5; 225:15-18; Cook Dep. 73:8-20; 78:11-18.

66.     Swap Financial's engagement by Washington TSA in December 2008 was not specifically approved or authorized by the TSA Board.  Herman Dep. 234:5-8.

67.     On January 15, 2009, Washington TSA filed a Motion to Compel Lehman to Assume or Reject the Reserve Fund Agreement (the "Motion to Compel").  Debtors' Ex. 41 Washington TSA's motion to compel Lehman to assume or reject the RFA.

68.     Following the filing of the Motion to Compel, Lehman and Washington TSA attempted to agree upon a mutual termination of the RFA, but were unsuccessful.  *See* Debtors' Ex. 39, Email chain between Washington TSA and U.S. Bank, Mar. 2, 2009; Cook 30(b)(6) Dep. 87:7-96:12.

69.     On March 25, 2009, the Court entered an Order deeming the RFA rejected. Debtors' Ex. 46, Court Order authorizing rejection, TSA_028653; Uncontested Facts at ¶ 28.

70.     On September 17, 2009, Washington TSA submitted Proof of Claim Nos. 15016 and 14871, against LBSF and LBHI respectively, claiming $47,046,214.01.  Uncontested Facts at ¶ 29.

71.     On October 12, 2009, Washington TSA filed amended Proofs of Claim Nos. 37355 and 37356 against LBSF and LBHI, respectively, claiming $47,063,714.01 (the "Proofs of Claim").  Joint Ex. 8, Proof of Claim no. 37355 against LBSF; Joint Ex. 9, Proof of Claim no. 37356 against LBHI; Uncontested Facts at ¶ 30.

72.     Washington TSA issued a Request for Proposals for Quantitative Consultant Services on March 15, 2010 (the "Quantitative Consultant RFP").  Debtors' Ex. 87, Quantitative Consultant RFP.

73.    PFM and Swap Financial both responded to the Quantitative Consultant RFP.

Debtors' Ex. 89, Presentation from Swap Financial, April 28, 2010; Debtors' Ex. 90,

Presentation from PFM, April 28, 2010.

74.    PFM continued to use LIBOR plus 10 basis points to value the RFA in its

presentation in response to the Quantitative Consultant RFP.  Debtors' Ex. 90, Presentation from

PFM, April 28, 2010.

75.    Swap Financial was retained as Washington TSA's Quantitative Consultant in

early May, 2010.  Debtors' Ex. 94, Memorandum from Bob Cook to Authority Members, June

28, 2010 at 2.

76.    On July 14, 2010, during the course of negotiations with Lehman, Kim Herman,

the executive director of Washington TSA, stated in an email to Peter Shapiro that "it will be a

cold day in hell [before] we pay Lehman anything!"  Debtors' Ex. 99, Email chain between Peter

Shapiro and Kim Herman, Jul. 14, 2010.

77.    The Proof of Claim, the April 2009 Calculation of Loss Memorandum, and the

September 2009 Calculation of Loss Memorandum all stated that the RFA was scheduled to

mature on May 30, 2042.  *See* Joint Ex. 8, Proof of Claim no. 37355 against LBSF, Debtors' Ex.

65, Swap Financial Memorandum re Calculation of Loss for TSA's Reserve Fund Agreement

with LBSF, Apr. 21, 2009; Joint Ex. 11, Memorandum Regarding Calculation of Loss from

Swap Financial, Sept. 10, 2009.

**IV.    Swap Financial Did Not Value the RFA Accurately**

**a.    Swap Financial Lacked Expertise Relating to RFAs**

78.    Peter Shapiro had no experience with reserve fund agreements.  Shapiro 30(b)(6)

Dep. 57:17-58:9; Tr. 679:3-10.

79.     When first asked by Washington TSA to value the RFA, Shapiro immediately asked his junior colleague, James Vergara, to "figure out how to put a value on it."  Debtors' Ex. 31; *see also* Tr. 594:18-595:5; 716:18-717; Shapiro 30(b)(6) Dep. 76:3-77:6.

80.     According to Peter Shapiro, Vergara did the actual valuation work for the Washington TSA RFA, and Vergara prepared the first draft of the valuation memorandum. Tr. 594:18-595:5; 622:17-23; 627:3-17; 629:14-19; Shapiro 30(b)(6) Dep. 198:14-199:12.

81.     In an internal Swap Financial email dated December 10, 2008, Swap Financial concluded that "we may be better off" not getting market quotations for Washington TSA. Debtors' Ex. 31, Email chain between Nathaniel Singer, Peter Shapiro and James Vergara of Swap Financial, Dec. 10, 2008.

82.     In an internal Swap Financial email dated December 10, 2008, Swap Financial schemed to determine how "Lehman will owe [Washington TSA] a boat load of money."  *Id.*

83.     While Vergara had worked on some reserve fund agreements while he was employed by Lehman Brothers, Vergara's experience consisted of sitting next to traders at Lehman who were involved in pricing and valuing reserve fund agreements.  Vergara Dep. 40:5-41:17, 61:15-62:19.

84.     Vergara was only involved in bidding on less than five reserve fund agreements. Vergara Dep. 44:16-18.

85.     In connection with the fewer than five bids he was involved with, Vergara relied on others to provide the critical profit and dealer charges to incorporate.  Vergara Dep. 44:16-18, 48:25-49:13.

86.     Furthermore, while at Lehman, Vergara was not involved in valuing reserve fund

agreements, including valuation of reserve fund agreements in the event of a termination.

Vergara Dep. 61:15-62:19.

**b.      Swap Financial Failed to Produce Any Evidence of its Market Quotation
Process**

87.     Washington TSA had asked Peter Shapiro to solicit market quotations, and

Shapiro testified that Swap Financial solicited market quotations from "every conceivable

dealer," but did not receive any quotes – either indicative or actionable – in response.  *See* Tr.

718:2-25, 149:5-150:17.

88.     However, Kim Herman and Bob Cook testified that Peter Shapiro received

indicative quotes during the market quotation process, although they did not know what the

indicative quotes were.  Tr. 190:6-21; 236:5-12.

89.     Curry and Hasterok, Washington TSA's other experts, acknowledged that

indicative quotations were available in the market in 2009 for tobacco RFAs.  Tr. 469:20-25.

90.     Tobacco settlement bond issuers from New Jersey and Virginia submitted proofs

of claims in this bankruptcy that purportedly derived the termination amounts of their respective

reserve fund agreements based on quotations provided by dealers. *See, e.g.*, Proof of Claim No.

17406 for  the Commonwealth of Virginia Tobacco Settlement Financing Corporation; Proof of

Claim No. 17407 for the Commonwealth of Virginia Tobacco Settlement Financing Corporation;

Proof of Claim No.  21488 for the Tobacco Settlement Financing Corporation (New Jersey).

91.     Swap Financial knew that a quotation solicitation process for purposes of placing

a value on a derivative contract, such as is found in the RFA, is common in the industry, must be

run fairly, must give the dealers a clear description of the agreement for which quotations are

being solicited and records must be kept of the process.  *See* Vergara Dep. 125:19-25; Tr.

587:25-588:25.

92.     Swap Financial also worked on the Tobacco Settlement Financing Corporation of

New York's proofs of claims and detailed the process by which it solicited quotations in a

memorandum submitted with the proof of claim.  Debtors' Ex. 71, Proof of Claim No. 18990 by

the New York Tobacco Settlement Financing Corporation against LBSF.

93.     There is no memorandum here that contains the details of the alleged quotation

process that was conducted for Washington TSA.

94.     Vergara explained that if Swap Financial had conducted a market quotation

process for Washington TSA, it would have recorded the results in a memorandum.  Vergara

Dep. 205:11-206:18.

95.     Swap Financial did not send out any bid packages to potential dealers that would

have informed them regarding the terms of the deal in connection with the alleged quotation

solicitation in either January or March of 2009.  Tr. 723:13-20.

96.     On March 26, 2009, Lehman received an indicative quote from Wachovia,

valuing the RFA at $6,225,000, payable to Washington TSA.  Debtors' Ex. 44, Email chain

between Casey Rogers and Sergey Arefiev, Mar. 26, 2009.

97.     Washington TSA has not produced any documentary evidence relating to any bid

process that was conducted on behalf of Washington TSA with respect to the RFA.

98.     Washington TSA has not produced any documentary evidence regarding the

indicative rates that Peter Shapiro received for the RFA.

99.    PFM, a financial advisor who has represented a number of claimants in the Lehman bankruptcy with terminated reserve fund agreements, testified that in every instance, the claims asserted against Lehman were based on market quotations.  Harris Dep. 74:4-10.

100.    James Vergara, the individual with primary responsibility at Swap Financial for determining the Termination Amount, testified that he did not recall conducting any market quotation process for Washington TSA.  Vergara Dep. 126:2-14, 133:18-134:6, 205:2-206:15.

101.    On Friday, March 27, 2009, Washington TSA's attorney informed Washington TSA that the RFA should be valued as of March 25, 2009, the Rejection Date.  Debtors' Ex. 45, Email chain between Swap Financial and Washington TSA, Mar. 30, 2009.  Later, on that same day, Cook forwarded the attorney's email to Swap Financial and asked Shapiro to "proceed with calculations." *Id*.  Shapiro responded in the early morning of the following Monday and Vergara furnished his calculations to Washington TSA that same day.  *Id*.  Shapiro also confirmed that no quotation process was conducted over the weekend before the Termination Amount calculation was done by Vergara.  Tr. 721:18-722:11.

**c.    Swap Financial Has Not Justified Its Valuation**

102.    Peter Shapiro, principal of Swap Financial, prepared a declaration in support of the Motion to Compel and stated that the Termination Amount due Washington TSA was $27.5 million in January 2009.  Debtors' Ex. 40, Declaration of Peter Shapiro in support of Washington TSA's motion to compel Lehman to assume or reject the RFA at ¶ 7.

103.    Washington TSA has not produced any work papers from Swap Financial revealing how the Termination Amount of $27.5 million contained in Shapiro's January 14, 2009 declaration was calculated.

104.    Swap Financial has not produced any work papers revealing how the Termination Amount of $27.5 million contained in Shapiro's January 14, 2009 declaration was calculated.

105.    On March 30, 2009, James Vergara prepared a draft memorandum to Washington

TSA regarding the valuation of the RFA and used a total of 150 basis points to represent all

dealer charges (*i.e.*, both profit and credit), which resulted in a Termination Amount of $23.7

million.  Debtors' Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund

Agreement with LBSF, Mar. 30, 2009.

106.    Swap Financial has not produced any analysis related to Vergara's calculation of

the Termination Amount using 150 bps in the draft memoranda prepared by Vergara. Debtors'

Ex. 47, Swap Financial Memorandum re Valuation of TSA's Reserve Fund Agreement with

LBSF, Mar. 30, 2009.

107.    After receiving comments from Peter Shapiro, in a subsequent draft of the

memorandum Vergara observed that the credit spread for the Bonds on March 25, 2009 was 429

basis points, but "conservatively used a credit spread of 3.000% (300 basis points)" that yielded

a Termination Amount of $34.4 million.  Debtors' Ex. 49, Email from J. Vergara to P. Shapiro

attaching draft memorandum, Apr. 21, 2009 at 2.

108.    Swap Financial has not produced any analysis related to Vergara's calculation of

the Termination Amount using 300 bps in the draft memoranda prepared by Vergara.  Debtors'

Ex. 49, Email from J. Vergara to P. Shapiro attaching draft memorandum, Apr. 21, 2009 at 2

109.    On April 21, 2009, Swap Financial prepared a Calculation of Loss Memorandum

(the "April 2009 Calculation of Loss Memorandum") that included a credit charge of 429 basis

points.  Debtors' Ex. 65, Swap Financial Memorandum re Calculation of Loss for TSA's

Reserve Fund Agreement with LBSF, Apr. 21, 2009.

110.    Peter Shapiro did not know how to use the Principia software that calculated the

valuation of the RFA. Tr. 628:12-629:22.

111.    Vergara understood how the Principia model calculated the valuation.  He testified that he used the software Principia to value the RFA and the model would "look at the two streams of payments.  So we have our fixed rate, guaranteed rate payment, and then we have our floating rate payment which is based on the different assumptions that we input into the model in terms of the spread to an index and then the forward value of that index, which is just determined by the market.  And so you would look at those two cash flows and discount each period. . . . and then you would sum those up and take the present value of them to come up with the net value, the net mark-to-market value."  Vergara Dep. 116:3-117:3.

112.    Washington TSA attached a Calculation of Loss Memorandum dated September 10, 2009 and prepared by Swap Financial (the "September 2009 Calculation of Loss Memorandum") to the Proofs of Claim.  Joint Ex. 8, Proof of Claim no. 37355 against LBSF.

113.    The September 2009 Calculation of Loss Memorandum is substantially similar to the April 2009 Calculation of Loss Memorandum.

114.    The Proofs of Claim state that the claim amount of $47,063,714.01 included $46,437,610 in Termination Amount as of March 25, 2009, $554,080.02 in lost earnings associated with LBSF's failure to deliver Qualified Securities on December 1, 2008, and $73,023.99 in costs and expenses incurred in connection with the Termination of the RFA.  Proofs of Claim.  Joint Ex. 8, Proof of Claim no. 37355 against LBSF.

115.    The September 2009 Calculation of Loss Memorandum used "a LIBOR plus spread analysis with an interest rate swap," which it described as "the broadly accepted market methodology."  Joint Ex. 11 at 2.  In the September 2009 Calculation of Loss Memorandum, Swap Financial calculated a Termination Amount of $46,437,610 as of March 25, 2009.  *Id.*

116.     On December 16, 2013, Peter Shapiro submitted an Expert Report pursuant to Federal Rule of Civil Procedure 26(a)(2) in which he opined that the "Termination Amount owed to Washington TSA is $38,007,347, plus Section 7.7(b) losses in the amount of $553,080, plus reasonable attorney and advisor fees" assuming that the RFA's maturity date is 2032.  The report is otherwise identical to the September 2009 Calculation of Loss Memo.  TSA Ex. W, Shapiro Expert Report.

117.     The September 2009 Calculation of Loss Memorandum used a fixed-for-floating interest rate swap, comparing the cash flows from two "legs" – a fixed leg of 4.484%, and a floating rate of LIBOR plus adjustments, assuming a maturity of the RFA of 2042.  Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2.

118.     According to Swap Financial, "the appropriate method" to value RFA "is to use a similar interest rate swap in which one payer (LBSF) would pay a fixed rate of 4.484% and the other payer (TSA) would pay a floating rate." *Id.*  The discounted difference between these two cash flows is the Termination Amount.  The comparison of the two cash flows – one for the floating leg and one for the fixed leg – is exactly the same basic approach used by Lehman's expert, Sam Gruer, and the generally accepted market methodology to value a reserve fund agreement.  Tr. 545:17-546:13 (Curry); 639:4-14 (Shapiro); 844:14-20 (Babbel); 949:6-19 (Gruer).

119.     The Guaranteed Rate of the RFA should be used in calculating the fixed payment leg.  Tr. 629:20-630:8 (Shapiro); 956:18-24, 1004:5-8 (Gruer).

120.     The floating leg "should represent the value of the securities which are going to be delivered – short term obligations (treasuries, agencies or commercial paper)" (*i.e.*, the Eligible Securities).  Joint Ex. 11 at 2; Tr. 948:15-949:12, 950:16-951:4.  The floating leg should

be determined using the "cheapest to deliver" of the Eligible Securities.  Vergara Dep. 45:25-46:21, 169:15-24; Shapiro 30(b)(6) Dep. 129:13-24; Tr. 948:15-949:12.

121.    The September 2009 Calculation of Loss Memorandum applied the following spreads to LIBOR:  0.666% of commercial paper spread, minus 4.290% of credit spread, minus 0.25% of profit spread, for a total spread of minus 3.874%.  *Id.* at 3.

122.    Principia screenshots confirm that 3.874% was deducted from the LIBOR curve to determine the floating leg cash flows for purposes of Swap Financial's determination of the Termination Amount.  Debtors' Ex. 63, Swap Financial Principia Screenshot v16

123.    Swap Financial did not use the "cheapest to deliver" of the Eligible Securities in constructing the floating leg, but instead used commercial paper.  Tr. 594:9-17, 714:2-10.

124.    U.S. Agency Securities were the cheapest to deliver of the Eligible Securities over the life of the RFA as of March 25, 2009 (that is, such securities would have produced the best economic result for Lehman).  Debtors' Ex. 139 at ¶ 42; Tr. 952:24-955:23.

125.    To construct the floating leg, Shapiro added 66.6 basis points to the LIBOR curve to represent the delivery of commercial paper pursuant to the RFA.  Shapiro looked at the historical trading relationship between commercial paper and LIBOR and determined that it was 66.6 basis points.  Tr. 675:12-18; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2.  Shapiro testified at his deposition that he was responsible for selecting commercial paper and determining the 66.6 basis point spread and that he done so because he was "try[ing] to do things accurately, fairly, correctly, defensively." Shapiro 30(b)(6) Dep. 131:22-133:22, 141:10-24; Tr. 701:9-702:11; 715:19-24.  Shapiro's mid-market value for the RFA (assuming the delivery of commercial paper) is $3,685,691.56 payable

- 85 -

to Washington TSA by Lehman.  *See* Tr. 967:6-11; 1041:10-16; Debtors' Ex. 139, Gruer Report at ¶ 68.

126.    Washington TSA did not replace the RFA or incur any dealer charges in connection with any replacement RFA.

127.    In its calculation of the Termination Amount, Swap Financial imposed two hypothetical "dealer charges" to purportedly represent what a dealer would require to replace the RFA:  (1) a credit charge of 429 basis points and (2) a profit charge of 25 basis points. Tr. 599:11-601:10; Joint Ex. 11, Memorandum Regarding Calculation of Loss from Swap Financial, Sept. 10, 2009 at 2-3.

128.    Swap Financial's credit charge is $32,431,696.44, which alone comprises nearly 85% of Washington TSA's Claim.  *See* Debtors' Ex. 139 at ¶¶ 68, 71.

129.    Swap Financial based its 429 basis point credit charge on the purported spread between the trading yields of Washington TSA's Bonds and an A-rated municipal-bond index as of March 25, 2009.  Tr. 599:11-22; Joint Ex. 11.  The application of this purported credit charge to the floating leg results in negative interest rates.

130.    Swap Financial conflates the concepts of a "credit spread" and a "credit charge." *See* Tr. 599:5-600:21; 958:15-959:20.  The "credit spread" that measures the difference between the yield on the Bonds and a benchmark bond index does not measure the credit risk a dealer would face assuming the obligations of the RFA or what that dealer would charge to assume such risk.  Tr. 958:15-959:20.  The credit risk associated with entering into a reserve fund agreement is very different from the risks associated with owning actual bonds.  *See* Tr. 1036:18-1039:14; Debtors' Ex. 139 at ¶¶ 64-65.  A bondholder is exposed both to the risk that interest payments will not be made and the potential loss of the principal of the Bonds.  The bondholder

is compensated for these risks by means of the credit spread that it receives (*i.e.*, the "spread" above the interest rate that equivalent "risk-free" bonds would yield). A replacement RFA dealer would not have any exposure to a principal loss on the Bonds issued by Washington TSA. *See* Tr. 1041:11-23. In contrast to the bondholder, a dealer entering into a reserve fund agreement includes a credit charge to protect itself against the risk that its counterparty will not be able to make timely and full payment under the terms of the governing instrument. Tr. 963:2-18.

131. There is an industry-standard approach to calculating a credit charge, which involves first, calculating potential exposures, *i.e.* the spread at which an issuer's bonds are trading to some index, and second, intersecting that with the probability of default by the dealer's counterparty, *i.e.* how often (and by how much) the dealer expects to be "in the money" under the reserve fund agreement. *Id.* at ¶ 64-67; Tr. 962:11-964:16, 1036:18-1039:9. In assessing the first step, as of the Termination Date, the potential exposure had reduced as compared to when the RFA was first entered into. That is, interest rates were lower as of the Termination Date and the substantial passage of time reduced the extent of moves in exposure. Next, the probability of default by the dealer's counterparty should be assessed. These probabilities may be inferred from the "credit spread" embedded in a bond yield. Debtors' Ex. 139 at ¶ 65. However, this is only the starting point to the second step, as a dealer would then apply default probabilities (derived from the credit spread) to each of the possible exposures in order to determine the credit charge. Tr. 1038:24-1039:14; Debtors' Ex. 139 at ¶ 65. In other words, the "credit spread" is just one of the inputs that a dealer would use to determine a credit charge to impose. Tr. 959:2-20, 962:11-22.

132. Shapiro admitted that he did not consider possible credit exposures and probability of default, in determining the credit charge he imposed as part of his Termination

Amount calculation.  Tr. 650:2-25, 653:27-654:24; Shapiro 30(b)(6) Dep. 154:23-155:6; 161:11-16.

133.   Swap Financial's credit charge does not represent the real credit risk associated with entering into a reserve fund agreement, but instead significantly overstates such risk.

134.   Swap Financial's credit charge implies that Swap Financial concluded there was a 100% chance that the replacement dealer for the RFA would be substantially "in the money." That conclusion  is at odds with Washington TSA's Claim which is premised upon  the replacement dealer being substantially "out of the money."

135.   Hasterok rejected Swap Financial's use of the entire credit spread as a credit charge.  Tr. 428:2-13.

136.   Vergara, the Swap Financial employee who valued the RFA, a credit charge would normally be "tens of basis points," not hundreds of basis points.  Vergara Dep. 49:8-19.

137.   Although Vergara's testimony and the screenshots produced by Swap Financial show that the spread of negative 3.874% was applied to three-month LIBOR to construct the floating leg of Swap Financial's "LIBOR plus spread" analysis, Shapiro maintained that 3.874% was not subtracted from the LIBOR curve, but instead would "come off the fixed rate." Tr. 811:2-812:7.  In other words, Shapiro claimed that the future cash flows were simply determined by subtracting 3.874% from the Guaranteed Rate of 4.484%, or 0.61%.  Tr. 754:20-25.

138.   None of the screenshots produced by Swap Financial shows 61 basis points on their face, and Swap Financial did not produce any spreadsheet relating to the derivation of the 61 basis points or how it would have discounted the cash flow based on the 61 basis points rate of return.  Tr. 635:17-636:10.

139.    After the Hearing, Swap Financial produced a screenshot of the cash flows that showed negative interest rates for most of the time period.  *See* TSA Ex. AA, Principia Discount Rate and Cash Flows Screenshot, SFG_002543-SFG_002544.

## V.    Curry and Hasterok's Expert Reports Are Unreliable

140.    Curry and Hasterok are financial industry professionals whose purported expertise derives solely from their experience in the market.

**a.**    The Rejection of the Forward Curve Is Not Justified

141.    Washington TSA submitted an expert report prepared by Daniel Curry and Jeffrey Hasterok that stated that the Termination Amount due from Lehman to Washington TSA should be approximately $37.5 million.  *See* TSA Ex. X, Curry/Hasterok Expert Witness Valuation Report at 20.

142.    Peter Shapiro referred Curry and Hasterok to Washington TSA's attorneys.  Tr. 544:18-25.

143.    Both Lehman's experts and Washington TSA's experts agree that there is an industry-standard methodology to value reserve fund agreements.  Tr. 465:20-466:8, 470:2-12 (Hasterok); Tr. 545:17-546:13, 547:23-548:5 (Curry); Tr. 639:4-14 (Shapiro); Tr. 844:14-845:2 (Babbel); Tr. 949:6-19, 961:18-962:10 (Gruer).

144.    Hasterok testified that "the methodology we would have used as a dealer doing this trade [] would have been start with a very simple LIBOR swap . . . and then apply adjustments to it . . . and come up with an all-in price."  Tr. 377:20-378:23.

145.    In fact, Hasterok testified that had he and Curry been valuing the contract from the dealer's perspective, they would have applied the forward curve methodology.  Tr. 465:20-466:8.

146.    Similarly, Curry testified that there is a generally accepted approach of using a forward curve, which is then adjusted to produce a final valuation number.  Tr. 545:17-546:13. Curry also agreed with Shapiro that "valuing the RFA like a fixed or floating swap is the broadly accepted methodology for valuing these types of products."  Tr. 547:23-548:5.

147.    Curry and Hasterok, despite recognizing the industry standard methodology, Tr. 545:17-546:13, 547:23-548:5 (Curry); 470:2-12 (Hasterok), created an *ad hoc* approach crafted only for this litigation.  *See* Tr. 410:4-20; 465:20-466:8; 523:2-20.

148.    Curry and Hasterok admit that, in their combined 40+ years of experience in the market, Tr. 410:4-20, 523:2-20, they have never used the valuation methodology they used in calculating the Termination Amount for this case.

149.    Washington TSA's ability to transact at the levels seen in the forward curves as of March 25, 2009 (the valuation date) has absolutely no relevance as to whether forward curves provide sufficient market information to support a valuation of the RFA as of that date.  The RFA's value simply does not depend on whether or not Washington TSA can currently transact.

### a.    The Selection of the Replacement Yield Is Arbitrary

150.    To determine the Termination Amount, Curry and Hasterok merely deducted 0.65% from the Guaranteed Rate of 4.484% and discounted the result to present value (also using 65 basis points as the discount rate).  Tr. 433:12-435:15; Debtors' Ex. 43, Excel Spreadsheet created by Daniel Curry and Jeffrey Hasterok.

151.    Curry and Hasterok's rejection of the use of forward yield curves for valuing a long-dated financial instrument has no justifiable or rational basis.  Similarly, Curry and Hasterok's assumption that Washington TSA will only earn 0.65% on its Reserve Fund for the next 23 years has no justifiable or rational basis.

152.    Curry and Hasterok did no analysis to reach the conclusion that the short-term interest rates would remain unchanged for up to 23 years.  Tr. 522:19-24.

153.    Curry and Hasterok did not include guaranteed investment contracts in the analysis of the potential replacement investments for their valuation of the Termination Amount, despite having learned of the various proposals during the discovery process.  Tr. 411:20-412:19. Curry and Hasterok did not examine the market to determine the types of guaranteed investment contracts available in the market around December 2008 in analyzing the potential replacement investment yields.

154.    Curry and Hasterok also did not include any of the alternative investment proposals that Washington TSA actually received in their analysis of potential replacement yields.  Tr. 415:16-417:10.

155.    Curry and Hasterok arbitrarily selected a four-month average to calculate the replacement rate and then projected the resultant 0.65% rate of return for the 23 years remaining on the RFA, despite there being no academic literature or market practice cited to support the selection of such an average, even though they recognize that the interval selected is material for the valuation.  Tr. 433:12-435:22.

**b.    Authorities Relied on by Curry and Hasterok Do Not Support Their Opinion that the Forward Curve Should be Rejected**

156.    Curry and Hasterok rely on several articles in support of their opinion that forward curves should be rejected.  Yet none of these articles actually support their opinion. Hasterok admitted that he did not do an academic survey of the literature, but instead searched on the internet for quotes that might support their opinions.  Tr. 444:20-445:25.

157.    Curry and Hasterok cite to a blog post written by Peter Orr in support of their opinion.  However, Orr wrote in his blog that "[i]f you are in a financial service environment as a

trader or you are looking to perform a fair price analysis of an interest rate derivative using an interest rate model, you better use forward rates." Tr. 447:14-448:2. Orr also responds to a reader comment that that "if anything, realized rates are likely to be higher than those forwards at some point over that ten-year horizon, at least at the long-end." Tr. 446:23-449:2.

158.    The authors of "Anticipations of Monetary Policy in Financial Markets" concluded that they had "found fairly striking evidence of an improved ability of the financial markets to predict future changes in policy" and that "the increase in predictability is remarkably strong and is evident in a number of different markets, giving more credence to the findings." Tr. 454:25-455:20.

159.    The authors of "Funding Value Adjustments and Fair Value" stated that "although there can be a number of different private values for a derivative, there is only one market price or fair value." Tr. 560:11-19. The authors also concluded "[s]hould two entities with different funding costs have different fair value estimates for the same asset? The answer is no." Tr. 559:8-11.

160.    The authors of "Interest Rate Forecasts: A Pathology," found that "when interest rates are on an upward (downward) cyclical path, the forecast underestimates (overestimates) the actual subsequent path of the rates." Tr. 461:10-16. According to the authors, when an "econometrician applies his or her tests to the complete time series, she will find no aggregate sign of [upward or downward] bias," meaning that forward curves do not over- or under-predict when longer time series are used. Tr. 462:8-463:2.

### c.    Curry and Hasterok Ignored the RFA's Provisions

161.    Despite the explicit requirement under Section 7.6(c) that Washington TSA value the RFA "as if it were Lehman," Curry and Hasterok did not include that phrase in their

summary of material terms of the RFA, nor factor it in it forming their opinions.  TSA Ex. X,

Curry/Hasterok Expert Valuation Report at 4, Tr. 466:9-25.

162.    Curry agreed that Section 7.6(c) of the RFA would be a critical phrase if it were

to be given effect by the judge.  Tr. 548:24-550:14.

## VI.    Lehman's Expert Valuations

163.    Lehman's valuation is based on the methodology that is used by market

participants to value forward delivery agreements like the RFA every day, regardless of whether

the valuation at issue is related to executing a new transaction, placing a value on an existing

transaction, or terminating a transaction, and regardless of whether the valuation was on behalf

of a dealer or an issuer.  Debtors' Ex. 139, Gruer Report at ¶ 34.  In addition to being generally

accepted, Lehman's methodology is consistent with the RFA that provided Lehman with the

right to deliver the "cheapest to deliver" Eligible Securities (meaning those securities that would

have produced the best economic result for Lehman).  Joint Ex. 1, RFA at § 2.1.

164.    Lehman submitted an expert report prepared by Samuel Gruer, who has more than

20 years of experience pricing agreements similar to the RFA, in support of its position.  *See* Tr.

933:12-934:3, 938:7-939:7, 944:15-20; Debtors' Ex. 139, Gruer Report.

165.    Gruer first identified the "cheapest to deliver" Eligible Securities as of the

valuation date, March 25, 2009.  To do so, Gruer analyzed the yield curves for each type of

Eligible Securities, as of March 25, 2009, using information published by Bloomberg.  After

looking at these yield curves, Gruer determined that U.S. Agency Securities were the highest

yielding or "cheapest to deliver" Eligible Securities as of March 25, 2009.  Debtors' Ex. 139,

Gruer Report at ¶ 40.

166.    Gruer reviewed the yield curves for each category of Eligible Securities

(Treasuries, Agencies and Commercial Paper) as of March 25, 2009.  Since Gruer determined

that U.S. Agency Securities were the "cheapest to deliver" on March 25, 2009, Gruer constructed

a forward curve for  U.S. Agency Securities, using Bloomberg data.  Debtors' Ex. 139, Gruer

Report at ¶¶ 40, 45, 46; Tr. 949:6-19, 950:14-951:9. It is standard market practice to use forward

rates of interest to value forward commitments like the RFA.  Debtors' Ex. 138, Report of

Professor David F. Babbel at 10.

167.    Then Gruer calculated the future cash flows of the two legs of the transaction and

discounted the difference between such cash flows to present value using the applicable LIBOR

rate.  Tr. 949:13-19; Debtors' Ex. 139 at  ¶¶ 40, 47, 48.  The "fixed leg" is determined by using

the Guaranteed Rate of the RFA (4.484%) and the "floating leg" is determined using the forward

curve for  U.S. Agency Securities.  *See* Tr. 948:8-949:19.

168.    Using this methodology, Gruer determined that the mid-market value of the RFA

was $1,359,394.59 payable by Washington TSA to Lehman.  Debtors' Ex. 139, Gruer Report at

¶ 49.

169.    Washington TSA's long-time financial advisor, PFM, testified that the "mid-

market" value is where PFM has "historically seen these sorts of agreements terminate."  Harris

Dep. 43:10-14.

170.    Gruer further calculated the amounts due from Lehman to Washington TSA under

Section 7.7(b) of the RFA, which required Lehman to compensate Washington TSA for its Lost

Earnings in connection with the failure to deliver Qualified Securities.  *Id*. at ¶ 50.

171.    The RFA required that, after Lehman's failure to deliver Qualified Securities,

Washington TSA should invest the Reserve Fund in the longest maturity date but maturing no

later than the next Bond Payment Date of June 1, 2009.  Joint Ex. 1, RFA at § 2.4(a).  Gruer

calculated that had Washington TSA complied with the RFA, its Lost Earnings would have been

$226,622 payable to Washington TSA from Lehman.  Debtors' Ex. 139, Gruer Report at ¶¶ 56, 57.

172.    Gruer then added the section 7.7(b) loss to the mid-market valuation of the RFA ($1,359,395 payable by Washington TSA to Lehman) and concluded that the Termination Amount of the RFA should be $1,132,773 due from Washington TSA to Lehman.  *Id.* at ¶ 58; Tr. 945:24-946:16.

**VII.    Washington TSA Chose Not To Pursue Alternative Investment Options**

173.    Washington TSA has maintained possession and control of the Reserve Fund, containing $45.5 million, since December 1, 2008 until the refunding of the Bonds in October 2013.  Cook 30(b)(6) Tr. 18:13-16; 98:16-18.

174.    Washington TSA has kept the Reserve Fund exclusively in money market funds since the RFA was terminated in March 2009.  Tr. 158:9-15; 224:15-21.

175.    Washington TSA is able to direct the Trustee to invest in other securities or investment contracts so long as the investments meet the requirements of the Indenture.  Tr. 162:11-20.

176.    On November 6, 2008, Barclays advised Washington TSA that it had "been approached by a AA insurer who was willing to take tobacco risk on an uncollateralized GIC." Debtors' Ex. 20, Email chain between Kim Herman and Bob Cook et al., Nov. 7, 2008.

177.    Washington TSA did not pursue the GIC referenced by Barclays on November 6, 2008.  Cook 30(b)(6) Tr. 94:5-11, 95:10-14.  According to Washington TSA's Senior Director of Finance, Barclays Capital's investment proposal was compliant with the definition of eligible security under the RFA.  Tr. 243:3-7; 255:2-7.

178.    According to PFM, agency securities were available for purchase by Washington TSA at a yield of 2.58% to 3.38% as of November 11, 2008.  Debtors' Ex. 22, Memorandum from PFM, Nov. 11, 2008 at 4.

179.    On June 3, 2009, after being provided with available investment options by the trustee, Bob Cook emailed Washington TSA staff and stated that "[w]ith rates so low, I'm hesitant to 'chase' rates. . . ."  Joint Ex. 7, Email from Bob Cook, June 3, 2009, TSA_008827.

180.    Washington TSA received a list of investment agreement rate indications from Grant Street Group on March 4, 2011.  According to Grant Street Group, rates of return on uncollateralized investment agreements ranged from 1.90% to 4.00%, based on maturities ranging from 5 to 12 years.  The rates of return for collateralized investment agreements ranged from 1.40% to 3.13%.  Debtors' Ex. 105, Email from John McCarthy to Bob Cook, attaching Debt Service Reserve Fund Rate Indications, Mar. 4, 2011.  All of these proposals provided significantly higher returns than what Washington TSA was earning on its Reserve Fund at the time in money market funds.  Tr. 242:4-15. Washington TSA staff did not discuss any of these investment alternatives with the TSA Board.  Cook 30(b)(6) Tr. 109:14-16.  Washington TSA did not pursue any of the investment agreement indications received by Grant Street Group on March 4, 2011.  Herman Dep. 309:11-18.

181.    On November 4, 2011, Barclays Capital advised Washington TSA that it was willing to enter into an uncollateralized guaranteed investment contract for a term of 5 years for an amount of $45,530,000 with a variable rate of 1.50% spread over 3-month LIBOR and a fixed rate of 2.75%.  Debtors' Ex. 109.  Under such a contract, Washington TSA would receive $1,252,075 in annual earnings.  *Id*.  According to Washington TSA's Senior Director of Finance, Barclays Capital's investment proposal complied with the Indenture.  Tr. 255:2-7.  Washington

TSA did not pursue the proposed Barclays guaranteed investment contract. Cook 30(b)(6) Tr. 112:20-113:3; 113:6-25.

182.    On November 16, 2011, Swap Financial provided a memorandum regarding reinvestment strategy and suggested an investment strategy that, according to Swap Financial, would yield approximately 2.60%. Debtors' Ex. 111 at 3. Shapiro believed that the investment proposal complied with the terms of the Indenture. Shapiro 30(b)(6) Dep. 90:11-18, 91:2-92:2. Washington TSA did not pursue the reinvestment strategy proposed by Swap Financial on November 16, 2011. Cook 30(b)(6) Tr. 116:23-117:13; 117:18-118:10.

183.    After Lehman's bankruptcy, Washington TSA did not enter into any investment agreements with respect to the Reserve Fund and instead invested the Reserve Fund exclusively in a money market account. Tr. 158:9-15; Tr. 224:15-21; Cook 30(b)(6) Tr. 91:2-4.

184.    Washington TSA partly refused to re-invest the Reserve Fund because it expected interest rates to rise and did not want to lock itself into an artificially low rate, such as the 2.60% under the Swap Financial proposal. Cook 30(b)(6) Dep. 92:6-14; Tr. 247:22-248:4.

185.    Despite offering to consult with any member of the board about investment alternatives for the Reserve Fund, Washington TSA staff did not in fact have any discussions with any board member regarding alternative investments for the Reserve Fund since the RFA was terminated. The TSA Board was not involved in the evaluation of any alternative investment options. Tr. 181:22-182:7; 191:22-25.

186.    The Senior Director of Finance of Washington TSA testified that "[he does not] want to be looking at investments or having [his] people take their time to look at various investments over time" after the termination of the RFA. Tr. 225:21-226:10.

187.     Furthermore, the Senior Director of Finance of Washington TSA testified that while it had received investment proposals from advisors familiar with Washington TSA's investment requirements under the Indenture, Washington TSA was not comfortable with the conditions of the investment proposals that it had received but did not make the analysis based on whether the proposals were consistent with the terms of the Indenture.  Tr. 251:4-252:9.

## VIII.   The Bonds Were Refunded in 2013

188.     On October 17, 2013, Washington TSA refinanced the Bonds by issuing $334.7 million in tax-exempt refunding revenue bonds, which resulted in all of the Bonds being refunded. Debtors' Ex. 134, Washington TSA Press Release, Oct. 17, 2013.

189.     According to Washington TSA the interest savings relating to the refunding "are just under $90 million, or $58 million in today's dollars when adjusted for inflation."  *Id.*

# PROPOSED CONCLUSIONS OF LAW

## I.    Burden of Proof

1.        Lehman had objected to Washington TSA's Proofs of Claim and continues to object to the Proofs of Claim.

2.        Washington TSA bears the burden of proof in connection with its Claim.  Fed. Bank. R. P. 3001(f) adv. Comm. Notes; *see also Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773-74 (B.A.P. 2d Cir. 2000); *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, Ch. 11 Case No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

3.        In order to meet this burden, Washington TSA must demonstrate that it determined its Claim in accordance with the Bankruptcy Code and the language of the RFA.

## II.    Section 562 of the Bankruptcy Code

4.        Section 562 of the Bankruptcy Code provides that the RFA should be valued using "commercially reasonable determinants of value" on the rejection or termination date, and if "commercially reasonable determinants of value are not available on that date, then the valuation must be done "as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562.

5.        Pursuant to Section 562, the valuation date for the RFA is March 25, 2009, the date on which the RFA was rejected.  Section 562 requires the Court to determine the value of the RFA independent of anything that may have happened subsequent to March 25, 2009.

6.         "Commercially reasonably determinants of value" existed on March 25, 2009, including forward curves and data to construct forward curves, by which the value of the RFA can be determined.

III.    **Calculation of Termination Amount Under the RFA**

7.      The RFA provided how the Termination Amount is to be determined in the event

of early termination of the RFA based upon a Lehman Event of Default.

8.      Upon a Lehman Event of Default, "Lehman shall determine the Termination

Amount."  Joint Ex. 1, RFA at § 7.6(c).

9.      If Lehman does not make the determination within three business days, then

Washington TSA can proceed to determine the Termination Amount, so long as it makes the

determination "as if it were Lehman."  *Id.* at § 7.6(c).

10.     The definition of the Termination Amount required that it be "calculated in good

faith" and "on the basis of the arithmetic mean of quotations from at least three Dealers of the

amount, if any, that each such Dealer would require the Burdened Party to pay the Dealer . . . in

consideration of such Dealer entering into an agreement with the Burdened Party . . . which

would have the effect of preserving for the Burdened Party the economic equivalent of its rights

under [the RFA] . . . ."  *Id.* at § 1.

11.     Only in the event that three market quotations cannot be obtained, can the

Termination Amount then be based upon a calculation of the Washington TSA's "total losses or

… gains."  *Id.* at § 1.

12.     Any determination of the Termination Amount – whether it is based upon market

quotations or a loss calculation – must be done "reasonably and in good faith."  *Id.*  If

Washington TSA determines the Termination Amount in accordance with the requirements of

the RFA, its determination is then binding "absent manifest error."  *Id.*

IV.     **Washington TSA Failed to Follow the RFA and Did Not Solicit Market Quotations**

13.     Washington TSA has failed to provide any evidence that it solicited market

quotations or that Swap Financial solicited market quotations from dealers on its behalf.

14.     Washington TSA's and Swap Financial's unsupported claims that Swap Financial surveyed the market are insufficient to satisfy the requirements of the RFA.

15.     In light of the evidence presented, Lehman is entitled to an adverse inference that Washington TSA avoided the market quotation process because it knew the results would not support its inflated Claim against Lehman.

16.     The language of the RFA is unambiguous that Washington TSA can only resort to a determination of "losses … or gains" in the event that it is "unable" to secure at least three market quotations.  Joint Ex. 1, RFA at § 1.

17.     Washington TSA cannot disregard certain provisions of a contract and selectively decide which provisions of the contract it wishes to follow.  *See NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259 (2011) ("when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms"); *Pavarini McGovern, LLC v. Tag-Court Square, LLC*, 878 N.Y.S2d 419, 420 (2d Dep't 2009) ("[w]hen interpreting [a] contract negotiated by and entered into at arm's length between sophisticated business people, represented by an attorney, a court [would be obligated to] enforce the agreement according to its terms"); *Maroney v. Hawkins*, 855 N.Y.S.2d 667, 669 (2nd Dep't 2008) (refusing to enforce a valuation agreed to by the parties, which was not consistent with the valuation mechanism of the contract); *ESPN, Inc. v Off. of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 400 (S.D.N.Y. 1999) (impermissible to selectively enforce some clauses of a contract and not others).

18.     Contracts must be interpreted in such a manner so as to give "reasonable, lawful and effective meaning to all the terms."  Restatement (Second) of Contracts, Section 203 (1981); *see also Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of

contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.").

## V.    Washington TSA Did Not Calculate the Termination Amount Reasonably and in Good Faith

19.    Washington TSA's Termination Amount was not determined reasonably and in good faith.

20.    Washington TSA's insistence that it would not pay Lehman any Termination Amount under any circumstance demonstrates its lack of good faith.

### A.    Swap Financial's Calculation of Termination Amount is Not Reasonable

21.    If Washington TSA had calculated the Termination Amount in good faith, it would have used the industry-standard methodology, using market-accepted assumptions. Washington TSA's did not, rendering its resulting Termination Amount calculations unreasonable and meaningless.

22.    The RFA should be valued similar to an interest rate swap, where one payer (Lehman) would be deemed to pay a fixed rate (the Guaranteed Rate of the RFA) and the other payer (Washington TSA) would be deemed to pay a floating rate.

23.    Swap Financial has distorted the resulting Termination Amount to inflate Washington TSA's Claim against Lehman.

24.    In valuing the RFA, Swap Financial failed to use the "cheapest to deliver" of the Eligible Securities in constructing the floating leg.

25.    Since Washington TSA did not replace the RFA, the theoretical dealer charges that were never incurred by Washington TSA are not properly recoverable by Washington TSA because the definition of the Termination Amount is expressly limited to losses or costs actually incurred.  *See* Joint Ex. 1, RFA at § 1.

26.     The charges imposed by Swap Financial for credit and profit are improper because Washington TSA did not replace the RFA.

27.     Charges imposed by Swap Financial in its determination of the Termination Amount were excessive and did not satisfy the requirement that the Termination Amount be calculated reasonably.

28.     Shapiro did not follow standard market practice in determining the credit charge, but instead based the credit charge only on the "credit spread" between the Bonds and an A-rated municipal-bond index.

29.     Swap Financial's credit charge does not represent the real credit risk associated with entering into a reserve fund agreement, but instead significantly overstates such risk.

30.     Shapiro's expert opinions lack the "rigorous analytical connection" between methodology and conclusions that Federal Rule 702 and *Daubert* demand.

31.     Shapiro lacks the requisite expertise to opine on the proper valuation of the RFA, and his opinions did not assist the Court at the Hearing.  Shapiro's expert opinions should therefore be excluded.

32.     Shapiro has not produced the work papers necessary for the Court to test the validity of his expert opinions.

33.     Shapiro's self-serving and contradictory testimony is simply not credible.

34.     As "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert," Shapiro's opinions should be excluded.  *See GE v. Joiner*, 522 U.S. 136, 146 (1997).

35.    Inconsistencies in Shapiro's testimony regarding the correct application of the charges means that his explanation at the Hearing that his methodology compares the Guaranteed Rate to a 0.61% rate of return should not be considered by the Court.

36.    Shapiro's testimony at the Hearing that the Principia model subtracted 3.874% from the Guaranteed Rate to value the RFA is not credible.  Documentary evidence produced following the Hearing conclusively shows that the Principia model compared the fixed and floating legs of the transaction, which, according to Swap Financial's own document, shows that the floating leg produced negative interests rates for most of the remaining 23 years of the RFA. TSA Ex. AA, Principia Discount Rate and Cash Flows Screenshot, SFG_002543-44.  It does not show a subtraction of 3.874% from the Guaranteed Rate.

37.    Shapiro's opinions are not admissible.

**B.    Curry and Hasterok's Opinions Should Not Be Considered**

38.    Curry and Hasterok's expert opinions are not reliable because they ignore the express terms of the RFA and rely on speculative assumptions regarding interest rates, in addition to rejecting widely accepted market methodologies in favor of a speculative and untested model specifically created for litigation.

39.    Curry and Hasterok's expert opinions are not reliable because they ignore the express terms of the RFA and rely on speculative assumptions regarding interest rates, in addition to rejecting widely accepted market methodologies in favor of a speculative and untested model specifically created for litigation.

40.    Curry and Hasterok have deviated from industry practice – which is where they obtained their purported expertise – therefore their expert opinions are not admissible. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216, at *15 (S.D.N.Y. June 5, 2008).  *See Kumho Tire Co.* 526 U.S. at 152 (stating that experts must

"use the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" in the expert opinion.)

41.    Curry and Hasterok's opinions lack the rigor and reliability required of expert testimony and will not assist the Court in resolving any issues. *Kumho Tire Co.*, 526 U.S. at 152.

42.    Curry and Hasterok's methodology, which is not based in any industry expertise that Curry and Hasterok may have, and which relies upon faulty and speculative assumptions, is patently unreliable and not an admissible expert opinion. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion" and the expert testimony "should be excluded if it is speculative or conjectural . . ."); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (concluding that testimony should be excluded when one of a report's "central conclusions . . . is premised on an elementary statistical error"); *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012) (where the "analysis rests on faulty assumptions, the trial court has discretion to exclude [the expert's] proffered testimony for lack of probative value.").

43.    The opinions of Curry and Hasterok lack the "rigorous analytical connection" between methodology and conclusions that Federal Rule 702 and *Daubert* demand. *See Nimely*, 414 F.3d at 396 (holding that admission of expert opinions require a "sufficiently rigorous analytical connection between [an expert's] methodology and the expert's conclusions.")Even if the Court were to conclude that Curry and Hasterok's approach were generally admissible, their failure to plausibly explain key ste*ps of t*heir analysis creates an insurmountable analytical gap between method and conclusion, and they rely on a series of speculative and faulty assumptions, making their opinions unreliable and inadmissible. *See Amorgianos v. Nat'l R.R. Passenger*

*Corp.*, 303 F.3d 256, 266-267 (2d Cir. 2002) (holding that when an expert's data or methodology "are simply inadequate to support to conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony" and "it is critical that an expert's analysis be reliable at every step.").

44.     Curry and Hasterok's failure to explain how they selected the "correct" Termination Amount from a "Valuation Matrix" of 40 different values s purely *ipse dixit* and renders their opinions inadmissible. *See GE v. Joiner*, 522 U.S. at 146 ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Amorgianos*, 303 F.3d at 267 ("To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. . . . [A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible."); Fed. R. Evid 702 advisory committee's note (2000 Amendments) (stating that an expert who is relying "solely . . . on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

45.     Curry and Hasterok have failed to calculate the Termination Amount from Lehman's perspective as required by Section 7.6(c) of the RFA.

46.     Curry and Hasterok's assumption about future earnings by Washington TSA is nothing more than sheer speculation. The Second Circuit has found that the "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996).

47.    Curry and Hasterok's opinions are not admissible.

## VI.    Washington TSA's Termination Amount Calculation Amounts to Manifest Error

48.    Washington TSA's valuation of the RFA amounts to manifest error.  *See Matter of Hermance v. Bd. of Supervisors of Ulster County* 71 N.Y. 481, 486 (1877) ("manifest error" is "evident, visible, plain, obvious to the understanding from an examination of the roll or document; or, at the most, only requiring a mathematical calculation to demonstrate it.")

## VII.    Lehman's Determination of Termination Amount is Reasonable

49.    Lehman's valuation of the Termination Amount is based on a sound methodology that is used by market participants to value forward delivery agreements like the RFA.

50.    Lehman's methodology is consistent with the RFA that provided Lehman with the absolute right to deliver the cheapest to deliver Eligible Securities as of the Rejection Date.

51.    Lehman's valuation is based upon commercially reasonable determinants of value as of March 25, 2009.

## VIII.    Lehman Should Not Be Responsible for Washington TSA's Failure to Mitigate Its Losses

52.    Lehman should not be penalized for Washington TSA's own refusal to invest the Reserve Fund and minimize its losses.  *See, e.g., Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011 (DC), 1996 U.S. Dist. LEXIS 16137 at *5 (S.D.N.Y.  October 30, 1996) (holding that six months is an unreasonable amount of time to wait before attempting to mitigate).

Dated:    New York, New York
          January 14, 2015

                                        /s/  Laura W. Sawyer
                                        JONES DAY
                                        Jayant W. Tambe
                                        Laura W. Sawyer
                                        222 East 41st Street
                                        New York, New York 10017
                                        Telephone: (212) 326-3685
                                        Facsimile: (212) 755-7306

                                        *Attorneys for the Debtors*