Paul J. Lawrence
Kymberly K. Evanson
PACIFICA LAW GROUP
1191 2nd Avenue, Suite 2000
Seattle, Washington 98101-3404
Tel: (206) 245-1700
Fax: (206) 245-1750

Robert N. Michaelson
Eric T. Moser
RICH MICHAELSON MAGALIFF MOSER, LLP
340 Madison Avenue, 19th Floor
New York, New York 11073
Tel: (212) 220-9404
Fax: (212) 913-9642

*Attorneys for Washington State Tobacco Settlement Authority*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
| Debtors. | (Jointly Administered) |

**WASHINGTON STATE TOBACCO SETTLEMENT AUTHORITY'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ...........................................................................1

   I.   TSA and its Reserve Fund ....................................................................1

   II.  TSA's Request for Bids .......................................................................2

   III. The Reserve Fund Agreement ............................................................3

   IV. The Termination Amount ....................................................................3

   V.  Lehman's Default and Rejection of the RFA ....................................5

   VI. Market Quotations ..............................................................................6

   VII. Alternative Valuation Methods ...........................................................7

   VIII. Pricing of Hypothetical Replacement RFA .........................................7

      A.  Selection of Eligible Security .....................................................8

      B.  Profit Charge .............................................................................9

      C.  Credit Charge ............................................................................9

   IX. Projected Returns from Reinvestment .............................................12

   X.  Mid-Market Value ............................................................................15

   XI. Actual Losses ...................................................................................16

   XII. Section 7.7(b) Losses .......................................................................16

PROPOSED CONCLUSIONS OF LAW ............................................................17

   I.   TSA Is Owed the Termination Amount.............................................17

   II.  The Termination Amount Is TSA's Total Losses and Costs. ...........18

   III. TSA's Determination of Its Total Losses and Costs Is Binding Absent Manifest Error. 18

   IV. The Termination Amount is $28,509,490 plus TSA's Costs and Attorneys' Fees..........19

CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y. 2012) .................................................................. 17, 19

*Cary Oil Co., Inc. v. MG Ref. and Mktg., Inc.*,
   90 F. Supp. 2d 401 (S.D.N.Y. 2000) ......................................................................... 18

*DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*,
   80 A.D.3d 448 (N.Y. App. Div. 2011) ...................................................................... 19

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007) ....................................................................... 19

*In re Bradlees Stores, Inc.*,
   313 B.R. 565 (S.D.N.Y. 2004) ................................................................................... 17

*In re Loews Cineplex Ent'm't Corp.*,
   No. 04 Civ. 612(HB), 2004 WL 875819 (S.D.N.Y. Apr. 23, 2004) ......................... 20

*Kalisch-Jarcho, Inc. v. City of New York*,
   58 N.Y.2d 377 (1983) ................................................................................................ 18

*O'Neil Supply Co. v. Petroleum Heat & Pwr. Co.*,
   280 N.Y. 50 (1939) .................................................................................................... 17

*Rattigan v. Commodore Int'l Ltd.*,
   739 F. Supp. 167 (S.D.N.Y. 1990) ............................................................................ 17

*Richland v. Crandall*,
   262 F. Supp. 538 (S.D.N.Y. 1967) ............................................................................ 20

*Schron v. Troutman Sanders LLP*,
   20 N.Y.3d 430 (2013) ................................................................................................ 17

*Tractebel Energy Mktg., Inc. v. AEP Pwr. Mktg., Inc.*,
   487 F.3d 89 (2d Cir. 2007) ........................................................................................ 19

## Statutes

11 U.S.C. § 562 ................................................................................................................ 18

Wash. Rev. Code § 43.340.080 ......................................................................................... 1

**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009) .................................................................................... 19

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW -  iii

TO:   THE HONORABLE SHELLEY CHAPMAN
      UNITED STATES BANKRUPTCY JUDGE

In connection with Washington Tobacco Settlement Authority's Proofs of Claim Nos.

37355 and 37356, and the evidentiary hearing that occurred on November 4-6, 2014, Washington

Tobacco Settlement Authority respectfully submits the following proposed findings of fact and

conclusions of law.

## PROPOSED FINDINGS OF FACT

### I.     TSA and its Reserve Fund

1.     The Washington State Tobacco Settlement Authority ("TSA") is an independent

public instrumentality of the State of Washington.  *See* Uncontested Facts[1] at ¶ 1.  TSA was

established in 2002 by the State of Washington to monetize future settlement payments owed to

Washington State from tobacco manufacturers.  *Id.* at ¶ 2.

2.     In 2002, TSA issued $517,905,000 of bonds pursuant to an Indenture, and used

$450 million dollars from the issuance to purchase a portion of Washington State's tobacco

settlement revenue stream.  *Id.* at ¶¶ 3-4.  The State of Washington then used that $450 million to

fill a budget gap the State was facing.  *Id.* at ¶ 5.  TSA has since been paying back bondholders

and will continue to receive a specified portion of Washington's tobacco revenue stream so long

as its bonds remain outstanding.  *See* Wash. Rev. Code § 43.340.080(2).  Once the bonds are

paid off, the revenue stream currently going to TSA will revert to the State of Washington to

support public health programs.  *See* Trans. 108:12-109:6.

---

[1] References to "Uncontested Facts" as used herein are to the Joint Statement of Uncontested
Facts dated October 20, 2014, ECF No. 46543.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 1

3.       The Indenture established a Liquidity Reserve Account with a Liquidity Reserve

Requirement in the amount of $45,534,106.25 (the "Reserve Fund").  Uncontested Facts at ¶ 8.

The Indenture imposed restrictions on both the term and ratings of Reserve Fund investments.

*Id.* at ¶ 10.

**II.      TSA's Request for Bids**

4.       After issuing its bonds, TSA sought to invest the Reserve Fund in accordance

with the limitations in the Indenture.  *Id.* at ¶ 11.  On October 22, 2002, TSA's financial advisor

distributed a "Request for Bids" to certain financial institutions, "seeking bids for a fixed rate

Guaranteed Yield Forward Purchase and Sale Agreement . . . [that] will provide for the

investment of proceeds to be deposited to the Liquidity Reserve Account . . . ."  Joint Ex. 4.  The

"Request for Bids" indicated that the "type of investment" involved was "the semi-annual tender

and purchase of Eligible Securities . . . ."  *Id.*

5.       The Request for Bids contained numerous additional contract conditions,

including a "par break" structure that would allow TSA to terminate the transaction with no

breakage fee in the event that the bonds were retired early due to greater than anticipated tobacco

revenues, default, late payments, or otherwise.  *See id.* at ¶¶ 11, 19.

6.       In response to the Request for Bids, TSA received five bids for the par break

structure, with proposed fixed rates of return ranging from 3.510% from Salomon SB to 4.484%

from Lehman Brothers Special Financing Inc. ("LBSF").  Joint Ex. 5 at 1; Hearing Transcript

("Trans.") 120:2-23.  TSA accepted LBSF's bid of 4.484%, which had been made without any

proposed change in conditions.  Trans. 120:17-121:18; Joint Ex. 5.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 2

### III.    The Reserve Fund Agreement

7.      The parties entered into the RFA on November 5, 2002.  Uncontested Facts at ¶

12.  Under the RFA, LBSF agreed to provide TSA a fixed rate of return of 4.484% through 2032.

*See* Joint Ex. 1 at 2; Joint Ex. 2 at 5.  LBSF further agreed that it would invest TSA's Reserve

Fund on a semiannual basis in "Eligible Securities," as defined in the RFA; that the funds would

be liquid and accessible every six months to correspond with bond payment dates; that the

parties would use a third party trustee, U.S. Bank, to oversee and protect the assets and

investments; and that TSA had the ability to withdraw the Reserve Fund without a termination

payment if and when necessary to pay bondholders.  Joint Ex. 1 at 1-2, 4, 6-8, Ex. A.

8.      In sum, under this arrangement LBSF would recoup actual earnings from six-

month investments of the Reserve Fund in Eligible Securities while paying TSA a guaranteed

rate of 4.484%.  In exchange for its $45.53 million, TSA's bargain with LBSF gave TSA access

to a market offering long-term rates it could not otherwise enter, protected TSA and the public

funds it invested from the uncertainties of interest rate fluctuations, and generated income to

support public health programs in Washington.

9.      Lehman Brothers Holdings Inc. ("LBHI") guaranteed the obligations of LBSF

under the RFA.  Uncontested Facts at ¶ 13.  Thus, both LBSF and LBHI (collectively,

"Lehman") were obligated to TSA under the RFA.

### IV.    The Termination Amount

10.      The RFA specifies that if one party defaults and the agreement is terminated as a

result, a "Termination Amount" must be paid.  Joint Ex. 1 at 18-20.  The RFA defines the

Termination Amount as "an amount, as determined by the Burdened Party reasonably and in

good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the

amount . . . such Dealer would require . . . or would pay . . . [for] an agreement . . . preserving for the Burdened Party the economic equivalent of its rights under this Agreement . . . ." *Id.* at 5. The RFA further provides that "if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs . . . or gains . . . including any loss of bargain . . . ." *Id.*

11.     Regardless of whether the preferred market "quotations" method or the alternative "total losses" method is used to determine the Termination Amount, the final calculation "shall also include . . . amounts due under Section 7.7 [i.e., losses from nonperformance prior to termination] . . . [and] any incidental costs and expenses incurred by the Burdened Party . . . (including costs of collection and reasonable attorneys' fees)." *Id.* at 5-6.

12.     The RFA's definition of the "Termination Amount" also states that "[a]ny determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error." *Id.* at 6.

13.     Finally, the RFA specifies that "in the case of a Lehman Event of Default," TSA is the Burdened Party. *Id.* at 1.

14.     Prior to executing the RFA, TSA's Request for Bids initially specified that the "Termination Amount" would be payable in case of a default and resulting termination. TSA Ex. 4 at 4, 6. The Termination Amount was defined as "[a]n amount determined by the burdened party, or a third party acceptable to both parties, in good faith and on the basis of the arithmetic mean of quotations from at least three Dealers of the . . . [price for] an agreement . . . preserving for the burdened party the economic equivalent of its rights under the Agreement . . . ." *Id.* at 4.

15.     Lehman's initial draft of the RFA instead defined the Termination Amount as "an amount, as determined *by Lehman* reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers . . . ." TSA Ex. E at 4-5 (emphasis added). Lehman's draft elsewhere included a provision indicating that if Lehman did not determine the Termination Amount within three days, TSA would do so "as if it were Lehman". *Id.* at 18-19.

16.     TSA noticed that Lehman had altered the definition of the Termination Amount from that found in the Request for Bids and asked for the Termination Amount to be determined either by the "Burdened Party"—i.e., the non-defaulting party—or by a third party, consistent with the Request for Bids. *See* TSA Ex. G at 2. In response, Lehman stated that it would "change" this aspect of the contract "to a determination by [the] Burdened Party . . . ." TSA Ex. F at 2. Lehman's subsequent draft changed the definition of "Termination Amount," as requested, to be consistent with the RFB. *See* TSA Ex. I at 5-6. The revised definition was agreed upon and is now found in the RFA. *See* Joint Ex. 1 at 5-6. But Lehman left in the RFA the "as if it were Lehman" provision. *See* TSA Ex. I at 19. The Court finds that the clear intent of the parties was that the Burdened Party would determine the "Termination Amount" as per the definition in the RFA.

## V.     Lehman's Default and Rejection of the RFA

17.     On September 15, 2008, LBHI filed a voluntary petition for relief under Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Uncontested Facts at ¶ 22. On October 3, 2008, LBSF filed a voluntary petition for relief under Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. *Id.* at ¶ 23.

18.     On December 1, 2008, LBSF failed to deliver Eligible Securities as required under the RFA.  *Id.* at ¶ 24.

19.     On March 25, 2009 (the "Rejection Date"), the Court authorized Lehman's rejection of the RFA.  *Id.* at ¶ 28.

20.     Under Proofs of Claim Nos. 37355 and 37356, TSA seeks compensation for Lehman's breach of the RFA.  The parties dispute the value of the Termination Amount that is owed under the contract.

## VI.     Market Quotations

21.     The parties dispute whether TSA sought market quotations for the RFA upon Lehman's rejection of the contract on March 25, 2009.  TSA's expert and financial consultant Peter Shapiro of Swap Financial testified that he and his colleague James Vergara "called every conceivable provider in this business" and that none was willing to give a bona fide quotation for replacing the RFA because they were no longer providing such agreements.  Trans. 587:21, 589:14-17.

22.     Lehman's expert Samuel Gruer testified that on the Rejection Date the market for new reserve fund agreements was inactive.  *See* Trans. 995:2-18.

23.     Lehman attempted to obtain multiple quotes for the RFA around the Rejection Date but was unsuccessful in obtaining the required three quotations.  *See* TSA Ex. R; Debtors Ex. 44.  The one quotation received by Lehman did not reflect what a dealer would require for a replacement RFA as the quotation was void at the time it was provided to Lehman.  Debtors Ex. 44.

24.     The Court finds that Swap Financial tried and was unable to obtain three market quotations as contemplated under the RFA.

25.    The Court further finds that regardless of the extent of TSA's efforts to obtain market quotations, the market for reserve fund agreements was inactive and dysfunctional on the Rejection Date and TSA could not have obtained three market quotations for replacing the RFA on or around that date.

## VII.    Alternative Valuation Methods

26.    The parties dispute the appropriate method for determining the Termination Amount. TSA has offered two distinct methods for measuring its total losses and costs as of the Rejection Date. First, TSA offers the price that a hypothetical willing dealer would charge to replace the RFA on the Rejection Date as a reasonable estimation of TSA's losses. *See* Trans. 589:18-590:16. Second, TSA offers a projection, as of the Rejection Date, of the returns TSA was likely to obtain from reinvestment of the Reserve Fund through 2032 without the RFA, in comparison to the returns that were guaranteed under the RFA. *See* Trans. 367:24-368:22. In contrast, Lehman offers a "mid-market" valuation of the RFA, which is a valuation based on the deliverable securities allowed under the RFA and long-term rates of return that were available on the Rejection Date for those securities, not taking into account the additional charges a hypothetical dealer would impose for a replacement RFA. *See* Trans. 991:13-993:17.

## VIII.    Pricing of Hypothetical Replacement RFA

27.    The parties' experts agree that a hypothetical willing dealer on the Rejection Date would have priced a replacement RFA based on three primary factors: (1) the rates of return available for whichever type of Eligible Securities the dealer considered "cheapest to deliver," (2) the dealer's desired profit margin, and (3) the perceived risk that the counterparty might later owe the dealer money but be unable to pay, known as credit risk. *See* Trans. 590:11-591:15, 1015:2-20. Christopher Harris of PFM, financial advisor to TSA, testified that if PFM had been

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 7

retained to do a formal valuation, it also would have determined the pricing of a hypothetical RFA using these same factors. Harris Dep. 68:15-69:8. The Court finds that a hypothetical dealer would price a replacement RFA based on these three primary factors.

A.    **Selection of Eligible Security**

28.    The parties dispute the appropriate eligible security. TSA's experts Daniel Curry and Peter Shapiro testified that commercial paper should be used. Trans. 515:22-517:12, 594:9-17. Lehman's expert Samuel Gruer testified that agencies should be used. *See* Trans. 1015:21-1016:2.

29.    Upon entering into the RFA in 2002, Lehman priced the transaction based on available rates of return for commercial paper rather than for the two other types of Eligible Securities allowed under the RFA, treasuries or agencies. *See, e.g.*, Trans. 328:22-25. Lehman also entered into related hedge transactions to mitigate interest-rate risk associated with the RFA, which transactions were also based on the delivery of commercial paper. *See, e.g.*, Trans. 335:3-337:7; Konheim Dep. 39:4-40:6, 72:8-12, 72:21-73:15.

30.    Lehman proceeded to deliver commercial paper throughout the life of the RFA and never delivered agencies. Uncontested Facts at ¶ 18.

31.    TSA's experts Daniel Curry and Peter Shapiro testified that commercial paper generally would be considered the cheapest-to-deliver security and that a hypothetical dealer pricing the RFA would determine an appropriate price based on available rates of return for commercial paper. Trans. 515:22-517:12, 594:9-17. These experts also testified that a dealer would not price the RFA based on agency securities in large part because there is no market for agencies in which a dealer could enter into related hedge transactions to mitigate the interest-rate risk associated with the RFA. Trans. 513:12-515:17, 611:16-612:3. Consistent with this

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 8

testimony is an internal Lehman document from 2008 stating that "[t]here is no Agency/LIBOR basis swap market" while "CP basis risk can be hedged with CP/LIBOR basis swaps . . . ." TSA Ex. P at 9.

32.     Lehman's expert Samuel Gruer acknowledged both that short-term agencies tend to underperform LIBOR and that a dealer pricing the RFA based on agencies would be assuming the opposite, namely, that short-term agencies would outperform LIBOR over the course of the deal. *See* Trans. 1009:16-1013:9. Mr. Gruer also conceded that since the Rejection Date, actual agency interest rates have never come close to the levels identified in his forward curve calculations. Trans. 1012:4-1013:9, 1004:25-1006:19.

33.     The Court finds it reasonable to assume that a hypothetical dealer would price the RFA based on rates of return for commercial paper.

### B.     Profit Charge

34.     TSA's expert Peter Shapiro testified that a profit charge of 25 basis points would be representative of what a hypothetical dealer would charge for the RFA on the Rejection Date. Trans. 601:4-10. Lehman's expert Samuel Gruer did not dispute the reasonableness of this charge. Trans. 968:10-15, 1016:20-22. The Court finds that a profit charge of 25 basis points, as part of a hypothetical dealer's price for the RFA on the Rejection Date, is reasonable.

### C.     Credit Charge

35.     The parties dispute the appropriate credit charge. TSA's expert Peter Shapiro suggested that a credit charge of 429 basis points is appropriate. Trans. 599:22, 600:19-21. Lehman's expert Samuel Gruer suggested that 17 basis points, or $1.3 million, would be an appropriate credit charge for the RFA on the Rejection Date. Trans. 960:3-12.

36.      When Lehman priced and booked the RFA in 2002, Lehman included a $4.5 million charge referred to as a "credit mitigation option" to account for credit risk and the potential for early payoff of TSA's bonds.  *See* TSA Exs. B, C; Trans. 322:3-323:2.  This charge was equivalent to 67 basis points.  Trans. 616:5-12.

37.      The wide range of bids TSA received for the RFA in 2002 suggests that credit charges and other such components of each dealer's price are somewhat subjective and variable. Joint Ex. 5 at 1.  Consistent with this evidence, Lehman's 30(b)(6) representative testified that a credit charge is a pricing component that would fall within the discretion and experience of each trader.  Konheim Dep. at 37:3-10.

38.      The parties' experts agree that the credit risk associated with the RFA generally would have been greater on the Rejection Date than in 2002.  Trans. 1018:23-1019:13.  The parties' experts also agree that a dealer's credit charge for the RFA on the Rejection Date would take into account the difference between where TSA's bonds and a municipal benchmark index traded on that date.  Trans. 599:11-600:18, 958:15-959:9.  TSA's expert Peter Shapiro testified that on the Rejection Date, the spread between TSA's bonds and Bloomberg's A-rated municipal revenue bond index was 429 basis points.  Trans. 599:22.  That testimony was not disputed by Lehman's experts.

39.      A proper credit charge for the RFA should also take into account the unique risk a dealer would face under the RFA being subordinate to TSA's bondholders.  Trans. 1022:22-1023:15.

40.      Lehman's expert Samuel Gruer testified that in his experience dealing with credit, he has not dealt specifically with any tobacco reserve fund agreements.  Trans. 990:23-991:10, 1017:5-17.  Gruer also testified that in calculating his proposed credit charge, he did not make

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 10

any effort to understand the charges Lehman originally imposed on the RFA in 2002 or the charges dealers would impose for such agreements in the past. Trans. 1017:14-17, 1019:20-25. Gruer testified that he conducted his analysis using a program that did not account for tobacco-related risk distinct from other types of risk and also did not account for the mandatory cleanup call aspect of the RFA. 1020:5-20, 1021:24-1022:21. Gruer also testified that his analysis used an incorrect percentage of recovery of 40% in a worst case scenario, rather than a correct 0% recovery, which would increase the credit risk. 1020:21-1021:17. Gruer did not factor in the unique risk a dealer would face under the RFA being subordinate to TSA's bondholders. Trans. 1022:22-1023:15. The Court finds that Gruer's proposed credit charge lacks adequate basis and is unreasonably low.

41.    In a draft of Swap Financial's loss valuation, James Vergara identified the 429 basis point spread of TSA's bonds testified to by Peter Shapiro. Vergara then proposed "conservatively [using] a credit spread of 3.000%," or 300 basis points, to represent the appropriate credit charge for the RFA on the Rejection Date. Debtors Ex. 49 at 2; Trans. 674:12-675:11, 676:18-677:13, 680:15-23. Using commercial paper as the cheapest-to-deliver security, a profit charge of 25 basis points, and a credit charge of 300 basis points results in a hypothetical dealer price of $27,956,410. *See* TSA Ex. BB at 6.[2]

---

[2] Vergara mistakenly calculated the hypothetical dealer price based on an end date of 2042 rather than 2032. Thus, Vergara's calculations must be adjusted by deducting all projected cash flows after May 2032. Because the cash flows used in Vergara's calculations are in three-month increments, including from April to June 2032, the Court has deducted all cash flows after June 2032 and one-third of the cash flow for April to June 2032. This results in a total of $27,956,410. Alternatively, the proportion between Vergara's 2042 figure and the correct 2032 figure should be the same as between Shapiro's calculated figures for 2042 and 2032, approximately 82%. *See* Trans. 681:15-682:15.

42.    In another draft of the report, James Vergara concluded that the floating leg of the replacement RFA should be valued "at LIBOR minus 1.50%" without specifying the exact amount of the credit charge being applied.  Debtors Ex. 47.  This would result in a hypothetical dealer price of $19,744,901.  *See* TSA Ex. BB at 3.

43.    The Court finds that 300 basis points is a reasonable cap on a hypothetical dealer's credit charge, and is an appropriate amount to be used as a credit charge for a hypothetical replacement transaction on the Rejection Date.  The Court finds that $27,956,410 is a reasonable estimate of a hypothetical willing dealer's price to replace the RFA on the Rejection Date.

## IX.    Projected Returns from Reinvestment

44.    To determine TSA's losses, TSA's experts Daniel Curry and Jeffrey Hasterok estimated TSA's projected future earnings based on its investment of the Reserve Fund and compared that to the guaranteed rate of return promised by Lehman under the RFA.

45.    Curry and Hasterok first considered the types of investments TSA might make going forward.  There are a limited number of potential investments TSA can make consistent with the Indenture on a semiannual basis into the future, including securities such as commercial paper and certificates of deposit.  *See, e.g.*, Trans. 368:8-19, 396:21-398:20.  TSA also must consider various risks, such as counterparty and market risk, when deciding how to reinvest its Reserve Fund.  *See, e.g.*, Trans. 118:14-119:7.  Further, TSA does not have the administrative capabilities to continually monitor and change its investments.  Trans. 225:21-226:18.

46.    After Lehman's default, TSA opted to reinvest the Reserve Fund in money market funds, which is the default investment choice under the Indenture.  158:13-15.  TSA's Executive Director Kim Herman testified that TSA was "very concerned about safety and liquidity," and

considers money markets to be the safest place to keep its Reserve Fund while still having access

to the money every six months. Trans. 158:20-24. TSA has evaluated whether other options for

investment would provide greater return while still meeting its safety and liquidity concerns.

Trans. 159:3-9. To evaluate such investment alternatives, TSA has considered numerous factors,

including potential return, third-party risk, credit risk, and liquidity. 160:10-25. To date, TSA

has determined that safety and liquidity concerns are too great to enter into any of the alternative

investments it has considered. Trans. 165:6-14. TSA would not enter into an uncollateralized

guaranteed investment contract, for example, due to the potential for loss of the Reserve Fund

itself with such an investment. *See, e.g.*, Trans. 227:4-24.

47.    To project TSA's future earnings, Curry and Hasterok concluded that TSA's

actual investment in money markets was the least speculative predictor of TSA's actual

reinvestment going forward from the Rejection Date. Trans. 393:19-394:4.

48.    Next, Curry and Hasterok determined the appropriate rate to project for TSA's

investments into the future. Future rates of return are unknown and difficult to predict.

Historically, rates vary substantially over time. Trans. 395:8-396:6. As of the Rejection Date,

the prevailing rates of return on qualifying investments could have gone up or down going

forward into the future. Curry and Hasterok thus determined that TSA's actual reinvestment

history up to the Rejection Date provided the most useful and least speculative data on which to

base TSA's projected returns. Trans. 393:17-394:24.

49.    As of the Rejection Date, TSA earned an average rate of return of .65% on its

reinvestment of the Reserve Fund. *See* TSA Ex. X at 17. Curry and Hasterok thus projected this

average rate of return for the remaining life of the RFA. This results in projected losses of $37.5

million. Trans. 400:19-23.

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 13

50.     Curry and Hasterok also analyzed market data for other qualifying investments during the period of TSA's actual reinvestment of the Reserve Fund (from the time of Lehman's initial default until the Rejection Date). *See* TSA Ex. X at 19. Specifically, Curry and Hasterok analyzed commercial paper, certificates of deposit, agencies, and a fixed cancellable swap with average yields of .43% to 1.25%. *See id.* The highest yielding of these investment opportunities were certificates of deposit. *See id.*

51.     TSA's actual rate of return from after the Rejection Date up to the date of Curry and Hasterok's expert report in December of 2013 was substantially lower than .65%. TSA Ex. X at 17; TSA Ex. V. After the Rejection Date, rates continued to fall and remain today at historic lows. *See, e.g.*, 229:11-13.

52.     Lehman has noted that Curry and Hasterok do not use a "forward curve" to project TSA's future losses. *See, e.g.*, Trans. 536:21-537:7. A forward curve is a finance tool that represents today's prices for making future commitments, i.e., a purchase today of certain securities in the future. *See, e.g.*, Trans. 909:15-910:11. A forward curve is not a predictive tool. *See id.* Forward curves do not accurately predict future rates of return. *See, e.g.*, 394:7-24; TSA Ex. X at 14-15; TSA Ex. Z at 15-17. The Court finds that treating a forward curve as a projection of TSA's likely future earnings on its reinvestment of the Reserve Fund would be unreasonable.

53.     The Court finds that certificates of deposit represent a reasonable investment that TSA could have been expected to make in reinvesting its Reserve Fund after Lehman's default. The average rate of return for certificates of deposit was 1.25% during the period of TSA's actual reinvestment of the Reserve Fund leading up to the Rejection Date. TSA Ex. X at 19. Forecasting this average rate of return until 2032 results in projected losses to TSA of

approximately $29.55 million.  *See id.*  The actual path interest rates have taken since the

Rejection Date confirms the reasonableness of this projection.  The Court finds that $29.55

million represents a reasonable and appropriate projection of TSA's losses as of the Rejection

Date.

## X.     Mid-Market Value

54.     Lehman has proposed using a mid-market valuation to determine the Termination

Amount.  *See* Trans. 991:13-993:17.  A mid-market valuation consists of calculating, based on

the forward curve for a given day, the cash flows from whichever deliverable security is

considered cheapest to deliver.  *See id.*  This valuation does not include dealer charges for credit

risk and profit.  *See id.*

55.     A mid-market valuation does not represent the price that a dealer would charge to

replace the RFA on the Rejection Date.  This type of valuation would not take into account how

Lehman actually priced the RFA in 2002, or performed under the RFA.  Trans. 1001:9-1002:2.

A mid-market valuation also is not a projection of future interest rates or of TSA's likely losses

from reinvestment of the Reserve Fund.

56.     Lehman's expert Samuel Gruer testified that his mid-market valuation of the RFA

is not a measure of TSA's losses and costs.  Trans. 994:6-22.  Gruer conducted such an

evaluation only because he was instructed by counsel to do so.  Trans. 990:7-18.  Lehman

presented no expert testimony on TSA's losses and costs.  *See id.*

57.     The Court finds that use of a mid-market valuation to measure TSA's losses and

costs resulting from Lehman's breach of the RFA would be unreasonable.

## XI.   Actual Losses

58.    As of September 30, 2013, TSA had lost approximately $9.4 million in interest payments when comparing TSA's actual reinvestment earnings to the rate of return Lehman had guaranteed under the RFA.  Trans. 229:14-231:15.  This figure does not include the financial impact of the delaying the ultimate retirement of the bonds.  *See id.*

## XII.   Section 7.7(b) Losses

59.    From Lehman's initial failure to perform in December 2008 up to the Rejection Date, TSA invested the Reserve Fund in accordance with the RFA and Indenture.  *See* Trans. 224:10-16, 362:5-13.  During this period, TSA earned less than the RFA's guaranteed rate of 4.484% and suffered losses totaling $553,080.  Trans. 361:11-362:25.

## PROPOSED CONCLUSIONS OF LAW

### I.  TSA Is Owed the Termination Amount.

60.     State contract law generally "governs the nature and amount" of TSA's claim here. *In re Bradlees Stores, Inc.*, 313 B.R. 565, 570 (S.D.N.Y. 2004).  Specifically, New York law governs.  *See* Joint Ex. 1 at 25.  The "fundamental rule" of contract interpretation is fulfilling "the substantial intent of the parties" to the contract.  *O'Neil Supply Co. v. Petroleum Heat & Pwr. Co.*, 280 N.Y. 50, 55 (1939).  A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013) (internal quotations omitted).

61.     Under New York law, the parties to a contract may agree on a method of calculating uncertain damages so long as public policy is not violated and the method chosen provides a reasonable estimation of actual damages.  *See, e.g.*, *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) (citing cases).  In particular, the parties to a complex financial instrument such as the RFA can decide that in case of breach, the non-defaulting party may determine its own damages reasonably and in good faith.  *See, e.g.*, *Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 635, 653, 655 (S.D.N.Y. 2012).

62.     The RFA is unambiguous as to the respective roles of the parties in determining damages.  If the contract is terminated, a "Termination Amount" must be paid.  Joint Ex. 1 at 18-20.  The Termination Amount is to be "determined by the Burdened Party reasonably and in good faith," under the "market quotation" method, or if three market quotations are unavailable, then under the "total losses" method, either of which provides a reasonable estimation of damages.  *Id.* at 5.  In turn, the RFA's definition of "Burdened Party" expressly provides that "in

the case of a Lehman Event of Default," TSA is the Burdened Party.  *Id.* at 1.  Thus, TSA is

entitled to calculate the Termination Amount as the value of its claim.

63.     Under federal bankruptcy law, TSA's damages are to be measured as of the date

Lehman rejected the RFA: March 25, 2009.  *See* 11 U.S.C. § 562(a).

## II.    The Termination Amount Is TSA's Total Losses and Costs.

64.     Under the RFA, the Termination Amount is to be calculated as the Burdened

Party's total losses and costs "if the Burdened Party is unable to obtain" three market quotations

for replacing the RFA.  Joint Ex. 1 at 5.

65.     The Court has found that Swap Financial tried and was unable to obtain three

market quotations as contemplated under the RFA.  Further, the Court has found that TSA could

not have obtained three such quotations regardless of its efforts, given the state of the market on

the Rejection Date.  Thus, even if TSA had failed to seek out market quotations and such failure

constituted a breach of contract, any such breach would have been immaterial and now moot.

*See, e.g.*, *Cary Oil Co., Inc. v. MG Ref. and Mktg., Inc.*, 90 F. Supp. 2d 401, 409 (S.D.N.Y.

2000).

66.     The Court concludes that the Termination Amount is to be determined as TSA's

total losses and costs.

## III.    TSA's Determination of Its Total Losses and Costs Is Binding Absent Manifest Error.

67.     TSA's determination of its total losses and costs is entitled to deference in

accordance with the terms of the RFA.  The RFA authorizes TSA, as the Burdened Party, to

determine its total losses reasonably and in good faith.  Joint Ex. 1 at 5.  Good faith entails

"honesty in fact."  *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 n.5 (1983).

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW -  18

And a "reasonable" determination is one that is "fair, proper or moderate under the circumstances." *DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l*, 80 A.D.3d 448, 450 (N.Y. App. Div. 2011) (internal quotations omitted).

68.     The RFA also provides that TSA's determination "shall be conclusive and binding on the parties [] absent manifest error." Joint Ex. 1 at 6.  A "manifest error" is one that is "plain and indisputable, and that amounts to a complete disregard of the controlling law or [available] evidence . . . ."  BLACK'S LAW DICTIONARY (9th ed. 2009).

### IV.    The Termination Amount is $28,509,490 plus TSA's Costs and Attorneys' Fees.

69.     TSA must be given deference in selecting an appropriate method of determining its total losses and costs resulting from Lehman's breach of the RFA.  Making the determination is a difficult and somewhat subjective task.  *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2007) (noting that even as to investments "traded between investors and dealers rather than on exchanges," valuation "is not a precise science" and "may be considerably more a statement of opinion than a report of an objectively determinable fact").  Theoretical perfection cannot be expected or demanded in this context.  *See Tractebel Energy Mktg., Inc. v. AEP Pwr. Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007); *cf. Bank of N.Y. Mellon*, 910 F. Supp. 2d at 645 (noting "the dearth of legal authority regarding the calculation of termination payments").

70.     TSA's proposed method of estimating the price a hypothetical willing dealer would have charged to replace the RFA on the Rejection Date, and using that figure as a measurement of its losses, reasonably mimics the preferred market quotation method set forth in the RFA.  The Court concludes that hypothetical replication is a reasonable and appropriate method for determining TSA's losses.

71.     The Court has found that the selection of commercial paper as the cheapest-to-delivery eligible security and a profit charge of 25 basis points are reasonable components of a hypothetical willing dealer's pricing of the RFA.  The Court has also found that 300 basis points is a reasonable cap on a credit charge, and thus concludes that a credit charge of 300 basis points should be used to calculate the hypothetical dealer price that represents TSA's losses.  On the basis of these components, a hypothetical dealer would have charged $27,956,410 to replace the RFA on the Rejection Date.

72.     The Court has found that $29.55 million is a reasonable projection of TSA's losses from reinvestment, which confirms the reasonableness of the Court's conclusion as to the appropriate hypothetical dealer charge.

73.     TSA's substantial actual losses to date also confirm the reasonableness of the hypothetical dealer charge.  Actual subsequent events may be used to confirm the reasonableness of difficult valuations.  *See In re Loews Cineplex Ent'm't Corp.*, No. 04 Civ. 612(HB), 2004 WL 875819, at *4 (S.D.N.Y. Apr. 23, 2004) (upholding bankruptcy claim valuation that included use of "subsequent events" to "corroborate an independently formed conclusion" as to value); *Richland v. Crandall*, 262 F. Supp. 538, 548 n.8 (S.D.N.Y. 1967) ("Evidence of events subsequent to the sale was [] admitted . . . as confirmation of judgments made at the time of sale about anticipated losses . . . .").  TSA's actual losses confirm the reasonableness of the hypothetical dealer charge.

74.     The Court concludes that TSA's losses resulting from Lehman's breach of the RFA are $27,956,410.  This amount constitutes the bulk of the Termination Amount that Lehman owes TSA.

75.    Under the RFA, the Termination Amount also includes losses resulting from Lehman's failure to deliver Eligible Securities prior to termination.  *See* Joint Ex. 1 at 5.  The RFA provides that upon Lehman's failure to deliver, the Reserve Fund should be invested "to the extent directed by [TSA] pursuant to the Indenture," and that TSA's losses are the difference between the guaranteed rate of 4.484% and the rate "actually earned" on the substitute investments.  Joint Ex. 1 at 7, 20-21.  TSA was not required to invest in the "highest yielding" Eligible Securities available.  Trans. 1029:7-24.  TSA is owed its actual losses of $553,080.  Adding this to the Termination Amount results in a figure of $28,509,490.

76.    The RFA also provides that the Termination Amount includes "any incidental costs and expenses incurred by the Burdened Party . . . (including costs of collection and reasonable attorneys' fees)."  Joint Ex. 1 at 5-6.  TSA is thus entitled to its reasonable costs and attorneys' fees.

## CONCLUSION

77.    TSA's claim against Lehman is hereby allowed in the amount of $28,509,490 plus reasonable costs and attorneys' fees.

DATED this 14th day of January, 2015.


PACIFICA LAW GROUP, LLP



By  /s/
    Paul J. Lawrence, WSBA # 13557
Admitted Pro Hac Vice
    Kymberly K. Evanson, WSBA # 39973
Admitted Pro Hac Vice
Attorneys for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW -  21

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2015, I caused the document to which

this Certificate is attached to be served upon the following:

| | |
|---|---|
| Jayant W. Tambe | ☐ via facsimile |
| Laura W. Sawyer | ☐ via overnight courier |
| Jennifer L. Del Medico | ☐ via first-class U.S. mail |
| Benjamin Rosenblum | ☐ via email |
| Jones Day | ☒ via electronic court filing |
| 222 East 41st Street | ☐ via hand delivery |
| New York, New York 10017 | |

Email:  jtambe@jonesday.com
Email:  lwsawyer@jonesday.com
Email:  jdelmedico@jonesday.com
Email:  brosenblum@jonesday.com
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Attorneys for the Debtors and Debtors in
Possession

Signed at Seattle, Washington this 14th day of January, 2015.

/s/  Kymberly K. Evanson
     Kymberly K. Evanson
Attorney for Washington State Tobacco
Settlement Authority

WASHINGTON STATE TOBACCO SETTLEMENT
AUTHORITY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW -  22