**HEARING DATE AND TIME: January 27, 2015 at 2:00 p.m. (Eastern Time)[1]**

**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
L. P. Harrison 3rd
Turner P. Smith
Cindi Eilbott Giglio

*Counsel for Lehman Brothers Holdings Inc.*
 *and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------x

**REPLY IN SUPPORT OF THE PLAN ADMINISTRATOR'S**
**FOUR HUNDRED EIGHTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS**

---

[1] The hearing on the Four Hundred Eighty-Eighth Omnibus Objection to Claims for the Newport Claims (defined below), which was scheduled for January 15, 2015 at 10:00 a.m., was adjourned to January 27, 2015 at 2:00 p.m. *See Notice of Adjournment of Hearing on the Four Hundred Eighty-Eighth Omnibus Objection to Claims (No Liability Claims) Solely as to Certain Claims* [ECF No. 47855].

# TABLE OF CONTENTS

**Page #**

**PRELIMINARY STATEMENT** ............................................................................................ 1

**REPLY** ................................................................................................................................ 3

I.      Claims Can Be Disallowed at a Sufficiency Hearing Without Discovery ................ 3

II.     Section 30 of the PBA Bars the Newport Claims ...................................................... 4

     A.    The Newport Claims Fall Squarely within Section 30's Exculpatory Language ..................................................................................................... 5

     B.    Newport Has Not Pleaded Sufficient Facts to Support a Claim for Gross Negligence or Willful Misconduct.......................................................... 9

        (1)    The Fact that Newport's Securities Were Not Transferred Over the Weekend Does Not Constitute Gross Negligence or Willful Misconduct ................................................................................................... 10

        (2)    Even Assuming that LBIE Did Rehypothecate Newport's Securities, Such Conduct Does Not Constitute Gross Negligence or Willful Misconduct ................................................................................................... 12

     C.    Newport's Gross Negligence Claims for Breach of Contract Fail Because Such Claims Are Not Cognizable as a Matter of Law ............................ 14

III.    Section 29 of the PBA Bars the Newport Claims .................................................... 14

IV.    The Debtors Are Not Jointly and Severally Liable for the Breaches of the PBA Alleged by Newport .................................................................................. 19

V.     The Debtors Are Not Liable for any Failure to Capitalize CAPCO ....................... 22

**RESERVATION OF RIGHTS** .............................................................................................. 24

**CONCLUSION** ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Acme Supply Co. v. City of New York,*
    834 N.Y.S.2d 142 (App. Div. 2007) ........................................................................................ 6

*Am. Tel. & Tel. Co. v. City of New York,*
    83 F.3d 549 (2d Cir. 1996) ....................................................................................................... 5

*Andino v. Fischer,*
    698 F. Supp. 2d 362 (S.D.N.Y. 2010) .................................................................................... 4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................................ 13

*Baker v. Andover Assocs. Mgmt. Corp.,*
    No. 6179/09, 2009 WL 7400085 (N.Y. Sup. Ct. Nov. 30, 2009) ........................................... 13

*Baquerizo v. Monasterio,*
    933 N.Y.S.2d 869 (N.Y. App. Div. 2011) ............................................................................... 12

*Bayerische Hypo–Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron
    Corp.),*
    292 B.R. 752 (Bankr. S.D.N.Y. 2003) ................................................................................ 9, 10

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,*
    949 F. Supp. 2d 486 (S.D.N.Y. 2013) ..................................................................................... 23

*City of New York v. 611 W. 152nd St., Inc.,*
    710 N.Y.S.2d 36 (N.Y. App. Div. 2000) ................................................................................. 14

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.,*
    611 N.E.2d 282 (N.Y. 1993) ..................................................................................................... 5

*Convergent Wealth Advisors LLC v. Lydian Holding Co.,*
    No. 12 Civ. 1199, 2012 WL 2148221 (S.D.N.Y. June 13, 2012) ............................................ 20

*Greenfield v. Philles Records, Inc.,*
    780 N.E.2d 166 (N.Y. 2002) ..................................................................................................... 6

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
    889 F.2d 1274 (2d Cir. 1989) ................................................................................................... 19

*In re Lehman Bros. Holdings Inc.,*
    515 B.R. 171 (Bankr. S.D.N.Y. 2014) (Chapman, J.) .......................................................... 3, 4

*In re MF Global Inc.,*
    515 B.R. 434 (Bankr. S.D.N.Y. 2014) ............................................................................... 15-19

*In re Spiegel, Inc.,*
    337 B.R. 821 (Bankr. S.D.N.Y. 2006) ...................................................................................... 4

*In Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.*,
No. 604952/2000, 2001 WL 36405059 (N.Y. Sup. Ct. May 17, 2001), *aff'd*, 740 N.Y.S.2d 198
(N.Y. App. Div. 2002) ................................................................................................. 7-8

*In Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.*,
740 N.Y.S.2d 198 (N.Y. App. Div. 2002) ........................................................................ 7-9

*Kel Kim Corp. v. Cent. Mkts., Inc.*,
519 N.E.2d 295 (N.Y. 1987) ............................................................................................... 15

*La Salle Bank Nat'l Ass'n v. CIBC Inc.*,
No. 08 CIV. 8426 WHP, 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011) ................................ 6-7

*Lemoine v. Cornell Univ.*,
769 N.Y.S.2d 313 (N.Y. App. Div. 2003) ............................................................................ 9

*Lemus v. Manhattan Car Wash, Inc.*,
No. 06 CIV. 15486 (MHD), 2010 WL 1372705 (S.D.N.Y. Mar. 26, 2010) ........................... 22

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
244 F.R.D. 204 (S.D.N.Y. 2007) ....................................................................................... 23

*Metro. Life Ins. v. Noble Lowndes Int'l*,
643 N.E.2d 504 (N.Y. 1994) ............................................................................................... 5

*Pacnet Network Ltd. v. KDDI Corp.*,
912 N.Y.S.2d 178 (N.Y. App. Div. 2010) ............................................................................. 14

*Reade v. Stoneybrook Realty, LLC*,
882 N.Y.S.2d 8 (N.Y. App. Div. 2009) ................................................................................ 16

*Reyes v. Metromedia Software, Inc.*,
840 F. Supp. 2d 752 (S.D.N.Y. 2012) .................................................................................. 6

*S.A. de Obras y Servicios, COPASA v. Bank of Nova Scotia*,
No. 651231/2012, 2013 WL 1232743 (N.Y. Sup. Ct. Mar. 22, 2013) ................................... 9

*S.A. de Obras y Servicios, COPASA v. Bank of Nova Scotia*,
No. 651555/2012, 2014 WL 2623900 (N.Y. Sup. Ct. June 12, 2014) .............................. 9, 14

*Schlaifer Nance & Co. v. Estate of Warhol*,
119 F.3d 91 (2d Cir. 1997) ................................................................................................ 23

*Shaw v. Citibank, N.A.*,
No. 13 C 5189, 2013 WL 6697767 (N.D. Ill. Dec. 19, 2013) ................................... 11-12, 17

*Sveaas v. Christie's Inc.*,
452 F. App'x 63 (2d Cir. 2011) .......................................................................................... 5

*Syncora Guar. Inc. v. EMC Mortg. Corp.*,
874 F. Supp. 2d 328 (S.D.N.Y. 2012) ................................................................................. 19

*Tahoe DBS, LLC v. Loral Space & Commcn's Ltd. (In re Loral Space & Commcn's Ltd.)*,
412 B.R. 64 (Bankr. S.D.N.Y. 2009) .............................................................................. 20-21

*Tradewell Foods v. New York Credit Men's Adjustment Bureau*,
179 F.2d 567 (2d Cir. 1950) .............................................................................................. 22

*Travelers Indem. Co. v. Losco Grp., Inc.*,
   204 F. Supp. 2d 639 (S.D.N.Y. 2002) ............................................................ 10

*U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*,
   949 F.2d 569 (2d Cir. 1991) .......................................................................... 6

*United States v. 0.35 of an Acre of Land, More or Less, Situated in Westchester Cnty., State of
N.Y.*,
   706 F. Supp. 1064 (S.D.N.Y. 1988) .............................................................. 6

*Whistler Inv., Inc. v. Depository Trust & Clearing Corp.*,
   539 F.3d 1159 (9th Cir. 2008) ................................................................. 11-12

*Whitnum v. Yahoo! Inc.*,
   No. 110987/06, 2007 WL 2609825 (N.Y. Sup. Ct. Sept. 5, 2007) ............... 13

**Statutes**

Insolvency Act, 1986, sch. B1 (Eng.) ................................................................ 16

N.Y. U.C.C. Art. 8 ............................................................................................. 20

**Other Authorities**

5 Corbin, Corbin on Contracts (1964) ............................................................... 5

*About Settling Trades in Three Days: T+3*,
   U.S. Securities and Exchange Commission,
   http://www.sec.gov/investor/pubs/tplus3.htm ................................... 10-11, 17

Fed. R. Bankr. P. 9014(c) ............................................................................... 3, 4

Fed. R. Civ. P. 12(b)(6) .............................................................................. 3-4, 13

Fed. R. Civ. P. 9(b) .......................................................................................... 23

Merriam Webster's Collegiate Dictionary (10th ed. 1997) .............................. 6

Objection of Lehman Brothers International (Europe) (In Administration) to Trustee's
   Determination of Claims,
   *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Oct. 31, 2011) [ECF No.
   4684] ....................................................................................................... 14, 19

Order, *Secs. Investor Prot. Corp. v. MF Global Inc.*, SIPA Case No. 11-2790 (Bankr. S.D.N.Y.
   Oct. 31, 2011) [ECF No. 1] ...................................................................... 16, 18

Order Approving Settlement Agreement Among the Trustee, Lehman Brothers International
   (Europe) (In Administration) and the LBIE Administrators,
   *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No.
   6021] ............................................................................................................. 19

Order Confirming the Trustee's Determination of Duplicative Claims,
   *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No.
   6022] ............................................................................................................. 19

*Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General
Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and
Alternative Dispute Resolution Procedures for Claims Against Debtors* [ECF No. 8474]..... 3-4

Reply Brief for Plaintiff-Appellant,
*Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.*, No. 747, 2002 WL 34351383 (N.Y.
App. Div. Jan. 11, 2002)........................................................................................................... 8

RESTATEMENT (SECOND) OF CONTRACTS (1981) ........................................................................ 22

The Trustee's Position Statement Regarding the Omnibus Customer Claim of Lehman Brothers
International (Europe),
*In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Jan. 13, 2012) [ECF No.
4865] ...................................................................................................................... 13-14, 17

**Regulations**

12 C.F.R. Part 220.................................................................................................................. 13

17 C.F.R. § 220.15c3-3 .......................................................................................................... 13

17 C.F.R. § 240.15c6-1 .......................................................................................................... 11

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities in the above-referenced

chapter 11 cases (collectively, the "Debtors"), files this reply (the "Reply") to the response [ECF

No. 47621] (the "Response") of Newport Global Opportunities Fund LP ("NGOF") and Newport

Global Credit Fund (Master) LP ("NGCF" and, collectively, "Newport") opposing the Four

Hundred Eighty-Eighth Omnibus Objection to Claims (No Liability Claims) [ECF No. 47101]

(the "Claim Objection"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      On Wednesday, September 10, 2008, Newport decided that it wanted to transfer

all of its securities to a new prime broker (Credit Suisse Securities (USA) LLC).  A Lehman

employee, Mizan Rahman, promptly followed up, by phone and email the next morning, telling

Newport that it would need to provide a letter of authorization in the form typically used to move

money.  In his September 11 email, Mr. Rahman listed the information needed for the

authorization letter and the terms that would apply to the transfer.  Specifically, Mr. Rahman

made clear that the transfers would be settled in "T+2," or, as understood by professionals in the

securities industry, in two business days.  Not one of these facts is disputed by Newport.  They

are cited by Newport's affiant, Roger May, in his supporting declaration.  *See Declaration of*

*Roger May in Support of the Response of Newport Global Opportunities Fund LP and Newport*

*Global Credit Fund (Master) LP to the Four Hundred and Eighty-Eighth Omnibus Objection to*

*Claims*, ¶¶ 46-51 & Exs. I-L [ECF No. 47621-1] (the "May Decl.").

2.       Apparently not in any rush, Newport did not provide the authorization letter until Friday afternoon, September 12th, meaning that the transfers would not occur until the following Tuesday, September 16th.  Despite the late hour, the transfers were able to be "booked" on Friday afternoon, before the market closed.  But the transfers could not be completed as originally scheduled.  Early in the morning of September 15, 2008, Lehman Brothers International (Europe) ("LBIE") entered an insolvency proceeding.  That, as a matter of U.K. law, meant that LBIE was prevented from taking further action with respect to Newport's securities.

3.       Newport filed claims against LBIE in its insolvency proceeding and has received payment from LBIE of one hundred percent of its allowed claims plus interest.[2]  But Newport wants more.  It has asserted various claims against the Debtors (the "Newport Claims"),[3] seeking compensation for purported damages resulting from alleged breaches of the Prime Brokerage Agreement (the "PBA").[4]

4.       Newport's claims are barred by two separate provisions in the governing PBA—a limitation of liability clause, which limits liability "in connection with the . . . handling . . . of securities . . . except for gross negligence or willful misconduct"; and a *force majeure* clause, which limits liability "for any loss caused, directly or indirectly, by government restrictions [or a] suspension of trading."

---

[2] Newport has received a 106% recovery on its LBIE "trust claims"; these trust claims are trading at up to 109.5% of par.  Newport has also received a 100% recovery on its LBIE "unsecured claims"; these unsecured claims are trading at up to 147% of par.

[3] On December 29, 2014, the Plan Administrator withdrew the Claim Objection, without prejudice, with respect to six claims asserted against LBHI—two of which (Claim Nos. 29235 and 26372) are held by Newport (the "LBHI Claims").  *See Notice of Withdrawal of Four Hundred Eighty-Eighth Omnibus Objection to Claims (No Liability Claims) Solely As to Certain Claims* [ECF No. 47564].  Newport suggests that the Plan Administrator withdrew the Claim Objection without prejudice for the LBHI Claims "to continue a strategic delay."  Response n.2.  This is plainly wrong.  The Plan Administrator withdrew the Claim Objection without prejudice for the LBHI Claims to streamline the Sufficiency Hearing which will occur on January 27, 2015.

[4] Newport, Lehman Brothers Inc. ("LBI") and LBIE also entered into a Margin Lending Agreement (the "MLA") governing margin loans between LBIE and Newport.  Except as set forth in Section 7(m) of the MLA executed by NGCF, both the MLA and PBA are governed by New York law.  *See* MLA § 7(m); PBA § 24.

20831858

5.       In an attempt to avoid application of both clauses, Newport either misunderstands or deliberately misstates what is meant by "T+2 settlement."  Newport asserts that "T+2" must mean the securities would have been transferred on Sunday, September 14th, a day when the banks and the markets were closed.  That is flat out wrong, as a matter of law and industry practice.  The transaction was in fact scheduled for final settlement on September 16, 2008, two *business* days after Newport delivered the required authorization letter.

6.       At bottom, Newport has only itself to blame for the incomplete transfer of its securities.  Newport decided to wait until the Wednesday before LBIE entered administration to change prime brokers and, even after it made its decision, it failed to provide the required paperwork until Friday afternoon.  Newport cannot rewrite history and call the events of the week of September 10, 2008 gross negligence.  Even at a sufficiency hearing, this just does not pass muster.

## REPLY

## I.    Claims Can Be Disallowed at a Sufficiency Hearing Without Discovery

7.       The Court has recognized, in a decision disallowing claims in these cases, that:

> [an] Objection trigger[s] a Sufficiency Hearing, as defined in the Court's April 19, 2010 Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors [ECF No. 8474]. Pursuant to that order, *all hearings to address the legal sufficiency of a particular Contested Claim and whether the Contested Claim states a claim against the asserted Debtor under Bankruptcy Rule 7012 shall be Sufficiency Hearings*, unless the Plan Administrator serves the holder of a contested claim with a Notice of ADR Procedure or Notice of Merits Hearing. *The standard of review for a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim.*

*In re Lehman Bros. Holdings Inc.*, 515 B.R. 171, 174 (Bankr. S.D.N.Y. 2014) (Chapman, J.)

(mem. decision sustaining Plan Administrator's objection to claims under Fed. R. Civ. P.

12(b)(6) ("Rule 12(b)(6)")) (emphasis added) (internal citations and quotation marks omitted);

*accord In re Lehman Bros. Holdings Inc.*, No. 08-13555, 2014 WL 2766164, at *1–2 (Bankr.

S.D.N.Y. June 18, 2014) (Chapman, J.); *Order Pursuant to Section 105 of the Bankruptcy Code,*

*Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims*

*Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors*

[ECF No. 8474]; *see also In re Spiegel, Inc.*, 337 B.R. 821, 824-25 (Bankr. S.D.N.Y. 2006)

(applying Rule 12(b)(6) to a claims objection pursuant to Bankruptcy Rule 9014(c)).

8.      Here, the Claim Objection triggered a Sufficiency Hearing, and the Court can and

must disallow and expunge the Newport Claims on the basis that Newport has failed to meet the

Rule 12(b)(6) standard, *i.e.*, to state a claim upon which relief may be granted.  Under the Rule

12(b)(6) standard, the Court must accept the factual allegations in the Newport Claims as true

and draw all reasonable inferences in Newport's favor.  However, factual allegations "must be

supported by more than mere conclusory statements. . . . [They] must be sufficient to raise a right

to relief above the speculative level and provide more than a formulaic recitation of the elements

of a cause of action." *Lehman Bros.*, 515 B.R. at 175 (internal citations and quotation marks

omitted).  Further, the Court should *not* accept as true "conclusions of law or unwarranted

deductions of fact." *Andino v. Fischer*, 698 F. Supp. 2d 362, 375 (S.D.N.Y. 2010).

**II.**      **Section 30 of the PBA Bars the Newport Claims**

9.      Section 30 of the PBA[5] provides as follows:

> Lehman Brothers shall not be liable in connection with the execution,
> clearing, handling, purchasing or selling of securities, commodities or
> other property, or other action, except for gross negligence or willful
> misconduct on Lehman Brothers' part.   You understand that certain
> securities may be held outside the United States by unaffiliated, foreign
> agent banks and depositories.   Lehman Brothers will not be liable to you

---

[5] In the PBA executed by NGOF, Sections 29 and 30 are contained within Sections 28 and 29, respectively.

20831858

for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct.  In no event will either party be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

10.    Under New York law, a contractual limitation of liability provision like Section 30 "represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Sveaas v. Christie's Inc.*, 452 F. App'x 63, 67 (2d Cir. 2011) (internal quotation marks omitted).[6]

11.    Newport argues that the Section 30 limitation of liability clause is inapplicable because (i) the Newport Claims do not fall within the clause, and (ii) the fact that the securities were not transferred amounts to gross negligence and willful misconduct.  *See* Response ¶¶ 135-59.

12.    Newport is wrong on both counts.  <u>First</u>, the Newport Claims fall squarely within Section 30.  <u>Second</u>, Newport has failed to allege facts that, even if accepted as true, show the type of conduct that is necessary to defeat a limitation of liability clause—conduct that "'smacks' of intentional wrongdoing." *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993)).

A.    *The Newport Claims Fall Squarely within Section 30's Exculpatory Language*

13.    Section 30 of the PBA expressly limits liability "in connection with the . . . handling . . . of securities."  PBA § 30.

---

[6] In hindsight, Newport may be unhappy that it agreed to the exculpatory language of Section 30.  However, as a sophisticated party that freely entered into a binding contractual arrangement, Newport is required to live by the terms of the contract it signed. *Metro. Life Ins. v. Noble Lowndes Int'l*, 643 N.E.2d 504, 507 (N.Y. 1994) ("[The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made." (citing 5 Corbin, Corbin on Contracts § 1068, at 386 (1964))).

20831858

14.    Under basic contract law "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). Here, because the term "handling" is unambiguous,[7] this Court should interpret the term pursuant to its plain meaning prior to resorting to canons of construction. *United States v. 0.35 of an Acre of Land, More or Less, Situated in Westchester Cnty., State of N.Y.*, 706 F. Supp. 1064, 1072 (S.D.N.Y. 1988) ("[W]here the language, as here, is unambiguous, it is unnecessary to resort to the principles of construction applicable to ambiguous contracts.").[8]

15.    The word "handling" is defined to include: (i) "act[ing] on or perform[ing] a required function with regard to," and (ii) "engag[ing] in the buying, selling, or distributing of." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997). Each of these definitions of "handling" encompasses transferring Newport's securities between prime brokers upon demand. Thus, the Newport Claims fit comfortably within Section 30.

16.    Newport argues that the term "handling" should be interpreted under the doctrine *noscitur a sociis* (Response ¶¶ 137, 140-42), which can be employed by Courts to interpret certain contractual terms "in accordance with the meaning of the words that are associated with

---

[7] Newport appears to argue that this Court should employ the doctrine of *contra proferentem* to interpret all ambiguity against the Debtors, as the alleged drafters of the PBA. *See* Response ¶ 139. As explained below, however, Section 30 is unambiguous, and thus the doctrine of *contra proferentem* is inapplicable. Further, even if Section 30 were ambiguous, Second Circuit law is clear that *contra proferentem* "is used only as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991) (internal quotation marks omitted).

[8] Even if this Court were to consider canons of construction, Newport's interpretation of Section 30 fails because it violates "the cardinal rule that a contract should not be read to render any provision superfluous." *Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012); *see also Acme Supply Co. v. City of New York*, 834 N.Y.S.2d 142, 143 (N.Y. App. Div. 2007) ("An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." (internal quotation marks omitted)). Newport's interpretation of the Section 30 exculpatory clause could be accomplished with the words "purchasing or selling" alone, and therefore renders the surrounding terms ("execution, clearing, handling") meaningless. Accordingly, Newport's interpretation of Section 30 is improper and cannot withstand scrutiny.

20831858

them." *La Salle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 CIV. 8426 WHP, 2011 WL 4943341, at

*4 (S.D.N.Y. Oct. 17, 2011).  Based on this canon of construction, Newport argues that, because

all of the other enumerated items "relate to the process of purchasing or selling securities," the

Section 30 exculpatory clause should be so limited.  *See* Response ¶¶ 137-38.  That is, the

exculpatory clause should only apply to actions that are related to purchasing or selling

securities.  *See id.*

17.    As explained above, use of *noscitur a sociis* to aid in interpreting Section 30

would be improper because the language of Section 30 is unambiguous.  *See La Salle Bank Nat'l*

*Ass'n*, 2011 WL 4943341, at *4 (*noscitur a sociis* is inapplicable where contract terms are

unambiguous).  However, even if this Court were to entertain Newport's argument, New York

courts have already considered, and rejected, Newport's interpretation of language identical to

Section 30.

18.    In *Retty Financing, Inc. v. Morgan Stanley Dean Witter & Co.*, a customer opened

a trading account with a broker pursuant to an agreement containing a limitation of liability

clause.  No. 604952/2000, 2001 WL 36405059 (N.Y. Sup. Ct. May 17, 2001), *aff'd*, 740

N.Y.S.2d 198 (N.Y. App. Div. 2002).  The limitation of liability clause was, in relevant part,

identical to the clause in the Newport PBA.  It provided that the broker "shall not be liable in

connection with the execution, clearing, handling, purchasing or selling of securities,

commodities or other property, or other action, except for gross negligence or willful misconduct

on [the broker's] part."  *Id.*  During the course of the relationship, the customer's principal

requested the broker to transfer funds from the trading account to an external account.  *Id.*  After

receiving the necessary authorization, the broker complied, not knowing that the principal had

20831858

falsified the authorization. *Id.* On these facts, the customer sought to assert breach of contract claims against the broker. *Id.*

19.    In its appellate reply brief, the customer made the exact arguments that Newport makes here. *See* Reply Brief for Plaintiff-Appellant, *Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.*, No. 747, 2002 WL 34351383, at *3 (N.Y. App. Div. Jan. 11, 2002). First, the customer argued that the exculpation clause was inapplicable to the transfer of funds because the clause focused on trading activities, such as negligently selling securities, but not other activities, such as transferring securities. *Id.* at *3-5. In the absence of specific language exculpating the broker from liability resulting from the transfer of funds out of the trading account, the customer argued that the exculpation clause only applied to the broker's processing of trades within the account. *Id.* Second, the customer argued that the "breadth of [the broker's] interpretation of the phrase 'or other action' effectively makes surplusage of the preceding phrase, 'execution, clearing, handling, purchasing or selling of securities, commodities or other property.'" *Id.* at *5. The customer argued that an exculpatory clause drawn in such overbroad terms was prohibited by New York law requiring that limitation of liability clauses be drafted in unmistakable language. *Id.* at *4-5.

20.    The New York Appellate Division rejected the customer's interpretation of the contractual language and affirmed the trial court's dismissal of the customer's claims under the exculpatory clause. *Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.*, 740 N.Y.S.2d 198, 198 (N.Y. App. Div. 2002). The court explained: "[t]he limitation of liability provision within the parties' contract, providing that defendant would be subject to liability only for gross negligence or willful misconduct *in its management of the subject investment fund*, was unambiguous and applicable to the instant matter." *Id.* (emphasis added).

21.    Applying *Retty*'s proper interpretation of the exculpatory clause, this Court should conclude that the Newport Claims fit squarely within Section 30's term "handling."  For similar reasons, the Newport Claims also fit within the phrase "other action," which appears at the end of the first sentence of Section 30.  Newport is correct that, under the doctrine *ejusdem generis*, the phrase "other action" must be construed in connection with the attributes of the preceding enumerated items.  *See* Response ¶ 146.  However, as explained above, Newport mischaracterizes the attributes of these enumerated items.  The items listed in Section 30 ("execution, clearing, handling, purchasing or selling of securities") do not relate exclusively to the purchasing and selling of securities, but rather relate to the overall management of the funds and investment assets in Newport's accounts generally, as explained in *Retty*.  740 N.Y.S.2d at 198.  As a result, the Newport Claims fall within the ambit of Section 30.

B.    *Newport Has Not Pleaded Sufficient Facts to
        Support a Claim for Gross Negligence or Willful Misconduct*

22.    "[C]ourts routinely dismiss gross negligence claims on motion to dismiss where the allegations do not 'smack of intentional wrongdoing.'"  *S.A. de Obras y Servicios, COPASA v. Bank of Nova Scotia*, No. 651231/2012, 2013 WL 1232743, at *9 (N.Y. Sup. Ct. Mar. 22, 2013); *see also Lemoine v. Cornell Univ.*, 769 N.Y.S.2d 313, 316 (N.Y. App. Div. 2003) ("Where a complaint does not allege facts sufficient to constitute gross negligence, dismissal is appropriate.").  Importantly, "[c]ourts apply a more exacting standard of gross negligence where sophisticated parties have entered into limitation of liability agreements."  *S.A. de Obras y Servicios, COPASA v. Bank of Nova Scotia*, No. 651555/2012, 2014 WL 2623900, at *9 (N.Y. Sup. Ct. June 12, 2014) (internal quotation marks omitted).

23.    To constitute gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care."  *Bayerische Hypo–Und*

*Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.)*, 292 B.R. 752, 767

(Bankr. S.D.N.Y. 2003) (internal quotation marks omitted).  A *prima facie* case in gross

negligence must be proved "by a fair preponderance of the credible evidence" that the defendant

"not only acted carelessly . . . but that it was so *extremely careless* that it was equivalent to

recklessness."  *Travelers Indem. Co. v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 644 (S.D.N.Y.

2002) (emphasis added).

> (1)    The Fact that Newport's Securities Were Not Transferred Over the
> <u>Weekend Does Not Constitute Gross Negligence or Willful Misconduct</u>

24.    Newport rests its entire argument for gross negligence and willful misconduct on

the incorrect premise that Newport's securities should have been transferred on Sunday,

September 14, 2008.  *See* Response ¶ 157.  Newport arrives at this conclusion by pointing to the

email confirming the Newport transfer request, which states that "[a]ny transfer initiated today

[September 12, 2008] will need to be T+2 settlement."  *See* May Decl. ¶ 51 & Ex. L.  According

to Newport, pursuant to this "confirmation . . . (not to mention industry custom and practice), the

transfer should have been completed no later than the day before the LBHI Chapter 11 filing and

LBIE administration order."  Response ¶ 25.

25.    But Newport overlooks one simple fact.  The securities industry-standard phrase

"T+2" refers to two *business* days, not calendar days.

26.    The widespread understanding that "T+2" is counted in business, not calendar,

days is demonstrated by the SEC's government-maintained website, which provides certain

"information as a service to investors."  *About Settling Trades in Three Days:  T+3*, U.S.

SECURITIES AND EXCHANGE COMMISSION, http://www.sec.gov/investor/pubs/tplus3.htm (the

"<u>SEC Website</u>") (last visited Jan. 22, 2015).  The SEC Website explains as follows:  "Investors

must settle their security transactions in three business days.  This settlement cycle is known as

'T+3' – shorthand for 'trade date plus three days.'" *Id.* The SEC Website explains this "T+3" rule as follows:

> This rule means that when you buy securities, the brokerage firm must receive your payment no later than *three business days* after the trade is executed. When you sell a security, you must deliver to your brokerage firm your securities certificate no later than *three business days* after the sale.

*Id.* (emphasis added). In fact, the SEC Website provides an example of how to calculate a settlement date, using T+3, when—like Newport's transfer request—the transaction is entered on a Friday:

> For example, let's say you bought a stock on Friday at anytime during the day. Saturday and Sunday are not considered business days, so *the three-day clock doesn't start running until Monday.*

*Id.* (emphasis added).

27.    This industry-wide understanding that "T+2" refers to business days is also confirmed by recent caselaw. For example, in *Shaw v. Citibank, N.A.*, the court explained that SEC Rule 15c6-1 "provides that the prompt and accurate clearance and settlement of securities transactions is accomplished if the broker-dealer settles a security transaction by the third business day after the date the trade was initiated [the '<u>T+3 Standard</u>']." No. 13 C 5189, 2013 WL 6697767, at *2 (N.D. Ill. Dec. 19, 2013) (citing 17 C.F.R. § 240.15c6-1).

28.    In *Shaw*, the plaintiff asserted claims against defendant Citibank, N.A., seeking damages due to Citibank's failure to settle securities transactions instantly. The plaintiff in *Shaw* argued that the T+3 standard was "'out-of-date' . . . and that the modern 'instantaneous nature of electronic trades' renders the T+3 standard unfair." *Id.* The court dismissed the plaintiff's claims, finding that it would be improper to require a broker-dealer to adhere to a more stringent standard because to do so would render the standards "set forth by the SEC meaningless." *Id.* (citing *Whistler Inv., Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1166 (9th Cir.

2008)).  Accordingly, the standard promulgated by the SEC, and enforced by federal courts, is that the timing of steps in a securities transaction is to be measured in *business* days, not calendar days.

29.    Under the correct understanding of "T+2," the agreed-upon settlement date for Newport's requested transfer was therefore September 16, 2008.[9]  Unfortunately, on September 15, 2008, LBIE entered administration, resulting in the inability of LBIE to take action with respect to the Newport securities.  The last step in fulfilling Newport's transfer order was therefore rendered impossible.

30.    Given this simple and undisputed chronology, it is clear that there was no undue delay in fulfilling Newport's transfer request.  The final steps simply could not be completed.  A party cannot be required to do more than what is in its contract or understood in the industry generally, and certainly it is not gross negligence or willful misconduct for a party to make a good faith effort to perform its contractual obligations.  *See Baquerizo v. Monasterio*, 933 N.Y.S.2d 869, 869-70 (N.Y. App. Div. 2011) (finding that defendant's actions in accordance with contract were not gross negligence or willful misconduct as a matter of law).

        (2)    Even Assuming that LBIE Did
              Rehypothecate Newport's Securities, Such Conduct
              <u>Does Not Constitute Gross Negligence or Willful Misconduct</u>

31.    Newport's unsupported statement that LBIE may have rehypothecated Newport's securities does nothing to bolster Newport's argument or create an issue of fact.  *See* Response ¶ 158.  Importantly, this accusation does not appear in the Newport Claims.  It is pure speculation, proffered for the first time in Newport's brief, and even then, only "upon

---

[9] Newport states that "Lehman Brothers confirmed that they would complete the transfer at least a day prior to the LBHI bankruptcy filing [September 14, 2008]."  Response ¶ 4.  This is simply not true.  The only way Newport can support this assertion is by pointing to the email from Mizan Rahman, dated September 12, 2008, stating that "[a]ny transfers initiated today will need to be T+2 settlement."  *See* May Decl. ¶¶ 51-52 & Ex. L.  As discussed above, "T+2" in this context meant September 16, 2008.

20831858

information and belief." *See Whitnum v. Yahoo! Inc.*, No. 110987/06, 2007 WL 2609825, at *2

(N.Y. Sup. Ct. Sept. 5, 2007) (dismissing claims for gross negligence and willful misconduct

when they were based on "mere speculation").

32.    Additionally, Newport has not explained how any action taken violated Federal

Reserve Board Regulation T, 12 C.F.R. Part 220 or SEC Rule 15c3-3, 17 C.F.R. § 220.15c3-3.

Rather, Newport summarily concludes that its "securities were rehypothecated by LBIE in

violation of [the PBA, the MLA, and these securities laws]." *See* Response ¶ 158.  Such a

blanket statement of liability is a legal conclusion, unentitled to the assumption of truth under the

Rule 12(b)(6) standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

33.    Moreover, even if LBIE did exercise its rights to rehypothecate Newport's

securities,[10] such rehypothecation would be irrelevant to the injury Newport alleges it suffered.

The crux of Newport's gross negligence argument is that its securities should have been

transferred in the days prior to the commencement of LBIE's administration.  However, after

LBIE entered administration on September 15, 2008, no further action could be taken with

respect to the Newport securities.  In other words, regardless of whether LBIE rehypothecated

Newport's securities, the securities could not be transferred for reasons unrelated to

rehypothecation.  Newport did not complete the transfer paperwork in time for the securities to

be transferred ahead of LBIE entering administration on September 15, 2008.[11]

---

[10] Newport admits that it granted LBIE broad rehypothecation rights under the PBA and MLA.  *See* Response ¶ 54;
PBA § 19(a); MLA §§ 5(b), (c).

[11] Newport's allegations of LBIE's rehypothecation also fail to save the Newport Claims for another reason—
LBIE's alleged conduct does not smack of intentional wrongdoing.  Thus, as matter of law, LBIE's alleged
rehypothecation does not constitute gross negligence or willful misconduct.  *See Baker v. Andover Assocs. Mgmt.
Corp.*, No. 6179/09, 2009 WL 7400085, at *26 (N.Y. Sup. Ct. Nov. 30, 2009) (dismissing gross negligence claim
because plaintiff failed to allege sufficient "factual allegations of conduct evincing a reckless disregard for the rights
of others or smacking of intentional wrongdoing" despite alleging that defendants failed to (i) discover red flags that
other investment advisors foresaw, (ii) undertake their fiduciary duties to supervise and manage, and (iii) perform or
cause to be performed appropriate due diligence).  Indeed, if Newport's securities had been rehypothecated, it was
LBIE's standard internal procedure to return such securities to Newport upon request.  *See* The Trustee's Position

C.    *Newport's Gross Negligence Claims for Breach of Contract*
      *Fail Because Such Claims Are Not Cognizable as a Matter of Law*

34.    Even if this Court were to conclude that the alleged breaches of the PBA

constituted gross negligence or willful misconduct, this Court should still dismiss these claims

because such claims are "not cognizable" under New York law.  *City of New York v. 611 W.*

*152nd St., Inc.*, 710 N.Y.S.2d 36, 36 (N.Y. App. Div. 2000) ("claims based on negligent or

grossly negligent performance of a contract are not cognizable."); *see also Pacnet Network Ltd.*

*v. KDDI Corp.*, 912 N.Y.S.2d 178, 178 (N.Y. App. Div. 2010) ("The motion court also correctly

dismissed the gross negligence claim relating to defendant's selection of the laser diodes and

delay in performing its warranty obligations, since claims based on negligent or grossly negligent

performance of a contract are not cognizable and plaintiff does not allege a breach of a duty

independent of the contract." (internal quotation marks and citation omitted)).

35.    Indeed, Newport has cited no authority allowing it to assert such claims.  Without

a basis in law to recover, the Newport Claims should be expunged.

## III.    Section 29 of the PBA Bars the Newport Claims

36.    Section 29 of the PBA ("Extraordinary Events") provides, in relevant part, that

"Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government

---

Statement Regarding the Omnibus Customer Claim of Lehman Brothers International (Europe), ¶ 8, *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Jan. 13, 2012) [ECF No. 4865] (the "Trustee's Position Statement") ("Under [LBIE's arrangements with its clients,] LBIE could 'lift' or rehypothecate the Client's securities . . . and would return these 'lifts' when the Client issued sell instructions for the lifted securities."). However, this procedure became inoperable due to the commencement of LBIE's administration. *Id.* ("After LBIE entered administration, the administrators do not appear to have entered any new transactions, including returning such 'lifts.'"); *see also* Objection of Lehman Brothers International (Europe) (In Administration) to Trustee's Determination of Claims, ¶ 17, *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Oct. 31, 2011) [ECF No. 4684] (the "LBIE Objection") ("During the week of September 15, 2008, which the [LBI] Trustee has described as 'confused,' it appears that the process of recalling lifted securities into the charge omnibus account to permit their sale . . . did not occur." (footnote omitted)).  Under New York law, "a failure to follow [one's] own internal protocols does not amount to gross negligence." *S.A. De Obras y Servicios*, 2014 WL 2623900, at *12 (internal citations omitted).  This is especially true in this case, given that LBIE was *prevented* from following its own internal procedures due to the LBIE administration commencement.  Thus, the fact that LBIE did not return Newport's securities cannot be considered gross negligence or willful misconduct—it was caused by a mere inability to follow internal procedures due to the commencement of administration.

-14-

restrictions [or a] suspension of trading." PBA § 29. Newport concedes that if a "government

restriction" or "suspension of trading" occurred, the Newport Claims would be barred under

Section 29. *See* Response ¶ 122 (citing *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296

(N.Y. 1987) for proposition that *force majeure* clause excuses performance if it "specifically

includes the event that actually prevents a party's performance"). Because Newport's damages

were both directly and indirectly caused by the "government restrictions" and "suspension of

trading" that occurred when LBIE entered administration, Newport's damages fall squarely

within the *force majeure* clause contained in Section 29 of the PBA.

37.       A recent decision by Judge Glenn—*In re MF Global Inc.*—is directly on point.

515 B.R. 434 (Bankr. S.D.N.Y. 2014). In *MF Global*, various claimants established brokerage

accounts with a broker pursuant to an agreement that contained a *force majeure* clause almost

identical to Section 29 of the PBA. *Id.* at 440. The *force majeure* clause stated that customers

have "no claim against [the broker] for any loss . . . caused directly or indirectly by," *inter alia*,

(1) "any Applicable Law, or any order of any court," (2) "suspension or termination of trading,"

and (3) "any other causes beyond [the broker's] control." *Id.* at 440-41. When the broker's

SIPA proceeding was commenced, the claimants' securities were still held by the broker. *Id.* at

440. The claimants later filed claims to recover damages for the securities' decline in value that

occurred while the broker held the securities during the SIPA proceeding. *Id.* Judge Glenn held

that the *force majeure* clause barred these claims because the broker's SIPA liquidation order

"led to the freezing of [the claimants'] accounts; an automatic result from the commencement of

the case and a cause beyond [the broker's] control." *Id.* at 441. Judge Glenn noted that the

"account freeze . . . was the result of the proper, statutory, mechanical operation of bankruptcy

procedure, CFTC Rules, and SIPA." *Id.* at 442 n.9.

20831858

38.     The *force majeure* clause in *MF Global* is, in substance, identical to the *force majeure* clause in Section 29 of the PBA.  The only substantive difference between the two is that, while *MF Global*'s *force majeure* clause covered any loss caused by "any order of any court," Section 29 of the PBA applies to "governmental restrictions" instead.  This is a distinction without a difference:  a court order is a type of governmental restriction.  *Reade v. Stoneybrook Realty, LLC*, 882 N.Y.S.2d 8, 9 (N.Y. App. Div. 2009) (holding that "a judicial temporary restraining order" "[c]ertainly . . . [fell] within the meaning of the term 'governmental prohibition,'" as used in *force majeure* clause).  Therefore, the clauses should operate identically and bar the Newport Claims as a matter of law.

39.     Further, the cause of the claimants' loss in *MF Global* (the commencement of the SIPA liquidation) is, in substance, identical to the cause of Newport's alleged losses (the commencement of the LBIE administration).  Pursuant to the *MF Global* SIPA liquidation order, "all persons and entities [were] stayed [from] . . . interfering with any assets or property owned, controlled or in the possession of the [broker]."  *See* Order, *Secs. Investor Prot. Corp. v. MF Global Inc.*, ¶ IV, SIPA Case No. 11-2790 (Bankr. S.D.N.Y. Oct. 31, 2011) [ECF No. 1].  Judge Glenn reasoned that this stay constituted a *force majeure* because it prevented access to the securities and was an event outside of the broker's control.  *MF Global*, 515 B.R. at 441.  Similarly, when LBIE entered administration, U.K. law imposed a moratorium against LBIE's creditors, preventing such creditors from, *inter alia*, commencing any "legal process (including legal proceedings, execution, distress and diligence) . . . against [LBIE] or property of [LBIE]."  *See* Insolvency Act, 1986, sch. B1, ¶¶ 42-44 (Eng.).

40.     The fact that LBI was able to settle certain pending LBIE trades after the commencement of the LBIE administration does not change the conclusion that, when LBIE was

placed into administration, it was "no longer functioning," directly resulting in LBI's inability "to settle transactions with LBIE or reconcile the LBIE Client trades as it did in the ordinary course of business." Trustee's Position Statement ¶ 3. Due to this disruption, certain transfers— like Newport's—could not occur as scheduled. Thus, the commencement of the LBIE administration made it impossible to complete Newport's transfer, bringing Newport's alleged damages for the incomplete transfer clearly within the confines of Section 29.

41.    Newport's attempts to distinguish *MF Global* are at best disingenuous. <u>First</u>, Newport argues that *MF Global* is distinguishable because "Lehman Brothers had more than sufficient time to transfer [Newport's] securities prior to LBHI's Chapter 11 bankruptcy [and] the LBIE administration order," and Mr. Rahman confirmed that the securities would be transferred on or by September 14, 2008. *See* Response ¶¶ 126, 129.

42.    However, as explained above, Newport did not provide the necessary transfer paperwork until Friday, September 12, 2008. Applying the industry-standard meaning of "T+2" to Newport's time frame, the agreed-upon settlement date for the securities transfer would be the following *Tuesday*—one day *after* the commencement of the LBIE administration placed Newport's securities under "lockdown." *See* May Decl. ¶ 51 & Exs. L, M. Newport does not point to a single document confirming a quicker transfer, and cannot credibly assert that it believed "T+2" meant calendar days instead of business days. *See* SEC Website; *Shaw*, 2013 WL 6697767, at *2 (noting that Rule 15c6-1 "provides that the prompt and accurate clearance and settlement of securities transactions is accomplished if the broker-dealer settles a security transaction by the third *business day* after the date the trade was initiated." (emphasis added)). Thus, *MF Global* is not distinguishable on this basis—Newport's transfer was not due to settle until *after* LBIE entered administration.

20831858

43.  <u>Second</u>, Newport mischaracterizes Judge Glenn's reasoning in *MF Global* by misquoting the decision.  In paragraph 128 of the Response, Newport explains Judge Glenn's reasoning as follows:

> In holding that the claims were barred because the customer agreement expressly exculpated the debtor from liability for losses caused by and after "a suspension of trading," the Court reasoned that the commencement of the SIPA proceeding "led to the freezing of [the] customer accounts; an automatic result from the commencement of the case *(the liquidation order specifically ordered all accounts to be "frozen")* and a cause beyond [the debtor's] control."

Response ¶ 128 (emphasis added).

44.  The problem with that explanation by Newport is that it deliberately misquotes Judge Glenn's decision—adding a parenthetical that does not exist in the original text. Moreover, the MF Global SIPA liquidation order did *not* specifically order all accounts to be "frozen."  Order, *Secs. Investor Prot. Corp. v. MF Global Inc.*, SIPA Case No. 11-2790 (Bankr. S.D.N.Y. Oct. 31, 2011) [ECF No. 1].  In fact, the word "frozen" does not appear within the liquidation order.  Rather, Judge Glenn's reasoning is based on the stay imposed by the liquidation order ("the result of the proper, statutory, mechanical operation of bankruptcy procedure, CFTC Rules, and SIPA"), which prevented access to the securities.  Here, it is the same:  the commencement of the LBIE administration caused LBIE to "no longer function[]," thus resulting in a disruption of the standard settlement methods and rendering Newport's transfers impossible to complete.

45.  <u>Third</u>, there is no gross negligence or willful misconduct exception to the Section 29 *force majeure* clause under New York law.  In *MF Global*, Judge Glenn rejected the claimants' attempt to insert an exception for gross negligence and willful misconduct into the *force majeure* clause.  Indeed, Judge Glenn held that the claimants' losses were not caused by alleged gross negligence and misconduct of the broker, but by an event outside of the broker's

control.  *See MF Global*, 515 B.R. at 441.[12]  Accordingly, the Newport Claims fall within

Section 29 of the PBA, and should be expunged as a result.

## IV.    The Debtors Are Not Jointly and Severally Liable for the Breaches of the PBA Alleged by Newport

46.    Newport argues that the Debtors must be held jointly and severally liable for the

breaches of obligations in the PBA[13] assumed by "Lehman Brothers" or a "Lehman Brothers

Entity."  Response ¶¶ 163-79.  Although Newport is correct that the Debtors technically fall

within the defined term "Lehman Brothers," Newport is wrong that the Debtors may be held

liable for breaching the identified obligations.  This is because, as non-broker-dealers,[14] the

Debtors *could not* perform these broker-dealer obligations.

47.    Under New York law, "the objective of contract interpretation is to give effect to

the expressed intentions of the parties."  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d

1274, 1277 (2d Cir. 1989).  "When interpreting an unambiguous contract, the court is to consider

its [p]articular words not in isolation but in light of the obligation as a whole and the intention of

the parties manifested thereby."  *Syncora Guar. Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328,

333 (S.D.N.Y. 2012) (internal quotation marks omitted).  "[W]here a contract provision lends

---

[12] Even if this Court were to disagree with Judge Glenn, and insert a gross negligence carve out where none exists, the Newport Claims would not fit within this carve out because, as explained above, the fact that Newport's transfer did not occur on Sunday, September 14, 2008, does not, as a matter of law, constitute gross negligence or willful misconduct.

[13] This Court has already implicitly rejected the argument that all Lehman entities that were allegedly party to the PBA should be held jointly and severally liable for any breach thereof when it expunged Newport's claims against LBI (based on the same facts and circumstances underlying Newport's LBIE claims and the Newport Claims asserted against the Debtors) in connection with approving the LBI / LBIE settlement.  *See* Order Approving Settlement Agreement Among the Trustee, Lehman Brothers International (Europe) (In Administration) and the LBIE Administrators, *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No. 6021]; Order Confirming the Trustee's Determination of Duplicative Claims, ¶ 4, *In re Lehman Bros. Inc.*, SIPA Case No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No. 6022].

[14] The Court may take judicial notice that LBI was a registered broker-dealer as evidenced by the commencement of LBI's SIPA proceeding, and that LBIE was a U.K. broker-dealer as evidenced by its regulation by the FSA and its securities settlement activities.  *See* LBIE Objection ¶ 9 ("LBIE was authorized and regulated by the Financial Services Authority ('FSA') in the U.K. and traded and settled securities in Europe and parts of Asia for its customers and affiliates, and for its own account.").  In contrast, the Debtors were not registered broker-dealers, as evidenced by the commencement of the Chapter 11 Cases.

20831858

itself to two interpretations, a court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions." *Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12 Civ. 1199, 2012 WL 2148221, at *4 (S.D.N.Y. June 13, 2012) (internal quotation marks omitted). "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* (internal quotation marks omitted).

48.    This Court should not accept Newport's interpretation of the PBA because such interpretation would be unreasonable:  it would obligate non-broker-dealers to perform broker-dealer functions.  Each of the following obligations of "Lehman Brothers," which Newport cites as obligations assumed by the Debtors, is a function that only a broker-dealer could perform: (i) holding securities on behalf of a client (PBA § 3); (ii) maintaining a client securities account under Article 8 of the Uniform Commercial Code, as adopted in New York (PBA § 3); (iii) transferring Newport's securities pursuant to the "SEC Letter," other SEC regulations and New York law (PBA § 2); (iv) remitting to Newport distributions made on account of Newport's securities (PBA § 19(b)); and (v) voting Newport's securities, or providing Newport with the opportunity to participate in corporate events (PBA §§ 10-11).  *See* Response ¶¶ 163-79. Because no reasonable person would agree to perform an obligation that it cannot perform, Newport's interpretation is unreasonable and thus invalid.

49.    This Court's decision in *Tahoe DBS, LLC v. Loral Space and Communications Ltd. (In re Loral Space and Communications Ltd.)* is directly on point.  412 B.R. 64 (Bankr. S.D.N.Y. 2009).  In *Tahoe*, the debtors ("Loral") had entered into a contract two years prior to filing for bankruptcy.  *Id.* at 65.  Under paragraph 9 of that contract, "Loral" appeared to assume certain obligations, such as to perform under a certain "Letter Agreement."  *Id.* at 66.  Based on

an alleged breach of the Letter Agreement—and a resulting breach of the contract—the
counterparty asserted claims in Loral's bankruptcy against all debtors.  *See id.* at 66-67.  It
argued that all debtors were liable for this breach of contract because all debtors had assumed the
obligation to perform on the Letter Agreement pursuant to paragraph 9 of the contract.  *Id.* at 68.

50.    Applying California law, this Court rejected this interpretation of the contract
because, "under paragraph 9, [the relevant] obligations of 'Loral' were capable of being
performed only by SpaceCom DBS [one of the debtors], and not by the Loral entities as a
whole."  *Id.* at 69.  This Court explained:

> SpaceCom DBS was the only "Loral" entity that was a party to the Letter
> Agreement, thus demonstrating that the term "Loral," as used in these paragraphs,
> can refer to no entity other than SpaceCom DBS. In other words, it is apparent
> that the parties intended the term "Loral" to refer to specific Loral entities in those
> provisions of the Agreement where it simply would make no sense, and would be
> contrary to known facts, to refer to the Loral entities collectively.

*Id.* at 68.

51.    *Tahoe*'s reasoning is directly applicable to the Newport Claims.  Newport seeks to
hold the Debtors jointly and severally liable for the breach of prime brokerage obligations that
appear to be assumed by "Lehman Brothers."  *See* Response ¶¶ 163-79.  However, the Debtors,
as non-broker-dealers, could not perform these obligations.  Accordingly, Newport's attempted
assertion of joint and several liability fails.  In the language of the *Tahoe* case:  "it is apparent
that [Newport and the Debtors] intended the term ['Lehman Brothers'] to refer to [LBI and
LBIE, as broker-dealers,] in those provisions of the [PBA] where it simply would make no sense,
and would be contrary to known facts, to refer to the ['Lehman Brothers'] entities collectively."
*See Tahoe*, 412 B.R. at 68.  Any contrary interpretation—placing broker-dealer obligations on
the Debtors—would be unreasonable and thus inappropriate.

52.    Newport also incorrectly argues that the Debtors are presumed to be jointly liable for the prime brokerage obligations set forth in the PBA.  *See* Response ¶ 187.  The presumption that contractual rights and responsibilities are joint in a multiparty contract applies only when two parties promise the *same performance*.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 288 (1981) ("The question whether two promisors promise the same or separate performances is distinct from the question whether two promisors of the *same performance* are bound by 'joint' or by 'several' duties or by both, but the two questions are sometimes confused.") (emphasis added); *see also Lemus v. Manhattan Car Wash, Inc.*, No. 06 CIV. 15486 (MHD), 2010 WL 1372705, at *7 (S.D.N.Y. Mar. 26, 2010) ("[W]hen multiple promisors agree to pay a stated sum to the same promisee, they will be jointly liable unless the promisors unambiguously expressed a contrary intention.").

53.    Additionally, Newport incorrectly argues that the Debtors should be liable for broker-dealer obligations under the PBA simply because the Debtors enjoyed benefits under the PBA.  *See* Response ¶¶ 194-96.  This argument is inconsistent with the well-settled law in New York that each party to a contract is liable only for its promised performance.  Indeed, parties routinely limit their liability under a multiparty contract despite reaping significant benefits therefrom.  *See, e.g.*, *Tradewell Foods v. New York Credit Men's Adjustment Bureau*, 179 F.2d 567, 569 (2d Cir. 1950) (debtor was not liable for payment obligations of its officers, even though the debtor was a beneficiary of, and party to, the applicable agreement).

## V.    The Debtors Are Not Liable for any Failure to Capitalize CAPCO

54.    Newport's fraudulent and negligent misrepresentation claims, based on the alleged "failure to capitalize CAPCO," fail as a matter of law.

55.    The only allegations Newport makes to support its fraudulent or negligent representation claims concern the 2007 Credit Protection Overview (the "Overview"), which

states that both LBI and LBIE maintained CAPCO surety bonds.  *See* Response ¶¶ 181-82.

Newport states that these statements were part of the reason Newport transacted with, and

entrusted securities to, "Lehman Brothers."  *See id.* ¶ 183.  Newport also alleges that it was

damaged by these alleged misrepresentations "to that effect."  *See id.*

56.     These vague and bare-bones allegations of fact do not support claims for

fraudulent or negligent misrepresentation.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119

F.3d 91, 98 (2d Cir. 1997) (under New York law, claim for fraudulent misrepresentation requires

(i) a material misrepresentation of fact; (ii) that was known to be false by the defendant; (iii) that

was made with the intent to deceive the plaintiff; (iv) on which the plaintiff reasonably relied;

and (v) which resulted in injury to the plaintiff); *Manhattan Motorcars, Inc. v. Automobili*

*Lamborghini, S.p.A.*, 244 F.R.D. 204, 215 (S.D.N.Y. 2007) (under New York law, claim for

negligent misrepresentation requires showing that "(i) the defendant had a duty, as a result of a

special relationship, to give correct information; (ii) the defendant made a false representation

that it should have known was incorrect; (iii) the information supplied in the representation was

known by the defendant to be desired by the plaintiff for a serious purpose; (iv) the plaintiff

intended to rely and act upon it; and (v) the plaintiff reasonably relied on it to his or her

detriment" (citation omitted) (internal quotation marks omitted)).

57.     To be sure, Newport's allegations do not satisfy the heightened pleading standard

required by New York law.  A claim for fraudulent or negligent misrepresentation must satisfy

the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which

requires all "averments of fraud" to be "stated with particularity."  *BNP Paribas Mortg. Corp. v.*

*Bank of Am., N.A.*, 949 F. Supp. 2d 486, 509 (S.D.N.Y. 2013).  Newport has not made any

factual allegations supporting its CAPCO claims "with particularity."  In fact, Newport has not

-23-

even alleged which of the Debtors made the statements in the Overview, instead opting to generally allege that "Lehman Brothers" made these statements.

58.     Newport's allegations cannot support claims for either fraudulent or negligent misrepresentation.  As a result, these claims should be expunged.

## **RESERVATION OF RIGHTS**

59.     To the extent that the Court denies the relief requested in the Claim Objection with respect to any of the Newport Claims, the Plan Administrator reserves the right to object to the Newport Claims on all other grounds.  The Plan Administrator reserves the right to conduct discovery as to the Newport Claims and any matters raised in the Response and to supplement this filing as a result thereof.  Without limiting any of the foregoing, the Plan Administrator reserves the right to conduct its own valuation of the Newport Claims and challenge the valuation of the Newport Claims conducted by Newport, LBIE or any other entity.

*[Remainder of Page Left Blank Intentionally]*

20831858

## <u>CONCLUSION</u>

WHEREFORE, for all the reasons set forth in the Claim Objection and this Reply, the

Plan Administrator respectfully requests that the Court: (i) grant the relief requested in the Claim

Objection, (ii) disallow and expunge the Newport Claims in their entirety, and (iii) grant such

other and further relief as is just and proper.

Dated: January 22, 2015
       New York, New York

 

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By:  */s/ L. P. Harrison 3rd*
       L. P. Harrison 3rd
       Turner P. Smith
       Cindi Eilbott Giglio
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Counsel for Lehman Brothers Holdings Inc.
 and Certain of Its Affiliates*

20831858