*In re Lehman Brothers Holdings Inc., et al.*

**Neuberger Berman Claimants Exhibit List Pursuant to ¶13 of the Evidentiary Hearing
Procedures Order [ECF No. 42176]**

| Exhibit No. | Document Date | Description | Bates Nos. |
|---|---|---|---|
| | | | |
| NB A | 6/27/01 | Judith Kenney Employment Agreement | |
| NB B | 8/19/03 | Henry Ramallo Retention Agreement | NB00111 - NB00119 |
| NB C | 8/2/99 | Stephanie Stiefel Neuberger Berman Stockholders Agreement | NB00077 - NB00101 |
| NB D | 10/31/03 | Amended and Restated Neuberger Berman Stockholders Agreement | LEH-RSU-CL 00697 - LEH-RSU-CL 000719 |
| NB E | 8/2/99 | Marvin Schwartz Neuberger Berman Stockholders Agreement | NB00001 - NB 00026 |
| NB F | 8/2/99 | David Weiner Neuberger Berman Stockholders Agreement | NB00027 - NB00052 |
| NB G | 8/2/99 | Richard Levine Neuberger Berman Stockholders Agreement | NB00053 - NB00076 |
| NB H | 8/20/03 | Stephanie Stiefel Retention Agreement | NB00102 - NB00110 |
| NB I | 7/30/03 | Richard Glasebrook Retention Agreement | NB00120 - NB00128 |
| NB J | 9/5/03 | Seth Finkel Retention Agreement | NB00129 - NB00137 |
| NB K | 9/5/03 | Judith Kenney Retention Agreement | NB00138 - NB00146 |
| NB L | 8/18/03 | Richard Nackenson Retention Agreement | LEH-RSU-CL 00670 - LEH-RSU-CL 000685 |
| NB M | 7/25/03 | Christian Reynolds Retention Agreement | LEH-RSU-CL 000686 - LEH-RSU-CL 000696 |
| NB N | 11/17/08 | Neuberger Berman Holdings Memorandum | NB00147 - NB00149 |
| NB O | Undated | Neuberger Berman Holdings Memorandum | NB00150 - NB00155 |

Exhibit A

Neuberger Berman, LLC
Investment Management
605 Third Avenue
New York, NY 10158-3698
Tel 212.476.9000

**NEUBERGER BERMAN**

June 27, 2001

Ms. Judith Ann Kenney
40 West 77th Street #11D
New York, NY  10024

Dear Judith Ann:

I am pleased to inform you that if you agree to the following conditions, you will be awarded the corporate title of Senior Vice President, and you will also be granted 2,000 shares of Neuberger Berman Inc. Restricted Stock ("Neuberger Restricted Stock"), according to the vesting period outlined below.

Neuberger Restricted Stock will vest in three equal annual installments, one third on each of the following dates: October 8, 2003, October 8, 2004, and October 8, 2005. It is important to note that any unvested Neuberger Restricted Stock will be forfeited upon termination of your employment with Neuberger Berman, LLC or its parents, subsidiaries or affiliates ("NB"). Any Neuberger Restricted Stock you receive will be subject to such other terms and conditions as Neuberger Restricted Stock awarded to other employees of NB. The granting and vesting of Neuberger Restricted Stock awards are contingent upon your continued employment at NB through payment, award and vesting dates. This award and the granting of the corporate title referenced above are consideration for your agreement to the terms and conditions outlined below.

In consideration of your employment by NB and of the payments and benefits afforded you under this Non-Solicitation and Confidentiality Agreement ("Agreement"), you understand and agree that your undertakings set forth in the following paragraphs below are material and essential terms to NB in entering into this agreement. You agree that during your employment with NB and for a period of one (1) year after your employment terminates for any reason, whether voluntarily or involuntarily, with or without cause:

(a)     You will not, directly or indirectly, as an individual, a sole proprietor, a member of a partnership, as a stockholder, investor, officer, employee or director of a corporation, or as an executive, agent, associate or consultant of any person, firm or corporation other than NB or a successor corporation or one of its parents, subsidiaries or affiliates, solicit, recruit, hire or otherwise encourage the resignation of any executive, employee, agent, consultant or independent



**NEUBERGER BERMAN**

contractor of NB or induce or attempt to induce any executive, employee, agent, consultant, or independent contractor of NB or any of its parents, subsidiaries or affiliates to terminate their association with NB or any of its parents, subsidiaries or affiliates.

(b)     You will not, directly or indirectly, as an individual, a sole proprietor or a member of a partnership, as a stockholder, investor, officer, employee or director of a corporation, or as an executive, agent, associate or consultant of any person, firm or corporation other than NB or a successor corporation or one of its parents, subsidiaries or affiliates, solicit the business of or provide or perform any services to any client or prospective client to whom you provided or performed services while employed by NB or as to whom you learned confidential information while at NB. You also agree not to assist any person or entity in competition with NB to solicit or service any such client to reduce its business with NB. Excluded from this prohibition are clients who are members of your immediate family and clients that you were directly involved in bringing to your previous firm before you joined NB. The term "prospective client" applies to any person or entity who has been solicited or identified for solicitation by NB, its parents, subsidiaries or affiliates during the twelve (12) month period prior to the date you cease to be an employee of NB.

(c)     You further agree and acknowledge that any knowledge or information of any type whatsoever of a confidential nature relating to the business of NB or any of its parents, subsidiaries or affiliates, including, without limitation, all types of trade secrets, concepts, techniques, methods, client lists and client information of any kind, employee lists or information, information regarding product development, prospective investment products and strategies, marketing plans, management organization information, operating policies or manuals, performance results, business plans, financial records, or other financial, commercial, business or technical information (collectively, "Confidential Information'), must be protected as confidential, not copied, disclosed or used, directly or indirectly, other than for NB's benefit at any time, unless and until such knowledge or information is in the public domain through no wrongful act by you. You agree that you will not, directly or indirectly, divulge or disclose to anyone (other than NB or any of its affiliates or any person employed or designated by such entities), publish or make use of any such Confidential Information without NB's prior written consent, except pursuant to an order of a court having competent jurisdiction or under subpoena from an appropriate government or regulatory agency.

NEUBERGER BERMAN

(d)    You further agree that following the termination of your employment, you shall deliver to NB all documents or other tangible and intangible materials in your possession, including all copies thereof, which contain or are derived from Confidential Information, and that you shall not misappropriate, utilize, disclose or infringe upon the Confidential Information of NB or any of its affiliates (including the recreation or reconstruction of Confidential Information from memory).

(e)    You further agree and acknowledge that NB and/or its clients and client relationships will be irreparably harmed by any breach, or threatened breach, by you of this Agreement and that monetary damages would be grossly inadequate. Accordingly, you agree that in the event of a breach, or threatened breach, by you of this Agreement, NB shall be entitled to immediate injunctive or other preliminary or equitable relief, as appropriate, without any requirement to post a bond in addition to other remedies available at law and equity.

(f)    You agree that any provision of this Agreement that is prohibited or unenforceable shall be ineffective to the extent, but only to the extent, of such prohibition or unenforceability without invalidating the remaining portions hereof and such remaining portions of this Agreement shall continue to be in full force and effect.

(g)    You agree that this Agreement shall be governed by and enforced in accordance with the laws of the State of New York, and that all disputes arising under this Agreement shall be brought exclusively in courts located within the State of New York.

This award offer is extended only for a period of ten (10) business days from the date of this letter. Thereafter it will be rescinded if not accepted by you within that time by signing this letter in the space provided below and returning it to NB.

**NEUBERGER BERMAN**

Only upon execution of this agreement will your corporate title and Neuberger Restricted Stock award be granted. Upon NB's due receipt of this signed Agreement, the Neuberger Berman corporate title and the Neuberger Restricted Stock award will be considered effective.

I look forward to hearing from you shortly.

Sincerely,

Barbara Katersky
Senior Vice President
Human Resources

Judith Ann Kenney                    7/13/01
                                     Date

**Exhibit B**

SEP-15-03  19:39    FROM-COMPLIANCE    2124769862    T-060    P 02/10    F-009

FORM OF
NEUBERGER BERMAN, INC
RETENTION BONUS POOL AWARD AGREEMENT
*(Ramallo)*

August 19, 2003

In connection with the acquisition of Neuberger Berman, Inc., a Delaware corporation ("*NB Inc.*") by Lehman Brothers Holdings, Inc 's ("*Lehman*"), pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "*Merger*"), as set forth in the Agreement and Plan of Merger dated as of July 21, 2003 among Lehman Brothers Inc., Neuberger Berman Acquisition Company and NB Inc. (the "*Merger Agreement*"), NB Inc. and Lehman have agreed that you are key to the business of NB Inc and, as such, NB Inc. desires to provide you with an incentive to remain employed with NB Inc. or its successor in the Merger (or a subsidiary thereof, if applicable) through and after the closing date of the Merger (the "*Merger Date*") Accordingly, NB Inc. is pleased to offer you the opportunity to participate in a retention bonus pool program (the "*Retention Pool Plan*"), to be established by NB Inc. as of the Merger Date. This Retention Bonus Pool Award Agreement (the "*Award Agreement*") sets forth the terms and conditions of your award under the Retention Pool Plan. Unless otherwise set forth herein, this Award Agreement will become effective upon the Merger Date.

1.    Retention Bonus Pool Award

Subject to the terms and conditions of this Award Agreement and Schedules A, B and C attached hereto, you will be entitled to receive such allocated amount of the retention bonus pool established pursuant to the Retention Pool Plan (the "*Retention Bonus Pool*") as is identified on Schedule A as your "*Retention Bonus Pool Allocation.*"

2.    Certain Definitions

As used herein, the following terms have the following meanings:

(a)    "Cause" means:

(i)    gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(ii)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(iii)    dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm,

DEFENDANT'S
EXHIBIT
NB 6
tabbies

Error Unknown document property name.

CONFIDENTIAL NB 00111

SEP-15-03  19:39    FROM-COMPLIANCE    2124769862    T-060   P 03/10   F-009

(iv)    a finding by the Securities and Exchange Commission ("*Commission*") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)    a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)    a breach of the provisions set forth on Schedule B hereto.

(b)    "Date of Termination" means (i) if your employment is terminated by the Firm, the date of the Firm's delivery of written notice of termination or (ii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion

(c)    "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(d)    "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(e)    "Good Reason" means, without your consent,

(i)    a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)    a change of more than fifty (50) miles in the location where you are to perform your principal duties;

(iii)    a material and adverse change in the overall structure of your total compensation, as of the date hereof, where such change results in a substantial diminution in your earning ability, it being understood that under the current structure of your total compensation, your applicable percentage payout is subject to change by the group head and is payable part in cash and part in conditional equity awards based on terms generally applicable to similarly situated NB Inc. employees; or

(iv)    a material breach by NB Inc. of a material term of this Award Agreement;

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of

Error: Unknown document property name.

CONFIDENTIAL NB 00112

SEP-15-09  10:40    FROM-COMPLIANCE                    2124769862              T-060  P 04/10  F-036

such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

(a)    This Award Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

(b)    Except as set forth in Schedule B, any dispute arising out of this Award Agreement will be exclusively resolved by binding statutory arbitration before the NASD or NYSE (as selected by NB Inc.), in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

(a)    Nothing contained in this Award Agreement obligates the Firm to employ you in any capacity whatsoever or prohibits or restricts the Firm from terminating your employment at any time or for any reason whatsoever.

(b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s (or its successor's) General Counsel, and to you at your last address appearing in the Firm's employment records.

(c)    Except as expressly provided herein, this Award Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder. You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Award Agreement shall be void. However, this Award Agreement shall be binding upon your permitted successors and assigns.

(d)    Without impairing your obligations or rights hereunder, NB Inc. or its successor may at any time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Award Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

(e)    This Award Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Award Agreement shall not be effective against the Firm without the written consent of NB, Inc. or its successors.

(f)    If any provision of this Award Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

Error! Unknown document property name.

CONFIDENTIAL NB 00113

SEP-15-03  19:40    FROM-COMPLIANCE                      2124769962              T-060  P 05/10  F-006

    (g)    NB Inc. may withhold from any amounts payable under this Award Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

    (h)    This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

NEUBERGER BERMAN, INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date of this Award Agreement by

_____
Henry Ramallo

Error: Unknown document property name.

CONFIDENTIAL NB 00114

SEP-15-03  19:40    FROM-COMPLIANCE                        2124769862            T-060    P 06/10    F-009

Schedule A

Retention Bonus Pool

1.    Retention Bonus Pool Allocation:  On the date of the Merger, $500,000 will be allocated
to you and awarded to you in the form of restricted stock units ("RSUs"), to be credited
to an account maintained on your behalf and payable in shares of common stock of
Lehman ("Lehman Shares"). Such number of RSUs to be allocated and awarded to you
will be determined by dividing the dollar amount set forth above by the "Parent
Reference Price" (as defined in the Merger Agreement). Subject to certain adjustments
and potential closing delay provisions described in the Merger Agreement, this price will
be the average of the volume of the average weighted sales prices of Lehman Shares on
the NYSE for the 10 trading days ending on the second trading day prior to the date of
the Merger. If the calculation described herein produces a fractional number of RSUs,
such fractional RSUs (to the second decimal point) will be credited to and continue to
accrue in your Retention Bonus Pool account.

2.    Vesting and Payment of RSUs:  20% per year, starting on the first anniversary of the
Merger. Over the vesting period of your RSUs, your Retention Bonus Pool account will
be credited with additional RSUs in respect of dividends paid to holders of the same
number of Lehman Shares as you have RSUs in your account. On each vesting date, you
will receive payment, in whole Lehman Shares, of such number of RSUs (including the
RSUs credited as dividend equivalents on such RSUs) as are vested on that date, and any
fractional Lehman Shares (to the second decimal point) will be used to offset any income
tax withholding obligations of NB Inc on such payment.

3.    (a)    Continued Vesting:

 -     Termination by the Firm without Cause, if all provisions set forth in Schedule B are
complied with before and after termination of employment.

 -     Termination by you for Good Reason, if all provisions set forth in Schedule B are
complied with before and after termination of employment.

 -     Termination due to death or by the Firm due to Extended Absence

      (b)    Payment of Vested Amount; after Termination of Employment:

 -     If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by
you for Good Reason, you will receive payment of your amounts on each of the
original vesting dates described in paragraph 2 above. (Payment will be made in the
event of continued vesting only if you continue to comply with the provisions of
Schedule B.)

 -     Upon your death, your estate will receive immediate payment of all unpaid amounts.

4.    Forfeiture of Retention Bonus Pool allocated amounts:

 -     Termination by Firm with Cause (with respect to any unvested amounts)

 -     Termination by you without Good Reason (with respect to any unvested amounts)

 -     Violation of any provisions set forth in Schedule B (with respect to any unvested
amounts or any vested but unpaid amounts)

5.    You will receive more details regarding the retention bonus pool when it is finalized.
Error: Unknown document property name

CONFIDENTIAL NB 00115

SEP-15-03  19:41    FROM-COMPLIANCE                    2124769862              T-060   P 07/10   F-009

Schedule B

Non-Solicitation; Company Information

1.    In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc ("NB Stock") for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

(a)    it is essential to the success of the Merger and the Firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

(b)    the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

2.    Therefore, you agree that the covenants and restrictions contained in this Schedule B are reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm) during your employment with the Firm and for a period of twelve months after your Date of Termination (the "Restricted Period"):

(a)    solicit or accept business from any individual or entity for whom any member of the Firm provides services within the one-year period before or after the Date of Termination;

(b)    solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

(c)    solicit or accept business from or through, or engage in any sales or marketing activities with, any broker-dealer, bank, insurance company, financial planner or other financial institution (or any person employed by or associated with any such entity), with whom Executive had business contact during the one-year period prior to Executive's Date of Termination;

(d)    employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other similar support personnel); or

Error! Unknown document property name

CONFIDENTIAL NB 00116

SEP-15-03  19:41    FROM-COMPLIANCE                    2124769862              7-060    P 06/10    F-009

2

(e)    solicit (or assist in soliciting) any such person described in (d) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (d) or (e), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

The covenants set forth in (a) through (e) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms  Furthermore, the covenants set forth in (a) through (e) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason.

Company Information.

3.    You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm  In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm.  You further agree not to make copies of such Confidential Information except as authorized by the Firm.

4.    For purposes of this Schedule B, "Confidential Information" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by you during the period of your employment  You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to, or by, any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule B

Error. Unknown document property name.

CONFIDENTIAL NB 00117

SEP-15-03  19:41    FROM-COMPLIANCE                    2124769662            7-090  P 09/10  F-009

3

<u>General</u>

5    <u>Specific Performance</u>. You acknowledge and agree that the Firm's remedies at law for a
breach or threatened breach of any of the provisions of this Schedule B would be
inadequate and the Firm would suffer irreparable damages as a result of such breach or
threatened breach. Therefore, you agree that, in the event of such a breach or threatened
breach, in addition to any remedies at law, NB Inc. (or its successor) or any other
member of the Firm, without posting any bond, may cease making any payments or
providing any benefit otherwise required by this Award Agreement and obtain equitable
relief in the form of specific performance, temporary restraining order, temporary or
permanent injunction or any other equitable remedy which may then be available.

6.    <u>Separability</u>. It is understood and agreed that although you and NB Inc. consider the
restrictions contained in this Schedule B to be reasonable, if a final judicial determination
is made by a court of competent jurisdiction that the time or any other restriction
contained in this Schedule B is an unenforceable restriction against you, the provisions of
this Schedule B shall not be void but shall be deemed amended to apply to such
maximum time and territory and to such maximum extent as the court may determine to
be enforceable. Alternatively, if any court of competent jurisdiction finds that any
restriction contained in this Schedule B is unenforceable, and such restriction cannot be
amended to make it enforceable, such finding shall not affect the enforceability of any of
the other restrictions contained herein

7.    <u>Confidentiality of Agreement</u>. Except as required by law, you will not disclose to
anyone, other than to your immediate family and legal or financial advisors, the existence
or contents of this Award Agreement; <u>provided</u> that you may disclose to any prospective
future employer the provisions of this Schedule B so long as they agree to maintain the
confidentiality of such provisions

8.    <u>Other Agreements</u>. Nothing in this Schedule B shall operate to supersede, limit or waive
any existing agreements between you and the Firm relating to the subject matter herein,
whether or not such other agreements contain similar restrictive covenants, and nothing
in any such other agreements shall operate to supersede, limit or waive the restrictive
covenants contained in this Schedule B regardless of whether such agreements purport to
contain the entire agreement on these matters between you and the Firm. If the restrictive
covenants contained in this Schedule B and in any other agreements appear to be in
conflict with each other, all such restrictive covenants shall apply independently of each
other and shall remain in full force and effect regardless of the conflict

Error: Unknown document property name.

CONFIDENTIAL NB 00118

SEF-15-03  19:42    FROM-COMPLIANCE                    2124769662                    T-066    P 10/10    F-009

4

Schedule C

Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Award Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule A shall be the first amounts to be reduced.

Error: Unknown document property name.

CONFIDENTIAL NB 00119

**Exhibit C**

Execution Copy

NEUBERGER BERMAN INC.

STOCKHOLDERS AGREEMENT

Dated as of August 2, 1999



20623913.3

Stockholders Agreement

CONFIDENTIAL NB 00077

TABLE OF CONTENTS

Page

ARTICLE I

LIMITATIONS ON TRANSFER OF SHARES                               2
Section 1.1.  Transfers Generally .                             2
Section 1.2.  Transfers Following Death or Disability .      . . .3
Section 1.3.  Transfers with the Consent of Board of Directors     4
Section 1.4.  Compliance with Law and Regulations       . . .    . 4
Section 1.5.  Legend on Certificates; Entry of Stop Transfer Orders    . 4
Section 1.6.  Certificates to be Held by Company .   .   .    . 4
Section 1.7.  Transfers in Violation of Agreement Void          6

ARTICLE II

VOTING AGREEMENT . . . . . . . . . . . . . . . . .  . . .  . . . 6
Section 2.1.  Preliminary Vote of Founder Stockholders .    . .     6
Section 2.2.  Voting by Founder Stockholders                  . . . 6
Section 2.3.  Termination of Voting Provisions .   .  . .      7

ARTICLE III

RIGHT TO PURCHASE SHARES .  . . . . . . . . . . .       7
Section 3.1.  Right of the Company to Purchase Shares in Case of Harmful
              Activity  . . . . . . . . . . . . . . .           7
Section 3.2.  Notice of Harmful Activity . . . . . . . . . . . .   . .  . . 8

ARTICLE IV

REPRESENTATIONS AND WARRANTIES . . . .    . . .   . . . . . . . 8
Section 4.1.  Representations and Warranties of the Founder Stockholders    . . . 8
Section 4.2.  Representations and Warranties of the Company .   . .    . . . . . 9

ARTICLE V

DEFINITIONS . . . . . . . . . . . . . . . .     . . .      . . . . . . 9

i

ARTICLE VI

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Section 6.1   Notices . . . . . . . . . . . . . . . . . . . . . . . . . 16
Section 6.2   Term of the Agreement . . . . . . . . . . . . . . . . . 16
Section 6.3   Amendments, Waivers . . . . . . . . . . . . . . . . . 16
Section 6.4   Adjustment Upon Changes in Capitalization . . . . . . 17
Section 6.5   Severability . . . . . . . . . . . . . . . . . . . . . . . 17
Section 6.7   Representatives, Successors and Assigns . . . . . . . . . 17
Section 6.8   Governing Law . . . . . . . . . . . . . . . . . . . . . 18
Section 6.9   Specific Performance . . . . . . . . . . . . . . . . . . 18
Section 6.10  Arbitration . . . . . . . . . . . . . . . . . . . . . . . 18
Section 6.11  Submission to Jurisdiction, Waiver of Immunity . . . . . 19
Section 6.12  Further Assurances . . . . . . . . . . . . . . . . . . . 19
Section 6.13  Execution in Counterparts . . . . . . . . . . . . . . . 19
Section 6.14  Entire Agreement . . . . . . . . . . . . . . . . . . . . 19

Schedule I

Schedule II

20623913.3

Stockholders Agreement

CONFIDENTIAL NB 00079

<u>STOCKHOLDERS AGREEMENT</u>

This STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is dated as of August 2, 1999, by and among (<u>i</u>) Neuberger Berman Inc., a Delaware corporation (the "<u>Company</u>"), (<u>ii</u>) the Principals (as defined below) listed on Schedule I hereto and (<u>iii</u>) the Family Affiliates (as defined below) listed on Schedule II hereto. Capitalized terms used herein have their respective meanings set forth in Article V of this Agreement.

<u>W I T N E S S E T H</u>:

WHEREAS, the parties hereto have entered into a Plan of Merger and Exchange Agreement, dated as of the date hereof (the "<u>Exchange Agreement</u>"), pursuant to which (i) the Principals and their Family Affiliates, as sole members of Neuberger Berman, LLC, a Delaware limited liability company ("<u>NB LLC</u>"), will contribute their respective interests in NB LLC to the Company in exchange for shares of common stock, par value $.01 (the "<u>Common Stock</u>"), of the Company (the "<u>Exchange</u>") and (<u>ii</u>) Neuberger Berman Sub Inc., a wholly-owned direct subsidiary of the Company, will merge into Neuberger Berman Management Inc., a New York corporation ("<u>NBMI</u>"), with the Principals, as the sole shareholders of NBMI, will receive shares of the Common Stock (the "<u>Merger</u>").

WHEREAS, as a result of the Exchange and Merger, the Principals and their Family Affiliates (collectively, the "<u>Founder Stockholders</u>") will Own all of the issued and outstanding Common Stock;

WHEREAS, the Company and the Founder Stockholders desire to enter into certain agreements with respect to the Transfer and voting of their Common Stock and various other matters in order to continue harmonious relationships among the themselves with respect to the conduct of the business and affairs of the Company;

WHEREAS, most of the Principals have devoted a substantial portion of their professional careers with the Company Group and its predecessors, and the parties hereto desire to encourage the Principals to continue their long-term professional association with the Company for the good of all parties, and

WHEREAS, it is a condition precedent to the closing under the Exchange Agreement that the parties hereto enter into this Agreement.

Stockholders Agreement

CONFIDENTIAL NB 00080

NOW THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows

## ARTICLE I

## LIMITATIONS ON TRANSFER OF SHARES

Section 1.1    _Transfers Generally_    Each Founder Stockholder agrees that, in addition to any restrictions imposed by law, no Founder Stockholder shall Transfer any Founder Shares Owned by such Founder Stockholder, except that

(a)    Subject to Sections 1.1(b) and 1.1(c), each Principal, together with his or her Family Affiliates, may in the aggregate Transfer (x) on and after January 1, 2002 and prior to January 1, 2003, a number of Founder Shares not to exceed the sum of such Principal's Unsold IPO Allotment and 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates and (y) in each calender year commencing January 1, 2003, a number of Founder Shares not to exceed 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, _provided_ that, in the case of each of the preceding clauses (x) and (y):

(i)    Prior to the third anniversary of the Employment Termination Date of such Principal, neither such Principal nor any of his or her Family Affiliates may Transfer Founder Shares if, as a result of such Transfer, such Principal and Family Affiliates would in the aggregate Own less than that number of Founder Shares that is equal to 30% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, and

(ii)    Commencing on such Principal's Employment Termination Date and continuing until the third anniversary thereof, such Principal and his or her Family Affiliates may not Transfer any Founder Shares other than Founder Shares eligible to be Transferred but not Transferred on or prior to such Employment Termination Date, and

2

Stockholders Agreement

CONFIDENTIAL NB 00081

(iii)    Any Founder Shares in respect of which the Company has exercised its right of purchase pursuant to Article III hereof may only be Transferred in accordance with Article III.

Any number of Founder Shares eligible to be Transferred in any calendar year under this Section 1.1(a) but not so Transferred may be Transferred in any future calendar year without any restriction imposed by this Section 1.1(a).

(b)    Notwithstanding Section 1.1(a), if the Employment Termination Date of any Principal occurs prior to January 1, 2003,

(i)    Such Principal and his or her Family Affiliates may not Transfer any Founder Shares prior to January 1, 2007, and

(ii)    Subject to Section 3.1, on and after January 1, 2007, such Principal, together with his or her Family Affiliates, may in the aggregate Transfer in any calendar year up to that number of Founder Shares that is equal to 20% of the aggregate number of Founder Shares Owned by such Principal and his or her Family Affiliates on the Employment Termination Date of such Principal, provided that any number of Founder Shares that was eligible to be Transferred under this clause (ii) but not so Transferred may be Transferred in any future calendar year without regard to the 20% annual limit imposed on Transfers by this clause (ii).

provided, further, that this Section 1.1(b) shall not apply if such Principal's employment with the Company Group was terminated by the Company Group without Cause.

(c)    Notwithstanding Sections 1.1 (a) and 1.1(b), no Principal nor any of his or her Family Affiliates may Transfer Founder Shares during the pendency of any dispute between the Company and such Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates.

Section 1.2.    Transfers Following Death or Disability.  Notwithstanding any other provisions of this Agreement, upon the death or Disability of any Principal, such Principal (or his or her estate) and his or her Family Affiliates may Transfer Founder Shares free of any provisions of this Agreement.

3

Stockholders Agreement

CONFIDENTIAL NB 00082

Section 1.3   Transfers with the Consent of Board of Directors.
Notwithstanding any other provisions of this Agreement, a Founder Stockholder may Transfer any number of Founder Shares at any time with the prior written consent of the Board of Directors, which consent may be withheld or delayed, or granted on such terms and conditions as it may determine, in its sole discretion.

Section 1.4   Compliance with Law and Regulations.   Each Founder Stockholder agrees that any Transfer of Founder Shares by such Founder Stockholder shall be in compliance with any applicable constitution, rule or regulation of, or any applicable policy of, the NASD, any of the exchanges or associations or other institutions with which the Company Group has membership or other privileges (including, without limitation, the NYSE), federal and state securities laws, and any applicable law, rule or regulation of the Commission or any other governmental agency having jurisdiction.

Section 1.5   Legend on Certificates; Entry of Stop Transfer Orders.
(a) Each Founder Stockholder agrees that each outstanding certificate representing any Founder Shares that are subject to this Agreement shall bear an endorsement noted conspicuously on each such certificate reading substantially as follows:

"The securities represented by this certificate were issued without registration under the Securities Act of 1933. No transfer of such securities may be made without an opinion of counsel, satisfactory to the Company, that such transfer may properly be made without registration under the Securities Act of 1933 or that such securities have been so registered under a registration statement which is in effect at the date of such transfer.

The securities represented by this certificate are subject to the provisions of an agreement dated as of August [  ], 1999 among the Company and certain persons listed on Schedules I and II to such agreement, a copy of which is on file at the principal executive office of the Company, and such securities may be sold, assigned, pledged or otherwise transferred only in accordance with such agreement."

(b)      Each Founder Stockholder agrees to the entry of stop transfer orders against the transfer of legended certificates representing shares of Common Stock except in compliance with this Agreement.

Section 1.6   Certificates to be Held by Company.   (a) Each Founder Stockholder agrees that the certificates representing such Founder Stockholder's Founder Shares shall be issued in the name of a nominee holder to be designated by the Company

4

Stockholders Agreement

CONFIDENTIAL NB 00083

and shall be held in custody by the Company at its principal office. Subject to Section 1.6(c), the Company shall, upon the request of any such Founder Stockholder or the estate of any Founder Stockholder, as the case may be, in writing addressed to the Secretary of the Company or any officer designated by the Secretary (which request shall include a representation by such Founder Stockholder or estate thereof that such Founder Stockholder is then permitted to Transfer a specified number of Founder Shares under the provisions of this Agreement), promptly release from custody the certificates representing such specified number of Founder Stockholder's Founder Shares which are then intended and permitted to be Transferred under the provisions of this Agreement.

(b)    Subject to Section 1.6(c), so long as the Founder Stockholders have provided appropriate written direction to the Company, whenever the nominee holder shall receive any cash dividend or other cash distribution upon any Founder Shares deposited pursuant to Section 1.6(a), the Company shall cause the nominee holder to distribute promptly such cash dividend or other distribution (by sale or any other manner that it may determine, net of its charges and expenses in effecting such conversion), by checks drawn on a bank in the United States, to the Founder Stockholders in proportion to the number of Founder Shares Owned by each of them respectively; provided that the Company shall cause the nominee holder to make appropriate adjustments in the amounts so distributed in respect of any amounts required to be withheld by the nominee holder from any distribution on account of taxes. The nominee holder shall distribute only such amount as can be distributed without distributing to any Founder Stockholder a fraction of one cent, and any balance not so distributable shall be held by the nominee holder (without liability for interest thereon) and shall be added to and become part of the next sum received by the nominee holder for distribution to the Founder Stockholders.

(c)    Notwithstanding Section 1.6(b), during the pendency of any dispute between the Company and any Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates, all cash dividends and other cash distributions received by the nominee holder in respect of the Founder Shares of such Principal and his or her Family Affiliates shall be retained by the nominee holder and shall not be distributed until the final resolution of such dispute. Each Principal and his or her Family Affiliates hereby irrevocably (i) authorizes the Company, upon any amount becoming payable by such Principal or his or her Family Affiliates in connection with any such dispute, to set off and apply against such amount an equal amount of any cash dividends or other cash distributions in respect of such the Founder Shares of such Principal and his or her Family Affiliates then retained by the nominee holder and (ii) instructs the nominee holder to distribute such amounts to the Company.

20623913.3
Stockholders Agreement

CONFIDENTIAL NB 00084

Section 1.7    Transfers in Violation of Agreement Void.  Any attempted Transfer of Founder Shares not made in accordance with the provisions of this Agreement shall be void, and the Company shall not register, or cause or permit the registry of Common Stock Transferred in violation of this Agreement.

## ARTICLE II

## VOTING AGREEMENT

Section 2.1    Preliminary Vote of Founder Stockholders.  Before any vote of the stockholders of the Company at a meeting called with respect to any corporate action or before action is taken by stockholders of the Company by written consent, a vote (the "Preliminary Vote") shall be taken of Founder Stockholders Owning Founder Shares and of Additional Stockholders Owning Additional Shares, in accordance with procedures established from time to time by the Board of Directors, upon all such matters upon which such stockholder vote or other action is proposed to be taken, in which each Founder Stockholder and Additional Shareholder shall be permitted to vote the Founder Shares and Additional Shares then Owned by such stockholder in such manner as each such stockholder may determine in his, her or its sole discretion.

Section 2.2    Voting by Founder Stockholders.  (a)  At any meeting of the stockholders of the Company called to vote with respect to any corporate action or where action by stockholders of the Company is taken by written consent, each Founder Stockholder agrees to vote or act by written consent with respect to all the Founder Shares then Owned by such stockholder on all such matters in which action is proposed to be taken in accordance with the vote of the majority of the shares present (in person or by proxy) and voting in the Preliminary Vote.

(b)    For purposes of effecting any vote pursuant to this Section 2.2, each Founder Stockholder does hereby irrevocably make, constitute and appoint the Secretary of the Company, or any officer(s) designated in writing by the Secretary, with full power of substitution, as his, her or its true attorney-in-fact and agent, for and in his, her or its name, place and stead, to act as his proxy to the maximum extent and for the maximum term permitted by law to (i) vote such Founder Stockholder's Founder Shares at any meeting of stockholders of the Company or to take any corporate action where action by stockholders of the Company is taken by written consent with respect to such Founder Shares, in each case in accordance with Section 2.2(a) and (ii) vote such Founder Stockholder's Founder Shares in such proxy holder's discretion upon any other business which properly comes before such meetings or for which action is to be taken pursuant to such written consents, giving and granting to said attorney full power and authority to do

6

Stockholders Agreement

CONFIDENTIAL NB 00085

and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as he, she or it might or could do if personally present, with full power of substitution, appointment and revocation. The foregoing power of attorney and proxy are coupled with an interest and shall not be revocable or revoked by such Founder Stockholder and shall be binding upon such stockholder and his, her or its successors and assigns.

Section 2.3    Termination of Voting Provisions.  Notwithstanding any other provisions of this Agreement, (i) the right of any Principal and his or her Family Affiliate to participate in the Preliminary Vote, (ii) the obligation of any Principal and his or her Family Affiliate to vote in accordance with Section 2.2 and (iii) the irrevocable power of attorney and proxy provided by such Founder Stockholders pursuant to Section 2.2(b) shall, in each case, terminate at the close of business on the Employment Termination Date of such Principal.

## ARTICLE III

## RIGHT TO PURCHASE SHARES

Section 3.1.    Right of the Company to Purchase Shares in Case of Harmful Activity.  (a) If, on or prior to the third anniversary of the Employment Termination Date of any Principal (including during such Principal's employment with the Company Group), the Board of Directors determines in its good faith judgment that such Principal has engaged in Harmful Activity, the Company shall have the right to purchase, at any time or from time to time, from such Principal (or, to the extent a Principal does not Own sufficient shares of Common Stock to satisfy his or her obligations under this Section 3.1, to purchase from his or her Family Affiliates pro rata in accordance with the number of Founder Shares Owned by such Family Affiliates on the Notice Date), the number of Founder Shares Owned by such Principal and his or her Family Affiliates that could not have been Transferred by such Founder Stockholders in accordance with Section 1.1 prior to the Notice Date. The purchase price of each Founder Share (the "Purchase Price") purchased by the Company pursuant to this Section 3.1 shall equal $2.00 per share

(b)    The Company may exercise its right to purchase Founder Shares under this Section 3.1 in accordance with the following procedures:

(i)    The Company shall give notice to the Founder Stockholder that Owns the Founder Shares subject to such right of purchase not later than the close of business on the third anniversary of the Employment Termination Date of such Principal (the "Notice Date"), advising such Founder Stockholder of the

7

CONFIDENTIAL NB 00086

Company's election to exercise such right, stating the number of Founder Shares to be so purchased, the Purchase Price, closing arrangements and a closing date at which payment of the consideration for such Founder Shares will be made, which date shall be not less than five days nor more than 90 days after the Notice Date

(ii)    On the closing date, the Company and such Founder Stockholder shall cause the nominee holding the Founder Shares being so purchased to deliver the certificates representing such Founder Shares, properly endorsed for transfer by such Founder Stockholder or his, her or its attorney-in-fact, to the Company at its principal place of business and the Company shall deliver to such Founder Stockholder the consideration therefor (it being understood and confirmed that NB LLC has been appointed attorney-in-fact for such Founder Stockholder pursuant to the Exchange Agreement to take all such actions, to make such endorsements and to execute such documents as may be required to consummate the sale under this Section 3.1 of Founder Shares to the Company).

(c)    If a Principal and his or her Family Affiliates are unable to satisfy their obligations under this Section 3.1 to deliver Founder Shares to the Company for any reason, such Principal shall be liable to the Company, as liquidated damages and not as a penalty, for an amount equal to the product of (i) the number of Founder Shares that should have been sold to the Company under this Section 3.1 but were not sold and (ii) the excess, if any, of the Market Value of such shares as of the Notice Date over the Purchase Price

Section 3.2    Notice of Harmful Activity.    Prior to the third anniversary of such Principal's Employment Termination Date (including during such Principal's employment with the Company Group), each Principal who engages (or intends to engage) in Harmful Activity agrees (a) to notify the Company in writing in reasonable detail at least 30 days prior to engaging in such Harmful Activity, (b) to respond to such questions and furnish such additional information as the Company may request with respect to such Harmful Activity and (c) to update such written notice or inquiries promptly in the event of any circumstances that would cause any notices or responses to be inaccurate or incomplete.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the Founder Stockholders. Each Founder Stockholder severally represents and warrants to the Company and to each

8

CONFIDENTIAL NB 00087

other Founder Stockholder that (a) in the case of a Founder Shareholder who is not a natural person, such Founder Stockholder is duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has been duly executed by such Founder Shareholder or his, her or its attorney-in-fact on behalf of such Founder Stockholder and is a valid and binding agreement of such Founder Shareholder, enforceable against such Founder Shareholder in accordance with its terms, (c) the execution, delivery and performance by such Founder Shareholder of this Agreement does not violate or conflict with or result in a breach of or constitute (or with notice or lapse of time or both constitute) a default under any agreement to which such Founder Shareholder is a party, and (d) such Founder Stockholder has good and marketable title to the shares of Common Stock acquired pursuant to the Exchange free and clear of any pledge, lien, security interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this Agreement

Section 4.2.  Representations and Warranties of the Company.  The Company represents and warrants to the Founder Stockholders that (a) the Company is duly authorized to execute, deliver and perform this Agreement; (b) this Agreement has been duly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms; and (c) the execution, delivery and performance by the Company of this Agreement does not violate or conflict with or result in a breach by the Company of or constitute (or with notice or lapse of time or both constitute) a default by the Company under its Certificate of Incorporation or By-Laws, any existing applicable law, rule, regulation, judgment, order, or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company or its property including the requirements of the NYSE, or any agreement or instrument to which the Company is a party or by which the Company or its property may be bound

ARTICLE V

DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"Additional Shares" means shares of Common Stock Owned by an Additional Stockholder that, pursuant to an agreement with the Company, are to be voted in accordance with Article II of this Agreement

9

"Additional Stockholder" means any Person that Owns Common Stock who has agreed, pursuant to an agreement with the Company, to vote shares of such Common Stock in accordance with Article II of this Agreement

"Agreement" has the meaning set forth in the preamble to this Agreement

"AMEX" has the meaning set forth in Section 6 10(b)

"Board of Directors" means the Board of Directors of the Company or, to the extent expressly authorized by the Board of Directors to exercise the powers of the Board of Directors under this Agreement, (i) any committee of such Board of Directors or (ii) any board of directors or committee of any Subsidiary of the Company

"Business Day" means a day on which the principal national securities exchange on which shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Borough of Manhattan, City and State of New York are not authorized or obligated by law or executive order to close

"Cause" means, with respect to any Principal:

(a)    gross negligence or willful misconduct in the performance of his or her duties as an employee of the Company Group or willful and repeated failure to perform his or her duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure,

(b)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury,

(c)    dishonesty that has resulted in damage to the property, business or reputation of the Company and its Subsidiaries, misappropriation of, or intentional damage to, the property, business or reputation of the Company and its Subsidiaries, perpetration of fraud on the Company Group that has resulted in damage to the property or business of the Company Group, or

20623913.3

Stockholders Agreement

CONFIDENTIAL NB 00089

(d)    a finding by the Commission or a court of competent jurisdiction that he or she has committed an act that would cause such Founder Stockholder, the Company or any of its affiliates to be disqualified in any manner under section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of the Company or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission.

"Closing Price" means, on any day, the last sales price, regular way, per share of Common Stock on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, as reported in the principal consolidated transaction reporting system covering securities listed or admitted to trading on the NYSE or, if shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system covering securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Quotation Bureau, Inc., or a similar reporting service designated by the Board of Directors.

"Commission" means the Securities and Exchange Commission.

"Common Stock" has the meaning set forth in the recitals to this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement and any successors thereof, whether by operation of law or otherwise.

"Company Group" means the Company and its Subsidiaries.

"Confidential Information" means information developed by or for the Company Group that has a significant business purpose related to the business of the Company Group and that is not generally available in the investment Founder industry or the public generally, but only for so long as such information continues to have a significant business purpose for the Company Group.

"Disability" means disability as that term is defined under the Company's long-term disability plan in effect at the date of such determination, or any other

11

plan or definition designated by the Board of Directors for the purpose of this provision.

"Effective Time" shall have the meaning given therefor in the Exchange Agreement.

"Employment Termination Date" means, with respect to any Principal, the date of termination of such Principal's employment with the Company Group for any reason, (whether or not terminated by action of the Company Group), as determined by the Board of Directors in its sole and absolute discretion.

"Exchange" has the meaning set forth in the recitals to this Agreement.

"Exchange Agreement" has the meaning set forth in the recitals to this Agreement.

"Family Affiliates" means, as the context requires, (a) the Persons listed on Schedule II hereto or (b) with respect to any Principal, (i) the Persons listed on Schedule II hereto to whom such Principal transferred a limited liability company interest prior to the Exchange and (ii) any Person to whom such Principal Transfers Founder Shares with the written consent of the Board of Directors in accordance with Section 1.3 and who agrees in writing to be subject to the terms and provisions of this Agreement as a Family Affiliate.

"Founder Shares" means, with respect to any Founder Stockholder, the shares of Common Stock received by such Founder Shareholders as a result of the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Founder Shares.

"Founder Stockholders" has the meaning set forth in the recitals to this Agreement.

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

(a)    solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action

12

Stockholders Agreement

CONFIDENTIAL NB 00091

taken during such Principal's employment with the Company Group, during the one-year period immediately prior to such action) or (ii) any prospective client of the Company Group who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, within the one-year period immediately prior to such action), had been directly solicited by such Principal or where, directly or indirectly, in whole or in part, such Principal supervised or participated in the Company Group's solicitation activities related to such prospective client.

(b)     solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such Principal had business contact during the one year period prior to such Principal's Employment Termination Date;

(c)     (i) employs any current or former employee or consultant of the Company Group (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with the Company Group, unless, in the case of (i) or (ii), such person shall have ceased to be employed by or a consultant to the Company Group for a period of at least one year prior to the time of such employment, recruitment, solicitation or inducement;

(d)     markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of the Company Group, assists any Person in marketing, promoting or otherwise trading on or claiming) as such Principal's (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with the Company Group;

(e)     discloses to any person, firm or corporation any Confidential Information that is known to the Principal as a result of his or her employment or professional association with the Company Group or

13

Stockholders Agreement

CONFIDENTIAL NB 00092

uses the same in any way other than in connection with the business of the Company Group, or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Market Value" means the average of the daily Closing Prices for the ten consecutive Business Days ending on the Business Day immediately prior to the date of determination.

"Merger" has the meaning set forth in the recitals to this Agreement.

"NASD" means the National Association of Securities Dealers, Inc.

"New Principal" means a Principal listed on Schedule III.

"NB LLC" has the meaning set forth in the recitals to this Agreement.

"NBMI" has the meaning set forth in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement, dated as of the date hereof, between the Company and the Principals.

"Notice Date" has the meaning set forth in Section 3.1(b)(i).

"Number of Initial Founder Shares" means, with respect to any Principal and his or her Family Affiliates, the aggregate number of Founder Shares received by such Persons in the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Initial Founder Shares.

"NYSE" means the New York Stock Exchange, Inc.

14

"Option Period" has the meaning set forth in Section 3.1(a).

"Own" means to own of record or beneficially, whether directly, through a nominee designated by the Company pursuant to Section 1.6 or through any other Person.

"Person" means any natural person or any firm, partnership, limited liability partnership, association, corporation, limited liability company, trust, business trust, governmental authority or other entity.

"Preliminary Vote" has the meaning set forth in Section 2.1.

"Principals" means the natural persons listed on Schedule 1 hereto.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Subsidiary" means a corporation, limited liability company or other entity of which the Company, directly or indirectly, has the power, whether through the ownership of voting securities, equity interests, contract or otherwise, (i) to elect at least a majority of the members of such entity's board of directors or other governing body or (ii) in the absence of a governing body, to control the business affairs of such entity.

"Transfer" means, with respect to any Founder Shares, directly or indirectly, (i) to sell, assign, transfer, pledge (including in margin transactions), convey, distribute, mortgage, encumber, hypothecate or otherwise dispose, whether by gift, for consideration or for no consideration and (ii) to grant any right to vote, whether by proxy, voting agreement, voting trust or otherwise.

"Unsold IPO Allotment" means, with respect to any Principal, that number of Founder Shares Owned by such Principal and his or her Family Affiliates that is equal to the amount, if any, by which (a) 15% of the Number of Initial Founder Shares Owned by such Principal and his or her Family Affiliates exceeds (b) the aggregate number of Founder Shares sold by such Principal and his or her Family Affiliates in the initial public offering of Common Stock of the Company.

20623913 3

Stockholders Agreement

CONFIDENTIAL NB 00094

ARTICLE VI

MISCELLANEOUS

Section 6.1    Notices.    (a) All notices, requests, demands, waivers and
other communications to be given by any party hereunder shall be in writing and shall be
(i) mailed by first-class, registered or certified mail, postage prepaid, (ii) sent by hand
delivery or reputable overnight delivery service or (iii) transmitted by telecopy (provided
that a copy is also sent by reputable overnight delivery service) addressed, in the case of
any Principal, to him or her at the address set forth on Schedule I, in the case of any
Family Affiliate, to it at the address set forth on Schedule II or, in the case of the
Company, to Neuberger Berman Inc., 605 Third Avenue, New York, NY 10158,
Attention: Secretary, or, in each case, to such other address as may be specified in writing
to the other parties hereto.

(b)    All such notices, requests, demands, waivers and other
communications shall be deemed to have been given and received (i) if by personal
delivery or telecopy, on the day of such delivery, (ii) if by first-class, registered or certified
mail, on the fifth Business Day after the mailing thereof or (iii) if by reputable overnight
delivery service, on the day delivered.

Section 6.2.    Term of the Agreement    (a)  This Agreement shall become
effective upon the occurrence of the Effective Time and shall terminate on the earlier to
occur of (i) the first date on which there are no Founder Stockholders who remain bound
by its terms and (ii) the date on which the Company and all Founder Stockholders who are
then bound by its terms agree to terminate this Agreement.

(b)    Unless this Agreement is theretofore terminated pursuant to
Section 6.2(a) hereof, a Founder Stockholder shall be bound by its terms until all Founder
Shares Owned by such Founder Stockholder are free of the provisions of Articles I, II and
III hereof.

Section 6.3    Amendments; Waivers.  (a)  This Agreement may be amended
or modified, and any provision in this Agreement may be waived, if such amendment,
modification or waiver is approved by the Board of Directors, provided that any
amendment that would materially adversely affect any Founder Stockholder (other than an
amendment that, in the good faith judgment of the Board of Directors, is intended to cure
any ambiguity or correct or supplement any provisions of this Agreement that may be
incomplete or inconsistent with any other provision contained herein) must be approved by
the Founder Stockholders that Own a majority of the Founder Shares subject to this
Agreement as of the date of such amendment or modification, provided, further, that,

16

Stockholders Agreement

CONFIDENTIAL NB 00095

without the consent of any Person, the Board of Directors may permit any Person who executes and delivers a counterpart of this Agreement to become a party to this Agreement by amending Schedule I or II hereto, as the case may be

(b)    The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the rights at a later time to enforce the same  No waiver by any party of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or the breach of any other term of this Agreement

Section 6.4.  Adjustment Upon Changes in Capitalization  In the event of any change in the outstanding shares of the Company by reason of stock dividends, split-ups, recapitalizations, combinations, exchanges of shares and the like, the term "shares of Common Stock" shall refer to and include the securities received or resulting therefrom and the terms and provisions of this Agreement, including without limitation the terms "Founder Shares" and "Purchase Price," shall be appropriately adjusted so that each Founder Stockholder will thereafter continue to have and be subject to, to the greatest extent practicable, the same rights and obligations he, she or it had been subject to prior to such change.

Section 6.5.  Disinterested Board Members to Make Determinations  In the event that any Founder Stockholder breaches its obligations under this Agreement, then the Board of Directors shall have the exclusive right to make (on behalf of the Company) any and all determinations that may be necessary or appropriate under this Agreement, including without limitation, determinations relating to the exercise and enforcement of remedies hereunder.  If a Founder Stockholder who is also a member of the Board of Directors breaches his or her obligations under this Agreement, such Founder Stockholder must refrain from exercising his or her vote at meetings of the Board and general meetings of the Company to give effect to this Section 6.5.

Section 6.6  Severability.  If the final determination of a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision

Section 6.7.  Representatives, Successors and Assigns.  Each Principal shall cause his or her Family Affiliate to comply with the terms and provisions of this

17

Agreement  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective legatees, legal representatives, successors and assigns, provided that Founder Stockholders may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement except with the written consent of the Board of Directors

Section 6 8    Governing Law  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OR RULES THEREOF)

Section 6 9    Specific Performance.  Each of the parties hereto acknowledges that it will be impossible to measure in money the damage to the Company or the Founder Stockholders if any party hereto fails to comply with the provisions of Article I, II or III and each party hereto agrees that in the event of any such failure, neither the Company nor any Founder Stockholder will have an adequate remedy at law. Therefore, the Company and each Founder Stockholder, in addition to all of the other remedies which may be available, shall have the right to equitable relief, including, without limitation, the right to enforce specifically the provisions of Article I, II and III by obtaining injunctive relief against any violation thereof, or otherwise  All claims for specific performance of one or more provisions of this Agreement shall be resolved exclusively by litigation before a court of competent jurisdiction located in the State of New York.

Section 6 10    Arbitration.  Except for claims for specific performance brought in accordance with Section 6.9, all disputes, differences, and controversies arising out of or in any way related to this Agreement shall be submitted:

(a)    to the NYSE to be heard and decided under the terms of this Agreement and the then applicable rules of the NYSE or, if those rules as interpreted by the NYSE do not permit the disputes, differences and controversies to be submitted to the NYSE for arbitration; then

(b)    to the American Stock Exchange (the "AMEX") in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the AMEX or, if those rules as interpreted by the AMEX do not permit the disputes, differences and controversies to be submitted to the AMEX for arbitration, then

(c)    to the NASD in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the NASD or, if

18

Stockholders Agreement

CONFIDENTIAL NB 00097

the disputes, differences and controversies are not eligible for submission to the NASD for arbitration under those rules as interpreted by the NASD, then

(d)    to the American Arbitration Association in New York, New York,

to be heard and decided under the terms of this Agreement and in accordance with the then applicable rules of the hearing body by a panel of three arbitrators (unless the rules of the hearing body shall require a different number of arbitrators) chosen in accordance with the then applicable rules of the hearing body. The decision of the arbitrators shall be final and binding upon the parties, and an order may be entered upon the award of the arbitrators in any court of competent jurisdiction.

Section 6.11    Submission to Jurisdiction; Waiver of Immunity. Each Founder Stockholder, for itself and its successors and assigns, hereby irrevocably waives (a) any objection, and agrees not to assert, as a defense in any arbitration or legal or equitable action, suit or proceeding against such Founder Stockholder arising out of or relating to this Agreement or any transaction contemplated hereby or the subject matter of any of the foregoing, that (i) it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable before such arbitral body or in said courts, (ii) the venue thereof may not be appropriate and (iii) the internal laws of the State of New York do not govern the validity, interpretation or effect of this Agreement, (b) any immunity from jurisdiction to which it might otherwise be entitled in any such arbitration, action, suit or proceeding which may be instituted before any state or federal court in the State of New York in accordance with Section 6.9 or before any arbitral body in accordance with Section 6.10 and (c) any immunity from the maintaining of an action against it to enforce any judgment for money obtained in any such arbitration, action, suit or proceeding and, to the extent permitted by applicable law, any immunity from execution.

Section 6.12.    Further Assurances. Each Founder Stockholder agrees to execute such additional documents and take such further action as may be requested by the Company to effect the provisions of this Agreement

Section 6.13    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument

Section 6.14.    Entire Agreement. This Agreement, including the Schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

19

20623913.3

Stockholders Agreement

CONFIDENTIAL NB 00098

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

NEUBERGER BERMAN INC

By: _____

Name: Jeffrey B. Lane
Title: President, Chief Executive Officer

20623913 3

Stockholders Agreement

CONFIDENTIAL NB 00099

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August  2 , 1999

_____

Stephanie J. Stiefel

CONFIDENTIAL NB 00100

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August __, 1999

STIEFEL ASSOCIATES, L.P.

By: Stiefel Associates, Inc., its General Partner

    By _____
        Stephanie J. Stiefel, its President

CONFIDENTIAL NB 00101

Exhibit D

EXECUTION COPY

---

## AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

**Dated as of October 31, 2003**

---



CONFIDENTIAL

LEH-RSU-CL 0000697

# TABLE OF CONTENTS

Page

ARTICLE I LIMITATIONS ON TRANSFER OF SHARES .......................................... 2

Section 1.1.    Transfers Generally ................................................................ 2
Section 1.2.    Transfers Following Death Or Disability ................................. 2
Section 1.3.    Transfers with the Consent of Board of Directors .................. 2
Section 1.4.    Compliance with Law and Regulations .................................. 3
Section 1.5.    Legend on Certificates; Entry of Stop Transfer Orders ......... 3
Section 1.6.    Certificates to Be Held by Company ....................................... 3
Section 1.7.    Transfers in Violation of Agreement Void .............................. 4

ARTICLE II [Intentionally omitted] ......................................................................... 4

ARTICLE III No Harmful Activity ............................................................................ 4

Section 3.1.    Covenant not to Engage in Harmful Activity; Liquidated Damages .......... 4
Section 3.2.    Notice of Harmful Activity. ...................................................... 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES .......................................... 6

Section 4.1.    Representations and Warranties of the Founder Stockholders ............... 6
Section 4.2.    Representations and Warranties of the Company ......................... 7

ARTICLE V DEFINITIONS ...................................................................................... 7

ARTICLE VI MISCELLANEOUS ............................................................................... 12

Section 6.1.    Notices ..................................................................................... 12
Section 6.2.    Term of the Agreement. ........................................................... 12
Section 6.3.    Amendments; Waivers ............................................................. 12
Section 6.4.    Adjustment Upon Changes in Capitalization and Extraordinary
               Transactions ........................................................................... 13
Section 6.5.    Disinterested Board Members to Make Determinations ............. 13
Section 6.6.    Severability .............................................................................. 13
Section 6.7.    Representatives, Successors and Assigns ................................. 13
Section 6.8.    GOVERNING LAW ................................................................... 14
Section 6.9.    Specific Performance ............................................................... 14
Section 6.10.   Arbitration ................................................................................ 14
Section 6.11.   Submission to Jurisdiction; Waiver of Immunity ...................... 15
Section 6.12.   Further Assurances .................................................................. 15
Section 6.13.   Execution in Counterparts ...................................................... 15
Section 6.14.   Entire Agreement .................................................................... 15

-i-

                                                      LEH-RSU-CL 0000698

Section 6.15.    Effectiveness ............................................................................. 15

Schedule I

Schedule II

CONFIDENTIAL

LEH-RSU-CL 0000699

## AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

This AMENDED AND RESTATED STOCKHOLDERS AGREEMENT (this "Agreement") is dated as of October 31, 2003, by and among (i) Lehman Brothers Holdings Inc. (the "Company"), (ii) Neuberger Berman Inc., a Delaware corporation ( "Neuberger"), (iii) the Principals (as defined below) listed on Schedule I hereto and (iv) the Family Affiliates (as defined below) listed on Schedule II hereto (the Principals and their Family Affiliates, collectively, the "Founder Stockholders"). Initially capitalized terms used herein have their respective meanings set forth in Article V of this Agreement.

### WITNESSETH:

WHEREAS, Neuberger and each Founder Stockholder is a party to that certain Stockholders Agreement, dated as of August 2, 1999 (the "Original Stockholders Agreement");

WHEREAS, the Company, Ruby Acquisition Company, a Delaware corporation and a wholly-owned subsidiary of the Company ("Merger Sub"), and Neuberger entered into an Agreement and Plan of Merger, dated as of July 21, 2003, as amended by the First Amendment to Agreement and Plan of Merger, dated as of September 22, 2003 (as amended, the "Merger Agreement"), pursuant to which Neuberger will be merged with and into Merger Sub (the "Merger") with Merger Sub continuing as the surviving corporation (the "Surviving Corporation") and a wholly-owned subsidiary of the Company;

WHEREAS, pursuant to the Merger Agreement, among other things, each share of common stock, par value $0.01 per share, of Neuberger ("Neuberger Stock") owned by each Founder Stockholder will be converted into an amount in cash and a number of shares of common stock, par value $0.10 per share, of the Company ("Common Stock");

WHEREAS, as a condition precedent under the Merger Agreement to the Company's obligation to consummate the Merger, the Company, Neuberger (with the approval of its Board of Directors) and the Founder Stockholders that Own a majority of the "Founder Shares" (as defined in the Original Stockholders Agreement) subject to the Original Stockholders Agreement as of immediately prior to the consummation of the Merger have entered into those several Amendments and Agreements in the form attached to the Merger Agreement (collectively, the "Amendment") pursuant to which, among other things, the Original Stockholders Agreement has been amended in the manner set forth in the Amendment; and

WHEREAS, pursuant to the Amendment, the Original Stockholders Agreement is being restated in its entirety as set forth herein to reflect the amendments thereto effected by the Amendment.

NOW THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

CONFIDENTIAL

# ARTICLE I

## LIMITATIONS ON TRANSFER OF SHARES

Section 1.1.  <u>Transfers Generally</u>.  Each Founder Stockholder agrees that, in addition to any restrictions imposed by law, no Founder Stockholder shall Transfer any Founder Shares Owned by such Founder Stockholder, except that:

(a)     Subject to Section 1.1(c), each Principal, together with his or her Family Affiliates, may in the aggregate Transfer, (x) at any time, any Initial Unrestricted Founder Shares held by such Persons, and (y) in each calendar year commencing January 1, 2004, an additional number of Founder Shares not to exceed 10% of the aggregate Number of Initial Restricted Founder Shares Owned by such Principal and Family Affiliates, <u>provided</u> that, in the case of each of the preceding clauses (x) and (y):

(i)     [intentionally omitted]; and

(ii)     [intentionally omitted]; and

(iii)     Any Founder Shares in respect of which the Company has exercised its right of purchase pursuant to Article III hereof may only be Transferred in accordance with Article III.

From and after a Principal's Employment Termination Date, such Principal and his or her Family Affiliates shall remain subject to the Transfer restrictions set forth in this Section 1.1(a).  Any number of Founder Shares eligible to be Transferred in any calendar year under this Section 1.1(a) but not so Transferred may be Transferred in any future calendar year without any restriction imposed by this Section 1.1(a).

(b)     [intentionally omitted]

(c) Notwithstanding Section 1.1(a), no Principal nor any of his or her Family Affiliates may Transfer Founder Shares during the pendency of any dispute between the Company and such Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Amendment or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates.

Section 1.2.  <u>Transfers Following Death Or Disability</u>.  Notwithstanding any other provisions of this Agreement, upon the death or Disability of any Principal, such Principal (or his or her estate) and his or her Family Affiliates may Transfer Founder Shares free of any provisions of this Agreement.

Section 1.3.  <u>Transfers with the Consent of Board of Directors</u>.  Notwithstanding any other provisions of this Agreement, a Founder Stockholder may Transfer any number of Founder Shares at any time with the prior written consent of the Board of Directors, which consent may be withheld or delayed, or granted on such terms and conditions as it may determine, in its sole discretion.

-2-

CONFIDENTIAL                                                                    LEH-RSU-CL 0000701

Section 1.4.    <u>Compliance with Law and Regulations</u>.  Each Founder Stockholder agrees that any Transfer of Founder Shares by such Founder Stockholder shall be in compliance with any applicable constitution, rule or regulation of, or any applicable policy of, the NASD, any of the exchanges or associations or other institutions with which the Company Group has membership or other privileges (including, without limitation, the NYSE), federal and state securities laws, and any applicable law, rule or regulation of the Commission or any other governmental agency having jurisdiction.

Section 1.5.    <u>Legend on Certificates; Entry of Stop Transfer Orders</u>.  (a)  Each Founder Stockholder agrees that each outstanding certificate representing any Founder Shares that are subject to this Agreement shall bear an endorsement noted conspicuously on each such certificate reading substantially as follows:

"The securities represented by this certificate were issued without registration under the Securities Act of 1933. No transfer of such securities may be made without an opinion of counsel, satisfactory to the Company, that such transfer may properly be made without registration under the Securities Act of 1933 or that such securities have been so registered under a registration statement which is in effect at the date of such transfer.

The securities represented by this certificate are subject to the provisions of an agreement dated as of October 31, 2003 among the Company and certain persons listed on Schedules I and II to such agreement, a copy of which is on file at the principal executive office of the Company, and such securities may be sold, assigned, pledged or otherwise transferred only in accordance with such agreement."

(b)    Each Founder Stockholder agrees to the entry of stop transfer orders against the transfer of legended certificates representing shares of Common Stock except in compliance with this Agreement.

Section 1.6.    <u>Certificates to Be Held by Company</u>.  (a)  Each Founder Stockholder agrees that the certificates representing such Founder Stockholder's Founder Shares shall be issued in the name of a nominee holder to be designated by the Company and shall be held in custody by the Company. Subject to Section 1.6(c), the Company shall, upon the request of any such Founder Stockholder or the estate of any Founder Stockholder, as the case may be, in writing addressed to the Secretary of the Company or any officer designated by the Secretary (which request shall include a representation by such Founder Stockholder or estate thereof that such Founder Stockholder is then permitted to Transfer a specified number of Founder Shares under the provisions of this Agreement), promptly release from custody the certificates representing such specified number of Founder Stockholder's Founder Shares which are then permitted to be Transferred under the provisions of this Agreement.

(b)    Subject to Section 1.6(c), so long as the Founder Stockholders have provided appropriate written direction to the Company, whenever the nominee holder shall receive any

-3-

CONFIDENTIAL

LEH-RSU-CL 0000702

cash dividend or other cash distribution upon any Founder Shares deposited pursuant to Section 1.6(a), the Company shall cause the nominee holder to distribute promptly such cash dividend or other distribution (by sale or any other manner that it may determine, net of its charges and expenses in effecting such conversion), by checks drawn on a bank in the United States, to the Founder Stockholders in proportion to the number of Founder Shares Owned by each of them respectively; provided that the Company shall cause the nominee holder to make appropriate adjustments in the amounts so distributed in respect of any amounts required to be withheld by the nominee holder from any distribution on account of taxes. The nominee holder shall distribute only such amount as can be distributed without distributing to any Founder Stockholder a fraction of one cent, and any balance not so distributable shall be held by the nominee holder (without liability for interest thereon) and shall be added to and become part of the next sum received by the nominee holder for distribution to the Founder Stockholders.

(c)    Notwithstanding Section 1.6(b), during the pendency of any dispute between the Company and any Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Amendment or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates, all cash dividends and other cash distributions received by the nominee holder in respect of the Founder Shares of such Principal and his or her Family Affiliates shall be retained by the nominee holder and shall not be distributed until the final resolution of such dispute. Each Principal and his or her Family Affiliates hereby irrevocably (i) authorizes the Company, upon any amount becoming payable by such Principal or his or her Family Affiliates in connection with any such dispute, to set off and apply against such amount an equal amount of any cash dividends or other cash distributions in respect of such the Founder Shares of such Principal and his or her Family Affiliates then retained by the nominee holder and (ii) instructs the nominee holder to distribute such amounts to the Company.

Section 1.7.    Transfers in Violation of Agreement Void. Any attempted Transfer of Founder Shares not made in accordance with the provisions of this Agreement shall be void, and the Company shall not register, or cause or permit the registry, of Common Stock Transferred in violation of this Agreement.

## ARTICLE II

### [Intentionally omitted]

## ARTICLE III

### No Harmful Activity

Section 3.1.    Covenant not to Engage in Harmful Activity; Liquidated Damages. (a) Each Principal covenants and agrees with the Company that it will not, prior to the third anniversary of the Employment Termination Date of such Principal, engage in any Harmful Activity (other than to the extent expressly permitted under any waivers granted by Neuberger prior to the date of the Merger Agreement and disclosed in Neuberger's disclosure schedules to the Merger Agreement).

-4-

CONFIDENTIAL                                    LEH-RSU-CL 0000703

(b)    It is expressly understood and agreed that although each Principal and the Company consider the restrictions contained in this Section 3.1 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against such Principal, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein. Each Principal understands that the provisions of this Section 3.1 may limit such Principal's ability to earn a livelihood in a business similar to the business of the Company Group.

(c)    In addition to any other remedies that the Company may have at law or in equity for any breach by any Principal of this Section 3.1, if, on or prior to the third anniversary of the Employment Termination Date of any Principal (including during such Principal's employment with the Company Group), the Board of Directors determines in its good faith judgment that such Principal has engaged in Harmful Activity prohibited by this Section 3.1, the Company shall have the right to purchase, at any time or from time to time, from such Principal (or, to the extent a Principal does not Own sufficient Founder Shares Subject to Repurchase (as defined below) to satisfy his or her obligations under this Section 3.1 (including, without limitation, because such Founder Shares Subject to Repurchase have been Transferred in violation of the transfer restrictions contained in Section 1.1), to purchase from his or her Family Affiliates pro rata in accordance with the number of Founder Shares Subject to Repurchase Owned by such Family Affiliates on the Notice Date) that number of Founder Shares equal to the number of Founder Shares Owned by such Principal and his or her Family Affiliates that could not have been Transferred by such Founder Stockholders in accordance with Section 1.1 prior to the Notice Date (such shares, "Founder Shares Subject to Repurchase"); provided, however, that the Company's right to recover monetary damages from a Principal and his or her Family Affiliates in respect of a breach by such Principal of this Section 3.1 shall be limited to the Company's right to repurchase Founder Shares Subject to Repurchase pursuant to this Section 3.1(c) (and to obtain the liquidated damages provided for in Section 3.1(e) below, to the extent such Principal and his or her Family Affiliates are unable for any reason to deliver Founder Shares Subject to Repurchase to the Company in accordance with this Section 3.1(c)), provided that nothing contained in this proviso or in Section 3.1(e) shall in any way be deemed to limit the Company's right to obtain equitable relief for such breach (including without limitation in the manner described in Section 6.9 below). The purchase price of each Founder Share Subject to Repurchase (the "Purchase Price") purchased by the Company pursuant to this Section 3.1 shall equal the quotient of $1.33 divided by the Applicable Exchange Ratio.

(d)    The Company may exercise its right to purchase Founder Shares under this Section 3.1 in accordance with the following procedures:

(i)    The Company shall give notice to the Founder Stockholder that Owns the Founder Shares subject to such right of purchase not later than the close of business on the third anniversary of the Employment Termination Date of such Principal (the "Notice Date"), advising such Founder Stockholder of the Company's election to exercise such

-5-

CONFIDENTIAL                                      LEH-RSU-CL 0000704

right, stating the number of Founder Shares to be so purchased, the Purchase Price, closing arrangements and a closing date at which payment of the consideration for such Founder Shares will be made, which date shall be not less than five days nor more than 90 days after the Notice Date.

(ii)    On the closing date, the Company and such Founder Stockholder shall cause the nominee holding the Founder Shares being so purchased to deliver the certificates representing such Founder Shares, properly endorsed for transfer by such Founder Stockholder or his, her or its attorney-in-fact, to the Company at its principal place of business and the Company shall deliver to such Founder Stockholder the consideration therefor (it being understood and confirmed that NB LLC has been appointed attorney-in-fact for such Founder Stockholder pursuant to the Exchange Agreement to take all such actions, to make such endorsements and to execute such documents as may be required to consummate the sale under this Section 3.1 of Founder Shares to the Company).

(e)    If a Principal and his or her Family Affiliates are unable to satisfy their obligations under this Section 3.1 to deliver to the Company such Founder Shares Subject to Repurchase for any reason (including, without limitation, because such Founder Shares Subject to Repurchase have been Transferred in violation of the transfer restrictions contained in Section 1.1), such Principal shall be liable to the Company, as liquidated damages and not as a penalty, for an amount equal to the product of (i) the number of Founder Shares Subject to Repurchase that should have been sold to the Company under this Section 3.1 but were not so sold and (ii) the excess, if any, of the Market Value of such shares as of the Notice Date over the Purchase Price.

Section 3.2.    Notice of Harmful Activity.    Prior to the third anniversary of such Principal's Employment Termination Date (including during such Principal's employment with the Company Group), each Principal who engages (or intends to engage) in Harmful Activity agrees (a) to notify the Company in writing in reasonable detail at least 30 days prior to engaging in such Harmful Activity, (b) to respond to such questions and furnish such additional information as the Company may request with respect to such Harmful Activity and (c) to update such written notice or inquiries promptly in the event of any circumstances that would cause any notices or responses to be inaccurate or incomplete.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1.    Representations and Warranties of the Founder Stockholders.    Each Founder Stockholder severally represents and warrants as of the date of this Agreement to the Company and to each other Founder Stockholder that (a) in the case of a Founder Stockholder who is not a natural person, such Founder Stockholder is duly authorized to execute, deliver and perform this Agreement; (b) this Agreement has been duly executed by such Founder Stockholder or his, her or its attorney-in-fact on behalf of such Founder Stockholder and is a valid and binding agreement of such Founder Stockholder, enforceable against such Founder Stockholder in accordance with its terms; (c) the execution, delivery and performance by such

-6-

CONFIDENTIAL    LEH-RSU-CL 0000705

Founder Stockholder of this Agreement does not violate or conflict with or result in a breach of or constitute (or with notice or lapse of time or both constitute) a default under any agreement to which such Founder Stockholder is a party; and (d) such Founder Stockholder has good and marketable title to its Founder Shares, free and clear of any pledge, lien, security interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this Agreement.

Section 4.2.    Representations and Warranties of the Company.    The Company represents and warrants as of the date of this Agreement to the Founder Stockholders that (a) the Company is duly authorized to execute, deliver and perform this Agreement; (b) this Agreement has been duly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms; and (c) the execution, delivery and performance by the Company of this Agreement does not violate or conflict with or result in a breach by the Company of or constitute (or with notice or lapse of time or both constitute) a default by the Company under its Certificate of Incorporation or By-Laws, any existing applicable law, rule, regulation, judgment, order, or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company or its property including the requirements of the NYSE, or any agreement or instrument to which the Company is a party or by which the Company or its property may be bound.

## ARTICLE V

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Amendment" has the meaning set forth in the recitals to this Agreement.

"Applicable Exchange Ratio" means 0.6104.

"AMEX" has the meaning set forth in Section 6.10(b).

"Board of Directors" means the Board of Directors of the Company or, to the extent expressly authorized by the Board of Directors to exercise the powers of the Board of Directors under this Agreement, (i) any committee of such Board of Directors or (ii) any board of directors or committee of any Subsidiary of the Company.

"Business Day" means a day on which the principal national securities exchange on which shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Borough of Manhattan, City and State of New York are not authorized or obligated by law or executive order to close.

-7-

CONFIDENTIAL    LEH-RSU-CL 0000706

"Cause" means, with respect to any Principal:

(a)    gross negligence or willful misconduct in the performance of his or her duties as an employee of the Company Group or willful and repeated failure to perform his or her duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(b)    conviction of, or entering a plea of NOLO CONTENDERE to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(c)    dishonesty that has resulted in damage to the property, business or reputation of the Company and its Subsidiaries, misappropriation of, or intentional damage to, the property, business or reputation of the Company and its Subsidiaries, perpetration of fraud on the Company Group that has resulted in damage to the property or business of the Company Group; or

(d)    a finding by the Commission or a court of competent jurisdiction that he or she has committed an act that would cause such Founder Stockholder, the Company or any of its affiliates to be disqualified in any manner under section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of the Company or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission.

"Closing Price" means, on any day, the last sales price, regular way, per share of Common Stock on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, as reported in the principal consolidated transaction reporting system covering securities listed or admitted to trading on the NYSE or, if shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system covering securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Quotation Bureau, Inc., or a similar reporting service designated by the Board of Directors.

"Commission" means the Securities and Exchange Commission.

"Common Stock" has the meaning set forth in the recitals to this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement and any successors thereof, whether by operation of law or otherwise.

"Company Group" means the Company and its Subsidiaries, including without limitation the Surviving Corporation and its Subsidiaries.

"Confidential Information" means information developed by or for the Company Group that has a significant business purpose related to the business of the Company Group and that is

-8-

CONFIDENTIAL                                                        LEH-RSU-CL 0000707

not generally available in the investment Founder industry or the public generally, but only for so long as such information continues to have a significant business purpose for the Company Group.

"Disability" means disability as that term is defined under the Company's long-term disability plan in effect at the date of such determination, or any other plan or definition designated by the Board of Directors for the purpose of this provision.

"Employment Termination Date" means, with respect to any Principal, the date of termination of such Principal's employment with the Company Group for any reason, (whether or not terminated by action of the Company Group), as determined by the Board of Directors in its sole and absolute discretion.

"Exchange" means the contribution of interests in NB LLC to Neuberger in exchange for shares of Neuberger Stock, as consummated pursuant to the Exchange Agreement.

"Exchange Agreement" means the Plan of Merger and Exchange Agreement, dated as of August 2, 1999, pursuant to which, among other things, the Exchange was consummated.

"Family Affiliates" means, as the context requires, (a) the Persons listed on Schedule II hereto or (b) with respect to any Principal, (i) the Persons listed on Schedule II hereto to whom such Principal transferred a limited liability company interest prior to the Exchange and (ii) any Person to whom such Principal Transfers Founder Shares with the written consent of the Board of Directors in accordance with Section 1.3 and who agrees in writing to be subject to the terms and provisions of this Agreement as a Family Affiliate.

"Founder Shares" means (i) with respect to any Founder Stockholder that was a party to the Original Stockholders Agreement, the shares of Common Stock received by such Founder Stockholder in the Merger in respect of such Founder Stockholder's Founder Shares (as such term was defined in the Original Stockholders Agreement without giving effect to the Amendment) Owned as of immediately prior to the Merger Effective Time, and (ii) with respect to any Founder Stockholder that becomes a party to this Agreement after the consummation of the Merger by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Founder Shares.

"Founder Shares Subject to Repurchase" has the meaning set forth in Section 3.1(c).

"Founder Stockholders" has the meaning set forth in the recitals to this Agreement.

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

(a)    solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, during the one-year period immediately prior to such action) or (ii) any prospective client of the Company Group who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group,

-9-

CONFIDENTIAL                                        LEH-RSU-CL 0000708

within the one-year period immediately prior to such action), had been directly solicited by such Principal or where, directly or indirectly, in whole or in part, such Principal supervised or participated in the Company Group's solicitation activities related to such prospective client;

(b)    solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such Principal had business contact during the one year period prior to such Principal's Employment Termination Date;

(c)    (i) employs any current or former employee or consultant of the Company Group (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with the Company Group, unless, in the case of (i) or (ii), such person shall have ceased to be employed by or a consultant to the Company Group for a period of at least one year prior to the time of such employment, recruitment, solicitation or inducement;

(d)    markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of the Company Group, assists any Person in marketing, promoting or otherwise trading on or claiming) as such Principal's (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with the Company Group;

(e)    discloses to any person, firm or corporation any Confidential Information that is known to the Principal as a result of his or her employment or professional association with the Company Group or uses the same in any way other than in connection with the business of the Company Group; or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group.

"Initial Unrestricted Founder Shares" means, respect to a Principal and his or her Family Affiliates, all shares of Common Stock received by such Persons in the Merger in respect of shares of Neuberger Stock, Owned by such Principal and his or her Family Affiliates other than Restricted NB Founder Shares.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Market Value" means the average of the daily Closing Prices for the ten consecutive Business Days ending on the Business Day immediately prior to the date of determination.

"Merger" has the meaning set forth in the recitals to this Agreement.

-10-

"Merger Agreement" has the meaning set forth in the recitals to this Agreement.

"Merger Effective Time" means the effective time of the Merger.

"Merger Sub" has the meaning set forth in the recitals to this Agreement.

"NASD" means the National Association of Securities Dealers, Inc.

"NB LLC" means Neuberger Berman, LLC, a Delaware limited liability company and wholly owned subsidiary of Neuberger.

"Neuberger" has the meaning set forth in the preamble to this Agreement.

"Neuberger Stock" has the meaning set forth in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement, dated as of August 2, 1999, between Neuberger and the Principals.

"Notice Date" has the meaning set forth in Section 3.1(d)(i).

"Number of Initial Restricted Founder Shares" means, with respect to a Principal and his or her Family Affiliates, that number of shares of Common Stock equal to the product of (a) the number of Restricted NB Founders Shares Owned by such Persons immediately prior to the Merger Effective Time, multiplied by (b) the Applicable Exchange Ratio.

"NYSE" means the New York Stock Exchange, Inc.

"Original Stockholders Agreement" has the meaning set forth in the recitals to this Agreement.

"Own" means to own of record or beneficially, whether directly, through a nominee designated by the Company pursuant to Section 1.6 or through any other Person.

"Person" means any natural person or any firm, partnership, limited liability partnership, association, corporation, limited liability company, trust, business trust, governmental authority or other entity.

"Principals" means the natural persons listed on Schedule I hereto.

"Purchase Price" has the meaning set forth in Section 3.1(c).

"Restricted NB Founder Shares" means, with respect to a Principal and his or her Family Affiliates, those shares of Neuberger Stock Owned by such Principal and his or her Family Affiliates that were subject to the transfer restrictions set forth in Section 1.1 of the Original Stockholders Agreement as of immediately prior to the Merger Effective Time (for the avoidance of doubt, after giving effect to any waivers of such transfer restrictions that were granted by Neuberger prior to the date of the Merger Agreement and were disclosed in Neuberger's disclosure schedules to the Merger Agreement).

-11-

CONFIDENTIAL

LEH-RSU-CL 0000710

"Subsidiary" means a corporation, limited liability company or other entity of which the Company, directly or indirectly, has the power, whether through the ownership of voting securities, equity interests, contract or otherwise, (i) to elect at least a majority of the members of such entity's board of directors or other governing body or (ii) in the absence of a governing body, to control the business affairs of such entity.

"Surviving Corporation" has the meaning set forth in the recitals to this Agreement.

"Transfer" means, with respect to any Founder Shares, directly or indirectly, (i) to sell, assign, transfer, pledge (including in margin transactions), convey, distribute, mortgage, encumber, hypothecate or otherwise dispose, whether by gift, for consideration or for no consideration and (ii) to grant any right to vote, whether by proxy, voting agreement, voting trust or otherwise.

## ARTICLE VI

## MISCELLANEOUS

Section 6.1.    Notices.  (a) All notices, requests, demands, waivers and other communications to be given by any party hereunder shall be in writing and shall be (i) mailed by first-class, registered or certified mail, postage prepaid, (ii) sent by hand delivery or reputable overnight delivery service or (iii) transmitted by telecopy (provided that a copy is also sent by reputable overnight delivery service) addressed, in the case of any Principal, to him or her at the address set forth on Schedule I, in the case of any Family Affiliate, to it at the address set forth on Schedule II or, in the case of the Company, to Lehman Brothers Holdings Inc., 399 Park Avenue—11th Floor, New York, NY 10022, Attention: Secretary, or, in each case, to such other address as may be specified in writing to the other parties hereto.

(b)    All such notices, requests, demands, waivers and other communications shall be deemed to have been given and received (i) if by personal delivery or telecopy, on the day of such delivery, (ii) if by first-class, registered or certified mail, on the fifth Business Day after the mailing thereof or (iii) if by reputable overnight delivery service, on the day delivered.

Section 6.2.    Term of the Agreement.  (a) This Agreement shall terminate on the earlier to occur of (i) the first date on which there are no Founder Stockholders who remain bound by its terms and (ii) the date on which the Company and all Founder Stockholders who are then bound by its terms agree to terminate this Agreement.

(b)    Unless this Agreement is theretofore terminated pursuant to Section 6.2(a) hereof, a Founder Stockholder shall be bound by its terms until all Founder Shares Owned by such Founder Stockholder are free of the provisions of Articles I and III hereof.

Section 6.3.    Amendments; Waivers.  (a) This Agreement may be amended or modified, and any provision in this Agreement may be waived, if such amendment, modification or waiver is approved by the Board of Directors, provided that any amendment that would materially adversely affect any Founder Stockholder (other than an amendment that, in the good faith judgment of the Board of Directors, is intended to cure any ambiguity or correct or supplement any provisions of this Agreement that may be incomplete or inconsistent with any

-12-

LEH-RSU-CL 0000711

other provision contained herein) must be approved by the Founder Stockholders that Own a
majority of the Founder Shares subject to this Agreement as of the date of such amendment or
modification, provided, further, that, without the consent of any Person, the Board of Directors
may permit any Person who executes and delivers a counterpart of this Agreement to become a
party to this Agreement by amending Schedule I or II hereto, as the case may be.

(b)    The failure of any party at any time or times to require performance of any
provision of this Agreement shall in no manner affect the rights at a later time to enforce the
same. No waiver by any party of the breach of any term contained in this Agreement, whether by
conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a
further or continuing waiver of any such breach or the breach of any other term of this
Agreement.

Section 6.4.    Adjustment Upon Changes in Capitalization and Extraordinary
Transactions.  In the event of (x) any change in the outstanding shares of the Company by reason
of stock dividends, split-ups, recapitalizations, combinations, exchanges of shares and the like, or
(y) any conversion or exchange of Common Stock pursuant to an acquisition of or other business
combination involving, the Company (whether by merger, recapitalization, combination or
otherwise), in each case the term "shares of Common Stock" shall refer to and include the
securities received or resulting therefrom and the terms and provisions of this Agreement,
including without limitation the terms "Founder Shares" and "Purchase Price," shall be
appropriately adjusted so that each Founder Stockholder will thereafter continue to have and be
subject to, to the greatest extent practicable, the same rights and obligations he, she or it had been
subject to prior to such change, and in respect of that new security.

Section 6.5.    Disinterested Board Members to Make Determinations.  In the event that
any Founder Stockholder breaches its obligations under this Agreement, then the Board of
Directors shall have the exclusive right to make (on behalf of the Company) any and all
determinations that may be necessary or appropriate under this Agreement, including without
limitation, determinations relating to the exercise and enforcement of remedies hereunder. If a
Founder Stockholder who is also a member of the Board of Directors breaches his or her
obligations under this Agreement, such Founder Stockholder must refrain from exercising his or
her vote at meetings of the Board and general meetings of the Company to give effect to this
Section 6.5.

Section 6.6.    Severability.  If the final determination of a court of competent jurisdiction
declares, after the expiration of the time within which judicial review (if permitted) of such
determination may be perfected, that any term or provision hereof is invalid or unenforceable, (a)
the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or
unenforceable term or provision shall be deemed replaced by a term or provision that is valid and
enforceable and that comes closest to expressing the intention of the invalid or unenforceable
term or provision.

Section 6.7.    Representatives, Successors and Assigns.  Each Principal shall cause his
or her Family Affiliate to comply with the terms and provisions of this Agreement. This
Agreement shall be binding upon and inure to the benefit of the respective parties hereto and
their respective legatees, legal representatives, successors and assigns; provided that Founder

-13-

CONFIDENTIAL

LEH-RSU-CL 0000712

Stockholders may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement except with the written consent of the Board of Directors.

Section 6.8.    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OR RULES THEREOF).

Section 6.9.    Specific Performance. Each of the parties hereto acknowledges that it will be impossible to measure in money the damage to the Company or the Founder Stockholders if any party hereto fails, or threatens to fail, to comply with the provisions of Article I or III and each party hereto agrees that in the event of any such failure or threatened failure, neither the Company nor any Founder Stockholder will have an adequate remedy at law. Therefore, in the event of such failure or threatened failure, the Company (without posting any bond) and each Founder Stockholder, in addition to all of the other remedies which may be available, shall be entitled to obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may be then available. All claims for specific performance of one or more provisions of this Agreement shall be resolved exclusively by litigation before a court of competent jurisdiction located in the State of New York.

Section 6.10.    Arbitration. Except for claims for specific performance brought in accordance with Section 6.9, all disputes, differences, and controversies arising out of or in any way related to this Agreement shall be submitted:

(a)    to the NYSE to be heard and decided under the terms of this Agreement and the then applicable rules of the NYSE or, if those rules as interpreted by the NYSE do not permit the disputes, differences and controversies to be submitted to the NYSE for arbitration; then

(b)    to the American Stock Exchange (the "AMEX") in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the AMEX or, if those rules as interpreted by the AMEX do not permit the disputes, differences and controversies to be submitted to the AMEX for arbitration; then

(c)    to the NASD in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the NASD or, if the disputes, differences and controversies are not eligible for submission to the NASD for arbitration under those rules as interpreted by the NASD; then

(d)    to the American Arbitration Association in New York, New York;

to be heard and decided under the terms of this Agreement and in accordance with the then applicable rules of the hearing body by a panel of three arbitrators (unless the rules of the hearing body shall require a different number of arbitrators) chosen in accordance with the then applicable rules of the hearing body. The decision of the arbitrators shall be final and binding upon the parties, and an order may be entered upon the award of the arbitrators in any court of competent jurisdiction.

-14-

CONFIDENTIAL

Section 6.11.  <u>Submission to Jurisdiction; Waiver of Immunity</u>.  Each Founder Stockholder, for itself and its successors and assigns, hereby irrevocably waives (a) any objection, and agrees not to assert, as a defense in any arbitration or legal or equitable action, suit or proceeding against such Founder Stockholder arising out of or relating to this Agreement or any transaction contemplated hereby or the subject matter of any of the foregoing, that (i) it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable before such arbitral body or in said courts, (ii) the venue thereof may not be appropriate and (iii) the internal laws of the State of New York do not govern the validity, interpretation or effect of this Agreement, (b) any immunity from jurisdiction to which it might otherwise be entitled in any such arbitration, action, suit or proceeding which may be instituted before any state or federal court in the State of New York in accordance with Section 6.9 or before any arbitral body in accordance with Section 6.10 and (c) any immunity from the maintaining of an action against it to enforce any judgment for money obtained in any such arbitration, action, suit or proceeding and, to the extent permitted by applicable law, any immunity from execution.

Section 6.12.  <u>Further Assurances</u>.  Each Founder Stockholder agrees to execute such additional documents and take such further action as may be requested by the Company to effect the provisions of this Agreement.

Section 6.13.  <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

Section 6.14.  <u>Entire Agreement</u>.  This Agreement, including the Schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 6.15.  <u>Effectiveness</u>.  This Agreement shall become effective and be binding upon the Company, Neuberger and all Founder Stockholders upon approval of the Board of Directors of Neuberger, execution of a counterpart hereof by a duly authorized officer of each of the Company and Neuberger and of counterparts of the Amendment by Founder Stockholders that Own a majority of the "Founder Shares" (as defined in the Original Stockholders Agreement) subject to the Original Stockholders Agreement as of immediately prior to the Merger Effective Time.

[Rest of page intentionally blank.]

-15-

CONFIDENTIAL                                                                LEH-RSU-CL 0000714

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

NEUBERGER BERMAN INC.

By: _____

Name:

Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

CONFIDENTIAL

LEH-RSU-CL 0000715

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

NEUBERGER BERMAN INC.

By: _____

    Name:

    Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

    Name:  James Rosenthal

    Title:  Vice President

CONFIDENTIAL

LEH-RSU-CL 0000716

SCHEDULE I

TO

STOCKHOLDERS AGREEMENT

<u>Name and Address* of Principal</u>

| | |
|---|---|
| Herbert W. Ackerman | Harold J. Newman |
| Robert J. Appel | Daniel P. Paduano |
| John J. Barker | Norman H. Pessin |
| Howard R. Berlin | Leslie M. Pollack |
| Jeffrey Bolton | William A. Potter |
| Richard A. Cantor | Janet W. Prindle |
| Vincent T. Cavallo | Kevin L. Risen |
| Lawrence J. Cohn | Daniel H. Rosenblatt |
| Robert W. D'Alelio | J. Curt Schnackenberg, Jr. |
| Salvatore D'Elia | Marvin C. Schwartz |
| Stanley Egener | Jennifer K. Silver |
| Michael N. Emmerman | Kent C. Simons |
| Robert D. English | R. Edward Spilka |
| Jack M. Ferraro | Gloria H. Spivak |
| Gregory P. Francfort | Heidi S. Steiger |
| Howard L. Ganek | Fred Stein |
| Robert T. Gendelman | Eleanor M. Sterne |
| Theodore P. Giuliano | Stephanie J. Stiefel |
| Mark R. Goldstein | Philip A. Straus |
| Lee H. Idleman | Peter Strauss |
| Alan L. Jacobs | Peter E. Sundman |
| Kenneth M. Kahn | Allan D. Sutton |
| Michael W. Kamen | Richard J. Sweetnam Jr. |
| Michael M. Kassen | Judith M. Vale |
| Mark P. Kleiman | Beth Owen Wade |
| Lee P. Klingenstein | David I. Weiner |
| Irwin Lainoff | Michael J. Weiner |
| Jeffrey B. Lane | Dietrich Weismann |
| Joseph R. Lasser | Leslie J. Werkstell |
| Richard S. Levine | Allan R. White, III |
| Christopher J. Lockwood | Lawrence Zicklin |
| Robert Matza | |
| Robert R. McComsey | |
| Martin McKerrow | |
| Martin E. Messinger | |
| Roy R. Neuberger | |

\*    Unless otherwise indicated, the address of each Principal is c/o Neuberger Berman, LLC,
605 Third Avenue, New York, New York 10158.

SCHEDULE II

TO

STOCKHOLDERS AGREEMENT

Name and Address** of Family Affiliate

Herbert W. Ackerman Associates, L.P.
Berlin Associates, L.P.
Bolton Associates, L.P.
Cantor Associates, L.P.
Cavallo Associates, L.P.
Egener Associates, L.P.
Egener 2003 Grat Trust
Ganek Associates, L.P.
Giuliano Associates, L.P.
Goldstein Associates, L.P.
Kamen Associates, L.P.
Michael M. Kassen Associates, L.P.
Michael M. Kassen 2002 Grantor Retained Annuity Trust
Michael M. Kassen 2003 Grantor Retained Annuity Trust
Klingenstein Associates, L.P.
Lasser Associates, L.P.
McKerrow Associates, L.P.
Messinger Associates, L.P.
Messinger 2003 Annuity Trust
Neuberger Associates, L.P.
Newman Associates, L.P.
Paduano Associates, L.P.
Paduano Associates Inc.
Daniel J. Paduano 2003 Irrevocable Trust
Daniel J. Paduano Descendants Exempt Irrevocable Trust
John P. Paduano 2003 Irrevocable Trust
John P. Paduano Descendants Exempt Irrevocable Trust
Pollack 1998 Trust A
Potter Associates, L.P.
Schwartz CS Associates, L.P.
Schwartz ES Associates, L.P.
Marvin Schwartz Family 2003 GRAT
Kent Simons 2002 Grat
Kent Simons Grat #2
Kent Simons Grat #3
The Spilka 1998 Trust
Steiger Associates, L.P.
Stiefel Associates, L.P.
Strauss 1998 Trust
Sundman Associates, L.P.
Allan D. Sutton 1998 Grantor Retained Annuity Trust

CONFIDENTIAL

Sutton 1998 GST Trust  F/B/O Nancy Sutton-Finley
Sutton 1998 GST Trust  F/B/O Peggy Lynn Sutton
Weismann Associates, L.P.
The Dietrich Weismann Revocable Trust
Lawrence Zicklin 2003 Grantor Retained Annuity Trust
Zicklin Associates, L.P.

\*\*        Unless otherwise indicated, the address of each Family Affiliate is c/o Neuberger &
         Berman Trust Company of Delaware, 919 Market Street, Suite 506, Wilmington,
         Delaware 19801.

CONFIDENTIAL

LEH-RSU-CL 0000719

**Exhibit E**

Execution Copy

NEUBERGER BERMAN INC.

STOCKHOLDERS AGREEMENT

Dated as of August 2, 1999



20623913.3

Stockholders Agreement

CONFIDENTIAL NB 00001

TABLE OF CONTENTS

Page

ARTICLE I

LIMITATIONS ON TRANSFER OF SHARES . . . . . . . . . . . . . . 2
Section 1.1.  Transfers Generally . . . . . . . . . . . . . . 2
Section 1.2.  Transfers Following Death or Disability . . . . 3
Section 1.3.  Transfers with the Consent of Board of Directors . . . 4
Section 1.4.  Compliance with Law and Regulations . . . . . . 4
Section 1.5.  Legend on Certificates; Entry of Stop Transfer Orders . 4
Section 1.6.  Certificates to be Held by Company . . . . . . . 4
Section 1.7.  Transfers in Violation of Agreement Void . . . . 6

ARTICLE II

VOTING AGREEMENT . . . . . . . . . . . . . . . . . . . . . . 6
Section 2.1.  Preliminary Vote of Founder Stockholders . . . . 6
Section 2.2.  Voting by Founder Stockholders . . . . . . . . . 6
Section 2.3.  Termination of Voting Provisions . . . . . . . . 7

ARTICLE III

RIGHT TO PURCHASE SHARES . . . . . . . . . . . . . . . . . . 7
Section 3.1.  Right of the Company to Purchase Shares in Case of Harmful
     Activity . . . . . . . . . . . . . . . . . . . . . . . . 7
Section 3.2.  Notice of Harmful Activity . . . . . . . . . . . 8

ARTICLE IV

REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . 8
Section 4.1.  Representations and Warranties of the Founder Stockholders . 8
Section 4.2.  Representations and Warranties of the Company . . 9

ARTICLE V

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . 9

i

ARTICLE VI

MISCELLANEOUS . . . . . . . . . . . . . . 16
Section 6.1   Notices . . . . . . . . . 16
Section 6.2   Term of the Agreement . . . . . . 16
Section 6.3   Amendments, Waivers . . . . . . 16
Section 6.4   Adjustment Upon Changes in Capitalization . . 17
Section 6.6   Severability . . . . . . . . 17
Section 6.7   Representatives, Successors and Assigns . . . . 17
Section 6.8   Governing Law . . . . . . . . 18
Section 6.9   Specific Performance . . . . . . . 18
Section 6.10  Arbitration . . . . . . . . . 18
Section 6.11  Submission to Jurisdiction, Waiver of Immunity . . . . . 19
Section 6.12  Further Assurances . . . . . . . 19
Section 6.13  Execution in Counterparts . . . . . . 19
Section 6.14  Entire Agreement . . . . . . . . 19

Schedule I

Schedule II

ii

Stockholders Agreement

CONFIDENTIAL NB 00003

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement") is dated as of August 2, 1999, by and among (i) Neuberger Berman Inc., a Delaware corporation (the "Company"), (ii) the Principals (as defined below) listed on Schedule I hereto and (iii) the Family Affiliates (as defined below) listed on Schedule II hereto. Capitalized terms used herein have their respective meanings set forth in Article V of this Agreement.

## W I T N E S S E T H :

WHEREAS, the parties hereto have entered into a Plan of Merger and Exchange Agreement, dated as of the date hereof (the "Exchange Agreement"), pursuant to which (i) the Principals and their Family Affiliates, as sole members of Neuberger Berman, LLC, a Delaware limited liability company ("NB LLC"), will contribute their respective interests in NB LLC to the Company in exchange for shares of common stock, par value $.01 (the "Common Stock"), of the Company (the "Exchange") and (ii) Neuberger Berman Sub Inc., a wholly-owned direct subsidiary of the Company, will merge into Neuberger Berman Management Inc., a New York corporation ("NBMI"), with the Principals, as the sole shareholders of NBMI, will receive shares of the Common Stock (the "Merger");

WHEREAS, as a result of the Exchange and Merger, the Principals and their Family Affiliates (collectively, the "Founder Stockholders") will Own all of the issued and outstanding Common Stock;

WHEREAS, the Company and the Founder Stockholders desire to enter into certain agreements with respect to the Transfer and voting of their Common Stock and various other matters in order to continue harmonious relationships among the themselves with respect to the conduct of the business and affairs of the Company;

WHEREAS, most of the Principals have devoted a substantial portion of their professional careers with the Company Group and its predecessors, and the parties hereto desire to encourage the Principals to continue their long-term professional association with the Company for the good of all parties; and

WHEREAS, it is a condition precedent to the closing under the Exchange Agreement that the parties hereto enter into this Agreement

CONFIDENTIAL NB 00004

NOW THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1

### LIMITATIONS ON TRANSFER OF SHARES

Section 1.1  Transfers Generally.  Each Founder Stockholder agrees that, in addition to any restrictions imposed by law, no Founder Stockholder shall Transfer any Founder Shares Owned by such Founder Stockholder, except that:

(a)    Subject to Sections 1.1(b) and 1.1(c), each Principal, together with his or her Family Affiliates, may in the aggregate Transfer (x) on and after January 1, 2002 and prior to January 1, 2003, a number of Founder Shares not to exceed the sum of such Principal's Unsold IPO Allotment and 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates and (y) in each calendar year commencing January 1, 2003, a number of Founder Shares not to exceed 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, provided that, in the case of each of the preceding clauses (x) and (y):

(i)    Prior to the third anniversary of the Employment Termination Date of such Principal, neither such Principal nor any of his or her Family Affiliates may Transfer Founder Shares if, as a result of such Transfer, such Principal and Family Affiliates would in the aggregate Own less than that number of Founder Shares that is equal to 30% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, and

(ii)    Commencing on such Principal's Employment Termination Date and continuing until the third anniversary thereof, such Principal and his or her Family Affiliates may not Transfer any Founder Shares other than Founder Shares eligible to be Transferred but not Transferred on or prior to such Employment Termination Date, and

2

Stockholders Agreement

CONFIDENTIAL NB 00005

(iii)    Any Founder Shares in respect of which the Company has exercised its right of purchase pursuant to Article III hereof may only be Transferred in accordance with Article III.

Any number of Founder Shares eligible to be Transferred in any calendar year under this Section 1.1(a) but not so Transferred may be Transferred in any future calendar year without any restriction imposed by this Section 1.1(a)

(b)    Notwithstanding Section 1.1(a), if the Employment Termination Date of any Principal occurs prior to January 1, 2003,

(i)    Such Principal and his or her Family Affiliates may not Transfer any Founder Shares prior to January 1, 2007; and

(ii)    Subject to Section 3.1, on and after January 1, 2007, such Principal, together with his or her Family Affiliates, may in the aggregate Transfer in any calendar year up to that number of Founder Shares that is equal to 20% of the aggregate number of Founder Shares Owned by such Principal and his or her Family Affiliates on the Employment Termination Date of such Principal, provided that any number of Founder Shares that was eligible to be Transferred under this clause (ii) but not so Transferred may be Transferred in any future calendar year without regard to the 20% annual limit imposed on Transfers by this clause (ii);

provided, further, that this Section 1.1(b) shall not apply if such Principal's employment with the Company Group was terminated by the Company Group without Cause.

(c)    Notwithstanding Sections 1.1 (a) and 1.1(b), no Principal nor any of his or her Family Affiliates may Transfer Founder Shares during the pendency of any dispute between the Company and such Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates.

Section 1.2.  Transfers Following Death or Disability  Notwithstanding any other provisions of this Agreement, upon the death or Disability of any Principal, such Principal (or his or her estate) and his or her Family Affiliates may Transfer Founder Shares free of any provisions of this Agreement.

3

Section 1.3  Transfers with the Consent of Board of Directors.
Notwithstanding any other provisions of this Agreement, a Founder Stockholder may
Transfer any number of Founder Shares at any time with the prior written consent of the
Board of Directors, which consent may be withheld or delayed, or granted on such terms
and conditions as it may determine, in its sole discretion.

Section 1.4  Compliance with Law and Regulations.  Each Founder
Stockholder agrees that any Transfer of Founder Shares by such Founder Stockholder
shall be in compliance with any applicable constitution, rule or regulation of, or any
applicable policy of, the NASD, any of the exchanges or associations or other institutions
with which the Company Group has membership or other privileges (including, without
limitation, the NYSE), federal and state securities laws, and any applicable law, rule or
regulation of the Commission or any other governmental agency having jurisdiction.

Section 1.5  Legend on Certificates, Entry of Stop Transfer Orders
(a)  Each Founder Stockholder agrees that each outstanding certificate representing any
Founder Shares that are subject to this Agreement shall bear an endorsement noted
conspicuously on each such certificate reading substantially as follows:

> "The securities represented by this certificate were issued without
> registration under the Securities Act of 1933.  No transfer of such
> securities may be made without an opinion of counsel, satisfactory to the
> Company, that such transfer may properly be made without registration
> under the Securities Act of 1933 or that such securities have been so
> registered under a registration statement which is in effect at the date of
> such transfer.
>
> The securities represented by this certificate are subject to the provisions of
> an agreement dated as of August [    ], 1999 among the Company and
> certain persons listed on Schedules I and II to such agreement, a copy of
> which is on file at the principal executive office of the Company, and such
> securities may be sold, assigned, pledged or otherwise transferred only in
> accordance with such agreement."

(b)  Each Founder Stockholder agrees to the entry of stop transfer
orders against the transfer of legended certificates representing shares of Common Stock
except in compliance with this Agreement.

Section 1.6  Certificates to be Held by Company  (a) Each Founder
Stockholder agrees that the certificates representing such Founder Stockholder's Founder
Shares shall be issued in the name of a nominee holder to be designated by the Company

4

and shall be held in custody by the Company at its principal office. Subject to Section 1.6(c), the Company shall, upon the request of any such Founder Stockholder or the estate of any Founder Stockholder, as the case may be, in writing addressed to the Secretary of the Company or any officer designated by the Secretary (which request shall include a representation by such Founder Stockholder or estate thereof that such Founder Stockholder is then permitted to Transfer a specified number of Founder Shares under the provisions of this Agreement), promptly release from custody the certificates representing such specified number of Founder Stockholder's Founder Shares which are then intended and permitted to be Transferred under the provisions of this Agreement.

(b)    Subject to Section 1.6(c), so long as the Founder Stockholders have provided appropriate written direction to the Company, whenever the nominee holder shall receive any cash dividend or other cash distribution upon any Founder Shares deposited pursuant to Section 1.6(a), the Company shall cause the nominee holder to distribute promptly such cash dividend or other distribution (by sale or any other manner that it may determine, net of its charges and expenses in effecting such conversion), by checks drawn on a bank in the United States, to the Founder Stockholders in proportion to the number of Founder Shares Owned by each of them respectively, provided that the Company shall cause the nominee holder to make appropriate adjustments in the amounts so distributed in respect of any amounts required to be withheld by the nominee holder from any distribution on account of taxes. The nominee holder shall distribute only such amount as can be distributed without distributing to any Founder Stockholder a fraction of one cent, and any balance not so distributable shall be held by the nominee holder (without liability for interest thereon) and shall be added to and become part of the next sum received by the nominee holder for distribution to the Founder Stockholders.

(c)    Notwithstanding Section 1.6(b), during the pendency of any dispute between the Company and any Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates, all cash dividends and other cash distributions received by the nominee holder in respect of the Founder Shares of such Principal and his or her Family Affiliates shall be retained by the nominee holder and shall not be distributed until the final resolution of such dispute. Each Principal and his or her Family Affiliates hereby irrevocably (i) authorizes the Company, upon any amount becoming payable by such Principal or his or her Family Affiliates in connection with any such dispute, to set off and apply against such amount an equal amount of any cash dividends or other cash distributions in respect of such the Founder Shares of such Principal and his or her Family Affiliates then retained by the nominee holder and (ii) instructs the nominee holder to distribute such amounts to the Company.

5

CONFIDENTIAL NB 00008

Section 1.7    Transfers in Violation of Agreement Void.  Any attempted Transfer of Founder Shares not made in accordance with the provisions of this Agreement shall be void, and the Company shall not register, or cause or permit the registry, of Common Stock Transferred in violation of this Agreement.

ARTICLE II

VOTING AGREEMENT

Section 2.1    Preliminary Vote of Founder Stockholders.  Before any vote of the stockholders of the Company at a meeting called with respect to any corporate action or before action is taken by stockholders of the Company by written consent, a vote (the "Preliminary Vote") shall be taken of Founder Stockholders Owning Founder Shares and of Additional Stockholders Owning Additional Shares, in accordance with procedures established from time to time by the Board of Directors, upon all such matters upon which such stockholder vote or other action is proposed to be taken, in which each Founder Stockholder and Additional Shareholder shall be permitted to vote the Founder Shares and Additional Shares then Owned by such stockholder in such manner as each such stockholder may determine in his, her or its sole discretion.

Section 2.2.    Voting by Founder Stockholders.  (a)  At any meeting of the stockholders of the Company called to vote with respect to any corporate action or where action by stockholders of the Company is taken by written consent, each Founder Stockholder agrees to vote or act by written consent with respect to all the Founder Shares then Owned by such stockholder on all such matters in which action is proposed to be taken in accordance with the vote of the majority of the shares present (in person or by proxy) and voting in the Preliminary Vote.

(b)    For purposes of effecting any vote pursuant to this Section 2.2, each Founder Stockholder does hereby irrevocably make, constitute and appoint the Secretary of the Company, or any officer(s) designated in writing by the Secretary, with full power of substitution, as his, her or its true attorney-in-fact and agent, for and in his, her or its name, place and stead, to act as his proxy to the maximum extent and for the maximum term permitted by law to (i) vote such Founder Stockholder's Founder Shares at any meeting of stockholders of the Company or to take any corporate action where action by stockholders of the Company is taken by written consent with respect to such Founder Shares, in each case in accordance with Section 2.2(a) and (ii) vote such Founder Stockholder's Founder Shares in such proxy holder's discretion upon any other business which properly comes before such meetings or for which action is to be taken pursuant to such written consents, giving and granting to said attorney full power and authority to do

6

Stockholders Agreement

CONFIDENTIAL NB 00009

and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as he, she or it might or could do if personally present, with full power of substitution, appointment and revocation. The foregoing power of attorney and proxy are coupled with an interest and shall not be revocable or revoked by such Founder Stockholder and shall be binding upon such stockholder and his, her or its successors and assigns.

Section 2.3  Termination of Voting Provisions. Notwithstanding any other provisions of this Agreement, (i) the right of any Principal and his or her Family Affiliate to participate in the Preliminary Vote, (ii) the obligation of any Principal and his or her Family Affiliate to vote in accordance with Section 2.2 and (iii) the irrevocable power of attorney and proxy provided by such Founder Stockholders pursuant to Section 2.2(b) shall, in each case, terminate at the close of business on the Employment Termination Date of such Principal.

## ARTICLE III

## RIGHT TO PURCHASE SHARES

Section 3.1  Right of the Company to Purchase Shares in Case of Harmful Activity  (a) If, on or prior to the third anniversary of the Employment Termination Date of any Principal (including during such Principal's employment with the Company Group), the Board of Directors determines in its good faith judgment that such Principal has engaged in Harmful Activity, the Company shall have the right to purchase, at any time or from time to time, from such Principal (or, to the extent a Principal does not Own sufficient shares of Common Stock to satisfy his or her obligations under this Section 3.1, to purchase from his or her Family Affiliates pro rata in accordance with the number of Founder Shares Owned by such Family Affiliates on the Notice Date), the number of Founder Shares Owned by such Principal and his or her Family Affiliates that could not have been Transferred by such Founder Stockholders in accordance with Section 1.1 prior to the Notice Date. The purchase price of each Founder Share (the "Purchase Price") purchased by the Company pursuant to this Section 3.1 shall equal $2.00 per share.

(b)    The Company may exercise its right to purchase Founder Shares under this Section 3.1 in accordance with the following procedures:

(i)    The Company shall give notice to the Founder Stockholder that Owns the Founder Shares subject to such right of purchase not later than the close of business on the third anniversary of the Employment Termination Date of such Principal (the "Notice Date"), advising such Founder Stockholder of the

7

Company's election to exercise such right, stating the number of Founder Shares to be so purchased, the Purchase Price, closing arrangements and a closing date at which payment of the consideration for such Founder Shares will be made, which date shall be not less than five days nor more than 90 days after the Notice Date.

(ii)    On the closing date, the Company and such Founder Stockholder shall cause the nominee holding the Founder Shares being so purchased to deliver the certificates representing such Founder Shares, properly endorsed for transfer by such Founder Stockholder or his, her or its attorney-in-fact, to the Company at its principal place of business and the Company shall deliver to such Founder Stockholder the consideration therefor (it being understood and confirmed that NB LLC has been appointed attorney-in-fact for such Founder Stockholder pursuant to the Exchange Agreement to take all such actions, to make such endorsements and to execute such documents as may be required to consummate the sale under this Section 3.1 of Founder Shares to the Company).

(c)    If a Principal and his or her Family Affiliates are unable to satisfy their obligations under this Section 3.1 to deliver Founder Shares to the Company for any reason, such Principal shall be liable to the Company, as liquidated damages and not as a penalty, for an amount equal to the product of (i) the number of Founder Shares that should have been sold to the Company under this Section 3.1 but were not sold and (ii) the excess, if any, of the Market Value of such shares as of the Notice Date over the Purchase Price.

Section 3.2.    Notice of Harmful Activity.  Prior to the third anniversary of such Principal's Employment Termination Date (including during such Principal's employment with the Company Group), each Principal who engages (or intends to engage) in Harmful Activity agrees (a) to notify the Company in writing in reasonable detail at least 30 days prior to engaging in such Harmful Activity, (b) to respond to such questions and furnish such additional information as the Company may request with respect to such Harmful Activity and (c) to update such written notice or inquiries promptly in the event of any circumstances that would cause any notices or responses to be inaccurate or incomplete.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the Founder Stockholders.
Each Founder Stockholder severally represents and warrants to the Company and to each

8

other Founder Stockholder that (a) in the case of a Founder Shareholder who is not a
natural person, such Founder Stockholder is duly authorized to execute, deliver and
perform this Agreement, (b) this Agreement has been duly executed by such Founder
Shareholder or his, her or its attorney-in-fact on behalf of such Founder Stockholder and
is a valid and binding agreement of such Founder Shareholder, enforceable against such
Founder Shareholder in accordance with its terms; (c) the execution, delivery and
performance by such Founder Shareholder of this Agreement does not violate or conflict
with or result in a breach of or constitute (or with notice or lapse of time or both
constitute) a default under any agreement to which such Founder Shareholder is a party,
and (d) such Founder Stockholder has good and marketable title to the shares of Common
Stock acquired pursuant to the Exchange free and clear of any pledge, lien, security
interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this
Agreement.

Section 4.2    Representations and Warranties of the Company.  The
Company represents and warrants to the Founder Stockholders that (a) the Company is
duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has
been duly authorized, executed and delivered by the Company and is a valid and binding
agreement of the Company, enforceable against the Company in accordance with its
terms, and (c) the execution, delivery and performance by the Company of this Agreement
does not violate or conflict with or result in a breach by the Company of or constitute (or
with notice or lapse of time or both constitute) a default by the Company under its
Certificate of Incorporation or By-Laws, any existing applicable law, rule, regulation,
judgment, order, or decree of any government, governmental instrumentality or court,
domestic or foreign, having jurisdiction over the Company or its property including the
requirements of the NYSE, or any agreement or instrument to which the Company is a
party or by which the Company or its property may be bound.

ARTICLE V

DEFINITIONS

For purposes of this Agreement, the following terms shall have the
following meanings:

"Additional Shares" means shares of Common Stock Owned by an
Additional Stockholder that, pursuant to an agreement with the Company, are to
be voted in accordance with Article II of this Agreement.

9

CONFIDENTIAL NB 00012

"Additional Stockholder" means any Person that Owns Common Stock who has agreed, pursuant to an agreement with the Company, to vote shares of such Common Stock in accordance with Article II of this Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"AMEX" has the meaning set forth in Section 6.10(b).

"Board of Directors" means the Board of Directors of the Company or, to the extent expressly authorized by the Board of Directors to exercise the powers of the Board of Directors under this Agreement, (i) any committee of such Board of Directors or (ii) any board of directors or committee of any Subsidiary of the Company.

"Business Day" means a day on which the principal national securities exchange on which shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Borough of Manhattan, City and State of New York are not authorized or obligated by law or executive order to close.

"Cause" means, with respect to any Principal:

(a)    gross negligence or willful misconduct in the performance of his or her duties as an employee of the Company Group or willful and repeated failure to perform his or her duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(b)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury,

(c)    dishonesty that has resulted in damage to the property, business or reputation of the Company and its Subsidiaries, misappropriation of, or intentional damage to, the property, business or reputation of the Company and its Subsidiaries, perpetration of fraud on the Company Group that has resulted in damage to the property or business of the Company Group; or

10

(d)    a finding by the Commission or a court of competent jurisdiction that he or she has committed an act that would cause such Founder Stockholder, the Company or any of its affiliates to be disqualified in any manner under section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of the Company or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission.

"Closing Price" means, on any day, the last sales price, regular way, per share of Common Stock on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, as reported in the principal consolidated transaction reporting system covering securities listed or admitted to trading on the NYSE or, if shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system covering securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Quotation Bureau, Inc., or a similar reporting service designated by the Board of Directors.

"Commission" means the Securities and Exchange Commission.

"Common Stock" has the meaning set forth in the recitals to this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement and any successors thereof, whether by operation of law or otherwise.

"Company Group" means the Company and its Subsidiaries.

"Confidential Information" means information developed by or for the Company Group that has a significant business purpose related to the business of the Company Group and that is not generally available in the investment Founder industry or the public generally, but only for so long as such information continues to have a significant business purpose for the Company Group.

"Disability" means disability as that term is defined under the Company's long-term disability plan in effect at the date of such determination, or any other

11

Stockholders Agreement

CONFIDENTIAL NB 00014

plan or definition designated by the Board of Directors for the purpose of this provision.

"Effective Time" shall have the meaning given therefor in the Exchange Agreement.

"Employment Termination Date" means, with respect to any Principal, the date of termination of such Principal's employment with the Company Group for any reason, (whether or not terminated by action of the Company Group), as determined by the Board of Directors in its sole and absolute discretion.

"Exchange" has the meaning set forth in the recitals to this Agreement.

"Exchange Agreement" has the meaning set forth in the recitals to this Agreement.

"Family Affiliates" means, as the context requires, (a) the Persons listed on Schedule II hereto or (b) with respect to any Principal, (i) the Persons listed on Schedule II hereto to whom such Principal transferred a limited liability company interest prior to the Exchange and (ii) any Person to whom such Principal Transfers Founder Shares with the written consent of the Board of Directors in accordance with Section 1.3 and who agrees in writing to be subject to the terms and provisions of this Agreement as a Family Affiliate.

"Founder Shares" means, with respect to any Founder Stockholder, the shares of Common Stock received by such Founder Shareholders as a result of the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Founder Shares.

"Founder Stockholders" has the meaning set forth in the recitals to this Agreement.

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

   (a) solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action

12

CONFIDENTIAL NB 00015

taken during such Principal's employment with the Company Group, during the one-year period immediately prior to such action) or (ii) any prospective client of the Company Group who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, within the one-year period immediately prior to such action), had been directly solicited by such Principal or where, directly or indirectly, in whole or in part, such Principal supervised or participated in the Company Group's solicitation activities related to such prospective client,

(b)    solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such Principal had business contact during the one year period prior to such Principal's Employment Termination Date;

(c)    (i) employs any current or former employee or consultant of the Company Group (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with the Company Group, unless, in the case of (i) or (ii), such person shall have ceased to be employed by or a consultant to the Company Group for a period of at least one year prior to the time of such employment, recruitment, solicitation or inducement.

(d)    markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of the Company Group, assists any Person in marketing, promoting or otherwise trading on or claiming) as such Principal's (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with the Company Group.

(e)    discloses to any person, firm or corporation any Confidential Information that is known to the Principal as a result of his or her employment or professional association with the Company Group or

13

uses the same in any way other than in connection with the business of the Company Group; or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Market Value" means the average of the daily Closing Prices for the ten consecutive Business Days ending on the Business Day immediately prior to the date of determination.

"Merger" has the meaning set forth in the recitals to this Agreement.

"NASD" means the National Association of Securities Dealers, Inc.

"New Principal" means a Principal listed on Schedule III.

"NB LLC" has the meaning set forth in the recitals to this Agreement.

"NBMI" has the meaning set forth in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement, dated as of the date hereof, between the Company and the Principals.

"Notice Date" has the meaning set forth in Section 3.1(b)(i).

"Number of Initial Founder Shares" means, with respect to any Principal and his or her Family Affiliates, the aggregate number of Founder Shares received by such Persons in the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Initial Founder Shares.

"NYSE" means the New York Stock Exchange, Inc.

14

Stockholders Agreement

CONFIDENTIAL NB 00017

"Option Period" has the meaning set forth in Section 3 1(a)

"Own" means to own of record or beneficially, whether directly, through a nominee designated by the Company pursuant to Section 1 6 or through any other Person

"Person" means any natural person or any firm, partnership limited liability partnership, association, corporation, limited liability company, trust, business trust, governmental authority or other entity.

"Preliminary Vote" has the meaning set forth in Section 2 1

"Principals" means the natural persons listed on Schedule 1 hereto

"Purchase Price" has the meaning set forth in Section 3 1(a)

"Subsidiary" means a corporation, limited liability company or other entity of which the Company, directly or indirectly, has the power, whether through the ownership of voting securities, equity interests, contract or otherwise, (i) to elect at least a majority of the members of such entity's board of directors or other governing body or (ii) in the absence of a governing body, to control the business affairs of such entity

"Transfer" means, with respect to any Founder Shares, directly or indirectly, (i) to sell, assign, transfer, pledge (including in margin transactions), convey, distribute, mortgage, encumber, hypothecate or otherwise dispose, whether by gift, for consideration or for no consideration and (ii) to grant any right to vote, whether by proxy, voting agreement, voting trust or otherwise

"Unsold IPO Allotment" means, with respect to any Principal, that number of Founder Shares Owned by such Principal and his or her Family Affiliates that is equal to the amount, if any, by which (a) 15% of the Number of Initial Founder Shares Owned by such Principal and his or her Family Affiliates exceeds (b) the aggregate number of Founder Shares sold by such Principal and his or her Family Affiliates in the initial public offering of Common Stock of the Company

15

Stockholders Agreement

CONFIDENTIAL NB 00018

ARTICLE VI

MISCELLANEOUS

Section 6.1    Notices.    (a) All notices, requests, demands, waivers and
other communications to be given by any party hereunder shall be in writing and shall be
(i) mailed by first-class, registered or certified mail, postage prepaid, (ii) sent by hand
delivery or reputable overnight delivery service or (iii) transmitted by telecopy (provided
that a copy is also sent by reputable overnight delivery service) addressed, in the case of
any Principal, to him or her at the address set forth on Schedule I, in the case of any
Family Affiliate, to it at the address set forth on Schedule II or, in the case of the
Company, to Neuberger Berman Inc., 605 Third Avenue, New York, NY 10158,
Attention: Secretary, or, in each case, to such other address as may be specified in writing
to the other parties hereto.

(b)    All such notices, requests, demands, waivers and other
communications shall be deemed to have been given and received (i) if by personal
delivery or telecopy, on the day of such delivery, (ii) if by first-class, registered or certified
mail, on the fifth Business Day after the mailing thereof or (iii) if by reputable overnight
delivery service, on the day delivered.

Section 6.2    Term of the Agreement.    (a) This Agreement shall become
effective upon the occurrence of the Effective Time and shall terminate on the earlier to
occur of (i) the first date on which there are no Founder Stockholders who remain bound
by its terms and (ii) the date on which the Company and all Founder Stockholders who are
then bound by its terms agree to terminate this Agreement.

(b)    Unless this Agreement is theretofore terminated pursuant to
Section 6.2(a) hereof, a Founder Stockholder shall be bound by its terms until all Founder
Shares Owned by such Founder Stockholder are free of the provisions of Articles I, II and
III hereof.

Section 6.3.    Amendments; Waivers.    (a) This Agreement may be amended
or modified, and any provision in this Agreement may be waived, if such amendment,
modification or waiver is approved by the Board of Directors, provided that any
amendment that would materially adversely affect any Founder Stockholder (other than an
amendment that, in the good faith judgment of the Board of Directors, is intended to cure
any ambiguity or correct or supplement any provisions of this Agreement that may be
incomplete or inconsistent with any other provision contained herein) must be approved by
the Founder Stockholders that Own a majority of the Founder Shares subject to this
Agreement as of the date of such amendment or modification, provided, further, that,

16

Stockholders Agreement

CONFIDENTIAL NB 00019

without the consent of any Person, the Board of Directors may permit any Person who executes and delivers a counterpart of this Agreement to become a party to this Agreement by amending Schedule I or II hereto, as the case may be.

(b)    The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the rights at a later time to enforce the same. No waiver by any party of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or the breach of any other term of this Agreement.

Section 6.4    Adjustment Upon Changes in Capitalization    In the event of any change in the outstanding shares of the Company by reason of stock dividends, split-ups, recapitalizations, combinations, exchanges of shares and the like, the term "shares of Common Stock" shall refer to and include the securities received or resulting therefrom and the terms and provisions of this Agreement, including without limitation the terms "Founder Shares" and "Purchase Price," shall be appropriately adjusted so that each Founder Stockholder will thereafter continue to have and be subject to, to the greatest extent practicable, the same rights and obligations he, she or it had been subject to prior to such change.

Section 6.5.    Disinterested Board Members to Make Determinations    In the event that any Founder Stockholder breaches its obligations under this Agreement, then the Board of Directors shall have the exclusive right to make (on behalf of the Company) any and all determinations that may be necessary or appropriate under this Agreement, including without limitation, determinations relating to the exercise and enforcement of remedies hereunder. If a Founder Stockholder who is also a member of the Board of Directors breaches his or her obligations under this Agreement, such Founder Stockholder must refrain from exercising his or her vote at meetings of the Board and general meetings of the Company to give effect to this Section 6.5.

Section 6.6.    Severability.    If the final determination of a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 6.7.    Representatives, Successors and Assigns.    Each Principal shall cause his or her Family Affiliate to comply with the terms and provisions of this

20623913 3

CONFIDENTIAL NB 00020

Agreement  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective legatees, legal representatives, successors and assigns, provided that Founder Stockholders may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement except with the written consent of the Board of Directors

Section 6.8  Governing Law  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OR RULES THEREOF)

Section 6.9.  Specific Performance.  Each of the parties hereto acknowledges that it will be impossible to measure in money the damage to the Company or the Founder Stockholders if any party hereto fails to comply with the provisions of Article I, II or III and each party hereto agrees that in the event of any such failure, neither the Company nor any Founder Stockholder will have an adequate remedy at law. Therefore, the Company and each Founder Stockholder, in addition to all of the other remedies which may be available, shall have the right to equitable relief, including, without limitation, the right to enforce specifically the provisions of Article I, II and III by obtaining injunctive relief against any violation thereof, or otherwise  All claims for specific performance of one or more provisions of this Agreement shall be resolved exclusively by litigation before a court of competent jurisdiction located in the State of New York.

Section 6.10.  Arbitration.  Except for claims for specific performance brought in accordance with Section 6.9, all disputes, differences, and controversies arising out of or in any way related to this Agreement shall be submitted.

(a)      to the NYSE to be heard and decided under the terms of this Agreement and the then applicable rules of the NYSE or, if those rules as interpreted by the NYSE do not permit the disputes, differences and controversies to be submitted to the NYSE for arbitration; then

(b)      to the American Stock Exchange (the "AMEX") in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the AMEX or, if those rules as interpreted by the AMEX do not permit the disputes, differences and controversies to be submitted to the AMEX for arbitration, then

(c)      to the NASD in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the NASD or, if

18

Stockholders Agreement

CONFIDENTIAL NB 00021

the disputes, differences and controversies are not eligible for submission to the NASD for arbitration under those rules as interpreted by the NASD, then

(d)    to the American Arbitration Association in New York, New York,

to be heard and decided under the terms of this Agreement and in accordance with the then applicable rules of the hearing body by a panel of three arbitrators (unless the rules of the hearing body shall require a different number of arbitrators) chosen in accordance with the then applicable rules of the hearing body.  The decision of the arbitrators shall be final and binding upon the parties, and an order may be entered upon the award of the arbitrators in any court of competent jurisdiction.

Section 6.11    Submission to Jurisdiction, Waiver of Immunity.  Each Founder Stockholder, for itself and its successors and assigns, hereby irrevocably waives (a) any objection, and agrees not to assert, as a defense in any arbitration or legal or equitable action, suit or proceeding against such Founder Stockholder arising out of or relating to this Agreement or any transaction contemplated hereby or the subject matter of any of the foregoing, that (i) it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable before such arbitral body or in said courts, (ii) the venue thereof may not be appropriate and (iii) the internal laws of the State of New York do not govern the validity, interpretation or effect of this Agreement, (b) any immunity from jurisdiction to which it might otherwise be entitled in any such arbitration, action, suit or proceeding which may be instituted before any state or federal court in the State of New York in accordance with Section 6.9 or before any arbitral body in accordance with Section 6.10 and (c) any immunity from the maintaining of an action against it to enforce any judgment for money obtained in any such arbitration, action, suit or proceeding and, to the extent permitted by applicable law, any immunity from execution.

Section 6.12    Further Assurances.  Each Founder Stockholder agrees to execute such additional documents and take such further action as may be requested by the Company to effect the provisions of this Agreement.

Section 6.13    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

Section 6.14    Entire Agreement.  This Agreement, including the Schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

206239133

Stockholders Agreement

CONFIDENTIAL NB 00022

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written

NEUBERGER BERMAN INC.

By _____

Name: Jeffrey B. Lane
Title: President, Chief Executive Officer

CONFIDENTIAL NB 00023

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August __ 1999

_____
    Marvin C  Schwartz

CONFIDENTIAL NB 00024

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August   2 , 1999


SCHWARTZ CS ASSOCIATES, L.P


By   Schwartz CS Associates, Inc., its general partner


By:  _____
          Marvin C  Schwartz, President

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August ___, 1999

SCHWARTZ ES ASSOCIATES, L.P.

By  Schwartz ES Associates, Inc., its general partner

By _____
        Marvin C. Schwartz, President

CONFIDENTIAL NB 00026