**Exhibit F**

Execution Copy

NEUBERGER BERMAN INC

STOCKHOLDERS AGREEMENT

Dated as of August 2, 1999



20623913 3

Stockholders Agreement

CONFIDENTIAL NB 00027

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **ARTICLE I** | |
| LIMITATIONS ON TRANSFER OF SHARES | 2 |
| Section 1.1  Transfers Generally | 2 |
| Section 1.2  Transfers Following Death or Disability | 3 |
| Section 1.3  Transfers with the Consent of Board of Directors | 4 |
| Section 1.4  Compliance with Law and Regulations | 4 |
| Section 1.5  Legend on Certificates; Entry of Stop Transfer Orders | 4 |
| Section 1.6  Certificates to be Held by Company | 4 |
| Section 1.7  Transfers in Violation of Agreement Void | 6 |
| **ARTICLE II** | |
| VOTING AGREEMENT | 6 |
| Section 2.1  Preliminary Vote of Founder Stockholders | 6 |
| Section 2.2  Voting by Founder Stockholders | 6 |
| Section 2.3  Termination of Voting Provisions | 7 |
| **ARTICLE III** | |
| RIGHT TO PURCHASE SHARES | 7 |
| Section 3.1  Right of the Company to Purchase Shares in Case of Harmful Activity | 7 |
| Section 3.2  Notice of Harmful Activity | 8 |
| **ARTICLE IV** | |
| REPRESENTATIONS AND WARRANTIES | 8 |
| Section 4.1  Representations and Warranties of the Founder Stockholders | 8 |
| Section 4.2  Representations and Warranties of the Company | 9 |
| **ARTICLE V** | |
| DEFINITIONS | 9 |

i

CONFIDENTIAL NB 00028

ARTICLE VI

MISCELLANEOUS . . . . . . . . . 16
Section 6.1   Notices . . . . . . . . . 16
Section 6.2   Term of the Agreement . . . . . . . 16
Section 6.3   Amendments, Waivers . . . . . . 16
Section 6.4   Adjustment Upon Changes in Capitalization . . 17
Section 6.6   Severability . . . . . . . . . 17
Section 6.7   Representatives, Successors and Assigns . . . 17
Section 6.8   Governing Law . . . . . . . . 18
Section 6.9   Specific Performance . . . . . . 18
Section 6.10  Arbitration . . . . . . . . . 18
Section 6.11  Submission to Jurisdiction, Waiver of Immunity . . . 19
Section 6.12  Further Assurances . . . . . . . 19
Section 6.13  Execution in Counterparts . . . . . . 19
Section 6.14  Entire Agreement . . . . . . . 19

Schedule I

Schedule II

[08235133]                    Stockholders Agreement

CONFIDENTIAL NB 00029

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement") is dated as of August 2, 1999, by and among (i) Neuberger Berman Inc., a Delaware corporation (the "Company"), (ii) the Principals (as defined below) listed on Schedule I hereto and (iii) the Family Affiliates (as defined below) listed on Schedule II hereto. Capitalized terms used herein have their respective meanings set forth in Article V of this Agreement.

## WITNESSETH

WHEREAS, the parties hereto have entered into a Plan of Merger and Exchange Agreement, dated as of the date hereof (the "Exchange Agreement"), pursuant to which (i) the Principals and their Family Affiliates, as sole members of Neuberger Berman, LLC, a Delaware limited liability company ("NB LLC"), will contribute their respective interests in NB LLC to the Company in exchange for shares of common stock, par value $.01 (the "Common Stock"), of the Company (the "Exchange") and (ii) Neuberger Berman Sub Inc., a wholly-owned direct subsidiary of the Company, will merge into Neuberger Berman Management Inc., a New York corporation ("NBMI"), with the Principals, as the sole shareholders of NBMI, will receive shares of the Common Stock (the "Merger").

WHEREAS, as a result of the Exchange and Merger, the Principals and their Family Affiliates (collectively, the "Founder Stockholders") will own all of the issued and outstanding Common Stock;

WHEREAS, the Company and the Founder Stockholders desire to enter into certain agreements with respect to the Transfer and voting of their Common Stock and various other matters in order to continue harmonious relationships among the themselves with respect to the conduct of the business and affairs of the Company;

WHEREAS, most of the Principals have devoted a substantial portion of their professional careers with the Company Group and its predecessors, and the parties hereto desire to encourage the Principals to continue their long-term professional association with the Company for the good of all parties; and

WHEREAS, it is a condition precedent to the closing under the Exchange Agreement that the parties hereto enter into this Agreement.

CONFIDENTIAL NB 00030

NOW THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## LIMITATIONS ON TRANSFER OF SHARES

Section 1.1    Transfers Generally.  Each Founder Stockholder agrees that, in addition to any restrictions imposed by law, no Founder Stockholder shall Transfer any Founder Shares Owned by such Founder Stockholder, except that

(a)    Subject to Sections 1.1(b) and 1.1(c), each Principal, together with his or her Family Affiliates, may in the aggregate Transfer (x) on and after January 1, 2002 and prior to January 1, 2003, a number of Founder Shares not to exceed the sum of such Principal's Unsold IPO Allotment and 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates and (y) in each calendar year commencing January 1, 2003, a number of Founder Shares not to exceed 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, provided that, in the case of each of the preceding clauses (x) and (y),

(i)    Prior to the third anniversary of the Employment Termination Date of such Principal, neither such Principal nor any of his or her Family Affiliates may Transfer Founder Shares if, as a result of such Transfer, such Principal and Family Affiliates would in the aggregate Own less than that number of Founder Shares that is equal to 30% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, and

(ii)    Commencing on such Principal's Employment Termination Date and continuing until the third anniversary thereof, such Principal and his or her Family Affiliates may not Transfer any Founder Shares other than Founder Shares eligible to be Transferred but not Transferred on or prior to such Employment Termination Date, and

2

CONFIDENTIAL NB 00031

(iii)   Any Founder Shares in respect of which the Company has exercised its right of purchase pursuant to Article III hereof may only be Transferred in accordance with Article III

Any number of Founder Shares eligible to be Transferred in any calendar year under this Section 1.1(a) but not so Transferred may be Transferred in any future calendar year without any restriction imposed by this Section 1.1(a)

(b)   Notwithstanding Section 1.1(a), if the Employment Termination Date of any Principal occurs prior to January 1, 2003,

(i)   Such Principal and his or her Family Affiliates may not Transfer any Founder Shares prior to January 1, 2007, and

(ii)   Subject to Section 3.1, on and after January 1, 2007, such Principal, together with his or her Family Affiliates, may in the aggregate Transfer in any calendar year up to that number of Founder Shares that is equal to 20% of the aggregate number of Founder Shares Owned by such Principal and his or her Family Affiliates on the Employment Termination Date of such Principal, provided that any number of Founder Shares that was eligible to be Transferred under this clause (ii) but not so Transferred may be Transferred in any future calendar year without regard to the 20% annual limit imposed on Transfers by this clause (ii).

provided, further, that this Section 1.1(b) shall not apply if such Principal's employment with the Company Group was terminated by the Company Group without Cause.

(c)   Notwithstanding Sections 1.1(a) and 1.1(b), no Principal nor any of his or her Family Affiliates may Transfer Founder Shares during the pendency of any dispute between the Company and such Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates.

Section 1.2   Transfers Following Death or Disability.   Notwithstanding any other provisions of this Agreement, upon the death or Disability of any Principal, such Principal (or his or her estate) and his or her Family Affiliates may Transfer Founder Shares free of any provisions of this Agreement.

3

CONFIDENTIAL NB 00032

Section 1.3    Transfers with the Consent of Board of Directors
Notwithstanding any other provisions of this Agreement, a Founder Stockholder may
Transfer any number of Founder Shares at any time with the prior written consent of the
Board of Directors, which consent may be withheld or delayed, or granted on such terms
and conditions as it may determine, in its sole discretion

Section 1.4    Compliance with Law and Regulations    Each Founder
Stockholder agrees that any Transfer of Founder Shares by such Founder Stockholder
shall be in compliance with any applicable constitution, rule or regulation of, or any
applicable policy of, the NASD, any of the exchanges or associations or other institutions
with which the Company Group has membership or other privileges (including, without
limitation, the NYSE), federal and state securities laws, and any applicable law, rule or
regulation of the Commission or any other governmental agency having jurisdiction

Section 1.5    Legend on Certificates; Entry of Stop Transfer Orders
(a)  Each Founder Stockholder agrees that each outstanding certificate representing any
Founder Shares that are subject to this Agreement shall bear an endorsement noted
conspicuously on each such certificate reading substantially as follows

> "The securities represented by this certificate were issued without
> registration under the Securities Act of 1933  No transfer of such
> securities may be made without an opinion of counsel, satisfactory to the
> Company, that such transfer may properly be made without registration
> under the Securities Act of 1933 or that such securities have been so
> registered under a registration statement which is in effect at the date of
> such transfer
>
> The securities represented by this certificate are subject to the provisions of
> an agreement dated as of August [    ], 1999 among the Company and
> certain persons listed on Schedules I and II to such agreement, a copy of
> which is on file at the principal executive office of the Company, and such
> securities may be sold, assigned, pledged or otherwise transferred only in
> accordance with such agreement "

(b)  Each Founder Stockholder agrees to the entry of stop transfer
orders against the transfer of legended certificates representing shares of Common Stock
except in compliance with this Agreement.

Section 1.6    Certificates to be Held by Company.  (a) Each Founder
Stockholder agrees that the certificates representing such Founder Stockholder's Founder
Shares shall be issued in the name of a nominee holder to be designated by the Company

4

CONFIDENTIAL NB 00033

and shall be held in custody by the Company at its principal office. Subject to Section 1.6(c), the Company shall, upon the request of any such Founder Stockholder or the estate of any Founder Stockholder, as the case may be, in writing addressed to the Secretary of the Company or any officer designated by the Secretary (which request shall include a representation by such Founder Stockholder or estate thereof that such Founder Stockholder is then permitted to Transfer a specified number of Founder Shares under the provisions of this Agreement), promptly release from custody the certificates representing such specified number of Founder Stockholder's Founder Shares which are then intended and permitted to be Transferred under the provisions of this Agreement.

(b)    Subject to Section 1.6(c), so long as the Founder Stockholders have provided appropriate written direction to the Company, whenever the nominee holder shall receive any cash dividend or other cash distribution upon any Founder Shares deposited pursuant to Section 1.6(a), the Company shall cause the nominee holder to distribute promptly such cash dividend or other distribution (by sale or any other manner that it may determine, net of its charges and expenses in effecting such conversion), by checks drawn on a bank in the United States, to the Founder Stockholders in proportion to the number of Founder Shares Owned by each of them respectively, provided that the Company shall cause the nominee holder to make appropriate adjustments in the amounts so distributed in respect of any amounts required to be withheld by the nominee holder from any distribution on account of taxes. The nominee holder shall distribute only such amount as can be distributed without distributing to any Founder Stockholder a fraction of one cent, and any balance not so distributable shall be held by the nominee holder (without liability for interest thereon) and shall be added to and become part of the next sum received by the nominee holder for distribution to the Founder Stockholders.

(c)    Notwithstanding Section 1.6(b), during the pendency of any dispute between the Company and any Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates, all cash dividends and other cash distributions received by the nominee holder in respect of the Founder Shares of such Principal and his or her Family Affiliates shall be retained by the nominee holder and shall not be distributed until the final resolution of such dispute. Each Principal and his or her Family Affiliates hereby irrevocably (i) authorizes the Company, upon any amount becoming payable by such Principal or his or her Family Affiliates in connection with any such dispute, to set off and apply against such amount an equal amount of any cash dividends or other cash distributions in respect of such the Founder Shares of such Principal and his or her Family Affiliates then retained by the nominee holder and (ii) instructs the nominee holder to distribute such amounts to the Company.

5

Stockholders Agreement

CONFIDENTIAL NB 00034

Section 1.7    Transfers in Violation of Agreement Void.  Any attempted Transfer of Founder Shares not made in accordance with the provisions of this Agreement shall be void, and the Company shall not register, or cause or permit the registry, of Common Stock Transferred in violation of this Agreement.

ARTICLE II

VOTING AGREEMENT

Section 2.1    Preliminary Vote of Founder Stockholders.  Before any vote of the stockholders of the Company at a meeting called with respect to any corporate action or before action is taken by stockholders of the Company by written consent, a vote (the "Preliminary Vote") shall be taken of Founder Stockholders Owning Founder Shares and of Additional Stockholders Owning Additional Shares, in accordance with procedures established from time to time by the Board of Directors, upon all such matters upon which such stockholder vote or other action is proposed to be taken, in which each Founder Stockholder and Additional Shareholder shall be permitted to vote the Founder Shares and Additional Shares then Owned by such stockholder in such manner as each such stockholder may determine in his, her or its sole discretion.

Section 2.2    Voting by Founder Stockholders  (a)  At any meeting of the stockholders of the Company called to vote with respect to any corporate action or where action by stockholders of the Company is taken by written consent, each Founder Stockholder agrees to vote or act by written consent with respect to all the Founder Shares then Owned by such stockholder on all such matters in which action is proposed to be taken in accordance with the vote of the majority of the shares present (in person or by proxy) and voting in the Preliminary Vote.

(b)    For purposes of effecting any vote pursuant to this Section 2.2, each Founder Stockholder does hereby irrevocably make, constitute and appoint the Secretary of the Company, or any officer(s) designated in writing by the Secretary, with full power of substitution, as his, her or its true attorney-in-fact and agent, for and in his, her or its name, place and stead, to act as his proxy to the maximum extent and for the maximum term permitted by law to (i) vote such Founder Stockholder's Founder Shares at any meeting of stockholders of the Company or to take any corporate action where action by stockholders of the Company is taken by written consent with respect to such Founder Shares, in each case in accordance with Section 2.2(a) and (ii) vote such Founder Stockholder's Founder Shares in such proxy holder's discretion upon any other business which properly comes before such meetings or for which action is to be taken pursuant to such written consents, giving and granting to said attorney full power and authority to do

6

CONFIDENTIAL NB 00035

and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as he, she or it might or could do if personally present, with full power of substitution, appointment and revocation. The foregoing power of attorney and proxy are coupled with an interest and shall not be revocable or revoked by such Founder Stockholder and shall be binding upon such stockholder and his, her or its successors and assigns.

Section 2.3   Termination of Voting Provisions.  Notwithstanding any other provisions of this Agreement, (i) the right of any Principal and his or her Family Affiliate to participate in the Preliminary Vote, (ii) the obligation of any Principal and his or her Family Affiliate to vote in accordance with Section 2.2 and (iii) the irrevocable power of attorney and proxy provided by such Founder Stockholders pursuant to Section 2.2(b) shall, in each case, terminate at the close of business on the Employment Termination Date of such Principal.

## ARTICLE III

## RIGHT TO PURCHASE SHARES

Section 3.1   Right of the Company to Purchase Shares in Case of Harmful Activity.  (a)  If, on or prior to the third anniversary of the Employment Termination Date of any Principal (including during such Principal's employment with the Company Group), the Board of Directors determines in its good faith judgment that such Principal has engaged in Harmful Activity, the Company shall have the right to purchase, at any time or from time to time, from such Principal (or, to the extent a Principal does not Own sufficient shares of Common Stock to satisfy his or her obligations under this Section 3.1, to purchase from his or her Family Affiliates pro rata in accordance with the number of Founder Shares Owned by such Family Affiliates on the Notice Date), the number of Founder Shares Owned by such Principal and his or her Family Affiliates that could not have been Transferred by such Founder Stockholders in accordance with Section 1.1 prior to the Notice Date.  The purchase price of each Founder Share (the "Purchase Price") purchased by the Company pursuant to this Section 3.1 shall equal $2.00 per share.

(b)    The Company may exercise its right to purchase Founder Shares under this Section 3.1 in accordance with the following procedures:

(i)    The Company shall give notice to the Founder Stockholder that Owns the Founder Shares subject to such right of purchase not later than the close of business on the third anniversary of the Employment Termination Date of such Principal (the "Notice Date"), advising such Founder Stockholder of the

7

CONFIDENTIAL NB 00036

Company's election to exercise such right, stating the number of Founder Shares to be so purchased, the Purchase Price, closing arrangements and a closing date at which payment of the consideration for such Founder Shares will be made, which date shall be not less than five days nor more than 90 days after the Notice Date

(ii)    On the closing date, the Company and such Founder Stockholder shall cause the nominee holding the Founder Shares being so purchased to deliver the certificates representing such Founder Shares, properly endorsed for transfer by such Founder Stockholder or his, her or its attorney-in-fact, to the Company at its principal place of business and the Company shall deliver to such Founder Stockholder the consideration therefor (it being understood and confirmed that NB LLC has been appointed attorney-in-fact for such Founder Stockholder pursuant to the Exchange Agreement to take all such actions, to make such endorsements and to execute such documents as may be required to consummate the sale under this Section 3 1 of Founder Shares to the Company)

(c)    If a Principal and his or her Family Affiliates are unable to satisfy their obligations under this Section 3 1 to deliver Founder Shares to the Company for any reason, such Principal shall be liable to the Company, as liquidated damages and not as a penalty, for an amount equal to the product of (i) the number of Founder Shares that should have been sold to the Company under this Section 3 1 but were not sold and (ii) the excess, if any, of the Market Value of such shares as of the Notice Date over the Purchase Price

Section 3 2   Notice of Harmful Activity.  Prior to the third anniversary of such Principal's Employment Termination Date (including during such Principal's employment with the Company Group), each Principal who engages (or intends to engage) in Harmful Activity agrees (a) to notify the Company in writing in reasonable detail at least 30 days prior to engaging in such Harmful Activity, (b) to respond to such questions and furnish such additional information as the Company may request with respect to such Harmful Activity and (c) to update such written notice or inquiries promptly in the event of any circumstances that would cause any notices or responses to be inaccurate or incomplete

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4 1   Representations and Warranties of the Founder Stockholders Each Founder Stockholder severally represents and warrants to the Company and to each

8

CONFIDENTIAL NB 00037

other Founder Stockholder that (a) in the case of a Founder Shareholder who is not a natural person, such Founder Stockholder is duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has been duly executed by such Founder Shareholder or his, her or its attorney-in-fact on behalf of such Founder Stockholder and is a valid and binding agreement of such Founder Shareholder, enforceable against such Founder Shareholder in accordance with its terms, (c) the execution, delivery and performance by such Founder Shareholder of this Agreement does not violate or conflict with or result in a breach of or constitute (or with notice or lapse of time or both constitute) a default under any agreement to which such Founder Shareholder is a party, and (d) such Founder Stockholder has good and marketable title to the shares of Common Stock acquired pursuant to the Exchange free and clear of any pledge, lien, security interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this Agreement

Section 4.2    Representations and Warranties of the Company    The Company represents and warrants to the Founder Stockholders that (a) the Company is duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has been duly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, and (c) the execution, delivery and performance by the Company of this Agreement does not violate or conflict with or result in a breach by the Company of or constitute (or with notice or lapse of time or both constitute) a default by the Company under its Certificate of Incorporation or By-Laws, any existing applicable law, rule, regulation, judgment, order, or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company or its property, including the requirements of the NYSE, or any agreement or instrument to which the Company is a party or by which the Company or its property may be bound

## ARTICLE V

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"Additional Shares" means shares of Common Stock Owned by an Additional Stockholder that, pursuant to an agreement with the Company, are to be voted in accordance with Article II of this Agreement

9

200239133

CONFIDENTIAL NB 00038

"Additional Stockholder" means any Person that Owns Common Stock who has agreed, pursuant to an agreement with the Company, to vote shares of such Common Stock in accordance with Article II of this Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"AMEX" has the meaning set forth in Section 6.10(b).

"Board of Directors" means the Board of Directors of the Company or, to the extent expressly authorized by the Board of Directors to exercise the powers of the Board of Directors under this Agreement, (i) any committee of such Board of Directors or (ii) any board of directors or committee of any Subsidiary of the Company.

"Business Day" means a day on which the principal national securities exchange on which shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Borough of Manhattan, City and State of New York are not authorized or obligated by law or executive order to close.

"Cause" means, with respect to any Principal,

(a) gross negligence or willful misconduct in the performance of his or her duties as an employee of the Company Group or willful and repeated failure to perform his or her duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure,

(b) conviction of, or entering a plea of <u>nolo contendere</u> to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury,

(c) dishonesty that has resulted in damage to the property, business or reputation of the Company and its Subsidiaries, misappropriation of, or intentional damage to, the property, business or reputation of the Company and its Subsidiaries, perpetration of fraud on the Company Group that has resulted in damage to the property or business of the Company Group, or

20825913.3

Stockholders' Agreement

CONFIDENTIAL NB 00039

(d)     a finding by the Commission or a court of competent jurisdiction that he or she has committed an act that would cause such Founder Stockholder, the Company or any of its affiliates to be disqualified in any manner under section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of the Company or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission.

"Closing Price" means, on any day, the last sales price, regular way, per share of Common Stock on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, as reported in the principal consolidated transaction reporting system covering securities listed or admitted to trading on the NYSE or, if shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system covering securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Quotation Bureau, Inc., or a similar reporting service designated by the Board of Directors.

"Commission" means the Securities and Exchange Commission.

"Common Stock" has the meaning set forth in the recitals to this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement and any successors thereof, whether by operation of law or otherwise.

"Company Group" means the Company and its Subsidiaries.

"Confidential Information" means information developed by or for the Company Group that has a significant business purpose related to the business of the Company Group and that is not generally available in the investment Founder industry or the public generally, but only for so long as such information continues to have a significant business purpose for the Company Group.

"Disability" means disability as that term is defined under the Company's long-term disability plan in effect at the date of such determination, or any other

11

Stockholders Agreement

CONFIDENTIAL NB 00040

plan or definition designated by the Board of Directors for the purpose of this provision.

"Effective Time" shall have the meaning given therefor in the Exchange Agreement.

"Employment Termination Date" means, with respect to any Principal, the date of termination of such Principal's employment with the Company Group for any reason, (whether or not terminated by action of the Company Group), as determined by the Board of Directors in its sole and absolute discretion.

"Exchange" has the meaning set forth in the recitals to this Agreement.

"Exchange Agreement" has the meaning set forth in the recitals to this Agreement.

"Family Affiliates" means, as the context requires, (g) the Persons listed on Schedule II hereto or (h) with respect to any Principal, (i) the Persons listed on Schedule II hereto to whom such Principal transferred a limited liability company interest prior to the Exchange and (ii) any Person to whom such Principal Transfers Founder Shares with the written consent of the Board of Directors in accordance with Section 1.3 and who agrees in writing to be subject to the terms and provisions of this Agreement as a Family Affiliate.

"Founder Shares" means, with respect to any Founder Stockholder, the shares of Common Stock received by such Founder Shareholders as a result of the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Founder Shares.

"Founder Stockholders" has the meaning set forth in the recitals to this Agreement.

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

(a)      solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action

12

CONFIDENTIAL NB 00041

taken during such Principal's employment with the Company Group, during
the one-year period immediately prior to such action or (ii) any
prospective client of the Company Group who, within the one year period
prior to such Employment Termination Date (or, in the case of an action
taken during such Principal's employment with the Company Group, within
the one-year period immediately prior to such action), had been directly
solicited by such Principal or where, directly or indirectly, in whole or in
part, such Principal supervised or participated in the Company Group's
solicitation activities related to such prospective client.

(b)    solicits or accepts business from or through, or engages in
any sales or marketing activities with, any financial intermediary (including,
without limitation, any broker-dealer, bank, insurance company, financial
planner or other financial institution), or any person employed by or
associated with a financial intermediary, with whom such Principal had
business contact during the one year period prior to such Principal's
Employment Termination Date;

(c)    (i) employs any current or former employee or consultant of
the Company Group (other than clerical, secretarial and other similar
support personnel) or (ii) recruits, solicits or induces (or in any way assists
another in recruiting, soliciting or inducing) any such Person to terminate
his or her employment or consultantship with the Company Group, unless,
in the case of (i) or (ii), such person shall have ceased to be employed by or
a consultant to the Company Group for a period of at least one year prior
to the time of such employment, recruitment, solicitation or inducement;

(d)    markets, promotes or otherwise trades on or (other than
solely in connection with seeking new employment) claims (or in any way,
other than in connection with the business of the Company Group, assists
any Person in marketing, promoting or otherwise trading on or claiming) as
such Principal's (or such other Person's), the investment performance
record (including without limitation performance ratings or rankings
provided by any rating or ranking service) of any mutual fund, client
account or group of mutual funds or client accounts with which such
Principal was associated while employed with the Company Group.

(e)    discloses to any person, firm or corporation any
Confidential Information that is known to the Principal as a result of his or
her employment or professional association with the Company Group or

13

CONFIDENTIAL NB 00042

uses the same in any way other than in connection with the business of the Company Group; or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

"Market Value" means the average of the daily Closing Prices for the ten consecutive Business Days ending on the Business Day immediately prior to the date of determination.

"Merger" has the meaning set forth in the recitals to this Agreement.

"NASD" means the National Association of Securities Dealers, Inc.

"New Principal" means a Principal listed on Schedule III.

"NB LLC" has the meaning set forth in the recitals to this Agreement.

"NBMI" has the meaning set forth in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement, dated as of the date hereof, between the Company and the Principals.

"Notice Date" has the meaning set forth in Section 3.1(b)(i).

"Number of Initial Founder Shares" means, with respect to any Principal and his or her Family Affiliates, the aggregate number of Founder Shares received by such Persons in the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Initial Founder Shares.

"NYSE" means the New York Stock Exchange, Inc.

14

CONFIDENTIAL NB 00043

"Option Period" has the meaning set forth in Section 3.1(a).

"Own" means to own of record or beneficially, whether directly, through a nominee designated by the Company pursuant to Section 1.6 or through any other Person.

"Person" means any natural person or any firm, partnership, limited liability partnership, association, corporation, limited liability company, trust, business trust, governmental authority or other entity.

"Preliminary Vote" has the meaning set forth in Section 2.1.

"Principals" means the natural persons listed on Schedule I hereto.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Subsidiary" means a corporation, limited liability company or other entity of which the Company, directly or indirectly, has the power, whether through the ownership of voting securities, equity interests, contract or otherwise (i) to elect at least a majority of the members of such entity's board of directors or other governing body or (ii) in the absence of a governing body, to control the business affairs of such entity.

"Transfer" means, with respect to any Founder Shares, directly or indirectly, (i) to sell, assign, transfer, pledge (including in margin transactions), convey, distribute, mortgage, encumber, hypothecate or otherwise dispose, whether by gift, for consideration or for no consideration and (ii) to grant any right to vote, whether by proxy, voting agreement, voting trust or otherwise.

"Unsold IPO Allotment" means, with respect to any Principal, that number of Founder Shares Owned by such Principal and his or her Family Affiliates that is equal to the amount, if any, by which (a) 15% of the Number of Initial Founder Shares Owned by such Principal and his or her Family Affiliates exceeds (b) the aggregate number of Founder Shares sold by such Principal and his or her Family Affiliates in the initial public offering of Common Stock of the Company.

15

CONFIDENTIAL NB 00044

ARTICLE VI

MISCELLANEOUS

Section 6.1    Notices.    (a) All notices, requests, demands, waivers and
other communications to be given by any party hereunder shall be in writing and shall be
(i) mailed by first-class, registered or certified mail, postage prepaid, (ii) sent by hand
delivery or reputable overnight delivery service or (iii) transmitted by telecopy (provided
that a copy is also sent by reputable overnight delivery service) addressed, in the case of
any Principal, to him or her at the address set forth on Schedule I, in the case of any
Family Affiliate, to it at the address set forth on Schedule II or, in the case of the
Company, to Neuberger Berman Inc., 605 Third Avenue, New York, NY 10158,
Attention Secretary or in each case, to such other address as may be specified in writing
to the other parties hereto.

(b)    All such notices, requests, demands, waivers and other
communications shall be deemed to have been given and received (i) if by personal
delivery or telecopy, on the day of such delivery, (ii) if by first-class, registered or certified
mail, on the fifth Business Day after the mailing thereof or (iii) if by reputable overnight
delivery service, on the day delivered.

Section 6.2    Term of the Agreement.    (a) This Agreement shall become
effective upon the occurrence of the Effective Time and shall terminate on the earlier to
occur of (i) the first date on which there are no Founder Stockholders who remain bound
by its terms and (ii) the date on which the Company and all Founder Stockholders who are
then bound by its terms agree to terminate this Agreement.

(b)    Unless this Agreement is theretofore terminated pursuant to
Section 6.2(a) hereof, a Founder Stockholder shall be bound by its terms until all Founder
Shares Owned by such Founder Stockholder are free of the provisions of Articles I, II and
III hereof.

Section 6.3    Amendments. Waivers.    (a) This Agreement may be amended
or modified, and any provision in this Agreement may be waived, if such amendment,
modification or waiver is approved by the Board of Directors, provided that any
amendment that would materially adversely affect any Founder Stockholder (other than an
amendment that, in the good faith judgment of the Board of Directors, is intended to cure
any ambiguity or correct or supplement any provisions of this Agreement that may be
incomplete or inconsistent with any other provision contained herein) must be approved by
the Founder Stockholders that Own a majority of the Founder Shares subject to this
Agreement as of the date of such amendment or modification, provided, further, that,

16

CONFIDENTIAL NB 00045

without the consent of any Person, the Board of Directors may permit any Person who executes and delivers a counterpart of this Agreement to become a party to this Agreement by amending Schedule I or II hereto, as the case may be

(b)    The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the rights at a later time to enforce the same. No waiver by any party of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or the breach of any other term of this Agreement

Section 6.4    <u>Adjustment Upon Changes in Capitalization</u>    In the event of any change in the outstanding shares of the Company by reason of stock dividends, split-ups, recapitalizations, combinations, exchanges of shares and the like, the term " shares of Common Stock" shall refer to and include the securities received or resulting therefrom and the terms and provisions of this Agreement, including without limitation the terms "Founder Shares" and "Purchase Price," shall be appropriately adjusted so that each Founder Stockholder will thereafter continue to have and be subject to, to the greatest extent practicable, the same rights and obligations he, she or it had been subject to prior to such change.

Section 6.5    <u>Disinterested Board Members to Make Determinations</u>    In the event that any Founder Stockholder breaches its obligations under this Agreement then the Board of Directors shall have the exclusive right to make (on behalf of the Company) any and all determinations that may be necessary or appropriate under this Agreement, including without limitation, determinations relating to the exercise and enforcement of remedies hereunder. If a Founder Stockholder who is also a member of the Board of Directors breaches his or her obligations under this Agreement, such Founder Stockholder must refrain from exercising his or her vote at meetings of the Board and general meetings of the Company to give effect to this Section 6.5

Section 6.6    <u>Severability</u>    If the final determination of a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision hereof is invalid or unenforceable, (<u>a</u>) the remaining terms and provisions hereof shall be unimpaired and (<u>b</u>) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision

Section 6.7    <u>Representatives, Successors and Assigns</u>    Each Principal shall cause his or her Family Affiliate to comply with the terms and provisions of this

20622913.3                                              Stockholders Agreement

CONFIDENTIAL NB 00046

Agreement. This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective legatees, legal representatives, successors and assigns, provided that Founder Stockholders may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement except with the written consent of the Board of Directors.

Section 6.8   Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OR RULES THEREOF).

Section 6.9   Specific Performance.  Each of the parties hereto acknowledges that it will be impossible to measure in money the damage to the Company or the Founder Stockholders if any party hereto fails to comply with the provisions of Article I, II or III and each party hereto agrees that in the event of any such failure, neither the Company nor any Founder Stockholder will have an adequate remedy at law. Therefore, the Company and each Founder Stockholder, in addition to all of the other remedies which may be available, shall have the right to equitable relief, including, without limitation, the right to enforce specifically the provisions of Article I, II and III by obtaining injunctive relief against any violation thereof, or otherwise. All claims for specific performance of one or more provisions of this Agreement shall be resolved exclusively by litigation before a court of competent jurisdiction located in the State of New York.

Section 6.10   Arbitration.  Except for claims for specific performance brought in accordance with Section 6.9, all disputes, differences, and controversies arising out of or in any way related to this Agreement shall be submitted:

(a)   to the NYSE to be heard and decided under the terms of this Agreement and the then applicable rules of the NYSE or, if those rules as interpreted by the NYSE do not permit the disputes, differences and controversies to be submitted to the NYSE for arbitration, then

(b)   to the American Stock Exchange (the "AMEX") in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the AMEX or, if those rules as interpreted by the AMEX do not permit the disputes, differences and controversies to be submitted to the AMEX for arbitration, then

(c)   to the NASD in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the NASD or, if

18

CONFIDENTIAL NB 00047

the disputes, differences and controversies are not eligible for submission to the NASD for arbitration under those rules as interpreted by the NASD, then

(d)    to the American Arbitration Association in New York, New York,

to be heard and decided under the terms of this Agreement and in accordance with the then applicable rules of the hearing body by a panel of three arbitrators (unless the rules of the hearing body shall require a different number of arbitrators) chosen in accordance with the then applicable rules of the hearing body. The decision of the arbitrators shall be final and binding upon the parties, and an order may be entered upon the award of the arbitrators in any court of competent jurisdiction.

Section 6.11.  Submission to Jurisdiction; Waiver of Immunity.  Each Founder Stockholder, for itself and its successors and assigns, hereby irrevocably waives (a) any objection, and agrees not to assert, as a defense in any arbitration or legal or equitable action, suit or proceeding against such Founder Stockholder arising out of or relating to this Agreement or any transaction contemplated hereby or the subject matter of any of the foregoing, that (i) it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable before such arbitral body or in said courts, (ii) the venue thereof may not be appropriate and (iii) the internal laws of the State of New York do not govern the validity, interpretation or effect of this Agreement, (b) any immunity from jurisdiction to which it might otherwise be entitled in any such arbitration, action, suit or proceeding which may be instituted before any state or federal court in the State of New York in accordance with Section 6.9 or before any arbitral body in accordance with Section 6.10 and (c) any immunity from the maintaining of an action against it to enforce any judgment for money obtained in any such arbitration, action, suit or proceeding and, to the extent permitted by applicable law, any immunity from execution.

Section 6.12  Further Assurances.  Each Founder Stockholder agrees to execute such additional documents and take such further action as may be requested by the Company to effect the provisions of this Agreement.

Section 6.13.  Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

Section 6.14.  Entire Agreement.  This Agreement, including the Schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

19

CONFIDENTIAL NB 00048

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be duly executed as of the date first above written.

NEUBERGER BERMAN INC

By _____

Name  Jeffrey B. Lane
Title  President, Chief Executive Officer

CONFIDENTIAL NB 00049

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August __, 1999

_____
David I. Weiner

CONFIDENTIAL NB 00050

The foregoing Stockholders Agreement
is hereby agreed to and executed
as of August ___, ____.


WEINER 1998 GRANTOR
RETAINED ANNUITY TRUST


By: Neuberger Berman Trust Company
      of Delaware, as Trustee


        By _____
             John W. Mack, Vice President


By _____
     David E. Weiner, as Trustee


By _____
     Louise E. Weiner, as Trustee


By _____
     Bontcar Patar, as Trustee

Stockholders Agreement

CONFIDENTIAL NB 00051

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August 31, 1999

WEINER 1998 GRANTOR
RETAINED ANNUITY TRUST

By  Neuberger Berman Trust Company
    of Delaware, as Trustee

By  _____
    John W. Mack, Vice President

By  _____
    David I. Weiner, as Trustee

By  _____
    Laurie I. Weiner, as Trustee

By  _____
    Bruton Palar, as Trustee

CONFIDENTIAL NB 00052

**Exhibit G**

Execution Copy

NEUBERGER BERMAN INC.

STOCKHOLDERS AGREEMENT

Dated as of August 2, 1999



DEFENDANT'S
EXHIBIT
NBG

20623913 3

CONFIDENTIAL NB 00053

# TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| ARTICLE I | | |
| LIMITATIONS ON TRANSFER OF SHARES | | 2 |
| Section 1.1  Transfers Generally | | 2 |
| Section 1.2  Transfers Following Death or Disability | | 3 |
| Section 1.3  Transfers with the Consent of Board of Directors | | 4 |
| Section 1.4  Compliance with Law and Regulations | | 4 |
| Section 1.5  Legend on Certificates; Entry of Stop Transfer Orders | | 4 |
| Section 1.6  Certificates to be Held by Company | | 4 |
| Section 1.7  Transfers in Violation of Agreement Void | | 6 |
| ARTICLE II | | |
| VOTING AGREEMENT | | 6 |
| Section 2.1  Preliminary Vote of Founder Stockholders | | 6 |
| Section 2.2  Voting by Founder Stockholders | | 6 |
| Section 2.3  Termination of Voting Provisions | | 7 |
| ARTICLE III | | |
| RIGHT TO PURCHASE SHARES | | 7 |
| Section 3.1  Right of the Company to Purchase Shares in Case of Harmful Activity | | 7 |
| Section 3.2  Notice of Harmful Activity | | 8 |
| ARTICLE IV | | |
| REPRESENTATIONS AND WARRANTIES | | 8 |
| Section 4.1  Representations and Warranties of the Founder Stockholders | | 8 |
| Section 4.2  Representations and Warranties of the Company | | 9 |
| ARTICLE V | | |
| DEFINITIONS | | 9 |

i

Stockholders Agreement

CONFIDENTIAL NB 00054

ARTICLE VI

MISCELLANEOUS                                                                16
Section 6.1   Notices                                                        16
Section 6.2   Term of the Agreement                                          16
Section 6.3   Amendments, Waivers                                            16
Section 6.4   Adjustment Upon Changes in Capitalization                      17
Section 6.5   Severability                                                   17
Section 6.7   Representatives, Successors and Assigns                        17
Section 6.8   Governing Law                                                  18
Section 6.9   Specific Performance                                           18
Section 6.10  Arbitration                                                    18
Section 6.11  Submission to Jurisdiction, Waiver of Immunity                 19
Section 6.12  Further Assurances                                             19
Section 6.13  Execution in Counterparts                                      19
Section 6.14  Entire Agreement                                               19

Schedule I

Schedule II

206239133

Stockholders Agreement

CONFIDENTIAL NB 00055

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "Agreement") is dated as of August 2, 1999, by and among (i) Neuberger Berman Inc., a Delaware corporation (the "Company"), (ii) the Principals (as defined below) listed on Schedule I hereto and (iii) the Family Affiliates (as defined below) listed on Schedule II hereto. Capitalized terms used herein have their respective meanings set forth in Article V of this Agreement.

### W I T N E S S E T H

WHEREAS, the parties hereto have entered into a Plan of Merger and Exchange Agreement, dated as of the date hereof (the "Exchange Agreement"), pursuant to which (i) the Principals and their Family Affiliates, as sole members of Neuberger Berman, LLC, a Delaware limited liability company ("NB LLC"), will contribute their respective interests in NB LLC to the Company in exchange for shares of common stock, par value $.01 (the "Common Stock"), of the Company (the "Exchange") and (ii) Neuberger Berman Sub Inc., a wholly-owned direct subsidiary of the Company, will merge into Neuberger Berman Management Inc., a New York corporation ("NBMI"), with the Principals, as the sole shareholders of NBMI, will receive shares of the Common Stock (the "Merger").

WHEREAS, as a result of the Exchange and Merger, the Principals and their Family Affiliates (collectively, the "Founder Stockholders") will Own all of the issued and outstanding Common Stock;

WHEREAS, the Company and the Founder Stockholders desire to enter into certain agreements with respect to the Transfer and voting of their Common Stock and various other matters in order to continue harmonious relationships among the themselves with respect to the conduct of the business and affairs of the Company;

WHEREAS, most of the Principals have devoted a substantial portion of their professional careers with the Company Group and its predecessors, and the parties hereto desire to encourage the Principals to continue their long-term professional association with the Company for the good of all parties, and

WHEREAS, it is a condition precedent to the closing under the Exchange Agreement that the parties hereto enter into this Agreement.

CONFIDENTIAL NB 00056

NOW THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## LIMITATIONS ON TRANSFER OF SHARES

Section 1.1    Transfers Generally    Each Founder Stockholder agrees that, in addition to any restrictions imposed by law, no Founder Stockholder shall Transfer any Founder Shares Owned by such Founder Stockholder, except that:

(a)    Subject to Sections 1.1(b) and 1.1(c), each Principal, together with his or her Family Affiliates, may in the aggregate Transfer (x) on and after January 1, 2002 and prior to January 1, 2003, a number of Founder Shares not to exceed the sum of such Principal's Unsold IPO Allotment and 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates and (y) in each calender year commencing January 1, 2003, a number of Founder Shares not to exceed 10% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates, provided that, in the case of each of the preceding clauses (x) and (y):

(i)    Prior to the third anniversary of the Employment Termination Date of such Principal, neither such Principal nor any of his or her Family Affiliates may Transfer Founder Shares if, as a result of such Transfer, such Principal and Family Affiliates would in the aggregate Own less than that number of Founder Shares that is equal to 30% of the aggregate Number of Initial Founder Shares Owned by such Principal and Family Affiliates; and

(ii)    Commencing on such Principal's Employment Termination Date and continuing until the third anniversary thereof, such Principal and his or her Family Affiliates may not Transfer any Founder Shares other than Founder Shares eligible to be Transferred but not Transferred on or prior to such Employment Termination Date, and

2

CONFIDENTIAL NB 00057

(iii)   Any Founder Shares in respect of which the Company has exercised its right of purchase pursuant to Article III hereof may only be Transferred in accordance with Article III

Any number of Founder Shares eligible to be Transferred in any calendar year under this Section 1.1(a) but not so Transferred may be Transferred in any future calendar year without any restriction imposed by this Section 1.1(a)

(b)   Notwithstanding Section 1.1(a), if the Employment Termination Date of any Principal occurs prior to January 1, 2005.

(i)   Such Principal and his or her Family Affiliates may not Transfer any Founder Shares prior to January 1, 2007; and

(ii)   Subject to Section 3.1, on and after January 1, 2007, such Principal, together with his or her Family Affiliates, may in the aggregate Transfer in any calendar year up to that number of Founder Shares that is equal to 20% of the aggregate number of Founder Shares Owned by such Principal and his or her Family Affiliates on the Employment Termination Date of such Principal, provided that any number of Founder Shares that was eligible to be Transferred under this clause (ii) but not so Transferred may be Transferred in any future calendar year without regard to the 20% annual limit imposed on Transfers by this clause (ii).

provided, further, that this Section 1.1(b) shall not apply if such Principal's employment with the Company Group was terminated by the Company Group without Cause.

(c)   Notwithstanding Sections 1.1(a) and 1.1(b), no Principal nor any of his or her Family Affiliates may Transfer Founder Shares during the pendency of any dispute between the Company and such Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates.

Section 1.2   Transfers Following Death or Disability   Notwithstanding any other provisions of this Agreement, upon the death or Disability of any Principal, such Principal (or his or her estate) and his or her Family Affiliates may Transfer Founder Shares free of any provisions of this Agreement

3

Stockholders Agreement

CONFIDENTIAL NB 00058

Section 1.3    Transfers with the Consent of Board of Directors.
Notwithstanding any other provisions of this Agreement, a Founder Stockholder may
Transfer any number of Founder Shares at any time with the prior written consent of the
Board of Directors, which consent may be withheld or delayed, or granted on such terms
and conditions as it may determine, in its sole discretion.

Section 1.4    Compliance with Law and Regulations.  Each Founder
Stockholder agrees that any Transfer of Founder Shares by such Founder Stockholder
shall be in compliance with any applicable constitution, rule or regulation of, or any
applicable policy of, the NASD, any of the exchanges or associations or other institutions
with which the Company Group has membership or other privileges (including, without
limitation, the NYSE), federal and state securities laws, and any applicable law, rule or
regulation of the Commission or any other governmental agency having jurisdiction.

Section 1.5    Legend on Certificates; Entry of Stop Transfer Orders.
(a)  Each Founder Stockholder agrees that each outstanding certificate representing any
Founder Shares that are subject to this Agreement shall bear an endorsement noted
conspicuously on each such certificate reading substantially as follows:

> "The securities represented by this certificate were issued without
> registration under the Securities Act of 1933.  No transfer of such
> securities may be made without an opinion of counsel, satisfactory to the
> Company, that such transfer may properly be made without registration
> under the Securities Act of 1933 or that such securities have been so
> registered under a registration statement which is in effect at the date of
> such transfer.
>
> The securities represented by this certificate are subject to the provisions of
> an agreement dated as of August [  ], 1999 among the Company and
> certain persons listed on Schedules I and II to such agreement, a copy of
> which is on file at the principal executive office of the Company, and such
> securities may be sold, assigned, pledged or otherwise transferred only in
> accordance with such agreement."

(b)    Each Founder Stockholder agrees to the entry of stop transfer
orders against the transfer of legended certificates representing shares of Common Stock
except in compliance with this Agreement.

Section 1.6.  Certificates to be Held by Company.  (a) Each Founder
Stockholder agrees that the certificates representing such Founder Stockholder's Founder
Shares shall be issued in the name of a nominee holder to be designated by the Company

4

CONFIDENTIAL NB 00059

and shall be held in custody by the Company at its principal office. Subject to Section 1.6(c), the Company shall, upon the request of any such Founder Stockholder or the estate of any Founder Stockholder, as the case may be, in writing addressed to the Secretary of the Company or any officer designated by the Secretary (which request shall include a representation by such Founder Stockholder or estate thereof that such Founder Stockholder is then permitted to Transfer a specified number of Founder Shares under the provisions of this Agreement), promptly release from custody the certificates representing such specified number of Founder Stockholder's Founder Shares which are then intended and permitted to be Transferred under the provisions of this Agreement.

(b)    Subject to Section 1.6(c), so long as the Founder Stockholders have provided appropriate written direction to the Company, whenever the nominee holder shall receive any cash dividend or other cash distribution upon any Founder Shares deposited pursuant to Section 1.6(a), the Company shall cause the nominee holder to distribute promptly such cash dividend or other distribution (by sale or any other manner that it may determine, net of its charges and expenses in effecting such conversion), by checks drawn on a bank in the United States, to the Founder Stockholders in proportion to the number of Founder Shares Owned by each of them respectively; provided that the Company shall cause the nominee holder to make appropriate adjustments in the amounts so distributed in respect of any amounts required to be withheld by the nominee holder from any distribution on account of taxes. The nominee holder shall distribute only such amount as can be distributed without distributing to any Founder Stockholder a fraction of one cent, and any balance not so distributable shall be held by the nominee holder (without liability for interest thereon) and shall be added to and become part of the next sum received by the nominee holder for distribution to the Founder Stockholders.

(c)    Notwithstanding Section 1.6(b), during the pendency of any dispute between the Company and any Principal or any of his or her Family Affiliates regarding the obligations under this Agreement, the Exchange Agreement or the Non-Competition Agreement of such Principal or any of his or her Family Affiliates, all cash dividends and other cash distributions received by the nominee holder in respect of the Founder Shares of such Principal and his or her Family Affiliates shall be retained by the nominee holder and shall not be distributed until the final resolution of such dispute. Each Principal and his or her Family Affiliates hereby irrevocably (i) authorizes the Company, upon any amount becoming payable by such Principal or his or her Family Affiliates in connection with any such dispute, to set off and apply against such amount an equal amount of any cash dividends or other cash distributions in respect of such the Founder Shares of such Principal and his or her Family Affiliates then retained by the nominee holder and (ii) instructs the nominee holder to distribute such amounts to the Company.

5

CONFIDENTIAL NB 00060

Section 1.7   Transfers in Violation of Agreement Void. Any attempted Transfer of Founder Shares not made in accordance with the provisions of this Agreement shall be void, and the Company shall not register, or cause or permit the registry, of Common Stock Transferred in violation of this Agreement.

ARTICLE II

VOTING AGREEMENT

Section 2.1   Preliminary Vote of Founder Stockholders. Before any vote of the stockholders of the Company at a meeting called with respect to any corporate action or before action is taken by stockholders of the Company by written consent, a vote (the "Preliminary Vote") shall be taken of Founder Stockholders Owning Founder Shares and of Additional Stockholders Owning Additional Shares, in accordance with procedures established from time to time by the Board of Directors, upon all such matters upon which such stockholder vote or other action is proposed to be taken, in which each Founder Stockholder and Additional Shareholder shall be permitted to vote the Founder Shares and Additional Shares then Owned by such stockholder in such manner as each such stockholder may determine in his, her or its sole discretion.

Section 2.2   Voting by Founder Stockholders. (a) At any meeting of the stockholders of the Company called to vote with respect to any corporate action or where action by stockholders of the Company is taken by written consent, each Founder Stockholder agrees to vote or act by written consent with respect to all the Founder Shares then Owned by such stockholder on all such matters in which action is proposed to be taken in accordance with the vote of the majority of the shares present (in person or by proxy) and voting in the Preliminary Vote.

(b)      For purposes of effecting any vote pursuant to this Section 2.2, each Founder Stockholder does hereby irrevocably make, constitute and appoint the Secretary of the Company, or any officer(s) designated in writing by the Secretary, with full power of substitution, as his, her or its true attorney-in-fact and agent, for and in his, her or its name, place and stead, to act as his proxy to the maximum extent and for the maximum term permitted by law to (i) vote such Founder Stockholder's Founder Shares at any meeting of stockholders of the Company or to take any corporate action where action by stockholders of the Company is taken by written consent with respect to such Founder Shares, in each case in accordance with Section 2.2(a) and (ii) vote such Founder Stockholder's Founder Shares in such proxy holder's discretion upon any other business which properly comes before such meetings or for which action is to be taken pursuant to such written consents, giving and granting to said attorney full power and authority to do

6

CONFIDENTIAL NB 00061

and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as he, she or it might or could do if personally present, with full power of substitution, appointment and revocation. The foregoing power of attorney and proxy are coupled with an interest and shall not be revocable or revoked by such Founder Stockholder and shall be binding upon such stockholder and his, her or its successors and assigns.

Section 2.3    Termination of Voting Provisions.  Notwithstanding any other provisions of this Agreement, (i) the right of any Principal and his or her Family Affiliate to participate in the Preliminary Vote, (ii) the obligation of any Principal and his or her Family Affiliate to vote in accordance with Section 2.2 and (iii) the irrevocable power of attorney and proxy provided by such Founder Stockholders pursuant to Section 2.2(b) shall, in each case, terminate at the close of business on the Employment Termination Date of such Principal.

## ARTICLE III

## RIGHT TO PURCHASE SHARES

Section 3.1    Right of the Company to Purchase Shares in Case of Harmful Activity.  (a)  If, on or prior to the third anniversary of the Employment Termination Date of any Principal (including during such Principal's employment with the Company Group), the Board of Directors determines in its good faith judgment that such Principal has engaged in Harmful Activity, the Company shall have the right to purchase, at any time or from time to time, from such Principal (or, to the extent a Principal does not Own sufficient shares of Common Stock to satisfy his or her obligations under this Section 3.1, to purchase from his or her Family Affiliates pro rata in accordance with the number of Founder Shares Owned by such Family Affiliates on the Notice Date), the number of Founder Shares Owned by such Principal and his or her Family Affiliates that could not have been Transferred by such Founder Stockholders in accordance with Section 1.1 prior to the Notice Date.  The purchase price of each Founder Share (the "Purchase Price") purchased by the Company pursuant to this Section 3.1 shall equal $2.00 per share.

(b)    The Company may exercise its right to purchase Founder Shares under this Section 3.1 in accordance with the following procedures:

(i)    The Company shall give notice to the Founder Stockholder that Owns the Founder Shares subject to such right of purchase not later than the close of business on the third anniversary of the Employment Termination Date of such Principal (the "Notice Date"), advising such Founder Stockholder of the

7

Company's election to exercise such right, stating the number of Founder Shares to be so purchased, the Purchase Price, closing arrangements and a closing date at which payment of the consideration for such Founder Shares will be made, which date shall be not less than five days nor more than 90 days after the Notice Date.

(ii)    On the closing date, the Company and such Founder Stockholder shall cause the nominee holding the Founder Shares being so purchased to deliver the certificates representing such Founder Shares, properly endorsed for transfer by such Founder Stockholder or his, her or its attorney-in-fact, to the Company at its principal place of business and the Company shall deliver to such Founder Stockholder the consideration therefor (it being understood and confirmed that NB LLC has been appointed attorney-in-fact for such Founder Stockholder pursuant to the Exchange Agreement to take all such actions, to make such endorsements and to execute such documents as may be required to consummate the sale under this Section 3.1 of Founder Shares to the Company).

(c)    If a Principal and his or her Family Affiliates are unable to satisfy their obligations under this Section 3.1 to deliver Founder Shares to the Company for any reason, such Principal shall be liable to the Company, as liquidated damages and not as a penalty, for an amount equal to the product of (i) the number of Founder Shares that should have been sold to the Company under this Section 3.1 but were not sold and (ii) the excess, if any, of the Market Value of such shares as of the Notice Date over the Purchase Price.

Section 3.2   Notice of Harmful Activity.   Prior to the third anniversary of such Principal's Employment Termination Date (including during such Principal's employment with the Company Group), each Principal who engages (or intends to engage) in Harmful Activity agrees (a) to notify the Company in writing in reasonable detail at least 30 days prior to engaging in such Harmful Activity, (b) to respond to such questions and furnish such additional information as the Company may request with respect to such Harmful Activity and (c) to update such written notice or inquiries promptly in the event of any circumstances that would cause any notices or responses to be inaccurate or incomplete.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1   Representations and Warranties of the Founder Stockholders. Each Founder Stockholder severally represents and warrants to the Company and to each

8

other Founder Stockholder that (a) in the case of a Founder Shareholder who is not a natural person, such Founder Stockholder is duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has been duly executed by such Founder Shareholder or his, her or its attorney-in-fact on behalf of such Founder Stockholder and is a valid and binding agreement of such Founder Shareholder, enforceable against such Founder Shareholder in accordance with its terms, (c) the execution, delivery and performance by such Founder Shareholder of this Agreement does not violate or conflict with or result in a breach of or constitute (or with notice or lapse of time or both constitute) a default under any agreement to which such Founder Shareholder is a party, and (d) such Founder Stockholder has good and marketable title to the shares of Common Stock acquired pursuant to the Exchange free and clear of any pledge, lien, security interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this Agreement.

Section 4.2.  <u>Representations and Warranties of the Company</u>.  The Company represents and warrants to the Founder Stockholders that (a) the Company is duly authorized to execute, deliver and perform this Agreement, (b) this Agreement has been duly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, and (c) the execution, delivery and performance by the Company of this Agreement does not violate or conflict with or result in a breach by the Company of or constitute (or with notice or lapse of time or both constitute) a default by the Company under its Certificate of Incorporation or By-Laws, any existing applicable law, rule, regulation, judgment, order, or decree of any government, governmental instrumentality or court, domestic or foreign, having jurisdiction over the Company or its property including the requirements of the NYSE, or any agreement or instrument to which the Company is a party or by which the Company or its property may be bound.

## ARTICLE V

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

"Additional Shares" means shares of Common Stock Owned by an Additional Stockholder that, pursuant to an agreement with the Company, are to be voted in accordance with Article II of this Agreement.

9

Stockholders Agreement

CONFIDENTIAL NB 00064

"Additional Stockholder" means any Person that Owns Common Stock who has agreed, pursuant to an agreement with the Company, to vote shares of such Common Stock in accordance with Article II of this Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"AMEX" has the meaning set forth in Section 6.10(b).

"Board of Directors" means the Board of Directors of the Company or, to the extent expressly authorized by the Board of Directors to exercise the powers of the Board of Directors under this Agreement, (i) any committee of such Board of Directors or (ii) any board of directors or committee of any Subsidiary of the Company.

"Business Day" means a day on which the principal national securities exchange on which shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Borough of Manhattan, City and State of New York are not authorized or obligated by law or executive order to close.

"Cause" means, with respect to any Principal:

(a)    gross negligence or willful misconduct in the performance of his or her duties as an employee of the Company Group or willful and repeated failure to perform his or her duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(b)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(c)    dishonesty that has resulted in damage to the property, business or reputation of the Company and its Subsidiaries, misappropriation of, or intentional damage to, the property, business or reputation of the Company and its Subsidiaries, perpetration of fraud on the Company Group that has resulted in damage to the property or business of the Company Group, or

10

Stockholders Agreement

CONFIDENTIAL NB 00065

(d)    a finding by the Commission or a court of competent jurisdiction that he or she has committed an act that would cause such Founder Stockholder, the Company or any of its affiliates to be disqualified in any manner under section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of the Company or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission.

"Closing Price" means, on any day, the last sales price, regular way, per share of Common Stock on such day, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, as reported in the principal consolidated transaction reporting system covering securities listed or admitted to trading on the NYSE or, if shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system covering securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Quotation Bureau, Inc., or a similar reporting service designated by the Board of Directors.

"Commission" means the Securities and Exchange Commission.

"Common Stock" has the meaning set forth in the recitals to this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement and any successors thereof, whether by operation of law or otherwise.

"Company Group" means the Company and its Subsidiaries.

"Confidential Information" means information developed by or for the Company Group that has a significant business purpose related to the business of the Company Group and that is not generally available in the investment Founder industry or the public generally, but only for so long as such information continues to have a significant business purpose for the Company Group.

"Disability" means disability as that term is defined under the Company's long-term disability plan in effect at the date of such determination, or any other

Stockholders Agreement

CONFIDENTIAL NB 00066

plan or definition designated by the Board of Directors for the purpose of this provision

"Effective Time" shall have the meaning given therefor in the Exchange Agreement

"Employment Termination Date" means, with respect to any Principal, the date of termination of such Principal's employment with the Company Group for any reason (whether or not terminated by action of the Company Group), as determined by the Board of Directors in its sole and absolute discretion

"Exchange" has the meaning set forth in the recitals to this Agreement

"Exchange Agreement" has the meaning set forth in the recitals to this Agreement

"Family Affiliates" means, as the context requires, (a) the Persons listed on Schedule II hereto or (b) with respect to any Principal, (i) the Persons listed on Schedule II hereto to whom such Principal transferred a limited liability company interest prior to the Exchange and (ii) any Person to whom such Principal Transfers Founder Shares with the written consent of the Board of Directors in accordance with Section 1.3 and who agrees in writing to be subject to the terms and provisions of this Agreement as a Family Affiliate

"Founder Shares" means, with respect to any Founder Stockholder, the shares of Common Stock received by such Founder Shareholders as a result of the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Founder Shares

"Founder Stockholders" has the meaning set forth in the recitals to this Agreement

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise

(a)      solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action

12

CONFIDENTIAL NB 00067

taken during such Principal's employment with the Company Group, during the one-year period immediately prior to such action) or (ii) any prospective client of the Company Group who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, within the one-year period immediately prior to such action), had been directly solicited by such Principal or where, directly or indirectly, in whole or in part, such Principal supervised or participated in the Company Group's solicitation activities related to such prospective client.

(b)      solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such Principal had business contact during the one year period prior to such Principal's Employment Termination Date;

(c)      (i) employs any current or former employee or consultant of the Company Group (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with the Company Group, unless, in the case of (i) or (ii), such person shall have ceased to be employed by or a consultant to the Company Group for a period of at least one year prior to the time of such employment, recruitment, solicitation or inducement;

(d)      markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of the Company Group, assists any Person in marketing, promoting or otherwise trading on or claiming) as such Principal's (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with the Company Group;

(e)      discloses to any person, firm or corporation any Confidential Information that is known to the Principal as a result of his or her employment or professional association with the Company Group or

13

uses the same in any way other than in connection with the business of the Company Group, or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder

"Market Value" means the average of the daily Closing Prices for the ten consecutive Business Days ending on the Business Day immediately prior to the date of determination.

"Merger" has the meaning set forth in the recitals to this Agreement

"NASD" means the National Association of Securities Dealers, Inc.

"New Principal" means a Principal listed on Schedule III.

"NB LLC" has the meaning set forth in the recitals to this Agreement

"NBMI" has the meaning set forth in the recitals to this Agreement.

"Non-Competition Agreement" means the Non-Competition Agreement, dated as of the date hereof, between the Company and the Principals.

"Notice Date" has the meaning set forth in Section 3.1(b)(i).

"Number of Initial Founder Shares" means, with respect to any Principal and his or her Family Affiliates, the aggregate number of Founder Shares received by such Persons in the Exchange or, in the case of any Founder Stockholder that becomes a party to this Agreement by an amendment to Schedule I or II hereof, the shares of Common Stock designated on such Schedule as such Founder Stockholder's Initial Founder Shares.

"NYSE" means the New York Stock Exchange, Inc.

20823913.3

CONFIDENTIAL NB 00069

"Option Period" has the meaning set forth in Section 3.1(a)

"Own" means to own of record or beneficially, whether directly, through a nominee designated by the Company pursuant to Section 1.6 or through any other Person

"Person" means any natural person or any firm, partnership, limited liability partnership, association, corporation, limited liability company, trust, business trust, governmental authority or other entity

"Preliminary Vote" has the meaning set forth in Section 2.1

"Principals" means the natural persons listed on Schedule I hereto

"Purchase Price" has the meaning set forth in Section 3.1(a)

"Subsidiary" means a corporation, limited liability company or other entity of which the Company, directly or indirectly, has the power, whether through the ownership of voting securities, equity interests, contract or otherwise, (i) to elect at least a majority of the members of such entity's board of directors or other governing body or (ii) in the absence of a governing body, to control the business affairs of such entity.

"Transfer" means, with respect to any Founder Shares, directly or indirectly, (i) to sell, assign, transfer, pledge (including in margin transactions), convey, distribute, mortgage, encumber, hypothecate or otherwise dispose, whether by gift, for consideration or for no consideration and (ii) to grant any right to vote, whether by proxy, voting agreement, voting trust or otherwise.

"Unsold IPO Allotment" means, with respect to any Principal, that number of Founder Shares Owned by such Principal and his or her Family Affiliates that is equal to the amount, if any, by which (a) 15% of the Number of Initial Founder Shares Owned by such Principal and his or her Family Affiliates exceeds (b) the aggregate number of Founder Shares sold by such Principal and his or her Family Affiliates in the initial public offering of Common Stock of the Company.

15

# ARTICLE VI

## MISCELLANEOUS

Section 6.1   Notices   (a) All notices, requests, demands, waivers and other communications to be given by any party hereunder shall be in writing and shall be (i) mailed by first-class, registered or certified mail, postage prepaid, (ii) sent by hand delivery or reputable overnight delivery service or (iii) transmitted by telecopy (provided that a copy is also sent by reputable overnight delivery service) addressed, in the case of any Principal, to him or her at the address set forth on Schedule I, in the case of any Family Affiliate, to it at the address set forth on Schedule II or, in the case of the Company, to Neuberger Berman Inc., 605 Third Avenue, New York, NY  10158, Attention   Secretary, or, in each case, to such other address as may be specified in writing to the other parties hereto

(b)   All such notices, requests, demands, waivers and other communications shall be deemed to have been given and received (i) if by personal delivery or telecopy, on the day of such delivery, (ii) if by first-class, registered or certified mail, on the fifth Business Day after the mailing thereof or (iii) if by reputable overnight delivery service, on the day delivered

Section 6.2   Term of the Agreement.  (a) This Agreement shall become effective upon the occurrence of the Effective Time and shall terminate on the earlier to occur of (i) the first date on which there are no Founder Stockholders who remain bound by its terms and (ii) the date on which the Company and all Founder Stockholders who are then bound by its terms agree to terminate this Agreement.

(b)   Unless this Agreement is theretofore terminated pursuant to Section 6.2(a) hereof, a Founder Stockholder shall be bound by its terms until all Founder Shares Owned by such Founder Stockholder are free of the provisions of Articles I, II and III hereof

Section 6.3   Amendments; Waivers.  (a) This Agreement may be amended or modified, and any provision in this Agreement may be waived, if such amendment, modification or waiver is approved by the Board of Directors, provided that any amendment that would materially adversely affect any Founder Stockholder (other than an amendment that, in the good faith judgment of the Board of Directors, is intended to cure any ambiguity or correct or supplement any provisions of this Agreement that may be incomplete or inconsistent with any other provision contained herein) must be approved by the Founder Stockholders that Own a majority of the Founder Shares subject to this Agreement as of the date of such amendment or modification, provided, further, that,

16

CONFIDENTIAL NB 00071

without the consent of any Person, the Board of Directors may permit any Person who executes and delivers a counterpart of this Agreement to become a party to this Agreement by amending Schedule I or II hereto, as the case may be

(b)    The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the rights at a later time to enforce the same. No waiver by any party of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or the breach of any other term of this Agreement

Section 6.4   Adjustment Upon Changes in Capitalization.  In the event of any change in the outstanding shares of the Company by reason of stock dividends, split-ups, recapitalizations, combinations, exchanges of shares and the like, the term "shares of Common Stock" shall refer to and include the securities received or resulting therefrom and the terms and provisions of this Agreement, including without limitation the terms "Founder Shares" and "Purchase Price," shall be appropriately adjusted so that each Founder Stockholder will thereafter continue to have and be subject to, to the greatest extent practicable, the same rights and obligations he, she or it had been subject to prior to such change

Section 6.5   Disinterested Board Members to Make Determinations.  In the event that any Founder Stockholder breaches its obligations under this Agreement, then the Board of Directors shall have the exclusive right to make (on behalf of the Company) any and all determinations that may be necessary or appropriate under this Agreement, including without limitation, determinations relating to the exercise and enforcement of remedies hereunder. If a Founder Stockholder who is also a member of the Board of Directors breaches his or her obligations under this Agreement, such Founder Stockholder must refrain from exercising his or her vote at meetings of the Board and general meetings of the Company to give effect to this Section 6.5.

Section 6.6   Severability.  If the final determination of a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 6.7   Representatives, Successors and Assigns.  Each Principal shall cause his or her Family Affiliate to comply with the terms and provisions of this

17

Agreement  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective legatees, legal representatives, successors and assigns, provided that Founder Stockholders may not assign, delegate or otherwise transfer any of their rights or obligations under this Agreement except with the written consent of the Board of Directors

Section 6 8  Governing Law  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OR RULES THEREOF)

Section 6.9.  Specific Performance.  Each of the parties hereto acknowledges that it will be impossible to measure in money the damage to the Company or the Founder Stockholders if any party hereto fails to comply with the provisions of Article I, II or III and each party hereto agrees that in the event of any such failure, neither the Company nor any Founder Stockholder will have an adequate remedy at law Therefore, the Company and each Founder Stockholder, in addition to all of the other remedies which may be available, shall have the right to equitable relief, including, without limitation, the right to enforce specifically the provisions of Article I, II and III by obtaining injunctive relief against any violation thereof, or otherwise  All claims for specific performance of one or more provisions of this Agreement shall be resolved exclusively by litigation before a court of competent jurisdiction located in the State of New York

Section 6.10.  Arbitration.  Except for claims for specific performance brought in accordance with Section 6 9, all disputes, differences, and controversies arising out of or in any way related to this Agreement shall be submitted:

(a)     to the NYSE to be heard and decided under the terms of this Agreement and the then applicable rules of the NYSE or, if those rules as interpreted by the NYSE do not permit the disputes, differences and controversies to be submitted to the NYSE for arbitration; then

(b)     to the American Stock Exchange (the "AMEX") in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the AMEX or, if those rules as interpreted by the AMEX do not permit the disputes, differences and controversies to be submitted to the AMEX for arbitration, then

(c)     to the NASD in New York, New York, to be heard and decided under the terms of this Agreement and the then applicable rules of the NASD or, if

18

Stockholders Agreement

CONFIDENTIAL NB 00073

the disputes, differences and controversies are not eligible for submission to the NASD for arbitration under those rules as interpreted by the NASD, then

(d)    to the American Arbitration Association in New York, New York,

to be heard and decided under the terms of this Agreement and in accordance with the then applicable rules of the hearing body by a panel of three arbitrators (unless the rules of the hearing body shall require a different number of arbitrators) chosen in accordance with the then applicable rules of the hearing body. The decision of the arbitrators shall be final and binding upon the parties, and an order may be entered upon the award of the arbitrators in any court of competent jurisdiction.

Section 6.11    Submission to Jurisdiction, Waiver of Immunity.  Each Founder Stockholder, for itself and its successors and assigns, hereby irrevocably waives (a) any objection, and agrees not to assert, as a defense in any arbitration or legal or equitable action, suit or proceeding against such Founder Stockholder arising out of or relating to this Agreement or any transaction contemplated hereby or the subject matter of any of the foregoing, that (i) it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable before such arbitral body or in said courts, (ii) the venue thereof may not be appropriate and (iii) the internal laws of the State of New York do not govern the validity, interpretation or effect of this Agreement, (b) any immunity from jurisdiction to which it might otherwise be entitled in any such arbitration, action, suit or proceeding which may be instituted before any state or federal court in the State of New York in accordance with Section 6.9 or before any arbitral body in accordance with Section 6.10 and (c) any immunity from the maintaining of an action against it to enforce any judgment for money obtained in any such arbitration, action, suit or proceeding and, to the extent permitted by applicable law, any immunity from execution.

Section 6.12    Further Assurances.  Each Founder Stockholder agrees to execute such additional documents and take such further action as may be requested by the Company to effect the provisions of this Agreement.

Section 6.13    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

Section 6.14    Entire Agreement.  This Agreement, including the Schedules hereto, contains the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

20623913 3

Stockholders Agreement

CONFIDENTIAL NB 00074

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written

NEUBERGER BERMAN INC

By _____
    Name: Jeffrey B. Lane
    Title: President, Chief Executive Officer

206239133

CONFIDENTIAL NB 00075

The foregoing Stockholders Agreement
is hereby agreed to by the undersigned
as of August  2 , 1999

Richard S  Levine

CONFIDENTIAL NB 00076

**Exhibit H**

FORM OF
NEUBERGER BERMAN, INC.
RETENTION BONUS POOL AWARD AGREEMENT
*(Snefel)*

October 20, 2003

In connection with the acquisition of Neuberger Berman, Inc., a Delaware corporation ("*NB Inc.*") by Lehman Brothers Holdings Inc.'s ("*Lehman*"), pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "*Merger*"), as set forth in the Agreement and Plan of Merger dated as of July 21, 2003 among Lehman Brothers Inc., Neuberger Berman Acquisition Company and NB Inc. (the "*Merger Agreement*"), NB Inc. and Lehman have agreed that you are key to the business of NB Inc. and, as such, NB Inc. desires to provide you with an incentive to remain employed with NB Inc. or its successor in the Merger (or a subsidiary thereof, if applicable) through and after the closing date of the Merger (the "*Merger Date*"). Accordingly, NB Inc. is pleased to offer you the opportunity to participate in a retention bonus pool program (the "*Retention Pool Plan*"), to be established by NB Inc. as of the Merger Date. All references to NB Inc. shall include the successor corporation after giving effect to the Merger, which is the parent corporation of the entity that you are employed by. This Retention Bonus Pool Award Agreement (the "*Award Agreement*") sets forth the terms and conditions of your award under the Retention Pool Plan. Unless otherwise set forth herein, this Award Agreement will become effective upon the Merger Date.

1.    Retention Bonus Pool Award

Subject to the terms and conditions of this Award Agreement and Schedules A, B and C attached hereto, you will be entitled to receive such allocated amount of the retention bonus pool established pursuant to the Retention Pool Plan (the "*Retention Bonus Pool*") as is identified on Schedule A as your "*Retention Bonus Pool Allocation.*"

2.    Certain Definitions

As used herein, the following terms have the following meanings:

(a)    "Cause" means:

(i)    gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(ii)    conviction of, or entering a plea of nolo contendere to, a felon [illegible] for a traffic violation) or a misdemeanor involving fraud, embezzlement, for [illegible] perjury;

(iii)    dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the



CONFIDENTIAL NB 00102

property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm;

(iv)   a finding by the Securities and Exchange Commission ("*Commission*") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)   a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)   a breach of the provisions set forth on Schedule B hereto.

(b)   "Date of Termination" means (i) if your employment is terminated by the Firm, the date of the Firm's delivery of written notice of termination or (ii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)   "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(d)   "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(e)   "Good Reason" means, without your consent,

(i)   a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)   a change of more than fifty (50) miles in the location where you are to perform your principal duties;

(iii)   a material and adverse change in the overall structure of your total compensation, as of the date hereof, where such change results in a substantial diminution in your earning ability, it being understood that under the current compensation structure of NB Inc., your total compensation is payable part in cash and part in conditional equity awards based on terms generally applicable to similarly situated NB Inc. employees; or

(iv)   a material breach by NB Inc. of a material term of this Award Agreement;

053125-0060-02343-NY03 2261642 3

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

(a)    This Award Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

(b)    Except as set forth in Schedule B, any dispute arising out of this Award Agreement will be exclusively resolved by binding statutory arbitration before the NASD or NYSE (as selected by NB Inc.), in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

(a)    Nothing contained in this Award Agreement obligates the Firm to employ you in any capacity whatsoever or prohibits or restricts the Firm from terminating your employment at any time or for any reason whatsoever.

(b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s (or its successor's) General Counsel, and to you at your last address appearing in the Firm's employment records.

(c)    Except as expressly provided herein, this Award Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder. You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Award Agreement shall be void. However, this Award Agreement shall be binding upon your permitted successors and assigns.

(d)    Without impairing your obligations or rights hereunder, NB Inc. or its successor may at any time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Award Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

(e)    This Award Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors, provided that any waiver, amendment or modification of any of the provisions of this Award Agreement shall not be effective against the Firm without the written consent of NB, Inc. or its successors.

(f)    If any provision of this Award Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the

CONFIDENTIAL NB 00104

OCT-27-09  20:35    FROM-COMPLIANCE                    2124769662          T-312  P 21/35  F-676
4

extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

(g)     NB Inc. may withhold from any amounts payable under this Award Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(h)     This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

NEUBERGER BERMAN, INC.

By: _____

Name:

Title:

Agreed to and accepted as of the date of this Award Agreement by

Stephanie Stiefel

CONFIDENTIAL NB 00105

OCT-27-03  20:36     FROM-COMPLIANCE                     2124769862              T-312  P 22/35  F-878

## Retention Bonus Pool

1.  Retention Bonus Pool Allocation: On the date of the Merger, $1,000,000 will be allocated to you and awarded to you in the form of restricted stock units ("RSUs"), to be credited to an account maintained on your behalf and payable in shares of common stock of Lehman ("Lehman Shares"). Such number of RSUs to be allocated and awarded to you will be determined by dividing the dollar amount set forth above by the "Parent Reference Price" (as defined in the Merger Agreement). Subject to certain adjustments and potential closing delay provisions described in the Merger Agreement, this price will be the average of the volume of the average weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on the second trading day prior to the date of the Merger. If the calculation described herein produces a fractional number of RSUs, such fractional RSUs (to the second decimal point) will be credited to and continue to accrue in your Retention Bonus Pool account.

2.  Vesting and Payment of RSUs: 20% per year, starting on the first anniversary of the Merger. Over the vesting period of your RSUs, your Retention Bonus Pool account will be credited with additional RSUs in respect of dividends paid to holders of the same number of Lehman Shares as you have RSUs in your account. On each vesting date, you will receive payment, in whole Lehman Shares, of such number of RSUs (including the RSUs credited as dividend equivalents on such RSUs) as are vested on that date, and any fractional Lehman Shares (to the second decimal point) will be used to offset any income tax withholding obligations of NB Inc. on such payment.

3.  (a)  Continued Vesting:

    – Termination by the Firm without Cause, if all provisions set forth in Schedule B are complied with before and after termination of employment.

    – Termination by you for Good Reason, if all provisions set forth in Schedule B are complied with before and after termination of employment.

    – Termination due to death or by the Firm due to Extended Absence

    (b)  Payment of Vested Amounts after Termination of Employment:

    – If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by you for Good Reason, you will receive payment of your amounts on each of the original vesting dates described in paragraph 2 above. (Payment will be made in the event of continued vesting only if you continue to comply with the provisions of Schedule B.)

    – Upon your death, your estate will receive immediate payment of all unpaid amounts.

4.  Forfeiture of Retention Bonus Pool allocated amounts:

    – Termination by Firm with Cause (with respect to any unvested amounts)

    – Termination by you without Good Reason (with respect to any unvested amounts)

    – Violation of any provisions set forth in Schedule B (with respect to any unvested amounts or any vested but unpaid amounts).

5.  You will receive more details regarding the retention bonus pool when it is finalized.

US3126-0080-02747-NY03 2251441 3

CONFIDENTIAL NB 00106

Non-Solicitation; Company Information

1.   In connection with the Merger, you will become entitled to receive distribution(s) from
the retention bonus pool and you will exchange your shares of common stock of NB Inc
("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and
you hereby acknowledge and agree that:

(a)   it is essential to the success of the Merger and the Firm's enterprise in the future,
and it is hereby so represented that your shares of NB Stock that are being
transferred to Lehman upon consummation of the Merger be protected by
covenants not to solicit clients or employees of the Firm; and

(b)   the Firm would suffer significant and irreparable harm, on and after the Effective
Date, from your engaging in certain activities relating to the clients or employees
of the Firm.

2   Therefore, you agree that the covenants and restrictions contained in this Schedule B are
reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the
business acquired in connection with the Merger and that the covenants and restrictions
will not unreasonably restrict your professional opportunities should your employment
with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly,
either individually or as an owner, partner, agent, employee, advisor, consultant or
otherwise (other than on behalf of the Firm while employed by the Firm) during your
employment with the Firm and for a period of twelve months after your Date of
Termination (the "Restricted Period"):

(a)   solicit or accept business from any individual or entity for whom any
member of the Firm provides services within the one-year period before
the Date of Termination;

(b)   solicit or accept business from any prospective client of the Firm who,
within the one-year period prior to the Date of Termination, you had
directly solicited or where, directly or indirectly, in whole or in part, you
supervised or participated in the Firm's solicitation activities related to
such prospective client;

(c)   solicit or engage in any sales or marketing activities with, any broker-
dealer, bank, insurance company, financial planner or other financial
institution (or any person employed by or associated with any such entity),
with whom Executive had business contact during the one-year period
prior to Executive's Date of Termination;

(d)   employ any current or former employee or consultant of the Firm (other
than clerical, secretarial and other similar support personnel); or

(e)   solicit (or assist in soliciting) any such person described in (d) to terminate
his or her employment or consulting services with the Firm (but only if,

CONFIDENTIAL NB 00107

with respect to a former employee, in the case of (d) or (e), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

The covenants set forth in (a) through (e) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (a) through (e) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason.

Company Information.

3.    You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

4.    For purposes of this Schedule B, "Confidential Information" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by you during the period of your employment. You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to. or by. any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule B

003.24:0066-05747-NY:551 228:841.5

CONFIDENTIAL NB 00108

<u>General</u>

5.    <u>Specific Performance</u>.  You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule B would be inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. (or its successor) or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Award Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

6.    <u>Separability</u>.  It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule B to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule B is an unenforceable restriction against you, the provisions of this Schedule B shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule B is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

7.    <u>Confidentiality of Agreement</u>.  Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Award Agreement; <u>provided</u> that you may disclose to any prospective future employer the provisions of this Schedule B so long as they agree to maintain the confidentiality of such provisions.

8.    <u>Other Agreements</u>  Nothing in this Schedule B shall operate to supersede, limit or waive any existing agreements between you and the Firm relating to the subject matter herein, whether or not such other agreements contain similar restrictive covenants, and nothing in any such other agreements shall operate to supersede, limit or waive the restrictive covenants contained in this Schedule B regardless of whether such agreements purport to contain the entire agreement on these matters between you and the Firm. If the restrictive covenants contained in this Schedule B and in any other agreements appear to be in conflict with each other, all such restrictive covenants shall apply independently of each other and shall remain in full force and effect regardless of the conflict.

CONFIDENTIAL NB 00109

OCT-27-09  20:37    FROM-COMPLIANCE                    2124769962            T-312   P 26/35   F-678

4

### Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Award Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule A shall be the first amounts to be reduced.

C33:26-0066-63747-NY03 2261341 3

CONFIDENTIAL NB 00110

**Exhibit I**

AUG-26-03  17:47    FROM-COMPLIANCE                2124769862          T-955   P 13/21   F-758

FORM OF
NEUBERGER BERMAN, INC.
RETENTION BONUS POOL AWARD AGREEMENT
(Glasebrook)

July 30, 2003

In connection with the acquisition of Neuberger Berman, Inc., a Delaware corporation ("NB Inc.") by Lehman Brothers Holdings, Inc.'s ("Lehman"), pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "Merger"), as set forth in the Agreement and Plan of Merger dated as of July 21, 2003 among Lehman Brothers Inc., Neuberger Berman Acquisition Company and NB Inc. (the "Merger Agreement"), NB Inc. and Lehman have agreed that you are key to the business of NB Inc. and, as such, NB Inc. desires to provide you with an incentive to remain employed with NB Inc. or its successor in the Merger (or a subsidiary thereof, if applicable) through and after the closing date of the Merger (the "Merger Date"). Accordingly, NB Inc. is pleased to offer you the opportunity to participate in a retention bonus pool program (the "Retention Pool Plan"), to be established by NB Inc. as of the Merger Date. This Retention Bonus Pool Award Agreement (the "Award Agreement") sets forth the terms and conditions of your award under the Retention Pool Plan. Unless otherwise set forth herein, this Award Agreement will become effective upon the Merger Date.

1.    Retention Bonus Pool Award

Subject to the terms and conditions of this Award Agreement and Schedules A, B and C attached hereto, you will be entitled to receive such allocated amount of the retention bonus pool established pursuant to the Retention Pool Plan (the "Retention Bonus Pool") as is identified on Schedule A as your "Retention Bonus Pool Allocation."

2.    Certain Definitions

As used herein, the following terms have the following meanings:

(a)    "Cause" means:

(i)    gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(ii)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(iii)    dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm;

Error Unknown document property name.

DEFENDANT'S
EXHIBIT
NB 1

(iv)    a finding by the Securities and Exchange Commission ("*Commission*") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)    a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)    a breach of the provisions set forth on Schedule B hereto.

(b)    "Date of Termination" means (i) if your employment is terminated by the Firm, the date of the Firm's delivery of written notice of termination or (ii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)    "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(d)    "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(e)    "Good Reason" means, without your consent,

(i)    a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)    a change of more than fifty (50) miles in the location where you are to perform your principal duties;

(iii)    a material and adverse change in the overall structure of your total compensation, as of the date hereof, where such change results in a substantial diminution in your earning ability, it being understood that under the current structure of your total compensation, your applicable percentage payout is subject to change by the group head and is payable part in cash and part in conditional equity awards based on terms generally applicable to similarly situated NB Inc. employees; or

(iv)    a material breach by NB Inc. of a material term of this Award Agreement;

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of

Error! Unknown document property name.

CONFIDENTIAL NB 00121

such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3    Governing Law; Arbitration

    (a)    This Award Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

    (b)    Except as set forth in Schedule B, any dispute arising out of this Award Agreement will be exclusively resolved by binding statutory arbitration before the NASD or NYSE (as selected by NB Inc.), in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

    (a)    Nothing contained in this Award Agreement obligates the Firm to employ you in any capacity whatsoever or prohibits or restricts the Firm from terminating your employment at any time or for any reason whatsoever.

    (b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s (or its successor's) General Counsel, and to you at your last address appearing in the Firm's employment records.

    (c)    Except as expressly provided herein, this Award Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder. You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Award Agreement shall be void. However, this Award Agreement shall be binding upon your permitted successors and assigns.

    (d)    Without impairing your obligations or rights hereunder, NB Inc. or its successor may at any time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Award Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

    (e)    This Award Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Award Agreement shall not be effective against the Firm without the written consent of NB, Inc. or its successors.

    (f)    If any provision of this Award Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

Error: Unknown document property name.

CONFIDENTIAL NB 00122

AUG-20-03  17:49    FROM-COMPLIANCE                    2124769562              T-955   P.16/21   F-758

(g)    NB Inc may withhold from any amounts payable under this Award Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(h)    This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

NEUBERGER BERMAN, INC.

By: _____

Name:

Title:


Agreed to and accepted as of the date of this Award Agreement by

Richard J. Glasebrook II

Error: Unknown document property name.

CONFIDENTIAL NB 00123

AUG-20-09  17:48    FROM-COMPLIANCE                    2124769662              T-955   P 17/21   F-758

### Retention Bonus Pool

1.      Retention Bonus Pool Allocation:  On the date of the Merger, $500,000 will be allocated to you and awarded to you in the form of restricted stock units ("RSUs"), to be credited to an account maintained on your behalf and payable in shares of common stock of Lehman ("Lehman Shares").  Such number of RSUs to be allocated and awarded to you will be determined by dividing the dollar amount set forth above by the "Parent Reference Price" (as defined in the Merger Agreement).  Subject to certain adjustments and potential closing delay provisions described in the Merger Agreement, this price will be the average of the volume of the average weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on the second trading day prior to the date of the Merger  If the calculation described herein produces a fractional number of RSUs, such fractional RSUs (to the second decimal point) will be credited to and continue to accrue in your Retention Bonus Pool account.

2       Vesting and Payment of RSUs:  20% per year, starting on the first anniversary of the Merger.  Over the vesting period of your RSUs, your Retention Bonus Pool account will be credited with additional RSUs in respect of dividends paid to holders of the same number of Lehman Shares as you have RSUs in your account.  On each vesting date, you will receive payment, in whole Lehman Shares, of such number of RSUs (including the RSUs credited as dividend equivalents on such RSUs) as are vested on that date, and any fractional Lehman Shares (to the second decimal point) will be used to offset any income tax withholding obligations of NB Inc. on such payment.

3.      (a)      Continued Vesting:

        –    Termination by the Firm without Cause, if all provisions set forth in Schedule B are complied with before and after termination of employment.

        –    Termination by you for Good Reason, if all provisions set forth in Schedule B are complied with before and after termination of employment.

        –    Termination due to death or by the Firm due to Extended Absence

        (b)      Payment of Vested Amounts after Termination of Employment:

        –    If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by you for Good Reason, you will receive payment of your amounts on each of the original vesting dates described in paragraph 2 above. (Payment will be made in the event of continued vesting only if you continue to comply with the provisions of Schedule B.)

        –    Upon your death, your estate will receive immediate payment of all unpaid amounts.

4.      Forfeiture of Retention Bonus Pool allocated amounts:

        –    Termination by Firm with Cause (with respect to any unvested amounts)

        –    Termination by you without Good Reason (with respect to any unvested amounts)

        –    Violation of any provisions set forth in Schedule B (with respect to any unvested amounts or any vested but unpaid amounts).

5.      You will receive more details regarding the retention bonus pool when it is finalized.

Errors i ria000 document properly befile

CONFIDENTIAL NB 00124

Schedule B

## Non-Solicitation: Company Information

1.  In connection with the Merger, you will become entitled to receive distribution(s) from
    the retention bonus pool and you will exchange your shares of common stock of NB Inc
    ("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and
    you hereby acknowledge and agree that:

    (a)   it is essential to the success of the Merger and the Firm's enterprise in the future,
          and it is hereby so represented that your shares of NB Stock that are being
          transferred to Lehman upon consummation of the Merger be protected by
          covenants not to solicit clients or employees of the Firm; and

    (b)   the Firm would suffer significant and irreparable harm, on and after the Effective
          Date, from your engaging in certain activities relating to the clients or employees
          of the Firm.

2.  Therefore, you agree that the covenants and restrictions contained in this Schedule B are
    reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the
    business acquired in connection with the Merger and that the covenants and restrictions
    will not unreasonably restrict your professional opportunities should your employment
    with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly,
    either individually or as an owner, partner, agent, employee, advisor, consultant or
    otherwise (other than on behalf of the Firm while employed by the Firm) during your
    employment with the Firm and for a period of twelve months after your Date of
    Termination (the "Restricted Period"):

    (a)   solicit or accept business from any individual or entity for whom any
          member of the Firm provides services within the one-year period before or
          after the Date of Termination;

    (b)   solicit or accept business from any prospective client of the Firm who,
          within the one-year period prior to the Date of Termination, you had
          directly solicited or where, directly or indirectly, in whole or in part, you
          supervised or participated in the Firm's solicitation activities related to
          such prospective client;

    (c)   solicit or accept business from or through, or engage in any sales or
          marketing activities with, any broker-dealer, bank, insurance company,
          financial planner or other financial institution (or any person employed by
          or associated with any such entity), with whom Executive had business
          contact during the one-year period prior to Executive's Date of
          Termination;

    (d)   employ any current or former employee or consultant of the Firm (other
          than clerical, secretarial and other similar support personnel); or

Error: Unknown document property name.

CONFIDENTIAL NB 00125

2

(e)     solicit (or assist in soliciting) any such person described in (d) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (d) or (e), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

The covenants set forth in (a) through (e) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (a) through (e) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason.

Company Information.

3.      You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

4.      For purposes of this Schedule B, "Confidential Information" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by you during the period of your employment. You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to, or by, any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule B.

Error! Unknown document property name.

CONFIDENTIAL NB 00126

AUG-20-03  17:49    FROM-COMPLIANCE                      2124769862              T-955  P 20/21  F-758

3

<u>General</u>

5.   <u>Specific Performance</u>. You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule B would be inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. (or its successor) or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Award Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

6.   <u>Separability</u>. It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule B to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule B is an unenforceable restriction against you, the provisions of this Schedule B shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule B is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

7.   <u>Confidentiality of Agreement</u>. Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Award Agreement; <u>provided</u> that you may disclose to any prospective future employer the provisions of this Schedule B so long as they agree to maintain the confidentiality of such provisions.

8    <u>Other Agreements</u>. Nothing in this Schedule B shall operate to supersede, limit or waive any existing agreements between you and the Firm relating to the subject matter herein, whether or not such other agreements contain similar restrictive covenants, and nothing in any such other agreements shall operate to supersede, limit or waive the restrictive covenants contained in this Schedule B regardless of whether such agreements purport to contain the entire agreement on these matters between you and the Firm. If the restrictive covenants contained in this Schedule B and in any other agreements appear to be in conflict with each other, all such restrictive covenants shall apply independently of each other and shall remain in full force and effect regardless of the conflict.

Error! Unknown document property name.

CONFIDENTIAL NB 00127

4

Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Award
Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the
meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code")
as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G
of the Code, and if, after reduction for any applicable federal excise tax imposed by Code
Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of
the Payments would be less than the amount of your net proceeds resulting from the payment of
the Reduced Amount (described below), after reduction for federal income taxes, *then* the
Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest
amount that could be received by you as Payments such that no Payment would be subject to the
Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the
amounts payable under Schedule A shall be the first amounts to be reduced.

CONFIDENTIAL NB 00128

**Exhibit J**

NEUBERGER BERMAN, INC.
RETENTION BONUS POOL AWARD AGREEMENT
(Finkel)

September 5, 2003

    In connection with the acquisition of Neuberger Berman, Inc., a Delaware corporation
("*NB Inc.*") by Lehman Brothers Holdings, Inc.'s ("*Lehman*"), pursuant to the merger of NB Inc.
with and into Neuberger Berman Acquisition Company (the "*Merger*"), as set forth in the
Agreement and Plan of Merger dated as of July 21, 2003 among Lehman Brothers Inc.,
Neuberger Berman Acquisition Company and NB Inc. (the "*Merger Agreement*"), NB Inc. and
Lehman have agreed that you are key to the business of NB Inc. and, as such, NB Inc. desires to
provide you with an incentive to remain employed with NB Inc. or its successor in the Merger
(or a subsidiary thereof, if applicable) through and after the closing date of the Merger (the
"*Merger Date*"). Accordingly, NB Inc. is pleased to offer you the opportunity to participate in a
retention bonus pool program (the "*Retention Pool Plan*"), to be established by NB Inc. as of the
Merger Date. This Retention Bonus Pool Award Agreement (the "*Award Agreement*") sets forth
the terms and conditions of your award under the Retention Pool Plan. Unless otherwise set
forth herein, this Award Agreement will become effective upon the Merger Date.

1.    Retention Bonus Pool Award

    Subject to the terms and conditions of this Award Agreement and Schedules A, B and C
attached hereto, you will be entitled to receive such allocated amount of the retention bonus pool
established pursuant to the Retention Pool Plan (the "*Retention Bonus Pool*") as is identified on
Schedule A as your "*Retention Bonus Pool Allocation*."

2.    Certain Definitions

    As used herein, the following terms have the following meanings:

    (a)    "Cause" means:

        (i)    gross negligence or willful misconduct in the performance of your duties
as an employee of the Firm or willful and repeated failure to perform your duties after
written notice specifying such failure and a reasonable time having been afforded to
correct such failure;

        (ii)    conviction of, or entering a plea of <u>nolo contendere</u> to, a felony (other than
for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or
perjury;

        (iii)    dishonesty that has resulted in, or may result in, damage to the property,
business or reputation of the Firm; misappropriation of, or intentional damage to, the
property, business or reputation of the Firm; perpetration of fraud on the Firm that has
resulted in, or may result in, damage to the property or business of the Firm;

653126-00ea-02747-rtru3 2261841 3



CONFIDENTIAL NB 00129

(iv)    a finding by the Securities and Exchange Commission ("*Commission*") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)    a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)    a breach of the provisions set forth on Schedule B hereto.

(b)    "Date of Termination" means (i) if your employment is terminated by the Firm, the date of the Firm's delivery of written notice of termination or (ii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)    "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(d)    "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(e)    "Good Reason" means, without your consent,

(i)    a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)    a change of more than fifty (50) miles in the location where you are to perform your principal duties;

(iii)    a material and adverse change in the overall structure of your total compensation, as of the date hereof, where such change results in a substantial diminution in your earning ability, it being understood that under the current compensation structure of NB Inc., your total compensation is payable part in cash and part in conditional equity awards based on terms generally applicable to similarly situated NB Inc. employees; or

(iv)    a material breach by NB Inc. of a material term of this Award Agreement;

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of

CONFIDENTIAL NB 00130

such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

   (a)    This Award Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

   (b)    Except as set forth in Schedule B, any dispute arising out of this Award Agreement will be exclusively resolved by binding statutory arbitration before the NASD or NYSE (as selected by NB Inc.), in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

   (a)    Nothing contained in this Award Agreement obligates the Firm to employ you in any capacity whatsoever or prohibits or restricts the Firm from terminating your employment at any time or for any reason whatsoever.

   (b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s (or its successor's) General Counsel, and to you at your last address appearing in the Firm's employment records

   (c)    Except as expressly provided herein, this Award Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder. You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Award Agreement shall be void. However, this Award Agreement shall be binding upon your permitted successors and assigns.

   (d)    Without impairing your obligations or rights hereunder, NB Inc. or its successor may at any time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Award Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

   (e)    This Award Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Award Agreement shall not be effective against the Firm without the written consent of NB, Inc. or its successors.

   (f)    If any provision of this Award Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

053125-0060-03747-NY02 2261841 3

CONFIDENTIAL NB 00131

(g)     NB Inc. may withhold from any amounts payable under this Award Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(h)     This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

NEUBERGER BERMAN, INC.

By: _____

Name:

Title:


Agreed to and accepted as of the date of this Award Agreement by

_____

Seth Finkel

CONFIDENTIAL NB 00132

SEP-17-03 17:23   FROM-COMPLIANCE   2724769662   T-061   P 15/19   F-053

Schedule A

## Retention Bonus Pool

1.   Retention Bonus Pool Allocation: On the date of the Merger, $500,000 will be allocated to you and awarded to you in the form of restricted stock units ("RSUs"), to be credited to an account maintained on your behalf and payable in shares of common stock of Lehman ("Lehman Shares"). Such number of RSUs to be allocated and awarded to you will be determined by dividing the dollar amount set forth above by the "Parent Reference Price" (as defined in the Merger Agreement). Subject to certain adjustments and potential closing delay provisions described in the Merger Agreement, this price will be the average of the volume of the average weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on the second trading day prior to the date of the Merger. If the calculation described herein produces a fractional number of RSUs, such fractional RSUs (to the second decimal point) will be credited to and continue to accrue in your Retention Bonus Pool account.

2.   Vesting and Payment of RSUs: 20% per year, starting on the first anniversary of the Merger. Over the vesting period of your RSUs, your Retention Bonus Pool account will be credited with additional RSUs in respect of dividends paid to holders of the same number of Lehman Shares as you have RSUs in your account. On each vesting date, you will receive payment, in whole Lehman Shares, of such number of RSUs (including the RSUs credited as dividend equivalents on such RSUs) as are vested on that date, and any fractional Lehman Shares (to the second decimal point) will be used to offset any income tax withholding obligations of NB Inc. on such payment.

3.   (a)   Continued Vesting:

   –   Termination by the Firm without Cause, if all provisions set forth in Schedule B are complied with before and after termination of employment.

   –   Termination by you for Good Reason, if all provisions set forth in Schedule B are complied with before and after termination of employment.

   –   Termination due to death or by the Firm due to Extended Absence

   (b)   Payment of Vested Amounts after Termination of Employment:

   –   If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by you for Good Reason, you will receive payment of your amounts on each of the original vesting dates described in paragraph 2 above. (Payment will be made in the event of continued vesting only if you continue to comply with the provisions of Schedule B.)

   –   Upon your death, your estate will receive immediate payment of all unpaid amounts.

4.   Forfeiture of Retention Bonus Pool allocated amounts:

   –   Termination by Firm with Cause (with respect to any unvested amounts)

   –   Termination by you without Good Reason (with respect to any unvested amounts)

   –   Violation of any provisions set forth in Schedule B (with respect to any unvested amounts or any vested but unpaid amounts)

5.   You will receive more details regarding the retention bonus pool when it is finalized.

CONFIDENTIAL NB 00133

SEP-17-03  17:24   FROM-COMPLIANCE                 2124769862           T-031   P 16/19   F-053

## Non-Solicitation, Company Information

1.  In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc. ("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

    (a)  it is essential to the success of the Merger and the Firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

    (b)  the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

2.  Therefore, you agree that the covenants and restrictions contained in this Schedule B are reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm) during your employment with the Firm and for a period of twelve months after your Date of Termination (the "Restricted Period"):

    (a)  solicit or accept business from any individual or entity for whom you provided services within the one-year period before the Date of Termination;

    (b)  solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

    (c)  employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other similar support personnel); or

    (d)  solicit (or assist in soliciting) any such person described in (c) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (c) or (d), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

09:126-00KX-02747-NY03 2261x41 3

CONFIDENTIAL NB 00134

SEP-17-03  17:24    FROM-COMPLIANCE                    2124769862         T-081  P.17/19  F-053

2

The covenants set forth in (a) through (d) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (a) through (d) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason.

Company Information

3       You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm

4       For purposes of this Schedule B, "Confidential Information" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by you during the period of your employment. You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to, or by, any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule B.

General

5.      Specific Performance.  You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule B would be

655:16-2004-02747:NY03 32e49-13

CONFIDENTIAL  NB  00135

SEP-17-03  17:24    FROM-COMPLIANCE                    2124769862            T-061   P.18/19   F-053

3

inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. (or its successor) or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Award Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

6.    Separability. It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule B to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule B is an unenforceable restriction against you, the provisions of this Schedule B shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule B is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

7.    Confidentiality of Agreement. Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Award Agreement; provided that you may disclose to any prospective future employer the provisions of this Schedule B so long as they agree to maintain the confidentiality of such provisions.

8.    Other Agreements. Nothing in this Schedule B shall operate to supersede, limit or waive any existing agreements between you and the Firm relating to the subject matter herein, whether or not such other agreements contain similar restrictive covenants, and nothing in any such other agreements shall operate to supersede, limit or waive the restrictive covenants contained in this Schedule B regardless of whether such agreements purport to contain the entire agreement on these matters between you and the Firm. If the restrictive covenants contained in this Schedule B and in any other agreements appear to be in conflict with each other, all such restrictive covenants shall apply independently of each other and shall remain in full force and effect regardless of the conflict.

CONFIDENTIAL NB 00136

4

Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Award Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule A shall be the first amounts to be reduced.

CONFIDENTIAL NB 00137