**Exhibit K**

## NEUBERGER BERMAN, INC.
## RETENTION BONUS POOL AWARD AGREEMENT
### (Kenney)

September 5, 2003

In connection with the acquisition of Neuberger Berman, Inc., a Delaware corporation ("*NB Inc.*") by Lehman Brothers Holdings, Inc.'s ("*Lehman*"), pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "*Merger*"), as set forth in the Agreement and Plan of Merger dated as of July 21, 2003 among Lehman Brothers Inc., Neuberger Berman Acquisition Company and NB Inc. (the "*Merger Agreement*"), NB Inc. and Lehman have agreed that you are key to the business of NB Inc. and, as such, NB Inc. desires to provide you with an incentive to remain employed with NB Inc. or its successor in the Merger (or a subsidiary thereof, if applicable) through and after the closing date of the Merger (the "*Merger Date*"). Accordingly, NB Inc. is pleased to offer you the opportunity to participate in a retention bonus pool program (the "*Retention Pool Plan*"), to be established by NB Inc. as of the Merger Date. This Retention Bonus Pool Award Agreement (the "*Award Agreement*") sets forth the terms and conditions of your award under the Retention Pool Plan. Unless otherwise set forth herein, this Award Agreement will become effective upon the Merger Date.

1.    Retention Bonus Pool Award

Subject to the terms and conditions of this Award Agreement and Schedules A, B and C attached hereto, you will be entitled to receive such allocated amount of the retention bonus pool established pursuant to the Retention Pool Plan (the "*Retention Bonus Pool*") as is identified on Schedule A as your "*Retention Bonus Pool Allocation*."

2.    Certain Definitions

As used herein, the following terms have the following meanings:

(a)    "*Cause*" means:

(i)    gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(ii)    conviction of, or entering a plea of <u>nolo contendere</u> to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(iii)    dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm;

053:20-0666-02747-NY03 2283841 3



CONFIDENTIAL NB 00138

(iv)    a finding by the Securities and Exchange Commission ("*Commission*") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)    a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)    a breach of the provisions set forth on Schedule B hereto.

(b)    "Date of Termination" means (i) if your employment is terminated by the Firm, the date of the Firm's delivery of written notice of termination or (ii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)    "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(d)    "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(e)    "Good Reason" means, without your consent,

(i)    a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)    a change of more than fifty (50) miles in the location where you are to perform your principal duties;

(iii)    a material and adverse change in the overall structure of your total compensation, as of the date hereof, where such change results in a substantial diminution in your earning ability, it being understood that under the current compensation structure of NB Inc., your total compensation is payable part in cash and part in conditional equity awards based on terms generally applicable to similarly situated NB Inc. employees; or

(iv)    a material breach by NB Inc. of a material term of this Award Agreement;

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of

053126-0066-02747-NY03 2381641 3

CONFIDENTIAL NB 00139

SEP-10-03  17:58     FROM-COMPLIANCE                                      T-039   P 13/19   F-992

such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

(a)    This Award Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

(b)    Except as set forth in Schedule B, any dispute arising out of this Award Agreement will be exclusively resolved by binding statutory arbitration before the NASD or NYSE (as selected by NB Inc.), in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4    Miscellaneous

(a)    Nothing contained in this Award Agreement obligates the Firm to employ you in any capacity whatsoever or prohibits or restricts the Firm from terminating your employment at any time or for any reason whatsoever.

(b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s (or its successor's) General Counsel, and to you at your last address appearing in the Firm's employment records.

(c)    Except as expressly provided herein, this Award Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder. You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Award Agreement shall be void. However, this Award Agreement shall be binding upon your permitted successors and assigns.

(d)    Without impairing your obligations or rights hereunder, NB Inc. or its successor may at any time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Award Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

(e)    This Award Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Award Agreement shall not be effective against the Firm without the written consent of NB, Inc. or its successors.

(f)    If any provision of this Award Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

053126-0066-02747-NY03 2261841 3

CONFIDENTIAL NB 00140

SEP-10-09  17:58    FROM-COMPLIANCE                21247699862                    T-039   P 14/19  F-992

(g)     NB Inc. may withhold from any amounts payable under this Award Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(h)     This Award Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

NEUBERGER BERMAN, INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date of this Award Agreement by

Judith Ann Kenney

053120-00060-007-N-NY03 3281844.3

CONFIDENTIAL NB 00141

SEP-10-09  17:59    FROM-COMPLIANCE                                    T-039    P 15/19    F-992

Schedule A

Retention Bonus Pool

1.  Retention Bonus Pool Allocation: On the date of the Merger, $300,000 will be allocated to you and awarded to you in the form of restricted stock units ("RSUs"), to be credited to an account maintained on your behalf and payable in shares of common stock of Lehman ("Lehman Shares"). Such number of RSUs to be allocated and awarded to you will be determined by dividing the dollar amount set forth above by the "Parent Reference Price" (as defined in the Merger Agreement). Subject to certain adjustments and potential closing delay provisions described in the Merger Agreement, this price will be the average of the volume of the average weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on the second trading day prior to the date of the Merger If the calculation described herein produces a fractional number of RSUs, such fractional RSUs (to the second decimal point) will be credited to and continue to accrue in your Retention Bonus Pool account.

2.  Vesting and Payment of RSUs: 20% per year, starting on the first anniversary of the Merger. Over the vesting period of your RSUs, your Retention Bonus Pool account will be credited with additional RSUs in respect of dividends paid to holders of the same number of Lehman Shares as you have RSUs in your account. On each vesting date, you will receive payment, in whole Lehman Shares, of such number of RSUs (including the RSUs credited as dividend equivalents on such RSUs) as are vested on that date, and any fractional Lehman Shares (to the second decimal point) will be used to offset any income tax withholding obligations of NB Inc. on such payment.

3.  (a)    Continued Vesting:

    –   Termination by the Firm without Cause, if all provisions set forth in Schedule B are complied with before and after termination of employment.

    –   Termination by you for Good Reason, if all provisions set forth in Schedule B are complied with before and after termination of employment.

    –   Termination due to death or by the Firm due to Extended Absence

    (b)    Payment of Vested Amounts after Termination of Employment:

    –   If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by you for Good Reason, you will receive payment of your amounts on each of the original vesting dates described in paragraph 2 above. (Payment will be made in the event of continued vesting only if you continue to comply with the provisions of Schedule B.)

    –   Upon your death, your estate will receive immediate payment of all unpaid amounts.

4.  Forfeiture of Retention Bonus Pool allocated amounts:

    –   Termination by Firm with Cause (with respect to any unvested amounts)

    –   Termination by you without Good Reason (with respect to any unvested amounts)

    –   Violation of any provisions set forth in Schedule B (with respect to any unvested amounts or any vested but unpaid amounts).

5.  You will receive more details regarding the retention bonus pool when it is finalized.

053126-0066-02247-N203 2261441 3

CONFIDENTIAL NB 00142

SEP-10-03  17:59   FROM-COMPLIANCE                              T-039  P.16/19  F-992

## Non-Solicitation: Company Information

1.   In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc. ("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

    (a)   it is essential to the success of the Merger and the Firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

    (b)   the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

2.   Therefore, you agree that the covenants and restrictions contained in this Schedule B are reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm) during your employment with the Firm and for a period of twelve months after your Date of Termination (the "Restricted Period"):

    (a)   solicit or accept business from any individual or entity for whom you provided services within the one-year period before the Date of Termination;

    (b)   solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

    (c)   employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other similar support personnel); or

    (d)   solicit (or assist in soliciting) any such person described in (c) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (c) or (d), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

US3326-0066-0274-7-NY-03 2281641 3

CONFIDENTIAL NB 00143

2

The covenants set forth in (a) through (d) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (a) through (d) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason.

Company Information.

3.  You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

4.  For purposes of this Schedule B, "Confidential Information" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by you during the period of your employment. You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to, or by, any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule B.

General

5.  Specific Performance. You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule B would be

CONFIDENTIAL NB 00144

inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. (or its successor) or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Award Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

6.    Separability. It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule B to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule B is an unenforceable restriction against you, the provisions of this Schedule B shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule B is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

7.    Confidentiality of Agreement. Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Award Agreement; provided that you may disclose to any prospective future employer the provisions of this Schedule B so long as they agree to maintain the confidentiality of such provisions.

8.    Other Agreements. Nothing in this Schedule B shall operate to supersede, limit or waive any existing agreements between you and the Firm relating to the subject matter herein, whether or not such other agreements contain similar restrictive covenants, and nothing in any such other agreements shall operate to supersede, limit or waive the restrictive covenants contained in this Schedule B regardless of whether such agreements purport to contain the entire agreement on these matters between you and the Firm. If the restrictive covenants contained in this Schedule B and in any other agreements appear to be in conflict with each other, all such restrictive covenants shall apply independently of each other and shall remain in full force and effect regardless of the conflict.

CONFIDENTIAL NB 00145

4

## Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Award Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule A shall be the first amounts to be reduced.

65312c-0c6b-02747-NY03 22a1241 3

CONFIDENTIAL NB 00146

**Exhibit L**

AUG-18-03  16:18    FROM-COMPLIANCE                2124768662            T-942   P.02   F-723

NEUBERGER BERMAN, INC.
EMPLOYMENT AGREEMENT
(*Nackenson*)

August 18, 2003

We are pleased that you will be continuing your employment as a portfolio manager with Neuberger Berman, Inc., a Delaware corporation ("NB Inc.") or one or more of its subsidiaries or affiliates (including Neuberger Berman, LLC), or their respective successors, and are writing to set forth the terms and conditions of your employment. Unless otherwise set forth herein, this Agreement will become effective upon the consummation of Lehman Brothers Holdings, Inc.'s ("Lehman") acquisition of NB Inc. pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "Merger"). Certain capitalized terms are defined in Section 2 hereof.

1.   Employment

(a)     You will be employed by NB Inc. or one or more of its subsidiaries or affiliates, subject to the terms and conditions of this Agreement for the period commencing on the date of the Merger and ending on the day prior to the fifth anniversary thereof (the "Initial Employment Period"). After the Initial Employment Period (unless otherwise agreed by you and the Firm in writing), there will be no set term of employment. You or the Firm may terminate your employment at any time during or after the Initial Employment Period for any reason, or for no reason, by giving not less than ninety (90) days' prior written notice of termination; provided, however, that the Firm may elect to place you on paid leave for all or any part of such 90-day period; and provided, further, that no advance notice need be given by the Firm to you in connection with a termination of your employment for Cause or on account of Extended Absence.

(b)     During the Employment Period: (i) you will have duties and responsibilities comparable to your duties on the Merger date; and (ii) you will devote your entire working time, labor, skill and energies to the business and affairs of the Firm. Your title will be Managing Director.

(c)     During the Employment Period, you will be paid the compensation as set forth on Schedule A hereto.

(d)     Your participation in the retention bonus pool being established in connection with the Merger is set forth on Schedule B hereto.

(e)     You will be subject to the provisions set forth in Schedule C and Schedule D hereto.

(f)     In the event your employment is terminated by the Firm without Cause (other than due to an Extended Absence) or by you for Good Reason, you will be entitled to severance payments as set forth in Schedule F hereto.

053120-00ss-02747-NY03 3277431.3



DEFENDANT'S
EXHIBIT
NO L

CONFIDENTIAL

LEH-RSU-CL 0000670

2

2.   Certain Definitions

As used herein, the following terms have the following meanings:

(a)   "Cause" means:

(i)   gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

(ii)   conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(iii)   dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm; or

(iv)   a finding by the Securities and Exchange Commission ("Commission") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)   a material breach of NB Inc.'s policies or rules applicable to its employees;

(vi)   a breach of the provisions set forth on Schedule C hereto.

(b)   "Date of Termination" means (i) if your employment is terminated by the Firm for Cause or on account of Extended Absence, the date of the Firm's delivery of written notice of termination, (ii) if your employment is terminated by the Firm other than for Cause or on account of Extended Absence, the date that is ninety (90) days after the Firm's delivery of written notice of termination, or (iii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)   "Employment Period" means the period commencing on the date hereof and ending on your Date of Termination.

(d)   "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

053126-0066-02747-NY03 2277431 3

CONFIDENTIAL                                                          LEH-RSU-CL 0000671

3

(e)     "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(f)     "Good Reason" means, without your consent,

(I)     a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(II)     a change of more than fifty (50) miles in the location where you are to perform your principal duties; or

(III)     a material breach by NB Inc. of a material term of this Agreement;

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

(a)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

(b)     Except as set forth in Schedule C, any dispute arising out of this Agreement, or any statutory or common law claim by you relating to your employment under this Agreement or the termination thereof (including any tort or discrimination claim), will be exclusively resolved by binding statutory arbitration before the NASD or NYSE, in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

(a)     This Agreement shall supersede any prior agreement, written or oral, pertaining to the matters covered herein.

(b)     Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s General Counsel, and to you are your last address appearing in the Firm's employment records.

(c)     You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Agreement shall be void.

053126-0066-02747-NY03 2277491 3

CONFIDENTIAL

LEH-RSU-CL 0000672

AUG-18-09  16:19    FROM-COMPLIANCE                    2124769862          T-942   P.05/16   F-723

4

(d)    This Agreement shall be binding upon your permitted successors and assigns.

(e)    Without impairing your rights or obligations hereunder, NB Inc. may at any time and from time to time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

(f)    This Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Agreement shall not be effective against the Firm without the written consent of NB Inc. or its successors.

(g)    If any provision of this Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

(h)    Except as expressly provided herein, this Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder.

(i)    The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

(j)    NB Inc. may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(k)    Except as set forth in Schedule C, NB Inc.'s obligation to provide the payments and benefits to you under Schedule B of this Agreement will not be subject to the set-off of amounts you owe to the Firm. You will not be required to mitigate the amount of any payment provided for under this Agreement by seeking other employment or otherwise, and the amount of any payment provided for under this Agreement will not be reduced by any compensation you earn from other employment.

(l)    This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

*[Continued on next page]*

05126-0066-02747-NY01 2277493 3

CONFIDENTIAL

LEH-RSU-CL 0000673

If the foregoing is in accordance with your understanding, kindly confirm your acceptance and agreement by signing and returning the enclosed duplicate of this letter which will thereupon constitute an agreement between you and NB Inc., on its behalf and on behalf of its subsidiaries and affiliates.

Very truly yours,

NEUBERGER BERMAN, INC.
(on its behalf, and on behalf of its subsidiaries and affiliates)

By: _____
        Name:
        Title

Agreed to and accepted as of
the date of this letter

_____
Richard S. Nackenson

053726-0066-02747-NY01.2277433.3

CONFIDENTIAL

LEH-RSU-CL 0000674

AUG-18-05  16:28    FROM-COMPLIANCE            2124769862           T-842  P.07/16  F-723

## Compensation

Consistent with past practice and the terms and conditions of your compensation in effect as of the date hereof (which includes, without limitation, the condition that the following compensation structure and applicable percentage payout is subject to change by the Ganek Group, subject to the consent of NB Inc. senior management), you shall be entitled to receive:

(i) Compensation equal to 20% of the following percentages of gross revenue (that is, investment advisory fees and commissions) that you generate for the Firm annually (such annual compensation, in the aggregate, your "Annual Performance Compensation"):

With respect to the PIM business: 22% up to the benchmark[1] and 40% thereafter; and

With respect to the IAM business: 22% up to the benchmark[2] and 25% thereafter; and

With respect to the IEM business: 15% on all accounts opened prior to 5/1/01 and 20% on all accounts opened on or after such date; and

(ii) initially, continued payment of your $120,000 annual base salary; however, consistent with NB Inc.'s past practice, your base salary may be reduced, and/or replaced with performance-based compensation (any such base salary, your "Base Salary").

Consistent with generally applicable NB Inc. policy in effect from time to time, (i) a portion of your Annual Performance Compensation and/or Base Salary (together, your "Total Compensation") may be awarded in conditional Lehman equity-based awards (restricted shares of Lehman common stock ("Lehman Shares"), restricted stock units (payable in Lehman Shares) ("RSUs"), options, and/or other equity-based awards) pursuant to the terms and conditions of any Lehman equity-based award program in effect for similarly situated employees at your level and (ii) all compensation will be payable pursuant to NB Inc. payroll practices (as generally in effect from time to time). Please see Schedule E attached to this Agreement for an illustrative Summary of Key Terms of the Lehman Equity Award Program.

Notwithstanding anything set forth on this Schedule A above, set forth below is the allocation of your Total Compensation between cash and equity for the years 2003 through 2006:

(i) Your 2003 Total Compensation will be allocated between cash and equity pursuant to the NB Inc. policy as in effect on the date hereof;

(ii) Your 2004 Total Compensation will be allocated between cash and equity, with the equity portion of such compensation to be equal to the greater of (x) 15% and (y) one-half of the Percent of Equity applicable to your level of total compensation under the Lehman Equity Award Program, calculated as described in Schedule E attached to this Agreement;

---

[1] Please note that the "benchmark" (also referred to as the "High Water Mark") for the Ganek Group High Water Mark shall be reset, as of the closing date of the Merger, to the annualized production for 2003.

[2] Please note that the "benchmark" (also referred to as the "High Water Mark") for the Ganek Group High Water Mark shall be reset, as of the closing date of the Merger, to the annualized production for 2003

053326-0066-02747-NY03 25774313

CONFIDENTIAL                                                    LEH-RSU-CL 0000675

AUG-16-05  15:20   FROM-COMPLIANCE                2124769562              T-942   P 05/16   F-729

(iii) Your 2005 Total Compensation will be allocated between cash and equity, with the equity portion of such compensation to be equal to the Percent of Equity applicable to your compensation based on your level of total compensation under the Lehman Equity Award Program, calculated as described in Schedule E attached to this Agreement; and

(iv) Your 2006 Total Compensation will be allocated between cash and equity in the same relative percentages as the total compensation of similarly situated NB Inc. employees at such time.

u53126-0066-02747-NY03.2277431.3

AUG-18-03  16:20    FROM-COMPLIANCE                    2124789662              T-942   F 09/16   F-723

Retention Bonus Pool

1.  On the date of the Merger, $3 million will be allocated to you and awarded to you in the
    form of restricted Lehman Shares and/or RSUs. Such number of Lehman Shares and/or
    RSUs to be allocated and awarded will be determined based on the "Parent Reference
    Price" as defined in the Merger Agreement. Subject to certain adjustments described in
    the Merger Agreement, this price will be the average of the volume of the average
    weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on
    the second trading day prior to the date of the Merger.

2.  Vesting and Payment: 20% per year, starting on the first anniversary of the Merger.

3.  (a)    Continued Vesting:

    -    Termination by the Firm without Cause if Non-Solicitation/Company Information
    Covenants set forth in Schedule C are complied with before and after termination of
    employment.

    -    Termination by you for Good Reason if Non-Solicitation/Company Information
    Covenants set forth in Schedule C are complied with before and after termination of
    employment.

    -    Termination due to death or by the Firm due to Extended Absence

    (b)    Payment of Vested Amounts after Termination of Employment:

    -    If termination is (i) by the Firm without Cause or due to Extended Absence or (ii)
    by you for Good Reason, you will receive payment of your amounts on each of the
    original vesting dates described in paragraph 2 above.

    -    Upon your death, your estate will receive immediate payment of all unpaid
    amounts.

    (Payment will be made in the event of continued vesting only if you continue to comply
    with the provisions of Schedule C.)

4.  Forfeiture of Retention Bonus Pool allocated amounts:

    -    Termination by Firm with Cause (with respect to any unvested amounts)

    -    Termination by you without Good Reason (with respect to any unvested amounts)

    -    Violation of Non-Solicitation/Company Information Covenants set forth in
    Schedule C (with respect to any unvested amounts or any vested but unpaid amounts).

5.  You will receive more details regarding the retention bonus pool when it is finalized.

053126-0066-02747-NY03 2277443 3                                    06/18/03 2:36 PM

CONFIDENTIAL                                                        LEH-RSU-CL 0000677

Schedule C

Non-Solicitation

(a)    In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc ("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

(i)    it is essential to the success of the Merger and the Firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

(ii)    the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

(b)    Therefore, you agree that the covenants and restrictions contained in this Schedule C are reasonable and necessary for the Lehman to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm):

(i)    during the Employment Period and for a period of eighteen months after your Date of Termination (the "Restricted Period"):

(A)    solicit or accept business from any individual or entity that constitutes a "high net worth" client of NB Inc. (as such term is defined by NB Inc. in its ordinary course of business at the Date of Termination) (a "High Net Worth Client") (x) for whom you, NB Inc. or any of its subsidiaries, and/or the PAM division of the Firm provides services within the one-year period before or after the Date of Termination, or (y) to whom you have been professionally introduced by virtue of your association with Lehman and it subsidiaries following the closing date of the Merger in connection with the performance of such services;

(B)    solicit or accept business from any prospective High Net Worth Client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

(C)    solicit or accept business from or through, or engage in any sales or marketing activities with, any broker-dealer, bank, insurance company, financial planner or other financial institution (or any person employed by or associated with any such entity), with whom you had business contact during the one-year period prior to your Date of Termination;

0553126-0066-02747-NY03 2257451.3

LEH-RSU-CL 0000678

(D)    employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other similar support personnel); or

(E)    solicit (or assist in soliciting) any such person described in (D) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (D) or (E), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

The covenants set forth in (A) through (E) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (A) through (E) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason, in either case, after the Initial Employment Period.

<u>Company Information</u>

(a)    You acknowledge that, during the course of your employment with NB Inc., you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information (as defined in (b) below) of the Firm; <u>provided</u>, <u>however</u>, that you may, following your employment with the Firm, retain and utilize, solely for purposes of disclosing to clients and/or potential clients (none of which constitute High Net Worth Clients) your abilities as a portfolio manager, Confidential Information illustrating the performance of the investment assets that you managed directly (the "Exempt Information") while employed by the Firm (but you may not disclose either the identity of any client whose assets you managed or any Confidential Information that constitutes Firm proprietary information (such as trade secrets, Firm protocols and processes, software or hardware configuration information). In connection with the foregoing, you are not permitted to disclose any Exempt Information in a manner that would, based on a reasonable review of such information, demonstrate any of the Firm's proprietary procedures or strategies for managing assets for High Net Worth Clients. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

(b)    For purposes of this Schedule C, "<u>Confidential Information</u>" means any Firm proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, client and customer lists and customers (including, but not limited to, customers of the Firm on whom you call or with whom you become acquainted during the term of your employment), prices and costs, markets, software, developments, inventions, protocols, interfaces, processes, formulas, technology, designs, drawings, engineering materials, hardware configuration information, marketing data, licenses, finances, budgets or other business information disclosed to you by the Firm either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by

2

US3126-0066-02747-NY08.2277454 3

CONFIDENTIAL

LEH-RSU-CL 0000679

AUG-16-08  16:27    FROM-COMPLIANCE                     2124766562         T-642    P 12/16    F-723

you during the period of your employment. You understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Firm's business which is either information not known by actual or potential competitors of the Firm or is confidential or proprietary information of the Firm or its customers or suppliers, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of yours or of others who were under confidentiality obligations as to the item or items involved; or (ii) any information that you are required to disclose to, or by, any governmental or judicial authority; provided, however, that you give the Firm prompt written notice thereof so that the Firm may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Schedule C.

General

    (a)   Specific Performance. You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule C would be inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

    (b)   Separability. It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule C to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule C is an unenforceable restriction against you, the provisions of this Schedule C shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule C is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

    (c)   Confidentiality of Agreement. Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Agreement; provided that you may disclose to any prospective future employer the provisions of this Schedule C so long as they agree to maintain the confidentiality of such provisions.

3

US3126-0000-02747-NY02.2277454.9

LEH-RSU-CL 0000680

Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule B shall be the first amounts to be reduced, and the amounts payable under Schedule F (if applicable) shall be the next amounts to be reduced.

CONFIDENTIAL

LEH-RSU-CL 0000681

Schedule E

## ILLUSTRATIVE SUMMARY OF KEY TERMS OF THE
## LEHMAN BROTHERS EQUITY AWARD PROGRAM[3]

| | |
|---|---|
| **Form of Equity Award** | Participants receive equity awards annually as a percentage of fiscal year total compensation. Historically, all participants have received equity awards in the form of Restricted Stock Units ("RSUs"). Each RSU represents the right to receive one share of Lehman Brothers ("LB") common stock five years after the date of grant and the right to receive dividends (which are automatically reinvested in additional RSUs) when dividends are declared. All RSUs are non-transferable.<br><br>In past years, senior-level employees' equity awards have been paid in a combination of RSUs and options. Based on anticipated changes in accounting rules, LB has not yet determined the extent to which it will use options or make further structural changes to the program in future years. |
| **Size of Equity Award** | The portion of total compensation paid in equity increases as compensation rises. The following chart shows the percentage of compensation to be paid in equity at specific compensation levels. (Below and above each compensation breakpoint, the percentage of equity changes based on marginal rates, similar to a tax table.) The percentages shown here represent the maximum portion of your total compensation payable in equity through 2005, subject to the phase-in described in Schedule A attached to the Agreement: |

| Total Compensation | Percent in Equity |
|---|---|
| $250,000 | 5.2% |
| $500,000 | 12.5% |
| $750,000 | 15.0% |
| $1,000,000 | 20.0% |
| $1,500,000 | 25.0% |
| $2,000,000 | 30.0% |
| $2,500,000 | 35.0% |

| | |
|---|---|
| **Discount Applied in Calculating Equity Award** | RSUs are awarded at fiscal year end, at a 25% discount to the closing market price of LB common stock at the time of award. Thus, each RSU award has a principal portion (75% of total units awarded) and a discount portion (25% of total units awarded). |
| **Vesting of Equity Award** | While employed, participants' equity awards vest as follows: the principal portion vests in full after 2 years; and the discount portion vests in full after 5 years. RSUs that result from reinvested dividends vest and are subject to the same terms as the RSUs to which the dividend payments relate. Note: "Vesting" does not refer to the date the RSUs are converted to shares. "Vesting" determines the portion of the award that participants are entitled to receive on voluntary resignation with Competitive Activity. |
| **Conversion to Stock** | Assuming continuous employment, RSUs are converted to freely tradable stock five years after the RSU is granted. See below for the treatment of RSUs in the event of employment termination during this five-year period. |
| **Termination Provisions[4]** | |
| **Voluntary Termination without Competitive Activity** | Participants are eligible to receive the principal portion of their award and a pro-rated amount of their discount portion (20% per year after grant). These shares are issued one year after termination, provided the participant has not engaged in Competitive Activity or Detrimental Activity. |
| **Involuntary Termination** | If involuntarily terminated without Cause, Participants are eligible to receive the principal portion of their award and a pro-rated amount of their discount portion (20% per year after grant). These shares are issued one year after termination, provided the participant has not engaged in Detrimental Activity. If the involuntary termination is with Cause, both the principal and discount are forfeited. |
| **Voluntary Termination with Competitive Activity** | Participants are eligible to receive only the "vested" portion of the equity award. These shares are issued one year after termination, provided the participant has not engaged in Detrimental Activity. |
| **Full Career Termination** | Participants who qualify for "Full Career Termination" are eligible to receive the principal portion of their award and 100% of their discount portion. These shares are issued one year after termination, provided the participant has not engaged in Competitive Activity or Detrimental Activity. |

NOTE: This summary is for informational purposes only. Awards are subject to controlling plan documents, including, as applicable, the RSU Award Agreement, Stock Option Award Agreement, the Employee Incentive Plan and related Prospectus. Select definitions appear on p. 2.

---

[3] The actual terms for the 2005 program have not yet been established but are currently expected to be substantially similar to those described in this outline

[4] Please note that there are also provisions for the treatment of equity awards in the event of Retirement, death or Disability, and a Change in Control.
053126-0066-02747-NY03 2277431 3

CONFIDENTIAL

LEH-RSU-CL 0000682

## GLOSSARY OF SELECT TERMS FOR LEHMAN BROTHERS EQUITY AWARD PROGRAM

"Cause" means a material breach by a person of an employment contract between the person and Lehman Brothers Holdings Inc ("Holdings") or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary, including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc

"Competitive Activity" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc

"Detrimental Activity" means (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing or (iii) any activity deemed to be detrimental to Holdings or any of its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc

"Full Career Termination" means a termination of employment when a) you have at least 20 years of service or b) your age and years of service with the Firm add up to 65 and you are at least 45 years old and your tenure with the Firm is at least 10 years

"Restricted Stock Units (RSUs)" An RSU represents the right to receive one share of Lehman Brothers common stock five year after the grant date. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf  Generally, RSUs cannot be sold, traded, pledged or transferred for that five-year period

2

US3126-0066-02747-NY03 2277431.3

CONFIDENTIAL

LEH-RSU-CL 0000683

AUG-18-09  15:23    FROM-COMPLIANCE              2124765882         T-942   P 16/16   F-729

## Severance Payments

If your employment by the Firm hereunder is terminated without Cause (other than due to an Extended Absence) by the Firm or for Good Reason by you during the Initial Employment Period, in addition to the amounts provided for in Schedule B upon the occurrence of either such termination of employment, you will receive continued payment in accordance with the Firm's normal payroll procedures, for the first eighteen (18) months following the Date of Termination, of your Base Salary (at the rate in effect on the Date of Termination) and Annual Performance Compensation (based on the amount of your Annual Performance Compensation payable to you (in cash and non-cash equivalents) in respect of the year immediately preceding the year in which the Date of Termination occurs), in each case payable to you entirely in cash. The foregoing severance payment (i) shall be payable less any applicable withholding taxes required to be withheld by the Firm, (ii) is payable subject to your continued compliance with the restrictive covenants set forth in Schedule C, and (iii) is in lieu of any other severance payments to which you might otherwise be entitled under any plan, policy or arrangement maintained by the Firm or any of its members.

053126-0066-02747-NY03-2277431 3

CONFIDENTIAL                                                      LEH-RSU-CL 0000684

Neuberger Berman Inc.
605 Third Avenue
New York, NY 10158-3698
Tel 212.476.9808



April 19, 2006

_By Hand_
Richard S. Nackenson

Dear Rich:

    This letter shall serve as an amendment to the Employment Agreement dated August 18, 2003, between you and Neuberger Berman ("NB", together with Lehman Brothers, the "Firm") (the "Employment Agreement"). With respect to the annual "benchmark" as described in Schedule A of the Employment Agreement, such amount with respect to the PIM business has been reset to $1,699,778, effective as of January 1, 2006. Except as expressly amended hereby, all other terms and conditions set forth in the Employment Agreement shall remain in effect.

    Please acknowledge your agreement by signing below and returning a copy of this letter to Sharon Asip in Human Resources.

    Sincerely,

Jeffrey B. Lane
Chairman, President & COO
Neuberger Berman

Agreed and Accepted:

Richard S. Nackenson

CONFIDENTIAL

**Exhibit M**

## NEUBERGER BERMAN, INC.
## EMPLOYMENT AGREEMENT
### (Reynolds)

July 25, 2003

We are pleased that you will be continuing your employment as a portfolio manager with Neuberger Berman, Inc., a Delaware corporation ("NB Inc.") or one or more of its subsidiaries or affiliates (including Neuberger Berman, LLC ("NB LLC")), or their respective successors, and are writing to set forth the terms and conditions of your employment. Unless otherwise set forth herein, this Agreement will become effective upon the consummation of Lehman Brothers Holdings, Inc.'s ("Lehman") acquisition of NB Inc. pursuant to the merger of NB Inc. with and into Neuberger Berman Acquisition Company (the "Merger"). Certain capitalized terms are defined in Section 2 hereof.

1.   Employment

   (a)   You will be employed by NB Inc. or one or more of its subsidiaries or affiliates, subject to the terms and conditions of this Agreement for the period commencing on the date of the Merger and ending on the day prior to the fifth anniversary thereof (the "Initial Employment Period"). After the Initial Employment Period (unless otherwise agreed by you and the Firm in writing), there will be no set term of employment. You or the Firm may terminate your employment at any time during or after the Initial Employment Period for any reason, or for no reason, by giving not less than ninety (90) days' prior written notice of termination; provided, however, that the Firm may elect to place you on paid leave for all or any part of such 90-day period; and provided, further, that no advance notice need be given by the Firm to you in connection with a termination of your employment for Cause or on account of Extended Absence.

   (b)   During the Employment Period: (i) you will have duties and responsibilities comparable to your duties on the Merger date. and (ii) you will devote your entire working time, labor, skill and energies to the business and affairs of the Firm. Your title will be Managing Director.

   (c)   During the Employment Period, you will be paid the compensation as set forth on Schedule A hereto.

   (d)   Your participation in the retention bonus pool being established in connection with the Merger is set forth on Schedule B hereto.

   (e)   You will be subject to the provisions set forth in Schedule C and Schedule D hereto.

2.   Certain Definitions

As used herein, the following terms have the following meanings:

   (a)   "Cause" means:

      (i)   gross negligence or willful misconduct in the performance of your duties as an employee of the Firm or willful and repeated failure to perform your duties after written notice specifying such failure and a reasonable time having been afforded to correct such failure;

DEFENDANT'S
EXHIBIT
NBM

(ii)    conviction of, or entering a plea of nolo contendere to, a felony (other than for a traffic violation) or a misdemeanor involving fraud, embezzlement, forgery or perjury;

(iii)    dishonesty that has resulted in, or may result in, damage to the property, business or reputation of the Firm; misappropriation of, or intentional damage to, the property, business or reputation of the Firm; perpetration of fraud on the Firm that has resulted in, or may result in, damage to the property or business of the Firm;

(iv)    a finding by the Securities and Exchange Commission ("Commission") or a court of competent jurisdiction that you have committed an act that would cause you or the Firm to be disqualified in any manner under Section 9 of the Investment Company Act, if the Commission were not to grant an exemptive order under section 9(c) thereof, or that would constitute grounds for the Commission to deny, revoke or suspend registration of NB Inc. or any of its affiliates as an investment advisor, broker-dealer or transfer agent, as applicable, with the Commission;

(v)    a material breach of NB Inc.'s policies or rules applicable to its employees; or

(vi)    a breach of the provisions set forth on Schedule C hereto.

(b)    "Date of Termination" means (i) if your employment is terminated by the Firm for Cause or on account of Extended Absence, the date of the Firm's delivery of written notice of termination, (ii) if your employment is terminated by the Firm other than for Cause or on account of Extended Absence, the date that is ninety (90) days after the Firm's delivery of written notice of termination, or (iii) if your employment is terminated by you, the date that is ninety (90) days after your delivery of written notice of termination, or such earlier date as may be determined by the Firm in its sole discretion.

(c)    "Employment Period" means the period commencing on the date hereof and ending on your Date of Termination.

(d)    "Extended Absence" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

(e)    "Firm" means, collectively, NB Inc., and any subsidiaries or affiliates thereof, and its and their predecessors and successors, including but not limited to Lehman and its subsidiaries and affiliates.

(f)    "Good Reason" means, without your consent,

(i)    a material adverse change in your authority or duties and responsibilities to those that are not, in the aggregate, substantially equivalent to your authority, duties and responsibilities as they exist immediately after the Merger (except that a mere change in your reporting relationship will not be deemed a material adverse change as described herein);

(ii)    a change of more than fifty (50) miles in the location where you are to perform your principal duties; or

(iii)    a material breach by NB Inc. of a material term of this Agreement;

us5126-0064-02747-N:C5 22a237e 2

CONFIDENTIAL                                    LEH-RSU-CL 0000687

AUG-04-09  20:09    FROM-COMPLIANCE                2124769562        T-872  P.90/98  F-596

3

but none of the events described herein will constitute Good Reason unless (x) within sixty (60) days after the event giving rise to your claim of Good Reason, you notify NB Inc. in writing of such claim, describing the event you reasonably believe constitutes Good Reason, and (y) NB Inc. fails to cure such event within thirty (30) days after the date of NB Inc.'s receipt of the written notice.

3.    Governing Law; Arbitration

      (a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

      (b)    Except as set forth in Schedule C, any dispute arising out of this Agreement, or any statutory or common law claim by you relating to your employment under this Agreement or the termination thereof (including any tort or discrimination claim), will be exclusively resolved by binding statutory arbitration before the NASD or NYSE, in accordance with the rules of the NASD or NYSE, as applicable, in effect at such time. Judgment upon the arbitrator's award may be entered by a court of competent jurisdiction.

4.    Miscellaneous

      (a)    This Agreement shall supersede any prior agreement, written or oral, pertaining to the matters covered herein.

      (b)    Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of NB Inc.'s General Counsel, and to you at your last address appearing in the Firm's employment records.

      (c)    You may not, directly or indirectly (including by operation of law), assign your rights or obligations hereunder without the prior written consent of NB Inc. or its successors, and any such assignment by you in violation of this Agreement shall be void.

      (d)    This Agreement shall be binding upon your permitted successors and assigns.

      (e)    Without impairing your rights or obligations hereunder, NB Inc. may at any time and from time to time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns.

      (f)    This Agreement may not be amended or modified other than by a written agreement executed by you and NB Inc. or its successors, nor may any provision hereof be waived other than by a writing executed by you or NB Inc. or its successors; provided that any waiver, amendment or modification of any of the provisions of this Agreement shall not be effective against the Firm without the written consent of NB Inc. or its successors.

      (g)    If any provision of this Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

      (h)    Except as expressly provided herein, this Agreement shall not confer on any person other than you and the Firm any rights or remedies hereunder.

053126-0066-02747-NY03 2242276 2

AUG-04-03  20:10   FROM-COMPLIANCE                    2124789862        T-872  P 01/09  F-536
4

(j)     The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

(i)     NB Inc. may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(k)     Except as set forth in Schedule C, NB Inc.'s obligation to provide the payments and benefits to you under Schedule B of this Agreement will not be subject to the set-off of amounts you owe to the Firm.  You will not be required to mitigate the amount of any payment provided for under this Agreement by seeking other employment or otherwise, and the amount of any payment provided for under this Agreement will not be reduced by any compensation you earn from other employment.

(l)     This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures were upon the same instrument.

If the foregoing is in accordance with your understanding, kindly confirm your acceptance and agreement by signing and returning the enclosed duplicate of this letter which will thereupon constitute an agreement between you and NB Inc., on its behalf and on behalf of its subsidiaries and affiliates.

Very truly yours,

NEUBERGER BERMAN, INC.
(on its behalf, and on behalf of its subsidiaries and affiliates)

By: _____
Name:
Title:

Agreed to and accepted as of the date of this letter

_____
F. Christian Reynolds

053125-0066-02747-NY03 2242376 2

AUG-04-03  20:10    FROM-COMPLIANCE              2124755562       T-872   P 92/98  F-555

## Compensation

Consistent with past practice and the terms and conditions of your compensation in effect as of the date hereof, you will continue to receive your annual base salary of $225,000, and will be eligible to receive a discretionary annual year-end bonus.

Consistent with past practice and the terms and conditions of your compensation in effect as of the date hereof (which includes, without limitation, the condition that the following compensation structure and applicable percentage payout is subject to change by the Bretter Group, subject to the consent of NB Inc. senior management), you shall be entitled to receive compensation equal to 15% of the following percentages of gross revenue (that is, investment advisory fees and commissions) that you generate for the Firm:

With respect to the PIM business: 22% up to the benchmark and 40% thereafter; and

With respect to the IAM business: 22% up to the benchmark and 25% thereafter; and

With respect to the IEM business: 15% on all accounts opened prior to 5/1/01 and 20% on all accounts opened on or after such date.

Consistent with generally applicable NB Inc. policy in effect from time to time, (i) a portion of your compensation may be awarded in conditional Lehman equity-based awards (restricted Lehman Shares, RSUs, options, and/or other equity-based awards) pursuant to the terms and conditions of any Lehman equity-based award program in effect for similarly situated employees at your level and (ii) all compensation will be payable pursuant to NB Inc. payroll practices (as generally in effect from time to time). Please see Schedule E attached to this Agreement for an illustrative Summary of Key Terms of the Lehman Equity Award Program.

Notwithstanding anything set forth on this Schedule A above, set forth below is the allocation of your total compensation between cash and equity for the years 2003 through 2006:

(i) Your 2003 total compensation will be allocated between cash and equity pursuant to the NB Inc. policy as in effect on the date hereof;

(ii) Your 2004 total compensation will be allocated between cash and equity, with the equity portion of such compensation to be equal to the greater of (x) 15% and (y) one-half of the Percent of Equity applicable to your level of total compensation under the Lehman Equity Award Program, calculated as described in Schedule E attached to this Agreement;

(iii) Your 2005 total compensation will be allocated between cash and equity, with the equity portion of such compensation to be equal to the Percent of Equity applicable to your compensation based on your level of total compensation under the Lehman Equity Award Program, calculated as described in Schedule E attached to this Agreement; and

(iv) Your 2006 total compensation will be allocated between cash and equity in the same relative percentages as the total compensation of similarly situated NB Inc. employees at such time.

Schedule B

Retention Bonus Pool

1.    On the date of the Merger, $3 million will be allocated to you and awarded to you in the form of restricted Lehman Shares and/or RSUs. Such number of Lehman Shares and/or RSUs to be allocated and awarded will be determined based on the "Parent Reference Price" as defined in the Merger Agreement. Subject to certain adjustments described in the Merger Agreement, this price will be the average of the volume of the average weighted sales prices of Lehman Shares on the NYSE for the 10 trading days ending on the second trading day prior to the date of the Merger.

2.    Vesting and Payment. 20% per year, starting on the first anniversary of the Merger.

3.    (a)    Continued Vesting:

-    Termination by the Firm without Cause if Non-Solicitation Covenants set forth in Schedule C and confidential information covenants set forth in your Existing Agreements are complied with before and after termination of employment

-    Termination by you for Good Reason if Non-Solicitation Covenants set forth in Schedule C and confidential information covenants set forth in your Existing Agreements are complied with before and after termination of employment

-    Termination due to death or by the Firm due to Extended Absence

(b)    Payment of Vested Amounts after Termination of Employment:

-    If termination is (i) by the Firm without Cause or due to Extended Absence or (ii) by you for Good Reason, you will receive payment of your amounts on each of the original vesting dates described in paragraph 2 above.

-    Upon your death, your estate will receive immediate payment of all unpaid amounts.

(Payment will be made in the event of continued vesting only if you continue to comply with the provisions of Schedule C and the confidential information covenants set forth in your Existing Agreements.)

4.    Forfeiture of Retention Bonus Pool allocated amounts:

-    Termination by Firm with Cause (with respect to any unvested amounts)

-    Termination by you without Good Reason (with respect to any unvested amounts)

-    Violation of Non-Solicitation Covenants set forth in Schedule C or confidential information covenants set forth in your Existing Agreements (with respect to any unvested amounts or any vested but unpaid amounts).

5.    You will receive more details regarding the retention bonus pool when it is finalized.

053126-0066-02747-NY03 2262276 2

CONFIDENTIAL                                                        LEH-RSU-CL 0000691

AUG-04-03  23:11    FROM-COMPLIANCE                    2124755662              T-872  P 84/98  F-590

Schedule C

Non-Solicitation

(a)      In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc. ("*NB Stock*") for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

(i)      it is essential to the success of the Merger and the Firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

(ii)      the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

(b)      Therefore, you agree that the covenants and restrictions contained in this Schedule C are reasonable and necessary for the Lehman to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm):

(i)      during the Employment Period and for a period of eighteen months after your Date of Termination (the "Restricted Period"):

(A)      solicit or accept business from any individual or entity for whom any member of the Firm provides services within the one-year period before or after the Date of Termination;

(B)      solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

(C)      solicit or accept business from or through, or engage in any sales or marketing activities with, any broker-dealer, bank, insurance company, financial planner or other financial institution (or any person employed by or associated with any such entity), with whom Executive had business contact during the one-year period prior to Executive's Date of Termination;

(D)      employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other similar support personnel); or

US512G-GC66-02747-NY03 2352276 2

CONFIDENTIAL                                                        LEH-RSU-CL 0000692

AUG-14-03  20:17    FROM-COMPLIANCE                    2124759862          T-872  P 96/99  F-595

2

(E)    solicit (or assist in soliciting) any such person described in (D) to terminate his or her employment or consulting services with the Firm (but only if, with respect to a former employee, in the case of (D) or (E), such person shall have ceased to be employed by, or a consultant to, the Firm coincident with, or within one year prior to or after, the Date of Termination).

The covenants set forth in (A) through (E) above will also apply beginning on the date hereof and through the date the Merger occurs, but these covenants will no longer apply (i) if your employment is terminated without Cause by NB Inc. prior to the date the Merger occurs or (ii) the Merger does not occur and the Merger Agreement is terminated in accordance with its terms. Furthermore, the covenants set forth in (A) through (E) will no longer apply if your employment is terminated without Cause by NB Inc. or by you for Good Reason, in either case, after the Initial Employment Period.

General

(a)    Specific Performance. You acknowledge and agree that the Firm's remedies at law for a breach or threatened breach of any of the provisions of this Schedule C would be inadequate and the Firm would suffer irreparable damages as a result of such breach or threatened breach. Therefore, you agree that, in the event of such a breach or threatened breach, in addition to any remedies at law, NB Inc. or any other member of the Firm, without posting any bond, may cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

(b)    Separability. It is understood and agreed that although you and NB Inc. consider the restrictions contained in this Schedule C to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Schedule C is an unenforceable restriction against you, the provisions of this Schedule C shall not be void but shall be deemed amended to apply to such maximum time and territory and to such maximum extent as the court may determine to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Schedule C is unenforceable, and such restriction cannot be amended to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

(c)    Confidentiality of Agreement. Except as required by law, you will not disclose to anyone, other than to your immediate family and legal or financial advisors, the existence or contents of this Agreement; provided that you may disclose to any prospective future employer the provisions of this Schedule C so long as they agree to maintain the confidentiality of such provisions.

v3128-0006-02747-NY03 2252276.2

AUG-04-03  20:12    FROM-COMPLIANCE                    2124766662        T-872  P 98/99  F-595

Parachute Payment Limitation

*If* it is determined that any payment or benefit whatsoever provided to you under this Agreement or otherwise (a "Payment") would be considered a "parachute payment" within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code") as a result of a change in ownership or control of NB Inc., within the meaning of Section 280G of the Code, and if, after reduction for any applicable federal excise tax imposed by Code Section 4999 (the "Excise Tax") and federal income tax imposed by the Code, your proceeds of the Payments would be less than the amount of your net proceeds resulting from the payment of the Reduced Amount (described below), after reduction for federal income taxes, *then* the Payments shall be limited to the Reduced Amount. The "Reduced Amount" shall be the largest amount that could be received by you as Payments such that no Payment would be subject to the Excise Tax. In the event that the Payments shall be limited to the Reduced Amount, then the amounts payable under Schedule B shall be the first amounts to be reduced.

c53126-0066-02747-NY03 3263276.3

AUG-04-03  20:12    FROM-COMPLIANCE                2124759962              T-972   P 97/96  F-356

## ILLUSTRATIVE SUMMARY OF KEY TERMS OF THE
## LEHMAN BROTHERS EQUITY AWARD PROGRAM[1]

**Form of Equity Award**

Participants receive equity awards annually as a percentage of fiscal year total compensation. Historically, all participants have received equity awards in the form of Restricted Stock Units ("RSUs"). Each RSU represents the right to receive one share of Lehman Brothers ("LB") common stock five years after the date of grant and the right to receive dividends (which are automatically reinvested in additional RSUs) when dividends are declared. All RSUs are non-transferable.

In past years, senior-level employees' equity awards have been paid in a combination of RSUs and options. Based on anticipated changes in accounting rules, LB has not yet determined the extent to which it will use options or make further structural changes to the program in future years.

**Size of Equity Award**

The portion of total compensation paid in equity increases as compensation rises. The following chart shows the percentage of compensation to be paid in equity at specific compensation levels. (Below and above each compensation breakpoint, the percentage of equity changes based on marginal rates, similar to a tax table.) The percentages shown here represent the maximum portion of your total compensation payable in equity through 2005, subject to the phase-in described in Schedule A attached to the Agreement.

| Total Compensation | Percent in Equity |
|---|---|
| $250,000 | 5.2% |
| $500,000 | 12.5% |
| $750,000 | 15.0% |
| $1,000,000 | 20.0% |
| $1,500,000 | 25.0% |
| $2,000,000 | 30.0% |
| $2,500,000 | 35.0% |

**Discount Applied in Calculating Equity Award**

RSUs are awarded at fiscal year end, at a 25% discount to the closing market price of LB common stock at the time of award. Thus, each RSU award has a principal portion (75% of total units awarded) and a discount portion (25% of total units awarded).

**Vesting of Equity Award**

While employed, participants' equity awards vest as follows: the principal portion vests in full after 2 years, and the discount portion vests in full after 5 years. RSUs that result from reinvested dividends vest and are subject to the same terms as the RSUs to which the dividend payments relate. Note: "Vesting" does not refer to the date the RSUs are converted to shares. "Vesting" determines the portion of the award that participants are entitled to receive on voluntary resignation with Competitive Activity.

**Conversion to Stock**

Assuming continuous employment, RSUs are converted to freely tradable stock five years after the RSU is granted. See below for the treatment of RSUs in the event of employment termination during this five-year period.

**Termination Provisions[2]**

**Voluntary Termination without Competitive Activity**

Participants are eligible to receive the principal portion of their award and a pro-rated amount of their discount portion (20% per year after grant). These shares are issued one year after termination, provided the participant has not engaged in Competitive Activity or Detrimental Activity.

**Involuntary Termination**

If involuntarily terminated without Cause, Participants are eligible to receive the principal portion of their award and a pro-rated amount of their discount portion (20% per year after grant). These shares are issued one year after termination, provided the participant has not engaged in Detrimental Activity. If the involuntary termination is with Cause, both the principal and discount are forfeited.

**Voluntary Termination with Competitive Activity**

Participants are eligible to receive only the "vested" portion of the equity award. These shares are issued one year after termination, provided the participant has not engaged in Detrimental Activity.

**Full Career Termination**

Participants who qualify for "Full Career Termination" are eligible to receive the principal portion of their award and 100% of their discount portion. These shares are issued one year after termination, provided the participant has not engaged in Competitive Activity or Detrimental Activity.

NOTE: This summary is for informational purposes only. Awards are subject to controlling plan documents, including, as applicable, the RSU Award Agreement, Stock Option Award Agreement, the Employee Incentive Plan and related Prospectus. Select definitions appear on p. 2.

---

[1] The actual terms for the 2003 program have not yet been established but are currently expected to be substantially similar to those described in this outline
[2] Please note that there are also provisions for the treatment of equity awards in the event of Retirement, death or Disability, and a Change in Control
NY1:\1128-0046-02747-NY01 228227e 2

CONFIDENTIAL                                                      LEH-RSU-CL 0000695

AUG-04-03  20:12    FROM-COMPLIANCE                 2124769552         T-872  P.58/96  F-555

2

# GLOSSARY OF SELECT TERMS FOR LEHMAN BROTHERS EQUITY AWARD PROGRAM

"Cause" means a material breach by a person of an employment contract between the person and Lehman Brothers Holdings Inc. ("Holdings") or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary, including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc.

"Competitive Activity" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc.

"Detrimental Activity" means (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing or (iii) any activity deemed to be detrimental to Holdings or any of its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Administrative Officer of Lehman Brothers Holdings Inc.

"Full Career Termination" means a termination of employment when a) you have at least 20 years of service or b) your age and years of service with the Firm add up to 65 and you are at least 45 years old and your tenure with the Firm is at least 10 years.

"Restricted Stock Units (RSUs)" An RSU represents the right to receive one share of Lehman Brothers common stock five year after the grant date. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf. Generally, RSUs cannot be sold, traded, pledged or transferred for that five-year period.

0531126-0066-02747-NY03 2282276 2

CONFIDENTIAL                                                      LEH-RSU-CL 0000696

**Exhibit N**

# Neuberger Berman Holdings LLC

Date:                    November 17, 2008

To:        U.S. Employees of Neuberger Berman Holdings and certain of its affiliates

From:            George Walker
                 Heather Zuckerman

1



DEFENDANT'S
EXHIBIT

*For internal use only. Do not redistribute.*

Over the past couple of months, we have been providing information to you as it has become available to us. As each day passes, we gain more clarity on employee-related matters and we thought it would be helpful to address some of the most common employee questions in this document for your reference. Separately, we will be scheduling a call within one week to give you an update on the sale and transition process.

**Advancement**

Q.  When will I hear if I am being promoted?

A.  We are still on track to make advancement announcements in January 2009. We have begun the process and will give it the same careful consideration as we have in past years.

**Compensation**

Q.  When will I hear about salary adjustments?

A.  We continue to examine our compensation structure and to gather competitive data as we migrate to a stand-alone asset manager. We intend to announce adjustments, if any, in the beginning of 2009.

Q.  Will I receive my full 2008 bonus if I am terminated?

A.  If your employment is terminated without cause before the payment in full of your 2008 bonus, you will still be entitled to receive the entirety of your bonus on the scheduled dates as per your compensation agreement provided that you sign a company standard release agreement. In accordance with company policy, the amount of any severance that you may receive will be reduced by the amount of the then outstanding bonus payments under your compensation agreement. As a reminder, funding for the entire 2008 bonus pool is in an irrevocable trust with Wells Fargo, as trustee.

Q.  If part of my production compensation was deferred under the Lehman Brothers Equity Award Program, will I receive any of that compensation?

A.  If you receive production compensation throughout the year and have had compensation deferred under the Lehman Brothers Equity Award Program, those deferrals have also been placed in the trust with Wells Fargo. You will soon receive an individual statement of your deferral and, to the extent you are entitled to such deferrals, the payments will be made in January 2009.

**Credit Cards/Expense Reimbursement/Travel**

Q.  What is the current status of expense reimbursement? How should I be booking and paying for travel?

2

A.    It has been a long process but we expect expense reimbursement will broadly be reinstated shortly. There is still a backlog which we expect to clear out soon. You should continue to submit your expenses through the online PeopleSoft system and you should book travel through Travel Inc. (see LehmanLive for details). We ask that you use your personal credit cards for business purposes as we continue to aggressively pursue a credit card solution.

Personal Investment Policy
Q.    What is the current Personal Investment Policy?
A.    As we continue to refine our Personal Investment Policy to reflect our new organizational structure, we ask that you keep in mind that all trades must be pre-cleared through Compliance, regardless of the Personal Investment Policy/Code of Ethics to which you are subject. For those employees who have been subject to the Lehman Brothers Personal Investment Policy, the ASPIRE system is back up and running and accessible via LehmanLive. Employees subject to the Asset Management Code of Ethics do not need to use the ASPIRE system.

**Exhibit O**

*Confidential*
*Internal Use Only*

### Neuberger Investment Management
### U.S. Employee Q&A

Over the past couple of months, we have been providing information to you as it has become available to us. We hope you will find this Q&A with new updates helpful. Please continue to send your questions and suggestions to http://www.nb.com/nb/suggestions

**Compensation Structure**

*Q.*   *How will compensation be handled for fiscal year 2009? Will any portion be contingent or deferred?*

*A.*   The specifics of the plan are still being developed; however, there are some facts that can be shared at this time. We have established a deferred/contingent compensation schedule as well as payment dates for the deferred compensation. Over the next several months, we will finalize the remaining details of the plan (for example, the conditions to vesting and the form of deferred payment to be made).

**For bonus-eligible employees.** As in the past, employees who are eligible to receive a year-end 2009 discretionary bonus, assuming continued employment in accordance with the bonus policy, will receive a portion of their total compensation in the form of a deferred payment, subject to vesting.

**For monthly and quarterly paid production based employees.** As in the past, production based employees will continue to receive a portion of compensation in monthly or quarterly cash payments and a portion determined by the Company as a contingent amount (a "conditional accrual"), with the conditional accrual subject to deferred vesting and payment.

*Note: The terms of the plan are not intended to guaranty any minimum level of total annual compensation for participating employees. With respect to individuals employed outside of the United States, the terms of the plan may be modified to comply with local laws.*

*Q.*   *What will be the vesting and deferral schedule?*

*A.*   **Deferral Schedule.** For fiscal year 2009, you will notice that the Company has adopted a schedule that provides for considerably less deferrals than the prior Lehman Brothers' plans (it is capped at 25% of total compensation and there are no deferrals for individuals earning less than $200,000).

| % of 2009 Total Compensation ("TC") Subject to Deferral/Contingent Payment | | |
|---|---|---|
| **2009 TC Range** | **% Contingent/Deferred** | **Maximum % Contingent/ Deferred** |
| $0 - $199,999 | 0% | 0% |
| $200,000 - $299,999 | 7.5% of 2009 TC | 7.5% |
| $300,000 - $499,999 | $22,500 plus 26.0% of 2009 TC above $300,000 | 15.0% |
| $500,000 - $749,999 | $75,000 plus 30.0% of 2009 TC above $500,000 | 20.0% |
| $750,000 - $849,999 | $150,000 plus 62.5% of 2009 TC above $750,000 | 25.0% |
| $850,000 and above | 25.0% of 2009 TC | 25.0% |

1



DEFENDANT'S EXHIBIT
Blumberg No. 6114
*NB 0*

*Confidential*
*Internal Use Only*

**Vesting and Payment Dates.** Subject to certain limitations, vesting of conditional accruals and compensation subject to deferral for fiscal year 2009 is conditioned on continued employment (except if an employee dies, becomes disabled, retires in good standing or is terminated involuntarily without cause, in which case vesting will continue on the normal schedule), restrictive covenants and other criteria established by the Company. 50% of such accruals and compensation will vest at the end of 2011 and be paid in the first quarter of 2012. The remaining 50% will vest at the end of 2012 and be paid the first quarter of 2013.

*Q.*  *What will be the form of the deferred payment?*

*A.*  For awards relating to fiscal year 2009, the deferred payment will be in cash. Over the coming months, we will endeavor to structure a program whereby the cash return during the vesting and payment period would track, as applicable, a portfolio team composite(s) or reference portfolio(s). In addition to providing further alignment of our interests with those of our clients, this should give us an opportunity to participate in the recovery potential of portfolios as markets normalize. If such reference portfolios are not created, a different cash return will be established.

*Q.*  *What about any deferral arrangements for future years, after fiscal 2009?*

*A.*  As mentioned above, our goal over the next few years is to continue to develop the deferred compensation arrangements. This could include changes in the manner and form of payment and extent of deferred compensation, and there is no guaranty that the provisions of the plan applicable with respect to the 2009 plan year will continue in effect during subsequent fiscal years.

*Q.*  *If part of my 2008 production compensation was conditionally deferred, will I receive any of that compensation?*

*A.*  For those employees eligible to receive conditionally deferred 2008 production compensation, it will be paid on January 26, 2009.

2

*Confidential*
*Internal Use Only*

**Bonus Payments and Payroll**

*Q.*   *When will I receive the remainder of the First Installment and the Second Installment of my 2008 bonus?*

*A.*   The 2009 Payroll Schedule has now been established by Barclays pursuant to our Transition Services Agreement.  Accordingly, we have modified our bonus payment.

- Assuming you have not voluntarily resigned or have not been terminated for cause prior to January 15, 2009, you will receive the remainder of the First Installment of your bonus on January 23, 2009.
- Assuming you have not voluntarily resigned or have not been terminated for cause and the transaction does not close prior to March 15, 2009, the Second Installment of your bonus will be paid on March 20, 2009.  If the transaction does close prior to March 15, 2009, we will inform you of the revised bonus payment date which shall be no later than March 20, 2009.
- If your employment is terminated without cause before the payment in full of your 2008 bonus, you will still be entitled to receive the entirety of your bonus as per your compensation agreement on the dates described above provided that you sign a company standard release agreement.  In accordance with company policy, the amount of any severance that you may receive will be reduced by the amount of the then outstanding bonus payments under your compensation agreement.

*Q.*   *Will there be any changes to the regular payroll schedule in 2009?*

*A.*   There will be no changes to the bi-weekly payroll.  In other words, if you are currently paid every other Friday, you will continue to be paid on the same schedule.

If you receive production compensation monthly, and it is normally paid by the 30th of every month, you will continue to be paid monthly, but by the 26th of every month, starting on January 26, 2009.

If you currently receive your salary on a monthly basis, your payroll schedule will change to bi-weekly.  Your last monthly check will be paid through December 31, 2008.  Your first bi-weekly pay date will be on January 9, 2009 for January 1, 2009 through January 10, 2009.  Your second bi-weekly pay date will be January 23, 2009 for January 11, 2009 through January 24, 2009, and so on.  Expats will receive more information regarding this change under separate cover.

*Q.*   *When and where should I expect to receive my 2008 Form(s) W-2?*

*A.*   At the end of January, your 2008 Form(s) W-2 will be mailed to your Primary Home Address. The Form(s)W-2 must be post marked no later than January 31st of the year after the year to which the form relates (e.g., by January 31, 2009, for 2008 Form(s) W-2).

*Confidential*
*Internal Use Only*

*Q.*   *Why am I receiving multiple 2008 Form(s) W-2?*
*A.*   There are many reasons why employees may receive multiple Form(s) W-2 statements.

- If your work state differed from your resident state (e.g., employee works in New Jersey and resides in New York, a fully populated Form W-2 will be issued reflecting New Jersey wages and taxes, a second Form W-2 will be issued reflecting only the New York wages and taxes).
- If you worked in multiple states during a calendar year (e.g., employee resides in Connecticut and works in New York from January - June, transfers to a New Jersey work location from July - December, a fully populated Form W-2 will be issued reflecting Connecticut wages and taxes, a second Form W-2 will be issued reflecting only the New York wages and taxes, and a third Form W-2 will be issued reflecting only the New Jersey wages and taxes).
- If you received income that was allocated across multiple states (e.g., the bonus allocation period was based on the number of days assigned to each work state during fiscal year 2007 (11/2006-11/2007), if you worked in multiple states during the allocation period, you would have incurred tax liabilities across those states resulting in multiple Form(s) W-2 issuances)
- If you performed services in multiple states and allocated your time accordingly (e.g., filing a NY IT2104.1 to allocate a percentage of time spent in NY while primarily working in a non NY work location)
- If you have multiple employers during a calendar year (e.g., employee worked for Lehman Brothers Inc. from January - mid September, transfers to Barclays Capital Inc. from mid September to October, transfers to Neuberger Berman November - December, the employee will receive Form(s) W-2 from each entity / employer). Please note that the Form(s) W-2 for Barclays Capital Inc will be issued and mailed by ADP Tax Services.

## Benefits

*Q.*   *Will there be changes to my benefits in 2009?*
*A.*   You will receive an e-mail next week from Neuberger Communications on updates and changes to the healthcare related benefits. Please refer to this communication for a full description of plan changes for 2009. Below are a few highlights of the plan changes:

- New Aetna ID cards with a new group number are being issued in early January. Your current ID card will work until you receive a new one. You do not need an ID card for MetLife dental.

*Confidential*
*Internal Use Only*

- Prescription drug coverage (retail and mail order) will now be provided by Aetna as part of the medical plan (coverage under Medco ends as of 12/31/08). Information on your prescriptions is not being sent from Medco to Aetna; you will need to ask your doctor for a new prescription.
- Other plan benefit changes:

| Benefit Category | Current Benefit | NEW 2009 Benefit |
|---|---|---|
| **Infertility Services** | $15,000 combined lifetime maximum for ALL infertility services including infertility prescription drugs | $15,000 per lifetime limit on Advanced Reproductive Technology. No dollar limit on artificial insemination or infertility prescription drugs. |
| **Outpatient Hospice Care** | $25,000 lifetime maximum | Unlimited outpatient benefit |
| **Outpatient Acupuncture & Chiropractic Care** | 30 visits per year | No visit limitation |
| **Outpatient Speech Therapy** | 30 visits per year for developmental delays | 60 visits per year for outpatient speech therapy treatment, including coverage for developmental delays |
| **Outpatient Alcohol/ Substance Abuse Therapy** | 50 visits per year | 60 visits per year |

We will continue to have basic life insurance with access to supplemental life insurance, FSA through Wageworks (medical and dependent), Transportation Accounts through Wageworks, vision care (Davis Vision), auto and homeowner insurance (MetLife), a legal plan (Hyatt Legal) and long term care insurance (Mass Mutual or John Hancock).

Benefit administration services and call center support are currently being provided by the Barclays HR Service Center as part of our Transition Services Agreement. If you have questions about your benefits, please contact the Service Center or your HR Generalist.

HR Service Center: 212-526-2363 or HRServices@barclayscapital.com

**Please look for your new Aetna ID card (early January) and benefits summary plan description booklet (late January). Both will be mailed to your home address.**

*Confidential*
*Internal Use Only*

*Q.* *Will there be changes to my benefit deductions in 2009?*
*A.* Yes, there are changes to the employee monthly rates.

| Insurance Earnings | Medical - Employee Monthly Rates | | | | | |
|---|---|---|---|---|---|---|
| | Single 2008 | Single 2009 | Single+1 2008 | Single+1 2009 | Family 2008 | Family 2009 |
| Under $50,000 | $35 | $37 | $71 | $74 | $109 | $114 |
| $50,000 to $99,999 | $53 | $55 | $106 | $111 | $164 | $172 |
| $100,000 to $149,999 | $71 | $74 | $141 | $148 | $219 | $229 |
| $150,000 to $299,999 | $88 | $92 | $176 | $185 | $274 | $286 |
| $300,000 to $499,999 | $106 | $111 | $212 | $221 | $328 | $343 |
| $500,000 to $749,999 | $124 | $129 | $247 | $258 | $383 | $400 |
| $750,000 and over | $141 | $148 | $282 | $295 | $438 | $458 |

*Q.* *Will there be a 401(k) match paid in 2009, for 2008?*
*A.* Due to the LBHI bankruptcy, there will not be a 401(k) match for 2008. We are currently developing our savings plan/retirement benefits post closing. As soon as we have more information, we will share it with you.

*Q.* *What is the status of previously approved outstanding education expenses?*
*A.* We are currently working through the reimbursement process and policies. As we have additional information on education reimbursement, we will share it with you.