Robert N. Michaelson
Rich Michaelson Magaliff Moser, LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
(P) 212.220.9404
(F) 212.913.9642
rmichaelson@r3mlaw.com

*Counsel for Compensation Claimants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

LEHMAN BROTHERS HOLDINGS, INC.,
*et al.*,

                                        Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Chapter 11

Case No. 08-13555 (SCC)
(Jointly Administered)

## COMPENSATION CLAIMANTS' DESIGNATION OF
## RECORD AND STATEMENT OF ISSUES ON APPEAL

Compensation Claimants Donald Boughrum, Morgan Lawrence, Nicole Lawrence and

Brian Monahan, creditors in the above-captioned proceeding, by and through their undersigned

counsel, pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, file this

Designation of Record and Statement of Issues on Appeal with respect to their appeal from order

of the United States Bankruptcy Court for the Southern District of New York, entitled *Order*

*Sustaining Omnibus Objections and Reclassifying Claims for Restricted Stock Units and*

*Contingent Stock Awards* [Docket No. 46853](the "Order") entered in the above-captioned

chapter 11 cases on November 7, 2014, including, without limitation, any and all judgments,

decrees, decisions, rulings, and/or opinions that merged into and/or became a part of the Order,

{00008865v1 }

that are related to the Order, and/or upon which the Order is based.

For items designated, the designation includes all documents referenced with the

particular docket number, including, without limitation, all statements, appendices, exhibits,

attachments, notices, declarations and affidavits related thereto.

| DESIGNATION NO. | FILING DATE | DOCKET NO. | DESCRIPTION |
|---|---|---|---|
| 1. | 12/07/2010 | 13295 | Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 2. | 04/06/2011 | 15666 | Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 3. | 04/18/2011 | 16115 | Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 4. | 04/18/2011 | 16116 | Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 5. | 05/03/2011 | 16530 | Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 6. | 05/03/2011 | 16532 | Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 7. | 05/13/2011 | 16808 | Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 8. | 08/19/2011 | 19392 | Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 9. | 09/06/2011 | 19714 | Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) |
| 10. | 09/15/2011 | 20012 | Debtors' Two Hundred Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 11. | 12/15/2011 | 23470 | Debtors' Omnibus Reply to Responses to Debtors' One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred |

| | | | |
|---|---|---|---|
| | | | Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventh-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claims as Equity Interests) |
| 12. | 12/27/2011 | 23741 | Transcript regarding hearing held on 12/21/2011 |
| 13. | 6/4/2012 | 28433 | Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 14. | 6/4/2012 | 28434 | Transcript regarding hearing held on 05/31/2012 |
| 15. | 6/4/2012 | 28435 | Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) |
| 16. | 6/15/2012 | 28777 | Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 17. | 8/24/2012 | 30357 | Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 18. | 10/2/2012 | 40263 | Order Approving Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs |
| 19. | 1/24/2014 | 42176 | Stipulation & Order Establishing Procedures for an Evidentiary Hearing in Connection with Omnibus Objections to Reclassify Proofs of Claim as Equity Interests |
| 20. | 1/29/2014 | 42348 | Memorandum in Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation Claims as Equity, or Alternatively, to Subordinate Claims Pursuant to Section 510(b) of the Bankruptcy Code |
| 21. | 1/31/2014 | 42404 | Memorandum of Law in Support of Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty- |

| | | | First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests) |
|---|---|---|---|
| 22. | 3/5/2014 | 43418 | Memorandum of Law in Opposition to Claimants' Opening Memoranda Regarding Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 23. | 3/5/2014 | 43421 | Supplemental Declaration of Ralph I. Miller in Opposition to Claimants' Opening Memoranda Regarding Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests) |
| 24. | 3/6/2014 | 43447 | Memorandum in Further Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation Claims as Equity, or Alternatively, to Subordinate Claims Pursuant to § 510(b) of the Bankruptcy Code |
| 25. | 3/6/2014 | 43452 | Declaration of Donald Boughrum |
| 26. | 3/6/2014 | 43465 | Declaration of Morgan Lawrence |
| 27. | 3/6/2014 | 43466 | Declaration of Nicole Lawrence |
| 28. | 3/6/2014 | 43467 | Declaration of Brian Monahan |
| 29. | 3/27/2014 | 43763 | Joint Stipulation Regarding Authenticity and Admissibility of Documents and Designated Deposition Testimony in Connection with Debtors' Omnibus Objections to Proofs of |

|  |  |  | Claim |
|---|---|---|---|
| 30. | 3/27/2014 | 43763-3 | Exhibit List for Represented Compensation Claimants (Excluding Neuberger Berman Claimants) |
| 31. | 3/27/2014 | 43763-4 | LBHI's Proposed Exhibit List Pursuant to ¶ 13 of the Evidentiary Hearing Procedures |
| 32. | 4/3/2014 | 43969 | Transcript regarding hearing on 04/01/2014 |
| 33. | 4/7/2014 | 43970 | Transcript regarding hearing held on 04/03/2014 |
| 34. | 11/3/2014 | 46797 | Memorandum Decision Sustaining Omnibus Objections to Claims |
| 35. | 11/7/2014 | 46853 | Order Sustaining Omnibus Objections and Reclassifying Claims for Restricted Stock Units and Contingent Stock Awards |
| 36. | 11/21/2014 | 47005 | Claimants' Notice of Appeal |
| 37. | 12/5/2014 | 47221 | Declaration of Ralph I. Miller dated January 28, 2014 in Support of Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (to Reclassify Proofs of Claim as Equity Interests)[1] |
| 38. | 12/5/2014 | 47221 | Transcript regarding hearing on 04/02/2014[2] |

## CLAIMANTS'EVIDENTIARY HEARING EXHIBITS[3]

---

[1] The Declaration is incorporated by reference in the Memorandum of Law in Support of Debtors' Omnibus Objections to Claims [Dkt. No. 42404]. A copy of the Mr. Miller's Declaration is annexed as Exhibit "A" to Docket No. 47221.

[2] Excerpts from the 04/02/2014 hearing are cited throughout the Court's memorandum decision underlying its Order [Dkt. # 46797]. A copy of the 04/02/2014 transcript is annexed as Exhibit "B" to Docket No. 47221.

[3] These documents are annexed hereto as Exhibits "A," "B," "C," "D" and "E."

{00008865v1 }

| 39. | -- | -- | 2007 Equity Award Program For Bonus-Eligible Employees and Production-Based Employees (Claimants' Ex. 70) |
|---|---|---|---|
| 40. | 2/13/2007 | -- | Email from R. Polisi to C. Tuininga with copy to T. Binkley, E. Arreglado, K. Macleod and J. Gault re: "Shareholder Q&A Slides – for updating" and attaching excerpt of PowerPoint slides entitled "Compensation: Info from: HR / Chris Tuininga" (Claimants' Ex. 71) |
| 41. | 9/7/1997 | -- | 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans (Claimants' Ex. 72) |
| 42. | 2/19/2003 | -- | Lehman Brothers Holdings Inc. Employee Incentive Plan, as amended through Feb. 19, 2003 (Claimants' Ex. 73) |
| 43. | 3/26/1997 | -- | RSU Trust Authorization (Claimants' Ex. 74) |

## STATEMENT OF ISSUES ON APPEAL

1.   Whether the Bankruptcy Court erred in concluding that Compensation Claimants' claims against Lehman for unpaid compensation are subject to subordination under §510(b) of title 11 of the United States Code (the "Code") where such claims do not arise from the purchase or sale of a security but arise from Lehman's compensation obligation to Compensation Claimants based upon (a) its promise made to claimants long before the Lehman bankruptcy to pay them their compensation in one of two alternative forms, either in cash or through the conversion of RSUs or CSAs to Lehman common stock and (b) the applicable statutory wage laws.

2.   Whether the Bankruptcy Court erred in concluding that Compensation Claimants' claims against Lehman for unpaid compensation are subject to subordination under §510(b) of the Code where such claims are not for damages within the meaning of §510(b) of the Code but are claims for enforcement of claimants' contractual alternative performance rights and their rights under applicable statutory wage laws.

3.   Whether the Bankruptcy Court erred in concluding that Compensation Claimants' claims based upon the applicable statutory wage laws are subject to subordination under §510(b) of the Code where the legislative history to §510(b) of the Code indicates that it does not apply to wage claims.

4.   Whether the Bankruptcy Court erred in concluding that Compensation Claimants' claims against Lehman based upon their contractual and statutory rights for unpaid compensation are subject to subordination under §510(b) where such claims are not based upon a

{00008865v1 }

6

purchase or sale of a security because RSUs and CSAs granted to Compensation Claimants as one means of performance of Lehman's compensation obligation to Compensation Claimants were mandatorily imposed upon claimants and therefore are not securities within the meaning of §510(b) of the Code.

   5. Whether the Bankruptcy Court erred in declining to consider the legislative history and policy concerns of §510(b) of the Code in concluding that the claims, which are not security fraud claims, are subject to subordination under §510(b) of the Code.

   6. Whether the Bankruptcy Court erred in applying a liberal interpretation of §510(b) where the claims are based upon a fixed amount that do not fluctuate with the price of Lehman common stock.

   7. Whether the Bankruptcy Court erred in concluding the claims of Compensation Claimants are based upon equity securities where the RSUs and CSAs are not an equity security  under §101(16) of the Code.

   8. Whether the Bankruptcy Court erred in reclassifying the claims as equity interests by its Order purportedly implementing its underlying decision where claimants were creditors of the Lehman estate by virtue of their contractual and statutory rights that were independent of any rights claimants had under the RSUs or CSAs.

Dated: January 28, 2015
  New York, New York

       RICH MICHAELSON MAGALIFF MOSER, LLP

       By: /s/  Robert N. Michaelson
       Robert N. Michaelson
       335 Madison Avenue, 9th Floor
       New York, New York 10017
       (P) 212.220.9404
       (F) 212.913.9642

       *Counsel for Compensation Claimants Donald Boughrum, Morgan Lawrence Morgan, Nicole Lawrence and Brian Monahan*

EXHIBIT A



# 2007 EQUITY AWARD PROGRAM

## LIFE @ LEHMAN

### YOUR BENEFITS AND LIFE BALANCE

For Bonus-Eligible Employees and
Production-Based Employees

# LEHMAN BROTHERS

CL0060

LEH-RSU 0000269

# DECEMBER 31, 2007
# EQUITY AWARD PROGRAM



## Contents

Eligibility.................................................... 1

How the Equity Award Program Works ................. 1

2007 Equity Award Schedule ............................... 3

Termination Provisions ........................................... 5

Your Conduct with Respect to
Lehman Brothers after You Leave........................... 6

Tax Considerations ................................................ 6

Change in Control ("CIC") Provisions.................... 7

Dividend Equivalents ............................................. 7

Voting Rights ......................................................... 7

Other Information .................................................. 7

This brochure describes significant features of the
Lehman Brothers Equity Award Program for 2007.
It is not intended to replace the award agreement
or other official plan documents. This brochure
should be read in conjunction with the other
award documents.

LEH-RSU 0000270

 **ELIGIBILITY**

Active employees of the Firm (both bonus-eligible and production-based) hired on or before November 30, 2007, including employees on an approved leave of absence, are eligible to receive an equity award for 2007.

If a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level.   The disposition of the equity award is subject to the termination provisions on page 5.

Note that eligibility to receive an equity award is subject to a 5-share minimum.

 **HOW THE EQUITY AWARD PROGRAM WORKS**

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm over time. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. Your 2007 equity award is awarded to you as a portion of your 2007 compensation.

Employees receive a portion of their total compensation (combined base salary, bonus, production payout, and other applicable forms of compensation) in the form of conditional equity awards. For 2007, the equity award is in the form of contingent stock awards ("CSAs") for all employees and will be granted in early December. Each CSA represents the conditional right to receive one share of Lehman Brothers Holdings Inc. common stock five years after the grant date, on or about November 30, 2012. You can consider the CSAs as shares of Lehman Brothers common stock which you will be entitled to receive at that time, provided you meet certain terms and conditions. The 2007 CSAs cannot be sold, traded, or pledged for that five-year period.

## The Size of Your Award

The details of your 2007 equity award are shown on your year-end compensation worksheet and will also be available on the Personal Award Summary section of the Equity Award Program site on LehmanLive, keyword EquityAward, before the end

of the first quarter of 2008. The amount of each employee's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title. Under this schedule, the amount of compensation awarded in the form of conditional equity awards (CSAs) increases as total compensation rises.

**Bonus-Eligible Employees:** Your 2007 award will be based on your 2007 total compensation, which includes salary earned in fiscal year 2007 plus any additional compensation with respect to fiscal year 2007, even if some of these payments are deferred or paid in 2008.  Such compensation includes 2007 bonus, commissions, and other compensation.

**Production-Based Employees:** Similar to bonus-eligible employees, you received a year-end 2007 conditional equity award as a portion of your 2007 total compensation.  Your 2007 equity award accrues on a monthly basis, as a portion of your total payout on gross production during December 2006 through November 2007 (paid from January through December 2007) after all adjustments. For 2007, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of the 2007 Equity Award Schedule appears on page 3.) The 2007 payout may have included regular production payout, certain special payments, and other production payout. During any period you are paid a draw, equity (in the form of CSAs) may be awarded with respect to the amount of the draw. If the draw ends and you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued). Note that for purposes of this communication, all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of CSAs you receive for the Firm's 2007 fiscal year will be based on the closing price of Lehman Brothers Holdings Inc. common stock on the grant date, less a discount:  30 % for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of CSAs awarded results in a total CSA award of $143; for other employees, with a 25 percent discount, every $100 of CSAs awarded results in a total CSA award of $133.  The discount really means that the Firm "grosses up" your non-discounted portion at the outset.



LEH-RSU 0000271



EQUITY AWARD PROGRAM

## How Will the Grant Price for My 2007 CSAs Be Determined?

The grant price will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on a date in early December as determined by the Compensation and Benefits Committee of the Board of Directors. The grant price, along with the number of CSAs granted to you, will be communicated as part of the employee year-end compensation discussion with your manager. For Production-based employees, please refer to the "Compensation Statement" within the Sales Compensation System or contact the Compensation Department in New York at (212) 526-8346.

## Conditions and Stock Entitlement

Your 2007 CSAs are subject to certain contingencies or conditions. The conditions determine the terms of your ownership interest in the CSAs, as well as your entitlement to receive shares.

**Full Conditions**—Initially, your CSAs are subject to "full conditions," which must be satisfied in order for you to retain your interest in the CSAs and, ultimately, to receive Lehman Brothers stock. While your CSAs are subject to full conditions, they could be forfeited if your employment with the Firm terminates or if you engage in any activity that is detrimental to the Firm.

**Limited Conditions**—Over time, some of the conditions will be satisfied if you remain employed with the Firm through the dates outlined below. When these conditions are satisfied, your CSAs become subject to "limited conditions," and your eligibility to receive shares increases. While your CSAs are subject to limited conditions, they will be forfeited if you engage in activity that is detrimental to the Firm or if your employment is terminated with Cause.

**Unconditional CSAs**—Provided you comply with the conditions of your award, the 2007 CSAs will become unconditional on November 30, 2012. Once your CSAs become unconditional, they cannot be forfeited for any reason.

You should consider your 2007 CSA award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of CSAs awarded as part of your 2007 total compensation before the discount. The discount portion represents the balance of your CSA award, provided by the Firm. The conditions of your 2007 CSAs will apply as follows:

|  | Period Subject to Full Conditions | Portion of Award |
|---|---|---|
| MDs | through November 30, 2010 | 35% (half of principal portion) |
|  | through November 30, 2012 | 65% (half of principal portion plus the discount portion) |
| Up to and including SVPs | through November 30, 2009 | 75% (the principal portion) |
|  | through November 30, 2012 | 25% (the discount portion) |

Notwithstanding the above, if your employment is terminated by the Firm with Cause, or if you engage in Detrimental Activity, prior to November 30, 2012, all of your outstanding CSAs will be forfeited. Please refer to page 6 for the definition of Detrimental Activity.

## When Will I Receive Shares of Stock?

In general, your 2007 CSAs which become unconditional will convert to shares of Lehman Brothers Holdings Inc. common stock and will be delivered to you on November 30, 2012, subject to the terms and conditions of the Program. See the sections entitled *Termination Provisions* and *Change In Control ("CIC") Provisions* for further information on share delivery.

# 2007 EQUITY AWARD SCHEDULE

The participation schedule for 2007 is shown below. This schedule reflects the percentage of 2007 total compensation ("TC") that represents the principal portion of your 2007 CSAs. For production-based employees, the participation schedule for 2007 below is the same as the one previously communicated in 2006. An example of the calculations follows.

## 2007 Equity Award Schedule

### Amount of Total Compensation ("TC") in Equity-Based Awards

| Total Compensation Range | Employees Through Vice President Level | Senior Vice Presidents | Managing Directors |
|---|---|---|---|
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

## Award Calculation Example

Using the Equity Award Schedule above, your 2007 equity award will be determined at year end based on your 2007 total compensation. Sample illustrations are shown below.

| | Employees thru VP Level | SVPs | MDs |
|---|---|---|---|
| 2007 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| Amount of Compensation in CSAs: | $2,300 | $71,875 | $240,000 |
| Est. FMV on grant date[1] | $63.49 | $63.49 | $63.49 |
| Discount: | 25% | 25% | 30% |
| Est. Discounted grant price: | $47.62 | $47.62 | $44.44 |
| Est. Total # of CSAs: | 48 | 1,509 | 5,400 |
| Principal Portion: | 36 | 1,132 | 3,780 |
| Discount Portion: | 12 | 377 | 1,620 |
| Total Grant Value with Discount: | $3,067 | $95,833 | $342,857 |

[1] Based on closing price of Lehman Brothers common stock on November 13, 2007. Actual grant price will be determined in early December.

Note: The number of CSAs has been rounded to the nearest whole number for illustrative purposes only. The actual grant price for 2007 CSAs will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on a date to be determined in early December.



EQUITY AWARD PROGRAM

## 2007 Monthly Equity Accrual for Production-Based Employees

As an example, below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2006 to November 2007 (paid January to December 2007) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|---|---|---|---|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| Step 2 | Calculate projected award from 2007 Equity Award Schedule. | $1,932 | $1,932 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,932 x 8.33%) - $0 | $161 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| Step 5 | Calculate projected award from 2007 Equity Award Schedule. | $2,070 | $2,070 |
| Step 6 | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($2,070 x 16.67%) - $161 | $184 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|---|---|---|---|---|---|---|---|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,932 | 8.33% | $161 | $161 |
| 2 | February | 8,000 | 15,000 | 90,000 | 2,070 | 16.67% | 345 | 184 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,300 | 25.00% | 575 | 230 |
| 4 | April | 7,500 | 32,500 | 97,500 | 2,243 | 33.33% | 748 | 173 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,355 | 41.67% | 981 | 234 |
| 6 | June | 7,000 | 49,000 | 98,000 | 2,254 | 50.00% | 1,127 | 146 |
| 7 | July | 7,500 | 56,500 | 96,857 | 2,228 | 58.33% | 1,300 | 173 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,335 | 66.67% | 1,556 | 257 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,300 | 75.00% | 1,725 | 169 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,314 | 83.33% | 1,928 | 203 |
| 11 | November | 6,500 | 90,000 | 98,182 | 2,258 | 91.67% | 2,070 | 142 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,300 | 100.00% | 2,300 | 230 |
| | Total | | 100,000 | | | | | $2,300 |

In the example above, $2,300 is the amount of total compensation accrued by the production-based employee toward the year-end CSA award. For the calculation of the number of CSAs (including principal and discount portion), see example on page 3. *Note that if a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 5.*



LEH-RSU 0000274

# TERMINATION PROVISIONS

|  | All Employees |
|---|---|
| **Voluntary Termination** (but not Full Career) | Participants will forfeit all 2007 CSAs still subject to full conditions. Any remaining 2007 CSAs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2012 (the "Share Payment Date") but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** (but not Full Career) | **Involuntary Termination without Cause:** Participants will become entitled to the principal portion of their award, including the principal portion subject to full conditions (provided the employee signs a Firm-standard release agreement). The discount portion will be forfeited. Shares for the principal portion will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date. |
| | **Involuntary Termination with Cause:** Participants will forfeit 100% of the principal and discount portions of CSAs. |
| **Full Career Termination** | A termination is "Full Career" if: |
| | » The participant has at least 20 years of service; or |
| | » The participant is at least 45 years old and has at least 10 years of service; or |
| | » The participant is at least 50 years old and has at least 5 years of service. |
| | **Voluntary Termination:** Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2012. |
| | **Involuntary Termination:** Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2012. |
| **Termination due to Death or Disability** | Entire principal and discount portions will immediately become unconditional, and shares will be delivered 30 days following the termination date. "Disability" means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act. |



LEH-RSU 0000275

EQUITY AWARD PROGRAM

# YOUR CONDUCT WITH RESPECT TO LEHMAN BROTHERS AFTER YOU LEAVE

You may forfeit your rights to any 2007 CSAs (and related dividend reinvestment) if you engage in Competitive Activity (for Full Career employees) or Detrimental Activity or if you commit an act constituting Cause prior to your termination of employment.

## Cause

*"Cause"* means a material breach by a person of an employment contract between the person and Holdings or any Group Company, failure by a person to devote substantially all business time exclusively to the performance of his duties for Holdings or any Group Company, willful misconduct, dishonesty related to the business and affairs of Holdings or any Group Company, conviction of a felony or of a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any Group Company to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Group Company including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

## Competitive Activity

*"Competitive Activity"* means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any Group Company on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).

*Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.* Asset management companies, mortgage-related companies, private equity firms, and hedge funds, along with investment banks, commercial banks, small boutique-type firms and most other financial services companies, are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

## Detrimental Activity

*"Detrimental Activity"* means at any time (i) using information received during a person's employment with Holdings or any Group Company relating to the business affairs of Holdings or any Group Company or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly  persuading or attempting to persuade, by any means, any employee of Holdings or any Group Company to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).



# TAX CONSIDERATIONS

## Tax Treatment of Your 2007 CSAs

Under current tax regulations, you will not be taxed on the value of your CSAs until shares of common stock are delivered. As a result, your CSAs (including dividend reinvestment CSAs—refer to page 7) appreciate on a pre-tax basis until they convert to



LEH-RSU 0000276

shares of common stock. Provided below is a summary of the taxes related to CSAs that are ultimately due under current law.

**Note:** Pursuant to current tax law, if you work in more than one tax jurisdiction during the period up to the date that the "full conditions" on the CSAs lapse, you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction. The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.



**Taxation of CSAs**
- No taxation on the award date.
- Upon delivery of common stock, the fair market value of the shares will be treated as employment income generally based on the closing price of Lehman Brothers Holdings Inc. common stock on the delivery date.
- This income will be subject to applicable tax withholding.
- Special provisions dealing with capital gains will not apply upon delivery of common stock.
- If you retain your shares after delivery, the basis for capital gains is the closing price on the delivery date.

Consult your personal tax advisor concerning the application of tax laws on your CSAs.



# CHANGE IN CONTROL ("CIC") PROVISIONS

Following a CIC, except to the extent that conditions would otherwise lapse earlier, CSAs (both principal and discount portions) will become unconditional on the later of: (i) 18 months following the CIC; or (ii) the end of the fiscal year in the year after the CIC occurs (the "CIC Delivery Date"), provided you remain actively employed through that date. Shares of Lehman Brothers common stock will be delivered on the earlier of the CIC Delivery Date or November 30, 2012, provided you do not engage in Detrimental Activity.

If your employment is terminated involuntarily without Cause following the CIC but prior to the CIC Delivery Date, all CSAs (both principal and discount portions) become immediately subject to limited conditions.

If your employment terminates for any reason (other than for Cause) following a CIC, any CSAs then subject to limited conditions (including those that may become subject to limited conditions by reason of your involuntary termination) will become unconditional and convert to shares and be delivered on the earlier of: (i) the end of the fiscal quarter 1

year following the termination date; (ii) the CIC Delivery Date; or (iii) November 30, 2012, provided you do not engage in Detrimental Activity.



# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your CSAs and are reinvested as additional CSAs, without a discount. Dividend reinvestment CSAs are subject to the same conditions and forfeiture provisions as the underlying CSAs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than CSAs.



# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit. Through the Trust, you may be able to direct the exercise of voting rights related to your 2007 CSAs. The trustees are required by the Trust to vote those shares as directed by holders of the CSAs who are still employed by the Firm. Voting rights are available to participants in countries where this facility does not accelerate personal income tax on CSAs.

# OTHER INFORMATION

This document is intended as a brief summary of the material terms of the 2007 Equity Award Program. This document does not purport to summarize or describe the terms of equity awards from prior years. In the event of any conflict or discrepancy between the plan documents (including, but not limited to, the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your CSAs become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive, keyword EquityAward, or contact the Compensation Department at 212-526-8346 (8-526-8346) or by e-mail at compensation@lehman.com.

EQUITY AWARD PROGRAM



# EXHIBIT B

| | |
|---|---|
| **From:** | Polisi, Ryan J <ryan.polisi@lehman.com> |
| **Sent:** | Tuesday, February 13, 2007 12:54 AM (GMT) |
| **To:** | Tuininga, Chris <Chris.Tuininga@lehman.com> |
| **Cc:** | Binkley, Tracy A <tbinkley@lehman.com>; Arreglado, Elizabeth R <earregla@lehman.com>; Macleod, Kimberly N <kmacleod@lehman.com>; Gault, Joseph J <joseph.gault@lehman.com> |
| **Subject:** | Shareholder Q&A Slides - for updating |
| **Attach:** | Slides_2006_Compensation.ppt |

---

> Hi Chris,
>
> I hope you are well.  We are updating the Q&A slides for Dick for the
> annual shareholder meeting.  Attached is what was provided last year.
>
> The slides need to be updated for 2006.  In addition, the Compensation
> deck will need to address other potential questions likely to arise
> about 2006 on new slides (with bullet points as appropriate).  Also,
> if any topics from last year's deck are irrelevant or extremely
> unlikely to come up, those slides / sections can be deleted.
>
> We will need to get this round of updates back by close of business on
> Tuesday, February 20.  If Dick finds these slides to be thorough
> enough, we won't need to come back for final round updates / sign off
> until March, prior to the shareholder meeting.
>
> Thanks for the help and please let me know if I should speak directly
> with someone else in the group,
> Ryan
>
> <<Slides_2006_Compensation.ppt>>
>
>
> Ryan J. Polisi
> Lehman Brothers
> (212) 526 - 1711 Direct
> (646) 758 - 1935 Direct Fax
> ryan.polisi@lehman.com
>





## 43. RSU Trust Implications (11/05)

- Trust no affect LB financials
- 60 M RSUs outstanding
- 35 M in Trust
- Shares added from treasury as amortized
- Trust shares in LB's shares out.

CONFIDENTIAL

LEH-F

# EXHIBIT C

# 1997 TRUST UNDER LEHMAN BROTHERS HOLDINGS INC.
## INCENTIVE PLANS

This Agreement dated as of September 4, 1997 (as amended from time to time, the "Agreement"), by and between Lehman Brothers Holdings Inc. (the "Company", as more fully defined in Exhibit A hereto) and State Street Bank & Trust Company (the "Trustee", as more fully defined in Exhibit A hereto);

WHEREAS, the Company has adopted and may in the future adopt compensation plans including the Lehman Brothers Holdings Inc. Employee Incentive Plan, the Lehman Brothers Holdings Inc. 1994 Management Ownership Plan and the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan and has listed certain of such plans on Schedule 2 to this Agreement, which Schedule 2 may from time to time be amended in accordance with Section 15(b) hereof to add or delete plans (the plans listed on Schedule 2, as such Schedule may from time to time be amended, are each referred to herein as a "Plan" and collectively referred to herein as "Plans");

WHEREAS, the Company has incurred or expects to incur liability under the terms of the Plans with respect to equity awards made or to be made to individuals participating in the Plans, that will result in the payment of shares of Common Stock, $.10 par value per share, of the Company ("Shares");

WHEREAS, the Company wishes to establish a trust (the "Trust") and to contribute and/or sell to the Trust assets including Shares, that shall be held therein, subject to the claims of the Company's general creditors in the event the Company becomes insolvent (as hereinafter defined), until paid to Participants (as hereinafter defined) in such manner and at such times as the Company may specify to fulfill the Company's obligations under the Plans;

WHEREAS, it is the intention of the parties that this Trust shall constitute an unfunded arrangement for all purposes and shall not affect the status of any Plans as unfunded plans maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees for purposes of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if applicable;

WHEREAS, the Company desires that the assets to be held in the Trust should be principally or exclusively Shares and, therefore, expressly waives any diversification of investments that might otherwise be necessary, appropriate, or required pursuant to applicable provisions of law; and

WHEREAS, capitalized and certain other terms used in this Agreement have the meanings given them in Exhibit A hereto;

CONFIDENTIAL

CL0062

LEH-RSU 0002279

2

NOW, THEREFORE, the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of as follows:

## Section 1.  Establishment of Trust.

(a)    The Company hereby sells or contributes to the Trustee in trust the cash and other property set forth in Schedule 1 hereto, which shall initially become the principal of the Trust to be held, administered and disposed of by the Trustee as provided in this Agreement.  The parties intend that the Trust will be an independent legal entity with title to and power to convey all of its assets.  The Trust is not a part of any of the Plans and does not itself provide retirement or other benefits to any Participant.

(b)    The assets held by the Trust shall be applied by the Trustee, in accordance with Instruction Schedules delivered to the Trustee by the Company, to satisfy the Company's obligations in connection with Eligible Awards.  The Plans under which Eligible Awards may be outstanding at any given time will be reflected on Schedule 2 to this Agreement, as such Schedule may be amended from time to time in accordance with Section 15(b) hereof.  The Company shall submit Instruction Schedules which direct the Trustee to utilize Trust assets to satisfy, on a calendar year basis, the Company's payment obligations under Eligible Awards in an amount not less than the lesser of (i) 10% of the assets held in the Trust at the commencement of such year or (ii) the aggregate payment obligations under 50% of the Covered Eligible Awards which become due during such year; provided that the amount of the excess, if any, of 10% of the Trust assets over the amount paid (or zero if no such amount is paid) in accordance with clause (ii) in a given calendar year shall be carried forward and added to the amount payable pursuant to clause (i) in subsequent years until such excess amounts are paid from the Trust or the Trust is terminated in accordance with Section 15(c) hereof.  For the portion of calendar year 1997 subsequent to the execution of this Agreement the references to 10% in the foregoing sentence shall be 5% and the reference to 50% shall be 25%.

(c)    Except as otherwise provided in Section 1 (e) and Section 3 hereof, the Trust hereby established shall be irrevocable by the Company.

(d)    The Trust is intended to be a grantor trust, of which the Company is the grantor, for the purposes and within the meaning of subpart E, part I, subchapter J, chapter 1, subtitle A of the Code, and shall be construed accordingly.

(e)    The principal of the Trust, and any earnings thereon, shall be held separate and apart from other funds of the Company and shall be used exclusively for the uses and purposes of Participants and general creditors as herein set forth.  Participants shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the Plans and this Agreement shall be mere unsecured contractual rights of Participants against the Company.  Any assets held by the Trust will be subject to the claims of the Company's general creditors under federal and state law in the event the Company becomes insolvent (as defined in Section 3(a) hereof).

CONFIDENTIAL

LEH-RSU 0002280

3

(f)    The Company, in its sole discretion, may at any time, or from time to time, subject to any required approval of the Board of Directors of the Company, make additional contributions of cash or contributions or sales of other property, including Shares, in trust with the Trustee to augment the principal to be held, administered and disposed of by the Trustee as provided in this Agreement. Neither the Trustee nor any Participant shall have any right to compel such additional contributions or sales.

(g)    The assets held at any time and from time to time under the Trust shall consist of contributions received or assets purchased by the Trustee, proceeds of any investments and reinvestment thereof, the earnings and income thereon, less disbursements therefrom. Except as herein otherwise provided, title to the assets of the Trust shall at all times be vested in the Trustee and securities that are part of the Trust shall be held in such manner that the Trustee's name and the fiduciary capacity in which the securities are held are fully disclosed, subject to the right of the Trustee to hold title in bearer form or in the name of a nominee, and the interests of others in the Trust shall be only the right to have such assets received, held, invested, administered and distributed in accordance with the provisions of the Trust.

### Section 2.  Payments to Participants and Separate Trusts.

(a)    Except as otherwise provided in Section 1(e) or 3 hereof, Payments from the Trust shall only be made to Participants or to Separate Trusts. When Payments in accordance with the most recent Instruction Schedule submitted by the Company to the Trustee are due, the Trustee shall make Payments to Participants or Separate Trusts in accordance with such Instruction Schedule, subject to the terms of this Agreement. The Company shall be responsible for the maintenance of any accounts for Participants under the respective Plans and for all withholding-related filings and reports. The Company shall be responsible for determining whether a Payment is in accordance with the relevant Plan and Award agreement. Any Payments to a Separate Trust shall be made immediately prior to the date Shares are distributable by such Separate Trust to designated Participants who are also the beneficiaries of such Separate Trust.

(b)    Prior to the Payment of Shares, other assets or the proceeds of any tender or exchange offer to a Participant or Separate Trust, the Trustee shall withhold the Withholding Amount, if any, as specified in the Instruction Schedule pursuant to which the Payment is to be made. The amount so withheld shall be remitted by the Trustee as directed by the Instruction Schedule. In the case of a Payment to be made in Shares or other securities, the Trustee shall reduce the amount of the Payment due by the smallest number of whole Shares or other securities that has a value equal to or greater than the Withholding Amount. For purposes of the foregoing sentence, the Shares or other securities shall be valued at their Fair Market Value on the date of distribution. Any amount so withheld in excess of the Withholding Amount will be paid by the Company to the Participant or a Separate Trust in cash.

### Section 3.  Trustee Responsibility Regarding Payments to Trust Beneficiary When Company Is Insolvent.

(a)    Subject to Section 3(b) hereof, the Trustee shall not make any Payments if the Company is insolvent. The Company shall be considered "insolvent" for purposes of this

CONFIDENTIAL

LEH-RSU 0002281

4

Agreement if (i) the Company is unable to pay its debts as they become due, or (ii) the Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

　　　　(b)    At all times during the continuance of this Trust, as provided in Section 1(e) hereof, the principal and income of the Trust shall be subject to claims of general creditors of the Company under federal and state law as set forth below:

　　　　　　(1)    The Board of Directors and the Chief Executive Officer of the Company shall have the duty to inform the Trustee in writing of the Company's insolvency. If a person claiming to be a creditor of the Company alleges in writing to the Trustee that the Company has become insolvent, the Trustee shall determine whether the Company is insolvent and, pending such determination, the Trustee shall discontinue Payments.

　　　　　　(2)    Unless the Trustee has actual knowledge of the Company's insolvency, or has received notice from the Company or a person claiming to be a creditor alleging that the Company is insolvent, the Trustee shall have no duty to inquire whether the Company is insolvent. The Trustee may in all events rely on such evidence concerning the Company's solvency as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning the Company's solvency. In no event shall "actual knowledge" be deemed to include knowledge of the Company's credit status held by banking officers or banking employees of the Trustee which is not permitted to be disclosed to the administrator of the Trust account or any other knowledge which is not actually possessed by such administrator. The Trustee may appoint an independent accounting or consulting firm to make any determination of insolvency required by the Trustee under this Section 3. In such event, the Trustee may conclusively rely upon the determination of such firm and shall be responsible only for the prudent selection of such firm.

　　　　　　(3)    If at any time the Trustee has determined that the Company is insolvent, the Trustee shall discontinue Payments and shall hold the assets of the Trust for the benefit of the Company's general creditors. Nothing in this Agreement shall in any way diminish any rights of Participants to pursue their rights as general creditors of the Company with respect to benefits due under the Plans or otherwise.

　　　　　　(4)    The Trustee shall not resume Payments in accordance with Section 2 of this Agreement until the Trustee has determined that the Company is not insolvent (or is no longer insolvent) and thereafter has received an Instruction Schedule.

**Section 4.  Transfers to Company.**

　　　　Except as otherwise set forth in this Agreement, the Company shall have no right or power to divert to others or to the Company any of the Trust assets.

CONFIDENTIAL

LEH-RSU 0002282

02/06/2003   17:09   LEHMAN → 91848758283   NO.984   005

5

### Section 5.  Investment Authority; Dividends.

Unless otherwise provided for herein, all Trust assets shall be invested in Shares. Any dividends paid in cash on Shares held by the Trust shall be invested in Shares as soon as practicable or, to the extent directed by the Company, used to pay Trust expenses or, if specified in an Instruction Schedule, distributed to Participants or Separate Trusts.  Dividends which are not paid in cash or in Shares shall be reduced to cash by the Trustee and reinvested in Shares as soon as practicable or, to the extent directed by the Company, used to pay Trust expenses or, if specified in an Instruction Schedule, distributed to Participants or Separate Trusts.  At the Company's direction, investments in Shares may be made through open-market purchases, private transactions or (with the Company's consent) purchases from the Company.  The Trustee may invest any portion of the Trust, as well as the proceeds of any tender offer or exchange offer, temporarily, pending investment in Shares, distribution or payment of expenses in (i) investments in United States Government obligations with maturities of less than one year, (ii) interest-bearing accounts including but not limited to certificates of deposit, time deposits, saving accounts and money market accounts with maturities of less than one year in any bank, including the Trustee if the Trustee is a bank, with aggregate capital in excess of $100,000,000 and a Moody's Investor Services rating of at least P1, or an equivalent rating from a nationally recognized ratings agency, which accounts are insured by the Federal Deposit Insurance Corporation or other similar federal agency, (iii) obligations issued or guaranteed by any agency or instrumentality of the United States of America with maturities of less than one year, (iv) short-term discount obligations of the Federal National Mortgage Association or (v) such money market fund or funds as may be approved by the Company from time to time.

### Section 6.  Disposition of Income.

During the term of the Trust, all income received by the Trust, net of expenses and taxes, if any, shall be accumulated and reinvested in accordance with the provisions of Section 5 hereof.

### Section 7.  Accounting by the Trustee.

Subject to Section 9(d) hereof, the Trustee shall keep, and supply the Company with, accurate and detailed records of all investments, receipts, disbursements, and all other transactions required to be made by the Trust, including such specific records as shall be agreed upon in writing between the Company and the Trustee.  Within 60 days following the close of each calendar year and within 60 days after the removal or resignation of the Trustee, the Trustee shall deliver to the Company a written account of its administration of the Trust during such year or during the period from the close of the last preceding year to the date of such removal or resignation, setting forth all investments, receipts, disbursements and other transactions effected by it, including, subject to Section 9(d) hereof, a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being shown separately), and showing all cash, securities and other property held in the Trust at the end of such year or as of the date of such removal or resignation, as the case may be.  In the absence of written notice to the Trustee by the Company of exceptions or objections to

CONFIDENTIAL

LEH-RSU 0002283

6

any such account within 90 days of its receipt of such account from the Trustee, the Company shall be deemed to have approved such account. In such case, or upon the written approval by the Company of any such account, the Trustee shall be released, relieved and discharged with respect to all matters set forth in such account as though such account had been settled by the decree of a court of competent jurisdiction.

### Section 8. Responsibility of the Trustee.

(a)    If the Trustee undertakes or defends any litigation arising in connection with this Trust, the Company agrees, except as otherwise provided in Section 8(f) hereof, to indemnify the Trustee against the Trustee's reasonable costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) relating thereto and to be primarily liable for such payments. Such costs, expenses and liabilities shall be paid from the Trust to the extent of cash held in the Trust and to the extent not previously paid by the Company, and any such remaining fees and expenses shall be paid by the Company.

(b)    The Trustee may consult with legal counsel (who may also be counsel for the Company generally) with respect to any of its duties or obligations hereunder.

(c)    The Trustee may hire agents, accountants, actuaries, investment advisors, financial consultants or other professionals to assist in performing any of its duties or obligations hereunder, and may pay their reasonable fees and expenses, which shall be deemed to be expenses of the Trust and which shall be paid in accordance with Section 10.

(d)    The Trustee shall have, without exclusion, all powers conferred on trustees by applicable law, unless expressly provided otherwise herein, and the Trustee shall have the following powers and rights, in addition to those provided elsewhere in this Agreement or by law, but subject in all cases to the other provisions of this Agreement:

(i) to retain any asset of the Trust;

(ii) with the consent of the Company, to settle, submit to arbitration, compromise, contest, prosecute or abandon claims and demands in favor of or against the Trust;

(iii) to exercise any of the powers and rights of an individual owner with respect to any asset of the Trust and to perform any and all other acts that in its judgment are necessary or appropriate for the proper administration of the Trust even though such powers, rights and acts are not specifically enumerated in this Agreement;

(iv) to cause any asset of the Trust to be issued, held or registered in the Trustee's name or in the name of its nominee, or in such form that title will pass by delivery, provided that the records of the Trustee shall indicate the true ownership of such asset;

(v) to utilize another entity (but not the Company, a Subsidiary or any affiliate thereof) as custodian to hold, but not invest or otherwise manage or control, some or all of the assets of the Trust.

CONFIDENTIAL

(e)     Notwithstanding any powers granted to the Trustee pursuant to this Agreement or applicable law, the Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains therefrom, within the meaning of Section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Code.

(f)  The Company shall indemnify, defend and hold harmless the Trustee from and against any and all liabilities, claims, losses, suits or expenses (including attorneys' fees) of whatever kind and nature that may be imposed upon, asserted against or incurred by the Trustee at any time by reason of its provision of services under this Agreement or its status as the Trustee, except to the extent that any such liability, claim, loss, suit or expense arises directly from the Trustee's (or the Trustee's officers, employees or agents) gross negligence or willful misconduct in the performance of responsibilities specifically allocated to it under this Agreement. This Section 8(f) shall survive the termination of this Agreement.

(g)  Except as prohibited by Section 9(d) hereof, the Trustee shall provide such reports to the Company as to such matters as the Company may reasonably request.

## Section 9. Voting and Tendering of Shares.

(a)     With respect to any meeting of the stockholders of the Company at which the stockholders are to vote on any corporate action or with respect to any solicitation of written consents in lieu of a meeting, the Company shall provide the Trustee with (i) a list of all Participants holding Voting Awards setting forth the number of Voting Awards held by each such Participant on the record date for such meeting or action by written consent and (ii) the total number of Voting Awards held by such Participants on such record date. Thereupon, the Trustee shall distribute to each Participant holding Voting Awards on such record date all proxy or consent solicitation or other materials distributed to stockholders of the Company generally in connection with such vote or consent, together with a form requesting instructions from each such Participant as to the manner in which such Participant desires Shares to be voted or not voted by the Trustee. The Trustee shall vote or abstain from voting in accordance with the instructions from each such Participant a number of Shares held by the Trust determined by multiplying the total number of Shares held by the Trust on the record date for such meeting or action by written consent by a fraction the numerator of which is the number of Voting Awards held by such Participant on such record date as reported to the Trustee by the Company and as to which the Trustee has received instructions to vote for, vote against or abstain, and the denominator of which is the total number of Voting Awards held by all such Participants on such record date as reported to the Trustee by the Company and as to which the Trustee has received instructions from such Participants to vote for, vote against or abstain. The Trustee shall not vote any Shares other than pursuant to this Section 9(a), and the Trustee shall have no discretion in such matter.

(b)     In the event of a tender or exchange offer, the Company shall provide the Trustee with an Instruction Schedule setting forth all Participants and the number of Covered Eligible Awards held by each Participant, together with such information about specific payment

CONFIDENTIAL

LEH-RSU 0002285

8

provisions applicable to such Covered Eligible Awards in the case of a tender or exchange offer as may be necessary for the Trustee to distribute the proceeds of such tender or exchange offer to Participants who give instructions as provided herein and maintain the confidentiality of such Participants' instructions as provided herein. Upon receipt of such Instruction Schedule, the Trustee shall timely distribute or cause to be distributed to each Participant all written materials distributed to stockholders of the Company generally in connection with such tender or exchange offer, together with a form requesting confidential instructions on whether to tender or exchange Shares. The Trustee shall tender or exchange or refrain from tendering or exchanging in accordance with the instructions from each Participant a number of Shares held by the Trust determined by multiplying the total number of Shares held in the Trust by a fraction the numerator of which is the number of Covered Eligible Awards held by such Participant as reported to the Trustee by the Company and the denominator of which is the total number of Covered Eligible Awards held by all Participants as reported to the Trustee by the Company. A Participant shall not be limited in the number of instructions to tender or exchange or withdraw from tender or exchange that he or she may give, but shall not have the right to give instructions to tender or exchange or withdraw from tender or exchange after a reasonable time established by the Trustee. The Trustee shall not tender or exchange Shares other than pursuant to this Section 9(b), and the Trustee shall have no discretion in such matter. If a tender offer or exchange offer is not consummated, all Shares tendered or exchanged shall revert to and continue to be held by the Trust as if such offer had not been made unless the Company directs in an Instruction Schedule that the Trustee distribute Shares to one or more Participants, or to one or more Separate Trusts for distribution to such Participants, to comply with the terms of a Covered Eligible Award requiring the payment of Shares.

(c)    In the event a tender or exchange offer is consummated, the proceeds from the tender or exchange shall be paid into the Trust. The proceeds of a tender or exchange offer shall be distributed by the Trustee, as specified in the Instruction Schedule delivered to the Trustee, as soon as practicable after receipt, directly, or indirectly through a Separate Trust, to each Participant who gave instructions to tender or exchange Shares in an amount equal to (i) the per share consideration paid in the tender or exchange offer (or such portion of the per share consideration as specified in any payment terms to which the Covered Eligible Award may be subject) multiplied by (ii) the lesser of (A) the number of Shares tendered or exchanged as a result of such Participant's instructions or (B) the number of Covered Eligible Awards held by such Participant. The proceeds of the tender or exchange not so distributed shall remain in the Trust, to be utilized as specified herein or in any Instruction Schedule. In the event of the consummation of an exchange offer, the Trustee, if so directed by the Company in an Instruction Schedule, shall sell in a commercially reasonable manner (but not to, or for the benefit of, the Company or any affiliate or subsidiary of the Company) the securities received in such exchange and distribute the cash proceeds in accordance with the second preceding sentence.

(d)    The Trustee shall maintain procedures to ensure that all instructions of Participants pursuant to Section 9(b) are collected, tabulated, transmitted to and carried out by the Trustee without being divulged or released to the Company or any person affiliated with the Company. All such actions taken by Participants shall be held confidential by the Trustee and, except as required by applicable law or court order, shall not be divulged or released to any person other than (i) agents of the Trustee who are not affiliated with the Company or its affiliates

CONFIDENTIAL

LEH-RSU 0002286

9

or (ii) by virtue of the execution by the Trustee of any letter of transmittal for any of the Shares held in the Trust.

(e)     Upon the occurrence of an event which would constitute a Hostile Change in Control as defined in the terms under which any Covered Eligible Awards have been granted, other than the commencement of, or the purchase or exchange of any Shares pursuant to, a tender offer or exchange offer, the Company shall deliver an Instruction Schedule to the Trustee directing the Trustee to distribute Shares, to the extent available in the Trust, to satisfy all vested Covered Eligible Awards as specified in such Instruction Schedule.

### Section 10.   Compensation and Expenses of the Trustee.

Other than payments pursuant to Section 8(f) hereof, all reasonable fees and expenses incurred by the Trustee in administering the Trust shall be paid by the Company or, if directed by the Company, shall be paid from the Trust to the extent of cash held in the Trust.

### Section 11.   Resignation and Removal of the Trustee.

(a)     The Trustee may resign at any time by written notice to the Company, which shall be effective 30 days after receipt of such notice unless the Company and the Trustee agree otherwise; provided, however, that no such resignation shall be effective until a successor Trustee has assumed the office of the Trustee hereunder.

(b)     The Trustee may be removed by the Company on 10 days notice or upon shorter notice accepted by the Trustee.

(c)     Upon resignation or removal of the Trustee and appointment of a successor Trustee, all assets held in the Trust shall be transferred to the successor Trustee.  The transfer shall be completed within 30 days after receipt of notice of resignation, removal or transfer, unless the Company extends the time limit.

(d)     If the Trustee resigns or is removed, a successor Trustee shall be appointed, in accordance with Section 12(a) hereof by the effective date of resignation or removal.  If no such appointment has been made, the Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions.  All expenses of the Trustee in connection with such proceeding shall be allowed as administrative expenses of the Trust and paid as provided in Section 10 hereof.

CONFIDENTIAL

02/06/2003    17:09    LEHMAN → 916467582    NO.984    P10

10

### Section 12. Appointment of Successor.

(a)     If the Trustee resigns or is removed in accordance with Section 11(a) or (b) hereof, the Company may appoint any third party, which is a bank trust department or other party that may be granted corporate trustee powers under state law, as a successor to replace the Trustee upon resignation or removal. The appointment shall be effective when accepted in writing by the successor trustee, who shall have all of the rights and powers of the former Trustee, including ownership rights in the Trust assets. The former Trustee shall execute any instrument necessary or reasonably requested by the Company or the successor Trustee to evidence the transfer. Any successor Trustee must be an institutional trustee that is unaffiliated with the Company.

(b)     The successor Trustee need not examine the records and acts of any prior Trustee and may retain or dispose of existing Trust assets in accordance with the terms of this Agreement. The successor Trustee shall not be responsible for and the Company shall indemnify and defend the successor Trustee from any claim or liability resulting from any action or inaction of any prior Trustee or from any other past event, or any condition existing at the time it becomes successor Trustee.

### Section 13. Changes in Organization of the Trustee.

In the event that any corporate Trustee hereunder shall be converted into, shall merge or consolidate with, or shall sell or transfer substantially all of its assets and business to, another corporation, state or federal, the corporation resulting from such merger or consolidation or to which such sale or transfer shall thereafter be made, shall thereunder become and be the Trustee under the Trust with the same effect as though originally so named.

### Section 14. Continuance of the Trustee's Powers in Event of Termination of the Trust.

In the event of the termination of the Trust, as provided herein, the Trustee shall dispose of the assets of the Trust in accordance with the provisions hereof. Until the final distribution of the assets of the Trust, the Trustee shall continue to have all powers provided hereunder as necessary or expedient for the orderly liquidation and distribution of the assets of the Trust.

### Section 15. Amendment or Termination.

(a)     Except as otherwise provided herein, the Company may amend the Trust at any time and from time to time in any manner which it deems desirable, provided that no amendment may (i) make the Trust revocable; (ii) alter the provisions of Sections 1(b), 2(a), 4, 9 or 15 hereof or paragraphs (b), (d), (e), (f), (g), (k), (l), (m), (n), (o), (p), (q), (r), (s), (t) or (v) of Exhibit A hereto or (iii) change the duties of the Trustee without the Trustee's consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, (x) the Company shall retain the power under all circumstances to amend the Trust to correct any errors or clarify any ambiguities or similar issues of interpretation in this Agreement and (y) the matters referred to

CONFIDENTIAL                                                                    LEH-RSU 0002288

in clause (ii) of the preceding sentence may be amended with the consent of Participants holding at least a majority of the Voting Awards.

      (b)    Schedule 2 hereto may be amended by adding thereto or subtracting therefrom one or more employee benefit plans (within the meaning of Section 3(3) of ERISA) or plans or arrangements that are not employee benefit plans (within the meaning of such Section); provided that (i) in making any modification to Schedule 2 hereto, the Company shall act in good faith taking into account the best interests of a broad cross-section of employees, and (ii) the Company shall ensure that at all times Schedule 2 shall include at least one Plan that is not an employee benefit plan within the meaning of Section 3(3) of ERISA.

      (c)    The Trust may be terminated at any time by the Company provided that, upon such termination, all assets held by the Trust shall be distributed directly, or indirectly through a Separate Trust, to Participants in accordance with an Instruction Schedule. Unless earlier terminated in accordance with the provisions of this Section 15(c), the Trust shall terminate on the earlier of (i) the date on which Participants are no longer entitled to benefits pursuant to the terms of the Plans, (ii) the twenty-first anniversary of the death of the last to survive of individuals who are Participants on the date of the creation of the Trust or (iii) at such time as the Trust no longer holds any assets. In the case of termination pursuant to clause (i) or (ii) of the preceding sentence all assets held by the Trust shall be distributed directly, or indirectly through a Separate Trust, to Participants and, if at the time of termination pursuant to clause (i) or (ii) there are no Participants, the Company shall amend Schedule 2 so that there are Participants.

### Section 16.  Miscellaneous.

      (a)    Any provision of this Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

      (b)    Benefits payable to Participants under this Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal or equitable process.

      (c)    Any capitalized terms used herein which are not defined herein or in Exhibit A hereto shall have the meaning ascribed to such term in the Plan or other documents which relate to the Eligible Award.

      (d)    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

### Section 17.  Effective Date.

The effective date of this Agreement shall be the date first above written.

CONFIDENTIAL

02/06/2003   17:09   LEHMAN → 9164675826   NO.984   P12

12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: John L. Cecil

Title: Chief Administrative Officer

STATE STREET BANK & TRUST COMPANY

By: _____

Name: John Scott Feeld

Title: Vice President

CONFIDENTIAL

LEH-RSU 0002290

13

## Exhibit A. Definitions.

As used in the Agreement, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)   "Agreement" shall have the meaning given it in the preamble to this Agreement.

(b)   "Award" shall mean any award under a Plan which consists of, or entitles the holder thereof to receive upon the payment of consideration, the passage of time, the fulfillment of conditions or otherwise, Shares and shall include any Plan which permits the deferral of compensation into an account payable in Shares.

(c)   "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)   "Company" shall mean Lehman Brothers Holdings Inc., and, except as otherwise specified in this Agreement in a particular context, any successor thereto, whether by merger, consolidation, purchase of substantially all its assets or otherwise.

(e)   "Covered Eligible Award" shall mean an Eligible Award which may be paid from the Trust, as designated from time to time by the Company on Schedule 3 hereto, and shall initially include RSUs and CSAs.

(f)   "CSAs" shall mean Contingent Stock Awards granted pursuant to a Plan.

(g)   "Eligible Award" shall mean any Award under a Plan listed in Schedule 2, other than Non-qualifying Awards; provided, that upon the commencement of a tender offer or exchange offer for Shares, the term "Eligible Award" shall only include Covered Eligible Awards and, upon the termination or abandonment of such tender offer or exchange offer without the purchase or exchange of any Shares thereunder, the term "Eligible Award" shall include all Awards issued under Plans listed on Schedule 2 other than Non-qualifying Awards.

(h)   "ERISA" shall have the meaning given it in the fourth recital to this Agreement.

(i)   "Fair Market Value" on any date means the closing price of the Shares or other securities for which the Fair Market Value is to be determined on such date on the principal national securities exchange on which such Shares or securities are listed or admitted to trading (or, if such exchange is not open on such date, the immediately preceding date on which such exchange is open), or if the Shares or securities are not so listed or traded, the arithmetic mean of the per share closing bid price and per share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System, or such other market in which such prices are regularly quoted, or, if there have been no published bid or asked quotations with respect to Shares or such other securities on such date, the Fair Market Value shall be the value established by the Company in good faith.

CONFIDENTIAL

02/06/2003   17:09   LEHMAN → 91646758265   NO. 984   P14

14

(j)     "insolvent" shall have the meaning given it in Section 3(a) of the Agreement.

(k)     "Instruction Schedule" shall mean a schedule provided by the Company to the Trustee indicating, with respect to a Participant or all Participants, information which will enable the Trustee to make Payments or solicit instructions including, without limitation, (i) the number of Covered Eligible Awards held by a Participant which are to be paid from the Trust, (ii) the form in which amounts due to such Participant are to be paid, (iii) the Withholding Amount applicable to any Payment to such Participant, (iv) the time of payment of such amounts, (v) the approved beneficiaries of such Participant, (vi) whether such Participant is to receive dividends paid on the Shares corresponding to his or her Eligible Awards in cash or kind or have such dividends invested in additional Shares, (vii) special payment provisions with respect to the proceeds of the purchase or exchange, of Shares pursuant to a tender or exchange offer, (viii) the number of Voting Awards held by any Participant and (ix) whether Payments are to be made to a Separate Trust.

(l)     "Non-qualifying Award" shall mean an Award which the Company determines from time to time should not be funded from the Trust or a Separate Trust because of tax or regulatory characteristics of the jurisdiction of which the holder of the Award is a citizen or resident.

(m)     "Participant" shall mean an individual who holds an Eligible Award or such individual's estate or beneficiaries.

(n)     "Payment" shall mean a payment from the Trust to a Participant or a Separate Trust pursuant to Sections 2(a), 9(c) or 15(c) of the Agreement.

(o)     "Plan" shall have the meaning given it in the first recital to the Agreement.

(p)     "RSUs" shall mean Restricted Stock Units granted pursuant to a Plan.

(q)     "Separate Trust" shall mean a trust, other than the Trust, the purpose of which is to receive and disburse Payments to satisfy the obligations of the Company to Participants who are also beneficiaries of such trust, and which Payments are to be distributed immediately on receipt by the Separate Trust to the Participants whose Awards are funded through such Separate Trust, subject to applicable withholding taxes.

(r)     "Shares" shall have the meaning given it in the second recital to the Agreement.

(s)     "Termination Date" shall mean the date that the Trust is terminated pursuant to Section 15(c) of the Agreement.

(t)     "Trust" shall mean the trust established pursuant to Section 1(a) hereof.

CONFIDENTIAL

15

(u)    "Trustee" shall mean State Street Bank & Trust Company or any successor thereto pursuant to the terms of the Agreement.

(v)    "Voting Award" shall mean an Eligible Award which is a Covered Eligible Award and which is held by a Participant who is an employee of the Company or its participating affiliates on the record date for a meeting of stockholders of the Company or action by written consent in lieu of a meeting; provided that Voting Awards shall be held by not less than 50% of the employees of the Company and its participating affiliates on such record date.

(w)    "Withholding Amount" shall mean the percentage of any federal, state, local or foreign taxes that may be required to be withheld with respect to any Payment.

CONFIDENTIAL

LEH-RSU 0002293

02/06/2003   17:09   LEHMAN → 9164675826 53   NO.984   P16

16

## SCHEDULE 1

### Property Sold or Contributed to the Trust

1.    Contributed Property

    (a)    Cash in the amount of $1,100,000

    (b)    5,000,000 shares of treasury stock of the Company

2.    Property Sold to the Trust

    (a)    11,000,000 shares of the Company's authorized but unissued shares sold to the Trust for $.10 per share

CONFIDENTIAL

LEH-RSU 0002294

17

## SCHEDULE 2

### Plans Under Which Eligible Awards Are Issued

1.    1994 Management Ownership Plan

2.    1996 Management Ownership Plan

3.    Employee Incentive Plan

CONFIDENTIAL

LEH-RSU 0002295

02/06/2003   17:09   LEHMAN → 9164675826..   NO. 984   018

18

## SCHEDULE 3

### Covered Eligible Awards

1.    Restricted Stock Units

2.    Contingent Stock Awards

32366

CONFIDENTIAL

LEH-RSU 0002296

# EXHIBIT D

.

# LEHMAN BROTHERS HOLDINGS INC.



# EMPLOYEE INCENTIVE PLAN

*As amended through February 19, 2003*

**1. PURPOSE.** The purpose of the Lehman Brothers Holdings Inc. Employee Incentive Plan (the "Plan") is to strengthen Lehman Brothers Holdings Inc. (the "Company") by providing selected employees of the Company with the opportunity to acquire a proprietary and vested interest in the growth and performance of the Company, thus generating an increased incentive to contribute to the Company's future success and prosperity, enhancing the value of the Company for the benefit of stockholders, and enhancing the Company's ability to attract and retain individuals of exceptional talent.

The purposes of the Plan are to be achieved through the grant of various types of stock-based awards.

**2. DEFINITIONS.** For purposes of the Plan, the capitalized terms shall have the meanings ascribed to them in Exhibit A hereof.

**3. SHARES SUBJECT TO THE PLAN.**

(a) Shares of Common Stock which may be issued under the Plan may be either authorized and unissued shares of Common Stock or authorized and issued shares of Common Stock held in the Company's treasury, or any combination thereof. Subject to adjustment as provided in Section 14, the number of shares of Common Stock with respect to which Awards (whether distributable in shares of Common Stock or in cash) may be granted under the Plan shall be 246 million shares. The maximum number of shares of Common Stock available for stock options, stock appreciation rights or Other Stock-based Awards that may be granted to a Participant during a calendar year shall not exceed two million.

(b) Notwithstanding the last sentence of Section 3(a), to the extent that the number of shares of Common Stock with respect to which Awards may be granted under the Plan to an individual in any calendar year exceeds the number of shares of Common Stock with respect to which Awards were granted under the Plan during that calendar year, such excess shall be available for grant under the Plan in succeeding calendar years.

(c) In the event that any other Award subject to repurchase or forfeiture rights is reacquired by the Company or if any Award is canceled, terminates or expires unexercised (except with respect to a stock option which terminates on the exercise of a stock appreciation right) for any reason under the Plan, any Common Stock allocated in connection with such Award shall thereafter again be available for grant pursuant to the Plan.

**4. ELIGIBILITY.** Selected employees, officers, directors and consultants to the Company and its Affiliates are eligible to be Participants in the Plan.

**5. ADMINISTRATION.** The Plan shall be administered by the Committee, which shall have the power to select those Participants who shall receive Awards and to determine the terms of such Awards. As to the selection of, and the terms of Awards granted the Committee may delegate any or all of its responsibilities to officers or employees of the Company.

The Committee's authority hereunder shall include, without limitation, the establishment of vesting schedules or exercisability in installments with respect to Awards. The Committee may, in its sole discretion, accelerate or waive vesting or exercise periods or the lapse of restrictions on all or any portion of any Award, or extend the exercisability (including to extend or provide for post-termination exercisability) of stock options or stock appreciation rights; provided that such exercisability shall not extend past ten years from the date of grant of any incentive stock options.

Subject to the provisions of the Plan, the Committee shall be authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware and applicable Federal law.

**6. STOCK OPTIONS.**

(a) Any stock options granted under the Plan shall be in such form as the Committee may from time to time approve and shall be subject to the terms and conditions provided herein and such additional terms and conditions not inconsistent with the terms of the Plan as the Committee shall deem desirable.

(b) Stock options may be granted to any Participant. Each grant of stock options shall specify whether the underlying options are intended to be incentive stock options or non-incentive stock options. In the case of incentive stock options, the terms and conditions of such grants shall be subject to and comply with such requirements as may be prescribed by Section 422(b) of the Code, as from time to time amended, and any implementing regulations, including, but not limited to, the requirement that such stock options are exercisable during the Participant's lifetime only by such Participant. The Committee shall establish the option price at the time each stock option is granted, which

price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant.

(c) No stock options may be exercisable later than ten years after their date of grant. The option price of each share of Common Stock as to which a stock option is exercised shall be paid in full at the time of such exercise or as otherwise permitted by the Committee. Such payment may be made at the sole discretion of the Committee, pursuant to and in accordance with criteria and guidelines established by the Committee (which criteria and guidelines may be different for executive officers and for other Participants), as the same may be modified from time to time, (i) in cash (in any form of currency acceptable to the Committee), (ii) by tender of shares of Common Stock already owned by the Participant, valued at Fair Market Value as of the date of exercise, (iii) if authorized by the Committee, by withholding pursuant to the election of the Participant, which election is subject to the disapproval of the Committee, from those shares that would otherwise be obtained upon exercise of the option a number of shares having a Fair Market Value equal to the option price, (iv) if authorized by the Committee, and in combination with services rendered by the exercising Participant, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by the Company to, (a) sell shares of Common Stock subject to the option and to deliver promptly to the Company a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to the Company the loan proceeds, at the time of exercise to pay the option price, (v) by any combination of (i), (ii), (iii) or (iv) above or (vi) by other means that the Committee deems appropriate.

(d) A stock option holder may, in the discretion of the Committee, have the right to surrender a stock option or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of unexercised shares of Common Stock under the option which are being surrendered multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90-day period preceding such Change in Control, over (ii) the purchase price of the option as set forth in the underlying option agreement (the foregoing, a "Limited SAR").

## 7. STOCK APPRECIATION RIGHTS.

(a) Stock appreciation rights may be granted independent of any stock option or in conjunction with all or any part of any stock option granted under the Plan, either at the same time as the stock option is granted or at any later time during the term of the option. Stock appreciation rights shall be subject to such terms and conditions as determined by the Committee, not inconsistent with the provisions of the Plan.

(b) Upon exercise, a stock appreciation right shall entitle the Participant to receive from the Company an amount equal to the excess of the Fair Market Value of a share of Common Stock on the date of exercise of the stock appreciation right over the per share grant or option price, as applicable (or such lesser amount as the Committee may determine at the time of grant), multiplied by the number of shares of Common Stock with respect to which the stock appreciation right is exercised. Upon the exercise of a stock appreciation right granted in connection with a stock option, the stock option shall be canceled to the extent of the number of shares as to which the stock appreciation right is exercised, and upon the exercise of a stock option granted in connection with a stock appreciation right or

the surrender of such stock option, the stock appreciation right shall be canceled to the extent of the number of shares as to which the stock option is exercised or surrendered. The Committee shall determine whether the stock appreciation right shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(c) A holder of a stock appreciation right may, in the discretion of the Committee, have the right to surrender the stock appreciation right or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of shares of Common Stock under the stock appreciation right which are being exercised, multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90 day period preceding such Change in Control, over (ii) the per share grant price of the stock appreciation right as set forth in the underlying agreement.

## 8. OTHER STOCK-BASED AWARDS.

(a) Other Awards of Common Stock and Awards that are valued in whole or in part by reference to, or otherwise based on, the Fair Market Value of Common Stock (all such Awards being referred to herein as "Other Stock-based Awards"), may be granted under the Plan in the discretion of the Committee. Other Stock-based Awards shall be in such form as the Committee shall determine, including without limitation, (i) the right to purchase shares of Common Stock, (ii) shares of Common Stock subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, and (iii) shares of Common Stock issuable upon the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee. Other Stock-based Awards may be granted alone or in addition to any other Awards made under the Plan. All references in the preceding sentence to "specified period of service," in the case of Other Stock-based Awards which (i) are not in lieu of cash compensation to employees generally, (ii) are not paid to recruit a new employee in an amount of less than 5% of the total awards available for grant under the Plan or (iii) are not subject to the attainment of performance objectives, shall provide that vesting, restrictions on transfer or some other comparable restriction which incents continued performance of the recipient, will be for a period of not less than three years (although vesting or lapsing may occur in tranches over the three years), unless there is a Change in Control or the recipient retires, becomes disabled or dies. Subject to the provisions of the Plan, the Committee shall have sole and absolute discretion to determine to whom and when such Other Stock-based Awards will be made, the number of shares of Common Stock to be awarded under (or otherwise related to) such Other Stock-based Awards and all other terms and conditions of such Awards. The Committee shall determine whether Other Stock-based Awards shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(b) With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary may pay to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

**9. DIVIDENDS, EQUIVALENTS AND VOTING RIGHTS.** Awards other than stock options and stock appreciation rights may, at the discretion of the Committee, provide the Participant with dividends or dividend equivalents and voting rights prior to either vesting or earnout.

**10. AWARD AGREEMENTS.** Each Award under the Plan shall be evidenced by an agreement setting forth the terms and conditions, not inconsistent with the provisions of the Plan, as determined by the Committee, which shall apply to such Award.

**11. WITHHOLDING.** The Company shall have the right to deduct from all amounts paid to any Participant in cash (whether under this Plan or otherwise) any taxes required by law to be withheld therefrom. In the case of payments of Awards in the form of Common Stock, at the Committee's discretion, the Participant may be required to pay to the Company the amount of any taxes required to be withheld with respect to such Common Stock, or, in lieu thereof, the Company shall have the right to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld. Without limiting the foregoing, the Committee may, in its discretion and subject to such conditions as it shall impose, permit share withholding to be done at the Participant's election.

**12. NON-TRANSFERABILITY.** No Award shall be assignable or transferable, and no right or interest of any Participant in any Award shall be subject to any lien, obligation or liability of the Participant, except by will, the laws of descent and distribution, or as otherwise set forth in the Award agreement.

**13. NO RIGHT TO EMPLOYMENT OR CONTINUED PARTICIPATION IN PLAN/NO RIGHTS AS STOCKHOLDERS.**

(a) No person shall have any claim or right to the grant of an Award, and the grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or to be eligible for any subsequent Awards. Further, the Company expressly reserves the right at any time to dismiss a Participant free from any liability or any claim under the Plan, except as provided herein or in any agreement entered into hereunder.

(b) The grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder.

**14. ADJUSTMENT OF AND CHANGES IN COMMON STOCK.** In the event of any change in the outstanding shares of Common Stock by reason of any Common Stock dividend or split, recapitalization, merger, consolidation, spin-off, combination or exchange of shares or other corporate exchange, or any distribution to stockholders of Common Stock other than regular cash dividends, the Committee shall make a substitution or adjustment to the number or kind of shares of Common Stock or other securities issued or reserved for issuance pursuant to the Plan, and to outstanding Awards, as well as the option price or other affected terms of such Awards as in its judgment shall be necessary to preserve the Participant's rights substantially proportionate to the rights existing prior to such event.

Unless otherwise provided in an award agreement, after a merger of one or more corporations into the Company or after a consolidation of the Company and one or more corporations (a "Merger Event") in which the Company shall be the surviving or resulting corporation, an Award holder shall, where applicable, at the same cost, be entitled upon the exercise of an Award, to receive (subject to any action required by stockholders) such securities of the surviving or resulting corporation as shall be equivalent to the shares underlying such Award as nearly as practicable to the nearest whole number and class of shares of stock or other securities.

Unless otherwise provided in an award agreement, if the Company enters into any agreement with respect to any transaction which would, if consummated, result in a Merger Event in which the Company will not be the surviving corporation, the Committee in its sole discretion and without liability to any person shall determine what actions shall be taken with respect to outstanding Awards, if any, including, without limitation, the payment of a cash amount in exchange for the cancellation of an Award or the requiring of the issuance of substitute Awards that will substantially preserve the value, rights and benefits of any affected Awards previously granted hereunder as of the date of the consummation of the Merger Event.

**15. AMENDMENT.** The Committee or the Board may amend, suspend or terminate the Plan or any portion hereof at any time

**16. UNFUNDED STATUS OF PLAN.** The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any payments not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or payments in lieu thereof or with respect to options, stock appreciation rights and other Awards under the Plan; provided, however, that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan.

**17. EFFECTIVE DATE.** This Plan shall be effective on April 5, 1995. No Awards may be granted under the Plan on or after April 30, 2006.

**APPENDIX**

**"Affiliate"** shall mean any entity designated by the Committee in which the Company or an Affiliate has an interest.

**"Award"** shall mean any type of stock-based award granted pursuant to the Plan.

**"Board"** shall mean the Board of Directors of the Company; provided, however, that any action taken by a duly authorized committee of the Board within the scope of authority delegated to such committee by the Board shall be considered an action of the Board for purposes of this Plan.

**"Change in Control"** shall mean the occurrence during the term of the Plan of:

(a) The commencement (within the meaning of Rule 14d-2 under the Securities Exchange Act of 1934 (the "Exchange Act")) of a tender offer for more than 20% of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors (the "Voting Securities");

(b) An acquisition (other than directly from the Company) of any voting securities of the Company by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the Exchange Act) immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary"), (ii) the Company or its Subsidiaries, or (iii) any Person who files

in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (b);

(c) The individuals who, as of the effective date of the 1994 initial public trading in Company shares, are members of the Board (the "Incumbent Board"), ceasing for any reason to constitute at least a majority of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act) or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest; or

(d) Approval by stockholders of the Company of:

(i) A merger, consolidation or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in (A), (B) and (C) below:

(A) the stockholders of the Company, immediately before such merger, consolidation or reorganization, own, directly or indirectly, immediately following such merger, consolidation or reorganization, at least the Applicable Minimum Percentage (as defined below) of the combined voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

(B) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least the Applicable Minimum Proportion (as defined below) of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation or reorganization; and

(C) no Person other than the Company, any Subsidiary, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary, or any Person who, immediately prior to such merger, consolidation or reorganization had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation or reorganization;

(ii) A complete liquidation or dissolution of the Company; or

(iii) An agreement for the sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary).

With respect to paragraph (d)(i) above, "Applicable Minimum Percentage" means (1) eighty percent (80%) with respect to Awards made prior to November 14, 2000, and (2) fifty percent (50%) with respect to Awards made on or after November 14, 2000; and "Applicable Minimum Proportion" means (1) two-thirds with respect to Awards made prior to November 14, 2000, and (2) a majority with respect to Awards made on or after November 14, 2000. Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

"Code" shall mean the Internal Revenue Code of 1986, as from time to time amended.

"Committee" shall mean the Compensation and Benefits Committee of the Company.

"Common Stock" shall mean the common stock of the Company, $.10 par value.

"Company" shall mean Lehman Brothers Holdings Inc. and, except as otherwise specified in this Plan in a particular context, any successor thereto, whether by merger, consolidation, purchase of substantially all its assets or otherwise.

"Fair Market Value" on any date means the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading (or, if such exchange is not open on such date, the immediately preceding date on which such exchange is open), the arithmetic mean of the per share closing bid price and per share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System, or such other market in which such prices are regularly quoted, or, if there have been no published bid or asked quotations with respect to such shares on such date, the Fair Market Value shall be the value established by the Committee in good faith and, in the case of an incentive stock option, in accordance with Section 422 of the Code.

"Other Stock-based Award" shall mean any of those Awards described in Section 8 hereof.

"Participant" shall mean an employee, officer, director or consultant of the Company.

"Subsidiary" shall mean any corporation which at the time qualifies as a subsidiary of the Company under the definition of "subsidiary corporation" in Section 424(f) of the Code, as amended from time to time.

©2004 Lehman Brothers.  All Rights Reserved.  LB10484_CB_EIP

LEH-RSU 0000004

# EXHIBIT E

# AUTHORIZATION

Pursuant to authority delegated to me by the Compensation and Benefits Committee on March 26 1997, I hereby take the following actions:

I hereby delegate to each of the individuals named on Exhibit A hereto the authority to exercise any or all of the authority delegated to me by the Committee with respect to the exercise of Lehman Brothers Holdings Inc.'s rights and powers under the trust agreement establishing the 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans and all related documents, including the authority (i) to give instructions to the trustee, (ii) to determine which employee benefit plans from time to time shall constitute "plans" some or all of whose equity awards shall be eligible to be satisfied out of Trust assets, and (iii) to determine which equity awards granted under such plans from time to time shall be eligible to be satisfied out of assets of the Trust.

The authority delegated by the foregoing shall immediately cease upon the individual's death or termination of employment (for any reason) with Lehman Brothers Holdings Inc. and all subsidiaries thereof.

Dated: September 4, 1997

John L. Cecil
Chief Administrative Officer
Lehman Brothers Holdings Inc.

33643

CONFIDENTIAL

CL0071

LEH-RSU 0002472

EXHIBIT A

Richard S. Fuld, Jr.
John L. Cecil
Elizabeth Arreglado
Tracy Binkley
Edward Grieb
Charles B. Hintz
Karen Manson
Jennifer Marre
Karen Muller
Marc Silverman
Rhonda Teadore
Nigel Walker

33643

CONFIDENTIAL

# CERTIFICATE

Reference is hereby made to the 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans ("Trust") established pursuant to the Agreement dated as of Sept. 4, 1997 between Lehman Brothers Holdings Inc. (the "Company") and State Street Bank & Trust Company, as Trustee ("Trust Agreement"). Terms defined in the Trust Agreement are used herein with the same meaning.

The Company hereby determines, for purposes of the term "Non-qualifying Award" as defined in Exhibit A (l) of the Trust Agreement, that Awards held by individuals who are residents, for tax purposes, of jurisdictions other than the United States of America, the United Kingdom, Germany, Hong Kong, Singapore and Japan should not be funded from the Trust or a Separate Trust.

Dated: September 10, 1997                    LEHMAN BROTHERS HOLDINGS INC.

                                             BY: _____

33135

CONFIDENTIAL

LEH-RSU 0002474

# AUTHORIZATION

Pursuant to authority delegated to me by the Compensation and Benefits Committee on March 26, 1997, I hereby take the following actions:

I hereby delegate to each of the individuals named or Exhibit A hereto the authority to exercise any or all of the authority delegated to me by the Committee with respect to the exercise of Lehman Brothers Holdings Inc.'s rights and powers under the trust agreement establishing the 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans and all related documents including the authority (i) to give instructions to the trustee, (ii) to determine which employee benefit plans from time to time shall constitute "plans" some or all of whose equity awards shall be eligible to be satisfied out of Trust assets, and (iii) to determine which equity awards granted under such plans from time to time shall be eligible to be satisfied out of assets of the Trust.

The authority delegated by the foregoing shall immediately cease upon the individual's death or termination of employment (for any reason) with Lehman Brothers Holdings Inc. and all subsidiaries thereof.

Dated as of August 7, 2001

Joseph M. Gregory
Chief Administrative Officer
Lehman Brothers Holdings Inc.

CONFIDENTIAL

LEH-RSU 0002475

**EXHIBIT A**

| NAME | SIGNATURE |
|------|-----------|
| Richard S. Fuld, Jr. | |
| Joseph M. Gregory | |
| David Goldfarb | |
| Elizabeth Arreglado | |
| Tracy Binkley | |
| Oliver Budde | |
| Barrett S. DiPaolo | |
| Edward S. Grieb | |
| Ian Lowitt | |
| Madeline L. Shapiro | |
| Jeffrey Welikson | |

CONFIDENTIAL