# E X H I B I T

# C

# EXHIBIT C

# CL002

# Guide to Working at Lehman Brothers

**Message from Richard S. Fuld, Jr., Chairman and Chief Executive Officer**

Dear Colleague:

At Lehman Brothers, we have achieved our success to date through the efforts and dedication of our people. Our momentum will continue to be driven by contributions of talented people like you.

To maintain our success, it is important that you understand how the Firm expects you to conduct yourself, both internally and externally. As part of our ongoing efforts to communicate these expectations, we have developed this Guide outlining Lehman Brothers' policies and procedures. The Guide also serves as a valuable source of other information, describing the services and benefits offered by the Firm.

While all of the policies contained in the Guide are important, it is particularly worth noting the Firm's Equal Employment Opportunity Policy, as it touches on many principles to which we are committed. Through this commitment, the Firm promotes a work environment in which you are treated with respect and dignity and are recognized and rewarded based on merit.

By observing the Firm's policies and procedures – and understanding the spirit and principles behind them – Lehman Brothers will continue to be a great place to work.

Sincerely,



**Richard S. Fuld, Jr.**
Chairman and Chief Executive Officer,
Lehman Brothers

**Employment at Will**

Your employment is "at will." This means that your employment is for no definite period and can be terminated by you or the Firm for any reason or no reason at all, with or without notice (subject to any applicable requirements under the Firm's written notice policy in the separation section of this Guide).

The provisions contained in this Guide are for your information. This Guide does not create a contract or employment rights, and none of its provisions is a guarantee or a

LEH-RSU 0000292

promise of any kind. The Firm may change, supplement, and/or withdraw any or all of the provisions of this Guide at any time, with or without notice. Accordingly, nothing in this Guide changes your status as an employee "at will."

## Introduction

### Using Your Guide

The Guide (LehmanLive, keyword: guide) has been designed to provide you with information regarding the terms, conditions, benefits and programs that Lehman Brothers offers, as well as the policies and procedures that govern day-to-day activities and conduct at the Firm. Please refer questions regarding specific practices and policies to your divisional Human Resources representative.

Lehman Brothers reserves the right to revise or discontinue, at any time and without notice, any or all of the terms, conditions, benefits, programs, policies, and procedures described in this guide. You are therefore encouraged to access the Firm's Intranet for the most current information relating to the terms, conditions, benefits, programs, policies and procedures governing your employment. This Guide supersedes any prior handbooks and may be revised from time to time.

Unless otherwise required by applicable law, this Guide contains policies and procedures relating to U.S.-based individuals. Throughout the Guide, "Lehman Brothers" and "the Firm" are used interchangeably to refer to Lehman Brothers Holdings Inc. and its affiliates.

This Guide may not apply to certain affiliates of the Firm. If you are employed by an affiliated company, you should contact your divisional Human Resources representative for a copy of the guide applicable to your employment.

### Equal Employment Opportunity

Policy

Lehman Brothers is committed to the principles of equal employment opportunity and affirmative action. The Firm does not discriminate against any employee or applicant for employment because of race, color, ethnicity, religion, gender, national origin, veteran status, disability, age, citizenship, marital or domestic/civil partnership status, sexual orientation, gender identity or expression, pregnancy status, or because of any other criteria prohibited under applicable law. As part of our commitment to affirmative action, the Firm takes affirmative steps to ensure that applicants for employment and employees are treated without regard to their race, color, religion, gender, national origin, veteran status or disability.

LEH-RSU 0000293

All activities of the Firm including, but not limited to, recruiting and hiring (including recruitment advertising), promotions and transfers, performance appraisals, training, job assignments, compensation, terminations (including layoffs), benefits and other terms, conditions and privileges of employment are administered on a non-discriminatory basis, consistent with applicable law. An essential part of the Firm's equal employment opportunity policy is to provide a working environment for all employees that is free of harassment, intimidation or retaliation on any unlawful basis. Sexual, racial, and other forms of harassment are expressly prohibited.

In keeping with the Firm's commitment to maintaining a work environment based on inclusion and respect, employees are prohibited from entertaining for business purposes (including entertaining, or being entertained by, clients or other employees) in public or private facilities that discriminate against and/or present a hostile or uncomfortable environment for clients or employees. Included under this policy are clubs featuring exotic, nude or topless dancers/hosts/hostesses, and Lehman-branded events at venues with policies restricting membership or use based on any of the protected characteristics listed in this policy statement above.

## Affirmative Action

As a government contractor, the Firm maintains Affirmative Action Plans to assist us in meeting our obligations in this regard. The Firm's Manager of Affirmative Action has been given the responsibility for the day to day implementation and monitoring of the Firm's Affirmative Action Plan. Relevant sections of the Firm's Affirmative Action Program are available for inspection during regular business hours. If an employee or applicant for employment has any questions about this policy or would like to be considered under our Affirmative Action Plan, please contact the Manager of Affirmative Action at (212) 526-7989.

## Employee Responsibility

Employees are responsible for ensuring adherence to this policy and for taking appropriate and immediate action as described below if they believe that a violation of this policy has occurred or if they become aware that someone is alleging that a violation has occurred. In addition, employees are responsible for supporting programs and practices designed to develop an understanding and acceptance of, commitment to and compliance with this policy.

In addition, employees should avoid any conduct that would give the appearance of impropriety in relationships with their subordinates or with others over whom they have direct or indirect influence for purposes of employment decisions, such as compensation, advancement and continuing employment.

## Procedures for Reporting Policy Violations

Employees or job applicants are encouraged to report violations of this policy. Employees should report violations to their immediate supervisor, their divisional Human Resources Director or an Employee Relations Specialist. Job applicants are encouraged to report violations of this policy to Corporate Human Resources/Employee Relations. Retaliation against employees or applicants who report violations is strictly prohibited. In addition, employees and applicants are protected from coercion, intimidation, interference or discrimination as a result of reporting violations or assisting in an investigation.

Investigations will be handled as discretely as practicable and appropriate corrective action will be taken whenever violations of this policy are determined to have occurred. Depending upon the nature of the violation, the individual found to have violated this policy will be subject to disciplinary action, up to and including termination of employment. Also, anyone interfering with an investigation, or providing information that the individual knows to be inaccurate, will be subject to disciplinary action, up to and including termination of employment.

**Reasonable Accommodation**

Lehman Brothers recognizes that individuals with disabilities may need reasonable accommodation with respect to their employment with the Firm. If you need accommodation at any time during your employment with the Firm as a result of a disability, you are strongly encouraged to contact your divisional Human Resources representative or an Employee Relations Specialist regarding your request. Applicants for employment who need accommodation should contact Corporate Human Resources/Staffing Services.

To the maximum extent possible, all information regarding disabilities or requests for accommodation will be kept confidential.

**Sexual Harassment**

Policy

Lehman Brothers strictly prohibits sexual harassment. If an employee becomes aware of any incidents of inappropriate behavior as described in this policy, he/she should contact his/her divisional Human Resources representative or an Employee Relations Specialist.

Definition

Sexual harassment refers to verbal, physical or other behavior of a sexual nature that is not welcome, that is personally offensive, and that fails to respect the rights of others, thereby interfering with an employee's ability to do his/her job.

LEH-RSU 0000295

Sexual harassment can occur in the office, at business meetings or business meals, or at private sites, wherever employees and/or other business affiliates (e.g., clients, applicants and vendors) meet.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal, visual or physical conduct of a sexual nature.

Sexual harassment occurs when a supervisor or other employee threatens or insinuates, either explicitly or implicitly, that another employee's, applicant's or vendor's refusal to submit to sexual advances will affect that person's employment, job evaluation, wages, advancement, or any other terms or conditions or privileges of employment.

Sexual harassment also includes repeated unwelcome sexual flirtations, advances or sexual propositions, subtle pressure or requests for sexual activities, unnecessary touching of an individual, graphic or verbal commentaries about an individual's body, sexually degrading words used to describe an individual, a display in the workplace of sexually suggestive objects or pictures, repeated telling of sexually offensive jokes, physical assault or other conduct that has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Employee Responsibility

Employees are responsible for ensuring adherence to this policy and for taking appropriate and immediate action as described below if they believe that a violation of this policy has occurred or if they become aware that someone is alleging that a violation has occurred. In addition, employees are responsible for supporting programs and practices designed to develop an understanding and acceptance of, commitment to and compliance with this policy.

No supervisor or other employee shall threaten or insinuate, either explicitly or implicitly, that another employee's, applicant's or vendor's refusal to submit to sexual advances will affect any person's employment, job evaluation, wages, advancement, or any other terms or conditions or privileges of employment.

In addition, employees should avoid any conduct that would give the appearance of impropriety in relationships with their subordinates or with others over whom they have direct or indirect influence for purposes of employment decisions, such as compensation, advancement and continuing employment.

Procedures for Reporting Policy Violations

Employees or job applicants are encouraged to report violations of this policy. Employees should report violations to their immediate supervisor, their divisional Human Resources Director or an Employee Relations Specialist. Job applicants are encouraged to report violations of this policy to Corporate Human Resources/Employee Relations.

LEH-RSU 0000296

Retaliation against employees or applicants who report violations is strictly prohibited. In addition, employees and applicants are protected from coercion, intimidation, interference or discrimination as a result of reporting violations or assisting in an investigation.

Investigations into alleged violations of this policy will be handled as discreetly as practicable and appropriate corrective action will be taken whenever violations are determined to have occurred. Depending upon the nature of the violation, any individuals found to have violated this policy are subject to disciplinary action, up to and including termination. Anyone interfering with, or providing information that the individual knows to be inaccurate during an investigation may be subject to disciplinary action, up to and including termination.

### Hours of Work/Compensation

**Work Week**

The regularly scheduled work week is generally Monday through Friday. However, other work week schedules may be established by your manager to meet specific business and personal needs. Your work week is considered to be the days that you are normally scheduled to work.

**Employment Status Definitions**

If you are benefits-eligible you are entitled to certain policies, programs and benefits offered by the Firm.

You are classified as benefits-eligible if:

- You are an active employee of Lehman Brothers Holdings Inc., Lehman Brothers Inc. or a participating affiliate (a list of participating affiliates is available from the HR Service Center); and
- You are an employee on the U.S. payroll who is regularly scheduled to work 20 hours or more per week; and
- If you are based outside of the United States, you are subject to U.S. income and Social Security taxes.

Temporary/seasonal individuals are regularly scheduled to work for a limited, defined period of time (e.g., a summer internship) and are not benefits-eligible.

**Overtime**

Lehman Brothers complies with applicable laws regarding minimum wage and overtime payments. All overtime work, however, must be approved in advance by your manager.

For purposes of wage and hour laws, your employment with the Firm is classified as either exempt or non-exempt. The determination of this status is dependent upon a variety of factors, including your job duties and responsibilities. Your divisional Human Resources representative can provide you with information relating to your exemption status.

Non-exempt individuals are paid one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a work week or as may be required to be in compliance with state law or local ordinance. Meal breaks are not included in the overtime calculation.

Please note:

For the purpose of calculating overtime, paid time off for vacation, holidays, and approved sick or personal days are considered as hours worked.

From time to time, your manager may require you to work overtime. The Firm generally will try to give you reasonable notice in advance of the need for you to work overtime.

Generally, overtime pay will be reflected in the paycheck following the pay period in which it is submitted to payroll for processing.

Exempt individuals do not receive overtime pay for additional hours worked each week.

Failure to comply with the Firm's overtime policy may result in appropriate disciplinary action, up to and including termination of employment.

**Shift Differentials**

Lehman Brothers may pay shift differentials to members of the Firm whose regularly scheduled hours of work differ from the Firm's regular working hours. Compensation practices for individuals working such shifts are as follows:

- Full-time individuals on shifts starting between 4:00 P.M. EST and 9:59 P.M. EST receive an additional 10% of the regular rate of base pay for their positions.

- Full-time individuals on shifts starting between 10:00 P.M. EST and 3:59 A.M. EST receive an additional 15% of the regular rate of base pay for their positions.

**Meal Breaks**

Lehman Brothers complies with applicable laws regarding meal breaks in the states and localities in which the Firm conducts business. You are expected to take meal breaks afforded under state law. For more information regarding the meal breaks applicable in your state, contact your divisional Human Resources representative.

LEH-RSU 0000298

**Pay Days**

Generally, individuals on the U.S. payroll are paid their salaries on a current bi-weekly basis. Fully-commissioned individuals are paid once a month, for the previous month's production.

**Time Sheets**

If you are classified as non-exempt, you are required to complete accurate time sheets using the Time and Attendance System ("TAS") at LehmanLive, keyword: tas. You should record your hours worked into TAS on a daily basis. Your time sheets are then submitted electronically for approval by your supervisor and processing by payroll. Your time sheets must state the actual, not approximate, times you begin and end work each day. Any absence should be noted on your time sheet, along with the reason for your absence.

You should sign out before you leave for, and sign in upon return from, any non-working time during the workday including lunch and dinner breaks unless otherwise authorized. These breaks are not considered paid time for purposes of calculating overtime. Your business unit may require you to sign in and out for shorter breaks. You may only record hours for yourself; you may not record this information for any other colleague.

**Flexible Work Arrangements**

Lehman Brothers is committed to helping you manage the demands of your career and personal life so that you can operate at peak performance in all areas of your life. Delivering on this commitment is central to our ability to attract and retain top talent. We seek to nurture talented individuals over the arc of their careers and we know this goal requires that we be open to new and innovative ways of working

Offering an array of life management programs and policies is central to delivering a workplace where people that they can be their very best. In certain instances, it may be appropriate to have a flexible work arrangement that meets both your needs and the Firm's.

For information on flexible work arrangements visit the Working Flexibly at Lehman page on LehmanLive, keyword: flexibility. Here you will find online training for employees and managers, useful tips, best practices, frequently asked questions, key contacts, quicklinks to relevant life management resources the Firm offers, the Guide to Working from Home and the flexible work arrangement application.

**Compensation**

Lehman Brothers is committed to attracting and retaining the most highly qualified individuals. To this end, the Firm pays you on a "total compensation" basis. This means

that the Firm's pay practices are designed to acknowledge your contributions throughout the year on an aggregate basis. Total compensation may include base salary, cash commissions, overtime, bonus payments, conditional equity awards (in accordance with the Lehman Brothers Equity Award Program), and other compensation.

Salaries and bonuses are reviewed on an annual basis to ensure consistency within the Firm and with our competitors.

## Bonuses

Bonuses may be awarded annually at the sole discretion of the Firm, with the dates of bonus communication and distribution varying from year to year. Bonuses are discretionary unless otherwise agreed upon in writing. The size and/or payment of bonuses are governed by the following guidelines:

- Bonuses are contingent upon the approval of the final bonus pool by the Compensation and Benefits Committee of the Board of Directors of Lehman Brothers Holdings Inc.

- A portion of bonuses may be awarded through the Lehman Brothers Equity Award Program or other Firm-sponsored programs.

- Only those individuals who are actively employed at the time bonuses are paid are eligible to receive consideration for, or payment of, a bonus. Partial or pro-rata bonuses are not paid to those who separate from the Firm or who are notified that their employment is being terminated before bonuses are paid.

- The cash portion of any bonus payment may be reduced by any outstanding advances, loans or other employee obligations to the Firm, as well as applicable tax and other withholding at the time bonuses are paid.

- Certain individuals may not receive a bonus in any given fiscal year based upon their performance, business conditions or other factors.

Please consult with your manager or your divisional Human Resources representative if you have any questions relating to bonus compensation.

## Equity Award Program

At the Firm's option, a portion of your total compensation (combined base salary, bonus and other compensation) may be payable in the form of conditional equity awards (restricted stock units ("RSUs"), stock options, or other equity awards) pursuant to the Firm's Equity Award Program. The grant of RSUs is subject to the applicable controlling plan documents available on LehmanLive, keyword: equityaward or contact Corporate Human Resources/Compensation at (212) 526-8346 (5-8346) for further details.

**Direct Deposit**

Lehman Brothers provides you with the option of enrolling in automatic direct deposit of regular payroll checks each payday. If you wish to enroll in direct deposit, contact your divisional Human Resources representative or go to LehmanLive, keyword: payroll to obtain the authorization form. Once enrolled, you can view an online copy of your pay stub by visiting LehmanLive, keyword: epay.

If you decide not to enroll in direct deposit, you will receive a payroll check each payday. You are encouraged to review your paycheck on a regular basis to confirm that your personal information is current and that the compensation paid is accurate.

**Time Off**

**Holidays - Firm**

Lehman Brothers' holiday schedule conforms to that of the New York Stock Exchange. The following holidays are generally observed:

- New Year's Day
- Martin Luther King, Jr. Day
- Presidents' Day
- Good Friday
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Christmas Day

**Holiday Pay Eligibility**

- If you are benefits-eligible and you are not required to work on a Firm-observed holiday, you are eligible to receive a regular day's rate of pay for the holiday.

- If you are not benefits-eligible, you are not eligible for holiday pay.

**Working on a Firm Holiday**

- If you are benefits-eligible, non-exempt and required to work on a Firm-observed holiday, you are entitled to receive a regular day's pay and are eligible for either one and one-half times your regular rate of pay for the actual hours worked, or a floating holiday.

- If you are benefits-eligible, exempt and required to work on a Firm-observed holiday, you are not entitled to receive any pay in addition to your regular rate of pay.

LEH-RSU 0000301

- If you are not benefits-eligible and required to work on a Firm-observed holiday, you will receive your regular rate of pay for the actual hours worked with no additional compensation.

**Holidays - Bank**

Occasionally, there are bank holidays such as Columbus Day and Veterans' Day on which the Firm is not closed. Certain division's activities, however, are directly affected by bank/exchange closings (e.g., Fixed Income Division).

If your division is affected by a bank holiday, your manager will determine whether you need to report to work. If you are not required to work on a bank holiday, the day will not be recorded as a vacation or personal day. If your manager determines that you need to report to work on a bank holiday, you are not eligible for an additional day off. If your manager determines that you need to report to work and you request a day off, an authorized day off will be recorded as a vacation or personal day.

**Vacation**

Lehman Brothers offers a vacation policy that provides individuals with time away from work to relax and rejuvenate, as well as to meet personal life demands. We strongly encourage you to take all the days to which you are entitled.

<u>Vacation Eligibility</u>

If you are an active full-time employee, and have completed at least one year of service, you are eligible for paid vacation time, based on your length of employment and corporate title, according to the schedule below.

| <u>Title/Tenure</u> | <u>Amount of Vacation</u> |
|---|---|
| <u>Up to Vice President level</u> | |
| New hire Jan 1 – Jun 30 | 2 weeks [1] |
| New hire July 1 – Dec 31 | 2 weeks [2] |
| Through the 5th anniversary | 3 weeks |
| On the 5th anniversary | 4 weeks |
| On the 10th anniversary | 4 weeks |

---

[1] Eligible after 6 months of continuous employment. Eligible for 3 weeks in the second calendar year of employment.
[2] Eligible after 6 months of continuous employment. Eligible for an additional week following the anniversary date in the second calendar year of employment. Eligible for 3 weeks in the next calendar year of employment.

| On the 15th anniversary | 4 weeks |
|---|---|
| On the 20th anniversary | 5 weeks |
| On the 25th anniversary | 5 weeks |

Vice Presidents and Above

| New hire Jan 1 - Jun 30 | 2 weeks [3] |
|---|---|
| New hire July 1 – Dec 31 | 2 weeks [4] |
| Through the 5th anniversary | 4 weeks |
| On the 5th anniversary | 4 weeks |
| On the 15th anniversary | 5 weeks |
| On the 25th anniversary | 5 weeks |
| On the 30th anniversary | 6 weeks |

In addition to the schedule above, full-time employees who have completed one year of service will be eligible for one week of unpaid vacation time per vacation year. This week is available after all paid vacation time has been used and when additional vacation time may be needed. Unpaid vacation time will be approved only for five consecutive days away from the office.

Vacation time may be scheduled at any time mutually convenient for you and your department, and should be confirmed with your immediate supervisor in advance. The Firm's vacation year begins January 1 and ends December 31. Vacation time may be taken in half-day or full-day increments. Vacation time that is not taken in the calendar year in which you become eligible for it may not be carried over into the subsequent calendar year unless it is approved in writing by your manager and your divisional Human Resources director. In addition, if your employment commences between January 1 and June 30, you may use your vacation time through December 31 of the following calendar year. Please note that you will not receive compensation in lieu of unused vacation time unless required by applicable law.

Break in Service

---

[3] Eligible after 6 months of continuous employment. Eligible for 4 weeks in the second calendar year of employment.
[4] Eligible after 6 months of continuous employment. Eligible for 2 additional weeks following the anniversary date in the second calendar year of employment. Eligible for 4 weeks in the next calendar year of employment.

LEH-RSU 0000303

If you have prior service with Lehman Brothers or one of its predecessor firms, you may receive credit for your prior service for purposes of determining vacation eligibility. If you return to Lehman Brothers within one year of your separation date, and you had at least one year of service prior to your separation, all prior service will be credited for vacation eligibility purposes. Uninterrupted periods of employment are added together to determine the actual length of service for vacation. Any break in service is not included in calculating the total length of service.

After your rehire date, you are eligible for vacation after completing six months of service.

Vacation Eligibility for Part-time Salaried and Part-time Hourly Individuals
If you are regularly scheduled to work a minimum of 20 hours per week on an ongoing basis, you are eligible for vacation according to the schedule above. Your vacation eligibility is determined by your regular or average work schedule. For example: If your regularly-scheduled work week is 3 days or 20 hours per week, and according to the schedule you are eligible for 3 weeks of vacation, your vacation eligibility would be 3 weeks of 3 days, or 3 weeks of 20 hours, for a total of 9 days or 60 hours of vacation.

Vacation Eligibility for Commissioned Individuals
Investment Representatives and other individuals paid by draw and/or commissions are eligible for the same vacation schedule as other members of the Firm. If you are paid through commissions or on a draw, you are eligible to receive any applicable draw and/or commissions generated in your absence as agreed upon by your manager and your divisional Human Resources director.

Change of Status

If your status changes (e.g., part-time to full-time, promotion to Vice President), you are eligible for vacation time at the new level, effective immediately, according to your total length of service.

Vacation Eligibility When You Separate

If you separate from the Firm, either voluntarily or involuntarily, you will not receive pay in lieu of unused vacation days, except as required by applicable law or pursuant to Lehman Brothers Inc. Severance Plan.

Please note that some of the policies described may vary somewhat from state to state in accordance with local legal requirements. In particular, employees in California should consult with Human Resources concerning special rules relating to the accrual and taking of vacation and personal time.

**Personal Days**

The Firm provides you with days off to attend to personal matters during the year. Similar to vacation time, personal days should be scheduled with your manager in advance, when

possible. Benefits-eligible employees are entitled to personal days each calendar year after six months of continuous employment as indicated below.

- If you work five days per week, you are entitled to three personal days.

- If work three or four days per week, you are entitled to two personal days.

- If you work one or two days per week, you are eligible for one personal day.

If you are not benefits-eligible, you are not entitled to personal days.

Unused personal days may not be carried over into the next calendar year, nor will you receive pay in lieu of any unused personal days, unless otherwise required by applicable law.

**Time Off To Vote**

The Firm supports your right to vote in national, state and local elections. Each Election Day, the Firm will provide you with information detailing the polling hours in your state.

When possible, you should make arrangements to vote before or after regular work hours. If you are unable to vote during non-working time, you should request time away from the office from your manager.

**Sick Days**

Lehman Brothers supports your need to take time off from work as medically necessary to recover from your own illness or to care for someone else during an illness for whom you are the primary caregiver, such as your child or your parent. Sick days are intended for single day or short term absences and should be used as appropriate; you do not accumulate sick days at Lehman Brothers. If you are away from work for more than three consecutive days, you should consult with your divisional Human Resources representative as you may be eligible for an Employee Medical Leave of Absence or a Family Medical Leave of Absence under the Firm's policies (for more information regarding medical leaves, please refer to LehmanLive, keyword: leaves).

You may be required to provide medical documentation substantiating your absences, e.g., when your absence is due to a communicable condition, when you are sent home or to a medical professional due to the illness, or when your absences are excessive. Your manager and your divisional Human Resources representative can provide you with guidelines for "excessive" absenteeism (for more information, refer to the Attendance and Punctuality Policy in the Work Practices section of this Guide. Please note that excessive absenteeism will be addressed as a performance issue.

**Religious Observance**

Lehman Brothers makes reasonable efforts to accommodate individuals' religious beliefs. This includes providing sufficient time off for religious observance if the absence does not cause undue hardship. At the beginning of each calendar year, you should schedule and use all available paid time off (personal and vacation days) for all known religious observances.

**Bereavement Leave**

The Firm provides time away from the office in the event you suffer the loss of a family member. If you are benefits-eligible, you are provided up to one regularly scheduled week of leave with pay when a death occurs in your immediate family. Your manager may approve a request for additional time away from the office if there are extenuating circumstances.

For purposes of this policy, immediate family includes your spouse or domestic partner, child, parent, sibling, grandparent or grandchild, as well as your spouse or domestic partner's child, parent, sibling, grandparent or grandchild.

**Jury Duty/Subpoena Duty**

Lehman Brothers supports your efforts to perform your civic duty by serving on a jury or testifying in a court of law. If called to serve, you should:

- present your manager with a copy of your juror summons or subpoena as far in advance as possible prior to the date you will be required to be away from work;

- call your manager daily to report your status;

- return to work during any regular office hours when you are excused from duty; and

- provide your manager with a notice of confirmation stating the duration of duty served.

If you are benefits-eligible and you are summoned for jury or subpoena duty, you will receive your regular pay for the period of active jury/subpoena duty for up to 4 regularly scheduled work weeks in any revolving 12 months. You are also permitted to retain any compensatory fees for performance of jury service (e.g., juror fees).

If you are not benefits-eligible, you are not entitled to receive your regular pay during jury or subpoena duty, unless otherwise required by applicable law.

**Leaves of Absence**

**Overview**

During the course of your life, situations may arise that require you to be away from the workplace for a period of time. In recognition of your need to care for yourself or a family member and to take time off for other obligations, Lehman Brothers provides the following leaves of absence.

## Employee Medical, Family Medical and Child Care Leave of Absence

Employee Medical, Family Medical and Child Care Leaves of Absence are intended to give you time off and continuing benefits with your job guaranteed. You may also be

LEH-RSU 0000306

eligible for salary continuation under the Employee Medical and Child Care Leave of Absence policies.

You may be eligible to take a leave of absence, for up to 12 weeks, for any of the following reasons:

- your own serious health condition prevents you from performing the functions of your job (EMLOA);

- you are needed to care for a family member (child, parent, spouse or domestic partner) with a serious health condition (FMLOA);

- the birth of your child or the care of your newborn child (CCLOA); or

- the adoption of your child or the placement of a child with you for foster care (CCLOA).

For more detailed information regarding these leaves, including eligibility, application procedures, compensation and benefits continuation, and job guarantee provisions, please speak with your divisional Human Resources representative or see the full policies at LehmanLive, keyword: leaves.

**Workers' Compensation**

The Firm is committed to maintaining a healthy, safe work environment and to eliminating recognized safety and health hazards in the workplace. Workers' compensation insurance covers injuries or illnesses that are work-related. If you experience a work-related injury or illness, you should notify your manager as soon as possible.

Since workers' compensation insurance is governed by state law, coverage varies from state to state. Generally, in order to qualify for workers' compensation, your illness or injury must arise out of your employment, either occurring at the workplace or in the course of performing Firm-related business elsewhere.

If you are disabled as a result of an injury or illness that qualifies for workers' compensation, payments are made to compensate you for lost wages, subject to different waiting periods in the locations in which the Firm conducts business. The amount paid will vary based on the extent of your disability and on the schedule of payments set by the state and the Firm's insurance carrier. In addition, you may be eligible for salary continuation pursuant to the Firm's Employee Medical Leave of Absence policy. After salary continuation payments end, Workers' Compensation benefits may be available.To file a claim please contact the Human Resources Service Center at 212-526-2363.

**Personal Leave of Absence**

On occasion, it may be necessary for you to take a leave of absence for personal reasons that are not covered by the Firm's other leave policies. Provided that your absence will not seriously impair the operations of the business, management may grant a job-guaranteed, unpaid leave of absence for up to 12 weeks. If you need to request a Personal Leave of Absence, please contact your divisional Human Resources representative.

## Sabbatical Leave of Absence

Lehman Brothers recognizes the contributions that long-tenured employees make to the Firm, and similarly values the contributions its employees make in the community. The Firm therefore offers employees the opportunity to take up to 12 weeks of partially paid sabbatical leave, with a job guarantee, to pursue life or work experiences in fields unrelated to the financial services industry. A sabbatical may be granted at your manager's discretion, in conjunction with your divisional Human Resources director, provided that your absence will not seriously impair the operations of your business or work group.

For more information about the Sabbatical Leave of Absence, please consult with your divisional Human Resources representative or refer to LehmanLive, keyword: sabbatical.

## Military Leave of Absence

The Firm supports service commitments you may have to the U.S. military and provides paid time off for this purpose for up to six months, with the opportunity for additional unpaid time off in accordance with applicable law. If you need to request a Military Leave of Absence, you should contact your divisional Human Resources representative. For more information, visit LehmanLive, keyword: leaves.

## Programs and Services

### Break in Service

If you have prior service with Lehman Brothers or one of its predecessor firms, you are eligible to receive credit for your prior service under the Firm's Service Recognition Award Program, Leaves of Absence policies, Vacation policy and Severance policy.

Uninterrupted periods of employment are added together to determine the actual length of service. Any break in service is not included in calculating the total length of service.

This Break in Service policy does not apply to, or control, any of the Firm's other benefit plans, which have their own break in service rules not described in this guide.

For the purpose of this policy, prior service with an acquired company generally includes your last period of continuous service with that prior company. Please consult with your divisional Human Resources representative for your specific situation.

## Cafeterias

Lehman Brothers provides cafeterias at the following locations:

745 Seventh Avenue – 9th Floor (LehmanLive, keyword: cafe745)
7:30 A.M. – 10:30 A.M.        Breakfast
11:30 A.M. – 2:30 P.M.        Lunch

1271 Avenue of the Americas – 2nd Floor (LehmanLive, keyword: cafe1271)
7:30 A.M. – 10:30 A.M.        Breakfast
10:30 A.M. – 11:30 A.M.       Snack
11:30 A.M. – 3:00 P.M.        Lunch

1301 Avenue of the Americas – 2nd Floor (LehmanLive, keyword: cafe1301)
7:30 A.M. – 10:30 A.M.        Breakfast
11:30 A.M. – 2:30 P.M.        Lunch

70 Hudson Street Cafeteria – 1st Floor (LehmanLive, keyword: cafe70)
7:30 A.M. – 10:30 A.M.        Breakfast
11:30 A.M. – 2:30 P.M.        Lunch

399 Park Avenue – Level B (LehmanLive, keyword: cafe399)
7:30 A.M. – 10:30 A.M.        Breakfast
11:30 A.M. – 2:30 P.M.        Lunch


Cafeteria hours are subject to change during and around Firm holidays.  Modified schedules will be posted in the cafeteria, as appropriate.

To view the daily café menu options, go to the webpage for the cafeteria of your choice.

## Car Service

At certain times of the day and in certain locations, it may be appropriate for you to use a car service.  For detailed information please visit LehmanLive, keyword: carservice.

## Corporate Credit Cards

The Firm issues American Express Corporate Cards and long distance calling cards to you if you regularly incur business expenses. These cards should not be used for personal expenses. You are responsible for settling your Corporate Card account within the required billing period.  For application forms or additional information regarding corporate cards, please contact your divisional program administrator or Corporate Travel at (212) 526-3545.  For additional information please visit the Travel & Expense section under Work Resources in Life@Lehman on LehmanLive.

LEH-RSU 0000309

**Credit Union**

As an employee of Lehman Brothers, you, your family members and anyone residing in your household are eligible for membership in the US Alliance Federal Credit Union, a federally-insured, full-service financial institution. US Alliance Federal Credit Union offers a complete line of financial services including checking accounts, low cost loans and convenient access to your money. USAlliance has a full-service branch at 745 Seventh Avenue (21st Floor) where MetroCards and stamps are available for purchase.

For additional information regarding membership and services available, visit LehmanLive, keyword: creditunion or contact the US Alliance Credit Union directly at (800) 431-2754.

**Employee Discounts and Ticket Sales**

The Firm has negotiated discounts with a wide variety of vendors to provide you with access to special rates at recreational, cultural and retail facilities. Discounts are offered on a wide variety of items including appliances, electronics, wireless plans, entertainment, flowers, jewelry, museum and theme parks. All discounts are subject to change. For detailed information regarding available discounts, please visit LehmanLive, keyword: employeediscounts. Discount cards and additional information regarding all discounts can be obtained from your divisional Human Resources representative.

In addition, although not discounted, the Firm owns a number of season tickets to virtually all major market home teams, as well as selected seats for theater and concert events. Tickets for these premium seats are generally used for client entertainment, but excess tickets are made available for employee purchase on a regular basis through the Sports and Theatre Tickets group. To learn more and view tickets currently available for employee purchase, visit LehmanLive, keyword: employeetickets.

**Child Care/Back-up**

Lehman Brothers recognizes that parents of young children can experience temporary disruption with regular child care arrangements. To assist in these situations, the Firm provides you with access to Back-Up Child Care services for children ages three months through 12 years through two vendors: ChildrenFirst and Work Options Group. Services vary by location. For details, visit the Back-Up Child Care page under Life Balance in Life@Lehman at LehmanLive, keyword: childcare.

**Service Recognition Award Program**

The Lehman Brothers Service Recognition Awards Program is designed to celebrate key milestones in your career at the Firm. Lehman Brothers commemorates service every five years with an engraved crystal award. In addition, employees with at least ten years of service are invited to select a gift from the Firm's Service Recognition Award

LEH-RSU 0000310

program. For more information regarding the program visit LehmanLive, keyword: serviceawards.

## Employee Assistance Program

The Employee Assistance Program ("EAP") is a professional and confidential counseling service that is available at no cost to you or members of your family. The EAP provides counseling and referrals to help participants understand and address a variety of personal issues.

There is a wide range of medical, behavioral, and personal problems, such as physical illness, emotional or financial problems, alcoholism, drug abuse, marital or family distress and other personal issues, that can affect your work performance.

The EAP helps to promote a healthy and productive work force. Generally, problems can be resolved if they are identified early and a referral is made to the appropriate resources. The Firm is prepared to provide help through the EAP, which is staffed with experienced and trained counselors. The situation need not be at a crisis level for you or a family member to call the EAP.

- The EAP is available 24 hours a day, seven days a week.

- You may contact the EAP at 866-216-8925.

You can be assured that your job security, compensation and opportunities for advancement will not be jeopardized because of your participation in the Program. However, participation in this Program does not provide any special privileges or exemptions from the Firm's standards of performance and will not delay action taken by managers to improve unsatisfactory job performance.

For more information, please visit LehmanLive, keyword: eap.

## Employee Referral Program

As a Lehman Brothers employee, you could receive up to $10,000 if a candidate you recommend is hired.

Attracting, developing and retaining a diverse group of highly talented people is one of Lehman Brothers' most important business strategies. By having the best people, we will continue providing superior value and service to clients and customers, delivering attractive returns to our shareholders, and building a strong team and a great firm. You can play a part in helping the Firm strengthen its talent today and in the future-and be awarded for your efforts-through the Employee Referral Program.

For detailed information visit LehmanLive, keyword: employeereferral.

**Expense Reimbursement**

The Firm has established a Travel and Expense Reimbursement Policy to ensure that business-related expenses are incurred in a manner that meets the objectives of the Firm, including revenue generation, cost containment and maximization of shareholder value. It is intended to provide reimbursement of reasonable and appropriate expenses fairly and expeditiously.

You are responsible for understanding the provisions of the policy and for ensuring that your expenditures are reasonable and necessary for the Firm's business and are in compliance with this policy and any regulatory/compliance requirement. Divisional CAO's and their designees, along with the Accounts Payable Department and each party whose approval is required for reimbursement, are responsible for ensuring that reimbursed expenses are in compliance with this policy. You should contact your divisional CAO or his/her designee before incurring any expense about which you are in doubt.

For the full Travel and Expense Reimbursement Policy, please visit LehmanLive, keyword: reimburse.

In order to expedite your expense reimbursement, the Firm can arrange to have your reimbursement check deposited directly into your bank account. Fill out a direct deposit form and submit it to the Payroll Department (available in the Forms and Documents section under Finances in Life@Lehman on LehmanLive).

**Employee Activities Committee**

There is tremendous volunteer spirit throughout Lehman Brothers as proven by personal commitments and team efforts in many areas. The Employee Activities Committee seeks to create opportunities for that spirit to flourish by offering activities that are both competitive and social in nature and that bring colleagues together from across all areas of the Firm. The Committee, comprised of representatives from the Firm's businesses and corporate groups, partners with Corporate Philanthropy and Human Resources to propose, plan, promote and deliver employee-led charitable, social and sporting events and programs. For more information, to volunteer or join a team, or to recommend participation in a specific program, please visit LehmanLive, keyword: eac.

**Medical Departments**

Lehman Brothers maintains facilities at 745 Seventh Avenue and 70 Hudson Street. In addition, Lehman Brothers employees are entitled to use the Citibank Health Center at 399 Park Avenue. In addition to general medical care for illness and injury, the Medical Departments provide preventive medical programs, health awareness education, communications and on-site promotions to enhance the physical, mental and emotional well-being of our employees of the Firm.

The following services are available:

- For general advice and medical care, you can visit the Medical Department at any time from 7:00 a.m. to 6:00 p.m. at 745 Seventh Avenue or 8:30 a.m. - 4:30 p.m. at 399 Park and 70 Hudson Street.

| Location | Phone Number |
|---|---|
| 745 Seventh Avenue, 21st Floor | (212) 526-6315 (5-6315) |
| 399 Park Avenue, Level A | (212) 599-3981 |
| 70 Hudson Street, 5th Floor | (201) 499-9029 (6-9029) |

- The Medical Departments are staffed with nurses and physicians.

- The on-site physicians are available to provide emergency treatment and consultation for many short-term medical conditions. Chronic medical conditions or those requiring ongoing care should be referred to your personal physician. Guidance is also available to help you select the appropriate medical care (primary care physician vs. specialist).

- The Medical Department also offers a variety of preventive health screening and referral services. Examples of the types of preventive care provided include: mammography, cholesterol, prostate and skin cancer screenings.

- Office ergonomics program information, flu vaccinations, allergy shots, business travel consultations and immunizations, and work-site safety services are available.

- Treatment for occupational illnesses, injuries, and emergencies are provided, as well as executive and pre-employment physical examinations.

Medical emergency: call 5-5555 (212-526-5555) from any Lehman Brothers location in NY or NJ. These numbers connect the caller to both the Medical and Security departments simultaneously and expedite response times.

For more information please visit LehmanLive, keyword: medicaldept.

## Relocation Program

Based on business needs, Firm management may request that you relocate and work at a Lehman Brothers office in another location. If you are requested to relocate, you should contact your divisional Human Resources representative or the Firm's Relocation Department at (212) 320-6730 (3-6730) for more detailed information regarding the Firm's relocation guidelines.

## Health and Fitness Centers

LEH-RSU 0000313

As part of our ongoing efforts to help employees manage their lives, we are pleased to offer a fitness program for employees. In the New York metropolitan area, membership to the Lehman Brothers Fitness Center (LBFC) at 745 Seventh Avenue (21st floor) is available to employees interested on a first come, first serve basis. The Firm also offers individual, significantly discounted memberships for employees, as well as their spouses/domestic partners to join New York Health and Racquet Club, Equinox Fitness Clubs or New York Sports Clubs (NYSC). Additionally, Drive 495, Manhattan's first private indoor golf and fitness club is offering preferred corporate rates to our employees.

For employees outside the New York metropolitan area, The Firm has also partnered with the International Fitness Club Network (IFCN), a Preventure company, offering employees access to Preventure's network of high quality health and fitness clubs. Through this partnership, employees will receive the lowest rate being promoted for the type of membership selected in their regional area. Rates vary according to the club size, location, facilities and programs offered.

For further information, please visit LehmanLive, keyword: fitnessprogram

### Training and Advancement

### Learning and Development

Lehman Brothers' investment in the professional and personal development of employees exemplifies our commitment to build the capabilities and culture of the Firm. We foster a work environment in which each employee is provided with the necessary career development tools to be successful in their position, build a rewarding career and deliver the best solutions to clients.

We encourage each employee to reach their full potential and provide numerous opportunities for both training and development to enhance performance and assist in career development goals. Firm wide strategic programs focus on building leadership capability and promoting the culture of the Firm, while tactically-focused programs address specific development needs within departments. Training and development opportunities fall into four major categories:

- Leadership & Management

- Professional Skills

- Product and Business Knowledge

- Technology and Application

In addition to internal training and development opportunities, the Firm encourages employees to pursue external training and development when appropriate.

If you are required to maintain licenses or registrations to perform in your position, you are responsible for scheduling and attending the necessary training programs. You must obtain your manager's approval prior to registering or attending any training program.

## Advancement and Promotion

The Firm promotes employees who have demonstrated outstanding skills, performance, leadership, and values to fill leadership roles in the Firm and to represent Lehman Brothers to our clients. At the Firm, promotions may occur either through the annual title advancement process or through job promotions that recognize an employee's contributions.

Advancement

Once a year, the Firm advances qualified employees and confers upon them the corporate titles of Managing Director, Senior Vice President and Vice President or the non-corporate title of Assistant Vice President. Advancing the best qualified, most skilled leaders is critical to the Firm's long-term goals.

Employees who are nominated for advancement are evaluated based upon established performance criteria for advancement. The Firm's overall criteria include:

- scope of responsibilities and tenure in position; and

- individual evaluation;

- demonstrated performance and contributions to the Firm;

- skills and expertise that provide the basis of future performance;

- leadership;

- values and personal characteristics; and

- consistency of performance and future potential.

Each division has developed specific advancement criteria based upon levels and types of positions in the business unit. For additional information regarding advancement, please contact your divisional Human Resources representative.

Promotion

Lehman Brothers recognizes the need to provide upward career mobility outside the annual advancement process. Accordingly, Lehman Brothers promotes those employees who have demonstrated superior performance to positions involving additional responsibility at any time during the year.

**Career Mobility**

The Firm supports internal mobility to meet individual professional and career development goals, as well as the Firm's business needs. Therefore, we encourage our managers to fill staffing vacancies through the transfer or promotion of current members of the firm, whenever appropriate. If you decide to pursue an internal transfer, you must inform your current manager prior to interviewing with the hiring manager.

Eligibility

In order to be eligible for an internal transfer, your current performance must be satisfactory. In addition, you should not have any performance issues or warnings, either verbal or written, during the six-month period prior to applying for the transfer.

In most cases, you should be in your current position for at least one year prior to transferring, unless otherwise approved by the divisional Human Resources Director.

For more information regarding career mobility, please contact your divisional Human Resources representative or Corporate Staffing, or visit the Mobility section in Life@Lehman at LehmanLive, keyword: jobpostings.

**Tuition Reimbursement**

Increasing skills and knowledge through higher education can benefit both you and the Firm. Lehman Brothers provides support for your professional development throughout your career with the Firm through our tuition reimbursement program. Employees interested in applying for tuition reimbursement should first obtain their manager's approval prior to registering or attending any training activity.

Some important information about the Tuition Reimbursement program:

- Some reimbursement under the Tuition Reimbursement Program may be taxable income to you. You are encouraged to consult with your tax advisor concerning which reimbursements may constitute taxable income and how these payments affect you.

- If you resign or are terminated for any reason prior to course completion, you will not receive tuition reimbursement. Employees who receive benefits under the Tuition Reimbursement Program must remain with the Firm for two years following the completion of any course for which reimbursement is received. All reimbursement is subject to your signed agreement that if you voluntarily leave the Firm, or leave the Firm for reasons other than a reduction in force, position elimination, job redefinition or change in control, before two years have elapsed, you are responsible for immediately repaying all tuition reimbursement made by the Firm during the previous two years.

☐    The Tuition Reimbursement policy does not cover tuition and related costs for Executive MBA programs, graduate degree programs that prepare you for a career outside of Lehman Brothers (e.g., a law degree or a masters or doctorate in education), or courses offered by non-accredited institutions such as the Institute of Finance.

For a complete description of criteria and more information about the program, please visit the Learning Resources section under Center for Learning and Development in Life@Lehman at LehmanLive, keyword: Tuitionre.

## Work Practices and Standards of Conduct

### Overview

In our industry, integrity and ethics are critically important because of the trust our clients and customers place in us. In building strong client relationships over the years, Lehman Brothers has both earned and benefited from the trust of the world's foremost institutions, organizations and individuals. The linchpin of that trust is the ethical standards and behavior of each member of the Firm.

As a world-class organization, Lehman Brothers is held to the highest professional and ethical standards. You are expected to use good judgment in accomplishing business objectives and providing service to clients. It is the Firm's philosophy to treat our clients, colleagues and all other people with whom we interact with respect and dignity.

### Alcohol and Drugs

Lehman Brothers regards alcohol and drug abuse as a serious social, economic, business and medical problem. The use of alcohol and drugs in the workplace has a potentially adverse impact on job performance, co-workers and the reputation of the Firm.

Therefore, you are not permitted to:

☐    Use, possess or manufacture illegal drugs on Firm premises or while conducting business off Firm premises;

☐    Report to work under the influence of illegal drugs on Firm premises or while conducting business off Firm premises;

☐    Abuse or misuse a legal drug on Firm premises or while conducting business off Firm premises;

☐    Consume alcohol on Firm premises, and/or report to work under the influence of alcohol. (Alcohol may be consumed in moderation at Firm-sponsored functions or business luncheons.); or

- Act in a fraudulent, dishonest or unlawful manner, including distributing or selling controlled substances.

Failure to comply with this policy may lead to appropriate disciplinary action, up to and including termination of employment.

Help for Substance Abuse Problems

If you need help addressing a substance abuse problem, either your own or that of a family member, you are encouraged to contact the Employee Assistance Program ("EAP") for professional, confidential counseling and rehabilitation advice. This service is available at no cost to you or your family members.

- The EAP is available 24 hours a day, seven days a week

- You may contact the EAP at (866)216-8925.

For more detailed information, please refer to the EAP section of Life Balance (LehmanLive, keyword: eap).

## Attendance and Punctuality

In order to ensure that the Firm's business needs are met on a daily basis, you are expected to be ready to work at the start of your regular business day. However, the Firm recognizes that certain situations may arise that result in employee absenteeism or tardiness.

If you will be absent or late, you should contact your manager as soon as practicable, but no later than one-half hour before your scheduled start time on each day you will be absent or late. If you cannot reach your manager directly within the appropriate time period, you should leave a message with a telephone number where you may be contacted. You should not have someone else call, unless you are physically or otherwise unable to perform this duty.

If you have a serious medical condition that causes you to be frequently absent or late, you may be eligible for an Employee Medical Leave of Absence. Under these circumstances, you should contact your divisional Human Resources representative.

Failure to comply with the attendance and punctuality standards established by your manager may result in appropriate disciplinary action, up to and including termination of employment.

## Behavior Violating the Law

We work in a highly regulated industry and are obligated to review arrest information and or charges, as well as the disposition of such matters. You are therefore required to

immediately inform your divisional Human Resources representative or an Employee Relations specialist if you are arrested or charged with violating any law during your employment.  You are responsible for subsequently providing court documents describing the disposition of any outstanding arrests or charges.  This includes charges or arrests that result in pre- or post-trial diversion, adjudication withheld, nollo prosse, plea of no contest, conviction or guilty plea for any felony, misdemeanor or violation.  Only minor traffic violations do not need to be reported.

The information provided will be considered in accordance with company policy and applicable law, but will not necessarily result in termination of your employment. Failure to report such information in a timely manner may result in disciplinary action up to and including immediate termination of your employment.

**Code of Conduct**

Lehman Brothers' Code of Conduct describes the legal and ethical framework which governs our day-to-day interactions.  More important, however, it reflects how we think and feel about doing business, the values we hold and look for in others and how we want to distinguish ourselves as a firm.  You are expected to conduct yourself in an appropriate manner at all times and to abide by the letter and the spirit of the Code of Conduct, as well as the other policies and procedures that apply in your particular business and geographical area.

The sections of the Code of Conduct contain policies relating to:

- Conflicts of interest

- Safeguarding Firm and client property

- Intellectual property

- Business practices

- Money laundering and other criminal activities

- Dealing with other people

- Dealing with governmental and regulatory bodies

- Lawsuits, arbitrations, and customer complaints

- Books and records

You should be familiar with all of the policies included in the Code of Conduct and ask questions of your manager or the Legal or Compliance Department if there is anything that you do not understand. Copies of the Code of Conduct may be obtained from the Compliance Department site on LehmanLive, keyword: codeofconduct.

LEH-RSU 0000319

**Compensation Information Confidentiality**

It is the Firm's position that an individual's compensation and participation in benefits programs are highly personal in nature and, therefore, are to be considered absolutely confidential between the individual and the Firm.

Revealing the compensation and/or benefits information of another individual at the Firm to anyone is unacceptable.

Failure to maintain confidentiality of compensation and/or benefits information may result in appropriate disciplinary action, up to and including termination of employment.

**Dress Code**

As a mode of dress creates an image perceived by colleagues, clients, and the general public, the Firm has developed guidelines to assist you in determining appropriate attire. During regular business hours professional business attire is required, except for Fridays between Memorial Day and Labor Day, the day before a holiday and the day after Thanksgiving, when our flexible dress policy is in effect.

Appropriate

The following business casual attire is appropriate on casual dress days:

- Shirts with buttons and collars; blouses; dresses; skirts or pants.

- Jackets and ties are not required.

Not Appropriate

Below are some examples of attire that are not appropriate in a professional work environment at any time:

- Articles of clothing that are not appropriately laundered or ironed;

- Golf or tennis shirts;

- Jeans, jean-style pants, shorts or capri pants;

- Any denim attire (e.g., shirts, pants, jackets, skirts, etc.);

- Sweats, warm-up suits, leggings or other exercise clothing;

- Tee-shirts, halter tops, backless clothing or any clothing that exposes the midriff or navel;

- Shirts with writing or slogans (with the exception of manufacturers' logos);

- Sneakers, running shoes, beach-type sandals, slip-on backless shoes or boat or deck shoes (e.g., Docksiders);

- Shoes worn without hose (e.g., socks or pantyhose).

Dressing in a manner that is controversial or provocative is not appropriate at any time. Inappropriately attired individuals who report to work may be asked to return home and change into appropriate attire.

Failure to comply with this policy may result in appropriate disciplinary action, up to and including termination of employment.

## Employment of Relatives

Lehman Brothers is committed to providing a positive work environment. Therefore, practices that have the appearance of impropriety are not appropriate. As a result, you may not work in conjunction with, or under the direct or indirect supervision of, a relative.

On occasion, the nature of the relationship between two individuals who are unrelated may also pose a conflict of interest. You are encouraged to notify the appropriate manager if such a relationship exists between you and a candidate or between you and another member of the Firm. In most circumstances, the same guidelines apply as those for employing relatives.

If you have any questions regarding this policy, you should contact your divisional Human Resources representative.

## Environmental Practices

The Firm complies with and supports applicable laws aimed at improving or protecting the environment. Accordingly, the Firm encourages widespread participation in a variety of environmental programs, including those that foster waste reduction, energy conservation and the elimination of pollutants.

You should comply with all related Firm policies and applicable environmental laws of the jurisdiction in which you work, including recycling efforts and policies aimed at reducing automotive emissions caused by commuter travel.

## Performance

Lehman Brothers fosters a work environment in which you are provided with the necessary tools to be successful in your position.

Performance Appraisals

In most departments, individuals receive performance appraisals on a regular basis.

Performance Issues

In those circumstances where performance issues exist, they are generally addressed through the use of a progressive discipline process. The progressive discipline process is designed to clarify understanding of the following: position requirements; Firm expectations of performance; and methods to grow and develop professionally.

Progressive discipline may include the following steps: verbal warning, written warning, suspension and/or termination of employment. In management's sole discretion, some or all of these steps may be omitted depending upon specific circumstances.

Addressing Misconduct

While the Firm generally strives to address poor performance through the progressive discipline process, there are certain circumstances in which immediate suspension or termination of employment may be necessary, such as misconduct.

Misconduct may include, but is not limited to, the following: physically or verbally threatening behavior; dishonesty; falsification of time records or other Firm documents; unapproved concurrent employment with another company; being under the influence of alcohol or illegal or controlled substances during work hours; theft; insubordination; gambling on the premises; disorderly conduct or conduct detrimental to the Firm's reputation; possession of a weapon on Firm premises; willful or negligent destruction of the Firm's or another individual's property; mutilating or altering documents or identifications; failure to notify the Firm of any criminal arrest during your employment; failure to cooperate in any investigation conducted by the Firm; inappropriate use of Firm technology; leaving work without authorization; failure to provide appropriate notice to the Firm of your termination of employment; soliciting individuals to leave the Firm; violation of Code of Conduct policies; violation of Securities and Exchange Commission rules or applicable rules of any self-regulatory organization or other governing body; and/or improper disclosure of confidential or sensitive information.

**Personal Information**

It is your responsibility to update the Firm with any changes to the information that the Firm maintains about you, including your address, telephone number and benefits data (e.g., dependents, beneficiaries, marital status, etc.). You are expected to provide updated information to your divisional Human Resources representative and the Human Resources Service Center as soon as you become aware of a change that will affect the Firm's records.

LEH-RSU 0000322

**Problem Resolution Guidelines**

Overview

While you are encouraged to speak with your manager regarding workplace issues that arise, the Problem Resolution Guidelines provide a more formal avenue for you to bring any thoughts or concerns to management. The Guidelines outline a process through which you may present issues, suggestions or ideas to management.

You may raise any matter of concern through these guidelines, such as questions about your salary, a difficult co-worker, suggestions for improved work practices, reports of harassment or discrimination, or knowledge of suspected unethical or illegal behavior.

Steps

If you believe that for some reason you cannot go through the channels recommended below, you may initiate discussion at any appropriate level. You are encouraged to consult with your divisional Human Resources representative or an Employee Relations Specialist for guidance on presenting your issues to management and pursuing the recommended procedure.

Step 1

Discuss the issue with your manager as soon as possible after the issue arises. Your manager will determine whether it is appropriate to investigate the situation or refer the issue to your divisional Human Resources representative for investigation. Your manager will let you know if he/she is referring the issue to his/her manager or Human Resources.

Step 2

If you are not satisfied with the resolution at Step 1, or if your manager advises you to do so, you should meet with the next level of management in your department. At this meeting, the issue will be discussed and, if possible, resolved.

Step 3

If you are not satisfied with the resolution at Step 2, or if your manager or the manager at the next level advises you to do so, then you may continue upward through the levels of management to discuss the issue.

Step 4

If you are not satisfied with the resolution at Step 3, or if your manager advises you to do so, the issue can be discussed with your divisional Human Resources representative or an Employee Relations Specialist at any time. Your divisional Human Resources representative or Employee Relations Specialist will investigate the problem, making all necessary inquiries, so that a fair and equitable resolution can be achieved. If you request

it, your divisional Human Resources representative or Employee Relations Specialist will
review the recommendation with the Chief Human Resources Officer. The proposed
resolution also will be reviewed with appropriate managers from your business unit.

## Reviewing Your Record

You may review the information maintained by Corporate Human Resources/Employee
Records at any time that is mutually convenient for you and your manager for you to be
away from your work area. Copies of documents will be provided to you where required
by applicable law.

If you have any questions regarding these records, or if you would like to know whether
you are entitled to copies of these records, contact your divisional Human Resources
representative.

## Smoking Policy

Lehman Brothers provides a smoke-free work environment for our employees. Smoking
is prohibited throughout all workplace areas, at all locations throughout the United States.

If you have questions regarding the smoking policy at your location, contact your
divisional Human Resources representative.

All members of the Firm and individuals who are visiting the Firm are required to
comply with the smoking policy. If you fail to comply with this policy, you will be
subject to appropriate disciplinary action, up to and including termination of
employment.

## Solicitation and Distribution

Lehman Brothers is committed to providing a productive work environment. To this end,
solicitation of one member of the Firm by another during working time, on Firm
premises, is not permitted. Solicitation includes selling or seeking contributions to
charities, and offering goods or services, tickets, petitions, memberships or authorizations
for memberships in organizations. Working time includes any time you are expected to
be performing job duties. It does not include break time or meal time.

Posting unauthorized materials on Firm bulletin boards, or distributing unauthorized
materials in work areas or via the Firm's email system, also is not permitted. The
personal distribution or posting of literature, leaflets, pamphlets, notices, cards,
advertising, telefaxes, electronic mail, chain letters, or any other material is strictly
prohibited within working areas at any time. Bulletin boards, electronic mail systems and
other official posting areas on Firm premises or through Firm technology are for the
display of Firm-sponsored or authorized notices relating to Firm business (including
policies, programs and benefits).

Failure to comply with this policy may lead to appropriate disciplinary action, up to and including termination of employment.

Unauthorized individuals who are not employed by the Firm are not permitted on Firm premises and are prohibited from soliciting members of the Firm, using bulletin boards or Firm equipment, or distributing anything on Firm premises at any time.

If you become aware of violations of this policy, you should immediately contact your divisional Human Resources representative. This policy does not apply to Firm-sponsored participation in charitable or community service programs.

## Use of Technology Policy

### Introduction

The Firm's technology [5] provides Lehman Brothers with a valuable tool for sending and receiving information and providing superior service to our clients and customers. Use of this technology comes with responsibilities that have security, compliance, productivity and ethical implications. The following global policy has been promulgated to clearly communicate the Firm's expectations with respect to the use of Firm technology and the high standard of conduct expected of employees at all Lehman Brothers locations worldwide.

### Covered Individuals

This policy applies to all users of Lehman Brothers' technology, either at one of the Firm's worldwide office locations or from a remote location, and covers employees, agents, individuals working through temporary agencies and consultants.

### Policy

### Firm Property

Lehman Brothers' technology is intended primarily for use, and is the exclusive technology to be used, in conducting Firm business and may be used in only limited circumstances for non business-related purposes. All electronic communications that are stored, composed or transmitted, including electronic mail and file transfers, over internal and external networks, are the property of Lehman Brothers and will be monitored and/or intercepted at the Firm's discretion. As such, all users shall conform to any security measures, which are in place to protect computer equipment and access control, and exercise proper control over passwords or any other security mechanisms.

---

[5] Technology includes, but is not limited to, all of the Firm's processing hardware (mainframe, servers and desk top computers), software (applications that support business processes, operating systems, utility software), networks and networking applications (PDAs, phone systems, voice mail, electronic mail, including instant messaging, facsimile machines), and market data systems.

LEH-RSU 0000325

**Appropriate Use**

- The Firm's technology may be used to send communications to clients, customers, Lehman Brothers colleagues and, on a limited basis, other individuals;

- Lehman Brothers' internet access may be used for information retrieval, research and approved business-related purchases;

- The Firm's technology may be used for limited personal use, e.g., checking the weather on the internet for vacation destinations, quick correspondence through the electronic mail system with family members and friends, and checking flight arrival/departure times for personal travel. It is essential that the use is not excessive and does not interfere with business-related responsibilities or activities;

- Technology use, including processing of data, should comply with all Firm policies and applicable laws and regulations, including laws governing the transmission of personal data. For more information, please refer to the Lehman Brothers Information Security Guide and the Lehman Brothers Global Protection of European Personal Data Policy.

**Inappropriate Use**

The viewing, downloading, transmitting or accessing of sexually oriented material including, but not limited to, pornographic material, or offensive speech is strictly prohibited. In addition, the Firm's technology may not be used to:

- Transmit messages or access Internet sites that disparage individuals on the basis of race, color, religion, gender, national origin, citizenship, veteran status, marital status, disability or sexual orientation or any other characteristic protected by local law;

- Send messages or access Internet sites that are not consistent with or violate the Firm's Equal Employment Opportunity policy, the policies contained in the Firm's Code of Conduct or any other Firm policy;

- Access, disclose or in any way make use of information that is not authorized or otherwise outside the scope of an individual's employment;

- Forward or otherwise redistribute documents or information designated as "Internal Use Only";

- Solicit for charitable contributions or other non work-related items not sponsored by Lehman Brothers;

LEH-RSU 0000326

    ☐  Originate or distribute chain letters;

    ☐  Send messages to large groups of employees (e.g., office-wide or divisional communications) without appropriate authorization. In most cases, appropriate authorization can be secured by contacting Corporate Communications;

    ☐  Participate in investment-related news groups, chat rooms or other public electronic bulletin boards or otherwise conduct business or communicate with the public in a manner that is inconsistent with the Firm's policies regarding communications with the public (See Chat Rooms and Bulletin Boards below);

    ☐  Advance personal gain or profit;

    ☐  Establish a personal public presence (i.e., "Web Sites") on or through the Firm's systems;

    ☐  Buy items from any source on the internet unless the item being purchased is approved as a business expense and is being purchased from an authorized vendor or has otherwise been authorized by the Firm; or

    ☐  Engage in other, non business-related purposes not contained within the exceptions described above under "Appropriate Use".

## Chat Rooms, Bulletin Boards and Blog Sites

Electronic traffic on the Internet is not anonymous. All Internet traffic originating from Lehman Brothers' technology can be traced to the Firm. Regardless of whether a communication emanates from the Firm's technology, employees may not use the Firm's name, identify themselves as employees of the Firm or transmit communications relating to the Firm or the securities business in any public forum on the Internet, including but not limited to, chat rooms, bulletin boards and blog sites.

## Guidelines for Drafting Electronic Communications

When drafting electronic communications, please be reminded of the following:

    ☐  All communications sent or received through the Firm's technology are retained, stored and subject to review to insure compliance with the Firm's policies and legal and regulatory obligations;

    ☐  As such, communications should be drafted in a manner that is consistent with the Firm's values of treating others with respect, as well as accepted business ethics and standards;

    ☐  Any questions regarding the appropriateness of any communication should be directed to your manager, your divisional Human Resources representative, Compliance or Employee Relations.

LEH-RSU 0000327

**Policy Compliance**

1.  The Firm's technology will be monitored and/or intercepted at Lehman Brothers' discretion to determine whether use is in accordance with this policy, and to investigate claims of inappropriate use of the Firm's systems. In this regard, all internet access through the Firm's technology is recorded and reviewable.

2.  All employees are responsible for ensuring adherence to this policy and for taking appropriate steps, including notifying their manager, their divisional Human Resources representative or a representative in the Employee Relations Department in New York (e-mail: employeerelations@lehman.com), if they believe that a violation of this policy has occurred.

3.  Violations of the policy on Appropriate Use of Lehman Brothers' Technology will result in appropriate disciplinary action, up to and including the termination of an individual's employment.

**Workplace Safety and Health**

Lehman Brothers is committed to maintaining a healthy, safe work environment and to eliminating recognized safety and health hazards in the workplace.
You are expected to comply with all applicable health and safety laws of the jurisdiction in which you work and with all related Firm policies. In order to ensure workplace safety, you should immediately report any unsafe conditions, hazards, broken equipment or accidents to your manager or divisional Human Resources representative.

If you have experienced a work-related injury or illness, please refer to the Worker's Compensation section of this Guide.

**Separation**

**Overview**

We hope that you have a successful, mutually beneficial relationship with the Firm, However, should you leave Lehman Brothers, you may have questions about the exit process. If you have any questions that are not covered here, please call the Human Resources Benefits Service Center at (212) 526-2363.

**Arbitration**

To the extent permitted by law, any controversy arising out of, or in connection with your employment or separation from the Firm shall be submitted to arbitration before the National Association of Securities Dealers, Inc., the New York Stock Exchange, Inc. or the American Stock Exchange Inc. and shall be resolved in accordance with the rules of such entities then in effect.

**Benefits**

The Guide to Leaving Lehman Brothers contains answers to your questions regarding the treatment of your benefits plans when you leave the Firm. It also summarizes the procedures and time frames necessary for conversations and/or distributions under the Firm's benefits programs. You can obtain the Guide to Leaving Lehman Brothers from your divisional Human Resources representative. For more specific personal information, please call the Human Resources Service Center at 212-526-2363.

**Notice Policy**

Lehman Brothers believes that the Firm, our employees, and our clients all benefit from the advance notice of an employee's separation from the Firm. Advance notice allows for the smooth transition of job responsibilities and of client and other business relationships.

**For Corporate Officers (Vice Presidents and above) excluding wholely commissioned employees**

If you resign from your position at the Firm, you are required to provide written notice of your resignation to your manager and divisional Human Resources representative at least 30 calendar days prior to the day on which you would like your resignation to be effective. This 30-day notice period will apply unless you are required to provide a longer period of notice under any applicable policy or agreement with the Firm.

If you are asked to leave by the Firm, the Firm will provide you a minimum of 30 calendar days of notice prior to your separation date, or salary continuation in lieu of notice, unless your termination by the Firm is with "cause" (as defined in the Lehman Brothers Severance Plan). Notice under this policy (or salary in lieu of notice) would be in addition to any severance for which you may be eligible under the Lehman Brothers Severance Plan.

During your notice period, your base salary and benefits will continue, but you will not be eligible for discretionary bonus payments or the accrual of additional vacation or personal days. Your manager will determine whether you will be required to report to work during your notice period and what your continuing job responsibilities, if any, will be during this time. During your notice period, you will remain an employee of the Firm. This means that you must continue to comply with all Firm policies, and that you may not perform any services for another firm or otherwise act in another firm's interests.

Violations of this policy may result in disciplinary action up to and including the involuntary termination of your employment, without notice pay, and may affect your eligibility to receive any outstanding equity awards, whether vested or unvested.

**For All Other Employees**

If you resign from your position at the Firm, you are expected to provide at least two weeks notice. Your manager will determine whether you will be required to report to work during your notice period. Please refer to the Lehman Brothers Severance Plan for your eligibility for notice pay or other benefits in the event you separate from the Firm involuntarily.

### References and Employment Inquiries

It is the Firm's policy to provide limited information to non-Lehman individuals or organizations. The Firm will provide information regarding your dates of employment, job title, status and income.

Requests for employment verification are handled by Verify Job System® at www.vjsus.com. Requestors will need to provide your Social Security number to obtain your employment information. To verify payroll information, requestors will need a PIN. You may create a PIN by logging onto the system at www.vjsus.com or by calling 800.800.4VJS (4857). The Firm's employer code is 7420. You also have the option to *prohibit* access to your payroll information.

Requestors can access the verification system 24 hours a day, 7 days a week online at www.vjsus.com or by calling 800.800.4VJS (4857).

### Severance

The Lehman Brothers Inc. Severance Plan is intended to help bridge individuals to their next employment opportunity. Please contact your divisional Human Resources representative or Employee Relations for a copy of the Summary Plan Description of the Severance Plan, or visit the Separation section under Lehmanlive, keyword: guide. The Firm reserves the right to change or terminate the Severance Plan at any time.

### Unemployment Insurance

Eligibility for unemployment insurance benefits is determined according to state requirements. Generally, unemployment insurance benefits are available to those individuals who lose their jobs through no fault of their own. Depending upon the state in which you worked, certain post-termination payments may disqualify you from receiving unemployment insurance benefits until these payments end.

To obtain unemployment insurance benefits, you must file your claim for benefits at the Unemployment Insurance office in the state in which you worked.

### Vacation Eligibility When You Separate

If you separate from the Firm, either voluntarily or involuntarily, you will not be eligible to receive pay in lieu of unused vacation days, except as required by applicable law or pursuant to The Lehman Brothers Inc. Severance Plan.

# CLX 090

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------------------X

4   In re

5   LEHMAN BROTHERS HOLDINGS INC., et al.,

6                       Debtors.

7   Chapter 11 Case No. 08-13555(JMP)

8   ------------------------------------------X

9                             767 5th Avenue

                              New York, New York

10

11                            October 24, 2013

                              10:13 a.m.

12

13          DEPOSITION of LEHMAN BROTHERS HOLDINGS

14   INC., by JAMES EMMERT, the Debtors herein, taken by

15   the Claimants, pursuant to Federal Rules of Civil

16   Procedure and order, held at the above-mentioned

17   time and place, before Brittany E. Bosak, a Notary

18   Public of the State of New York.

19

20

21

22

23

24

25   Job No. NJ1755493

CLX 090

Page 181

1                       J. EMMERT

2      I would -- I don't know.

3          Q    This may be a silly question, but I have

4      to ask it.  Were RSUs issued only to employees of

5      Lehman?

6              MR. MILLER:  Object to the form of the

7          question.  I simply object to the word Lehman,

8          which has thousands of entities.

9              MR. GOLDENBERG:  Forgive me.  I should be

10         more specific.

11         Q    Were RSUs issued to employees of LBI?

12         A    Issued or granted?

13         Q    Granted.

14         A    Yes.

15         Q    Was it -- were RSUs issued to employees of

16     LBHI?  I'm sorry, granted to employees of LBHI.

17         A    Yes.

18         Q    Were RSUs granted only to individuals who

19     were employed with LBI or LBHI?

20             MR. MILLER:  Object to the form of the

21         question.  It's also outside the scope.

22         A    You would have to rephrase the question.

23         Q    What was the basis for LBHI's claim for

24     RSUs against LBI?

25         A    The basis for the claim was the

Page 182

1                        J. EMMERT

2    amortization associated with the awards that were

3    granted to employees of LBI.  Since LBI did not have

4    stock to grant to employees and LBHI did, LBI had to

5    buy the stock from LBI -- from LBHI who had stock.

6         Q     Was this at the time of grant or upon the

7    issuance?

8         A     It was at the time of amortization.  A

9    receivable would be set up from LBI to LBHI.

10        Q     When you say at time of amortization, are

11   you basing that time on the vesting schedules?

12        A     Whatever the vesting -- whatever the

13   amortization was that was appropriate at that time

14   would be when these receivables would be set up.

15        Q     And the appropriate time would be based on

16   whatever position we're talking about, whoever --

17   whatever position that individual held, it would be

18   based on a different amortization schedule?

19        A     That's correct.

20        Q     Okay.  So at that time LBI purchased stock

21   from LBHI?

22        A     An intercompany receivable was set up for

23   the value that the LBI employees were getting in the

24   form of stock.

25        Q     Now, where would this intercompany

Page 183

1                          J. EMMERT

2    receivable be reflected in the financials?

3         A    You would have to be more specific.

4         Q    Well, you said that there was an

5    intercompany receivable between LBI and LBHI.  Where

6    was that recognized or recorded or however you want

7    to characterize it?

8         A    Lehman Brothers Holdings, it would have

9    been netted out, receivable on one legal entity and

10   payable on the other legal entity and net to zero on

11   holdings' books, financial statements.

12        Q    So the claim that LBHI had against LBI

13   related to the cost of funding the RSU program,

14   correct?

15        A    I would say that the receivable on LBHI's

16   books represented the cost of the amortization or

17   the award that LBI could not issue because they

18   didn't have stock, that LBI would be issuing on

19   their behalf -- LBHI would be issuing on LBI's

20   behalf.

21        Q    Was there a specific time period that LBHI

22   was seeking to fund the RSU program from LBI?

23             MR. MILLER:  Objection to form.

24        A    I'm not sure I understand what you mean by

25   funding.

Page 184

1                      J. EMMERT

2        Q      What period is covered by this claim that

3   LBHI filed against LBI?

4        A      It's the intercompany receivables that

5   were outstanding that were due LBHI.

6        Q      And do you know which years of

7   intercompany receivables we're talking about?

8        A      Primarily it would have been 2003 for 2008

9   because those were the awards that were being

10  amortized; however, there were some prior year

11  receivables that were out there that had not been

12  paid in full.

13       Q      And do you know of any documents that

14  reflect these intercompany receivables?

15       A      Not that I'm -- not that I know of, I

16  mean.

17       Q      So what are you basing this statement on?

18       A      Based on my discussions in preparing for

19  this.

20       Q      Based on your discussions -- I'm sorry?

21       A      In preparing for this deposition.

22       Q      What obligation did LBHI have relating to

23  the RSUs post-petition to the claimants in this

24  proceeding?

25              MR. MILLER:   Object to the form of the

Page 185

1                         J. EMMERT

2        question also object beyond the scope.

3        Q    Well, I'm trying to figure out -- you are

4   saying that there was -- there were RSUs outstanding

5   in which LBHI filed a claim against LBI for,

6   correct?

7        A    I would say there were intercompany

8   receivables that were due LBHI that LBHI filed a

9   claim for.

10       Q    And these intercompany receivables, that's

11  all the -- that was a claim that LBHI related to --

12  withdraw that.

13            The intercompany receivables -- the proof

14  of claim that was filed by LBHI against LBI related

15  to the intercompany receivables on the RSUs,

16  correct?

17       A    That were created by the amortization of

18  the RSUs.

19            MR. GOLDENBERG:  Okay.  I would like to

20       mark this.

21            (LBHI's Proof of Claim was marked as

22            Defendants' Exhibit T for identification,

23            as of this date.)

24       Q    Mr. Emmert, you mentioned before that you

25  reviewed the proof of claim briefly?

Page 187

                            J. EMMERT

1

2      A    Yes.

3      Q    And a little further down, maybe 20 pages,

4  gives you the 2007 Amendments to the Outstanding

5  Equity Awards to Comply with Tax Rules, correct?

6      A    Yes.

7      Q    One more, maybe 30 pages, gives you the

8  2008 Equity Award Program, correct?

9      A    I can't find it, but I will assume you are

10  right.

11      Q    Okay.  Good enough for me.  Do you know

12  why LBHI would include all these documents in

13  Exhibit G to its proof of claim?

14      A    I do not.

15      Q    Do you know if the amount in the claim

16  summary on page two was established by these

17  documents?

18      A    I don't know.

19      Q    Do you know if there's any other documents

20  that were considered in getting that claim amount?

21      A    I don't know.

22      Q    Do you have any idea where the number

23  comes from on page two?

24          MR. MILLER:  Objection to the form.

25      Q    Where does the claim amount of

Page 188

1                        J. EMMERT

2    $626 million on page two of LBHI's proof of claim,

3    where is that number derived from?

4         A     From the intercompany receivable balance

5    that LBI owed LBHI related to RSU amortization.

6         Q     Does that figure only relate to RSUs?

7         A     I don't know.

8         Q     So it could relate to stock options and

9    other equity awards?

10        A     The only other potential would be stock

11   options because I'm not sure we have any other

12   equity awards.

13        Q     So there's a possibility that that amount

14   is not limited to RSUs?

15        A     Yeah.  Without -- I don't know -- I don't

16   know.

17        Q     How would you go about figuring out --

18             MR. MILLER:  We'll offer to stipulate it's

19        not limited to RSUs.  It included stock

20        options, if that will help you.

21             MR. GOLDENBERG:  Well, it helps me a

22        little.

23        Q     But I would like to know what portion of

24   that amount relates to RSUs and what portion relates

25   to stock options.

Page 191

1                          J. EMMERT

2               for Entry of Order Approving Settlement

3               Agreement Between the Trustee and the LBHI

4               Entities was marked as Defendants' Exhibit

5               U for identification, as of this date.)

6        Q      Have you seen this document before?

7        A      Not that I recall.

8               MR. GOLDENBERG:  Let record reflect that

9        this is the Declaration of Christopher K.

10       Kiplock in Support of Trustee's Motion for an

11       order Approving Settlement between the Trustee

12       and the LBHI Entities.

13       Q      If you could, go to paragraph seven.  The

14       first sentence reads, "The Parties have worked

15       diligently since 2009 to reconcile the tens of

16       thousands of transactions between LBI and the LBI

17       Entities as part of the effort to resolve LBI's and

18       the LBHI Entities' respective claims against each

19       other."  Is that correct?

20       A      That's what it reads.

21       Q      Okay.  Going now to paragraph 38, the

22       heading before paragraph 38 reads, "The Parties'

23       Reconciliation Process," and going to the third

24       sentence it states, "Additional information provided

25       by the LBHI Entities assisted the Trustee's

Page 192

1                           J. EMMERT

2     professionals in reconciling the LBHI Entities'

3     claims to LBI's books and records by providing more

4     specific information about the claims."   Are you

5     familiar at all with this account reconciliation

6     process?

7          A     No.

8          Q     Do you have any idea how the claims

9     between LBHI and LBI were reconciled?

10         A     No.

11              MR. MILLER:   Object to -- the question is

12         outside the scope.

13              MR. GOLDENBERG:   How is this outside the

14         scope?

15              MR. MILLER:   The scope is limited under

16         recital D to the RSU and CSA claims that were

17         included in the settlement of the intercompany

18         claims between LBHI and LBI on or around the

19         February 21st, 2013, and that doesn't have to

20         do with the reconciliation process, and it

21         actually doesn't have to do with the terms of

22         the settlement.   It has to do with the claims

23         themselves.

24              MR. GOLDENBERG:   Are you saying that there

25         was no reconciliation process that related to

Page 193

1                          J. EMMERT

2      the RSUs?

3              MR. MILLER:  We have already -- I don't

4      want to testify for the witness.  You can ask

5      him what value is included for the RSU claims.

6      He has that information from -- he's gathered

7      that information.

8              MR. GOLDENBERG:  Well, I'm confused

9      because -- okay.  All right.

10     Q    Going back to this so-called account

11  reconciliation process, you don't know how the RSU

12  claims were reconciled; is that correct?

13     A    I don't.

14     Q    So you wouldn't know how the RSU account

15  reconciliation compared to reconciling all the other

16  claims that LBHI had; is that correct?

17     A    That's correct.

18     Q    Going to paragraph 29 of Exhibit U, I'll

19  give you a chance to read it.  Do you know if the

20  term restricted stock awards refers to RSUs in that

21  paragraph?

22     A    I don't.  I would assume it does.

23     Q    Okay.  And I guess that would be a safe

24  assumption since page two of the proof of claim

25  states, "RSU - Restricted Stock Award," correct,

Page 194

1                              J. EMMERT

2    page two?

3          A    Yes.

4          Q    Okay.   Thank you.

5               MR. GOLDENBERG:   I'll submit this as

6    Exhibit V.

7               (Notice of Motion with Attached Settlement

8               was marked as Defendants' Exhibit V for

9               identification, as of this date.)

10         Q    Mr. Emmert, have you seen this document

11   before?

12         A    No.

13         Q    Okay.   If you could, please go to exhibit

14   A.

15         A    Do you know what page that's on?

16         Q    That would be after page 35.

17         A    I must be on a different page 35.   I have

18   articles on page 36.

19         Q    I'm sorry.   If you start at the beginning,

20   the first document should be the motion and should

21   end at 35.

22         A    Sorry.   Got it.

23         Q    So Exhibit A, you can flip the page,

24   states, "Settlement Agreement."   Have you seen this

25   document before?

Page 195

1                          J. EMMERT
2        A    I have never seen this before.
3        Q    So you never reviewed the settlement
4   agreement between LBI and LBHI?
5        A    Correct.
6        Q    So you wouldn't know if there's anything
7   in that document relating to RSUs?
8        A    Not from anything I have read here.
9        Q    Okay.  Do you know if any value was given
10  to RSUs as part of this settlement?
11       A    I have been told that no value has been
12  given to RSUs as part of the overall settlement.
13       Q    Who told you?
14       A    Counsel.
15       Q    Did you review any documents to come to
16  that conclusion other than conversations you had
17  with Counsel?
18       A    I did not review any other documents.
19       Q    Do you know if any value was given to
20  stock options as part of the settlement agreement?
21       A    I did not discuss that with Counsel.
22       Q    Do you know if value was given to any
23  other type of compensation relating to the
24  settlement agreement?
25       A    I did not discuss any other areas of

Page 201

1                          J. EMMERT

2          there's anything else we need to do.

3                  (A recess was taken from

4                6:56 p.m. until 6:59 p.m.)

5     EXAMINATION BY

6     MR. MILLER:

7          Q      I want to ask two questions to clarify

8     things you were asked earlier.  With regard to

9     Exhibit T -- this is the claim that was submitted to

10    LBI.  Do you recall that, sir?

11         A      Yes.

12         Q      You were asked some questions about where

13    this claim number came from on page two?

14         A      Yes.

15         Q      Did you speak to anyone other than lawyers

16    about where that claim number came from?

17         A      I actually did.  I remember that.

18         Q      Who was that?

19         A      I spoke with Cliff Fibus when we were

20    preparing for the stipulation, and I recall that --

21    you know, we had a discussion.  He was the one that

22    told me how the claim came about, the RSU portion of

23    the claim, that it was receivable based on the

24    amortization of equity awards.

25         Q      On a different topic, with regard to

# LBHI0028



# 2007 EQUITY AWARD PROGRAM

## L I F E  @  L E H M A N

### YOUR BENEFITS AND LIFE BALANCE

For Bonus-Eligible Employees and
Production-Based Employees

## LEHMAN BROTHERS

LBHI0028

CONFIDENTIAL

## Eligibility

Active employees of the Firm (both bonus-eligible and production-based) hired on or before November 30, 2007, including employees on an approved leave of absence, are eligible to receive an equity award for 2007.

If a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.

Note that eligibility to receive an equity award is subject to a 5-share minimum.

## How the Equity Award Program Works

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm over time. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. Your 2007 equity award is awarded to you as a portion of your 2007 compensation.

Employees receive a portion of their total compensation (combined base salary, bonus, production payout, and other applicable forms of compensation) in the form of conditional equity awards. For 2007, the equity award is in the form of contingent stock awards ("CSAs") for all employees and will be granted on December 7, 2007. Each CSA represents the conditional right to receive one share of Lehman Brothers Holdings Inc. common stock five years after the grant date, on or about November 30, 2012. You can consider the CSAs as shares of Lehman Brothers common stock which you will be entitled to receive at that time, provided you meet certain terms and conditions. The 2007 CSAs cannot be sold, traded, or pledged for that five-year period.

### The Size of Your Award

The details of your 2007 equity award are shown on your year-end compensation worksheet and will also be available on the Personal Award Summary section of the Equity Award Program site on LehmanLive, keyword EquityAward, before the end of the first quarter of 2008. The amount of each employee's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title. Under this schedule, the amount of compensation awarded in the form of conditional equity awards (CSAs) increases as total compensation rises.

**Bonus-Eligible Employees:** Your 2007 award will be based on your 2007 total compensation, which includes salary earned in fiscal year 2007 plus any additional compensation with respect to fiscal year 2007, even if some of these payments are deferred or paid in 2008. Such compensation includes 2007 bonus, commissions, and other compensation.

**Production-Based Employees:** Similar to bonus-eligible employees, you received a year-end 2007 conditional equity award as a portion of your 2007 total compensation. Your 2007 equity award accrues on a monthly basis, as a portion of your total payout on gross production during December 2006 through November 2007 (paid from January through December 2007) after all adjustments. For 2007, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of the 2007 Equity Award Schedule appears on page 5.) The 2007 payout may have included regular production payout, certain special payments, and other production payout. During any period you are paid a draw, equity (in the form of CSAs) may be awarded with respect to the amount of the draw. If the draw ends and you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which

CONFIDENTIAL                                                                        LEH-RSU 0023024

overage is accrued).  Note that for purposes of this communication,  all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of CSAs you receive for the Firm's 2007 fiscal year will be based on the closing price of Lehman Brothers Holdings Inc. common stock on December 7, 2007, less a discount:  30 % for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of CSAs awarded results in a total CSA award of $143; for other employees, with a 25 percent discount, every $100 of CSAs awarded results in a total CSA award of $133.  The discount really means that the Firm "grosses up" your non-discounted  portion at the outset.

## How Will the Grant Price for My 2007 CSAs be Determined?

The grant price will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on December 7, 2007.  The grant price, along with the number of CSAs granted to you, will be communicated as part of the employee year-end compensation discussion with your manager.  For Production-based employees, please refer to the "Compensation Statement" within the Sales Compensation System or contact the Compensation Department in New York at (212) 526-8346.

## Conditions and Stock Entitlement

Your 2007 CSAs are subject to certain contingencies or conditions.  The conditions determine the terms of your ownership interest in the CSAs, as well as your entitlement to receive shares.

**Full Conditions**-Initially, your CSAs are subject to "full conditions," which must be satis  fied in order for you to retain your interest in the CSAs and, ultimately, to receive Lehman Brothers stock.  While your CSAs are subject to full conditions, they could be forfeited if your employment with the Firm terminates or if you engage in any activity that is detrimental to the Firm.

**Limited Conditions**-Over time, some of the conditions will be satisfied if you remain employed wi  th the Firm through the dates outlined below.  When these conditions are satisfied, your CSAs become subject to "limited conditions," and your eligibility to receive shares increases.  While your CSAs are subject to limited conditions, they will be forfeited if you engage in activity that is detrimental to the Firm or if your employment is terminated with Cause.

**Unconditional CSAs**-Provided you comply with the conditions of your award, the 2007 CSAs will become unconditional on November 30, 2012.  Once your CSAs become unconditional, they cannot be forfeit ed for any reason.

2007 CSA

CONFIDENTIAL                                                                                    LEH-RSU 0023025

You should consider your 2007 CSA award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of CSAs awarded as part of your 2007 total compensation before the discount. The discount portion represents the balance of your CSA award, provided by the Firm. The conditions of your 2007 CSAs will apply as follows:

|  | Period Subject to Full Conditions | Portion of Award |
|---|---|---|
| **MDs** | through November 30, 2010<br>through November 30, 2012 | 35% (half of principal portion)<br>65% (half of principal portion plus the discount portion) |
| **Up to and including SVPs** | through November 30, 2009<br>through November 30, 2012 | 75% (the principal portion)<br>25% (the discount portion) |

Notwithstanding the above, if your employment is terminated by the Firm with Cause, or if you engage in Detrimental Activity, prior to November 30, 2012, all of your outstanding CSAs will be forfeited. Please refer to page 9 for the definition of Detrimental Activity.

## When Will I Receive Shares of Stock?

In general, your 2007 CSAs which become unconditional will convert to shares of Lehman Brothers Holdings Inc. common stock and will be delivered to you on November 30, 2012, subject to the terms and conditions of the Program. See the sections entitled *Termination Provisions* and *Change In Control ("CIC") Provisions* for further information on share delivery.

CONFIDENTIAL
LEH-RSU 0023026

# 2007 Equity Award Schedule

The participation schedule for 2007 is shown below. This schedule reflects the percentage of 2007 total compensation ("TC") that represents the principal portion of your 2007 CSAs . For production-based employees, the participation schedule for 2007 below is the same as the one previously communicated in 2006.  An example of the calculations follows.

### 2007 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

CONFIDENTIAL                                                                                        LEH-RSU 0023027

# Award Calculation Example

Using the Equity Award Schedule above, your 2007 equity award will be determined at year end based on your 2007 total compensation.  Sample illustrations are shown below.

|  | Employees thru VP Level | SVPs | MDs |
|---|---|---|---|
| 2007 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| *Amount of Compensation in CSAs:* | *$2,300* | *$71,875* | *$240,000* |
| Est. FMV on grant date[1]: | $63.49 | $63.49 | $63.49 |
| Discount: | 25% | 25% | 30% |
| Est. Discounted grant price: | $47.62 | $47.62 | $44.44 |
| Est. Total # of CSAs: | 48 | 1,509 | 5,400 |
| *Principal Portion:* | *36* | *1,132* | *3,780* |
| *Discount Portion:* | *12* | *377* | *1,620* |
| *Total Grant Value with Discount:* | *$3,067* | *$95,833* | *$342,857* |

Note:  The number of CSAs has been rounded to the nearest whole number for illustrative purposes only.  The actual grant price for 2007 CSAs will be determined based on the closing price of Lehman Brothers Holdings Inc. common stock on the New York Stock Exchange on December 7, 2007.

---

[1] Based on closing price of Lehman Brothers common stock on November 13, 2007.  Actual grant price will be determined as of December 7, 2007.

CONFIDENTIAL                                                                 LEH-RSU 0023028

# 2007 Monthly Equity Accrual for Production-Based Employees

As an example, below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2006 to November 2007 (paid January to December 2007) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|--------------|--------------------|---------------|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| Step 2 | Calculate projected award from 2007 Equity Award Schedule. | $1,932 | $1,932 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($1,932 x 8.33%) - $0 | $161 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| Step 5 | Calculate projected award from 2007 Equity Award Schedule. | $2,070 | $2,070 |
| Step 6 | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($2,070 x 16.67%) - $161 | $184 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|-----------|---------------------|-----------------|------------------------|------------------------|--------------|--------------------|------------------------|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,932 | 8.33% | $161 | $161 |
| 2 | February | 8,000 | 15,000 | 90,000 | 2,070 | 16.67% | 345 | 184 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,300 | 25.00% | 575 | 230 |
| 4 | April | 7,500 | 32,500 | 97,500 | 2,243 | 33.33% | 748 | 173 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,355 | 41.67% | 981 | 234 |
| 6 | June | 7,000 | 49,000 | 98,000 | 2,254 | 50.00% | 1,127 | 146 |
| 7 | July | 7,500 | 56,500 | 96,857 | 2,228 | 58.33% | 1,300 | 173 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,335 | 66.67% | 1,556 | 257 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,300 | 75.00% | 1,725 | 169 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,314 | 83.33% | 1,928 | 203 |
| 11 | November | 6,500 | 90,000 | 98,182 | 2,258 | 91.67% | 2,070 | 142 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,300 | 100.00% | 2,300 | 230 |
| | **Total** | | | | | | | **$2,300** |

In the example above, $2,300 is the amount of total compensation accrued by the production-based employee toward the year-end CSA award. For the calculation of the number of CSAs (including principal and discount portion), see example on page 6. *Note that if a production-based employee terminates employment prior to November 30, 2007, the 2007 equity award is based on the amount of production-based compensation accrued for the 2007 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.*

CONFIDENTIAL                                                          LEH-RSU 0023029

# Termination Provisions

|  | **All Employees** |
|---|---|
| **Voluntary Termination**<br><br>*(but not Full Career)* | Participants will forfeit all 2007 CSAs still subject to full conditions. Any remaining 2007 CSAs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2012 (the "Share Payment Date") but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination**<br><br>*(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to the principal portion of their award, including the principal portion subject to full conditions (provided the employee signs a Firm-standard release agreement). The discount portion will be forfeited. Shares for the principal portion will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2012, provided the participant does not engage in Detrimental Activity through that date.<br><br>**Involuntary Termination with Cause:** Participants will forfeit 100% of the principal and discount portions of CSAs. |
| **Full Career Termination** | <u>A termination is "Full Career" if:</u><br><br>• The participant has at least 20 years of service; <u>or</u><br><br>• The participant is at least 45 years old and has at least 10 years of service; <u>or</u><br><br>• The participant is at least 50 years old and has at least 5 years of service.<br><br>**Voluntary Termination:** Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2012.<br><br>**Involuntary Termination:** Participants will become entitled to 100% of both the 2007 CSA principal and discount portions on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2007 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2012. |
| **Termination due to Death or Disability** | Entire principal and discount portions will immediately become unconditional, and shares will be delivered 30 days following the termination date. "Disability" means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act. |

2007 CSA

CONFIDENTIAL

LEH-RSU 0023030

# Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2007 CSAs (and related dividend reinvestment) if you engage in Competitive Activity (for Full Career employees) or Detrimental Activity or if you commit an act constituting Cause prior to your termination of employment.

## Cause

"**Cause**" means a material breach by a person of an employment contract between the person and Holdings or any Group Company, failure by a person to devote substantially all business time exclusively to the performance of his duties for Holdings or any Group Company, willful misconduct, dishonesty related to the business and affairs of Holdings or any Group Company, conviction of a felony or of a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any Group Company to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Group Company including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

## Competitive Activity

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any Group Company on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.* Asset management companies, mortgage-related companies, private equity firms, and hedge funds, along with investment banks, commercial banks, small boutique-type firms and most other financial services companies, are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

## Detrimental Activity

Detrimental Activity means at any time (i) using information received during a person's employment with Holdings or any Group Company relating to the business affairs of Holdings or any Group Company or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any Group Company to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).

CONFIDENTIAL                                                                    LEH-RSU 0023031

# Tax Considerations

## Tax Treatment of Your 2007 CSAs

Under current tax regulations, you will not be taxed on the value of your CSAs until shares of common stock are delivered.  As a result, your CSAs (including dividend reinvestment CSAs-refer to page 11) appreciate on a pre-tax basis until they convert to shares of common stock.  Provided below is a summary of the taxes related to CSAs that are ultimately due under current law.

**Note**: Pursuant to current tax law, if you work in more than one tax jurisdiction during the period up to the date that the "full conditions" on the CSAs lapse, you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction.  The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.

---

**CSAs**

- No taxation on the award date.

- Upon delivery of common stock, the fair market value of the shares will be treated as employment income generally based on the closing price of Lehman Brothers Holdings Inc. common stock on the delivery date.

- This income will be subject to applicable tax withholding.

- Special provisions dealing with capital gains will not apply upon delivery of common stock.

- If you retain your shares after delivery, the basis for capital gains is the closing price on the delivery date.

---

Consult your personal tax advisor concerning the application of tax laws on your CSAs.

CONFIDENTIAL                                                                                    LEH-RSU 0023032

# Change in Control ("CIC") Provisions

Following a CIC, except to the extent that conditions would otherwise lapse earlier, CSAs (both principal and discount portions) will become unconditional on the later of: (i) 18 months following the CIC; or (ii) the end of the fiscal year in the year after the CIC occurs (the "CIC Delivery Date"), provided you remain actively employed through that date. Shares of Lehman Brothers common stock will be delivered on the earlier of the CIC Delivery Date or November 30, 2012, provided you do not engage in Detrimental Activity.

If your employment is terminated involuntarily without Cause following the CIC but prior to the CIC Delivery Date, all CSAs (both principal and discount portions) become immediately subject to limited conditions.

If your employment terminates for any reason (other than for Cause) following a CIC, any CSAs then subject to limited conditions (including those that may become subject to limited conditions by reason of your involuntary termination) will become unconditional and convert to shares and be delivered on the earlier of: (i) the end of the fiscal quarter 1 year following the termination date; (ii) the CIC Delivery Date; or (iii) November 30, 2012, provided you do not engage in Detrimental Activity.

# Dividend Equivalents

Dividend equivalents accrue quarterly on your CSAs and are reinvested as additional CSAs, without a discount. Dividend reinvestment CSAs are subject to the same vesting and forfeiture provisions as the underlying CSAs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than CSAs.

# Voting Rights

Lehman Brothers established a Trust and funded it with shares for your benefit. Through the Trust, you may be able to direct the exercise of voting rights related to your 2007 CSAs. The trustees are required by the Trust to vote those shares as directed by holders of the CSAs who are still employed by the Firm. Voting rights are available to participants in countries where this facility does not accelerate personal income tax on CSAs.

# Other Information

This document is intended as a brief summary of the material terms of the 2007 Equity Award Program. This document does not purport to summarize or describe the terms of equity awards from prior years. In the event of any conflict or discrepancy between the plan documents (including, but not limited to, the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your CSAs become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive, keyword EquityAward, or contact the Compensation Department at 212-526-8346 (8-526-8346) or by e-mail at compensation@lehman.com.

CONFIDENTIAL                                                        LEH-RSU 0023033

# LBHI0034

## 2003 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS

*Investment Representatives*



# LEHMAN BROTHERS

CONFIDENTIAL

1. GRANT OF UNITS. Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below). In the event of your Termination (as defined below) prior to November 30, 2003, the number of Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2003 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

2. ADDITIONAL DOCUMENTS; DEFINITIONS. You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. VESTING. Units awarded to you hereunder shall become vested in accordance with the following vesting schedule:

◻ The Principal Units (75% of the total award) shall become vested on November 30, 2005.

◻ The Discount Units (25% of the total award) shall become vested on November 30, 2008.

Notwithstanding the above, in the event your employment is terminated with Cause or if you engage in Detrimental Activity prior to November 30, 2008, all of your vested and unvested Units will be forfeited and canceled.

4. ENTITLEMENT TO RECEIVE COMMON STOCK.
(a) General Rule. Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2008 (the "Maturity Date"). Delivery of Common Stock hereunder shall be made on, or as soon as practicable after, the Maturity Date except as specified in Paragraphs 4(b), (c), (d), (e), (f) and (g) below. For purposes of the Equity Award Program, "Termination" means the end of employment with Holdings or any subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

(b) Voluntary Termination with Competitive Activity. In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited, and canceled, (ii) if such Termination occurs prior to November 30, 2005, all Principal Units shall be forfeited and canceled, and (iii) if such Termination occurs on or subsequent to November 30, 2005, you shall be entitled to the Principal Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity through the Share Payment Date.

(c) Voluntary Termination without Competitive Activity. In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a subsidiary after November 30, 2003. However, if your Termination is a Full Career Termination (as defined in Annex A), you shall be entitled to receive all the

Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(b) shall apply. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(c) shall be forfeited and canceled.

(d) Involuntary Termination with Cause. In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

(e) Involuntary Termination without Cause. In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or subsidiary after November 30, 2003. However, if your Termination is a Full Career Termination, you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity prior to the Share Payment Date. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(e) shall be forfeited and canceled.

(f) Retirement. Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, all Principal Units and Discount Units shall become immediately payable. You will receive transferable shares of common stock for each payable Unit as soon as practicable after your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(b) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(b). If you engage in Detrimental Activity, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

(g) Occurrence of a Bankruptcy Distribution Event, Death, or Disability. Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of the occurrence of (i) a Bankruptcy Distribution Event, (ii) your death or Disability, (iii) your death or Disability following a Termination of employment described in Paragraph 4(c) or (e) hereof, all outstanding Units held by you shall become immediately issuable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

(h) Affidavit. In the event of your Termination, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit within 60 days may cause you to forfeit all Units held by you at that time.

5. DIVIDEND EQUIVALENTS. With respect to each dividend or distribution paid or made on Common Stock to holders of record, you shall be paid cash and/or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

6. LIMITATION ON OBLIGATIONS. Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder,

LEH-RSU 0015056

and in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

7. NON-ASSIGNMENT. Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. EQUITABLE ADJUSTMENT. In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Maturity Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. CHANGE IN CONTROL. Except as set forth below, upon the occurrence of a Hostile Change in Control, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, you shall receive in the same form of consideration as that received by shareholders generally, the undiscounted market value (at the time of grant) for your Units, and the excess of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of two years from the date of the Friendly Change in Control or the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. TREATMENT IN BANKRUPTCY. (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you, or to a subsidiary for delivery by such subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

11. AMENDMENT. The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions.)

12. BINDING ACTIONS. Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of

the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

13. NO RIGHT TO CONTINUED EMPLOYMENT. The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

14. APPLICABLE LAW. The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

15. WITHHOLDING/DEDUCTIONS. Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and/or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

ANNEX A: DEFINITIONS

"Appropriate Officer" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"Bankruptcy Distribution Event" means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

"Cause" means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S.

CONFIDENTIAL

securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"**Committee**" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"**Discount Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

"**Friendly Change in Control**" shall mean any Change in Control, which is not a Hostile Change in Control.

"**Full Career Termination**" means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

"**Hostile Change in Control**" shall mean the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

"**Principal Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

"**Retirement**" means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"**Share Payment Date**" means as soon as practicable after the earlier of (a) November 30, 2008 or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

©2004 Lehman Brothers.  All Rights Reserved.  LB10484_C1_US_RSUAgmt/RSU_IR_Agmt

# LBHI0035

## 2003 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

CONFIDENTIAL

LBHI0035

LEH-RSU 0014309

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Units awarded to you hereunder shall become vested in accordance with the following vesting schedule:

- The Principal Units (75% of the total award) shall become vested on November 30, 2005.

- The Discount Units (25% of the total award) shall become vested on November 30, 2008.

Notwithstanding the above, in the event your employment is terminated with Cause or if you engage in Detrimental Activity prior to November 30, 2008, all of your vested and unvested Units will be forfeited and canceled.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2008 (the "Maturity Date"). In the event of your Termination (as defined below) for any reason or notification of termination of employment prior to January 30, 2004 or you engage in Detrimental Activity at any time prior to the Maturity Date, all Units held by you shall be forfeited and canceled. Delivery of Common Stock hereunder shall be made on, or as soon as practicable after, the Maturity Date except as specified in Paragraphs 4(b), (c), (d), (e), (f) and (g) below. For purposes of the Equity Award Program, "Termination" means the end of employment with Holdings or a subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

**(b) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited, and canceled, (ii) if such Termination occurs prior to November 30, 2005, all Principal Units shall be forfeited and canceled, and (iii) if such Termination occurs on or subsequent to November 30, 2005, you shall be entitled to the Principal Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity through the Share Payment Date.

**(c) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination (as defined in Annex A), you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not

engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(b) shall apply. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(c) shall be forfeited and canceled.

**(d) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(e) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity prior to the Share Payment Date. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(e) shall be forfeited and canceled.

**(f) Retirement.** Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of your Retirement on or after January 30, 2004 and provided you do not engage in Competitive Activity or Detrimental Activity, all Principal Units and Discount Units shall become immediately payable. You will receive freely transferable shares of common stock for each payable Unit as soon as practicable after your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(b) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(b). If you engage in Detrimental Activity, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(g) Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of the occurrence on or after January 30, 2004 of (i) a Bankruptcy Distribution Event, (ii) your death or Disability, (iii) your death or Disability following a Termination of employment described in Paragraph 4(c) or (e) hereof, all outstanding Units held by you shall become immediately issuable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

**(h) Affidavit.** In the event of your Termination on or after January 30, 2004, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit within 60 days may cause you to forfeit all Units held by you at that time.

**5. DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 30, 2004, you shall be paid cash and/or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock

on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

7. NON-ASSIGNMENT. Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. EQUITABLE ADJUSTMENT. In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Maturity Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. CHANGE IN CONTROL. Except as set forth below, upon the occurrence of a Hostile Change in Control, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, you shall receive in the same form of consideration as that received by shareholders generally, the undiscounted market value (at the time of grant) for your Units, and the excess of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of two years from the date of the Friendly Change in Control or the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. TREATMENT IN BANKRUPTCY. (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you, or to a subsidiary for delivery by such subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

11. AMENDMENT. The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions.)

12. BINDING ACTIONS. Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

13. NO RIGHT TO CONTINUED EMPLOYMENT. The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any subsidiary and you is specifically reserved.

14. APPLICABLE LAW. The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

15. WITHHOLDING/DEDUCTIONS. Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and/or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

ANNEX A: DEFINITIONS

"**Appropriate Officer**" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"**Bankruptcy Distribution Event**" means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

"**Cause**" means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or

any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"**Committee**" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"**Discount Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

"**Friendly Change in Control**" shall mean any Change in Control, which is not a Hostile Change in Control.

"**Full Career Termination**" means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

"**Hostile Change in Control**" shall mean the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

"**Principal Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

"**Retirement**" means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"**Share Payment Date**" means as soon as practicable after the earlier of (a) November 30, 2008 or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

©2004 Lehman Brothers.  All Rights Reserved.  LB10484_C1_US_RSUAgmt/RSU_Reg_Agmt

# LBHI0036



2003
# EQUITY AWARD PROGRAM

*Managing Director*

# LEHMAN BROTHERS

LBHI0036

CONFIDENTIAL

LEH-RSU 0014184

# 2003 EQUITY AWARD PROGRAM

*Managing Director*

## Contents

2003 Equity Award Program at a Glance . . . . . . . .1

How the Equity Award Program Works . . . . . . . . .2

Components of the 2003 Equity Award  . . . . . . . .3

Equity Award Vesting
  When will my RSUs vest? . . . . . . . . . . . . . . . .3
  When will my stock options
  become exercisable? . . . . . . . . . . . . . . . . . . . . .3

Salaried Members of the Firm:
  2003 Equity Award Schedule . . . . . . . . . . . . . .4
  Award Calculation Example . . . . . . . . . . . . . . .4

Investment Representatives (IRs):
  2003 Equity Award Schedule . . . . . . . . . . . . . .5
  Calculating Your 2003 Monthly Accrual . . . . . . .6
  Award Calculation Example  . . . . . . . . . . . . . . .7

Termination Provisions for RSUs
and Stock Options . . . . . . . . . . . . . . . . . . . . . . . .8

Tax Considerations . . . . . . . . . . . . . . . . . . . . . .11

Change in Control ("CIC") Provisions . . . . . . . .12
  Payment of RSUs Upon a Friendly CIC . . . . . . .12

Dividend Equivalents . . . . . . . . . . . . . . . . . . . . .13

Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Other Information . . . . . . . . . . . . . . . . . . . . . . . .13

This brochure describes significant features of the
Lehman Brothers Equity Award Program for 2003.
It is not intended to replace the award agreement
or other official plan documents. This brochure
should be read in conjunction with the other
award documents.

CONFIDENTIAL

# 2003 EQUITY AWARD PROGRAM AT A GLANCE

n All Managing Directors (MDs) receive a portion of their total compensation in conditional equity awards. The amount of compensation payable in equity increases as the amount of your compensation rises.

n The equity component of total compensation is in a combination of restricted stock units (RSUs) and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

n Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment with the Firm. On November 30, 2008, the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold at that time. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, transferred or pledged before conversion.

n Your 2003 RSUs were calculated based on the price of $49.97 per RSU (reflecting a December 10, 2003 market price of $71.39, less a 30 percent discount).

n Your 2003 stock options have an exercise price of $71.39 and will expire on November 29, 2013. The number of options you received was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option, less a 30 percent discount ($19.45).

**1**

*Managing Director*

*Your Award Summary details your 2003 award.*



CONFIDENTIAL

**EQUITY AWARD** PROGRAM

**2**

# HOW THE EQUITY AWARD PROGRAM WORKS

The Equity Award Program for Managing Directors (MDs) was developed to recognize the critical role you, as an MD, play in the success of the Firm. As an MD, you help drive the Firm's profitability, ensure the quality and integrity of service to our clients and customers, and are responsible for attracting and developing talent. Given your key role in Lehman Brothers' success, it is important for you to have a significant stake in the Firm. With this in mind, the Equity Award Program for MDs was designed to deliver a significant portion of your compensation in conditional equity awards (restricted stock units (RSUs) and stock options), which you acquire at a substantial discount. The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time.

Your 2003 equity award was awarded to you as a portion of your 2003 compensation. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2008. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time provided, you meet certain terms and conditions. The RSUs cannot be sold, traded, or pledged for that five-year period.

The stock options awarded to you in 2003 will expire on November 29, 2013. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

## The Size of Your Award

The Award Summary shows your 2003 equity award. The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation. Under this schedule, the amount of compensation paid in the form of conditional equity awards (RSUs and stock options) increases as total compensation rises.

**Salaried Members of the Firm:** Your award was based on your 2003 total compensation, which includes salary earned in fiscal year 2003 plus any additional compensation with respect to fiscal year 2003, even if some of these payments are deferred or paid in 2004. Such compensation includes 2003 bonus, commissions, and other compensation.

**Investment Representatives (IRs):** Similar to salaried employees, you received a year-end conditional equity award as a portion of your 2003 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2002 through October 2003 (paid from January through November 2003) after all adjustments. For 2003, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2003 Equity Award Schedule appears on page 5.) The 2003 payout may have included regular grid production payout, certain special payments, and other production payout. During any period an IR is paid a draw, equity (in the form of RSUs and/or stock options) is awarded with respect to the amount of the draw. If the draw ends and the IR has earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued).

*Note that for purposes of this brochure, all references to payout or compensation assume compensation payments that are equity eligible only.*

## The Firm-Provided Discount

The number of RSUs you received for 2003 was based on the closing price of Lehman Brothers common stock ($71.39 per share), less a 30 percent discount. With a 30 percent discount, every $100 of compensation in RSUs gives you $143 in value. A 30 percent discount really means that the Firm "grosses up" your contribution 43 percent at the outset.

The number of options you received for 2003 was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option on December 10, 2003, less a 30 percent discount ($19.45). These options have an exercise price of $71.39. Your 2003 options will expire approximately 10 years after the grant date, on November 29, 2013.



*The amount of compensation paid in equity increases as the amount of total compensation rises.*

CONFIDENTIAL                                                                      LEH-RSU 0014187

# C OMPONENTS OF 2003 EQUITY AWARD

## Equity Award in RSUs and Stock Options

All MDs receive a portion of their total compensation in the form of conditional equity awards. The equity component of total compensation is in a combination of both RSUs and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was paid in stock options.

| Description | RSUs | Stock Options |
|---|---|---|
| Grant Date: | December 10, 2003 | December 10, 2003 |
| Market Price: | $71.39 | N/A |
| Exercise Price: | N/A | $71.39 |
| Black-Scholes Value: | N/A | $27.79 |
| Discount: | 30% | 30% |
| Cost to MD: | $49.97 | $19.45 |
| Restriction Period: | 5 years, until 11/30/08 | N/A |
| Option Period: | N/A | 10 years, until 11/29/13 |

**3**

*Managing Director*

# E QUITY AWARD VESTING

## When will my RSUs vest?

The vesting provisions of your 2003 RSUs are consistent with last year's MD RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2003 compensation before the discount (70 percent of the award). The discount portion represents 30 percent of your RSU award.

Your RSUs will vest in two stages:

| | |
|---|---|
| 3 Years (November 30, 2006): | Half of the principal portion |
| 5 Years (November 30, 2008): | Half of the principal portion plus the discount portion |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2008, all of your RSUs will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

## When will my stock options become exercisable?

You should consider your stock option award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of stock options awarded as part of your 2003 compensation before the discount (70 percent of the award). The discount portion represents 30 percent of your stock option award.

Your stock options will become exercisable in two stages:

| | |
|---|---|
| 3 Years (November 30, 2006): | Half of the principal portion |
| 5 Years (November 30, 2008): | Half of the principal portion plus the discount portion |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2013, all of your stock options will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions for RSUs and Stock Options* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.



EQUITY AWARD PROGRAM

4

# S ALARIED MEMBERS OF THE FIRM

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation. An example of the calculations follows.

| Total Compensation Range | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $30,000 plus 16.25% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $62,500 plus 20% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $112,500 plus 35% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $200,000 plus 44% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $420,000 plus 56% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $700,000 plus 60% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 40% of 2003 total compensation |

## Award Calculation Example

Using the equity award schedule above, your 2003 equity award was determined at year-end based on your 2003 total compensation.

EXAMPLE: As an example, we'll go through the calculation for an MD whose 2003 total compensation was $1,000,000.

| | |
|---|---|
| 2003 Total Compensation: | $1,000,000 |
| Equity Award Based on 2003 Grid: | $200,000 |
| RSU Component: | $150,000   (75% of Total Equity) |
| Stock Option Component: | $50,000   (25% of Total Equity) |

Based on a stock price of $71.39 and a Black-Scholes option value of $27.79, the components of the 2003 equity award are as follows:

| RSU Component | | Market Price | Discount Price | Number of Shares |
|---|---|---|---|---|
| RSU Award (75%): | $150,000 | $71.39 | $49.97 | 3,002 |
| **Option Component** | | | | |
| Option Award (25%): | $50,000 | $27.79 (a) | $19.45 | 2,571 |
| Total 2003 Equity Award: | $200,000 | | | |

(a) Black-Scholes value

**Note to Investment Representatives (IRs):** Your 2003 equity award was accrued as a portion of your monthly payout. Please refer to the section *IRs: Calculating Your 2003 Monthly Accrual* on page 6 for an illustration of how your monthly equity award accrual was determined.



# INVESTMENT REPRESENTATIVES (IRs)

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation.* An example of the calculations follows.

| Total Compensation Range* | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2.50% of 2003 total compensation |
| $100,000 - $199,999 | $2,500 plus 7.50% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $10,000 plus 12.50% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $37,500 plus 20.31% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $78,125 plus 25.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $140,625 plus 43.75% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $250,000 plus 55.00% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $525,000 plus 70.00% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $875,000 plus 75.00% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 50% of 2003 total compensation |

*For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

**5**
*Managing Director*



## Calculating Your 2003 Monthly Accrual

As an example, we'll go through the monthly calculation for an MD IR whose 2003 total compensation earned from December 2002 through October 2003 (paid from January through November 2003) was $900,000.

| Step | Instructions | Sample Calculation | Sample Result |
|---|---|---|---|
| **Step 1** | Take YTD Total Payout for first month and annualize (multiply by 12 and divide by production month number). | $80,000 x 12 ÷ 1 | $960,000 |
| **Step 2** | Calculate equity accrual from 2003 award schedule on page 5. | $960,000 | $232,500 |
| **Step 3** | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($232,500 x 8.33%) - $0 | $19,375 |
| **Step 4** | Take YTD Total Payout for second month and annualize (multiply by 12 and divide by production month number). | $180,000 x 12 ÷ 2 | $1,080,000 |
| **Step 5** | Calculate equity accrual from 2003 award schedule on page 5. | $1,080,000 | $294,000 |
| **Step 6** | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($294,000 x 16.67%) - $19,375 | $29,625 |
| **Step 7** | Repeat for next month. | | |

### Example

| # | Pay Month | Monthly Total Payout($) | YTD Total Payout ($) | Annualized Total Payout ($) | Annualized Equity Award ($) | Allocation % | YTD Equity Accrual ($) | Monthly Equity Accrual ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | January | 80,000 | 80,000 | 960,000 | 232,500 | 8.33% | 19,375 | 19,375 |
| 2 | February | 100,000 | 180,000 | 1,080,000 | 294,000 | 16.67% | 49,000 | 29,625 |
| 3 | March | 75,000 | 255,000 | 1,020,000 | 261,000 | 25.00% | 65,250 | 16,250 |
| 4 | April | 125,000 | 380,000 | 1,140,000 | 327,000 | 33.33% | 109,000 | 43,750 |
| 5 | May | 65,000 | 445,000 | 1,068,000 | 287,400 | 41.67% | 119,750 | 10,750 |
| 6 | June | 75,000 | 520,000 | 1,040,000 | 272,000 | 50.00% | 136,000 | 16,250 |
| 7 | July | 100,000 | 620,000 | 1,062,857 | 284,571 | 58.33% | 166,000 | 30,000 |
| 8 | August | 80,000 | 700,000 | 1,050,000 | 277,500 | 66.67% | 185,000 | 19,000 |
| 9 | September | 50,000 | 750,000 | 1,000,000 | 250,000 | 75.00% | 187,500 | 2,500 |
| 10 | October | 60,000 | 810,000 | 972,000 | 237,750 | 83.33% | 198,125 | 10,625 |
| 11 | November | 90,000 | 900,000 | 981,818 | 242,045 | 91.67% | 221,875 | 23,750 |
| 12 | December [1] | – | 900,000 | 900,000 | 206,250 | 100.00% | 206,250 | (15,625) |
| **Total** | | | | | | | | **206,250** |

[1] Note that for purposes of calculating your 2003 equity award, your December payout was assumed to be zero.

EQUITY AWARD PROGRAM

6



## Award Calculation Example

As an example, we'll go through the calculation for an MD IR with payout of $900,000 for 2003. For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Your 2003 award was determined at year-end based on your total compensation from January through November. | Not applicable | $900,000 |
| **Step 2** | According to the schedule on page 5, the MD in our example with 2003 total compensation between $750,000 and $999,999 received $140,625 plus 43.75 percent of his 2003 total compensation over $750,000 in RSUs and stock options. | $140,625 + (43.75% x $150,000) | $206,250 |
| **Step 3** | The next step is to figure out how many options were awarded in 2003. The 2003 equity award was based on total payout, after all adjustments, for production months December 2002 through October 2003 (paid from January through November 2003) and the 2003 IR Equity Award Schedule on page 5. According to the schedule, the award for an IR with 2003 total payout of $900,000 is $140,625 plus 43.75 percent of 2003 total payout over $750,000, or $206,250. This amount, multiplied by 25 percent, gives us the stock option award. | [$140,625 + (43.75% x $150,000)] x 25% | $51,562 |
| **Step 4** | To calculate the number of options received, divide the value from step 3 by $19.45 (which represents the $27.79 Black-Scholes value of a 10-year Lehman Brothers option, less the Firm-provided 30 percent discount). | $51,562 ÷ $19.45 | 2,651 options |
| **Step 5** | The next step is to figure out how many RSUs were awarded in 2003. According to the schedule, the award for an IR with 2003 total payout of $900,000 is $140,625 plus 43.75 percent of 2003 total payout over $750,000, or $206,250. This amount, less the result in step 3 (which represents the value of the 2003 stock options), gives us the 2003 RSU award. | [($140,625 + (43.75% x $150,000)) - ($51,562)] | $154,688 |
| **Step 6** | To calculate the number of RSUs received, divide the value from step 5 by $49.97 (which represents the $71.39 price of Lehman Brothers stock on December 10, 2003, less the Firm-provided 30 percent discount). | $154,688 ÷ $49.97 | 3,096 RSUs |

**7**

*Managing Director*



EQUITY AWARD PROGRAM

8

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS

| Reason | RSUs | Stock Options |
|---|---|---|
| **General Rules** | | |
| **Salaried Members of the Firm** | • If termination occurs prior to January 30, 2004, all RSUs will be forfeited. | • If termination occurs prior to January 30, 2004, all options will be forfeited. |
| | • If termination occurs after January 30, 2004, the disposition of the RSUs will be subject to the provisions outlined below. | • If termination occurs after January 30, 2004, the disposition of the options will be subject to the provisions outlined below. |
| **Investment Representatives** | • If termination occurs prior to November 30, 2003, the 2003 RSUs will be based on the amount of production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 75 percent. The disposition of the RSUs will be subject to the provisions outlined below. | • If termination occurs prior to November 30, 2003, options will be based on the amount of production compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 25 percent. The disposition of the options will be subject to the provisions outlined below. |
| **Voluntary Not to a Competitor** | • Entitled to the entire principal portion provided no Competitive Activity or Detrimental Activity through the Share Payment Date as defined below. | • Entitled to the entire principal portion and discount portion of the option award. |
| | • Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Competitive Activity or Detrimental Activity through the Share Payment Date. | • Options become exercisable six months after termination (or on the scheduled date if sooner than six months), provided no Competitive Activity or Detrimental Activity. |
| | • If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Competitive Activity or Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. | • Options remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after the termination date. |
| | | • If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date), provided you do not engage in Competitive Activity or Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. |
| | • Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following the termination date. | • In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |



CONFIDENTIAL

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Voluntary to a Competitor** | n Forfeit entire principal portion if termination occurs prior to November 30, 2006 (three years after the award date).<br><br>n Entitled to half of the principal portion if termination occurs after November 30, 2006 (three years after the award date) provided no Detrimental Activity.<br><br>n Forfeit entire discount portion.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Forfeit entire principal portion and discount portion if termination occurs prior to November 30, 2006 (three years after the award date).<br><br>n Forfeit options that are not exercised prior to termination date if termination occurs after November 30, 2006 (three years after the award date). |
| **Involuntary with Cause** | n Entire principal and discount portion will be forfeited immediately upon termination. | n Entire principal and discount portion will be forfeited immediately upon termination. |
| **Involuntary without Cause** | n Entitled to the entire principal portion provided no Detrimental Activity through the Share Payment Date.<br><br>n Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Detrimental Activity through the Share Payment Date.<br><br>n If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Entitled to the entire principal portion and discount portion of the option award.<br><br>n Options become immediately exercisable and remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after termination date, provided no Detrimental Activity.<br><br>n If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date) provided you do not engage in Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |

**9**

*Managing Director*



CONFIDENTIAL

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Death, Disability, Retirement** | n Entire principal portion and discount portion will vest immediately. | n Entire principal portion and discount portion will immediately become exercisable and remain exercisable until the expiration date (November 29, 2013). |
| | n Shares of Lehman Brothers common stock will be issued immediately. | |
| | n Retirement means a termination of employment which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. | n Retirement means a termination of employment, which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. |

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2003 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

### COMPETITIVE ACTIVITY

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affilliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, all of the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### DETRIMENTAL ACTIVITY

Detrimental Activity means at any time (i) using information received during a person's employment with Lehman Brothers Holdings Inc. or any subsidiary, their affiliates or clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with Holdings or any subsidiary or to breach any of the terms of his or her employment with Holdings or any subsidiary; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).



# TAX CONSIDERATIONS

## Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period.

You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding.

Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

**11**

*Managing Director*

### RSUs

- No taxation on the award date.

- Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply upon conversion to common stock.

- If you retain your shares after RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date.

### Options

- No taxation on the award date.

- When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale price(s) (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply when options are exercised.

- If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise.

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.



LEH-RSU 0014196

# CHANGE IN CONTROL ("CIC") PROVISIONS

**EQUITY AWARD** PROGRAM

12

| Reason | RSUs | Stock Options |
|---|---|---|
| **Hostile** | n All RSUs vest immediately.<br><br>n Shares of Lehman Brothers common stock will be issued immediately. | n All options become immediately exercisable. |
| **Friendly** | n Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity.<br><br>n The additional value of the RSUs in excess of the undiscounted RSU award price will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2008 (five years after the award date).<br><br>n The RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | n Half of the non-exercisable options will become immediately exercisable.<br><br>n The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates (35 percent on November 30, 2006 and 65 percent on November 30, 2008). |

## Payment of RSUs Upon a Friendly CIC

EXAMPLE: Let's use as an example an MD whose 2003 compensation was $1,000,000. The amount of compensation paid in RSUs was $150,000 (for 3,002 RSUs at a market value of $214,313). Assume there is a Change in Control and the market price for Lehman Brothers stock at that time is $100 per share.

### UNDISCOUNTED PURCHASE PRICE:

n Upon a Friendly Change in Control, this MD receives a payment of shares (or cash) equivalent in value to the original award, $214,313. Assuming a market price of $100, this MD would receive 2,143 shares.

### PREMIUM OVER UNDISCOUNTED PRICE:

n The additional value of the RSUs, in excess of the original award value, $85,887 ((3,002 RSUs x $100) - $214,313), will be held on the MD's behalf in either cash or equity of the successor entity.

n The payment (in either cash or equity of the successor entity) will be subject to the same vesting and issuance restrictions as the RSU award.

n Assume the MD leaves within two years of the Change in Control:

– The MD will be entitled to 70 percent of the additional value of the RSUs, in excess of the original award value ($85,887 x 70% = $60,121), provided no Competitive Activity or Detrimental Activity for a period of one year after termination date (or the second anniversary of the Change in Control, if sooner).

– The MD will also be entitled to a pro-rata portion of the remaining 30 percent of the additional value of the RSUs (in excess of the original award value) based on the number of full years completed after the RSU award date (e.g., if termination occurs during 2006 (but before November 30, 2006), 2/5th of the remaining amount or $10,306).

– In total, the MD will receive $70,427 ($10,306 plus $60,121) or 704 shares. In this example, the MD receives 82 percent of the additional value of the RSUs in excess of the original award value.

n Please note that this value may be converted to shares of the successor entity. In this instance, the above percentages will be applied to the converted shares.



# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs. Dividends will not be paid on stock option awards.

# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit award agreement, the stock option award agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, call the Compensation Department at 212-526-8346 (5-8346), or for IRs, your PCS Human Resources contact at 212-526-2921 (5-2921).

13

*Managing Director*



# LBHI0038



2003

# EQUITY AWARD PROGRAM

# LEHMAN BROTHERS

LBHI0038

CONFIDENTIAL

LEH-RSU 0014168

# 2003 EQUITY AWARD PROGRAM

## Contents

2003 Equity Award Program at a Glance . . . . . . . .1

How the Equity Award Program Works . . . . . . . . .2

Vesting and Conversion . . . . . . . . . . . . . . . . . . . .2

Dividend Equivalents . . . . . . . . . . . . . . . . . . . . . .3

Salaried Members of the Firm:
  2003 Equity Award Schedule . . . . . . . . . . . . . .4
  Calculating Your 2003 Award . . . . . . . . . . . . . .5

Investment Representatives (IRs):
  2003 Equity Award Schedule . . . . . . . . . . . . . .6
  Calculating Your 2003 Monthly Accrual . . . . . . .7
  Award Calculation Example . . . . . . . . . . . . . . .8

If Your Employment Ends . . . . . . . . . . . . . . . . . . .9

Tax Treatment of Restricted Stock Units . . . . . . . .11

Change in Control ("CIC") Provisions . . . . . . . . .12
  Payment of RSUs Upon a Friendly CIC . . . . . . .12

Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Other Information . . . . . . . . . . . . . . . . . . . . . . . .13

This brochure describes significant features of the Lehman Brothers Equity Award Program for 2003. It is not intended to replace the award agreement or other official plan documents. This brochure should be read in conjunction with the other award documents.

## 2003 EQUITY AWARD PROGRAM AT A GLANCE

- All eligible members of the Firm receive a portion of their total compensation in conditional restricted stock units (RSUs). Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment with the Firm.

- RSUs have been awarded to you as part of your 2003 compensation payable for the year's performance. The amount of compensation paid in RSUs increases as the amount of your compensation rises.

- Your 2003 RSU award was determined by dividing the portion of your compensation paid through the Equity Award Program by $53.54 (reflecting a market price of $71.39 less a 25 percent discount provided by the Firm).

- On November 30, 2008, the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold at that time. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, traded, pledged, or assigned before conversion.

**1**

*Your Award Summary details your 2003 award.*



CONFIDENTIAL

LEH-RSU 0014170

# HOW THE EQUITY AWARD PROGRAM WORKS

The Equity Award Program provides every member of Lehman Brothers with a direct ownership interest in the Firm, and requires us to hold that stake for at least five years. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time.

Your 2003 restricted stock units (RSUs) were awarded to you as a portion of your 2003 compensation. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2008. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time provided you meet certain terms and conditions. The RSUs cannot be sold, traded, pledged, or assigned for that five-year period.

## The Size of Your Award

The Award Summary shows your 2003 equity award. The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation. Under this schedule, the amount of compensation paid in the form of conditional RSUs increases as total compensation rises. Thus, more highly compensated members of the Firm have a greater percentage of their compensation paid in RSUs.

**Salaried Members of the Firm**: Your award was based on your 2003 total compensation, which includes salary earned in fiscal year 2003 plus any additional compensation with respect to fiscal year 2003, even if some of these payments are deferred or paid in 2004. Such compensation includes 2003 bonus, commissions, and other compensation.

**Investment Representatives (IRs):** Similar to salaried employees, you received a year-end conditional equity award as a portion of your 2003 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2002 through October 2003 (paid from January through November 2003) after all adjustments. For 2003, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2003 Equity Award Schedule appears on page 5.) The 2003 payout may have included regular grid production payout, certain special payments, and other production payout.

During any period an IR is paid a draw, RSUs are awarded with respect to the amount of the draw. If the draw ends and the IR has earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end RSU award (in the year in which overage is accrued).

*Note that for purposes of this brochure, all references to payout or compensation assume compensation payments that are equity eligible only.*

## The Firm-Provided Discount

The number of RSUs you received for 2003 was based on the closing price of Lehman Brothers common stock ($71.39 per share), less a 25 percent discount provided by the Firm. With a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value. A 25 percent discount really means that the Firm "grosses up" your contribution 33 percent at the outset.

# VESTING AND CONVERSION

The vesting provisions of your 2003 RSUs are consistent with last year's RSUs. For purposes of discussing the vesting provisions, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2003 compensation before the discount (75 percent of the award). The discount portion represents 25 percent of your total 2003 RSU award.

Provided you remain employed by the Firm, your 2003 RSUs will vest in two stages:

◻ The principal portion, 75 percent of your award, will vest two years after the award date, on November 30, 2005.

◻ The discount portion, 25 percent of your award, will vest five years after the award date, on November 30, 2008.

◻ Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2008, all of your RSUs will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

◻ Your 2003 RSUs will convert to Lehman Brothers common stock five years after the award date, on November 30, 2008.

Refer to the section *If Your Employment Ends*, on page 9, for a detailed explanation of how your RSUs may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs.



*The amount of compensation paid in equity increases as the amount of total compensation rises.*



# DIVIDEND EQUIVALENTS

Dividends may be declared from time to time at the discretion of the Board of Directors. Until your RSUs convert to common stock, if dividends are declared, you will receive dividend equivalents. Your dividend equivalents will be automatically reinvested as additional RSUs. (The stock price used for your dividend reinvestment will be the closing price of Lehman Brothers common stock on each dividend payment date.)

The RSUs you receive as dividend equivalents will vest and convert to Lehman Brothers common stock on the same date as the underlying RSUs to which they relate. In the event the underlying RSUs are forfeited, the related dividend reinvested RSUs will also be forfeited.

**For example:** For an award of 93 RSUs, based on the current annual dividend rate of $0.64 per share, the dollar value of dividend equivalents would be $59.52 annually. In this example, assume the market price of Lehman Brothers stock on each dividend payment date is $71.00 per share.

3

| | Number of RSUs | | Dividend Rate | | Dividend Equivalents | | Stock Price | | Additional RSUs Through Dividend Reinvestment | Scheduled Vesting Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Principal portion (75%) | 69 | x | $0.64/share | = | $44.16 | ÷ | $71 | = | 0.62 | November 30, 2005 |
| Discount portion (25%) | 24 | x | $0.64/share | = | $15.36 | ÷ | $71 | = | 0.22 | November 30, 2008 |
| | 93 | x | $0.64/share | = | $59.52 | ÷ | $71 | = | 0.84 | |

Using this example, if you should terminate your employment and forfeit the portion of your RSU award related to the 25 percent discount (24 RSUs), you would also forfeit 0.22 RSUs (the related dividend reinvestment).



EQUITY AWARD PROGRAM

**S**ALARIED MEMBERS OF THE FIRM

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation. An example of the calculations follows.

| Total Compensation Range | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $74,999 | 1.00% of 2003 total compensation |
| $75,000 - $99,999 | 2.00% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6.00% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10.00% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15.00% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25.00% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30.00% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $310,500 plus 35.00% of 2003 total compensation over $1,500,000 |



## Calculating Your 2003 Award

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Your 2003 RSU award was determined at year end based on your actual compensation for 2003. As an example, we'll go through the calculations for a participant whose 2003 total compensation was $150,000. | Not applicable | $150,000 |
| **Step 2** | Refer to the award schedule on page 4 to determine how much of the 2003 compensation was paid in RSUs. According to the award schedule, a participant whose 2003 total compensation is between $100,000 and $199,999 should have $2,000 plus 6 percent of his 2003 total compensation over $100,000 in RSUs. | [$2,000 + (6% x $50,000)] | $5,000 |
| **Step 3** | The next step is to figure out how many RSUs were awarded. Divide the result from step 2 by $53.54 (which represents the $71.39 market price of Lehman Brothers stock, less the Firm-provided 25 percent discount). This participant's 2003 award is 93 RSUs. | $5,000 ÷ $53.54 | 93 RSUs |
| **Step 4** | To calculate the value of the 2003 RSUs on the grant date, multiply the number of RSUs by the market price which was $71.39. | $71.39 x 93 | $6,639 |
| **Step 5** | Seventy-five percent of the 93 RSUs will vest on November 30, 2005. The Firm will continue to hold these RSUs until they convert to common stock. | 75% x 93 | 69 RSUs vest on 11/30/05 |
| **Step 6** | On November 30, 2008, the other 24 RSUs (received because of the Firm-provided 25 percent price discount) will vest. Also, all the RSUs awarded in 2003 will convert one-for-one into shares of common stock. | 93 – 69 | 24 RSUs vest on 11/30/08  All RSUs convert to shares on 11/30/08 |

This example applies for members of the Firm whose employment continues through the end of the restriction period. Please refer to the section *If Your Employment Ends* for information on how your RSUs may be affected if you leave the Firm.

**Note to Investment Representatives (IRs):** Your 2003 stock award was accrued as a portion of your monthly payout. Please refer to the section *IRs: Calculating Your 2003 Monthly Accrual* on page 7 for an illustration of how your monthly RSU accrual was determined.



**EQUITY AWARD PROGRAM**

# INVESTMENT REPRESENTATIVES (IRs)

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation.[*] An example of the calculations follows.

| Total Compensation Range[*] | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2.00% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6.00% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10.00% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $30,000 plus 16.25% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $62,500 plus 20.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $112,500 plus 35.00% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $200,000 plus 35.00% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $375,000 plus 45.00% of 2003 total compensation over $1,500,000 |

[*] For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

6



## Calculating Your 2003 Monthly Accrual

As an example, we'll go through the monthly calculation for an IR whose 2003 total compensation earned from December 2002 through October 2003 (paid from January through November 2003) was $135,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|--------------|--------------------|---------------|
| Step 1 | Take YTD Total Payout for first month and annualize (multiply by 12 and divide by production month number). | $18,000 x 12 ÷ 1 | $216,000 |
| Step 2 | Calculate the RSU accrual from 2003 award schedule on page 6. | $216,000 | $9,600 |
| Step 3 | Multiply result by allocation %. Subtract previous month's YTD RSU accrual from result. This is the monthly RSU accrual. | ($9,600 x 8.33%) - $0 | $800 |
| Step 4 | Take YTD Total Payout for second month and annualize (multiply by 12 and divide by production month number). | $29,500 x 12 ÷ 2 | $177,00 |
| Step 5 | Calculate RSU accrual from 2003 award schedule on page 6. | $177,000 | $6,620 |
| Step 6 | Multiply result by allocation %. This is the YTD RSU accrual. Subtract previous month's YTD RSU accrual from result. This is the monthly RSU accrual. | ($6,620 x 16.67%) - $800 | $303 |
| Step 7 | Repeat for next month. | | |

## Example

| # | Pay Month | Monthly Total Payout($) | YTD Total Payout ($) | Annualized Total Payout ($) | Annualized Stock Award ($) | Allocation % | YTD RSU Accrual ($) | Monthly RSU Accrual ($) |
|---|-----------|-------------------------|----------------------|-----------------------------|----------------------------|--------------|---------------------|-------------------------|
| 1 | January | 18,000 | 18,000 | 216,000 | 9,600 | 8.33% | 800 | 800 |
| 2 | February | 11,500 | 29,500 | 177,000 | 6,620 | 16.67% | 1,103 | 303 |
| 3 | March | 10,000 | 39,500 | 158,000 | 5,480 | 25.00% | 1,370 | 267 |
| 4 | April | 11,000 | 50,500 | 151,500 | 5,090 | 33.33% | 1,697 | 327 |
| 5 | May | 12,000 | 62,500 | 150,000 | 5,000 | 41.67% | 2,083 | 386 |
| 6 | June | 13,000 | 75,500 | 151,000 | 5,060 | 50.00% | 2,530 | 447 |
| 7 | July | 12,000 | 87,500 | 150,000 | 5,000 | 58.33% | 2,917 | 387 |
| 8 | August | 15,000 | 102,500 | 153,750 | 5,225 | 66.67% | 3,483 | 566 |
| 9 | September | 10,000 | 112,500 | 150,000 | 5,000 | 75.00% | 3,750 | 267 |
| 10 | October | 12,500 | 125,000 | 150,000 | 5,000 | 83.33% | 4,167 | 417 |
| 11 | November | 10,000 | 135,000 | 147,273 | 4,836 | 91.67% | 4,433 | 266 |
| 12 | December[1] | ——— | 135,000 | 135,000 | 4,100 | 100.00% | 4,100 | (333) |
| Total | | | | | | | | 4,100 |

[1] Note that for purposes of calculating your 2003 equity award, your December payout was assumed to be zero.



## Award Calculation Example

As an example, we'll go through the calculation for an IR with payout of $135,000 for 2003. For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Your 2003 RSU award was determined at year end based on your total compensation from January through November. | Not applicable | $135,000 |
| Step 2 | The 2003 RSU award was based on total payout, after all adjustments, for production months December 2002 through October 2003 (paid from January through November 2003) and the 2003 IR Stock Award Schedule on page 6. According to the award schedule, a participant whose 2003 total compensation is between $100,000 and $199,999 should have $2,000 plus 6 percent of his 2003 total compensation over $100,000 in RSUs. | [$2,000 + (6% x $35,000] | $4,100 |
| Step 3 | The next step is to figure out how many RSUs were awarded. Divide the result from step 2 by $53.54 (which represents the $71.39 market price of Lehman Brothers stock, less the Firm-provided 25 percent discount). This participant's 2003 award is 77 RSUs. | $4,100 ÷ $53.54 | 77 RSUs |
| Step 4 | To calculate the value of the 2003 RSUs on the grant date, multiply the number of RSUs by the market price which was $71.39. | $71.39 x 77 | $5,497 |
| Step 5 | Seventy-five percent of the 77 RSUs will vest on November 30, 2005. The Firm will continue to hold these RSUs until they convert to common stock. | 75% x 77 | 57 RSUs vest on 11/30/05 |
| Step 6 | On November 30, 2008, the other 20 RSUs (received because of the Firm-provided 25 percent price discount) will vest. Also, all the RSUs awarded in 2003 will convert one-for-one into shares of common stock. | 77 – 57 | 20 RSUs vest on 11/30/08  All RSUs convert to shares on 11/30/08 |

This example applies for members of the Firm whose employment continues through the end of the restriction period. Please refer to the section *If Your Employment Ends* for information on how your RSUs may be affected if you leave the Firm.



CONFIDENTIAL

EQUITY AWARD PROGRAM

8



# IF YOUR EMPLOYMENT ENDS

If your employment with the Firm ends before November 30, 2008, the disposition of your 2003 RSUs will be determined by when you leave, why you leave, and your conduct with respect to Lehman Brothers after you leave. Depending on these factors, you may forfeit your rights to some or all of the 2003 RSUs.

## When You Leave

### SALARIED MEMBERS OF THE FIRM:

If you leave after January 30, 2004, but before November 30, 2008, you may be entitled to your 2003 RSUs depending on why you leave the Firm and your conduct with respect to the Firm after you leave, as described below.

### INVESTMENT REPRESENTATIVES:

If you leave before November 30, 2003, your 2003 RSU award will be based on the amount of your production-based compensation accrued for your 2003 RSU award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

## Why You Leave

### VOLUNTARY TERMINATION

▪ **Resignation to a Non-Competitor:** If you leave voluntarily and you do not go to work for a competitor of Lehman Brothers, you will be entitled to receive the entire principal portion (75 percent) of your 2003 RSUs and a pro-rata portion of the discount (25 percent of the award). The portion of the discount you receive will be prorated in 20 percent increments for every full year of service with the Firm after November 30, 2003. So, if you leave the Firm prior to November 30, 2004, you will not be entitled to receive any of the RSUs related to the discount portion. However, if your termination occurs after a "Full Career" with the Firm, you will be entitled to receive the entire discount portion of your RSU award. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. Shares of Lehman Brothers common stock will be issued to you, without restrictions, at the earlier of a) November 30,

2008 (five years after the award date) or b) the end of the fiscal quarter one year following your termination date, provided you do not engage in Competitive Activity or Detrimental Activity through that date.

▪ **Resignation to a Competitor:** If you leave voluntarily and you go to work for a competitor of Lehman Brothers prior to November 30, 2005, you will not be entitled to the principal portion (75 percent) of your award. If you leave after November 30, 2005, you will be entitled to receive the entire principal portion of your RSU award. In either case, you will not be entitled to receive any of the RSUs related to the discount portion (25 percent) of your award. Shares of Lehman Brothers common stock will be issued to you, without restrictions, at the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following your termination date, provided that you do not engage in Detrimental Activity through that date.

### INVOLUNTARY TERMINATION

▪ **Involuntary Termination With Cause:** If you are terminated involuntarily with Cause, your entire 2003 RSU award will be forfeited immediately upon termination.

▪ **Involuntary Termination Without Cause:** If you are terminated involuntarily but without Cause, you will be entitled to receive the entire principal portion (75 percent) of your 2003 RSUs and a pro-rata portion of the discount (25 percent of the award). The portion of the discount you receive will be prorated in 20 percent increments for every full year of service with the Firm after November 30, 2003. So, if your termination occurs prior to November 30, 2004, you will not be entitled to receive any of the RSUs related to the discount portion. However, if your termination occurs after a "Full Career" with the Firm, you will be entitled to receive the entire discount portion of your RSU award. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. Shares of Lehman Brothers common stock will be issued to you, without restrictions, at the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following your termination date, provided you do not engage in Detrimental Activity through that date.

9





**EQUITY AWARD PROGRAM**

**10**

### DEATH, DISABILITY, RETIREMENT

▫ If you die, retire, or become disabled (as defined in the award agreement), all unvested RSUs will vest immediately and convert to Lehman Brothers common stock. Shares of Lehman Brothers common stock will be issued to you or your estate, without restrictions, following your termination date.

▫ At the time the shares are issued to you or your estate, the market value of the shares on the payment date will be reported as ordinary income and you or your estate will be subject to tax withholding on this amount. Please consult your personal tax advisor concerning the application of federal, state, and local tax rules.

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2003 RSUs (and related dividend reinvestment) if you engage in Competitive Activity or Detrimental Activity.

### COMPETITIVE ACTIVITY

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). **Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.**

Most financial services companies, including but not limited to, all of the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### DETRIMENTAL ACTIVITY

Detrimental Activity means at any time (i) using information received during a person's employment with Lehman Brothers Holdings Inc. or any subsidiary, their affiliates or clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with Holdings or any subsidiary or to breach any of the terms of his or her employment with Holdings or any subsidiary; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).



CONFIDENTIAL

LEH-RSU 0014179

# TAX TREATMENT OF RESTRICTED STOCK UNITS

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. (For members of the Firm whose employment status changes, special provisions apply. Please see the following section.)

Provided below is a summary of the U.S. taxes that are ultimately due under current tax law:

- At the time the RSUs are awarded, there is no taxable event.

- After the restriction period for 2003 RSUs ends, on November 30, 2008, your RSUs, including any additional RSUs that you receive through dividend reinvestment, convert to common stock. Ordinary income equal to the November 30, 2008 market value of your shares will be reported to the IRS, and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rates apply, rather than the special provisions dealing with capital gains.

- On November 30, 2008, when your 2003 RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares than it was when the RSUs converted, you will have a capital loss to declare.

*Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs.*

11

*Your RSUs appreciate on a pre-tax basis for the five-year restriction period.*

CONFIDENTIAL

EQUITY AWARD PROGRAM

# CHANGE IN CONTROL ("CIC") PROVISIONS

**12**

## HOSTILE

- All RSUs vest immediately.
- Shares of Lehman Brothers common stock will be issued immediately so that you may tender your shares with other shareholders.

## FRIENDLY

- Upon the CIC, you will receive the undiscounted award price for your RSUs ($71.39 x your number of 2003 RSUs) in either cash or equity.
- The additional value of the RSUs in excess of the undiscounted RSU award price will be paid on the Payment Date, defined as the earlier of:
  a) two years following the CIC or
  b) November 30, 2008 (five years after the award date).
- The RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date.

## Payment of RSUs Upon a Friendly CIC

EXAMPLE: Let's use as an example a participant whose 2003 compensation was $150,000. The amount of compensation paid in RSUs was $5,000 (for 93 RSUs at a market value of $6,639). Assume there is a Change in Control and the market price for Lehman Brothers stock at that time is $100 per share.

### UNDISCOUNTED PURCHASE PRICE:

- Upon a Friendly Change in Control, this participant receives a payment of shares (or cash) equivalent in value to the original award, $6,639. Assuming a market price of $100, this participant would receive 66 shares.

### PREMIUM OVER UNDISCOUNTED PRICE:

- The additional value of the RSUs, in excess of the original award value, $2,661 ((93 RSUs x $100) - $6,639), will be held on the participant's behalf in either cash or equity of the successor entity.
- The payment (in either cash or equity of the successor entity) will be subject to the same vesting and issuance restrictions as the RSU award.
- Assume the participant leaves within two years of the Change in Control:
  - The participant will be entitled to 75 percent of the additional value of the RSUs, in excess of the original award value ($2,661 x 75% = $1,996), provided no Competitive Activity or Detrimental Activity for a period of one year after termination date (or the second anniversary of the Change in Control, if sooner).
  - The participant will also be entitled to a pro-rata portion of the remaining 25 percent of the additional value of the RSUs (in excess of the original award value) based on the number of full years completed after the RSU award date (e.g., if termination occurs during 2006 (but before November 30, 2006), 2/5th of the remaining amount or $266).
  - In total, the participant will receive $2,262 ($266 plus $1,996) or 23 shares. In this example, the participant receives 85 percent of the additional value of the RSUs in excess of the original award value.
- Please note that this value may be converted to shares of the successor entity. In this instance, the above percentages will be applied to the converted shares.



# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Unit award agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, call the Compensation Department at 212-526-8346 (5-8346), or for IRs, your PCS Human Resources contact at 212-526-2921 (5-2921).

13



©2004 Lehman Brothers Inc.  All Rights Reserved.  LB10484_C3_US_Brochures/VP_Brochure

CONFIDENTIAL

# LBHI0047

2005 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

LBHI0047

LEH-RSU 0000120

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of November 30, 2005 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

- The Principal Units (75% of the total award) shall become vested on November 30, 2007.

- The Discount Units (25% of the total award) shall become vested on November 30, 2010.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2010 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date, but no later than December 31, 2010.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of your death or Disability on or after January 31, 2006, all outstanding Units held by you shall become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2006, all Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2007, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2007, you shall be entitled to receive freely transferable shares of Common Stock for the Principal Units.

**(ii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a Subsidiary after November 30, 2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to

receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(iv) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

**(v) Retirement.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i), (ii), and (iv), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units on the 30th day following your Retirement. In the event of a voluntary Termination, if you engage in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply as of the date of your Retirement, and you shall forfeit Units in accordance with such provision or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d)(i). In any case, if you engage in Detrimental Activity prior to the Share Payment Date, you shall forfeit all Units held by you or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(vi) Occurrence of Death or Disability following Termination.** Notwithstanding the foregoing provisions of Paragraph 4(d)(i), (ii), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(d)(ii) or (iv) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of Paragraph 4(d) shall be canceled by Holdings.

**(e) Affidavit.** In the event of your Termination on or after January 31, 2006, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time or, in the event of Retirement, to repay to Holdings the full gross amounts or shares you received under this Agreement.

LEH-RSU 0000121

**5. DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 31, 2006, you shall be credited with a number of additional Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares with respect to Units are to be issued or delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**7. NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

**8. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the Units, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

**9. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

**10. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with

the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14. WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**15. CODE SECTION 409A.** It is intended that none of the Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment

contract between the person and Holdings or any Subsidiary; failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

**"Retirement"** means a Termination when the person's age plus years of service with Holdings or any Subsidiary equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service.

**"Share Payment Date"** means the earlier of (a) the Maturity Date or (b) the 30th day after the completion of the fiscal quarter following the one-year anniversary of termination of employment.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2005 Lehman Brothers. All Rights Reserved.

# LBHI0048

# LEHMAN BROTHERS



# 2005 EQUITY AWARD PROGRAM
# FOR BONUS-ELIGIBLE AND
# PRODUCTION-BASED EMPLOYEES

LBHI0048

LEH-RSU 0000124

# LEHMAN BROTHERS

## Eligibility

Active employees (both bonus-eligible and production-based) hired on or before November 30, 2005, including employees on an approved leave of absence, are eligible to receive an equity award for 2005. Any bonus-eligible employee whose employment terminates (or who gives notice or is notified of termination) prior to the time when bonuses are paid in January 2006 is not entitled to a 2005 equity award.

If a production-based employee terminates employment prior to November 30, 2005, the 2005 equity award is based on the amount of production-based compensation accrued for the 2005 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level. The disposition of the equity award is subject to the termination provisions on page 8.

Note that eligibility to receive an equity award is subject to a 3-share minimum.

## How the Equity Award Program Works

The Equity Award Program provides members of Lehman Brothers with a direct ownership interest in the Firm, and requires us to hold that stake for at least five years. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. Your 2005 equity award was awarded to you as a portion of your 2005 compensation.

For MDs and SVPs, if you elected to receive stock options in 2005, seventy-five percent of the value of your 2005 equity award was in restricted stock units ("RSUs") and 25 percent was in stock options; for all other employees (as well as MDs and SVPs who did not elect to receive stock options), one hundred percent of the value of your 2005 equity award was in RSUs. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2010. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time, provided you meet certain terms and conditions. The RSUs cannot be sold, traded, or pledged for that five-year period. Any stock options awarded to you as part of the 2005 Equity Award Program will expire on or before November 29, 2015. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

### The Size of Your Award

The details of your 2005 equity award are available on the Personal Award Summary section of the Equity Award Program site on LehmanLive (keyword: EquityAward). The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation and corporate title. Under this schedule, the amount of compensation paid in the form of conditional equity awards (RSUs and stock options, as applicable) increases as total compensation rises.

**Bonus-Eligible Employees:** Your award was based on your 2005 total compensation, which includes salary earned in fiscal year 2005 plus any additional compensation with respect to fiscal year 2005, even if some of these payments are deferred or paid in 2006. Such compensation includes 2005 bonus, commissions, and other compensation.

2005 RSU

LEH-RSU 0000125

# LEHMAN BROTHERS

**Production-Based Employees:**  Similar to bonus-eligible employees, you received a year-end conditional equity award as a portion of your 2005 total compensation.  Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2004 through November 2005 (paid from January through December 2005) after all adjustments.  For 2005, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2005 Equity Award Schedule appears on page 5.)  The 2005 payout may have included regular production payout, certain special payments, and other production payout.  During any period you are paid a draw, equity (in the form of RSUs and/or stock options) may be awarded with respect to the amount of the draw.  If the draw ends and the you have earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued).  Note that for purposes of this communication, all references to payout or compensation assume compensation payments that are equity eligible only.

## The Firm-Provided Discount

The number of RSUs you received for 2005 was based on the closing price of Lehman Brothers common stock on November 30, 2005 ($126.00 per share), less a discount:  30 % for MDs and 25% for all other employees.

For MDs, with a 30 percent discount, every $100 of compensation in RSUs gives you $143 in value; for other employees, with a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value.  The discount really means that the Firm "grosses up" your contribution at the outset.

If you elected stock options for 2005 (MDs and SVPs only), the number of options you received was based on the Black-Scholes value ($46.96) of a 10-year Lehman Brothers option on November 30, 2005, less the applicable discount (30% for MDs and 25% for SVPs).  These options have an exercise price of $126.00 and will expire on or before November 29, 2015.

# Components of the Equity Award

Employees receive a portion of their total compensation in the form of conditional equity awards.  The equity component of total compensation is in a combination of 75% RSUs and 25% stock options (for MDs and SVPs who elected to receive stock options) or 100% in RSUs (for all other employees):

|  | **RSUs** | **Options** |
|---|---|---|
| Grant Date: | November 30, 2005 | November 30, 2005 |
| Market Price: | $126.00 | N/A |
| Exercise Price: | N/A | $126.00 |
| Black-Scholes Value: | N/A | $46.96 |
| Discount: | 30% MDs<br>25% Others | 30% MDs<br>25% SVPs |
| Cost to Employee: | $88.20 (MDs)<br>$94.50 (Others) | $32.87 (MDs)<br>$35.22 (SVPs) |
| Restriction Period: | 5 years | N/A |
| Option Period: | N/A | 10 years |

3

LEH-RSU 0000126

# LEHMAN BROTHERS

## When Will My RSUs Vest?

The vesting provisions of your 2005 RSUs are consistent with last year's RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2005 total compensation before the discount.  The discount portion represents the balance of your RSU award, provided by the Firm.  Your RSUs will vest in accordance with the schedule below:

|        | Principal | Discount |
|--------|-----------|----------|
| **MDs**   | 35% on November 30, 2008<br>35% on November 30, 2010 | 30% on November 30, 2010 |
| **Others** | 75% on November 30, 2007 | 25% on November 30, 2010 |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2010, all of your RSUs will be forfeited.  Please refer to page 9 for the definition of Detrimental Activity.

## When Will My Stock Options Become Exercisable (MDs and SVPs, as applicable)?

You should consider your stock option award as having two components:  the **principal portion** and the **discount portion**. The principal portion represents the number of stock options awarded as part of your 2005 compensation before the discount. The discount portion represents the balance of your stock option award, provided by the Firm.

Your stock options (if elected) will become exercisable in accordance with the schedule below:

|        | Principal | Discount |
|--------|-----------|----------|
| **MDs**   | 35% on November 30, 2008<br>35% on November 30, 2010 | 30% on November 30, 2010 |
| **SVPs**  | 75% on November 30, 2007 | 25% on November 30, 2010 |

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2015, all of your stock options will be forfeited.  Please refer to page 9 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.

2005 RSU

LEH-RSU 0000127

# LEHMAN BROTHERS

## 2005 Equity Award Schedule

The participation schedule for 2005 is listed below. This schedule reflects the equity portion of 2005 total compensation ("TC"). An example of the calculations follows.

### 2005 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $75,000 - $99,999 | 2% of 2005 TC | 2% of 2005 TC | 2% of 2005 TC |
| $100,000 - $199,999 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 | $2,000 plus 6% of 2005 TC over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 | $8,000 plus 10% of 2005 TC over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 | $30,000 plus 16.25% of 2005 TC over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 | $62,500 plus 20% of 2005 TC over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 | $112,500 plus 35% of 2005 TC over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30% of 2005 TC over $1.0 million | $200,000 plus 35% of 2005 TC over $1.0 million | $200,000 plus 44% of 2005 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $310,500 plus 35% of 2005 TC over $1.5 million | $375,000 plus 45% of 2005 TC over $1.5 million | $420,000 plus 56% of 2005 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $485,500 plus 40% of 2005 TC over $2.0 million | $600,000 plus 55% of 2005 TC over $2.0 million | $700,000 plus 60% of 2005 TC over $2.0 million |
| $2,500,000 and up | $685,500 plus 45% of 2005 TC over $2.5 million up to a max of 30% of 2005 TC | 35% of 2005 TC | 40% of 2005 TC |

LEH-RSU 0000128

# LEHMAN BROTHERS

## Award Calculation Example

Using the Equity Award Schedule above, your 2005 equity award was determined at year-end based on your 2005 total compensation.  Sample illustrations are shown below.

|  | **Employees thru VP Level** | **SVPs[1]** | **MDs[1]** |
|---|---|---|---|
| 2005 Total Compensation | $100,000 | $500,000 | $1,000,000 |
| Amount of Compensation in Equity | $2,000 | $62,500 | $200,000 |
| ***Amount of Compensation in RSUs:*** | ***$2,000*** | ***$46,875*** | ***$150,000*** |
| FMV on grant date: | $126.00 | $126.00 | $126.00 |
| Discount: | 25% | 25% | 30% |
| Discounted grant price: | $94.50 | $94.50 | $88.20 |
| Total # of RSUs: | 21 | 496 | 1,701 |
| *Principal Portion:* | *16* | *372* | *1,191* |
| *Discount Portion:* | *5* | *124* | *510* |
| ***Amount of Compensation in Options:*** |  | ***$15,625*** | ***$50,000*** |
| Exercise price on grant date: |  | $126.00 | $126.00 |
| Black-Scholes (B-S) value: |  | $46.96 | $46.96 |
| Discount: | N/A | 25% | 30% |
| Discounted B-S value: |  | $35.22 | $32.87 |
| Total # of Options: |  | 444 | 1,521 |
| *Principal Portion:* |  | *333* | *1,065* |
| *Discount Portion:* |  | *111* | *456* |

Note:  The number of RSUs has been rounded to the nearest whole number for illustrative purposes only.

---

[1] Assumes SVP/MD elected to receive 25% of the 2005 equity award in stock options.

LEH-RSU 0000129

# LEHMAN BROTHERS

## 2005 Monthly Equity Accrual for Production-Based Employees

Below is the monthly calculation for a production-based employee whose total compensation earned for production months December 2004 to November 2005 (paid January to December 2005) is $100,000.

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $7,000 x 12 ÷ 1 | $84,000 |
| Step 2 | Calculate projected award from 2005 Award schedule. | $1,680 | $1,680 |
| Step 3 | Multiply result by allocation %.  Subtract previous month's YTD equity accrual from result.  This is the monthly equity accrual. | ($1,680 x 8.33%) - $0 | $140 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $15,000 x 12 ÷ 2 | $90,000 |
| Step 5 | Calculate projected award from 2005 Award schedule | $1,800 | $1,800 |
| Step 6 | Multiply result by allocation %.  This is the YTD equity accrual.  Subtract previous month's YTD equity accrual from result.  This is the monthly equity accrual. | ($1,800 x 16.67%) - $140 | $160 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|-----------|--------------------|-----------------|------------------------|------------------------|--------------|--------------------|------------------------|
| 1 | January | $7,000 | $7,000 | $84,000 | $1,680 | 8.33% | $140 | $140 |
| 2 | February | 8,000 | 15,000 | 90,000 | 1,800 | 16.67% | 300 | 160 |
| 3 | March | 10,000 | 25,000 | 100,000 | 2,000 | 25.00% | 500 | 200 |
| 4 | April | 7,500 | 32,500 | 97,500 | 1,950 | 33.33% | 650 | 150 |
| 5 | May | 9,500 | 42,000 | 100,800 | 2,048 | 41.67% | 853 | 203 |
| 6 | June | 7,000 | 49,000 | 98,000 | 1,960 | 50.00% | 980 | 127 |
| 7 | July | 7,500 | 56,500 | 96,857 | 1,937 | 58.33% | 1,130 | 150 |
| 8 | August | 10,500 | 67,000 | 100,500 | 2,030 | 66.67% | 1,353 | 223 |
| 9 | September | 8,000 | 75,000 | 100,000 | 2,000 | 75.00% | 1,500 | 147 |
| 10 | October | 8,500 | 83,500 | 100,200 | 2,012 | 83.33% | 1,677 | 177 |
| 11 | November | 6,500 | 90,000 | 98,182 | 1,964 | 91.67% | 1,800 | 123 |
| 12 | December | 10,000 | 100,000 | 100,000 | 2,000 | 100.00% | 2,000 | 200 |
| | **Total** | | | | | | | **$2,000** |

In the example above, $2,000 is the amount of total compensation delivered to the production-based employee in equity.  For calculation of the number of RSUs and/or stock options (including principal and discount portion), see example on page 6.  *Note that if a production-based employee terminates employment prior to November 30, 2005, the 2005 equity award is based on the amount of production-based compensation accrued for the 2005 equity award through the date of termination, in accordance with the Firm's standard formula for the payout of equity-based compensation for employees at the applicable level.  The disposition of the equity award is subject to the termination provisions on page 8.*

LEH-RSU 0000130

# LEHMAN BROTHERS

## Termination Provisions

| | **All Employees** |
|---|---|
| **Voluntary Termination to Non-Competitor** | **RSUs:** Participants remain entitled to the principal portion of their RSU award plus a pro-rata portion of their discount (20% for each full year of employment after November 30, 2005). Shares will be issued on the Share Payment Date (defined as the earlier of the end of the fiscal quarter one year after termination or November 30, 2010), provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| | **Stock Options:** Stock options become exercisable six months after termination and remain exercisable until the later of 5 years from grant, or 6 months after termination (but no later than the expiration date), provided the participant does not engage in Competitive Activity or Detrimental Activity. |
| **Involuntary Termination** | **RSUs:** Participants remain entitled to the principal portion of their award plus a pro-rata portion of the discount (20% for each full year of employment after November 30, 2005). Shares will be issued on the Share Payment Date, provided the participant does not engage in Detrimental Activity. |
| | **Stock Options:** Stock options become exercisable immediately upon termination and remain exercisable until the later of 5 years from grant, or 6 months after termination (but no later than the expiration date), provided the participant does not engage in Detrimental Activity. |
| | **However, in the event of an involuntary termination with Cause, both the principal and discount portions of both RSUs and stock options will be forfeited.** |
| **Voluntary Termination to Competitor** | **RSUs:** Participants forfeit all unvested RSUs. Any remaining shares will be issued on the Share Payment Date, provided the participant does not engage in Detrimental Activity. |
| | **Stock Options:** Any stock options that have not been exercised prior to termination will be forfeited. |
| **Full Career Termination** | **RSUs:** Participants who leave the Firm or are involuntarily terminated without Cause but who qualify under "Full Career" provisions will receive 100% of the RSU discount (in addition to the principal portion) on the Share Payment Date, subject to applicable Competitive Activity and Detrimental Activity provisions. A termination is "Full Career" if: |
| | • The participant has at least 20 years of service, <u>OR</u> |
| | • The participant has at least 10 years of service, is at least 45 years old and the sum of the participant's age plus service is 65 or more |
| | **Stock Options:** All stock options become exercisable under the applicable provisions described above and remain exercisable until the expiration date (November 29, 2015), subject to applicable Competitive Activity and Detrimental Activity provisions. |
| **Death, Disability, Retirement[1]** | **RSUs:** Entire principal and discount vest immediately, and shares of Lehman Brothers common stock will be issued immediately. |
| | **Options:** Entire principal and discount immediately become exercisable and remain exercisable until the expiration date (November 29, 2015). |

---

[1] Retirement means a termination of employment when the person's age plus years of service equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service. Entitlement is subject to applicable Competitive Activity and Detrimental Activity provisions.

2005 RSU

LEH-RSU 0000131

# LEHMAN BROTHERS

# Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2005 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

## Competitive Activity

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, investment banks, commercial banks, small boutique-type firms, asset management companies, mortgage-related companies, private equity firms, and hedge funds, are considered competitors of the Firm for purposes of the Equity Award Program.

While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

## Detrimental Activity

Detrimental Activity means at any time (i) using information received during a person's employment with Holdings or any of its subsidiaries relating to the business affairs of Holdings or any of its subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

LEH-RSU 0000132

# LEHMAN BROTHERS

## Tax Considerations

### Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding. Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

**Note**: Pursuant to current tax law, if you work in more than one tax jurisdiction during the 5-year restriction period (from the date of grant through the conversion date for RSUs) or during the 10-year option period (from the date of grant through the date of exercise), you and/or the Firm may have a tax reporting requirement and/or tax withholding obligation and/or actual tax liability with respect to each such jurisdiction. The income attributed to a specific tax jurisdiction will be calculated for tax withholding and reporting purposes based on the relevant employment period in each location during the applicable period.

| RSUs | Options |
|---|---|
| • No taxation on the award date. | • No taxation on the award date. |
| • Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date. | • When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale price(s) (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options. |
| • This income will be subject to applicable tax withholding. | • This income will be subject to applicable tax withholding. |
| • Special provisions dealing with capital gains will not apply upon conversion to common stock. | • Special provisions dealing with capital gains will not apply when options are exercised. |
| • If you retain your shares after your RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date. | • If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise. |

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.

2005 RSU

LEH-RSU 0000133

# LEHMAN BROTHERS

## Change in Control ("CIC") Provisions

| Reason | RSUs | Options |
|--------|------|---------|
| Hostile | • All RSUs vest immediately.<br>• Shares of Lehman Brothers common stock will be issued immediately. | • All options become immediately exercisable. |
| Friendly | • Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity.<br>• The additional value of the RSUs in excess of the undiscounted RSU award price ("Premium") will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2010 (five years after the award date).<br>• The premium RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | • Half of the non-exercisable options will become immediately exercisable.<br>• The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates:<br>▪ MDs: 35 percent on 11/30/08<br>65 percent on 11/30/10<br>▪ SVPs: 75 percent on 11/30/07<br>25 percent on 11/30/10 |

## Example: Payment of RSUs Upon a Friendly CIC

| | Employees thru VP Level | SVP[1] | MD[1] |
|---|---|---|---|
| FMV of LEH at Grant | $126.00 | $126.00 | $126.00 |
| Discounted Grant Price | $94.50 | $94.50 | $88.20 |
| Amount of Compensation in RSUs | $2,000 | $62,500 | $200,000 |
| Principal RSUs | 16 | 496 | 1,587 |
| Discount RSUs | 5 | 165 | 680 |
| Total Grant Value with Discount | $2,667 | $83,333 | $285,714 |
| | | | |
| **Upon Change in Control** | | | |
| CIC Offer Price | $200.00 | $200.00 | $200.00 |
| Total Value of RSUs at CIC Price | $4,233 | $132,275 | $453,515 |
| Value of RSUs to be Issued | $2,667 | $83,333 | $285,714 |
| # Shares of LEH Issued Upon CIC | 13 | 417 | 1,429 |
| | | | |
| **Premium over Grant Value** | | | |
| *(paid on earlier of 2 years from CIC or November 30, 2010)* | | | |
| Value of Premium | $1,566 | $48,942 | $167,800 |
| Additional Premium RSUs | 8 | 245 | 839 |
| "Principal Premium RSUs" | 6 | 184 | 587 |
| "Discount Premium RSUs" | 2 | 73 | 252 |

---

[1] Assumes SVP/MD elected to receive 100% of the 2005 equity award in RSUs.

2005 RSU

LEH-RSU 0000134

# LEHMAN BROTHERS

## Dividend Equivalents

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs.  Dividends will not be paid on stock option awards.

## Voting Rights

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

## Other Information

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit Award Agreement, the Stock Option Award Agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law.  You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award summary or your award agreement, visit the Equity Award Program site on LehmanLive (keyword:   EquityAward) or contact the Compensation Department at 212-526-8346 (5-8346) or by e-mail at compensation@lehman.com.

2005 RSU

LEH-RSU 0000135

# LBHI0116

PROSPECTUS

# Lehman Brothers Holdings Inc.
## 2005 Stock Incentive Plan
## 95,000,000 Shares of Common Stock

———————————

This Prospectus pertains to shares of Common Stock, par value $.10 per share ("Common Stock"), of Lehman Brothers Holdings Inc. ("Holdings" or, including its subsidiaries, the "Company") to be delivered in connection with awards of restricted stock units and options, and also pertains to awards of Common Stock and other awards that are related to the Common Stock, pursuant to the Holdings 2005 Stock Incentive Plan, as amended (the "Plan"), to selected officers, employees, consultants and directors of the Company.

———————————

THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.

———————————

November 15, 2007

LBHI0116

LEH-RSU 0000172

## DOCUMENTS INCORPORATED BY REFERENCE

The following documents previously filed by Holdings with the Securities and Exchange Commission (the "SEC") pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are hereby incorporated by reference in this Prospectus:

(1) Holdings' Annual Report on Form 10-K for the fiscal year ended November 30, 2006, filed with the SEC on February 13, 2007;

(2) Holdings' Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2007 filed with the SEC on April 9, 2007; for the quarterly period ended May 31, 2007 filed with the SEC on July 10, 2007 and for the quarterly period ended August 31, 2007, filed with the SEC on October 10, 2007;

(3) Holdings' Current Reports on Form 8-K, filed with the SEC since November 30, 2006;

(4) The description of Holdings' Common Stock, as contained in Holdings' Form 8-A Registration Statement, filed with the SEC on April 29, 1994; and

(5) Holdings' 2005 Stock Incentive Plan, as amended, filed as Exhibit 10.2 to Holdings' Current Report on Form 8-K, filed with the SEC on November 15, 2007.

Requests should be directed to the Corporate Secretary's Office, Lehman Brothers Holdings Inc., 1301 Avenue of the Americas, New York, New York 10019 (telephone (212) 526-0858).

## THE PLAN

### General Information

The following description summarizes the main features of the Plan. It is intended to give you a working knowledge of how the Plan operates and your entitlements and obligations thereunder. You should read this Prospectus carefully and in full. The description of the Plan contained in this Prospectus is not meant to interpret, extend, or change the Plan itself in any way.

The Plan is a long-term incentive plan which provides for the granting of stock options ("Options"), stock appreciation rights ("SARs" ), and other awards of Common Stock and awards that are valued in whole or in part by reference to, or otherwise based on the fair market value of Common Stock, including but not limited to restricted stock ("Restricted Stock") and restricted stock units ("RSUs") (collectively, the "Awards"). Awards under the Plan may be made to any employee, prospective employee, director or consultant of Holdings and its affiliates (collectively, "Participants"). The purpose of the Plan is to strengthen Holdings by providing an incentive to such Participants to encourage them to devote their abilities to increase stockholder value and to sustain excellence.

The Board of Directors of Holdings (the "Board of Directors") adopted the original Plan in February 2005, effective as of May 1, 2005. No further Awards shall be granted under the Plan on or after May 1, 2015. The Board of Directors may at any time terminate, amend, modify or suspend the Plan (subject to applicable stockholder approval requirements); provided, however, that no such amendment, modification, suspension or termination shall materially impair or have a material adverse effect upon any Awards theretofore granted under the Plan, except with the consent of the Participant.

The Plan is not subject to the rules and regulations of the Employee Retirement Income Security Act of 1974, as amended.

Additional information about the Plan and its administration may be obtained by writing to the Compensation Department, 1301 Avenue of the Americas, 6th Floor, New York, New York 10019 or by calling (212) 526-8062.

2

LEH-RSU 0000173

## Administration

Features of the Plan are summarized below, but the summary is qualified in its entirety by reference to the full text of the Plan itself. The Plan has been designed to permit it to be administered to grant "performance-based" Awards to executive officers which are intended to qualify for tax deductibility under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code").

The Plan will be administered by the Compensation and Benefits Committee (the "Committee") of the Board of Directors, which is currently comprised exclusively of independent, non-employee Directors. The Committee has discretion to select the individuals to whom Awards will be granted and to determine the type, size and terms of each Award and the authority to administer, construe, implement and interpret the Plan and any Award. The members of the Committee do not serve for fixed periods but may be appointed or removed at any time by the Board of Directors. The Committee has the ability to delegate the authority to grant Awards to officers or employees of the Company to the extent consistent with Rule 16b-3 under the Exchange Act .

The Committee shall have the full and exclusive power and authority to make, and establish the terms and conditions of, any Award to any person eligible to be a Participant, or waive any such terms and conditions at any time, provided, however, the Committee shall not have such power and authority to accelerate or otherwise provide for the times at which shares of Common Stock with respect to any Award are delivered if any Award is subject to Section 409A of the Code in a manner that would result in  the imposition upon any Participant of an additional tax under Section 409A of the Code, and provided further, in the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, a Participant is deemed to be a "specified employee" (within the meaning of Section 409A of the Code), payments and/or deliveries of shares of Common Stock in respect of any Award subject to Section 409A of the Code shall not be made prior to the date which is six months after the date of such Participant's separation from service from the Company and all its subsidiaries, to the extent required under Section 409A of the Code and the regulations promulgated thereunder. Without limiting the foregoing, the Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award agreements, and to enter into non-uniform and selective Award agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's employment has been terminated for purposes of the Plan and (iv) any adjustments to be made to Awards.

## Stock Subject to the Plan

A total of 95 million shares of Common Stock are subject to Awards under the Plan, subject to adjustment in accordance with the terms of the Plan. In addition, shares of Common Stock authorized for issuance under the Holdings 1996 Management Ownership Plan and the Holdings Employee Incentive Plan, each of which terminated according to its terms in 2006, that remained unawarded upon the expiration of those plans are available for Awards under the Plan, as well as the shares that are otherwise reacquired or not payable or issuable by Holdings as described below. The shares of Common Stock issuable under the Plan may be authorized and unissued shares of Common Stock, authorized and issued shares of Common Stock held in Holdings' treasury, or any combination thereof. If any shares of Common Stock subject to repurchase or forfeiture rights under an award that has been granted under the Plan, the Holdings 1996 Management Ownership Plan or the Holdings Employee Incentive Plan are reacquired by Holdings, or if any shares of Common Stock are withheld or delivered pursuant to the terms of the Plan in payment of any applicable exercise price or tax withholding obligation, or if any award relating to shares of Common Stock under any of such plans is canceled, terminates or expires unexercised (except with respect to a stock option that terminates on the exercise of a stock appreciation right) or, for any other reason is not payable, the shares of Common Stock which were issued or would have been issuable pursuant thereto will again become available for the purpose of granting Awards. In any calendar year, no individual Participant may receive Options, SARs or other stock-based Awards under the Plan attributable to more than four million shares of Common Stock, subject to adjustment in accordance with the terms of the Plan.

3

Except as otherwise provided in a Participant's Award agreement, no Participant (or other person having rights pursuant to an Award) shall have any of the rights of a shareholder of the Company with respect to shares of Common Stock subject to an Award until the delivery of such shares of Common Stock.

**Awards**

Set forth below are certain types of Awards which may be granted under the Plan.

*Stock Options.* An Option, which may be a non-qualified stock option ("NQSO") or an incentive stock option ("ISO") under Section 422 of the Code, is the right to purchase a specified number of shares of Common Stock at a price (the "Option Price") fixed by the Committee. The Option Price of an Option may be no less than the fair market value of the underlying Common Stock on the date of grant.

Unless otherwise provided in an optionee's Award agreement, options are not transferable during the Participant's lifetime. In no event shall an Option be exercisable more than ten years after the date it is granted. Options become exercisable at such times and in such installments as the Committee shall determine. The Committee may also accelerate the period for exercise of any or all Options held by a Participant. Payment of the Option Price must be made in full at the time of exercise of the Option by any of the following methods, at the election of the Committee: (i) in cash; (ii) by tendering to Holdings shares of Common Stock having a fair market value equal to the Option Price, which shares have been held by the Participant for at least six months and which meet such other requirements as may be imposed by the Committee; (iii) partly in cash and partly in Common Stock; (iv) by certain withholding methods that constitute a cashless exercise through the delivery of irrevocable instructions by the Participant to a broker to sell the Common Stock received upon exercise of the Option and to deliver promptly to Holdings an amount out of the proceeds equal to the aggregate Option Price; or (v) by other means that the Committee deems appropriate.

*Stock Appreciation Rights.* A SAR may be granted alone or in tandem with an Option. If granted in tandem with an Option, the SAR must cover the same (or a fewer) number of shares of Common Stock covered by the related Option and will be generally subject to the same terms and conditions as the related Option. Upon exercise, a SAR will entitle the Participant to receive from Holdings an amount equal to the excess of the fair market value of a share of Common Stock on the date of exercise of the SAR minus the per SAR exercise price (or Option Price, as applicable), multiplied by the number of shares of Common Stock with respect to which the SAR is exercised. Upon the exercise of a SAR granted in connection with an Option, the related Option will be canceled to the extent of the number of shares as to which the SAR is exercised, and upon the exercise of the Option granted in connection with a SAR or the surrender of such Option, the related SAR will be canceled to the extent of the number of shares as to which the Option is exercised or surrendered. The Committee will determine whether the SAR will be settled in cash, Common Stock or a combination of cash and Common Stock.

*Other Stock Based Awards.* Other Awards of Common Stock and Awards that are valued in whole or in part by reference to, or otherwise based on the fair market value of Common Stock (all such Awards being referred to herein as "Other Stock-based Awards"), may be granted under the Plan in the discretion of the Committee. Other Stock-based Awards will be in such form as the Committee will determine, including without limitation, (i) the right to purchase shares of Common Stock, (ii) shares of Common Stock subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, (iii) shares of Common Stock issuable upon the completion of a specified period of service, the occurrence of an event, or the attainment of performance objectives, each as specified by the Committee, and (iv) dividend equivalent rights with respect to Common Stock subject to any Award. Any Other Stock-based Awards that are granted subject to the completion of a specified period of service by the Participant that are (i) not in lieu of cash compensation to employees generally, (ii) not paid to recruit a new employee in an amount less than 5% of the total Awards available for grant under the Plan or (iii) not subject to the attainment of performance objectives, will provide that vesting, restrictions on transfer, or some other comparable restriction that encourages continued performance of the Participant, will in any such case be

4

for a period of not less than three years (although vesting or lapsing of restrictions may occur in installments over such period), unless there is a "Change in Control" of Holdings (as defined in the Plan) or the Participant retires, becomes disabled or dies. Other Stock-based Awards may be granted alone or in addition to any other Awards made under the Plan.

With respect to any RSUs granted under the Plan, the obligations of the Company are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Award agreement, and in no event will the Company become obligated to pay cash in respect of such obligation (except that the Company may pay to the Participant amounts in cash in respect of a RSU equal to cash dividends paid to a holder of the same number of shares of Common Stock that are subject to the RSU, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

The Committee may establish performance objectives that must be attained in order for Holdings to make payments pursuant to Other Stock-based Awards. Accordingly, unless the Committee determines at the time of grant not to qualify such award as performance-based compensation under Section 162(m) of the Code, the performance objectives for such Other Stock-based Awards made under the Plan will be based upon one or more of the following criteria: (i) pre-tax income or net income; (ii) earnings per share; (iii) book value per share; (iv) stock price; (v) return on equity; (vi) expense management; (vii) return on investment; (viii) improvements in capitalization; (ix) profitability of an identifiable business unit or product; (x) profit margins; (xi) budget comparisons; (xii) total return to stockholders; (xiii) net revenue; and (xiv) economic value added. The Committee must certify as to the attainment of the applicable performance goals prior to payment of any Other Stock-based Award, and may reduce the amount of any Other Stock-based Award. Subject to the provisions of the Plan, the Committee will have sole and absolute discretion to determine to whom and when such Other Stock-based Awards will be made, the number of shares of Common Stock to be awarded under (or otherwise related to) such Other Stock-based Awards, and all other terms and conditions of such Awards. The Committee will determine whether Other Stock-based Awards will be settled in cash, Common Stock or a combination of cash and Common Stock. The maximum amount of Other Stock-based Awards that may be granted during any calendar year to any Participant in the Plan will be (i) with respect to Other Stock-based Awards that are denominated or payable in Common Stock, four million shares of Common Stock, and (ii) with respect to Other Stock-based Awards that are not denominated or payable in Common Stock, $50 million.

*Additional Information.* Under the Plan, if there is any change in the outstanding shares of Common Stock by reason of any stock dividend or split, reorganization, recapitalization, merger, consolidation, spin-off, combination or transaction or exchange of shares of Common Stock or other corporate exchange, or any distribution to shareholders of shares of Common Stock other than regular cash dividends, or any transaction similar to the foregoing, the Committee in its sole discretion and without liability to any person may make such substitution or adjustment, if any, as it deems to be equitable, as to the number or kind of securities that may be issued under the Plan and in the terms of outstanding Awards. The Committee may waive any terms and conditions of an Award, including accelerating or waiving any vesting conditions on an Award. If a Change in Control, as defined below, occurs, the Committee may, but is not required to, (i) accelerate or waive vesting or exercise periods or the lapse of restrictions on all or any portion of any Award, (ii) cancel the Awards for fair value (as determined in the discretion of the Committee), (iii) provide for the issuance of substitute Awards that will substantially preserve the terms of the original Awards or (iv) provide for the full exercisability of Options or SARs for a period of at least 30 days prior to the occurrence of the Change in Control.

In general, with respect to any Award granted on or prior to November 8, 2007, a "Change in Control" is deemed to occur when: (i) 20% or more of the combined voting power of Holdings' voting securities is acquired in certain instances (whether through a tender offer, merger, or otherwise); (ii) individuals who, as of the effective date of the Plan, are members of the Board of Directors or whose election or nomination is approved by a vote of at least two-thirds of such initial directors (the "Incumbent Board") cease, subject to certain exceptions, to constitute at least a majority of the Board of Directors; (iii) a merger, consolidation, recapitalization or reorganization involving Holdings occurs, whereby the stockholders immediately prior to such transaction cease to hold at least 50% of the combined voting power

LEH-RSU 0000176

of the outstanding voting securities of the corporation resulting from such transaction, members of the Incumbent Board immediately prior to the execution of the agreement providing for such transaction cease to constitute at least a 50% of the board of directors of the resulting corporation, or a person or entity becomes the beneficial owner of 20% or more of the combined voting power of the resulting corporation; (iv) a liquidation of Holdings or a sale or other disposition of all or substantially all of the assets of Holdings; or (v) any event occurs that would constitute a "Change in Control" within the meaning of such term with respect to any Award granted after November 8, 2007.

However, with respect to any Award granted after November 8, 2007, a "Change in Control" is deemed to occur when: (i) 70% or more of the combined voting power of Holdings' voting securities is acquired in certain instances (whether through a tender offer, merger, or otherwise); (ii) a merger, consolidation, recapitalization or reorganization involving Holdings occurs, whereby the stockholders immediately prior to such transaction cease to hold at least 30% of the combined voting power of the outstanding voting securities of the corporation resulting from such transaction, the individuals who were members of the Board of Directors immediately prior to the execution of the agreement providing for such transaction cease to constitute at least 50% of the board of directors of the resulting corporation, or a person or entity becomes the beneficial owner of 70% or more of the combined voting power of the resulting corporation; (iii) within a consecutive twelve month period, a majority of the individuals who are members of the Board of Directors are replaced with individuals who do not receive endorsement by a majority of the Board of Directors before the date of the appointment or election of such individuals; or (iv) a sale or other disposition of all or substantially all of the assets of Holdings.

Holdings shall require payment of any amount it may determine to be necessary to withhold for federal, state, local or other taxes or to otherwise satisfy any tax obligations due as a result of the exercise, grant, vesting of, or payment pursuant to, an Award. Unless the Committee specifies otherwise, the Participant may elect to pay a portion or all of such withholding or other taxes by (i) delivery, in cash or by check, (ii) delivery in shares of Common Stock or (iii) having shares of Common Stock withheld by Holdings with a market value equal to the minimum statutory withholding rate from any shares of Common Stock that would have otherwise been received by the Participant.

Unless otherwise determined by the Committee or as otherwise set forth in any Award, an Award shall not be transferable or assignable by a Participant otherwise than by will or by the laws of descent and distribution. No person shall have any claim or right to the grant of an Award, and the grant of an Award shall not be construed as giving a Participant the right to be retained in the employment of the Company or any of its subsidiaries or to be eligible for any subsequent Awards. A Participant's rights under and interests in the Plan may be forfeited if such Participant ceases to be employed by the Company.

The Committee or the Board may amend or terminate the Plan or any portion hereof at any time, subject to the following restrictions: (a) that no amendment to the Plan shall be made without approval of the stockholders which shall (i) increase (except as provided in the third preceding paragraph) shares of Common Stock or the percentage of shares of Common Stock reserved for issuance pursuant to the Plan; (ii) change the class of employees eligible to be Participants in the Plan; or (iii) extend the date after which Awards cannot be granted under the Plan and (b) no amendment may be made without the consent of a participant if the amendment would diminish the rights of the participant under any Award previously granted to that participant. However, the Committee may amend the Plan as it deems necessary to permit the grant of Awards meeting the requirements of applicable laws.

**Possible Restrictions on Resale**

The Plan shall be administered to comply with the Securities Act of 1933, as amended (the "Securities Act"), and the Exchange Act. Reoffers or resales of Common Stock acquired by an individual under the Plan who may be deemed an "affiliate" of Holdings (that is, generally, a director or executive officer of Holdings or a person who directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, Holdings) must be made only (i) pursuant to a "reoffer prospectus" complying with the provisions of the Securities Act and the rules and regulations thereunder,

LEH-RSU 0000177

(ii) in compliance with Rule 144 under the Securities Act, or (iii) in a transaction otherwise exempt from the registration provisions of the Securities Act.

Common Stock acquired pursuant to the Plan by all other individuals is not restricted and may be resold through normal securities market channels.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF AWARDS

Certain of the federal income tax consequences to recipients of Awards and their employers should generally be as set forth in the following summary. For purposes of this discussion, the term "employer" shall be deemed to include the employer of an employee receiving an Award and the taxpayer for whom a non-employee Award recipient performs services. The following is a summary of United States federal income tax rules currently applicable to the Plan and the Awards that may affect the income tax consequences of Participants and employers who are United States taxpayers. This is only a summary and is not intended to be a complete description of all possible tax consequences under the current provisions of the Code. You should consult with your personal tax advisor concerning the federal, state, local or other tax implications of the Plan and of the Awards before making any decision with respect to your Awards.

*Options*

An employee to whom an ISO is granted will not recognize income at the time of grant or exercise of such Option. No federal income tax deduction will be allowable to the employee's employer upon the grant or exercise of such ISO. However, upon the exercise of an ISO, special alternative minimum tax rules apply for the employee. When the employee sells such shares more than one year after the date of transfer of such shares and more than two years after the date of grant of such ISO, the employee will normally recognize a long-term capital gain or loss, as the case may be, equal to the difference, if any, between the sale prices of such shares and the Option exercise price. If the employee does not hold such shares for this period, when the employee sells such shares, the employee will recognize ordinary compensation income and possibly capital gain or loss in such amounts as are prescribed by the Code and regulations thereunder.

A Participant to whom a NQSO is granted will not recognize income at the time of grant of such Option. When such Participant exercises such NQSO, the Participant will recognize ordinary compensation income equal to the excess of the fair market value, as of the date of Option exercise, of the share the Participant receives over the Option Price. Generally, the tax basis of such shares to such Participant will be equal to the Option Price paid plus the amount includable in the optionee's gross income, and the Participant's holding period for such shares will commence on the date after such exercise. However, where the Participant uses shares to exercise the Option, a number of shares equal to the shares used to exercise the Option will retain their original basis and holding period, the Participant's basis in the remaining shares will be their fair market value on the date of Option exercise, and the Participant's holding period for such shares will commence on the date after such exercise. When the employee sells any shares, the employee will recognize short-term or long-term capital gain or loss, as the case may be, depending on the holding period, equal to the difference, if any, between the sale prices of such shares and the tax basis of such shares.

*Restricted Stock*

Unless an election is made by the Participant under Section 83(b) of the Code, the grant of an Award of Restricted Stock will have no immediate tax consequences to the Participant. Generally, upon the lapse of restrictions (as determined by the applicable restricted stock agreement between the Participant and Holdings), a Participant will recognize ordinary income in an amount equal to the product of (i) the fair market value of a share of Common Stock on the date an which the restrictions lapse, less any amount paid with respect to the Award of Restricted Stock, multiplied by (ii) the number of shares of Restricted Stock with respect to which restrictions lapse on such date. The Participant's tax basis will be equal to the sum of the amount of ordinary income recognized upon the lapse of restrictions and any amount paid for such Restricted Stock. The participant's holding period will commence on the date on which the restrictions lapse.

7

A Participant may make an election under Section 83(b) of the Code within 30 days after the date of transfer of an Award of Restricted Stock to recognize ordinary income on the date of award based an the fair market value of Common Stock on such date. An employee making such an election will have a tax basis in the shares of Restricted Stock equal to the sum of the amount the employee recognizes as ordinary income and any amount paid for such Restricted Stock, and the employee's holding period for such Restricted Stock for tax purposes will commence an the date after such date.

With respect to shares of Restricted Stock upon which restrictions have lapsed, when the employee sells such shares, the employee will recognize capital gain or loss consistent with the treatment of the sale of shares received upon the exercise of NQSOs, as described above.

*Restricted Stock Units*

A Participant to whom an RSU is granted will not recognize income at the time of grant of such RSU. Upon delivery of shares of Common Stock in respect of an RSU, a Participant will recognize ordinary income in an amount equal to the product of (i) the fair market value of a share of Common Stock an the date on which the Common Stock is delivered, multiplied by (ii) the number of shares of Common Stock delivered.

Any dividends or dividend equivalents payable in respect of Restricted Stock or RSUs shall be taxable as ordinary income to the Participant upon receipt thereof.

*Other Stock-based Awards*

With respect to Other Stock-based Awards paid in cash or Common Stock, Participants will generally recognize income equal to the fair market value of the Award on the date on which the Award is delivered to the recipient.

*Code Section 409A*

The American Jobs Creation Act of 2004 introduced a new section of the Code (Section 409A) covering certain nonqualified deferred compensation arrangements. Section 409A generally establishes new rules that must be followed with respect to covered deferred compensation arrangements in order to avoid the imposition of an additional 20% tax (plus interest) upon the service provider who is entitled to receive the deferred compensation. Certain Awards that may be granted under the Plan may constitute "deferred compensation" within the meaning of and subject to Section 409A. While the Committee intends to administer and operate the Plan and establish terms (or make required amendments) with respect to Awards subject to Section 409A in a manner that will avoid the imposition of additional taxation under Section 409A upon a Participant, there can be no assurance that additional taxation under Section 409A will be avoided in all cases. In the event the Company is required to delay delivery of shares or any other payment under an Award in order to avoid the imposition of an additional tax under Section 409A, the Company will deliver such shares (or make such payment) on the first day that would not result in the Participant incurring any tax liability under Section 409A. The Committee may amend the Plan and outstanding Awards to preserve the intended benefits of Awards granted under the Plan and to avoid the imposition of an additional tax under Section 409A of the Code.

*General*

Ordinary income recognized by virtue of the exercise of NQSOs, the lapse of restrictions on Restricted Stock or RSUs or payments made in cash or shares of Common Stock is subject to applicable tax withholding as required by law.

Holdings generally will be entitled to a federal tax deduction to the extent permitted by the Code at the time and in the amount that ordinary income is recognized by Participants.

The discussion set forth above does not purport to be a complete analysis of all potential tax consequences relevant to recipients of Options or other Awards or to their employers or to describe tax

LEH-RSU 0000179

consequences based on particular circumstances. It is based on federal income tax law and interpretational authorities as of the date of this Prospectus, which are subject to change at any time. Each holder of an Option or other Award under the Plan should consult the holder's own accountant, legal counsel or other financial advisor regarding the tax consequences of participation in the Plan.

## LEGAL OPINIONS

The validity of the Common Stock offered hereby has been passed upon for Holdings by Karen Corrigan, Vice President and Assistant Secretary of Holdings.

## INDEPENDENT ACCOUNTANTS

The consolidated financial statements and financial statement schedule of the Company as of November 30, 2006, and for each of the years in the three-year period ended November 30, 2006, and management's assessment of the effectiveness of internal control over financial reporting as of November 30, 2006 of the Company have been audited by Ernst & Young LLP, independent certified public accountants, as set forth in their reports thereon appearing in the Company's annual report on Form 10-K for the year ended November 30, 2006 and incorporated herein by reference. The consolidated financial statements of the Company referred to above are incorporated by reference in this prospectus in reliance upon such report given on the authority of Ernst & Young LLP as experts in accounting and auditing. To the extent that Ernst & Young LLP audits and reports on the Company's consolidated financial statements and management's assessment of internal control over financial reporting issued at future dates, and consents to the use of their reports thereon, such consolidated financial statements and management's assessment of internal control over financial reporting also will be incorporated by reference in this prospectus in reliance upon their reports given on said authority.

LEH-RSU 0000180

No dealer, salesperson or other person has been authorized to give any information or to make any representations not contained in this Prospectus and, if given or made, such information or representations must not be relied upon as having been authorized by Holdings or any agent or underwriter. This Prospectus does not constitute an offer of any securities other than those to which it relates or an offer to sell, or a solicitation of an offer to buy, to any person to whom it is unlawful to make such offer in any jurisdiction where such offer or solicitation would be unlawful. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that the information contained herein is correct as of any time subsequent to the date hereof.

---

# Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan

## 95,000,000 Shares of Common Stock

### TABLE OF CONTENTS

**Page**

DOCUMENTS INCORPORATED BY REFERENCE ...............................................2
THE PLAN.........................................................2
CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF AWARDS ............7
LEGAL OPINIONS .........................................9
INDEPENDENT ACCOUNTANTS.................9

---

## PROSPECTUS

November 15, 2007

---

LEH-RSU 0000181

# LBHI0117

### LEHMAN BROTHERS HOLDINGS INC.
### 1996 MANAGEMENT OWNERSHIP PLAN
### As amended through November 8, 2007

## SECTION 1 — PURPOSE

The purpose of the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan (the "Plan") is to strengthen Lehman Brothers Holdings Inc. (the "Company") by providing selected employees of the Company with the opportunity to acquire a proprietary and vested interest in the growth and performance of the Company, thus generating an increased incentive to contribute to the Company's future success and prosperity, enhancing the value of the Company for the benefit of stockholders, and enhancing the Company's ability to attract and retain individuals of exceptional talent.

The purposes of the Plan are to be achieved through the grant of various types of stock-based awards.

## SECTION 2 — DEFINITIONS

For purposes of the Plan, the capitalized terms shall have the meanings ascribed to them in Exhibit A hereof.

## SECTION 3 — SHARES SUBJECT TO THE PLAN

(a)   Shares of Common Stock which may be issued under the Plan may be either authorized and unissued shares of Common Stock or authorized and issued shares of Common Stock held in the Company's treasury, or any combination thereof. Subject to adjustment as provided in Section 14, the number of shares of Common Stock with respect to which Awards (whether distributable in shares of Common Stock or in cash) may be granted under the Plan shall be 42 million shares. The maximum number of shares of Common Stock available for stock options, stock appreciation rights or Other Stock-based Awards that may be granted to a Participant during a calendar year shall not exceed two million.

(b)   Notwithstanding the last sentence of Section 3(a), to the extent that the number of shares of Common Stock with respect to which Awards may be granted under the Plan to an individual in any calendar year exceeds the number of shares of Common Stock with respect to which Awards were granted under the Plan during that calendar year, such excess shall be available for grant under the Plan in succeeding calendar years.

(c)   In the event that any other Award subject to repurchase or forfeiture rights is reacquired by the Company or if any Award is canceled, terminates or expires unexercised (except with respect to a stock option which terminates on the exercise of a stock appreciation right) for any reason under the Plan, any Common Stock allocated in connection with such Award shall thereafter again be available for grant pursuant to the Plan.

## SECTION 4 — ELIGIBILITY

Members of the Corporate Management Committee and the Operating Committee (and successor entities of such committees), all Senior Vice Presidents, all Managing Directors and officers holding a title senior to Managing Director are eligible to be Participants in the Plan.

## SECTION 5 — ADMINISTRATION

The Plan shall be administered by the Committee, which shall have the power to select those Participants who shall receive Awards and to determine the terms of such Awards. As to the selection of, and the terms of Awards granted to, Participants who are not Executive Officers, the Committee may delegate any or all of its responsibilities to officers or employees of the Company. With respect to any "Covered Employee" (as such term is defined in Section 162(m) of the Code), the Committee shall administer the Plan in such a manner as to comply with the requirements for deductibility under Section 162(m) of the Code.

The Committee's authority hereunder shall include, without limitation, the establishment of vesting schedules or exercisability in installments with respect to Awards. The Committee may, in its sole discretion, accelerate or waive

LBHI0117

LEH-RSU 0000237

vesting or exercise periods or the lapse of restrictions on all or any portion of any Award, or extend the exercisability (including to extend or provide for post-termination exercisability) of stock options or stock appreciation rights; provided that such exercisability shall not extend past ten years from the date of grant of any incentive stock options.

Subject to the provisions of the Plan, the Committee shall be authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware and applicable Federal law.

## SECTION 6 — STOCK OPTIONS

(a)   Any stock options granted under the Plan shall be in such form as the Committee may from time to time approve and shall be subject to the terms and conditions provided herein and such additional terms and conditions not inconsistent with the terms of the Plan as the Committee shall deem desirable.

(b)   Stock options may be granted to any Participant. Each grant of stock options shall specify whether the underlying options are intended to be incentive stock options or non-incentive stock options. In the case of incentive stock options, the terms and conditions of such grants shall be subject to and comply with such requirements as may be prescribed by Section 422(b) of the Code, as from time to time amended, and any implementing regulations, including, but not limited to, the requirement that such stock options are exercisable during the Participant's lifetime only by such Participant. The Committee shall establish the option price at the time each stock option is granted, which price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant.

(c)   No stock options may be exercisable later than ten years after their date of grant. The option price of each share of Common Stock as to which a stock option is exercised shall be paid in full at the time of such exercise or as otherwise permitted by the Committee. Such payment may be made at the sole discretion of the Committee, pursuant to and in accordance with criteria and guidelines established by the Committee (which criteria and guidelines may be different for Executive Officers and for other Participants), as the same may be modified from time to time, (i) in cash (in any form of currency acceptable to the Committee), (ii) by tender of shares of Common Stock already owned by the Participant, valued at Fair Market Value as of the date of exercise, (iii) if authorized by the Committee, by withholding pursuant to the election of the Participant, which election is subject to the disapproval of the Committee, from those shares that would otherwise be obtained upon exercise of the option a number of shares having a Fair Market Value equal to the option price, (iv) if authorized by the Committee, and in combination with services rendered by the exercising Participant, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by the Company to, (a) sell shares of Common Stock subject to the option and to deliver promptly to the Company a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to the Company the loan proceeds, at the time of exercise to pay the option price, (v) by any combination of (i), (ii), (iii) or (iv) above or (vi) by other means that the Committee deems appropriate.

(d)   A stock option holder may, in the discretion of the Committee, have the right to surrender a stock option or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of unexercised shares of Common Stock under the option which are being surrendered multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90-day period preceding such Change in Control, over (ii) the purchase price of the option as set forth in the underlying option agreement (the foregoing, a "Limited SAR").

LEH-RSU 0000238

## SECTION 7 — STOCK APPRECIATION RIGHTS

(a)    Stock appreciation rights may be granted independent of any stock option or in conjunction with all or any part of any stock option granted under the Plan, either at the same time as the stock option is granted or at any later time during the term of the option. Stock appreciation rights shall be subject to such terms and conditions as determined by the Committee, not inconsistent with the provisions of the Plan.

(b)    Upon exercise, a stock appreciation right shall entitle the Participant to receive from the Company an amount equal to the excess of the Fair Market Value of a share of Common Stock on the date of exercise of the stock appreciation right over the per share grant or option price, as applicable (or such lesser amount as the Committee may determine at the time of grant), multiplied by the number of shares of Common Stock with respect to which the stock appreciation right is exercised. Upon the exercise of a stock appreciation right granted in connection with a stock option, the stock option shall be canceled to the extent of the number of shares as to which the stock appreciation right is exercised, and upon the exercise of a stock option granted in connection with a stock appreciation right or the surrender of such stock option, the stock appreciation right shall be canceled to the extent of the number of shares as to which the stock option is exercised or surrendered. The Committee shall determine whether the stock appreciation right shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(c)    A holder of a stock appreciation right may, in the discretion of the Committee, have the right to surrender the stock appreciation right or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of shares of Common Stock under the stock appreciation right which are being exercised, multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90 day period preceding such Change in Control, over (ii) the per share grant price of the stock appreciation right as set forth in the underlying agreement.

## SECTION 8 — OTHER STOCK-BASED AWARDS

(a)    Other Awards of Common Stock and Awards that are valued in whole or in part by reference to, or otherwise based on, the Fair Market Value of Common Stock (all such Awards being referred to herein as "Other Stock-based Awards"), may be granted under the Plan in the discretion of the Committee. Other Stock-based Awards shall be in such form as the Committee shall determine, including without limitation, (i) the right to purchase shares of Common Stock, (ii) shares of Common Stock subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, and (iii) shares of Common Stock issuable upon the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee. Other Stock-based Awards may be granted alone or in addition to any other Awards made under the Plan. All references in the preceding sentence to "specified period of service," in the case of Other Stock-based Awards which (i) are not in lieu of cash compensation to employees generally, (ii) are not paid to recruit a new employee in an amount of less than 5% of the total awards available for grant under the Plan or (iii) are not subject to the attainment of performance objectives, shall provide that vesting, restrictions on transfer or some other comparable restriction which incents continued performance of the recipient, will be for a period of not less than three years (although vesting or lapsing may occur in tranches over the three years), unless there is a Change in Control or the recipient retires, becomes disabled or dies. Subject to the provisions of the Plan, the Committee shall have sole and absolute discretion to determine to whom and when such Other Stock-based Awards will be made, the number of shares of Common Stock to be awarded under (or otherwise related to) such Other Stock-based Awards and all other terms and conditions of such Awards. The Committee shall determine whether Other Stock-based Awards shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(b)    With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary may pay to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of

LEH-RSU 0000239

Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

(c)    The Committee shall establish the performance objective that must be attained in order for the Company to grant other Other Stock-based Awards. Accordingly, unless the Committee determines at the time of grant not to qualify the award as performance based compensation under Section 162(m) of the Code, the performance objectives for awards made under the Plan will be based upon one or more of the following criteria: (i) before or after tax net income; (ii) earnings per share; (iii) book value per share; (iv) stock price; (v) return on stockholders' equity; (vi) the relative performance of peer group companies; (vii) expense management; (viii) return on investment; (ix) improvements in capital structure; (x) profitability of an identifiable business unit or product; (xi) profit margins; (xii) budget comparison; and (xiii) total return to stockholders. Participants who have primary responsibility for a business unit of the Company may be measured on business unit operating profit, business unit operating profit as a percent of revenue, and/or measures related to business unit profitability above its cost of capital, in place of some or all of the corporate performance measures. The Committee must certify as to the attainment of the applicable performance goals prior to payment of any Other Stock-based Awards and may reduce the amount of any Other Stock-based Award.

## SECTION 9 — DIVIDENDS, EQUIVALENTS AND VOTING RIGHTS

Awards other than stock options and stock appreciation rights may, at the discretion of the Committee, provide the Participant with dividends or dividend equivalents and voting rights prior to either vesting or earnout.

## SECTION 10 — AWARD AGREEMENTS

Each Award under the Plan shall be evidenced by an agreement setting forth the terms and conditions, not inconsistent with the provisions of the Plan, as determined by the Committee, which shall apply to such Award.

## SECTION 11 — WITHHOLDING

The Company shall have the right to deduct from all amounts paid to any Participant in cash (whether under this Plan or otherwise) any taxes required by law to be withheld therefrom. In the case of payments of Awards in the form of Common Stock, at the Committee's discretion, the Participant may be required to pay to the Company the amount of any taxes required to be withheld with respect to such Common Stock, or, in lieu thereof, the Company shall have the right to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld. Without limiting the foregoing, the Committee may, in its discretion and subject to such conditions as it shall impose, permit share withholding to be done at the Participant's election.

## SECTION 12 — NON-TRANSFERABILITY

No Award shall be assignable or transferable, and no right or interest of any Participant in any Award shall be subject to any lien, obligation or liability of the Participant, except by will, the laws of descent and distribution, or as otherwise set forth in the Award agreement.

## SECTION 13 — NO RIGHT TO EMPLOYMENT OR CONTINUED PARTICIPATION IN PLAN/NO RIGHTS AS STOCKHOLDERS

(a)    No person shall have any claim or right to the grant of an Award, and the grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or to be eligible for any subsequent Awards. Further, the Company expressly reserves the right at any time to dismiss a Participant free from any liability or any claim under the Plan, except as provided herein or in any agreement entered into hereunder.

(b)    The grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder.

LEH-RSU 0000240

## SECTION 14 — ADJUSTMENT OF AND CHANGES IN COMMON STOCK

In the event of any change in the outstanding shares of Common Stock by reason of any Common Stock dividend or split, recapitalization, merger, consolidation, spin-off, combination or exchange of shares or other corporate exchange, or any distribution to stockholders of Common Stock other than regular cash dividends, the Committee shall make a substitution or adjustment to the number or kind of shares of Common Stock or other securities issued or reserved for issuance pursuant to the Plan, and to outstanding Awards, as well as the option price or other affected terms of such Awards as in its judgment shall be necessary to preserve the Participant's rights substantially proportionate to the rights existing prior to such event.

Unless otherwise provided in an award agreement, after a merger of one or more corporations into the Company or after a consolidation of the Company and one or more corporations (a "Merger Event") in which the Company shall be the surviving or resulting corporation, an Award holder shall, where applicable, at the same cost, be entitled upon the exercise of an Award, to receive (subject to any action required by stockholders) such securities of the surviving or resulting corporation as shall be equivalent to the shares underlying such Award as nearly as practicable to the nearest whole number and class of shares of stock or other securities.

Unless otherwise provided in an award agreement, if the Company enters into any agreement with respect to any transaction which would, if consummated, result in a Merger Event in which the Company will not be the surviving corporation, the Committee in its sole discretion and without liability to any person shall determine what actions shall be taken with respect to outstanding Awards, if any, including, without limitation, the payment of a cash amount in exchange for the cancellation of an Award or the requiring of the issuance of substitute Awards that will substantially preserve the value, rights and benefits of any affected Awards previously granted hereunder as of the date of the consummation of the Merger Event.

## SECTION 15 — AMENDMENT

The Committee or the Board may amend, suspend or terminate the Plan or any portion hereof at any time, provided that no amendment shall be made without approval of the stockholders of the Company which shall (i) increase (except as provided in Section 14 hereof) the total number of shares or the percentage of shares reserved for issuance pursuant to the Plan; (ii) change the class of Employees eligible to be Participants; (iii) extend the date after which Awards cannot be granted under the Plan; or (iv) materially increase the benefits to any participant or group of participants covered by the Plan without approval by the stockholders of the Company.

## SECTION 16 — UNFUNDED STATUS OF PLAN

The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any payments not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or payments in lieu thereof or with respect to options, stock appreciation rights and other Awards under the Plan; provided, however, that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan.

## SECTION 17 — EFFECTIVE DATE

Subject to approval of the stockholders of the Company, in accordance with Rule 16b-3 under the Securities Exchange Act of 1934, and Code Sections 162(m) and 422, this Plan shall be effective on April 10, 1996. No Awards may be granted under the Plan on or after January 10, 2006.

## SECTION 18 — SECTION 409A

Notwithstanding other provisions of the Plan or any Award agreements thereunder, no Award shall be granted, deferred, accelerated, extended, paid out or modified under this Plan in a manner that would result in the imposition of an additional tax under Section 409A of the Code upon a Participant.  In the event that it is reasonably determined

LEH-RSU 0000241

by the Committee that, as a result of Section 409A of the Code, payments or deliveries of shares in respect of any Award under the Plan may not be made at the time contemplated by the terms of the Plan or the relevant Award agreement, as the case may be, without causing the Participant holding such Award to be subject to taxation under Section 409A of the Code, the Company will make such payment or delivery of shares on the first day that would not result in the Participant incurring any tax liability under Section 409A of the Code.  In the case of a Participant who is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares in respect of any Award subject to Section 409A of the Code that are linked to the date of the Participant's separation from service shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from the Company and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.  The Company shall use commercially reasonable efforts to implement the provisions of this Section 18 in good faith; provided that neither the Company, the Committee nor any of the Company's employees, directors or representatives shall have any liability to Participants with respect to this Section 18.

LEH-RSU 0000242

## EXHIBIT A

(a)    "Award" shall mean any type of stock-based award granted pursuant to the Plan.

(b)    "Board" shall mean the Board of Directors of the Company; provided, however, that any action taken by a duly authorized committee of the Board within the scope of authority delegated to such committee by the Board shall be considered an action of the Board for purposes of this Plan.

(c)    "Change in Control" shall mean the occurrence during the term of the Plan of:

a)    The commencement (within the meaning of Rule 14d-2 under the Securities Exchange Act of 1934 (the "Exchange Act")) of a tender offer for more than 20% of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors (the "Voting Securities");

b)    An acquisition (other than directly from the Company) of any voting securities of the Company by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the Exchange Act) immediately after which such Person has "Beneficial Ownership" (within, the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary"), (ii) the Company or its Subsidiaries, or (iii) any Person who files in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (b);

c)    The individuals who, as of the effective date of the 1994 initial public trading in Company shares, are members of the Board (the "Incumbent Board"), ceasing for any reason to constitute at least a majority of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest;

d)    Approval by stockholders of the Company of:

(i)    A merger, consolidation or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in (A), (B) and (C) below:

(A)    the stockholders of the Company, immediately before such merger, consolidation or reorganization, own, directly or indirectly, immediately following such merger, consolidation or reorganization, at least the Applicable Minimum Percentage (as defined below) of the combined voting power of the outstanding voting securities of the corporation resulting from such merger or

A-1

LEH-RSU 0000243

consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

(B) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least the Applicable Minimum Proportion (as defined below) of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation or reorganization; and

(C) no Person other than the Company, any Subsidiary, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary, or any Person who, immediately prior to such merger, consolidation or reorganization had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation or reorganization;

(ii)   A complete liquidation or dissolution of the Company; or

(iii)  An agreement for the sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary); or

e) An event that would constitute a "Change in Control" within the meaning of Section 2(g) in the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

With respect to paragraph (d)(i) above, "Applicable Minimum Percentage" means (1) eighty percent (80%) with respect to Awards made prior to December 11, 2000, and (2) fifty percent (50%) with respect to Awards made on or after December 11, 2000; and "Applicable Minimum Proportion" means (1) two-thirds with respect to Awards made prior to December 11, 2000, and (2) a majority with respect to Awards made on or after December 11, 2000.

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

(d)   "Code" shall mean the Internal Revenue Code of 1986, as from time to time amended.

(e)   "Committee" shall mean the Compensation and Benefits Committee of the Company.

(f)   "Common Stock" shall mean the common stock of the Company, $.10 par value.

(g)   "Company" shall mean Lehman Brothers Holdings Inc. and, except as otherwise specified in this Plan in a particular context, any successor thereto, whether by merger, consolidation, purchase of substantially all its assets or otherwise.

(h)   "Executive Officer" shall mean a Participant who is subject to the requirements of Sections 16(a) and 16(b) of the Securities Exchange Act of 1934.

(i)   "Fair Market Value" on any date means the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading (or, if such exchange is not open

LEH-RSU 0000244

on such date, the immediately preceding date on which such exchange is open), the arithmetic mean of the per share closing bid price and per share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System, or such other market in which such prices are regularly quoted, or, if there have been no published bid or asked quotations with respect to such shares on such date, the Fair Market Value shall be the value established by the Committee in good faith and, in the case of an incentive stock option, in accordance with Section 422 of the Code.

(j)    "Other Stock-based Award" shall mean any of those Awards described in Section 8 hereof.

(k)    "Participant" shall mean a member of the Corporate Management Committee or the Operating Committee (and successor entities of such committees), a Senior Vice President, a Managing Director or an officer holding a title senior to Managing Director who is selected by the Committee to receive an Award under the Plan.

(l)    "Subsidiary" shall mean any corporation which at the time qualifies as a subsidiary of the Company under the definition of "subsidiary corporation" in Section 424(f) of the Code, as amended from time to time.

LEH-RSU 0000245

# LBHI0118

<div align="center">

**LEHMAN BROTHERS HOLDINGS INC.**
**EMPLOYEE INCENTIVE PLAN**
**As amended through November 8, 2007**

</div>

## SECTION 1 — PURPOSE

The purpose of the Lehman Brothers Holdings Inc. Employee Incentive Plan (the "Plan") is to strengthen Lehman Brothers Holdings Inc. (the "Company") by providing selected employees of the Company with the opportunity to acquire a proprietary and vested interest in the growth and performance of the Company, thus generating an increased incentive to contribute to the Company's future success and prosperity, enhancing the value of the Company for the benefit of stockholders, and enhancing the Company's ability to attract and retain individuals of exceptional talent.

The purposes of the Plan are to be achieved through the grant of various types of stock-based awards.

## SECTION 2 — DEFINITIONS

For purposes of the Plan, the capitalized terms shall have the meanings ascribed to them in Exhibit A hereof.

## SECTION 3 — SHARES SUBJECT TO THE PLAN

(a)    Shares of Common Stock which may be issued under the Plan may be either authorized and unissued shares of Common Stock or authorized and issued shares of Common Stock held in the Company's treasury, or any combination thereof. Subject to adjustment as provided in Section 14, the number of shares of Common Stock with respect to which Awards (whether distributable in shares of Common Stock or in cash) may be granted under the Plan shall be 246 million shares. The maximum number of shares of Common Stock available for stock options, stock appreciation rights or Other Stock-based Awards that may be granted to a Participant during a calendar year shall not exceed two million.

(b)    Notwithstanding the last sentence of Section 3(a), to the extent that the number of shares of Common Stock with respect to which Awards may be granted under the Plan to an individual in any calendar year exceeds the number of shares of Common Stock with respect to which Awards were granted under the Plan during that calendar year, such excess shall be available for grant under the Plan in succeeding calendar years.

(c)    In the event that any other Award subject to repurchase or forfeiture rights is reacquired by the Company or if any Award is canceled, terminates or expires unexercised (except with respect to a stock option which terminates on the exercise of a stock appreciation right) for any reason under the Plan, any Common Stock allocated in connection with such Award shall thereafter again be available for grant pursuant to the Plan.

## SECTION 4 — ELIGIBILITY

Selected employees, officers, directors and consultants to the Company and its Affiliates are eligible to be Participants in the Plan.

## SECTION 5 — ADMINISTRATION

The Plan shall be administered by the Committee, which shall have the power to select those Participants who shall receive Awards and to determine the terms of such Awards. As to the selection of, and the terms of Awards granted the Committee may delegate any or all of its responsibilities to officers or employees of the Company.

LBHI0118

LEH-RSU 0000254

The Committee's authority hereunder shall include, without limitation, the establishment of vesting schedules or exercisability in installments with respect to Awards. The Committee may, in its sole discretion, accelerate or waive vesting or exercise periods or the lapse of restrictions on all or any portion of any Award, or extend the exercisability (including to extend or provide for post-termination exercisability) of stock options or stock appreciation rights; provided that such exercisability shall not extend past ten years from the date of grant of any incentive stock options.

Subject to the provisions of the Plan, the Committee shall be authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, to determine the terms and provisions of any agreements entered into hereunder, and to make all other determinations necessary or advisable for the administration of the Plan. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent it shall deem desirable to carry the Plan or any such Award into effect. The determinations of the Committee in the administration of the Plan, as described herein, shall be final and conclusive.

The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the laws of the State of Delaware and applicable Federal law.

## SECTION 6 — STOCK OPTIONS

(a)    Any stock options granted under the Plan shall be in such form as the Committee may from time to time approve and shall be subject to the terms and conditions provided herein and such additional terms and conditions not inconsistent with the terms of the Plan as the Committee shall deem desirable.

(b)    Stock options may be granted to any Participant. Each grant of stock options shall specify whether the underlying options are intended to be incentive stock options or non-incentive stock options. In the case of incentive stock options, the terms and conditions of such grants shall be subject to and comply with such requirements as may be prescribed by Section 422(b) of the Code, as from time to time amended, and any implementing regulations, including, but not limited to, the requirement that such stock options are exercisable during the Participant's lifetime only by such Participant. The Committee shall establish the option price at the time each stock option is granted, which price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant.

(c)    No stock options may be exercisable later than ten years after their date of grant. The option price of each share of Common Stock as to which a stock option is exercised shall be paid in full at the time of such exercise or as otherwise permitted by the Committee. Such payment may be made at the sole discretion of the Committee, pursuant to and in accordance with criteria and guidelines established by the Committee (which criteria and guidelines may be different for executive officers and for other Participants), as the same may be modified from time to time, (i) in cash (in any form of currency acceptable to the Committee), (ii) by tender of shares of Common Stock already owned by the Participant, valued at Fair Market Value as of the date of exercise, (iii) if authorized by the Committee, by withholding pursuant to the election of the Participant, which election is subject to the disapproval of the Committee, from those shares that would otherwise be obtained upon exercise of the option a number of shares having a Fair Market Value equal to the option price, (iv) if authorized by the Committee, and in combination with services rendered by the exercising Participant, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by the Company to, (a) sell shares of Common Stock subject to the option and to deliver promptly to the Company a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to the Company the loan proceeds, at the time of exercise to pay the option price, (v) by any combination of (i), (ii), (iii) or (iv) above or (vi) by other means that the Committee deems appropriate.

(d)    A stock option holder may, in the discretion of the Committee, have the right to surrender a stock option or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of

LEH-RSU 0000255

unexercised shares of Common Stock under the option which are being surrendered multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90-day period preceding such Change in Control, over (ii) the purchase price of the option as set forth in the underlying option agreement (the foregoing, a "Limited SAR").

## SECTION 7 — STOCK APPRECIATION RIGHTS

(a)     Stock appreciation rights may be granted independent of any stock option or in conjunction with all or any part of any stock option granted under the Plan, either at the same time as the stock option is granted or at any later time during the term of the option. Stock appreciation rights shall be subject to such terms and conditions as determined by the Committee, not inconsistent with the provisions of the Plan.

(b)     Upon exercise, a stock appreciation right shall entitle the Participant to receive from the Company an amount equal to the excess of the Fair Market Value of a share of Common Stock on the date of exercise of the stock appreciation right over the per share grant or option price, as applicable (or such lesser amount as the Committee may determine at the time of grant), multiplied by the number of shares of Common Stock with respect to which the stock appreciation right is exercised. Upon the exercise of a stock appreciation right granted in connection with a stock option, the stock option shall be canceled to the extent of the number of shares as to which the stock appreciation right is exercised, and upon the exercise of a stock option granted in connection with a stock appreciation right or the surrender of such stock option, the stock appreciation right shall be canceled to the extent of the number of shares as to which the stock option is exercised or surrendered. The Committee shall determine whether the stock appreciation right shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(c)     A holder of a stock appreciation right may, in the discretion of the Committee, have the right to surrender the stock appreciation right or any portion thereof to the Company within 30 days following a Change in Control and to receive from the Company in exchange therefor a cash payment in an amount equal to (a) the number of shares of Common Stock under the stock appreciation right which are being exercised, multiplied by (b) the excess of (i) the greater of (A) the highest price per share of Common Stock paid in connection with the Change in Control or (B) the highest Fair Market Value per share of Common Stock in the 90 day period preceding such Change in Control, over (ii) the per share grant price of the stock appreciation right as set forth in the underlying agreement.

## SECTION 8 — OTHER STOCK-BASED AWARDS

(a)     Other Awards of Common Stock and Awards that are valued in whole or in part by reference to, or otherwise based on, the Fair Market Value of Common Stock (all such Awards being referred to herein as "Other Stock-based Awards"), may be granted under the Plan in the discretion of the Committee. Other Stock-based Awards shall be in such form as the Committee shall determine, including without limitation, (i) the right to purchase shares of Common Stock, (ii) shares of Common Stock subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, and (iii) shares of Common Stock issuable upon the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee. Other Stock-based Awards may be granted alone or in addition to any other Awards made under the Plan. All references in the preceding sentence to "specified period of service," in the case of Other Stock-based Awards which (i) are not in lieu of cash compensation to employees generally, (ii) are not paid to recruit a new employee in an amount of less than 5% of the total awards available for grant under the Plan or (iii) are not subject to the attainment of performance objectives, shall provide that vesting, restrictions on transfer or some other comparable restriction which incents continued performance of the recipient, will be for a period of not less than three years (although vesting or lapsing may occur in tranches over the three years), unless there is a Change in Control or the recipient retires, becomes disabled or dies. Subject to the provisions of the Plan, the Committee shall have sole and absolute discretion to determine to whom and when such Other Stock-based Awards will be made, the number of shares of Common Stock to be awarded under (or otherwise related to) such Other Stock-based Awards and all other terms and conditions of such Awards. The Committee

3

shall determine whether Other Stock-based Awards shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(b)    With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary may pay to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

## SECTION 9 — DIVIDENDS, EQUIVALENTS AND VOTING RIGHTS

Awards other than stock options and stock appreciation rights may, at the discretion of the Committee, provide the Participant with dividends or dividend equivalents and voting rights prior to either vesting or earnout.

## SECTION 10 — AWARD AGREEMENTS

Each Award under the Plan shall be evidenced by an agreement setting forth the terms and conditions, not inconsistent with the provisions of the Plan, as determined by the Committee, which shall apply to such Award.

## SECTION 11 — WITHHOLDING

The Company shall have the right to deduct from all amounts paid to any Participant in cash (whether under this Plan or otherwise) any taxes required by law to be withheld therefrom. In the case of payments of Awards in the form of Common Stock, at the Committee's discretion, the Participant may be required to pay to the Company the amount of any taxes required to be withheld with respect to such Common Stock, or, in lieu thereof, the Company shall have the right to retain the number of shares of Common Stock the Fair Market Value of which equals the amount required to be withheld. Without limiting the foregoing, the Committee may, in its discretion and subject to such conditions as it shall impose, permit share withholding to be done at the Participant's election.

## SECTION 12 — NON-TRANSFERABILITY

No Award shall be assignable or transferable, and no right or interest of any Participant in any Award shall be subject to any lien, obligation or liability of the Participant, except by will, the laws of descent and distribution, or as otherwise set forth in the Award agreement.

## SECTION 13 — NO RIGHT TO EMPLOYMENT OR CONTINUED PARTICIPATION IN PLAN/NO RIGHTS AS STOCKHOLDERS

(a)    No person shall have any claim or right to the grant of an Award, and the grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or to be eligible for any subsequent Awards. Further, the Company expressly reserves the right at any time to dismiss a Participant free from any liability or any claim under the Plan, except as provided herein or in any agreement entered into hereunder.

(b)    The grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder.

4

LEH-RSU 0000257

## SECTION 14 — ADJUSTMENT OF AND CHANGES IN COMMON STOCK

In the event of any change in the outstanding shares of Common Stock by reason of any Common Stock dividend or split, recapitalization, merger, consolidation, spin-off, combination or exchange of shares or other corporate exchange, or any distribution to stockholders of Common Stock other than regular cash dividends, the Committee shall make a substitution or adjustment to the number or kind of shares of Common Stock or other securities issued or reserved for issuance pursuant to the Plan, and to outstanding Awards, as well as the option price or other affected terms of such Awards as in its judgment shall be necessary to preserve the Participant's rights substantially proportionate to the rights existing prior to such event.

Unless otherwise provided in an award agreement, after a merger of one or more corporations into the Company or after a consolidation of the Company and one or more corporations (a "Merger Event") in which the Company shall be the surviving or resulting corporation, an Award holder shall, where applicable, at the same cost, be entitled upon the exercise of an Award, to receive (subject to any action required by stockholders) such securities of the surviving or resulting corporation as shall be equivalent to the shares underlying such Award as nearly as practicable to the nearest whole number and class of shares of stock or other securities.

Unless otherwise provided in an award agreement, if the Company enters into any agreement with respect to any transaction which would, if consummated, result in a Merger Event in which the Company will not be the surviving corporation, the Committee in its sole discretion and without liability to any person shall determine what actions shall be taken with respect to outstanding Awards, if any, including, without limitation, the payment of a cash amount in exchange for the cancellation of an Award or the requiring of the issuance of substitute Awards that will substantially preserve the value, rights and benefits of any affected Awards previously granted hereunder as of the date of the consummation of the Merger Event.

## SECTION 15 — AMENDMENT

The Committee or the Board may amend, suspend or terminate the Plan or any portion hereof at any time.

## SECTION 16 — UNFUNDED STATUS OF PLAN

The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any payments not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock or payments in lieu thereof or with respect to options, stock appreciation rights and other Awards under the Plan; provided, however, that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan.

## SECTION 17 — EFFECTIVE DATE

This Plan shall be effective on April 5, 1995. No Awards may be granted under the Plan on or after April 30, 2006.

## SECTION 18 — SECTION 409A

Notwithstanding other provisions of the Plan or any Award agreements thereunder, no Award shall be granted, deferred, accelerated, extended, paid out or modified under this Plan in a manner that would result in the imposition of an additional tax under Section 409A of the Code upon a Participant. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments or deliveries of shares in respect of any Award under the Plan may not be made at the time contemplated by the terms of the Plan or the relevant Award agreement, as the case may be, without causing the Participant

5

holding such Award to be subject to taxation under Section 409A of the Code, the Company will make such payment or delivery of shares on the first day that would not result in the Participant incurring any tax liability under Section 409A of the Code.  In the case of a Participant who is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares in respect of any Award subject to Section 409A of the Code that are linked to the date of the Participant's separation from service shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from the Company and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.  The Company shall use commercially reasonable efforts to implement the provisions of this Section 18 in good faith; provided that neither the Company, the Committee nor any of the Company's employees, directors or representatives shall have any liability to Participants with respect to this Section 18.

6

## EXHIBIT A

(a)  "Affiliate" shall mean any entity designated by the Committee in which the Company pr an Affiliate has an interest.

(b)  "Award" shall mean any type of stock-based award granted pursuant to the Plan.

(c)  "Board" shall mean the Board of Directors of the Company; provided, however, that any action taken by a duly authorized committee of the Board within the scope of authority delegated to such committee by the Board shall be considered an action of the Board for purposes of this Plan.

(d)  "Change in Control" shall mean the occurrence during the term of the Plan of:

a)  The commencement (within the meaning of Rule 14d-2 under the Securities Exchange Act of 1934 (the "Exchange Act")) of a tender offer for more than 20% of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors (the "Voting Securities");

b)  An acquisition (other than directly from the Company) of any voting securities of the Company by any "Person" (as the term person is used for purposes of Section 13(d) or 14(d) of the Exchange Act) immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 20% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary"), (ii) the Company or its Subsidiaries, or (iii) any Person who files in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (b);

c)  The individuals who, as of the effective date of the 1994 initial public trading in Company shares, are members of the Board (the "Incumbent Board"), ceasing for any reason to constitute at least a majority of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened "Election Contest" (as described in Rule 14a-11 promulgated under the Exchange Act or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Election Contest or Proxy Contest;

d)  Approval by stockholders of the Company of:

(i)  A merger, consolidation or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in (A), (B) and (C) below:

(A)  the stockholders of the Company, immediately before such merger, consolidation or reorganization, own, directly or indirectly, immediately following such merger, consolidation or reorganization, at least the Applicable Minimum Percentage (as defined below) of the combined

7

LEH-RSU 0000260

voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization;

(B)    the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation or reorganization constitute at least the Applicable Minimum Proportion (as defined below) of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation or reorganization; and

(C)    no Person other than the Company, any Subsidiary, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary, or any Person who, immediately prior to such merger, consolidation or reorganization had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation or reorganization;

(ii)    A complete liquidation or dissolution of the Company; or

(iii)    An agreement for the sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary); or

e)    An event that would constitute a "Change in Control" within the meaning of Section 2(g) in the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

With respect to paragraph (d)(i) above, "Applicable Minimum Percentage" means (1) eighty percent (80%) with respect to Awards made prior to November 14, 2000, and (2) fifty percent (50%) with respect to Awards made on or after November 14, 2000; and "Applicable Minimum Proportion" means (1) two-thirds with respect to Awards made prior to November 14, 2000, and (2) a majority with respect to Awards made on or after November 14, 2000.

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

(e)    "Code" shall mean the Internal Revenue Code of 1986, as from time to time amended.

(f)    "Committee" shall mean the Compensation and Benefits Committee of the Company.

(g)    "Common Stock" shall mean the common stock of the Company, $.10 par value.

(h)    "Company" shall mean Lehman Brothers Holdings Inc. and, except as otherwise specified in this Plan in a particular context, any successor thereto, whether by merger, consolidation, purchase of substantially all its assets or otherwise.

(i)    "Fair Market Value" on any date means the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading (or, if such

8

exchange is not open on such date, the immediately preceding date on which such exchange is open), the arithmetic mean of the per share closing bid price and per share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System, or such other market in which such prices are regularly quoted, or, if there have been no published bid or asked quotations with respect to such shares on such date, the Fair Market Value shall be the value established by the Committee in good faith and, in the case of an incentive stock option, in accordance with Section 422 of the Code.

(j)    "Other Stock-based Award" shall mean any of those Awards described in Section 8 hereof.

(k)    "Participant" shall mean an employee, officer, director or consultant of the Company.

(l)    "Subsidiary" shall mean any corporation which at the time qualifies as a subsidiary of the Company under the definition of "subsidiary corporation" in Section 424(f) of the Code, as amended from time to time.

LEH-RSU 0000262

# LBHI0131

# LEHMAN BROTHERS

February 28, 2003

Dear Stockholder,

The 2003 Annual Meeting of Stockholders of Lehman Brothers Holdings Inc. will be held on Tuesday, April 8, 2003, at 10:30 a.m. (New York time) in the 12th Floor Auditorium of 399 Park Avenue, New York, New York 10022. A notice of the meeting, a proxy card and a proxy statement containing information about the matters to be acted upon are enclosed. You are cordially invited to attend.

All holders of record of the Company's outstanding shares of Common Stock at the close of business on February 14, 2003 will be entitled to vote at the Annual Meeting. It is important that your shares be represented at the meeting. You will be asked to (i) elect three Class III Directors; (ii) ratify the selection of Ernst & Young LLP as the Company's independent auditors for the 2003 fiscal year; and (iii) re-approve the Short-Term Executive Compensation Plan (formerly named the 1996 Short-Term Executive Compensation Plan), as amended. Accordingly, we request that you promptly sign, date and return the enclosed proxy card, or register your vote online or by telephone according to the instructions on the proxy card, regardless of the number of shares you hold.

Very truly yours,

Richard S. Fuld, Jr.
Chairman and Chief Executive Officer

LBHI0131

CONFIDENTIAL

CONFIDENTIAL

LEH-RSU 0020597

# LEHMAN BROTHERS HOLDINGS INC.

---

## NOTICE OF 2003 ANNUAL MEETING OF STOCKHOLDERS

---

To the Stockholders of Lehman Brothers Holdings Inc.:

The 2003 Annual Meeting of Stockholders of Lehman Brothers Holdings Inc. (the "Company") will be held on Tuesday, April 8, 2003, at 10:30 a.m. (New York time) in the 12th Floor Auditorium of 399 Park Avenue, New York, New York 10022, to:

1. Elect three Class III Directors for terms of three years each;

2. Ratify the selection of Ernst & Young LLP as the Company's independent auditors for the 2003 fiscal year;

3. Re-approve the Short-Term Executive Compensation Plan (formerly named the 1996 Short-Term Executive Compensation Plan), as amended; and

4. Act on any other business which may properly come before the Annual Meeting or any adjournment thereof.

Common stockholders of record at the close of business on February 14, 2003 are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

The Company will admit to the Annual Meeting (1) all Stockholders of record at the close of business on February 14, 2003, (2) persons holding proof of beneficial ownership as of such date, such as a letter or account statement from the person's broker, (3) persons who have been granted proxies and (4) such other persons that the Company, in its sole discretion, may elect to admit. **All persons wishing to be admitted must present photo identification. Persons attending the Annual Meeting must enter the 399 Park Avenue building through its Lexington Avenue entrance. If you plan to attend the Annual Meeting, please check the appropriate box on your proxy card or register your intention when voting online or by telephone according to the instructions provided.**

A copy of the Company's Annual Report to Stockholders is enclosed herewith for all Stockholders other than Lehman Brothers employees, to whom the Annual Report is being separately distributed.

By Order of the Board of Directors

*Jeffrey A. Welikson*

Jeffrey A. Welikson
Secretary

New York, New York
February 28, 2003

**WHETHER OR NOT YOU INTEND TO BE PRESENT AT THE ANNUAL MEETING, PLEASE COMPLETE, SIGN AND DATE THE ENCLOSED PROXY CARD AND RETURN IT IN THE ENCLOSED PREPAID ENVELOPE, OR REGISTER YOUR VOTE ONLINE OR BY TELEPHONE ACCORDING TO THE INSTRUCTIONS ON THE PROXY CARD.**

CONFIDENTIAL

CONFIDENTIAL

LEH-RSU 0020599

# LEHMAN BROTHERS HOLDINGS INC.

745 Seventh Avenue
New York, New York 10019

February 28, 2003

---

## PROXY STATEMENT

---

### INTRODUCTION

**Vote by Proxy.**   This proxy statement (the "Proxy Statement") is furnished in connection with the solicitation of proxies by the Board of Directors of Lehman Brothers Holdings Inc. (the "Company" and, together with its subsidiaries, the "Firm") for use at the 2003 Annual Meeting of Stockholders of the Company to be held on Tuesday, April 8, 2003 at 10:30 a.m. (New York time), or any adjournment thereof (the "Annual Meeting"). The Company expects to mail this Proxy Statement and the accompanying proxy card to the Company's common stockholders of record at the close of business on February 14, 2003 (the "Stockholders") on or about February 28, 2003.

You are cordially invited to attend the Annual Meeting. Whether or not you expect to attend in person, you are urged to complete, sign and date the enclosed proxy card and return it as promptly as possible in the enclosed, prepaid envelope, or to vote your shares online or by telephone according to the instructions on the proxy card. Stockholders have the right to revoke their proxies at any time prior to the time their shares are actually voted by (i) giving written notice to the Corporate Secretary of the Company, (ii) subsequently filing a later dated proxy or (iii) attending the Annual Meeting and voting in person. Please note that attendance at the meeting will not by itself revoke a proxy.

The enclosed proxy indicates on its face the number of shares of common stock registered in the name of each Stockholder at the close of business on February 14, 2003 (the "Record Date"). Proxies furnished to Company employees also indicate the number of shares, if any, (i) held by the employee under the Lehman Brothers Holdings Inc. Employee Stock Purchase Plan (the "ESPP"), (ii) that relate to the total number of restricted stock unit awards granted to the employee pursuant to various of the Company's Incentive Plans (as defined below), which shares are held, in part, in the 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans (the "Incentive Plans Trust"), (iii) held by the employee in a brokerage account at the Company's wholly owned subsidiary, Lehman Brothers Inc. ("LBI") and/or a brokerage account at Fidelity Brokerage Services LLC ("Fidelity Brokerage"), and (iv) held by the employee under the Lehman Brothers Savings Plan (the "Savings Plan"). Proxies returned by employees holding shares in the ESPP will be considered direct voting instructions with respect to such shares. Proxies returned by employees holding restricted stock units related to shares held in the Incentive Plans Trust will be considered to be voting instructions returned to the Incentive Plans Trust trustee (the "Incentive Plans Trustee") with respect to the number of shares determined pursuant to the terms of the agreement governing the Incentive Plans Trust, as described below under "The Voting Stock." Proxies returned by employees holding shares in an LBI or Fidelity Brokerage account will be considered to be voting instructions returned to LBI or Fidelity Brokerage, as applicable, with respect to such shares. Proxies returned by employees holding shares in the Savings Plan will be considered to be voting instructions returned to the Savings Plan trustee (the "Savings Plan Trustee") with respect to such shares, and Savings Plan shares for which no proxies are returned shall be voted in the same proportions as Savings Plan shares for which proxies are returned, as described below under "The Voting Stock." Except with respect to Savings Plan shares, no voting instructions will be confidential.

**General.**   Unless contrary instructions are indicated on the proxy or in a vote registered online or by telephone, all shares represented by valid proxies received pursuant to this solicitation (and not revoked before they are voted) will be voted as follows:

**FOR** the election of the three nominees for Class III Directors named below;

**FOR** the ratification of the selection of Ernst & Young LLP as the Company's independent auditors for the 2003 fiscal year; and

**FOR** the re-approval of the Short-Term Executive Compensation Plan (formerly named the 1996 Short-Term Executive Compensation Plan), as amended (the "STEP").

In the event a Stockholder specifies a different choice on the proxy or by online or telephone vote, his or her shares will be voted in accordance with the specification so made. Confidential voting is not provided for in the Company's Restated Certificate of Incorporation or By-Laws.

The Company's 2002 Annual Report has been distributed to Stockholders in connection with this solicitation. A copy (exclusive of exhibits) of the Company's 2002 Form 10-K as filed with the Securities and Exchange Commission (the "SEC") may be obtained without charge by writing to: Lehman Brothers Holdings Inc., 399 Park Avenue, 11th Floor, New York, New York 10022, Attention: Secretary. The Company's 2002 Annual Report and 2002 Form 10-K also will be available through the Lehman Brothers web site at http://www.lehman.com.

**Cost of Solicitation.** The cost of soliciting proxies will be borne by the Company. In addition to solicitation by mail, proxies may be solicited by directors, officers or employees of the Company in person or by telephone or telegram, or other means of communication, for which no additional compensation will be paid. The Company has engaged the firm of Georgeson Shareholder to assist the Company in the distribution and solicitation of proxies. The Company has agreed to pay Georgeson Shareholder a fee of $11,000 plus expenses for its services.

The Company also will reimburse brokerage houses, including LBI, and other custodians, nominees and fiduciaries for their reasonable expenses, in accordance with the rules and regulations of the SEC, the New York Stock Exchange and other exchanges, in sending proxies and proxy materials to the beneficial owners of shares of the Company's Common Stock.

**The Voting Stock.** The Company's Common Stock, par value $.10 per share (the "Common Stock"), is its only class of voting stock. As of the Record Date, 242,519,083 shares of Common Stock (exclusive of 16,934,413 shares held in treasury) were outstanding. Stockholders are entitled to one vote per share with respect to each matter to be voted on at the Annual Meeting. There is no cumulative voting provision applicable to the Common Stock.

The presence in person or by proxy at the Annual Meeting of the holders of a majority of the shares of Common Stock outstanding on the Record Date shall constitute a quorum.

The Incentive Plans Trust holds shares of Common Stock ("Trust Shares") issuable to future, current and former employees of the Company in connection with the granting to such employees of Restricted Stock Units ("RSUs") under the Company's Employee Incentive Plan (the "Employee Incentive Plan"), the Company's 1994 Management Ownership Plan (the "1994 Plan") and the Company's 1996 Management Ownership Plan (together with the Employee Incentive Plan and the 1994 Plan, the "Incentive Plans"). The Incentive Plans Trustee will vote or abstain from voting all Trust Shares in the same proportions as the RSUs in respect of which it has received voting instructions from current employees who have received RSUs under the Incentive Plans ("Current Participants"). As of the Record Date, 50,065,456 Trust Shares (representing 20.6% of the votes entitled to be cast at the Annual Meeting) were held by the Incentive Plans Trust and 62,599,434 RSUs were held by Current Participants.

The Savings Plan Trustee will vote or abstain from voting any Savings Plan shares for which proxy instructions are received in accordance with such instructions, and will vote or abstain from voting any Savings Plan shares for which no proxy instructions are received in the same proportions as the Savings Plan shares for which it has received instructions. As of the Record Date, 1,367,921 Savings Plan shares

CONFIDENTIAL                                                                                                                                 LEH-RSU 0020601

(representing 0.6% of the votes entitled to be cast at the Annual Meeting) were held by the Savings Plan Trustee.

**Stockholders Entitled to Vote.** Only Common Stockholders of record on the Record Date are entitled to notice of and to vote at the Annual Meeting or any adjournment thereof.

### SECURITY OWNERSHIP OF PRINCIPAL STOCKHOLDERS

To the knowledge of management, except for the Incentive Plans Trust (described above) and as described below, no person beneficially owned more than five percent of the Common Stock as of the Record Date.

| Beneficial Owner | Number of Shares of Common Stock | Percent of Outstanding Common Stock (a) |
|---|---|---|
| AXA................................................. | 14,663,847 (b) | 6.0% |

(a)  Percentages are calculated in accordance with applicable SEC rules and are based on the number of shares issued and outstanding on the Record Date.

(b)  According to a Schedule 13G jointly filed on February 12, 2003 by AXA Assurances I.A.R.D. Mutuelle, AXA Assurances Vie Mutuelle, AXA Conseil Vie Assurance Mutuelle, and AXA Courtage Assurance Mutuelle (collectively, the "Mutuelles AXA"), AXA ("AXA"), and AXA Financial, Inc., a subsidiary of AXA ("AFI"): (a) the Mutuelles AXA, which as a group control AXA, and AXA beneficially own 14,663,847 shares of Common Stock solely for investment purposes and have sole voting power with respect to 7,928,133 of such shares, shared voting power with respect to 1,232,544 of such shares, and sole dispositive power with respect to all of such shares, and (b) 13,880,365 of such shares are beneficially owned by Alliance Capital Management L.P., a subsidiary of AFI, and the remainder of such shares are beneficially owned by other affiliates of AXA. Addresses of the joint filers are as follows: the Mutuelles AXA, 370, rue Saint Honore, 75001 Paris France and 26, rue Louis le Grand, 75002 Paris, France; AXA, 25, avenue Matignon, 75008 Paris, France; and AFI, 1290 Avenue of the Americas, New York NY 10104.

CONFIDENTIAL                                                                                   LEH-RSU 0020602

## PROPOSAL 1

## ELECTION OF CLASS III DIRECTORS

At the Annual Meeting three Class III Directors are to be elected, each to serve until the Annual Meeting in 2006 and until his successor is elected and qualified. The Restated Certificate of Incorporation of the Company establishes a classified Board of Directors with three classes, designated Class I, Class II and Class III. The terms of the Class I and Class II Directors continue until the Annual Meetings in 2005 and 2004, respectively, and until their respective successors are elected and qualified.

The three nominees for Director are Thomas H. Cruikshank, Henry Kaufman and John D. Macomber, who were first elected Directors in 1996, 1995 and 1994, respectively.

The three nominees receiving the greatest number of votes cast by the holders of the Common Stock will be elected as Class III Directors of the Company. Abstentions and broker nonvotes will be disregarded and will have no effect on the vote for directors. Except as stated in the following sentence, the persons specified on the enclosed proxy card intend to vote for the nominees listed below, each of whom has consented to being named in this Proxy Statement and to serving if elected. Although management knows of no reason why any nominee would be unable to serve, the persons designated as proxies reserve full discretion to vote for another person in the event any such nominee is unable to serve.

**The Board of Directors unanimously recommends a vote FOR all Nominees.**

The following information is provided with respect to the nominees for Director and the incumbent Directors. Italicized wording indicates principal occupation(s).

## NOMINEES FOR ELECTION AS CLASS III DIRECTORS TO SERVE UNTIL THE 2006 ANNUAL MEETING OF STOCKHOLDERS

**THOMAS H. CRUIKSHANK**        **Director since 1996**        **Age: 71**

*Retired Chairman and Chief Executive Officer of Halliburton Company.*  Mr. Cruikshank was the Chairman and Chief Executive Officer of Halliburton Company, a major petroleum industry service company, from 1989 to 1995 and President and Chief Executive Officer from 1983 to 1989. He joined Halliburton in 1969, and served as a Director from 1977 to 1996. Mr. Cruikshank is a member of the Board of Directors of The Williams Companies, Inc. Mr. Cruikshank serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

**HENRY KAUFMAN**        **Director since 1995**        **Age: 75**

*President of Henry Kaufman & Company, Inc.*  Dr. Kaufman has been President of Henry Kaufman & Company, Inc., an investment management and economic and financial consulting firm, since 1988. For the previous 26 years, he was with Salomon Brothers Inc, where he was a Managing Director, Member of the Executive Committee, and in charge of Salomon's four research departments. He was also a Vice Chairman of the parent company, Salomon Inc. Before joining Salomon Brothers, Dr. Kaufman was in commercial banking and served as an economist at the Federal Reserve Bank of New York. Dr. Kaufman is a Director of Federal Home Loan Mortgage Corporation and the Statue of Liberty-Ellis Island Foundation Inc. He is a Member (and the Chairman Emeritus) of the Board of Trustees of the Institute of International Education, a Member of the Board of Trustees of New York University, a Member (and the Chairman Emeritus) of the Board of Overseers of the Stern School of Business of New York University and a Member of the Board of Trustees of the Animal Medical Center. Dr. Kaufman is a Member of the Board of Trustees of the Whitney Museum of American Art, a Member of the International Advisory Committee of the Federal Reserve Bank of New York, a

4

CONFIDENTIAL
LEH-RSU 0020603

Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan, a Member of the Board of Governors of Tel-Aviv University and Treasurer (and former Trustee) of The Economic Club of New York. Dr. Kaufman serves as the Chairman of the Finance Committee.

**JOHN D. MACOMBER**                    **Director since 1994**                    **Age: 75**

*Principal of JDM Investment Group.* Mr. Macomber has been a Principal of JDM Investment Group, a private investment firm, since 1992. He was Chairman and President of the Export-Import Bank of the United States from 1989 to 1992, Chairman and Chief Executive Officer of Celanese Corporation from 1973 to 1986 and a Senior Partner at McKinsey & Co. from 1954 to 1973. Mr. Macomber is a Director of Mettler-Toledo International, Sovereign Specialty Chemicals, Inc. and Textron Inc. He is Chairman of the Council for Excellence in Government and Vice Chairman of the Atlantic Council. He is a Director of the National Campaign to Prevent Teen Pregnancy and the Smithsonian Institute and a Trustee of the Carnegie Institution of Washington and the Folger Library. Mr. Macomber serves as the Chairman of the Compensation and Benefits Committee and as a member of the Executive Committee and the Nominating and Corporate Governance Committee.

## CLASS I DIRECTORS WHOSE TERMS CONTINUE
## UNTIL THE 2005 ANNUAL MEETING OF STOCKHOLDERS

**MICHAEL L. AINSLIE**                    **Director since 1996**                    **Age: 59**

*Private Investor and Former President and Chief Executive Officer of Sotheby's Holdings.* Mr. Ainslie, a private investor, is the former President, Chief Executive Officer and a Director of Sotheby's Holdings. He was Chief Executive Officer of Sotheby's from 1984 to 1994. From 1980 to 1984 he was President and Chief Executive Officer of the National Trust for Historic Preservation. From 1975 to 1980 he was Chief Operating Officer of N-Ren Corp., a Cincinnati-based chemical manufacturer. From 1971 to 1975, he was President of Palmas Del Mar, a real estate development company. He began his career as an associate with McKinsey & Company. Mr. Ainslie is a Director of the St. Joe Company and Artesia Technologies, an internet software provider. He is a Trustee of Vanderbilt University, and also serves as Chairman of the Posse Foundation. Mr. Ainslie serves as a member of the Audit Committee.

**JOHN F. AKERS**                    **Director since 1996**                    **Age: 68**

*Retired Chairman of International Business Machines Corporation.* Mr. Akers, a private investor, is the retired Chairman of the Board of Directors of International Business Machines Corporation. Mr. Akers served as Chairman of the Board of Directors and Chief Executive Officer of IBM from 1985 until his retirement on May 1, 1993, completing a 33-year career with IBM. Mr. Akers is a Director of W. R. Grace & Co., The New York Times Company, PepsiCo, Inc. and Hallmark Cards, Inc. He is a former member of the Board of Trustees of the California Institute of Technology and The Metropolitan Museum of Art, as well as the former Chairman of the Board of Governors of United Way of America. Mr. Akers was also a member of former President George Bush's Education Policy Advisory Committee. Mr. Akers serves as a member of the Finance Committee and the Compensation and Benefits Committee.

CONFIDENTIAL
LEH-RSU 0020604

**RICHARD S. FULD, JR.**                    **Director since 1990**                    Age: 56

*Chairman and Chief Executive Officer.*   Mr. Fuld has been Chairman of the Board of Directors of the Company and LBI since April 1994 and Chief Executive Officer of the Company and LBI since November 1993. Mr. Fuld serves as the Chairman of the Executive Committee. Mr. Fuld was President and Chief Operating Officer of the Company and LBI from March 1993 to April 1994 and was Co-President and Co-Chief Operating Officer of both corporations from January 1993 to March 1993. He was President and Co-Chief Executive Officer of the Lehman Brothers Division of Shearson Lehman Brothers Inc. from August 1990 to March 1993. Mr. Fuld was a Vice Chairman of Shearson Lehman Brothers from August 1984 until 1990. Mr. Fuld has been a Director of LBI since 1984. Mr. Fuld joined Lehman Brothers in 1969. Mr. Fuld is Chairman of the U.S. Thailand Business Council (USTBC). Mr. Fuld is a former member of the Board of Governors of the New York Stock Exchange. He is also a former member of the President's Advisory Committee on Trade Policy Negotiations. Mr. Fuld is a trustee of the Mount Sinai Medical Center, and former Chairman of the Mount Sinai Children's Center Foundation. He currently serves on the foundation's Executive Committee. In addition, he is a member of the University of Colorado Business Advisory Council, is a member of the Executive Committee of the New York City Partnership and serves on the Board of Directors of Ronald McDonald House.

## CLASS II DIRECTORS WHOSE TERMS CONTINUE
## UNTIL THE 2004 ANNUAL MEETING OF STOCKHOLDERS

**ROGER S. BERLIND**                    **Director since 1985**                    Age: 72

*Theatrical Producer.*   Roger S. Berlind, who is also a private investor, has been a theatrical producer and principal of Berlind Productions since 1981. Mr. Berlind is also a Director of LBI, a Governor of the League of American Theaters and Producers and has served as a Trustee of Princeton University, the Eugene O'Neill Theater Center and the American Academy of Dramatic Arts. Mr. Berlind serves as the Chairman of the Audit Committee and as a member of the Finance Committee.

**DINA MERRILL**                    **Director since 1988**                    Age: 74

*Director and Vice Chairman of RKO Pictures, Inc. and Actress.*   Dina Merrill, a Director and Vice Chairman of RKO Pictures, Inc., is an actress and a private investor. Ms. Merrill was a Presidential Appointee to the Kennedy Center Board of Trustees and is a Vice President of the New York City Mission Society, a Trustee of the Eugene O'Neill Theater Foundation and a member of the Board of Orbis International, the Juvenile Diabetes Foundation and the Museum of Television and Radio. Ms. Merrill serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation and Benefits Committee.

## COMMITTEES OF THE BOARD OF DIRECTORS

The Executive, Audit, Compensation and Benefits, Finance, and Nominating and Corporate Governance Committees of the Board of Directors are described below.

**Executive Committee.**   The Executive Committee consists of Mr. Fuld, who chairs the Executive Committee, and Mr. Macomber. The Executive Committee has the authority, in the intervals between meetings of the Board of Directors, to exercise all the authority of the Board of Directors, except for those matters that the Delaware General Corporation Law or the Restated Certificate of Incorporation reserves to the full Board of Directors. The Executive Committee acted by unanimous written consent five times during the fiscal year ended November 30, 2002 (''Fiscal 2002'').

6

CONFIDENTIAL

**Audit Committee.**   The Audit Committee consists of Mr. Berlind, who chairs the Audit Committee, and Messrs. Ainslie and Cruikshank, all of whom are non-management directors and are independent as defined in the current listing standards of the New York Stock Exchange. The Audit Committee operates under a written charter adopted by the Board of Directors, which is attached hereto as Appendix A and is available through the Lehman Brothers web site at http://www.lehman.com. The Audit Committee assists the Board in fulfilling its oversight of the quality and integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements. The Audit Committee is responsible for retaining (subject to shareholder ratification) and, as necessary, terminating, the independent auditors, annually reviews the qualifications, performance and independence of the independent auditors and the audit plan, fees and audit results, and approves non-audit services to be performed by the auditors and related fees. The Audit Committee also oversees the performance of the Company's internal audit and compliance functions. The Audit Committee held five meetings during Fiscal 2002.

**Compensation and Benefits Committee.**   The Compensation and Benefits Committee (the "Compensation Committee") consists of Mr. Macomber, who chairs the Compensation Committee, and Mr. Akers and Ms. Merrill, all of whom are non-management directors. The Compensation Committee operates under a written charter adopted by the Board of Directors which is available through the Lehman Brothers web site at http://www.lehman.com.  The Compensation Committee has general oversight responsibility with respect to compensation and benefits programs and compensation of the Company's executives, including reviewing and approving compensation policies and practices, such as salary, cash incentive, restricted stock, long-term incentive compensation and stock purchase plans and other programs, and grants under such plans. The Compensation Committee evaluates the performance of the Chief Executive Officer of the Company and other members of senior management and, based on such evaluation, reviews and approves the annual salary, bonus, share and option awards, other long-term incentives and other benefits to be paid to the Chief Executive Officer and such other members of senior management. The Compensation Committee has the authority, where appropriate, to delegate its duties. The Compensation Committee held six meetings and acted by unanimous written consent two times during Fiscal 2002.

**Finance Committee.**   The Finance Committee consists of Dr. Kaufman, who chairs the Finance Committee, and Messrs. Akers and Berlind. The Finance Committee reviews and advises the Board of Directors on the financial policies and practices of the Company, and periodically reviews, among other things, major capital expenditure programs and significant capital transactions and recommends a dividend policy to the Board of Directors.  The Finance Committee held two meetings during Fiscal 2002.

**Nominating and Corporate Governance Committee.**   The Nominating and Corporate Governance Committee (the "Nominating Committee") consists of Ms. Merrill, who chairs the Nominating Committee, and Messrs. Cruikshank and Macomber, all of whom are non-management directors. The Nominating Committee operates under a written charter adopted by the Board of Directors which is available through the Lehman Brothers web site at http://www.lehman.com.  The Nominating Committee considers and makes recommendations to the Company's Board of Directors with respect to the size and composition of the Board of Directors and Board Committees and with respect to potential candidates for membership on the Board of Directors. The Nominating Committee is also responsible for developing and recommending to the Board of Directors a set of corporate governance principles applicable to the Company. The Nominating Committee held two meetings during Fiscal 2002. The Nominating Committee will consider nominees for Director recommended by Stockholders. Stockholders wishing to submit recommendations for the 2004 Annual Meeting of Stockholders should write to the Corporate Secretary, Lehman Brothers Holdings Inc., 399 Park Avenue, 11th Floor, New York, New York 10022. The Company's By-Laws contain time limitations, procedures and requirements relating to Stockholder nominations which are explained below under "Other Matters."

## NON-MANAGEMENT DIRECTORS

The Board of Directors has adopted a policy of regularly scheduled executive sessions, where non-management directors will meet independently of management.

CONFIDENTIAL

LEH-RSU 0020606

## ATTENDANCE AT MEETINGS BY DIRECTORS

The Board of Directors held eight meetings during Fiscal 2002. During Fiscal 2002, each Director attended 75 percent or more of the aggregate of (a) the total number of meetings of the Board held during the period when he or she was a Director and (b) the total number of meetings held by all Committees of the Board on which he or she served during the period when he or she was a member. Overall Director attendance at such meetings averaged 98%. The number of meetings held by each Committee during Fiscal 2002 is set forth above.

## COMPENSATION OF DIRECTORS

Non-management Directors receive an annual cash retainer of $45,000 and are reimbursed for reasonable travel and related expenses. The annual retainer is paid quarterly; however, the fourth quarter payment will be withheld for failure to attend 75% of the total number of meetings. In addition, each non-management Director who served as a chairman of a Committee of the Board of Directors received an additional annual retainer of $15,000 per Committee, and each non-management Director who served as a Committee member (including as Chairman) received $1,500 per Committee meeting or unanimous written consent.

*Restricted Stock Unit and Option Grants for Non-Management Directors.* An annual equity retainer in the form of a grant of 2,500 RSUs is made to each non-management Director on the day of the Company's Annual Meeting of Stockholders. As of each date that a dividend is paid on Common Stock, each non-management Director holding RSUs is credited with a number of additional RSUs equal to the product of (A) the dividend paid on one share of Common Stock, multiplied by (B) the number of RSUs held by the non-management Director, divided by (C) the closing price of the Common Stock on the New York Stock Exchange on such date. The RSUs vest immediately and are payable in Common Stock upon death, disability or termination of service.

Alternatively, a non-management Director may elect to receive an option to purchase 7,500 shares of Common Stock, with an exercise price per share equal to the closing price of the Common Stock on the New York Stock Exchange on the date the award is made. Such option has a ten-year term, is not forfeitable, and becomes exercisable in one-third increments on each of the first three anniversaries of the award date or, if sooner, upon termination of service.

*The Company's Deferred Compensation Plan for Non-Management Directors.* The Company's Deferred Compensation Plan for Non-Management Directors is a nonqualified deferred compensation plan, which provides each non-management Director an opportunity to elect to defer receipt of cash compensation to be earned for services on the Board of Directors. Each non-management Director may elect to defer all or a portion of his or her future cash compensation with respect to one or more terms as Director. Such election can be revoked only by a showing of financial hardship and with the consent of the Compensation Committee. Amounts deferred are credited quarterly with interest, based upon the average 30-day U.S. Treasury Bill rate, and compounded annually. Deferred amounts will be paid in either a lump sum or in annual installments over a period not to exceed ten years as elected by the non-management Director. Payments commence as the non-managment Director elects, at a specified date in the future or upon termination of service as a non-management Director.

*The Company's Frozen Retirement Plan for Non-Management Directors.* Prior to May 1994, the Company maintained the Company's Retirement Plan for Non-Management Directors which was a nonqualified retirement plan which provided a limited annual retirement benefit for non-management Directors who had earned five or more years of service as defined in the plan. Participation in this plan was frozen on May 31, 1994. Any non-management Director who had, on such date, completed at least five years of service as a Director (determined in accordance with the plan) has vested benefits under the plan. Any individual who was a non-management Director on such date, but had not completed five years of service as of such date, acquired vested benefits under this plan at the time such individual completed such five years of service as a Director. Any individual who became a non-management Director after such date was ineligible to participate in this plan. Vested benefits under this plan will be paid after a participant ceases to be a Director.

8

                                                                          LEH-RSU 0020607

## EXECUTIVE OFFICERS OF THE COMPANY

Biographies of the current executive officers of the Company are set forth below, excluding Mr. Fuld's biography, which is included above. Each executive officer serves at the discretion of the Board of Directors.

**JONATHAN BEYMAN**                                                                                     **Age: 47**

*Chief of Operations and Technology.*  Mr. Beyman has been the Chief of Operations and Technology since July 2002 and is an Executive Vice President of the Company. From July 1999 to July 2002 Mr. Beyman was the Firm's Global Head of Operations, and from March 1999 to July 1999 he was the Firm's US Head of Operations. From December 1997 to February 1999, Mr. Beyman was chief operating officer of Cendant Corporation's Internet-based business, and chief information officer of Cendant from July 1994 to June 1998. Prior thereto, Mr. Beyman was with the Firm for eight years, in a variety of technology and operations senior management roles. Mr. Beyman is a member of the Board of Directors of the Depository Trust and Clearing Corporation.

**DAVID GOLDFARB**                                                                                      **Age: 45**

*Chief Financial Officer.*  Mr. Goldfarb has been the Chief Financial Officer of the Company since April 2000 and is an Executive Vice President of the Company and a member of the Firm's Executive Committee. Mr. Goldfarb served as the Company's Controller from July 1995 to April 2000. Mr. Goldfarb has been the Chief Financial Officer of LBI since July 1998. Mr. Goldfarb joined the Firm in December 1993; prior to that, Mr. Goldfarb was a partner at Ernst & Young.

**JOSEPH M. GREGORY**                                                                                   **Age: 50**

*Chief Operating Officer.*  Mr. Gregory has been Chief Operating Officer of the Company since May 2002 and is a member of the Firm's Executive Committee. From April 2000 until May 2002 Mr. Gregory was the Firm's Chief Administrative Officer, and from 1996 to April 2000 Mr. Gregory was Head of the Firm's Global Equities Division, in charge of the overall equities business. From 1991 to 1996 he was Co-Head of the Firm's Fixed Income Division. From 1980 to 1991, he held various management positions in the Fixed Income Division, including Head of the Firm's Mortgage Business. Mr. Gregory joined the Firm in 1974 as a commercial paper trader. Mr. Gregory is a member of the board of directors of The Posse Foundation Inc. and the Dorothy Rodbell Cohen Foundation, and is a member of the Board of Trustees of The Millbrook School.

**BRADLEY H. JACK**                                                                                     **Age: 44**

*Chief Operating Officer.*  Mr. Jack has been Chief Operating Officer of the Company since May 2002 and is a member of the Firm's Executive Committee. From 1996 to May 2002 Mr. Jack was Head of the Firm's Investment Banking Division, and from 1993 to 1996 he was a Sector Head in Investment Banking, responsible for the Firm's businesses involving Debt Capital Markets, Financial Services, Leveraged Finance and Real Estate. Prior to that he was head of the Firm's Fixed-Income Global Syndicate activities. Mr. Jack joined the Firm in 1984 as an associate in the Fixed Income Division. Mr. Jack is a member of the Board of Directors of the Dorothy Rodbell Cohen Foundation and a member of the Board of Trustees of the Juilliard School.

**THOMAS A. RUSSO**                                                                                     **Age: 59**

*Chief Legal Officer.*  Mr. Russo has been Chief Legal Officer of the Company since 1993 and is an Executive Vice President of the Company. Mr. Russo also serves as counsel to the Firm's Executive Committee. He has been a Vice Chairman of LBI since July 1999. Mr. Russo joined the Firm in 1993; prior to that, Mr. Russo was a partner at the Wall Street law firm of Cadwalader, Wickersham & Taft and a member of its management committee. Mr. Russo is a member of the Executive Committee of the Board of Directors of the March of Dimes, Vice Chairman and a member of the Executive Committee of the Board of Trustees of the Institute for Financial Markets, and Chairman of the Executive Committee of the Board of Trustees of the Institute for International Education. He is also Co-Chairman of the Global Documentation Steering Committee and a member of the Board of Directors of NYU Downtown Hospital.

9

## SECURITY OWNERSHIP OF DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth beneficial ownership information as of January 31, 2003 with respect to the Common Stock for each current Director of the Company (including all nominees for Director), each executive officer named in the tables set forth under "Compensation of Executive Officers" below and all current Directors and executive officers as a group. Except as described below, each of the persons listed below has sole voting and investment power with respect to the shares shown. None of the Directors or executive officers beneficially owned any of the Company's other outstanding equity securities as of January 31, 2003.

| Beneficial Owner | Number of Shares of Common Stock (a) | Number of Shares of Common Stock which may be acquired within 60 days of January 31, 2003 | Percent of Outstanding Common Stock (b) |
|---|---|---|---|
| Michael L. Ainslie (c) .............. | 23,965 | 16,511 | * |
| John F. Akers ................... | 8,485 | 16,511 | * |
| Roger S. Berlind (d) ............... | 291,525 | 16,511 | * |
| Thomas H. Cruikshank ............. | 26,363 | 0 | * |
| Richard S. Fuld, Jr. ................ | 4,336,783 | 1,756,640 | 2.64 |
| Joseph M. Gregory ................ | 2,334,804 | 700,000 | 1.32 |
| Bradley H. Jack ................... | 1,485,428 | 1,300,000 | 1.21 |
| Henry Kaufman (e) ................ | 33,803 | 14,107 | * |
| John D. Macomber ................ | 59,525 | 16,511 | * |
| Dina Merrill ..................... | 22,005 | 16,511 | * |
| Thomas A. Russo ................. | 522,360 | 75,000 | * |
| Jeffrey Vanderbeek ................ | 1,522,154 | 1,200,000 | 1.19 |
| All current Directors and executive officers as a group (13 individuals) . . . | 9,402,655 | 4,050,025 | 5.76 |

* Less than one percent.

(a) Amounts include vested and unvested RSUs. RSUs are convertible on a one-for-one basis into shares of Common Stock, but cannot be sold or transferred until converted to Common Stock and, with respect to each person identified in the table, are not convertible within 60 days following January 31, 2003. A portion of the vested RSUs held by the executive officers are subject to forfeiture for detrimental or competitive activity. Nonetheless, an executive officer who holds RSUs will be entitled to direct the Incentive Plans Trustee to vote a number of Trust Shares that is proportionate to the number of RSUs held irrespective of vesting; such number of Trust Shares will be calculated prior to the Annual Meeting and will be determined by the number of Trust Shares held by the Incentive Plans Trust on the Record Date and the extent to which Current Participants under the Incentive Plans return voting instructions to the Incentive Plans Trustee. See "Introduction-The    Voting Stock."

(b) Percentages are calculated in accordance with applicable SEC rules and are based on the number of shares issued and outstanding on January 31, 2003.

(c) Includes 3,500 shares held by Mr. Ainslie's private charitable foundation, as to which Mr. Ainslie disclaims beneficial ownership.

(d) Includes 80,000 shares held by Mr. Berlind's wife, as to which Mr. Berlind disclaims beneficial ownership.

(e) Includes 25,000 shares held by Dr. Kaufman's wife, as to which Dr. Kaufman disclaims beneficial ownership.

## COMPENSATION COMMITTEE REPORT ON EXECUTIVE OFFICER COMPENSATION

The Compensation Committee oversees the compensation programs of the Company, with particular attention to the compensation of the Company's Chief Executive Officer and the other executive officers. The Compensation Committee is comprised of Mr. Macomber, who chairs the Compensation Committee, Mr. Akers and Ms. Merrill.

CONFIDENTIAL
LEH-RSU 0020609

In making its decisions with respect to the compensation of executive officers, the Compensation Committee has adopted the following philosophical positions and policies:

- Deliver a significant portion of total compensation in equity-based awards, thereby aligning the financial interests of executive officers with those of Stockholders and encouraging prudent long-term strategic decisions. Where feasible, based on market conditions and other factors, shares will be repurchased in the market to avoid Stockholder dilution.

- Tie compensation for executive officers to both annual and long-term performance goals, which further aligns the interests of executive officers with those of Stockholders and rewards executive officers for results.

- Ensure that compensation opportunities are comparable with those at major competitors, so that the Firm can attract, retain and motivate talented executive officers who are key to the Company's long-term success.

The overall objective in determining total compensation levels across the Firm is to balance competitive pressures in the market for professional talent with cost considerations. The elements and weightings of the compensation program at the Company are comparable to those used in the securities industry, but are considerably different from those of other major corporations operating in different industries. The nature of the securities industry requires a large percentage of highly skilled professionals, who are in great demand due to the revenue they can generate. Competitive pressure to hire these professionals results in high levels of compensation in order to attract and retain the talent needed to compete effectively.

Total compensation is comprised of base salary and both cash and noncash incentive compensation. Base salaries are intended to make up a small portion of total compensation. The greater part of total compensation is based on the Company's financial performance and other factors and is delivered through a combination of cash and equity-based awards. This approach results in overall compensation levels which follow the financial performance of the Company.

As in prior years, a key element of executive officer compensation for Fiscal 2002 was a pre-established compensation formula, which in Fiscal 2002 was based on the Company's return on equity. The formulas were intended to provide a specific amount of annual compensation, which is paid in cash and RSUs. The RSUs are subject to significant vesting and forfeiture restrictions, and cannot be sold or transferred until converted to Common Stock.

Additionally, Fiscal 2002 executive officer compensation included a long-term incentive plan ("LTIP") as a component of total compensation. Whereas the cash and RSU components of total compensation are based upon annual performance goals, the LTIP is based upon performance over a longer period and is initially in the form of Performance Stock Units ("PSUs"). Under the current LTIP, the Company's return on equity as well as any price appreciation in the Common Stock over a three and one-half year period which began June 1, 2000 will determine an award of RSUs which will vest in one-third increments in 2006 through 2008. The performance component of the LTIP seeks to further align executive performance with Stockholder interests. The vesting component seeks to encourage the retention of talented executives, particularly if the Company's return on equity and stock price result in a meaningful award.

The Compensation Committee also utilized stock option awards in Fiscal 2002 to further encourage executive officers to strive for long-term Stockholder value. The options were awarded with exercise prices equal to fair market value on the date of the grant, and with terms providing for exercisability in three years if the market price of the Common Stock increases to a level well above the market price on the date of grant. However, if the price targets are not achieved, exercisability for all or a portion of the options is delayed until four and one-half years after the date of grant. The Compensation Committee believes that options assist the Firm in maintaining a competitive compensation program.

11

LEH-RSU 0020610

In determining overall executive officer compensation for Fiscal 2002, the Compensation Committee also considered a number of business factors and conditions. Despite the continuing difficult economic and market conditions, the Company continued to deliver strong overall financial performance across all phases of the business cycle and build on its reputation as an industry leader. In addition, the Compensation Committee reviewed compensation provided in the prior year, along with estimates of compensation for the current year for competitor firms. In making its determinations, the Compensation Committee had available to it third-party advisors knowledgeable about industry practices.

In establishing Fiscal 2002 compensation for Richard S. Fuld, Jr., the Company's Chairman and Chief Executive Officer, the Compensation Committee considered, in addition to the financial results of the Company relative to competitors, the following performance factors:

- Continuing market share gains in major product categories in investment banking and capital markets.

- Broad recognition of the Company's franchise building efforts, both in select market segments and overall.

- The successful relocation of the Company to its new headquarters in mid-town Manhattan and successful business recovery following the September 11, 2001 terrorist attacks.

The Committee did not assign specific relative weights to the performance factors above. Despite Mr. Fuld's strong performance as a leader in a difficult business environment, the actual financial results of the Company for Fiscal 2002 were lower than for 2001. Since the major portion of Mr. Fuld's compensation is based on financial results, his Fiscal 2002 compensation reflects a decrease from 2001.

Section 162(m) of the Internal Revenue Code limits the tax deductibility of compensation in excess of $1 million unless the payments are made under qualifying performance-based plans. While the Compensation Committee generally seeks to maximize the deductibility of compensation paid to executive officers, it will maintain flexibility to take other actions which may be based on considerations other than tax deductibility.

<div style="margin-left: 40%">

Compensation and Benefits Committee:

John D. Macomber, Chairman
John F. Akers
Dina Merrill
February 28, 2003

</div>

**Compensation and Benefits Committee Interlocks and Insider Participation**

During the last completed fiscal year, John D. Macomber, John F. Akers and Dina Merrill served on the Compensation Committee. None of these individuals has ever served as an officer or employee of the Firm.

CONFIDENTIAL

LEH-RSU 0020611

## COMPENSATION OF EXECUTIVE OFFICERS

The following table shows, for the years ended November 30, 2002, 2001 and 2000, as applicable, the cash and other compensation paid or accrued and certain long-term awards made to the Chairman and Chief Executive Officer (the "CEO") and to the Company's four most highly compensated executive officers for Fiscal 2002 other than the CEO for services in all capacities. Mr. Russo became an executive officer in Fiscal 2002.

### SUMMARY COMPENSATION TABLE

| Name and Principal Position at November 30, 2002 | Fiscal Year | Annual Compensation | | | Long-Term Compensation Awards | | All Other Compensation (b) |
| | | Salary | Bonus | Other Annual Compensation | Restricted Stock Unit Awards (a) | Securities Underlying Options | |
|---|---|---|---|---|---|---|---|
| R. S. Fuld, Jr. ............. | 2002 | $750,000 | $1,050,000 | - | $ 5,771,003 | 400,000 | $13,008 |
| Chairman and Chief | 2001 | 750,000 | 4,000,000 | - | 6,785,299 | 450,000 | 12,517 |
| Executive Officer | 2000 | 750,000 | 8,750,000 | - | 13,572,896 | 800,000 | 13,710 |
| J. M. Gregory ............. | 2002 | $450,000 | $1,050,000 | - | $ 3,571,803 | 300,000 | $ 7,128 |
| Chief Operating Officer | 2001 | 450,000 | 2,800,000 | - | 4,642,616 | 350,000 | 6,373 |
| | 2000 | 450,000 | 8,050,000 | - | 7,857,992 | 600,000 | 5,339 |
| B. H. Jack ................ | 2002 | $450,000 | $1,050,000 | - | $ 3,571,803 | 300,000 | $ 0 |
| Chief Operating Officer | 2001 | 450,000 | 2,800,000 | - | 4,642,616 | 350,000 | 0 |
| | 2000 | 450,000 | 8,050,000 | - | 7,857,992 | 600,000 | 0 |
| T. A. Russo ............... Executive Vice President and Chief Legal Officer | 2002 | $450,000 | $1,050,000 | - | $ 1,428,721 | 0 | $ 0 |
| J. Vanderbeek ............. | 2002 | $450,000 | $1,050,000 | - | $ 3,571,803 | 300,000 | $ 1,004 |
| Executive Vice President | 2001 | 450,000 | 2,800,000 | - | 4,642,616 | 350,000 | 904 |
| and Office of the Chairman | 2000 | 450,000 | 8,050,000 | - | 7,857,992 | 600,000 | 1,084 |

(a)  The values indicated are calculated by multiplying the closing market price of the Common Stock on the respective dates the awards were granted by the number of shares awarded. RSUs are subject to significant vesting and forfeiture restrictions and pursuant to the terms of the awards cannot be sold or transferred until they convert to Common Stock, which in the case of the RSUs granted for Fiscal 2002 will occur November 30, 2007. Dividends are payable by the Company on all such holdings from their respective dates of award, and are reinvested in additional RSUs. The total number of RSUs granted for Fiscal 2002 that underlies the value shown for each of Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek was 103,701.76, 65,634.02, 65,634.02, 26,253.61 and 65,634.02, respectively. Of such RSUs, 35% will vest on November 30, 2005 and the balance will vest on November 30, 2007. Notwithstanding the foregoing, RSUs may become vested (and may convert to Common Stock) sooner upon certain termination events or upon death or disability.

Including the RSUs described immediately above, as of November 30, 2002, the total number of RSUs held by Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek was 2,626,902.48, 1,786,484.61, 1,335,724.23, 427,671.57 and 1,335,724.23, respectively. The value of these holdings at the November 29, 2002 closing price per share of Common Stock of $61.40 was $161,291,812, $109,690,155, $82,013,468, $26,259,034 and $82,013,468, respectively. These RSU holdings as of November 30, 2002 include Extended RSUs, described under "Employment Contracts, Termination of Employment and Change in Control Arrangements," which vest (and convert to Common

*(footnotes continued on next page)*

13

Stock) upon certain termination events or upon death or disability or a change in control, and that were based upon the Company's 1995, 1996 and 1997 PSU award programs. These RSU holdings as of November 30, 2002 also include for each of Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek 97,091.24, 73,195.74, 73,195.74, 33,705.23 and 73,195.74 RSUs, respectively, earned in Fiscal 2002 that are based on PSU awards made in 2000.

(b) The amounts reported under "All Other Compensation" for Fiscal 2002 consist of the dollar value of above-market earnings on deferred compensation. Included are credits to compensation deferred pursuant to the Executive and Select Employees Plan, which was established in 1985, and the Lehman Brothers Kuhn Loeb Deferred Compensation Plans, which were established in 1977 and 1980.

The following table contains information concerning the grant of nonqualified stock options in Fiscal 2002 to the named executive officers.

### OPTION GRANTS IN LAST FISCAL YEAR

| Name | Number of Securities Underlying Options Granted (a) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value (b) |
|---|---|---|---|---|---|
| R. S. Fuld, Jr. ................. | 400,000 | 1.5 | $63.40 | 12/02/06 | $4,900,000 |
| J. M. Gregory ................. | 300,000 | 1.1 | 63.40 | 12/02/06 | 3,675,000 |
| B. H. Jack .................... | 300,000 | 1.1 | 63.40 | 12/02/06 | 3,675,000 |
| J. Vanderbeek ............... | 300,000 | 1.1 | 63.40 | 12/02/06 | 3,675,000 |

(a) Five-year nonqualified stock options were granted on December 3, 2001 with terms providing for exercisability in four and one-half years and for accelerated exercisability, to no earlier than the third anniversary of the grant date, in one-third increments if the closing price of the Common Stock on the New York Stock Exchange (the "NYSE") reaches $75.00, $85.00 and $95.00, respectively, for 15 out of 20 consecutive trading days. Notwithstanding the foregoing, the options may become exercisable without regard to the three-year holding period upon certain termination events, and without regard to either the holding period or the stock price thresholds upon death or disability.

(b) These values were calculated using the Black-Scholes option pricing model as of the grant date. The Black-Scholes model is a mathematical formula that is widely used and accepted for valuing traded stock options. The model is premised on immediate exercisability and transferability of the options, neither of which was true for the options granted to the named executive officers at the time of grant. Therefore, certain discounting assumptions about the time of exercise and risk of forfeiture were applied, as indicated below. These hypothetical present values are presented pursuant to SEC rules even though there is no assurance that such values will ever be realized. The actual amount, if any, realized upon the exercise of stock options would depend upon the market price of Common Stock relative to the exercise price per share of the stock option at the time the stock option is exercised.

The following assumptions were used in employing the Black-Scholes option pricing model: an exercise price equal to the closing price of the Common Stock on the date of grant; an expected time to exercise of three years; a dividend rate of $0.28 per share; a risk-free rate of return equal to the yield for the U.S. Treasury Strip security with a maturity date closest to the expected option life of the grant; an expected Common Stock price volatility rate of 40% per annum; and a 10% per annum adjustment for nontransferability or risk of forfeiture.

14

CONFIDENTIAL

The following table sets forth information concerning the exercise of stock options during Fiscal 2002 by each of the named executive officers and the fiscal year-end value of unexercised options.

## AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR
## AND FISCAL YEAR-END OPTION VALUES

| Name | Shares Acquired on Exercise | Value Realized | Number of Securities Underlying Unexercised Options at Fiscal Year End | | Value of Unexercised In-The-Money Options at Fiscal Year End (a) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| R. S. Fuld, Jr. ......... | 700,000 | $21,125,090 | 1,756,640 | 850,000 | $62,997,936 | $4,623,750 |
| J. M. Gregory .......... | 600,000 | 23,531,220 | 1,300,000 | 650,000 | 44,738,750 | 3,596,250 |
| B. H. Jack ............. | 464,500 | 15,846,770 | 1,300,000 | 650,000 | 44,738,750 | 3,596,250 |
| T. A. Russo ............ | 85,240 | 2,119,320 | - | 450,000 | - | 9,347,625 |
| J. Vanderbeek .......... | 700,000 | 24,149,470 | 1,200,000 | 650,000 | 40,642,500 | 3,596,250 |

(a)  Aggregate values shown above represent the excess of $61.40 per share, the closing price of the Common Stock on November 29, 2002 on the NYSE, over the respective exercise prices of the options. The actual amount, if any, realized upon exercise of stock options will depend upon the market price of the Common Stock relative to the exercise price per share of the stock option at the time the stock option is exercised. There is no assurance that the values of unexercised in-the-money options reflected above will be realized.

## PENSION BENEFITS

The Lehman Brothers Holdings Inc. Retirement Plan (the "U.S. Pension Plan") is a funded, qualified, noncontributory, integrated, defined benefit pension plan covering eligible U.S. employees.

All U.S. employees of the Company or a designated subsidiary who have attained the age of 21 and completed one year of service are generally eligible to participate in the U.S. Pension Plan. The U.S. Pension Plan formula provides for an annual retirement benefit payable at age 65, calculated as a straight life annuity. Pensionable earnings are total Form W-2 earnings (plus elective deferrals under the Lehman Brothers Savings Plan and certain other health plan deferral amounts) up to the applicable Internal Revenue Service maximum. For each year of plan participation prior to 1989, the annual accrual was based on percentages of pensionable earnings up to and in excess of the social security taxable wage base. After 1988 the annual accrual is equal to one percent of pensionable earnings up to the average Social Security taxable wage base plus 1.65% of pensionable earnings in excess of the average taxable wage base. Generally, participants have a nonforfeitable right to their accrued benefits upon completing five years of vesting service. As of November 30, 2002, the estimated annual projected benefits payable upon retirement at a normal retirement age of 65 for Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek are approximately $103,228, $116,124, $103,097, $39,029 and $110,735, respectively.

### Supplemental Retirement Plan

The Company has adopted a nonqualified, noncontributory Supplemental Retirement Plan (the "SRP"), which is a defined benefit plan, covering Messrs. Fuld, Gregory, Jack and Vanderbeek and certain other executives, with full benefits payable to those who upon retirement are at least age 60 and who have completed at least five years of service, or whose age plus years of service equals or exceeds the sum of 85. The SRP also provides for the payment beginning at age 60 of reduced benefits payable to those who upon retirement are not yet age 60 if upon retirement the participant is above age 45 or has completed five years of service. Benefits are not payable in cases of termination by the Company or

15

employment by a competitor. As of January 31, 2003, the estimated annual projected benefits payable upon retirement at age 60 for Mr. Fuld are $1.25 million, and for each of Messrs. Gregory, Jack and Vanderbeek are $700,000. In the event of a change in control, vesting is accelerated.

## EMPLOYMENT CONTRACTS, TERMINATION OF EMPLOYMENT AND CHANGE IN CONTROL ARRANGEMENTS

Pursuant to its authority to accelerate vesting and waive the transfer restrictions for grants of RSUs, in 1994 the Compensation Committee determined to provide for the acceleration of vesting and the waiver of transfer restrictions of existing and any subsequently granted RSUs (other than RSUs based upon PSU awards) held by executive officers (and made comparable provisions for all other employees) in the event of a hostile change in control, which generally means a tender offer, acquisition of 20% of the Company's voting securities or a change of a majority of the incumbent Board of Directors, in each case without the prior approval of a majority of the independent members of the incumbent Board of Directors. To the extent there is a change in control which is not hostile, these RSUs would be paid out but the difference between the acquisition price and the RSU value at grant would be deferred for the shorter of two years or the term of any remaining restrictions and the conditions of the original RSU grant would govern the deferred amounts. Comparable arrangements were implemented for options held by the executive officers and all other employees. In the case of 1996 PSU award grants and 1997 PSU award grants, an additional number of RSUs would be payable following a change of control (which aggregate payouts, upon a change in control, would represent the full awards earned pursuant to the performance formula). The number of such additional RSUs payable following a change of control for Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek would be 1,231,978, 847,482, 615,987, 222,995 and 615,987, respectively. In addition, under a Cash Award Plan, if a change of control occurs within six months after a grant of RSUs, then Mr. Fuld would receive a payment equal to 350% of his previous annual cash compensation, Mr. Russo would receive 200%, and the other participants would receive 300%.

The Compensation Committee has delayed the payout of certain RSU awards received by executives in accordance with the Firm's 1995, 1996 and 1997 PSU award programs (the ''Extended RSUs''). Such extended vesting will support the Company's executive stock ownership objectives and ensure that senior executives continue to have a substantial economic interest in the Company. The Extended RSUs were initially scheduled to vest (and convert to Common Stock) in tranches at several successive fiscal year ends (the ''Prior Vesting Dates''). Each tranche of the Extended RSUs will now vest following termination of employment with the Firm, provided such termination occurs after the relevant Prior Vesting Date, or sooner upon death or disability or a change in control. Until the relevant Prior Vesting Date, each tranche of Extended RSUs was or will be subject to forfeiture under the terms of the original award; thereafter, the Extended RSUs will remain subject to forfeiture for involuntary termination with cause or if the recipient engages in detrimental activity. Pursuant to the foregoing, Messrs. Fuld, Gregory, Jack, Russo and Vanderbeek presently hold 1,471,646.56, 1,081,100.76, 630,340.38, 190,343.94 and 630,340.38 Extended RSUs, respectively, with values based on the November 29, 2002 closing price per share of Common Stock of $61.40 totaling $90,359,099, $66,379,587, $38,702,899, $11,687,118 and $38,702,899, respectively. All of the Extended RSUs are included in the total RSU holdings disclosed in footnote (a) to the Summary Compensation Table contained herein.

16

## PERFORMANCE GRAPH

The performance graph below illustrating cumulative stockholder return compares the performance of the Common Stock, measured at each of the Company's last five fiscal year-ends, with that of (1) the S&P 500 Index and (2) the S&P Financial Index.

The graph assumes $100 was invested in the Common Stock and each index on November 30, 1997, and that all dividends were reinvested in full.

**Cumulative Total Return
For Lehman Brothers Holdings Inc. Common Stock,
the S & P 500 Index and the S & P Financial Index**



| | Cumulative Total Return (in dollars) | | | | |
|---|---|---|---|---|---|
| | 11/30/97 | 11/30/98 | 11/30/99 | 11/30/00 | 11/30/01 | 11/30/02 |
| Lehman Brothers Holdings Inc. ........... | 100.00 | 99.43 | 152.84 | 199.35 | 267.09 | 249.42 |
| S & P 500 Index ....................... | 100.00 | 123.66 | 149.50 | 143.19 | 125.69 | 104.94 |
| S & P Financial Index ................... | 100.00 | 114.66 | 124.29 | 140.45 | 136.45 | 125.76 |

17

CONFIDENTIAL

## CERTAIN TRANSACTIONS AND AGREEMENTS
## WITH DIRECTORS AND EXECUTIVE OFFICERS

In the ordinary course of business, the Firm from time to time engages in transactions with other corporations or financial institutions whose officers or directors are also executive officers or Directors of the Company. Transactions with such corporations and financial institutions are conducted on an arm's-length basis and may not come to the attention of the Directors or executive officers of the Company or those of the other corporations or financial institutions involved.

To the extent permitted by the Sarbanes-Oxley Act of 2002, Directors and executive officers of the Company and their associates from time to time may be or may have been indebted to the Company or its subsidiaries under lending arrangements offered by those companies to the public. For example, such persons may be or may have been indebted to LBI, as customers, in connection with margin account loans, revolving lines of credit and other extensions of credit. Such indebtedness is in the ordinary course of business, is substantially on the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with other persons and does not involve a more than normal risk of collectibility or present other unfavorable features. In addition, such executive officers, Directors and associates may engage in transactions in the ordinary course of business involving other goods and services provided by the Firm, such as investment services, limited partnership investments and financial counseling, on terms similar to those extended to employees of the Company generally. From time to time, the Company, through certain of its subsidiaries, in the ordinary course of business has provided investment, financial advisory and other services to certain corporations and entities with which certain of its Directors are affiliated.

Throughout Fiscal 2002 the Company was party to a consulting agreement with Henry Kaufman & Company, Inc. ("HK Company") pursuant to which HK Company will provide, upon request, advice to the Firm on global initiatives, economic forecasts and other matters. HK Company receives a consulting fee of $12,500 per month. Henry Kaufman, a Director of the Company, is a principal of HK Company. The contract expires in April 2003, subject to renewal by agreement of the parties.

Directors and qualifying employees and consultants of the Firm who are accredited investors have been provided with the opportunity to invest as limited partners in various investment partnerships that qualify as "employees' securities companies" for purposes of the Investment Company Act of 1940. These investment partnerships provide the participants with an opportunity to make investments in a portfolio of investment opportunities, often together with the Firm's private equity, venture capital and real estate funds that are offered to third-party investors. The Company, either directly or through a subsidiary, is the general partner of these investment partnerships. None of the rights of directors as limited partners in these investment partnerships are contingent in any way on their continued service as directors.

Lehman Brothers Capital Partners III, L.P. ("Capital Partners III") was established in 1995. The general partner has made preferred capital contributions equal to eight times the amount of capital contributed by the limited partners. The amount of the general partner's capital contribution, together with a fixed return thereon, which varies from month to month and averaged 4.2% for Fiscal 2002, is generally distributed to the general partner before any distributions are made to the limited partners. The limited partners' respective capital contributions are then returned and subsequent profits, if any, are divided 90% to the limited partners and 10% to the general partner. During Fiscal 2002, Mr. Fuld received distributions from Capital III of $77,000 (representing $61,138 of profits and $15,862 of returns of capital). The amount of Mr. Fuld's unreturned limited partner capital in Capital Partners III as of November 30, 2002 did not exceed $60,000.

18

CONFIDENTIAL

LEH-RSU 0020617

Lehman Brothers Capital Partners IV, L.P. ("Capital Partners IV") was established in 1997. The general partner has made capital contributions equal to 25% of the amount of capital contributed by the limited partners. Recourse financing for 75% of limited partner contributions was offered to the limited partners by the general partner. A fixed return on the general partner's capital contribution, which return varies from month to month and averaged 4.2% for Fiscal 2002, is generally distributed to the general partner before any other distributions are made. A fixed return at the same rate is then distributed to the limited partners on 75% of their capital contributions. Thereafter, capital contributions are returned to the limited partners and then the general partner, and subsequent profits, if any, are divided 90% to the limited partners and 10% to the general partner. The table below sets forth for each of the limited partners listed (1) the amount of distributions from Capital Partners IV during Fiscal 2002, (2) the amount of unreturned limited partner capital in Capital Partners IV as of November 30, 2002 and (3) the amount of recourse financing remaining as of November 30, 2002.

| Limited Partner | Fiscal 2002 Distributions (1) | Unreturned LP Capital as of 11/30/02 (2) | Recourse Financing Remaining as of 11/30/02 |
|---|---|---|---|
| Michael L. Ainslie ..................... | * | $ 79,160 | $ 230,704 |
| Roger S. Berlind ...................... | * | 309,864 | - |
| Thomas H. Cruikshank .................. | * | 79,160 | 230,704 |
| Richard S. Fuld, Jr. .................... | $434,693 | 949,920 | 2,768,453 |
| David Goldfarb ....................... | * | 59,370 | 173,028 |
| Joseph M. Gregory .................... | 289,795 | 633,280 | 1,845,635 |
| Jeremy Isaacs ........................ | 64,500 | 118,740 | 346,057 |
| Bradley H. Jack ...................... | 289,795 | 633,280 | 1,845,635 |
| Henry Kaufman ....................... | * | 309,864 | - |
| Thomas Russo ........................ | 90,561 | 197,900 | 576,761 |
| Jeffrey Vanderbeek ................... | 289,795 | 633,280 | 1,845,635 |
| Adult children of John F. Akers** .......... | 72,449 | 158,320 | 461,409 |
| Adult children of John D. Macomber** ...... | 72,449 | 158,320 | 461,409 |
| Adult children of Dina Merrill** ........... | * | 79,160 | 230,704 |

* Aggregate 2002 distributions did not exceed $60,000.

** In the aggregate.

(1) The distributions shown are net of amounts used to repay any related financing provided by the general partner, which amounts were $81,307 for Mr. Fuld, $54,205 for Mr. Gregory, $54,205 for Mr. Jack, $16,939 for Mr. Russo, $54,205 for Mr. Vanderbeek, an aggregate of $13,551 for adult children of Mr. Akers, and an aggregate of $13,551 for adult children of Mr. Macomber.

(2) The limited partner capital shown is net of related financing provided by the general partner.


Lehman Brothers Partnership Account 2000/2001, L.P. ("Partnership Account 2000") was established in 2000. The general partner has committed to make capital contributions equal to four times the amount of capital contributed by the limited partners. Fifty percent of the general partner's capital is with recourse to the limited partners. A fixed return on the general partner's capital contributions, which return varies from month to month and averaged 7.74% for Fiscal 2002, is generally distributed to the general partner before any other distributions are made. Thereafter, capital contributions are returned to the general partner and then to the limited partners, and subsequent profits, if any, are divided 90% to the limited partners and 10% to the general partner. Partnership Account 2000 did not make any distributions in Fiscal 2002. As of November 30, 2002, the amount of

19

the general partner's contribution which was with recourse to the limited partners was $104,438 for each of Messrs. Ainslie, Berlind, Goldfarb, Kaufman and Russo, $208,876 for each of Messrs. Fuld, Gregory, Isaacs, Jack and Vanderbeek, an aggregate of $104,438 for adult children of Mr. Akers, an aggregate of $104,438 for adult children of Mr. Macomber and an aggregate of $104,438 for adult children of Ms. Merrill. The amount of unreturned limited partner capital in Partnership Account 2000 as of November 30, 2002 was $75,000 for each of Messrs. Ainslie, Berlind, Goldfarb, Kaufman and Russo, $150,000 for each of Messrs. Fuld, Gregory, Isaacs, Jack and Vanderbeek, an aggregate of $75,000 for adult children of Mr. Akers, an aggregate of $75,000 for adult children of Mr. Macomber and an aggregate of $75,000 for adult children of Ms. Merrill.

Lehman Brothers Capital Partners II, L.P. ("Capital Partners II") was established in 1988. All partner capital has been returned from Capital Partners II and any future profits will be divided 30% to the limited partners and 70% to the general partner. Capital Partners II did not make any distributions in Fiscal 2002.

Lehman Brothers Venture Capital Partners I, L.P. ("Venture Capital I"), Lehman Brothers Communications Capital Partners I, L.P. ("Communications Capital I"), Lehman Brothers Venture Capital Partners II, L.P. ("Venture Capital II") and Lehman Brothers Real Estate Capital Partners I, L.P. ("Real Estate Capital I") were established in 1999 to 2001. The general partner has contributed 1% of the capital of each of these partnerships. After returns of capital to the partners, any profits are distributed to the partners in proportion to their capital contributions, except that 10% of the profits of Communications Capital I, Venture Capital II and Real Estate Capital I otherwise distributable to the limited partners are, subject to certain exceptions, distributed to the general partner instead. None of these partnerships made distributions in Fiscal 2002 of more than $60,000 to any of the limited partners named in the table below, other than Venture Capital I, which made distributions to Mr. Fuld during Fiscal 2002 of $67,851 (representing $49,275 of profits and $18,576 of returns of capital). The table below sets forth the amounts of unreturned limited partner capital in these partnerships as of November 30, 2002 for each of the limited partners listed.

| | Unreturned LP Capital as of 11/30/02 | | | |
|---|---|---|---|---|
| Limited Partner | Venture Capital I | Communications Capital I | Venture Capital II | Real Estate Capital I |
| Michael L. Ainslie ..................... | - | $ 62,500 | - | - |
| Roger S. Berlind ....................... | $ 94,876 | 62,500 | * | - |
| Thomas H. Cruikshank ................... | 94,876 | 62,500 | - | - |
| Richard S. Fuld, Jr. ................... | 711,572 | 375,000 | $171,000 | $335,412 |
| David Goldfarb ........................ | 118,595 | * | 85,500 | 223,608 |
| Joseph M. Gregory ..................... | 474,381 | 250,000 | 171,000 | 335,412 |
| Jeremy Isaacs ......................... | 189,752 | 125,000 | 171,000 | 335,412 |
| Bradley H. Jack ....................... | 474,381 | 375,000 | 171,000 | 335,412 |
| Henry Kaufman ......................... | - | 62,500 | - | - |
| Thomas Russo .......................... | 284,629 | 75,000 | 85,500 | 223,608 |
| Jeffrey Vanderbeek .................... | 474,381 | 250,000 | 85,500 | 335,412 |
| Adult children of John F. Akers** ......... | 94,876 | 62,500 | - | - |
| Adult children of John D. Macomber** ...... | 94,876 | 62,500 | * | 89,443 |
| Adult children of Dina Merrill** .......... | 94,876 | 62,500 | - | * |

\*    Does not exceed $60,000.

\*\*    In the aggregate.

20

LEH-RSU 0020619

## CERTAIN TRANSACTIONS AND AGREEMENTS WITH
## AMERICAN EXPRESS AND SUBSIDIARIES

American Express Company ("American Express") beneficially owned a majority of the Company's Redeemable Voting Preferred Stock, par value $1.00 per share, until July 15, 2002, when all of the Company's Redeemable Voting Preferred Stock was redeemed.

American Express Travel Related Services Company, Inc. ("TRS") provides the Corporate Card to employees of the Firm, for which TRS has waived all annual fees. In January 1994, the Company agreed to consolidate all of the Firm's domestically initiated business travel reservations through the TRS Travel Center in Omaha. Such arrangements with respect to the Corporate Card and travel services continue to be in effect.

In August 1990, American Express agreed to guarantee certain payments to employees who were then active employees of the Company under certain deferred compensation programs. As of January 31, 2003, deferred compensation with an aggregate balance of approximately $48.2 million was covered by this guarantee. The Company pays American Express an annual fee equal to 0.625% on approximately 60% of the outstanding balance under such deferred compensation plans, in consideration of American Express maintaining the guarantee.

The Firm, from time to time, provides investment banking, commercial paper placement, brokerage and various other financial services such as repurchase transactions, investment advisory, strategic advisory and derivative products to American Express and its subsidiaries, including acting as placement agent for medium-term notes, dealer for commercial paper and advisor regarding certain dispositions. The Firm, American Express and its subsidiaries also engage in the ordinary course of business in various trading and short-term funding transactions, including foreign exchange and precious metals transactions. In addition to the services referred to above, American Express and its subsidiaries provide banking and other financial services to the Firm. All of these transactions are done on an arm's-length basis with customary fees.

The Company and American Express entered into an Agreement dated May 26, 1994 (the "Tax Allocation Agreement"), which provided for the allocation, settlement and payment of the Company's federal, state and local income tax liabilities for the years during which the Company and any of its subsidiaries were included in the American Express consolidated Federal income tax return or any combined or unitary state and local tax returns. Under the terms of the Tax Allocation Agreement, American Express retained significant control and discretion over issues relating to the allocation, settlement and payment of the covered tax liabilities, including the resolution of proposed audit adjustments. For income tax filings relating to periods commencing on or after June 1, 1994 (the date of the Company's spin-off from American Express), the Company files its own consolidated Federal income tax return and applicable state and city filings.

The Company, LBI and Lehman Commercial Paper Inc. (collectively, the "LB Co-tenants") were co-tenants together with American Express and certain of its subsidiaries (the "AXP Co-tenants" and, together with the LB Co-tenants, the "Co-tenants") of the leasehold interest in 3 World Financial Center in New York City (the "Property") until September 6, 2002. On September 6, 2002, the Firm sold its interest in the Property to an unrelated party. The Co-tenants' relationship with respect to the Property was governed by an Agreement of Tenants-In-Common. The agreement provided, among other things, that each Co-tenant was obligated to pay its proportionate share of all Property obligations and limited the actions that could be taken by individual Co-tenants.

21

CONFIDENTIAL

LEH-RSU 0020620

## PROPOSAL 2

## RATIFICATION OF THE COMPANY'S SELECTION OF ITS AUDITORS

The Board of Directors recommends to the Stockholders that they ratify the selection by the Audit Committee of Ernst & Young LLP, independent auditors, to audit the accounts of the Firm for the fiscal year ending November 30, 2003.

The affirmative vote of the majority of the shares of Common Stock present in person or by proxy at the Annual Meeting is required to ratify the selection of auditors. In determining whether the proposal has received the requisite number of affirmative votes, abstentions will be counted and will have the same effect as a vote against the proposal. Broker nonvotes will have no impact on such matter since they are not considered "shares present" for voting purposes.

In the event that the Stockholders fail to ratify the appointment, the Audit Committee will consider it a direction to select other auditors for the subsequent year. Even if the selection is ratified, the Audit Committee, in its discretion, may direct the appointment of a new independent accounting firm at any time during the year if the Audit Committee feels that such a change would be in the best interests of the Company and its Stockholders.

A representative of Ernst & Young LLP will be present at the Annual Meeting and will have the opportunity to make a statement if he or she desires to do so and will be available to respond to appropriate questions.

**The Board of Directors unanimously recommends a vote FOR Proposal No. 2.**

## ERNST & YOUNG LLP FEES FOR FISCAL 2002

*Audit Fees.*   Audit fees billed to the Company by Ernst & Young LLP with respect to the Fiscal 2002 financial statements were $6,000,000.

*Financial Information Systems Design and Implementation Fees.*   No services were performed by, or fees incurred to, Ernst & Young LLP in connection with financial information systems design and implementation projects for Fiscal 2002. The provision of such services to the Company by its independent auditors is now prohibited by the Sarbanes-Oxley Act of 2002.

*All Other Fees.*   All other fees billed by Ernst & Young LLP with respect to Fiscal 2002 were $10,321,000, including audit related services of $7,945,000, tax services of $1,476,000 and other non-audit services of $900,000. Audit related services generally include fees for statutory and employee benefit plan audits, other attest services for certain subsidiary companies, accounting consultations, due diligence work on certain assets acquired by the Company and work on SEC registration statements. Tax services primarily involve assistance with tax return compliance.

The Audit Committee considered whether the provision of services described above under "All Other Fees" is compatible with maintaining Ernst & Young's independence.

The Audit Committee has adopted an auditor independence policy that limits the scope of non-audit services that may be provided to the Company by its independent auditor. The policy specifically prohibits, among other things, provision by the independent auditor to the Company of strategic consulting services of the type typically provided by management consulting firms. The Company will also comply with the provisions of the Sarbanes-Oxley Act of 2002 and the related SEC rules pertaining to auditor independence and audit committee pre-approval of audit and non-audit services. It is expected that the independent auditors will continue to provide certain accounting,

22

CONFIDENTIAL

LEH-RSU 0020621

auditing and tax-related services to the Company and its affiliates, including tax advisory services, due diligence services and audit related services.

## AUDIT COMMITTEE REPORT

The Audit Committee of the Company's Board of Directors is composed of three non-management Directors and operates under a written charter adopted by the Board of Directors. The Audit Committee is responsible for the selection of the Company's independent auditors.

Management is responsible for the Company's internal controls, the financial reporting process and preparation of the consolidated financial statements of the Company. The independent auditors are responsible for performing an independent audit of the Company's consolidated financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes. It should be noted that the Committee members are not professionally engaged in the practice of accounting or auditing.

In this context, the Committee has met and held discussions with management and the independent auditors. Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with generally accepted accounting principles. The Audit Committee reviewed and discussed the consolidated financial statements with management and the independent auditors. The Audit Committee further discussed with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees) as amended.

The Company's independent auditors also provided to the Audit Committee the written disclosures and letter required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), and the Audit Committee discussed with the independent auditors that firm's independence.

Based upon the Audit Committee's discussions with management and the independent auditors and the Audit Committee's review of the representations of management and the report and letter of the independent auditors provided to the Audit Committee, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended November 30, 2002 for filing with the Securities and Exchange Commission.

Audit Committee:

Roger S. Berlind, Chairman
Michael L. Ainslie
Thomas H. Cruikshank
February 28, 2003

23

## PROPOSAL 3

### RE-APPROVAL OF THE SHORT-TERM EXECUTIVE COMPENSATION PLAN (FORMERLY NAMED THE 1996 SHORT-TERM EXECUTIVE COMPENSATION PLAN), AS AMENDED

The Board of Directors originally adopted the 1996 Short-Term Executive Compensation Plan (the "1996 STEP") on January 30, 1996, subject to approval by the Stockholders. The Stockholders approved the 1996 STEP on April 10, 1996 and the Compensation Committee has granted bonuses to the Firm's employees thereunder. However, in order to meet the requirements for the continuing deductibility of payments under Section 162(m) of the Internal Revenue Code (the "Code"), the Compensation Committee has determined that it is in the best interest of the Firm to resubmit the plan to Stockholders of the Company for their approval. The terms of the plan, as amended (the "STEP"), are outlined below, but the outline is qualified in its entirety by reference to the full text of the STEP itself, which is attached hereto as Appendix B. We have also separately described the amendments to the plan that the Compensation Committee has approved.

Section 162(m) of the Code limits the Company's tax deduction to $1 million per year per executive for certain compensation paid to each of its Chief Executive Officer ("CEO") and the four highest compensated executives other than the CEO (each, a "Covered Employee"). In general, the regulations under Section 162(m) exclude from this limitation compensation that is, among other things, calculated based on "objective" performance criteria and awarded under a plan that has received stockholder approval. The Board therefore recommends stockholder approval of the STEP so that the Company may, if all other requirements of the regulations are met, fully deduct certain annual bonus payments to the Covered Employees (described below as "Special Bonuses") in compliance with Section 162(m) of the Code.

The STEP provides the Company with an effective vehicle to focus and motivate the annual performance of key employees of the Firm, offer such employees opportunities to attain competitive levels of compensation and reward those employees who have contributed to the profitability of the Company. If the Stockholders do not re-approve the STEP, no Special Bonuses (as defined below) will be paid under the STEP to Covered Employees, but Covered Employees may be paid other compensation, including Standard Bonuses (as defined below). However, as a result of Section 162(m) of the Code, such other compensation might not be tax deductible.

Future incentive awards under the STEP are not currently determinable.

**Summary of the STEP.**  The purpose of the STEP is to motivate and reward executives by making a significant portion of their annual bonuses directly dependent upon achieving key strategic objectives. The STEP provides the opportunity for the senior officers to earn substantial incentive cash compensation for attaining financial and operational objectives that are critical to the Company's ongoing growth and profitability.

The STEP allows the Compensation Committee (or, in certain situations, its delegate) to grant to certain employees of the Firm annual awards of two types-"Standard Bonuses" and "Special Bonuses" (each, a "Bonus"). Bonuses may be issued to members of the Firm's Executive Committee or other Managing Directors of the Firm. As of February 15, 2003, approximately 645 individuals were eligible to participate in the STEP.

A Standard Bonus may be granted in the discretion of the Compensation Committee or its delegate to any STEP participant. The amount of the Standard Bonus will be based on any criteria the Compensation Committee or its delegate wishes to consider, including but not limited to, the objective or subjective performance of the employee, the Company or any subsidiary or division thereof. A Standard Bonus will be paid at the time determined by the Compensation Committee or its delegate.

24

CONFIDENTIAL

LEH-RSU 0020623

As indicated above, the STEP has been designed and will be administered to provide "performance based" incentive compensation, within the meaning of Section 162(m) of the Code. To that end, a Special Bonus may be granted in the discretion of the Compensation Committee to any participant in the STEP who the Compensation Committee reasonably believes may be a Covered Employee. The amount of any Special Bonus will be based on objective performance goals established by the Compensation Committee, based on one or more of the following performance factors: (1) before or after tax net income; (2) earnings per share; (3) book value per share; (4) stock price; (5) return on Stockholders' equity; (6) expense management; (7) return on investment; (8) improvements in capital structure; (9) profitability of an identifiable business unit or product; (10) profit margins; (11) budget comparisons; (12) total return to Stockholders and (13) the performance of the Company relative to a peer group of companies on any of the measures above. The performance goals for STEP participants who have primary responsibility for a business unit of the Firm may be measured on business unit operating profit, business unit operating profit as a percent of revenue, and/or measures related to business unit profitability above its cost of capital, in place of some or all of the corporate performance measures. The Committee must certify as to the attainment of the applicable performance goals prior to payment of any Special Bonus, and may reduce the amount of any Special Bonus. All terms and conditions of Special Bonuses, and the STEP provisions referring thereto, are intended to be administered and interpreted in accordance with Section 162(m) of the Code, to ensure the deductibility by the Company of the Special Bonuses. The performance goals based on one or more of the foregoing performance factors will be established by the Compensation Committee no more than 90 days after the commencement of the period to which the performance goals relate (or, if less, the number of days which is equal to 25 percent of the relevant performance period).

The Compensation Committee has the authority to determine in its sole discretion the applicable performance period relating to any Bonus; provided, however, that any such determination with respect to a Special Bonus shall be subject to any applicable restrictions imposed by Section 162(m) of the Code.

At the end of the applicable performance period, the Compensation Committee must certify as to the attainment of the applicable performance goals prior to payment of any Special Bonus, and may reduce (but not increase) the amount of any Special Bonus. Bonuses will be paid, as soon as practicable after certification of attainment of performance goals, where required, by the Compensation Committee, in cash. Payment may be deferred, in part or whole, on a mandatory basis by the Compensation Committee or electively by participants with Compensation Committee approval. The maximum amount of a Special Bonus under the STEP that may be granted in any fiscal year to any one participant is 2.0% of the Firm's consolidated income before taxes and dividends paid on the Company's trust preferred securities (as stated in the Company's audited consolidated financial statements) in the fiscal year in respect of which the Special Bonus is to be paid. The maximum amount need not be awarded.

The STEP may be amended or suspended in whole or in part at any time and from time to time by the Compensation Committee.

**Summary of Amendments.**    The amended plan removes from the list of eligible plan participants all references to the Company's Corporate Management Committee, as that committee no longer exists. The amended plan also clarifies the calculation of the maximum Special Bonus that may be granted to any one participant under the plan in any fiscal year.

The affirmative vote of the holders of a majority of the shares of Common Stock present in person or by proxy at the Annual Meeting is required for adoption of the proposal concerning the STEP. In accordance with Section 162(m) of the Code, in determining whether the proposal has received the requisite number of affirmative votes, abstentions will be counted and will have the same effect as a

CONFIDENTIAL                                                                                    LEH-RSU 0020624

vote against the proposal. Broker nonvotes will have no impact on such matter since they are not considered "shares present" for voting purposes.

**The Board of Directors unanimously recommends a vote FOR Proposal No. 3.**

## EQUITY COMPENSATION PLAN INFORMATION

In accordance with SEC rules, the following table sets forth certain information as of November 30, 2002, regarding the Firm's equity compensation plans for stock-based awards.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (1) | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders(2) | 13.3 million | $39.93 | 15.5 million |
| Equity compensation plans not approved by security holders(3) | 70.2 million | $45.03 | 59.3 million |
| Total .................. | 83.5 million | $44.21 | 74.8 million |

(1) In addition to securities to be issued upon the exercise of outstanding options, warrants and rights, there are 7.4 million RSUs outstanding under shareholder approved plans and 61.9 million RSUs outstanding under non-shareholder approved plans. Where feasible, based on market conditions and other factors, shares of common stock are repurchased in the market to offset the future delivery requirements associated with options and RSUs. As of February 14, 2003, approximately 50.1 million shares have been repurchased by the Company with respect to outstanding awards and are held in the Incentive Plans Trust.

(2) Securities remaining available for future issuance under equity compensation plans approved by security holders include 9.3 million shares under the 1994 Management Ownership Plan and the 1996 Management Ownership Plan and 6.2 million shares under the Company's Employee Stock Purchase Plan (the "ESPP"). The ESPP is a broadly-based plan, qualified under Section 423 of the Internal Revenue Code and is described further in Note 10 to the Company's Fiscal 2002 Consolidated Financial Statements included in the Annual Report.

(3) Shares shown under equity compensation plans not approved by security holders are issued under the Employee Incentive Plan (the "EIP"), which was originally adopted by the Board of Directors as of April 5, 1995 and is described further in Note 10 to the Company's Fiscal 2002 Consolidated Financial Statements included in the Annual Report. Shareholder approval was not required for the EIP under the current rules of the New York Stock Exchange because it is a broadly-based plan, as a majority of the Firm's full-time U.S. employees are eligible for awards under the plan and a majority of the awards during any three-year period are to employees who are not officers or directors.

## OTHER MATTERS

Management does not know of any business to be transacted at the meeting other than as indicated herein. Should any such matter properly come before the meeting for a vote, the persons designated as proxies will vote thereon in accordance with their best judgment.

You are urged to sign, date and return the enclosed proxy card as promptly as possible, using the prepaid envelope provided for such purpose, or to vote online or by telephone according to the instructions on the proxy. It is hoped that registered Stockholders will give us advance notice of their plans to attend the Annual Meeting by marking the box provided on the proxy card or by registering their intention when voting online or by telephone.

CONFIDENTIAL

LEH-RSU 0020625

If you will need special assistance at the Annual Meeting because of a disability, please contact the Secretary of the Company, Mr. Jeffrey A. Welikson, at (212) 526-0858 or at jwelikso@lehman.com. Directions to the meeting are on the last page of this Proxy Statement.

**Householding.**  In accordance with a notice sent previously to certain beneficial owners holding shares in street name (for example, through a bank, broker or other holder of record) and who share a single address with other similar holders, only one annual report and proxy statement is being sent to that address unless contrary instructions were received from any shareholder at that address. This practice, known as "householding," is designed to reduce printing and postage costs. Any of such beneficial owners may discontinue householding by writing to the address or calling the telephone number provided for such purpose by their holder of record. Any such shareholder may also request prompt delivery of a copy of the annual report or proxy statement by contacting the Company at (212) 526-0858 or by writing to the Secretary, Lehman Brothers Holdings Inc., 399 Park Avenue, 11th Floor, New York, New York 10022.

Other beneficial owners holding shares in street name may be able to initiate householding if their holder of record has chosen to offer such service, by following the instructions provided by the record holder.

**Deadline and procedures for submitting proposals for next year's meeting.**  Stockholders who intend to present proposals for inclusion in the proxy material to be distributed by the Company in connection with the Company's 2004 Annual Meeting of Stockholders must submit their proposals to the Secretary of the Company on or before October 31, 2003.

In addition, in accordance with Article II, Section 9 of the Company's By-Laws, in order to be properly brought before the 2004 Annual Meeting by a Stockholder, notice of a matter must be received by the Company no earlier than December 10, 2003 and no later than January 9, 2004. The notice must set forth as to each matter that the Stockholder proposes to bring forth (1) a brief description of the business desired to be brought forth and the reasons for conducting such business at the Annual Meeting, (2) the name and address, as they appear on the Company's books, of the Stockholder, (3) the number of shares of Common Stock beneficially owned by the Stockholder, (4) any material interest of the Stockholder in such business and (5) any other information relating to the Stockholder or the proposal that is required to be disclosed pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended.

**Deadline and procedures for making nominations for director at next year's meeting.** Stockholders who intend to nominate persons for election to the Board of Directors at the Company's 2004 Annual Meeting of Stockholders must give notice to the Secretary of the Company no earlier than December 10, 2003 and no later than January 9, 2004. The notice must set forth, as to each nominee, (1) the name, age, business address and residence address of the person, (2) the principal occupation or employment of the person, (3) the class and number of shares of capital stock of the Company, if any, which are beneficially owned by the person and (4) any other information relating to the person that is required to be disclosed in solicitations for proxies in election of directors pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended, and as to such Stockholder, (1) the name and record address of the Stockholder and (2) the class and number of shares of capital stock of the Company which are beneficially owned by the Stockholder.

**Incorporation by reference.**  As indicated above under "Equity Compensation Plan Information," we have incorporated the description of the Company's Employee Stock Purchase Plan and Employee Incentive Plan by reference to Note 10 to the Company's Fiscal 2002 Consolidated Financial Statements included in the Annual Report delivered in connection with this proxy statement.

CONFIDENTIAL

LEH-RSU 0020626

## DIRECTIONS TO THE LEHMAN BROTHERS HOLDINGS INC.
## 2003 ANNUAL MEETING OF STOCKHOLDERS

The 2003 Annual Meeting of Stockholders will be held at 399 Park Avenue, on the east side of midtown Manhattan, between 53rd and 54th Streets and Park and Lexington Avenues. The building is in the vicinity of several subway lines, and is also readily accessed by bus, taxicab or automobile. **Persons attending the Annual Meeting must enter the 399 Park Avenue building through its Lexington Avenue entrance. All persons wishing to be admitted must present photo identification.**

28

CONFIDENTIAL

LEH-RSU 0020627

APPENDIX A

## LEHMAN BROTHERS HOLDINGS INC.
## AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
## CHARTER

I.  PURPOSE

The purpose of the Audit Committee of the Board of Directors shall be to:

A.  Assist the Board of Directors in fulfilling its oversight of:

1.  The quality and integrity of the Corporation's financial statements;

2.  The Corporation's compliance with legal and regulatory requirements;

3.  The qualifications and independence of the Corporation's independent auditors; and

4.  The performance of the Corporation's internal audit and compliance functions and its independent auditors.

B.  Prepare any reports that the rules of the Securities and Exchange Commission ("SEC") require be included in the Corporation's annual proxy statement.

II.  STRUCTURE AND OPERATIONS

A.  Composition and Qualifications

1.  The Audit Committee shall be comprised of three or more members of the Board of Directors and shall comply with the "independent director" requirements under the rules of the New York Stock Exchange (the "NYSE") and the federal securities laws and the rules of the SEC promulgated thereunder.

2.  Each member of the Audit Committee shall have a working familiarity with basic finance and accounting terminology and practices, and at least one member shall have accounting or related financial management expertise.

B.  Compensation

No member of the Audit Committee shall receive from the Corporation or any of its subsidiaries (collectively, the "Firm") compensation prohibited by, or which violate the independence requirements of, applicable laws and rules and regulations of governmental bodies and self-regulatory organizations, including the SEC and the NYSE.

C.  Appointment and Removal

Each member of the Audit Committee shall be appointed by the Board of Directors and shall serve until such member's successor is duly elected and qualified or until such member's earlier resignation or removal. The members of the Audit Committee may be removed, with or without cause, by a majority vote of the Board of Directors.

D.  Chairman

Unless a Chairman is elected by the Board of Directors, the members of the Audit Committee shall designate a Chairman by the majority vote of the Audit Committee membership. The Chairman will chair all regular sessions of the Audit Committee.

A-1

CONFIDENTIAL

## III.  MEETINGS

A.  The Audit Committee shall meet at least quarterly, or more frequently as circumstances dictate. The Audit Committee shall periodically meet separately with each of management, the head of Internal Audit, the head of Compliance and the independent auditors to discuss any matters that the Audit Committee or any of these persons or groups believes would be appropriate to discuss privately. In addition, the Audit Committee shall meet with the Corporation's independent auditors, Internal Audit and management quarterly to review the Corporation's financial statements in a manner consistent with that outlined in Section IV of this Charter. The Chairman of the Board or any member of the Audit Committee may call meetings of the Audit Committee. All meetings of the Audit Committee may be held telephonically, provided that all persons participating in the meeting can hear each other.

B.  All non-employee directors that are not members of the Audit Committee may attend meetings of the Audit Committee but may not vote. Additionally, the Audit Committee may invite to its meetings any other director or member of management of the Corporation and such other persons as it deems appropriate in order to carry out its responsibilities. The Audit Committee may also exclude from its meetings any persons it deems appropriate in order to carry out its responsibilities.

## IV.  RESPONSIBILITIES AND DUTIES

The following functions shall be the ordinary recurring activities of the Audit Committee in carrying out its responsibilities outlined in Section I of this Charter. These functions should serve as a guide with the understanding that the Audit Committee may carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal or other conditions. The Audit Committee shall also carry out any other responsibilities and duties delegated to it by the Board of Directors from time to time related to the purposes of the Audit Committee outlined in Section I of this Charter.

The Audit Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern that the Audit Committee deems appropriate. In this regard, the Audit Committee shall have the authority to retain outside legal, accounting or other advisors for this purpose, including the authority to approve the fees payable to and expenses of such advisors and any other terms of retention, and any such fees and expenses so approved shall be obligations of the Corporation.

The Audit Committee shall be given full access to the Firm's books and records, Internal Audit and Compliance departments, the Board of Directors, corporate executives and independent accountants as necessary to carry out these responsibilities. While acting within the scope of its stated purpose, the Audit Committee shall have all the authority of the Board of Directors.

Notwithstanding the foregoing, the Audit Committee is not responsible for certifying the Corporation's financial statements or guaranteeing the independent auditors' report. The fundamental responsibility for the Corporation's financial statements and disclosures rests with management. The independent auditors are responsible for auditing the Company's financial statements and for reviewing the Company's unaudited interim financial statements.

A.  Documents/Reports Review

1.  Review with management, Internal Audit and the independent auditors prior to public dissemination the Corporation's annual audited financial statements and quarterly financial statements, including the notes thereto, and the Corporation's disclosures under ''Management's Discussion and Analysis of Financial Condition and Results of Operations'', contained or incorporated in its annual and quarterly reports filed with the

A-2

LEH-RSU 0020629

SEC, and discuss with the independent auditors the matters required to be discussed by Statements of Auditing Standards Nos. 61 and 90.

2.  Review and discuss the Corporation's earnings press releases (paying particular attention to the use of any "pro forma", "adjusted" or other non-GAAP financial measures and compliance thereof with relevant rules of the SEC), as well as financial information and earnings guidance provided to analysts and rating agencies, as required by applicable laws and rules or regulations of governmental bodies and self-regulatory organizations, including the SEC, the Public Company Accounting Oversight Board (the "PCAOB") or the NYSE.

3.  Review reports from management or Compliance of material findings, and the responses thereto, resulting from examinations by regulatory agencies, and discuss the foregoing, where appropriate, with Internal Audit and the independent auditors.

4.  Perform any functions required to be performed by it or otherwise appropriate under applicable law, rules or regulations, the Corporation's By-Laws and the resolutions or other directives of the Board.

B.  Independent Auditors

1.  Appoint, retain and terminate the Corporation's independent auditors (subject to shareholder ratification).

2.  Inform each registered public accounting firm employed by the Corporation for the purpose of preparing or issuing an audit report or related work that such firm shall report directly to the Audit Committee.

3.  Oversee the work of any registered public accounting firm employed by the Corporation for the purpose of preparing or issuing an audit report or related work, or performing other audit, review or attest services for the Corporation, including the resolution of any disagreement between management and the auditors regarding financial reporting.

4.  (a)  Approve in advance all audit, review and attest services and all non-audit services (including, in each case, the engagement fees therefor and terms thereof) to be performed by the independent auditors, in accordance with applicable laws and rules or regulations of governmental bodies and self-regulatory organizations, including the SEC, the PCAOB or the NYSE.

(b)  The fees and expenses of the independent auditors approved by the Audit Committee shall be obligations of the Corporation.

(c)  Notwithstanding the foregoing, the Audit Committee shall not approve or permit the performance by the independent auditors of any non-audit services that are prohibited or that impair the independence of the auditors under applicable law or rules or regulations of governmental bodies and self-regulatory organizations, including the SEC, the PCAOB or the NYSE.

5.  Review, at least annually, the qualifications, performance and independence of the independent auditors (including financial, employment and business relationships between the independent auditors and the Firm and rotation and compensation of audit personnel (each as defined in, and as prohibited or required by, applicable law and rules and regulations of governmental bodies and self-regulatory organizations, including the SEC, the PCAOB and the NYSE)) and present its conclusions to the Board of Directors.

A-3

LEH-RSU 0020630

C.   Financial Reporting Process

1.   In consultation with the independent auditors, management and the Controller's and Internal Audit departments, review the Corporation's disclosure controls and procedures and accounting and financial reporting processes and controls.

   (a)   The Audit Committee shall review with management and the independent auditors the scope of the proposed audit for the current year and the audit procedures to be utilized, including the staffing plan;

   (b)   The Audit Committee shall obtain and discuss with management and the independent auditors, prior to the filing of each audit report with the SEC, a report regarding:

      (i)    all critical accounting policies and practices of the Firm;

      (ii)   all alternative treatments within GAAP, for policies and practices related to material items, that have been discussed with management, including the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditors;

      (iii)  major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles;

      (iv)   major issues as to the adequacy of the Corporation's internal controls and any specific audit steps adopted in light of material control deficiencies; and

      (v)    any other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

2.   Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation.

3.   Review with the independent auditors (i) any audit problems or other difficulties encountered by the auditors in the course of the audit process, including any restrictions on the scope of the independent auditors' activities or on access to requested information and any significant disagreements with management, and (ii) management's responses to such matters. The Audit Committee should review with the independent auditors (i) any accounting adjustments that were noted or proposed by the auditors but were "passed" (as immaterial or otherwise), (ii) any material communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement and (iii) any letter issued, or proposed to be issued, by the independent auditors to the Corporation reporting material observations or recommendations regarding the Firm's internal controls.

D.   Internal Audit

1.   Review the appointment, compensation and replacement of the head of the Firm's Internal Audit department.

2.   Discuss with management and the independent auditors (i) the responsibilities, budget and staffing of the Internal Audit department and (ii) its proposed annual audit plan.

3.   Review a summary of findings from completed internal audits and management's responses and progress reports on the current internal audit plan.

A-4

                                                                    LEH-RSU 0020631

E.  Legal/Compliance

1.  Review periodically the scope of Compliance department activities and confer with Compliance representatives on significant compliance issues and the management process for correcting them.

2.  Review any reports from management, Compliance, Internal Audit and the independent auditors with respect to any material failures by the Firm to comply with applicable laws and regulations.

3.  Review significant cases of employee misconduct or fraud as brought to the Committee's attention by management Compliance, Internal Audit or the independent auditors.

F.  Other

1.  Discuss with management and the independent auditors the Corporation's guidelines and policies with respect to risk assessment and risk management. The Audit Committee should discuss the Corporation's major financial and other risk exposures (including technology risks) and the steps management has taken to monitor and control such exposures.

2.  Set clear policies for hiring by the Firm of current employees of the independent auditors (and their close family members), and of former employees of the independent auditors, that satisfy all applicable provisions of law and rules and regulations of governmental bodies and self-regulatory organizations, including the SEC, the PCAOB and the NYSE.

3.  Establish procedures for: (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Firm of concerns regarding questionable accounting or auditing matters.

4.  Perform such other functions as from time to time may be mandated by applicable law or rules or regulations of governmental bodies or self-regulatory organizations, including the SEC, the PCAOB and the NYSE.

G.  Reports

1.  Prepare all reports, policies and procedures of the Audit Committee required to be included in the Corporation's proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC.

2.  Report regularly to the Board of Directors including:

(a)  with respect to any issues that arise with respect to the quality or integrity of the Corporation's financial statements, the Firm's compliance with legal or regulatory requirements, the performance and independence of the Corporation's independent auditors or the performance of the Internal Audit department;

(b)  with respect to meetings of the Audit Committee; and

(c)  with respect to such other matters as are relevant to the Audit Committee's discharge of its responsibilities.

The Audit Committee shall provide such recommendations as the Audit Committee may deem appropriate. The report to the Board of Directors may take the form of an oral report by the Chairman or any other member of the Committee designated by the Committee to make such report.

A-5

    3.   Maintain or cause to be maintained minutes or other records of meetings and activities of the Audit Committee.

## V.  ANNUAL PERFORMANCE EVALUATION AND CHARTER REVIEW

A.   The Audit Committee shall perform a review and evaluation, at least annually, of the performance of the Audit Committee and its members, including by reviewing the compliance of the Audit Committee with this Charter.

B.   In addition, the Audit Committee shall review and reassess, at least annually, the adequacy of this Charter and recommend to the Board of Directors any improvements to this Charter that the Audit Committee considers necessary or valuable.

C.   The Audit Committee shall conduct such evaluations and reviews in such manner as it deems appropriate.

A-6

LEH-RSU 0020633

APPENDIX B

## LEHMAN BROTHERS HOLDINGS INC.
## SHORT-TERM EXECUTIVE COMPENSATION PLAN
### As amended through February 19, 2003

1.   **PURPOSE.**   The purpose of the Short-Term Executive Compensation Plan (the "Plan") is to advance the interests of Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), and its stockholders by providing incentives in the form of periodic bonus awards to certain employees of the Company and any of its subsidiaries or other related business units or entities ("Affiliates") including those who contribute significantly to the strategic and long-term performance objectives and growth of the Company and its Affiliates.

2.   **ADMINISTRATION.**   The Plan shall be administered by the Compensation and Benefits Committee of the Board of Directors (the "Committee"), as such committee is from time to time constituted. The Committee may delegate its duties and powers in whole or in part (i) to any subcommittee thereof consisting solely of at least two "outside directors," as defined under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) to the extent consistent with Section 162(m) of the Code, to any other individual or individuals.

The Committee has all the powers vested in it by the terms of the Plan set forth herein, such powers to include the exclusive authority to select the employees to be granted bonus awards ("Bonuses") under the Plan, to determine the size and terms of the Bonus to be made to each individual selected (subject to the limitation imposed on "Special Bonuses," as defined below), to modify the terms of any Bonus that has been granted (except with respect to any modification which would increase the amount of compensation payable to a "Covered Employee," as such term is defined in Section 162(m) of the Code), to determine the time when Bonuses will be awarded, to establish performance objectives in respect to Bonuses and to certify that such performance objectives were attained. The Committee is authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, and to make any other determinations that it deems necessary or desirable for the administration of the Plan. The Committee may correct any defect or supply any omission or reconcile any inconsistency in the Plan in the manner and to the extent the Committee deems necessary or desirable to carry it into effect. Any decision of the Committee in the interpretation and administration of the Plan, as described herein, shall lie within its sole and absolute discretion and shall be final, conclusive and binding on all parties concerned. No member of the Committee and no officer of the Company shall be liable for anything done or omitted to be done by him or her, by any other member of the Committee or by any officer of the Company in connection with the performance of duties under the Plan, except for his or her own willful misconduct or as expressly provided by statute.

3.   **PARTICIPATION.**   The Committee shall have exclusive power (except as may be delegated as permitted herein) to select the employees of the Company and its Affiliates who may participate in the Plan and be granted Bonuses under the Plan ("Participants"); provided, however, that Special Bonuses (as defined below) may only be granted to members of the Company's Executive Committee (or any successor entity of such committee in accordance with subsection (c) below) and other Managing Directors of the Company.

4.   **BONUSES UNDER THE PLAN**.

(a)  In General.  The Committee shall determine the amount of a Bonus to be granted to each Participant in accordance with subsections (b) and (c) below.

(b)  Standard Bonuses. The Committee may in its discretion grant to a Participant a cash Bonus (a "Standard Bonus") in the amount, and payable at the time, determined by the Committee or its

B-1

CONFIDENTIAL

delegate in its discretion. The amount of a Participant's Standard Bonus may be based upon any criteria the Committee wishes to consider, including but not limited to the objective or subjective performance of the Participant, the Company or any subsidiary or division thereof.

(c)  Special Bonuses. (i) The Committee may in its discretion award a Bonus to a Participant who it reasonably believes may be a Covered Employee (a "Special Bonus") for the taxable year of the Company in which such Bonus would be deductible, under the terms and conditions of this subsection (c). Subject to clause (iii) of this Section 4(c), the amount of a Participant's Special Bonus shall be an amount determinable from written performance goals approved by the Committee while the outcome is substantially uncertain and no more than 90 days after the commencement of the period to which the performance goal relates or, if less, the number of days which is equal to 25 percent of the relevant performance period. The maximum amount of any Special Bonus that may be granted in any given fiscal year shall be 2.0% of the consolidated income of the Company and its subsidiaries before taxes and dividends paid or payable on the Company's trust preferred securities earned by the Company and its subsidiaries (as stated in the Company's audited financial statements) in the fiscal year in respect of which the Special Bonus is to be paid.

(ii)  The amount of any Special Bonus will be based on objective performance goals established by the Committee using one or more performance factors. The performance criteria for Special Bonuses made under the Plan will be based upon one or more of the following criteria: (A) before or after tax net income; (B) earnings per share; (C) book value per share; (D) stock price; (E) return on Stockholders' equity; (F) expense management; (G) return on investment; (H) improvements in capital structure; (I) profitability of an identifiable business unit or product; (J) before or after tax profit margins; (K) budget comparisons; (L) total return to Stockholders; and (M) the relative performance of the Company against a peer group of companies on any of the measures above. Participants who have primary responsibility for a business unit of the Company may be measured on business unit operating profit, business unit operating profit as a percent of revenue and/or measures related to business unit profitability above its cost of capital, in place of some or all of the corporate performance measures.

(iii)  The Committee shall determine whether the performance goals have been met with respect to any affected Participant and, if they have, so certify and ascertain the amount of the applicable Special Bonus. No Special Bonuses will be paid until such certification is made by the Committee.

(iv)  The provisions of this Section 4(c) shall be administered and interpreted in accordance with Section 162(m) of the Code to ensure the deductibility by the Company or its affiliates of the payment of Special Bonuses.

5.    **DESIGNATION OF BENEFICIARY BY PARTICIPANT.**   The Committee or its delegate shall create a procedure whereby a Participant may file, on a form to be provided by the Committee, a written election designating one or more beneficiaries with respect to the amount, if any, payable in the event of the Participant's death. The Participant may amend such beneficiary designation in writing at any time prior to the Participant's death, without the consent of any previously designated beneficiary. Such designation or amended designation, as the case may be, shall not be effective unless and until received by the duly authorized representatives of the Committee or its delegate prior to the Participant's death. In the absence of any such designation, the amount payable, if any, shall be delivered to the legal representative of such Participant's estate.

6.    **MISCELLANEOUS PROVISIONS**.

(a)  No employee or other person shall have any claim or right to be paid a Bonus under the Plan. Determinations made by the Committee under the Plan need not be uniform and may be made selectively among eligible individuals under the Plan, whether or not such eligible individuals are similarly situated. Neither the Plan nor any action taken hereunder shall be construed as giving any employee or other person any right to continue to be employed by or perform services for the

B-2

Company or any Affiliate, and the right to terminate the employment of or performance of services by any Participant at any time and for any reason is specifically reserved to the Company and its Affiliates.

(b)  Except as may be approved by the Committee, a Participant's rights and interest under the Plan may not be assigned or transferred, hypothecated or encumbered in whole or in part either directly or by operation by law or otherwise (except in the event of a Participant's death) including, but not by way of limitation, execution, levy, garnishment, attachment, pledge, bankruptcy or in any other manner; provided, however, that, subject to applicable law, any amounts payable to any Participant hereunder are subject to reduction to satisfy any liabilities owed to the Company or any of its Affiliates by the Participant.

(c)  The Committee shall have the authority to determine in its sole discretion the applicable performance period relating to any Bonus; provided, however, that any such determination with respect to a Special Bonus shall be subject to any applicable restrictions imposed by Section 162(m) of the Code.

(d)  The Company and its Affiliates shall have the right to deduct from any payment made under the Plan any federal, state, local or foreign income or other taxes required by law to be withheld with respect to such payment.

(e)  The Company is the sponsor and legal obligor under the Plan, and shall make all payments hereunder, other than any payments to be made by any of the Affiliates, which shall be made by such Affiliate, as appropriate. Nothing herein is intended to restrict the Company from charging an Affiliate that employs a Participant for all or a portion of the payments made by the Company hereunder. The Company shall not be required to establish any special or separate fund or to make any other segregation of assets to assure the payment of any amounts under the Plan, and rights to the payment hereunder shall be no greater than the rights of the Company's unsecured, subordinated creditors, and shall be subordinated to the claims of the customers and clients of the Company. All expenses involved in administering the Plan shall be borne by the Company.

(f)  The validity, construction, interpretation, administration and effect of the Plan and rights relating to the Plan and to Bonuses granted under the Plan, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

(g)  Any controversy or dispute arising in connection with the Plan shall be resolved by arbitration pursuant to the Constitution and rules of the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc.

(h)  The Plan shall be effective as of April 8, 2003, subject to the affirmative vote of the holders of a majority of all shares of Common Stock of the Company present in person or by proxy at the Annual Meeting of the Company to be held on April 8, 2003.

7.  **PLAN AMENDMENT OR SUSPENSION.**   The Plan may be amended or suspended in whole or in part at any time and from time to time by the Committee.

8.  **PLAN TERMINATION.**   This Plan shall terminate upon the adoption of a resolution of the Committee terminating the Plan.

9.  **ACTIONS AND DECISION REGARDING THE BUSINESS OR OPERATIONS OF THE COMPANY AND/OR ITS AFFILIATES.**   Notwithstanding anything in the Plan to the contrary, neither the Company nor any of its Affiliates nor their respective officers, directors, employees or agents shall have any liability to any Participant (or his or her beneficiaries or heirs) under the Plan or otherwise on account of any action taken, or not taken, in good faith by any of the foregoing persons with respect to the business or operations of the Company or any Affiliates.

B-3

CONFIDENTIAL

LEH-RSU 0020636

10.  **SUBORDINATED CAPITAL STATUS.**    Notwithstanding any other provision of this Plan, any amounts due to Participants hereunder may be treated, in the Committee's sole discretion, to the extent that the Company accrues a liability in respect thereof, as subordinated capital of the Company in calculating the Company's net capital for regulatory purposes, and the terms of the Plan applicable to such amounts shall include (and, may be amended to add) such provisions as the Committee determines are necessary or appropriate in order to secure such treatment, including without limitation, provisions for the suspension of any payment obligation under the Plan under certain prescribed circumstances.

B-4

CONFIDENTIAL