WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Lauren B. Hoelzer

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>Westpac Banking Corporation,<br><br>    Defendant. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator" or "Plaintiff"), under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), and on behalf of Lehman Brothers Special Financing Inc. ("LBSF"), alleges the following, on knowledge as to LBSF's and LBHI's own acts and upon information and belief as to all other matters, against defendant Westpac Banking Corporation ("Westpac"):

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action seeking to recover millions of dollars in principal (and appropriate interest thereon) that Westpac owes to LBSF as a result of Westpac's early termination of 122 interest rate swap and credit default swap transactions between the parties (the "Swaps"). At the time that it terminated the Swaps, Westpac knew that LBSF was substantially "in-the-money" – *i.e.*, the present value of the expected payments that Westpac would have made to LBSF over the remaining life of the Swaps was over $14 million – but undertook a skewed valuation process designed to enable it to avoid making any payment to LBSF.

2. The agreement between the parties required Westpac to determine the amount it owed to LBSF as a result of Westpac's early termination of the Swaps through a commercially reasonable bidding process during which Westpac would request from four leading dealers the amount each dealer would pay to step into LBSF's shoes in respect of the terminated Swap(s) (the "Market Quotation" process). Westpac, however, breached the parties' agreement by ignoring the clear terms governing calculation and, instead, employed a commercially unreasonable methodology that significantly understated the amount owed by Westpac to LBSF. In fact, Westpac delivered to LBSF a calculation statement in which it asserted that LBSF owed *Westpac* an early termination payment in the amount of $4,876,225.

3. Had Westpac calculated the Settlement Amount as it was contractually obligated to do, it would have determined that, rather than LBSF owing Westpac a payment, Westpac owed LBSF millions of dollars. Westpac thus must now pay what it owes to LBSF, which amount will continue to accrue interest until payment is made in full.

## JURISDICTION AND VENUE

4. Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of title 11 of the United State Code (the "Bankruptcy Code").

5. This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 362(a)(3), 365(e)(1), 502(b), 541(a), 541(c)(1), and 542(b) of the Bankruptcy Code.

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

7. This Court has personal jurisdiction over Westpac because, among other reasons, Westpac has filed proofs of claim against various Lehman entities in connection with the dispute at issue in this adversary proceeding[1] and has appeared in the bankruptcy proceedings in connection with this dispute.

8. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

9. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

---

[1] Westpac has filed proofs of claim against LBSF and LBHI in their respective bankruptcies, each in the amount of $4,931,625.63 (the "Claims"). *See* Proofs of Claim Nos. 12129 and 12130.

2

WEIL:\95221815\8\58399.0011

10. Venue is proper in this Court under 28 U.S.C. § 1409(a) because the chapter 11 cases of LBHI and LBSF were filed and are pending in this district.

## THE PARTIES

11. LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

12. LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

13. Upon information and belief, Westpac is an Australian bank and financial services provider. Westpac's principal place of business is located in Sydney, New South Wales.

## BACKGROUND FACTS

### F. The Governing Documents

14. On March 31, 1996, LBSF and Westpac entered into a 1992 form (Multicurrency-Cross Border) ISDA Master Agreement (together with the associated schedule and exhibits and annexes thereto (the "Schedule") and Credit Support Annex, the "Master Agreement"). On various dates thereafter, LBSF and Westpac entered into the 122 Swaps pursuant to the Master Agreement.

15. The Master Agreement provides the basic terms of the parties' contractual relationship and contemplates supplementation by "confirmations" that provide the economic terms of the specific Swaps entered into under the Master Agreement. Each of the terminated

3

Swaps was documented by such a confirmation (collectively, the "Confirmations" and with the Master Agreement, the "Agreement").

16.     The Swaps consisted of 77 interest rate swaps (the "Rates Portfolio") and 45 credit default swaps (the "Credit Portfolio").

17.     Within the Rates Portfolio, 68 of the Swaps were plain "vanilla" interest rate swaps (the "Vanilla Swaps"), whereby one party periodically paid the other a fixed interest rate, while the other party paid a floating interest rate based on an index.  For some of these 68 "Vanilla Swaps," LBSF was the fixed interest rate payer; for others, it was the floating rate payer.  The nine other swaps within the Rates Portfolio were cross currency swaps (the "Cross Currency Swaps"), which involved two different currencies.  The principal amount of the Cross Currency Swaps is exchanged in each of the different currencies at the inception of the transaction and again at its maturity, with interest payments exchanged periodically during the life of each Swap.

18.     Among the Vanilla Swaps were 45 trades denominated in Australian Dollars (the "AUD Interest Rate Swaps"), 19 trades denominated in New Zealand Dollars (the "NZD Interest Rate Swaps"), three trades denominated in U.S. Dollars (the "USD Interest Rate Swaps"), and one trade denominated in Euros (the "EUR Interest Rate Swap").  The Cross Currency Swaps were comprised of eight trades involving Australian Dollars and U.S. Dollars (the "AUD/USD Cross Currency Swaps") and one trade involving New Zealand Dollars and U.S. Dollars (the "NZD/USD Cross Currency Swap").

19.     The Credit Portfolio consisted of 45 credit default swaps (the "Credit Default Swaps").  A credit default swap is a transaction in which one party periodically pays the other

4

party a fixed rate (a "Credit Spread") in exchange for credit protection on one or more debt issuers.

20. The Agreement is governed by English law.

### G. Westpac Terminates the Swaps

21. On September 15, 2008, LBHI, LBSF's corporate parent and its "Credit Support Provider" under the Master Agreement, commenced a case under chapter 11 of the Bankruptcy Code.[2] Pursuant to the terms of the Master Agreement, the bankruptcy filing of LBHI constituted an Event of Default that permitted Westpac to terminate the Swaps and designate an "Early Termination Date."[3] *See* Master Agreement §§ 5(a)(vii), 6(a). The Master Agreement then requires the Non-defaulting Party to determine the amount owed by or to it as a result of the early termination (the "Early Termination Payment"). *See id.* § 6(c)(ii).

22. On September 17, 2008, Westpac delivered to LBSF a notice of early termination (the "Termination Notice"), designating September 18, 2008 as the "Early Termination Date" for all 122 then outstanding Swaps.

23. As of the Early Termination Date, the terminated Swaps were collectively "in-the-money" to LBSF by more than $14 million. After offsetting the approximately $9 million of collateral and unpaid amounts owed to Westpac, Westpac should have paid LBSF approximately $5 million. Nonetheless, on September 30, 2008, Westpac delivered a calculation statement (the "Calculation Statement") stating that LBSF *owed Westpac* $4,876,225, plus interest, as a result of Westpac's early termination of the Transactions.

---

[2] LBSF filed its own chapter 11 petition on October 3, 2008.

[3] Capitalized terms not otherwise defined herein bear the meanings ascribed to them in the Agreement.

5

Pg 7 of 18

      **C.**      **The Master Agreement Required Westpac to Use "Second Method" and "Market Quotation" to Determine the Settlement Amount It Owed to LBSF**

24.    Section 6(e) of the Master Agreement governs the payment owed on the early termination date (the "Early Termination Payment"). *See id.* § 6(e). It allows the parties to elect in the Schedule the payment measure that will apply should an early termination date occur. *Id.* The parties have the option of selecting "Market Quotation" or "Loss" to determine the "Settlement Amount" and "First Method" or "Second Method." *Id.* The "Settlement Amount" represents the commercially reasonable value of the terminated Swaps, determined on the basis of Market Quotation or Loss. *See id.* § 14. The Settlement Amount is the primary component of the Early Termination Payment.[4]

25.    Here, the Schedule provides that the Early Termination Payment will be calculated based upon "Market Quotation" and "Second Method." *See* Schedule to the Master Agreement at Part 1(f). Second Method means that the party that is "in-the-money" on the Early Termination Date has a right to receive an early termination payment, regardless of whether it is the "Defaulting Party" (here, LBSF). *See* Master Agreement § 6(e)(i). Thus, the termination payment provisions to which the parties agreed are designed to provide each of the parties with their gain and loss under the Swaps as of the Early Termination Date regardless of which party defaulted, in essence preserving the benefit of the bargain and placing the parties in the same position they would have occupied but for the termination.

26.    "Market Quotation" is defined in the Master Agreement as follows:

---

[4] If the parties elect Market Quotation, once a commercially reasonable Market Quotation calculation is reached, the Non-defaulting Party then must add or subtract the net value of Unpaid Amounts that were due, but not paid prior to the Early Termination Date to determine the amount owed under Section 6(e) (here, LBSF owed Westpac $364,950 in Unpaid Amounts). *Id.* § 6(e)(i)(3). After taking into account any collateral that had been posted by the parties (here, Westpac posted $8,634,286.24 in collateral), the final step in calculating the Early Termination Payment is to calculate the amount of interest due. *Id.* § 14 (definitions).

6

> *"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. . . . If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*Id.* § 14.

27. "Reference Market-makers," in turn, is defined in the Master Agreement as follows:

> *"Reference Market-makers"* means *four* leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*Id.* (emphasis added).

28. Thus, Market Quotation requires that, upon early termination of a transaction, the Non-defaulting Party (here, Westpac) solicit quotations from exactly four Reference Market-makers for the amount that each would pay, or demand as payment, to step into the shoes of the Defaulting Party (here, LBSF) in respect of the Swaps; the valuation is determined by taking the mean of the middle two quotations if four quotations are received or the middle quotation if only three quotations are received. *See id.* § 14. If less than three of the four Reference Market-

7

makers solicited provide a quotation or the result is not commercially reasonable, then the Non-defaulting Party must use the Loss measure instead of the Market Quotation measure to calculate the Settlement Amount. *Id.* (defining Settlement Amount).[5]

### D. Westpac Failed to Adhere to the Requirements of Market Quotation in Valuing Both the Rates Portfolio and the Credit Portfolio, Thereby Breaching the Agreement

29. Westpac valued the 77 trades in the Rates Portfolio in various ways, none of which adhered to the requirements of Market Quotation. For the 45 AUD Interest Rate Swaps and eight AUD/USD Cross Currency Swaps, Westpac calculated its Loss using a model based on a combination of internal inputs and other inputs it sourced from the market. To value the remaining 24 Swaps in the Rates Portfolio, Westpac purported to follow the Market Quotation process, but requested quotations for replacement swaps from only three, rather than four, dealers in contravention of the Master Agreement. In certain cases, Westpac used the middle quotation it received for each Swap in a certain bucket to calculate the termination amounts, while in other cases it used the middle quotation it received for the entire bucket of Swaps. In other words, Westpac failed to use a consistent methodology in valuing the Swaps and instead chose differing methodologies favorable to Westpac.

30. Westpac similarly ignored the requirements of Market Quotation when valuing the 45 terminated Credit Default Swaps. Upon terminating the Credit Default Swaps on the Early Termination Date, Westpac should have followed the Market Quotation measure by asking

---

[5] The Master Agreement provides that "'Settlement Amount' means, with respect to a party and any Early Termination Date, the sum of: —(a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and (b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or *would not* (in the reasonable belief of the party making the determination) *produce a commercially reasonable result*." (Emphasis added).

8

Reference Market-makers what they would be willing to pay or would have to receive in order to step into LBSF's position in respect of the Credit Default Swaps. Westpac, instead, solicited and received then-current market Credit Spreads at which the dealers were willing to enter into new hedging transactions. Westpac then extrapolated the termination amounts for the Credit Default Swaps from these Credit Spreads.

### i. Westpac's Valuation of the Rates Portfolio Did Not Comply with the Terms of the Master Agreement

31. The Master Agreement requires Westpac to value the terminated Swaps using the Market Quotation measure. *Id.* § 6(e)(i)(3). The Master Agreement provides that the Non-defaulting Party must obtain market quotations that are "for an amount, if any, that would be paid to such party . . . or by such party . . . that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." *Id.* § 14 (definition of "Market Quotation"). Thus, to be valid, Market Quotations obtained by the Non-defaulting Party must reflect what a counterparty actually would pay to (or receive from) a dealer willing to enter into a replacement transaction. *Id.*

#### a. The AUD Interest Rate Swaps and the AUD/USD Cross Currency Swaps

32. In valuing the 45 AUD Interest Rate Swaps and eight AUD/USD Cross Currency Swaps in the Rates Portfolio, Westpac made no attempt to conduct a Market Quotation process consistent with the requirements of the Master Agreement. While Westpac's Calculation Statement misleadingly shows three "Quotes" for each of the AUD Interest Rate Swaps and for each leg of the AUD/USD Cross Currency Swaps, each such "Quote" actually reflects an amount calculated entirely by Westpac itself. Rather than requesting replacement values for each of these 53 terminated Swaps, Westpac requested data inputs from Reference Market-makers and

9

used these data inputs to construct its own rate curves, which it then used to calculate termination values for those Swaps. Furthermore, by its very construction, Westpac's calculation included significant bid/ask spreads for each of these Swaps far in excess of any bid/ask spread Westpac might have incurred in replacing the Swaps. As a result, the termination values it calculated reflected large amounts of hypothetical transaction costs that it never incurred.

33. Additionally, Westpac's valuation of the AUD/USD Cross Currency Swaps was further flawed by the exchange rates ("Spot Rates") that it used in converting the two currencies. Rather than simply converting the Australian Dollar legs of these trades into U.S. Dollars, the Termination Currency designated by Westpac, Westpac converted the U.S. Dollar legs into Australian Dollars and then converted the net value of the trades from Australian Dollars back into U.S. Dollars. This extra step artificially reduced Westpac's valuation to LBSF's detriment by more than $2 million dollars because Westpac applied two different Spot Rates, taken at different times of the day, for the very same trades. This "double conversion" makes no economic or contractual sense. After first calculating U.S. Dollar cash flows of the AUD/USD Cross Currency Swaps to be $345.6 million, Westpac converted that same U.S. Dollar value to Australian Dollars using the 4:30PM Sydney time exchange rate of 0.8005, and then it converted it back to U.S. Dollars at the 11:00AM Sydney time exchange rate of 0.7938. Through this trick, Westpac turned $345.6 million into $342.7 million and pocketed a $2.9 million windfall.

### b.    The Remaining Vanilla Swaps and Cross Currency Swaps

34. Westpac also failed to revert to Loss when it knew that the Market Quotation process had failed to yield a commercially reasonable result. *Id.* (defining Settlement Amount) (requiring that the Non-defaulting Party revert to the Loss measure if Market Quotation does not produce a commercially reasonable result); *see also supra* at n. 5. For example, even when one

10

of the quoting dealers clearly mispriced one of the NZD Interest Rate Swaps (its bid was approximately $900,000 away from the other two bids and Westpac's own internal valuation), Westpac nonetheless used that dealer's quotation to calculate the Early Termination Payment. Westpac had to have known this Swap was mispriced by this dealer, yet it still relied on that clearly erroneous quote in its calculation of the Market Quotation for that Swap. This is not permitted under the definition of Settlement Amount.

35. Moreover, the purported Market Quotation process that Westpac followed to value the remaining 24 Vanilla Swaps and Cross Currency Swaps in the Rates Portfolio (*i.e.*, the 19 NZD Interest Rate Swaps, three USD Interest Rate Swaps, one EUR Interest Rate Swap, and one NZD/USD Cross Currency Swap) also was invalid because Westpac again ignored the express requirements for the Market Quotation process set forth in the Master Agreement. With these Swaps, Westpac sought quotations from only *three* dealers, whereas the Master Agreement requires Westpac to seek four.[6] By seeking and obtaining quotations from only three dealers, Westpac did not comply with the express terms of the Master Agreement.[7]

### ii. Westpac Also Employed a Flawed Process to Value the Terminated Credit Default Swaps

36. Upon terminating the 45 Credit Default Swaps on the Early Termination Date, Westpac should have followed the Market Quotation measure by asking Reference Market-makers what they would be willing to pay or would have to receive in order to step into LBSF's

---

[6] The Master Agreement defines "Market Quotation" to mean "an amount determined on the basis of quotations from Reference Market-makers." Master Agreement § 14 (definition of "Market Quotation"). "Reference Market-makers," in turn, is defined to mean "*four* leading dealers in the relevant market." *Id.* (definition of "Reference Market-makers") (emphasis added).

[7] Upon receipt of Market Quotations bids, Westpac used the middle quotation for each Swap or bucket of Swaps to value these 24 Vanilla Swaps and Cross Currency Swaps.

11

position in respect of those 45 terminated Credit Default Swaps. Westpac, instead, solicited and received then-current market Credit Spreads at which the dealers were willing to enter into new hedging transactions with *different* fixed rates than those of the terminated Credit Default Swaps. These quotations did not provide the termination values for the terminated Credit Default Swaps because they were effectively for different transactions than the 45 Credit Default Swaps. Compounding its breach, when Westpac executed new credit default swaps based on the Credit Spread bids it obtained, it did not give LBSF the benefit of the Credit Spreads bids upon which it actually transacted when it calculated the Settlement Amount. Instead, Westpac consistently used less favorable Credit Spreads in order to minimize its payment to LBSF.

37. Additionally, Westpac made obvious math errors in calculating the Settlement Amount: it mislabeled the +/- sign for two of the Swaps when summing the value of the Credit Default Swaps, which led to a further understatement of the amount owed to LBSF by approximately $800,000.

### E. Because Westpac Failed to Follow the Calculation Methodology to Which the Parties Agreed, Its Calculations Must Be Disregarded and Contract Damages Assessed

38. Because Westpac breached the express terms of the Master Agreement by failing to conduct a Market Quotation process in accordance with its terms, Westpac's Settlement Amount calculation must be disregarded and contract damages assessed.

39. Under the terms of the Agreement, if Market Quotation cannot be determined or does not "produce a commercially reasonable result," the Non-defaulting Party must instead use the Loss measure to determine the Settlement Amount. *See* Master Agreement § 14 (defining Settlement Amount). "Loss" is defined in the Master Agreements in relevant part as: "an amount that party reasonably determines in good faith to be its total losses and costs (*or gain*, in which

12

case expressed as a negative number) in connection with this Agreement or . . . [the] Terminated Transaction[s] . . . ." *Id.* (emphasis added).

40. The Loss payment measure attempts to put the parties in the same economic position they would have been in had the transactions not been terminated. Loss is in no way meant to provide the Non-defaulting Party an opportunity to improve its economic position or penalize the Defaulting Party. The objective of the Loss methodology, thus, parallels the objective of contract damages – "to put the plaintiff in the same economic position [it] would have been in had the defendant fulfilled his contract." *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir. 1984).

41. Westpac gained approximately $14 million by terminating the Swaps on September 18, 2008. Westpac owes this amount, less Unpaid Amounts and posted collateral, plus interest, to LBSF.

### F.    Westpac Must Pay Interest

42. Section 6 of the Master Agreement governs payments upon early termination and provides that any amount payable thereunder will be paid inclusive of interest at the "Applicable Rate." *See* Master Agreement §§ 6(d)(ii) and 6(e). Applicable Rate is defined as the "Termination Rate" between the Early Termination Date and receipt of the Calculation Statement and the "Default Rate" following the date upon which sums become payable under Section 6(d)(ii), which is the date that the Calculation Statement is received. *Id.* § 14.

43. Westpac designated September 18, 2008 as the Early Termination Date and delivered its Calculation Statement on September 30, 2008. Accordingly, the Termination Rate applied from and including September 18, 2008, through, but excluding, September 30, 2008.

13

The Default Rate applies from September 30, 2008, until LBSF receives payment in full from Westpac.

## **COUNT I**

### **(Breach of the Master Agreement)**

44. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-43 of this Complaint as though fully set forth in this cause of action.

45. The Swaps were entered into pursuant to a valid and enforceable contract with adequate consideration and LBSF fully performed its obligations thereunder.

46. On the Early Termination Date, LBSF was the "in-the-money" party and thus entitled to receive an Early Termination Payment from Westpac pursuant to the terms of the Master Agreement.

47. The Master Agreement required Westpac to determine the Settlement Amount component of the Early Termination Payment it owed using a Market Quotation process that complied with the Master Agreement, was conducted in a commercially reasonable manner, and produced a commercially reasonable result.

48. Westpac breached the Master Agreement because the Market Quotation process conducted by Westpac did not comply with the terms of the Master Agreement, was not run in a commercially reasonable manner, and did not produce a commercially reasonable result.

49. As a result of the foregoing breaches of contract, LBSF has been damaged in an amount to be proven at trial, but no less than $5,236,667, plus Termination Rate interest and Default Rate interest.

## COUNT II

### (Unjust Enrichment)

50. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-49 of this Complaint as though fully set forth in this cause of action.

51. As a result of Westpac's failure to pay LBSF an Early Termination Payment reflecting the amount LBSF was "in-the-money" under the Swaps, Westpac obtained an unjust windfall at the expense of LBSF given the value of the payments to LBSF that Westpac has avoided by terminating the Swaps.

52. Westpac thus has been improperly and unjustly enriched at LBSF's expense. Equity and good conscience require that Westpac pay to LBSF that to which LBSF was entitled, plus prejudgment interest.

## COUNT III

### (Money Had and Received)

53. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-52 of this Complaint as though fully set forth in this cause of action.

54. Westpac has been improperly and unjustly enriched at LBSF's expense as a result of Westpac's failure to pay LBSF an Early Termination Payment reflecting the amount that LBSF was "in-the-money" under the Swaps. Equity and good conscience require that Westpac pay to LBSF that to which LBSF was entitled.

55. Westpac has no right to retain the amounts that it should have paid to LBSF, and has received the benefit of using LBSF's property since the Early Termination Date. As such, equity and good conscience require that Westpac pay to LBSF that to which LBSF was entitled, plus prejudgment interest.

## COUNT IV

15

**(Disallowance of Westpac's Claims and Objection to Claims)**

56. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-55 of this Complaint as though fully set forth in this cause of action.

57. A proof of claim will not be deemed allowed if a party in interest objects thereto. 11 U.S.C. § 502(a).

58. Plaintiff objects to Westpac's Claims and seeks entry of a judgment against Westpac disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code.

59. Westpac's Claims should be disallowed and expunged on the basis that they provide no basis of liability as to LBSF or LBHI.

60. Indeed, Westpac's Claims rest solely upon the premise that LBSF owed an Early Termination Payment to Westpac, based on Westpac's commercially unreasonable Market Quotation process that was in breach of the Agreement, when in fact Westpac owed LBSF an Early Termination Payment.

61. Accordingly, Plaintiff has no liability to Westpac, and LBSF does not owe any amounts to Westpac. As a result, Westpac's Claims are not valid claims.

62. Accordingly, pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007, the Plan Administrator on behalf of LBSF requests that this Court disallow the Claims in their entirety.

63. The Plan Administrator on behalf of LBSF hereby expressly reserves the right to further object to the Claims, or any other claim filed by Westpac, on any other basis.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

16

      A.      As to Count I, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than $5.2 million, plus interest that has accrued since the Early Termination Date and that will continue to accrue until final payment is made to LBSF;

      B.      As to Counts II and III, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than that to which LBSF is entitled, plus prejudgment interest;

      C.      As to Count IV, entry of a judgment against Westpac disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code;

      D.      For such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: New York, New York  
       February 13, 2015

                          By: /s/ Richard Slack  
                                Richard W. Slack  
                                Lauren B. Hoelzer

                                WEIL, GOTSHAL & MANGES LLP  
                                767 Fifth Avenue  
                                New York, New York 10153  
                                Telephone: (212) 310-8000  
                                Facsimile: (212) 310-8007

                                *Attorneys for Lehman Brothers Holdings Inc.*  
                                *and Lehman Brothers Special Financing Inc.*

WEIL:\95221815\8\58399.0011