Hearing Date and Time: February 19, 2015 at 10:00 a.m. (Prevailing Eastern Time)

**HOGAN LOVELLS US LLP**
Christopher R. Donoho, III, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: chris.donoho@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC., et al.,**<br><br>Debtors. | **Chapter 11**<br>**Case No. 08-13555 (SCC)**<br>**(Jointly Administered)** |

**REPLY IN SUPPORT OF**
**MOTION OF DR. THOMAS MARSONER TO DEEM**
**PROOFS OF CLAIM TO BE TIMELY FILED BY THE CLAIMS BAR DATE**

Dr. Thomas Marsoner ("Dr. Marsoner") submits this reply brief (the "Reply") in support of the Motion of Dr. Thomas Marsoner to Deem Proofs of Claim to be Timely Filed by the Claims Bar Date (the "Motion") [Docket No. 47589].[1] In support of the Motion, Dr. Marsoner respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    While Dr. Marsoner understands the high standard for having a late filed claim allowed, the Debtors' Objection to Dr. Thomas Marsoner's Motion to Deem Proofs of Claim Timely Filed (the "Objection") [Docket No. 48206] is not sufficient to deny Dr. Marsoner fair and equitable treatment in these proceedings where he was unaware of the existence or relevance of the Claims Bar Date to him, and where he was not provided with actual notice of the Claims Bar Date.

---

[1] Capitalized terms not defined in the Reply have the same meaning as in the Motion.

To deny Dr. Marsoner a timely filed claim would unfairly provide the Lehman entities with a windfall, particularly in light of the fact that the Debtors would easily have been able to determine that Dr. Marsoner was a creditor <u>and</u> also the proper address for service of the Bar Date Notice to Dr. Marsoner, as explained below.  Yes, the amount in question is a sizeable sum based on the formula, but the proper and fair amount of any claim can be determined at another time.  The question before the court in this Motion is for the recognition of the timeliness of the proofs of claim, which fundamental fairness requires.

2. The Debtors in the Objection state that they were unaware of Dr. Marsoner's Agreements with Lehman Brothers Europe Limited ("<u>LBEL</u>") and the advice he provided that led to the F1 Reinvestment. Objection ¶ 15. However, this is not correct.  Dr. Marsoner's contact person under his 2004 Agreement with LBEL was Vittorio Pignatti, who at the time of the F1 Reinvestment was the Head of European M&A and a Vice Chairman and member of the senior management of Lehman Brothers Holdings Inc. ("<u>LBHI</u>"). <u>See</u> Supplemental Declaration of Dr. Thomas Marsoner ("<u>Marsoner</u> <u>Supp.</u> <u>Decl.</u>"), Pignatti Letter [Docket No. 48171].

3. The division between LBEL and LBHI and Lehman Commercial Paper Inc. ("<u>LCPI</u>") is not nearly as clear as the Debtors contend.  At least two of the other representatives of LBEL that Dr. Marsoner dealt with also served simultaneously as senior executives at Lehman Brothers Inc., a direct subsidiary of LBHI. <u>See</u> Marsoner Supp. Decl., Magnoni & Bernard Letters. Ruggero Magnoni served as both an appointed director of Lehman Brothers Europe Limited and a Vice Chairman of the Board of Lehman Brothers Inc. <u>See id.</u>, Magnoni Letter. Thomas Bernard served as Head of Global Credit Businesses at Lehman Brothers Inc. <u>See id.</u>, Bernard Letter. The fact that the Debtors determined to allocate the investment to LCPI was outside of Dr. Marsoner's ambit.

4. If the Debtors are to be believed, they apparently knew so little about LBEL's operations that they did not even know LBEL moved its headquarters from One Broadgate 5th Floor, London, EC2M 7HA, United Kingdom to 25 Bank Street in London. Objection ¶¶ 6 and 12. This is presumably the reason they sent notice of the Claims Bar Date to Dr. Marsoner at the One Broadgate address, even though Dr. Marsoner was no longer an employee of LBEL, and LBEL had already moved approximately seven years earlier. See Corrected Affidavit Of Service of Herb Baer ("Corrected Aff. of Service") [Docket No. 9395]. The Debtors argue in their Objection that it was Dr. Marsoner's responsibility to inform them that this was no longer an effective address. Objection ¶¶ 6 and 12. One wonders how LBHI communicated by mail with LBEL if it did not know LBEL had moved?

5. By contrast, the Debtors expect Dr. Marsoner, an Austrian investment banker, to be intimately familiar with the inner workings of the U.S. Lehman family of companies AND be familiar with US bankruptcy law. Specifically, they contend that Dr. Marsoner had the "know-how to file timely proofs of claim" because Dr. Marsoner knew or should have known the intricacies of the Debtors' and LBEL's operations and insolvency proceedings. Objection ¶ 4. He should somehow have known the deadline to file claims and that he was a potential creditor of LBHI and LCPI, despite never receiving notice of the Claims Bar Date. Objection ¶¶ 29-31. He should have known that LCPI reinvested in F1, even though he did not even know the original investor. Id. He should have known to inform the Debtors that LBEL moved its offices. Id. at ¶ 6. Although Dr. Marsoner is an expert investor and advisor – as LBHI recognized when it paid him both fixed and contingent fees on numerous occasions for his advisory services – he did not know (and could not reasonably be expected to have known) which Lehman entity had benefitted from the F1 transaction until mid-2014. Marsoner Decl. ¶ 18.

6. Furthermore, LBHI both knew Dr. Marsoner was a potential creditor and how to reach him, yet failed to alert him of these facts. Unless LBHI made payments on behalf of LBEL without keeping records of who it paid, a simple review of its books and records would plainly show that Dr. Marsoner was a potential creditor, and show how to reach him.

7. The Debtors want the benefit of approximately $1.5 billion dollars in value while pretending to not know the person who materially helped create that value. To permit this result without determining the merits of Dr. Marsoner's claims would be unjust and contrary to the Bankruptcy Code's notice requirements.

## ARGUMENT

### A. Dr. Marsoner was a Known Creditor of both LBHI and LCPI

8. The former Vice Chairman and Head of European M&A for LBHI who helped coordinate the F1 Reinvestment stated in a sworn letter to the Court that "[i]t was my understanding that Dr. Marsoner would have been paid by Lehman Brothers for his services concerning the F1 investment or I would not have asked him to help." Marsoner Supp. Decl., Pignatti Letter. It was therefore LBEL's intent that LBHI would pay Dr. Marsoner. See id.

9. Moreover, Pignatti knew about the Agreements with LBEL because he was the signatory for LBEL on the 2002 and 2004 Agreements. See id. Pignatti's knowledge of the Agreements and the advisory services Dr. Marsoner provided is imputed to LBHI because "[t]he knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation." Baker v. Latham Sparrowbush Associates, 72 F.3d 246, 255 (2d Cir. 1995) (citation omitted); Battino v. Cornelia Fifth Ave., LLC, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012). Dr. Marsoner provided his F1 advice to a member of LBHI's senior management, and Lehman used this advice to reinvest in F1 through LCPI. LBHI and LCPI therefore cannot credibly argue that they did not know Dr. Marsoner was a potential creditor.

10.     Furthermore, despite the Debtors' alleged ignorance of the Agreements Dr. Marsoner entered into with LBEL, the 2007 Agreement provided that Dr. Marsoner would "provide advice and assistance to Lehman Brothers and *other members of the Lehman Brothers' group*." See Executive Advisory Services Agreements, attached to Motion as Exhibit C (emphasis added). Prior Agreements also contained similar language. See id. LBEL would not enter into these Agreements and then appoint a member of LBHI's senior management as the contact person if LBHI was not aware of the Agreements. Moreover, the BAWAG transaction, which LBHI paid Dr. Marsoner for his advisory services even though no Agreement covered the transaction, benefitted Lehman Brothers (Bankhaus) AG, a direct subsidiary of LBHI. See Marsoner Decl. ¶ 10. Therefore, at the very least LBHI and LCPI should have been aware of the Agreements because they involved advisory services that benefitted them.

11.     Dr. Marsoner's identity was also reasonably ascertainable based on the Debtors' books and records and their knowledge of the Agreements. "[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.'" In re XO Commc'ns, Inc., 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) aff'd, No. 04 CIV. 01489LAK, 2004 WL 2414815 (S.D.N.Y. June 14, 2004). "The requisite search . . . focuses on the debtor's own books and records." Chemetron Corp. v. Jones, 72 F.3d 341, 347 (3d Cir. 1995). LBHI's books and records must show that it paid Dr. Marsoner both fixed and contingent fees on numerous occasions. See Dr. Marsoner's Bank Statements, attached to the Motion as Exhibit D; see also Marsoner Decl. ¶ 5. To contend that LBHI has no record of the payments it made to Dr. Marsoner is not credible.

12.     The Debtors also perversely and shockingly argue that Dr. Marsoner was an "unknown creditor" because he did not know he had a claim against LBHI and LCPI until mid-2014. Objection ¶ 19-20. The Debtors boldly attempt to invert the meaning of known creditor from

"known to the debtor" to "known to the creditor," an effort that plainly does not comport with the relevant case law. "A 'known' creditor includes 'both a claimant whose identity is *actually known to the debtor* or a claimant whose identity is 'reasonably ascertainable' *by the debtor*.'"). In re BGI, Inc., 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012) subsequently aff'd, No. 13-2226-BK, 2014 WL 5462477 (2d Cir. Oct. 29, 2014) (quoting Chemetron, 72 F.3d 341 at 346 (emphasis added)).

13.     Dr. Marsoner is a known creditor because LBHI and LCPI knew he was a potential creditor based on the knowledge of Pignatti, LBHI's books and records showing payments made to Dr. Marsoner, and the Agreements that provided Dr. Marsoner would advise the Lehman group.

**B.  Notice was not Sufficient**

14.     As a known creditor, Dr. Marsoner was entitled to actual notice of the Claims Bar Date at his last known address. Levin v. Maya Constr. (In re Maya Constr. Co.), 78 F.3d 1395, 1399 (9th Cir. 1996) ("Generally, if a known contingent creditor is not given formal notice, he is not bound by an order discharging the bankruptcy's obligations."); Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.), 62 F.3d 730, 736 (5th Cir. 1995) (holding that notice sent to the "last known address of a creditor satisfies due process because it is 'reasonably calculated' to inform the creditor of the bar date for filing Proofs of Claim."). And despite the Debtors' assertions, "[t]he fact that a creditor has actual knowledge that a Chapter 11 bankruptcy proceeding is going forward involving a debtor does not obviate the need for notice." Levin, 78 F.3d at 1399; Objection ¶¶ 4 and 31.

15.     Dr. Marsoner's last known address was at Andreas Hofer Strasse 43, 6020 Innsbruck, Austria. Marsoner Decl. ¶ 12. The last Agreement Dr. Marsoner entered into with LBEL in 2007 listed this address for Dr. Marsoner. Id. As discussed above, LBHI knew about Dr. Marsoner's Agreements because Vittorio Pignatti was the contact person under the 2002 and 2004

Agreements, and he coordinated the F1 Reinvestment. See Marsoner Supp. Decl., Pignatti Letter. LBHI and LCPI also should have been aware of the Agreements because they contemplated that Dr. Marsoner would provide advice to the entire Lehman group, not just LBEL. See Executive Advisory Services Agreements. In addition, Lehman Brothers Commercial Corporation ("LBCC") knew about Dr. Marsoner's Austrian address, despite the fact that it instead sent notice to Dr. Marsoner at LBEL's former address. See Corrected Aff. of Service. On October 27, 2008, Dr. Marsoner sent an e-mail to Allyson Carine at Barclays Capital, the person tasked with overseeing termination notices for LBCC transactions, which listed his address in Innsbruck, Austria as his contact address. See Dr. Marsoner E-mail to Allyson Carine, attached hereto as Exhibit A.

16.    Despite this knowledge, the Debtors did not provide notice of the Claims Bar Date to Dr. Marsoner's last known address. See Corrected Aff. of Service; Marsoner Decl. ¶ 12. The Debtors also did not provide notice at Dr. Marsoner's London address at 20 Earls Terrace, which was listed on his bank account where LBHI paid him his fees. See Bank Statements; Marsoner Decl. ¶¶ 11 and 17. **This was the same address that Dr. Marsoner listed on his May 1, 2009 claim against Lehman Brothers Inc. ("LBI") in its Securities Investor Protection Act of 1970 ("SIPA") proceeding.** See Marsoner LBI SIPA Proof of Claim, attached hereto as Exhibit B. They instead allegedly sent notice to LBEL's former address, two addresses in Malta, an address in Mexico, and an address in Italy. See Corrected Aff. of Service. None of these addresses were even remotely adequate.

17.    The London address was the former address of LBEL until it moved in 2002 to 25 Bank Street in London, approximately seven years before the Claims Bar Date. Marsoner Decl. ¶ 16. The Debtors cannot credibly argue that this was adequate notice when they knew this was no longer the correct address for LBEL or Dr. Marsoner. It is not Dr. Marsoner's responsibility to inform them that one of its affiliates has moved addresses.

18.    The other addresses are all temporary addresses that Dr. Marsoner could not have received mail at in 2009. <u>Id.</u> at ¶¶ 13-15. The addresses in Malta were addresses where Dr. Marsoner periodically stayed with a friend from 2002-2006. <u>Id.</u> at ¶ 13. The Mexican address is the location of a home Dr. Marsoner rented once for three weeks in 2006. <u>Id.</u> at ¶ 14. The Italian address was the address of his father's vacation home, which does not have a mail box for deliveries. <u>Id.</u> at ¶ 15. Permitting the Debtors to send notice of the Claims Bar Date to these addresses would allow future debtors to send notice to any address that a person has ever visited, instead of a creditor's last known address.

19.    The Debtors also argue that notice to Dr. Marsoner was appropriate based on Bankruptcy Rule 2002(g)(2), which provides that if a creditor "has not filed a request designating a mailing address under Rule 2002(g)(1) or Rule 5003(e), the notices shall be mailed to the address shown on the list of creditors or schedule of liabilities, whichever is filed later." Fed. R. Bankr. P. 2002(g)(2). This Rule is inapplicable because neither LBHI nor LCPI listed Dr. Marsoner on its list of creditors or schedule of liabilities.

**C. Dr. Marsoner did not know he had a potential claim against a U.S. Lehman Entity until he was informed by LBEL's Administrators**

20.    The Debtors' Objection states that Dr. Marsoner "has given no explanation for why it took him so many years to think about filing a claim in these cases." Objection ¶ 4. As Dr. Marsoner's Declaration explains, he did not file his Motion until 2014 because he did not know that a U.S. Lehman entity had benefitted from the F1 Reinvestment until LBEL's administrators informed him of this fact in June of 2014. Marsoner Decl. ¶ 18. **And it was not until 2014 when Dr. Marsoner hired counsel to investigate his potential U.S. claims related to the F1 Reinvestment that he found out LCPI was the Lehman entity that reinvested in F1**. Any assertion by the Debtors to the contrary is not based in fact. <u>See</u> Objection ¶¶ 29-32.

21.     The Debtors also argue that Dr. Marsoner must have been informed of the Claims Bar Date because he sat on LBEL's Creditors' Committee, and one of its progress reports stated that "[t]he Administrators will liaise will the Creditors' Committee to discuss significant issues and outline key decisions." Objection ¶ 31. However, **the LBEL Creditors' Committee held one meeting in 2009, and the minutes show that LBHI's Claims Bar Date was never mentioned**. See Minutes of the first meeting of the LBEL Creditors' Committee, attached hereto as Exhibit C.

**D.  The Requested Relief is Appropriate under the Due Process Clause of the Fifth Amendment and Rule 60(b)(6)**

**a.  Due Process Clause**

22.     The Debtors assert that Dr. Marsoner provided "no argument, discussion, or basis for grounding his requested relief" in Bankruptcy Rule 9024 or section 105(a) of the Bankruptcy Code. Objection ¶ 22. The Debtors conveniently ignored Dr. Marsoner's request for relief "consistent with Due Process" cited in the first paragraph of his Motion's "Requested Relief" section. See Motion, Requested Relief ¶ 1. In addition, Dr. Marsoner cited to cases in the next paragraph of his Motion that held "[t]he constitutional standard for due process requires that known creditors in a bankruptcy case receive actual notice of the bar date." In re AMR Corp., 492 B.R. 660, 663 (Bankr. S.D.N.Y. 2013); Grant v. U.S.H. Corp. (In re U.S.H. Corp.), 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998) ("[I]f a creditor is not given reasonable notice of the bankruptcy proceeding and the relevant bar dates, its claim cannot be constitutionally discharged."); XO Commc'ns, Inc., 301 at 791-92 ("Before a debtor can obtain a discharge of a claim in bankruptcy, however, the Due Process Clause of the Fifth Amendment dictates that a debtor's creditors receive notice of the debtor's bankruptcy case and applicable bar date so that creditors have an opportunity to make any claims they may have against the debtor's estate."); Levin, 78 F.3d at 1399

("Generally, if a known contingent creditor is not given formal notice, he is not bound by an order discharging the bankruptcy's obligations."); <u>Shu Lun Wu v. May Kwan Si, Inc.</u>, 508 B.R. 606, 614 (S.D.N.Y. 2014) ("If plaintiffs did not have notice of the Bar Date, their claims were not discharged under the plan."); <u>In re Chateaugay Corp. Reomar, Inc.</u>, No. 86 B 11270 BRL, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009). Accordingly, Dr. Marsoner's requested relief is appropriate and was specified in his Motion.

### b. Rule 60(b)(6)

23.    Alternatively, the requested relief is appropriate under Rule 60(b) of the Federal Rules of Civil Procedure, which is incorporated by Bankruptcy Rule 9024. Rule 60(b)(6) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). A motion under Rule 60(b)(6) "must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1).

24.    Dr. Marsoner is entitled to relief under this section because he provided extraordinary value to the Debtors' estate, but was never compensated. Marsoner Decl. ¶ 8. He also made his Motion within a reasonable time because he only learned that he had a claim against a U.S. Lehman entity in mid-2014. Marsoner Decl. ¶ 18.

### E.  Dr. Marsoner Contributed Significant Value to LCPI's Estate

25.    Finally, it is undisputed that Dr. Marsoner provided valuable advisory services that benefitted LCPI. <u>See</u> Marsoner Supp. Decl., Pignatti Letter ("Dr. Marsoner provided valuable advice with respect to the F1 transaction both in e-mail and in telephone conversations, and Lehman relied on Dr. Marsoner's advice when it reinvested in F1."), Magnoni Letter ("Dr. Marsoner provided valuable advice to Lehman both in e-mail and in telephone conversations, and as a result, Lehman decided to continue its investment in Formula One."); <u>see also</u> Marsoner Decl.

¶ 8. It was the understanding of two high ranking Lehman executives, including LBHI's Vice Chairman, that Dr. Marsoner would receive 10% of the F1 Reinvestment revenues for his advisory services. See Marsoner Supp. Decl., Pignatti Letter ("The advisory services Dr. Marsoner provided in relation to the F1 reinvestment were similar in nature to the advice provided in relation to the BAWAG acquisition and other transactions for which Dr. Marsoner received approximately 10% of Lehman's gross revenues."), Magnoni Letter ("It was well understood by the Lehman decision makers that Dr Marsoner's fees normally amounted to 10% of Firm revenues.").

26.     The Debtors do not contest that Dr. Marsoner provided extraordinary value to their estate. Instead, they argue that Dr. Marsoner had no direct contact with LBHI or LCPI. Objection ¶ 18. But this argument fails because Dr. Marsoner had direct contact with Pignatti, who he advised on the F1 Reinvestment. Marsoner Supp. Decl., Pignatti Letter.

**NOTICE**

27.     Dr. Marsoner has provided notice of the Reply pursuant to the Second Amended Order Implementing Certain Notice and Case Management Procedures entered in this proceeding [Docket No. 9635]. Dr. Marsoner submits that no other or further notice need be given.

WHEREFORE, Dr. Marsoner respectfully requests that the Court enter an order substantially in the form attached to the Motion as Exhibit A, (i) permitting Dr. Marsoner to file Proofs of Claim against LBHI and LCPI based on the Debtors failure to properly serve Dr. Marsoner with the Bar Date Notice within five (5) business days of the entry of the order, and (ii) granting such other and further relief as this Court deems just and equitable.

Dated: February 17, 2015
New York, New York

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By:  /s/    Christopher R. Donoho III
**HOGAN LOVELLS US LLP**
Christopher R. Donoho, III, Esq.
M. Shane Johnson, Esq.
875 Third Avenue
New York, NY 10022
Telephone:  (212) 918-3000
Facsimile:  (212) 918-3100
Email: chris.donoho@hoganlovells.com
Email: shane.johnson@hoganlovells.com

*Attorneys for Dr. Thomas Marsoner*

# *EXHIBIT A*

From: Thomas Marsoner [mailto:thomas@marsoner.com]
Sent: Monday, August 09, 2010 2:56 AM
To: Acquaviva, Jonathan
Subject: WG: FX collar Termination Notice of October 2
Importance: High

Jonathan,

set out below please find my original termination notice as well as its re-confirmation to
LBCC's representatives **as** instructed by them.

Regards

Thomas Marsoner

-----Ursprüngliche Nachricht-----
Von: Thomas Marsoner [mailto:thomas@marsoner.com]
Gesendet: Montag, 27. Oktober 2008 14:54
An: 'allyson.carine@barclayscapital.com'
Cc: 'Pucciarelli, Jim'; 'mary.myszkowski@barclayswealth.com';
'fran.aorta@barclayswealth.com'
Betreff: FX collar Termination Notice of October 2
Wichtigkeit: Hoch

Dear Ms Carine,

I have just been advised that you have been nominated by LBCC's attorneys to collate
Termination Notices for LBCC transactions. Please find below my Termination Notice of
October 2, 2008 to the representatives of LBCC that I had been dealing with regarding all
matters concerning the US$5mn FX Collar in account 270-95043.

Please let me know:

1) if you require anything else, e.g., a signed hard copy, and
2) when I can expect the (some US$60k) margin funds in this account back.

Thanks and regards

Dr Thomas Marsoner
Andreas Hofer Strasse 43
6020 Innsbruck
AUSTRIA

-----Ursprüngliche Nachricht-----
Von: Thomas Marsoner [mailto:thomas@marsoner.com]
Gesendet: Donnerstag, 02. Oktober 2008 16:53
An: 'Aorta, Fran'; 'Pucciarelli, Jim'; 'Myszkowski, Mary Ann'
Betreff: AW: fx collar
Wichtigkeit: Hoch

Jim,

Further to our conversation today: since LB Commercial Corp can obviously not transact on
the order below, Fran's original statement that the collar was in default, with which I
agreed at the time, was obviously correct. As a result, Lehman's inability to perform on
its side of the deal with effect from the Chapter 11 filing also annuls any obligations I
had under it with effect from that date.

Were a claim against me to be made either during the originally envisaged life of the
collar or upon its expiration, I would not only resist it based on the above but also

3

# *EXHIBIT B*

**Filed: USBC - Southern District of New York**
**SIPC v. Lehman Brothers Inc.**
**08-01420 (JMP)**

**Bankruptcy Claim #**



**000004413**

**RECEIVED**

MAY 0-1 2009

LEGAL SERVICES

PK -7

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers, Inc. | Case Number:<br>08-01420 (JMP) SIPA |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property): | ☐ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>1000192111 LBI 12/1/2008 *78000739952*<br>THOMAS S MARSONER<br>20 EARLS TERRACE LONDON W8 6LP<br>Telephone number:   UNITED KINGDOM | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:    $ *109 596.17* | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
|---|---|

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

| 2. Basis for Claim: *cash balance in account*<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
|---|---|

3. **Last four digits of any number by which creditor identifies debtor:** _____

    3a. **Debtor may have scheduled account as:** _____
    (See instruction #3a on reverse side.)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
**Describe:**

Value of Property:$_____   Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:<br>*April 27, 20XX* | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Thomas Marsoner* | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 (Official Form 10) (12/07) — Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

# EXHIBIT C

**Lehman Brothers Europe Ltd (in administration) ("LBEL")**

**Strictly Private and Confidential**
**Minutes of the first meeting of the Creditors' Committee ("the Committee")**

Venue:  City Temple, Holborn Viaduct, London, EC1A 2DE
Date:  4 June 2009
Time:  2.30pm

Present:

Joint Administrator:                            Dan Schwarzmann (DS)

Committee members:

| **Creditor** | **Represented by** |
|---|---|
| Consultant | Dr Thomas Marsoner (TM) |
| Lehman Brothers Holdings Inc. | Mr B Matthews (BM)<br>Blandine Davies (BD) |
| Lehman Brothers Holdings plc | Mr Jeremy Lewin (JL) |
| Lehman Brothers International (Europe) | Mr Tony Kett (KT) |

In attendance:

| | |
|---|---|
| Tony Bugg (TB) | Linklaters LLP |
| Diana Gardner-Brown | PricewaterhouseCoopers LLP |
| Huw Battrick | PricewaterhouseCoopers LLP |
| Chris Kamaris | PricewaterhouseCoopers LLP |
| Philip Tooke | PricewaterhouseCoopers LLP |
| Emma Whalley | PricewaterhouseCoopers LLP |
| Paul Dodd | PricewaterhouseCoopers LLP |
| Joseph Gordon | PricewaterhouseCoopers LLP |

DS opened the meeting, welcoming the Committee and thanking them for attending. It was noted that "Guidance for Members of Creditors' Committees" and "Creditors' Guide to Administrators' fees" had been circulated in advance of the meeting.

DS explained the formalities including Committee members' eligibility and consents. It was noted that the key role of the Committee is to assist the Joint Administrators in discharging their functions and also to represent the interests of the creditors as a whole, act as a sounding board for the Administrators and to consider the Administrators' fees.

TM requested permission to disclose information from the meeting to the other consultants. This was discussed and it was decided to consider any request to share information on a case-by-case basis. Diana Gardner-Brown would follow up with TM after the meeting.

Detailed updates were given on the key activities. Reference was made to the presentation pack throughout the meeting.

**Pension regulation**

Presented by:
Philip Tooke (PT)                                PricewaterhouseCoopers LLP

PT reported on a potential pension liability affecting LBEL. The liability is dependent on a ruling by the Pension Regulator ("Regulator").

It was explained that Lehman Brothers in the UK had one pension scheme which was run via Lehman Brothers Limited ("LBL"). The scheme included both a defined contribution and defined benefit scheme. A deficit had arisen in the defined benefit scheme of the pension fund. This deficit is due to be met by LBL and is of the order of £150m.

It was disclosed that the Regulator is able to assign the deficit to another group company based on the following;
-   reasonableness of the claim again the group company
-   possibility of getting a return for the scheme

PT explained that the deficit could be assigned to Lehman Brothers International (Europe) ("LBIE") or LBEL if the Regulator decided to re-assign the liability to other group entities under the relatively new Financial Support Direction 2004 ("FSD") regulation. To date only one direction has been issued.

The order under the FSD is likely to be issued before September 2009 and will progress to a hearing after a short notice period. PT therefore stressed the importance of performing the preparatory work in advance of the notice period.

PT informed the meeting that the Regulator had already asked for financial information from across the group which we were obliged to provide. This is currently being collated for the Regulator.

**Sale of IBD**

Presented by:
Chris Kamaris (CK)                                PricewaterhouseCoopers LLP

CK provided an introduction and overview of the sale of the investment banking division to Nomura for a nominal amount on 23 September 2008.

It was explained that although 900 interested parties had come forward during the sales process, this had been reduced to two credible purchasers with Nomura emerging as the most suitable.

An overview of the timeline and the issues faced by the sales team was presented by CK in the meeting. The strategy initially was to achieve value for LBEL through the sale of the profitable division but this changed to limiting liabilities which were primarily salaries, guaranteed bonuses and associated costs as this represented the best value for the creditors.

BM queried how much Nomura had paid for the division. It was disclosed the sales price was £2. BM also asked if any value had been assigned to the IT infrastructure.   CK explained that no value had been assigned to this as it was mainly used for recording details of deals and client contacts. He went on to stress the value of the division lay in the individual bankers and their contacts.

CK informed the Committee of the initial difficulty experienced by the Administrators in getting support from the bankers. DS emphasised the effort and commitment put into the sale of the investment banking business by the team. The sale was carried out at the same time as the sale of the equities business and both were completed very quickly after the collapse of Lehmans.

BM asked under what terms employees were transferred to Nomura. CK explained they were moved by The Transfer of Undertakings (Protection of Employment) meaning their pension liabilities and guaranteed bonuses were no longer payable by LBEL. This represented a very significant reduction in LBEL's liabilities.

**Reverse repo with LBIE**

Presented by:
Huw Battrick (HB)                                                      PricewaterhouseCoopers LLP

As LBIE is a key party to this transaction, the LBIE representative TK was asked to leave the meeting whilst the detail was discussed with the remainder of the Committee.

HB gave an overview of the tripartite relationship between LBEL, LBIE and JPM. It was explained that the largest asset on the LBEL statement of affairs was an intercompany balance due from LBIE. In respect of a financing arrangement whereby LBEL distributed the cash, required for capital adequacy purposes, to LBIE through a reverse repo.

The Committee were informed that the balance of $856m was the collateral relating to the reverse repo entered into with LBIE to distribute cash of $575m.

HB explained that as LBEL did not have the appropriate accounts to hold the collateral pre-administration it was instead held in a sub-custodian account at JPM. This account was opened by LBIE and the relationship with JPM was exclusively with LBIE.

TM queried whether the collateral is held in a separate account to the other securities held by JPM for LBIE. HB confirmed the collateral appears to be in a segregated custodian account number LB028.

It was disclosed that both LBIE and LBEL are currently working together to get the collateral back from JPM. It will then need to be agreed, after appropriate investigation which party has title to the collateral.

TM suggested that the collateral clearly belongs to LBEL and asked why the Administrators of LBEL could not just request that it is returned. TB informed the Committee that it depended on the legal agreements in place.

BM asked if a claim could be made against JPM for the loss in the value of the collateral since the administration. HB replied that this is unlikely due to a term of the JPM custody agreement.

TB gave an overview of the process for returning the cash potentially due to LBEL. He said the collateral would be returned to LBIE first, as it was LBIE who entered into the JPM custody agreement. As no tripartite agreement was in place LBEL can only state their ownership of the collateral under the Master Custodian Agreement ("MCA") which was entered into between LBEL and LBIE. It was stated that if appropriate documentation had been in place the collateral might have been would be under the control on LBEL as it appears to be the legal beneficiary of the securities.

Unfortunately the legal documentation was not completed and so LBEL is required to prove conclusively to LBIE that the collateral is LBEL's before LBIE can return it.

BM queried what would happen to the assets when they are returned to LBIE and whether they would be put into an escrow account. HB confirmed that the intention is for assets will be put in an escrow account by LBIE and a consensus would be needed on whether they are sold depending on the price. However, this is still to be agreed with LBIE. The assets would then be held under the MCA giving LBEL greater control over the course of action taken with regard to the securities.

TB explained that the intention is for LBIE and LBEL to work together to share all available information. This will lead to a common platform to allow open discussion about resolving the dispute. It was explained this may result in the issue being resolved amicably and in line with the legal agreements. The Committee was made aware it could also lead to both parties agreeing to disagree, potentially resulting in litigation.

While both parties intend to work together to resolve the dispute it was stressed the importance of all inter-group negotiations being carried out at on arms-length basis.

TM suggested that as LBEL had to hold the collateral under regulatory requirements this should be taken as proof of the collateral ownership. HB confirmed this might form part of the case we put forward to prove LBEL's ownership but it was not, in itself, conculsive.

When discussing the collateral valuation BM asked if the collateral had been valued recently. HB explained the estimated value of the collateral, which is made up of illiquid stocks and some convertible bonds, had been performed on the 15 May. This had resulted in an indicative value of $610m.

JL asked if the loans were accruing interest. HB informed the Committee that the terms of the reverse repo would need to be reviewed to identify any interest due before cash settlement takes place. **HB to confirm,**

Finally, TM proposed that the Administrators hedge the downside risk associated with holding the securities by entering into a cost free collar. DS stated this would be followed up by the LBEL team with LBIE but noted that under the terms of the JPM custody arrangement LBEL was not itself able to put any hedge in place..

**M&A Invoices**

Presented by:
Diana Gardner-Brown (DGB)                    PricewaterhouseCoopers LLP

DGB gave an overview of the progress made to date on collecting the fees due from outstanding banking mandates. It was explained that although there were $124m of outstanding fees from a total of 58 deals it would prove difficult to collect these fees in many cases. To date  $1.5m of debts have been collected.

The main issues experienced while attempting to collect the fees include:
 - the lack of documentation, such as letters of engagement, setting out entitlement to fees;
 - as insolvency has ended the relationship with LBIE, parties may seek to avoid payment; and
 - jurisdiction of the debtors can make recovery through legal means very difficult.

The Committee were informed that the Administrator's team will continue to assess the cost to collect versus the expected value to ensure there is a clear cost/benefit in seeking to recover from each debtor.

**Tax**

Presented by:
Diana Gardner-Brown                                    PricewaterhouseCoopers LLP

DGB explained there are a number of complex tax issues affecting LBEL. These were described as being work-in-progress by the Administrators.

The potential recovery of c.£70m with respect of tax losses was disclosed. Payment would not be expected until after 2010.

The tax work has not been helped by LBEL's incomplete tax records. The tax returns had not been signed off by the Revenue since 2005 leading to a number of fines.

BM queried if there were tax compliance issues given the incomplete records. DGB was able to confirm there were compliance issues pre-administration for which LBEL were fined on a number of occasions. It was noted that it is not unusual for fines to be levied on companies, although clearly it is not desirable.

**Financials**

Presented by:
Diana Gardner-Brown                                    PricewaterhouseCoopers LLP

The receipts and payment account for the period 23 September 2008 to 30 April 2009 was presented. This showed receipts of $1.5m and payments of $0.2m.

It was emphasised that this was a receipts and payments account, it does not include accrued amounts but only reflected those payments that have passed through the bank account.

The accrued costs including the payroll, building cost and legal bills were also disclosed showing the accrued costs to be £7.1m as at 30 April 2009.

**Remuneration**

Presented by:
Huw Battrick                                             PricewaterhouseCoopers LLP

The Committee was presented with detailed narrative and analysis of the time costs incurred for the period 23 September 2008 to 30 April 2009. HB explained certain aspects of the analysis and highlighted how the costs reflected the work in the presentations.

Four resolutions were put to the Committee as follows;

Resolution 1:    THAT, the basis of the Joint Administrators' remuneration be fixed by reference to the time properly given by the Joint Administrators and their staff in attending to matters arising in the Administration.

Resolution 2:    THAT the Joint Administrators' remuneration for the period 23 September 2008 to 30 April 2009 be agreed at £3.17 million and that they be authorised to draw £3.17m plus VAT in respect of their remuneration.

5

Resolution 3:  THAT, from 1 May 2009 the Joint Administrators are authorised to draw 75% of their time costs on account of their remuneration following each monthly time recording period and that the balance be paid once the Creditors' Committee have approved the Joint Administrators' remuneration for the relevant period.

Resolution 4:  THAT, in accordance with Statement of Insolvency Practice No 9, the Joint Administrators are authorised to draw "Category 2" disbursements (i) for mileage at a rate up to 62p per mile for 2,000 cc engines or up to 81p per mile for engines over 2,000 cc and (ii) for photocopying regarding circulars and exceptional amounts of copying at a rate of 3p per sheet, and that reasonable inflationary increases may be applied to the foregoing costs but not more often than once per annum.

TM suggested the non-group committee members, himself and LBHI have a private meeting to discuss the fees while they were all together and a room was located for this purpose.

**Any other business**

There being no other business, the meeting closed at 5.20pm.

Signed:

D Y Schwarzmann
Joint Administrator

Dated: 10 November 2009

*Lehman Brothers Europe Limited*
*AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis were appointed as Joint Administrators of Lehman Brothers Europe Limited on 23 September 2008 to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis are licensed to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*
*.*