Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5

6    LEHMAN BROTHERS HOLDINGS INC.,

7                                    Case No. 08-13555(SCC)

8          Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   LEHMAN BROTHERS HOLDINGS INC.,

11   as Plan Administrator,

12              Plaintiff,

13         v.                     Adv. Case No. 13-01719(SCC)

14   WELLMONT HEALTH SYSTEMS, INC.,

15              Defendant.

16

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19              U.S. Bankruptcy Court

20              One Bowling Green

21              New York, New York

22

23              February 11, 2015

24              10:09 AM

25

Page 2

1    B E F O R E :

2    HON SHELLEY C. CHAPMAN

3    U.S. BANKRUPTCY JUDGE

4

5

6

7    Hearing re:  Doc. #46785 Four Hundred Eighty-Third Omnibus

8    Objection to Claims (No Liability claims)

9

10   Hearing re:  Doc #47101 Four Hundred Eighty-Eighth Omnibus

11   Objection to Claims (No Liability Claims)

12

13   Hearing re:  Adv. 13-01719 - Doc #20 Motion to Dismiss

14   Counts II, III & IV of Plaintiffs Complaint

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Debra McCostlin, and Sheila

25   Orms

Page 3

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorney for Lehman Brothers Holdings Inc.

4          1300 Eye Street NW

5          Suite 900

6          Washington, DC 20005-3314

7

8    BY:   RALPH I. MILLER, ESQ.

9

10   WEIL, GOTSHAL & MANGES LLP

11         Attorneys for Lehman Brothers Holdings Inc.

12         767 Fifth Avenue

13         New York, NY 10153-0119

14

15   BY:   ADAM M. LAVINE, ESQ.

16         GARRETT A. FAIL, ESQ.

17

18   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

19         Attorneys for Leman Brothers Holdings Inc.

20         101 Park Avenue

21         New York, NY 10178-0061

22

23   BY:   TURNER P. SMITH, ESQ.

24         CINDI M. GIGLIO, ESQ.

25

```
 1   DECHERT LLP

 2        Attorneys for Stonehill Entities

 3        1095 Avenue of the Americas

 4        New York, NY 10036

 5

 6   BY:  ALLAN S. BRILLIANT, ESQ.

 7        SHMUEL VASSER, ESQ.

 8

 9   BROWN RUDNICK

10        Seven Time Square

11        New York, NY 10036

12

13   BY:  HOWARD S. STEEL, ESQ.

14        ANDREW DASH, ESQ.

15

16   MILBANK, TWEED, HADLEY & MCCLOY LLP

17        International Square Building

18        1850 K Street, NW

19        Washington, DC 20006

20

21   BY:  DAVID S. COHEN, ESQ.

22        NICHOLAS A. BASSETT, ESQ.

23

24

25
```

1   BRADLEY, ARANT, BOULT & CUMMINGS LLP

2        Attorney for Wellmont Health Systems

3        One Federal Place

4        1819 Fifth Avenue North

5        Birmingham, AL 35203

6

7   BY:   STEWART M. COX, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  How is everyone today?

3          (A chorus of good morning)

4              THE COURT:  We had a rare break of sun yesterday,

5      so I had to shield the witness from the sun, but we're going

6      to open it up.

7              All right.  Who would like to start?

8              MR. MILLER:  Good morning, Your Honor.

9              THE COURT:  Good morning, Mr. Miller.

10             MR. MILLER:  May it please the Court, I'm Ralph

11     Miller from Weil, Gotshal & Manges here for the plan

12     administrator, Lehman Brothers Holdings Inc. or LBHI, and

13     the other Chapter 11 estates that are sued in this rather

14     broad claim or the claims against.

15             This agenda item deals with the four hundred

16     eighty-third omnibus objection to claims, and specifically

17     with the Stonehill claimants, which are Stonehill

18     Institutional Partners LP and Stonehill Offshore Partners

19     Limited.

20             Even if the Court treats all the facts as true

21     that are asserted in the Stonehill claims themselves,

22     together with all the facts that are asserted in the

23     Stonehill response to the four hundred and eight-third

24     objection, no claim is stated for relief.

25             The Stonehill claims all arise from prime

Page 7

1   brokerage agreements that contain only performance

2   obligations of Lehman Brothers Inc., that is LBI.

3          As the objection and reply of the plan

4   administrator have shown, the central contract claim of

5   Stonehill cannot impose any liability on E debtors in this

6   Chapter 11 case for a number of reasons, and each of

7   Stonehill's creative efforts to plead a tort claim related

8   to that alleged breach of the prime brokerage contract has a

9   series of reasons why those tort claims also are

10  insufficient.

11         I'd like to start with the nature of the loss

12  asserted and then talk about the simplest reasons that both

13  the central contract claim and the add-on tort claims fail,

14  and then there are layers of reasons that these claims are

15  defective, and in the interest of brevity I will summarize

16  some of those, but I'd like to reserve some time if they are

17  raised in the response and talk about them specifically.

18         Let me talk about the claim and issue first, which

19  is important.  We need to start by being clear about what

20  the claim is, and it's stated in paragraph 9 of the

21  attachment to each proof of claim.  And the first sentence

22  reads in a way that contains three critical facts, and if I

23  might take a moment and put that in the record.

24         THE COURT:  Uh-huh.

25         MR. MILLER:  Paragraph 9 says:

1              "In addition the debtor and Lehman entities are

2       obligated to claimant for damages, interest, costs,

3       attorneys' fees, including, but not limited to, the amount

4       respecting the diminution in value of the securities held by

5       LBI under the PD agreement from the date in which LBI's SIPA

6       proceeding was commenced through the date that such

7       securities were returned to claimant."

8              This is the only place there's any specificity

9       that I can find about the mechanism that is said to have

10      caused the loss.  There are some allegations that because

11      they didn't have these claims they had some foreign exchange

12      losses and they had some attorneys' fees and they had some

13      diminution of value, but the essence of the claim is that

14      during the period of time from the filing the SIPA

15      proceeding under the return of securities they didn't have

16      access to their securities.

17             THE COURT:  So for shorthand we'll call this the

18      diminution claim?

19             MR. MILLER:  That's fine, Your Honor, I think

20      that's fair.  Again, I suppose a foreign exchange may not

21      technically be a diminution exactly, but --

22             THE COURT:  Okay.  Can I just ask you just a

23      threshold question, because there's a lot of aspects of

24      this, and I appreciate your trying to -- simplify is not the

25      right word -- but categorize, if you will.  And maybe this

Page 9

1    is a little bit of a softball for you, but here it comes.

2              How would this be different -- in your view the

3    claim that Stonehill is seeking to assert, the diminution

4    claim, how would it be different from the same claim that

5    every other customer of the prime brokerage firm had for

6    diminution of the securities?

7              Stated differently, if Stonehill has this claim

8    doesn't every customer of LBI have this claim if its

9    securities were diminished?

10             MR. MILLER:  Well certainly, Your Honor, any

11   holder that had a portfolio of complex securities is going

12   to have some of these costs that they are asserting.  I

13   suppose, Your Honor, to be completely candid it's possible

14   that if somebody had a -- had Apple stock and they were just

15   going to leave it sitting there and the Apple stock just

16   went up and up and up --

17             THE COURT:  Sure.  No, I'm assuming --

18             MR. MILLER:  -- and they got it back --

19             THE COURT:  -- I'm assuming diminution.

20             MR. MILLER:  Yes.

21             THE COURT:  I'm assuming diminution.

22             MR. MILLER:  If there was a diminution and if

23   there were foreign exchange effects, if there was interest

24   cost, if there was something they could show that they did

25   because they didn't have access to their securities of

Page 10

1    course.  This is something everybody would have, and frankly

2    this would basically be a way around the SIPA proceeding to

3    all the affiliates of --

4              THE COURT:  So -- right.  So now you're getting to

5    the heart of my question, which I guess is more -- should be

6    more direct than at Mr. Brilliant.

7              So there aren't a spool of these asserted or let

8    alone allowed claims at the debtors other than LBI.

9              MR. MILLER:  Well, I think that's true, Your

10   Honor, and you're going to hear one in a few minutes that is

11   -- that has some similarity --

12             THE COURT:  Yes.

13             MR. MILLER:  -- to this one, Your Honor, and there

14   have been some other prime brokerage claims, but I think

15   these are among the very few that are left, as I understand

16   it.  Maybe Mr. Fail --

17             THE COURT:  Mr. Fail?

18             MR. MILLER:  -- can clarify the numbers.

19             MR. FAIL:  Yes, Your Honor.  These and the new

20   court ones are -- that you'll hear later today are the only

21   ones remaining against the Chapter 11 estates, none were

22   allowed against the Chapter 11 estates.

23             THE COURT:  And were they simply not pursued or

24   where they stricken by Judge Peck after prior hearings on

25   these?  Do you know, Mr. Fail?

Page 11

1                MR. FAIL:  The vast majority have been -- well, I

2       don't want to say that.  There's a combination of

3       withdrawals -- voluntary withdrawals and court orders, but

4       none of a contested.  So a number of objections were filed

5       and responses were not submitted.

6                THE COURT:  Okay.  But there was no disposition on

7       the merits of this issue in this case by Judge Peck.

8                MR. FAIL:  There was no dispositions on the

9       merits.

10               THE COURT:  Okay.

11               MR. FAIL:  And one caveat, Your Honor, when I said

12      Chapter 11 estates I referred to -- I meant to refer to

13      other than LBHI there are certain claims outstanding related

14      to guaranteed claims, but --

15               THE COURT:  Different.

16               MR. FAIL:  -- those are contractual based on a

17      guarantee not --

18               THE COURT:  Different.  Right.  Okay.

19               MR. FAIL:  Thank you.

20               THE COURT:  Okay.  Thank you.  Sorry for the

21      interruption, Mr. Miller.  Go ahead.

22               MR. MILLER:  And, Your Honor, I think that that is

23      important to bear that in mind.

24               I want to go back to the three key facts from what

25      they do asserting their claim.

Page 12

1              First these are about securities held by LBI under

2    the plan agreement.  They were held by LBI.  There's no

3    allegation here that these securities were ever held by any

4    of the Chapter 11 debtors.

5              THE COURT:  But there's a bailee -- there's a

6    bailment allegation.

7              MR. MILLER:  There is a bailment, and I'll deal

8    with that --

9              THE COURT:  Okay.

10             MR. MILLER:  -- Your Honor.  We take that as a

11   misreading of the contract, but it also can't be a bailment

12   if the party doesn't hold it.  You have to hold the object

13   to be -- to at least have an implied bailment.

14             The second point is that the securities were

15   returned to claimant.  They're not saying there was a

16   shortage of securities or the securities were lost or the

17   securities were sent to any of the Chapter 11 debtors and

18   mishandled, any of that.

19             And finally the duration of the claimed loss and

20   value is from the date in which LBI's SIPA proceeding was

21   concerned through the date the securities were returned.  So

22   it precisely corresponds with the filing of the SIPA

23   proceeding and it goes through the date that they got them

24   back.

25             It's important what is not alleged, it is not

Page 13

1    alleged that any of the affiliates ever held, handled, or

2    had the right to hold or handle any of these securities.

3    And it's not alleged that there were any damages before the

4    SIPA proceeding was commenced.  It's not alleged that LBHI

5    or any of its affiliates ever received any benefit from

6    holding these securities over this period of time.

7            Now let me talk a little bit about the simplest

8    way to resolve these claims, which is the broad force

9    majeure clause in paragraph -- Section 29 of both

10   agreements.

11           As summarized in our papers and with some ellipses

12   it exculpates all the Chapter 11 estates from "any loss

13   caused directly or indirectly by government restrictions ...

14   suspension of trading ... or other conditions beyond Lehman

15   Brothers' control."  This is virtually identical to the

16   clause and a similar clause considered by Judge Glenn in MF

17   Global.  He properly found that clause was triggered by a

18   SIPA proceeding because the alleged damages as here flowed

19   directly or indirectly from government restriction or

20   suspension of trading.

21           Now there are some factual differences within

22   that --

23           THE COURT:  Right.  So that was -- the SIPA

24   proceeding was the debtor.

25           MR. MILLER:  Yes, Your Honor.

Page 14

1          THE COURT:  But here the SIPA proceeding is the

2     affiliate.

3          MR. MILLER:  The SIPA -- it was in the SIPA

4     proceeding, but that actually I think makes this claim

5     harder, because in that instance that entity did have it,

6     and the allegation was that the SIPA entity there had been

7     grossly negligent and had willful misconduct and had

8     breached the contract by letting itself go broke basically

9     was the allegation.  And that was under Illinois law, but we

10    cite cases on page 10 of our reply that say that Illinois

11    law is not materially different from New York law.  And the

12    claimant did set up its gross negligence and willful

13    misconduct allegations a little differently here.

14          Here there is an effort to plead fraud, and I'll

15    talk about that directly, we don't think that pleading is

16    adequate, but it doesn't work in any event we think to get

17    around it had restriction.

18          Your Honor, if you think about force majeure

19    clauses, I mean this clause covered things like terrorism

20    and war, and there's always going to be some allegation that

21    an entity that has a terrorist attack could have had better

22    security or that something could have been done that might

23    have prevented or that the parties that were doing business

24    with the business should have been warned that they were

25    exposed to a terrorist attack or something else, these broad

Page 15

1    force majeure clauses are designed to deal with a category

2    of loss and not a specific cause of that loss.  This

3    includes things like nuclear war.

4           So in essence a SIPA proceeding is the equivalent

5    of a war event in this instance, there's just no ability for

6    anybody else to deal with those securities while SIPA has

7    them tied up and they're in control of the court.

8           So we think that Judge Glenn properly recognized

9    that that clause included willful misconduct and gross

10   negligence, and frankly we think the same would be true if

11   there were fraud that induced a party to continue to do

12   business, which is essentially what their allegation is

13   here.  All of those are contributing causes, but it's not

14   about the cause, it's about the category of loss.

15          So we think that is the simple answer and it takes

16   care of everything.

17          They do argue that their claim is based on

18   prepetition actions with LBHI, but whether that's true or

19   not the losses that resulted were directly or indirectly

20   caused by government restrictions, suspension of trading, or

21   other conditions beyond Chapter 11 debtor's control.

22          Now Stonehill says that --

23          THE COURT:  So even if -- just to focus on that

24   last point.

25          MR. MILLER:  Yeah.

1            THE COURT:  So even if prepetition, pre-SIPA,

2    August into September of 2008 there was a very full record

3    beyond what's alleged now, a very full record of meetings

4    and conversations and specific promises and showing of

5    numbers -- I'm making this up -- even if there was a record

6    that Stonehill had been actively and affirmatively reassured

7    and led to stay put, not as a fraud claim, but that wouldn't

8    -- it would not have an affect on the effectiveness --

9    preclusive effectiveness of the force majeure clause, right?

10           MR. MILLER:  I think that's right, Your Honor.

11           THE COURT:  I mean that's what you're telling me.

12           MR. MILLER:  Certainly unless the assurance was

13    there's no way you'll ever lose even a moment of access to

14    your security, don't worry about that, we promise -- I mean

15    this is a question of misrepresentation -- well even if

16    there's a SIPA proceeding trading will continue.  I mean you

17    could --

18           THE COURT:  You could come --

19           MR. MILLER:  -- concoct some very specific things.

20           THE COURT:  Right.

21           MR. MILLER:  But if the assurance was this

22    broker/dealer is regulated, its got lots of money, you've

23    got protection from SIPA, you will get your securities back,

24    that all turned out to be true.  The only thing that

25    happened was there was a delay in being able to get the

Page 17

1    securities back.

2             So all of these assurances about liquidity and

3    about the operations turned out in a sense to be true.

4    There was enough liquidity, everybody's securities came back

5    to them, nobody lost any securities.  And parts of the

6    broker/dealer continued to function through the sale of

7    Barclays.

8             So it's not true that, you know, these securities

9    went away, what happened was there was a delay, and there's

10   no allegation that anybody ever said there will never be any

11   delay.  I mean, you know, you don't have to worry about it,

12   you'll always have your securities, everything will continue

13   smoothly.  The allegation is that there were statements that

14   there was certain amounts of liquidity and basically it was

15   the intention of keep doing business.  And I'll explain,

16   even if you didn't have this exculpation clause -- or I

17   really think this is a force majeure clause and there's

18   another exculpation clause in Section 30 -- but --

19             THE COURT:  Right.

20             MR. MILLER:  -- even if you didn't have Section 29

21   or Section 30 I don't think the allegations here of tort or

22   contract work -- and I'd like to talk about that briefly

23   now.

24             THE COURT:  Sure.

25             MR. MILLER:  So -- but I think the force majeure

Page 18

1   clause is a simple complete answer, and I think Judge Glenn

2   applied it broadly, and I think his approach to that clause

3   where he said, look, hanging tort allegations around it or

4   saying there were torts before or torts after doesn't change

5   the fact that the category of loss was in -- between

6   sophisticated parties was excluded from recovery.  And I

7   notice the point is made that SIPA also precludes this kind

8   of recovery.  I mean it's statutory.  So that's consistent

9   with something in the SIPA proceeding.  That's consistent

10  with something that Congress did.

11          Now there's also a limitation of liability clause

12  in paragraph 30.  It expressly excludes gross negligence or

13  willful misconduct.  That is there's a critical difference

14  though because it's much broader in terms of the actions,

15  and it deals with categories of actions that include

16  "execution, clearing, handling, purchasing, or selling

17  securities, commodities, or other property, or other action

18  except for gross negligence or willful misconduct."  So it

19  basically is a very broad exculpatory clause, and it covers

20  any action whether it was beyond the control or not beyond

21  the control.

22          So there's a real qualitative difference and

23  that's the reason there are indifferent provisions, and

24  Judge Glenn did not -- there's a similar two clause

25  arrangement in MF Global, he didn't import the gross

Page 19

1    negligence or willful misconduct as an expectation to the

2    other clause.  It's not in Section 29, it's only in

3    Section 30.

4               THE COURT:  Well that supports --

5               MR. MILLER:  Yes.

6               THE COURT:  That seems to support your

7    characterization of the first as a force majeure and the

8    second as a more ordinary exculpation.

9               MR. MILLER:  Yes.  One is sort of broad and thin

10   and the other one is very narrow and deep, Your Honor.

11              The first one is very narrowly defined to certain

12   things that I think -- traditionally in law school when I

13   was there they call those acts of God, but things that are

14   pretty much beyond human control to some extent, and that

15   includes the government deciding that somebody has to shut

16   down and locking down its assets.

17              So again, we think that that takes care of

18   everything.  But even if Section 29 did not exist these

19   claims are still insufficient.  And let me start with some

20   of the imaginative contract theories.

21              First of all Stonehill says that the reference to

22   Lehman Brothers and the broad definition makes LBHI and

23   other affiliates jointly and severely liable, which is by

24   the way more of a tort concept than a contract concept.

25              The only provision that it posts a duty to hold

Page 20

1    and return securities however is paragraph 21 of the PB

2    agreement, and it imposes duties only on LBI, and indeed the

3    Court can take judicial notice of the fact that only LBI is

4    licensed to hold and trade and deal with securities.  The

5    other Chapter 11 debtors were not licensed as

6    broker/dealers.

7            New York law is clear, as stated in the Abundance

8    Partners case that we cite on page 10, that "where the plain

9    language of a contract signed by multiple parties indicates

10   that only one party has assumed an obligation, only that

11   party will be held liable for a failure to perform."  There

12   are other cases that say the same thing.  The multiple party

13   allegation only works if it looks like all the parties

14   agreed to perform the whole contract, and here clearly the

15   prime brokerage functions were broken out.

16           Now, there's also an allegation by Stonehill that

17   somehow LBHI should be jointly and severely liable because

18   it received a benefit from the PB agreement because it was

19   the parent corporation of LBI.  Well this of course just

20   jumps over the whole alter ego doctrine and says, well,

21   gosh, if you might have gotten a dividend from this benefit,

22   from this business you're liable for all these contracts.

23   They cite no law and there is no law.

24           Now let me talk about the bailee argument.  It's

25   interesting.

Page 21

1              It is first of all based on a misreading of a

2    clause and contract.  What the contract clause really says,

3    Your Honor, is that LBI holds as a bailee for the benefit of

4    other Lehman entities.

5              As the examiner found, and Stonehill admitted, the

6    purpose of this kind of clause was to protect Lehman

7    entities who were owed money by a brokerage customer by

8    allowing them to treat those securities held by LBI as a

9    form of collateral.  Basically it was a cross-

10   collateralization arrangement.  So (indiscernible) got a

11   loan from LBCC or some LBDP or one of the other entities

12   that was in the banking business and they had securities,

13   LBI was holding for their benefit and they could claim on

14   it.

15             Now Stonehill reads this clause backwards, it

16   tries to say this makes LBHI a bailee for the benefit of the

17   brokerage customer, which is not the way the clause reads.

18   And so it says at least it's an implied bailor.  But the

19   admitted facts are here that LBI was the only entity that

20   held securities.  There's -- as I said, there's no

21   allegation that any other entity held it, and we cite cases

22   in our brief, our reply on page 13 for the clear proposition

23   under New York law that there can be no bailment without

24   possession by the bailee.

25             THE COURT:  So this fits into the category of LBHI

Page 22

1    has a relationship in which its counterparty is obligated to

2    post collateral.

3              MR. MILLER:  Yes, Your Honor.

4              THE COURT:  LBHI can't hold the securities.

5              MR. MILLER:  Yes, Your Honor.

6              THE COURT:  LBHI turns around to LBI and says,

7    here, hold these securities for us as our agent or as our --

8              MR. MILLER:  I think what it really says is that

9    LBI holds the securities as a bailee and it holds it as a

10   bailee, but the beneficiary of that bailment is not just the

11   bailor, but also other entities.  In other words one can

12   post a bailment --

13             THE COURT:  But not the counterparty to the -- but

14   not the counterparty --

15             MR. MILLER:  Right.

16             THE COURT:  -- whose securities they actually are.

17             MR. MILLER:  It doesn't say that -- it would be

18   like an escrow agent.

19             THE COURT:  Right.

20             MR. MILLER:  Let's say that two parties to a real

21   estate contract put money into escrow and the contract says

22   that the escrow agent holds as the bailee for both the buyer

23   and the seller, and under the circumstances that does not

24   make the buyer or it does not make -- yes, it doesn't make

25   the buyer who maybe a beneficiary of this money in escrow a

Page 23

```
 1    bailee or the seller.  It means that it is a beneficiary of

 2    the bailment, that's really what's happened here --

 3             THE COURT:  Got it.

 4             MR. MILLER:  -- mechanically, I believe, Your

 5    Honor.

 6             So, I think again, creative, but it doesn't fit

 7    the facts.

 8             Now, there's also an agency allegation, and this

 9    is really another way around alter ego.  The conclusory

10    allegation that "LBHI had the ability to influence and

11    control LBI, its wholly-owned subsidiary, as well as other

12    Lehman entities, including with respect to the Lehman

13    entities' obligations under the prime brokerage agreement."

14             Now again, that's just to say that would make

15    parent corporations liable for every contract of their

16    subsidiaries and subsidiaries of subsidiaries if that were

17    the law.  They don't have any cases for it.  It doesn't

18    work.

19             There's a UCC claim that has to do with failing to

20    hold securities in an account that is protected from other

21    creditors, and this is again creative, it doesn't have

22    anything to do delay and returning securities, it has to do

23    with making sure the securities were returned.  Here the

24    securities were returned.  And again, there's no indication

25    that LBHI or any of the others could do anything to make
```

Page 24

1    sure what account LBI used to hold these securities.  So the

2    UCC claim doesn't add anything.

3            Again, all of these contracts claims are also

4    resolved by your Section 29 or 30, which they would be

5    actions, and if they got the wrong account it wouldn't

6    necessarily be willful misconduct or gross negligence.  So

7    they're also swept up by Section 30, the broad exculpatory

8    language.

9            Now let's talk about the tort claims.

10           There are two events.  There was an earnings call

11   on September 10th and an alleged conversation of Mr. John

12   Wickham, whose employer is not clearly identified by

13   Stonehill, and we'll come back to that in a moment.  LBHI

14   has shown that the September 10, 2008 earnings call had

15   extensive disclaimers and cautionary language, that's in

16   paragraph 55 of the objection.  Stonehill has not responded

17   at least that I could find to the argument that this

18   language eliminated reasonable reliances as a matter of law.

19   We think it did.  It was future events, it turned out to be

20   wrong, they didn't plan to go into Chapter 11 a few days

21   later, and they certainly didn't plan for the SIPA

22   proceeding to happen on the 19th.  But that's not actionable

23   because reliance on that was not reasonable.

24           Now, Mr. Wickham made certain statements that are

25   -- and they're outlined in paragraph 39 really of their

Page 25

```
 1    response, and just to outline what they say about this.

 2    They -- and they talk about the intent, and I want to

 3    suggest to you that this is first of all fraud by hindsight,

 4    and second, it does not plead specific intent for

 5    Mr. Wickham.

 6             What they say is the proofs of claim allege that

 7    Lehman Brothers' "misrepresentations were intended to

 8    convince Lehman Brothers' customers and counterparties in

 9    general and SCM in particular of the financial stability and

10    health of Lehman Brothers despite the fact that Lehman

11    Brothers' officers knew or should have known that there were

12    substantial risks that Lehman Brothers liquidity and capital

13    may not continue to support its operations."  That the

14    liquidity and capital may not continue to support its

15    operations, that's what they allege.

16             Then they say, skipping a citation in

17    paragraph 40:

18             "The proofs of claim further allege that only a

19    few days after Lehman Brothers' direct misrepresentation to

20    SCM regarding Lehman Brothers' liquidity and financial

21    condition 'the debtor commenced its Chapter 11 case and LBI

22    commenced its SIPA proceeding.'"

23             Well, Your Honor, this is classic fraud by

24    hindsight.  Some good things were said at some point and

25    then a bad thing happened, therefore you must have known
```

Page 26

1    this bad thing was going happen and you must have lied to us

2    about it, or otherwise, you know, the bad thing would not

3    have happened, you had to know it was coming.  That does not

4    under any kind of pleading, and certainly under rule 9,

5    which we belief does apply to allegations of fraud as well

6    as allegations of gross negligence, we don't think that that

7    raises either an allegation of falsity sufficiently, or more

8    importantly, Your Honor, it doesn't allege adequately the

9    intent of the speaker for fraud.

10            An element of fraud is that the speaker knew or

11   was reckless in knowing that the statement was false when

12   made.  And although intent can be pleaded generally, there

13   has to be a motive that is clearly pleaded at that time, and

14   there must be more than the motive that the speaker wanted

15   to do things that business people always want to do like

16   earn fees or make a profit.

17            And so even if we treat the response as a

18   supplement, this is fatally deficient to allege that

19   Mr. Wickham had knowledge that his alleged statements were

20   false or had a motive to mislead.  And I'd like to cite two

21   cases that I think are not in our brief that I've since come

22   cross that I think deal with this well.  One is the Wori,

23   W-O-R-I Bank versus RBS Securities case, 910 F.Supp.2d 697,

24   Southern District of New York 2012.  It says:

25            "A general statement of knowledge under Rule 9

Page 27

1    requires either one, a showing that the defendant had a

2    motive and opportunity to commit fraud, or two, allegations

3    of strong circumstantial evidence of conscious misbehavior

4    or recklessness."

5          Further the plaintiffs cannot cite -- and I'm no

6    longer quoting the case, Your Honor -- but further

7    plaintiffs cannot satisfy the motive requirement "based on

8    motives possessed by virtually all corporate insiders,

9    including ... the appearance of corporate profitability or

10   the success of an investment."  And that's a quote actually

11   from Novak, N-O-V-A-K versus Kasaks, K-A-S-A-K-S, 216 F.3d

12   300 at 307, Second Circuit 2000.

13         The Wori bank case that I just cited at page 703

14   has a similar quotation.  It says, "A general profit motive

15   such as the motive to earn fees ... is not sufficient to

16   show fraud."

17         It would go to the specifics in the claim and the

18   response what Stonehill alleges as motive is "the purpose of

19   these representations was to induce Stonehill to refrain

20   from demanding the returns of its assets held by LBI and

21   other Lehman entities and otherwise taking actions to

22   promptly reduce its commercial exposure to Lehman Brothers"

23   at a time when the senior executives of Lehman Brothers knew

24   the enterprise was on the verge of collapse.

25         Again, Your Honor, this is merely an allegation

Page 28

1    that they were being encouraged to keep doing business, and

2    that does not have the necessary motive and intent

3    allegation under Rule 9 to allege fraud.

4           Now, it's important also another defect in terms

5    of this fraud pleading, is that Stonehill does not say which

6    executives it's talking about, and it's not offering any

7    allegation that John Wickham specifically knew the

8    enterprise was on the verge of collapse.  This is the

9    problem with group pleading of fraud.

10          Under Rule 9, which again we believe and cite

11   cases that does apply, you can't just say a bunch of people

12   had certain knowledge and certain of those people made some

13   statements and therefore there's a fraud.  You have to say

14   the people making the statement knew the fraud.

15          We cite a number of cases in our reply that a

16   group allegation of fraud without an identification of which

17   entity committed the fraud is insufficient, and there are no

18   specific allegations that Mr. Wickham himself had knowledge

19   his statements were false.  This is clearly a group pleading

20   about Lehman Brothers' executives generally, it also does

21   not identify which debtor.  They just sued a myriad of

22   Chapter 11 debtors.

23          When you put this together, Your Honor, even if

24   you didn't have the force majeure clause, which we think

25   takes care of it, Stonehill has not asserted a tort case

1    that can rise to the level of gross negligence or willful

2    misconduct or fraud.  And I might add that it has not

3    alleged the kind of gross negligence or willful misconduct

4    facts having to do with -- or a reckless disregard of the

5    truth or the like.

6             So -- and we think by that way that chapter --

7    paragraph 30 of the prime brokerage agreement takes care of

8    negligent misrepresentation.

9             And there's also an interesting little duty

10   problem they have with neglect misrepresentation, because

11   they don't allege who Mr. Wickham worked with they either

12   have, as we believe the facts would show, but we don't have

13   them in the record, that Mr. Wickham was an LBI employee in

14   which case that wouldn't be the problem with these debtors,

15   or if Mr. Wickham did have something to do or had worked for

16   LBHI he didn't have any duty to them.  This would be in

17   essence asking a stranger for opinions.

18            I don't think those are the facts, but the fact is

19   if you go in the Apple store and ask an Apple employee do

20   you think I ought to buy Apple stock and he says to some

21   customer, yeah, I have it myself, and the guy goes out and

22   buys Apple stock and tries to sue Apple, the answer that the

23   customer was just walking in -- or perspective customer just

24   walks in off the street, asks somebody for directions on the

25   street, is 6th Avenue over there and they give you the wrong

Page 30

```
 1    directions you can't sue them.  So if Mr. Wickham actually

 2    worked for another entity they didn't have a -- weren't --

 3    didn't have a special relationship with.  And they get back

 4    to this bailment story is their special relationship.  They

 5    don't have any duty for negligent misrepresentation as well.

 6    I think that's a technical point.

 7            THE COURT:  You're also asserting that any

 8    reliance was not reasonable, right?

 9            MR. MILLER:  Yes, Your Honor, absolutely.

10            THE COURT:  Separate argument, right?

11            MR. MILLER:  Separate argument, Your Honor.  What

12    we think -- essentially they have not pleaded any of the

13    elements adequately, or as a matter of law when you look at

14    the facts and take out the conclusory allegations, they have

15    to use words like misrepresented, they don't -- they have to

16    have facts to meet Rule 9, and they do do who, what, when,

17    and where, but they don't do why or what the person knew,

18    and they don't do intent and they don't do reasonable

19    reliance.  They don't have all the elements that they would

20    need.

21            Now finally, Your Honor --

22            THE COURT:  So let me give you another --

23            MR. MILLER:  Yeah.

24            THE COURT:  -- hypothetical.

25            MR. MILLER:  Yes, Your Honor.
```

Page 31

1              THE COURT:  Purely hypothetical, obviously.

2              I think everybody our age can recall early

3    September in 2008 what it was like.

4              MR. MILLER:  Yes.

5              THE COURT:  Hypothetically if over Labor Day

6    weekend, you know, Mr. Fold had gathered everybody in and

7    said get on the phone, get on the phone, the only way we're

8    going to, you know, gather this is if everybody gets out

9    there and keeps everybody from taking their capital out,

10   right?  Get on the -- work those phones.  Hypothetical.

11             MR. MILLER:  Hypothetical, yes, Your Honor.

12             THE COURT:  Okay?  Hypothetical.  And then that --

13   and then they went and there was the Wickham phone call

14   pursuant to my hypothetical.

15             MR. MILLER:  Yes, Your Honor.

16             THE COURT:  I think what you're telling me is

17   nonetheless the reliance on the Apple store like

18   reassurance, our liquidity is strong, life is good, stick

19   with us would not have been reasonable.

20             MR. MILLER:  We believe that's true, Your Honor.

21             It's also important to understand that they did

22   not allege that as to --

23             THE COURT:  Well, I said it was a hypothetical.

24             MR. MILLER:  -- what Mr. Wickham said.

25             THE COURT:  That's why I said it was a

Page 32

1    hypothetical, and I'm not trying to make suggestions to

2    Mr. Brilliant on how to improve his pleading, I'm just --

3    I'm trying to understand kind of the --

4            MR. MILLER:  I know.

5            THE COURT:  -- scope of the legal argument, and I

6    think the legal argument is that reliance on those

7    statements, even if all that stuff had happened that I just

8    made up or not, just wasn't reasonable.

9            MR. MILLER:  It was not, Your Honor, and it would

10   have been reliance on essentially assurance of future

11   performance.

12           It also feeds neatly into a doctrine that I want

13   to talk about in a moment, which is that a duplicative

14   assertion that a party is going to perform a contract

15   doesn't give rise to a tort in New York law.  But let me go

16   back for just a minute to what the allegation is about

17   Mr. Wickham, because it's really thin.

18           If you look at --

19           THE COURT:  It's paragraph 13.

20           MR. MILLER:  -- paragraphs 13 and 14.

21           THE COURT:  Right.

22           MR. MILLER:  Yes, Your Honor.  If you've already

23   looked at it, this is apparently what the testimony would

24   be.

25           During a phone call held in early September 2008,

Page 33

1  shortly before the Lehman Chapter 11 filing, Mr. John

2  Wickham, believed to be head of Lehman Brothers Global

3  Client Services, which again is very vague, and acting as a

4  representative of the Lehman entities -- again, there's no

5  facts to support that other than believed to be -- called

6  John Motulsky of SCM in response to Mr. Motulsky's voicemail

7  message to Alex Kirk -- so this was a response -- believed

8  to be a senior officer of LBHI asking about the Lehman

9  entities' financial stability specifically in connection of

10  Lehman entities' prime brokerage and other commercial

11  relationships with claimant and its affiliates.

12       Paragraph 14:

13       "In response to questions and concerns expressed

14  by Mr. Motulsky regarding the Lehman entities' financial

15  strength and viability, Mr. Wickham sought to reassure

16  claimant through SCM and Mr. Motulsky regarding the Lehman

17  entities' financial condition and the stability of its prime

18  brokerage operation.

19       Mr. Motulsky recalls that Mr. Wickham stated that

20  Lehman had adequate liquidity, because unlike Vera Stearns

21  (ph), they prudently financed its customers with matched

22  funds and had sufficient liquidity from sources it believed

23  to be reliable to meet all of its obligations for a year,

24  even if no financing was available, that it had 12 billion

25  surplus cash and also cited the ability of secured financing

Page 34

1       from the federal reserve, none of which was used."

2              Let me stop right there, Your Honor.  All of those

3       facts could be completely true, they don't allege they're

4       false, they just say there was then a SIPA proceeding,

5       that's all they say.  So there's no allegation that any of

6       that is not true.

7              Then it goes on, paragraph 15 and it says:

8              "Mr. Motulsky also recalls that Mr. Wickham stated

9       that Lehman's unrealized depreciation in various assets, one

10      of which was Neuberger Berman, half of which Mr. Wickham

11      stated might soon be sold at a profit to realize value and

12      edit to tangible equity, were more than sufficient to cover

13      possible unrealized losses in its portfolio and provide

14      incremental equity that would be required for a plan spin

15      out of most of Lehman's commercial real estate portfolio,

16      and conveyed a message to Lehman Brothers' prime brokerage

17      operations would continue operating in the normal course."

18             It says here conveyed a message that, and the

19      claimant should be comfortable continuing its customer and

20      counterparty relationship with Lehman Brothers.

21             And then it says a few days after this

22      conversation the debtor commenced the Chapter 11 case.

23             But, Your Honor, again, that's -- there's two

24      categories of allegations.  Some of those are future hopes,

25      representations, and beliefs, and you can't reasonably rely

Page 35

1    on any of that.  And the rest of that stuff is not alleged

2    to be untrue.  And the fact that they got all their

3    securities back, in fact it's consistent with the central

4    theme of this, none of this says there is no possibility

5    that you'll ever have any break in your trading or that the

6    SIPA proceeding won't cause you a problem.

7            So, again, Your Honor, I think the way this is

8    pleaded it simply does not rise to the level of meeting

9    Rule 9.

10           Now finally, Your Honor, there is a doctrine in

11   New York that tort claims cannot be asserted if they are

12   duplicative of contract claims.  Now these cases are cited,

13   among other places, on page 30 of our reply, the doctrine

14   applies perfectly here, because the tort claims of Stonehill

15   are merely contingents that Stonehill treated the earnings

16   call and the statements of Mr. Wickham as assurances that

17   LBI would perform the PB agreement.  And when a party says I

18   promise to do this in writing in a contract and somebody

19   calls them up and says you're still going to come out and do

20   this contract aren't you, and they say, yeah, I'm still

21   planning to come out and do it, then they don't do it, you

22   have a breach of contract, you don't have fraud on top of

23   the breach of contract.  Otherwise every time somebody

24   breaches a contract, since almost always the contract has

25   other assurances, scheduling, all the rest of this, you get

1    a whole tort case on top of a contract case.  And in this

2    that's what they're trying to do.

3             So -- and there's a red herring raised in a

4    Stonehill footnote about whether this doctrine applies if

5    there's no valid contract.  These cases really stand for the

6    proposition that if the tort claim is not duplicative of a

7    promise in the contract, if somebody has a contract with a

8    guy to do plumbing and he comes out and misrepresents

9    something about the foundation of their house, the fact that

10   there was a plumbing contract doesn't excuse -- doesn't

11   apply to this doctrine.

12            There's also an economic loss doctrine which we

13   cite in our brief, and that really has to do with concept.

14   That if the loss is the same as the breach of the contract

15   then hanging torts around it by negligent misrepresentation

16   doesn't increase the claim.

17            In summary, Your Honor, this is creative, it's

18   interesting, but it's just not a set of claims that work

19   with this contract and the facts that we have with the Court

20   and we think they're insufficient.

21            THE COURT:  All right.  Thank you, Mr. Miller.

22            MR. MILLER:  Thank you, Your Honor.

23            MR. BRILLIANT:  Can I have one moment, Your Honor?

24            THE COURT:  Sure.

25        (Pause)

Page 37

1          MR. BRILLIANT:  Good morning, Your Honor.

2          THE COURT:  Good morning.  How are you?

3          MR. BRILLIANT:  Good.  Thank you, Your Honor.

4          So, I guess this hearing was a long time coming,

5   you know, two snowstorm delays and --

6          THE COURT:  Was it --

7          MR. BRILLIANT:  -- we're finally here.

8          THE COURT:  I've just -- I've lost track.

9          MR. BRILLIANT:  Right.  But your chambers was very

10  good about rescheduling.  We appreciate that, Your Honor.

11         THE COURT:  They always are.

12         MR. BRILLIANT:  That's absolutely true.

13         THE COURT:  Especially my colleague sitting to my

14  left.

15         MR. BRILLIANT:  Your Honor, I'm sure -- you can

16  tell Your Honor has read, you know, the briefs and

17  understand the issues.

18         THE COURT:  Sure.  Sure.

19         MR. BRILLIANT:  You know, it's -- what I'd like to

20  do is just kind of give you a little bit of the statements

21  to what we're here about, because I think, you know,

22  Mr. Miller didn't really talk about that.

23         THE COURT:  Well we're here on a sufficiency

24  hearing.

25         MR. BRILLIANT:  We're here on a sufficiency

Page 38

1    hearing, Your Honor.

2            THE COURT:  Yeah.  I got all that.

3            MR. BRILLIANT:  And we're here -- right.  And

4    we're here on a -- I know you know that, I don't think

5    there's going to be a lot I'm going to tell you today, Your

6    Honor, that you don't know.  It's very clear to me you're

7    very well prepared for the hearing.  But we're here on a

8    sufficiency hearing.  But we're here on a sufficiency

9    hearing in connection with a proof of claim.  We're not here

10   on a sufficiency hearing in connection with a complaint, and

11   most of the cases, especially with respect to, you know,

12   9(d) that are -- you know, that are cited by Mr. Miller all

13   deal with complaints.

14           THE COURT:  Uh-huh.

15           MR. BRILLIANT:  And as Your Honor knows the Second

16   Circuit in the, you know, the Aetna, you know, case, the

17   Shadow, you know, Gay case, you know, there, you know, Judge

18   Lifland had dismissed, you know, the allegation for setoff,

19   you know, on the basis of pleading in a proof of claim, it

20   went up to the District Court, it was affirmed, and the

21   Second Circuit said, no, a burden of proof of claim just

22   needs to state, you know, that you're -- what the nature of

23   the claim is and if you seek to hold the debtor liable.  The

24   proof of claim --

25           THE COURT:  Right, but I think the --

```
 1              MR. BRILLIANT:  -- the proof of claim did that.

 2              THE COURT:  Right.  I think I can help you out

 3    though, because here on top of whatever, you know, the law

 4    is, we've got this procedure, right, so that given that the

 5    proof of claim got filed and then we lay it on that

 6    procedure you might make the argument, I think it would be a

 7    good one, that even if you have to satisfy the standard and

 8    plead with particularity, ala (sic) 9(b), you should have an

 9    opportunity to do that, because the order of things in this

10    case didn't put you on notice that you had to do that,

11    right?

12              MR. BRILLIANT:  That's right, Your Honor.

13              THE COURT:  So that -- and Mr. Miller didn't

14    address that.  I mean his arguments at the podium were all

15    addressed to what -- you know, the merits.

16              MR. BRILLIANT:  That's right, Your Honor, and I

17    think you're absolutely right about that, Your Honor.  I

18    mean obviously to the extent somehow there was some

19    determination that 9(b) somehow applies because they filed

20    an objection then clearly that would be, you know, putting a

21    retroactive, you know, pleading requirement on a party,

22    which obviously violates due process, and you know, the

23    Second Circuit says in any event even if we had filed the

24    complaint here, you know, the right to replead, you know,

25    should be, you know, given freely.
```

Page 40

1           So we would expect -- you know, from a worse case

2    perspective that Your Honor should allow that, but I think

3    we -- I don't think, Your Honor, we need to get there today.

4           THE COURT:  Okay.

5           MR. BRILLIANT:  Because we filed a proof of claim,

6    and the question is whether it's sufficient.

7           THE COURT:  Uh-huh.

8           MR. BRILLIANT:  And we think with respect to, you

9    know, the fraud allegations we have alleged more than

10   enough, you know, in terms of the who, the what, the when,

11   you know, and the reliance, you know, and the damages.

12          But I think let me just step back for a second,

13   Your Honor.  So, I think we all understand, you know, what

14   we're here about, it's a sufficiency hearing in connection

15   with a proof of claim, and then -- and there's two different

16   types -- as Your Honor knows there's two different types of

17   claims asserted here.  There's the contract claim, you know,

18   and the tort claims.

19          And -- but when -- you know, listening to your

20   colloquy with Mr. Miller it's clear that their view is that

21   by virtue of the exculpation provisions, you know, contained

22   in the contract that a broker/dealer, leaving aside the

23   issue of, you know, the different entities here, that a

24   broker/dealer on the eve of insolvency is free to lie to all

25   of its customers to get them to keep their securities in

Page 41

1    there knowing that they will suffer, you know, loss, you

2    know, after, you know, a bankruptcy filing, and that they

3    can just defraud people, and that the provisions of the

4    exculpation, which say, you know, their view, I don't agree

5    with their view, that -- you know, that a force majeure, any

6    damages caused by -- you know, they view, you know, a SIPA

7    proceeding to be a force majeure.  We don't agree with that.

8    But --

9                THE COURT:  But so let's go right to it.  So how

10   do you distinguish, putting aside --

11               MR. BRILLIANT:  Uh-huh.

12               THE COURT:  -- your tort claim.

13               MR. BRILLIANT:  Right.

14               THE COURT:  Just on the contract claim how do you

15   distinguish our facts from MF Global?

16               MR. BRILLIANT:  Putting aside, you're saying --

17               THE COURT:  Putting aside the tort claim.

18               MR. BRILLIANT:  Right.

19               THE COURT:  Right.

20               MR. BRILLIANT:  Okay.

21               THE COURT:  Just what you said was --

22               MR. BRILLIANT:  Yes.

23               THE COURT:  -- you know, on the eve --

24               MR. BRILLIANT:  Yes.

25               THE COURT:  -- of a SIPA proceeding --

```
 1              MR. BRILLIANT:  Yes.

 2              THE COURT:  -- our broker/dealers --

 3              MR. BRILLIANT:  Yes.

 4              THE COURT:  -- are free to lie.

 5              MR. BRILLIANT:  Yes.

 6              THE COURT:  Similar allegations were made in MF

 7    Global, and I think -- and you can disagree with me -- I

 8    asked Mr. Miller the question, well isn't MF Global

 9    different because that was the debtor --

10              MR. BRILLIANT:  Uh-huh.

11              THE COURT:  -- was the SIPA -- the entity that --

12              MR. BRILLIANT:  Yes.

13              THE COURT:  -- filed, and here basically

14    Mr. Miller said, well, that's -- our case is a force majeure

15    to that because that was the debtor, this was --

16              MR. BRILLIANT:  Yes.

17              THE COURT:  -- one step removed.

18              MR. BRILLIANT:  Yes.

19              THE COURT:  So basic question is, you know, help

20    me out of MB Global --

21              MR. BRILLIANT:  Right.

22              THE COURT:  -- because I find MF Global frankly

23    very persuasive and on point.

24              MR. BRILLIANT:  Uh-huh.  Okay.

25              THE COURT:  Okay?
```

1           MR. BRILLIANT:  So, I think as Your Honor points

2     out, MF Global deals with the contract claim, not the tort

3     claim.

4           THE COURT:  Yes.

5           MR. BRILLIANT:  But starting out with I think

6     there's three really important differences.

7           THE COURT:  Okay.

8           MR. BRILLIANT:  One is the one that you asked

9     Mr. Miller about, which is the fact in MF Global only dealt

10    with the SIPA entity.

11          THE COURT:  SIPA, right.

12          MR. BRILLIANT:  Not the other entities.  And with

13    respect to SIPA policy the policy was you just get back your

14    securities, there's not a policy for other claims.  And

15    that's -- and we -- you know, the MF Global opinion really

16    deals with a whole litany of different claimants who raised,

17    you know, different issues, the vast majority of the

18    claimants that are dealt with are claimants who asserted

19    claims other than just for the return of their securities in

20    the SIPA proceeding, and Judge Glenn goes into, you know, a

21    lengthy analysis of the policies of SIPA, which are

22    different in a Chapter 11 case.

23          So the first thing is that issue and his

24    application of the force majeure provision, you know, that

25    dealt with, you know, the SIPA policies and applying it in

Page 44

1      the SIPA proceeding.  So that's the first issue.

2             The second, you know, issue here is that the force

3      majeure provision is very different.  There one of the

4      issues in the -- you know, one of the litany of things that

5      were listed was specifically, you know, court orders.  It

6      was a much broader force majeure provision which included,

7      you know, language that was broader, you know, than the

8      language that was included in this one.  And in our

9      particular force majeure provision, you know, it doesn't

10     pick up, you know, this type of issue.

11            THE COURT:  Can we look at it together?

12            MR. BRILLIANT:  Sure.

13         (Pause)

14            THE COURT:  I'm trying to find it.

15            MR. BRILLIANT:  So we're on page -- paragraph 29

16     in the --

17            THE COURT:  In the response?

18            MR. BRILLIANT:  Well, I was going to go through

19     the contract and then I'm going to pull up the case as well

20     and read the two.  But looking at paragraph, you know, 29,

21     which is the extraordinary events.

22         (Pause)

23            MR. BRILLIANT:  But it's government restrictions,

24     exchange or market rulings, suspension of trading, war, you

25     know, whether declared or undeclared terrorist acts,

Page 45

1    insurrection, riots, fires, flooding, strikes, failure of

2    utility services, accidents, adverse weather, other events

3    of nature, including, but not limited to, earth quakes,

4    hurricanes, tornados, or other conditions beyond Lehman

5    Brothers' control.

6              THE COURT:  Right.  So why doesn't that do it?

7              MR. BRILLIANT:  Well --

8              THE COURT:  We had a SIPA proceeding, right?

9              MR. BRILLIANT:  Right.  And a SIPA proceeding is

10   not -- well one it's not something outside of their control.

11   The other thing is --

12             THE COURT:  Well how -- hold on.  SIPA -- I think

13   SIPA would disagree with you.  SIPA gets to decide when it

14   commences a proceeding.  How could Lehman Brothers

15   generically have done anything to affect when SIPA decided

16   to commence a proceeding?

17             MR. BRILLIANT:  Well, I guess what -- you know, I

18   mean -- we start with the litany -- Your Honor, it doesn't

19   say SIPA proceeding.  So a SIPA proceeding --

20             THE COURT:  Sure.

21             MR. BRILLIANT:  -- would either have to be a

22   government restriction --

23             THE COURT:  Suspension of trading.

24             MR. BRILLIANT:  -- or a suspension of trading.

25   And I guess the question is, is it, you know, suspension --

Page 46

1    you know, does suspension of trading mean the New York Stock

2    Exchange closed for a day or does it mean, you know,

3    specifically with respect to, you know, this particular --

4              THE COURT:  Was LBI able to trade after the SIPA

5    proceeding commenced?

6              MR. BRILLIANT:  No, but -- all right.  We can turn

7    -- even if -- and I was going to say, even if Your Honor --

8    but the language is different.  If you look at the MF

9    Global --

10             THE COURT:  Right.

11             MR. BRILLIANT:  -- order language, you know, it

12   talks about, you know, orders of courts, and it's more

13   specifically tailored towards these types of issues.

14             But under -- the third issue, Your Honor, and

15   maybe the most important, is under New York law we all know

16   that exculpation provisions, you know, that -- you know,

17   will not be enforced to the extent that the, you know, the

18   damages, you know, result are willful misconduct.

19             THE COURT:  Okay.  But that's a general public

20   policy argument with respect to limitations of liability,

21   and if you -- and I know that headings in contracts don't

22   mean anything, I don't know if this one specifically has a

23   clause that says so, but we -- the distinction that

24   Mr. Miller draws between the paragraph 29 events and

25   paragraph 30 events I think has some merit.

Page 47

1          MR. BRILLIANT:  Okay.  Well, Your Honor, I think

2     that's -- that goes to an issue of damages, you know, what

3     would the -- you know, the -- he's basically saying that

4     damages, you know, that result from things outside, you

5     know, the parties' control --

6          THE COURT:  Right.

7          MR. BRILLIANT:  -- pursuant to this are damages

8     that you can't recover.  And I guess from a public policy

9     perspective, I mean that just can't be.

10         So what they're basically saying is, you know, a

11    party should be -- you know, should -- you know, a

12    broker/dealer, you know, or its affiliates in this context

13    can do anything they want to do, you know, lie, make

14    misrepresentations, you know, out and out defraud a client,

15    and that if the loss has occurred, in their view directly or

16    indirectly or in part because of, you know, a SIPA

17    proceeding or a government order or something else, that

18    they have no liability for any of those damages, and that

19    just -- in a SIPA proceeding, you know, I understand we're

20    -- you know, why the policies are different there, why Judge

21    Glenn can come to that conclusion.  That's not controlling

22    law, it's just precedent, it's on a different agreement --

23         THE COURT:  Uh-huh.

24         MR. BRILLIANT:  -- in context of the different

25    type of allegation here, but what they're saying is when you

Page 48

1    really boil it down, you know, to its assets, they're saying

2    that under New York law a contract will be -- a limitation

3    on liability will be enforced even if the damages are

4    caused, you know, unwillful misconduct and fraud of the

5    party.

6            THE COURT:  But who's the party?  You said -- the

7    hypothetical you're setting up is the broker/dealer can do

8    terrible things and then if they've saved by a force majeure

9    event no damages.

10           Here the allegation is that -- seems to be the

11   allegation that it was somebody acting not in the capacity

12   of an LBI employee but in some other capacity.

13           MR. BRILLIANT:  That's right, Your Honor.  That's

14   right.  Well, you know, I was using -- if you want to say,

15   you know, broker/dealer, you want to say the -- all of the

16   affiliates of the broker/dealer, but that's right, you know,

17   that -- you know, what they're basically saying is that an

18   employee of, you know, the Lehman entities, you know, Lehman

19   Brothers, let's just say, you know, all right, the Lehman

20   entities can defraud parties, they can, you know, tell you,

21   you know, as we allege here we have the liquidity to get us

22   for an entire year, we don't have any problem, we're going

23   to continue our business in the ordinary course, keep your

24   securities here, you know, you're going to be fine, even

25   though they knew or should have known that they were on the

Page 49

1    verge of insolvency in filing bankruptcy.  They knew that

2    they had hired -- someone at Lehman Brothers knew that

3    they'd hired bankruptcy counsel.  That they had other issues

4    and that the statements they made weren't true.

5              THE COURT:  But this -- now this gets to -- it

6    skips over it, but -- and you can come back to your argument

7    -- but then it gets to the concept that certainly

8    sophisticated market participants and others in that time

9    period they're reading the newspaper and there wasn't a day

10   that went buy where people didn't think, wow, Is Lehman

11   Brothers going to make it?  That was -- I mean we could put

12   into the record, you know, the Wall Street Journal, the

13   Financial Press.

14             MR. BRILLIANT:  Uh-huh.

15             THE COURT:  I mean the record would be -- would

16   fill this room of, you know, the doubts and the worries and

17   whatever.

18             So, you know --

19             MR. BRILLIANT:  Right.  But -- right.  But the

20   issue of reasonable reliance is not really an issue for

21   today, that's a question of --

22             THE COURT:  No, but it is an issue for today,

23   because Mr. Miller confirmed that part of what Lehman is

24   saying is that as a matter of law, even assuming what -- as

25   true what you alleged, that even more so even assuming that

Page 50

1    you allege my, you know --

2              MR. BRILLIANT:  Uh-huh.

3              THE COURT:  -- (indiscernible) conspiracy --

4              MR. BRILLIANT:  Right.

5              THE COURT:  -- hypothetical --

6              MR. BRILLIANT:  Right.

7              THE COURT:  -- the reliance wasn't reasonable.

8              MR. BRILLIANT:  Okay.  And I --

9              THE COURT:  And I think I'll ask Mr. Miller on

10   rebuttal, but I think that that's what their position is.

11             MR. BRILLIANT:  No, look, I agree that that's

12   their position, and I guess what I'm trying to say, Your

13   Honor, is that's just not, you know, appropriate under the

14   law.  You know, the issue of reasonable reliance is a fact-

15   based, you know, inquiry.

16             You know, in some of the cases they cite where,

17   you know, they're talking about reasonable reliance on

18   provisions in a prospectus or reasonable reliance in

19   connection with, you know, provisions in a -- you know, in

20   an advertisement, you can make arguments of this type.  But

21   here where there's a conversation, you know, that occurred

22   that was designed to induce Stonehill to keep their -- and

23   that's the allegation here -- was designed to induce

24   Stonehill to leave its securities, you know, at Lehman

25   Brothers, and there's a -- you know, we'll go on to

Page 51

1    paragraph 16 of the attachment -- but with respect to

2    paragraph, you know, 16 where we say these were

3    misrepresentations, you know, and based upon these

4    misrepresentations Stonehill agreed to leave its securities

5    there.

6              THE COURT:  Right.  But the other thing that you

7    also say in a footnote I believe -- I think it's in the

8    proof of claim.  There's a footnote that says this was --

9    yes, it's footnote 6 in the proof of claim.

10             "Many of Mr. Wickham's comments appear to be taken

11   from talking points Mr. Wickham received from the Lehman

12   entities, the communications with customers, rather than

13   being quote/unquote off the cuff remarks of Mr. Wicket's

14   personal views regarding Lehman's financial condition."

15             So, I think that that rather cuts against your

16   argument and brings me more to the Apple store where

17   generally speaking you're in a distressed situation and you

18   have a crisis PR firm -- again, I'm making it up -- and you

19   have to talking points.  Why?  Because your phone is going

20   to be ringing off the hook with people who want to know

21   what's happens.  So that little footnote kind of cuts the

22   other way.  So that's point number one.

23             MR. BRILLIANT:  No --

24             THE COURT:  Point number two that I wanted to ask

25   you at the top and I forgot, was Mr. Miller pointed out that

Page 52

1    there was no response to the point about the earnings calls

2    and --

3              MR. BRILLIANT:  Uh-huh.

4              THE COURT:  -- so the -- their --

5              MR. BRILLIANT:  Okay.  Well.

6              THE COURT:  -- position is that you've conceded

7    that point.

8              MR. BRILLIANT:  No, we've --

9              THE COURT:  Is that true?

10             MR. BRILLIANT:  No.  If you look at paragraph 36

11   and 37 of our pleadings we haven't conceded that, and they

12   raise the -- you know, the (indiscernible) caution rule in

13   their reply, not, you know, up front, and I would like to

14   speak about that, because --

15             THE COURT:  Okay.

16             MR. BRILLIANT:  -- they applied it

17   inappropriately.

18             THE COURT:  Keep going.  I'm interrupting you --

19             MR. BRILLIANT:  No, no.

20             THE COURT:  -- way too much.

21             MR. BRILLIANT:  But let me just point one thing

22   out on this reasonable reliance issue --

23             THE COURT:  Uh-huh.

24             MR. BRILLIANT:  -- first.  You know, they cite the

25   Dola (ph) versus Wachnek (ph) case, you know, in their

Page 53

1    papers, and there, you know, I believe it cuts against them

2    rather than for them, the court actually found that the

3    plaintiff's complaint adequately pled reasonable reliance

4    for 12(b)(6), and in reasoning the court found:

5              "Whether or not reliance on alleged

6    misrepresentations is reasonable in the context of a

7    particular case is intentionally fact specific and generally

8    considered inappropriate for determination on a motion to

9    dismiss"

10             I think that's right on point here, Your Honor.

11   Your Honor may be able to put yourself, you know, back to

12   right before Lehman Brothers filed and remember that there

13   was a lot of information, you know, swirling around, and

14   think, well gee, you know, well why would somebody, you

15   know, have agreed, you know, to stay, you know, that may --

16   you know, in my mind I can't see how that's reasonable, but

17   you need to wait, you know, on this hearing, you can't just

18   say, you know, that -- you know, it's not plausible that

19   somebody based upon, you know, phone conversations and

20   information, you know, in the public, you know, reasonably,

21   you know, determined, you know, based upon, you know, what

22   we think is well pled here, you know, misrepresentations,

23   you know, agreed to, you know, keep their, you know,

24   securities at Lehman Brothers.  So that's a fact-based issue

25   not to be, you know, decided here.

1          Because, you know, although -- you know, I

2     understand there's, you know -- you know, obviously Judge

3     Peck lived the case for a long time before you did, but

4     you're hearing a lot of --

5               THE COURT:  Really?

6               MR. BRILLIANT:  -- Lehman Brothers' issues and

7     you're dealing with a lot of different issues over a large

8     time frame.  And I understand there's some sense that, you

9     know, that you want to, you know, weigh the different facts

10    or the different allegations and see, but the reality is --

11              THE COURT:  No, I'm not -- I'm really not

12    interested in getting reversed by the district court for

13    having decided facts in a motion to dismiss.

14              MR. BRILLIANT:  Right.

15              THE COURT:  So I'm definitely not going to do

16    that.

17              MR. BRILLIANT:  Right.  Okay.  Thank you, Your

18    Honor.  And it could actually, you know, with the --

19              THE COURT:  But I am interested -- since you've

20    raised kind of the case as a whole -- I'm interested -- and

21    I mean this in the nicest possible way -- I'm interested in

22    the issue of why nobody else was clever enough to have come

23    up with this.

24              MR. BRILLIANT:  Yes.  You know, I don't think the

25    answer clever enough is really appropriate, Your Honor.  I

Page 55

1    think -- I can't speak for other people because I don't know

2    what damages they had, what claims they filed, why they, you

3    know, decided to withdraw them, what the debtors may have

4    given them with respect to other things in exchange for

5    doing that or how other people, you know, filed their

6    complaint.

7           All I can tell you is here that, you know,

8    Stonehill suffered extreme loss of, you know, you've seen

9    the allegations, $150 million or more.  I can't -- you see

10   the point.  You'd have to add them up.  But they suffered

11   extreme loss here, you know, caused, you know, by the, you

12   know, the debtor's misconduct and, you know, after being,

13   you know, in their perspective, you know, fraudulently, you

14   know, induced to stay, you know, at the company and believe

15   that they have, you know, valid claims and decided to, you

16   know, assert them.

17          The fact that others didn't assert them, I can't

18   really respond to that.  Clearly in the MF Global case in

19   the SIPA proceeding, you know, there were, it would appear,

20   hundreds of people who, you know, asserted those types of

21   claims and were, you know, overruled by Judge Glen.  You

22   know, why other parties didn't do it, don't know.  Don't

23   know if the prime brokerage agreements for other parties

24   were different in light of the fact that Stone -- that

25   Newport has virtually the same one would assume that other

Page 56

1   prime brokerage, you know, clients had similar agreements

2   and could have made, you know, similar arguments.

3           THE COURT:  But you have -- Stonehill has an

4   allowed customer claim at Lehman -- at LBI?

5           MR. BRILLIANT:  They got (indiscernible).

6           THE COURT:  They got by this?  Good.

7           MR. BRILLIANT:  They have other claims there have,

8   you know, been alluded to, you know, that have not been paid

9   because the securities, you know, weren't there.  FX claims

10  and derivative claims.  They have other claims at that

11  entity.  That's correct.

12          THE COURT:  But has a diminution claim been

13  asserted against --

14          MR. BRILLIANT:  No.

15          THE COURT:  -- LBI?

16          MR. BRILLIANT:  No.

17          THE COURT:  So that's the exact parallel to MF

18  Global, right?

19          MR. BRILLIANT:  That Judge Klein ruled on, but

20  that's not been asserted there.

21          THE COURT:  But what I'm saying is that you have

22  not asserted a diminution claim against LBI.  You've

23  asserted a diminution claim against LBHI and other Lehman

24  entities other than LBI.

25          MR. BRILLIANT:  Let me just -- that's correct,

Page 57

1    Your Honor.

2              THE COURT:  So based on what you just said, why

3    haven't you asserted the diminution claim against LBI

4    consistent with your theory that it's all just Lehman

5    Brothers and on the other end of the phone when I'm talking

6    to, you know, whoever talking with them, it's Lehman

7    Brothers, and he's acting on behalf of everybody.  So sounds

8    good.  Why don't you assert that there's no diminution claim

9    against LBI?  I mean, that ship has sailed, right?

10             MR. BRILLIANT:  Well, we're not saying, Your

11   Honor, that, you know, I guess that's not at issue here

12   today, right, because Your Honor's not -- we're not here on

13   the LBI SIPA proceeding and I don't think that the fact that

14   we didn't assert it against LBI in any way, you know,

15   prejudices our ability under our theories and we'll go look

16   at the contract because that's something that I think is

17   really important that Your Honor do, but --

18             THE COURT:  But you can't -- SIPA doesn't let you

19   assert --

20             MR. BRILLIANT:  But what I was going to say -- but

21   the bottom line is, as I say, SIPA doesn't let you assert it

22   and Judge Blaine said, you know, that SIPA is right about

23   that so, you know, I don't know what, you know, what you're

24   really saying to me, you know, that we should be, you know,

25   raising that claim and then taking that up, you know,

Page 58

1    assuming that, you know, that it --

2            THE COURT:  I'm just trying to line things up

3    between here and MF Global.

4            MR. BRILLIANT:  Okay.

5            THE COURT:  Because part of your argument is that

6    MF Global's -- I understand it's not binding on me, but it's

7    not dispositive.  I shouldn't follow it here.  I can't

8    apply it.

9            MR. BRILLIANT:  That's right.  Our view is this,

10   it's not binding and it's not, you know, dispositive in

11   their differences in the context --

12           THE COURT:  No.

13           MR. BRILLIANT:  -- their claims are being raised

14   as well as, you know, they say New York law and Illinois law

15   are the same, but we're raising specific New York law issues

16   here --

17           THE COURT:  Yes.  Okay.

18           MR. BRILLIANT:  -- that public policy of New York

19   and New York law does not allow for exculpation for --

20           THE COURT:  Okay.

21           MR. BRILLIANT:  -- gross misconduct and willful

22   misconduct, gross negligence which occurred here in this

23   situation.

24           Your Honor, let's just turn and look at the

25   contract quickly.  I'm sure from the pleadings that you're

Page 59

1    aware of these things, but I think that, you know, that the

2    contracts, it says very different things --

3            THE COURT:  Okay.

4            MR. BRILLIANT:  -- than what Mr. Miller would ask

5    Your Honor to find.  If you turn to the beginning of the

6    contract, you know, in the preamble it says, "This agreement

7    sets forth the terms of conditions under which Lehman

8    Brothers, you know, (as defined below) will open and

9    maintain prime brokerage accounts in your name and otherwise

10   transact business with you as our customer."

11           Now, it says Lehman Brothers.  It doesn't say LBI

12   and it says that Lehman Brothers will open and maintain

13   prime brokerage accounts in your name.  The next line says,

14   "In consideration of Lehman Brothers opening a prime

15   brokerage account for you, you agree to the following."  And

16   then the rest of the agreement, you know, follows.

17           Now, Lehman Brothers, you know, is defined here as

18   being all the Debtor entities that we filed the proofs of

19   claim against.  It's not just LBI.  So you start out with

20   the standpoint it's not, you know, they would say, well the

21   only party that agreed to be your prime broker was LBI, but

22   that's not right.  It's Lehman Brothers.  We agreed to be a

23   customer of Lehman Brothers pursuant to their agreement.

24   And the document, the agreement deals with how the logistics

25   of how Lehman Brothers was going to, you know, provide all

Page 60

1    those services, you know, to Stonehill, to the customer.

2            And then the agreement, Your Honor, is signed by,

3    you know, the parties to this, you know, it's signed as an

4    accepted and agreed to and it says, "By Lehman Brothers,

5    Inc. as signatory for itself and as agent for the affiliates

6    named herein."

7            So, you know, the party to this agreement is all

8    of the Lehman Brothers' entities, so it is not that this is

9    just a, you know, a contract where LBI, you know, agreed to

10   be, you know, the, you know, the customer.  I'm sorry, where

11   LBI, you know, agreed to be the prime broker.  It's Lehman

12   Brothers agreed to provide, you know, the prime brokerage

13   services provided herein.

14           THE COURT:  I'm just not getting that.  I mean,

15   the only entity that could act as a prime broker was LBI.

16   It clearly says that in the first sentence.  It says a prime

17   brokerage account opened pursuant to this agreement will be

18   opened at Lehman Brothers, Inc. LBI.

19           MR. BRILLIANT:  No, that's right, Your Honor, but

20   I think -- I think, Your Honor, what, you know, what our

21   allegation is, all right, and I think the only fair way, I

22   think, to read the contract, Your Honor, is that this is a

23   contract where Lehman Brothers agreed to provide all of

24   these services and with respect to these issues, LBI is

25   Lehman Brothers' agent for purposes of the prime brokerage

Page 61

1    account.

2             THE COURT:  But it -- I'm just not -- I'm just --

3    I hear you, but I'm just not seeing it that way and it goes

4    back to something that Mr. Miller was talking about which is

5    -- and related to your bailment argument.  That is that this

6    would appear to be drafted that way -- again, I'm not making

7    a factual determination, I'm just stating an observation.

8    That when you follow this down to, for example, paragraph 3,

9    security interest and lien registration of securities, to

10   acknowledge a business of all the Lehman entities that they

11   were going to engage in other transactions in which

12   counterparties to agreements with LBSF, LBHI, you know,

13   LOTSI (ph), whoever it might be, we're going to have to post

14   collateral.  LBHI or whatever counterparty that was can hold

15   the collateral so that there is this prime brokerage

16   agreement in which it's made clear that when another Lehman

17   entity takes collateral, security, they're going to hand it

18   over to LBI because LBI under the law is the only entity

19   that can hold securities, because it's the only licensed

20   prime broker.

21             So sure, everybody is in here, right, but that

22   doesn't translate into creating -- necessarily translate

23   into creating the sweeping obligations that you say exist

24   that everybody was acting as, you know, the counterparty

25   here for the purposes of the safekeeping, if you will, of

Page 62

1    Stonehill Securities.

2              MR. BRILLIANT:  Your Honor, I think my argument is

3    a little bit more subtle than that.

4              THE COURT:  Okay.

5              MR. BRILLIANT:  Or sophisticated, which is that,

6    you know, and again, you know, the agreement says Lehman

7    Brothers, all these entities, you know, will open up, you

8    know, will, you know, will maintain prime brokerage

9    accounts.  And then it says and you will be a customer of

10   Lehman Brothers.  So just give me a moment, Your Honor.

11             THE COURT:  Sure.

12             MR. BRILLIANT:  Now, I recognize that there are

13   certain provisions where LBI, as the regulated

14   broker/dealer, agreed to open the prime brokerage account.

15   You know, our view is that the way this is set up, and the

16   signatory line reflects this as well, is that these entities

17   were all agents -- or LBI for purposes of setting up the

18   agreement was the agent for Lehman Brothers.

19             So let me give you an example in a different

20   context just to make it a little simpler.  So let's say a

21   client, you know, comes to my firm and they want to do, you

22   know, a transaction that involves multinational, you know,

23   transactions.  Now, we have, you know, we're actually other

24   than a (indiscernible), we're just one law firm, but some

25   law firms have multiple entities because of, you know,

Page 63

1    regulated (indiscernible).

2           THE COURT:  Right.

3           MR. BRILLIANT:  So the client comes in, they hire

4    Deckard and it goes through and it says in the engagement

5    letter you're hiring Deckard, blah, blah, blah, blah, and

6    then it says, you know, partner X, Y and Z of such and such,

7    you know, entity, you know, Deckard, Europe.  You know, it

8    doesn't (indiscernible) that way, but it says Deckard Europe

9    and then Deckard Europe will provide the issues in Europe

10   and then there's a, you know, a breach of the agreement.

11          And then the question is, well can you only sue

12   Deckard Europe or can you sue Deckard?  Well the way this,

13   you know, and I guess what I would say is you retained the

14   firm and that's what happened here in this agreement, Your

15   Honor, when you read the entire agreement it's very clear

16   that what happened here is Lehman Brothers, the defined

17   entities, you know, agreed to provide all of these services.

18   And what LBI is, is an agent of Lehman Brothers for purpose

19   of providing some portion of the services, but all of the

20   Lehman Brothers' entities entered into this agreement and

21   agreed to provide all of these services with the --

22          THE COURT:  But they couldn't have agreed.  That's

23   my point.  They couldn't have agreed to provide all the

24   services because the only broker/dealer was LBI.

25          MR. BRILLIANT:  Right, but, Your Honor, they

Page 64

1    agreed through their agent.  They agreed -- our allegation

2    is that they agreed through their agent, through their

3    subsidiary or affiliate, LBI, to provide the prime

4    brokerage, you know, the prime brokerage services.

5              Now, the presumption, so and let me cite some

6    cases to you, Your Honor, because this came up in their

7    reply brief and so we didn't get an opportunity, you know,

8    to cite this.

9              THE COURT:  Now, this -- so under your theory,

10   putting aside there's alter ego issues, putting -- if

11   customer claims had not been paid, if the securities hadn't

12   been returned or customer claims were not paid in full at

13   LBI, under your theory every single customer would have a

14   claim for any loss against other Lehman entities?

15             MR. BRILLIANT:  Those who signed this contract

16   with this language, yes.

17             THE COURT:  Yeah.

18             MR. BRILLIANT:  Yes.

19             THE COURT:  Every -- so every single one of them?

20             MR. BRILLIANT:  To the extent that they signed

21   this agreement.

22             THE COURT:  -- who signed the contract that says,

23   customer account prime -- customer account agreement, prime

24   brokerage Lehman Brothers, Inc., account number.  Every

25   single person who signed one of these would have a claim

Page 65

1    against all the other Lehman entities?

2              MR. BRILLIANT:  Well, Your Honor --

3              THE COURT:  That's absurd, Mr. Brilliant.

4              MR. BRILLIANT:  Well --

5              THE COURT:  That can't be what you're telling me.

6              MR. BRILLIANT:  Okay.  Well, Your Honor, let's

7    just step back, because you're making the assumption that

8    everyone had the same prime brokerage agreement at the time

9    of the filing.  The vast majority of customers, I'm sure,

10   were not prime brokerage customers, were just -- just

11   brokerage customers and didn't have a similar, you know,

12   type of agreement.  But what I'm telling you is that this

13   particular contract is a Lehman Brothers contract.  It says

14   itself it's a Lehman Brothers contract, you know, Lehman

15   Brothers agreed to perform these services that LBI, for

16   purposes of these arguments, was an agent of Lehman Brothers

17   and the other entities made themselves liable for the

18   performance of this agreement by virtue of the signature.

19             Under, you know, Your Honor, as we cite in our

20   brief, under New York law where you have joint parties here,

21   you know, and you don't specifically sever, you know,

22   liabilities, you know, they're deemed to be, you know, joint

23   and severally liable.  You know, it's presumed to be.  And

24   so there's a, you know, it would have to be, you know, some,

25   you know, evidence to overcome it, you know, at worst, Your

Page 66

1   Honor, we think it's ambiguous as to whether or not -- we

2   don't think it's ambiguous, we think they did agree to be

3   joint and severally liable, but to the extent they didn't --

4   Your Honor thinks it's not clear because of the, you know,

5   the difference in the language and you think that's

6   ambiguous and would be subject, you know, to, you know, to

7   evidence as to what the intent of, you know, what the intent

8   of the parties, you know, was here.

9           But, you know, their argument, Your Honor, is that

10  since LBI was the only registered broker/dealer, that

11  they're the only party, you know, that could be a bailee.

12  You know, I mean, that's just wrong.  I mean, you know, in

13  ordinary everyday life, you know, bailees use agents, you

14  know, to perform their obligations.

15          So I want to just give you a couple of cites that,

16  you know, cases that you can look at, you know, that where,

17  you know, where parties are liable for their, you know,

18  their agents bailment or they're still bailees even though

19  their, you know, their agent was holding the goods, you

20  know.

21          Mays v. New York, New Hampshire (sic) Railroad, 97

22  N.Y. Supp. 2d 909, 1950, you know, there the Court found

23  that an actual bailment exists when there is an actual

24  delivery of the property to the bailee or his agents or

25  constructive delivery comprehending all those acts was not

Page 67

1    truly compromising real possession have been held by legal

2    construction equivalent to acts of delivery which include

3    symbolical or substituted delivery.

4         Goldman Sachs Mortgage Company v. Natixis 2008

5    N.Y. Misc. Lexus 9849 Superior Court, New York, 2008.

6    Finding that a defendant accepted bailee letters when its

7    custodian agent took possession of mortgage loan documents.

8         Klotz v. Morocco, 288 N.Y. Supp. 684, 1967

9    finding, "Plaintiff established a prima facie case for

10   bailment by proving delivery to defendant's agent and

11   failure to redeliver upon demand."  It was reversed on other

12   grounds, but, you know, the proposition wasn't reversed.

13        So, Your Honor, it's -- the idea here that just

14   because LBI was the only broker/dealer means that somehow it

15   was the only one that had these obligations, just it's a

16   matter of law it's not right.  The question is looking at

17   the contract itself and trying to discern whether --

18        THE COURT:  So if the securities hadn't been

19   returned, you believe that there would be a claim against

20   other Lehman entities, non-LBI Lehman entities for the

21   return of the securities?

22        MR. BRILLIANT:  We believe, Your Honor, that, you

23   know, and it's not relevant to this today, right, but we

24   believe that in addition to the diminution claims, if we

25   wanted to, we could have, you know, we did give back, as we

Page 68

1    said most of the securities but they're joint --

2              THE COURT:  But answer my -- answer my question.

3              MR. BRILLIANT:  Yes.  Yes, we -- I believe they

4    are joint and severally liable.

5              THE COURT:  But that's contrary -- that's contrary

6    to a decision that's already actually been rendered in this

7    case by the district court.

8              MR. BRILLIANT:  Well --

9              THE COURT:  Just --

10             MR. BRILLIANT:  That may be, but, you know, but in

11   connection, but I'm saying --

12             THE COURT:  This whole theory of --

13             MR. BRILLIANT:  But I'm saying based on a -- I'm

14   saying on our contract, these other entities agreed that

15   they would -- they were responsible for, you know, for all

16   of the services here, that they're joint and severally

17   liable.  Yes, that's what I'm telling Your Honor.  I can't

18   -- I'm not familiar with the other case.  I can't tell you

19   was that based on, you know, a specific contract or as a

20   matter of law.

21             THE COURT:  It's unfair to ambush you.  It's a

22   decision in the First Bank Puerto Rico case by the district

23   court, that I see a connection to here in which it was

24   argued that there was a claim against LBHI in connection

25   with securities held by LBI.  I see similarities.  It's not

Page 69

1    on all fours, but in any event we can -- we can move on.

2            MR. BRILLIANT:  Right.

3            THE COURT:  We're going to have to move on,

4    because I have another group --

5            MR. BRILLIANT:  Right.

6            THE COURT:  -- of parties here.  So let me stop

7    interrupting you.

8            MR. BRILLIANT:  Okay.  Well, but I do want to

9    answer your questions, Your Honor.  Obviously that's better

10   than just droning on.  But our -- but our view is that when

11   you read the precursor language, the signature page, you go

12   through the contract itself, that this is a contract where

13   all of the, you know, the Lehman Brother entities agreed to

14   be liable, you know, for all of the obligations.

15           The other thing, Your Honor, is, you know, as Your

16   Honor knows, this is a, you know, this is a form contract;

17   it was, you know, basically adhesion contract.  You know, it

18   should be --

19           THE COURT:  So what about -- I'm sorry, I'm

20   contradicting myself.  What about paragraph 21 though?  Look

21   at paragraph 21.

22           MR. BRILLIANT:  Yes, Your Honor.  But I guess what

23   I'm -- what I'm saying --

24           THE COURT:  Okay.  So it says LBI is going to act

25   as a prime broker for you and lists all these things.  So

Page 70

1    LBI shall be responsible for settling trades executed on

2    your behalf.  So LBI doesn't -- you try to execute a

3    trade -- LBI doesn't settle it because of chaos or because

4    of SIPA or some, whatever, you know, hurricane.  You say,

5    ah-ha, LBHI, you're on the hook for that even though this

6    says, LBI, you're the one who's going to settle the trade.

7              MR. BRILLIANT:  Right.

8              THE COURT:  Under your theory --

9              MR. BRILLIANT:  Yes.

10             THE COURT:  -- the words on this page don't mean

11   anything.

12             MR. BRILLIANT:  No, that's not right at all, Your

13   Honor.  They do -- they do, like I said, it's like if you go

14   back to, you know, my analogy where you hire a law firm and

15   they designate certain people will do things.  So certain

16   people, you know, agree to do things, but they're agents for

17   the group which are joint and severally liable.

18             Your Honor, I mean, I don't think -- you don't --

19   wouldn't disagree with me if it said in here, right, if it

20   just said in here, Lehman Brothers will provide these

21   services and all the entities agree to be joint and

22   severally liable, you don't disagree with me that that would

23   be effective, right?

24             THE COURT:  That would be good.

25             MR. BRILLIANT:  Okay.  So --

Page 71

1          THE COURT:  I mean, that would be more -- that

2    would be --

3          MR. BRILLIANT:  Right.

4          THE COURT:  -- that would be clearer, but we've

5    got the opposite here.

6          MR. BRILLIANT:  Well, we don't have.  That's what

7    I'm saying, we don't have the opposite here, Your Honor.  If

8    you go through the document 29 and 30 --

9          THE COURT:  Right.

10         MR. BRILLIANT:  -- which we've talked about the

11   exculpation and the limitation of liability, they talk about

12   Lehman Brothers shall not, right?

13         THE COURT:  Well, is there a statement that says

14   that all Lehman entities shall be jointly and severally

15   liable for all the obligations of the parties under this

16   agreement?  Is there something that says that?

17         MR. BRILLIANT:  No.

18         THE COURT:  No.

19         MR. BRILLIANT:  But there's a signature that says

20   they're signing on behalf of all the entities, but Your

21   Honor, it doesn't say either way.  That's the point, right.

22   It doesn't say either way.

23         It could also have said -- if you, I mean, if you

24   look at, Your Honor pointed to 21, if you go down to 21, you

25   know, you know, you know, J, or, you know, I rather, you

Page 72

1    know, the -- you know, it says Lehman Brothers will not be

2    responsible for ex -- or omissions of any executing broker.

3    Now, an executing broker is not any of the other Lehman

4    entities, you know, that's the party that's stands between

5    them.

6              THE COURT:  Yeah, yeah.

7              MR. BRILLIANT:  But they could have also said, you

8    know, that Lehman Brothers will not be obligated for any

9    obligations, you know, of LBI.  It doesn't say that.  And

10   New York law, Your Honor, presumes -- you should read the

11   cases we cite in our, you know --

12             THE COURT:  Okay.

13             MR. BRILLIANT:  -- in our brief.  You know, New

14   York law presumes that when parties enter into a contract

15   jointly like this, like all the, you know, the LB, you know,

16   the LBHI and its affiliate entities did, that unless it's,

17   you know, unless there's specific severing language, that

18   they're joint and severally liable.  And here there's no --

19   no severing language.

20             Now, the language that, you know, that the Lehman

21   entities point to and that Your Honor is pointing to doesn't

22   say that they're not liable, it just says that there are

23   specific things that these entities will do, but it doesn't

24   say that they're not doing it as an agent, which is if you

25   read the signature block, they say they're signing as an,

Page 73

1   you know, as an agent for the other entities.  Our view is

2   that they were the agent for the entities with respect to

3   those specific issues and therefore they were -- the whole

4   entity was liable for all of the obligations.

5           Like I said, Your Honor, it's not like -- I can't

6   point to something that says they agreed to be joint and

7   severally liable, nor can they point to something that says

8   that they don't.  But if you look at the first paragraph,

9   you know, it says, you're a customer of Lehman Brothers.

10  Lehman Brothers.  These are the terms on which Lehman

11  Brothers will open a prime brokerage account for you.  It

12  doesn't say these are the, you know, that LBI will open a

13  prime brokerage account for you.

14          You're right, paragraph 1 and 21, you know, you

15  know, say something slightly different, but it's how Lehman

16  Brothers as defined below will open an account for you.  So

17  the combination of that, the signature, the lack of severing

18  clause, we believe makes them joint and severally liable.

19  At a minimum, you know, we think it's -- and we also think,

20  Your Honor, it needs to be interpreted against Lehman

21  Brothers because it was their form, you know, agreement.  If

22  they wanted to say they weren't liable, they clearly could

23  have done it.  They put in 29, they put in 30, they put in

24  all kinds of other exclusions, but they chose not to do it

25  and they have to live with it.

Page 74

1           And they, you know, as Mr. Miller said, a

2   contract, you know, he said, we haven't alleged that there

3   were, you know, any benefits the other Lehman entities, you

4   know, got here, and that's not right, but the bottom line --

5   and in our proof of claim specifically we say, you know,

6   that they did.

7           But the Lehman Brother entities got the benefits

8   of this contract in a whole lot of different ways, you know,

9   the ability to, you know, have, you know, lend securities,

10  do various other things throughout the --

11          THE COURT:  Well, that was the whole point.

12  I mean --

13          MR. BRILLIANT:  Yeah.

14          THE COURT:  They weren't just doing it for fun.

15          MR. BRILLIANT:  Right.  Right.

16          THE COURT:  Everyone wanted to make money.

17          MR. BRILLIANT:  And so they took on this

18  additional responsibility because they got benefits for it.

19  And if they wanted to say we're going to get the benefits of

20  all this agreement, including having, you know, you do your

21  prime brokerage work at LBI but not have LBI -- but not be

22  liable for LBI, they -- it was incumbent upon them to put in

23  severing language.  Not having done that, it's presumed as a

24  matter of New York law that they are liable and there is

25  nothing in the agreement itself that says that they're not.

Page 75

```
 1              THE COURT:  Okay.

 2              MR. BRILLIANT:  So --

 3              THE COURT:  All right.  Let me hear --

 4              MR. BRILLIANT:  Let me just go back to the tort

 5     claims quickly, Your Honor.

 6              THE COURT:  Quickly.  Okay.

 7              MR. BRILLIANT:  I know that this has taken me a

 8     long time, but you had Mr. Miller up here a little bit

 9     longer than me at this point.

10              THE COURT:  That's okay.

11              MR. BRILLIANT:  So, Your Honor, with respect to

12     the, you know, to the, you know, the tort claims, the first

13     thing is with respect to the, you know, the speaking, you

14     know, you know, caution rule, which, you know, they raised

15     for the first time, you know, you know, in connection with

16     their reply brief.  We don't think that, you know, you know,

17     applies here for, you know, for two -- two reasons.

18              You know, one, it does not apply to facts, you

19     know, or to opinions that incorporate present facts and

20     what's been alleged here were facts that they, you know,

21     they, you know, Mr. Wickham, you know, and in the conference

22     call, you know, well it's really only in the conference

23     call, because the only, the only, you know, caution was

24     alleged in the, you know, the caution is in the conference

25     call.  You know, the allegation is that they said they have
```

Page 76

1    adequate liquidity and that incorporates present facts so it

2    doesn't apply.

3              Also, the speaking caution rule doesn't apply if

4    the speaker did not have genuinely or reasonably believed in

5    the opinion.  You know, so, you know, this is really in the

6    nature of an affirmative type defense, you know, but it's

7    not appropriate here in a 12(b)(6) type context where the,

8    you know, the, where the, you know, they have not alleged

9    that, you know, they say we haven't alleged, you know, you

10   know, that these facts weren't true, that they didn't have

11   the liquidity that they said they did and various things.

12   Well, we do because we say in paragraph 16 that these were

13   all misrepresentations.  We, you know, and we also say that

14   the speakers knew or should have known, you know, that, you

15   know, as what's, you know, Your Honor, read in the

16   attachment that there were, you know, there were risks that

17   weren't, you know, disclosed.

18              So it really comes down to, you know, the issue,

19   whether it was adequate pleadings, but the speak of caution

20   rule, you know, doesn't apply in this case.  And I would,

21   you know, point Your Honor to Iowa Public Employees

22   Retirement System, 620 F.3d 137, the second thirty – 2nd

23   Circuit 2010, you know, where the Court found a forecast may

24   extrapolate present or historical facts into the future --

25   and I'm skipping a little bit -- but in each instance, the

Page 77

1    forward looking elements and the non-forward looking are

2    severable.  Here, characterizations of MF Global's risk

3    management system, that the system was robust, for example,

4    invite the inference that the system will reduce the firm's

5    risk.  However, the speaks caution does not apply insofar as

6    those characterizations communication present or historical

7    facts as to the measures taken.

8           And so basically you can't just say, you know,

9    like they're saying, like we gave up caution so you couldn't

10   believe anything.  It doesn't work that way.  You know,

11   there are, if you say, you know, it only protects people

12   from future statements and it only protects them for the

13   actual future projections.  But if the future statement

14   incorporates current -- the current facts like they do here,

15   like we have adequate liquidity, you know, the -- you know,

16   the --

17          THE COURT:  But there's more than we have adequate

18   liquidity, there has to be a, we have adequate liquidity for

19   what, so that the for what is in the future, right?

20          MR. BRILLIANT:  Well, but there's two issues.  And

21   here, Your Honor, because of the bankruptcy filing being so

22   soon after, I mean, you know, it's not as if, you know, they

23   can say that we had adequate, you know, you know, liquidity

24   on Friday, you know, and then on, you know, on Monday we --

25   on Sunday night we filed bankruptcy.  You know, it may be

1   that something changed, but that's -- they -- from a

2   pleading perspective, at this point, Your Honor, there were

3   currently embedded in, you know, there were current facts

4   that were, you know, that were, you know, discussed that

5   people had the right to reasonably rely.  You can't just,

6   you know, forward looking statements, you know, are, get the

7   benefit of this.

8           THE COURT:  But you're not alleging that in this

9   phone call, there was a statement made that have -- are

10  making it $100 billion in government securities sitting in

11  an account?  There's no -- right?  That would be a -- that

12  would be a bad misrepresentation, right?

13          MR. BRILLIANT:  Right.

14          THE COURT:  What you are -- what you're pointing

15  to are talking points, our liquidity is strong, right?

16          MR. BRILLIANT:  All right.  Well, Your Honor,

17  there's two different issues here.  They're not saying that

18  the conversation with Wickham is protected by, you know, by

19  this (indiscernible) issue, because there was no -- there

20  was no caution, it wasn't an SEC document, it wasn't in the

21  call, so that's not -- they're not alleging that this

22  particular rule applies like that.

23          THE COURT:  Right.

24          MR. BRILLIANT:  They're just saying with respect

25  to the, you know, the --

Page 79

```
 1              THE COURT:  Earnings call.

 2              MR. BRILLIANT:  -- the earnings call.

 3              THE COURT:  Right.

 4              MR. BRILLIANT:  I guess what I'm saying with

 5   respect to the earnings call, you know, our allegation, you

 6   know, is that there was misrepresentations of fact that were

 7   given in the call and that this does not apply and that this

 8   rule, which they raised in their reply brief, just doesn't

 9   apply.  And if you read the Iowa Public Employees case --

10              THE COURT:  Okay.

11              MR. BRILLIANT:  -- I think it will be pretty

12   clear.  And that's a situation where the district court, you

13   know, applied the law the way they were talking about and it

14   was reversed on appeal.

15              THE COURT:  Okay.

16              MR. BRILLIANT:  The other issue is, Your Honor, is

17   that with respect to the, you know, the, you know, this

18   issue, the question is whether or not the party, you know,

19   genuinely believed the information to be true.  And if you

20   look at American International Group, 741 F.Supp. 2d 511,

21   you know, there it says, you know, that if the speaker does

22   not genuinely or reasonably believe what they are saying,

23   that there are, you know, that, you know, the fact that you

24   give caution doesn't insulate you.  You actually have to

25   have genuine belief that what you're saying is true.  And
```

Page 80

1    we've alleged that, you know, that there are

2    misrepresentations.

3            And as, Your Honor, we point out, Your Honor, that

4    the examiner, you know, said that, you know, Lehman, you

5    know, had, you know, gone to great lengths to make its

6    customers, you know, you know, giving them information.  So

7    we believe that there's enough of a factual, you know,

8    record here that, you know, for us to show that, you know,

9    that there was, you know, that there was fraud, you know,

10   you know, here to induce, you know, Stonehill, to continue

11   to, you know, maintain its relationship.

12           And so we just don't, you know, don't think that,

13   you know, that, you know, that, you know, that the pleadings

14   that we have don't adequately represent (indiscernible)

15   issues.

16           And with respect to Wickham, Your Honor, I think

17   it's, you know, they say, well, we don't identify what

18   entity, you know, he was with.  What happened was we -- and

19   this was alleged in the, you know, in the proof of claim,

20   you know, Mr. Motulsky called a very senior person at LBHI

21   and then he got a call back from Mr. Wickham, you know, who

22   was calling him back, you know, on -- we -- and this is

23   properly alleged in the proof of claim, you know, that, you

24   know, called him back on behalf of, you know, all of the

25   Lehman entities.  You know, he didn't specify specifically

Page 81

1      which one, you know, he worked for, but as we say we believe

2      that he is a senior executive, you know, in the client

3      services department and he spoke on behalf of all the Lehman

4      entities, you know, you know, to, you know, induce Stonehill

5      to, you know, to maintain its accounts at the company.

6              Your Honor, so I think from our perspective, you

7      know, you know, at the sufficiency hearing, we think the,

8      you know, the proof of claim, you know, adequately, you

9      know, you know, states claims both under contract and as a

10     matter of law to the extent that Your Honor thinks the

11     contract, you know, is, you know, whether or not there's

12     joint and several liability.  We think at worst from our

13     perspective, it's ambiguous and we should have the

14     opportunity to do discovery and show that the intention of

15     the parties was that the --

16             THE COURT:  But if I apply the force majeure

17     clause the way that Judge Glen did in MF Global and as Mr.

18     Miller suggests, I don't -- we don't get to any of that.

19             MR. BRILLIANT:  Well, I think, Your Honor, I think

20     you, you know, that is one way to look at this on the

21     contract side, but I don't think that that's right either,

22     because I think you'd also have to find that there's no

23     allegations that the loss here comes from, you know, you

24     know, the, you know, the willful misconduct.

25             THE COURT:  No, no, I'm talking about the 29, not

Page 82

1    30.

2              MR. BRILLIANT:  No, no, I understand, but as a

3    matter, you know, you know, my view, Your Honor, you may

4    disagree --

5              THE COURT:  Yeah.

6              MR. BRILLIANT:  -- that is a matter of law in

7    interpreting a New York contract that every force majeure or

8    other exculpation provision --

9              THE COURT:  Implies it.

10             MR. BRILLIANT:  -- implies that it will not be

11   applied in the context where there's been, you know, willful

12   misconduct by the party.  And the allegation here is that

13   there was willful misconduct, you know, from the parties and

14   therefore, you know, although that may be an affirmative

15   defense they would raise, they would have to prove that at

16   trial that -- that there was no willful misconduct, you

17   know, such that, you know, that should apply.

18             I mean, absent that, Your Honor, as I said, you

19   know, earlier, what they're really saying is we can defraud

20   you, but if your ultimate damages, you know, relate to the

21   SIPA proceeding, then you're not -- then, you know, we don't

22   have -- then you have no claim against us and that just

23   can't be.

24             You know, in the context that you laid out where,

25   you know --

Page 83

```
1              THE COURT:  But conversely, if it can be, then I

2    would have a huge crowd of people in the hallway and I

3    don't.

4              MR. BRILLIANT:  Well, you won't, Your Honor,

5    because the bar date has passed and you don't have to worry

6    about opening up the floodgates at this point, so that's not

7    an issue.

8              THE COURT:  No, no, no, I wasn't making a

9    floodgates argument.  I was making a, you know, we're in the

10   greatest city in the world with the smartest lawyers in the

11   world and with all due respect to you, Mr. Brilliant, you

12   know, the case has not been overwhelmed by similar claims.

13   So everybody who was on the earnings call or everybody who

14   had a prime brokerage agreement and everybody who had a

15   similar portfolio of securities, you know, not Apple or not

16   something, you know, securities that didn't weather the

17   downturn in the fall of 2008, they would all be here.  And

18   I'm just observing, it's not dispositive --

19             MR. BRILLIANT:  Right.

20             THE COURT:  -- of anything, I'm just observing

21   that they're not.

22             MR. BRILLIANT:  Well, Your Honor, I think, you

23   know, empirical experience as to who brings claims or

24   doesn't bring claims I don't think is really relevant as to

25   whether it's a matter of law --
```

Page 84

1              THE COURT:  I agree with you.

2              MR. BRILLIANT:  -- claims exist.

3              THE COURT:  I agree.

4              MR. BRILLIANT:  I guess the other thing I would

5    say is, I don't know to what extent other parties, you know,

6    had the type of conversations that Mr. Motulsky had with Mr.

7    Wickham and whether or not there are, you know, other

8    parties who actually have, you know, fraud claims.  So --

9              THE COURT:  Okay.

10             MR. BRILLIANT:  -- so I think --

11             THE COURT:  Let me let Mr. Miller get back up

12   because I'm not only keeping the Newport Global folks

13   waiting, but I have another crowd coming in at 2:00.  So,

14   Mr. Miller?

15             MR. MILLER:  Yes, Your Honor.  May I briefly

16   clarify a note from the client and then I'll speak.

17             THE COURT:  Yes, of course.

18        (Pause)

19             MR. MILLER:  Thank you, Your Honor.

20             MR. BRILLIANT:  Your Honor?

21             THE COURT:  Yes.

22             MR. BRILLIANT:  Thank you.  The client points out

23   to me there's -- to answer your question about why other

24   people aren't here.  He says it may very well be that there

25   was a very small amount of prime brokerage clients that were

Page 85

1    LBI rather than LBIE as of the time of the SIPA proceeding

2    and so there --

3              THE COURT:  Okay.

4              MR. BRILLIANT:  -- may not have --

5              THE COURT:  All right. Well, as you point out it's

6    neither here nor there.

7              MR. BRILLIANT:  Exactly.

8              THE COURT:  It's just interesting.

9              MR. BRILLIANT:  But that's what he tells me is,

10   you know, there may not be as many as one thinks there would

11   have.

12             THE COURT:  Thank you.

13             MR. MILLER:  Ralph Miller again, Your Honor.  I'll

14   try to be brief, but let me hit a few key points.  First of

15   all, with regard to the SIPA policy, Judge Glen mentioned

16   it, but he didn't rely on any policy finding that SIPA

17   prohibited this as I read his opinion he relied on the force

18   majeure clause.

19             I want to talk just a little bit about this agency

20   and the way the contract's put together.

21             THE COURT:  Yeah.

22             MR. MILLER:  First, the -- if we look at the

23   contract -- and I have just three or four points to

24   identify.  The first thing he referred to is a recital,

25   which is really just a setup for the discussion.  It's not

Page 86

1    an operative provision.  And it says, Lehman Brothers is

2    going to be defined below.

3           If you go to the signature block, which is really

4    very informative, it is Lehman Brothers, Inc. as signatory

5    for itself and as agent for the affiliates named herein.  So

6    it signs for itself and it also signs for the affiliates.

7           We go over to Paragraph 21 it actually recites the

8    authority for LBI to act as a prime broker by referring to

9    an SEC --

10          THE COURT:  Right.

11          MR. MILLER:  -- no action letter.

12          THE COURT:  Uh-huh.

13          MR. MILLER:  And in our reply in paragraph 28, we

14   cited a series of cases that says that an agent cannot --

15   that a principal cannot act in an unlawful way under the law

16   of agency.  It's well settled and we cite Minor (ph) v. New

17   York State Department of Corrections Services case.  It's

18   well settled -- a tenet of agency that a principal may only

19   do through an agent those things that he may lawfully do

20   personally.

21          And so if -- LBI cannot create the right of LBHI

22   and others to act as principals or agents for things that

23   they're not lawfully entitled to do.  It can't make them

24   prime brokers.  It can't delegate its prime brokerage

25   responsibilities.  So we think the law is clear that it

Page 87

1    could not be doing that.  It's also --

2            THE COURT:  But what Mr. Brilliant is saying is

3    that LBI signed and agreed on behalf of the Lehman

4    affiliates that they would be jointly and severally liable.

5    So that's what he says.

6            MR. MILLER:  Well, that's what he says, but that's

7    not what the contract says, Your Honor.  Because the

8    contract makes it clear that the only prime brokerage

9    relationship is going to be with LBI.  It's on LBI

10   letterhead, by the way, and it defines LBI first and it says

11   a prime brokerage account opened pursuant to this agreement

12   will be opened at Lehman Brothers, Inc.  And it says, "all

13   transactions, agreements and contracts between you and

14   Lehman Brothers have been entered into in consideration of

15   which other."  And then the bailment provision, by the way,

16   which is also relevant to this is in a section called

17   security interest and lien registration and securities.  It

18   grants liens in these securities basically for the benefit

19   of other Lehman Brothers entities who may do business.

20           And the bailment language clearly states you

21   hereby acknowledge and agree that all such assets held by or

22   through any Lehman Brothers' entity are held as collateral

23   by such Lehman Brothers' entities' agent and bailee for

24   itself and all other Lehman Brothers' entities and as such,

25   each Lehman Brothers' entity is to will comply with any

Page 88

1    orders or instructions originated by any other Lehman

2    Brothers' entity with respect to or in connection with such

3    collateral without your further consent.

4            So the purpose and the structure of this is it's a

5    security agreement as well as the creation of a prime

6    brokerage agreement, but it doesn't have any obligations

7    imposed on any of the other Lehman Brothers' entities.

8            This is -- I would suspect, Your Honor, that some

9    lawyer decided that it was better to make them parties than

10   to make them third party beneficiaries.  But in effect what

11   you have here is the --

12           THE COURT:  Right, but it's what I described.

13           MR. MILLER:  Yes.

14           THE COURT:  Was this document creates the link

15   between other Lehman entities serving as counterparties in

16   transactions which require the posting of collateral and

17   then those other Lehman entities taking the collateral,

18   handing it over to LBI, because only LBI could -- was the

19   only prime broker in the crowd.

20           MR. MILLER:  That may well be true, Your Honor.  I

21   think that's a fair way to do this.

22           THE COURT:  Again, not deciding facts on a motion

23   to dismiss.

24           MR. MILLER:  No, but I think you can look at the

25   contract and again, I don't think the agency argument adds

1    anything to the position.  A couple of more points, Your

2    Honor.

3              He said -- the point was made by Mr. Brilliant

4    that this is a sufficiency hearing.  That's true, Your

5    Honor, but in effect, the mechanism that's been adopted in

6    this Court is that parties file a claim, there is an

7    objection.  This is a very substantive objection.  They then

8    file a response.

9              And I started by saying if you take everything in

10   the claim and everything in the response and treat those as

11   essentially a complaint and an amended complaint, we've got

12   the same mechanism as if you had a motion to dismiss.

13             THE COURT:  It's a 12(b)(6).  It's a 12(b)(6)

14   hearing.

15             MR. MILLER:  It's a 12(b)(6) hearing, Your Honor.

16   And he said, well we weren't -- they weren't put on notice

17   on the speaks caution.  Paragraph 55 of the objection says

18   Stonehill's alleged reliance on a statement made during the

19   September 10, 2008 earnings call is unreasonable as a matter

20   of law.

21             The call began with a disclaimer advising

22   listeners that statements may contained forward looking

23   statements that are not guarantees of future performance but

24   only represent the firm's current expectations, estimates

25   and projections regarding future events.

Page 90

```
 1              A subsequent statement was that Lehman Brothers'

 2     liquidity position remains very strong -- if they made that,

 3     it is at most a mere representation of opinion that cannot

 4     support an action for fraud, and we cite some cases.  So

 5     they were on notice, of the -- although the speaks caution

 6     phrase was not used, they were on notice of the unreasonable

 7     --

 8              THE COURT:  Could you address Mr. Brilliant's

 9     finale, if you will, that if I don't agree with them, what

10     that means is that there can be outright utter fraud and

11     there's no ability to recover the damages for that in the

12     SIPA claim context.

13              MR. MILLER:  Well, Your Honor, I don't --

14              THE COURT:  It was a very -- I mean, it's a very

15     sweeping statement.

16              MR. MILLER:  It is very sweeping and the problem,

17     Your Honor, of course, in a motion to dismiss context with

18     well what if we'd alleged X and what if we'd alleged Y is

19     they didn't allege X or Y.

20              What they have alleged is essentially that there

21     was this earnings call and I think that's pretty clear how

22     that's dealt with and they allege that there was this phone

23     call with Mr. Wickham.

24              Now, I -- there's more facts around the phone call

25     with Mr. Wickham than anything else, but the facts all are
```

Page 91

1    that this was an assurance of performance of the contract

2    and there's no allegation that the statements that were made

3    were known by Mr. Wickham to be false about current facts or

4    that they were -- that they say that it was -- they say that

5    senior executives knew that they were wrong and they say as

6    you pointed out, Your Honor, that Mr. Wickham appears to

7    have been reading talking points.

8              Now, they are saying those talking points must

9    have been wrong because there was a business failure.  Now,

10   the fraud by hindsight doctrine is pretty clear that you

11   cannot infer falsity from statements made that are then

12   followed by a bad event.  You've got to do more.  You've got

13   to say something was specifically wrong.

14             In accounting cases, for example, somebody says

15   there was a clean audit opinion and this business went

16   broke, we're going to sue the accountants.  The securities

17   law and the securities law is actually easier because the

18   standards are lower --

19             THE COURT:  Right.

20             MR. MILLER:  -- than common law fraud.  And, Your

21   Honor, Oliver Wendell Holmes famously said that even a dog

22   distinguishes between being stumbled over and being kicked.

23   And fraud is an intentional tort.  It carries a lot of

24   consequences including, not in Chapter 11, but normally

25   punitive damages, but it has to do with someone having an

Page 92

1    intent to harm the other party knowing at the time that it

2    is -- that it's being done that the statements are false and

3    to produce reliance.

4            Wishing and hoping and assuring a party that

5    they're going to -- a party is going to try to perform a

6    contract does not constitute common law fraud, and that's

7    actually New York law.  That's the same promise that's

8    already made in the contract.  It was already made in

9    writing.  And the fact that the person has some doubts about

10   it at a later date does not convert that into fraud.

11           So, your hypothetical, which I'm trying to respond

12   to, isn't this case.  Would it be possible for there to be a

13   specific fraudulent statement?

14           THE COURT:  Well, the one that I gave the

15   hypothetical of, great news we've got $100 billion in cash

16   sitting in my office and that was not true.

17           MR. MILLER:  That could be.  And Your Honor, in

18   the -- if somebody said we've just gotten communication from

19   the FDIC that we have a loan for $100 billion, it's coming

20   through tomorrow, it's not -- it hasn't hit the news yet and

21   if that's all false, that might -- and the person making it

22   knows it's false, they might get there, but that's not the

23   allegations that have been made here and they've had a

24   chance to do the best they can and they just haven't gotten

25   over Rule 9.

Page 93

1          And I think again, these general sorts of

2     allegations are going to be possible with regard to almost

3     any business failure.  There's almost always going to be

4     some storm clouds on the horizon and somebody who says, you

5     know, are you all going to survive this storm and there's

6     going to be employees all the time who are going to be

7     saying things about, we really mean to, you know, we're

8     getting it together, sales are up, we're doing better.  And

9     as this Court knows, this is a little bit of the reason that

10    there may not be -- it's hard to argue that there's time

11    travelers, where are the time tourists from the future.

12          I mean, the argument here, Your Honor, is if this

13    was always a cause of action, how come there are not just

14    thousands and thousands of cases out there.  And the answer

15    really is that those kinds of things are not the kinds of

16    representations that create torts and particularly where you

17    have this force majeure clause.

18          And we don't think they cite any case law, by the

19    way, in New York, that says the force majeure clauses cannot

20    cover a cause of loss even though there is some allegation

21    that there was a contribution to that loss through some sort

22    of negligence or misrepresentation.

23          THE COURT:  Thank you.

24          MR. MILLER:  Thank you, Your Honor.

25          MR. BRILLIANT:  Your Honor, may I have 30 seconds?

Page 94

1    Truly it will be 30 seconds.  Your Honor, I just ask Your

2    Honor to look at paragraph 14.

3              THE COURT:  Of the agreement?

4              MR. BRILLIANT:  No, of the proof of claim.

5              THE COURT:  Yes.

6              MR. BRILLIANT:  Because the types of allegations

7    that Your Honor was saying would be problematic and that

8    counsel is saying would be problematic were made.  We say in

9    the second sentence, Mr. Motulsky recalls that Mr. Wickham

10   stated that Lehman had adequate liquidity because unlike

11   Bear Stearns, it prudently financed its customers with match

12   funding and it had sufficient liquidity from sources it

13   believed to be reliable to meet all of its obligations for a

14   year even if no new financing was available, that it had $12

15   billion of surplus cash, and it also cited the availability

16   of secured financing from the federal reserve, none of which

17   was used.

18              So they did tell us that they had all of this, you

19   know, this, this money, and that's what we relied on.  And

20   as for, you know, the case law, you know, you know, counsel

21   says we didn't cite any cases and I would just refer you to

22   our brief and the MBIA case that we cited.

23              THE COURT:  Where was what you just read to me?

24              MR. BRILLIANT:  Paragraph 12.  The attachment to

25   the proof of claim.

Page 95

1          THE COURT:  No, paragraph 14.  Mr. Motulsky

2   recalls that Mr. Wickham stated that Lehman had adequate

3   liquidity.

4          MR. BRILLIANT:  Yes.  Yes.

5          THE COURT:  Okay.  Thank you.

6          MR. MILLER:  Your Honor, may I have ten seconds to

7   respond to that?  And I'm sorry I will be brief.

8          THE COURT:  Death by a thousand cuts.

9          MR. MILLER:  I hope not, Your Honor.  The call

10  with Mr. Wickham was supposed to be early September.  The

11  SIPA proceeding was September 19th.

12         THE COURT:  Right.

13         MR. MILLER:  Lots of things happened between early

14  September and September 19th.  The complaint in this case,

15  the claim and the response do not allege that those

16  statements were untrue when made.  They allege they turned

17  out not to be true on September 19th.  Thank you.

18         THE COURT:  All right.  I know I have the Newport

19  Global folks waiting with some of the similar issues, but

20  this is a separate matter and I'm going to give you a ruling

21  right now.

22         The contract claims don't survive.  I agree with

23  the arguments articulated in the briefs and here today by

24  Mr. Miller with respect to the applicability of MF Global

25  and the lack of any meaningful dispositive distinction

Page 96

1    between what's alleged here even taking it as true and what

2    was alleged in MF Global.  So the contract claims are

3    dismissed with prejudice.

4             With respect to the so-called tort and fraud

5    claims, any claim based on the earnings call is dismissed as

6    a matter of law with prejudice.

7             With respect to the Wickham conversation type

8    claims, dismissed without prejudice to being re-pled and the

9    scope of the re-pleading is consistent with the deficiencies

10   that have been identified by Lehman and to afford Stonehill

11   a full opportunity consistent with its due process rights

12   under the procedures that have been followed in this case to

13   file an amended pleading that complies with the requirements

14   of Rule 9(b) if not specifically applicable, but at that

15   level for the purpose of being able to get to the next stage

16   in these proceedings.

17            So I hope that was clear.  And if I could ask

18   Mr. Miller if you could reduce that to an order and share it

19   with Mr. Brilliant.

20            MR. MILLER:  Do you have a time for this, Your

21   Honor?

22            THE COURT:  I'll leave that to Mr. Brilliant to

23   suggest what works for him, 60 days?

24            MR. BRILLIANT:  Sixty days will be fine, Your

25   Honor.

Page 97

1                 THE COURT:  Okay.

2                 MR. BRILLIANT:  And then Your Honor, I assume that

3       we would have some reasonable time to --

4                 THE COURT:  Sure.  You can work --

5                 MR. BRILLIANT:  -- work out --

6                 THE COURT:  -- out a briefing schedule --

7                 MR. BRILLIANT:  -- whatever we think might be an

8       objection.

9                 THE COURT:  -- on that.  And then for the purposes

10      of preserving your appeal rights at that point, I'll write

11      an opinion that explains the ruling today in more detail so

12      that to the extent you wish to take it up on appeal, you

13      have a recent decision.  All right?

14                MR. MILLER:  And just so I understand, is Your

15      Honor going to enter an order?

16                THE COURT:  I'm going to enter an order that will

17      say decision to follow.

18                MR. BRILLIANT:  And that will extend the appeal

19      date or --

20                THE COURT:  You should put that in the order to

21      make that clear.

22                MR. MILLER:  Okay.  That's not a final order on

23      that issue.

24                THE COURT:  Correct.  Right.  Right?  Does that

25      work for you?  It seems to me that just makes sense rather

Page 98

1    than have you wait some period of time for a written

2    decision and then to restart the process on the re-pleading.

3            MR. BRILLIANT:  That works, Judge.

4            THE COURT:  All right.  In the spirit of moving

5    things along.  All right.  Thank you so much.  This was

6    extremely interesting.

7            MR. BRILLIANT:  Thank you for your time, Your

8    Honor.

9            THE COURT:  I'm going to take about a seven-minute

10   break and at 12:10 we'll start on Newport Global and I

11   apologize for making you wait so long.

12       (Recessed and reconvened at 12:37 p.m.)

13           THE COURT:  Okay.  Ready when you are.

14           MR. SMITH:  Thank you, Your Honor, Turner Smith

15   with Curtis, Mallet-Prevost, Colt & Mosle.  As you may know,

16   we are the conflicts counsel for Lehman Brothers Holdings,

17   Inc. which is the plan administrator, and so I'm here today

18   on the objection to Newport claims filed by Newport Global

19   Opportunities Fund and Newport Global Credit Fund.

20           And, Your Honor, I know you're pressed for time,

21   and I'm going to try to get --

22           THE COURT:  No, I'll give you -- I have other

23   folks coming in at 2, but other than that, I'm good, so.

24   And we did have what happened here this morning, so maybe a

25   good starting point --

Page 99

1          MR. SMITH:  Right.

2          THE COURT:  -- is to tell me why this is the same

3    or why this is different.

4          MR. SMITH:  I've been drawing VIN diagrams in my

5    mind, and I'm trying to figure out where it departs from

6    what you just heard and where it's consistent.

7          Now, obviously the main consistency is I represent

8    Lehman Brothers Holdings, and I am the same group of debtors

9    that Mr. Miller just stood up here and defended quite

10   admirably.  So I'm not going to deviate really from any of

11   the arguments that Mr. Miller has made with respect to the

12   agreement, which is by the way, the same prime brokerage

13   agreement that you heard so much about during the Stonehill

14   argument.

15         So very quickly and let me see if I can spot the

16   differences.  First and perhaps the biggest is that there

17   are no fraud claims --

18         THE COURT:  Right.

19         MR. SMITH:  -- asserted in connection with this.

20   So that's headline number one.  Headline number two, this is

21   not a diminuation (sic) claim, as you'll see in a moment.

22   What happened is that the Newport folks perhaps were smarter

23   and a little more on the ball than the Stonehill folks, and

24   they actually put in an order to move the portfolio from

25   Lehman Brothers to Credit Suisse, and I'll walk you through

Page 100

1    steps in just a minute.

2          The securities are, in this situation, happened to

3    be held at LBIE, I don't think that makes a difference

4    between what you've just heard with regard to Stonehill.  It

5    does add a different -- an additional agreement called the

6    margin lending agreement, which is an engagement directly

7    with LBIE.

8          And this is, as I just said, not a holder claim.

9    There's no claim here that they were somehow lulled into or

10   seduced into letting things stand as they were.  So again,

11   the two claimants are Newport Global Opportunities Fund and

12   Newport Global Credit.

13         They -- each of them entered into the same prime

14   brokerage agreement that you've just seen with respect to

15   the Stonehill agreements.  And in addition, they entered

16   into a margin lending agreement with LBIE because as

17   practice was on this account, the securities were often in

18   the custody and under the control of LBIE.

19         Mr. May, who was the declarant on behalf of the

20   claimants, very helpfully put in a supplemental declaration

21   in which he describes a prior instance in 2007 in which they

22   moved a small set of securities.  Those were also at LBIE,

23   so there is no claim here that they didn't know that the

24   securities were being held at LBIE in London.

25         So the debtors are 18 debtors, we're not -- LBHI

Page 101

1   is not at issue on the guarantee claim here.  These are

2   strictly contract claims, and they are contract claims with

3   respect to 18 debtors, not including LBHI.  And we will get

4   to this later, although because you didn't reach this point

5   in the Stonehill decision, as I heard you -- Your Honor's

6   ruling, you were accepting as the initial gating issue the

7   exculpation, the two exculpation clauses --

8          THE COURT:  Yes.

9          MR. SMITH:  -- the extraordinary events clause and

10  the gross negligence clause.

11         But it is -- it's important to have in mind as

12  you're thinking about this joint and several liability issue

13  that you heard something about during Stonehill, just what

14  the nature of these 18 debtors are.  They're -- these are --

15  not one of them is a prime brokerage -- is able to perform

16  the prime brokerage function.

17         And just to, so you get some comfort on this,

18  among these debtors that are being sued for this enormous

19  obligation because of a mishap that occurred in London in

20  transferring securities, they are included, that is to say

21  Newport folks are suing CES Aviation, which is one of three

22  other or four other CES entities being named as liable for

23  their trading losses.  That's a -- these are the companies

24  by which Lehman kept and maintained its aircraft.

25         They've included among the debtors who are

Page 102

1    responsible for these trading losses, LB Rose Ranch, which

2    is an entity that LB -- that Lehman Brothers created to run

3    a golf course and some other properties.

4             They've included among these debtors as being

5    liable for their trading losses, a Hawaiian hotel operation

6    that Lehman Brothers had separately established under a

7    special purpose vehicle.  And they've included among the

8    entities that are responsible for these trading losses, the

9    special purpose vehicle that held the headquarters building

10   up on 7th Avenue -- on 6th Avenue.

11            So if we need to, we will get to that prime

12   brokerage, but I just want you to understand exactly who

13   these defendants are, or who these debtors are that are

14   being tagged with the liability for these trading losses.

15            So I think to get us right to the point, which is

16   the operation of the two clauses that you have accepted, in

17   effect, Judge Glenn's reading of the extraordinary events

18   clause, some people called a force majeure clause or the

19   gross negligence clause.  I'm comfortable with either one of

20   those clauses, because as the gating issue it precludes all

21   contract liability.

22            And to illustrate why that's the case, I'm just

23   going to hand up, if it's okay --

24            THE COURT:  Uh-huh.

25            MR. SMITH:  -- these are the three e-mails, three

Page 103

1    of the e-mails that Mr. May, the declarant on behalf of --

2              THE COURT:  Does counsel for Newport Global have

3    these?

4              UNIDENTIFIED:  Yes, I do, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. SMITH:  I previewed those with him before the

7    argument started.

8              I'm doing it this way only because they're out of

9    chronological order in the May declaration.  So -- but let's

10   see what this tells us, and I'm have in mind particular this

11   allegation, the gating issue allegation of was there gross

12   negligence on the part of Lehman Brothers, whichever one of

13   these debtors you want to describe.

14             Here's what happens very simply.  We are told in

15   the May declaration and we don't have a document, but Mr.

16   May asserts in his declaration that on September 10, which

17   was a Wednesday, he had -- he says in his declaration on

18   page 47, "I instructed Lehman Brothers to transfer all of

19   the Newport funds securities to Credit Suisse Securities."

20   That's all he says, he doesn't attach a document, but we'll

21   take that as true.

22             The securities he's talking about is a very large

23   portfolio of bonds.  Just by way of illustration, you can

24   see there's five pages I'm holding up here of attached lists

25   of CUSIPs and securities that were in -- there's probably

Page 104

1          five and a half or six pages.  So that's the portfolio.

2                  And on September 10, we're told that Newport has

3          resolved, because there is frankly a rush to the exits going

4          on during that final week, and Newport is awake enough to

5          say on Wednesday, look, I want you to -- so that we accept

6          as having, in fact, happened.

7                  So let's just track what occurs next and keep in

8          mind again the standards by which we are to be held, which

9          is a standard of gross negligence, which the case law will

10         tell you, it must be something that truly smacks of

11         intentional wrongdoing and mistake, it has to be a very

12         aggravated set of circumstances.

13                 So we know from Mr. May's own e-mail traffic that

14         the next thing that happens is the very next day, September

15         11, a Thursday.  In the morning, a Lehman representative

16         sends him an e-mail and says, "I called, but got your voice

17         mail."

18                 So right off the bat we know that my guy is on the

19         ball, he is calling to follow-up on whatever instruction was

20         delivered, apparently orally because there is no written

21         instruction the previous day.

22                 He then lists what he needs to have in order to

23         carry out the transfer, and item number one, two, three,

24         four, five on that list, you'll see a settlement date should

25         be T plus 2.  That's from -- you know, from the reading the

Page 105

1   papers, that's what this thing is all about.  T plus 2 as we

2   show is T plus two business days to settle the trade.

3         So Mr. May and Newport has been told as of

4   Thursday at least, that if they expect this transfer to

5   work, it's going to be on a T plus 2 basis.

6         Turning to the next document, we have which is --

7         THE COURT:  What about that last line, "I have

8   been advised the transfer has to be versus payment"?

9         MR. SMITH:  Frankly I don't know what that means.

10        THE COURT:  Okay.

11        MR. SMITH:  The next event is on -- these string

12  of e-mails is the next morning.  I take this as a warning

13  from Mr. Rockmon (ph) from Lehman Brothers who is telling

14  Mr. May, "Good morning, Roger.  Any transfers initiated

15  today will need to be T plus 2 settlement."  So he's told

16  Mr. May, get me a letter of authorization and warning once,

17  not once but twice, it's going to be T plus 2 settlements.

18        And Newport, perhaps not having the crystal ball,

19  and in fact, nobody having a crystal ball at that precise on

20  that Thursday or Friday decides not to do anything, he waits

21  until the very next day, Friday.  And he does this at 12:05

22  we see as the next document.

23        Mr. May gets around to preparing a letter of

24  authorization that he was told he would have to provide in

25  order to move to the next step of initiating and completing

Page 106

1      a transfer on a T plus 2 basis.  So that arrives at -- well,

2      it says 12:05.  Now, I -- Mr. May is based in Texas, so we

3      can assume that's 1:05 New York time, in other words, London

4      is closed at that hour.

5              So we know from the record that Mr. May has put

6      before the --

7              THE COURT:  So let me just pause on the time

8      zones.

9              MR. SMITH:  Sure.

10             THE COURT:  This says 12:05 p.m.  It's emanating

11     from Texas --

12             MR. SMITH:  Texas.

13             THE COURT:  -- so therefore it is --

14             MR. SMITH:  1:05 in New York.

15             THE COURT:  -- 1:05 a.m. New York time --

16             MR. SMITH:  P.m.

17             THE COURT:  1:05 --

18             MR. SMITH:  In the afternoon on Friday.

19             THE COURT:  12:05 p.m. -- hold on.  Yes, it's 1:05

20     p.m. New York time, and therefore, it's in the evening in

21     London.

22             MR. SMITH:  Yes, it's five hours, there's a five

23     hour difference.

24             THE COURT:  Okay.

25             MR. SMITH:  But the point is that by now the --

Page 107

1          THE COURT:  COB had occurred in London.

2          MR. SMITH:  Yes.

3          THE COURT:  Okay.

4          MR. SMITH:  And this was, as we know, a very large

5   portfolio that they were asking to transfer and we also know

6   that going into that weekend, there was a great deal of

7   turmoil.  I think everybody would accept that set of facts

8   and the Court can take judicial notice.

9          As of Friday when this -- when the letter of

10  authorization finally arrived to initiate the transfer, the

11  question then becomes what did Lehman Brothers do in order

12  to carry it out.

13         Now, Mr. May also attaches e-mails confirming that

14  the trade got booked on Friday.  So good for Lehman, it was

15  on the ball, it got -- when the letter -- as soon as the

16  letters of authorization came in, they booked the trade.

17  But it didn't settle the next day, on Monday, it was

18  actually scheduled to settle on Tuesday, but it didn't --

19  nothing could happen on Monday or Tuesday, because as we

20  know, very early in the morning in London, LBIE went into

21  administration, and PWC came on the scene and things were

22  effectively and completely locked down.

23         And so from that point onward from the perspective

24  of these debtors, or from LBIE's perspective, there is

25  nothing more that could be done, and we had no visibility

Page 108

1    into what was occurring within the administration of that

2    estate because the PWC's administration then effectively

3    takes it out of our hands.

4            I'm told that the commencement of the

5    administration proceedings was around 8 or 9 in the morning

6    in London, so that means we're talking 3 o'clock certainly

7    in the morning, well before anything else happens at -- in

8    Lehman New York.

9            And besides the point, this was a T plus 2

10   settlement, and if we count the two business days, we're

11   really talking about the commitment being made to complete

12   this transfer by Tuesday and no sooner.  So the question

13   is --

14           THE COURT:  Is T plus 2 market or was that an

15   extraordinary settlement term?

16           MR. SMITH:  It was the -- it's within market.

17   Sometimes it's --

18           THE COURT:  It's within market.

19           MR. SMITH:  -- T plus 3 frankly, so it's a little

20   bit better.  We've seen both.  We've cited the Court to an

21   SEC website to show that settling issues are usually counted

22   by business days.  And we cited the Court to a case called

23   Shaw v Citibank in which there is -- that practice confirms

24   that it's going to be two days of -- two business days.  I

25   think it was three days perhaps in that one instance.  But

Page 109

1      the point is, business days.

2              It doesn't really matter because when you get an

3      order late on Friday afternoon, and you can't -- certainly

4      you can't expect it to be settled until the Monday at the

5      earliest, and by then, no doubt about it, no dispute, LBIE

6      is in lockdown position.

7              And so the question is, what did Lehman, we'll

8      call it Lehman in the general sense now, what could Lehman

9      have done with that state of play on Friday afternoon.  And

10     what it did do is it booked the trade, and it had to stand

11     back and wait for Monday morning to arrive.  And when Monday

12     morning arrived, events had overtaken them, and it was out

13     of their hands.  And there cannot possibly be an argument

14     here that there was gross negligence.

15             You have to remember that also going into that

16     weekend who knew what was going on with Lehman.  It wasn't

17     until Sunday, this is all a matter of record, it wasn't

18     until Sunday that Lehman knew that for sure that the

19     Barclay's transaction would fail, and that the Fed wouldn't

20     fund it.  But that's really beside the point as well because

21     you have to look at this, the conduct of Lehman for purposes

22     of this gross negligence from the perspective of the guy on

23     the trading desk.  And certainly the people on the trading

24     desk didn't know, and it came as quite a surprise to all of

25     them no doubt on Monday morning when the whole world changed

Page 110

1      for them.

2              So we go back then to the two provisions that

3      you've already analyzed at some length with the Stonehill

4      advocate.  We have the forced majeure clause, it's -- or the

5      extraordinary events clause which is I think is probably a

6      more accurate description because it is -- it does, as

7      you've pointed out, fit this set of circumstances to a tee.

8              LBIE had gone into administration.  That is the

9      functional equivalent of suspension of trading.  If you look

10     at the Judge Glenn's decision in MF Global, it was almost

11     identical language.  In MF Global it says suspension or

12     termination of trading, but it's essentially the same thing.

13             So -- and this is clearly written so that if there

14     are events that are out of Lehman's hands, and that

15     certainly is a condition that occurs outside of Lehman's

16     control, that this extraordinary events exclusion would

17     apply, without the need to resort to a negligent standard.

18             We're just as happy applying the paragraph 30 of

19     the PBA, the limitation of liability clause, which says that

20     "Lehman Brothers shall not be liable in connection with the

21     execution clearing handling," which is what this falls

22     under, "purchasing or selling of securities or" -- and some

23     ellipses, "or other action except for gross negligence or

24     willful misconduct."

25             So the very tall order that Newport has in this

Page 111

1    case, is that it has to convince you, that little series of

2    steps that I've shown you through the e-mails somehow

3    amounts to gross negligence in the handling of those

4    securities.

5              THE COURT:  So even if I'm wrong with respect to

6    how I read the force majeure clause, even if --

7              MR. SMITH:  Even if.

8              THE COURT:  -- even if implied in the force

9    majeure clause is a carve-out, public policy exception for

10   gross negligence and willful misconduct, the point is it

11   doesn't matter because assuming I take as true Newport

12   Global's allegations, there's been no gross negligence or

13   willful misconduct.

14             MR. SMITH:  That's exactly right.  And just a

15   footnote and I think it's -- it'll be helpful for you just

16   to understand where things are.  In one respect, if you're

17   talking about breach of contract and that's all this really

18   is, is just a breach of contract claims, what position was

19   Newport left in ultimately after passage of many years, no

20   doubt, but just so you know, LB -- and they concede this in

21   their papers, they were paid off by LBIE in connection with

22   the administration.

23             What's only -- the only thing that's left for Your

24   Honor ultimately if this were to go forward, would be a

25   differential of $13 million.  Because LBI used one kind of

Page 112

1   exchange, one exchange rate for the pound sterling as part

2   of its administration, which is $1.79 to the pound, whereas

3   under the plan, the confirmed plan here, the allowed claims

4   were computed at $1.56 to the pound.

5           So that results in a $13 million delta, which is

6   really all that's left.  They've been paid in all other

7   respects.  Now, I'm not saying that to say that they're

8   crybabies, I'm saying that to point out in terms of the

9   breach of the contract, they are in no worse position having

10  left the securities of LBIE and having gone through that

11  lockdown, they are in no worst position that they would've

12  been had they stayed at LBI, or had been returned to them by

13  some miracle Friday afternoon within hours of them having

14  put in the letter.

15          So I think that's enough to put you into the

16  picture and apply what your rulings have been in Stonehill,

17  and I'll just --

18          THE COURT:  But let's talk about the guarantee

19  claim, right.

20          MR. SMITH:  Yes, there is no guarantee claim

21  before you.

22          THE COURT:  I'm sorry?

23          MR. SMITH:  There is no guarantee claim before

24  you, so I'll make it simple.  This -- the claims initially

25  included a guarantee claim, and there were objections.

Page 113

1              THE COURT:  Yes.

2              MR. SMITH:  As part of the objection process, they

3    raised for the first time in our understanding some

4    guarantee evidence that was not part of -- we didn't believe

5    was part of their discovery.  We took the guarantee issue

6    because it looked as though there might then be an issue of

7    fact that we had to get through, and we took it off the

8    table.

9              THE COURT:  Okay.  I missed that.

10             MR. SMITH:  Right.

11             THE COURT:  I missed that episode in the story.

12             MR. SMITH:  I know it's a --

13             THE COURT:  How did we not -- how did we miss

14   that?  What should I be looking at?

15             MR. SMITH:  So you're --

16             THE COURT:  What did I miss?

17             MR. SMITH:  I guess it's when -- let me ask one of

18   my associates.  It's -- at some point, there's a transition

19   where it is withdrawn.  While they look for the docket --

20             THE COURT:  Okay.

21             MR. SMITH:  -- entry that tells you that --

22             THE COURT:  Okay.

23             MR. SMITH:  -- there were 19 debtors including

24   LBHI with a guarantee claim.

25             THE COURT:  Okay.  Just so you know, and I'm not

Page 114

1    being a crybaby, the aggregate dockets in these cases are

2    probably approaching 100,000 entries.  There's no way.  Our

3    computers would start to smoke if we tried to follow the

4    docket, so we very much rely on the parties to let us know

5    when something happens like that.

6              If we did and we missed it, I totally apologize.

7    But if --

8              MR. SMITH:  My concern is it may have been a

9    little too nuanced, so that may -- which would be our fault,

10   but at least it's good news, you don't have to think about

11   it.

12             THE COURT:  Yeah, okay, it's on a --

13             MR. SMITH:  There was a notice of withdrawal.

14             THE COURT:  Yeah, there was a notice of

15   withdrawal.

16             MR. SMITH:  Do you have document 47564?

17             THE COURT:  Yes.  Yes.

18             MR. SMITH:  All right.  So that --

19             THE COURT:  Which is document number 47,565 --

20             MR. SMITH:  Proving your point.

21             THE COURT:  -- just to be clear.

22             MR. SMITH:  So we've made it simple --

23             THE COURT:  Okay.

24             MR. SMITH:  -- I think for you.

25             THE COURT:  So what is it -- so those -- you're --

Page 115

1    I'm sorry.  Tell me again.

2              MR. SMITH:  Okay.

3              THE COURT:  You've withdrawn your motion to

4    dismiss?

5              MR. SMITH:  We've withdrawn -- there is no

6    sufficiency challenge --

7              THE COURT:  To the guaranteed claims.

8              MR. SMITH:  -- to the guarantee claim.

9              THE COURT:  Okay.

10             MR. SMITH:  In fact, I think all LBHI, any claim

11   against LBHI, whether it's guarantee --

12             THE COURT:  Okay.

13             MR. SMITH:  -- or joint and several liability or

14   anything else.

15             THE COURT:  Right.  That was efficient because

16   that's what I was going to tell you would've been the result

17   if the argument on the guarantee claim was that survives --

18             MR. SMITH:  Okay.

19             THE COURT:  -- the sufficiency hearing.

20             MR. SMITH:  Yes.  I -- that was lurking in our

21   minds and we didn't want --

22             THE COURT:  So, Mr. Steel, you won that one

23   without --

24             MR. SMITH:  -- to waste your time.

25             THE COURT:  -- really breaking a sweat.

Page 116

1           MR. STEEL:  Thank you, Your Honor.

2           THE COURT:  All right.  So why don't I hear --

3           MR. SMITH:  And then the only other issue really

4   is this joint and several liability.  I think you've heard a

5   lot about that, and we are in the position.

6           THE COURT:  Okay.  So that being said though, and

7   let me get back to my -- the question that I was going to

8   ask before I got sidetracked.  So the guaranteed claim is --

9   survives a sufficiency hearing.

10          MR. SMITH:  It will live beyond this, yes.

11          THE COURT:  Okay.

12          MR. SMITH:  We're not making sufficiency

13  challenge.

14          THE COURT:  Okay.  So let's take the allegations

15  as true.  Let's say --

16          MR. SMITH:  If you --

17          THE COURT:  I'm trying to fill in your VIN

18  diagram.

19          MR. SMITH:  Uh-huh.

20          THE COURT:  If there's a good sufficiency claim,

21  is that precluded --

22          MR. SMITH:  If a good guarantee --

23          THE COURT:  -- if it's a good guarantee claim, I'm

24  sorry, is that precluded by 29 or 30, or is that a separate

25  claim?  If I say to you, I agree with you, 29 and 30 applies

Page 117

1    even more clearly here than it did in Stonehill, based on

2    what you've taken me through even without even getting what

3    you've taken me through?

4              MR. SMITH:  I don't think I can rely on the

5    exculpation.  I think the guarantee --

6              THE COURT:  The guarantee claims stands on its

7    own.

8              MR. SMITH:  I'd have to look at what they're

9    saying about it, but I think that the guarantee would stand

10   on its own.

11             THE COURT:  Okay.  I think so too, but I -- you

12   know, I was trying to fill in the VIN diagram, but I think

13   the guarantee claim stands on its own.

14             MR. SMITH:  Yes, if you look at it as a sort of a

15   blanket guarantee of whatever loss you suffer, we'll somehow

16   make it good --

17             THE COURT:  Right.

18             MR. SMITH:  -- just come see Uncle LBHI and he'll

19   take care of it.

20             THE COURT:  Right.  It's not hooked into the prime

21   brokerage agreement.

22             MR. SMITH:  That's right.  I don't think you can

23   take it up because that comes afterwards.

24             THE COURT:  Okay.

25             MR. SMITH:  But that's for another day and

Page 118

1    frankly, I don't think it'll ever occur, because I expect

2    that LBIE will true up that 13 in -- over the course of --

3              THE COURT:  Okay.  I got it, okay, very good.

4    Thank you.

5              MR. SMITH:  Thank you.

6              MR. STEEL:  Good afternoon, Your Honor.

7              THE COURT:  How are you?  I apologize again for

8    making you wait so long.

9              MR. STEEL:  Oh, no worries at all.  Howard Steel

10   of Brown Rudnick on behalf of Newport Global Opportunities

11   Fund and Newport Global Credit Fund Master.  With me is my

12   partner, Andrew Dash.

13             THE COURT:  How are you, Mr. Dash?

14             MR. DASH:  Pleasure to be in your courtroom, Your

15   Honor.

16             MR. STEEL:  Your Honor, I dare maybe snatch some

17   victory on the guaranteed claims from jaws of defeat, but

18   there's a little dispute I think from Mr. Smith's last

19   comments that --

20             THE COURT:  Okay.

21             MR. STEEL:  -- well, it doesn't matter.  Well, it

22   matters a lot to us.  We briefed in our response the

23   guarantee issue.  We're confident it's a good claim --

24             THE COURT:  Okay.

25             MR. STEEL:  -- we're very sensitive to your late

Page 119

1    square ruling that otherwise allowable guarantee claims

2    should be permitted to be allowed.  Well, it was just taken

3    off the calendar unilaterally by Lehman.  We didn't consent

4    to that.  They said in their notice is they're trying to

5    streamline the proceeding, yeah, three hours in, so

6    that's --

7              THE COURT:  Okay.  So now --

8              MR. STEEL:  Your policy -- I just --

9              THE COURT:  Now, I'm really -- now, I'm confused.

10   So they -- they're withdrawing their 12(b)(6) objection --

11             MR. STEEL:  Right.

12             THE COURT:  -- to your guaranteed claim, that's a

13   good thing for you.

14             MR. STEEL:  Right.

15             THE COURT:  Right.  So -- but I'm hearing you

16   complain so I don't understand.

17             MR. STEEL:  Well, it's not otherwise allowed just

18   because they're withdrawing the sufficiency challenge.

19             THE COURT:  Right.

20             MR. STEEL:  We're still in limbo.  We'd like the

21   assurances that that guaranteed claim which we think are --

22   is bona fide is designated as allowed.

23             THE COURT:  Well, but that's not the next step.

24   The next step is now that it survived a sufficiency hearing

25   and now we're going to have discovery, I suppose, and you're

Page 120

1    going to go forward.  Unless you think that you're entitled

2    to -- and I don't want to again trip over procedure here,

3    but unless there's something in the case management order

4    that suggests otherwise, if you believe that you can make a

5    summary judgment motion.  Then under 7056(1) you would ask

6    for a conference and ask to do that.  But it feels very

7    facty to me --

8            MR. STEEL:  Right.

9            THE COURT:  -- particularly on the issue of

10   reliance among others, knowledge, so that's where we would

11   be going next.  So they don't win, but you haven't won yet

12   either.

13           MR. STEEL:  Great.

14           THE COURT:  Okay?

15           MR. STEEL:  And I don't mean to trip over the

16   procedures --

17           THE COURT:  Okay.

18           MR. STEEL:  -- and I'll revisit the procedures.  I

19   just wanted some reasonable assurance that they would engage

20   in such discovery and I have a right to --

21           THE COURT:  Oh, that --

22           MR. STEEL:  -- prosecute and move this claim

23   forward.

24           THE COURT:  So, Mr. Smith --

25           MR. STEEL:  We've just got the back of the hand.

Page 121

1              THE COURT:  -- you don't disagree with any of

2    that, right?

3              MR. SMITH:  No, in fact, I'm waiting for discovery

4    because --

5              THE COURT:  Okay.

6              MR. SMITH:  -- I'd like to test this claim, Your

7    Honor.

8              THE COURT:  Okay.

9              MR. STEEL:  Well, I heard the opposite.  He said,

10   well, we'll never have to address this claim, so.

11             THE COURT:  No, I think he was -- I didn't take

12   the comment that way.

13             MR. STEEL:  Okay.

14             THE COURT:  And we're not going to wait for that

15   to occur.  You've got a claim --

16             MR. STEEL:  Okay.

17             THE COURT:  -- and we'll go to discovery.  Right?

18             MR. SMITH:  I'm told that there are some very --

19   there are procedures --

20             THE COURT:  Yeah, that's what --

21             MR. SMITH:  -- that must be followed --

22             THE COURT:  Right, that's what --

23             MR. SMITH:  -- and we're following those

24   procedures --

25             THE COURT:  That's what I was saying.

Page 122

1            MR. SMITH:  That's what I assumed would happen now

2    till we withdraw.

3            THE COURT:  Right.  But I think what Mr. Steel is

4    saying, you don't get now to go back into your bunker and

5    wait it out.

6            MR. SMITH:  No.  And he has the tools, I believe,

7    to --

8            THE COURT:  Right.

9            MR. SMITH:  -- move things forward.

10           THE COURT:  Okay.  All right.  Great.

11           MR. STEEL:  Okay.  We'll do that because we have

12   been waiting six and --

13           THE COURT:  Okay.

14           MR. STEEL:  -- a half years on these claims.

15           THE COURT:  Okay.

16           MR. STEEL:  I just want to go quickly through the

17   scorecard, Your Honor, because my paramount point is to show

18   you how far outside the MF Global box we are on one hand,

19   and how unique we are from the 200 or so other prime

20   brokers, customers with these contracts.  We think we're a

21   special case and the facts actually put us in a different

22   place when you evaluate the exculpation provisions and the

23   joint and several liability question.

24           Your Honor, let me just identify the things that I

25   take issue with on Mr. Smith's statements.  He goes, that

Page 123

1   this dispute, we've already been paid off by LBIE, we have

2   no harm, but then on the other hand, he acknowledges under

3   their confirmed plan, this is at least a $13 million

4   dispute, that's meaningful.

5           We also have unliquidated claims that if they

6   survive this 12(b)(6) that we'd want discovery on those

7   claims.

8           THE COURT:  What are those?

9           MR. STEEL:  There's -- I can walk Your Honor

10  through each of the claims, but the unliquidated portions

11  are --

12          THE COURT:  You mean attorney's fees and the like?

13          MR. STEEL:  Well, things like that, and also for

14  the failure to be able to participate in corporate events

15  attached to the securities.  While our securities were not

16  returned after recall, there is ancillary damages.  We

17  weren't able to participate in (indiscernible) or rights

18  offering, we weren't able to --

19          THE COURT:  So consequential type damages.

20          MR. STEEL:  Those type of damages but --

21          THE COURT:  Okay.

22          MR. STEEL:  -- I think that we could fit under the

23  contract, given I'll show you, and I'll walk you through

24  which sections of the PB agreement they're directly liable

25  on a contract basis.

Page 124

1          THE COURT:  Okay.  That's -- but those all go in

2     the bucket of in the guaranteed claim, you would assert

3     those, right, as part of the guaranteed claim?  But that

4     doesn't really have a bearing on whether or not the claims,

5     the contract claims survive 29 or 30, right?  The existence

6     of those types of -- the allegation of the existence of

7     those types of damages don't change the analysis as to

8     whether the predicate events here get you out of the

9     application of the force majeure or the exculpation clause,

10    right?

11         MR. STEEL:  Right.  The exculpation still remain a

12    gating issue.  I think it comes in on joint and several

13    liability, that's why I raise it now.

14         THE COURT:  Okay.

15         MR. STEEL:  And we can address it on the back end

16    or whenever Your Honor would like, by looking at the

17    elements of the claims.

18         And that just gets another thing on my scorecard,

19    he passed and said, that we didn't have any claims on fraud.

20    We do have an element of a fraud in the negligent

21    misrepresentation claim with respect to the CapCo bonds

22    which were insurance backing for LBI and LBIE.  It's in our

23    proof of claim, it's part of our claims.

24         THE COURT:  Can you point that out to me?

25         MR. STEEL:  Sure.  Let me find the claims.  It's

Page 125

1   in paragraph 3 and 10 of our addendum attached to the myriad

2   proofs of claim.  And it relates -- I'm sorry, Your Honor,

3   I --

4           THE COURT:  Go ahead, go.

5           MR. STEEL:  It relates -- I've got to jump around

6   a little bit.  We filed two declarations of --

7           THE COURT:  Uh-huh.

8           MR. STEEL:  -- Roger May, Mr. Smith referenced

9   that.  I know Your Honor has read and is familiar.  As

10  Exhibit G to the first May declaration was a document called

11  a 2007 customer asset protection overview.

12          THE COURT:  Okay.

13          MR. STEEL:  This is a document produced with

14  Lehman Brothers on the top, and throughout it makes

15  references to Lehman Brothers, the credit protection it

16  provides, its PD customers as a holistic enterprise.

17          There's a lot of interesting things in this

18  document, and the declaration goes through how we obtained

19  it, oh, Lehman Brothers gave it to us because we were

20  getting concerned about their credit protection as the

21  credit markets were in the boiling waters.

22          It says a couple of interesting things, and the

23  two most important for this is that one, LBIE benefits from

24  a para guarantee from LBHI, we'll deal with this down the

25  road.  And two, that the benefit from this CapCo insurance

Page 126

1   that any PB customer would have the back stop of a third

2   party insurer, that would satisfy any claims under these

3   contracts.

4           So to the extent we have pled a fraud, a negligent

5   misrepresentation claim that set forth our claim, I just

6   take an issue, and this is just an overview or scorecard, I

7   still think Your Honor's right that the exculpations are the

8   gating issues.

9           THE COURT:  But this doesn't take me out of that

10  issue, right?

11          MR. STEEL:  No.  No.

12          THE COURT:  No.

13          MR. STEEL:  I just wanted to identify what I

14  thought Mr. Smith was wrong on in terms of the scorecard of

15  issues to address.  And then I'll dive into to sort of the

16  overview and the exculpation provisions.

17          Just two more points on Mr. Smith's --

18          THE COURT:  Uh-huh.

19          MR. STEEL:  -- presentation.  He goes on a lot

20  about, well, it was accepted that our securities were at

21  LBIE.  Well, there's no evidence to that effect and I'll get

22  into our position.  Our declaration sets forth our position

23  that there's no evidence where our securities were at all.

24  That we had a prime brokerage, and you spent time with the

25  Stonehill proceedings saying that under this contract, the

Page 127

1    prime brokerage agreements opened up at LBI.

2              All right.  Well, there was an MLA agreement and

3    that provides certain rights for LBIE -- Lehman affiliates

4    like LBIE to lift and take some of the securities that are

5    pledged for things like loans, right.

6              THE COURT:  Uh-huh.

7              MR. STEEL:  Well, that's in fact, in our story

8    what LBIE did.  It took our client's Newport securities en

9    masse and in violation of application U.S. and SEC customer

10   protection rules, and took them and used them in their own

11   borrowing base and rehypothecated them in trading at the

12   benefit of the Lehman enterprise.

13             All right.  Well, the point being is that upon the

14   recall, and it's -- now is an appropriate time to really go

15   through the timeline, Lehman never provided us with any

16   evidence.  And since they haven't provided us evidence were

17   our securities were at the time of the recall.

18             And now I think it's a good time for me to address

19   the timeline.

20             THE COURT:  Does that last statement have any

21   impact on the gating issue?

22             MR. STEEL:  Yes, because it impacts gross

23   negligence.  We claim from the get go that the

24   rehypothecation by LBIE in violation of U.S. laws is part

25   and parcel an element of our gross negligence claim because

Page 128

1   they rehypothecated, because they didn't have effective

2   control of our securities.

3           When we recalled them on Wednesday, the 10th,

4   Lehman was unable to transfer them per our instructions.

5   Right.  And I'll walk you through the time, but the --

6           THE COURT:  Wait, wait.

7           MR. STEEL:  -- gross negligence claim --

8           THE COURT:  Wait, wait, wait, wait.

9           MR. STEEL:  Uh-huh.

10          THE COURT:  You didn't recall them on the 10th.

11  You -- someone made a phone call.

12          MR. STEEL:  Right.  And --

13          THE COURT:  And then at 11:18, Mr. Ramond (ph)

14  told Mr. May, hey, Roger, I need an authorization letter.

15  Right?  Now, so the interesting thing is when you get to the

16  authorization letter, which was sent mid-day on Friday, you

17  know, the authorization letter would've taken approximately

18  45 seconds to generate.

19          So --

20          MR. STEEL:  Okay.  Let --

21          THE COURT:  Okay.  So that doesn't work.

22          MR. STEEL:  Well, let me walk you through how I

23  think it works.  I think Mr. Smith sort of spun it a little

24  bit.  We filed a supplemental declaration at Docket 48062,

25  that's the one that Mr. Smith referred to.

Page 129

```
 1              THE COURT:  See, I'm already over 48,000.

 2              MR. STEEL:  I know, oh, my goodness, I can't

 3   imagine.

 4              THE COURT:  What does that say?

 5              MR. STEEL:  A lot of paper.  The supplemental

 6   declaration though says, that Lehman was able to make a

 7   transfer of many millions of Newport securities in the blink

 8   of an eye, in less than a few hours, Lehman was able to

 9   effectuate the transfer or recall of the transfer of these

10   securities.

11              So it's unquestioned in the record before Your

12   Honor that they had the ability and they had the capacity to

13   do same day transfers.

14              THE COURT:  All right.  But -- okay.  But now

15   we're -- I mean, and we are on the sufficiency hearing.

16              MR. STEEL:  Yes.

17              THE COURT:  The documents that you put in show

18   this chain of events that at least commenced in writing with

19   Mr. Ramond's getting back to Mr. May, right.  So there's no

20   document back from Mr. May saying, Mr. Ramond, T plus 2

21   doesn't cut it, here's -- attached is our authorization.

22   The authorization doesn't come in for, you know, over

23   however many hours, and then you're up against the weekend.

24              So I don't -- I'm still not following you.

25              MR. STEEL:  Right.  That gives this credibility
```

Page 130

1    this was a more national flowing relationship.  There wasn't

2    -- in the contract, there's no set procedures when you want

3    to transfer securities.

4            THE COURT:  Do you think it's a good idea for

5    securities to be transferred without a letter of

6    authorization?  You don't think so, I'm sure you don't.

7            MR. STEEL:  Well, I'm opining on that, I'm just

8    saying that the contract doesn't specify the procedures that

9    were in place for the transfer.  The letter of authorization

10   could memorialize something that's already in place, that's

11   already in process.

12           He also pointed -- let --

13           THE COURT:  If that existed, Mr. Steel, I think

14   you would've given it to me.  I think you would've given it

15   to me and then said, this Ramond -- this is a smokescreen

16   because he didn't need a letter of authorization, he had

17   blanket -- I mean, I can't even imagine how that would work,

18   right.  I'm sitting at a desk at Lehman Brothers and I get a

19   voice mail from somebody saying, hey, you know, I'm Roger

20   May, transfer my $150 million of securities to, you know,

21   Credit Suisse.  It's not going to happen, right, so I'm

22   trying hard to follow what you're saying, but I'm not

23   getting there.

24           MR. STEEL:  My only point through the supplemental

25   declaration is when there's appropriate authorizations

Page 131

1    Lehman had the capacity to transfer instantaneously, if not

2    for a short delay.  That's my point.  So if you're accepting

3    the predicate that September 10th the phone call was

4    insufficient, September 11th, Lehman's acknowledgement that

5    they would transfer the accounts, if that's insufficient,

6    but then on the 12th, they get the letter of authorization

7    and say that the --

8              THE COURT:  After --

9              MR. STEEL:  -- recall is booked.

10             THE COURT:  -- the close of business in London.

11             MR. STEEL:  Why does -- why is it only LBIE.  We

12   have no proof in the record that LBIE was in control of this

13   when LBI was the prime broker in New York.  Every phone

14   call, every fax, every order, every trade went through New

15   York.  There's no evidence otherwise.

16             THE COURT:  Okay.  But then -- so if I meet you on

17   that ground, if I assume, and I wasn't aware that that's

18   where you were going with this, that the securities were

19   actually at LBI not at LBIE.

20             MR. STEEL:  We don't know first and foremost.

21             THE COURT:  Okay.  All right.  So suppose they

22   were at LBI, then here comes this e-mail at 12:05 on Friday,

23   September 12th, then you're telling me that then it was

24   gross negligence or willful misconduct for that -- the trade

25   not to have closed in the next four hours and 55 minutes on

Page 132

1    Friday, September 12th, given everything else that was going

2    on?

3            MR. STEEL:  Well, not in the next four hours.  The

4    next six years plus.  I mean, that's an exaggeration, but

5    let me walk you through the next and the subsequent days and

6    why it turns into a claim for gross negligence.

7            So we're still on that Friday, the 12th, it's our

8    position that Lehman had the capacity when they got the

9    letter of authorization --

10           THE COURT:  Can I just ask you to stop, because

11   I'm really just stuck on this LBI versus LBIE --

12           MR. STEEL:  Us too.

13           THE COURT:  -- issue.  And let me ask Mr. Smith, I

14   mean, is this an issue here?  Because your whole

15   presentation was keyed off of, and we know what happened

16   next, LBIE went into administration.  Am I -- so am I

17   missing something here?

18           MR. SMITH:  No, Your Honor.  The agreement with

19   the parties included placing securities at LBIE, in fact,

20   there's a margin lending agreement for that purpose with

21   LBIE.

22           THE COURT:  Okay.  So two separate issues.  One,

23   where were the securities actually?

24           MR. SMITH:  Oh, as to that, no doubt.  Whether

25   they say they knew it or not, there is no doubt they were at

Page 133

1     LBIE.  Because that's who paid them.  They made a claim in

2     the LBI administration and got paid by LBIE.

3              THE COURT:  Oh, that's an excellent point.  You

4     made a claim in the LBIE case.

5              MR. STEEL:  We made a claim against LBI also and

6     the Chapter 11 debtors.

7              MR. SMITH:  And I was just reminded, that they

8     made a claim in the LBI case.

9              THE COURT:  Yes, he did.

10             MR. SMITH:  And it was disallowed.

11             THE COURT:  Correct because --

12             MR. STEEL:  Only because it was part and parcel of

13    a 9019 between the two estates, LBI and LBIE.

14             THE COURT:  Okay.  Let's not be cute.  As you're

15    standing here today, do you know where the securities were?

16             MR. STEEL:  We do not.  And I have never seen any

17    evidence of where the securities physically were located on

18    the 12th.

19             THE COURT:  Well then, you know, we have a huge

20    problem because then if 9019 or no 9019 there are standards,

21    and to the extent that the securities were not at LBIE, then

22    that shouldn't have been an allowed claim.  I mean, I'm just

23    -- now, I'm really confused.

24             MR. STEEL:  Well, Your Honor, we always thought we

25    had an allowed customer claim against LBI.  We took

Page 134

1    extensive discovery.  We were here on the first day, I see

2    Hughes Hubbard colleagues here, we were a hornet in their

3    nest.  I mean, we buzzed, buzzed, buzzed that -- the SIPA

4    trustee of the obligation of a term and securities because

5    of what this contract says that we're a prime brokerage

6    customer of LBI, right.

7              THE COURT:  Okay.

8              MR. STEEL:  When it came to post-petition, three

9    years in when LBI and LBIE negotiated a settlement between

10   the two massive estates --

11             THE COURT:  Okay.

12             MR. STEEL:  -- we weren't in a position to say,

13   oh, we want to get our securities still back from LBI when

14   we're standing to receive an allowed claim against LBIE

15   because the market was --

16             THE COURT:  Okay.  I mean, maybe this is much ado

17   about nothing.  To the extent that the securities were at

18   LBI, then the point that the administration occurred on

19   Monday becomes beside the point.  But to the extent that the

20   allegation is that the securities were actually at LBIE, and

21   LBI didn't have the authority to transfer -- to

22   rehypothecate them to LBIE, then I still don't think that

23   solves the general problem of the applicability of the force

24   majeure or the exculpation provisions.

25             MR. STEEL:  All right.  Let me walk you through

Page 135

1    the rest of the timeline and --

2            THE COURT:  Okay.

3            MR. STEEL:  -- I'll walk you through how we're

4    outside the exculpations.

5            Mr. Smith makes a lot about T plus 2.  I still

6    don't think that there's -- because they cite to a rulebook

7    on the purchase and sale of securities, that's a far

8    different thing than the recall of your property.

9            Again, I think it's belied that T plus 2 is new to

10   the relationship.  It's never been before a part of a trader

11   transfer.  There's no evidence that in the contracts that it

12   wasn't business days, or it wasn't just calendar days.  So I

13   think it's a real disputed fact what -- the T plus 2.

14           THE COURT:  Well, it might be a disputed fact, but

15   the question is then, can I say that number one, if I don't

16   imply a gross negligence willful misconduct carve-out into

17   the force majeure clause, it doesn't matter.  You say I

18   should, but it doesn't matter.

19           If I assume that there was gross negligence or

20   willful misconduct, which I don't, but if I do, then I could

21   still say as a matter of law, that the force majeure clause

22   applies nonetheless.  Because of the --

23           MR. STEEL:  So let's go -- I hear you, I hear you.

24           THE COURT:  Okay.

25           MR. STEEL:  So let's go to Section 29, force

Page 136

1       majeure --

2                 THE COURT:  Okay.

3                 MR. STEEL:  -- clause.  Let's get into the

4       substance of it.  All right.  So they say -- I still wanted

5       to make one more point on the timeline --

6                 THE COURT:  Sure.

7                 MR. STEEL:  -- it'll go really, really quick.

8                 THE COURT:  Go ahead.

9                 MR. STEEL:  That on Sunday, the 14th, it turned

10      the lights on here in New York and did tens of thousands of

11      transfers and transactions for favorite customers, why was

12      Newport out of that box?  And then now we get to the fabled

13      15th, right?  The plan administrator claims that the force

14      majeure now comes into play, because all of our claims are

15      allegedly caused, directly or indirectly, by quote,

16      government restrictions and suspension of trading.  That's

17      the two --

18                THE COURT:  Uh-huh.

19                MR. STEEL:  -- clauses used in the force majeure

20      provision that's at issue.

21                All right.  Our first argument that we're outside

22      of that is that the claims aren't based on government

23      restrictions or suspension of tradings.  The claims are

24      based on Lehman's failure to recall and return the customer

25      property in advance of any of those waters getting onto our

Page 137

1   toes, that's why the timeline is so important, that we

2   should've been (indiscernible), we should've been smooth

3   sailing outside of any insolvency proceeding or any

4   purported suspension of trading or government restrictions.

5           So that's our first argument why Section 29 is not

6   applicable.  And just to add to that, Section 29 doesn't

7   even say insolvency proceedings.  It says government

8   restrictions and suspension of trading.

9           THE COURT:  Right.  I went through that this

10  morning.

11          MR. STEEL:  True.  And let me get to our other

12  argument, other than the claim has nothing to do with

13  restrictions or suspensions, it's all about failure to

14  return and recall securities.

15          Your Honor, they spent a lot of time briefing this

16  issue, and they spent six and a half years, right, before we

17  got to litigate this on a 12(b)(6), six and a half years,

18  and now they're saying to a force majeure clause, well, I

19  don't see any evidence that there's a government restriction

20  or suspension of trading in play on the 15th.  I got the

21  LBIE administration order --

22          THE COURT:  You don't?

23          MR. STEEL:  -- here, right here, right here, this

24  is the LBIE --

25          THE COURT:  Right.

Page 138

1          MR. STEEL:  -- administration order.

2          THE COURT:  Okay.  And it said, LBIE's

3     administration business as usual?

4          MR. STEEL:  It doesn't say that there's suspension

5     of trading or government restriction.  It does not say it.

6     And under UK law, under UK law, as I understand there's

7     no --

8          THE COURT:  Was LBIE still trading after it went

9     into --

10         MR. STEEL:  Yes.

11         THE COURT:  It was?

12         MR. STEEL:  There was no automatic suspension of

13    trading.  LBIE completed a substantial number of trades

14    post-administration.  They cite in their papers.  In fact,

15    one of the early progress reports from the administrators

16    was, in the context of OTC trades in limbo, they said, well,

17    suspension of trade is not practicable or desirable.  It

18    would adversely affect the administration and recoveries of

19    beneficiaries, right.

20         Look how the trust claimants, how it evolves their

21    positions, people like Newport, the hedge funds stuck in the

22    morass.  Prior to the UK high court rejecting a proposed

23    scheme for the return of their property, then they modeled

24    the CRA, which everybody fits under in this, well, what was

25    the administrators doing?  They were entering into bilateral

Page 139

1    negotiations with people like Newport on how to effectuate

2    these transfers.

3                THE COURT:  That's what you mean by there was no

4    suspension of trading?

5                MR. STEEL:  How -- if you're talking to me about

6    how to give me my property back, how is there suspension of

7    trading?  I can get my property back from you, I don't read

8    that as a suspension of trading.  And that's our other

9    position, that the UK administration order, UK law and the

10   actual events on the ground didn't effectuate a suspension

11   of trading.  There might have been an insolvency proceeding,

12   there might have been an automatic stay saying I couldn't

13   bang on their door, but they sure as -- they could've

14   returned and recalled my securities.

15                And that's only the 15th, Your Honor, right.

16                THE COURT:  Uh-huh.

17                MR. STEEL:  We've got four more days until the

18   19th in the SIPA proceeding.  So that -- then we're now

19   talking about how we're so far outside MF Global, right.

20                First Newport's not submitting a diminution in

21   value claim, this is in the SIPA claim.  We're not like

22   Stonehill.  And second, Lehman had nine days before the SIPA

23   order, and what that provided for came into play.  And if

24   you look in the context of the nine days, or as Your Honor

25   says, seven days between the letter of authorization --

Page 140

1          THE COURT:  Uh-huh.

2          MR. STEEL:  -- in my mind, that's gross negligence

3    for not being able to transfer many millions of a customer's

4    property at risk during Lehman -- this isn't a fire, this

5    isn't a riot, this wasn't an act of terrorism, it was --

6          THE COURT:  But if it -- where do you allege that

7    you don't know where the securities were?

8          MR. STEEL:  Well, I think we've alleged it in the

9    four or five 2004 applications we filed over the last six

10   years.

11         THE COURT:  No, no, in the actual pleadings.  Not

12   so much?  I mean, in the proof of claim, because before -- a

13   half an hour ago, it wasn't on my radar screen at all that

14   what you really were saying was that the securities weren't

15   at LBIE they were actually at LBI.

16         MR. STEEL:  Well, be mindful, this is our proof of

17   claim dated September 18th, 2009.

18         THE COURT:  Yeah.

19         MR. STEEL:  We say in the first paragraph on

20   information, believed the account remains with and under the

21   control of LBI and was not transferred to Barclay's Capital

22   or other third parties in connection with a mere sale.

23         THE COURT:  Okay.

24         MR. STEEL:  Remember, we filed a 2004 to answer

25   this question the first day.

Page 141

1                    THE COURT:  Okay.

2                    MR. STEEL:  We went over to England to answer this

3       question, we've been asking it, Judge, we just haven't

4       gotten much clarity and it's very convenient for them to say

5       -- it's a no brainer, their securities were with LBHI.  LBHI

6       filed for administration, there was a government

7       restriction, our hands were tied, force majeure kicks in.

8       Those aren't the facts that we understand them to be.  And

9       this is a 12(b)(6) we should get the benefit of exploring

10      whether our facts are correct.

11                   Your Honor, they still raise the other

12      exculpation.

13                   THE COURT:  Uh-huh.

14                   MR. STEEL:  We still have joint and several

15      liability, if you want us to address those too.

16                   THE COURT:  What do you mean, they --

17                   MR. STEEL:  If we get through the exculpation

18      gating, they're still saying that the debtors aren't liable

19      for these claims.

20                   THE COURT:  Right.

21                   MR. STEEL:  He said we sued a golf course, a

22      hotel, and a plane financing company.

23                   THE COURT:  Right.

24                   MR. STEEL:  And we have arguments with respect to

25      that if you want to hear it.  Our papers go into pretty good

Page 142

1    detail.

2            THE COURT:  No, let me hear from Mr. Smith again

3    on this new --

4            MR. STEEL:  Okay.

5            THE COURT:  -- late breaking issue of where the

6    securities actually were.  Thank you.

7            MR. STEEL:  Thank you.

8            THE COURT:  So, Mr. Smith, talk to me about LBI

9    and LBIE and talk to me about this notion that there wasn't

10   actually -- well, that if the securities were at LBIE there

11   wasn't really a suspension of trading that would've

12   precluded the return of the securities.

13           MR. SMITH:  Okay.  And different --

14           THE COURT:  And if those are -- if I shouldn't

15   even be thinking about those issues, you can tell me that

16   too.

17           MR. SMITH:  Right.  Let's start with where are the

18   securities.  The securities on Monday morning, as they were,

19   I believe on Friday and Thursday prior, were at LBIE.

20   There's no -- I can't imagine that there's a dispute about

21   that.

22           THE COURT:  Okay.  They're reacting --

23           MR. SMITH:  They say that they --

24           THE COURT:  -- with consternation to your

25   statement.  So --

Page 143

1              MR. SMITH:  Okay.  So they may not -- they may say

2       that they didn't know.  That's fair, you didn't know.

3       That's -- you can take that position.  But you certainly

4       knew when you were told Monday morning that they were on

5       lockdown at LBIE, that that's where they were.

6              And I'm assuming that that's lead that they got on

7       that Monday morning is what led them to go over to London,

8       meet with the administrator, and start the negotiation that

9       eventually ended up with an allowed claim that got paid.

10             So I think that's where you and I are confused

11      about what Mr. Steel is saying, is he's saying, I didn't

12      realize that they were at LBIE until that Monday morning

13      when the world turned upside down.  Or is he saying, I don't

14      even know that they're still at LBIE, because that can't

15      possibly be true.  He got paid by LBIE.

16             THE COURT:  Well, there seems to be -- he seems to

17      be leading me to look beyond the world of T plus 2, and that

18      was a whole different set of arguments, that Monday is not

19      the operative day.  A, Monday is not the operative day on

20      the -- at a sufficiency hearing because for all we know, the

21      securities might have been at LBI, and then that the wait

22      was longer, and they could've traded at that point.

23             So that seems to be one argument.

24             MR. SMITH:  So the theory -- yes.  The theory

25      would have to be they were really at LBI --

Page 144

```
 1              THE COURT:  Right.

 2              MR. SMITH:  -- and LBI could've closed out that

 3    Monday.

 4              THE COURT:  Exactly, yes, and it was grossly

 5    negligent --

 6              MR. SMITH:  But they moved it to LBIE --

 7              THE COURT:  Oh, I don't think we get to the -- I

 8    don't think I'm hearing that they moved it to LBIE, I think

 9    it was just that it -- for all we know, it was at LBI, yes,

10    I have an allowed claim against LBIE, but that was a 9019,

11    that was a settlement driven by settlements between LBI and

12    LBIE, and the securities might have been at LBI, and if they

13    were, then it was grossly negligent to not close them out,

14    because oh, look, they can transfer securities within a

15    couple of hours.

16              MR. SMITH:  Well, I'm puzzled that they would take

17    that position.  It reminds me of the $100 billion cash

18    hypothetical that you have, because it is so contrary to

19    fact they received and they've attached it as an exhibit,

20    Exhibit M to the May declaration is Mr. Rockmon e-mailing

21    back on the 15th to say, it's the very last exhibit in his

22    declaration, "I'm sorry to advise, all accounts under the

23    LBIE entity are under lockdown and we have lost access to

24    them," which is a simple statement of what the facts were.

25              "The administrators for the receivership is
```

Page 145

1   PricewaterhouseCoopers and they will advise us in due course

2   on the road plan."  Now, I can't imagine that they're truly

3   challenging that proposition and really what Mr. Rockmon was

4   doing was hiding that it was being held at LBI.  So I don't

5   accept that as a creating an issue of fact.

6           THE COURT:  So -- and if there were -- so then the

7   next level is that okay, let's assume they were at LBIE,

8   they were wrongfully hypothecated by LBI to LBIE, right?

9           MR. SMITH:  Okay.

10          THE COURT:  So you would say -- you're going to

11  say to me, well, that doesn't matter.

12          MR. SMITH:  It's a) doesn't matter because the --

13  that's not their problem.  Their problem was they put in the

14  order on Friday, and LBIE went into lockdown on Monday.  So

15  it's too bad for them, they were just a little bit too late

16  in getting their paperwork together.  So rehypothecation --

17          THE COURT:  But if there was a wrongful --

18          MR. SMITH:  -- it --

19          THE COURT:  -- a so-called wrongful

20  rehypothecation then --

21          MR. SMITH:  We don't -- I don't -- frankly I don't

22  know what they mean when they talk about a wrongful

23  hypothecation.  But let's assume something was wrong.

24          All right.  Let's assume they did something that

25  they didn't have the contractual authority to do.

Page 146

1              THE COURT:  Right.

2              MR. SMITH:  Well then, what they did was breach

3    the prime brokerage agreement.  And the breach of that

4    agreement is now precluded, a claim for breach unless there

5    was gross negligence, has been precluded by either one of --

6    either paragraph 30 or paragraph 29 of the prime brokerage

7    agreement.  So they can talk all they want about they did

8    some weird thing with the rehypothecating and lifting

9    securities, a) I don't believe that there's anything wrong;

10   b) I don't know that that happened.  It's because we don't

11   have visibility into what was going on at LBIE.  And c) they

12   allege this on information and belief, and they have been

13   working with the LBIE administrator for the past six years

14   and never --

15             THE COURT:  But you don't -- not to get into

16   disputed facts, but there's the margin lending agreement,

17   right?  I mean, the fine line --

18             MR. SMITH:  There is a margin lending, which

19   allows --

20             THE COURT:  -- with your position is that it

21   completely allows the rehypothecation of the securities,

22   right?

23             MR. SMITH:  Yes.  And I suspect they'll say, well,

24   there are certain circumstances that you have to have a

25   loan-out or not a loan-out.  We don't know any of these

Page 147

1    things.

2            THE COURT:  I'm just looking at the -- in the MLA.

3            MR. SMITH:  It should be paragraph --

4            THE COURT:  5(e)?

5            MR. SMITH:  That's an E or C.

6            THE COURT:  Right.

7            MR. SMITH:  Any collateral together with --

8            THE COURT:  All right.  So okay.

9            MR. SMITH:  So -- but let's assume something was

10   wrong, that we didn't do something, we did something wrong

11   by whatever because of something that LBIE did.  I'll make

12   it easy for you, you don't have to get to that issue,

13   because it is that kind of a claim is excluded by the gross

14   negligence limitation and liability.

15           If that was gross negligence to allow LBIE to do

16   something with the securities, it'd have to be gross

17   negligence in order for it to survive at the sufficiency

18   stage.

19           THE COURT:  It would have to have been gross

20   negligence by LBI to have transferred the securities to

21   LBIE.

22           MR. SMITH:  LBI to have transferred it, to put

23   them in harm's way with something.

24           THE COURT:  Right.

25           MR. SMITH:  And, of course, LBIE had been the

Page 148

1    trading partner that these guys had used for years.  So

2    there's nothing wrong in allowing securities to be held at

3    LBIE.  That was actually what these fellows expected would

4    happen with those securities.  So that answers the, I

5    believe, the rehypothecation and the location issues.

6            This -- I'm troubled by the notion that there are

7    these unliquidated claims that corporate -- they couldn't

8    vote securities or certain corporate events that they don't

9    describe, it's all --

10           THE COURT:  Classic consequential damages.

11           MR. SMITH:  Exactly.  That's also in that same

12   paragraph, paragraph 30 precludes claims for consequential

13   damages.  So those go out the door.

14           He says that there's a CapCo fraud claim.  Well,

15   that's not what this claim is.  The claim, as they've

16   attached it in their Exhibit A to their proof of claim, is a

17   breach of contract, you failed to capitalize CapCo or get a

18   surety bond.

19           So that is -- they don't ever use the word fraud

20   until well into these proceedings, when they have Mr. May

21   say that they were -- somehow it was fraudulent not to do

22   what they were supposed to do with the surety bond.  But

23   that's -- Mr. Miller has already gone through that with you.

24   Those are the economic loss, you can't dress up a breach of

25   contract as a fraud.

Page 149

1        So I hope I've answered your questions.

2        THE COURT:  Yes, you have, thank you.

3        MR. SMITH:  Okay.  Thank you.

4        THE COURT:  All right.  Mr. Steel, quickly.

5        MR. STEEL:  Yes.  I'm sorry, Your Honor.

6        THE COURT:  Don't be sorry.

7        MR. STEEL:  Howard Steel on behalf of the Newport

8   Funds.

9        Oh, gosh, Your Honor, this is a 12(b)(6) and I

10   heard a lot from Mr. Smith we don't know, and that's a lot

11   of the problem, we tried to roll up our sleeves --

12        THE COURT:  All right.  But it's a 12(b)(6), but

13   it's also a Rule 11, okay.  So you need to be standing up

14   here and looking me in the eye and telling me that, as you

15   stand here today, you're telling me gosh, gee, we don't know

16   where those securities were?

17        MR. STEEL:  Yes, that's correct.  Let me tell you

18   what I think happened from our limited dribs and drabs of

19   discovery from the SIPA trustee, you know, less discovery

20   from the joint administrators.  We tried, we've cast our net

21   wide, we acknowledge that.

22        THE COURT:  I just want to like flash some lights,

23   because this is a big moment.  Okay.  This is a big moment.

24   I'm not about cutting off claims prematurely or deciding

25   disputed issues of fact on sufficiency hearings or

Page 150

1    12(b)(6)'s and I'm actually heartened by the fact that, in

2    fact, the objections to the sufficiency objection to the

3    guaranteed claim was withdrawn, because I think it has legs.

4         On the other hand, I believe notwithstanding the

5    language that you read me in the proof of claim, I don't

6    believe that you actually don't know where those securities

7    were.  And if you're going to tell me that that's actually

8    what's going on here, you know, that's kind of a big thing.

9         MR. STEEL:  Well, it's what I am telling you

10   because --

11        THE COURT:  Pleading in the alternative is one

12   thing, lawyers do that all the time.  But we're now many,

13   many years out and Mr. Smith has pointed me to documents

14   reflecting statements that indicated that, in fact, the

15   securities had -- were at LBIE, and has also said that you

16   acted on that in meeting with folks in the UK.  He just said

17   that.

18        Okay.  So if you're going to tell me that you're

19   resting your claim on the factual question of where were the

20   securities, and therefore, you want the ability to make out

21   a claim for gross negligence because the securities were

22   actually still at LBIE, is that really what you're saying?

23        MR. STEEL:  What I'm saying is that there's no

24   evidence, there's no record, there's no documentation that

25   on the 15th the securities were stuck at LBIE.  We have no

Page 151

1    record that the securities were stuck at LBIE.  I thought

2    Mr. Smith was just saying that we've dealt with the UK

3    entity in terms of relaying instructions, right, to purchase

4    or sell, right, that would make sense.  We had a margin

5    lending relationship with LBIE.

6            THE COURT:  Yes.

7            MR. STEEL:  LBIE had certain rights, but just by

8    U.S. law, to rehypothecate, to lift the securities up from

9    what we thought they resided at LBI, the contract that we

10   signed, the prime brokerage agreement says, prime brokerage

11   agreement will be opened up at LBI, you identified that in

12   the Stonehill proceeding.  That's what we understood.  We

13   knew that LBIE had certain rights to lift and take those

14   securities --

15           THE COURT:  Right.

16           MR. STEEL:  -- within U.S. law and then do what --

17           THE COURT:  And then on Monday, the 15th, after

18   Mr. May tries to get the securities back, a letter arrives

19   that says, gee, I'm so sorry, I can't give you your

20   securities back, because LBIE's in administration.

21           MR. STEEL:  All right.  Well, there's a couple of

22   points on this that still makes it really everybody in the

23   dark.  This is coming from a New York person, Ramond is in

24   New York, there's no dispute on that.

25           THE COURT:  Right.

Page 152

1          MR. STEEL:  So why is he -- why are we talking

2     with somebody from New York from just Lehman Brothers --

3          THE COURT:  Because you asked for your securities

4     back, and that's who you dealt with, and the guy who's

5     telling you that he sent your securities to the UK is

6     responding with the --

7          MR. STEEL:  But he didn't say that he sent the

8     securities anywhere.  He just said -- the only thing he said

9     was they're on lockdown.  I don't know what lockdown means.

10    And lockdown doesn't -- lockdown can mean many different

11    things.

12         THE COURT:  Now, you've moved to a different

13    point.  You've moved to the suspension of trading point.

14         MR. STEEL:  All right.  Well then getting back to

15    the where were the securities.  We sought discovery for

16    that.  Discovery was not given to us.  What was given to us

17    was limited discovery of those things, was a document called

18    a sub-custody agreement.

19         It's a document -- it's in the record in these

20    proceedings, I can direct Your Honor --

21         THE COURT:  No, that's okay.

22         MR. STEEL:  -- although I think we got it in

23    discovery (indiscernible).  And the sub-custody agreement if

24    I recall is an agreement between LBI and LBIE whereby LBIE

25    takes these rehypothecated securities and has them at LBI in

Page 153

1    LBIE's name.  That's why there was all these inner-debtor

2    conflicts with --

3              THE COURT:  Right.

4              MR. STEEL:  -- respect to where the securities

5    were, who had rights to the securities.  That's why it

6    wasn't so easy for them to just transfer the securities back

7    to Newport.

8              So our point is we did not know with clarity where

9    the securities were.  Some I think were rehypothecated in

10   the ether and they weren't -- Lehman was unable to recall --

11             THE COURT:  Now, there's a new place they might

12   have been, LBI ether?

13             MR. STEEL:  It was the two -- no.

14             THE COURT:  Okay.  Do you have any points that you

15   want to make to wrap up?

16             MR. STEEL:  Your Honor, I think we've fleshed out,

17   of course, around the exculpation provisions.  I think in

18   real brief, Section 30 for all the same reasons, because

19   there was no clear handling of these accounts for the

20   reasons that we said that it's unclear that anything was in

21   fact handled, we think that exculpation is not applicable.

22             And I think we can rely on Mr. Brilliant's

23   statements for the joint and several liability argument, in

24   addition to our proof of claim specifies the contractual

25   provisions where Lehman Brothers, the joint enterprise, were

Page 154

1    responsible.

2           THE COURT:  Okay.  Any last licks, Mr. Smith?

3           MR. SMITH:  No, I don't think so, Your Honor.

4           THE COURT:  Okay.  All right.  Many, many

5    interesting points, but at the end of the day, I don't

6    believe it matters where the securities were, whether they

7    were at LBI or LBIE.  I hesitate to give a lot of credence

8    to the allegation that there was some uncertainty, but it

9    ultimately doesn't matter.

10          I think that putting the guaranteed claim to one

11   side which was made clear to me it has been done, I think

12   these claims fall at the feet of paragraph 29 or paragraph

13   30 whether or not a gross negligence willful misconduct

14   exception is read into the -- what I've been calling the

15   force majeure paragraph, paragraph 29.  And even if the

16   securities were still at LBI, I don't think it matters.

17          These claims don't survive a sufficiency hearing.

18   That being said, all the damages including the alleged

19   consequential damages can be sought in the further

20   proceedings in the guarantee action.

21          All right.  So I would ask that you -- I mean, if

22   for the purposes of appeal, I mean, if you need a longer

23   opinion, I'd be happy to elaborate for the purposes of the

24   order, however, the basis of my ruling is that I believe

25   that this is on all fours with Judge Glenn's ruling in MF

Page 155

1    Global, and I think it's equally applicable here.  And I see

2    -- I've heard nothing that takes me out of that construct.

3            So for the purposes of -- let's talk procedure,

4    for the purposes of appeal, we can have an order, we can

5    agree that it's not final, we can wait to see what happens

6    at the end of the day.  If it becomes something that needs

7    to go up on appeal we, of course, will write an opinion.  It

8    has to go in the queue with everything else, so it's not

9    going to be accomplished very quickly.

10            I assume you'll agree on discovery.  Do you need

11   me to do anything else?

12            MR. SMITH:  No, I think we're done with that.

13   Thank you.

14            THE COURT:  I'm waiting for this conference.

15            MR. STEEL:  I'm sorry, Your Honor --

16            THE COURT:  Is there something else, Mr. Steel?

17            MR. STEEL:  -- Howard Steel from -- we just want

18   to acknowledge for the record we do need to preserve our

19   appellate rights.

20            THE COURT:  Sure.  So my question is, what do you

21   want to do?  Do you want this to become a final order, I

22   don't -- if so, then I'm going to write an opinion.  I'm

23   happy to do it, happy to do it, it's just not going to

24   happen really quickly.  So what I was suggesting to you was,

25   we could have an order, have it not be final, and then when

Page 156

1    you get to the end of the day -- I mean, if you win on your

2    guarantee claim, it rather renders moot the other claim.

3           I'm trying to preserve all of your rights, I'm not

4    trying to deprive you of any of your appellate rights.

5           MR. STEEL:  Your Honor, Howard Steel again, can we

6    have till the end of the day for the determination, so I can

7    talk to --

8           THE COURT:  Oh, sure.  Just figure out whatever

9    works for you is fine with me.  I just am trying to give you

10   a disposition in a way that moves it along, but I don't want

11   to eclipse any of your appellate rights whatsoever.  But

12   take your time.  All right?

13          Okay.  I'm going to go take a break before the 2

14   o'clock hearing.  Thank you very much.  Good to see

15   everyone.

16     (Recessed at 1:48 p.m. and reconvened at 2:10 p.m.)

17          THE COURT:  All right.  Sorry to keep you waiting.

18   I'm ready when you are.

19          MR. COX:  Your Honor, good afternoon, Stewart Cox

20   for the Defendant, Wellmont Health Systems.

21          Based on some of the arguments I heard earlier and

22   the Court's questions, I'm guessing this is going to be an

23   easy one for Your Honor to tackle.

24          THE COURT:  Yes, actually.

25          MR. COX:  And hopefully it won't take quite as

Page 157

1    long.  We have -- Wellmont has before the Court a motion to

2    dismiss.

3                THE COURT:  Right.

4                MR. COX:  A motion to dismiss three of the four

5    claims, counts in the Lehman adversary complaint and as the

6    Court may know, Lehman on Friday dismissed the two

7    Bankruptcy Code claims.

8                THE COURT:  Right.

9                MR. COX:  So we have one claim --

10               THE COURT:  Counts I and IV.

11               MR. COX:  Correct.

12               THE COURT:  Right.

13               MR. COX:  One claim left that's the subject of the

14   motion to dismiss, and that's the breach of the implied

15   covenant of good faith and fair dealing claim.

16               And the primary point that I want to offer the

17   Court today in this argument is that the implied covenant

18   claim and the breach of contract claim that's Count I that

19   we're not addressing the motion, and even the two bankruptcy

20   claims that were dismissed, the entire case rests on certain

21   language on a document that we call the certifications.

22               And that language is quoted, as the Court knows in

23   the complaint --

24               THE COURT:  Right.

25               MR. COX:  -- and all four counts, and now we're

Page 158

1    talking about Count IV.  That's the entire predicate for the

2    implied covenant claim.  And as Your Honor knows from our

3    motion, our argument is, our legal argument is the implied

4    covenant claim is redundant.  It duplicates the breach of

5    contract, the express contract claim that they have in Count

6    I.

7              So that's our argument.  And if the Court will

8    indulge me, I'll back up a little to explain the background

9    with the contract, and then I'll come back to the

10   certifications that's the documents of the subject of their

11   adversary proceeding complaint.

12             THE COURT:  So the -- you dispute that the

13   certifications are contract, right?

14             MR. COX:  Correct.

15             THE COURT:  Okay.  So if the certifications can't

16   support, if the certifications are a contract then do you

17   lose or do you say I think the certifications are not a

18   contract, but even if you hold that -- find that they are,

19   we didn't breach anything?

20             MR. COX:  Correct on both counts.

21             THE COURT:  Okay.  But then, but then you get to

22   the issue of the breach of the implied covenant and good

23   faith and fair dealing which is implied in every contract

24   governed by New York law.  So even if there is no breach of

25   an express provision of a contract, there can be a breach of

Page 159

1    the implied covenant with good faith and fair dealing,

2    that's read into the contract.

3              So I'm trying to figure out whether this is a, you

4    know, a semantic difference, if you will, because I believe

5    that there is a cause of action for the breach of a covenant

6    and good faith and fair dealing that can prevail subject,

7    you know, based on factual record, even if there's no breach

8    of another express provision of a contract.  Okay?

9              MR. COX:  Yes.

10             THE COURT:  Go ahead.

11             MR. COX:  Let me respond this way, if the

12   complaint had only an implied covenant count, or implied

13   covenant count plus the two bankruptcy counts that were

14   dismissed, we wouldn't be attacking that implied covenant

15   count with a motion to dismiss, because we're not saying

16   they don't have a cause of action.  What we're saying is,

17   they can't both coexist.

18             THE COURT:  But what if their complaint said

19   complaint, complaint in one count?  Okay.  Breach of

20   contract, recitals, recitals, recitals, paragraphs,

21   paragraphs, and then there's a paragraph that says, they're

22   liable because they breached the express provision set forth

23   in paragraph XXYY, they breached the implied covenant of

24   good faith and fair dealing, wherefore, we get -- we win.

25   One count just two different contractual provisions; one

Page 160

1      express, one implied.

2              MR. COX:  Because the way they have the complaint

3      pled is not -- there's no implied term that's even pled in

4      the complaint.  The complaint rests entirely on the language

5      in that certifications document that they have quoted --

6              THE COURT:  Uh-huh.

7              MR. COX:  -- in the complaint.  That's why they're

8      redundant.  And that's why these New York cases that we've

9      cited to the Court say, you can't have both.  And to pick up

10     on the Court's about it being semantics, why would it matter

11     if they're pleading the same thing in one count, versus

12     pleading the same thing in two separate counts?  Because at

13     the end of the day, the Court's going to look at what

14     they're really alleging to support the breach of contract

15     theory, whether it's on an express term or implied term, and

16     the Court is going to see this is based on specific language

17     that's in that certifications document.

18             THE COURT:  But it's based on specific language,

19     but even if I were ultimately to conclude that there was no

20     breach of the specific language, but that the course of

21     conduct constituted a breach of the covenant of good -- of

22     the implied covenant of good faith and fair dealing, I could

23     still find in Lehman's favor.

24             MR. COX:  I can't argue against that, Judge.  But

25     we could hypothesize about different ways.  They could plead

Page 161

1    the complaint.

2            THE COURT:  Right.

3            MR. COX:  And that's not what we have today, what

4    we're facing.  What we're facing right now is a complaint

5    that has two different counts that duplicate each other.

6            THE COURT:  But you're telling me that they can't

7    plead both, right?

8            MR. COX:  Correct.

9            THE COURT:  And I'm telling you that they actually

10   can plead both.  So I hope -- have you read what I've

11   written about the breach of the covenant of good faith and

12   fair dealing?

13           MR. COX:  I don't know that I have, Your Honor.

14           THE COURT:  All right.  Well, some young person

15   who works for you didn't do their job.  Because if you look,

16   you'd see it, I had a decision on the issue of the breach of

17   covenant of good faith and fair dealing.

18           MR. COX:  Is it in this Lehman case?

19           THE COURT:  No, it's not in the Lehman case, it's

20   another case called Lightsquare.

21           MR. COX:  All right.

22           THE COURT:  It doesn't matter, though, because

23   it's a contract claim.  So, you know, I don't want to --

24   I'll let you continue to try to convince me --

25           MR. COX:  No, I --

Page 162

```
 1              THE COURT:  -- but I'm just kind of letting you

 2      know --

 3              MR. COX:  Okay.

 4              THE COURT:  -- that it's going to be an uphill

 5      battle.  Thanks.

 6              MR. COX:  Thank you, Judge.

 7              THE COURT:  So but if you would rather that the

 8      counts be combined so that we have a breach of contract

 9      claim and that as life moves on, they either have to prove a

10      breach of an express provision, or demonstrate the breach of

11      the implied covenant of good faith and fair dealing all

12      under the rubric of a contract claim, that's -- we can do

13      that.  I mean, I don't think that it really matters.  We're

14      going to go to trial, apparently not here, unless you

15      consent, which I'm guessing after today you won't.  I'd be

16      delighted to have you, but you know, we still -- it's still

17      going to be the same record however you sort it out, right?

18              MR. COX:  Right.  We do think there is a

19      substantive difference between what Your Honor has

20      articulated and how it ought to be pled and the way it's

21      pled today.  So understanding how the Court is inclined to

22      rule on this, we do feel like it's at least incumbent on

23      Lehman to amend the complaint to set forth a breach of

24      contract claim as the Court has articulated it in one count.

25              THE COURT:  Let me hear from Lehman, Mr. Cohen.
```

Page 163

1    You know, from my perspective, I don't think it really

2    matters, but you may have a different view.  I'm trying to

3    preserve the cause of action because I think that Lehman's

4    entitled to go forward and attempt to prove one or the other

5    or frankly both, because they're I think in this

6    constellation of alleged facts, there is room for both.  But

7    what do you think, Mr. Cohen?

8              MR. COHEN:  Good afternoon, Your Honor, David

9    Cohen, Milbank Tweed Hadley and McCoy on behalf of Lehman

10   Brothers Holdings, Inc. and Lehman Brothers Special

11   Financing, Inc.

12             I think the issue with redundancy and the cases

13   that deal with that are concerned with the potential for

14   double recovery on a single theory.

15             THE COURT:  Yeah.

16             MR. COHEN:  And that's absolutely not --

17             THE COURT:  Not on the table at all.

18             MR. COHEN:  We're not at all.

19             THE COURT:  Right.

20             MR. COHEN:  And if Wellmont conceded that the

21   certifications were part of the contract, then we wouldn't

22   need the implied covenant.  But as we sit here today, there

23   is a question as to what's covered by the contract --

24             THE COURT:  Right.

25             MR. COHEN:  -- and what isn't.  And that's why we

Page 164

1    pled in the alternative.

2            And in the motion to dismiss papers, they seem to

3    suggest that we missed some special language by saying in

4    the alternative, we'd pled breach of good -- covenant of

5    good faith and fair dealing.  We've looked at the Rule 8

6    cases, we don't think we have to.  We think it's fairly

7    clear we understand, and we've understood from the beginning

8    that at least as we view the case and the facts, once the

9    Court determines whether the certifications are part of the

10   contract or out of the contract, the nature of the case

11   changes.

12           And we're either going with breach of contract on

13   the certifications as part of the contract, or we're going

14   with the certifications as part of the expectations and the

15   reasonable expectations of the party at contract formation,

16   and they're --

17           THE COURT:  Down the implied covenant path.

18           MR. COHEN:  Exactly.

19           THE COURT:  Right.

20           MR. COHEN:  And they're post contract conduct to

21   frustrate the performance.

22           THE COURT:  Well, that's the way I see it.  So

23   there's no chance of double recovery, and I didn't

24   understand Lehman to be seeking a double recovery.

25           MR. COHEN:  Absolutely not.

Page 165

1          THE COURT:  It's just kind of classic alternative

2   pleading and the cases that say you can't do both, I think

3   are just, you know, they're just a little misleading.

4   Because I think in this -- you know, this is -- would be a

5   classic example of a case in which you need to be able to

6   pursue both.  I mean, the undisputed facts that we have,

7   i.e., you know, the redemptions, you know --

8          MR. COHEN:  Right.

9          THE COURT:  -- I mean, it's frankly a very

10  fascinating set of facts and legal issues.  But I don't

11  think that, Mr. Cox, that I want to put the debtors through

12  the additional expense of, you know, trying it again and

13  risking that we haven't said in some -- that they haven't

14  pleaded in some magic way that parties could differ about.

15         They have a cause of action I think that survives

16  a 12(b)(6) for express, for implied.  And then at the end of

17  the day, they'll either prevail on one, or they'll prevail

18  on the other, but not both.

19         So I'm inclined to just deny the motion with

20  respect to Count IV, leave it the way it is, and you know,

21  let's move on.

22         MR. COHEN:  That would be fine with us, Your

23  Honor.

24         THE COURT:  And I'm delighted that you came up to

25  enjoy our -- you brought us the sunshine actually.

Page 166

```
 1              MR. COX:  You have a beautiful --

 2              THE COURT:  So for that, we're thankful, but you

 3    better get out quickly because the temperature is going to

 4    be dropping.

 5              MR. COX:  No further argument on that, Judge.

 6              THE COURT:  Okay.

 7              MR. COX:  I did want to ask the Court one more

 8    question here, and Your Honor may not have had a chance to

 9    see it yet.  We submitted a --

10              THE COURT:  I did.  A confidentiality --

11              MR. COX:  Exactly.

12              THE COURT:  -- a protective order.

13              MR. COX:  Right.  And the only reason I bring it

14    up now is we have a deposition coming up on February 25

15    where we probably will use documents that are --

16              THE COURT:  Okay.  So I will enter this.  I'm

17    going to go in the stack and this will get entered by the

18    end of the day.  Today, Mr. Cohen, you had no issues with

19    this?

20              MR. COHEN:  No, we commented on earlier drafts,

21    the defendants accepted our comments, and --

22              THE COURT:  Okay.

23              MR. COHEN:  -- the version reflects those.

24              THE COURT:  Okay.  We need an electronic copy.

25              UNIDENTIFIED:  E-mail my (indiscernible).
```

Page 167

1          MR. COX:  Fine.

2          THE COURT:  All right.  So if you can't do that

3   today because you're in transit, then we'll enter it as soon

4   as we get it.  But surely we'll enter it by the time of your

5   deposition.

6          Can I clarify something, because this is back to

7   me after denial of a motion to withdraw the reference,

8   right?  So I am going to take this through trial or not.  I

9   know that it's clear that I don't have authority to enter a

10  final order, right or not right?  But -- well, that's what

11  the district court said.

12         MR. COX:  Well, as the Court knows better than me,

13  this is of course is a jurisdictional thicket, but I don't

14  understand the need for us to play ping pong with the

15  district court --

16         THE COURT:  Your words not mine.

17         MR. COX:  All right.  Well, I do have to be

18  careful because she still has her thumb on us, but I don't

19  see the need to submit a report or recommendation to the

20  district court just on a motion to dismiss.  As the --

21         THE COURT:  Okay.  I wasn't -- I agree with you on

22  that, and the motion to dismiss, no.  I'm beyond that.  I'm

23  at the after trial or summary judgment.

24         MR. COX:  Okay.  I'll just say, Wellmont is not to

25  that point yet, Judge.

Page 168

1              THE COURT:  Okay.

2              MR. COX:  We've got a lot of discovery to do and

3    then we probably will file a summary judgment motion in this

4    court, and it's probably too early for us to --

5              THE COURT:  That's fine.  That's fine.  I just

6    want to note what the district court said in the order

7    denying the motion to withdraw the referencing and come

8    back, so let's all just remember to revisit it, revisit that

9    issue as and when it becomes relevant, but it doesn't really

10   affect what we do.

11             MR. COHEN:  We will, Your Honor.

12             THE COURT:  Okay.  All right.  So you'll send us

13   the protective order by e-mail, and will you send us an

14   order on Count IV as well?

15             MR. COHEN:  Yes, we'll prepare that and send that

16   back to you and Ms. Stewart (ph) will get your comments on

17   that.

18             THE COURT:  Okay.  All right.  Thank you so much.

19             MR. COHEN:  Thank you, Your Honor.

20             THE COURT:  Good day.

21   (Proceedings concluded at 2:26 PM)

22                         * * * * *

23

24

25

Page 169

1                         I N D E X

2

3                         RULINGS

4                                                   PAGE

5    Hearing re:  Doc. #46785 Four Hundred Eighty-Third

6    Omnibus Objection to Claims (No Liability claims)    95

7

8    Doc #47101 Four Hundred Eighty-Eighth Omnibus

9    Objection to Claims (No Liability Claims)       95/154

10

11   Doc #20 Motion to Dismiss Counts II, III & IV       165

12   of Plaintiffs Complaint

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

1                      C E R T I F I C A T I O N

2

3       I, Dawn South, certify that the foregoing transcript is a

4       true and accurate record of the proceedings.

5       Dawn South    Digitally signed by Dawn South
                       DN: cn=Dawn South, o, ou,
                       email=digital1@veritext.com,
6       _____
                       c=US
                       Date: 2015.02.12 14:39:39 -05'00'

7       Dawn South

8       AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12      Date:  February 12, 2015

13

14

15

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501

| & |
|---|
| **&**   2:14 3:2,10,18 4:16 5:1 6:11 98:15 169:11 |

| 0 |
|---|
| **08-13555**   1:7 |

| 1 |
|---|
| **1**   73:14 120:5 |
| **1.56**   112:4 |
| **1.79**   112:2 |
| **10**   14:10 20:8 24:14 89:19 103:16 104:2 125:1 |
| **100**   78:10 92:15,19 144:17 |
| **100,000**   114:2 |
| **10036**   4:4,11 |
| **101**   3:20 |
| **10153-0119**   3:13 |
| **10178-0061**   3:21 |
| **1095**   4:3 |
| **10:09**   1:24 |
| **10th**   24:11 128:3,10 131:3 |
| **11**   1:23 6:13 7:6 10:21,22 11:12 12:4 12:17 13:12 15:21 20:5 24:20 25:21 28:22 33:1 34:22 43:22 91:24 104:15 133:6 149:13 |
| **11501**   170:25 |
| **11:18**   128:13 |
| **11th**   131:4 |
| **12**   33:24 53:4 76:7 89:13,13,15 94:14 94:24 119:10 123:6 137:17 141:9 149:9 149:12 150:1 165:16 170:12 |
| **12:10**   98:10 |
| **12:37**   98:12 |
| **12th**   131:6,23 132:1 132:7 133:18 |
| **13**   21:22 32:19,20 111:25 112:5 118:2 |

123:3
| **13-01719**   1:13 2:13 |
| **1300**   3:4 |
| **137**   76:22 |
| **14**   32:20 33:12 94:2 95:1 |
| **14th**   136:9 |
| **15**   34:7 |
| **150**   55:9 130:20 |
| **15th**   136:13 137:20 139:15 144:21 150:25 151:17 |
| **16**   51:1,2 76:12 |
| **165**   169:11 |
| **18**   100:25 101:3,14 |
| **1819**   5:4 |
| **1850**   4:18 |
| **18th**   140:17 |
| **19**   113:23 |
| **1950**   66:22 |
| **1967**   67:8 |
| **19th**   24:22 95:11,14 95:17 139:18 |
| **1:48**   156:16 |

| 2 |
|---|
| **2**   98:23 104:25 105:1,5,15,17 106:1 108:9,14 129:20 135:5,9,13 143:17 156:13 |
| **20**   2:13 169:11 |
| **200**   122:19 |
| **2000**   27:12 |
| **20005-3314**   3:6 |
| **20006**   4:19 |
| **2004**   140:9,24 |
| **2007**   100:21 125:11 |
| **2008**   16:2 24:14 31:3 32:25 67:4,5 83:17 89:19 |
| **2009**   140:17 |
| **2010**   76:23 |
| **2012**   26:24 |
| **2015**   1:23 170:12 |
| **21**   20:1 69:20,21 71:24,24 73:14 86:7 |

| **216**   27:11 |
|---|
| **25**   166:14 |
| **28**   86:13 |
| **288**   67:8 |
| **29**   13:9 17:20 19:2 19:18 24:4 44:15,20 46:24 71:8 73:23 81:25 116:24,25 124:5 135:25 137:5 137:6 146:6 154:12 154:15 |
| **2:00**   84:13 |
| **2:10**   156:16 |
| **2:26**   168:21 |
| **2d**   66:22 79:20 |
| **2nd**   76:22 |

| 3 |
|---|
| **3**   61:8 108:6,19 125:1 |
| **30**   17:18,21 18:12 19:3 24:4,7 29:7 35:13 46:25 71:8 73:23 82:1 93:25 94:1 110:18 116:24 116:25 124:5 146:6 148:12 153:18 154:13 |
| **300**   27:12 170:24 |
| **307**   27:12 |
| **330**   170:23 |
| **35203**   5:5 |
| **36**   52:10 |
| **37**   52:11 |
| **39**   24:25 |

| 4 |
|---|
| **40**   25:17 |
| **408**   170:8 |
| **45**   128:18 |
| **46785**   2:7 169:5 |
| **47**   103:18 |
| **47,565**   114:19 |
| **47101**   2:10 169:8 |
| **47564**   114:16 |
| **48,000**   129:1 |
| **48062**   128:24 |

| 5 |
|---|
| **5**   147:4 |
| **511**   79:20 |
| **55**   24:16 89:17 131:25 |

| 6 |
|---|
| **6**   51:9 53:4 76:7 89:13,13,15 119:10 123:6 137:17 141:9 149:9,12 150:1 165:16 |
| **60**   96:23 |
| **620**   76:22 |
| **684**   67:8 |
| **697**   26:23 |
| **6th**   29:25 102:10 |

| 7 |
|---|
| **703**   27:13 |
| **7056**   120:5 |
| **741**   79:20 |
| **767**   3:12 |
| **7th**   102:10 |

| 8 |
|---|
| **8**   108:5 164:5 |

| 9 |
|---|
| **9**   7:20,25 26:4,25 28:3,10 30:16 35:9 38:12 39:8,19 92:25 96:14 108:5 |
| **900**   3:5 |
| **9019**   133:13,20,20 144:10 |
| **909**   66:22 |
| **910**   26:23 |
| **95**   169:6 |
| **95/154**   169:9 |
| **97**   66:21 |
| **9849**   67:5 |

| a |
|---|
| **a.m.**   106:15 |
| **aaert**   170:8 |
| **ability**   15:5 23:10 33:25 57:15 74:9 90:11 129:12 |

150:20
**able** 16:25 46:4
53:11 96:15 101:15
123:14,17,18 129:6
129:8 140:3 165:5
**absent** 82:18
**absolutely** 30:9
37:12 39:17 163:16
164:25
**absurd** 65:3
**abundance** 20:7
**accept** 104:5 107:7
145:5
**accepted** 60:4 67:6
102:16 126:20
166:21
**accepting** 101:6
131:2
**access** 8:16 9:25
16:13 144:23
**accidents** 45:2
**accomplished** 155:9
**account** 23:20 24:1
24:5 59:15 60:17
61:1 62:14 64:23,23
64:24 73:11,13,16
78:11 87:11 100:17
140:20
**accountants** 91:16
**accounting** 91:14
**accounts** 59:9,13
62:9 81:5 131:5
144:22 153:19
**accurate** 110:6
170:4
**acknowledge** 61:10
87:21 149:21
155:18
**acknowledgement**
131:4
**acknowledges**
123:2
**act** 60:15 69:24
86:8,15,22 140:5
**acted** 150:16
**acting** 33:3 48:11
57:7 61:24

**action** 18:17,20
86:11 90:4 93:13
110:23 154:20
159:5,16 163:3
165:15
**actionable** 24:22
**actions** 15:18 18:14
18:15 24:5 27:21
**actively** 16:6
**acts** 19:13 44:25
66:25 67:2
**actual** 66:23,23
77:13 139:10
140:11
**adam** 3:15
**add** 7:13 24:2 29:2
55:10 100:5 137:6
**addendum** 125:1
**addition** 8:1 67:24
100:15 153:24
**additional** 74:18
100:5 165:12
**address** 39:14 90:8
121:10 124:15
126:15 127:18
141:15
**addressed** 39:15
**addressing** 157:19
**adds** 88:25
**adequate** 14:16
33:20 76:1,19 77:15
77:17,18,23 94:10
95:2
**adequately** 26:8
30:13 53:3 80:14
81:8
**adhesion** 69:17
**administration**
107:21 108:1,2,5
110:8 111:22 112:2
132:16 133:2
134:18 137:21
138:1,3,14,18 139:9
141:6 151:20
**administrator** 1:11
6:12 7:4 98:17
136:13 143:8

146:13
**administrators**
138:15,25 144:25
149:20
**admirably** 99:10
**admitted** 21:5,19
**ado** 134:16
**adopted** 89:5
**adv** 1:13 2:13
**advance** 136:25
**adversary** 157:5
158:11
**adverse** 45:2
**adversely** 138:18
**advertisement**
50:20
**advise** 144:22 145:1
**advised** 105:8
**advising** 89:21
**advocate** 110:4
**aetna** 38:16
**affect** 16:8 45:15
138:18 168:10
**affiliate** 14:2 64:3
72:16
**affiliates** 10:3 13:1
13:5 19:23 33:11
47:12 48:16 60:5
86:5,6 87:4 127:3
**affirmative** 76:6
82:14
**affirmatively** 16:6
**affirmed** 38:20
**afford** 96:10
**afternoon** 106:18
109:3,9 112:13
118:6 156:19 163:8
**age** 31:2
**agency** 23:8 85:19
86:16,18 88:25
**agenda** 6:15
**agent** 22:7,18,22
60:5,25 62:18 63:18
64:1,2 65:16 66:19
67:7,10 72:24 73:1
73:2 86:5,14,19
87:23

**agents** 62:17 66:13
66:18,24 70:16
86:22
**aggravated** 104:12
**aggregate** 114:1
**ago** 140:13
**agree** 41:4,7 50:11
59:15 66:2 70:16,21
84:1,3 87:21 90:9
95:22 116:25 155:5
155:10 167:21
**agreed** 20:14 51:4
53:15,23 59:21,22
60:4,9,11,12,23
62:14 63:17,21,22
63:23 64:1,1,2
65:15 68:14 69:13
73:6 87:3
**agreement** 8:5 12:2
20:2,18 23:13 29:7
35:17 47:22 59:6,16
59:23,24 60:2,7,17
61:16 62:6,18 63:10
63:14,15,20 64:21
64:23 65:8,12,18
71:16 73:21 74:20
74:25 83:14 87:11
88:5,6 94:3 99:12
99:13 100:5,6,14,16
117:21 123:24
127:2 132:18,20
146:3,4,7,16 151:10
151:11 152:18,23
152:24
**agreements** 7:1
13:10 55:23 56:1
61:12 87:13 100:15
127:1
**ah** 70:5
**ahead** 11:21 125:4
136:8 159:10
**aircraft** 101:24
**al** 5:5
**ala** 39:8
**alex** 33:7
**allan** 4:6

[allegation - assurance]                                                                Page 3

**allegation** 12:3,6
  14:6,9,20 15:12
  17:10,13 20:13,16
  21:21 23:8,10 26:7
  27:25 28:3,7,16
  32:16 34:5 38:18
  47:25 48:10,11
  50:23 60:21 64:1
  75:25 79:5 82:12
  91:2 93:20 103:11
  103:11 124:6
  134:20 154:8
**allegations** 8:10
  14:13 17:21 18:3
  26:5,6 27:2 28:18
  30:14 34:24 40:9
  42:6 54:10 55:9
  81:23 92:23 93:2
  94:6 111:12 116:14
**allege** 25:6,15,18
  26:8,18 28:3 29:11
  31:22 34:3 48:21
  50:1 90:19,22 95:15
  95:16 140:6 146:12
**alleged** 7:8 12:25
  13:1,3,4,18 16:3
  24:11 26:19 29:3
  35:1 40:9 49:25
  53:5 74:2 75:20,24
  76:8,9 80:1,19,23
  89:18 90:18,18,20
  96:1,2 140:8 154:18
  163:6
**allegedly** 136:15
**alleges** 27:18
**alleging** 78:8,21
  160:14
**allow** 40:2 58:19
  147:15
**allowable** 119:1
**allowed** 10:8,22
  56:4 112:3 119:2,17
  119:22 133:22,25
  134:14 143:9
  144:10
**allowing** 21:8 148:2

**allows** 146:19,21
**alluded** 56:8
**alter** 20:20 23:9
  64:10
**alternative** 150:11
  164:1,4 165:1
**ambiguous** 66:1,2,6
  81:13
**ambush** 68:21
**amend** 162:23
**amended** 89:11
  96:13
**american** 79:20
**americas** 4:3
**amount** 8:3 84:25
**amounts** 17:14
  111:3
**analogy** 70:14
**analysis** 43:21
  124:7
**analyzed** 110:3
**ancillary** 123:16
**andrew** 4:14 118:12
**answer** 15:15 18:1
  29:22 54:25 68:2,2
  69:9 84:23 93:14
  140:24 141:2
**answered** 149:1
**answers** 148:4
**anybody** 15:6 17:10
**apologize** 98:11
  114:6 118:7
**apparently** 32:23
  104:20 162:14
**appeal** 79:14 97:10
  97:12,18 154:22
  155:4,7
**appear** 51:10 55:19
  61:6
**appearance** 27:9
**appears** 91:6
**appellate** 155:19
  156:4,11
**apple** 9:14,15 29:19
  29:19,20,22,22
  31:17 51:16 83:15

**applicability** 95:24
  134:23
**applicable** 96:14
  137:6 153:21 155:1
**application** 43:24
  124:9 127:9
**applications** 140:9
**applied** 18:2 52:16
  79:13 82:11
**applies** 35:14 36:4
  39:19 75:17 78:22
  116:25 135:22
**apply** 26:5 28:11
  36:11 58:8 75:18
  76:2,3,20 77:5 79:7
  79:9 81:16 82:17
  110:17 112:16
**applying** 43:25
  110:18
**appreciate** 8:24
  37:10
**approach** 18:2
**approaching** 114:2
**appropriate** 50:13
  54:25 76:7 127:14
  130:25
**approximately**
  128:17
**arant** 5:1
**aren't** 136:22 141:8
  141:18
**argue** 15:17 93:10
  160:24
**argued** 68:24
**argument** 20:24
  24:17 30:10,11 32:5
  32:6 39:6 46:20
  49:6 51:16 58:5
  61:5 62:2 66:9 83:9
  88:25 93:12 99:14
  103:7 109:13
  115:17 136:21
  137:5,12 143:23
  153:23 157:17
  158:3,3,7 166:5
**arguments** 39:14
  50:20 56:2 65:16

95:23 99:11 141:24
  143:18 156:21
**arrangement** 18:25
  21:10
**arrive** 109:11
**arrived** 107:10
  109:12
**arrives** 106:1
  151:18
**articulated** 95:23
  162:20,24
**aside** 40:22 41:10
  41:16,17 64:10
**asked** 42:8 43:8
  152:3
**asking** 29:17 33:8
  107:5 141:3
**asks** 29:24
**aspects** 8:23
**assert** 9:3 55:16,17
  57:8,14,19,21 124:2
**asserted** 6:21,22
  7:12 10:7 28:25
  35:11 40:17 43:18
  55:20 56:13,20,22
  56:23 57:3 99:19
**asserting** 9:12
  11:25 30:7
**assertion** 32:14
**asserts** 103:16
**asset** 125:11
**assets** 19:16 27:20
  34:9 48:1 87:21
**associates** 113:18
**assume** 55:25 97:2
  106:3 131:17
  135:19 145:7,23,24
  147:9 155:10
**assumed** 20:10
  122:1
**assuming** 9:17,19
  9:21 49:24,25 58:1
  111:11 143:6
**assumption** 65:7
**assurance** 16:12,21
  32:10 91:1 120:19

**assurances** 17:2
35:16,25 119:21
**assuring** 92:4
**attach** 103:20
**attached** 103:24
123:15 125:1
129:21 144:19
148:16
**attaches** 107:13
**attachment** 7:21
51:1 76:16 94:24
**attack** 14:21,25
**attacking** 159:14
**attempt** 163:4
**attorney** 3:3 5:2
**attorneys** 3:11,19
4:2 8:3,12
**attorney's** 123:12
**audit** 91:15
**august** 16:2
**authority** 86:8
134:21 145:25
167:9
**authorization**
105:16,24 107:10
107:16 128:14,16
128:17 129:21,22
130:6,9,16 131:6
132:9 139:25
**authorizations**
130:25
**automatic** 138:12
139:12
**availability** 94:15
**available** 33:24
94:14
**avenue** 3:12,20 4:3
5:4 29:25 102:10,10
**aviation** 101:21
**awake** 104:4
**aware** 59:1 131:17

**b**

**b** 2:1 39:8,19 53:4
76:7 89:13,13,15
96:14 119:10 123:6
137:17 141:9
146:10 149:9,12

150:1 165:16
**back** 9:18 11:24
12:24 16:23 17:1,4
24:13 30:3 32:16
35:3 40:12 43:13
49:6 53:11 61:4
65:7 67:25 70:14
75:4 80:21,22,24
84:11 109:11 110:2
116:7 120:25 122:4
124:15 126:1
129:19,20 134:13
139:6,7 144:21
151:18,20 152:4,14
153:6 158:8,9 167:6
168:8,16
**background** 158:8
**backing** 124:22
**backwards** 21:15
**bad** 25:25 26:1,2
78:12 91:12 145:15
**bailee** 12:5 20:24
21:3,16,24 22:9,10
22:22 23:1 66:11,24
67:6 87:23
**bailees** 66:13,18
**bailment** 12:6,7,11
12:13 21:23 22:10
22:12 23:2 30:4
61:5 66:18,23 67:10
87:15,20
**bailor** 21:18 22:11
**ball** 99:23 104:19
105:18,19 107:15
**bang** 139:13
**bank** 26:23 27:13
68:22
**banking** 21:12
**bankruptcy** 1:1,19
2:3 41:2 49:1,3
77:21,25 157:7,19
159:13
**bar** 83:5
**barclays** 17:7
**barclay's** 109:19
140:21

**base** 127:11
**based** 11:16 15:17
21:1 27:7 50:15
51:3 53:19,21,24
57:2 68:13,19 96:5
106:2 117:1 136:22
136:24 156:21
159:7 160:16,18
**basic** 42:19
**basically** 10:2 14:8
17:14 18:19 21:9
42:13 47:3,10 48:17
69:17 77:8 87:18
**basis** 38:19 105:5
106:1 123:25
154:24
**bassett** 4:22
**bat** 104:18
**battle** 162:5
**bear** 11:23 94:11
**bearing** 124:4
**beautiful** 166:1
**began** 89:21
**beginning** 59:5
164:7
**behalf** 57:7 70:2
71:20 80:24 81:3
87:3 100:19 103:1
118:10 149:7 163:9
**belied** 135:9
**belief** 26:5 79:25
146:12
**beliefs** 34:25
**believe** 23:4 28:10
29:12 31:20 51:7
53:1 55:14 67:19,22
67:24 68:3 73:18
77:10 79:22 80:7
81:1 113:4 120:4
122:6 142:19 146:9
148:5 150:4,6 154:6
154:24 159:4
**believed** 33:2,5,7,22
76:4 79:19 94:13
140:20
**beneficiaries** 88:10
138:19

**beneficiary** 22:10
22:25 23:1
**benefit** 13:5 20:18
20:21 21:3,13,16
78:7 87:18 125:25
127:12 141:9
**benefits** 74:3,7,18
74:19 125:23
**berman** 34:10
**best** 92:24
**better** 14:21 69:9
88:9 93:8 108:20
166:3 167:12
**beyond** 13:14 15:21
16:3 18:20,20 19:14
45:4 116:10 143:17
167:22
**big** 149:23,23 150:8
**biggest** 99:16
**bilateral** 138:25
**billion** 33:24 78:10
92:15,19 94:15
144:17
**binding** 58:6,10
**birmingham** 5:5
**bit** 9:1 13:7 37:20
62:3 75:8 76:25
85:19 93:9 108:20
125:6 128:24
145:15
**blah** 63:5,5,5,5
**blaine** 57:22
**blanket** 117:15
130:17
**blink** 129:7
**block** 72:25 86:3
**boil** 48:1
**boiling** 125:21
**bona** 119:22
**bond** 148:18,22
**bonds** 103:23
124:21
**booked** 107:14,16
109:10 131:9
**borrowing** 127:11
**bottom** 57:21 74:4

[boult - capital]                                                               Page 5

boult 5:1
bowling 1:20
box 122:18 136:12
bradley 5:1
brainer 141:5
breach 7:8 35:22,23
36:14 63:10 111:17
111:18 112:9 146:2
146:3,4 148:17,24
157:14,18 158:4,19
158:22,24,25 159:5
159:7,19 160:14,20
160:21 161:11,16
162:8,10,10,23
164:4,12
breached 14:8
159:22,23
breaches 35:24
break 6:4 35:5
98:10 156:13
breaking 115:25
142:5
brevity 7:15
brief 21:22 26:21
36:13 64:7 65:20
72:13 75:16 79:8
85:14 94:22 95:7
153:18
briefed 118:22
briefing 97:6
137:15
briefly 17:22 84:15
briefs 37:16 95:23
brilliant 4:6 10:6
32:2 36:23 37:1,3,7
37:9,12,15,19,25
38:3,15 39:1,12,16
40:5,8 41:11,13,16
41:18,20,22,24 42:1
42:3,5,10,12,16,18
42:21,24 43:1,5,8
43:12 44:12,15,18
44:23 45:7,9,17,21
45:24 46:6,11 47:1
47:7,24 48:13 49:14
49:19 50:2,4,6,8,11
51:23 52:3,5,8,10

52:16,19,21,24 54:6
54:14,17,24 56:5,7
56:14,16,19,25
57:10,20 58:4,9,13
58:18,21 59:4 60:19
62:2,5,12 63:3,25
64:15,18,20 65:2,3
65:4,6 67:22 68:3,8
68:10,13 69:2,5,8
69:22 70:7,9,12,25
71:3,6,10,17,19
72:7,13 74:13,15,17
75:2,4,7,11 77:20
78:13,16,24 79:2,4
79:11,16 81:19 82:2
82:6,10 83:4,11,19
83:22 84:2,4,10,20
84:22 85:4,7,9 87:2
89:3 93:25 94:4,6
94:24 95:4 96:19,22
96:24 97:2,5,7,18
98:3,7
brilliant's 90:8
brilliant's 153:22
bring 83:24 166:13
brings 51:16 83:23
broad 6:14 13:8
14:25 18:19 19:9,22
24:7
broader 18:14 44:6
44:7
broadly 18:2
broke 14:8 91:16
broken 20:15
broker 16:22 17:6
20:6 40:22,24 42:2
47:12 48:7,15,16
59:21 60:11,15
61:20 62:14 63:24
66:10 67:14 69:25
72:2,3 86:8 88:19
131:13
brokerage 7:1,8 9:5
10:14 20:15 21:7,17
23:13 29:7 33:10,18
34:16 55:23 56:1
59:9,13,15 60:12,17

60:25 61:15 62:8,14
64:4,4,24 65:8,10
65:11 73:11,13
74:21 83:14 84:25
86:24 87:8,11 88:6
99:12 100:14
101:15,16 102:12
117:21 126:24
127:1 134:5 146:3,6
151:10,10
brokers 86:24
122:20
brother 69:13 74:7
brothers 1:6,10 3:3
3:11,19 6:12 7:2
13:15 19:22 25:7,8
25:10,11,12,19,20
27:22,23 28:20 33:2
34:16,20 45:5,14
48:19 49:2,11 50:25
53:12,24 54:6 57:5
57:7 59:8,11,12,14
59:17,22,23,25 60:4
60:8,12,18,23,25
62:7,10,18 63:16,18
63:20 64:24 65:13
65:14,15,16 70:20
71:12 72:1,8 73:9
73:10,11,16,21 86:1
86:4 87:12,14,19,22
87:23,24,25 88:2,7
90:1 98:16 99:8,25
102:2,6 103:12,18
105:13 107:11
110:20 125:14,15
125:19 130:18
152:2 153:25
163:10,10
brought 165:25
brown 4:9 118:10
bucket 124:2
building 4:17 102:9
bunch 28:11
bunker 122:4
burden 38:21
business 14:23,24
15:12 17:15 20:22

21:12 26:15 28:1
48:23 59:10 61:10
87:19 91:9,15 93:3
105:2 108:10,22,24
109:1 131:10
135:12 138:3
buy 29:20 49:10
buyer 22:22,24,25
buys 29:22
buzzed 134:3,3,3

c

c 2:2 3:1 6:1 146:11
147:5 170:1,1
calendar 119:3
135:12
call 8:17 19:13
24:10,14 31:13
32:25 35:16 75:22
75:23,25 78:9,21
79:1,2,5,7 80:21
83:13 89:19,21
90:21,23,24 95:9
96:5 109:8 128:11
131:3,14 157:21
called 33:5 80:20,24
87:16 96:4 100:5
102:18 104:16
108:22 125:10
145:19 152:17
161:20
calling 80:22
104:19 154:14
calls 35:19 52:1
candid 9:13
can't 109:3,4 129:2
130:17 142:20
143:14 145:2
148:24 151:19
158:15 159:17
160:9,24 161:6
165:2 167:2
capacity 48:11,12
129:12 131:1 132:8
capco 124:21
125:25 148:14,17
capital 25:12,14
31:9 140:21

capitalize 148:17
care 15:16 19:17
  28:25 29:7 117:19
careful 167:18
carries 91:23
carry 104:23
  107:12
carve 111:9 135:16
case 1:7,13 7:6 11:7
  20:8 25:21 26:23
  27:6,13 28:25 29:14
  34:22 36:1,1 38:16
  38:17 39:10 40:1
  42:14 43:22 44:19
  52:25 53:7 54:3,20
  55:18 67:9 68:7,18
  68:22 76:20 79:9
  83:12 86:17 92:12
  93:18 94:20,22
  95:14 96:12 102:22
  104:9 108:22 111:1
  120:3 122:21 133:4
  133:8 157:20
  161:18,19,20 164:8
  164:10 165:5
cases 14:10 20:12
  21:21 23:17 26:21
  28:11,15 35:12 36:5
  38:11 50:16 64:6
  66:16 72:11 86:14
  90:4 91:14 93:14
  94:21 114:1 160:8
  163:12 164:6 165:2
cash 33:25 92:15
  94:15 144:17
cast 149:20
categories 18:15
  34:24
categorize 8:25
category 15:1,14
  18:5 21:25
cause 15:2,14 35:6
  93:13,20 159:5,16
  163:3 165:15
caused 8:10 13:13
  15:20 41:6 48:4
  55:11 136:15

causes 15:13
caution 52:12 75:14
  75:23,24 76:3,19
  77:5,9 78:20 79:24
  89:17 90:5
cautionary 24:15
caveat 11:11
central 7:4,13 35:3
certain 11:13 17:14
  19:11 24:24 28:12
  28:12 62:13 70:15
  70:15 127:3 146:24
  148:8 151:7,13
  157:20
certainly 9:10 16:12
  24:21 26:4 49:7
  108:6 109:3,23
  110:15 143:3
certifications
  157:21 158:10,13
  158:15,16,17 160:5
  160:17 163:21
  164:9,13,14
certified 170:8
certify 170:3
ces 101:21,22
cet 170:8
chain 129:18
challenge 115:6
  116:13 119:18
challenging 145:3
chambers 37:9
chance 92:24
  164:23 166:8
change 18:4 124:7
changed 78:1
  109:25
changes 164:11
chaos 70:3
chapman 2:2
chapter 6:13 7:6
  10:21,22 11:12 12:4
  12:17 13:12 15:21
  20:5 24:20 25:21
  28:22 29:6 33:1
  34:22 43:22 91:24
  133:6

characterization
  19:7
characterizations
  77:2,6
chorus 6:3
chose 73:24
chronological 103:9
cindi 3:24
circuit 27:12 38:16
  38:21 39:23 76:23
circumstances
  22:23 104:12 110:7
  146:24
circumstantial 27:3
citation 25:16
cite 14:10 20:8,23
  21:21 26:20 27:5
  28:10,15 36:13
  50:16 52:24 64:5,8
  65:19 72:11 86:16
  90:4 93:18 94:21
  135:6 138:14
cited 27:13 33:25
  35:12 38:12 86:14
  94:15,22 108:20,22
  160:9
cites 66:15
citibank 108:23
city 83:10
claim 6:14,24 7:4,7
  7:13,18,20,21 8:13
  8:18 9:3,4,4,7,8
  11:25 14:4 15:17
  16:7 21:13 23:19
  24:2 25:6,18 27:17
  36:6,16 38:9,19,21
  38:23,24 39:1,5
  40:5,15,17 41:12,14
  41:17 43:2,3 51:8,9
  56:4,12,22,23 57:3
  57:8,25 59:19 64:14
  64:25 67:19 68:24
  74:5 80:19,23 81:8
  82:22 89:6,10 90:12
  94:4,25 95:15 96:5
  99:21 100:8,9,23
  101:1 112:19,20,23

112:25 113:24
  115:8,10,17 116:8
  116:20,23,25
  117:13 118:23
  119:12,21 120:22
  121:6,10,15 124:2,3
  124:21,23 125:2
  126:5,5 127:23,25
  128:7 132:6 133:1,4
  133:5,8,22,25
  134:14 137:12
  139:21,21 140:12
  140:17 143:9
  144:10 146:4
  147:13 148:14,15
  148:15,16 150:3,5
  150:19,21 153:24
  154:10 156:2,2
  157:9,13,15,18,18
  158:2,4,5 161:23
  162:9,12,24
claimant 8:2,7
  12:15 14:12 33:11
  33:16 34:19
claimants 6:17
  43:16,18,18 100:11
  100:20 138:20
claimed 12:19
claims 2:8,8,11,11
  6:14,16,21,25 7:9
  7:13,14 8:11 10:8
  10:14 11:13,14 13:8
  19:19 24:3,9 35:11
  35:12,14 36:18
  40:17,18 43:14,19
  55:2,15,21 56:7,9
  56:10,10 58:13
  64:11,12 67:24 75:5
  75:12 81:9 83:12,23
  83:24 84:2,8 95:22
  96:2,5,8 98:18
  99:17 101:2,2
  111:18 112:3,24
  115:7 117:6 118:17
  119:1 122:14 123:5
  123:7,10 124:4,5,17
  124:19,23,25 126:2

136:13,14,22,23
141:19 148:7,12
149:24 154:12,17
157:5,7,20 169:6,6
169:9,9
**clarify** 10:18 84:16
167:6
**clarity** 141:4 153:8
**classic** 25:23 148:10
165:1,5
**clause** 13:9,16,16
13:17 14:19 15:9
16:9 17:16,17,18
18:1,2,11,19,24
19:2 21:2,2,6,15,17
28:24 46:23 73:18
81:17 85:18 93:17
101:9,10 102:18,18
102:19 110:4,5,19
111:6,9 124:9
135:17,21 136:3
137:18
**clauses** 14:19 15:1
93:19 101:7 102:16
102:20 136:19
**clean** 91:15
**clear** 7:19 20:7
21:22 38:6 40:20
61:16 63:15 66:4
79:12 86:25 87:8
90:21 91:10 96:17
97:21 114:21
153:19 154:11
164:7 167:9
**clearer** 71:4
**clearing** 18:16
110:21
**clearly** 20:14 24:12
26:13 28:19 39:20
55:18 60:16 73:22
87:20 110:13 117:1
**clever** 54:22,25
**client** 33:3 47:14
62:21 63:3 81:2
84:16,22
**clients** 56:1 84:25

**client's** 127:8
**close** 131:10 144:13
**closed** 46:2 106:4
131:25 144:2
**clouds** 93:4
**cob** 107:1
**code** 157:7
**coexist** 159:17
**cohen** 4:21 162:25
163:7,8,9,16,18,20
163:25 164:18,20
164:25 165:8,22
166:18,20,23
168:11,15,19
**collapse** 27:24 28:8
**collateral** 21:9 22:2
61:14,15,17 87:22
88:3,16,17 147:7
**collateralization**
21:10
**colleague** 37:13
**colleagues** 134:2
**colloquy** 40:20
**colt** 3:18 98:15
**combination** 11:2
73:17
**combined** 162:8
**come** 16:18 24:13
26:21 35:19,21
47:21 49:6 54:22
93:13 117:18
129:22 158:9 168:7
**comes** 9:1 36:8
62:21 63:3 76:18
81:23 117:23
124:12 131:22
136:14
**comfort** 101:17
**comfortable** 34:19
102:19
**coming** 26:3 37:4
84:13 92:19 98:23
151:23 166:14
**commence** 45:16
**commenced** 8:6
13:4 25:21,22 34:22
46:5 129:18

**commencement**
108:4
**commences** 45:14
**comment** 121:12
**commented** 166:20
**comments** 51:10
118:19 166:21
168:16
**commercial** 27:22
33:10 34:15
**commit** 27:2
**commitment**
108:11
**committed** 28:17
**commodities** 18:17
**common** 91:20 92:6
**communication**
77:6 92:18
**communications**
51:12
**companies** 101:23
**company** 55:14
67:4 81:5 141:22
**complain** 119:16
**complaint** 2:14
38:10 39:24 53:3
55:6 89:11,11 95:14
157:5,23 158:11
159:12,18,19,19
160:2,4,4,7 161:1,4
162:23 169:12
**complaints** 38:13
**complete** 18:1
108:11
**completed** 138:13
**completely** 9:13
34:3 107:22 146:21
**completing** 105:25
**complex** 9:11
**complies** 96:13
**comply** 87:25
**comprehending**
66:25
**compromising** 67:1
**computed** 112:4
**computers** 114:3

**concede** 111:20
**conceded** 52:6,11
163:20
**concept** 19:24,24
36:13 49:7
**concern** 114:8
**concerned** 12:21
125:20 163:13
**concerns** 33:13
**conclude** 160:19
**concluded** 168:21
**conclusion** 47:21
**conclusory** 23:9
30:14
**concoct** 16:19
**condition** 25:21
33:17 51:14 110:15
**conditions** 13:14
15:21 45:4 59:7
**conduct** 109:21
160:21 164:20
**conference** 75:21
75:22,24 120:6
155:14
**confident** 118:23
**confidentiality**
166:10
**confirmed** 49:23
112:3 123:3
**confirming** 107:13
**confirms** 108:23
**conflicts** 98:16
153:2
**confused** 119:9
133:23 143:10
**congress** 18:10
**connection** 33:9
38:9,10 40:14 50:19
68:11,23,24 75:15
88:2 99:19 110:20
111:21 140:22
**conscious** 27:3
**consent** 88:3 119:3
162:15
**consequences** 91:24
**consequential**
123:19 148:10,12

154:19
consideration 59:14
  87:14
considered 13:16
  53:8
consistency 99:7
consistent 18:8,9
  35:3 57:4 96:9,11
  99:6
conspiracy 50:3
constellation 163:6
consternation
  142:24
constitute 92:6
constituted 160:21
construct 155:2
construction 67:2
constructive 66:25
contain 7:1
contained 40:21
  89:22
contains 7:22
contested 11:4
context 47:12,24
  53:6 58:11 62:20
  76:7 82:11,24 90:12
  90:17 138:16
  139:24
contingents 35:15
continue 15:11
  16:16 17:12 25:13
  25:14 34:17 48:23
  80:10 161:24
continued 17:6
continuing 34:19
contract 7:4,8,13
  12:11 14:8 17:22
  19:20,24 20:9,14
  21:2,2 22:21,21
  23:15 32:14 35:12
  35:18,20,22,23,24
  35:24 36:1,5,7,7,10
  36:14,19 40:17,22
  41:14 43:2 44:19
  48:2 57:16 58:25
  59:6 60:9,22,23
  64:15,22 65:13,13

65:14 67:17 68:14
  68:19 69:12,12,16
  69:17 72:14 74:2,8
  81:9,11,21 82:7
  85:23 87:7,8 88:25
  91:1 92:6,8 95:22
  96:2 101:2,2 102:21
  111:17,18 112:9
  123:23,25 124:5
  126:25 130:2,8
  134:5 148:17,25
  151:9 157:18 158:5
  158:5,9,13,16,18,23
  158:25 159:2,8,20
  160:14 161:23
  162:8,12,24 163:21
  163:23 164:10,10
  164:12,13,15,20
contract's 85:20
contracts 20:22
  24:3 46:21 59:2
  87:13 122:20 126:3
  135:11
contractual 11:16
  145:25 153:24
  159:25
contradicting 69:20
contrary 68:5,5
  144:18
contributing 15:13
contribution 93:21
control 13:15 15:7
  15:21 18:20,21
  19:14 23:11 45:5,10
  47:5 100:18 110:16
  128:2 131:12
  140:21
controlling 47:21
convenient 141:4
conversation 24:11
  34:22 50:21 78:18
  96:7
conversations 16:4
  53:19 84:6
conversely 83:1
convert 92:10

conveyed 34:16,18
convince 25:8 111:1
  161:24
copy 166:24
corporate 27:8,9
  123:14 148:7,8
corporation 20:19
corporations 23:15
correct 56:11,25
  97:24 133:11
  141:10 149:17
  157:11 158:14,20
  161:8
corrections 86:17
corresponds 12:22
cost 9:24
costs 8:2 9:12
couldn't 77:9
  139:12 148:7
could've 139:13
  143:22 144:2
counsel 49:3 94:8
  94:20 98:16 103:2
count 108:10
  157:18 158:1,5
  159:12,13,15,19,25
  160:11 162:24
  165:20 168:14
counted 108:21
counterparties 25:8
  61:12 88:15
counterparty 22:1
  22:13,14 34:20
  61:14,24
country 170:23
counts 2:14 157:5
  157:10,25 158:20
  159:13 160:12
  161:5 162:8 169:11
couple 66:15 89:1
  125:22 144:15
  151:21
course 10:1 20:19
  34:17 48:23 84:17
  90:17 102:3 118:2
  141:21 145:1
  147:25 153:17

155:7 160:20
  167:13
court 1:1,19 6:2,4,9
  6:10,20 7:24 8:17
  8:22 9:17,19,21
  10:4,12,17,20,23
  11:3,6,10,15,18,20
  12:5,9 13:23 14:1
  15:7,23 16:1,11,18
  16:20 17:19,24 19:4
  19:6 20:3 21:25
  22:4,6,13,16,19
  23:3 30:7,10,22,24
  31:1,5,12,16,23,25
  32:5,19,21 36:19,21
  36:24 37:2,6,8,11
  37:13,18,23 38:2,14
  38:20,25 39:2,13
  40:4,7 41:9,12,14
  41:17,19,21,23,25
  42:2,4,6,11,13,17
  42:19,22,25 43:4,7
  43:11 44:5,11,14,17
  45:6,8,12,20,23
  46:4,10,19 47:6,23
  48:6 49:5,15,22
  50:3,5,7,9 51:6,24
  52:4,6,9,15,18,20
  52:23 53:2,4 54:5
  54:11,12,15,19 56:3
  56:6,12,15,17,21
  57:2,18 58:2,5,12
  58:17,20 59:3 60:14
  61:2 62:4,11 63:2
  63:22 64:9,17,19,22
  65:3,5 66:22 67:5
  67:18 68:2,5,7,9,12
  68:21,23 69:3,6,19
  69:24 70:8,10,24
  71:1,4,9,13,18 72:6
  72:12 74:11,14,16
  75:1,3,6,10 76:23
  77:17 78:8,14,23
  79:1,3,10,12,15
  81:16,25 82:5,9
  83:1,8,20 84:1,3,9
  84:11,17,21 85:3,5

[court - deal]    Page 9

85:8,12,21 86:10,12
87:2 88:12,14,22
89:6,13 90:8,14
91:19 92:14 93:9,23
94:3,5,23 95:1,5,8
95:12,18 96:22 97:1
97:4,6,9,16,20,24
98:4,9,13,22 99:2
99:18 101:8 102:24
103:2,5 105:7,10
106:7,10,13,15,17
106:19,24 107:1,3,8
108:14,18,20,22
111:5,8 112:18,22
113:1,9,11,13,16,20
113:22,25 114:12
114:14,17,19,21,23
114:25 115:3,7,9,12
115:15,19,22,25
116:2,6,11,14,17,20
116:23 117:6,11,17
117:20,24 118:3,7
118:13,20,24 119:7
119:9,12,15,19,23
120:9,14,17,21,24
121:1,5,8,11,14,17
121:20,22,25 122:3
122:8,10,13,15
123:8,12,19,21
124:1,14,24 125:4,7
125:12 126:9,12,18
127:6,20 128:6,8,10
128:13,21 129:1,4
129:14,17 130:4,13
131:8,10,16,21
132:10,13,22 133:3
133:9,11,14,19
134:7,11,16 135:2
135:14,24 136:2,6,8
136:18 137:9,22,25
138:2,8,11,22 139:3
139:16 140:1,6,11
140:18,23 141:1,13
141:16,20,23 142:2
142:5,8,14,22,24
143:16 144:1,4,7
145:6,10,17,19

146:1,15,20 147:2,4
147:6,8,19,24
148:10 149:2,4,6,12
149:22 150:11
151:6,15,17,25
152:3,12,21 153:3
153:11,14 154:2,4
155:14,16,20 156:8
156:17,24 157:1,3,6
157:8,10,12,17,22
157:24 158:7,12,15
158:21 159:10,18
160:6,9,16,18 161:2
161:6,9,14,19,22
162:1,4,7,21,24,25
163:15,17,19,24
164:9,17,19,22
165:1,9,24 166:2,6
166:7,10,12,16,22
166:24 167:2,11,12
167:15,16,20,21
168:1,4,5,6,12,18
168:20
courtroom  118:14
courts  46:12
court's  156:22
  160:10,13
covenant  157:15,17
  158:2,4,22 159:1,5
  159:12,13,14,23
  160:21,22 161:11
  161:17 162:11
  163:22 164:4,17
cover  34:12 93:20
covered  14:19
  163:23
covers  18:19
cox  5:7 156:19,19
  156:25 157:4,9,11
  157:13,25 158:14
  158:20 159:9,11
  160:2,7,24 161:3,8
  161:13,18,21,25
  162:3,6,18 165:11
  166:1,5,7,11,13
  167:1,12,17,24
  168:2

cra  138:24
create  86:21 93:16
created  102:2
creates  88:14
creating  61:22,23
  145:5
creation  88:5
creative  7:7 23:6,21
  36:17
credence  154:7
credibility  129:25
credit  98:19 99:25
  100:12 103:19
  118:11 125:15,20
  125:21 130:21
creditors  23:21
crisis  51:18
critical  7:22 18:13
cross  21:9 26:22
crowd  83:2 84:13
  88:19
crybabies  112:8
crybaby  114:1
crystal  105:18,19
cuff  51:13
cummings  5:1
current  77:14,14
  78:3 89:24 91:3
currently  78:3
curtis  3:18 98:15
cusips  103:25
custodian  67:7
custody  100:18
  152:18,23
customer  9:5,8 21:7
  21:17 29:21,23,23
  34:19 56:4 59:10,23
  60:1,10 62:9 64:11
  64:12,13,23,23 73:9
  125:11 126:1 127:9
  133:25 134:6
  136:24
customers  25:8
  33:21 40:25 51:12
  65:9,10,11 80:6
  94:11 122:20
  125:16 136:11

customer's  140:3
cut  129:21
cute  133:14
cuts  51:15,21 53:1
  95:8
cutting  149:24

**d**

d  6:1 38:12 169:1
  170:8
damages  8:2 13:3
  13:18 40:11 41:6
  46:18 47:2,4,7,18
  48:3,9 55:2 82:20
  90:11 91:25 123:16
  123:19,20 124:7
  148:10,13 154:18
  154:19
dare  118:16
dark  151:23
dash  4:14 118:12,13
  118:14
date  8:5,6 12:20,21
  12:23 83:5 92:10
  97:19 104:24
  170:12
dated  140:17
david  4:21 163:8
dawn  2:24 170:3,7
day  31:5 46:2 49:9
  104:14,21 105:21
  107:17 117:25
  128:16 129:13
  134:1 140:25
  143:19,19 154:5
  155:6 156:1,6
  160:13 165:17
  166:18 168:20
days  24:20 25:19
  34:21 96:23,24
  105:2 108:10,22,24
  108:24,25 109:1
  132:5 135:12,12
  139:17,22,24,25
dc  3:6 4:19
deal  12:7 15:1,6
  20:4 26:22 38:13
  107:6 125:24

163:13
**dealer** 16:22 17:6
40:22,24 47:12 48:7
48:15,16 62:14
63:24 66:10 67:14
**dealers** 20:6 42:2
**dealing** 54:7 157:15
158:23 159:1,6,24
160:22 161:12,17
162:11 164:5
**deals** 6:15 18:15
43:2,16 59:24
**dealt** 43:9,18,25
90:22 151:2 152:4
**death** 95:8
**debra** 2:24
**debtor** 8:1 13:24
25:21 28:21 34:22
38:23 42:9,15 59:18
153:1
**debtor's** 15:21
55:12
**debtors** 1:8 7:5 10:8
12:4,17 20:5 28:22
29:14 55:3 99:8
100:25,25 101:3,14
101:18,25 102:4,13
103:13 107:24
113:23 133:6
141:18 165:11
**dechert** 4:1
**decide** 45:13
**decided** 45:15 53:25
54:13 55:3,15 88:9
**decides** 105:20
**deciding** 19:15
88:22 149:24
**decision** 68:6,22
97:13,17 98:2 101:5
110:10 161:16
**deckard** 63:4,5,7,8
63:9,12,12
**declarant** 100:19
103:1
**declaration** 100:20
103:9,15,16,17
125:10,18 126:22

128:24 129:6
130:25 144:20,22
**declarations** 125:6
**declared** 44:25
**deemed** 65:22
**deep** 19:10
**defeat** 118:17
**defect** 28:4
**defective** 7:15
**defendant** 1:15 27:1
67:6 156:20
**defendant's** 67:10
**defendants** 102:13
166:21
**defended** 99:9
**defense** 76:6 82:15
**deficiencies** 96:9
**deficient** 26:18
**defined** 19:11 59:8
59:17 63:16 73:16
86:2
**defines** 87:10
**definitely** 54:15
**definition** 19:22
**defraud** 41:3 47:14
48:20 82:19
**delay** 16:25 17:9,11
23:22 131:2
**delays** 37:5
**delegate** 86:24
**delighted** 162:16
165:24
**delivered** 104:20
**delivery** 66:24,25
67:2,3,10
**delta** 112:5
**demand** 67:11
**demanding** 27:20
**demonstrate** 162:10
**denial** 167:7
**deny** 165:19
**denying** 168:7
**department** 81:3
86:17
**departs** 99:5
**deposition** 166:14
167:5

**depreciation** 34:9
**deprive** 156:4
**derivative** 56:10
**describe** 103:13
148:9
**described** 88:12
**describes** 100:21
**description** 110:6
**designate** 70:15
**designated** 119:22
**designed** 15:1 50:22
50:23
**desirable** 138:17
**desk** 109:23,24
130:18
**despite** 25:10
**detail** 97:11 142:1
**determination**
39:19 53:8 61:7
156:6
**determined** 53:21
**determines** 164:9
**deviate** 99:10
**diagram** 116:18
117:12
**diagrams** 99:4
**didn't** 100:23 101:4
107:17,18 109:24
113:4 115:21 119:3
121:11 124:19
128:1,10 130:16
134:21 139:10
143:2,2,11 145:25
147:10 152:7
158:19 161:15
164:23
**differ** 165:14
**difference** 18:13,22
66:5 100:3 106:23
159:4 162:19
**differences** 13:21
43:6 58:11 99:16
**different** 9:2,4
11:15,18 14:11
40:15,16,23 42:9
43:16,17,22 44:3
46:8 47:20,22,24

54:7,9,10 55:24
59:2 62:19 73:15
74:8 78:17 99:3
100:5 122:21 135:8
142:13 143:18
152:10,12 159:25
160:25 161:5 163:2
**differential** 111:25
**differently** 9:7
14:13
**diminished** 9:9
**diminuation** 99:21
**diminution** 8:4,13
8:18,21 9:3,6,19,21
9:22 56:12,22,23
57:3,8 67:24 139:20
**direct** 10:6 25:19
152:20
**directions** 29:24
30:1
**directly** 13:13,19
14:15 15:19 47:15
100:6 123:24
136:15
**disagree** 42:7 45:13
70:19,22 82:4 121:1
**disallowed** 133:10
**discern** 67:17
**disclaimer** 89:21
**disclaimers** 24:15
**disclosed** 76:17
**discovery** 81:14
113:5 119:25
120:20 121:3,17
123:6 134:1 149:19
149:19 152:15,16
152:17,23 155:10
168:2
**discussed** 78:4
**discussion** 85:25
**dismiss** 2:13 53:9
54:13 88:23 89:12
90:17 115:4 157:2,4
157:14 159:15
164:2 167:20,22
169:11

**dismissed** 38:18
96:3,5,8 157:6,20
159:14
**disposition** 11:6
156:10
**dispositions** 11:8
**dispositive** 58:7,10
83:18 95:25
**dispute** 109:5
118:18 123:1,4
142:20 151:24
158:12
**disputed** 135:13,14
146:16 149:25
**disregard** 29:4
**distinction** 46:23
95:25
**distinguish** 41:10
41:15
**distinguishes** 91:22
**distressed** 51:17
**district** 1:2 26:24
38:20 54:12 68:7,22
79:12 167:11,15,20
168:6
**dive** 126:15
**dividend** 20:21
**doc** 2:7,10,13 169:5
169:8,11
**docket** 113:19
114:4 128:24
**dockets** 114:1
**doctrine** 20:20
32:12 35:10,13 36:4
36:11,12 91:10
**document** 59:24
71:8 78:20 88:14
103:15,20 105:6,22
114:16,19 125:10
125:13,18 129:20
152:17,19 157:21
160:5,17
**documentation**
150:24
**documents** 67:7
129:17 150:13
158:10 166:15

**doesn't** 103:20
109:2 111:11
118:21 124:4 126:9
128:21 129:21,22
130:8 135:17,18
137:6 138:4 145:11
145:12 152:10
154:9 161:22 168:9
**dog** 91:21
**doing** 14:23 17:15
28:1 55:5 72:24
74:14 87:1 93:8
103:8 138:25 145:4
**dola** 52:25
**don't** 100:3 103:15
105:9 114:10 116:2
117:4,22 118:1
119:16 120:2,11,15
121:1 122:4 124:7
129:24 130:6,6
131:20 134:22
135:6,15,20 137:19
137:22 139:7 140:7
143:13 144:7,8
145:4,21,21,21
146:9,10,10,15,25
147:12 148:8,19
149:6,10,15 150:5,6
152:9 154:3,5,16,17
155:22 156:10
159:16 161:13,23
162:13 163:1 164:6
165:10 167:9,13,18
**door** 139:13 148:13
**double** 163:14
164:23,24
**doubt** 109:5,25
111:20 132:24,25
**doubts** 49:16 92:9
**downturn** 83:17
**drabs** 149:18
**drafted** 61:6
**drafts** 166:20
**drawing** 99:4
**draws** 46:24
**dress** 148:24

**dribs** 149:18
**driven** 144:11
**droning** 69:10
**dropping** 166:4
**due** 39:22 83:11
96:11 145:1
**duplicate** 161:5
**duplicates** 158:4
**duplicative** 32:13
35:12 36:6
**duration** 12:19
**duties** 20:2
**duty** 19:25 29:9,16
30:5

**e**

**e** 2:1,1 3:1,1 6:1,1
7:5 102:25 103:1
104:13,16 105:12
107:13 111:2
131:22 144:20
147:4,5 166:25
168:13 169:1 170:1
**earlier** 82:19
156:21 166:20
**earliest** 109:5
**early** 31:2 32:25
95:10,13 107:20
138:15 168:4
**earn** 26:16 27:15
**earnings** 24:10,14
35:15 52:1 79:1,2,5
83:13 89:19 90:21
96:5
**earth** 45:3
**easier** 91:17
**easy** 147:12 153:6
156:23
**eclipse** 156:11
**economic** 36:12
148:24
**edit** 34:12
**effect** 88:10 89:5
102:17 126:21
**effective** 70:23
128:1
**effectively** 107:22
108:2

**effectiveness** 16:8,9
**effects** 9:23
**effectuate** 129:9
139:1,10
**efficient** 115:15
**effort** 14:14
**efforts** 7:7
**ego** 20:20 23:9
64:10
**eight** 6:23
**eighth** 2:10 169:8
**eighty** 2:7,10 6:16
169:5,8
**either** 26:7 27:1
29:11 45:21 71:21
71:22 81:21 102:19
120:12 146:5,6
162:9 164:12
165:17
**elaborate** 154:23
**electronic** 166:24
170:8
**element** 26:10
124:20 127:25
**elements** 30:13,19
77:1 124:17
**eliminated** 24:18
**ellipses** 13:11
110:23
**emanating** 106:10
**embedded** 78:3
**empirical** 83:23
**employee** 29:13,19
48:12,18
**employees** 76:21
79:9 93:6
**employer** 24:12
**en** 127:8
**encouraged** 28:1
**ended** 143:9
**enforced** 46:17 48:3
**engage** 61:11
120:19
**engagement** 63:4
100:6
**england** 141:2

enjoy 165:25
enormous 101:18
enter 72:14 97:15
97:16 166:16 167:3
167:4,9
entered 63:20 87:14
100:13,15 166:17
entering 138:25
enterprise 27:24
28:8 125:16 127:12
153:25
entire 48:22 63:15
157:20 158:1
entirely 160:4
entities 4:2 8:1 21:4
21:7,11 22:11 23:12
23:13 27:21 33:4,9
33:10,14,17 40:23
43:12 48:18,20
51:12 56:24 59:18
60:8 61:10 62:7,16
62:25 63:17,20
64:14 65:1,17 67:20
67:20 68:14 69:13
70:21 71:14,20 72:4
72:16,21,23 73:1,2
74:3,7 80:25 81:4
87:19,23,24 88:7,15
88:17 101:22 102:8
entitled 86:23 120:1
163:4
entity 14:5,6,21
21:19,21 28:17 30:2
42:11 43:10 56:11
60:15 61:17,18 63:7
73:4 80:18 87:22,25
88:2 102:2 144:23
151:3
entries 114:2
entry 113:21
episode 113:11
equally 155:1
equity 34:12,14
equivalent 15:4
67:2 110:9
escrow 22:18,21,22
22:25

especially 37:13
38:11
esq 3:8,15,16,23,24
4:6,7,13,14,21,22
5:7
essence 8:13 15:4
29:17
essentially 15:12
30:12 32:10 89:11
90:20 110:12
established 67:9
102:6
estate 22:21 34:15
108:2
estates 6:13 10:21
10:22 11:12 13:12
133:13 134:10
estimates 89:24
ether 153:10,12
europe 63:7,8,9,9
63:12
evaluate 122:22
eve 40:24 41:23
evening 106:20
event 14:16 15:5
39:23 48:9 69:1
91:12 105:11
events 24:10,19
44:21 45:2 46:24,25
89:25 101:9 102:17
109:12 110:5,14,16
123:14 124:8
129:18 139:10
148:8
eventually 143:9
everybody 10:1
31:2,6,8,9 57:7
61:21,24 83:13,13
83:14 107:7 138:24
151:22
everybody's 17:4
everyday 66:13
evidence 27:3 65:25
66:7 113:4 126:21
126:23 127:16,16
131:15 133:17
135:11 137:19

150:24
evolves 138:20
ex 72:2
exact 56:17
exactly 8:21 85:7
102:12 111:14
144:4 148:11
164:18 166:11
exaggeration 132:4
examiner 21:5 80:4
example 61:8 62:19
77:3 91:14 165:5
excellent 133:3
exception 111:9
154:14
exchange 8:11,20
9:23 44:24 46:2
55:4 112:1,1
excluded 18:6
147:13
excludes 18:12
exclusion 110:16
exclusions 73:24
exculpates 13:12
exculpation 17:16
17:18 19:8 40:21
41:4 46:16 58:19
71:11 82:8 101:7,7
117:5 122:22 124:9
124:11 126:16
134:24 141:12,17
153:17,21
exculpations 126:7
135:4
exculpatory 18:19
24:7
excuse 36:10
execute 70:2
executed 70:1
executing 72:2,3
execution 18:16
110:21
executive 81:2
executives 27:23
28:6,20 91:5
exhibit 125:10
144:19,20,21

148:16
exist 19:18 61:23
84:2
existed 130:13
existence 124:5,6
exists 66:23
exits 104:3
expect 40:1 105:4
109:4 118:1
expectation 19:1
expectations 89:24
164:14,15
expected 148:3
expense 165:12
experience 83:23
explain 17:15 158:8
explains 97:11
exploring 141:9
exposed 14:25
exposure 27:22
express 158:5,25
159:8,22 160:1,15
162:10 165:16
expressed 33:13
expressly 18:12
extend 97:18
extensive 24:15
134:1
extent 19:14 39:18
46:17 64:20 66:3
81:10 84:5 97:12
126:4 133:21
134:17,19
extraordinary
44:21 101:9 102:17
108:15 110:5,16
extrapolate 76:24
extreme 55:8,11
extremely 98:6
eye 3:4 129:8
149:14

**f**

f 2:1 170:1
f.3d 27:11 76:22
f.supp. 79:20
f.supp.2d 26:23

**fabled** 136:12
**facie** 67:9
**facing** 161:4,4
**fact** 18:5 20:3 25:10
29:18 35:2,3 36:9
43:9 50:14 53:7,24
55:17,24 57:13 79:6
79:23 92:9 104:6
105:19 113:7
115:10 121:3 127:7
132:19 135:13,14
138:14 144:19
145:5 149:25 150:1
150:2,14 153:21
**facts** 6:20,22 7:22
11:24 21:19 23:7
29:4,12,18 30:14,16
33:5 34:3 36:19
41:15 54:9,13 75:18
75:19,20 76:1,10,24
77:7,14 78:3 88:22
90:24,25 91:3 107:7
122:21 141:8,10
144:24 146:16
163:6 164:8 165:6
165:10
**factual** 13:21 61:7
80:7 150:19 159:7
**facty** 120:7
**fail** 3:16 7:13 10:16
10:17,19,25 11:1,8
11:11,16,19 109:19
**failed** 148:17
**failing** 23:19
**failure** 20:11 45:1
67:11 91:9 93:3
123:14 136:24
137:13
**fair** 8:20 60:21
88:21 143:2 157:15
158:23 159:1,6,24
160:22 161:12,17
162:11 164:5
**fairly** 164:6
**faith** 157:15 158:23
159:1,6,24 160:22
161:11,17 162:11

164:5
**fall** 83:17 154:12
**falls** 110:21
**false** 26:11,20 28:19
34:4 91:3 92:2,21
92:22
**falsity** 26:7 91:11
**familiar** 68:18
125:9
**famously** 91:21
**far** 122:18 135:7
139:19
**fascinating** 165:10
**fatally** 26:18
**fault** 114:9
**favor** 160:23
**favorite** 136:11
**fax** 131:14
**fdic** 92:19
**february** 1:23
166:14 170:12
**fed** 109:19
**federal** 5:3 34:1
94:16
**feeds** 32:12
**feel** 162:22
**feels** 120:6
**fees** 8:3,12 26:16
27:15 123:12
**feet** 154:12
**fellows** 148:3
**fide** 119:22
**fifth** 3:12 5:4
**figure** 99:5 156:8
159:3
**file** 89:6,8 96:13
168:3
**filed** 11:4 39:5,19
39:23 40:5 42:13
53:12 55:2,5 59:18
77:25 98:18 125:6
128:24 140:9,24
141:6
**filing** 8:14 12:22
33:1 41:2 49:1 65:9
77:21

**fill** 49:16 116:17
117:12
**final** 97:22 104:4
155:5,21,25 167:10
**finale** 90:9
**finally** 12:19 30:21
35:10 37:7 107:10
**financed** 33:21
94:11
**financial** 25:9,20
33:9,14,17 49:13
51:14
**financing** 33:24,25
94:14,16 141:22
163:11
**find** 8:9 24:17 42:22
44:14 59:5 81:22
124:25 158:18
160:23
**finding** 67:6,9
85:16
**fine** 8:19 48:24
96:24 146:17 156:9
165:22 167:1 168:5
168:5
**fire** 140:4
**fires** 45:1
**firm** 9:5 51:18
62:21,24 63:14
70:14
**firm's** 77:4 89:24
**firms** 62:25
**first** 7:18,21 12:1
19:7,11,21 21:1
25:3 43:23 44:1
52:24 60:16 68:22
73:8 75:12,15 85:14
85:22,24 87:10
99:16 113:3 125:10
131:20 134:1
136:21 137:5
139:20 140:19,25
**fit** 23:6 110:7
123:22
**fits** 21:25 138:24
**five** 103:24 104:1
104:24 106:22,22

140:9
**flash** 149:22
**fleshed** 153:16
**floodgates** 83:6,9
**flooding** 45:1
**flowed** 13:18
**flowing** 130:1
**focus** 15:23
**fold** 31:6
**folks** 84:12 95:19
98:23 99:22,23
101:21 150:16
**follow** 58:7 61:8
97:17 104:19 114:3
130:22
**followed** 91:12
96:12 121:21
**following** 59:15
121:23 129:24
**follows** 59:16
**footnote** 36:4 51:7,8
51:9,21 111:15
**force** 13:8 14:18
15:1 16:9 17:17,25
19:7 28:24 41:5,7
42:14 43:24 44:2,6
44:9 48:8 81:16
82:7 85:17 93:17,19
102:18 111:6,8
124:9 134:23
135:17,21,25
136:13,19 137:18
141:7 154:15
**forced** 110:4
**forecast** 76:23
**foregoing** 170:3
**foreign** 8:11,20
9:23
**foremost** 131:20
**forgot** 51:25
**form** 21:9 69:16
73:21
**formation** 164:15
**forth** 59:7 126:5,22
159:22 162:23
**forward** 77:1,1 78:6
89:22 111:24 120:1

120:23 122:9 163:4
**found**  13:17 21:5
53:2,4 66:22 76:23
**foundation**  36:9
**four**  2:7,10 6:15,23
85:23 101:22
104:24 131:25
132:3 139:17 140:9
157:4,25 169:5,8
**fours**  69:1 154:25
**frame**  54:8
**frankly**  10:1 15:10
42:22 104:3 105:9
108:19 118:1
145:21 163:5 165:9
**fraud**  14:14 15:11
16:7 25:3,23 26:5,9
26:10 27:2,16 28:3
28:5,9,13,14,16,17
29:2 35:22 40:9
48:4 80:9 84:8 90:4
90:10 91:10,20,23
92:6,10 96:4 99:17
124:19,20 126:4
148:14,19,25
**fraudulent**  92:13
148:21
**fraudulently**  55:13
**free**  40:24 42:4
**freely**  39:25
**friday**  77:24 105:20
105:21 106:18
107:9,14 109:3,9
112:13 128:16
131:22 132:1,7
142:19 145:14
157:6
**front**  52:13
**frustrate**  164:21
**full**  16:2,3 64:12
96:11
**fun**  74:14
**function**  17:6
101:16
**functional**  110:9
**functions**  20:15

**fund**  98:19,19
100:11 109:20
118:11,11
**funding**  94:12
**funds**  33:22 103:19
138:21 149:8
**further**  25:18 27:5
27:6 88:3 154:19
166:5
**future**  24:19 32:10
34:24 76:24 77:12
77:13,13,19 89:23
89:25 93:11
**fx**  56:9

**g**

**g**  6:1 125:10
**garrett**  3:16
**gather**  31:8
**gathered**  31:6
**gating**  101:6 102:20
103:11 124:12
126:8 127:21
141:18
**gay**  38:17
**gee**  53:14 149:15
151:19
**general**  25:9 26:25
27:14 46:19 93:1
109:8 134:23
**generally**  26:12
28:20 51:17 53:7
**generate**  128:18
**generically**  45:15
**genuine**  79:25
**genuinely**  76:4
79:19,22
**getting**  10:4 54:12
60:14 93:8 117:2
125:20 129:19
130:23 136:25
145:16 152:14
**giglio**  3:24
**give**  29:25 30:22
32:15 37:20 62:10
62:19 66:15 67:25
79:24 95:20 98:22
139:6 151:19 154:7

156:9
**given**  39:4,25 55:4
79:7 123:23 130:14
130:14 132:1
152:16,16
**gives**  129:25
**giving**  80:6
**glen**  55:21 81:17
85:15
**glenn**  13:16 15:8
18:1,24 43:20 47:21
**glenn's**  102:17
110:10 154:25
**global**  13:17 18:25
33:2 41:15 42:7,8
42:20,22 43:2,9,15
46:9 55:18 56:18
58:3 81:17 84:12
95:19,24 96:2 98:10
98:18,19 100:11,12
103:2 110:10,11
118:10,11 122:18
139:19 155:1
**global's**  58:6 77:2
**global's**  111:12
**go**  11:21,24 14:8
24:20 27:17 29:19
32:15 41:9 44:18
50:25 57:15 69:11
70:13 71:8,24 75:4
86:3,7 110:2 111:24
120:1 121:17 122:4
122:16 124:1 125:4
125:4 127:14,23
135:23,25 136:7,8
141:25 143:7
148:13 155:7,8
156:13 159:10
162:14 163:4
166:17
**god**  19:13
**goes**  12:23 29:21
34:7 43:20 47:2
61:3 63:4 122:25
125:18 126:19
**going**  6:5 9:11,15
10:10 14:20 26:1

31:8 32:14 35:19
38:5,5 44:18,19
46:7 48:22,24 49:11
51:19 52:18 54:15
57:20 59:25 61:11
61:13,17 69:3,24
70:6 74:19 86:2
87:9 91:16 92:5,5
93:2,3,5,6,6 95:20
97:15,16 98:9,21
99:10 102:23 104:3
105:5,17 107:6
108:24 109:15,16
115:16 116:7
119:25 120:1,11
121:14 130:21
131:18 132:1
145:10 146:11
150:7,8,18 155:9,22
155:23 156:13,22
160:13,16 162:4,14
162:17 164:12,13
166:3,17 167:8
**goldman**  67:4
**golf**  102:3 141:21
**good**  6:3,8,9 25:24
31:18 37:1,2,3,10
39:7 56:6 57:8
70:24 98:23,25
105:14 107:14
114:10 116:20,22
116:23 117:16
118:3,6,23 119:13
127:18 130:4
141:25 156:14,19
157:15 158:22
159:1,6,24 160:21
160:22 161:11,17
162:11 163:8 164:4
164:5 168:20
**goodness**  129:2
**goods**  66:19
**gosh**  20:21 149:9,15
**gotshal**  3:2,10 6:11
**gotten**  20:21 92:18
92:24 141:4

**governed** 158:24
**government** 13:13
  13:19 15:20 19:15
  44:23 45:22 47:17
  78:10 136:16,22
  137:4,7,19 138:5
  141:6
**grants** 87:18
**great** 80:5 92:15
  107:6 120:13
  122:10
**greatest** 83:10
**green** 1:20
**gross** 14:12 15:9
  18:12,18,25 24:6
  26:6 29:1,3 58:21
  58:22 101:10
  102:19 103:11
  104:9 109:14,22
  110:23 111:3,10,12
  127:22,25 128:7
  131:24 132:6
  135:16,19 140:2
  146:5 147:13,15,16
  147:19 150:21
  154:13
**grossly** 14:7 144:4
  144:13
**ground** 131:17
  139:10
**grounds** 67:12
**group** 28:9,16,19
  69:4 70:17 79:20
  99:8
**guarantee** 11:17
  101:1 112:18,20,23
  112:25 113:4,5,24
  115:8,11,17 116:22
  116:23 117:5,6,9,13
  117:15 118:23
  119:1 125:24
  154:20 156:2
**guaranteed** 11:14
  115:7 116:8 118:17
  119:12,21 124:2,3
  150:3 154:10

**guarantees** 89:23
**guess** 10:5 37:4
  45:17,25 47:8 50:12
  57:11 63:13 69:22
  79:4 84:4 113:17
**guessing** 156:22
  162:15
**guy** 29:21 36:8
  104:18 109:22
  152:4
**guys** 148:1

**h**

**ha** 70:5
**hadley** 4:16 163:9
**half** 34:10 104:1
  122:14 137:16,17
  140:13
**hallway** 83:2
**hampshire** 66:21
**hand** 61:17 102:23
  120:25 122:18
  123:2 150:4
**handing** 88:18
**handle** 13:2
**handled** 13:1
  153:21
**handling** 18:16
  110:21 111:3
  153:19
**hands** 108:3 109:13
  110:14 141:7
**hanging** 18:3 36:15
**happen** 24:22 26:1
  107:19 122:1
  130:21 148:4
  155:24
**happened** 16:25
  17:9 23:2 25:25
  26:3 32:7 63:14,16
  80:18 95:13 98:24
  99:22 100:2 104:6
  132:15 146:10
  149:18
**happens** 51:21
  103:14 104:14
  108:7 114:5 155:5

**happy** 110:18
  154:23 155:23,23
**hard** 93:10 130:22
**harder** 14:5
**harm** 92:1 123:2
**harm's** 147:23
**haven't** 120:11
  127:16 141:3
  165:13,13
**hawaiian** 102:5
**head** 33:2
**headings** 46:21
**headline** 99:20,20
**headquarters** 102:9
**health** 1:14 5:2
  25:10 156:20
**hear** 10:10,20 61:3
  75:3 116:2 135:23
  135:23 141:25
  142:2 162:25
**heard** 99:6,13 100:4
  101:5,13 116:4
  121:9 149:10 155:2
  156:21
**hearing** 2:7,10,13
  37:4,24 38:1,7,8,9
  38:10 40:14 53:17
  54:4 81:7 89:4,14
  89:15 115:19 116:9
  119:15,24 129:15
  143:20 144:8
  154:17 156:14
  169:5
**hearings** 10:24
  149:25
**heart** 10:5
**heartened** 150:1
**hedge** 138:21
**held** 8:4 12:1,2,3
  13:1 20:11 21:8,20
  21:21 27:20 32:25
  67:1 68:25 87:21,22
  100:3,24 102:9
  104:8 145:4 148:2
**help** 39:2 42:19
**helpful** 111:15

**helpfully** 100:20
**here's** 103:14
  129:21
**herring** 36:3
**hesitate** 154:7
**hey** 128:14 130:19
**he'll** 117:18
**he's** 103:22 105:15
  143:11
**hiding** 145:4
**high** 138:22
**hindsight** 25:3,24
  91:10
**hire** 63:3 70:14
**hired** 49:2,3
**hiring** 63:5
**historical** 76:24
  77:6
**hit** 85:14 92:20
**hold** 12:12,12 13:2
  19:25 20:4 22:4,7
  23:20 24:1 38:23
  45:12 61:14,19
  106:19 158:18
**holder** 9:11 100:8
**holding** 13:6 21:13
  66:19 103:24
**holdings** 1:6,10 3:3
  3:11,19 6:12 98:16
  99:8 163:10
**holds** 21:3 22:9,9,22
**holistic** 125:16
**holmes** 91:21
**hon** 2:2
**honor** 6:8 8:19 9:10
  9:13 10:10,13,19
  11:11,22 12:10
  13:25 14:18 16:10
  19:10 21:3 22:3,5
  23:5 25:23 26:8
  27:6,25 28:23 30:9
  30:11,21,25 31:11
  31:15,20 32:9,22
  34:2,23 35:7,10
  36:17,22,23 37:1,3
  37:10,15,16 38:1,6
  38:15 39:12,16,17

40:2,3,13,16 43:1
45:18 46:7,14 47:1
48:13 50:13 53:10
53:11 54:18,25 57:1
57:11,17 58:24 59:5
60:2,19,20,22 62:2
62:10 63:15,25 64:6
65:2,6,19 66:1,4,9
67:13,22 68:17 69:9
69:15,16,22 70:13
70:18 71:7,21,24
72:10,21 73:5,20
75:5,11 76:15,21
77:21 78:2,16 79:16
80:3,3,16 81:6,10
81:19 82:3,18 83:4
83:22 84:15,19,20
85:13 87:7 88:8,20
89:2,5,15 90:13,17
91:6,21 92:17 93:12
93:24,25 94:1,2,7
95:6,9 96:21,25
97:2,15 98:8,14,20
103:4 111:24 116:1
118:6,15,16 121:7
122:17,24 123:9
124:16 125:2,9
129:12 132:18
133:24 137:15
139:15,24 141:11
149:5,9 152:20
153:16 154:3
155:15 156:5,19,23
158:2 161:13
162:19 163:8
165:23 166:8
168:11,19
**honor's** 57:12
**honor's** 101:5 126:7
**hook** 51:20 70:5
**hooked** 117:20
**hope** 95:9 96:17
149:1 161:10
**hopefully** 156:25
**hopes** 34:24
**hoping** 92:4

**horizon** 93:4
**hornet** 134:2
**hotel** 102:5 141:22
**hour** 106:4,23
140:13
**hours** 106:22
112:13 119:5 129:8
129:23 131:25
132:3 144:15
**house** 36:9
**howard** 4:13 118:9
149:7 155:17 156:5
**hubbard** 134:2
**huge** 83:2 133:19
**hughes** 134:2
**huh** 7:24 38:14 40:7
41:11 42:10,24
47:23 49:14 50:2
52:3,23 86:12
102:24 116:19
125:7 126:18 127:6
128:9 136:18
139:16 140:1
141:13 160:6
**human** 19:14
**hundred** 2:7,10
6:15,23 169:5,8
**hundreds** 55:20
**hurricane** 70:4
**hurricanes** 45:4
**hypothecated** 145:8
**hypothecation**
145:23
**hypothesize** 160:25
**hypothetical** 30:24
31:1,10,11,12,14,23
32:1 48:7 50:5
92:11,15 144:18
**hypothetically** 31:5

**i**

**i.e.** 165:7
**idea** 67:13 130:4
**identical** 13:15
110:11
**identification** 28:16
**identified** 24:12
96:10 151:11

**identify** 28:21 80:17
85:24 122:24
126:13
**ii** 2:14 169:11
**iii** 2:14 169:11
**illinois** 14:9,10
58:14
**illustrate** 102:22
**illustration** 103:23
**imaginative** 19:20
**imagine** 129:3
130:17 142:20
145:2
**impact** 127:21
**impacts** 127:22
**implied** 12:13 21:18
111:8 157:14,17
158:2,3,22,23 159:1
159:12,12,14,23
160:1,3,15,22
162:11 163:22
164:17 165:16
**implies** 82:9,10
**imply** 135:16
**import** 18:25
**important** 7:19
11:23 12:25 28:4
31:21 43:6 46:15
57:17 101:17
125:23 137:1
**importantly** 26:8
**impose** 7:5
**imposed** 88:7
**imposes** 20:2
**improve** 32:2
**inappropriate** 53:8
**inappropriately**
52:17
**inclined** 162:21
165:19
**include** 18:15 67:2
**included** 15:9 44:6
44:8 101:20,25
102:4,7 112:25
132:19
**includes** 15:3 19:15

**including** 8:3 23:12
27:9 45:3 74:20
91:24 101:3 113:23
154:18
**incorporate** 75:19
**incorporates** 76:1
77:14
**increase** 36:16
**incremental** 34:14
**incumbent** 74:22
162:22
**indicated** 150:14
**indicates** 20:9
**indication** 23:24
**indifferent** 18:23
**indirectly** 13:13,19
15:19 47:16 136:15
**indiscernible** 21:10
50:3 52:12 56:5
62:24 63:1,8 78:19
80:14 123:17 137:2
152:23 166:25
**induce** 27:19 50:22
50:23 80:10 81:4
**induced** 15:11
55:14
**indulge** 158:8
**infer** 91:11
**inference** 77:4
**influence** 23:10
**information** 53:13
53:20 79:19 80:6
140:20 146:12
**informative** 86:4
**initial** 101:6
**initially** 112:24
**initiate** 107:10
**initiated** 105:14
**initiating** 105:25
**inner** 153:1
**inquiry** 50:15
**insiders** 27:8
**insofar** 77:5
**insolvency** 40:24
49:1 137:3,7 139:11
**instance** 14:5 15:5
76:25 100:21

108:25
**instantaneously**
131:1
**institutional** 6:18
**instructed** 103:18
**instruction** 104:19
104:21
**instructions** 88:1
128:4 151:3
**insufficient** 7:10
19:19 28:17 36:20
131:4,5
**insulate** 79:24
**insurance** 124:22
125:25
**insurer** 126:2
**insurrection** 45:1
**intended** 25:7
**intent** 25:2,4 26:9
26:12 28:2 30:18
66:7,7 92:1
**intention** 17:15
81:14
**intentional** 91:23
104:11
**intentionally** 53:7
**interest** 7:15 8:2
9:23 61:9 87:17
**interested** 54:12,19
54:20,21
**interesting** 20:25
29:9 36:18 85:8
98:6 125:17,22
128:15 154:5
**international** 4:17
79:20
**interpreted** 73:20
**interpreting** 82:7
**interrupting** 52:18
69:7
**interruption** 11:21
**investment** 27:10
**invite** 77:4
**involves** 62:22
**iowa** 76:21 79:9
**isn't** 140:4,5 163:25

**issue** 7:18 11:7
40:23 43:23 44:1,2
44:10 46:14 47:2
49:20,20,22 50:14
52:22 53:24 54:22
57:11 76:18 78:19
79:16,18 83:7 97:23
101:1,6,12 102:20
103:11 113:5,6
116:3 118:23 120:9
122:25 124:12
126:6,10 127:21
132:13,14 136:20
137:16 142:5 145:5
147:12 158:22
161:16 163:12
168:9
**issues** 37:17 43:17
44:4 46:13 49:3
54:6,7 58:15 60:24
63:9 64:10 73:3
77:20 78:17 80:15
95:19 108:21 126:8
126:15 132:22
142:15 148:5
149:25 165:10
166:18
**item** 6:15 104:23
**it'd** 147:16
**it'll** 111:15 118:1
136:7
**it's** 99:6 101:11
102:23 105:5,17
106:10,19,20,22
108:16,17,18,19,24
110:4,12 111:15
113:12,17,18
114:10,12 115:11
116:23 117:20
118:23 119:17
124:22,23,25
127:14,18 129:11
130:4,21 132:7
135:9,10,13 137:13
141:4,5 144:21
145:12,15 146:10
148:9 149:12,13

150:9 152:19,19
153:20 155:1,5,8,23
160:15,18 161:19
161:19,23 162:4,16
162:20,22 164:6
165:1,9 167:9 168:4
**iv** 2:14 157:10
158:1 165:20
168:14 169:11
**i'd** 117:8 121:6
154:23 162:15
**i'll** 98:22 99:25
112:17,24 120:18
123:23,23 126:15
126:21 128:5 135:3
147:11 158:8,9
161:24 167:24
**i'm** 98:17,21,23
99:5,10 102:19,22
103:8,10,24 108:4
111:5 112:7,8,22
113:25 115:1
116:17,23 119:9,9
119:15 121:3,18
125:2 129:1,24
130:6,7,7,18,19,21
130:22 132:11
133:22,23 143:6
144:8,16,22 147:2
148:6 149:5,24
150:1,23 151:19
155:14,15,22,22
156:3,3,13,18,22
159:3 161:9 162:1
162:15 163:2
165:19,24 166:16
167:22,22
**i've** 99:4 111:2
125:5 149:1 154:14
155:2 161:10

**j**

**j** 71:25
**jaws** 118:17
**job** 161:15
**john** 24:11 28:7
33:1,6

**joint** 65:20,22 66:3
68:1,4,16 70:17,21
72:18 73:6,18 81:12
101:12 115:13
116:4 122:23
124:12 141:14
149:20 153:23,25
**jointly** 19:23 20:17
71:14 72:15 87:4
**journal** 49:12
**judge** 2:3 10:24
11:7 13:16 15:8
18:1,24 38:17 43:20
47:20 54:2 55:21
56:19 57:22 81:17
85:15 98:3 102:17
110:10 141:3
154:25 160:24
162:6 166:5 167:25
**judgment** 120:5
167:23 168:3
**judicial** 20:3 107:8
**jump** 125:5
**jumps** 20:20
**jurisdictional**
167:13

**k**

**k** 4:18 27:11,11,11
**kasaks** 27:11
**keep** 17:15 28:1
40:25 48:23 50:22
52:18 53:23 104:7
156:17
**keeping** 84:12
**keeps** 31:9
**kept** 101:24
**key** 11:24 85:14
**keyed** 132:15
**kicked** 91:22
**kicks** 141:7
**kind** 18:7 21:6 26:4
29:3 32:3 37:20
51:21 54:20 111:25
147:13 150:8 162:1
165:1
**kinds** 73:24 93:15
93:15

**kirk** 33:7
**klein** 56:19
**klotz** 67:8
**knew** 25:11 26:10
  27:23 28:7,14 30:17
  48:25 49:1,2 76:14
  91:5 109:16,18
  132:25 143:4
  151:13
**know** 10:25 17:8,11
  26:2,3 31:6,8 32:4
  37:5,16,19,21 38:4
  38:4,6,11,12,16,16
  38:17,17,17,18,19
  38:22 39:3,15,20,21
  39:22,24,24,25 40:1
  40:9,10,11,11,13,17
  40:19,21,23 41:1,2
  41:2,4,5,6,6,23
  42:19 43:15,17,20
  43:24,25 44:2,4,5,7
  44:7,9,10,20,25
  45:17,25 46:1,2,3
  46:11,12,15,16,16
  46:17,18,21,22 47:2
  47:3,4,5,10,11,11
  47:12,13,14,16,19
  47:20 48:1,4,14,15
  48:16,17,18,18,19
  48:20,21,24 49:12
  49:16,18 50:1,13,14
  50:15,16,17,19,19
  50:21,24,25 51:2,3
  51:20 52:12,13,24
  52:25 53:1,11,13,14
  53:15,15,15,16,17
  53:18,18,19,20,20
  53:21,21,21,22,23
  53:23,23,25 54:1,1
  54:2,2,9,9,18,24
  55:1,3,5,7,8,11,11
  55:12,12,13,13,14
  55:14,15,16,19,20
  55:21,22,22,23 56:1
  56:2,8,8,9 57:6,11
  57:14,22,23,23,23
  57:24,24,25 58:1,10

58:14 59:1,6,8,16
59:17,20,25 60:1,3
60:3,7,9,9,10,10,11
60:12,20 61:12,24
62:6,6,7,8,8,15,21
62:22,22,23,25 63:6
63:7,7,7,10,13,17
64:4,7 65:11,14,19
65:21,21,22,22,23
65:24,24,25,25 66:4
66:6,6,7,8,9,11,12
66:12,13,14,16,16
66:17,17,19,20,22
67:12,23,25 68:10
68:15,19 69:13,14
69:15,16,17,17 70:4
70:14,16 71:25,25
71:25,25 72:1,1,4,8
72:9,11,13,15,15,17
72:20 73:1,9,12,14
73:15,19,21 74:1,2
74:3,4,5,8,9,9,20
75:7,12,12,13,14,14
75:14,15,15,16,16
75:17,18,19,20,21
75:21,22,23,24,25
76:5,5,6,8,8,9,9,10
76:13,14,15,15,16
76:17,18,20,21,23
77:8,10,11,15,15,22
77:22,23,23,24,24
77:25 78:3,4,4,6,6
78:18,25 79:5,6,13
79:17,17,18,21,21
79:23,23 80:1,4,4,5
80:5,6,6,7,8,8,9,9
80:10,10,11,12,13
80:13,13,17,18,19
80:20,21,22,23,24
80:24,25 81:1,2,4,4
81:4,5,7,7,8,8,9,9
81:11,11,20,23,24
81:24 82:3,3,11,13
82:14,17,17,19,20
82:21,24,25 83:9,12
83:15,16,23 84:5,5
84:7,8 85:10 93:5,7

94:19,20,20,20
95:18 98:15,20
100:23 104:13,18
104:25 105:9 106:5
107:4,5,20 109:24
111:20 113:12,25
114:4 117:12 125:9
128:17 129:2,22
130:19,20 131:20
132:15 133:15,19
140:7 143:2,2,14,20
144:9 145:22
146:10,25 149:10
149:15,19 150:6,8
152:9 153:8 157:6
159:4,7 161:13,23
162:2,16 163:1
165:3,4,7,7,12,20
167:9
**knowing** 26:11 41:1
  92:1
**knowledge** 26:19,25
  28:12,18 120:10
**known** 25:11,25
  48:25 76:14 91:3
**knows** 38:15 40:16
  69:16 92:22 93:9
  157:22 158:2
  167:12

---

**l**

**labor** 31:5
**lack** 73:17 95:25
**laid** 82:24
**language** 20:9 24:8
  24:15,18 44:7,8
  46:8,11 64:16 66:5
  69:11 72:17,19,20
  74:23 87:20 110:11
  150:5 157:21,22
  160:4,16,18,20
  164:3
**large** 54:7 103:22
  107:4
**late** 109:3 118:25
  142:5 145:15
**lavine** 3:15

**law** 14:9,11,11
  19:12 20:7,23,23
  21:23 23:17 24:18
  30:13 32:15 39:3
  46:15 47:22 48:2
  49:24 50:14 58:14
  58:14,15,19 61:18
  62:24,25 65:20
  67:16 68:20 70:14
  72:10,14 74:24
  79:13 81:10 82:6
  83:25 86:15,25
  89:20 91:17,17,20
  92:6,7 93:18 94:20
  96:6 104:9 135:21
  138:6,6 139:9 151:8
  151:16 158:24
**lawfully** 86:19,23
**laws** 127:24
**lawyer** 88:9
**lawyers** 83:10
  150:12
**lay** 39:5
**layers** 7:14
**lb** 72:15 102:1,2
  111:20
**lbcc** 21:11
**lbdp** 21:11
**lbhi** 6:12 11:13 13:4
  15:18 19:22 20:17
  21:16,25 22:4,6
  23:10,25 24:13
  29:16 33:8 56:23
  61:12,14 68:24 70:5
  72:16 80:20 86:21
  100:25 101:3
  113:24 115:10,11
  117:18 125:24
  141:5,5
**lbi** 7:2 8:5 9:8 10:8
  12:1,2 20:2,3,19
  21:3,8,13,19 22:6,9
  23:11 24:1 25:21
  27:20 29:13 35:17
  46:4 48:12 56:4,15
  56:22,24 57:3,9,13
  57:14 59:11,19,21

60:9,11,15,18,24
61:18,18 62:13,17
63:18,24 64:3,13
65:15 66:10 67:14
67:20 68:25 69:24
70:1,2,3,6 72:9
73:12 74:21,21,22
85:1 86:8,21 87:3,9
87:9,10 88:18,18
111:25 112:12
124:22 127:1
131:13,19,22
132:11 133:2,5,8,13
133:25 134:6,9,13
134:18,21 140:15
140:21 142:8
143:21,25 144:2,9
144:11,12 145:4,8
147:20,22 151:9,11
152:24,25 153:12
154:7,16
**lbi's** 8:5 12:20
**lbie** 85:1 100:3,7,16
100:18,22,24
107:20 109:5 110:8
111:21 112:10
118:2 123:1 124:22
125:23 126:21
127:3,4,8,24 131:11
131:12,19 132:11
132:16,19,21 133:1
133:2,4,13,21 134:9
134:14,20,22
137:21,24 138:8,13
140:15 142:9,10,19
143:5,12,14,15
144:6,8,10,12,23
145:7,8,14 146:11
146:13 147:11,15
147:21,25 148:3
150:15,22,25 151:1
151:5,7,13 152:24
152:24 154:7
**lbie's** 107:24 138:2
151:20 153:1
**lbsf** 61:12

**lead** 143:6
**leading** 143:17
**leave** 9:15 50:24
51:4 96:22 165:20
**leaving** 40:22
**led** 16:7 143:7
**left** 10:15 37:14
111:19,23 112:6,10
157:13
**legal** 32:5,6 67:1
158:3 165:10
170:22
**legs** 150:3
**lehman** 1:6,10 3:3
3:11 6:12 7:2 8:1
13:14 19:22 21:4,6
23:12,12 25:7,8,10
25:10,12,19,20
27:21,22,23 28:20
33:1,2,4,8,10,14,16
33:20 34:16,20 45:4
45:14 48:18,18,19
49:2,10,23 50:24
51:11 53:12,24 54:6
56:4,23 57:4,6 59:7
59:11,12,14,17,22
59:23,25 60:4,8,11
60:18,23,25 61:10
61:16 62:6,10,18
63:16,18,20 64:14
64:24 65:1,13,14,14
65:16 67:20,20
69:13 70:20 71:12
71:14 72:1,3,8,20
73:9,10,10,15,20
74:3,7 80:4,25 81:3
86:1,4 87:3,12,14
87:19,22,23,24,25
88:1,7,15,17 90:1
94:10 95:2 96:10
98:16 99:8,25
101:24 102:2,6
103:12,18 104:15
105:13 107:11,14
108:8 109:7,8,8,16
109:18,21 110:20
119:3 125:14,15,19

127:3,12,15 128:4
129:6,8 130:18
131:1 132:8 139:22
140:4 152:2 153:10
153:25 157:5,6
161:18,19 162:23
162:25 163:9,10
164:24
**lehman's** 34:9,15
51:14
**lehman's** 110:14,15
131:4 136:24
160:23 163:3
**leman** 3:19
**lend** 74:9
**lending** 100:6,16
132:20 146:16,18
151:5
**length** 110:3
**lengths** 80:5
**lengthy** 43:21
**letter** 63:5 86:11
105:16,23 107:9,15
112:14 128:14,16
128:17 130:5,9,16
131:6 132:9 139:25
151:18
**letterhead** 87:10
**letters** 67:6 107:16
**letting** 14:8 100:10
162:1
**let's** 103:9 104:7
112:18 116:14,15
133:14 135:23,25
136:3 142:17 145:7
145:23,24 147:9
155:3 165:21 168:8
**level** 29:1 35:8
96:15 145:7
**lexus** 67:5
**liabilities** 65:22
**liability** 2:8,11 7:5
18:11 46:20 47:18
48:3 71:11 81:12
101:12 102:14,21
110:19 115:13
116:4 122:23

124:13 141:15
147:14 153:23
169:6,9
**liable** 19:23 20:11
20:17,22 23:15
38:23 65:17,23 66:3
66:17 68:4,17 69:14
70:17,22 71:15
72:18,22 73:4,7,18
73:22 74:22,24 87:4
101:22 102:5
110:20 123:24
141:18 159:22
**licensed** 20:4,5
61:19
**licks** 154:2
**lie** 40:24 42:4 47:13
**lied** 26:1
**lien** 61:9 87:17
**liens** 87:18
**life** 31:18 66:13
162:9
**lifland** 38:18
**lift** 127:4 151:8,13
**lifting** 146:8
**light** 55:24
**lights** 136:10
149:22
**lightsquare** 161:20
**limbo** 119:20
138:16
**limitation** 18:11
48:2 71:11 110:19
147:14
**limitations** 46:20
**limited** 6:19 8:3
45:3 149:18 152:17
**line** 57:21 58:2
59:13 62:16 74:4
105:7 146:17
**link** 88:14
**liquidity** 17:2,4,14
25:12,14,20 31:18
33:20,22 48:21 76:1
76:11 77:15,18,18
77:23 78:15 90:2
94:10,12 95:3

**list** 104:24
**listed** 44:5
**listeners** 89:22
**listening** 40:19
**lists** 69:25 103:24
  104:22
**litany** 43:16 44:4
  45:18
**litigate** 137:17
**little** 9:1 13:7 14:13
  29:9 37:20 51:21
  62:3,20 75:8 76:25
  85:19 93:9 99:23
  108:19 111:1 114:9
  118:18 125:6
  128:23 145:15
  158:8 165:3
**live** 73:25 116:10
**lived** 54:3
**llp** 3:2,10,18 4:1,16
  5:1
**loan** 21:11 67:7
  92:19 146:25,25
**loans** 127:5
**located** 133:17
**location** 148:5
**lockdown** 109:6
  112:11 143:5
  144:23 145:14
  152:9,9,10,10
**locked** 107:22
**locking** 19:16
**logistics** 59:24
**london** 100:24
  101:19 106:3,21
  107:1,20 108:6
  131:10 143:7
**long** 37:4 54:3 75:8
  98:11 118:8 157:1
**longer** 27:6 75:9
  143:22 154:22
**look** 18:3 30:13
  32:18 44:11 46:8
  50:11 52:10 57:15
  58:24 66:16 69:20
  71:24 73:8 79:20
  81:20 85:22 88:24

94:2 104:5 109:21
  110:9 113:19 117:8
  117:14 138:20
  139:24 143:17
  144:14 160:13
  161:15
**looked** 32:23 113:6
  164:5
**looking** 44:20 67:16
  77:1,1 78:6 89:22
  113:14 124:16
  147:2 149:14
**looks** 20:13
**lose** 16:13 158:17
**loss** 7:11 8:10 12:19
  13:12 15:2,2,14
  18:5 36:12,14 41:1
  47:15 55:8,11 64:14
  81:23 93:20,21
  117:15 148:24
**losses** 8:12 15:19
  34:13 101:23 102:1
  102:5,8,14
**lost** 12:16 17:5 37:8
  144:23
**lot** 8:23 38:5 53:13
  54:4,7 74:8 91:23
  116:5 118:22
  125:17 126:19
  129:5 135:5 137:15
  149:10,10 154:7
  168:2
**lots** 16:22 95:13
**lotsi** 61:13
**lower** 91:18
**lp** 6:18
**lulled** 100:9
**lurking** 115:20

**m**

**m** 3:15,24 5:7
  144:20
**magic** 165:14
**mail** 104:13,16,17
  130:19 131:22
  166:25 168:13
**mailing** 144:20

**mails** 102:25 103:1
  105:12 107:13
  111:2
**main** 99:7
**maintain** 59:9,12
  62:8 80:11 81:5
**maintained** 101:24
**majeure** 13:9 14:18
  15:1 16:9 17:17,25
  19:7 28:24 41:5,7
  42:14 43:24 44:3,6
  44:9 48:8 81:16
  82:7 85:18 93:17,19
  102:18 110:4 111:6
  111:9 124:9 134:24
  135:17,21 136:1,14
  136:19 137:18
  141:7 154:15
**majority** 11:1 43:17
  65:9
**making** 16:5 23:23
  28:14 51:18 61:6
  65:7 78:10 83:8,9
  92:21 98:11 116:12
  118:8
**mallet** 3:18 98:15
**management** 77:3
  120:3
**manges** 3:2,10 6:11
**margin** 100:6,16
  132:20 146:16,18
  151:4
**market** 44:24 49:8
  108:14,16,18
  134:15
**markets** 125:21
**masse** 127:9
**massive** 134:10
**master** 118:11
**match** 94:11
**matched** 33:21
**materially** 14:11
**matter** 24:18 30:13
  49:24 67:16 68:20
  74:24 81:10 82:3,6
  83:25 89:19 95:20
  96:6 109:2,17

111:11 118:21
  135:17,18,21
  145:11,12 154:9
  160:10 161:22
**matters** 118:22
  154:6,16 162:13
  163:2
**mays** 66:21
**may's** 104:13
**mb** 42:20
**mbia** 94:22
**mccloy** 4:16
**mccostlin** 2:24
**mccoy** 163:9
**mean** 14:19 16:11
  16:14,16 17:11 18:8
  39:14,18 45:18 46:1
  46:2,22 47:9 49:11
  49:15 54:21 57:9
  60:14 66:12,12
  70:10,18 71:1,23
  74:12 77:22 82:18
  90:14 93:7,12
  120:15 123:12
  129:15 130:17
  132:4,14 133:22
  134:3,16 139:3
  140:12 141:16
  145:22 146:17
  152:10 154:21,22
  156:1 162:13 165:6
  165:9
**meaningful** 95:25
  123:4
**means** 23:1 67:14
  90:10 105:9 108:6
  152:9
**meant** 11:12
**measures** 77:7
**mechanically** 23:4
**mechanism** 8:9
  89:5,12
**meet** 30:16 33:23
  94:13 131:16 143:8
**meeting** 35:8
  150:16

meetings 16:3
memorialize 130:10
mentioned 85:15
mere 90:3 140:22
merely 27:25 35:15
merit 46:25
merits 11:7,9 39:15
message 33:7 34:16
  34:18
mf 13:16 18:25
  41:15 42:6,8,22
  43:2,9,15 46:8
  55:18 56:17 58:3,6
  77:2 81:17 95:24
  96:2 110:10,11
  122:18 139:19
  154:25
mid 128:16
milbank 4:16 163:9
miller 3:8 6:8,9,10
  6:11 7:25 8:19 9:10
  9:18,20,22 10:9,13
  10:18 11:21,22 12:7
  12:10 13:25 14:3
  15:25 16:10,12,19
  16:21 17:20,25 19:5
  19:9 22:3,5,8,15,17
  22:20 23:4 30:9,11
  30:23,25 31:4,11,15
  31:20,24 32:4,9,20
  32:22 36:21,22
  37:22 38:12 39:13
  40:20 42:8,14 43:9
  46:24 49:23 50:9
  51:25 59:4 61:4
  74:1 75:8 81:18
  84:11,14,15,19
  85:13,13,22 86:11
  86:13 87:6 88:13,20
  88:24 89:15 90:13
  90:16 91:20 92:17
  93:24 95:6,9,13,24
  96:18,20 97:14,22
  99:9,11 148:23
million 55:9 111:25
  112:5 123:3 130:20

millions 129:7
  140:3
mind 11:23 53:16
  99:5 101:11 103:10
  104:8 140:2
mindful 140:16
minds 115:21
mine 167:16
mineola 170:25
minimum 73:19
minor 86:16
minute 32:16 98:9
  100:1
minutes 10:10
  131:25
miracle 112:13
misbehavior 27:3
misc 67:5
misconduct 14:7,13
  15:9 18:13,18 19:1
  24:6 29:2,3 46:18
  48:4 55:12 58:21,22
  81:24 82:12,13,16
  110:24 111:10,13
  131:24 135:16,20
  154:13
mishandled 12:18
mishap 101:19
mislead 26:20
misleading 165:3
misreading 12:11
  21:1
misrepresentation
  16:15 25:19 29:8,10
  30:5 36:15 78:12
  93:22 124:21 126:5
misrepresentations
  25:7 47:14 51:3,4
  53:6,22 76:13 79:6
  80:2
misrepresented
  30:15
misrepresents 36:8
missed 113:9,11
  114:6 164:3
missing 132:17

mistake 104:11
mla 127:2 147:2
modeled 138:23
moment 7:23 16:13
  24:13 32:13 36:23
  62:10 99:21 149:23
  149:23
monday 77:24
  107:17,19 109:4,11
  109:11,25 134:19
  142:18 143:4,7,12
  143:18,19 144:3
  145:14 151:17
money 16:22 21:7
  22:21,25 74:16
  94:19
moot 156:2
morass 138:22
morning 6:3,8,9
  37:1,2 98:24 104:15
  105:12,14 107:20
  108:5,7 109:11,12
  109:25 137:10
  142:18 143:4,7,12
morocco 67:8
mortgage 67:4,7
mosle 3:18 98:15
motion 2:13 53:8
  54:13 88:22 89:12
  90:17 115:3 120:5
  157:1,4,14,19 158:3
  159:15 164:2
  165:19 167:7,20,22
  168:3,7 169:11
motive 26:13,14,20
  27:2,7,14,15,18
  28:2
motives 27:8
motulsky 33:6,14
  33:16,19 34:8 80:20
  84:6 94:9 95:1
motulsky's 33:6
move 69:1,3 99:24
  105:25 120:22
  122:9 165:21
moved 100:22
  144:6,8 152:12,13

moves 156:10 162:9
moving 98:4
multinational 62:22
multiple 20:9,12
  62:25
myriad 28:21 125:1

n

n 3:1 6:1 27:11
  169:1 170:1
n.y. 66:22 67:5,8
name 59:9,13 153:1
named 60:6 86:5
  101:22
narrow 19:10
narrowly 19:11
national 130:1
natixis 67:4
nature 7:11 38:22
  45:3 76:6 101:14
  164:10
neatly 32:12
necessarily 24:6
  61:22
necessary 28:2
need 7:19 30:20
  40:3 53:17 102:11
  105:15 110:17
  128:14 130:16
  149:13 154:22
  155:10,18 163:22
  165:5 166:24
  167:14,19
needs 38:22 73:20
  104:22 155:6
neglect 29:10
negligence 14:12
  15:10 18:12,18 19:1
  24:6 26:6 29:1,3
  58:22 93:22 101:10
  102:19 103:12
  104:9 109:14,22
  110:23 111:3,10,12
  127:23,25 128:7
  131:24 132:6
  135:16,19 140:2
  146:5 147:14,15,17
  147:20 150:21

[negligence - opportunities]                                                    Page 22

154:13
**negligent** 14:7 29:8
  30:5 36:15 110:17
  124:20 126:4 144:5
  144:13
**negotiated** 134:9
**negotiation** 143:8
**negotiations** 139:1
**neither** 85:6
**nest** 134:3
**net** 149:20
**neuberger** 34:10
**never** 17:10 121:10
  127:15 133:16
  135:10 146:14
**new** 1:2,21,21 3:13
  3:21 4:4,11 10:19
  14:11 20:7 21:23
  26:24 32:15 35:11
  46:1,15 48:2 58:14
  58:15,18,19 65:20
  66:21,21 67:5 72:10
  72:13 74:24 82:7
  86:16 92:7 93:19
  94:14 106:3,14,15
  106:20 108:8
  131:13,14 135:9
  136:10 142:3
  151:23,24 152:2
  153:11 158:24
  160:8
**newport** 55:25
  84:12 95:18 98:10
  98:18,18,19 99:22
  100:11,12 101:21
  103:2,19 104:2,4
  105:3,18 110:25
  111:11,19 118:10
  118:11 127:8 129:7
  136:12 138:21
  139:1 149:7 153:7
**newport's** 139:20
**news** 92:15,20
  114:10
**newspaper** 49:9
**nicest** 54:21

**nicholas** 4:22
**night** 77:25
**nine** 139:22,24
**non** 67:20 77:1
**normal** 34:17
**normally** 91:24
**north** 5:4
**note** 84:16 168:6
**notice** 18:7 20:3
  39:10 89:16 90:5,6
  107:8 114:13,14
  119:4
**notion** 142:9 148:6
**notwithstanding**
  150:4
**novak** 27:11
**nuanced** 114:9
**nuclear** 15:3
**number** 7:6 11:4
  28:15 51:22,24
  64:24 99:20,20
  104:23 114:19
  135:15 138:13
**numbers** 10:18 16:5
**nw** 3:4 4:18
**ny** 3:13,21 4:4,11
  170:25

**o**

**o** 2:1 6:1 26:23
  27:11 170:1
**object** 12:12
**objection** 2:8,11
  6:16,24 7:3 24:16
  39:20 89:7,7,17
  97:8 98:18 113:2
  119:10 150:2 169:6
  169:9
**objections** 11:4
  112:25 150:2
**obligated** 8:2 22:1
  72:8
**obligation** 20:10
  101:19 134:4
**obligations** 7:2
  23:13 33:23 61:23
  66:14 67:15 69:14
  71:15 72:9 73:4

88:6 94:13
**observation** 61:7
**observing** 83:18,20
**obtained** 125:18
**obviously** 31:1
  39:18,22 54:2 69:9
  99:7
**occur** 118:1 121:15
**occurred** 47:15
  50:21 58:22 101:19
  107:1 134:18
**occurring** 108:1
**occurs** 104:7 110:15
**offer** 157:16
**offering** 28:6
  123:18
**office** 92:16
**officer** 33:8
**officers** 25:11
**offshore** 6:18
**oh** 118:9 120:21
  125:19 129:2
  132:24 133:3
  134:13 144:7,14
  149:9 156:8
**okay** 8:22 11:6,10
  11:18,20 12:9 31:12
  40:4 41:20 42:24,25
  43:7 46:19 47:1
  50:8 52:5,15 54:17
  58:4,17,20 59:3
  62:4 65:6 69:8,24
  70:25 72:12 75:1,6
  75:10 79:10,15 84:9
  85:3 95:5 97:1,22
  98:13 102:23 103:5
  105:10 106:24
  107:3 113:9,20,22
  113:25 114:12,23
  115:2,9,12,18 116:6
  116:11,14 117:11
  117:24 118:3,3,20
  118:24 119:7
  120:14,17 121:5,8
  121:13,16 122:10
  122:11,13,15
  123:21 124:1,14

125:12 128:20,21
  129:14 131:16,21
  132:22 133:14
  134:7,11,16 135:2
  135:24 136:2 138:2
  140:23 141:1 142:4
  142:13,22 143:1
  145:7,9 147:8 149:3
  149:13,23 150:18
  152:21 153:14
  154:2,4 156:13
  158:15,21 159:8,19
  162:3 166:6,16,22
  166:24 167:21,24
  168:1,12,18
**old** 170:23
**oliver** 91:21
**omissions** 72:2
**omnibus** 2:7,10
  6:16 169:6,8
**once** 105:16,17
  164:8
**ones** 10:20,21
**onward** 107:23
**open** 6:6 59:8,12
  62:7,14 73:11,12,16
**opened** 60:17,18
  87:11,12 127:1
  151:11
**opening** 59:14 83:6
**operating** 34:17
**operation** 33:18
  102:5,16
**operations** 17:3
  25:13,15 34:17
**operative** 86:1
  143:19,19
**opining** 130:7
**opinion** 43:15 76:5
  85:17 90:3 91:15
  97:11 154:23 155:7
  155:22
**opinions** 29:17
  75:19
**opportunities** 98:19
  100:11 118:10

[opportunity - plaintiffs]                                                Page 23

**opportunity** 27:2
  39:9 64:7 81:14
  96:11
**opposite** 71:5,7
  121:9
**orally** 104:20
**order** 39:9 46:11
  47:17 96:18 97:15
  97:16,20,22 99:24
  103:9 104:22
  105:25 107:11
  109:3 110:25 120:3
  131:14 137:21
  138:1 139:9,23
  145:14 147:17
  154:24 155:4,21,25
  166:12 167:10
  168:6,13,14
**orders** 11:3 44:5
  46:12 88:1
**ordinary** 19:8 48:23
  66:13
**originated** 88:1
**orms** 2:25
**otc** 138:16
**ought** 29:20 162:20
**outline** 25:1
**outlined** 24:25
**outright** 90:10
**outside** 45:10 47:4
  110:15 122:18
  135:4 136:21 137:3
  139:19
**outstanding** 11:13
**overcome** 65:25
**overruled** 55:21
**overtaken** 109:12
**overview** 125:11
  126:6,16
**overwhelmed** 83:12
**owed** 21:7
**owned** 23:11
**o'clock** 108:6
  156:14

**p**

**p** 3:1,1,23 6:1
**p.m.** 98:12 106:10
  106:16,19,20
  156:16,16
**page** 14:10 20:8
  21:22 27:13 35:13
  44:15 69:11 70:10
  103:18 169:4
**pages** 103:24 104:1
**paid** 56:8 64:11,12
  111:21 112:6 123:1
  133:1,2 143:9,15
**paper** 129:5
**papers** 13:11 53:1
  105:1 111:21
  138:14 141:25
  164:2
**paperwork** 145:16
**para** 125:24
**paragraph** 7:20,25
  13:9 18:12 20:1
  24:16,25 25:17 29:7
  32:19 33:12 34:7
  44:15,20 46:24,25
  51:1,2 52:10 61:8
  69:20,21 73:8,14
  76:12 86:7,13 89:17
  94:2,24 95:1 110:18
  125:1 140:19 146:6
  146:6 147:3 148:12
  148:12 154:12,12
  154:15,15 159:21
  159:23
**paragraphs** 32:20
  159:20,21
**parallel** 56:17
**paramount** 122:17
**parcel** 127:25
  133:12
**parent** 20:19 23:15
**park** 3:20
**part** 47:16 49:23
  58:5 103:12 112:1
  113:2,4,5 124:3,23
  127:24 133:12
  135:10 163:21

  164:9,13,14
**participants** 49:8
**participate** 123:14
  123:17
**particular** 25:9
  44:9 46:3 53:7
  65:13 78:22 103:10
**particularity** 39:8
**particularly** 93:16
  120:9
**parties** 14:23 18:6
  20:9,13 22:20 47:5
  48:20 55:22,23 60:3
  65:20 66:8,17 69:6
  71:15 72:14 81:15
  82:13 84:5,8 88:9
  89:6 114:4 132:19
  140:22 165:14
**partner** 63:6 118:12
  148:1
**partners** 6:18,18
  20:8
**parts** 17:5
**party** 12:12 15:11
  20:10,11,12 32:14
  35:17 39:21 47:11
  48:5,6 59:21 60:7
  66:11 72:4 79:18
  82:12 88:10 92:1,4
  92:5 126:2 164:15
**passage** 111:19
**passed** 83:5 124:19
**path** 164:17
**pause** 36:25 44:13
  44:22 84:18 106:7
**payment** 105:8
**pb** 20:1,18 35:17
  123:24 126:1
**pba** 110:19
**pd** 8:5 125:16
**peck** 10:24 11:7
  54:3
**people** 26:15 28:11
  28:12,14 41:3 49:10
  51:20 55:1,5,20
  70:15,16 77:11 78:5
  83:2 84:24 102:18

  109:23 138:21
  139:1
**perfectly** 35:14
**perform** 20:11,14
  32:14 35:17 65:15
  66:14 92:5 101:15
**performance** 7:1
  32:11 65:18 89:23
  91:1 164:21
**period** 8:14 13:6
  49:9 98:1
**permitted** 119:2
**person** 30:17 64:25
  80:20 92:9,21
  151:23 161:14
**personal** 51:14
**personally** 86:20
**perspective** 29:23
  40:2 47:9 55:13
  78:2 81:6,13 107:23
  107:24 109:22
  163:1
**persuasive** 42:23
**petition** 134:8
**ph** 33:21 52:25,25
  61:13 86:16 105:13
  128:13 168:16
**phone** 31:7,7,13
  32:25 51:19 53:19
  57:5 78:9 90:22,24
  128:11 131:3,13
**phones** 31:10
**phrase** 90:6
**physically** 133:17
**pick** 44:10 160:9
**picture** 112:16
**ping** 167:14
**place** 5:3 8:8 122:22
  130:9,10 153:11
**places** 35:13
**placing** 132:19
**plain** 20:8
**plaintiff** 1:12 67:9
**plaintiff's** 53:3
**plaintiffs** 2:14 27:5
  27:7 169:12

**[plan - procedure]**                                                    Page 24

**plan** 1:11 6:11 7:3
  12:2 24:20,21 34:14
  98:17 112:3,3 123:3
  136:13 145:2
**plane** 141:22
**planning** 35:21
**plausible** 53:18
**play** 109:9 136:14
  137:20 139:23
  167:14
**plead** 7:7 14:14
  25:4 39:8 160:25
  161:7,10
**pleaded** 26:12,13
  30:12 35:8 165:14
**pleading** 14:15 26:4
  28:5,9,19 32:2
  38:19 39:21 78:2
  96:9,13 98:2 150:11
  160:11,12 165:2
**pleadings** 52:11
  58:25 76:19 80:13
  140:11
**please** 6:10
**pleasure** 118:14
**pled** 53:3,22 96:8
  126:4 160:3,3
  162:20,21 164:1,4
**pledged** 127:5
**plumbing** 36:8,10
**plus** 104:25 105:1,2
  105:5,15,17 106:1
  108:9,14,19 129:20
  132:4 135:5,9,13
  143:17 159:13
**pm** 168:21
**podium** 39:14
**point** 12:14 15:24
  18:7 25:24 30:6
  42:23 51:22,24 52:1
  52:7,21 53:10 55:10
  63:23 71:21 72:21
  73:6,7 74:11 75:9
  76:21 78:2 80:3
  83:6 85:5 89:3
  97:10 98:25 101:4
  102:15 106:25

107:23 108:9 109:1
  109:20 111:10
  112:8 113:18
  114:20 122:17
  124:24 127:13
  130:24 131:2 133:3
  134:18,19 136:5
  143:22 152:13,13
  153:8 157:16
  167:25
**pointed** 51:25 71:24
  91:6 110:7 130:12
  150:13
**pointing** 72:21
  78:14
**points** 43:1 51:11
  51:19 78:15 84:22
  85:14,23 89:1 91:7
  91:8 126:17 151:22
  153:14 154:5
**policies** 43:21,25
  47:20
**policy** 43:13,13,14
  46:20 47:8 58:18
  85:15,16 111:9
  119:8
**pong** 167:14
**portfolio** 9:11 34:13
  34:15 83:15 99:24
  103:23 104:1 107:5
**portion** 63:19
**portions** 123:10
**position** 50:10,12
  52:6 89:1 90:2
  109:6 111:18 112:9
  112:11 116:5
  126:22,22 132:8
  134:12 139:9 143:3
  144:17 146:20
**positions** 138:21
**possessed** 27:8
**possession** 21:24
  67:1,7
**possibility** 35:4
**possible** 9:13 34:13
  54:21 92:12 93:2

**possibly** 109:13
  143:15
**post** 22:2,12 61:13
  134:8 138:14
  164:20
**posting** 88:16
**posts** 19:25
**potential** 163:13
**pound** 112:1,2,4
**pr** 51:18
**practicable** 138:17
**practice** 100:17
  108:23
**pre** 16:1
**preamble** 59:6
**precedent** 47:22
**precise** 105:19
**precisely** 12:22
**precluded** 116:21
  116:24 142:12
  146:4,5
**precludes** 18:7
  102:20 148:12
**preclusive** 16:9
**precursor** 69:11
**predicate** 124:8
  131:3 158:1
**prejudice** 96:3,6,8
**prejudices** 57:15
**prematurely** 149:24
**prepare** 168:15
**prepared** 38:7
**preparing** 105:23
**prepetition** 15:18
  16:1
**present** 75:19 76:1
  76:24 77:6
**presentation**
  126:19 132:15
**preserve** 155:18
  156:3 163:3
**preserving** 97:10
**press** 49:13
**pressed** 98:20
**presumed** 65:23
  74:23

**presumes** 72:10,14
**presumption** 64:5
**pretty** 19:14 79:11
  90:21 91:10 141:25
**prevail** 159:6
  165:17,17
**prevented** 14:23
**previewed** 103:6
**previous** 104:21
**prevost** 3:18 98:15
**pricewaterhousec...**
  145:1
**prima** 67:9
**primary** 157:16
**prime** 6:25 7:8 9:5
  10:14 20:15 23:13
  29:7 33:10,17 34:16
  55:23 56:1 59:9,13
  59:14,21 60:11,12
  60:15,16,25 61:15
  61:20 62:8,14 64:3
  64:4,23,23 65:8,10
  69:25 73:11,13
  74:21 83:14 84:25
  86:8,24,24 87:8,11
  88:5,19 99:12
  100:13 101:15,16
  102:11 117:20
  122:19 126:24
  127:1 131:13 134:5
  146:3,6 151:10,10
**principal** 86:15,18
**principals** 86:22
**prior** 10:24 100:21
  138:22 142:19
**probably** 103:25
  110:5 114:2 166:15
  168:3,4
**problem** 28:9 29:10
  29:14 35:6 48:22
  90:16 133:20
  134:23 145:13,13
  149:11
**problematic** 94:7,8
**procedure** 39:4,6
  120:2 155:3

procedures 96:12
120:16,18 121:19
121:24 130:2,8
proceeding 8:6,15
10:2 12:20,23 13:4
13:18,24 14:1,4
15:4 16:16 18:9
24:22 25:22 34:4
35:6 41:7,25 43:20
44:1 45:8,9,14,16
45:19,19 46:5 47:17
47:19 55:19 57:13
82:21 85:1 95:11
119:5 137:3 139:11
139:18 151:12
158:11
proceedings 96:16
108:5 126:25 137:7
148:20 152:20
154:20 168:21
170:4
process 39:22 96:11
98:2 113:2 130:11
produce 92:3
produced 125:13
profit 26:16 27:14
34:11
profitability 27:9
progress 138:15
prohibited 85:17
projections 77:13
89:25
promise 16:14
35:18 36:7 92:7
promises 16:4
promptly 27:22
proof 7:21 38:9,19
38:21,24 39:1,5
40:5,15 51:8,9 74:5
80:19,23 81:8 94:4
94:25 124:23
131:12 140:12,16
148:16 150:5
153:24
proofs 25:6,18
59:18 125:2

properly 13:17 15:8
80:23
properties 102:3
property 18:17
66:24 135:8 136:25
138:23 139:6,7
140:4
proposed 138:22
proposition 21:22
36:6 67:12 145:3
prosecute 120:22
prospectus 50:18
protect 21:6
protected 23:20
78:18
protection 16:23
125:11,15,20
127:10
protective 166:12
168:13
protects 77:11,12
prove 82:15 162:9
163:4
provide 34:13 59:25
60:12,23 63:9,17,21
63:23 64:3 70:20
105:24
provided 60:13
127:15,16 139:23
provides 125:16
127:3
providing 63:19
proving 67:10
114:20
provision 19:25
43:24 44:3,6,9 82:8
86:1 87:15 136:20
158:25 159:8,22
162:10
provisions 18:23
40:21 41:3 46:16
50:18,19 62:13
110:2 122:22
126:16 134:24
153:17,25 159:25
prudently 33:21
94:11

public 46:19 47:8
53:20 58:18 76:21
79:9 111:9
puerto 68:22
pull 44:19
punitive 91:25
purchase 135:7
151:3
purchasing 18:16
110:22
purely 31:1
purported 137:4
purpose 21:6 27:18
63:18 88:4 96:15
102:7,9 132:20
purposes 60:25
61:25 62:17 65:16
97:9 109:21 154:22
154:23 155:3,4
pursuant 31:14
47:7 59:23 60:17
87:11
pursue 165:6
pursued 10:23
put 7:23 16:7 22:21
28:23 39:10 49:11
53:11 73:23,23,23
74:22 85:20 89:16
97:20 99:24 100:20
106:5 112:14,15
122:21 129:17
145:13 147:22
165:11
putting 39:20 41:10
41:16,17 64:10,10
154:10
puzzled 144:16
pwc 107:21
pwc's 108:2

q

quakes 45:3
qualitative 18:22
question 8:23 10:5
16:15 40:6 42:8,19
45:25 49:21 63:11
67:16 68:2 79:18
84:23 107:11

108:12 109:7 116:7
122:23 135:15
140:25 141:3
150:19 155:20
163:23 166:8
questions 33:13
69:9 149:1 156:22
queue 155:8
quick 136:7
quickly 58:25 75:5
75:6 99:15 122:16
149:4 155:9,24
166:3
quite 99:9 109:24
156:25
quotation 27:14
quote 27:10 51:13
136:15
quoted 157:22
160:5
quoting 27:6

r

r 2:1 3:1 6:1 26:23
170:1
radar 140:13
railroad 66:21
raise 52:12 82:15
124:13 141:11
raised 7:17 36:3
43:16 54:20 58:13
75:14 79:8 113:3
raises 26:7
raising 57:25 58:15
ralph 3:8 6:10
85:13
ramond 128:13
129:20 130:15
151:23
ramond's 129:19
ranch 102:1
rare 6:4
rate 112:1
rbs 26:23
reach 101:4
reacting 142:22
read 37:16 44:20
60:22 63:15 69:11

[read - require]                                                                    Page 26

72:10,25 76:15 79:9
85:17 94:23 111:6
125:9 139:7 150:5
154:14 159:2
161:10
**reading** 49:9 91:7
102:17 104:25
**reads** 7:22 21:15,17
**ready** 98:13 156:18
**real** 18:22 22:20
34:15 67:1 135:13
153:18
**reality** 54:10
**realize** 34:11
143:12
**really** 17:17 21:2
22:8 23:2,9 24:25
32:17 36:5,13 37:22
43:6,15 48:1 49:20
54:5,11,25 55:18
57:17,24 75:22 76:5
76:18 82:19 83:24
85:25 86:3 93:7,15
99:10 108:11 109:2
109:20 111:17
112:6 115:25 116:3
119:9 124:4 127:14
132:11 133:23
136:7,7 140:14
142:11 143:25
145:3 150:22
151:22 155:24
160:14 162:13
163:1 168:9
**reason** 18:23 93:9
166:13
**reasonable** 24:18
24:23 30:8,18 31:19
32:8 49:20 50:7,14
50:17,18 52:22 53:3
53:6,16 97:3 120:19
164:15
**reasonably** 34:25
53:20 76:4 78:5
79:2
**reasoning** 53:4

**reasons** 7:6,9,12,14
75:17 153:18,20
**reassurance** 31:18
**reassure** 33:15
**reassured** 16:6
**rebuttal** 50:10
**recall** 31:2 123:16
127:14,17 128:10
129:9 131:9 135:8
136:24 137:14
152:24 153:12
**recalled** 128:3
139:14
**recalls** 33:19 34:8
94:9 95:2
**receive** 134:14
**received** 13:5 20:18
51:11 144:19
**receivership** 144:25
**recessed** 98:12
156:16
**recital** 85:24
**recitals** 159:20,20
159:20
**recites** 86:7
**reckless** 26:11 29:4
**recklessness** 27:4
**recognize** 62:12
**recognized** 15:8
**recommendation**
167:19
**reconvened** 98:12
156:16
**record** 7:23 16:2,3
16:5 29:13 49:12,15
80:8 106:5 109:17
129:11 131:12
150:24 151:1
152:19 155:18
159:7 162:17 170:4
**recover** 47:8 90:11
**recoveries** 138:18
**recovery** 18:6,8
163:14 164:23,24
**red** 36:3
**redeliver** 67:11

**redemptions** 165:7
**reduce** 27:22 77:4
96:18
**redundancy** 163:12
**redundant** 158:4
160:8
**refer** 11:12 94:21
**reference** 19:21
167:7
**referenced** 125:8
**references** 125:15
**referencing** 168:7
**referred** 11:12
85:24 128:25
**referring** 86:8
**reflecting** 150:14
**reflects** 62:16
166:23
**refrain** 27:19
**regard** 85:15 93:2
100:4
**regarding** 25:20
33:14,16 51:14
89:25
**registered** 66:10
**registration** 61:9
87:17
**regulated** 16:22
62:13 63:1
**rehypothecate**
134:22 151:8
**rehypothecated**
127:11 128:1
152:25 153:9
**rehypothecating**
146:8
**rehypothecation**
127:24 145:16,20
146:21 148:5
**rejecting** 138:22
**relate** 82:20
**related** 7:7 11:13
61:5
**relates** 125:2,5
**relationship** 22:1
30:3,4 34:20 80:11
87:9 130:1 135:10

151:5
**relationships** 33:11
**relaying** 151:3
**relevant** 67:23
83:24 87:16 168:9
**reliable** 33:23 94:13
**reliance** 24:23 30:8
30:19 31:17 32:6,10
40:11 49:20 50:7,14
50:17,18 52:22 53:3
53:5 89:18 92:3
120:10
**reliances** 24:18
**relied** 85:17 94:19
**relief** 6:24
**rely** 34:25 78:5
85:16 114:4 117:2
153:22
**remain** 124:11
**remaining** 10:21
**remains** 90:2
140:20
**remarks** 51:13
**remember** 53:12
109:15 140:24
168:8
**reminded** 133:7
**reminds** 144:17
**removed** 42:17
**rendered** 68:6
**renders** 156:2
**replead** 39:24
**reply** 7:3 14:10
21:22 28:15 35:13
52:13 64:7 75:16
79:8 86:13
**report** 167:19
**reports** 138:15
**represent** 80:14
89:24 99:7
**representation** 90:3
**representations**
27:19 34:25 93:16
**representative** 33:4
104:15
**require** 88:16

**required** 34:14
**requirement** 27:7
  39:21
**requirements** 96:13
**requires** 27:1
**rescheduling** 37:10
**reserve** 7:16 34:1
  94:16
**resided** 151:9
**resolve** 13:8
**resolved** 24:4 104:3
**resort** 110:17
**respect** 23:12 38:11
  40:8 43:13 46:3,20
  51:1 55:4 60:24
  73:2 75:11,13 78:24
  79:5,17 80:16 83:11
  88:2 95:24 96:4,7
  99:11 100:14 101:3
  111:5,16 124:21
  141:24 153:4
  165:20
**respecting** 8:4
**respects** 112:7
**respond** 55:18
  92:11 95:7 159:11
**responded** 24:16
**responding** 152:6
**response** 6:23 7:17
  25:1 26:17 27:18
  33:6,7,13 44:17
  52:1 89:8,10 95:15
  118:22
**responses** 11:5
**responsibilities**
  86:25
**responsibility** 74:18
**responsible** 68:15
  70:1 72:2 102:1,8
  154:1
**rest** 35:1,25 59:16
  135:1
**restart** 98:2
**resting** 150:19
**restriction** 13:19
  14:17 45:22 137:19
  138:5 141:7

**restrictions** 13:13
  15:20 44:23 136:16
  136:23 137:4,8,13
**rests** 157:20 160:4
**result** 46:18 47:4
  115:16
**resulted** 15:19
**results** 112:5
**retained** 63:13
**retirement** 76:22
**retroactive** 39:21
**return** 8:15 20:1
  43:19 67:21 136:24
  137:14 138:23
  142:12
**returned** 8:7 12:15
  12:21 23:23,24
  64:12 67:19 112:12
  123:16 139:14
**returning** 23:22
**returns** 27:20
**reversed** 54:12
  67:11,12 79:14
**revisit** 120:18 168:8
  168:8
**rico** 68:22
**right** 6:7 8:25 10:4
  11:18 13:2,23 16:9
  16:10,20 17:19
  22:15,19 30:8,10
  31:10 32:21 34:2
  36:21 37:9 38:3,25
  39:2,4,11,12,16,17
  39:24 41:9,13,18,19
  42:21 43:11 45:6,8
  45:9 46:6,10 47:6
  48:13,14,16,19
  49:19,19 50:4,6
  51:6 53:10,12 54:14
  54:17 56:18 57:9,12
  57:22 58:9 59:22
  60:19,21 61:21 63:2
  63:25 67:16,23 69:2
  69:5 70:7,12,19,23
  71:3,9,12,21 73:14
  74:4,15,15 75:3
  77:19 78:5,11,12,13

78:15,16,23 79:3
81:21 83:19 85:5
86:10,21 88:12
91:19 95:12,18,21
97:13,24,24 98:4,5
99:1,18 102:15
104:18 111:14
112:19 113:10
114:18 115:15
116:2 117:17,20,22
119:11,14,15,19
120:8,20 121:2,17
121:22 122:3,8,10
124:3,5,10,11 126:7
126:10 127:2,5,13
128:5,12,15 129:14
129:19,25 130:18
130:21 131:21
134:6,25 136:4,13
136:21 137:9,16,23
137:23,25 138:19
139:15,19 141:20
141:23 142:17
144:1 145:8,24
146:1,17,22 147:6,8
147:24 149:4,12
151:3,4,15,21,25
152:14 153:3 154:4
154:21 156:12,17
157:3,8,12,24
158:13 161:2,4,7,14
161:21 162:17,18
163:19,24 164:19
165:8 166:13 167:2
167:8,10,10,17
168:12,18
**rights** 96:11 97:10
  123:17 127:3 151:7
  151:13 153:5
  155:19 156:3,4,11
**ringing** 51:20
**riot** 140:5
**riots** 45:1
**rise** 29:1 32:15 35:8
**risk** 77:2,5 140:4
**risking** 165:13

**risks** 25:12 76:16
**road** 125:25 145:2
  170:23
**robust** 77:3
**rockmon** 105:13
  144:20 145:3
**roger** 105:14 125:8
  128:14 130:19
**roll** 149:11
**room** 49:16 163:6
**rose** 102:1
**rubric** 162:12
**rudnick** 4:9 118:10
**rule** 26:4,25 28:3,10
  30:16 35:9 52:12
  75:14 76:3,20 78:22
  79:8 92:25 96:14
  149:13 162:22
  164:5
**rulebook** 135:6
**ruled** 56:19
**rules** 127:10
**ruling** 95:20 97:11
  101:6 119:1 154:24
  154:25
**rulings** 44:24
  112:16 169:3
**run** 102:2
**rush** 104:3

|  s  |
|---|

**s** 3:1 4:6,13,21 6:1
  27:11,11
**sachs** 67:4
**safekeeping** 61:25
**sailed** 57:9
**sailing** 137:3
**sale** 17:6 135:7
  140:22
**sales** 93:8
**satisfy** 27:7 39:7
  126:2
**saved** 48:8
**saying** 12:15 18:4
  41:16 47:3,10,25
  48:1,17 49:24 56:21
  57:10,24 68:11,13
  68:14 69:23 71:7

77:9 78:17,24 79:4
79:22,25 82:19 87:2
89:9 91:8 93:7 94:7
94:8 112:7,8 117:9
121:25 122:4
126:25 129:20
130:8,19,22 137:18
139:12 140:14
141:18 143:11,11
143:13 150:22,23
151:2 159:15,16
164:3
**says** 7:25 15:22
19:21 20:20 21:2,18
22:6,8,21 26:24
27:14 29:20 34:7,18
34:21 35:4,17,19
39:23 46:23 51:8
59:2,6,11,12,13
60:4,16,16 62:6,9
63:4,6,8 64:22
65:13 69:24 70:6
71:13,16,19 72:1,22
73:6,7,9 74:25
79:21 84:24 86:1,14
87:5,6,7,10,12
89:17 91:14 93:4,19
94:21 103:17,20
104:16 106:2,10
110:11,19 125:22
129:6 134:5 137:7
139:25 148:14
151:10,19 159:21
**scc** 1:7,13
**scene** 107:21
**schedule** 97:6
**scheduled** 107:18
**scheduling** 35:25
**scheme** 138:23
**school** 19:12
**scm** 25:9,20 33:6,16
**scope** 32:5 96:9
**scorecard** 122:17
124:18 126:6,14
**screen** 140:13
**sec** 78:20 86:9
108:21 127:9

**second** 12:14 19:8
25:4 27:12 38:15,21
39:23 40:12 44:2
76:22 94:9 139:22
**seconds** 93:25 94:1
95:6 128:18
**section** 13:9 17:18
17:20,21 19:2,3,18
24:4,7 87:16 135:25
137:5,6 153:18
**sections** 123:24
**secured** 33:25 94:16
**securities** 8:4,7,15
8:16 9:6,9,11,25
12:1,3,14,16,16,17
12:21 13:2,6 15:6
16:23 17:1,4,5,8,12
18:17 20:1,4 21:8
21:12,20 22:4,7,9
22:16 23:20,22,23
23:24 24:1 26:23
35:3 40:25 43:14,19
48:24 50:24 51:4
53:24 56:9 61:9,19
62:1 64:11 67:18,21
68:1,25 74:9 78:10
83:15,16 87:17,18
91:16,17 100:2,17
100:22,24 101:20
103:19,19,22,25
110:22 111:4
112:10 123:15,15
126:20,23 127:4,8
127:17 128:2 129:7
129:10 130:3,5,20
131:18 132:19,23
133:15,17,21 134:4
134:13,17,20 135:7
137:14 139:14
140:7,14 141:5
142:6,10,12,18,18
143:21 144:12,14
146:9,21 147:16,20
148:2,4,8 149:16
150:6,15,20,21,25
151:1,8,14,18,20
152:3,5,8,15,25

153:4,5,6,9 154:6
154:16
**security** 14:22
16:14 61:9,17 87:17
88:5
**seduced** 100:10
**see** 53:16 54:10
55:9 68:23,25 99:15
99:21 103:10,24
104:24 105:22
117:18 129:1 134:1
137:19 155:1,5
156:14 160:16
161:16 164:22
166:9 167:19
**seeing** 61:3
**seek** 38:23
**seeking** 9:3 164:24
**seen** 55:8 100:14
108:20 133:16
**sell** 151:4
**seller** 22:23 23:1
**selling** 18:16 110:22
**semantic** 159:4
**semantics** 160:10
**send** 168:12,13,15
**sends** 104:16
**senior** 27:23 33:8
80:20 81:2 91:5
**sense** 17:3 54:8
97:25 109:8 151:4
**sensitive** 118:25
**sent** 12:17 128:16
152:5,7
**sentence** 7:21 60:16
94:9
**separate** 30:10,11
95:20 116:24
132:22 160:12
**separately** 102:6
**september** 16:2
24:11,14 31:3 32:25
89:19 95:10,11,14
95:14,17 103:16
104:2,14 131:3,4,23
132:1 140:17

**series** 7:9 86:14
111:1
**services** 33:3 45:2
60:1,13,24 63:17,19
63:21,24 64:4 65:15
68:16 70:21 81:3
86:17
**serving** 88:15
**set** 14:12 36:18
62:15 100:22
104:12 107:7 110:7
126:5 130:2 143:18
159:22 162:23
165:10
**setoff** 38:18
**sets** 59:7 126:22
**setting** 48:7 62:17
**settle** 70:3,6 105:2
107:17,18
**settled** 86:16,18
109:4
**settlement** 104:24
105:15 108:10,15
134:9 144:11
**settlements** 105:17
144:11
**settling** 70:1 108:21
**setup** 85:25
**seven** 4:10 98:9
139:25
**sever** 65:21
**severable** 77:2
**severally** 65:23 66:3
68:4,16 70:17,22
71:14 72:18 73:7,18
87:4
**severely** 19:23
20:17
**severing** 72:17,19
73:17 74:23
**shadow** 38:17
**share** 96:18
**shaw** 108:23
**sheila** 2:24
**shelley** 2:2
**shield** 6:5

ship 57:9
shmuel 4:7
short 131:2
shortage 12:16
shorthand 8:17
shortly 33:1
shouldn't 133:22
  142:14
should've 137:2,2
show 9:24 27:16
  29:12 80:8 81:14
  105:2 108:21
  122:17 123:23
  129:17
showing 16:4 27:1
shown 7:4 24:14
  111:2
shut 19:15
sic 39:8 66:21 99:21
side 81:21 154:11
sidetracked 116:8
signatory 60:5
  62:16 86:4
signature 65:18
  69:11 71:19 72:25
  73:17 86:3
signed 20:9 60:2,3
  64:15,20,22,25 87:3
  151:10
signing 71:20 72:25
signs 86:6,6
similar 13:16 18:24
  27:14 42:6 56:1,2
  65:11 83:12,15
  95:19
similarities 68:25
similarity 10:11
simple 15:15 18:1
  112:24 114:22
  144:24
simpler 62:20
simplest 7:12 13:7
simplify 8:24
simply 10:23 35:8
  103:14
single 64:13,19,25
  163:14

sipa 8:5,14 10:2
  12:20,22 13:4,18,23
  14:1,3,3,6 15:4,6
  16:1,16,23 18:7,9
  24:21 25:22 34:4
  35:6 41:6,25 42:11
  43:10,11,13,20,21
  43:25 44:1 45:8,9
  45:12,13,13,15,19
  45:19 46:4 47:16,19
  55:19 57:13,18,21
  57:22 70:4 82:21
  85:1,15,16 90:12
  95:11 134:3 139:18
  139:21,22 149:19
sit 163:22
sitting 9:15 37:13
  78:10 92:16 130:18
situation 51:17
  58:23 79:12 100:2
six 104:1 122:12
  132:4 137:16,17
  140:9 146:13
sixty 96:24
skipping 25:16
  76:25
skips 49:6
sleeves 149:11
slightly 73:15
smacks 104:10
small 84:25 100:22
smarter 99:22
smartest 83:10
smith 3:23 98:14,14
  99:1,4,19 101:9
  102:25 103:6 105:9
  105:11 106:9,12,16
  106:16,18,22,25
  107:2,4 108:16,19
  111:7,14 112:20,23
  113:2,10,12,15,17
  113:21,23 114:8,13
  114:16,18,20,22,24
  115:2,5,8,10,13,18
  115:20,24 116:3,10
  116:12,16,19,22
  117:4,8,14,18,22,25

118:5 120:24 121:3
  121:6,18,21,23
  122:1,6,9 125:8
  126:14 128:23,25
  132:13,18,24 133:7
  133:10 135:5 142:2
  142:8,13,17,23
  143:1,24 144:2,6,16
  145:9,12,18,21
  146:2,18,23 147:3,5
  147:7,9,22,25
  148:11 149:3,10
  150:13 151:2 154:2
  154:3 155:12
smith's 118:18
  122:25 126:17
smoke 114:3
smokescreen
  130:15
smooth 137:2
smoothly 17:13
snatch 118:16
snowstorm 37:5
softball 9:1
sold 34:11
solutions 170:22
solves 134:23
somebody 9:14
  19:15 29:24 35:18
  35:23 36:7 48:11
  53:14,19 91:14
  92:18 93:4 130:19
  152:2
soon 34:11 77:22
  107:15 167:3
sooner 108:12
sophisticated 18:6
  49:8 62:5
sorry 11:20 60:10
  69:19 95:7 112:22
  115:1 116:24 125:2
  144:22 149:5,6
  151:19 155:15
  156:17
sort 19:9 93:21
  117:14 126:15
  128:23 162:17

sorts 93:1
sought 33:15
  152:15 154:19
sounds 57:7
sources 33:22 94:12
south 2:24 170:3,7
southern 1:2 26:24
speak 52:14 55:1
  76:19 84:16
speaker 26:9,10,14
  76:4 79:21
speakers 76:14
speaking 51:17
  75:13 76:3
speaks 77:5 89:17
  90:5
special 30:3,4 102:7
  102:9 122:21
  163:10 164:3
specific 15:2 16:4
  16:19 25:4 28:18
  53:7 58:15 68:19
  72:17,23 73:3 92:13
  160:16,18,20
specifically 6:16
  7:17 28:7 33:9 44:5
  46:3,13,22 65:21
  74:5 80:25 91:13
  96:14
specificity 8:8
specifics 27:17
specifies 153:24
specify 80:25 130:8
spent 126:24 137:15
  137:16
spin 34:14
spirit 98:4
spoke 81:3
spool 10:7
spot 99:15
spun 128:23
square 4:10,17
  119:1
stability 25:9 33:9
  33:17
stack 166:17

**stage** 96:15 147:18
**stand** 36:5 100:10
   109:10 117:9
   149:15
**standard** 39:7
   104:9 110:17
**standards** 91:18
   104:8 133:20
**standing** 133:15
   134:14 149:13
**standpoint** 59:20
**stands** 72:4 117:6
   117:13
**start** 6:7 7:11,19
   19:19 45:18 59:19
   98:10 114:3 142:17
   143:8
**started** 89:9 103:7
**starting** 43:5 98:25
**state** 38:22 86:17
   109:9
**stated** 6:24 7:20 9:7
   20:7 33:19 34:8,11
   94:10 95:2
**statement** 26:11,25
   28:14 71:13 77:13
   78:9 89:18 90:1,15
   92:13 127:20
   142:25 144:24
**statements** 17:13
   24:24 26:19 28:13
   28:19 32:7 35:16
   37:20 49:4 77:12
   78:6 89:22,23 91:2
   91:11 92:2 95:16
   122:25 150:14
   153:23
**states** 1:1 81:9
   87:20
**stating** 61:7
**statutory** 18:8
**stay** 16:7 53:15
   55:14 139:12
**stayed** 112:12
**stearns** 33:20 94:11
**steel** 4:13 115:22
   116:1 118:6,9,9,16

118:21,25 119:8,11
119:14,17,20 120:8
120:13,15,18,22,25
121:9,13,16 122:3
122:11,14,16 123:9
123:13,20,22
124:11,15,25 125:5
125:8,13 126:11,13
126:19 127:7,22
128:7,9,12,20,22
129:2,5,16,25 130:7
130:13,24 131:9,11
131:20 132:3,12
133:5,12,16,24
134:8,12,25 135:3
135:23,25 136:3,7,9
136:19 137:11,23
138:1,4,10,12 139:5
139:17 140:2,8,16
140:19,24 141:2,14
141:17,21,24 142:4
142:7 143:11 149:4
149:5,7,7,17 150:9
150:23 151:7,16,21
152:1,7,14,22 153:4
153:13,16 155:15
155:16,17,17 156:5
156:5
**step** 40:12 42:17
   65:7 105:25 119:23
   119:24
**steps** 100:1 111:2
**sterling** 112:1
**stewart** 5:7 156:19
   168:16
**stick** 31:18
**stock** 9:14,15 29:20
   29:22 46:1
**stone** 55:24
**stonehill** 4:2 6:17
   6:17,18,21,23,25
   7:5 9:3,7 15:22
   16:6 19:21 20:16
   21:5,15 24:13,16
   27:18,19 28:5,25
   35:14,15 36:4 50:22
   50:24 51:4 55:8

56:3 60:1 62:1
80:10 81:4 96:10
99:13,23 100:4,15
101:5,13 110:3
112:16 117:1
126:25 139:22
151:12
**stonehill's** 7:7 89:18
**stood** 99:9
**stop** 34:2 69:6
   126:1 132:10
**store** 29:19 31:17
   51:16
**storm** 93:4,5
**story** 30:4 113:11
   127:7
**stranger** 29:17
**streamline** 119:5
**street** 3:4 4:18
   29:24,25 49:12
**strength** 33:15
**stricken** 10:24
**strictly** 101:2
**strikes** 45:1
**string** 105:11
**strong** 27:3 31:18
   78:15 90:2
**structure** 88:4
**stuck** 132:11 138:21
   150:25 151:1
**stuff** 32:7 35:1
**stumbled** 91:22
**sub** 152:18,23
**subject** 66:6 157:13
   158:10 159:6
**submit** 167:19
**submitted** 11:5
   166:9
**submitting** 139:20
**subsequent** 90:1
   132:5
**subsidiaries** 23:16
   23:16,16
**subsidiary** 23:11
   64:3
**substance** 136:4

**substantial** 25:12
   138:13
**substantive** 89:7
   162:19
**substituted** 67:3
**subtle** 62:3
**success** 27:10
**sue** 29:22 30:1
   63:11,12 91:16
**sued** 6:13 28:21
   101:18 141:21
**suffer** 41:1 117:15
**suffered** 55:8,10
**sufficiency** 37:23,25
   38:8,8,10 40:14
   81:7 89:4 115:6,19
   116:9,12,20 119:18
   119:24 129:15
   143:20 147:17
   149:25 150:2
   154:17
**sufficient** 27:15
   33:22 34:12 40:6
   94:12
**sufficiently** 26:7
**suggest** 25:3 96:23
   164:3
**suggesting** 155:24
**suggestions** 32:1
**suggests** 81:18
   120:4
**suing** 101:21
**suisse** 99:25 103:19
   130:21
**suite** 3:5 170:24
**summarize** 7:15
**summarized** 13:11
**summary** 36:17
   120:5 167:23 168:3
**sun** 6:4,5
**sunday** 77:25
   109:17,18 136:9
**sunshine** 165:25
**superior** 67:5
**supp** 66:22 67:8
**supplement** 26:18

supplemental
  100:20 128:24
  129:5 130:24
support   19:6 25:13
  25:14 33:5 90:4
  158:16 160:14
supports   19:4
suppose   8:20 9:13
  119:25 131:21
supposed   95:10
  148:22
sure   9:17 17:24
  23:23 24:1 36:24
  37:15,18,18 44:12
  45:20 58:25 61:21
  62:11 65:9 97:4
  106:9 109:18
  124:25 130:6 136:6
  139:13 155:20
  156:8
surely   167:4
surety   148:18,22
surplus   33:25 94:15
surprise   109:24
survive   93:5 95:22
  123:6 124:5 147:17
  154:17
survived   119:24
survives   115:17
  116:9 165:15
suspect   88:8 146:23
suspension   13:14
  13:20 15:20 44:24
  45:23,24,25 46:1
  110:9,11 136:16,23
  137:4,8,20 138:4,12
  138:17 139:4,6,8,10
  142:11 152:13
suspensions   137:13
sweat   115:25
sweeping   61:23
  90:15,16
swept   24:7
swirling   53:13
symbolical   67:3
system   76:22 77:3,3
  77:4

systems   1:14 5:2
  156:20

              t

t   104:25 105:1,2,5
  105:15,17 106:1
  108:9,14,19 129:20
  135:5,9,13 143:17
  170:1,1
table   113:8 163:17
tackle   156:23
tagged   102:14
tailored   46:13
take   7:23 12:10
  20:3 30:14 89:9
  97:12 98:9 103:21
  105:12 107:8
  111:11 116:14
  117:19,23 121:11
  122:25 126:6,9
  127:4 143:3 144:16
  151:13 156:12,13
  156:25 167:8
taken   51:10 75:7
  77:7 117:2,3 119:2
  128:17
takes   15:15 19:17
  28:25 29:7 61:17
  108:3 152:25 155:2
talk   7:12,17,18 13:7
  14:15 17:22 20:24
  24:9 25:2 32:13
  37:22 71:11 85:19
  112:18 142:8,9
  145:22 146:7 155:3
  156:7
talked   71:10
talking   28:6 50:17
  51:11,19 57:5,6
  61:4 78:15 79:13
  81:25 91:7,8 103:22
  108:6,11 111:17
  139:5,19 152:1
  158:1
talks   46:12
tall   110:25
tangible   34:12

technical   30:6
technically   8:21
tee   110:7
tell   37:16 38:5
  48:20 55:7 68:18
  94:18 99:2 104:10
  115:1,16 142:15
  149:17 150:7,18
telling   16:11 31:16
  65:5,12 68:17
  105:13 131:23
  149:14,15 150:9
  152:5 161:6,9
tells   85:9 103:10
  113:21
temperature   166:3
ten   95:6
tenet   86:18
tens   136:10
term   108:15 134:4
  160:3,15,15
termination   110:12
terms   18:14 28:4
  40:10 59:7 73:10
  112:8 126:14 151:3
terrible   48:8
terrorism   14:19
  140:5
terrorist   14:21,25
  44:25
test   121:6
testimony   32:23
texas   106:2,11,12
thank   11:19,20
  36:21,22 37:3 54:17
  84:19,22 85:12
  93:23,24 95:5,17
  98:5,7,14 103:5
  116:1 118:4,5 142:6
  142:7 149:2,3
  155:13 156:14
  162:6 168:18,19
thankful   166:2
thanks   162:5
that's   99:20 101:23
  102:22 103:20
  104:1,25 105:1

106:3 109:20
  111:14,17,23 112:6
  112:15 115:16
  117:22,25 119:6,12
  119:23 120:10
  121:20,22,25 122:1
  123:4 124:1,13
  127:7 128:25
  130:10,10 131:2,5
  131:17 132:4 133:1
  133:3 135:7 136:16
  136:20 137:1,5
  139:3,8,15 140:2
  143:2,3,5,6,10
  145:13 147:5
  148:11,15,23
  149:10,17 150:7,8
  151:12 152:4,21
  153:1,5 157:13,14
  157:18 158:1,7,10
  159:2 160:3,7,8,17
  161:3 162:12
  163:16,25 164:22
  167:10 168:5,5
theme   35:4
theories   19:20
  57:15
theory   57:4 64:9,13
  68:12 70:8 143:24
  143:24 160:15
  163:14
there's   100:9
  103:24,25 106:22
  111:12 113:18
  114:2 116:20
  118:18 120:3 123:9
  125:17 126:21,23
  129:19 130:2,25
  131:15 132:20
  135:6,11 137:19
  138:4,6 142:20,20
  146:9,16 148:2,14
  150:23,24,24
  151:21,24 153:11
  159:7,21 160:3
  164:23

**they'll**  146:23
  165:17,17
**they're**  101:14
  103:8 112:7 117:8
  119:4,10,18 123:24
  137:18 141:18
  142:22 143:14
  145:2 152:9 159:21
  160:7,11,14 163:5
  164:16,20 165:3
**they've**  101:25
  102:4,7 112:6
  144:19 148:15
**thicket**  167:13
**thin**  19:9 32:17
**thing**  16:24 20:12
  25:25 26:1,2 43:23
  45:11 51:6 52:21
  69:15 75:13 84:4
  85:24 104:14 105:1
  110:12 111:23
  119:13 124:18
  128:15 135:8 146:8
  150:8,12 152:8
  160:11,12
**things**  14:19 15:3
  16:19 19:12,13
  25:24 26:15 39:9
  44:4 47:4 48:8 55:4
  58:2 59:1,2 69:25
  70:15,16 72:23
  74:10 76:11 86:19
  86:22 93:7,15 95:13
  98:5 100:10 107:21
  111:16 122:9,24
  123:13 125:17,22
  127:5 147:1 152:11
  152:17
**think**  8:19 10:9,14
  11:22 14:4,15,16,18
  15:8,10,15 16:10
  17:17,21,25 18:1,2
  19:12,17 22:8 23:6
  24:19 26:6,21,22
  28:24 29:6,18,20
  30:6,12 31:2,16
  32:6 35:7 36:20

37:21 38:4,25 39:2
  39:6,17 40:2,3,8,12
  40:13 42:7 43:1,5
  45:12 46:25 47:1
  49:10 50:9,10 51:7
  51:15 53:10,14,22
  54:24 55:1 57:13,16
  59:1 60:20,20,21,22
  62:2 66:1,2,2,5
  70:18 73:19,19
  75:16 79:11 80:12
  80:16 81:6,7,12,19
  81:19,21,22 83:22
  83:24 84:10 86:25
  88:21,24,25 90:21
  93:1,18 97:7 100:3
  102:15 107:7
  108:25 110:5
  111:15 112:15
  114:10,24 115:10
  116:4 117:4,5,9,11
  117:12,22 118:1,18
  119:21 120:1
  121:11 122:3,20
  123:22 124:12
  126:7 127:18
  128:23,23 130:4,6
  130:13,14 134:22
  135:6,9,13 140:8
  143:10 144:7,8,8
  149:18 150:3
  152:22 153:9,16,17
  153:21,22 154:3,10
  154:11,16 155:1,12
  158:17 162:13,18
  163:1,3,5,7,12
  164:6,6 165:2,4,11
  165:15
**thinking**  101:12
  142:15
**thinks**  66:4 81:10
  85:10
**third**  2:7 6:16,23
  46:14 88:10 126:1
  140:22 169:5
**thirty**  76:22

**thought**  126:14
  133:24 151:1,9
**thousand**  95:8
**thousands**  93:14,14
  136:10
**three**  7:22 11:24
  43:6 85:23 101:21
  102:25,25 104:23
  108:25 119:5 134:8
  157:4
**threshold**  8:23
**thumb**  167:18
**thursday**  104:15
  105:4,20 142:19
**tied**  15:7 141:7
**till**  122:2 156:6
**time**  4:10 7:16 8:14
  13:6 26:13 27:23
  35:23 37:4 49:8
  54:3,8 65:8 75:8,15
  85:1 92:1 93:6,10
  93:11 96:20 97:3
  98:1,7,20 106:3,7
  106:15,20 113:3
  115:24 126:24
  127:14,17,18 128:5
  137:15 150:12
  156:12 167:4
**timeline**  127:15,19
  135:1 136:5 137:1
**today**  6:2 10:20
  38:5 40:3 49:21,22
  57:12 67:23 95:23
  97:11 98:17 105:15
  133:15 149:15
  157:17 161:3
  162:15,21 163:22
  166:18 167:3
**toes**  137:1
**told**  103:14 104:2
  105:3,15,24 108:4
  121:18 128:14
  143:4
**tomorrow**  92:20
**tools**  122:6
**top**  35:22 36:1 39:3
  51:25 125:14

**tornados**  45:4
**tort**  7:7,9,13 17:21
  18:3 19:24 24:9
  28:25 32:15 35:11
  35:14 36:1,6 40:18
  41:12,17 43:2 75:4
  75:12 91:23 96:4
**torts**  18:4,4 36:15
  93:16
**totally**  114:6
**tourists**  93:11
**track**  37:8 104:7
**trade**  20:4 46:4
  70:3,6 105:2 107:14
  107:16 109:10
  131:14,24 138:17
**traded**  143:22
**trader**  135:10
**trades**  70:1 138:13
  138:16
**trading**  13:14,20
  15:20 16:16 35:5
  44:24 45:23,24 46:1
  101:23 102:1,5,8,14
  109:23,23 110:9,12
  127:11 136:16
  137:4,8,20 138:5,8
  138:13 139:4,7,8,11
  142:11 148:1
  152:13
**tradings**  136:23
**traditionally**  19:12
**traffic**  104:13
**transact**  59:10
**transaction**  62:22
  109:19
**transactions**  61:11
  62:23 87:13 88:16
  136:11
**transcribed**  2:24
**transcriber**  170:8
**transcript**  170:3
**transfer**  103:18
  104:23 105:4,8
  106:1 107:5,10
  108:12 128:4 129:7
  129:9,9 130:3,9,20

131:1,5 134:21
135:11 140:3
144:14 153:6
**transferred**  130:5
140:21 147:20,22
**transferring**  101:20
**transfers**  105:14
129:13 136:11
139:2
**transit**  167:3
**transition**  113:18
**translate**  61:22,22
**travelers**  93:11
**treat**  21:8 26:17
89:10
**treated**  35:15
**treats**  6:20
**trial**  82:16 162:14
167:8,23
**tried**  114:3 149:11
149:20
**tries**  21:16 29:22
151:18
**triggered**  13:17
**trip**  120:2,15
**troubled**  148:6
**true**  6:20 10:9
15:10,18 16:24 17:3
17:8 31:20 34:3,6
37:12 49:4,25 52:9
76:10 79:19,25
88:20 89:4 92:16
95:17 96:1 103:21
111:11 116:15
118:2 137:11
143:15 170:4
**truly**  67:1 94:1
104:10 145:2
**trust**  138:20
**trustee**  134:4
149:19
**truth**  29:5
**try**  70:2 85:14 92:5
98:21 161:24
**trying**  8:24 32:1,3
36:2 44:14 50:12
58:2 67:17 92:11

99:5 116:17 117:12
119:4 130:22 156:3
156:4,9 159:3 163:2
165:12
**tuesday**  107:18,19
108:12
**turmoil**  107:7
**turn**  46:6 58:24
59:5
**turned**  16:24 17:3
24:19 95:16 136:9
143:13
**turner**  3:23 98:14
**turning**  105:6
**turns**  22:6 132:6
**tweed**  4:16 163:9
**twice**  105:17
**two**  18:24 22:20
24:10 26:20 27:2
34:23 37:5 40:15,16
44:20 51:24 75:17
75:17 77:20 78:17
99:20 100:11 101:7
102:16 104:23
105:2 108:10,24,24
110:2 125:6,23,25
126:17 132:22
133:13 134:10
136:17 153:13
157:6,19 159:13,25
160:12 161:5
**type**  44:10 47:25
50:20 65:12 76:6,7
84:6 96:7 123:19,20
**types**  40:16,16
46:13 55:20 94:6
124:6,7

**u**

**u.s.**  1:19 2:3 127:9
127:24 151:8,16
**ucc**  23:19 24:2
**uh**  7:24 38:14 40:7
41:11 42:10,24
47:23 49:14 50:2
52:3,23 86:12
102:24 116:19
125:7 126:18 127:6

128:9 136:18
139:16 140:1
141:13 160:6
**uk**  138:6,6,22 139:9
139:9 150:16 151:2
152:5
**ultimate**  82:20
**ultimately**  111:19
111:24 154:9
160:19
**unable**  128:4
153:10
**uncertainty**  154:8
**uncle**  117:18
**unclear**  153:20
**undeclared**  44:25
**understand**  10:15
31:21 32:3 37:17
40:13 47:19 54:2,8
58:6 82:2 97:14
102:12 111:16
119:16 138:6 141:8
164:7,24 167:14
**understanding**
113:3 162:21
**understood**  151:12
164:7
**undisputed**  165:6
**unfair**  68:21
**unidentified**  103:4
166:25
**unilaterally**  119:3
**unique**  122:19
**united**  1:1
**unlawful**  86:15
**unliquidated**  123:5
123:10 148:7
**unquestioned**
129:11
**unquote**  51:13
**unrealized**  34:9,13
**unreasonable**  89:19
90:6
**untrue**  35:2 95:16
**unwillful**  48:4
**uphill**  162:4

**upside**  143:13
**use**  30:15 66:13
148:19 166:15
**usual**  138:3
**usually**  108:21
**utility**  45:2
**utter**  90:10

**v**

**v**  1:13 27:11 66:21
67:4,8 86:16 108:23
**vague**  33:3
**valid**  36:5 55:15
**value**  8:4,13 12:20
34:11 139:21
**various**  34:9 74:10
76:11
**vasser**  4:7
**vast**  11:1 43:17 65:9
**vehicle**  102:7,9
**vera**  33:20
**verge**  27:24 28:8
49:1
**veritext**  170:22
**version**  166:23
**versus**  26:23 27:11
52:25 105:8 132:11
160:11
**viability**  33:15
**victory**  118:17
**view**  9:2 40:20 41:4
41:5,6 47:15 58:9
62:15 69:10 73:1
82:3 163:2 164:8
**views**  51:14
**vin**  99:4 116:17
117:12
**violates**  39:22
**violation**  127:9,24
**virtually**  13:15 27:8
55:25
**virtue**  40:21 65:18
**visibility**  107:25
146:11
**voice**  104:16 130:19
**voicemail**  33:6
**voluntary**  11:3

**vote** 148:8

**w**

**w** 26:23
**wachnek** 52:25
**wait** 53:17 98:1,11
 109:11 118:8
 121:14 122:5 128:6
 128:6,8,8,8,8
 143:21 155:5
**waiting** 84:13 95:19
 121:3 122:12
 155:14 156:17
**waits** 105:20
**walk** 99:25 123:9
 123:23 128:5,22
 132:5 134:25 135:3
**walking** 29:23
**walks** 29:24
**wall** 49:12
**want** 11:2,24 25:2
 26:15 32:12 47:13
 48:14,15 51:20 54:9
 62:21 66:15 69:8
 85:19 102:12
 103:13 104:5
 115:21 120:2
 122:16 123:6 130:2
 134:13 141:15,25
 146:7 149:22
 150:20 153:15
 155:17,21,21
 156:10 157:16
 161:23 165:11
 166:7 168:6
**wanted** 26:14 51:24
 67:25 73:22 74:16
 74:19 120:19
 126:13 136:4
**war** 14:20 15:3,5
 44:24
**warned** 14:24
**warning** 105:12,16
**washington** 3:6
 4:19
**wasn't** 109:16,17
 130:1 131:17
 135:12,12 140:5,13

142:9,11 153:6
 167:21
**waste** 115:24
**waters** 125:21
 136:25
**way** 7:22 10:2 13:8
 16:13 19:24 21:17
 23:9 29:6 31:7 35:7
 51:22 52:20 54:21
 57:14 60:21 61:3,6
 62:15 63:8,12 71:21
 71:22 77:10 79:13
 81:17,20 85:20
 86:15 87:10,15
 88:21 93:19 99:12
 103:8,23 114:2
 121:12 147:23
 156:10 159:11
 160:2 162:20
 164:22 165:14,20
**ways** 74:8 160:25
**we've** 39:4 52:8
 71:4,10 80:1 89:11
 92:15,18
**weather** 45:2 83:16
**website** 108:21
**wednesday** 103:17
 104:5 128:3
**week** 104:4
**weekend** 31:6 107:6
 109:16 129:23
**weigh** 54:9
**weil** 3:2,10 6:11
**weird** 146:8
**wellmont** 1:14 5:2
 156:20 157:1
 163:20 167:24
**wendell** 91:21
**went** 9:16 17:9
 31:13 38:20 49:10
 91:15 107:20
 131:14 132:16
 137:9 138:8 141:2
 145:14
**weren't** 76:17
 123:17,18 134:12
 140:14 153:10

**we'd** 119:20 123:6
 164:4
**we'll** 103:20 109:7
 117:15 121:10,17
 122:11 125:24
 167:3,4 168:15
**we're** 100:25 104:2
 108:6,10 110:18
 116:12 118:23,25
 119:20,25 121:14
 121:23 122:20
 129:15 132:7 134:5
 134:14 135:3
 136:21 139:18,19
 139:21 150:12
 155:12 157:19,25
 159:15,16 161:4,4
 162:13 163:18
 164:12,13 166:2
**we've** 108:20,20
 114:22 115:5
 120:25 123:1
 139:17 140:8 141:3
 149:20 151:2
 153:16 160:8 164:5
 164:7 168:2
**whatsoever** 156:11
**what's** 111:23
 150:8 163:23
**wherefore** 159:24
**whichever** 103:12
**wholly** 23:11
**whosoever** 57:6
**who's** 152:4
**wicket's** 51:13
**wickham** 24:12,24
 25:5 26:19 28:7,18
 29:11,13,15 30:1
 31:13,24 32:17 33:2
 33:15,19 34:8,10
 35:16 51:11 75:21
 78:18 80:16,21 84:7
 90:23,25 91:3,6
 94:9 95:2,10 96:7
**wickham's** 51:10
**wide** 149:21

**willful** 14:7,12 15:9
 18:13,18 19:1 24:6
 29:1,3 46:18 58:21
 81:24 82:11,13,16
 110:24 111:10,13
 131:24 135:16,20
 154:13
**win** 120:11 156:1
 159:24
**wish** 97:12
**wishing** 92:4
**withdraw** 55:3
 122:2 167:7 168:7
**withdrawal** 114:13
 114:15
**withdrawals** 11:3,3
**withdrawing**
 119:10,18
**withdrawn** 113:19
 115:3,5 150:3
**witness** 6:5
**won** 115:22 120:11
**won't** 156:25
 162:15
**word** 8:25 148:19
**words** 22:11 30:15
 70:10 106:3 167:16
**wori** 26:22 27:13
**work** 14:16 17:22
 23:18 31:10 36:18
 74:21 77:10 97:4,5
 97:25 105:5 128:21
 130:17
**worked** 29:11,15
 30:2 81:1
**working** 146:13
**works** 20:13 96:23
 98:3 128:23 156:9
 161:15
**world** 83:10,11
 109:25 143:13,17
**worries** 49:16 118:9
**worry** 16:14 17:11
 83:5
**worse** 40:1 112:9
**worst** 65:25 81:12
 112:11

| | |
|---|---|
| **wouldn't** 109:19 | 32:15 35:11 46:1,15 |
| 159:14 163:21 | 48:2 58:14,15,18,19 |
| **would've** 112:11 | 65:20 66:21 67:5 |
| 115:16 128:17 | 72:10,14 74:24 82:7 |
| 130:14,14 142:11 | 86:17 92:7 93:19 |
| **wow** 49:10 | 106:3,14,15,20 |
| **wrap** 153:15 | 108:8 131:13,15 |
| **write** 97:10 155:7 | 136:10 151:23,24 |
| 155:22 | 152:2 158:24 160:8 |
| **writing** 35:18 92:9 | **young** 161:14 |
| 129:18 | **you'd** 161:16 |
| **written** 98:1 104:20 | **you'll** 99:21 104:24 |
| 110:13 161:11 | 155:10 168:12 |
| **wrong** 24:5,20 | **you're** 98:20 101:12 |
| 29:25 66:12 91:5,9 | 111:16 113:15 |
| 91:13 111:5 126:14 | 114:25 119:25 |
| 145:23 146:9 | 120:1 129:23 |
| 147:10,10 148:2 | 130:22 131:2,23 |
| **wrongdoing** 104:11 | 133:14 139:5 |
| **wrongful** 145:17,19 | 145:10 149:15 |
| 145:22 | 150:7,18,18,22 |
| **wrongfully** 145:8 | 161:6 167:3 |
| **x** | **you've** 100:4,14 |
| **x** 1:3,9,17 63:6 | 110:3,7 115:3 116:4 |
| 90:18,19 169:1 | 117:2,3 121:15 |
| **xxyy** 159:23 | 152:12,13 |
| **y** | **z** |
| **y** 63:6 90:18,19 | **z** 63:6 |
| **yeah** 15:25 29:21 | **zones** 106:8 |
| 30:23 35:20 38:2 | **'** |
| 64:17 72:6,6 74:13 | **'s** 150:1 |
| 82:5 85:21 114:12 | |
| 114:14 119:5 | |
| 121:20 140:18 | |
| 163:15 | |
| **year** 33:23 48:22 | |
| 94:14 | |
| **years** 111:19 122:14 | |
| 132:4 134:9 137:16 | |
| 137:17 140:10 | |
| 146:13 148:1 | |
| 150:13 | |
| **yesterday** 6:4 | |
| **york** 1:2,21,21 3:13 | |
| 3:21 4:4,11 14:11 | |
| 20:7 21:23 26:24 | |