UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
: 
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No. 08-13555 (SCC)
:
Debtors. : (Jointly Administered)
:
---------------------------------------------------------------x

**RESPONSE OF JPMORGAN CHASE BANK, N.A. TO OBJECTION TO
CLAIM NOS. 66462 AND 66455 REGARDING DERIVATIVES LOSSES**

JPMorgan Chase Bank, N.A. ("JPMCB" and, together with its subsidiaries, "JPMorgan"), in response to the *Objection to Portions of Proof of Claim No. 66462 against Lehman Brothers Holdings Inc. and Proof of Claim No. 66455 against Lehman Brothers Special Financing Inc. of JPMorgan Chase Bank, N.A. Regarding Derivatives Losses* (the "Objection") filed by Lehman Brothers Holdings Inc. ("LBHI," and, together with its subsidiaries, "Lehman"), Lehman Brothers Special Financing Inc. ("LBSF") and their affiliated debtors on January 7, 2015, respectfully states as follows:

**INTRODUCTION**

1. More than six years after the events at issue and years after having filed other objections to the same proofs of claim, LBHI and LBSF now bring a belated Objection to the claims (the "WaMu Claims") arising from the commercially reasonable closeout of the derivative positions between Washington Mutual Bank, FA ("WaMu") and LBSF. JPMCB acquired substantially all of the assets of WaMu before filing its proofs of claim against LBSF and LBHI, and thus JPMCB's proofs of claim against LBSF and LBHI included the WaMu Claims.

2. JPMorgan will demonstrate that WaMu traders followed a commercially reasonable process in closing out the WaMu-LBSF trades, and JPMCB filed its proofs of claim (including the WaMu Claims) in good faith. Specifically, JPMorgan will show that, upon LBHI's bankruptcy filing, WaMu traders worked as efficiently and expeditiously as reasonably practicable to determine its Loss (as defined by the governing ISDA Master Agreement). In connection with determining its Loss, WaMu traders obtained price quotes from several leading derivatives dealers in the illiquid, chaotic and volatile markets that Lehman's collapse exacerbated.

3. In making this meritless Objection, Lehman completely disregards the unprecedented market context within which WaMu traders were forced to close out their trades. The present Objection is yet another example of Lehman's strategy of blaming JPMorgan and other counterparties for the loss created by Lehman's own failure to take — or even attempt to take — steps before its bankruptcy to prepare for an orderly and value-preserving unwind.

4. Lehman's argument that WaMu used a flawed Market Quotation Method to calculate its closeout amount lacks any basis and, more importantly, is wholly irrelevant because the International Swaps and Derivatives Association Master Agreement between WaMu and LBSF, dated May 28, 1998 (the "ISDA Master Agreement"), stated that the Loss Method applied. *See* ISDA Master Agreement Schedule Part 1(f).

5. Lehman's arguments, at least in part, are also precluded by the FDIC Improvement Act, 12 U.S.C. § 4401 *et seq.* ("FDICIA"). That statute broadly protects a financial institution's right to enforce "netting contracts," such as the ISDA Master Agreement, strictly in accordance with their terms, notwithstanding any contrary provision in the Bankruptcy Code or other law.

6. For these and other reasons, JPMorgan will demonstrate that the WaMu Claims should be allowed in the full amount stated in JPMCB's proofs of claim.

## BACKGROUND

7. At the time of LBHI's bankruptcy filing, WaMu held a number of derivative positions facing LBSF, which are the subject of this Objection and which were governed by the ISDA Master Agreement.

8. As LBHI acknowledges in the Objection (¶ 10), it is a guarantor of the obligations of LBSF under the ISDA Master Agreement.[1]

9. The ISDA Master Agreement stated that the Loss Method would apply in determining the amount, if any, payable upon an early termination. *See* ISDA Master Agreement Schedule Part 1(f). The Loss Method is a liquidated damages provision and is enforceable as a reasonable estimate of a party's losses that are otherwise difficult to measure. *See* ISDA Master Agreement § 14. The ISDA Master Agreement accordingly defined Loss as "an amount that [a] party reasonably determines in good faith to be its total losses and costs," including that "[a] party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets." *Id*. Regarding the timing for calculating Loss, the ISDA Master Agreement stated that "[a] party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable." *Id.*[2]

---

[1] LBHI guaranteed LBSF's obligations under the ISDA Master Agreement in a guaranty executed on the same date as the ISDA Master Agreement. The guaranty LBHI executed on September 9, 2008, covering all obligations of LBHI's subsidiaries to JPMorgan and its affiliates, is inapplicable to this claim.

[2] Section 6 of the ISDA Master Agreement titled "Early Termination" similarly included a provision stating that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," a party should calculate the payment due as a result of the early termination. *See id*. § 6(d)(i).

- 3 -

10.    Following the commencement of LBHI's chapter 11 case on September 15, 2008, WaMu terminated the outstanding derivatives transactions under the ISDA Master Agreement late in the day on September 15, 2008, and proceeded to close out those transactions in one of the most volatile and illiquid derivatives markets in history.

11.    WaMu's commercially reasonable closeout process entailed soliciting and receiving quotes from leading broker-dealers, including, among others, Goldman Sachs, Bank of America and Morgan Stanley. WaMu closed out each position as soon as reasonably practicable after receiving at least three quotes. Using three to four dealer quotes, WaMu then calculated a median price for each position and totaled the amounts to determine the claim amount. WaMu's calculation of its Loss, based on quotes from leading dealers in the market, was entirely consistent with, and expressly contemplated by, the good-faith standard for determining closeout amounts under the Loss Method.

12.    WaMu also executed trades to replace all of the WaMu-LBSF positions except one, which was expiring on September 19, 2008, at amounts that included the types of transaction costs reflected in WaMu's closeout claim. These replacement trades are further evidence that WaMu's commercially reasonable process for determining its Loss led to a commercially reasonable claim amount.

13.    On September 25, 2008, WaMu was placed into receivership and the Federal Deposit Insurance Corporation was appointed as the receiver. The following day, JPMorgan purchased substantially all of the assets of WaMu, including WaMu's rights under the ISDA Master Agreement and the WaMu Claims.

14.    On October 17, 2008, JPMorgan submitted a calculation statement (the "Calculation Statement") to Lehman, detailing the calculation of the WaMu Claims. The Calculation Statement contained a spreadsheet identifying three to four price quotes for each

terminated position, and related details, including the name of the dealer and the date, time and price of each quote. The Calculation Statement thus provided Lehman with complete information about the quotes that formed the basis of the Loss calculation underlying the WaMu Claims and how the total amount was calculated. The Calculation Statement also identified that Lehman owed over $1.2 million in interest payments associated with WaMu-LBSF derivative positions. JPMorgan subsequently submitted proofs of claim against LBSF and LBHI, which included the WaMu Claims.

15. On September 14, 2012, Lehman commenced an adversary proceeding objecting to the same claim numbers at issue in this Objection, but only challenging claims relating to the closeout of derivatives between JPMorgan and LBSF and two other Lehman chapter 11 debtors; Lehman did not raise any objection to the closeout of the derivatives positions between WaMu and LBSF.

16. On January 7, 2015, Lehman filed the present Objection. Thus, over six years after the WaMu-LBSF derivatives positions were closed out and Lehman received the information regarding how the WaMu Claims were calculated, Lehman now argues that it has insufficient information and objects to the claim amount.

**RESPONSE TO OBJECTION**

17. In challenging the WaMu Claims, Lehman makes the following arguments: (i) Lehman does not owe the $1,208,594 in unpaid interest; (ii) JPMorgan has not provided sufficient information to allow Lehman to evaluate WaMu's closeout process; (iii) the derivative positions were valued as of an incorrect date, including in contravention of Bankruptcy Code section 562; and (iv) WaMu failed to request and obtain the proper number of quotations under the Market Quotation Method. Each of these arguments should be rejected for the reasons discussed below.

18. First, JPMorgan's Calculation Statement included a claim for $1,208,594 in Unpaid Amounts arising from interest payments due under the WaMu-LBSF derivatives positions. Lehman states in a footnote that it "calculate[s] that no unpaid amounts are due," but provides no explanation or basis for this calculation, which prevents JPMorgan from further addressing this cursory objection. Objection ¶ 21, n.1.

19. Second, six years after receiving the documentation that detailed the basis for and calculation of the WaMu Claims, Lehman now asserts that the information provided is insufficient. However, throughout this time Lehman has had the list of dealer quotes that formed the basis of the claims, including the dealer's name and the date, time and price associated with each quote. To address Lehman's alleged need for further supporting information, JPMorgan is producing to Lehman additional evidence supporting the dealer price quotes reflected in the spreadsheet that Lehman received over six years ago. *See* Exhibit A.[3] These documents further confirm and support the reasonableness of the WaMu Claims.

20. Third, quoting from the ISDA Master Agreement's definition of Market Quotation, Lehman claims that all of the WaMu-LBSF positions should have been valued and closed out on September 15, 2008. However, the Market Quotation Method did not apply since the ISDA Master Agreement specified that the Loss Method would be used to calculate amounts due upon early termination. *See* ISDA Master Agreement Schedule Part 1(f). As previously stated, the Loss Method specified that a party should determine its Loss "as of the relevant Early Termination Date, or, *if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.*" ISDA Master Agreement § 14 (emphasis added). WaMu closed out all of its positions by September 17, 2008, which, given the timing of the Early Termination Date notice and the market illiquidity and chaos at the time, was as soon as reasonably practicable.

---

[3] Attached as Exhibit A is a copy of the cover letter for the production sent to counsel for LBHI and LBSF on March 11, 2015.

- 6 -

21. Even the Market Quotation Method, which Lehman incorrectly claims applied, specified that a party should ask a dealer "to provide its quotation to the extent reasonably practicable as of the same day and time . . . *on or as soon as reasonably practicable after the relevant Early Termination Date*." ISDA Master Agreement § 14 (emphasis added). Thus, WaMu's timing in closing out its LBSF derivative positions also complied with the Market Quotation Method.

22. Lehman further claims that by not completing the closeout on September 15, 2008, the WaMu-LBSF closeout violated section 562 of the Bankruptcy Code, which specifies the date on which damages must be calculated when a debtor's swap agreement is terminated. *See* Objection ¶¶ 17, 26. It is JPMorgan's position that section 562 permits closeouts as soon as reasonably practicable after the Early Termination Date. In any event, this challenge is barred by FDICIA, which provides that "netting contracts" — *i.e.*, contracts between financial institutions that provide for the netting of the parties' obligations (12 U.S.C. § 4402), such as ISDA Master Agreements — must be enforced strictly in accordance with their terms, "[n]otwithstanding any other provision of State or Federal law" (*id.* § 4403(a)). The ISDA Master Agreement clearly stated that WaMu was allowed to determine its closeout amount "as soon as reasonably practicable," without any requirement that it be accomplished in one day; Lehman therefore cannot rely on any alleged contrary provision in the Bankruptcy Code.

23. Fourth, Lehman claims that WaMu failed to comply with the Market Quotation Method because WaMu asked more than four dealers to provide quotes for each position. This argument is irrelevant as the Loss Method, not the Market Quotation Method, applied. The Loss Method simply required that WaMu make a good-faith determination of its Loss. It further stated that the good-faith determination could be based on quotes received from leading dealers — which WaMu sought and received — but it did not restrict the number of dealers that WaMu

- 7 -

could ask to provide quotes. To the extent WaMu asked more than four dealers to provide a quote, it was in furtherance of a good-faith effort to collect additional information about the market value for each position and was a reasonable step in view of the difficulty of obtaining quotes in the chaotic market that existed at the time. It is patently illogical to claim that WaMu's efforts to obtain quotes and become more informed about the market value constituted bad faith. In addition, Lehman's argument is premised upon a flawed interpretation of the spreadsheet in the Calculation Statement; WaMu did not ask all six of the dealers identified in the chart to provide a quote for every position, rather, different combinations of dealers were asked to submit quotes for different positions.

24. Lehman's Objection is contrary to the governing ISDA Master Agreement and relies upon *post hoc* arguments completely divorced from the reality of the market conditions that existed during the week of September 15, 2008. JPMorgan will demonstrate that the closeout of the WaMu-LBSF derivatives trades in one of the worst derivatives markets in history was commercially reasonable and fully compliant with the ISDA Master Agreement and applicable law. Any losses that Lehman now complains of resulted from Lehman's own failure to take, or even consider taking, any action before its bankruptcy to prepare for an orderly wind-down.

## CONCLUSION

25. For the foregoing reasons, the Objection should be denied in all respects and the WaMu Claims should be allowed in the full amount thereof.

Dated: March 11, 2015
       New York, New York

       /s/ *Harold S. Novikoff*
       Harold S. Novikoff
       Ian Boczko
       Courtney L. Heavey

       WACHTELL, LIPTON, ROSEN & KATZ
       51 West 52nd Street
       New York, New York  10019
       (212) 403-1000
       *Attorneys for JPMorgan Chase Bank, N.A.*