UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
: 
In re: : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*, : Case No. 08-13555 (SCC)
:
Debtors. : (Jointly Administered)
:
------------------------------------------------------------x

**RESPONSE OF JPMORGAN CHASE BANK, N.A. TO OBJECTION TO PORTIONS OF PROOFS OF CLAIM NO. 66462 AGAINST LEHMAN BROTHERS HOLDINGS INC. AND NO. 4939 AGAINST LEHMAN BROTHERS INC. REGARDING SECURITIES LENDING**

JPMorgan Chase Bank, N.A. ("JPMorgan"), in response to the *Objection to Portions of Proofs of Claim No. 66462 against Lehman Brothers Holdings Inc. and No. 4939 against Lehman Brothers Inc. of JPMorgan Chase Bank, N.A. regarding Securities Lending* (the "Objection") filed by Lehman Brothers Holdings Inc. ("LBHI," and with its subsidiaries, "Lehman") on January 7, 2015, respectfully states as follows:

## INTRODUCTION

Shortly before the commencement of its SIPA liquidation proceeding in September 2008, Lehman Brothers Inc. ("LBI") failed to return $3.31 billion of securities that it had borrowed from other JPMorgan customers through JPMorgan's Securities Lending business unit. This put JPMorgan, acting as agent for those customers, in the position of having to find a large volume of replacement securities and purchase them with collateral LBI had posted. Despite the volatile markets during that period, JPMorgan was able to purchase the replacement securities in the principal markets for those securities at prices consistent with market pricing benchmarks, prices low enough that JPMorgan did not even use all of the collateral LBI had

posted. Indeed, after fully covering LBI's securities lending obligations, JPMorgan credited $49.9 million of the remaining LBI securities lending collateral to LBI's much larger clearance-related obligations to JPMorgan. Yet now, five years after JPMorgan filed its claims arising from its Securities Lending agent role (the "Securities Lending Claims") — and years after the Securities Lending Claims were consensually allowed in full in LBI's SIPA proceeding — LBHI belatedly argues in this Objection that JPMorgan should have gotten even better prices so that the clearance-related deficiency claim (the "Deficiency Claim") owing to JPMorgan by LBHI, as guarantor of LBI's clearance obligations, might have been *further reduced* by some additional, unspecified amount.

The Objection's basic contention — that JPMorgan overpaid for some replacement securities because it purchased them from its own affiliate — is entirely unsupported and actually contradicted by the data. JPMorgan purchased $1.4 billion in replacement equity securities from third parties on stock exchanges at prices that were within the reported Bloomberg daily price ranges. The rest of JPMorgan's replacement purchases consisted of $1.9 billion of U.S. Treasury securities, U.S. agency securities, and other fixed income securities (the "Fixed Income Securities") that JPMorgan was able to purchase at prices consistent with recognized prices for the same securities at normal transaction sizes, despite the outsized portfolio that had to be replaced and the illiquidity of some of the securities. Moreover, JPMorgan used several brokers, including JPMorgan Securities Inc. ("JPMSI"), now known as JPMorgan Securities LLC, to purchase the Fixed Income Securities, but the Objection omits that the prices obtained from JPMSI were *better* than those obtained from third-party brokers. JPMorgan's process and results, which actually managed to *return* money to LBI, were more than reasonable and fully complied with the governing agreement.

Because the facts are inconsistent with its contentions, the Objection focuses on a single U.S. Treasury security (in a universe of $3.31 billion in purchases) for which it claims that JPMorgan paid too much — but even there, the Objection is grossly misleading and omits the key facts. The Objection notes that JPMorgan paid $110.53 for that single U.S. Treasury security when there were other transactions at $108.61 and $108.81, but the Objection omits that this particular security was an off-the-run Treasury that was difficult to acquire at the very large quantity of over $746 million that JPMorgan had to replace. The Objection also omits that pricing in this security was volatile at the time because the security was about to be reopened by the Treasury for an additional issue.[1] The Objection therefore fails to identify any legitimately objectionable transaction, let alone anything responsive to the fundamental fact that JPMorgan acquired the entire replacement portfolio at reasonable prices in compliance with the governing agreement, despite the volatile market environment created by Lehman's bankruptcy.

The Objection fails for several additional reasons. First, while JPMorgan chose to apply the excess $49.9 million in LBI securities lending collateral to LBI's clearance obligations, JPMorgan had no legal obligation to do so. Indeed, JPMorgan could have applied the proceeds to other claims or returned the collateral to LBI, which would have worked to LBHI's detriment as guarantor of LBI's liability to JPMorgan. LBHI therefore lacks a legal basis for challenging the amount JPMorgan applied to the Deficiency Claim.

Second, while the Objection asserts that JPMorgan has produced insufficient documentation on several line items in the Deficiency Claim, JPMorgan has been voluntarily cooperating with the Lehman Estate on these claims for years and has produced thousands of

---

[1] Nor does the Objection disclose that there were other offsetting purchases of Fixed Income Securities below the prices indicated by Interactive Data Corp. ("IDC"), an independent provider of market pricing for such securities, which worked to Lehman's benefit.

pages of documents supporting this claim. Regardless, JPMorgan is producing additional documentation on the line items identified in the Objection concurrently with this Response.

This Objection is a classic example of "looking a gift horse in the mouth." Not only was JPMorgan so successful in replacing the unreturned loaned securities at such favorable prices that LBHI was not required to pay anything with respect to its guaranty of LBI's securities lending obligations, but also LBHI was relieved of $49.9 million of its guaranty obligations with respect to LBI's unpaid clearance obligations. Nonetheless, LBHI baselessly contends that the Deficiency Claim should be reduced even further.

## BACKGROUND

1.  As part of its Securities Lending business unit, JPMorgan acts as agent for customers who wish to lend securities. When a customer lends a security to a broker-dealer, such as LBI, the broker-dealer typically posts cash or securities collateral to secure its obligation to return the loaned security, and JPMorgan holds that collateral until the security is returned. Prior to September 18, 2008, LBI borrowed securities from other JPMorgan customers (the "Loaned Securities"), and posted cash and securities as collateral, pursuant to the Master Securities Lending Agreement between JPMorgan and LBI dated March 9, 1983 (the "MSLA"). Ex. A to Objection.

2.  On September 18, 2008, following the LBHI chapter 11 filing and shortly before the commencement of its SIPA liquidation proceeding, LBI failed to return the Loaned Securities. Accordingly, on September 18, 2008, JPMorgan provided LBI with notice that an Event of Default had occurred under the MSLA. Ex. B to Objection. The MSLA provided JPMorgan with various remedies upon an Event of Default. In particular, JPMorgan was afforded the right to apply LBI collateral to "purchase securities equivalent to the Loaned

Securities which have not been delivered, or any part thereof, in any principal market for such securities and apply such purchased securities toward [LBI's] obligation to deliver such Loaned Securities." Ex. A to Objection at § 10(c)(i), (d). The MSLA also provided that, upon an Event of Default, LBI would pay JPMorgan's expenses in connection with applying its collateral to purchase equivalent securities. *Id*. at § 10(e).

3. After Lehman failed to return the Loaned Securities, JPMorgan promptly began a process of using LBI's collateral to purchase replacement securities in the principal markets for such securities at market prices. JPMorgan made these purchases using collateral LBI had posted, specifically $2.5 billion in cash collateral and $859 million of securities collateral, for a total of $3.36 billion in collateral (the "LBI Collateral"). Using that collateral, JPMorgan was able to acquire all the required replacements for its customers (in some cases paying customers cash in lieu of illiquid securities). The cost of the replacement securities was $3.27 billion, plus $42 million of cash paid in lieu of obtaining certain illiquid securities, for a total of $3.31 billion.

4. In addition to JPMorgan's losses from its role as lender of securities to LBI, the Securities Lending Claims also include losses incurred by JPMorgan's Securities Lending customers as a result of LBI's failure to return their securities. JPMorgan covered its customers' losses and asserted claims against LBI under the indemnity provision in the MSLA, which provides that "[t]he Borrower [LBI] agrees to indemnify and hold harmless the Trustee [JPMorgan] from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees) which the Trustee may incur or suffer arising in any way out of . . . any failure of the Borrower to deliver Loaned Securities in accordance herewith." Ex. A to Objection at § 13.

5. Because JPMorgan was able to replace the securities for a total of only $3.31 billion (compared to $3.36 billion in LBI Collateral), $49.9 million of LBI collateral remained after full payment of the Securities Lending Claims. Pursuant to its rights as a secured creditor, JPMorgan applied that $49.9 million against LBI's outstanding clearance-related obligations to JPMorgan, which in turn reduced by $49.9 million JPMorgan's Deficiency Claim against LBHI as guarantor of all of LBI's obligations.

## RESPONSES TO OBJECTIONS

### I. JPMORGAN USED LBI COLLTERAL IN A COMMERCIALLY REASONABLE MANNER TO PURCHASE REPLACEMENT SECURITIES AT MARKET PRICES.

6. The Objection contends that JPMorgan's application of the collateral posted by LBI to purchase replacement securities (a) was not "commercially reasonable" under New York Uniform Commercial Code ("N.Y. U.C.C.") § 9-610 and also (b) produced results "significantly below the range of proceeds" that should have been achieved under N.Y. U.C.C. § 9-615(f). The U.C.C. provisions cited by LBHI govern the disposition of securities collateral, not the application of cash collateral to purchase replacement securities. Notwithstanding LBHI's attempt to distort the statutory provisions to apply to a "disposition" of cash collateral, JPMorgan was required solely to enforce its remedies in accordance with the applicable provisions of the MSLA. Nonetheless, even if the cited U.C.C. provisions were applicable, JPMorgan satisfied them.

#### A. JPMorgan complied with the remedies set forth in Sections 10(c) and (d) of the MSLA.

7. As described in further detail below, JPMorgan acquired replacements for the Loaned Securities that LBI failed to return by purchasing replacements in the principal

- 6 -

markets for the relevant securities.  In the case of equity securities, it purchased replacement securities on the principal exchanges for the securities.  In the case of Fixed Income Securities, it purchased the replacements through recognized brokers for those securities.

8.  Even though they are not applicable, JPMorgan's purchases also complied with the "commercial reasonableness" provisions of the Uniform Commercial Code cited by LBHI.

9.  *First*, JPMorgan purchased the replacement securities "at the price current in any recognized market at the time of the disposition." N.Y. U.C.C. 9-627(b)(2).  The Objection's contention that JPMorgan purchased replacement securities "at significantly above-market prices" is completely belied by the facts.  Objection ¶ 15.

10.  With regard to the $1.4 billion in equity securities purchases, the data show that the entire equities portfolio was purchased well within recognized price ranges on the date of purchase.  Indeed, of the more than 1,200 U.S. equities CUSIPs purchased, each was purchased within the Bloomberg price range for the day, except for three securities which were purchased for only a few cents above Bloomberg's range.

11.  With regard to the $1.9 billion in purchases of Fixed Income Securities, JPMorgan was able to purchase these securities at prices near other recognized market prices for those securities.  In fact, the recognized market prices for those securities do not reflect what a market participant at the time needed to pay to replace the outsized portfolio of Fixed Income Securities, including illiquid positions, that JPMorgan had to acquire.

12.  The Objection identifies a single transaction in a U.S. Treasury security as a purported example of JPMorgan having paid an "inflated price," Objection ¶¶ 16-17, but the Objection omits the details that show why the price was reasonable.  For U.S. Treasury Note

4.25% 08/15/15 (CUSIP 912828EE6) (the "UST Security"), JPMorgan was in the difficult position of needing to obtain an enormous quantity of this security ($745.9 million), despite the fact that it was an off-the-run Treasury, which is less frequently traded (particularly in such a large quantity). Moreover, there was particular risk in transacting in this security, because the Treasury Department was about to reopen it for an additional issue, which created uncertainty and made pricing information particularly unreliable. In order to acquire a large quantity of the UST Security in that context, JPMorgan had to pay $110.53 (meaning 110.53% of principal amount).

13. The Objection points to other transactions in this UST Security at lower prices ($108.61 and $108.81), Objection ¶ 17, but those transactions are not comparable for two reasons. First, these other transactions were for smaller quantities, which are easier to acquire. *See* Ex. C to Objection . Second, the two transactions the Objection highlights are *purchases* by a broker, whereas the $110.53 transaction here was a *sale* by a broker, and as such, the price difference includes the bid-ask spread. *Id*. The Objection also points to a transaction in the UST Security 6 days later at $106.16, *see* Objection at ¶ 17 n.11, but fails to disclose that, not only was this transaction smaller, but also the market for the UST Security had shifted downward over that 6 day period, as indicated in the Bloomberg pricing in Exhibit D to the Objection. The Objection therefore relies entirely on "apples-to-oranges" comparisons.

14. The Objection's focus on a single cherry-picked security is particularly egregious given that there were at least 31 other offsetting occasions where JPMorgan purchased a replacement Fixed Income Security *below* IDC prices, all of which worked to LBI's benefit. For example, JPMorgan purchased CUSIP 94978SAA7 (WELLS FARGO CAPITAL VAR BDS 01/DEC/2086 USD100000) on September 18, 2008, at a price of $80.10, when the IDC price

was $86.34, for a total discount to IDC prices of $518,981.  Instead of recognizing that LBI got the benefit of this purchase and at least 30 others at discounts to IDC prices, the Objection focuses on a single security (and even there makes flawed comparisons).

15. *Second*, JPMorgan's purchases were generally made "in the usual manner on any recognized market" under Section 9-627(b) and were therefore *per se* commercially reasonable, even if the prices had not been as good as they were.  *See Bankers Trust Co.* v. *J.V. Dowler & Co., Inc.*, 47 N.Y.2d 128, 135 (1979) (secured party's sale of bonds through "regular market channels" was "immune to attack on the grounds of commercial unreasonableness").  For the $1.4 billion in equity securities, JPMorgan made the purchases on stock exchanges.  The U.C.C. describes purchases on "stock exchanges" as the very archetype of purchases on a "recognized market."  N.Y. U.C.C. §§ 9-610 cmt. 9, 9-627 cmt. 4.

16. For the $1.9 billion of Fixed Income Securities, JPMorgan was able to purchase those securities in the usual manner by using a wide range of broker-dealers, including JPMSI.  Such fixed income securities have been repeatedly recognized as traded on recognized markets.  *Bankers Trust*, 47 N.Y.2d at 135; *Washburn* v. *Union Nat'l Bank & Trust Co. of Juliet*, 502 N.E.2d 739, 742 (Ill. App. Ct. 1986).

17. *Third*, even if the Section 9-627(b) safe harbors did not apply, every aspect of JPMorgan's use of the LBI Collateral to purchase replacement securities was commercially reasonable under N.Y. U.C.C. § 9-610.  The prices JPMorgan achieved were eminently reasonable and consistent with market prices.  JPMorgan also used commercially reasonable procedures to purchase these securities by purchasing them on securities exchanges and through broker-dealers who regularly handle transactions in such securities.  *See, e.g.*, *Bankers Trust*, 47 N.Y.2d at 135.

18. In fact, the Objection's only stated ground for questioning the commercial reasonableness of JPMorgan's use of the LBI Collateral is its contention that there was "self-dealing" because JPMorgan "purchase[d] securities at inflated prices from its own affiliate." Objection ¶ 23. This allegation is untethered from the data. Some Fixed Income Securities were indeed purchased from JPMSI, but the prices on those purchases were *lower* than prices on securities that were purchased from third-party brokers. This indicates that JPMorgan was ultimately able to credit LBI with *more* collateral proceeds because of the superior results achieved by JPMSI as compared to other brokers.

19. Not surprisingly, then, the Objection does not identify a single instance of a disposition similar to JPMorgan's here that has been held to be commercially unreasonable. Instead, the Objection cites cases where a secured party sold collateral to itself at prices that were *13% to 82%* below fair market value. Objection ¶ 22 (citing *Central Budget Corp.* v. *Garrett*, 48 A.D.2d 825, 825-26 (N.Y. App. Div. 2d Dep't 1975) (creditor repossessed a car that had been purchased for $1627.50 a month earlier and sold it for $300 (*i.e.*, 82% below purchase price)); *Primavera Familienstifung* v. *Askin*, 130 F. Supp. 2d 450, 546 (S.D.N.Y. 2001) (noting that "the prices credited by Merrill to the Funds in the liquidation were on average 13 percent lower than fair market prices" in addition to being resold for a 2% profit); *In re Solfanelli*, 230 B.R. 54, 60, 67-68 (M.D. Pa. 1999) (agent of creditor resold securities at $13.00 that it had purchased from the debtor for $10.25 two days earlier (*i.e.*, a 21% discount))).

### B. JPMorgan replaced the Loaned Securities at reasonable prices and no adjustment is appropriate.

20. As noted above, JPMorgan replaced the Loaned Securities at reasonable prices in the market. N.Y.U.C.C § 9-615(f), which LBHI contends is applicable, governs sales of collateral *to* a related person but does not govern purchases of replacement securities *from* a

related person. But, in any event, no adjustment is appropriate, even under the inapplicable Uniform Commercial Code provisions cited by LBHI. N.Y. U.C.C. Section 9-615(f), which provides a method for calculating the surplus or deficiency from a collateral disposition to a person related to the secured party, only applies where "the amount of proceeds of the disposition is *significantly below* the *range of proceeds* that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought." N.Y. U.C.C. § 9-615(f)(2) (emphasis added). Section 9-615(f) therefore recognizes that there is an acceptable "range of proceeds" for complying dispositions, and the Section is only triggered when the amount of proceeds is "significantly below" that acceptable range. *Id*. *See also* 1B-8 Julian B. McDonnell & James P. Nehf, *Secured Transactions Under the UCC* § 8.11[6][a] (2015).

21. Moreover, under Section 9-615(f), the burden is on LBHI to prove that there was such a "significant" deviation: "If a deficiency or surplus is calculated under Section 9-615(f), the debtor or obligor has the burden of establishing that the amount of proceeds of the disposition is significantly below the range of prices that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought." N.Y. U.C.C. § 9-626(a)(5). *See also* McDonnell & Nehf, *supra* at § 8.11[6][a].

22. Section 9-615(f) does not apply here for the additional reason that, as discussed above, the dispositions were not "significantly below the range of proceeds" that could have been obtained from an unrelated party. While LBI Collateral was used to purchase certain of the Fixed Income Securities from JPMSI, those purchases were made at reasonable prices in the market, and, in any event, the prices achieved were actually *better* than the prices that were

achieved by third-party brokers. The Objection's invocation of Section 9-615(f) is therefore misplaced.

## II. JPMORGAN HAD NO LEGAL DUTY TO APPLY THE EXCESS SECURITIES LENDING COLLATERAL POSTED BY LBI TO THE DEFICIENCY CLAIM AGAINST LBHI.

23. The Objection contends that "there was far less cash collateral available to satisfy the Deficiency Claims than there should have been" because JPMorgan paid above-market prices for the replacement securities, and that, accordingly, "JPMorgan's Deficiency Claims should be reduced." Objection at ¶¶ 15, 20; *see also id*. at ¶¶ 3, 23. Even if it were true (which it is not) that JPMorgan should have been able to obtain the replacement securities using less LBI Collateral, it does not follow that the Deficiency Claim against LBHI should be reduced.

24. JPMorgan had no legal duty to apply the excess collateral posted by LBI in connection with securities lending to LBI's obligations arising from extensions of credit in connection with securities clearance. If there actually had been any additional excess collateral, JPMorgan could have returned it to LBI (*see* N.Y. U.C.C. §9-608(4)) or applied it to other obligations of LBI. It is well established under New York law that a creditor owed multiple debts by a debtor may apply payments as the creditor sees fit, notwithstanding the objection of a guarantor, absent agreement as to how payments should be applied. *Walther* v. *Bank of New York*, 772 F. Supp. 754, 762 (S.D.N.Y. 1991); *accord Daiwa Special Asset Corp.* v. *Desnick*, 2002 WL 1997922 (S.D.N.Y. Aug. 29, 2002); *Idearc Media* v. *Alex Figiolia Contracting Corp.*, 2011 WL 2463533, at *1 (E.D.N.Y. June 21, 2011). A secured creditor has a right to use collateral to its advantage — which JPMorgan did by applying LBI's excess securities lending

collateral to LBI's clearance obligations — but JPMorgan had no duty to do so, or to otherwise use excess collateral for the guarantor's advantage. *Walther*, 772 F. Supp. at 762.

25. Here, JPMorgan did not seek any payment from LBHI under its Guaranty with regard to Securities Lending. To the contrary, it was able to purchase the replacement securities with LBI collateral and still had $49.9 million left over. JPMorgan then chose to apply that collateral to LBI's clearance obligations (and, thus, reduced the Deficiency Claim against LBHI as guarantor), even though it had no legal duty to use it in that particular manner. LBHI had no right to require that JPMorgan apply those funds to LBI's clearance obligations, and it now has no basis for asserting that JPMorgan should have applied *even more* collateral to the clearance claims so that its Deficiency Claim could be further reduced.

26. Moreover, there was no basis under the LBHI Guaranty (or any other agreement between JPMorgan and LBHI) for requiring JPMorgan to apply the collateral posted by LBI to the Deficiency Claim. In fact, the guaranty was unconditional, and LBHI broadly waived any defenses to enforceability of the guaranty, including the requirement that JPMorgan first take action against any collateral. That waiver means that JPMorgan had a right to collect under its guaranty from LBHI regardless of whether or to what extent it applied collateral to the secured obligations.

### III. JPMORGAN'S CLAIM AMOUNTS ARE SUPPORTED BY SUFFICIENT DOCUMENTATION.

27. The Objection asserts that JPMorgan's claims include line items that are not supported by "sufficient" documentation. Objection at ¶ 24. The Objection fails to disclose, however, that JPMorgan has voluntarily cooperated with the Lehman Estate with respect to these claims over the past five plus years. Nor does the Objection mention that JPMorgan has

produced thousands of pages of documents about these claims in response to numerous "informal" requests from the Lehman Estate. It also omits that JPMorgan has resolved all issues relating to these transactions with the LBI Trustee, and it was LBI that was the actual Lehman counterparty to these transactions.[2]

28.     Nevertheless, JPMorgan is concurrently with the filing of this Response producing to LBHI additional documents, which support the line items identified in the Objection. Attached as Exhibit A is a copy of the cover letter for the production sent to LBHI's counsel on March 11, 2015. These documents include hundreds of pages of support for the $15.8 million line item and a breakdown of how the $8,656,357 item was calculated. JPMorgan will also produce any information available on the $25,302 item.

\*   \*   \*

29.     For the foregoing reasons, JPMorgan requests that the Deficiency Claims be allowed in full and that it be granted such other relief as may be appropriate.

Dated: March 11, 2015
       New York, New York

/s/ Harold S. Novikoff
Harold S. Novikoff
Ian Boczko
Luke M. Appling

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000

*Attorneys for JPMorgan Chase Bank, N.A.*

---

[2] Pursuant to a settlement with the Trustee appointed in LBI's SIPA liquidation proceeding, the entire amount of JPMorgan's asserted securities lending and clearance claims were allowed in the LBI case. *See In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Apr. 21, 2011), ECF No. 4242 at Ex. 1 § 3 & ECF No. 4356.